**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | | |
|---|---|---|
| STATE OF TENNESSEE, COMMONWEALTH OF KENTUCKY, STATE OF OHIO, STATE OF INDIANA, COMMONWEALTH OF VIRGINIA, and STATE OF WEST VIRGINIA, | ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) | Civil Action No. _____ |
| MIGUEL CARDONA, in his official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## COMPLAINT

1.      For fifty years, Title IX of the Educational Amendments Act has helped equalize women's access to educational facilities and programs by barring discrimination "on the basis of *sex*" by schools receiving federal funds.  At the same time, given the "enduring" physical differences between men and women, *United States v. Virginia*, 518 U.S. 515, 533 (1996), Title IX has always allowed the nation's schools to divide private spaces and participation on sports teams by sex.  Yet through unprecedented new regulations, the U.S. Department of Education now seeks to twist Title IX's prohibition on sex discrimination into a mandate that schools protect and promote their students' "gender identity," among other "sex characteristics."  Exhibit A, U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024).  Defendants' sweeping and

1

unlawful Title IX reading will bar schools' long-lawful practices to protect student privacy, perversely hamper fair competition in women's sports, and punish States for following their laws. The State of Tennessee, Commonwealth of Kentucky, State of Ohio, State of Indiana, Commonwealth of Virginia, and State of West Virginia bring this Complaint against the U.S. Department of Education and its Secretary to enjoin and invalidate the new Title IX regulations.

## INTRODUCTION

2.      Congress enacted Title IX to remedy historic and persistent sex-based discrimination in education, including by promoting equal opportunity for women in the educational sphere. Title IX does so by barring recipients of federal educational funding from engaging in discrimination "on the basis of *sex*."  20 U.S.C. § 1681(a) (emphasis added).

3.      All of the tools of statutory interpretation support reading this provision as barring discrimination based on sex, not the distinct term "gender identity" and associated theories.  *See Ohio v. Becerra*, 87 F.4th 759, 769 (6th Cir. 2023) ("The traditional tools of construction include consideration of a statute's text, structure, history, and purpose." (cleaned up)); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020) (explaining that courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment").

4.      Federal courts across the country have recognized that the ordinary public meaning of "sex" at the time of Title IX's enactment referred to the biological distinction between male and female.  *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 817 (11th Cir. 2022) (en banc); *Bridge ex rel. Bridge v. Okla. State Dep't of Educ.*, No. CIV-22-00787-JD, 2024 WL 150598, at *8 (W.D. Okla. Jan. 12, 2024); *Neese v. Becerra*, 640 F. Supp. 3d 668, 684 (N.D. Tex. 2022); *D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 835-36 (M.D. Tenn.

2022); *cf. Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632-33 (4th Cir. 2020) (Niemeyer, J., dissenting).

5.     Additional textual clues, such as Title IX's consistent treatment of "sex" as binary, support this reading.  For example, § 1681(a)(2) delays Title IX's application to an institution in the process of "changing from being an institution which admits only students of *one sex*" to being "an institution which admits students of *both sexes*."  20 U.S.C. § 1681(a)(2) (emphasis added).

6.     The statute's structure likewise indicates that Title IX proscribes practices that treat women worse than men, and vice versa—not sex-differentiation based on inherent differences between the sexes.  For one thing, Title IX *expressly authorizes* sex-segregated living spaces and programs by stating it does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes," 20 U.S.C. § 1686—a provision included to protect "personal privacy."  118 Cong. Rec. 5,807 (1972) (statement of Sen. Bayh).  And many of Title IX's exclusions from coverage preserve female-only spaces—a choice that would have no meaning if "sex" is a fluid concept.  *See, e.g.*, 20 U.S.C. § 1681(a)(6) (exempting college sorority membership practices and service organizations like the Girl Scouts).

7.     The historical evidence overwhelmingly confirms this reading of Title IX.  Just a sampling: The statute arose from seven days of U.S. House hearings examining the problem of "discrimination against women."  *See Hearings Before the Special Subcommittee on Education of the Committee on Education and Labor House of Representatives on Section 805 of H.R. 16098*, 91st Cong. 1-2 (1970) (statement of Rep. Green).  And the bill's Senate sponsor, Birch Bayh, called the proposed Title IX legislation "[t]he only antidote" to "the continuation of corrosive and unjustified discrimination against women . . . in[] all facets of education."  118 Cong. Rec. 5,803.  At the same time, Senator Bayh stressed that Title IX did not "desegregate" anything, but merely

3

"provide[d] equal access for women and men students to the educational process and extracurricular activities in school."  117 Cong. Rec. 30,407 (1971).

8.    The Department of Education and its predecessor agency have historically and consistently interpreted "sex" to refer to a binary male-female distinction.  This position began in 1975—with Title IX's original implementing regulations—and persisted until the early days of President Barack Obama's second term.  And Congress chose to retain the relevant statutory text when it amended Title IX in 1987 to encompass all educational programs.  Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988).  Given the uniform and well-known status of Title IX's regulatory history, that indicates that Congress embraced the long-standing practices and precedents greenlighting sex-separation in the nation's schools.  *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 73 (1992) (drawing a similar inference from the Act's failure to overturn an intervening U.S. Supreme Court precedent interpreting Title IX).

9.    Against this avalanche of evidence regarding Title IX's plain scope, President Biden's Department of Education has finalized a new Title IX rule that fundamentally alters the meaning of Title IX's bar on sex discrimination.  The rule, which takes effect on August 1, 2024, declares that "sex" is an expansive concept whose bounds it need not define.  Instead, under the Department's view, unlawful "sex discrimination" covers "any discrimination that depends" even "in part on consideration of a person's sex," 89 Fed. Reg. at 33,803, including but not limited to "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," *id.* at 33,886 (adding 34 C.FR. § 106.10).

10.    The Department pursued this Title IX overhaul despite Congress's repeated refusal to expand Title IX's coverage beyond "sex."  *See, e.g.*, Student Non-Discrimination Act of 2015,

S. 439, 114th Cong. (2015).[1]  The result is unauthorized lawmaking by regulators set on carrying out the Biden Administration's whole-of-government approach to "prohibit[ing] discrimination on the basis of gender identity or sexual orientation."  Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021).

11.     The Final Rule's distorted definition of sex has radical ramifications.  Start with schools' ubiquitous distinctions between male and female areas—in bathrooms, locker rooms, changing facilities, and the like.  Now, drawing these lines is illegal discrimination unless schools permit persons to access even private spaces "consistent with their gender identity."  89 Fed. Reg. at 33,887 (amending 34 C.F.R. § 106.31(a)); *see also id.* at 33,816-17, 33,818-20.  The Final Rule, moreover, says the "person[s]" Title IX protects include anyone "participating or *attempting* to participate" in the recipient's program or activity, including students from other schools, visiting lecturers, and invited community members.  *Id.* at 33,816 (emphasis added).  And it prohibits schools from making any inquiries or requiring any evidence before allowing access based on a person's self-professed gender identity.  *Id.* at 33,819.  The upshot:  Just about *any* person on a school's campus can use the private facilities reserved for the sex of their choice, no questions asked.  *Id.* at 33,816, 33,818.

12.     Despite the Department's best efforts to muddy the issue, the Final Rule's gender-identity mandate also will invalidate scores of States' and schools' sex-separated sports policies.  As President Biden's administration has consistently argued, and as the Final Rule suggests, the

---

[1] *See also* Ryan T. Anderson, *On the Basis of Identity: Redefining "Sex" in Civil Rights Law and Faulty Accounts of "Discrimination"*, 43 Harv. J.L. & Pub. Pol'y 387, 387 & n.5 (2020).

Department's reading of Title IX will not allow schools to enforce a generally applicable rule prohibiting males who identify as females from playing on female sports teams. *Id.* at 33,817.

13.     Instead, the Department's discussion of athletics confirms that schools can lawfully exclude men from women's sports teams only in limited circumstances yet to be determined.  To justify this differential treatment of sports, the Final Rule unveils the eleventh-hour justification that Title IX's regulations "have always permitted" sex-separate athletic teams. *Id.* at 33,819; *see also id.* 33,816-17 (citing 34 C.F.R. § 106.41(b)).  But that reasoning would apply equally to the single-sex bathrooms and locker rooms that those regulations have likewise permitted from the start but that the Final Rule now deems discriminatory against transgender students, among others. *See infra* ¶¶ 148-49; *see also* 34 C.F.R. §§ 106.33-.34.  That the Final Rule must draw dubious distinctions to avoid illogical consequences indicts the Department's approach of preferencing subjective gender-identity theory over the women Title IX aims to protect.

14.     The Final Rule then compounds its erroneous reading of sex discrimination by adopting an expansive definition of what counts as prohibited "harassment" for Title IX purposes. Under the Final Rule, repercussions risk running to any speech or religious expression that might reasonably be deemed "unwelcome," "offensive," and "limit[ing]" of a student's educational participation or benefits.  89 Fed. Reg. at 33,884 (amending 34 C.F.R. § 106.2); *see also id.* at 33,562. But the Sixth Circuit and other courts have concluded that the First Amendment protects students' and faculty's prerogative not to "communicat[e] messages about gender identity [they] believe[] are false," including using "a pronoun that reflects a student's self-asserted gender identity" rather than sex. *Meriwether v. Hartop*, 992 F.3d 492, 498-99, 512-13 (6th Cir. 2021).  Yet instead of grappling with the clear constitutional implications of the Final Rule's contrary harassment guidelines, the Department punts any First Amendment problems to resolution on a case-by-case basis.

6

The resulting regime is cold comfort to the teachers and students who now must toe the line of gender-identity directives or risk Title IX sanctions.

15.     In short, the Department has used rulemaking power to convert a law designed to equalize opportunities for both sexes into a far broader regime of its own making. Under the Final Rule, those who "identify as LGBQTI+" must receive access to spaces reserved to members of the opposite sex. 89 Fed. Reg. at 33,808, 33,816-17, 33,818-20. Men who identify as women will, among other things, have the right to compete within programs and activities that Congress made available to women so they can fairly and fully pursue academic and athletic excellence—turning Title IX's protections on their head. And anyone who expresses disagreement with this new status quo risks Title IX discipline for prohibited harassment.

16.     Title IX does not authorize such sweeping steps. At the very least, it does not do so in the clear manner required to impose Spending-Clause conditions on congressional funding or to override States' traditional prerogatives to set school policy. The lack of clear congressional authorization for the Final Rule's unprecedented gender-identity mandate also requires invalidating the rule under the major-questions doctrine.

17.     Tennessee, Kentucky, Ohio, Indiana, Virginia, West Virginia and tens of thousands of other commenters opposed the Department's approach for these and many additional reasons.[2] Yet in adopting the Final Rule, the Department failed to respond to many commenters' critiques— let alone with adequate explanations or substantial supporting evidence. But it is Administrative

---

[2] Exhibit B, Jonathan Skrmetti, Letter to Miguel Cardona, ED-2021-OCR-0166-218129 (Sept. 12, 2022) [hereinafter Tennessee Facilities-and-Programs Comment]; Exhibit C, Jonathan Skrmetti, Letter to Miguel Cardona, ED-2022-OCR-0143-148789 (May 15, 2023) [hereinafter Tennessee Athletics Comment]; Exhibit D, Todd Rokita, Letter to Miguel Cardona, ED-2022-OCR-0143-150756 (May 15, 2023) [hereinafter Indiana Athletics Comment].

Law 101 that agencies must offer well-reasoned decision-making to support their regulations, not dodge important aspects of the problem or draw arbitrary lines for political reasons. The Final Rule flunks this baseline limit on the Department's rulemaking authority.

18.     Absent this Court's immediate intervention, the Final Rule will inflict severe irreparable harm on the States, their educational programs and policies, and their citizens.

19.     Tennessee is a case in point. State law is replete with duly enacted policies that conflict with the Department's new Title IX reading. By a combination of law and policy, Tennessee schools generally require sex-separated participation in sports. *See* Tenn. Code Ann. § 49-6-310(a); Tennessee Secondary School Athletic Association, *2023-24 TSSAA Handbook* (July 18, 2023), https://perma.cc/KG36-4JLZ [hereinafter TSSAA Handbook]. Tennessee law does not mandate that any educational institution defer to students' gender identity in matters such as bathroom or facility access. *Cf.* Tenn. Code Ann. §§ 49-2-802(2), 803(a) (providing that a public school may accommodate a student's desire for greater privacy when using a sex-specific restroom or facility by offering a single-occupancy option). And Tennessee protects the rights of students and faculty to express even "offensive" ideas in the classroom, *see* Tenn. Code Ann. § 49-7-2405, including ideas whose expression might run afoul of the Final Rule's capacious conception of "harassment." The Final Rule thus forces Tennessee to choose between enforcing its own laws and losing about $1.5 billion in federal funds on which important programs at every level of Tennessee education depend. On top of that, Tennessee's laws place it at risk of Title IX suits by private plaintiffs seeking to recover under the Department's gender-identity mandate.

20.     The other Plaintiff States face the same choice between following duly enacted policies that protect students' privacy and girls' fair participation in athletics, on the one hand, and forfeiting billions in federal educational funding on the other. *See, e.g.*, Ky. Rev. Stat.

8

156.070(2)(g) (directing that a student's sex for the purpose of determining eligibility for inter-scholastic athletics shall be determined by the student's biological sex, and prohibiting males from participating in any athletic activity or team designated for girls in grades six through twelve); Ky. Rev. Stat. § 164.2813 (providing the same for postsecondary institutions); *see also infra* ¶¶ 206, 208.

21.     Because the Final Rule is set to take effect in mere months, all Plaintiff States also face imminent, unrecoverable compliance expenses and risk of liability in private suits.  These compliance sums and efforts will be substantial—as the Final Rule itself acknowledges.

22.     The Plaintiff States now seek this Court's intervention to protect their interests and constitutional principles, under which Congress—not unelected members of the Department of Education—has exclusive power to pass and amend laws that apply nationwide.  This Court should stay the Final Rule's effective date and enjoin its enforcement pending judicial review, and ultimately issue final relief vacating and setting aside the Final Rule in its entirety.

## PARTIES

23.     Plaintiff the State of Tennessee is a sovereign State.  Through its state-level agencies and local subdivisions, Tennessee operates "education program[s]" and "activities" that "receiv[e] Federal financial assistance" within the meaning of Title IX.  20 U.S.C. § 1681.  Jonathan Skrmetti, the Attorney General and Reporter of Tennessee, is authorized by statute to try and direct "all civil litigated matters . . . in which the state . . . may be interested."  Tenn. Code Ann. § 8-6-109(b)(1).

24.     Plaintiff the Commonwealth of Kentucky is a sovereign State.  Through its state-level agencies and local subdivisions, Kentucky operates "education program[s]" and "activities" that "receiv[e] Federal financial assistance" within the meaning of Title IX.  20 U.S.C. § 1681.

9

The Attorney General of the Commonwealth of Kentucky is authorized to bring legal actions on behalf of the Commonwealth and its citizens.  Ky. Rev. Stat. § 15.020.  The Attorney General is "charged with the duty of protecting the interest of all the people," *Hancock v. Terry Elkhorn Mining Co.*, 503 S.W.2d 710, 715 (Ky. 1973), including by ensuring that government actors perform their duties lawfully, *see Commonwealth ex rel. Beshear v. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016); *see also Cameron v. EMW Women's Surgical Ctr., PSC*, 595 U.S. 267, 278 (2022) (recognizing that the Attorney General is "deemed Kentucky's 'chief law officer' with the authority to represent the Commonwealth 'in all cases'" (citation omitted)).

25.     Plaintiff the State of Indiana is a sovereign State.  Through its state-level agencies and local subdivisions, Indiana operates "education program[s]" and "activities" that "receiv[e] Federal financial assistance" within the meaning of Title IX.  20 U.S.C. § 1681.  Theodore E. Rokita is the Attorney General of Indiana.  General Rokita is authorized to "represent the state in any matter involving the rights or interests of the state."  Ind. Code § 4-6-1-6.

26.     Plaintiff the State of Ohio is a sovereign State.  Through its state-level agencies and local subdivisions, Ohio operates "education program[s]" and "activities" that "receiv[e] Federal financial assistance" within the meaning of Title IX.  20 U.S.C. § 1681.  Dave Yost, the Attorney General of Ohio, is "the chief law officer for the state and all its departments."  Ohio Rev. Code § 109.02.  He is authorized to represent the State of Ohio "in any court or tribunal in a cause … in which the state is directly interested."  *Id.*

27.     Plaintiff the Commonwealth of Virginia is a sovereign State.  Through its state-level agencies and local subdivisions, Virginia operates "education program[s]" and "activities" that "receiv[e] Federal financial assistance" within the meaning of Title IX.  20 U.S.C. § 1681.  Jason Miyares, the Attorney General of Virginia, is authorized by statute to "represent the interests

of the Commonwealth … in matters before or controversies with the officers and several departments of the government of the United States." Va. Code § 2-2.513.

28.     Plaintiff the State of West Virginia is a sovereign State.  Through its state-level agencies and local subdivisions, West Virginia operates "education program[s]" and "activities" that "receiv[e] Federal financial assistance" within the meaning of Title IX.  20 U.S.C. § 1681. Patrick Morrisey is the Attorney General of the State of West Virginia.  The Attorney General "is the State's chief legal officer," *State ex rel. McGraw v. Burton*, 569 S.E.2d 99, 107 (W. Va. 2002), and his express statutory duties include "appear[ing] as counsel for the state in all causes pending … in any federal court[] in which the state is interested," W. Va. Code § 5-3-2.

29.     Defendant U.S. Department of Education is an executive agency of the federal government responsible for enforcement and administration of Title IX.  20 U.S.C. § 3411, 3441.

30.     Defendant Miguel Cardona is the Secretary of the U.S. Department of Education and is responsible for its administration, including the effectuation of Title IX via rulemaking.  20 U.S.C. § 3474; 20 U.S.C. § 1682.

31.     Together, Defendants are referred to as the "Department."

### JURISDICTION AND VENUE

32.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the Plaintiff States challenge the Secretary and the Department's actions under the Administrative Procedure Act's provision for judicial review of agency action, 5 U.S.C. § 702, and other federal law, *see* 20 U.S.C. § 1683 (providing for judicial review of "agency action" effectuating Title IX).

33.     This Court also has jurisdiction under 28 U.S.C. § 1346 because this case involves a claim against an agency and employee of the federal government.

34.     An actual controversy exists between the parties under 28 U.S.C. § 2201(a).

11

35.     This Court has authority to grant Plaintiff States' requested relief and other appropriate relief under 5 U.S.C. §§ 705-06, 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act), and its inherent equitable powers.

36.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1).  Defendants are United States agencies and officers sued in their official capacities.  Plaintiff Commonwealth of Kentucky is a resident of every judicial district in its sovereign territory, including this judicial district and division.

37.     The Covington Division of the Eastern District of Kentucky is a proper division for this action because a substantial part of the events giving rise to this action occurred in the division, Kentucky's Attorney General maintains a physical office in Covington, Kentucky, and no defendant resides in the Commonwealth.  The Final Rule purposely regulates schools and other Title IX recipients across the country, including those located in the Plaintiff States.  This Court thus has personal jurisdiction over the Secretary for purposes of this action because his immunity has been abrogated by 5 U.S.C. § 702 and he has "submi[tted]" to such jurisdiction "through contact with and" regulatory "activity directed at" Plaintiff States and their schools.  *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011).

## FACTUAL ALLEGATIONS

## I.   Congress Enacted Title IX's Prohibition on Sex Discrimination to Promote Equal Opportunity for Women in Education.

### A.   Remedying Discrimination Against Women with Title IX

38.     The leadup to Title IX's passage indisputably reflects a congressional aim to rectify a "history of sex discrimination" against women in the educational sphere.  *Virginia*, 518 U.S. at 531 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973)).

39.     Title VI of the Civil Rights Act of 1964 prohibited discrimination in "program[s] or activit[ies] receiving Federal financial assistance" "on the ground of race, color, or national origin." *See* Pub. L. No. 88-352, tit. VI, 78 Stat. 252 (1964) (codified at 42 U.S.C. § 2000d).  But the law did not include "sex" as a protected ground.  *Id.*

40.     By the early 1970s, many recognized that "women still face[d] pervasive, although at times more subtle, discrimination in [American] educational institutions," *Frontiero*, 411 U.S. at 686, including those that received federal funds.

41.     Women's college and graduate-school enrollment lagged behind their male peers. 118 Cong. Rec. 5,804, 5,805; *Title IX & Gender Equity in Science, Technology, Engineering and Mathematics*, 31 J.C. & U.L. 291, 293-95 (2005).  Many schools remained closed to women or required them to meet higher admissions standards.  Katie Lew, *Unbalanced: The Case for Removing Title IX's Private College Admissions Exemption*, 70 Duke L.J. 847, 855-56 & n.48 (2021).

42.     Moreover, female college students were often excluded from "male" disciplines and activities, *id.* at 855 n.38, and only about 30,000 women participated in college athletics versus 170,000 men.  Jocelyn Samuels and Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marq. Sports L. Rev. 11, 18-19 (2003).

43.     In 1970, U.S. House Representative Edith Green led seven days of hearings documenting the problem of "discrimination against women" in education.  *See Hearings Before the Special Subcommittee on Education of the Committee on Education and Labor House of Representatives on Section 805 of H.R. 16098*, 91st Cong. 1-2 (1970) (statement of Rep. Green).

44.     Two years later, Congress enacted the statute now called "Title IX," prohibiting discrimination based on "sex" in education programs and activities receiving federal financial

13

assistance.  *See* Equal Opportunity in Education Act, Pub. L. No. 92-318, tit. IX, 86 Stat. 373 (1972) (codified as amended at 20 U.S.C. § 1681 *et seq.*).

45.     The bill's Senate sponsor, Birch Bayh of Indiana, called Title IX "[t]he only anti-dote" to "the continuation of corrosive and unjustified discrimination against women . . . in[] all facets of education."  118 Cong. Rec. 5,803.  Referencing extensive evidence, including the 1970 hearings, Senator Bayh said Title IX would help "provide [American] women … an equal chance to attend the schools of their choice[ and] to develop the skills they want."  *Id.* at 5,804-06, 5,808.

46.     The House Report recommending passage of the bill and statements from the bill's House sponsors sounded similar themes.  H.R. Rep. No. 92-554, at 51-52 (1971); 117 Cong. Rec. 39,252 (1971) (statement of Rep. Patsy Mink).

47.     Although Title IX's text did not expressly reference athletics, Congress quickly amended the statute to add the "Javits Amendment."  Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).  That provision directed the Department of Education's predecessor agency, the Department of Health, Education, and Welfare ("HEW"), to propose regulations "implementing [Title IX's] provisions[,] . . . includ[ing,] with respect to intercollegiate athletic activities[,] reasonable provisions considering the nature of particular sports."  *Id.*

48.     The Javits Amendment supplemented the statute's general authorization of federal agencies administering federal financial assistance to education programs and activities to "effectuate" Title IX's provisions via "rules, regulations, or orders."  20 U.S.C. § 1682.

49.     Congress also authorized federal agencies to enforce Title IX's prohibition by terminating a non-compliant recipient's Title IX assistance.  *See id.*

**B. Title IX's Legacy and Challenges to Its Success**

50.     Fifty years after Title IX's enactment, women outnumber men in higher education, earning more than fifty percent of undergraduate and postgraduate degrees.[3]

51.     These gains have improved the opportunities available to tens of millions of American women, including the thirty million female Americans who are currently school aged.[4]

52.     Female athletics participation has also increased exponentially.  Since its enactment in 1972, Title IX has led to an explosion in the participation of girls and women in sports.  In 2021, 3.4 million girls played high school sports, and 219,000 women played NCAA sports.[5]  These recent figures reflect a broader trend.  NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates), female participation rates in athletics have risen from 43% of the male participation rate (74,329 to 169,800) to 78% (219,177 to 278,988) in 2021—almost doubling.[6]  The successes of women on America's playing fields correlate directly to greater opportunities for women in America's board rooms.  *See Adams*, 57 F.4th at 820-21 (Lagoa, J., concurring) ("[R]esearch shows stunningly that 94[ ] percent of women C-Suite executives today played sport[s]." (citation omitted)).  Rolling back progress for women in sports is a civil rights issue of the highest order.  *See* Indiana Athletics Comment at 10.

---

[3] National Center for Education Statistics, *Postsecondary Education: Undergraduate Degree Fields* (May 2023), https://perma.cc/8NP8-JLNS; National Center for Education Statistics, *Postsecondary Education: Graduate Degree Fields* (May 2023), https://perma.cc/N7WB-WAQV.

[4] *Data Profiles: United States*, U.S. Census Bureau, https://perma.cc/2NCW-4LAJ (last visited Mar. 13, 2024).

[5] NCAA Sports Sponsorship and Participation Rates Database, https://perma.cc/QD82-F6P3.

[6] *Id.*

53.     Since Title IX's enactment, science has confirmed what common sense suggested in the 1970s: "[W]ere play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. TSSAA*, 563 F.2d 793, 795 (6th Cir. 1977).  Because of the physiological differences between males and females, men and even boys outperform the best female athletes in the world.  *See* Comment by the Independent Women's Law Center, ED-2022-OCR-0143-155361, at 3 (May 15, 2023), attached as Exhibit E-6 [hereinafter IWLC Comment] (citing research).  The same is true across all levels of sports.  *See* Tennessee Athletics Comment at 14-15.

54.     Differences in "cardiovascular endurance, muscular strength, muscular endurance, speed/agility and power," among others, reduce female competitiveness as early as age six—a disadvantage that the onset of male puberty only exaggerates.  *Id.* at 14 (quoting United Kingdom Sports Councils, *Int'l Res. Literature Rev.* at 3 (Sept. 2021), https://perma.cc/H3TJ-KEDE).  The performance advantage of men over women is typically 10-50% depending on the sport.[7]  The reason for male athletic advantage is biology.  Males have 45% higher lean-body mass, 33% higher lower-body muscle mass, 40% higher upper-body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output.[8]  The result is that, by early teens, many ado-lescent males surpass elite (*i.e.*, Olympic and world championship level) female performance in nearly all sports.[9]  *See* Indiana Athletics Comment at 10.  And studies show that suppressing

---

[7] Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Med. 199 (2021); *see also* Ex. 1 to Comment by Independent Council on Women's Sports, ED-2022-OCR-0143-148316 (May 14, 2023), attached as Exhibit E-7.

[8] Hilton & Lundberg, *supra*, at 202.

[9] *See id.* at 204.

testosterone after puberty begins will not substantially eliminate the male athletic advantage. *See* Tennessee Athletics Comment at 15; *see also* IWLC Comment at 5-6 (citing similar research).[10]

55.    Yet, in recent years, high school and collegiate sporting bodies have adopted policies that threaten to undermine the gains women have achieved in sports and beyond by allowing men who identify as women to participate in women's athletic competitions.

56.    The NCAA, for example, has allowed males with suppressed testosterone levels to compete on women's teams.[11]   Some high school athletic associations have even adopted policies allowing males to compete on girls' or women's teams without undergoing surgery or hormone therapy.[12]

57.    Although these policies are relatively new, they have already proved detrimental to female opportunity and physical safety.  Men identifying as women have taken athletic titles—and opportunities to compete—from women.  *See* Tennessee Athletics Comment at 15; *see also* Cyd Zeigler, *These 23 trans women have won national or international competitions or championships*, Outsports (Mar. 1, 2022), https://perma.cc/X7UT-9FDQ.  And as common sense would dictate given their greater strength and speed, allowing males to compete in women's sports has led to serious physical injuries among female athletes.  *See* Tennessee Athletics Comment at 15.

---

[10] Timothy A. Roberts, et al., *Effect of Gender Affirming Hormones on Athletic Performance in Transwomen and Transmen: Implications for Sporting Organizations and Legislators*, 55 British J. of Sports Med., 577, 577 (Dec. 7, 2020), https://perma.cc/J59C-Z4PD.

[11] NCAA, *2010 NCAA Policy on Transgender Student-Athlete Participation* (2010), https://perma.cc/Y9SN-5JVJ; NCAA, *Transgender Student-Athlete Participation Policy* (Updated Apr. 17, 2023), https://perma.cc/RQ46-6YJQ.

[12] Samantha Pell, *Girls Say Connecticut's transgender athlete policy violates Title IX, file federal complaint*, Wash. Post. (June 19, 2019), https://perma.cc/KJ9W-W2UJ.

58.     Recognizing these dangers and the "science around physical performance and male advantage," a number of international sporting bodies have barred male athletes or athletes who have gone through male puberty from participating in female competitions.[13]  *See* Comment by Alliance Defending Freedom, ED-2022-OCR-0143-150698, at 24 (May 15, 2023), attached as Exhibit E-5 [hereinafter ADF Athletics Comment].

59.     At least twenty-five States have likewise adopted restrictions that preclude males' participation in female athletics, even when a male athlete identifies as a woman.[14]

60.     Allowing males to play on female teams will moreover reduce women's educational access.  Athletic scholarships help students pursue educational opportunities.  If scholarships available to students joining a female team are given to males (as reportedly attempted by one Division I school[15]), that means fewer athletic—and educational—opportunities for women.

### C. Title IX's Clear Scope

61.     Many scholars attribute the dramatic improvement in women's educational opportunities since 1972, at least in part, to Title IX's simple pronouncement: "No person in the United States shall, on the basis of *sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681 (emphasis added); *see, e.g.*, Samuels & Galles, *supra*, at 33-34; *see*

---

[13] Katie Falkingham, *World Athletics bans transgender women from competing in female world ranking events*, BBC (Mar. 23, 2023), https://perma.cc/JG9S-V5AR; *see also World Cycling's governing body bans female transgender athletes from women's events*, Associated Press (July 14, 2023), https://perma.cc/Q9MN-NVZN.

[14] Movement Advancement Project, *LGBTQ Youth: Bans on Transgender Youth Participation in Sports* (2024), https://perma.cc/P7E7-K55H.

[15] Taylor Penley, *NCAA volleyball player refuses to stay silent as trans athletes put women's opportunities 'at risk'*, FoxBusiness (Dec. 19, 2023), https://perma.cc/UE88-F9JE.

*also* Elizabeth Kaufer Busch & William E. Thro, *Restoring Title IX's Constitutional Integrity*, 33 Marq. Sports L. Rev. 507, 507-08 & n.1 (2022).

62.     The plain meaning of this provision belies that it applies to terms like "gender identity" that are distinct from "sex."  As the en banc Eleventh Circuit recognized, "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment [in 1972] show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females." *Adams*, 57 F.4th at 815.

63.     Context confirms this reading.  Title IX expressly states that it does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes," i.e., "*for*" males and females.  20 U.S.C. § 1686 (emphasis added).  Senator Bayh explained that such "differential treatment by sex" was permissible "where personal privacy must be preserved." 118 Cong. Rec. 5,807 (statement of Sen. Bayh).  And it makes sense that Title IX would not treat the provision of sex-separate facilities as discriminatory.  Sex-based classifications like this one, unlike race-based classifications, are not inherently invidious because they are rooted in "enduring' differences between men and women." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (quoting *Virginia*, 518 U.S. at 533).  In other words, they do not treat "similarly situated" individuals unequally. *Bostock*, 590 U.S. at 657.

64.     Moreover, § 1686's safe-harbor for "separate" male and female facilities "would be rendered meaningless" if "sex" did not refer to a male-female binary based on physiological differences. *Adams*, 57 F.4th at 813.  Interpreting sex discrimination to encompass "gender identity" discrimination, for example, "would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity." *Id.* at 814.  That would grant

19

transgender persons "dual protection under Title IX based on *both* sex and gender identity," impermissibly giving "'different meanings to the same [statutory] phrase.'"  *Id.* (quoting *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019)).

65.   Beyond § 1686, Title IX consistently treats sex as a binary, using phrases such as "one sex," "the other sex," and "both sexes."  For example, the statute excepts from its coverage a public undergraduate institution with a historic "policy of admitting only students of *one sex*," 20 U.S.C. § 1681(a)(5) (emphasis added); certain organizations whose memberships have "traditionally been limited to persons of *one sex*," *id.* § 1681(a)(6) (emphasis added); "father-son or mother-daughter activities," so long as similar opportunities provided for "*one sex*" are provided for "*the other sex*," *id.* § 1681(a)(8) (emphasis added); and scholarships associated with participation in a beauty pageant "limited to individuals of *one sex* only," *id.* § 1681(a)(9) (emphasis added).  Title IX also clarifies that it does not require "preferential or disparate treatment to the members of *one sex*."  *Id.* § 1681(b).

66.   Many of Title IX's exclusions from coverage preserve male-only or female-only spaces.  The statute does not apply, for example, to the membership practices of college fraternities and sororities or to those of sex-segregated voluntary service organizations like the Girl Scouts and Camp Fire Girls.  *Id.* § 1681(a)(6).  Nor does it apply to the programs or activities of Boys and Girls State and Boys and Girls Nation.  *Id.* § 1681(a)(7).

67.   This treatment of "sex" as a male-female binary reflects Title IX's linguistic context.  "The phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications."  Ryan T. Anderson & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do*, at 9, The Heritage Found. (2017), https://perma.cc/VG5N-ZAYE.  And the word "gender" had itself "been coined only recently in

contradistinction to sex." *Id.* Indeed, "psychiatric literature" at the time "conflated sexual orien-

tation with gender identity." *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1336 (11th Cir.

2021) (Pryor, C.J., dissenting) (citing Jack Drescher, *Transsexualism, Gender Identity Disorder*

*and the DSM*, 14 J. Gay & Lesbian Mental Health 109, 111 (2010)), *rev'd on reh'g on banc*, 57

F.4th 791.

68.    These textual, structural, and linguistic clues accord with the evidence that Con-

gress enacted Title IX with a sex-specific purpose: to remedy discrimination against women in

American education by promoting equal educational opportunities for them going forward.

## II.   Decades of Administrative Interpretations Confirm Title IX's Limited Application to Sex Discrimination.

69.    Soon after Title IX's enactment, in 1975, HEW finalized regulations "effectuat[ing]

the provisions of [Title IX]" and, per then-applicable statutory procedures, submitted them to Con-

gress for review. 20 U.S.C. § 1682; *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531 (1982); *see*

*also* 45 C.F.R. pt. 86 (1975) (now codified at 34 C.F.R. pt. 106). These provisions addressed the

effect of Title IX's prohibition of discrimination based on "sex" in admissions, education programs

and activities, athletics, and employment. *See generally* 34 C.F.R. pt. 106.

70.    Both houses of Congress held extensive hearings reviewing the regulations' con-

sistency with Title IX. *See* Samuels & Galles, *supra*, at 20 & n.48. No congressional resolution

disapproving them passed, and HEW's regulations went into effect on July 21, 1975.[16] *See Bell*,

---

[16] Congress later created the Department of Education and transferred all HEW's functions relating to educational programs to the Secretary of Education. 20 U.S.C. §§ 3411, 3441(a)(3). HEW's determinations, rules, and regulations remain effective. And the relevant provisions of the Title IX regulations discussed below have not been revised since 1975.

456 U.S. at 532-33; *see also id.* at 534 (finding Congress's failure to disapprove the regulations "lends weight" to the notion that they are "valid and consistent with the legislative intent").

71.   Like Title IX, the 1975 regulations, which were recodified without substantive change in 34 C.F.R. part 106, treat sex as a binary, referring multiple times to "one sex," especially versus "the other sex," using the phrase "both sexes," and referencing "boys and girls" and "male and female teams."   *See, e.g.*, 34 C.F.R. §§ 106.33, 106.34(a)(3), 106.36(c), 106.37(a)(3), 106.41(c), 106.51(a)(4), 106.58(a), 106.60(b), 106.61; *see also* 34 C.F.R. pt. 86 (1975).

72.   Consistent with the statutory structure, the regulations also preserve certain sex-segregated spaces, authorizing a recipient, for example, to "provide separate housing on the basis of sex," *id.* § 106.32; "provide separate toilet, locker room, and shower facilities on the basis of sex," *id.* § 106.33; conduct "separate sessions for boys and girls" of sexual-education classes in elementary and secondary schools, *id.* § 106.34(a)(3); and "make requirements based on vocal range or quality which may result in a chorus or choruses of one or predominantly one sex," *id.* § 106.34(a)(4).  Like the statutory carveout for sex-separate facilities, these regulatory provisions would make no sense if "sex" refers to something other than physiological differences between males and females.

73.   The original rules governing athletics accord with Title IX's general prohibition on discrimination and with its approval of sex separation in certain cases.  They forbid discrimination "on the basis of sex" in "interscholastic, intercollegiate, club or intramural athletics" but allow a recipient to sponsor "separate teams for members of each sex" when team selection is "based upon competitive skill" or the sport is a "contact sport."  *Id.* § 106.41(a)-(b).  Underlining that sex differentiation does not equal sex discrimination under Title IX, the athletics rules require "equal athletic opportunity for members of both sexes," including in the distribution of athletic

scholarships and the provision of facilities, equipment, and services, but provide that "aggregate expenditures for members of each sex" and "expenditures for male and female teams" need not necessarily be equal to comply with Title IX.  *Id.* § 106.41(c); *see also id.* § 106.37(c).

74.     Consistent, too, with Title IX's purpose, the regulations also require covered institutions that admitted "only students of *one sex*" before 1965 to "overcome the effects of past exclusion of students on the basis of sex" by developing and implementing a plan to "encourage individuals of *the previously excluded sex* to apply for admission."  45 C.F.R. §§ 86.16, 86.17(d) (emphasis added).  In many cases, "the previously excluded sex" means women.  *See* Lew, *supra,* at 855-56 & n.40 (noting the transition from male-only education to coeducation in private universities took place in the late 1960s and early 1970s).

75.     Judicial decisions in the first decades after the statute's passage reflect a similar understanding that Congress enacted Title IX to combat "discrimination against *women* in the field of education."  *Bell*, 456 U.S. at 523-24 (emphasis added); *see also Cannon v. Univ. of Chi.*, 441 U.S. 677, 694 & n.16, 704 n.36 (1979) (recognizing that a female applicant to medical school was "clearly a member of that class for whose special benefit [Title IX] was enacted").  Such decisions describe the law and its regulations as a deliberate check on "male dominance" in academic settings.  *Yellow Springs Exempted Vill. Sch. Dist. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 658 (6th Cir. 1981); *accord Ridgeway v. Mont. High Sch. Ass'n*, 858 F.2d 579, 581 (9th Cir. 1988).

76.     In the decades that followed, the Department of Education consistently interpreted "sex" as a binary classification—male, female—consistent with the statutory text, structure, and purpose and with the statute's implementing regulations.

77.     For example, in adopting 1997 guidance clarifying that Title IX covers same-sex sexual harassment, the Department stated, "both male and female students are protected from

sexual harassment . . . even if the harasser and the person being harassed are members of the same sex." U.S. Dep't of Educ., Off. for Civ. Rts., Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,039 (Mar. 13, 1997)  https://perma.cc/AT7Y-KCFC.  The guidance did not use the term "gender identity," and it stated that "Title IX does not prohibit discrimination on the basis of sexual orientation," presumably because the Department then understood "sex" to refer to the status of being male or female, not that of being heterosexual or homosexual.  *Id.*; *see also id.* at 12,036.

### III.   The Obama Education Department Unveils a New 2014 Reading of Title IX that Turns on Students' Gender Identity, Not Sex.

78.    The Department's longstanding and consistent view of Title IX suddenly shifted in the second half of President Obama's tenure.

79.    Previously, in a "Dear Colleague Letter" on bullying, the Obama Department of Education had tracked the historic understanding of Title IX as limited to sex-based discrimination. That letter acknowledged that claims of sex discrimination by lesbian, gay, bisexual, and transgender students based on their "LGBT status" must overlap with "sexual harassment or gender-based harassment." U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Bullying, at 8 (Oct. 26, 2010) (marked "not for reliance"), https://perma.cc/3AGM-SB8P.

80.    Yet, a few years later, the Department performed an about-face, asserting that "Title IX's sex discrimination prohibition extends to claims of discrimination" based solely on "gender identity." U.S. Dep't of Educ., Off. for Civ. Rts., Questions and Answers on Title IX and Sexual Violence, at 5 (Apr. 29, 2014) (rescinded in 2017), https://perma.cc/Y7BD-XHFU; *see also G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 722 (4th Cir. 2016) (citation omitted)

(deferring to but acknowledging the "novelty" of this position).  The Department offered no explanation or justification for its reversal.

81.    A subsequent "Dear Colleague" letter asserting that Title IX "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status," compounded this deficiency.  U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Title IX and Transgender Students, at 1 (May 13, 2016) (rescinded in 2017), https://perma.cc/G5VG-ZNV9 [hereinafter 2016 Dear Colleague Letter]; *see also* U.S. Dep't of Educ., Off. for Civ. Rts., Letter to Emily T. Prince, Esq., at 1-2 (Jan. 7, 2015) (rescinded in 2017), https://perma.cc/4ZRV-8LQ7 (previewing this position).  The guidance failed to square the Department's new reading with its previous interpretation of "sex."  Nor did it offer any legal analysis supporting the new interpretation.  Instead, it asserted that a recipient would discriminate "on the basis of sex" if it failed to "treat students consistent with their gender identity," even if a student's gender identity conflicted with records of his or her sex.  2016 Dear Colleague Letter at 3.

82.    The Department suggested that a recipient's failure to compel faculty and staff to "use pronouns and names consistent with a transgender student's gender identity" could violate this newly interpreted Title IX.  *Id.*  A recipient would also engage in sex discrimination under the Department's reading if it failed to permit students to access restrooms, locker rooms, shower facilities, and housing, or if the recipient failed to allow students to participate in activities, including sports, based on their gender identity alone.  *Id.* at 3-4.

83.    A federal court in Texas swiftly enjoined the enforcement of the Dear Colleague letter and related guidance nationwide.  *See Texas v. United States*, 201 F. Supp. 3d 810, 816 n.4, 836 (N.D. Tex. 2016), *clarified by*, No. 7:16-cv-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18,

2016).  The court held that plaintiffs would likely succeed on the merits in arguing (a) that the Department and other defendants violated the APA's notice and comment requirements by adopting "legislative and substantive" rules in the guise of guidance, and (b) that the ordinary public meaning of "sex" as used in Title IX unambiguously precluded construing that term to mean "gender identity."  *Id.* at 827-34.  The injunction was dissolved when plaintiffs voluntarily dismissed their suit after the guidance was withdrawn.  *See* Pls.' Notice of Voluntary Dismissal, *Texas v. United States*, No. 7:16-cv-00054-O (N.D. Tex. Mar. 3, 2017), ECF No. 128.

## IV.    The Trump Education Department Returns to Reading Title IX to Cover Only Sex.

### A.  Rescission of the Dear Colleague Letter and 2020 Title IX Rule

84.    In February 2017, President Trump's administration withdrew and rescinded the Obama Department's gender-identity guidance.  U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Gender Identity Guidance (Feb. 22, 2017), https://perma.cc/H6E3-YBEZ.  The Departments of Education and Justice explained that the withdrawn documents (a) did not contain "extensive legal analysis," (b) did not explain the consistency of their position with Title IX's "express language," and (c) did not "undergo any formal public process."  *Id.* at 1.  The Departments also emphasized the "primary role of the States and local school districts in establishing educational policy."  *Id.*  And the administration made clear that the withdrawal of the previous guidance merely returned the state of the law to the pre-2014 understanding of Title IX's scope.  *See id.* at 2.

85.    In 2020, the Department promulgated further amendments to its Title IX regulations to better align the Department's enforcement practices with the statutory text and case law in the area of sexual harassment.  *See* Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May

26

19, 2020). Relevant here, the Department defined "sexual harassment" as "conduct that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education." *Id.* at 30,036. By requiring that harassment satisfy all three of those characteristics, the Department stated its definition would capture "serious situations" of conduct or speech while accounting for the fact that "younger students are still learning social skills and older students benefit from robust exchange of ideas, opinions, and beliefs." *Id.* at 30,143.

86. In justifying its definition of harassment, the Department explained that it tracked "verbatim," *id.* at 30,036, the Supreme Court's definition in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). Though *Davis* arose in the context of determining schools' Title IX liability in private damages actions for student-on-student harassment, the Department noted that "[n]othing in . . . *Davis* purports to restrict" its framework "only to private lawsuits for money damages." 85 Fed. Reg. at 30,033. The Department, moreover, reasoned that the *Davis* "framework" reflected Title IX's application to "discrimination" (i) "by the school," 85 Fed. Reg. at 30,200, 30,033, that (ii) is severe enough that it "effectively denies a person's equal access" to an educational program or activity, *id.* at 30,154. The Department also explained that a "narrowly tailored" definition of hostile-environment harassment was necessary to apply Title IX "in a manner consistent with respect for First Amendment rights, and principles of free speech and academic freedom, in education programs and activities." *Id.* at 30,142.

87. The 2020 Rule did not amend other regulations implementing Title IX's non-discrimination directive, like those permitting sex-separated housing and intimate facilities. *Id.* at 30,178 (discussing 34 C.F.R. 106.32-34). But it noted that both "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification," and that the

Department has "acknowledged physiological differences based on biological sex" in regulating physical education under Title IX.  *Id.*

**B.  *Bostock***

88.    One month after the Department issued the 2020 Rule, the U.S. Supreme Court issued its decision in *Bostock v. Clayton County*, 590 U.S. 644, holding that Title VII's prohibition on sex discrimination bars an employer from firing an employee based on sexual orientation or transgender status.  *Id.* at 651-52.  The Court's decision rested on two key holdings.

89.    First, the Court held that Title VII's prohibition of discrimination "because of" sex incorporates a but-for causation standard, meaning that "[s]o long as the plaintiff's sex was one but-for cause of [a challenged employment decision]," Title VII's coverage is triggered.  *Id.* at 656, 659; *see also* 42 U.S.C. § 2000e-2(a)(1).

90.    Second, the Court held that, an employee's "sex plays an unmistakable and impermissible role in [a] discharge decision" based on homosexual or transgender status.  590 U.S. at 660.  The Court reasoned that an employer who fires a male employee "for no reason other than the fact he is attracted to men . . . discriminates against him for traits or actions it tolerates in his female colleague"; likewise, an employer who fires a male transgender person who now identities as a female "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth."  *Id.*  Because Title VII forbids any consideration of sex in firing an employee, the Court reasoned that Title VII prohibits an employer from firing an employee based on his or her homosexuality or transgender status.  *Id.* at 660-62.

91.    Importantly, the Court assumed that "sex" referred "only to biological distinctions between male and female" at the time of Title VII's enactment in 1964.  *Id.* at 655.

92.    The Court also expressly declined to "prejudge" whether its decision in *Bostock* would "sweep beyond Title VII" to laws such as Title IX.  *Id.* at 681.

93.    It similarly declined to consider whether employer conduct other than firing an employee for being homosexual or transgender—for example, enforcing "sex-segregated bathrooms, locker rooms, and dress codes"—would constitute actionable discrimination under Title VII.  *Id.*

94.    And the Court did not consider, much less decide, what Title IX's statutory phrase "on the basis of *sex*" means or whether and how Title IX's explicit provision for sex-separated living facilities and other spaces inform the meaning of sex discrimination under Title IX.

### C. Post-*Bostock* Guidance

95.    In the wake of the *Bostock* decision, some courts read *Bostock* broadly—disregarding the decision's explicit limitations of its scope.  Such courts concluded that *Bostock*'s reasoning applied to Title IX, meaning that "Title IX, like Title VII, prohibits discrimination against a person because he is transgender, because this constitutes discrimination based on sex."  *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020), *rev'd on reh'g en banc*, 47 F.4th 791.

96.    The Department of Education's Office of the General Counsel sharply disagreed. In a January 2021 memorandum discussing the decision's implications for enforcement of Title IX, the General Counsel underlined *Bostock*'s narrow scope.  Reed D. Rubinstein, Memorandum For Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights, re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), https://perma.cc/Q9YC-Q4Y2.  The memorandum concluded that *Bostock* does not control the meaning of "sex" under Title IX and that the "Department's longstanding construction of the term 'sex' in Title IX [is] biological sex, male or female."  *Id.* at 1.  It also reasoned that construing "sex" to mean "biological sex" is "the only

29

construction consistent with the ordinary public meaning of 'sex' at the time of Title IX's enact-

ment," the statutory and regulatory text and structure—including § 1686's express carve-out for

sex-separate facilities—and Department practice. *Id.* at 1-4. Finally, the memorandum determined

that giving "sex" its ordinary meaning not only permits but *requires* a Title IX recipient providing

"separate toilet, locker room, and shower facilities" or "separate athletic teams" to regulate entry

based on sex. *Id.* at 7, 9.

97.     Several courts have likewise held that "Title VII differs from Title IX in important

respects" and that "principles announced in the Title VII context [do not] automatically apply in

the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (noting that,

"under Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R.

§ 106.37(c), and may take it into account in 'maintaining separate living facilities for the different

sexes.' 20 U.S.C. § 1686"); *see also Adams*, 57 F.4th at 811 (explaining that "Title IX, unlike Title

VII, includes express statutory and regulatory carve-outs for differentiating between the sexes

when it comes to separate living and bathroom facilities, among others"); *A.C. ex rel. M.C. v.

Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) (finding *Bostock* provided

"useful guidance" but noting that "the particular application of sex discrimination it addressed was

different"), *cert. denied sub nom.*, *Metro. Sch. Dist. of Martinsville v. A.C.*, 144 S. Ct. 683 (2024).

*But see Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116-18 (9th Cir. 2023) (construing

Title IX consistently with Title VII and thus applying *Bostock* to hold that Title IX covers discrim-

ination based on "perceived sexual orientation"); *Grimm*, 972 F.3d at 616-17 (similar as to a

transgender student).

## V.   The Biden Administration Reverses Course Again by Proposing the Challenged Gender-Identity Mandate.

### A.  Initial Guidance

98.     Upon assuming office, President Biden and his administration surged in the opposite direction.  As one of his first official acts as president, President Biden declared that *Bostock*'s analysis changed the meaning of *all* federal law governing sex discrimination: "Under *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 et seq.), . . . , along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary."  Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021).

99.     President Biden directed each federal agency to review all existing regulations and other agency actions for consistency with that position and develop a plan to "ensure that [the agency was] fully implementing the policy" set forth in the Executive Order.  *Id.* at 7,024.

100.     Accordingly, in June 2021, the Department of Education published guidance regarding "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*."  86 Fed. Reg. 32,637-01 (June 22, 2021) [hereinafter Interpretation].  Relying heavily on *Bostock*'s analysis of Title VII, the Department "interpret[ed] Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity."  *Id.* at 32,637.

101.     In relevant part, the Department concluded that the phrase "on the basis of sex" in Title IX has the same meaning as the phrase "because of . . . sex" in Title VII.  *Id.* at 32,638-39.

It cited two federal appellate court decisions—one of which has since been reversed—"recogniz[ing] that Title IX's prohibition on sex discrimination encompasses discrimination based on sexual orientation and gender identity." *Id.* at 32,639 (collecting cases). It ignored other federal appellate decisions distinguishing Title VII and Title IX. *See, e.g.*, *Meriwether*, 992 F.3d at 510 n.4. And the Department concluded that its interpretation "is most consistent with the purpose of Title IX"—"ensur[ing] equal opportunity and . . . protect[ing] individuals from the harms of sex discrimination." 86 Fed. Reg. at 32,639.

102.   The Department followed this new guidance with a "Dear Educator" letter and fact sheet, vowing that the Office of Civil Rights "w[ould] fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." Suzanne B. Goldberg, Dear Educator letter on Confronting Anti-LGBTQI+ Harassment in Schools, at 2 (June 23, 2021), https://perma.cc/A759-WKR9.

103.   The fact sheet purported to provide examples of discriminatory action under Title IX, as interpreted through the *Bostock* lens, but it described scenarios that *Bostock* explicitly declined to address, such as a school that does not allow a transgender student to use the restroom or participate in sports associated with the student's gender identity. *Id.*; *cf. Bostock*, 590 U.S. at 681.

104.   Like the Obama Administration guidance, the Biden guidance failed to withstand a preliminary challenge in federal court. In *Tennessee v. U.S. Department of Education*, the court preliminarily enjoined the Department and its co-defendants from implementing the Interpretation, Dear Educator letter, and fact sheet against twenty States, including the State of Tennessee. 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022). In relevant part, the court held that the Biden Department,

like the Obama Department before it, had likely proceeded illegally by "creat[ing] new rights and obligations" without complying with the APA's notice-and-comment requirements. *Id.* at 838.

105.   In support, the court reasoned that the new guidance "plausibly 'adopt[s] a new position inconsistent with . . . [the Department's] existing regulations" for two reasons. *Id.* at 839. First, "Title IX does allow for sex-separation in certain circumstances," but "the Department's guidance, specifically the Fact Sheet, appears to suggest such conduct will be investigated as unlawful discrimination." *Id.* Second, the guidance "creates rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations." *Id.*

106.   The court emphasized that "*Bostock* d[id] not require Defendants' interpretations of Title . . . IX." *Id.* at 833. Rather, Defendants "fail[ed] to cabin themselves to *Bostock*'s holding," "advanc[ing] *new* interpretations of [Title IX] and impos[ing] *new* legal obligations." *Id.*

107.   The Eastern District's injunction remains in effect pending appeal. *See Tennessee v. U.S. Dep't of Educ.*, No. 22-5807 (6th Cir.) (argued Apr. 26, 2023).

**B.   The Proposed Facilities-and-Programs Rule**

**1.   The Department's Proposal**

108.   In July 2022, the Biden Department proposed amendments to its Title IX regulations adopting the interpretation of Title IX advanced in its previous guidance documents (the "Proposed Facilities-and-Programs Rule"). *See* Notice of Proposed Rulemaking re: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (proposed July 12, 2022) (to be codified at 34 C.F.R. pt. 106).

109.   In relevant part, the Proposed Facilities-and-Programs Rule redefined sex discrimination under Title IX to "include[] discrimination on the basis of sex stereotypes, sex

33

characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 41,571 (to be codified at 34 C.F.R. § 106.10).

110.    The Department made clear that this definition would apply to "any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient that receives Federal financial assistance." *Id.* (to be codified at 34 C.F.R. § 106.31(a)).

111.    The Proposed Facilities-and-Programs Rule provided that, even when Title IX otherwise authorizes "different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or this part." *Id.* (to be codified at 34 C.F.R. § 106.31(a)(2)).  Applying this standard, the Department went on to clarify that "subject[ing] a person to more than de minimis harm on the basis of sex" would include "[a]dopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity." *Id.*; *see also id.* at 41,534-35.

112.    Moreover, the Proposed Facilities-and-Programs Rule required a recipient to "take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects." *Id.* at 41,572 (to be codified at 34 C.F.R. § 106.41(a)).

113.    The Department's new definition of sex discrimination also affected the revised definition of harassment, which would include "all forms of sex-based harassment, as opposed to only sexual harassment," including harassment based on gender identity. *Id.* at 41,410.

114.     The Department also proposed to "make clear" that its Title IX regulations, including the Proposed Facilities-and-Program Rule, "would preempt" "any State or local law" conflicting with them.  *Id.* at 41,404; *see also id.* at 41,569 (to be codified at 34 C.F.R. § 106.6(b)).

115.     In short, the Proposed Facilities-and-Programs Rule rewrote Title IX to prohibit sex differentiation that the statute explicitly permits.

116.     Notably, the Proposed Facilities-and-Programs Rule declined to address the application of its redefinition of sex discrimination to athletics.  The Department cited "a longstanding congressional view that athletics presents unique considerations," and it claimed that Congress conferred "special authority" on the Department to regulate athletics via the Javits Amendment.  *Id.* at 41,537-38.  The Department said it planned to issue a separate notice of proposed rulemaking to address "whether and how" the Department should amend its 1975 athletics regulation, including by considering "what criteria, if any, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team."  *Id.*

### 2.  Public Comments

117.     Underlining the significance of the Department's reinterpretation of Title IX, as well as the strength of opposition to it, the Proposed Facilities-and-Programs Rule generated more than 200,000 comments.[17]

118.     Among others, the State of Tennessee and nineteen co-signing States submitted a public comment criticizing the Proposed Facilities-and-Programs Rules as unlawful and irrational.

---

[17]  Comments on the Proposed Facilities-and-Programs Rule are available at https://www.regulations.gov/document/ED-2021-OCR-0166-0001/comment.

*See generally* Tennessee Facilities-and-Programs Comment.  The letter articulated three categories of concerns.

119.    *First*, the States argued the Proposed Facilities-and-Programs Rule conflicted with Title IX.  For many of the reasons discussed above, the States explained that the Department's interpretation of "sex" to mean "gender identity" contravenes Title IX's text, structure, and purpose, as well as the Department's own regulations and historical practice.  *Id.* at 2-5.

120.    *Second*, the States cautioned that the Proposed Facilities-and-Programs Rule presented a number of constitutional issues.  For example, the proposal exceeded Congress's legislative authority under the Spending Clause of the U.S. Constitution.  *Id.* at 7.  And it threatened both to violate the First Amendment by requiring state-run public colleges to compel speech, and to infringe parental rights by forcing school administrators to accommodate a child's gender identity, regardless of parental preferences.  *Id.* at 6-7.

121.    *Third*, the States critiqued the Department's failure to address crucial policy issues that undermined the Proposed Facilities-and-Programs Rule, as the APA requires.  More specifically, the Department (i) had not considered the difficulties of authenticating gender identity; (ii) dismissed well-founded concerns regarding student and faculty safety; and (iii) failed to account for the sex-based discrimination its proposal would cause.  *Id.* at 8-13.

122.    Numerous organizations agreed that the Proposed Facilities-and-Programs Rule's interpretation of "sex" defied Title IX's plain meaning.  For example, Brigham Young University and the Council for Christian Colleges and Universities emphasized their commitment to "inclusive communities" and "legislative efforts to protect both LGBTQ rights and religious freedom."  Comment by Brigham Young University, et al., ED-2021-OCR-0166-226740, at 1 (Sept. 12, 2022), attached as Exhibit E-1.  But they argued that the proposal "impose[d] a definition of 'sex'"

. . . that extends beyond the plain language Congress provided in the statute" and "[could ]not be reconciled with the statute's binary word choice concerning the word 'sex.'"  *Id.* at 1-2.

123.    Other organizations argued that the Proposed Facilities-and-Programs Rule's expansion of the meaning of "sex" surpassed Congress's power to legislate under the Spending Clause.  *See, e.g.*, Comment by Alliance Defending Freedom ("The Rule is Legally Unsound and Procedurally Infirm"), ED-2021-OCR-0166-200280, at 9-12 (Sept. 11, 2022), attached as Exhibit E-2.  "Congress' 'intention' to cover sexual-orientation and gender-identity discrimination under Title IX must be 'unmistakably clear in the language of the statute.'  It is not."  *Id.* at 10 (footnote omitted) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

124.    Still others raised concerns that the Proposed Facilities-and-Programs Rule would "chill First Amendment protected speech" by applying "Title IX for the first time to discrimination on the basis of sexual orientation or gender identity."  *See, e.g.*, Comment by Pacific Legal Foundation, ED-2021-OCR-0166-212692, at 2, 7-12 (Sept. 12, 2022), attached as Exhibit E-3.  Especially in combination with amendments to the regulations governing sexual harassment, this expansion would, the Pacific Legal Foundation predicted, lead to "encroachments into protected speech," such as "coaches speaking in opposition to biological males in women's sports" or "students expressing sincere religious beliefs about the fixed nature of gender."  *Id.* at 7.  They also predicted that professors and others might be "required to use a transgender person's preferred pronouns"—i.e., compelled to speak in violation of the First Amendment.  *Id.* at 7-8.

125.    Other organizations highlighted the many ways in which the Department's proposal was arbitrary and capricious.  The Department had purported to expand the definition of "sex discrimination" without defining "sex"; acted without evidence supporting its inclusion of some new "forms of sex discrimination" and not others; failed to address and clearly protect women's sports;

and shirked its obligation to consider the safety costs of the Proposed Facilities-and-Programs Rule, as well as the proposal's potential to *decrease* female participation and opportunities.  Comment by Ethics & Public Policy Center Scholars, ED-2021-OCR-0166-228237, at 4, 8-10, 23-26 (Sept. 12, 2022), attached as Exhibit E-4.

### C.  The Proposed Athletics Rule

#### 1.  The Department's Proposal

126.   About a year after proposing the rule challenged here, the Department proposed a second Title IX rule (the "Proposed Athletics Rule") addressing the application of its new interpretation of sex discrimination to athletics.  *See* 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) (to be codified at 34 C.F.R. pt. 106).  It gave interested parties just thirty days (plus two days to avoid a weekend deadline) to submit comments.  *Id.* at 22,860.

127.   Amending its regulations governing athletics for the first time since 1975, the Department proposed to add the following provision:

> (b)
> (2) If a recipient adopts or applies sex-related criteria that would limit or deny a student's eligibility to participate on a male or female team consistent with their gender identity, such criteria must, for each sport, level of competition, and grade or education level:
> (i) Be substantially related to the achievement of an important educational objective; and
> (ii) Minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied.

*Id.* at 22,891 (to be codified at 34 C.F.R. § 106.41).

128.   Explaining that its proposed standard was rooted in case law interpreting the Equal Protection Clause, the Department offered two examples of "important educational objective[s]" that *might* qualify under the rule—"ensuring fairness in competition and prevention of sports-related injury."  *Id.* at 22,872.  But the Department explained that these objectives would not pass

muster unless they were "substantially related to ensuring fairness in competition in [a] particular sport at the applicable level of competition and grade or educational level." *Id.* at 22,873, 22874-76. And the Department cautioned that even criteria that were "substantially related" to achieving an "important educational objective" would violate proposed § 106.41(b)(2) if the recipient "c[ould] reasonably adopt or apply alternative criteria that would be a less harmful means of achieving the recipient's important educational objective." *Id.* at 22,877.

129.    Despite purporting not to "prohibit a recipient's use of sex-related criteria altogether," the Department admitted that "few, if any, sex-related eligibility criteria" would be able to surmount this high hurdle for elementary and middle school students. *Id.* at 22,860, 22,875. Such criteria at the high school level would only be "more likely" to satisfy the Proposed Rule. *Id.* at 22,875.

130.    The Department also identified certain justifications that would never qualify as "important educational objective[s]": "communicating or codifying disapproval of a student or a student's gender identity"; "excluding transgender students from sports"; "requir[ing] adherence to sex stereotypes"; and "administrative convenience." *Id.* at 22,872.

131.    The Department suggested that the Proposed Athletics Rule would preempt State laws in at least Indiana, West Virginia, and Idaho. Yet the Department declined to consider any "federalism implications," merely inviting States and local officials to review and comment on its proposal. *Id.* at 22,866, 22,890.

### 2. Public Comments

132.    Again, Tennessee, joined by sixteen other States, submitted a comment letter raising many of the same concerns the States expressed about the Proposed Facilities-and-Programs Rule. *See generally* Tennessee Athletics Comment. The States also contended that the Proposed

Athletics rule adopted an unworkable standard for determining whether a recipient may lawfully exclude students from sports teams that conflict with their sex but align with their gender identity. *Id.* at 10-13.  And the States argued that the Department had ignored crucial evidence about the physiological differences between the male and female sexes and failed to support its proposal with the requisite federalism analysis or any quantitative data.  *Id.* at 14-17.  Nor had the Department provided States with sufficient time to investigate the full costs of compliance, including restructuring athletic competitions and paying higher insurance rates due to the heightened risk of injury, or the costs associated with non-compliance, i.e., the potential loss of Title IX funding and its consequences to recipients.  *Id.*

133.    Indiana submitted a separate comment letter objecting to the Proposed Athletics Rule.  *See generally* Indiana Athletics Comment.  Indiana argued that the rewriting of the Title IX definition of "sex" to include "gender identity" would dismantle the ultimate purpose behind the statute and "destroy[] the progress made to protect the rights of girls and women . . . over the past fifty years."  *Id.* at 1.  Indiana also contended that the Proposed Rule failed to consider the physiological differences between men and women, *id.* at 10-13, circumnavigated Congressional authority, *id.* at 6-7, and would create obstacles to schools' protection of safety and fairness for girls in athletics, *id.* at 7-10.

134.    Once again, comments poured in—more than 150,000.[18]  Many presented similar objections to those Tennessee, Indiana, and other States raised.  Alliance Defending Freedom argued, for example, that both the major-questions doctrine and the "federalism clear-notice canon"

---

[18]  Comments on the Proposed Athletics Rule are available at https://www.regulations.gov/docket/ED-2022-OCR-0143/comments.

indicate the Department lacked authority for the Proposed Athletics Rule.  ADF Athletics Comment at 6-8.

135.    Others argued the Proposed Athletics Rule would allow men to displace women on the athletic field, emphasized the scientifically backed differences between men and women that make competition between the sexes unfair, and highlighted the dangers to girls and women from allowing males to use women's facilities and participate in women's sports.  *See, e.g.*, *id.* at 8-9; IWLC Comment at 3, 5-7; Comment by Independent Council on Women's Sports at 2-5 & Exhibits.

136.    The Proposed Athletics Rule likely would have generated even more comments, except that the Department cut short the comment period to a mere thirty-two days.  *See* Proposed Athletics Rule, 88 Fed. Reg. at 22,860; *cf.* Proposed Facilities Rule, 87 Fed. Reg. 41,390, 41,390 (providing about sixty days to comment).  It did so despite recognizing that the Proposed Rule was a "significant" regulatory action subject to Executive Order 13,563, *see* 88 Fed. Reg. at 22,878, which provides that a comment period "should generally be at least 60 days."[19]

137.    Tennessee and twenty-two other States requested that the Department extend the abnormally short comment period.  Tennessee & Co-Signing States, Comment Deadline Extension Request, ED-2022-OCR-0143-10614 (Apr. 21, 2023).  The Department declined.

**VI.    The Final Programs-and-Facilities Rule**

138.    On April 29, 2024, the Secretary published the final version of the Proposed Facilities-and-Programs Rule.  *See* Exhibit A, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule").

---

[19] Executive Order on Improving Regulation and Regulatory Review, Exec. Order No. 13,563, 76 Fed. Reg. 3,821, 3,821-22 (Jan. 18, 2011), https://perma.cc/JF52-7Z6Q.

Despite widespread opposition throughout the comment process, the Department maintained its initial approach in substantially identical form.

139.    The Final Rule fundamentally and unlawfully alters Title IX's regime in two ways relevant here. *First*, the Final Rule expands what constitutes unlawful sex discrimination by incorporating a suite of so-called "sex characteristics," including "gender identity." *Second*, the Final Rule broadly redefines the speech and conduct that constitute sex-based harassment subject to intervention or punishment by school administrators and private Title IX plaintiffs.

**A. Broadened Definition of "Sex" Discrimination.**

**1. Reading "Sex" to Include Gender-Identity Mandate.**

140.    Title IX's core nondiscrimination mandate prevents recipients of federal educational funding from engaging in discrimination "on the basis of *sex*." 20 U.S.C. § 1681(a) (emphasis added). In the Final Rule, the Department says this provision captures "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,476 (quoting new 34 C.F.R. § 106.10). Even this expansive list is "not exhaustive," *id.* at 33,512, making it anyone's guess what other gender theories Title IX might now protect in the Department's view.

141.    To implement this re-definition of sex-based discrimination, the Final Rule enshrines a new way for schools to determine whether practices inflict discriminatory harm based on students' gender identity. The Department starts by instructing that schools are permitted to maintain certain sex-segregated programs, activities, and facilities. *Id.* at 33,814. But the Department then says that schools cannot enforce these sex-based distinctions in a way that "causes . . . more than de minimis harm." *Id.* at 33,814, 33,816 (citing amended 34 C.F.R. § 106.31(a)).

42

142.    Next, the Department determines that it automatically inflicts more than de minimis harm—and thus violates Title IX—to prohibit any "'person'" from "'participating in . . . education program[s and] activit[ies] consistent with [the person's] gender identity,'" except as "otherwise permitted by Title IX or [the Title IX regulations]." *Id.* at 33,816, 33,819-20 (quoting amended 34 C.F.R. § 106.31(a)).

143.    While the Final Rule's jargon is complex, the new bottom line for the nation's schools is simple:  All federally funded elementary, middle, high, and postsecondary schools must generally adopt students' gender identity and ignore their sex, or else face Title IX sanctions.

144.    The Final Rule's related provisions make this gender-identity mandate broader still. For one, the Department explains that § 106.31(a)'s de minimis harm standard protects anyone even "attempting" to participate in a recipient school's program or activity.  *Id.* at 33,816.  This category includes "students, employees, applicants for admission or employment, . . . parents of minor students, students from other institutions . . . , visiting lecturers, or other community members" invited to campus.  *Id.*  The Final Rule thus grants nearly *anyone* who sets foot on a school's campus a Title IX right to use restrooms and other private facilities designated for members of the opposite sex.

145.    In addition, the Final Rule states that it inflicts "more than de minimis harm" on students to even inquire into or seek confirmation of their gender identity.  *Id.* at 33,819.  This means, the Final Rule continues, that a school cannot require documentary evidence of diagnosed gender dysphoria or another gender-based condition to permit participation in or use of a sex-separate activity or facility.  *Id.*  It thus violates the Final Rule's conception of Title IX *to even try to verify* the access of those using facilities like an elementary or secondary school girls' bathroom or locker room.  *Id.* at 33,818-19.

43

146.    The Final Rule acknowledges that its gender-identity mandate conflicts with several other provisions of Title IX, which expressly allow sex-segregated facilities, programs, and activities.  *See id.* at 33,818.  In particular, 20 U.S.C. § 1686 allows "separate living facilities for the different sexes," while 20 U.S.C. § 1681(a)(1) through (9) protect sex-based fraternity and sorority membership practices, programs and activities related to Boys State and Girls State, "father-son or mother-daughter" activities, and "'beauty' pageants" "limited to individuals of one sex only," *id.* § 1681(6)-(9).

147.    The Department's gender-identity mandate does not square with these provisions, which contemplate dividing facilities and programs based on sex.  Rather than pause at how reading the term "sex" to cover gender identity makes a hash of other portions of Title IX's scheme, the Department says these exceptions to Title IX's "general nondiscrimination mandate" mean schools can lawfully inflict more than de minimis discriminatory injury on students in the circumstances covered.  89 Fed. Reg. at 33,816, 33,818-19.

148.    The Final Rule's gender-identity mandate further conflicts with Title IX's original implementing regulations, which are chock-full of sex-based distinctions.  Since the statute's passage, the Title IX regulations have "recognized limited contexts in which sex separation or differentiation is allowed."  *Id.* at 33,814 (citing 87 Fed. Reg. at 41,534).  The 1975 regulations still in effect permit sex-separated "toilet, locker room, and shower facilities."  *See* 34 C.F.R. § 106.33; *see supra* ¶ 72.  Likewise, the Department's regulations have for many decades permitted certain sex-separate classes and activities, including physical-education and sexual-education classes, as well as "choruses of one . . . sex."  34 C.F.R. § 106.34.

149.    The Final Rule does not address the tension its new reading creates with these longstanding regulatory provisions.  To the contrary, the Department leaves the regulations in

44

place and says schools can still maintain the covered sex-separated practices.  89 Fed. Reg. at 33,818-19.  But the Final Rule then specifies that schools may no longer apply the regulations' allowance for sex-separation against males who identify as females or females who identify as males.  *Id.*

150.    The Final Rule makes no attempt to explain why allowing recipients to enforce sex-separate father-son or mother-daughter activities and not sex-separate sexual-education classes or sex-separate choruses is logically consistent.  Nor does it address the reasonableness of prohibiting uniform enforcement of sex-separate "toilet, locker room, and shower facilities," 34 C.F.R. § 106.33, but allowing enforcement of sex-separate housing policies.

151.    The Department's patchwork approach thus maintains regulations purporting to allow sex-separated spaces and activities—thereby avoiding the politically unpalatable step of altogether eliminating the longstanding concept of separating the sexes in spaces like bathrooms and locker rooms.  Yet the Department's Final Rule outlaws schools from enforcing those same sex-separated bounds when it comes to transgender students—thereby confirming that the Department really is eliminating schools' ability to adopt rules dividing spaces and activities based on sex.

**2.  Discussion of Sex-Separated Athletics.**

152.    The Department's treatment of athletics reflects similar regulatory gymnastics.  Plainly, school athletics qualify as a "program or activity" subject to the face of the Final Rule's gender-identity mandate.  But because of the "enduring" physical differences between men and women, *L.W.*, 83 F.4th at 484 (quoting *Virginia*, 518 U.S. at 533), applying the gender-identity mandate to women's sports would have a fairness-obliterating impact, *cf. supra* ¶¶ 53-60.  So, the Department's Final Rule fashions a bespoke application of its gender-identity mandate to sports replete with contradictory reasoning.

45

153.   In the Final Rule's words, "athletic competition raises unique considerations" that warrant "impos[ing] more than de minimis harm on individual students" in certain circumstances. 89 Fed. Reg. at 33,817, 33,819.   And the Department promises to flesh this out on some future date in a forthcoming rule on athletics with new "criteria" about sex-based separation.   But the Final Rule does not acknowledge the way this position makes clear that schools that continue to comply with the old athletic regulations will be in violation of the Department's new interpretation of Title IX.

154.   To justify this approach to athletics, the Final Rule first points to the Javits Amendment, which it characterizes as "tolerat[ing] sex separation in athletics."   89 Fed. Reg. at 33,816-17.   But the Final Rule does not quote any language from the Javits Amendment, *id.*, nor acknowledge that this law applied only to "intercollegiate" sports programs—not those found in elementary, middle, and high schools.   88 Stat. 484, 612.   Next, the Final Rule points to the "longstanding athletics regulations" in support of continuing to allow enforcement of sex-separate athletics in at least some circumstances.   89 Fed. Reg. at 33,817.   The Final Rule does not explain why the Department's "longstanding . . . regulations" should continue to support enforcement of sex-separated sports but not sex-separated "toilet, locker room, and shower facilities," which have been permitted by regulation for just as long.   *Compare* 40 Fed. Reg. 24,128, 24,141 (1975) (now codified at 34 C.F.R. § 106.33), *with* 40 Fed. Reg. at 24,142-43 (now codified at 34 C.F.R. § 106.41(b)).

155.   The Final Rule also does not acknowledge that the Department of Justice ("DOJ") under the Biden Administration has taken the opposite view of how Title IX applies to the issue of gender identity and sports.   In the words of DOJ, Title IX's athletics "implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex."   U.S.

Statement of Interest, *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, ECF No. 42 at 6-7

(S.D. W. Va. June 17, 2021) (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th

Cir. 2020)).  So, as DOJ concluded: "Any interpretation of Title IX's regulations that requires

gender identity discrimination would violate the statute's nondiscrimination mandate." *Id.* at 7.

The Department of Education's regulation-based discussion of Title IX and athletics does not

acknowledge this stark disconnect.  89 Fed. Reg. at 33,816-19.

### 3. *Bostock*-Based Justification for the Gender-Identity Mandate.

156.    The Final Rule largely rests on *Bostock* to justify its final approach to sex discrim-

ination, while generally ignoring courts' and commentators' contrary analysis, evidence, and ob-

jections.  The Final Rule asserts that "Title IX does not use the term 'on the basis of sex' in a

restrictive way." *Id.* at 33,802.  Beyond that, the Department insists that *Bostock* renders it unnec-

essary to define "sex" because any discrimination on the Final Rule's broad bases "necessarily

involves consideration of a person's sex, even if that term is understood to mean only physiological

or 'biological distinctions between male and female.'" *Id.* (quoting *Bostock*, 590 U.S. at 655).

The Final Rule thus effectively abandons the argument that the word "sex" itself encompasses

concepts, like gender identity, that are divorced from sex entirely.

157.    Casting *Bostock* as a silver bullet, the Department instead says "because of sex" in

Title VII and "on the basis of sex" in Title IX mean the same thing, so *Bostock*'s analysis of pro-

tected discrimination controls. *Id.* at 33,806-07.  Absent from the Final Rule is any meaningful

discussion of the reasoning of decisions, such as *Meriwether*, which held that "principles an-

nounced in the Title VII context [do not] automatically apply in the Title IX context" because

"Title VII differs from Title IX in important respects."  992 F.3d at 510 n.4; *accord Adams*, 57

F.4th at 813-15 (noting Title IX's "statutory context" precludes reading it to cover gender-identity discrimination).

158.   Nor does the Final Rule adequately address *Bostock*'s language, *cf.* 89 Fed. Reg. at 33,807, which stressed that its holding did not "sweep beyond Title VII" to laws such as Title IX and did not address sex-segregated "bathrooms, locker rooms, and dress codes," 590 U.S. at 681; *see* Rubinstein Mem., *supra* ¶ 96, at 1 (citing same language to conclude *Bostock* did not require gender-identity mandate in prior Title IX guidance).

159.   Blowing past *Bostock*'s self-described limits, the Department claims *it* has the right to extend the Supreme Court's reasoning to "sex separation in bathrooms [and] locker rooms" governed by Title IX. 89 Fed. Reg. at 33,818, 33,807-08. That is so, the Final Rule asserts, because such an expansion would best effectuate Title IX's purpose of broadly prohibiting sex discrimination—even as it displaces women from athletic podiums and sports teams across the country. *Id.* at 33,804 (citing 20 U.S.C. § 1682).

### 4. Constitutional and Compliance Concerns.

160.   The Final Rule denies that the major-questions doctrine precludes its interpretation, reasoning that the Department has "expertise on what constitutes sex discrimination in education programs or activities." *Id.* at 33,815. The Department also disagrees that its approach is "unprecedented," yet does not dispute that this regulation is the first in Title IX's fifty-year history to codify a gender-identity mandate. *Id.* (pointing to case law and recipient practice to justify its interpretation); *see also id.* at 33,476, 33,805 (citing no regulation but the proposed rulemaking as notice to recipients that Title IX covers gender-identity discrimination). Even if the major-questions doctrine applied, the Department insists that its "authority is especially clear." *Id.* at 33,815. For support, the Department points only to Congress's general grant of authority to federal

agencies to "effectuate the provisions of [Title IX]," 20 U.S.C. § 1682, which the Department claims its novel gender-identity position accomplishes, *id.* at 33,804-05, 33,815.

161.   The Final Rule further dismisses comments that its new sex-discrimination view presents Spending Clause or federalism problems.  According to the Department, since the statutory text provided notice that Title IX "means that no recipient may discriminate on the basis of sex," recipients received clear notice that they may not discriminate based on gender identity or any other basis contained in the Department's non-exhaustive list.  *Id.* at 33,805.  And the Department claims that the rulemaking has itself provided the required Spending Clause notice regardless.  *Id.*

162.   The Department similarly rejects comments that its reading infringes on States' and local governments' traditional prerogative to regulate public education, all while accepting that there are "existing State laws and policies that directly conflict with Title IX."  *Id.* at 33,806.  But the Final Rule declines to "highlight examples" of such conflicts without "relevant facts," even as it provides several examples of Title IX's scope elsewhere.  *E.g.*, *id.* at 33,803 (explaining that it need not add "gender norms," "gender expression," or "intersex traits" to its definition of sex discrimination because each one is represented by another term); *see id.* at 33,813 (clarifying that recipients have a duty to prevent menstruation-related harassment, such as "requiring a student to remove a garment around their waist").

163.   In response to commenters' concerns about overriding parents' choices regarding sensitive matters like gender identity, the Final Rule asserts that "nothing in the final regulations disturbs parental rights."  *Id.* at 33,821.  The Department further states that "deference to [parental] judgment . . . is appropriate" when a "parent and minor student disagree about how to address sex discrimination against that student," and that the regulations don't prevent a recipient from

"disclosing information about a minor child to their parent who has the legal right to receive disclosures on behalf of their child." *Id.* at 33,822.

164.    But the Final Rule again declines to address any specific factual scenarios raised by commenters. *Id.* As a result, nothing in the Final Rule clears up the most pressing questions for parental rights—like whether the gender-identity mandate means schools must adopt their students' gender identity even over their parents' or guardians' objections.

165.    The Final Rule contains no discussion of other important issues commenters highlighted.

166.    For instance, nowhere in the Final Rule does the Department address the difficulties associated with authenticating gender identity. *See supra* ¶ 121; *cf.* 89 Fed. Reg. at 33,809 ("The Department appreciates . . . that one person may not know another's gender identity without inquiring unless the other person volunteers the information."). If anything, the Final Rule exacerbates this problem by allowing recipient schools to maintain certain sex-separate spaces yet denying their ability to verify a person's basis for entering a space for the opposite sex. *Supra* ¶ 145.

167.    The Department's exceptions from its gender-identity mandate for living facilities and the statutory exceptions in 20 U.S.C. § 1681(a)(1)-(9) confuse compliance further. The Department doesn't address whether a recipient may require documentation for participation in these activities and programs that it may not require for toilets, locker rooms, showers, classes, and other purposes. Nor does it instruct schools how to determine whether certain spaces—like toilets and showers in the hall of a dorm complex—fall within "housing" facilities that can exclude by sex, or "bathroom" facilities that cannot. *See generally* 89 Fed. Reg. at 33,816-17, 33,820-21.

168.    In addition, the Department gives short shrift to comments about the privacy concerns and safety risks the Final Rule presents. Tennessee and other commenters cited extensive

evidence of sexual assaults and other crimes perpetrated by a boy or man who took advantage of a bathroom's or locker room's privacy-enhancing features to victimize a vulnerable female.  *See, e.g.*, Tennessee Facilities-and-Programs Comment at 9-11.  Rather than address this evidence head on, the Department says it "does not agree" such evidence shows that "transgender students pose a safety risk."  89 Fed. Reg. at 33,820.

169.    The Department then casts the real problem as "cisgender" persons' "preferences [and] discomfort," and rejects the notion that "*the mere presence* of a transgender person in a single-sex space compromises anyone's legitimate privacy interest" or poses "a safety risk to cis-gender students."  *Id.* (emphasis added).  But "courts have long recognized" that persons' bodily privacy interests are "significantly heightened when persons of the opposite biological sex are present."  *Grimm*, 972 F.3d at 633 (Neimeyer, J., dissenting) (collecting cases).  The Department nonetheless conflates students' privacy concerns—which have informed practices "universally ac-cepted … across societies and throughout history," *id.*—with "unconstitutional discrimination," 89 Fed. Reg. at 33,820.

170.    Moreover, as to safety, the Final Rule requires that just about "any 'person'" on campus be allowed to use sex-separate facilities consistent with his or her subjective and internal sense of gender identity.  *See supra* ¶¶ 144-45; 89 Fed. Reg. at 33,816.  The Department nowhere explains how a school can continue to "make and enforce rules that protect all students' safety and privacy," yet also abide by the Final Rule's requirement of allowing any person unfettered, unver-ified access to facilities for the opposite sex.  89 Fed. Reg. at 33,820.

171.    The Department "declines … to require" recipients to "provide gender-neutral or single-occupancy facilities," in part because it "would likely carry significant cost implications."  *Id.*  But the Department fails to consider that many schools have responded to gender-identity

mandates by building such facilities for students who do not wish to encounter members of the opposite sex in private spaces.  Nor does the Department consider cost implications from restructuring facilities to comply with the Final Rule's requiring recipients to allow males to use female facilities and vice versa.

172.    The Department lastly dismisses evidence that allowing males to participate in activities previously reserved for females will harm women's opportunities.  It states in conclusory fashion that extending Title IX's protections to gender identity "in no way lessens the force of Title IX's protections against discrimination that limits educational opportunities for girls and women." *Id.* at 33,808.  But the Department does not address commenters' evidence that males have already taken championships, titles, scholarships, and opportunities to compete from girls and women in the athletics context—opportunities that correlate with female success in other fields.  *See supra* ¶¶ 133-35.  Nor does it recognize the possibility that males who identify as female could take other educational opportunities from women in a world that is often "zero-sum." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218-19 (2023) (noting "[a] benefit provided to some [college] applicants but not to others necessarily advantages the former group at the expense of the latter").[20]

173.    The Department also fails to consider evidence of the physical differences between males and females that justify sex-separation in sports and elsewhere.  *See supra* ¶¶ 133, 135. Instead, the Final Rule states without explanation or evidence that "physical differences" generally

---

[20] *See also, e.g.*, Amanda Musa, *Transgender swimmer Lia Thomas nominated for NCAA Woman of the Year Award*, CNN (July 15, 2022), https://perma.cc/RXU4-Z3S4; *Female Athletes Sue the NCAA*, Independent Council on Women's Sports, https://www.iconswomen.com/take-on-the-ncaa/#filing (last visited Apr. 26, 2024).

cannot justify enforcing sex separation—contrary to the premise of Title IX's express exclusions and longstanding regulatory history.  89 Fed. Reg. at 33,818-19.  And the Final Rule leaves schools to largely guess at how to apply its reasoning regarding sports, beyond making clear that schools will violate Title IX by enforcing uniform rules against dividing sports based on sex rather than gender identity.  *Id.* at 33,817.

174.    The Department identifies many millions in costs arising from compliance with the Final Rule's gender-identity mandate.  *See id.* at 33,878; *see also infra* ¶¶ 174, 188.  But it claims that the "non-monetary benefits of providing clarity and recognizing the broad scope of Title IX's protections"—unquantified benefits—"justify" all the associated expenses.  89 Fed. Reg. at 33,877, 33,878.  The Department does not account for the "non-monetary" harms of allowing women to be displaced from sports teams, scholarships, championships, and awards by men.

**B.  Broadened Definition of Prohibited "Harassment."**

175.    In addition to expanding the meaning of "sex" discrimination, the Final Rule widens the speech and expression subject to Title IX's limit on "hostile environment sex-based harassment."  *Id.* at 33,496.

176.    As discussed, the 2020 Rule aligned the definition of Title IX harassment with both the Supreme Court's formulation in *Davis* and First Amendment considerations.  The 2020 Rule did so by requiring that harassment involve conduct that is "severe, pervasive, and objectively offensive."  *Supra* ¶¶ 85-86.

177.    The Department rejects the 2020 Rule's approach and replaces it with a new definition of harassment that is broader in critical ways.  *See* 89 Fed. Reg. at 33,884 (amending 34 C.F.R. § 106.2).  *First*, harassment need only be "severe" *or* "pervasive"—meaning even a "single serious" instance of unwelcome speech, or a pattern of non-severe incidents, might count.  *Id.* at

33,500.  *Second*, harassment covers conduct that is "subjectively and objectively" offensive as measured from the "the complainant's position"—meaning transgender persons' views on what harms gender identity controls the analysis.  *Id.* at 33,510.  *Third*, harassment is anything that "limits" a person's "ability to participate" in an educational program or activity—requiring only "some impact" on a student's ability to participate, without any "particular limits or denials."  *Id.* at 33,511.

178.    The Final Rule declines to limit its new definition of harassment to speech that occurs on school campuses.  Instead, the Title IX harassment obligations are triggered whenever a school employee "has information about conduct among students that took place on social media or other platforms."  *Id.* at 33,535.  Online conduct subject to harassment inquiry could include "sex-based derogatory name-calling" or "sending sex-based … cartoons," among any other "sex-based conduct" that might be "reasonably" viewed as harassing.  *Id.* at 33,515.

179.    The Department acknowledges commenters' concern that the new definition of harassment will infringe individuals' "freedom of speech, assembly, press, and religion."  *Id.* at 33,502.  Yet the Final Rule responds only with boilerplate language that it does not "restrict[] any rights that would otherwise be protected from government action by the First Amendment."  *See, e.g.*, *id.* at 33,500, 33,503, 33,506, 33,507, 33,508, 33,535, 33,542, 33,559.

180.    In downplaying commenters' First Amendment concerns, the Department does not discuss its prior guidance, enforcement history, or cited EEOC guidance, all of which set out a narrow view of protected speech in the gender-identity context.  *See supra* ¶ 82; 89 Fed. Reg. at 33,516 (incorporating EEOC gender-identity guidance); *see also* EEOC, *Proposed Enforcement Guidance on Harassment in the Workplace*, 88 Fed. Reg. 67,750 (Oct. 2, 2023) (permitting employees to "misgender" co-workers violates Title VII), https://perma.cc/VY3Y-RCE8.

181.    The Final Rule likewise declines to address commenters' particular examples of speech-infringing enforcement of Title IX because it cannot judge "factual scenarios" before they arise. *E.g.*, 89 Fed. Reg. at 33,507.  The Department for instance declines to say whether so-called "misgendering" may constitute actionable harassment because addressing this topic is allegedly too "fact-specific." *Id.* at 33,516.  Yet the Final Rule elsewhere provides "[e]xamples" of actions Title IX might require or cover, *id.* at 33,515, 33,525, as does EEOC's harassment and related guidance, which the Department elsewhere cites.  *Supra* ¶ 162; EEOC, *Sexual Orientation and Gender Identity (SOGI) Discrimination*, https://perma.cc/W3MG-DEZB (last visited Apr. 27, 2024) (cited at 89 Fed. Reg. at 33,516) ("intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment").

182.    In all events, the Final Rule suggests that it could overcome any First Amendment challenge.  The Department explains that "eradicating discrimination"—including, in the Final Rule's view, failure to adopt students' gender identities—is the type of compelling interest that could satisfy strict scrutiny and override limits on inhibiting otherwise protected speech or religious free exercise.  89 Fed. Reg. at 33,503 (citation omitted).

183.    The Final Rule instructs that Title IX administrators are to take "prompt[]" action to investigate and respond to any speech that "reasonably may" constitute harassment.  *Id.* at 33,509, 33,533, 33,562.  Such responses might include "educational programming" or "employee training," *id.* at 33,599, as well as "emergency removal" of alleged offenders from educational programs and activities, *id.* at 33,616; *see also id.* at 33,890 (amended 34 C.F.R. § 106.44(h)).

\* \* \*

184.   Putting all of this together, the resulting Title IX regime leaves schools to navigate a conflicting web of rules for assessing whether and how they apply sex-based distinctions in the educational sphere.  But at least a few things are clear.  No State or recipient school can exclude a student from using the bathroom, locker room, or other private changing or showering space that aligns with that student's self-professed gender identity, no matter their sex.  No State or recipient school can maintain laws or rules that require eligibility for all sports teams and competitions to be based on athletes' sex.  And no State can protect teachers' and students' right not to speak in ways that a student might view as offensive to the student's subjective gender identity.

185.   The Final Rule's effective date of August 1, 2024, means that these and other Department directives will apply when the next school year begins.  *Id.* at 33,474.

**IRREPARABLE HARM TO PLAINTIFFS**

186.   The Department's Final Rule inflicts significant, irreparable harms on Plaintiff States that only prompt judicial intervention can redress.

187.   *First*, Plaintiff States would suffer the "irreparable harm of nonrecoverable compliance costs."  *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)); *cf. Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-162-BJB, ---F. Supp. 3d----, 2024 WL 1402443, at *3 (W.D. Ky. Apr. 1, 2024) (noting such costs establish an injury for standing purposes).

188.   The Final Rule acknowledges as much: It states that § 106.32(1)(2) would require schools that do not already have policies governing the directed treatment of students based on gender identity to incur costs related to "review" of current policies, "updating of policies or training materials," and "train[ing] of employees or students on gender identity discrimination."  89 Fed. Reg. at 33,876.  Indeed, the Department estimates that simply "reading and understanding the

56

final regulations" will have a one-time cost of more than $24 million across all recipients. *Id.* at 33,867. Providing new training for school administrators, faculty and teachers, and Title IX coordinators will require many more millions—as the Final Rule also concedes. Yet sovereign immunity means Plaintiff States could not later recover these substantial compliance sums, showing textbook irreparable harm. *Biden*, 57 F.4th at 556; *see Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) ("no guarantee of eventual recovery" of monies owed was irreparable harm).

189.     *Second*, enforcement of the Final Rule threatens to collectively strip Plaintiff States of billions of dollars in federal Title IX funds and to impose substantial penalties through private suits. This severe financial exposure in turn endangers important programs that serve attendees of Plaintiff States' schools and higher-education institutions.

190.     The Tennessee legislature, for example, has a constitutional obligation to "provide for the maintenance, support and eligibility standards of a system of free public schools." Tenn. Const. art. XI, § 12. To that end, the Tennessee Department of Education directly operates several special schools—the Tennessee School for the Blind, Tennessee School for the Deaf (encompassing three campuses), and the Alvin C. York Agricultural Institute—as well as twenty-seven public schools in the Achievement School District. All these schools receive federal funds and are thus Title IX recipients.

191.     Similarly, the Indiana General Assembly has a constitutional obligation to "encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement" and "to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." Ind. Const. art. VIII, § 1. The Indiana Department of Education operates two special schools—the Indiana School for the Blind and Visually Impaired

and the Indiana School for the Deaf, *id.* art. IX, § 1—as well as 1,769 public schools[21] across the state as of 2022. All these schools receive federal funds and are thus Title IX recipients. Both Tennessee's and Indiana's special schools maintain sex-separated sports teams for multiple sports. Additionally, Tennessee's special schools maintain separate bathroom and locker-room facilities for males and females.

192. Kentucky's General Assembly, likewise, has a constitutional obligation to "provide for an efficient system of common schools throughout the State." Ky. Const. § 183. In Kentucky, there are 1,477 public schools serving primary and secondary school-aged children. Kentucky also operates the Kentucky School for the Blind and the Kentucky School for the Deaf. All these schools receive federal funds and are thus Title IX recipients.

193. The Ohio General Assembly is constitutionally obligated to "secure a thorough and efficient system of common schools throughout the State," as well as to provide "by law for the organization, administration and control of the public school system of the state." Ohio Const. art. VI, §§ 2-3.

194. The Virginia General Assembly has a constitutional obligation to "provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth." Va. Const. art. VIII, § 1. There are 1,944 public schools serving elementary and secondary school-aged children in Virginia. Virginia also operates the Virginia School for the Deaf and the Blind. All these schools receive federal funds and are thus Title IX recipients.

---

[21] Public Education in Indiana, *Ballotpedia*, https://perma.cc/CGU6-EVPY (last visited Apr. 18, 2024).

195.    West Virginia has fifty-five school districts as created by the West Virginia legislature.  *See* W. Va. Code § 18-1-3.  These school districts "are a part of the educational system of the state" and are "established in compliance with article 12, section 1, of [West Virginia's] Constitution."  *Krutili v. Bd. of Educ. of Butler Dist.*, 129 S.E. 486, 487 (W. Va. 1925).  All the districts in West Virginia receive federal funds—administered by the West Virginia Department of Education—and are thus subject to Title IX.

196.    The special schools in Tennessee, Indiana, Kentucky, and Virginia maintain sex-separated sports teams for multiple sports.  Additionally, Tennessee's and Virginia's special schools maintain separate bathroom and locker-room facilities for males and females.

197.    Tennessee is also home to nearly 150 "[l]ocal education agencies"—school districts—that Tennessee's legislature creates or authorizes.  Tenn. Code Ann. § 49-1-103.  Indiana has 291 public school districts that the Indiana General Assembly established as of 2022.  Of Kentucky's 171 school districts, 120 are public school districts and 51 are independent districts, which are run by local municipalities.  In Virginia, students are educated within 131 public-school divisions, which are created by the Virginia Board of Education subject to the criteria and conditions of the General Assembly.  *See* Va. Const. art. VIII, § 5.  All of these districts receive federal funds, administered by their respective States, and are thus subject to Title IX.

198.    Altogether, educational programs and activities funded through the Tennessee Department of Education received an estimated $1.5 billion in federal funds in Fiscal Year 2022-23, making up approximately 18% of the Tennessee Department's budget.  The Indiana Department of Education received an estimated $761,425,610 in federal funds in Fiscal Year 2022-23 for

elementary and secondary level education programs.[22]  Kentucky received over $617 million dollars in federal funding for primary and secondary level education programs in 2023.[23]  In the prior year, federal funds accounted for over 17% of district funding of primary and secondary schools in Kentucky.[24]  In 2023, the State of Ohio received over $5.2 billion in funding from the U.S. Department of Education and expects to receive additional funds of equal or greater amount in future fiscal years.[25]  Virginia received an estimated $1.48 billion for public school educational programs and activities in the Fiscal Year 2022, making federal funds an estimated 15.5% of the total estimated annual budget.  The West Virginia Department of Education received an estimated $731,500,000 in federal funds in Fiscal Year 2022-23, making up approximately 26.63% of the West Virginia Department's budget.

199.    Public and special schools in the Plaintiff States use such federal funds to provide supplemental educational support and materials to students, offer non-academic support for students, provide professional learning opportunities for teachers, offer technology for student use, and for other purposes.  Losing these funds would require these schools to eliminate certain services or seek new funding for them—and there is no guarantee that any other funding could be found to cover the lost funding.

200.    Tennessee's legislature also "establish[es] and support[s] . . . postsecondary educational institutions, including public institutions of higher learning."  Tenn. Const. art. 11, § 12.

---

[22] *See* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables for the U.S. Dep't of Educ.* (Mar. 15, 2024), https://perma.cc/753G-GG3H; *see also* https://perma.cc/92PL-8VKD.

[23] *Id.*

[24] Ky. Dep't of Educ., *School Report Card* (2022), https://perma.cc/V7GR-57YP.

[25] *See supra* note 22.

Tennessee currently has fifty-one public institutions of higher learning.  Public higher education institutions in Tennessee received an estimated $4.2 million in federal funds administered by the U.S. Department of Education in Fiscal Year 2022-23, subjecting them to Title IX.

201.    In Indiana, the Indiana General Assembly has established seven public institutions of higher education.  *See generally* Ind. Code § 21-19 *et. seq.*  Public higher education institutions in Indiana received an estimated $622,469,030 in federal funds in Fiscal Year 2022-23, subjecting them to Title IX.[26]

202.    There are forty-two postsecondary institutions in Kentucky.  Twenty-four are public institutions, including sixteen community and technical schools.  All postsecondary institutions in Kentucky are subject to Title IX as recipients of federal funds.  For example, each postsecondary institution receives Pell Grants.[27]  In 2023, Kentucky postsecondary institutions received over $423 million in Pell Grant funds.[28]  For the 2024-2025 school year, Kentucky's community and technical schools anticipate receiving over $294 million in federal funds, while the four-year public postsecondary institutions expect to receive over $936 million in federal funds.[29]

203.    The Commonwealth of Virginia has fifteen public four-year institutions of higher education, twenty-four public two-year institutions of higher education, five regional higher education centers, and one public/private medical school.  Public higher education institutions in

---

[26] *See supra* note 22.

[27] *See, e.g.*, U.S. Dep't of Educ*., Distrib. of Fed. Pell Grant Program Funds by Instit., 2017-18 Award Year* (last modified Feb. 26, 2020), https://perma.cc/73LX-535V.

[28] *See supra* note 22.

[29] *See* An Act relating to appropriations, 24 RS HB 6/VO in Part, https://perma.cc/RQT2-ZM9X (last visited Apr. 29, 2024).

Virginia received over $2 billion in federal funds in the federal Fiscal Year 2022-23, subjecting them to Title IX.

204.    West Virginia's legislature has established at least twenty public institutions of higher learning.  W. Va. Code § 18B-2A-1(b).  Annually, public higher education institutions in West Virginia receive hundreds of millions of dollars in federal funds, subjecting them to Title IX.

205.    These postsecondary institutions use federal funds for many purposes, including student loans, student grant aid, research and service, veterans' affairs, and funding historically black colleges and universities.  Losing Title IX funds would require those institutions to eliminate certain educational services or seek new funding.  Additionally, students who rely on federal funds to attend those institutions might have their education interrupted, resulting in disenrollment or abandonment of a degree or other program.

206.    By a combination of law and policy, Tennessee public higher-education institutions that offer intercollegiate or intramural athletic teams or sports for "females," "women," or "girls" may not allow students of the male sex, as identified by a student's original birth certificate or other evidence, to participate on those teams or in those sports.  Tenn. Code Ann. § 49-7-180; TSSAA Handbook.  A similar law exists in other Plaintiff States.  *See* Ind. Code § 20-33-13-4; W. Va. Code § 18-2-25d.  Under Kentucky law, public and private postsecondary education institutions that are members of a national intercollegiate athletic association must "designate all intercollegiate and intramural athletic teams, activities, sports, and events" as "Men's," "Women's," or "Coed."  Ky. Rev. Stat. § 164.2813(1).  Institutions are required to prohibit a male from competing in any "intercollegiate or intramural athletic team, activity, sport or event designated as 'women's.'"  *Id*.  Eligibility to participate—as well as to use an athletic facility designated for the

exclusive use of a single sex—is determined by the student's sex at birth. Ky. Rev. Stat. § 164.2813(2).

207.    Plaintiff States thus face a credible threat that the Department of Education will enforce the Final Rule against them and terminate federal assistance to noncomplying state entities. *See* 20 U.S.C. § 1682; *cf.* 89 Fed. Reg. 33,543 (amended § 106.6(b)) ("clarify[ing]" that Title IX regulations preempt "any State or local law" conflicting with them).

208.    *Third*, Plaintiff States would be unable to enforce a number of their own laws without coming into conflict with the Final Rule. For example, in many cases, Plaintiff States' educational institutions that offer male-female sports would be forced to choose between complying with the State's statutes and existing rules and complying with the Final Rule's prohibition on gender-identity discrimination. *See, e.g.*, Tenn. Code Ann. § 49-6-310(a) (providing that "[a] student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth"); TSSAA Handbook (providing for boys and girls teams); Tenn. Code Ann. § 49-7-180 (similar for public higher-education institutions); *see also* Ind. Code § 20-33-13-4 (providing that "[a] male, based on a student's biological sex at birth in accordance with the student's genetics and reproductive biology, may not participate on an athletic team or sport designated under this section as being a female, women's, or girls' athletic team or sport"); Ky. Rev. Stat. § 156.070(2)(g)(3) ("An athletic activity or sport designated as 'girls' for students in grade six (6) through twelve (12) shall not be open to members of the male sex."); Ky. Rev. Stat. § 164.2813(1)(b) (prohibiting a male from competing in any team, activity, or event designated as "'women's'" at a postsecondary institution).

209.     Moreover, unlike the Final Rule, Tennessee law does not require any educational institution to allow students to access bathrooms and facilities "consistent with their gender identity" and provides that public schools may not accommodate a student's desire for greater privacy in multiple-occupancy facilities by allowing access to a restroom or changing facility that is designated for use by members of the opposite sex, as determined by immutable biological sex, while members of the opposite sex are present or could be present.  *Compare* 89 Fed. Reg. at 33,816, 33,818-20, *with*, Tennessee Accommodations for All Children Act, Tenn. Code Ann. § 49-2-801 *et seq.*; *see also* Tenn. Code Ann. §§ 49-2-802(2), (4) (incorporating Tenn. Code Ann. § 1-3-105(c)), -803(a).  Given that Tennessee gives public school students, teachers, and employees a private right of action for monetary damages against a school that "intentionally allow[s] a member of the opposite sex to enter [a] multi-occupancy restroom or changing facility while other persons were present," Tenn. Code Ann. § 49-2-805(a), Tennessee schools would also face potential liability arising from compliance with the Final Rule's mandate that students be allowed to use facilities associated with their gender identity.

210.     In Kentucky, it is clear that educational institutions will be asked to choose between following the Final Rule and state law.  Kentucky Revised Statutes § 158.189 requires local boards of education to adopt policies that do "not allow students to use restrooms, locker rooms, or shower rooms that are reserved for students of a different biological sex."  Interscholastic athletics for students in grades six through twelve must be designated as "Boys," "Girls," or "Coed," and the sex of a student for the purpose of determining eligibility to participate must be determined by the student's sex at the time of birth.  Ky. Rev. Stat. § 156.070(2)(g).  Additionally, athletic activities or sports designated as "Girls" "shall not be open to members of the male sex."  Ky. Rev. Stat. §

156.070(2)(g)(3).  The language of these statutes leaves no room for Kentucky schools to allow access to bathrooms or locker rooms inconsistent with the student's sex.

211.    Similarly, West Virginia would be unable to enforce many of its own laws without conflicting with the Final Rule's prohibition on gender-identity discrimination.  For instance, West Virginia law provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  W. Va. Code § 18-2-25d(c)(2).  This separation applies to "teams or sports that are sponsored by any public secondary school or a state institution of higher education."  *Id.* § (c)(1).  And sex-based sports teams have been part of West Virginia's public education system for at least 30 years.  *See, e.g.*, W. Va. Code R. § 127-2-3(3.8) (stating that "[s]chools may sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill").  Further, when a student is "aggrieved by a violation" of the law separating male and female sports, West Virginia law creates a private cause of action for "injunctive relief and actual damages."  W. Va. Code § 18-2-25d(d)(1).  So West Virginia schools would face potential liability under this provision from being forced to comply with the Final Rule.

212.    The Final Rule would also preempt Ohio laws governing athletics, *see* 87 Fed. Reg. at 41,404, causing irreparable harm to the State of Ohio's sovereign lawmaking authority.  The Ohio Revised Code provides that "[e]ach school that participates in athletic competitions or events administered by an organization that regulates interscholastic athletic conferences or events shall designate … [s]eparate teams for participants of the female sex within female sports divisions" and that "[n]o school, interscholastic conference, or organization that regulates interscholastic athletics shall knowingly permit individuals of the male sex to participate on athletic teams or in athletic competitions designated only for the female sex."  Ohio Rev. Code § 3313.5320(A), (B).

And Ohio law similarly requires that "[e]ach state institution of higher education or private college that is a member of the national collegiate athletics association, the national association of inter-collegiate athletics or the national junior college association shall designate … [s]eparate teams for participants of the female sex within female sports divisions" and that  "[n]o state institution or private college . . . shall knowingly allow individuals of the male sex to participate on athletic teams or in athletic competitions designated for only participants of the female sex." *Id.* § 3345.562(B), (C).

213.     Similarly, the Final Rule's prohibition of harassment based on gender identity could conflict with Plaintiff States' protections of student and faculty speech.  Even before finalizing the Final Rule, the Biden Department, like the Obama Department before it, used Title IX investiga-tions to promulgate its view of "faculty misgendering" as evidence of a "hostile environment based on sex" in violation of Title IX.[30]  And beyond such enforcement actions, educational institutions face the threat of private suit for violations of Title IX.  *See Davis*, 526 U.S. at 642-43, 650.

214.     By contrast, Tennessee law provides that public school teachers and employees are not "[r]equired to use a student's preferred pronoun when referring to the student if the preferred pronoun is not consistent with the student's biological sex."  Tenn Code Ann. § 49-6-5102(b); *see also id.* § 49-7-2405 (protecting speech in higher education institutions).  Indeed, Tennessee law

---

[30] Department of Education, *U.S. Department of Education's Office for Civil Rights An-nounces Resolution of Sex-Based Harassment Investigation of Taft College in California* (Oct. 19, 2023), https://perma.cc/47U8-VP2N (finding a faculty comment that a student's physical appear-ance was not "feminine enough," an administrator's exclusion of the student in addressing female students as "ladies," and "almost daily . . . faculty misgendering" created a hostile environment); *see also, e.g.*, Department of Education, *U.S. Department of Education's Office for Civil Rights Resolves Sex-Based Harassment Investigation in Rhinelander School District in Wisconsin* (July 6, 2023), https://perma.cc/79G5-F9T6 (categorizing teachers' use of "incorrect pronouns" as an allegation of harassment).

requires that a student "shall be enrolled in the name that appears on the student's certificate of live birth" and "shall be known by that lawful name in all facets of school records, report cards, student testing and any school activities." *Id.* § 49-6-5106.  Tennessee law also provides students a right to "[e]xpress religious viewpoints in a public school," *id.* § 49-6-2904, including those that reject the separation of "biological sex" and "gender."

215.     Similarly, in Indiana, the law protects the religious viewpoints of students and their parents, including those that reject the separation of "biological sex" and "gender."  *See* Ind. Code § 20-33-12-2 (providing that "[a] public school shall treat a student's voluntary expression of a religious viewpoint, if any, on an otherwise permissible subject in the same manner the public school treats a student's voluntary expression of a secular or other viewpoint on an otherwise per-missible subject and may not discriminate against the student based on a religious viewpoint ex-pressed by the student on an otherwise permissible subject").

216.     Kentucky law prohibits the Board of Education and the Kentucky Department of Education from requiring or recommending policies for the use of pronouns that do not align with the student's sex as determined at birth.  Ky. Rev. Stat. § 158.191(5)(b).  Additionally, local school districts cannot require school personnel or students to use pronouns inconsistent with a student's sex.  *Id.* § 158.191(5)(c).

217.     Further, the Constitution of Virginia protects the free-exercise and free-speech rights of Virginia citizens.  In *Vlaming v. West Point School Board*, the Supreme Court of Virginia held that a teacher who was terminated by a school board for refusing to violate his religious beliefs by using a transgender student's preferred pronouns stated a legally viable free-exercise claim under the Constitution of Virginia.  895 S.E.2d 705, 724 (Va. 2023).  Similarly, the teacher stated a legally viable "compelled speech" claim under the Constitution of Virginia.  *See id.* at 743.

67

218.     As the court held in *Tennessee v. U.S. Department of Education*, States have a "sovereign interest[] in enforcing their duly enacted state laws." 615 F. Supp.3d at 841.  In light of the conflict between Plaintiff States' laws and the Final Rule, Plaintiffs "will continue to face substantial pressure" to disregard their own laws "in order to avoid material legal consequences." *Tennessee*, 615 F. Supp. 3d at 841; *cf. LaShonda*, 526 U.S. at 657-58 (Kennedy, J., dissenting) ("[M]any school districts, desperate to avoid Title IX peer harassment suits, will adopt whatever federal code of student conduct and discipline the Department of Education sees fit to impose on them.").  And any time "a State is [prevented] from effectuating statutes enacted by representatives of its people," it suffers irreparable harm. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020); *see also Tennessee*, 615 F. Supp. 3d at 841 (collecting cases).

219.     And *fourth*, the Final Rule would force individual citizens of Plaintiff States to endure a variety of irreversible harms.  To name just a few: Students of both sexes would experience violations of their bodily privacy by students of a different sex.  *Cf. Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing that "most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating'" (citation omitted)) (collecting cases); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989) ("[E]xcretory function[s are] traditionally shielded by great privacy.").  In an effort to avoid such harm, schools might be forced to expend limited taxpayer resources on updating restrooms and other facilities to ensure student privacy.  The risk of "inappropriate sexual behavior" toward other students would be heightened too.  *Cf. Doe v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 464 (6th Cir. 2022) (addressing allegations of students taking advantage of semi-private school spaces, including bathrooms, to engage in "unwelcome sexual contact").

68

220.    Female athletes, for their part, would face unfair competition from physiologically superior competitors, would lose games, awards, and even championships to males, and would be exposed to a higher risk of injury.  *See* IWF Report at 41-50; *see also supra* ¶¶ 53-60.  Scholarships awarded to women would likely decrease as a result—and thereby, educational opportunity for women would decrease.  And depending on the Rule's effective date in a particular State, schools could be forced to adopt new policies in the middle of the school year, creating potential disruptions to student learning and long-term learning losses.[31]  Judicial relief would avert these harms.

## CLAIMS FOR RELIEF

### CLAIM I
### Violation of APA, 5 U.S.C. § 706(2)(A), (C)
### Agency Action Not in Accordance with Law and in Excess of Statutory Authority

221.    All allegations above are incorporated herein by reference.

222.    The Department of Education is a federal agency within the meaning of the APA.

223.    The Final Rule is "final agency action," 5 U.S.C. § 704, because it was published in the Federal Register following notice-and-comment rulemaking.  *See* 89 Fed. Reg. 33,474 (Apr. 29, 2024).  The Final Rule is the "'consummation' of the agency's decisionmaking process." *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 495 (6th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  And "legal consequences will flow" from the Final Rule, *see id.* at 496 (quoting *Bennett*, 520 U.S. at 178), because Plaintiff States' schools must now comply with the Rule or else risk their federal education funding and potential liability under Title IX's private right of action,

---

[31] *Cf.* Denise-Marie Ordway, *When Schools shut down: How education interruptions can hurt student achievement*, The Journalist's Resource (Aug. 28, 2021), https://perma.cc/VBM9-BV5L (collecting research).

*see, e.g.*, *S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 710 (6th Cir. 2023) (affirming damages award in private Title IX suit).

224.    Plaintiff States lack another adequate remedy in court, and no rule requires that they appeal to a superior agency authority before seeking judicial review.  5 U.S.C. § 704.

225.    The APA requires courts to set aside and vacate agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C); *Sierra Club v. EPA*, 60 F.4th 1008, 1021 (6th Cir. 2023) ("Reviewing courts certainly have the power to vacate an agency action they find unlawful."); *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) ("Vacatur is the normal remedy under the APA, which provides that a reviewing court 'shall … set aside' unlawful agency action." (quoting 5 U.S.C. § 706(2)).

226.    The Department's redefinition of sex discrimination is unlawful because it contravenes Title IX's text and the meaning of the Department's own regulations.

227.    *First*, the "'traditional tools' of statutory interpretation" confirm that the Department's interpretation is "contrary to the clear meaning of" Title IX itself.  *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) (quoting *Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  Congress expressly limited Title IX's coverage to discrimination "on the basis of sex," and the ordinary public meaning of "sex" at the time of Title IX's enactment unambiguously excludes consideration of a person's gender identity.  *See Adams*, 57 F.4th at 812, 815.  And *Bostock*, which assumed that "sex" "refer[ed] only to *biological* distinctions between male and female" and held merely that Title VII bars hiring and firing based on sexual orientation and transgender status, does not require a different reading.  *See id.* at 813-14 (quoting *Bostock*, 590 U.S. at 655); *see also Bostock*, 590 U.S. at 681.  Indeed, this Circuit has repeatedly recognized

70

that *Bostock*'s "reasoning applies only to Title VII." *L.W.*, 83 F.4th at 484 (collecting cases); *cf. id.* at 480-81 (holding that laws barring a girl's access to testosterone to treat gender dysphoria, but not a boy's for other purposes, do not discriminate based on sex). The Department nonetheless reads Title IX's unambiguous prohibition on "sex-based" discrimination to cover action that conflicts with an individual's gender identity. And it says this gender-identity mandate applies to private bathrooms and shower facilities, among other spaces, despite the statute's clear provision for "living facilities" to be separated between the sexes. *See* 20 U.S.C. § 1686; *see Adams*, 57 F.4th at 815 (equating "bathrooms" with "living facilities").

228.   "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Because the Department's interpretation contravenes Title IX's plain meaning, it exceeds the Department's lawful authority to "effectuate" Title IX's provisions. 20 U.S.C. § 1682; *see also Util. Air*, 573 U.S. 302, 327-28, 334; 5 U.S.C. § 706(2). This Court should adopt the reasoning of several courts that have invalidated similar readings of Title IX on this basis. *See supra* ¶ 4 (collecting cases).

229.   Alternatively, even if "sex" as used in Title IX were an ambiguous term, the Department's interpretation would not be entitled to *Chevron* deference. For one, the Department's reading falls outside the range of reasonable interpretations of the statutory text because it purports to resolve a policy issue of major political significance without clear congressional authority, *see West Virginia v. EPA*, 597 U.S. 697, 721-25 (2022), and fails to "construe[ 'on the basis of sex'] to avoid serious constitutional doubts," *Brawner v. Scott Cnty.*, 14 F.4th 585, 592 n.2 (6th Cir. 2021) (quoting *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 516 (2009)); *see also infra* Claim II. For another, the Department has read Title IX to impose a new federal-funding condition in an area in which States "historically have been sovereign"—the education field. *United States v.*

*Lopez*, 514 U.S. 549, 564 (1995).  In such areas, "it is insufficient merely that an agency reasonably liquidated ambiguities in the relevant statute"; rather, "Congress *itself* must have spoken with a 'clear voice.'"  *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

230.    To the extent *Chevron* would permit the Department's interpretation, that decision should be reconsidered.  *Cf. Loper Bright Enters. v. Raimondo*, No. 22-451 (U.S. argued Jan. 17, 2024) (presenting question "[w]hether the Court should overrule *Chevron*").

231.    *Second*, the Department's reading of Title IX violates the "elemental principle of administrative law that agencies are bound to follow their own regulations."  *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010).  Here, the Department has chosen to leave the 1975 regulations—allowing sex-separated "toilet, locker room, and shower facilities," among other things—on the books unchanged.  *See* 89 Fed. Reg. at 33,816, 33,819, 33,820 (discussing 34 C.F.R. §§ 106.33-.34); *supra* ¶¶ 148-51.  But these regulations expressly contemplate and permit schools' dividing certain areas based on students' sex, not other characteristics like gender identity. The Department's gender-identity mandate thus conflicts with these regulations by rendering their core sex-based distinctions "meaningless."  *Adams*, 57 F.4th at 813.

232.    Because the Department's interpretation of Title IX conflicts with the statutory text and operative regulations, it is not entitled to deference and exceeds the Department's legal authority to implement Title IX.  The Final Rule therefore should be declared unlawful, "set aside," and vacated.  *See* 5 U.S.C. § 706(2).

### CLAIM II
### Violation of APA, 5 U.S.C. § 706(2)(A), (B)
### Agency Action Contrary to the U.S. Constitution

233.    All allegations above are incorporated herein by reference.

234.    The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity."   5 U.S.C. § 706(2)(B); *see also id.* § 706(2)(A); *Sierra Club*, 60 F.4th at 1021; *Long Island Power Auth.*, 27 F.4th at 717.

235.    The Final Rule is unconstitutional—and thus violates the APA—in multiple ways.

236.    *First*, if Title IX means what the Department says in the Final Rule, then Title IX's prohibition on sex discrimination transgresses the Spending Clause several times over.  *See* U.S. Const. art. I, § 8, cl. 1.

237.    "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Adams*, 57 F.4th at 815 (quoting *Pennhurst*, 451 U.S. at 17).  That framework means that "if Congress intends to impose a condition on the grant of federal moneys [under its Spending Clause authority], it must do so unambiguously."  *Id.* (quoting *Pennhurst*, 451 U.S. at 17).  As this Circuit has directed, this Spending Clause "clear-statement rule" applies with particular force when a federal-funding condition "encroache[s] upon a traditional state power," such as the regulation of education.  *Yellen*, 54 F.4th at 354 (quoting *SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001)); *see also Lopez*, 514 U.S. at 564.

238.    All agree that Congress passed Title IX "pursuant to its authority under the Spending Clause."  *Adams*, 57 F.4th at 815.  So, the Department can enforce the Final Rule's reading of Title IX against the States only if that reading is unambiguously directed by Title IX's text.  *Id.* at 815-16.  As the Eleventh Circuit correctly held in *Adams*, the Department's position does not clear that high hurdle.  *Id.* at 816.  At *best*, the text is ambiguous, and ambiguous statutes cannot support new duties on the part of Spending Clause recipients.  *Id.* at 815-16; *accord Yellen*, 54 F.4th at 354

("Congress *itself* must have spoken with a 'clear voice'" to satisfy the Spending Clause's clear-statement rule (quoting *Pennhurst*, 451 U.S. at 17)).

239.    The Final Rule also runs afoul of other Spending Clause limits.  To start, given that Plaintiff States' non-compliance would threaten immense sums in federal monies distributed to State educational institutions—including some $1.5 billion to Tennessee alone—the Rule unconstitutionally leaves Plaintiff States with "no real option but to acquiesce" to the Department's interpretation, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78, 580-82 (2012) (opinion of Roberts, C.J., joined by Breyer & Kagan, JJ.).  Second, the Final Rule impermissibly conditions federal funding on States' and school recipients' taking unconstitutional actions against faculty and students for engaging in protected expression.  *See South Dakota v. Dole*, 483 U.S. 203, 210-11 (1987); *infra* ¶¶ 242-44.  Finally, extending Title IX's protections to individuals based on gender identity alone is not related, as it must be, to the statute's purpose of remedying past discrimination against women and promoting equal opportunity for women in education.  *See South Dakota*, 483 U.S. at 207-08; *supra* ¶¶ 38-49.  For these additional reasons, the Final Rule unlawfully exceeds Congress's Spending-Clause power.

240.    *Second*, to the extent the Department asserts authority to define new "discriminatory practices" that violate Title IX exclusively "through [its] regulations," 89 Fed. Reg. at 33,517, 33,560, that position would transgress "the Constitution's rule vesting federal legislative power in Congress," not agencies acting by "pen-and-phone regulations."  *West Virginia*, 597 U.S. 737, 753 (Gorsuch, J., concurring).  Reading "sex" as a term capacious enough to encompass a controversial gender-identity mandate, among other novelties, would shift "unfettered" lawmaking power to the Department in a manner the nondelegation doctrine does not tolerate.  *See Tiger Lily, LLC v. U. S. Dep't of Hous. & Urban Dev.*, 5 F.4th 666, 672 (6th Cir. 2021).

241.    *Third*, the Final Rule violates the First and Fourteenth Amendments to the U.S. Constitution.  *See* U.S. Const. amends. I, XIV.

242.    To the extent the Biden Administration acts consistently with prior enforcement practice, *see supra* ¶¶ 81-82, 213 & note 30, and interprets the Final Rule to compel school administrators and faculty to use gender-identity-based pronouns for a student, the Final Rule would violate the First Amendment.  *Cf. Davis*, 526 U.S. at 642-43, 650 (recognizing that a school's Title IX liability extends to sexual harassment of a student by teachers and peers).  The First Amendment protects at least the rights of professors at public universities to decline to use pronouns inconsistent with the student's sex when teaching.  *See Meriwether*, 992 F.3d at 498-500, 505.  And disciplining a professor or other member of an educational community for failing to follow a school pronoun policy can violate the Free Exercise Clause.  *Id.* at 512, 514.  Either way, such an interpretation of the Final Rule would flout the First Amendment.

243.    The Final Rule's expansive definition of "hostile environment harassment" creates further First Amendment problems.  89 Fed. Reg. at 33,493, 33,884.  Under the Final Rule, this concept covers all expression—even personal speech made in online forums off campus—that might "reasonably" be deemed "unwelcome" and that is so "severe" as to "limit" students' educational participation based on their sex.  *Id.* at 33,535, 33,562, 33,884 (amending 34 C.F.R. § 106.02).  But the Department then defines sex-based harassment to include harassment based on characteristics extending far beyond sex, including various "sex characteristics" and "gender identity."  *Id.* at 33,756, 33,886 (34 C.F.R. §§ 106.02, .10).  This broad framework inhibits First Amendment rights by chilling, or risking liability over, students' expression on deeply held views regarding significant moral and political issues.

75

244.     Additionally, by requiring school administrators to "respond promptly and effec-tively" to accommodate a student's stated gender identity, 89 Fed. Reg. at 33,533, 33,888 (amend-ing § 106.444(a)); *see also supra* ¶¶ 112, 163-64, the Final Rule trespasses on the "substantive and procedural protection[s]" our Constitution extends to cover the right of parents to "[]bring [up]" their children as they deem fit.  *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)).  The Final Rule's statement that schools should defer to parental wishes about whether "to make a complaint" about or how "to address" sex discrimination is no answer.  89 Fed. Reg. at 33,821-22.  That language does not purport to excuse schools from following the Final Rule's directive that sex discrimination encompasses gender-identity preferences, or otherwise state that parental opposition requires excepting students from Title IX's new reach.

245.     Because the Final Rule is unconstitutional in the ways discussed above, it should be declared unlawful, "set aside," and vacated.  5 U.S.C. § 706(2).

### CLAIM III
### Violation of APA, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious Agency Action

246.     All allegations above are incorporated herein by reference.

247.     Federal law prohibits agency actions, findings, and conclusions that are "arbitrary, capricious," or "an abuse of discretion."  5 U.S.C. § 706(2)(A).

248.     A federal agency acts in an "arbitrary and capricious" manner when it (1) "has re-lied on factors which Congress has not intended it to consider"; (2) "entirely fail[s] to consider an important aspect of the [regulatory] problem"; (3) "offer[s] an explanation for" its conduct "that runs counter to the evidence before" it; or (4) reaches a determination that "is so implausible … it

could not be ascribed to a difference in view or … agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

249.    In adopting the Final Rule over commenters' widespread opposition and decades of contrary practice, the Department has acted arbitrarily and capriciously.

250.    *First*, the Department fails to offer a "reasoned explanation" for the Final Rule's departure from the historic understanding of the meaning of Title IX's prohibition on "sex" discrimination, which regulations have codified since 1975 (*see supra* ¶¶ 69-74). *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). The Final Rule retreats from the reality-blinking statement that the Department "does not have a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'" 87 Fed. Reg. at 41,537. Instead, citing *Bostock*, the Final Rule claims that the Department's interpretation is entirely consistent with reading "sex" to mean "biological sex." 89 Fed. Reg. at 33,802, 33,805.

251.    *Bostock*, though, *disclaimed* that its reasoning "address[ed] bathrooms, locker rooms … or anything else of the kind." *Tennessee*, 615 F. Supp. 3d at 817 (quoting *Bostock*, 590 U.S. at 681). Further, as the Sixth Circuit has held, "the rule in *Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp., Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). By definition, *Bostock* thus cannot excuse the inconsistency between the Department's longstanding view that enforcing sex-separation in spaces like bathrooms, locker rooms, and shower facilities is not sex discrimination, on the one hand, and its new rule deeming such policies actionable Title IX discrimination, on the other.

252.    Such "[u]nexplained inconsistency in agency policy is a reason for holding [the Department's] interpretation to be an arbitrary and capricious change." *Encino Motorcars*, 579 U.S. at 222 (cleaned up). Indeed, the Department's internally conflicting analysis suggests that

the Final Rule's *Bostock*-based justifications for redrawing Title IX reflect "contrived reasons" offered to support a predetermined result:  Effectuating President Biden's day-one directive to find new federal authority for adopting "prohibitions on sex discrimination on the basis of gender identity or sexual orientation."  Exec. Order No. 13,988, 86 Fed. Reg. at 7,023 (capitalization altered); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019).

253.   *Second* and relatedly, the Department fails to "engage in 'reasoned decisionmaking.'"  *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).  This APA requirement means agencies cannot rest on "statements contradict[ing] earlier responses."  *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015).

254.   Yet the Department's stated reasoning offers "self-contradictory … logic" in spades.  *Id.* at 16 (citation omitted).  The Department points to Congress's allowing sex-separation in "living facilities" and 20 U.S.C. § 1681(1)-(9)'s exceptions as justification for omitting such facilities and programs from its gender-identity mandate.  89 Fed. Reg. at 33,816, 33,818-19.  But the Department arbitrarily declines to extend the same treatment to bathrooms, toilets, and showers, which its regulations likewise permit to be separated based on sex.  *Supra* ¶¶ 148-49.  Nor can the Department identify a rational basis for allowing school activities and programs associated with Girls and Boys State to restrict participation based on sex, *see* § 1686(a)(7), yet requiring the participation of boys identifying as girls in sex-ed classes for girls.  Nor can it explain why its "longstanding athletics regulations" support continuing to allow some (unspecified) enforcement of sex-separate sports, 89 Fed. Reg. at 33,817, but the equally longstanding regulations governing bathrooms and locker rooms do not.  Nor can the Department defend its assertion that consistently

enforcing sex-separation policies based on persons' "physical differences" violates Title IX, since such differences underlie Title IX's entire statutory and regulatory scheme. *Id.* at 33,819.

255.  *Third*, the Department failed to adequately "consider and respond to significant comments received during the period for public comment" on the Final Rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Commenters raised a raft of concerns about the constitutional defects and compliance challenges attending the Final Rule's approach. But in response to many, the Final Rule offers only a "handful of conclusory sentences" and "unexplained inconsistencies." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated as moot*, 142 S. Ct. 1665 (Mem.) (2022); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015). "Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not the hallmark of reasoned decisionmaking." *Gresham*, 950 F.3d at 103.

256.  Examples of the Department's flawed approach abound. The Final Rule claims "nothing in the[] regulations" conflicts with the First Amendment. *E.g.*, 89 Fed. Reg. at 33,500, 33,507, 33,535, 33,819. Yet it relies on Title VII EEOC harassment guidance that implicates free-speech rights on its face. *Supra* ¶¶ 180-81. The Final Rule defers consideration of constitutional concerns to future "technical assistance" documents, *id.* at 33,822, and enforcement actions, *id.* at 33,512, saying it can only address "specific examples" with future facts, *id.* at 33,509, 33,512. Yet elsewhere the Final Rule references examples provided for "illustrative purposes." *Id.*; *supra* ¶ 162. Regardless, promising to address future chaos does not adequately address the Final Rule's here-and-now legal problems. *See Bloomberg L.P. v. SEC*, 45 F.4th 462, 476-77 (D.C. Cir. 2022).

257.  *Fourth*, the Department "entirely fail[s] to consider [certain] important aspect[s] of the problem" or address relevant evidence that "runs counter" to its cost-benefit determination. *State Farm*, 463 U.S. at 43. The Department altogether ignores States' practical concerns about

authenticating gender identity, and likewise sidesteps commenters' objections that the Final Rule endangers privacy and safety interests. *See supra* ¶¶ 168-70. The Department rejects the view that the Final Rule will "lessen[] the force of Title IX's protections against discrimination that limits educational opportunities for girls and women," 89 Fed. Reg. at 33,808, ignoring the evidence that men identifying as women have already taken such opportunities from women, *see supra* ¶ 172. The Department fails to consider evidence of the biological differences between men and women that have long justified sex-separated facilities, certain sex-separated classes, and sex-separated sports. *See supra* ¶ 13. And the Department downplays the grave compliance challenges with structuring school operations based on internal notions of gender identity that are subjective and subject to change. Tennessee Programs-and-Facilities Comment at 8-9.

258.    For any and all of the preceding reasons, the Secretary's promulgation of the Final Rule was "arbitrary [and] capricious" and an "abuse of [agency] discretion," and the Rule should therefore be declared unlawful, "set aside," and vacated. 5 U.S.C. § 706(2).

### CLAIM IV
### Relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and 5 U.S.C. § 706
### Claim for Declaratory Judgment Against Defendants

259.    All allegations above are incorporated herein by reference.

260.    The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

261.    This case presents an actual controversy. The Final Rule operates on recipients of Title IX funds directly, meaning its requirements affect their legal rights. Moreover, the imminent enforcement of the Department's Final Rule threatens to force state recipients of Title IX funding

to choose between violating State Plaintiffs' laws and abandoning consistent policies or losing their Title IX funding—funding that amounts to many billions annually.

262.    The controversy involves questions of federal law and thus arises in this Court's jurisdiction.  Venue is proper, as the Commonwealth of Kentucky resides in this District.

263.    Through this Complaint, the Plaintiff States have filed an appropriate pleading to have their rights declared.  The Court can resolve this controversy by declaring that Plaintiffs have a right to Title IX funding notwithstanding state policies and legal directives that students participate in covered education programs and activities based on their sex, not gender identity.

## PRAYER FOR RELIEF

An actual controversy exists between the parties that entitles Plaintiff States to declaratory and injunctive relief.  Plaintiff States request that this Court:

a)      Enter a stay of the Final Rule's effective date under 5 U.S.C. § 705 and a preliminary injunction enjoining Defendants, and any other agency or employee of the United States, from enforcing or implementing the portions of the Final Rule that violate Title IX, the APA, and the U.S. Constitution;

b)      Enter a judgment declaring, pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706, that (i) the Final Rule's interpretation of Title IX is unlawful; (ii) that the Final Rule is arbitrary and capricious; and (iii) that the Plaintiff States, their political subdivisions, and their resident institutions may continue receiving Title IX funding notwithstanding any failure to adhere to the Final Rule's unlawful requirements;

c)      Set aside and vacate the Final Rule on the basis that it violates Title IX, the APA, and the U.S. Constitution, pursuant to 5 U.S.C. § 706;

    d)      Permanently enjoin Defendants from withholding Title IX funding from Plaintiff

        States, their political subdivisions, and resident institutions for refusing to comply

        with the Final Rule's unlawful requirements; and

    e)      Grant any and all other relief the Court deems just and proper.

Dated: April 30, 2024                  Respectfully submitted,

<table>
<tr><td>

**RUSSELL COLEMAN**
  Attorney General

*/s/ Justin D. Clark*
JUSTIN D. CLARK
  Civil Chief
VICTOR B. MADDOX
  Counsel for Special Litigation
LINDSEY R. KEISER
  Assistant Attorney General
**Kentucky Office of the Attorney General**
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
victor.maddox@ky.gov
justind.clark@ky.gov
lindsey.keiser@ky.gov

*Counsel for the Commonwealth of Kentucky*

</td><td>

**JONATHAN SKRMETTI**
  Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE*
  Solicitor General
WHITNEY D. HERMANDORFER*
  Director of Strategic Litigation
STEVEN J. GRIFFIN*
  Senior Counsel for Strategic Litigation &
Assistant Solicitor General
VIRGINIA N. ADAMSON*
  Counsel for Strategic Litigation &
Assistant Solicitor General
BRIAN DANIEL MOUNCE*
  Counsel for Strategic Litigation &
Assistant Solicitor General
**Office of the Tennessee Attorney General**
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3491
matt.rice@ag.tn.gov
whitney.hermandorfer@ag.tn.gov
steven.griffin@ag.tn.gov
jenna.adamson@ag.tn.gov
brian.mounce@ag.tn.gov

*Counsel for the State of Tennessee*

</td></tr>
</table>

**THEODORE E. ROKITA**
  Attorney General

*/s/ James A. Barta*
JAMES A. BARTA*
  Solicitor General
CORRINE L. YOUNGS*
  Policy Director and Legislative Counsel
JOSHUA DAVID*
  Deputy Attorney General - Policy
**Indiana Attorney General's Office**
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov
corrine.youngs@atg.in.gov
joshua.david@atg.in.gov

*Counsel for the State of Indiana*


**DAVE YOST**
  Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
  Solicitor General
MATHURA SRIDHARAN*
  Deputy Solicitor General
**Office of the Ohio Attorney General**
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*


**JASON S. MIYARES**
  Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER*
  Principal Deputy Solicitor General
BRENDAN T. CHESTNUT*
  Deputy Solicitor General
**Virginia Attorney General's Office**
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for the Commonwealth of Virginia*


**PATRICK MORRISEY**
  Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS*
  Principal Deputy Solicitor General
**Office of the West Virginia Attorney General**
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

* *Pro Hac Vice* application forthcoming