**Exhibit C**

Jonathan Skrmetti, Letter to Miguel Cardona, ED-2022-OCR-0143-148789 (May 15, 2023).



# STATE OF TENNESSEE
# Office of the Attorney General

**JONATHAN SKRMETTI**
ATTORNEY GENERAL AND REPORTER

P.O. BOX 20207, NASHVILLE, TN 37202
TELEPHONE (615)741-3491
FACSIMILE (615)741-2009

May 15, 2023

**SUBMITTED ELECTRONICALLY**
  **VIA REGULATIONS.GOV**

The Honorable Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

Dear Secretary Cardona:

The States of Tennessee, Alabama, Alaska, Georgia, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Ohio, South Carolina, South Dakota, Texas, Utah, and Virginia submit the following comment on the U.S. Department of Education's proposed rule about "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams," 88 Fed. Reg. 22860 (Apr. 13, 2023). The States have an interest in providing equal athletic opportunities for their students.

Unfortunately, the proposed rule continues the Department's misguided crusade to "create[] rights for students and obligations for regulated entities not to discriminate based on . . . gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations." *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 839 (E.D. Tenn. 2022), *appeal argued*, No. 22-5807 (6th Cir. Apr. 26, 2023). And the proposed rule's preference for "commingling" biologically male and biologically female students "in the female athletics arena would significantly undermine the benefits afforded to female student athletes under Title IX's allowance for sex-separated sports teams." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819 (11th Cir. 2022) (en banc) (Lagoa, J., specially concurring). Title IX does not authorize the Department to privilege concerns about gender identity over providing equal athletic opportunities for members of the female sex, for whom "athletic opportunities" were "limited" before Title IX. 34 C.F.R. § 106.41(b).

The Department's claimed purpose of "clarify[ing] Title IX obligations," 88 Fed. Reg. 22861, is belied by the proposed rule's reliance on unclear terms that appear nowhere in Title IX or

1

implementing regulations already in the Code of Federal Regulations.  The Department has failed to define adequately terms such as "sex-related criteria" and "important educational objective."  Even if the Department defines those terms in the final rule, nothing in the text of Title IX suggests that "Congress provide[d] the States with a clear statement" that Title IX imposed such an obligation on the States when they originally accepted federal funding.  *Adams*, 57 F.4th at 815 (majority).  In 1972, "when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., between males and females."  *Id.* at 812.  The proposed rule's use of terms such as "female" and "male" to refer to gender identity is inconsistent with Title IX.

On top of the proposed rule's substantive shortcomings, the Department has failed to provide the meaningful opportunity to comment that the Administrative Procedure Act requires.  The Department provided the public only 32 days to comment on the proposed rule after publishing it in the Federal Register.  The Department acknowledged its failure to develop or consider necessary quantitative data, 88 Fed. Reg. 22861, 22879-80, and to conduct the required federalism analysis, *id.* at 22890.

In light of those gaps, Tennessee and 22 other States promptly asked the Department to extend the comment deadline to the usual 90 days.  *See* Tennessee & 22 Co-Signing States, Comment Deadline Extension Request, ED-2022-OCR-0143-10614 (Apr. 21, 2023).  The Department responded by denying the request two weeks later.  The Department's refusal to extend the comment deadline is confirmation that the agency's mind is closed on whether Title IX prohibits discrimination based on gender identity.

Accordingly, the Department should scrap the proposed rule and leave the current athletics regulation in place.  Title IX provides no justification for rewriting a rule that has remained substantively unchanged for nearly half a century.  Nothing in the text of Title IX permits the Department to impose obligations on regulated entities with the goal of allowing students to participate on athletic teams "consistent with their gender identity" but inconsistent with their sex.  88 Fed. Reg. 22891.  If your agency instead continues its efforts to rewrite the law by executive fiat, the States will turn to the courts to protect the States' sovereignty from federal interference and their student-athletes, coaches, and teachers from harm.

**I.      The Department's proposed rule conflicts with Title IX and violates the Constitution.**

The Department has an obligation to "reasonably explain[]" how its rules fit within its lawful administrative authority.  *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 596 (D.C. Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).  But because the Department disregards the text of Title IX and multiple constitutional restraints, there is no reasonable explanation for its assault on sex-separated sports teams, which have expanded athletic opportunities for female athletes.  Nothing in Title IX conditions schools' ability to sex-separate sport teams on proving, "for each sport, level of competition, and grade or education level," that sex separation is "substantially related to the achievement of an important educational objective" *and* does not stop students from participating on teams "consistent with their gender identity" but inconsistent with their sex.  88 Fed. Reg. 22891.  The Department is fabricating requirements out of thin air to achieve policy goals that no member of Congress in 1972 ever contemplated.

2

### A.   The Department's proposed rule conflicts with Title IX's text, structure, and purpose of expanding opportunities for members of the female sex.

The Department cannot lawfully promulgate rules that conflict with Title IX. *E.g.*, *Children's Health Def. v. FCC*, 1045, 1052 (D.C. Cir. 2022). Title IX's meaning comes from its terms, "read in context," and in light of "the problem Congress sought to solve." *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004)). In enacting Title IX, Congress required that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "[N]owhere in" Title IX is there an "obligation[] for regulated entities not to discriminate based on . . . gender identity" or a ban on categorically sex-separating athletic teams while providing equal athletic opportunities for both sexes. *Tennessee*, 615 F. Supp. 3d at 839.

### 1.   In Title IX, "sex" means biological sex, not gender identity.

To begin with, Title IX explicitly addresses "sex," not gender identity. 20 U.S.C. § 1681(a). "Sex" in Title IX refers only to biological sex, not gender identity. Because Title IX does not provide a statutory definition of "sex," courts "interpret the word[] consistent with [its] ordinary public meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (cleaned up).

In 1972, "the overwhelming majority of dictionaries defin[ed] 'sex' on the basis of biology and reproductive function," not gender identity. *Adams*, 57 F.4th at 812-13 (collecting dictionaries); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020) (Niemeyer, J., dissenting) ("[V]irtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females."); *accord Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex . . . is an immutable characteristic determined solely by the accident of birth."). In 1961, the Oxford English Dictionary defined "Sex" as "[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these." 9 Oxford English Dictionary 578 (1961). In 1970, the American College Dictionary defined "Sex" to mean "the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished." The American College Dictionary 1109 (1970). The year after Title IX became law, Random House defined "Sex" as "either the male or female division of a species, esp. as differentiated with reference to the reproductive functions." The Random House College Dictionary 1206 (rev. ed. 1973). And a few years after that, the American Heritage Dictionary defined "Sex" as "[t]he property of quality by which organisms are classified according to their reproductive functions." American Heritage Dictionary 1187 (1976). Each of these sources indicate that Title IX uses "sex" as a reference to the categories of "male" and "female," which "simply are not physiologically the same." *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (citing and discussing *United States v. Virginia*, 518 U.S. 515 (1996)).

Title IX itself repeatedly uses the biological binary of sex. For example, Title IX speaks of permitting sex-based discrimination among ''Men's'' and ''Women's'' associations and organizations for ''Boy[s]'' and ''Girls,'' "the membership of which has traditionally been limited

3

to persons of one [or the other] sex." 20 U.S.C. § 1681(a)(6)(B). The statute also describes how an institution may change "from . . . admit[ting] only students of one sex" (that is, male or female) "to . . . admit[ting] students of both sexes" (male and female). 20 U.S.C. § 1681(a)(2).[1] Title IX thus treats "sex" as having two biological possibilities: male or female.

### 2. Sex-differentiation is not sex-discrimination under Title IX.

Title IX makes clear that differentiating biological boys from biological girls is not enough to constitute a Title IX violation.[2] Section 1681(a) prohibits "exclud[ing]" a member of one sex from "participation in" educational programs, "den[ying] the benefits of" such a program to a member of one sex, or otherwise "subject[ing] to discrimination" a member of one sex "on the basis of sex." Title IX does *not* say that merely separating boys from girls equates to discrimination when members of both sexes have equal educational opportunities.

If there were any doubt that a construction of Title IX equating separation with discrimination is wrong, Congress expressly clarified that, "[n]otwithstanding anything to the contrary contained in [Title IX], nothing contained herein shall be construed to prohibit any educational institution . . . from maintaining separate living facilities for the different sexes." 42 U.S.C. § 1686; *see also Adams*, 57 F.4th at 813 ("[I]f 'sex' were ambiguous enough to include 'gender identity,' . . . then this carve-out, as well as the various carveouts under the implementing regulations, would be rendered meaningless."). Senator Bayh, the chief sponsor of Title IX in the Senate, explained that this statutory instruction on how to construe Title IX was intended to "permit differential treatment by sex . . . in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5,807 (1972). It makes little sense to read Title IX as rigorously policing "sex-related criteria" for determining whether someone is a boy or a girl when trying out for an athletics team while the statute itself categorically allows separating locker rooms using biological sex.

### 3. Longstanding regulations require or allow distinguishing the two sexes.

For nearly half a century, Title IX regulations in the Code of Federal Regulations have allowed, and sometimes required, schools to separate the two sexes in athletics and other contexts. As the preamble to the proposed rule acknowledges, in 1974 "Congress enacted the Javits Amendment in response to concerns that Title IX would disrupt existing practices in intercollegiate athletics," where there were particular concerns about resource imbalances. 88 Fed. Reg. 22862. Congress's grant of rulemaking authority "relating to the prohibition of sex discrimination" in all "federally assisted education programs" was hardly an excuse for federal agencies to disrupt non-collegiate athletics. 88 Stat. 484, 612.

---

[1] Consequently, the Department of Education has historically construed the term "sex" in Title IX to mean biological sex—not gender identity. *E.g.*, 85 Fed. Reg. 30178 (May 19, 2020) ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification. . . . In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes.").

[2] Not only does this analysis help define what constitutes unlawful discrimination, it also demonstrates that Congress meant for "sex" to mean "biological sex."

4

Accordingly, the U.S. Department of Health, Education, and Welfare ("HEW")—the predecessor to the Department of Education—adopted Title IX regulations that allowed sex-separated athletic teams when institutions "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). The regulation, which has remained substantively unchanged since its initial enactment in 1975, expressly allows "a recipient to operate or sponsor separate teams for members of each sex where selection is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b).

The only exception is that "members of that sex" for whom "athletic opportunities" "have previously been limited"—understood by everyone in the 1970s to mean members of the female sex—can try out for a non-contact sports team when a school offers such a team for males but does not offer such a team for females. *Id.* The regulation is premised on the existence of a biological binary distinguishing "one sex" from "the other sex." *Id.* Even when a school offers only a basketball team for boys, the regulation expressly allows the categorical exclusion of all girls through a broad definition of "contact sports" because the regulation seeks to protect female athletes from "bodily contact" with males regardless of their grade level. *Id.*

With no way to reliably distinguish boys from girls, schools would not be able to provide equal athletic opportunities for female student-athletes as the regulation requires. After HEW enacted the regulation, HEW immediately issued a Fact Sheet to explain the rule. HEW Fact Sheet, *Title IX – Civil Rights* (June 1975), https://bit.ly/3K2rCSy. HEW explained that the regulation *allowing* sex-separated teams did "not alter the responsibility which a recipient has with regard to the provision of equal opportunity." *Id.* at 7. Accordingly, an institution "would be *required* to provide separate teams for men and women[] in situations where the provision of only one team" with both sexes "would not 'accommodate the interests and abilities of both sexes.'" *Id.* (emphasis added) (quoting the equivalent of 34 C.F.R. § 106.41(c)(1)).

The public also understood that, "if teams theoretically open to all on a competitive basis result in exclusion of women from athletic participation, separate teams for women may be required by the regulation and are certainly required by the statute itself." *Implementing Title IX: The HEW Regulations*, 124 U. Pa. L. Rev. 806, 840 (1976); *see also Cape v. TSSAA*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that[,] were play and competition not separated by sex, the great bulk of females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement."). Schools need reliable methods, such as original unaltered birth certificates, to distinguish between boys and girls so that they can protect girls' sports from (biological) boys who want to compete against girls.

Other regulations require or at least permit schools to distinguish between boys and girls. Title IX regulations *require* universities to distinguish between "each sex" when awarding athletic scholarships. 34 C.F.R. § 106.37(c). And, consistent with 42 U.S.C. § 1686, schools may provide "separate toilet, locker room, and shower facilities on the basis of sex," as long as "facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. These regulations assume sex is a biological binary, allow sex separation as long as schools provide equal opportunities for both sexes, and include no limitation about minimizing harm related to gender identity.

As the Department notes, the 1975 HEW regulations "were subject to a statutory 'laying before' provision, designed to afford Congress an opportunity to examine the proposed regulations and disapprove them by regulation within 45 days if Congress deemed them to be inconsistent with Title IX." 88 Fed. Reg. 22862 (quotation omitted). If the "fact that no such disapproval resolution was adopted 'strongly implies that the [Title IX] regulations accurately reflect congressional intent,'" then the fact that Congress allowed the regulations to go into effect without any rule like the one the Department now proposes decades later is yet more proof that the Department is departing from the text of Title IX. *Id.* at 22862-63 (alteration in original) (quoting *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984)). In fact, one week after the Department promulgated the proposed rule, the U.S. House of Representatives passed the "Protection of Women and Girls in Sports Act of 2023" to ban outright allowing males to compete in female sports and to define sex "based solely on a person's reproductive biology and genetics at birth." H.R. 734 (2023). The proposed rule is simply an unlawful attempt to achieve by rulemaking what Congress has not required in Title IX.

### 4. *Bostock* provides no excuse for the proposed rule.

In its narrowly circumscribed decision in *Bostock v. Clayton County*, the Supreme Court held that firing an employee "simply for being homosexual or transgender" constitutes discrimination "because of . . . sex" under Title VII. 140 S. Ct. 1731, 1737-38 (2020) (quoting 42 U.S.C. § 2000e-2(a)(1)). In reaching that conclusion, however, the Court "assum[ed]" that the term "sex" means "biological distinctions between male and female." *Id.* at 1739. And the Court made clear that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues that were not before the Court. *Id.* at 1753; *cf. Pelcha v. MW Bancorp, Inc.*, 988 F. 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself.").

Nor is *Bostock*'s analysis necessarily applicable to Title IX. As the Sixth Circuit has explained, "Title VII differs from Title IX in important respects." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). It therefore "does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Id.* Unlike Title VII, Title IX expressly authorizes sex-separated living facilities, *id.* (citing 20 U.S.C. § 1686), and its implementing regulations require universities to "consider sex in allocating athletic scholarships," *id.* (citing 34 C.F.R. § 106.41(c)).

Even if *Bostock*'s analysis applied to Title IX with respect to employment termination, that analysis would not extend to decisions concerning athletics. Discrimination requires treating individuals "worse than others who are similarly situated." *Bostock*, 140 S. Ct. at 1740. While "[a]n individual's homosexuality or transgender status *is not relevant* to employment decisions" about hiring and firing, *id.* at 1741 (emphasis added), sex *is relevant* in contexts such as athletics or living facilities where physiological differences between the sexes matter. As Justice Thurgood Marshall put it, "[a] sign that says 'men only' looks very different on a bathroom door than a courthouse door." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *see also Virginia*, 518 U.S. at 550 n.19 (acknowledging that admitting women to the Virginia Military Institute "would

6

undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements").

So too for athletics. "When the classification, as here, relates to athletic activity, it must be apparent that" there are "distinct differences in physical characteristics and capabilities between the sexes." *Cape*, 563 F.2d at 795. The Department itself agreed shortly after *Bostock* that Title IX and implementing regulations "require[] a recipient providing separate athletic teams to separate participants solely based on their biological sex, male or female, and not based on transgender status . . . to comply with Title IX." U.S. Dep't of Educ., Memorandum from Reed D. Rubinstein to Kimberly M. Richey Re: Bostock v. Clayton Cnty., 140 S. Ct. 1731 (2020), at 7 (Jan. 8, 2021), https://bit.ly/3mwKI7H ("Rubinstein Memorandum"). The Rubinstein Memorandum agreed with the States that a "person's biological sex *is* relevant for the considerations involving athletics" because "of physiological differences between males and females." *Id.* The Department has mothballed the Rubinstein Memorandum. *See* 88 Fed. Reg. 22864. But the Department has failed to explain why the Rubinstein Memorandum, existing regulations, and historical agency practice all had Title IX wrong. *Cf. Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) ("When an agency changes its existing position, . . . the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." (quotations omitted)).

### B. The Department's proposed rule conflicts with the U.S. Constitution.

The Department, acting as if it has legislative power to prohibit discrimination on the basis of gender identity, violates the Spending Clause, separation-of-powers principles, and the Major Questions Doctrine. Deciding for the whole country what constitutes "an important educational objective," 88 Fed. Reg. 22891, the Department violates the Tenth Amendment and misconstrues the Fourteenth Amendment's rational-basis test for laws and regulations that define "sex." If enacted, the rule would force schools to violate teachers, coaches, and students' beliefs while substituting President Biden's religious beliefs for the policy goals of the States.

#### 1. The proposed rule violates the Spending Clause.

Congress enacted Title IX pursuant to its Spending Clause authority. *See* U.S. Const. art. I, § 8. The Spending Clause authorizes Congress to "attach conditions on the receipt of federal funds," but the "spending power is of course not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987). The most basic Spending Clause limit is that, if "Congress intends to impose a condition the grant of federal moneys," "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022). For the proposed rule to be valid under the Spending Clause, Congress must have "unambiguously meant something other than biological sex" when it prohibited discrimination on the basis of "sex." *Adams*, 57 F.4th at 816. As the en banc Eleventh Circuit has ruled, Title IX "does not" unambiguously depart from the common biological understanding of sex. *Id.* The Department's "own flip-flop in its position" is enough to tell that Title IX did not unambiguously prohibit discrimination on the basis of gender identity or define sex in a manner detached from biology. *Hardin v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 20-6380, 2023 WL 3065807, at *2 (6th Cir. Apr. 25, 2023).

7

On top of the clear-statement requirement, the Spending Clause also prohibits the Department from using the threat of withholding substantial federal funding to coerce States into adopting the agency's preferred policies. The proposed rule, which could lead to the many States with arguably conflicting laws losing Title IX funding, "is much more than 'relatively mild encouragement'—it is a gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (op. of Roberts, C.J.) (quoting *South Dakota*, 483 U.S. 203, 211 (1987)).

### 2. The proposed rule violates structural limitations on agency power.

In attempting to rewrite Title IX, the Department violates constitutional limitations on the Executive's authority. "All legislative Powers" granted in the U.S. Constitution "shall be vested in . . . Congress." U.S. Const. art. I, § 1. Under U.S. Supreme Court precedent, "a statutory delegation" of rulemaking authority "is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Grundy v. United States*, 139 S. Ct. 2116, 2123 (2019). Prohibiting discrimination "on the basis of sex" provides no authority to consider "gender identity" when promulgating Title IX regulations.

Moreover, under the Major Questions Doctrine, Congress must "speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (quotation omitted). Yet the mandate to minimize harms for students on the basis of gender identity is inconsistent with the "history and the breadth of the authority that" the Department "asserted" for the first forty years of Title IX. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022). By threatening the loss of billions of dollars in Title IX funding if States do not assent to this politically motivated rewriting of Title IX, the Department has stepped way beyond its authority.

### 3. The proposed rule encroaches on areas of traditional State authority.

Regulating schools and universities within their jurisdiction is a power traditionally reserved to the States. *See* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Many States have enacted laws directly regulating school and university athletics that would arguably conflict with the proposed regulation. *E.g.*, Tenn. Code Ann. § 49-6-310(a) ("A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate."); *id.* § 49-7-180 (prohibiting students of the male sex from competing in women's intercollegiate and intramural sports).

Congress must make "clear and manifest" its purpose to supersede powers historically reserved to the States. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Yet the preamble to the proposed rule provides only "ensuring fairness in competition and prevention of sports-related injuries" as examples of "important educational objectives" States may consider in deciding how to sex-separate sports. 88 Fed. Reg. 22872. The text of the rule should expressly defer to States to pursue a broader array of educational objectives, such as teaching student-athletes that males

8

and females are biologically distinct and that expressed gender identity cannot override the fundamental biological differences between boys and girls.

To be sure, Title IX has regulated the disbursement of federal funds to schools to prohibit discrimination on the basis of sex, including in athletics. But sex discrimination has been recognized by the U.S. Supreme Court as subject to intermediate scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *See, e.g.*, *Virginia*, 518 U.S. at 533. Gender identity discrimination receives no more than rational-basis review because gender identity is not "definitively ascertainable at the moment of birth," unlike "race or biological gender." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015).

While the decision to sex-separate sports teams (i.e., to provide separate teams for males and females) might be subject to intermediate scrutiny, the definitional contours of those classifications are subject only to rational-basis review. That is how courts have approached even the definitional contours of racial and ethnicity classifications. *See, e.g.*, *Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195, 210 (2d Cir. 2006) (applying rational-basis review to definition of "Hispanic"); *Orion Ins. Grp. of Wash. State Off. of Minority & Women's Bus. Enters.*, No. 16-5582, 2017 WL 3387344, at *2, 11, 13 (W.D. Wash. Aug. 7, 2017) (applying rational-basis review to definition of "Black"); *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, 1159 (D. Haw. 1986) (applying rational-basis review to definition of "Hawaiian"). And sex-based "distinctions are less likely to create the analytical and practical[ ]problems present in preferential programs premised on racial or ethnic criteria" because "with respect to gender," using the traditional equivalence of "gender" and "sex," "there are only two possible classifications." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 302-03 (1978) (op. of Powell, J.). The proposed rule, therefore, wrongly attempts to apply intermediate-scrutiny-style criteria to the definition of "male" and "female."

### 4.     The proposed rule threatens First Amendment rights.

Title IX does not require school administrators, coaches, and student-athletes to treat a biological boy as a girl simply because the student claims to be a girl. Courts have already stepped in to protect university professors from policies that would force them to use biologically inaccurate "preferred pronouns." *Meriwether*, 992 F.3d at 498-503, 506. And state legislatures have stepped up to provide even clearer protection for their teachers and coaches. *E.g.*, 2023 Tenn. S.B. 466 (prohibiting schoolteachers from being "[r]equired to use a student's preferred pronoun when referring to the student if the preferred pronoun is not consistent with the student's biological sex").

The proposed rule takes the opposite approach and forces States to privilege "consisten[cy] with gender identity" over consistency with the biological reality of sex. 88 Fed. Reg. 22891. It is no secret that this policy comes from President Biden and not from Title IX. President Biden has repeatedly stated that his Administration's approach to gender identity stems from his belief that transgender individuals are "made" so "in the image of God." White House, A Proclamation on Transgender Day of Visibility, 2022 (Mar. 30, 2022), https://bit.ly/4194NBL; White House, A Proclamation on Transgender Day of Visibility, 2023 (Mar. 30, 2023), https://bit.ly/42b4XKp. Forcing schools to propagate this gnostic dogma will inevitably lead to conflicts with coaches and students who recognize that men and women are biologically distinct or who believe that mankind was created "male and female." Genesis 1:27 (the same verse that President Biden distorts).

9

**II.     The Department's proposed rule relies on vague and impossible-to-implement terms.**

Again and again, the Department insists that the proposed rule will "provide needed clarity" to the regulatory landscape. 88 Fed. Reg. 22860; *see also id.* at 22861, 22866-68, 22877, 22879, 22881, 22887-90 (repeatedly citing the need to "clarify" existing regulations or to provide "clarity" to regulated entities). But the text of the proposed rule fails to define its key terms. "Sex-related criteria" and "important educational objective" appear nowhere else in the Code of Federal Regulations. And the term "gender identity"—another new addition to the Department's Title IX regulations—creates definitional tension with terms such as "male" and "female" where none existed previously. The Department should stick to "sex" as used in Title IX instead of attempting to graft new and poorly defined terms onto its regulations.

### A.     "Sex-related criteria" and "important educational objective" are vague.

The Department has invented and then failed to define in the text of the proposed rule key terms such as "sex-related criteria" and "important educational objective." That is hardly in keeping with the supposed goal of providing clarity to existing regulations, unless clarity means expanding existing regulations to avoid continued losses in court. To achieve its stated objective, the Department should propose definitions for these terms and then allow the public an opportunity to provide supplemental comments about the proposed definitions.

*First*, the Department fails to define "sex-related criteria" in the proposed rule, and its amorphous approach to the term in the preamble is deeply flawed. The Department's use of the term "sex-related criteria" demonstrates the agency's failure to understand that, when schools use original birth certificates or physiological tests to separate students onto separate male and female teams, those schools are separating sports teams using sex itself, not mere sex-related criteria. The Department never defines "sex-related criteria" outright in the preamble. The closest it comes is in an "e.g.," clause that suggests sex-related criteria are criteria that "relate to how a student's sex is determined for team-eligibility purposes, including by imposing eligibility requirements related to a student's sex characteristics." 88 Fed. Reg. 22871. The preamble then includes "a sex marker on an identification document, such as a birth certificate, passport or driver's license" and "physical examinations or medical testing" as examples of sex-related criteria. *Id.*

What doctors note on an original birth certificate and what physical examinations for purposes of athletic competition identify is whether the individual is male or female. As understood in the 1970s, a "male" is "[o]f or belonging to the sex which begets offspring, or performs the fecundating function of generation." *Adams*, 57 F.4th at 812 (quoting Male, Oxford English Dictionary (re-issue ed. 1978)). And a "female" is someone "[b]elonging to the sex which bears offspring." *Id.* (quoting Female, Oxford English Dictionary (re-issue ed. 1978)). In other words, original birth certificates and physical examinations directly identify an individual's sex, which turns on the physiological differentiation of humans depending on how their reproductive systems are organized. When schools and universities use those tools to separate student-athletes onto different sports teams, they are separating students using sex itself, not "sex-related criteria."

*Second*, "important educational objective" is another regulatory novelty that the Department fails to define in the proposed rule. The only two examples the Department provides are more athletic

10

than educational: "ensuring fairness in competition and prevention of sports-related injury." 88 Fed. Reg. 22872. Those are no doubt important objectives. But education, first and foremost, is about teaching students the realities of the world. Student-athletes are students first, athletes second. The States have an important educational objective, if that is the term the Department wants to use, in teaching students that males and females are biologically distinct. Only "women" can "bear a child." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2317 (2022) (Breyer, Sotomayor, and Kagan, J.J., dissenting). That is the same message the States teach students in biology classes around the country. Forcing schools, which otherwise provide males and females equal opportunities, to contradict on the athletics field what they teach their students in class would frustrate the States' important educational objective. "[I]t is simply incorrect to assert that the inclusion of a single" male student as a putative girl on a sports team "would not significantly alter" the States' educational interests in teaching students about the immutable biological binary of sex. *Green v. Miss USA, LLC*, 52 F.4th 773, 786 (9th Cir. 2022) (ruling that a beauty pageant did not need to allow a man to participate as a putative woman).

The Department then says "communicating or codifying disapproval of a student or a student's gender identity" does not count as an important educational objective. 88 Fed. Reg. 22872. However, refusing to agree with the inaccurate view of the world that students with gender dysphoria might have does not equate to "codifying disapproval" of the students themselves. The Department disserves other students by forcing them to pretend that a biological boy is a girl or that a biological girl is a boy. Older students will understand that their teachers and coaches are lying about reality. And younger students will become confused. Gender identity simply is not an appropriate concept to teach young children, and many States have enacted laws requiring parental notice and an opportunity to opt out before schools teach children about gender identity. *E.g.*, Tenn. Code Ann. § 49-6-1301. The Department's embrace of gender identity as a more accurate description of reality than biological sex is not an educational decision Title IX requires.

Accordingly, the Department should propose a definition of "important educational objective" that expressly allows States to cite teaching about the fundamental biological differences between the two sexes as an important educational objective that justifies separating sports teams using sex itself.[3] The only two federal court opinions that use the term "important educational objective" are Justice Scalia's dissent in *Virginia*, 518 U.S. at 587 (Scalia, J., dissenting), and a Second Circuit decision that immediately follows up by agreeing that high school "sports teams may be divided into girls and boys teams," *Hsu v. Roslyn Union Free Sch. Dist.*, 85 F.3d 839, 871 (2d Cir. 1996). If the Department disagrees with those sources' approach to sex discrimination, then the Department,to provide clarity, needs to propose an alternative term and provide the public an opportunity to provide supplemental comments.

---

[3] The Department acknowledges that it *could* define this term in the rule itself, just as 34 C.F.R. § 106.34(b) does with "important objective." *See* 88 Fed. Reg. 22872. But the Department provides no explanation for why it has chosen "not [to] specify the objectives that a recipient may assert" in the text of the proposed rule. *Id.*

11

### B. The Department's use of "gender identity" is unworkable for athletics.

The Department's proposed rule focuses on "minimiz[ing] harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied" from sex-separating athletic teams. 88 Fed. Reg. 22891. This proposal is nonsensical.

For starters, "male" and "female" in Title IX and implementing regulations have always referred to an individual's sex. *See* 85 Fed. Reg. 30178 (May 19, 2020) ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification. . . . In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). The proposed rule, in contrast, simultaneously uses "male" and "female" to refer both to sex and to gender identity. No dictionary from the 1970s defined "male" and "female" in terms of gender identity rather than sex.

And gender identity is not an immutable binary like sex, so referring to "a male or female team consistent with [a student's] gender identity" fails to account for how gender identity is often described by many of its proponents. Individuals have expressed gender identities "other than those of men and women," including "nonbinary, genderqueer, gender neutral, agender, gender fluid, and 'third' gender, among others." World Pro. Ass'n for Transgender Health ("WPATH"), *Standards of Care for the Health of Transgender and Gender Diverse People* 252 (8th version) (2022) ("WPATH Guidelines").[4] Many of these terms, such as "genderqueer" and "nonbinary" did not emerge until the 1990s or 2000s, decades after Title IX's enactment. *Id.* at 80. New gender identities are invented every year. *See id.* at 9, 31, 88 (including "eunuchs" as a gender identity and providing a "new chapter" in the WPATH Guidelines to describe their "unique needs"). The Department fails to explain whether "a male or female team" is "consistent with" a nonbinary, genderqueer, gender neutral, agender, gender fluid, or eunuch gender identity.

Gender identity is not stable. Many purported gender identities, such as "genderfluid," are defined by how an individual claims to "have a gender that changes over time." *Id.* at 80. The same goes for "nonbinary" people who claim to have "more than one gender identity simultaneously or at different times." *Id.* And that mutability is especially common among children, who "may experience gender fluidity or even detransition after an initial social transition." *Id.* at 77. The Department fails to specify whether regulated entities must allow children to shift categories of competition mid-season as their asserted gender identity changes.

Nor is gender identity objective. The term "refers to a person's deeply felt, internal, intrinsic sense of" the person's "own gender" and does not require any physical alteration. *Id.* at 252. That approach to identity is fundamentally "subjective" and impossible for schools to police using objective standards. *Id.* at 81. Accordingly, even the WPATH Guidelines agree that the "*non-linear* spectrum" of gender identity should not be used "for the purpose of situating" individuals in a "binary model" of male and female, as the Department attempts to require. *Id.*

---

[4] The States cite the WPATH Guidelines merely as an example of public claims about gender identity and do not accept their authoritativeness for treatment of gender dysphoria or any other condition.

12

These concerns are not mere hypotheticals. With increasing frequency, mediocre male athletes have declared themselves females, switched to female divisions, and immediately started winning championships. *See, e.g.*, *Soule v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43, 48 (2d Cir. 2022) (providing examples of biological males winning numerous high school track championships that would otherwise have been won by females), *vacated by rehearing en banc*, No. 21-1365 (2d Cir. Feb. 13, 2023). The proposed rule's ostrichism offers no solutions to the problems it will create.

### III.     The Department's proposed rule is needlessly rushed and misunderstands athletics.

The States understand that the Department values regulatory speed. *See, e.g.*, *Tennessee*, 615 F. Supp. 3d at 842 (preliminarily enjoining the Department's 2021 Notice of Interpretation and Fact Sheet for failing to comply with the Administrative Procedure Act's notice-and-comment requirements). But Congress enacted the Administrative Procedure Act precisely because measured deliberation is likely to slow down faulty regulatory efforts. Here, the Department has failed to provide the meaningful opportunity to comment that the Administrative Procedure Act requires. More time might have improved the regulation. The Department fails to understand the role States play in regulating interscholastic and intercollegiate athletics and knowingly proceeds using shoddy data. The Department's haste is an indication of something even more troubling: the agency's mind is already made up, likely due to the Interpretation and Fact Sheet that the Department is currently enjoined from implementing against twenty States. If the Department proceeds with rulemaking in such a manner, then there is no way to avoid running afoul of the Administrative Procedure Act.

####     A.     The Department should allow more time for supplemental comments.

The Department has failed to provide the statutorily required meaningful opportunity to comment. 5 U.S.C. § 553(c). "The APA requires that the public have a meaningful opportunity to submit data and written analysis regarding a proposed rulemaking." *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011). The "usual" length of time for comments is 90 days. *Id.* Despite the significance of the proposed rule for schools and universities across the country, the Department only scheduled 30 days for comments on the proposed rule—really 32 because the deadline would have otherwise fallen on a weekend. The preamble to the proposed rule acknowledges it "may have federalism implications" but provided no federalism analysis. 88 Fed. Reg. 22890. The Department repeatedly acknowledged that it has failed to develop or consider quantitative data needed to justify the rule. *Id.* at 22861, 22879-80.

Therefore, Tennessee and 22 other States politely requested that the Department extend the abnormally short comment period. Tennessee & 22 Co Signing States, Comment Deadline Extension Request, ED-2022-OCR-0143-10614 (Apr. 21, 2023). Rushing through this comment period at the end of the school year, when administrators are too busy with their normal responsibilities to provide as much insight, makes no sense. The Executive has instructed agencies to provide "at least 60 days" to "afford the public a meaningful opportunity to comment." Exec. Order 13563, 76 Fed. Reg. 3821, 3822-23 (Jan. 21, 2011). Sixty days was the length of time the Department provided last year for its proposed rule about "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 87 Fed. Reg. 41390 (July 12, 2022) ("2022 Proposed Rule"). Federal courts are currently considering legal issues,

13

including challenges to Department rulemaking on this very topic, that may impact the proposed rule. The Sixth Circuit just heard oral argument on the Department's appeal of the preliminary injunction of the 2021 Notice of Interpretation and Fact Sheet. *See* 88 Fed. Reg. 22865 n.6 (citing *Tennessee*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022), *appeal argued*, No. 22 5807 (6th Cir. Apr. 26, 2023)). "The staggered nature of this rulemaking in conjunction with other related rules," such as the 2021 Interpretation and Fact Sheet and the 2022 Proposed Rule, will almost certainly "result[] in an arbitrary and capricious failure to consider the combined impact of numerous intersecting policy changes." *Centro Legal de la Raza v. Exec. Off. for Immigration Rev.*, 524 F. Supp. 3d 919, 954-55 (N.D. Cal. 2021) (concluding plaintiffs were likely to succeed on notice-and-comment claim both for that reason and because only 30 days for comment "deprived" the public "of the opportunity to meaningfully review the proposed rule and provide informed comment").

The Department denied the sensible extension request. According to the Department, 30 days is all that is necessary because this proposed rule is narrower in scope and shorter than the 2022 Proposed Rule. That excuse assumes the already short 60-day comment period was enough for the 2022 Proposed Rule and that meaningful opportunity for comment under the Administrative Procedure Act turns on the number of pages in a proposed rule, no matter how significant the rule proposal is or how intertwined its meaning is with other pending rules. A failure to follow the rules one time does not justify an even more egregious violation the second time around.

      **B.**      **The proposed rule misunderstands how the two sexes physiologically differ.**

The Department arbitrarily and capriciously ignores data demonstrating physiological differences between the two sexes that impact athletic performance. One positive aspect of the proposed rule's preamble is that the Department acknowledges that "schools have an interest in the prevention of sports-related injury" and in "ensur[ing] competition is fair." 88 Fed. Reg. 22872. However, the Department is wrong in assuming that fairness does not matter categorically for all grade levels and sports. And female athletes have already been injured by policies that privilege gender identity over sex.

From infancy, boys' and girls' bodies differ. Girls, on average, have more body fat and less fat-free mass than boys. *See, e.g.*, S.M. Davis et al., *Sex differences in infant body composition emerge in the first 5 months of life*, J. Pediatric. Endocrinology & Metabolism 32:1235-39 (2019); R.W. Taylor et al., *Gender differences in body fat content are present well before puberty*, Int'l J. Obesity Related Metabolic Disorders 21:1082-84 (1997). As the United Kingdom governmental Sports Councils concluded, "large-scale data reports on children from the age of six show that young males have significant advantage in cardiovascular endurance, muscular strength, muscular endurance, speed/agility and power tests," with similarly aged girls scoring better "on flexibility tests." United Kingdom Sports Councils, *International Research Literature Review* at 3 (Sept. 2021), *available at* https://bit.ly/3VGkhfn. Australian data agrees that, "compared with 9-year-old females, 9-year-old males were faster over short sprints (9.8%) and 1 mile (16.6%), could jump 9.5% further from a standing start (a test of explosive power), could complete 33% more push-ups in 30 [seconds] and had 13.8% stronger grip." E.N. Hilton & T.R. Lundberg, *Transgender women in the female category of sport: perspectives on testosterone suppression and performance advantage*, Sports Medicine 51:199, 201 (2021) (summarizing the Australian study and others).

Of course, the rapid increase in testosterone during male puberty increases the general male athletic advantage. But the available evidence shows that suppression of testosterone in a male will not substantially eliminate the male athletic advantage that has already accumulated. For example, males who undergo testosterone suppression tend to lose only 7% hand grip strength after a year of suppression and only a cumulative 9% hand grip strength after two years of suppression, far less than the 60% great hand grip strength of men over women. E. VanCaenegem et al., *Preservation of volumetric bone density and geometry in trans women during cross-sex hormonal therapy: a prospective observational study*, Osteoporosis Int'l 26:35-47 (2015). One study of members of the U.S. Air Force found that males, after at least two years of testosterone suppression, still ran 12% faster than biological females in the Air Force. T.A. Roberts et al., *Effect of gender affirming hormones on athletic performance in transwomen and transmen: implications for sporting organizations and legislators*, British J. Sports Med. (Dec. 7, 2020), https://bit.ly/42vrCAL.

The Department has so far refused to consider any of that scientific data and, therefore, should allow for supplemental comments after thoroughly reviewing relevant scientific literature on physiological differences between the two sexes relevant for athletics. The preamble boasts about the supposedly well-formulated "testosterone suppression criteria" of organizations such as the Union Cycliste Internationale. 88 Fed Reg. 22870, 22883. Men who identify as women are already winning "marquee stage races" in the women's category under these rules. Dave Skretta, *Transgender woman's US cycling win within rules, UCI says*, ABC News (May 3, 2023), https://abcn.ws/3B1h5S6. Those rules fail to protect female athletes from unfair competition.

The Department's failure to consider evidence about the biological differences between males and females could have even more disastrous consequences for female athletes than just losing an athletic competition. In North Carolina, a boy identifying as a girl injured a biological girl by spiking a volleyball so hard it sent her to the hospital. Jenny Goldsberry, *Footage Shows Moment Female High School Volleyball Player Injured By Spike From Trans Opponent*, Wash. Examiner (Oct. 22, 2022), https://bit.ly/3ndcGIe. The North Carolina school district whose female athlete was injured has voted to forfeit all matches against the other school as a safety precaution. Injuries such as that one will become more frequent if the Department's proposed rule becomes the standard nationwide. The current regulations expressly identify sports involving "bodily contact," including basketball, as ones where schools do not need to allow girls to compete against boys even if there is no equivalent sport for girls. 34 C.F.R. § 106.41(b). The Department should similarly exclude sports such as volleyball, soccer, basketball, lacrosse, and wrestling from the proposed rule's reach due to injury concerns.

About the only scientific articles the Department does cite are at a high level of generality about the benefits of sports for children. 88 Fed. Reg. 22875. The Department does not cite any scientific article that considers whether boys and girls are physiologically distinct or that considers the impact being forced to compete athletically against boys will have on girls. And the only article the Department relies on for the idea that "allowing transgender children to socially transition . . . is associated with positive mental health outcomes" fails to prove that point. 88 Fed. Reg. 22880 (citing Kristina Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 3 (Mar. 2016)). That article does not consider social transition in athletics and merely found no statistically significant differences from the children the authors had selected

15

as the control group, which is not the same as showing an "associat[ion] with positive mental health outcomes." 88 Fed. Reg. 22880. The sample size of the study was small; the study included only 73 children who identified as transgender, so it is no wonder the authors could not obtain statistically significant results. Olson at 4. Looking at the raw data, the transgender children had higher rates of depression and anxiety than the national average, the control group, and even their own siblings. *Id.* at 5. More recent studies have also failed to find any significant mental health benefit from socially transitioning children who claim to be transgender. *E.g.*, James S. Morandini, *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, Archives of Sexual Behavior 52:1045-60 (2023).

### C. The Department wrongfully defers to athletic associations instead of States.

The preamble to the proposed rule operates on the flawed presumption that "the NCAA or similar national athletic associations" alone get to set the rules for intercollegiate sports teams. 88 Fed. Reg. 22880. Just as state laws can supersede rules of state athletic associations, "[t]he NCAA is not above the law." *NCAA v. Alston*, 141 S. Ct. 2141, 2169 (2021) (Kavanaugh, J., concurring). States ultimately retain the power to determine eligibility rules for their own public school and university sports teams.

The Department is also incorrect in assuming that the NCAA and the International Olympic Committee have crafted the best rules for athletic eligibility. The preamble notes that the NCAA and other athletic associations have repeatedly modified their rules in recent years to move closer to rules the States have developed for their own schools and universities. 88 Fed. Reg. 22869-70. But the Department glosses over the main reason why the NCAA and other athletic associations have altered their rules: men identifying as women have repeatedly demonstrated the flaws in the rules those associations have now abandoned. In a glaring omission, the preamble fails to mention how Lia Thomas—a mediocre swimmer in the men's division—became the "first transgender athlete to win an NCAA D-I title" by crossing over to the women's division. Eric Levenson & Steve Almasy, *Swimmer Lia Thomas Becomes First Transgender Athlete to Win an NCAA D-I Title*, CNN (Mar. 17, 2022), https://cnn.it/406psGU. Thomas defeated two Olympic medalists during the final, *id.*, and apparently exposed his male genitalia to competitors in the women's locker room, Jesse O'Neill, *Ex-swimmer Demands Transgender Locker Rooms After Lia Thomas Allegedly Exposed 'Male Genitalia,'* N.Y. Post (Feb. 9, 2023), https://bit.ly/40uB862. That embarrassment of the NCAA's previous rules is the reason why the NCAA and USA Swimming have been so quick to change their rules to avoid repeats at their level of competition. Those organizations have given little thought to competition in elementary, middle, and high schools because that is not the level of competition they care about.

Nor has the Department considered the true cost to States from the proposed rule. If a State does not accept the new rule, it risks losing billions of dollars in Title IX funding. Complying with the proposed rule might require restructuring athletic competitions or paying higher insurance rates due to the heightened risk of injury. The Department, however, refused to give the States sufficient time to investigate the full extent of financial costs. And compliance will certainly mean a loss of "flexibility to the recipient of federal funds to organize its athletic program as it wishes, so long as the goal of equal athletic opportunity is met." 88 Fed. Reg. 22863 (quoting *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 171 (3d Cir. 1993)); *see also id.* at 22866 (intimating that the proposed

16

rule will attempt to preempt the laws of at least Idaho, Indiana, and West Virginia). The Department should not so cavalierly attempt to remove from public, democratic debate an issue of such national importance.

### D. The Department has failed to approach this issue with an open mind.

The proposed rule appears to rely on the 2021 Notice of Interpretation that the U.S. District Court for the Eastern District of Tennessee has preliminarily enjoined the Department from enforcing against twenty States, including Tennessee. The preamble identifies the Notice of Interpretation as "explain[ing] the Department's enforcement authority over discrimination based on sexual orientation and gender identity under Title IX." 88 Fed. Reg. 22865. The next sentence declares that, "[a]gainst this backdrop and for reasons described in this preamble, the Secretary proposes to amend the Department's Title IX regulation in 34 CFR 106.41." *Id.* The Department attempts to soften the blow in a footnote that acknowledges the preliminary injunction and claims that "[t]his Athletics NPRM is not based on the 2021 Bostock Notice of Interpretation." *Id.* at n.6. Despite that self-serving footnote, the proposed rule makes little sense if the Department has not *already* attempted to expand Title IX to prohibit discrimination on the basis of gender identity. Nowhere in the text of Title IX or implementing regulations in the Code of Federal Regulations is there a requirement for the Department to consider gender identity.

In short, the Department's apparent reliance on the 2021 Notice of Interpretation—which remains in effect in thirty States—means that the "agency's mind" has not "remain[ed] open enough," as the Administrative Procedure Act requires. *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988). An agency approaching such a significant and controversial political issue would not speed run through the notice-and-comment process if its mind were really open.

\* \* \*

Thank you for your consideration of these concerns. We encourage the Department to leave its Title IX athletics regulations as they have been for nearly half a century. If the Department insists on pursuing its rulemaking proposal, the Department must "make appropriate changes" to the proposed rule, *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142 (6th Cir. 2022), to avoid once more unlawfully attempting to "create[] rights for students and obligations for regulated entities not to discriminate based on . . . gender identity that appear nowhere in *Bostock*, Title IX, or its [current] implementing regulations," *Tennessee*, 615 F. Supp. 3d at 839. If necessary, Tennessee and the co-signing States will take action to safeguard our schools and universities and to protect women's sports.

Sincerely,

*Jonathan Skrmetti*

Jonathan Skrmetti
Tennessee Attorney General and Reporter

17

Steve Marshall
Alabama Attorney General

Treg R. Taylor
Alaska Attorney General

Christopher M. Carr
Georgia Attorney General

Raúl R. Labrador
Idaho Attorney General

Theodore E. Rokita
Indiana Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Austin Knudsen
Montana Attorney General

Mike Hilgers
Nebraska Attorney General

Dave Yost
Ohio Attorney General

Alan Wilson
South Carolina Attorney General

18

Marty J. Jackley
South Dakota Attorney General

Ken Paxton
Texas Attorney General

Sean D. Reyes
Utah Attorney General

Jason S. Miyares
Virginia Attorney General