**Exhibit D**

Todd Rokita, Letter to Miguel Cardona, ED-2022-OCR-0143-150756 (May 15, 2023).



OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA

302 W. WASHINGTON ST. IGCS 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

**TODD ROKITA**

ATTORNEY GENERAL

May 15, 2023

Dr. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Re: Notice of Proposed Rulemaking, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams,* Docket ID ED-2022-OCR-0143

Dear Secretary Cardona:

Title IX of the Education Amendments Act marked a monumental shift in women's equality in education. But, rather than protect the rights of girls and women, your Notice of Proposed Rulemaking (hereinafter, "Proposed Rule") interpreting the term "sex" in Title IX to mean "gender identity" rather than "biological sex" harms the rights of women and girls. A distinct feature of Title IX is that it requires schools to provide equal opportunities to females in education, including sports. It prohibits schools from excluding females from sports or denying females the benefits of sports on the basis of sex. 20 U.S.C. § 1681(a). Rewriting "sex" to mean "gender identity" puts Title IX at war with itself, and the Department's erroneous reliance on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), destroys the progress made to protect the rights of girls and women under Title IX over the past fifty years.

Compounding these problems, the Proposed Rule does not even provide a consistent definition of "sex" but instead sets forth standards by which schools may set their own criteria to determine when transgender students may play on girls' teams. Such an approach has no grounding in statutory text and indeed gives away the game, as it replaces the statutory categorization of sex with individual inquiry of size, strength, testosterone levels, or any number of other sex-neutral metrics that may address athletic safety and competitiveness. Equally as disturbing, the Proposed Rule

1

would place schools in an untenable position as they search for ways to provide girls with equal opportunities while avoiding the Department's uncertain definition of discrimination.

Your misguided and illegal efforts to redefine Title IX purport to preempt protections afforded girls and women by individual States, including Indiana. As you are aware, State Attorneys General play a critical role in preserving federalism and the constitutionally prescribed balance of power. To that end, we have steadfastly fought to protect the rights of girls and women under Title IX against attacks from this Administration, including by obtaining an injunction against your efforts to weaken Title IX through administrative "guidance." *Tennessee et al. v. United States Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *1 (E.D. Tenn. July 15, 2022) (pending appeal). The Proposed Rule represents more of the same. The Department has no authority to redefine sex to mean gender identity, much less to replace the notion of sex entirely with sex-neutral biometrics. We will continue our fight in defense of girls' sports by opposing the Proposed Rule.

## BACKGROUND

The Department's Proposed Rule would require federal educational grant recipients to provide opportunities for transgender students to participate on male and female teams consistent with their respective gender identity. The Department claims that "students may be harmed significantly if a school denies them the opportunity to participate in its athletic program consistent with their gender identity."[1] However, the Proposed Rule does not categorically allow all transgender students to participate on the team consistent with their gender identity; rather, the Proposed Rule creates standards for Title IX recipients to adopt "sex-related criteria that would limit or deny a student's eligibility to participate on a male or female team consistent with their gender identity."[2] The criteria adopted by each recipient must consider "each sport, level of competition, and grade of education level."[3] The criteria must "(i) be substantially related to the achievement of an important educational objective, and (ii) minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied."[4] Important educational objectives include "ensuring fairness in competition and prevention of sports-related injuries."[5]

The Proposed Rule applies only to "sex-related criteria," meaning where a student's sex determines team eligibility. Yet the Proposed Rule purports not to affect whether schools may "offer separate male and female athletic teams when selection is based on competitive skill or the activity involved is a contact sport."[6]

---

[1] 88 Fed. Reg. 22870.
[2] 88 Fed. Reg. 22871.
[3] *Id.*
[4] *Id.*
[5] 88 Fed. Reg. at 22872.
[6] *Id.*

The Proposed Rule is unlawful for numerous reasons, but this comment addresses only five concerns. The Proposed Rule: 1) relies erroneously on *AM v. Indianapolis Public Schools*, 2) lacks proper authority to be promulgated, 3) creates obstacles and uncertainty for schools and girls, 4) fails to address the biological differences of males and females, and 5) preempts State laws protecting the rights of girls and women in athletics. In sum, a rule where each Title IX recipient will adopt its own criteria for whether a student participates on a team consistent with gender identity has no grounding in statutory text and threatens regulatory chaos.

## COMMENT

### 1.  The Proposed Rule Erroneously relies on *A.M. v. Indianapolis Public Schools* for support of the Proposed Rule.

For support and justification, the Proposed Rule erroneously cites *A.M. v. Indianapolis Pub. Schs.*, No. 1:22-cv-01075-JMS-DLP, 2022 WL 2951430 (S.D. Ind. July 26, 2022), where a district court temporarily entered a narrow injunction entitling one transgender elementary student to participate on a girls' softball team notwithstanding Indiana's statute prohibiting biological males from competing on girls' teams (Ind. Code § 20-33-13 et seq.). The State intervened in the case to defend the law (Ind. Code § 20-33-13 et seq.) and appealed the preliminary injunction ruling. While the appeal was pending, A.M. transferred schools and mooted the case, resulting in vacatur of the injunction. Therefore, the Indiana statute barring biological males from participating on sports teams reserved for girls remains in full force and effect.

Absent final judgment or an appellate ruling on the merits of the case, it is misleading for the Department to assert in the Proposed Rule that "courts have found that excluding transgender students from participating on athletic teams consistent with their gender identity impermissibly discriminates against these students based on sex," much less to add that the conclusion was "'not even a close call.'"[7] One district court's now-vacated preliminary assessment that relies on bathroom-access precedents rather than sports participation cases cannot bear the weight the Department places on it. It was never "courts" plural, and it was never final or reviewed. Indiana's statute continues to apply in all cases, and the Department's suggestion otherwise is deceptive.

### 2.  The Department Lacks Authority to Promulgate the Proposed Rule.

An agency may not confer power upon itself. "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Without statutory authority, an agency has no power to act, period. *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). And an

---

[7] 88 Fed. Reg. at 22868.

agency may not act beyond the scope of its congressionally delegated authority. Congress has not given the Department authority to promulgate the Proposed Rule.

### a. The Department lacks authority to expand the definition of "sex" under Title IX.

The Proposed Rule seeks to expand the definition of "discrimination on the basis of sex" from biological sex, which was the meaning intended by Congress when it passed Title IX in 1972, to include discrimination on gender identity. By this interpretation, the Proposed Rule ignores over fifty years of precedent limiting the term to biological sex. Indeed, attempting to rewrite Title IX's fifty-year-old definition of "sex" to mean gender identity constitutes a 180-degree change from the position taken by the Department on the exact same issue several years earlier.

The Proposed Rule cites *Bostock v. Clayton County* as the legal basis for reinterpreting the term "sex" to mean gender identity, but *Bostock* did not redefine the term "sex." 140 S. Ct. 1739 (2020). To the contrary, *Bostock* "assum[ed]" that the term "sex" means "biological distinctions between male and female." 140 S. Ct. at 1739, 1746–47. As noted by the Department's General Counsel in 2021,[8] *Bostock* merely held that, in the employment context, discrimination based on "sexual orientation," "gender identity," or "transgender" status is prohibited because such discrimination "necessarily and intentionally applies sex-based rules." *Bostock,* 140 S. Ct. at 1745. The Court concluded that the violation occurs if "an employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee." *Id.* at 1741. Put simply, "if changing the employee's sex would have yielded a different choice" then a statutory violation occurred. *Id.*

*Bostock* refrained from addressing key items under Title IX, such as "sex-segregated bathrooms, locker rooms, and dress codes."[9] Indeed, *Bostock* expressly stated that it did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court. 140 S. Ct. at 1753. *Bostock*'s holding thus "extends no further than Title VII." *Pelcha v. MW Bancorp.*, 988 F.3d 318, 324 (6th Cir. 2021); *see Tennessee v. U.S. Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) ("in applying *Bostock* to Title IX, the Department overlooked the caveats expressly recognized by the Supreme Court and created new law").

The Proposed Rule departs most significantly from *Bostock* when it protects gender identity at the expense of biological sex, saying that "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than

---

[8] U.S. Dept. of Education, Memorandum for Kimberly M. Richey Acting Asst. Sec. of the Office for Civil Rights Re: *Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020)*, (Jan. 8, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf.

[9] *Id.* at 1753; *see also U.S. Dep't of Justice, Application of Bostock*, at 4 ("*Bostock* does not require any changes to . . . sex-specific facilities or policies.").

*de minimis* harm on the basis of sex" and therefore violates Title IX.[10] The Proposed Rule undermines Title IX: Schools cannot "provide equal athletic opportunity for" boys and girls if the Department functionally forbids them from acknowledging two biologically distinct sexes.[11]

### b. The Department Provides No Consistent Understanding of "Sex" and Therefore Adopts an Entirely New Scheme for Regulating Athletic Opportunities Based on Safety and Skill.

Although the Proposed Rule interprets "sex" to include gender identity, it provides no real standard and no consistent understanding of "sex." Under the Proposed Rule, the Department requires that students *should* be permitted to play on teams "consistent with their gender identity,"[12] as if Title IX protects gender identity.[13] But the Proposed Rule adopts that standard in one breath only to discard it in the next when it provides that schools may "adopt criteria" "that would limit or deny a student's eligibility to participate consistent with their gender identity."[14] Such criteria need only (i) be "substantially related to the achievement of an important educational objective," and (ii) "minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity is limited or denied," *i.e.*, transgender students.[15]

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S. Code § 1681(a). Schools must afford students the same educational opportunities regardless of sex. Title IX's implementing regulations permit "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). Doing so allows "institutions to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both sexes."[16]  But, to the extent the separate-teams allowance amounts to an exemption from Title IX's *anti-discrimination* rule, it does so to enable *equal opportunities*, not to advance "educational interests" generally or to protect its beneficiaries from unspecified "harms."

Plainly, the Department is concerned about the obvious athletic advantages that biological males have over biological females and about the physical safety of biological females competing against biological males. But instead of merely adhering to the ordinary understanding of "sex" that resolves those concerns, the Department

---

[10] 88 Fed. Reg. at 22877.
[11] 88 Fed. Reg. at 22860.
[12] 88 Fed. Reg. at 22866.
[13] 88 Fed. Reg. at 22871.
[14] *Id.*
[15] *Id.*
[16] Policy Interpretation, 44 Fed.Reg. at 71,417.

imposes a new meaning of sex and then invents its own non-statutory exemptions to alleviate the obvious risks. The Department has no power to rewrite the statute in this way, either as to the meaning of sex or as to exemptions from the non-discrimination mandate.

The Department has no cogent understanding of "sex." If it did, it would not allow schools to generate criteria to evade Title IX, even if sex does mean gender identity. That is, even if gender identity was included in the definition of "sex" under the statute, the Proposed Rule allows for the violation of the statute in both respects—as currently written and if gender identity was included. Title IX prohibits discrimination on the basis of sex except when necessary to ensure equal educational opportunities regardless of sex. The Department cannot permit sex discrimination, however defined, for additional reasons of its own device.

### c. The Proposed Rule Creates Policy on a Major Policy Question that Congress Did Not Expressly Delegate to It.

Courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies. *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022). Even if an agency has "a colorable textual basis" or a "merely plausible textual basis" for a rule, it cannot enact a major policy change without demonstrating "clear congressional authorization" for the power it claims. *Id*.

Here, the Department's rule creates policy on a major question: Whether and when recipients of federal education funding must permit students to compete on athletic teams consistent with their gender identity. The concept of "gender identity" invokes the philosophical question of what makes humans either male or female. In 1972, no such issue existed. It was understood that there were only two sexes—male and female. Sex was determined at birth. Now, but not then, many people claim to suffer from "gender dysphoria," meaning an incongruence between sex as determined at birth and their "innermost concept" of gender.[17]

As debates over the concept and consequences of gender identity have grown, several states have passed regulations to address gender identity issues. Twenty-one states have adopted laws that prevent biological males from participating on sports teams reserved for girls. Fifteen states have passed, in some form, a law or rule prohibiting gender transition procedures on minors. These numbers will likely only grow.

The Department is attempting to pretermit that robust public debate by unilateral decree rather than legislative action—which is precisely what the Supreme Court has said, multiple times in recent years, that federal agencies may not do. Last year, the Supreme Court invoked the doctrine in a challenge to the Occupational Safety and Health Administration's (OSHA) mandatory COVID-19 vaccination rule. Expressing much doubt over OSHA's authority for the unprecedented vaccine mandate, the Court

---

[17] *Sexual Orientation and Gender Identity Definitions,* HUMAN RIGHTS CAMPAIGN, https://www.hrc.org/resources/sexual-orientation-and-gender-identity-terminology-and-definitions (last visited May 8, 2023).

stated it "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022). In the same year, the Supreme Court raised the doctrine yet again in *West Virginia v. EPA* where the Court found that Congress did not grant the EPA under Section 111(d) of the Clean Air Act the authority to devise emissions caps based on the generation shifting approach the agency took in the Clean Power Plan. The issue's importance and ongoing debate "makes the oblique form of the claimed delegation all the more suspect." *W. Virginia*, 142 S. Ct. at 2614 (citations omitted).

"Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" *Id.* (citing E. Gellhorn & P. Verkuil, Controlling *Chevron* Based Delegations, 20 Cardozo L. Rev. 989, 1011 (1999)). The Department is attempting to change the plot line here. The Proposed Rule is a major policy decision: defining "sex" under Title IX and determining which students are eligible to play on an athletic team threatens substantial consequences for the opportunities afforded girls and women in sports compared with the gains realized for them under Title IX since 1972. Congress has not delegated to the Department the authority to re-direct national policy over the meaning of sex and gender, particularly as it relates to education and sports. Point of fact, one week after the Department promulgated the Proposed Rule, the U.S. House of Representatives passed the "Protection of Women and Girls in Sports Act of 2023" to prohibit biological males from participating in programs or activities that are for created women and girls.  H.R. 734 (2023). This Proposed Rule is an unlawful attempt to circumvent what Congress has required in Title IX.

### 3. The Proposed Rule will Sow Confusion and Create Obstacles for Schools and Girls.

Currently under Title IX, schools must create equal athletic opportunities for biological girls. 20 U.S.C. § 1681. The Proposed Rule places Title IX in tension with itself by threatening those opportunities. Title IX cannot require schools to ensure equal opportunities for females while prohibiting the enforcement of female-only categories.

Yet, the Department ignores that tension and suggests that the Proposed Rule "offer[s] greater clarity regarding how a recipient can comply" with Title IX.[18] But by imposing broad standards for determining whether schools may exclude transgender students from participating on sports teams consistent with gender identity—again, such rules must bear a substantial relationship to education objectives or minimization of harm to the transgender students—the Proposed Rule sows confusion.[19]

---

[18] 88 Fed. Reg. at 22867.
[19] 88 Fed. Reg. at 22871.

### a. Substantially Related to Achievement of an Important Educational Objective

The first prong of the two-step approach is that if you exclude transgender students, the exclusion must be "substantially relate[d] to achievement of an important educational objective."[20] The Department points to the current Title IX regulation for single-sex classes under 34 CFR 106.34(b)[21] as grounds for this first standard. The Department states that possible "important educational objectives" justifying exclusion of transgender students from sports teams include "ensuring fairness in competition and preventing sports-related injur[ies]."[22] A school must consider "each sport, level of competition, and grade or education level" to determine whether an exclusion rule is "substantially related" to achieving an "important educational objective."[23] For example, the Proposed Rule suggests that the developmental focus of elementary and middle school teams is less likely to justify an exclusion rule, while the intense competition at high school and collegiate levels may be more likely to justify an exclusion rule. Of course, fairness and safety are important—Title IX already accomplishes both of these goals. The Department ignores that the benefits of Title IX's current, longstanding approach to athletics already satisfy the objectives of the Proposed Rule. The gray line that the Department attempts to draw does not provide either of these guarantees to girls and women.

For instance, in regard to preventing injury, the Proposed Rule suggests schools can implement "strategies" to alleviate injury-related concerns, such as "appropriate coaching and training, requiring use of protective equipment, and specifying rules of play."[24] Thus, the Department would have schools and sports authorities upend their entire athletic programs to achieve safety goals already achieved by maintaining distinctions between biological sexes, all for the sake of allowing biological males to play girls' sports. The Department establishes no rationale for imposing such costs on a highly successful system that affords equal opportunities for boys and girls. And in all events, there is no way to determine whether any of these "strategies" would provide the necessary safety for girls and women. The safest approach would be to provide equal opportunities for males and females, as the law already requires.

The Proposed Rule points to numerous athletic governing bodies, such as National Collegiate Athletic Association (NCAA), International Olympic Committee (IOC), USA Gymnastics, among others, to demonstrate that various organizations have adopted differing policies concerning transgender students' eligibility to participate

---

[20] *Id.*
[21] Specifically, §106.34(b)(1) provides that a recipient must choose one of these two important educational objectives: (A) To improve educational achievement of its students, through a recipient's overall established policy to provide diverse educational opportunities, provided that the single-sex nature of the class or extracurricular activity is substantially related to achieving that objective; or (B) To meet the particular, identified educational needs of its students, provided that the single-sex nature of the class or extracurricular activity is substantially related to achieving that objective."
[22] 88 Fed. Reg. at 22872.
[23] 88 Fed. Reg. at 22866.
[24] 88 Fed. Reg. at 22873.

on a male or female athletic team. NCAA and IOC adopted a sport-by-sport approach taking into consideration the nature of each individual sport when developing eligibility restrictions.[25] USA Gymnastics allows transgender athletes to compete consistent with their gender identity at lower levels of competition.[26] Similarly, USA Volleyball does not restrict transgender girls ages 12 and under seeking to play on girls' teams.[27] The Proposed Rule presents such varying policies as exemplars for schools. But unlike NCAA and sports-governing bodies, schools do not create rules for everyone in their leagues. If each school adopts different criteria, chaos will ensue, girls will be injured, and Title IX's assurance of equal opportunity will be undermined. It might make more sense under the Proposed Rule to allow school consortiums like the Indiana High School Athletic Association to promulgate uniform rules and prevent havoc between each recipient institution. Nevertheless, this does not resolve the issue of fairness and safety for girls in athletics.

### b. Harm Minimization Requirement

The second prong of the Proposed Rule requires that if a recipient adopts or applies criteria that would limit transgender students from playing on teams consistent with their identity, "it must do so in a way that minimizes harms to students."[28] The Proposed Rule explains that criteria that limits or prohibits transgender students' participation on certain teams "can force individual students to disclose that they are transgender, which can be 'extremely traumatic,' 'undermine social transition,' and cause '"embarrassment, harassment, and invasion of privacy . . ."'[29] The Department asserts vague "harm" to transgender students, but other than the example of disclosing a student's transgenderism, it provides no explanation what that might mean. Nor does the rule explain how to minimize any such harm, or specify whether, or in what circumstances, otherwise-justified rules excluding biological boys from girls' sports must yield out of concern for minimizing "harm" to one or more transgender students. This Proposed Rule creates confusion for schools.

In the Proposed Rule, the Department emphasizes the harm to transgender students and requires schools to "minimize harms to [those] students."  Yet, as long as biological boys and men play in women's categories, women will always be sidelined and mistreated. Transgender students may feel "traumatized" by not being able to play on their chosen team, but women and girls will also feel traumatized by losing to, and even suffering physical injury at the hands of males in their own sport.

---

[25] NCAA, *Transgender Student- Athlete Participation Policy* (Jan. 2022) (NCAA 2022 Policy); https://www.ncaa.org/sports/2022/1/27/ transgender-participation-policy.aspx; NCAA, 2010 NCAA Policy on Transgender Student-Athlete Participation (2010), https:// ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStudentAthlete ParticipationPolicy.pdf; IOC, *IOC Framework on Fairness, Inclusion, and Non-Discrimination on the Basis of Gender Identity and Sex Variations* (Nov. 2021) (IOC Framework), https:// stillmed.olympics.com/media/ Documents/News/2021/11/IOCFramework-Fairness-Inclusion-Nondiscrimination-2021.pdf, *see* 88 Fed. Reg. at 22869.
[26] USA Gymnastics, *Transgender & Non-Binary Athlete Inclusion Policy* at 2, *see* 88 Fed. Reg. at 22876.
[27] USA Volleyball, *Gender Competition Guidelines (2022–23 Season)*, https://usavolleyball.org/about/gender-guidelines (last visited April 26, 2023), *see* 88 Fed. Reg. at 22870.
[28] 88 Fed. Reg. at 22876.
[29] 88 Fed. Reg. at 22877.

Allowing biological males who wish to be women to compete in women and girls sports disadvantages and destroys their athletic opportunities, as discussed in *infra* 4. There is no way to minimize harm for all athletic players, and the Department offers none in the Proposed Rule.

### 4. The Proposed Rule Fails to Address the Biological Differences between Males and Females.

Title IX expressly recognizes biological differences between male and female students. Its text explicitly states that, "[n]otwithstanding anything to the contrary in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Regulations embrace the same understanding when they provide that Title IX recipients "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

Since its enactment in 1972, Title IX has led to an explosion in the participation of girls and women in sports. In 2021, 3.4 million girls played high school sports, and 219,000 women played NCAA sports. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates), female participation rates in athletics have risen from 43% of the male participation rate (74,329 to 169,800) in 1982 to 78% (219,177 to 278,988) in 2021—almost doubling.[30] The successes of women on America's playing fields correlate directly to greater opportunities for women in America's board rooms. Rolling back progress for biological women in sports is a civil rights issue of the highest order.

The Biden Administration's insistence on redefining "sex" in Title IX ignores science and puts girls and women at risk. The performance advantage of men over women is typically 10-50% depending on the sport.[31] The reason for male athletic advantage is biology. Males have 45% higher lean body mass, 33% higher lower body muscle mass and 40% higher upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output.[32] The result is that by early teens, many adolescent males surpass the best measurable elite (i.e., Olympic and world championship level) female performances in nearly all sports.[33]

Nor are these male advantages capable of suppression to a level that would allow meaningful competition of transgender girls and women (biological males) with

---

[30] NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx.
[31] Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med.* 2021 Feb;51(2): 199-214.
[32] *Id.*
[33] *Id.*

biological girls and women.[34] The Proposed Rule erroneously suggests throughout that a male who has not undergone endogenous puberty has no advantages over girls the same age.[35] Male advantages begin *in utero,* with males experiencing surges in testosterone in the womb and during a mini-puberty stage during the first six months after birth.[36] These early surges of testosterone lead, for instance, to higher bone density in the male spine and larger size of the axial skeleton in infant males.[37] Male athletic performance advantages are observable well before adolescence and are irreversible.[38] Among other endogenous physical benefits, even with pre-puberty hormone suppression, biological males will have a height advantage over biological girls and women.[39]

Importantly, not only do these biological differences put girls and women at an enormous competitive disadvantage when facing biological boys and men in athletics, but significant size, speed, and strength disparities put girls and women at greater risk of injury when competing against biological males in contact and combat sports.

---

[34] *Id.*; Wiik, A., Lundberg, T.R., Rullman, E., Andersson, D.P., Holmberg, M., Mandic, M., Brismar, T.B., Dahlqvist Leinhard, O., Chanpen, S., Flanagan, J.N., Arver, S., Gustaffson, T., Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals, *J. Clin. Endocrinol. Metab.* 2020 Mar 1;105(3):dgz247.

[35] 88 Fed. Reg. 22870, 22872-4.

[36] *See, e.g.,* Pedersen, Ultrasound evidence of sexual difference in fetal size in first trimester, *Br. Med. J.* 1980 281(6250): 1253; Persson et al., Impact of fetal and maternal factors on the normal growth of the biparietal diameter, *Scandinavian Association of Obstetricians and Gynaecologists* 1978 78: 21-27; Schwartzler et al., Sex-specific antenatal reference growth charts for uncomplicated singleton pregnancies at 15—40 weeks of gestation, *Ultrasound in Obstetrics and Gynaecology* 2004 23(1): 23-29; Broerre-Brown, et al., Sex-specific differences in fetal and infant growth patterns: a prospective population-based cohort study, *Biology of Sex Differences* 2016 7: 65; Galjaard, et al., Sex differences in fetal growth and immediate birth outcomes in a low-risk Caucasian population, 2019 *Biology of Sex Differences* 10: 48; Gilsanz, et al., Differential Effect of Gender on the Sizes of the Bones in the Axial and Appendicular Skeletons, *J. of Clin. Endocrin. And Metabol.* 1997 21(3): 415-430; Lanciotti, et al., Up-To-Date Review About Minipuberty and Overview on Hypothalamic-Pituitary-Gonadal Axis Activation in Fetal and Neonatal Life, *Frontiers in Endocrinology* 2018 9:410; Boas, et al., Postnatal penile length and growth rate correlate to serum testosterone levels: a longitudinal study of 1962 normal boys, *Eur. J. of Endocrin.* 2006 154(1): 125-129; Kiviranta, et al., Transient Postnatal Gonadal Activation and Growth Velocity in Infancy, *Pediatrics* 2016 138(1): e20153561; Becker, et al., Hormonal 'minipuberty' influences the somatic development of boys but not of girls up to the age of 6 years, *Clin. Endocrin.* 2015 83: 694-701.

[37] *Id.*

[38] Catley, M.J., Tomkinson, G.R., Normative health-related fitness values for children: analysis of 85347 test results on 9-17-year-old Australians since 1985. *Br. J. Sports Med.* 2013 Jan;47(2):98-108 (showing 9-yr. old males 9.8% faster in short sprints, 16.6% faster in mile run, 9.5% better standing long jump, completed 33% more push-ups in 30 seconds and had a 13.8% stronger grip); Tambalis K.D., Panagiotakos, D.B., Psarra, G., Daskalakis, S., Kavouras, S.A., Geladas, N., Tokmakidis, S., Sidossis, L.S., Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method, *Eur. J. Sport Sci.* 2016 Sep;16(6):736-46 (6-yr. old boys when compared to 6-yr. old girls completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position).

[39] Boogers, L.S., Wiepjes, C.M., Klink, D.T., Hellinga, I., van Trotsenburg, A.S.P., de Heijer, M., Hannema, S.E., Trans girls grow tall: adult height is unaffected by GnRH analogue and estradiol treatment, *J. Clin. Endocrinol. Metab.* 2022 Jun 6:dgac349. Doi: 10.1210/cinlnem/dgac349.

Scientific evidence shows that females are at greater risk of concussive injuries in sports.[40]

The Proposed Rule will ruin athletic opportunities for many girls and women.[41] Lia Thomas, the first transgender athlete to win a Division I national championship,[42] presents the most noteworthy case. Prior to "transitioning" from male to female, Thomas' best time in the 100-meter freestyle was 47.15. Post-transition, Thomas posted a prelims time of 47.37 in the 100-meter freestyle swim.[43] With a difference of just 22 seconds, the transition had a minimal effect upon Thomas' male-puberty advantage. In Thomas' last season competing on the men's team, Thomas ranked 554th in the 200-meter freestyle, 65th in the 500-meter freestyle, and 32nd in the 1650 meter freestyle. After transitioning to a female athlete, Thomas moved to 5th, 1st, and 8th places in those same events when competing as a woman.[44] When competing in the female divisions, biological males who rank toward the bottom of their given sport will always rank at the top and displace females in those categories.

While Lia Thomas stands athwart biology—aiming for Olympic glory as a self-declared woman[45]—swimming's worldwide governing body, FINA, acknowledged the harms that accompany the willful disregard of science and sense: allowing biological males to compete in women's athletics irreparably destroys opportunities for women and girls. On June 19, 2022, FINA adopted a new gender eligibility policy that only

---

[40] *See, e.g.*, Brown, K.A., Patel, D.R., Participation in sports in relation to adolescent growth and development, *Transl Pediatr* 2017;6(3):150-159; Gill, N., Study: State Concussion Laws Effective in Reducing Rates of Injury, *NFHS* (Nov. 2, 2017), *available at:* https://www.nfhs.org/articles/study-state-concussion-laws-effective-in-reducing-rates-of-injury/ (When "comparing the rates in gender comparable/available sports (basketball, soccer, baseball/softball), females had almost double the annual rate of concussions as males."); https://www.rugbypass.com/news/long-term-brain-damage-could-be-a-significantly-bigger-issue-in-womens-rugby-than-mens-says-lead-concussion-doctor/.

[41] *See e.g.* "Concerned Women for America announced Thursday that the organization filed a Title IX complaint against the University of Pennsylvania. CWA contends that Penn is violating Title IX by allowing Thomas to compete on the women's team …. This is not the first Title IX complaint CWA has filed in response to a prominent transgender athlete. After Franklin Pierce University (FPU) track athlete CeCe Telfer won a Division II national championship in the 400m hurdles in 2019, CWA filed a Title IX complaint with the Office for Civil Rights (OCR) at the Department of Education. OCR found that FPU's transgender inclusion policy violated Title IX and the school was forced to rescind its policy." https://www.espn.com/college-sports/story/_/id/33529775/amid-protests-pennsylvania-swimmer-lia-thomas-becomes-first-known-transgender-athlete-win-division-national-championship, *Equality Florida, et al. v. Florida, et al.*, Cause No. 4:22-cv-00134-AW-MJF, pending in the United States District Court for the Norther District of Florida, filed on March 31, 2022; and, "21 conservative AGs push back on Education Department's Title IX guidance." https://www.politico.com/news/2021/07/16/conservative-ags-education-department-title-ix-499867.

[42] https://www.espn.com/college-sports/story/_/id/33529775/amid-protests-pennsylvania-swimmer-lia-thomas-becomes-first-known-transgender-athlete-win-division-national-championship.

[43] *A Look at the Numbers and Times: No Denying the Advantages of Lia Thomas*, SWIMMING WORLD MAGAZINE (April 5, 2022), https://www.swimmingworldmagazine.com/news/a-look-at-the-numbers-and-times-no-denying-the-advantages-of-lia-thomas/.

[44] *Id.*

[45] *Transgender swimmer Lia Thomas reveals her Olympic dream as US trials for Paris draw closer*, ABC NEWS (May 31, 2022), https://www.abc.net.au/news/2022-06-01/transgender-swimmer-lia-thomas-reveals-olympic-dream/101116092.

permits swimmers who transitioned by age 12 or the onset of male puberty (known as Tanner Stage 2), whichever is later, and who have continuously suppressed testosterone to a level within the female range, to compete in women's events.

But while taking some account of biological differences between males and females, the FINA rules do not go far enough. Starting puberty blockers at the onset of Tanner Stage 2 does not erase the relative physical advantages characteristic of biological males. And permitting conditional cross-sex participation requires intensive and extensive monitoring of the conditions. As a practical matter, testing and monitoring testosterone levels or evidence of puberty-suppressing medications would require significant effort and resources to achieve. These resources necessary to monitor hormone suppression for transgender athletes to ensure compliance—including regular, unannounced testing and sample analysis to monitor testosterone—are likely beyond high school athletic associations' budgetary means and experience levels.

Biological males are genetically different from females. They develop different body structures and experience several early surges of testosterone that females do not. At no point do boys and girls play on an even field, which is why Title IX exists.

### 5. The Proposed Rule Unlawfully Purports to Preempt State Laws that Protect the Rights of Girls and Women.

The Proposed Rule also purports to preempt State laws that protect the rights of girls and women to participate in sports teams without having to compete against biological males. The Proposed Rule states that it is offered for the purposes of clarifying Title IX's application because "some States have adopted criteria that categorically limit transgender students' eligibility to participate on male or female athletic teams consistent with their gender identity."[46] Indiana, among twenty other states,[47] has passed such a law that remains in effect. Ind. Code § 20-33-13. Congress has provided no authority under Title IX for the Department to preempt States in this way.

### a. The Proposed Rule Confuses Spending Conditions for Law.

The Supremacy Clause, which authorizes federal preemption in some circumstances, provides that "the Laws of the United States . . . shall be the supreme Law

---

[46] 88 Fed. Reg at 22866.

[47] Tex. Educ. Code § 33.0834 (prohibits inclusion of biological males in women's sports K-12); Tenn. Code Ann. § 49-6-310(a) ("A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate."); id. § 49-7-180 (prohibits students of the male sex from competing in women's intercollegiate and intramural sports); KRS § 156.070 (prohibits inclusion of biological males in women's sports 6-college); Miss. Code. Ann. § 37-97-1 et seq. (requires state schools to designate teams by biological sex).; 2023 Kan. Sess. Laws Ch. 13. (prohibits biological males from participating on womens's sports from K-College).

of the Land." U.S. Const. art. VI. Title IX and its implementing regulations, however, simply impose conditions on federal grants. And conditions on federal grants are not "law" under the Supremacy Clause. Historically, "regulation was traditionally a matter of public congressional enactment," and Congress was "reluctan[t] . . . to use conditions as a means of national domestic regulation."[48] Attaching conditions to federal grants affords a way to incent desired behavior without commanding it. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent," *i.e.*, the consent of the individual accepting a federal grant, as opposed to the consent of the people writ large. *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562, 1570 (2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981)).

The distinction is critical to a proper understanding of the spending power and its limits. In sum, "the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). In other words, "Congress' *legislative* powers *cannot be avoided* by simply opting out," but "Congress' power to spend money is *not* a *legislative* power."[49] That limitation protects critical state interests. Thus, "unlike statutory provisions that are grounded in Congress' *legislative* powers, spending terms and conditions are obligatory and enforceable only if voluntarily accepted."[50] The "knowing acceptance" standard preserves the vertical balance of power between States and the federal government, "ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

For this reason, the Supreme Court has set limits on the conditions that Congress may impose on federal funding. For instance, Congress may impose "conditions that define the limits of the government spending program" but not "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *United States Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). And while Congress may financially induce States to accept policy changes, it may not impose conditions "so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).

Critically, a grantee need not accept a federal contract in the first instance, and if it does, the remedy for violation of its terms is a matter between the grantee and the United States. Thus, "when a federal statute does not directly require adherence to its provisions, but instead proposes them as terms of a contractual promise, it is not

---

[48] Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 91 n.* (2021).

[49] David Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 498 (2007).

[50] *Id.* at 500.

giving them the obligation of law."[51] Because "conditions do not purport to bind . . . in the manner of law," "[n]o federal condition, by whatever means adopted, should be understood to defeat the obligation of contrary state law."[52] Otherwise, "[i]n shifting legislative power to . . . private decisions, conditions displace public representative self-government . . . with private barter."[53] Treating grant conditions as "law" that trumps a generally applicable state exercise of the police power threatens a fundamental alteration to the relationships among citizens, their States, and the federal government, whereby the federal government may induce citizens and political subdivisions to violate state law with impunity.

The Supreme Court has never countenanced such a capacious understanding of congressional spending power, and the Department should not attempt to exercise such power here. It is worth observing that neither of the two existing Title IX regulations that purport to preempt state law, 34 CFR § 106.6(b) & (h), have been contested and upheld. And indeed, when the Department promulgated § 106.6(h) in 2020, it did not cite any Supreme Court cases upholding its authority to use spending conditions to preempt state law. Each case cited by the Department upheld preemption under Commerce Clause legislation, not spending power legislation.[54]

Furthermore, unlawful coercion violates the Tenth Amendment when Congress uses its taxing-and-spending power to enter the arena of general police power and override contrary state laws. In *Linder v. United States*, 268 U.S. 5 (1925), the Court rejected the use of the power to tax for the general welfare to regulate the practice of medicine. It said that "[o]bviously, direct control of medical practice in the states is beyond the power of the federal government," which meant that "[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure." *Linder v. United States*, 268 U.S. 5 (1925) at 18; *see also United States v. Doremus*, 249 U.S. 86, 93 (1919) (invalidating a federal regulation of physicians predicated on the taxing power because it invaded the police power of States and observing, "[o]f course Congress may not in the exercise of federal power exert authority wholly reserved to the states").

The Proposed Rule's preemption threat constitutes such an invasion of core state police power. As the Supreme Court has observed, "States traditionally have been accorded the widest latitude in ordering their internal governmental processes, and school boards, as creatures of the State, obviously must give effect to policies announced by the state legislature." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S.

---

[51] Hamburger, *supra*, at 132.

[52] *Id.* at 131.

[53] *Id.* at 92.

[54] *See* 85 Fed. Reg. 97,30454 fn. 1653 (May 19, 2020) (codified at 34 C.F.R. § 106.6 (2020)) (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (FDA regulations authorized by the Public Health Service Act); *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (National Traffic and Motor Vehicle Safety Act); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 396 (1986) (FCC regulations authorized by the Communications Act); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (National Traffic and Motor Vehicle Safety Act).

457, 476 (1982) (citation omitted). Congress noted in the Department of Education Organization Act that "in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States." 20 USC § 3401(4); *see also* 20 USC § 3403(a)&(b) ("The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States"). Indeed, the Department's own website acknowledges that "[e]ducation is primarily a State and local responsibility in the United States."[55] The Proposed Rule imposes unlawful conditions and preempts the powers of the States.

### b. The Proposed Rule Undermines Representative Government.

The Proposed Rule would suspend state police power regulations without the State's consent and thereby undermines state sovereignty in a way that implicates the Republican Form of Government Clause. While the federal government may "induce the states to adopt policies that the Federal Government itself could not impose," it cannot induce citizens (corporate or otherwise) or political subdivisions to violate state law. A "republican form of government" is one where the people are governed by legislatively enacted laws, not one where a different sovereign tempts some citizens or political subdivisions to exempt themselves from state laws. Manifestly, "the purchase of submission is not what traditionally was understood as a republican form of government."[56] That observation is particularly apt where the submission is not undertaken by the State itself but by a citizen or political subdivision being paid by the federal government to violate state law. And while the Supreme Court has never directly enforced the Guarantee Clause against the United States, it has observed that "perhaps not all claims under the Guarantee Clause present non-justiciable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992). Where Congress (or the Executive Branch) "actively interfere[s] in the states' republican self-governance," courts do not face unanswerable questions about how the United States itself should "guarantee" republican government.[57]

Even assuming that the Department could theoretically use spending conditions to preempt state law, any attempt to do so here would run afoul of basic preemption doctrine, including the presumption against preemption, which is grounded in the structural disfavor of preemption. *See e.g., Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "In all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "[W]here a statute regulates [a] field traditionally occupied by states, such as health, safety, and land use, a

---

[55] The Federal Role in Education," U.S. Department of Education, June 15, 2021, https://www2.ed.gov/about/overview/fed/role.html.
[56] Hamburger, *supra*, at 147.
[57] Hamburger, *supra*, at 147.

'presumption against preemption' adheres." *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)). Courts "assume that a federal law does not preempt the states' police power absent a clear and manifest purpose of Congress." *Atay*, 842 F.3d at 699; *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000).

The presumption against preemption is particularly strong in areas of core state responsibility, including (as described above) education. Here, the Department intends to preempt state laws. As the Department notes, the Proposed Rule's "clarification regarding Title IX's application to sex-related eligibility criteria is particularly important as some States have adopted criteria that categorically limit transgender students' eligibility to participate on male or female athletic teams consistent with their gender identity."[58] And this Proposed Rule will preempt those laws—thus, the very reason for the "clarification."

### c. The Proposed Rule violates the *Pennhurst* Clear-Statement Rule.

Under the clear-statement rule of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), the Department cannot change the conditions attached to federal funds without statutory text expressly authorizing it to do so. No one takes seriously the idea that, from the get-go, grant recipients understood Title IX to make a clear statement that gender identity discrimination was prohibited. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295–96 (2006) (observing that the Court must consider conditions on federal grants "from the perspective of a state official who is engaged in the process of deciding" whether to accept grant funds and "ask whether such a state official would clearly understand" the asserted condition). Put another way, preempting state and local laws protecting girls and women based on biological sex would breach the contractual agreement by which States and their educational entities accepted federal funds under Title IX and other federal statutes.

The Proposed Rule erroneously relies on *Bostock* to claim falsely that the term "sex" has always meant gender identity and that States and their officials "would clearly understand" as much. But in *Bostock*, the majority expressly accepted the understanding that "sex" means biological sex, and it expressly forswore condemnation of "sex-segregated bathrooms," "locker rooms," "dress codes," or "anything else of the kind." *Bostock*, 140 S. Ct. at 1753.

When Title IX was enacted in 1972, "sex" carried a "narrow, traditional interpretation." *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085–86 (7th Cir. 1984). It referred to the "two divisions" of organisms, "designated *male* and *female*," classified "according to their reproductive functions."[59] Title IX even distinguishes between institutions, organizations, and activities open to "only students of one sex" and those open to "students of both sexes." 20 U.S.C. § 1681(a)(2); *see also* § 1681(a)(5), (a)(6), (a)(7), (a)(8), (a)(9), (b). And as examples of organizations and activities open to "one sex,"

---

[58] 88 Fed. Reg at 22866.

[59] *The American Heritage Dictionary of the English Language* 1187 (1980).

Title IX lists the "Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls," "father-son" activities, "mother-daughter" activities, and "beauty pageants." § 1681(a)(6)(B), (a)(7), (a)(8), (a)(9). Title IX also speaks of "separate living facilities for the different sexes," authorizing separate showers, bathrooms, and bunks. § 1686. All of these provisions presume two discrete sexes with different anatomies and physiologies—not "gender identity," *i.e.*, an "individual's self-identification as being male, female, neither gender, or a blend of both genders."[60]

As explained, history tells us that the requirements of Title IX held a binary interpretation of sex. Congress has not intended this interpretation to include prohibitions of discrimination based on gender identity. And under the Clear Statement Rule, the Department does not have authority to change the conditions under Title IX.

\*\*\*

The Proposed Rule threatens to destroy Title IX. Our States will continue to ensure that American women and girls are treated with more respect than this Administration offers in this Proposed Rule.

Respectfully,

Todd Rokita
Indiana Attorney General

Steve Marshall
Alabama Attorney General

Tim Griffin
Arkansas Attorney General

Chris Carr
Georgia Attorney General

Raúl R. Labrador
Idaho Attorney General

Kris W. Kobach
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

---

[60] *The American Heritage Dictionary of the English Language* (5th ed. 2022).

Lynn Fitch
Mississippi Attorney General

Austin Knudsen
Montana Attorney General

Mike Hilgers
Nebraska Attorney General

Alan Wilson
South Carolina Attorney General

Marty Jackley
South Dakota Attorney General

Jonathan Skrmetti
Tennessee Attorney General

Ken Paxton
Texas Attorney General

Sean Reyes
Utah Attorney General

Jason Miyares
Virginia Attorney General

Patrick Morrisey
West Virginia Attorney General