**Exhibit E**

Collected Comments

**Exhibit E-1**

Comment by Brigham Young University and Council for Christian Colleges and Universities, ED-2021-OCR-0166-226740 (Sept. 12, 2022).

September 12, 2022


Submitted via www.regulations.gov

Secretary Miguel Cardona
U.S. Department of Education
400 Maryland Ave. SW
Washington, D.C. 20202

*Re: Written Comment on Proposed Rule: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (Docket ID ED-2021-OCR-0166)*

Dear Secretary Cardona:

Brigham Young University and the Council for Christian Colleges and Universities appreciate this opportunity to comment on the U.S. Department of Education's proposed changes to regulations implementing Title IX of the Education Amendments of 1972 (Title IX).

Title IX compliance and enforcement are of great importance to us and our students. We are committed to the objectives of eliminating sexual harassment and sex-based discrimination on our campuses. In fact, we believe our religious missions and practices reinforce the fundamental purposes of Title IX and help us prevent and address many of the most damaging consequences of sexual harassment and sex-based discrimination.

As religious organizations, we work to "create more inclusive communities that foster a sense of belonging for us all,"[1] where our "hearts are knit together in love."[2] We applaud and will continue to support ongoing efforts to find common ground,[3] including legislative efforts to protect both LGBTQ rights and religious freedom.[4]

This comment focuses on the Department of Education's interpretation of the statutory text of Title IX. The proposal for Title IX regulations to interpret the term "sex" to include "sexual orientation" and "gender identity" is inconsistent with the text, structure, purpose, and history of Title IX, which make clear that the statutory term "sex" is not ambiguous and refers only to biological differences between males and females.

As we pointed out in a Supreme Court *amicus curiae* brief we filed three years ago along with 40 other religious colleges and universities, interpreting "sex" under Title IX to include more than males and females cannot be reconciled with the statute's binary word choice concerning the word "sex." Specifically, Title IX refers to "both sexes," 20 U.S.C. § 1681(a)(2), and if certain opportunities are provided for students of "one sex," then comparable activities

---

[1] CCCU Welcoming Toolkit: Encouraging Belonging on Our Campuses and in Our Communities, https://www.cccu.org/wp-content/uploads/2021/04/2021-CCCU-Welcoming-Toolkit.pdf.
[2] BYU Statement of Belonging, https://belonging.byu.edu/statement-on-belonging.
[3] *See, e.g.*, NCAA, *Common Ground*, https://www.ncaa.org/about/resources/inclusion/common-ground.
[4] *See* Fairness for All Act, H.R. 1440, 117th Congress (2021) (protecting LGBTQ rights and religious freedom).

must be provided for students of "the other sex," *id.* § 1681(a)(8). The statute also references providing "separate living facilities for the different sexes," *id.* § 1686, which the U.S. Supreme Court has recognized as "necessary to afford members of each sex privacy from the other sex in living arrangements" arising from "[p]hysical differences." *United States v. Virginia*, 518 U.S. 515, 533, 550 n.19 (1996). Thus, the Title IX statute is at odds with the Department of Education's proposal to expand Title IX's regulatory definition of "sex" to encompass sexual orientation and gender identity. Moreover, because Title IX is a different statutory framework from Title VII (employment), the Supreme Court's decision that Title VII's definition of "sex" includes sexual orientation and gender identity does not compel the conclusion that the Department of Education must use that same definition of "sex" in its Title IX regulations.

Title IX contains a statutory religious exemption whereby Title IX requirements "shall not apply to an educational institution which is controlled by a religious organization if the application [of Title IX] would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). We reaffirm that the First Amendment to the U.S. Constitution protects the autonomy of religious institutions to be free from government involvement in the teaching or practice of religion, and from government action that is not neutral or that targets religious practice or belief. Further, federal law prohibits the government from imposing any substantial burden on our religious free exercise that is not the least restrictive means of meeting a compelling government interest. Even though our institutions qualify for this religious exemption, we are concerned that the proposed regulations impose a definition of "sex" under Title IX that extends beyond the plain language Congress provided in the statute.

We welcome and support all our students and employees who agree to abide by the requirements of our various higher education communities, including those who identify as LGBTQ. We acknowledge the complicated realities that many individuals experience as they navigate issues surrounding sexual orientation, gender identity, and religious doctrine. The intersection of religious identity and LGBTQ identity—both at an institutional level and an individual level—is complex and nuanced. We stand firm in our religious beliefs and at the same time reiterate our love and respect for each member of our campus communities as well as each member of the broader higher education community.

We are grateful for this opportunity to comment on these important issues, and we also welcome opportunities to continue to find ways consistent with the U.S. Constitution, federal statutory text, and our religious missions to support those who identify as LGBTQ.

Kevin J Worthen, President
Brigham Young University

Shirley V. Hoogstra, President
Council for Christian Colleges and Universities

**Exhibit E-2**

Comment by Alliance Defending Freedom ("The Rule is Legally Unsound and Procedurally Infirm"), ED-2021-OCR-0166-200280 (Sept. 11, 2022).



September 11, 2022

**Miguel A. Cardona**
**Secretary of Education**
**U.S. Department of Education**
**VIA REGULATIONS.GOV**

**RE:   Nondiscrimination on the Basis of Sex in Education Programs or**
      **Activities Receiving Federal Financial Assistance**
      **Docket ID ED-2021-OCR-01666**

   *The Rule is Legally Unsound and Procedurally Infirm*

Dear Secretary Cardona,

Fifty years ago, Congress acted to protect equal opportunity for women by passing Title IX. Now, by radically rewriting federal law, the Biden administration is threatening the advancements that women have long fought to achieve in education and athletics. Along with denying women a fair and level playing field in sports, this new rule seeks to impose widespread harms, including threatening the health of adults and children, denying free speech on campus, trampling parental rights, violating religious liberty, and endangering unborn human life.

Alliance Defending Freedom (ADF) submits these comments on the Notice of Proposed Rulemaking (NPRM) on Title IX of the Education Amendments of 1972, Docket ID ED-2021-OCR-0166. ADF is an alliance-building legal organization that advocates for the right of all people to freely live out their faith. It pursues its mission through litigation, training, strategy, and funding. Since its launch in 1994, ADF has handled many legal matters involving Title IX, the First Amendment, athletic fairness, student privacy, and other legal principles addressed by the Notice of Proposed Rulemaking.

ADF strongly opposes any effort to redefine sex in federal regulations inconsistent with the text of Title IX itself, or otherwise impair the First Amendment, due process, or parental rights. This proposed rule seeks to redefine sex discrimination and sexual harassment under Title IX to address new matters beyond the scope of the statute. ADF thus encourages the Department of Education to withdraw and abandon the NPRM.

These comments focus on the rule's overarching legal and procedural infirmities.

U.S. Department of Education
September 11, 2022
Page 2

I.   **Redefining "sex discrimination" will harm students, faculty, and schools.**

The Department's notice proposes to add new sections that impact the definition of sex discrimination:

- the Department proposes in section 106.10 to define sex discrimination to include discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity;[1]

- the Department proposes in section 106.31(a)(2) to clarify that even where Title IX permits sex separation, a recipient cannot carry out that different treatment in a way that discriminates on the basis of sex by subjecting a person to more than de minimis harm. A policy or practice that prevents a person from participating in an education program or activity consistent with their gender identity subjects a person to more than de minimis harm.[2]

Not only does this redefinition of sex deviate from past agency statements[3] (as the Department admits) and lack any basis in federal law or Supreme Court opinion, but this collective redefinition of sex in Title IX will hurt students, faculty, and schools alike. For the reasons detailed below, Alliance Defending Freedom opposes the addition of sections 106.10 and 106.31(a)(2) to the Title IX regulations.

The Department thus should consider the alternative of using the biological definition of sex, which does not address gender identity or sexual orientation on any theory. It must explain why that definition cannot be retained. And it must consider the many harms that will follow from this redefinition.

II.   **Redefining "sex discrimination" is not authorized by Title IX's text or Supreme Court precedent.**

The NPRM states that the "Department now believes that its prior position (i.e., that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity) is at odds with Title IX's text and purpose and the reasoning of the *Bostock* Court and other courts to

---

[1] NPRM at 519.

[2] NPRM at 529.

[3] NPRM at 7-8.

U.S. Department of Education
September 11, 2022
Page 3

have considered the issue in recent years—both before and after *Bostock*."[4] This is simply wrong.

### A.   Title IX deals with sex, not gender identity or sexual orientation.

To interpret a statute, "we begin with the text."[5] "After all, only the words on the page constitute the law."[6] And neither judges nor bureaucrats can "add to, remodel, update, or detract from old statutory terms" according to their "own imaginations,"[7] or to ensure statutes "better reflect the current values of society."[8] Title IX says no person "shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity."[9]

Title IX doesn't say anything about sexual orientation or gender identity. It prohibits discrimination only "on the basis of sex." But sexual orientation, gender identity, and "transgender status are distinct concepts from sex."[10] Since the word "sex" can't fully encompass all of these terms at once, the question is which term Title IX uses when it prohibits discrimination "on the basis of sex."[11] Because "sex" is not defined in the statute, it should be interpreted according to "the ordinary public meaning of [the] term[ ] at the time of its enactment."[12] In 1972, the ordinary meaning of "sex" was "one of the two divisions of organic esp. human beings respectively designated male or female."[13]

---

[4] NPRM at 521.

[5] *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019).

[6] *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020).

[7] *Id.*

[8] *Id.* at 1756 (Alito, J., dissenting).

[9] 20 U.S.C. § 1681(a) (emphasis added).

[10] *Bostock*, 140 S. Ct. at 1746–47; *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1053 (7th Cir. 2017).

[11] 20 U.S.C. § 1681(a).

[12] *Bostock*, 140 S. Ct. at 1738.

[13] Webster's Third New International Dictionary 2081 (1968); *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("sex" meant "an immutable characteristic determined solely by the accident of birth."); The American Heritage Dictionary of the English Language 1187 (1st ed. 1969) (defining sex as "[t]he property or quality by which organisms are classified according to their reproductive functions"); *see also Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) (opining that sex

U.S. Department of Education
September 11, 2022
Page 4

Though we start with the words themselves, the text should be "interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole."[14] "After all, context matters. As the late Justice Thurgood Marshall once put it, 'A sign that says "men only" looks very different on a bathroom door than a courthouse door.'"[15]

Throughout Title IX, "sex" is used as a binary concept, encapsulating only male and female. For example, Title IX allows schools in some cases to change "from being an institution which admits only students *of one sex* to being an institution which admits students of *both sexes*."[16] Not only do these provisions speak of "the" other sex or "both sexes," rather than "another" sex or "all sexes," they also use terms like "father-son" and "mother-daughter" which are rooted in biology. At the time, mother was defined as "a female parent";[17] "father" as "a male parent";[18] "son" as a "male offspring";[19] and "daughter" as "a human female."[20] This makes no sense if "sex" includes the non-binary concept of gender identity. (In stark contrast to the statute's biological binary, the Department attempts to erase references to "both sexes" in the regulations and replace them with "all applicants."[21])

If sex included concepts like a person's gender identity, many Title IX exemptions would not make sense. Title IX's regulations would not make sense either. They correctly allow for separate locker rooms and showers, so long as facilities "for students of one sex" are comparable to "facilities provided for students of the other sex."[22] In sports, the regulation allows schools to "sponsor separate

---

did not encompass "a person who has a sexual identity disorder, *i.e.*, a person born with a male body who believes himself to be female, or a person born with a female body who believes herself to be male"). And until it is changed by Congress, "Title IX's ordinary public meaning remains intact." *Neese v. Becerra*, 2:21-CV-163-Z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022) (interpreting Title IX to protect biological sex, not gender identity).

[14] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001).

[15] *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1321 (11th Cir.) (Pryor, J. dissenting) (citation omitted), reh'g en banc granted, 9 F.4th 1369 (11th Cir. 2021).

[16] 20 U.S.C. § 1681(a)(2) (emphases added).

[17] Webster's Third New International Dictionary 1474 (1968).

[18] *Id.* at 828.

[19] *Id.* at 2172.

[20] *Id.* at 577.

[21] *See* NPRM at 469, 509.

[22] 34 C.F.R. § 106.33.

U.S. Department of Education
September 11, 2022
Page 5

teams for members of each sex."[23] And schools must "provide equal athletic opportunity for members of both sexes" to "effectively accommodate the interests and abilities of members of both sexes."[24]

The list goes on. Title IX or its regulations exempt institutions "traditionally" limited to "only students of one sex";[25] "youth service organizations" traditionally "limited to persons of one sex";[26] "living facilities for the different sexes";[27] "separation of students by sex within physical education classes" for sports chiefly involving bodily contact;[28] and human sexuality classes and choirs separated by "sex".[29] Title IX and its regulations only make sense against a binary, biological backdrop. For these reasons, courts, jurists, and even this Department have repeatedly rejected the effort to redefine sex to mean gender identity, both before *and* after *Bostock v. Clayton County*.[30]

In contrast, the Department's proposed regulations would have a discriminatory, and even nonsensical, effect. If sex includes sexual orientation, these exemptions affirmatively bless heterosexual-only choirs,[31] or living facilities for gays only.[32] And if sex means gender identity, schools could not use a biology-based classification to separate physical education classes involving sports like

---

[23] *Id.* § 106.41(b).

[24] *Id.* § 106.41(c) (emphases added).

[25] 20 U.S.C. § 1681(a)(5).

[26] *Id.* § 1681(a)(6)(B)

[27] 20 U.S.C. § 1686.

[28] 34 C.F.R. § 106.34(a)(1).

[29] *Id.* § 106.34(a)(3)&(4).

[30] *See, e.g.*, *Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) (noting a plausible conflict between the U.S. Department of Education's redefinition of sex discrimination to include gender identity and Title IX itself and its implementing regulations); *see also Adams v. Sch. Bd. of St. Johns Cnty., Fla.*, 3 F.4th 1299, 1336-38 (11th Cir. 2021) (Pryor, J. dissenting); *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 731 (4th Cir. 2016) (Niemeyer, J. concurring in part and dissenting in part); U.S. Dep't of Educ., Office for Civil Rights, Memorandum from Principal Deputy General Counsel Reed D. Rubinstein to Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights re *Bostock v. Clayton Cnty.* (Jan. 8, 2021) (rescinded 2021) https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf.

[31] *See* 34 C.F.R. § 106.34(a)(4).

[32] *See* 20 U.S.C. § 1686.

U.S. Department of Education
September 11, 2022
Page 6

boxing and rugby.[33] These exemptions only make sense if they are rooted in biology, not identity or orientation.

There is no basis in the text of Title IX, or its implementing regulations, for reinterpreting sex to include gender identity.

### B.  *Bostock* does not require reinterpreting "sex" under Title IX.

*Bostock v. Clayton County* does not compel a different conclusion. *Bostock* held that discrimination based on sexual orientation or gender identity in the employment context violates Title VII.[34] In short, the Court observed that an employer who discriminates against an employee based on their sexual orientation or gender identity bases their decision, in part, on sex, and sex "is not relevant to the selection, evaluation, or compensation of employees."[35]

*Bostock* does not support the Department's reinterpretation of "sex" for at least three reasons. First, *Bostock* does not change the "ordinary, contemporary, common meaning" of sex under Title IX.[36] Just the opposite: *Bostock* recognized that "sex," "gender identity," and "sexual orientation" are "distinct concepts."[37] *Bostock* merely said that gender-identity discrimination considered sex. [38] But did not consider the inverse question: whether considering biological sex always constitutes gender-identity discrimination.

Second, *Bostock* was a narrow holding, and the Court disclaimed any application outside the Title VII employment context.

The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws

---

[33] *See* 34 C.F.R. § 106.34(a)(1).

[34] 140 S. Ct. at 1741.

[35] *Id.*

[36] *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted).

[37] 140 S. Ct. at 1739.

[38] 140 S. Ct. at 1747–48.

U.S. Department of Education
September 11, 2022
Page 7

are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today.[39]

For this reason, other courts have concluded that "the rule in *Bostock* extends no further than Title VII."[40]

Third, *Bostock*'s analysis does not work under Title IX. "Title VII differs from Title IX in important respects."[41] Though sex is irrelevant to hiring or firing decisions, "athletics differs from . . . employment in analytically material ways."[42] So "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context."[43] "Congress itself recognized that addressing discrimination in athletics presented a unique set of problems not raised in areas such as employment and academics."[44]

Sports prove the point. Remember, *Bostock* simply held that Title VII forbids employers from taking sex into consideration (even in part) when they fire an employee. Applying the same reasoning here would mean Title IX forbids schools from taking sex into consideration (even in part) when they field a soccer team. But "athletics programs necessarily allocate opportunities separately for male and female students."[45] And because males would largely displace females in sports if they were forced to compete against one another, the Department's interpretation would be the death knell of women's sports.

But no one thinks that Title IX forbids all sex-separated sports in every situation[46]—including the Department.[47] And even if the Department attempts to

---

[39] 140 S. Ct. at 1753.

[40] *See, e.g.*, *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

[41] *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4.

[42] *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996).

[43] *Meriwether*, 992 F.3d at 510 n.4; *Neal*, 198 F.3d at 772 n.8 (Title VII "precedents are not relevant in the context of collegiate athletics. Unlike most employment settings, athletic teams are gender segregated"); *Cohen*, 101 F.3d at 177 ("It is imperative to recognize that athletics presents a distinctly different situation from . . . employment and requires a different analysis in order to determine the existence *vel non* of discrimination.").

[44] *Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994).

[45] *Cohen*, 101 F.3d at 17.

[46] *See Kelley*, 35 F.3d at 271 (rejecting male's challenge to sex-separated sports under Title IX).

[47] NPRM at 538 ("The Department also recognizes that exclusion from a particular male or female athletics team may cause some students more than de minimis harm, and yet that possibility is

U.S. Department of Education
September 11, 2022
Page 8

preserve sex separation in sports except to the extent an athlete wants to play on an opposite-sex team that matches his or her gender identity, it would still destroy women's sports by making it impossible to police males' participation. That's because "the transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)."[48] And major governing sports bodies that allow males to participate in women's sports only do so for males who have taken puberty blockers or suppressed their testosterone. World Rugby, for example, only allows males to participate if they have never experienced male puberty. And organizations like the NCAA acknowledge that males' participation in women's sports based solely on gender identity is untenable. But even these regulations would violate the Department's interpretation of Title IX because they would still exclude some males (who identify as female) from participating in the women's category. According to the Department's proposed rule, every male (who identifies as female) gets to participate in women's sports—regardless of medical interventions or athletic ability—because to do otherwise would inflict more than de minimis harm.

Ironically, the Department's proposed de minimis standard violates its own interpretation of *Bostock*. The Department—without foundation in law, logic, or statute—invented a new de minimis standard. The Department's proposed rule would make subjecting a person to more than de minimis harm on the basis of sex a violation of Title IX. Subjecting a person to *less* than de minimis harm is permissible—and it appears that only the Department can define that threshold. But *Bostock* did not use such a standard. According to the Department's own interpretation, *Bostock* is all or nothing. Either the policy or rule considers sex, or it does not. *Bostock* does not consider or measure harm. This means that the Department's own proposed rule, by its interpretation of *Bostock*, is flawed.

Finally, sex-separated "bathrooms, locker rooms, [and] anything else of the kind"—even overnight facilities at battered-women's shelters—would be abruptly illegal. Mechanically and uncritically importing *Bostock*'s narrow holding into Title

---

allowed under current § 106.41(b). The Department's authority to permit such different treatment in the context of athletics is described in the discussion of § 106.41").

[48] *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring); *see also id.* at 701 (Wilkins, J., concurring) (same holding).

U.S. Department of Education
September 11, 2022
Page 9

IX would work precisely a sea change in this country's education laws, a change to Title IX that *Bostock* itself refused to endorse.[49]

### C.     Reinterpreting "sex" is a matter for Congress and exceeds the Department's authority.

Our federal government is one "of limited powers."[50] "The powers not delegated to the United States" are reserved to the individual States and the people.[51] And though the Supremacy Clause gives the federal government "a decided advantage" to "impose its will on the States," States still "retain substantial sovereign authority" owing to our system's "constitutionally mandated balance of power."[52] This decentralized structure "preserves to the people numerous advantages," and helps to protect "our fundamental liberties."[53]

That is why "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides this balance."[54] A "clear and manifest" statement is necessary for a statute to preempt "the historic police powers of the States,"[55] to abrogate state sovereign immunity, or to permit an agency to regulate a matter in "areas of traditional state responsibility."[56] Courts thus "insist on a clear" statement "before interpreting" any "expansive language in a way that intrudes on the police power of the States."[57]

Courts may also insist that "Congress speak with a clear voice" when it imposes conditions on the receipt of federal funds.[58] " 'Legislation enacted pursuant to the spending power is much in the nature of a contract,' and therefore, to be

---

[49] 140 S. Ct. at 1753.

[50] *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).

[51] U.S. Const. amend. X.

[52] *Gregory*, 501 U.S. at 457–460 (citation omitted).

[53] *Id.* at 458.

[54] *Id.* at 460 (citation omitted).

[55] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

[56] *Bond v. United States*, 572 U.S. 844, 858 (2014).

[57] *Id.*, 572 U.S. at 860; *Rice*, 331 U.S. at 230 (requiring "clear and manifest purpose" to override the "historic police powers of the States").

[58] *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

U.S. Department of Education
September 11, 2022
Page 10

bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'"[59]

So the federal government may not "surpris[e] participating States with post acceptance or 'retroactive' conditions,"[60] or impose "a burden of unspecified proportions and weight, to be revealed only through case-by-case adjudication."[61] And private recipients of federal funds must have "notice" of their responsibilities too.[62] Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property."[63] The federal Constitution limits the States' and the public's obligations to those requirements "unambiguously" set forth on the face of the statute,[64] both to make a statute apply to the States and to show that the statute applies in the particular manner claimed.[65]

All of these federalism concerns call for the "clear statement" rule here.[66] The Department's reinterpretation of Title IX obviously affects education, which is the state's "high responsibility."[67] In fact, public education is "the very apex of the function of a State."[68] And "Title IX was enacted as an exercise of Congress' powers under the Spending Clause."[69]

For these reasons Congress' "intention" to cover sexual-orientation and gender-identity discrimination under Title IX must be "unmistakably clear in the language of the statute."[70] It is not. Congress did not unmistakably address sexual

---

[59] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).

[60] *Pennhurst*, 451 U.S. at 24.

[61] *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.. v. Rowley*, 458 U.S. 176, 190 n.11 (1982).

[62] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) (citation omitted).

[63] *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (citation omitted) (striking down eviction 'moratorium').

[64] *Pennhurst*, 451 U.S. at 17.

[65] *Gregory*, 501 U.S. at 460–70.

[66] *Bond*, 572 U.S. at 2089.

[67] *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

[68] *Id.*

[69] *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005). So was § 1557 of the ACA. 42 U.S.C. § 18116(a); *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012).

[70] *Gregory*, 501 U.S. at 460 (citations omitted).

U.S. Department of Education
September 11, 2022
Page 11

orientation and gender identity in the 1972 Title IX, let alone unmistakably force colleges to abandon their codes of conduct on matters of sex, sexuality, and the human person. In fact, in a 1976 letter to the President of Harding College, OCR Acting Director Martin H. Gerry specifically denied that Title IX applied to sexual orientation: "We should, perhaps, note in this connection that Title IX does not address the question of homosexuality—it prohibits discrimination based on sex, not actions based upon sexual preference."[71]

The Department's reinterpretation goes against the plain text and purpose of Title IX. And in doing so, it doesn't just infringe core state responsibilities or upend settled expectations; the Department seeks to redefine notions of privacy, fairness, and biological differences that have "been commonplace and universally accepted . . . across societies and throughout history."[72] Congress did not address sexual orientation or gender identity when it codified Title IX in 1972. For fifty years, everyone has accepted that schools may recognize biological differences between males and females. And the Department's reinterpretation would have momentous consequences throughout society. That's an unfair "surprise[e]" to States and their citizens if there ever was one.[73]

The proposed rule thus unlawfully seeks to impose obligations that Congress did not clearly impose when it enacted Title IX—reason enough for it to be unconstitutional.[74]

*Bostock* does not help the Department here. In fact, Title IX's "contractual framework distinguishes [it] from Title VII, which is framed in terms not of a condition but of an outright prohibition."[75] So while "Title VII applies to all employers without regard to federal funding and aims broadly to 'eradicate discrimination throughout the economy,' " "Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal

---

[71] Letter from Martin H. Gerry, Acting Dir., Office for Civil Rights, Dep't of Health, Educ., & Welfare, to Clifton L. Ganus, Jr., President, Harding Coll. 4-5 (Oct. 14, 1976), http://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/harding-university-response-10141976.pdf.

[72] *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting).

[73] *Pennhurst*, 451 U.S. at 25.

[74] U.S. Const. amend. X.

[75] *Gebser*, 524 U.S. at 286.

U.S. Department of Education
September 11, 2022
Page 12

funds."[76] "Title IX's contractual nature" is one more reason to distinguish this case from *Bostock*, and why Title IX demands a narrow reading.[77]

Moreover, modern agency interpretations cannot change the ordinary meaning of a statutory text. Agency interpretations only come into play when the underlying statute is "genuinely ambiguous."[78] And Title IX is not ambiguous. When Congress enacted Title IX, "'sex' referred to the physiological distinctions between males and females."[79]

This means that by redefining sex discrimination to include sexual orientation and gender identity—concepts that cannot coexist with biological sex— the Department has exceeded its agency authority in going beyond the clear, unambiguous terms of Title IX. The Department's interpretation also "radically readjusts the balance of state and national authority."[80] The Department's proposed regulations must therefore be rejected.

## III.   The attempt to redefine sex is arbitrary and capricious.

The proposed rule claims that "[c]ontrary to the assertions made in 2020 and January 2021, the Department does not have a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'"[81]

If this claim is incorrect, then the Department's mischaracterization of its own prior position and consequent failure to appreciate the degree to which it is effectuating change in that position is arbitrary and capricious.

This claim is incorrect. The Department's own regulations showed a biological binary. The Department never announced any notices of a contrary definition until 2016, when its attempt to do so was swiftly struck down.[82] When the

---

[76] *Id.* at 286–87.

[77] *Id.* at 287.

[78] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

[79] *Grimm*, 822 F.3d at 736 (Niemeyer, J., concurring and dissenting in part) (collecting sources).

[80] *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539–540) (1947).

[81] 87 Fed. Reg. at 41537.

[82] Educational providers sued when the government sent a "Dear Colleague" letter to impose a similar standard on federally funded educational facilities. *Texas v. United States*, 201 F. Supp. 3d 810, 819–23 (N.D. Tex. 2016). There, as here, the Department announced new guidelines under which colleges must "alter their policies concerning students' access to single sex toilet, locker room,

U.S. Department of Education
September 11, 2022
Page 13

Department tried to do so last year, through informal guidance, the guidance was again enjoined. The Department never had this definition in the past.[83]

And, indeed, the past notices themselves are evidence that a past definition was in place. The proposed rule even says that the "Department now believes that its prior position (i.e., that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity) is at odds with Title IX's text and purpose and the reasoning of the *Bostock* Court and other courts to have considered the issue in recent years—both before and after *Bostock*."[84]

The Department is trying to rewrite the past to pretend that its new far-reaching interpretation of Title IX was in the statute all along. But this defies common sense. The Department would be on better ground simply to admit that it seeks to add new protected classes to the statute.

## IV.   IV.   The Department should delay the rule until after the next Supreme Court term and then re-open the comment period.

The Department should delay the start of any comment period until the Supreme Court decides *303 Creative* in the October 2022 term.[85]

A Colorado law threatens web designer Lorie Smith and her studio, 303 Creative, to design and publish websites promoting messages that violate her religious beliefs. The law at issue also prevents Lorie from even explaining on her

---

and shower facilities, forcing them to redefine who may enter apart from traditional biological considerations." *Id.* A similar coalition sued in 2021 when the Department tried to do so again with informal guidance, and it was again enjoined. *Tennessee v. U.S. Dep't of Educ.*, 2022 WL 2791450, at *5–12.

[83] On February 23, 2021, citing the Executive Order, President Biden's Departments of Education and Justice explicitly withdrew the previous administration's position that Title IX does not allow schools to let biological men compete in women's sports. Dep't of Educ. Office for Civil Rights, Letter to City of Hartford, et al. (Feb. 23, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01194025-a5.pdf; *see* Dep't of Educ., Letter to City of Hartford, et al. (Aug. 31, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01194025-a2.pdf, at the top of which the Biden Administration posted a red-lettered disclaimer stating, "This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation."

[84] NPRM at 521.

[85] *303 Creative LLC v. Elenis*, No. 21-476 (U.S.).

U.S. Department of Education
September 11, 2022
Page 14

own company's website what websites she can create consistent with her religious beliefs.

The U.S. Court of Appeals for the 10th Circuit ruled that Colorado can force Lorie to express messages and celebrate events that violate her faith because of the importance of the alleged government interest in prohibiting discrimination on the basis of sexual orientation and gender identity.

No one should be banished from the marketplace simply for living and speaking consistently with his or her religious beliefs. That's why ADF appealed this decision to the U.S. Supreme Court on Lorie's behalf.

The Supreme Court agreed to hear Lorie's case and will address the question of "whether applying a public-accommodation law to compel an artist to speak or stay silent violates the Free Speech Clause of the First Amendment." ADF looks forward to representing Lorie before the high court.

This could be a landmark case for the freedom of speech, religious liberty, and artistic freedom. Because that same nondiscrimination standard is the one the Department plans to insert into the proposed rule, the Department and the public need to be aware of how the Supreme Court views the significance of that interest generally, and how it balances those interests in light of important constitutional concerns such as free speech and free exercise of religion.

Given the direct applicability of this case to the proposed rule's speech restrictions, the Department should hold its consideration of the proposed rule, which affects provider speech, until after the Supreme Court decides *303 Creative*.

If the Department publishes the final rule or (as seems likely) closes the comment period before the Supreme Court rules in *303 Creative*, it should revise its proposed rule and open a supplemental comment period after the Supreme Court issues its decision.

## V.     The proposed rule suffers from multiple procedural errors.

### A.     The proposed rule fails to give adequate definitions of key terms.

The proposed rule fails, but should, define the terms used in proposed § 106.10. The Department proposes to enact a new regulation stating, "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation,

U.S. Department of Education
September 11, 2022
Page 15

and gender identity." But the rule does not define "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." This rule does not even define what is a man, or what is a woman. Even though it uses the terms male and female throughout its proposed rule, it never addresses what these terms mean.

The proper definition is, of course, by biological sex. No theory of interpretation, such as a sex-stereotyping theory, should incorporate concepts of gender identity or sexual orientation.

The final rule must address these vagueness issues and define, in a non-circular way, what is a man and what is a woman. If the rule fails to do so, the Department is ignoring key issues and is failing to act with reasoned decision making. It is also susceptible to challenge under the due process clause for vagueness because the regulated community would lack clear notice of its obligations.

The final rule should define these terms with precision and moreover do so expressly in the text of a new regulation. In particular, key terms like "gender identity" and "transgender status" must be defined in ways that show how they comport with Title IX, and in ways that are not vague or malleable. It should explain frankly whether and how they address persons who identify as a detransitioner or as gender non-conforming.

The final rule must also address the inherent contradiction of reinterpreting "sex" (an immutable reality) to include "gender identity" and "transgender status" (subjective self-identifiers based on a person's rejection of his or her own biological sex).

Nor does the final rule define "termination of pregnancy." It is impossible to know what an abortion mandate may require.

Any final definition section must provide a rationale for any proposal that redefines "sex" in terms inherently contradictory to the statutory intent of Title IX as a whole and to Title IX's specific provisions regarding sex-specific clubs, activities, facilities, and athletics, as well as to the statutory abortion neutrality provision. If the government does not provide definitions, it should explain why it will not do so, and explain why its current proposed text will not create problems of vagueness, lack of notice, and contradictions. It should also reopen the comment period to allow comment on the correct definitions to be proposed.

U.S. Department of Education
September 11, 2022
Page 16

### B.      The agency must ascertain important economic impacts.

The agency should (but fails to) estimate the economic impacts of adding gender identity as a nondiscrimination category under Title IX. These impacts include estimating the number of women covered by Title IX and impacted by such a change, and the macroeconomic impacts on women's opportunities generally by reversing the progress made since Title IX was enacted. All of the costs identified in this comment, in particular, must be taken into consideration, and quantified or estimated to the maximum extent possible for a sufficient analysis of impact, costs, benefits, and transfers. The agency cannot avoid this cost calculation by claiming, implausibly, that the rule will not change anything—the rule obviously seeks to impose massive changes in practice in this area, even if the Department believes its position to have legal authority and even if the Department believes that all of these changes should have been carried into effect many years ago.

In addition to the numerous costs of the proposed rule the Department must consider, it must also consider alternatives, including not regulating, or maintaining the status quo, and provide that analysis, with analysis of each cost in each alternative.

- The agency should consider multiple alternative approaches, and it should specify why each alternative approach cannot be maintained.

- The agency should identify why each alternative is feasible or not, and it should give specific reasons for its conclusions.

- The agency should perform cost-benefit analyses for each alternative, so that HHS can select the most cost-effective option.

- If any one of the following alternative regulatory approaches better follows the law, better promotes good education or good medicine, or better protects conscience and religious freedom, it should be chosen.[86]

The agency should consider the alternative of leaving the current rule in place, in whole or in part, or of rescinding the current rule without replacement.

- The current rule ensures that the Department does not exceed its authority.

- The current rule helps eliminate religious discrimination and intolerance in healthcare. In a pluralistic society, we should respect many religious perspectives.

---

[86] *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021).

U.S. Department of Education
September 11, 2022
Page 17

- The current rule reduces burdens on schools and healthcare providers and improves parental rights, freedom of choice, personal dignity, and personal freedom.

- Even if part of the rule is rescinded, the Department should consider retaining individual portions of the past rule.

- For example, the Department should consider retaining the rule's protections for good medicine, single-sex facilities, conscience, and religious freedom, especially the Title IX religious exemption.

- Likewise, the Department should consider retaining the scope of the current Section 1557 rule on the size of the regulated community, rather than reaching out to sweep in new regulated entities, such as insurers.

- The agency should consider providing for disclosure of the limited scope of services, rather than performance mandates, and the Department should consider flexible approaches to enforcement, providing for warnings rather than penalties for non-compliance.

- The agency should consider allowing regional variations to reflect the differences in state and local laws, including by respecting state and local laws that regulate or prohibit practices that the Department would otherwise seek to mandate, including state laws prohibiting gender interventions on minors and laws prohibiting abortion. Federal law should be harmonized to allow regional variation and flexibility, respecting the primary role of state and local governments to set healthcare policy.

The agency thus should consider each individual portion of the rule, in each possible combination, to ensure that it has considered all possible regulatory alternatives to full repeal. And its cost-benefit analysis should be altered accordingly, on a granular level, in order to accurately consider each alternative.

This analysis should include the following specific considerations of costs and benefits.

### 1.    *Benefits*

The Department must quantify and show the proposed rule's benefits with evidence and data. But instead the proposal calls into question the benefits side of the equation, by opining—without evidence—that the current regulations "may have created a risk that Title IX's prohibition on sex discrimination would be

U.S. Department of Education
September 11, 2022
Page 18

underenforced."[87] Nowhere does the Department show such underenforcement. And a rule is arbitrary and capricious if it seeks to address a problem that is not a problem at all. The Department thus should withdraw the rule, provide this evidence, reopen the comment period, and allow an orderly process of decision making on this point.

Toward the same end, the proposal admits that its redefinition of sex discrimination "could result in increased costs to recipients, especially those recipients that limited the application of their Title IX policies to those forms of conduct" hitherto covered as sex discrimination—yet it asserts without any analysis that "the non-monetary benefits of providing clarity and recognizing the broad scope of Title IX's protections outweighs the costs associated with the implementation of" the revised definition.[88] Because this off-hand analysis fails to 1) articulate the extent to which discrimination (as the Department views it) is happening now, 2) assess the costs of the expansion of the definition, and 3) compare #1 to #2, the analysis is arbitrary and capricious. The Department should engage instead in an evidence-based cost-benefit analysis.

### 2.    *Distributive Impact*

The agency should consider how a rule that allows transgender athletes to compete in women's sports will impact women and girls who already face inequitable opportunities. For example, a transgender swimmer at the University of Pennsylvania recently set a women's record at the Ivy League Championship swim meet, superseding the previous record set by a female competitor.[89] And in Connecticut two transgender athletes recently "won 15 state championships that were once held by nine different girls."[90] One female competitor described it as "discouraging and demoralizing."[91] These anecdotes highlight the distributive

---

[87] 87 Fed. Reg. at 41561.

[88] *Id.* at 41562.

[89] David Chavkin, *Lia Thomas Sets Record at Ivy League Swimming and Diving Championships*, Sports Illustrated, Feb. 18, 2022, https://www.si.com/college/2022/02/19/lia-thomas-ivy-league-championships-record.

[90] *The battle over trans athletes in American schools heats up*, The Economist, Sep. 5, 2020, https://www.economist.com/united-states/2020/09/05/the-battle-over-trans-athletes-in-american-schools-heats-up.

[91] Chelsea Mitchell, *Chelsea Mitchell on the unfairness of trans women at the Olympics*, The Economist, July 27, 2021, https://www.economist.com/by-invitation/2021/07/27/chelsea-mitchell-on-the-unfairness-of-trans-women-at-the-olympics.

U.S. Department of Education
September 11, 2022
Page 19

impact on women and girls that the Department should consider, including in the form of:

- Displacement of women winning championships and setting records.
- Displacement of women competing at championship events.
- Displacement of women on team rosters.
- Deterrence on female participation on athletic teams.

### 3.      *Cost to Female Athletes*

The agency should consider how the rule imposes economic and non-economic costs on female athletes by, for example, shifting lost opportunities from males (who might not be talented enough to secure a spot on the men's team) to females (where the same males could displace women on the women's team).

The agency should calculate these costs, including but not limited to:

- Costs of lost college scholarships.
- Costs of lost college admissions due to displacement on team rosters, or due to a student's inability to attend because of lost scholarships.
- Costs of lost professional athletic opportunities.
- Costs of lost athletic sponsorships.
- Costs of lost leadership opportunities.
- Costs of increased incidence of injuries to female athletes by virtue of competing against larger, faster, and stronger male bodies in contact sports.[92] This includes the costs of medical care, and the lost opportunities to compete, win championships, and obtain the other financial benefits described above.

### 4.      *Costs to Educational Institutions*

The agency should consider how the rule adding gender identity to Title IX's nondiscrimination provisions would impose compliance costs on educational institutions or governing sports leagues, including but not limited to:

---

[92] *See, e.g.*, World Rugby Transgender Women Guidelines, https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women (detailing risks to female players' welfare if forced to compete against males).

U.S. Department of Education
September 11, 2022
Page 20

- Costs of constructing restrooms, showers, and other facilities to protect the privacy of male and female athletes in the presence of transgender athletes of the opposite sex.

- Costs of researching and developing policies to support competitive equity and safety of female players. For example, there may be little or no guidelines or peer-reviewed studies on how the inclusion of transgender athletes in particular women's sports like wrestling or hockey affects fairness and safety.

- Costs of implementing a regime of hormone testing to ensure males who compete in women's sports have testosterone levels at or below respective guidelines,[93] or to ensure that females who are transgender and receiving hormone treatment do not have an unfair advantage if they continue to compete on the women's team.

- Likely administrative and legal costs for school districts, regional athletic organizations, and inter-collegiate athletic organizations in managing rules changes, record-keeping, and participation criteria, and responding to potential legal challenges from displaced female athletes.

- Likely costs, apart from athletics, of a "gender identity" criteria that results in greater need for retrofitting school and institutional facilities to accommodate student needs for privacy (single stall "all-gender" restrooms and locker rooms instead of multi-user facilities; measures to ensure privacy in dormitories and overnight accommodations; signage changes; and other additional privacy measures, e.g., doors, curtains, and other measures).

- Potential increased costs in monitoring for and preventing any sexual assaults in all-gender restroom and locker room facilities, occasioned by male students gaining unchallenged access to female facilities or in response to female requests to ensure safe access to shared facilities.

The proposed rule, 87 Fed. Reg. at 41552, also underestimates the costs to schools (in employee time) and students (in lost productivity) for attending lengthier trainings which would be caused by the proposed rule if finalized. The proposal claims that, because schools have an interest in keeping these trainings as short as possible, they will find a way to add no time to the trainings. But if in fact the schools have such an interest, then they have already made them as short as

---

[93] *See, e.g.*, USA Swimming Athlete Inclusion, Competitive Equity and Eligibility Policy, https://www.usaswimming.org/docs/default-source/governance/governance-lsc-website/ rules_policies/usa-swimming-policy-19.pdf (requiring proof of testosterone levels below guidelines for 36 months).

U.S. Department of Education
September 11, 2022
Page 21

possible, so lack any spare time in the current trainings to devote to the proposed rule's new requirements. Because so many schools, employees, and students are involved, this is a potentially large additional cost. Further, the proposed rule does not calculate the costs to students of lost productivity at all.

Of further critical importance is the Department's failure to consider the likely litigation costs from its new proposal. The Department admits that "there may be some costs associated with potential litigation," but it declines to predict how large or small those costs will be.[94] Given the manifold risks of constitutional and statutory violations outlined in this comment, the failure to identify and quantify these risks and costs is arbitrary and capricious. The final rule should correct this error by providing this important data and by engaging in a cost-benefit analysis. Indeed, commenters are predicting "a wave of litigation."[95]

The agency should also consider the unnecessary costs imposed if the religious exemption rules are changed.[96]

- Religious educational institutions would incur costs and information collection burdens associated with the preparation (by institutions) and processing (by the Department of Education's Office for Civil Rights) of a wave of new exemption confirmation requests by institutions that have been assured (both by the statutory text and the May 2020 regulation) that they need not undergo the optional administrative process until such time (if ever) they face a charge of discrimination under Title IX.

- The rule would cause unnecessary costs for institutions for whom the Department might incorrectly deem ineligible for the Title IX religious exemption on the ground that they are controlled by their boards of trustees as opposed to some separate external entity.

- The rule could incur costs on students at religious educational institutions who may effectively lose their federal financial assistance in the event schools deemed ineligible for the Title IX religious exemption elect to forego

---

[94] 87 Fed. Reg. at 41561.

[95] Colleen Murphy, *'A Wave of Litigation' Likely as Proposed Title IX Changes Roll Back Due Process Rights at Universities, Observers Say*, N.Y.L.J., July 13, 2022, https://www.law.com/ nationallawjournal/2022/07/13/proposed-title-ix-changes-would-roll-back-due-process-rights-at-universities-causing-wave-of-litigation/.

[96] 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12.

U.S. Department of Education
September 11, 2022
Page 22

participation in federal student aid programs in order to avoid unlawful and unconstitutional applications of Title IX to them.

### 5.    *Costs to Students*

The rule under review could pose significant costs to students in the combined effect of adding gender identity nondiscrimination provisions and the removal of due process protections afforded by the previous administration.

- Students have a First Amendment right to freedom of speech when attending a public educational institution, or when being regulated by a federal statute such as Title IX. This includes the freedom to speak one's views on a public campus regarding issues of sexuality and gender identity, and to use pronouns that the speaker deems appropriate. It also includes the freedom not to be punished by Title IX and its regulations for engaging in speech on those issues.

- A rule adding gender identity nondiscrimination provisions to Title IX and simultaneously removing due process protections could lead to students being accused of discrimination or harassment under Title IX because of the students' exercise of free speech on campus concerning issues of sexuality or use of pronouns to which others object.

- These accusations, combined with the lack of due process protections for students, could lead to excessive burdens and costs on students for exercising their freedom of speech.

- Costs to students may also include costs from false convictions (made more likely by some of the NPRM's changes, such as impeding access to evidence that the schools deem irrelevant) and costs to students and employees who can no longer attend or work at schools receiving federal funding because they would be compelled to violate their beliefs about gender.

- Costs to students and to their parents and families from the proposed rule's interference with the parent-child relationship, as described above.

The Department has utterly failed to quantify these costs to students.[97] The proposed rule examines only costs to *institutions*; it does not examine costs to students. But, as shown throughout this comment, evidence shows significant costs to students. So this is a major oversight, and failure to rectify it would render the

---

[97] 87 Fed. Reg. at 41547 *et seq.* (cost-benefit analysis).

U.S. Department of Education
September 11, 2022
Page 23

final rule arbitrary and capricious. Any attempt to quantify these costs should also be subject to a separate comment period, so that it can properly subject to scrutiny.

### 6.    *Other Costs to Society*

The agency should consider how the adverse effects on women and girls described above impact society and our economy. The agency should calculate these costs, including but not limited to the impact of fewer women obtaining college degrees because they were displaced on a team roster or lost college scholarships. These costs include the downstream effects of fewer women obtaining higher salaries and other measures of economic success correlated with a college education. The cost analysis should also consider the added financial, health, administrative, legal, and other costs likely to be incurred by society and individuals as a result of the Department's undoing of sex-based protections and opportunities that have been in place for decades and successfully ensured female equality and advancement.

It must also quantify the costs of States and schools losing federal funding—including an estimate of which States and schools will lose funding—and by how much and with what downstream effects, rather than comply with the rule. This impact should be measured in evidence, reflecting the many States and many schools that have already sued and indicated an unwillingness to comply.

### 7.    *Costs to the Unborn and Pregnant Mothers*

The Department should also quantify the irreparable loss of life to the unborn who are killed via abortion as a result of the pressure to abort and the coercion to abort, which will be caused by this rule. It must also quantify the impact and unfairness to other students (grades, participation, etc.) because of any reasonable modification (such as delayed or longer test taking) due to leave for abortions. More importantly, it must quantify the irreparable loss of First Amendment rights to free speech or free exercise of religion rights for any school employee (such as a counselor) forced to promote or refer for abortion; for any student or employee silenced from speaking out against abortion; for any other chilling of pro-life free speech; and for the negative impacts on the parent-child relationship.

As to method, the Department must quantify the loss of life, productivity, and intangible value of the lives lost to abortion. It must apply a statistical value for each life cut short in the womb. As a matter of equality and human dignity, it should not assign a lesser value to some people than to others. This means that it should value children in the womb as people. Under the principle of inter-generational neutrality, future generations should not be treated as of lesser

U.S. Department of Education
September 11, 2022
Page 24

concern. Applying a discount rate to their welfare poses serious ethical concerns. It should also consider the harms of abortion to pregnant women, including their long-term mental health.

### 8.    *Small Businesses and Non-profits*

The agency needs to assess the impact on small businesses, which includes nonprofit entities, under the Regulatory Flexibility Act ("RFA").

- If fewer women have the opportunity to go to college due to a lack of an athletic scholarship, that will impact businesses who are looking to hire new employees, particularly in female dominated fields that require a college degree.[98]

- Religious educational institutions are small entities for purposes of the RFA, and any changes to the Title IX rule that affects a substantial number of them needs to account for and certify the impacts on those institutions.

The proposed rule fails to implement these requirements. For instance, at p. 41565, the discussion of impacts on small entities just states that discrimination can occur at small entities, and therefore no modifications can be made for them. But the RFA requires that agencies do more than assess whether the harm against which the regulation protects can be found at small entities; rather, the Department has the obligation to determine whether the smallness and presumably slender resources of small entities warrant the application of different rules than to large, well-funded entities.

### 9.    *Healthcare and Housing*

The rule must consider its impact on Section 1557 in healthcare and on housing under the Fair Housing Act. When issuing a far-reaching rule like this one, the Department must consider the impact of those regulations on other laws and in other contexts. For example, Section 1557 of the Patient Protection and Affordable Care Act incorporates Title IX's prohibition against sex discrimination. Section 1557 guarantees that no individual can "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under," any federally run or federally funded health program "on the ground prohibited under . . . Title IX."[99] Thus, how

---

[98] For example, women fill a majority of the following positions: veterinarians, physician assistants, speech language pathologists, dietitians and nutritionists, human resource management, psychologists, and occupational therapists.

[99] 42 U.S.C. § 18116(a) (citing Title IX, 20 U.S.C. § 1681 *et seq.*).

U.S. Department of Education
September 11, 2022
Page 25

the Department defines the ground of sex discrimination under Title IX in its regulations could have direct impact for Section 1557 and the healthcare context. That is why the Department must also evaluate the impact of the rule on Section 1557 and the healthcare context. Likewise, the Department of Housing and Urban Development has interpreted the Fair Housing Act's prohibition on sex discrimination in practice and in enforcement purportedly in a way that harmonizes with Title IX on campus. If Title IX is changed, this housing enforcement will change, too, and so the Department must address this issue and quantify its costs.

The Department also should consider this rule in an omnibus rulemaking with the related Section 1557 rule, and in joint inter-agency rule led by the Department of Justice under Executive Order 12,250, so that a holistic sense of statutory interplay and related costs and benefits may be established.

As to the specific assessment of healthcare costs, the proposed rule will create poor health outcomes—costs which must be quantified. The Department must quantify the harms of gender procedures and the costs of the resulting necessary lifelong care. The Department must quantify the immediate and long-term risks relative to benefit of these new forms of medical intervention, including significant intervention-associated morbidity, especially evidence that raises concerns that the main goal of suicide prevention is not achieved. The Department should consider in its assessment of the health benefits and costs of encouraging and mandating gender interventions studies showing the lifelong costs of such interventions in the form of ongoing treatment and negative side effects. This quantification should include data on the precise encouraged or mandated services, procedures, treatments, drugs, surgeries, and more to be covered by insurance or provided by healthcare professionals, including whether this includes services for detransitioners, and including their number, direct cost, cost of follow-up treatments and complications, and their attendant increase in premium costs. This data should also quantify the number of people covered by age, including minor children, including estimated annual increases. The Department should identify the present number and qualifications of doctors willing to perform such services, especially on minor children. The Department must quantify the number and costs of malpractice and other suits by those who regret gender interventions against practitioners who performed them.

As to healthcare, if it requires certain procedures or actions in healthcare settings as to gender identity, the proposed rule will also transfer costs to healthcare providers and patients more generally—costs that the Department must also quantify.

U.S. Department of Education
September 11, 2022
Page 26

- It must quantify the cost to the health care profession of requiring healthcare providers nationwide to violate the Hippocratic Oath, which requires they "do no harm" and refrain from providing gender interventions and participating in abortion.

- Any improvement in access to services by government attempts to coerce participation in objectionable practices will be greatly outweighed by transferred costs to others. Any new mandates are bad medicine and will drive many good providers out of healthcare unless the rule exempts scientific, moral, conscientious, and religious objections. Any benefits in increasing access to for some, by coercing the provision of objectionable services, will be massively offset by curtailing access to the healthcare marketplace for patients and providers overall and in specific fields like obstetrics. By driving religious healthcare providers in particular out of medicine in many settings, the government will increase existing health disparities in rural and underserved communities, which will in turn raise prices.

- Any benefits in regulatory clarity will be offset by uncertainty about the government's shifting view of what constitutes discrimination and about its disregard for conscience and religious freedom protections.

- The agency should consider the costs from freezing the development of medical research, including the problems attendant upon mandating a standard of care and preventing the free flow of medical information.

- The agency should identify the costs of the lack of public trust in healthcare overall from its efforts to set a standard of care contrary to the best interests of patients and contrary to state laws.

- Because the current law protects conscience, religious freedom, diversity, free speech, and pro-life nondiscrimination, the Department should calculate the cost of losing those benefits. The agency should assess how rescinding this rule would lead to further discrimination, intolerance, and marginalization of religious people in healthcare, particularly those who are members of minority religions or those who lack a cause of action to vindicate a statutory conscience right.

- The agency must quantify the free speech harms of making doctors use preferred pronouns contrary to biology, of refraining from free medical discussions, and of inaccurately charting patient sex.

- The agency should consider the burdens and costs resulting from loss of diversity in healthcare from non-enforcement of statutory protections and from rescission of the rule, and it should assess the number of religious

U.S. Department of Education
September 11, 2022
Page 27

people and organizations out of practice or likely to be expelled from healthcare that currently should have protection under this regulation.

- The agency must state how many people will choose not to enter the health care profession or certain practices like obstetrics as a result of the proposed rule and lack of conscience protections.

- The agency must calculate the stresses to be placed on the nation's infrastructure of healthcare as a whole, and the detrimental public health consequences resulting from the inability of conscientious providers to participate in healthcare practice on equal terms.

- The agency should quantify the number and demographics of healthcare providers and institutions that will be driven out of the practices they built, and estimate their economic value, including loss of livelihood, unpaid small business loans, defaulted mortgages or leases, and unpaid student loan debt.

- The agency should quantify the number and demographics of patients who have lost or lose the ability to find any provider or the provider of their choice, and who thus are less likely to seek or receive timely care. The loss of a provider because of government coercion increases travel costs, reduces regular care, risks higher morbidities, and creates a lack of trust for patients, who will not easily trust new providers who do not share their values, another factor to quantify.

- The agency must calculate the costs of constructing hospital wards, exam rooms, locker rooms, restrooms, showers, and other facilities to protect the privacy of male and female patients and providers in the presence of the opposite sex, such as single-stall rooms or new privacy screens, and the potential increased costs in monitoring for and preventing any sexual assaults in all-gender restroom and other facilities, occasioned by males gaining unchallenged access to female facilities or in foreseeable response to foreseeable female requests to ensure safe access to shared facilities.

- The agency must calculate the costs to health and welfare of women deprived of female-only health programs, such as breastfeeding support groups or postpartum mental health groups or mother-baby groups, or breast cancer groups, given the foreseeable reluctance of women to participate in programs that cannot guarantee female privacy.

- The agency must calculate costs for employees who lose their jobs or cannot practice medicine, including not only their economic losses, but greater payments in unemployment benefits, and decreased productivity among companies that lose employees. These combined factors will contribute to an increase in the national debt. The agency must calculate the rule's costs in

U.S. Department of Education
September 11, 2022
Page 28

    exacerbating existing labor shortages, and the negative effects on the economy overall should also be calculated.

- The rule will contribute to a shortage in labor because many employees will quit or accept termination rather than participate in objectionable practices. Economic and health costs also result to consumers from exacerbating labor shortages. Shortages in nursing have led to increased travel and medical costs for patients, for example.

- The agency must calculate the rule's costs for time spent reading and understanding how to comply with the rule and for costs spent availing themselves of rights that HHS will not defend, respect, or enforce, including through litigation, measured in terms of time, expenses, and uncertainties.

- The agency must estimate the effects of all of the above to federal, state, and local healthcare programs like Medicaid.

### 10.    *Proper Assessment of Evidence and Costs*

    The agency should consider, with citations, a fair view of science and medicine on gender interventions and abortion from all perspectives.[100]

    This evidence-based decision making should include considering scholarship pointing out the deficiencies in studies on gender dysphoria.

    There is a lack of high-quality scientific data for common gender identity interventions, such as the general lack of randomized prospective trial design, a small sample size, recruitment bias, short study duration, high subject dropout rates, and reliance on opinion. There are serious deficits in understanding the cause of this condition or in understanding the reasons for the marked increase in people presenting for care.[101]

    The agency should ensure the objectivity of any scientific and medical information by avoiding reliance on standards promoted by advocacy groups and industry groups with a financial incentive in promoting gender interventions and

---

[100] Both in 2016 and in 2021, in its Section 1557 rules, HHS failed to adequately consider one side of the issue—the side for which, in medical practice, sex is a biological reality; patients are harmed by imposing the provision of controversial and dangerous medical procedures; and patients are harmed by preventing doctors from providing full and timely disclosure of all relevant health information about gender identity procedures and interventions. Instead, HHS only considered evidence from the other side of the issue, mostly from advocacy groups. 81 Fed. Reg. at 31,429 n.263.

[101] *See, e.g.*, Paul W. Hruz, *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*, 87 Linacre Quarterly 34, 34-42 (2019), https://doi.org/10.1177/0024363919873762.

U.S. Department of Education
September 11, 2022
Page 29

abortions. This means avoiding uncritical acceptance of biased sources of information such as the American College of Obstetricians and Gynecologists (ACOG), Planned Parenthood, the Guttmacher Institute, and related groups.

The agency should not use unreliable or inapposite studies. That includes avoiding uncritical reliance on self-selected online surveys, polls with cash prizes, studies with tiny samples, and studies missing more than half of their subjects.[102] The agency also should not generalize from studies involving adult patients and clinics with strong gatekeeping procedures to studies involving minor patients and clinics without strong gatekeeping procedures.[103] The agency should not repeat the mistakes that HHS made in the recent document "Gender-Affirming Care and Young People."[104] HHS's claims conflict with the conclusions of more and more of other nations' public health authorities, misreads data, and ignores contrary evidence.[105]

The agency should take care to quantify the number of detransitioners, which could number in the tens of thousands (and growing), as a detrans subreddit has over 26,000 members, with 4,000 new members since December 2021.[106]

---

[102] Nathanael Blake, *The Studies Cited To Support Gender-Bending Kids Are Largely Junk Science*, The Federalist, Mar. 10, 2020, https://thefederalist.com/2022/03/10/the-studies-cited-to-support-gender-bending-kids-are-largely-junk-science/; Nathanael Blake, *What We Don't Know: Does Gender Transition Improve the Lives of People with Gender Dysphoria?* Public Discourse, Apr. 13, 2019, https://www.thepublicdiscourse.com/2019/04/51524/.

[103] *Id.*

[104] HHS, Gender-Affirming Care and Young People, https://opa.hhs.gov/sites/default/files/2022-03/gender-affirming-care-young-people-march-2022.pdf.

[105] *See, e.g.*, Society for Evidence-Based Gender Medicine, *Fact-Checking the HHS* (April 7, 2022), https://segm.org/fact-checking-gender-affirming-care-and-young-people-HHS (explaining that "a number of the claims made in the document range from overreaching to highly misleading," such as "[m]isstatements of the effects of social transition on well-being"; "[u]nsupported claim of the reversibility of puberty blockers"; "[i]naccurate statement regarding the age eligibility for surgeries"; "[e]rroneous claims about the effects of gender transition on adolescent mental health"; "[o]mission of any discussion of risks"; "[c]onflation of distinctly different concepts"; "[m]isleading information on the incidence of suicide and suicidality," and the HHS document relied on an "[i]nadequate literature review"; "[b]iased recommendations that do not acknowledge the low quality of evidence"; "[f]ailure to consult a range of stakeholders with diverse views"; and "[l]ack of identification or acknowledgement of alternatives.").

[106] Ginny Gentles, *Detransitioners and Parents vs. Gender Ideology*, Independent Women's Forum (March 30, 2022), https://www.iwf.org/2022/03/30/detransitioners-and-parents-vs-gender-ideology.

U.S. Department of Education
September 11, 2022
Page 30

The analyses of the effect of conscience protections should also occur in light of HHS OCR's record-high receipt of complaints between 2017–2020 identifying violations of conscience laws in comparison to the much smaller number of complaints filed before OCR announced in 2017 that it was "open for business" in enforcing these laws.

### C.   The proposed rule fails to account for increased compliance costs.

The proposed rule fails to consider important factors, explore sufficient data, and make necessary estimates.

First, recipient institutions previously had responsibility where there was "actual knowledge of sexual harassment." The proposed rules provide, "A recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity."[107] Combined with the new obligations of administrators to report and take action for anything that "may constitute sex discrimination" under proposed § 106.44(b) & (f), dramatically expanding (1)  potential liabilities of the recipients, (2) costs of compliance, and (3) likely restrictions on speech in order to avoid those liabilities.

Second, the Department says that it "assumes that the proposed regulations would ultimately have a de minimis effect on the time burden for employees associated with training, but requests comment on this assumption."[108] Expanding from "sex" to "sexual orientation and gender identity" is an enormous expansion and raises myriad sensitive, difficult issues surrounding names, pronouns, recordkeeping, access to facilities, and more. This will exact far more than de minimis training costs. The Department should generate a well-supported estimate of those costs.

Third, the Department "anticipates that the proposed regulations may increase the number of incidents for which supportive measures are provided per year," but never addresses any costs associated with litigation.[109] As recent cases indicate, incidents of supportive measures (including no-contact orders giving rise to costly litigation) are on the rise *even without* the dramatic expansion the proposed

---

[107] NPRM at 672.

[108] NPRM at 598.

[109] NPRM at 602.

U.S. Department of Education
September 11, 2022
Page 31

rules will authorize.[110] The Department should estimate (1) the likely increase in the number of supportive measures offered, (2) the cost of offering measures themselves, and (3) the likely litigation costs in view of the extent to which the proposed rules authorize use of supportive measures that restrict constitutionally protected speech.

Finally, the Department notes in passing that "[a]s this is an evolving area of the law, the Department anticipates there may be some costs associated with potential litigation."[111] The Department has failed to account for potential litigation from female athletes who have experienced lost opportunities or injury from males; students and even teachers whose First Amendment speech and expression is censored; school districts who are being forced to violate state law or risk their federal funding; and parents whose children are being pushed towards dangerous and unscientific ideologies behind their backs.

### D. The proposed rule would improperly impose additional paperwork costs, should it amend the religious exemption procedures.

There is also no need for regulatory action to the extent the administration plans to restrict or repeal regulations issued by the previous administration that protect the religious exemption that Title IX affords to religious colleges and universities. Pursuing such actions would impose significant costs, including unnecessary information collection requirements under the Paperwork Reduction Act. These costs should be considered expressly, and they are reason alone to ensure that the rule does not change the procedural requirements for invoking the religious exemption.

Title IX includes a robust religious exemption, which declares that "this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization."[112]

---

[110] *See, e.g., Perlot v. Green*, No. 3:22-cv-00183-DCN, 2022 WL 2355532, at *3–4 (D. Idaho June 30, 2022). *See also DeJong v. Pembrook*, No. 22-1124 (S.D. Ill. May 31, 2022).

[111] NPRM at 628.

[112] 20 U.S.C. § 1681(a)(3).

U.S. Department of Education
September 11, 2022
Page 32

Decades ago, the Department created by regulation a process under which a religious educational institution may seek confirmation of its possession of the exemption with respect to particular applications of Title IX.[113]

Recent regulations relieved the regulatory and paperwork burdens of those rules by acknowledging that religious schools are statutorily exempt and do not need to pursue a paperwork confirmation of their exemption.[114]

The Education Department's Office for Civil Rights, to our knowledge, has never declined to confirm an institution's possession of the exemption on the ground that it is controlled by its board of trustees as opposed to some separate external entity. Nor has it declined to acknowledge the applicability of the exemption when an institution invokes it for the first time in response to a charge (as opposed to having gone through the optional administrative confirmation process at an earlier time).

The proposed rule does not purport to affect these recent rule changes. Nor should it do so. The confirmation process re-created if the Department repeals the recent rules would therefore impose unnecessary regulatory costs and paperwork burdens on religious schools. And the 2020 rule avoided unnecessary costs by deferring to colleges and universities concerning their religious control under the Title IX exemption rather than requiring them to establish that control through a flawed interpretation of the statute.

Religious educational institutions are by definition controlled by a religious organization. The Department of Education recently acknowledged the existence of religious control at Brigham Young University in response to a complaint.[115] This is consistent with the approach taken by the 2020 regulation acknowledging that religious schools satisfy the control element of the Title IX exemption by virtue of having religious boards. And we are not aware of the Department ever rejecting a religious school's request for confirmation of exemption, much less because of how their governing board is structured.

---

[113] *See* 34 C.F.R. § 106.12; 45 FR 30955, 30958 (May 9, 1980).

[114] *See* 85 FR 30026, 30573 ("An institution is not required to seek assurance from the Assistant Secretary in order to assert such an exemption.")(May 19, 2020); 85 FR 59916, 59980-59981 (setting forth exemption eligibility criteria)(Sep. 23, 2020).

[115] U.S. Department of Education letter to Kevin J. Worthen, https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/brigham-young-university-response-01032022.pdf.

U.S. Department of Education
September 11, 2022
Page 33

Repealing the 2020 regulation's deferential approach on the issue of control of religious schools therefore avoids the unnecessary costs and paperwork burdens that schools would incur due to trying to prove religious control in circumstances where the question of such control has apparently never been dispositive in considering a religious school's exempt status. The final rule thus should leave that issue untouched.

In light of these many legal and procedural failings, the Department should withdraw and abandon the proposed rule. It is for Congress, not unelected bureaucrats, to address the major questions presented in this rulemaking.

Thank you for your consideration of these important concerns.

Respectfully Submitted,

*Julie Marie Blake*

Julie Marie Blake
Senior Counsel
Regulatory Litigation
Alliance Defending Freedom

**Exhibit E-3**

Comment by Pacific Legal Foundation, ED-2021-OCR-0166-212692 (Sept. 12, 2022).


PACIFIC LEGAL
FOUNDATION

September 12, 2022

Ms. Catherine E. Lhamon
Assistant Secretary for Civil Rights
United States Department of Education
  Office for Civil Rights
Lyndon Baines Johnson Department of Education Building
400 Maryland Avenue, SW
Washington, DC 20202 1100

Re: Opposition to Proposed Title IX Regulation (Docket ID ED 2021 OCR 0166)

Dear Assistant Secretary Lhamon:

Pacific Legal Foundation files this comment opposing the issuance of this Proposed Rule, or, in the alternative, calling for significant revisions to address our concerns. First, the Proposed Rule would chill First Amendment protected speech. Second, the Proposed Rule would lead to unconstitutional and unfair denials of due process for accused students and faculty. Third, it improperly expands coverage of Title IX to questions of sexual orientation and gender identity. This significant expansion involves major questions to which Congress is required to speak clearly for the agency to act in this area. Congress did not do so in enacting Title IX, and so the Office for Civil Rights (OCR) may not issue rules in this area. This comment addresses each objection in turn.

## STATEMENT OF INTEREST

Pacific Legal Foundation is the nation's leading public interest organization advocating in courts and with policymakers throughout the country to defend individual liberty and limited government. PLF is concerned about the Constitution's separation of powers and the protection these structural limits on power provide for individual liberty. PLF also fights to ensure that individuals are treated as individuals and not based on their demographic identity including their race or sex. PLF attorneys have extensive experience championing limited government and defending the constitutional separation of powers against the growing administrative state. PLF's attorneys have represented clients in major administrative law cases before the United

Ms. Catherine E. Lhamon
September 12, 2022
Page 2

States Supreme Court.[1] They have also produced substantial scholarship on administrative law.[2] PLF attorneys often provide their expertise on administrative law matters to policymakers through congressional testimony,[3] rulemaking petitions,[4] and policy papers.

    PLF is also concerned about the chilling effect imposed by overbroad and unduly vague laws that restrain First Amendment freedoms. PLF attorneys have published significant First Amendment scholarship[5] and represented clients in free speech cases before the United States Supreme Court and the United States Courts of Appeals.[6]

    I.   The proposed rule would chill First Amendment protected speech.

    Enacted in 1972, Title IX's core provision provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court in *Davis v. Monroe County* interpreted this provision to prohibit federal funding recipients from acting with deliberate indifference to known acts of sexual harassment that are

---

[1] *See, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016); *Sackett v. U.S. Envtl. Prot. Agency*, 566 U.S. 120 (2012); *Rapanos v. United States*, 547 U.S. 715 (2006); *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876 (2018).

[2] *See, e.g.*, John Yoo & Todd Gaziano, *Presidential Authority to Revoke or Reduce National Monument Designations*, 35 Yale J. on Reg. 617 (2018); Jonathan Wood, *Standing Up to the Regulatory State: Is Standing's Redressability Requirement an Obstacle to Challenging Regulations in an Over-Regulated World?*, 86 UMKC L. Rev. 147 (2017); Damien M. Schiff & Luke A. Wake, *Leveling the Playing Field in David v. Goliath: Remedies to Agency Overreach*, 17 Tex. Rev. L. & Pol. 97 (2013).

[3] *See, e.g.*, *Federally Incurred Cost of Regulatory Change and How Such Changes Are Made: Hearing before the Subcomm. On Federal Spending Oversight and Emergency Management of the S. Comm. On Homeland Sec. and Government Affairs*, 116 Cong. 116–62 (Testimony of Mr. Thomas Berry, Attorney, Pacific Legal Foundation).

[4] *See, e.g.*, Damien Schiff & Anthony L. Francois, Petition for Rulemaking to Establish Notice and Hearing Procedures for Compliance Orders Issued Under Section 309(a) of the Clean Water Act, Pacificlegal.org, (Jan. 10, 2020), *available at* https://pacificlegal.org/wp-content/uploads/2020/05/PLF-Petition-for-Rule-Making-for-Procedures-to-Govern-CWA-Compliance-Orders.pdf.

[5] *See* Daniel M. Ortner, *In the Name of Diversity: Why Mandatory Diversity Statements Violate the First Amendment and Reduce Intellectual Diversity in Academia*, 70 Cath. U. L. Rev. 515 (2021).

[6] *See, e.g.*, *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018); *American Society of Journalists and Authors, Inc. v. Bonta*, 15 F.4th 954 (9th Cir. 2021).

Ms. Catherine E. Lhamon
September 12, 2022
Page 3

sufficiently severe, pervasive, and objectively offensive so as to effectively bar the victim's access to education.[7]

The First Amendment to the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech."[8] Because sexual harassment law as it pertains to schools and workplaces has been interpreted to reach at least some pure speech (as well as expressive conduct), there is a long recognized tension between the First Amendment and Title VII and Title IX's prohibitions on harassment at school and work.[9] In the recent past (2010), for example, OCR promulgated guidance interpreting Title IX to cover "telling sexual or dirty jokes," "spreading sexual rumors" (without any limitation to false rumors), "circulating or sharing emails or websites of a sexual nature," or "displaying or distributing sexually explicit drawings, pictures, materials, or written materials."[10] When such pure expression is involved, antidiscrimination law "steers into the territory of the First Amendment."[11]

Although the Supreme Court has never definitively spoken on this issue, the requirement that harassment be "severe, persuasive, and objectively offens[ive]"[12] is, as OCR correctly found when promulgating the 2020 amendments, a critical safeguard that ensures that the prohibition on harassment "comports with First Amendment protections."[13] The Proposed Rule abandons that definition and reinstates a broader one that harassment is unlawful if it is "severe *or* pervasive." (Ital. added.). This change imperils freedom of speech on campus by making it likely that professors and students

---

[7] 526 U.S. 629, 633 (1999).

[8] U.S. Const. amend. I.

[9] David Bernstein, *You Can't Say That! The Growing Threat to Civil Liberties from Anti-Discrimination Laws* (2004); Eugene Volokh, Testimony to the United States Commission on Civil Rights, July 25, 2014, *available at* http://www.newamericancivilrightsproject.org/wp-content/uploads/2015/02/SupplementalDocsforOCRBudgetMailing.pdf (p. 52 of PDF), finding that a previous Department of Education policy on sexual harassment had "serious" First Amendment implications.

[10] U.S. Department of Education, Office for Civil Rights, *Sexual Harassment: It's Not Academic*, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf; Dear Colleague letter, October 26, 2010, *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html (guidance marked "not for reliance" because it departs from current Department practices in some ways).

[11] *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995).

[12] 526 U.S. 629 (1999).

[13] 85 Fed. Reg. 30,026, 30,036 (May 19, 2020).

Ms. Catherine E. Lhamon
September 12, 2022
Page 4

are investigated for even a single remark or one time action that is perceived as offensive.

Although the Proposed Rule contains some safeguards to prevent recipients from running afoul of the First Amendment, the safeguards are insufficient to cure the constitutional difficulties or eliminate the chilling effect that this new rule will have on campus. To its credit, the preamble to the Proposed Rule states that "the offensiveness of a particular expression as perceived by some persons, standing alone, would not be a legally sufficient basis to establish a hostile environment under Title IX." At the same time, the Proposed Rule is vague about where the line between First Amendment protected speech and prohibited speech lies. Instead, it instructs recipients to "make an individualized determination whether the unwelcome sex based conduct created a hostile environment based on the totality of the circumstances, including the age and roles of the parties." It also states that "Whether a hostile environment has been created is a fact specific inquiry" and "A hostile environment may manifest itself in different ways for different complainants."

Because of how vague and open ended this standard is, recipients have an incentive to treat any incidents of speech that come anywhere close to the line as Title IX violations. Law professor and United States Commission on Civil Rights member Gail Heriot has described how similar indefiniteness regarding what qualified as sufficiently severe or pervasive in the employment discrimination context led employers to react strongly to minor incidents of potential sexual harassment:

> Perhaps the most fundamental problem that employers had to contend with was the Supreme Court's emphasis on the cumulative effect of separate, vaguely defined inputs on the working environment. Liability could stem from verbal or non verbal conduct that is either severe or pervasive. A thousand pricks, no one of which is serious in itself, could therefore add up to a hostile environment. Those pricks didn't need to come from the same person. They could come from a thousand different colleagues, and those colleagues need not be aware of the existence of each other. That makes it tough on an employer. Even if it had some method for keeping track of how many "pricks" an employee has suffered, it probably would not be able to conclude whether a "hostile environment" had been created ....
>
> ... No one should be surprised to learn that many employers aimed (and continue to aim) at stamping out all the slings and arrows, whether large or small, that might plausibly be viewed as helping form a hostile

Ms. Catherine E. Lhamon
September 12, 2022
Page 5

environment. This is a perfectly rational response to the legal landscape in which the 1991 Act had landed them.[14]

Abundant anecdotes, going back decades, indicate that many funding recipients have accordingly erred on the side of cracking down on even protected speech to avoid hostile environment liability. Take, for example, the plight of Laura Kipnis, a film and gender studies professor at Northwestern University. She published an essay in *The Chronicle of Higher Education* called "Sexual Paranoia Strikes Academe," claiming that "In the post Title IX landscape, sexual panic rules" and that if "you wanted to produce a pacified, cowering citizenry, this would be the method."[15] Kipnis's speech about the impact of Title IX on civic participation is at the core of the freedom of speech protected by the First Amendment: "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."[16] Nonetheless, Kipnis's statements were alleged to have created a "hostile environment" that created a "chilling effect" on complaints of sexual harassment. Northwestern launched a formal Title IX investigation of Kipnis. While her story has complex twists and turns and spanned months of wrangling with her university's Title IX bureaucrats, including a second investigation into Kipnis's writing about her first Title IX investigation, she was eventually cleared of all wrongdoing. Ultimate exoneration, however, did not erase the months of stress, fear, and wasted time and legal costs that were the bitter fruits of an investigation that should have never occurred. It is all too easy for similarly situated persons to look at Kipnis's experience and feel chilled from speaking forthrightly on matters regarding sex discrimination.[17] Examining Kipnis's story, Harvard Law professor Jeannie Suk Gersen concluded that beyond merely prohibiting sex discrimination,

---

[14] Gail L. Heriot, *The Roots of Wokeness: Title VII Damage Remedies as Potential Drivers of Attitudes Toward Identity Politics and Free Expression* 42-43 (Feb. 14, 2022), Tex. Rev. L. & Pol. (forthcoming), *available at* https://deliverypdf.ssrn.com/delivery.php?ID=533082078095110093118085102004010122024088054014066064078070087101081069118114094078049030032063122035021070078010122007120106024018060008053092093012126005120029003008085105078007071094071010118001022002080017091080028075030106087068096122115103083&EXT=pdf&INDEX=TRUE.

[15] Published February 27, 2015; *available at* http://laurakipnis.com/wp-content/uploads/2010/08/Sexual-Paranoia-Strikes-Academe.pdf.

[16] *Mills v. Alabama*, 384 U.S. 214 (1966).

[17] *See Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) ("For the threat of sanctions may deter almost as potently as the actual application of sanctions.") (cleaned up).

Ms. Catherine E. Lhamon
September 12, 2022
Page 6

> Title IX can also be used to discourage disagreement, deter dissent, deflect scrutiny, or register disapproval of people whom colleagues find loathsome…That risk is now built into the professional life of those of us in universities who engage on subjects related to gender and sexuality. Like Kipnis, I routinely hear from teachers who say they are refraining from teaching and writing on such topics for fear of attracting Title IX complaints, which bring possibilities of termination, demotion, pay cuts, and tens of thousands of dollars in legal fees.[18]

Rules with this kind of chilling effect violate the First Amendment.[19]

Though particularly prominent in national media discussions about Title IX, Kipnis's story is neither unique nor an isolated incident of overreach. Close to home, one author of this letter served as a mentor to an intern who had faced discipline under Title IX for a philosophy paper that he wrote as a Yale University undergraduate criticizing Plato's tripartite theory of the soul:

> I believe spirit can be allied with appetite against reason. Take any drunken fest. People drink spiritedly even when they know it is against their greater good. Even if an argument will be presented in that case that people's reason is impaired at the time they drink, and thus not in conflict with their spirit, consider the case of a rapist. A rapist may rape with much vigor, or in anger. Here, presumably, reason should dictate not to rape. Is spirit not allied with appetite against reason in this case?

The teaching assistant for the course complained about the above passage to Yale's Title IX office, and the student was ordered to cease contact with the teaching assistant and attend sensitivity training.[20]

---

[18] *Laura Kipnis's Endless Trial By Title IX*, The New Yorker, Sept. 20, 2017, *available at* https://www.newyorker.com/news/news-desk/laura-kipniss-endless-trial-by-title-ix.

[19] *See generally Baggett v. Bullitt*, 377 U.S. 360 (1964) (striking down a loyalty oath requirement and Washington state law that forbade the government to employ "subversive persons"); *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (striking down a postal regulation requiring individuals who wished to receive communist literature to sign up at the post office. Although the program included no express sanctions against recipients, the Court held said it would chill individuals who wanted the material but were afraid to make their wishes known to the government); *Dombrowski v. Pfister*, 380 U.S. 479 (1965) (a court may enjoin enforcement of a statute that is so overbroad in its prohibition of unprotected speech that it substantially prohibits protected speech—especially if the statute is being enforced in bad faith).

[20] He later sued Yale. The case was settled out of court.

Ms. Catherine E. Lhamon
September 12, 2022
Page 7

In 2005, a Muslim student at William Paterson University in New Jersey was disciplined for responding to a professor's email featuring a "lesbian relationship story" with a comment that gay relationships are perverted. It took an appeal through a union grievance process before a hearing officer to get the sanction reversed.[21] A year earlier, in 2004, an Occidental College student was disciplined for making sexual jokes on a campus radio show about his rivals in student government.[22]

Because the Proposed Rule expressly applies Title IX for the first time to discrimination on the basis of sexual orientation or gender identity, the potential for First Amendment violations will increase. Both are hot button issues that are the subject of much political debate. Some recipients have already attempted to crack down on protected speech about public affairs because it might offend LGBTQ persons. For example, Michael Stannard, a professor in California's State Center Community College District, faced an investigation from his employer because of comments that "studies showed children do better if they are raised by both biological parents."[23] Another California Community College professor at Madera Community College and co plaintiff with Professor Stannard, David Richardson, faced a Title IX investigation after a transgender colleague was offended when he used the personal pronouns Do Re Mi on his Zoom profile.[24] It is easy to anticipate more of these encroachments into protected speech under the proposed rule, whether it be coaches speaking in opposition to biological males in women's sports, students expressing sincere religious beliefs about the fixed nature of gender, or a range of other viewpoints on matters of great public concern.

The First Amendment also has been interpreted to prohibit government from compelling speech: "If there is any fixed star in our constitutional constellation, it is

---

[21] Press Release, Foundation for Individual Rights and Expression, *Victory for Free Speech and Religious Liberty at William Paterson University* (Dec. 7, 2005), https://www.thefire.org/victory-for-free-speech-and-religious-liberty-at-william-paterson-university/.

[22] Cited in Eugene Volokh's testimony at page 52.

[23] *Stannard v. State Center Community College District*, First Amended Complaint, July 15, 2022 (copy on file with the authors of this letter). In the Complaint, Professor Stannard claims that the administration misunderstood his comments, which in his view were about the general "problem of origins" faced by children who grew up apart from their biological parents and were not targeted at gay parents .

[24] *Id*. *See also* Josh Bleisch, Punished for Not Using a Student's Preferred Pronouns, Theater Professor Sues, FIRE (Sept. 8, 2022), https://www.thefire.org/punished-for-not-using-a-students-preferred-pronouns-theater-professor-sues/#:~:text=A%20lawsuit%20filed%20last%20week,use%20a%20student s%20preferred%20pro nouns.

Ms. Catherine E. Lhamon
September 12, 2022
Page 8

that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."[25] Such compelled speech issues loom large with regard to whether professors or students must be required to use a transgender person's preferred pronouns.[26] Professor Nicholas Meriwether, for example, a philosophy professor at Shawnee State University, faced discipline when a student complained that the professor declined to use a preferred pronoun based on Meriwether's religious convictions. Meriwether had sought a compromise by offering to just refer to the student by first name only, but this did not satisfy his college's administrators. His case ultimately settled out of court after Prof. Meriweather prevailed in the Sixth Circuit Court of Appeals.[27] Professors will not be the only ones compelled to speak: A Wisconsin school recently accused three middle schoolers of sexual harassment for using the wrong pronouns for a classmate.[28] The Proposed Rule should be amended to emphasize that refusing to speak does not constitute harassment under Title IX. At a

---

[25] *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

[26] *West Virginia v. Barnette* notes that requiring gestures or words that seem inconsequential in and of themselves may nonetheless offend the Constitution if the mandated gesture symbolizes acquiescence to a broader ideology: "the flag salute is a form of utterance. Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design. The State announces rank, function, and authority through crowns and maces, uniforms and black robes; the church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment. Symbols of State often convey political ideas just as religious symbols come to convey theological ones. Associated with many of these symbols are appropriate gestures of acceptance or respect: a salute, a bowed or bared head, a bended knee. A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn." *Id.* at 633. Preferred pronouns may be understood as a "short cut from mind to mind" symbolizing acceptance of progressive gender ideology. But more than that, some people may simply not want to make their gender identity the thing that defines them or the trait that they lead with in public conversations on Zoom. Such an expression of viewpoint and speech should not subject a person to punishment.

[27] Matt Lavietes, *Professor who wouldn t use trans student s pronouns wins $400K settlement*, NBC News, Apr. 19, 2022, *available at* https://www.nbcnews.com/nbc-out/out-news/professor-wouldnt-use-trans-students-pronouns-wins-400k-settlement-rcna24989.

[28] Rick Esenberg & Luke Berg, *The Progressive Pronoun Police Come for Middle Schoolers*, Wall St. J., May 3, 2022, *available at* ttps://www.wsj.com/articles/the-pronoun-police-middle-schoolers-sexual-harassment-title-ix-nine-mispronouning-transgender-lgbtqia-free-speech-pronoun-11653337766.

Ms. Catherine E. Lhamon
September 12, 2022
Page 9

minimum, the Proposed Rule should be clarified to state that Title IX does not compel any individual to use a transgender individual's preferred pronouns.

The Proposed Rule, as already exhibited by the above examples, is likely viewpoint discriminatory. Viewpoint discrimination is a particularly "egregious" First Amendment violation,[29] and laws discriminating based on viewpoint almost never can survive constitutional scrutiny.[30] Viewpoint discrimination can arise where a law allows viewpoints praising or supporting an idea while punishing viewpoints that criticize that idea. For instance, in *Iancu v. Brunetti*, the Supreme Court struck down a Lanham Act provision that denied trademark registration to "immoral or scandalous" trademarks. The Court held that the provision discriminated based on viewpoint because it "permits registration of marks that champions society's sense of rectitude and morality, but not marks that denigrates those concepts."[31]

The Rule here would likewise discriminate based on viewpoint. By targeting speech that "discriminates" against or "harasses" based on gender identity or sexual orientation, it targets speech that criticizes or "denigrates" these groups while permitting speech that "champions" them. The viewpoint discriminatory nature of this restriction should be apparent. For instance, a professor could be investigated and disciplined for calling for a ban on teenage sex conversion treatments, but not for calling for a ban on teenage conversion therapy. A student could be investigated and disciplined for opposing the inclusion of a transgender athlete on her swim team, but not for celebrating the student's inclusion.

The Rule also does not list any explicit First Amendment protections for research or scholarly inquiry. Universities have sometimes taken adverse actions against researchers because their work takes controversial positions on matters relating to race, sex, or other matters protected by the civil rights laws. Two of the authors of this letter represent Elizabeth Weiss, an anthropology professor at San Jose State University in California. Her case shows how universities might invoke antidiscrimination laws to punish dissidents' research on controversial topics. Weiss specializes in osteology   the study of human skeletal remains. She recently published a book criticizing the Native American Graves Protection and Repatriation Act (NAGPRA) as stunting scientific research and arguing that such laws may even be

---

[29] *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

[30] *Matal v. Tam*, 137 S. Ct. 1744, 1768 (2017) (Kennedy, J., concurring in part) ("It is telling that the Court's precedents have recognized only one narrow situation in which viewpoint discrimination is permissible: where the government itself is speaking or recruiting others to communicate a message on its behalf.").

[31] 139 S. Ct. 2294, 2299 (2019).

Ms. Catherine E. Lhamon
September 12, 2022
Page 10

unconstitutional. The book was both peer reviewed and published through a reputable academic press. Nevertheless, critics ignored the merits of the book's arguments and instead launched a campaign to label Prof. Weiss as anti Indigenous and racist.

Rather than stand by Weiss, her university joined in on the criticism, sponsoring a speaker series that called for shutting down views such as hers. At a Zoom event entitled "What to Do When a Tenured Professor Is Branded a Racist," university officials repeatedly called Prof. Weiss a racist and a white supremacist. She has also been told that if she dares to teach her views to her students, she could face disciplinary action or other forms of retaliation. After Prof. Weiss posted a photo on Twitter of herself with skeletal remains, a common practice used to promote the anthropology department and anthropological research more generally, the university removed her access to the skeletal collection that forms the basis for her academic research, going so far as to change the locks to bar her from the curational facility. While Weiss's university has not expressly invoked laws prohibiting race discrimination as justification for their actions, it is plausible to imagine a university in a similar situation doing so.

It is similarly plausible to imagine a university citing Title IX as a justification for taking adverse action against a professor whose research is viewed (fairly or otherwise) as disparaging to persons based on their sex, gender identity, or sexual orientation. Returning to Dr. Weiss's field, osteology, some have claimed that classifying a skeleton as male or female is wrong and unfair to transgender people because long dead persons' gender identities cannot be ascertained.[32] Professor Weiss has written an article opposing this trend and plans to continue classifying remains as male or female.[33] It seems all too likely that under the Proposed Rule, she could be accused of violating Title IX. One might also imagine similar scenarios regarding research that casts doubt on the desirability of gender transition or on research suggesting that children raised by same sex couples have worse outcomes on some measure than children raised by opposite sex couples such as the findings that Prof. Stannard highlighted.

Finally, the Proposed Rule exacerbates these First Amendment concerns by expanding the scope of Title IX's reach far beyond the educational environment. Section 106.11 states that schools have "an obligation to address a sex based hostile environment under its education program or activity, even if sex based harassment contributing to the hostile environment *occurred outside the recipient's education program*

---

[32] Alexandra Krawlick, *How Human Bones Reveal the Fallacy of a Biological Sex Binary*, Pac. Standard, Dec. 25, 2018, *available at* https://psmag.com/social-justice/our-bones-reveal-sex-is-not-binary.

[33] Elizabeth Weiss, *There's no such thing as a binary skeleton*, Spiked (Aug. 10, 2022).

Ms. Catherine E. Lhamon
September 12, 2022
Page 11

*activity or outside the United States.*" (Ital. added). This vague and overbroad language threatens to chill a wide variety of expression by students and faculty who have no means of knowing when their speech may have some incidental or indirect effect on the learning environment. Even in the K 12 environment, where free speech is more circumscribed than in the post secondary context, the Supreme Court has warned that "[w]hen it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention."[34] If a government purports to "regulate off campus[35] speech," it must carefully limit the reach of off campus regulation because an overbroad regulation "may mean the student [or faculty] cannot engage in that kind of speech at all."[36] If that is the case with K 12 education where the Supreme Court has found greater leeway for speech regulations to prevent disruption and prevent decorum, than that is even more certainly the case in higher education where the full weight of the First Amendment applies.

The scope of the new rule is particularly problematic because it may cover speech with little to no nexus to the learning environment. Ostensibly, almost any speech on social media or in other public settings can reach the ears or eyes of students or faculty and thus have an incidental effect on the learning environment. Would a student's retweet of an article criticizing a biological male for competing against biologically female athletes fall within Title IX's reach if a transgender classmate saw the tweet, thus causing the tweet to "contribute" to a hostile environment? Would a student giving a sermon in his church congregation defending his faith's traditional view of marriage be subject to a Title IX investigation if someone in the congregation is a classmate or the video is recorded and uploaded to YouTube? By failing to clearly define the reach of Title IX to those circumstances that directly affect the educational environment, the Rule chills a substantial range of protected speech.

To address these problems, we first recommend that the final rule return to using the *Davis* definition of sexual harassment to reach only harassment that is severe, pervasive, and objectively offensive. While restoring that definition may not resolve all First Amendment concerns, it would make it less likely that a recipient will find protected speech or expression to be prohibited harassment. Second, we recommend that any final rule clarify that speech about matters of governmental policy or other matters of public concern touching on matters of sex, gender, gender identity, and sexual orientation is protected under the First Amendment and does not violate Title

---

[34] *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021).

[35] *Id*. at 2046.

[36] *Id*.

Ms. Catherine E. Lhamon
September 12, 2022
Page 12

IX.[37] Third, we recommend that the rule be clarified to state that Title IX does not compel speech of any kind. Fourth, we recommend that the Rule clarify that research or scholarly inquiry that addresses matters of sex, gender identity, or sexual orientation is not prohibited harassment under Title IX. Finally, we recommend that the Rule clearly and specifically tie the prohibited discrimination or harassment to the educational environment.

II.  <u>The Proposed Rule would lead to unconstitutional and unfair denials of due process</u>.

As the Proposed Rule states, OCR's interpretation of the requirement to provide prompt and equitable grievance procedures must observe the due process rights of the persons involved in a public recipient's grievance procedures.[38] Although OCR does not enforce the Due Process Clause directly, it is an agency of the federal government subject to the Constitution, including the Fifth Amendment, and cannot interpret Title IX to compel a recipient, public or private, to deprive a person of due process rights. Similarly, the Due Process Clause does not directly apply to private institutions. But the government may not use funding cut offs to incentivize recipients to take adverse actions against persons that, if taken directly by OCR, would violate the Due Process Clause.

The 2020 amendments to the Title IX regulations required all recipients to adopt grievance procedures that provide for the fair resolution of sex discrimination complaints, establishing "procedures that ensure that Title IX is enforced consistent with both constitutional due process and fundamental fairness, so that whether a student attends a public or private institution, the student has the benefit of a consistent, transparent grievance process with strong procedural protections regardless of whether the student is a complainant or respondent."[39] To its credit, the Proposed Rule retains some of the due process protections set forth in the 2020 Amendments and is thus an improvement over some pre 2020 OCR guidance documents.

On the other hand, the Proposed Rule removes important safeguards that in our view are crucial to maintaining constitutional due process and fundamental fairness.[40]

[37] 85 Fed. Reg. at 30,051 n.226 (citing 2001 Revised Sexual Harassment Guidance at 22).

[38] For a general introduction to the constitutional principles of due process and how they apply to the regulatory state, please see "Why Due Process of Law Is a Necessary Constraint on the Regulatory State," *available at* https://pacificlegal.org/the-separation-of-powers-explained/#3.

[39] 85 Fed. Reg. at 30,047.

[40] The Preamble in several places describes conversations that OCR had with administrators at recipients that are K-12 school districts who recounted why grievance procedures appropriate

Ms. Catherine E. Lhamon
September 12, 2022
Page 13

Among those are the rule that Title IX investigations and adjudications may not be performed by the same person and the requirement that postsecondary institutions must provide for a live hearing with cross examination for complaints of sex based harassment.

1.   The "single investigator" model routinely led to violations of due process and deprivations of fundamental fairness and should not be permitted.

One of the core guarantees of due process is the right to be heard before an impartial tribunal. Unfortunately, the proposed rule would undermine that core due process protection. Proposed section 106.45(b)(2) would eliminate the prohibition found in the 2020 Amendments on the decisionmaker in Title IX cases also being the Title IX coordinator or investigator. Before the 2020 Amendments, some recipients used a single investigator model in which one person or one team both investigated a complaint and made findings of fact regarding whether a respondent violated Title IX. The 2020 Amendments specifically prohibited this method because OCR found that combining the investigative and adjudicative functions in a single entity created an unnecessary risk of bias that unfairly impacted one or both parties. Specifically, OCR stated that placing these varied responsibilities in one individual or group risks those involved improperly relying on information gleaned during one role to affect decisions while performing a different role, and that separating investigative and adjudicative functions protected the parties by making it more likely that fact based determinations regarding responsibility are based on objective evaluations of relevant evidence.

As a federal court found in a case concerning alleged sexual misconduct at Brandeis University, "The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions. The dangers of such a process can be considerably mitigated if there is effective review by a neutral party, but here that right of review was substantially circumscribed." That decision recognized why the American legal system has long forbidden such proceedings in the criminal

---

for colleges or universities were inappropriately onerous for them. A kindergarten student who refuses to stop hugging his classmate, for example, might arguably be engaged in sexual misconduct as defined by Title IX. Yet a full-fledged disciplinary tribunal would make little sense given that he lacks the maturity to understand such a proceeding. We agree that for elementary and preschool students, more modest due process protections in this area are appropriate. Our comments are directed mostly toward accusations of sexual misconduct in postsecondary settings.

Ms. Catherine E. Lhamon
September 12, 2022
Page 14

justice system: In a criminal proceeding, vesting a single person with such a great quantity of aggregated power would violate due process.[41]

Another example of how combining the investigative, prosecutorial, and judicial power in one works in practice appears in Alexandra Brodsky's *Sexual Justice*. Brodsky is a prominent progressive advocate for sexual harassment victims. "Brandon," a young African American man at a community college in California, was found responsible for sexual assault based on the findings of a single investigator without a hearing. When Brodsky received a copy of the investigator's report, she recounted being "genuinely shocked by its lack of detail and level of analysis. It provided no explanation for the investigator's decision, jumping from a bare recitation of the facts to the conclusion. It included testimony provided by the [accuser's] witnesses, but not Brandon's, without an explanation as to why.... Brandon told me that when he sought out the investigator, the older man told him that he found [the accuser] more credible, but did not elaborate." Eventually Brandon cleared his name, but only after hiring a lawyer at his own personal expense and after much related aggravation and stress.[42]

While some postsecondary institutions have argued that the single investigator model is more efficient, efficiency is not the only nor most important value at stake in these proceedings. The criminal justice system would also function more efficiently if we dispensed with independent judges and juries and simply let prosecutors also serve as factfinders. We would never permit such a practice, largely because determining the truth of an accusation matters more than efficiency when it comes to criminal allegations. While jail time is not on the table in postsecondary sexual misconduct proceedings, the consequences are far from trivial. A student found responsible for sexual misconduct may face expulsion and struggle to enroll elsewhere or to find a good job because of the stigma associated with a sexual misconduct expulsion. Because the consequences of a biased inquisitorial model are particularly severe for the accused, the Department should restore the old rule prohibiting the single investigator model.

---

[41] *In re Oliver*, 333 U.S. 257, 278–79 (1948) (Rutledge, J., concurring) ("Michigan's one-man grand jury ... combines in a single official the historically separate powers of grand jury, committing magistrate, prosecutor, trial judge and petit jury. This aggregated authority denies to the accused not only the right to a public trial, but also those other basic protections secured by the Sixth Amendment.).

[42] Brodsky, *Sexual Justice* 82 (2021).

Ms. Catherine E. Lhamon
September 12, 2022
Page 15

2. <u>The Department should retain the rule that requires postsecondary institutions to use live hearing with cross examination</u>.

Current § 106.45(b)(6)(i) provides that for formal complaints of sexual harassment, postsecondary institutions must provide for a live hearing during which the decisionmaker must permit each party's advisor to ask the other party and any witnesses all relevant and any other follow up questions, including those challenging credibility. The Proposed Rules get rid of these question and answer requirements and replace them with a weaker 106.45(g), which would merely require a recipient to provide a process that enables the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is both in dispute and relevant to evaluating one or more allegations. This Proposed Rule would in effect permit, but not require, live hearings.

In the rulemaking that led to the 2020 Amendments, OCR described cross examination as "the greatest legal engine ever invented for the discovery of truth" and a necessary part of a fair, truth seeking process in postsecondary institutions.[43] The Preamble to those rules also noted that at least one federal circuit court has held that cross examination is a constitutional requirement of due process in the Title IX context at public institutions.[44] Even absent a general right to cross examination, some courts have held that in both public and private postsecondary settings, due process and fundamental fairness require some method of cross examination when a disciplinary charge rests on a witness or complaint's credibility.

While OCR now claims that postsecondary education institutions objected to these procedures as too prescriptive and burdensome, values other than procedural efficiency are at stake in these proceedings. OCR states in the Preamble to the Proposed Rule that some postsecondary institutions "questioned the utility of live hearings, noting that much of the information elicited during a hearing relates to questions that were asked and answered during an investigation." But that redundancy is a feature, not a bug, when it comes to the pursuit of justice. The criminal justice system has live trials even though the questions asked there are often the same as those asked by police officers at the interrogation stage. So, too, in civil trials, the questions asked there commonly overlap with those asked in depositions or interrogatories. Among the reasons for the repetitiveness: sometimes witnesses change their stories, and a witness who tells the same story consistently is more likely to be telling the truth than one who does not. Also, having different people conduct investigation and adjudication

---

[43] 83 Fed. Reg. 61,462, 61,476 (Nov. 29, 2018) (quoting *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 John Wigmore, Evidence § 1367 at 29 (3d ed. 1940))).

[44] *Doe v. Baum*, 903 F.3d 575, 581 (5th Cir. 1981).

Ms. Catherine E. Lhamon
September 12, 2022
Page 16

helps ensure that biases or prejudices on the part of one party do not unfairly affect the outcome.

Some postsecondary institutions have also complained that the new rules make it difficult for recipients to address sexual harassment in situations where a complainant or witness declines to submit to cross examination. But an accuser's or witness's willingness to submit to cross examination indicates her willingness to stand by her claims. Sometimes persons may decline to submit to cross examination because they have been intimidated, and that is a serious problem. On other occasions witnesses decline to submit to cross examination because they fear probing questions will show that they are lying. The 2020 Amendment contained safeguards that minimized some potential negative effects on complainants, while at the same time ensuring that claims are tested appropriately for truthfulness through cross examination.[45] Because live hearings with cross examination help to ensure that sexual misconduct proceedings in post secondary institutions uncover the actual truth of what happened and are fair to all parties, this requirement should be kept in the Final Rule.

III.  <u>The prohibition of discrimination based on sexual orientation or gender identity is a major question that is not addressed by Title IX, and this Rule should not interpret Title IX to broadly address such discrimination.</u>

As noted in the Preamble to the Proposed Rule, the Department's Title IX regulations have never previously addressed the application of Title IX to discrimination based on sexual orientation or gender identity. This Proposed Rule, however, proposes adding a new section, § 106.10, titled "Scope," that would interpret Title IX's prohibition on sex discrimination to cover sexual orientation and gender identity.[46] The Proposed Rule also amends the current § 106.31 to make clear that preventing any person from participating in any education program or activity consistent with their gender identity would subject them to more than *de minimis* harm

---

[45] The 2020 Amendments require that cross-examination must be conducted by the party advisors rather than by the parties themselves.

[46] We agree that in some instances, sex discrimination that is prohibited under Title IX would overlap with sexual orientation or gender identity discrimination. For example, if a gay student faced severe and pervasive harassment at school because of his mannerisms that are perceived as effeminate, that harassment would violate Title IX.

Ms. Catherine E. Lhamon
September 12, 2022
Page 17

and thus be prohibited.[47] The questions of how to handle sexual orientation and gender identity discrimination in athletics has been reserved for a subsequent rulemaking.

Sexual orientation and gender identity discrimination are major questions about which Congress is required to speak clearly when giving an agency power to address them. Agencies, including the Department of Education, have only those powers given to them by Congress. Generally, Congress intends to make major policy decisions itself, not leave those decisions to agencies.[48] Thus, in cases involving such major policy decisions, both separation of powers principles and a practical understanding of legislative intent require that Congress clearly authorize the agency's use of such power.[49]

The major questions doctrine has developed over a series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably have been understood to have granted. In *West Virginia v. EPA*, for example, the Supreme Court discerned a major question where the agency "claim[ed] to discover in a long extant statute an unheralded power" that constituted "a transformative expansion [in] its regulatory authority"[50] and where the agency's "discovery allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."[51]

In concurrence in *West Virginia v. EPA*, Justice Neil Gorsuch offered some additional observations on when an agency action involves a major question for which clear congressional authority is required.

Most importantly for present purposes, the doctrine applies when an agency claims the power to resolve a matter of great "political significance"[52] or to "end an

---

[47] The Department's current rules allow recipients to separate students by sex in limited circumstances where separation would not cause more than *de minimis* harm. *See, e.g.*, 34 C.F.R. § 106.33 (allowing separate toilet, locker room, bathroom, and shower facilities); *id.* § 106.34(a)(3).

[48] *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc).

[49] *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).

[50] *West Virginia v. EPA*, 142 S. Ct. at 2610, 2595.

[51] *West Virginia v. EPA*, 142 S. Ct. at 2610 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000), *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006); *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2486–87, 2490 (2021)).

[52] *West Virginia v. EPA*, 142 S. Ct. at 2616, 2620 (Gorsuch, J., concurring) (citing *NFIB v. OSHA*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring)).

Ms. Catherine E. Lhamon
September 12, 2022
Page 18

earnest and profound debate across the country."[53] Also, the Court has found it telling
when Congress has "considered and rejected" bills authorizing something akin to the
agency's proposed cause of action, as that may be a sign that the agency is attempting
to work around the legislative process to resolve for itself a question of great political
significance.[54]

Sexual orientation and gender identity discrimination are matters of great
"political significance," and the Proposed Rule would "end an earnest and profound
debate across the country" about how funding recipients should address these matters.
The decision therefore belongs to Congress.

## CONCLUSION

The Proposed Rule should not be adopted,
or should be at least significantly revised, to address three major concerns. First, the
redefinition of harassment as severe or pervasive conduct is likely to chill some First
Amendment protected speech. The current, narrower definition should be retained,
and OCR should add more explicit rules to make sure that recipients do not chill
protected speech. Second, the Proposed Rule removes some due process safeguards that
are necessary to secure fair treatment for accused students. OCR should continue to
maintain these due process rules. Third, prohibitions on sexual orientation and gender
identity discrimination are major questions, which an agency cannot regulate without
a clear statement from Congress that it intended to regulate conduct in this area.
Because Congress has not spoken clearly to those particular major questions, OCR
should not adopt rules regarding discrimination on sexual orientation and gender
identity.

Sincerely,

Alison Somin

Ethan Blevins

Daniel Ortner
Counsel for Pacific Legal Foundation

---

[53] *Id.* (citing *Gonzales*, 546 U.S. at 267–68).

[54] *Id.* at 10 (citing *Brown & Williamson*, 529 U.S. at 144).

**Exhibit E-4**

Comment by Ethics & Public Policy Center Scholars, ED-2021-OCR-0166-228237 (Sept. 12, 2022).



ETHICS AND
PUBLIC
POLICY
CENTER

September 12, 2022

**Via Federal eRulemaking Portal**

Miguel A. Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

Re:     **EPPC Scholars Comment Opposing "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," RIN 1870-AA16, Docket ID ED-2021-OCR-0166**

Dear Secretary Cardona:

We are scholars at the Ethics and Public Policy Center (EPPC), and we write in strong opposition to the Department of Education's ("ED" or "the Department") proposed rule "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" ("Proposed Rule").[1] Rachel N. Morrison is an EPPC Fellow, member of the HHS Accountability Project, and former attorney at the Equal Employment Opportunity Commission. Mary Hasson is the Kate O'Beirne Senior Fellow at EPPC, an attorney, and co-founder of EPPC's Person and Identity Project, an initiative that equips parents and faith-based institutions to counter gender ideology and promote the truth of the human person.

The Proposed Rule radically rewrites Title IX of the Education Amendments of 1972, landmark federal civil rights law that prohibits sex discrimination in education. As proposed, the rule is arbitrary and capricious, exceeds statutory authority, and is unlawful and unconstitutional. The rationale for the proposed changes is unsupported by substantial evidence. The Proposed Rule contradicts long-standing scientific understandings of the human person and places ideology ahead of sound policy. It turns the clock back on girls' and women's rights, tramples parental rights, harms children's interests, and ignores religious freedom and free speech of students, employees, and religious educational institutions. We urge the Department to withdraw and abandon the Proposed Rule.

**1.    ED has failed to provide substantial evidence that a revision of the current Title IX regulations is warranted.**

EO 12866, section 1(b) establishes the principles of regulation, including that "Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem." To justify replacing current regulations, including the 2020 Rule, ED must provide specific evidence as to how those regulations are causing harms or burdens. ED has failed to meet that standard.

---

[1] 87 Fed. Reg. 41390.

The Department's stated purpose in proposing new and amended regulations is "to better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate;" "to clarify the scope and application of Title IX;" and to clarify "the obligation of all schools … and other recipients" of "federal financial assistance … to provide an educational environment free from discrimination on the basis of sex" by "responding to incidents of sex discrimination."[2]

Far from demonstrating need or a factual warrant for proposing new regulations, ED admits that its review of the current regulations, "stakeholder listening sessions," and public hearings merely "*suggest* that the current regulations do not *best* fulfill" Title IX's purpose to "eliminate discrimination on the basis of sex" in "education programs or activities."[3] ED goes on to conclude that "the current regulations do not adequately clarify or specify the scope of sex discrimination prohibited by Title IX, including discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, or gender identity"[4] and that the proposed rule changes will "fully" align with Title IX's anti-discrimination mandate.[5]

The opposite is true: as we explain below, the proposed rules redefine the scope of Title IX in ways that *contradict* Title IX's clear purpose and plain language, are inconsistent with 50 years of actual practice in the implementation of Title IX, and are unsupported in law (see discussion of *Bostock* below).

In addition, ED cites almost no evidence to support its claim that discrimination on the basis of sex—as reflected in the 2020 (and other current) regulations—remains a "serious problem,"[6] and serious enough to justify the Proposed Rule. ED acknowledges that investigations related to Title IX have decreased, but offers little evidence on the reasons why.[7] It admits that it lacks reliable data regarding the extent of possible Title IX sex discrimination at covered institutions, programs, and activities, relying on "anecdotal" evidence and a 2014 study (which also was relied upon by the 2020 Rule) that "did not address the prevalence of other forms of sex discrimination, including discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."[8]

---

[2] *Id.*
[3] *Id.* (emphasis added).
[4] 87 Fed. Reg. 41392.
[5] 87 Fed. Reg. 41393.
[6] 87 Fed. Reg. 41397.
[7] 87 Fed. Reg. 41549.
[8] For example:

"In the absence of a recent, high quality, and comprehensive data source, the Department relies, as it did for the 2020 amendments, on a 2014 report titled Sexual Violence on Campus (2014 Senate Subcommittee Report) issued by the U.S. Senate Subcommittee on Financial and Contracting Oversight. The report included survey data from 440 four-year IHEs regarding the number of investigations of sexual violence that had been conducted during the previous five-year period; however, this report did not address the prevalence of other forms of sex discrimination, including discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 87 Fed. Reg. 41548.

"The Department has not been able to identify reliable data sources about actions taken by recipients following the promulgation of the 2020 amendments. As a result, it is difficult for the Department to estimate the number of investigations that have occurred since issuance of the 2020 amendments or the number that would likely occur in later years in the absence of the Department's proposed regulations. This absence of data means the Department could not construct a baseline from which to estimate the likely effects of the proposed regulations." 87 Fed. Reg. 41549.

Instead, the department is relying on "anecdotal" evidence that "confirms the Department's 2020 estimate related to the decrease in the number of investigations, it is anecdotal and, as such, does not provide the Department with sufficient evidence on which to revise its 2020 estimate. Further, the Department recognizes that the COVID–

ED appears to lack any substantial evidence on the prevalence to date of alleged discrimination "on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."[9] This raises a critically important question: If there's little to no hard evidence of the number and kinds of incidents related to "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," how can the Proposed Rule's significant expansion to include these "forms of sex discrimination" be justified?

ED claims that the Proposed Rules are necessary because of "the Department's identification of sex-based barriers to equal educational opportunity," but fails to explain what these "sex-based barriers to equal educational opportunity" are, how the Department identified them, and how it measured the supposed impact of these barriers, given the lack of available data.[10] Indeed, from day one, the Biden administration has made no secret of its desire to privilege the concept of "gender identity" over the reality of biological sex.[11] ED employs circular reasoning to justify its proposed rule changes: ED complains that the 2020 regulations fail to eliminate discrimination on the basis of "sex" because the 2020 regulations do not prohibit discrimination on the basis of "gender identity" (a concept inherently at odds with sex-based protections, as discussed below). ED then proposes to solve the problem by "clarifying," through new regulations, that "discrimination on the basis of sex prohibits discrimination on the basis of "gender identity."

ED has failed to demonstrate need and a substantial evidentiary basis for the Proposed Rule. This is nothing more than arbitrary and capricious rulemaking by the Department.

---

19 pandemic resulted in many LEAs and IHEs operating remotely, which may have reduced the incidence or reporting of sexual harassment, the willingness of students and others to initiate a recipient's grievance procedures in response to alleged sexual harassment, or both. Again, however, the Department has not identified high-quality research studies to inform its analysis. Therefore, the Department continues to assume that the estimates of the 2020 amendments represent the baseline level of a recipient's actions to comply with Title IX in future years when considered in the absence of the proposed regulations. The Department invites comment on whether these estimates are reasonable and whether high quality data sources or studies exist regarding recipients' actions in response to the 2020 amendments."

"Notwithstanding the estimates used for the 2020 amendments, for recipients that saw reductions in the number of investigations conducted each year under the 2020 amendments, the Department estimates that 90 percent of alleged incidents that were previously classified as sexual harassment under subregulatory guidance documents, but did not meet the definition of ''sexual harassment'' under the current regulations, were handled by a recipient in other disciplinary processes." 87 Fed. Reg. 41549.

"[H]arassment based on sexual orientation can be difficult to distinguish from other forms of harassment based on sex. However, the Department also believes it is unreasonable to assume that the express inclusion of sexual orientation and gender identity in the proposed regulations would have no effect on the number of investigations occurring annually. Based on the analysis set out here, the Department estimates that the additional clarity provided by the proposed regulations would result in a 10 percent increase in the number of investigations occurring annually. 87 Fed. Reg. 41551.

9 87 Fed Reg. 41571.

10 87 Fed. Reg. 41531.

11 *See* Rachel N. Morrison, *Gender Identity Policy Under the Biden Administration*, 23 Federalist Soc'y Rev. 85 (May 2, 2022), https://ssrn.com/abstract=4104566.

2.  **The Proposed Rule's expansive definition of discrimination "on the basis of sex" is arbitrary and capricious and contrary to law.**

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[12]

ED declines to define the term "sex" because, it argues, "sex can encompass many traits and because it is not necessary for the regulations to define the term for all circumstances."[13] But "to clarify the scope of Title IX's prohibition on discrimination on the basis of sex," ED proposes that discrimination on the basis of sex be expanded to include ("at a minimum") discrimination on the basis of:

- sexual orientation,
- gender identity,
- sex stereotypes (i.e., "fixed or generalized expectations regarding a person's aptitudes, behavior, self-presentation, or other attributes based on sex"),
- sex characteristics (including "a person's physiological sex characteristics and other inherently sex-based traits," and "intersex traits"), and
- pregnancy or related conditions (defined as "(1) Pregnancy, childbirth, termination of pregnancy, or lactation; (2) Medical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation; or (3) Recovery from pregnancy, childbirth, termination of pregnancy, lactation, or their related medical conditions").[14]

The Proposed rule does not define "gender identity" or "termination of pregnancy."

It is irrational for ED to define what constitutes discrimination "on the basis of sex," while it refuses to define what "sex" even is. Without knowing what "sex" is, one cannot know what sex discrimination is.

As explained below, "sex" in Title IX is clearly and historically meant to refer to "biological sex." Nevertheless, the Proposed Rule claims that "[c]ontrary to the assertions made in 2020 and January 2021, the Department does not have a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'"[15] This is a blatant mischaracterization of the Department's prior positions. ED's failure to appreciate the degree to which it is effectuating change in sex discrimination under Title IX is arbitrary and capricious.

Indeed, ED's proposal to expand sex discrimination to include "gender identity" (among other bases) would rewrite the landmark civil rights laws and take away girls' and women's rights—the impetus for passing Title IX in the first place. ED's radical rewriting of Title IX is a major question that raises serious constitutional problems concerning the separation of powers under *West Virginia v. EPA*.[16]

---

[12] 20 U.S.C. § 1681(a).
[13] 87 Fed. Reg. 41531.
[14] 87 Fed. Reg. 41515.
[15] 87 Fed. Reg. 41537.
[16] No. 20-1530 (U.S. Jun. 30, 2022).

**A. Title IX was not amended by *Bostock*, and *Bostock* does not support the need for regulatory action.**

ED relies heavily on the Supreme Court's decision in *Bostock v. Clayton County*.[17] The Proposed Rule explains that the Department's "prior position (*i.e.,* that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity) is at odds with Title IX's text and purpose and the reasoning of the *Bostock* Court and other courts to have considered the issue in recent years—both before and after *Bostock.*"[18] ED claims that its proposed definition is "consistent with *Bostock* and other Supreme Court precedent" because *Bostock* "makes clear that it is 'impossible to discriminate against a person' on the basis of sexual orientation or gender identity without 'discriminating against that individual based on sex,' even assuming that sex refers only to certain 'biological distinctions.'"[19]

But *Bostock* was not a Title IX case. Rather, in *Bostock* the Supreme Court held that under *Title VII of the Civil Rights Act of 1964* "an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'"[20] Title VII is the federal law that prohibits sex (and race, color, religion, national origin) discrimination in employment, a completely different context than education and Title IX. Notably, *Bostock*'s Title VII analysis does not apply to Title IX because Title IX has a different sex-specific structure and, unlike Title VII, specifically uses language based on a biological binary, as detailed below.

The Majority in *Bostock* used the term "transgender status," and did not adopt "gender identity" as a protected class. Thus, HHS cannot rely on *Bostock* to support the inclusion of the term "gender identity" within the definition of "sex discrimination." The *Bostock* Court premised its decision on the assumption that "sex" refers only to the "biological distinctions between male and female."[21] The Proposed Rule tries to explain this away: "*Bostock* demonstrated with respect to Title VII, even accepting that definition of 'sex' would not preclude Title IX's coverage of these forms of discrimination."[22] To be consistent with *Bostock*, ED must assume "sex" refers to "biological distinctions between male and female" (which it does not do) and that "sex" is incompatible with a gender spectrum or fluidity (which is promoted in the Proposed Rule).

Further, *Bostock* was a limited holding. The Supreme Court specifically cabined its decision to the hiring and firing context under Title VII, stating it was not addressing other Title VII issues, such as sex-specific bathrooms, locker rooms, and dress codes, or other laws.[23] While the Court acknowledged concerns by some that its decision could make sex-segregated bathrooms, locker rooms, and dress codes "unsustainable" and "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination," the Court did not address those concerns.[24] The Court explained that such questions were for "future cases" and the Court would not prejudge any such questions because "none of th[o]se other laws [we]re before [them]."[25] Likewise, ED should not prejudge those questions the Court left unanswered, especially as it relates to sex-segregated bathrooms, lockers rooms, dress codes, and housing

---

[17] 140 S. Ct. 1731 (2020).
[18] 87 Fed. Reg. 41530.
[19] 87 Fed. Reg. 41532.
[20] 140 S. Ct. at 1737.
[21] *Id.* at 1739.
[22] 87 Fed. Reg. 41530.
[23] 140 S. Ct. at 1753.
[24] *Id.* at 1753.
[25] *Id.*

in the education context. The Supreme Court was clear that *Bostock* did not decide any issue beyond hiring and firing under Title VII, and it is arbitrary and capricious for ED to ignore *Bostock*'s limitations and claim *Bostock* requires its regulatory action. As the Sixth Circuit recently put it, "Bostock extends no further than Title VII."[26]

The Proposed Rule state, "Other Federal courts that reviewed the Department's interpretation found it to be reasonable."[27] In support, ED cites to a Fourth Circuit case and a couple of district court cases.[28] But the Department fails to acknowledge or address Circuit Court precedent that contradicts its interpretation. In another federal appellate case (formerly relied on by the Biden administration), *Adams v. School Board of St. Johns County*, the Eleventh Circuit granted rehearing en banc and vacated the panel's 2-1 decision that aligns with the Department's Proposed Rule.[29] The vacated panel majority had held that *Bostock*'s reasoning that Title VII with its "starkly broad terms" forbids discrimination against transgender people "applies with the same force to Title IX's equally broad prohibition on sex discrimination."[30] The dissent, however, pointed out that "any guidance *Bostock* might otherwise provide about whether Title VII allows for sex-separated bathrooms does not extend to Title IX," since Title IX expressly "permits schools to act on the basis of sex through sex-separated bathrooms."[31] While the en banc Eleventh Circuit had not issued its opinion,[32] it would be arbitrary and capricious for ED to ignore this impending decision.

The Proposed Rule also repeatedly cites to a 2021 *Bostock* Notice of Interpretation issued by ED (without going through the notice and comment process) purportedly applying *Bostock*'s reasoning to Title IX, even though Bostock stated that its implications for other laws were questions for "future cases."[33] The *Bostock* Notice preemptively stated ED will enforce Title IX to prohibit discrimination based on sexual orientation and gender identity, based on *Bostock*.[34] On July 15, 2022, a federal district court preliminarily enjoined the *Bostock* Notice document for not following the public notice and comment process required under the Administrative Procedure Act.[35] Further, as the Supreme Court stated in *Perez v. Mortgage Bankers Association*, "Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'"[36] Thus, ED's *Bostock* Notice is neither legally authoritative, and cannot be used as a basis for this rulemaking.

To the extent ED is relying on *Bostock* as the legal impetus for its definition, that basis is deficient. *Bostock* requires no such regulatory action. It is arbitrary and capricious and contrary to law for ED to claim *Bostock* requires ED's interpretation under Title IX and supports its need for rulemaking.

---

[26] *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

[27] 87 Fed. Reg. 41531.

[28] 87 Fed. Reg. 41531-32.

[29] *Adams v. Sch. Bd. of St. Johns Cnty*, No. 18-13592 (11th Cir. Aug. 23, 2021).

[30] *Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020), *vacated*, No. 18-13592 (11th Cir. Aug. 23, 2021).

[31] *Id.* at 1320 (Pryor, C.J., dissenting).

[32] Oral argument was held February 22, 2022.

[33] *See* 87 Fed. Reg. 41395, 41530, 41532, 41533.

[34] Office for Civil Rights, U.S. Dep't Educ., Notification of Interpretation: Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 16, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/202106-titleix-noi.pdf.

[35] *Tennessee v. Department of Education*, No. 3:21-cv-308 (D. Ten. July 15, 2022) https://adfmedialegalfiles.blob.core.windows.net/files/TennesseeOrderOpinionPI.pdf.

[36] 575 U.S. 92, 97 (2015).

**B.  Under Title IX, "sex" is a binary classification and means "biological sex."**

ED attempts to justify its expansion of the scope of Title IX's protections against sex discrimination to include "sexual orientation" and "gender identity,"[37] even though it acknowledges that "the Department has at times articulated a narrower scope of Title IX's prohibition on sex discrimination," including "previously stated" determinations that "Title IX does not fully encompass discrimination on the basis of sexual orientation or gender identity" (emphasis added).[38] To overcome these past determinations, ED relies on the *Bostock* decision (discussed above) and a conclusory determination that ED's "prior position [i.e., that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity] is at odds with Title IX's text and purpose."[39] This conclusion—that Title IX's text and purpose require expansion to include sexual orientation and gender identity—is erroneous.

Title IX prohibits discrimination based on sex in education programs or activities that receive Federal financial assistance.[40] It's also clear that Title IX and its accompanying regulations repeatedly recognize the fact of biological sexual difference and clearly presuppose "sex" as a binary classification (male or female). As a federal court recently observed, "Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'"[41] The following select references from the Title IX statute and long-standing regulations illustrate the point:

- Title IX provisions are not to be construed as prohibiting an educational institution "from maintaining separate living facilities for the *different sexes*."[42]
- Addressing changes in admissions policies for "an institution which admits only students of o*ne sex* to being an institution which admits students of *both sexes*."[43]
- References to "men's" and "women's" associations as well as organizations for "boys" and "girls" in the context of organizations "the membership of which has traditionally been limited to persons of *one sex*."[44]
- References to "boys'" and "girls'" conferences.[45]
- "[S]eparation of students by sex within physical education classes or activities."[46]
- "[C]lasses in elementary and secondary schools that deal primarily with human sexuality may be conducted in separate sessions for *boys and girls*."[47]
- "[S]eparate teams for members of *each sex* where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[48]

Contrary to ED's claims in the Proposed Rule, Title IX's specific language communicates an understanding of sex as binary (male or female) and permits and accommodates separate facilities for males and females (toileting, locker rooms, etc.) and certain kinds of sex-specific activities and athletic competitions *in fulfillment of* its statutory intent to ensure equality between males and females. As Justice

---

[37] 87 Fed. Reg. 41531, § 106.10.
[38] *Id.*
[39] *Id.*
[40] Office for Civil Rights, U.S. Dep't Educ., *Title IX and Sex Discrimination* (last modified Aug. 20, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html.
[41] *Neese v. Becerra*, 2:21-CV-163-Z, 22 (N.D. Tex. Apr. 26, 2022).
[42] 20 U.S.C. § 1686 (emphasis added).
[43] 20 U.S.C. § 1681(a)(2) (emphasis added).
[44] 20 U.S.C. § 1681(a)(6)(B) (emphasis added).
[45] 20 U.S.C. § 1681(a)(7)(A).
[46] 34 CFR § 106.34.
[47] 34 CFR § 106.34 (emphasis added).
[48] 34 CFR § 106.41 (emphasis added).

Ginsburg wrote in *United States v. Virginia*,[49] laws prohibiting sex discrimination do not prohibit sex-based distinctions that account for the differences between males and females: "Physical differences between men and women … are enduring. The two sexes are not fungible." Thus, ED has no grounds for concluding that the current Title IX regulations, which safeguard necessary sex-based distinctions while ensuring equality, fail to "fully" implement Title IX's anti-discrimination mandate.

Title IX aims to ensure equality while accounting for sexual difference (male and female). Title IX regulations should likewise recognize that "sex" under Title IX means "biological sex," a binary classification. The Proposed Rule is arbitrary and capricious and contrary to law because it fails to recognize the text of Title IX and the biological and binary classification of "sex."

### 3.  The Proposed Rule expands Title IX's scope of protection to an arbitrarily selected set of terms, which are poorly defined, not defined at all, or defined as open-ended categories.

"Sex" is an objective fact, a biological classification of "male" or "female," linked to the organism's whole-body design to fulfill one of two reproductive roles. Yet the Proposed Rule disregards decades of clarity regarding the meaning of "sex," and introduces a new set of arbitrarily selected set of terms, which are poorly defined, not defined at all, or defined as open-ended categories. The proposed change is purportedly to "clarify" Title IX's scope in prohibiting discrimination on the basis of sex. ED admits that "[t]he statute does not explicitly reference distinct forms of sex discrimination, such as discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, or gender identity, or discrimination taking the form of sex-based harassment." Undaunted, ED assumes legislative-style powers and writes its own preferred set of protected characteristics, rather than accepting the limited, historical meaning of "sex" and the current (2020), well-grounded regulations.

Specifically, ED unlawfully extends the scope of Title IX, re-interpreting "sex" to include an arbitrarily chosen set of terms that lack consistent, objective meanings. ED asserts that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."[50] Bald assertions are no substitute for evidence. ED needs to specify the evidentiary base on which it relies for its claim that these five categories fall within the statutory language and legislative intent of Title IX. Other questions need attention too: On what basis did ED select *these* categories, and not others? Were other new categories considered, and if so, on what basis were they excluded? What is the nexus between the selected categories and historical evidence of sex discrimination? ED provides no answers, making its definition of sex discrimination arbitrary and capricious.

In fact, nowhere in the Proposed Rule does ED provide evidence supporting its selection of these particular "forms of sex discrimination" (and not others). It attempts to justify the arbitrary inclusion of these new "forms of sex discrimination" by citing to the Supreme Court's language in *North Haven Board of Education*, which states: ''if we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language.''[51] However, ED extrapolates beyond the facts of *North Haven Board of Education*, which involved the court's determination of whether the statutory term "a person" included employees as well as students. In answering that question, the Court considered legislative intent, as well as the plain meaning of the word "person." For ED's Proposed Rule, it expands the "sweep" of the regulations far beyond the language and legislative intent of Title IX: ED *adds* new terms and concepts (like "gender identity" and "sex characteristics"), with no legal grounds for doing so, fails to

---

[49] 518 U.S. 515, 534 (1996).
[50] 87 Fed. Reg. 41571, proposed § 106.10.
[51] 87 Fed. Reg. 41528 (quoting *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982)).

define these terms clearly, and fails to provide evidence that this expansion was necessary. This constitutes arbitrary and capricious—and highly politicized—rulemaking.

But that's not all. In addition to the five new categories listed in the proposed § 106.10, the Proposed Rule explains it also would prohibit discrimination for additional, unknown, and undefined categories: "The Department does not intend that the specific categories of discrimination listed in proposed § 106.10 would be exhaustive, as evidenced by the use of the word 'includes.'"[52] In other words, ED arrogates for itself an elastic power to expand the potential grounds for discrimination under Title IX. Recipients will face an open-ended threat of failing to identify, address, or remedy forms of sex discrimination that are as yet unnamed. This violates the nature and purpose of the entire rule-making process (which aims to provide clear notice of statutorily based regulatory requirements, potential violations, and expected remedial actions) and is the very definition of arbitrary and capricious.

ED further obscures the scope of Title IX by littering its examples with still more undefined terms, purportedly to show "at a minimum" the kinds of sexual orientation and gender identity labels that will enjoy protected status. ED states that: "Title IX's broad prohibition on discrimination 'on the basis of sex' under a recipient's education program or activity encompasses, at a minimum, discrimination against an individual because, for example, they are or are perceived to be male, female, or nonbinary; transgender or cisgender; intersex; currently or previously pregnant; lesbian, gay, bisexual, queer, heterosexual, or asexual; or gender-conforming or gender-nonconforming."[53] It is not clear under which of the five new categories each of the listed examples might fall. Nor are the terms in these examples well-defined, or even well-accepted.

Additionally, the Proposed Rule includes a footnote referencing "LGBTQI+," a term ED describes as referring to "students who are lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, or describe their sex characteristics, sexual orientation, or gender identity in another similar way."[54] None of these additional terms—such as "queer," "asexual," "gender-conforming" or "gender non-conforming"—are defined in the Proposed Rule either. These terms reflect ever-shifting identity labels, not immutable characteristics like biological sex. The use of undefined and non-exhaustive terms to describe actionable forms of discrimination under the Proposed Rule puts recipients in an untenable position. ED's failure under the Proposed Rule to hew closely to Title IX's statutory text and purpose and to define the terms it intends to include within its expanded scope of protection, renders the Proposed Rule unworkable and unlawful. A few examples illustrate why.

First, the term "cisgender" is used in ED's example but not defined.[55] The Media Reference Guide from GLADD, an LGBTQ advocacy group, defines "cisgender" as "[a]n adjective used to describe people who are not transgender" or "a person whose gender identity is aligned with the sex they were assigned at birth," and concludes by saying, "[c]urrently, cisgender is a word not widely understood by most people."[56] Nevertheless, according to the Proposed Rule, a person's misuse of such a term might draw an accusation of "discrimination" or sex-based harassment.

Second, ED's example cites the possibility of a person being discriminated against because they are, or are perceived to be, "non-binary," but fails to define "non-binary." GLAAD defines "non-binary" as follows: "Nonbinary is an adjective used by people who experience their gender identity and/or gender expression as falling outside the binary gender categories of 'man' and 'woman.' Many nonbinary people

---

[52] 87 Fed. Reg. 41532.
[53] *Id.*
[54] 87 Fed. Reg. 41395.
[55] 87 Fed. Reg. 41532.
[56] GLAAD Media Reference Guide, https://www.glaad.org/reference/trans-terms (last visited Sept. 12, 2022).

also call themselves transgender and consider themselves part of the transgender community. Others do not. Nonbinary is an umbrella term that encompasses many different ways to understand one's gender. Some nonbinary people may also use words like agender, bigender, demigender, pangender, etc. to describe the specific way in which they are nonbinary."[57] According to GLAAD's description, "non-binary" is a subjective label that could mean almost anything. How does a recipient identify, prevent, address, and remedy potential discrimination based on such a fluid and subjective label?

Finally, ED fails to define "gender identity." GLAAD defines "gender identity as "[a] person's internal, deeply held knowledge of their own gender" (but fails to define "gender"), and then boldly claims that "[e]veryone has a gender identity." In contrast, a psychiatrist at a Dallas children's gender clinic defends the idea that a child might reject all "gender" labels, in favor of an "agender" identity, meaning a person who is "genderless, without a gender identity."[58] These confusing, contradictory definitions represent but a few of the many versions potentially used by recipient educational institutions or their students and staff. In the absence of limited terms, each clearly defined, how is a recipient supposed to train staff members, prevent discrimination and harassment, identify and evaluate complaints, and fashion appropriate remedies?

Below, we offer some additional observations and concerns about the specific terms proposed under § 106.10 as the basis for sex discrimination claims.

## 4.  Title IX protects "sex," not "gender identity," which is subjective, often fluid, and stands in opposition to the objective nature of "sex."

"Gender identity" conceptualizes a person's desire to assume and express a self-defined identity, based on feelings incongruent with or divergent from the person's biological sex (objectively male or female).

### A.  Legislative intent: sex, not gender identity.

On its face, Title IX clearly permits certain distinctions "on the basis of sex" to take account of biological differences between males and females. These distinctions based on biology are consistent with Title IX's purpose of advancing equality between the sexes. In an arbitrary attempt to expand the scope of Title IX beyond its legislative intent, ED's Proposed Rule seeks to inject the undefined category of "gender identity" into the sex-based protections of Title IX.

When Title IX was passed and implemented, no one—not legislators, psychologists, or the average person—would have understood "sex" to mean "gender identity."[59] As a recent federal court put it, "Congress enacted Title IX in 1972. At that time, 'sex' was commonly understood to refer to physiological differences between men and women—particularly with respect to reproductive functions."[60]

---

[57] *Id.*

[58] Vera Papisova, *What it Means to Identify as Agender*, Teen Vogue (Jan. 20, 2016), https://www.teenvogue.com/story/what-is-agender (quoting Dr Meredith Chapman of Children's Health in Dallas, TX).

[59] Judicial opinions interpreting Title IX sometimes used the word "gender" as a synonym for "sex," although the Title IX legislative history used the term "sex." See, for example, *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982). But to date, as described in our discussion on the *Bostock* decision, the Supreme Court has not defined "gender identity" as included within the meaning of "sex," for purposes of Title IX.

[60] *Neese v. Becerra*, 2:21-CV-163-Z, 22 (N.D. Tex. Apr. 26, 2022) (citing 20 U.S.C. § 1681) (internal citations omitted).

Nor is there any evidence that Congress intended Title IX's prohibition of discrimination "on the basis of sex" to apply to "gender identity." In contrast, the notion of "sex stereotypes," included in later Title IX analyses, was a familiar concept integral to ongoing cultural and political discussions of sex discrimination. The term "gender identity," however, was largely unknown in 1972 outside the specialized fields of psychiatry and psychology. To the extent "gender identity" entered the public conversation, it denoted the *rejection* of, or *disassociation* from, biological sex (male or female), and the personal expression of a desired, alternative social presentation.

### B.  Logic, language, and medical history: gender identity is not sex.

It is logically incoherent to claim that a statute that intends to ensure sex-based equality simultaneously protects claims based on "gender identity," a self-perception that emerges from the *rejection* of one's sex-based identity.

Historically, the term "gender identity" was coined in 1968 by psychoanalyst Robert J. Stoller to express a person's psychological self-categorization, *distinct* from sex (male or female).[61] In fact, "gender identity" connotes a psychological feeling of *incompatibility* with the sexed body; the term describes the interior "sense" or experience of a person who feels alienated from the sexed body (male or female) or who experiences a strong desire to present socially as the opposite sex. It was a rare phenomenon (until recently), with prevalence estimated at less than 0.002%.[62]

When Title IX became law, the field of psychiatry regarded a person's assertion of a "gender identity" incongruent with the person's biological sex to be a sign of serious mental illness. The pioneering use of surgery to alleviate the extreme mental suffering of adults (mostly males) whose "gender identity" clashed with the reality of the person's biological sex further emphasizes the historical divergence between "sex" and "gender identity." These surgeries initially were described as "sex change" surgeries, a term that signals the oppositional dynamic between sex and "gender identity." The individual who expresses a "gender identity" incongruent with natal sex (a "transgender" identity) and desires "sex change" surgery *repudiates* and seeks to escape the sexed body and natal identity as male or female, in pursuit of a desired but physiological impossible result: a "sex change."

The first American who gained notoriety for seeking "sex change" surgery was a male named George Jorgenson, who underwent surgical castration in Europe and returned to America as Christine Jorgenson.[63] The initial castration and later surgeries to create a "neo-vagina" changed Jorgenson's physical presentation and psychologically validated Jorgenson's expressed social identity but did not "change" Jorgenson's genetic sex. The truth is that no one can change sex, because, according to the Institute of Medicine, "every cell has a sex," meaning a person's sex (male or female) is genetically

---

[61] Richard Green., *Robert Stoller's Sex and Gender: 40 Years On*, 39 Arch Sex Behav. 1457-65 (2010). Https://Doi.Org/10.1007/S10508-010-9665-5. John Money, a sexologist, conceptualized the term "gender" and "gender roles" earlier, in the mid-1950s, based on his work with "transsexuals" and patients who suffered disorders of sexual development. He theorized that a person's social identity need not align with the fact of the person's sex and believed that a child's identity as a boy or girl depended on social conditioning rather than biology. He tested his theories on twin boys, one of whom suffered the loss of his penis during circumcision. Under Money's direction, the parents raised the boy as a girl and Money prematurely declared his experiment a success. It was a failure. The boy later reverted to his masculine identity as a teen, but the psychological damage was immense. He eventually committed suicide. The story was chronicled by John Colapinto in *As Nature Made Him: The Boy who Was Raised as a Girl* (2006).

[62] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Health Disorders (5th ed. 2013) ("Gender dysphoria" presents in 0.002% of the population.).

[63] Rebecca Poole, *From GI Joe to GI Jane: Christine Jorgensen's Story* (June 30, 2022), https://www.nationalww2museum.org/war/articles/christine-jorgensen.

11

expressed in every cell of the human body.[64] Modifying the appearance of a person's body and destroying or impairing the natural functions of the sexed body do not "change" the person's sex.

The current field of "gender medicine" no longer describes these medical or surgical interventions as "sex change" or "sex reassignment" procedures (implicitly acknowledging the impossibility of "changing" one's sex). Instead, it describes these interventions as "gender affirming" procedures—procedures that attempt to remedy the *dissonance* between mind and body by modifying the appearance and function of the sexed body to better align with, and validate, the person's psychological self-concept.[65] Put differently, the person seeking "gender-affirming" interventions desires to alter the appearance and function of the body *precisely because* the concrete physical reality of sex *contradicts* the person's inner feelings or self-perception ("gender identity"). The goal of "gender affirming" medical and surgical interventions is to create an *appearance or social presentation* that more closely matches the person's subjective sense of self ("gender identity"), which *diverges* from the objective fact of the person's sexual identity as male or female.

This dissonance between mind and body was long viewed as a mental health disorder, although it wasn't until 1980 that "gender identity disorder" first appeared in the American Psychiatric Association's Diagnostic and Statistical Manual (DSM) of Mental Disorders as an official mental health diagnosis.[66] Subsequent versions of the DSM reinforced the conceptual opposition between a person's natal sex and psychological self-perception (or "gender identity"). DSM-IV described "gender dysphoria" as distress arising out of perceived conflict between "biological sex" and "gender identity."[67] In 2013, the DSM was revised to replace "gender identity disorder" with "gender dysphoria," a diagnosis based on clinical distress arising from the experience of gender *incongruence* (a perceived discordance between the fact of a person's biological sex and the individual's self-perceived identity).[68]

The American Psychological Association's guidance on "gender and sexual orientation diversity in children and adolescents in schools" (promoting a gender-affirming approach to transgender identification) *contrasts* "sex" and "gender identity."[69] It defines "sex" as "a person's *biological* status … typically categorized as male, female or intersex," while describing "gender identity" as referring "to one's *sense* of oneself as male, female or something else," regardless of the person's biological sex.[70]

Historically, then, the psychological sciences not only consistently distinguished "sex" and "gender identity," but also, in the context of transgender identification, framed them as "incongruent," unharmonious, or incompatible with one another. The American Psychological Association (APA) today describes a person who identifies as "transgender" as one who has a "gender identity and biological sex [that] are not congruent."[71] According to the APA, "transgender" is "an umbrella term ... wherein one's

---

[64] *Exploring the Biological Contributions to Human Health: Does Sex Matter?*, Inst. of Medicine 1 (2001), https://doi.org/10.17226/10028.

[65] The latest surgical techniques can construct a facsimile of the genitalia of the opposite sex (e.g., a "neo-phallus" or "neo-vagina") but cannot transform a person of one sex into the opposite sex. It is impossible to create fully functioning reproductive organs and genitalia of one sex within the body of the opposite sex, because sex is a "whole body" classification of the organism's design to produce either large gametes (ova) or small gametes (sperm).

[66] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 261 (3d Ed. 1980).

[67] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 532-33 (4th Ed. 1994).

[68] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 452 (5th Ed. 2013).

[69] Gender And Sexual Orientation Diversity in Children and Adolescents in Schools, American Psychological Association (2015) https://www.apa.org/pi/lgbt/resources/diversity-schools.

[70] Gender And Sexual Orientation Diversity in Children and Adolescents in Schools, American Psychological Association (2015), https://Www.Apa.Org/Pi/Lgbt/Resources/Diversity-Schools.

[71] *Id.*

assigned biological sex doesn't match their felt identity."[72] The Human Rights Campaign Foundation publication entitled *Coming Out: Living Authentically as Transgender or Non-binary* defines "gender identity" as a person's subjective self-perception, and a "transgender" gender identity as one that is "different from their sex assigned at birth."[73] Expressing a transgender "gender identity" *contradicts* (but cannot change) a person's immutable biological sex.

It's not clear precisely what "gender identity" is (and ED fails to define the term), but it's clear what it isn't: "gender identity" is not the same as "biological sex." In fact, the only thing that is certain when a person declares a "transgender," "queer," or "nonbinary" "gender identity" (or any of the terms listed in the Proposed Rule,[74] is that the person is *rejecting* a sex-based identity, determined by natal or biological sex. Consequently, redefining "sex" (a biological reality) to include "gender identity" (a contradictory self-perception) does violence to the express intent of Title IX and, as discussed below, jeopardizes the rights of the very people—females—it was designed to protect.

### C. Gender identity threatens females' sex-based rights.

In practical terms, interpreting discrimination protections "on the basis of sex" to privilege "gender identity" effectively guts Title IX of meaningful protections for females and threatens to erase 50 years of women's sex-based rights under the law. Title IX's sex-based distinctions are grounded in common sense, historical perspective, and biology. They recognize that women's safety is often threatened by the intrusion of males into private spaces where women are sexually vulnerable (e.g., spaces for toileting, showering, and sleeping). A high-profile incident in Loudoun County, Virginia, illustrates the problem: a male student wearing a skirt went unchallenged into the girls' restroom and sexually assaulted a female student.[75] When school policies normalize biological males—regardless of how they identify—entering female single-sex spaces, girls (biological females) will be told to ignore their discomfort lest they make a trans-identified student feel uncomfortable or be subject to a Title IX complaint for "harassment." At the same time, bad actors will take advantage of the situation and girls will be less safe. Concern for the privacy and safety of females has motivated states like Tennessee and Oklahoma to pass laws requiring sex-specific bathroom use in schools (sex determined at birth).[76] Conversely, the ideological claim that gender identity beliefs should be privileged over the reality of biological sex has motivated lawsuits seeking to deny females their rights to sex-specific private spaces.

Efforts to shoehorn "gender identity" into Title IX's protections against "sex discrimination" undercut the very purpose of Title IX, which was intended to ensure female equality, opportunity, safety, and privacy. The proposed rules disregard the common-sense, reasonable sex-based restrictions permitted under Title IX by requiring recipients to grant access to single-sex facilities, programs, and activities on the basis of "gender identity." "Gender identity" also threatens to stall women's progress and equality in specific arenas, such as interscholastic athletics, where biological differences between the sexes come into play (a topic addressed below).

---

[72] *Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools*, American Psychological Association & National Association of School Psychologists (2015), https://www.apa.org/pi/lgbt/resources/diversity-schools?item=3.

[73] "Gender identity—One's innermost concept of self as man, woman, a blend of both or neither—how individuals perceive themselves and what they call themselves. One's gender identity can be the same or different from their sex assigned at birth." *Coming Out: Living Authentically as Transgender or Non-binary*, Human Rights Campaign Found., https://www.hrc.org/resources/coming-out-living-authentically-as-transgender-or-non-binary. .

[74] *See* 87 Fed. Reg. 41532.

[75] Caroline Downey, *Judge Rules Loudoun County Teen Sexually Assaulted Female Student in Girls' Bathroom,* Yahoo News (Oct. 26, 2021), https://news.yahoo.com/judge-rules-loudoun-county-teen-131413442.html.

[76] Associated Press, *Oklahoma Bathroom Law Challenged in Federal Lawsuit*, FoxNews.com (Sept. 7, 2022), https://www.foxnews.com/us/oklahoma-bathroom-law-challenged-federal-lawsuit.

**D. The proposed *de minimis* standard privileges the subjective claim of "gender identity" over the objective reality of "sex" every time.**

According to the Proposed Rule, **"**a recipient must not carry out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than de minimis harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity."[77] The "gender identity" de minimis standard tips the scales permanently against children, turning the statutory purpose of Title IX on its head. It means that "gender identity" trumps sex-based rights *every time*.

Under the de minimis standard, sex-specific facilities, programs, and activities will no longer be single-sex—simply by ED fiat. ED provides no substantial evidence to show how it weighed the costs and benefits of its de minimis standard. Nor does it explain why the desires of some individuals—those who express a "gender identity" at odds with their biological sex—are given absolute priority over the competing claims of females, who seek exactly what Title IX promised them 50 years ago: equality, with respect for sex-based differences (ensuring separate sleeping, toileting, and bathing facilities). Redefining "sex" to mean "gender identity" completely erases the protections females need, and disadvantages females in every encounter with males-who-identify-as-women. Lacking any evidentiary basis of demonstrated need, with no apparent weighing of costs and benefits, or taking into account women's voices, the de minimis standard is a harsh slap in the face to all women who have relied on Title IX protections in education.

**E. Required use of preferred names and pronouns based on gender identity raises First Amendment free speech concerns for students and teacher.**

With increasing numbers of students identifying as transgender, preferred name and pronoun usage is becoming more prevalent in the school context. Multiple teachers have been fired over their refusal, based on their religious beliefs, to use students' chosen names or pronouns in violation of school policy (even in cases where they opt to not use pronouns altogether to avoid unintentionally giving offense).[78] The Sixth Circuit recently found that a teacher who was disciplined for not using a student's preferred title and pronouns was able to claim protection under the First Amendment.[79] ED should clarify

---

[77] 87 Fed. Reg. 41391.

[78] *See, e.g.*, *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300 (4th Cir. 2021) (affirming rejection of federal court removal of claims under the Virginia constitution and state statutes by high school French teacher who was fired for not abiding by school nondiscrimination policy that required him to use student's preferred pronouns in violation of his religious beliefs); *Kluge v. Brownsburg Cmty. Sch. Corp.*, 1:19-cv-2462 (S.D. Ind. July 12, 2021) (granting summary judgment for school on Title VII failure to accommodate and retaliation claims by Christian music teacher who was allegedly forced to resign for not complying with school name policy requiring use of students' preferred names and pronouns in violation of his religious beliefs after school revoked accommodation to use last names only for all students); *see also Cross v. Loudoun Cnty. Sch. Bd.*, No. CL21-3254 (Va. Dec. 1, 2021) (affirming parties' agreement to permanently enjoin school in case raising free speech and free exercise claims by elementary school teacher who was placed on administrative leave after speaking out against proposed preferred pronoun policy at public school board meeting); *Ricard v. USD 475 Geary Cnty. Schs. Sch. Bd. Members*, No. 5:22-cv-04015 (D. Kan.) (involving First Amendment free speech and free exercise of religion, unconstitutional conditions, Fourteenth Amendment due process and equal protection, and breach of contract claims by middle school teacher who was suspended and reprimanded for harassment and bullying for not using students' preferred name and denied religious accommodation from using preferred pronouns).

[79] *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) (reversing dismissal of First Amendment free speech and free exercise claims by professor disciplined by university for not following university's gender identity nondiscrimination policy when he refused to address transgender identifying student by student's preferred title and

that under its proposed Title IX regulations, students and teachers retain free speech protections and it will not be considered discriminatory or harassment based on the sex to choose not to use a person's preferred pronouns based on gender identity.

**5.  ED's inclusion of "gender identity" as a protected category under Title IX functions as a mandate to schools to promote gender ideology and strip parents of their fundamental right to direct the upbringing and education of their children.**

### A.  Schools and parents' rights.

For the past year, parents across America have been discovering, and blowing the whistle on, the harmful impact of "gender identity" policies in public schools. With good reason. Five years ago, California parents were stunned to learn that teachers had read their kindergarten children books about transgender-identified children, then conducted a "transgender reveal" for a newly-transitioning classmate—all without parental permission.[80] Today, such stories are commonplace, and parents are outraged. Some have filed lawsuits, and many have fled the public schools.[81]

The Supreme Court has long recognized the fundamental right of parents "to direct the upbringing and education of children under their control."[82] Parents have the right to direct their children's education and to make decisions for them, because parents have a correlative responsibility for their children. The Court also recognizes that the "natural bonds of affection lead parents to act in the best interests of their children."[83] Absent evidence of abuse, abandonment, or neglect, parents have the right to make educational and medical decisions for their children and can be trusted to make decisions for the overall good of the child.

ED's proposed regulations, however, give no hint of recognizing, much less deferring to, parents' constitutional rights to guide their children in education-related matters and personal decisions. Nor does ED acknowledge the tremendous grief, alienation, and upheaval in family relationships too often caused by a school's decision to facilitate a child's "gender transition," without parental knowledge or consent.[84] Consistent with the policies first promoted by ED under the Obama Administration, ED's Proposed Rule embeds gender ideology in public schools by giving privileged status to "gender identity" claims. The consequence of day-after-day, year-after-year promotion of "gender identity" exploration in schools, from pre-K to the university, has a formative influence on impressionable children. The result: a culturally driven, unprecedented rise in self-defined (transgender) identities and identity confusion. Schools are not the only contributing factor (social media and peer relationships play strong roles), but they are a

---

pronouns and instead used only student's last name), *settled & voluntarily dismissed sub nom. Meriwether v. Trustees of Shawnee State Univ.*, No. 1:18-cv-00753 (S.D. Ohio Apr. 14, 2022), *press release available at* https://adfmedia.org/case/meriwether-v-trustees-shawnee-state-university (university agreed to pay teacher $400,000 plus attorneys' fees, and agreed teacher has a right to choose when to use, or avoid using, titles or pronouns when referring to or addressing students, including when student requests preferred pronouns).

[80] Dr. Susan Berry, *Parents Frightened: Kindergartners 'Crying, Shaking' Over Transgender Book Teacher Read*, MicedTimes.com (Aug. 24, 2017), https://www.mixedtimes.com/news/parents-frightened-kindergartners-crying-shaking-over-transgender-book-teacher-read.

[81] *Judge Issues Injunction: Madison School District Staff Cannot Lie or Deceive Parents About Gender Transitions*, Wis. Inst. for Law & Liberty (Sept. 29, 2020), https://will-law.org/judge-issues-injunction-madison-schools-staff-cannot-lie-or-deceive-parents-about-gender-transitions-at-school/.

[82] *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925).

[83] *Parham v. J. R.*, 442 U.S. 584, 602 (1979)

[84] Bailee Hill, *Florida Mom Filing Suit After Child Transitioned At School Without Her Consent: Happening All Over*, Foxnews.com (May 2, 2022), https://www.foxnews.com/media/florida-mom-january-littlejohn-lawsuit-transgender-school.

substantial one. A 2021 study of Pittsburgh high schoolers reported that 9.2% of high schoolers now identify as transgender or gender diverse—a shocking increase in little over a decade.[85]

Every child should be treated kindly and welcomed. But adding "gender identity" to Title IX's anti-discrimination categories will accelerate efforts by schools to promote gender exploration and the "coming out" process to school children of all ages. GLSEN, for example, the leading promoter of "LGBTQ-inclusive" K-12 schools, tells students that "[g]ender identity is how you identify and see yourself. Everyone gets to decide their gender identity for themselves…. If you don't feel like a boy or a girl, you might identify as agender, genderqueer, nonbinary or just as a person.…You have a right to identify however you want, and your identity should be respected." GLSEN, like the schools it serves, says not a word about bodily reality, and the fact that no one can change sex, ever. Instead, GLSEN materials teach students that "sex" is merely a "label" given by the medical community when a child is born. It's up to the child to decide if the label will stick. Children also are taught that they have "cis-privilege" if their "identities align," because they "get to move through the world without thinking about gender [or] being misgendered."[86] This too creates pressure on children to select an identity that helps them fit in with the rainbow school culture.

From Alaska to Florida, Texas to Vermont, and every place in between, schools are vocal promoters of "gender identity" exploration and validating a child's self-declared identity. In a growing number of states, school districts create a "Gender Support Plan" to facilitate a student's "gender transition," often behind the parents' backs. Under many policies, students themselves are (erroneously) given premature decision-making power by schools, tasked with deciding their own "gender identity" (regardless of the sexed body), whether or not to begin a gender transition (social, medical, or surgical), and whether or not to involve their parents.

To lessen the risk of that a school will be accused of failing to address a "hostile" environment for a trans-identified child, schools will amp up their celebrations of transgender identities, and take pains to undo practices that could be perceived as "cisnormative," "heteronormative," or "harassing."[87] When schools fear the loss of federal funds—such as federal lunch money to feed low-income students—they have a strong incentive to become ideological messengers promoting gender identity, regardless of parents' wishes or permission.

In practical terms, adding "gender identity" to the protected characteristics under Title IX, means that schools will be forced, upon threat of losing federal funding, to introduce concepts of gender identity, encourage "gender exploration," insist that other students and staff use "chosen names" and pronouns, validate the expressed "transgender identities" of students and teachers, celebrate "gender identity" "coming out" declarations, use trans-inclusive curricula, and forbid teachers to tell parents what their children are learning or "who" they currently identify as. School culture, much like the youth media culture, is already saturated with LGBTQ themes, curricula, and activist teachers. Under the guise of fostering a safe and inclusive environment for LGBTQ-identified students, school leaders offer faux-science curricula (such as "gender inclusive" puberty education) and police the use of pronouns, sometimes enforcing compliance by threatening disciplinary action (for students) or job loss (for staff). "Gender identity" rules generally also permit males who identify as females to use restrooms, locker rooms, and other private spaces formerly reserved for females. Mental health issues are escalating, and

---

[85] Kacie M Kidd, et al., *Prevalence of Gender-Diverse Youth in an Urban School District*, 147 Pediatrics e2020049823 (2021). A decade ago, the percent of the adult population identifying as transgender was estimated to be a fraction of a percent (0.002). Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 452 (5th Ed. 2013).
[86] *Gender Terminology Guide*, GLSEN, https://www.glsen.org/activity/gender-terminology.
[87] *Gender Terminology*, GLSEN, https://www.glsen.org/activity/gender-terminology (last visited Sept. 12, 2022).

test scores are falling, but schools are doubling down on ideological content and goals. Gender identity policies have no place in schools; Title IX cannot protect both sex-based rights and "gender identity" claims at the same time.

**B. School to clinic pipeline.**

Backed by government support for "gender-affirming care," schools in some cities are enmeshed with the business side of adolescent gender clinics.[88] Clinicians provide trainings for teachers on "transgender" youth, "gender affirmation," social transition, and medical/surgical transition. Teachers and school staff, in turn, follow the advice of gender clinicians, validate children's "gender identities" (no matter how young or troubled), facilitate their "gender transitions" (often behind parents' backs) and refer them (and sometimes their parents) to gender clinics for medical interventions.

The "gender-affirming" climate in schools, fueled by policies that teach and privilege "gender identity" explorations, has been described by some parents as a school-to-gender-clinic-pipeline. This is another reason why we oppose the injection of "gender identity" into the school environment. Gender-affirming medical and surgical interventions cause serious harm to the developing bodies and vulnerable psyches of children.

Across the globe, gender specialists and whistleblowers have raised alarm over the scant evidence supporting gender-affirming protocols and the mounting evidence that gender affirmation causes harm to minors. In the wake of extensive evidence reviews, several leading European gender clinics recently ended or curtailed gender-affirming interventions for minors. Extensive psychotherapy, open to exploring alternative diagnoses and non-invasive ways of managing gender dysphoria, is emerging as the first-line response to adolescent identity distress.

The number of children and adolescents diagnosed with gender dysphoria or identifying as "transgender" has risen dramatically over the past decade, becoming "an international phenomenon, observed all across North America, Europe, Scandinavia, and elsewhere."[89] The typical patient profile also has changed markedly: until recently, patients seeking treatment for gender dysphoria were usually either adult males or very young children, mostly boys. Today, the typical patient is an adolescent, usually female.[90]

Alongside the explosive growth in gender-dysphoric or transgender-identified children and adolescents, the worlds of psychology and medicine have witnessed a sea change in the dominant clinical approach towards these issues—changes which raise serious ethical questions.[91] For years, gender dysphoria in children was addressed through "watchful waiting" or with psychotherapy for the child and family. In most (up to 88%) of these situations, the child's gender dysphoria (identity distress) would resolve by puberty.[92] In contrast, nearly all minors who begin gender-affirming social and medical

---

[88] The gender clinics at Lurie Children's Hospital (IL) and Seattle Children's Hospital (WA), for example, have collaborative relationships with local public school districts.

[89] Kenneth J. Zucker., *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 Archives of Sexual Behavior 1983, n.3 (2019), https://link.springer.com/article/10.1007%2Fs10508-019-01518-8.

[90] *Id.*

[91] Lucy Griffin et al., *Sex, Gender and Gender Identity: A Re-Evaluation of the Evidence*, 45 BJPsych Bulletin 291 (2021), https://pubmed.ncbi.nlm.nih.gov/32690121/.

[92] Devita Singh et al., *A Follow-Up Study of Boys with Gender Identity Disorder*, 12 Frontiers in Psychiatry 632784 (2021), https://www.frontiersin.org/articles/10.3389/fpsyt.2021.632784/full.

transitions today persist in transgender identification.[93] Based on the belief that "gender variations are not disorders, gender may be fluid and not binary," the gender-affirming approach insists that children and adolescents who identify as transgender should be permitted "to live in the gender that feels most real or comfortable to that child and to express that gender with freedom from restriction, aspersion, or rejection."[94]

According to gender therapist Laura Edwards-Leeper, gender affirmation means "the gender identity and related experienced asserted by a child, an adolescent, and/or family members" should be accepted as "true" and "the clinician's role in providing affirming care to that family is to empathetically support such assertions."[95] Consequently, the gender-affirming model rejects "therapeutic approaches that encourage individuals to accept their given body and assigned gender," and contends that alternative approaches "may inadvertently cause psychological harm."[96]

Despite the "absence of empirical data" to support them, the gender affirming model and gender affirming medical and surgical interventions have been heavily promoted by transgender activists, allied clinicians, and several establishment medical organizations.[97] Even so, the rapid swing from the "watchful waiting" therapeutic paradigm to a "gender affirmative" protocol that validates all asserted "gender identities" and puts adolescents on a path towards "gender-affirming" medical interventions is unprecedented. So too is the number of transgender- identified adolescents seeking irreversible "transgender" body modifications—drastic measures that some come to regret.[98]

Clinical concerns over the outcomes of gender affirmation have escalated.[99] Gender affirmation has a domino effect, beginning with psycho-social transition.[100] Although it is not physically invasive, once begun, psycho-social transition is psychologically difficult to walk back. Children who socially transition are more likely to persist in a transgender-identification than children who do not socially transition. This raises serious ethical questions.[101] The Dutch gender-affirming protocol never supported

---

[93] See, for example, this study from the Tavistock and Portman NHS Gender Identity Development Service (UK), which found 98% of adolescents who underwent puberty suppression continued on to cross- sex hormones. Polly Carmichael, et al., *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 To 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16 *PloS one* e0243894 (2021), https://doi.org/10.1371/journal.pone.0243894.

[94] Laura Edwards-Leeper et al., *Affirmative Practice with Transgender and Gender Nonconforming Youth: Expanding the Model*, 3 Psychology of Sexual Orientation & Gender Diversity 165 (2016), https://www.apa.org/pubs/journals/features/sgd0000167.pdf.

[95] *Id.* at 165.

[96] *Id.* at 166 (citing Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth, Substance Abuse and Mental Health Services Administration (2015), https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf).

[97] *Id.*

[98] Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Arch Sex Behav 3353 (2021), https://pubmed.ncbi.nlm.nih.gov/34665380/.

[99] For example, see the following recent publications: William Malone et al., *Puberty Blockers for Gender Dysphoria: The Science Is Far From Settled*, 5 The Lancet Child & Adolescent Health e33 (2021), https://doi.org/10.1016/S2352- 4642(21)00235-2; Kirsty Entwistle, *Debate: Reality Check—Detransitioner's Testimonies Require Us to Rethink Gender Dysphoria*, Child & Adolescent Mental Health (2020), https://doi.org/10.1111/camh.12380; Paul W. Hruz, *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*, 87 The Linacre Quarterly 34 (2020), https://doi.org/10.1177/ 0024363919873762.

[100] When a minor's desired identity is affirmed, the minor initiates external "social" changes to express the desired identity (name, pronouns, hair, clothing, etc.).

[101] Kenneth J. Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al.*, 19 Int'l

social transition for pre-pubertal children, over concerns that it would tip the scales towards persistence in transgender identification.[102] Social transition sets the child on a path toward medical transition before the child is mature enough to appreciate the long-term and psychological consequences.

For pre-pubertal children, social transition also creates an impetus for the next step in gender affirming care: puberty blockers. A pre-pubertal child who presents as a member of the opposite sex views puberty with extreme anxiety, as the growth of secondary sex characteristics will reveal the child's true sexual identity. Puberty blockers interrupt the child's natural development and preserve the child's secret, if only for a time.

Puberty is a whole-body developmental process. Preventing its normal course, for an indeterminate time, has unknown long-term consequences beyond the "pause" in development of secondary sex characteristics: The child's social and cognitive maturation (including advances in executive functioning and other brain functions) is suspended along with other developmentally appropriate growth, including bone growth. Stopping the puberty blockers will allow the development of secondary sex characteristics to resume, but the time lost from the unnatural delay in biological maturation cannot be recaptured. No longer described as "fully reversible," puberty blockers have negative effects on bone density, social and emotional maturation, and other aspects of development. Further, puberty blockers generally fail to lessen the child's gender dysphoria and results are mixed in terms of effects on mental health.[103] Long-term effects remain unknown.[104]

Multiple studies show that the vast majority of children who begin puberty blockers go on to receive cross-sex hormones, the next step in gender-affirming care, with life-altering consequences.[105]Blocking a child's natural puberty (preventing maturation of genitals and reproductive organs) and then introducing cross-sex hormones renders the child permanently sterile.[106] Gender clinicians now admit that puberty blocking may impair the child's later sexual functioning as an adult as well.[107] These losses cannot be fully comprehended by a child, precluding the possibility of informed consent.

Cross-sex hormones carry numerous health risks and cause many irreversible changes in adolescents' bodies, including genital or vaginal atrophy, hair loss (or gain), voice changes, and impaired

---

J. of Transgenderism 231 (2018). Michael Biggs, *Revisiting the Effect of GnRH Analogue Treatment on Bone Mineral Density in Young Adolescents with Gender Dysphoria*, 34 J. of Pediatric Endocrinology & Metabolism 937 (2021), https://doi.org/10.1515/jpem-2021-0180.

[102] Annelou L. C. de Vries, & Peggy T. Cohen-Kettenis, *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*, 59 J. of Homosexuality 301 (2012), https://doi.org/10.1080/00918369.2012.653300.

[103] Annelou L. C. de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. Sex Med. 2276 (2011), https://www.jsm.jsexmed.org/article/S1743-6095(15)33617-1/pdf.

[104] There are no long-term, rigorous studies on the safety and outcomes of using puberty blockers to disrupt natural puberty in healthy but dysphoric children for an extended time.

[105] Polly Carmichael, et al., *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 To 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16 *PloS one* e0243894 (2021), https://doi.org/10.1371/journal.pone.0243894.

[106] Stephen B. Levine, *Ethical Concerns About Emerging Treatment Paradigms for Gender Dysphoria*, 44 J. Sex Marital Ther. 29 (2018), https://pubmed.ncbi.nlm.nih.gov/28332936/.

[107] Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy Care,"* Common Sense (Oct. 4, 2021), https://bariweiss.substack.com/p/top-trans-doctors-blow-the-whistle.

fertility. They also increase cardiovascular risks and cause liver and metabolic changes.[108] The flood of opposite sex hormones has variable emotional and psychological effects as well. Females who take testosterone experience an increase in gender dysphoria, particularly regarding their breasts, creating heightened demand for double mastectomies on teens as young as 13.[109] The gender affirming model recommends performing mastectomies on the healthy breasts of adolescent girls in order to address emotional discontent. This is an unethical practice described by psychotherapist Alison Clayton as nothing less than "dangerous medicine."[110]

The gender-affirming approach continues to push ethical boundaries. The World Professional Association for Transgender Health (WPATH) recently released its proposed "Standards of Care Version 8," which lower the recommended ages for adolescents to receive cross-sex hormones to age 14, double mastectomy ("chest masculinization") to age 15, male breast augmentation and facial surgery to age 16, and removal of testes, vagina, or uterus to age 17, with flexibility to provide these gender affirming interventions at even younger ages.[111] This is unethical human experimentation—on *children*. A Swedish teen who underwent medical transition and then de-transitioned after suffering substantial bodily harm describes the "gender affirming" medical protocol this way: "They're experimenting on young people ... we're guinea pigs."[112]

Schools that promote "gender identity" exploration and "gender transitions" are the gateway to medical and surgical "transgender" interventions. Protecting "gender identity" under Title IX, as the Proposed Rule intends, will put countless numbers of children on the transgender assembly line—and lead to irreversible harm.

## C.  ED must conduct a Family Policymaking Assessment.

The Treasury and General Government Appropriations Act of 1999 requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being.[113] As explained above, this rule would negatively affect family well-being, requiring ED to provide an assessment of the Proposed Rule'.

---

[108] *Gender-Affirming Hormone in Children and Adolescents*, BMJ EBM Spotlight Blog (Feb. 25, 2019), https://blogs.bmj.com/bmjebmspotlight/2019/02/25/gender-affirming-hormone-in-children-and-adolescents-evidence-review/.

[109] Johanna Olson-Kennedy et. al. *Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts. JAMA Pediatr.* 2018 May 1;172(5):431-436. doi: 10.1001/jamapediatrics .2017.5440. PMID: 29507933; PMCID: PMC5875384.

[110] Alison Clayton, *The Gender Affirmative Treatment Model for Youth with Gender Dysphoria: A Medical Advance or Dangerous Medicine?. Arch Sex Behav* (2021), https://doi.org/10.1007/s10508-021-02232-0.

[111] WPATH Standards of Care, Version 8, Draft for Public Comment, December 2021, "Adolescent" Chapter, p. 3.

[112] Mission: Investigate. Trans Children ("Trans Train 4") (Nov. 26, 2021), https://www.svtplay.se/video/33358590/uppdrag-granskning/mission-investigate-trans-children-avsnitt-1.

[113] Pub. L. 105-277 ("(c) FAMILY POLICYMAKING ASSESSMENT.—Before implementing policies and regulations that may affect family well-being, each agency shall assess such actions with respect to whether—(1) the action strengthens or erodes the stability or safety of the family and, particularly, the marital commitment; (2) the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children; (3) the action helps the family perform its functions, or substitutes governmental activity for the function; (4) the action increases or decreases disposable income or poverty of families and children; (5) the proposed benefits of the action justify the financial impact on the family; (6) the action may be carried out by State or local government or by the family; and (7) the action establishes an implicit or explicit policy concerning the relationship between the behavior and personal responsibility of youth, and the norms of society.").

**6. Interpreting "sex" to include "sex characteristics" undermines the binary interpretation of "sex," has no basis in law, and is not justified by evidence.**

The Proposed Rule prohibits discrimination on the basis of a classification not typically recognized in U.S. civil rights law: "sex characteristics." The Proposed Rule defines "sex characteristics" in open-ended language, that is, not with finality, stating that sex characteristics "include" (and by implication are not limited to) "a person's physiological sex characteristics and other inherently sex-based traits" (these "other" traits are undefined) and "would cover, among other things" (additional grounds are not listed) "discrimination based on intersex traits."[114] ED offers additional guidance on the meaning of "sex characteristics," explaining that "discrimination based on anatomical or physiological sex characteristics (such as genitals, gonads, chromosomes, and hormone function) is inherently sex-based." The Proposed Rule explains the basis for prohibiting discrimination on the basis of "intersex traits," as "rooted in perceived differences between an individual's specific sex characteristics and those that are considered typical for their sex assigned at birth."[115]

ED's proposed inclusion of "sex characteristics" under Title IX's discrimination protections is deeply problematic, for several reasons. The first step of extending civil rights protections is to clearly define who is protected under the law and, if the civil rights protections are based on particular classifications, then to clearly define those classifications, supported by evidence of discrimination (need for protection), and vetted by public debate and hearings. ED has done none of those things with regard to the proposed term "sex characteristics."

First, if "sex" is understood as a whole-body, binary classification as male or female, then why does the statute—which already protects "sex"—need regulations to cover the separate category of "sex characteristics," which are clearly a part, or subset, of a person's sexed body. In fact, ED's promotion of distinct non-discrimination protections for the term "sex characteristics" serves to further undermine the scientific understanding of "sex," by appearing to fragment the male or female person into "parts" or "characteristics" disconnected from the person's whole-body sexual identity as male or female.

"Sex characteristics" are not typically covered as a separate classification in U.S. discrimination law, and for good reason: "sex" (whole body) discrimination is already covered by Title IX. Several paragraphs of the Proposed Rule describe various "intersex" disorders that would be protected under the new classification.[116] But the Proposed Rule uses curious language in giving examples of "intersex" disorders. It describes "intersex" as referring to "people with variations in physical sex characteristics. These variations may involve anatomy, hormones, chromosomes, and other traits that differ from expectations generally associated with male and female bodies. Intersex traits are typically a result of medical conditions." It is not clear why the Proposed Rule would describe intersex traits as "typically" occurring as the result of a medical condition. This is inaccurate.

The technical name for an "intersex" condition is a "disorder of sexual development" (DSD), a disorder—of male sexual development or female sexual development—that occurs in utero. "Intersex" conditions or DSDs are *always* the result of a medical condition. Although there are dozens of DSDs, they are fairly rare. (Klinefelter's Syndrome has an incidence rate of 0.092% while classic congenital adrenal hyperplasia has an incidence rate of 0.008%.) Unlike the official categories of "Disorders of Sexual

---

[114] 87 Fed. Reg. 41532.
[115] *Id.*
[116] *Id.*

Development," the "intersex" descriptor in the Proposed Rule is not rigorously or accurately applied and it is unclear what it might include.

Further, given that DSDs are so rare, what is ED's evidence that discrimination towards persons diagnosed with DSDs is large enough or serious enough to warrant adding a new regulatory term to Title IX? Given that ED's definition of "sex characteristics" is not exhaustive, ED needs to explain in detail, backed by evidence, what additional circumstances it anticipates might be covered under the term "sex characteristics."

ED's true purpose in seeking to add "sex characteristics" to the proposed rule is unclear. Does ED intend to provide protection for a tiny subset of the population (persons diagnosed with disorders of sexual development/intersex conditions)? Or to establish a basis for discrimination complaints for another, as yet undefined, group of persons who might fall within the general description of having "sex characteristics"? (In fact, every person has sex characteristics, such as genitals, gonads, hormones, and hormone function, and they are usually not visible or known. It would seem rare for a DSD to be a cause for discrimination.) On the other hand, a person who has a sexual fetish and has undergone castration (a eunuch), might be positioned under the Proposed Rule to claim discrimination protection on the basis of sex characteristics. Does ED anticipate that a person who seeks voluntary castration as a eunuch needs protection under Title IX? Is so, on what basis? And who else might be protected, and under what circumstances?

As a final note, the term "sex characteristics" was added to the non-binding Yogyakarta Principles +10 in 2017. The Yogyakarta Principles and Yogyakarta Principles +10 are international blueprints, developed by activists, to demand and delineate a wide scope of "rights" under the categories of sexual orientation, gender identity, gender expression, and sex characteristics. Only a few countries in the world have adopted discrimination protections for "sex characteristics," with Malta leading the way in 2015.[117] Activists who oppose circumcision, or medical interventions for children who are born with disorders of sexual development, often seek protections for "sex characteristics" as the legal basis for preventing parents from deciding the appropriate treatment for their children. In addition, protections for "sex characteristics" under the Yogyakarta Principles aim to secure for children a purported right to "bodily and mental integrity, autonomy and self-determination," regardless of the rights of parents. The Yogyakarta Principles also assert that states incur the following obligations under anti-discrimination protections for sexual orientation, gender identity, and sex characteristics: States must "prohibit any practice, and repeal any laws and policies, allowing intrusive and irreversible treatments on the basis of sexual orientation, gender identity, gender expression or sex characteristics, including forced genital-normalising surgery, involuntary sterilisation, unethical experimentation, medical display, 'reparative' or 'conversion' therapies, when enforced or administered without the free, prior, and informed consent of the person concerned."

If this administration seeks to outlaw circumcision, medical interventions that aim to restore function in a child born with DSDs, or reparative therapies and conversion therapy, then it ought to pursue such a policy openly through legislation, not by stealth through the Title IX regulatory process. If ED has some other aim in mind, then it needs to produce substantial evidence to show the evidentiary basis for seeking to add "sex characteristics." ED must clarify the definition of "sex characteristics," and who it intends to protect, specifically whether it is intended to protect persons with Disorders of Sexual Development, or some other (undefined) group of people. In addition, ED needs to produce evidence of

---

[117] Morgan Carpenter, *Intersex Human Rights, Sexual Orientation, Gender Identity, Sex Characteristics and the Yogyakarta Principles Plus 10*, 23 Cult Health Sex. 516 (2021), https://pubmed.ncbi.nlm.nih.gov/32679003/.

significant and ongoing discrimination towards the defined subset, sufficient to justify adding a new classification to the regulations.

Perhaps Congress will decide in the future to weigh the merits of making "sex characteristics" (however defined) a protected category under U.S. civil rights law. But Congress has not chosen to do so, and ED has no authority to unilaterally declare the undefined category of "sex characteristics" to be entitled to sex-based protections under Title IX. As written, the Proposed Rule's expansion to include protection for "sex characteristics" appears to be arbitrary and capricious, extending well beyond the statute's intent.

**7.   It is arbitrary and capricious for the Proposed Rule to not address and protect female sports.**

**A.   Why female sports are necessary.**

The reason why we have *female* sports is because we recognize the significant physiological and anatomical differences between males and females, and the resulting performance advantage for males—an advantage that has not diminished even though female athletes now receive the same top-level training as male athletes. Biological sex must continue to be the basis for participation standards in interscholastic athletics. A research review published in 2021 in the journal *Sports Medicine* states that "the performance gap between males and females becomes significant at puberty and often amounts to 10-50%, depending on the sport."[118] This performance gap is greatest in sports like track and field that require explosive power—track and field, incidentally, is the among the most popular sports for high school female athletes.[119] The basis of this performance gap is physiological: Males and females are physiologically different—on average, males have a built-in biological advantage. They are bigger, stronger, faster, have more muscle mass, stronger bones, greater lung and cardio capacity, and more fast-twitch muscle fibers (which gives an advantage in explosive power); males, on average, also have more upper-body muscle and lower-body muscle than females.[120] The male body is simply built differently—an advantage conferred by nature. As exercise physiologists have long acknowledged, in direct competitions between male and female athletes, males will win. For females to have the chance to win, especially at elite levels of competition, males and females must compete in separate categories.[121] *This performance advantage cannot be erased even when males suppress their testosterone production*: longitudinal studies show that "the loss of lean body mass, muscle area and strength typically amounts to 5% after 12 months of

---

[118] Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Medicine 199 (2021), https://doi.org/10.1007/s40279-020-01389-3.

[119] Jill Kochanek, & Daniel Gould, *The Status of High School Girls' Sport Participation: A Report Compiled for the State of Michigan Women in Sports Task Force*, Institute for the Study of Youth Sports, Michigan State University, East Lansing, Mich. (2020).

[120] Eduardo Saez-Saez de Villarreal et. al. *Does Plyometric Training Improve Strength Performance? A Meta-Analysis*, 13 J. Sci. Med. Sport 513 (2010), https://pubmed.ncbi.nlm.nih.gov/19897415/; A. E. Miller, *Sale DG. Gender Differences in Strength and Muscle Fiber Characteristics*. 66 Eur J Appl Physiol Occup Physiol 254 (1993), https://pubmed.ncbi.nlm.nih.gov/8477683/.

[121] "Virtually all elite sports are segregated into male and female competitions. The main justification is to allow women a chance to win, as women have major disadvantages against men who are, on average, taller, stronger, and faster and have greater endurance due to their larger, stronger muscles and bones as well as a higher circulating hemoglobin level. Hence, elite female competition forms a protected category with entry that must be restricted by an objective eligibility criterion related, by necessity, to the relevant sex-specific physical advantages." David J. Handelsman, et. al. *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, 39 Endocrine Reviews 803 (2018), https://doi.org/10.1210/er.2018-00020.

treatment" to suppress testosterone.[122] Moreover, suppressing testosterone does not eliminate enduring male-bodied anatomical advantages. A 15-year-old male who uses medication to suppress his natural testosterone does not lose the performance advantages conferred by nature, rooted in numerous physiological differences. All males and females deserve a team on which to play. But the costs to females, who are muscled out of positions on "girls" or "women's" school athletic teams by males who identify as "girls" or "women," are likely to be substantial.

### B. Title IX is responsible for increased participation in female sports and educational opportunities for women.

Historically, women had few athletic opportunities in school. But that all changed when Congress passed Title IX in 1972. It has been 50 years since Title IX became law and ensured equal educational opportunities on the basis of sex. Title IX was pivotal for females: interscholastic athletic opportunities for girls and young women skyrocketed in the years following its enactment. On a national level, ten times as many females now participate in high school sports compared to the pre-Title IX era.[123] What changed? Because of Title IX, schools created new opportunities for girls and young women—females—to participate and compete in athletic activities with other females. Because of these new opportunities, females—in massive numbers—came off the sidelines and became athletes, experiencing the exhilaration of competition, teamwork, fitness, recognition, and athletic excellence. According to a 2020 report by the Institute for the Study of Youth Sports, for example, nearly half of high school females in Michigan are athletes.[124] This outstanding level of participation and achievement for female athletes is possible *only* because of *female* sports teams—teams separated on the basis of biological sex. How do we know? Because pre-Title IX, females did not participate at the same level, achieve the same levels of excellence, nor enjoy the same level of opportunities. Title IX is widely lauded for championing women's sports, and since its implementation, participation by girls and women in athletics have increased more than tenfold.

Because of the opportunity to compete in interscholastic sports, millions of female athletes across the country have had the chance to go to college, their educations funded by the athletic scholarships they earned. Countless more were healthier and happier because of their participation in interscholastic sports. As we learned during the COVID pandemic, decreasing opportunities for young people to participate in sports takes a serious toll on mental and physical health of young people.[125] Why should even one female be deprived of the opportunities that come from competing in female-only competitions?

### C. The Proposed Rule applies to athletics, which means ED will require schools to permit access and participation in athletics on the basis of "gender identity."

On the 50th anniversary of Title IX, ED released the Proposed Rule which will require women to give up their spots on teams, in competitions, at championships, and on the podium. Biological men will continue to receive women's honors and awards in the name of "gender identity" nondiscrimination.

---

[122] Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Medicine 199 (2021), https://doi.org/10.1007/s40279-020-01389-3.

[123] Charles L. Kennedy, *A New Frontier for Women's Sports (Beyond Title IX)*, Gender Issues, (1-2), 78 (2010), https://link.springer.com/article/10.1007/s12147-010-9091-y.

[124] Jill Kochanek & Daniel Gould, *The Status of High School Girls' Sport Participation: A Report Compiled for the State of Michigan Women in Sports Task Force*, Institute for the Study of Youth Sports, Michigan State University, East Lansing, Michigan (2020).

[125] Timothy A. McGuine, et al. *High School Sports During the COVID-19 Pandemic: The Effect of Sport Participation on the Health of Adolescents*, 57 J. Athl. Train 51 (2022), https://doi.org/10.4085/1062-6050-0121.21; https://meridian.allenpress.com/jat/article/57/1/51/465818/High-School-Sports-During-the-COVID-19-Pandemic.

The Proposed Rule would define discrimination "on the basis of sex" to include discrimination on the basis of "gender identity." Under the proposed regulations, "preventing any person from participating in an education program or activity consistent with their gender identity would subject them to more than de minimis harm on the basis of sex and therefore be prohibited."[126] Since school sports are considered "an education program or activity,"[127] the very text of the proposed regulations appear to require participation in sports be based on gender identity.[128]

The Proposed Rule states that denying access or participation in education programs or activists consistent with a person's gender identity "generally violates Title IX's prohibition on discrimination, at least to the extent it causes more than de minimis harm and unless otherwise permitted by Title IX or the regulations."[129] Under current Title IX regulations, schools may "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[130]

The Department explains that it does not propose (at this time) to change current Title IX regulations.[131] ED appears to punt on the sports issue, promising to issue separate proposed regulations to address "whether and how" to amend the current regulations on sex-specific athletics and "the question of what criteria, if any, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team."[132]

Inter-scholastic and collegiate athletics are already riven with conflict over the question of biological male athletes who identify as transgender participating in competitions previously reserved for females. The NCAA position is unclear and in a state of flux, as are many policies set by state-level and sports-specific governing bodies.[133] More importantly, the statutory right of females to participate equally in athletics cannot be dependent on the shifting positions of governing bodies of particular sports or schools.

Just last year, the Department of Justice (DOJ) under the Biden administration issued a statement of interest in a federal court case about a state law ensuring only biological females can participate in girls' and women's sports.[134] DOJ claimed that the law violates Title IX. It argued that *current* Title IX regulations do not "address how students who are transgender should be assigned to such teams" and do not "require, or even suggest" that schools assign students who identify as transgender to teams based on their biological sex. "[A]ny interpretation of Title IX's regulations that requires gender identity discrimination would violate the statute's nondiscrimination mandate," the statement declares. It doesn't get much clearer than that. DOJ's statement exposes the Biden administration's (and presumably the

---

[126] 87 Fed. Reg. 41535 (citing proposed § 106.31(a)(2)).
[127] 87 Fed. Reg. 41400.
[128] The Proposed Rule contemplates that the Title IX Coordinator would ensure athletics comply with Title IX obligations. 87 Fed. Reg. 41424 ("Similarly, a Title IX Coordinator could have designees that oversee compliance with different aspects of the recipient's Title IX obligations, such as those related to athletics…."). In responding to complaints, Coordinators are to consider the scope of the alleged sex discrimination, including "in connection with a specific athletic team," and "take steps to repair an educational environment in which sex discrimination occurred, such as within a specific … athletic team." 87 Fed. Reg. 41445, 41447.
[129] 87 Fed. Reg. 41537.
[130] 34 CFR § 106.41.
[131] 87 Fed. Reg. 41537.
[132] *Id.*
[133] Transgender Student-Athlete Participation Policy, NCAA, https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx.
[134] *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D.W.V. June 17, 2021), https://www.justice.gov/crt/case-document/file/1405541/download.

Department's) true legal position: Title IX and current regulations require schools to permit participation in sex-specific sports on the basis of gender identity. (Translation: the sun is setting on female-only sports.)

Nowhere does the Proposed Rule explicitly state that participation in sex-specific sports must (or may) be based on biological sex. Indeed, there is no indication that schools can choose *not* to take gender identity into consideration. Delaying regulations that merely address the *criteria* for participation in athletics is a fake punt by ED, and it is arbitrary and capricious for the Department to ignore comments on the athletics issue when the text of its proposed regulations apply. The Biden administration has already telegraphed in court its legal and policy position: Regardless of current or future regulations, when it comes to athletics, Title IX requires schools to privilege biological-males-who-identify-as-girls over female athletes.

Anything short of an explicit statement by ED that athletes' gender identity does not apply to sex-specific school sports would be patently unfair to female athletes and antithetical to the 50-year legacy of Title IX. The Department's failure to state its position outright in the Proposed Rule is not only politically cowardly, but also arbitrary and capricious.

**D.  The Proposed Rule must consider the costs of allowing biological males to compete in female athletics based on "gender identity."**

As part of its regulatory impact and economic analysis of the costs, benefits, and transfers of its Proposed Rule, ED must take into consideration the following costs that likely will result if athletic participation under Title IX is no longer based on biological sex but rather gender identity.

- Potential losses in female participation, with consequent reduced health benefits, increased obesity, poorer mental health, and loss of social connection.
- Potential loss of female participation and leadership opportunities, particularly at the high school level, as girls experience displacement by male athletes who identify as transgender and exert leadership based on superior athletic prowess.
- Potential loss of scholarships and academic opportunities facilitated by athletic participation.
- Costs of retrofitting locker rooms, restrooms, equipment, and facilities to accommodate male bodies competing in women's categories and to ensure safety and privacy of all participants.
- Likely administrative and legal costs for school districts, regional athletic organizations, and inter-collegiate athletic organizations in managing rules changes, record-keeping, and participation criteria, and responding to potential legal challenges from displaced female athletes.
- Likely costs, apart from athletics, of a "gender identity" criteria that results in greater need for retrofitting school and institutional facilities to accommodate student needs for privacy (single stall "all-gender" restrooms and locker rooms instead of multi-user facilities; measures to ensure privacy in dormitories and overnight accommodations; and other additional privacy measures, e.g., doors, curtains, and other measures).
- Potential increased costs in monitoring for and preventing any sexual assaults in all-gender restroom and locker room facilities, occasioned by male students gaining unchallenged access to female facilities or in response to female requests to ensure safe access to shared facilities.[135]
- Potential costs of litigations as female athletes seek to defend their sex-based rights in court.

---

[135] See for example, the situation in Loudoun County, Virginia, where a teen male wearing a skirt was unchallenged entering the female restroom and subsequently assaulted a female student. Virginia Aabram, *Teenager Found Guilty in Loudoun County Bathroom Assault*, Yahoo News (Oct. 25, 2021), https://news.yahoo.com/teenager-found-guilty-loudoun-county-004300075.html.

**8.   ED fails to show a genuine need to change its pregnancy regulations.**

In 1975, the Department of Health, Education, and Welfare (the Department of Education's forerunner) issued regulations prohibiting discriminatory treatment on the basis of "pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom" in the areas of admission (except false pregnancy), recipient programs or activities, and employment. Under the Proposed Rule, "Discrimination on the basis of sex" would include discrimination on the basis of "pregnancy or related conditions" which is defined in regulations as: "(1) Pregnancy, childbirth, termination of pregnancy, or lactation; (2) Medical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation; or (3) Recovery from pregnancy, childbirth, termination of pregnancy, lactation, or their related medical conditions."[136] ED fails to show concrete evidence sufficient to justify changing the current regulations, making its proposed changes arbitrary and capricious.

**A.   It is appropriate for Title IX regulations to protect biological-based sex distinctions, like lactation.**

We applaud ED's desire to support pregnant women and mothers, and the desire to accommodate pregnancy, childbirth, and lactation within education. No woman should be pressured to abort her child or leave the educational environment because of pregnancy or childbirth. We support the clarification that women should be accommodated for lactation post-childbirth. Lactation is something unique to being a biological female and falls within the scope of the type of regulations that ED should be promoting.

While we are supportive of lactation spaces, ED has failed to do a proper cost-benefit analysis of the proposal. ED fails to identify the number of schools that do not currently have adequate lactation spaces, and the costs to each school that has to create lactation spaces. It's unclear how many lactation spaces are needed and what a school would do if one mother is using the space while another needs access. To the extent schools already provide lactation spaces and reasonable modifications for lactation, this is the baseline, which means ED cannot claim it as a benefit. The cost and benefits based on an accurate baseline must be accounted for if and when finalizing the Rule.

**B.   ED cannot use Title IX to promote abortion or preempt state abortion laws.**

"Termination of pregnancy" is not defined in the Proposed Rule and "abortion" is not mentioned once. Neither is the Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Organization*, overruling *Roe v. Wade* and holding that there is no constitutional right to abortion.[137] Post-*Dobbs* the Biden administration is seeking ways for the federal government to pay for and promote abortion.[138] There is no federal constitutional right to abortion and no compelling government interest in promoting abortion, which is the intentional ending of a child's life in the womb. Considering the Proposed Rule does not mention abortion, it would be arbitrary and capricious and not a logical outgrowth for ED to use Title IX regulations to promote abortion.

Assuming ED demonstrates sufficient need to change the 1975 pregnancy regulations, the Department should consider the alternative of dropping "termination of pregnancy" or clarifying that "termination of pregnancy" does not cover abortion under Title IX. Abortion is not the moral equivalent to pregnancy and childbirth and should not be treated as such. Moreover, Title IX contains an explicit

---

[136] 87 Fed. Reg. 41568.
[137] No. 19-1392 (U.S. Jun. 24, 2022).
[138] Rachel N. Morrison, *The Biden Administration's Post-Dobbs, Post-Roe Response*, FedSoc Blog (July 13, 2022), https://fedsoc.org/commentary/fedsoc-blog/the-biden-administration-s-post-dobbs-post-roe-response.

abortion neutrality provision: Nothing in Title IX "shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion."[139]

ED must clarify whether (and why) it believes that certain abortion-related activities or acts falls under Title IX's abortion neutrality provision. ED should make clear that pro-life speech, speakers, events, etc. are permitted and will not be deemed a form of "harassment" based on "termination of pregnancy." Otherwise, the proposed regulations are contrary to law, by prohibiting protected First Amendment free exercise of religion and free speech and by creating a chilling effect on the exercise of those rights.

We ask that ED clarify the following under the Proposed Rule:

- Do recipient schools have to prohibit pro-life speech, pro-life organizations pro-life events, and pro-life speakers from its educational programs and activities?
- Is there any circumstance in which pro-life speech would be considered "harassment" based on "termination of pregnancy"? If yes, what?
- Does the Proposed Rule restrict education or instruction on abortion in medical or moral contexts that are not "pro-abortion"?
- Would states have to allow abortion access on campuses under the Proposed Rule?
- Are schools or teachers prohibited from notifying parents of a minor child about the child receiving or seeking to receive an abortion?
- Is it the Department's view that the proposed regulations could preempt a state abortion law?

To the extent ED would say its Title IX regulations preempt certain state abortion laws, it must explain as such in a proposed rule and give states and the American public proper notice so that they can comment on the far-reaching implications of ED's regulations. The lack of discussion in the Proposed Rule about abortion would make any final rule requiring preemption of state abortion laws arbitrary and capricious and not a logical outgrowth of the proposed rule. Preempting state abortion laws would raise a major question under *West Virginia v. EPA*. It is ludicrous to think that Title IX which was about giving women access to education and athletics and which contains an abortion neutrality provisions all of a sudden preempts state abortion laws.

If ED finalizes a rule that promotes abortion, it must consider the following costs:

- Irreparable loss of life to unborn who are killed via abortion as a result of abortion required or promoted by Proposed Rule.
- Irreparable loss of First Amendment free speech or free exercise of religion rights for: (a) any school employee (counselor) forced to promote or refer for abortion, and (b) any student or employee silenced from speaking out against abortion.
- Unconstitutional chilling of pro-life free speech.

**C. Requiring "reasonable modifications" requires a more robust analysis of the costs.**

The proposed regulations would require educational institutions to make "reasonable modifications" to policies, practices, or procedures for students "because of pregnancy or related conditions." ED must consider the costs of such a requirement and weigh them against the purported benefits, including:

---

[139] 20 U.S.C. § 1688.

- What reasonable modifications, in addition to lactation spaces and leave, that would be required under the Proposed Rule.
- The financial costs for required reasonable modifications is the school required to undertake.
- Any negative impact or unfairness to other students (grades, participation, etc.) because of any reasonable modification (such as delayed or longer test taking).
- Any reasonable modifications required for parents, or fathers.

**9.   The Proposed Rule raises serious religion freedom concerns.**

**A.   The Proposed Rule must respect religious exercise protections under the First Amendment and RFRA.**

As, the Supreme Court in *Bostock* explained, it is "deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution"—a "guarantee" that "lies at the heart of our pluralistic society."[140] It flagged three doctrines protecting religious liberty it thought relevant to claims of sex discrimination:

1. Title VII's religious organization exemption, which allows religious organizations to employ individuals "of a particular religion"[141];

2. The ministerial exception under the First Amendment, which "can bar the application of employment discrimination laws 'to claims concerning the employment relationship between a religious institution and its ministers'"[142]; and

3. The Religious Freedom Restoration Act (RFRA), which the Court described as a "super statute" that "might supersede Title VII's commands in appropriate cases."[143]

Because it is constitutionally and statutorily required and since ED is relying on *Bostock* in the Proposed Rule, ED should recognize the important protections for religious exercise under the First Amendment and RFRA.

**B.   ED should consider this rule in conjunction with the Free Inquiry Rule.**

Title IX contains several statutory exemptions, including a religious exemption under which Title IX does not apply to an educational institution that is "controlled by a religious organization," to the extent that its application would be inconsistent with the religious tenets of the organization.[144] The Proposed Rule does not propose any changes to regulations on the religious exemption. But currently under review by the White House is a rule titled "Religious Liberty and Free Inquiry Rule" where ED plans "to propose to rescind certain regulations under 34 CFR parts 75 and 76 that place additional requirements on postsecondary institutions that receive Federal research or education grants as a material condition of the Department's grant."[145] To the extent the Free Inquiry Rule will modify which educational institutions qualify for Title IX's religious exemption, ED should consider that rule in conjunction with this Proposed Rule. To do so at separate times would make the Department's assurances of protection for religious educational institutions arbitrary and capricious. Religious educational

---

[140] *Bostock*, 140 S. Ct. at 1754.
[141] 42 U.S.C. § 2000e-1(a). Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j).
[142] *Bostock*, 140 S. Ct. at 1754 (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012)).
[143] *Id.* (citing 42 U.S.C. § 2000bb-3).
[144] 20 U.S.C. § 1681(a)(3); 34 CFR § 106.12.
[145] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202204&RIN=1840-AD72.

institutions that believe they qualify for religious exemptions to certain requirements under the Proposed Rule, should be given fair opportunity to comment on the merits of the Proposed Rule that would apply to them under ED's anticipated or actual changes to the religious exemption.

### C.   The Proposed Rule infringes on the free exercise of religion rights for students.

In its cost-benefit analysis, ED does not take into consideration the significant costs to religious students in non-religious institutions who will be pressured to violate their religious beliefs.[146] These costs should include students who are no longer able to attend or work at federally funded schools because they would be compelled to violate their sincerely held religious beliefs about marriage, gender, and sexuality. Not taking these irreparable harms into consideration makes the rule arbitrary and capricious. In addition, the Department should make clear that it does not extend Title IX to impose any constitutionally conflicting requirements on religious student groups who meet on or off campus.

### D.   The Proposed Rule infringes on free exercise and religious nondiscrimination and accommodation rights for employees.

ED should also consider its rule in connection with Title VII's religious nondiscrimination and accommodation requirements. Employers cannot create a hostile work environment based on religion and are generally required to reasonably accommodate an employee's sincerely held religious belief, observance, and practice. ED should clarify that these regulations would not be the impetus to deny reasonable accommodations for religious staff members by creating an undue hardship on the employer.

### E.   The final rule should be held for *303 Creative*.

The Department should hold finalizing the Proposed Rule until the Supreme Court decides *303 Creative LLC v. Elenis* in the October 2022 term.[147] This case involves a public accommodations nondiscrimination law and freedom of speech, religious liberty, and artistic freedom—issues raised directly by the Proposed Rule. As such, it would be arbitrary and capricious for ED to issue a final rule without input from the Court on issues directly applicable to the proposed regulations. Indeed, one federal court criticized the Department of Health and Human Services (HHS) for issuing a final rule on Section 1557 before the Supreme Court's *Bostock* decision was issued and said the agency should have halted publication of the rule to consider *Bostock*'s implications.[148] At a minimum, ED should open a supplemental comment period after the Supreme Court's decision is issued in *303 Creative*.

### 10.   The Proposed Rule's purported preemption of state laws is contrary to law.

Proposed § 106.6(b) states, "*Effect of State or local law or other requirements. The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement. Nothing in this part would preempt a State or local law that does not conflict with this part and that provides greater protections against sex discrimination.*"[149]

---

[146] 87 Fed. Reg. 41547.

[147] No. 21-476 (U.S.).

[148] *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 42 (D.D.C. 2020) ("It is sufficient for the Court to determine that *Bostock*, at the very least, has significant implications for the meaning of Title IX's prohibition on sex discrimination, and that it was arbitrary and capricious for HHS to eliminate the 2016 Rule's explication of that prohibition without even acknowledging—let alone considering—the Supreme Court's reasoning or holding.").

[149] 87 Fed. Reg. 41569

The Proposed Rule explains this language would make "clear in a simple comprehensive statement that the Title IX regulations preempt *any* State or local law with which there is a conflict."[150] Further, "[t]his clarification would ensure that the proposed regulations appropriately cover the full scope of Title IX while not extending further than the Department's authority to promulgate regulations to effectuate Title IX."[151] While we agree state laws do not alleviate a recipient's burden to comply with Title IX regulations to receive federal funding, Title IX regulations cannot preempt inconsistent or conflicting state laws. Title IX imposes strings on the receipt of federal funding. To the extent that an educational institution is unable to follow Title IX regulations due to oversight, choice, or a conflicting state law requirement, it would be unable to comply with the strings attached to receipt of federal funding. The appropriate response from ED is disallowance of federal funding. ED does not have the power under Title IX to preempt state laws. To the extent ED's proposed regulations purport to preempt state law, they are "extending further than the Department's authority" and contrary to law.

The Proposed Rule also states that proposed § 106.6(b) would not "preempt a State or local law that provides greater protections to students and does not conflict with these regulations."[152] It is unclear what the Department views as "greater protection to students." State laws that ensure girls and women have access to sex-specific private spaces and sports teams free from biological males, regardless of gender identity, provide greater protection to female students. Similarly, several states have laws that protect minors, including students, from harmful, sterilizing, and irreversible gender transition drugs and surgeries. To the extent the Proposed Rule would preempt or conflict with these protective state laws, it is arbitrary and capricious because these state laws provide "greater protection to students."

Proposed § 106.6(b) should not be adopted as it is contrary to law.

The Department should also wait for the Supreme Court to issue a decision in the October 2022 term case *Health and Hospital Corporation of Marion County, Indiana v. Talevski*, which involves the scope of authority under Spending Clause legislation.[153]

**11. It is arbitrary and capricious for ED not to address the impact of the Proposed Rule on Section 1557 and in the health care context.**

When issuing Title IX regulations, the Department must consider the impact of those regulations on other laws that incorporate Title IX, or explicitly disclaim that its regulations affect those laws and contexts. As Justice Alito pointed out in his *Bostock* dissent, "Over 100 federal statutes prohibit discrimination because of sex."[154] Many of these and other statutes also explicitly incorporate Title IX's prohibition against sex discrimination.

For example, Section 1557 of the Patient Protection and Affordable Care Act incorporates Title IX. Section 1557 guarantees that no individual can "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under," any federally run or federally funded health program

---

[150] 87 Fed. Reg. 41405.
[151] *Id.*
[152] 87 Fed. Reg. 41405.
[153] No. 21-806 (U.S.).
[154] *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1778 (2020) (Alito, J., dissenting).

"on the ground prohibited under … Title IX."[155] Thus, how ED defines the ground of sex discrimination under Title IX in its regulations could have direct impact for Section 1557 and the health care context.[156]

If adopted, the Proposed Rule would greatly expand the scope of what is considered sex discrimination. Perhaps most relevant to the health care context, the Proposed Rule would radically define and expand discrimination "on the basis of sex" to include discrimination based on "gender identity" and "termination of pregnancy" (which presumably would be interpreted by this administration to cover elective abortions). Indeed, recently proposed regulations directly on Section 1557 by the Department of Health and Human Services (HHS) would mirror the definition of sex discrimination in the proposed Title IX regulations.[157] Medical professionals deserve fair notice and opportunity to comment on title IX regulations that could impact them via Section. 1557.

As such, in issuing Title IX regulations, it would be arbitrary and capricious for ED to ignore the impact of its regulations on Section 1557 and the health care context. Changing interpretation and enforcement under Section 1557 would have significant costs, impacts on small businesses, and raise federalism concerns.[158] ED should address the impact of its regulations in the health care context or explicitly disclaim that any of its Title IX regulations should be interpreted to apply to Section 1557 and the health care context. Further, ED should clarify:

- Whether the definition of "pregnancy and related conditions" be incorporated into 1557.
  - If yes, the impact such a definition will have to the extent to which Title IX's abortion neutrality and religious exemptions are not incorporated (which they should be).
- Whether doctors will be forced to provide or participate in abortions.
- Whether health insurance insurers will be required to cover abortion.
- Whether the insured will be forced to pay for abortion.

ED should jointly consider the Proposed Rule with HHS's proposed Section 1557 rule as a common rule. Both rules concern interpretation of Title IX's application to sexual orientation and gender identity, and Title IX and Section 1557 have significant overlap concerning their application to educational institutions that receive health funding. As discussed above, how ED defines the ground of sex discrimination under Title IX in its proposed regulations could have direct impact for Section 1557, its regulations, and the health care context. Inconsistency in implementation of discrimination on the basis of sex across agencies and across programs, such as Title IX and Section 1557, could lead to legal vulnerability and make the varying interpretations arbitrary and capricious.

Under Executive Order 12250, the Department of Justice is required to coordinate the implementation of any regulations implementing nondiscrimination provisions of Title IX or of "[a]ny other provision of Federal statutory law which provides, in whole or in part, that no person in the United States shall, on the ground of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." Only

---

[155] 42 U.S.C. § 18116(a) (citing Title IX, 20 U.S.C. § 1681 *et seq*.).

[156] Rachel N. Morrison, *Why the Medical Community Should Care About Biden's Proposed Title IX Regulations*, Nat'l Rev. (Aug. 30, 2022), https://www.nationalreview.com/bench-memos/why-the-medical-community-should-care-about-bidens-proposed-title-ix-regulations/.

[157] 87 Fed. Reg. 47824 (Aug. 4, 2022), https://www.federalregister.gov/documents/2022/08/04/2022-16217/nondiscrimination-in-health-programs-and-activities.

[158] These concerns, and others, are detailed in EPPC's comment submitted to OIRA during its pre-rule review of HHS's proposed Section 1557 regulations. EPPC Comment to OIRA for EO 12866 Meeting on "Nondiscrimination in Health Programs and Activities" rule (Apr. 6, 2022), https://eppc.org/wp-content/uploads/2022/04/EEPC-Scholars-Comment-for-EO-12866-Meeting-on-Section-1557-Rule.pdf.

through coordination by the Department of Justice and joint common rules across agencies can the administration as a whole consider the proper interpretation and application of the principles of nondiscrimination.

**12.  ED should clarify that tax exempt status is not federal financial assistance, subjecting an institution to Title IX.**

Current Title IX regulations define "federal financial assistance" as:

(1) A grant or loan of Federal financial assistance, including funds made available for:
 (i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and
 (ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.
(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.
(3) Provision of the services of Federal personnel.
(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.
(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.[159]

ED does not propose to amend this definition. Indeed, in footnote 2 of the Proposed Rule it explains that "The definition of the term 'Federal financial assistance' under the Title IX regulations is not limited to monetary assistance, but encompasses various types of in-kind assistance, such as a grant or loan of real or personal property, or provision of the services of Federal personnel."[160]

Recently, two district courts have held that a private school which is tax exempt, and did not otherwise receive federal financial assistance, was nevertheless receiving federal financial assistance based on its tax-exempt status and thus subject to Title IX.[161] This is absurd. Under these strained rulings, any organization that Congress does not choose to tax could be subject to all federal spending legislation. ED should clarify that tax-exempt status is not "federal financial assistance" under Title IX.

**Conclusion**

We urge ED to abandon and withdraw the Proposed Rule.

---

[159] 34 CFR § 106.2(g).
[160] 87 Fed. Reg. 41392 n.2.
[161] *E.H. v. Valley Christian Acad.*, 2:21-cv-07574-MEMF, 10 (C.D. Cal. Jul. 25, 2022) ("Accordingly, the Court holds that Valley Christian's tax-exempt status confers a federal financial benefit that obligates compliance with Title IX."); *Buettner-hartsoe v. Balt. Lutheran High Sch. Ass'n*, No. RDB-20-3229, 6 (D. Md. Jul. 21, 2022) ("The tax-exempt status of a private school subjects it to the same requirements of Title IX imposed on any educational institution. CPS cannot avail itself of federal tax exemption but not adhere to the mandates of Title IX.").

Sincerely,

Rachel N. Morrison, J.D.
Fellow, HHS Accountability Project
Ethics and Public Policy Center

Mary Rice Hasson, J.D.
Kate O'Beirne Fellow and Co-Founder, Person and Identity Project
Ethics and Public Policy Center



**Exhibit E-5**

Comment by Alliance Defending Freedom, ED-2022-OCR-0143-150698 (May 15, 2023).



May 15, 2023

Secretary Miguel A. Cardona
U.S. Department of Education
VIA REGULATIONS.GOV

**RE: Nondiscrimination on the Basis of Sex in Education Programs or
    Activities Receiving Federal Financial Assistance: Sex-Related
    Eligibility Criteria for Male and Female Athletic Teams
    Docket ID: ED-2022-OCR-0143**

Dear Secretary Cardona,

Alliance Defending Freedom (ADF) opposes the Notice of Proposed
Rulemaking on Title IX of the Education Amendments of 1972.

The Biden administration's proposed sports rule is a slap in the face to
female athletes who deserve an equal opportunity to compete on the playing field.
The proposed rule degrades women and tells them that their athletic goals and
placements do not matter. When society and the law try to ignore reality, people get
hurt. And, in sports, Congress recognized long ago that it's women and girls who
pay the price.

That price has already been felt and it is only going up. From the Atlanta
pool at the NCAA Swimming and Diving Championships to track podiums in
Connecticut, female athletes like Selina Soule, Riley Gaines, Madison Kenyon,
Mary Kate Marshall, and Chelsea Mitchell have already been displaced by males
competing in women's sports. Countless other women and girls across the country
have already lost championships, qualifying points, placements, and even the
opportunity to compete in competitions. Their efforts and the harm they have
suffered have been completely erased. The message this sends to women and girls
wanting equal opportunity is both devasting and demoralizing—a message the
Biden administration wants to memorialize now in its proposed sports rule.

Thankfully, a growing number of states are stepping up to protect women's
athletics. Right now, 21 states and counting have enacted laws that protect women
and girls from having to compete against males, and polls show that a majority of
Americans agree that the competition is not fair when males are permitted to
compete in women's and girls' sports. Every woman deserves the respect and
dignity that comes with having an equal opportunity to excel and win in athletics.

U.S. Department of Education
May 15, 2023
Page 2

But the proposed sports rule seeks to undo this progress. Fifty years ago, Congress acted to protect equal opportunity for women by passing Title IX. Now, by radically rewriting this federal law, the Biden administration is threatening the advancements that women have long fought to achieve in education and athletics. Rather than protect women's equal opportunities, the sports rule puts girls on defense, forcing them to advocate for the very existence of their own sports teams.

ADF is an alliance-building legal organization that advocates for the right of all people to freely live out and speak the truth. ADF pursues its mission through litigation, training, strategy, and funding. Since its launch in 1994, ADF has handled many legal matters involving Title IX, the First Amendment, athletic fairness, student privacy, and other legal principles addressed by the proposed rule.

## BACKGROUND

Shortly after the Biden administration took office, the Department of Education issued "guidance" that interpreted the term sex in Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), to compel schools to allow males to compete in female sports. The Department issued this mandate without notice and comment, and so it has been enjoined in 20 states in an ADF case.[1]

Now the Department seeks to exacerbate this injustice through two rulemakings. *First*, last fall, the Department proposed a wide-ranging Title IX rule redefining sex to mean gender identity under Title IX.[2] That proposed rule, which ADF will call for shorthand the Title IX rule, redefines sex across the board in education. Even though this rule claims to not discuss athletics, it necessarily sweeps in physical education classes, sports teams, and extracurricular athletics. *Second*, in this proposed rule, which ADF will call for shorthand the sports rule, the Department proposes to explicitly address eligibility for participation on sex-separated athletic teams—and to require schools to allow males to play on female teams in virtually all cases.[3]

---

[1] *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022), *appeal docketed*, No. 22-5807 (6th Cir. Sept. 13, 2022).

[2] Dep't of Educ., Notice of Proposed Rulemaking, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022).

[3] Dep't of Educ., Notice of Proposed Rulemaking, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860 (April 13, 2023) (to be codified at 34 C.F.R. 106.41(b)).

U.S. Department of Education
May 15, 2023
Page 3

Last fall, in response to the Department's proposed Title IX rule, ADF submitted five formal comments urging the administration to abandon course.[4] As ADF explained, the Title IX rule—like the Department's guidance—violates Americans' legally protected freedoms and threatens women's advancements.

- **The Title IX rule lacks legal authority:** Nothing requires schools to give special treatment to males who want to compete in girls' sports. To the contrary, it is illegal for the Secretary of Education, an unelected bureaucrat, to rewrite federal law without Congress' authority.

- **The Title IX rule hurts female athletes:** Redefining sex in Title IX undermines fairness in women's sports and diminishes privacy and safety in school facilities. Allowing males on female teams threatens females with injury and takes away podium spots from girls who earned them.

- **The Title IX rule undermines parental rights:** The Title IX rule wrongly seeks to compel schools to treat students as whatever sex they prefer—without parents' knowledge or consent.

- **The Title IX rule harms suffering students and the medical profession:** The Title IX rule harms students with gender dysphoria and coerces doctors to perform dangerous, life-altering medical procedures.[5]

- **The Title IX rule violates freedoms of speech and religion, and it tramples due process:** The Title IX rule threatens to force students and teachers to use pronouns and titles that are inconsistent with a person's sex, with no due process protections for those accused of violations.

ADF thus urged the Department to abandon the Title IX rule.

But instead, the Department has proceeded with the proposed Title IX rule *and* it has now proposed the sports rule—which will directly provide that males must be allowed to play on female teams in nearly all cases. The Department's sports rule suffers from all the legal and policy infirmities as the Department's

---

[4] Press Release, ADF, *ADF to Biden: Hands off Title IX* (Sept. 12, 2022), https://adflegal.org/press-release/adf-biden-hands-title-ix, ADF Exs. 1–5, attached (formal comments on each topic). An exhibit list is enclosed on the final page of this comment.

[5] Relying on the same theory of sex discrimination in Title IX, the U.S. Department of Health and Human Services (HHS) is engaged in rulemaking under Section 1557 of the Affordable Care Act. ADF's attached 1557 comments provide medical evidence rebutting this mistaken understanding. *See* ADF Exs. 6–12, attached.

U.S. Department of Education
May 15, 2023
Page 4

guidance and Title IX rule, and more—not the least of which is its disastrous effect on women's equal opportunities in athletics.

## DISCUSSION

The Biden administration should abandon its plans to open female athletic teams to males. Title IX is an equal opportunity statute. It requires schools to protect females from having to compete against males in female sports and it respects females' rights to privacy and safety in intimate spaces like locker rooms.[6] The Department's sports rule violates Title IX and is a transparent end-run around Congress and the voters.

I.    **The Biden administration lacks the legal authority to rewrite Title IX and put males on female sports teams.**

Redefining sex in Title IX to encompass gender identity has no basis in law and will cause a multitude of harms. This was true for the Department's informal guidance redefining sex in Title IX, it was true for its rulemaking last fall redefining sex in Title IX across education, and it is true for this sports rule.

A.    **The sports rule violates Congress' requirement that schools field female teams and sports.**

The Department lacks the power to adopt the sports rule, because Congress acquiesced to and adopted the 1975 Title IX sports rule[7] and its 1979 guidance. As a result, those standards are now part of the Title IX statute, and agencies lack the authority to edit their authorizing statutes. But those standards not only permit—they often require—schools to field female-only teams and sports. The sports rule therefore directly contradicts the statute by requiring schools to field males in female teams and sports in many contexts.

Congress adopted the 1975 Title IX sports rule by virtue of the peculiar legislative history of that rule. In that history, Congress ordered the Department to promulgate a rule,[8] and subjected that rule to Congressional review before it went into effect. Congress then engaged in that review, and it held extensive hearings on

---

[6] 34 C.F.R. §§ 106.33, 106.34, 106.41.

[7] Under this rule, a school may provide separate teams "for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." Schools also must provide "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41.

[8] Sex Discrimination Act of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484.

U.S. Department of Education
May 15, 2023
Page 5

the rule. In those proceedings Congress considered, and rejected, proposed amendments to the rule and to Title IX itself, which would have precluded the requirement to field female-only teams and sports.[9] Instead, the rule Congress accepted provides (as the Department concedes) that it is a "longstanding requirement [that] reflects the Department's recognition that a recipient's provision of male and female teams *can advance rather than undermine* overall equal opportunity in the unique context of athletics *by creating meaningful participation opportunities that were historically lacking for women and girls.*"[10]

Congress thus legislated Title IX to allow for sex-separated sports to protect women's opportunities. The Department concedes that the Supreme Court held that this history "strongly implies that the [Title IX] regulations accurately reflect congressional intent."[11] The case is even stronger: Congress itself affirmed the regulations and guidance themselves.

Congress' 1975 review of the Title IX sports rule alone would be sufficient to render the 1975 rule part of the Title IX statute by acquiescence, and thus to make the right to women's sports untouchable by the Department—but Congress went even further. In 1988, Congress adopted the Civil Rights Restoration Act and asserted its adoption of the "consistent and long-standing executive branch interpretation" of Title IX's application to athletics.[12] Congress thus adopted and made part of the statutory scheme both the 1975 Title IX athletics rule and its guidance through 1987, including the Department's 1979 Policy Interpretation,[13] as several scholars and courts concluded.[14]

The sports rule is illegal. The 1975 Title IX sports regulation and its 1979 policy interpretation require schools to have female-only sports and teams, where there is sufficient interest and ability to sustain a team for each sex. This regulation

---

[9] Hearing on H.R. Con. Res. 330 Before the House Subcomm. on Equal Opportunities of the Comm. on Educ. & Labor, 94th Cong. (1975); Prohibition of Sex Discrimination: Hearings Before the Senate Subcomm. on Educ. of the Comm. on Labor & Pub. Welfare, 94th Cong. (1975); 122 Cong. Rec. at 28,147.

[10] 88 Fed. Reg. at 22,877 (citing 1979 Policy Interpretation, 44 Fed. Reg. 71,421) (emphasis added).

[11] 88 Fed. Reg. at 22,862–63.

[12] Public Law 100–259; 102 Stat. 28 (Mar 22, 1988).

[13] 44 Fed. Reg. 71,413 (Dec. 11, 1979).

[14] Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marq. Sports L. Rev. 11 (2003), attached as ADF Ex. 13 (discussing cases and Congressional sources).

U.S. Department of Education
May 15, 2023
Page 6

was promulgated because of educational institutions' historical provision of opportunities for male sports teams and the concomitant exclusion of opportunities for "members of the other sex," that is, because of educational institutions' historical exclusion of sports teams for females.[15] As a result, if a school has teams that are not co-ed (that is, it has male sports teams), the regulations require the school to create female sports teams. Under this regulation, the Department cannot legally require, or permit, a school to allow a male into female teams, because the statute (as acquiesced to by Congress) requires the female teams to be female-only, and female means sex, not gender identity.

The Department claims that "the Javits Amendment reflects that the Department has discretion to tailor its regulations in the athletics context that it might not have in other contexts."[16] That assertion ignores the fact that Title IX addresses sex, not gender identity. Giving the Department discretion to regulate athletics by sex does not empower it to regulate by gender identity. Moreover, this claim by the Department ignores the fact after the Department enacted regulations in 1975, Congress adopted them through extensive hearings and rejection of amendments, then Congress explicitly adopted the 1975 rule and 1979 interpretation in the CRRA. In so doing, Congress statutorily removed the Department's ability to use the Javits Amendment to contradict the approach taken by the 1975 and 1979 Title IX standards, because they are now part of the statute. By using gender identity to trump sex in this proposed sports rule, the Biden Administration is trying to rewrite Title IX without Congress.

**B.    The proposed rule violates Title IX's entire text and purpose for female athletics.**

The sports rule is a sweeping violation of the Department's authority—not in service of Title IX's purpose, but in opposition to it.[17] Congress passed Title IX to protect women's equal access to education and athletics "on the basis of sex," and President Richard Nixon signed it into law in 1972. But, as one commenter put it, "The idea that Nixon and leaders in Congress—the likes of Tip O'Neill and Hale Boggs, Mike Mansfield and Robert Byrd—considered sex the same as gender identity is too ridiculous for words."[18] Title IX uses a male-female binary that

---

[15] 44 Fed. Reg. at 71,418.

[16] 88 Fed. Reg. at 22,866.

[17] Cf. Michael E. Rosman, *Gender Identity, Sports, and Affirmative Action: What's Title IX Got to Do With It?*, 53 St. Mary's L.J. 1093 (2022), attached as ADF Ex. 14.

[18] Rich Lowry, *Executive Aggrandizement vs. Women's Sports*, NRO (April 11, 2023), https://www.nationalreview.com/2023/04/executive-aggrandizement-vs-womens-sports/.

U.S. Department of Education
May 15, 2023
Page 7

excludes the gender identity concept.[19] No one seriously thought that Title IX required schools to let men play on women's teams. The original understanding of the word sex in Title IX—as well as Title IX's purpose, structure, and context— points to this binary, biological understanding.[20]

That lack of clear statutory authority for the Department's new interpretation of Title IX should end the analysis for two independent reasons. *First*, whether the Department may force schools nationwide to allow males to play on female teams or sports is a major question, if there ever was one. So under the Supreme Court's major questions doctrine, the Department must have clear statutory authority before it may impose this mandate.[21] *Second*, Title IX is also a Spending Clause statute, so, under the federalism clear-notice canon, the Department cannot add any Title IX conditions unless they were unmistakably clear in the statute when the statute was enacted.

But the Department concedes that there has not been prior clear notice or authority for this sports rule. It says "[a]thletic programs have long been recognized by Congress, the Department, and Federal courts as an integral part of a recipient's education program or activity subject to Title IX."[22] And, crucially, it concedes that, rather than providing clear notice that men must be allowed to play on women's teams, the Department itself has had confusion and varied understandings about

---

[19] 20 U.S.C. §§ 1681, 1686.

[20] *See, e.g.*, *supra* n.4 & *infra* n. 29 (detailing these textual and structural arguments); *accord Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc); *Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022); *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-CV-00316, 2023 WL 111875 (S.D. W. Va. Jan. 5, 2023); *D.H. v. Williamson Cnty. Bd. of Educ.*, No. 3:22-CV-00570, 2022 WL 16639994, at *10 (M.D. Tenn. Nov. 2, 2022).

[21] *See West Virginia v. EPA*, 142 S. Ct. 2587 (2022).

[22] 88 Fed. Reg. at 22,861-62 (citing Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (Javits Amendment); U.S. Dep't of Health, Educ., and Welfare, Final Rule: *Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 40 Fed. Reg. 24128, 24134 (June 4, 1975); U.S. Dep't of Health, Educ., and Welfare, Office for Civil Rights, *A Policy Interpretation: Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71413 (Dec. 11, 1979) (1979 Policy Interpretation), https://www.govinfo.gov/content/pkg/FR-1979-12-11/pdf/FR-1979-12-11.pdf; *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 516, 531-32, 532 n.22 (1982)).

U.S. Department of Education
May 15, 2023
Page 8

whether men can play on female teams under Title IX.[23] With no clear notice, there is no authority for the sports rule under both doctrinal canons.

### C.     The sports rule hurts female athletes.

By rewriting Title IX, the sports rule is threatening to erode advancements that women have long fought to achieve. Women and girls deserve to compete on a level playing field. Everyone knows the truth that allowing males into female sports creates disadvantages that threaten females' opportunities. But the Department has rejected reality and chosen ideology over justice and law.

When we ignore biological reality, women and girls get hurt. In athletics, girls may be physically hurt; and across the country, women and girls are unjustly losing medals, podium spots, public recognition, and the opportunity to compete when males take their places. Just in the past few years, young women and girls have been displaced hundreds of times under the ideology adopted by this sports rule. Those are hundreds of opportunities lost forever, and the sports rule promises to impose that injustice system wide for millions of females far into the future.

### D.     The sports rule undermines female privacy and safety.

Forcing schools to allow students to play sports based on their subjective gender identity jeopardizes the safety, privacy, and dignity of all students—especially female students and young students. Women and girls should be able to change, shower, and sleep without fear of men watching them. But if males may play on female teams, males may access female athletic facilities and team members' private facilities. Female students and employees will be forced to share locker rooms, showers, swimming pools, and other intimate spaces—including hotel rooms on overnight trips or bedrooms in athletic dorms. When men are allowed in women's spaces, women lose. They lose privacy, they lose safety, and they lose dignity. Faced with the prospect of being forced to compete against males—and faced with the prospect of sharing locker rooms, showers, and other private spaces with males—many women and girls will reevaluate whether to play sports at all. But the sports rule ignores this impact, as well as the resulting liability for schools who fail to protect women and girls.

The Department should not force females—especially young girls—to share private spaces with males. Locker rooms, showers, restrooms, and bedrooms should

---

[23] 88 Fed. Reg. at 22,861, 22,865–66.

U.S. Department of Education
May 15, 2023
Page 9

be private and safe. Schools have a duty to respect females' dignity by not assigning males as their roommates or allowing males into their private spaces.

### E.    The sports rule undermines parental rights.

The sports rule's lack of privacy protections also undermines parents' authority. Because the Biden administration's understanding of Title IX extends to teachers and employees, it threatens to allow males to be assigned as females' coaches and chaperones and to let adult males sleep or shower with women and young girls—even elementary school girls. The rule does not even make any provision for allowing schools to inform parents or students before or after this happens. And this nightmare scenario is not hypothetical: school districts already cite Title IX to allow this to happen and they cite educational privacy rules to conceal this critical information from parents and students.

This dynamic highlights an even more fundamental problem: the Department seeks to compel schools to treat students as whatever sex they identify as—without first asking parents. This mandate undermines parents' authority to make vital decisions about their child's emotional, mental, or physical health by giving that right to school staff instead.

### F.    The sports rule violates constitutional and statutory rights.

The threat today from the sports rule is most dangerous for women and girls, but freedom for every American to speak and live the truth is at stake. Every American should be free to live in every area of life according to the truth that humans are male or female. No one should be punished for that. But the Department has made no provision for respecting the rights of free expression in education, and so its rewrite will weaponize Title IX to force people to deny truth in athletics.

We know what will happen next, because we can see it already happening across the country. Vermont school officials, for instance, suspended Travis Allen from his coaching job and disciplined his teenage daughter Blake Allen for calling a male student "a dude" and for using male pronouns when expressing the view that the male student should not be allowed to change in the girls' locker room.[24]

The Department's officials are free to believe what they choose—as we all should be—but they cannot legally threaten to withhold federal funding to punish

---

[24] Complaint, *Allen v. Millington*, No. 2:22-cv-00197-cr (D. Vt. Oct. 27, 2022) attached as ADF Ex. 15.

U.S. Department of Education
May 15, 2023
Page 10

schools, administrators, teachers, coaches, and students who choose not to abandon truth. The Department should not force schools to censor and compel speech by forcing everyone, on a Title IX harassment or hostile environment theory, to pretend that a male athlete is female or to use pronouns and titles that are inconsistent with a person's sex. The Department has no power to require students and teachers to express messages with which they disagree as a matter of faith.

What's more, everyone loses when these new sports mandates are tied to the Biden administration's hands-free, no-rules adjudication of Title IX complaints—campus kangaroo court procedures that lack even basic due process protections. Redefining Title IX to add new protected classes threatens to bring Star Chamber procedures down on the heads of Americans who refuse to speak or live a lie.

The sports rule also threatens to burden religious schools and their female athletes in violation of their constitutional and statutory freedoms. Even though religious schools are exempt from Title IX, religious schools stand to lose under the sports rule because religious schools often play in the same athletic leagues and in the same sports facilities as other schools that are subject to Title IX. The sports rule thus creates an uneven playing field for religious schools' female athletic teams by requiring them to compete against other teams that include biological males.[25]

If the sports rule goes into effect, female athletes from religious schools will no longer be able to remain in many of their current sports leagues. By requiring secular private schools, public schools, and charter schools to open their teams and facilities to males, the Department threatens to make it impossible for religious schools to play in the same leagues and facilities as non-religious schools unless the religious schools abandon their beliefs in the binary nature of sex and fail to protect the rights of their female athletes to fair competition, safety, and privacy. Many religious schools will field no team at all if their female athletes have to share locker rooms with males, or if their female athletes will be subject to serious competitive disadvantages and heightened risks of injury by having to compete against males.[26] If religious schools must leave their elementary school, high school, or college athletic associations, they will suffer harm by being excluded from state-wide competitions, events, and championships, by being excluded from a state-wide

---

[25] *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 833 (E.D. Tenn. 2022), attached as ADF Exs. 16–40; *see infra* n. 29.

[26] *E.g.*, Samantha Pell, *Maryland High School Leaves Athletic Association over Transgender Policy* (Mar. 22, 2019), https://wapo.st/3B3uh7k.

U.S. Department of Education
May 15, 2023
Page 11

association, and by being unable to offer female student athletes opportunities to compete at the highest levels of high school competition.[27]

Rather than repeat these and many more arguments made at length in ADF's comments last fall about how redefining Title IX breaks the law and harms everyone, ADF's past comments are attached and incorporated by reference.[28]

After ADF filed those comments, many important developments occurred in many pending cases. So ADF also attaches and incorporates by reference several key filings and decisions in these ongoing cases that shed further light over the proper understanding of Title IX.[29] In these cases and amicus briefs, many female

---

[27] Under the First Amendment to the U.S. Constitution and the Religious Freedom Restoration Act, the Department has to consider these reliance interests in its rulemaking and to avoid placing these substantial burdens on religious exercise. But the Department ignores this important issue—i.e., how the sports rule substantially burdens religious organizations and schools in violation of these laws.

[28] *See* ADF Exs. 1–5, attached.

[29] The Department is on weak legal, policy, and evidentiary ground any time it seeks to push a redefinition of sex that leads to limiting women's equal opportunities in athletics. The following court filings attached to this comment from the following important Title IX cases show this to be the case in great detail. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (Eleventh Circuit en banc decision & ADF amicus brief, attached as ADF Exs. 41–42); *Barrett v. Montana*, No. DV-21-581-B (Mont. 18th Jud. Dist.), *appeal docketed*, No. DA 22-0586 (Mont. Oct. 13, 2022) (ADF amicus brief filed Feb. 22, 2023, attached as ADF Ex. 43); *A.M. v. Indianapolis Pub. Schs.*, No. 22-2332, *appeal dismissed* 2023 WL 371646 (7th Cir.) (ADF and Alabama amicus briefs filed Sept. 13, 2022, attached as ADF Exs. 44–45); *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-CV-00316, 2023 WL 111875 (S.D. W. Va. Jan. 5, 2023) (key court filings and key expert reports, as well as six pdfs of op-ed commentary setting forth policy considerations, attached as ADF Exs. 46–102); *D.N. v. DeSantis*, Case No. 0:21-cv-61344-RKA (S.D. Fla.) (ADF intervention motion and declaration filed Sept. 12, 2021 and ADF amicus brief filed Feb. 5, 2023, attached as ADF Exs. 103–106); *Faith Action Ministry Alliance v. Fried*, No. 8:22-cv-01696 (M.D. Fla. 2022) (complaint and preliminary injunction motion with legal claims, as well as joint stay, dismissal, and religious exemption, attached as ADF Exs. 107–111); *Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020), *aff'd*, No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023) (court filings and three pdfs of op-ed commentary setting forth policy considerations, attached as ADF Exs. 112–133); *Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) (district court opinion and ADF amicus briefs, attached as ADF Exs. 134–135); *Soule v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43 (2d Cir. 2022) (key case filings plus five pdfs of op-ed commentary setting forth policy considerations, attached as ADF Exs. 136–164); *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022)

U.S. Department of Education
May 15, 2023
Page 12

athletes (including Selina Soule, Chelsea Mitchell, Madison Kenyon, Riley Gaines, Debbie Powers, Macy Petty, and Cynthia Monteleone) have shared their stories of competing against males and have taken public stands that sex in Title IX refers to the biological binary.

## II.   The sports rule puts girls on defense, forcing them to advocate for the very existence of their own sports teams.

All these problems would be a part of any proposal like the sports rule that allows males to play on female teams, but the sports rule nevertheless manages to make things worse by introducing an equal protection-style balancing test that schools must satisfy to separate teams by sex.

Rather than protect women's equal opportunities, the sports rule puts girls on defense, forcing them to advocate under this balancing test for the very existence of their own sports teams. The sports rule is thus fundamentally unfair—and it is unworkable, unscientific, illogical, and incoherent.

### A.   The sports rule's balancing test excludes most female sports.

Under the sports rule, the Department puts a heavy thumb on the scales against female athletes. The sports rule provides that schools may have sex-separated teams only if the decision to separate the team survives a detailed new balancing test: if the decision (1) is made "for each sport, level of competition, and grade or education level," (2) is "substantially related to the achievement of an important educational objective"; and (3) minimizes "harms to students" who seek to participate on the team based on gender identity.[30] The Department claims that

---

(key court filings and two pdfs of op-ed commentary setting forth policy considerations, attached as ADF Exs. 16–40). The expert reports reveal the science and evidence behind gender dysphoria and sex-separated sports, including showing for example that puberty suppression followed by cross-sex hormones has little effect on adult height—giving males a retained athletic advantage in many sports. They also show for example that a female athlete received head and neck injuries from a jump spike delivered by a male athlete on the opposing girls' team.

[30] The proposed regulation reads, in full:

If a recipient adopts or applies sex-related criteria that would limit or deny a student's eligibility to participate on a male or female team consistent with their gender identity, such criteria must, for each sport, level of competition, and grade or education level:

U.S. Department of Education
May 15, 2023
Page 13

this balancing test would "preserve and build on the current regulatory framework"[31] but it instead takes away females' legal rights to female teams.

*First*, this test is illegal as described above. It cannot be reconciled with Title IX text, purpose, and structure (which concerns biological sex and seeks to advance the opportunities of biological females); the 1975 rule; or 1979 policy interpretation, which require female-only teams based on simpler and frequently satisfied criteria. Replacing that test with this proposed test is illegal because Congress adopted the previous tests.

*Second*, the sports rule categorically forbids all state laws saving women's sports, and it introduces chaos by prohibiting simple, uniform rules keeping males from playing on females' teams.[32] In one fell swoop, it takes away female athletes' legal rights under Title IX and state laws to equal athletic opportunities. And it does so with almost no legal analysis.

*Third*, the preamble makes clear that, under the new balancing test, elementary and junior high schools must automatically let males play female sports.[33] The Department says that there is no way that the test will come out in favor of allowing sex-separated teams at these age levels. But there is no rational reason to disregard the evidence showing that male and female physiology differs at each age (and not just at college or high-school ages), that there is a risk of injury and unfairness to girls at younger ages if they play against males, and that in general sex-separated educational activities have educational benefits.[34]

---

(i) Be substantially related to the achievement of an important educational objective; and

(ii) Minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied.

88 Fed. Reg. at 22,891.

[31] 88 Fed. Reg. at 22,867.

[32] *E.g.*, 88 Fed. Reg. at 22,866.

[33] The preamble says that it would be "particularly difficult" to exclude students from participation based on gender identity "immediately following elementary school." 88 Fed. Reg. at 22,875.

[34] Indep. Council on Women's Sports (ICONS) Amicus Br., *B.P.J. v. W. Va. State Bd. of Educ.*, No. 23-1078 (4th Cir. May 3, 2023), attached as ADF Ex. 90 (setting forth the science on pre-puberty physicality).

U.S. Department of Education
May 15, 2023
Page 14

The Department seeks to substitute its own educational goals for schools, saying that young children are all similar physically in these grade levels and that the primary educational goal for youth sports is just to learn basic physical and emotional skills, such as leadership skills, teamwork, hand-eye coordination, and physical fitness.[35] This ignores that schools have other goals in many sports—goals such as fair competition, privacy, and safety—for students at young ages and certainly for students beginning puberty. It seems that the Department's true goal is to condition children early to the idea that female sports include males who identify as females.

*Fourth*, the preamble explains that, under this balancing test, every school, including high schools and colleges, must allow males to compete in female sports in all but the most "competitive" or contact-based sports.[36] But it is terrible policy to single out and eliminate young girls' teams and older girls' no-cut, intramural, club, or junior varsity female teams—teams designed to let women and girls of smaller size and ability have a chance to safely participate in athletics. It is hard to think of a surer way to discourage nascent and recreational female athletic participation than to say that there is no opportunity for females to safely play sports unless they are already so physically strong that they could hold their own competitively at the varsity or college level in contact sports. Just because a team has a "lower level of competition" does not mean that it is safe or fair to allow any male who wishes to play. To the contrary, the sports rule makes the youngest, most vulnerable, and least athletic girls the first to be injured and displaced by males. And, because there is less public attention for youth sports, recreational leagues, or "less competitive" female sports, their injuries will receive less visibility.

*Fifth*, the sports rule, in theory, allows more narrowly tailored sex-separations in collegiate or high school highly competitive or contact-based sports teams—ostensibly as some sort of a moderate compromise. But any compromise is an illusion. The ability to retain sex-separated sports teams even at the highest competitive levels in contact sports is elusive in theory and effectively impossible in practice.

### B.     The sports rule's balancing test is unworkable.

Under the sports rule's balancing test, schools *might* be able to have some sex-separated sports at the highest level of collegiate or high school contact sports.

---

[35] 88 Fed. Reg. at 22,874–75.

[36] 88 Fed. Reg. at 22,875.

U.S. Department of Education
May 15, 2023
Page 15

But the Department still unfairly and illegally prioritizes the rights of males over females in these situations.

Even at high school or college levels, the Department requires schools to assemble a mountain of evidence to keep just one male out of a female team or sport. Administrators have to develop participation criteria by sport, by competition level, by grade level, by team, and by individual athlete, marshalling proof in each instance (1) that female-only participation eligibility is "substantially related to the achievement of an important educational objective" (whatever that means), rather than resting on (2) what the Department deems to be stereotypical generalizations and pretexts,[37] while showing (3) that the school simultaneously "minimized" what the Department views as harm to the males kept off of female teams (however that would even be possible).

Unpacking this balancing test shows it is both unworkable and almost always eliminates female-only athletics. The Department will not consider an educational objective "important" or non-pretextual if the Department thinks that the objective is just cover for disapproval of students who identify other than as their sex, as a desire to harm a particular student, as a desire to exclude students who identify other than as their sex from sports, as adherence to sex stereotypes, as assumptions about the conduct of students who identify other than as their sex, as assumptions about male superiority or physical advantages, or as an excuse for administrative convenience.[38] The sports rule also forbids reliance by schools on "overbroad generalizations that do not account for the nature of particular sports," meaning that the Department gets to veto and redo any fairness or safety decisions made by schools with which it disagrees.[39] And the Department cites many policies allowing males to play on women's sports as informative of its understanding of the requirements of the sports rule's new balancing test.[40] With all this to prove, it is hard to see what evidence in individual cases could ever satisfy the Department.

What is more, even if a school passes through this evidentiary gauntlet—assembling a mountain of evidence to justify an individual student's participation and successfully persuading the Department that none of this is a generalized stereotype or impermissible pretext—the school still must allow the male on the female team unless the school adequately "minimized harm" to the excluded male student. The preamble says that if the Department thinks that if a school can

---

[37] 88 Fed. Reg. at 22,872–74.

[38] 88 Fed. Reg. at 22,872.

[39] 88 Fed. Reg. at 22,873, 22,876.

[40] 88 Fed. Reg. at 22,869–70, 22,872–74.

U.S. Department of Education
May 15, 2023
Page 16

reasonably adopt or apply alternative criteria for athletic participation that the Department thinks would cause less harm and still achieve its important educational objective, then the school has to do so (much like a "least restrictive means" test from strict scrutiny analysis).[41] Plus, even if no reasonable alternative exists, the Department still requires a school to balance any identified harm to the excluded student against its important educational objective. The Department does not explain how this balancing would occur, or even how schools would gain information about harms. Yet the sports rule always requires schools to minimize the harm caused by sex-separated teams by taking into account the "difficulty of obtaining documentation, [or] risk of invasion of privacy or disclosure of confidential information."[42] That means, that if a male would find it inconvenient—or feel that it is an invasion of his privacy—to have to show a birth certificate or pass a basic medical exam or play on a male team, that alone is enough to let the male play on a female team. On top of all this, the Department says that "some students may suffer harm as a result of being unable to gain the benefits associated with equal opportunity to participate on athletic teams at school"[43] because participation on a team inconsistent with a student's gender identity is "not a viable option for many students,"[44] which further suggests that any rule that excludes males from female teams harms males—and thus any exclusion of males from female sports categorically must be minimized.

While schools navigate this impossible gauntlet, the Department lurks in the background ready to veto any sex-separation in athletics and yank federal funding if the school gets the balance "wrong" in even one instance. School administrators will not likely assume the risky burden of developing a detailed rationale for basing participation on biological sex for every sport at every athletic level. Most likely they will default to allowing males on females' teams. Indeed, legal guides are already telling schools to drop female sports now rather than try to pass this test.[45]

---

[41] 88 Fed. Reg. at 22,869–70, 22,874, 22,877.

[42] 88 Fed. Reg. 22,877.

[43] 88 Fed. Reg. 22,861.

[44] 88 Fed. Reg. 22,871.

[45] One guide advises K-12 schools this way: "Prepare for change if your state is one of the approximately 20 states that has adopted legislation banning transgender athlete participation in youth sport. Such bans will conflict with the new Title IX regulation. While this may lead to extensive litigation about the enforceability of the state laws, we anticipate federalism principles will prevail and that such bans will be found to violate Title IX. . . . If your athletics association imposes restrictions on transgender participation in elementary

U.S. Department of Education
May 15, 2023
Page 17

Of course, the one thing missing from all of this analysis is any effort to minimize harm to women and girls—the very mandate of the statute. Minimizing their loss of equal opportunities and minimizing the stigma and discrimination that they face when males displace them is what Congress requires. But the new test would prohibit that. The Department does not even factor females' concerns into the balancing test.

Instead, the sports rule points to what it considers alternative strategies and mitigating measures, such as "appropriate coaching and training, requiring use of protective equipment, and specifying rules of play."[46] In other words, females will face re-education and coercion from their coaches and teachers to acquiesce to males in their sports; females will have to put on new shields, masks, and gear to defend themselves from the physical dangers of males playing on their sports teams; and females will even have to change the rules of their games, just to allow males to play. A rule that more greatly contradicts the existing congressional mandate to protect women is hard to imagine.

Women's sports won't survive the sports rule. Only women's sports will be put to the Department's new test—a test that women's sports teams are meant to fail. Male-dominated sports will as a practical matter rarely be put to this test and are likely to pass it and remain separated by sex. Women naturally will not pass the try-outs or other selective recruitment processes to play male sports (that's why Title IX was enacted). Plus, it's possible to see someone concluding that Division I male football or basketball or wrestling is sufficiently competitive that women should not be allowed to play, or to conclude that it could be incredibly dangerous

---

and middle school sports, be ready to advocate that such policies be eliminated as they are unlikely to comport with the final regulation, and you are likely to be in violation of Title IX if you implement them at your institutions." Bryan Cave Leighton Paisner LLP, *Department of Education's New Proposed Rule for Transgender Participation in Athletics* (April 11, 2023), https://www.lexology.com/library/document.ashx?g=3f3245fe-5883-4be9-8403-bf310c6217a7. The guide tells high schools that it "seems highly unlikely that defensible justifications will be available for exclusionary policies outside the context of intercollegiate competition." *Id.* And the guide advises colleges to reconsider their national or international athletic standards, too: "Either the collegiate athletic associations or you as institutions may want to proactively prepare reasoned and scientifically/medically supported explanation for how the adopted criteria further important educational objectives. If you feel that sport-specific regulations will be important, look to the international federation and national governing body publications to determine if sufficient evidence exists to justify imposition of criteria to limit participation in the specific circumstances contemplated." *Id.*

[46] 88 Fed. Reg. at 22,873.

U.S. Department of Education
May 15, 2023
Page 18

for women to play these contact sports. But it's hard to see the same being true for men in women's sports. Because of their natural advantages over women, plenty of males will easily meet the physical requirements to join and to be competitive on female teams. Males are already successfully competing in women's sports in surprisingly high numbers because of the Department's illegal 2021 Title IX mandate and similar approaches taken by other bodies. There is no comparable phenomenon of women successfully competing in men's sports during this same timeframe. And because the Department will consider the level of competition and risk of injury lower in women's sports, its balancing test will require schools to let men play—any exclusion will be "stereotypical."

The practical consequences of this test will not merely destroy competition on female teams, it will remove the most competitive categories of female sports teams from athletic programs. Under the sports rule, schools may either assume major litigation risks from the Department or they may assume major injury risks for women on their teams. To solve this dilemma, they will inevitably cut female sports teams in which size and strength advantages matter—spelling the end of the most competitive and athletic forms of female sports. Because schools do not want to lose federal funding or pay out large personal injury claims, most schools will be pressured by insurers to sunset female teams in any categories of sports where biological males pose an elevated injury threat to women (such as contact sports like football, soccer, basketball, volleyball, hockey, and rugby). And schools will be pressured to maintain female teams only in categories of sports without as much of a risk of contact (such as archery, bowling, dance, trivia, and video gaming).

But the proposed rule imposes even greater injustice. The balancing test has one more step: the sports rule also requires colleges to review their athletics programs *as a whole*[47] to ensure students have equal access based on gender identity to athletics opportunities across sports. That means, that if schools want to keep *any* sex-separated teams, *other* teams will have to be abandoned to get the balance right—putting even more female teams on the chopping block.

Finally, this balancing test is made even more unpredictable and idiosyncratic when the Department, without explanation, proposes to allow for students to identify not merely as the opposite sex, but also as nonbinary, as a member of neither sex, or as a member of more than one sex.[48] This (and the long list of other possible often-fluid identities) raises the specter that a student could seek the right to participate on both a male and a female team, if the student so

---

[47] *E.g.*, 88 Fed. Reg. at 22,863, 22,867, 22,878, 22,880, 22,889.

[48] 88 Fed. Reg. at 22,869.

U.S. Department of Education
May 15, 2023
Page 19

identifies; that a student could require creating an entirely new team for each gender identity; that a student could often change teams; and that a student could constantly require a school to reassess and re-justify its rationales, criteria, and balance of teams. But any third or new categories of sports teams would take away resources and visibility from female sports, threatening even more unfairness.

### C.      The sports rule's balancing test is atextual and lawless.

This entire proposed balancing test lacks any sound legal policy principles—the sports rule's approach has no grounding in Title IX or any other coherent source of law. None of these rules or limits are found in Title IX. The Department is just making everything up as it goes along.

In fact, never does the sports rule justify including males on female teams in the first place as a sound approach under Title IX—instead, the Department treats that question as a settled issue. The Department assumes that the question is closed from its previous statements,[49] or from the prior proposed rule,[50] or from some selectively cited district court or circuit court opinions,[51] rather than conducting its own textual analysis of Title IX. The Department acknowledges the existence of adverse court opinions like *Adams* or *B.P.J.*, but it never engages their reasoning or authorities, and it never explains why its favorite court opinions are right and why all the others are wrong. The doctrine of reasoned decision-making requires that the Department give notice of its rationale by offering some reason why certain opinions are right and others are wrong—as opposed to just reciting lots of cases and saying which ones it's going with.

Much of the sports rule's preamble essentially concedes that *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), does not apply to Title IX—making arguments that admit that *Bostock*'s hermeneutic does not apply to an equal opportunity statute protecting women's rights. Every time the Department states that schools can, but need not, adopt sex-specific criteria, the Department implicitly concedes that *Bostock* does not govern.[52] And every time it describes how male and female athletic teams are "unique circumstances," it concedes that sports are not like employment.[53] The Department vaguely says that declining to recognize a

---

[49] 88 Fed. Reg. at 22,865.

[50] *E.g.*, 88 Fed. Reg. at 22,866, 22,876.

[51] *E.g.*, 88 Fed. Reg. at 22,868, 22,871–73, 22,877.

[52] *E.g.*, 88 Fed. Reg. at 22,860, 22,871 ("[T]he proposed regulation would not prohibit a recipient's use of sex-related criteria altogether.").

[53] *E.g.*, 88 Fed. Reg. at 22,862, 22,866–67, 22,888–90.

U.S. Department of Education
May 15, 2023
Page 20

gender identity is the same as punishing gender non-conformance,[54] but it does not explain how Title IX addresses that concept either.

Nor is there anything in the current regulation that extends Title IX to gender identity or requires the sports rule's balancing test. The Department claims that the current regulation "say[s] that a recipient must still provide equal opportunity in its athletic program as a whole."[55] But this is incomplete at best. The regulation says that schools must provide equal opportunity "for members of both sexes," not that schools must provide equal opportunity generally or on a gender-identity theory. Title IX isn't about fairness and safety generally in sports. It's about fairness and safety for women and girls by sex (not by gender identity), because females have been historically disadvantaged in educationally sponsored athletics.

Elsewhere, the Department recognizes that under its current regulation "a recipient's provision of male and female teams *can advance rather than undermine* overall equal opportunity in the unique context of athletics *by creating meaningful participation opportunities that were historically lacking for women and girls*."[56] In other words, the Department admits that the current regulation imposes a duty to provide equal opportunity to students in a sex-based, sex-conscious way—by female-only teams to remedy past and systematic discrimination—not by imposing gender identity ideology. That is why the Department recognizes that under its current regulation "an institution would not be effectively accommodating the interests and abilities of women if it abolished all its women's teams and opened up its men's teams to women, but only a few women were able to qualify for the men's team."[57]

Introducing a balancing test into this regulation departs from the current regulation's clear rules that do not involve any values-based policy balancing. The current regulation has a simple standard requiring schools to allow female teams if there are male teams.[58] In service of that simple rule, it includes a multi-factor analysis for the factual question of whether males and females have an equal

---

[54] *E.g.*, 88 Fed. Reg. at 22,868, 22,871.

[55] *E.g.*, 88 Fed. Reg. at 22,863, 22,867, 22,878, 22,880, 22,889.

[56] 88 Fed. Reg. at 22,877 (citing 1979 Policy Interpretation, 44 Fed. Reg. 71,421) (emphasis added).

[57] 88 Fed. Reg. at 22,863 (citing U.S. Dep't of Health, Educ., and Welfare, Office for Civil Rights, *Sex Discrimination in Athletic Programs*, 40 Fed. Reg. 52655, 52656 (Nov. 11, 1975)). As explained above, this regulation is binding by congressional acquiescence, which is why the sports rule cannot change it to require the abolition of women's teams.

[58] 34 C.F.R. § 106.41(c).

U.S. Department of Education
May 15, 2023
Page 21

number of various program components. In contrast, with an equal-protection style balancing test the very existence of the legal rule depends on weighing intangible policy, interests, and values determinations—something very different from factual comparisons about the number of playing fields, salaries of coaches, or amount of athletic equipment allotted between male and female teams.[59] The key to understanding what is novel in the sports rule is what the Department is comparing or evaluating under its proposed balancing test, not the mere fact that under the current regulation schools must have an equal balance of opportunities between male and female teams.

In short, *everything* in the current regulation counsels against the sports rule. The Department admits that women suffered prior disadvantages and it admits that Title IX in the sports context seeks to provide equal opportunity for women. So the Department has all but conceded that changing this regulation and enacting the sports rule conflicts with Title IX because it lessens the opportunity for women by including men who identify as women.

What's more, the sports rule even conflicts with the Department's own proposed (but not yet finalized) Title IX rule. That rule generally prohibits "a policy or practice that prevents a person from participating in an education program or activity consistent with their gender identity" and says that it applies in any situation where the exclusion "subjects a person to more than de minimis harm on the basis of sex."[60] But this sports rule equates any exclusion with more than de minimis harm.[61] And the sports rule's balancing test does not incorporate the "de minimis" harm standard at all, instead allowing sex-separated teams even if they may cause some students more than de minimis harm.

The only possible legal policy principles behind the balancing test appear to be from the equal-protection context. But Title IX is a statute with simple and longstanding rules, especially in athletics. Title IX seeks to promote women's equal opportunities, not to create a roving form of scrutiny for protected classes that were never approved by Congress in this statute. The Equal Protection Clause is simply irrelevant to Title IX. Even the Department admits that "the scope of Title IX differs from the scope of the Equal Protection Clause."[62]

---

[59] *E.g.*, *Daniels v. Sch. Bd. of Brevard Cnty., Fla.*, 985 F. Supp. 1458, 1462 (M.D. Fla. 1997).

[60] *E.g.*, 88 Fed. Reg. at 22,866, 22,876–77.

[61] 88 Fed. Reg. at 22,877.

[62] 88 Fed. Reg. at 22,867.

U.S. Department of Education
May 15, 2023
Page 22

Not only is the proposed equal-protection framework irrelevant to what Title IX requires, the Department gets the equal-protection framework wrong. It adopts the wrong equal-protection standards and then warps them beyond recognition. Sex discrimination is subject to intermediate scrutiny, not strict scrutiny. But the sports rule's new regulatory text essentially provides for heightened scrutiny of a sex-separated team. That is the wrong standard. Dividing sports by biological sex easily meets the correct equal-protection standard of intermediate scrutiny, as many appellate courts have held.[63] Moreover, an equal-protection challenge to sex-separated sports teams arguably presents merely an under-inclusiveness challenge: a male who identifies as female is not seeking to end all sex classifications, but is seeking access to the sex-based benefit of being on a girls' sports team and of competing against girls.[64] A school's adoption of male and female teams is subject to the heightened scrutiny that applies to sex-based policies, but an under-inclusiveness challenge to eligibility criteria arguably receives only rational-basis review. And a school does not act irrationally when it defines sex biologically for sports.

Another legal complication is that the Department's preamble anticipates a broad role for athletic associations like the National Collegiate Athletic Association ("NCAA") to set standards for association member institutions. Indeed, much of the analysis proceeds on the mistaken presumption that "the NCAA or similar national athletic associations" alone get to set the rules for intercollegiate sports teams, and that these rules will be just fine under Title IX.[65] The Department does not explain how the NCAA's standards meet its balancing test and it does not consider conflicts between these standards and its balancing test, casting doubt on this presumption. But even assuming that the Department would allow the existence of NCAA standards to supersede the balancing test, or to presumptively satisfy the test, the Department would run headlong into another constitutional problem: improper delegation of federal rulemaking standards to a private entity.[66] Title IX requires schools to follow Title IX—the NCAA's existence or beliefs gives neither schools nor the Department an excuse to violate the statute.

---

[63] Alabama Amicus Br., *A.M. v. Indianapolis Pub. Schs.*, No. 22-2332 (7th Cir. Sept. 13, 2022), attached as ADF Ex. 45.

[64] *See also* Ed Whelan, *Transgender Bathroom/Sports Claims Are Underinclusiveness Challenges*, (Jan. 18, 2023), https://www.nationalreview.com/bench-memos/transgender-bathroom-sports-claims-are-underinclusiveness-challenges/, attached as ADF Ex. 165.

[65] 88 Fed. Reg. at 22,880, 22,869, 22,875–76, 22,880, 22,883, 22,885–86.

[66] *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 668 (D.C. Cir. 2013).

U.S. Department of Education
May 15, 2023
Page 23

### D.     The sports rule's balancing test lacks evidence.

The difficulty of meeting these balancing tests and retaining sex-separated sports also flies in the face of evidence before the Department—evidence that the Department agrees justifies some sex-separation in sports out of fairness concerns or to prevent injury.

The Department recognizes in the preamble that sex is not a stereotype. At times, the sports rule agrees that sex is real, sex characteristics are real, and that there are in theory valid ways of determining sex, such as various identity documents from birth.[67] The sports rule proposes to limit the use of these valid sex-related criteria if it conflicts with its broader goal of allowing students to join teams based on their gender identity.[68]

But the Department never explains why sex discrimination provisions in Title IX require students to be allowed to play sports based on gender identity that contradicts the student's sex. Nor does it explain why physical sex advantages, including pre-puberty advantages by sex, do not matter in athletics.[69] The Department never explains why it can ignore the evidence showing that male and female physiology differs at each age, that there is a risk of injury and unfairness to girls at all ages if they play against males, and that in general sex-separated educational activities have educational benefits. Instead, the Department just seems to assume that the use of biological characteristics related to sex is an impermissible stereotype—and then it only applies that conclusion against persons who identify other than as their sex.[70] The Department says that it is a stereotype to consider the physical abilities of all persons identifying as other than their sex to be the same.[71] But the Department allows what it calls "overbroad generalizations" about the characteristics of men who identify *as men*—so why can schools not use those "generalizations" for men who identify as women? How does this treatment of all sex distinctions as "overbroad generalizations" unconnected to individual skills

---

[67] 88 Fed. Reg. at 22,871.

[68] 88 Fed. Reg. at 22,871.

[69] *See, e.g.*, USA Swimming, 2021-2024 National Age Group Motivational Times, Long Course Meters (Oct. 1, 2020), https://www.usaswimming.org/docs/default-source/timesdocuments/time-standards/2024/2021-2024-national-age-group-motivational-times.pdf, attached as ADF Ex. 166.

[70] 88 Fed. Reg. at 22,872, 22,876.

[71] 88 Fed. Reg. at 22,873–74.

U.S. Department of Education
May 15, 2023
Page 24

not spell the end of all biological distinctions in sports in favor of the Department's preferred general objectives of "inclusion," "fairness," or "safety"?

The Department recognizes in the preamble that fairness and safety interests are valid, but its treatment of these concerns is inconsistent. The sports rule acknowledges the benefits of athletic participation for all students (although it casts these benefits at a general level rather than as a right of women and girls to have fair and safe competition), and it acknowledges that "fairness in competition may be particularly important for recipients in some sports, grade and education levels, and levels of competition."[72] The Department recognizes that the size and strength advantages associated with male puberty can increase the risk of a sports-related injury to women in contact sports and so it agrees that problems arise when male athletes compete against females at high levels of female competition, which disadvantages women competing for scholarships and limited spots on highly competitive teams. If this is the case—if fairness and safety for women matters—it applies at all levels of competition, and the sports rule is arbitrary by making it virtually impossible to keep teams sex-separated at virtually any level of competition.

The mounting evidence of the harm to women and girls from allowing males to play on female sports teams is why sporting organizations around the world are reconsidering allowing males to play on females' teams, reversing the trend of allowing males to take female opportunities.[73] The new World Athletics policy, for instance, is an example of an international sporting body evaluating the risks that women face when competing with males, and realizing that it is necessary to bar males from women's sports if they have experienced any part of puberty.[74] This

---

[72] *E.g.*, 88 Fed. Reg. at 22,860–61, 22,872 ("The Department recognizes that prevention of sports-related injury is an important educational objective in recipients' athletic programs and that—as courts have long recognized in cases involving sex-separate athletic teams— fairness in competition may be particularly important for recipients in some sports, grade and education levels, and levels of competition").

[73] 88 Fed. Reg. at 22,869–70 (collecting policies).

[74] World Athletics, *Rule C3.5: Eligibility Regulations For Transgender Athletes (Version 2.0, approved by Council on 23 March 2023, and coming into effect on 31 March 2023), in Book of Rules*, https://www.worldathletics.org/download/download?filename=ace036ec-a21f-4a4a-9646-fb3c40fe80be.pdf&urlslug=C3.5%20-%20Eligibility%20Regulations%20Transgender%20Athletes, attached as ADF Ex. 167. Of course, rules such as these are not perfect—a better policy is a clear line between the sexes, so that no policy incentivizes any use of puberty blockers on children—but the growing adoption of these revised policies are a step in the right direction. The Department should not buck this trend.

U.S. Department of Education
May 15, 2023
Page 25

policy is supported by an extensive body of research, such as an article that was recently published in the area of sports science: "Should Transwomen be Allowed to Compete in Women's Sports?" The article (co-authored by expert Dr. Gregory A. Brown) examines the biological basis of sex, provides an overview of sex differences in sports performance, and then discusses the effect of testosterone suppression and puberty blockers.[75] And this trend gives the lie to the Department's assumption that all sports body policies will move in the direction of maximizing participation based on gender identity.[76]

The Department also tries to wave away the effect of this rule, claiming that the number of males seeking to play female sports is relatively low and incredibly small.[77] But this claim is both irrelevant and false. A 2021 study suggests that the rate of transgender identification among America's youth may be as high as 9 in 100.[78] Title IX does not allow the deprivation of equal opportunities for what the Department arbitrarily deems a "small" number of female athletes. And current evidence shows much higher and increasing rates of male participation in female sports under the gender identity ideology that this rule would impose. The fact that Title IX's existing rules prohibit letting men compete in women's teams and leagues, and the fact that so many states prohibit males from participating in female sports in obedience to those rules, and the fact that the Department's 2021 gender identity mandate under Title IX is enjoined, all explain why there are not yet more male interlopers in female sports. But this rule would change those numbers drastically. It is arbitrary and capricious for the Department to justify this rule based on an allegedly small number of instances of male participation in female sports when this rule would open the floodgates to that participation.

---

[75] Gregory A. Brown Ph.D., Professor of Exercise Science, Physical Activity and Wellness Laboratory, Department of Kinesiology and Sport Sciences, University of Nebraska Kearney & Tommy Lundberg Ph.D., Assistant Senior Lecturer, Department of Laboratory Medicine, Division of Clinical Physiology, Karolinska Institutet, Stockholm, SWE, *Should Transwomen be Allowed to Compete in Women's Sports?: A View From an Exercise Physiologist*, Sport Policy Center, https://www.sportpolicycenter.com/news/2023/4/17/should-transwomen-be-allowed-to-compete-in-womens-sports, attached as ADF Ex. 168.

[76] 88 Fed. Reg. at 22,883.

[77] 88 Fed. Reg. at 22,884.

[78] William Malone, *Time to Hit Pause on 'Pausing' Puberty in Gender-Dysphoric Youth*, Medscape (Sept. 17, 2021), https://wb.md/3D4IVf5. In addition, by making a faulty assumption about the low numbers of males identifying as females (and vice versa), the sports rule undermines its own basis for existence by showing that there is no need numerically for the new rule.

U.S. Department of Education
May 15, 2023
Page 26

### E.      The sports rule's balancing test is arbitrary and incoherent.

At the same time, if the Department were correct that Title IX addresses gender identity, there is little logical ground in the statute to use balancing tests at all—tests invented out of whole cloth for the first time in this rule.

Rather than have one rule that applies to everyone, a balancing test in the gender-identity context invites arbitrary, uneven, and inconsistent enforcement. No one can predict what a school will, must, or may do. That lack of clarity is unfair for everyone. When the Department assesses so many policies and supporting rationales on a case-by-case basis under such a loose balancing test, it seems possible that the Department will accept some rationales but not others for policies that do the same thing. Female athletes will ask why federal civil rights protections allow them to have their own teams in some states and at some schools, but not in others.

And given that the proposed rule (without evidence) wrongly likens "participating in sports on teams that contradict one's gender identity . . . to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical,"[79] and describes what it sees as various harms from not allowing students on teams by gender identity,[80] and given that the sports rule wrongly says that medical opinion considers "social transition" of minors to be "crucial" for their self-esteem and mental health,[81] the sports rule will not satisfy even its own favored activists, who will seize upon this language to get a court to vacate as inconsistent and arbitrary even a slim possibility of allowing schools to protect sex-separated sports. They will no doubt pursue litigation claiming that any exclusion of males from female sports is a strong dignitary or other mental harm that every school must avoid under the sports rule.

At the same time, the sports rule requires schools to allow males who identify as females to be admitted into most female teams, but the rule makes no allowance for schools allowing males who identify as males onto female teams—retaining all the prior rules for those cases. That effect constitutes "discrimination" against certain men based on gender identity, under the Department's own theory, because in that case males who identify as males receive less favorable treatment than

---

[79] 88 Fed. Reg. at 22,871.

[80] 88 Fed. Reg. at 22,870–71, 22,877.

[81] 88 Fed. Reg. at 22,879–80. For the reasons set forth in ADF's prior Title IX and Section 1557 comments and attachments, these harms rest on a lack of solid scientific and medical evidence; the better treatment for gender dysphoria in children is watchful waiting.

U.S. Department of Education
May 15, 2023
Page 27

males who identify as females. That is literally "gender identity discrimination." Yet the ostensible point of the sports rule is to prohibit gender identity discrimination.[82] The sports rule is therefore self-contradictory and incoherent.

Of course, the current regulation does not require schools to make decisions by gender identity, requires sex-based distinctions including female-only sports and teams, and generally prohibits unequal treatment of the sexes. So the statute does not draw any distinctions by gender identity.[83] But because the Department rejects that interpretation, it cannot coherently explain why under this rule males who identify as males can be legally disfavored to males who identify as females under Title IX.

In short, this rule's entire approach is unworkable, lawless, incoherent, and arbitrary. And women's sports will suffer the effects.

**III.     The sports rule is not entitled to judicial deference.**

For some time, it appeared that the Department might not issue any Title IX rulemakings, as instead the Department issued "guidance" to avoid the hassle of notice-and-comment rulemaking. But the Department is now re-promulgating the guidance's sports mandate through its twin rulemakings. It seeks to make its mandate binding nationwide and eligible for *Chevron* deference—so that federal courts never consider whether Congress in fact sought to end women's sports when it passed Title IX. When the Department sought to impose the same mandate during the Obama administration, it claimed *Chevron* deference for its view of Title IX,[84] and it claimed *Auer* deference for its view of its binding regulations.[85]

But the Department cannot look to deference to save the sports rule. The proposed rule's balancing test lacks any basis in statutory text, and it conflicts with Title IX and the Constitution. Title IX does not address gender identity; indeed, allowing males onto females' teams violates Title IX. There is thus no ambiguity for a court or an agency to construe, and there is no reason for any court to give the Department deference under any existing standard.

---

[82] 88 Fed. Reg. at 22,877.

[83] 88 Fed. Reg. at 22,871.

[84] *Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016).

[85] *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 721 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017).

U.S. Department of Education
May 15, 2023
Page 28

And there is now a new and further reason why the Department likely will be unable to resort to agency deference. Since the rulemaking began, the Supreme Court agreed to hear *Loper-Bright Enterprises v. Raimondo*, a case reconsidering *Chevron* deference or restricting its scope.[86] ADF filed an amicus brief in this *Chevron* case on behalf of Christian Employers Alliance, explaining that unelected, unaccountable bureaucrats are weaponizing federal laws such as Title IX to violate Americans' most fundamental rights.[87] The Biden administration's radical agenda, whole-of-government approach thus merits no deference from the courts. The Department thus should consider the eventual decision in this case and address the arguments in ADF's attached brief. It should face the realistic prospect that the Supreme Court is posed to rein in unaccountable bureaucrats, overrule *Chevron v. Natural Resources Defense Council,* and affirm that courts should not defer to federal agencies when they overstep their executive authority and violate the freedoms the First Amendment protects for all Americans.

## IV.    The Department should protect female athletes.

The Department should abandon this rule, the 2022 proposed Title IX rule, and the 2021 Title IX mandate, and leave in place the existing Title IX regulations and guidance to protect female athletes.

### A.    The Department should not force schools to put males in female sports.

The Department has a duty to consider alternatives to its proposed rulemaking, and here, the proper alternative to adopt is one of no action. Taking no action will leave in place the current framework of Title IX, which obligates the Department to protect women's equal opportunities by ensuring that women and girls need not compete against males.

---

[86] *Loper Bright Enterprises v. Raimondo*, No. 22-451, 2023 WL 3158352, at *1 (U.S. May 1, 2023) (memorandum opinion granting review on Question 2 presented by the petition for a writ of certiorari, i.e., whether "the Court should overrule *Chevron* or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency"). In addition, the Supreme Court's decision to hear *Loper Bright* warrants allowing additional public comment on that question after that case is decided in a supplemental period and in favor of delaying any final rulemaking until after the Court issues its decision.

[87] ADF Amicus Br., *Loper-Bright Enterprises v. Raimondo*, No. 22-451 (U.S. Dec. 15, 2022), attached as ADF Ex. 169.

U.S. Department of Education
May 15, 2023
Page 29

The Department thus should not adopt the proposed rule as written, should not proceed with its fall Title IX rulemaking, and certainly should not adopt any version of the sports rule that would allow or require males to play on female teams. Some activists have criticized the proposed rule for not requiring every school to allow every male to play on every female sports team if they so identify. But no version of the final rule should force schools to put males on females' teams or to give them access to females' private spaces, in whole or in part, as a categorical rule or under any form of a balancing test.

**B.    The Department should enforce Title IX and protect female athletes.**

Furthermore, even if the Department adopts the proposed rule, the Department should change the proposed rule to protect women's sports.

*First*, the Department could make clear in the regulatory text and in the preamble that the rule does not require any school to violate state law. Just because a regulated entity receives federal funding does not mean that the entity or the Department should be free to set aside or preempt state law. Withdrawing educational funding will be catastrophic, and therefore the Department should allow schools to disregard this rule if they must do so to follow state law.

*Second*, the Department should also factor this federalism dynamic into its cost-benefit analysis, its regulatory impact analysis, and its (almost non-existent) federalism analysis[88]: the reliance interests at stake are federal funding for the entirety of 21 states and counting—a far cry from the merely $23–24 million or so in compliance costs that the Department naively anticipates on the mistaken belief that every school and state will abandon state law and female athletes.

No analysis is accurate that assumes that schools and states can or will participate contrary to state law. Indeed, the Department's failure to address these reliance interests—reliance interests to the tune of hundreds of billions of dollars in federal funding—makes its rulemaking lack reasoned decision-making. If the Department has not considered the reliance of schools, states, and students on their continued ability to access education funding, it has failed to consider an important factor and is procedurally invalid. And, indeed, these massive reliance interests are why the major questions doctrine and the federalism clear-notice canon apply to this rulemaking, requiring a more limited interpretation of Title IX in accord with its unmistakable meaning at the time of enactment.

---

[88] 88 Fed. Reg. at 22,890.

U.S. Department of Education
May 15, 2023
Page 30

In other words, the Department must estimate that many states would rather abandon federal educational funding than comply with this lawless imposition of Title IX. This rule's economic estimates must calculate not only the loss of that funding but the harms that will result to all students and to society when that funding is abandoned.

*Third*, the Department should remove any requirement to justify sex-separated athletics and facilities under a balancing test or to document reasons for retaining sex-separated athletics or facilities. As is, the proposed rule's balancing test requires a mountain of bureaucratic paperwork for each student who is placed against their wishes in a sex-separated category of athletics (a paperwork burden that the Department overlooks in its regulatory impact analysis). This paperwork requirement has no basis in the statutory text; it introduces a lack of clarity and predictability; and it threatens to induce schools to throw up their hands, avoid any litigation risks, and simply abandon sex-separated athletics.

The Department should also state that there is no requirement to cut sports teams to achieve any form of balancing across sports teams, such as to compensate for female teams on which males are not allowed to play. Another alternative the Department should consider is to provide that a fully acceptable (and indeed, legally required) way to minimize harms to students excluded from teams of the opposite sex is to allow those students to compete on or try out for the team of their own sex. Another alternative to consider is to explain whether the adjustment period in the current regulation will extend to compliance with any amendments made by the sports rule, effectively giving schools a three-year grace period for compliance. The Department could also consider the alternative of grandfathering existing programs and policies.

*Fourth*, the Department could issue a rule that does not contradict the existing Title IX rules and standards, but more strictly enforces them. For example, the Department could define sex, women, girl, female, and gender, to provide for their biological binary meanings at the time of Title IX's enactment consistent with the existing rules, and to exclude gender identity ideology from those definitions. This step would ensure that officials cannot redefine terms at will, and it would ensure that the regulations' text aligns with the correct legal meaning. Under such a rule, recipients of federal funds that allow males to compete on female teams using gender identity ideology would know they are violating Title IX and risk federal funding.

*Fifth*, it is far past time for the Department to enforce Title IX in the way it was written—to take action against states and schools that allow males to take away females' athletic opportunities. Before President Biden took office, the Department was processing and acting on complaints that males were taking away

U.S. Department of Education
May 15, 2023
Page 31

females' Title IX athletic rights. The Department should reinstate these enforcement actions, act on all complaints, and enforce the existing law to protect women's sports.

**V.      The Department's regulatory redefinition of sex discrimination is procedurally unlawful.**

To return to the beginning: the sports issue does not exist in isolation from the broader problems with reinterpreting Title IX in education. Many aspects of education are interrelated under Title IX. Allowing males onto female athletic teams will harm women's privacy and dignity in locker rooms, shared showers, overnight hotel rooms, and other private spaces; will create conflicts with the parental rights, due process rights, free speech rights, and free exercise rights of students, teachers, schools, states, and families; and threatens to create facilities and litigation costs far beyond the regulatory impact analysis' estimate because schools will need to act to protect women and girls—like cutting "unbalanced" sports teams, renovating shower and locker room facilities, and paying far more for increased privacy protections, like separate hotel rooms.

Reasoned decision-making requires that, whenever the Department decides whether Title IX includes gender identity, it considers *all* these issues (issues that involve significant reliance interests) because they are all interrelated: deciding that Title IX addresses gender identity does not make a decision just about sports or admissions or discipline or facilities or just about one other aspect of education. It makes a decision about them all.

It is arbitrary and capricious for the Department to ignore these interrelated issues, reliance interests, and costs. They must be considered together as part of any Title IX rulemaking on gender identity—whether in the Title IX rulemaking or in this sports rulemaking. The Department cannot engage the sports question in isolation. But it seems almost certain that the Department seeks to shirk this duty of reasoned decision-making.

Something fishy is going on with the Biden administration's Title IX twin rulemakings on Title IX and women's sports. Rather than engaging in one, unified comprehensive form of reasoned decision-making, the Department has attempted a regulatory two-step. This two-step consists of: (1) issuing a broad gender identity rule that applies across the board—including to sports—while deferring any reasoned decision-making about its application to sports, and then (2) issuing a sports rule that finds the inclusion of gender identity as to sports a *fait accompli*, not open to reasoned consideration or comment, including as to its interaction with other aspects of education.

U.S. Department of Education
May 15, 2023
Page 32

Make no mistake: the Department acted in bad faith by deterring public comment on women's sports in the Title IX rule in 2022. The public was told last year not to comment about sports, and instead to comment only on the forthcoming sports rule about the application of Title IX's sex discrimination provision as to women's sports. The Department's press releases, fact sheet, and notice to the public in the Title IX rule did not solicit comment on this important and high-profile issue and instead said that the Department would issue separate proposed regulations to address "whether and how" to amend the current regulations on sex-specific athletics and "the question of what criteria, if any, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team." The Department even said that it did not then propose to change current Title IX regulations, under which schools may "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." The Department expressly discouraged comments on "this issue," saying that they are beyond the rule's scope, and thus signified that they will not be considered.[89]

But then, when the sports rule came out, not only was the comment period shorter, the sports rule treated the meaning of sex under Title IX as applied to sports as a done-deal, not conducting any textual analysis itself and just selectively citing cases that held that Title IX requires this outcome.[90] The only explanation for this separate rulemaking was to evade public participation and accountability by removing the most controversial issues from notice and comment in the initial Title IX rule, and then hoping to do the same on the sports rule.

This process not only deterred public participation, it failed to provide the required notice of the Department's reasoning. Under the Administrative Procedure Act, 5 U.S.C. § 553, the Department must acknowledge changes are being made, offer good reasons, and address reliance and religious freedom interests.[91] But nowhere does the 2022 Title IX proposed rule's notice offer a statement about its effect on women's sports, consider reliance interests, or provide a rationale for such

---

[89] 87 Fed. Reg. 41537. The notice states: "the Department plans to address by separate notice of proposed rulemaking the question of what criteria, if any, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team. The scope of public comment on this notice of proposed rulemaking therefore does not include comments on that issue; those comments should be made in response to that separate rulemaking."

[90] *E.g.*, 88 Fed. Reg. at 22,877.

[91] *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020).

U.S. Department of Education
May 15, 2023
Page 33

a change to women's sports—all of which is necessary to give the public adequate notice. Such "notice" as the Department provided—an effort to tell the public not to comment on this rule as to sports—was inadequate because it does not "fairly apprise interested persons of the nature of the rulemaking" by disclosing the Department's *action and rationale*.[92] When a notice states a "proceeding was limited to changing" one part of a standard and provides a "substantive sections focus entirely" on that part, the notice is inadequate to reasonably inform the public the Department proposes to change another part.[93] The Department has thus failed its duty to give proper notice and to reasonably explain its Title IX rule's effect and rationale.[94]

Nor can the Department claim that this cynical omission was harmless. To be sure, many members of the public still submitted comments about women's sports. But courts only "rarely" find harmless error for failure to provide notice for a comment opportunity.[95] And courts have "repeatedly" rejected the idea that "because at least a few parties to the rulemaking did in fact comment upon the question" the notice must have been adequate.[96] "[T]he comments received do not cure the inadequacy of the notice given."[97]

Because the Department never addressed Title IX's application to sports in its 2022 Title IX rule, either on athletic extracurricular teams or physical education classes, nothing it can do in the present 2023 sports rule can cure that lack of notice.[98] No "post hoc rationalizations" are permitted to defend agency actions, and when offered, they "are not properly before" a court.[99]

The Department has acted in bad faith—for the sole purpose of dissuading and limiting public participation in rulemaking. The APA forbids such bad-faith

---

[92] *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1221 (D.C. Cir. 1980) (cleaned up).

[93] *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1141 (D.C. Cir. 1995).

[94] *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

[95] *Texas Med. Ass'n v. HHS*, No. 6:21-cv-425-JDK, 2022 WL 542879, at *13 (E.D. Tex. Feb. 23, 2022).

[96] *MCI*, 57 F.3d at 1142.

[97] *Id.*

[98] *Dep't of Homeland Sec.*, 140 S. Ct. 1891.

[99] *Id.* at 1909.

U.S. Department of Education
May 15, 2023
Page 34

gamesmanship with the public.[100] In the sports rule, the Department has given "an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process."[101]

Whichever rule the Department finalizes first—the Title IX rule or this sports rule—is thus invalid on these grounds. Neither rule gave proper notice or consideration of all of these interrelated interests. And there is no way to sequence the issuance of these rules to cover for these omissions. On the one hand, the Title IX rule lacks crucial consideration of sports. On the other hand, the sports rule lacks crucial consideration of every other aspect of Title IX. Whichever rule seeks to establish sexual orientation and gender identity as a protected class fails the requirements of reasoned decision-making by failing to address significant issues in the preamble so that the public could comment on the Department's rationales. The Department should republish a comprehensive proposed rule addressing Title IX in its totality before proceeding with rulemaking on these topics.

## VI. The Biden administration torched bipartisan norms for good government when it rushed the proposed sports rule.

The Department shattered bipartisan norms governing public participation in the regulatory process when it rushed this rule out without allowing for pre-publication regulatory review, a reasonable comment period, or transparency into its rulemaking procedures.

### A. The Biden administration has abandoned longstanding, norms allowing for public participation in pre-publication regulatory review.

In its rush to advance this Title IX sports rule, the Biden administration has taken the extraordinary step of jettisoning longstanding, bipartisan norms governing the pre-publication regulatory review process.

The *same day* as the proposed rule was published on the Department's website, the White House announced that it would no longer abide by the pre-publication regulatory review process that has governed rulemakings of both

---

[100] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

[101] *Id.* at 2575.

U.S. Department of Education
May 15, 2023
Page 35

parties for decades.[102] Under this pre-publication regulatory review process, rules of great policy significance, like the sports rule, would be subject to review by nonpartisan economic experts in the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA) for at least three months, and interested parties may request meetings with the Office of Management and Budget (OMB) and other relevant federal agencies to provide input the agency must consider before the regulations are unveiled as proposed or final rules. But the sports rule was before OIRA for one week and no meetings occurred with the public. Then, the same day, the White House announced a new Executive Order and a series of new OIRA rules to provide that thus rushed, partisan regulatory review process would now be the norm—all under the guise of "modernizing" regulatory review.[103]

Without this robust public participation, the administration's rulemakings are more likely to be ill-conceived and vulnerable to judicial vacatur in litigation on substantive and technical grounds.

B.      The Department's comment period is impermissibly brief and designed to evade robust public participation.

The Department has also signaled that it does not intend to engage in a good-faith comment process in another way: by setting an unusually short comment period. The legal, financial, and equal opportunity implications of this proposed rule are monumental. And the Department discouraged comment on them in the 2022 Title IX public comment process. Thirty-two days is simply too short a timeframe in which to allow the public to comment on this sports rule.

The Department should extend the current May 15, 2023 deadline to July 12, 2023, which is 90 days after the Department published the proposed rule in the Federal Register, or it should reopen the comment period for a commensurate time. Thirty-two days is far too short. The "usual" length of time for comments is 90 days.[104] Usually, "at least 60 days" is necessary to "afford the public a meaningful opportunity to comment."[105]

---

[102] It is not a coincidence that this release was also late in the day before a holiday weekend—a weekend important to the Christian and Jewish religions, when the public's attention was likely elsewhere.

[103] White House, Modernizing Regulatory Review, https://www.whitehouse.gov/omb/information-regulatory-affairs/modernizing-regulatory-review/.

[104] *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011).

[105] Exec. Order 13563, 76 Fed. Reg. 3821, 3822-23 (Jan. 21, 2011).

U.S. Department of Education
May 15, 2023
Page 36

**C.     The Department should disclose its method of reading and responding to public comments.**

Given the rise of the appearance of impropriety raised by the rushed pre-publication regulatory review and by the surprisingly short period of public comment for this rule, the Department should identify any methods of sampling or other anomalies in the process. In the past, the Department has responded only to stakeholders on one side of the issue, never reaching out to the female athletes, schools, and states suing the Department over its unlawful reinterpretation of Title IX. And the Department ignored, for instance, the testimony of female athletes in listening sessions, preferring instead to credit only the testimony of its preferred activists.

Without reading every comment, and responding to significant comments, the proposed Title IX rule and the proposed sports rule will not comply with the APA. So the Department should identify and explain in the final rule's notice the size of any samples collected; each methodology used to select a sample; its de-duplication process; any self-imposed deadline or caps on hours; and the percentage of the sample actually reviewed. The Department should specifically identify whether the sample or its methodology rested on an estimate of what the Department or its contractor could accomplish under time and budget constraints that the Department had imposed on itself and its contractor.

The Department also should explain how its sample of unique and "pivot" comments is representative of the broader pool. If not, the Department must explain how it addressed the full range of significant issues. Any report from a contractor, including proposals on sampling, should be specifically disclosed in the docket for comment.

These efforts would help avoid the flaws in a similar high-profile rulemaking on these issues before the Department of Health and Human Services (HHS),[106] where HHS "fail[ed] either to review all unique public comments or to employ a methodology reasonably designed to capture the significant comments raised by the public."[107] HHS reviewed only a small fraction of the non-duplicative comments, did not employ a sampling methodology likely to produce an adequate sample of the comments received, and did not explain its use of sampling in the final rule.

---

[106] *See* 84 Fed. Reg. 63,831; 86 Fed. Reg. at 2,261.

[107] *See Facing Foster Care in Alaska v. HHS*, No. 21-cv-00308, ECF No. 4141 at *3–4, 6-9 (D.D.C. June 17, 2022). Ex. 1 to Declaration of Renee Cooper, HSAG, Summary of Comments – Final Report (Apr. 8, 2020), attached as ADF Exs. 170–172.

U.S. Department of Education
May 15, 2023
Page 37

## CONCLUSION

Girls shouldn't be spectators in their own sports. The Biden administration should withdraw this disastrous sports rule.

Respectfully Submitted,

Julie Marie Blake
Senior Counsel
ALLIANCE DEFENDING FREEDOM
ADF REGULATORY PRACTICE TEAM

Christiana Kiefer
Senior Counsel
ALLIANCE DEFENDING FREEDOM
ADF CENTER CONSCIENCE INITIATIVES

Enclosure: Exhibit List

U.S. Department of Education
May 15, 2023
Page 38

## **Exhibit List**

1. ADF Title IX Rule Comment—Lacks Legal Authority
2. ADF Title IX Rule Comment —Hurts Female Athletes
3. ADF Title IX Rule Comment —Harms Unborn Children
4. ADF Title IX Rule Comment —Undermines Parental Rights
5. ADF Title IX Rule Comment —Violates Free Speech, Religion
6. ADF Section 1557 Rule Comment—Main
7. ADF Section 1557 Rule Comment Attachment—*ACPeds* Attachments Part 1
8. ADF Section 1557 Rule Comment Attachment —*ACPeds* Attachments Part 2
9. ADF Section 1557 Rule Comment Attachment —EMTALA Attachment
10. ADF Section 1557 Rule Comment Attachment —Legal Attachments
11. ADF Section 1557 Rule Comment Attachment —*Tingley* Filings
12. ADF Section 1557 Rule Comment Attachment —Factual Attachments
13. Jocelyn Samuels, Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marq. Sports L. Rev. 11 (2003)
14. Michael E. Rosman, *Gender Identity, Sports, and Affirmative Action: What's Title IX Got to Do With It?*, 53 St. Mary's L. J. 1093 (2022)
15. ADF, *Allen v. Millington*, (D. Vt.), Complaint
16. *Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807, 833 (E.D. Tenn. 2022) (opinion).
17. *Tennessee v. United States Dep't of Educ.*, *World* op-ed.
18. *Tennessee v. United States Dep't of Educ.*, *FOX* op-ed.
19. *Tennessee v. United States Dep't of Educ.*, Intervention Order.
20. *Tennessee v. United States Dep't of Educ.*, Intervention Complaint.
21. *Tennessee v. United States Dep't of Educ.*, Exhibit A to Intervention Complaint.
22. *Tennessee v. United States Dep't of Educ.*, Exhibit B to Intervention Complaint.
23. *Tennessee v. United States Dep't of Educ.*, Exhibit C to Intervention Complaint.
24. *Tennessee v. United States Dep't of Educ.*, Opposition to Motion to Dismiss.
25. *Tennessee v. United States Dep't of Educ.*, State Appellees Brief.
26. *Tennessee v. United States Dep't of Educ.*, Intervenors-Appellees Brief Part 1
27. *Tennessee v. United States Dep't of Educ.*, Intervenors-Appellees Brief Part 2
28. *Tennessee v. United States Dep't of Educ.*, Intervenors-Appellees Brief Part 3
29. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of Thomas More Society
30. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of Institute for Faith and Family
31. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of Defense of Freedom Institute for Policy Studies

U.S. Department of Education
May 15, 2023
Page 39

32. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of American Civil Rights Project
33. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of Foundation for Moral Law
34. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of LONANG Institute
35. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of Mountain States Legal Foundation
36. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of Southeastern Legal Foundation
37. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of State of Texas
38. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of America First Legal Foundation
39. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of America First Legal Foundation Exhibit
40. *Tennessee v. United States Dep't of Educ.*, Amicus Brief of Women's Liberation Front
41. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (Eleventh Circuit en banc decision),
42. *Adams v. Sch. Bd. of St. Johns Cnty.*, Amicus Brief of ADF for Drs. Miriam Grossman et al.
43. *Barrett v. State*, No. DV-21-581-B (Mont. 18th Jud. Dist.), *appeal docketed*, No. DA 22-0586 (Mont. October 13, 2023) (ADF amicus brief)
44. *A.M. v. Indianapolis Pub. Schs.*, No. 22-2332, *appeal dismissed* 2023 WL 371646 (7th Cir. Jan. 19, 2023) (ADF amicus brief filed Sept. 13, 2022)
45. *A.M. v. Indianapolis Pub. Schs.*, No. 22-2332, *appeal dismissed* 2023 WL 371646 (7th Cir. Jan. 19, 2023) (Alabama amicus brief filed Sept. 13, 2022)
46. *B. P. J. v. W. Virginia State Bd. of Educ.*, *FOX* op-ed (March 2023)
47. *B. P. J. v. W. Virginia State Bd. of Educ.*, *Herald-Dispatch* op-ed
48. *B. P. J. v. W. Virginia State Bd. of Educ.*, *CNSNews* op-ed
49. *B. P. J. v. W. Virginia State Bd. of Educ.*, *National Review* op-ed
50. *B. P. J. v. W. Virginia State Bd. of Educ.*, *Daily Signal* op-ed
51. *B. P. J. v. W. Virginia State Bd. of Educ.*, *FOX* op-ed (January 2023)
52. *B. P. J. v. W. Virginia State Bd. of Educ.*, Intervention Motion
53. *B. P. J. v. W. Virginia State Bd. of Educ.*, Armistead Declaration
54. *B. P. J. v. W. Virginia State Bd. of Educ.*, Intervention Order
55. *B. P. J. v. W. Virginia State Bd. of Educ.*, Brown Expert Report
56. *B. P. J. v. W. Virginia State Bd. of Educ.*, Cantor Expert Report
57. *B. P. J. v. W. Virginia State Bd. of Educ.*, Carlson Expert Report
58. *B. P. J. v. W. Virginia State Bd. of Educ.*, Levine Expert Report

U.S. Department of Education
May 15, 2023
Page 40


59. *B. P. J. v. W. Virginia State Bd. of Educ.*, Intervenor MSJ Memo
60. *B. P. J. v. W. Virginia State Bd. of Educ.*, Intervenor MSJ Opposition
61. *B. P. J. v. W. Virginia State Bd. of Educ.*, Memo on excluding testimony of Janssen
62. *B. P. J. v. W. Virginia State Bd. of Educ.*, Memo on excluding testimony of Adkins
63. *B. P. J. v. W. Virginia State Bd. of Educ.*, Memo on excluding testimony of Safer
64. *B. P. J. v. W. Virginia State Bd. of Educ.*, Memo on excluding testimony of Fry
65. *B. P. J. v. W. Virginia State Bd. of Educ.*, Intervenor Reply Brief on MSJ
66. *B. P. J. v. W. Virginia State Bd. of Educ.*, Memo on excluding testimony of Carlson
67. *B. P. J. v. W. Virginia State Bd. of Educ.*, Memo on excluding testimony of Brown
68. *B. P. J. v. W. Virginia State Bd. of Educ.*, Memo on excluding testimony of Cantor
69. *B. P. J. v. W. Virginia State Bd. of Educ.*, Memo on excluding testimony of Levine
70. *B. P. J. v. W. Virginia State Bd. of Educ.*, Supplemental Expert Report of Brown
71. *B. P. J. v. W. Virginia State Bd. of Educ.*, Supplemental Expert Report of Carlson
72. *B. P. J. v. W. Virginia State Bd. of Educ.*, Order and Opinion
73. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appellees' Stay Response and Appendix Part 1 (4th Cir. 2023)
74. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appellees' Stay Response and Appendix Part 2 (4th Cir. 2023)
75. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appellees' Stay Response and Appendix Part 3 (4th Cir. 2023)
76. *B. P. J. v. W. Virginia State Bd. of Educ.*, Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Circuit (U.S. 2023)
77. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appendix to Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Circuit (U.S. 2023) Part 1
78. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appendix to Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Circuit (U.S. 2023) Part 2
79. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appendix to Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Circuit (U.S. 2023) Part 3

U.S. Department of Education
May 15, 2023
Page 41

80. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appendix to Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Circuit (U.S. 2023) Part 4
81. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appendix to Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Circuit (U.S. 2023) Part 5
82. *B. P. J. v. W. Virginia State Bd. of Educ.*, Appendix to Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Circuit (U.S. 2023) Part 6
83. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Female Athletes (U.S.)
84. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of States (U.S.)
85. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Women's Liberation Front (U.S.)
86. *B. P. J. v. W. Virginia State Bd. of Educ.*, Reply supporting Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Circuit (U.S. 2023)
87. *B. P. J. v. W. Virginia State Bd. of Educ.*, Supreme Court Opinion
88. *B. P. J. v. W. Virginia State Bd. of Educ.*, Defendant-Appellees' Response Brief (4th Cir. 2023)
89. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Female Olympic Rowers
90. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of International Consortium on Female Sport (ICONS)
91. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of 25 Athletic Officials and Coaches
92. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Concerned Women for America
93. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Women's Declaration International USA
94. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of 17 States
95. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Defense of Freedom Institute for Policy Studies
96. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of 78 Female Athletes, Coaches, Sports Officials, and Parents of Female Athletes
97. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Independent Women's Law Center
98. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Institute for Faith and Family
99. *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Thomas More Society

U.S. Department of Education
May 15, 2023
Page 42

100.  *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Parents Defending Education

101.  *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of Public Advocate of the United States

102.  *B. P. J. v. W. Virginia State Bd. of Educ.*, Amicus Brief of 22 Business Executives

103.  *D.N. v. DeSanctis*, Case No. 0:21-cv-61344-RKA (S.D. Fla. 2021), ADF Soule Intervention Motion

104.  *D.N. v. DeSanctis*, Case No. 0:21-cv-61344-RKA (S.D. Fla. 2021), Soule Declaration

105.  *D.N. v. DeSanctis*, Case No. 0:21-cv-61344-RKA (S.D. Fla. 2021), Amicus Brief of States

106.  *D.N. v. DeSanctis*, Case No. 0:21-cv-61344-RKA (S.D. Fla. 2021), Amicus Brief of ADF for Soule on Motion to Dismiss

107.  *Faith Action Ministry Alliance, dba, Grant Park Christian Academy v. Fried*, Complaint

108.  *Faith Action Ministry Alliance, dba, Grant Park Christian Academy v. Fried*, Motion for Preliminary Injunction

109.  *Faith Action Ministry Alliance, dba, Grant Park Christian Academy v. Fried*, Joint Motion to Stay

110.  *Faith Action Ministry Alliance, dba, Grant Park Christian Academy v. Fried*, Dismissal

111.  USDA Religious Exemption Letter

112.  *Hecox v. Little, Post-Register* op-ed

113.  *Hecox v. Little, National Review* op-ed

114.  *Hecox v. Little, FOX* op-ed

115.  *Hecox v. Little,* Summary

116.  *Hecox v. Little,* Fairness in Women's Sports Act

117.  *Hecox v. Little,* ADF Female Athletes' Motion to intervene

118.  *Hecox v. Little,* Kenyon Declaration

119.  *Hecox v. Little,* Marshall Declaration

120.  *Hecox v. Little,* Mitchell Declaration

121.  *Hecox v. Little,* Levine Affidavit

122.  *Hecox v. Little,* Brown Affidavit

123.  *Hecox v. Little,* Memo Opposing Preliminary Injunction

124.  *Hecox v. Little,* Intervention Order

125.  *Hecox v. Little,* Opening Appellate Brief of Intervenors

126.  *Hecox v. Little,* Amicus Brief of Sandra Bucha, et al.

127.  *Hecox v. Little,* Amicus Brief of Medical Professionals

U.S. Department of Education
May 15, 2023
Page 43

128. *Hecox v. Little*, Amicus Brief of States
129. *Hecox v. Little*, Amicus Brief of US-
130. *Hecox v. Little*, Amicus Brief of US- Withdrawal
131. *Hecox v. Little*, Amicus Brief of Women's Human Rights Campaign – USA
132. *Hecox v. Little*, Amicus Brief of Women's Liberation Front
133. *Hecox v. Little*, Appellate Reply Brief of Intervenors
134. *Neese v. Becerra*, Amicus Brief of ADF for Three Female Athletes
135. *Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 16902425, at *10 (N.D. Tex. Nov. 11, 2022), Opinion
136. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, *FOX* op-ed (June 2022)
137. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, *FOX* op-ed (Jan. 2022)
138. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, *Newsweek* op-ed
139. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, *World* op-ed
140. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, *FOX* op-ed (Oct. 2022)
141. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Title IX complaint with OCR
142. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Brown Expert Declaration supporting Title IX complaint with OCR,
143. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, OCR, Investigation Letter
144. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, OCR Letter of Impending Action
145. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, OCR Revised Letter
146. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Complaint
147. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, DOJ Statement of Interest
148. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Preliminary Injunction Motion and Brief
149. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, DOE Withdrawal Letter
150. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Appellate Brief
151. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, En Banc Order
152. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, En Banc Opening Brief
153. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of Institute for Faith and Family
154. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of Ray Hacke
155. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of 21 Athletic Officials and Coaches of Female Athletes
156. *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of 23 States

U.S. Department of Education
May 15, 2023
Page 44

157.   *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of 40 Business Executives

158.   *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of 73 Female Athletes, Coaches, Sports Officials, and Parents of Female Athletes

159.   *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of Thomas More Society

160.   *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of Concerned Women for America

161.   *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of Defense of Freedom Institute for Policy Studies

162.   *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of Female Olympic Rowers

163.   *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of International Consortium on Female Sport (ICONS)

164.   *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, Amicus Brief of Parents Defending Education

165.   Ed Whelan, *Transgender Bathroom/Sports Claims Are Underinclusiveness Challenges*, (Jan. 18, 2023)

166.   USA Swimming, 2021-2024 National Age Group Motivational Times, Long Course Meters (Oct. 10, 2020)

167.   World Athletics, *Eligibility Regulations For Transgender Athletes* (Version 2.0, approved by Council on March 23, 2023, and coming into effect on March 31, 2023)

168.   Gregory A. Brown Ph.D., Professor of Exercise Science, Physical Activity and Wellness Laboratory, Department of Kinesiology and Sport Sciences, University of Nebraska Kearney & Tommy Lundberg Ph.D., Assistant Senior Lecturer, Department of Laboratory Medicine, Division of Clinical Physiology, Karolinska Institute, Stockholm, SWE, *Should Transwomen be allowed to Compete in Women's Sports?: A view from an Exercise Physiologist*, Sport Policy Center,

169.   ADF amicus brief, *Loper-Bright Enterprises v. Raimondo*, No. 22-451 (U.S.)

170.   *Facing Foster Care in Alaska v. HHS*, No. 21-cv-00308, ECF No. 41 (D.D.C. June 17, 2022), Remand Motion

171.   *Facing Foster Care in Alaska v. HHS*, No. 21-cv-00308, Exhibit to Declaration of Renee Cooper, HSAG, Summary of Comments–Final Report (June 17, 2022)

172.   *Facing Foster Care in Alaska v. HHS*, No. 21-cv-00308, Final Order (June 28, 2022)

**Exhibit E-6**

Comment by the Independent Women's Law Center, ED-2022-OCR-0143-155361 (May 15, 2023).

 

May 15, 2023

Secretary Miguel A. Cardona
United States Department of Education
Lyndon Baines Johnson Building
400 Maryland Ave., SW
Washington, DC 20202

Docket No: ED-2022-OCR-0143

**Re: Comment of Independent Women's Law Center and Independent Women's Forum regarding implications of the Department of Education's proposed Title IX rule.**

Dear Secretary Cardona:

More than fifty years ago, Congress enacted the landmark sex equality law Title IX to end unjust sex discrimination in education and to expand educational opportunities for women and girls. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1989) (one of Title IX's principal objectives was "[t]o avoid the use of federal resources to support discriminatory practices"); *McCormick ex. rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286, 295 (2d Cir. 2004) ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities"). Congress did *not* pass this landmark protection to force females to compete for resources and playing time against male-bodied athletes, trans-identified or not, who have inherent physical advantages. Yet the Department's proposed rule would require precisely that adverse outcome in almost all circumstances. This is not fair to female athletes. In fact, it is a violation of the very statute the Department purports to enforce. The rule should be withdrawn.

**Independent Women's Law Center and Independent Women's Forum**

Independent Women's Law Center (IWLC) is a project of Independent Women's Forum (IWF), a non-profit, non-partisan 501(c)(3) organization founded by women to foster education and debate on legal, social, and economic policy issues. IWLC supports this mission by advocating—in the courts, before administrative agencies,

in Congress, and in the media—for equal opportunity, individual liberty, and the rights of women and girls.

IWLC and IWF strongly oppose the proposed rules contained in the notice of proposed rulemaking entitled "*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams,*" set forth at 88 Federal Register 22,860 ("the proposed rule"). IWLC and IWF accordingly submit these comments to request that the Department withdraw the proposed rule.

## A.   *Bostock* does not require reinterpretation of Title IX with respect to athletics

In proffering this new rule, the Department relies on the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), which held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), prohibits an employer from "fir[ing] someone simply for being . . . transgender." *Id.* at 1737. But the Court's analysis in *Bostock* is inapplicable to athletics.

**To begin with, *Bostock* dealt only with hiring and firing in the employment context under Title VII**. As the *Bostock* majority noted, "[a]n individual employee's sex is not relevant to the selection, evaluation, or compensation of employees." 140 S. Ct. at 1741 (internal quotation marks omitted). Athletics in education, however, are governed by a different statute: Title IX. And when it comes to athletics, sex is not only relevant: it is often dispositive. *See* Section B, *infra*.

The Supreme Court has made clear that "discrimination" in the legal sense involves treating "similarly situated" people differently. *Bostock*, 140 S. Ct. at 1740. As Title IX recognizes, however, different treatment of the sexes is warranted when it comes to athletics because the two sexes are *not* similarly situated. In fact, the original athletic regulation adopted in 1975 explicitly contemplates separate athletic teams for males and females. *See* Section C, *infra*. *Bostock*'s conclusion that employment discrimination against a trans-identified person "necessarily entails discrimination based on sex" under Title VII, *id.* at 1747, is simply inapplicable to the athletics governed by Title IX, where males and females are not similarly situated. *See Kleczek v. Rhode Island Interscholastic League, Inc.,* 612 A.2d 734, 738 (R.I. 1992) ("Because of innate physiological differences, boys and girls are not similarly situated as they enter athletic competition.").

This analysis prompts our first request: ***Please clarify how* Bostock, *a case applying a separate statute that governs the very different context of employment, has any relevance to athletics under Title IX, where the sexes are not similarly situated.***

## B.     The Male Athletic Advantage

Men and women are not "similarly situated" when it comes to athletics because, on average, males are stronger, faster, and more powerful than females.   *See* Independent Women's Forum & Independent Women's Law Center, *Competition: Title IX, Male-Bodied Athletes, and the Threat to Women's Sports* 17-18 (2021) (providing a detailed overview of the scientific literature on the significant and enduring nature of the male-female athletic gap) [hereinafter *Competition*], https://tinyurl.com/IWFComp.[1]  In fact, research confirms that, overall, "[t]here is a 10 to 12% difference between male and female athletic performance." Tim Layden, *Is it fair for Caster Semenya to compete against women at the Rio Olympics?*, Sports Illustrated (Aug. 11, 2016).

Male-female performance gaps are evident not just as to specific athletic skills, but as to overall athletic performance *at all levels of athletic competition and even in individuals who are not athletically trained at all.*   Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Med. 199, 204 (2021). So great is the athletic disparity that, in many events, young men outperform the best female athletes in the world thousands of times a year.  For example, Duke Law Professors Doriane Lambelet Coleman and Wickliffe Shreve found that, in 2017 alone, men and boys around the world beat the best women's time in the 400-meter dash more than 15,000 times.  The professors put it simply: men and boys beating the world's best female athletes "is far from the exception.  It's the rule."  Doriane Lambelet Coleman & Wickliffe Shreve, *Comparing Athletic Performances: The Best Elite Women to the Boys and Men*, Duke Ctr. for Sports L. & Pol'y (Summer 2017), https://tinyurl.com/ColemanShreve.

Given what Justice Ruth Bader Ginsburg, writing for the Supreme Court, called the "enduring" "[p]hysical differences between men and women," *United States v. Virginia*, 518 U.S. 515, 533 (1996), female athletes will not have the same "chance to be champions" if forced to compete against male-bodied athletes.  *McCormick*, 370 F.3d at 295.

## C. Title IX's Binary Structure Permits Single Sex Teams

By explicitly referring to "both sexes," 20 U.S.C. § 1681(a)(2), requiring schools to "provide equal athletic opportunities for members of both sexes," 34 C.F.R. § 106.41(c), and allowing schools to provide separate athletic teams for males and

---

[1] The male-female athletic differential is not the result of human variation between top athletes and non-athletes.  Nor is it the result of socialization, unequal opportunity, or lack of funding.  Rather, the male-female athletic gap is almost entirely the result of biology.  *See Competition*, *supra*, at 17.

females, 34 C.F.R. § 106.41(b), Title IX and its regulations play an important role in leveling the proverbial "playing field" and increasing athletic opportunities for females.[2]

The proposed rule flies in the face of all this by requiring recipients to meet extratextual requirements before applying sex-based criteria. Indeed, under the proposed rules, schools must *presumptively* allow biological males to participate in women's sports and may only restrict teams by sex to advance an "important educational objective." 88 Fed Reg. 22,860.

To be sure, the proposed rule "does not specify the objectives that a recipient may assert." 88 Fed. Reg. 22,872. But the Department asserts throughout the NPRM that funding recipients impose harm on trans-identifying students by restricting teams based on biological sex, 88 Fed. Reg. 22,870; identifies only two important educational objectives that might satisfy the proposed rule (safety and fairness), 88 Fed. Reg. 22,873; and looks down on a third important educational objective: the privacy rights of women and girls. 88 Fed. Reg. 22,874.

These facts lead to our next set of requests:

> ***Please clarify how the proposed rule can be reconciled with the statutory text adopting a binary view of sex.***
>
> ***Please clarify what important educational objectives a funding recipient can assert, in addition to fairness in competition and prevention of sports-related injury.***
>
> ***Please explain why the Department does not believe privacy for girls and women in sex-segregated facilities such as locker rooms is an important educational objective.***

Even though Title IX explicitly contemplates single-sex athletic teams, the proposed rule places the burden of defending such teams on individual schools. This prompts our next request:

---

[2] The statute likewise refers to "Men's" and "Women's" organizations, "the membership of which has traditionally been limited to persons of one sex," 20 U.S.C. § 1681(a)(6)(B), and requires that, if opportunities "are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of *the other sex*," *id.* § 1681(a)(8) (emphasis added). Such wording would make no sense if "sex" were being used to describe the range of identifications included within the concept of gender identity.

*Please explain why every school in the nation should be forced to prove to the Department of Education the specific value of each and every single-sex team it seeks to offer.*

Because the burden of relitigating basic science as to numerous teams places a significant burden on schools with limited budgets and resources, it is likely that many schools will choose the path of least resistance and allow all students to compete on athletic teams consistent with their gender identity.  This, of course, places a disproportionate burden on female students, who are far more likely to be displaced by biological males, than on male students, who have little to fear from female bodies seeking opportunities on men's teams.

### D. Testosterone Suppression Cannot Eliminate the Male Athletic Advantage

The Department further asserts that recipients may not adopt criteria based on "overbroad generalizations of sex." 88 Fed. Reg. 22,874. But its discussion of what would constitute such "overbroad" generalization cites district court decisions that rely heavily on the faulty assumption that the male athletic advantage can be sufficiently mitigated by the use of hormonal therapy and puberty blockers.  *See e.g., Hecox v. Little*, 479 F. Supp. 3d. 930, 978 (D. Idaho 2020); *Roe v. Utah High School Activities Ass'n*, No. 220903262, 2022 WL 3907182, at *8 (Utah Dist. Ct. Aug. 19, 2022).  In fact, the assumption that the male athletic advantage can be eliminated with hormone therapy is contrary to science.

Indeed, studies make clear that testosterone suppression can never completely eliminate the athletic advantage of males who have experienced puberty.  Jennifer C. Braceras, *FACT CHECK: Can Transgender Athletes Eliminate The Male Athletic Advantage By Suppressing Testosterone*? (Jan. 13, 2022), https://www.iwf.org/2022/01/13/fact-check-can-transgender-athletes-eliminate-the-male-athletic-advantage-by-suppressing-testosterone/; *see also* Carole Hooven, T: The Story Of Testosterone: The Hormone That Dominates And Divides Us 128 (2021); Hilton & Lundberg, *supra*, at 205. Even after *years* of testosterone suppression, biological males remain stronger and faster than most females. *Competition*, *supra*, at 29.  That is because "many of the changes brought about by increased levels of testosterone during male puberty (such as changes to skeletal architecture) are permanent and unalterable by testosterone reduction later in life.  Testosterone suppression will not, for example, make a person shorter or reduce a person's wingspan." *Competition*, *supra*, at 28.  In short, **while testosterone suppression will impair male athletic performance, it will not come close to reducing male performance to normal female levels.**

There is also evidence that even biological males who have not experienced male puberty have an athletic advantage over females.  Indeed, males experience some degree of heightened exposure to testosterone even prior to puberty—both in the

womb and shortly after birth. Hooven, *supra*, at 116. This could account for the differences in athletic performance between the sexes that have been measured even pre-puberty. For example, one review of fitness data from Australian children reveals that, when compared with 9-year-old females, 9-year-old males were 9.8% faster over short sprints, 16.6% faster over a mile, could jump 9.5% further from a standing start, could complete 33% more push-ups in 30 seconds, and had a 13.8% stronger grip. Hilton & Lundberg, *supra*, at 201. A study of Greek children found "[m]ale advantage of a similar magnitude." *Id.* (noting that 6-year-old Greek males "completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position").

In addition, the increased testosterone to which males are exposed in "mini puberty" (which occurs between one to six months of age) "may be correlated with higher growth velocity and an 'imprinting effect' on BMI and bodyweight." *Id.* Thus, unsurprisingly, at least one study of males treated with puberty blockers as young as 12, followed by hormone treatment at 16, found that early intervention did *not* reduce height, lean body mass, or grip strength to age-matched female levels. *Competition, supra,* at 31.

Finally, it is worth noting that **female bodies have athletic *disadvantages* that biological males cannot create for themselves**. For example, the female pelvis has less joint rotation than a male pelvis, making females slower than biological males. Taryn Knox et al., *Transwomen in Elite Sport: Scientific and Ethical Considerations*, 45 J. Med. Ethics 395, 398 (2019). Menstrual cycles and potential pregnancies, factors that *cannot* affect biological males, may also impact training and performance in females. Romuald Lepers et al., *Trends in Triathlon Performance: Effects of Sex & Age*, 43 Sports Med. 851, 853 (2013); *see also* Doriane Lambelet Coleman, *Sex in Sport*, 80 Law and Contemp. Problems 63, 109–10 (2017). For these and other reasons, even biological males who never experience male puberty are likely to have an athletic advantage over females.

To the extent the proposed rule would require recipients to consider each student's individual "level of ability," 88 Fed. Reg. 22,874, the rule would be unworkable and inconsistent with Title IX's provision for single-sex sports. To be sure, not every biological male who identifies as a woman will outperform every biological female—just as not every cisgender boy or man will do so. Yet Title IX has long allowed schools to categorically exclude male-bodied athletes from competition. The proposed rule's evisceration of the longstanding recognition of the male athletic advantage will eliminate numerous athletic opportunities for biological women and girls. In the long run, moreover, such a rule undermines the legal justification for maintaining any sex-specific athletic teams whatsoever, threatening the very existence of women's sports.

All of this leads to our next set of requests:

> ***Please clarify how the Department believes female athletes can ever fairly participate in sports against male competitors given the biologically-based male athletic advantage.***

> ***Please explain why the Department has not cited any studies regarding the impact on women of being forced to compete against biological males.***

**E. The Proposed Rule Violates Title IX's Equal Opportunity Mandate.**

Despite all the talk of fairness, Title IX isn't a "fairness in sports" law.  It's an equal opportunity law concerned with making sure that females have opportunities previously denied them.  Thus, even if there were a way to ensure a level playing field when biological men participate in women's sports—and there is not—the proposed rule would not only exceed the statutory mandate, but contradict it.

The world of competitive sport is a zero-sum game in which some athletes make the team and others do not.  On teams with limited roster spots, allowing a biological male to join the team takes a roster spot from a female athlete.  Allowing a biological male to compete in a women's swim meet means that one less female will compete in that race.  Allowing a biological male to take the field in a women's soccer game, means that a female athlete loses playing time.  In each instance, the coach and the school that have allowed this to occur have denied a female student an athletic opportunity.  And in each instance, ***the school is authorizing sex discrimination that violates Title IX.***

**F.     Conflicting Legal Obligations on Schools**

Should this proposed rule become final, schools will be broadly required to allow athletes who were born male to compete on female teams.  And yet, Title IX and its athletic regulations still require that schools provide equal athletic opportunities for "both sexes." 34 C.F.R. § 106.41(c).

This brings us to our final request:

> ***Please explain how schools with limited budgets, roster spots, and scholarship money can possibly provide equal athletic opportunities for male and female athletes while also allowing biological males to compete on women's teams.***

\*     \*     \*

IWF and IWLC respectfully request that the Department withdraw the proposed rule, which harms female athletes.

Carrie Lukas
INDEPENDENT WOMEN'S FORUM
4 Weems Lane #312
Winchester, VA 22601
(202)807-9986
clukas@iwf.org

Jennifer C. Braceras
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
jennifer.braceras@iwf.org

Gene C. Schaerr
Annika Boone Barkdull
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

**Exhibit E-7**

Comment by Independent Council on Women's Sports, ED-2022-OCR-0143-148316 (May 14, 2023).



The Independent Council on Women's Sport, ICONS, is writing to comment on 34 CFR Part 106 [Docket ID ED-2022-OCR-0143] RIN 1870-AA19 Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, published on April 13,2023.

The Biden administration's reinterpretation of Title IX reverses the only sex-based legal protection for women and girls against discrimination in education by equating sex and "gender identity", essentially granting the legal protections for women to men. Applying this logic to athletic opportunities and sports is both illogical and dangerous.

The equating of sex and "gender identity" in US law means the erasure of the distinction of sex as a boundary for women where sex matters. The outcome of this is obvious in any physical endeavor or contest; it will displace and hurt women and girls. This interpretation is presently being debated in the courts and government, leaving women with a patchwork of protections around the United States and a shifting belief in their value and safety. Where laws mandate women share spaces with males, girls have resorted to changing for sports and physical education participation in their cars, toilet stalls, or hallway bathrooms. It has resulted in girls suffering severe anxiety, depression and fear from the presence or anticipation of men and boys in their spaces. In at least California and Virginia, high school girls have suffered physical and sexual assault. In sports competitions women and girls have been told they do not have a right to ask or know the sex of an individual in women's competitions. This has resulted in injuries and psychological torture.

The reinterpretation of sex as a "gender identity" removes sex as a valid distinction in efforts to prevent physical and sexual violence against women, as well as the legal protections necessary to view women as equally contributing members of society. It removes sex as a protected characteristic necessary to provide equal opportunity to fair and safe sport, and removes sex as a clear measure to track statistics that communicate an understanding of sex-based discrimination. The federal government will be mandating increased risk of the physical and sexual violence against young girls and women by denying any physical distinction in sport and private spaces.

The proposed policy clarification does not contemplate or discuss a consideration for the potential safety, mental health, and exclusion impact on individual women and girls when males are allowed to participate on women's teams. The Biden administration has clarified that students who identify as transgender cannot be excluded from participating on the team they wish to join based on sex, as this may cause them harm. The result of such a policy has begun to play out in many sports arenas where women are suffering physical harm and mental torture. When sex separated sports opportunities are not guaranteed for female athletes, there will be an inevitable exclusion of female students. This removes their opportunities for achievement and exposes them to physical and mental harm. Every male who joins a female team

automatically excludes a female member. This reinterpretation of Title IX effectively undermines the law's original purpose, which was to ensure the protection of female students and provide them with equal opportunities. Instead, it prioritizes male participation over female safety and inclusion. (BRIEF OF 67 FEMALE ATHLETES, COACHES, SPORTS OFFICIALS, AND PARENTS OF FEMALE ATHLETES, AS AMICI CURIAE IN SUPPORT OF APPLICANTS, West Virginia v BPJ, 2023)

The Biden administration's clarification considers the potential harm to students who identify as transgender while it fails to consider the harm that may be caused to women and girls when they are required to compete against males or relinquish their spots on teams to males. It also ignores the harm associated with teaching women and girls to disregard the biological reality of their physical sex, while teaching boys and men that it is acceptable to overlook the biological differences of the opposite sex. This approach reinforces the idea that it is the fault of women and girls if they are physically weaker than men and that their bodies are inherently flawed if they are not as capable in sports as males. Moreover, it creates an expectation that women and girls should be able to physically compete with men and boys, and that society embraces this competition.

Allowing a boy or a man to box, wrestle, pin, shove, aim for, or strike a girl or a woman on a playing field, regardless of the power differences based on sex, makes it easier to tolerate such behavior off the field. By providing permission to disregard the biological differences between sexes in the name of identity, this approach teaches women and girls that physical confrontations with men and boys are acceptable, a lesson which will carry into all aspects of life and further endangers them. In this reinterpretation of a 50 year-old law that was enacted to protect women, the Biden administration has failed to consider women as it prioritizes males who identify as trangender.

The Biden administration clarification communicates that Title IX prioritizes transgender identities over women. The basis for the clarification is to reduce harm to transgender students by removing sex-based criteria except at the highest levels of sport or when safety might be at issue in high school and college. This only infringes upon safety, fairness and health for girls and women, not for men and boys. It communicates that women and girls are only valuable enough if they reach "elite" or "varsity" status. If Title IX does not specifically require schools to protect women and girls on the basis of sex, it sacrifices their safety, rights and equal opportunity simply for being born female. This clarification creates institutionalized vulnerability for women and girls - those born female are permanently and necessarily, under federal law, required to be in positions of physical and emotional vulnerability. This cannot become our nation's standard. Our education system must be able to give girls equal consideration and this standard does not.

These regulation clarifications put schools in an impossible position. This policy threatens our educational institutions with cutting federal funding unless schools discriminate against women and girls. It requires schools to cease recognizing the impact of sex on human development and physical competition, putting girls at risk of physical and emotional harm. It increases the

financial burden, litigation risk and liability of schools to have sports for girls at any age, any level of education, and any level of sport.

Safety: Ensuring safety for students must be a top priority. If a young girl or woman is injured because a policy failed to consider the effects of sex, a school will be liable for damages. Under these guidelines a school has the option to put such a policy in place and should have been able to foresee the effects of sex on physical contests. Schools will need to understand criteria for safety with regard to human development in every level, every grade and every sport. For safety, they will need expertise in biomechanics, kinesiology, sports science, orthopedics, and concussion risk among a host of other specialties. They will need to understand the detailed risks associated with each sport when it comes to training drills, performance, collision, and propensity for injury based on sex. All of these considerations are directly tied to sex, but this policy forbids categorization by sex, instead asking for a consideration of criteria from other biological measures. A school could comply by testing for a combination of attributes like chromosomes, active SRY genes and testosterone levels as objective measurements that directly correlate with injury risk, size, speed, strength and performance. Using this method of compliance would create more testing and expense when sex is the identical measure (Blair, 2007). In short, this policy pursues a scientific distinction for fairness and safety that we already know. It mandates a convoluted and litigious path to achieve safety and fairness while preventing logical policy that would minimize harm, risk and cost. Forbidding schools to use the widely known distinction of sex to create reasonable policy that protects the safety and fairness of half our population is an unnecessary and unreasonable burden for our education system. This administration is creating a financial and litigation disaster when it invites students to sue schools for not looking at objective criteria to protect their female students. Schools must be able to protect female students against known physical harm.

Fairness: Ensuring fair treatment of students must be a top priority for schools. We can't teach any student that they don't deserve to be treated fairly. It is well understood that there is no standard by which a male body competes "fairly" with a female body. Every human is male or female, even those categorized as intersex are still male or female (Marinov, 2020). At every age and level in physical sport, males outperform females. If we draw distribution curves of the top 1%, 5%, 10% and even 50% of males and females and compare their performance, males will outperform females in all competition. A good supporting example are the age group motivational standards set for USA Swimming. These are generated from the times posted by registered swimmers throughout recent years and are some of the most comprehensive records of performance in any sport; at every age, every level and every distance, males outperform females (https://www.usaswimming.org/docs/default-source/timesdocuments/time-standards/2024/2021-2024-national-age-group-motivational-times.pdf). These examples are replete in tennis with UTR (Universal Tennis Ranking), track and field and records across sports from high school levels through Olympic. This does not mean women and girls are worse; it means they are built differently. Every part of our body is influenced by sex, with over 6500 genetically expressed differences between the sexes (Gershoni & Pietrokovski, 2017) and there is no amount of mitigation or suppression, through hormone treatment and surgery, that can reverse the effects

of male development (Hilton and Lundberg, 2021). "Fairness" is a measure by which everyone has an equal chance to succeed and compete based upon their merits and abilities. There is a baseline from which we all begin, this is the "level playing field". No female has access to male development that begins in utero (Hooven, 2021), shown to be worth 10-60%, so there can be no comparison of male and female merits and abilities. This is most obvious to see where sport rewards its best, but is relevant at every level of sport. The idea that it is "fair" for a less skilled male, a smaller male, or a "mitigated male" to compete against or take the place of the better females is a misnomer; it is simply a sexist premise providing preference to an individual because they were born male.

According to this clarification standard, in elementary and middle school the administration is demanding that girls compete directly with boys on girls' teams or have coed teams. Schools and society have a vested interest in encouraging sport, as was recognized in the clarification standards. For youth in elementary and middle school, the clarification standard removes any ability to consider the effects of being born female on physical and psychological encouragement in sports competition and opportunities. We know that girls drop out of sport and physical activity around the age of puberty at a much higher rate than boys. We know this happens at puberty, when girls' bodies are changing during elementary and middle school ages. Why would we encourage a policy that could in any way disadvantage or discourage more girls from participating and developing enthusiasm for sport by removing a guarantee of fair competition and equal opportunity? Why would we discourage having sports teams that allow girls to participate as much as boys? Why would we not want to ensure young girls know they have fair sports opportunities at each stage of their development? Under these regulations, if a school recognizes the value of offering teams for both sexes and encouraging more girls, they are forced to allow young males to play on the girls team. If a school recognizes that a policy of including males in girls sports hurts the participation of young girls, a school is threatened with the stripping of federal funds. These proposed regulation changes run counter to the encouragement of girls, counter to the investment in health, and counter to the original intention of Title IX.

According to these clarification regulations, a male who identifies as transgender is given special privilege to determine which sports team he would like to participate on. In most cases the justification cited is a mental, physical or social benefit. One benefit cited is the preference of an individual to not reveal their sex. A few questions arise from these justifications.
What grants a young male the privilege to choose a girl's sports team above another boy who wishes to play with girls for similar benefit? Why are transgender identities given a choice above the considerations of another male who would improve their physical and mental health by participating on the girl's team?
Is it ever appropriate to consider situational benefit to young female athletes? What if it benefits the mental and physical health of a few girls to play on teams with only other female athletes? What if it benefits a girl to know they are competing with or against other members of the same sex?

These reinterpretations or clarifications of Title IX pose a significant threat to the human rights of women and girls, as they undermine the recognition of a female body. The impacts of these reinterpretations extend well beyond the scope of sport. When women are told they must ignore the reality of being female, even in physical contest, the message is that women and girls bear the responsibility of overcoming any of the issues they face where sex is relevant, including the pervasive physical and sexual violence experienced by women around the world.

On behalf of female athletes and students across the United States, we ask the Department of Education and the Biden administration to stop all proposals and clarification on Title IX including the clarification for Sex-Related Eligibility Criteria for Male and Female Athletic Teams. We ask the Department of Education and the Biden Administration to seek counsel and approval from Congress for any reframing or clarification associated with Title IX. We ask the Department of Education and the Biden Administration to answer all concerns and conduct bi-partisan hearings and research into the effects of rule and clarifications on women and girls. We ask the Department of Education and the Biden Administration to support the original intent of Title IX and recognize the immutable and binary nature of sex for the necessary protection and equal value of women and girls in the United States and around the world.

Please see cited materials in the attached documents.

Sports Medicine (2021) 51:199–214
https://doi.org/10.1007/s40279-020-01389-3

**REVIEW ARTICLE**



# Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage

**Emma N. Hilton**[1] · **Tommy R. Lundberg**[2,3]

Published online: 8 December 2020
© The Author(s) 2020

## Abstract

Males enjoy physical performance advantages over females within competitive sport. The sex-based segregation into male and female sporting categories does not account for transgender persons who experience incongruence between their biological sex and their experienced gender identity. Accordingly, the International Olympic Committee (IOC) determined criteria by which a transgender woman may be eligible to compete in the female category, requiring total serum testosterone levels to be suppressed below 10 nmol/L for at least 12 months prior to and during competition. Whether this regulation removes the male performance advantage has not been scrutinized. Here, we review how differences in biological characteristics between biological males and females affect sporting performance and assess whether evidence exists to support the assumption that testosterone suppression in transgender women removes the male performance advantage and thus delivers fair and safe competition. We report that the performance gap between males and females becomes significant at puberty and often amounts to 10–50% depending on sport. The performance gap is more pronounced in sporting activities relying on muscle mass and explosive strength, particularly in the upper body. Longitudinal studies examining the effects of testosterone suppression on muscle mass and strength in transgender women consistently show very modest changes, where the loss of lean body mass, muscle area and strength typically amounts to approximately 5% after 12 months of treatment. Thus, the muscular advantage enjoyed by transgender women is only minimally reduced when testosterone is suppressed. Sports organizations should consider this evidence when reassessing current policies regarding participation of transgender women in the female category of sport.

| Key Points |
| --- |
| Given that biological males experience a substantial performance advantage over females in most sports, there is currently a debate whether inclusion of transgender women in the female category of sports would compromise the objective of fair and safe competition. |
| Here, we report that current evidence shows the biological advantage, most notably in terms of muscle mass and strength, conferred by male puberty and thus enjoyed by most transgender women is only minimally reduced when testosterone is suppressed as per current sporting guidelines for transgender athletes. |
| This evidence is relevant for policies regarding participation of transgender women in the female category of sport. |

**Supplementary Information** The online version contains supplementary material available at https://doi.org/10.1007/s40279-020-01389-3.

✉ Tommy R. Lundberg
tommy.lundberg@ki.se

[1] Faculty of Biology, Medicine and Health, University of Manchester, Manchester, UK

[2] Department of Laboratory Medicine/ANA Futura, Division of Clinical Physiology, Karolinska Institutet, Alfred Nobels Allé 8B, Huddinge, 141 52 Stockholm, Sweden

[3] Unit of Clinical Physiology, Karolinska University Hospital, Stockholm, Sweden

# 1 Introduction

Sporting performance is strongly influenced by a range of physiological factors, including muscle force and power-producing capacity, anthropometric characteristics, cardiorespiratory capacity and metabolic factors [1, 2]. Many of these physiological factors differ significantly between biological males and females as a result of genetic differences and androgen-directed development of secondary sex characteristics [3, 4]. This confers large sporting performance advantages on biological males over females [5].

When comparing athletes who compete directly against one another, such as elite or comparable levels of school-aged athletes, the physiological advantages conferred by biological sex appear, on assessment of performance data, insurmountable. Further, in sports where contact, collision or combat are important for gameplay, widely different physiological attributes may create safety and athlete welfare concerns, necessitating not only segregation of sport into male and female categories, but also, for example, into weight and age classes. Thus, to ensure that both men and women can enjoy sport in terms of fairness, safety and inclusivity, most sports are divided, in the first instance, into male and female categories.

Segregating sports by biological sex does not account for transgender persons who experience incongruence between their biological sex and their experienced gender identity, and whose legal sex may be different to that recorded at birth [6, 7]. More specifically, transgender women (observed at birth as biologically male but identifying as women) may, before or after cross-hormone treatment, wish to compete in the female category. This has raised concerns about fairness and safety within female competition, and the issue of how to fairly and safely accommodate transgender persons in sport has been subject to much discussion [6–13].

The current International Olympic Committee (IOC) policy [14] on transgender athletes states that "it is necessary to ensure insofar as possible that trans athletes are not excluded from the opportunity to participate in sporting competition". Yet the policy also states that "the overriding sporting objective is and remains the guarantee of fair competition". As these goals may be seen as conflicting if male performance advantages are carried through to competition in the female category, the IOC concludes that "restrictions on participation are appropriate to the extent that they are necessary and proportionate to the achievement of that objective".

Accordingly, the IOC determined criteria by which transgender women may be eligible to compete in the female category. These include a solemn declaration that her gender identity is female and the maintenance of total serum testosterone levels below 10 nmol/L for at least 12 months prior to competing and during competition [14]. Whilst the scientific basis for this testosterone threshold was not openly communicated by the IOC, it is surmised that the IOC believed this testosterone criterion sufficient to reduce the sporting advantages of biological males over females and deliver fair and safe competition within the female category.

Several studies have examined the effects of testosterone suppression on the changing biology, physiology and performance markers of transgender women. In this review, we aim to assess whether evidence exists to support the assumption that testosterone suppression in transgender women removes these advantages. To achieve this aim, we first review the differences in biological characteristics between biological males and females, and examine how those differences affect sporting performance. We then evaluate the studies that have measured elements of performance and physical capacity following testosterone suppression in untrained transgender women, and discuss the relevance of these findings to the supposition of fairness and safety (i.e. removal of the male performance advantage) as per current sporting guidelines.

# 2 The Biological Basis for Sporting Performance Advantages in Males

The physical divergence between males and females begins during early embryogenesis, when bipotential gonads are triggered to differentiate into testes or ovaries, the tissues that will produce sperm in males and ova in females, respectively [15]. Gonad differentiation into testes or ovaries determines, via the specific hormone milieu each generates, downstream in utero reproductive anatomy development [16], producing male or female body plans. We note that in rare instances, differences in sex development (DSDs) occur and the typical progression of male or female development is disrupted [17]. The categorisation of such athletes is beyond the scope of this review, and the impact of individual DSDs on sporting performance must be considered on their own merits.

In early childhood, prior to puberty, sporting participation prioritises team play and the development of fundamental motor and social skills, and is sometimes mixed sex. Athletic performance differences between males and females prior to puberty are often considered inconsequential or relatively small [18]. Nonetheless, pre-puberty performance differences are not unequivocally negligible, and could be mediated, to some extent, by genetic factors and/or activation of the hypothalamic–pituitary–gonadal axis during the neonatal period, sometimes referred to as "minipuberty". For example, some 6500 genes are differentially expressed between males and females [19] with an estimated 3000 sex-specific

differences in skeletal muscle likely to influence composition and function beyond the effects of androgenisation [3], while increased testosterone during minipuberty in males aged 1–6 months may be correlated with higher growth velocity and an "imprinting effect" on BMI and bodyweight [20, 21]. An extensive review of fitness data from over 85,000 Australian children aged 9–17 years old showed that, compared with 9-year-old females, 9-year-old males were faster over short sprints (9.8%) and 1 mile (16.6%), could jump 9.5% further from a standing start (a test of explosive power), could complete 33% more push-ups in 30 s and had 13.8% stronger grip [22]. Male advantage of a similar magnitude was detected in a study of Greek children, where, compared with 6-year-old females, 6-year-old males completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position [23]. In terms of aerobic capacity, 6- to 7-year-old males have been shown to have a higher absolute and relative (to body mass) $VO_{2max}$ than 6- to 7-year-old females [24]. Nonetheless, while some biological sex differences, probably genetic in origin, are measurable and affect performance pre-puberty, we consider the effect of androgenizing puberty more influential on performance, and have focused our analysis on musculoskeletal differences hereafter.

Secondary sex characteristics that develop during puberty have evolved under sexual selection pressures to improve reproductive fitness and thus generate anatomical divergence beyond the reproductive system, leading to adult body types that are measurably different between sexes. This phenomenon is known as sex dimorphism. During puberty, testes-derived testosterone levels increase 20-fold in males, but remain low in females, resulting in circulating testosterone concentrations at least 15 times higher in males than in females of any age [4, 25]. Testosterone in males induces changes in muscle mass, strength, anthropometric variables and hemoglobin levels [4], as part of the range of sexually dimorphic characteristics observed in humans.

Broadly, males are bigger and stronger than females. It follows that, within competitive sport, males enjoy significant performance advantages over females, predicated on the superior physical capacity developed during puberty in response to testosterone. Thus, the biological effects of elevated pubertal testosterone are primarily responsible for driving the divergence of athletic performances between males and females [4]. It is acknowledged that this divergence has been compounded historically by a lag in the cultural acceptance of, and financial provision for, females in sport that may have had implications for the rate of improvement in athletic performance in females. Yet, since the 1990s, the difference in performance records between males and females has been relatively stable, suggesting that biological differences created by androgenization explain most of the male advantage, and are insurmountable [5, 26, 27].

Table 1 outlines physical attributes that are major parameters underpinning the male performance advantage [28–38]. Males have: larger and denser muscle mass, and stiffer connective tissue, with associated capacity to exert greater muscular force more rapidly and efficiently; reduced fat mass, and different distribution of body fat and lean muscle mass, which increases power to weight ratios and upper to lower limb strength in sports where this may be a crucial determinant of success; longer and larger skeletal structure, which creates advantages in sports where levers influence force application, where longer limb/digit length is favorable, and where height, mass and proportions are directly responsible for performance capacity; superior cardiovascular and respiratory function, with larger blood and heart volumes, higher hemoglobin concentration, greater cross-sectional area of the trachea and lower oxygen cost of respiration [3, 4, 39, 40]. Of course, different sports select for different physiological characteristics—an advantage in one discipline may be neutral or even a disadvantage in another—but examination of a variety of record and performance metrics in any discipline reveals there are few sporting disciplines where males do not possess performance advantage over females as a result of the physiological characteristics affected by testosterone.

## 3 Sports Performance Differences Between Males and Females

### 3.1 An Overview of Elite Adult Athletes

A comparison of adult elite male and female achievements in sporting activities can quantify the extent of the male performance advantage. We searched publicly available sports federation databases and/or tournament/competition records to identify sporting metrics in various events and disciplines, and calculated the performance of males relative to females. Although not an exhaustive list, examples of performance gaps in a range of sports with various durations, physiological performance determinants, skill components and force requirements are shown in Fig. 1.

The smallest performance gaps were seen in rowing, swimming and running (11–13%), with low variation across individual events within each of those categories. The performance gap increases to an average of 16% in track cycling, with higher variation across events (from 9% in the 4000 m team pursuit to 24% in the flying 500 m time trial). The average performance gap is 18% in jumping events (long jump, high jump and triple jump). Performance differences larger than 20% are generally present when considering sports and activities that involve extensive upper body contributions. The gap between fastest recorded tennis serve

E. N. Hilton, T. R. Lundberg

**Table 1** Selected physical difference between untrained/ moderately trained males and females. Female levels are set as the reference value

| Variable | Magnitude of sex difference (%) | References |
|---|---|---|
| **Body composition** | | |
| Lean body mass | 45 | Lee et al. [28] |
| Fat% | − 30 | |
| **Muscle mass** | | |
| Lower body | 33 | Janssen et al. [29] |
| Upper body | 40 | |
| **Muscle strength** | | |
| Grip strength | 57 | Bohannon et al. [30] |
| Knee extension peak torque | 54 | Neder et al. [31] |
| **Anthropometry and bone geometry** | | |
| Femur length | 9.4 | Jantz et al. [32] |
| Humerus length | 12.0 | Brinckmann et al. [33] |
| Radius length | 14.6 | |
| Pelvic width relative to pelvis height | − 6.1 | |
| **Tendon properties** | | |
| Force | 83 | Lepley et al. [34] |
| Stiffness | 41 | |
| **$VO_{2max}$** | | |
| Absolute values | 50 | Pate et al. [35] |
| Relative values | 25 | |
| **Respiratory function** | | |
| Pulmonary ventilation (maximal) | 48 | Åstrand et al. [36] |
| **Cardiovascular function** | | |
| Left ventricular mass | 31 | Åstrand et al. [36] |
| Cardiac output (rest) | 22 | Best et al. [37] |
| Cardiac output (maximal) | 30 | Tong et al. [38] |
| Stroke volume (rest) | 43 | |
| Stroke volume (maximal) | 34 | |
| Hemoglobin concentration | 11 | |



**Fig. 1** The male performance advantage over females across various selected sporting disciplines. The female level is set to 100%. In sport events with multiple disciplines, the male value has been averaged across disciplines, and the error bars represent the range of the advantage. The metrics were compiled from publicly available sports federation databases and/or tournament/competition records. *MTB* mountain bike

is 20%, while the gaps between fastest recorded baseball pitches and field hockey drag flicks exceed 50%.

Sports performance relies to some degree on the magnitude, speed and repeatability of force application, and, with respect to the speed of force production (power), vertical jump performance is on average 33% greater in elite men than women, with differences ranging from 27.8% for endurance sports to in excess of 40% for precision and combat sports [41]. Because implement mass differs, direct comparisons are not possible in throwing events in track and field athletics. However, the performance gap is known to be substantial, and throwing represents the widest sex difference in motor performance from an early age [42]. In Olympic javelin throwers, this is manifested in differences in the peak linear velocities of the shoulder, wrist, elbow and hand, all of which are 13–21% higher for male athletes compared with females [43].

The increasing performance gap between males and females as upper body strength becomes more critical for performance is likely explained to a large extent by the observation that males have disproportionately greater strength in their upper compared to lower body, while females show the inverse [44, 45]. This different distribution of strength compounds the general advantage of increased muscle mass in upper body dominant disciplines. Males also have longer arms than females, which allows greater torque production from the arm lever when, for example, throwing a ball, punching or pushing.

## 3.2 Olympic Weightlifting

In Olympic weightlifting, where weight categories differ between males and females, the performance gap is between 31 and 37% across the range of competitive body weights between 1998 and 2020 (Fig. 1). It is important to note that at all weight categories below the top/open category, performances are produced within weight categories

with an upper limit, where strength can be correlated with "fighting weight", and we focused our analysis of performance gaps in these categories.

To explore strength–mass relationships further, we compared Olympic weightlifting data between equivalent weight categories which, to some extent, limit athlete height, to examine the hypothesis that male performance advantage may be largely (or even wholly) mediated by increased height and lever-derived advantages (Table 2). Between 1998 and 2018, a 69 kg category was common to both males and females, with the male record holder (69 kg, 1.68 m) lifting a combined weight 30.1% heavier than the female record holder (69 kg, 1.64 m). Weight category changes in 2019 removed the common 69 kg category and created a common 55 kg category. The current male record holder (55 kg, 1.52 m) lifts 29.5% heavier than the female record holder (55 kg, 1.52 m). These comparisons demonstrate that males are approximately 30% stronger than females of equivalent stature and mass. However, importantly, male vs. female weightlifting performance gaps increase with increasing bodyweight. For example, in the top/open weight category of Olympic weightlifting, in the absence of weight (and associated height) limits, maximum male lifting strength exceeds female lifting strength by nearly 40%. This is further manifested in powerlifting, where the male record (total of squat, bench press and deadlift) is 65% higher than the female record in the open weight category of the World Open Classic Records. Further analysis of Olympic weightlifting data shows that the 55-kg male record holder is 6.5% stronger than the 69-kg female record holder (294 kg vs 276 kg), and that the 69-kg male record is 3.2% higher than the record held in the female open category by a 108-kg female (359 kg vs 348 kg). This Olympic weightlifting analysis reveals key differences between male and female strength capacity. It shows that, even after adjustment for mass, biological males are significantly stronger (30%) than females, and

**Table 2** Olympic weightlifting data between equivalent male–female and top/open weight categories

| | Sex | Weight (kg) | Height (m) | Combined record (kg) | Strength to weight ratio | Relative performance (%) |
|---|---|---|---|---|---|---|
| 2019 record in the 55 kg weight-limited category | | | | | | |
| Liao Qiuyun | F | 55 | 1.52 | 227 | 4.13 | |
| Om Yun-chol | M | 55 | 1.52 | 294 | 5.35 | 29.5 |
| 1998–2018 record in the 69-kg weight-limited category | | | | | | |
| Oxsana Slivenko | F | 69 | 1.64 | 276 | 4.00 | |
| Liao Hui | M | 69 | 1.68 | 359 | 5.20 | 30.1 |
| Comparative performances for top/open categories (all time heaviest combined lifts) | | | | | | |
| Tatiana Kashirina | F | 108 | 1.77 | 348 | 3.22 | |
| Lasha Talakhadze | M | 168 | 1.97 | 484 | 2.88 | 39.1 |

*F* female, *M* male

that females who are 60% heavier than males do not overcome these strength deficits.

### 3.3  Perspectives on Elite Athlete Performance Differences

Figure 1 illustrates the performance gap between adult elite males and adult elite females across various sporting disciplines and activities. The translation of these advantages, assessed as the performance difference between the very best males and very best females, are significant when extended and applied to larger populations. In running events, for example, where the male–female gap is approximately 11%, it follows that many thousands of males are faster than the very best females. For example, approximately 10,000 males have personal best times that are faster than the current Olympic 100 m female champion (World Athletics, personal communication, July 2019). This has also been described elsewhere [46, 47], and illustrates the true effect of an 11% typical difference on population comparisons between males and females. This is further apparent upon examination of selected junior male records, which surpass adult elite female performances by the age of 14–15 years (Table 3), demonstrating superior male athletic performance over elite females within a few years of the onset of puberty.

These data overwhelmingly confirm that testosterone-driven puberty, as the driving force of development of male secondary sex characteristics, underpins sporting advantages that are so large no female could reasonably hope to succeed without sex segregation in most sporting competitions. To ensure, in light of these analyses, that female athletes can be included in sporting competitions in a fair and safe manner, most sports have a female category the purpose of which is the protection of both fairness and, in some sports, safety/welfare of athletes who do not benefit from the physiological changes induced by male levels of testosterone from puberty onwards.

### 3.4  Performance Differences in Non-elite Individuals

The male performance advantages described above in athletic cohorts are similar in magnitude in untrained people. Even when expressed relative to fat-free weight, $VO_{2max}$ is 12–15% higher in males than in females [48]. Records of lower-limb muscle strength reveal a consistent 50% difference in peak torque between males and females across the lifespan [31]. Hubal et al. [49] tested 342 women and 243 men for isometric (maximal voluntary contraction) and dynamic strength (one-repetition maximum; 1RM) of the elbow flexor muscles and performed magnetic resonance imaging (MRI) of the biceps brachii to determine cross-sectional area. The males had 57% greater muscle size, 109% greater isometric strength, and 89% greater 1RM strength than age-matched females. This reinforces the finding in athletic cohorts that sex differences in muscle size and strength are more pronounced in the upper body.

Recently, sexual dimorphism in arm force and power was investigated in a punch motion in moderately-trained individuals [50]. The power produced during a punch was 162% greater in males than in females, and the least powerful man produced more power than the most powerful woman. This highlights that sex differences in parameters such as mass, strength and speed may combine to produce even larger sex differences in sport-specific actions, which often are a product of how various physical capacities combine. For example, power production is the product of force and velocity, and momentum is defined as mass multiplied by velocity. The momentum and kinetic energy that can be transferred to another object, such as during a tackle or punch in collision and combat sports are, therefore, dictated by: the mass; force to accelerate that mass, and; resultant velocity attained by that mass. As there is a male advantage for each of these factors, the net result is likely synergistic in a sport-specific action, such as a tackle or a throw, that widely surpasses the sum of individual magnitudes of advantage in isolated fitness variables. Indeed, already at 17 years of age, the average male throws a ball further than 99% of 17-year-old females [51], despite no single variable (arm length, muscle mass etc.) reaching this numerical advantage. Similarly, punch power is 162% greater in men than women even though no single parameter that produces punching actions achieves this magnitude of difference [50].

**Table 3** Selected junior male records in comparison with adult elite female records

| Event | Schoolboy male record | Elite female (adult) record |
|---|---|---|
| 100 m | 10.20 (age 15) | 10.49 |
| 800 m | 1:51.23 (age 14) | 1:53.28 |
| 1500 m | 3:48.37 (age 14) | 3:50.07 |
| Long jump | 7.85 m (age 15) | 7.52 m |
| Discus throw | 77.68 m (age 15) | 76.80 m |

*M* meters

Time format: minutes:seconds.hundredths of a second

# 4 Is the Male Performance Advantage Lost when Testosterone is Suppressed in Transgender Women?

The current IOC criteria for inclusion of transgender women in female sports categories require testosterone suppression below 10 nmol/L for 12 months prior to and during competition. Given the IOC's stated position that the "overriding sporting objective is and remains the guarantee of fair competition" [14], it is reasonable to assume that the rationale for this requirement is that it reduces the male performance advantages described previously to an acceptable degree, thus permitting fair and safe competition. To determine whether this medical intervention is sufficient to remove (or reduce) the male performance advantage, which we described above, we performed a systematic search of the scientific literature addressing anthropometric and muscle characteristics of transgender women. Search terms and filtering of peer-reviewed data are given in Supplementary Table S1.

## 4.1 Anthropometrics

Given its importance for the general health of the transgender population, there are multiple studies of bone health, and reviews of these data. To summarise, transgender women often have low baseline (pre-intervention) bone mineral density (BMD), attributed to low levels of physical activity, especially weight-bearing exercise, and low vitamin D levels [52, 53]. However, transgender women generally maintain bone mass over the course of at least 24 months of testosterone suppression. There may even be small but significant increases in BMD at the lumbar spine [54, 55]. Some retrieved studies present data pertaining to maintained BMD in transgender women after many years of testosterone suppression. One such study concluded that "BMD is preserved over a median of 12.5 years" [56]. In support, no increase in fracture rates was observed over 12 months of testosterone suppression [54]. Current advice, including that from the International Society for Clinical Densitometry, is that transgender women, in the absence of other risk factors, do not require monitoring of BMD [52, 57]. This is explicable under current standard treatment regimes, given the established positive effect of estrogen, rather than testosterone, on bone turnover in males [58].

Given the maintenance of BMD and the lack of a plausible biological mechanism by which testosterone suppression might affect skeletal measurements such as bone length and hip width, we conclude that height and skeletal parameters remain unaltered in transgender women, and

that sporting advantage conferred by skeletal size and bone density would be retained despite testosterone reductions compliant with the IOC's current guidelines. This is of particular relevance to sports where height, limb length and handspan are key (e.g. basketball, volleyball, handball) and where high movement efficiency is advantageous. Male bone geometry and density may also provide protection against some sport-related injuries—for example, males have a lower incidence of knee injuries, often attributed to low quadriceps ($Q$) angle conferred by a narrow pelvic girdle [59, 60].

## 4.2 Muscle and Strength Metrics

As discussed earlier, muscle mass and strength are key parameters underpinning male performance advantages. Strength differences range between 30 and 100%, depending upon the cohort studied and the task used to assess strength. Thus, given the important contribution made by strength to performance, we sought studies that have assessed strength and muscle/lean body mass changes in transgender women after testosterone reduction. Studies retrieved in our literature search covered both longitudinal and cross-sectional analyses. Given the superior power of the former study type, we will focus on these.

The pioneer work by Gooren and colleagues, published in part in 1999 [61] and in full in 2004 [62], reported the effects of 1 and 3 years of testosterone suppression and estrogen supplementation in 19 transgender women (age 18–37 years). After the first year of therapy, testosterone levels were reduced to 1 nmol/L, well within typical female reference ranges, and remained low throughout the study course. As determined by MRI, thigh muscle area had decreased by − 9% from baseline measurement. After 3 years, thigh muscle area had decreased by a further − 3% from baseline measurement (total loss of − 12% over 3 years of treatment). However, when compared with the baseline measurement of thigh muscle area in transgender men (who are born female and experience female puberty), transgender women retained significantly higher thigh muscle size. The final thigh muscle area, after three years of testosterone suppression, was 13% larger in transwomen than in the transmen at baseline ($p < 0.05$). The authors concluded that testosterone suppression in transgender women does not reverse muscle size to female levels.

Including Gooren and Bunck [62], 12 longitudinal studies [53, 63–73] have examined the effects of testosterone suppression on lean body mass or muscle size in transgender women. The collective evidence from these studies suggests that 12 months, which is the most commonly examined intervention period, of testosterone suppression to female-typical reference levels results in a modest (approximately − 5%) loss of lean body mass or muscle size (Table 4). No

**Table 4** Longitudinal studies of muscle and strength changes in adult transgender women undergoing cross-sex hormone therapy

| Study | Participants (age) | Therapy | Confirmed serum testosterone levels | Muscle/strength data | Comparison with reference females |
|---|---|---|---|---|---|
| Polderman et al. [73] | $N=12$ TW 18–36 yr (age range) | T suppression + E supplementation | <2 nmol/L at 4 mo | *LBM* 4 mo − 2.2% | *LBM* 4 mo 16% |
| Gooren and Bunck [62] | $N=19$ TW 26±6 yr | T suppression + E supplementation | ≤1 nmol/L at 1 and 3 yr | *Thigh area* 1 yr − 9% / 3 yr -12% | *Thigh area* 1 yr 16%/3 yr 13% |
| Haraldsen et al. [63] | $N=12$ TW 29±8 yr | E supplementation | <10 nmol/L at 3 mo and 1 yr | *LBM* 3 mo/1 yr—small changes, unclear magnitude | |
| Mueller et al. [64] | $N=84$ TW 36±11 yr | T suppression + E supplementation | ≤1 nmol/L at 1 and 2 yr | *LBM* 1 yr − 4%/2 yr − 7% | |
| Wierckx et al. [65] | $N=53$ TW 31±14 yr | T suppression + E supplementation | <10 nmol/L at 1 yr | *LBM* 1 yr − 5% | *LBM* 1 yr 39% |
| Van Caenegem et al. [53] (and Van Caenegem et al. [76]) | $N=49$ TW 33±14 yr | T suppression + E supplementation | ≤1 nmol/L at 1 and 2 yr | *LBM* 1 yr − 4%/2 yr − 0.5% *Grip strength* 1 yr − 7%/2 yr − 9% *Calf area* 1 yr − 2%/2 yr − 4% *Forearm area* 1 yr − 8%/2 yr − 4% | *LBM* 1 yr 24%/2 yr 28% *Grip strength* 1 yr 26%/2 yr 23% *Calf area* 1 yr 16%/2 yr 13% *Forearm area* 1 yr 29%/2 yr 34% |
| Gava et al. [66] | $N=40$ TW 31±10 yr | T suppression + E supplementation | <5 nmol/L at 6 mo and ≤1 nmol/L at 1 yr | *LBM* 1 yr − 2% | |
| Auer et al. [67] | $N=45$ TW 35±1 (SE) yr | T suppression + E supplementation | <5 nmol/L at 1 yr | *LBM* 1 yr − 3% | *LBM* 1 yr 27% |
| Klaver et al. [68] | $N=179$ TW 29 (range 18–66) | T suppression + E supplementation | ≤1 nmol/L at 1 yr | *LBM 1 yr* Total − 3% Arm region − 6% Trunk region − 2% Android region 0% Gynoid region − 3% Leg region − 4% | *LBM 1 yr* Total 18% Arm region 28% Leg region 19% |
| Fighera et al. [69] | $N=46$ TW 34±10 | E supplementation with or without T suppression | <5 nmol/L at 3 mo ≤1 nmol/L at 31 mo | *ALM* 31 mo − 4% from the 3 mo visit | |
| Scharff et al. [70] | $N=249$ TW 28 (inter quartile range 23–40) | T suppression + E supplementation | ≤1 nmol/L at 1 yr | *Grip strength* 1 yr − 4% | *Grip strength* 1 yr 21% |
| Wiik et al. [71] | $N=11$ TW 27±4 | T suppression + E supplementation | ≤1 nmol/L at 4 mo and at 1 yr | *Thigh volume* 1 yr − 5% *Quad area* 1 yr − 4% *Knee extension strength* 1 yr 2% *Knee flexion strength* 1 yr 3% | *Thigh volume* 1 yr 33% *Quad area* 26% *Knee extension strength* 41% *Knee flexion strength* 33% |

Studies reporting measures of lean mass, muscle volume, muscle area or strength are included. Muscle/strength data are calculated in reference to baseline cohort data and, where reported, reference female (or transgender men before treatment) cohort data. Tack et al. [72] was not included in the table since some of the participants had not completed full puberty at treatment initiation. van Caenegem et al. [76] reports reference female values measured in a separately-published, parallel cohort of transgender men

*N* number of participants, *TW* transgender women, *Yr* year, *Mo* month, *T* testosterone, *E* estrogen. ± Standard deviation (unless otherwise indicated in text), *LBM* lean body mass, *ALM* appendicular lean mass

study has reported muscle loss exceeding the $-12\%$ found by Gooren and Bunck after 3 years of therapy. Notably, studies have found very consistent changes in lean body mass (using dual-energy X-ray absorptiometry) after 12 months of treatment, where the change has always been between $-3$ and $-5\%$ on average, with slightly greater reductions in the arm compared with the leg region [68]. Thus, given the large baseline differences in muscle mass between males and females (Table 1; approximately 40%), the reduction achieved by 12 months of testosterone suppression can reasonably be assessed as small relative to the initial superior mass. We, therefore, conclude that the muscle mass advantage males possess over females, and the performance implications thereof, are not removed by the currently studied durations (4 months, 1, 2 and 3 years) of testosterone suppression in transgender women. In sports where muscle mass is important for performance, inclusion is therefore only possible if a large imbalance in fairness, and potentially safety in some sports, is to be tolerated.

To provide more detailed information on not only gross body composition but also thigh muscle volume and contractile density, Wiik et al. [71] recently carried out a comprehensive battery of MRI and computed tomography (CT) examinations before and after 12 months of successful testosterone suppression and estrogen supplementation in 11 transgender women. Thigh volume (both anterior and posterior thigh) and quadriceps cross-sectional area decreased $-4$ and $-5\%$, respectively, after the 12-month period, supporting previous results of modest effects of testosterone suppression on muscle mass (see Table 4). The more novel measure of radiological attenuation of the quadriceps muscle, a valid proxy of contractile density [74, 75], showed no significant change in transgender women after 12 months of treatment, whereas the parallel group of transgender men demonstrated a $+6\%$ increase in contractile density with testosterone supplementation.

As indicated earlier (e.g. Table 1), the difference in muscle strength between males and females is often more pronounced than the difference in muscle mass. Unfortunately, few studies have examined the effects of testosterone suppression on muscle strength or other proxies of performance in transgender individuals. The first such study was published online approximately 1 year prior to the release of the current IOC policy. In this study, as well as reporting changes in muscle size, van Caenegem et al. [53] reported that hand-grip strength was reduced from baseline measurements by $-7\%$ and $-9\%$ after 12 and 24 months, respectively, of cross-hormone treatment in transgender women. Comparison with data in a separately-published, parallel cohort of transgender men [76] demonstrated a retained hand-grip strength advantage after 2 years of 23% over female baseline measurements (a calculated average of baseline data obtained from control females and transgender men).

In a recent multicenter study [70], examination of 249 transgender women revealed a decrease of $-4\%$ in grip strength after 12 months of cross-hormone treatment, with no variation between different testosterone level, age or BMI tertiles (all transgender women studied were within female reference ranges for testosterone). Despite this modest reduction in strength, transgender women retained a 17% grip strength advantage over transgender men measured at baseline. The authors noted that handgrip strength in transgender women was in approximately the 25th percentile for males but was over the 90th percentile for females, both before and after hormone treatment. This emphasizes that the strength advantage for males over females is inherently large. In another study exploring handgrip strength, albeit in late puberty adolescents, Tack et al. noted no change in grip strength after hormonal treatment (average duration 11 months) of 21 transgender girls [72].

Although grip strength provides an excellent proxy measurement for general strength in a broad population, specific assessment within different muscle groups is more valuable in a sports-specific framework. Wiik et al., [71] having determined that thigh muscle mass reduces only modestly, and that no significant changes in contractile density occur with 12 months of testosterone suppression, provided, for the first time, data for isokinetic strength measurements of both knee extension and knee flexion. They reported that muscle strength after 12 months of testosterone suppression was comparable to baseline strength. As a result, transgender women remained about 50% stronger than both the group of transgender men at baseline and a reference group of females. The authors suggested that small neural learning effects during repeated testing may explain the apparent lack of small reductions in strength that had been measured in other studies [71].

These longitudinal data comprise a clear pattern of very modest to negligible changes in muscle mass and strength in transgender women suppressing testosterone for at least 12 months. Muscle mass and strength are key physical parameters that constitute a significant, if not majority, portion of the male performance advantage, most notably in those sports where upper body strength, overall strength, and muscle mass are crucial determinants of performance. Thus, our analysis strongly suggests that the reduction in testosterone levels required by many sports federation transgender policies is insufficient to remove or reduce the male advantage, in terms of muscle mass and strength, by any meaningful degree. The relatively consistent finding of a minor (approximately $-5\%$) muscle loss after the first year of treatment is also in line with studies on androgen-deprivation therapy in males with prostate cancer, where the annual loss

E. N. Hilton, T. R. Lundberg

of lean body mass has been reported to range between $-2$ and $-4\%$ [77].

Although less powerful than longitudinal studies, we identified one major cross-sectional study that measured muscle mass and strength in transgender women. In this study, 23 transgender women and 46 healthy age- and height-matched control males were compared [78]. The transgender women were recruited at least 3 years after sex reassignment surgery, and the mean duration of cross-hormone treatment was 8 years. The results showed that transgender women had 17% less lean mass and 25% lower peak quadriceps muscle strength than the control males [78]. This cross-sectional comparison suggests that prolonged testosterone suppression, well beyond the time period mandated by sports federations substantially reduces muscle mass and strength in transgender women. However, the typical gap in lean mass and strength between males and females at baseline (Table 1) exceeds the reductions reported in this study [78]. The final average lean body mass of the transgender women was 51.2 kg, which puts them in the 90th percentile for women [79]. Similarly, the final grip strength was 41 kg, 25% higher than the female reference value [80]. Collectively, this implies a retained physical advantage even after 8 years of testosterone suppression. Furthermore, given that cohorts of transgender women often have slightly lower baseline measurements of muscle and strength than control males [53], and baseline measurements were unavailable for the transgender women of this cohort, the above calculations using control males reference values may be an overestimate of actual loss of muscle mass and strength, emphasizing both the need for caution when analyzing cross-sectional data in the absence of baseline assessment and the superior power of longitudinal studies quantifying within-subject changes.

### 4.3 Endurance Performance and Cardiovascular Parameters

No controlled longitudinal study has explored the effects of testosterone suppression on endurance-based performance. Sex differences in endurance performance are generally smaller than for events relying more on muscle mass and explosive strength. Using an age grading model designed to normalize times for masters/veteran categories, Harper [81] analyzed self-selected and self-reported race times for eight transgender women runners of various age categories who had, over an average 7 year period (range 1–29 years), competed in sub-elite middle and long distance races within both the male and female categories. The age-graded scores for these eight runners were the same in both categories, suggesting that cross-hormone treatment reduced running performance by approximately the size of the typical male advantage. However, factors affecting performances in the interim, including training and injury, were uncontrolled

for periods of years to decades and there were uncertainties regarding which race times were self-reported vs. which race times were actually reported and verified, and factors such as standardization of race course and weather conditions were unaccounted for. Furthermore, one runner improved substantially post-transition, which was attributed to improved training [81]. This demonstrates that performance decrease after transition is not inevitable if training practices are improved. Unfortunately, no study to date has followed up these preliminary self-reports in a more controlled setting, so it is impossible to make any firm conclusions from this data set alone.

Circulating hemoglobin levels are androgen-dependent [82] and typically reported as 12% higher in males compared with females [4]. Hemoglobin levels appear to decrease by 11–14% with cross-hormone therapy in transgender women [62, 71], and indeed comparably sized reductions have been reported in athletes with DSDs where those athletes are sensitive to and been required to reduce testosterone [47, 83]. Oxygen-carrying capacity in transgender women is most likely reduced with testosterone suppression, with a concomitant performance penalty estimated at 2–5% for the female athletic population [83]. Furthermore, there is a robust relationship between hemoglobin mass and $VO_{2max}$ [84, 85] and reduction in hemoglobin is generally associated with reduced aerobic capacity [86, 87]. However, hemoglobin mass is not the only parameter contributing to $VO_{2max}$, where central factors such as total blood volume, heart size and contractility, and peripheral factors such as capillary supply and mitochondrial content also plays a role in the final oxygen uptake [88]. Thus, while a reduction in hemoglobin is strongly predicted to impact aerobic capacity and reduce endurance performance in transgender women, it is unlikely to completely close the baseline gap in aerobic capacity between males and females.

The typical increase in body fat noted in transgender women [89, 90] may also be a disadvantage for sporting activities (e.g. running) where body weight (or fat distribution) presents a marginal disadvantage. Whether this body composition change negatively affects performance results in transgender women endurance athletes remains unknown. It is unclear to what extent the expected increase in body fat could be offset by nutritional and exercise countermeasures, as individual variation is likely to be present. For example, in the Wiik et al. study [71], 3 out of the 11 transgender women were completely resistant to the marked increase in total adipose tissue noted at the group level. This inter-individual response to treatment represents yet another challenge for sports governing bodies who most likely, given the many obstacles with case-by-case assessments, will form policies based on average effect sizes.

Altogether, the effects of testosterone suppression on performance markers for endurance athletes remain

insufficiently explored. While the negative effect on hemoglobin concentration is well documented, the effects on $VO_{2max}$, left ventricular size, stroke volume, blood volume, cardiac output lactate threshold, and exercise economy, all of which are important determinants of endurance performance, remain unknown. However, given the plausible disadvantages with testosterone suppression mentioned in this section, together with the more marginal male advantage in endurance-based sports, the balance between inclusion and fairness is likely closer to equilibrium in weight-bearing endurance-based sports compared with strength-based sports where the male advantage is still substantial.

## 5 Discussion

The data presented here demonstrate that superior anthropometric, muscle mass and strength parameters achieved by males at puberty, and underpinning a considerable portion of the male performance advantage over females, are not removed by the current regimen of testosterone suppression permitting participation of transgender women in female sports categories. Rather, it appears that the male performance advantage remains substantial. Currently, there is no consensus on an acceptable degree of residual advantage held by transgender women that would be tolerable in the female category of sport. There is significant dispute over this issue, especially since the physiological determinants of performance vary across different sporting disciplines. However, given the IOC position that fair competition is the overriding sporting objective [14], any residual advantage carried by transgender women raises obvious concerns about fair and safe competition in the numerous sports where muscle mass, strength and power are key performance determinants.

### 5.1 Perspectives on Athletic Status of Transgender Women

Whilst available evidence is strong and convincing that strength, skeletal- and muscle-mass derived advantages will largely remain after cross-hormone therapy in transgender women, it is acknowledged that the findings presented here are from healthy adults with regular or even low physical activity levels [91], and not highly trained athletes. Thus, further research is required in athletic transgender populations.

However, despite the current absence of empirical evidence in athletic transgender women, it is possible to evaluate potential outcomes in athletic transgender women compared with untrained cohorts. The first possibility is that athletic transgender women will experience similar reductions (approximately −5%) in muscle mass and strength as untrained transgender women, and will thus retain significant advantages over a comparison group of females. As a result of higher baseline characteristics in these variables, the retained advantage may indeed be even larger. A second possibility is that by virtue of greater muscle mass and strength at baseline, pre-trained transgender women will experience larger relative decreases in muscle mass and strength if they converge with untrained transgender women, particularly if training is halted during transition. Finally, training before and during the period of testosterone suppression may attenuate the anticipated reductions, such that relative decreases in muscle mass and strength will be smaller or non-existent in transgender women who undergo training, compared to untrained (and non-training) controls.

It is well established that resistance training counteracts substantial muscle loss during atrophy conditions that are far more severe than testosterone suppression. For example, resistance exercise every third day during 90-days bed rest was sufficient to completely offset the 20% reduction in knee extensor muscle size noted in the resting control subjects [92]. More relevant to the question of transgender women, however, is to examine training effects in studies where testosterone has been suppressed in biological males. Kvorning et al. investigated, in a randomized placebo-controlled trial, how suppression of endogenous testosterone for 12 weeks influenced muscle hypertrophy and strength gains during a training program (3 days/week) that took place during the last 8 weeks of the 3-month suppression period [93]. Despite testosterone suppression to female levels of 2 nmol/L, there was a significant +4% increase in leg lean mass and a +2% increase in total lean body mass, and a measurable though insignificant increase in isometric knee extension strength. Moreover, in select exercises used during the training program, 10RM leg press and bench press increased +32% and +17%, respectively. While some of the training adaptations were lower than in the placebo group, this study demonstrates that training during a period of testosterone suppression not only counteracts muscle loss, but can actually increase muscle mass and strength.

Males with prostate cancer undergoing androgen deprivation therapy provide a second avenue to examine training effects during testosterone suppression. Testosterone levels are typically reduced to castrate levels, and the loss of lean mass has typically ranged between −2 and −4% per year [77], consistent with the findings described previously in transgender women. A recent meta-analysis concluded that exercise interventions including resistance exercise were generally effective for maintaining muscle mass and increasing muscle strength in prostate cancer patients undergoing androgen deprivation therapy [94]. It is important to emphasize that the efficacy of the different training programs may vary. For example, a 12-week training study of prostate cancer patients undergoing androgen deprivation therapy

included drop-sets to combine heavy loads and high volume while eliciting near-maximal efforts in each set [95]. This strategy resulted in significantly increased lean body mass (+3%), thigh muscle volume (+6%), knee extensor 1RM strength (+28%) and leg press muscle endurance (+110%).

In addition to the described effects of training during testosterone suppression, the effect of training prior to testosterone suppression may also contribute to the attenuation of any muscle mass and strength losses, via a molecular mechanism referred to as 'muscle memory' [96]. Specifically, it has been suggested that myonuclei acquired by skeletal muscle cells during training are maintained during subsequent atrophy conditions [97]. Even though this model of muscle memory has been challenged recently [98], it may facilitate an improved training response upon retraining [99]. Mechanistically, the negative effects of testosterone suppression on muscle mass are likely related to reduced levels of resting protein synthesis [100], which, together with protein breakdown, determines the net protein balance of skeletal muscle. However, testosterone may not be required to elicit a robust muscle protein synthesis response to resistance exercise [100]. Indeed, relative increases in muscle mass in men and women from resistance training are comparable, despite marked differences in testosterone levels [101], and the acute rise in testosterone apparent during resistance exercise does not predict muscle hypertrophy nor strength gains [102]. This suggests that even though testosterone is important for muscle mass, especially during puberty, the maintenance of muscle mass through resistance training is not crucially dependent on circulating testosterone levels.

Thus, in well-controlled studies in biological males who train while undergoing testosterone reduction, training is protective of, and may even enhance, muscle mass and strength attributes. Considering transgender women athletes who train during testosterone suppression, it is plausible to conclude that any losses will be similar to or even smaller in magnitude than documented in the longitudinal studies described in this review. Furthermore, pre-trained transgender women are likely to have greater muscle mass at baseline than untrained transgender women; it is possible that even with the same, rather than smaller, relative decreases in muscle mass and strength, the magnitude of retained advantage will be greater. In contrast, if pre-trained transgender women undergo testosterone suppression while refraining from intense training, it appears likely that muscle mass and strength will be lost at either the same or greater rate than untrained individuals, although there is no rationale to expect a weaker endpoint state. The degree of change in athletic transgender women is influenced by the athlete's baseline resistance-training status, the efficacy of the implemented program and other factors such as genetic make-up and nutritional habits, but we argue that it is implausible that

athletic transgender women would achieve final muscle mass and strength metrics that are on par with reference females at comparable athletic level.

## 5.2 The Focus on Muscle Mass and Strength

We acknowledge that changes in muscle mass are not always correlated in magnitude to changes in strength measurements because muscle mass (or total mass) is not the only contributor to strength [103]. Indeed, the importance of the nervous system, e.g. muscle agonist activation (recruitment and firing frequency) and antagonist co-activation, for muscle strength must be acknowledged [104]. In addition, factors such as fiber types, biomechanical levers, pennation angle, fascicle length and tendon/extracellular matrix composition may all influence the ability to develop muscular force [105]. While there is currently limited to no information on how these factors are influenced by testosterone suppression, the impact seems to be minute, given the modest changes noted in muscle strength during cross-hormone treatment.

It is possible that estrogen replacement may affect the sensitivity of muscle to anabolic signaling and have a protective effect on muscle mass [106] explaining, in part, the modest change in muscle mass with testosterone suppression and accompanying cross-hormone treatment. Indeed, this is supported by research conducted on estrogen replacement therapy in other targeted populations [107, 108] and in several different animal models, including mice after gonadectomy [109] and ovariectomy [110].

In terms of other performance proxies relevant to sports performance, there is no research evaluating the effects of transgender hormone treatment on factors such as agility, jumping or sprint performance, competition strength performance (e.g. bench press), or discipline-specific performance. Other factors that may impact sports performance, known to be affected by testosterone and some of them measurably different between males and females, include visuospatial abilities, aggressiveness, coordination and flexibility.

## 5.3 Testosterone-Based Criteria for Inclusion of Transgender Women in Female Sports

The appropriate testosterone limit for participation of transgender women in the female category has been a matter of debate recently, where sports federations such as World Athletics recently lowered the eligibility criterion of free circulating testosterone (measured by means of liquid chromatography coupled with mass spectrometry) to < 5 nmol/L. This was based, at least in part, on a thorough review by Handelsman et al. [4], where the authors concluded that, given the nonoverlapping distribution of circulating testosterone between males and females, and making an allowance

for females with mild hyperandrogenism (e.g. with poly-cystic ovary syndrome), the appropriate testosterone limit should be 5 rather than 10 nmol/L.

From the longitudinal muscle mass/strength studies summarised here, however, it is apparent that most therapeutic interventions result in almost complete suppression of testosterone levels, certainly well below 5 nmol/L (Table 4). Thus, with regard to transgender women athletes, we question whether current circulating testosterone level cut-off can be a meaningful decisive factor, when in fact not even suppression down to around 1 nmol/L removes the anthropometric and muscle mass/strength advantage in any significant way.

In terms of duration of testosterone suppression, it may be argued that although 12 months of treatment is not sufficient to remove the male advantage, perhaps extending the time frame of suppression would generate greater parity with female metrics. However, based on the studies reviewed here, evidence is lacking that this would diminish the male advantage to a tolerable degree. On the contrary, it appears that the net loss of lean mass and grip strength is not substantially decreased at year 2 or 3 of cross-hormone treatment (Table 4), nor evident in cohorts after an average 8 years after transition. This indicates that a plateau or a new steady state is reached within the first or second year of treatment, a phenomenon also noted in transgender men, where the increase in muscle mass seems to stabilise between the first and the second year of testosterone treatment [111].

## 6 Conclusions

We have shown that under testosterone suppression regimes typically used in clinical settings, and which comfortably exceed the requirements of sports federations for inclusion of transgender women in female sports categories by reducing testosterone levels to well below the upper tolerated limit, evidence for loss of the male performance advantage, established by testosterone at puberty and translating in elite athletes to a 10–50% performance advantage, is lacking. Rather, the data show that strength, lean body mass, muscle size and bone density are only trivially affected. The reductions observed in muscle mass, size, and strength are very small compared to the baseline differences between males and females in these variables, and thus, there are major performance and safety implications in sports where these attributes are competitively significant. These data significantly undermine the delivery of fairness and safety presumed by the criteria set out in transgender inclusion policies, particularly given the stated prioritization of fairness as an overriding objective (for the IOC). If those policies are intended to preserve fairness, inclusion and the safety of biologically female athletes, sporting organizations may need to reassess their policies regarding inclusion of transgender women.

From a medical-ethical point of view, it may be questioned as to whether a requirement to lower testosterone below a certain level to ensure sporting participation can be justified at all. If the advantage persists to a large degree, as evidence suggests, then a stated objective of targeting a certain testosterone level to be eligible will not achieve its objective and may drive medical practice that an individual may not want or require, without achieving its intended benefit.

The research conducted so far has studied untrained transgender women. Thus, while this research is important to understand the isolated effects of testosterone suppression, it is still uncertain how transgender women athletes, perhaps undergoing advanced training regimens to counteract the muscle loss during the therapy, would respond. It is also important to recognize that performance in most sports may be influenced by factors outside muscle mass and strength, and the balance between inclusion, safety and fairness therefore differs between sports. While there is certainly a need for more focused research on this topic, including more comprehensive performance tests in transgender women athletes and studies on training capacity of transgender women undergoing hormone therapy, it is still important to recognize that the biological factors underpinning athletic performance are unequivocally established. It is, therefore, possible to make strong inferences and discuss potential performance implications despite the lack of direct sport-specific studies in athletes. Finally, since athlete safety could arguably be described as the immediate priority above considerations of fairness and inclusion, proper risk assessment should be conducted within respective sports that continue to include transgender women in the female category.

If transgender women are restricted within or excluded from the female category of sport, the important question is whether or not this exclusion (or conditional exclusion) is necessary and proportionate to the goal of ensuring fair, safe and meaningful competition. Regardless of what the future will bring in terms of revised transgender policies, it is clear that different sports differ vastly in terms of physiological determinants of success, which may create safety considerations and may alter the importance of retained performance advantages. Thus, we argue against universal guidelines for transgender athletes in sport and instead propose that each individual sports federation evaluate their own conditions for inclusivity, fairness and safety.

## Compliance with Ethical Standards

**Funding** None. Open access funding provided by Karolinska Institutet.

**Conflicts of interest** Emma N Hilton and Tommy R Lundberg declare that they have no conflict of interest with the content of this review.

**Authorship contributions** Both authors (ENH and TRL) were involved in the conception and design of this paper, and both authors drafted, revised and approved the final version of the paper.

**Ethics approval** Not applicable.

**Informed consent** Not applicable.

**Data availability** Available upon request.

**Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

# References

1. Suchomel TJ, Nimphius S, Bellon CR, Stone MH. The importance of muscular strength: training considerations. Sport Med. 2018;48:765–85.
2. Coyle EF. Integration of the physiological factors determining endurance performance ability. Exerc Sport Sci Rev. 1995;23:25–63.
3. Haizlip KM, Harrison BC, Leinwand LA. Sex-based differences in skeletal muscle kinetics and fiber-type composition. Physiology. 2015;30(1):30–9.
4. Handelsman DJ, Hirschberg AL, Bermon S. Circulating testosterone as the hormonal basis of sex differences in athletic performance. Endocr Rev. 2018;39(5):803–29.
5. Sandbakk Ø, Solli GS, Holmberg HC. Sex differences in world-record performance: the influence of sport discipline and competition duration. Int J Sports Physiol Perform. 2018;13(1):2–8.
6. Genel M. Transgender athletes: how can they be accommodated? Curr Sports Med Rep. 2017;16(1):12–3.
7. Coggon J, Hammond N, Holm S. Transsexuals in sport—fairness and freedom, regulation and law. Sport Ethics Philos. 2008;2(1):4–17.
8. Pitsiladis Y, Harper J, Betancurt JO, et al. Beyond fairness. Curr Sports Med Rep. 2016;15:386–8.
9. Reeser JC. Gender identity and sport: is the playing field level? Br J Sports Med. 2005;39(10):695–9.
10. Transgender Policy in Sport. A review of current policy and commentary of the challenges of policy creation. Curr Sports Med Rep. 2019;18(6):239–47.
11. Harper J, Martinez-Patino MJ, Pigozzi F, Pitsiladis Y. Implications of a third gender for elite sports. Curr Sports Med Rep. 2018;17(2):42–4.
12. Singh B, Singh K. The hermeneutics of participation of transgender athletes in sports—intensifying third force. Phys Cult Sport Stud Res. 2011;52(1):44–8.
13. Bianchi A. Transgender women in sport. J Philos Sport. 2017;44:229–42.
14. Harper J, Hirschberg AL, Jose M, et al. IOC consensus meeting on sex reassignment and hyperandrogenism. 2015. https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf. Accessed 28 Nov 2020
15. Carré GA, Greenfield A. The gonadal supporting cell lineage and mammalian sex determination: the differentiation of sertoli and granulosa cells. In: Piprek R, editor. Molecular mechanisms of cell differentiation in gonad development. Results and problems in cell differentiation, vol 58. Cham: Springer; 2016. p. 47–66.
16. Sobel V, Zhu YS, Imperato-McGinley J. Fetal hormones and sexual differentiation. Obstet Gynecol Clin N Am. 2004;31(4):837–xi.
17. Hughes IA. Disorders of sex development: a new definition and classification. Best Pract Res Clin Endocrinol Metab. 2008;22(1):119–34.
18. Tønnessen E, Svendsen IS, Olsen IC, et al. Performance development in adolescent track and field athletes according to age, sex and sport discipline. PLoS ONE. 2015;10(6):e0129014.
19. Gershoni M, Pietrokovski S. The landscape of sex-differential transcriptome and its consequent selection in human adults. BMC Biol. 2017;15(1):7.
20. Lanciotti L, Cofini M, Leonardi A, Penta L, Esposito S. Up-to-date review about minipuberty and overview on hypothalamic-pituitary-gonadal axis activation in fetal and neonatal life. Front Endocrinol. 2018;23(9):410.
21. Becker M, Hesse V. Minipuberty: why does it happen? Horm Res Paediatr. 2020;93(2):76–84.
22. Catley MJ, Tomkinson GR. Normative health-related fitness values for children: analysis of 85347 test results on 9–17-year-old Australians since 1985. Br J Sports Med. 2013;47(2):98–108.
23. Tambalis KD, Panagiotakos DB, Psarra G, et al. Physical fitness normative values for 6–18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method. Eur J Sport Sci. 2016;16(6):736–46.
24. Eiberg S, Hasselstrom H, Grønfeldt V, et al. Maximum oxygen uptake and objectively measured physical activity in Danish children 6–7 years of age: the Copenhagen school child intervention study. Br J Sports Med. 2005;39(10):725–30.
25. Bae YJ, Zeidler R, Baber R, et al. Reference intervals of nine steroid hormones over the life-span analyzed by LC-MS/MS: Effect of age, gender, puberty, and oral contraceptives. J Steroid Biochem Mol Biol. 2019;193:105409.
26. Thibault V, Guillaume M, Berthelot G, et al. Women and men in sport performance: the gender gap has not evolved since 1983. J Sport Sci Med. 2010;9(2):214–23.
27. Millard-Stafford M, Swanson AE, Wittbrodt MT. Nature versus nurture: have performance gaps between men and women reached an asymptote? Int J Sports Physiol Perform. 2018;13(4):530–5.
28. Lee DH, Keum N, Hu FB, et al. Development and validation of anthropometric prediction equations for lean body mass, fat mass and percent fat in adults using the National Health and Nutrition Examination Survey (NHANES) 1999–2006. Br J Nutr. 2017;118(10):858–66.
29. Janssen I, Heymsfield SB, Wang ZM, Ross R. Skeletal muscle mass and distribution in 468 men and women aged 18–88 yr. J Appl Physiol. 2000;89:81–8.
30. Bohannon RW, Wang YC, Yen SC, Grogan KA. Handgrip strength: a comparison of values obtained from the NHANES and NIH Toolbox studies. Am J Occup Ther. 2019;73(2):1–9.
31. Neder JA, Nery LE, Shinzato GT, et al. Reference values for concentric knee isokinetic strength and power in nonathletic men and women from 20 to 80 years old. J Orthop Sports Phys Ther. 1999;29:116–26.

32. Jantz LM, Jantz RL. Secular change in long bone length and proportion in the United States, 1800–1970. Am J Phys Anthropol. 1999;110(1):57–67.

33. Brinckmann P, Hoefert H, Jongen HT. Sex differences in the skeletal geometry of the human pelvis and hip joint. J Biomech. 1981;14(6):427–30.

34. Lepley AS, Joseph MF, Daigle NR, et al. Sex differences in mechanical properties of the Achilles tendon: longitudinal response to repetitive loading exercise. J Strength Cond Res. 2018;32(11):3070–9.

35. Pate RR, Kriska A. Physiological basis of the sex difference in cardiorespiratory endurance. Sports Med. 1984;1(2):87–9.

36. Astrand PO, Cuddy TE, Saltin B, Stenberg J. Cardiac output during submaximal and maximal work. J Appl Physiol. 1964;19:268–74.

37. Best SA, Okada Y, Galbreath MM, et al. Age and sex differences in muscle sympathetic nerve activity in relation to haemodynamics, blood volume and left ventricular size. Exp Physiol. 2014;99(6):839–48.

38. Tong E, Murphy WG, Kinsella A, et al. Capillary and venous haemoglobin levels in blood donors: a 42-month study of 36 258 paired samples. Vox Sang. 2010;98(4):547–53.

39. Dominelli PB, Molgat-Seon Y, Sheel AW. Sex differences in the pulmonary system influence the integrative response to exercise. Exerc Sport Sci Rev. 2019;47(3):142–50.

40. Wingate S. Cardiovascular anatomy and physiology in the female. Crit Care Nurs Clin N Am. 1997;9(4):447–52.

41. Haugen T, Breitschädel F, Wiig H, Seiler S. Countermovement jump height in national team athletes of various sports: a framework for practitioners and scientists. Int J Sports Physiol Perform. 2020 **(accessed 4 May 2020 from Researchgate)**

42. Thomas JR, French KE. Gender differences across age in motor performance a meta-analysis. Psychol Bull. 1985;98(2):260–82.

43. Antti M, Komi PV, Korjus T, et al. Body segment contributions to javelin throwing during final thrust phases. J Appl Biomech. 1994;10:166–77.

44. Lassek WD, Gaulin SJC. Costs and benefits of fat-free muscle mass in men: relationship to mating success, dietary requirements, and native immunity. Evol Hum Behav. 2009;20(5):322–8.

45. Stoll T, Huber E, Seifert B, et al. Maximal isometric muscle strength: normative values and gender-specific relation to age. Clin Rheumatol. 2000;19(2):105–11.

46. Coleman DL. Sex in sport. Law Contemp Probl. 2017;80:63–126.

47. CAS 2018/O/5794 Mokgadi Caster Semenya v. International Association of Athletics Federation. https://www.tas-cas.org/fileadmin/user_upload/CAS_Award_-_redacted_-_Semenya_ASA_IAAF.pdf. Accessed 28 Nov 2020

48. Sparling PB. A meta-analysis of studies comparing maximal oxygen uptake in men and women. Res Q Exerc Sport. 1980;51(3):542–52.

49. Hubal MJ, Gordish-Dressman H, Thompson PD, et al. Muscle size and strength gain after unilateral resistance training. Med Sci Sport Exerc. 2005;37(6):964–72.

50. Morris JS, Link J, Martin JC, Carrier DR. Sexual dimorphism in human arm power and force: implications for sexual selection on fighting ability. J Exp Biol. 2020;223(Pt 2):jeb212365.

51. Thomas JR, Thomas KT. Development of gender differences in physical activity. Quest. 1988;40(3):219–29.

52. Wiepjes CM, de Jongh RT, de Blok CJM, et al. Bone safety during the first ten years of gender-affirming hormonal treatment in transwomen and transmen. J Bone Miner Res. 2019;34(3):447–54.

53. Van Caenegem E, Wierckx K, Taes Y, et al. Preservation of volumetric bone density and geometry in trans women during

54. Singh-Ospina N, Maraka S, Rodriguez-Gutierrez R, et al. Effect of sex steroids on the bone health of transgender individuals: a systematic review and meta-analysis. J Clin Endocrinol Metab. 2017;102(11):3904–13.

55. Fighera TM, Ziegelmann PK, da Silva TR, Spritzer PM. Bone mass effects of cross-sex hormone therapy in transgender people: updated systematic review and meta-analysis. J Endocr Soc. 2019;3(5):943–64.

56. Ruetsche AG, Kneubuehl R, Birkhaeuser MH, Lippuner K. Cortical and trabecular bone mineral density in transsexuals after long-term cross-sex hormonal treatment: a cross-sectional study. Osteoporos Int. 2005;16(7):791–8.

57. Rosen HN, Hamnvik OPR, Jaisamrarn U, et al. Bone densitometry in transgender and gender non-conforming (TGNC) individuals: 2019 ISCD official position. J Clin Densitom. 2019;22(4):544–53.

58. Khosla S, Melton LJ, Riggs BL. Estrogens and bone health in men. Calcif Tissue Int. 2001;69(4):189–92.

59. Sigward SM, Powers CM. The influence of gender on knee kinematics, kinetics and muscle activation patterns during side-step cutting. Clin Biomech. 2006;21(1):41–8.

60. Francis P, Whatman C, Sheerin K, et al. The proportion of lower limb running injuries by gender, anatomical location and specific pathology: a systematic review. J Sport Sci Med. 2019;18(1):21–31.

61. Elbers JM, Asscheman H, Seidell JC, Gooren LJ. Effects of sex steroid hormones on regional fat depots as assessed by magnetic resonance imaging in transsexuals. Am J Physiol. 1999;276(2):E317-25.

62. Gooren LJG, Bunck MCM. Transsexuals and competitive sports. Eur J Endocrinol. 2004;151(4):425–9.

63. Haraldsen IR, Haug E, Falch J, et al. Cross-sex pattern of bone mineral density in early onset gender identity disorder. Horm Behav. 2007;52(3):334–43.

64. Mueller A, Zollver H, Kronawitter D, et al. Body composition and bone mineral density in male-to-female transsexuals during cross-sex hormone therapy using gonadotrophin-releasing hormone agonist. Exp Clin Endocrinol Diabetes. 2011;119(2):95–100.

65. Wierckx K, Van Caenegem E, Schreiner T, et al. Cross-sex hormone therapy in trans persons is safe and effective at short-time follow-up: results from the European network for the investigation of gender incongruence. J Sex Med. 2014;11(8):1999–2011.

66. Gava G, Cerpolini S, Martelli V, et al. Cyproterone acetate vs leuprolide acetate in combination with transdermal oestradiol in transwomen: a comparison of safety and effectiveness. Clin Endocrinol (Oxf). 2016;85(2):239–46.

67. Auer MK, Ebert T, Pietzner M, et al. Effects of sex hormone treatment on the metabolic syndrome in transgender individuals: focus on metabolic cytokines. J Clin Endocrinol Metab. 2018;103(2):790–802.

68. Klaver M, De Blok CJM, Wiepjes CM, et al. Changes in regional body fat, lean body mass and body shape in trans persons using cross-sex hormonal therapy: results from a multicenter prospective study. Eur J Endocrinol. 2018;178(2):163–71.

69. Fighera TM, da Silva E, Lindenau JDR, Spritzer PM. Impact of cross-sex hormone therapy on bone mineral density and body composition in transwomen. Clin Endocrinol (Oxf). 2018;88(6):856–62.

70. Scharff M, Wiepjes CM, Klaver M, et al. Change in grip strength in trans people and its association with lean body mass and bone density. Endocr Connect. 2019;8:1020–8.

71. Wiik A, Lundberg TR, Rullman E, et al. Muscle strength, size, and composition following 12 months of gender-affirming

treatment in transgender individuals. J Clin Endocrinol Metab. 2020;105(3):247.

72. Tack LJW, Craen M, Lapauw B, et al. Proandrogenic and antiandrogenic progestins in transgender youth: differential effects on body composition and bone metabolism. J Clin Endocrinol Metab. 2018;103(6):2147–56.

73. Polderman KH, Gooren LJG, Asscheman H, et al. Induction of insulin resistance by androgens and estrogens. J Clin Endocrinol Metab. 1994;79(1):265–71.

74. Aubrey J, Esfandiari N, Baracos VE, et al. Measurement of skeletal muscle radiation attenuation and basis of its biological variation. Acta Physiol (Oxf). 2014;210(3):489–97.

75. Rasch A, Byström AH, Dalen N, Berg HE. Reduced muscle radiological density, cross-sectional area, and strength of major hip and knee muscles in 22 patients with hip osteoarthritis. Acta Orthop. 2007;78(4):505–10.

76. Van Caenegem E, Wierckx K, Taes Y, et al. Body composition, bone turnover, and bone mass in trans men during testosterone treatment: 1-year follow-up data from a prospective case-controlled study (ENIGI). Eur J Endocrinol. 2015b;172(2):163–71.

77. Storer TW, Miciek R, Travison TG. Muscle function, physical performance and body composition changes in men with prostate cancer undergoing androgen deprivation therapy. Asian J Androl. 2012;14(2):204–21.

78. Lapauw B, Taes Y, Simoens S, et al. Body composition, volumetric and areal bone parameters in male-to-female transsexual persons. Bone. 2008;43(6):1016–21.

79. Imboden MT, Swartz AM, Finch HW, et al. Reference standards for lean mass measures using GE dual energy x-ray absorptiometry in Caucasian adults. PLoS ONE. 2017;12(4):e0176161.

80. Bohannon RW, Peolsson A, Massy-Westropp N, et al. Reference values for adult grip strength measured with a Jamar dynamometer: a descriptive meta-analysis. Physiotherapy. 2006;92(1):11–5.

81. Harper J. Race times for transgender athletes. J Sport Cult Identities. 2015;6(1):1–9.

82. Coviello AD, Kaplan B, Lakshman KM, et al. Effects of graded doses of testosterone on erythropoiesis in healthy young and older men. J Clin Endocrinol Metab. 2008;93(3):914–9.

83. Bermon S. Androgens and athletic performance of elite female athletes. Curr Opin Endocrinol Diabetes Obes. 2017;24(3):246–51.

84. Joyner MJ. VO2MAX, blood doping, and erythropoietin. Br J Sports Med. 2003;37(3):190–1.

85. Ekblom B, Goldbarg AN, Gullbring B. Response to exercise after blood loss and reinfusion. J Appl Physiol. 1972;33(2):175–80.

86. Kanstrup IL, Ekblom B. Blood volume and hemoglobin concentration as determinants of maximal aerobic power. Med Sci Sports Exerc. 1984;16(3):256–62.

87. Otto JM, Montgomery HE, Richards T. Haemoglobin concentration and mass as determinants of exercise performance and of surgical outcome. Extrem Physiol Med. 2013;2(1):33.

88. Joyner MJ, Lundby C. Concepts about $VO_{2max}$ and trainability are context dependent. Exerc Sport Sci Rev. 2018;46(3):138–43.

89. T'Sjoen G, Arcelus J, Gooren L, et al. Endocrinology of transgender medicine. Endocr Rev. 2018;40(1):97–117.

90. Klaver M, Dekker MJHJ, de Mutsert R, et al. Cross-sex hormone therapy in transgender persons affects total body weight, body fat and lean body mass: a meta-analysis. Andrologia. 2017. https://doi.org/10.1111/and.12660.

91. Muchicko MM, Lepp A, Barkley JE. Peer victimization, social support and leisure-time physical activity in transgender and cisgender individuals. Leis Loisir. 2014;3–4:295–308.

92. Alkner BA, Tesch PA. Knee extensor and plantar flexor muscle size and function following 90 days of bed rest with or without resistance exercise. Eur J Appl Physiol. 2004;93:294–305.

93. Kvorning T, Andersen M, Brixen K, Madsen K. Suppression of endogenous testosterone production attenuates the response to strength training: a randomized, placebo-controlled, and blinded intervention study. Am J Physiol Metab. 2006;291:E1325-32.

94. Chen Z, Zhang Y, Lu C, et al. Supervised physical training enhances muscle strength but not muscle mass in prostate cancer patients undergoing androgen deprivation therapy: a systematic review and meta-analysis. Front Physiol. 2019;10:843.

95. Hanson ED, Sheaff AK, Sood S, et al. Strength training induces muscle hypertrophy and functional gains in black prostate cancer patients despite androgen deprivation therapy. J Gerontol A Biol Sci Med Sci. 2013;68(4):490–8.

96. Gundersen K. Muscle memory and a new cellular model for muscle atrophy and hypertrophy. J Exp Biol. 2016;219:235–42.

97. Bruusgaard JC, Johansen IB, Egner IM, et al. Myonuclei acquired by overload exercise precede hypertrophy and are not lost on detraining. Proc Natl Acad Sci. 2010;107:15111–6.

98. Murach KA, Dungan CM, Dupont-Versteegden EE, et al. "Muscle Memory" not mediated by myonuclear number?: secondary analysis of human detraining data. J Appl Physiol. 2019;127(6):1814–6.

99. Staron RS, Leonardi MJ, Karapondo DL, et al. Strength and skeletal muscle adaptations in heavy-resistance-trained women after detraining and retraining. J Appl Physiol. 1991;70:631–40.

100. Hanson ED, Nelson AR, West DWD, et al. Attenuation of resting but not load-mediated protein synthesis in prostate cancer patients on androgen deprivation. J Clin Endocrinol Metab. 2017;102(3):1076–83.

101. Roberts BM, Nuckols G, Krieger JW. Sex differences in resistance training. J Strength Cond Res. 2020;34(5):1448–60.

102. Morton RW, Oikawa SY, Wavell CG, et al. Neither load nor systemic hormones determine resistance training-mediated hypertrophy or strength gains in resistance-trained young men. J Appl Physiol. 2016;121:129–38.

103. Balshaw TG, Massey GJ, Maden-Wilkinson TM, et al. Changes in agonist neural drive, hypertrophy and pre-training strength all contribute to the individual strength gains after resistance training. Eur J Appl Physiol. 2017;117:631–40.

104. Balshaw TG, Massey GJ, Maden-Wilkinson TM, et al. Neural adaptations after 4 years vs. 12 weeks of resistance training vs. untrained. Scand J Med Sci Sports. 2018;29(3):348–59.

105. Maden-Wilkinson TM, Balshaw TG, Massey GJ, Folland JP. What makes long-term resistance-trained individuals so strong? A comparison of skeletal muscle morphology, architecture, and joint mechanics. J Appl Physiol. 2020;128:1000–11.

106. Chidi-Ogbolu N, Baar K. Effect of estrogen on musculoskeletal performance and injury risk. Front Physiol. 2019;9:1834.

107. Sørensen MB, Rosenfalck AM, Højgaard L, Ottesen B. Obesity and sarcopenia after menopause are reversed by sex hormone replacement therapy. Obes Res. 2001;9(10):622–6.

108. Greising SM, Baltgalvis KA, Lowe DA, Warren GL. Hormone therapy and skeletal muscle strength: a meta-analysis. J Gerontol A Biol Sci Med Sci. 2009;64(10):1071–81.

109. Svensson J, Movérare-Skrtic S, Windahl S, et al. Stimulation of both estrogen and androgen receptors maintains skeletal muscle mass in gonadectomized male mice but mainly via different pathways. J Mol Endocrinol. 2010;45(1):45–57.

110. Kitajima Y, Ono Y. Estrogens maintain skeletal muscle and satellite cell functions. J Endocrinol. 2016;229(3):267–75.

111. Elbers JMH, Asscheman H, Seidell JC, et al. Long-term testosterone administration increases visceral fat in female to male transsexuals. J Clin Endocrinol Metab. 1997;82(7):2044–7.

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7
DOI 10.1186/s12915-017-0352-z

**BMC Biology**

RESEARCH ARTICLE  **Open Access**

# The landscape of sex-differential transcriptome and its consequent selection in human adults



Moran Gershoni* and Shmuel Pietrokovski

## Abstract

**Background:** The prevalence of several human morbid phenotypes is sometimes much higher than intuitively expected. This can directly arise from the presence of two sexes, male and female, in one species. Men and women have almost identical genomes but are distinctly dimorphic, with dissimilar disease susceptibilities. Sexually dimorphic traits mainly result from differential expression of genes present in both sexes. Such genes can be subject to different, and even opposing, selection constraints in the two sexes. This can impact human evolution by differential selection on mutations with dissimilar effects on the two sexes.

**Results:** We comprehensively mapped human sex-differential genetic architecture across 53 tissues. Analyzing available RNA-sequencing data from 544 adults revealed thousands of genes differentially expressed in the reproductive tracts and tissues common to both sexes. Sex-differential genes are related to various biological systems, and suggest new insights into the pathophysiology of diverse human diseases. We also identified a significant association between sex-specific gene transcription and reduced selection efficiency and accumulation of deleterious mutations, which might affect the prevalence of different traits and diseases. Interestingly, many of the sex-specific genes that also undergo reduced selection efficiency are essential for successful reproduction in men or women. This seeming paradox might partially explain the high incidence of human infertility.

**Conclusions:** This work provides a comprehensive overview of the sex-differential transcriptome and its importance to human evolution and human physiology in health and in disease.

**Keywords:** Sex-differential expression, Sex-differential selection, Sexual dimorphism

## Background

Sexual reproduction is present in nearly all multicellular eukaryotes [1]. In all cases, males and females have identical genetic information across most of their genomes, but harbor many distinct sex-specific characteristics. For example, mammalian offspring depend on maternal lactation in their early life. Lactation is thus a key factor in mammalian reproduction, and its associated genetic system is expected to be under tight selection. However, genes involved in lactation are also carried by males, who do not express this trait [2]. Different selection constraints are thus expected on these genes in males and females. Such cases can lead to reduced purifying

selection on genes that otherwise are expected to be highly conserved [3]. In the same manner, many genes that are associated with sexually dimorphic traits might undergo differential selection, which will likely impact reproduction, evolution, and even speciation events [4]. Human sexual dimorphism has been demonstrated for diverse traits, such as brain anatomy and development [5–7], behavior [8], mortality, longevity and morbidity [9, 10], and distribution and metabolism of fat biogenesis [11, 12]. Physical performance capabilities and pain response have also been shown to differ between men and women [13–15]. Previous work found that about 15% of the expression quantitative trait loci (eQTLs) identified in B-lymphocytes have a sex-biased impact on gene expression [16]. That work also reported an overlap of eQTLs and genome-wide association study single

* Correspondence: moran.gershoni@weizmann.ac.il
Department of Molecular Genetics, Weizmann Institute of Science, Rehovot, Israel



© Gershoni et al. 2017 **Open Access** This article is distributed under the terms of the Creative Commons Attribution 4.0 International License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

nucleotide polymorphisms that are associated with sex-biased diseases. Moreover, a recent work reported sex-specific genetic architecture in complex traits [17]. It is therefore not surprising that men and women differ in their predisposition to many diseases, in disease courses, and in drug response [18, 19]. Manifestations of all these differences are likely associated with the biology of sexual reproduction.

Sexual dimorphism was suggested to evolve due to differential selection on equally expressed traits that become sexually dimorphic and even sex-limited traits [20]. This can lead to the accumulation of genes with different effects on males and females. It is thus expected that the vast majority of sexually dimorphic traits are due to differential expression of genes that are present in both sexes [21]. While carried by both males and females, such genes are expected to undergo sex-biased selection. This can lead to diverse selection patterns, including sexual antagonism where alleles increasing the fitness in one sex reduce it in the other [21]. In population genetics terms, the cost of sexual dimorphisms might be reflected in the elevated frequency of an allele with deleterious effects only on one sex. Hence, a mutation causing congenital disease in only one sex can propagate to a high population frequency due to reduced selective constraints or neutrality in half of the population (i.e., in the other sex). This might contribute to sex specificity in the susceptibility to common diseases, and provide a partial explanation to the phenomenon of "missing heritability" [18]. Indeed, differential selection due to sexual dimorphism was suggested and modeled as a mechanism that contributes to the propagation of deleterious mutations in the population [22, 23]. We recently showed first evidence that this occurs in humans. We found that deleterious mutations in testis-exclusive genes tended to accumulate more than expected, likely due to reduced selective constraints in women [24]. However, a more general demonstration of the association between sex-differential gene expression and sex-differential selection is limited to model organisms [25], mainly due to poor mapping of the sex genetic architecture and the unavailability of large-scale transcriptome sequencing in humans [24, 26].

Mapping sex-differential selection and gene expression are fundamental for understanding human evolution and biology, in health and disease. Recent advances in DNA sequencing technologies with steadily dropping costs have made such aims feasible. The release of the Genotype-Tissue Expression (GTEx) project data, which currently includes 53 tissue samples from 544 donors [27, 28], has paved the way for such progress, and preliminary results for sex-differential gene expression are already available [28].

Here, by rigorous analysis of RNA-sequencing (RNA-seq) data from the GTEx project [27, 28], we have comprehensively mapped, for the first time, human adults sex-differential gene expression over 45 tissues common to both sexes. We then identified highly and moderately sex-specific genes while considering the complete panel of 53 tissues. Such genes are expected to have general sex-differential roles, thus suggesting differential selection. We thus hypothesized that deleterious mutations in these genes will propagate in the population more than expected by chance, due to the reduced impact of purifying selection [22, 24, 29]. By analyzing the signature of selection in these genes, we have found, for the first time, reduced selective constraints and differential rates of accumulation of deleterious mutations in both men and women sex-specific genes. The expression and function of these genes are associated with several tissues and biological pathways, including ones common to both sexes, suggesting a general phenomenon that directly arises from sex-differential selection. Moreover, many of these sex-differentially expressed genes were enriched in sexually dimorphic systems. Finally, some of these genes suggest new insights into the pathophysiology of several human diseases.

## Results

We examined human gene expression from RNA-seq data of the GTEx project version 6 (October 2015 release), including 8555 samples comprising 53 tissues from 357 men and 187 women post-mortem donors aged 20–79 years old [30]. Gene expression data for each tissue was grouped by sex. This created 98 sets with 45 tissues common to men and women and eight tissues specific to one of the sexes.

### Sex-differentially expressed genes

Sex-differential expression (SDE) was tested in each of the 45 common tissues by comparing the individual expression values of 18,670 out of 19,644 informative protein-coding genes in men versus women. To identify SDE we used the NOISeqBIO method [31, 32] to compare gene expression in the common tissues between men and women. The results were further analyzed to produce a relative SDE score for each gene in each common tissue using a metric we devised (Additional file 1: Figure S1).

On the background of similar expression in most tissues of most genes (Additional file 2: Figure S2; Additional file 3: Table S1), there are over 6500 protein-coding genes with significant SDE in at least one tissue. Most of these genes have SDE in just one tissue, but about 650 have SDE in two or more tissues, 31 have SDE in more than five tissues, and 22 have SDE in nine

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7

or more tissues (Additional file 4: Figure S3 and Additional file 5: Table S2). As expected, Y-linked genes that are normally carried only by men show SDE in many tissues. Nevertheless, 16 out of the 244 X-linked SDE genes also have widespread SDE (across six or more tissues, Additional file 5: Table S2) in either men or women. We found that three of these X-linked genes are located at pseudo-autosomal region 1 (PAR1), which undergoes relatively frequent recombination between the X and Y chromosomes and is known to escape X-inactivation [33] (Additional file 5: Table S2; Additional file 6: Figure S4). It is noteworthy that these PAR1 genes have men-biased expression.

The most sex-differentiated tissue, with 6123 SDE protein-coding genes, is the breast mammary glands (Fig. 1; Additional file 2: Figure S2), as previously noted [28]. This suggests major differences in the physiology and sex genetic architecture of this tissue. We found 1145 genes to be SDE in non-mammary gland tissues. The most differentiated of these

tissues, with over 100 SDE genes, are the skeletal muscle, two skin tissues, subcutaneous adipose, anterior cingulate cortex, and heart left ventricle (Figs. 1 and 2). Most GTEx tissues (46 out of 53) have more than seventy samples (70–361). This sample-size variation can affect the number of identified SDE genes per tissue. The Pearson correlation coefficient between the sample size and the number of identified SDE genes is 0.10 for the 45 analyzed tissues common to men and women, and 0.57 when the mammary glands tissue is excluded. This suggests that sample size contributes to the differences in the number of identified SDE genes per tissue, although several tissues noticeably deviate from this trend (e.g., the breast and whole blood tissues, Fig. 1). Besides the number of SDE genes, the tissues can also be clustered by the patterns of gene SDE scores. This analysis found the two skin, adipose-subcutaneous, and stomach tissues to deviate the most from all other tissues, and that seven of the thirteen



**Fig. 1** Box plot of (**a**) sex-differential expression (*SDE*) scores of all protein-coding genes, and (**b**) the number of SDE genes in 45 tissues common to men and women. Most genes are not differentially expressed, and have an SDE score of zero. Positive and negative values denote women- and men-biased expression, respectively, colored according to their organs or their biological-system affiliation

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7



**Fig. 2** Heatmap of sex-differential expression (SDE) scores of all genes with at least one SDE in non-mammary gland tissue. *Red* denotes women specificity and *blue* denotes men specificity. The genes are grouped according to principal component analysis clusters (Additional file 8: Figure S6). Tissues are grouped using hierarchical clustering

brain tissues clustered together (Fig. 2, Additional file 7: Figure S5) [34].

Clustering genes by their SDE patterns across tissues revealed 10 groups (Fig. 2, Additional file 8: Figure S6), nine of which can be described as follows:

1. Three groups of men-biased expression in the skin, skeletal muscle, or cingulate cortex tissues (e.g., *MYH1*; Fig. 3).
2. Five groups of women-biased expression in the liver, heart left ventricle, skin, skeletal muscle, or adipose subcutaneous tissues (e.g., *NPPB*; Fig. 3).
3. A group of mostly X-linked genes with SDE in various tissues, mainly with women-biased expression (e.g., *ZFX*; Fig. 3).

Other genes, such as *TSHB*, show tissue-specific expression bias (Additional file 9: Figure S7), and a few genes present an alternating pattern of expression biases, such as *MUCL1* that is overexpressed in men skin tissue

and in women mammary glands (Additional file 9: Figure S7). To detect differential expression in genes with complex modes of expression we used an additional analysis approach, which is more sensitive to such cases. This analysis uncovered 241 additional genes in non-mammary gland tissues that were clearly not detected in the first approach (see "Methods" and Additional file 10: Table S3, supplementary results). For instance, we found a likely age-related gene overexpression in women brain tissue (Additional files 11 and 12: Figures S8 and S9).

Genes found to have SDE were analyzed for gene enrichment in different types of terms (e.g., diseases, Gene Ontology (GO) terms, pathways [35]). Genes with women-biased expression were associated with obesity, muscular diseases, and cardiomyopathy. In addition, overexpressed women-biased genes were enriched in glucose metabolism and adipogenesis pathways (Additional file 13: Table S4). Interestingly, 15 out of 20 genes found to be associated with cardiomyopathy also showed a women overexpression bias in heart tissue, as in the

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7



**Fig. 3** Examples of various patterns of differential expression. Expression of genes *TCHH*, *CPZ*, *PAGE4*, *MYH1*, *NPPB*, and *ZFX* in 53 human tissues. Reads per kilobase of transcript per million values of these genes were retrieved from the GTEx project data [27, 28]. *Red bars* denote women samples and *blue bars* denote men samples; *pink bars* denote women reproductive tissues and *light blue bars* denote men reproductive tissues

natriuretic peptide B-secreted cardiac hormone gene *NPPB* (Fig. 3), supporting previous evidence on its involvement in sex-differential cardiovascular phenotypes [36, 37]. Genes with men-biased expression also showed enrichment in glucose metabolism pathways, but the gene sets differed, suggesting alternative pathways in glucose metabolism between men and women (Additional file 14: Table S5). A muscle-contraction pathway was also associated with genes overexpressed in men (Additional file 14: Table S5). This might be related to the physiological differences in muscle tissues and in physical features between men and women [38, 39].

**Identification of sex-specific genes**

Beyond genes that have SDE in one or several tissues are more extreme cases of genes with overall exclusive or high expression-specificity in one sex [40]. Such sex-specific genes are more likely to have global sex-differential functional roles, and are thus expected to present measurable sex-differential selection that can be reflected by a reduction in purifying selection [24]. A gene was considered sex specific if its maximal expression value in one sex was significantly higher from its expression values in all tissues of the other sex. In addition, genes were considered as non-SDE if their maximal expression values in men and women differed by no more than 10% (≤1.1 fold). We identified 1559 sex-specific and moderately sex-specific genes. Of these genes, 1288 (82.6%) were men-specific and overexpressed in the testis (Additional file 15: Table S6; Additional file 16: Figure S10). Aside from these 1559 genes, we found 26 women-specific and 114 moderately women-specific genes, and 82 non-testis men-specific and 49 moderately men-specific genes (Fig. 4; Additional file 17: Table S7). Over 8000 genes were identified as non-SDE (see "Methods" and Additional file 3: Table S1).

The sex-specific and moderately sex-specific genes could be grouped by their expression patterns into six major categories (Fig. 4; Additional file 16: Figure S10):

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7



**Fig. 4** Heatmap of sex-differential expression (*SDE*) scores of the sex-specific and moderately sex-specific genes, colored as in Fig. 2. *Red, blue,* and *purple boxes* denote major women, men, and combined gene clusters, respectively

1) Testis overexpressed genes in men (Additional file 16: Figure S10)
2) Prostate overexpressed genes in men (e.g., *PAGE4*, Fig. 3)
3) Reproductive system overexpressed genes in women (e.g., *CPZ*, Fig. 3)
4) Skin-specific overexpressed genes in men (e.g., *TCHH*, Fig. 3)
5) Brain tissue overexpressed genes in women
6) Mainly gland and brain tissue overexpressed genes, in men or women (e.g., *TSHB*, Additional file 17: Table S7).

Overall, sex-specific genes are mainly expressed in the reproductive system, emphasizing the notable physiological distinction between men and women. However, scores of genes that are not known to directly associate with reproduction were also found to have sex-specific expression (e.g., the men-specific skin genes).

**Selection analysis**

We calculated the numbers of observed (1000 Genomes Project [41]) and possible deleterious non-synonymous (DNS), stop-gain, and synonymous (S) single-nucleotide variants (SNVs) for each gene. This allowed us to quantify the selection pressure and its direction by dDNS/dS and dStop/dS ratios. Similar to dN/dS, these ratios are selection indicators [42, 43]. Ratios close to 1 indicate neutral selection, lower ratios indicate purifying (negative) selection, and significantly higher ratios suggest adaptive (positive) selection (see "Methods").

Natural gene variants have different frequencies, with most of the variation due to alleles with rare to low minor allele frequencies (MAFs) [24, 44]. However, selection is expected to have only a slight effect on the propagation of very rare variations because they are predominantly new while selection is mainly a long-term process [44, 45]. In addition, most phenotypes result from allele and gene interplay, and are thus highly unlikely (except in inbreeding) for rare variations, as in recessive and epistatic models of inheritance [45]. We hence studied the population genetics of the dDNS/dS and dStop/dS to find the proper MAF threshold in which the selection efficiency is maximal. Higher dDNS/

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7

dS ratios are more abundant for SNVs with rare MAFs (<0.005, Fig. 5), indicating that negative selection predominantly affects the propagation of deleterious SNVs for MAFs >0.005, as previously shown [24, 44]. However, dStop/dS ratios are sharply decreased for very rare SNVs (i.e., MAFs <0.001, Fig. 5). We thus further analyzed the effect of selection on DNS and stop-gain using MAF thresholds of >0.005 and >0.001, respectively.

### Selection analyses of sex-specific and moderately sex-specific genes

We have previously shown that human testis-exclusive genes are under reduced selection [24]. All 1100 of 1295 men testis-overexpressed genes identified here that are covered in the 1000 Genomes Project were also found to have significantly higher dDNS/dS and dStop/dS ratios (Table 1). This gene set includes 77 out of 95 of the genes we previously identified as testis exclusive [24]. The other 18 out of 95 genes that we previously found to be specifically expressed in testis tissues might not be

identified here because these tissues are not present in the GTEx samples. The non-testis men-specific and moderately women-specific genes also had significantly higher dDNS/dS ratios (Table 1, Fig. 6). The significantly higher dDNS/dS ratio of these men-specific genes did not depend on the presence of the 55 keratin genes (Table 1). women-specific genes too had a significantly higher dDNS/dS ratio (Table 1, Fig. 6). Moderately women-specific genes had a higher, yet not significant, dDNS/dS ratio (Table 1). However, when comparing the moderately women-specific genes to non sex-specific genes, we found the dDNS ratios to be significantly higher for the moderately women-specific genes (1.66 fold change, Fisher's exact test *p*-value <1 × 10⁻⁴) but the dS ratios showed no significant change (1.08 fold change, Fisher's exact test *p*-value = 1.5 × 10⁻¹). Thus, moderately women-specific genes have significantly reduced selection relative to non sex-specific genes. The same analysis for dStop/dS of men- and women-specific genes also found significantly reduced selection (Table 1).



**Fig. 5** Population genetics of selection pressures. Population distribution frequencies (y-axis) of protein-coding gene (**a**) dStop/dS and (**b**) dDNS/dS values in the 1000 Genome Project, Phase 3, for different minor allele frequency (*MAF*) ranges (x-axis). Different dStop/dS and dDNS/dS ratio ranges are denoted by different colors (see key). *dDNS* deleterious non-synonymous, *dS* deleterious synonymous, *dSTOP* deleterious stop-gain

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7

**Table 1** Selection analysis summary

| Gene group | n | dDNS/dS (MAF > 0.005) | p-value | dStop/dS (MAF > 0.001) | p-value |
|---|---|---|---|---|---|
| Women-specific | 26 | 0.23 | 0.02 | 0.27 | 0.0117 |
| Men-specific | 82 | 0.30 | 0.0005 | 0.29 | 0.0001 |
| Men-specific; no keratin and keratin-associated genes | 27 | 0.28 | 0.009 | 0.22 | 0.026 |
| Moderately women-specific | 114 | 0.16 | 0.09 | 0.13 | 0.0076 |
| Moderately men-specific | 49 | 0.25 | 0.005 | 0.07 | 0.27 |
| Men testis overexpressed | 1100 | 0.238 | <0.0001 | 0.29 | <0.0001 |

*dDNS* deleterious non-synonymous, *dS* deleterious synonymous, *dSTOP* deleterious stop-gain, *MAF* minor allele frequency

A significant reduction in purifying selection on sex-specific genes was hence found by independent analyses of selection on DNS and stop-gain mutations on diverse sets of sex-specific genes from both women and men, including sets from non-reproduction-related tissues. It is also notable that although reduced selection was observed for both men- and women-specific genes, it was higher in men-specific genes compared to women-specific genes (Fig. 6, Table 1).

## Discussion

Mapping sex-differential gene expression we found more than 6500 protein-coding genes with significant SDE in one tissue or more. The most differentiated tissue was the breast mammary gland, with more than 6000 genes having significant SDE (Fig. 1). This remarkable sex-biased gene expression is likely due to the distinct physiologic properties of this tissue between men and women [2]. In evolutionary terms, differential selection between the sexes of so many genes that are likely

involved in lactation, an essential reproductive trait, might inhibit optimal adaptation of this trait due to its distinct importance in men and women.

Almost all SDE genes are sex differentiated in one or just a few tissues. Thirty-one genes have SDE in six or more tissues. Besides Y-linked genes that have men-specific expression, 16 of the other genes are X-linked, with multiple-tissue SDE in either men or women. Three of these X-linked genes are located in the PAR1 region (Additional file 6: Figure S4; Additional file 5: Table S2), which includes genes that undergo recombination with the Y chromosome and also escape X-inactivation [33]. These PAR1 genes have identical sequences in their X and Y copies (Additional file 5: Table S2), but are only classified as X-linked in the GTEx data. While this should have led to similar expression in men and women (as in most autosomal genes), these genes have men-biased expression in multiple tissues. It is possible that although the copies are identical, the regulation of their expression is distinct between the X and Y-



**Fig. 6** Sex-specific expression and purifying selection. **a** dDNS/dS ratios of different groups of genes (Table 1, *black bars*) and the mean (*white circles*) and standard deviations (*lines*) of 10,000 random control sets with the corresponding number of genes. **b** Inverse correlation between sex specificity and selection efficiency. *dDNS* deleterious non-synonymous, *dS* deleterious synonymous

chromosomes. Besides the PAR1 genes, X-linked SDE genes in multiple tissues were found to only have women-biased expression (Additional file 6: Figure S4). In several cases we found that such genes have an active paralog on the Y chromosome and it is therefore likely that these genes escape X-inactivation and both X alleles are expressed in women, while men have only one X-linked allele.

Aside from the mammary glands, the adipose, skeletal muscle, skin, and heart tissues have over a one hundred SDE genes. This indicates substantial differences in the physiology, or alternate biological pathways, in these tissues between adult men and women. However, the differences in the number of SDE genes per tissue should be carefully assessed because the variability in tissue sample sizes could contribute to the number of SDE genes per tissue that we can identify. Functional terms analysis of SDE genes suggests sexual dimorphism in fat biogenesis, muscle contraction, and cardiomyopathy (Additional files 13 and 14: Tables S4 and S5). Tissues with few identified SDE genes might have overall similar function between men and women, yet even very few SDE genes can have extensive physiological impacts on the organism. For instance, the pituitary gland has only 26 identified SDE genes (Figs. 1 and 2), but two of them are the FSHB (women-biased) and TSHB (men-biased) gonadotropin hormones that have wide-ranging roles in human reproduction and metabolism [46, 47]. Another example is the CYP3A4 and CYP2B6 cytochrome P450 enzymes, which have women-biased expression in liver. Cytochrome P450 (P450, CYP) enzymes are associated with drug metabolism and other essential catabolic processes [48], and might be involved in sex-differential drug responses, as previously reported [49]. Other identified specific genes might shed new light on the pathophysiology of human diseases. For instance, the *NPPB* gene, which is mainly overexpressed in young women's hearts (Additional file 18: Figure S13), is related to cardiovascular homeostasis [36, 37]. Variations in this gene are associated with postmenopausal osteoporosis, a health condition mainly affecting women [50]. Thus, a sexually dimorphic effect of this gene on both phenotypes would be interesting to assess.

To evaluate the association between SDE and selection we identified sex-specific genes. Such genes are likely to possess different roles between the sexes and therefore are likely to undergo different selection pressures in each sex. The vast majority of sex-specific genes we found are overexpressed in the testis. We previously showed reduced selection and accumulation of damaging mutation in such genes. Here we confirmed our previous findings, extended them to many more testis-overexpressed genes, and to sex-specific genes of other men and women tissues. Many of the non-testis sex-specific genes

are also related to the reproductive system, including genes expressed in tissues common to both sexes, such as gonadotropin hormones expressed in the pituitary (e.g., *FSHB* and *CGB7*). Dozens of genes with no direct association to reproduction were also identified as sex specific. Many of these genes are expressed in skin tissues, are linked to hairiness (Additional files 13 and 14: Tables S4 and S5), and are likely involved in hair dimorphism in women and men. Other non-reproductive genes do not seem to share common features with each other, but are each interesting on their own, for example, the moderately men-specific growth hormone GHRH and the men-specific calcitonin-related polypeptide alpha (CALCA) (Additional file 17: Table S7). The latter is involved in calcium regulation and functions as a vasodilator [51, 52]. The genes fro both seem specific to adult men, although they are related to apparently general biological processes.

Analyzing selection on highly and moderately men- and women-specific genes, we found a significant association with reduced selection efficiency, as reflected in their dDNS/dS and dStop/dS ratios (Table 1, Fig. 6). The reduced purifying selection efficiency was also correlated with the level of sex specificity. This suggests that higher sex specificity indicates greater distinction in the functional importance for each sex, and reduced selection efficiency. This in turn enables the propagation of damaging alleles through the non-expressing sex lineages. The resulting relatively high population frequencies of these alleles can enhance the prevalence of different human diseases.

Although we found reduced selection on both men- and women-specific genes, it is notable that reduced selection was more prevalent in men-specific genes (Fig. 6). This supports our previous expectations to find men-specific genes to be under less selection than women-specific genes [24]. We suggest that the basis for this could be the practically unlimited numbers of available male gametes compared to the restricted number of available women gametes, as suggested in the Bateman principle [53]. Thus, the ability of women to pass on alleles that cause men-specific lethality will less affect the number of fertile men required to sustain the population, but not vice versa.

In this work we focused on protein-coding genes, because currently there is a broad functional knowledge on these genes and extensive experience in analyzing and quantifying the selection trends these genes have undergone. However, the importance of non-coding RNA genes for the regulation and execution of sexual dimorphism was not ignored. For instance, the function of the *XIST* long non-coding RNA gene in the sex-specific X-inactivation process is well documented (Additional file 19: Figure S11) [54]. Our preliminary observations of

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7

the RNA gene differential transcriptome support a global role of these genes in the sex genetic architecture (Additional file 20: Figure S12). Hence, this work and the data it provides might trigger further in-depth studies on the contribution of RNA genes to sexual dimorphism.

Finally, the vast majority of sex-specific genes we found are associated with the reproductive system. Damaging mutations in many reproductive genes can hence propagate to high population frequencies. We suggest that sex-specific genes are major contributors to the high incidence of infertility in men and women.

Our results are delimited by the scope of the data in the GTEx study. This study includes 53 tissues from adult humans. All tissues are composed of several cell types and a few are represented in fewer than 15 men or women donors. We believe our statistical and analysis measures excluded most false-positive results. However, the distinct age limits of the samples are acutely pertinent to sexual dimorphism and we do not know how much of our findings can be extended beyond adults. Examining comparable data from puberty and during embryonic stages of sex determination will likely augment the genes and phenomena described here.

After submitting this work for review, two studies on sexual dimorphism in human gene expression were made public. Kassam *et al.* examined the sex-specific genetic architecture of autosomal gene expression in whole blood samples from about one thousand men and one thousand women using DNA arrays [55]. No differences between men and women were found in autosomal genetic control of gene expression. We too did not identify autosomal genes with different expression between men and women in the GTEx whole blood tissue (Fig. 1; Additional file 3: Table S1). Chen *et al.* posted to bioRxiv a non-peer-reviewed preprint analyzing the GTEx data for gene expression sexual dimorphism and regulatory networks [56]. They report sexually dimorphic patterns of gene expression involving as many as 60% of autosomal genes. Similar to our findings, they reported breast, skin, adipose, heart, and skeletal muscle as the most sexually dimorphic tissues. The studies vary in their analyses procedures and emphasize different contexts of SDE. These studies are complementary works with different insights.

The mode of gene expression is very complex, depending on the gene's genomic and chromatin contexts, activity of other genes, expressing tissue, the individual's developmental stage, and external factors such as exposure to pathogens, diet, and temperature. The expression level of genes thus varies temporally (in scales of minutes to decades) and across tissues, and is a multidimensional system. This is the key challenge in evaluating differential gene expression between populations.

SDE between men and women stems from any deviations of gene activity in place (i.e., organs, tissues, and cells) and time (e.g., developmental stage, age, cell cycle point, or periodic processes). The overall distribution of gene expression values in two populations could be highly similar, and distinct in only a minor subset of samples that represents a genuine biological difference in time and/or place. For instance, a gene can have similar basal expression in men and women, but upon sex-specific induction its expression will be altered only in one sex. Thus, only a small fraction of one population in any one time might differentially express this gene. Identifying differential expression is thus a challenging problem. In addition, sex-specific expression is a particular case of SDE, in which genes present a global bias in their mode of expression in one sex compared to the other.

We applied several approaches to identify SDE and sex-specific expression. Besides analyzing differences according to the population variance (NOISeqBIO), we also used an approach that gave weight to a subset of samples that notably deviated from all other samples (using count trimmed means and NOISeq-sim). The DESeq2 method was also used to validate the results in selected datasets. In addition we used a new normalized measure for gene differential expression between pairs of sample populations. This differential expression measure takes into account the expression difference between the sexes and the maximal expression of the gene in all tissues, placing the difference in specific tissues in the context of the gene overall mode of expression. This measure is general and can be used in other population-based differential gene expression studies (Additional file 1: Figure S1). Combining these approaches increased our ability to identify differential expression from various modes of gene expression. Accumulation of many more samples from different donors and conditions will uncover the full spectra of gene modes of expression and improve the resolution of differential expression analyses.

## Conclusions

This work comprehensively mapped for the first time the sex-specific genetic architecture of human adults. We identified hundreds of genes with women and men SDE, and showed the relation of these genes to several sexually dimorphic features, to human diseases, and to human evolution. Our results can facilitate the understanding of diverse biological characteristics in the context of sex. We also demonstrated the increased propagation of deleterious mutations in many men- and women-specific genes and thus the likely contribution of SDE genes to the occurrence of common human diseases.

Gershoni and Pietrokovski *BMC Biology* (2017) 15:7

## Methods

### Data sources

RNA-seq data were retrieved from the GTEx project version 6 [27, 28]. Population variation data were retrieved from the 1000 Genomes Project, Phase 3 ($n$ = 2504 individuals, [41]). The human GRCh37 release coding exome coordinates and sequences were retrieved from Ensembl [57].

### Variation analysis

The AnnoVar software package [58] was used to annotate the reported variations from the 1000 Genomes Project, and all possible variations (relative to the GRCh37; h19 reference genome) in every human protein-coding position documented in GRCh37. For each variation we determined its specific protein-transcript consequences, its population frequency, and its predicted functional likelihood (using both SIFT and PolyPhen algorithms [59, 60]). A non-synonymous (NS) variation was considered functional only when both SIFT and PolyPhen algorithms predicted it as deleterious [24]. Because SIFT mainly uses sequence conservation and PolyPhen mainly uses structural and functional impacts, we found the combination of the two methods to be highly accurate (number of true positive from total positive prediction [24]). This analysis calculated the distribution of all mutation types for each gene as observed in the 1000 Genomes Project population, and the computed distribution of all possible nucleotide substitutions consequences (i.e., NS, DNS, S, and stop-gain) for each protein-coding gene. The obtained data allowed us to calculate the deleterious (dDNS), loss-of-function (dStop-gain), and neutral (dS) mutation rates for each gene or group of genes according to the 1000 Genomes Project data. We examined the use of other available sources of human genetic variations, such as ExAC [61]. However, the number of additional SNVs with population frequencies >0.005, which are predominantly affected by selection, from these sources was negligible relative to the 1000 Genomes Project data (not shown).

### Selection analysis

Previously, others and we have shown that the effect of selection on a mutation largely depends on its population frequency. Selection predominantly affects mutations that are have a population frequency >0.005, while very rare mutations (population frequency <0.001) tend to undergo negligible selection [24, 44]. Selection was thus analyzed according to the MAF range of the variations [24]. Selection pressures were assessed by calculating for each gene, or group of genes, the ratios of its functional (DNS and stop-gain) mutation rates to its neutral (S) mutation rate. The rate of a mutation type is the number of observed mutations from a certain type (e.g., S) in the 1000 Genomes Project, Phase 3, divided by all computed possible nucleotide substitutions leading to that type of mutation in the gene. The selection signature is the ratio of the functional rates (dDNS or dStop-gain) divided by the neutral rate (dS), that is, dDNS/dS and dStop-gain/dS. These measures extend the dN/dS type measures, similar to a previous work [43]. As in dN/dS, higher ratios indicate lower purifying selection [42]. To calculate if the dDNS/dS and dStop/dS ratios in a group of sex-specific genes deviated from these ratios in other protein-coding genes, we performed a randomization test: all non-Y-linked, non-testis-specific unique protein-coding human genes for which we have variation data in the 1000 Genomes Project and expression data in the GTEx project were used to create 10,000 random sets for each gene group. The number of genes in each set was the number of genes in the examined gene group. To compare the dDNS and the dS ratios between the two independent groups of moderately women-specific genes and non-sex-specific genes, we performed a Fisher's exact test.

### Differential expression

Genes with SDE were detected by two approaches from the NOISeq R package [31, 32] The first approach used the NOISeqBIO algorithm, which treats the sample population as biological replicates in which the computed variability within the population is considered as noise [31, 32]. We used this to compare gene reads per kilobase of transcript per million mapped reads (RPKM) expression values between women and men population samples from corresponding tissues after excluding uninformative genes, that is, genes that did not have at least an expression of 1 RPKM in any sample. A probability cutoff of 0.95 was used to identify genes with significant differential expression, as this cutoff value is considered correct for multiple testing [31, 62]. The NOISeqBIO method provides effective statistics for determining differential expression between two populations. However, this approach regards the population variability as noise and could exclude some genuinely sex-differentiated genes that have complex modes of expression. For instance, genes activated during ovulation are expected to be expressed only in a few women (mainly in women <50 years old and on a few days each month [63]), while not being expressed in most women and in all men samples. The differential expression of such genes will be difficult to identify using a straightforward population analysis. To detect at least some of these cases, we used an additional analysis approach that could identify the difference in such cases.

To overcome this issue, at least partially, a single trimmed mean of all RPKM or read count expression values was calculated for every gene from each tissue

sample and sex (men or women) by removing the two most extreme sample values. This removed samples that could have skewed the mean. Assuming the trimmed means of read counts reflect the population expression of a gene in men or women samples, we then computed their differential expression using the NOISeq-sim algorithm [32]. NOISeq-sim relies on the assumption that read counts follow a multinomial distribution, in which the probability for each feature in the multinomial distribution is the probability of a read to map to that feature. This identified an additional list of genes with differential expression that were not identified by NOISeqBIO but had NOISeq-sim probability scores of at least 0.8 and a NOISeqBIO probability score at least 0.2 smaller.

Finally, to assess the reproducibility of SDE analysis by NOISeqBIO we implemented and used another differential expression method, DESeq2 [64], and analyzed the adipose-subcutaneous and liver datasets. We found that after *p*-value adjustment for multiple-testing correction, >92% of the adipose-subcutaneous and liver genes identified as SDE in NOISeqBIO were also found to be SDE by DESeq2.

The possible impact of the sample size on the number of identified SDE genes per tissue was tested by the Pearson correlation co-efficient (r). To assess a possible bias in the age distribution between men and women samples we used the two-sample Kolmogorov–Smirnov test. We found no significant differences in age distribution between men and women.

### Gene and tissue clustering

Patterns of differential expression were analyzed using the following gene differential expression score, calculated for tissues with data for both men and women:

$$SDE = LOG_2\{(1 + EXPR^w_{g,t}/MAX_g)/(1 + EXPR^m_{g,t}/MAX_g)\}$$

Where $g$ is a specific gene, $t$ is a specific tissue, and $m$ and $w$ represent men and women, respectively. $EXPR^w_{g,t}$ is the NOISeqBIO-calculated mean RPKM expression value of gene $g$ in tissue $t$ for women (or for men with the m superscript), and $MAX_g$ is the maximal NOISeqBIO calculated mean RPKM expression value of gene $g$ in all tissues (including tissues specific for men or women). This score returns the differential expression value of a gene in a specific tissue, relative to the maximal expression of the gene. The value ranges from 1 (exclusive expression in women) to -1 (exclusive expression in men). This formula gives lower scores when expression in the examined gene and tissue are lower than those of the gene in some other tissue and can be generalized to compare the difference between two populations normalizing by a maximal value (Additional file 1: Figure S1).

Hierarchical cluster analyses and principle component analysis (PCA) were performed on a matrix of sex-differential expression (SDE) scores, with values of 0 given to genes that were not found significant in the NOISeq statistical analyses described above. Heatmap and hierarchical cluster analyses used the hclust method of the heatmap.2 R package and the pvclust method [34]. The PCA and the partitioning around medoids analyses used the CLARA and PAM methods of the R cluster package [65], with Euclidean distance measurements. This analysis allowed us to group genes according to their SDE patterns similarity.

### Sex-specific expression

To find genes that are specific or highly specific to one sex, for each non Y-chromosome gene we calculated the ratio of its maximal trimmed mean expression values in one sex to its maximal trimmed mean expression in the other sex. Genes were considered as specific or highly sex-specific for ratios of at least 4-fold, when the lower maximal expression value was at least 1 RPKM. A ratio cutoff of 2-fold was used when the higher maximal expression was at least 1 RPKM but the other lower maximal expression value was very low (<1 RPKM). Other genes with sex ratios of 2–4-fold were considered as having moderately sex-specific expression, and genes with ratios of 1.1–0.9-fold were considered as having sex-similar expression. The statistical significance of the highly sex-specific gene expression was tested using the NOISeqBIO method, comparing samples from the tissue with the highest expression in one sex to samples from the tissue with the highest expression in the other sex.

### Gene enrichment analysis

Gene enrichment analysis was performed using the GeneAnalytics server, which can identify gene enrichment for several tissues and data sources, including diseases, pathways, GO terms, and tissue expression [35].

## Additional files

**Additional file 1: Figure S1.** Differential expression score. Landscape of scores for all possible ratios of men and women expression values using a base 2 logarithm. The formula we derived for SDE score can be generalized to compare the difference between two populations ($x$ and $y$) in a certain tissue or condition ($t$), normalizing by a gene ($g$) maximal expression value ($MAXg$). This differential expression score (DES) is a logarithm of the normalized ratios, giving scores between −1 and 1. We use a logarithm base of 2, but other bases ($n$) are possible. The general expression is thus DES = LOGn((1 + ($EXPR^t_{g,x}/MAXg$) * ($n$−1))/(1 + ($EXPR^t_{g,y}/MAXg$) * ($n$ − 1))) where $EXPR^t_{g,x}$ is the expression value of gene $g$ in tissue/condition $t$ for population $x$. This score returns the differential expression value of a gene in a specific tissue/condition, relative to the maximal expression of the gene. The value ranges from 1 (exclusive expression in $x$) to −1 (exclusive expression in $y$). Larger logarithm bases ($n$) exponentially increase the

transitions between exclusive expression (1 and −1) and non-differential (0) scores. (PDF 276 kb)

**Additional file 2: Figure S2.** SDE score heatmap of all protein-coding genes in 45 tissues common to both sexes. Scores are color-coded from blue (strictly men) to red (strictly women), with non-differential expression in white. Most genes are similarly expressed in most tissues with the exception of the breast mammary gland (more than 6000 SDE genes). (PDF 187 kb)

**Additional file 3: Table S1.** SDE scores for all protein-coding genes in 45 tissues common to men and women. Genes were analyzed by NOISeqBIO with scores of zero given for genes with insignificant differential expression. Other genes have SDE scores below zero for men-biased expression and above zero for women-biased expression. (CSV 2205 kb)

**Additional file 4: Figure S3.** Occurrence of genes according to number and exact (**a**) or cumulative (**b**) number of tissues they have SDE in. Most SDE genes are differentially expressed in one or few tissues. SDE genes in multiple tissues are mostly linked to the sex chromosomes (Additional file 5: Table S2). (PDF 177 kb)

**Additional file 5: Table S2.** Genes with SDE in more than five tissues. (DOCX 17 kb)

**Additional file 6: Figure S4.** SDE score heatmap of 244 protein-coding X-linked genes, ordered by their chromosomal position. Three genes have men-biased expression in multiple tissues, are in the PAR1, and none in PAR2 regions (green boxes). Scores are color-coded from blue (strictly men) to red (strictly women), with non-differential expression in white. (PDF 152 kb)

**Additional file 7: Figure S5.** Hierarchical clustering of 44 tissues common to men and women (excluding mammary glands) by their gene SDE patterns. Percent *p*-values are Bootstrap-Probability in green, and Approximately-Unbiased in red [34]. The mammary gland tissue was excluded from the analysis because it had an order of magnitude more SDE genes than the other 44 common tissues. (PDF 45 kb)

**Additional file 8 Figure S6.** The first two components of principle component analysis of all protein-coding genes with SDE in at least one non-mammary gland tissue. Cluster colors denote groups of genes with the similar SDE patterns. See also Fig. 2. (PDF 191 kb)

**Additional file 9: Figure S7.** Expression of *TSHB* and *MUCL1* genes in 53 human tissues. Box-plots of women samples are in red and men samples in blue. The pituitary-specific gene *TSHB* is significantly overexpressed in men. *MUCL1* is significantly overexpressed in men skin and in women mammary glands. (PDF 199 kb)

**Additional file 10 Table S3.** Integrated SDE NOISeqBIO and NOISeq-sim based analyses (see "Methods") for all protein-coding genes in 44 tissues common to men and women (excluding mammary glands). Values below or above zero denote men- or women-biased expression, respectively, and zero denotes genes with insignificant SDE. (CSV 2111 kb)

**Additional file 11 Figure S8.** Non-Y-linked genes partitioning around medoids clustering by the gene SDE patterns in 44 tissues common to men and women (excluding mammary glands). To identify SDE in genes with complex modes of expression we applied the NOISeq-sim approach that weighs groups of outliers (see "Methods"). The mammary gland tissue was excluded from the analysis because it had an order of magnitude more SDE genes than the other common tissues. (PDF 138 kb)

**Additional file 12: Figure S9.** Sex-biased expression of the *MTRNR2L2* gene. *MTRNR2L2* is notably expressed in women substantia-nigra (**a**, red box) due to overexpression in women older than 60 years. **b** Women under and above 60 years, *n* = 12 and *n* = 12 respectively. Men under and above 60 years, *n* = 16 and *n* = 23, respectively. (PDF 297 kb)

**Additional file 13: Table S4.** Women-biased protein-coding gene terms enrichment analyses. Multiple Excel worksheets summarizing GeneAnalytics [35] gene enrichments including diseases, GO terms, and pathways. (XLSX 625 kb)

**Additional file 14: Table S5.** Men-biased protein-coding gene terms enrichment analyses. Multiple Excel worksheets summarizing GeneAnalytics [35] gene enrichments including diseases, GO-terms, and pathways. (XLSX 557 kb)

**Additional file 15: Table S6.** SDE scores for testis overexpressed protein-coding genes across 53 tissues. Values below or above zero denote male or women-biased expression, respectively, and zero denotes genes with insignificant SDE. (CSV 791 kb)

**Additional file 16: Figure S10.** SDE score heatmap of testis-specific and moderately specific genes. Red and blue denote women or men specificity, respectively. (PDF 200 kb)

**Additional file 17: Table S7.** SDE scores for non-testis sex-specific and moderately sex-specific protein-coding genes across 53 tissues. Values below or above zero denote men- or women-biased expression, respectively. (CSV 177 kb)

**Additional file 18: Figure S13.** Age-related expression of the *NPPB* gene in heart left ventricle show overexpression in young women. Women under and above 60, *n* = 54 and *n* = 22, respectively. Men under and above 60, *n* = 103 and *n* = 39, respectively. (PDF 92 kb)

**Additional file 19: Figure S11.** Expression of *XIST* gene in 53 human tissues shown as box-plots with women samples in red and men samples in blue. Pink and light blue are women and men reproductive tissues, respectively. (PDF 41 kb)

**Additional file 20: Figure S12.** SDE score heatmap of non-protein-coding genes. Red and blue denote women or men specificity, respectively. (PDF 221 kb)

## Acknowledgements
We thank Dan Mishmar and Tsviya Olender for helpful discussion and advice.

## Funding
This research was supported in part by the Ministry of Agriculture of the State of Israel, and Weizmann Institute Forchheimer Center for Molecular Genetics and Crown Human Genome Center. The results shown here are in part based upon data generated by the GTEx project and the 1000 Genomes Project.

## Availability of data and materials
All the data is publicly available. The GTEx Analysis V6 RNA-seq (05 Oct 2015) data are available on the GTEx portal (http://www.gtexportal.org/home/datasets). Variation data from the 1000 Genomes Project, Phase 3, can be obtained from http://www.internationalgenome.org/data/.

## Authors' contributions
MG and SP designed the experiments, performed the analysis, and wrote the manuscript. Both authors read and approved the final manuscript.

## Competing interests
The authors declare that they have no competing interests.

## Consent for publication
Not applicable.

## Ethics approval and consent to participate
This study only analyses existing publicly available data.

Received: 24 October 2016 Accepted: 19 January 2017
Published online: 07 February 2017

## References
1. Bachtrog D, Mank JE, Peichel CL, Kirkpatrick M, Otto SP, Ashman T-L, Hahn MW, Kitano J, Mayrose I, Ming R. Sex determination: why so many ways of doing it? PLoS Biol. 2014;12:e1001899.
2. McClellan HL, Miller SJ, Hartmann PE. Evolution of lactation: nutrition v. protection with special reference to five mammalian species. Nutr Res Rev. 2008;21:97–116.
3. McClellan J, King M-C. Genetic heterogeneity in human disease. Cell. 2010; 141:210–7.
4. Connallon T. The geography of sex-specific selection, local adaptation, and sexual dimorphism. Evolution. 2015;69:2333–44.
5. Deaner RO, Shepherd SV, Platt ML. Familiarity accentuates gaze cuing in women but not men. Biol Lett. 2007;3:65–8.
6. Goldstein JM, Holsen L, Handa R, Tobet S. Fetal hormonal programming of sex differences in depression: linking women's mental health with sex differences in the brain across the lifespan. Front Neurosci. 2014;8:247.

7. Giedd JN, Castellanos FX, Rajapakse JC, Vaituzis AC, Rapoport JL. Sexual dimorphism of the developing human brain. Prog Neuro-Psychopharmacol Biol Psychiatry. 1997;21:1185–201.

8. Collaer ML, Hines M. Human behavioral sex differences: a role for gonadal hormones during early development? Psychol Bull. 1995;118:55.

9. Waldron I. Sex differences in human mortality: the role of genetic factors. Soc Sci Med. 1983;17:321–33.

10. Subbaraman M, Goldman-Mellor S, Anderson E, LeWinn K, Saxton K, Shumway M, Catalano R. An exploration of secondary sex ratios among women diagnosed with anxiety disorders. Human Reprod. 2010;25:2084–91.

11. Pulido MR, Rabanal-Ruiz Y, Almabouada F, Díaz-Ruiz A, Burrell MA, Vázquez MJ, Castaño JP, Kineman RD, Luque RM, Diéguez C. Nutritional, hormonal, and depot-dependent regulation of the expression of the small GTPase Rab18 in rodent adipose tissue. J Mol Endocrinol. 2013;50:19–29.

12. Link JC, Chen X, Arnold AP, Reue K. Metabolic impact of sex chromosomes. Adipocyte. 2013;2:74–9.

13. Bartley EJ, Fillingim RB. Sex differences in pain: a brief review of clinical and experimental findings. Br J Anaesth. 2013;111:52–8.

14. Courtright SH, McCormick BW, Postlethwaite BE, Reeves CJ, Mount MK. A meta-analysis of sex differences in physical ability: revised estimates and strategies for reducing differences in selection contexts. J Appl Psychol. 2013;98:623.

15. Tseng LA, Delmonico MJ, Visser M, Boudreau RM, Goodpaster BH, Schwartz AV, Simonsick EM, Satterfield S, Harris T, Newman AB. Body composition explains sex differential in physical performance among older adults. J Gerontol Ser A Biol Med Sci. 2014;69:93–100.

16. Dimas AS, Nica AC, Montgomery SB, Stranger BE, Raj T, Buil A, Giger T, Lappalainen T, Gutierrez-Arcelus M, McCarthy MI. Sex-biased genetic effects on gene regulation in humans. Genome Res. 2012;22:2368–75.

17. Rawlik K, Canela-Xandri O, Tenesa A. Evidence for sex-specific genetic architectures across a spectrum of human complex traits. Genome Biol. 2016;17:166.

18. Gilks WP, Abbott JK, Morrow EH. Sex differences in disease genetics: evidence, evolution, and detection. Trends Genet. 2014;30:453–63.

19. Sandberg K, Verbalis JG. Sex and the basic scientist: is it time to embrace Title IX? Biol Sex Differ. 2013;4:13.

20. Fisher RA. The genetical theory of natural selection: a complete variorum edition. Oxford: Oxford University Press; 1930.

21. Connallon T, Clark AG. The resolution of sexual antagonism by gene duplication. Genetics. 2011;187:919–37.

22. Frank SA, Hurst LD. Mitochondria and male disease. Nature. 1996;383:224.

23. Morrow EH, Connallon T. Implications of sex-specific selection for the genetic basis of disease. Evol Appl. 2013;6:1208–17.

24. Gershoni M, Pietrokovski S. Reduced selection and accumulation of deleterious mutations in genes exclusively expressed in men. Nat Commun. 2014;5:4438.

25. Innocenti P, Morrow EH. The sexually antagonistic genes of Drosophila melanogaster. PLoS Biol. 2010;8:e1000335.

26. Su AI, Wiltshire T, Batalov S, Lapp H, Ching KA, Block D, Zhang J, Soden R, Hayakawa M, Kreiman G. A gene atlas of the mouse and human protein-encoding transcriptomes. Proc Natl Acad Sci U S A. 2004;101:6062–7.

27. Ardlie KG, Deluca DS, Segrè AV, Sullivan TJ, Young TR, Gelfand ET, Trowbridge CA, Maller JB, Tukiainen T, Lek M. The Genotype-Tissue Expression (GTEx) pilot analysis: multitissue gene regulation in humans. Science. 2015;348:648–60.

28. Melé M, Ferreira PG, Reverter F, DeLuca DS, Monlong J, Sammeth M, Young TR, Goldmann JM, Pervouchine DD, Sullivan TJ. The human transcriptome across tissues and individuals. Science. 2015;348:660–5.

29. Mank JE. The transcriptional architecture of phenotypic dimorphism. Nature Ecology & Evolution. 2017;1:0006.

30. Carithers LJ, Ardlie K, Barcus M, Branton PA, Britton A, Buia SA, Compton CC, DeLuca DS, Peter-Demchok J, Gelfand ET. A novel approach to high-quality postmortem tissue procurement: The GTEx Project. Biopreservation and Biobanking. 2015;13:311–9.

31. Tarazona S, Furió-Tarí P, Turrà D, Di Pietro A, Nueda MJ, Ferrer A, Conesa A. Data quality aware analysis of differential expression in RNA-seq with NOISeq R/Bioc package. Nucleic Acids Res. 2015;43:e140.

32. Tarazona S, García-Alcalde F, Dopazo J, Ferrer A, Conesa A. Differential expression in RNA-seq: a matter of depth. Genome Res. 2011;21:2213–23.

33. Mangs HA, Morris BJ. The human pseudoautosomal region (PAR): origin, function and future. Curr Genomics. 2007;8:129–36.

34. Suzuki R, Shimodaira H. Pvclust: an R package for assessing the uncertainty in hierarchical clustering. Bioinformatics. 2006;22:1540–2.

35. Fuchs SB-A, Lieder I, Stelzer G, Mazor Y, Buzhor E, Kaplan S, Bogoch Y, Plaschkes I, Shitrit A, Rappaport N. GeneAnalytics: an integrative gene set analysis tool for next generation sequencing, RNAseq and microarray data. OMICS. 2016;20:139–51.

36. Holditch SJ, Schreiber CA, Burnett JC, Ikeda Y. Arterial remodeling in B-type natriuretic peptide knock-out females. Sci Rep. 2016;6:25623.

37. Wang TJ, Larson MG, Levy D, Leip EP, Benjamin EJ, Wilson PW, Sutherland P, Omland T, Vasan RS. Impact of age and sex on plasma natriuretic peptide levels in healthy adults. Am J Cardiol. 2002;90:254–8.

38. Clark BC, Collier SR, Manini TM, Ploutz-Snyder LL. Sex differences in muscle fatigability and activation patterns of the human quadriceps femoris. Eur J Appl Physiol. 2005;94:196–206.

39. Russ DW, Kent-Braun JA. Sex differences in human skeletal muscle fatigue are eliminated under ischemic conditions. J Appl Physiol. 2003;94:2414–22.

40. Ellegren H, Parsch J. The evolution of sex-biased genes and sex-biased gene expression. Nat Rev Genet. 2007;8:689–98.

41. 1000 Genomes Project Consortium, Abecasis GR, Altshuler D, Auton A, Brooks LD, Durbin RM, Gibbs RA, Hurles ME, McVean GA. A map of human genome variation from population-scale sequencing. Nature. 2010;467: 1061–73.

42. Kryazhimskiy S, Plotkin JB. The population genetics of dN/dS. PLoS Genet. 2008;4:e1000304.

43. Ostrow SL, Barshir R, DeGregori J, Yeger-Lotem E, Hershberg R. Cancer evolution is associated with pervasive positive selection on globally expressed genes. PLoS Genet. 2014;10:e1004239.

44. Tennessen JA, Bigham AW, O'Connor TD, Fu W, Kenny EE, Gravel S, McGee S, Do R, Liu X, Jun G, et al. Evolution and functional impact of rare coding variation from deep sequencing of human exomes. Science. 2012;337:64–9.

45. Wu R, Lin M. Functional mapping - how to map and study the genetic architecture of dynamic complex traits. Nat Rev Genet. 2006;7:229–37.

46. de Moura Souza A, Sichieri R. Association between serum TSH concentration within the normal range and adiposity: a review. Eur J Endocrinol. 2011;165:11–5.

47. Skorupskaite K, George JT, Anderson RA. The kisspeptin-GnRH pathway in human reproductive health and disease. Hum Reprod Update. 2014; 20:485–500.

48. Guengerich FP, Waterman MR, Egli M. Recent structural insights into cytochrome P450 function. Trends Pharmacol Sci. 2016;37:625–40.

49. Lamba V, Lamba J, Yasuda K, Strom S, Davila J, Hancock ML, Fackenthal JD, Rogan PK, Ring B, Wrighton SA. Hepatic CYP2B6 expression: gender and ethnic differences and relationship to CYP2B6 genotype and CAR (constitutive androstane receptor) expression. J Pharmacol Exp Ther. 2003; 307:906–22.

50. Xiong Q, Jiao Y, Hasty KA, Canale ST, Stuart JM, Beamer WG, Deng H-W, Baylink D, Gu W. Quantitative trait loci, genes, and polymorphisms that regulate bone mineral density in mouse. Genomics. 2009;93:401–14.

51. Brain S, Williams T, Tippins J, Morris H, MacIntyre I. Calcitonin gene-related peptide is a potent vasodilator. Nature. 1985;313:54–6.

52. Gangula PR, Zhao H, Supowit SC, Wimalawansa SJ, Dipette DJ, Westlund KN, Gagel RF, Yallampalli C. Increased blood pressure in α-calcitonin gene–related peptide/calcitonin gene knockout mice. Hypertension. 2000;35:470–5.

53. Bateman AJ. Intra-sexual selection in Drosophila. Heredity. 1948;2:349–68.

54. Cerase A, Pintacuda G, Tattermusch A, Avner P. Xist localization and function: new insights from multiple levels. Genome Biol. 2015;16:1.

55. Kassam I, Lloyd-Jones L, Holloway A, Small KS, Zeng B, Bakshi A, Metspalu A, Gibson G, Spector TD, Esko T. Autosomal genetic control of human gene expression does not differ across the sexes. Genome Biol. 2016;17:248.

56. Chen C-Y, Lopes-Ramos CM, Kuijjer ML, Paulson JN, Sonawane AR, Fagny M, Platig J, Glass K, Quackenbush J, DeMeo DL. Sexual dimorphism in gene expression and regulatory networks across human tissues. bioRxiv 2016. Epub ahead of print. doi:10.1101/082289.

57. Herrero J, Muffato M, Beal K, Fitzgerald S, Gordon L, Pignatelli M, Vilella AJ, Searle SM, Amode R, Brent S. Ensembl comparative genomics resources. Database. 2016;2016:bav096.

58. Wang K, Li M, Hakonarson H. ANNOVAR: functional annotation of genetic variants from high-throughput sequencing data. Nucleic Acids Res. 2010;38:e164.

59. Kumar P, Henikoff S, Ng PC. Predicting the effects of coding non-synonymous variants on protein function using the SIFT algorithm. Nat Protoc. 2009;4:1073–81.
60. Adzhubei IA, Schmidt S, Peshkin L, Ramensky VE, Gerasimova A, Bork P, Kondrashov AS, Sunyaev SR. A method and server for predicting damaging missense mutations. Nat Methods. 2010;7:248–9.
61. Lek M, Karczewski KJ, Minikel EV, Samocha KE, Banks E, Fennell T, O'Donnell-Luria AH, Ware JS, Hill AJ, Cummings BB, et al. Analysis of protein-coding genetic variation in 60,706 humans. Nature. 2016;536:285–91.
62. Efron B, Tibshirani R, Storey JD, Tusher V. Empirical Bayes analysis of a microarray experiment. J Am Stat Assoc. 2001;96:1151–60.
63. Ferin M, Jewelewicz R. The menstrual cycle: physiology, reproductive disorders, and infertility. New York: Oxford University Press; 1993.
64. Love MI, Huber W, Anders S. Moderated estimation of fold change and dispersion for RNA-seq data with DESeq2. Genome Biol. 2014;15:1.
65. Kaufman L, Rousseeuw PJ. Finding groups in data: an introduction to cluster analysis, vol. 344. Hoboken, New Jersey: John Wiley & Sons; 2009.

Submit your next manuscript to BioMed Central and we will help you at every step:

• We accept pre-submission inquiries
• Our selector tool helps you to find the most relevant journal
• We provide round the clock customer support
• Convenient online submission
• Thorough peer review
• Inclusion in PubMed and all major indexing services
• Maximum visibility for your research

Submit your manuscript at
www.biomedcentral.com/submit

 **BioMed** Central

**2021-2024 National Age Group Motivational Times**

**Long Course Meters**

| B Min | BB Min | A Min | AA Min | AAA Min | AAAA Min | | AAAA Min | AAA Min | AA Min | A Min | BB Min | B Min |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **10 & under Girls** | | | | | | | **10 & under Boys** | | | |
| 44.09 | 39.89 | 35.59 | 34.19 | 32.79 | 31.39 | 50 M Free | 31.39 | 32.79 | 34.09 | 35.49 | 39.49 | 43.59 |
| 1:41.99 * | 1:31.19 * | 1:20.29 * | 1:16.69 * | 1:13.09 * | 1:09.39 * | 100 M Free | 1:09.49 | 1:12.89 * | 1:16.39 * | 1:19.79 * | 1:30.19 * | 1:40.59 * |
| 3:45.79 | 3:20.99 | 2:56.29 | 2:48.09 | 2:39.79 | 2:31.59 | 200 M Free | 2:29.49 | 2:36.59 | 2:43.69 | 2:50.79 | 3:12.09 | 3:33.49 |
| 7:36.79 | 6:51.09 | 6:05.39 | 5:50.19 | 5:34.99 | 5:19.79 | 400 M Free | 5:14.59 * | 5:29.59 * | 5:44.49 * | 5:59.49 * | 6:44.49 * | 7:29.39 * |
| 54.89 | 48.89 | 42.89 | 40.89 | 38.89 | 36.89 | 50 M Back | 36.89 | 38.89 | 40.99 | 42.99 | 49.19 | 55.29 |
| 1:59.19 | 1:45.99 | 1:32.69 | 1:28.29 | 1:23.89 | 1:19.49 | 100 M Back | 1:18.89 * | 1:22.89 * | 1:26.99 * | 1:30.99 * | 1:43.09 * | 1:55.09 * |
| 1:00.49 | 53.99 | 47.49 | 45.29 | 43.09 | 40.89 | 50 M Breast | 40.59 | 42.69 | 44.89 | 46.99 | 53.29 | 59.69 |
| 2:14.79 * | 1:59.79 * | 1:44.89 * | 1:39.89 * | 1:34.89 * | 1:29.89 * | 100 M Breast | 1:29.29 * | 1:33.79 * | 1:38.19 * | 1:42.69 * | 1:55.99 * | 2:09.39 * |
| 53.39 * | 47.09 * | 40.79 * | 38.69 * | 36.59 * | 34.49 * | 50 M Fly | 34.39 | 36.29 | 38.19 | 40.19 | 45.99 | 51.79 |
| 2:09.99 | 1:52.99 | 1:35.99 | 1:30.29 | 1:24.59 | 1:18.89 | 100 M Fly | 1:18.09 * | 1:23.59 * | 1:28.99 * | 1:34.49 * | 1:50.79 * | 2:07.09 * |
| 4:09.39 | 3:43.19 | 3:17.09 | 3:08.29 | 2:59.59 | 2:50.89 | 200 M IM | 2:49.89 | 2:58.39 | 3:06.89 | 3:15.39 | 3:40.79 | 4:06.19 |
| | | **11-12 Girls** | | | | | | | **11-12 Boys** | | | |
| 38.39 * | 35.69 * | 32.99 * | 31.69 * | 30.39 * | 29.09 * | 50 M Free | 27.99 * | 29.29 * | 30.69 | 31.99 * | 34.69 | 37.29 * |
| 1:24.09 * | 1:18.09 * | 1:12.09 * | 1:09.09 * | 1:06.09 * | 1:03.09 * | 100 M Free | 1:00.99 * | 1:03.89 * | 1:06.79 * | 1:09.69 * | 1:15.49 * | 1:21.29 * |
| 3:02.29 * | 2:49.19 * | 2:36.19 * | 2:29.69 * | 2:23.19 * | 2:16.69 * | 200 M Free | 2:13.19 * | 2:19.49 * | 2:25.79 * | 2:32.19 * | 2:44.89 * | 2:57.49 * |
| 6:23.89 | 5:56.49 | 5:29.09 | 5:15.39 | 5:01.69 | 4:47.99 | 400 M Free | 4:41.59 | 4:55.09 | 5:08.49 | 5:21.89 | 5:48.69 | 6:15.49 |
| 13:24.09 * | 12:26.69 * | 11:29.29 * | 11:00.59 * | 10:31.79 * | 10:03.09 * | 800 M Free | 9:53.79 | 10:22.09 | 10:50.39 | 11:18.59 | 12:15.19 | 13:11.69 |
| 25:45.79 | 23:55.39 | 22:04.99 | 21:09.79 | 20:14.59 | 19:19.39 | 1500 M Free | 18:55.19 | 19:49.19 | 20:43.29 | 21:37.39 | 23:25.49 | 25:13.59 |
| 43.99 * | 40.79 * | 37.69 * | 36.09 * | 34.49 * | 32.99 * | 50 M Back | 31.99 * | 33.69 * | 35.39 * | 36.99 * | 40.39 * | 43.69 * |
| 1:38.69 * | 1:30.99 * | 1:23.19 * | 1:19.29 * | 1:15.39 * | 1:11.49 * | 100 M Back | 1:09.19 * | 1:12.99 * | 1:16.69 * | 1:20.49 * | 1:27.99 * | 1:35.49 * |
| 3:24.49 * | 3:09.89 * | 2:55.29 * | 2:47.99 * | 2:40.69 * | 2:33.39 * | 200 M Back | 2:29.59 * | 2:36.69 * | 2:43.79 * | 2:50.99 * | 3:05.19 * | 3:19.49 * |
| 48.99 | 45.49 | 41.99 | 40.19 | 38.49 | 36.69 | 50 M Breast | 35.49 * | 37.49 * | 39.39 * | 41.29 * | 45.19 * | 48.99 * |
| 1:48.89 * | 1:40.89 * | 1:32.79 * | 1:28.79 * | 1:24.79 * | 1:20.79 * | 100 M Breast | 1:18.09 * | 1:22.19 | 1:26.19 * | 1:30.29 * | 1:38.39 * | 1:46.59 * |
| 3:52.59 * | 3:35.99 * | 3:19.39 * | 3:11.09 * | 3:02.79 | 2:54.49 | 200 M Breast | 2:48.49 | 2:56.59 | 3:04.59 | 3:12.59 | 3:28.69 | 3:44.69 |
| 41.29 | 38.29 | 35.39 | 33.89 | 32.39 * | 30.99 | 50 M Fly | 30.19 * | 31.89 * | 33.59 * | 35.19 * | 38.59 * | 41.89 * |
| 1:36.19 | 1:28.49 | 1:20.79 | 1:16.99 | 1:13.09 * | 1:09.29 | 100 M Fly | 1:06.99 | 1:10.89 | 1:14.69 | 1:18.59 | 1:26.29 | 1:33.99 |
| 3:24.89 | 3:10.19 | 2:55.59 | 2:48.29 | 2:40.99 | 2:33.69 | 200 M Fly | 2:30.39 * | 2:37.49 * | 2:44.69 * | 2:51.89 * | 3:06.19 * | 3:20.49 * |
| 3:26.09 * | 3:11.39 * | 2:56.59 * | 2:49.29 * | 2:41.89 * | 2:34.59 * | 200 M IM | 2:30.19 * | 2:37.79 * | 2:45.49 * | 2:53.19 * | 3:08.49 * | 3:23.79 * |
| 7:19.69 | 6:48.29 | 6:16.89 | 6:01.19 | 5:45.49 | 5:29.79 | 400 M IM | 5:22.39 * | 5:37.79 * | 5:53.09 * | 6:08.49 * | 6:39.19 * | 7:09.89 * |
| | | **13-14 Girls** | | | | | | | **13-14 Boys** | | | |
| 37.09 * | 34.49 * | 31.79 * | 30.49 * | 29.19 * | 27.89 * | 50 M Free | 25.79 | 27.09 | 28.29 | 29.49 | 31.99 | 34.39 |
| 1:20.49 * | 1:14.79 * | 1:08.99 * | 1:06.19 * | 1:03.29 * | 1:00.39 * | 100 M Free | 56.49 * | 59.09 * | 1:01.79 * | 1:04.49 * | 1:09.89 * | 1:15.29 * |
| 2:54.29 * | 2:41.79 * | 2:29.39 * | 2:23.19 * | 2:16.89 * | 2:10.69 * | 200 M Free | 2:03.09 | 2:08.89 | 2:14.79 | 2:20.59 | 2:32.29 | 2:44.09 |
| 6:06.79 * | 5:40.59 * | 5:14.39 * | 5:01.29 * | 4:48.19 * | 4:35.09 * | 400 M Free | 4:21.79 | 4:34.29 | 4:46.69 | 4:59.19 | 5:24.09 | 5:49.09 |
| 12:35.99 | 11:41.99 | 10:47.99 | 10:20.99 | 9:53.99 | 9:26.99 | 800 M Free | 9:04.39 | 9:30.29 | 9:56.29 | 10:22.19 | 11:13.99 | 12:05.89 |
| 24:06.39 | 22:23.09 | 20:39.79 | 19:48.09 | 18:56.49 | 18:04.79 | 1500 M Free | 17:19.89 | 18:09.39 | 18:58.89 | 19:48.39 | 21:27.39 | 23:06.49 |
| 1:29.99 | 1:23.59 | 1:17.09 | 1:13.89 | 1:10.69 | 1:07.49 | 100 M Back | 1:02.89 * | 1:05.89 * | 1:08.89 * | 1:11.89 * | 1:17.89 * | 1:23.89 * |
| 3:12.39 * | 2:58.69 * | 2:44.89 * | 2:38.09 * | 2:31.19 * | 2:24.29 * | 200 M Back | 2:16.59 * | 2:23.09 * | 2:29.59 * | 2:36.09 * | 2:49.09 * | 3:02.09 * |
| 1:42.09 * | 1:34.79 * | 1:27.49 * | 1:23.89 * | 1:20.19 * | 1:16.59 * | 100 M Breast | 1:11.19 | 1:14.59 | 1:17.89 | 1:21.29 | 1:28.09 | 1:34.89 |
| 3:39.69 * | 3:23.99 * | 3:08.29 * | 3:00.49 * | 2:52.59 * | 2:44.79 * | 200 M Breast | 2:34.09 * | 2:41.39 * | 2:48.79 * | 2:56.09 * | 3:10.79 * | 3:25.49 * |
| 1:26.59 * | 1:20.39 * | 1:14.29 * | 1:11.19 * | 1:08.09 * | 1:04.99 * | 100 M Fly | 1:00.99 | 1:03.89 | 1:06.79 | 1:09.69 | 1:15.49 | 1:21.29 |
| 3:12.99 * | 2:59.19 * | 2:45.49 * | 2:38.59 * | 2:31.69 * | 2:24.79 * | 200 M Fly | 2:15.69 * | 2:22.19 * | 2:28.59 * | 2:35.09 * | 2:47.99 * | 3:00.89 * |
| 3:15.79 * | 3:01.79 * | 2:47.79 * | 2:40.79 * | 2:33.89 * | 2:26.89 * | 200 M IM | 2:18.49 * | 2:25.09 * | 2:31.69 * | 2:38.29 * | 2:51.39 * | 3:04.59 * |
| 6:55.49 * | 6:25.89 * | 5:56.19 * | 5:41.29 * | 5:26.49 * | 5:11.69 * | 400 M IM | 4:54.59 | 5:08.59 | 5:22.59 | 5:36.59 | 6:04.69 | 6:32.69 |

**2021-2024 National Age Group Motivational Times**

| 15-16 Girls | | | | | | Event | 15-16 Boys | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36.39 | 33.79 | 31.19 | 29.89 | 28.59 | 27.29 | 50 M Free | 24.39 | 25.59 | 26.79 | 27.89 | 30.19 | 32.59 |
| 1:19.19 * | 1:13.49 * | 1:07.89 * | 1:04.99 * | 1:02.19 * | 59.39 * | 100 M Free | 53.99 * | 56.59 * | 59.19 * | 1:01.69 * | 1:06.89 * | 1:11.99 * |
| 2:50.49 * | 2:38.29 * | 2:26.19 * | 2:20.09 * | 2:13.99 * | 2:07.89 * | 200 M Free | 1:57.99 | 2:03.69 | 2:09.29 | 2:14.89 | 2:26.09 | 2:37.39 |
| 5:58.49 | 5:32.89 | 5:07.29 | 4:54.49 | 4:41.69 | 4:28.89 | 400 M Free | 4:10.29 | 4:22.19 | 4:34.19 | 4:46.09 | 5:09.89 | 5:33.69 |
| 12:21.29 | 11:28.39 | 10:35.39 | 10:08.99 | 9:42.49 | 9:15.99 | 800 M Free | 8:45.09 * | 9:10.09 * | 9:35.09 * | 10:00.09 * | 10:50.09 * | 11:40.09 * |
| 23:43.89 | 22:02.19 | 20:20.49 | 19:29.59 | 18:38.79 | 17:47.89 | 1500 M Free | 16:36.69 | 17:24.19 | 18:11.69 | 18:59.09 | 20:33.99 | 22:08.99 |
| 1:27.29 * | 1:21.09 * | 1:14.89 * | 1:11.79 * | 1:08.59 * | 1:05.49 * | 100 M Back | 1:00.09 * | 1:02.99 * | 1:05.89 * | 1:08.69 * | 1:14.39 * | 1:20.19 * |
| 3:08.39 * | 2:54.99 * | 2:41.49 * | 2:34.79 * | 2:28.09 * | 2:21.29 * | 200 M Back | 2:10.29 | 2:16.49 | 2:22.69 | 2:28.89 | 2:41.39 | 2:53.79 |
| 1:39.49 * | 1:32.39 * | 1:25.29 * | 1:21.69 * | 1:18.19 | 1:14.59 * | 100 M Breast | 1:07.39 | 1:10.59 | 1:13.79 | 1:16.99 | 1:23.49 | 1:29.89 |
| 3:35.89 * | 3:20.49 * | 3:05.09 * | 2:57.39 * | 2:49.59 * | 2:41.89 * | 200 M Breast | 2:26.49 * | 2:33.49 * | 2:40.49 * | 2:47.49 * | 3:01.39 * | 3:15.39 * |
| 1:25.39 * | 1:19.29 * | 1:13.19 * | 1:10.09 * | 1:07.09 * | 1:03.99 * | 100 M Fly | 57.99 | 1:00.79 | 1:03.59 | 1:06.29 | 1:11.79 | 1:17.39 |
| 3:07.29 * | 2:53.99 * | 2:40.59 * | 2:33.89 * | 2:27.19 * | 2:20.49 * | 200 M Fly | 2:09.19 * | 2:15.39 * | 2:21.49 * | 2:27.69 * | 2:39.99 * | 2:52.29 * |
| 3:11.89 * | 2:58.19 * | 2:44.49 * | 2:37.59 * | 2:30.79 * | 2:23.89 * | 200 M IM | 2:12.49 | 2:18.79 | 2:25.09 | 2:31.39 | 2:43.99 | 2:56.59 |
| 6:47.89 | 6:18.79 | 5:49.69 | 5:35.09 | 5:20.49 | 5:05.99 | 400 M IM | 4:40.59 | 4:53.89 | 5:07.29 | 5:20.59 | 5:47.29 | 6:14.09 |
| **17-18 Girls** | | | | | | | **17-18 Boys** | | | | | |
| 36.19 | 33.59 | 30.99 | 29.69 | 28.39 | 27.09 | 50 M Free | 24.29 * | 25.49 | 26.59 * | 27.79 | 30.09 | 32.39 * |
| 1:18.59 | 1:12.99 | 1:07.39 | 1:04.59 | 1:01.79 | 58.99 | 100 M Free | 52.69 * | 55.19 * | 57.69 * | 1:00.19 * | 1:05.29 * | 1:10.29 * |
| 2:49.59 | 2:37.49 | 2:25.39 | 2:19.29 | 2:13.19 | 2:07.19 | 200 M Free | 1:55.99 * | 2:01.49 * | 2:06.99 * | 2:12.49 * | 2:23.59 * | 2:34.59 * |
| 5:57.09 * | 5:31.59 * | 5:06.09 * | 4:53.39 * | 4:40.59 * | 4:27.89 * | 400 M Free | 4:06.89 * | 4:18.69 * | 4:30.39 * | 4:42.19 * | 5:05.69 * | 5:29.19 * |
| 12:16.89 * | 11:24.29 * | 10:31.59 * | 10:05.29 * | 9:38.99 * | 9:12.69 * | 800 M Free | 8:34.59 | 8:59.09 | 9:23.59 | 9:48.09 | 10:37.09 | 11:26.09 |
| 23:30.39 * | 21:49.59 * | 20:08.89 * | 19:18.49 * | 18:28.19 * | 17:37.79 * | 1500 M Free | 16:25.99 * | 17:12.99 * | 17:59.89 * | 18:46.89 * | 20:20.79 * | 21:54.69 * |
| 1:26.59 * | 1:20.39 * | 1:14.19 * | 1:11.09 * | 1:08.09 * | 1:04.99 * | 100 M Back | 58.99 * | 1:01.79 * | 1:04.59 * | 1:07.39 * | 1:12.99 * | 1:18.59 * |
| 3:06.89 * | 2:53.59 * | 2:40.19 * | 2:33.49 * | 2:26.89 * | 2:20.19 * | 200 M Back | 2:07.89 * | 2:13.99 * | 2:20.09 * | 2:26.19 * | 2:38.39 * | 2:50.59 * |
| 1:38.69 * | 1:31.69 * | 1:24.59 * | 1:21.09 * | 1:17.59 * | 1:14.09 * | 100 M Breast | 1:05.99 * | 1:09.09 * | 1:12.29 * | 1:15.39 * | 1:21.69 * | 1:27.99 * |
| 3:33.09 | 3:17.89 | 3:02.69 | 2:55.09 | 2:47.49 | 2:39.89 | 200 M Breast | 2:23.69 * | 2:30.59 * | 2:37.39 * | 2:44.19 * | 2:57.89 * | 3:11.59 * |
| 1:24.29 * | 1:18.29 * | 1:12.19 * | 1:09.19 * | 1:06.19 * | 1:03.19 * | 100 M Fly | 56.59 * | 59.29 * | 1:01.99 * | 1:04.69 * | 1:10.09 * | 1:15.49 * |
| 3:06.79 * | 2:53.39 * | 2:40.09 * | 2:33.39 * | 2:26.69 * | 2:20.09 * | 200 M Fly | 2:06.29 * | 2:12.39 * | 2:18.39 * | 2:24.39 * | 2:36.39 * | 2:48.39 * |
| 3:10.69 | 2:56.99 | 2:43.39 | 2:36.59 | 2:29.79 | 2:22.99 | 200 M IM | 2:10.29 * | 2:16.49 * | 2:22.69 * | 2:28.89 * | 2:41.29 * | 2:53.69 * |
| 6:45.19 | 6:16.29 | 5:47.29 | 5:32.89 | 5:18.39 | 5:03.89 | 400 M IM | 4:37.09 * | 4:50.19 * | 5:03.39 * | 5:16.59 * | 5:42.99 * | 6:09.39 * |

## 2021-2024 National Age Group Motivational Times
### Short Course Meters

| B Min | BB Min | A Min | AA Min | AAA Min | AAAA Min | | AAAA Min | AAA Min | AA Min | A Min | BB Min | B Min |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **10 & under Girls** | | | | | | **10 & under Boys** | | | |
| 42.99 | 38.89 | 34.69 | 33.29 | 31.89 | 30.59 | 50 M Free | 30.29 | 31.59 | 32.89 | 34.19 | 38.09 | 41.99 |
| 1:38.99 | 1:28.39 | 1:17.89 | 1:14.39 | 1:10.89 | 1:07.39 | 100 M Free | 1:06.99 | 1:10.29 | 1:13.69 | 1:16.99 | 1:26.99 | 1:36.99 |
| 3:40.09 | 3:15.99 | 2:51.89 | 2:43.89 | 2:35.79 | 2:27.79 | 200 M Free | 2:24.39 | 2:31.29 | 2:38.19 | 2:44.99 | 3:05.69 | 3:26.29 |
| 7:22.89 | 6:38.59 | 5:54.29 | 5:39.59 | 5:24.79 | 5:10.09 | 400 M Free | 5:04.29 | 5:18.79 | 5:33.29 | 5:47.79 | 6:31.19 | 7:14.69 |
| 51.99 | 46.29 | 40.59 | 38.69 | 36.79 | 34.89 | 50 M Back | 35.09 | 37.09 | 38.99 | 40.99 | 46.79 | 52.69 |
| 1:52.69 | 1:40.19 | 1:27.69 | 1:23.49 | 1:19.29 | 1:15.19 | 100 M Back | 1:15.89 | 1:19.79 | 1:23.59 | 1:27.49 | 1:39.09 | 1:50.69 |
| 58.89 | 52.49 | 46.19 | 44.09 | 41.89 | 39.79 | 50 M Breast | 39.19 | 41.19 | 43.29 | 45.29 | 51.39 | 57.59 |
| 2:10.49 | 1:55.99 | 1:41.49 | 1:36.69 | 1:31.89 | 1:26.99 | 100 M Breast | 1:26.69 | 1:30.99 | 1:35.29 | 1:39.59 | 1:52.59 | 2:05.59 |
| 52.39 | 46.19 | 39.99 | 37.99 | 35.89 | 33.79 | 50 M Fly | 33.49 | 35.29 | 37.19 | 39.09 | 44.79 | 50.49 |
| 2:05.99 | 1:49.49 | 1:32.99 | 1:27.49 | 1:21.99 | 1:16.49 | 100 M Fly | 1:16.29 | 1:21.69 | 1:26.99 | 1:32.29 | 1:48.29 | 2:04.19 |
| 1:53.39 | 1:41.29 | 1:29.19 | 1:25.19 | 1:21.19 | 1:17.19 | 100 M IM | 1:16.89 | 1:20.49 | 1:24.19 | 1:27.89 | 1:38.79 | 1:49.79 |
| 4:01.49 | 3:36.19 | 3:10.79 | 3:02.39 | 2:53.99 | 2:45.49 | 200 M IM | 2:44.29 | 2:52.49 | 3:00.69 | 3:08.89 | 3:33.49 | 3:58.09 |
| | | | **11-12 Girls** | | | | | | **11-12 Boys** | | | |
| 37.29 | 34.69 | 32.19 | 30.89 | 29.59 | 28.29 | 50 M Free | 26.99 | 28.29 | 29.59 | 30.89 | 33.39 | 35.99 |
| 1:21.29 | 1:15.49 | 1:09.69 | 1:06.79 | 1:03.89 | 1:00.99 | 100 M Free | 58.89 | 1:01.69 | 1:04.49 | 1:07.29 | 1:12.89 | 1:18.49 |
| 2:58.09 | 2:45.39 | 2:32.69 | 2:26.29 | 2:19.99 | 2:13.59 | 200 M Free | 2:09.09 | 2:15.19 | 2:21.29 | 2:27.49 | 2:39.79 | 2:52.09 |
| 6:15.49 | 5:48.69 | 5:21.89 | 5:08.49 | 4:55.09 | 4:41.69 | 400 M Free | 4:33.89 | 4:46.89 | 4:59.99 | 5:12.99 | 5:39.09 | 6:05.19 |
| 12:57.19 | 12:01.69 | 11:06.19 | 10:38.49 | 10:10.69 | 9:42.89 | 800 M Free | 9:32.69 | 9:59.99 | 10:27.29 | 10:54.59 | 11:49.09 | 12:43.59 |
| 24:45.29 | 22:59.19 | 21:13.09 | 20:20.09 | 19:26.99 | 18:33.99 | 1500 M Free | 18:09.99 | 19:01.89 | 19:53.79 | 20:45.69 | 22:29.59 | 24:13.39 |
| 42.39 | 39.29 | 36.29 | 34.79 | 33.29 | 31.79 | 50 M Back | 30.89 | 32.49 | 34.09 | 35.69 | 38.99 | 42.19 |
| 1:34.19 | 1:26.69 | 1:19.29 | 1:15.59 | 1:11.89 | 1:08.19 | 100 M Back | 1:05.79 | 1:09.39 | 1:12.99 | 1:16.59 | 1:23.69 | 1:30.89 |
| 3:15.19 | 3:01.29 | 2:47.29 | 2:40.29 | 2:33.39 | 2:26.39 | 200 M Back | 2:23.09 | 2:29.89 | 2:36.69 | 2:43.49 | 2:57.19 | 3:10.79 |
| 47.59 | 44.19 | 40.79 | 39.09 | 37.39 | 35.69 | 50 M Breast | 34.39 | 36.19 | 38.09 | 39.99 | 43.69 | 47.39 |
| 1:44.29 | 1:36.59 | 1:28.89 | 1:24.99 | 1:21.19 | 1:17.29 | 100 M Breast | 1:14.89 | 1:18.79 | 1:22.69 | 1:26.59 | 1:34.39 | 1:42.29 |
| 3:44.49 | 3:28.39 | 3:12.39 | 3:04.39 | 2:56.39 | 2:48.39 | 200 M Breast | 2:41.59 | 2:49.29 | 2:56.99 | 3:04.59 | 3:19.99 | 3:35.39 |
| 40.59 | 37.69 | 34.79 | 33.39 | 31.89 | 30.49 | 50 M Fly | 29.59 | 31.19 | 32.79 | 34.49 | 37.79 | 40.99 |
| 1:33.99 | 1:26.49 | 1:18.99 | 1:15.19 | 1:11.49 | 1:07.69 | 100 M Fly | 1:05.59 | 1:09.39 | 1:13.19 | 1:16.89 | 1:24.49 | 1:32.09 |
| 3:19.79 | 3:05.59 | 2:51.29 | 2:44.19 | 2:36.99 | 2:29.89 | 200 M Fly | 2:26.39 | 2:33.29 | 2:40.29 | 2:47.29 | 3:01.19 | 3:15.19 |
| 1:33.19 | 1:26.59 | 1:19.89 | 1:16.59 | 1:13.29 | 1:09.89 | 100 M IM | 1:06.69 | 1:09.89 | 1:13.19 | 1:16.39 | 1:22.89 | 1:29.39 |
| 3:19.69 | 3:05.39 | 2:51.19 | 2:43.99 | 2:36.89 | 2:29.79 | 200 M IM | 2:24.59 | 2:31.99 | 2:39.39 | 2:46.69 | 3:01.49 | 3:16.19 |
| 7:04.49 | 6:34.19 | 6:03.89 | 5:48.69 | 5:33.59 | 5:18.39 | 400 M IM | 5:09.19 | 5:23.89 | 5:38.69 | 5:53.39 | 6:22.79 | 6:52.29 |
| | | | **13-14 Girls** | | | | | | **13-14 Boys** | | | |
| 36.09 | 33.49 | 30.89 | 29.59 | 28.39 | 27.09 | 50 M Free | 24.89 | 26.09 | 27.29 | 28.39 | 30.79 | 33.19 |
| 1:18.29 | 1:12.69 | 1:07.09 | 1:04.29 | 1:01.49 | 58.69 | 100 M Free | 54.39 | 56.99 | 59.59 | 1:02.19 | 1:07.29 | 1:12.49 |
| 2:49.29 | 2:37.19 | 2:25.09 | 2:18.99 | 2:12.99 | 2:06.99 | 200 M Free | 1:58.49 | 2:04.19 | 2:09.79 | 2:15.39 | 2:26.69 | 2:37.99 |
| 5:58.29 | 5:32.69 | 5:07.09 | 4:54.29 | 4:41.49 | 4:28.69 | 400 M Free | 4:13.79 | 4:25.89 | 4:37.89 | 4:49.99 | 5:14.19 | 5:38.29 |
| 12:16.89 | 11:24.19 | 10:31.59 | 10:05.29 | 9:38.99 | 9:12.69 | 800 M Free | 8:45.89 | 9:10.89 | 9:35.99 | 10:00.99 | 10:51.09 | 11:41.09 |
| 23:15.29 | 21:35.69 | 19:55.99 | 19:06.19 | 18:16.29 | 17:26.49 | 1500 M Free | 16:38.29 | 17:25.89 | 18:13.39 | 19:00.89 | 20:35.99 | 22:11.09 |
| 1:25.29 | 1:19.19 | 1:13.09 | 1:10.09 | 1:06.99 | 1:03.99 | 100 M Back | 59.69 | 1:02.59 | 1:05.39 | 1:08.19 | 1:13.89 | 1:19.59 |
| 3:04.89 | 2:51.69 | 2:38.49 | 2:31.89 | 2:25.29 | 2:18.69 | 200 M Back | 2:10.19 | 2:16.39 | 2:22.59 | 2:28.79 | 2:41.19 | 2:53.59 |
| 1:37.99 | 1:30.99 | 1:23.99 | 1:20.49 | 1:16.99 | 1:13.49 | 100 M Breast | 1:07.49 | 1:10.69 | 1:13.89 | 1:17.09 | 1:23.49 | 1:29.89 |
| 3:32.19 | 3:16.99 | 3:01.89 | 2:54.29 | 2:46.69 | 2:39.09 | 200 M Breast | 2:27.79 | 2:34.89 | 2:41.89 | 2:48.89 | 3:02.99 | 3:17.09 |
| 1:24.99 | 1:18.89 | 1:12.89 | 1:09.79 | 1:06.79 | 1:03.79 | 100 M Fly | 59.19 | 1:01.99 | 1:04.89 | 1:07.69 | 1:13.29 | 1:18.89 |
| 3:07.89 | 2:54.49 | 2:41.09 | 2:34.39 | 2:27.69 | 2:20.99 | 200 M Fly | 2:11.19 | 2:17.49 | 2:23.69 | 2:29.99 | 2:42.49 | 2:54.99 |
| 3:09.49 | 2:55.89 | 2:42.39 | 2:35.59 | 2:28.89 | 2:22.09 | 200 M IM | 2:12.59 | 2:18.89 | 2:25.19 | 2:31.59 | 2:44.19 | 2:56.79 |
| 6:44.19 | 6:15.39 | 5:46.49 | 5:31.99 | 5:17.59 | 5:03.19 | 400 M IM | 4:43.29 | 4:56.79 | 5:10.29 | 5:23.79 | 5:50.69 | 6:17.69 |

## 2021-2024 National Age Group Motivational Times

### 15-16 Girls | | | | | | | 15-16 Boys

| | | | | | | Event | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35.39 | 32.89 | 30.39 | 29.09 | 27.89 | 26.59 | 50 M Free | 23.89 | 25.09 | 26.19 | 27.39 | 29.59 | 31.89 |
| 1:16.89 | 1:11.39 | 1:05.89 | 1:03.19 | 1:00.39 | 57.69 | 100 M Free | 52.09 | 54.59 | 57.09 | 59.59 | 1:04.49 | 1:09.49 |
| 2:45.59 | 2:33.79 | 2:21.99 | 2:16.09 | 2:10.09 | 2:04.19 | 200 M Free | 1:53.79 | 1:59.29 | 2:04.69 | 2:10.09 | 2:20.89 | 2:31.79 |
| 5:50.69 | 5:25.59 | 5:00.59 | 4:48.09 | 4:35.49 | 4:22.99 | 400 M Free | 4:04.59 | 4:16.19 | 4:27.89 | 4:39.49 | 5:02.79 | 5:26.09 |
| 12:05.69 | 11:13.89 | 10:22.09 | 9:56.09 | 9:30.19 | 9:04.29 | 800 M Free | 8:27.39 | 8:51.59 | 9:15.69 | 9:39.89 | 10:28.19 | 11:16.49 |
| 22:57.09 | 21:18.69 | 19:40.39 | 18:51.19 | 18:01.99 | 17:12.79 | 1500 M Free | 16:05.89 | 16:51.89 | 17:37.89 | 18:23.89 | 19:55.89 | 21:27.89 |
| 1:23.39 | 1:17.39 | 1:11.49 | 1:08.49 | 1:05.49 | 1:02.49 | 100 M Back | 56.69 | 59.39 | 1:02.09 | 1:04.79 | 1:10.19 | 1:15.59 |
| 3:01.39 | 2:48.39 | 2:35.49 | 2:28.99 | 2:22.49 | 2:15.99 | 200 M Back | 2:04.19 | 2:10.09 | 2:15.99 | 2:21.99 | 2:33.79 | 2:45.59 |
| 1:36.09 | 1:29.19 | 1:22.39 | 1:18.89 | 1:15.49 | 1:12.09 | 100 M Breast | 1:04.29 | 1:07.39 | 1:10.49 | 1:13.49 | 1:19.59 | 1:25.79 |
| 3:27.89 | 3:13.09 | 2:58.19 | 2:50.79 | 2:43.39 | 2:35.99 | 200 M Breast | 2:19.79 | 2:26.49 | 2:33.09 | 2:39.79 | 2:53.09 | 3:06.39 |
| 1:23.29 | 1:17.29 | 1:11.39 | 1:08.39 | 1:05.39 | 1:02.49 | 100 M Fly | 56.59 | 59.29 | 1:01.99 | 1:04.69 | 1:10.09 | 1:15.49 |
| 3:04.29 | 2:51.09 | 2:37.99 | 2:31.39 | 2:24.79 | 2:18.19 | 200 M Fly | 2:05.49 | 2:11.49 | 2:17.49 | 2:23.39 | 2:35.39 | 2:47.29 |
| 3:05.79 | 2:52.59 | 2:39.29 | 2:32.69 | 2:25.99 | 2:19.39 | 200 M IM | 2:06.59 | 2:12.59 | 2:18.69 | 2:24.69 | 2:36.69 | 2:48.79 |
| 6:35.09 | 6:06.89 | 5:38.69 | 5:24.59 | 5:10.49 | 4:56.39 | 400 M IM | 4:32.69 | 4:45.69 | 4:58.69 | 5:11.69 | 5:37.69 | 6:03.59 |

### 17-18 Girls | | | | | | | 17-18 Boys

| | | | | | | Event | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34.79 | 32.29 | 29.79 | 28.59 | 27.29 | 26.09 | 50 M Free | 23.19 | 24.29 | 25.39 | 26.49 | 28.69 | 30.89 |
| 1:15.29 | 1:09.99 | 1:04.59 | 1:01.89 | 59.19 | 56.49 | 100 M Free | 50.89 | 53.29 | 55.69 | 58.19 | 1:02.99 | 1:07.79 |
| 2:44.19 | 2:32.49 | 2:20.79 | 2:14.89 | 2:08.99 | 2:03.19 | 200 M Free | 1:51.59 | 1:56.89 | 2:02.19 | 2:07.59 | 2:18.19 | 2:28.79 |
| 5:49.29 | 5:24.39 | 4:59.39 | 4:46.89 | 4:34.49 | 4:21.99 | 400 M Free | 4:00.09 | 4:11.49 | 4:22.89 | 4:34.29 | 4:57.19 | 5:20.09 |
| 12:03.09 | 11:11.39 | 10:19.79 | 9:53.89 | 9:28.09 | 9:02.29 | 800 M Free | 8:23.79 | 8:47.79 | 9:11.69 | 9:35.69 | 10:23.69 | 11:11.69 |
| 22:50.29 | 21:12.39 | 19:34.59 | 18:45.59 | 17:56.69 | 17:07.69 | 1500 M Free | 15:49.39 | 16:34.59 | 17:19.79 | 18:04.99 | 19:35.39 | 21:05.79 |
| 1:22.29 | 1:16.39 | 1:10.49 | 1:07.59 | 1:04.69 | 1:01.69 | 100 M Back | 54.89 | 57.49 | 1:00.09 | 1:02.79 | 1:07.99 | 1:13.19 |
| 2:58.19 | 2:45.39 | 2:32.69 | 2:26.39 | 2:19.99 | 2:13.59 | 200 M Back | 2:01.19 | 2:06.89 | 2:12.69 | 2:18.49 | 2:29.99 | 2:41.49 |
| 1:34.89 | 1:28.09 | 1:21.29 | 1:17.99 | 1:14.59 | 1:11.19 | 100 M Breast | 1:02.89 | 1:05.89 | 1:08.89 | 1:11.89 | 1:17.89 | 1:23.89 |
| 3:24.39 | 3:09.79 | 2:55.19 | 2:47.89 | 2:40.59 | 2:33.29 | 200 M Breast | 2:17.19 | 2:23.79 | 2:30.29 | 2:36.79 | 2:49.89 | 3:02.99 |
| 1:21.99 | 1:16.09 | 1:10.29 | 1:07.29 | 1:04.39 | 1:01.49 | 100 M Fly | 54.59 | 57.19 | 59.79 | 1:02.39 | 1:07.59 | 1:12.79 |
| 3:01.59 | 2:48.69 | 2:35.69 | 2:29.19 | 2:22.69 | 2:16.19 | 200 M Fly | 2:03.09 | 2:08.99 | 2:14.89 | 2:20.69 | 2:32.39 | 2:44.19 |
| 3:02.99 | 2:49.99 | 2:36.89 | 2:30.39 | 2:23.79 | 2:17.29 | 200 M IM | 2:04.39 | 2:10.39 | 2:16.29 | 2:22.19 | 2:33.99 | 2:45.89 |
| 6:29.99 | 6:02.09 | 5:34.29 | 5:20.29 | 5:06.39 | 4:52.49 | 400 M IM | 4:25.99 | 4:38.69 | 4:51.29 | 5:03.99 | 5:29.29 | 5:54.69 |

## Short Course Yards

| B Min | BB Min | A Min | AA Min | AAA Min | AAAA Min | | AAAA Min | AAA Min | AA Min | A Min | BB Min | B Min |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **10 & under Girls** | | | | | | | **10 & under Boys** | | | |
| 38.89 | 35.19 | 31.39 | 30.19 | 28.89 | 27.69 | 50 Y Free | 27.39 | 28.59 | 29.79 | 30.99 | 34.49 | 38.09 |
| 1:29.59 | 1:19.99 | 1:10.49 | 1:07.29 | 1:04.19 | 1:00.99 | 100 Y Free | 1:00.59 | 1:03.69 | 1:06.69 | 1:09.69 | 1:18.79 | 1:27.79 |
| 3:18.99 * | 2:57.19 * | 2:35.39 * | 2:28.19 * | 2:20.89 * | 2:13.59 * | 200 Y Free | 2:10.69 | 2:16.89 | 2:23.09 | 2:29.39 | 2:47.99 | 3:06.69 |
| 8:25.39 * | 7:34.89 * | 6:44.29 * | 6:27.49 * | 6:10.59 * | 5:53.79 * | 500 Y Free | 5:47.69 | 6:04.19 | 6:20.79 | 6:37.39 | 7:26.99 | 8:16.69 |
| 46.99 | 41.89 | 36.69 | 34.99 | 33.29 | 31.59 | 50 Y Back | 31.69 * | 33.49 * | 35.19 * | 36.99 * | 42.29 * | 47.49 * |
| 1:41.99 | 1:30.69 | 1:19.29 | 1:15.59 | 1:11.79 | 1:07.99 | 100 Y Back | 1:08.39 * | 1:11.89 * | 1:15.39 * | 1:18.79 * | 1:29.29 * | 1:39.79 * |
| 53.19 * | 47.49 | 41.69 * | 39.79 * | 37.89 * | 35.99 | 50 Y Breast | 35.49 | 37.29 | 39.19 | 40.99 | 46.59 | 52.09 |
| 1:58.00 | 1:44.99 | 1:31.89 | 1:27.49 | 1:23.09 | 1:18.79 | 100 Y Breast | 1:18.29 * | 1:22.19 * | 1:26.09 * | 1:29.99 * | 1:41.69 * | 1:53.39 * |
| 47.39 | 41.79 | 36.19 | 34.39 | 32.49 | 30.59 | 50 Y Fly | 30.29 | 31.99 | 33.69 | 35.39 | 40.49 | 45.69 |
| 1:53.99 | 1:39.09 | 1:24.09 | 1:19.19 | 1:14.19 | 1:09.19 | 100 Y Fly | 1:08.49 * | 1:13.19 * | 1:17.99 * | 1:22.79 * | 1:37.09 * | 1:51.39 * |
| 1:42.59 | 1:31.69 | 1:20.79 | 1:17.09 | 1:13.49 | 1:09.79 | 100 Y IM | 1:09.09 * | 1:12.39 * | 1:15.69 * | 1:18.99 * | 1:28.89 * | 1:38.79 * |
| 3:38.49 | 3:15.59 | 2:52.69 | 2:45.09 | 2:37.39 | 2:29.79 | 200 Y IM | 2:28.69 | 2:36.19 | 2:43.59 | 2:50.99 | 3:13.19 | 3:35.49 |
| | | **11-12 Girls** | | | | | | | **11-12 Boys** | | | |
| 33.59 * | 31.29 * | 28.99 * | 27.79 * | 26.59 * | 25.49 * | 50 Y Free | 24.49 | 25.59 | 26.79 | 27.89 | 30.29 | 32.59 |
| 1:13.59 | 1:08.29 | 1:03.09 | 1:00.49 | 57.79 | 55.19 | 100 Y Free | 53.29 | 55.79 | 58.29 | 1:00.89 | 1:05.89 | 1:10.99 |
| 2:40.39 * | 2:28.99 * | 2:17.49 * | 2:11.79 * | 2:05.99 * | 2:00.29 * | 200 Y Free | 1:55.89 * | 2:01.39 * | 2:06.99 * | 2:12.49 * | 2:23.49 * | 2:34.59 * |
| 7:08.79 * | 6:38.19 * | 6:07.59 * | 5:52.19 * | 5:36.89 * | 5:21.59 * | 500 Y Free | 5:12.99 | 5:27.89 | 5:42.79 | 5:57.69 | 6:27.49 | 6:57.29 |
| 14:48.09 | 13:44.69 | 12:41.19 | 12:09.49 | 11:37.79 | 11:06.09 | 1000 Y Free | 10:54.39 | 11:25.59 | 11:56.79 | 12:27.89 | 13:30.19 | 14:32.59 |
| 24:53.99 | 23:07.29 | 21:20.59 | 20:27.19 | 19:33.89 | 18:40.49 | 1650 Y Free | 18:16.39 | 19:08.59 | 20:00.79 | 20:52.99 | 22:37.49 | 24:21.89 |
| 38.09 * | 35.39 * | 32.69 * | 31.29 * | 29.99 * | 28.59 * | 50 Y Back | 27.79 * | 29.29 * | 30.69 * | 32.09 * | 34.99 * | 37.89 * |
| 1:24.79 * | 1:18.09 * | 1:11.39 * | 1:08.09 * | 1:04.69 * | 1:01.39 * | 100 Y Back | 59.49 * | 1:02.79 | 1:05.99 * | 1:09.19 * | 1:15.69 * | 1:22.19 |
| 2:56.59 | 2:43.99 | 2:31.39 | 2:25.09 | 2:18.79 | 2:12.49 | 200 Y Back | 2:08.99 * | 2:15.19 * | 2:21.29 * | 2:27.39 * | 2:39.69 * | 2:51.99 * |
| 42.99 * | 39.99 | 36.89 | 35.39 | 33.79 * | 32.29 | 50 Y Breast | 31.09 | 32.69 * | 34.39 * | 36.09 * | 39.49 * | 42.89 |
| 1:34.09 * | 1:27.19 * | 1:20.19 * | 1:16.69 * | 1:13.19 * | 1:09.79 * | 100 Y Breast | 1:06.99 * | 1:10.49 * | 1:13.99 * | 1:17.49 * | 1:24.49 * | 1:31.39 * |
| 3:20.89 * | 3:06.59 * | 2:52.19 * | 2:45.09 * | 2:37.89 * | 2:30.69 * | 200 Y Breast | 2:25.59 * | 2:32.49 * | 2:39.39 * | 2:46.39 * | 3:00.19 * | 3:14.09 * |
| 36.49 * | 33.89 * | 31.29 * | 29.99 * | 28.69 * | 27.39 * | 50 Y Fly | 26.79 | 28.19 | 29.69 | 31.19 | 34.19 | 37.09 |
| 1:24.39 * | 1:17.59 * | 1:10.89 * | 1:07.49 * | 1:04.19 * | 1:00.79 * | 100 Y Fly | 58.99 * | 1:02.39 * | 1:05.89 * | 1:09.29 * | 1:16.09 * | 1:22.89 * |
| 2:59.99 * | 2:47.19 * | 2:34.29 * | 2:27.89 * | 2:21.39 * | 2:14.99 * | 200 Y Fly | 2:09.89 * | 2:16.09 * | 2:22.19 * | 2:28.39 * | 2:40.79 * | 2:53.19 * |
| 1:24.09 * | 1:18.09 * | 1:12.09 * | 1:09.09 * | 1:06.09 * | 1:03.09 * | 100 Y IM | 1:00.29 | 1:03.29 | 1:06.19 | 1:09.09 | 1:14.99 | 1:20.89 |
| 3:00.19 * | 2:47.29 * | 2:34.49 * | 2:27.99 * | 2:21.59 * | 2:15.19 * | 200 Y IM | 2:10.69 * | 2:17.29 * | 2:23.99 * | 2:30.69 * | 2:43.99 * | 2:57.29 * |
| 6:24.19 | 5:56.79 | 5:29.29 | 5:15.59 | 5:01.89 | 4:48.19 | 400 Y IM | 4:39.79 | 4:53.19 | 5:06.49 | 5:19.79 | 5:46.39 | 6:13.09 |
| | | **13-14 Girls** | | | | | | | **13-14 Boys** | | | |
| 32.59 * | 30.19 * | 27.89 * | 26.79 | 25.59 * | 24.39 * | 50 Y Free | 22.49 | 23.49 * | 24.59 * | 25.69 | 27.79 * | 29.89 * |
| 1:10.59 * | 1:05.49 * | 1:00.49 * | 57.99 * | 55.49 * | 52.89 * | 100 Y Free | 49.19 | 51.59 | 53.89 | 56.29 | 1:00.89 | 1:05.59 |
| 2:32.09 * | 2:21.29 * | 2:10.39 * | 2:04.99 * | 1:59.49 * | 1:54.09 * | 200 Y Free | 1:47.29 | 1:52.39 | 1:57.49 | 2:02.59 | 2:12.79 | 2:22.99 |
| 6:47.79 * | 6:18.69 * | 5:49.59 * | 5:34.99 * | 5:20.39 * | 5:05.89 * | 500 Y Free | 4:49.99 | 5:03.79 | 5:17.59 | 5:31.39 | 5:58.99 | 6:26.59 |
| 14:01.99 | 13:01.79 | 12:01.69 | 11:31.59 | 11:01.59 | 10:31.49 | 1000 Y Free | 10:00.89 | 10:29.49 | 10:58.09 | 11:26.69 | 12:23.89 | 13:21.19 |
| 23:23.49 | 21:43.19 | 20:02.99 | 19:12.89 | 18:22.79 | 17:32.59 | 1650 Y Free | 16:44.19 | 17:31.99 | 18:19.79 | 19:07.59 | 20:43.19 | 22:18.89 |
| 1:16.69 * | 1:11.19 * | 1:05.69 * | 1:02.99 * | 1:00.19 * | 57.49 * | 100 Y Back | 53.59 * | 56.19 * | 58.69 * | 1:01.29 * | 1:06.39 * | 1:11.49 * |
| 2:46.79 * | 2:34.89 * | 2:22.99 * | 2:17.09 * | 2:11.09 * | 2:05.09 * | 200 Y Back | 1:57.19 * | 2:02.79 * | 2:08.39 * | 2:13.99 * | 2:25.09 * | 2:36.29 * |
| 1:27.99 * | 1:21.69 * | 1:15.39 * | 1:12.29 * | 1:09.09 * | 1:05.99 * | 100 Y Breast | 1:00.99 * | 1:03.89 * | 1:06.79 * | 1:09.69 * | 1:15.49 * | 1:21.29 * |
| 3:10.89 * | 2:57.29 * | 2:43.69 * | 2:36.79 * | 2:29.99 * | 2:23.19 * | 200 Y Breast | 2:12.49 * | 2:18.79 * | 2:25.09 * | 2:31.39 * | 2:43.99 * | 2:56.59 * |
| 1:16.39 * | 1:10.89 * | 1:05.49 * | 1:02.69 * | 59.99 * | 57.29 * | 100 Y Fly | 53.39 * | 55.89 * | 58.49 * | 1:00.99 * | 1:06.09 * | 1:11.19 * |
| 2:48.99 * | 2:36.89 * | 2:24.89 * | 2:18.79 * | 2:12.79 * | 2:06.79 * | 200 Y Fly | 1:58.69 * | 2:04.29 * | 2:09.99 * | 2:15.59 * | 2:26.89 * | 2:38.19 * |
| 2:49.79 * | 2:37.59 * | 2:25.49 * | 2:19.49 * | 2:13.39 * | 2:07.29 * | 200 Y IM | 1:59.99 | 2:05.69 | 2:11.39 | 2:17.09 * | 2:28.49 * | 2:39.99 |
| 6:03.59 * | 5:37.59 * | 5:11.69 * | 4:58.69 * | 4:45.69 * | 4:32.69 * | 400 Y IM | 4:16.09 * | 4:28.29 * | 4:40.49 * | 4:52.69 * | 5:17.09 * | 5:41.49 * |

**2021-2024 National Age Group Motivational Times**

## 15-16 Girls / 15-16 Boys

| Girls | | | | | | Event | Boys | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31.79 * | 29.49 * | 27.19 * | 26.09 * | 24.99 * | 23.79 * | 50 Y Free | 21.29 * | 22.29 * | 23.29 * | 24.39 * | 26.39 * | 28.39 * |
| 1:08.89 * | 1:03.99 * | 58.99 * | 56.59 * | 54.09 * | 51.69 * | 100 Y Free | 46.79 * | 48.99 * | 51.19 * | 53.49 * | 57.89 * | 1:02.39 * |
| 2:29.39 * | 2:18.69 * | 2:08.09 * | 2:02.69 * | 1:57.39 * | 1:52.09 * | 200 Y Free | 1:42.39 * | 1:47.29 * | 1:52.09 * | 1:56.99 * | 2:06.79 * | 2:16.49 * |
| 6:40.59 * | 6:11.99 * | 5:43.39 * | 5:29.09 | 5:14.79 | 5:00.49 | 500 Y Free | 4:37.99 * | 4:51.19 * | 5:04.39 * | 5:17.69 * | 5:44.09 * | 6:10.59 * |
| 13:49.19 | 12:49.99 | 11:50.79 | 11:21.19 | 10:51.59 | 10:21.89 | 1000 Y Free | 9:39.79 | 10:07.39 | 10:34.99 | 11:02.59 | 11:57.79 | 12:52.99 |
| 23:05.19 | 21:26.19 | 19:47.29 | 18:57.79 | 18:08.39 | 17:18.89 | 1650 Y Free | 16:11.59 | 16:57.79 | 17:44.09 | 18:30.39 | 20:02.89 | 21:35.39 |
| 1:14.69 * | 1:09.39 * | 1:03.99 * | 1:01.39 * | 58.69 * | 55.99 * | 100 Y Back | 51.09 * | 53.49 * | 55.99 * | 58.39 * | 1:03.19 * | 1:08.09 * |
| 2:42.99 * | 2:31.39 * | 2:19.69 * | 2:13.89 * | 2:08.09 * | 2:02.29 * | 200 Y Back | 1:50.99 * | 1:56.29 * | 2:01.59 * | 2:06.89 * | 2:17.49 * | 2:27.99 * |
| 1:25.89 * | 1:19.69 * | 1:13.59 * | 1:10.49 * | 1:07.49 * | 1:04.39 * | 100 Y Breast | 57.39 * | 1:00.19 * | 1:02.89 * | 1:05.59 * | 1:11.09 * | 1:16.49 * |
| 3:05.99 * | 2:52.79 * | 2:39.49 * | 2:32.79 * | 2:26.19 * | 2:19.49 * | 200 Y Breast | 2:06.19 * | 2:12.19 * | 2:18.19 * | 2:24.19 * | 2:36.19 * | 2:48.19 * |
| 1:14.69 * | 1:09.39 * | 1:03.99 * | 1:01.39 * | 58.69 * | 55.99 * | 100 Y Fly | 50.59 * | 53.09 * | 55.49 * | 57.89 * | 1:02.69 * | 1:07.49 * |
| 2:45.29 * | 2:33.49 * | 2:21.69 * | 2:15.79 * | 2:09.89 * | 2:03.99 * | 200 Y Fly | 1:53.49 * | 1:58.89 * | 2:04.29 * | 2:09.69 * | 2:20.49 * | 2:31.29 * |
| 2:46.79 * | 2:34.89 * | 2:22.99 * | 2:16.99 * | 2:10.99 * | 2:05.09 * | 200 Y IM | 1:53.79 * | 1:59.19 * | 2:04.69 * | 2:10.09 * | 2:20.89 * | 2:31.69 * |
| 5:55.89 * | 5:30.49 * | 5:04.99 * | 4:52.29 * | 4:39.59 * | 4:26.89 * | 400 Y IM | 4:05.29 * | 4:16.99 * | 4:28.59 * | 4:40.29 * | 5:03.69 * | 5:26.99 * |

## 17-18 Girls / 17-18 Boys

| Girls | | | | | | Event | Boys | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31.39 * | 29.09 * | 26.89 * | 25.79 * | 24.59 * | 23.49 * | 50 Y Free | 20.89 * | 21.89 * | 22.89 * | 23.89 * | 25.89 * | 27.89 * |
| 1:08.19 | 1:03.29 | 58.49 | 55.99 | 53.59 | 51.19 | 100 Y Free | 45.79 * | 47.99 * | 50.09 * | 52.29 * | 56.69 * | 1:00.99 * |
| 2:28.49 * | 2:17.89 * | 2:07.29 * | 2:01.99 * | 1:56.69 * | 1:51.39 * | 200 Y Free | 1:39.79 * | 1:44.59 * | 1:49.29 * | 1:54.09 * | 2:03.59 * | 2:13.09 * |
| 6:35.69 * | 6:07.39 * | 5:39.19 * | 5:24.99 * | 5:10.89 * | 4:56.79 * | 500 Y Free | 4:31.59 * | 4:44.59 * | 4:57.49 * | 5:10.39 * | 5:36.29 * | 6:02.19 * |
| 13:46.19 | 12:47.19 | 11:48.19 | 11:18.69 | 10:49.19 | 10:19.69 | 1000 Y Free | 9:32.59 * | 9:59.79 * | 10:27.09 * | 10:54.39 * | 11:48.89 * | 12:43.39 * |
| 22:48.49 * | 21:10.69 * | 19:32.99 * | 18:44.09 * | 17:55.19 * | 17:06.39 * | 1650 Y Free | 15:51.49 * | 16:36.79 * | 17:22.09 * | 18:07.39 * | 19:37.99 * | 21:08.59 * |
| 1:13.69 * | 1:08.49 * | 1:03.19 * | 1:00.59 * | 57.89 * | 55.29 * | 100 Y Back | 49.69 | 51.99 * | 54.39 | 56.69 * | 1:01.49 | 1:06.19 * |
| 2:39.79 * | 2:28.39 * | 2:16.99 * | 2:11.29 * | 2:05.59 * | 1:59.89 * | 200 Y Back | 1:48.69 * | 1:53.89 * | 1:58.99 * | 2:04.19 * | 2:14.59 * | 2:24.89 * |
| 1:24.89 * | 1:18.79 * | 1:12.79 * | 1:09.79 * | 1:06.69 * | 1:03.69 * | 100 Y Breast | 56.39 * | 58.99 * | 1:01.69 * | 1:04.39 * | 1:09.79 * | 1:15.09 * |
| 3:03.79 * | 2:50.69 * | 2:37.59 * | 2:30.99 * | 2:24.39 * | 2:17.89 * | 200 Y Breast | 2:02.49 * | 2:08.29 * | 2:14.19 * | 2:19.99 * | 2:31.69 * | 2:43.29 * |
| 1:13.59 * | 1:08.29 * | 1:03.09 * | 1:00.49 * | 57.79 * | 55.19 * | 100 Y Fly | 49.39 | 51.79 | 54.09 | 56.49 | 1:01.19 | 1:05.89 |
| 2:43.49 * | 2:31.89 * | 2:20.19 * | 2:14.29 * | 2:08.49 * | 2:02.69 * | 200 Y Fly | 1:50.59 * | 1:55.89 * | 2:01.19 * | 2:06.39 * | 2:16.99 * | 2:27.49 * |
| 2:44.39 * | 2:32.69 * | 2:20.89 * | 2:15.09 * | 2:09.19 * | 2:03.29 * | 200 Y IM | 1:50.79 * | 1:55.99 * | 2:01.29 * | 2:06.59 * | 2:17.09 * | 2:27.69 * |
| 5:51.19 * | 5:26.09 * | 5:00.99 * | 4:48.49 * | 4:35.89 * | 4:23.39 * | 400 Y IM | 3:59.89 * | 4:11.29 * | 4:22.69 * | 4:34.19 * | 4:56.99 * | 5:19.89 * |

No. 22A800

## In The
# Supreme Court of the United States

———————◆———————

WEST VIRGINIA, ET AL.,

*Applicants,*

v.

B.P.J., BY NEXT FRIEND AND MOTHER, HEATHER JACKSON,

*Respondent.*

———————◆———————

To the Honorable John G. Roberts, Jr., Chief Justice of the Supreme Court of the United States and Circuit Justice for the Fourth Circuit

———————◆———————

## BRIEF OF 67 FEMALE ATHLETES, COACHES, SPORTS OFFICIALS, AND PARENTS OF FEMALE ATHLETES, AS *AMICI CURIAE* IN SUPPORT OF APPLICANTS

———————◆———————

KRISTINE L. BROWN
*Counsel of Record*
8700 E. Jefferson Ave. #370953
Denver, CO 80237
(720) 285-9552
kristiburtonbrown@gmail.com

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ...........................1

SUMMARY OF ARGUMENT....................................3

ARGUMENT ...............................................4

I.      Females are uniquely and adversely affected when they are forced to compete against males in sports. ...............................................4

     A.      Females and males cannot experience or compete in physical sports in the same way. ............................................6

     B.      The psychological, tangible, and long-term harm suffered by females forced to compete against males is irreversible. ..........................................7

     C.      Females are suffering real harm that threatens their right to basic equality and equal opportunity. ......................9

         1. Reka Gyorgy, 2016 Hungarian Olympian, 2x ACC Champion from Virginia Tech......................14

         2. Macy Petty, current NCAA volleyball player...........................15

         3. Riley Gaines, 12x All-American, SEC Record Holder......................16

4. Catrina Allen, World Champion in Disc Golf................................17

5. Hannah Arensman, professional women's cycling, Cyclocross National Champion....................19

6. Courtney DeSoto, parent of current high school track athlete...20

CONCLUSION .....................................................21

APPENDIX ...........................................................i

## INTEREST OF AMICI CURIAE[1]

Since the founding of this nation, equality has been a constant struggle for various people groups. When the struggle has reached this Court, this Court has consistently been willing to consider how to uphold equal protection, equality of opportunity, and equal rights for all persons in these United States.

In the emergency application sought by West Virginia, the need to protect the equality of women is at issue. Sports is the new playing field, but the ultimate victory sought is for equality. *Amici* are 67 female athletes, coaches, teammates, parents, and relatives of these athletes[2]. These athletes come from many levels of playing – from elementary school to collegiate; from professional to Olympic. No matter their level of accomplishment, their years in their chosen sport, or their age – some minors and some adults – all have been forced to compete against males or to suffer the psychological impact of helplessly watching the forced competition of men against women. Each of the *amici* who have signed on to this brief have a unique story to tell that all weave

---

[1] This *amicus* brief is filed in connection with an application under Rule 22. Under the time-sensitive provisions laid out in Rule 37.4, electronic transmission of the brief has been provided to both parties in accordance with Rule 29.3. In accordance with Rule 37.6, counsel affirms that no counsel for any party authored this brief in whole or in part and that no person or entity other than *amici* or their counsel made a monetary contribution intended to fund the preparation and submission of this brief.

[2] Athletes, coaches, and family members are identified in the Appendix.

2

a common thread essential to this Court's consideration of West Virginia's application.

Among the 67 athletes, coaches, and family members are: (i) Martina Navratilova, 59x Grand Slam Champion; (ii) Jennifer Sees, former NCAA track and field athlete, high school track coach, and parent of an NCAA soccer player; (iii) Summer Sanders, Olympic Gold Medalist; (iv) Courtney DeSoto, mother of a high school female athlete; (v) Jill Sterkel, an Olympic swimmer, former world record holder, and former University of Texas head swim coach; (vi) Pam Etem, an Olympian in rowing; (vii) Madisan Debos, current NCAA track athlete; (viii) Laura Wilkinson, an Olympian and World Champion in diving and parent to a daughter; (ix) Donna de Varona, an Olympic Gold Medalist and world record holder; and (x) Evie Edwards, a cyclist and the mother of an elementary-age female cyclist.

*Amici* demonstrate, through painfully lived experiences, that West Virginia's situation is not unique. Female athletes across the country, at all levels of sports, stand on the precipice of permanently losing their access to equal opportunity and safety in sports. Based on their biological sex, they are at risk of being pushed aside in law and in life in a permanently damaging and irreversible way.

By bringing their names, their voices, and their personal stories to this Court's attention, *amici* hope to highlight the plea of women and girls across the nation: that this Court affirm their continued right to equal opportunity and to set in granite that females

3

may not be put at a clear and targeted disadvantage based on their biological sex.

## SUMMARY OF ARGUMENT

*Amici* offer an argument that uniquely supplements West Virginia's bold defense of females' equal rights. By vacating the injunction against West Virginia's law, this Court can reaffirm that women should not lose their equal opportunity to compete in sports on a level playing field. By affirming West Virginia's right to stand with women and girls, this Court can ensure that females' basic right to be treated equally is still the legal norm in the United States. In order for women and girls to be able to talk frankly about their biology and the impact of their sex in sport and in life, the words "female," "girl," and "woman" are an essential recognition of scientific reality throughout this brief. Accurate language that clearly describes the biological existence of female humans must have priority over language of preferred personal identification. This is the only way to protect the rights, equality, and safety of female athletes.

A growing number of women and girls have been facing the humiliating and damaging experience of being forced to compete against males who identify as transgender in the women's sports category. Lawmakers in West Virginia passed a law to put a stop to this abusive and discriminatory practice, but this law has been enjoined. *Amici* ask this Court to allow for the protection of women and girls while the lower courts work through further arguments. One male competing against women and girls negatively

4

affects every girl he competes with as well as every girl who loses a playing opportunity and every girl who must witness a female athlete being asked to step aside for the feelings of a male despite the knowledge that it is unfair to ask her to do so.

*Amici*'s experiences as athletes, coaches, parents, and relatives of female athletes prove that females are uniquely and adversely affected when they are forced to compete against males in sports. Their personal stories demonstrate that females and males cannot experience or compete in physical sports in the same way; that the psychological, tangible, and long-term harm suffered by females forced to compete against males is irreversible; and that females across the nation at all levels of sports are suffering real harm that threatens their right to basic equality, safety, and equal opportunity under the law.

## ARGUMENT

## I. Females are uniquely and adversely affected when they are forced to compete against males in sports.

It is hard to express the pain, humiliation, frustration, and shame women experience when they are forced to compete against males in sport. It is public shaming and suffering, an exclusion from women's own category. The message to women and girls, 50% of our population, is shared by the parents, teammates, and spectators who watch it unfold. The shame does not disappear after competition is over. It stays forever as a memory of sanctioned public ridicule and a reminder of how women should expect

5

to be treated and set aside for the needs and desires of males.

At every age and every level, a female athlete deserves to know she is worthy of respect and fair competition against other females. She should not have to reach elite status to finally be deemed good enough to play without facing sex discrimination. College women's teams do not play against college men's teams; the high school girls' basketball team does not play against the boys' basketball team. The individual men's and women's state champion in tennis do not play against each other to determine who is the actual champion. The women's Olympic sprint champion does not race the men's champion.

This kind of competition is not allowed because we understand the result would almost always serve to humiliate women. It is not real or fair competition. We know the outcome because the numbers, science, and physical realities predict it with concrete assurance. A far less talented and skilled male will soundly beat a female. With this knowledge, we know the contests would merely be a predetermined public display of the physical differences between males and females. Such competition robs women and girls of a place to be held up in equal value to boys and men. In fact, it solidifies and reinforces that they are not worthy of equal opportunity and recognition.

Each stage of a girl's sports development path provides the opportunity to play – from granting her the last spot on the team to the first-place podium. These experiences – which start at a young age – create   inspiration,   self-belief,   resilience,   and

6

confidence – things every girl should be able to seek fairly and with equal opportunity to her male counterparts. We know the names of women like Martina Navratilova because these pathways and opportunities have been protected for females from a young age to the most competitive levels.

### A. Females and males cannot experience or compete in physical sports in the same way.

There is enormous emotional trauma that accompanies women and girls when they are subject to competing against males in their sports opportunities. This trauma is grounded in real science and an understanding of our physical world as women; it is not a figment of our imagination. As athletes, coaches, and spectators of sport, we know there is a clear and obvious physical difference between boys and girls. We know the physical development of boys – beginning in utero – results in a performance difference between boys and girls. We see this play out in sports and physical activity at every age and every level.

Physical fitness tests and records for youth sports showcase a measurable performance disparity between males and females at every age. The genetic gene expressions that differ between males and females number over 6,000 and are not limited to: height, body mass, skeletal structure, strength, muscle quality, center of gravity, limb length ratios, cardiovascular performance, and, of course, reproductive influence. The effects of any amount of

7

male puberty and androgenization make those early performance differences explode even further.

As athletes, coaches, and parents of female athletes, we know this because we live it. We see and understand that the average age at which male athletes will beat the world records of women is 14-15 years of age. The use, weight, and design of sports equipment such as bikes, balls, bats, javelins, discs, and suits, as well as playing fields and net heights reflect the biological differences between boys and men and girls and women and are designed to optimize the competition. At every level, we are aware that less skilled, less determined males beat higher level female athletes because of innate physical difference in the sexes. Physical and developmental differences should not mean that girls and women are less worthy of participating, competing, and winning in sport. Females are half of the world's population and deserve equal opportunities as much as males.

## B. The psychological, tangible, and long-term harm suffered by females forced to compete against males is irreversible.

When women and girls are asked to compete against male athletes, they are asked to ignore biological reality, the reality that defines female physical bodies. They are asked to pretend there is no hardship or difference in competing against male development that began in utero and resulted in differences in muscle structure, bone structure, response and reaction times, bone density, and finally, reproductive influences, such as monthly

8

cycles and possible pregnancy. They are asked to ignore almost all their lived experiences. This expected disconnection from reality has a very real psychological impact. It tells female athletes, their coaches, and their family members that female bodies don't matter enough to be recognized. This message is received when girls and women are told that rules in their sports don't need to be fair and that female bodies don't have equal representation on a playing field. Women's and girls' positions can be taken by a male if he requests to play with females, despite his physical advantages. Women and girls must stand by as boys and men now have a claim to female spaces, in addition to their own full male teams.

The girl who loses her place or her chance to compete must watch a male take a place that was set aside for her. She not only has to deal with a loss; but she must also deal with the psychological trauma that comes from knowing that the loss was not just, fair, or equal; it was an 'extra' spot given to a male – one she had no equal opportunity to compete for. The girls around her must watch a male supplant a place that was once set aside for women. This is mental torture for them. Women and girls know this means their fair treatment and their equal opportunity are no longer recognized as important. They are not protected or safe in their own sports. The girls competing receive the message that their competition is not important enough to demand integrity and fairness, while they witness firsthand that the males' competition and demands are always enough. The damage this causes is irreversible.

9

As athletes, coaches, and parents of female athletes, we are left with questions. How are we not seen working and training and striving – only to be beaten by a male who has less objective talent and skill but is able to rely on innate male advantage? How have we come to a place where we no longer have fair and equal opportunities in sports and where females are excluded from our own podiums, our own teams, and our own championships because we are expected to affirm males who wish to have our place? How are we expected to compare ourselves to males who everyone knows are physically stronger and biologically different? Why are women not allowed to have a female champion when there is already a male champion – whose place we could never take? Why does a male get to take a female's place on a team or in a race because it will help him feel better? If the measurement is feelings, why do our feelings not count? Will this Court agree that females no longer have the right to equal opportunities in real competitions? Females are suffering irreversible psychological damage that compounds every day this unequal treatment continues.

## C. Females are suffering real harm that threatens their right to basic equality and equal opportunity.

Women and girls had begun to believe that the measured and known performance gap between males and females did not have to be viewed as a stamp of male superiority, but rather as the understood physiological and biological divergence

10

between equally respected members of society. The sex of female bodies, organized around and along divergent developmental paths, affects every cell and system, from reproduction and muscular development to skeletal and cardiovascular systems. Females had come to appreciate that these innate differences did not strip them of an expected place of equality and fair treatment. Sport and physical competition is the one public place where males and females have been guaranteed the right to celebrate their entirely independent and incomparable physical limits under laws like Title IX. Now, these same rules are being interpreted to remove women's access to equal protection and equal opportunities.

Women's sports were created and set aside to be a place where 50% of the population could finally be included and seen as worthy of the title, "champion"; where they could be held up as valuable members of schools, teams, and society.

Now, the nation is being told that fair sports for women and girls was a lie. As athletes, coaches, and parents of female athletes, we know that asking women to compare their bodies to male bodies is not a just request. The athletes know the competition is unfair. The coaches, officials, and sports scientists know the competition is unfair. The parents and spectators know the competition is unfair. And we all know exactly why. We even know that many of the male athletes taking our positions and titles were not exceptional male athletes in comparison to other males; they now serve as a reminder that a physically unexceptional male is entitled to showcase physical prowess against women and demand women

11

relinquish their opportunity to compete, their place in the event, their hard-earned title, and even their records. The girls and women must comply; the officials must congratulate; the parents must cheer; and the records must be etched for all to appreciate the reinforced reality that males are entitled to replace and show dominance over females in what was once an equal society.

These policies and actions are violating the spirit of the formation of women's sports and laws like Title IX. People in positions of power are looking for the right words to justify this deprivation of equal opportunity. As women, we can only think that it is because we are "just women;" and that even our biological reality is a debatable concept.

The realization that the laws and rights written to protect women are being used against females and the knowledge that people in power cannot or will not see – even in a publicly visible contest – that females are not being treated with the same respect and honor as men is a message that cuts deep into the psyche of women. The women that have experienced this feel the weight of unequal treatment, the stripping of rights, the loss of rewards, and the erasure of fair and equal representation. Women feel the weight of the message that female physical bodies are only good enough if they are able to compete with a physical development of biology that does not match their own. Women see and hear the rule makers and lawmakers argue the purpose of women's sports and, indeed, that the purpose of female athletes is to make a male athlete feel welcome and honored above the female athletes. Girls and women hear the message that it is

12

a female's job to consider our kindness above our demands for fair and equal treatment. Female athletes are told that "there are only a few" male athletes who want to compete against women, and so females must step aside and make room for them. The awards and record boards, originally meant to help girls and women share new possibilities for those of us born female, are rewritten with male names. Female existence and accomplishment in sports is being erased, name by name. When women compete in races against males and compete on teams with males, females know they are supporting the premise of male dominance; they are supporting the idea that females can only respond with meek compliance when treated as less than men; women and girls are forced to support the erasure of something females were proud of and once esteemed for.

As athletes, coaches, and parents of female athletes, what is our choice? To cede to participate? To give up entirely? Do we not then also give away our rights and our dignity? There is no solution for women and girls without the protection of laws that recognize equal opportunity for females.

The forced competition against males is humiliating. It cannot be fair or equal and yet, girls and women must either walk away from sports opportunities or accept the humiliation. Frustratingly, the rules and laws written for the expressed purpose of equality have not been enough; states now need to write new laws on top of the old ones to prevent the redefinition of the physical reality of being female.

13

A question being asked is if there is a way to make competition fair for women while still including some of the males who wish to participate with women. This is also an insulting proposition. Competition is how human beings find their physical limits. It is an invitation to bring one's absolute personal best and match it with the personal best of others in a fair and clean contest. Bringing a body forward to compete that is intentionally and artificially hindered is not in the spirit of that ethos. The question the lawmakers and governing bodies of sport are asking as they try to make guidelines to include males is just how much rules must impair male performance and development to be equated to that of women. This argument – this experiment – is not empowering for women; it is damaging to an entire generation of females. It is deeply misogynistic and demeaning. Girls and women are not encumbered male bodies. Girls and women are uniquely and innately female, and females should not have to fight for representation and see only biology that does not compare to their own rewarded

As athletes, coaches, and parents of female athletes, we are hurt and shamed that people in power do not find female athletes important enough to speak up for. We are left to cry and sink into depression on our own as we embrace our new understanding of girls' and women's place in the world. We are left with the shame of not being able to compete physically with a male who wants our place, the shame that laws have not been enough, the shame of losing while others cheered in a competition with no integrity, the shame of seeing males so easily take over that which was established for us, the

14

shame of having to speak out for something so plainly obvious, and the shame of having been silent, even if just for a moment, while we suffered or watched other women suffer. Not one more girl should go through this. Not one more parent should have to watch their daughter sidelined for a male who is deemed more important than her fair and equal chance.

The rules and record boards have not been fixed. We are not just haunted by our memories and experiences. We are forced to reckon with a public record that condones and historically celebrates our abuse and marginalization. This cannot be the legacy we leave for women and girls; for millions of human beings who are born female.

### 1. Reka Gyorgy, 2016 Hungarian Olympian, 2x ACC Champion from Virginia Tech

I was a senior competing in my last swim meet at the NCAA Women's Swimming & Diving Championships on March 17th, 2022. I swam the 500 freestyle in preliminaries where I got 17th, which means I did not make it back to the finals and was first alternate. I watched Lia Thomas [a biological male] from the pool deck win a women's national title in a finals that I deserved to be in because the rules in place did not support biological women. I couldn't help but cry and feel frustrated, angry, and sad. It hurt me, my team, and other women in the pool. A year later, there is still no response to my letter to the NCAA. This is an ongoing, painful reminder of how little all the women at that swim meet matter to the people running our schools and sports competitions.

15



Photo 1: The podium at the 2022 NCAA Women's Swimming and Diving Championships where a male took the place of Reka Gyorgy.

## 2. Macy Petty, current NCAA volleyball player

While in high school, I competed in club volleyball tournaments across the country with hopes of being recruited to a college volleyball team. At one of these tournaments, with several college recruiters watching, I had to play against a boy in a girls' volleyball tournament. While trying to evaluate our skills, the recruiters instead watched this athlete repeatedly slam the ball in our faces. Because the girls' volleyball net heights are different from boys', this athlete was competing on a net 7.5 inches shorter than he should have as a male. As an athlete, this was humiliating; as a woman, I was horrified to see a boy so easily steal the right to play in brackets that were designed specifically to make volleyball safe and competitive for female bodies. I thought this was a

16

mistake everyone could see, and it would never happen again.

### 3. Riley Gaines, 12x All-American, SEC Record Holder

I have been a devout swimmer from the age of seven. It's hard to explain the amount of time, hard work, and sacrifice I have made in an effort to be successful at my sport. Every opportunity and every small victory along the way made the next step possible.

Last year, a 6'4" male (Lia Thomas) and I raced at the National Championships, which ultimately resulted in a tie. Upon tying, I was told Thomas (the male athlete) would get the trophy instead of myself as it was necessary for photo purposes. Everything I worked my entire life for was reduced to a photo-op to validate a male's feelings and identity of himself. All the women in the race faced unfair competition and the silencing of our voices through intimidation, emotional blackmail and gas-lighting by these large organizations and institutions.

I still struggle with knowing the people who were supposed to shield us from harm and make sure our sport is ethical were the same people who were silent and allowed us to be discriminated against. This goes against everything federal civil rights laws and Title IX were intended to protect. Women's sports were created to recognize and celebrate the unique physical accomplishments of female athletes. I feel neither recognized nor celebrated. I feel betrayed,

17

belittled, and traumatized. Please don't make any other women go through this.



Photo 2: Riley Gaines is forced to share the podium with a male.

### 4. Catrina Allen, World Champion in Disc Golf

I have been playing sports since I was five, and although I've lost many times over the course of my career, I've never felt as defeated as the day I had to compete against a male opponent in the disc golf female professional division. As tears ran down my face, during an elite series tournament, I realized that even though I have a strict practice regiment,

18

workout plan and am known as a fighter, there is no outworking the physical advantages that a male has. I have since faced four different males in the female category in 26 different tournaments. The worst part is if the women speak out and share their feelings of defeat and frustration, they fear loss of sponsorships and the very public wrath of those defending the male athletes. The women feel helpless, scared, voiceless and isolated.



*Photo 3: A male becomes the women's champion in disc golf in competition against Catrina Allen and other females.*

19

### 5. Hannah Arensman, professional women's cycling, Cyclocross National Champion

I was born into a family of athletes. Encouraged by my parents and siblings, I competed in sports from a young age, and I followed in my sister's footsteps, climbing the ranks to become an elite cyclocross racer. Over the past few years, I have had to race directly with male cyclists in women's events. As this has become more of a reality, it has become increasingly discouraging to train as hard as I do only to have to lose to a man with the unfair advantage of an androgenized body that intrinsically gives him an obvious advantage over me, no matter how hard I train.

I have decided to end my cycling career. At my last race at the recent UCI Cyclocross National Championships in the elite women's category in December 2022, I came in 4th place, flanked on either side by male riders awarded 3rd and 5th places. My sister and family sobbed as they watched a man finish in front of me, having witnessed several physical interactions with him throughout the race.

Additionally, it is difficult for me to think about the very real possibility I was overlooked for an international selection on the US team at Cyclocross Worlds in February 2023 because of a male competitor.

Moving forward, I feel for young girls learning to compete and who are growing up in a day when they no longer have a fair chance at being the new record

20

holders and champions in cycling because men want to compete in our division. I have felt deeply angered, disappointed, overlooked, and humiliated that the rule makers of women's sports do not feel it is necessary to protect women's sports to ensure fair competition for women anymore.



*Photo 4: Hannah Arensmen misses the podium while a male takes her place.*

### 6. Courtney DeSoto, parent of current high school track athlete

I am the parent of a minor daughter who runs varsity track in a public school in California. A male freshman joined the women's team this year and is running varsity track and winning every race while the girls watch in bewilderment. This same

21

individual is using the girl's locker room to change and shower. The girls are so uncomfortable that some are not using the locker room themselves anymore. The head coach is about to quit over the injustice of it all. Complaints and concerns for the girls are made to school and district administration, but no one is willing to say anything because our state laws and legislators will not protect our daughters.  I have a younger daughter who is also interested in sports, but I am concerned for the future of all our girls.

## CONCLUSION

Every day that girls' and women's equal opportunity in sports is denied, is a day that females suffer irreversible harm and psychological trauma. By vacating the injunction against West Virginia's law, this Court can reaffirm that females have not lost their equal opportunity to compete in sports on a level playing field. By affirming West Virginia's right to stand with girls and women, this Court can ensure that the basic right to be treated equally as a person born female is still the legal norm in the United States.

Respectfully submitted,

KRISTINE L. BROWN
    *Counsel of Record*
8700 E. Jefferson Ave. #370953
Denver, CO 80237
(720) 285-9552
kristiburtonbrown@gmail.com

March 13, 2023

i

**APPENDIX**

ii

# APPENDIX

**LIST OF 67 *AMICI CURIAE* FEMALE ATHLETES, COACHES, SPORTS OFFICIALS, AND FEMALE ATHLETES' FAMILY MEMBERS, MANY OF WHOM HAVE BEEN FORCED TO COMPETE AGAINST BIOLOGICAL MALES AND ALL OF WHOM HAVE SUFFERED THE PSYCHOLOGICAL DAMAGE FROM WITNESSING FORCED AND UNEQUAL MALE DOMINANCE OVER FEMALES IN SPORTS[1]**

**Brianna Alexander***
*Cyclist*

**Catrina Allen***
*World Champion – professional disc golf*

**Hannah Arensman***
*Professional cyclist*

**Sarah Powers Barnhard**
*Professional volleyball player, current coach*

**Lauren Bondly**
*Masters National Champion – Triathlon*

**Carol Brown**
*Olympian – rowing*

---

[1] *Amici* submit this brief solely in their capacities as private citizens. To the extent an *Amicus*'s employer, institution, or association is named, it is solely for descriptive purposes and does not constitute endorsement by the employer, institution, or association of the brief or any portion of its content.

\* An asterisk by a name indicates that the athlete has personally faced a male in sports competition or the parent has a daughter who has personally faced this.

iii

**Abigail Buckley***
*Mother of two female athletes who have been forced to compete against males*

**Mariah Burton Nelson**
*Former professional women's basketball player*

**Monika Burzynska***
*Current NCAA swimmer*

**Kathy Smith Connor***
*Former NCAA athlete and mother of daughter who competed in the 2022 NCAA Swim Championship*

**Madisan Debos***
*Current NCAA track athlete*

**Courtney DeSoto***
*Mother of a female high school track athlete*

**Donna de Varona**
*Olympic Gold Medalist, World Record holder*

**Evie Edwards***
*Cyclist, mother of elementary age female cyclist*

**Stephanie Elkins**
*Olympian – swimming*

**Pat Etem**
*Olympian – rowing*

**Dianna Fussner***
*Pro Masters disc golf*

**Riley Gaines***
*All-American swimming, tied Lia Thomas in the 200 free at the NCAA Swim Championships*

**Shawna Glazier***
*Cyclist, Triathlete*

**Annie Grevers**
*U.S. National Team – swimming*

iv

**Reka Gyorgy***
*Olympian – swimming, missed finals by one placement at NCAA Swim Championships in the 500 free where Lia Thomas won first place*

**Rena Hedeman***
*Mother of female rowing athlete*

**Nancy Hogshead-Makar**
*Olympic Gold Medalist*

**Sarah Hokom***
*World Champion – professional disc golf*

**Lacey John**
*Olympic Silver Medalist, NCAA Woman of the Year*

**Kim Jones***
*All American – tennis, mother of a female swimmer*

**Raime Jones***
*Current NCAA athlete – swimming, lost a finals spot in Ivy League Championships to Lia Thomas*

**Margot Kackzorowski***
*Current NCAA swimmer*

**Ronda Key***
*Disc golf athlete*

**Samantha Keddington***
*Former professional disc golf athlete, missed payout qualification by one placement won by a male, current coach*

**Danielle Keen***
*Professional disc golf,*

**Marshi Kokmeyer**
*NCAA Champion – swimming*

v

**Jess Kruchoski***
*Fiancé of female athlete who competed against a male*

**Holly LaVasser***
*Cyclist*

**Donna Lopiano**
*6x National Champion, Former AD University of Texas*

**Valerie McClain**
*Olympian – rowing*

**Riona C. McCormick**
*Current rowing athlete*

**Cynthia Monteleone***
*Masters track athlete, mother of female track athlete, both of whom competed against male athletes*

**Martina Navratilova**
*59x Grand Slam Tennis Champion*

**Sarita Nori***
*Mother of female rowing athlete*

**Mary O'Connor**
*Olympian – rowing*

**Keri Olson**
*NCAA Champion – tennis, mother of female athlete*

**Jan Palchikoff**
*Olympian – rowing*

**Macy Petty***
*Current NCAA athlete – volleyball*

**Mary T. Plant**
*Olympian – swimming*

**Lori Post***
*Mother of NCAA female swimmer who competed against Lia Thomas*

**Genoa Rossi**
*Current NCAA water polo athlete, U.S. Jr. National Team*

**Jennifer Sees**
*NCAA pole vaulter, current high school track coach, mother of NCAA soccer player*

vi

**Jennifer Sey**
*U.S. National Champion – gymnastics*

**Jeri Shanteau**
*National Champion, U.S. National Team member – swimming*

**Sandy Shasby***
*Family member of a female athlete*

**DeNee Shepherd***
*Disc golf athlete*

**Taylor Silverman***
*Skateboard athlete*

**Anne Simpson**
*Rowing athlete*

**Summer Sanders**
*Olympic Gold Medalist*

**Lori Stenstrom**
*National Champion, former American Record holder, mother of female athletes*

**Jill Sterkel**
*Olympian – swimming, former University of Texas head swim coach*

**Tracy Sundlan**
*5x Olympic coach, manager, and administrator – track and field*

**Maya Tait***
*NCAA rowing athlete*

**Leanne Venema***
*Mother of female NCAA swimmer*

**Eric Venema***
*Father of female NCAA swimmer*

**Michelle Venema***
*Aunt of female NCAA swimmer*

**Sue Walsh**
*Olympian – swimming, coach, sports official*

**Claudia Westholder**
*Female athlete, mother of female athlete*

vii

**Max Wettstein**
*Father of U.S. Olympic skateboard team member*

**Val Whiting**
*National Champion, WNBA*

**Laura Wilkinson**
*Olympian and World Champion – diving, mother of female athlete*

Acad. Quest. (2020) 33:279  288
DOI 10.1007/s12129 020 09877 8

**ARTICLES**

# In Humans, Sex is Binary and Immutable



Georgi K. Marinov

Published online: 9 May 2020
© Springer Science+Business Media, LLC, part of Springer Nature 2020

This article says nothing novel. It discusses a fact as well-established as the billions of years of evolution that shaped our species. We live in a world, however, that increasingly ignores such truths, and in which the combination of awareness and courage to set the record straight appears rare.

A disclaimer: I am not a tenured faculty member and have no job security; I am well aware that my career prospects could be jeopardized by this essay. I also write from a perspective—not widely shared—that anyone who pledges allegiance to any political party or ideology cannot rightly call himself a scientist. Political and ideological loyalties, in my view, violate the epistemic practices scientists are supposed to follow.

## Denying the Sex Binary

In late 2018, the current U.S. presidential administration circulated a memo directing government agencies to adopt a definition of gender "determined by the genitals that a person is born with."[1] Much outrage followed, even including protest rallies at prestigious medical schools. More than 2,600 scientists signed a statement claiming that "[t]here are no genetic tests that can unambiguously determine gender, or even sex."[2] *Nature*, the world's premier science journal, ran an editorial stating that "the research and medical community now sees sex

---

[1]Erica L. Green, Katie Benner, Robert Pear, " 'Transgender' Could Be Defined Out of Existence Under Trump Administration," *New York Times,* October 21, 2018.

[2]Transgender, Intersex, and Gender Non Conforming People #WontBeErased by Pseudoscience, October 26, 2018, https://not binary.org/statement/

**G.K. Marinov** is Postdoctoral Research Scholar at the Department of Genetics, Stanford University School of Medicine, Stanford, CA 94305; gkm359@gmail.com.



as more complex than male and female'" and "the idea that science can make definitive conclusions about a person's sex or gender is fundamentally flawed."[3]

These are remarkable statements as they are equivalent to outright denial of humans' biological nature. Numerous publications promoted such positions. *Nature* had previously published an editorial titled "Sex Redefined," boldly stating that "[t]he idea of two sexes is simplistic. Biologists now think there is a wider spectrum than that."[4] Popular science magazines such as *Scientific American* and *National Geographic* told readers that "the science is clear and conclusive: sex is not binary,"[5] a view even more aggressively pushed in mainstream media, where we regularly read that "biologists now think the idea of two sexes is inaccurate."[6]

Much has been written by feminist authors about the non-binary nature of "gender," where "gender" is defined as something "socially constructed," distinct from sex. But biological sex itself is also under attack. Feminist philosophers such as Judith Butler and Anne Fausto-Sterling initially advanced the view that both gender and sex are "socially constructed," denying the objective reality of binary biological sex, and academic writings promoting this view continue to be produced.[7]

Usually this is done by taking a list of criteria for dividing humans into two sexes—anatomical/gonadal/hormonal/chromosomal/genetic/genomic/brain/neural sex—and matching that list to examples of "intersex" conditions not fitting neatly on either side, supposedly discrediting the binary. But the topics that truly matter for understanding sex—gametes, reproduction, and evolutionary selection pressures—are missing from such treatments.

Yet this has become mainstream, and an unquestionable dogma too, even within the hard sciences. This is disastrous, as the objective truth is that sex in humans is strictly binary and immutable, for fundamental reasons that are common knowledge to all biologists taking the findings of their discipline seriously. Denying that sex in humans is binary attacks the very foundations of the biological sciences. This needs to be properly summarized and openly articulated.

---

[3]"US proposal for defining gender has no basis in science," *Nature* 563 (2018):5

[4]Claire Ainsworth, "Sex redefined," *Nature* 518 (2015):288    291.

[5]Robin M. Henig, "How science is helping us understand gender," *National Geographic,* January 2017; The Editors, "The New Science of Sex and Gender," *Scientific American*, September 1, 2017.

[6]Anne Fausto Sterling , "Why Sex Is Not Binary," *The New York Times*, October 25, 2018.

[7]V. Sanz, "No Way Out of the Binary: A Critical History of the Scientific Production of Sex," *Signs: Journal of Women in Culture and Society* 43 (2017):1 27

## The Nature of Self-replicators and Organisms

To understand the nature of human sex, we need to review our place in the grander scheme of life on Earth. We do not know exactly how life appeared on our planet but we do know some of the features it had from the beginning. Key among these is the self-replicating nature of genetic material and its relationship to the organism. Because of our anthropocentric bias, we tend to see genes as existing with the "purpose" of encoding for the organism. However, to the extent we can speak of "purpose" in biology, the relationship is exactly the opposite—the organism exists to propagate its genetic material, and this is the sole "meaning" of its existence.[8] Getting that relationship backwards is the ultimate cause of most falsehoods propagated in the debates around gender and sex.

There are two broad hypotheses regarding life's origins, usually shortened as "metabolism-first" and "genetics/replicators-first." Both hypotheses converge onto a state, in which evolution is Darwinian (i.e. descent with modifications of genetic material), and life is one unbroken succession of self-replicators making more copies of themselves. Cells (and complex multicellular organisms) can be seen as being put together around self-replicators to facilitate the process. This realization mandates a radical rethinking of who and what we are. This understanding, however, has not yet spread very far into public consciousness because much of what makes it obvious and uncontroversial has been learned only in the last few decades.

One such important piece of the puzzle is the nature of prokaryote genomes. The concept of "species" was developed based on observing and studying multicellular organisms and does not really make sense for prokaryotes. By force of habit, "species" were traditionally assigned to bacterial strains, and it was assumed that each such strain had a "genome." But once multiple genomes were sequenced for different strains, a striking discovery emerged—there was no such thing as a specie's genome. Instead, each strain contains a relatively small number of common genes, together with some small portion of a larger set belonging to a "pan-genome."[9] Genes in the pan-genome are exchanged, often quite rapidly, through various mechanisms for horizontal gene transfer (HGT).

Such discoveries dramatically shift our focus towards a gene-centric view of evolution—genes are exchanged, creating new combinations and phenotypes,

---

[8]Richard Dawkins, *The Selfish Gene* (New York: Oxford University Press, 1976).

[9]H. Tettelin, V. Masignani, M.J. Cieslewicz et al., "Genome analysis of multiple pathogenic isolates of *Streptococcus agalactiae*: implications for the microbial 'pan genome'," *Proc Natl Acad Sci U.S.A.* 102 (2005):13950 13955.

on which natural selection acts, determining how successful the propagation of those genes is, with the individual cells being rather ephemeral temporary entities.

Mobile genetic elements (MGEs) and viruses take that principle to the extreme—if gene propagation is the primary evolutionary objective, there is no requirement for any "progress" towards more "complex" entities. There can just as well be no organism involved as long as genetic material is replicated. This is the strategy adopted by viruses (only "alive" when inside a cell they have hijacked) and MGEs (not even encoding for viral particles, their sole capacity being ensuring their replication).

What sex is and how and why it evolved can only be properly understood in this context.

## Why There is Sex

There are two types of cellular life on Earth: prokaryotes and eukaryotes. Prokaryotes have a simple organization, usually lacking the hallmark features of eukaryotes, such as nucleus, endomembrane systems, mitochondria, etc. Life is also divided into two lineages, not coinciding with the prokaryote/eukaryote divide. Prokaryotes are split into bacteria and archaea, with eukaryotes evolving as a result of a fusion between an archaeal host and a bacterial endosymbiont.[10]

The subsequent complexification of eukaryotes gave rise to their modern features, one of them being meiosis (reductive cell division creating haploid cells/gametes) and sexual reproduction. Prokaryotes reproduce asexually and lack meiosis. They do, however, employ mechanisms for exchanging genetic material, which they do on a massive scale.[11]

The ubiquity of genetic material exchange mechanisms strongly suggests that recombination is advantageous. Although it is not possible to concisely summarize the vast literature on the subject,[12] we will focus on just a few crucial points.

The first key concept is evolutionary fitness. Fitness is most often expressed as a selection coefficient $s$, which ranges from -1 to infinity, where $s = -1$ corresponds to lethality/complete sterility.

---

[10]E.V. Koonin, "The origin and early evolution of eukaryotes in the light of phylogenomics," *Genome Biol* 11 (2010): 209.

[11]P. Puigbo, Y.I. Wolf, E.V. Koonin, "The tree and net components of prokaryote evolution," *Genome Biol Evol* 2 (2010):745 756.

[12]N.H. Barton, "Why sex and recombination?," *Cold Spring Harb Symp Quant Biol* 74 (2009):187 195.

Sexual reproduction is costly to an individual as it involves producing gametes, yet only half of one's genes are transmitted to the next generation. The classical argument for why there is sex is that it helps create new favorable combinations of alleles.[13] However, just as it can create favorable combinations, recombination can also break up existing ones. Asexually reproducing organisms would naively be expected to have an advantage. So why have sex?

The "Fundamental Theorem of Natural Selection"[14] states that the increase in mean fitness due to natural selection equals the additive genetic variance in fitness. In real organisms, different loci are physically linked in various ways; fitness is therefore affected by the associations of alleles with each other. If negative such associations (i.e. between beneficial and maladaptive alleles) predominate, recombination will act to increase variance in fitness; mechanisms for recombination will thus be selected through their association with generating favorable variation and the overall higher fitness of the recombining genotypes.

An additional consideration is that real-life populations are finite and stochastic fluctuations of allelic frequencies ("genetic drift") play a major role. Without recombination, genetic drift and linkage disequilibrium together lead to linked loci interfering with each other's response to selection.

Absence of recombination is predicted to result in irreversible accumulation of deleterious mutations ("Muller's ratchet"). This is indeed what is observed. Obligate asexuals arise occasionally among eukaryotes, but they tend to go extinct quickly. The one notable exception are bdelloid rotifers, which have been asexual for around 70 million years. However, this is an exception proving the rule, as it appears that HGT (otherwise rare in eukaryotes) plays the role of recombination in these animals.[15]

Bdelloids and prokaryotes illustrate an important point: meiosis and recombination are not the same thing. Recombination can be accomplished through a variety of mechanisms. In eukaryotes that mechanism is meiosis. Why exactly it evolved in its current form is not clear. Eukaryotes cannot exchange DNA freely the way prokaryotes do, because of the presence of the nucleus and the physical organization of their chromatin. Some alternative was needed, but we cannot be certain whether meiosis was the only possible

---

[13]A. Weismann, "The significance of sexual reproduction in the theory of natural selection," in *Essays upon heredity and kindred biological problems*, ed. E.B. Poulton, S. Schonland, A.E. Shipley (Oxford: Clarendon, 1889), 251   332.

[14]Ronald A. Fisher, *The Genetical Theory of Natural Selection* (Oxford: Clarendon, 1930).

[15]J. Felsenstein, "The evolutionary advantage of recombination," *Genetics* 78 (1974):737   756; H.J. Muller, "Some genetic aspects of sex," *Am Nat* 66, no. 703 (1932):118 138; N.A. Moran, "Accelerated evolution and Muller's ratchet in endosymbiotic bacteria," *Proc Natl Acad Sci U S A* 93 (1996):2873   2878.

284                                                                          G.K. Marinov

solution. In any case, evolve it did, and very early in eukaryote evolution too, prior to the Last Eukaryotic Common Ancestor (LECA).[16]


**Sex Determination and Mating Systems**

Eukaryotes are immensely diverse, and exhibit much variation in sexual reproduction mechanisms and life cycles. But two variables are key: the alternation of generations and the size of gametes. The eukaryote life cycle follows a general pattern of alternating haploid ($1n$ set of chromosomes) and diploid ($2n$) generations. Diploid cells can undergo meiotic divisions, producing haploid cells, while haploid cells can fuse into a diploid cell. Whether haploid and diploid cells undergo nonreductive mitotic divisions determines the type of life cycle. Animals are diplontic (only diploid cells divide). Most fungi are haplontic (only haploid cells do), land plants are haplodiplontic (both generations divide), algae and protozoans exhibit a wide diversity of life cycles.

There are also three types of fertilization: isogamy, anisogamy and oogamy. Isogamy features morphologically similar gametes, and is common in unicellular eukaryotes. Almost certainly it was the ancestral LECA condition.

On multiple occasions, isogamy evolved into anisogamy, i.e. production of two different gametes. In some lineages, anisogamy further evolved into oogamy, the classic example being practiced by animals. By convention, larger gametes are taken to be the egg/"female" while smaller gametes are the sperm/"male." Why has anisogamy evolved? The traditional model proposes that eggs will become bigger if fitness increases non-linearly with increased egg size. Although a rather unusual assumption, it does appear to hold in multicellular organisms.[17]

Several important points follow:

1. Meiosis and gamete fusion evolved to allow for recombination to happen; once they came to exist, generations must inevitably alternate. The organismal complexity of the two generations can be immense, but it is of little importance for what is actually happening—haploid gametes fuse to form a diploid cell, from which, or from its lineage, haploid gametes have to then again be produced to restart the cycle. Overt focus on human-specific complexities often obscures these deeper underlying processes.

---

[16]D. Speijer, J. Lukes, M. Elias, "Sex is a ubiquitous, ancient, and inherent attribute of eukaryotic life," *Proc Natl Acad Sci U S A* 112 (2015):8827 8834.

[17]E.R. Hanschen, M.D. Herron, J.J. Wiens et al., "Multicellularity Drives the Evolution of Sexual Traits," *Am Nat* 192 (2018):E93 E105.

2.  At the level of gametes, sex in eukaryotes is inherently digital—two gametes fuse together to form one zygote. Yet it need not be binary—more than two mating types can exist,. Indeed, this is what many unicellular eukaryotes practice (some can have >100 mating types.)[18] However, "non-binary" sex does not mean "non-digital" sex. Mating types are distinct and finite in number, with no continuum between them, and they mate pairwise.

3.  Having more than two mating types is restricted to isogamous lineages. Anisogamy is inherently binary, and the fusion of one of each gamete type is necessary for reproduction.

4.  The type of gametes produced is a very objective criterion for classifying the sex of an individual, and is its fundamental defining feature. In metazoans, there are only two types of gametes, although they do exhibit enormous diversity in the relationship between the individual and gamete production and fertilization. Numerous species practice parthenogenesis, many are predominantly hermaphroditic (e.g. earthworms and snails), while individuals of some species can change their sex (e.g. clownfish).

However, no such examples have ever been observed in mammals, in which binary sexual reproduction appears to be extremely strongly enforced.

Why is that? Genetic imprinting is the most likely answer. A subset of genes are only expressed from either the parental or maternal chromosome, with DNA methylation controlling the pattern. Why imprinting evolved in mammals is another evolutionary puzzle;[19] for our purposes its existence is of primary importance.

That both a male and a female gamete contribute to the zygote is vitally necessary–debilitating human diseases result from disturbing the imprinting of even single genes (Prader-Willi syndrome, Angelman syndrome, etc.). Yet 100 or more genes are imprinted in total. Disrupting imprinting for all of them is incompatible with life. This explains why the male-female binary at the organismal level is so tightly locked in place in mammals.

Admittedly, imprinting explains why there is no parthenogenesis, but does not fully explain why there are no true hermaphrodites (i.e. individuals producing both sperm and eggs). This is inherently near-impossible because in mammals the two gonads inhibit each other's embryonic development (e.g. the Anti-Mullerian Hormone inhibits the development of the female reproductive system in males).

---

[18]S.S. Phadke, R.A. Zufall, "Rapid diversification of mating systems in ciliates," *Biol J Linnean Society* 98 (2009):187 197.

[19]T. Moore, D. Haig, "Genomic imprinting in mammalian development: a parental tug of war," *Trends Genet* 7 (1991):45 49.

## Why "Intersex" Conditions Do Not Invalidate the Sex Binary

But what about "intersex" individuals? Unfortunately, confusion and misunderstanding reign when it comes to their existence. Humans are indeed born with a variety of "intersex" conditions at low frequency, but that does not mean that these conditions are part of normal healthy variation. Humans are also born with a great variety of devastating congenital deformities and diseases, and if alien exozoologists were to write a description of *Homo sapiens* based on extensive observations of the population, such a description would never feature, for example, anencephaly, and neither would it include anything else but binary sex.

Extremely deleterious phenotypes, especially when their fitness is invariant with respect to environmental conditions, cannot be part of that description, as they are by definition actively eliminated from the population. The mathematics of natural selection is remorseless. For the human population, even an allele with an initial frequency as low as 0.01 and selection coefficient $s = 0.05$ is nearly ensured fixation. On the other hand, that should not be taken to mean that natural selection is all powerful. First, even if an allele is strongly deleterious, its frequency will not be zero, as it is constantly reintroduced by mutations at some rate $\mu$. Second, alleles with small selective (dis)advantages are not ensured fixation. Genetic drift can lead to fixation of alleles with small selective coefficients irrespective of their effects, as long as $s < \sim 1/N_e$ ($N_e$ is the effective population size).

Therefore we cannot expect "perfection" from biological processes. Imagine that a biochemical reaction runs with a given accuracy in a finite population. The selective advantage of mutations improving its accuracy will generally be at most the fractional improvement that they confer. Thus it is not possible for selection to push the system towards absolute perfection as further fractional improvements are "invisible" to it if smaller than the selection barrier $\sim 1/N_e$. Errors are thus expected to occur everywhere, and indeed they do. This is why important genes get mutated, developmental processes get disrupted, and the results are newborns with very low fitness.

These facts bear on how we are to think about "intersex"' people. The great diversity of such conditions cannot be explored here in detail. These include Androgen Insensitivity Syndrome (feminization of males due to androgen receptor mutations), Klinefelter's syndrome (47,XXY karyotype), XX male syndrome (46, XX "males" due to translocation of the master regulator *SRY* to the X), Turner's syndrome (45,X0) and many others.

These conditions present with a variety of phenotypes intermediate between typical male and female features, but they have one crucial

commonality—individuals afflicted are almost invariably sterile.[20] On the few occasions where fertility is possible, the phenotypes are mild and it is hard to even call them "intersex." Their evolutionary fitness is therefore as negative as fitness could possibly be short of being stillborn ($s = -1$ for sterile individuals). Importantly, these fitness reductions are invariant to environmental variables. It is possible for a condition that is a debilitating disease under some circumstances to be beneficial under others (e.g. sickle-cell anemia and malaria). But this does not apply to the inability to produce viable gametes, which makes one unable to reproduce under all circumstances.

All "intersex" conditions, when examined, clearly arise from single-gene mutations or chromosomal aberrations on a genetic background that would have indisputably been producing male or female gametes had these mutations not occurred, and, rarely, due to chimerism (i.e. individuals made up of both male and female cells). True hermaphrodites possessing both sets of functional gonads and genitalia have never been observed in *Homo sapiens*.

Therefore the "intersex" argument against the sex binary is simply not valid. Intersex individuals exist only because of continuous *de novo* reintroduction of the relevant mutations in the population, recessive genes becoming unmasked, or disruptions of normal embryonic development.

Sex in mammals is on a fundamental level binary and immutable, and claims that "intersex'" individuals disprove that can only be made in the absence of any consideration of the biological nature of humans and how our evolutionary history has shaped our biology. Which brings us to the most worrying aspect of the widespread adoption of such denial.

**The Coming Battle**

The reasoning outlined above rests on two assumptions. First, population genetics is true, and second, common descent from the original self-replicators is true. That "population genetics is true" means that our knowledge of inheritance mechanisms is broadly correct, i.e. we understand molecular biology sufficiently well, and "random" events (mutations and gamete segregation) are truly random, i.e. they happen with no foreknowledge of their future consequences.

If these assumptions are accepted, what I have argued here regarding the binary nature of biological sex in humans is incontrovertibly true. It follows directly from the basic relationship between genes, organisms, recombination,

---

[20]J.P. Van Batavia, T.F. Kolon, "Fertility in disorders of sex development: A review," *J Pediatr Urol* 12 (2016):418 425.

&#9899; Springer

and reproduction. If mutations are random and undirected, then genetic material is the key entity in the center of the evolutionary process, not organisms. The inverse is also true—if the binary nature of biological sex in humans is to be denied, that automatically requires the rejection of one or both of these assumptions, for otherwise the binary nature of sex cannot be denied.

As these assumptions are foundational for modern science, a troubling realization follows—a direct attack against the hard sciences can be expected from the people who deny the binary nature of human sex. So far it has not happened, but there have been warning signs and it might just be a matter of time and of little understanding of the deep philosophical contradictions involved.

Certain parallels can perhaps be made with battles over the teaching of evolution, but there is one critical difference—the ideas in question here are coming directly from within the highest ranks of academia, where they appear to have significant institutional support, and, as recent years have demonstrated, their proponents are more than willing to use aggressive tactics outside the scholarly realm to silence their critics. There is also little understanding of the seriousness of the situation within the scientific community, which, whether for political reasons or due to lack of awareness, has been willingly supporting outright "bio-denialism."

I hope that this text will help prevent the potential damage by providing the plain statement of the fundamental biological facts that, until now, did not exist, and that it will serve as the foundation for pushing back against the insanity.

