**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

| | |
|---|---|
| STATE OF TENNESSEE, COMMONWEALTH OF KENTUCKY, STATE OF OHIO, STATE OF INDIANA, COMMONWEALTH OF VIRGINIA, and STATE OF WEST VIRGINIA, <br><br> *Plaintiffs*, <br><br> v. <br><br> MIGUEL CARDONA, in his official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION, <br><br> *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 2:24-cv-00072-DLB-CJS <br> ) District Judge David L. Bunning <br> ) Magistrate Judge Candace J. Smith <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM IN SUPPORT OF THE STATES'
MOTION FOR A § 705 STAY AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.    Congress Enacts Title IX to Remedy Discrimination Against Women. ............................. 3

    B.    The Department Abandons Its Longstanding Position that Title IX Permits Sex-Separated Programs and Facilities. ........................................................................ 4

    C.    The Department Proposes Requiring Schools to Adopt Students' Gender Identity for Title IX Purposes. ..................................................................... 7

    D.    The Department Issues the Final Rule. .......................................................... 8

    E.    Plaintiffs Sue and Now Seek Preliminary Relief. ......................................... 10

LEGAL STANDARD ...................................................................................................... 11

ARGUMENT ................................................................................................................... 11

I.    Plaintiffs Are Likely to Succeed on the Merits of Their Challenge. ......................... 11

    A.    The Final Rule Exceeds the Department's Authority to Implement Title IX. ................................................................................ 11

    B.    The Final Rule Violates the Constitution. .................................................... 17

    C.    The Final Rule Is Arbitrary and Capricious. ................................................ 19

II.    Plaintiffs Face Irreparable Harm Absent Preliminary Relief. ................................... 21

III.    Preliminary Relief Will Not Harm the Department or the Public Interest. .............. 25

CONCLUSION ................................................................................................................ 25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ................................................................................................................. 18

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
57 F.4th 791 (11th Cir. 2022) .......................................................................................... *passim*

*Arangure v. Whitaker,*
911 F.3d 333 (6th Cir. 2018) ..................................................................................... 12, 16

*Artis v. District of Columbia,*
583 U.S. 71 (2018) .................................................................................................................... 12

*Bauer v. Lynch,*
812 F.3d 340 (4th Cir. 2016) .......................................................................................... 12

*Bloomberg L.P. v. SEC,*
45 F.4th 462 (D.C. Cir. 2022) ........................................................................................ 20

*Bond v. United States,*
572 U.S. 844 (2014) ............................................................................................................... 16

*Bostock v. Clayton County,*
590 U.S. 644 (2020) .................................................................................... 2, 6, 7, 15, 19

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
595 U.S. 267 (2022) ............................................................................................................. 24

*Catholic Healthcare Int'l, Inc. v. Genoa Charter Twp.,*
82 F.4th 442 (6th Cir. 2023) .......................................................................................... 11

*Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ............................................................................................................. 12

*D.H. by A.H. v. Williamson Cnty. Bd. of Educ.,*
638 F. Supp. 3d 821 (M.D. Tenn. 2022) .............................................................. 15

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) .......................................................................................................... 17, 24

*Dep't of Nat. Res. & Envtl. Control v. EPA,*
785 F.3d 1 (D.C. Cir. 2015) ........................................................................................... 20

*Doe v. Metro. Gov't of Nashville & Davidson Cnty.*,
   35 F.4th 459 (6th Cir. 2022)....................................................................................25

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)..............................................................................................19

*Fortner v. Thomas*,
   983 F.2d 1024 (11th Cir. 1993)............................................................................24

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020)..................................................................12, 13, 25

*Grove City Coll. v. Bell*,
   465 U.S. 555 (1984)..............................................................................................15

*Johnson v. Bauman*,
   27 F.4th 384 (6th Cir. 2022)................................................................................12

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022)................................................................................25

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023)..........................................................................21, 25

*Kentucky v. Fed. Highway Admin.*,
   No. 5:23-cv-162-BJB, ---F. Supp. 3d----, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024)...................21

*Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2022)....................................................................16, 17, 18

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019).........................................................................................15

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023)..........................................................................2, 3, 15

*Long Island Power Auth. v. FERC*,
   27 F.4th 705 (D.C. Cir. 2022)..............................................................................11

*Louisiana v. U.S. Dep't of Energy*,
   90 F.4th 461 (5th Cir. 2024)................................................................................20

*M.L.B. v. S.L.J.*,
   519 U.S. 102 (1996)..............................................................................................19

*Meister v. U.S. Dep't of Agric.*,
   623 F.3d 363 (6th Cir. 2010)................................................................................14

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ...................................................................... 10, 15, 17, 18

*Meyer v. Nebraska,*
  262 U.S. 390 (1923) .................................................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................................................21

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) .................................................................................................18

*Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n,*
  812 F.2d 288 (6th Cir. 1987) ...................................................................................11

*Pelcha v. MW Bancorp, Inc.,*
  988 F.3d 318 (6th Cir. 2021) ...................................................................................15

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) .......................................................................................... 16, 17, 18, 19

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ...................................................................................................20

*Sierra Club v. EPA,*
  60 F.4th 1008 (6th Cir. 2023) ..................................................................................11

*Smith v. Org. of Foster Fams. for Equal. & Reform,*
  431 U.S. 816 (1977) .................................................................................................19

*South Dakota v. Dole,*
  483 U.S. 203 (1987) .................................................................................................18

*Speech First, Inc. v. Cartwright,*
  32 F.4th 1110 (11th Cir. 2022) ................................................................................17

*Tennessee v. U.S. Dep't of Educ.,*
  615 F. Supp. 3d 807 (E.D. Tenn. 2022) .............................................................. 7, 24

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
  992 F.3d 350 (5th Cir. 2021) ...................................................................................18

*Texas v. United States,*
  201 F. Supp. 3d 810 (N.D. Tex. 2016) ............................................................... 6, 10

*Thompson v. DeWine,*
  976 F.3d 610 (6th Cir. 2020) ...................................................................................24

iv

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ............................................................................................................21

*United States v. Grant*,
    979 F.3d 1141 (6th Cir. 2020) ..........................................................................................13

*United States v. Lopez*,
    514 U.S. 549 (1995) ............................................................................................................16

*United States v. Virginia*,
    518 U.S. 515 (1996) ...................................................................................................1, 3, 12

*Util. Air Reg. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................................................12

*Van Buren v. United States*,
    593 U.S. 374 (2021) ............................................................................................................13

*West Virgina v. EPA*,
    597 U.S. 697 (2022) ............................................................................................................16

*West Virginia v. U.S. Dep't of Treasury*,
    59 F.4th 1124 (11th Cir. 2023) .........................................................................................25

*Wilson v. Comm'r. of Soc. Sec.*,
    378 F.3d 541 (6th Cir. 2004) ............................................................................................11

### U.S. Constitution and Statutes

U.S. Const. art. I, § 8, cl. 1 ...........................................................................................17, 18

5 U.S.C. § 701, *et seq.* .......................................................................................11, 17, 19, 25

20 U.S.C. § 1681, *et seq.* .............................................................................................*passim*

Ky. Rev. Stat. § 158.189 ........................................................................................................24

Ohio Rev. Code § 3313.5320 ..............................................................................................24

### Rules

Fed. R. Civ. P. 65(c) ..............................................................................................................11

### Regulations and Guidance

34 C.F.R. pt. 106 ...........................................................................................................*passim*

Enforcement of Title IX of the Education Amendments of 1972 with respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32,637-01 (June 22, 2021) ................................................................................7

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (July 12, 2022) .....................................................................................7

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (Apr. 13, 2023) ..........................................................................................7

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ................................................................................passim

Reed D. Rubinstein, Memorandum For Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights, re: Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020), at 1-4 (Jan. 8, 2021), https://perma.cc/Q9YC-Q4Y2 ................................................................................6

U.S. Dep't of Educ., Off. for Civ. Rts., Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ................................................................................5

U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Title IX and Transgender Students, at 1, 3-4 (May 13, 2016), https://perma.cc/G5VG-ZNV9 ........................6

U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Gender Identity Guidance, at 1 (Feb. 22, 2017), https://perma.cc/H6E3-YBEZ. ........................6

### Other Authorities

Exec. Order No. 13,988 86 Fed. Reg. 7,023 (Jan. 20, 2021) ........................................................6

Hearings Before the Special Subcommittee on Education of the Committee on Education and Labor House of Representatives on Section 805 of H.R. 16098, 91st Cong. 1-2 (1970) H.R. 16098 ................................................................................3

H.R. Rep. No. 92-554 (1971) ................................................................................3

In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity, 14 Marq. Sports L. Rev. 11 (2003) ................................................................................3

What Divides Textualists from Purposivists?, 106 Colum. L. Rev. 70 (2006) ................................................................................13, 14

vi

## INTRODUCTION

For fifty years, Title IX has helped equalize women's access to educational opportunities by barring discrimination "on the basis of *sex*" by schools receiving federal funds.  But given the "enduring" physical differences between men and women, *United States v. Virginia*, 518 U.S. 515, 533 (1996), Title IX has always allowed schools to separate boys' and girls' bathrooms, locker rooms, and sports teams.  These sex-based bounds have long helped protect students' safety and privacy, as well as secure Title IX's promise of helping women achieve academic and athletic success.

A radical new U.S. Department of Education mandate threatens to upend all of this.  In a Final Rule issued just days ago, the Department distorts Title IX's prohibition on sex discrimination by reading it to require schools to protect their students' "gender identity," among other supposedly "sex-based" characteristics.  *See* Doc. # 1-2, U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024).  The Final Rule further adopts a definition of prohibited "harassment" that will punish students and teachers who fail to abide by this gender-identity mandate.  The resulting regime would give almost anyone on a school's campus—from preschools through graduate schools—an unfettered right to use whatever bathroom, locker room, or other private facility he or she chooses.  Those who object to this new normal do so at risk of Title IX sanctions.

Plaintiff States now seek emergency and preliminary relief against the Final Rule to avoid immense harm in the leadup to the Final Rule's August 1, 2024 effective date.  The Court should grant relief because the States overwhelmingly satisfy the relevant factors.  To start, the States have a substantial likelihood of success on the merits because the Final Rule flouts Title IX, the U.S. Constitution, and the Administrative Procedure Act ("APA").  Title IX's text and longstanding regulations are replete with provisions using "sex" to reference the binary concept of male versus female and allowing

1

sex-segregated facilities and programs.  The Final Rule thus exceeds the Department's authority by prohibiting schools from maintaining these sex-based bounds and compelling them to observe gender-identity notions divorced from sex entirely.  Nor does the U.S. Supreme Court's opinion in *Bostock v. Clayton County*, 590 U.S. 644 (2020), counsel differently: As Sixth Circuit precedents "make clear," *Bostock*'s reasoning "applies only to Title VII." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023).  The Department's broadened harassment definition heaps injury on injury by chilling the speech of anyone who objects to the Final Rule's unprecedented gender-identity mandate.

The Final Rule also transgresses constitutional limits by wielding Spending-Clause power to condition billions in States' educational funding on compliance with a novel gender-identity regime foreclosed by Title IX's text—a regime that Congress repeatedly rejected and that violates core First Amendment protections of speech and religious exercise.  The Final Rule's cursory response to key comments and self-contradictory reasoning likewise fails baseline administrative-law requirements for reasoned decision-making.  Any one of these flaws independently warrants vacating the Final Rule.  Together, they drive home the grave problems that arise when unelected agencies like the Department claim power to circumvent statutory constraints with rulemakings that reorder swaths of society.

The regulations will imminently and irreparably harm the States by, among other things, imposing unrecoverable compliance costs and effectively erasing many of the States' duly enacted laws protecting privacy, safety, and women's achievement, in derogation of State sovereignty.  Nor would maintaining the status quo of sex-separated spaces and programs harm the Department, which for decades understood that system to comply with Title IX.  If anything, the balance of equities favors permitting the States to continue enforcing laws that protect students' privacy, ensure women's educational and athletic opportunities, and vindicate the promise of Title IX's prohibition of discrimination on the basis of "sex."

**BACKGROUND**

A.      **Congress Enacts Title IX to Remedy Discrimination Against Women.**

Congress passed Title IX to remedy persistent sex-based discrimination against women in education.  Although Title VI of the Civil Rights Act of 1964 had prohibited discrimination based on "race, color, or national origin" in federally supported programs and activities, it didn't touch sex discrimination.  So women still faced higher admission standards and exclusion from "male" disciplines and activities in higher education.  *See* Compl. ¶¶ 40-42.

As a result, by the time of Title IX's enactment in the early 1970s, women's educational attainment lagged their male peers'.  *See Hearings Before the Special Subcommittee on Education of the Committee on Education and Labor House of Representatives on Section 805 of H.R. 16098*, 91st Cong. (1970); *see also* Compl. ¶ 41.  Women's athletic participation likewise trailed—only about 30,000 women participated in college athletics versus 170,000 men.  Jocelyn Samuels and Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marq. Sports L. Rev. 11, 18-19 (2003).

Enter Title IX's rule against discrimination "on the basis of sex."  20 U.S.C. § 1681(a).  The bill's Senate sponsor, Birch Bayh of Indiana, called Title IX "[t]he only antidote" to "the continuation of corrosive and unjustified discrimination against women … in[] all facets of education."  118 Cong. Rec. 5,803 (1972).  His House colleagues echoed this view of Title IX's purpose and potential, and hearing testimony in the leadup to Title IX's passage likewise supported the need for Title IX.  H.R. Rep. No. 92-554, at 51-52 (1971); 117 Cong. Rec. 39,252 (1971); *see* Compl. ¶¶ 43-46.

Just as clear as Title IX's remedial purpose is what the statute did *not* require:  Identical treatment of the sexes in every context.  To the contrary, Title IX contains several exceptions to the sex-discrimination bar that reflect "'enduring' differences between men and women."  *L.W.*, 83 F.4th at 484 (quoting *Virginia*, 518 U.S. at 533).  For one, to "preserv[e]" "personal privacy," 118 Cong. Rec.

3

5,807 (statement of Sen. Bayh), Title IX expressly allows schools to "maintain[] separate living facilities for the different sexes."  20 U.S.C. § 1686.  Title IX also carves out exceptions for certain traditional male-only or female-only activities, so long as similar opportunities provided for "one sex" are provided for "the other sex."  *Id.* § 1681(a)(8).  These include "father-son or mother-daughter activities," sorority and fraternity membership, and activities of Boys and Girls State.  *Id.* § 1681(a)(6)-(8).

These provisions and others highlight how Title IX uses the term "sex" to refer to a male-female binary.  *See* Compl. ¶ 65 ("one sex," "the other sex," "both sexes").  Title IX's allowance for sex-separated facilities and programs would be "meaningless" if schools cannot use sex to assign students to facilities and programs.  *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 813 (11th Cir. 2022) (en banc).  Thus, Title IX's text and structure reflect what Senator Bayh stressed: Title IX "provide[d] equal access for women and men students to the educational process," but did not "desegregate" spaces and activities that have long been sex-separated.  117 Cong. Rec. 30,407 (1971).

On the heels of Title IX, Congress passed the Javits Amendment.  That law directed the Department's predecessor agency to propose regulations "implementing [Title IX's] provisions[,] . . . includ[ing] with respect to intercollegiate athletic activities[,] reasonable provisions considering the nature of particular sports."  88 Stat. 484, 612 (1974).  The law did not extend beyond intercollegiate athletics or upset colleges' longstanding practice of maintaining sex-separated sports teams.

Congress has authorized federal agencies administering Title IX to "effectuate" Title IX's provisions via "rules, regulations, or orders" and to enforce Title IX's prohibition by terminating a non-compliant recipient's Title IX assistance.  20 U.S.C. § 1682.

**B.    The Department Abandons Its Longstanding Position that Title IX Permits Sex-Separated Programs and Facilities.**

1.    In the decades that followed Title IX's passage, the Department and its predecessor agency carried forward regulations confirming the scope of Title IX's "sex"-discrimination bar.

The initial 1975 regulations also treated "sex" as a binary.  Like the statute, those regulations refer multiple times to "one sex," especially versus "the other sex," use the phrase "both sexes," and reference "boys and girls" and "male and female teams."  *See, e.g.*, 34 C.F.R. §§ 106.33, 106.34(a)(3), 106.36(c), 106.37(a)(3), 106.41(c), 106.51(a)(4), 106.58(a), 106.60(b), 106.61.  Also tracking Title IX, the regulations permit certain sex-segregated spaces, including "separate housing," *id.* § 106.32; "separate toilet, locker room, and shower facilities," *id.* § 106.33; "separate [sexual-education] sessions for boys and girls," *id.* § 106.34(a)(3); and separate boys' and girls' choirs, *id.* § 106.34(a)(4).  The 1975 athletics regulations took the same tack.  They generally bar discrimination based on "sex" in "interscholastic, intercollegiate, club or intramural athletics."  *Id.* § 106.41(a).  But they permit schools to maintain "separate teams for members of each sex" when team selection is "based upon competitive skill" or the sport is a "contact sport."  *Id.* § 106.41(b).  Per the then-applicable procedures, Congress received the original regulations and did not disapprove them.  *See* Compl. ¶¶ 69-70.

For decades, the Department and its predecessor interpreted Title IX's reference to "sex" consistently to bar discrimination based on maleness or femaleness alone.  In 1997, for example, the Department adopted guidance recognizing that "Title IX does not prohibit discrimination on the basis of sexual orientation."  U.S. Dep't of Educ., Off. for Civ. Rts., Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,039 (Mar. 13, 1997), https://perma.cc/AT7Y-KCFC.  In other words, it directed that "sex" discrimination under Title IX does not protect characteristics distinct from "sex" that may bear some relation to it.

2.      No agency document took a different position until 2014, when the Obama Department unveiled sparsely reasoned guidance asserting that Title IX bars discrimination based solely on "gender identity."  *See* Compl. ¶¶ 78-82 (discussing guidance documents).  Later guidance reiterated this conclusion while simultaneously acknowledging that a transgender person's "gender identity is

5

different from the sex they were assigned at birth." U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Title IX and Transgender Students, at 1, 3-4 (May 13, 2016) (rescinded in 2017), https://perma.cc/G5VG-ZNV9.  A federal court enjoined the guidance nation-wide because, among other reasons, the ordinary meaning of "sex" as used in Title IX unambiguously excluded "gender identity." *Texas v. United States*, 201 F. Supp. 3d 810, 831-34 (N.D. Tex. 2016).

The Trump Department promptly rescinded that gender-identity guidance because it lacked "extensive legal analysis" and was inconsistent with Title IX's "express language."  U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Gender Identity Guidance, at 1 (Feb. 22, 2017), https://perma.cc/H6E3-YBEZ.  The Department reaffirmed this position after *Bostock v. Clayton County*, 590 U.S. 644, read Title VII's prohibition on sex discrimination to bar an employer's firing an employee because of sexual orientation or transgender status.  *Id.* at 651-52.  That makes sense: Bostock did *not* hold that "sex" meant "gender identity"; it assumed that "sex" refers "only to biological distinctions between male and female."  *Id.* at 655.  The Department reasoned that construing "sex" to mean "biological sex" is "the only construction consistent with the ordinary public meaning of 'sex' at the time of Title IX's enactment," the statutory and regulatory text and structure, and Department practice.  Reed D. Rubinstein, Memorandum for Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights, re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020), at 1-4 (Jan. 8, 2021), https://perma.cc/Q9YC-Q4Y2.

Things shifted again when, on his first day in office, President Biden issued an Executive Order directing every federal agency to regulate consistently with the position that "laws that prohibit sex discrimination—including Title IX [and its] implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation."  Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021).  The Biden Department thereafter issued a series of guidance advising that "Title

6

IX's prohibition on discrimination 'on the basis of sex' … encompass[ed] discrimination on the basis of sexual orientation and gender identity." 86 Fed. Reg. 32,637-01 (June 22, 2021); *see also* Compl. ¶¶ 98-103.  Later, a federal district court enjoined enforcement of the guidance against Tennessee and other States, holding the guidance should have gone through notice-and-comment procedures because it "creat[ed] new rights and obligations" that "appear[ed] nowhere in *Bostock*, Title IX, or its imple- menting regulations." *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 838-39, 842 (E.D. Tenn. 2022), *appeal pending*, No. 22-5807 (6th Cir.) (argued Apr. 26, 2023).  That injunction remains in place.

### C.    The Department Proposes Requiring Schools to Adopt Students' Gender Iden- tity for Title IX Purposes.

At around the same time, the Department shifted its focus to the rulemaking giving rise to this suit.  In July 2022, the Department proposed amendments to its Title IX regulations that advanced the same reading of sex delineated in the enjoined guidance documents.  *See* Notice of Proposed Rulemaking re: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (July 12, 2022) ("Proposed Rule").  In relevant part, the Proposed Rule redefined sex discrimination under Title IX to "include[] discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 41,571.  And it confirmed that school policies "that prevent[] a person from participating in an education program or activity consistent with the person's gender identity" would constitute unlawful discrimination. *Id.*  The Proposed Rule likewise expanded its definition of pro- hibited "harassment" to include "all forms of sex-based harassment, as opposed to only sexual har- assment," including harassment based on gender identity.  *Id.* at 41,410.

The Department later proposed a second Title IX rule addressing the application of its new interpretation of sex discrimination to athletics.  *See* 88 Fed. Reg. 22,860 (Apr. 13, 2023).  In it, the Department proposed amendments to the 1975 athletics regulation for the first time, proposing to

specify that applying "sex-related eligibility criteria" to deny students' access to sports teams would violate Title IX in many, if not most, cases. *Id.* at 22,860, 22,875. The Proposed Athletics Rule would thus invalidate States' and schools' across-the-board policies stating that sports participation must be determined on the basis of sex, not gender identity. *Id.* at 22,871-72.

Both proposals prompted more than 150,000 comments.[1] Tennessee filed comment letters opposing both Proposed Rules on statutory, constitutional, and APA grounds, joined by almost all Plaintiff States, including Kentucky. *See* Docs. # 1-3, 1-4. The States urged the Department to withdraw its reading in order to protect students' safety and women's educational opportunities. Doc. # 1-3 at 9-14; Doc. # 1-4 at 15-18. A coalition of states led by Indiana filed a separate comment opposing the Proposed Athletics Rule, because among other reasons, it would thwart women's Title IX right to fully and fairly compete in athletic competitions. *See* Doc. # 1-5. Many other commenters raised similar concerns. *See generally* Compl. ¶¶ 117-125, 132-37.

### D.    The Department Issues the Final Rule.

On April 29, 2024, the Secretary published the final version of the Proposed Facilities-and-Programs Rule. *See* Doc. # 1-2, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule"). Despite widespread opposition, the Department mostly adopted its initial approach.

The Final Rule states that unlawful "sex discrimination" covers "any discrimination that depends" even "in part on consideration of a person's sex," 89 Fed. Reg. at 33,803, including but not limited to "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," *id.* at 33,886 (adding 34 C.F.R. § 106.10). This new definition has radical ramifications: The Final Rule directs that schools cannot lawfully enforce

---

[1] Comments on the Proposed Facilities-and-Programs Rule are available at https://www.regulations.gov/document/ED-2021-OCR-0166-0001/comment. Comments on the Proposed Athletics Rule are available at https://www.regulations.gov/docket/ED-2022-OCR-0143/comments.

commonplace, sex-based divisions between male and female bathrooms, locker rooms, and the like; instead, they must permit persons to access such spaces "consistent with their gender identity." *Id.* at 33,887 (amending 34 C.F.R. § 106.31(a)); *see also id.* at 33,816-17, 33,818-20. The Department refuses to define "gender identity" but concedes that it is an internal, subjective "sense" of "gender." *Id.* at 33,809. Of course, Title IX itself expressly allows sex separation, contrary to the Department's gender-identity mandate. But rather than reevaluate how its reading clashes with Title IX's text and structure, the Department reasons that Title IX's exclusions show Congress intended to "permit" schools to inflict "more than de minimis harm" on affected students in those "contexts"—as when students seek to use "living facilities" inconsistent with their sex. *E.g.*, *id.* at 33,816.

This gender-identity mandate extends to anyone "participating or *attempting* to participate" in a recipient's program or activity—including students from other schools, visiting lecturers, and invited community members. *Id.* at 33,816 (emphasis added). And the Final Rule prohibits schools from verifying or otherwise inquiring into a person's purported gender identity—meaning they generally must grant anyone on campus an unfettered right to use opposite-sex facilities, no questions asked. *Id.* at 33,816, 33,818-19. Rather than address commenters' evidence-backed privacy and safety concerns with this regime, the Final Rule casts them off as "cisgender" persons' "preferences [and] discomfort" or "unconstitutional discrimination." *Id.* at 33,820.

The Final Rule tries to blunt the impact of its broad gender-identity mandate on women's athletics, promising that more specific "criteria" for using sex and sports will come at some later date. *Id.* at 33,817. To justify treating sports differently than other "program[s] and activit[ies]," 34 C.F.R. § 106.1, the Final Rule states that Title IX's "longstanding" regulations "have always permitted" sex-separate athletic teams. 89 Fed. Reg. at 33,817, 33,819; *see also id.* at 33,816 (citing 34 C.F.R. § 106.41(b)). The Department does not explain why this reasoning holds for sports, but not for single-

sex bathrooms, locker rooms, and other programs permitted by the Title IX regulations for just as long. *See* Compl. ¶¶ 148-49; *see also* 34 C.F.R. §§ 106.33-.34.

The Final Rule folds its gender-identity mandate into a new and expansive definition of prohibited Title IX "sexual harassment." Under the Final Rule, the "harassment" regulations cover any speech or religious expression, on campus or online, that might reasonably be deemed "unwelcome," "offensive," and "limit[ing]" of a student's educational participation. 89 Fed. Reg. at 33,884 (amending 34 C.F.R. § 106.2); *see id.* at 33,515, 33,562. The Final Rule says it will address any future First Amendment problems with this broad definition on a case-by-case basis, *see* Compl. ¶ 179, ignoring that the Sixth Circuit and other courts have held that the First Amendment protects students' and faculty's prerogative not to "communicat[e] messages about gender identity [they] believe[] are false," including by using "a pronoun that reflects a student's self-asserted gender identity" rather than sex. *Meriwether v. Hartop*, 992 F.3d 492, 498-99, 512-13 (6th Cir. 2021). By issuing this Final Rule, the Department is pushing a results-oriented mandate without seriously considering its constitutional defects.

### E.     Plaintiffs Sue and Now Seek Preliminary Relief.

Plaintiffs filed this suit the day after the Final Rule's publication in the Federal Register. *See* Compl. (Apr. 30, 2024). Plaintiffs request that this Court vacate the Final Rule as unlawful under Title IX, the U.S. Constitution, and the APA. States have filed challenges across the country presenting similar arguments and requesting relief.[2]

The Final Rule is set to take effect on August 1, 2024, necessitating a flurry of compliance preparations in the meantime. Plaintiffs thus seek interim and preliminary relief from the Final Rule pending this Court's resolution of the case.

---

[2] *Texas v. United States*, No. 2:24-cv-00086-Z (N.D. Tex. Apr. 29, 2024); *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-cv-00563 (W.D. La. Apr. 29, 2024); *Alabama v. Cardona*, No. 7:24-cv-00533 (N.D. Ala. Apr. 29, 2024).

**LEGAL STANDARD**

The States ask this Court to "postpone the effective date" of the Final Rule under 5 U.S.C. § 705 and to issue a preliminary injunction against associated enforcement.  Both routes to relief allow a court to "preserve status or rights pending" completion of the proceedings by pausing the Final Rule's effect.  5 U.S.C. § 705; *see also* Fed. R. Civ. P. 65(c).  Courts consider four factors to determine whether relief is appropriate: (1) whether the movant is "likely to succeed on the merits"; (2) the likelihood of "irreparable harm" to the movant in the absence of preliminary relief; (3) the "balance of equities"; and (4) whether preliminary relief would serve the "public interest."  *Catholic Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 447 (6th Cir. 2023); *see also Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (applying these factors under § 705).

**ARGUMENT**

All factors support granting Plaintiffs preliminary relief against the Final Rule's attempt to convert Title IX's bar on "sex" discrimination into a sweeping gender-identity mandate.

**I.      Plaintiffs Are Likely to Succeed on the Merits of Their Challenge.**

The APA directs courts to set aside and vacate "final agency action" that is unlawful.  5 U.S.C. §§ 704, 706(2); *see Sierra Club v. EPA*, 60 F.4th 1008, 1021 (6th Cir. 2023) ("Reviewing courts certainly have the power to vacate an agency action they find unlawful."); *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022).  To pass APA muster, agencies cannot exceed their lawful authority, act "contrary to constitutional right," or engage in "arbitrary [or] capricious" decision-making. 5 U.S.C. § 706(2).  The Final Rule commits all three errors.

**A.      The Final Rule Exceeds the Department's Authority to Implement Title IX.**

To act within their lawful authority, agencies must obey their governing statutes and regulations.  *See* 5 U.S.C. § 706(2)(C); *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).  This

11

baseline principle forecloses the Final Rule's gender-identity mandate, which flagrantly contravenes Title IX's text, structure, history, and regulations.

### 1.   The Gender-Identity Mandate Violates Title IX and the Department's Regulations.

"[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Here, the "'traditional tools' of statutory interpretation"—text, structure, and history—uniformly confirm that the Department's interpretation is "contrary to the clear meaning of" Title IX. *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) (quoting *Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).

*Title IX*. The analysis here can begin and end with the "ordinary meaning" of Title IX's text. *Johnson v. Bauman*, 27 F.4th 384, 388-89 (6th Cir. 2022) (quoting *Artis v. District of Columbia*, 583 U.S. 71, 83 (2018)). "Sex" clearly defines Title IX's anti-discrimination scope. And as the en banc Eleventh Circuit found in *Adams*, "[r]eputable dictionary definitions of 'sex'" from the time of Title IX's enactment "show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females." 57 F.4th at 815; *accord Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632-33 (4th Cir. 2020) (Niemeyer, J., dissenting) (collecting definitions).[3] These sources confirm that Title IX uses "sex" to reference the categories of "male" and "female," which "are not physiologically the same." *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (citing *Virginia*, 518 U.S. at 550 & n.19 (noting the "undoubt[ed]" need for "privacy from the other sex in living arrangements")).

---

[3] *See also, e.g.*, *The American College Dictionary* 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished"); *The Random House College Dictionary* 1206 (rev. ed. 1973) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions").

Though Title IX's "on the basis of sex" language is "trouble" enough for the Department, a "wider look at the statute's structure gives … even more reason for pause." *Van Buren v. United States*, 593 U.S. 374, 389 (2021) (citation omitted).  Title IX expressly states that it does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes," i.e., "*for*" males and females.  20 U.S.C. § 1686 (emphasis added).  And the statute consistently treats sex as a binary, using phrases such as "one sex," "the other sex," and "both sexes."  The statute excepts from its coverage certain organizations whose membership "has traditionally been limited to persons of *one sex*," *id.* § 1681(a)(6) (emphasis added); "father-son or mother-daughter activities" so long as similar opportunities provided for "*one sex*" are provided for "*the other sex*," *id.* § 1681(a)(8) (emphasis added); and scholarships associated with beauty-pageant participation "limited to individuals of *one sex* only," *id.* § 1681(a)(8).  Title IX also clarifies that it does not require "preferential or disparate treatment to the members of *one sex*."  *Id.* § 1681(b).  And many of its exclusions from coverage preserve male-only or female-only spaces, such as college fraternities and sororities and sex-segregated voluntary service organizations like the Boy Scouts and Girl Scouts.  *Id.* § 1681(a)(6); *see also id.* § 1681(a)(7).

Title IX thus sets out provisions that schools can enforce only by reference to students' sex. It would render these provisions "meaningless" if schools must apply them based not on sex, but instead on students' "gender identity or transgender status." *Adams*, 57 F.4th at 813.[4]

Title IX's linguistic context, which is essential to determining a statute's "plain meaning," confirms that "sex" has a distinct meaning from "gender identity" or other so-called "sex-based" characteristics.  *United States v. Grant*, 979 F.3d 1141, 1145 (6th Cir. 2020) (quoting John Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 79-80 (2006)).  "The phrase 'gender identity'

---

[4] *Accord Grimm*, 972 F.3d at 634 (Neimeyer, J., dissenting) (requiring female to use male restroom "compromises the separation as explicitly authorized by Title IX").

did not exist" in 1972 "outside of some esoteric psychological publications."  Ryan T. Anderson, Ph.D, & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do*, at 9, The Heritage Found. (2017).  And the word "gender" had itself "been coined only recently in contradistinction to sex."  *Id.*  Indeed, "psychiatric literature" at the time "conflated sexual orientation with gender identity."  *Adams*, 57 F.4th 1299, 1336 (11th Cir. 2021) (Pryor, C.J., dissenting) (citations omitted), *rev'd on reh'g en banc*, 57 F.4th 791.  Plainly, the ordinary public meaning of "sex" could not have encompassed "gender identity" when Title IX became law.

Title IX's history and purpose confirm what Title IX's text and structure reveal.  As the Complaint details, *see* ¶ 43, Title IX emerged from seven days of congressional hearings examining the problem of "discrimination against women."  Compl. ¶ 7 (quoting statement of Rep. Green).  Key sponsors of the law deemed Title IX "[t]he only antidote" to "the continuation of corrosive and unjustified discrimination against women . . . in[] all facets of education."  118 Cong. Rec. 5,803 (statement of Sen. Bayh); *see supra* p. 3.  Congress used the binary term "sex" to do that, while still allowing some "differential treatment by sex" to protect persons' "personal privacy."  *Id.* at 5,807.

*Regulations.*  For many of the same reasons, the Department's reading of Title IX violates the "elemental principle of administrative law that agencies are bound to follow their own regulations."  *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (citation omitted).  The Final Rule maintains, as-is, the 1975 regulations that allow sex-separated "toilet, locker room, and shower facilities," among other things.  *See* 89 Fed. Reg. at 33,816, 33,818-20 (discussing 34 C.F.R. §§ 106.33-.34); Compl. ¶¶ 148-51.  But like Title IX's statutory exclusions, these regulations expressly contemplate and permit schools' dividing certain areas based on students' sex—not other characteristics like gender identity.  *See supra* p. 4-5.  So the Final Rule's gender-identity mandate conflicts with the plain meaning of regulations that remain on the books.  And the Department concedes that the fact Congress did

not disapprove these original regulations "strongly implies that [they] accurately reflect congressional intent." 89 Fed. Reg. at 33,816-17 (quoting *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984)). At a minimum, the Final Rule's interpretation of those regulations as allowing schools to have but not enforce sex-based categories does not "fall within the bounds of reasonable interpretation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (cleaned up); *cf. D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 835 (M.D. Tenn. 2022) (noting such an argument "appears to contradict the very purpose of allowing separate facilities").

### 2.   Neither *Bostock* Nor Deference Licenses the Department's Reading.

The Final Rule does not meaningfully dispute that "sex" means "sex." Instead, the Department principally grounds its reading in *Bostock* and an argument that the Department's effort to "effectuate" Title IX's anti-discrimination purposes warrants deference. 89 Fed. Reg. at 33,804 (citing 20 U.S.C. § 1682). Neither argument works.

This Circuit's precedents foreclose the Department's effort to graft *Bostock*'s Title VII holding onto Title IX. *Bostock* itself assumed that "sex" "refer[ed] only to *biological* distinctions between male and female"—the meaning of "sex" Plaintiffs advance here. *Adams*, 57 F.4th at 813-14 (quoting *Bostock*, 590 U.S. at 655). And *Bostock* limited its holding to Title VII's prohibition on discriminatory hiring and firing by stressing the decision did "not purport to address bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. The Department previously and correctly agreed. *See supra* p. 6; Compl. ¶ 96. This Circuit, moreover, has repeatedly held that *Bostock*'s "reasoning applies only to Title VII." *L.W.*, 83 F.4th at 484 (citing *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021)); *Meriwether*, 992 F.3d at 510 n.4 (noting the "important" distinctions between Title VII and Title IX, including Title IX's express allowance of sex-separated facilities in §1686). Therefore, *Bostock* does not permit the Department to read a gender-identity mandate into Title IX.

Even were Title IX's reference to "sex" ambiguous in some respects, the Department's proffered interpretation would warrant no deference. Whatever *Chevron*'s shelf life,[5] it does not permit the Final Rule's re-interpretation of "sex" discrimination. To start, the Department needs clear congressional authority, not just an arguable *Chevron* hook, to enshrine a novel, nationwide gender-identity mandate of vast "political significance." *West Virginia v. EPA*, 597 U.S. 697, 729-30 (2022) (citation omitted). Title IX likewise lacks the required "clear statement" allowing the Department to intrude on States' educational systems, the management of which is a "core aspect of state sovereignty." *Bond v. United States*, 572 U.S. 844, 858 (2014); *Kentucky v. Yellen*, 54 F.4th 325, 352 (6th Cir. 2022); *see United States v. Lopez*, 514 U.S. 549, 564 (1995) (noting States' "historical[] … sovereign[ty]" in education). For the same reason, the Spending-Clause clear-statement rule forbids the Department from conditioning Title IX funds on recipients' following its mandate absent "clear" direction from Congress. *Yellen*, 54 F.4th at 353-54 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Finally, the Final Rule has significant constitutional defects, *infra* pp. 17-19, and the constitutional-avoidance canon "take[s] precedence" over any interpretive deference the Department might claim. *Arangure*, 911 F.3d at 339-40.

### 3.    The "Harassment" Definition Is Also Unlawful.

The Department further exceeded its statutory authority in adopting an expansive definition of prohibited Title IX "harassment." *See* Compl. ¶¶ 175-83. The Final Rule newly defines punishable harassment as conduct that—from the complainant's view—is so "severe *or* pervasive" as to "*limit[]* . . . a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (34 C.F.R. § 106.2) (emphases added). This formulation goes beyond the Supreme

---

[5] By the end of the current Term, the Supreme Court is expected to issue a decision in a set of cases raising the question of "whether the Court should overrule *Chevron*." *See Loper Bright Enters. v. Raimondo* (No. 22-451); *Relentless, Inc. v. U.S. Dep't of Commerce* (No. 22-1219).

Court's definition of actionable Title IX harassment, which is limited to conduct that is "so severe, pervasive, *and* objectively offensive that it *denies* its victims … equal access to education." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999) (emphases added).  In so doing, the Final Rule's definition risks punishing students for a single instance of speech and schools for conduct not fairly attributable to their educational program.  *See* Compl. ¶¶ 177-78, 183.

The harassment definition's breadth also runs afoul of the First Amendment by, for example, requiring students and teachers to use "preferred" rather than accurate pronouns.  *Cf.* Compl. ¶ 180 (similar enforcement policy).  The Sixth Circuit and others have held that such policies present First Amendment problems by compelling speech in violation of students' and teachers' moral and religious beliefs.  *See Meriwether*, 992 F.3d at 498-500, 505; *accord Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125-27 (11th Cir. 2022).  The Final Rule's harassment definition thus overruns statutory and consti-tutional guardrails on the Department's power to police educational speech and expression.

### B.     The Final Rule Violates the Constitution.

The Final Rule's multiple constitutional failings independently warrant vacatur.  *See* 5 U.S.C. § 706(2)(B).  *First*, if Title IX means what the Department says in the Final Rule, then Title IX's pro-hibition on sex discrimination transgresses the Spending Clause several times over.  *See* U.S. Const. art. I, § 8, cl. 1.  Funding under the Spending Clause functions "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."  *Yellen*, 54 F.4th at 347-48 (quoting *Pennhurst*, 451 U.S. at 17).  That framework means that "if Congress intends to impose a condition on the grant of federal moneys [under its Spending Clause authority], it must do so unambiguously."  *Id.* (quoting *Pennhurst*, 451 U.S. at 17).  This "clear-statement rule" applies with particular force when a federal-funding condition "encroache[s] upon a traditional state power," such as the regulation of education.  *Id.* at 354 (citation omitted).  And because the spending power

belongs only to Congress, *see* U.S. Const. art. I, § 8, cl. 1, spending conditions for grants "must come directly from the statute" rather than an agency, *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021).  As this Circuit put it in *Yellen*, "Congress *itself* must have spoken with a 'clear voice.'"  54 F.4th at 354 (quoting *Pennhurst*, 451 U.S. at 17).

Title IX is indisputably a Spending-Clause statute.  Yet it lacks any congressional statement—let alone a clear one—authorizing the Department to condition funding on recipients' following the Final Rule's gender-identity mandate.  Thus, as the Eleventh Circuit reasoned in *Adams*, the Final Rule's interpretation violates the Spending-Clause clear-statement rule.  57 F.4th at 815.  The Final Rule's (i) highly coercive effect due to its link to billions in state funding, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78, 580-82 (2012) (opinion of Roberts, C.J., joined by Breyer & Kagan, JJ.); (ii) utter perversion of Title IX's "purpose" to protect women from sex discrimination, *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987); and (iii) risk of requiring States to unconstitutionally infringe students' and teachers' First Amendment expression and religious practice, *id.* at 210-11—provide further bases for invaliding the Final Rule under the Spending Clause.

*Second*, the Final Rule raises significant free-speech and free-exercise problems.  Prior Department enforcement reveals that the Department believes its gender-identity mandate to require school administrators to use gender-identity-based pronouns for a student.  *See* Compl. ¶¶ 81-82, 213 & note 30.  Read that way, the Final Rule would violate this Circuit's interpretation of the First Amendment as protecting at least the rights of professors at public universities to decline to use pronouns inconsistent with the student's sex when teaching.  *See Meriwether*, 992 F.3d at 498-500, 505.  Compelling students and teachers to speak—even online and off campus—in ways that violate deeply held conscience and religious beliefs transgresses core constitutional protections.  *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) ("[T]he government may not compel a person to speak its own preferred

messages."). The Final Rule's expansive definition of "hostile environment harassment" compounds these First Amendment problems. 89 Fed. Reg. at 33,493, 33,884; *see supra* p. 10.

*Third*, by requiring school administrators to "respond promptly and effectively" to accommodate a student's stated gender identity, 89 Fed. Reg. at 33,533, 33,888 (amending § 106.44(a)); *see also* Compl. ¶¶ 112, 163-64, the Final Rule trespasses on the "substantive and procedural protection[s]" that our Constitution extends to cover the right of parents to "[]bring [up]" their children as they deem fit. *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)). Though the Final Rule gestures at certain parental rights, *see* 89 Fed. Reg. at 33,821-22, it nowhere states that parental opposition requires schools to exempt students from Title IX's new gender-identity mandate. To the contrary, the Final Rule suggests that Title IX could trump parents' preferences about their child's treatment depending on the case. *See, e.g.*, *id.* at 33,822. This requirement facially infringes the rights of parents whose children will be subject to the Final Rule's gender-identity mandate.

### C.   The Final Rule Is Arbitrary and Capricious.

The Final Rule also impermissibly rests on flawed reasoning. *See* 5 U.S.C. § 706(2)(A).

*First*, the Department flouts its obligation to offer a "reasoned explanation" for departing from its longstanding view on the meaning of "sex" in Title IX. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). The Department hinges its change in position on *Bostock*—having abandoned its incredible previous claim that it "does not have a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'" 87 Fed. Reg. at 41,537. But it is arbitrary to rely on *Bostock*, which *disclaimed* "address[ing] bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. Nor does the Final Rule's *Bostock*-based, but-for reasoning account for "nonbinary" students who identify with neither sex or who assert an identity or preferred pronouns de-linked from sex entirely.

19

*Second*, the Department's justifications reflect ill-supported and "self-contradictory … logic." *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015) (citation omitted).  The Department points to Congress's allowing sex-separation in "living facilities" and the exceptions in 20 U.S.C. § 1681(1)-(9) as justification for omitting such facilities and programs from its gender-identity mandate.  89 Fed. Reg. at 33,816, 33,818-19.  At the same time, the Department arbitrarily applies its gender-identity mandate to bathrooms, toilets, and showers, which its existing regulations likewise allow to be separated based on sex.  *See* Compl. ¶¶ 148-49.  Nor can the Department identify a rational basis for allowing school activities associated with Girls and Boys State to restrict participation based on sex, *see* 20 U.S.C. § 1681(a)(7), yet requiring boys identifying as girls to participate in sex-ed classes for girls.  Absent too is any explanation for why the Department's "longstanding athletics regulations" support continuing to allow some (unspecified) enforcement of sex-separate sports, 89 Fed. Reg. at 33,817, but the equally "longstanding" regulations governing bathrooms and locker rooms do not.

*Third*, the Department failed to adequately "consider and respond to significant comments received during the period for public comment."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).  The Final Rule claims "nothing in the[] regulations" conflicts with the First Amendment.  Compl. ¶ 179 (collecting examples).  Yet it relies on Title VII EEOC harassment guidance that implicates free speech rights on its face.  Compl. ¶¶ 180-81.  The Final Rule defers hard constitutional questions to resolution in future cases, 89 Fed. Reg. at 33,512, saying it lacks needed facts to address "specific examples," *id.* at 33,509, 33,512.  But elsewhere the Final Rule references examples provided for "illustrative purposes."  *Id.* at 33,512; Compl. ¶ 162.  "[B]are acknowledgement is no substitute for reasoned consideration," *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024), and an agency cannot adopt sweeping rules with serious here-and-now consequences, while kicking the can on answering requests for guidance, *see Bloomberg L.P. v. SEC*, 45 F.4th 462, 476-77 (D.C. Cir. 2022).

*Fourth*, the Department "entirely fail[s] to consider [certain] important aspect[s] of the prob-lem" or address relevant evidence that "runs counter" to its cost-benefit determination. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Department sidesteps comments that the Final Rule endangers privacy and safety interests by ignoring safety-incident evidence entirely. *See* Compl. ¶¶ 168-70, 257. The Department rejects the view that the Final Rule will result in men "limit[ing] educational opportunities for girls and women," 89 Fed. Reg. at 33,808, by ignoring evidence that men identifying as women have already taken girls' awards, honors, and championships, *see* Compl. ¶ 172. The Department fails to consider evidence of the biological differences between men and women that have long justified sex-separated facilities, certain sex-separated classes, and sex-separated sports. *See* Compl. ¶ 13. And the Department downplays the grave compliance and safety challenges with structuring school operations based on notions of gender identity that are subjective, internal, and subject to change. Doc. # 1-3 at 9-12.

## II.   The States Face Irreparable Harm Absent Preliminary Relief.

Without immediate judicial intervention, the Final Rule will inflict irreparable harm on the States, their school systems, and their citizens.

*First*, the States would suffer the "irreparable harm of nonrecoverable compliance costs." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part)); *cf. Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-162-BJB, ---F. Supp. 3d----, 2024 WL 1402443, at *3 (W.D. Ky. Apr. 1, 2024) (noting such costs establish an injury for standing). Even the Department admits that the gender-identity mandate would require many schools to "updat[e] policies or training materials" and host trainings for employees and Title IX coordinators at substantial expense, among other compliance-related costs. 89 Fed. Reg. at 33,867, 33,876 (discussing 34 C.F.R. § 106.31(a)(2)). Plaintiffs' declarations confirm the Final Rule would

require State recipients to undertake significant and costly compliance activities to prepare for the August 1, 2024 effective date. *See, e.g.*, Thompson Decl., Ex. B ¶¶ 9-11; Mason Decl., Ex. C ¶ 7.[6] The Department's sovereign immunity guarantees that Plaintiffs could not later recover these sums.

*Second*, enforcement of the Final Rule threatens to strip the States and their Title IX recipients of several billion dollars in federal support—endangering important programs that serve attendees of the States' public schools, special schools, and higher education institutions. *See, e.g.*, Bryson Decl., Ex. A ¶¶ 3-5; Thompson Decl. ¶¶ 6-8; Gentile Decl., Ex. D ¶¶ 6-8.[7] The Final Rule makes clear that its gender-identity mandate and other provisions displace contrary state and school policies. 89 Fed. Reg. at 33,542. Because the States have policies that conflict with the Final Rule, they face Title IX funding losses should the Final Rule remain in place.

Title IX funds support significant educational programs in the States. Plaintiffs distribute state and federal funding to local education agencies, and some operate public schools or special schools directly. By way of example:

- The Tennessee Department of Education directly operates and provides federal funds to special schools and certain public schools; it also receives and distributes federal funds to all Tennessee K-12 public schools, which educate about 968,683 students. Thompson Decl. ¶¶ 3-5.

- The Kentucky Department of Education receives and distributes hundreds of millions of dollars in federal funds to public primary and secondary schools in Kentucky, which educate more than 700,000 students. Thacker Decl. ¶¶ 3, 7.

- Virginia operates a special school for the deaf and blind, and the State Department of Education administers the distribution of more than a billion in federal funds to all Virginia K-12 public schools, which educate about 1,261,962 students. Trice Decl. ¶ 3; Coons Decl. ¶¶ 3-5.

---

[6] *See also* Garrison Decl., Ex. H ¶¶ 11-12; Deuth Dec., Ex. G ¶ 13; Coons Decl., Ex. J ¶ 9; Trice Decl., Ex. K ¶ 7; Tucker Decl., Ex. N ¶ 9.

[7] *See also* Thacker Decl., Ex. F ¶¶ 6-10, 12; Blanton Decl., Ex. O ¶¶ 3-4; Deuth Dec. ¶ 6, 8-12; Garrison Decl. ¶¶ 6-9; Maul Decl., Ex. I ¶¶ 3-6; Coons Decl. ¶¶ 5-8; Edwards Decl., Ex. L ¶¶ 6-9; Purkey Decl., Ex. M ¶¶ 6-9; Tucker Decl. ¶¶ 5-8.

Title IX funds—which comprise substantial portions of Plaintiffs' state-education budgets—allow schools to fund professional school and service personnel positions, provide supplemental educational support and materials to students, offer non-academic support for students, support vulnerable student populations, provide professional learning opportunities for teachers, and offer student technology.[8] *See, e.g.*, Thompson Decl. ¶ 6; Coons Decl. ¶ 6; Purkey Decl. ¶¶ 7, 9.  Losing Title IX funds would require those schools to eliminate certain services or seek new funding for them.  *See, e.g.*, Thompson Decl. ¶¶ 7-8; Coons Decl. ¶¶ 7-8; Purkey Decl. ¶¶ 8-9.

The States also support postsecondary educational institutions that are Title IX recipients. Tennessee, for its part, currently has fifty-two public institutions of higher learning, including ten public universities, two special-purpose institutes, thirteen community colleges, and twenty-seven colleges of applied technology.  Gentile Decl. ¶ 3.  Public higher education institutions in Tennessee received an estimated $4.2 million in federal funds administered by the U.S. Department of Education in Fiscal Year 2022-23, subjecting them to Title IX.  Bryson Decl. ¶ 5; *see also* Compl. ¶¶ 200-04.  These institutions in Tennessee and those in other States use federal funds for many purposes, including student loans, research, veterans' affairs, and funding historically black colleges and universities.  *See, e.g.*, Gentile Decl. ¶ 7; Tucker Decl. ¶ 7.[9]  Losing their Title IX funds would require those institutions to eliminate educational services or seek new funding and might interrupt the educations of students with federal tuition support.  *See, e.g.*, Gentile Decl. ¶ 8; Garrison Decl. ¶ 9; *see also supra* note 9.

---

[8] For example, educational programs and activities funded through the Tennessee Department of Education received an estimated $1.5 billion in federal funds administered by the U.S. Department of Education in Fiscal Year 2022–23, making up approximately 17.6% of the Tennessee Department's budget.  Bryson Decl. ¶ 3; *see also, e.g.*, Compl. ¶ 198; Maul Decl. ¶¶ 3-6; Purkey Decl. ¶ 6.

[9] *See also* Compl. ¶ 205; Garrison Decl. ¶ 8; Edwards Decl. ¶¶ 8-9.

*Third*, the Final Rule derogates the States' "sovereign interests in enforcing duly enacted state laws." *Tennessee*, 615 F. Supp. 3d at 841; *see also Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) (describing this power as "[p]aramount among the States' retained sovereign powers"). And "any time a State is [prevented] from effectuating statutes enacted by representatives of its people," it suffers irreparable harm. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020); *see also Tennessee*, 615 F. Supp. 3d at 841 (collecting cases). Compliance with the Final Rule would prevent many Plaintiff States from enforcing their laws permitting sex separation in private spaces and sports, thus inflicting irreparable injury.[10] Similarly, the Final Rule's prohibition of harassment based on gender identity could coerce schools into noncompliance with the States' laws protecting student and faculty speech and requiring use of sex in school registration and activities. *See* Compl. ¶¶ 213-17. In light of the Biden Department's history of enforcing Title IX to prohibit so-called "misgendering" and other concepts contrary to Plaintiff States' laws, *see* Compl. ¶¶ 180, 213 & n.30, as well as the threat of private suit for Title IX violations, *see Davis*, 526 U.S. at 642-43, 650, the States "will . . . face substantial pressure" to disregard their own laws "in order to avoid material legal consequences." *Tennessee*, 615 F. Supp. 3d at 841; *cf. Davis*, 526 U.S. at 657-58 (Kennedy, J., dissenting) (making a similar prediction).

*Finally*, the Final Rule would force Plaintiff States' citizens to endure a variety of irremediable harms. To name just a few: Students of both sexes would experience violations of their bodily privacy by students of a different sex. *Cf. Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing that "most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating'" (citation

---

[10] *See* Compl. ¶¶ 206, 208-12; *see also e.g.*, Ky. Rev. Stat. § 158.189 (requiring local school boards to adopt policies that do "not allow students to use restrooms, locker rooms, or shower rooms that are reserved for students of a different biological sex"); Black Decl., Ex. E ¶¶ 3-15 & accompanying exhibits (similar); Mason Decl. ¶¶ 4-5; Ohio Rev. Code § 3313.5320(B) (similar as to sports).

omitted)) (collecting cases); *Grimm*, 972 F.3d at 633-34 (Niemeyer, J., dissenting) (collecting similar cases). The risk of "inappropriate sexual behavior" toward other students would be heightened. *Cf. Doe v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 464 (6th Cir. 2022); Doc. # 1-3 at 10-12. And elimination of female sports resulting from the Final Rule would cause female athletes to face unfair and unsafe competition. *See* Compl. ¶¶ 52-58, 133. Judicial relief would avert these harms.

## III. Preliminary Relief Will Not Harm the Department or the Public Interest.

For the reasons given, the States have a strong likelihood of success on the merits and confront substantial, imminent irreparable harm. The Department thus "faces a high hurdle" in establishing that the remaining two factors weigh against granting relief. *Biden*, 57 F.4th at 556. And the Department cannot clear it. Granting a stay would serve the public interest by ensuring that the States may continue to enforce their laws protecting privacy, safety, and student and faculty speech without risking the loss of Title IX funding. Moreover, granting a stay will merely preserve the status quo pending review. And the Department cannot credibly claim that time is of the essence, after taking nearly two years to complete this rulemaking and some fifty years to reach the novel conclusion that Title IX's prohibition of discrimination based on "sex" refers to something completely different than sex.

Conversely, "the public's true interest lies in the correct application of the law," including Title IX. *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). "Enforcing the Spending Clause's limitations" also serves the public interest by "help[ing] preserve state sovereignty and the [Framers'] 'two-government system.'" *West Virginia v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1149 (11th Cir. 2023) (citation omitted). Thus, far from harming the public interest, granting preliminary relief would promote it.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff States' motion for a stay under 5 U.S.C. § 705 and a preliminary injunction.

Dated: May 3, 2024

RESPECTFULLY submitted,

**RUSSELL COLEMAN**
  Attorney General

*/s/ Lindsey R. Keiser*
JUSTIN D. CLARK
  Civil Chief
VICTOR B. MADDOX
  Counsel for Special Litigation
LINDSEY R. KEISER
  Assistant Attorney General
**Kentucky Office of the Attorney General**
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
victor.maddox@ky.gov
justind.clark@ky.gov
lindsey.keiser@ky.gov

*Counsel for the Commonwealth of Kentucky*

Respectfully submitted,

**JONATHAN SKRMETTI**
  Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE*
  Solicitor General
WHITNEY D. HERMANDORFER*
  Director of Strategic Litigation
STEVEN J. GRIFFIN*
  Senior Counsel for Strategic Litigation &
Assistant Solicitor General
VIRGINIA N. ADAMSON*
  Counsel for Strategic Litigation &
Assistant Solicitor General
BRIAN DANIEL MOUNCE*
  Counsel for Strategic Litigation &
Assistant Solicitor General
**Office of the Tennessee Attorney General**
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3491
matt.rice@ag.tn.gov
whitney.hermandorfer@ag.tn.gov
steven.griffin@ag.tn.gov
jenna.adamson@ag.tn.gov
brian.mounce@ag.tn.gov

*Counsel for the State of Tennessee*

26

**THEODORE E. ROKITA**
  Attorney General

*/s/ James A. Barta*
JAMES A. BARTA*
  Solicitor General
CORRINE L. YOUNGS*
  Policy Director and Legislative Counsel
JOSHUA DAVID*
  Deputy Attorney General - Policy
**Indiana Attorney General's Office**
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov
corrine.youngs@atg.in.gov
joshua.david@atg.in.gov

*Counsel for the State of Indiana*

**DAVE YOST**
  Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
  Solicitor General
MATHURA SRIDHARAN*
  Deputy Solicitor General
**Office of the Ohio Attorney General**
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

**JASON S. MIYARES**
  Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER*
  Principal Deputy Solicitor General
BRENDAN T. CHESTNUT*
  Deputy Solicitor General
**Virginia Attorney General's Office**
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**PATRICK MORRISEY**
  Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS*
  Principal Deputy Solicitor General
**Office of the West Virginia Attorney General**
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

27

## CERTIFICATE OF SERVICE

I certify that on May 3, 2024, the above document was filed with the CM/ECF filing system and sent via regular U.S. mail, postage prepaid, to:

**Miguel Cardona**
United States Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

**United States Department of Education**
400 Maryland Avenue SW
Washington, D.C. 20202

*/s/ Lindsey R. Keiser*
Lindsey R. Keiser