# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

| | |
|---|---|
| **State of Tennessee**; **Commonwealth of Kentucky**; **State of Ohio**; **State of Indiana**; **Commonwealth of Virginia**; and **State of West Virginia**, | |
| *Plaintiffs,* | |
| *and* | **Case No. 2:24-cv-00072-DLB-CJS** |
| **Christian Educators Association International**; **A.C.**, by her next friend and mother, Abigail Cross, | |
| *Proposed Intervenor-Plaintiffs,* | |
| v. | |
| **Miguel Cardona**, in his official capacity as Secretary of Education; and **United States Department of Education**, | |
| *Defendants* | |

# INTERVENOR-PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 3

    I.    The Department redefines "sex" throughout Title IX ............................. 3

    II.   Christian Educators is an organization that supports members who serve in public schools. ............................................................................ 5

    III.  A.C. is a talented high schooler and female athlete. ............................. 7

Argument ........................................................................................................................ 9

    I.    Intervenors satisfy the requirements to intervene as of right. .............. 9

        A.    Intervenors' motion is timely. ..................................................... 10

        B.    Intervenors have substantial and legally protectable interests in expression, sex-specific spaces, privacy, and sports. ............. 10

            1. The rules threaten Christian Educators' rights to free speechand religious exercise. ...................................................... 11

            2. The rules invade privacy and raise safety concerns in sensitive areas designated by sex. ............................................... 13

            3. The rules eliminate A.C.'s interest in participating in fair competition against other girls. ................................................. 15

        C.    Intervenors' interests will be impaired by this litigation. ......... 16

        D.    Intervenors' interests are not adequately represented by Plaintiff States because they will raise different arguments about expression, sex-specific spaces, privacy, and sports. ....... 19

    II.   Intervenors also satisfy the requirements for permissive intervention. ........................................................................................ 24

Conclusion ..................................................................................................................... 25

Certificate of Service ................................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Adams ex rel. Kasper v. School Board of St. Johns County*,
   57 F.4th 791 (11th Cir. 2022) .................................................................. 13, 22

*Americans United for Separation of Church & State v. City of Grand Rapids*,
   922 F.2d 303 (6th Cir. 1990) ......................................................................... 17

*B.P.J. by Jackson v. West Virginia State Board of Education*,
   No. 23-1078, 23-1130, 2024 WL 1627008 (4th Cir. Apr. 16, 2024) .............. 8, 9

*B.P.J. v. West Virginia State Board of Education*,
   550 F. Supp. 3d 347 (S.D.W. Va. 2021) ............................................................ 8

*B.P.J. v. West Virginia State Board of Education*,
   No. 2:21-CV-00316, 2021 WL 5711547 (S.D.W. Va. Dec. 1, 2021) ................. 24

*Balow v. Michigan State University*,
   24 F.4th 1051 (6th Cir. 2022) .................................................................. 15, 16

*Board of Education of the Highland Local School District v. United States
   Department of Education*,
   No. 2:16-CV-524, 2016 WL 4269080 (S.D. Ohio Aug. 15, 2016)............... 13, 24

*Berger v. North Carolina State Conference of the NAACP*,
   597 U.S. 179 (2022) ....................................................................................... 19

*Blount-Hill v. Zelman*,
   636 F.3d 278 (6th Cir. 2011) .......................................................................... 10

*Brannum v. Overton County School Board*,
   516 F.3d 489 (6th Cir. 2008) .................................................................... 13, 21

*Buck v. Gordon*,
   959 F.3d 219 (6th Cir. 2020) .......................................................................... 24

*Canedy v. Boardman*,
   16 F.3d 183 (7th Cir. 1994) ............................................................................ 21

*Clark v. Arizona Interscholastic Association*,
   695 F.2d 1126 (9th Cir. 1982) ........................................................................ 15

*Cohen v. Brown University*,
   991 F.2d 888 (1st Cir. 1993) ........................................................................... 15

*D.H. by A.H. v. Williamson County Board of Education,*
    638 F. Supp. 3d 821 (M.D. Tenn. 2022) ........................................................... 14

*Doe No. 1 v. Bethel Local School District Board of Education,*
    No. 3:22-cv-337, 2023 WL 348272 (S.D. Ohio Jan. 20, 2023) .................. 13, 24

*Doe v. Luzerne County,*
    660 F.3d 169 (3d Cir. 2011) ............................................................................ 13

*Grimm v. Gloucester County School Board,*
    972 F.3d 586 (4th Cir. 2020) ........................................................................... 14

*Grubbs v. Norris,*
    870 F.2d 343 (6th Cir. 1989) ..................................................................... 19, 24

*Grutter v. Bollinger,*
    188 F.3d 394 (6th Cir. 1999) ..................................................................*passim*

*Hatton v. County Board of Education of Maury County,*
    422 F.2d 457 (6th Cir. 1970) ........................................................................... 11

*Hecox v. Little,*
    479 F. Supp. 3d 930 (D. Idaho 2020) ........................................... 16, 18, 19, 23

*Horner v. Kentucky High School Athletic Association,*
    43 F.3d 265 (6th Cir. 1994) ............................................................................. 16

*Kelley v. Board of Trustors,*
    35 F.3d 265 (7th Cir. 1994) ............................................................................. 15

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) ........................................................................... 20

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ................................................................................... 20, 21

*L.M. v. Town of Middleborough,*
    667 F. Supp. 3d 29 (D. Mass. 2023) ....................................................... 3, 4, 12

*League of Women Voters of Michigan v. Johnson,*
    902 F.3d 572 (6th Cir. 2018) ..................................................................... 24, 25

*Marquez-Warner v. Campus Crest at Louisville, LLC,*
    No. 3:15-CV-172-DJH-CHL, 2018 WL 11446385 (W.D. Ky.
    Apr. 6, 2018) ................................................................................................... 10

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
    370 F.3d 275 (2d Cir. 2004) ............................................................... 22

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ............................................................. 11

*Meriwether v. Trustees of Shawnee State University,*
    No. 1:18-cv-753, 2019 WL 2052110 (S.D. Ohio May 9, 2019)............. 11, 21, 24

*Michigan State AFL-CIO v. Miller,*
    103 F.3d 1240 (6th Cir. 1997) ..................................................... 16, 17

*Purnell v. Akron,*
    925 F.2d 941 (6th Cir. 1991) ......................................................... 9, 11

*Sisters for Life, Inc. v. Louisville-Jefferson County,*
    56 F.4th 400 (6th Cir. 2022) ............................................................. 17

*Students & Parents for Privacy v. United States Department of Education,*
    No. 16-CV-4945, 2016 WL 3269001 (N.D. Ill. June 15, 2016)........................ 24

*Stupak-Thrall v. Glickman,*
    226 F.3d 467 (6th Cir. 2000) ............................................................. 10

*Tennessee v. United States Department of Education,*
    615 F. Supp. 3d 807 (E.D. Tenn. 2022) ........................................... 4

*Trbovich v. United Mine Workers of America,*
    404 U.S. 528 (1972) ............................................................................ 19

*United States v. City of Detroit,*
    712 F.3d 925 (6th Cir. 2013) ............................................................. 10

*Virginia v. American Booksellers Association, Inc.,*
    484 U.S. 383 (1988) ............................................................................ 13

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943) ............................................................................ 11

*Williams v. School District of Bethlehem,*
    998 F.2d 168 (3d Cir. 1993) ............................................................. 15

*Wineries of the Old Mission Peninsula Association v. Township of Peninsula,*
    41 F.4th 767 (6th Cir. 2022) ...............................................................*passim*

*Wood v. Florida Department of Education,*
    No. 4:23-cv-526-MW/MAF, 2024 WL 1536749 (N.D. Fla. Apr. 9, 2024) ........ 20

## Statutes, Rules and Regulations

20 U.S.C. § 1681 ................................................................................................ 1, 22

20 U.S.C. § 1687 (1988) ......................................................................................... 23

34 C.F.R. § 106.2 ............................................................................................... 3, 12

34 C.F.R. § 106.6 .................................................................................................... 3

34 C.F.R. § 106.8 .................................................................................................... 3

34 C.F.R. § 106.10 ............................................................................................... 3, 4

34 C.F.R. § 106.11 .................................................................................................. 3

34 C.F.R. § 106.31 ............................................................................................... 3, 4

34 C.F.R. § 106.41 ............................................................................................... 4, 5

Fed. R. Civ. P. 24 ............................................................................................... 9, 24

K.R.S. § 158.189 ............................................................................................ 6, 7, 14

K.R.S. § 158.191 ............................................................................................... 11, 12

T.C.A. § 49-2-802 ................................................................................................ 14

T.C.A. § 49-2-803 ......................................................................................... 7, 14, 18

T.C.A. § 49-2-805 ................................................................................................ 18

T.C.A. § 49-6-5102 ....................................................................................... 6, 11, 12

W. Va. Code § 18-2-25d ................................................................................ 7, 8, 15, 18

## Other Authorities

Brief for the United States as Amicus Curiae, *B.P.J. v. West Virginia State Board of Education*, Nos. 23-1078, 23-1130 (4th Cir. April 4, 2023) ............... 5

*Confronting Anti-LGBTQI+ Harassment in Schools* (Fact Sheet) (June 2021) .......... 4

Education Amendments of 1974, Public Law 93-380, 88 Stat. 484 (1974) ............... 22

Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunit*y, 14 Marq. Sports L. Rev. 11 (2003) ................................................................. 23

Memorandum Opinion & Order, *Tennessee v. United States Department of Education*,
No. 3:21-cv-308 (E.D. Tenn. Sept. 14, 2022) ............................................. 24, 25

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (April 29, 2024)..................................................................................... 3, 4, 5, 12

Office for Civil Rights, *Letter from Peter Holmes to Chief State School Officers*, Title IX Obligations in Athletics (Nov. 11, 1975) ............................. 23

Statement of Interest of the United States, *B.P.J. v. West Virginia State Board of Education*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021) .............. 5

Text Order Granting Motion to Intervene, *Soule v. Connecticut Association of Schools, Inc.*, No. 3:20-cv-00201 (RNC) (D. Conn. April 22, 2020)................. 16

Webster's Seventh New Collegiate Dictionary New International Dictionary (1966) .................................................................................................... 2

## INTRODUCTION

Congress passed Title IX of the Education Amendments to promote students' equal access to educational programs. The law prohibits "any education program or activity receiving Federal financial assistance" from discriminating "on the basis of sex." 20 U.S.C. § 1681(a). And for more than fifty years, "sex" meant male and female. During that time, Title IX thoroughly elevated and particularly empowered women. Women now enroll in college more often than men. Women enjoy safe access to intimate spaces reserved for them. And women participate in sports at record levels. Title IX contributed to this remarkable progress.

But this progress is now in question. On April 29, 2024, the United States Department of Education (Department) published new final regulations redefining "sex" in Title IX to include "gender identity." This change will revolutionize how Title IX works and will harm the very population Title IX was meant to protect— students, teachers, parents, and especially young girls.

Intervenor-Plaintiff A.C. knows what this harm looks and feels like. Now a high school freshman, last year A.C. competed in track and field at a public middle school against B.P.J., a male classmate who identifies as female. B.P.J. repeatedly beat A.C. in meets and took away A.C.'s spot to compete in a conference championship. A.C. even had to change in the girls' locker room with B.P.J. while enduring B.P.J.'s vulgar, sexual comments. West Virginia has a state law designating sports for males and females, and this law could protect A.C. from males accessing her sports teams and her locker room. But the new Title IX rules put that state law in doubt and now require that B.P.J. and other males be given access to female sports teams and locker rooms.

Intervenor-Plaintiff Christian Educators Association International is also harmed by the new rules. It is an association of Christian teachers who serve, teach,

and mentor students in every state in the country, including in Plaintiff States. Its members have been free to teach without violating their religious beliefs about gender identity. But the rules threaten that freedom by lowering the standard for harassment and intruding on their ability to speak freely about gender ideology. Meanwhile, Tennessee and Kentucky laws protect these members' right to speak consistently with their beliefs and use pronouns that truthfully reflect people's biology. Tennessee and Kentucky laws also ensure access to sex-specific restrooms so these members can work and teach without losing their privacy. But the new rules will preempt all these laws, depriving Christian Educators members of their current protection.

A.C. and Christian Educators (Intervenors) ask to intervene by right or by permission under Federal Rule of Civil Procedure 24. They meet all the requirements to do so. First, their request to intervene is timely, submitted just a few days after the States filed their lawsuit. Second, Intervenors have a strong interest to defend state laws and school policies that protect them. Their constitutional and statutory rights are also at stake. Third, they will advance arguments that States cannot and will not—they will advocate for limits on state power. And finally, Intervenors can provide important perspectives missing from this case. Students, teachers, and female athletes experience the on-the-ground harms inflicted by the Department's rewrite of Title IX. Intervenors also raise common questions of law and fact and their intervention will not cause undue delay or prejudice.

Redefining "sex" won't just affect state funding and preempt state laws. It means young girls will be forced to undress in front of boys in gym class, teenage girls will share bedrooms with teenage boys on overnight school trips, teachers and students will refrain from speaking about gender identity, and girls will fall behind in sports again. This Court deserves to hear from those most acutely affected by the Department's attempt to recast Title IX.

## BACKGROUND

## I.     The Department redefines "sex" throughout Title IX.

The new rules redefine "sex" throughout Title IX. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (April 29, 2024), https://bit.ly/3WijcNn. Now, "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes … and gender identity." 89 Fed. Reg. at 33886 (34 C.F.R. § 106.10). The Department intentionally declined to define "gender identity," but understands the phrase "to describe an individual's sense of their gender." 89 Fed. Reg. at 33809. The new rules prohibit funding recipients from discriminating "on the basis of sex"—redefined to include gender identity—in "program[s] or activit[ies]." *Id.* at 33887 (34 C.F.R. § 106.31(a)(1)). The rules preempt conflicting state or local laws. *Id.* at 33885 (34 C.F.R. § 106.6(b)). The rules go into force on August 1, 2024. *Id.* at 33474. And the rules affect the Intervenors in three primary ways.

*First*, the rules adopt broad language that penalizes "a hostile environment" as "sex-based harassment." *Id.* at 33884 (34 C.F.R. § 106.2(2) (defining "sex-based harassment")). "Sex-based harassment" includes speech and nonverbal conduct that "is subjectively and objectively offensive" and "severe *or* pervasive." *Id.* Title IX recipients must address these hostile environments even when the alleged harassment "occurred outside the recipient's education program or activity or outside the United States." *Id.* at 33886 (34 C.F.R. § 106.11). Schools must rewrite their policies and train their staff on this new definition—and the other new regulatory features created by the rules. *Id.* at 33885 (34 C.F.R. § 106.8(b), (d)).

A hostile environment can occur in many circumstances. Proposed Plaintiff-Intervenors' Complaint (Proposed Compl.) ¶¶ 210–22, 259–80. It can follow from "a single serious incident" or speech "online." 89 Fed. Reg. at 33500, 33515. It can result from expressing beliefs about gender identity, including the view that there

are only two genders. *Id.* at 33504 (relying on *L.M. v. Town of Middleborough*, 667 F. Supp. 3d 29, 40 (D. Mass. 2023)). And it can stem from using a student's pronoun consistent with their sex, but not their gender identity. *Id.* (collecting cases); *id.* at 33516; *Confronting Anti-LGBTQI+ Harassment in Schools* (Fact Sheet) (June 2021), https://bit.ly/3UGA3Z1.[1] The Department suggests that even if the rules stifle freedom of speech or religion, they would still pass strict scrutiny—a suggestion giving the Department carte blanche to limit these freedoms. 89 Fed. Reg. 33503.

*Second*, the rules prohibit schools from separating "bathrooms or locker rooms" based on sex "when it denies a transgender student access to a sex-separate facility … consistent with that student's gender identity." 89 Fed. Reg. 33818; *id.* ("[A] recipient must provide access to sex-separate facilities, including bathrooms, in a manner that does not cause more than de minimis harm"); *id.* at 33819 (alleging "substantial harm transgender students experience when they are excluded from a sex-separate facility" like a bathroom or locker room). A regulation implements this policy. 89 Fed. Reg. at 33887 (34 C.F.R. § 106.31(a)(2)).

*Third*, the rules govern athletics. To be sure, the rules seek to set sports aside, *id.* (excluding 34 C.F.R. § 106.41(b)), and the Department suggests that it will issue separate regulations "related to sex-related eligibility criteria for male and female athletic teams," *id.* at 33839. But the rules do not leave sports untouched.

The rules broadly prohibit Title IX recipients from discriminating "on the basis of sex"—i.e., "gender identity." *Id.* at 33886 (34 C.F.R. § 106.10). While the rules purport to exempt sports from section 106.41(b), they do not exempt sports from section 106.41(a). *Id.* at 33887 (34 C.F.R. § 106.31(a)(2)). Yet section 106.41(a)

---

[1] A court enjoined the Fact Sheet as to some of the States. *See Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022). But the Department's interpretation of Title IX as requiring pronoun usage based on a person's gender identity was not. For that reason, the Fact Sheet reveals the Department's understanding of Title IX and the rules reinforce that interpretation.

prohibits discrimination "on the basis of sex … in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient." 34 C.F.R. § 106.41(a). So the rules facially forbid gender-identity discrimination in athletics.

That result reflects the Department's comments throughout the rules' preamble. The Department notes that Title IX is a "broad prohibition" that covers contexts "even if Congress did not specify those contexts when the law was passed." 89 Fed. Reg. at 33801. The Department explains that practically anyone can file Title IX complaints "including a spectator at a recipient's sports game," *id.* at 33656, and that bans on some "sex" discrimination extends to sports, *id.* at 33784 ("This prohibition [related to pregnancy] extends to athletic … opportunities"). The preamble notes that the Department believes that "a categorical ban on transgender students playing sports consistent with their gender identity" violates Title IX. *Id.* at 33817. The upshot is that schools may have separate boys' and girls' teams, but must let a male onto the girls' team if he identifies himself as a girl.

And finally, the rules' coverage of athletics matches how the Department officially interprets Title IX and its regulations. The Department's 2022 Fact Sheet used discrimination in sports as a prototypical example of a Title IX violation. Fact Sheet (discussing a cheerleading team). And the Department has argued twice that Title IX—including 34 C.F.R. § 106.41(a), which still applies to sports—may not categorically designate sports by sex. Br. for the United States as Amicus Curiae at 24–27, *B.P.J. v. W. Va. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. April 4, 2023); Statement of Interest of the United States at 1, 6–7, *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D.W. Va. June 17, 2021), ECF No. 42.

## II. Christian Educators is an organization that supports members who serve in public schools.

Christian Educators is a membership organization comprised of Christians in the teaching profession. Proposed Compl. ¶¶ 11, 127; *see generally* Proposed Compl.

Ex. C (providing more details about the organization and its members). It has members in every state, including Tennessee and Kentucky. Proposed Compl. ¶¶ 11, 125–30. Members sign a statement of faith. *Id*. at ¶ 131. Christian Educators equips its members to serve in schools consistent with their Christian beliefs. *Id*. at ¶¶ 131–33. The organization has increasingly helped its members navigate gender-identity issues in school settings without compromising these beliefs. *Id*. at ¶¶ 133–41. Many members are concerned about how the rules will affect their freedom of speech, their beliefs, their privacy, and students generally. *Id*. at ¶¶ 142–68.

At least five members live and teach at Tennessee public schools regulated by Title IX. Proposed Compl. ¶ 143. Their faith is central to who they are and informs their worldview. *Id*. at ¶¶ 144–49. They believe that God designed humans as either male or female; a biological reality that cannot be changed or chosen. *Id*. When asked and when appropriate, these members have expressed their religious beliefs to students and teachers. *Id*. at ¶¶ 144–49, 159–64.

In the past, several students have asked some of these members to refer to them using pronouns inconsistent with their sex. *Id*. at ¶¶ 157–58. Because doing so would have violated the members' religious beliefs, they did not use the requested pronoun. *See* Proposed Compl. Ex. D, ¶¶ 18–24; Proposed Compl. Ex. E ¶¶ 15–24; Proposed Compl. Ex. F ¶¶ 21–29; Proposed Compl. Ex. G ¶¶ 13–16; Proposed Compl. Ex. H ¶¶ 12–21. Tennessee and Kentucky law currently protect that choice. T.C.A. § 49-6-5102; K.R.S. § 158.191(5)(c). Meanwhile, some members' school's policies adopt a different standard for sexual harassment that protects against such harassment while preserving their freedom of expression. *E.g.*, Ex. F ¶ 29; Ex. H ¶ 22. These members have an interest in keeping those policies, but the rules will preempt them.

When the rules go into effect several members will no longer speak openly about their beliefs on gender identity if asked. Proposed Compl. ¶¶ 162–65. They

also fear having to report themselves for using students' pronouns consistent with their sex. *See* Ex. D ¶¶ 35–43; Ex. F ¶¶ 48–53; Ex. G ¶ 22; Ex. H ¶¶ 35–38.

Tennessee and Kentucky laws also currently ensure that these members have access to bathrooms separated by sex—Tennessee by plain text and Kentucky by consequence of requiring school boards to divide restrooms for use by "biological sex." T.C.A. § 49-2-803; K.R.S. § 158.189(3). Some members in Tennessee use the same restrooms as students of the same sex. Ex. D ¶¶ 28–32; Ex. H ¶¶ 39–45. Those restrooms have urinals, flimsy walls between toilets, and other open spaces. Ex. D ¶¶ 28–32. These members have serious privacy concerns about sharing restrooms with opposite-sex students when the rules take effect. *Id.*;  Ex. H ¶¶ 39–45.

### III.    A.C. is a talented high schooler and female athlete.

A.C. is a female athlete at a public high school in West Virginia. Proposed Compl. Ex. A ¶ 2. Sports have played an important role in her life since she was little. *Id.* at ¶¶ 3–6. In middle school and now into high school, A.C. has also participated on the girls' track and field team. *Id.* This season—her freshman year in high school—she competed in discus, pole vault, and shot put. *Id.* at ¶ 2. She intends to continue with track and field throughout high school. *Id.*

For a time, A.C. benefitted from West Virginia's Save Women's Sports Act. W. Va. Code, § 18-2-25d. That law passed in 2021 and ensures that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based on competitive skill or the activity involved is a contact sport." *Id.* at § 18-2-25d(c)(2). "[M]ale" means "an individual whose biological sex determined at birth is male." *Id.* at § 18-2-25d(b)(3). The law likewise protects A.C.'s right to access women's-only locker rooms because it requires schools to designate "athletic teams or sports"—of which locker rooms are a vital part—by sex and because it gives a cause of action to any student "who is

deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a violation of this chapter." *Id.* at § 18-2-25d. Under the cover of that law, A.C. has been and generally still is free to enjoy fair competition against her female peers and to access sensitive spaces usually restricted to members of her sex.

With one exception. When she was in middle school, A.C. often competed against another student, B.P.J.—a biological male who identifies as a female. Ex. A ¶¶ 7–35. Throughout the spring 2023 season, B.P.J. regularly beat A.C. in the shot put and discus. *Id.* That culminated in April 2023, when B.P.J. deprived A.C. of the opportunity to compete in the conference championship. *Id.* at ¶¶ 19–24. Even though B.P.J. was almost two years younger than A.C., B.P.J.'s personal best in the shot put and discus were significantly better than A.C.'s. *Id.* at ¶¶ 7, 12–19. So A.C. dropped from third place on the team to fourth place and became ineligible to compete in that meet—a meet she had been diligently working towards all season. *Id.* That experience was "extremely frustrating" and "discourag[ing]," making A.C. feel "unheard and unseen." *Id.* at ¶¶ 23, 28.

A.C. has not competed against B.P.J. this year because B.P.J. is now in eighth grade while A.C. is in high school. *Id.* at ¶ 35. But B.P.J. will move up to A.C.'s high school next year. *Id.* at ¶ 65. A.C. expects to be on the same team with B.P.J. again at that time. *Id.*

B.P.J. competed against A.C. because B.P.J. obtained an injunction against West Virginia's Save Women's Sports Act soon after it passed. *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 358 (S.D.W. Va. 2021). But the injunction only applied to B.P.J.—hence A.C. didn't have to compete against other boys. *Id.* The Fourth Circuit later ruled in B.P.J.'s favor based on its incorrect interpretation of Title IX. *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, No. 23-1078, 23-1130, 2024 WL 1627008, at *11–13 (4th Cir. Apr. 16, 2024). But that holding was again limited to B.P.J. *Id.* at *13. The court did "not hold that Title IX requires schools to allow

8

every transgender girl to play on girls teams." *Id.* at *13. Even so, B.P.J. alone has displaced nearly three hundred other female athletes. Proposed Compl. ¶¶ 81–82.

A.C. had other alarming interactions with B.P.J. Because B.P.J. participated on the girls' track and field team, B.P.J. changed clothes with the team—including A.C.—before practice in the girls' locker room and bathroom. Ex. A ¶¶ 40–50. A.C. felt uncomfortable changing in front of B.P.J., so she would retreat to the bathroom stalls. *Id.* at ¶¶ 40–43. B.P.J. often made "inappropriate sexual comments" that made A.C. feel "annoy[ed]," "embarrassed," and sometimes "threaten[ed]"—like when B.P.J. threatened sexual acts against A.C. *Id.* at ¶¶ 51, 53–56. B.P.J. made similar comments to A.C. in the girls' locker room. *Id.* at ¶ 57. Next year, when they are both in high school, A.C. expects to interact with B.P.J. even more often as they participate in activities like band and track and field. *Id.* at ¶¶ 44–50, 63–69.

## ARGUMENT

Federal Rule of Civil Procedure 24 authorizes intervention by right and by permission. The Sixth Circuit construes Rule 24 "broadly … in favor of potential intervenors." *Purnell v. Akron*, 925 F.2d 941, 950 (6th Cir. 1991). The Intervenors should be granted (I) intervention as of right or (II) intervention by permission.

## I.   Intervenors satisfy the requirements to intervene as of right.

The Sixth Circuit uses four factors to evaluate intervention requests: (1) timeliness; (2) the intervenors' "substantial legal interest" in the case; (3) impairment of that interest absent intervention; and (4) the parties' ability to adequately represent that interest. *Grutter v. Bollinger*, 188 F.3d 394, 397–98 (6th Cir. 1999). To that end, Rule 24(a)'s "general theme" is that the "burden is minimal." *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula* (*Wineries*), 41 F.4th 767, 774 (6th Cir. 2022) (cleaned up). Intervenors easily clear each minimal hurdle.

### A.    Intervenors' motion is timely.

Intervenors' motion is timely. Timeliness breaks down into five sub-divisions: (1) litigation stage; (2) how long the intervenor knew about her interest in the case; (3) intervention's purpose; (4) prejudice to the original parties; and (5) any unusual circumstances. *Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011). Each factor is context-specific, not determinative. *Id*. Intervenors meet them.

For factors one and two, Intervenors filed this motion a few days after the States filed their complaint. Courts grant intervention motions filed much later. *E.g.*, *Marquez-Warner v. Campus Crest at Louisville, LLC*, No. 3:15-CV-172-DJH-CHL, 2018 WL 11446385, at *1 (W.D. Ky. Apr. 6, 2018) (three years). What's more, besides the complaint filing, no other "significant steps" of "litigation" have "occurred." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000). Defendants have not filed an answer. There are no scheduling orders, interlocutory orders, or discovery. Intervenors could hardly have acted any earlier.

For the remaining factors, Intervenors seek to intervene for legitimate reasons—protecting their free speech, religious liberty, privacy, and equal athletic opportunities. Intervenors are uniquely suited to protect those interests. *Infra* § I.D.

Adding Intervenors causes no prejudice. Prejudice here refers to prejudice from delay, not from intervention itself. *See U.S. v. City of Detroit*, 712 F.3d 925, 933 (6th Cir. 2013). Intervenors will not slow anything down because the States only filed this case this week. Intervenors have attached their complaint to this motion and filed it contemporaneously. And no unusual factors exist to prevent intervention. Intervenors' motion is timely.

### B.    Intervenors have substantial and legally protectable interests in expression, sex-specific spaces, privacy, and sports.

Intervenors also have "a substantial interest in the subject matter of this litigation." *Grutter*, 188 F.3d at 398. Substantial interest is "a rather expansive

notion." *Wineries*, 41 F.4th at 771 (cleaned up). It is "construed liberally." *Hatton v. Cnty. Bd. of Educ. of Maury Cnty.*, 422 F.2d 457, 461 (6th Cir. 1970). And it is especially lenient compared to Article III standing. *See Purnell*, 925 F.2d at 948 ("[A] party seeking to intervene need not possess the standing necessary to initiate a lawsuit."). Intervenors' interests run to (1) freedom of speech and religion for Christian Educators members; (2) privacy and safety in sensitive areas like bathrooms and locker rooms; and (3) fair and safe competition in sports for A.C.

### 1.   The rules threaten Christian Educators' rights to free speech and religious exercise.

Christian Educators members undoubtedly have a substantial interest in their freedom to speak consistently with their religious beliefs, inside and outside the classroom. State law on pronoun usage currently protects that interest. *See* T.C.A. § 49-6-5102; K.R.S. § 158.191(5)(c). But that interest is more broadly protected by the First Amendment. *See, e.g.*, *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 634 (1943); *Meriwether v. Hartop*, 992 F.3d 492, 508–11 (6th Cir. 2021). The new rules threaten that interest. That warrants intervention.

Courts commonly find that proposed intervenors have a substantial interest in upholding policies or rules that benefit them. For example, in *Grutter v. Bollinger*, the Sixth Circuit held that minority students who benefitted from an affirmative-action program could intervene in a lawsuit challenging that program. 188 F. 3d at 398–99. The lawsuit placed their specific interest—"gaining admission to the University"—at risk because "an adverse ruling in the underlying case" could have "impaired" that interest. *Id.* Likewise, a student who identified as transgender and a student organization intervened as of right in a case that addressed a university's pronoun policy because the case's outcome affected their interests in upholding the policy. *See Meriwether v. Trustees of Shawnee State Univ.* (*Meriwether I*), No. 1:18-cv-753, 2019 WL 2052110, at *9 (S.D. Ohio May 9, 2019).

So too here. Christian Educators members have religious objections to referring to a student or teacher with pronouns inconsistent with their sex. *E.g.*, Proposed Compl. ¶¶ 146–49, 154–58; Ex. D ¶¶ 18–24; Ex. E ¶¶ 15–24; Ex. F ¶¶ 21–29; Ex. G ¶¶ 13–16; Ex. H ¶¶ 12–21. Tennessee and Kentucky law currently protects members in those states from doing that. T.C.A. § 49-6-5102; K.R.S. § 158.191. But the rules jeopardize Tennessee's and Kentucky's laws and threaten to deprive Christian Educators' members of the benefit of those laws. That's because the Department claims that using a student's or a teacher's pronouns based on sex violates Title IX if that usage differs from the student's or teacher's gender identity. 89 Fed. Reg. at 33516; Fact Sheet. But using pronouns inconsistent with a student's sex would force members of Christian Educators to speak contrary to their religious beliefs on gender identity. So that compelled speech would violate their freedoms under the First Amendment and the Religious Freedom Restoration Act (RFRA). Proposed Compl. ¶¶ 316–22.

The rules also extend beyond pronouns. By adopting a panoramic definition of "sex-based harassment," the rules capture constitutionally protected speech about gender identity that members would like to express. *See* 89 Fed. Reg. at 33884 (34 C.F.R. § 106.2(2)). For example, Christian Educators members hope to share their religious beliefs about gender identity with students and faculty when asked. *E.g.*, Proposed Compl. ¶¶ 144–65; Ex. D ¶¶ 35–43; Ex. E ¶¶ 25–36; Ex. G ¶¶ 17–21; Ex. H ¶¶ 23–32. But the rules seemingly prohibit those discussions. 89 Fed. Reg. at 33500, 33515; *id.* at 33504 (prohibiting certain views on gender identity by referencing *L.M.*, 667 F. Supp. 3d at 40). Meanwhile, some of the members teach in schools that follow harassment policies that are compatible with the First Amendment. *E.g.*, Ex. F ¶ 29; Ex. H ¶ 22. The regulations deprive members of those policies' protection. To avoid triggering a Title IX complaint, some members will

chill their speech on this topic when the rules take effect rather than risk penalties. *E.g.*, Ex. D ¶¶ 35–43; Ex. E ¶ 36; Ex. F ¶¶ 30–53; Ex. G ¶¶ 22–23; Ex. H ¶¶ 48–50.

This kind of "self-censorship" is the exact "harm" the First Amendment protects against. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). These members—and others like them—have an overwhelming interest in their freedom to continue to express their views on gender identity consistent with their beliefs without the threat of punishment.

### 2. The rules invade privacy and raise safety concerns in sensitive areas designated by sex.

Intervenors also have an interest in protecting their privacy and safety in bathrooms, locker rooms, and other sensitive areas distinguished by sex. Courts in this circuit regularly find substantial interests in inverse circumstances—i.e., when persons who identify as transgender seek access to spaces set aside for members of the opposite sex. *See Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. Of Educ.* (*Bethel*), No. 3:22-cv-337, 2023 WL 348272, at *2 (S.D. Ohio Jan. 20, 2023); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.* (*Highland*), No. 2:16-CV-524, 2016 WL 4269080, at *2–4 (S.D. Ohio Aug. 15, 2016). Similarly, Intervenors have a constitutional right to bodily privacy, which forbids the government from placing them in situations where they will risk exposing their unclothed or partially clothed bodies "to viewing by the opposite sex." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *accord Doe v. Luzerne Cnty.*, 660 F.3d 169, 175–76 n.5 (3d Cir. 2011) (noting a Fourteenth Amendment right to bodily privacy from persons of the opposite sex); *Adams ex. rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 805 (11th Cir. 2022) (collecting cases).

A.C. has already suffered harms associated with being forced to change in the same intimate space as a male. Ex. A ¶¶ 40–50. She felt "uncomfortable" changing in front of B.P.J., so she withdrew to the bathroom stall for privacy. *Id.* at ¶¶ 40–43.

And B.P.J. made vile sexual comments to A.C. in the girls' locker room. *Id.* at ¶¶ 53–56.

Like other students, A.C. has an interest in ensuring that Title IX permits— and sometimes even requires—schools to separate bathrooms, locker rooms, and sleeping arrangements during overnight trips based on sex to avoid future situations like this. *Id.* at ¶¶ 40–50, 63–69; *infra* § I.D.[2]

 Christian Educators members currently benefit from laws in Tennessee and Kentucky that authorize sex-designation for a "multi-occupancy restroom or changing facility designated for the student's, teacher's, or employee's sex." T.C.A. § 49-2-803; *see also* K.R.S. § 158.189(3). Tennessee's law requires schools to adopt policies that prevent students, teachers, and employees from accessing restrooms designed for members of the opposite sex when those members "are present or could be present" in the restroom. T.C.A. § 49-2-802(2). Before the new rules, a federal judge held that the Tennessee law tracks Title IX. *See D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 834–36 (M.D. Tenn. 2022).

Members have a substantial interest in maintaining their own privacy by preserving Tennessee's and Kentucky's laws. Some members teach at schools where teachers and students use the same restroom. Ex. D ¶¶ 28–32; Ex. H ¶¶ 39–45. Those restrooms are currently separated by sex. Ex. D ¶¶ 28–32; Ex. H ¶¶ 39–45. But they provide few secluded spaces. Ex. D ¶¶ 28–32; Ex. H ¶¶ 39–45. The men's bathroom has urinals without privacy screens and bathroom stalls with walls that

---

[2] *Grimm v. Gloucester County School Board* held that a school policy violated Title IX when it required a female plaintiff who identified as male to use bathrooms consistent with the plaintiff's sex. 972 F.3d 586, 619 (4th Cir. 2020). The plaintiff had taken hormones, undergone surgery, and "received a court order" identifying the plaintiff as a male. *Id.* at 593, 601. The court limited its holding "as applied to" the plaintiff. *Id.* at 593. *Grimm* did not address A.C.'s situation of sharing a locker room with a boy who identifies as a girl. Nor did it consider the harm inflicted on females being exposed to males who identify as female generally, much less to males making lewd comments in female-only spaces.

end a foot from the ground. Ex. D ¶¶ 28–32. It would be uncomfortable, "awkward" and "embarrassing" for these male teachers to share these restrooms with female students, teachers, or staff. *Id.* at ¶ 30; Ex. H ¶ 40. They currently do not have to. But the Department's rules would change that.

### 3. The rules eliminate A.C.'s interest in participating in fair competition against other girls.

A.C. benefits from West Virginia's Save Women's Sports Act. W. Va. Code, § 18-2-25d. Except for B.P.J., who had to go to court and win an injunction, A.C. has enjoyed fair and safe competition in female sports. She has a substantial interest in keeping it that way.

The rules jeopardize that interest. *Supra* Background § I. The new definition of "sex" prohibits West Virginia from protecting female athletes from competing against males. That deprives A.C. of benefits she otherwise has under West Virginia's Save Women's Sports Act—the opportunity to fairly compete against females. A.C.'s previous losses to B.P.J. prove how she and other girls are harmed when they must compete against male athletes. Ex. A ¶¶ 6–39. She has an interest in ensuring that West Virginia's law applies as broadly as possible going forward.

Courts across the country agree "there is no question" that a woman's right to an equal athletic opportunity is a "legitimate and important" interest. *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982).[3] The Sixth Circuit has echoed this important interest for female athletes. *E.g.*, *Balow v. Mich. State Univ.*, 24 F.4th 1051, 1053–61 (6th Cir. 2022) (discussing how to ensure "substantially

---

[3] *Accord Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994) ("Congress … recognized that addressing discrimination in athletics presented a unique set of problems."); *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) ("Equal opportunity to participate lies at the core of Title IX's purpose."); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993) (holding prior regulations meant to remedy "the historic … exclusion of girl's athletic programs ….").

proportionate athletic opportunities" for women in college); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994) (similar as to girls in high school).

Given this interest, another court permitted female athletes to intervene as of right in a similar case—i.e., a case in which males sought access to female sports. *Hecox v. Little*, 479 F. Supp. 3d 930, 952, 955, 958 (D. Idaho 2020) (allowing female athletes to intervene to defend Idaho law protecting women's sports). And courts have also allowed male athletes to intervene to defend policies allowing them to compete against female athletes. Text Order Granting Mot. to Intervene, *Soule v. Conn. Ass'n of Schs., Inc.*, No. 3:20-cv-00201 (RNC) (D. Conn. April 22, 2020), ECF No. 93, *available at* https://bit.ly/3wiNhBE. Just so here—female athletes like A.C. must be allowed to intervene to defend laws protecting their right to compete only against females. *See Grutter*, 188 F.3d at 396–98 (finding "substantial legal interest" to intervene in lawsuit affecting policy that benefitted intervenors).

## C.    Intervenors' interests will be impaired by this litigation.

Next, Intervenors' legal interests will be impaired without intervention. Like the other factors, this one imposes a "minimal" burden. *Wineries*, 41 F.4th at 774. It asks movants to show that "disposition" of the action "would put the movant at a practical disadvantage in protecting [her] interest." *Id.* (cleaned up). And, consistent with the relaxed nature of 24(a), the impairment need only be "possible," not certain. *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997).

This litigation will affect the statutory and constitutional rights of Christian Educators members to free speech, religious exercise, and privacy—as well as their interest to keep current state and school policies in place. If this Court enjoins the rules, the members have no need to fear punishment for using certain pronouns or to chill their speech on gender identity to avoid Title IX complaints. Proposed Compl. ¶¶ 144, 149–65. Meanwhile, if the rules take effect, these members face a

16

legal requirement threatening them to use pronouns contrary to their beliefs (as some have already been asked to do), the policies at members' schools would be pre-empted, and members would become pronoun police by reporting on themselves and others. Ex. D ¶¶ 35–43; Ex. E ¶¶ 13–24; Ex. F ¶¶ 21–29; Ex. G ¶ 22; Ex. H ¶ 48. Some will take the reasonable step of avoiding certain speech to limit potential liability under Title IX. Ex. D ¶¶ 35–43; Ex. E ¶ 36; Ex. F ¶¶ 30–53; Ex. G ¶ 23; Ex. H ¶¶ 49–50. Those injuries constitute irreparable harm. *See, e.g.*, *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 408 (6th Cir. 2022) ("The loss of First Amendment freedoms, for even minimal periods of time, amounts to irreparable injury." (cleaned up)). That supports Intervenors' motion. *See Ams. United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 305–07 (6th Cir. 1990) (noting delay of filing separate lawsuit rather than intervening would have prevented Chabad House from displaying menorah during Hanukkah).

This litigation also affects Intervenors' constitutional right to privacy and right to use sex-specific bathrooms and locker rooms. *See supra* § I.B.2 (collecting cases protecting this right). The decision will bind the Plaintiff States, where Christian Educators has members and where A.C. goes to school. Proposed Compl. ¶¶ 66, 143. So this case will determine whether Intervenors enjoy sex-specific spaces or will be forced to use restrooms or undress before the opposite sex.

If the States lose this lawsuit, they and their schools will have to ignore current policies protecting Intervenors and to follow new policies imperiling Intervenors. It is unclear whether Intervenors could collaterally attack that judgment, which supports their intervention here. *Cf. Miller*, 103 F.3d at 1247 ("[P]otential stare decisis effects can be a sufficient basis for finding an impairment of interest."); *Wineries*, 41 F.4th at 774 (similar). In fact, under Tennessee law, Christian Educators members currently have a private right of action to guarantee their access to sex-specific bathrooms and civil immunity for using accurate

pronouns. T.C.A. §§ 49-2-803, -805. But the new Title IX rules will effectively extinguish that private cause of action and invalidate that immunity. The conflict necessarily destroys Intervenors' protections.

A.C.'s locker-room experience with B.P.J., for example, shows the real harms at stake. Ex. A ¶¶ 40–50, 57. A.C. hopes to avoid repeating those humiliating incidents going forward, both as to B.P.J. and to other males who identify as female. *Id.* at ¶¶ 40–50, 63–69. West Virginia Save Women's Sports Act normally protects A.C.'s right to access women's-only locker rooms because it requires schools to designate "athletic teams or sports"—of which locker rooms are a vital part—by sex and because it gives a cause of action to any student who is "aggrieved by a violation" of the law. W. Va. Code, § 18-2-25d(c)(2), (d).

This litigation also threatens to undermine A.C.'s interests in ensuring equal athletic opportunities for women and girls. The States seek declaratory relief and an injunction relieving them from the Department's rules. States Compl. Prayer for Relief ¶¶ a–e, ECF No.1. Intervenors seek that same relief. Proposed Compl. Prayer for Relief ¶¶ A–H. If that relief is granted, West Virginia's Save Women's Sports Act would remain in force generally. If that relief is denied, the rules reimagine "sex" throughout Title IX to mean gender identity, including in sports. *Supra* Background § I (making this point). And the rules will preempt West Virginia's law, leaving A.C. unable to claim its benefits.

Absent the rules, A.C. could still generally benefit from that law in sports and locker rooms. She could even still benefit from the law as to B.P.J. because West Virginia has announced its intent to appeal the *B.P.J.* ruling to the Supreme Court. Proposed Compl. ¶ 80. Alternatively, if the States lose, the new rules would completely and inevitably preempt West Virginia's law, and A.C. "will not have the protection of the law [she] claim[s] is vital to ensure [her] right to equality in athletics." *Hecox*, 479 F. Supp. 3d at 953. And just like with bathrooms and locker

rooms, she would have few if any legal avenues to challenge that judgment. That satisfies the low threshold for impairment. *Id.*

### D.    Intervenors' interests are not adequately represented by Plaintiff States because they will raise different arguments about expression, sex-specific spaces, privacy, and sports.

Lastly, the States do not adequately represent Intervenors' interests in freedom of speech and religious freedom, maintaining sex-designated areas, safeguarding their privacy rights, or preserving West Virginia's Save Women's Sports Act. For this factor, prospective intervenors need only show that their interests "'may be' inadequate[ly]" represented. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *Grutter*, 188 F.3d at 400 (noting only the "*potential* for inadequate representation"). As always, the burden is "minimal." *Trbovich*, 404 U.S. at 538 n.10; *Wineries*, 41 F.4th at 774. Intervenors carry that light load by showing no party will "make all of the prospective intervenor's arguments." *Grutter*, 188 F.3d 400. Intervenors' interests are not adequately represented if they are "not represented at all," in which case "intervention … must be allowed." *Grubbs v. Norris*, 870 F.2d 343, 347 (6th Cir. 1989). Intervenors offer different arguments and distinctly helpful perspectives.

The States have an interest in upholding their own laws against federal overreach. Though important, these interests do not "overla[p] fully" with the Intervenors', nor are the States' interests "identical" to Intervenors'. *Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 196–97 (2022) (noting lack of complete overlap of interests triggers "minimal" burden standard). Intervenors will offer arguments the States do not and cannot make. That justifies intervention.

Take Christian Educators members' RFRA arguments. The Department's rules threaten members with pronoun usage contrary to their religious beliefs and chill their speech on a matter of public concern—gender identity. *Supra* § I.B.1. But

using pronouns in this way burdens the members' religious beliefs. To protect those beliefs, Christian Educators claim the new rules are invalid because they violate RFRA. Proposed Compl. ¶¶ 316–22. The States do not make that argument. Indeed, the States never even allude to RFRA. *Cf.* States Compl. ¶¶ 241–45 (mentioning First Amendment "free exercise" but not RFRA). So Christian Educators' interests necessarily go further than and differ from the States'.

Christian Educators also claim the rules violate their freedom of speech by compelling members to use pronouns that may be inconsistent with a persons' sex and chilling their speech on gender identity. Proposed Compl. ¶¶ 329–36. To be sure, Tennessee seeks to preserve its law protecting teachers from being forced to use inaccurate pronouns. States Compl. ¶¶ 208, 214. And the States mention some First Amendment concerns. *Id.* at ¶¶ 241–45. But Christian Educators will make that argument more forcefully than the States.

Here's how: Christian Educators have a personalized interest in limiting state power over their members' speech. While the States will seek to preserve their laws—including Tennessee's and Kentucky's laws on pronoun usage—they cannot raise a private party's constitutional rights and will not push those arguments to undermine their own power. *Cf. Kentucky v. Biden*, 23 F.4th 585, 596–97 (6th Cir. 2022) ("[A] state cannot litigate in a third-party capacity as *parens patriae* against the United States."). In fact, states often claim a right to control and regulate speech within the classroom—something the States may want to reserve unto themselves. *Cf. Wood v. Fla. Dep't of Educ.*, No. 4:23-cv-526-MW/MAF, 2024 WL 1536749, at *16–17 (N.D. Fla. Apr. 9, 2024) (Florida defending against First Amendment challenge to its law requiring teachers to use students' pronoun based on their sex). And, perhaps for similar reasons, the States do not raise a vagueness challenge to the rules as Intervenors do. Proposed Compl. ¶¶ 335–36. The vagueness doctrine restrains government authority by requiring at least "minimal

guidelines to govern law" enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). With all due respect to the States, they do not have an interest in pursuing an argument that could limit their own authority. For that reason, Christian Educators' interests are necessarily broader than the States', which means those interests are not currently represented by existing parties. *See Meriwether I*, 2019 WL 2052110, at *12 (recognizing that "a public entity" emphasizes "different harms and will not adequately represent the interests" of private parties).

Next consider bathrooms and locker rooms. The States recognize the rules implicate privacy concerns, but never seek to vacate the rules on that basis. States Compl. ¶ 219. *Cf. id.* at ¶¶ 241–45 (never mentioning constitutional right to bodily privacy). Intervenors possess particular insight into their own privacy. So they make that argument explicitly. *See* Proposed Compl. ¶¶ 337–40. Forcing students and teachers to use intimate, sex-specific spaces with the opposite sex—as the rules require—will violate Intervenors' privacy rights. *See Brannum*, 516 F.3d at 495; *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (recognizing "invasion" of privacy attendant to having "one's naked body viewed by a member of the opposite sex"). Indeed, A.C.'s experience demonstrates the harm to females when they are forced to share spaces like locker rooms with males. Ex. A ¶¶ 40–50, 57.

Finally consider bathrooms, locker rooms, and equal athletic opportunities together. The States suggest that the Department's rules violate the APA because Title IX *permits* sex distinctions. *See* States Compl. ¶¶ 2–8, 221–32. But they never outright claim that Title IX *requires* sex-separation—including in sports and in areas like bathrooms and locker rooms. Intervenors do. *See* Proposed Compl., ¶¶ 298, 301–02. Again, with that difference, Intervenors' interests cannot be adequately represented by the States.

Title IX's demand for sex separation also applies to athletics—a position Intervenors take that goes further than the States'. When Title IX passed in 1972,

"sex" meant "either of two divisions of organisms distinguished respectively as male or female." Webster's Seventh New Collegiate Dictionary New International Dictionary 795 (1966). Other language in Title IX indicates the statute uses "sex" to refer to a biological binary. *E.g.*, 20 U.S.C. § 1681(a)(2) (referring to "both sexes"); 20 U.S.C. § 1681(a)(8) (exempting "father-son or mother-daughter activities").

Without requiring sex-designated sports, Title IX would cease to fulfill its purpose in athletics. Recall that Title IX prohibits "exclud[ing]" or "deny[ing]" "on the basis of sex." 20 U.S.C. § 1681. But allowing male athletes to compete in events reserved exclusively for females both "excludes" girls and "denies" them the very benefits Title IX protects. When males have been allowed to compete against females, they have consistently displaced them because of their inherent "physiological advantages in many sports." *Adams*, 57 F.4th at 818–21 (Lagoa, J., concurring) (collecting and summarizing studies); *see also* Proposed Compl. ¶¶ 48–62 (listing examples). In effect, then, forcing females to compete against males excludes or denies them an educational benefit—equal opportunity in sports. As one court put it, "[t]reating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 295 (2d Cir. 2004).

History confirms this necessary distinction. Just after passing Title IX, Congress enacted the Javits Amendment requiring future Title IX regulations to consider "reasonable provisions" related to "sex discrimination" in "intercollegiate athletic activities." Education Amendments of 1974, Public Law 93-380, 844, 88 Stat. 484, 612 (1974). Afterwards, the Department's predecessor explained in a letter to state officials that a school could not eliminate womens' teams and direct

women to try out for the men's team if "only a few women were able to qualify."[4] And in 1979, the agency issued another guidance document stating that schools who sponsor a sports team "for members of one sex," "may be required … to sponsor a separate team for the previously excluded sex." *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics* (Dec. 11, 1979), 44 Fed. Reg. 71413, 71418, https://perma.cc/338U-LD4S.

About a decade later, Congress amended Title IX. *See* Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687 (1988); Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunit*y, 14 Marq. Sports L. Rev. 11, 18–24 (2003) (detailing this history). In so doing, Congress ratified the unanimous understanding of Title IX at the time (that it requires sex separation in sports), detailed both in prior court cases and in prior guidance documents. *Cf. Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 537–38 (2015) (amendments to Fair Housing Law that "assume[d] the existence of disparate-impact claims" showed "that Congress ratified disparate-impact liability").

A.C.'s experience proves the point. Her losses to B.P.J. show how the Department's redefinition of "sex" harms women. The States cannot fully replicate this experience or sufficiently represent A.C.'s interests. Nor do the States advance A.C.'s identical arguments. The States note the rules' impact on athletics to show how the rules impermissibly intrude on their own sovereign laws. States Compl. ¶¶ 208–18. But A.C. will add that Title IX requires sex distinctions in sports. *E.g.*, Proposed Compl., ¶¶ 298, 301–02. That's another different argument based on different interests. *See Hecox* , 479 F. Supp. 3d at 955 (granting intervention when

---

[4] Off. for Civ. Rts., *Letter from Peter Holmes to Chief State School Officers*, Title IX Obligations in Athletics (Nov. 11, 1975), https://perma.cc/7T36-TJCZ.

intervenors argued that Idaho law "must be read broadly to categorically preclude transgender women from ever playing on female sports teams").

The States will not make all Intervenors' arguments or represent all their interests. Beyond that, Intervenors provide evidence of the real-world harms inflicted by the Department's unlawful actions. That justifies intervention here. *See Grutter*, 188 F.3d 400; *Grubbs*, 870 F.2d at 347.

## II. Intervenors also satisfy the requirements for permissive intervention.

Intervenors also qualify for permissive intervention under Rule 24(b). That rule permits intervention when a request is timely and the claim "shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Courts must also consider "undu[e] delay or prejudice" to the original parties. *Id.* at 24(b)(3). Judicial economy "supports permissive intervention" to "avoid multiplicity of litigation wherever and whenever possible." *Buck v. Gordon*, 959 F.3d 219, 225 (6th Cir. 2020). Intervenors satisfy these requirements.

Two recent Sixth Circuit cases build the scaffolding to support permissive intervention. *See id.* at 223–25 (applying above considerations to allow intervention); *League of Women Voters of Michigan v. Johnson*, 902 F.3d 572, 576– 77–80 (6th Cir. 2018) (same). Other cases, similar to this one, solidify permissive intervention here. Courts have widely allowed intervention on issues of pronouns, *supra Meriwether I*; bathrooms, *Students & Parents for Priv. v. United States Dep't of Educ.*, No. 16-CV-4945, 2016 WL 3269001, at *3 (N.D. Ill. June 15, 2016); *supra Bethel*; *supra Highland*; and sports, *see B.P.J. v. W. Virginia State Bd. of Educ.*, No. 2:21-CV-00316, 2021 WL 5711547, at *1 (S.D.W. Va. Dec. 1, 2021) (allowing female athlete to intervene to defend West Virginia's law guaranteeing equal opportunities for female athletes); Memorandum Opinion & Order, *Tennessee v. United States*

*Dep't of Educ.*, No. 3:21-cv-308 (E.D. Tenn. Sept. 14, 2022), ECF No. 102 (same as to female athletes in Title IX litigation), *available at* https://bit.ly/3Wom8bl.

For similar reasons, this Court should permit Intervenors to intervene. Their motion is timely. *See supra* § I.A. Their claims share common questions of law and fact with the States. *Compare* States Compl. ¶¶ 221–63 *and* Prayer for Relief ¶¶ a–e *with* Proposed Compl. ¶¶ 281–362 *and* Prayer for Relief ¶¶ A–H. Like the States, the Intervenors' challenge the Department's regulations. Like the States, the Intervenors argue that the rules violate the APA many times over. And like the States, the Intervenors request the same relief.

Finally, granting this motion will cause no delay or prejudice. There is no delay because "at the time" of this intervention, the case is in its newborn "infancy." *League of Women*, 902 F.3d at 578–79. And there is no prejudice because "as the case" stands now, Intervenors can participate from its inception and provide "input" into how it progresses. *Id.* While Intervenors raise overlapping claims, they contribute unique legal arguments to facilitate the disposition of this case. And A.C.'s intervention gives a voice to the population that Title IX was specifically designed to empower—female students and female athletes.

## CONCLUSION

This case raises important legal issues for students and teachers in Plaintiff States. This Court should hear from those who Title IX was meant to protect and who stand to lose the most by the Department's actions. For these reasons, A.C. and Christian Educators ask this Court to grant their request to intervene.

Respectfully submitted this 3rd day of May, 2024.

_s/ Edward L. Metzger III_

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Edward L. Metzger III
Kentucky Bar No. 94138
OMEGA LAW PLLC
P.O. Box 559
Union, KY 41091
(859) 898-2140
Lee@nkylaw.net

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Natalie D. Thompson**
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

_Counsel for Intervenor-Plaintiffs_

_*Motion for pro hac vice admission filed
concurrently_

_**Motion for pro hac vice admission filed
concurrently; practice supervised by one or
more D.C. Bar members while D.C. Bar
application is pending._

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of May, 2024, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record who are registered users of the ECF system, and a true and exact copy of the foregoing document will be served by U.S. Certified Mail, to the parties identified below:

U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

The Honorable Miguel Cardona
Secretary of the U.S. Department of
Education
400 Maryland Avenue, SW
Washington, D.C. 20202

United States of America
c/o Carlton S. Shier, IV
     United States Attorney
Attn: Civil Process Clerk
U.S. Attorney's Office for the Eastern
District for The Eastern District of
Kentucky
260 W. Vine Street, Suite 300
Lexington, KY 40507-1612

By: *s/ Edward L. Metzger III*
Edward L. Metzger III
Kentucky Bar No. 94138
OMEGA LAW PLLC
P.O. Box 559
Union, KY 41091
(859) 898-2140
Lee@nkylaw.net