## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

| | |
|---|---|
| **State of Tennessee**; **Commonwealth of Kentucky**; **State of Ohio**; **State of Indiana**; **Commonwealth of Virginia**; **and State of West Virginia**, | |
| *Plaintiffs,* | |
| *and* | **Case No.** 2:24-cv-00072-DLB-CJS |
| **Christian Educators Association International**; **A.C.**, by her next friend and mother, Abigail Cross, | |
| *Proposed Intervenor-Plaintiffs,* | |
| v. | |
| **Miguel Cardona**, in his official capacity as Secretary of Education; and **United States Department of Education**, | |
| *Defendants.* | |

## PROPOSED INTERVENOR-PLAINTIFFS' COMPLAINT

1

Fifty years ago, Congress passed Title IX to promote equal opportunities for women and men by prohibiting discrimination "on the basis of sex" in educational programs. But Title IX does not treat men and women as though they were androgynous. Instead, it says schools may—and sometimes must—consider their differences to ensure equal opportunity. So for fifty years, Title IX protected women's-only bathrooms, locker rooms, physical-education classes, and sports. In doing so, Title IX recognized a common-sense reality: "[p]hysical differences between men and women … are enduring" and "remain cause for celebration," not something we have to ignore. *United States v. Virginia*, 518 U.S. 515, 533–34 (1996) (cleaned up). But that all changed this week when the Department of Education issued final rules reinterpreting Title IX to treat men as if they were women (and vice versa) when they identify as such. This redefinition rewrites federal law and rewires the nation's educational system, hurting the women Title IX was supposed to protect and requiring students and teachers to speak as if biological differences don't exist.

Take Intervenor A.C., a track and field athlete in West Virginia public school. Although her state protects women's-only sports, a male classmate who identifies as female began to compete on A.C.'s middle school girls' track and field team and access the girls' locker rooms. The young male quickly eclipsed A.C. during competitions, forcing her to stay at home while the boy got a spot in the school's conference championships. And the boy's presence in the locker room forced A.C. to change in bathroom stalls to protect her privacy. The boy also made inappropriate sexual and harassing comments to A.C. while they competed together on the girls' sports team. Yet the Department's new rules would multiply A.C.'s experience nationwide—forcing girls to share bathrooms, locker rooms, PE classes, and athletic podiums with boys.

The Department's new rules also harm teachers, like the members of Intervenor Christian Educators Association International. Christian Educators has thousands of members throughout the country who teach at public schools and who believe that sex is binary and people should cherish their sex, not seek to reject it. These members also do not want to share restrooms with colleagues and students of the opposite sex. Yet the new rules force a male teacher to use the restroom alongside middle-school girls. And it mandates this result nationwide—exalting the individual's subjective and internal perception of self over society's respect for the objective and external differences between the sexes.

The new rules also burden free speech by redefining sex to include gender identity and by lowering the standard for harassment to apparently reach good-faith objections to gender ideology. Now, members of Christian Educators face potential punishment for expressing their beliefs at school that men cannot become women or vice versa. And the members must violate their beliefs and use inaccurate pronouns that reflect others' gender identity and contradict their sex, or these members face possible hostile-environment charges. In effect, the new rules create a nationwide speech code that polices teachers' and students' expression of their belief that men and women are different. Not content to trample on protections for women, the new rules seek to undermine every student's and teacher's constitutional rights.

The government cannot rewrite Title IX by executive fiat. The new rules contradict the statute's text, history, and purpose, while ignoring students' and teachers' fundamental constitutional and statutory rights to privacy, freedom of speech, and religious freedom. This Court should hold the rule unlawful and set it aside under the Administrative Procedure Act (APA), 5 U.S.C. § 706.

## JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

2.     This Court has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

3.     This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

4.     The APA waives sovereign immunity and provides jurisdiction and a cause of action to review Defendants' actions and enter appropriate relief. 5 U.S.C. §§ 553, 701–06.

5.     This Court has equitable jurisdiction and remedial power to review and enjoin ultra vires or unconstitutional agency action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

6.     This Court may grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the APA, 5 U.S.C. §§ 701–06; and Federal Rule of Civil Procedure 57.

7.     This Court may grant injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65.

8.     This Court may award costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

9.     Venue is proper in this Court and this division under 28 U.S.C. § 1391 because Defendants are agencies of the United States or officers and employees of a United States agency acting in their official capacity or under color of legal authority. Further, (1) Defendants can and do perform official duties in this district; (2) Plaintiff Kentucky resides in this District; (3) Kentucky's agencies and employees subject to the agency actions at issue reside in the District; (4) a substantial part of the events or omissions giving rise to Kentucky's claims occurred

in this district; (5) Intervenors reside or have members who reside in Plaintiff States; (6) Intervenors or their members are protected by laws enacted and enforced by Plaintiff States; and (7) the effects of Defendants' challenged actions are felt in this district.

## INTERVENORS

10.     Christian Educators Association International ("Christian Educators") is a religious non-profit corporation organized under California law, with its principal place of business in Placentia, California.

11.     Christian Educators is a voluntary membership organization comprised of Christians in the teaching profession. It has members in all fifty states, including 1,636 dues-paying professional members in Plaintiff States.

12.     A.C. is a fifteen-year-old girl who resides in Harrison County, West Virginia.

13.     A.C. currently attends Bridgeport High School.

14.     A.C. brings this suit through her next friend and mother Abigail Cross.

## DEFENDANTS

15.     Defendant Miguel Cardona is sued in his official capacity as Secretary of the United States Department of Education. His address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

16.     Secretary Cardona is responsible for the overall operations of the U.S. Department of Education, including the Department's administration of Title IX and its regulations.

17.     Defendant United States Department of Education (Department) is an agency under 5 U.S.C. §§ 551 and 701(b)(1). The Department's address is 400 Maryland Avenue SW, Washington, D.C. 20202. The Department implements and enforces Title IX and the rule.

## BACKGROUND

I.    **Title IX**

    A.    **Title IX was enacted in 1972 to promote equal educational opportunities for students, particularly women and girls**

18.    In 1972, Congress enacted Title IX, which states that:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …." 20 U.S.C. § 1681(a).

19.    Title IX protects men and women from discrimination based on sex.

20.    Nonetheless, Title IX's purpose was to promote equal opportunities for women and girls—"the class for whose special benefit the statute was enacted." *Cohen v. Brown Univ.*, 101 F.3d 155, 175 (1st Cir. 1996) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694 (1979)).

21.    That is because America long suffered from "pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004).

22.    Sports are illustrative. Before 1972, many schools and colleges did not field women's and girls' teams that were comparable to men's and boys' teams—if they had any women's teams at all.

23.    For example, West Virginia was a forerunner in women's sports and was one of the first three states to start a state-wide girls' basketball tournament in 1919.[1] But many still opposed girls' sports. The annual tournaments ended in 1924, and interscholastic competition largely ended in the 1930s. The girls' basketball tournament did not reappear until 1976.[2]

---

[1] Bob Barnett, *Hillside Fields*, 259 (2013).

[2] *Id.*

24.     In other sports, too, boys long enjoyed more opportunities than girls. The West Virginia Secondary School Activities Commission (the governing body for athletic competitions) records the first state-wide boys' track and field championship in 1914.[3] The first girls' track and field championship was in 1975.[4]

25.     Title IX played a central role in promoting athletic opportunities for female athletes.

26.     Shortly after its enactment Congress passed the Javits amendment directing the Department of Health, Education, and Welfare (the Department of Education's predecessor) to publish regulations implementing the statute, including "with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).

27.     The agency promulgated the statute's implementing regulations requiring federally funded schools that sponsor athletic programs to "provide *equal athletic opportunity* for members of *both* sexes." 34 C.F.R. § 106.41(c) (emphasis added).

28.     Title IX has been strikingly successful in accomplishing its goals.

29.     For example, between 1972 and 2018, girls' annual participation in high school athletics increased from just under 300,000 to 3.3 million.[5]

**B.    Title IX gives the federal government and private parties myriad enforcement mechanisms**

30.     As a condition of receiving federal funds, institutions must adopt policies that comply with Title IX and the implementing regulations. They may not maintain policies that violate Title IX and the implementing regulations.

---

[3] https://bit.ly/3wsdFsO.

[4] Barnett, *supra* n.1, at 274.

[5] National Federation of State High School Associations, 2022–23 High School Athletics Participation Survey, https://bit.ly/3JLBRtp.

7

31.     Any member of the public may file a complaint about an educational institution that he or she believes is not complying with Title IX or the implementing regulations.

32.     The Department's Office of Civil Rights can investigate complaints alleging that an institution has violated Title IX and its implementing regulations or initiate an investigation on its own.

33.     If the Office of Civil Rights finds a covered institution is noncompliant, the Department may require the institution to take remedial action at the risk of losing federal funding.

34.     Title IX also provides for a judicially implied private right of action, including a right of action for damages. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 76 (1992); *Cannon*, 441 U.S. at 709.*Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 76 (1992).

35.     The Attorney General on behalf of the Justice Department may also bring an enforcement action against an educational institution that is not in compliance with Title IX and its implementing regulations.

## II.     The increasing numbers of males seeking to access women's-only spaces and competitions

36.     While Title IX has achieved remarkable success in promoting opportunities for women on and off the field, some men have opposed its equal-opportunity mandate since the statute's inception. *E.g.*, *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615–16 (6th Cir. 2002) (holding elimination of men's programs to remedy inequitable athletic opportunities did not violate Title IX because it "does not bestow rights on the historically overrepresented gender"); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 271 (7th Cir. 1994) (upholding elimination of men's swimming program to remedy inequitable athletic programs).

37.     A new crop of men—those who identify as female—are seeking to benefit from Title IX's protections by claiming it grants them access to women's-only spaces and competitions.

**A.     Men in women's private spaces**

38.     An increasing number of individuals who identify as transgender are seeking access to sex-specific spaces like bathrooms, locker rooms, and showers belonging to the opposite sex.

39.     For example, individuals identifying as transgender have challenged laws and policies that protect men's-only and women's-only facilities in many states. *E.g.*, *Grimm v. Gloucester Cnty., Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*, 858 F.3d 1034 (7th Cir. 2017); *Roe v. Critchfield*, No. 23-cv-00315, 2023 WL 7109822 (D. Idaho Oct. 27, 2023); *Women in Struggle et al. v. Bain et al.*, No. 23-cv-01887, 2023 WL 6541031; (M.D. Fla. Oct. 6, 2023); *D.H. v. Williamson Cnty. Bd. of Educ.*, No. 22-cv-00570, 2023 WL 6302148 (M.D. Tenn. Sept. 27, 2023); *Bridge v. Okla. State Dep't of Educ.*, No. Civ-22-00787, 2022 WL 20689557 (W.D. Okla. Dec. 20, 2022); *see also Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 22-cv-337, 2023 WL 348272 (S.D. Ohio Jan. 20, 2023).

40.     This has caused serious violations of people's rights to bodily privacy.

41.     In 2023, an 18-year-old male student who identified as female allegedly exposed his male genitals to a 14-year-old female student in the girls' shower room of a Wisconsin school.[6]

---

[6] Corrine Hess, *U.S. Dep't of Educ. Is Opening an Investigation into Sun Prairie Locker Room Incident*, Wisconsin Public Radio, Nov. 30, 2023, https://bit.ly/3t5ao0W.

42.     And a school in Colorado tried to force an 11-year-old girl to share a bed with a male student who identified as female on an overnight trip.[7]

43.     In 2017 both male and female high school students filed a lawsuit against the Boyertown School District in Pennsylvania after it enacted a policy (without telling parents and students) allowing students who identify as transgender to utilize bathrooms and locker rooms belonging to the opposite sex. This caused students to encounter students of the opposite sex in their locker room, sometimes while they were in their underwear. *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3rd Cir. 2018).

44.     Allowing members of the opposite sex into private spaces also threatens people's safety.

45.     In 2021, a male student wearing a skirt sexually assaulted a 15-year-old girl in a girls' restroom.[8]

46.     Women have also spoken publicly about their concerns about biological males in women-only spaces. Riley Gaines, a female athlete who competed on the University of Kentucky Women's swim team, testified before the Senate Judiciary Committee that she and her teammates were traumatized when forced to use a locker room with biological male Lia Thomas.[9] Gaines is also part of a class action against the NCAA for their Title IX violations, including for breaches of privacy and loss of athletic opportunities for women.[10]

---

[7] Melissa Koenig, *Parents Claim Daughter, 11, Was Forced to Sleep in Bed with Transgender Student on Sch. Trip*, N.Y. Post, Dec. 6, 2023, https://bit.ly/46LskLZ.

[8] Salvador Rizzo, *Victim of Sch. Bathroom Sexual Assault Sues Va. Sch. Dist.*, Wash. Post, Oct. 5, 2023, https://bit.ly/4181FrB.

[9] https://bit.ly/3ybpnsg.

[10] https://bit.ly/4dns4Hn.

47.     In her testimony, Gaines explained, "the NCAA forced me and my female swimmers to share a locker room with Thomas, a 6'4" 22-year-old male equipped with and exposing male genitalia .… I truly hope you can see how this is a violation of our right to privacy and how some of us have felt uncomfortable, embarrassed, and even traumatized by this experience."[11]

**B.     Men in women's sports**

48.     Increasing numbers of boys and men are trying to compete in women's sports, depriving girls and women of athletic opportunities and accomplishments.

49.     For example, male athletes seeking to compete in women's sports have challenged laws in Idaho, Indiana, Utah, West Virginia, and Florida that require or permit schools to maintain sex-designated sports teams according to biological sex.

50.      In Connecticut, two biological males competing in female athletics won 15 women's state championship titles in girls' high school track and field (titles previously held by nine different girls).

51.      At the University of Montana, June Eastwood, a male who previously competed on the men's track and cross-country teams, began competing on the women's track and cross-country teams after being treated for a year with testosterone suppression medication.

52.     Eastwood placed first in the women's mile at the 2020 National Collegiate Athletic Association (NCAA) Big Sky Indoor Track and Field Championships, a Division I conference championship meet, and won the race by more than 3.5 seconds.

53.     CeCe Telfer, a male who ran as Craig Telfer throughout high school and the first two years of college, eventually began competing in female track events for the 2019 indoor and outdoor track and field seasons.

---

[11] https://bit.ly/4dl2Ole.

54.    Telfer took the Division II national championship in women's 400-meter hurdles in 2019 by almost two seconds.[12]

55.    In March 2022, Lia Thomas—who, as mentioned above, is a biological male who identifies as female—became the first male to win an NCAA Division I women's national championship while competing at the 2022 Swimming and Diving Championships. Thomas won the women's 500-yard freestyle event, beating out Olympic medalist Emma Weyant who finished second.

56.    The Connecticut athletes, Eastwood, Telfer, and Thomas displaced women and prevented women from earning championships.

57.    In addition to displacing women from earning higher achievements, men competing against women have caused significant injuries to women.

58.    In September of 2022, Payton McNabb, a female athlete in North Carolina, was severely injured when a biological male on the opposing high school team spiked a volleyball that hit McNabb in the face.[13]

59.    McNabb suffers from "impaired vision, partial paralysis on [her] right side, constant headaches, as well as anxiety and depression" as a result of the injuries. Due to her traumatic injuries, McNabb was also unable to complete her senior volleyball season.

60.    A similar event transpired in Massachusetts in 2023, when a female field-hockey athlete was severely injured by a biological male whose corner shot resulted in the puck striking the female athlete in the face. The female athlete was sent to the hospital for "serious facial and dental issues."[14]

---

[12] Results listed are available online at Track & Field Results Reporting System: https://bit.ly/4a3aHcj.

[13] Valerie Richardson, *N.C. on verge of transgender sports ban after hearing from injured female athlete,* Nov. 23, 2023, https://bit.ly/4b04Eq1.
[14]  https://bit.ly/4djDEU1e/.

61.     This year, the fear of further injury by a biological male caused a Massachusetts school to forfeit a basketball game because of a biological male on the opposing team who was six feet tall with facial hair. [15] The school forfeited after losing two of its female athletes to injuries in plays involving the male athlete.

62.     Meanwhile, multiple sources report that the percentage of children identifying as transgender has multiplied rapidly within just the last few years.

**C.     States like Tennessee, Kentucky, Ohio, Indiana, and West Virginia pass laws to protect women's-only spaces and competitions**

63.     In response to efforts to open sex-specific facilities to people of the opposite sex, more than ten states (including Kentucky and Tennessee) have passed laws or policies protecting sex-specific spaces like bathrooms, locker rooms, and overnight accommodations. *See, e.g.*, Ala. Code § 16-1-54; Ark. Code Ann. § 6-21-120; Fla. Stat. § 553.865; Idaho Code Ann. § [33-6703]33-6603; Iowa Code § 216.9A, 280.33; Kan. Stat. Ann. § 72–6286; Ky. Rev. Stat. Ann. § 158.189; N.D. Cent. Code §§ 15.1-06-21, 15-10-68; Okla. Stat. tit. 70 § 1-125; Tenn. Code Ann. § 49-2-802; Utah Code Ann. § 63G-31-301.

64.     In response to the increasing number of males displacing females in athletic competitions, around 24 states (including Kentucky, Tennessee, and West Virginia) have passed laws or adopted policies providing that sex designations for school-sponsored athletic teams in high school, and sometimes middle school, must be based on biological sex. Ala. Code § 16-1-52(b)(2); Ariz. Rev. Stat. Ann. § 15-120.02;  Ark. Code § 6-1-107(b)-(c); Fla. Stat. Ann. § 1006.205(3)(a); Idaho Code § 33-6203; Ind. Code § 20-33-13(4); Iowa Code § 261I.2; Kan. Stat. Ann. § 60-5601–60-5606; Ky. Rev. Stat. Ann. §§ 156.070(g), 164.2813; La. Stat. Ann. § 4:444; Mo.

---

[15] https://bit.ly/3JGipOP.

Ann. Stat. § 163.048; Mont. Code Ann. § 20-7-1306; Miss. Code. Ann. § 37-97-1; N.C. Gen. Stat. Ann. § 115C-407.59; N.D. Cent. Code Ann. § 15-10.6-02; Okla. Stat. tit. 70, § 27-106; S.C. Code Ann. § 59-1-500; S.D. Codified Laws § 13-67-1; Tenn. Code Ann. §§ 49-6-310, 49-7-180; Tex. Educ. Code § 33.0834; Utah Code Ann. § 53G-6-902; W. Va. Code Ann. § 18-2-25d; Wyo. Stat. Ann. § 21-25-204.

65.     These laws do little to protect women and girls if Title IX requires schools to open up men's and women's spaces and competitions to individuals of the opposite sex.

## III.   A.C.

66.     A.C. is a 15-year-old girl, athlete, and student at Bridgeport High School, a public high school in Harrison County, West Virginia subject to Title IX. She is currently in 9th grade.

67.     A.C. has submitted a declaration as an attachment to this Complaint as Exhibit A.

68.     A.C. competes on the track and field team in the discus and shot-put events. She also participates in the marching band.

69.     Sports have been a part of A.C.'s life since she was a toddler. She's played a variety of sports including soccer, gymnastics, swimming, and Brazilian jiu-jitsu. She was especially good at Brazilian jiu-jitsu, and from early on was at the top of her class.

70.     A.C. first began competing in track and field while she attended Bridgeport Middle School, competing mainly in the 100-meter dash, pole vault, shot put, and discus.

71.     A.C. enjoys the comradery of sports and plans to continue in track throughout high school.

### A.   West Virginia's Save Women's Sports Act

72.   In 2021, West Virginia enacted a statute, colloquially dubbed the "Save Women's Sports Act" (the Act). It provided that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." W. Va. Code § 18-2-25d(b)(3) & (c)(2).

73.   The Act was passed to promote safety and fairness in athletic opportunities for women and girls like A.C.

74.   Before the Act became effective, B.P.J.—a male who identifies as female—challenged the Act's provisions as applied to B.P.J.

75.   In July 2021, a district court entered a preliminary injunction, prohibiting the state from enforcing the Act against B.P.J.

76.   A year and a half later, the district court lifted the injunction, holding that the Act is constitutional and complies with Title IX.

77.   B.P.J. appealed to the Fourth Circuit Court of Appeal, which enjoined the Act's application to B.P.J. again.

78.   Recently, on April 16, 2024, the Fourth Circuit ruled that West Virginia's Act violates Title IX as applied to B.P.J. and does so even if B.P.J. has physiological advantages over female athletes.

79.   West Virginia and its schools may still apply the Act to stop other males from competing on female sports teams.

80.   And the West Virginia Attorney General's office has announced that it plans to appeal the Fourth Circuit's decision to the Supreme Court.[16]

---

[16] Leah Willingham and John Raby, *W. Va. says it will appeal ruling that allowed transgender teen athlete to compete*, Associated Press, Apr. 24, 2024, https://bit.ly/3Umi6xm.

81.     In the meantime, the various injunctions have allowed B.P.J. to compete on the Bridgeport middle school cross-country and track teams—displacing nearly 300 different girls in over 600 separate instances.

82.     Records of the competitions in which B.P.J. has displaced female athletes are attached to this Complaint as Exhibit B.

**B.     B.P.J. accesses women's-only spaces and sports, undermining A.C.'s privacy and equal athletic opportunity.**

83.     One day, A.C. was surprised to see a male—B.P.J.—join the Bridgeport middle school girls' track and field team.

84.     A.C. is one class above and nearly two years older than B.P.J.

85.     When B.P.J. joined the team, B.P.J. began changing in the girls' locker room before practice. This prompted A.C. to change in the girls' restroom (a separate facility from the locker room) to preserve her privacy.

86.     The school later closed the girls' locker room, and the entire team—including B.P.J.—began changing in the girls' restroom. This prompted A.C. to change clothes in a bathroom stall.

87.     A.C. feels uncomfortable changing and/or appearing in a state of undress in front of a male. Nor does A.C. want to see a male changing and/or in a state of undress.

88.     A.C. and B.P.J. both participated in shot put and discus.

89.     Initially, A.C. could beat B.P.J. in both events, but by the end of A.C.'s seventh grade year, B.P.J. could match A.C. in shot put.

90.     And by the last meet of the 2021–22 season, B.P.J. repeatedly beat A.C. in discus.

91.     By the next school year, B.P.J. was noticeably taller, had a distinctly lower voice than the prior season, and was one of the top three athletes in both shot put and discus.

16

92.     By late spring of 2023, B.P.J. was throwing 16-feet farther than B.P.J. did at the outset of the season—an improvement that is almost unheard of in girls' discus.

93.     B.P.J. soon took coveted spots in competitions.

94.     In the past, A.C. consistently placed in the top three for discus and in the top three or four for shot put at her school.

95.     While everyone can compete early in the track season, usually only the top three athletes in each sport get to compete in later-season competitions like the conference championships.

96.     As B.P.J. matured, B.P.J. frequently displaced A.C. in events.

97.     B.P.J. would even mock A.C. and would say she "just needed to get stronger."

98.     Despite being nearly two years younger, B.P.J. began to surpass A.C. in shot put by almost three feet and in discus by over ten feet.

99.      A.C. later learned that B.P.J. displaced her from competing in discus at the conference championships—bumping A.C. out of the top three spots that got to participate from her team.

100.    A.C. wanted to tell her coach that losing her place in the competition to a male was unfair to her and to her teammates.

101.    But A.C. felt at first that she could not speak up for herself or her teammates because the adults in charge did not seem to care that a male had displaced over a hundred female athletes over the course of one season.

102.    A.C.'s teammates sympathized with A.C. but also knew they were not supposed to say anything.

103.    For the remainder of A.C.'s eighth-grade season, A.C. did not get to compete in any meets except the eighth-grade invitational where no seventh graders, including B.P.J, were allowed to compete.

104.    To date, B.P.J. has displaced nearly 300 female athletes in over 600 separate instances.

105.    Given the length of time it normally takes to complete an appeal to the Supreme Court, the Fourth Circuit's ruling will almost certainly permit B.P.J. to continue competing in track and field with A.C. during the 2024–2025 season, when B.P.J. reaches Bridgeport High School.

**C.    B.P.J. makes sexual remarks to female athletes while competing on the girls' track team.**

106.    B.P.J. regularly made explicit and inappropriate sexual comments to and about A.C. and other female athletes.

107.    A.C. felt disgusted and threatened after hearing these remarks.

108.    B.P.J. would usually make these sexual comments in the pit or on the track, in the locker room, or while they were walking to track practice at the high school.

109.    A.C. reported the vulgar comments to her school and the school administrators.

110.    She was told the school was investigating, but nothing changed while A.C. was there.

**D.    A.C.'s future interactions with B.P.J.**

111.    While A.C. and B.P.J. are at different schools this year, they still see one another up to three times a week because Bridgeport Middle School shares a track with the high school.

112.    B.P.J. will likely compete on the high school track team next year.

113.    Given B.P.J.'s recent growth spurt—despite being on cross-sex hormones—A.C. believes B.P.J.'s competitive advantage will continue to grow.

114.    A.C. will likely also participate in the marching band with B.P.J. Both B.P.J. and A.C. play the trumpet.

115.    B.P.J. and A.C. will begin attending the frequent marching band practices together beginning in July 2024.

116.    Through marching band, they will likely travel together to overnight competitions, where students share hotel rooms.

117.    On these trips, girls are assigned to rooms with other girls, and boys share rooms with other boys.

118.    A.C. would not feel comfortable sharing a room with a male student, particularly a student who has repeatedly made sexual comments to her.

119.    The band members also sometimes change on the bus on these trips. When this occurs, girls and boys are given separate opportunities to change.

120.    But A.C. is not comfortable changing in front of a male classmate.

121.    When A.C. heard that the Fourth Circuit had ruled to let B.P.J. compete on the girls' sports team, she felt frustrated because this meant that B.P.J. would continue to take competitive spots away from her and other girls.

122.    On its face, the Fourth Circuit ruling kept the West Virginia Act intact so that other males should not flood into girls' sports, take opportunities away from girls, or invade women's-only spaces.

123.    But under the new Title IX rules, West Virgnia can no longer apply the Act to stop males who identify as female from accessing women's sports teams or private spaces.

124.    A.C. knows what it feels like to lose to a boy and have a boy enter her private, intimate spaces. She wants to make sure that doesn't happen again.

## IV.    Christian Educators Association International

125.    Founded in 1953, Christian Educators is a voluntary membership organization of Christians serving educators in American schools.

126.    David Schmus, Executive Director of Christian Educators, has attached a declaration to this Complaint as Exhibit C.

127.    Christian Educators' mission is to support, connect, and protect Christians serving primarily in public education. Its membership is composed of school employees like teachers, counselors, students studying to become teachers, retired educators, or anyone who has an interest in the organization's mission.

128.    Christian Educators' core membership consists of approximately 8,000 dues-paying members throughout the United States.

129.    The majority of dues-paying members are "professionals," like teachers and counselors, employed in K-12 public schools that are subject to Title IX.

130.    Christian Educators has 1,636 professional members in Plaintiff States, of which 1,556 work in public schools.

   a.    501 professional members in Tennessee, of which 481 work in public schools;

   b.    451 professional members in Kentucky, of which 439 work in public schools;

   c.    312 professional members in Ohio, of which 297 work in public schools;

   d.    189 professional members in Virginia, of which 162 work in public schools;

   e.    124 professional members in Indiana, of which 120 work in public schools; and

   f.    59 professional members in West Virginia, of which 57 work in public schools.

131.    Christian Educators maintains a Statement of Faith that affirms beliefs in core Christian doctrines, and all dues-paying members must affirm that they are Christians.

132.    Christian Educators seeks to support its members—particularly its educators in K-12 public schools—who want to live and work consistent with their shared belief that God created human beings as male and female and that sex is an immutable trait.

133.    To this end, Christian Educators objects to policies forcing educators to use pronouns that do not accord with a person's biological sex.

134.    Christian Educators also objects to policies that chill educators from expressing their sincerely held religious beliefs about the immutability of sex, and the group supports the rights of educators to discuss these beliefs with students and colleagues at work through informal discussions in and out of the classroom.

135.    Christian Educators objects to policies requiring educators to share private facilities like restrooms and locker rooms with persons of the opposite sex.

136.    Christian Educators seeks to assist in multiple ways members who are trying to serve in public schools without violating their consciences or religious beliefs on these issues.

137.    For example, Christian Educators has sought to educate its members on how to navigate issues involving gender identity that arise in the school setting without compromising their faith and beliefs as Christians.

138.    Christian Educators has addressed the issue at an annual conference and in regular publications and newsletters.

139.    Christian Educators also provides a dedicated resources page on its website devoted to topics involving gender-identity issues, including an article from Executive Director Schmus on handling requests to use inaccurate pronouns.[17]

---

[17] https://bit.ly/3WpeoG2.

21

140.    Christian Educators members have increasingly faced on-the-job issues related to school officials punishing or threatening to punish members for refusing to use inaccurate pronouns.

141.    Christian Educators anticipates that its members will increasingly ask the organization for guidance and help navigating these issues at their schools, and the organization has already expended resources answering members' questions and strategizing how to help its members faithfully live out the Christian walk while serving as educators.

142.    Some Christian Educators members fear that the new Title IX rules will punish them for their speech, deprive them of statutory free-speech protections, and infringe on their privacy rights by forcing them to share sex-specific facilities with students and teachers of the opposite sex.

143.    Brett Campbell, Michelle Keaton, Amy McKay, Silvia Moore, and Joshua Taylor are members of Christian Educators who teach at public high schools subject to Title IX in Tennessee.

144.    Each of these members has attached a declaration to this Complaint. *See* Exs. D–H.

145.    Each of these members is Christian.

146.    Each of these members believes that God created mankind as male and female and that sex is an immutable characteristic that cannot be changed.

147.    Accordingly, each of these members avoids using pronouns that do not accurately reflect a person's biological sex. They cannot refer to a male student as "she" or "they," nor can they refer to a female student as "he" or "they."

148.    Each of these members desires to express—during informal conversations with students and colleagues when these topics naturally arise—their view that biological sex is immutable, that males should not enter women's spaces or competitions, and that females should not enter men's spaces.

149.    Because each of these members wants to speak consistent with their beliefs by using words that accurately reflect biological reality, the new rules threaten to harm them.

150.    Each member's school conducts training on Title IX, tells teachers they must comply with Title IX, publishes and distributes a Title IX policy or similar harassment policy, and maintains a website advising the public of the school's Title IX policies and obligations.[18]

151.    Several of these schools conduct Title IX training for employees at the beginning of each school year.

152.    Several of these schools require employees aware of sexual harassment, or allegations of sexual harassment, to immediately report that to the district's Title IX coordinator.[19]

153.    Several of these districts maintain policies that define sexual harassment consistent with the previous Title IX regulations to include sexual remarks or actions but do not say anything about gender identity.[20]

154.    Several of these districts maintain policies that define hostile environment harassment consistent with the previous Title IX regulations as unwelcome conduct that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access" to educational programs.[21]

---

[18] https://bit.ly/3WbHFnr (Arlington Community Schools Title IX policy); https://bit.ly/3UrDYsp (Bartlett City Schools Title IX policy); https://bit.ly/3y2Bubl (Coffee County School District Title IX policy); https://bit.ly/49YVEjD (Knox County Schools); https://bit.ly/4bbBow7 (Warren County Schools Title IX policy)

[19] *See supra* n.18; *see also* https://bit.ly/3JCSur0 (Arlington Community Schools training explaining employees "MUST ***immediately*** inform the ACS Title IX Coordinator" of sexual harassment).

[20] *See supra* n.18.

[21] *See supra* n.18.

155.    None of the schools have a specific policy requiring staff to use inaccurate pronouns or restricting staff members from sharing their views on issues related to gender identity with students or colleagues.

156.    Further, Campbell, Keaton, McKay, Moore, and Taylor have had students who identify or identified as transgender.

157.    Some of them currently have students in their class who identify as transgender or non-binary.

158.    Some of them have received requests that they use inaccurate pronouns. Those members respectfully declined, and their schools did not discipline or punish them in any way for so declining.

159.    Each of these members informally interacts with students and colleagues throughout the school day, including in the hallways, in teacher's lounges, in meetings, and during after-school programs and activities.

160.    Some of them have had informal conversations with their colleagues about gender identity and have shared their religious and scientific view that men and women are different and that males should not be allowed to compete in women's sports, regardless of their claimed gender identity.

161.    At least one of them has used social media to express their views on gender identity.

162.    Each of them desires to speak consistent with their beliefs by politely sharing their view that sex is immutable, posting their beliefs on social media, or declining to say anything they don't believe.

163.    But they fear that the new rules will prevent them from speaking consistent with their faith and prohibit them from sharing their views.

164.    Some of them will censor their speech to avoid punishment under the new rules when they go into effect on August 1, 2024.

165.    These members want to explain and defend their view that sex is immutable, but they fear that the new rules will be used to punish them.

166.    Further, some of the members work in schools where students and teachers frequently share the same restroom.

167.    For example, Campbell and Taylor work at schools in which students and faculty share the men's restroom.

168.    These members want to avoid utilizing restrooms in the presence of students or teachers of the opposite sex. They believe that males and females have the right to use sex-specific intimate spaces.

## V.    The Department tries to rewrite Title IX.

169.    At the President's direction, the federal administrative branch is attempting to implement a whole-of-government agenda to redefine "sex" to mean "gender identity."

### A.    President Biden directs the executive branch to add gender identity to federal laws.

170.    In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the U.S. Supreme Court held that under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of … sex[.]" *Id.* at 681.

171.    The Court assumed that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

172.    The Court also recognized that "transgender status" and "sex" are "distinct concepts." *Id.* at 669.

173.    The Court emphasized that "other federal or state laws that prohibit sex discrimination," such as Title IX, were not "before" the Court. *Id.* at 681.

174.    The Court did not compare Title IX's text with the distinct text of Title VII. *Compare* 42 U.S.C. § 2000e-2(a) (Title VII), *with* 20 U.S.C. § 1681(a) (Title IX).

175.    Nor did *Bostock* address Title IX's safe harbor for sex-separated living facilities or any of the other distinctions between the two sexes that Title IX recognizes and permits.

176.    Even so, on his first day in office, President Biden declared that *Bostock*'s analysis applies to all federal laws on sex discrimination, including Title IX, by prohibiting gender-identity discrimination "so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021).

177.    The executive order specifically mentioned school restrooms, locker rooms, and sports.

178.    Shortly thereafter, the Department of Justice's (DOJ) Civil Rights Division issued a memorandum instructing all federal agencies that "*Bostock* applies to Title IX." U.S. Dep't of Just. C. R. Div., The Application of *Bostock v. Clayton County* to Title IX of the Educ. Amends. of 1972 (Mar. 26, 2021), https://perma.cc/TUL5-9GAN.

## B.    The Department attempts to implement a gender-identity mandate through "guidance" documents.

179.    Even before promulgating the new Title IX rules, the Department engaged in other agency action to implement President Biden's Executive Order.

180.    *First*, the Department published in the Federal Register its "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County." 86 Fed. Reg. 32,637 (June 22, 2021) ("Interpretation").

181.    The Department concluded that the phrase "on the basis of sex" in Title IX has the same meaning as the phrase "because of … sex" in Title VII and

that this interpretation "is most consistent with the purpose of Title IX." 86 Fed. Reg. at 32,638–39.

182.   Relying on *Bostock*, the Department pledged to enforce its Title IX interpretation and declared that it "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." 86 Fed. Reg. at 32,639.

183.   *Second*, Acting Assistant Secretary Suzanne B. Goldberg issued a "Dear Educator" letter notifying Title IX recipients of the Interpretation and reiterating that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." U.S. Dep't of Educ. Office for C.R., Letter to Educators on Title IX's 49th Anniversary, (June 23, 2021), https://perma.cc/J5V4-EGYA.

184.   The Dear Educator letter included a "fact sheet" issued by the Civil Rights Division of the DOJ and the Office for Civil Rights at the Department of Education. U.S. Dep't of Just. & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools, https://perma.cc/KA47-U9LJ ("Fact Sheet").

185.   A federal court preliminarily enjoined enforcement of the Interpretation and the Fact Sheet in 20 states, including Kentucky, Tennessee, and West Virginia. *See Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 838 (E.D. Tenn. 2022), *appeal docketed* No. 22-5807 (6th Cir. June 13, 2022). That court concluded that the challengers were likely to show that the Interpretation was a legislative rule under the APA that required notice and comment, which was not conducted.

27

C.     **The Department redefines "sex" to mean "gender identity" in the final Title IX rules.**

186.   In 2022, the Department issued a notice of proposed rulemaking proposing new Title IX regulations. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (July 12, 2022) ("2022 NPRM").

187.   On April 29, 2024, the Department finalized those rules, titled: "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance." 89 Fed. Reg. 33,474 (Apr. 29, 2024).

1.     **The Department's new definition of discrimination "on the basis of sex"**

188.   Under the rules, "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 33,886 (to be codified at 34 C.F.R. § 106.10).

189.   The Department's rationale for its definition comes straight from *Bostock*: "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*." *Id.* at 33,802.

190.   The rules provide for discriminatory-intent liability, disparate-impact liability, hostile-environment liability, harassment liability, and other theories of liability on all of these bases.

191.   As the Department's notice of proposed rulemaking explained it, this provision is intended to codify the Department's view that "Title IX's broad prohibition on discrimination 'on the basis of sex' … encompasses, at a minimum, discrimination against an individual because, for example, they are or are perceived to be male, female, or nonbinary; transgender or cisgender; intersex; currently or

previously pregnant; lesbian, gay, bisexual, queer, heterosexual, or asexual; or gender-conforming or gender-nonconforming." 2022 NPRM, 87 Fed. Reg. at 41,390–01.

192.    Nothing on this point changed in the final rules. The rules state that Title IX applies to "discrimination against an individual based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity" because "[a]ll of these classifications depend, at least in part, on consideration of a person's sex." 89 Fed. Reg. at 33,493.

193.    The new regulatory provisions do not define "sex." According to the rules, "it is not necessary to resolve the question of what 'sex' means in Title IX for the Department to conclude that no statutory provision permits a recipient to discriminate against students … in the context of maintaining certain sex-separate facilities or activities." *Id.* at 33,821. But in the notice of proposed rulemaking, the Department said that "sex can encompass many traits."

194.    The rules also fail to define "gender identity," though the rules' preamble says that "gender identity … describe[s] an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33,809.

195.    The revised version of the rules codified at 34 C.F.R. § 106.10 treats the new enumerated bases of liability—sex stereotyping and the like—as overlapping ways in which Title IX addresses gender identity.

196.    For example, the rules define gender-identity discrimination to be sex discrimination, but the rules also define "sex-stereotypes" discrimination to be sex discrimination, and also considers "sex-stereotypes" discrimination to encompass gender-identity discrimination. *E.g.*, 89 Fed. Reg. at 33,807 ("A person's nonconformity with expectations about . . . the sex with which they should identify implicate one's sex, and discrimination on that basis is prohibited.").

197.    Built on this framework, the rules implement Title IX to prohibit educational institutions from distinguishing between persons based on sex in a vast set of circumstances. At the same time, the rules implement Title IX to require educational institutions to ignore sex in favor of a person's "sense of their gender"—requiring schools to treat a boy who identifies as a girl as if he were a girl (and vice versa). *Id.* at 33,809.

198.    When this Complaint refers to the rules and Defendants' actions prohibiting discrimination based on gender identity, Intervenors intend to encompass any alternative theory that Defendants may use to achieve these ends.

### 2.    The new "de minimis harm" standard: gender identity controls over sex

199.    The rules revised 34 C.F.R. § 106.31(a)(2) to say:

> In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b).

89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

200.    The rules then specify that "a policy or … practice that prevents a person from participating in an education program or activity ***consistent with the person's gender identity*** subjects a person to more than de minimis harm on the basis of sex." *Id.* (emphasis added).

201.    The Department explains its view that *any* consideration of sex presumptively causes harm, but when the statute allows sex-based separation, sex differentiation is permissible even though (the Department claims) it causes more than *de minimis* harm. *Id.* at 33,816; *see* 2022 NPRM, 87 Fed. Reg. at 41,390–01

(explaining that "regardless of whether some students might experience more than de minimis harm if excluded from a particular sex-separate living facility on the basis of sex, Congress has nonetheless permitted that exclusion").

202.    The rules declare that these new standards apply to—and thus prohibit sex separation when applied to students who profess a gender identity different than their sex for "sex-separate restrooms and locker rooms," "single-sex classes or portions of classes," and "dress and grooming codes." 89 Fed. Reg. at 33,819, 33,816.

203.    The rules' preamble states that "§ 106.31(a)(2) does not apply to male and female athletic teams a recipient offers under § 106.41(b)." *Id.* at 33,816 (discussing provision to be codified at 34 C.F.R. § 106.31(a)(2)). In other words, the Department claims that separating athletic teams by sex (ignoring gender identity) might be permissible even if it causes "more than de minimis harm." *Id.*

204.    This caveat does not protect women's sports because the rules elsewhere say that gender-identity discrimination is a kind of sex discrimination, which requires schools to treat a boy who identifies as a girl as if he *were* a girl.

205.    Section 106.31(a)(2)'s gender-identity mandates exempt subsection (b) of 34 C.F.R. § 106.41, but not subsection (a). Subsection (a) says, "[n]o person shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a) (emphasis added); *see* 89 Fed. Reg. at 33,887 (to be codified as 34 C.F.R. § 106.31(a)(2)).

206.    That means a school risks sex-discrimination liability if a student is excluded from athletics "on the basis of [gender identity]," or "on the basis of [sex stereotypes]." The upshot of the rules is that schools may have separate boys' and

girls' teams but must let a male play on the girls' team if the male identifies as a girl. Thus, in practice under the rules, schools cannot maintain teams that are truly separated by sex.

207.    This tracks what the Biden administration has elsewhere stated about Title IX's requirements. DOJ has recently and repeatedly argued that, under Title IX, student athletes must be able to participate based on their gender identity rather than their sex. *E.g.*, Brief for the United States as Amicus Curiae in Support of Plaintiff-Appellant and Urging Reversal at 24–27, *B.P.J. v. W. Va. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. Apr. 3, 2023); Statement of Interest of the United States at 1, 7, *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021), ECF No. 42.

208.    Moreover, the new § 106.31(a)(2) does not exempt P.E. classes from its gender-identity mandates. Indeed, the rules do not even mention P.E. except to observe that "some sex-based distinctions may be appropriate in the protective gear or uniforms a recipient expects students to wear when participating in certain physical education classes or athletic teams." 89 Fed. Reg. at 33,824.

209.    Sex-specific P.E. classes have been permissible for decades. *See* 34 C.F.R. § 106.34(a). And girls are exposed to the same safety risks when competing against males in P.E. class as they are in sports.

### 3.    The new, lower, standard for hostile-environment claims

210.    The new rules expand Title IX's sexual harassment provisions to cover any form of sex-based harassment. *See* 89 Fed. Reg. at 33,491 ("[S]ex discrimination refers to any discrimination based on sex, including, but not limited to, sex-based harassment.").

211.    Specifically, the new rules replace the previous provision on "sexual harassment" (§ 106.30) with a provision defining "sex-based harassment" (to be codified at § 106.2).

212.    Sex-based harassment "is a form of sex discrimination and means sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10," 89 Fed. Reg. at 33,884 (to be codified at § 106.2), which includes "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," *id.* at 33,886 (to be codified at § 106.10).

213.    As the Department explained in its 2020 rule proposal, the rules clarify that harassment claims, including "hostile environment harassment" claims, cover "all forms of sex-based harassment, as opposed to only sexual harassment." 2022 NPRM, 87 Fed. Reg. at 41,410.

214.    These new rules also create a "broader standard" for evaluating hostile environment harassment. 89 Fed. Reg. at 33,498.

215.    According to the new rules, Title IX prohibits harassment tied to a complainant's gender identity or sex characteristics, as opposed to just sexual harassment like "unwelcome sexual conduct" or sexual assault. 34 C.F.R. § 106.30(a).

216.    The Department's new rules also adopt a lower standard for evaluating what constitutes a hostile environment.

217.    In *Davis v. Monroe County Board of Education*, the Supreme Court held that a person could bring a Title IX damages claim for peer-to-peer harassment if the harassment was "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." 526 U.S. 629, 633 (1999).

218.    Diverging from the "*Davis* standard" for hostile environment claims, the new rules define harassment sufficient to create a hostile environment as:

> Unwelcome sex-based conduct that is sufficiently severe <u>or</u> pervasive, that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment).

89 Fed. Reg. at 33,884 (emphasis added).

219.    According to the Department, "a single serious incident—even if not pervasive—may be so severe as to create a hostile environment. And based on the specific circumstances in which it occurs, pervasive conduct—even if no single occurrence of the conduct, taken in isolation, is severe—may likewise create a hostile environment." *Id.* at 33,500.

220.    The rules also state that "the definition of hostile environment sex-based harassment does not require a complainant to demonstrate any particular harm, such as reduced grades or missed classes." *Id.* at 33,511. Instead, "some impact on their ability to participate or benefit from the education program or activity" is enough. *Id.*

221.    Indeed, the Biden Administration has already taken the position that teachers' failure to use inaccurate pronouns can trigger liability under Title IX. Brief for the United States as Amicus Curiae in Supporting Defendant-Appellee and Urging Affirmance at 27–30, *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861 (7th Cir. 2023), 2021 WL 5405970.

222.    The new rules' preamble also states that *Bostock*'s reasoning applies to Title IX because of Title IX's parallels to Title VII. 89 Fed. Reg. at 33,807 ("Title IX's prohibition on sex discrimination must be read similarly to Title VII's prohibition."). And the Biden Administration has taken the position that "misgendering" can prove a hostile work environment under Title VII. U.S. Equal Emp. Opportunity Comm'n, Enf't Guidance on Harassment in the Workplace, https://bit.ly/3Qsliqh.

**D.      The new rules contradict Title IX's text, history, and purpose.**

223.    Although Title IX does not define "sex" or "on the basis of sex," Title IX's plain text, history, and past application all prove that these terms refer to sex according to *biology*, not "gender identity."

224.    The dictionary definition of the term "sex" has never—including when Title IX was enacted in 1972—meant "gender identity" as that term is used in the rules. Instead, the word "sex" refers to the biological binary of male and female, or to the physiological and biological differences between male and female.

225.    For decades, Title IX has been understood to allow distinctions by sex. Recognizing the biological fact of differences between males and females is necessary to achieving Title IX's policy goal of promoting educational opportunity for women.

226.    Title IX specifies that it cannot be construed to prevent sex separation in "living facilities." 20 U.S.C. §1686. That rule has long been implemented in the Department's regulations to permit "separate housing," 34 C.F.R. § 106.32(b)(1), as well as "separate toilet, locker room, and shower facilities," *id.* § 106.33.

227.    The rules eviscerate Title IX's respect for the biological differences between male and female by requiring schools to categorize students in line with their "gender identity" while ignoring their sex.

228.    The rules also erase Title IX's longstanding recognition that sex in the human species is binary. *See*, *e.g.*, 20 U.S.C. § 1681(a)(2) ("both sexes"); 34 C.F.R. § 106.32(c)(2) (referring to "housing … provided to students of one sex, when compared to that provided to students of the other sex").

229.    For example, the rules revise 34 C.F.R. § 106.21 by replacing the statutory term "both sexes" with the term "all applicants." 89 Fed. Reg. at 33,887. The notice of proposed rulemaking said that this change was "in recognition of the fact that some applicants may have a nonbinary gender identity." 2022 NPRM, 87

35

Fed. Reg. at 41,517, 41,528. The final preamble to the rules continues to refer to the concept of a "nonbinary" gender. *See* 89 Fed. Reg. at 33,818 (referring to "nonbinary" students).

230.    That reasoning conflicts with the statute. Title IX's statutory text and its implementing regulations—until now—have used "sex" to mean the biological binary of male and female.

231.    Redefining discrimination "on the basis of sex" to include "gender identity" will preclude school policies and practices that recognize sex to equalize opportunity, ensure privacy, or safeguard students, such as separating P.E. classes, locker rooms, and school sports teams based on biological sex.

## VI.    The new rules will eviscerate protections for women's-only spaces and competition, privacy, free speech, and religious freedom.

232.    The rules take effect on August 1, 2024. They will impose immediate harms on Intervenors.

### A.    The rules prohibit sex-specific spaces and preempt state laws protecting Intervenors' privacy and safety.

233.    The rules prohibit schools from limiting access to men's or women's restrooms or locker rooms according to biological sex rather than gender identity.

234.    In other words, the rules require that schools grant males who identify as girls access to women's restrooms, locker rooms, and other privacy facilities. And schools must grant females who identify as boys access to men's restrooms, locker rooms, and other privacy facilities.

235.    This undermines Title IX's guarantee of equal educational opportunities and prohibits schools from safeguarding people's privacy.

### 1.    Tennessee and Kentucky

236.    In 2021, Tennessee passed a law creating civil liability for any school that fails to designate multi-occupancy restrooms by sex because failure to do so

36

would allow a teacher or student to encounter members of the opposite sex in a multi-occupancy facility. Tenn. Code Ann. § 49-2-805(a).

237.    Kentucky passed a similar law, prohibiting public schools from allowing "students to use restrooms, locker rooms, or shower rooms that are reserved for students of a different biological sex." Ky. Rev. Stat. Ann. § 158.189.

238.    The Tennessee law protects Christian Educators members in Tennessee from being forced to share a restroom with teachers or students of the opposite sex.

239.    The new Title IX regulations, however, would force public schools in Tennessee and Kentucky to ignore these state laws and permit students and teachers to use opposite-sex restrooms based on their claimed gender identity.

240.    The new Title IX regulations thus injure Christian Educators members in Tennessee and Kentucky by depriving them of the protection of Tennessee's and Kentucky's laws ensuring they can use multi-occupancy restrooms without encountering a person of the opposite sex.

### 2.    West Virginia

241.    Under West Virginia's Act, Bridgeport Middle School likely could not legally allow males like B.P.J. to access women's-only locker rooms because the Act requires schools to designate "athletic teams or sports"—of which locker rooms are a vital part—by sex and because the Act gives a cause of action to "[a]ny student aggrieved by a violation of" the law. W. Va. Code § 18-2-25d(c)(1), (d)(1).

242.    The Fourth Circuit enjoined West Virginia from applying the Act to B.P.J., and that ruling is still being litigated. But the Fourth Circuit did not enjoin West Virginia from applying the Act to other male students.

243.    Under the new rules, however, the Harrison County school district must allow any male who identifies as a girl to access women's-only spaces, preempting West Virginia's Act.

244.    A.C. faces the prospect of sharing a restroom or locker room with B.P.J. in high school.

245.    A.C. also faces the prospect of sharing an overnight room with B.P.J. during trips for marching band.

246.    Requiring schools to allow males in women's-only spaces (and vice-versa) deprives children like A.C. of privacy and threatens their personal sense of safety and security.

247.    Forcing young women (or men) to share intimate spaces like restrooms and locker rooms with the opposite sex would likely cause some young athletes to quit sports or other extra-curricular activities entirely.

248.    And because Title IX applies to employees of educational institutions, the rules require schools to allow adults, such as teachers and coaches, to access opposite-sex bathrooms and locker rooms too.

249.    In this way, the rules deprive children like A.C. of the equal educational opportunities that Title IX guarantees.

**B.     The rules will dismantle Save Women's Sports laws and preempt state laws protecting Intervenor A.C.**

250.    West Virginia's Act still protects girls from competing against other males in women's sports because the Fourth Circuit ruling granted as-applied relief only to B.P.J.

251.    But under the new rules, the Harrison County school district must allow any male who identifies as a girl to play women's sports, preempting West Virginia's Act.

252.    Nullifying women's-sports laws like West Virginia's will harm female athletes like A.C. by destroying women's-only competitions and allowing males to continue to injure and displace the women and girls that Title IX was meant to benefit.

253.    Forcing young women to compete against males will likely cause some young female athletes to quit sports entirely because they view such competition as inherently unfair.

254.    In fact, five female athletes recently refused to compete against B.P.J. during an April 18 track meet—refusing to throw the shot put in protest and forfeiting their chance to place or to score points for their team.[22]

255.    Harrison County School Board subsequently punished the girls by suspending them from competing in a subsequent track meet on April 27.[23]

## C.    The rules compel and restrict protected speech and preempt state law and school policies protecting Intervenors.

256.    The new rules will also likely infringe on Intervenors' First Amendment rights.

257.    In 2023, Tennessee and Kentucky passed laws protecting teachers from school-district policies requiring them to use inaccurate pronouns to refer to students. Tenn. Code Ann. § 49-6-5102(b)(1); Ky. Rev. Stat. Ann. § 185.191(5)(c).

258.    These laws protect Christian Educators members in Tennessee and Kentucky public schools who have faith-based objections to using inaccurate pronouns.

259.    But the new Title IX rules threaten to force these teachers to use words (including pronouns) to communicate messages they disagree with while

---

[22] https://bit.ly/3UqPPpg.

[23] https://bit.ly/3WnNiip.

requiring them to refrain from expressing messages they want to speak in several ways.

260.   First, the new rules overrule Tennessee's and Kentucky's laws, depriving Christian Educators members of their protections. 89 Fed. Reg. at 33,508 ("[A] recipient's obligation to comply with Title IX and these final regulations is not obviated or alleviated by a conflicting State law that governs speech that is not protected by the First Amendment.")

261.   Second, the new rules deprive Christian Educators members of school-district harassment policies that are more protective of speech compared with the new rules.

262.   Some Christian Educators work at schools that define harassment more narrowly than the new rules; they define hostile environment claims under Title IX as sexual harassment that is so pervasive *and* severe as to limit a student's educational opportunities. *E.g.*, *supra* ¶ 150 n.18.

263.   But the new rules lower the standard for proving sex-based harassment under Title IX, while simultaneously expanding its scope to reach alleged harassment related to a person's gender identity. *Supra* § V.C.3.

264.   Because the new rules control any school district policies to the contrary, the new rules will require local school districts to adopt the new regulatory approach to hostile environment claims.

265.   So the new rules will subject Christian Educators members to sex-based harassment policies that are less protective of speech.

266.   This threatens to chill the speech of Christian Educators members because the new policies seemingly cover their speech about the immutability of sex.

267.    Third, Christian Educators face a credible threat of punishment under the new rules for declining to use a student's pronouns or sharing their views on the immutability of sex with students or other school-district employees.

268.    The new rules instruct school districts to implement policies prohibiting sex-based harassment, including harassment based on gender identity.

269.    As already explained, the new rules say that harassment causing a hostile environment need only be severe *or* pervasive and does not require "any particular harm, such as reduced grades or missed classes." 89 Fed. Reg. at 33,511.

270.    So under the new rules, a teacher who politely declines to use a student's inaccurate pronouns may cause a hostile educational environment so long as the student "demonstrate[s] some impact on their ability to participate or benefit from the education program or activity." *Id.*

271.    School districts governed by Title IX must comply with these regulations. Indeed, Christian Educators members work at schools that regularly instruct their teachers on Title IX obligations.

272.    School districts will likely implement policies requiring Christian Educators members to speak messages with which they disagree (like inaccurate pronouns) and to refrain from speaking their sincerely held beliefs about the immutability of biological sex.

273.    These school districts have, consistent with Title IX, implemented several enforcement mechanisms, including mandated reporting by employees and anonymous complaints.

274.    Christian Educators members face a credible threat of receiving a request from one or more students requesting that they use inaccurate pronouns, either inside or outside of class. Indeed, Campbell, Keaton, McKay, Moore, and Taylor are each aware of multiple students in their respective schools who identify

as transgender and several of the teachers have received requests to use inaccurate pronouns.

275.   Because these and other Christian Educators members will decline to use inaccurate pronouns, Christian Educators face a credible threat of punishment. They fear that the new, lower standard for harassment claims, combined anonymous complaint procedures and mandatory reporting requirements (*supra* ¶ 273), will subject them to Title IX complaints for their speech.

276.   In this way, the rules injure them by compelling them to speak words like pronouns to communicate a message that they believe is false.

277.   Fourth, the rules also injure them by prohibiting them from sharing their views on the immutability of sex with colleagues, students, or even during their personal time away from school.

278.   The new rules state that schools have a responsibility to police behavior that occurs "outside the recipient's education program or activity or outside the United States." *Id.* at 33,886.

279.   Under the new rules, Christian Educators members fear that they will be subject to Title IX complaints for expressing their sincerely held beliefs during informal conversations at their school and even for their speech occurring outside of school with students and colleagues, whether at their church, on social media, or in other conversations.

280.   For example, one Christian Educators member was accused of "hate speech" by a colleague in the school hallway just for voicing her support for a Tennessee law prohibiting drag shows for minors. The colleague became visibly upset, yelled, and attacked the sincerity of the member's religious beliefs.

## VII.   Intervenors' need for judicial relief

281.   All the acts of Defendants described above, and their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the United States.

282.   The rules are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

283.   No statute precludes judicial review of the rules, and the rules are not committed to agency discretion by law under 5 U.S.C. § 701(a).

284.   The Department declares that the rules have the full force of law, and the rules are definitive and determine the rights and obligations of persons.

285.   Intervenors can only receive adequate relief through judicial review.

286.   The rules will harm A.C. and Christian Educators members by denying them Title IX's educational benefits.

287.   The rules also deprive A.C. of the protection of West Virginia's Save Women's Sports Act, which ensures A.C. does not have to compete against and share a locker room with males, absent a court-granted exception.

288.   The rules will harm Christian Educator members by infringing on their free-speech rights and their religious-exercise rights to speak and act consistent with their faith.

289.   The rules will harm students and teachers like A.C. and Christian Educators members by infringing on their substantive due-process right to privacy and to access intimate, sex-designated spaces.

290.   The rules also deprive Christian Educators members of the protection of Tennese's and Kentucky's laws protecting their right to avoid using inaccurate pronouns.

291.     The rules also deprive Christian Educators members of school-district harassment policies that are more protective of their speech rights as compared to the new rules.

292.     Absent injunctive and declaratory relief, Intervenors will be harmed by the rules' mandates, and Intervenors have no adequate remedy at law.

## CLAIM I
## Violation of APA, 5 U.S.C. § 706(2)(A), (C)
## Agency Action Not in Accordance with Law and in Excess of Statutory Authority

293.     Intervenors incorporate by reference all other paragraphs.

294.     The Department is a federal agency under the APA.

295.     Under the APA, a court must "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(A)–(C).

296.     The new rules rewrite Title IX to create novel rights and obligations inconsistent with the language of the statute itself.

297.     The rules exceed statutory jurisdiction, authority, and limitations.

298.     Title IX uses the word "sex" to mean the biological, binary distinction between male and female and has always allowed and sometimes required schools to consider physical differences between the sexes.

299.     But the rules promulgate a "nonbinary" approach to sex discrimination and sex differences, expanding Title IX's nondiscrimination clause to cover discrimination "on the basis of gender identity," and requiring educational institutions to disregard sex differences.

300.     This is irreconcilable with Title IX's text and purpose.

301.   This contradicts Title IX's permissive approach to considering biological differences between the sexes in settings like physical education classes, living facilities, and sports teams.

302.   This also contradicts Title IX's mandatory approach to considering biological differences between the sexes in settings like showers, locker rooms, and competitive and contact sports.

303.   By prohibiting educational institutions from considering sex differences in certain settings, the new rules nullify the statute's text and aim of promoting equal opportunity.

304.   The statute does not permit educational institutions to *ignore* sex in favor of gender identity.

305.   And the Department's "de minimis harm" standard is not found in the statutory text.

306.   Congress has not delegated to Defendants the authority to prohibit gender-identity discrimination under Title IX.

307.   Substantive canons of statutory construction preclude reading Title IX's references to "sex" to include "gender identity" that differs from a person's physiology.

### *Federalism Clear Statement Rule*

308.   A clear and manifest statement is necessary for a statute to preempt the historical police powers of the states, to abrogate state sovereign immunity, or to permit an agency to regulate a matter in areas of traditional state responsibility. This is especially true when Congress conditions federal funding in such a way that it tips the balance of federal and state power.

309.   The rules purport to override state laws, including West Virginia's Save Women's Sports Act (W. Va. Code § 18-2-25d), Tennessee's and Kentucky's

laws preserving men's and women's private spaces (Tenn. Code Ann. § 49-2-803; Ky. Rev. Stat. Ann. § 158.189(3)), and Tennessee's and Kentucky's laws protecting educators' free-speech rights (Tenn. Code Ann. § 49-6-5102(b); Ky. Rev. Stat. § 185.191(5)(c)).

310.    A clear statement is needed to displace the states' traditional authority over public education, which includes separating the sexes in physical education class and sports, as well as in school restroom facilities, locker room facilities, and shower facilities. When Title IX was enacted in 1972, the public lacked clear notice that Title IX would apply in the way mandated by these rules. The federalism clear statement rule therefore precludes the Department from interpreting Title IX to include the rules' redefinition of "sex."

### Major Questions Doctrine

311.    The major questions doctrine also precludes reading "on the basis of sex" in Title IX to include the gender-identity mandates created by the rules.

312.    If Congress wanted to require schools to ignore biological differences for students who identify themselves with a different gender identity, it would have said so openly. Title IX, which is filled with references to the inherent biological differences between male and female, cannot be read to give administrative agencies like the Department authority to mandate that schools ignore the biological distinctiveness of girls and boys.

### Spending Clause

313.    When Congress imposes conditions on the acceptance of federal funds under the Spending Clause, the Constitution limits the states and the public's obligations to those requirements "unambiguously" set out on the face of the statute. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

314.    No funding recipient could unmistakably know or clearly understand that Title IX would impose the gender-identity mandates created by the rules as a condition of accepting federal funds from the Department.

315.    The public lacked the constitutionally required clear notice that the Act would apply in this way when Title IX was passed or when funding grants were made. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

### *Religious Freedom Restoration Act*

316.    In addition to violating all these clear-statement principles of construction, the rules are also contrary to the Religious Freedom Restoration Act ("RFRA").

317.    RFRA protects Intervenors and other Christian Educators members' right to speak consistent with their faith and to refrain from saying anything inconsistent with their faith. 42 U.S.C. § 2000bb-1.

318.    These members' speech expressing their faith-based views about gender and their decisions to refrain from using words to communicate a message they believe to be false are protected within the meaning of RFRA.

319.    The rules substantially burden these members' right to speak or refuse to speak in a manner motivated by sincerely held religious belief teachers by compelling the teachers to speak words that violate their beliefs and to refrain from speaking their faith-based views.

320.    RFRA prohibits the government from substantially burdening a sincerely held religious belief unless it is a narrowly tailored means to furthering a compelling government interest.

321.    The rules do not employ the least restrictive means for achieving the government's interest, nor do they further a compelling or even valid interest by burdening the teachers' rights.

322.    As applied to Christian Educators' members, the rules infringe on their statutorily protected rights to religious freedom.

\* \* \*

323.    As a result, the rules must be set aside under 5 U.S.C. § 706.

324.    The rules must also be enjoined and declared unenforceable under 5 U.S.C. § 705 in order to preserve status and rights pending review of this Court.

## CLAIM II
### Violation of APA, 5 U.S.C. § 706(2)(A), (C)
### Agency Action Contrary to the U.S. Constitution

325.    Intervenors incorporate by reference all other paragraphs.

326.    The Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

327.    Under the APA, a court must "hold unlawful and set aside agency action" if the agency action is "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B).

328.    A court has equitable jurisdiction to review and enjoin ultra vires or unconstitutional agency action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

### First Amendment - Free Speech

329.    The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I.

330.    The First Amendment protects educators' speech on matters of public concern.

331.    The rules restrict and compel educators' speech on an issue of public concern by requiring them to use words like inaccurate pronouns and to refrain from expressing their view that sex is binary and cannot be changed.

48

332.    The rules regulate educators' speech based on content and viewpoint: prohibiting them from expressing disfavored viewpoints and requiring them to speak the government's preferred views on an issue of public concern.

333.    The rules are so vague and overbroad that they will chill protected expression that disagrees with the Department's view about the meaning of sex.

334.    The rules deprive Intervenors of the protection of Tennessee and Kentucky laws prohibiting schools from requiring educators to use inaccurate pronouns. They also subject Intervenors to school policies that threaten free speech more than current school policies in place.

***Fourteenth Amendment - Vagueness***

335.    Statutes and regulations that condition the receipt of benefits must provide fair notice of what is prohibited and explicit standards for enforcement.

336.    The new rules are unconstitutionally vague as applied to Intervenors because they fail to define relevant terms, fail to provide Plaintiffs with fair notice of what is prohibited, and encourage discriminatory enforcement against religious viewpoints.

***Fourth Amendment and Fourteenth Amendment - Right to Privacy***

337.    Citizens have a fundamental right to privacy that is deeply rooted in this nation's history and tradition and implicit in the concept of ordered liberty.

338.    This protects individuals' right to shield their undressed body from a person of the opposite sex and to avoid seeing a person of the opposite sex in a state of undress. *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) ("[T]he constitutional right to privacy … includes the right to shield one's body from exposure to viewing by the opposite sex[.]").

339.    The new rules deprive Intervenors of single-sex spaces like restrooms, showers, locker rooms, and overnight accommodations, making it likely that they

will encounter persons of the opposite sex while they appear in a state of undress or while a person of the opposite sex appears in a state of undress.

340.    The new rules deprive Intervenors of state statutory protections for single-sex spaces like restrooms, showers, and locker rooms.

* * *

341.    As a result, the rules must be set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions.

342.    The rules must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

## CLAIM III
## Violation of APA, 5 U.S.C. § 706(2)(A), (C)
## Arbitrary and Capricious Agency Action

343.    Intervenors incorporate by reference all other paragraphs.

344.    Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

345.    Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

346.    The rules fail to define the key terms "sex," "gender identity," "sexual orientation," "sex stereotypes," "sex characteristics," "transgender," and "sex assigned at birth."

347.    In drafting and promulgating the rules, the Department failed to undertake reasoned decision-making in many respects.

50

348.   *First*, the rules act irrationally by explicitly resting its gender-identity regime on *Bostock*, even though *Bostock* said it did not encompass other civil-rights statutes that address sex discrimination (as Title IX does) or circumstances implicating intimate or physical contact (as Title IX does). 590 U.S. at 681. The Department's explicit and pivotal reliance on *Bostock* represents a fundamental error at the heart of the rules and renders them arbitrary and capricious on their face.

349.   *Second,* the rules' gender-identity mandates are vague and impossible to apply. The rules describe "gender identity" as "an individual's sense of their gender." This is undefinable and unworkable. Schools cannot know what it means or how to apply it consistently. It has no basis in the statutory text. It rejects Title IX's biological binary and therefore undermines the statute's purposes.

350.   The rules also impose inconsistent requirements. For example, the rules require schools to let males who identify as girls into girls' P.E. classes and locker rooms even though limiting males from girls' programs is not a gender-identity distinction.

351.   34 C.F.R. §§ 106.10 and 106.31(a)(2) mandate gender-identity discrimination despite purporting to prohibit it. For example, under the rules, schools must let students use a locker room based on the sex with which they identify, meaning that a male who identifies as a boy cannot use the girls' locker room, but a male who identifies as a female can. The rules require the school to treat the two males differently based on gender identity, even as the rules purport to prohibit discrimination based on gender identity. The rules fail to consider this important aspect of the problem. Such unexplained inconsistency is arbitrary and capricious.

352.   The Department's inclusion of "sex stereotypes" as a type of sex discrimination is also unreasoned. "[B]iological differences between males and

females" are "not stereotypes associated with either sex." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023); *accord L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023). The Department fails to explain why it considers biological differences to be sex stereotypes within the meaning of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality). That is a failure of reasoned decision-making.

353.   *Third*, the rules fail to address its impact on interscholastic athletics by asserting that it does not impact sports even though that contradicts other provisions of the rules and Department positions. *Supra* ¶¶ 203–09. The Department cannot redefine "sex" as "gender identity" without affecting sex-specific sports programs, but the rules never explain why Title IX purportedly permits more than de minimis harms in the sports context.

354.   *Fourth*, the rules ignore their effect on P.E. classes. 34 C.F.R. § 106.31(a)(2) requires that schools enroll male students in girls' P.E. classes (and vice-versa). P.E. classes regularly include contact sports, such as basketball and soccer, and the Department's longstanding regulations allow separation by sex in those classes. *See* 34 C.F.R. § 106.34(a)(1). But the rules now require schools to allow students to participate in P.E. according to their gender identity instead of their sex. *See* 89 Fed. Reg. at 33,887 (to be codified at 106 C.F.R. § 106.31(a)(2)). The rules ignore the harms this will cause girls. The Department's failure to address this problem is a lack of reasoned decision-making.

355.   *Fifth*, the rules do not consider the privacy interest in not exposing one's unclothed body to persons of the opposite sex. Students and teachers have a constitutionally protected privacy interest in preventing persons of the opposite sex from seeing their unclothed or partially clothed body. *See, e.g., Brannum*, 516 F.3d at 495. This interest in bodily privacy, which is protected even in prisons, *see, e.g., Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993), applies to public-school

students in housing as well as restrooms, locker rooms, and shower facilities. By putting persons of the opposite sex into these sex-specific spaces, the rules create a serious risk that students and teachers will be forced to expose their bodies to the opposite sex against their wishes. Children and teachers alike will reasonably hesitate to object lest the objection be taken as discriminatory harassment based on gender identity. The Department's failure to consider these privacy interests lacks reasoned decision-making.

356.    *Sixth*, the rules do not explain the Department's reversal of its previous position that "restroom, locker room, and shower facilities" are "living facilities" subject to 20 U.S.C. § 1686.

357.    *Seventh*, the Department's inclusion of "sex stereotypes" as a version of sex discrimination is unreasoned. If a school separates sports teams or locker rooms based on sex, instead of gender identity, it is not applying a harmful sex stereotype. "[B]iological differences between males and females" are "not stereotypes associated with either sex." *Eknes-Tucker*, 80 F.4th at 1229; *accord Skrmetti*, 83 F.4th at 484. The Department fails to address this obvious problem with its "sex stereotyping" theory. That is a failure of reasoned decision-making.

358.    *Eighth*, the rules do not adequately explain how they proscribe discrimination against non-binary students or justify its inconsistent use of the de minimis harm standard to students who identify as transgender, as non-binary, and as consistent with their sex. The rules' preamble states that schools cannot exclude a student from using bathrooms or locker rooms "consistent with that student's gender identity" because that "imposes more than de minimis injury." 89 Fed. Reg. at 33,818. The rules' preamble also says that discrimination based on sex, "including when they access sex-separate facilities … applies with equal force to all students, including … nonbinary students." *Id.* at 33,818; *see also id.* at 33,807. But the rules simultaneously do "not specify how a recipient must provide access to sex

separate facilities for students who do not identify as male or female." *Id.* at 33,818. These contradictions and non-explanations show a failure of reasoned decision-making.

359.   *Ninth*, the Department failed to consider any alternative policies, such as (1) taking no action; (2) creating rules to protect privacy and girls' equal access to athletic programs, including P.E. classes, under the correct understanding of Title IX; (3) grandfathering existing categories of programs and practices covered by Title IX; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

360.   *Tenth*, the Department failed to consider reasonable reliance interests, such as students' and teachers' longstanding interest in accessing sex-specific facilities and teams that are separated based on biological sex.

361.   As a result, the rules must be set aside under 5 U.S.C. § 706.

362.   The rules must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

## PRAYER FOR RELIEF

Intervenors respectfully ask this Court for the following relief:

A.   Enter a stay of the rules' effective date under 5 U.S.C. § 705 and a preliminary injunction enjoining Defendants, and any other agency or employee of the United States, from enforcing or implementing the portions of the rules that violate Title IX, the APA, and the U.S. Constitution;

B.   Enter a judgment declaring, pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706, that (i) the rules' interpretation of Title IX is unlawful and (ii) the rules are arbitrary and capricious;

C.   Set aside and vacate the rules on the basis that they violate Title IX, the APA, and the U.S. Constitution, pursuant to 5 U.S.C. § 706;

D.   Permanently enjoin Defendants from enforcing the portions of the rules that violate Title IX, the APA, and the U.S. Constitution;

E.   Award attorneys' fees, costs, and other expenses of this action to Intervenors under any applicable federal statute, including 28 U.S.C. § 2412;

F.   Grant the requested injunctive relief without a condition of bond or other security being required of Intervenors;

G.   Retain jurisdiction over this matter for the purpose of enforcing its orders; and

H.   Grant any and all other relief the Court deems just and proper.

Respectfully submitted this 3rd day of May, 2024.


Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Natalie D. Thompson**
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

*s/ Edward L. Metzger III*
Edward L. Metzger III
Kentucky Bar No. 94138
OMEGA LAW PLLC
P.O. Box 559
Union, KY 41091
(859) 898-2140
Lee@nkylaw.net

*Counsel for Plaintiffs*

*Motion for pro hac vice admission filed concurrently*

**Motion for pro hac vice admission filed concurrently;
    practice supervised by one or more D.C. Bar members while D.C. Bar
    application is pending.*