# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY
# COVINGTON DIVISION

| | |
|---|---|
| **State of Tennessee**; **Commonwealth of Kentucky**; **State of Ohio**; **State of Indiana**; **Commonwealth of Virginia**; and **State of West Virginia**, *Plaintiffs,* and **Christian Educators Association International**; **A.C.**, by her next friend and mother, Abigail Cross, *Proposed Intervenor-Plaintiffs,* v. **Miguel Cardona**, in his official capacity as Secretary of Education; and **United States Department of Education**, *Defendants.* | **Case No.** 2:24-cv-00072-DLB-CJS |

**DECLARATION OF DAVID SCHMUS, EXECUTIVE DIRECTOR OF CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL**

1

I, David Schmus, under penalty of perjury, declare as follows:

1. I am over the age of 18, of sound mind, and otherwise competent to sign this declaration. I have personal knowledge of the information below.

2. I am the Executive Director of Christian Educators Association International, also known as Christian Educators.

3. As the Executive Director of Christian Educators, I am the organization's Chief Executive Officer, accountable to the Board of Directors. I direct all the ministry and association activities.

## *Christian Educators' Background*

4. Christian Educators is a Christian educational association that primarily serves member individuals who teach and support public schools.

5. Christian Educators' mission is to support, connect, and protect Christians serving in public education. Christian Educators supports teachers who want to make a difference in their students, parents, and coworkers' lives and throughout the broader community.

6. At Christian Educators, we want to support Christian teachers and help them through discipleship and spiritual development. To support our teachers, we create content, host events, prepare trainings, and distribute materials all geared toward spurring our teachers on in their faith and explaining how that carries over to their classrooms.

7. Christian Educators' members consist of a group of educators, counselors, administrators, aides, and even bus drivers and custodians who serve as thriving ambassadors for Christ in our public schools.

8. Christian Educators is a non-profit corporation organized under California law with its principal place of business in Placentia, California.

9. Christian Educators serves educators in all fifty states, with approximately 15,000 members. And of those members, approximately 8,000 of them are paying members whose dues fund our services and ministry. There are dues-paying members in all fifty states.

10. Based on our members' stage in teaching, we have four different types of dues-paying membership: professional, student, retired, and associate.

11. Professional members must be W-2 employees of an educational institution. As part of their membership, they receive professional liability insurance negotiated and purchased by Christian Educators for the benefit of its professional members. In addition, Christian Educators' professional liability insurance policy and benefits cover the cost of an attorney if a professional member faces an adverse job action, and it provides access to free legal and educational advice on personnel and religious issues.

12. While professional members may serve at the K-12 or college level, approximately 98% of them serve at the K-12 level.

13. Similarly, although professional members may serve in any educational institution, approximately 96% of them serve in traditional public schools.

14. Thus, the majority of Christian Educators' dues-paying members are "professionals" employed in public schools at the K-12 level.

15. Christian Educators has approximately 6,043 professional members across the country.

16. Student members may be college students and may not be paid as educators. These students receive professional liability insurance negotiated and purchased by Christian Educators for the benefit of its student members, as well as access to free legal advice on religious issues.

17. Christian Educators has around 1,560 student members.

3

18. Retired members are retired educators. They do not receive any insurance benefits. Anyone who supports the mission and vision can be eligible for associate membership. Those members also do not receive any professional liability insurance benefits. Christian Educators has 365 retired and associate members.

19. In addition to dues-paying members, Christian Educators has 7,000 "movement members" who are included in the mailing list, but do not pay dues or receive insurance benefits.

20. There are 501 professional members in Tennessee, and 481 of those members are employed at public schools.

21. There are 451 professional members in Kentucky, and 439 of those members are employed at public schools.

22. There are 312 professional members in Ohio, and 297 of those members are employed at public schools.

23. There are 59 professional members in West Virginia, and 57 of those members are employed at public schools.

24. There are 189 professional members in Virginia, and 162 of those members are employed at public schools.

25. There are 124 professional members in Indiana, and 120 of those members are employed at public schools.

26. Christian Educators has 1,666 paying members with coverage in the Sixth Circuit. There are 1,390 professional members in the Sixth Circuit, and 1,340 of those members work at public schools.

27. Christian Educators was founded in 1953 when several Los Angeles educators and school administrators met to create a coalition of like-minded individuals who work in public schools. The coalition's goal was to reach students across America and provide them with caring teachers concerned for their moral and spiritual well-being.

28. Over the last 70 years, Christian Educators has grown and now has members nationwide. Christian Educators provides training and resources to its member educators, enhancing their professional and personal development while offering membership benefits.

29. We publish content, host events, plan trainings, and distribute materials all geared toward the spiritual development of our members. Some of our training and materials are designed to educate our members on issues such as their First Amendment rights and responsibilities and the current law governing union representation of teachers.

30. Christian Educators offers several benefits to its members.

31. For example, Christian Educators offers members $2 million in professional liability insurance, a local attorney to represent members in possible job actions against the members, unlimited consultations with attorneys and educational experts, and all the support provided from a biblical worldview.

32. Our members consult attorneys and educational experts on several different professional categories and areas.

33. Our members consult attorneys and experts to discuss issues like allegations about harassment or about members expressing their views and in turn offending someone who complains. They also discuss contract and employment issues, which usually pertain to issues such as non-renewal of contracts, involuntary transfer, suspension, or termination of employment.

34. They discuss their educational practices, such as the best practices for developing or managing Individualized Education Programs and observations by supervisors. Our members receive consultation from attorneys and experts on faith challenges, like how to deal with the worldview clash over gender identity or whatever the issue of the day is. We encourage our members to respond humbly,

prayerfully, and consistent with their religious beliefs while seeking to love and respect others.

34. Members receive consultations on peer conflicts, which could involve issues with teachers' aides, union representatives, or even hostility towards our members because of their faith.

36. The attorneys help our members with professional associations. We help our members with their teachers' unions and discuss issues such as opting out, receiving fair representation or benefits under the collective bargaining agreement, or even if the members are excluded from bargaining unit meetings. The attorneys also help the members with supervisor conflicts, where the supervisor lacks support for a teacher and disciplines them or is hostile toward the teacher.

37. Our members also consult with attorneys about their religious freedoms. Most often, these issues concern what teachers can and can't do regarding sharing about their faith, praying, having a Bible at work, advising Christian clubs, posting scripture at or near their desks, and any religious accommodation requests. This also includes any parent/student conflicts. Increasingly these issues are students wanting to identify as another gender socially at school without informing their parents.

38. Christian Educators also provides a broad spectrum of resources to equip our members to live out their faith in public schools. One of the ways we do that is through our online national conference called the Rise Up Summit, attended by approximately 10,000 educators each year. We co-host the Summit with Teach 4 the Heart and we have hosted well-known Christian leaders like Francis Chan, Mark Batterson, David Platt, Sean McDowell, and others. Our other in-person events help encourage and equip teachers to best help their students.

39. We host our events to provide encouragement to our members. The primary focus of our events is to teach our members how to think biblically about

6

who we are and who God is and how to show God's love to others in their work. We encourage them to model their beliefs in all aspects of their lives. We teach our members how to see challenges at their schools and in their classrooms as opportunities to trust and represent Christ. We help our members connect Christian educators with each other to build and sustain the local community. We equip our members to share about our Christian Educators organization with their colleagues and others. We also teach our members what teachers can and cannot do to respect the rights of their students and the school community.

40. We publish an award-winning magazine called Teachers of Vision, which has three editions a year. We also publish a monthly column focused on public policy issues called Free to Teach. We send out a monthly email newsletter called "In the Know" that informs our members about current events, resources, and opportunities. For encouragement, we send a daily devotional to all our members.

41. Our website is full of free resources for our members to use when needed. Our "Resource Center" houses many of our materials for our members. We have resources tackling topics such as articles of interest for Christian educators, professional development webinars, encouragement, campus ministry, parent engagement, prayer and bible study, benefits of membership, insurance, legal advice, and union issues. Each topic has webinars, videos, and publications that our members can access freely.

42. For example, our website has documents explaining our professional liability plan for our members. At Christian Educators we want to provide our members with peace of mind that, even if their school does not have coverage to defend a teacher, Christian Educators provides a back-up plan.

43. Christian Educators helps its members while also abiding by its own Statement of Faith, which explains some of Christian Educators' religious beliefs on topics including the Trinity, the Bible, Jesus Christ, and the need for redemption.

44. Christian Educators also maintains a mission and vision statement that underscores the idea of empowering Christian educators "to serve as thriving ambassadors for Christ in our schools."

45. Christian Educators also has a set of moral and religious standards for employees and volunteers entitled the Kingdom Living Standards for Staff/Volunteers. This includes upholding "the understanding of gender that affirms the goodness of God's creation of humankind as male and female and recognizes the blessing of living in congruence with His created order—a created order demonstrated in this context through biological sex."

46. To become a member of Christian Educators, an educator visits the website, completes a form, and pays a membership fee. Many members opt to resign from teachers' unions before they join Christian Educators. We will assist potential members in that process.

47. There is a faith requirement to joining Christian Educators. The membership form has a "Faith Agreement" and requires an affirmative response to the statement, "I am a Christian."

48. Christian Educators works to educate its members on how to navigate issues involving gender identity that come up in the school setting without compromising on their beliefs as Christians.

49. Christian Educators members generally object on religious, scientific, and philosophical grounds to referring to a student by pronouns that do not align with a student's biological sex.

50. Christian Educators has addressed the issue at our Rise Up Summit, as well as in our Teachers of Vision magazine and the monthly Free to Teach columns.

51. Christian Educators also has a page on its website dedicated to gender-identity issues, including an article I wrote on handling requests to use a student's self-selected pronouns. *See* David Schmus, *Gender Pronouns: Navigating a Difficult Landscape*, available at https://magazine.ceai.org/stories/navigating-gender-pronouns.

52. Christian Educators regularly advocates for the right of its members, at school and related school functions, to use biologically accurate pronouns consistent with their religious beliefs and for the right of its members to express their religious beliefs in appropriate settings at school and school functions.

53. These beliefs held by our members and their expression of their rights are encouraged to be reflected with integrity in their everyday interactions with others as an exercise of their sincerely held religious beliefs.

*My Role as Executive Director*

54. I submit this declaration on my own behalf as Christian Educators' Executive Director and on behalf of Christian Educators as its corporate representative.

55. I have my bachelor's degree in political science from Pepperdine University, a master's degree in biblical studies and theology from Biola University, and a secondary teaching credential from Biola University. I was an adjunct professor at Biola University teaching Christian Worldview and Biblical Studies courses for 13 years. I became a member myself of CEAI in 2005, and then began volunteering as seminar/workshop speaker/leader with CEAI in 2010. I began working for CEAI in 2015, and was promoted to Executive Director in 2017.

56. Given my frequent interactions with all aspects of the organization and its members, I know our organization's operations and membership. As Executive Director, I participate in all CEAI Board of Directors activities as a voting member. I help ensure that Christian Educators' leaders implement Christian Educators' mission and values and help ensure that local members share the mission and values. I am responsible for increasing Christian Educators' membership and for advocating for our members. I supervise the member admission and ensure the members share Christian Educators' positions.

57. I have observed the operations and circumstances of Christian Educators' members related to their commitment to living their Christian examples in their classrooms and supporting Christian Educators' values in their workplaces.

58. As Executive Director of Christian Educators, I know the concerns of Christian Educators' members. Based on my experience and interactions with members, I know that educators are gravely concerned about the effects that these Title IX changes will have on them and how the changes will clash with their constitutional rights and the statutory protections that they may lose.

59. Many members are expressing their reservations to our consultants and indicating they are not likely to speak out publicly for fear of retaliation and they are concerned with coerced self-censoring due to the chilling nature of the Title IX changes. And under the new rules, members fear that they will be subject to Title IX complaints for expressing their sincerely held beliefs during informal conversations at their school and even for their speech occurring outside of school with students and colleagues, whether at their church, on social media, or in other conversations.

60. For example, I know educators who have faced pushback and ridicule in their jobs because they failed to use a student's chosen pronouns in class or for opposing the school's gender ideology. Decent and honorable teachers who want to

10

follow their religious convictions while providing a safe and respectful environment for children to learn are at risk because of these changes.

63. Christian Educators recently conducted an email survey of its members, and of the 637 members that responded, more than half of the members reported that students requested the teachers use pronouns or other identifiers that communicate the student identifies as a gender identity that is different from their biological sex.

62. And twenty-three respondents related circumstances in which school officials and others have punished or threatened to punish educators for refusing to use these inaccurate names or pronouns.

63. And other members expressed situations where they are in schools or can invoke state laws or school policies that protect their rights to use pronouns consistent with students' biological sex.

64. We have had members accused of harassment because other teachers in their schools were offended by what our members said about gender identity or believed generally about their faith.

65. For example, a teacher member in Virginia received a Title IX complaint from another teacher in their school because our member expressed disapproval of using pronouns for students that do not align with the student's sex. The teacher was offended by this view and filed a complaint against our member.

66. In Colorado, one of our members was accused of bullying a student and causing the student severe mental harm for failing to use the student's chosen pronouns that did not align with the student's sex. Our member would not use this student's chosen pronouns, and the member was accused of discriminatory and offensive remarks toward the student.

11

67. Another member in Colorado was fired from a substitute teacher position because the member told a student that there is more to life than this student's gender identity.

68. One of our members is the Bible Club sponsor at this member's school in California. The member was accused of harassment for hosting different events and discussing biblical issues, even though this member and the Bible Club followed the school's policies for hosting events and speaking about their beliefs.

69. These are just a few examples of the harassment our members face at their schools when they speak according to their religious beliefs. The teacher colleagues at our members' schools are often easily offended, especially about gender identity issues. This offense causes some of our members to be afraid to speak their religious views. It causes other members to chill their speech about their views, as they do not want to be falsely accused of harassment or bullying simply for sharing a belief about gender identity that is unpopular.

70. I anticipate that, when the new Title IX rules go into effect, Christian Educators will receive many more calls and questions from our members about how to handle situations like using inaccurate pronouns, speaking about religious beliefs on gender identity without incurring liability, and accessing single-sex intimate spaces (like restrooms) with members of the opposite sex. We help our teachers with numerous issues in the schools and the classrooms. If the Title IX rules go into effect, we will have reduced bandwidth for our current operations.

71. Christian Educators has already received inquiries about these topics and expended resources answering those questions as they come up under local school policies. But because the new Title IX rules create a nationwide policy, I fully expect, based on past inquiries, that Christian Educators will receive many more inquiries about the new Title IX rules as they relate to these topics.

*The effect of new Title IX rules on Christian Educators' members*

72. Christian Educators' members are harmed by the Biden Administration's recent changes to the Title IX regulations.

73. Christian Educators' members teach from a foundation of their Christian faith, which means their faith informs how they communicate with students and conduct themselves in the classroom. They want to show dignity and respect for all their students.

74. The vast majority of our members teach at schools that must comply with Title IX. This means that the schools comply with the Title IX prohibition on sex discrimination. It is standard for schools to have a process for Title IX violations.

75. Compliance with Title IX in public schools is expected for teachers and other employees.

76. Because of this compliance with Title IX, Christian Educators has thousands of members who are teachers in schools that are impacted by the Biden Administration's changes to Title IX.

77. Approximately 96% of our members teach or work at schools that are in traditional public schools and will be impacted by the changes to Title IX.

78. The Biden Administration's changes will require Christian Educators' members to use pronouns that do not align with their students' biological sex. If they refuse to use pronouns that violate their faith, they will be subject to discipline at their individual schools and even face termination.

79. The Title IX changes will also apply to interactions in classrooms, outside of classrooms, between employees, and even online when the teachers may post something that students and teachers see.

80. Christian Educators' members Silvia Moore, Michelle Keaton, Amy McKay, Brett Campbell, and Joshua Taylor have filed declarations in this case, and

13

I can affirm that, based on my interactions with other members, the statements and experiences of these specific teachers are similar to those of other members of Christian Educators.

81. Based on my interactions with and knowledge of Christian Educator members, I anticipate that the new Title IX rules will lead to teachers being required to use pronouns that violate their religious beliefs and/or coerced into silence by the chilling effect of these changes in order to remain in good standing with their employers. Either way, they are forced to choose between staying silent about their beliefs or speaking according to their beliefs and facing possible discipline at their schools.

82. Based on my interactions with and knowledge of Christian Educator members, I anticipate the new Title IX rules will lead to teachers being falsely accused of harassment for expressing their biblical views on sex, gender-identity, and human sexuality. The fear of government persecution is a reality.

83. Christian Educators joined this suit to ensure its members will not face discipline, investigation, or any other negative repercussions, official or social, for exercising their constitutional and statutory rights.

***The effect of new Title IX rules on Christian Educators***

84. In addition, Christian Educators joined this suit to ensure that the organization can focus on its primary mission of developing professionals as Christian educators—instead of diverting its limited resources in response to Defendants' unlawful Title IX actions.

85. Christian Educators exists to support, connect, and protect our members and spur them on toward greater spiritual development they use in their daily lives, at their schools, and in their classrooms.

14

86. Daily, we as an organization are busy responding to service requests from our members, managing memberships, developing and distributing online and printed content, producing live and virtual events, praying for and with our members, and developing our membership, mission, and service offerings.

87. In response to Defendants' Title IX actions, Christian Educators will need to reduce our work on creating content, preparing for our annual events, and managing our memberships with current members. Instead, we will be consumed by answering calls from members regarding how they can remain faithful Christians while implementing the new Title IX rules as teachers. That is because these questions are not easily answered about how our members can follow the Title IX rule changes while staying true to their faith convictions.

88. The difficulty of these questions means that we cannot simply push out standard content to answer our members' questions. Instead, we will have to walk through these challenges with our members in prayer and discernment as they weigh whether to quit, risk violating their faith, or risk being charged with violations and prosecuted. It will be a very time-consuming process.

89. These efforts will remove our ability to consult with our members on their professional association questions or supervisor conflicts. We will not be able to operate normally due to these strenuous Title IX rule changes and the burden they place on our members.

90. Also, if these Title IX changes were to go into effect, we anticipate that many of our members would either resign or retire early and lose their positions at their schools due to non-compliance with the rules. This would shrink the number of members who participate with Christian Educators, and it would be a direct harm.

91. Over the years, we have heard from many of our members that they will not comply with rules that require them to communicate messages that violate their faith, particularly about gender identity. These members work in public

schools and will not comply with the Title IX rule change. If those members were terminated from their schools and the membership of Christian Educators diminished, it would cause us as an organization to lay off our staff and limit our ministry initiatives.

92. If Defendants are not enjoined and the Title IX actions are not set aside, Christian Educators will continue to suffer organizational harm and redirect its limited resources in response to Defendants' unlawful actions.

## DECLARATION UNDER PENALTY OF PERJURY

I, <u>David Schmus</u>, a citizen of the United States and a resident of the State of <u>California</u>, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this <u>2nd</u> day of May, 2024 at Washington, D.C.

_____
David Schmus