# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### COVINGTON DIVISION

| | |
|---|---|
| **State of Tennessee**; **Commonwealth of Kentucky**; **State of Ohio**; **State of Indiana**; **Commonwealth of Virginia**; and **State of West Virginia**, | |
| *Plaintiffs,* | |
| *and* | |
| **Christian Educators Association International**; and **A.C.**, by her next friend and mother, Abigail Cross, | **Case No.** 2:24-cv-00072-DLB-CJS |
| *Intervenor-Plaintiffs,* | District Court Judge Danny C. Reeves |
| v. | |
| **Miguel Cardona**, in his official capacity as Secretary of Education; and **United States Department of Education**, | |
| *Defendants.* | |

## INTERVENOR-PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR STAY AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ......................................................................................... v

Introduction ...................................................................................................... 1

Statement of Facts ........................................................................................... 2

Argument ........................................................................................................... 4

I.     Intervenors will likely succeed on the merits. ..................................... 5

     A.     The rules are contrary to Title IX. ............................................. 5

          1.     Title IX prohibits treating one sex worse than the other. ........... 5

          2.     Title IX does not prohibit all sex distinctions. ........................... 7

          3.     Title IX sometimes requires sex-specific spaces. ........................ 9

          4.     Because Title IX permits and sometimes requires sex distinctions, *Bostock* cannot apply to Title IX. ........................... 13

          5.     The rule's de-minimis-harm standard overrides Title IX's sex-based protections. ........................................................... 15

     B.     The rules are contrary to constitutional rights. .................... 18

          1.     The rules are unconstitutionally vague and overbroad, restricting and compelling Intervenors' speech based on viewpoint. ............................................................................ 18

          2.     The rules violate Intervenors' right to bodily privacy .............. 21

     C.     The rules are arbitrary and capricious. ................................... 22

II.     Intervenors will suffer irreparable harm. ....................................... 24

III.     The public interest and balance of equities favor a stay. ............... 25

Conclusion ....................................................................................................... 25

**CERTIFICATE OF SERVICE** ............................................................... 27

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adams ex rel. Kasper v. School Board of St. Johns County,*
  57 F.4th 791 (11th Cir. 2022) ............................................................ 6, 7, 13, 16, 22

*Alexander v. Choate,*
  469 U.S. 287 (1985) ............................................................................................ 10

*AMG Capital Management, LLC v. Federal Trade Commission,*
  593 U.S. 67 (2021) ............................................................................................... 9

*B.P.J. v. West Virginia State Board of Education,*
  98 F.4th 541 (4th Cir. 2024) (Nos. 23-1078, 23-1130), 2023 WL 2859726 ............ 23

*Bauer v. Lynch,*
  812 F.3d 340 (4th Cir. 2016) ................................................................................. 7

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ........................................... 3, 5, 13, 14, 15, 22, 23, 24

*Boulahanis v. Board of Regents,*
  198 F.3d 633 (7th Cir. 1999) ............................................................................... 14

*Brannum v. Overton County School Board,*
  516 F.3d 489 (6th Cir. 2008) ........................................................................ 10, 22

*Cannon v. University of Chicago,* 441 U.S. 677 (1979)........................................... 6, 8

*Cape v. Tennessee Secondary School Athletic Association,*
  563 F.2d 793 (6th Cir. 1977) ............................................................................... 11

*Chalenor v. University of North Dakota,*
  291 F.3d 1042 (8th Cir. 2002) ............................................................................. 14

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
  695 F.2d 1126 (9th Cir. 1982) ....................................................................... 11, 17

*Cohen v. Brown University,*
  101 F.3d 155 (1st Cir. 1996).......................................................................... 7, 13, 14

*Cohen v. Brown University,*
  991 F.2d 888 (1st Cir. 1993)................................................................................... 9

*Commonwealth v. Biden,*
  57 F.4th 545 (6th Cir. 2023) ................................................................................. 25

*CSX Transportation, Inc. v. Alabama Department of Revenue,*
   562 U.S. 277, 287 (2011) ............................................................................ 6

*D.H. ex rel. A.H. v. Williamson County Board of Education,*
   638 F. Supp. 3d 821 (M.D. Tenn. 2022) ................................................... 22

*Davis ex rel. LaShonda D. v. Monroe County. Board of Education,*
   526 U.S. 629 (1999) .................................................................................. 10

*Déjà Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson*
   *County,* 274 F.3d 377 (6th Cir. 2001) .................................................... 18

*Department of Homeland Security v. Regents of the University of California,*
   591 U.S. 1 (2020) ...................................................................................... 15

*Doe v. Luzerne County,*
   660 F.3d 169 (3d Cir. 2011) ...................................................................... 22

*Entertainment Productions, Inc. v. Shelby County,*
   588 F.3d 372 (6th Cir. 2009) .................................................................... 19

*Forsyth County v. Nationalist Movement,*
   505 U.S. 123 (1992) .................................................................................. 21

*Fry v. Napoleon Community Schools,*
   580 U.S. 154 (2017) .................................................................................. 10

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) .................................................................................. 19

*Grove City College v. Bell,*
   465 U.S. 555 (1984) ................................................................................ 8, 9

*Jackson v. Birmingham Board of Education,*
   544 U.S. 167 (2005) .............................................................................. 6, 13

*Janus v. American Federation of State, County, and Municipal Employees,*
   *Council 31,* 585 U.S. 878 (2018) ........................................................ 19, 20

*Kelley v. Board of Trustees,*
   35 F.3d 265 (7th Cir. 1994) ........................................................................ 9

*Kennedy v. Bremerton School District,*
   597 U.S. 507 (2022) .................................................................................. 19

*Kent v. Johnson,*
   821 F.2d 1220 (6th Cir. 1987) .................................................................. 21

*Knox County v. M.Q.*,
  62 F.4th 978 (6th Cir. 2023) ................................................................. 10

*L. W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ............................................................. 7, 24

*L.M. v. Town of Middleborough*,
  No. 23-cv-11111, 2023 WL 4053023 (D. Mass. June 26, 2023) .............................. 20

*Mansourian v. Regents of University of California*,
  602 F.3d 957 (9th Cir. 2010) ............................................................... 11

*Mayerova v. East Michigan University*,
  346 F. Supp. 3d 983 (E.D. Mich. 2018) ..................................................... 25

*McCormick ex rel. McCormick v. School District of Mamaroneck*,
  370 F.3d 275 (2d Cir. 2004) ............................................................... 6, 9

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................................. 20, 21

*Miami University Wrestling Club v. Miami University*,
  302 F.3d 608 (6th Cir. 2002) ............................................................. 7, 14

*Muldrow v. City of St. Louis*,
  144 S. Ct. 967 (2024) .................................................................... 15, 16

*Neal v. Board of Trustees of California State Universities*,
  198 F.3d 763 (9th Cir. 1999) ............................................................. 13, 14

*Niz-Chavez v. Garland*,
  593 U.S. 155, 160 (2021) .................................................................... 5

*North Haven Board of Education v. Bell*,
  456 U.S. 512 (1982) ......................................................................... 8

*O'Connor v. Board of Education of School District 23*,
  449 U.S. 1301 (1980) ....................................................................... 17

*Overstreet v. Lexington-Fayette Urban County Government*,
  305 F.3d 566 (6th Cir. 2002) ............................................................... 24

*Pederson v. Louisiana State University*,
  213 F.3d 858 (5th Cir. 2000) ............................................................... 11

*Rapanos v. United States*,
  547 U.S. 715 (2006) ......................................................................... 9

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) ............................................................ 24

*Sackett v. Environmental Protection Agency,*
598 U.S. 651, 676 (2023) ............................................ 14, 15

*Speech First, Inc. v. Cartwright,*
32 F.4th 1110 (11th Cir. 2022) ........................................ 21

*Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519 (2015) ............................................. 9

*Threat v. City of Cleveland,*
6 F.4th 672 (6th Cir. 2021) ....................................... 5, 6, 18

*United States v. Riverside Bayview Homes, Inc.,*
474 U.S. 121 (1985) ........................................................... 9

*United States v. Virginia,*
518 U.S. 515 (1996) ................................................. 7, 10, 11

*Vlaming v. West Point School Board,*
895 S.E.2d 705 (Va. 2023) ............................................... 20

*West Virginia v. Environmental Protection Agency,*
597 U.S. 697 (2022) ........................................................ 15

*Whitman v. American Trucking Associations,*
531 U.S. 457 (2001) .......................................................... 6

*Williams v. School District of Bethlehem,*
998 F.2d 168 (3d Cir. 1993) ............................................. 12

*Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association,* 647 F.2d 651 (6th Cir. 1981) ............... 10, 11

## <u>Statutes</u>

20 U.S.C. § 1681(a) .......................................... 1, 3, 5, 6, 10

20 U.S.C. § 1687(2)(A) ...................................................... 9

5 U.S.C. § 706(2) ............................................................ 5

Tenn. Code Ann. § 49-2-805(a) ................................................................. 4

Tenn. Code Ann. § 49-6-5102(b)(1) ...................................................... 4, 21

W.V. Code § 18-2-25d .............................................................................. 4

**Regulations**

34 C.F.R. § 106 ........................................................................... 8, 12, 15, 24

34 C.F.R. § 41 ............................................................................................ 3

**Other Authorities**

*Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance,*
40 Fed. Reg. 24,127 (June 4, 1975) ................................................. 8, 12

*Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71,413 (Dec. 11, 1979) ............................... 12

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* 89 Fed. Reg. 33,474 (April 29, 2024)
............................................................3, 5, 8, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24, 25

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* (2012) ...................................... 6, 8

Webster's Third New International Dictionary (1966) ........................................... 5, 6

**INTRODUCTION**

Fifty years ago, Congress revolutionized our educational system. In 1970, nearly 34% of working women lacked high-school diplomas. In 2016, it was 6%.[1] In 1972, 7% of high-school varsity athletes were women. In 2018, it was 43%.[2] The change occurred because the people's representatives balanced various interests and produced legislation centered on 37 words in 20 U.S.C.§ 1681(a): no person shall be excluded from, denied benefits of, or subjected to discrimination in educational programs on the basis of sex.

A different sort of revolution took place a few weeks ago. On April 29, unelected Department of Education officials published Title IX rules that add the concept of gender identity—"an individual's sense of their gender." The new rules sometimes even prioritize this subjective concept over someone's objective sex, requiring schools to allow some men to use women's restrooms, to change in women's locker rooms, to shower in women's showers, and to compete in women's sports. The result is that Title IX's primary beneficiaries are denied the privacy, dignity, equality, and fairness needed to benefit from our educational system.

All this turns Title IX's text, structure, and purpose upside down, exchanging a well-established, biological, and binary concept of sex for a recent, subjective, and fluid concept of identity. This usurps Congress's role, enlarges the Department's power, and makes Title IX incoherent. Indeed, under the Department's new reading, women must share showers with some men (but not share dorm rooms or programs like the Boy Scouts); women must compete in sports against some men (but not in beauty pageants or sororities); and women must share restrooms and overnight accommodations with some men (but not with men who identify as male or non-binary). None of this is justified—or justifiable.

---

[1] https://perma.cc/EH4F-2CYD.
[2] https://perma.cc/TN74-PJ4S.

This interpretative mishmash will harm many, especially females like Intervenor A.C. When a male student began competing on the girls' track team at A.C.'s middle school, that male student quickly beat almost 300 different girls, knocking them down the leaderboard over 700 times. That male student took A.C.'s spot in a championship meet and forced her to leave her locker room to avoid the humiliation of changing in front of a male. And that male student even sexually harassed A.C. in the locker room, using graphic, sexual language about her. The new Title IX rules would mandate many of these harms nationwide.

These new rules will also violate the constitutional rights of educators across the country, like members of Christian Educators Association International. Its members believe that sex is an immutable characteristic. They want to live and speak consistent with this belief. But the new rules force them to use inaccurate pronouns, to self-censor to avoid harassment complaints, and to use restrooms with students and staff of the opposite sex. At the same time, the new rules preempt many state laws that protect Intervenors' rights to speak, to access intimate spaces without those of the opposite sex, and to compete in fair athletic competitions.

The net result is that the new Title IX rules irreparably harm Intervenors while violating the Constitution, contradicting Title IX, and supplanting state laws protecting privacy, free speech, and fair athletic competitions. This Court should therefore stay the effective date of—and preliminary enjoin—these new rules because they are contrary to law and arbitrary and capricious.

## STATEMENT OF FACTS

*The new Title IX rules.* Congress passed Title IX to remedy historical discrimination against women by prohibiting discrimination "on the basis of sex." Memo. in Supp. of the States' Mot. for a § 705 Stay and Prelim. Inj. (States' Br.) 3–5, Doc. 19-1. Now, the Department is trying to interpret Title IX to cover gender-

identity discrimination, citing *Bostock v. Clayton County*, 590 U.S. 644 (2020), as justification. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (April 29, 2024); *see generally* States' Br. 7–10.

The new rules impose a gender-identity mandate through two key provisions. First, the rules state that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes … and gender identity." 89. Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). "[S]ex discrimination" is "any discrimination that depends" even "in part on consideration of a person's sex." *Id.* at 33,803. Under the new rules, Title IX prohibits gender-identity discrimination because it "necessarily involves consideration of a person's sex, even if [the word "sex"] is understood to mean only physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*." *Id.* at 33,802.

Second, the rules craft a new "de minimis harm" standard that permits certain sex distinctions and forbids others depending on whether they cause more than de minimis harm. *Id.* at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2). Any policy or "practice that prevents a person from participating in an education program or activity consistent with the person's gender identity" causes more than de minimis harm absent some statutory (20 U.S.C. § 1681(a)(1)–(9)) or regulatory (34 C.F.R. § 41(b), (c)) exception. 89 Fed. Reg. at 33,818.

Together, sections 106.10 and 106.31(a)(2) create a gender-identity mandate: while "sex separation … is not presumptively unlawful," sex distinctions cannot deny "a transgender student access to a sex-separate facility or activity consistent with that student's gender identity." 89 Fed. Reg. at 33,818; States' Br. 8–10.

*Intervenors.* A.C. is a female athlete and high-school student in West Virginia. Decl. of A.C. ¶¶ 1–2, Doc. 21-5 ("A.C."). A.C. throws the shot put and discus, runs the 4 x 100 relay, and plays in the marching band. *Id.* ¶¶ 2, 63. When

A.C. was in middle school, a boy who identified as a girl named B.P.J. competed on her school track team. *Id.* ¶¶ 7–8. B.P.J. regularly beat A.C. and other girls. *Id.* ¶¶ 9–35. So far, B.P.J. has displaced nearly 300 girls in over 700 individual instances. *Id.* ¶ 36. B.P.J. also changed in the girls' locker room and sexually harassed A.C. and her teammates. *Id.* ¶¶ 40–49, 51–61. A.C. does not want to compete against or share private spaces with any boy, no matter how they identify. *Id.* ¶¶ 63–69. But the new rules purport to preempt a West Virginia law that prohibits males from competing on women's sports teams. W. Va. Code § 18-2-25d.

Christian Educators Association International ("Christian Educators") is a membership organization for Christian teachers and educators. Decl. of David Schmus ¶¶ 4–7, Doc. 21-7 ("Schmus"). Some of its members want to express their religious belief that sex is an immutable characteristic. *See generally*, Decl. of Brett Campbell, Doc. 21-8 ("Campbell"); Decl. of Michelle Keaton, Doc. 21-9 ("Keaton"); Decl. of Amy McKay, Doc. 21-10; Decl. of Silvia Moore, Doc. 21-11; Decl. of Joshua Taylor, Doc. 21-12 ("Taylor"). These members have received requests to use inaccurate pronouns, and they fear the new rules will compel them to speak these words while prohibiting them from expressing their religious beliefs. *Id.* Some members also fear that their schools will open up shared restrooms to members of the opposite sex. Campbell ¶¶ 28–32; Taylor ¶¶ 39–47. Christian Educators seeks to protect its members' constitutional and statutory rights to speak, to use only accurate pronouns, and to access single-sex restrooms. Schmus ¶¶ 79–81; *see* Tenn. Code Ann. § 49-6-5102(b)(1) (pronouns); Tenn. Code Ann. § 49-2-805(a) (restrooms).

## ARGUMENT

To obtain a stay or preliminary injunction, Intervenors must show (I) likely success on the merits, (II) irreparable harm, and (III) both balance of equities and public interest favoring a stay. States' Br. 11. Intervenors meet each factor.

## I.    Intervenors will likely succeed on the merits.

Intervenors are likely to succeed because the rules contradict Title IX, contravene the Constitution, and are arbitrary and capricious. 5 U.S.C. § 706(2).

### A.    The rules are contrary to Title IX.

Title IX prohibits schools from treating one sex worse than the other sex. This does not prohibit all sex distinctions. In fact, Title IX sometimes requires them. That makes *Bostock* inapposite, and the Department's new de-minimis-harm standard inconsistent with Title IX's text and purpose.

#### 1.    Title IX prohibits treating one sex worse than the other.

Statutory interpretation begins with the text. We give "terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). Courts must not "add to, remodel, update, or detract from old statutory terms" to fit their "own imaginations." *Bostock*, 590 U.S. at 654–55. Title IX states: "No person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 § U.S.C. 1681(a).

Start with "on the basis of sex." As the States explain, this refers to the biological binary of male and female. States' Br. 12–13. The rules also "assum[e] that 'sex' refers to 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,804–05 (citing *Bostock*, 590 U.S. at 655).

Next, consider the word "discrimination." Sometimes, it means "to make a distinction," Webster's Third New International Dictionary 648 (1966) ("Webster's Third"), or to treat someone "differently," *Threat v. City of Cleveland*, 6 F.4th 672, 677 (6th Cir. 2021) (citing Webster's Third 648). But to "be subjected to discrimination," 20 U.S.C. § 1681(a), suggests a distinction for the wrong reasons: "a difference in treatment or favor on a class or categorical basis in disregard of individual merit." Webster's Third 648. Here, "precedent and dictionaries row in

the same direction." *Threat*, 6 F.4th at 677. "To discriminate … means to treat similarly situated individuals differently." *Id.*

Title IX also prohibits excluding from or denying benefits of an educational program. 20 U.S.C. § 1681(a). These nearby terms help clarify discrimination. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–98 (2012) (explaining associated-words canon). To "exclude" means to "bar from participation, enjoyment, consideration, or inclusion." Webster's Third 793. And to "deny" here means "to turn down or give a negative answer." *Id.* 603. These words reinforce that discrimination is not merely "differential" treatment but "less favorable" treatment based on sex, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), where "there is no justification for the difference in treatment," *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 287 (2011).

Finally, these words must be understood within the context of an "education program," like classrooms and sports. Putting these parts together shows that Title IX prohibits differential treatment that disfavors, denies, or treats one sex worse than the other sex when it comes to the full and equal enjoyment of educational opportunities. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (explaining Title IX's "purpose, as derived from its text, is to prohibit sex discrimination in education").

What dictionaries say, "statutory and historical context" confirms. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). As many courts have recognized, "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 & n.36 (1979).[3] That means "Title IX's remedial focus

---

[3] "[W]hatever approach" cases like *McCormick* or *Cannon* "may have used" to deduce Title IX's purpose, we may rely on them as "an integral part of [the]

is, quite properly, not on the overrepresented gender, but on the underrepresented gender; in this case, women." *Cohen v. Brown Univ.*, 101 F.3d 155, 175 (1st Cir. 1996) (*Cohen II*); *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002) (making the same point).

### 2.    Title IX does not prohibit all sex distinctions.

a. While Title IX prohibits sex *discrimination*, it does not forbid all sex *distinctions*. That is because men and women are different. "[P]hysical differences between men and women are … enduring: [t]he two sexes are not fungible." *United States v. Virginia* (*VMI*), 518 U.S. 515, 533 (1996). When it comes to privacy, for example, "biological sex is the sole characteristic" that determines whether persons are similarly situated for purposes of restrooms. *Adams*, 57 F.4th at 803 n.6.

Courts apply the same principle elsewhere. Employers may consider physiological differences and use physical fitness standards tailored to each sex. *Bauer v. Lynch*, 812 F.3d 340, 350–51 (4th Cir. 2016) (permitting sex-specific FBI training requirements under Title VII). And states may consider a child's sex when regulating harmful, sex-specific medical procedures. *L. W. ex rel. Williams v. Skrmetti,* 83 F.4th 460, 481 (6th Cir. 2023) (upholding law that "confirms … a lasting feature of the human condition" as not "presumptively invalid").

"A community made up exclusively of one sex is different from a community composed of both." *VMI*, 518 U.S. at 533 (cleaned up). Title IX therefore permits sex-specific spaces like living facilities, social organizations, and events like beauty pageants. States' Br. 13. Though fraternities, sororities, and pageants may not be necessary to ensure educational opportunities, Congress protected them anyway, recognizing that traditional single-sex spaces are not discriminatory. This logic

---

jurisprudence" on Title IX. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 286 n.17 (1993).

applies even more so for areas like multi-use restrooms that must be sex-specific to ensure meaningful access to educational programs.

b. Title IX's history confirms its plain meaning. The Supreme Court has interpreted Title IX's "postenactment developments" as "authoritative expressions concerning the scope and purpose of Title IX." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (citation omitted). That is because when Congress acquiesces to a statute's settled interpretation, courts assume this interpretation is correct. *See Cannon*, 441 U.S. at 687 n.7, 702. "One might even say that the body of law of which a statute forms a part … is part of the statute's context." Scalia & Garner, *supra*, 322–26 (explaining prior-construction canon).

Start with Title IX's implementing regulations born out of the Javits Amendment. States' Br. 4. Those regulations are codified throughout 34 C.F.R. § 106. *Compare Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance,* 40 Fed. Reg. 24,127, 24,139–43 (June 4, 1975) ("1975 rulemaking"), *with* 34 C.F.R. § 106.14–41. They permit sex-specific spaces like physical-education classes, restrooms, showers, locker rooms, and sports teams. States' Br. 5. Congress required the Department of Education predecessor agency ("HEW") to submit the rules to Congress for review. 1975 rulemaking, 40 Fed. Reg. 24,128. After six days of hearings on whether the rulemaking was "consistent with the law" and Congressional intent, Congress allowed the regulations to take effect. *N. Haven*, 456 U.S. at 531–32.

Courts and federal administrations (including this one) have long understood these regulations to "accurately reflect congressional intent." *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); States' Br. 5; *see also* 89 Fed. Reg. at 33,817. Unlike situations where Congress merely fails to act, refusing "to overrule an agency's construction" that Congress was aware of provides "some evidence of the reasonableness of that construction." *United States v. Riverside Bayview*

*Homes, Inc.*, 474 U.S. 121, 137 (1985). It's more probative still because Congress mandated congressional review of the regulations before they took effect, which is why courts have given Title IX's implementing regulations a "high" degree of deference. *E.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) (*Cohen I*); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994).

Congress ratified this construction and widespread judicial understanding when it amended Title IX through the 1987 Civil Rights Restoration Act, 20 U.S.C. § 1687(2)(A). That Act reversed *Grove City College* to ensure that Title IX applied to all education programs at federally funded schools, including programs like sports. *Id.* Congress did this to ensure "equal opportunities for female athletes." *McCormick*, 370 F.3d at 287; *Cohen I*, 991 F.2d at 894. This amendment was not unrelated to sex-specific distinctions. *See AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 81 (2021) (dismissing "isolated amendments" that "tell [the Court] nothing about the words" in question). Rather, "Congress considered … the '*precise* issue' presented" here. *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality) (citation omitted). That is "convincing" evidence that Congress adopted this statutory understanding. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Comtys. Project, Inc.*, 576 U.S. 519, 537–38 (2015) (amendments to Fair Housing Law that "assume[d] the existence of disparate-impact claims" showed "that Congress ratified disparate-impact liability"). Congress thus adopted the legal consensus since 1972 that Title IX allows schools to consider biological sex.

### 3.   Title IX sometimes requires sex-specific spaces.

a. While Title IX permits some sex distinctions, other times it requires them. Again, start with the text. "Students are not only protected from discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity[.]'" *Davis ex rel. LaShonda D. v.*

*Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (quoting 20 U.S.C. § 1681(a)). That could be harassment that prevents "female students from using … an athletic field." *Id.* at 650–51. In analogous contexts under disability statutes, it means any action "that unintentionally results in exclusion," *Knox Cnty. v. M.Q.*, 62 F.4th 978, 1002 (6th Cir. 2023), or precludes "meaningful access" to the sought-after benefit, *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Here too, "the yardstick for measuring the adequacy of the education that a school offers" depends on results and reality. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 167 (2017). Consider showers and locker rooms. Students retain "a significant privacy interest in their unclothed bodies," including "the right to shield [their] body from exposure to viewing by the opposite sex." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008). As Justice Ginsburg said, integrating the Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19. But the new rules partially mandate co-ed showers and locker rooms. That result is impossible to square with Title IX. Students cannot receive adequate educational benefits if forced to shower or share intimate spaces with the opposite sex. A.C. illustrates why. She lost educational benefits when she had to change in separate facilities and single-stall bathrooms to avoid changing in front of a male. A.C. ¶¶ 40–49. Adding insult to injury, that male made vulgar sexual comments in the locker room and elsewhere. *Id.* ¶¶ 51–61. Women and men simply cannot obtain true educational benefits in situations like this.

Similarly, for "equal opportunity" in sports, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). Because of the "average physiological differences" between men and women, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark ex*

*rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). Indeed, "the great bulk of the females would quickly be eliminated from participation and denied any *meaningful* opportunity for athletic involvement," without sex-specific teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam) (emphasis added).

"[F]ailing to field women's varsity teams … certainly creates a barrier for female students" to achieve equal athletic opportunities. *Pederson v. La. State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000). For example, after one college eliminated its women's varsity wrestling team, the school allowed female wrestlers to continue wrestling, "conditioned on their ability to beat male wrestlers in their weight class, using men's collegiate wrestling rules." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 962 (9th Cir. 2010). But this resulted in "female students [being] unable to participate on the wrestling team and [losing] the benefits associated with varsity status, including scholarships and academic credit." *Id.*

A.C.'s situation underscores the point. The male athlete at her school deprived hundreds of females of meaningful athletic competition. That athlete consistently beat A.C. during her 8th-grade year, took her spot at her school's conference championships, and displaced nearly 300 other female athletes. A.C. ¶¶ 19–24, 33; *see also* Decl. of Rachel Rouleau 2–3 (Doc. 63-2). "When males and females are not in fact similarly situated and when the law is blind to those differences, there may be as much a denial of equality as when a difference is created which does not exist." *Yellow Springs*, 647 F.2d at 657. Title IX's promise of equal opportunity means little if the statute ignores reality.

b. While the Department pretends biological differences are "artificial," the old regulations recognized that sex distinctions in many situations advance "the talent and capacities of our Nation's people." *VMI*, 518 U.S. at 533. Along with allowing sex-specific teams for contact sports and sports that involve "competitive

11

skill," they also require "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(b), (c). This includes equal opportunities in "the selection of sports and levels of competition" necessary to "effectively accommodate the interests and abilities of members of both sexes." *Id.* at § 106.41(c)(1). As the agency said, a school is "required to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and abilities of members of both sexes.'" 1975 rulemaking, 40 Fed. Reg. at 24,134.

Likewise, a long line of administrations understood Title IX to permit and sometimes require sex-specific sports teams. In 1975, for example, HEW explained that schools could not eliminate women's teams and tell women to try out for men's teams if "only a few women were able to qualify."[4] And in 1979, the agency issued a guidance document stating that schools who sponsor sports teams "for members of one sex" "may be required … to sponsor a separate team for the previously excluded sex." *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71,413 (Dec. 11, 1979). This makes sense too. The athletics regulations sought to overcome "the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993). The solution was to give women their own playing field because men would otherwise displace women in head-to-head competition.

Athletes like A.C. have benefited from "real opportunities, not illusory ones." *Id.* at 175. "[T]he mere opportunity for girls to try out" for a team is not enough if they don't stand a realistic chance of making the roster because of competition from men. *Id.* And the mere opportunity to participate isn't enough if women cannot realistically win scholarships or "enjoy the thrill of victory" in sports dominated by

---

[4] Off. for Civ. Rts., Letter from Peter Holmes to Chief State School Officers, Title IX Obligations in Athletics (Nov. 11, 1975), https://perma.cc/7T36-TJCZ.

men. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999). Schools must field women's-only teams so that women have the chance to compete, win, and become champions in their sport.

### 4. Because Title IX permits and sometimes requires sex distinctions, *Bostock* cannot apply to Title IX.

The Department justifies its gender-identity mandate by citing *Bostock*, but that case is inapposite here for at least five reasons.

*First*, *Bostock* did not change the meaning of "sex" in Title VII or Title IX. States' Br. 6, 15. Nor do the new rules purport to equate gender identity and "sex." *E.g.*, 89 Fed. Reg. at 33807. That is fatal because *Bostock* said that gender-identity discrimination is a form of sex-based discrimination; *Bostock* did not say that all sex-based distinctions are a form of gender-identity discrimination.

*Second*, *Bostock* dealt with hiring and firing in employment, while Title IX deals with educational opportunities. "[T]he school is not the workplace." *Adams*, 57 F.4th at 808. And "Title VII … is a vastly different statute from Title IX." *Jackson*, 544 U.S. at 175. That was why *Bostock* did not "purport to address bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. As the Sixth Circuit has repeatedly held, *Bostock*'s reasoning does not translate into other contexts, including Title IX. States' Br. 15.

*Third*, *Bostock* held that "sex is not relevant to the selection, evaluation, or compensation of employees" under Title VII, which treats sex like race, national, origin, and other protected classifications. 590 U.S. at 660 (cleaned up). But Title IX *only* covers sex, which often *is* relevant to promoting educational opportunities. *Supra* §§ I.A.2–3. Take sports. Under *Bostock*, employers cannot consider sex to hire or fire employees. Applied to sports, that logic would mean schools cannot consider sex to create any sports team. But "athletics programs *necessarily* allocate opportunities separately for male and female students." *Cohen II*, 101 F.3d at 177.

"Unlike most employment settings, athletic teams are gender segregated[.]" *Neal*, 198 F.3d at 772 n.8. Applying *Bostock* here would require schools to allow boys to compete against girls, allowing males to displace females and limiting women's opportunities. So here, "only one" interpretation "produces a substantive effect that is compatible with the rest of the law." *Sackett v. EPA*, 598 U.S. 651, 676 (2023) (citation omitted). That is why courts distinguish athletics and employment, each of which "requires a different analysis in order to determine the existence *vel non* of discrimination." *Cohen II*, 101 F.3d at 177; *Neal*, 198 F.3d at 772 n.8 (Title VII "precedents are not relevant in the context of collegiate athletics.").

Plenty of plaintiffs have tried, and failed, to show that Title IX prohibits schools from noticing sex. When some schools began cutting men's sports teams to bring themselves into compliance with Title IX, male athletes sued for sex discrimination. *E.g.*, *Miami Univ. Wrestling Club*, 302 F.3d at 615; *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1049 (8th Cir. 2002) (collecting cases). Like the Department, they argued that any action "taken 'but for' the sex of the participants" facially violated Title IX. *Boulahanis v. Bd. of Regents*, 198 F.3d 633, 636 (7th Cir. 1999); 89 Fed. Reg. at 33,807 (incorporating "but-for causation test"). But Title IX does not prohibit schools "from making gender-conscious decisions to reduce the proportion of roster spots assigned to men." *Neal*, 198 F.3d at 765.

*Fourth*, *Bostock*'s logic contradicts the very distinctions drawn by the new rules. For example, the rules in theory allow men's and women's restrooms—just separated by gender identity instead of sex. 89 Fed. Reg. at 33,818. But even facilities separated by gender identity still discriminate based on sex under the new rules; "it is impossible to discriminate against a person because of their … gender identity without discriminating against that individual based on sex." *Id.* at 33,816 (cleaned up). So under the Department's reading, the rules draw distinctions forbidden by Title IX's general non-discrimination text.

14

The Department's logic works only if the rule permitting sex-specific intimate spaces in fact redefines "sex" to mean "gender identity." *E.g.*, 34 C.F.R. § 106.33 (allowing "separate toilet, locker room, and shower facilities on the basis of [gender identity]"). But the Department has already disclaimed that argument. *E.g.*, 89 Fed. Reg. at 33807. So the *statute* prohibits schools from considering sex under the Department's reading (per *Bostock*), while the new rules sometimes override the statute, discard *Bostock*, and permit these forbidden distinctions. In other words, "sex" means "sex," except when it means gender identity. Nothing in the statute's text supports this illogic. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (explaining judicial review is "limited to the grounds that the agency invoked when it took the action" (cleaned up)).

*Fifth*, *Bostock* has no application to spending-clause statutes like Title IX. They demand a "clear statement" that gives funding recipients notice of their obligations. States' Br. 16. That is doubly so when the Department asserts "highly consequential" and "transformative" power to remake the nation's educational system. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (applying major-questions doctrine). And it is triply so when an agency "significantly alter[s] the balance between federal and state power" in an area traditionally regulated by the state (like education). *Sackett*, 598 U.S. at 679.

### 5. The rules' de-minimis-harm standard overrides Title IX's sex-based protections.

Because *Bostock* cannot apply to Title IX, the Department concocts a new de-minimis-harm standard to achieve its desired ends. 89 Fed. Reg. at 33,887 (codified soon at 34 C.F.R. § 106.31(a). But this standard flouts Title IX's text and purpose.

Once again, start with that text. It never mentions de minimis harm. It prohibits schools from excluding, denying benefits, or discriminating—meaning to "treat worse." *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024); *see supra*

§ I.A.1. "But neither that phrase nor any other says anything about how much worse." *Muldrow*, 144 S. Ct. at 974.

The Supreme Court addressed this issue in Title VII—the statute the Department cites to justify its new standard. 89 Fed. Reg. at 33815. But as *Muldrow* clarified, nothing in Title VII's text requires plaintiffs to show "an elevated threshold of harm." 144 S. Ct. at 974. Instead, a plaintiff need only show "some injury," *id.* at 977, not one that is "serious, or substantial, or any similar adjective suggesting that the disadvantage … must exceed a heightened bar," *id.* at 974. Title IX has no such bar either.

Moving from the extratextual to illogical, the Department's de-minimis-harm rule creates enormous inconsistencies. For example, the Department insists that sex distinctions *always* cause more than de minimis harm, but only when applied to persons with certain gender identities. *E.g.*, 89 Fed. Reg. at 33,887; *see also id.* at 33,815 (explaining "stigmatic injuries" are per se harmful). So sex-specific rules for restrooms cause de minimis harm when applied only to men who identify as men but more than de minimis harm when applied to men who identify as women. *Id.* at 33,820. On this logic, gender identity trumps sex-based protections—the very thing the statute explicitly protects. *Adams*, 57 F.4th at 814.

Meanwhile, the new rules implausibly exempt many sex-specific spaces from its gender-identity mandate, including living facilities, single-sex colleges, military schools, fraternities, sororities, boys' and girls' clubs, and beauty pageants. 89 Fed. Reg. at 33,818–19. This means schools can enforce biology-based standards for dorms but not locker rooms; colleges but not sports; beauty pageants but not showers. That makes little sense. Privacy matters at least as much in showers and locker rooms as it does in dorms.

By elevating gender identity above Title IX's protections for sex, the new rules define harms ideologically rather than biologically. This causes bizarre

16

results, like women's colleges accepting both females and males—unless the males identify as men.[5] The rules also take a fluid approach to sex distinctions. For example, sometimes the rules lament "harms associated with being treated consistent with a gender identity that differs from one's sex," like forcing females who identify as male to compete on the men's athletic team.[6] *Id.* at 33,819–20. But elsewhere the rules discourage schools from forcing students to abide by their gender identity. *Id.* (explaining that individuals can "weigh … for themselves" whether to participate in programs according to their gender identity or their sex). In the end, the rules permit persons who identify as transgender to abide by biological sex distinctions—or not. It's a choose-your-own adventure.

The Department also claims that "transgender students experience" real harm from sex-based distinctions, but it's "unaware" of analogous harms to "cisgender students." *Id.* at 33,820. Yet schools have often excluded students who identify with their sex from opposite-sex teams *because of their sex. E.g., O'Connor v. Bd. of Ed. of Sch. Dist. 23*, 449 U.S. 1301, 1306 (1980) (Stevens, J., in chambers) (girl excluded from boys' basketball team); *Clark*, 695 F.2d at 1131 (boy excluded from girls' volleyball team). Title IX allows these types of sex *distinctions* despite a ban on sex *discrimination. See supra* 14 (citing cases allowing schools to eliminate men's teams to comply with Title IX). Surely, the statute also allows sex distinctions in intimate spaces regardless of alleged harms based on gender identity, a trait Title IX never mentions.

The Department also misses how its de-minimis-harm standard hurts women and girls—the group Title IX is supposed to protect. Just look where the

---

[5] Barnard College, *Transgender Policy*, https://perma.cc/5KXR-KJJW.
[6] *Cf.* Isaac Henig, *I Chose to Compete as My True Self. I Win Less, but I Live More*, N.Y. Times, Jan. 5, 2023, https://perma.cc/88LD-KE6D (describing female athlete's experience on both the women's and men's teams while identifying as a man).

Department's interpretation leads. This administration supported one male's efforts to compete against girls at A.C.'s middle school. Intervenor-Plaintiffs' Compl. ¶ 207, Doc. 21-3 ("Intervenors' Compl."). That male beat girls hundreds of times during track and field competitions and accessed sex-specific spaces like locker rooms. A.C ¶¶ 40–61. The Department may view the harm these girls suffered as "de minimis," but Title IX disagrees—it ensures equal educational benefits *regardless of sex*. By "giv[ing] the de minimis rule too broad a reach," the Department has "den[ied] proper effect to [the] statute." *Threat*, 6 F.4th at 679 (warning about overbroad definitions of de minimis harm in Title VII). Simply put, the Department has redefined de minimis harm to mean particular ideological harms—picking and choosing which injuries matter, usurping Congress' right to identify statutory violations, and inflicting new harms on women and girls in the process. In so doing, this invented standard "convert[s]" Title IX's "ultimate message into something quite different from the original message—indeed sometimes into the opposite message." *Id*. (cleaned up). This Court should reject this effort to rewrite Title IX.

###### B.    The rules are contrary to constitutional rights.

Besides contradicting Title IX, the rules also violate the Constitution in at least two ways. They compel and restrict speech through vague and overbroad standards and infringe people's constitutional right to bodily autonomy.

######   1.    The rules are unconstitutionally vague and overbroad, restricting and compelling Intervenors' speech based on viewpoint.

A law is overbroad if it "chills speech outside the purview of its legitimate regulatory purpose." *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 387 (6th Cir. 2001). And a restriction is unconstitutionally vague if it "fail[s] to 'give the person of ordinary intelligence a

reasonable opportunity to know what is prohibited.'" *Entm't Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 379 (6th Cir. 2009) (citation omitted).

The rules are overbroad and vague for two reasons. First, the gender-identity mandate expands the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes." 89 Fed. Reg.  at 33,886. The rules don't even define "gender identity," except to say it "describe[s] an individual's sense of their gender." *Id.* at 33,809. Second, the rules create a "broader standard" for hostile-environment claims that is amorphous. *Id.* at 33,498. Harassment need only be severe *or* pervasive. Intervenors' Compl. ¶¶ 216–29. A complainant need not "demonstrate any particular harm," or conduct that denies access. 89 Fed. Reg. at 33,511. Harassment can be anything the student considers "unwelcome" or that "limits" the student's ability to benefit from an educational program. *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2).

Put these together and the new rules implicate educators' rights to speak as citizens on matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Schools cannot "treat[] everything teachers … say in the workplace as government speech subject to government control." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 509 (2022). Plus, the government bears a "heavier burden" to justify a regulation that compels speech. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 907 (2018).

The rules falter because they force teachers to speak inaccurate pronouns and to avoid stating that sex is binary. The rules say that schools must treat people according to their gender identity and failure to do so imposes "more than de minimis harm." 89 Fed. Reg. at 33,887. So failing to use someone's inaccurate pronouns causes more than de minimis harm, which likely explains why the Department says that "misgendering" can be harassment. *Id.* at 33516. Plus, the harassment need not be severe. *Id.* at 33,498. Pervasiveness is enough, and

pronoun usage is pervasive given its ubiquity in conversation. *Id.* Additionally, the rules applauded punishing a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS," because that speech "invades the rights of others." *Id.* at 33,504 (citing *L.M. v. Town of Middleborough*, No. 23-cv-11111, 2023 WL 4053023 (D. Mass. June 26, 2023)). This tracks the administration's position elsewhere. *See* States' Br. 18; Intervenors' Compl. ¶¶ 183–185; 221.

This confirms that the rules seek to punish certain speech about gender identity—a matter "of profound value and concern to the public" that "merits special protection." *Janus*, 585 U.S. at 913–14 (cleaned up). And words like "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021); *accord Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 740 (Va. 2023).

Since schools must institute policies consistent with the new rules, this puts Christian Educators members at risk. Some members believe that sex is a binary, immutable characteristic. *E.g.*, Campbell ¶ 15; Keaton ¶ 20; Taylor ¶ 11. They want to speak consistent with this belief by avoiding inaccurate pronouns and by sharing their religiously informed views during informal conversations with students and colleagues in the hallway, after school, or in the teacher's lounge. *E.g.*, Campbell ¶¶ 21–24; 34–39; Keaton ¶¶ 22–25, 28–32; Taylor ¶¶ 17–18, 24–32.

But they fear their speech will trigger harassment complaints. Indeed, one teacher accused a Christian Educators member of "hate speech" just because the member told someone in the hallway that she supported a Tennessee law banning drag shows for minors. Keaton ¶ 26. If a teacher politely expressed that view more than once on social media, that speech might be pervasive. 89 Fed. Reg. at 33,498; *see also id.* at 33,886 (requiring schools to monitor speech outside of school).

Some members have also received requests to use inaccurate pronouns in the past and will likely receive such requests in the future *See, e.g.*, Keaton ¶¶

15–19. These teachers have declined to speak inaccurate words without being punished. *Id.* Tennessee law protects that decision. Tenn. Code Ann. § 49-6-5102(b)(1). Now they reasonably fear that the rules will preempt their statutory free-speech protections, force them to use inaccurate pronouns, and prevent them from expressing their views. *E.g.*, Campbell ¶¶ 39–41; Keaton ¶ 34; Taylor ¶¶ 33–38; *see also Meriwether*, 992 F.3d at 499–502 (detailing university's attempt to punish professor for avoiding inaccurate pronouns).

Courts regularly hold that policies chilling speech on controversial subjects are unconstitutionally overbroad. For example, the Eleventh Circuit in *Speech First, Inc. v. Cartwright* condemned a school's hostile-environment harassment policy that mirrored the Department's new rules. 32 F.4th 1110, 1114–15 (11th Cir. 2022). That policy prohibited harassment "so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education." *Id.* That was "fatally overbroad," the court explained, because it chilled protected statements like "a man cannot become a woman because he 'feels' like one." *Id.* at 1125.

The rules are vague for the same reason. Nearly any statement about gender identity could subject a teacher to a harassment claim. To avoid investigation and punishment, reasonable educators will chill their speech. *E.g.*, Campbell ¶¶ 42–43; Taylor ¶¶ 48–49. That creates an "impermissible risk of suppression of ideas." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129–30 (1992).

### 2.       The rules violate Intervenors' right to bodily privacy.

The Sixth Circuit has recognized a fundamental right "to be free from forced exposure of one's person to strangers of the opposite sex." *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987). This right applies in intimate spaces like school restrooms, showers, and locker rooms where students appear in their "underwear."

*Brannum*, 516 F.3d at 495; *accord Doe v. Luzerne Cnty.*, 660 F.3d 169, 175–76 n.5 (3d Cir. 2011) (noting Fourteenth Amendment right to bodily privacy from persons of the opposite sex); *Adams*, 57 F.4th at 805 (collecting cases).

But the new rules burden this right by requiring schools to admit students to intimate spaces by gender identity rather than sex. 89 Fed. Reg. at 33,820–21. This harms A.C. and Christian Educators' members who use restrooms or locker rooms that will be (or have been) accessed by students of the opposite sex. *See, e.g.*, A.C. ¶¶ 48–49; Campbell ¶¶ 28–32; Taylor ¶¶ 39–47.

The government lacks a compelling interest to do this. As the Supreme Court recognized in *VMI*, stopping sex discrimination does not vitiate the need "to afford members of each sex privacy from the other sex in living arrangements." 518 U.S. at 550 n.19. Indeed, designating intimate spaces by sex "advances [an] important governmental objective": protecting people's interests in "using the bathroom away from the opposite sex and shielding one's body from the opposite sex." *Adams*, 57 F.4th at 804–07; a*ccord D.H. ex rel. A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 834–35 (M.D. Tenn. 2022) (recognizing constitutional interest in bodily privacy in sex-designated bathrooms). Constitutional rights thus cut *against* the gender-identity mandate.

## C.    The rules are arbitrary and capricious.

The rules are arbitrary and capricious for at least eight reasons.

*First*, the gender-identity mandate irrationally hinges on *Bostock*, even though *Bostock* did not change the meaning of "sex" under Title IX (or other statutes) or resolve the lawfulness of sex-specific spaces and athletics. States' Br. 19.

*Second*, the gender-identity mandate applies arbitrarily. For example, the rules allow biology-based standards for beauty pageants, girls and boys clubs, and admissions, but not for restrooms, showers, locker rooms, or physical-education

classes where biological differences play at least an equal role. *Id.* at 20. Under the Department's implausible read, Congress in 1972 cared more about ensuring Camp Fire Girls' clubs were women-only than protecting women's privacy in showers.

*Third*, the rules fail to grapple with the impact on sports—a central part of Title IX's purpose. The rules first pretend that the gender-identity mandate does not apply to sports. 89 Fed. Reg. at 33817. But they do. Intervenors' Compl. ¶¶ 203–07. At most, the new rules claim to exempt one provision regulating sports (34 C.F.R. § 106.41(b)) from the mandate. 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). But the new rules do not exempt the other sports provision (§ 106.41(a)) from this mandate. *Id.* And DOJ has repeatedly told courts that § 106.41(a)—not just § 106.41(b)—requires schools to admit males who identify as women into women's sports. Br. for the U.S. as Amicus Curiae in Supp. of Pl.-Appellant and Urging Reversal at 24–27, *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 541 (4th Cir. 2024) (Nos. 23-1078, 23-1130), 2023 WL 2859726. If § 106.41(a)'s older version required this, § 106.41(a)'s new version must as well; the new rules merely expand § 106.41(a)'s reach to *explicitly* include gender identity. So the demand to include males in women's sports has only become clearer now. *See also* States' Br. 9–10 (explaining how the Department's attempt to distinguish sports from restrooms by citing deference afforded implementing regulations fails because sports and restrooms provisions were part of the same rulemaking).

*Fourth*, the gender-identity mandate is vague and fails to adequately explain the who, what, when, where, or why of how it applies in different contexts. For example, the rules purport to exempt sports but as just explained, they don't fully do so. The rules also say that the gender-identity mandate "applies with equal force to … nonbinary students," but fails to explain "how a recipient must provide access to sex separate facilities for students who do not identify as male or female." 89 Fed. Reg. at 33,818. The rules do not even explain how *Bostock*'s "but-for test" can

apply to students who don't identify as male or female. *Bostock*, 590 U.S. at 656; *see* States' Br. 19.

*Fifth*, the rules apply the gender-identity mandate coyly, haphazardly, and inconsistently. For example, the rules say that schools may continue to provide sex-specific facilities consistent with the implementing regulations. 89 Fed. Reg. at 33820. But the rules also say schools can't maintain *sex-specific* places (based on biology) to ensure women's-only bathrooms or locker rooms. Rather than adjust the regulations to make this explicit, the new rules arbitrarily leave the implementing regulations in place. *Id.* at 33821; *see* 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex[.]").

*Sixth*, the rules disregard the biological differences between men and women that justify sex-specific spaces and athletics, including a person's privacy interest in avoiding exposure to persons of the opposite sex.

*Seventh*, the rules apply the gender-identity mandate to cover discrimination based on sex stereotypes, even though "[r]ecognizing and respecting biological sex differences does not amount to stereotyping." *Skrmetti,* 83 F.4th at 486.

*Eighth*, the rules fail to meaningfully respond to comments. States' Br. 20.

## II.   Intervenors will suffer irreparable harm.

Violating constitutional freedoms always constitutes irreparable injury. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (First Amendment); *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). The new rules threaten Christian Educators' free-speech rights. *Supra* § I.B.1. The rules do so by claiming to deprive Intervenors of state laws that protect their free speech and of school-district harassment policies that protect their free-speech rights more broadly. Intervenors' Compl. ¶¶ 260–66. As a result, some Christian Educators' members will begin to self-censor their speech

when the new rules go into effect. *E.g.*, Taylor ¶¶ 48–49. In addition, A.C. and Christian Educators also face the imminent violation of their constitutional right to privacy. *Supra* § I.B.2; Intervenors' Compl. ¶¶ 236–240.

Moreover, courts have recognized that the "lost opportunity to participate in … athletics" is a form of irreparable harm. *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018) (collecting cases). A.C. seeks to participate in marching band this summer and fall and to participate in track next season. A.C. ¶¶ 63, 64. But A.C. is "reluctant" to continue with band or track because she fears her school will assign boys to overnight hotel rooms with girls, admit boys into the girls' restrooms and locker room, and allow boys to compete on the track team. *Id.* ¶¶ 64–68; *see* 89 Fed. Reg. at 33821 (stating carveout for "living facilities" applies only to housing). Intervenors need relief now.

## III.   The public interest and balance of equities favor a stay.

The balance of equities and public interest inquiries "merge when the government is the defendant." *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). As the States explain, these factors weigh decisively in Intervenors' favor. States' Br. 25.

## CONCLUSION

Intervenors respectfully ask this Court to grant their motion for a stay and preliminary injunction.

Respectfully submitted this 16th day of May, 2024.


By: */s/ Rachel A. Rouleau*

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Natalie D. Thompson*
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

Edward L. Metzger III
Kentucky Bar No. 94138
OMEGA LAW PLLC
P.O. Box 559
Union, KY 41091
(859) 898-2140
Lee@nkylaw.net

*Counsel for Intervenor-Plaintiffs*

***Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of May, 2024, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send a notification to all counsel of record.

By: */s/ Rachel A. Rouleau*
     Rachel A. Rouleau*
     Virginia Bar No. 97783
     **Alliance Defending Freedom**
     44180 Riverside Parkway
     Lansdowne, Virginia 20176
     (571) 707-2119
     (571) 707-4790 Fax
     rrouleau@ADFlegal.org