**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| STATE OF TENNESSEE, et al.,<br><br>     *Plaintiffs*,<br><br>v.<br><br>MIGUEL CARDONA, *in his official capacity as Secretary of Education*, et al.,<br><br>     *Defendants*. | No. 2:24-cv-00072 |

<u>**DEFENDANTS' OPPOSITION TO**</u>
<u>**PLAINTIFFS' MOTION FOR A § 705 STAY AND PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

I.     Title IX, Implementing Regulations, and Guidance ........................................... 3

II.    Procedural History ............................................................................................. 4

LEGAL STANDARD ............................................................................................................... 5

ARGUMENT ........................................................................................................................... 5

I.     Plaintiffs Are Unlikely To Succeed on the Merits............................................... 5

     A.    The Final Rule's Clarification that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text. ....................... 5

     B.    The Final Rule's Limitations on Sex Separation and Differentiation Properly Account for Congressional Direction on Title IX's Coverage and Application to Different Contexts........................................................ 10

     C.    The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is a Reasonable Exercise of the Department's Statutory Authority and Consistent with the Requirements of the First Amendment.......... 15

     D.    The Final Rule's Clarification of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Power Issue. ................. 19

     E.    The Final Rule Does Not Violate Parental Rights. ................................................ 20

II.    Plaintiffs Have Not Established Irreparable Harm. ........................................... 21

III.   The Equities and Public Interest Weigh Against Preliminary Relief. ............................ 23

IV.   Any Relief Afforded by the Court Should Be Limited in Accordance with the Administrative Procedure Act ("APA") and Equitable Principles. ................................... 24

CONCLUSION......................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*,
   75 F.4th 760 (7th Cir. 2023) ................................................................. 7

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ................................................................. 24

*Ayotte v. Planned Parenthood of N. New England*,
   546 U.S. 320 (2006) ............................................................................ 25

*Benning v. Georgia*,
   391 F.3d 1299 (11th Cir. 2004) ............................................................ 19

*Bostock v. Clayton County*,
   590 U.S. 644 (2020) ..................................................................... *passim*

*Califano v. Aznavorian*,
   439 U.S. 170 (1978) ............................................................................ 12

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ............................................................................ 24

*Cannon v. Univ. of Chi.*,
   441 U.S. 677 (1979) ............................................................................ 24

*Cornish v. Dudas*,
   540 F. Supp. 2d 61 (D.D.C. 2008) ....................................................... 23

*D.T. v. Sumner Cnty. Sch.*,
   942 F.3d 324 (6th Cir. 2019) ............................................................... 22

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
   526 U.S. 629 (1999) ...................................................................... 15, 16

*DHS v. New York*,
   140 S. Ct. 599 (2020) .......................................................................... 25

*EEOC v. Frank's Nursery & Crafts, Inc.*,
   177 F.3d 448 (6th Cir. 1999) ............................................................... 24

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................................ 14

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
   503 U.S. 60 (1992) ................................................................................ 7

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) ................................................................................... 15, 16

*Grabowski v. Ariz. Bd. of Regents*,
   69 F.4th 1110 (9th Cir. 2023) ............................................................................ 7

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ...................................................................... 7, 11

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009) ...................................................................................... 7, 8

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ........................................................................................ 20

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993) ................................................................................... 15, 17

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ...................................................................................... 3, 20

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) .......................................................................... 21

*Kentucky v. EPA*,
   Civ. No. 3:23-CV-00007, 2023 WL 2733383 (E.D. Ky. Mar. 31, 2023),
   *appeal filed*, Nos. 23-5343, 23-5345 (6th Cir. Apr. 19, 2023) ......................... 21, 22

*L.W. ex rel. Williams v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023) .......................................................................... 8, 9

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
   814 F. App'x 125 (6th Cir. 2020) ................................................................... 24

*Leary v. Daeschner*,
   228 F.3d 729 (6th Cir. 2000) ........................................................................... 5

*M.L.B. v. S.L.J.*,
   519 U.S. 102 (1996) ........................................................................................ 20

*Mayo v. United States*,
   319 U.S. 441 (1943) ........................................................................................ 23

*Memphis A. Philip Randolph Inst. v. Hargett*,
   978 F.3d 378 (6th Cir. 2020) .......................................................................... 21

*Meritor Sav. Bank, FSB v. Vinson*,
   477 U.S. 57 (1986) ............................................................................................ 7

iii

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ................................................................ 7, 8, 9, 18

*Munaf v. Geren*,
   553 U.S. 674 (2008)................................................................................ 5

*Ne. Ohio Coal. for the Homeless v. Husted*,
   696 F.3d 580 (6th Cir. 2012) ................................................................ 5

*Nelson v. Christian Bros. Univ.*,
   226 F. App'x 448 (6th Cir. 2007) ........................................................ 7

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)................................................................................ 19

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................ 23

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ................................................................ 8, 9

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981)................................................................................ 19

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007)................................................................................ 7

*Sampson v. Murray*,
   415 U.S. 61 (1974)................................................................................ 25

*Smith v. Org. of Foster Fams. for Equal. & Reform*,
   431 U.S. 816 (1977)................................................................................ 20

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ............................................................ 18

*Speet v. Schuette*,
   726 F.3d 867 (6th Cir. 2013) ................................................................ 16, 17

*United States v. Miami Univ.*,
   294 F.3d 797 (6th Cir. 2002) ................................................................ 24

*Whitaker ex rel Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) .............................................................. 11

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................ 5

**STATUTES**

5 U.S.C. § 705 .............................................................................................................. 25

20 U.S.C. § 1681 ..................................................................................................... *passim*

20 U.S.C. § 1682 ..................................................................................................... *passim*

20 U.S.C. § 1686 ............................................................................................... 3, 12, 22

29 U.S.C. § 623 ................................................................................................................ 8

42 U.S.C. § 2000e-2 .................................................................................................... 4, 6

**REGULATIONS**

34 C.F.R. § 106.2 ......................................................................................................... 18

34 C.F.R. § 106.10 ......................................................................................................... 5

34 C.F.R. § 106.31 ............................................................................................. 2, 11, 14

34 C.F.R. §§ 106.33–.34 .............................................................................................. 11

34 C.F.R. § 106.41 ....................................................................................................... 13

Sexual Harassment Guidance,
   62 Fed. Reg. 12,034 (Mar. 13, 1997) ...................................................................... 16

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
   Federal Financial Assistance,
   85 Fed. Reg. 30,026 (May 19, 2020) ......................................................................... 3

Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex,
   Including Sexual Orientation or Gender Identity,
   Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021) .................................. 4

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
   Federal Financial Assistance,
   87 Fed. Reg. 41,390 (proposed July 12, 2022) .................................................... 4, 11

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
   Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female
   Athletic Teams,
   88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) ....................................................... 13

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
   Federal Financial Assistance,
   89 Fed. Reg. 33,474 (Apr. 29, 2024) ................................................................ *passim*

**OTHER AUTHORITIES**

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946) ....................... 2

## INTRODUCTION

Title IX prohibits recipients of federal funds from discriminating on the basis of sex in their education programs or activities. 20 U.S.C. § 1681(a). The Department of Education (the "Department") is charged with issuing rules to effectuate this prohibition. 20 U.S.C. § 1682. On April 29, 2024, the Department issued a rule titled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "Final Rule" or "Rule"). Among other things, the Final Rule clarifies that "discrimination on the basis of sex" includes "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," and that the definition of hostile environment sex-based harassment includes "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884.

The Department's interpretation of discrimination "on the basis of sex" straightforwardly applies the Supreme Court's reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* concluded that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of gender identity "because it is impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex." *Id.* at 660. That same reasoning applies to the materially similar prohibition on sex discrimination in Title IX.

Further, Plaintiffs fail to demonstrate that the Final Rule is arbitrary or capricious based on the distinctions it recognizes between contexts in which Congress has specified exceptions to Title IX's prohibition on sex discrimination, and other contexts—such as restrooms—in which it has not. The Department's implementation of Title IX's narrow exceptions to the general prohibition

1

on separate or different treatment based on sex, through the provision to be codified at 34 C.F.R. § 106.31(a)(2), does not somehow render the rest of the Rule unreasonable. On the contrary, the Rule's adherence to the lines drawn by Congress—which specified only a handful of contexts where separation or different treatment based on sex is permitted even when it may subject a person to harm—was proper and lawful.

Plaintiffs also mischaracterize the Final Rule as creating an unworkable harassment standard. In fact, courts and the Equal Employment Opportunity Commission ("EEOC") have used a similar standard to identify harassment under Title VII's similar provisions for decades. And the Department used a similar standard in its enforcement of Title IX for decades prior to regulatory changes made in 2020. Plaintiffs nowhere grapple with or even address this reality. Nor do Plaintiffs demonstrate that the challenged harassment standard threatens freedom of speech or free exercise of religion.

In addition, Plaintiffs fail to show that the Final Rule is an unconstitutional exercise of the Spending Power or that it violates parental rights.

Because Plaintiffs fail to show that the Department's promulgation of these regulations was arbitrary and capricious, beyond the Department's statutory authority, or otherwise unlawful, they have not demonstrated a likelihood of success on the merits and their motion for preliminary relief should be denied.

Plaintiffs also have not met their high burden to satisfy the other requirements for a stay or preliminary injunction. Plaintiffs' alleged harms are speculative at best, or otherwise not legally cognizable, and thus cannot establish irreparable injury justifying preliminary relief. Moreover, the public interest and balance of equities weigh against granting Plaintiffs' motion, as enjoining the Rule would substantially harm the Government's interests in preventing discrimination in

2

federally funded educational programs and activities.

Accordingly, the Court should deny the motion for a § 705 stay or preliminary injunction.

## BACKGROUND

### I.    Title IX, Implementing Regulations, and Guidance

Title IX's anti-discrimination provision states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are only a small number of "specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see* 20 U.S.C. § 1681(a)(1)–(9) (listing educational institutions, organizations, or programs that are exempt or partly exempt from Title IX's prohibition on sex discrimination); *id.* § 1686 (permitting maintenance of sex-separate living facilities).

Title IX authorizes and directs the Department to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." *Id.* § 1682. Title IX also sets forth an administrative enforcement scheme, which allows the Department to obtain voluntary compliance from or, failing that, terminate the federal funds of a recipient that fails to comply with the statute or the Department's implementing regulations. *Id.*

Over the years, the Department has promulgated regulations effectuating Title IX, including in 2020, when it specified how recipients of federal funds must respond to allegations of sexual harassment in their education programs or activities. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) [hereinafter 2020 Amendments].

One month after publication of the 2020 Amendments, the Supreme Court held that the

3

prohibition on discrimination "because of … sex" in Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity. *See Bostock*, 590 U.S. at 660. Following *Bostock*, President Biden directed the Department of Education to review the 2020 Amendments and existing agency guidance "for consistency with governing law." Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021, § 2, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

In June 2021 the Department's Office for Civil Rights ("OCR") held a nationwide virtual public hearing on Title IX. 89 Fed. Reg. at 33,480. OCR also received more than 30,000 written comments in connection with the hearing, in addition to over 280 live comments. *Id.* at 33,835, 33,860. In addition, OCR held listening sessions with a wide variety of stakeholders. *Id.* at 33,480. In July 2022, the Department issued a Notice of Proposed Rulemaking (NPRM). *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (proposed July 12, 2022). Following extensive review of the more than 240,000 public comments, the Department published the Final Rule, which goes into effect on August 1, 2024. *See* 89 Fed. Reg. at 33,476.

As relevant to this case, the Final Rule: (1) clarifies the scope of sex discrimination under Title IX, *id.* at 33,476; (2) clarifies the limits of permissible different or separate treatment on the basis of sex under Title IX, *id.* at 33,477; and (3) clarifies the definition of sex-based harassment under Title IX, *id.* at 33,476.

## II.   Procedural History

On April 30, 2024, Plaintiffs filed their Complaint. ECF No. 1. On May 3, 2024, Plaintiffs filed their Motion for a § 705 Stay and Preliminary Injunction. Pls.' Mot., ECF No. 19. This Court also granted a Motion to Intervene, ECF No. 21, and the Intervenor-Plaintiffs have filed a separate

Motion for a § 705 Stay and Preliminary Injunction, ECF No. 63.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted); *see Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In determining whether a preliminary injunction is warranted, the Court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012) (citation omitted).

## ARGUMENT

### I.    Plaintiffs Are Unlikely To Succeed on the Merits.

### A.    The Final Rule's Clarification that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text.

Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Final Rule clarifies, "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological

or 'biological distinctions between male and female." *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Plaintiffs argue that the Department's interpretation of Title IX is inconsistent with the statutory text, Pls.' Mem. 12–16, ECF No. 19-1, and that it is arbitrary and capricious, *id.* 19–21. To the contrary, the Department faithfully interpreted the statutory text in light of *Bostock*, which interpreted Title VII's provision making it unlawful, in relevant part, "for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex," 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656–57 (citation omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of transgender status "because it is impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex." *Id.* at 660, 661 (emphasis omitted). If, for example, an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. "[T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* That is so even assuming "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. 1681(a), which employs a causation standard indistinguishable from Title VII's "because of . . . sex" language, 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has long used the phrase "on the basis of" interchangeably with Title VII's "because of" language

when discussing Title VII's causation standard, including in *Bostock* itself. *See* 590 U.S. at 650 ("[I]n Title VII, Congress outlawed discrimination in the workplace on the basis of . . . sex."); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (explaining statutory phrase, "based on" has the same meaning as the phrase "because of" (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 & n.14 (2007))). Courts consistently rely on interpretations of Title VII's prohibition against discrimination "because of . . . sex" to interpret Title IX's textually similar provision. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)); *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007) (unpublished) (collecting cases). And as to the specific question at hand, several courts have already held that there is no difference between the two statutes that would require a different result. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). Title IX no more permits a school to bar a transgender student from band practice on the basis of the student being transgender than Title VII permits an employer to fire a transgender employee because the employee is transgender.

The cited Sixth Circuit decisions do not "foreclose" application of *Bostock*'s reasoning to Title IX, Pls.' Mem. 15. First, *Meriwether v. Hartop* was a fact-specific free speech case, which held that a university lacked a sufficient interest in disciplining a professor for certain classroom statements regarding transgender students. 992 F.3d 492 (6th Cir. 2021). The court explained that the university's Title IX interests were "not implicated" because there was "no indication at this stage of the litigation" that the professor's speech inhibited students' "education or ability to succeed in the classroom." *Id*. at 511. The court also footnoted that "Title VII differs from Title

IX in important respects," pointing to Title IX's provisions allowing for consideration of sex in athletic scholarships and maintenance of separate living facilities for different sexes. *See id.* at 510 & n.4. *Meriwether*, however, nowhere suggests that discrimination "because of . . . sex" in Title VII imposes a different causal standard or means something different than discrimination "on the basis of sex" in Title IX.

The two other cases—*Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021), an Age Discrimination in Employment Act ("ADEA") case, and *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023), an equal protection case—are also inapposite. Neither was confronted with nor addressed whether *Bostock*'s interpretation of Title VII's anti-discrimination provision informs interpretation of Title IX's materially indistinguishable anti-discrimination provision. In *Pelcha*, the court merely declined to rely on *Bostock* in light of binding Supreme Court precedent interpreting the ADEA's causality requirement. *See* 988 F.3d at 323–24 (citing *Gross*, 557 U.S. 167). In any event, the court recognized that the ADEA's prohibition on terminating employees "because of such individual's age," 29 U.S.C. § 623(a)(1), imposed no more than "but for" causation, *Pelcha*, 988 F.3d at 324, which is the same causal standard the Court applied in *Bostock* to hold that discrimination "because of sex" necessarily includes discrimination because of transgender status, *Bostock*, 590 U.S. at 656–57.

*L.W.* similarly did not interpret Title IX, nor did it address what it means to discriminate on the "basis of sex." In staying the preliminary injunction of a state "law that prohibits healthcare providers from performing gender-affirming surgeries and administering hormones or puberty blockers to transgender minors," the court expressed its "initial views"—which "may be wrong"— that transgender status was not a quasi-suspect class subject to heightened scrutiny under the Equal Protection Clause. *See* 73 F.4th at 412, 419–20, 422. After observing that *Bostock* "does not change

8

the [quasi-suspect class] analysis," *id.* at 420, the court noted in dicta that *Bostock*'s reasoning that "Title VII's prohibition on employment discrimination 'because of . . . sex' encompasses discrimination against persons who are gay or transgender . . . applies only to Title VII, as *Bostock* itself and our subsequent cases make clear," *id.* (citing *Bostock*, 590 U.S. at 681; *Pelcha*, 988 F.3d at 324; *Meriwether*, 992 F.3d at 510 n.4). But contrary to Plaintiffs' suggestion, Pls.' Mem. 15, this acontextual dicta cannot overcome the reasoning in *Bostock* itself. *See Bostock*, 590 U.S. at 654–55, 664–65.

Plaintiffs lean heavily on their view that sex is binary and "biological," Pls.' Mem. 12–16, but fail to acknowledge that *Bostock* "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female." 590 U.S. at 655. Regardless of how one defines the word, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660. The Final Rule proceeds under the same assumption. *See* 89 Fed. Reg. at 33,802, 33,804–05, 33,807. As *Bostock* underscores, discriminating against someone based on their gender identity necessarily constitutes discrimination "on the basis of" the sex that they were assigned at birth. *See Bostock*, 590 U.S. at 660–61 (explaining "transgender status [is] inextricably bound up with sex").

Plaintiffs argue that it is "arbitrary" to rely on *Bostock*, based on the Court's statement that it did "not purport to address bathrooms, locker rooms, or anything else of the kind." Pls.' Mem. 19 (citing 590 U.S. at 681); *see id.* 15. But neither does the Final Rule's clarification of the scope of sex discrimination (to be codified at § 106.10) purport to address "bathrooms, locker rooms, or anything else of the kind." Rather, the provision merely explains the general scope of prohibited "[d]iscrimination on the basis of sex" under Title IX. 89 Fed. Reg. at 33,886. Whether any different or separate treatment on the basis of sex may be permissible in certain circumstances is addressed

by other portions of the Final Rule and Title IX regulations. *See infra* Part I.B. Plaintiffs' challenge appears to stem in large part from § 106.31(a)(2), the provision governing the manner in which recipients may permissibly implement measures separating or differentiating students based on sex. *See* 89 Fed. Reg. at 33,887. Plaintiffs conflate § 106.10 with § 106.31(a)(2). But these are separate provisions with separate justifications; *Bostock*'s reasoning is fully consistent with § 106.10's general description of the scope of Title IX's prohibition on sex discrimination with or without § 106.31(a)(2)'s more specific instructions. *Compare id.* at 33,801–13, *with id.* at 33,814–25.

For these reasons, the Department properly applied *Bostock*'s straightforward textual analysis in interpreting Title IX's anti-discrimination provision. Plaintiffs thus are unlikely to succeed on the merits of their claims that the interpretation of sex discrimination in the Final Rule is inconsistent with Title IX or otherwise arbitrary and capricious.

### B.   The Final Rule's Limitations on Sex Separation and Differentiation Properly Account for Congressional Direction on Title IX's Coverage and Application to Different Contexts.

Contrary to Plaintiffs' suggestion, Pls.' Mem. 20–21, the Final Rule's adherence to the limited scope of Title IX's exceptions to the statute's general prohibition on sex discrimination also follows naturally from Title IX's operative text, and is not arbitrary or capricious. Plaintiffs take issue with the Final Rule's provision that, with limited exceptions, a recipient may not carry out otherwise permissible different or separate treatment on the basis of sex in a manner that prevents a person from participating in an education program or activity consistent with the person's gender identity. *See id.* Plaintiffs also claim that this provision of the Rule ignores safety, privacy, and compliance concerns. *Id.* at 21. These arguments fail.

As explained in the Final Rule, the Department's regulations have long specified that separate or different treatment on the basis of sex is generally prohibited under Title IX because

such treatment is presumptively discriminatory. 89 Fed. Reg. at 33,814 (citing NPRM, 87 Fed. Reg. at 41,534; 34 C.F.R. § 106.31(b)(4), (7)). The regulations, however, also have long recognized limited contexts in which sex separation or differentiation is allowed. *Id.* The provision to be codified at 34 C.F.R. § 106.31(a)(2) explains how recipients may carry out such separate or different treatment without running afoul of the statute's nondiscrimination mandate. In short, the Rule provides, consistent with Supreme Court precedent, that save for limited instances allowed by statute, Title IX prohibits "distinctions or differences in treatment [on the basis of sex] that injure protected individuals." 89 Fed. Reg. at 33,814 (brackets in original) (quoting *Bostock*, 590 U.S. at 681).

As compelled by that natural reading of the statutory text, the Department explained that, except in certain contexts explained below, a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury, *i.e.*, more than de minimis harm. *Id.* As Plaintiffs note, the Department has regulations that "allow sex-separated 'toilet, locker room, and shower facilities,' among other things." Pls.' Mem. 14 (citing 89 Fed. Reg. at 33,816, 33,818–20; 34 C.F.R. §§ 106.33–.34). The Department has long recognized that sex "separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" because such sex-separate facilities generally impose no more than de minimis harm on students. 89 Fed. Reg. at 33,818; *see generally* 34 C.F.R. § 106.33. But consistent with federal court decisions and guidelines published by respected medical organizations, the Department explained that sex separation that prevents a person from participating in a program or activity consistent with their gender identity *does* cause more than de minimis harm—a conclusion that Plaintiffs do not dispute. 89 Fed. Reg. at 33,816 (citing *Grimm*, 972 F.3d at 617–18; *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,

858 F.3d 1034, 1045–46 (7th Cir. 2017)); *id.* at 33,819 n.90 (citing guidelines published by medical organizations). Because preventing a student from using sex-separate restrooms or participating in single-sex classes consistent with their gender identity causes more than de minimis harm on the basis of sex, *id.* at 33,814, it is prohibited by Title IX.

At the same time, the Department recognized that Congress specified a few limited contexts in which more than de minimis harm is permitted by the statute. *Id.* at 33,819; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership practices of certain social fraternities or sororities); *id.* § 1681(a)(4) (institutions focused on military training); *id.* § 1686 (educational institution's maintenance of "separate living facilities for the different sexes"). Plaintiffs are incorrect that the Final Rule's attention to the distinction between regulations informed by express congressional direction, listed in § 106.31(a)(2), and regulations permitting sex separation in other contexts reflects "self-contradictory . . . logic," Pls.' Mem. 20. To the contrary, as explained by the Department, this distinction follows directly from the statute itself. 89 Fed. Reg. at 33,814, 33,819. The Final Rule "clearly effectuates this basic congressional decision." *Califano v. Aznavorian*, 439 U.S. 170, 178 (1978). As Congress did not except bathrooms and sexual education classes from the general prohibition on sex discrimination, Pls.' Mem. 20, the Department reasonably determined that sex separation in such contexts can be consistent with Title IX only to the extent that any sex-based harm imposed is de minimis—*i.e.*, not discriminatory. 89 Fed. Reg. at 33,816; *see id.* at 33,821 (explaining that the statutory living facilities "carve-out" in 20 U.S.C. § 1686 is inapplicable to "other aspects of a recipient's education program or activity for which Title IX permits different treatment or separation on the basis of sex, such as bathrooms, locker rooms, or shower facilities," and noting that the latter are "regulations that the Department adopted under different statutory authority, and which have long been addressed separately from 'living

12

facilities'").

Nor does the Department's decision to address athletics through a separate rulemaking,[1] and to specify that the de minimis harm rule in § 106.31(a)(2) does not apply to male and female athletic teams that a recipient offers under § 106.41(b), *see* 89 Fed. Reg. at 33,816, bear on this issue. Congress recognized by statute that athletics is a special context, *id.*; *see* Education Amendments of 1974, section 844, and the Department's athletics regulations have always tracked this determination that the unique circumstances of athletics merit a different approach, "governed by an overarching nondiscrimination mandate and obligation to provide equal athletic opportunities for students regardless of sex." 89 Fed. Reg. at 33,816 (citing 34 C.F.R. § 106.41(a), (c)). This approach allows that individual students may be excluded from a particular male or female team based on their sex, even when doing so may impose more than de minimis harm. *Id.* at 33,817. Contrary to Plaintiffs' contention, Pls.' Mem. 20, the Rule thoroughly explains why the de minimis harm standard in § 106.31(a)(2) does not apply to the athletics regulations, and why this is consistent with the Department's longstanding approach to athletics. 89 Fed. Reg. at 33,816–19.

Further, Plaintiffs have not shown that, in promulgating § 106.31(a)(2), the Department "entirely fail[ed] to consider certain important aspects of the problem or address relevant evidence" counter to its conclusions. Pls.' Mem. 21 (cleaned up). The Department thoroughly considered and addressed commenters' concerns, including reported concerns regarding safety, privacy, and

---

[1] In April 2023, the Department issued a separate notice of proposed rulemaking regarding the athletics regulations, which will be finalized in a separate rulemaking. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023). As the Department has explained, "[u]ntil that rule is finalized and issued, the current regulations on athletics continue to apply." 89 Fed. Reg. at 33,817.

compliance. The Department "strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy." 89 Fed. Reg. at 33,820 (explaining that, under § 106.31(a)(2), "a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity"); *id.* ("nothing in Title IX or the final regulations prevents a recipient from offering single occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason"). The Department reasonably concluded, however, that there is no "evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* The Final Rule notes, for example, that federal courts have rejected "unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." *Id.* (citing cases). The Department also addressed concerns regarding compliance, including "questions about how a recipient should determine a person's gender identity for purposes of § 106.31(a)(2)." *Id.* at 33,819 (noting that "many recipients rely on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher").

In sum, the Final Rule's application of the de minimis harm standard in § 106.31(a)(2) is supported and logical, and, in promulgating this provision, the Department neither entirely failed to consider an important aspect of the problem nor ignored relevant evidence. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (noting that judicial review under arbitrary-and-capricious standard is "deferential" and "simply ensures that the agency has acted within a zone of reasonableness").

C.     **The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is a Lawful Exercise of the Department's Statutory Authority and Consistent with the Requirements of the First Amendment.**

The Final Rule defines hostile environment sex-based harassment, in relevant part, as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884. This definition "closely tracks longstanding case law defining sexual harassment," *id.* at 33,494 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)), and aligns with the definition used by the EEOC. *Id.* at 33,516. In addition, the definition in the Final Rule is consistent with "relevant judicial precedent, and . . . with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." *Id.* at 33,490.

Plaintiffs nevertheless argue that the Final Rule's harassment definition is unlawful for three reasons: (1) the definition is inconsistent with the definition in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), Pls.' Mem. 16–17; (2) the "definition's breadth . . . runs afoul of the First Amendment," *id.* 17; *see also id.* 18–19; and (3) in promulgating the definition, the Department failed to consider and respond to significant comments, *id.* 20. These arguments are incorrect.

*First*, Plaintiffs' reliance on *Davis* is misplaced because *Davis* addressed a standard that a plaintiff must meet to bring a private action for damages, 526 U.S. at 650; it did not limit the Department's investigative and enforcement authority. The Supreme Court's articulation of the scope of the private cause of action in Title IX focused on the fact that this cause of action is implied, rather than an express creation of Congress. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). Explaining that "[t]he requirement that recipients receive adequate

notice of Title IX's proscriptions . . . bears on the proper definition of 'discrimination' in the context of a private damages action," *Davis* thus held that "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 651.

Plaintiffs identify no basis to conclude that the *Davis* standard must apply in the distinct administrative enforcement context. Title IX permits the Department to enforce its nondiscrimination mandate through "'any . . . means authorized by law,' including ultimately the termination of federal funding." *Gebser*, 524 U.S. at 280–81, 287 (quoting 20 U.S.C. § 1682). But Title IX and its implementing regulations do not allow the Department to sue for damages, and *Davis*'s analysis of when to allow recovery of damages on theories of *respondeat superior* and constructive notice is thus inapposite. Indeed, after observing that Congress ''entrusted'' Federal agencies to ''promulgate rules, regulations, and orders to enforce the objectives'' of Title IX, 526 U.S. at 638, the *Davis* Court repeatedly and approvingly cited the Department's then-recently published guidance regarding sexual harassment, *see id.* at 647–48, 651 (citing Sexual Harassment Guidance, 62 Fed. Reg. 12,034 (Mar. 13, 1997)). That guidance specifically stated that schools could be found to violate Title IX if the relevant harassment "was sufficiently severe, persistent, or pervasive to create a hostile environment." 62 Fed. Reg. at 12,040.

*Second*, Plaintiffs fail to show that the Final Rule's definition of sex-based harassment runs afoul of the First Amendment. *See* Pls.' Mem. 16–17, 18–19. "Where a plaintiff makes a facial challenge under the First Amendment to a statute's constitutionality, the 'facial challenge' is an 'overbreadth challenge.'" *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (citation omitted).

In such a facial challenge, "a plaintiff must show substantial overbreadth: that the statute prohibits a substantial amount of protected speech both in an absolute sense and relative to the statute's plainly legitimate sweep." *Id.* (cleaned up). Plaintiffs cannot meet this standard.

By its own terms, the Final Rule "maintain[s] the language from . . . the 2020 amendments that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment." 89 Fed. Reg. at 33,503. In response to concerns about the Rule's interaction with the First Amendment, the Department "revised the definition to retain the 2020 amendments' reference to offensiveness," and so the definition "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits" a person's ability to participate in the recipient's education program or activity. *Id.* The Supreme Court has upheld Title VII's anti-harassment provisions that apply a similar standard "without acknowledging any First Amendment concern." *Id.* at 33,505 (citing *Harris*, 510 U.S. at 23). Further, the Final Rule "only prohibit[s] conduct that meets *all* the elements" set forth in the definition. *Id.* at 33,506 (emphasis added). The Rule's "reference to the totality of the circumstances derives from these very specific and required elements and is meant to ensure that no element or relevant factual consideration is ignored." *Id*. Plaintiffs do not show that the challenged definition "prohibits a substantial amount of protected speech . . . in an absolute sense" or "relative to the statute's plainly legitimate sweep." *Speet*, 726 F.3d at 872.

The cases Plaintiffs rely upon to argue that "such policies present First Amendment problems" are inapposite. Pls.' Mem. 17. In *Speech First*, at issue was a policy that, among other things, prohibited "a wide range of 'verbal, physical, electronic, and other' expression concerning any of (depending on how you count) some 25 or so characteristics," and "reache[d] not only a

17

student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022). In contrast to the Final Rule, "[t]he policy, in short, [was] staggeringly broad," *id.*, and it was not "tailored to harms that have long been covered by hostile environment laws." 89 Fed. Reg. at 33,505 (discussing *Speech First*, 32 F.4th 1110). In *Meriwether*, similarly, the challenged policy did not prohibit harassment with a standard that delineated elements necessary to show a hostile environment, but rather flatly ordered faculty—on threat of discipline—to "refer to students by their "preferred pronoun[s]." 992 F.3d at 498. Plaintiffs cite no case in which a court has held unconstitutional a definition of harassment analogous to the hostile environment sex-based harassment definition to be codified at 34 C.F.R. § 106.2.

*Third*, Plaintiffs' argument that the Final Rule fails to adequately consider First Amendment concerns raised by commentors is belied by the record. *See* 89 Fed. Reg. at 33,492-97, 33,500-11, 33,514-16, 33,542, 33,559, 33,570-71, 33,616, 33,810, 33,828, 33,838. And with respect to Plaintiffs' specific concern that the Department "relies on Title VII EEOC harassment guidance that implicates free speech rights on its face," Pls.' Mem. 20, the Department specifically addressed comments related to that guidance and explained that "unwelcome conduct based on gender identity can create a hostile environment when it otherwise satisfies the definition of sex-based harassment." 89 Fed. Reg. at 33,516 (citing EEOC guidance document). But "a stray remark, such as a misuse of language, would not constitute harassment under [the applicable] standard," and "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516.

Accordingly, Plaintiffs cannot show that the Rule's definition of sex-based harassment is arbitrary, capricious, in excess of statutory authority, or in violation of the First Amendment.

**D.      The Final Rule's Clarification of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Power Issue.**

Plaintiffs contend that if the Final Rule correctly describes the scope of Title IX's prohibition on discrimination on the basis of sex, Title IX violates the Spending Clause. Pls.' Mem. 17–18. Plaintiffs are incorrect.

There is no Spending Clause problem because the relevant provision in the Final Rule merely clarifies the scope of Title IX's unambiguous prohibition on sex discrimination, based on the statutory language's plain meaning. *See* 89 Fed. Reg. at 33,802. "Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds," *NFIB v. Sebelius*, 567 U.S. 519, 579 (2012), so long as it does so "unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The requirement of unambiguity requires that Congress "make the existence of the condition itself" "explicitly obvious," not that Congress list all ways in which a recipient could fail to comply. *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (citation omitted). Indeed, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Id.* at 1306.

Here, this condition is met because Title IX unambiguously prohibits any form of sex-based discrimination. *See, e.g.*, 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). Plaintiffs in essence argue—again—that Title IX should not be understood to prohibit discrimination based on gender identity because the statute does not expressly state that discrimination based on gender identity is sex discrimination. Pls.' Mem. 18. But "the fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates

19

the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up); *see also id.* at 688 (Alito, J., dissenting) ("According to the Court, the text is unambiguous.").

This conclusion is in harmony with the Supreme Court's prior decisions addressing Title IX: in 2005 the Court rejected the argument that retaliation was not covered as a form of sex-based discrimination, concluding that specific forms of discrimination not mentioned in the statute— such as retaliation—were nonetheless discrimination. *Jackson*, 544 U.S. at 175; *see also id.* ("Because Congress did not list any specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered."). Title IX places recipients of federal funds clearly on notice that they must comply with the prohibition on sex-based discrimination in all of its forms.

**E.       The Final Rule Does Not Violate Parental Rights.**

Plaintiffs are also incorrect that the Final Rule will "trespass" on the right of parents to "bring up" their children. Pls.' Mem. 19 (cleaned up). As an initial matter, Plaintiffs—who are exclusively state governments—lack standing to bring any claim based on the rights of parents. *See Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (noting that "'[a] State does not have standing as *parens patriae* to bring an action against the Federal Government'" (citation omitted)).

Plaintiffs also fail to support their argument on the merits. The only cases cited by Plaintiffs involve a completely different context—the procedural protections available before the permanent termination of a parental relationship. *See* Pls.' Mem. 19 (citing *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996)). Nothing in the Final Rule would terminate any parental relationships. On the contrary, the Department thoroughly considered parental rights and drafted the Final Rule with the utmost respect for the fundamental role of parents in bringing up their children, and without disturbing any existing parental rights. *See, e.g.*, 89 Fed. Reg. at 33,821 (explaining that "nothing in Title IX or the final

regulations may be read in derogation of any legal right of a parent . . . to act on behalf of a minor child"); *see also id.* at 33,835–36, 33,531.

## II.     Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs also fail to establish the imminent irreparable harm needed to justify a preliminary injunction. "Irreparable harm is an 'indispensable' requirement for a preliminary injunction, and 'even the strongest showing' on the other factors cannot justify a preliminary injunction if there is no 'imminent and irreparable injury.'" *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted).

*First*, Plaintiffs claim that they will suffer irreparable harm in the form of unrecoverable compliance costs in the lead up to the Final Rule's effective date of August 1, 2024. When weighing the relevance of unrecoverable compliance costs, courts must look to "the peculiarity and size of a harm." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Plaintiffs have failed to show that their alleged compliance costs are either peculiar or of such a great magnitude to justify a preliminary injunction. Rather, most of Plaintiffs' declarants identify the "general[] . . . costs to comply with a federal rule implementing Title IX." Mason Decl., Ex. C ¶ 7; *see also* Thompson Decl., Ex. B ¶ 11; Coons Decl., Ex. J ¶ 9; Garrison Decl., Ex. H ¶ 11; Trice Decl., Ex. K ¶ 7. At most, some declarants assert unspecified costs associated with standard practices taken to ensure compliance with Title IX and its implementing regulations. *See, e.g*., Thompson Decl. ¶ 11 ("The amount of time dedicated to Title IX training . . . and thus the cost for providing that training[,] increases in a year in which the [Department] adopts significant changes to Title IX regulations."); Coons Decl. ¶ 9 (costs "may include updating policies and training materials that reflect policies inconsistent with such a rule and incurring additional training costs for Title IX Coordinators"). But far from peculiar, costs associated with updating policies and conducting training to ensure compliance with new Title IX regulations are routine. *See Kentucky v. EPA*, Civ. No. 3:23-CV-

21

00007, 2023 WL 2733383, at *7 (E.D. Ky. Mar. 31, 2023) (finding that "jurisdictional assessments and consultations" are not "peculiar" because they "are a common element of doing business"), *appeal filed*, Nos. 23-5343, 23-5345 (6th Cir. Apr. 19, 2023).

Moreover, despite Plaintiffs' assertion that the Final Rule will lead to "significant and costly compliance activities," Pls.' Mem. 22, their declarants do not quantify the alleged compliance cost with any measure of specificity—let alone show it will be "significant." *See, e.g.*, Thompson Decl. ¶ 11 ("[W]hen new Title IX regulations are promulgated, the Department's Office of Civil Rights must review the regulations to determine whether the Department will recommend that the Tennessee State Board of Education's Civil Rights Compliance Rules be revised."). Such generic statements do not establish irreparable harm. *See, e.g.*, *Kentucky*, 2023 WL 2733383, at *8 (finding general description of cost of "'develop[ing] a plan to address the implications of the Final Rule on a number of [state-administered] programs' . . . and . . . 'need[ing] to hire additional manpower or divert' resources" did not adequately "establish the amount (or 'size') of compliance costs" (citation omitted)).

*Second*, Plaintiffs allege that the Final Rule threatens to strip them of federal funding. Pls.' Mem. 22. But Plaintiffs fail to identify how any such injury is realistic, let alone "imminent." *See D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). Indeed, even if an administrative enforcement action were to occur once the Rule goes into effect, Plaintiffs could at that time raise challenges to any administrative enforcement proceedings, which would necessarily precede any termination of funds. 20 U.S.C. § 1682. Moreover, any adverse administrative determination would be subject to judicial review. *Id.* § 1683.

*Third*, Plaintiffs claim the Rule will prevent some Plaintiff States from enforcing their laws. But regardless of whether Plaintiff States' laws conflict with the Final Rule, a "corollary [of the

Supremacy Clause] is that the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Accordingly, it is the federal government, not the States, that faces significant irreparable harm, if it is prevented from administrating the Rule.

*Finally*, Plaintiffs claim that the Final Rule will cause irreparable harm to their citizens in the form of violations of bodily privacy, "heightened" "inappropriate sexual behavior," and "unfair and unsafe competition" for female athletes.[2] Pls.' Mem. 24–25. As explained above, Plaintiffs lack standing to sue the federal government in *parens patriae* capacity, so they cannot rely on such alleged harms to satisfy the irreparable-harm element. *See supra* Part I.E. But regardless, Plaintiffs fail to show that such alleged future harms are concrete and imminent, rather than speculative and hypothetical. Plaintiffs' fears are at most a "possibility," which is insufficient to establish irreparable harm. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III. The Equities and Public Interest Weigh Against Preliminary Relief.

The balance of equities and the public interest "merge when the Government is the opposing party." *Id*. Here, these combined factors strongly counsel against issuing the requested preliminary relief. The Final Rule implements the Department's authority to enforce the statutory objectives of Title IX. *See* 20 U.S.C. § 1682. "There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). The public interest favors allowing the Department to fulfill these responsibilities.

Moreover, granting preliminary relief would significantly harm the Government's interests in preventing discrimination in educational programs and activities. The Final Rule effectuates

---

[2] As noted above, *supra* note 1, the Rule does not affect the Department's athletics regulations.

Title IX's important goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Needless to say, preventing sex discrimination is in the public interest. *See EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 458 (6th Cir. 1999).

Conversely, Plaintiffs have failed to show they face significant imminent and irreparable harm. *See supra* Part II. At best, Plaintiffs have pointed to an unspecified amount of compliance costs. *See id.* But compelling non-monetary government interests measure up against even serious economic harm. *See, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (unpublished) (weighing Plaintiffs' "very real risk of losing their businesses" against "the Governor's interest in combatting COVID-19").

## IV.   Any Relief Afforded by the Court Should Be Limited in Accordance with the Administrative Procedure Act ("APA") and Equitable Principles.

While Defendants dispute that any relief is necessary for the reasons explained above, any relief afforded must be appropriately limited.

The Court should not issue preliminary relief that extends beyond Plaintiffs or beyond portions of the Rule as to which the Court has found that Plaintiffs have established a likelihood of success. Under traditional equitable principles, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). That means that a court should not issue injunctions that provide relief to non-parties, or that enjoin more than is "necessary to remedy the harm at issue." *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002). "At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government." *Arizona v. Biden*, 40 F.4th 375, 395–96 (6th Cir. 2022) (Sutton, C.J.,

concurring).

Alternatively, Plaintiffs assume that pursuant to 5 U.S.C. § 705, this Court can "[s]tay[] the effective date of the Department's Final Rule . . . thus denying it legally operative effect" for the country at large. Pls.' Mot. 3. But such a sweeping remedy would raise all the problems of nationwide injunctions. *See DHS v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring in the grant of stay). Moreover, Section 705 (like other APA provisions) "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Plaintiffs do not identify, and the Government has not found, any pre-APA practice of district courts granting universal stays of agency regulations. Consistent with that backdrop, Congress contemplated that any relief under Section 705 "would normally, if not always, be limited to the parties," Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946).

Finally, the Final Rule is severable. *See* 89 Fed. Reg. at 33,848 ("[R]emov[ing] any 'doubt that it would have adopted the remaining provisions of the Final Rule' without any of the other provisions, should any of them be deemed unlawful."). Plaintiffs have challenged only certain provisions of the Rule as discussed above; the remainder should be permitted to go into effect, as intended, on August 1, 2024. As the Supreme Court explained, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, . . . or . . . sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a § 705 stay and preliminary injunction.

Dated: May 24, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

*/s/ Pardis Gheibi*

ELIZABETH TULIS
REBECCA KOPPLIN
BENJAMIN TAKEMOTO
HANNAH SOLOMON-STRAUSS
PARDIS GHEIBI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: 202-305-3246
Fax: (202) 616-8470
E-mail: Pardis.Gheibi@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2024, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.


*/s/ Pardis Gheibi*