**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

STATE OF TENNESSEE,
COMMONWEALTH OF KENTUCKY,
STATE OF OHIO, STATE OF INDIANA,
COMMONWEALTH OF VIRGINIA, and
STATE OF WEST VIRGINIA,

     *Plaintiffs*,

and

CHRISTIAN EDUCATORS ASSOCIA-
TION INTERNATIONAL, and A.C., by
her next friend and mother, Abigail Cross,

     *Intervenor-Plaintiffs*,


v.

MIGUEL CARDONA, in his official capac-
ity as Secretary of Education, and UNITED
STATES DEPARTMENT OF EDUCA-
TION,

     *Defendants*.

Case No. 2:24-cv-00072-DCR-CJS
District Judge Danny C. Reeves
Magistrate Judge Candace J. Smith

---

**REPLY IN SUPPORT OF THE STATES' MOTION FOR A § 705 STAY AND
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.       The States Are Likely to Succeed on the Merits of Their Challenge. ............................... 2

      A.     The Gender-Identity Mandate Exceeds the Department's Title IX Authority .................... 2

      B.     The "Harassment" Definition Exceeds the Department's Title IX Authority. ................. 9

      C.     The Final Rule Violates the Constitution. ....................................................................... 9

      D.     The Final Rule Is Arbitrary and Capricious ................................................................... 10

II.      The Remaining Factors Favor Preliminary Relief. ........................................................ 11

      A.     The Final Rule Inflicts Irreparable Harm on the States. ................................................ 11

      B.     Preliminary Relief Will Not Harm Defendants or the Public Interest. ............................ 14

III.    The APA and Equity Support Entry of the States' Requested Relief. ............................ 15

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
  75 F.4th 760 (7th Cir. 2023)....................................................................................................2

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
  968 F.3d 1286 (11th Cir. 2020).............................................................................................14

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
  57 F.4th 791 (11th Cir. 2022)........................................................................................3, 5, 7, 8

*B.P.J. ex rel. Jackson v. W.V. State Bd. of Educ.,*
  98 F.4th 542 (4th Cir. 2024)..............................................................................................5, 8

*Bostock v. EEOC,*
  590 U.S. 644 (2020)....................................................................................................*passim*

*Brannum v. Overton Cnty. Sch. Bd.,*
  516 F.3d 489 (6th Cir. 2008).................................................................................................5

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024)...............................................................................................15

*Charvat v. GVN Mich., Inc.,*
  561 F.3d 623 (6th Cir. 2009).................................................................................................4

*D.H. ex rel. A.H. v. Williamson Cnty. Bd. of Educ.,*
  638 F. Supp. 3d 821 (M.D. Tenn. 2022) ..............................................................................3, 8

*Dodds v. U.S. Dep't of Educ.,*
  845 F.3d 217 (6th Cir. 2016).................................................................................................5

*Fla. Bankers Ass'n v. U.S. Dep't of Treasury,*
  799 F.3d 1065 (D.C. Cir. 2015)............................................................................................13

*Griffin v. HM Florida-ORL, LLC,*
  144 S. Ct. 1 (2023)............................................................................................................15

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020).................................................................................................5

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  822 F.3d 709 (4th Cir. 2016)................................................................................................13

*In re Juntoff*,
    76 F.4th 480 (6th Cir. 2023)........................................................................................9

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)................................................................................................10

*Kasper v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022)..........................................................................3, 5, 7, 8

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022)......................................................................................13

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023)......................................................................................12

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022)........................................................................................9

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020)..............................................................................15

*L.W. v. Skrmetti*,
    73 F.4th 408 (6th Cir. 2023)........................................................................................2

*L.W. v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023)..........................................................2, 3, 6, 13, 14

*LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999)..................................................................................................9

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021)................................................................................3, 10

*N. Haven Bd. of Educ. v. Bell*,
    456 U.S. 512 (1982)..................................................................................................3

*Pelcha v. MW Bancorp., Inc.*,
    988 F.3d 318 (6th Cir. 2021)......................................................................................3

*Peltier v. Charter Day Sch., Inc.*,
    37 F.4th 104 (4th Cir. 2022)......................................................................................5

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
    66 F.4th 593 (5th Cir. 2023)......................................................................................12

*Tennessee v. Dep't of Educ.*,
    615 F. Supp. 3d 807 (E.D. Tenn. 2022)....................................................................10

iv

*United States v. Virginia*,
   518 U.S. 515 ............................................................................................................14

*West Virginia v. EPA*,
   577 U.S. 1126 (2016)...............................................................................................15

*West Virginia v. EPA*,
   597 U.S. 697 (2022).................................................................................................6

**Statutes**

20 U.S.C. § 1681 ........................................................................................2, 4, 5, 8, 9

20 U.S.C. § 1686 .................................................................................................... 3, 4

Tenn. Code Ann. § 49-6-316.....................................................................................10

Tenn. Code Ann. § 49-50-805...................................................................................13

**Regulations**

34 C.F.R. § 106.6 ......................................................................................................13

34 C.F.R. § 106.10 ......................................................................................................6

34 C.F.R. § 106.32 ......................................................................................................4

34 C.F.R. § 106.33 ................................................................................................ 4, 5, 8

34 C.F.R. § 106.34 ......................................................................................................8

89 Fed. Reg. 33,474 (2024) ...............................................................................*passim*

**Other Authorities**

HEW, Nondiscrimination on Basis of Sex,
   40 Fed. Reg. 24,127 (June 4, 1975) ..........................................................................4

## INTRODUCTION

Defendants insist (at 1, 4, 5, 9, 19-20) that the Final Rule merely "clarifies" that Title IX has always required the Nation's schools to give men unfettered access to girls' bathrooms. Never mind that sex-separated facilities have persisted for centuries, or that Title IX expressly allows them: Defendants say schools may *have* policies requiring boys' and girls' bathrooms, just not *enforce* those policies against students with differing gender identities. Nor are Defendants detained by women's discomfort over undressing with men (and vice versa): Defendants' opposition is silent on Title IX's aim to protect women and dismisses all privacy and safety concerns as unfounded or based in bigotry.

*Bostock* is Defendants' lone justification for prohibiting sex-segregated bathrooms in schools. But that opinion *expressly refused* to address "sex-segregated … bathrooms, locker rooms, or anything else of the kind." 590 U.S. 644, 681 (2020). Defendants do not explain how a decision can both disavow discussing bathrooms and set a "clear" rule for them. These and other legal and logical flaws—covering sports, pronouns, and more—pervade the Final Rule and Defendants' opposition. And they indict Defendants' use of rulemaking to transform a 1972 statute aimed at advancing women into a gender-identity mandate that thwarts women's educational opportunity and defies Congress.

Defendants otherwise fail to rebut the States' entitlement to preliminary relief. The States will suffer severe, unrecoverable compliance costs or risk billions in lost funding—as the Final Rule and the States' unrebutted factual submissions confirm. More concerning are the States' sovereignty harms—which Defendants nowhere dispute—and risk to students' safety and privacy—which Defendants dismiss out of hand. Separating intimate facilities by sex reflects legitimate biological concerns, not discrimination, and has existed for all of modern time. The public interest favors maintaining this status quo a while longer, not permitting Defendants to inflict unprecedented consequences on school children the coming school year without review. This Court should grant preliminary relief.

1

**ARGUMENT**

**I.    The States Are Likely to Succeed on the Merits of Their Challenge.**

**A.    The Gender-Identity Mandate Exceeds the Department's Title IX Authority.**

Title IX's prohibition on "sex" discrimination does not outlaw schools' traditional ability to separate bathrooms and sports by students' sex. PI Br. 12-15. Defendants (at 5-6, 9), departing from leading cases in their corner, *e.g.*, *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), now accept that "sex" means "only physiological or biological distinctions between male and female." But they say (at 1) *Bostock*'s reasoning "straightforwardly" supports the Final Rule.

Since Defendants' position is entirely divorced from Title IX's text, structure, and history, their logic is hard to follow. But as best the States can tell, the argument goes like this. To begin, Defendants posit that *Bostock* means any gender-identity discrimination qualifies as "sex" discrimination under Title IX. 20 U.S.C. § 1681(a). Next, Defendants announce that requiring the use of sex-separated facilities always inflicts "more than de minimis harm" on, and thus discriminates against, persons whose sex and subjective gender-identities differ. That is so even though Title IX permits such policies, which treat both sexes, as well as all members of each sex, equally. Having posited that enforcing sex separation is *always* gender-identity discrimination, the Final Rule arrives at its conclusion: Separating facilities by sex = gender-identity discrimination = sex discrimination. This new formula for reading a gender-identity mandate into Title IX breaks down on multiple fronts.

1. Defendants' reliance on *Bostock* for the proposition that gender-identity discrimination equals sex discrimination in Title IX fails for a simple reason: *Bostock*'s analysis "applies only to Title VII," as this Circuit's cases "make clear." *L.W. v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023). Defendants dismiss (at 8-9) this directive as "acontextual dicta" in an "initial" panel ruling that did not "address what it means to discriminate on 'the basis of sex.'" Not so. Defendants' "initial view" language (at 8) stems from the first *L.W.* decision at the panel phase, 73 F.4th 408 (6th Cir. 2023), not the later

2

*L.W.* opinion that binds here, 83 F.4th 460. Nor was the Circuit's discussion "dicta," since the plaintiffs (and dissent) relied on *Bostock* as a central basis for their constitutional argument. And that argument *was* that state laws barring certain irreversible treatments for children with gender dysphoria discriminated "on the basis of sex"—a theory the Circuit rejected. *Id.* at 469, 484-86.

The Sixth Circuit's rule against applying *Bostock* to Title IX reflects the fact that the two statutes "differ[] . . . in important respects." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021); *accord* 89 Fed. Reg. 33,474, 33,563 (2024) ("[T]he Department is not bound by Title VII standards in implementing Title IX."). Most relevant: Unlike Title VII, which presumes sex is irrelevant to employment decisions, Title IX throughout allows schools to treat male and female students differently in educational programs and facilities *because* of the biological differences between the sexes. Such core differences are why the Department itself first concluded that *Bostock* did not bear on Title IX—a fact Defendants ignore. *See* PI Br. 6. And they are why the Sixth Circuit declined to apply *Bostock* in the ADEA context—even though, as Defendants note, the ADEA's "because of" text is the "same causal standard" *Bostock* applied. Opp'n 8; *Pelcha v. MW Bancorp., Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

2. Even if *Bostock* bore on the meaning of Title IX, it would not support the Final Rule. Simply put, separating the sexes in areas where biological sex differences matter is not discrimination for purposes of Title IX—whether under *Bostock* or otherwise. This is so for two independent reasons.

*First*, Section 1686 of the statute expressly *allows* schools to "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686. The "living facilities" referred to in the statute include bathrooms. *See, e.g.*, *Adams ex. Rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811-12, 814 (11th Cir. 2022) (en banc); *D.H. ex rel. A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 835-36 (M.D. Tenn. 2022). Offering "authoritative guid[ance on] the statute's construction," *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526-27 (1982), Senate sponsor Birch Bayh described § 1686's safe-harbor

3

language as "permit[ing] differential treatment by sex" in "instances where personal privacy must be preserved." 118 Cong. Rec. 5,807 (1972). The "relevant regulation[s]" soon codified and "confirm[ed]" that view, *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 632 (6th Cir. 2009), permitting the separation of "toilet, locker room, and shower facilities on the basis of sex" so long as the "facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex." HEW, Nondiscrimination on Basis of Sex, 40 Fed. Reg. 24,127, 24,141 (June 4, 1975) (now codified at 34 C.F.R. § 106.33). The takeaway: Title IX does not prohibit the exclusion of one "sex" from the bathrooms of the other "sex"; it clearly *allows* that practice. *See* 20 U.S.C. § 1686.

Defendants (at 12) agree that Section 1686 means schools may enforce sex-separated bounds in facilities falling within that provision. But they then echo the Final Rule's conclusion that such facilities capture only sex-separated "housing" and not "toilet, locker room, and shower facilities." *See, e.g.*, 89 Fed. Reg. at 33,821. And yet, "housing" facilities often comprise sleeping quarters with separate communal bathrooms—meaning, on Defendants' implausible reading, the Final Rule's gender mandate could apply differently to private areas on the same hallway. Moreover, the privacy concerns behind Section 1686 play out in bathrooms, showers, and dorm rooms alike. And the housing and bathroom regulations—still codified at 34 C.F.R. §§ 106.32 and 106.33, respectively—were proposed together, adopted together, approved by Congress together, and use the same "may provide separate [facilities] on the basis of sex" language. *Id.*; Compl. ¶¶ 69-72. This background confirms that the "living facilities" provision covers bathrooms and the like. At a minimum, since the housing regulation permits schools to separate by sex, so too does the identically worded bathroom regulation (which remains in force, *see* PI Br. 14-15). Defendants' lone response (at 12) is that the housing regulation cited as authority Section 1686, while the bathroom regulation cited Section 1681's general non-discrimination provision. But that just supports that the non-discrimination provision *itself* does

not bar schools from separating bathrooms, locker rooms, and showers by sex.

*Second*, as just mentioned, requiring students to use facilities associated with their sex is not discrimination of any kind.  Defendants' newly conjured "de minimis harm standard" cannot override Title IX's text, which in relevant part directs that no person "shall, on the basis of sex," be "subjected to discrimination."  20 U.S.C. § 1681(a).  Under Title IX, "the term 'discrimination' 'means treating [an] individual worse than others who are similarly situated.'"  *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 129-30 (4th Cir. 2022) (citation omitted).  This does not extend to assigning "comparable" bathrooms by sex, 34 C.F.R. § 106.33, in order to give both groups safety and privacy while performing "intimate, personal activity," *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008).

Not only do sex-segregated bathrooms not "treat[]" the members of one sex "worse than [the] other[]."  *Peltier*, 37 F.4th at 130 (citation omitted).  For purposes of accessing private facilities, females who identify as males are not "similarly situated" to males, and males who identify as females are not "similarly situated" to females.  *Cf., e.g.*, *B.P.J. ex rel. Jackson v. W.V. State Bd. of Educ.*, 98 F.4th 542, 567-68, 572-73 (4th Cir. 2024) (Agee, J., concurring in part and dissenting in part).  Males and females have different body parts that affect how they use the bathroom and other private facilities like showers.  *See id.* at 578; *Adams*, 57 F.4th at 811-17.  They also differ in what they have to keep private, what they wish to keep private, and from whom.  These "anatomical differences are at the root of why communal restrooms are generally [sex-]separated," *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 636 (4th Cir. 2020) (Niemeyer, J., dissenting),[1] and have historically been.

---

[1] Enforcing sex separation in bathrooms and related facilities likewise does not implicate sex-stereotyping.  *Cf. Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016).  "[I]t is neither myth nor outdated stereotype that there are inherent differences between" the sexes.  *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring).  And *L.W.* instructed that the Circuit's sex-stereotyping analysis in *Smith* does not "extend . . . beyond claims about discrimination over dress or appearance" or "create a new rule for transgender discrimination."  84 F.4th at 486.

In short, "recognizing and respecting biological sex differences" is not discrimination period, *L.W.*, 83 F.4th at 486—let alone for purposes of a statute that divides the sexes on biological bases throughout. At a minimum, Defendants lack the type of "clear authorization" needed to read Title IX's prohibition on "sex discrimination" as license to force schools to adopt individuals' self-professed and unverifiable gender identities for purposes of accessing bathrooms and other sex-separated facilities. *See West Virginia v. EPA*, 597 U.S. 697, 723, 732, 735 (2022).

3. Defendants' contrary arguments in defense of the Final Rule all fail. *Bostock* has no bearing on sex-separated bathrooms. Unlike here, the factual setting of *Bostock*—*i.e.*, the firing of individuals based on their gender identities—met the "worse treatment" and "similarly situated" conditions. Being fired is a quintessential form of worse treatment, so "discrimination" was a given. The "similarly situated" prong, 590 U.S. at 657, was likewise satisfied, given the Court's conclusion that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions" about hiring and firing, *id.* at 660. For good reason, then, *Bostock* emphatically declined to address "sex-segregated bathrooms" "or anything . . . of the kind." 590 U.S. at 681. Defendants' read of *Bostock* as barring "sex-segregated bathrooms" flouts that limitation, just as their contention (at 9) that § 106.31 is separable from § 106.10 and thus the Final Rule's non-discrimination discussion does not "purport to address 'bathrooms'" defies reality, *cf.* 89 Fed. Reg. at 33,815-16.

Defendants (at 6) separately err in invoking *Bostock*'s proposition that "discrimination based on . . . transgender status necessarily entails discrimination based on sex." 590 U.S. at 669. Defendants' statutory position (at 9) presents the inverse of *Bostock*: Their position rests *not* on the notion that "discrimination based on … transgender status necessarily entails discrimination based on sex," *id.*, but on the notion that separation based on sex "necessarily entails" discrimination based on transgender status. Nothing in *Bostock*—or in Title IX—supports the distinct and logically flawed

6

theory that any action *explicitly* based on sex necessarily takes cognizance of gender identity.  To the contrary, all members of the same sex receive like treatment, regardless of their gender identities.

Nor does *Bostock*'s but-for logic map onto the wide-ranging gender identities that the Final Rule claims to cover.  Because the Final Rule does not define "gender identity," that concept extends to any number of gender identities that reject association with sex altogether, or to individuals who associate with two sexes simultaneously.  If the Final Rule were right that denying bathroom access aligned with gender identity always inflicted more than de minimis harm on the basis of sex, then there would seem to be no limit on the types of facilities (*e.g.*, "bigender," "agender," "nonbinary"[2]) Title IX might require.  If anything, the Final Rule's bespoke de minimis harm standard that covers only students' subjective gender identities would result in the very discrimination Defendants purport to prohibit by preferencing transgender students over their so-called "cisgender" classmates based on gender identity.  *Cf. Adams*, 57 F.4th at 813-14.  On Defendants' view, a male who identifies as male would not be able to play on the woman's softball team, while a male who identifies as female could.  Such head-scratching results highlight the implausibility of the Final Rule's interpretation.

Defendants' position makes a hash of Title IX's statutory and regulatory provisions.  In Defendants' telling (at 11), a school *always* discriminates under Title IX by requiring students to access facilities and programs aligned with their sex but inconsistent with their gender identity.  But multiple provisions of Title IX authorize just that.  PI Br. 13.  Defendants do not pause at how the Final Rule's *Bostock*-based view of "sex discrimination" clashes with Title IX's broader structure.  Instead, they claim (at 10-12) that Title IX's carve-outs show Congress "naturally" and expressly *authorized* certain types of harmful discrimination against students.  *Accord* 89 Fed. Reg. at 33,814, 33,819 (advancing

---

[2] E. Coleman *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health No. S1, S80 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

this view).   It "defies logic" to conclude that Congress went out of its way to allow discrimination in policies covering housing, "father-son or mother-daughter activities," and Boys and Girls State, but not bathrooms, choirs, and sexual education.  *B.P.J.*, 98 F.4th at 579 (Agee, J., concurring in part and dissenting in part); *compare* 20 U.S.C. §§ 1681(7)-(8), 1686, *with* 34 C.F.R. §§ 106.33, 106.34(a)(3)-(4).

Defendants (at 10, 12-14) insist that there is nothing illogical about saying schools can *maintain* policies requiring sex separated bathrooms, but must not "*implement*" those policies anytime doing so conflicts with a student's gender identity.  And they try (at 11) to square the Final Rule with the still-operative regulation permitting sex-separated bathrooms on this basis.  But this view would render any allowance for sex-separation entirely "meaningless."  *Adams*, 57 F.4th at 813.  A "sex-separation" policy that must give way to students' gender-identity preferences does not "allow" sex-separation (Opp'n 11)—just gender-identity-based separation.  Defendants' reading also "contradict[s] the very purpose of allowing separate facilities"; it necessitates "privacy"-harming exposure to members of the opposite sex.  *Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d at 835.  Defendants give no answer, other than to dispute wholesale (at 14) that encountering a person of the opposite sex in a bathroom, locker room, or shower implicates any "legitimate privacy interest."  *But see supra* p. 4.

The Final Rule's nonsensical treatment of sports makes matters worse.  Defendants' argument (at 13) that sports, but not bathrooms, are a "special context" permitting different sex-separation rules overlooks how sex differences underpin sex-separated bathrooms.  Defendants cannot rest (at 13) on their "longstanding" approach to athletics, since they do not dispute that the bathroom regulation is just as longstanding.  Nor do Defendants acknowledge the Department of Justice's opposite position on sports in different Title IX litigation.  *See* Compl. ¶ 155.  Otherwise, the Final Rule's reasoning suggests that Title IX might permit some sex-separated sports teams depending on the "sport, level of competition, and grade or education level."  89 Fed. Reg. at 33,817; *see also* Compl. ¶¶ 126-29.  But

8

even this limited reasoning confirms what the States here stress: biological sex differences exist, matter in practice, and can be recognized and respected by schools consistent with Title IX.

**B.    The "Harassment" Definition Exceeds the Department's Title IX Authority.**

Defendants (at 15-16) agree that the Final Rule's sexual harassment definition is broader than the definition the Supreme Court required in *Davis ex. Rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). So Defendants apparently read the same Title IX language to provide two different definitions of harassment depending on who sues. This "chameleon" view of Title IX is unpersuasive on its own terms, *In re Juntoff*, 76 F.4th 480, 485 (6th Cir. 2023) (citation omitted), and further ignores central legal justifications for *Davis*'s holding. Among them, the Court adopted its harassment definition to reflect that discrimination must "occur '*under* any education program or activity,'" *Davis*, 526 U.S. at 652 (quoting 20 U.S.C. § 1681(a)), and with "limitations" meant to avoid infringing protected speech, *id.* Contrary agency practice (cited at Opp'n 15) cannot override the permissible meaning of Title IX, as interpreted by the Supreme Court.

**C.    The Final Rule Violates the Constitution.**

The Final Rule's constitutional failings further foreclose Defendants' reading. PI Br. 17-19.

1. *Spending Clause*. Defendants (at 19) rest on their mantra that the Final Rule merely "clarifies the scope of Title IX's unambiguous prohibition on sex discrimination." But to state the obvious, a provision that "unambiguously" "condition[s] . . . the grant of federal moneys" needs no clarifying. *Kentucky v. Yellen*, 54 F.4th 325, 348 (6th Cir. 2022). The Final Rule in reality changes the plain meaning of "sex discrimination" from sex—*i.e.*, male versus female—to gender identity and a "not exhaustive" list of other "sex characteristics." 89 Fed. Reg. at 33,801-03. And it deems schools' longstanding sex-separated-facilities policies discriminatory. *Id.* at 33,887. If the Spending-Clause clear-statement rule bars anything, it is agencies' adopting conditions with a meaning they can't fully articulate and

directives that are inherently self-contradictory. Nor does *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) (cited at 20), require otherwise. Unlike the retaliation there (punishing a coach for seeking equality in women's athletics, *id.* at 171-72), maintaining sex separation in intimate spaces *is not discriminatory*—let alone clearly so. The en banc Eleventh Circuit in *Adams* thus cited Spending-Clause principles as reason to reject Defendants' reading. PI Br. 18. Defendants offer no response.

2. *First Amendment*. Defendants (at 18) do not disavow that the Final Rule will force students, teachers, and staff to use students' preferred pronouns. Nor could they, since Defendants' enforcement history proves as much. Compl. ¶¶ 81-82, 213 & n.30.[3] As the Sixth Circuit and other courts have recognized, broadly compelling such speech is constitutionally impermissible. PI Br. 18; Intervenors' Br. 20. The States' argument about how the Final Rule applies to pronouns need not clear the "substantial applications" test (Opp'n 17-18), but does, given the widespread way in which pronoun-speech arises. Nor can Defendants (at 7) dodge *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), as a case about "certain classroom statements," since the "statements" were a professor's "use of pronouns" contrary to a student's "self-asserted gender identity." *Id.* at 498, 503-512.

3. *Parental Rights*. Defendants (at 20-21) do not disagree that the Final Rule *could* require schools to adopt a student's gender identity over a parent's opposition depending on a "case-by-case determination[]," *id.* at 33,822, and would preempt any contrary state laws, *id.*—thus harming States directly. *Cf. e.g.*, Tenn. Code Ann. § 49-6-316 (2024). At a minimum, this treatment of parental rights presents a constitutional can of worms that further cautions against the Final Rule's interpretation.

### D.   The Final Rule Is Arbitrary and Capricious.

Defendants' recitation (at 14) of the Final Rule's discussion of privacy and safety interests

---

[3] Such enforcement is occurring in Tennessee, *see* Ex. C to Reply (OCR May 16, 2023 Complaint), even though the Department is currently enjoined from "implementing" its present Title IX interpretation, *Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022).

underscores that arbitrariness abounds. The Final Rule's assertion that schools can "make and enforce rules" protecting privacy (cited at Opp'n 14) is empty given that schools and students face liability for even inquiring about the presence of opposite-sex persons in a sex-separated space, PI Br. 9-10. Defendants' point (at 14) that many schools opt to use "written confirmation" or "consistent assertion[s]" of gender identity does not address how schools are to verify access for persons lacking such evidence. Parroting (at 14) the Final Rule's conclusion that there is no "evidence" the gender-identity mandate "compromises anyone's legitimate privacy interest" adds insult to injury by conflating the long-recognized interest in not being exposed to strangers of the opposite sex with bigotry. It also sidesteps the relevant safety risks, since the Final Rule's no-questions-asked access regime means there would be no telling whether opposite-sex encounters in intimate spaces in fact involve safety threats seeking to capitalize on the cover the gender-identity mandate provides. *See* Doc. # 1-3 at 9-12. The Final Rule's remaining suggestion—that schools offer additional and different facilities for students—would impose seismic new costs that the Final Rule elsewhere rejects considering. Compl. ¶ 171.

Nor can Defendants (at 18) rehabilitate their failure to rationally justify the expanded definition of prohibited "harassment." If the Final Rule indeed considered consistency with the First Amendment, then disavowing required use of preferred pronouns should have followed—yet Defendants decline that step, *see supra* p. 10. That the Final Rule felt the need to clarify that it does not "confer[] parental rights to" schools is troubling, *id.* at 33,531, 33,835, as well as hard to square with Defendants' failure to answer whether they think Title IX forces schools to engage in gender interventions over parental opposition, *see supra* p. 10.

## II.   The Remaining Factors Favor Preliminary Relief.

### A.   The Final Rule Inflicts Irreparable Harm on the States.

1. *Unrecoverable Compliance Costs.* Defendants (at 21-22) do not dispute what this Court (and

the Final Rule itself) observed:  The States face "nonrecoverable compliance costs which they will no doubt begin to incur well before the August 1, 2024 effective date" of the Final Rule.  *See* Order, Doc. # 49 at 2; *see* PI Br. 21-22; 89 Fed. Reg. at 33,858 ("increased costs").  Indeed, the States detail several categories of "specific[]" obligations and "greater" costs the Final Rule requires of them, including "staff or … third party contractor" costs to "conduct training," "travel costs" to provide training across school districts, "updating policies and training materials," and "updat[ing] school building re-strooms and locker[s]."  Thompson Decl. ¶¶ 10-11, Mason Decl. ¶ 7, Deuth Decl. ¶ 13.  This evidence amply supports relief and is further bolstered by supplemental declarations detailing schools' ongoing compliance efforts submitted in conjunction with this brief.  *See* Exs. A-B to Reply.

Defendants' dismissal of these costs as routine (at 21) contradicts circuit precedent holding similar costs proved irreparable harm.  *See Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  The contrary district court case Defendants cite (at 21) was swiftly stayed by the Sixth Circuit, which found the challengers' "costs to ensure their compliance" as well as risk of punishment sufficient to show irreparable injury.  *See Kentucky v. EPA*, Nos. 23-5343/5345, at 6-7 (6th Cir. May 10, 2023), ECF No. 24.  Defendants' "quantification" argument (at 22) rests on the same stayed district court opinion and also was rejected by the Sixth Circuit.  *Id.* at 5.  If anything, Defendants' request that the States devote resources to finding the "precise dollar figure" of compliance expenses would perversely compound their unrecoverable costs.  *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 600 (5th Cir. 2023).

2. *Funding Losses*.  Defendants (at 3, 16) reiterate their power to "terminate" States' funding, yet say the States' exposure to such losses does not support preliminary relief.  If Defendants mean that States can "merely acquiesc[e]" to the Final Rule's unlawful mandates rather than lose funding, circuit caselaw forecloses this end round because the States "need not subject themselves to the very framework they say is unlawful."  *Biden*, 57 F.4th at 555 (cleaned up).  Nor need the States proceed

with a cloud over their federal funding while awaiting a later enforcement action. *Cf. Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, 799 F.3d 1065, 1066 (D.C. Cir. 2015) (Kavanaugh, J.).

3. *Sovereignty Harms*. Defendants have no answer to the States' sovereignty harms, other than to say (at 22-23) the Supremacy Clause means federal rules trump. Of course, only *valid* federal laws enjoy this effect—and the Final Rule is not one. *Supra* Part I. Regardless, the States' irreparable harm stems "from their inability to enforce the will of their legislatures." *L.W.*, 73 F.4th at 421; *see, e.g.*, Tenn. Code Ann. § 49-50-805; PI Br. 24. And here, the Final Rule confirms that it preempts state law in ways undisputed by Defendants. 89 Fed. Reg. at 33,540-42; *id.* at 33,885 (Proposed § 106.6(b)).

4. *Harms to Privacy, Safety, and Competition Interests*. Defendants' no-standing argument (at 23) likewise overlooks the States' "quasi-sovereign interest in the 'health and well-being … of [their] residents in general,'" *Kentucky v. Biden*, 23 F.4th 585, 599 (6th Cir. 2022) (citation omitted), which readily encompasses protecting students from unwanted "expos[ure] to persons of the opposite biological sex." *Grimm*, 822 F.3d at 734 (Niemeyer, J., concurring in part and dissenting in part). So too, state employees working on campuses subject to the Final Rule would suffer directly from the gender-identity mandate. *See, e.g.*, Thompson Decl. ¶¶ 4-5; Gentile Decl. ¶¶ 3, 5; Intervenors' Br. 21-22.

Defendants (at 23) dismiss the States' asserted privacy, safety, and competition injuries as "speculative and hypothetical." That will be news to Intervenor-Plaintiff A.C., who has already suffered very real irreparable harm from policies akin to Defendants' Title IX position. *See* Decl. of A.C., Doc. # 21-5 ¶¶ 15-27, 41-59 (discussed being "pushed out" from sports opportunities and subjected to "aggressive, vile, and disturbing" "sexual comments" in "locker room"). Defendants' rebuttal also ignores the record and recent reality, which exhibit safety and competition incidents. Compl. ¶ 57.[4]

---

[4] *See, e.g.*, Ryan Morik, *West Virginia Middle School Students Barred from Track Meet After Protesting Transgender Athlete's Inclusion*, Fox News (May 2, 2024), https://perma.cc/VG8H-3EGY.

Defendants cannot ignore the similar harm their distortion of Title IX is likely to inflict.

**B.     Preliminary Relief Will Not Harm Defendants or the Public Interest.**

The public interest overwhelmingly favors temporarily maintaining the status quo permitting sex-separated bathrooms, which "'date[] back as far as written history will take us.'" *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1312 (11th Cir. 2020) (Pryor, C.J., dissenting) (citation omitted). Supreme Court precedent also recognizes that separating the sexes may be "necessary to afford members of each sex privacy from the other sex." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996); *see* PI Br. 24-25. Defendants do not address the States' point that a pause of the Final Rule is reasonable given these longstanding realities, as well as the Department's two-year delay in promulgating the Final Rule and Title IX's unbroken history of permitting sex-separated facilities.

Defendants also overlook how the Final Rule's gender-identity mandate will widely affect the interests of students, educational employees, and families. Instead, Defendants (at 24) seem to believe that no amount of collateral damage to the privacy of those opposing forced, intimate-setting encounters with members of the opposite sex could justify delaying their new regime. Contra Defendants' characterization (at 11), the States—as well as an ever-growing body of international authorities—*do* dispute that denying widespread gender-identity interventions like social transitioning necessarily inflicts harm on school-aged children, versus the other way around. *See, e.g.*, *L.W.*, 83 F.4th at 468-70, 77. That aside, the Final Rule notes that schools can and do "voluntarily" adopt Defendants' preferred gender-identity policies. *E.g.*, 89 Fed. Reg. at 33,816. The public interest favors addressing difficult gender-identity issues through "[e]lected representatives" and state-and-local policy, *L.W.*, 83 F.4th at 491, not an agency-made mandate that settles the debate for all and overrides Title IX's limits.

14

**III.    The APA and Equity Support Entry of the States' Requested Relief.**

The States are entitled to postponement of the Rule under Section 705 of the APA, whose plain text permits entry of relief that is not "party-restricted." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (discussing *West Virginia v. EPA*, 577 U.S. 1126 (2016)); *see* T. Elliot Gaiser, *et al.*, *The Truth of Erasure: Universal Remedies for Universal Agency Actions* 3 n.4 (forthcoming in Univ. Chi. L. Rev. Online), https://perma.cc/G2HD-PAKA.  This reading reflects the difference between the APA context—where vacatur of a rule "for everyone" is the normal remedy, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (K.B. Jackson, J.) (citation omitted); *see Career Colls.*, 98 F.4th at 255 (collecting authorities)—and non-APA cases involving requests for equitable relief that flow to particular parties, *cf. Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 1, n.1 (2023) (Kavanaugh, J., concurring in denial of stay) (explaining difference).  Further, this Court may issue an injunction providing "complete relief."  Opp'n 24.  Here, the States press protected interests in enforcing their laws; safeguarding privacy, safety, and fairness for educators and students; and ensuring continued funding for valuable programs.  Preventing harm to these interests, at minimum, requires enjoining Defendants from unlawful Title IX action against the States and their schools statewide.

Defendants (at 25) assert that the Final Rule is severable and that any lawful portions should take effect on August 1, 2024.  Defendants' boilerplate severability discussion, *see* 89 Fed. Reg. at 33,848, does not explain how Defendants—or this Court—would disentangle the unlawful gender-identity requirements from other provisions.  Nor does it acknowledge the practical complications that would arise from saddling schools with dual-track compliance duties.  These dynamics cut against resolving the Department's thorny severability arguments at this preliminary phase.

## CONCLUSION

This Court should grant the States' motion for preliminary relief.

Dated: June 7, 2024

Respectfully submitted,

**RUSSELL COLEMAN**
  Attorney General

*/s/ Justin D. Clark*
JUSTIN D. CLARK
  Civil Chief
VICTOR B. MADDOX
  Counsel for Special Litigation
LINDSEY R. KEISER
  Assistant Attorney General
**Kentucky Office of the Attorney General**
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
victor.maddox@ky.gov
justind.clark@ky.gov
lindsey.keiser@ky.gov

*Counsel for the Commonwealth of Kentucky*

**JONATHAN SKRMETTI**
  Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE*
  Solicitor General
WHITNEY D. HERMANDORFER*
  Director of Strategic Litigation
STEVEN J. GRIFFIN*
  Senior Counsel for Strategic Litigation &
  Assistant Solicitor General
VIRGINIA N. ADAMSON*
  Counsel for Strategic Litigation &
Assistant Solicitor General
BRIAN DANIEL MOUNCE*
  Counsel for Strategic Litigation &
Assistant Solicitor General
**Office of the Tennessee Attorney General**
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3491
matt.rice@ag.tn.gov
whitney.hermandorfer@ag.tn.gov
steven.griffin@ag.tn.gov
jenna.adamson@ag.tn.gov
brian.mounce@ag.tn.gov

*Counsel for the State of Tennessee*

**THEODORE E. ROKITA**
  Attorney General

*/s/ James A. Barta*
JAMES A. BARTA*
  Solicitor General
CORRINE L. YOUNGS*
  Policy Director and Legislative Counsel
JOSHUA DAVID*
  Deputy Attorney General - Policy
**Indiana Attorney General's Office**
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709

**DAVE YOST**
  Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
  Solicitor General
MATHURA SRIDHARAN*
  Deputy Solicitor General
**Office of the Ohio Attorney General**
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

16

james.barta@atg.in.gov
corrine.youngs@atg.in.gov
joshua.david@atg.in.gov

*Counsel for the State of Indiana*


**JASON S. MIYARES**
  Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER*
  Principal Deputy Solicitor General
BRENDAN T. CHESTNUT*
  Deputy Solicitor General
**Virginia Attorney General's Office**
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for the Commonwealth of Virginia*


*\*Admitted pro hac vice*

**PATRICK MORRISEY**
  Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS*
  Principal Deputy Solicitor General
**Office of the West Virginia Attorney General**
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

**CERTIFICATE OF SERVICE**

I certify that on June 7, 2024, the above document was filed with the CM/ECF filing system, which provided copies of the foregoing to all counsel of record.


*/s/ Whitney Hermandorfer*

WHITNEY HERMANDORFER

18