**Exhibit B**

Reply in Support of the States' Motion for a § 705 Stay and Preliminary Injunction

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

| | |
|---|---|
| STATE OF TENNESSEE, COMMONWEALTH OF KENTUCKY, STATE OF OHIO, STATE OF INDIANA, COMMONWEALTH OF VIRGINIA, and STATE OF WEST VIRGINIA,<br><br> *Plaintiffs*,<br><br>and<br><br>CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL, and A.C., by her next friend and mother, Abigail Cross,<br><br> *Intervenor-Plaintiffs*,<br><br>v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br> *Defendants.* | Case No. 2:24-cv-00072-DCR-CJS<br>District Judge Danny C. Reeves<br>Magistrate Judge Candace J. Smith |

### **DECLARATION OF MARK A. FULKS, J.D., Ph.D., LL.M.**

 Pursuant to 28 U.S.C. § 1746, I, Mark A. Fulks, J.D., Ph.D., LL.M., duly affirm under penalty of perjury as follows:

 1. I have personal knowledge of the following matters.

 2. I have been a licensed attorney in the state of Tennessee for more than 25 years. I currently serve as University Counsel and Chief Compliance Officer for East Tennessee State University, a position I have held since August 1, 2019. In this position, I maintain a very diverse in-

1

house legal practice that includes all areas of law affecting the university's operations. Additionally, with the assistance of four attorneys and five staff members, I also oversee all University compliance, including research compliance, Title IV, Title VI, Title IX, OSHA, HIPAA, FERPA, the ADA, Clery Act compliance, NCAA and athletics compliance, and many others areas.

3. In addition to my legal experience, I have about 20 years of experience in management positions in both the public and private sectors. I also have extensive education and training in public management, budgeting, and policy implementation. I have a Ph.D. in Public Administration, a Master of Public Administration, and a Master of Arts in Political Science. I have also successfully completed several management training programs.

4. To effectively manage compliance, I have the assistance of the Office of University Compliance, which is housed in my office. The compliance office employs three people—a Director of University Compliance & Title IX Coordinator, a Senior Compliance Investigator & Deputy Title IX Coordinator, and a Compliance Investigator & Deputy Title IX Coordinator—who are primarily responsible for administering and complying with Title IX of the Education Amendments Act of 1972, as well as the U.S. Department of Education's Title IX regulations. These employees also handle the full panoply of compliance-related duties that extend beyond Title IX (except for Athletics Compliance), including investigating complaints of discrimination and harassment under other state and federal laws, complaints under the Americans with Disabilities Act, and other internal investigations of alleged employee misconduct. The Office of University Compliance receives legal support from me and an Assistant University Counsel.

5. To effectively manage the university's rulemaking and policy development, which is also housed in my office, I have the assistance of a Deputy University Counsel & Chief Policy Counsel and an Assistant University Counsel for Policy. These employees manage the university's

rulemaking and policy development process, providing legal advice and drafting assistance for all university rules and policies.

6. ETSU is home to approximately 14,000 undergraduate and graduate students in East Tennessee. To fulfill its educational mission, the university employs approximately 2,400 faculty and staff that work across five campuses.

7. In late April 2024, the U.S. Department of Education promulgated a new Title IX rule. *See* 89 Fed. Reg. 33,474 ("Final Rule"). The Final Rule takes effect August 1, 2024.

8. The Final Rule acknowledges that it will lead covered recipients to experience "increased costs" associated with compliance with the Final Rule's new requirements. 89 Fed. Reg. at 33,858. As an example, the Final Rule expects that its changes "may result in a 10 percent increase in the number of investigations conducted annually." *Id.* at 33,850.

9. Based on my review and understanding of the relevant regulatory documents, I believe the Final Rule underestimates its impact on this university's operational costs associated with processing, investigating, and resolving Title IX complaints. Among other things, the Final Rule expands the scope of the characteristics that fall within prohibited "sex" discrimination as well as the definition of "hostile environment harassment." The Final Rule likewise expands the scope of our authority beyond our campuses to include conduct that occurs elsewhere. The Final Rule allows third-parties to submit complaints. It implements a "more than de minimis harm" standard, imputes knowledge if "any employee is aware" of alleged sexual harassment or discrimination, and expands the list of mandatory reporters while lowering the standard for a reportable incident. Moreover, the Final Rule requires annual training for all employees and specialized training for certain employees who have roles in the Title IX and grievance processes. Finally, the Final Rule expands the responsibilities of the Title IX Coordinator. In these ways, the Final Rule imposes

3

significant new compliance responsibilities not just on three members of my staff for the Federal Government's regulatory purposes, but also on a significant portion of this university's faculty and staff.  As for the costs related to implementation of the Final Rule, they will be extensive.

10. The University takes seriously its obligation to comply with Title IX.  Our Title IX investigations are often time and resource intensive.  Investigations routinely involve the decisions of three full-time employees, who collectively may spend anywhere from dozens to hundreds of hours on each complaint, depending on factors such as the severity of the allegations, the scope of the investigation, the number of witnesses, the availability of documentary evidence, and the complexity of the legal issues.  The most contentious cases may last for several years as they work their way through grievance processes, disciplinary processes, de-tenuring proceedings, and litigation.  Our compliance team finds itself occupied by these matters throughout their duration.

11. Last year, the University received approximately 61 Title IX complaints.  Not all of those complaints resulted in full investigations, but all of them were received, reviewed, and processed according to Title IX Regulations.  The Final Rule's predicted 10 percent increase in such investigations would thus require the University to incur increased compliance expenses. Given the increased scope of the Final Rule and the lower standard, I believe the increase will be considerably more than 10 percent.  The University is currently in the process of attempting to forecast our personnel and resource needs under the Final Rule.  To ensure continued compliance, we will need to proactively staff in preparation for such an increase because we will need to hire and train new staff before the increase occurs.  Otherwise, we will have to require our compliance team to absorb that increased number of cases into their current workload.  Other university participants in the grievance and disciplinary processes will face a similar increase in their workloads.

12. Moreover, we are skeptical of the accuracy of the Final Rule's estimated 10 percent increase in the number of investigations because the extension of our authority beyond our campuses, the lower standard, and the increased number of mandatory reporters, combine to create a situation in which it is reasonable to assume that the increase will be far greater. I believe the 10 percent estimate may be more accurately described as the minimum increase that we should expect. But, as previously noted, a 10 percent increase in the number of investigations does not equate to a 10 percent increase in our workload. My compliance team's actual workload is likely to increase considerably more than 10 percent because investigations are dynamic proceedings that cannot be cabined to a strict schedule or limited number of hours. Because of the minimum 10 percent increase in the number of investigations and the correspondingly larger increase in actual workload, I face a budget issue in my department that will come to fruition in less than two months but long after the annual budget has been set. In short, somebody must pay for that increase, whether it is my employees who may carry heavier workloads or the University that may have to allocate additional resources to my office.

13. The Final Rule also acknowledges that it will lead recipients' staff to "review and revise policies" and "notices of nondiscrimination." *Id.* at 33,852. To provide one example, the University's current definition of harassment adheres to the prior definition of harassment required under the 2020 Title IX rule. *See* ETSU, Policy on Discrimination, Harassment, and Sexual Misconduct 9 (Oct., 12, 2021), https://www.etsu.edu/policies/documents/discrimination-harrasment-sexual-misconduct.pdf. The Final Rule provides a "revised definition" of harassment, 89 Fed. Reg. at 33,491, that differs from the current definition in the University's Title IX policy, which in turn will require that the policy be updated. As previously noted, this will add to my policy team's workload.

5

14. The Final Rule also states that it will require recipients "to dedicate some additional resources for training." *Id.* Preparing for and bringing the University into compliance with the Final Rule will require the expenditure of resources and time of various personnel. We will have to implement annual training for all of our 2,400 regular employees while also implementing specialized training for other employees. This will be a very expensive and time-consuming process. We may also have to expend funds to retain outside consultants to create training materials and conduct training seminars for our thousands of students and employees or purchase a new or updated training platform to provide online training seminars.

15. Overall, there are at least five individuals in my office who are directly responsible for ensuring compliance with the Final Rule and two additional individuals who are directly responsible for rule and policy development. Their collective compliance efforts have begun, and have already required a significant number of hours for reviewing the Final Rule, attending training seminars on the new regulations, analyzing the regulations, searching for new training options, and drafting amended policies and a new rule.

16. The information above is limited to the specific resources, personnel hours, and other compliance expenses that the University is and will continue to incur on account of the Final Rule. This declaration does not otherwise take any position about the Final Rule.

17. I declare under penalty of perjury that the foregoing is true and correct.

_____
Mark A. Fulks, J.D., Ph.D., LL.M.
Dated: June 7, 2024