**Exhibit A**

Plaintiff States' Notice of Supplemental Authority

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| **STATE OF LOUISIANA ET AL** | **CASE NO.  3:24-CV-00563** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **U S DEPT OF EDUCATION ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

<u>**MEMORANDUM RULING**</u>

### I.      INTRODUCTION

On April 29, 2024, the United States Department of Education issued the Final Rule, which redefined sexual discrimination in Title IX. Plaintiffs immediately filed suit in this Court followed by a request for this Court to issue a Preliminary Injunction and/or Temporary Restraining Order against the Final Rule.

It is a tenant of this free country that harassment against any person, whether it be based on their gender identity or sexual orientation, is unacceptable. Harassment against children in school for these very reasons is even more inappropriate. The Final Rule redefines "sex discrimination" to include gender identity, sexual orientation, sex stereotypes, and sex characteristics; preempts state law to the contrary; requires students to be allowed to access bathrooms and locker rooms based on their gender identity; prohibits schools from requiring medical or other documentation to validate the student's gender identity; requires schools to use whatever pronouns the student requires; and imposes additional requirements that will result in substantial costs to the school.

Contained within the 423-page Final Rule are substantive and procedural regulations that amend previous Title IX regulations.[1] Such changes will significantly affect every public school and college in the United States. The primary changes include:

1) Adding 34 CFR 106.10 to read:

> 106.10 Scope
> Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation or gender identity.[2]

2) Revising 34 C.F.R. 106.6 to declare that the Final Rule preempts state law.[3]

3) Revising 34 C.F.R. 106.8 to require recipients to designate, hire, and pay for a Title IX Coordinator to ensure compliance with Title IX. This revision further requires recipients to train employees and hire investigators and facilitators. The revision additionally sets forth required grievance procedures.[4]

4) Revises 34 C.F.R. 106.6(b) to prohibit any recipient from adopting or implementing any practice or procedure concerning a student's current, potential, or past parental, family, or marital status where such practice or procedure treats students differently on the basis of sex.[5]

5) Amends 34 C.F.R. 106.44 to require recipients "with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity" to mandatorily report the conduct to the Title IX Coordinator or to give the person alleging discrimination the Title IX Coordinator's contact information.[6]

6) Amends 34 C.F.R. 106.45 to impose grievance procedures for complaints of sex discrimination. This includes requiring the recipient to perform and/or conduct an investigation into alleged sex discrimination complaints, interview witnesses, and obtain evidence.[7]

7) Prohibits recipients from requiring medical or any other documentation to validate the student's gender identity.[8]

---

[1] 20 U.S.C. § 1681-1688.
[2] 89 Fed. Reg. at 33886.
[3] Section (b) states that despite any state law to the contrary, the recipients are still required to comply with Title IX and its regulations. 89 Fed. Reg. at 33885. Recipients are schools that receive Title IX funding.
[4] 89 Fed. Reg. at 33885-86.
[5] 89 Fed. Reg. at 33887.
[6] 89 Fed. Reg. at 33888.
[7] 89 Fed. Reg. at 33891-92.
[8] 89 Fed. Reg. at 33819.

8) Requires a recipient to allow students to access bathrooms and locker rooms based upon their gender identity.[9]

9) Requires that any student's claimed gender identity be treated as if it was his or her sex and requires recipients to compel staff and students to use whatever pronouns the student requests.[10]

10) Creates a new standard for "hostile environment harassment" that could include views critical of gender identity occurring outside the recipient's educational programs or even outside the United States.[11]

11) The effective date for the Final Rule to take effect is August 1, 2024.[12]

Louisiana Plaintiffs[13] and the School Board of Rapides Parish ("Rapides") (collectively "Plaintiffs") filed Motions for Preliminary Injunction and Motions for Stay [Doc. Nos. 17 and 27] Defendants filed a Response [Doc. No. 38].[14] Plaintiffs filed Replies [Doc. Nos. 46 and 52]. The States of California, Colorado, District of Columbia, Delaware, Hawaii, Illinois, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington filed an amici curiae brief in Opposition to the Motions for Preliminary Injunction [Doc. No. 50].

For the reasons set forth herein, this Court finds the Plaintiffs are likely to succeed on the merits that the Defendants' Final Rule is (1) contrary to law under the Administrative Procedures

---

[9] 89 Fed. Reg. at 33818.
[10] 89 Fed. Reg. at 33516
[11] 89 Fed. Reg. at 33516 and 33530.
[12] 89 Fed. Reg. at 33474.
[13] Louisiana Plaintiffs consists of: State of Louisiana, by and through its Attorney General, Elizabeth B. Murrill; LA Dept. of Education, State of Mississippi, by and through its Attorney General, Lynn Fitch; State of Montana, by and through its Attorney General, Austin Knudsen; State of Idaho, by and through its Attorney General, Raul Labrador; School Board of Webster Parish; School Board of Red River Parish; School Board of Bossier Parish; School Board of Sabine Parish; School Board of Grant Parish; School Board of West Carroll Parish; School Board of Caddo Parish; School Board of Natchitoches Parish; School Board of Caldwell Parish; School Board of Allen Parish; School Board of LaSalle Parish; School Board of Jefferson Davis Parish; School Board of Ouachita Parish; School Board of Franklin Parish; School Board of Acadia Parish; School Board of DeSoto Parish; and School Board of  St. Tammany Parish.
[14] Defendants consists of: U.S. Department of Education; Miguel Cardona, in his official capacity as Secretary of Education; Office for Civil Rights, U S Dept. of Education; Catherine Lhamon, in her official capacity as the Assistant Secretary for Civil Rights; U S Dept of Justice, and Merrick B. Garland, in his official capacity as the Attorney General of the United States.

Act ("APA"), (2) violates the Free Speech Clause of the First Amendment, (3) violates the Free Exercise Clause of the First Amendment, (4) violates the Spending Clause, and (5) is arbitrary and capricious in accordance with Title 5 U.S.C. § 706 (2)(A) of the APA.

Therefore, the Motions for Preliminary Injunction [Doc. Nos. 17 and 27] are **GRANTED**. The Motions to Stay [Doc. Nos. 17 and 27] are **DENIED** as moot.

## II. BACKGROUND

### a. History of Title IX

On June 23, 1972, Congress enacted Title IX of the Education Amendments,[15] which forbid educational programs or activities receiving federal financial assistance from discriminating on the basis of sex. Title IX was a direct response to the discrimination of women in educational programs and activities. As of 1970, only eight percent (8%) of American women had a college degree, and only fifty-nine (59%) percent had graduated from high school.[16] Title 20 U.S.C. § 1681(a) provides:

> No person… shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

The text of Title IX confirms that Title IX was intended to prevent biological women from being discriminated against in education in favor of biological men. Title IX lists several exemptions which use the language "one sex" or "both sexes" showing that the statute was referring to biological men and biological women, not gender identity, sexual orientation, sex stereotypes, or sex characteristics. Title 20 U.S.C. § 1681 contains the following exemptions (collectively referred to as "Exemptions"):

---

[15] 20 U.S.C. § 1681, et seq.
[16] Equal Access to Education: Forty Years of Title IX, U.S. Dep't. Just. 2 (June 23, 2012), https://perma.cc/3 GFD-74YX ("DOJ Equal Access").

1) public institutions that traditionally and continually had a policy of admitting only "students of one sex"[17];

2) educational institutions which had started to transition from being an institution which admits only students of "one sex" to students of "both sexes"[18];

3) social fraternities or sororities and voluntary youth organizations, specifically exempting the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and other youth service organizations which had traditionally been limited to persons of one sex[19];

4) Boys State Conference, Boys Nation Conference, Girls State Conference, Girls Nation conference, or any program or activity specifically for, or promoting said organizations[20];

5) father-son or mother-daughter activities at an educational institution[21];

6) scholarship or other financial assistance awarded by an institution of higher education as a result of an award in a beauty pageant where participation is limited to individuals of "one sex only[.]"[22]

Additionally, 20 U.S.C. § 1686 of Title IX states that nothing contained in Title IX shall be construed to prohibit any educational facility from "maintaining separate living facilities for the different sexes."[23]

In 1974, Congress enacted legislation instructing regulations to be promulgated "which shall include with respect to intercollegiate athletic activities reasonable provisions concerning the nature of particular sports."[24] Those regulations allowed a school "to provide separate teams for 'men and women' where the provisions of only one team would 'not accommodate the interests and ability of both sexes.'"[25]

---

[17] 20 U.S.C. § 1681(a)(5).
[18] Id (a)(A)(2).
[19] Id (a)(6)(A)and (B).
[20] Id (a)(7).
[21] Id (a)(8).
[22] Id (a)(9).
[23] 20 U.S.C. § 1681(c) defines an education institution as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department."
[24] Pub. L. 93-380 § 844, 88 Stat. 484, 612 (1974).
[25] 34 C.F.R. 106.41(c)(1).

The United States Department of Justice ("DOJ") promulgated the DOJ Equal Access bulletin (see FN 16) in which the DOJ referred to the discriminated sex as "women." In discussing the impact Title IX had in its forty years, the DOJ stated:

> Since 1972, women have made great strides in their educational attainment, benefitting from the protections enacted through Title IX. In 2009, approximately 87 percent of women had at least a high school education and approximately 28 percent had at least a college degree, up from 59 percent with a high school education and 8 percent with a college degree in 1970. Additionally, enrollment in higher education has increased at a greater rate for females than for males; since 1968, the percentage of women between the ages of 25 and 34 with at least a college degree has more than tripled. Women now have higher graduation rates and lower high school dropout rates, take more Advanced Placement exams, and earn more advanced degrees than their male counterparts. They also tend to score higher in reading assessment tests than male students.[26]

The DOJ Equal Access bulletin also noted how Title IX expanded women's access to high school athletic programs, noting that from 1972 to 2011 female participation rose from approximately 250,000 in 1972 to 3,250,000 in 2011.[27] In discussing the success of Title IX for women in athletics more thoroughly, Deborah Brake wrote in the University of Michigan Journal of Law Reform that:

> Title IX has paved the way for significant increases in athletic participation for girls and women at all levels of education. Since the enactment of Title IX, female participation in competitive sports has soared to unprecedented heights. Fewer than 300,000 female students participated in interscholastic athletics in 1976. By 1998-99, that number exceeded 2.6 million, with significant increases in each intervening year. To put these numbers in perspective, since Title IX was enacted, the number of girls playing high school sports has gone from one in twenty-seven to one in three.[28]

---

[26] DOJ Equal Access pp. 2-3.
[27] Id. pp. 4-5.
[28] Deborah Brake, *The Struggle for Sex Equality in Sport and the Theory Behind Title IX*, 34 U. Mich. J. L. Reform 13 (2000)

It is clear in the text of Title IX itself, and in the decades-long impact of Title IX, that its enactment was created to apply to two sexes. There is nothing in the text or history of Title IX indicating that the law was meant to apply to anyone other than biological men and/or women. The logic of Title IX was sound, the execution was flawless, and the application has had stellar results for years. Therefore, the Court must ask itself, what is the driving force behind a change to such a successful and inclusive rule, and if the driving force has legitimate reasons for the change, why is the enforcement of the changes being done in such a hurried and sloppy manner?

### b. The Final Rule

The Final Rule is what is at issue here, but in order for the Court to thoroughly examine that rule, it must start at the beginning, which goes back to January 2021, i.e., the beginning of President Joe Biden's ("President Biden") term in office.

On the same day of his inauguration,[29] President Biden executed Executive Order 13988, entitled "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation."[30] This Executive Order declared that discrimination "because of sex" includes discrimination on the basis of gender identity and sexual orientation under Title IX and other federal laws.

The Executive Order directed the head of each agency, as soon as practicable, to review all existing orders, regulations, guidance documents, policies, programs, or other agency actions that were promulgated or administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination. The head of each agency was also ordered to consider whether to revise, suspend, or rescind agency actions and to consider whether there were additional actions

---

[29] January 20, 2021.
[30] 86 Fed. Reg 7023 (January 20, 2021).

the agency should take in implementing the Executive Order. Additionally, the head of each agency was ordered to devise a plan within 100 days to implement those actions.

On June 22, 2021, the DOE, Office for Civil Rights ("OCR") published an "Interpretation"[31] of 20 U.S.C. § 1681(a) (which prohibits discrimination on the basis of sex) to include discrimination based on sexual orientation and gender identity. The DOE stated it would fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education and activities that receive federal financial assistance from the DOE. The Interpretation took effect the same day it was published.

On June 23, 2021, the DOE issued a "Dear Educator" letter[32] to directly notify the institutions and persons subject to Title IX of the DOE's interpretation. This "Dear Educator" letter also informed institutions and persons subject to Title IX that the DOE would begin immediately enforcing enforcement of discrimination based on gender identity or sexual orientation.

As a result of the Interpretation and "Dear Educator" letter, Tennessee and nineteen other states filed suit against the DOE, the Equal Employment Opportunity Commission, and the DOJ seeking a preliminary injunction to prohibit the DOE's interpretation from taking effect. On July 15, 2022, in *Tennessee v. United States Department of Education*,[33] the district court granted the Plaintiff's Motion for Preliminary Injunction, prohibiting the DOE's Interpretation from taking effect.

After the "Dear Educator" rule was enjoined, the DOE engaged in formal agency rulemaking to amend the Title IX regulations. On April 13, 2023, the DOE published a Notice of

---

[31] 86 Fed. Reg. 32637.
[32] 615 F.Supp. 3d at 817-18
[33] 615 F. Supp. 3d 807 (E.D. Tenn. 2022),

Proposed Rulemaking with regard to Title IX regulations in the Federal Register.[34] Comments were to be received by May 15, 2023.

Thereafter, on April 29, 2024, the DOE published the Final Rule[35] which contained the amendments at issue here. The Final Rule has an effective date of August 1, 2024.

### III.    STANDING

A court is required to evaluate its jurisdiction, which requires a determination of whether the Plaintiffs have standing. The United States Constitution, via Article III, limits federal courts' jurisdiction to "cases" and "controversies." *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (citing U.S. Const. art. III, § 2). The "law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 435 (2017) (citation omitted).

Thus, "the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (citation and internal quotation marks omitted). The Article III standing requirements apply to claims for injunctive and declaratory relief. *See Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018), *as revised* (Aug. 9, 2018); *Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997). In the context of a preliminary injunction, "the 'merits' required for the plaintiff to demonstrate a likelihood of success include not only substantive theories but also the establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

---

[34] 88 Fed. Reg. 22860
[35] 89 Fed. Reg. 33474

Article III standing is comprised of three essential elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citation omitted). "The plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (internal citations omitted). Furthermore, "[a] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y.*, 581 U.S. at 439 (citations omitted). However, the presence of one party with standing "is sufficient to satisfy Article III's case-or-controversy requirement." *Texas v. U.S.*, 809 F.3d 134, 151 (5th Cir. 2015) (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)). Further, a plaintiff's standing is evaluated at the time of filing of the initial complaint in which they joined. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004); *Davis v. F.E.C.*, 554 F.3d 724, 734 (2008); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013).

In order to establish standing, the plaintiff must demonstrate that they have encountered or suffered an injury attributable to the defendant's challenged conduct and that such injury is likely to be resolved through a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). Further, during the preliminary injunction stage, the movant is only required to demonstrate a likelihood of proving standing. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). For the reasons stated herein, the Court finds that the Plaintiffs have demonstrated a likelihood of satisfying Article III's standing requirements.

**(1) Injury-in-fact**

Plaintiffs seeking to establish injury-in-fact must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citations and internal quotation marks omitted). For an injury to be "particularized," it must "affect the plaintiff in a personal and individual way." *Id.* (citations and internal quotation marks omitted).

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), the Supreme Court held that, for purposes of an Article III injury-in-fact, an allegation of future injury may suffice if there is "a 'substantial risk' that the harm will occur." (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, (2013)). In *SBA List*, a petitioner challenged a statute that prohibited making certain false statements during the course of a political campaign. *Id.* at 151–52. In deciding whether the pre-enforcement challenge was justiciable—and in particular, whether it alleged a sufficiently imminent injury for purposes of Article III—the Court noted that pre-enforcement review is warranted under circumstances that render the threatened enforcement "sufficiently imminent." *Id.* at 159. Specifically, the Court noted that past enforcement is "good evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Similarly, in *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the Supreme Court held that a complaint alleges an Article III injury-in-fact where fear of future injury is not "imaginary or wholly speculative."

Plaintiffs consist of four states[36] and a total of eighteen Louisiana Parish School Boards ("School Board Plaintiffs").[37] Plaintiffs argue they are injured because the Final Rule (1) conflicts with State laws that are designed to safeguard female sports, safety, privacy and parental rights, (2) results in non-recoverable costs of complying with the Final Rule, (3) requires Plaintiffs to secure funding, and (4) interferes with the State Plaintiffs' sovereign authority to enforce its laws,

---

[36] Louisiana, Mississippi, Montana and Idaho (Plaintiff States").
[37] School Board Plaintiffs consist of Webster Parish, Red River Parish, Bossier Parish, Sabine Parish, Grant Parish, West Carroll Parish, Caddo Parish, Natchitoches Parish, Caldwell Parish, Allen Parish, LaSalle Parish, Jefferson Davis Parish, Ouachita Parish, Franklin Parish, Acadia Parish, DeSoto Parish, St. Tammany Parish and Rapides Parish.

which in turn interferes with the Plaintiff States' police power over public health policy. Plaintiffs further argue they are facing "substantial pressure" from the DOE to change their state laws. Similarly, School Board Plaintiffs assert that they are being pressured to revise their current policies and practices or risk losing significant federal funding. School Board Plaintiffs further argue they will suffer harm by increased recordkeeping, additional obligations, potential complaints, administrative investigation, private litigation, increased liability exposure, and/or decreased enrollment of students.

School Board Plaintiffs prepared ten Declarations discussing the injuries school boards would suffer if the Final Rule were to go into effect.[38] School Board Plaintiffs received millions of dollars of federal funds for the 2022-23 school year ranging from a low of $2,907,104 to a high of $75,635,132. Each School Board Plaintiff indicated that the Final Rule increased its federal obligations, compliance costs, and litigation risks. Most School Board Plaintiffs also had construction costs to construct gender-neutral bathrooms and locker rooms.[39] The School Board Plaintiffs additionally estimated decreased school enrollment, loss of teachers, and increased litigation. The School Board Plaintiffs further expressed concerns about whether the Final Rule would apply to sports, which would incur substantial additional costs.

Louisiana State Superintendent of Education Preston Brumley estimated that federal funds accounted for approximately 13% of Louisiana State school funding ($725,432,889) last year.[40] Further, Plaintiff States argue that the Final Rule conflicts with their duly enacted laws (and soon-to-be enacted laws) designed to safeguard female sports, safety, privacy, and parental rights. See, e.g., La. Rev. Stat. §§ 4:442, 4:444; Miss. Code Ann. §§ 37-97-1, 37-97-3, Mont. Ann. §§ 1-1-201,

---

[38] Allen, Caldwell, Franklin, Grant, Jefferson, LaSalle, Ouachita, Sabine, St. Tammany and West Carroll Parish School Boards [Doc. No. 18-16 -25].

[39] The DOE made no attempt to estimate construction costs in the Final Rule. 89 Fed. Reg. 33849-878.

[40] [Doc. Nos. 18-33, 34].

20-7-1306, 40-6-704, Idaho Code §§ 73-114(2), 33-6201–6203, 33-6701–6707; S.B. 2753, 2024 Leg. Reg. Sess. (Miss. 2024); see also H.B. 610, 2024 Leg. Reg. Sess. (La. 2024); H.B. 121, 2024 Leg. Reg. Sess. (La. 2024); 89 Fed. Reg. at 33,885.[41]

Defendants contest Plaintiffs have sustained irreparable harm needed to justify a preliminary injunction, but Defendants do not contest injury-in-fact.

By alleging injuries due to compliance costs, conflicts with state laws, additional recordkeeping, construction costs, and violation of First Amendment Rights, Plaintiffs have shown they have suffered invasion of a legally protected interest that is concrete and particularized and actual and imminent. The inquiries are actual and imminent because the Final Rule is set to go into effect in August.

Accordingly, the Plaintiffs have alleged a likelihood of establishing an injury-in-fact sufficient to satisfy Article III.

### (2) Traceability

To establish traceability or "causation" in this context, a plaintiff must demonstrate a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Therefore, courts examining this element of standing must assess the remoteness, if any, between the plaintiff's injury and the defendant's actions. As explained in *Ass'n of Am. Physicians & Surgeons v. Schiff*, the plaintiff must establish that it is "'substantially probable that the challenged acts of the defendant, not of some absent third party' caused or will cause the injury alleged." 518 F. Supp. 3d 505, 513 (D.D.C. 2021), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*") (quoting *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996)).

---

[41] [Doc. No. 24, p. 36]

Defendants do not contest traceability.

In *Duke Power Co. v. Carolina Envt. Study Grp*., the United States Supreme Court found that a plaintiff's injury was fairly traceable to a statute under a theory of "but-for" causation. 438 U.S. 59 (1978). The plaintiffs, who were comprised in part of individuals living near the proposed sites for nuclear plants, challenged a statute that limited the aggregate liability for a single nuclear accident under the theory that, but for the passing of the statute, the nuclear plants would not have been constructed. *Id*. at 64-65. The Supreme Court agreed with the district court's finding that there was a "substantial likelihood" that the nuclear plants would have been neither completed nor operated absent the passage of the nuclear-friendly statute. *Id*. at 75.

Similarly, Plaintiffs easily meet the traceability standard. All of the alleged injuries have a direct relation between the Final Rule and injuries alleged. The Final Rule here is the but-for cause of any of Plaintiff's alleged injuries. Therefore, it is unquestionable that the actions of Defendants in implementing the Final Rule are the cause of the Plaintiffs' alleged injuries, and Plaintiffs have established traceability for standing purposes.

### (3) Redressability

The redressability element of the standing analysis requires that the alleged injury is "likely to be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 141 U.S. 2104, 2115, 210 L. Ed. 2d 230 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). Additionally, courts typically find that where an injury is traceable to a defendant's conduct, it is usually redressable as well. *See, e.g.*, *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016) ("[C]ausation and

redressability are closely related, and can be viewed as two facets of a single requirement."); *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("Redressability . . . is closely related to traceability, and the two prongs often overlap."); *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019).

Plaintiffs argue that they are likely to prove that a favorable decision would redress their injuries because they provided ample evidence that their injuries are imminent and ongoing. In response, Defendants contend that any threat of future injury is merely speculative.

The Court finds that Plaintiffs are likely to prove that their injuries would be redressed by a preliminary injunction. The Defendants have attempted to enact these rules for three- and one-half years. The Plaintiffs would be required to immediately hire additional employees and a Title IX Coordinator, train employees, and/or begin additional construction in order to comply with the Final Rule before it goes into effect. Thus, Plaintiffs are likely to prove that the injuries are imminent and would be redressed by a Preliminary Injunction.

Accordingly, Plaintiffs have satisfied all the requirements for Article III standing.

## IV.   PRELIMINARY INJUNCTION

The Plaintiffs move the Court to issue a preliminary injunction to stop the implementation of the Defendants' Final Rule. A preliminary injunction is an extraordinary and drastic remedy that should never be awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A movant must make a clear showing that it is entitled to relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Specifically, to obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) the threat of

irreparable harm outweighs any harm that would result if the injunction were granted; and (4) an injunction is in the public interest.[42]

Here, Defendants contend that a preliminary injunction is not warranted because Plaintiffs have not established irreparable harm; that the Final Rule is a "clarification" and not a change in the law; the Defendants have the authority to enforce the Final Rule; and the Final Rule does not violate the Spending Clause, First Amendment, or the major question doctrine.

Plaintiffs argue that a preliminary injunction is necessary here to cure the unlawfulness of the Final Rule. Specifically, Plaintiffs assert that the Final Rule "ignores the text, structure, and context of Title IX to advance Defendants' political and ideological agenda. Defendants have no authority [] to rewrite Title IX and decide major questions as the Final Rule does. The Final Rule also violates the Spending Clause, is an unconstitutional exercise of legislative power, and fails arbitrary-and-capricious review several times over. And to top it off, the Final Rule causes Plaintiffs immediate irreparable harm and will cause additional irreparable harm, including unrecoverable compliance costs."[43]

After considering the extensive and expedited briefing herein, the Court finds that Plaintiffs satisfied all elements required for the issuance of a preliminary injunction, and it **GRANTS** Plaintiffs' Motions for the following reasons.

### a. Likelihood of Success on the Merits

To show a likelihood of success on the merits, the Plaintiffs must "present a prima facie case, but need not show it is certain to win." *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011). As stated previously, Plaintiffs make four arguments for why they are likely to succeed on the merits. These arguments are that (1) the Final Rule is contrary to law and exceeds statutory

---

[42] *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021).
[43] [Doc. No. 24, p. 12]

authority; (2) the Final Rule's conditions violate the spending clause; (3) the Final Rule is an unconstitutional exercise of legislative power; and (4) the Final Rule is arbitrary and capricious.

### 1. The Final Rule is Contrary to Law and Exceeds Statutory Authority

Plaintiffs argue that because the Final Rule is contrary to Title IX's text and structure and Defendants have no statutory authority to subvert Title IX or to decide major questions, then they are likely to succeed in showing that the Final Rule is not in accordance with the law and exceeds statutory authority under Title 5 U.S.C. § 706(2)(A), (C).[44] 5 U.S.C. § 706(2)(A), (C) reads as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--
> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]

The Court will analyze this argument in parts, beginning with the Final Rule's contrariness to the text of Title IX.

### a. Contrariness to Title IX

As stated earlier, Title IX provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"

---

[44] 5 U.S.C. § 706(2)(A), the Administrative Procedures Act

Plaintiffs argue that the plain text of the statute reads that there is a prohibition on discrimination based on someone's biological text and that the Final Rule's requirement that recipients consider gender identity and treat people consistent with their self-professed gender identity is at odds with Title IX.

Defendants rely on *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) to support their interpretation of "sex discrimination" under Title IX. In *Bostock*, the Supreme Court found that an employer violates Title VII[45] by firing an individual for being homosexual or transgender because sex plays a necessary and undistinguished role in that employment decision. *Id.* at 662. Defendants applied this holding to find that "sex discrimination" under Title IX included not only biological men and women but also discrimination based on sex stereotypes, sex characteristics, sexual orientation, and gender identity.

However, applying *Bostock* to Title IX is not that straightforward. First, the DOE maintains it has the power to issue the Final Rule because *Bostock* only "clarifies" the laws and does not change it.[46] However, the Supreme Court specifically did not determine whether *Bostock* applied to other federal laws.[47] *Id.* at 681. Second, there exists a split among the courts as to the application of *Bostock* to Title IX, with some courts finding that *Bostock* applies to Title IX[48] and others finding

---

[45] Title VII makes it unlawful to discriminate against an individual "because of" the individual's sex.

[46] 89 Fed. Reg. 33474

[47] The Supreme Court stated, "The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination…. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today." 590 U.S. at 681.

[48] *Grimm v. Gloucester County School Board*, 972 F.3d 586, 617 (4th Cir. 2020) (*Bostock* applied to Title IX claims); *Doe by and through Doe v. Boyertown Area School District*, 897 F.3d 518, 536 (3rd Cir. 2018) (prior to *Bostock*, but refused to enjoin school allowing transgender students to use bathroom, and locker rooms consistent with their gender identity in a Title IX claim); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1118 (9th Cir. 2023) (found *Bostock* applied to Title IX claims); AC by MCV Metropolitan School District of Martinsville, 75 F.4th 760, 770 (7th Cir. 2023) (*Bostock* applies to Title IX); *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (a faithful application of *Bostock* causes us to conclude that the district court's understanding of *Bostock* was far too narrow)

that it does not.[49] Because a circuit split exists and there is no binding federal jurisprudence on this issue, the Court must make its own interpretation as to the applicability of *Bostock* to Title IX. For the reasons set forth below, the Court finds that *Bostock* does not apply to Title IX.

First, when interpreting a statutory term, the Court must interpret the words in a manner consistent with the ordinary meaning at the time Congress enacted the statute. *Wisconsin Central Ltd. v. U.S.*, 585 U.S. 274, 277 (2018); *Perrin v. U.S.*, 444 U.S. 37, 42 (1979). A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary meaning. *Id.* at 284. To interpret the meaning of a word, Courts look at the meaning of the word at the time Congress enacted it. *Id.* Courts routinely consult dictionaries as a principal source of ordinary meaning at the time of enactment. *Cascabel Cattle Company, LLC v. United States*, 955 F.3d 445, 451 (5th Cir. 2020).

In applying these statutory principles to Title IX, the Court finds that the term "sex discrimination" only included discrimination against biological males and females at the time of enactment. Plaintiffs provided this Court with three different dictionary definitions of "sex" before, at, and after Title IX's enactment in 1972.[50] All these dictionaries define "sex" as "male or female." Defendants have not provided a single dictionary definition that defined "sex" as including gender identity or sexual orientation either before or at the time of Title IX's enactment. Additionally,

---

[49] *Adams v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. en banc. 2022); ("sex" in Title IX, at the time of enactment, meant biological sex); *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). (The rule in *Bostock* extends no further than Title VII). *Neese v. Becerra*, 640 F.Supp. 3d 668, 666-667 (N.D. Tex. 2022) (*Bostock* does not extend to Section 1557 of the Affordable Care Act or Title IX.) *Tennessee v. United States Dept. of Educ.*, 615 F.Supp. 3d 807, 839 (E.D. Tenn. 2022). (DOE guidance creates rights for students and obligation for regular entities not to discriminate based upon sexual orientation or gender identity that appear nowhere in *Bostock*, Title IX or its implementing regulations); *Meriweather v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (it does not follow that principles announced in Title VII context automatically apply in the Title IX context.); and *Texas v. United States*, 201 F.Supp. 3d 810, (N.D. Texas 2016) (before *Bostock*, but held the DOE's "Dear Colleague Letter" sent to schools to allow students to use the bathroom, locker rooms and showers at the student's choosing, contradicted the meaning of Title IX).

[50] Sex, Webster's Third New International Dictionary 2081 (1966); Sex, Webster's New World Dictionary (1972); Sex, American Heritage Dictionary 1187 (1969).

while Defendants argue that the Supreme Court's prior use of the word "gender" shows gender identity was included within the meaning of "sex" at the time of enactment, dictionary definitions during and after enactment show the word "gender" was used as a synonym for "sex."[51] The word "gender", as used in prior Supreme Court opinions, meant biological men and/or women, not gender identity.[52]

Further, Congress has recognized the probative value of the 1975 Title IX regulations (which added Title IX's application to women's sports), in light of Title IX's unique post-enactment history. *Grove City Coll. V. Bell*, 465 U.S. 555, 567 (1984). These 1975 regulations clearly dealt with protecting biological women in sports and show that sex discrimination means discrimination of someone based upon his or her biological sex.[53]

Together, the ordinary meaning of "sex discrimination" at the time of enactment and the 1975 regulations of Title IX indicate that "sex discrimination" included only biological males or females. The Court finds no support in either the ordinary meaning or the 1975 regulations that *Bostock*'s interpretation of "sex" should apply to Title IX. The Court further finds that Defendants use of *Bostock*'s interpretation of "sex" to Title IX would essentially reverse the entire premise of Title IX, as it would literally allow biological males to circumvent the purpose of allowing biological females to participate in sports that they were unable to participate in prior to 1975. The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme. *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021). Here, the Final Rule would render meaningless all of the Exemptions set forth in Title IX, such as traditionally one-sex colleges, social fraternities and sororities, voluntary youth organizations, one-sex youth

---

[51] Sex, Webster's Third New International Dictionary 944 (1966).
[52] *United States v. Virginia*, 518 U.S. 515, 532-33 (1996); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (Superseded by Statute); and *Frontiero v. Richardson*, 93 S.Ct. 1764, 1770 (1973).
[53] 40 Fed. Reg. 24132, 24134, and 24,135.

service organizations, beauty pageants, and the exemption that allows educational facilities to maintain separate living facilities. Allowing this would allow decades of triumphs for women and men alike to go down the drain, and this Court finds that Defendants' argument is meritless.

Finally, this Court finds that the application of *Bostock* and the Final Rule's definition of "sex discrimination" contradict the purpose of Title IX. A statute is to be read "as a whole" because the statutory language, plain or not, depends on context. *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991); *Southwest Airlines Co. v. Saxton*, 596 U.S. 450, 455 (2022). Here, the language, exemptions, legislative history, and prior regulations of Title IX demonstrates that Title IX was intended to prevent biological women from discrimination.[54] *Bostock* dealt with Title VII, which prohibits an employer from hiring or discharging an individual because of the individual's race, color, religion, sex, or national origin. Title IX exempts certain conduct as being discrimination by the above discussed exemptions. *Bostock* does not apply because the purpose of Title VII to prohibit discrimination in hiring is different than Title IX's purpose to protect biological women from discrimination in education.

Thus, Title IX was written and intended to protect biological women from discrimination. Such purpose makes it difficult to sincerely argue that, at the time of enactment, "discrimination on the basis of sex" included gender identity, sex stereotypes, sexual orientation, or sex characteristics. Enacting the changes in the Final Rule would subvert the original purpose of Title IX: protecting biological females from discrimination.

The above statutory analysis demonstrates that, at the time of enactment, "sex discrimination" clearly included only discrimination against biological males and females. Defendants thus seemingly use *Bostock* in an attempt to circumvent Congress and make major

---

[54] Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24, 1281 (June 4, 1975).

changes to the text, structure, and purpose of Title IX. Such changes are undoubtedly contrary to Title IX and contrary to the Law.

> **b. The Final Rule's "Harassment Standard" is contrary to Title IX and Violates the First Amendment**

Plaintiffs further argue that the Final Rule is contrary to law because the "Harassment Standard" would require recipients of federal funding under Title IX to violate First Amendment rights. Under the statute, harassment becomes discrimination "'under' the recipient's programs" when it "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit" and when "the recipient exercises substantial control over both the harasser and the context." *Davis*, 526 U.S. at 633, 645 (emphasis added); *see Meriwether*, 992 F.3d at 511.

Plaintiffs argue the Final Rule's new broad "severe or pervasive" standard, which considers speech or other expressive conduct that "limits" a person's ability to participate in a program to be discriminatory harassment, cannot be squared with Title IX. 89 Fed. Reg. at 33,884. Plaintiffs further urge that the Final Rule's requirement that a recipient consider conduct that occurred outside of its program or outside of the United States in determining whether a hostile environment has been created in its education program and activity be consistent with Title IX's harassment standard. Id. at 33,530.

Plaintiffs further urge that this standard chills and punishes protected speech under the First Amendment because it would compel staff and students to use whatever pronouns a person demands, even when those are contrary to grammar rules, reality, or political ideologies, and it further prohibits staff and students from expressing their own views on certain topics. Essentially, the harassment standard allows for one political ideology to dominate the educational landscape while either silencing the other or calling the other "harassment" under these standards.

Thus, Plaintiffs argue that the Final Rule conflicts with the "fixed star in our constitutional constellation" that the government cannot "prescribe what shall be orthodox" or "force citizens to confess by word or act their faith therein," *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), and "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

In Opposition, Defendants argue that the harassment standard was used by the DOE in a similar standard in its enforcement of Title IX and uses a similar standard in Title VI and Section 504 of the Rehabilitation Act. Further, Defendants claim that courts and the Equal Employment Opportunity Commission have used a similar standard to identify harassment under Title VII's analogous provisions for decades.

As Defendants did earlier with their attempt to use the same standards in *Bostock* to the facts here, this attempt is equally as unconvincing. The Court is not considering the merits of this case in this ruling, but it cannot overlook that the implications here are different than implication in something like a Title VII case. While Title VII is vastly important, and the Court sees the merits in harassment standards set forth in those provisions, the Court cannot simply apply the same standard to federally funded educational institutions. The "harassment standard" created by the Final Rule is obviously contrary to Title IX, and Plaintiffs have made compelling arguments for how it can violate the free speech right of the First Amendment.

### c.   Defendants' Authority to Rewrite Title IX and Decide Major Questions

Plaintiffs lastly argue that the Final Rule is contrary to law and exceeds statutory authority because Defendants lack any authority to rewrite Title IX and thus decide major questions under the major questions doctrine. The "major questions doctrine" provides that an agency is not

authorized to make decisions of vast economic and political significance without specific congressional authorization.

To be a "major question," the power exercised must be of a vast economic and political significance. *Utility,* 573 U.S. 302, 324. Here, the Court finds that the Final Rule is an issue of vast economic significant. The DOE modified the Title IX regulations to require every public elementary school, middle school, high school, and college in the United States that receives federal financial assistance. The Final Rule also gives the student the right to sue the school, other students, the school board, teachers, and administrators if discriminated against based upon gender identity, among other requirements. Recipients of Title IX will be required to make millions of dollars in improvements to their facilities to comply with the Final Rule.[55] Should Plaintiff School Boards fail to comply with the Final Rule, millions of dollars of funding are at stake.[56] The power exercised is thus of vast economic significance.

The issue is also one of vast political significance. The validity of the Final Rule will ultimately determine whether biological males that identify as female are allowed in female bathrooms and locker rooms and vice versa. The Court finds that this effect is one of vast political significance because it will affect every public elementary school, middle school, high school, and college in the United States that receive federal funding. The Final Rule prohibits requiring medical or other documentation to determine whether the biological male claiming to identify as female is sincere.[57] The Final Rule also places no limit on how many times a person can change

---

[55] [Doc. No. 18-16] ("significant costs") [Doc. No. 18-17] ($1.2 million) [Doc. No. 18-18] ("astronomical" costs); [Doc. No. 18-19] ($2.1 million); [Doc. No. 18-20, p. 8 ("significant" costs); [Doc. No. 18-21, p. 8] ("substantial expense"); [Doc. No. 18-22] (20.3 to 20.7 million dollars); [Doc. No. 18-23 at 8] (hundreds of millions of dollars") [Doc. No. 18-25, p. 7] (expensive construction costs), and [Doc. No. 18-26] (new bathrooms at 5 schools cost of $11 million dollars and up to $211.2 million if the program were expanded to each school in the district).
[56] Rapides itself receives about $30 million dollars, or about 10% of its budget as federal funding.
[57] 89 Fed. Reg. 33819

gender identity. And what about students that identify as non-binary?[58] Title IX is silent on this issue, which is of vast political significance because it is a polarizing political issue that an agency has no authority to make. The Court thus finds the enactment of the Final Rule is also an issue of vast political significance.

Additionally, the Court shares a concern with Plaintiffs that the Final Rule may also biological males who identify as females to compete on female sports teams. The DOE disputes that the Final Rule will apply to women's sports because the Javits Amendment and the relevant regulations historically interpreted Title IX's non-discrimination mandate to tolerate sex separation in activities.[59] Additionally, the DOE proposed rules that govern athletics under Title IX.[60] However, the Final Rule applies to sex discrimination in any educational "program" or "activity" receiving Federal financial assistance.[61] The terms "program" or "activity" are not defined but could feasibly include sports teams for recipient schools. Certainly, the DOE has proposed rules and amendments, but those rules and amendments may never be enacted or may be substantially amended. If those rules and amendments are not enacted, the Final Rule will arguably apply to athletic teams. There thus exists a credible concern that the Final Rule may allow biological males who identify as females to compete on female sports teams. However, because the effect of the Final Rule on sports is not certain, the Court is not considering that aspect of the Final Rule when analyzing the major questions doctrine.

Because the Final Rule is a matter of both vast economic and political significance, the Court finds the enactment of this rule involves a major question pursuant to the major questions

---

[58] Person whose gender identity does not fit into the categories of male or female.
[59] 89 Fed. Reg. 33816-17.
[60] 88 Fed. Reg 22860 (April 13, 2023).
[61] 34 C.F.R. 106.1

doctrine. Therefore, Congress must have given "clear statutory authorization"[62] to the applicable agency. The Court finds that Congress did not give clear statutory authorization to this agency.

Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress provides. We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance. *National Federation of Independent Business v. Department of Labor*, 142 S.Ct. 661, 665 (2022). Further, an agency's decreed result must be within the scope of its lawful authority. *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

Statements by individual legislators should not be given controlling effect but are an authoritative guide to the statute's construction. *Grove City College v. Bell*, 104 S.Ct. 1211, 1218 (1984). Statutory permission for an agency or official to "modify" does not authorize basic and fundamental changes in the scheme designed by Congress, and instead that term carries "a connotation of increment or limitation," and must be read to mean "to change moderately or in minor fashion." *Biden v. Nebraska*, 143 S.Ct. 2355, 2368 (2023). Finally, agencies are not free to adopt unreasonable interpretations of statutory provisions and then edit the other statutory provisions to mitigate the unreasonableness. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 320 (2014).

Here, Defendants maintain they have this authority pursuant to 20 U.S.C. 1682.[63] That statute (in pertinent part) reads:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity by way of grant, loan, or contract other than a contract of insurance or guaranty is authorized and directed to effectuate the provisions of Section 1681 of this title with respect to such program or activity by issuing rules, regulations or orders of general applicability which shall be consistent with the achievement of the objectives of the

---

[62] *West Virginia v. Environmental Protection Agency*, 142 S.Ct. 2587 (2022); *Biden v. Nebraska*, 143 S.Ct. 2355, 2374-75 (2023).
[63] 89 Fed. Reg. 33803

statute authorizing the financial assistance in connection with which the action is taken.[64]

The Court finds that Congress did not give the Defendants "clear statutory authorization" to enact the Final Rule. Congress only gave Defendants the authority to issue rules, regulations, or orders to "effectuate the provisions of Section 1681" that "shall be consistent with the achievement of the objectives of the Statute." However, as discussed above, Defendants are attempting to circumvent Congress by using *Bostock* to make major changes in Title IX law. Such changes are inconsistent with the text, structure, and purpose of Title IX.

Accordingly, this Court finds that Defendants do not have the authority to enact regulations which change the meaning of "sex discrimination" to include gender identity, sexual orientation, sex stereotypes or sex characteristics.

### 2. The Final Rule's Conditions Violate the Spending Clause

Plaintiffs next argue that the Final Rule violates the Spending Clause because the Final Rule's conditions do not satisfy the elements imposed by Congress in the Spending Clause. The Spending Clause of the U.S. Constitution grants Congress the power to impose taxes and borrow money to "pay the Debts and provide for the … general welfare of the United States." U.S. Constitution, Art. I, Section 8, c1. 1. Legislation enacted pursuant to the Spending Clause is much in the nature of a contract. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981). In return for federal funds, the State agrees to comply with federally imposed conditions. *Id.* However, the State must accept the terms of the contract voluntarily and knowingly. *Id.* If Congress intends to impose a condition, it must do so unambiguously. *Id.* By insisting Congress speak with a clear voice, the States can exercise their choice knowingly, cognizant with the consequences of their participation. *Id.*

---

[64] 20 U.S.C. 1682.

Although the federal government cannot control state conduct directly, Congress often uses its power to tax and spend as a work-around by offering federal funds in exchange for states establishing preferred programs or enacting favored laws. *West Virginia by and through Morrisey v. U.S. Dept. of the Treasury*, 59 F. 4th 1124, 1131 (11th Cir. 2023). In a pre-enforcement constitutional challenge, the injury-in-fact requirement can be satisfied by establishing a "realistic danger of sustaining direct injury" from the statute's operation or enforcement. *Id*. at 1137.

Further, conditioned funding grants enacted pursuant to the Spending Clause must satisfy five elements: (1) the expenditure must advance the general welfare; (2) any attached condition must be unambiguous; (3) conditions must relate to the federal interest in particular natural projects or programs; (4) conditions cannot violate another constitutional provision. In some circumstances, conditions cannot be so coercive that pressure turns into compulsion. If the first four elements are not satisfied, it is unconstitutional. *South Dakota v. Dole*, 483 U.S. 203, 207-11 (1987). Title IX is enacted pursuant to Congress' authority under the Spending Clause. *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 640 (1999).

Here, Plaintiffs argue the Final Rule violates the Spending Clause because it is ambiguous, contrary to the federal interest, would require participants to engage in unconstitutional activities, and is so coercive that it is compulsive. Plaintiffs contend that the term "sex discrimination" could not have provided the Plaintiffs with notice that the term "sex" included gender identity, sex characteristics, sexual orientation, or sex stereotypes. Defendants argue that *Bostock* should have provided notice to the Plaintiffs that "sex discrimination" also included gender identity, sex characteristics, sexual orientation, or sex stereotypes.

First, because Title IX was enacted pursuant to Congress' authority under the Spending Clause, the regulatory scheme must provide funding recipients with notice that they may be liable

for their failure to abide by the terms. *Davis Next Friend LaShonda D. v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 640, 643 (1999). As previously discussed, when Title IX was enacted in 1972, "sex discrimination" only referred to biological women and men. It did not include gender identity, sex characteristics, sexual orientation, or sex stereotypes. Also, as discussed, Title VII, which was at issue in *Bostock*, is much different than Title IX. Even though the Defendants had failed attempts to change the definition of "sex discrimination", proper notice was not given by Defendants to Plaintiffs.

Second, the regulatory scheme must also comply with the elements for conditioned funding grants. The Court ultimately finds that the Final Rule is ambiguous and thus violates the Spending Clause. The new regulation implemented by the Final Rule clearly changes the prior regulations. The Final Rule interprets the original wording of "sex discrimination" in 20 U.S.C. § 1981 to include sexual orientation, sex characteristics, sex stereotypes, and gender identity. The Final Rule also requires participants with knowledge of conduct that may reasonably constitute sex discrimination to report it to the Title IX Coordinator. The Final Rule interprets the statute to create new requirements for a "hostile work environment."

The Final Rule does not discuss the effect changing the interpretation will have on middle school, high school, and college sports. Consequently, a recipient could not have interpreted sexual discrimination to include gender identity prior to the Defendants' intended changes. The Final Rule is not a clarification of existing laws – it is a new law enacted by an administrative agency, not Congress. This Court thus finds the Final Rule ambiguous. Because the Court finds the Final Rule is ambiguous, the Court finds that it does not satisfy the elements of the Spending Clause, and thus, it violates the Spending Clause.

This Court finds the Final Rule violates the Spending Clause because it contains ambiguous conditions and because the Final Rule violates other constitutional provisions – free speech and free exercise. Because this Court has found the Final Rule violates the Spending Clause, there is no need to discuss the Plaintiffs' argument that the Final Rule violates the non-delegation doctrine.

**3.   Whether the Final Rule is an Unconstitutional Exercise of Legal Power**

Plaintiffs also argue that because there was no true intelligible principle guiding the DOE's discretion, then the Final rule is an impermissible exercise of legal power. In support of this argument, Plaintiffs claim that if Congress delegated the authority to issue the Final Rule, which the Court found it did not, then the delegation would violate Article I and separation-of-powers principles. Because the Court finds that Congress did not impose this authority, an analysis on this argument is unnecessary.

**4.   Whether the Final Rule is Arbitrary and Capricious under the APA**

Plaintiffs maintain the Final Rule is arbitrary and capricious in accordance with APA Title 5 U.S.C. § 706(2)(A). Courts presume that when an agency-administered statute is ambiguous with respect to what it prescribes, Congress has empowered the agency to resolve the ambiguity. The question for a reviewing court is whether, in resolving the ambiguity, the agency acted reasonably and thus "stayed within the bounds of its statutory authority." *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

Even under *Chevron's* deferential framework, agencies must operate "within the bounds of reasonable interpretation." *Arlington v. FCC*, 133 U.S. 1863, 1868 (2015). Reasonable statutory interpretation must account for both "the special content in which the language is used" and "the broader content of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Thus, an agency interpretation that is inconsistent with the design and structure of the statute as a

whole does not merit deference. *University of Tex. Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2529 (2015).

Federal administrative agencies are required to engage in "reasoned decision making." *Allentown Mack Sales & Service, Inc., v. NLRB*, 522 U.S. 359, 374 (1998). Not only must an agency's decreed result be within the scope of its lawful authority but also the process by which it reaches that result must be logical and rational. *Michigan v. E.P.A.,* 576 U.S. 743, 750 (2015). Agency action is lawful only if it rests on a consideration of the relevant factors. *Id.* An agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate. *Utility,* 573 U.S. 302, 328. Agencies are not free to adopt unreasonable interpretations of statutory provisions and then edit other interpretations of statutory provisions to mitigate the unreasonableness. *Id.*

Plaintiffs contends the Defendants were not authorized to enact the Final Rule, the process was not rational and lawful, and the Final Rule is inconsistent with Title IX.

To decide whether agency action is arbitrary and capricious, courts begin by asking whether "an agency articulated a rational connection between the facts found and the decision made." *Louisiana v. United States Department of Energy*, 90 F.4th 461, 469 (5th Cir. 2024) (citing *ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 571 (5th Cir. 2017)). We then ask if the agency's reasoning "fails to account for relevant factors or evinces a clear error of judgment." *Id.* An agency must display awareness that it is changing position. *Id.* When an agency changes position, such changes require a careful comparison of the agency's statements to ensure that the agency has recognized the change, reasoned through it without factual or legal error, and balanced all relevant interests affected by the change. *Id.* In sum, an administrative agency's actions are arbitrary and capricious if the agency has: (1) relied on factors which Congress had not intended for it to

consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) is so implausible that it could not be ascribed to a difference in view of the product of agency expertise. *Id*.

This Court has found that the Defendants did not have congressional authority to enact the Final Rule and that the Final Rule violates Free Speech rights, Free Exercise rights, and the Spending Clause. This Court further finds that the Final Rule is arbitrary and capricious because the DOE (1) failed to address relevant factors and (2) and failed to consider important aspects of the problem. The Court shall address each in turn.

**1. DOE's Failure to Address Relevant Factors**

The Court finds that the DOE failed to consider several relevant factors when drafting the Final Rule. These multiple failures indicate that the Final Rule is arbitrary and capricious.

First, Defendants failed to include any requirements for changing one's gender identity and did not include any guidance for addressing "non-binary" students or students with other gender identities.[65] A "gender fluid"[66] person could possibly change gender identities every day or several times per day. The Final Rule prohibits recipients from enacting common-sense rules to make sure the person who changed gender identities is sincere. Allowing a student to announce what gender they are, without requiring any supporting documentation, is arbitrary and capricious.

Second, Defendants failed to consider that biological females and biological males that identify as females have different body parts. Nearly every civilization recognizes a norm against exposing one's unclothed body to the opposite sex. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 176 (3rd

---

[65] Any gender that falls outside of the binary system of male/female or man/woman. *Adams*, supra note 31.
[66] A "gender fluid" person is a person who does not identify with a single fixed gender and expresses a fluid or unfixed gender identity. One's expression of identity is likely to shift and change depending on context. Cydney Adams, The Gender Identity Terms You Need To Know, CBS INTERACTIVE, INC., March 24, 2017.

Cir. 2011). Yet, Defendants did not consider these cultural norms or the reasons such norms are so prevalent when adopting the Final Rule.

Third, the Defendants failed to consider the effect of the additional costs on the recipient schools and only gave those schools three months to comply.  However, compliance requires recipient schools to hire a Title IX Coordinator, redesign locker rooms and bathrooms, provide training to all staff and students,[67] and likely pay much higher liability insurance premiums. The increased liability exposure for placing biological males who identify as females, and vice versa, into women's locker rooms and bathrooms will likely greatly increase insurance premiums, if covered at all.  The Final Rule did not even consider or discuss these additional construction and insurance costs.

Fourth, Defendants failed to consider the Final Rule's effect on the Exemptions[68] that allow males and females to be separated. The only reference to the application of the new definitions discussed in 34 C.F.R. 106.31(2) is ambiguous. It states:

> (2) In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimus harm except as permitted by 20 U.S.C. § 1681(a)(1) through (9) and the corresponding regulations.

The Court questions how this regulation affects Title IX's Exemptions for fraternities and sororities, voluntary youth organizations, public colleges that have traditionally only admitted students of one sex, beauty pageants, and other exemptions. The language refers to the Exemptions that allow separation on the basis of sex but then states any sex separation cannot be done if it subjects a person to "more than de minimis harm." It makes the Exemptions meaningless. It

---

[67] See FN 50
[68] See Section II.

arguably changes the law in the Title IX Exemptions where the Exemptions cannot be relied on to allow sex separation. It is ambiguous and therefore arbitrary and capricious.

Finally, despite receiving more than 240,000 comments, including numerous comments opposing the proposed rule,[69] Defendants only made minor changes to the proposed rules. Many of the comments pointed out the problems the Final Rule had, including, but not limited to, no authority, ambiguity, violation of the Spending Clause, violation of First Amendment Free Speech and Free Exercise rights, and lack of religious exemptions. Despite the comments, the Final Rule did not change anything regarding those issues.

### 2. DOE's Failure to Consider Important Aspects of the Problem

The Court finds that the DOE failed to consider several important aspects of the problems with the Final Rule.

Title IX was enacted for the protection of the discrimination of biological females. However, the Final Rule may likely cause biological females more discrimination than they had before Title IX was enacted. Importantly, Defendants did not consider the effect the Final Rule would have on biological females by requiring them to share their bathrooms and locker rooms with biological males. The Final Rule only focuses on the "effect on the student who changes their gender identity" and fails to address the effect on the other students ("cisgender students"). These cisgender females must use the bathroom, undress, and shower in the presence of persons who may identify as females but still have male biological parts. Many of these students are minors. The DOE made no attempt to determine the effect on students having students who are biologically

---

[69] 89 Fed. Reg. 33477.

the opposite sex in their locker rooms and bathrooms. Instead, the DOE declared in the Final Rule, with no explanation, that transgender students do not pose a safety risk for cisgender students.[70]

Further, by allowing biological men who identify as a female into locker rooms, showers, and bathrooms, biological females risk invasion of privacy, embarrassment, and sexual assault. Further, by not requiring medical or other documentation to verify that biological men actually identify as females, the only Final Rule requirement is for a person to simply declare they have changed gender identities. This protocol likewise places biological females at risk. After that declaration is made, these schools are prohibited from questioning the sincerity of the new gender identity. The school cannot require any documentation to prove the sincerity of the gender change, i.e., doctor diagnosis. The school also must use the pronouns required by the student that changes gender. Allowing a biological male student to change to a female by simply declaring it, requiring no documentation of the change, and allowing the student to shower with cisgender females in the girls' locker room goes beyond the scope of arbitrary and capricious.

It is unambiguous that when Title IX was enacted, under the Supreme Court canons of construction, "sex discrimination" referred to biological females and males. "Sex discrimination" did not refer to gender identity, sex stereotypes, sex characteristics, or sexual orientation. Yet, this fact was ignored and not considered by Defendants.

This Court finds the Final Rule is arbitrary and capricious pursuant to Title 5 U.S.C. § 706(2)(A).

In sum, Plaintiffs have demonstrated that they are likely to succeed on the merits for their claims that the (1) the Final Rule is contrary to law and exceeds statutory authority; (2) the Final

---

[70] 89 Fed. Reg. 33820

Rule's conditions violate the spending clause; (3) the Final Rule is an unconstitutional exercise of legislative power; and (4) the Final Rule is arbitrary and capricious.

Accordingly, the first element for a preliminary injunction is satisfied.

### b. Irreparable Harm

The second requirement for a Preliminary Injunction is a showing of "a substantial threat of irreparable injury" if the injunction is not issued. *Texas*, 809 F.3d at 150. For injury to be "irreparable," plaintiffs need only show it cannot be undone through monetary remedies. *Burgess v. Fed. Deposit Inc., Corp.*, 871 F.3d 297, 304 (5th Cir. 2017). Deprivation of a procedural right to protect a party's concrete interests is irreparable injury. *Texas*, 933 F.3d at 447. Additionally, violation of a First Amendment constitutional right, even for a short period of time, is always irreparable injury. *Elrod v. Burns*, 427 U.S. at 347, 373 (1976). Finally, costs for expanded recordkeeping requirements, expanded training requirements, and other compliance costs and imminent threats of costs that cannot be recovered also constitute irreparable harm. *Career Colleges and Schools of Texas v. United States Dept. of Educ.*, 98 F.4th 220, 235-38 (5th Cir. 2024).

Defendants argue Plaintiffs have not shown irreparable harm because there is only a possibility of irreparable harm and because the compliance costs are necessary and do not justify a preliminary injunction.

The Court finds that Plaintiffs demonstrated a "significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc., v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986). To demonstrate irreparable harm at the preliminary injunction stage, Plaintiffs must adduce evidence showing that the irreparable injury is likely to occur during the pendency of the litigation. *Justin Indus. Inc.*, v. *Choctaw Secs., L.P.*, 920 F.2d 262, 268 n. 7 (5th Cir. 1990). Plaintiffs satisfied this requirement

and showed that irreparable injury is likely to occur during the pendency of the litigation. This Court finds that the alleged past actions of Defendants show a substantial risk of harm that is not imaginary or speculative. *SBA List*, 573 U. S. at 164. Based upon the Affidavits and Declarations of Plaintiffs, the compliance costs, the short time Plaintiffs have to comply, and the substantial likelihood of the violations of First Amendment rights and violations of the Spending Clause, Plaintiffs have shown irreparable harm. Despite the Defendants' assertion that the compliance costs are minimal, the Defendants have provided no evidence to dispute both construction and compliance costs. The State Plaintiffs have also shown irreparable harm in violation of First Amendment rights, preemption of state laws, loss of Title IX federal funds, pressure to change their laws, and invasion of state sovereignty.

### c.  Equitable Factors and Public Interest

Plaintiffs must also demonstrate that the threatened harm outweighs any harm that may result to the Federal Defendants and that the injunction will not undermine the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). These two factors overlap considerably. *Texas*, 809 F.3d at 187. In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The public interest factor requires the court to consider what public interests may be served by granting or denying a preliminary injunction. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

The balance of equities and public interest strongly favors Plaintiffs. A preliminary injunction would simply keep the status quo. There are strong arguments by Plaintiffs that Free

Speech and Free Exercise rights are being violated. Keeping the status quo is necessary in light of a serious question of whether Defendants had Congressional authority to enact the Final Rule.

Defendants maintain equitable considerations favor Defendants because granting a preliminary injunction would significantly harm the government's intentions in preventing discrimination in educational programs and activities. However, the Defendants are responsible for a significant change in the status quo and for the short three-month deadline they gave the Plaintiffs to comply. Equity is not in Defendants' favor.

Because Plaintiffs met all the elements necessary to show entitlement to a preliminary injunction, this Court shall issue said injunction against the Defendants herein. There are presently at least six other cases considering this issue in other courts.[71] It would be appropriate for this Court to allow those proceedings to be decided in their respective courts. Therefore, this Preliminary Injunction will be limited to the States of Louisiana, Mississippi, Montana, and Idaho.

## V. CONCLUSION

This case demonstrates the abuse of power by executive federal agencies in the rulemaking process. The separation of powers and system of checks and balances exist in this country for a reason.

> When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner.

Montesquieu, The Spirit of the Laws (1748).

---

[71] State where proceeding filed is listed first.  (1) Kentucky, Tennessee, Indiana, Ohio, West Virginia, and Virginia; (2) Texas; (3) Alabama, Florida, Georgia, South Carolina; (4) Kansas, Alaska, Utah, and Wyoming; (5) Oklahoma; and (6) Missouri, Arkansas, Iowa, Nebraska, North Dakota, and South Dakota.

Since 2020, the United States Supreme Court has vacated executive agency rules numerous times.[72]  Both the Legislative Branch and Judicial Branches have the power to stop the abuse of power. The Judicial Branch can vacate rules that are beyond the executive agencies' authority,[73] but only after a suit is filed.

The abuse of power by administrative agencies is a threat to democracy.

Accordingly, and for the reasons set forth herein,

**IT IS ORDERED, ADJUDGED, AND DECREED** that the Motion for Preliminary Injunctions [Doc. Nos. 17 and 27] filed by Louisiana Plaintiffs and by Rapides is **GRANTED.**

**IT IS FURTHER ORDERED** that the UNITED STATES DEPARTMENT OF EDUCATION, THE OFFICE OF CIVIL RIGHTS, THE UNITED STATES DEPARTMENT OF JUSTICE, MIGUEL CARDONA, SECRETARY OF THE U.S. DEPARTMENT OF EDUCATION, CATHERINE LHAMON, ASSISTANT SECRETARY OF THE OFFICE OF CIVIL RIGHTS, MERRICK D. GARLAND, ATTORNEY GENERAL OF THE STATES, along with their secretaries, directors, administrators, and employees, **ARE HEREBY ENJOINED AND RESTRAINED from implementing, enacting, enforcing and taking action in any manner to enforce the FINAL RULE**, NONDISCRIMINATION ON THE BASES OF SEX IN EDUCATION PROGRAM ACTIVITIES RECEIVING FINANCIAL ASSISTANCE, 89 Fed. Reg. 33474 (April 29, 2024), which is scheduled to go into effect on August 1, 2024.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the FINAL RULE entitled NONDISCRIMINATION ON THE BASIS OF SEX, IN EDUCATION PROGRAM

---

[72] *Ala. Ass'n. of Realtors v. Dep't. of Health & Human Services*, 141 S.Ct 2485 (2021); *National Federation of Independent Businesses v. OSHA*, 142 S.Ct. 661(2022); *West Virginia v. EPA*, 142 S.Ct. 2587 (2022); and *Biden v. Nebraska*, 143 S.Ct. 2355 (2023).
[73] The Supreme Court implemented the major questions doctrine to prohibit executive agencies from making rules that are of vast economic and political significance.

ACTIVITIES RECEIVING FINANCIAL ASSISTANCE, 89 Fed. Reg. 33474 (April 27, 2024) is

**HEREBY ENJOINED AND RESTRAINED** from going into effect on August 1, 2024, pending

further orders of the Court.

This Injunction is limited to the States of Louisiana, Mississippi, Montana, and Idaho.

**IT IS FURTHER ORDERED** that no security is required to be posted by Louisiana

Plaintiffs or Rapides under Federal Rule of Civil Procedure 65.

**IT IS FURTHER ORDERED** that this Preliminary Injunction Order shall remain in effect

pending the final resolution of this case, or until further orders from this Court, the United States

Court of Appeal, for the Fifth Circuit, or the Supreme Court of the United States.

**IT IS FURTHER ORDERED** that no evidentiary hearing is required at this time.

MONROE, LOUISIANA, this 13th day of June 2024.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE