**Exhibit A**

Plaintiff States' 6/14/24 Notice of Supplemental Authority

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0132p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT
_____

STATE OF TENNESSEE; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF WEST VIRGINIA,

*Plaintiffs-Appellees*,

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL; A.F., a minor, by Sara Ford, her mother,

*Intervenors-Appellees*,

> No. 22-5807

*v.*

DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as Secretary of Education; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE A. BURROWS, in her official capacity as Chair of the Equal Employment Opportunity Commission; U.S. DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, Attorney General, in his official capacity as Attorney General of the United States; KRISTEN CLARKE, in her official capacity as Assistant Attorney General for Civil Rights at the United States Department of Justice,

*Defendants-Appellants*.

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:21-cv-00308—Charles Edward Atchley, Jr., District Judge.

Argued: April 26, 2023

Decided and Filed: June 14, 2024

Before: BOGGS, LARSEN, and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** David Peters, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Clark Lassiter Hildabrand, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Plaintiffs-Appellees except the State of Arizona. Matthew S. Bowman, ALLIANCE DEFENDING FREEDOM, Washington, D.C., for Intervenors-Appellees. **ON BRIEF:** David Peters, Charles Scarborough, Jack Starcher, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Clark Lassiter Hildabrand, Steven J. Griffin, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Plaintiffs-Appellees except the State of Arizona. Matthew S. Bowman, John J. Bursch, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Jonathan Scruggs, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Intervenors-Appellees. Keira McNett, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., Joshua A. Block, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Brian Bilford, OFFICE OF THE CALIFORNIA ATTORNEY GENERAL, Los Angeles, California, Timothy Belz, OTTSEN LEGGAT & BELZ, LC, St. Louis, Missouri, Deborah J. Dewart, Hubert, North Carolina, Gary M. Lawkowski, DHILLON LAW GROUP, Alexandria, Virginia, Christopher Mills, SPERO LAW LLC, Charleston, South Carolina, Celia Howard O'Leary, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, William E. Trachman, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, Peter N. Kirsanow, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP, Cleveland, Ohio, Kerry Lee Morgan, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, Talmadge Butts, FOUNDATION FOR MORAL LAW, Montgomery, Alabama, William J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, Ryan D. Walters, OFFICE OF THE TEXAS ATTORNEY GENERAL, Austin, Texas, Lauren Adams Bone, JACKSON BONE LLP, Washington, Wisconsin, for Amici Curiae.

NALBANDIAN, J., delivered the opinion of the court in which LARSEN, J., concurred. BOGGS, J. (pp. 45–53), delivered a separate dissenting opinion.

---

## OPINION

---

NALBANDIAN, Circuit Judge.  After the Supreme Court's 2020 *Bostock* decision, the U.S. Department of Education issued three documents under Title IX—each stating that the Department will now fully enforce Title IX to prohibit sexual orientation and gender identity

discrimination in education programs and activities receiving federal financial assistance.[1]  The Department's actions prompted twenty states to bring a pre-enforcement challenge.  A district court granted the States a preliminary injunction.  On interlocutory appeal, the Department challenges this ruling, arguing that the States lack standing, the Documents are unreviewable, and the district court abused its discretion in issuing the injunction.  We disagree and affirm.

## I.

Title IX of the Education Amendments of 1972 prohibits sex discrimination in education programs or activities receiving federal financial assistance.  A watershed enactment, Title IX contains two core provisions.  The first prohibits discrimination: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The second relates to enforcement, authorizing agencies that award federal financial assistance to education programs to "issu[e] rules, regulations, or orders of general applicability," ensuring that aid recipients adhere to § 1681's mandate.  *Id.* § 1682.  One such agency is the Department of Education.

In the first few decades of Title IX's existence, the Department of Education—and its predecessor-in-enforcement, the Department of Health, Education, and Welfare—primarily issued regulations covering hiring, admissions, and athletics.  Helped by the Supreme Court, the Department then extended § 1681's anti-discrimination mandate to cases of sexual harassment and retaliation.  *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (extending Title IX to sexual harassment); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) (extending Title IX to retaliation).

---

[1] We are aware that the Federal Register recently published a final rule amending the Department of Education's Title IX regulations, which go into effect August 1, 2024.  *See* U.S. Dep't of Educ., *Final Rule: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024).  This new rule does not moot this case for two reasons.  First, the final rule does not go into effect until August 2024.  Second, the final rule does not cover everything that is covered by the documents, like housing and athletics.  So even once the rule goes into effect, it will not change the fact that the laws of the Plaintiff States will still conflict with the Department's policies in these areas.

In 1997, the Department issued guidance recognizing that harassment of a sexual nature directed at gay or lesbian students may constitute sexual harassment prohibited by Title IX. Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034, 12039 (Mar. 13, 1997) (revised in 2001), https://www.govinfo.gov/content/pkg/FR-1997-03-13/pdf/97-6373.pdf.    Title IX protects students "even if the harasser and the person being harassed are members of the same sex." *Id.* But the Department made clear that "Title IX does not prohibit discrimination on the basis of sexual orientation." *Id.*[2]

Then, in 2014, the Office for Civil Rights ("OCR")—the Department's sub-agency tasked with enforcing civil rights laws—issued a Q&A document stating that Title IX protects "straight, gay, lesbian, bisexual and transgender students" from "sexual violence." U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* at 5 (Apr. 29, 2014) (rescinded in 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.    Then in 2016, OCR issued a letter saying Title IX "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status." C.R. Div. & Off. for C.R., U.S. Dep't of Justice & U.S. Dep't of Educ., *Dear Colleague Letter on Transgender Students* at 1 (May 13, 2016) (rescinded in 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.    Both documents have since been rescinded. U.S. Dep't of Educ., Office for Civil Rights, *Rescinded Policy Guidance* (Aug. 16, 2021), https://www2.ed.gov/about /offices/list/ocr/frontpage/faq/rr/policyguidance/respolicy.html.

Next, in early 2021, the Department's general counsel issued a memorandum on the effect of the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* held that an employer violates Title VII, which makes it unlawful to discriminate in employment against an individual "because of sex," by firing an individual for being gay or transgender. *Id.* at 669–71.    The Department's 2021 memorandum said that *Bostock* did not

---

[2]The Department's new sexual harassment rules in 2020 did not disturb this finding.    Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30178–80 (May 19, 2020) https://www.govinfo.gov/content/pkg/FR-2020-05-19/pdf/2020-10512.pdf.

construe Title IX, and that the "Title IX text is very different from Title VII text in many important respects," including that Title IX "contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex." U.S. Dep't of Educ., *Memorandum Re:* Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020) at 1 (Jan. 8, 2021) (rescinded in 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf. The memorandum said that "the Department's long-standing construction of the term 'sex' in Title IX" is that it means "biological sex, male or female." *Id.* at 2.

This is where our story begins. The new administration had a different take on *Bostock*. Basically, the opposite take. On June 22, 2021, the Department published its "Interpretation" of Title IX in the Federal Register. Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32637 (June 22, 2021). The Department noted that OCR "at times has stated that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity." *Id.* But it explained that, given *Bostock* and Title IX's similarities to Title VII, the Department will now "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." *Id.* at 32639.

A "Dear Educator" Letter followed. Off. for C.R., U.S. Dep't of Educ., *Letter to Educators on Title IX's 49th Anniversary* (*Letter to Educators*), at *1 (June 23, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf. The letter told Title IX recipients about the Notice of Interpretation and reiterated that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." *Id.* at *2.

The letter also attached a "Fact Sheet." C.R. Div. & Off. for C.R., U.S. Dep't of Justice and U.S. Dep't of Educ., *Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families* (Fact Sheet), https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf. The Fact Sheet asserts that "discrimination against students based on their sexual orientation or gender identity is a form of sex discrimination prohibited by federal

law." *Id.* The Fact Sheet also provides examples of what types of claims the Department may investigate. To name a few, these claims include preventing a "'transgender high school girl' from using the 'girls' restroom,'" "preventing a 'transgender high school girl' from 'trying out for the girls' cheerleading team,'" and "failing to use a transgender student's preferred name or pronouns." R. 1, Compl., PageID 13–14 (quoting R. 1-4, Exhibit C, PageID 73).

The Fact Sheet adds that Title IX's financial recipients "have a responsibility to investigate and address sex discrimination, including sexual harassment, against students because of their perceived or actual sexual orientation or gender identity." R. 1-4, PageID 73. And the Department "can also provide information to assist schools in meeting their legal obligations." *Id.*

On August 30, 2021, twenty states[3] sued, challenging the legality of these Documents.[4] The Plaintiff States operate educational programs and activities that receive federal funding and are thus subject to Title IX's requirements. The States allege that the Department's Documents are procedurally and substantively unlawful under the Administrative Procedure Act (APA), Title IX, and the U.S. Constitution.

The States moved for a preliminary injunction on September 2, 2021. They requested that the district court enjoin the Department from enforcing the challenged Documents until the case is resolved on the merits. The Department filed a response, as well as a motion to dismiss for lack of subject matter jurisdiction and failure to state plausible claims for relief. The Department presented identical arguments in its motion to dismiss and its response to the Plaintiff States' motion for preliminary injunction. So the district court decided to resolve both motions in the context of whether a preliminary injunction was warranted. In an order granting the States a preliminary injunction (and denying the motion to dismiss), the district court found

---

[3]Alabama, Alaska, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, and West Virginia.

[4]In district court, the States also challenged the Equal Employment Opportunity Commission's issuance of a "technical assistance document." On appeal, the Department no longer defends the merits of that document because another court has set it aside nationwide. *See Texas v. EEOC*, 633 F. Supp. 3d 824, 847 (N.D. Tex. 2022). Given that the Department has abandoned that aspect of its appeal, we won't review the issue. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998); *Nichols v. United States*, 285 F.3d 445, 447 n.1 (6th Cir. 2002).

that the States have standing, the Department's Documents are reviewable, and the States' claim that the Documents had to go through notice and comment is likely to succeed.[5]  On that basis, the court enjoined and restrained the implementation of the Documents against the Plaintiff States.  The Department timely appealed.

## II.

We first consider whether the States' claims are justiciable.  *See, e.g.*, *Kentucky v. Yellen*, 54 F.4th 325, 335 (6th Cir. 2022).  This Court reviews standing questions de novo.  *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019).  And because this case is at the preliminary-injunction stage, the States must only show "a 'substantial likelihood' of standing" to be "entitled to a preliminary injunction."  *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020).  If any State can't make this showing, we must deny it preliminary relief, but we don't have to dismiss the State from the case, as long as one State has standing.  *Id.*  To have standing, the States must establish an injury that is (1) actual or imminent as well as concrete and particularized, (2) traceable to the Documents, and (3) likely to be redressed by a favorable decision.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

We consider three theories supporting the States' standing: (1) a proprietary-interest theory, (2) a sovereign-interest theory, and (3) a procedural-rights theory.  In the end, all twenty Plaintiff States show a substantial likelihood of standing sufficient to obtain a preliminary injunction.[6]

## A.

First, the proprietary-interest theory.  States have "proprietary" standing to sue if state entities "reliant on the states' coffers" will "become subject" to federal regulations that threaten those coffers.  *Kentucky v. Biden*, 23 F.4th 585, 594–95 (6th Cir. 2022); *see also Minnesota v.*

---

[5]The district court did not address the likelihood of success of the States' other claims.  We similarly don't address the likelihood of success of those other claims today.

[6]Arizona did not join the other nineteen states in briefing on appeal but is still a plaintiff in this suit.  Given that "an appellee doesn't even have to file a response brief," *Anderson v. Knox County*, Case No. 22-5280, 2023 WL 4536078, at *7 (6th Cir. July 12, 2023) (citing Fed. R. App. P. 31(c); *In re Hollis*, 810 F.2d 106, 107 (6th Cir. 1987)), we still address the States' claims that involve Arizona.

*N. Sec. Co.*, 194 U.S. 48, 68 (1904) (acknowledging that states possess protectable proprietary interests).[7]  A state "is bound to have a variety of proprietary interests."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).  "A State may, for example, own land or participate in a business venture," in which case "it is likely to have the same interests as other similarly situated proprietors" and "may at times need to pursue those interests in court." *Id.* at 601–02; *see also Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 35 (D.C. Cir. 2002) (The "Government unquestionably is the proprietor of its own funds, and when it acts to ensure the most effective use of those funds, it is acting in a proprietary capacity.").  For instance, state universities fall under the purview of these interests, including to the extent that they receive federal funding.  *Kentucky v. Biden*, 23 F.4th at 594–95.

Indeed, for 70 years a state has been able to assert Article III standing via injuries to a state university—the state's "agency in the educational field."  *Arkansas v. Texas*, 346 U.S. 368, 371 (1953); *see id.* at 370 (holding that Arkansas had Article III standing to represent the interests of the University of Arkansas because under Arkansas law "the University of Arkansas is an official state instrumentality" and "any injury . . . to the University is an injury to Arkansas").  And the Supreme Court recently reaffirmed that a state "seek[s] to protect its *own* interests" when it enters court to redress the harms of an instrumentality of the state, such as a state university.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2366–67 (2023) (holding that a state had standing because its "instrumentality" that suffered an injury "was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State").

The Department concedes that, because of the Documents, the States may sustain injuries "in their capacity as employers or educators."  Appellants Br. at 31.  This is true for various reasons.  For example, as the States note, a regulation that prohibits "discrimination on the basis of gender identity allows the Department to take action against a school that only allows (biological) girls to try out for girls' teams."  States Br. at 18.  On top of that, under the

---

[7]A state's proprietary interests are distinct from its sovereign interests.  A "proprietary" interest is the right of a state to run its own schools, universities, hospitals, etc., much like the proprietor of a private school or hospital. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).  But a state's sovereign interests are unique to states as separate sovereigns, for these are the rights of the sovereign to regulate others.

Documents, the Department may take enforcement action against any school that regulates entry to restrooms based on biological sex. Plus, the Documents impose new duties on the States. The States must now "investigate and address sex discrimination, including sexual harassment, against students because of their perceived or actual sexual orientation or gender identity." *Fact Sheet*, *supra*. And what if the States don't investigate or address incidents in the way the Documents specify? By not complying, the States' schools face legal and financial consequences because of Title IX's enforcement mechanisms. *See* 20 U.S.C. § 1682.

This fear is not unfounded. It comes directly from the text of the Documents. The Department says it "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity" in a way that is "[c]onsistent with the analysis" in the Documents. Enforcement of Title IX, 86 Fed. Reg. at 32639. The Department also indicates that the position expressed in the Documents' is now the "interpretation" moving forward, while noting that this agency action "supersedes and replaces any prior inconsistent statements made by the Department." *Id.* Not to mention, both the regulation and "Dear Educator" Letter reiterate that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." *Id.*; *Letter to Educators*, *supra*, at *2.

Alongside the threat of enforcement come the penalties the Department can impose. Title IX allows the Department to suspend or terminate federal education funding if it doesn't achieve voluntary compliance.[8] 20 U.S.C. § 1682; *see* 34 C.F.R. § 100.8(a). And aside from a loss of

---

[8]At argument, the Department's counsel stated that it has not and would not enforce the Documents in enforcement actions against the Plaintiff States. And on that reasoning, the Department argued that "any harm that the states have suffered is not traceable to these documents." Oral Argument at 9:55. The Supreme Court rejected a similar argument in *West Virginia v. EPA*, 597 U.S. 697 (2022). There, the government argued that any "possibility" of an injury was "eliminated" because the "EPA informed the Court of Appeals that it does not intend to enforce the Clean Power Plan." *Id.* at 719. The Court recognized this maneuver for what it was: an attempt to moot the case. *Id.* It was a voluntary cessation argument in disguise. *Id.* at 720. Courts are rightly skeptical about taking a party at its word that it will not enforce something when enforcement is within its discretion.

Indeed, it is "well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Otherwise, "courts would be compelled to leave the defendant free to return to his old ways." *Id.* (cleaned up). A defendant bears the burden of establishing "that a once-live case has become moot." *West Virginia*, 597 U.S. at 719. And that burden is "heavy" where, as here, the "only conceivable basis for a finding of mootness in the case is the respondent's voluntary conduct." *Id.* (quoting *Friends of the Earth*, 528 U.S. at 189). The Department's "mootness argument boils down to its representation that [it] has no intention of enforcing" its policy. *Id.* at 720.

funding, the Department can take any other means authorized by law, such as referring the matter to the Department of Justice.  34 C.F.R. § 100.8(a).

The Documents threaten the States' educational institutions with financial penalties, specifically the revocation of federal funds, if they don't comply with the policies outlined in its letter.  This is an injury to the States as proprietors of their educational institutions and is sufficient to confer standing.  And because all twenty States operate educational institutions, each State has standing under the proprietary-interest theory.

The next question is whether that injury is imminent.  It is.  For pre-enforcement challenges, a party may establish imminence with "an adequate showing that sometime in the relatively near future" it will "continue" an action that "allegedly violates the law."  *Kentucky v. Biden*, 23 F.4th at 602 (citation omitted) (reasoning that a plaintiff established imminence by showing a history of bidding on contracts that would allegedly violate a new mandate and by asserting that it would "likely" bid on contracts in the future).

The States "have shown that their existing" policies dealing with biological sex-separated programs are "threatened with modification" under the Documents, that federal education funding provides "critical funding for their functions," that they are "likely to continue" enforcing their policies while accepting federal funds, that such funding is "likely subject to the [Documents'] mandate, and that resistance to the [Documents'] mandate will likely lead either to the loss of [funding] or difficulty executing" education programs.  *Id.* at 601.  In short, because the States allege that they are "likely" to continue doing what the Documents prohibit, "we are satisfied that" they have "standing to bring this lawsuit."  *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 212 (1995).

Any remaining doubt about imminence is resolved when we consider the fact that, under the Documents, the schools now "have a responsibility to investigate and address sex discrimination, including sexual harassment, against students because of their perceived or actual

---

So "voluntary cessation does not moot a case" unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (internal quotation marks omitted).  And given that the Department "vigorously defends" the legality of the Documents, it's not "clear."  *See id.*

sexual orientation or gender identity." R. 1-4, PageID 73. And the Department tells schools that these are "legal obligations" that they must "meet[]." *Id.* The schools previously didn't have to investigate scenarios which they do not consider to be sex discrimination, but now they do. These harms aren't just imminent; they apparently require action now. So we need not wait and see whether any actual conflict arises—as the Department would have us do.[9]

Up next, traceability and redressability. The injury here is traceable to the Documents. *See Lujan*, 504 U.S. at 560. On the one hand, we have a new position on what sex discrimination can include, requiring states to both investigate different forms of discrimination and get rid of policies to the contrary. On the other, we know that the Department "will fully enforce" its new position on Title IX. Enforcement of Title IX, 86 Fed. Reg. at 32639. Indeed, the Department has stated a position to *only* enforce Title IX with its new interpretation going forward, not "any prior inconsistent" ones. *Id.* And, for the same reasons, the States' injuries will be redressed by a favorable ruling enjoining the enforcement of the Documents against them.[10]

---

[9]It is true that "many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, not in federal pre-enforcement cases like this one." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49–50 (2021). But the harm here is not a "possibility." *Id.* at 49. Nor is it based on a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Rather, as explained, the States make a substantial showing that the Department will "fully enforce" the new position—and only that position. Enforcement of Title IX, 86 Fed. Reg. at 32639. So the injury here is "certainly impending." *Clapper*, 568 U.S. at 410.

[10]In challenging traceability and redressability, the Department argues that the injuries stem from *Bostock* and Title IX, not the Documents. The Department cites *School of the Ozarks v. Biden* in support of its argument that the states have failed to establish traceability and redressability. 41 F.4th 992 (8th Cir. 2022). That case, however, does not answer the question before us. In *Ozarks*, the challenger "failed to show that enjoining officials from implementing" an "internal" agency directive "would redress any injury allegedly arising" from the document "because the agency retain[ed] the authority and responsibility to carry out the same enforcement activity based on the statute alone." *Id.* at 1001. The *Ozarks* court reasoned that the U.S. Department of Housing and Urban Development would still have to "investigat[e] all complaints of sex discrimination . . . including complaints of discrimination because of gender identity or sexual orientation." *Id.* And it added that the agency "must consider the meaning of the Fair Housing Act in light of *Bostock* and its interpretation of similar statutory language." *Id.*

*Ozarks*'s logic is questionable. It hinges on the premise that even if the agency didn't use its documents, the agency could still get to the same outcome by interpreting the underlying statute in a way that tracks the documents. But that's not at all clear in this case. Unlike in *School of the Ozarks,* the Documents here are not internal agency memoranda. Instead, they tell regulated entities, including the States, that they must take affirmative steps to investigate forms of sex discrimination that they previously were under no obligation to pursue. Failure to do so puts them at risk of losing their funding.

Taken together, the States are trapped between choosing to enforce state laws or receiving federal funds, all while having to investigate gender-identity and sexual-orientation discrimination (unlike before). Thus, the injuries here are "fairly traceable to the challenged action of the defendant," and "a favorable decision" will redress these injuries. *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted).

### B.

Second, the sovereign-interest theory. States cannot "bypass proof of injury," but, in their capacities as sovereigns, they can incur injuries that private parties cannot. *See Arizona v. Biden*, 40 F.4th 375, 385–86 (6th Cir. 2022). For instance, states have Article III standing when "quasi-sovereign rights [are] actually invaded or threatened." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923)). Relevant here, "a State clearly has a legitimate interest in the continued enforceability of its own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986). So "when a federal regulation purports to preempt state law," states have "a sovereign interest to sue the United States." *Kentucky v. Biden*, 23 F.4th at 598 (collecting cases).[11]

That makes sense. The "history and tradition" of sovereign interests shows that such interests can establish Article III standing. *United States v. Texas*, 599 U.S. 670, 676 (2023) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008)). So "precedent, history, or tradition of courts" inform our understanding of whether a state has established an Article III injury. *Id.* at 677. Looking to those sources here reveals important background

---

[11]*See Alfred L. Snapp*, 458 U.S. at 601 (recognizing that interference with a state's sovereign "power to create and enforce a legal code" is sufficient to establish Article III standing); *Missouri v. Holland*, 252 U.S. 416, 431 (1920) (exercising jurisdiction over a case because Missouri's lawsuit "is a reasonable and proper means to assert the alleged quasi sovereign rights of a State" against federal regulation); *Yellen*, 54 F.4th at 336 (concluding that states had standing from threats to their "enacted or planned . . . tax cuts" because of their "powerful sovereign prerogative under federalism principles to control their own internal taxation policies"); *Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 957 (6th Cir. 2020) (noting that Article III standing can be met if a state faces "some tangible interference with its authority to regulate or to enforce its laws"); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985) (holding that a state had standing to "vindicate its own law" that was "endangered and rendered uncertain by the formal position of [an agency] that the [state] statute is preempted"); *South Dakota v. Dole*, 483 U.S. 203, 205 (1987) (allowing a state to bring a Spending Clause challenge to a federal statute burdening continued enforcement of a state law).

principles about states' ability to protect their sovereign interests, such as regulating education within their borders.

The understanding that states could assert their sovereign interests against the federal government appears often in Founding-era evidence. Key among the talking points in the framing of our Constitution was federalism, the innovative mode of government we still embrace today. The Constitution delegated "few and defined" powers to the federal government, while the states retained "a very extensive portion of active sovereignty." *The Federalist No. 45*, at 286, 289 (James Madison) (C. Rossiter ed., 1961). Indeed, the powers that "remain in the State governments are numerous and indefinite." *Id.* at 289. As James Wilson famously explained, the Constitution's federalist structure ensured that, for state governments, "every thing which is not given, is reserved." James Wilson's State House Yard Speech October 6, 1787, *in* 1 *Collected Works of James Wilson* 171, 171–76 (Kermit L. Hall & Mark David Hall eds., 2007).[12] This meant that the "powers reserved to the several States [would] extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." *The Federalist No. 45*, at 289.[13]

Yet some remained skeptical about the division of power. *See, e.g.*, Letters from a Federal Farmer No. 18 (1788), *in* 2 *The Complete Anti-Federalist* 339, 345 (H. Storing ed., 1981) ("[T]he stipulations of a state, or of the inhabitants of the place ceded, can be of but little avail against the power and gradual encroachments of the union."). Anti-Federalists worried that the Constitution was "designedly framed[] to reduce the state governments to mere corporations,

---

[12]This speech was republished in thirty-four newspapers across every state except Delaware and North Carolina. J. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 144 n.36 (1996).

[13]It is worth mentioning that the ability to pass and enact laws has been a cornerstone of legislatures' powers dating back at least to the English Bill of Rights of 1689, which denounced—as one of its chief complaints—the King "Assumeing and Exerciseing a Power of Dispensing with and Suspending of Lawes and the Execution of Lawes without Consent of Parlyament." An Act Declareing the Rights and Liberties of the Subject and Setleing the Succession of the Crowne (Bill of Rights), 1 W. & M. 2, c. 2 (1689). The power of a legislature to enact its own legislation proved so important that when James Madison "proposed giving the national government an unlimited veto over all state laws," the idea was rejected, and the convention instead adopted a system that retained state sovereignty over its own legislation—a plan in which "most framers agreed that the scope of national lawmaking would remain modest," and the "most numerous objects of legislation" would "belong to the states." Rakove, *supra*, at 168–69, 179.

and eventually to annihilate them."  J. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 182 (1996); *see also* Brutus 1 (1787), *in* 2 *The Complete Anti-Federalist*, *supra*, at 367 (lamenting that the Constitution, through the Necessary and Proper Clause, allows the federal government to "exercise this power as entirely to annihilate all the state governments, and reduce this country to one single government").

To address these concerns, the Framers assured the public that the federal government would "at all times stand ready to check the usurpations of the state governments, and these will have the same disposition towards the [federal] government." *The Federalist No. 28*, at 176–77 (Alexander Hamilton); *see also id.* at 177 ("[T]he State Governments will, in all possible contingencies, afford complete security against invasions of the public liberty by the National authority.").  So even if the federal government "invaded" the rights of the people, the people could still "make use of" the state government "as the instrument of redress." *Id.*  Put simply, the "different governments will control each other, at the same time that each will be controlled by itself." *The Federalist No. 51*, at 320 (James Madison).  Indeed, it was understood that the federal government may not just be "the sword" in all cases, but "sometimes be appealed to as the arbiter of [states'] differences." *The Federalist No. 7*, at 56 (Alexander Hamilton).

Important here, among the sovereign "powers" that the Constitution "reserved to the States" was the ability to regulate the education of their citizens.  U.S. Const. amend. X; *see United States v. Lopez*, 514 U.S. 549, 580 (1995) (Kennedy, J., concurring) ("[I]t is well established that education is a traditional concern of the States.").  Nothing in the Constitution "was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the . . . education . . . of the people." *Barbier v. Connolly*, 113 U.S. 27, 31 (1884); *see Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 55 (1973) ("We are unwilling to assume for ourselves a level of wisdom superior to that of legislators, scholars, and educational authorities in 50 States.").  And the states' strong interest in regulating education hasn't changed. *See, e.g.*,

*Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) ("Today, education is perhaps the most important function of state and local governments.").[14]

So we know that preemption of a state law is an injury that gives rise to Article III standing because it infringes a state's sovereign interests. The next question is: at this stage of the suit, do any of the States here sufficiently show that injury? The answer: yes.[15]

---

[14]This is not to suggest that an injury based on a state's sovereign interests is cognizable only when it impacts an area "traditionally" regulated by the states, such as education. States can suffer an injury affecting their sovereign interests even when they regulate beyond "traditional" areas of state regulation. *See, e.g.*, *Celebrezze*, 766 F.2d at 229 (6th Cir. 1985) (involving preemption of an Ohio statute that "requires prenotification of shipment into or through the State of any large quantity of special nuclear material or by-product material").

But we also do not suggest that states suffer an injury to their sovereign interests *any time* the federal government purports to regulate in an area of "traditional" state concern, such as education. Such an assertion would likely run headlong into the *Mellon* bar. *See Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923).

[15]Multiple states do not show a state policy that conflicted with the Documents at the time the States filed their complaint. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."). So although these states can show a likelihood that they have standing under procedural-rights and proprietary-interest theories, it's unlikely that they have standing under a sovereign-interest theory.

But, even if these states couldn't make a showing of standing under any theory, the states could stay in this suit thanks to the one-party rule. *Rumsfeld v. Forum for Acad. & Int'l Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). Alternatively, because no court would have made a "final judgment on the merits" for these states, *Montana v. United States*, 440 U.S. 147, 153 (1979), they could bring suit again without res judicata concerns—asserting on the second go-around that they have standing based on new laws. *See* Ariz. Rev. Stat. § 15-120.02(B) ("Athletic teams or sports designated for 'females,' 'women' or 'girls' may not be open to students of the male sex."); Ga. Code Ann. § 20-2-316(c)(1)(E)(v) (amended 2022) ("If the athletic association determines that it is necessary and appropriate to prohibit students whose gender is male from participating in athletic events that are designated for students whose gender is female, then the athletic association may adopt a policy to that effect; provided, however, that such policy shall be applied to all of the athletic association's participating public high schools."); Ind. Code § 20-33-13-4(b) ("A male, based on a student's biological sex at birth in accordance with the student's genetics and reproductive biology, may not participate on an athletic team or sport designated under this section as being a female, women's, or girls' athletic team or sport."); Kan. Stat. Ann. Ch. 13, § 3(b) (amended 2023) ("Athletic teams or sports designated for females, women or girls shall not be open to students of the male sex."); Ky. Rev. Stat. Ann. § 158.189(3) ("Those policies shall, at a minimum, not allow students to use restrooms, locker rooms, or shower rooms that are reserved for students of a different biological sex."); S.B. 44 Reg. Sess. (La. 2022) (requiring "that schools designate intercollegiate and interscholastic athletic teams according to the biological sex of the team members" and "that teams designated for females are not open to participation by biological males"); Mo. Rev. Stat. § 163.048.3(1) (amended 2023) ("[N]o private school, public school district, public charter school, or public or private institution of postsecondary education shall allow any student to compete in an athletics competition that is designated for the biological sex opposite to the student's biological sex."); Ohio Rev. Code § 3313.5320(B) (amended 2024) ("No school, interscholastic conference, or organization that regulates interscholastic athletics shall knowingly permit individuals of the male sex to participate on athletic teams or in athletic competitions designated only for participants of the female sex."); Okla. Stat. Ann. tit. 70, § 1-125(B) ("[S]tudents in prekindergarten through twelfth grades in this state shall require every multiple occupancy restroom or changing area designated as follows: 1. For the exclusive use of the male sex; or 2. For the exclusive use of the female sex."); S.C. Code Ann. § 59-1-500(B)(2)–(3) ("Athletic teams or sports designated for males, men, or boys shall not be open to students of

Several states show a substantial likelihood that they face a sovereign injury. To start, they allege that they "maintain laws or policies that at least arguably conflict" with the Documents. R. 1, PageID 19, ¶ 99 (citing state laws). They're correct. The Department's stance on sexual orientation and gender identity discrimination conflicts with how these states regulate education—separating students based on biological sex, whether in school sports, restrooms, or in some other way.

Keeping in mind the novel policy expressed in the Documents, several states had conflicting policies in place at the time the complaint was filed.[16]  As we have explained, the States have a sovereign interest in regulating education, so the Documents give rise to a sovereign injury. Given the "precedent, history, or tradition of courts," states can protect their traditional lawmaking authority. *United States v. Texas*, 599 U.S. at 677. Our recent cases have acknowledged that the sovereign injury here—a state's ability to enforce its laws, particularly over a traditional sovereign prerogative like education—is sufficient to confer standing. *See Kentucky v. Biden*, 23 F.4th at 598–99. Consistent with our precedent, several states can show their "own, contrary [education] policy, and that the [new federal policy] threatens to override those policies." *Id.* at 599. So our precedent aligns with what the original understanding confirms: States can "sue the United States when a federal regulation purports to preempt state law." *Id.* at 598.

---

the female sex, unless no team designated for females in that sport is offered at the school in which the student is enrolled. . . . Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex."); S.D. Codified Laws § 13-67-1 ("Only female students, based on their biological sex, may participate in any team, sport, or athletic event designated as being for females, women, or girls.").

[16]*See, e.g.*, Tenn. Code Ann. § 49-6-310(a) ("A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth."); Ala. Code § 16-1-52(b)(2) ("A public K–12 school may not allow a biological female to participate on a male team if there is a female team in a sport. A public K–12 school may not allow a biological male to participate on a female team."); Alaska Stat. § 14.18.040(a) ("Separate school-sponsored teams may be provided for each sex."); Ark. Code Ann. § 6-1-107(c)(2)(B) ("An interscholastic, intercollegiate, intramural, or club athletic team or sport that is expressly designated for females, women, or girls shall not be open to students of the male sex."); Idaho Code § 33-6203(2) ("Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex."); Miss. Code Ann. § 37-97-1(2) ("Athletic teams or sports designated for 'females,' 'women' or 'girls' shall not be open to students of the male sex."); Mont. Code Ann. § 20-7-1306(2) ("Athletic teams or sports designated for females, women, or girls may not be open to students of the male sex."); Neb. Rev. Stat. § 79-2,124 (providing that the "Nebraska Equal Opportunity in Education Act does not prohibit any educational institution from maintaining separate public toilet facilities, locker rooms, or living facilities for the different sexes"); W. Va. Code § 18-2-25d(c)(2) ("Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex.").

So the sovereign-interest theory shows another injury suffered by the States, an injury to their interest in enforcing their duly enacted laws without contradiction from the federal government.  As for imminence, traceability, and redressability, the analysis under the sovereign-interest theory is similar to the analysis discussed above for the proprietary-interest theory.  The injury is imminent because the Department has made clear that it will investigate states not in compliance with its new regime, thus putting the Plaintiff States on a collision course with the federal government.  For traceability, the States' sovereign injuries are "fairly traceable to the challenged action of the defendant," *Lujan*, 504 U.S. at 560, because the Department's stance on discrimination conflicts with how the States regulate education.  And, as mentioned under the proprietary-interest theory, a court can likely redress the States' injuries with "a favorable decision" by holding that the Documents are not enforceable against the Plaintiff States.  *Id.* at 561 (citation omitted).

## C.

Proprietary and sovereign interests aside, all twenty States have a substantial likelihood of standing under a procedural-rights theory.[17]  We have long recognized that parties have Article III standing when an agency action allegedly did not abide by procedural requirements that are designed to protect the plaintiff's concrete interests.  *See Dismas Charities, Inc. v. DOJ*, 401 F.3d 666, 677–78 (6th Cir. 2005) (holding that plaintiffs had standing because they had concrete interests that 5 U.S.C. § 553's "procedures" were "designed to protect" (quoting *Lujan*, 504 U.S. at 573 n.8)).  And that remains the case even if, on the merits, we determine that an agency doesn't "clearly" have to comply with the alleged procedural requirements after all.  *Id.* at 677.  The procedural-rights theory requires that the States meet two requirements: Article III standing and prudential standing.  *Id.* at 671.

The States must first have Article III standing.  Under a procedural-rights theory, "when a statute affords a litigant 'a procedural right to protect his concrete interests,' the litigant may establish Article III jurisdiction without meeting the usual 'standards for redressability and

---

[17]The district court did not analyze Article III standing using the procedural-rights theory.  Even so, we may affirm on any ground supported by the record, even if not relied on by the district court.  *See Dismas Charities, Inc. v. DOJ*, 401 F.3d 666, 677 (6th Cir. 2005); *United States v. Hudgins*, 52 F.3d 115, 118 (6th Cir. 1995).

immediacy.'" *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan*, 504 U.S. at 572 n.7). But the litigant must have a "concrete interest that is affected by the deprivation of the claimed right." *Id.* (internal quotation marks omitted). So "[o]nly a 'person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (quoting *Lujan*, 504 U.S. at 572 n.7). This Court has recognized that the "requirements of notice and comment prior to rulemaking" fit within a procedural-rights theory because they give persons with "concrete interests" affected by a regulation the "chance to argue to [an agency] that its policy is wrong before the policy is adopted." *Dismas Charities*, 401 F.3d at 677. And "concrete" interests can include a plaintiff's "interest in continuing to provide services" that the agency action at issue stops. *Id.*

Given this framework, the States here have "concrete interests" that the "procedural requirements of notice and comment prior to rulemaking . . . certainly protect." *Id.* The APA requires agencies to engage in "notice and comment" for legislative rules.[18] 5 U.S.C. § 553(b)– (c). And the States allege that the Department's Documents are "legislative rules that were adopted without the required notice-and-comment procedures." R. 1, PageID 22, ¶ 119.

If the APA's procedures are "applicable," the States are in the same position as the plaintiff in *Dismas Charities*, 401 F.3d at 677. To start, the APA's notice-and-comment procedures would have given the States a "chance to argue" that Education's Title IX "policy [wa]s wrong before the policy [wa]s adopted." *Id.*; *see* R. 1, PageID 24, ¶ 131 ("The Department's Interpretation and Fact Sheet are contrary to law and exceed the Department's statutory authority because *Bostock*'s interpretation of Title VII's language is inapplicable to Title IX's materially different language."); *id.* ¶ 133 ("The Department's Interpretation and Fact Sheet are contrary to law because Title IX and longstanding Department regulations expressly permit distinctions based on biological sex in certain circumstances.").

And the States have an "interest in continuing to provide services" at public schools that separate programs and activities based on biological sex. *Dismas Charities*, 401 F.3d at 677.

---

[18]More on legislative rules below.

In particular, the States seek to keep their "laws and policies, and established sex-separated restrooms, locker rooms, showers, residence halls, and other living facilities" that they made "in reliance on their understanding that Title IX" does "not prohibit those laws, policies, and practices." R. 1, PageID 20, ¶ 106. Seeing how the procedural requirements of the APA seeks to protect those "concrete interests," the States have Article III standing "to challenge the [the Department's Documents] on the ground that notice and comment rulemaking was required before the [Documents] could be put into effect." *Dismas Charities*, 401 F.3d at 677.

We next turn to the procedural-rights theory's second requirement: "prudential standing." *Id.* at 674–77; *see Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 488 (1998) (interpreting 5 U.S.C. § 702 to require all parties "adversely affected or aggrieved" by a final agency action to have prudential standing). To establish prudential standing, we determine whether the States have an interest that "arguably [falls] within the zone of interests to be protected or regulated by the statute" in question. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). We answer that inquiry in two parts: (1) we determine what interests the statute arguably was intended to protect; and (2) we determine whether the "plaintiff's interests affected by the agency action in question are among them." *Bangura v. Hansen*, 434 F.3d 487, 499 (6th Cir. 2006) (quoting *Nat'l Credit Union Admin.*, 522 U.S. at 492). Importantly, the "test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987) (footnote omitted).

As to the first part, the APA's notice-and-comment rulemaking requirements were "intended to 'assure fairness and mature consideration of rules of general application.'" *Dismas Charities*, 401 F.3d at 678 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (plurality opinion)). At the same time, they seek to "give those with interests affected by rules the chance to participate in the promulgation of the rules." *Id.*

As to the second part, the States' interests are among those that the APA was designed to protect. *See Bangura*, 434 F.3d at 499. The States "oversee and operate educational institutions and other educational programs and activities that receive federal funding and thus are subject to the requirements of Title IX." R. 1, PageID 5, ¶ 15. Since the States are objects of the

Documents, the notice-and-comment process was designed to give them an "opportunity to participate in and influence agency decision making at an early stage." *Dismas Charities*, 401 F.3d at 678 (citation omitted). Not only that. Almost every Plaintiff State faces a "threatened injury to [the] enforcement" of its laws, which falls "within the zone of interests of" the APA and Title IX. *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985). Our Court has long acknowledged that a state has "standing to challenge [an agency's] regulation and undertake to vindicate its own law" when the state statute was "endangered and rendered uncertain by the formal position of" an agency that the state statute was "preempted." *Id.*

As a result, the States' interests fall "squarely within the zone of interests protected by the notice and comment requirements of the APA." *Dismas Charities*, 401 F.3d at 679. The States therefore show a substantial likelihood of both constitutional and prudential standing for their procedural-rights claim.

In sum, the Department has adopted a new position on its enforcement of Title IX. Whether that position is a legislative rule is a matter for the merits. But for standing purposes, we know this much: thanks to whatever the Department published in the Federal Register, the Department is now locked into that position moving forward. We know that it "will fully enforce" that position, not "any prior inconsistent" ones. Enforcement of Title IX, 86 Fed. Reg. at 32639. The States, which depend on federal education funds under Title IX, are the "objects" of this regulatory position. Most of them also have laws on the books that likely conflict with that position. And because the Department skipped the notice-and-comment process, the States lacked a chance to argue that the Department's new Title IX policy was wrong before it was issued. Seeing that the States are stuck between the rock of being forced to comply with these regulations by abrogating state policies and the hard place of being threatened with enforcement under Title IX, despite being unable to voice their concerns, we hold that they show a substantial likelihood of Article III standing to support the district court's preliminary injunction.

## III.

Next up, reviewability. Reviewability is what it sounds like. It deals with whether federal courts can hear certain claims. The Department makes three arguments for why we

cannot review the Documents: (1) the Documents are not "final" agency action;[19] (2) Title IX provides an adequate alternative remedy for the States, so reviewing their claims under the APA is improper; and (3) Title IX impliedly precludes pre-enforcement actions like this. We reject each of these arguments in turn.[20]

## A.

First, the Documents are "final" agency action. Courts, of course, can only review an agency action under the APA if it is "final." 5 U.S.C. § 704. We take a "'pragmatic' approach" to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Lab'ys v. Gardener*, 387 U.S. 136, 149 (1967)). With that pragmatic approach in mind, an agency action is final if it is both (1) "the consummation of the agency's decisionmaking process" and (2) a decision "by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). Here, the parties agree that the first condition is satisfied, so we'll focus on the second.

Our past cases put a gloss on this second condition. We ask: "Will the agency's action 'impose liability' on a regulated party, create legal rights [or obligations], or 'mandate, bind, or limit other government actors' in the future?" *Arizona*, 40 F.4th at 387 (quoting *Parsons v. DOJ*, 878 F.3d 162, 169 (6th Cir. 2017)). And we also ask whether the agency's action has a "'sufficiently direct and immediate' impact on the aggrieved party and a 'direct effect on its day-to-day business.'" *Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 633 (6th Cir. 2016) (quoting *Abbott Labs*, 387 U.S. at 152). "Through it all, we will not overlook whether the agency's action puts a party to a 'Catch-22,' stuck between heavy compliance costs or feared liability, neither of

---

[19]We note that the Department treats the issuance of the three Documents as one agency "action." Put differently, it doesn't provide independent arguments for why the Fact Sheet isn't final as compared to the Notice of Interpretation. So we treat the Documents as one "action" too.

[20]In this Circuit, the reviewability question is not jurisdictional. *See Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 423–24 (6th Cir. 2016); *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 n.4 (6th Cir. 2014). And whether the Documents are interpretive or legislative rules goes to the merits. *See* 5 U.S.C. § 553(b)–(c); *id.* § 706(2)(D). So we treat these issues separately, disentangled from the jurisdictional issues above. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) (explaining that finality analysis is distinct from test for whether agency action is legislative rule).

which can be undone." *Arizona*, 40 F.4th at 387 (quoting *Air Brake Sys. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004)).

To figure out whether an agency action is binding, we look to the text of the agency action to see if it "evoke[s] binding legal effect." *Id.* at 387–88. In other words, we look to the "definitive nature" of the legal conclusion. *Id.* at 388. We can also look to surrounding context—for example, how an agency has made use of the action or what it has said about it. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019).

Under this framework, we find that the Documents bind the Department to a legal position and create legal consequences. First, consider how the Documents bind the Department. The Notice of Interpretation announces that the Department will "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity" in a way that is "[c]onsistent with [its] analysis." Enforcement of Title IX, 86 Fed. Reg. at 32639. This "supersedes and replaces any prior inconsistent statements made by the Department." *Id.* The "Dear Educator" Letter tells the regulated entitles that "Title IX's protection against sex discrimination encompasses discrimination based on sexual orientation and gender identity." *Letter to Educators*, *supra*, at *1. And the Fact Sheet states that "[i]t is important to know that discrimination against students based on their sexual orientation or gender identity is a form of sex discrimination prohibited by federal law." *Fact Sheet*, *supra*. Clearly, the Documents do more than express a "privileged viewpoint." *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006).

Simply put, the Department leaves itself no room to take the position that Title IX *does not* prohibit discrimination based on sexual orientation or gender identity. *See Texas v. EEOC*, 933 F.3d at 443 ("[B]y broadly condemning a [felon-hiring ban] policy or practice . . . the Guidance leaves no room for EEOC staff *not* to issue referrals to the Attorney General when an employer uses a categorical felon-hiring ban."); *Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 319–20 (D.C. Cir. 2011) (holding that EPA guidance was a final agency action because it withdrew agency discretion to refuse to find state emission-control plans non-compliant with EPA air quality standards for particular reasons). Agency actions such as this "legally bind an agency" and "cause legal consequences." *See Parsons*, 878 F.3d at 167–68.

The Documents tell the States how to avoid liability, thereby creating legal consequences. Take the Fact Sheet. After explaining that "[p]ublic elementary and secondary schools, as well as public and private colleges and universities, have a responsibility to investigate and address" discrimination because of a student's "perceived or actual sexual orientation or gender identity," it lists "[e]xamples of the kinds of incidents . . . OCR can investigate." *Fact Sheet*, *supra*. It further states that "OCR can also provide information to assist schools in meeting their *legal obligations*." *Id.* (emphasis added). These examples are not simply enforcement "priorities." *Arizona*, 40 F.4th at 389. These examples—as well as the Notice of Interpretation and "Dear Educator" Letter—are intended as a basis for the States to "order[] and arrang[e] their affairs." *Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956). Our "pragmatic approach" to finality counsels us to find that these Documents create legal "safe harbors." *Hawkes*, 578 U.S. at 598–99; *Texas v. EEOC*, 933 F.3d at 443.

Similarly, the States allege that the Documents force them "either to alter [their] conduct, or expose [themselves] to potential liability." *Texas v. EEOC*, 933 F.3d at 446 (citation omitted). We find this persuasive. For example, Tennessee law provides: "A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth." Tenn. Code Ann. § 49-6-310(a). But the Fact Sheet says that the Department can investigate a situation where "a transgender high school girl [i.e., a biological male] . . . joins her friends to try out for the girls' cheerleading team and the coach turns her away from tryouts solely because she is transgender." *Fact Sheet*, *supra*.

So States will risk losing their federal funding if they continue to run their educational institutions in accordance with their own laws and policies. 34 C.F.R. §§ 100.7(a), (d), 100.8(a), (c). This is a "severe" penalty. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 705 (1979). In fact, "[i]n fiscal year 2020-2021, educational programs and activities in Tennessee that are funded through the Tennessee Department of Education are estimated to have received approximately $1.5 billion in federal funding." R. 1, PageID 5, ¶ 14. So again, the Documents are "the basis for . . . ordering and arranging" the affairs of the States. *Frozen Food*, 351 U.S. at

44.  This demonstrates that the Documents "determine[]" "rights or obligations."  *Bennett*, 520 U.S. at 178.

By all accounts, the States' obligation to investigate claims of sexual orientation and gender identity discrimination is new.  The Department doesn't point to anything that establishes that it had a consistent practice of interpreting Title IX to include these types of injuries.  *See Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1025, 1028 (D.C. Cir. 2016) (explaining that the document at issue in that case "created no new legal obligations" because it merely expressed a "longstanding view").  In fact, the Notice of Interpretation admits that "OCR at times has stated that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity."  Enforcement of Title IX, 86 Fed. Reg. at 32637.  And the Department concedes that its "Title IX regulations have never directly addressed the application of Title IX to discrimination based on sexual orientation or gender identity."  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41394 (July 12, 2022).

The Department disputes the characterization that the Documents amount to final agency action.  It points to the fact that the Notice of Interpretation is called just that—an "Interpretation"—and argues that the Notice "does not itself determine the outcome in any particular case or set of facts."  Appellants Br. at 37.  But the "particular label placed upon [it] is not necessarily conclusive, for it is the substance of what the [agency] has purported to do and has done which is decisive."  *Detroit Edison Co. v. EPA*, 496 F.2d 244, 249 (6th Cir. 1974) (quoting *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416 (1942)).  As we've discussed, the Department binds itself to a view of Title IX and tells the States how to avoid liability under this view, which in turn requires the States to adjust their operations and to immediately broaden the scope of their own Title IX investigations or face the consequences.  Because of the immediate impact on the States, whether the Documents determine the outcome in any particular case is irrelevant to our inquiry (particularly on pre-enforcement review).  *See Frozen Food*, 351 U.S. at 44; *see also Hawkes*, 578 U.S. at 599–600 (finding that when an agency has the authority to impose legal consequences on a regulated party, its actions can be considered "final" simply

by warning regulated parties that, if they engage in certain conduct, "they do so at the risk of significant criminal and civil penalties").

But, the Department says, the Documents were in effect for a year prior to the district court's injunction. And during that year, the Documents didn't have an immediate and significant impact on the States because courts did not rely upon or mention the Documents during that year. Even if that's true (and without knowing how many suits the Department of Justice initiated or was involved in during that year), we don't think that's where most of the "direct and immediate" impact would be. The first step on the road to enforcement action is investigation. Since the release of the Documents, the Department has opened dozens of gender discrimination investigations.[21]

Last, the Department's reliance on *Parsons* is misplaced. In *Parsons*, we found that an agency whose only congressionally delegated authority consisted of "collect[ing], analyz[ing], and disseminat[ing] gang activity information" and creating an annual report didn't have the power to bind government actors or generate legal consequences. 878 F.3d at 169–70. The Department points to this case to say that the Documents would only affect "private citizens considering whether to bring discrimination complaints." Appellants Br. at 39–40. It is true that "harms caused by agency decisions are not legal consequences if they stem from independent actions taken by third parties." *Parsons*, 878 F.3d at 168 (internal quotation marks omitted). But here, the Department bound itself to enforcing Title IX in a new, more demanding manner and has the power to initiate investigations based on alleged Title IX violations. The Department's new position also imposes increased investigatory responsibilities on Title IX recipients themselves, including the States. If attempts to secure "voluntary compliance" fail, the Department "will make a written finding that the recipient is in violation of Title IX," and it can "begin administrative proceedings to suspend or terminate federal financial assistance." Appellants Br. at 5 (citing 34 C.F.R §§ 100.7(d), 100.8(a)). While other entities (including some private parties) have concurrent enforcement authority, the Department can see this process all

---

[21]See U.S. Dep't of Educ., Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools as of May, 17 2024 Search, https://www2.ed.gov/about/offices/list/ocr/docs /investigations/open-investigations/tix html.

the way through from investigation to the revocation of funds. This all makes our circumstances significantly different from those in *Parsons*. In sum, we find that the Documents are final agency action.

## B.

Next, the Department argues that Title IX provides an adequate alternative remedy such that APA review is not appropriate. We hold that it does not.

Even if agency action is final, "an agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court." *Hawkes*, 578 U.S. at 600 (citing 5 U.S.C. § 704). An alternative remedy must provide "'relief of the same genre' to the party seeking redress." *Rimmer v. Holder*, 700 F.3d 246, 262 (6th Cir. 2012) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)). The relevant statute here ensures "that the APA's general grant of jurisdiction to review agency decisions is not duplicative of more specific statutory procedures for judicial review." *Bangura*, 434 F.3d at 501; 5 U.S.C. § 704. But this exception "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

The Department posits that the States have one alternative to pre-enforcement review under the APA: fail to conform to the Documents and risk an enforcement action (or referral to DOJ for further legal action), during which the States can argue that the Documents are procedurally flawed and should be set aside.

That's not adequate. As the Supreme Court has "long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'" *Hawkes*, 578 U.S. at 600 (citing *Abbott Labs*, 387 U.S. at 153). In similar fashion, failing to conform with the Documents puts the States at risk of an often lengthy and arduous investigation and at risk of losing their federal funding through an enforcement proceeding. States "need not assume such risks while waiting for [an agency] to 'drop the hammer.'" *Id.* at 600 (citing *Sackett v. EPA*, 566 U.S. 120, 127 (2012)).

The Department responds that the "default rule under the APA is that challenges to agency action are raised as defenses in an enforcement action." Reply Br. at 16 (citing 5 U.S.C. § 703). But the only case it points to in support of this contention—*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1 (2019)—is inapposite. That case looked at whether an aggrieved party may challenge an agency's interpretation of a statute during an enforcement proceeding where a special review act explicitly permitted pre-enforcement review of certain regulations. *Id.* at 13–15 (Kavanaugh, J., concurring in the judgment). Basically, the question was: Does a regulated party have to raise the argument pursuant to the statute's pre-enforcement review provision or forever lose it? That question isn't at issue here—the Department seeks to force the states to *wait* for review in an enforcement proceeding, not to preclude such review. Nor does the Department argue that Title IX explicitly provides for pre-enforcement review of certain regulations, such that general APA review might be precluded.

And, in any event the Court did not answer the question presented in *PDR Network*, instead remanding to the court of appeals to answer two antecedent questions. *Id.* at 2056 (majority opinion). Still, four Justices concurring in the judgment noted that the "key aim" of its "revolution[ary"] decision in *Abbott Labs* "was to expand the opportunities for judicial review by allowing *both* facial, pre-enforcement challenges *and* as-applied challenges to agency action." *Id.* at 2060 (Kavanaugh, J., concurring in the judgment).

Next, the Department argues that eventual de novo review in a federal court—even if only after adverse administrative action—is an adequate remedy. But to support that statement, it only cites cases where a statute provided regulated parties with the ability to initiate administrative proceedings (thereby making administrative review and APA review available concurrently). *See Parke, Davis & Co. v. Califano*, 564 F.2d 1200, 1205–06 (6th Cir. 1977); *Garcia*, 563 F.3d at 521, 523. The Department does not argue that the States have any ability to do that. And for the reasons we articulated above, the States need not wait for the Department to make the first move. All said, Title IX doesn't provide an adequate alternative remedy.

## C.

Our last reviewability question is whether Title IX precludes pre-enforcement challenges to agency action. We find that it does not.

As a general rule, facial pre-enforcement challenges to agency action are permissible absent statutory preclusion of such review. *Abbott Labs*, 387 U.S. at 139–41. Congress may foreclose such review "explicitly" or "implicitly, by specifying a different method to resolve claims about agency action." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). So our primary inquiry is to ask if the statutory scheme displays a "fairly discernible" intent to limit jurisdiction. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 216 (1994).

The Department does not argue that Title IX explicitly specifies a way to resolve the States' suit. By all accounts, Title IX is silent regarding pre-enforcement challenges. So we look to whether Title IX implicitly precludes the States from bringing an APA pre-enforcement challenge. We find that it does not.

"Title IX contains no comprehensive enforcement scheme." *Lillard v. Shelby Cnty. Bd. Of Educ.*, 76 F.3d 716, 723 (6th Cir. 1996). "The statute's only express enforcement mechanism, [20 U.S.C.] § 1682, is an administrative procedure resulting in the withdrawal of federal funding from institutions that are not in compliance." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009). And the Court has previously recognized a private right of action. *See Cannon*, 441 U.S. 677.[22] "These remedies—withdrawal of federal funds and an implied cause of action—stand in stark contrast to the unusually elaborate, carefully tailored, and restrictive enforcement schemes of" other statutes that have been held to impliedly preclude other statutory remedies. *Fitzgerald*, 555 U.S. at 255 (internal quotation marks omitted).

---

[22]We note that *Cannon* has been questioned and criticized, *see, e.g.*, *Franklin*, 503 U.S. at 77–78 (Scalia, J., concurring) (explaining that courts "have abandoned the expansive rights-creating approach exemplified by *Cannon*, and perhaps ought to abandon the notion of implied causes of action entirely" (citations omitted)), but it remains good law.

This brings us to Title IX's judicial review provision.  As we must, we start with the text:

> Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds.  In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

20 U.S.C. § 1683.  Looking at the plain text, it's clear that there is more than one path to some type of judicial review.  The second sentence of § 1683, which provides one avenue to judicial review, says that after an administrative enforcement proceeding strips the recipient of its funding, the recipient can sue under the APA.  *Id.*

The Department argues that this provision bars judicial review of enforcement actions until the enforcement proceeding is complete.  But the text of that provision conflicts with the Department's position because it's phrased in permissive terms.  It says that those aggrieved by an enforcement proceeding "may" sue under the APA.  But it doesn't say that anyone "shall" or "shall not" do anything.  And courts have explained in a similar context that it would be "troublingly counterintuitive to interpret [a statute's] permissive language as eliminating alternative routes to federal court review."  *Cochran v. SEC*, 20 F.4th 194, 201 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023); *see Dorris v. Absher*, 179 F.3d 420, 429 (6th Cir. 1999) ("The use of the term 'may' in a statute is generally construed as permissive rather than as mandatory.").[23]

Contrast the second provision's permissive language with the mandatory language of the first provision of § 1683, which says that agency action taken pursuant to § 1682 "*shall* be subject to such judicial review *as may otherwise be provided by law* for similar action taken by

---

[23]This provision also says APA review is possible for any other action "not otherwise subject to judicial review."  20 U.S.C. § 1683.  The Department does not explain what "not otherwise subject to judicial review" refers to, nor does it argue that it has any particular significance.  It might be a poorly drafted savings clause.  We leave this for another day.

such department or agency on other grounds." 20 U.S.C. § 1683 (emphases added). Put differently, the availability of judicial review is dictated by the type of agency action, and § 1683 doesn't provide an independent bar to review. For example, some courts interpreting an identical judicial review provision in Title VI of the Civil Rights Act of 1964[24] say that the phrase "as may otherwise be provided by law for similar action" can refer to 20 U.S.C. § 1234g.[25] *See, e.g.*, *Freeman v. Cavazos*, 923 F.2d 1434, 1440 (11th Cir. 1991) (finding that 20 U.S.C. § 1234g is "the appropriate judicial review provision[] for the termination order in" a case concerning "agency action terminating federal funding"). Another "provision in law, as specifically identified in the legislative history of [the Civil Rights] Act" is § 702 of the APA. *Adams v. Bell*, 711 F.2d 161, 182 (D.C. Cir. 1983) (Wright, J., dissenting); *Marlow v. U.S. Dep't of Educ.*, 820 F.2d 581, 582 (2d Cir. 1987). All of this suggests to us that § 1683 alone doesn't bar judicial review.

But even if Congress intended § 1683 to strip jurisdiction over some claims, we find that the States' claim is not the type that Congress intended to funnel through § 1683. *See Axon*, 598 U.S. at 188–89. *Thunder Basin* provides three considerations to guide our analysis here. 510 U.S. at 212–13.[26] First, we ask: Will precluding federal court jurisdiction "foreclose all meaningful judicial review" of the claim? *Id.* Next, we ask: Is the claim "wholly collateral to [the] statute's review provisions?" *Id.* at 212 (internal quotation marks omitted). Finally, we

---

[24]Because "Title IX was patterned after Title VI of the Civil Rights Act of 1964," and because "[b]oth statutes provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination," we look to interpretations of Title VI's judicial review provision to guide our discussion here. *See Cannon*, 441 U.S. at 694–96; *see also Fitzgerald*, 555 U.S. at 258 (Congress "passed Title IX with the explicit understanding that it would be interpreted as Title VI was."); *compare* 20 U.S.C. § 1683, *with* 42 U.S.C. § 2000d-2.

[25]20 U.S.C. § 1234g provides for judicial review in the court of appeals of three types of adverse actions: (1) an agency determines that a funding recipient "made an expenditure of funds that is not allowable under [a] grant or cooperative agreement" (§ 1234a); (2) an agency withholds funds from a recipient after finding that it failed to comply with a requirement that applies to it (§ 1234d); or (3) an agency issues a cease and desist order (§ 1234e). Notably, 20 U.S.C. § 1234g doesn't mention review of compliance agreements (§ 1234f)—the most frequent form of agency action in this space. This is because, once the Department commences an investigation, it is statutorily required to seek voluntary compliance at almost every step of the process. 20 U.S.C. § 1682; *see also* 34 C.F.R. § 100.7(d).

[26]We acknowledge that important questions have been raised in the debate over the extent to which the *Thunder Basin* factors are even needed for our inquiry. *See Axon*, 598 U.S. at 205–17 (Gorsuch, J., concurring in the judgment) (criticizing *Thunder Basin* and instead looking to the text of 28 U.S.C. § 1331 to answer jurisdictional questions). But we do not take up those concerns here.

ask: Is the claim "outside the agency's expertise?"  *Id.*  "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit [federal court] jurisdiction.'"  *Axon*, 598 U.S. at 186 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010)).  "[T]he same conclusion might follow if the factors point in different directions," however, because the "ultimate question is how best to understand what Congress has done— whether the statutory review scheme, though exclusive where it applies, reaches the claim in question."  *Id.*[27]

Naturally, we start with the first consideration—whether prohibiting this pre-enforcement action would "foreclose all meaningful judicial review of the claim."  *Id.* (internal quotation marks omitted).  As the Department reads § 1683, the States must lose their federal funding through an enforcement proceeding before bringing any claims to federal court.  But the mechanics of how the Department and OCR (its litigation division) carry out its mandate suggests that their proposal would foreclose all meaningful judicial review of the States' claims.

This is because "not once has the OCR ever cut off funds to enforce Title IX."  R. Shep Melnick, *The Strange Evolution of Title IX*, National Affairs, (Summer 2018).  Instead, matters are resolved "informal[ly]."  34 C.F.R. § 100.7(d)(1).  To illustrate the point, consider the following scenario.  The Department initiates an investigation against a Tennessee school district, where state law requires that participation in athletic activities at public middle schools

---

[27]We also note that this case differs from *Thunder Basin* itself in various ways.  First, the Court in *Thunder Basin* concluded that the statute's "comprehensive enforcement structure, combined with the legislative history's clear concern with channeling and streamlining the enforcement process, establishes a fairly discernible intent to preclude district court review."  510 U.S. at 216 (internal quotation marks omitted).  Here, on the other hand, the text of § 1683 does not come close to establishing a "comprehensive enforcement structure."  Second, *Thunder Basin* addressed a situation in which two inspectors were appointed representatives of the agency to inspect the mine for compliance with the statute.  *Id.* at 203.  After complaining to the agency that the appointment of these representatives violated the company's statutory rights and refusing to provide the inspectors with required information, the company then filed suit in federal court.  *Id.* at 205; *see also Axon*, 598 U.S. at 186–87.  Though the mining company in *Thunder Basin* "sued before a citation was issued," 510 U.S. at 216, agency action had begun in other ways.  Namely, the agency had already taken action when it appointed two representatives to inspect the mine and demanded they be provided with particular information.  *See id.*; *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 7–8 (2012) (holding that plaintiff must first go through administrative review process because the plaintiff was brought before an ALJ, which counted as agency action, prior to plaintiff filing case in federal court).  So in *Thunder Basin* and *Elgin*, it made sense to insist that the parties go through the statutorily prescribed agency review process rather than take a short cut to federal court.  Here, no similar circumstances exist that would make it more efficient for the States to first go through the administrative adjudication process.  To the contrary, a process that requires administrative review first and judicial review second would prove costly and dilatory for all parties involved.

and high schools "must be determined by the student's sex at the time of the student's birth." Tenn. Code Ann. § 49-6-310(a).  A lengthy investigation ensues.  The Department finds that a Tennessee school district is out of compliance and then seeks voluntary compliance, as it must before it goes any further.  20 U.S.C. § 1682.  Both parties are incentivized (one by statute and regulation, the other by practical realities, costs, and the threat of enforcement action) to resolve the matter informally.  In fact, these matters "will be resolved by informal means whenever possible." *See* 34 C.F.R. § 100.7(d)(1).

The point is that investigations, informal coercion, and compliance agreements are where Title IX is "litigated."  And the Department doesn't contend that matters resolved "informally" are subject to any sort of judicial review.  *Cf. Sackett v. EPA*, 566 U.S. 120, 130–31 (2012) ("There is no reason to think that the Clean Water Act was uniquely designed to enable the strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review.").

Even so, the Department in effect proposes that the States invite enforcement proceedings—and risk the loss of federal funding—perhaps by ignoring requests to examine their records, policies, and procedures during an investigation or compliance review, or negotiating in bad faith.  But "we normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law."  *Free Enter. Fund*, 561 U.S. at 490 (cleaned up).

Simply put, this isn't a case where the States "can be injured" from the Documents "only in the course of being the subject of an enforcement proceeding."  *Polyweave Packaging, Inc. v. Buttigieg*, 51 F.4th 675, 683 (6th Cir. 2022).  This is a "here-and-now injury" where the States' injury as alleged has immediate effects on the States' ordering of their own affairs.  *Axon*, 598 U.S. at 191; *see also Romeo Cmty. Schs. v. U.S. Dept. of Health, Educ., and Welfare*, 438 F. Supp. 1021, 1028 (E.D. Mich. 1977).  And the upshot of winning this claim is that the States shouldn't be subjected to administrative investigations or proceedings at all.  A later court-of-appeals decision could not fully remedy that harm.  *See Axon*, 598 U.S. at 194.

That brings us to the second question—are the States' claims wholly collateral?  The answer: Yes, for similar reasons to those just articulated.  Important here, the "collateral" inquiry, as "*Free Enterprise Fund* recognized, requires considering the nature of the claim, not the status (pending or not) of an agency proceeding." *Axon*, 598 U.S. at 194.  The States "are challenging the [Department's] power to proceed at all, rather than actions taken in the agency proceedings." *Id.* at 192; *see Heckler v. Ringer*, 466 U.S. 602, 614 (1984); *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 564 (D.C. Cir. 2023).  At bottom, the States are seeking notice and an opportunity to comment.  If the States' notice-and-comment claim succeeds, the agency action must be "set aside."  5 U.S.C. § 706.[28]  All other claims the States include in their complaint are alternatives if their notice-and-comment claim fails (and the Department explicitly asks us not to consider them).

And finally, this claim is "outside the [Department's] expertise." *Thunder Basin*, 510 U.S. at 212.  The States raise a "standard question[] of administrative law"—whether notice-and-comment rulemaking was required—a question wholly separate from "technical considerations of agency policy." *Free Enter. Fund*, 561 U.S. at 491 (quoting *Johnson v. Robison*, 415 U.S. 361, 373 (1974); *Axon*, 598 U.S. at 194.  Moreover, the Department puts forth no evidence of its expertise in administrative law.  Though the Department "knows a good deal about [education] policy," it is "ill suited to address" complicated administrative law questions. *Axon*, 598 U.S. at 194–95.

To sum it up, the States' claims are reviewable.  We are reviewing final agency action where there is no other adequate remedy at law, and Title IX does not preclude this APA pre-enforcement suit.

---

[28]Our cases demonstrate that this is our ordinary remedial practice in successful notice-and-comment challenges. *E.g.*, *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1148 (6th Cir. 2022) ("Because the IRS's [challenged Notice] did not satisfy the notice-and-comment procedures for promulgating legislative rules under the APA, we must set it aside.").  We recognize the question regarding whether the APA's "set aside" provision authorizes a federal court to order universal vacatur of agency action. *See, e.g.*, *United States v. Texas*, 599 U.S. at 693–703 (Gorsuch, J., concurring).  But we have no occasion to take up that question here.

## IV.

We must now decide whether the district court properly granted the preliminary injunction. In deciding whether to grant a preliminary injunction, we ask the following questions: (1) Has the plaintiff established "that he is likely to succeed on the merits?" (2) Would the plaintiff likely "suffer irreparable harm in the absence of preliminary relief?" (3) Does the "balance of equities tip[] in his favor?" And (4) does "the public interest" favor an injunction? *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "We review the district court's ultimate decision whether to grant a preliminary injunction for abuse of discretion, and we evaluate its legal determinations, including the likelihood of success on the merits, with fresh eyes," i.e., de novo. *Arizona*, 40 F.4th at 381 (internal quotation marks omitted).

### A.

We start with the first question. Are the States likely to succeed on their claim that the issuance of the Documents violated the APA? We think so.

The APA divides agency action, as relevant here, into three boxes: legislative rules, interpretive rules, and general statements of policy. This distinction matters. Legislative rules have the force and effect of law and are subject to notice and comment. That means that an agency must publish a notice about the proposed rule, allow the public to comment on the rule, consider the comments, and issue a final rule setting forth the basis and purpose of the rule. *See* 5 U.S.C. § 553(b)–(c). These procedural requirements do not apply to interpretive rules or general statements of policy. *See id.* § 553(b)(A).

The Documents did not go through notice and comment. So if the Documents are legislative rules, the Department has not exercised its authority in a procedurally proper way, and a court must set aside the Documents. *Id.* § 706(2)(D).[29] This means that we must determine the nature of the Department's action: Is it a legislative rule? Or an interpretive rule?[30]

---

[29] We note that beyond the procedural requirements of the APA, the Department's own interim final regulations required a period of public notice and comment for "[s]ignificant guidance documents"—guidance documents "that may reasonably be anticipated to" "[r]aise novel, legal, or policy issues arising out of legal

This inquiry is familiar but abstruse.  "Interpretive rule" is not defined by the APA, "and its precise meaning is the source of much scholarly and judicial debate."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).  We do know that "the critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'"  *Id.* at 97 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).  Interpretive rules "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely track preexisting requirements and explain something the statute or regulation already required."  *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (cleaned up).  In short, they do not have the force and effect of law.

Legislative rules, on the other hand, do.  They "impose new rights or duties and change the legal status of regulated parties."  *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022).  We ask: Does the new rule "effect[] a substantive regulatory change to the statutory or regulatory regime?"  *Mendoza*, 754 F.3d at 1021 (internal quotation marks omitted).  And "[w]hen rulemaking carries out an express delegation of authority from Congress to an agency, it usually leads to legislative rules."  *Mann Constr.*, 27 F.4th at 1143.  Distinguishing between legislative and interpretive rules is an "extraordinarily case-specific endeavor."  *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987).

For at least three reasons, the States are likely to succeed on their claim that the Documents amount to a legislative rule and therefore must be set aside.

---

mandates."  Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597-01, 62608 (effective Nov. 4, 2020).  The Department rescinded those interim final regulations effective September 29, 2021, but that was after the Department issued the Documents challenged in this case.  Rulemaking and Guidance Procedures, 86 Fed. Reg. 53863-02.  The States do not raise this point, however, so we don't address it further.

**30**Recall that we determined that the Documents are binding on the Department because it withdrew its previously held discretion to enforce Title IX consistent with a view that its anti-discrimination mandate does *not* include sexual orientation and gender identity.  This means the Documents cannot amount to a policy statement because statements of policy are, "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a *discretionary* power."  *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (emphasis added and internal quotation marks omitted); *see Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023); *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1111 (D.C. Cir. 1993) (explaining that the inquiry of whether a rule "restrict[s] agency discretion" is helpful in determining whether a rule is interpretive or a policy statement, but "restricting discretion tells one little about whether a rule is interpretive").  So here we will determine whether the Documents are an interpretive rule or a legislative rule.

First, the Documents carry out an express delegation of authority from Congress. The law at issue tells education institutions that "[n]o person . . . shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). And the Department is "authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability." *Id.* § 1682.

The "express statutory means of enforcement" of this general prohibition "is administrative." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280 (1998). "The statute directs federal agencies that distribute education funding to establish requirements to effectuate the nondiscrimination mandate." *Id.* (citing § 1682). And "[w]hen rulemaking carries out an express delegation of authority from Congress to an agency, it usually leads to legislative rules." *Mann Constr.*, 27 F.4th at 1143; *see Mendoza*, 754 F.3d at 1021 (finding a rule is legislative when the statutory language "establishes the [Act's] general mission; Congress left it to the [agency] to implement that mission through the creation of specific substantive provisions").

That brings us to our second point: the Documents impose new duties on the States. Put another way, "the disputed rule really adds content to the governing legal norms." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 96 (D.C. Cir. 1997). "Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered." *Jackson*, 544 U.S. at 175.

And here, the Department says: "Public elementary and secondary schools, as well as public and private colleges and universities, have a *responsibility to investigate* and address sex discrimination, including sexual harassment, against students because of their perceived or actual sexual orientation or gender identity." *Fact Sheet*, *supra* (emphasis added). "When schools fail to respond appropriately, [the Department] can help by enforcing federal laws that protect students from discrimination. . . . OCR can also provide information to assist schools in meeting their *legal obligations*." *Id.* (emphasis added).

Prior to the Documents, the States had no obligation to investigate these claims. According to the Department, they now do. And, the States say, this in turn obligates them to

stop the enforcement of their own contrary laws and policies.  Failure to comply comes with the risk of penalties, i.e., loss of funding, 20 U.S.C. § 1682, which is "characteristic[] of legislative rules," *Mann Constr.*, 27 F.4th at 1143.  In short, by changing the means of compliance with Title IX, the Documents affected the stringency of Title IX itself.  The Documents extend Title IX's protections to new forms of sex discrimination, obligating the States to act or face repercussions.

The third reason that the Documents are likely legislative pertains specifically to the Fact Sheet.  As we've mentioned, the Fact Sheet lists five types of investigations Education can initiate in accordance with the Documents.  One scenario includes:

> On her way to the girls' restroom, a transgender high school girl is stopped by the principal who bars her entry.  The principal tells the student to use the boys' restroom or nurse's office because her school records identify her as "male."  Later, the student joins her friends to try out for the girls' cheerleading team and the coach turns her away from tryouts solely because she is transgender.  When the student complains, the principal tells her "those are the district's policies."

*Fact Sheet*, *supra*.  This conflicts with the Department's current regulations on access to school facilities and athletics programs, which, on our read, permit schools to issue rules and policies in accordance with one's biological sex without accommodating gender identity.  The relevant regulation says: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of *one sex* shall be comparable to such facilities provided for students of *the other sex*."  34 C.F.R. § 106.33 (emphases added).  And "a recipient may operate or sponsor separate teams for members of *each sex* where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* § 106.41(b) (emphasis added).

Without deciding any substantive merits questions, and applying any number of interpretive canons, we can all agree that phrases such as "one sex," "the other sex," and "each sex" could refer to biological sex.  *See, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69, 78, 170 (2012) (describing the ordinary-meaning canon, fixed-meaning canon, and presumption of consistent usage canon, respectively).  And, at times, this has been the Department's position.  *See* Nondiscrimination on the Basis of Sex in Education

Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30178 (May 19, 2020). ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations . . . reflect this presupposition.").

"Because interpretive rules cannot effect a substantive change in the regulations, a rule that adopts a new position inconsistent with any of the [agency's] existing regulations is necessarily legislative." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (cleaned up).[31] Basically, the regulations permit, but do not require, aid recipients to organize their athletics programs and facilities by biological sex. Schools could, for example, choose coeducational teams and facilities. It follows that they could also separate programs and facilities by gender identity. No one disputes that athletics programs solely used biological sex as a classification method for decades—an approach authorized by existing Title IX regulations. *See* 34 C.F.R. § 106.41(b). Yet the Fact Sheet makes clear that aid recipients must not organize their athletics programs and facilities exclusively by biological sex. *Fact Sheet*, *supra* (noting that the Department can initiate an investigation if "the district's policies" do not allow for a biological male "to try out for the girls' cheerleading team" or enter "the girls' restroom"). Having permitted funding recipients to organize their athletics programs and facilities exclusively by biological sex, the Department cannot now narrow the regulation's classification methods through an interpretive rule. *See Tenn Hosp.*, 908 F.3d at 1043; *Flight Training*, 58 F.4th at 244 (finding that a rule is legislative where it requires less than the regulations currently in place); *see generally Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc) (noting differences between gender identity and biological sex).

---

[31]This finding is not in conflict with *Perez v. Mortgage Bankers Association*, which dealt specifically with the now-defunct *Paralyzed-Veterans* doctrine. 575 U.S. at 95 (holding that *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), is not consistent with the APA). That doctrine involved a different question: When an agency changes its interpretation of one of the regulations that it enforces, does that interpretation need to go through notice and comment? *Id.* at 102. *Perez* said no. *Id.* Put another way, when an agency has issued an interpretive rule on a regulation and then a different interpretive rule later, the second interpretation doesn't need to go through notice and comment solely because it conflicts with the first one. *See id.* at 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

The Department "seemed to recognize" that modification of its current regulations through notice-and-comment rulemaking was needed to effectuate its new reading of Title IX. *Tenn. Hosp.*, 908 F.3d at 1045.  Shortly before the district court issued a preliminary injunction in this case, the Department issued a proposed rule that, among other things, codifies: "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." Nondiscrimination on the Basis of Sex in Education, 87 Fed. Reg. at 41571.  And last year, it released a Notice of Proposed Rulemaking claiming sexual orientation and gender identity fit within the Title IX scheme in the athletics space.  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22860 (April 13, 2023). The Department proposes to prevent categorical bans on transgender athletes participating on sports teams in alignment with their gender identities.  *See id.*; U.S. Dep't of Educ., *Fact Sheet: U.S. Department of Education's Proposed Change to its Title IX Regulations on Students' Eligibility for Athletic Teams* (April 6, 2023),  https://www.ed.gov/news/press-releases/fact-sheet -us-department-educations-proposed-change-its-title-ix-regulations-students-eligibility-athletic- teams. This move on behalf of the Department "weigh[s] in favor" of finding that the interpretation is legislative.  *Tenn. Hosp.*, 908 F.3d at 1045.

In response to all this, the Department asserts that the Documents simply represent its "understanding of the longstanding sex discrimination prohibitions contained in [Title IX] and are merely intended to advise the public of the agency's construction of the statutes and rules which it administers."  Appellants Br. at 49 (internal quotation marks omitted).  But the Department doesn't provide any support for the position that its understanding of Title IX is "longstanding."   And it can't be that the Documents "convey[]" the Department's "understanding" that discrimination based on sexual orientation and gender identity "have always been" prohibited forms of sex discrimination under Title IX.  *Guedes v. ATF*, 920 F.3d 1, 19 (D.C. Cir. 2019).

To our understanding, the first time the Department articulated a stance like the one expressed in the Documents was in 2016.  *Dear Colleague Letter on Title IX and Transgender*

*Students* (May 13, 2016) (rescinded in 2017).  Even if the Department had maintained consistent views on the issue since 2016, we're skeptical that a position held for that amount of time would be considered "longstanding."  *Rhea Lana*, 824 F.3d at 1028; *see id.* at 1025 ("The Department of Labor has for several decades read the Fair Labor Standards Act to prohibit for-profit, private-sector entities from using volunteer workers.").  And, in any event, the view hasn't been consistent.  *See Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (relying on the fact that a rule "simply restated the consistent practice of the agency"); *see, e.g.*, Nondiscrimination on the Basis of Sex in Education (2020), 85 Fed. Reg. at 30178 ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations . . . reflect this presupposition."); Sexual Harassment Guidance, 62 Fed. Reg. at 12039 ("Title IX does not prohibit discrimination on the basis of sexual orientation.").  It can't be that sexual orientation and gender identity have always been protected given the clear evidence of prior contrary agency positions.

What's more, the position that Title IX has always prohibited discrimination on the basis of sexual orientation and gender identity conflicts with the Department's view espoused in the Documents.  The Documents purport "to clarify the Department's enforcement authority . . . in light of the Supreme Court's decision in *Bostock*," published just a few years ago.  Enforcement of Title IX, 86 Fed. Reg. at 32637.  In other words, according to the Department, *Bostock* provided the legal grounding to extend an interpretation of a similar phrase in Title VII to Title IX.[32]  According to the Department, however, it can proceed to enforce its view of Title IX in the absence of the Documents, and this suggests the Documents are merely interpretive.  Title IX, the Department says, would be the basis for any enforcement action, not the Documents.

Two responses.  First, the Department seems to suggest that it exercised enforcement discretion by not asserting authority over the States in the past and is therefore simply reversing that discretionary decision.  But that is just another way of saying that the Documents amount to a mere policy statement.  We've already determined that the Documents aren't policy statements because they bind the Department to a position that the States have an obligation to investigate

---

[32]To be clear, today we are not speaking to the validity of any arguments, raised below and on which the district court did not opine, that the Documents violate the Spending Clause.  *See, e.g.*, *Jackson*, 544 U.S. at 181–84.

sexual orientation and gender identity discrimination claims and to provide certain accommodations—all because Title IX now prohibits discrimination on the basis of such traits. *See Syncor*, 127 F.3d at 96.

Second, if this were all it took, we wouldn't have cases like *Mann Construction*. There, a statutory provision permitted the IRS to penalize the failure to provide information concerning "listed transactions." 27 F.4th at 1142. The IRS issued a notice that "designate[d] certain employee-benefit plans . . . as listed transactions." *Id.* After the IRS enforced its rule against a taxpayer, it too could have said that, in some sense, the *statute*, not the *notice* was the authority for the enforcement action. Yet we found that the notice was a legislative rule that had impermissibly "skipp[ed] the notice-and-comment process." *Id.* at 1141. So we don't find this argument convincing.

One final note. Recognizing new forms of discrimination "substantially changes the experience" for all regulated entities, in terms of how to carry out their obligations, and for all the beneficiaries of Title IX—including biological women. *See Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011). It seems to us that such "sweeping policy initiatives" are not what courts have in mind when they say that "agencies need not address every conceivable question that could arise in a regulatory scheme through notice-and-comment rulemaking." *Tenn. Hosp.*, 908 F.3d at 1046 (internal quotation marks omitted).**33**

For these reasons, we believe the States are likely to succeed in their claim that the Documents amount to a legislative rule and therefore should be set aside.

---

**33**Taking a step back and considering our Constitution's first principles, it becomes clear why sweeping new rules promulgated under the language of "discrimination on the basis of sex" are properly considered legislative rather than interpretive. The Founders understood legislative power to be the ability to promulgate generally applicable rules governing private conduct. *See Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 70 (2015) (Thomas, J., concurring in the judgment) ("Under the original understanding of the Constitution," the "formulation of generally applicable rules of private conduct" "requires the exercise of legislative power."); *Gundy v. United States*, 588 U.S. 128, 153 (2019) (Gorsuch, J., dissenting) ("When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons."); *see West Virginia*, 597 U.S. at 738 (Gorsuch, J., concurring) ("The framers believed that the power to make new laws regulating private conduct was a grave one that could, if not properly checked, pose a serious threat to individual liberty."). When agencies create new rules that bear on private individuals' and entities' legal rights and obligations, therefore, they are exercising a power that is unquestionably legislative by nature.

## B.

We next ask whether the States are "likely to suffer irreparable harm in the absence of preliminary relief." *Platt v. Bd. of Comm'rs on Grievances & Discipline*, 769 F.3d 447, 453 (6th Cir. 2014). They are. Absent an injunction, the States will be forced to comply with the Department's new regulations, contrary to their own policies. And they are "likely to incur unrecoverable compliance costs in the absence of a preliminary injunction," and the federal government's "sovereign immunity typically makes" such losses irreparable. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Moreover, the States with conflicting laws will be hampered in their ability to enforce their laws, and the States will continue to face pressure to change their laws to avoid legal consequences. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."); *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012))). "[I]nvasions of state sovereignty . . . likely cannot be economically quantified, and thus cannot be monetarily redressed," and as such constitute irreparable harm. *Kentucky v. Biden*, 23 F.4th at 611 n.19. Thus, the second factor favors a preliminary injunction.

## C.

The last two factors—the harm to the opposing party and the public's interest—"merge" because the "Government is the opposing party" in this case. *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). On the one hand, a preliminary injunction would prevent the Department from fully enforcing the Documents, which, on the Department's view, properly implement Title IX. But "the public's *true* interest lies in the correct application of the law." *Kentucky v. Biden*, 23 F.4th at 612 (emphasis added). And here, the States have shown that the Documents are likely procedurally invalid. As a result, all factors support the issuance of a preliminary injunction.

## D.

In response, the Department argues that even if all four factors support a preliminary injunction, the injunction is too broad. Not so.

To be sure, "federal courts should not issue relief that extends further than necessary to remedy" plaintiffs' injuries. *Kentucky v. Biden*, 57 F.4th at 556–57. In similar pre-enforcement challenges to federal regulations, we have expressed concern over "nationwide injunctions," which "seem to take the judicial power beyond its traditionally understood uses" by "permitting district courts to order the government to act or refrain from acting toward nonparties." *Arizona v. Biden*, 31 F.4th at 483–84 (Sutton, C.J., concurring). And we have indicated that even "geographically limited" injunctions extending to non-parties raise "substantial questions about federal courts' constitutional and equitable powers." *Kentucky v. Biden*, 57 F.4th at 556–57.

But rather than granting a nationwide injunction, the district court here issued relief limited to only the Plaintiff States. And *each* of the twenty plaintiff states has shown a substantial likelihood that it has standing under both a proprietary and a procedural-rights theory, as explained above. So the preliminary injunction is "no more burdensome to the defendant than necessary" to prevent the irreparable harm identified. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Kentucky v. Biden,* 57 F. 4th at 557.

Nonetheless, the Department claims that the district court abused its discretion because, for some states, the law of the relevant circuit indicates that discrimination based on gender identity or sexual orientation is unlawful sex discrimination. But the cases that the Department says conflict with the preliminary injunction don't. Some deal exclusively with Title VII, not Title IX, even before *Bostock*. *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock*, 590 U.S. at 683; *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004). Another does not answer the merits question because it was in an early stage of litigation. *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221–22 (6th Cir. 2016) (not determining the merits of the issue presented). Most importantly, none deal with the Department's Documents here. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 (4th Cir. 2020) ("[A]pplication of [a] restroom policy against [a student with gender dysphoria] violated Title

IX."); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (finding a probability of success on the merits of a gender identity Title IX claim), *abrogated on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020).

Yes, courts ordinarily should "not award injunctive relief that would cause substantial interference with another court's sovereignty." *United States v. AMC Ent., Inc.*, 549 F.3d 760, 770 (9th Cir. 2008) (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952)). But here, as the States point out, "*this* preliminary injunction turns on whether the challenged documents complied with the APA." States Br. at 52. For that reason, a preliminary injunction here doesn't step on the toes of another court. Saying that the Documents aren't procedurally valid does not "negate" any out-of-circuit precedent. *AMC Ent.*, 549 F.3d at 773. Indeed, the precedent remains in effect. And no "conflicting order[]" has been issued. *Feller v. Brock*, 802 F.3d 722, 728 (4th Cir. 1986).

As of now, no court has ruled on the lawfulness of the Documents—not even the district court below because we are in the preliminary-injunction phase. So there is no conflict with another court's jurisdiction.

**V.**

For the reasons above, we AFFIRM.

————————————

## DISSENT

————————————

BOGGS, Circuit Judge, dissenting.   I would vacate the preliminary injunction and dismiss this case for lack of standing.   In my view, the Interpretation, "Dear Educator" Letter, and Fact Sheet (collectively, "the Documents") are interpretative rules or policy statements, which are generally not final for purposes of judicial review under the Administrative Procedure Act.[1]   *See* 5 U.S.C. § 704.   Legislative rules, to which the APA's notice-and-comment provisions apply, have the "force and effect of law"; interpretative actions, to which those provisions do not apply, have no such force and effect and are thus not subject to judicial review.   *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015)).   Distinguishing between the two is often difficult, but some guideposts help.   Legislative rules impose new rights or obligations on regulated parties, while interpretative rules "articulate what an agency thinks a statute means."   *Ibid.*   Legislative rules, then, bind agencies by stripping them of their decision-making discretion, while interpretations are mere "clarifying documents" that "bind[] no one."   *Valero Energy Corp. v. EPA*, 927 F.3d 532, 537–38 (D.C. Cir. 2019).   The Documents here are paradigmatic interpretations.   Exactly as expected, they articulate what the Department thinks Title IX means.   They do not create legal obligations or bind the Department to the position that any particular conduct constitutes discrimination on the basis of sexual orientation or gender identity.

Conditional phrases like "depending on the facts" and non-exhaustive lists of "examples" are "telltale signs . . . of a nonbinding policy statement, not of reviewable agency action."   *Arizona v. Biden*, 40 F.4th 375, 387–88 (6th Cir. 2022).   And the Documents are chock full of

---

[1]There is some debate in the courts as to whether finality or reviewability, as a formal matter, is distinct from the question of an action's interpretative or legislative nature.   Decades of administrative law, however, make clear that the characteristics that make something an interpretative rule are the same characteristics that make that rule non-final (and thus unreviewable) under the APA.   *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (final actions are ones "by which rights or obligations have been determined, or from which legal consequences will flow"); *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("'Interpretative rules' that do not establish a binding norm are not subject to judicial review under the APA."); *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) (recognizing relationship between finality and legislative rules).

this type of language.  When a complaint meets the requirements described in the Interpretation, the Documents do not require the Department to punish an educational entity.  Rather, the Department will at most "open an investigation."  Interpretation, 86 Fed. Reg. 32637, 32639 (June 22, 2021).  Likewise, the Interpretation "does not determine the outcome of any particular case or set of facts."  *Ibid.*  It only "guide[s]" the Department.  *Ibid.*  For each complaint, the Department will address "the specific compliance concerns."  *Ibid.*  And the Fact Sheet provides only "[e]xamples of the kinds of incidents [the Department] can investigate."  Fact Sheet, p. 1. The Documents take no position on how to identify a student's gender identity or whether any specific conduct alleged in a complaint in fact violates Title IX.  Thus, not only do the Documents preserve the discretion of Department staff to determine whether any conduct alleged in any complaint violates Title IX, but they also preserve the Department's discretion to investigate conduct at all.  The Department is not, as with Ulysses binding himself to the mast to resist the call of the Sirens, *dictating* to itself the action it must take whenever a particular type of complaint comes in.

In this important respect, the Documents differ from the agency actions considered in *Kentucky v. Biden*, 23 F.4th 585, 594–95 (6th Cir. 2022), and *Biden v. Nebraska*, 143 S. Ct. 2355, 2366–67 (2023), upon which the majority relies to craft its "proprietary-interest theory" of state standing.  In *Kentucky*, we held that states had standing to challenge federal guidance "*mandating* that the employees of federal contractors . . . become fully vaccinated against COVID-19."  23 F.4th at 589 (emphasis added).  If an employee was working in a "covered contract," the guidance *required* that employee to be vaccinated against COVID-19.  *Ibid.* Similarly, in *Nebraska*, the Supreme Court entertained a challenge by several states to the Secretary of Education's student-loan-forgiveness plan.  143 S. Ct. at 2362.  The Secretary's plan identified specific and quantifiable requirements for qualifying loans—"[f]or borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education *will* discharge the balance of those loans in an amount up to $10,000 per borrower."  *Id.* at 2365 (emphasis added).  Unlike the Documents at issue here, these actions involved no exercise of discretion by agency staff.  If an employee was covered, she was required to get a vaccine.  If a borrower had eligible federal loans, the Department would discharge up to $10,000 of his loan balance.  Here, though, the Department must still decide

whether each filed complaint warrants an investigation and, ultimately, whether any complained-of action constitutes sex discrimination. This obligation is based on Title IX alone, which requires the Department to investigate claims of sex discrimination. The Documents explain to the public that the Department believes that the sex discrimination prohibited by Title IX includes discrimination based on sexual orientation or gender identity. And they do so at a high level of generality. The Documents do not answer, for example, the most prominent question in public discourse concerning this subject: whether separating athletic teams and events by biological sex constitutes discrimination based on gender identity.

In *School of the Ozarks v. Biden*, the Eighth Circuit followed a similar rationale to hold that a college did not have standing to challenge a memorandum by the Department of Housing and Urban Development that directed the Department's Office of Fair Housing and Equal Opportunity to "accept for filing and investigate all complaints of sex discrimination, including discrimination because of gender identity or sexual orientation." 41 F.4th 992, 996 (8th Cir. 2022). The *Ozarks* court reasoned that an injunction against the memorandum "would not stop the Department from investigating all complaints of sex discrimination . . . including complaints of discrimination because of gender identity or sexual orientation" because the agency was still required by statute to investigate sex-discrimination claims. *Id.* at 1001. The memorandum merely defined what the agency believed to be sex discrimination. The agency could easily hold that same belief regardless of whether it circulated the memorandum to its staff. *Ibid.* The same is true here. With or without the Documents, the Department can investigate, for example, a complaint alleging that a school prevented a biologically male, transgender, high-school student from using the girls' restroom or allowed students to harass their gay or transgender peers.

The majority finds *School of the Ozarks* "questionable," but I do not understand why. True, *Ozarks* concerned an internal agency memorandum, but there is no rule that an agency's statements are mere interpretations of a statute only if they are not made public. To the contrary, regulated entities and the public alike benefit when an agency announces how it interprets and intends to enforce a statute. *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 167 (7th Cir. 1996). I disagree that it is "not at all clear in this case" that "the agency could still get to the same outcome by interpreting the underlying statute in a way that tracks the documents." *Ante* at 11

n.10.  It seems perfectly clear that it could do so because the Documents only do what agency staff do on a case-by-case basis—authorize a particular investigation and potentially support a finding of sanctionable conduct.

Even so, the majority asserts that the Documents are binding because "the Department leaves itself no room to take the position that Title IX *does not* prohibit discrimination based on sexual orientation or gender identity." *Ante* at 22.  But even if that were true, the Department still must determine what constitutes this discrimination.  The Documents do not establish that any specific conduct constitutes discrimination based on sexual orientation or gender identity. Even the specific incidents described in the Fact Sheet are only "[e]xamples of the kinds of the incidents [the Department] *can investigate.*"  Fact Sheet, p. 1 (emphasis added).  They are not examples of incidents that the Department *will* investigate, nor of incidents that necessarily violate Title IX.  As with all Title IX complaints, the Department remains free to decide both whether to investigate an incident and, if it does, whether the incident violates Title IX's prohibition on sex discrimination.  The Documents rather explain what the Department thinks, at a high level of generality, such discrimination includes.

In particular, the Documents say nothing about the most contested and controversial aspect of what is phrased as "gender identity" or "transgender status."  Thus, in adding these categories to standard harassment analysis "on the basis of sex," it is fairly easy to see how the perception of these statuses would work out.  Consider the classic high-school harassment activity of stuffing the victim in their locker.  *See, e.g.*, Lean on Me (Norman Twain Productions 1989).  In many circumstances, if this is done to females but not to males who are similarly perceived as "dweebs" or members of the chess club, this would be actionable student-on-student harassment.  *See, e.g.*, *S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 714 (6th Cir. 2023) (explaining that, under Title IX, schools may be liable for "deliberate indifference" to student-on-student harassment committed "under the school's disciplinary authority").  And thus if similar treatment is meted out because a person is perceived as gay or transgender, the application of the statute and regulations might be clear (and the plaintiffs, from their filings and arguments, do not seem concerned about being subject to this type of investigation).

However, in the most controversial and fraught areas of access to sex-separated private spaces and athletic teams (which are explicitly permitted under 20 U.S.C. § 1686 and 34 C.F.R. § 106.41(b)), the application is much less clear.  At oral argument, I asked the lawyer for the Department if the Documents contained any definition of "transgender" or "gender identity," or if an application of the status "transgender" might require a line-drawing exercise along a continuum.  The counsel readily agreed that the Documents do not address this matter.  *See* Tr. of Oral Argument at p. 8, ll. 10–24 ("Not reflected in these documents, Your Honor.  These documents don't speak to it.").

Thus, one could come up with a typology of steps in a "transition" that we have no idea of when or how the Department might deal with.  For example:

- A simple declaration of transgender status, perhaps by a change of name or demand for grammatical adjustment.[2]
- Modest changes in appearance, as by clothing choices and other cosmetic (either by definition or by adjustment of substances to alter appearance) choices.
- Application or adjustment of hormones or other drugs that might alter a person's manner of presentation.
- Physical and surgical alterations, such as castration or mastectomy.
- Surgical alterations or implementations to resemble the genitals of a different sex.

All of these could be seen as simply a variety of methods of changing, in greater or lesser degree, the way in which human beings, whether biologically male or female, choose to "present" themselves in personal interaction or general society.  *See generally* Erving Goffman, The Presentation of Self in Everyday Life (1959).  The degree to which a state needs to adjust to or fear departmental policy is not clear, as would also be the case in the absence of the Documents.

---

[2]Even a name change might not be necessary.  In the classic *Saturday Night Live* sketches, Julia Sweeney played an androgynous person named Pat whose interactions often left other people unsure of Pat's biological sex or gender identity.  *See, e.g.*, *Saturday Night Live: Pat at the Office* (NBC television broadcast Dec. 1, 1990).  Another example comes in the context of the Social Security Administration's name roles, where names like Kris (50% female), Carey (48% female), Riley (49% female), and Emerson (47% female) might provide little insight to whether a person conforms to conventional sex or gender clues.  *See* Soc. Sec. Admin., *National Name Data*, https://www.ssa.gov/oact/babynames/names.zip; Andrew Flowers, "The Most Common Unisex Names in America," FiveThirtyEight (June 10, 2015, 9:16 AM), https://fivethirtyeight.com/features/there-are-922-unisex-names-in-america-is-yours-one-of-them.

I agree that the Documents are intended to have *in terrorem* effect on states and school districts such as the plaintiffs.  They clearly can be interpreted as desiring a change in voluntary policies by recipients of federal funding.  However, the same could be said of a major Presidential address or a Secretarial campaign targeting the States with speeches and public statements.

In order to actually have operational consequences beyond those stemming from the statute itself, what would be needed are specific regulations, promulgated after notice and comment.  And this is in fact what the Department has done to some extent, in regulations finalized recently.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474 (Apr. 29, 2024). Interestingly, these regulations, not directly at issue here, though they well may be the subject of separate litigation, do not directly address the controversial areas above.

To be blunt, the issue that will need to be decided at some point in other venues and litigation is whether it is "discrimination" to treat people who have XY chromosomes, who have a penis or once had a penis, or who can or once could produce sperm, just the same as one treats all others in those categories, or whether it is instead "discrimination" to treat the very same people the same way, or to refuse to treat the very same people differently, if they choose to declare or present at some point along the possible continuum laid out above.[3]

The Documents, which again only explain the Department's interpretation at a high level of generality, do not answer this core question or many others.  To hold, as the majority does, that such interpretative actions "legally bind an agency" implies that a person alleging discrimination based on sexual orientation or gender identity would be entitled to sue the Department if it or a defendant did *not* investigate that person's complaint.  And this cannot be reconciled with the core principle of administrative law that "enforcement priorities are 'committed to agency discretion by law.'"  *Arizona*, 40 F.4th at 389 (quoting 5 U.S.C. § 701(a)(2)).  The Documents are only an explanation that the Department will enforce Title IX

---

[3]Or, of course, the same applies to equal treatment of people with XX chromosomes, people who have or once had vaginas, or can or once could produce human ova.

to prohibit discrimination based on sexual orientation and gender identity, without binding itself to what actions will be found to constitute that discrimination.

The majority makes several potentially extravagant claims.  It states that "winning" this litigation means "that the States shouldn't be subjected to administrative investigations or proceedings at all."  *Ante* at 32.  Does this mean that injunctive relief is available against any investigation into any complaint that even mentions sexual orientation or gender identity?  It concludes that the Documents—which only discuss when the Department might investigate a complaint—"legally bind" the Department.  *Ante* at 22.  Does this mean that if the injunction below is reversed, a student could sue the Department if it does not investigate the student's complaint?  That seems an extravagant proposition—but a necessary implication of the majority's position.

The majority also claims that the inquiry into whether a rule is binding is actually not "helpful" to determine whether the rule is interpretative or legislative.  *Ante* at 35 n.30 (citing *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1111 (D.C. Cir. 1993)).  This is a puzzling assertion. Whether a rule is binding is a key inquiry.  *See, e.g.*, *Perez*, 575 U.S. at 97 ("Interpretative rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995))); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) ("An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule. . . . [A]n agency action that merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties, is an interpretive rule."); *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (interpretative rules "do not establish a binding norm").

In any event, the Department can easily take the position that "Title IX *does not* prohibit discrimination based on sexual orientation or gender identity," *ante* at 22—or interpret that discrimination in a different way—by simply rescinding the Documents.  *See Perez*, 575 U.S. at 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretative rule, it is also not required to use those procedures when it amends or repeals that interpretative rule.").  Indeed, the Trump Administration did exactly that in 2017 when it issued,

without notice and comment, a "Dear Colleague" letter withdrawing what it called "statements of policy and guidance" that interpreted 34 C.F.R. § 106.33 to "require access to sex-segregated facilities based on gender identity." *See* Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter* (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.  And there has been no argument that this letter or its subsequent recission required notice-and-comment procedures.

To be sure, this rescission is not at issue here.  But as the majority correctly points out, we can "look to surrounding context—for example, how an agency has made use of the action or what it has said about it."  *Ante* at 22.  And this history suggests that the Department has consistently considered itself free to rescind actions such as the Documents at any point without warning or notice-and-comment procedures.  In that sense, these Documents are no different than a speech given by the Secretary or the President, announcing that henceforth the Department will take a particular litigating position in enforcing Title IX but leaving it free to change course if it determines that to be warranted.  That certainly does not "evoke[] binding legal effect," *ibid*.

Put simply, the Documents explain legal obligations; they do not create them.  They consistently speak of what the Department believes *Title IX* requires, not what the Documents themselves require.  And while an agency's characterization of an action is not dispositive of its true nature, this conclusion should be obvious here.  The Documents do not "fully enforce" themselves.  They explain the Department's enforcement of Title IX.  Without Title IX, the Documents are meaningless.  Naturally, any penalties that the States might face or injuries they might incur will flow from the statute, not from the Documents.

Consider the analogous example of a court interpreting a statute.  As the Supreme Court has explained, "[o]ne would not normally say that a court 'amends' a statute when it interprets its text.  So too can an agency 'interpret' a regulation without 'effectively amend[ing]' the underlying source of law."  *Perez*, 575 U.S. at 103.  The same logic applies to an agency that interprets a statute.  We do not say that an agency "amends" a statute when it announces how it interprets the statute's text.  So when the Department says, for example, that it will "provide information to assist schools in meeting their legal obligations," Fact Sheet, p. 1, those legal

obligations—and any others related to the Documents—flow from Title IX, not from the Documents themselves.

Nonetheless, the majority claims that the Documents force the States into a supposed catch-22 where they must comply with federal law or lose federal funding. But the choice faced is neither Scylla nor Charybdis. There is always a choice between following the law and being punished. Here, the alleged liability—losing federal funding—is speculative at best. The majority admits that "not once has the OCR ever cut off funds to enforce Title IX." *Ante* at 31 (quoting R. Shep Melnick, *The Strange Evolution of Title IX*, National Affairs (Summer 2018)). The threat, then, seems nothing more than "a highly attenuated chain of possibilities" that does not constitute injury in fact. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). And even if there were a stronger likelihood that the States would incur this injury, the injury would still flow from Title IX, not the Documents.

The majority also claims that the Documents are legislative because they stem from Congress's delegation of rulemaking authority. *Ante* at 36. But the fact that the Department has this rulemaking authority—and has exercised it in the past to promulgate legislative rules—does not prove that it did so here. To conclude otherwise would mean that Congress gelds an agency by giving it rulemaking authority, making it unable to create simple interpretations. That is, an agency could issue *only* legislative rules and could never issue interpretative rules or general statements of policy. Numerous cases, as well as the APA itself, show that this is not true. *See, e.g.*, 5 U.S.C. § 553; *Perez*, 575 U.S. at 97; *Guernsey Mem'l Hosp.*, 514 U.S. at 99.

These realities reveal that the Documents are neither binding in any meaningful sense nor the source of any legal obligations imposed on the States. Thus, they are not final for purposes of judicial review under the APA, regardless of whether petitioners otherwise might meet what the majority calls a proprietary-interest, sovereign-interest, or procedural-rights theory of standing. *See* 5 U.S.C. §§ 553(b)(A); 704. The Documents simply do not create legal interests or injuries for which the States can seek judicial remedies. For these reasons, I respectfully dissent.