## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

**State of Tennessee**; **Commonwealth of Kentucky**; **State of Ohio**; **State of Indiana**; **Commonwealth of Virginia**; and **State of West Virginia**,

     *Plaintiffs,*

*and*

**Christian Educators Association International**; **A.C.**, by her next friend and mother, Abigail Cross,

     *Intervenor-Plaintiffs,*

     v.

**Miguel Cardona**, in his official capacity as Secretary of Education; and **United States Department of Education**,

     *Defendants.*

**Case No. 2:24-cv-00072-DCR-CJS**

District Court Judge Danny C. Reeves
Magistrate Judge Candace J. Smith

## INTERVENOR-PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR STAY AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Table of Authorities ................................................................................ ii

Introduction ......................................................................................... 1

Argument ............................................................................................. 2

I.   The rules are contrary to law.................................................... 2

    A.   The gender-identity mandate applies to sports. ................ 2

    B.   *Bostock* does not apply to Title IX. ................................... 5

    C.   The de-minimis-harm standard subverts Title IX's sex-based
       protections.......................................................................... 7

II.  The rules are contrary to the Constitution. ........................... 10

    A.   The gender-identity mandate infringes on privacy rights. ........ 10

    B.   The gender-identity mandate infringes on free-speech rights. ...... 12

III. This Court should stay the entire rulemaking........................ 14

Conclusion........................................................................................... 15

Certificate of Service.......................................................................... 17

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adams ex rel. Kasper v. School Board of St. Johns County*,
  57 F.4th 791 (11th Cir. 2022) .................................................................. 5, 6, 10

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ....................................................................................... 1

*Brannum v. Overton County School Board*,
  516 F.3d 489 (6th Cir. 2008) ...................................................................... 11

*Byrd v. Maricopa County Sheriff's Department*,
  629 F.3d 1135 (9th Cir. 2011) ..................................................................... 10

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................................... 15

*Career Colleges & Schools of Texas v. United States Department of Education*,
  98 F.4th 220 (5th Cir. 2024) ....................................................................... 14

*Dambrot v. Central Michigan University*,
  55 F.3d 1177 (6th Cir. 1995) ....................................................................... 14

*Davis v. Monroe County Board of Education*,
  526 U.S. 629 (1999) ..................................................................................... 13

*EMW Women's Surgical Center, P.S.C. v. Beshear*,
  920 F.3d 421 (6th Cir. 2019) ........................................................................ 9

*Everson v. Michigan Department of Corrections*,
  391 F.3d 737 (6th Cir. 2004) ....................................................................... 11

*Griffin v. HM Florida-ORL, LLC*,
  144 S. Ct. 1 (2023) ....................................................................................... 14

*Helfand v. Gerson*,
  105 F.3d 530 (9th Cir. 1997) ......................................................................... 4

*In re Ohio Execution Protocol*,
  860 F.3d 881 (6th Cir. 2017) ......................................................................... 6

*Kleczek ex rel. Kleczek v. Rhode Island Interscholastic League, Inc.*,
  768 F. Supp. 951 (D.R.I. 1991) ..................................................................... 7

*L. W. ex rel. Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023).................................................................5, 9

*MD/DC/DE Broadcasters Association v. FCC*,
    236 F.3d 13 (D.C. Cir. 2001) ...........................................................15

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) .......................................................12, 13

*Michenfelder v. Sumner*,
    860 F.2d 328 (9th Cir. 1988) ...........................................................11

*Mirando v. United States Department of Treasury*,
    766 F.3d 540 (6th Cir. 2014) .............................................................4

*Muldrow v. City of St. Louis*,
    144 S. Ct. 967 (2024)....................................................................7, 8

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ...........................................................9

*Reno v. ACLU*,
    521 U.S. 844 (1997).......................................................................15

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022)..........................................................13

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) ...........................................................14

*Texas v. Cardona*,
    2024 WL 2947022 (N.D. Tex. June 11, 2024)............................................1, 5

*West v. Radtke*,
    48 F.4th 836 (7th Cir. 2022)........................................................11, 12

## **Statutes**

5 U.S.C. § 705...............................................................................14

## **Other Authorities**

Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121 (2020) ........15

## **Regulations**

34 C.F.R. § 106.32 ...........................................................................11

34 C.F.R. § 106.41 ................................................................................................2

89 Fed. Reg. 33,474 (Apr. 29, 2024) ........................................ 2, 6, 7, 8, 11, 12, 13, 14

## INTRODUCTION

The Department of Education ("Department") argues that its new Title IX rules are compelled by *Bostock v. Clayton County*, 590 U.S. 644 (2020). But *Bostock* merely held that firing someone based on gender identity was unlawful in the workplace under Title VII. And Title VII is not Title IX. They have different texts, structures, histories, and purposes. After all, "the workplace is not the same as the educational environment." *Texas v. Cardona*, No. 4:23-cv-00604, 2024 WL 2947022, at *37 (N.D. Tex. June 11, 2024) ("*Texas*"). In educational programs, biological sex matters in places like restrooms, showers, locker rooms, and sports. Yet the rules treat biology like it's a fairy tale and interpret Title IX like it's a statute about gender identity—someone's internal sense of self—instead of biological reality. That undermines the statute's sex-based protections for women and girls.

The Department's defense repeatedly defies logic. *Bostock* said gender-identity discrimination was a form of sex discrimination in the workplace; but now, sex discrimination is a form of gender-identity discrimination everywhere. *Bostock* said it was only about employment under Title VII; but now, *Bostock* unambiguously applies to education under Title IX. Before the Fourth Circuit, the government said Title IX and its regulations require letting males compete in women's sports; but now, the government says this Court should ignore sports altogether. The government admits that students have an interest in their privacy; but now, preserving women's only spaces harms certain men, whereas allowing those men into these spaces causes no harm to women. None of this makes sense.

And none of it changes the realities on the ground for women and girls. Intervenor-Plaintiff A.C. has already suffered the indignities of sharing a locker room with a male, losing athletic opportunities to a male, and enduring egregious sexual harassment by a male. The Department's rules will lead to this happening again to young women across the country. This Court should prevent that.

## ARGUMENT

The Department's rules are (I) contrary to law, (II) contrary to the Constitution, and (III) should be set aside.

## I.     The rules are contrary to law.

The Department's rules seek to redefine sex discrimination under Title IX. That changes everything about the statute. The Department can't make such fundamental changes without affecting sports. Nor can it apply *Bostock*'s but-for-causation logic to a statute that permits sex distinctions. And the Department's de-minimis-harm standard is as extra-textual as it is ideological. The rules are contrary to the statute, arbitrary and capricious, and should be vacated.

### A.     The gender-identity mandate applies to sports.

1. The Department argues that its gender-identity mandate does not apply to sports. Defs.' Opp'n to Intervenor-Pls.' Mot. for a § 705 Stay and Prelim. Inj. § I.A., Doc. 91 ("Opp'n"). On this theory, while § 106.10 (sex discrimination covers gender identity) and § 106.31(2) (de-minimis-harm standard) together require schools to allow anyone to participate in activities "consistent with [that] person's gender identity," 89 Fed. Reg. 33,474, 33,887 (Apr. 29, 2024), the rules do not apply the mandate to certain statutory and regulatory carveouts, including § 106.41(b), which allows for sex-specific sports teams in skills-based or contact sports. *Id.*; *see* 34 C.F.R. § 106.41(b).

This only tells half the story. Again, look at the text. The Department doesn't dispute that there is *no* carveout for § 106.41(a). Opp'n 3. *See* 89 Fed. Reg. at 33,887. That section applies the general nondiscrimination mandate to athletics: "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in" sports. 34 C.F.R. § 106.41(a). Since the nondiscrimination

mandate requires participation by gender identity, § 106.41(a) applies the gender-identity mandate to sports.

The Department's response is that § 106.41(a) doesn't govern participation according to gender identity because it's *not* one of the regulatory carveouts to the nondiscrimination mandate, while § 106.41(b) is. Opp'n 11. But this supports Intervenors' position, not the Department's. Section 106.41(a) applies the gender-identity mandate to sports. Section 106.41(b) says sports may be designated by sex, just like other provisions say the same about restrooms, showers, and locker rooms. Reading these provisions together suggests schools can maintain designate men's and women's teams—they just can't deny participation according to gender identity. And that's been the Department's position all along: § 106.10 (the nondiscrimina-tion mandate) does not prohibit sex-specific activities or facilities; it just explains how to "effectuate such sex separation." Opp'n 14; *see also id.* at 11 (same). Because the gender-identity mandate applies to § 106.41(a), and § 106.41(a) specifically governs sports, the mandate must still apply to sports. Men's and women's sports teams are allowed. But men's and women's sports teams based on biology are not.

In fact, the Department of Justice can't seem to decide what § 106.41(a) does. Last year, the Department argued to the Fourth Circuit that "Title IX *and its regulations*" only allow women's sports teams (without men who identify as women) "to the extent that such exclusion is consistent with the statute's requirement that [schools] provide equal opportunity in athletics programs. *See 34 C.F.R. 106.41(a)* … Bans that extend beyond that (*as categorical bans do*) violate the general nondiscrimination mandate in the statute *and the regulations*." Br. for the U.S. as Amicus Curiae in Supp. of Pl.-Appellant and Urging Reversal at 27–28, *B.P.J. ex. rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024) (Nos. 23-1078, 23-1130), 2023 WL 2859726, at *27–28 (emphasis added). So before the Fourth Circuit, § 106.41(a) did one thing; now, no longer, even though the new rules now

3

explicitly redefine sex in § 106.41(a) to include gender identity. "[A]chieving success on one position, then arguing the opposite to suit an exigency of the moment," is the sort of "cynical gamesmanship" that courts disfavor. *Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 545 (6th Cir. 2014); *see Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997) (criticizing "assertion of inconsistent positions, factual or legal").

2. The Department's reading is also arbitrary for at least two reasons. First, the Department errs when it describes § 106.41(b) as "an exception" to the nondiscrimination mandate. Opp'n 3. Sports are not a Title IX-free zone. Section 106.41(b) does not say the nondiscrimination mandate is inapplicable. It just says that "[n]otwithstanding" § 106.41(a), sex-designated teams are still allowed. Like the statutory provisions allowing sex-specific dormitories and beauty pageants, this provision helps clarify what *is* sex-discrimination in the first place. Intervenor-Pls.' Mem. in Supp. of their Mot. for Stay and Prelim. Inj. 7–8, Doc. 63-1 ("MPI"). Plus, the provisions on sex-designated restrooms, showers, and locker rooms were part of the same implementing regulations as athletics. If "Congress provided by statute that athletics is a special context," Opp'n 12, the Department fails to explain why the gender-identity mandate applies to one and not the other. *See* Reply in Supp. of the States' Mot. for a § 705 Stay and Prelim. Inj. 4, 8, Doc. 92 ("States' Reply").

Second, the Department's reading leads to bizarre results. MPI 16–17. The Department asserts there's no evidence "that excluding cisgender students … from sex-separate facilities inconsistent with their gender identity causes cognizable harm." Opp'n 13. But a "cisgender" person's gender identity is the same as their sex, so the Department seems to say it's always harmless to exclude someone *because of their sex*. But sex discrimination is what Title IX is all about. And Intervenors provided other examples rebutting this. MPI 14, 17.

3. Finally, the Department argues that Intervenor A.C. has no "standing to raise claims based on the sex-separation of athletic teams" or based on her personal

4

experiences losing to a male in track. Opp'n 4. But Intervenors don't need to show standing. They just need to show a "substantial legal interest." Intervenor-Pls.' Mem. in Supp. of Mot. to Intervene 9, Doc. 21-1 ("MTI") (citation omitted). Further, while A.C. suffered many unfortunate injuries competing against a male at her middle school, A.C. still seeks to benefit from West Virginia's Save Women's Sports law. MTI § I.B.3. A ruling for the Department's gender-identity mandate will impair that interest. *Id.* § I.C. That's all she needs to make her claims.

### B.   *Bostock* does not apply to Title IX.

The Department argues that Title IX employs the same "but-for" causation standard as Title VII, so *Bostock*'s logic must apply to Title IX. Opp'n 5. That's wrong. Intervenors have already shown that *Bostock*'s logic against employers noticing sex doesn't work for a statute that permits and even requires sex distinctions. MPI 13–15; *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (explaining this). "Recognition of innate biological differences is permissible—encouraged even—under Title IX." *Texas*, 2024 WL 2947022, at *31.

The Sixth Circuit has already rejected the Department's arguments. *E.g.*, *L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023); *see* States' Reply 3. And now other courts recently reached the same conclusion: *Bostock*'s "holding only applies to Title VII." *Texas*, 2024 WL 2947022, at *37. In response, the Department seeks to dismiss cases like *Skrmetti* as dicta. Defs.' Opp'n to Pls.' Mot. for a § 705 Stay and Prelim. Inj. 8, Doc. 73 ("State Opp'n"). But elsewhere, DOJ agrees that *Skrmetti* controls and that "the Sixth Circuit *held* that *Bostock*'s 'reasoning applies only to Title VII.'" Pet. for a Writ of Cert. at 14, *Skrmetti*, 83 F.4th 460 (No. 23-477), https://perma.cc/X5Q6-73FJ (emphasis added); *see also id.* at

5

23, 30 (same). Here too, the Department plays "fast and loose with the courts." *In re Ohio Execution Protocol*, 860 F.3d 881, 892 (6th Cir. 2017) (citation omitted).

Next, the Department tries to distinguish *Adams*. It argues that *Adams* merely said that sex-specific restrooms were consistent with Title IX's sex-specific carveouts, while § 106.10 doesn't say anything about restrooms at all. Opp'n 6–7. Not so. Section 106.10 doesn't *explicitly* mention restrooms, but put it together with § 106.31(a)(2) and it does; they form the backbone of the gender-identity mandate and prohibit policies that prevent anyone from accessing activities "consistent with the person's gender identity." 89 Fed. Reg. at 33,887; MPI 3 (explaining this).

Take a step back and *Adams*' holding contradicts the Department's view. *Adams* said a biology-based restroom policy was *consistent* with Title IX, even though it excluded a girl from accessing the boys' restroom according to her gender identity. 57 F.4th at 815. And while *Bostock* said that gender-identity discrimination is a form of sex discrimination under Title VII, this case "centers on the converse of that statement—whether discrimination based on biological sex necessarily entails discrimination based on transgender status." *Id.* at 809; States' Reply 6–7. "*Bostock* does not resolve" that question. *Adams*, 57 F.4th at 808. And repeating "*Bostock*" ad nauseum doesn't transform *Bostock*'s one-way logic into a two-way thoroughfare for the Department to push its ideological preferences into Title IX. *Contra* Opp'n 6, 13.

The Department also argues that *Bostock*'s logic applies equally to a person who identifies as non-binary because discrimination based on nonconformity with sex expectations is discrimination on the basis of sex. Opp'n 8. But this repeats the same mistake, inverting *Bostock*'s logic to suggest that biological sex distinctions always discriminate based on gender identity. *See also* States' Reply 6–7 (refuting this). In reality, biological sex distinctions don't care, or even notice, what a person's gender identity is. That makes *Bostock* inapposite.

### C.   The de-minimis-harm standard subverts Title IX's sex-based protections.

The Department argues that its de-minimis-harm standard is another way of saying a "legally cognizable injury." Opp'n 9 (citing 89 Fed. Reg. at 33,814). It's not. And rather than upholding Title IX's sex-based protections, it subverts them, in addition to being arbitrary and capricious.

1. The problem with the de-minimis-harm standard is not that it seeks to define what a legally cognizable injury is; the problem is that its definition of a legally cognizable harm turns on gender identity rather than sex. This contravenes the holding in *Muldrow v. City of St. Louis*—rejecting a "heightened threshold of harm" to show an injury. 144 S. Ct. 967, 973 (2024).

For example, take a boy who wants to play field hockey but can't because his school fields only a women's team. He unquestionably suffers an injury. *See Kleczek ex rel. Kleczek v. R.I. Interscholastic League, Inc.*, 768 F. Supp. 951, 953 (D.R.I. 1991) (describing how this boy was excluded to the "sidelines"). But Title IX allows it, even if he has no other opportunity to play field hockey. *Id.* at 956. Under the new rules too, that harm is "de minimis." *E.g.*, Opp'n 13 (arguing there is "no basis to conclude that excluding cisgender students … from sex-separate facilities inconsistent with their gender identity causes cognizable harm").

But assume the same boy identified as a girl. Same policy. Same exclusion. But for the Department, a different injury. In this context, a sex-based exclusion alone is de minimis. A sex-based exclusion applied to someone who happens to identify as transgender (or, in the Department's words, gender-identity discrimination) is more than de minimis. That "add[s] words" and "impose[s] a new requirement" that Title IX does not. *Muldrow*, 144 S. Ct. at 974. And far from employing an "objective standard," the rules say the harm is only significant if it implicates a person's "subjective, deep-core sense of self." *Compare* 89 Fed. Reg. at

33,815, *with id.* at 33,809; *see also Muldrow*, 144 S. Ct. at 974–75 (explaining elevated harm showing leads to subjective evaluations of what counts as "significant"). Nothing in Title IX's text distinguishes between sex-based exclusions "causing significant disadvantages and [sex-based exclusions] causing not-so-significant ones." *Muldrow*, 144 S. Ct. at 974.

The Department's reading has other problems too. Take the idea that the statutory carveouts from the nondiscrimination mandate show that Congress *intended* schools to impose more than de minimis harm in certain contexts. 89 Fed. Reg. at 33,818 (explaining carveouts allow "sex-specific policies and practices … that may cause more than de minimis harm to a protected individual"). That makes little sense and leads to absurd results, like "biology-based standards for beauty pageants, girls and boys clubs, and admissions, but not for restrooms, showers, locker rooms, or physical-education classes." MPI 22–23.

Intervenors have the better reading, beginning with Title IX's text. It prohibits subjecting someone to discrimination, excluding, or denying anyone educational benefits on the basis of sex, meaning to "treat worse." MPI 15 (quoting *Muldrow*, 144 S. Ct. at 974 (same). Of course, not all sex distinctions are discriminatory. MPI 7–13. Plus, other provisions, like carveouts for living facilities, fraternities and sororities, and beauty pageants, help define what *is* a prohibited discriminatory practice. *Id.* Add in some historical context and statutory canons of construction, and you arrive at a statutory text aligned with its purpose: promoting equal educational opportunities for all students—particularly women and girls. *See generally*, *id.* 5–13.

The Department has no response to Intervenor's textual and structural analysis. Instead, it looks to "respected" medical groups who say it's harmful if schools don't accommodate someone's gender identity. Opp'n 10. But "expert consensus, whether in the medical profession or elsewhere, is not the North Star of"

judicial review. *Skrmetti*, 83 F.4th at 479 (rejecting similar argument that medical guidelines control constitutional analysis). They do not "define the boundaries" of statutory or constitutional rights. *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020) (explaining medical group's opposition to certain speech was not relevant to understanding free-speech rights). Whether the Department's de-minimis-harm standard is faithful to Title IX turns on the statutory text, not "whether the [rule] is consistent with … views of certain medical groups." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 439 (6th Cir. 2019) (similarly rejecting reliance on professional medical groups).

The Department's reliance on outside medical groups confirms that the de-minimis-harm standard is really a policy determination by an agency trying to usurp Congress's role. Congress in 1972 did not know about, much less peg Title IX's meaning to the views of the World Professional Association on Transgender Health. After all, that group did not exist until 1978, and its views have changed and can change again. Nor did Congress tell the Department to ignore the objective markers of biological sex in favor of subjective personal perceptions of gender identity. Changing the definition of sex-based discrimination in Title IX changes *everything* about it. The Department simply can't account for all of the unintended and arbitrary consequences of changing something so fundamental to the statute.

2. Besides contravening Title IX's text, the de-minimis-harm standard also contravenes Title IX's purpose by hurting women and girls. The Department argues that there's "no evidence that the de minimis harm standard in § 106.31(a)(2) 'hurts women and girls.'" Opp'n 13–14 (citation omitted). But the evidence is abundant.

Start with B.P.J, the male athlete in West Virginia. B.P.J. displaced almost 300 different girls while competing on the middle school cross-country and track and field teams. Decl. of Rachel Rouleau 3, Doc. 63-2. One of those girls was Intervenor A.C., who lost a spot at her school's conference championships during

her eighth-grade year. Decl. of A.C. ¶¶ 19–23, Doc. 21-5 ("A.C. Decl."). Other girls voluntarily forfeited their placement to protest that schools were requiring them to compete against a male. Intervenor-Pls.' Compl. ¶¶ 254–55, Doc. 21-3 ("Intervenors' Compl."). Intervenors have identified many other instances of male athletes competing against, displacing, and even injuring female competitors. *Id.* ¶¶ 48–61.

The Department could not have "reasonably concluded" that its harmless to let males into girls' private spaces either. Opp'n 15. When B.P.J. began using the girls' locker room, A.C. was forced to change in separate restrooms or bathroom stalls to protect her privacy. A.C. Decl. ¶¶ 42–43. And other girls have been unwillingly exposed to male genitalia from males changing in women's spaces. Intervenors' Compl. ¶¶ 41–47. The Department avoids mentioning the threat of sexual harassment too. B.P.J. made inappropriate and threatening comments to A.C. on the track, in the pit, and in the locker room. A.C. Decl. ¶ 57.

In these ways, the new rules put girls like A.C. in the crosshairs—all because the rules say gender-identity protections come first, sex protections second. The new rules are a-textual, arbitrary, and should be vacated.

## II.   The rules are contrary to the Constitution.

In addition to contravening the statute, the rules violate Intervernors' privacy and free-speech rights as well.

### A.   The gender-identity mandate infringes on privacy rights.

The Department says there is no fundamental right to bodily privacy. Opp'n 16. That's incorrect. "[T]he desire to shield one's unclothed figure from the view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (cleaned up). That's why it's "unremarkable—and nearly universal" for schools to designates places like restrooms and showers "based on biological sex." *Adams*, 57 F.4th at 796; *see id.* at 805 (collecting cases). So it's not

surprising that cases litigating the privacy rights at issue here have come up in contexts different from this one. *E.g.*, *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988).

Contrary to what the Department argues, cases protecting privacy rights in prisons affirm that students and teachers have privacy rights too. Opp'n 16. While "inmates may lose many of their freedoms at the prison gate," they don't lose all of them. *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 756 (6th Cir. 2004). That includes a right to privacy and avoiding "forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners." *Id.* at 757. Young boys and girls should have more privacy rights than adult men and women who are incarcerated. But the Department argues that girls like A.C. don't have any fundamental right to privacy at all.

*West v. Radtke* is instructive. 48 F.4th 836 (7th Cir. 2022). There a prisoner challenged a prison policy allowing a female who identified as male to participate in strip searches of men. *Id.* at 840. The prison argued that Title VII compelled it to treat the female prison guard no differently than male prison guards. *Id.* at 848. The Seventh Circuit disagreed. Because "sex is a trait relevant to inmate privacy," sex was "bona fide occupational" trait for performing strip searches. *Id.* at 850. And it did not matter "that inmates have significantly diminished privacy interests by virtue of their incarceration." *Id.*

If Title VII does not diminish an inmate's right to privacy, Title IX (much less *Bostock*) cannot diminish a student's right to privacy in school. It's hard to imagine that schools have *any* interest in forcing girls to expose themselves to boys, or vice-versa. Take overnight accommodations. The new rules narrowly interpret "single-sex living facilities" to cover only "housing" under 34 C.F.R. § 106.32(b)(1)—not "any other aspects of a recipient's education program or activity" like restrooms and showers. 89 Fed. Reg. at 33,821. That means assignments on overnight trips may

leave students sharing the same bed or hotel room with someone of the opposite sex. A.C. is understandably "hesitant to continue playing in the band" if the rules require her to be alone in a room with a male. A.C. Decl. ¶¶ 63–64. A.C. is also "reluctant to keep competing on a team that exposes [her] to … inappropriate comments" by males or that forces her to share a locker room or showers with boys. *Id.* ¶¶ 48–50, 66. Other female athletes have endured "traumatiz[ing]" experiences because schools did not respect their privacy rights. Intervenors' Compl. ¶¶ 46–47. And these girls' "right" to bodily privacy "does not change based on [another student's] transgender status." *West*, 48 F.4th at 851.

The Department should seek to protect women and girls' inherent dignity rather than belittling them. A.C.'s story proves that ignoring privacy rights would render Title IX's guarantee of equal education opportunities meaningless.

### B.   The gender-identity mandate infringes on free-speech rights.

The Department nowhere denies that the rules require teachers to use pronouns against their consciences. At oral argument, the government suggested that the fact-pattern of *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), where a teacher declined to use inaccurate pronouns, might not violate the new rules. But the rules themselves say otherwise. Failing to treat a person "consistent with the person's gender identity" automatically "subjects a person to more than de minimis harm." 89 Fed. Reg. at 33,887. And a harassment complainant need not "demonstrate any particular harm." *Id.* at 33,511. Just showing "some impact" will do. *Id.* Under this standard, declining to use someone's pronouns is *defined* as harmful and unlawful—no further inquiry needed.

By requiring pronouns, the rules violate *Meriwether* in two ways. First, *Meriwether* held that declining to use a student's pronouns did not "have the systemic effect of denying the [student] equal access to an educational program or

activity." *Meriwether*, 992 F.3d at 511 (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999)). The rules would overrule *Meriwether* on this point by repudiating *Davis*, subbing in the new "broader standard" for harassment, and finding a Title IX violation. 89 Fed. Reg. at 33,498.

Second, as *Meriwether* explained, compelling pronouns violates the First Amendment. 992 F.3d at 511–12. The government's interest in compelling pronouns is "comparatively weak" to teachers' and students' substantial interest in "remain[ing] free to inquire, … to evaluate, [and] to gain new maturity and understanding." *Id.* at 510 (citation omitted). Since the new harassment standards apply everywhere a teacher might interact with a student, compelling them to speak against their consciences would be egregious. 89 Fed. Reg. at 33,532–33.

2. The rules are also overbroad and vague because they fail to explain what teachers can or can't say. Can an athlete say it's unfair for males to compete in women's sports without having "some impact" on students who identify as transgender? Decl. of Amy McKay ¶¶ 34–43, Doc. 21-10. Can a teacher express support for Tennessee laws on drag shows without being accused of "hate speech"? Decl. of Michelle Keaton ¶¶ 26–27, Doc. 21-9. Can a teacher explain in casual conversation what the Bible says about human sexuality? Decl. of Joshua Taylor ¶¶ 23–32, Doc. 21-12. The government won't say. The rules' "gestaltish 'totality of known circumstances' approach" and "imprecision exacerbates its chilling effect." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1121, 1125 (11th Cir. 2022).

Plus, § 106.31(a)(2) proclaims that failing to unqualifiedly accommodate a person's gender identity automatically causes harm; this would deter a reasonable teacher from expressing any contrary views. As would the rules' approving citation to cases punishing students for speaking their minds. MPI 20 (citing 89 Fed. Reg. at 33,504). The vague "some impact" standard would do the same. 89 Fed. Reg. at 33,511. This imprecision is antithetical to a school environment where people can

"voice ideas and opinions without fear of repercussion." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 761 (6th Cir. 2019).

Finally, the Department's insistence that it will comply with the First Amendment can't save it. 89 Fed. Reg. at 33,503. Generic savings clauses cannot save a rule that is overbroad on its face. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995) (disregarding savings clause in harassment policy). So the breadth and vagueness of the rules violate the Constitution.

## III.   This Court should stay the entire rulemaking.

The Department repeats prior arguments to claim the Intervenors cannot show irreparable harm. Opp'n 20–21. But as already explained, A.C. and Christian Educators are seeking relief from imminent injuries, not any injuries they suffered in the past. MTI § I.C. And the equities favor protecting constitutional rights; not the government's ability to promote its gender ideology. *Contra* Opp'n 22.

Finally, the Department argues that relief should be "limited." Opp'n 22–23. But the APA empowers this Court "to postpone the effective date of an agency action" pending judicial review. 5 U.S.C. § 705. Nothing in the statutory text "suggests that either preliminary or ultimate relief under the APA needs to be limited" to the plaintiffs. *Career Colleges & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). "Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA goes further by empowering the judiciary to act directly against the challenged agency action," and "the disapproved agency action is treated as though it had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., statement respecting the denial of the application for stay) (cleaned up).

Put differently, Congress intended § 705 to authorize reviewing courts to "maintain the status quo" while the case proceeds. S. Rep. No. 79-752, at 27

(1945), *reprinted in* S. Comm. on the Judiciary, Administrative Procedure Act: Legislative History, S. Doc. No. 79-248, at 185, 213 (2d Sess. 1946). "There is no question that this judicial power to preserve the status quo was understood to encompass the power to suspend a rule on a wholesale basis." Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121, 1157–58 (2020). And contrary to the government's claim (State Opp'n 25), courts acting before the APA's enactment entered blanket stays of—and vacated—legally dubious agency action. Sohoni, *supra* at 1142–54 (surveying pre-APA cases).

Even under the Department's view (State Opp'n 24), an order must be broad enough "to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Christian Educators has "members in all fifty states," Decl. of David Schmus ¶ 9, Doc. 21-7, so a stay must be broad enough to protect them all.

Finally, the Department's plea for severability misses the mark. Opp'n 22; State Opp'n 25. Severability is not appropriate if it would "produce a rule strikingly different" from what the agency considered. *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 23 (D.C. Cir. 2001). Here, the gender-identity mandate is the rules' centerpiece, and its tentacles permeate every part. Without it, the rules become an altogether different directive. Indeed, the government does not even attempt to explain how the rules would work without the mandate or identify which provisions should remain. *Reno v. ACLU,* 521 U.S. 844, 882 (1997) (severability "requires textual provisions that can be severed"). Thus, the gender-identity mandate is not severable, and the entire rule should be stayed.

## CONCLUSION

This Court should set aside the rules in their entirety and enjoin them from being enforced against anyone in the Plaintiff States.

Respectfully submitted this 14th day of June, 2024.

By: */s/ Jonathan A. Scruggs*

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Natalie D. Thompson*
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

Edward L. Metzger III
Kentucky Bar No. 94138
OMEGA LAW PLLC
P.O. Box 559
Union, KY 41091
(859) 898-2140
Lee@nkylaw.net

*Counsel for Intervenor-Plaintiffs*

*\*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of June, 2024, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record who are registered users of the ECF system.

By: _/s/ Jonathan A. Scruggs_
Jonathan A. Scruggs
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
