UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| STATE OF TENNESSEE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2: 24-072-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MIGUEL CARDONA, in his Official | ) | **MEMORANDUM OPINION** |
| Capacity as Secretary of Education, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

**I.**

**Introduction**

There are two sexes: male and female.[1]  More than fifty years ago, Congress recognized that girls and women were not receiving educational opportunities that were equal to those afforded to their male counterparts.  It attempted to remedy this historical inequity through the passage of the Education Amendments Act of 1972, commonly known as Title IX.  And for more than fifty years, educational institutions across the country risk losing federal funding if they fail to comply with the dictates of the statute.

This case concerns an attempt by the executive branch to dramatically alter the purpose and meaning of Title IX through rulemaking.  But six states, an association of Christian educators, and one fifteen-year-old girl object.  As they correctly argue, the new rule contravenes the plain text of Title IX by redefining "sex" to include gender identity, violates

---

[1]    The defendants made this concession during oral arguments on the plaintiffs' motion for injunctive relief.  The parties have agreed to little else.

government employees' First Amendment rights, and is the result of arbitrary and capricious rulemaking.  If the new rule is allowed to take effect on August 1, 2024, all plaintiffs will suffer immediate and irreparable harm.  Because the plaintiffs are likely to prevail on the merits of their claims, and the public interest and equities highly favor their position, the new rule will be enjoined, and its application stayed.

## II.

### Title IX's Prohibition on Sex Discrimination

"The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both."  *Peters v. Kiff*, 407 U.S. 493, 504 n.12 (1972) (quoting *Ballard v. United States*, 329 U.S. 187, 193-94 (1946)).  The United States Supreme Court made this observation in 1972—the same year Indiana Senator Birch Bayh introduced an amendment that would become Title IX of the Education Amendments of 1972.  *See* 118 Cong. Rec. 5803 (1972).

Title IX was patterned largely after the Civil Rights Act of 1964, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Momentum for passing federal legislation prohibiting discrimination on the basis of sex began building later in the 1960s as congressional attention turned to remedying the disparate treatment of women in education and the workforce.  *See* Leslie Gladstone and Gary Galemore, Cong. Rsch. Serv. 97-954, Sex Discrimination In Education: Overview of Title IX (1998) ("Title IX grew out of the women's civil rights movement of the late 1960s and early

1970s.  In that period, Congress began to focus attention on systemic educational barriers to women and girls.").

In May 1970, Dr. Bernice Sandler of the Women's Equity Action League testified before the Senate Subcommittee on Constitutional Amendments concerning the discrimination women faced in colleges and universities, stating "[w]omen have been discriminated against in many areas of life, of which the university is but one.  We need to begin to redress these wrongs."  *The Equal Rights Amendment: Hearing Before the S. Subcomm. on Const. Amendments*, 91st Cong. (1970).  Congress did just that by shifting focus to the problem of sex-based discrimination in education.  The House Special Subcommittee on Education, as part of the Committee on Education and Labor, held seven days of hearings on discrimination against women in education programs receiving federal funding and employment in education.  *Discrimination Against Women: Hearings on H.R. 16098 Before the H. Special Subcomm. on Educ. & Labor*, 91st Cong. (1970).  Representative Edith Green of Oregon, the chair of the subcommittee, presided over the hearing for Section 805 of 91 H.R. 16098, which sought to prohibit discrimination on the basis of sex in federally funded programs and education.  91st Cong. 1-2 (1970) (statement of Rep. Green).

The testimony before the subcommittee identified the following as examples of differential treatment between males and females:

- Some publicly funded university undergraduate admissions policies did not allow for the admission of women, imposed higher standards for admitting women, or imposed sex-based quotas;

- Some academic programs and courses within publicly funded educational institutions, such as nursing schools, would not admit married women;

- Women generally were found to be less likely to receive financial aid and married women were often excluded from receiving any financial aid;

- Certain school-sponsored activities, such as honor societies, were reserved for male students only;

- Athletic programs for women were funded at significantly lower levels than those for men;

- Women were frequently discouraged from applying to law and medical schools, as well as programs in the hard sciences, such as physics; and

- Women who sought employment at educational institutions with equivalent training and experience to men were hired at lower rates and with lower salaries and upward mobility potential for promotions compared to male counterparts.

Leslie Gladstone and Gary Galemore, Cong. Rsch. Serv. 97-954, Sex Discrimination In Education: Overview of Title IX (1998).

The obvious takeaway is that females were disadvantaged compared to their male counterparts. In agreement, Representative Green observed following the hearing that "[m]any of us would like to think of educational institutions as being far from the maddening crowd, where fair play is the rule of the game and everyone, including women, gets a fair roll of the dice." *Discrimination Against Women: Hearings on H.R. 16098 Before the H. Special Subcomm. on Educ. & Labor*, 91st Cong. (1970). Although her proposed legislative remedy was not included in the Education Amendments of 1971, these hearings were a major step toward the eventual enactment of Title IX.

A short time later, Representative Abner Mikva of Illinois introduced a similar bill to enshrine into law the recommendations of the Presidential Task Force on Women's Rights and Responsibilities. *See* 116 Cong. Rec. 22681–82 (statement of Rep. Mikva). The bill sought to eliminate sex discrimination in several areas, including federally assisted programs, government employment, employment in educational institutions, wages, and housing. *Id.*

Senator Birch Bayh introduced a similar version in the upper chamber, arguing that "our greatest legislative failure relates to our continued refusal to recognize and take steps to eradicate the pervasive, divisive, and unwarranted discrimination against a majority of our citizens, the women of this country."  117 Cong. Rec. 22735 (1971) (statement of Sen. Bayh).  On the Senate floor, he stated:

> Let us ensure that no American will be denied access to higher education because of race, color, religion, national origin, or sex.  The bill I am submitting today will guarantee that women, too, enjoy the educational opportunity every American deserves.

*See* 117 Cong. Rec. 22735 (1971).

The legislation stalled, but a report from the House Committee on Education and Labor accompanied a related proposal known as the Higher Education Act by the fall of 1971.  The House version included a specific provision, authored primarily by Representative Patsy Mink of Hawaii, prohibiting discrimination on the basis of sex in educational programs or activities receiving federal funds.  *See* H.R. Rep. No. 92-554 (1971).  Members fiercely debated whether broad coverage of the amendment was appropriate, citing the threat of intrusive government overreach into the sensitive decision-making apparatuses of the country's colleges and universities.  117 Cong. Rec. 39248–63 (1971).  They argued that the federal government should not remove private institutions' control over admissions and recommended amending the language to exempt university admissions and recruitment policies from being subject to quotas on the basis of sex.  *Id.*  To proceed, the committee ultimately adopted an amendment by Representative John Neal Erlenborn of Illinois to exempt private institutions' undergraduate admissions policies from the sex-based discrimination provisions.  *Id.*

A similar legislative exercise overflowed in the upper chamber the following year as Senator Bayh continued to stress that economic inequities suffered by women were traceable to educational inequities by emphasizing the link between discrimination in education and subsequent employment opportunities.  Amid consideration of the House's language to exempt private undergraduate admissions policies from the prohibition of sex discrimination, a perfecting amendment was adopted to likewise exempt the undergraduate admissions policies of public institutions that had historically been traditionally single sex.  *See* 118 Cong. Rec. 5802-5815 (1972).

After years of intense legislative debate premised on the fixed biological dichotomy between males and females, Congress eventually took an affirmative step toward eliminating discrimination based on sex in education.  In early 1972, Congress passed Title IX as part of a broader bill expanding civil rights in education once a conference committee reconciled the House and Senate versions.  Senator Bayh referred to the legislation, known as the Education Amendments Act, as "[t]he only antidote" to "the continuation of corrosive and unjustified discrimination against women . . . in[] all facets of education."  118 Cong. Rec. 5803 (1972) (statement of Sen. Bayh).

President Richard Nixon signed the Education Amendments Act into law on June 23, 1972.  As enacted, Title IX prevents discrimination on the basis of sex in educational programs and opportunities that receive federal funding.  Title IX's general prohibition on discrimination provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C § 1681.

The enactment of Title IX meant that educational institutions receiving federal funding, as well as non-educational institutions conducting or facilitating educational programs with ancillary federal support, were prohibited from discriminating based on sex in their academic courses or programmatic offerings, scholarships, athletic opportunities, and other matters. Its original goal was to ensure women experienced "full citizenship stature," including the "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *See United States v. Virginia*, 518 U.S. 515, 532 (1996).

Title IX carves out exceptions for a number of traditional male-only or female-only activities, as long as similar opportunities provided for "one sex" are provided for "the other sex." *See* 20 U.S.C. § 1681(a)(1)-(8). However, Senator Bayh, one of the proposal's architects, stressed that Title IX "provide[d] equal access for women and men students to the educational process," but did not "desegregate" spaces and activities that have long been sex-separated. 117 Cong. Rec. 30407 (1971).

In 1974, Congress passed an amendment to Title IX introduced by Senator Jacob Javits of New York, clarifying its application to intercollegiate athletics. *See* 88 Stat. 484, 612 (1974). The amendment directed the Department of Health, Education, and Welfare ("HEW"), the Department of Education's ("the Department") predecessor, to issue a regulation that contained "with respect to intercollegiate athletic activities, reasonable provisions considering the nature of particular sports." Notably, this amendment further cemented that Congress intended Title IX to cover athletics at all levels for both males and females at schools receiving federal funding.

As a general matter, Title IX's antidiscrimination provision has remained unchanged since the statute's enactment. 20 U.S.C. § 1681. And until the last decade, Title IX was

universally understood to equalize female access to educational facilities and programs by barring discrimination "on the basis of sex" at schools receiving federal funds. But then came the administrative state, lacking any real power to rewrite a law that Congress duly passed, with its bureaucratic cudgel.

The initial effort to redefine "sex" through regulatory decree occurred between 2014 and 2016 when the Department issued guidance construing Title IX's implementing regulations to restrict federal funding recipients from treating individuals inconsistently with their gender identity. *See* Jared Cole and Christine J. Back, Cong. Rsch. Serv., LSB10229, *Title IX: Who Determines the Legal Meaning of "Sex"?* (2018). In May 2016, the Department's Office of Civil Rights ("OCR") issued a "Dear Colleague" letter, noting that schools may continue to provide sex-segregated facilities, such as restrooms, locker rooms, and showers, pursuant to existing Title IX regulations, while interpreting the prohibition of sex discrimination to encompass discrimination based on a student's gender identity, including transgender status.[2] The letter warned that schools "generally must treat transgender students consistent with their gender identity" when rendering sex-based distinctions in certain circumstances, such as providing separate facilities for male and female students. *Id.* OCR rescinded the May 2016 Dear Colleague letter in the early days of the Trump administration.[3] However, it neither promulgated further guidance nor issued a rule regarding whether Title IX covers gender identity.

---

[2]     *See* Dept. of Justice & Dept. of Education, Dear Colleague Letter on Transgender Students, May 13, 2016, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[3]     *See* Dept. of Justice & Dept. of Education, Dear Colleague Letter, Feb. 22, 2017, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

On June 15, 2020, the United States Supreme Court issued its decision in *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020).  The Court held that an employer violates Title VII of the Civil Rights Act of 1964 by firing an individual for being homosexual or transgender.  On his first day in office, President Joseph Biden issued Executive Order 13988, entitled "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation."  Exec. Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 21, 2021).  Citing *Bostock*, President Biden stated that "[a]ll persons should receive equal treatment under the law, no matter their gender identity or sexual orientation."  According to the President's proclamation, federal laws on the books that prohibit sex discrimination similarly "prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary."  *Id.*

President Biden subsequently issued Executive Order 14021, captioned "Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity."  Exec. Order No. 14,021, 86 Fed. Reg. 13803 (Mar. 8, 2021).  Therein, President Biden directed the Secretary of Education, in consultation with the Attorney General, to review agency actions and issue new guidance as needed to comply with the policy set forth in the Executive Order.

The Department subsequently amended the regulations implementing Title IX on April 29, 2024, by issuing a Final Rule: "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" (the "Final Rule" or "Programs and Facilities Rule").  89 Fed. Reg. 33474 (Apr. 29, 2024).  The Final Rule "clarif[ies]" that, for purposes of Title IX, "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related

conditions, sexual orientation, and gender identity." *Id.* at 33476 (to be codified at 34 C.F.R. § 106.10). The bases listed in 34 C.F.R. § 106.10 are not exhaustive and are offered only as examples to clarify the scope of Title IX's coverage, "which includes any discrimination that depends in part on consideration of a person's sex." *Id.* at 33803.

The Final Rule brings another significant change to Title IX by way of a "de minimis harm" standard, which provides:

> [i]n the limited circumstances in which Title IX . . . permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. § 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. § 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

*See id.* at 33814-26 (to be codified at 34 C.F.R. § 106.31(a)(2)).

The Department declined to provide a specific definition of "gender identity," but understands the term to "describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id*. at 33809. The Final Rule suggests that recipients of federal funds should rely on a student's "consistent assertion" or "written confirmation" to determine the student's gender identity. *Id.* at 33819. Recipients, however, may not require students to submit to "invasive medical inquiries or burdensome documentation requirements" to determine gender identity. *Id.*

**Title IX bans sexual harassment.**

Harassment is not mentioned in the text of Title IX, but both the Department and the United States Supreme Court have long recognized that sexual harassment may constitute

- 10 -

discrimination on the basis of sex for purposes of Title IX. *See OCR; Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties*, 62 Fed. Reg. 12034 (Mar 13, 1997); *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629 (1999). In 2011, OCR issued a Dear Colleague letter regarding a variety of topics, including sexual and gender-based harassment.[4] It followed up in 2014 with additional guidance that defined hostile environment sexual harassment as that which is "sufficiently serious as to limit or deny a student's ability to participate in or benefit from the school's educational program or activity."[5]

In May 2020, the Department exercised its formal rulemaking authority to issue a regulation that defined sexual harassment under Title IX. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30033 (May 19, 2020) (codified at 34 C.F.R. § 106.30). In relevant part, section 106.30 defines "sexual harassment" as "conduct on the basis of sex" that is "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." (Emphasis added.)

The new rule redefines this term as "sex-based harassment," which means "sexual harassment and other harassment on the basis of sex, including on the bases described in [34 C.F.R.] § 106.10 . . . ." 34 C.F.R. 106.2 (effective Aug. 1, 2024). Additionally, hostile

---

[4]     Dept. of Education, Dear Colleague Letter, Apr. 4. 2011, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[5]     Dept. of Education, Questions and Answers on Title IX and Sexual Violence, Apr. 29, 2014, https://www2.ed.gov.about/offices/list/ocr/docs/qa-201494-title-ix.pdf.

environment harassment is redefined as "[u]nwelcome *sex-based* conduct that, based on the totality of the circumstances, is *subjectively and objectively* offensive and is so severe *or* pervasive that it *limits or denies* a person's ability to participate in or benefit from the recipient's education program or activity. . . ." 34 C.F.R. § 106.2 (effective Aug. 1, 2024) (emphasis added).  *See* 89 Fed. Reg. at 33498 (explaining the adoption of the new standard).

It is noteworthy that the Department does not limit harassment to speech that occurs on school campuses and believes a recipient's obligations under Title IX are triggered whenever a school employee "has information about conduct among students that took place on social media or other platforms that reasonably may have created a sex-based hostile environment in the recipient's education program or activity."  89 Fed. Reg. at 33535.

The Final Rule and its accompanying regulations are scheduled to take effect August 1, 2024.

### III.

### The Plaintiffs and Intervenors

Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia filed a Complaint with this Court on April 30, 2024, seeking to enjoin and invalidate the Final Rule and its accompanying regulations.  Each state is obligated through its constitution to provide a free system of public education for primary and secondary school-aged children.  Accordingly, the states operate public primary and secondary schools, as well as "special schools," for the hearing and visually impaired, and various public institutions of higher learning.  Pursuant to public policy and state law, each of these states' public schools generally require students to use bathrooms and play on sports teams associated with the student's biological sex.  [Record No. 1, ¶¶ 206-212]  Additionally, the plaintiff-States generally do not require public schools

- 12 -

or their employees to use pronouns that are inconsistent with an individual's biological sex.  *Id.* at ¶¶ 213-217]  All of these schools receive federal funding under Title IX.

Christian Educators Association International ("Christian Educators") and A.C. were permitted to file an Intervenor Complaint on May 8, 2024.  Christian Educators is a religious non-profit organization primarily composed of Christians in the teaching profession from all 50 states.  Its mission is to "support, connect, and protect Christians serving primarily in public education."  The organization maintains a Statement of Faith that affirms beliefs in core Christian doctrines and all dues-paying members must affirm that they are Christians.

Christian Educators seeks to support its members—particularly educators in K-12 public schools—who wish to "live and work consistent with their shared belief that God created human beings as male and female and that sex is an immutable trait."  It objects to policies that would force educators to use pronouns that do not correspond with an individual's biological sex.  Christian Educators also takes issue with policies that chill educators from expressing their sincerely held religious beliefs regarding the immutability of sex, and the group supports the rights of educators to discuss these beliefs with students and colleagues at work through informal discussions both inside and outside of the classroom.  Further, Christian Educators disputes any policy that would require educators to share private facilities like restrooms or locker rooms with persons of the opposite sex, including their students.

A.C. is a 15-year-old girl who resides in West Virginia and attends Bridgeport High School.  She has played and excelled in a variety of sports since an early age.  A.C. first began competing in track and field while attending Bridgeport Middle School, and she now competes in these sports as a high school student.  B.P.J. is a student who was born male but identifies as female.  He also was allowed to compete on the Bridgeport Middle School cross-country

and track teams.  B.P.J. was permitted to use the girls' locker room to change clothes, which prompted A.C. to change clothes elsewhere, as A.C. feels uncomfortable dressing and undressing in the presence of biological males and does not want to see biological males undressing.

A.C. asserts that it is apparent that B.P.J.'s status as a biological male gives B.P.J. an advantage over A.C. and other female athletes.  And she has tendered significant statistical information from her middle school track and field competitions supporting this opinion.  [Record No. 72-3]  While A.C. and B.P.J. presently attend different schools, A.C. believes B.P.J. will compete on the high school track team next year.

The plaintiff-States and the Intervenor plaintiffs (collectively, the "plaintiffs") lodge various objections to the Final Rule and its accompanying regulations and seek a declaratory judgment announcing their invalidity.  *See* 28 U.S.C. § 2201(a).  For now, the plaintiffs seek injunctive relief to prevent the Department from enforcing the Final Rule and regulations.  They assert various violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), to wit, that the Department acted in excess of its statutory authority and in violation of the United States Constitution, and that its action was arbitrary and capricious.

## IV.

### The Standard of Review

The APA provides that a district court "may issue all necessary and appropriate process to postpone the effective date of any agency action" to the extent necessary to prevent irreparable injury.  5 U.S.C. § 705.  And for purposes of this Court's analysis, a motion for a stay under § 705 is judged by the same standard as a motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.  *Ohio v. Nuclear Reg. Comm'n*, 812 F.2d 288,

290 (6th Cir. 1987).  Accordingly, the Court applies the following factors to the pending motions: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether the movant has demonstrated irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.  *Parker v. U.S. Dep't of Agric.*, 879 F.2d 1362, 1367 (6th Cir. 1989).

These factors are not "prerequisites that must be met," but instead, "interrelated considerations that must be balanced together."  *Ne. Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).  Still, some showing of irreparable harm is required—otherwise preliminary injunctive relief would not be necessary.  *See D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019).  However, the amount of irreparable harm the plaintiffs must prove is inversely proportional to the probability of success on the merits they are able to demonstrate.  *See Blackwell*, 467 F.3d at 1009.

At the outset, the Court acknowledges that a preliminary injunction is "an extraordinary remedy which should only be granted if the movant carries [its] burden of proving the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  The purpose of a preliminary injunction is simply to preserve the relative positions of the parties until a trial on the merits can be held.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citing *Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981)).

### Likelihood of Success on the Merits

Start with the basics.  Title IX prohibits educational institutions receiving federal funds from discriminating against individuals "on the basis of sex."  20 U.S.C. § 1681(a).  Congress

- 15 -

authorized the Department to issue "rules, regulations, or orders of general applicability" that are "consistent with achievement of the objectives" of Title IX.   20 U.S.C. § 1682.   Those objectives are avoiding the use of federal resources to support discriminatory practices and providing individual citizens with effective protection against those practices.  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).

The APA supplies the standard for judicial review of agency rulemaking.  5 U.S.C. § 706(2).  The plaintiffs claim that the Department violated the Act in a variety of ways, including violating its statutory authority under Title IX, acting contrarily to various provisions of the United States Constitution, and by acting arbitrarily and capriciously.  The Court addresses these arguments in turn.

**The Department's interpretation of "on the basis of sex" exceeds its statutory authority.**

The Court accords significant deference to an agency's reasonable interpretation of an ambiguous statute that is within the agency's jurisdiction.[6]  *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865-66 (1984).  *See also Nat'l Cable & Telecommc'ns. Ass'n Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (observing that "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.").  But an agency has no authority to promulgate a regulation that "undoes the unambiguous language of the statute."  *River City Fraternal Order of Police Lodge 614, Inc. v. Ky. Ret. Sys.*, 999 F.3d 1003, 1009 (6th Cir. 2021)

---

[6]      The Court recognizes that *Chevron's* future is uncertain.  *See Loper Bright Enters., et al. v. Raimondo*, No. 22-451 (S. Ct. Argued Jan. 17, 2024).  However, this uncertainty does not impact the Court's analysis because it does not defer to the Department's interpretation of Title IX under *Chevron*.

(citing *Chevron*, 467 U.S. at 842-43); *see also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 274 (5th Cir. 2015) (stating that "a broad grant of general rulemaking authority does not allow an agency to make amendments to statutory provisions"); *Texas v. Cardona*,-- F.3d--, 2024 WL 2947022 (N.D. Tex. June 11, 2024) (noting that "the Department lacks the authority to 'rewrite clear statutory terms to suit its own sense of how the statute should operate'") (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014)).

In determining whether *Chevron* deference is warranted, the Court looks first to whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. The Court begins by examining whether discrimination "on the basis of sex" is ambiguous. This inquiry requires the Court to perform a "full interpretive analysis" to fulfill its "emphatic duty to say what the law is." *See Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) (alterations and internal quotation marks omitted). Rather than outsourcing this duty to the agency, the Court utilizes the traditional tools of statutory interpretation and spurns administrative constructions that contravene the plain meaning of the statute. *Id.* (citing *Chevron*, 467 U.S. at 843 n.9). Abdicating this obligation constitutes a "misuse of *Chevron*" and would "abrogate[] separation of powers without even the fig leaf of Congressional authorization." *Id.* (quoting *Voices for Int'l Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 780-81 (5th Cir. 2018) (Ho, J., concurring)).

The starting point for analyzing any statute is the language of the statute itself. *See Conn. Nat'l. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). The Court begins with the text of Title IX because "a legislature says in a statute what it means and means in a statute what it says there." *Id.* (observing this first, cardinal canon of statutory interpretation). Title IX's general prohibition against discrimination provides:

- 17 -

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).

Because "sex" is not defined within the statute, the Court looks to its ordinary meaning at the time Title IX was enacted. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018); *see Keen v. Helson*, 930 F.3d 799, 802-04 (6th Cir. 2019) (noting that, "[w]hen interpreting the words of a statute, contemporaneous dictionaries are the best place to start"). At that time, the term ordinarily was understood to mean "the character of being either male or female." *See The American College Dictionary* 1109 (1970); *see also Webster's Third New International Dictionary* 2081 (1971) ("one of the two divisions of organic esp. human beings respectively designated male or female"); *Webster's Dictionary* 442 (1972) ("the sum total of characteristics, structural and functional, which distinguish male and female organisms, esp. with regard to the part played in reproduction"); *Funk & Wagnalls Standard College Dictionary* 1231 (1973) ("Either of two divisions, male and female, by which organisms are distinguished with reference to the reproductive functions"); *Webster's New Collegiate Dictionary* (1974) ("either of two divisions of organisms distinguished respectively as male or female").

Uncontroversially, "discriminate" means "[t]o make a difference in treatment or favor (of one as compared with others)." *Bostock*, 590 U.S. at 657 (quoting *Webster's New International Dictionary* 745 (2d ed. 1954)). *See also Merriam-Webster's Unabridged Dictionary* ("to make a difference in treatment or favor on a class or categorical basis in

disregard of individual merit)."[7]  And as the text of Title IX reveals, "not all differential treatment based on biological sex will qualify as prohibited discrimination" under the statute.  *Texas*, 2024 WL 2947022, at *32.  Instead, discrimination means treating an individual *worse* than others who are similarly situated.  *Id.* (citing *Bostock*, 590 U.S. at 657).  The drafters of Title IX recognized that "[s]afeguarding . . . equal educational opportunities for men and women necessarily requires differentiation and separation" of the sexes at times.  *Texas*, 2024 WL 2947022, at *32.

"Statutory interpretation is a 'holistic endeavor'" and, therefore, "the structure and wording of other parts of a statute can help clarify the meaning of an isolated term."  *Keen*, 930 F.3d at 803 (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000)).  Thus, while the meaning of these terms is straightforward, the Court nevertheless examines "the context provided by the rest of the statute."  *Keen*, 930 F.3d at 803.

The Court initially considers the various exceptions to the general prohibition on discrimination.  Section 1681(a)(1) through (9) lists multiple exceptions to the discrimination ban, which explicitly authorize institutions to treat males and females differently in certain situations.  And the language Congress employed presumes that males and females will be separated based on biological sex.  For example, section 1681(a)(2) provides a limited exception for educational institutions that had begun the process of changing from being an institution that only admitted students of *one sex* to being an institution that admitted students

---

[7]     "Discriminate."  *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/discriminate.  Accessed June 11, 2024.

of *both sexes*.  Section 1681(a)(5) provides that the prohibition does not apply to any public institution of undergraduate education "that traditionally and continually from its establishment has had a policy of admitting only students of *one sex*."

Additionally, the sex-discrimination prohibition does not apply to membership practices of certain fraternities or sororities or the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth organizations, "the membership of which has traditionally been limited to persons *of one sex . . . .*"  § 1681(a)(6)(A)-(B).  Likewise, the prohibition does not apply to "boy or girl conferences," or "father-son" or "mother-daughter" activities as those events are defined under the statute.  § 1681(a)(8)-(9).  And section 1686 permits educational institutions receiving federal funds to maintain "separate living facilities for the different sexes."  When Title IX is viewed in its entirety, its various provisions confirm that "sex" means the character of being male or female.

The Final Rule's conclusion that "sex" includes gender identity is based largely on the Supreme Court's decision in *Bostock v. Clayton County, Ga.*, 590 U.S. 644 (2020), a case which did not concern Title IX but, instead, involved claims of employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.  Specifically, *Bostock* involved various employers' decisions to terminate employees based solely on their status as homosexual or transgender persons.  590 U.S. at 653.  Title VII, of course, prohibits discrimination in the employment context because of an individual's sex.  § 2000e-2(a)(1).

The employer-defendants in *Bostock* argued that Title VII does not prohibit discrimination based on sexual orientation or gender identity.  Specifically, they asserted that, for purposes of Title VII, "sex" means what it meant in 1964 and refers to "status as either

male or female [as] determined by reproductive biology." *Id.* at 655. The plaintiffs countered that even in 1964, "sex" was defined more broadly and "reach[ed] at least some norms concerning gender identity and sexual orientation." *Id.* The Court concluded that this distinction was not outcome determinative and proceeded on the assumption that "'sex' . . . refer[s] only to biological distinctions between male and female." *Id.*

The Court did not stop there, however. It proceeded to flesh out "what Title VII says about [sex]." *Id.* at 656. Observing that Title VII prohibits employers from taking certain actions "because of" sex, it noted that, "[s]o long as the plaintiff's sex was one but-for cause of [the employer's] decision, that is enough to trigger the law." *Id.* (citing *Burrage v. United States*, 571 U.S. 204, 211-12 (2014)). The Court observed that "homosexuality and transgender status are inextricably bound up with sex." For example, Bostock, who was fired for being gay (i.e., being attracted to men), would not have been fired for that same trait had he been a woman. And Aimee Stephens, who was fired after she informed her employer that she planned to "live and work full-time as a woman," would not have been fired for that trait had she been born female. The Court concluded that "to discriminate on these grounds requires an employer to intentionally treat the individual differently because of their sex" and, therefore, violates Title VII. *Id.* at 660-61.

Justice Alito, with whom Justice Thomas joined, issued a compelling dissent which proclaimed the majority's opinion *de facto* legislation. *Id.* at 683. The dissent first observed that Title VII explicitly lists the statuses that are protected under the statute—sexual orientation and gender identity are not included. The dissent further noted that a court's duty is to interpret statutory terms to "mean what they conveyed to reasonable people *at the time they were written*." *Id.* at 685 (emphasis in original). As Justice Alito remarked, "[i]f every single living

American had been surveyed in 1964, it would have been hard to find any who thought that discrimination because of sex meant discrimination because of sexual orientation—not to mention gender identity, a concept that was essentially unknown at the time." *Id.*  The dissent also observed that, "[e]ven as understood today, the concept of discrimination because of 'sex' is different from discrimination because of 'sexual orientation' or 'gender identity.'" *Id.*

More notably for present purposes, the dissent noted that the majority's decision was "virtually certain to have far-reaching consequences," since "[o]ver 100 federal statutes prohibit discrimination because of sex." *Id.* at 724 (citing, *inter alia*, 20 U.S.C. § 1681(a)).  These include transgender or "gender fluid" persons' purported entitlement to use bathrooms and locker rooms that are reserved for persons of the sex with which they identify and the right of transgender persons to participate on a sports team or in an athletic competition reserved for members of one biological sex.  *Id.* at 726-27.  The dissent also observed that the Court's decision could affect the way teachers and school officials are required to address students, as plaintiffs may begin to claim that the failure to use their preferred pronoun violates federal sex-discrimination laws.  *Id.* at 731-32.  At the same time, employers may become pressured to suppress employee speech that expresses disapproval of same-sex relationships or sex reassignment procedures.  *Id.* at 732.

The majority responded to these real-world concerns by clarifying that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination."  *Id.* at 681.  And even with respect to Title VII, the opinion said nothing about "bathrooms, locker rooms, or anything else of the kind."  *Id.*  Instead, the Court's holding was limited to the narrow issue of "whether an employer who fires someone simply for being homosexual or transgender

has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.*

While no Sixth Circuit case following *Bostock* confronts the precise issues at hand, that court has clearly acknowledged the limited nature of *Bostock*'s holding. *L.W. by and through Williams v. Skrmetti,* 83 F.4th 460 (6th Cir. 2023) involved a challenge to Tennessee and Kentucky laws prohibiting healthcare providers from administering certain medical procedures to minors for purposes of attempting to alter the appearance or perception of the minor's sex. *See* Tenn. Code Ann. § 68-33-101, Ky. Rev. Stat. § 311.372. Transgender minors and their parents brought suit claiming that the laws violated their constitutional rights to due process and equal protection.

In rejecting the plaintiffs' equal protection claim, the court noted that the state laws were not based on sex and, therefore, were not subject to heightened review. Specifically, it concluded that the laws "treat similarly situated individuals evenhandedly" because the laws "regulate sex-transition treatments for all minors, regardless of sex." *Id.* at 479-80. Such an "across-the-board" regulation lacks the hallmarks of sex discrimination because it does not prefer one sex over the other. *Id.* at 480. In other words, the laws do not "bestow benefits or burdens based on sex" or provide different rules for males and females. *Id.* Further, the plaintiffs did not seek a remedy that would "equalize treatment options"—instead, the requested outcome was that "both sexes get a type of care or neither one does."

The court was not persuaded by the plaintiffs' reliance on *Bostock*. As an initial matter, it acknowledged that *Bostock* is limited to Title VII claims. *Id.* at 484. Further, the court noted that "there is a marked difference in application of the anti-discrimination principle" at issue. *Id.* at 485 (observing that "a case about potentially irreversible medical procedures

available to children falls far outside Title VII's adult-centered employment bailiwick"). The court also pointed to the enduring physical differences between men and women that permit states to make sex-based classifications as long as they do not "perpetuate[] invidious stereotypes or unfairly allocate[] benefits and burdens." *Id.* (citing *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 131 (1994)). As the Sixth Circuit observed, "recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States v. Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping." *Id.* at 486 (quoting 518 U.S. 515, 533 (1996)).

Since *Bostock*, the Sixth Circuit also has highlighted the differences between Title VII and Title IX. For example, in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), a public university professor filed suit against his employer after being disciplined for refusing to use a transgender student's preferred pronouns. The university relied on the principles announced in *Bostock* in arguing that it had a compelling interest in stopping discrimination against transgender students. *Id.* at 510 (citing *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018)). The court noted, however, that Title VII "differs from Title IX in important respects," and "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Id.* at 510 n.4. *See also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (declining to apply *Bostock* to an ADEA claim, as the Supreme Court "was clear on the narrow reach of its decision and how it was only limited to Title VII itself"). *See also Texas*, 2024 WL 2947022, at *37 ("Title VII focuses exclusively on hiring and firing in employment, whereas Title IX deals with educational opportunities").

The purpose of statutory construction is to give effect to the intent of Congress. *See United States v. Underhill*, 813 F.2d 105, 111 (6th Cir. 1987) (citing *United States v. Am.*

*Trucking Ass'ns, Inc.*, 310 U.S. 532, 542-44 (1940)).  While Title VII allows employers to discriminate between the sexes when the employee's sex is a bona fide occupational qualification, 42 U.S.C. § 2000e-2(e), Title IX is rife with instances in which males and females may be separated.  *See* 20 U.S.C. §§ 1681(a)(1)-(9), 1686, 34 C.F.R. §§ 106.34, 106.41(b).  Title IX's text, coupled with the legislative history discussed at the beginning at this opinion, leaves little doubt that Title IX's drafters meant "male" and "female" when they wrote "on the basis of sex."  *See* 118 Cong. Reg. 5807 (Feb. 28, 1972) (Statement of Sen. Bayh) (acknowledging that Title IX "permit[s] differential treatment by sex" in various situations including "in sport facilities or other instances where personal privacy must be preserved").  And this conclusion is bolstered by the regulatory framework the Department leaves intact.

The Department's new definition of "discrimination on the basis of sex" wreaks havoc on Title IX and produces results that Congress could not have intended.  Under the new rules, recipients of federal funds will still be permitted to separate the sexes for all the reasons listed in 20 U.S.C. § 1681(a)(1)-(9) and § 1686.  However, recipients must permit individuals access to private facilities and course offerings consistent with the individual's gender identity.  *See* 34 C.F.R. §§ 106.31(a)(2), 106.33, 106.34.  For example, the new rules provide that recipients may separate students for purposes of fraternities and sororities, but not for purposes of utilizing bathrooms.  *Compare* 20 U.S.C. § 1681(a)(6)(A) and 34 C.F.R. § 106.33.  Likewise, recipients of federal funds may require children to participate in the Boy Scouts or Girl Scouts consistent with the student's biological sex but may not require the same for sex education or physical education classes.  *Compare* 20 U.S.C. § 1681(a)(6)(B) *and* 34 C.F.R. § 106.34(a).  In yet another example, recipients of federal funds may still provide separate living facilities for

- 25 -

the different sexes but may not require students to use the shower or locker room associated with their biological sex.  *Compare* 20 U.S.C. § 1686 and 34 C.F.R. § 106.33.

> In attempting to justify these inconsistencies, the Department states that it:

> has long recognized that sex 'separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively sex discrimination' because such sex-separate facilities generally impose no more than de minimis harm on students. . . .   But consistent with federal court decisions and guidelines published by respected medical organizations, the Department explained that sex separation that prevents a person from participating in a program or activity consistent with their gender identity *does* cause more than de minimis harm—a conclusion that Plaintiffs do not dispute.

[Record No. 73, p. 18 (citing 89 Fed. Reg. at 33816)] The Department attempts to explain away the areas in which sex segregation *is* still allowed by simply stating that Congress has specified a "few limited contexts in which more than de minimis harm is permitted by the statute."  *Id.* (citing 20 U.S.C. §§ 1681(a), 1686).  But this throwaway reasoning does not reconcile these stark inconsistencies or persuade the Court that this is the result that Congress intended.

The United States Court of Appeals for the Eleventh Circuit considered similar issues in *Adams by and through Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022).  In *Adams*, a high school student who was born female, but identified as male, sued the school under 42 U.S.C. § 1983 and Title IX due to the school's policy that prohibited her from using the boys' bathroom.  The court declined to apply the holding from *Bostock* in this context, observing that, unlike Title VII, Title IX includes "express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities, among others."  *Id.* at 811.  It reasoned that, if "'sex' [was] ambiguous enough to include gender identity," then the various carve-outs would be rendered meaningless."  *Id.* at

813.  *See Chrysler Corp. v. C.I.R.*, 436 F.3d 644, 654-55 (6th Cir. 2006) (stating that statutory provisions should be interpreted so that other provisions in the statute are not rendered inconsistent, superfluous, or meaningless).

The likely consequences of the Final Rule are virtually limitless.  Title IX prohibits discrimination "on the basis of sex."  And as noted at the outset of this opinion, the Department acknowledges that "sex is binary and assigned at birth" but it contends that "on the basis of sex" includes gender identity, which describes "an individual's sense of their gender, which *may or may not* be different from their sex assigned at birth."  89 Fed. Reg. at 33809.

With those principles in mind, consider the following hypothetical:  Taylor is a biological male student and uses he/him pronouns.  Taylor has a hypermasculine self-identity that he feels is essential to his being.  But unfortunately for Taylor, his parents gave him a family name that he finds feminine.  Taylor feels that the name Bruce is more reflective of how he expresses his gender and has asked his teacher to refer to him by this new name.  However, his teacher refuses to do so even after he accuses the teacher of defamation.  The teacher's refusal to acknowledge the name that comports with the student's gender expression makes the student feel invisible and emasculated.  The student's frustration becomes so severe that he decides to drop out of the class.

This scenario does not implicate the male/female dichotomy or subject the student to discrimination on the basis of his sex.  It does, however, arguably reflect discrimination on the basis of gender identity, which *would* result in a violation of the new regulations.  This is an impermissible result.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976) (noting that "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law.  Rather, it is the power to

adopt regulations to carry into effect the will of Congress as expressed by the statute.") (internal quotation marks omitted).

"Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004). While undercutting that purpose, the Final Rule creates myriad inconsistencies with Title IX's text and its longstanding regulations. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that "[a]n agency may not . . .depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."). Like the district court in Louisiana, the undersigned is not persuaded that the ordinary meaning of sex includes subjective gender identity. *See State of Louisiana, et al. v. U.S. Dep't of Educ., et al.*, 3: 24-CV-00563, 2024 WL 2978786, at *4 (W.D. La. June 13, 2024) (observing that "[t]here is nothing in the text or history of Title IX indicating that the law was meant to apply to anyone other than biological men and/or women"). Accordingly, the plaintiffs are likely to succeed on their claim that the Department exceeded its statutory authority in redefining "on the basis of sex" for purposes of Title IX.

**The major questions doctrine counsels against the Department's reading.**

For purposes of Title IX, "sex" is unambiguous. Therefore, there is no "implicit delegation from Congress" to the Department to change or expand its meaning. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 159 (explaining that *Chevron* deference is "premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps"). But even if the word were ambiguous, there would be significant reason for pause before assuming that Congress "had intended such an implicit

- 28 -

delegation." *See id.* Education is one of the most important functions of state and local governments and is an area where states "historically have been sovereign." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954); *United States v. Lopez*, 514 U.S. 549, 564 (1995). Accordingly, it is unlikely that Congress would have intended to delegate the authority to deviate from Title IX's original purpose "in so cryptic a fashion." *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 160).

The major questions doctrine assumes that Congress speaks clearly when it delegates to an agency the authority to make "decisions of vast economic and political significance." *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014). *See also West Virginia by and through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1146-47 (11th Cir. 2023) (suggesting that a "major question" is more likely when it "alters the traditional balance of federalism by imposing a condition on a state's entire budget process"). Thus, if an agency's regulatory action "brings about an enormous and transformative expansion in [the agency's] regulatory authority," then there must be "clear congressional authorization" to do so. *Id.*

While Congressional inaction is of limited persuasive value, the Court notes that Congress has refused to expand Title IX to include gender identity. *See* Student Non-Discrimination Act of 2015 ("SNDA"), S. 439 114th Cong. (2015). Just like the Final Rule, the SNDA prohibited discrimination based on actual or perceived sexual orientation or gender identity under any program or activity receiving federal financial assistance. Programs or activities not complying with the SNDA would have faced losing federal funds and/or private lawsuits. However, the SNDA did not receive enough votes in the Senate to proceed. Separation of powers requires that any legislation pass through the legislature, no

- 29 -

matter how well-intentioned the policy may be.  *See Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 472-73 (6th Cir. 2021).  While not outcome determinative, this factor weighs in the plaintiff-State's favor, as the changes implemented under the Final Rule represent a novel expansion of the Department's power under Title IX.  *See State of Louisiana*, 2024 WL 2978786, at *13-14 (concluding that the Final Rule involves a major question pursuant to the major questions doctrine).

### The clear statement rule weighs against the Department's reading.

Title IX was enacted as an exercise of Congress' powers under the Spending Clause U.S. Const. Art. I, § 8, cl. 1.  The Spending Clause gives Congress broad powers to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).  And "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Id.* (quoting *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  As with any contract, education institutions cannot "knowingly accept" funds from the federal government unless they would "'clearly understand . . . the obligations' that would come along with doing so." *Id.* at 219 (quoting *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006)).  *See also South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (providing that Congress must state the conditions of receipt of federal funds "unambiguously" so that the states may "exercise their choice knowingly, cognizant of the consequences of their participation").

Title IX's language provides no indication that an institution's receipt of federal funds is conditioned on any sort of mandate concerning gender identity.  The Spending Clause is an Article I power, so it is likely that Congress, and not the Department or any other agency, must

provide the constitutionally required clarity.  *See State v. Yellen*, 539 F. Supp. 3d 802, 816 (S.D. Ohio 2021) (citing *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 284 (6th Cir. 2009) (en banc) (Sutton, J. concurring).  *See also Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 666 (1985) (acknowledging applicability of agency guidance to clarify the nature of condition but noting that the statute itself provided the constitutionally required level of clarity).

The Department relies on *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005) in which the Supreme Court held that Title IX's private right of action encompasses claims of retaliation against an individual because he has complained about sex discrimination.  The Eleventh Circuit had dismissed the plaintiff's complaint, reasoning that Title IX did not prohibit retaliation because "the statute makes no mention of retaliation."  *Id.* at 174.  The Supreme Court remarked that this conclusion ignored the import of its repeated holdings construing Title IX broadly.  For instance, although the statute does not mention sexual harassment or a recipient's deliberate indifference to sexual harassment, these acts have been deemed discrimination under Title IX.  *Id.* at 174-75.

But *Jackson* did not involve an agency interpretation of Title IX.  *See* 544 U.S. at 178.  Rather, the Court looked to Title IX and determined, based on its plain language and the relevant case law, that "intentional discrimination on the basis of sex" includes retaliation.  *Jackson* indicates that Title IX must be read broadly with respect to the *category* of discrimination that falls under the statute.  Neither *Jackson* nor any of the cases it cites indicates the statute should be read to expand the traditional definition of "on the basis of sex."

The Eleventh Circuit explained in *Adams* that "what constitutes 'sex' for purposes of Title IX will have ramifications far beyond the bathroom door at a single high school" and will

"at the very least, generally impact . . . locker rooms, and showers, in addition to bathrooms, at schools across the country—affecting students in kindergarten through the post-graduate level." 57 F.4th at 816.  This is particularly true since the Department construes this mandate to protect anyone "participating or attempting to participate" in a recipient's program or activity.  *See* 89 Fed. Reg. at 33816.  The apparent result is that not only a recipient's students, but virtually anyone who enters a public school, would be entitled to use the facilities consistent with that person's purported gender identity.  For all these reasons, it is likely that a clear statement from Congress equating "sex" to "gender identity" or "transgender status" is necessary before states' acceptance of federal funds may be conditioned on such a term.  *See Adams*, 57 F.4th at 816; *State of Louisiana*, 2024 WL 2978786, at *16 (concluding that the Final Rule violates the Spending Clause).  This consideration weighs in the plaintiffs' favor with respect to their likelihood of success on the merits.

### The plaintiffs are likely to succeed on their First Amendment claims.

The First Amendment to the United States Constitution stands as a sentry over one of the Nation's most indispensable freedoms through a proclamation clear and uncompromising: "Congress shall make no law . . . abridging the freedom of speech, . . . ."  U.S. Const. amend. I.  Today's Free Speech principles trace back to the democratic ideals of ancient Western Civilization.[8]  These early societies understood that the unfettered exchange of ideas was the

---

[8]      *See, e.g.,* Keith Werhan, *The Classical Athenian Ancestry of American Freedom of Speech*, 2008 S. Ct. Rev. 293, 300 ("The classical Athenians adopted two free-speech concepts that were central to their democracy.  The first was isēgoria, which described the equal opportunity of all Athenian citizens to speak in the principal political institution of the democracy, the Assembly.  The second was parrhēsia, which described the practice of Athenians to speak openly and frankly once they had the floor." (citations and footnotes omitted)); Cornelius Tacitus, *The Histories* 3 (Kenneth Wellesley III trans., Penguin Books,

lifeblood of a free and vibrant polity.  Centuries later, these values were embraced by many Enlightenment thinkers, who viewed them as indispensable to reason and individual rights.  *See, e.g.*, John Milton, *Areopagitica* 33 (J.C. Suffolk ed., Univ. Tutorial Press 1968) ("Give me the liberty to know, to utter, and to argue freely according to conscience, above all liberties."); John Locke, *Two Treatises of Government* 306 (Peter Laslett ed., Cambridge Univ. Press 1988) ("The end of law is not to abolish or restrain, but to preserve and enlarge freedom.  For in all the states of created beings capable of laws, where there is no law, there is no freedom."); 2 The Complete Writings of Thomas Paine 588 (P. Foner ed. 1945) ("He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty he establishes a precedent that will reach to himself.").[9]

As the American colonies wrested their independence from British tyranny, the primacy of free speech became even more pronounced.  Benjamin Franklin, writing under the pseudonym Silence Dogood, encapsulated the critical nature of free speech in 1722: "Whoever would overthrow the Liberty of a Nation, must begin by subduing the Freeness of Speech;" Silence Dogood, Letter to the Editor, No. 8, The New-England Courant (July 9, 1722).  The trial of John Peter Zenger in 1735, wherein a jury acquitted him of seditious libel for publishing anonymous political pamphlets attacking the Crown Governor of New York, marked a seminal

---

1995) ("Modern times are indeed happy as few others have been, for we can think as we please, and speak as we think.").

[9]     Arguably the most famous "quote" from an Enlightenment thinker is the apocryphal declaration attributed to Voltaire: "I disapprove of what you say, but I will defend to the death your right to say it."  *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 63 (1976) ("The essence of that comment has been repeated time after time in our decisions invalidating attempts by the government to impose selective controls upon the dissemination of ideas.").

moment in the American tradition of protecting free expression.  *See* J. Alexander, *A Brief Narrative of the Case and Trial of John Peter Zenger* 9–19 (S. Katz ed. 1972).

The Nation's Founders enshrined these principles in the nascent republic, acutely aware of the profound importance of free speech to a democratic nation and the consequences of its absence.  *See* Benjamin Franklin, *On Freedom of Speech and the Press*, Pa. Gazette, Nov. 1737, *reprinted in The Works of Benjamin Franklin, Vol. II*, 285 (Philadelphia, Hilliard, Gray & Co. 1840) ("Freedom of speech is a principal pillar of a free government; when this support is taken away, the constitution of a free society is dissolved, and tyranny is erected on its ruins."); *see also* John Adams, *A Dissertation on the Canon and Feudal Law* (1765), *reprinted in* 3 *The Works of John Adams* 447, 456 (Charles C. Little & James Brown eds., 1851) ("[L]iberty cannot be preserved without a general knowledge among the people, who have a right . . . and a desire to know.").

James Madison, America's fourth President and a chief architect of the Constitution, remarked that "the right of freely examining public characters and measures, and of free communication among the people thereon . . . has ever been justly deemed, the only effectual guardian of every other right."  James Madison, *Resolutions of 1798* (Dec. 21, 1798), *in* 6 *The Writings of James Madison*, 1790–1802, at 328–29 (Gaillard Hunt ed., 1900).  In his First Inaugural Address, Thomas Jefferson encapsulated the ethos of the First Amendment with the assertion, "[e]rror of opinion may be tolerated where reason is left free to combat it."  Thomas Jefferson, *First Inaugural Address*, *in The Papers of Thomas Jefferson: 17 February to 30 April 1801*, at 148 (Barbara G. Oberg ed., 2006).  This articulation of the marketplace of ideas remains a cornerstone of Supreme Court jurisprudence.  *See Whitney v. California*, 274 U.S. 357, 375 (1927) ("Those who won our independence believed . . . that freedom to think as you

- 34 -

will and to speak as you think are means indispensable to the discovery and spread of political truth.").

This underlying vision transcends mere tolerance by envisioning a dynamic forum where even the most politically charged and contentious ideas are open for debate.  To that end, speech on matters of public importance receive the highest protection under the First Amendment.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasizing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

The enduring principle of protecting pure speech is further underscored in *Snyder v. Phelps*, where the Supreme Court protected the right to express even deeply unpopular and offensive viewpoints.  *See* 562 U.S. 443, 454 (2011) (holding that the First Amendment protects the right to picket outside military funerals with signs bearing messages such as, "Thank God for Dead Soldiers").  But in a society that is "constantly proliferating new and ingenious forms of expression," *Erznoznik v. Jacksonville*, 422 U.S. 205, 210 (1975), it can be "necessary to protect the superfluous in order to preserve the necessary," *Mahanoy Area Sch. Dist. v. B. L. by and through Lev*y, 594 U.S. 180, 193 (2021).  The Supreme Court's consistent defense of offensive and even hateful speech demonstrates a profound commitment to the principle that freedom of expression must include the protection of all ideas, no matter how repugnant they may be to some.  *See Cohen v. California*, 403 U.S. 15, 25 (1971) ("We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of

individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.").

### Speech in Schools

Schools are not "enclaves of totalitarianism," where "students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 511 (1969). To the contrary, the classroom is the most cherished "marketplace of ideas," where the Nation's future leaders must be exposed to a "robust exchange" of competing viewpoints. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom," *id.*, an environment where "[t]eachers and students must always remain free to inquire, to study and to evaluate, [and] to gain new maturity and understanding," *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957).

But "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). For example, the First Amendment does not prevent schools from prohibiting vulgar and offensive speech that undermines the school's educational mission. *See id.* at 681 ("The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."). But undermining a school's educational mission must mean "more than a mere desire to avoid the discomfort and unpleasantness that always accompan[ies] an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Where speech constitutes a "substantial disruption" or causes a "material interference

with school activities," its suppression may fall outside the reach of First Amendment protections.[10]  *Id.* at 514.

In *Fraser*, the Supreme Court upheld disciplinary action taken against a high school student who gave a speech at a school assembly where he referred to a fellow classmate "in terms of an elaborate, graphic, and explicit sexual metaphor."  478 U.S. at 678.  The speech had an immediate and disruptive impact on many of the approximately 600 students in the auditorium; one teacher even felt it necessary to dedicate a portion of the following day's class to discussing the speech.  *Id.* ("Some students hooted and yelled; some by gestures graphically simulated the sexual activities pointedly alluded to in respondent's speech.  Other students appeared to be bewildered and embarrassed by the speech.").  Beyond recognizing the disruptive nature of certain speech, the *Fraser* decision recognizes schools' interest in and ability to "protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech."  *Id.* at 684.

Schools' compelling interest in protecting their students may also permit them to regulate speech encouraging illegal activity.  *See Morse v. Frederick*, 551 U.S. 393, 410 (2007) (upholding the suspension of a student who unfurled a banner promoting illegal drug use at a school event).  So too may schools impose certain restrictions on speech when necessary to maintain student's physical safety.  *See Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 336 (6th Cir. 2010) (upholding a ban on displaying the Confederate flag where the school reasonably

---

[10]     Schools also may exercise editorial control "over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."  *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

forecasts it will incite disruption in light of past racial violence, tension, and threats).  But these limited exceptions do not absolve schools of the need to carefully balance their duty to provide a safe and effective learning environment with students' rights to free expression.

The impact of speech regulation within schools also has a unique impact on institutions themselves as well as the faculty and staff who play a crucial role in fostering an effective learning environment.  Academic freedom is a principle recognized by the Sixth Circuit "to denote both the freedom of the academy to pursue its end without interference from the government . . . and the freedom of the individual teacher . . . to pursue his ends without interference from the academy."  *Parate v. Isibor*, 868 F.2d 821, 826 (6th Cir. 1989) (quoting *Piarowski v. Ill. Cmty. Coll. Dist.* 515, 759 F.2d 625, 629 (7th Cir. 1985)).

While teachers possess certain First Amendment protections over their in-class speech, their "right to academic freedom is not absolute" and may be subject to limitations that ensure the effectiveness of their educational duties and the institution's mission.  *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001); s*ee Pickering v. Board of Ed. of Tp. High School Dist.*, 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

Whether a public teacher's speech is constitutionally protected depends on whether it is "public" or "private" in nature.  *Connick v. Myers*, 461 U.S. 138, 146–47 (1983).  This distinction recognizes that "[t]he First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  *Id.* at 145 (quoting *Roth v. United States,* 354 U.S. 476, 484 (1957)).  This form of

speech is "the essence of self-government," *id.* (quoting *Garrison v. Louisiana,* 379 U.S. 64, 75 (1964), "and is entitled to special protection," *id.*

The court looks to the "content, form, and context of a given statement, as revealed by the whole record" in determining whether speech is public in nature. *Id.* at 147–48. "Speech that relates 'to any matter of political, social, or other concern to the community' touches upon matters of public concern." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 678 (2001) (quoting *Connick*, 461 U.S. at 146)). "Thus, a teachers in-class speech about 'race, gender, and power conflicts' addresses matters of public concern." *Meriwether,* 992 F.3d at 508 (quoting *Hardy*, 260 F.3d at 679).

"Because the essence of a teacher's role is to prepare students for their place in society as responsible citizens, classroom instruction will often fall within the Supreme Court's broad conception of 'public concern.'" *Hardy*, 260 F.3d at 679 (citing Gregory A. Clarick, Note, *Public School Teachers and the First Amendment: Protecting the Right to Teach,* 65 N.Y.U. L. Rev. 693, 702 (1990)). But the court must also determine "the *point* of the speech in question . . . because controversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection." *Dambrot v. Cent. Mich. Univ.,* 55 F.3d, 1177–87 (6th Cir. 1995) (emphasis in original) (cleaned up). "The linchpin of the inquiry is, thus, for both public concern and academic freedom, the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Id.* at 1189. This embrace of academic freedom and open dialogue in the classroom is exemplified in the following case.

The Sixth Circuit decision in *Meriwether v. Hartop* addresses the pivotal intersection of academic freedom and free speech within academic settings. 992 F.3d 492, 505 (6th Cir.

2021).  Dr. Nicholas Meriwether, a philosophy professor at Shawnee State University, challenged the university's disciplinary actions against him for refusing to refer to a student using pronouns reflecting the student's "self-asserted gender identity."  *Id.* at 498.  Meriwether, who used the Socratic method for class discussion, addressed his students as "Mr." or "Ms." to instill a sense of formality and seriousness into the academic setting.  *Id.* at 499.  He found this practice "an important pedagogical tool in all of his classes."  *Id.*

In 2018, Meriwether was approached by a transgender student[11] who "demanded that Meriwether refer to [the student] as a woman and use feminine titles and pronouns."  *Id.* (quotations omitted).  Due to his religious beliefs, Meriwether instead referred to the student by last name—a practice the student and university administration found unacceptable.  Meriwether was instead presented with two options: "(1) stop using all sex-based pronouns in referring to students (a practical impossibility that would also alter the pedagogical environment in his classroom), or (2) refer to [the student] as a female, even though doing so would violate Meriwether's religious beliefs."  *Id.* at 500.  When he failed to abide, the university's Title IX office concluded that Meriwether's "disparate treatment" constituted a "hostile environment."  *Id.*  After finding no recourse through administrative remedies, Meriwether sued in federal court.  After the district court dismissed Meriwether's free-speech and free-exercise claims, the Sixth Circuit reversed the holdings with an opinion that sheds considerable light on the issues presently before this Court.

---

[11]     Meriwether is quoted in the record as stating that "no one . . . would have assumed that [the student] was female" based on outward appearance.  *Meriwether,* 992 F.3d at 499.

- 40 -

The Sixth Circuit's opinion expressly recognized that "titles and pronouns carry a message," and compelling someone to use preferred pronouns communicates the message that "[p]eople can have a gender identity inconsistent with their sex at birth." *Id.* at 507. The court found that Meriwether's refusal to use preferred pronouns "*was* the message," one that expressed his belief that "sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Id.* at 509 (quotation omitted). "The 'focus,' 'point,' 'intent,' and 'communicative purpose' of the speech in question was a matter of public concern," *id.* at 509 (quoting *Farhat v. Jopke*, 370 F.3d 580, 592 (6th Cir. 2004)), and it addressed "a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes," *id.* at 508 (citation omitted). Plainly stated: "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508.

The opinion also illustrates the profound significance of the First Amendment's protection of a teacher's in-class free speech rights more broadly.

> If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity. A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as "comrades." That cannot be.

*Id.* at 505.

### Compelled Speech

Individuals cannot be coerced into affirming messages with which they fundamentally disagree. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak

freely and the right to refrain from speaking at all."); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

The plaintiffs argue that the Final Rule prohibits schools from maintaining certain sex-based distinctions while mandating adherence to "gender-identity notions divorced from sex entirely." [Record No. 19, p. 9]  In doing so, private and public institutions, as well as the students, faculty, and staff therein, will be forced to convey a particular message that may contradict moral or religious values. [*Id.* at 24]  For example, the Final Rule's definition of harassment will likely compel "students and teachers to use 'preferred' rather than accurate pronouns." [Record No. 19-1, p. 17]  Christian Educators reports that some of its members have already declined requests to use "inaccurate pronouns" and "fear the new rules will compel them to speak these words." [Record No. 63-1, p. 11].  In addition to compelling affirmation of gender identity through policy, the Final Rule compels silence of opposing viewpoints.  "There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

The Department argues that the Final Rule's guidance is clear: "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33516.  Furthermore, the Department argues that the regulations have codified a provision expressly declaring that nothing in the Title IX regulations requires a recipient to "[r]estrict any rights that would otherwise be protected from government action by the First

Amendment of the U.S. Constitution."  89 Fed. Reg. at 33492; *see* 85 Fed. Reg. at 30418, 30573 (adding 34 C.F.R. § 106.6(d)(1) via the 2020 amendments).  Despite these assurances, the plaintiffs contend that the text of the regulation and the Department's past action speaks for itself.

The Department's 2016 Dear Colleague Letter noted that schools "must treat students consistent with their gender identity," while noting that prior Title IX investigations were resolved "with agreements committing that school staff and contractors will use pronouns and names consistent with a transgender student's gender identity."  Dep't of Just. & Dep't of Educ., Dear Colleague Letter on Transgender Students (May 13, 2016).  The Final Rule does not depart from that position.

When commenters questioned whether misgendering could constitute sex-based harassment, the Department indicated that it could, depending on the circumstances.  *See* 89 Fed. Reg. at 33516 ("Many commenters, as highlighted above, believe that misgendering is one form of sex-based harassment.  As discussed throughout this preamble, whether verbal conduct constitutes sex-based harassment is necessarily fact-specific."); *id.* ("[H]arassing a student—including acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on the student's nonconformity with stereotypical notions of masculinity and femininity or gender identity—can constitute discrimination on the basis of sex under Title IX in certain circumstances.").

In a discussion section on "Free Speech," the Department acknowledges that "the First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech," but suggests nonetheless that the Final Rule has been narrowly tailored to advance the Department's "'compelling interest in eradicating

discrimination' on the basis of sex." *Id.* at 33503 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24 (1984)).

To ascertain the Department's true intention behind the 2020 First Amendment saving clause, 34 C.F.R. § 106.6(d)(2), one needs to look no further than the Amicus Briefs that the Department highlights on a webpage dedicated to "Resources for LGBTI+ Students."[12] In November 2021, after the saving clause had already been adopted, the United States filed an Amicus Brief in a case before the Seventh Circuit Court of Appeals.[13] *See* Brief for the United States, *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861 (7th Cir. filed Nov. 8, 2021), ECF No. 34.  The question presented was,

> whether a public high school must accommodate a teacher's religious objection to referring to transgender students by names and pronouns that match their gender identities, by permitting him to address all students by their last names only, where the record shows that the accommodation harmed students and undermined the school's policy of providing a supportive learning environment for all students.

*Id.* at 2–3.  As a result of the teacher's accommodation, two transgender students reported that the use of their last names "made them feel isolated and targeted." *Id.* at 6.  The students also expressed that they "felt strongly that they wanted others to acknowledge their corrected names, and [the teacher's] refusal to do so hurt them." *Id.*  The faculty advisor for the school's Equality Alliance club reported that "the emotional distress and the harm that was being caused . . . was very, very clear." *Id.*  The Brief goes on to describe the adverse effects this religious

---

[12]    *See* U.S. Dep't of Educ., Resources for LGBTI+ Students (last visited June 11, 2024), https://www2.ed.gov/about/offices/list/ocr/lgbt.html.

[13]    The only claims before the Seventh Circuit were grounded in Title VII.  The Government's interpretation of Title IX's mandate is nonetheless informative.

accommodation had on students and school operations, citing a report that it was "affecting the overall functioning of the performing arts department," and that a parent referred to the accommodation as "'very disrespectful and hurtful'—even 'bordering on bullying.'" *Id.* at 8 (cleaned up). Ultimately, the school rescinded the accommodation and explained that if the teacher was unwilling to adhere to the school's pronoun policy he could resign or would be fired.

The Brief concludes that the last-name only accommodation "harmed students and increased the school's risk of Title IX liability," after finding undisputed evidence that it "had caused transgender students . . . significant distress and alienation." *Id.* at 12. One of the transgender students decided not to continue in that teacher's class the following year because the teacher's "'refusal to acknowledge his personhood and identity' made him 'miserable' and caused him 'anxiety.'" The Government concludes that "this evidence, if proven, could potentially support a claim that [the student] was 'excluded from participation in,' 'denied the benefits of,' and 'subjected to discrimination under' an education program or activity under Title IX." *Id.* at 29.

The Government further contends that because the teacher "changed his behavior in obvious ways, no longer using honorifics like 'Mr.' and 'Ms.'," it served to "isolate and alienate those students." *Id.* at 29–30 (cleaned up). The Brief cautioned that "practices adopted for discriminatory reasons—even facially neutral practices—can constitute unlawful intentional discrimination." *Id.* at 31. The Government takes the position that because "students correctly recognized that [the teacher's] facially neutral approach was motivated by an aversion to referring to transgender students by names and pronouns that accorded with their gender identity," the otherwise neutral naming practice "does not diminish the

reasonableness of school officials' concern that his conduct could have created a risk of Title IX liability." *Id.* at 31–32.

It is unclear how the Government's articulated position can be seen as anything less than a tacit endorsement of a content-based heckler's veto.[14]  So long as the offended individuals complain with sufficient vigor, the refusal to abide by preferred pronouns can be deemed harassment and exposes a recipient of Federal funds to liability under Title IX.  Given the Department's apparent interpretation of Title IX's mandate, the saving clause is exposed as little more than a paper tiger.

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).  "[C]ontent-based restrictions on speech [are] presumed invalid," and matters of public importance receive the highest protection under First Amendment jurisprudence.  *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).  "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022) (citing *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000)).  With respect to the topic of gender identity, the Biden

---

[14]     The Sixth Circuit has acknowledged the impact of the heckler's veto, quoting an explanation provided by constitutional scholar Harry Kalven: "If the police can silence the speaker, the law in effect acknowledges a veto power in hecklers who can, by being hostile enough, get the law to silence any speaker of whom they do not approve." *Bible Believers v. Wayne County*, 805 F.3d 228, 234 n.1 (6th Cir. 2015) (quoting Harry Kalven, Jr., *The Negro and the First Amendment* 140 (Ohio St. Univ. Press 1965)).

Administration has taken a clear position.[15]  And while the First Amendment does not require "viewpoint-neutrality on government speech," *Matal v. Tam*, 582 U.S. 218, 234 (2017), "[t]he government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed," *R.A.V. v. City of St. Paul,* 505 U.S. 377, 386 (1992).  Nor can the Government compel speech "to 'excise certain ideas or viewpoints from the public dialogue.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023) (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 512 U. S. 622, 642 (1994)).

The Department's Final Rule forces the Nation's schools and educators to convey a message ordained in Washington, D.C., while silencing dissenting opinions and undermining state law and the discretion of local school boards.  *See Nat'l Rifle Assoc. of Am. v. Vullo*, No. 22-842, slip op. at 1 (U.S. 2024) ("A government entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment.").  In his 2024 Proclamation on Transgender Day of Visibility, President Biden declared that "extremists are proposing hundreds of hateful laws that target and terrify transgender kids and their families—silencing teachers;

---

[15]      *See, e.g.*, Exec. Order No. 14075, Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals, 87 Fed. Reg. 37189 (June 15, 2022);  Exec. Order No. 14021, Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, 86 Fed. Reg. 13803 (Mar. 8, 2021);  Exec. Order No. 14020, Establishment of the White House Gender Policy Council, 86 Fed. Reg. 13797 (Mar. 8, 2021);   Exec. Order No. 13988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021);  Proclamation No. 10767, Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Pride Month, 2024, 89 Fed. Reg. 48225 (May 31, 2024);   Proclamation No. 10724, Transgender Day of Visibility, 2024, 89 Fed. Reg. 22901 (Mar. 29, 2024); U.S. Office of Personnel Management, Guidance Regarding Gender Identity and Inclusion in the Federal Workplace (Mar. 31, 2023) (directing the use of preferred pronouns while noting that failing to do so could contribute to an unlawful hostile work environment).

. . . ." Proclamation No. 10724, Transgender Day of Visibility, 2024, 89 Fed. Reg. 22901 (Mar. 29, 2024).  To cite just one example, Tennessee law provides that teachers are not "[r]equired to use a student's preferred pronoun when referring to the student if the preferred pronoun is not consistent with the student's biological sex."  Tenn Code Ann. § 49-6-5102(b); *see also* Ky. Rev. Stat. § 158.191(5)(c) (protecting the same).  In other words, Tennessee teachers are not compelled to communicate the message that "[p]eople can have a gender identity inconsistent with their sex at birth."  *See Meriwether*, 992 F.3d at 507.  Under the Final Rule, these teachers will be silenced.  The Final Rule only suppresses one side of the debate, strangling the marketplace of ideas in a way that is "uniquely harmful to a free and democratic society."  *Nat'l Rifle Assoc. of Am.*, No. 22-842, slip op. at 8.

The Supreme Court has spoken clearly on this issue.  In *R.A.V. v. City of St. Paul*, the Court struck down a city ordinance that prohibited speech or symbols one knows or has reason to know "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender."  505 U.S. 377, 379 (1992).  The Court found the ordinance impermissibly engaged in viewpoint discrimination by "impos[ing] special prohibitions on those speakers who express views on disfavored subjects."  *Id.* at 391.  Similarly, the Final Rule here attempts to compel speakers to affirm the concept of gender identity, while punishing or silencing those with a different perspective.  That is plainly impermissible.  *See id.* at 392 ("[The government] has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.").

The Final Rule compels speech and otherwise engages in viewpoint discrimination.  This consideration weighs in the plaintiffs' favor with respect to their likelihood of success on the merits.

### Chilled Speech

Chilled speech differs from the overt suppression of speech because it is self-imposed.  Laws and regulations imposing broad and vague restrictions on speech can deter individuals from exercising their rights out of fear of punishment.  The result is that the avoidance of wrongdoing leads people to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Dombrowski v. Pfister*, 380 U.S. 479, 486–87 (1965).  "Overbroad laws 'may deter or "chill" constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).  A law or regulation "may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).  "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).  A regulation can also be impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)).

The plaintiff-States contend that the Final Rule's "broadened harassment definition" will chill the speech of those who object to the gender-identity mandate.  [Record No. 19-1, 9].  Christian Educators similarly condemns the Final Rule as both overbroad and vague.  [Record No. 63-1, p. 26].  It argues that the Final Rule is vague because the gender-

identity mandate includes undefined "subjective concepts," and is overbroad because the new amorphous harassment standard only requires conduct be "severe *or* pervasive," and is entirely dependent on a claimant's subjective sense of harm.  [*Id.*]

The plaintiffs' chilled speech concerns largely coalesce around the interplay of the Final Rule's definitions of "sex," "sex-based harassment," and "hostile environment harassment."  The expansive new definition of "sex," includes "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  89 Fed. Reg. at 33886 (adding 34 C.F.R. § 106.10 to increase the scope of "discrimination on the basis of sex").  Commenters share the plaintiffs' concerns regarding vagueness.

> Some commenters argued that the term "gender identity" is subjective, unconstitutionally vague, overbroad, and requires "self-identification" of which others may not be aware, or that may change unbeknownst to a recipient.  One commenter asserted that the failure to define the term makes it impossible for recipients to determine how to adequately ensure they do not discriminate on that basis.

*Id*. at 33809.  In response to those concerns, the Department stated that it "disagrees that the term 'gender identity' is too vague, subjective, or overbroad . . . . The Department understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth."  *Id.  But the Department's response offers no guidance whatsoever.*  Arguably worse, it suggests that this term of vital importance can be subjectively defined by each and every individual based entirely upon his or her own internal sense of self.

The Final Rule takes that expanded—and undefined—characterization of "sex," and places it into a newly defined prohibition on "sex-based harassment."

> *Sex-based harassment* prohibited by this part is a form of sex discrimination and means sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10, that is:
> (1) *Quid pro quo harassment.* . . . ;
> (2) *Hostile environment harassment.* . . . ; or
> (3) *Specific offenses.* . . .

*Id*. at 33884 (amending 34 C.F.R. § 106.02).  The focus of the plaintiffs' concern pertains to "hostile environment harassment," which is also a newly defined term.  It includes the following:

> Unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment). . . .

*Id.*

This definition is once again vague, but the entirely fact-dependent and subjective nature of it also makes it overbroad.  How does one determine when conduct will be "objectively offensive"?  Whose standard is the measure of objectivity?  Take the following comments regarding misgendering as an example.  "[C]ommenters urged the Department to clarify that misgendering is a form of sex-based harassment that can create a hostile environment, especially for gender-nonconforming and LGBTQI+ students."  *Id.*  at 33516.  And another: "Many commenters, as highlighted above, believe that misgendering is one form of sex-based harassment."  *Id.*  Contrast those viewpoints with this one: "Some commenters argued that prohibiting misgendering as a form of harassment could lead to compelled speech in violation of the First Amendment and could be used to target people with unpopular viewpoints."  *Id.*  Considering this is a hotly debated topic of public interest, how can there be an "objective" standard?  Unsurprisingly, the Department has no answer other

than to note that it is "fact-specific" and that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." *Id.*

The problem highlighted above is one the Supreme Court has previously addressed in the context of "true threats" and "the danger of deterring non-threatening speech." *Counterman v. Colorado*, 600 U.S. 66, 78 (2023). "An objective standard, turning only on how reasonable observers would construe a statement in context, would make people give threats 'a wide berth.'" *Id.* (quoting *Rogers v. United States*, 422 U.S. 35, 47 (1975) (Marshall, J., concurring)). Concerningly, "that degree of deterrence would have substantial costs in discouraging the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Rogers*, 422 U.S. at 48 (Marshall, J., concurring) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). But in this case, the "objective standard" is inherently not objective at all because the Final Rule imposes a viewpoint consistent with the affirmation of gender identity. So, in the context of misgendering, the offensive conduct must be "subjectively offensive" and "objectively offensive" as viewed through the lens of someone who recognizes sex and gender to be separate and distinct.

Similarly vague, what is required for conduct to be "so severe *or* pervasive"? Once again, the Court is not alone in wondering: "One commenter questioned how a recipient would measure whether the conduct was sufficiently severe or pervasive." 89 Fed. Reg. at 33508. The Department responds by once again affirming that "isolated comments" would generally not suffice. *Id.* But it cannot render a *de facto* "ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 324 (2010). And as Christian Educators rightly points out, "pronoun usage is pervasive given its ubiquity in conversation." [Record

- 52 -

No. 63-1, p. 27]  So anyone refusing to use preferred pronouns, be it for moral or religious reasons, would necessarily be engaging in pervasive conduct.

The Final Rule goes on to "clarify" that "conduct meets the 'severe or pervasive' standard of sex-based harassment if it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity."  89 Fed. Reg. at 33508.  If the "severe or pervasive" standard derives its definition not from some measurable criteria, but from an entirely fact-dependent consequence, the clause is without meaning.  The obviousness of this flaw becomes more apparent after addressing the next question.

What is the threshold for determining when one's participation in or benefit from a program or activity has been limited?

> Some commenters said that the term "limits" is vague and overly broad.  Commenters expressed concern that the use of the term "limits" would threaten protected speech, cover conduct that detracts in any way from another student's enjoyment of the recipient's education program, require a recipient to primarily consider the conduct from the complainant's perspective, and expose postsecondary institutions to lawsuits from students alleging they were expelled on arbitrary grounds.

*Id.* at 33511.  The Department reasons that "[w]hether conduct limits or denies a person's ability to participate in or benefit from the recipient's education program or activity is a fact-based inquiry that requires consideration of all relevant and not otherwise impermissible evidence."  *Id.*  It also recognizes that "individuals react to sexual harassment in a wide variety of ways."  *Id.*  It further clarifies that "the definition of hostile environment sex-based harassment does not require a complainant to demonstrate any particular harm, . . . . [but] *some impact* on their ability to participate or benefit from the education program or activity, . . . ."  *Id.* (emphasis added).

- 53 -

To summarize, hostile environment harassment is: (1) unwelcome; (2) sex-based; (3) determined by the totality of the circumstances; (4) subjectively offensive; (5) objectively offensive; (6) so severe or pervasive; and it must (7) limit or deny a person's ability to participate in or benefit from a program or activity.   Unwelcomed and subjectively offensive are both determined by the complainant.  The objective standard of offensiveness will necessarily depend on the totality of the circumstances and a viewpoint imposed by the Department.  Whether it is sex-based is dependent on vague terminology the Department has elected not to define.  And whether the conduct is severe or pervasive is entirely measured by whether it limits or denies a person's participation or benefit in a program or activity, and the sufficiency of said limitation will depend, in part, on how the complainant reacts to the conduct.

In other words, students, teachers, States, and Federal funding recipients will all be expected to comply with Department guidance that is as user-friendly and objective as Justice Stewart's obscenity test: "I know it when I see it."  *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).  It is obvious that the public's confusion comes as no surprise to the Department—the Final Rule has entire comment and discussion sections dedicated to addressing "Vagueness and Overbreadth," 89 Fed. Reg. at 33494, "Prohibiting or Chilling Speech," *id.* at 33502, and "Compelled Speech," *id.*, just to highlight a few.  The Department was presented with public comment expressing concerns that key terminology was vague.  Not only did the Department fail to meaningfully address these First Amendment concerns, *but it also intentionally opted to leave the vague terms undefined.*

- 54 -

Further, the Final Rule authorizes, if not encourages, arbitrary and discriminatory enforcement pursuant to definitions of harassment that are almost entirely fact-dependent. The fact-specific inquiry that recipients are directed to contemplate consider the following factors:

> (i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity;
> (ii) The type, frequency, and duration of the conduct;
> (iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct;
> (iv) The location of the conduct and the context in which the conduct occurred; and
> (v) Other sex-based harassment in the recipient's education program or activity.

*Id.* at 33884. These factors are inherently flexible and grant extraordinary discretion to whoever may be tasked with interpreting a suspected instance of harassment. While this level of flexibility certainly has administrative benefits, it places far too much discretion over speech protected under the First Amendment. And because the Final Rule mandates an acceptance of gender identity concepts, the discretion only flows in one direction.

The Final Rule also extends to speech outside of the classroom.

> [A] recipient's obligation is to address all forms of sex discrimination, including sex-based harassment that occurs within the recipient's education program or activity, whether the conduct takes place online, in person, or both. Online harassment can include, but is not limited to, unwelcome conduct on social media platforms such as sex-based derogatory name-calling, the nonconsensual distribution of intimate images (including authentic images and images that have been altered or generated by artificial intelligence (AI) technologies), cyberstalking, sending sex-based pictures or cartoons, and other sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity.

*Id.* at 33515.  The Department suggests that this understanding is consistent with the holding of *Mahanoy*, and more specifically the examples provided in Justice Alito's concurring opinion.  But the Department's reading of the concurrence stops curiously short of the opinion's clarifying statements.

> At the other end of the spectrum, there is a category of speech that is almost always beyond the regulatory authority of a public school.  This is student speech that is not expressly and specifically directed at the school, school administrators, teachers, or fellow students and that addresses matters of public concern, including sensitive subjects like politics, religion, and social relations.  Speech on such matters lies at the heart of the First Amendment's protection. . . .
> . . . .  It is unreasonable to infer that parents who send a child to a public school thereby authorize the school to take away such a critical right.

*Mahanoy,* 594 U.S. at 205–06 (Alito, J., concurring).  The problem remains that the Final Rule's underlying terminology is vague and intentionally undefined.  In addition to chilling speech in schools, it seeks to root out "all forms of sex discrimination" occurring online, so long as it meets the amorphous and discretionary definition provided.  Such a sweeping and subjective standard most certainly chills protected speech.

Because the Final Rule's text is vague and overbroad in a way that impermissibly chills protected speech, this consideration weighs in the plaintiffs' favor with respect to their likelihood of success on the merits.

### States' Rights

The States are validly before the Court based on a modern form of the "*parens patriae"* authority allowing them to sue the federal government.  The common law authority, which rests primarily in state attorneys general in the United States, traces its origins to the English King's power to sue the government on behalf of the citizenry as the "parent of the country."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601

(1982).  The Sixth Circuit recognizes claims pursuant to this authority when a State "seeks to vindicate its own sovereign and quasi-sovereign interests against the United States" without merely "represent[ing] its citizens in a purely third-party . . . capacity."  *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022); *but see Texas v. SEC*, 2024 WL 2106183, at *3 (5th Cir. May 10, 2024) (acknowledging the Supreme Court has yet to clarify to "what extent states can still bring a *parens patriae* suit against the federal government when a state asserts its own sovereign or quasi-sovereign interest" following the decision in *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023)).  Although states often purport to sue in a "*parens patriae*" capacity by representing the interests of individuals within their states, they are generally asserting some specific injury to their own interests separate and apart from their citizens' interests.  In such cases, the Supreme Court has held "the State has an interest independent of and behind the titles of its citizens" to safeguard "its domain" in applicable areas.  *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907).

States have a variety of sovereign and quasi-sovereign interests that they can vindicate in court.  As a general matter, individual states have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal."  *Alfred L. Snapp & Son, Inc*, 458 U.S. at 601.  Therefore, "states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law."  *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).  More specifically, "[b]ecause a state alone has the right to create and enforce its legal code, only the state has the kind of direct stake necessary to satisfy standing in defending the standards embodied in that code."  *See generally Texas v. Becerra*, 623 F. Supp.

3d 696, 714 (N.D. Tex. 2022).  And with critical importance, the Supreme Court for more than half a century has considered "education [as] perhaps the most important function of state and local governments." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).  The Court has affirmed the importance of state and local control over education on multiple subsequent occasions.

> No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. Thus, in *San Antonio Independent School District v. Rodriguez*, . . . we observed that local control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'

*Milliken v. Bradley*, 418 U.S. 717, 741–42 (1974) (citation omitted).

Indeed, the Court has specifically cautioned that "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint," and that "[b]y and large, public education in our nation is committed to the control of state and local authorities." *Goss v. Lopez,* 419 U.S. 565, 578 (1975).  Because the federal government's "intrusions [can be] analogous to pressure to change state law" within this domain, States have an independent stake in defending their own educational laws and regulations.  *Texas*, 809 F.3d at 153.

States likewise maintain a valid interest in protecting the health and wellbeing of their citizenry.  *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 605; *see also Missouri v. Illinois*, 180 U.S. 208, 241 (1901) (noting states' interest in "the health and comfort of the[ir] inhabitants"); *Pennsylvania v. West Virginia*, 262 U.S. 553, 592, (1923) (concluding that a state could litigate to defend the "health, comfort, and welfare" of its citizens).  By extension, state governments have an abiding interest in "preserving and promoting the welfare of the child." *Schall v.*

*Martin*, 467 U.S. 253, 265 (1984).  This interest gives States broad power even to "limit[ ] parental freedom" when the welfare of children is at stake.  *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944).  It follows that the States similarly have an interest in protecting the safety and wellbeing of students, faculty, and visitors on property and within facilities belonging to public educational institutions within their domains.  *See L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 474 (6th Cir. 2023).

More than quasi-sovereign and sovereign interests are at stake, however.  Each plaintiff-State has independent legal obligations pursuant to their state constitution or state statute to provide a variety of educational services and opportunities that would be impacted if the Final Rule becomes effective.  Many would be forced to abandon enforcement of their own laws or risk the loss of federal funding because they operate "education program[s]" and "activities" that "receiv[e] federal financial assistance" within the meaning of Title IX through state level agencies and local subdivisions.  20 U.S.C. § 1681.

Specifically, Tennessee has an obligation to "provide for the maintenance, support and eligibility standards of a system of free public schools."  Tenn. Const. art. XI, § 12.  Tennessee's legislature also "establish[es] and support[s] . . . postsecondary educational institutions, including public institutions of higher learning," which total 51 in the state.  Tenn. Const. art. 11, § 12.  The legislature also provides support and direction to 150 "[l]ocal education agencies" in the form of local school districts.  Tenn. Code Ann. § 49-1-103.

Directly applicable here, Tennessee law does not require educational institutions to allow students to access bathrooms and facilities "consistent with their gender identity" and provides that public schools may not accommodate a student's desire for greater privacy in multiple-occupancy facilities by allowing access to a restroom or changing facility that is

- 59 -

designated for use by members of the opposite biological sex while members of the opposite sex are present or could be present.  *Cf.* 89 Fed. Reg. at 33816, 33818-20, with, Tennessee Accommodations for All Children Act, Tenn. Code Ann. § 49-2-801 et seq.; *see also* Tenn. Code Ann. §§ 49-2-802(2).  Tennessee schools could even be exposed to civil liability arising from compliance with the Final Rule's mandate that students be allowed to use facilities associated with their gender identity because Tennessee gives public school students, teachers, and employees a private right of action for monetary damages against a school that "intentionally allow[s] a member of the opposite sex to enter [a] multi-occupancy restroom or changing facility while other persons were present."  Tenn. Code Ann. § 49-2-805(a).

Even more, Tennessee law provides that public school teachers and employees are not "[r]equired to use a student's preferred pronoun when referring to the student if the preferred pronoun is not consistent with the student's biological sex."  Tenn Code Ann. § 49-6-5102(b).  Tennessee also protects by statute the rights of students and faculty to express even "offensive" ideas in the classroom.  *See* Tenn. Code Ann. § 49-7-2405.

Similarly, the Commonwealth of Kentucky has a constitutional obligation to "provide for an efficient system of common schools throughout the State."  Ky. Const. § 183.  Kentucky code also requires local boards to adopt policies that do "not allow students to use restrooms, locker rooms, or shower rooms that are reserved for students of a different biological sex."  Ky. Rev. Code § 158.189.  The Commonwealth operates 1,477 public schools serving primary and secondary school-aged children. There are also twenty-four public postsecondary educational institutions, including sixteen community and technical schools.  These institutions are subject to Title IX as recipients of federal funds.  With particular relevance here, Kentucky law prohibits the Kentucky Department of Education and its local subdivisions from requiring or

recommending policies for the use of pronouns that do not align with the student's sex as determined at birth.  Ky. Rev. Stat. § 158.191(5)(b).  Additionally, local school districts cannot require school personnel or students to use pronouns inconsistent with a student's biological sex.  *Id*.  § 158.191(5)(c).

The State of Indiana which operates 1,769 public schools has a constitutional obligation to "encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement" and "to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all."  Ind. Const. art. VIII, § 1.  In Indiana, there are seven public institutions of higher education. *See generally* Ind. Code § 21-19 *et. seq*.  And state law specifically protects the religious viewpoints of students and their parents that reject the separation of "biological sex" and "gender."  *See* Ind. Code § 20-33-12-2 (providing that "[a] public school shall treat a student's voluntary expression of a religious viewpoint, if any, on an otherwise permissible subject in the same manner the public school treats a student's voluntary expression of a secular or other viewpoint on an otherwise permissible subject and may not discriminate against the student based on a religious viewpoint expressed by the student on an otherwise permissible subject").  Once again, the state would be forced to decide between enforcement of these laws or enforcement of the new Title IX gender identity mandate.

The Commonwealth of Virginia has a constitutional obligation to "provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth."  Va. Const. art. VIII, § 1.  There are 1,944 public schools serving elementary and secondary school-aged children in that Commonwealth, as well as fifteen public four-year institutions of higher education, twenty-four public two-year institutions of higher education,

five regional higher education centers, and one semi-public medical school. The Commonwealth of Virginia's state constitution likewise protects the free exercise and free speech rights of its citizens, including the right of an individual to avoid using a person's preferred gender pronouns based on these protections.

West Virginia has fifty-five school districts as created by the state legislature. *See* W. Va. Code § 18-1-3. These districts "are a part of the educational system of the state" and are "established in compliance with article 12, section 1, of [West Virginia's] Constitution." *Krutili v. Bd. of Educ. of Butler Dist.*, 129 S.E. 486, 487 (W. Va. 1925). All districts in West Virginia receive federal funds—administered by the West Virginia Department of Education—and are thus subject to Title IX. West Virginia's legislature has also established at least twenty public institutions of higher learning that are similarly subject to Title IX based on their status as recipients of federal funding. W. Va. Code § 18B-2A-1(b).

And Ohio is constitutionally obligated to "secure a thorough and efficient system of common schools throughout the State," as well as to provide "by law for the organization, administration and control of the public school system of the state." Ohio Const. art. VI, §§ 2-3. 194. Many of its public school systems and postsecondary educational institutions receive federal assistance, subjecting them to Title IX.

The common thread if the Final Rule is enacted is that state officials would be forced to choose between enforcing their own laws, essentially protecting their independent quasi-sovereign and sovereign interests, or violating the Title IX gender identity mandate. Many of these interests focus on protecting student safety in sensitive areas such as bathrooms and other facilities on the grounds of educational institutions. But as a separate court held in *Tennessee v. U.S. Department of Education*, States indeed maintain an undeniable "sovereign interest[]

- 62 -

in enforcing their duly enacted state laws." 615 F. Supp. 3d 807, 841 (E.D. Tenn. 2022).  *See also State of Tenn. v. Dep't of Educ.*, --F.4th--, 2024 WL 2984295, at *4-*7 (6th Cir. June 14, 2024) (determining that States have legitimate propriety interests if federal regulations threaten states' coffers and legitimate quasi-sovereign interests in the continued enforcement of their own statutes).

Based on the obvious tension between each of the plaintiff-States' laws and the proposed Final Rule, it appears likely that the States "will continue to face substantial pressure" to disregard their own laws "in order to avoid material legal consequences." *Tennessee*, 615 F. Supp. 3d at 841; *cf. LaShonda v. Monroe County Bd. of Educ.*, 526 U.S. 629, 657-58 (1999) (Kennedy, J., dissenting) ("[M]any school districts, desperate to avoid Title IX peer harassment suits, will adopt whatever federal code of student conduct and discipline the Department of Education sees fit to impose on them.").  Indeed, certain States could face civil liability in some circumstances for disregarding their own duly enacted laws by complying with the Final Rule's gender identity mandate.  Even for those free of this risk, the Final Rule squarely implicates the plaintiff-States' powers and abilities to govern themselves as sovereign and independent entities.

**The plaintiffs are likely to succeed on their parental rights claim.**

The plaintiff-States claim that the Department has also failed to account for the impact its Final Rule will have on the constitutional right of parents to influence their children's education.  A longstanding right recognized by the Supreme Court is the right for parents to raise their own children as they see fit.  *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) (finding that "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Zelman v. Simmons–Harris*, 536 U.S.

639, 680 n.5 (2002) (Thomas, J., concurring) (emphasizing that "[t]his Court has held that parents have the fundamental liberty to choose how and in what manner to educate their children"). Parents' "fundamental right . . . to make decisions concerning the care, custody, and control of their children[,]" *Troxel v. Granville*, 530 U.S. 57, 66 (2000), "is 'far more precious than [any] property right[ ]." *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020). It follows that parents retain a constitutionally protected right to guide their own children on matters of identity, including the decision to adopt or reject various gender norms and behaviors.

The plaintiff-States argue that the Department threatens parental rights by requiring school administrators to "take prompt and effective action" to accommodate the stated gender identity of each student, including young students. 87 Fed. Reg. 41571–72 (proposed 34 C.F.R. § 106.44(a)). Indeed, the Final Rule's provisions seemingly bind administrators to treat such children "consistent with [their] gender ident[ies]" on school grounds, even if that conflicts with parental preferences. *Id*. at 41571. Therefore, school personnel would be forced to improperly insert themselves into constitutionally protected family affairs not only to act when gender discrimination is claimed but to "prevent its recurrence and remedy its effects." *Id* 41572. In practice, this translates to policing basic interactions among students, parents, and faculty to compel public accommodation of each person's individualized and unverifiable gender identity. *Id.* at 41571 (proposed 34 C.F.R. §§ 106.10, 106.31(a)(2)). This undermines a meaningful role for parents if the child decides his or her biological gender is not preferential. School personnel would be forced to abide by the student's wishes if the student chooses not to involve his or her parents. As the Sixth Circuit had emphasized, nothing could be more noxious to the "enduring American tradition" that gives a child's parents the

"primary role . . . in the upbringing of their children." *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004) (quoting *Yoder*, 406 U.S. at 232). As such, the forced transferal of this role to school faculty by the Final Rule directly undermines traditional responsibilities reserved for parents.

The Department seeks to subvert this argument, noting that "nothing in the final regulations disturbs parental rights" in response to commenters' concerns about overriding parental choices regarding a child's gender identity. 87 Fed. Reg. 33821. Although the Final Rule gestures at retaining a certain role for parents, it does not provide that parental opposition to their child's selective gender identity requires schools to exempt that student from Title IX's new mandate. To the contrary, it implies that Title IX could supersede parental preferences about a child's treatment depending on the case. 87 Fed. Reg. 33822. Indeed, the Department states that "deference to [parental] judgment . . . is appropriate" when a "parent and minor student disagree about how to address sex discrimination against that student." *Id*. Additionally, the Department contends that the regulations do not prevent a recipient educational institution from "disclosing information about a minor child to their parent who has the legal right to receive disclosures on behalf of their child." *Id*.

But the Final Rule fails to clarify whether the gender-identity mandate requires schools to adopt a student's gender identity based solely on a student's wishes when the parent is not involved in the child's decision to identify as a gender other than his or her biological assignment. It also fails to clarify whether the mandate means schools must adopt their students' gender identity even over a parental objection. This creates uncertainty not only for families but also school personnel who could face liability for discrimination under Title IX if a student's preferred gender identity clashes with parental preferences. The Department must

recognize that "[t]here [is] a 'private realm of family life which the state cannot enter,' that has been afforded both substantive and procedural protection[s]" under our Constitution. *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977). The Final Rule unduly interferes with these protections.

### The Department's actions are arbitrary and capricious.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). When promulgating a rule, the agency must "'reasonably consider[] the relevant issues' and factors" bearing on the analysis, s*ee Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 595 (D.C. Cir. 2022), and must draw "rational connection[s] between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Any agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see Michigan v. EPA*, 576 U.S. 743, 750 (2015).

To keep agencies under the Executive branch's control accountable, courts are directed to set aside agency actions if they are "arbitrary" or "capricious." *See* 5 U.S.C. § 706(2)(A); *see also* The Federalist No. 78, at 380 (Alexander Hamilton) (Dover ed., 2014) ("There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void."). Under this narrow standard of review, "a court is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009), but instead is to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402, 416 (1971).  Therefore, when reviewing an agency's rulemaking, a court "must uphold a rule unless it exceeds the authority vested in the agency by Congress or is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Radio Ass'n on Defending Airwave Rights, Inc. v. Dep't of Transp.*, 47 F.3d 794, 801-02 (6th Cir. 1995) (quoting 5 U.S.C. § 706(2)(A)).  An agency acts in an arbitrary and capricious manner when it (1) "has relied on factors which Congress has not intended it to consider"; (2) "entirely fail[s] to consider an important aspect of the [regulatory] problem"; (3) "offer[s] an explanation for" its conduct "that runs counter to the evidence before" it; or (4) reaches a determination that "is so implausible…it could not be ascribed to a difference in view or…agency expertise." *State Farm*, 463 U.S. at 43.

The plaintiff-States claim that the Department spurns its obligation to offer a "reasoned explanation" for departing from its longstanding view on the meaning of "sex" in Title IX. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."); *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (It is an "elemental principle of administrative law that agencies are bound to follow their own regulations" unless an agency dutifully follows established rulemaking procedures for amending them).

The Court's analysis again returns to *Bostock,* 590 U.S. 644 (2020).  The Department asserts that there is not "a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'"  *See* 87 Fed. Reg. at 41537.  But this argument is severely undermined by the series of congressional amendments and agency regulations since the statute's enactment that consistently have construed "sex" as a male-female binary.  Indeed, past regulations from the Department are direct evidence that a definition has been in place.  The Department's own

Notice of Proposed Rulemaking even declared that it "now believes that its prior position (i.e., that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity) is at odds with Title IX's text and purpose and the reasoning of the *Bostock* Court and other courts to have considered the issue in recent years— both before and after *Bostock*." *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (proposed July 12, 2022) (to be codified at 34 C.F.R. § 106). Disagreement with its own past interpretation constitutes a concession that a longstanding interpretation indeed has existed.

The Department's changed position through the Final Rule is based on the Supreme Court's decision in *Bostock*, which interpreted the scope of Title VII's protections for employees facing discrimination. 590 U.S. at 645. The Department argues that the phrase "because of sex" in Title VII and "on the basis of sex" in Title IX mean the same thing, so *Bostock's* analysis concerning discrimination controls. 89 Fed. Reg. at 33806-07. Although Title VII shares some similarity to Title IX, it is arbitrary to rely on *Bostock's* reasoning as a source of support for upending a term's meaning when the text, structure, purpose, and history of the statutes vary considerably. *See Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

The Supreme Court used no small amount of ink clarifying what that decision did not mean as it did in explaining its significance:

> As judges we possess no special expertise or authority to declare for ourselves what a self-governing people should consider just or wise. And the same judicial humility that requires us to refrain from adding to statutes requires us to refrain from diminishing them. What are these consequences anyway? The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove

unsustainable after our decision today.  But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today.  Under Title VII, too, *we do not purport to address bathrooms, locker rooms, or anything else of the kind.*

*Bostock*, 590 U.S. at 681.  Based on this express disclaimer, it is suspect that the Department bases its explanation for changing its interpretation of a term—again, whose meaning has been unchanged since the statute was enacted—by relying on reasoning that the highest court said was inapplicable.

Even more, the Sixth Circuit has explained that "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself.  The [Supreme] Court noted that 'none of' the many laws that might be touched by their decision were before them and that they 'do not prejudge any such question today.'"  *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Bostock*, 590 U.S. at 681-82).  As a result, the Sixth Circuit properly concluded that "*Bostock* extends no further than Title VII."  *Id*; *see also Skrmetti*, 83 F.4th at 484 (holding that *Bostock's* reasoning "applies only to Title VII.").  This Court dutifully takes the Sixth Circuit at its word.  Ultimately, there is little reason in the Department's purportedly "reasoned explanation" for departing from its longstanding interpretation of sex as a binary construct because *Bostock* did not expand the meaning of "sex" within Title IX.  The Final Rule's mistaken reliance on this decision simply led the Department to a determination implausible to fathom by reasonable observers.

The Department's additional justifications for changing its interpretation of "sex" are arbitrary and capricious, as well.  *See Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015) (citation omitted).  The Final Rule acknowledges that the gender-identity mandate conflicts with several provisions of Title IX, which expressly permit sex-

based segregation in certain facilities and activities.  89 Fed. Reg. at 33818.  It also identifies permissible sex-separation in "living facilities" and the exceptions in 20 U.S.C. § 1681(a)(1)-(9)—such as institutions whose primary purpose is for military training, social fraternities, and sororities—to justify omitting such facilities and programs from its gender-identity mandate.  20 U.S.C. § 1686; *see also* 89 Fed. Reg. at 33816, 33818-19.  At the same time, the Department arbitrarily applies its gender-identity mandate to bathrooms, toilets, and showers, even though existing regulations allow separation based on sex in those places.  Rather than pause at how reading the term "sex" to include gender identity interferes with other portions of Title IX's general scheme, the Department says these exceptions to Title IX's "nondiscrimination mandate" indicate that schools can lawfully inflict more than de minimis discriminatory injury on students in the circumstances covered.  *See* 89 Fed. Reg. at 33816, 33818-19.  In essence, the Final Rule accommodates a reality in which student housing remains sex-segregated while students are free to choose the bathrooms and locker rooms they use based on gender identity.  Of course, the latter would render the purpose of former obsolete in terms of the privacy interests Congress sought to protect by permitting sex-based segregation in sensitive areas where separation has been traditional.

Although there is obvious tension between longstanding regulations and the Final Rule, the Department fails to address whether a recipient institution may require gender verifying documentation for participation in certain activities and programs that it may not require for toilets, locker rooms, showers, classes, and other purposes.  Nor does it instruct schools how to determine whether certain spaces—like toilets and showers in the hall of a dorm complex—fall within "housing" facilities that can exclude by sex, or "bathroom" facilities that cannot.  *See generally* 89 Fed. Reg. at 33816-17, 33820-21.

Beyond the logic that seemingly distorts previous congressional and regulatory purposes in allowing educational institutions to segregate certain places based on sex, the Department likewise fails to identify a rational basis for allowing activities associated with the American Legion's Girls and Boys State programs to restrict participation based on sex, *see* 20 U.S.C. § 1681(a)(7), while requiring schools to allow males identifying as females to participate in sexual education classes for females.  As the States emphasize, "[t]he Final Rule makes no attempt to explain why allowing recipients to enforce sex-separate father-son or mother-daughter activities and not sex-separate sexual-education classes or sex-separate choruses is logically consistent."  [Record No. 1, ¶ 150]

Absent too is any material explanation for why the Department's "longstanding athletics regulations" support continuing to allow arbitrary enforcement of sex-separate sports but the equally "longstanding" regulations governing bathrooms and locker rooms no longer merit the same treatment.  89 Fed. Reg. at 33817.  In effect, the Department leaves in place certain regulations allowing schools to maintain covered sex-segregated practices.  89 Fed. Reg. at 33818-19.  But the Final Rule then specifies that schools may no longer apply the regulations' allowance for sex-separation against males who identify as females or females who identify as males.  *Id.*  It seems obvious that the Department simply failed to consider these contradictory aspects when promulgating the Final Rule.

As a general matter, courts cannot uphold an administrative decision that fails to build a logical bridge between the agency action and the expected outcomes within the broader area the agency seeks to regulate based on contradictions or missing premises.  *See Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024).  After all, "[t]he reviewing court should not attempt itself to make up for . . . deficiencies" in the agency's reasoning and

"may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43. Without a clearly articulated explanation regarding why certain parts of an educational institution's campus and activities must comply with the Final Rule's "gender identity" mandate while others do not, the agency's contradictory reasoning constitutes a level of rulemaking arbitrariness prohibited by the APA.

And of serious concern, the Department has not adequately accounted for the potential risks posed to student and faculty safety that were raised by states, educators, and parents during the notice and comment period. Educational institutions at every level have long provided sex-separated facilities—including locker rooms, restrooms, and student housing— to protect individuals on campus and ensure that basic privacy expectations are met. The private characteristics of these places render them susceptible to abuse by bad actors. Public restrooms and locker rooms, for example, have long been designed with isolating features to deliberately obstruct sightlines, limit entrances and exits, and conceal from most forms of surveillance. Individuals using these facilities are not always fully clothed, and the potential for malfeasance is apparent.

But the Final Rule ignores significant evidence offered by commenters regarding the safety and privacy interests at stake. Tennessee, for example, tendered a comment identifying numerous instances of males attacking females in public restrooms that were designated for females only. [Record No. 1-3, p. 11] In Tennessee's view, the new rules would further enable such conduct, as men and boys could then enter restrooms designated for females without restriction. Additionally, girls and women may be subjected to voyeurism against which they would have little recourse because male perpetrators could enter and remain in spaces traditionally reserved for women. *Id.* While Tennessee acknowledged that such activity may

- 72 -

occur with or without sex-segregated spaces, the potential for such abuse increases when boys and men can enter public spaces where girls and women are at their most vulnerable. *Id.*

Ultimately, the law requires the Department to identify "the most critical factual material … used to support" its new rules before they are finalized, specifically for the purpose of "expos[ing]" such material "to refutation" in the public comment process. *See Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984)). But even where the heightened opportunity for sexual misconduct and other nefarious activity is so obvious, the Department similarly declined to provide any credible empirical analysis supporting its new regulation. Instead, it simply says it "does not agree" with commenters who allege there is evidence that transgender students pose a safety risk to other students. *See* 89 Fed. Reg. at 33820. Surely, more is required than a categorical dismissal of serious concerns such as these.

As a practical note, ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities. In intimate spaces like bathrooms and locker rooms, students retain "a significant privacy interest in their unclothed bodies." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008). This necessarily includes "the right to shield one's body from exposure to viewing by the opposite sex." *Id.* After all, in the words of former Justice Ruth Bader Ginsburg, the integration of an all-male military institution "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996). This interest in protecting bodily privacy is sex-specific because of—not in spite of—the different male and female anatomies. *See id.* at

- 73 -

533 ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible.'") (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)); *see also Nguyen v. INS*, 533 U.S. 53, 73 (2001) (Scalia, J.) ("The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific to each."); Ryan T. Anderson, *Neither Androgyny Nor Stereotypes: Sex Differences and the Difference They Make*, 24 Tex. Rev. L. & Pol. 211, 218 (2019) ("No one finds it particularly difficult—let alone controversial—to identify male and female members of the bovine species or the canine species. It's only recently, and only in the human species, that the very concept of sex has become convoluted and controversial."). To reiterate, the Department says only that it "does not agree."

But at a minimum, students of both sexes would experience violations of their bodily privacy by students of a different sex if the Final Rule became effective. *See Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing that "most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'"); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989) ("[E]xcretory function[s are] traditionally shielded by great privacy."); *Grimm v. Glouster Co. Sch. Bd.*, 972 F.3d 586, 633 (4th Cir. 2020) (Neimeyer, J., dissenting) ("[C]ourts have long recognized" that persons' bodily privacy interests are "significantly heightened when persons of the opposite biological sex are present.") (collecting cases). And as the States emphasize, the risk of "inappropriate sexual behavior" toward other students would certainly be heightened too. *See Doe v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 464 (6th Cir. 2022) (addressing allegations of students taking advantage

of semi-private school spaces, including bathrooms, to engage in "unwelcome sexual contact").

Nonetheless, despite society's enduring recognition of biological differences between the sexes, as well as an individual's basic right to bodily privacy, the Final Rule mandates that schools permit biological men into women's intimate spaces, and women into men's, within the educational environment based entirely on a person's subjective gender identity. This result is not only impossible to square with Title IX but with the broader guarantee of education protection for all students. *Nguyen*, 533 U.S. at 73 ("To fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it.").

Ultimately, the Department's failure to provide any concrete, contradictory data to the concerns raised by the States, parents, and educators renders it is difficult to fathom how it determined that "the benefits" of the new regulations "far outweigh [their] estimated costs." *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41547 (proposed July 12, 2022) (to be codified at 34 C.F.R. § 106). This miscalculation is underscored by the fact that officials seemingly failed to seriously account for the possibility that abolishing sex-separated facilities would likely increase the incidence of crime and deter large swaths of the public from using public accommodations altogether. *Id.*

Beyond the student-to-student dynamic, the Final Rule requires that nearly "any person" who enters an educational campus would be allowed to use sex-separate facilities consistent with his or her internal sense of gender identity. 89 Fed. Reg. at 33816. Yet, the Department does not explain how a school can continue to "make and enforce rules that protect

all students' safety and privacy," while abiding by the Final Rule's requirement of allowing any person unfettered, unverified access to facilities for the opposite sex.  89 Fed. Reg. at 33820.  Notably, it "declines . . . to require" funding recipients to "provide gender-neutral or single-occupancy facilities," in part because it "would likely carry significant cost implications." *Id*.  At the same time, the Department also fails to acknowledge that many schools across the country have responded to non-federal gender-identity mandates by building separate facilities for individuals who do not wish to encounter members of the opposite sex.  *Id*.  Nor does the Department consider cost implications that recipients would incur by restructuring other facilities to comply with the Final Rule's requirements to modify certain facilities for accommodating those with transgender status merely weeks in advance of the Final Rule's effective date.  *Id*.

It is an inescapable conclusion based on the foregoing discussion that the Department has effectively ignored the concerns of parents, teachers, and students who believe that the Final Rule endangers basic privacy and safety interests.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (providing that an agency must "consider and respond to significant comments received during the [limited] period for public comment").  Rather than address the evidence provided by the plaintiff-States and others during the commenting period, the Department throws its figurative hands in the air and says, "too bad."  But as the United States Court of Appeals for the Fifth Circuit has underscored, "bare acknowledgement" of possible issues a rule will create "is no substitute for reasoned consideration," especially when the regulated subject is one of extraordinary consequence.  *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024).  The Department has not identified significant evidence indicating that its motivations here are rooted more in sound considerations accounting for the

serious privacy and safety interests than in the political preferences of an outcome-oriented rule.  Based on this analysis, the Final Rule is arbitrary and capricious.

### The Proposed Athletics Rule

The plaintiffs discuss girls' and women's athletics extensively and A.C.'s portion of the Intervenor Complaint is largely focused on this topic.  Title IX's implementing regulations provide that, in general, a person may not be discriminated against with respect to athletics and "no recipient shall provide [athletics] separately" on the basis of sex.  34 C.F.R. § 106.41(a).  However, 34 C.F.R. § 106.41(b) provides that recipients *may* operate or sponsor separate athletic teams for members of each sex "where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  The Programs and Facilities Rule leaves § 106.41(b) intact, as 34 C.F.R. § 106.31(a)(2) excepts this provision from the de minimis harm standard.  *See* 89 Fed. Reg. at 33816-17 (stating that "§ 106.31(a)(2) does not apply to male and female athletic teams a recipient offers under § 106.41(b)").[16]

West Virginia enacted the "Save Women's Sports Act" in 2021 to address its concerns regarding biological males who may seek to participate in women's sports.  W. Va. Code § 18-2-25d.  The law essentially provides that athletic teams designated for females shall not be open to students whose biological sex determined at birth is male.  *Id.*  Shortly after the passage of that law, B.P.J. filed suit in federal court in West Virginia. *B.P.J. by Jackson v. West Virginia State Bd. of Educ.*, 550 F. Supp. 3d 347 (S.D. W. Va. 2021).  B.P.J. alleged, *inter alia*, that the

---

[16]     The intervenor Plaintiffs argue persuasively that Final Rule allows schools to maintain athletics teams that are designated for males or females only but requires them to allow students to participate on the team that is consistent with their self-reported gender identity. [Record No. 99, p. 8]  As with many aspects of the rule, educational institutions would struggle to understand their compliance obligations.

Save Women's Sports Act violated Title IX, as applied to B.P.J, who had received puberty blockers and hormone therapy as treatment for gender dysphoria.

B.P.J. was allowed to compete against A.C. in middle school track and field competitions because of court-imposed injunctions during that litigation.  Approximately two months ago, B.P.J. prevailed in the United States Court of Appeals for the Fourth Circuit, which held that the Act violated Title IX as applied to B.P.J.  *See B.P.J. by Jackson v. West Virginia State Bd. of Educ.*, 98 F.4th 542, 562 (4th Cir. 2024).  West Virginia Attorney General Patrick Morrisey has indicated the state will file a petition for a writ of certiorari in the United States Supreme Court.  [Record No. 72, ¶ 80]

The Department has issued a Notice of Proposed Rulemaking titled, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams."  88 Fed. Reg. 22860 (Apr. 13, 2023) ("the Proposed Athletics Rule").  If the rule goes into effect, it will alter 34 C.F.R. § 106.41 dramatically as it will provide that public schools may not categorically ban transgender students from playing sports consistent with their gender identity.[17]  *Id.* at 22,871.

The plaintiff-States allege that, if the Programs and Facilities Rule goes into effect, its gender-identity mandate will "invalidate scores of States' and schools' sex-separated sports policies."  [Record No. 1, ¶ 12]  While that may be the inevitable consequence, until the

---

[17]     The Department has stated that limitations based on "more targeted criteria, substantially related to sport, level of competition, and grade or education level, could be permissible."  89 Fed. Reg. at 33817.

Proposed Athletics Rule is finalized and issued, the current regulations on athletics continue to apply and schools may separate athletic teams for the sexes in the same way they always have.  *See* 34 C.F.R. § 106.41(b).  To the extent A.C. (or any other plaintiff) challenges the Proposed Athletic Rule, the Court lacks jurisdiction to evaluate the claim because the proposed rule does not constitute a final agency action.  *See Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1170 (6th Cir. 1983) (citing 5 U.S.C. § 551(13)).

## V.     Irreparable Injury

### a.     Compliance Costs

The Final Rule provides cost estimates of implementing the new regulations based on "feedback provided by stakeholders in listening sessions and review of comments received" in response to the proposed rulemaking.  *See* 89 Fed. Reg. at 33866-74.  The Department has provided various cost estimates including Year 1 training, investigations and adjudications, and recordkeeping.  *Id.*  The plaintiff-States contend the Department has underestimated these costs, as well as the uptick in Title IX complaints that will result from implementation of the Final Rule.

The States presented the testimony of Christy Ballard, General Counsel for the Tennessee Department of Education ("TDOE").  TDOE oversees Tennessee's local public school districts and administers their federal funding.  While TDOE does not control public schools on a day-to-day basis, it provides guidance and oversight in ensuring their compliance with state and federal laws.  TDOE is in the process of reviewing the Final Rule and determining what policy changes, student handbook changes, and training requirements will be necessary within Tennessee's public school system to comply with the Final Rule.

Ballard testified that the Final Rule's time of publication—the end of April—is a very busy time within the school system because that is when schools administer state and federally required standardized testing. These tests inform accountability for school districts, individual schools, and teachers. They also determine whether some elementary school children will require supplementary reading instruction during the summer.

In Tennessee, local school districts develop their own unique policies based on the size and type of school and the community values in the area.[18]  Before a school can adopt a policy, the school board must draft the policy and conduct a public meeting after giving adequate public notice. Ballard testified that most school boards have meetings in June and August. Additionally, since school is out of session from June to August, most school staff are not working during that time. To implement new policies, staff must prepare and print new student handbooks. Based on these facts, Ballard believes it would be very difficult to ensure that any new policies are in place by August 1.

Ballard also testified that the burdens imposed by the Final Rule are more onerous than those of a typical update to a school's policy or procedure. She acknowledged that schools update their policies based on new laws every year, but they are "usually not based on hundreds of pages of a rule." Ballard noted that most school districts are unlikely to have the expertise

---

[18]     For instance, during cross-examination of Ballard, the Department asked the Court to take judicial notice of the non-discrimination statement of the Metro Nashville Public Schools, which provides: "Metropolitan Nashville Public Schools (MNPS) does not discriminate on the basis of race, religion, creed, sex, gender, gender identity, sexual orientation, national origin, color, age and/or disability in admission to, access to or operation of its programs, services or activities and provides access to the Boy Scouts and other designated youth groups. MNPS does not discriminate in its hiring or employment practices." *Available at Handbook - Policies and Procedures - Metro Nashville Public Schools (mnps.org)* (last accessed June 12, 2024).

in-house to fully understand the rule and will likely require the assistance of outside counsel.

Ballard noted that the Final Rule requires training for anyone who might work on a school campus when students are present. Tennessee's public school system serves just under one million students and employs approximately 130,000 people. The required training varies according to the individual's particular role within the institution, so completing this training will require extensive planning. Ballard also anticipates that the training will be expensive, causing the states to incur registration fees, travel costs, and payment for substitute teachers to cover teacher absences.

The Department predicts that recipients of federal funds will see a ten percent increase in Title IX complaints and investigations under the Final Rule. Ballard testified that TDOE is already very busy addressing all matters of civil rights, truancy, and student discipline. Accordingly, she contends, an increased number of Title IX complaints will take attention away from these matters or will require the TDOE to hire additional staff.

Ballard's sentiments are echoed by Shaundraya Hersey, Assistant General Counsel for Civil Rights for the Tennessee Department of Education, and Mark Fulks, University Counsel and Chief Compliance Officer for East Tennessee University. [Record Nos. 92-1; 92-2] And because recipients of federal funds must comply with the new regulations before the next school year begins, the states expect to incur compliance costs in the spring and summer of 2024. [*See* Thompson Declaration, Record No. 19-3; Mason Declaration, Record No. 19-4; Deuth Declaration, Record No. 19-8; Garrison Declaration, Record No. 19-9; Coons Declaration, Record No. 19-11; Trice Declaration, Record No. 19-12.]

Irreparable harm is generally defined as harm that cannot be fully compensated by money damages. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578

(6th Cir. 2002).  The States note that, if the preliminary injunction is not granted but they ultimately prevail in this lawsuit, they will not be able to recoup the compliance expenses from the Department due to its sovereign immunity.  *See Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (noting that the federal government's sovereign immunity makes such expenses unrecoverable) (citing *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (observing that, "[a]bsent a waiver of sovereign immunity, the Court lacks subject matter jurisdiction over claims for money damages against the United States and its agencies.").

Some circuits have concluded that compliance costs do not qualify as irreparable harm because they are an ordinary result of new government regulation.  *See New York v. U.S. Dep't of Education*, 477 F. Supp. 3d 279, 303 (S.D.N.Y. 2020).  But the Sixth Circuit has declined to hold so broadly, concluding that it depends on the circumstances of the case.  *Biden*, 57 F.4th at 556 (noting that "the peculiarity and size of a harm affects its weight in the equitable balance, not whether it should enter the calculus at all").  The plaintiffs have sufficiently demonstrated that the compliance costs here are extraordinary due to the sweeping policy changes they are required to implement and the short timeframe in which they must do so.  And because the recovery of these costs would necessarily be barred, this factor weighs in favor of a finding of irreparable harm.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.").

### b.     Loss of Federal Funding

The States next cite the federal funding they stand to lose if they do not comply with the Final Rule when it goes into effect on August 1.  *See* 20 U.S.C. § 1682.  The States

presented the testimony of David Thurman, State Budget Director for the Tennessee Department of Finance and Administration (F&A). Thurman explained how Tennessee's yearly budget is developed, including a budget for the Department of Education. Thurman reported that the education budget for fiscal year 2023 was approximately 8 billion dollars, with approximately 1.8 billion dollars comprising federal funds, and approximately 1.5 billion dollars coming from the United States Department of Education.[19]

Thurman testified that agencies submit budget requests for the upcoming fiscal year in September. Following internal hearings with agencies and public hearings with the governor and the agencies, the governor makes a recommendation to the legislature around the end of January or the beginning of February. At that point, local governments and school districts begin their planning process because they get an idea of what funds they will have for the upcoming school year. This allows them to begin considering resources and hiring decisions.

Thurman testified that, given this timeline, it is important to have a sense of certainty regarding the amount of federal funding that is available for the state Department of Education and local school districts. If federal funding is lost after the budget is already set, there is very little flexibility to adjust. In other words, when money is allocated for a specific program, local school districts cannot use the money for another purpose. Thurman also explained that a loss of federal funding would disproportionately impact low-income or other high-risk students.

---

[19]     The remainder of federal funds came from the United States Department of Agriculture, which funded Tennessee's school nutrition program.

Some programs, such as special education and child nutrition, are mandated regardless of funding.  Thurman testified that if federal funding was lost, it would be impossible to replace those funds in one fiscal year based on normal growth of the state budget.  Without federal funding, the state would likely have to look for state funds by defunding other programs.

Steven Gentile, Executive Director of the Tennessee Higher Education Commission, also testified at the preliminary injunction hearing.  Gentile testified that Tennessee's various public institutions of higher learning receive federal funding to support their education programs—in fiscal year 2023, they received approximately 1.5 billion dollars in federal support.  This money is used for purposes such as financial aid, scholarships, and research.  Gentile testified that a loss of federal funds would have a devastating effect on institutions of higher education in Tennessee, as enrollment inevitably would decline, and research would be adversely impacted.  Consistent with Thurman's statements, Gentile testified that higher education institutions plan their budgets well in advance of the school year and rely on the expectation that they will receive federal funding.

The plaintiff-States tendered declarations from various education officials describing the likely impact the loss of federal funds would have on their schools.  James Bryson, Commissioner of the Tennessee Department of Finance and Administration, reports that 17.6 percent of the Tennessee Department of Education's total annual budget for fiscal year 2022-2023 came from federal funds.  [Record No. 19-2]  Christopher Thacker, General Counsel to the Kentucky Office of Attorney General, reports that over 17 percent of Kentucky's education funding comes from the federal government.[20]  [Record No. 19-7]  Derek Deuth, the Chief

---

[20]     This value appears to reference the 2021-2022 school year.  The information for 2022-2023 produces a value of approximately 14.4 percent.  *See School Report Card – Financial*

Financial Officer for the Indiana Department of Education, reports that 13.8 percent of Indiana's education budget for 2022-2023 came from federal funds. [Record No. 19-8]  Michael Maul, the Director of the Virginia Department of Planning and Budget, reports that federal funds comprised 12.1 percent of the total spending for public education programs in Virginia in 2023.  [Record No. 19-10]  Melanie Purkey is the Assistant Superintendent for the Division of Federal Programs and Support at the West Virginia Department of Education.  [Record No. 19-14]  She reports that 26.63 percent of West Virginia's total annual expenditures for public educational programs and activities in fiscal year 2023 came from federal funds.  Finally, Jonathan Blanton, the First Assistant Attorney General for the Office of the Ohio Attorney General, reports that Ohio received over $5.2 billion in funding from the United States Department of Education in 2023.  [Record No. 19-16]

The plaintiff-States' schools use these federal funds for a variety of purposes including: providing supplemental educational support, materials, and enrichment for students, providing non-academic support for students; providing professional learning opportunities for teachers; providing technology for students; providing food and nutrition for students; supporting special education programs; supporting low-income students, and providing support for English learners, homeless students, and students with disabilities.  Public higher education institutions use federal funds for student loans, scholarships, research and services, veterans' affairs, and for funding for historically Black colleges and universities.

---

*Transparency,* Kentucky Dep't of Education, https://www.kyschoolreportcard.com/organization/20?year=2023#financial_transparency (last visited June 1, 2024).

If the preliminary injunction is not granted and the States do not comply with the new regulations, they risk losing these substantial amounts of funds.  Various officials' declarations indicate that, without federal funding, the plaintiff States will be forced to either eliminate educational programming or seek alternative funding.  Further, the programming would likely have to be paused while alternative funding is being sought.  David Thurman's testimony indicates that, at least with respect to Tennessee, budget planning would be difficult in the absence of injunctive relief.

The loss of these funds undoubtedly would have a devastating impact on the plaintiff-States' public schools and their students.  And while the Department of Education must seek voluntary compliance before terminating any funds that are given to states under Title IX, "the States' injury as alleged has immediate effect on the States' ordering of their own affairs."  *See State of Tenn. v. Dep't of Educ.*, --F.3d--, 2024 WL 2984295, at *20 (6th Cir. June 14, 2024) (observing that plaintiffs normally are not required "to bet the farm by taking the violative action before testing the law).[21]

### c.    Interference with States' Sovereign Interests

States have compelling interests in enforcing their own laws, particularly with respect to matters like education, which have traditionally been reserved to the states.  *See Tennessee v. United States Dep't of Education*, 615 F. Supp. 3d 807, 840-41 (2022) (citing *Thompson v.*

---

[21]    During the preliminary injunction hearing, counsel for the Department suggested through cross-examination that the Department of Education has never terminated a recipient's funding in response to a suspected Title IX violation.  But even if this assertion is accurate, it is no guarantee that the Department will not do so in the future.  *See State of Tenn., et al. v. Dep't of Educ., et al.*, --F.4th.--, 2024 WL 2984295, at *5 n.8 (June 14, 2024) ("Courts are rightly skeptical about taking a party at its word that it will not enforce something when enforcement is within its discretion.").

*DeWine*, 976 F.3d 610, 619 (6th Cir. 2020)).  *See also Abbott v. Perez*, 585 U.S. 579 n.17 (2018) (observing that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State").  In many instances, the Final Rule conflicts with the plaintiff-States' own duly enacted laws.  *See, e.g.,* Tenn. Code. Ann § 49-2-802; Ky. Rev. Stat. 158.189.[21]  But displacement of state statute by federal law is not required.  Instead, irreparable harm exists when a federal agency's action places a state's "sovereign interests and public policies at stake."  *Tennessee*, 615 F. Supp. 3d at 841 (quoting *Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001)).  The plaintiffs have sufficiently alleged that the new regulations pose a significant, immediate threat to public policies that have traditionally been left to state determination.

### d.   Citizen Harms

Finally, the plaintiff-States contend that the Final Rule would cause their citizens to endure a variety of irremediable harms including violations of their bodily privacy by students of the opposite sex.  As previously discussed, States can defend their quasi-sovereign and sovereign interests, such as the safety of their populations, in court against the federal government.  The Court has no doubts that individual privacy is an important concern for the plaintiff-States, and the Department undoubtedly dismissed many of these concerns raised by the parents, teachers, and other commenters.  To the extent the States seek to ensure the safety of their populations, the claims against the federal government may proceed.  *See Biden*, 23 F.4th at 596 (discussing states' quasi-sovereign interests).

Turning to the Intervenor plaintiffs, Christian Educators has sufficiently alleged such claims to establish irreparable injury.  Irreparable injury is presumed when a moving party shows "that a constitutional right is being threatened or impaired."  *Am. Civil Liberties Union*

*of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 445 (6th Cir. 2003) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Loss of First Amendment freedoms, in particular, even if just for a minimal period of time, "unquestionably constitutes irreparably injury." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

## VI.    Substantial Harm and the Public Interest

The third and fourth factors—the likely harm to others and the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Sixth Circuit has repeatedly recognized that "the public interest lies in a correct application" of the law.  *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (quoting *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991)).  The relevant regulations have been unchanged for approximately 50 years.  Therefore, it would be of relatively little harm to others to maintain the status quo pending the resolution of this lawsuit.

## VII.    Scope of Relief

The Department contends that, even if the Court grants a preliminary injunction, some of the challenged regulations may remain intact.  The undersigned, however, disagrees with this assertion.  The Court starts with 34 C.F.R. § 106.10, which seeks to redefine the scope of discrimination on the basis of sex under Title IX.  It provides: "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  For the reasons previously explained, the text and legislative history of Title IX do not permit a reading of "sex" that includes sex stereotypes and gender identity.

It follows that 34 C.F.R. § 106.2 (Aug. 1, 2024) is invalid, as well.  It reads, in relevant part:

> Sex-based harassment prohibited by this part is a form of sex discrimination and means sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10, that is: . . .
>
> (2) Hostile environment harassment.  Unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment).  Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following:
>
> (i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity;
> (ii) The type, frequency, and duration of the conduct;
> (iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct;
> (iv) The location of the conduct and the context in which the conduct occurred; and
> (v) Other sex-based harassment in the recipient's education program or activity.
> . . .

This provision bases actionable sexual harassment on impermissible grounds identified in § 106.10.  If discrimination cannot arise from these statuses under Title IX, neither can sexual harassment.  *See Foster v. Bd. Of Regents of Univ. of Mich.*, 982 F.3d 960 (6th Cir. 2020) (noting that Title IX covers at least two types of discrimination—a school's direct interference with a student's participation in an education program and a school's deliberate indifference to known acts of student-on-student harassment).

Finally, 34 C.F.R. § 106.31(a)(2) provides:

> In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. § 1681(a)(1) through (9) and the corresponding regulations at §§

106.12 through 106.15, 20 U.S.C. § 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b).  Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

This regulation is arbitrary in the truest sense of the word.  As explained above, the Department has failed to demonstrate why recipients are allowed to inflict more than de minimis harm in some situations but not in others when there is no meaningful difference (e.g., living facilities versus showers).

Further, as previously explained, the Department's rulemaking was arbitrary and capricious, resulting in a rule that is invalid in its entirety.

Each subsection in which these provisions appear contains a severability clause that provides: "If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby."  34 C.F.R. §§ 106.9; 106.16; 106.48.  The severability clause has little impact on the Court's analysis because the impermissible definition of "discrimination on the basis of sex" in 34 C.F.R. § 106.10 permeates the remaining regulations.  Although it could potentially excise the portions of 34 C.F.R. § 106.2 that make any reference to sex discrimination or sexual harassment, the Court is hesitant to do so when rulemaking is exclusively within the purview of the Executive Branch.  *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006) (asking whether the legislature would have "preferred what is left of its statute to no statute at all").

Finally, the Court recognizes prudential limitations to its determination.  The Sixth Circuit has cautioned against granting nationwide injunctions against the federal government.  *See Tennessee v. Dep't of Education*, 615 F. Supp. 3d 807, 842 n.18 (E.D. Tenn.

July 15, 2022) (citing *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022)) (Sutton, J., concurring).  And clearly there are states that do not want this relief as evidenced by the proposed amicus curiae filing in this case.

The Intervenor plaintiffs have asked the Court to waive any security requirement under Rule 65 of the Federal Rules of Civil Procedure, reporting that no security requirement attends a stay under 5 U.S.C. § 705.  Rule 65 provides that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  While Rule 65 appears to require a security bond, the Court has discretion over whether to require the posting of security.  *Moltan Co. v. Eagle-Pritcher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).  Under the facts presented in this litigation, the Court concludes that no security is necessary in this matter due, in large part, to the strength of the plaintiffs' case and the strong public interest favoring the plaintiffs' positions.  *See id.*; *Tennessee v. Dep't of Education*, 615 F.3d at 842.

## VIII.  Conclusion

Title IX of the Education Amendments of 1972 was intended to level the playing field between men and women in education.  The statute tells us that no person shall be subjected to discrimination under any education program or activity receiving Federal financial assistance "on the basis of sex."  20 U.S.C. § 1681.  However, the Department of Education seeks to derail deeply rooted law with a Final Rule that is set to go into effect on August 1, 2024.

At bottom, the Department would turn Title IX on its head by redefining "sex" to include "gender identity."  But "sex" and "gender identity" do not mean the same thing.  The

Department's interpretation conflicts with the plain language of Title IX and therefore exceeds its authority to promulgate regulations under that statute.  This Court is not persuaded by the Department's reliance on the Supreme Court's decision *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020)—a case that was explicitly limited to the context of employment discrimination under Title VII of the Civil Rights Act of 1964.

The Final Rule also has serious First Amendment implications.  The rule includes a new definition of sexual harassment which may require educators to use pronouns consistent with a student's purported gender identity rather than their biological sex.  Based on the "pervasive" nature of pronoun usage in everyday life, educators likely would be required to use students' preferred pronouns regardless of whether doing so conflicts with the educator's religious or moral beliefs.  A rule that compels speech and engages in such viewpoint discrimination is impermissible.

Additionally, the Department's actions with respect to this rulemaking are arbitrary and capricious.  The Department fails to provide a reasoned explanation for departing from its longstanding interpretations regarding the meaning of sex and provided virtually no answers to many of the difficult questions that arose during the public comment phase.  Notably, the Department does not provide a sufficient explanation for leaving regulations in place that conflict with the new gender-identity mandate, nor does it meaningfully respond to commentors' concerns regarding risks posed to student and faculty safety.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      The motions for a preliminary injunction/stay filed by Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia [Record No. 19] and Christian Educators Association International and A.C. [Record No. 63] are **GRANTED**.

2.      The United States Department of Education and Miguel Cardona, Secretary of the U.S. Department of Education, along with their secretaries, directors, administrators, and employees, are **ENJOINED** and **RESTRAINED** from implementing, enacting, enforcing, or taking any action in any manner to enforce the Final Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474 (Apr. 29, 2024), which is scheduled to take effect on August 1, 2024.

3.      This injunction is limited to the plaintiff-States of Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia and extends to intervening plaintiffs Christian Educators Association International and A.C. in these six states.

Dated:  June 17, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky