```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
 2                  CENTRAL DIVISION AT COVINGTON
                              - - -
 3    STATE OF TENNESSEE, et al.    : Docket No. 24-72
                                    :
 4                   Plaintiffs,    : Lexington, Kentucky
      and                          : Monday, June 10, 2024
 5                                  : 9:00 a.m.
      CHRISTIAN EDUCATORS          :
 6    ASSOCIATION INTERNATIONAL, and:
      A.C., by her next friend and  :
 7    mother, Abigail Cross,        :
                                    :
 8         Intervenor Plaintiffs,   :
                                    :
 9    v.                            :
                                    :
10    MIGUEL CARDONA, in his        :
      official capacity as Secretary:
11    of Education, and UNITED      :
      STATES DEPARTMENT OF          :
12    EDUCATION,                    :
                                    :
13                   Defendants.    :

                              - - -
14
                  TRANSCRIPT OF MOTION HEARING
15              BEFORE DANNY C. REEVES
         UNITED STATES CHIEF DISTRICT COURT JUDGE
16                            - - -

17    APPEARANCES:

18    For the Plaintiff,
      State of Tennessee:        STEVEN J. GRIFFIN, ESQ.
19                               WHITNEY D. HERMANDORFER, ESQ.
                                 VIRGINIA N. ADAMSON
20                               Office of Attorney General
                                 P.O. Box 20207
21                               Nashville, Tennessee  37202

22    For the Plaintiff,
      Commonwealth of Kentucky:  JUSTIN D. CLARK, ESQ.
23                               LINDSEY KEISER, ESQ.
                                 VICTOR B. MADDOX, ESQ.
24                               Attorney General's Office
                                 1024 Capital Center Drive
25                               Suite 200
                                 Frankfort, Kentucky  40601
```

2

1    APPEARANCES (Continued)

2    FOR THE INTERVENOR
     PLAINTIFFS:              HENRY W. FRAMPTON, IV, ESQ.
3                             RACHEL ROULEAU, ESQ.
                              Omega Law PLLC
4                             P.O. Box 559
                              Union, Kentucky  41091
5
     FOR THE DEFENDANTS:      ELIZABETH TULIS, ESQ.
6                             PARDIS GHEIBI, ESQ.
                              EMILY NESTLER, ESQ.
7                             U.S. Department of Justice
                              Civil Division
8                             1100 L. Street, NW
                              Washington, DC  20005
9

10   Court Reporter:          LAUREN I. GOOTEE, RMR, CRR
                              Official Court Reporter
11                            101 Barr Street
                              Lexington, Kentucky 40507
12                            (859) 469-7459

13

14

15

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by mechanical stenography,
     transcript produced by computer.

3

1          (Proceedings commenced in open court at 9:00 a.m.)

2          THE COURT:  Thank you.  Madam Clerk, would you call

3     the matter.

4          COURTROOM DEPUTY:  Yes, Your Honor.

5     Covington Civil Action Number 24-72, State of Tennessee,

6     et al., versus Miguel Cardona, in his official capacity as

7     Secretary of Education, et al., called for motion hearing.

8          THE COURT:  Thank you.

9     Would counsel identify themselves for the record.

10     We'll begin with the plaintiffs.

11          MR. CLARK:  Justin Clark on behalf of the

12     Commonwealth of Kentucky with the Office of Attorney General.

13     And with me are my colleagues, Victor Maddox and Lindsey

14     Keiser, also on behalf of the Commonwealth of Kentucky.

15          THE COURT:  Thank you.  Good morning.

16          MS. HERMANDORFER:  Good morning, Your Honor.  Whitney

17     Hermandorfer from the Tennessee Office of the Attorney

18     General.  With me at counsel table are my colleagues, Steven

19     Griffin and Jenna Adamson.

20          THE COURT:  Thank you.  Good morning to you as well.

21          MR. FRAMPTON:  Your Honor, Hal Frampton on behalf of

22     the intervener plaintiffs.  And with me is my co-counsel

23     Rachel Rouleau.

24          THE COURT:  Thank you.  Good morning.

25     On behalf of defendants.

4

1          MS. TULIS:  Good morning, Your Honor.  Elizabeth
2     Tulis from the Department of Justice for defendants.  I have
3     with me Pardis Gheibi and Emily Nestler, also from the
4     Department of Justice.
5          THE COURT:  Thank you.
6          Before we begin with the hearing, just a few ground
7     rules.
8          Of course, counsel of record may have their cellular
9     telephones in the courtroom, but you need to make sure that
10    those phones are on silent.  If they do go off or alarm, the
11    security officer will take those up, and we'll talk later
12    about whether you get those back.
13         You may also use your laptops, but they cannot have
14    internet access.  I don't want anyone to be doing research in
15    the middle of the hearing.
16         Next, I understand the plaintiffs in the case will be
17    presenting testimony for argument of their respective
18    positions.  Is that accurate?
19         MS. HERMANDORFER:  That's correct, Your Honor.
20         THE COURT:  Will you be presenting the witnesses on
21    behalf of the plaintiffs?
22         MS. HERMANDORFER:  My colleague Steven Griffin will
23    be, Your Honor.
24         THE COURT:  All right.  Mr. Griffin, how many
25    witnesses do you anticipate?

1        MR. GRIFFIN:  Your Honor, we have three witnesses
2    today.
3        THE COURT:  Would you like to present those prior to
4    arguments?
5        MR. GRIFFIN:  Yes, Your Honor.
6        THE COURT:  All right.  We'll proceed in that manner
7    at this time.  You may call your first witness.
8        MR. GRIFFIN:  Thank you, Your Honor.
9    The first witness I'd like to call today on behalf of the
10   plaintiffs is Christy Ballard.
11       THE COURT:  Thank you.
12       CHRISTY BALLARD, PLAINTIFF'S WITNESS, SWORN
13       THE COURT:  Thank you.  You may proceed.
14       MR. GRIFFIN:  Thank you, Your Honor.
15                       DIRECT EXAMINATION
16   BY MR. GRIFFIN:
17   Q.   Good morning, Ms. Ballard.  Would you please state your
18   full name for the record.
19   A.   Christy Leanne Ballard.
20   Q.   And where do you work?
21   A.   The Tennessee Department of Education.
22   Q.   And what's your role there?
23   A.   I am currently the general counsel for the department.
24   Q.   And as general counsel at the Department of Education in
25   Tennessee, what are your duties and responsibilities?

1    A.    I generally serve as the chief legal officer for the

2    agency.  So I serve on the Commissioner of Education's Cabinet

3    where I advise cabinet and senior leadership on all matters

4    related to the law.  I also advise other team members of the

5    department on legal issues.  Part of that would include

6    training for internal staff, also sometimes training for

7    school officials across the state.

8    Q.    And how long have you served in that capacity?

9    A.    I've served as general counsel for 22 years.  I became

10   general counsel after my first two years at the department.

11   I've been at the department for 24.  My first two years at the

12   department, I was the special education attorney.  And in that

13   role, I managed the special education dispute resolution

14   process that's required by state and federal law for the

15   department and did a lot of internal training for internal

16   Department of Education staff on those federal regulations,

17   and I also did a lot of training across the state for local

18   public school districts.

19   Q.    And you've served in your role as general counsel for

20   over 20 years?

21   A.    24 years, four governors, and probably about 12

22   commissioners of education.

23   Q.    Did you have any experience before you came to the

24   department similar to the work that you do now?

25   A.    I did.  I served as a staff attorney for the Tennessee

1    school board's association for a year and a half prior to

2    moving to the Department of Education.  And in that role --

3    that is an organization where school board members in

4    Tennessee are members, and that is the organization that does

5    the majority of training that's required by state law for

6    school board members who are elected.  They serve in a role

7    where they provide policy services for districts who pay those

8    fees.  So it's a lot of training for school board members and

9    school officials.

10   Q.   Let me ask you real quick about public schools in

11   Tennessee.

12        Do you know how many students are served by Tennessee's

13   K through 12 public schools?

14   A.   It's just under a million.  I believe it's approximately

15   985,000, but just under a million students.

16   Q.   Do you know how many teachers and other staff are

17   employed across all the schools in Tennessee, the public

18   schools?

19   A.   I believe licensed staff is approximately 84,000.  But,

20   of course, there are about 53,000 -- around approximately

21   53,000 of non-licensed staff.  And that would be non-teaching

22   positions, such as administrators not required to hold a

23   license, cafeteria workers, custodians, and all the various

24   positions.

25   Q.   Okay.  So a little over 130,000 teachers and staff

BALLARD - Direct                                                      8

1    combined?

2    A.    That's accurate, I believe.

3    Q.    Okay.  And what's the relationship between the Tennessee

4    Department of Education and the local school districts in the

5    state?

6    A.    Well, in Tennessee, the State Department of Education, we

7    don't manage and control the public schools on a day-to-day

8    basis.  They all are managed and controlled by locally elected

9    boards.  But we do serve in an oversight role generally in

10   certain areas.  We provide state funding to local public

11   school districts.  We pass through the federal funding to

12   those local school districts.  And along with that, we have

13   some compliance and oversight role in ensuring compliance with

14   federal and state laws.

15        So as part of that compliance role, we provide technical

16   assistance and general guidance on the laws generally.  They

17   have their own local board attorneys who provide specific

18   legal advice, but we do a lot of technical assistance.  We

19   have staff at the department who are program experts,

20   non-lawyer former educators who provide technical assistance.

21   And then my team is the legal department.  We have about --

22   counting me, about 19 attorneys and paralegals and other

23   compliance staff who assist in that role.

24   Q.    Okay.  And I understand that Tennessee also has what's

25   called special schools?

1    A.   We call them our Tennessee State Special Schools, and

2    they're unique.  They are public schools, but unlike all the

3    other public school districts in Tennessee where they are

4    managed and controlled by a local board that's elected

5    locally, the State Department of Education actually directly

6    runs those schools.

7         They are Tennessee School for the Blind in Nashville,

8    Tennessee.  It's actually a residential school, and so those

9    students stay there overnight through the week.  We have

10   Tennessee School for the Deaf in Knoxville, Tennessee, West

11   Tennessee School for the Deaf in Jackson, Tennessee.  We have

12   a Tennessee School for the Deaf campus also in Nashville.  And

13   then we have a regular public high school in Jamestown,

14   Tennessee, Alvin C. York Agricultural Institute.  And we

15   directly run those schools.

16        So the department's role with those schools is unique and

17   very different, because all the employees of those schools are

18   actually employees of the Tennessee Department of Education.

19   So, for example, my role and my team's role in those schools

20   is quite different because we do serve as the attorneys for

21   those schools.  We do everything from advising their

22   administrators and staff on a day-to-day basis on all matters,

23   HR, policy.  We help write their policies.  We help write

24   their procedures.  We do more intensive training and provide

25   specific legal advice for those schools.

*BALLARD - Direct*                                                          10

1    Q.   So where a local school district may have their own board

2    attorney, the State Department of Education serves in that

3    role for these special schools you described?

4    A.   You're correct.  We get to actually serve in that

5    capacity for those schools.

6    Q.   Ms. Ballard, are you familiar with the new Title IX rule

7    that was recently issued by the United States Department of

8    Education?

9    A.   I am familiar with the rule.  It's extensive.  It's

10    complicated.  And I have a team -- within the Office of

11    General Counsel, I have a civil rights team that's made up of

12    three attorneys and a paralegal.  And while I have been

13    reviewing the rule and looking at it, they've done a more deep

14    dive because they are the subject matter experts in reviewing

15    that type of rule.

16    Q.   And is that type of rule something that your department,

17    your team there at the Department of Education, would counsel

18    or advise the state special schools and also the local school

19    districts on?

20    A.   Yes, we would and are currently reviewing the rule and

21    looking at policy changes that are required, procedure

22    changes, student handbook changes, training requirements, all

23    of those things.

24    Q.   And when does the rule become effective?

25    A.   August 1.

BALLARD - Direct                                                    11

1    Q.   So less than two months away?

2    A.   Yes.  Correct.

3    Q.   Do you recall when the Department of Education published

4    that rule?

5    A.   I believe it was the end of April.

6    Q.   What are school districts in Tennessee typically doing at

7    the end of April?

8    A.   It's an extremely busy time of the school year.  In

9    Tennessee, the end of the school year in the spring is when

10   our state and federally required standardized assessments are

11   being given.  Students are taking, we call it the TCAP.  Those

12   tests are important.  They inform future teaching for

13   teachers.  They inform the accountability for, you know,

14   school districts and individual schools, teacher evaluations.

15        And really importantly, we in Tennessee want to ensure

16   that all students can read at grade level by the third grade,

17   so it's a very important test for that age group.  Because if

18   they score not proficient in reading, we institute a summer

19   learning program where they get intensive tutoring and

20   remediation over several weeks of the summer.

21        So while they're administering those tests, school

22   districts are also planning their summer learning programs for

23   those students who need it.  Our general assembly typically

24   adjourns at the end of -- around that time, end of April/early

25   May, so districts are also trying to read all the new state

1  laws that go into effect maybe over the summer or before the
2  next school year.

3  So they're making staffing decisions.  They're getting
4  ready to have budget meetings with their board.  So it's a
5  really busy season.

6  Q.  And when generally does the school year come to an end
7  for public schools in Tennessee?

8  A.  Around the mid/end of May.  Every district has their own
9  calendar, so they're all unique.  But most school districts
10  are coming to a close end of May, during the May month.

11  Q.  So this new rule came out end of April.  It has about a
12  three-month lead-up time to the effective date August 1st.
13  What kind of impact does that sort of timeline have on the
14  ability of these local school districts to implement the
15  requirements of the new rule?

16  A.  It's tough because there are so many steps that have to
17  be taken before a new regulation can be implemented.

18  For example, you have to read and determine what is
19  necessary as far as policy tweaks, have a policy drafted, have
20  a policy actually adopted by the local board, which is its own
21  logistics problem.  Because in Tennessee, those have to occur
22  in a public meeting where there is adequate public notice
23  provided.  And most of the time, school boards have a meeting
24  in June where they adopt their budget, and many districts
25  don't have another meeting until August.  They don't have a

*BALLARD - Direct*                                                          13

1    July meeting.

2        So if they haven't quickly already read the rule,

3    digested the rule, drafted -- had experts lean in and draft a

4    new policy and approved it, then actually draft the procedures

5    to implement that.  They also have to get student handbooks

6    ready.  And they still print handbooks.  Students take them

7    home in school.  So they have to get to the printer in time.

8        If they have not already done that in June, they won't

9    have another opportunity to meet, unless they call a special

10   called meeting, until August 1 or after.  And by that time,

11   schools are started in most districts.  A lot of districts

12   start in July, some start the first week of August, some start

13   the second week of August.

14       Also during the summer, in Tennessee, a lot of, if not

15   most, school district employees are ten-month employees.  So

16   unless you're working a summer program or some special

17   project, you're not working during the summer.  So when school

18   is out at the end of May, most teaching staff and others,

19   they're not working during the summer.  Well, they're working.

20   They're working second jobs a lot of times.  And they're

21   vacationing.  So calling people in for training is outside

22   their regular work contract.

23   Q.   And you mentioned the need to update policies and

24   procedures.  Is that something that every school district

25   individually has to do?

BALLARD - Direct                                                    14

1    A.   Absolutely.  Because every school has to develop their

2    own unique policy based on the size and the type of school.

3    Q.   Is that something that your team at the Department of

4    Education does for the state special schools that you

5    mentioned earlier?

6    A.   We do it directly for the state special schools because

7    we serve as their lawyers.  While we might provide general

8    technical assistance on how to implement state and federal

9    rules, we do not draft policies for local public school

10   districts, other than the state special schools.

11   Q.   There's been some suggestion in this case that, you know,

12   you already have to update policies and procedures each year

13   to take account of new state and federal laws that may be

14   adopted and so this doesn't really add much additional burden

15   to the school districts.

16        Do you agree or disagree with that assertion?

17   A.   I disagree.  While districts are used to looking at new

18   laws that pass every year and drafting new policies, they're

19   usually not based on hundreds of pages of a rule.  There may

20   be a slight tweak to a policy.  It may be a new policy.

21        For example, in Tennessee, the general assembly just

22   passed a law that says every school district has to have an

23   artificial intelligence policy.  It doesn't say what must be

24   included, it's just acknowledging that schools need to be

25   apprised of artificial intelligence and have policies

1    accordingly, and they have to have a new policy on that.

2         But that's a simple -- I mean, it's pretty much a

3    one-sentence bill.  It's easy to read.  There's probably

4    expertise within a district that can do that.  They don't have

5    to engage necessarily outside parties in a lot of the

6    policymaking, whereas this rule, most school districts in

7    Tennessee are not going to have the expertise in-house to

8    necessarily understand and digest this rule and draft a strong

9    policy on this tight timeline.

10   Q.   Does this particular rule, the Title IX rule we're

11   talking about, does it have any mandatory training

12   requirements for school districts?

13   A.   It does have training requirements for all school

14   employees, and the training requirements have to be

15   differentiated based on the role that the person serves in the

16   district.  So it's not a situation where you can just call

17   everybody to the gym together and do an hour-long PowerPoint

18   and say you've been trained.  It requires extensive planning

19   to facilitate training that is effective.

20   Q.   The training that's required, does that include training

21   for all school district employees?

22   A.   It does.  So it requires specialized training for certain

23   roles, like Title IX coordinators and investigators and

24   decision-makers.  But also, it's going to require training for

25   anyone who might work on a school campus when students are

1    present, anyone who might engage with students, such as office

2    workers and cafeteria workers and custodians and all those

3    people who are working on a school campus when children are

4    present.

5    Q.    So in Tennessee, that could mean having to train over

6    130,000 people that work at the schools across the state

7    before August 1st?

8    A.    Yes.  It requires a massive amount of training for a lot

9    of people, and it's specific differentiated training.

10   Q.    How is training for a new law or regulation typically

11   carried out in Tennessee?

12   A.    Training occurs different ways.  As I spoke earlier about

13   the department's role in ensuring compliance with state and

14   federal laws and rules, we really try to provide a lot of

15   technical assistance and guidance, and, where we can, we try

16   to hold trainings.  Either we do them internally with the

17   Office of General Counsel's team, we may have a conference, we

18   may do it virtually.  Many times we may contract with outside

19   entities, especially if it's a very complex law and rule that

20   requires specific subject matter expertise.

21        And this rule is one that would probably require more

22   subject matter expertise than non-educators would have in the

23   school district.  And even local board attorneys might feel

24   the need to bring in outside groups that have more specialized

25   knowledge.

Q.   Why is training on a rule like the new Title IX rule
something that a local school board attorney may not feel
comfortable training staff on?

A.   Well, there are a lot of really good school board
attorneys in Tennessee and they do various work.  Some of them
are the county attorney or city attorney and they work with
small school district clients and they answer questions when
they come up, but they may not have that special civil rights
knowledge to train on a rule like this.  They might not know
special education law.

     So a lot of districts have a local board attorney that
they use on a day-to-day basis for construction projects and
HR and just other general school law issues facing their
district, but they engage outside counsel with more subject
matter expertise on complicated matters, such as civil rights
or special education.  So this would be an area where they
might engage a firm or a group that has more specialized
knowledge.

Q.   Is that something that the state Department of Education
does from time to time is retain outside counsel or outside
vendors to help train on a complex rule or regulation?

A.   We have done that in the past.  We have had contracts
with entities that did state-wide training.  We've done
in-person training in the past with an outside agency where
this department paid.  We have done virtual trainings to

1   provide, like, just heads-up on new things coming.  So we do

2   do that.  Because we also want experts.  We want to ensure

3   that districts have the resources they need to implement all

4   laws with fidelity.

5   Q.   Is that something that has happened as it pertains to

6   this specific Title IX regulation?

7   A.   Yes.  Before the rule was published, we did have a

8   training session -- I believe it was February -- with an

9   outside law firm that specializes in this type of training

10  about the upcoming rule and possible changes.  And I

11  anticipate we will continue to engage another organization to

12  provide similar training now that the rule has been published.

13  Q.   And when school districts bring in outside counsel or

14  outside vendors to assist with training on specialized matters

15  like this new Title IX rule, does that come with any cost?

16  A.   Yes, it can be very expensive.  It can be hundreds of

17  dollars per person.  And it's not just the cost of the

18  registration fee for a conference or a training.  If it's one

19  centralized training, that means that school officials have to

20  travel and pay the travel cost.  Depending on the time of

21  year, if it's when school is in session, for people to be

22  away, they may have to have substitutes fill in in roles.  So

23  it can be costly however you do the training.

24  Q.   And does the Final Rule's effective date of August 1st,

25  does that have any impact on the ability to complete all the

1    training requirements for the new rule?

2    A.   Yes.  I think it will be extremely difficult to ensure

3    that there are policies ready to go, procedures in place

4    adopted by local boards, and training conducted.  All of this

5    has to take place over the summer when many school officials

6    are not working.  During the summer, they are not employed

7    under a 12-month contract.  And the effective date of August 1

8    is after some districts have started in July and before some.

9    So it just depends on when the school starts.

10   Q.   Is training on a rule like this new Title IX rule, is

11   that something that -- let me ask you specifically about the

12   Title IX regulations that just came out.

13        Is this something that schools can just incorporate into

14   their general staff training, you know, the week before school

15   starts in late July?

16   A.   Typically, no.  This is not -- there are lots of

17   trainings that are annually required of school districts.  In

18   fact, on our department website, we have a list we try to keep

19   updated when new laws are passed about state requirements for

20   training.  And generally what happens is, the week before

21   school starts where students are back in session, we call it

22   in-service week where staff come in and they get the required

23   training.  And it's an hour of this here and an hour of that.

24   And I'm talking about the trainings like bloodborne pathogens

25   and teacher code of ethics and all of those trainings that the

BALLARD - Direct                                                      20

1    law requires.  Of course, that's in addition to the actual

2    substantive work that teachers need, like new methods of

3    reading instruction that is part of the core responsibility of

4    a teacher.

5         So those all take place during that first week of school.

6    And it's my opinion that a training that needs to be -- that

7    needs to be as robust as this rule would require could not

8    just be crammed in in an hour or watch this slide deck or

9    everybody go to the cafeteria and have an hour-long

10   presentation.  It would take more planning and preparation,

11   because it would have to be differentiated by your role.

12   Q.   Let me ask you:  What kind of feedback, if any, have you

13   received from local officials who are trying to implement the

14   Title IX rule by the August 1st effective date?

15   A.   We have started to receive calls from districts

16   frustrated and nervous about the timeline.

17            MS. GHEIBI:  Objection; hearsay.

18            THE COURT:  Overruled.  It will be allowed for

19   purposes of this hearing.

20   A.   We've received calls from directors of schools, even

21   legislators, school board members about, you know, what

22   guidance, what help they're going to receive for implementing

23   the new rule on the timeline.  So there is a lot of angst.

24   Q.   There's been some suggestion in this case that even if

25   the Court finds that certain parts of the rule should be put

1    on hold while this case proceeds that other parts of the rule

2    should be allowed to go forward and be implemented on the

3    effective date August 1st.

4            MS. GHEIBI:  Objection; legal argument.

5            THE COURT:  Prefatory to the question, the objection

6    is overruled.

7        Go ahead.

8    BY MR. GRIFFIN:

9    Q.  To the extent there's a suggestion that parts of the rule

10   might be put on hold but other parts would be allowed to go

11   forward starting August 1st, do you have any reaction as to

12   the feasibility of that suggestion?

13           MS. GHEIBI:  Objection; calls for a legal conclusion.

14           THE COURT:  Are you going to take the position in

15   this case that the rule should be completely invalidated as

16   opposed to invalidated in part if the Court chooses to do

17   that?

18           MS. TULIS:  I'm sorry, Your Honor.  Is that --

19           THE COURT:  Who made the objection?

20           MS. GHEIBI:  So in our briefing, we did argue for

21   severability.

22           THE COURT:  Yes, I know.  I understand that.  And

23   this is a question relating to that issue that you'd argued.

24   So your objection is overruled.

25       Please proceed.

1          MR. GRIFFIN:  Thank you, Your Honor.

2     A.   If I understand what you're describing, I think that

3     could be incredibly confusing to districts.  It would need to

4     be very clear what part of the rule they would be implementing

5     and training on.  And then if later -- it might require

6     training again later, which would be more time and more money

7     spent training.  I just think that could be more costly and

8     confusing possibly for school officials, and for those people

9     helping school officials.

10    Q.   Let me ask you about Title IX investigations and Title IX

11    complaints.

12         How are those investigations typically handled by your

13    office at the Department of Education?

14    A.   Well, there are two ways we might handle them.  If

15    there's something occurring, a student has filed a complaint

16    at one of our state special schools, as I explained earlier,

17    our Office of General Counsel, we actually assist in those

18    investigations at the local level much like a local school

19    district would do.  So we work to investigate those

20    complaints, my office does.

21         If it's a local public school district and a student

22    files with that district, or if they don't, they could -- we

23    have a process in Tennessee where they can actually file a

24    civil rights complaint, a Title IX complaint, with our

25    Tennessee Office for Civil Rights.  And so that team would

BALLARD - Direct                                                    23

1   also investigate from the state level those complaints to

2   ensure that the district had fully complied with Title IX.

3       So a lot of times those investigations look at not just

4   the underlying allegation, but did the school district follow

5   Title IX?  Did they have a proper policy?  Did they have

6   training required under the law?  Did they implement their

7   policy?  So those are the things that my legal team would be

8   looking at from the state perspective.  That is part of how we

9   monitor and ensure compliance with the federal law in

10  Tennessee.

11  Q.   Okay.  And the Final Rule that we're dealing with in this

12  case estimates that there would be approximately a 10 percent

13  increase in Title IX complaints and investigations.  So

14  assuming that to be true, what kind of impact would that have

15  on your team at the Department of Education?

16  A.   It could have a big impact.  That team is already very

17  busy.  We have quite a few complaints filed, because they

18  handle all matters of civil rights.  They provide technical

19  assistance on 504.  They do investigations for Title VI and

20  Title IX.

21      So an increase in Title IX complaints would either -- and

22  that team also, they don't just handle civil rights, they

23  handle truancy and general student discipline.  So those would

24  be areas that they would not be able to put their full time

25  and attention to, and it may require additional staff

BALLARD - Direct                                                    24

1    depending on the level of those complaints and how many are

2    filed at the state special school level versus the local

3    public school district level.  So it could actually require us

4    to increase staff.  And it would certainly increase the time

5    and attention to that role and may require de-prioritizing

6    other areas.

7    Q.   And can you just briefly tell the Court what efforts are

8    already being undertaken in Tennessee for school districts to

9    comply with the new Title IX requirements?

10   A.   I think that school board attorneys are already meeting

11   with their teams, they're reviewing the rules, they're

12   soliciting trainings from outside experts.  They're working

13   quickly to try to make policy changes and get things done on

14   the timeline.

15   Q.   And how does the department's focus on complying with the

16   requirements of the new Title IX rule by August 1st, how does

17   that affect other programs or initiatives that the department

18   has, if at all?

19   A.   Well, it does.  That team is working just on this right

20   now and there are other areas of need.  In Tennessee law, we

21   have a bullying law that they're supposed to do training on

22   bullying generally and hazing and other areas, and all time

23   and attention is being paid to reviewing this rule and

24   developing training schedules and policies and procedures and

25   resources that we can pass along to school districts, or

*BALLARD - Cross*                                                          25

1   looking at outside experts and who would be available for us

2   to quickly contract with and try to provide more resources.

3   Q.   Does that divert resources away from other efforts --

4   A.   Yes, absolutely.

5   Q.   -- on other laws or regulations?

6   A.   Yes.  And our general assembly just recently adjourned,

7   and there are pages of new public chapters that we are also

8   reading and trying to digest and help draft state board of

9   education rules to implement those new rules and laws.

10       MR. GRIFFIN:  Your Honor, I don't have any further

11  questions for Ms. Ballard at this time.

12       THE COURT:  All right.  Thank you.

13       Let's see if we have cross-examination of the witness.

14  Yes, ma'am.

15                       CROSS-EXAMINATION

16  BY MS. GHEIBI:

17  Q.   Good morning, Ms. Ballard.

18  A.   Good morning.

19  Q.   So you testified here today that you're the general

20  counsel for the Tennessee Department of Education, correct?

21  A.   That is correct.

22  Q.   Are you familiar with the definition of "harassment"

23  provided on the Tennessee Department of Education's website?

24  A.   I am.  I'm aware that we have a definition posted.

25       MS. GHEIBI:  Judge, pursuant to Federal Rule of

1    Evidence 201, we ask that the Court take judicial notice of

2    the definition of "harassment" on Tennessee's Department of

3    Education's website.  The definition provided is available on

4    the Department of Education's website and we also have

5    printout copies.

6         Permission to approach the bench.

7              THE COURT:  What is the definition?

8              MS. GHEIBI:  Would you like me to read it for the

9    record?

10             THE COURT:  I would, yes.

11             MS. GHEIBI:  "Harassment is any unwelcome conduct

12   based on a protected class under the federal civil rights laws

13   that is severe, pervasive or persistent and creates a hostile

14   environment that interferes with or limits a student's ability

15   to participate in or benefit from services, activities, or

16   opportunities offered by a school.

17        "Harassment meets one or more of the following criteria:

18   Is an act directed at one or more students that is received as

19   harmful or embarrassing; is directed at one or more students;

20   substantially interferes with educational opportunities,

21   benefits, or programs of one or more students; substantially

22   affects the ability of a student to participate in or benefit

23   from the school district's educational programs or activities

24   by placing the student in a reasonable fear of physical harm

25   or by causing emotional distress; is based on a student's

1    actual or perceived distinguishing characteristic, or is based

2    on an association with another person who has or is perceived

3    to have any distinguishing characteristics; is repeated over

4    time, is severe, persistent, and pervasive; causes mental

5    distress or psychological trauma to the victim."

6              THE COURT:  All right.  If you'd like to tender that

7    to the clerk.

8              MS. GHEIBI:  Sure.

9              THE COURT:  And if you'd like to show a copy to the

10   witness if you'd like to ask her questions about that, you may

11   approach.

12             MS. GHEIBI:  Permission to approach opposing counsel

13   to provide a copy?

14             THE COURT:  Yes, ma'am

15   BY MS. GHEIBI:

16   Q.   So, Ms. Ballard, isn't it true that this definition

17   provides various different characteristics or criteria that

18   could lead to harassment?

19   A.   Yes.  As I read it, yes.

20   Q.   And it provides a basic definition for harassment?

21   A.   Yes.

22   Q.   Thank you.

23        You testified about the efforts that are going to be

24   required of the school -- the recipients in Tennessee to

25   comply with this new rule, correct?

*BALLARD - Cross*                                                          28

1   A.   Correct.

2   Q.   Isn't it true that many, if not all, of these recipients

3   already have antidiscrimination training and policies in

4   place?

5   A.   They do have policies in place, yes, but this rule would

6   require changes to those current policies and additional

7   training.

8   Q.   But just to clarify, these schools already do have

9   routine training for staff and teachers on antidiscrimination,

10  correct?

11  A.   On the current, not the new rule.

12  Q.   Right.  But it is part of the school's general routine

13  practice to provide such training?

14  A.   It should be.

15  Q.   And isn't it true that some K through 12 schools in

16  Tennessee already have policies that prohibit discrimination

17  on the basis of gender identity?

18  A.   I'm not sure.  I'm assuming, yes, but I've not reviewed

19  that.

20          MS. GHEIBI:   Judge, pursuant to Rule 1201 of the

21  Federal Rules of Evidence, we respectfully ask the Court to

22  take judicial notice of the nondiscrimination notice on the

23  website of the Metropolitan Nashville Public Schools.  Again,

24  we have copies for the Court.

25          May I approach the witness and offer one to her?

1          THE COURT:  You may.  You may tender a copy to the

2     clerk and to opposing counsel as well.

3     BY MS. GHEIBI:

4     Q.   Ms. Ballard, can you read the highlighted part for the

5     record?

6     A.   Yes.  "The Metropolitan Nashville Public Schools does not

7     discriminate on the basis of race, religion, creed, sex,

8     gender, gender identity, sexual orientation, national origin,

9     color, age, and/or disability in admission to, access to, or

10    operation of its programs, services, or activities, and

11    provides access to the Boy Scouts and other designated youth

12    groups."

13    Q.   And the Metropolitan Nashville Public Schools is within

14    Tennessee, correct?

15    A.   Correct.

16    Q.   And as you read that definition, it already prohibits

17    discrimination on the basis of gender identity, correct?

18    A.   That's what it says, yes.

19         MS. GHEIBI:  Thank you.  No further questions for

20    this witness.

21         THE COURT:  Ma'am, I have just a couple questions for

22    you and then there may be some redirect.

23         As I understand schools in Tennessee, you have public

24    schools as well as some private schools and parochial schools;

25    is that correct?

1          THE WITNESS:  That is correct, Your Honor.

2          THE COURT:  Do you oversee the parochial schools?

3          THE WITNESS:  The Department has a role.  It's very

4     limited when it comes to non-public schools in Tennessee.

5     There are state board of education rules, and depending upon

6     the type of non-public school it is, they have different

7     requirements that they have to meet.

8       For example, we have different categories.  Category 1

9     private schools, non-public schools, they are the most similar

10    to public schools.  They are required to have licensed

11    teachers and utilize certain types of curriculum.  Categories

12    2, 3, and 4 don't have those similar requirements.  So it

13    really depends on the type of private school that it is.

14         THE COURT:  Correct me if I'm wrong, but it's my

15    understanding that public schools, private schools, and

16    parochial schools in Tennessee will often compete -- I'm

17    thinking of sport events, I'm thinking of band competitions --

18    with schools from other states surrounding Tennessee.  Is that

19    still the situation?

20         THE WITNESS:  You are correct.

21         THE COURT:  So you may have a school in Tennessee

22    that hosts a school or schools from other states, adjoining

23    states, you may have Tennessee schools that travel to other

24    states?

25         THE WITNESS:  That is correct.  And I know even our

1    state special schools sometimes travel to other states for

2    tournaments and competitions.

3              THE COURT:  Does that go beyond just the adjoining

4    states of Tennessee, or do they sometimes travel to Florida,

5    New York?

6              THE WITNESS:  I think so.  I'm not really an expert

7    in the athletic and non-curriculum-related stuff.  But that is

8    my understanding, that, yes, it's not limited to just the

9    borders of Tennessee, that depending on what tournaments

10   they're in and what other parties are competing that it could

11   be travel.

12             THE COURT:  All right.  So assuming that you have

13   schools from other states that would travel to Tennessee to

14   compete, the Tennessee schools would have to provide

15   facilities for those competitors from other states, locker

16   rooms, rest rooms, things of that nature; is that fair?

17             THE WITNESS:  That is what generally occurs, correct.

18             THE COURT:  All right.  Those are all the questions I

19   have, ma'am.

20        Let's see if there's any redirect.

21             MR. GRIFFIN:  Your Honor, just briefly.

22             THE COURT:  Yes, sir.

23                       REDIRECT EXAMINATION

24   BY MR. GRIFFIN:

25   Q.  Ms. Ballard, just a few follow-up questions.

1      My friend on the other side showed you a

2   nondiscrimination statement for Metro Nashville Public

3   Schools.  Do you recall that?

4   A.   Yes.

5   Q.   And you testified earlier about these school district

6   policies and the local school districts in Tennessee.

7      Can you remind the Court, is that a state policy, or are

8   those policies adopted by each school district individually?

9   A.   Every school district individually must have their own

10   policy.  And when we do training, we train on the requirements

11   that are in the law and, of course, tell them that, you know,

12   they need to talk to their local board attorney if they have

13   policies that go beyond what the federal or the state law

14   require.

15   Q.   And when a local school district adopts its own policies

16   and procedures, are those based on community values that they

17   have in that particular area or based on some federal notion

18   of values?

19   A.   Certainly.  If I might give an example.  In Tennessee,

20   it's considered a zero tolerance offense in our state law to

21   bring a firearm or for a student to be in possession of a

22   firearm on school grounds.  Local boards of education can

23   expand that definition of what is considered a zero tolerance

24   offense as far as weapons.  And most every school district

25   expands that, because they add other weapons, knives and

1    blades.  That's not required by our state law, but most

2    districts have their own policy and they tweak it based on

3    their community standards and what they're seeing happening in

4    their community.

5    Q.   And this local policy that you were presented from the

6    Metro Nashville School District, does it say anything about

7    the use of pronouns?

8    A.   It does not that I'm reading.

9    Q.   Does it say anything about access to bathrooms?

10   A.   It does not.

11   Q.   Or locker rooms?

12   A.   It does not.  It's not that specific.

13   Q.   Does it say anything about access or eligibility for

14   sports teams at the K through 12 level?

15   A.   It does not.

16   Q.   And is there a law in Tennessee that protects teachers

17   and school employees when it comes to the use of pronouns and

18   free speech?

19   A.   I believe there is, yes.

20   Q.   Is there a law in Tennessee that creates liability if a

21   student is allowed to use the bathroom aligning with their

22   gender identity rather than their biological sex?

23   A.   There is currently a law related to that, yes.

24   Q.   And is it your understanding that that conflicts with the

25   new federal Title IX regulations?

THURMAN - Direct                                                          34

1   A.   I believe it would, yes.

2            MR. GRIFFIN:  Your Honor, may I have just a moment,

3   please, sir?

4            THE COURT:  Yes, sir.

5            MR. GRIFFIN:  That's all the questions I have,

6   Your Honor.  Thank you.

7            THE COURT:  Let's see if there's any recross on

8   matters that were either brought up through my questions or on

9   redirect.

10           MS. GHEIBI:  No recross.  Thank you, Your Honor.

11           THE COURT:  Ms. Ballard, you may step down.

12      (Witness excused.)

13           THE COURT:  Thank you.

14      When you're ready, you may call your next witness.

15           MR. GRIFFIN:  Thank you, Your Honor.

16      Our next witness we'd like to call is David Thurman.

17           THE COURT:  Thank you.

18              PLAINTIFF'S WITNESS, DAVID THURMAN, SWORN

19           THE COURT:  Thank you.  You may proceed.

20           MR. GRIFFIN:  Thank you, Your Honor.

21                        DIRECT EXAMINATION

22   BY MR. GRIFFIN:

23   Q.   Good morning, Mr. Thurman.

24   A.   Good morning.

25   Q.   Could you please state your full name for the record.

1    A.   David Charles Thurman.

2    Q.   Mr. Thurman, where do you work?

3    A.   I work for the Department of Finance Administration in

4    the State of Tennessee.

5    Q.   And what's your title there?

6    A.   I am the state budget director for the budget office.

7    Q.   And as the state budget director, what are your duties

8    and responsibilities?

9    A.   My role is to build and manage the budget for the

10   governor and track it through the legislative process, execute

11   the final budget after it's passed and then monitor it

12   throughout the year.

13   Q.   How long have you served as the state budget director?

14   A.   13 years.

15   Q.   And what did you do before that?

16   A.   Before that, I was the budget director for the

17   legislature, the budget office.  Prior to that, I was in

18   higher education.  I was the director of higher education

19   budgeting.  And then prior to that, I was in the office I'm in

20   now as an analyst and coordinator.

21   Q.   So how many years total experience do you have in the

22   budgeting process for state government entities?

23   A.   36.

24   Q.   36 years?

25   A.   Uh-huh.

1  Q.   When it comes to developing a state budget, can you talk

2  a little bit about what the timing looks like for that?

3  A.   So it's a long process.  We begin in August to send

4  instructions out to agencies.  We get their requests in

5  September for the upcoming fiscal year.  We spend a good part

6  of the fall, September, October, November, having internal

7  hearings with agencies, having public hearings with the

8  governor and the agencies, having a lot of back and forth to

9  understand what they're asking for and why and how that aligns

10  with the governor's priorities.  It culminates in his

11  recommendation to the legislature end of January/first of

12  February.  And then at that point, the legislature will

13  conduct their own set of hearings to enact a budget.

14  Q.   And part of your role, does that help -- are you involved

15  with the development of a budget also for the State Department

16  of Education?

17  A.   We are.

18  Q.   And how many public school districts are there in

19  Tennessee?

20  A.   There are 148 school districts.

21  Q.   And do you know how many individual public schools are

22  included in those school districts?

23  A.   About 1,900 schools in those 148 school districts.

24  Q.   Where does the funding come from to support the children

25  that are served by Tennessee's public schools?

1   A.   So their budget is funded from state appropriations,

2   which is funded from state taxes, federal funding from

3   different funding streams and programs, and then a small

4   amount from other dollars.  The large amount there is really

5   lottery dollars.

6   Q.   What state agency is it that oversees the state's public

7   K through 12 schools?

8   A.   The Department of Education.

9   Q.   Okay.  And do you recall what the total budget is for the

10  State Department of Education?

11  A.   About a little over $8 billion.

12  Q.   And that's for the latest fiscal year?

13  A.   FY '23.

14  Q.   And out of that a little over $8 billion budget for the

15  State Department of Education, how much of that comes from

16  federal funding sources?

17  A.   1.8.

18  Q.   Is that all from the United States Department of

19  Education, or how much of that 1.8 billion comes from --

20  A.   About 80 percent of that 1.8 billion comes from the

21  Department of Education, which is about 1.5 billion.  The

22  remainder comes from USDA, which funds our school nutrition

23  program.

24  Q.   So 1.5 billion from the United States Department of

25  Education?

1   A.   Correct.

2   Q.   Where does that money go?

3   A.   So the majority of the dollars go to the local education

4   agencies of the school districts.

5   Q.   And when you say "local education agency," that's just a

6   fancy term for school district?

7   A.   Right.

8   Q.   How does the money get from the federal government to the

9   school districts in Tennessee?

10  A.   It flows through the Department of Education.  They

11  administer those dollars.  There's a very small amount that

12  goes directly to the school districts.

13  Q.   Directly from the federal government to the school

14  districts without passing through the state?

15  A.   That's right.

16  Q.   Okay.  Most of it, though, flows through the State

17  Department of Education?

18  A.   That's correct.

19  Q.   And how is federal funding built into the budgets for

20  state and local governments for education?

21  A.   So as I mentioned earlier, it's a long process to build a

22  budget for the state.  The budget, when it's revealed in

23  January/February to legislature, it really kind of kicks off

24  the planning process for local governments and school

25  districts.  It's at that time they will start to get an idea

1    of what dollars they're going to have in the upcoming school

2    year so they can begin their planning process.  They also have

3    a long process to build their budgets.  So when we start

4    giving them estimates, it allows them time to start thinking

5    about resources, to start thinking about hiring, to start

6    thinking about positions and staffing.

7    Q.   So given that sort of timeline, Mr. Thurman, would you

8    say it's important or not important to have some sense of

9    certainty regarding the amount of federal funding that's

10    available for the State Department of Education and local

11    school districts?

12    A.   It's extremely important.  Again, given the long timeline

13    to set a budget, to think about planning for programs, to

14    think about planning for people and resources, to know whether

15    you need to expand or decrease a program, you need a lot of

16    lead time.  The time to set a budget for locals is -- they

17    have the same fiscal year, July to June, like we do, but their

18    budgets are not set until probably end of May/first of June.

19    So there's a long process to build that.  They really need to

20    see what we've done first in our budget before they can start

21    to plan their budget.  So it's a long time to kind of think

22    through that process to build a budget for them.

23    Q.   And what happens if that funding, the federal funding

24    that's anticipated by the state and local school districts, if

25    that is lost after the budget is already set?

THURMAN - Direct                                                    40

1    A.   Yeah.   So after the budget is set, we have very little

2    flexibility at a state level to make adjustments.   We really

3    depend upon the authority given to us when the budget is set

4    by the legislature.   And if the budget is passed and the

5    legislature has gone home, we don't have the ability to move

6    dollars around.   Locals are the same way.   If their budget is

7    set, if changes occur after it's set and they've made funding

8    decisions to fund people, to expand programs and those dollars

9    aren't realized, it causes a huge interruption to their

10   ability to manage that budget.

11   Q.   And when we're talking about federal funding for local

12   school districts, how are those dollars typically allocated?

13   A.   So allocated -- most of it is flow-through to LEAs, and

14   there's no flexibility with federal funding.   When they

15   receive the dollars, it is for a specific program, for a

16   specific purpose that they are given.   They can't use the

17   dollars for another program.

18   Q.   There's been a declaration submitted in this case by the

19   commissioner of the Department of Finance and Administration

20   James Bryson.

21        Are you familiar with that declaration?

22   A.   I am.

23             MR. GRIFFIN:   Your Honor, may I approach the witness?

24             THE COURT:   Yes, you may.   You need to show that to

25   opposing counsel though.

*THURMAN - Direct*                                                            41

1              MR. GRIFFIN:  Yes, Your Honor.

2         May I approach the witness?

3              THE COURT:  Yes, sir.  And please watch your step as

4    you come over here.  There's a step just beyond the jury box.

5              MR. GRIFFIN:  Thank you, I will.

6    BY MR. GRIFFIN:

7    Q.   This is a document that's been marked on the docket as

8    Document Number 19-2, filed May 3rd, 2024.

9         Mr. Thurman, can you identify what this document is?

10   A.   Yes, sir.

11   Q.   What is that?

12   A.   So this is a declaration that we put together for

13   Commissioner Jim Bryson to identify the funding for education.

14   Q.   So you've seen this declaration before?

15   A.   Yes.

16   Q.   And if you look at page 2 of Mr. Bryson's declaration,

17   there's a table there that has a list of programs along with

18   estimated federal funding and estimated state funding for each

19   of those programs.

20        Do you see that?

21   A.   Yes.

22   Q.   Are you familiar with those categories that are listed

23   there on pages 2 and 3?

24   A.   Yes.  So when an agency submits their budget -- when the

25   Department of Education submits their budget, they will submit

1    it in these categories with these type of dollars.

2    Q.   I'd like to ask you just about a few of those.

3         There's one category, it's a pretty big chunk of money.

4    It says, "ESSA and Federal Programs," estimated federal

5    funding of $387 million.

6         Can you tell the Court what ESSA and Federal Programs,

7    what that is?

8    A.   Yes.  So this is the Every Student Succeeds Act.  It is

9    federal funding that is received from the federal government

10   to the Department of Education to pass through to school

11   districts.  The focus of a lot of these dollars are to support

12   low-income students, high-risk students for programming.  A

13   good amount of dollars to do that are for staffing to lower

14   class size ratios, to provide what I would call wraparound

15   services for those at-risk students for, think counselors,

16   think English language learners, think different types of both

17   in-classroom type support and then outside-the-classroom type

18   support.

19   Q.   Thank you.

20        There's another category toward the bottom of page 2.  It

21   says, "Special Education Services," and it's listed with an

22   estimated federal funding amount of $253 million.

23        Can you just briefly explain to the Court what's involved

24   with Special Education Services?

25   A.   Right.  So this is a program that provides federal

1    funding for students with disabilities to help them be

2    successful in the classroom, and it provides additional

3    supports in terms of personnel, in terms of teachers.  It

4    depends on the disability, but sometimes a student may need a

5    one-to-one type ratio to escort them through the classroom.

6    So it's very people intensive.  And other type supports around

7    that student that they may need.

8    Q.   Are the types of services that school districts provide

9    related to disabilities and special education, is that

10   something that's mandated by state or federal law?

11   A.   It's mandated by both, yes.

12   Q.   Mr. Thurman, there's another category on page 2 titled

13   "Improving Schools Program," and it has an estimated federal

14   funding amount of $29,986,900.

15        What is involved with the Improving Schools Program?

16   A.   So these support school health-type programs in the

17   school districts.  It also provides funding for smoking

18   cessation.  It helps provide funding for programs to reduce

19   violence in schools, drug abuse, and drug awareness.

20   Q.   Okay.  And there's also a category listed, "Early

21   Childhood Education."  What would be involved with that?

22   A.   So Early Childhood is a pre-K program mainly for

23   need-based students, financially needy students.  It

24   administers the Head Start program, it administers the family

25   resource centers.  All these are programs targeted to early

1    learning, and a lot of it is heavy toward financially needy

2    families.

3    Q.   There's also a category listed as "Data and Research,"

4    and its total is a little over $9 million in estimated federal

5    funding.  What all would be involved for Data and Research?

6    A.   So the Department of Education does a lot with collecting

7    all the data necessary that's required by either the federal

8    or state from the school districts for reporting.  It provides

9    the accountability component for schools.  It provides the --

10    it manages the state report card to report how schools are

11    doing, all the things that are necessary for improving --

12    providing data to improve schools.

13    Q.   And, Mr. Thurman, on page 3, there's a category listed,

14    "College, Career and Technical Education."  That one has an

15    estimated federal funding amount of over $25 million.  Can you

16    just briefly tell the Court what's involved with College,

17    Career and Technical Education?

18    A.   I guess I would describe this as the old vocational

19    education programs that are in K-12.  These dollars support

20    those programs.  The federal dollars are heavily weighted

21    toward equipment replacement and renewal.  These programs are

22    heavy equipment -- emphasis on heavy equipment, so they're

23    very expensive to maintain and replace.  A lot of these

24    dollars are used to do that.

25    Q.   And if the state lost federal funding or the school

1    districts lost federal funding for any of these programs we've

2    discussed, how would that be addressed by the state or at the

3    local level?

4    A.   Well, I would say it depends.  I mean, a billion eight or

5    a billion five is a significant amount of dollars.  It would

6    be impossible to think that we could replace that in a fiscal

7    year.

8        Just to put it in context, normal growth of the state

9    budget in terms of new money is probably between 400 and 600

10    million dollars.  There are things in our budget that I would

11    consider normal growth that we have to fund.  Think salaries,

12    think health insurance, think program inflation of our health

13    program.  There's very little discretion in new dollars to

14    allocate each year for new things.  And if we were to lose

15    these dollars, it would be very difficult in a year to find

16    the dollars to put that back.

17        And, again, if we haven't submitted our budget sets, we

18    don't have those dollars to reallocate.  Local school

19    districts certainly don't have the dollars to replace dollars

20    of this magnitude at once.

21    Q.   And along those lines, do school districts have any

22    obligations or programs they're required to provide regardless

23    of where the funding comes from?

24    A.   So I know some of the federal programs have mandates

25    regardless of funding.  The one that comes to mind is special

1    education.  If a student is identified that needs services,

2    once that is identified, those services must be provided.

3    Regardless of the federal funding, regardless of the state

4    funding, the LEAs have to provide those services.

5         I think child nutrition also has a similar requirement,

6    that a child must have a nutritious meal each day.  And there

7    are requirements around providing services for English

8    language learners as well.

9    Q.   And if a school district lost funding for those

10   particular services that are required by state or federal law,

11   how would they fill the gap?

12   A.   I don't know.  It depends on the magnitude of the loss.

13   I think if it's large, it would be difficult.  An option for

14   us would be to use new dollars that we have as we build a

15   budget, which, again, is not enough to fully fund the loss of

16   a billion five if that's what happened.

17        Depending on the magnitude, we would probably have to

18   look at -- and so would the local school districts -- look at

19   unfunding other programs to make up the loss of funding, if

20   that's what they want to do.

21   Q.   And when you're talking about pulling money from other

22   parts of the state budget or even parts of the local school

23   district budgets, are there any limitations on the ability of

24   the state to reallocate dollars from other areas?

25   A.   So we cannot move federal dollars within the state

1    because those dollars are very specific.  So there's no

2    discretion with those dollars.  It is difficult with state

3    dollars because a lot of our programs are already built, and

4    it would be -- it would be a choice.  I think to make a

5    decrease to a program, a cut is difficult and always

6    challenging, so it would be hard to do.

7    Q.   What about after a budget is already set, is there an

8    ability of the state to move money around at that point?

9    A.   Really not.  Once the budget is set, we don't have the

10   authority to move money from correction to education to

11   transportation.  The authority that we have, given by

12   legislature when they pass a budget is they are approving an

13   agency's spending authority for that particular agency, and we

14   don't have authority to move those dollars to another agency.

15   Q.   Okay.  And would the impact of a loss of federal funding

16   due to a Title IX violation or anything else, would a loss of

17   federal funding have the same impact or a different impact

18   from one school district to another?

19   A.   Yeah, it would vary.  I think the federal funding -- I

20   would think the school districts that aren't as wealthy, that

21   aren't able to put dollars into their system as much as the

22   poorer systems -- I think the poorer systems are heavily

23   dependent relative to the others on the federal funding.  I

24   think the funding varies between -- some of our poorer

25   districts, it represents maybe 30 percent of their budget.

1    Some of our wealthier districts, it's only maybe 6 percent.

2    So it does vary quite a bit.

3    Q.   So in other words, would the loss of federal funding have

4    the greatest impact on those school districts that serve the

5    most needy and at-risk populations?

6    A.   Yes.  Because most of the dollars that we receive are

7    formula driven and it's heavy weighted toward need-based,

8    at-risk type students.

9         MR. GRIFFIN:  Your Honor, I don't have any further

10   questions of Mr. Thurman at this time.

11        THE COURT:  All right.  Thank you.

12   Let's see if we have any cross-examination of

13   Mr. Thurman.

14                         CROSS-EXAMINATION

15   BY MS. GHEIBI:

16   Q.   Good morning, Mr. Thurman.

17   A.   Good morning.

18   Q.   You testified here today about the federal funding

19   received by the Tennessee Department of Education for

20   K through 12, correct?

21   A.   Correct.

22   Q.   And you testified about the consequences of losing this

23   federal funding, correct?

24   A.   Yes.

25   Q.   You've been involved in the budgeting for Tennessee K

1    through 12 education for at least the past 30 years, correct?

2    A.    Yes.

3    Q.    Isn't it correct that in the past 30 years, there has not

4    been a single instance where the Department of Education has

5    terminated funding for a Tennessee recipient for a Title IX

6    violation?

7    A.    I'm not aware of that federal stream being terminated,

8    but others, yes.

9    Q.    So just to clarify, you're not aware of a single instance

10   where the Department of Education has terminated funding for a

11   Title IX violation, correct?

12   A.    Correct.

13   Q.    Are you familiar with the enforcement process the

14   Department of Education would have to undertake in response to

15   a suspected Title IX violation in order to terminate funding?

16   A.    I'm not.

17   Q.    So you're not aware that there would be numerous steps in

18   this process before funding is actually terminated?

19   A.    I am not.

20   Q.    So you're not aware that in order for funding to be

21   terminated, there would first have to be a complaint to the

22   Office of Civil Rights, correct?

23   A.    I am not.

24   Q.    So you're not aware that OCR would then have to commence

25   an investigation, which would require them to interview

1    witnesses, gather data and evidence from the schools, correct?

2    A.    I am not.

3    Q.    And you're not aware that, by statute, OCR is actually

4    first required to seek voluntary compliance from any school

5    that it suspects is in violation of Title IX, correct?

6    A.    I am not.

7    Q.    And you're not aware that if voluntary compliance is not

8    achieved, then at that point, OCR would have to either

9    commence an administrative proceeding or refer the matter to

10   the Department of Justice, correct?

11   A.    I am not.

12   Q.    And you're not aware that an administrative proceeding

13   would require a hearing before an administrative judge, the

14   right to administrative appeal, and then discretionary review

15   by the secretary of education, correct?

16   A.    I am not.

17   Q.    And you're also not aware that for the Department of

18   Education to then terminate funding, it would have to give a

19   30-day notice to both houses of congress, correct?

20   A.    I am not.

21   Q.    And you're not aware that if at any point during the

22   process the school then complies with Title IX, it would

23   receive its funding, correct?

24   A.    I am not.

25   Q.    And you're not aware that if an adverse administrative

1    decision is actually achieved, then the school is actually

2    entitled to judicial review in a United States Court of

3    Appeals, correct?

4    A.   I am not.

5    Q.   And you're not aware that if the matter goes to the

6    Department of Justice and the Department of Justice actually

7    tries to seek enforcement, it would have to file a lawsuit in

8    a federal district court like this one, correct?

9    A.   I am not.

10   Q.   And at that point, the recipient would then have an

11   opportunity to defend its actions as compliant with Title IX,

12   correct?

13   A.   I am not.

14        MS. GHEIBI:  Thank you.  No further questions for

15   this witness.

16        THE COURT:  All right.  Thank you.

17        Any redirect?

18                    REDIRECT EXAMINATION

19   BY MR. GRIFFIN:

20   Q.   Mr. Thurman, if the Department of Education, the federal

21   Department of Education, finds that a school district or the

22   state has violated Title IX, is one potential remedy of that

23   termination of federal funding?

24   A.   Yes.

25   Q.   How does that risk of uncertainty of knowing whether an

1   enforcement action would be brought and termination of federal

2   funding, how does that impact the planning process and

3   budgeting process for school districts?

4   A.   So, again, the planning process is a long process, so the

5   sooner the local education agencies, school districts

6   understand their funding stream, their funding estimates, it

7   allows them the time to do that planning process, to identify

8   resources and to begin the hiring process.  If there is

9   uncertainty about that funding stream as they approach the

10  school year, it's very difficult to make those decisions, to

11  put the people and resources in place to plan for a school

12  year that's going to happen.

13          MR. GRIFFIN:  All right.  Your Honor, I don't have

14  any further questions.

15          THE COURT:  Anything else of the witness?

16          MS. GHEIBI:  No recross.  Thank you.

17          THE COURT:  Mr. Thurman, I have just one question for

18  you.

19      In your job, do you calculate the risk of potentially

20  losing federal funds when you work on the budget for the

21  upcoming year?

22          THE WITNESS:  Not the risk.  What we do is, when we

23  build a budget, it's based on an estimate of what agencies

24  feel like they're going to get from the federal programs.

25          THE COURT:  That was going to be my next question for

GENTILE - Direct                                                          53

1   you, and that is whether you assume that you'll receive

2   funding based upon funding that you might have received in the

3   past?

4            THE WITNESS:  Yes.  That's our starting point.

5            THE COURT:  All right.  Thank you, sir.  You may step

6   down.

7        (Witness excused.)

8            THE COURT:  Please watch your step there.

9        We'll call our next witness before we take our morning

10  break.

11           MR. GRIFFIN:  Your Honor, I'd like to call Dr. Steven

12  Gentile.

13            STEVEN GENTILE, PLAINTIFF'S WITNESS, SWORN

14           THE COURT:  Thank you.  You may proceed.

15           MR. GRIFFIN:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17  BY MR. GRIFFIN:

18  Q.   Good morning, Dr. Gentile.  Could you please state your

19  full name for the record.

20  A.   Steven Pittenger Gentile.

21  Q.   And where do you work?

22  A.   I work at the Tennessee Higher Education Commission for

23  the State of Tennessee.

24  Q.   Can you just briefly tell the Court what the Tennessee

25  Higher Education Commission is, what it does?

GENTILE - Direct                                                    54

A.    Yes, sir.  The Tennessee Higher Education Commission

serves as the State of Tennessee's coordinating body for all

public higher education, including all of our universities,

Tennessee colleges of applied technology, and community

colleges.  It also distributes state financial aid to all

eligible institutions in Tennessee, including private

institutions.  And it authorizes all post-secondary programs

in Tennessee.

Q.    What's your role at the Higher Education Commission?

A.    I am the executive director at the Tennessee Higher

Education Commission.  I have been since the fall of last

year.

Q.    And in your role as executive director, what do you do?

A.    I oversee our academic affairs, our fiscal policy, our

policy planning and research teams, our financial aid teams.

          COURT REPORTER:  Can you please slow down.

          THE WITNESS:  I'm sorry.

     I oversee various functions that our agency oversees by

statute for the State of Tennessee.  I also serve as the

liaison for the general assembly and the administration to the

institutions and back and forth between them representing the

needs of higher education to the state, representing the needs

of the state to higher education institutions as well.

Q.    And what did you do before you became executive director

at the commission?

1  A.   I've worked at the Higher Education Commission for 11

2  years, since 2013.   Immediately before I became the executive

3  director, I was the chief policy and strategy officer for

4  three years that oversaw functions like fiscal policy, how our

5  institutions receive funding from the state, tuition policy,

6  general knowledge of all funds going to our institutions, as

7  well as other research and reporting functions from there.

8  Prior to that, I worked as an analyst in that division.

9  Q.   And exactly how many public colleges and universities are

10  there in Tennessee?

11  A.   There are 10 public universities plus a health science

12  center, we have some special education functions, 13 community

13  colleges, and just over 25 Tennessee colleges of applied

14  technology, which is our traditional vocational education

15  programs.

16  Q.   And are all those entities considered state entities?

17  A.   Yes, sir.

18  Q.   And do you recall how many students those institutions

19  serve?

20  A.   It varies, but in total, approximately 250,000 students.

21  Q.   And do you know across all of Tennessee's colleges and

22  universities how many faculty and staff are employed there?

23  A.   In our public institutions, universities, community

24  colleges, and technical colleges, it's just north of 28,000.

25  About 30,000 staff and faculty.

GENTILE - Direct                                                    56

1    Q.   And do Tennessee's colleges and universities receive

2    federal funding to support their education programs?

3    A.   They do.

4    Q.   And is that the case for all of Tennessee's higher

5    education institutions?

6    A.   The public institutions, yes.

7    Q.   How do federal funds typically flow to the colleges and

8    universities in Tennessee?

9    A.   Most of the aid flows directly to the institutions.  Very

10   little of it goes through the State of Tennessee.  The

11   Title IV federal fund financial aid dollars, the Pell Grants,

12   the federal loans go directly to the institutions on the way

13   to the students to pay back the cost of education.  Research

14   dollars go straight to the institution and to the principal

15   investigator but via the bursar's office there.

16   Q.   And do you recall about how much Tennessee's colleges and

17   universities receive in federal funding on an annual basis?

18   A.   It's approximately $1 and a half billion.

19   Q.   Was that for the last fiscal year?

20   A.   That is for fiscal year ending in 2023, yes.

21   Q.   Very good.

22        What exactly does that $1 and a half billion go toward?

23   A.   Just about 850 to 900 million annually will go straight

24   to financial aid, including the Pell Grant, which is going to

25   our lowest income students, our loan programs, the federal

loan programs, that's also part of Title IV, and other smaller

financial aid programs as part of that.  And about $400

million are going towards research functions at our

institutions, so our top research university, UT Knoxville,

University of Memphis, but also our regional universities and

some community colleges receive research dollars.  And the

balance of our institutional funds, that could be for our HVCU

institution, our land grant functions, and other functions as

well for the federal government.

Q.    You mentioned the financial aid.  Is Tennessee Promise

part of the program that receives assistance from federal

funding?

A.    Tennessee Promise is the state's tuition-free education

for community colleges and our technical colleges and a few of

our universities.  It was the country's first tuition-free

education for students.  It promises that students can receive

a full scholarship to cover all of their tuition.  The

financial stability of that program rests on the Pell Grant

and financial aid coming from the feds primarily and also from

the state, but anything that a student does not receive from

the Pell or from a state scholarship would be covered by, the

remainder, the Tennessee Promise.

Q.    And the federal funds that you mentioned, how is that

used to develop budgets for the state's colleges and

universities?

GENTILE - Direct                                                    58

1    A.   It is akin to what Mr. Thurman, the state budget

2    director, mentioned.  Back in October before our fiscal year

3    starts, institutions start to plan out the upcoming fiscal

4    year.

5    Q.   What's your fiscal year for colleges and universities?

6    A.   The fiscal year starts July 1.  So October for the prior

7    fiscal year they start assessing their needs, where they need

8    to go.  And right around January/February when the

9    administration releases its budget, the institutions have a

10    fairly good idea about what state appropriations they'll be

11    receiving.  And once the general assembly signs the final

12    budget, typically in April, our commission sets a cap on

13    tuition for our institutions.  And then institutions around

14    May, June, right now, some this week, set tuition for the

15    upcoming fiscal year.  So all the budgets are gelled starting

16    in October and finishing right about now.

17    Q.   And can a university have its federal funding terminated

18    if the Federal Department of Education finds that it's in

19    violation of Title IX?

20    A.   Yes.

21    Q.   And if Tennessee law requires colleges and universities

22    in Tennessee to do something that the Federal Department of

23    Education says they can't do, or vice versa, does having that

24    potential violation hanging over their heads, does that have

25    any impact at all on the planning and budgeting process?

1    A.   It does.  Any uncertainty involved in the assuredness of

2    whatever funds are coming this way from the state or from the

3    feds definitely impact what the institutions do ahead of time.

4    We saw a similar deal with the pandemic a few years ago, great

5    uncertainty.  Had institutions budgeting cuts on the front end

6    as 80 percent of all funding of our institutions go towards

7    personnel.

8    Q.   And what kind of impact would that have for an

9    institution to be stripped of its federal funding?

10   A.   It would have substantial impact on an institution, on

11   students, and on the State of Tennessee.  With regards to

12   institutions, it would first, of course, hit their demand side

13   of the equation.  If students aren't able to receive loans to

14   go to the institution or a Pell Grant -- and the majority of

15   our students do receive a Pell Grant -- they may not enroll,

16   and if they don't enroll, then the institution's student

17   population will decline, having great uncertainty on their

18   budget and revenue coming in.

19        It impacts research grant dollars, ongoing research of

20   our faculty and researchers on campus.  If they can't plan

21   ahead, they will not receive their funds and the

22   administration -- the institutions would not receive indirect

23   costs.  To the State of Tennessee as mentioned earlier,

24   Tennessee Promise, one of our seminal financial aid programs,

25   rests on the assumption that federal aid will balance out the

1      financial aid costs if students go to our community colleges.

2      Q.    And do colleges and universities have any obligations

3      they have to comply with under state and federal law

4      regardless of the funding source?

5      A.    Sorry.  Can you repeat your question?

6      Q.    Do the universities have any obligations they have to

7      comply with under state or federal law regardless of where the

8      funding comes from?

9      A.    Yes.

10     Q.    Can you explain that just briefly?

11     A.    The institutions, I believe, if I understand your

12     question correctly, must adhere to the state laws as far as

13     how to administer education and what laws and principles to

14     abide by, and if they do not follow that themselves, they

15     could be at risk of losing that funding in the upcoming year,

16     much like they are with the feds too.

17     Q.    How would the institutions deal with the loss of federal

18     funding?

19     A.    The institutions could do a number of things.  First of

20     all, on the front end going into a fiscal year, if they assume

21     that the federal funding will be lost or if it is actually

22     lost, they would first look at their personnel costs, their

23     adjunct professors primarily and student support services as

24     well.  Again, 80 percent of an institution's expenditure is

25     personnel directly.  They would typically go for those

1    positions that are filled or unfilled and remove them from the

2    books going into the academic year.

3    Q.   Are you familiar with this new Title IX rule that's been

4    issued by the U.S. Department of Education?

5    A.   I am.

6    Q.   I understand that the new Title IX rule includes several

7    requirements for compliance that include reviewing and

8    updating policies and procedures, training.  And there's a

9    declaration that's been submitted in this case by Dr. Mark

10   Fulks at East Tennessee State University.

11        Have you had a chance to review that declaration?

12   A.   I have.

13   Q.   And is his testimony regarding the compliance efforts and

14   costs and resources required to comply with the new Title IX

15   requirements, is that something that you see as typical of

16   other colleges and universities in Tennessee?

17   A.   It is.  In fact, ETSU, East Tennessee State University,

18   is typical of our universities as it's just right about the

19   average -- right above the average size of our institutions.

20   So as the costs were laid out in that document, you can expect

21   for a larger university, like UT Knoxville or University of

22   Memphis, which has about 10,000 more students than ETSU, the

23   costs would go up from there.

24        For some of our smaller universities, like Austin Peay

25   State University and Tennessee State University, there are

*GENTILE - Cross*                                                                62

1   still some fixed element costs that I would assume to be the

2   same in there, but it would be a marginal difference from

3   ETSU.

4           MR. GRIFFIN:  Your Honor, I don't have any further

5   questions for Dr. Gentile at this time.

6           THE COURT:  Thank you.

7       Let's see if we have cross-examination.

8                           CROSS-EXAMINATION

9   BY MS. GHEIBI:

10  Q.   Good morning, Dr. Gentile.

11  A.   Good morning.

12  Q.   So you testified here today about the federal funding

13  received by Tennessee higher education, correct?

14  A.   Yes.

15  Q.   And that federal funding includes various forms of

16  funding, including Pell Grants, other forms of grants,

17  research and services, correct?

18  A.   Correct.

19  Q.   Are you aware of a single instance where the Department

20  of Education has terminated any of these fundings for a

21  Title IX violation?

22  A.   For our public institutions, I am not.

23  Q.   So you're not aware of a single instance where the

24  Department of Education has, for instance, terminated Pell

25  Grants because a public university has violated Title IX,

GENTILE - Cross                                                    63

1    correct?

2    A.    In Tennessee, no.

3    Q.    You also testified about the consequences if federal

4    funding were terminated in this hypothetical situation where

5    there would be a Title IX violation.

6         Are you familiar with the process that the Department of

7    Education would have to go through in order to actually

8    terminate funding?

9    A.    Vague familiarity, but not in depth.

10   Q.    So you're not familiar with the numerous different steps

11   the Department of Education would have to go through?

12   A.    I am not.

13   Q.    You're not familiar with the investigation that the

14   Office of Civil Rights would have to commence in order to

15   terminate funding?

16   A.    I understand there would be an investigation.

17   Q.    You understand.

18        Are you also aware that, by statute, the Department of

19   Education first has to seek voluntary compliance --

20   A.    I am.

21   Q.    -- before it terminates funding?

22        MR. GRIFFIN:  Your Honor, we stipulate to the fact

23   that there's an administrative process that must take place

24   before federal funding is terminated.  So if that cuts any

25   questions as unnecessary, I just want to let the Court --

GENTILE - Cross                                                              64

1          THE COURT:  All right.

2       Are you willing to accept that stipulation?

3          MS. GHEIBI:  Yeah, we accept the stipulation with the

4    previous line of questioning of Mr. Thurman.

5    BY MS. GHEIBI:

6    Q.   Dr. Gentile, you also testified about the compliance

7    costs of complying with this new Title IX regulation, correct?

8    A.   Correct.

9    Q.   Isn't it true that many of the Tennessee recipients

10   already have routine training regarding antidiscrimination?

11   A.   Yes.

12   Q.   Isn't it true that many recipients, if not all, already

13   maintain policy guidelines on antidiscrimination?

14   A.   Yes.

15   Q.   Are you aware that Tennessee public education -- public

16   universities of higher education already have hostile

17   environment harassment policies?

18   A.   I assume they do.

19   Q.   Are you aware that the University of Tennessee has such a

20   policy?

21   A.   I am not.

22          MS. GHEIBI:  Judge, pursuant to Rule 201 of the

23   Federal Rules of Evidence, we respectfully ask the Court take

24   judicial notice of the University of Tennessee's systemwide

25   policy of sexual harassment and other discriminatory

1      harassment.  The policy is on the website and we have copies.

2           May I approach?

3              THE COURT:  Yes, ma'am.  And if you could please

4      provide opposing counsel a copy as well.

5           Thank you.

6      BY MS. GHEIBI:

7      Q.   Dr. Gentile, can you read the highlighted portion at the

8      top?  At the very top, it says, "Systemwide Policy," correct?

9      I'll read it.  "Systemwide Policy," correct?

10     A.   That's correct.

11     Q.   And that is for the University of Tennessee, correct?

12     A.   Correct.

13     Q.   Approximately how many students are enrolled at the

14     University of Tennessee?

15     A.   At University of Tennessee Knoxville, about 25,000.

16     Q.   But this is a systemwide policy, correct?

17     A.   That's correct.

18     Q.   So for all the different divisions of the university?

19     A.   50,000.

20     Q.   50,000 students, correct?

21              MR. GRIFFIN:  Your Honor, objection just to the

22     extent that this appears to be an old policy that's no longer

23     in effect.  October 1st of 2017 is the effective date.  I

24     believe there's a new policy.  I just don't happen to have a

25     copy of that handy.

1          THE COURT:  All right.  Before taking judicial notice

2    of the policy, I will do a little research and determine

3    whether this is in fact the policy in effect.

4          MS. GHEIBI:  We request that the Court -- right, to

5    the extent that the policy --

6          THE COURT:  In other words, you can't ask me to take

7    judicial notice of something that's no longer in effect, can

8    you?  So I need to make sure that what you've given me is in

9    fact something I can take judicial notice of.  All right.

10   Thank you.

11         MS. GHEIBI:  Correct.

12         MR. GRIFFIN:  Thank you, Your Honor.

13   BY MS. GHEIBI:

14   Q.  We request that you read the highlighted portion in the

15   middle of the page.

16   A.  "The university, therefore, prohibits employees from

17   engaging in acts of harassment on the basis of sex, which

18   includes harassment based on gender, pregnancy, sexual

19   orientation, and gender identity, as required by state or

20   federal law."

21   Q.  And the University of Tennessee is one of Tennessee's

22   public institutions of higher education, correct?

23   A.  That's correct.

24   Q.  And as you read this policy, it already prohibits

25   discrimination based on, among other things, gender identity,

1    correct?

2    A.    According to these words here, yes.

3            MS. GHEIBI:  Thank you.  No further questions for

4    this witness.

5            THE COURT:  Thank you.

6        Do you have any other questions of the witness?

7        I just have one or two before we take our morning break.

8            MR. GRIFFIN:  Your Honor, I have no further

9    questions.

10            THE COURT:  All right.

11        Dr. Gentile, I just have a couple questions for you.

12        You've testified primarily about the university of higher

13    education system in Tennessee and the public schools.  There

14    are also private schools, such as Vanderbilt, correct?

15            THE WITNESS:  Yes, sir.

16            THE COURT:  And the higher education schools in

17    Tennessee -- I'll just take University of Tennessee at

18    Knoxville as an example.  That school competes with other

19    schools in sporting events, as well as other events,

20    throughout the southeast; is that fair?

21            THE WITNESS:  That is true, yes, sir.

22            THE COURT:  It participates in the Southeastern

23    Conference?

24            THE WITNESS:  Uh-huh.

25            THE COURT:  But I assume it also participates in

68

1    other conferences and some of the other schools participate in

2    other conferences as well?

3             THE WITNESS:  Yes, sir.

4             THE COURT:  For example, your basketball team may be

5    in the Southeastern Conference, but the soccer team may be in

6    some other conference.  Is that your understanding?

7             THE WITNESS:  To my knowledge.

8             THE COURT:  So the school has interaction with

9    schools really across the country throughout the course of any

10   calendar year; is that fair?

11            THE WITNESS:  Yes, sir.

12            THE COURT:  And you provide facilities for those

13   schools when they come and compete at a Tennessee school?

14            THE WITNESS:  Yes, sir.

15            THE COURT:  All right.  That's all the questions I

16   have for you.

17      Any other questions for the witness based on what I've

18   asked?

19            MR. GRIFFIN:  No further questions, Your Honor.

20            THE COURT:  Anything else?

21            MS. GHEIBI:  Oh, sorry.  No recross.  Thank you.

22            THE COURT:  All right.  We'll take just a brief --

23   first, I understand you had three witnesses to call.

24      Will the defendants have any witnesses they'd like to

25   present this morning?

1          MS. GHEIBI:  No witnesses from the defense.

2          THE COURT:  All right.  We'll take about a 15-minute

3     recess.  We'll resume at that time and I'll hear arguments

4     from the parties at that point.  Thank you.

5          (Recess from 10:31 a.m. until 10:47 a.m.)

6          THE COURT:  Thank you.  We'll continue at this time

7     in the case of State of Tennessee and others versus Miguel

8     Cardona, Secretary of the Department of Education.

9          The parties have completed the presentation of testimony

10    in the matter, so we'll turn to arguments on the motions that

11    have been filed for injunctive relief on behalf of the

12    plaintiff states as well as the intervening plaintiffs in the

13    case.

14         Who will be proceeding first on behalf of the plaintiffs?

15         MS. HERMANDORFER:  I will, Your Honor, on behalf of

16    the plaintiff states.

17         THE COURT:  All right.  Ms. Hermandorfer, you'll be

18    proceeding on behalf of the states.

19         Will there be separate argument by the intervening

20    plaintiffs in the case?

21         MR. FRAMPTON:  Yes, Your Honor.  Supplementary only.  I

22    won't repeat myself.

23         THE COURT:  All right.  Thank you.

24         We'll proceed, then, with Ms. Hermandorfer on behalf of

25    the states that are presently before the Court.

1          Ms. Hermandorfer, before you begin your argument, it

2     would be of help to the Court if you would, in the course of

3     your argument, address several issues, but one on the scope of

4     the relief that's being sought.  And when I refer to "scope,"

5     I'm referring to the issue of whether the injunctive relief

6     that is sought is being sought as a nationwide injunction,

7     which is discussed somewhat in the parties' briefs; in other

8     words, what state or states or entities would be affected.

9     And the second would be whether you're seeking injunctive

10    relief to basically invalidate or stay the rule that would go

11    into effect on August 1st completely as opposed to just a

12    portion of the rule.

13          MS. HERMANDORFER:  Yes, Your Honor, I will address

14    those two issues.  I'm going to make one more trip back for

15    some binders.

16          THE COURT:  Yes, ma'am.

17          MS. HERMANDORFER:  And, Your Honor, just as a matter

18    of housekeeping, at the end of the colloquy with the last

19    witness, there was a University of Tennessee policy proffered

20    to the Court.

21          THE COURT:  Yes.  2017, I believe.

22          MS. HERMANDORFER:  That's correct.

23          So, with apologies, I don't have the printed version, but

24    I can refer Your Honor to the operative Tennessee policy with

25    respect to student sexual harassment.  That policy is dated

1    August 14th, 2023, and it can be found at Title IX, that's

2    Title I-X-dot-U-T-K-dot-e-d-u.  And on page 4 of that policy,

3    I will represent to the Court that it materially differs from

4    the policy that was proffered dated 2017, which makes sense,

5    because the 2020 rule which changed the scope of sexual

6    harassment came out in 2020, so schools had to react to that

7    new federal rule.  So just for the Court's background

8    knowledge, I wanted to clarify that point.

9         THE COURT:  But it's not the position of Tennessee,

10   or perhaps all of the states, that "sexual harassment" as used

11   in the 2023 policy is identical to the definition of "sexual

12   harassment" that is contained within the rule that the

13   defendants' wish to propose to go forward on August 1st; is

14   that fair?

15        MS. HERMANDORFER:  That's fair, Your Honor.

16    With respect to the UT policy in particular, and also to

17   the ETSU policy that is discussed in Dr. Fulks' declaration,

18   you'll be able to see that those policies differ.  They are

19   worded more similarly to the 2020 rule, which itself notes

20   material differences with the current 2024 rule.

21    I don't have access to all of the higher education

22   policies, but those two certainly, that is true.

23        THE COURT:  All right.  Thank you.

24        MS. HERMANDORFER:  May I proceed, Your Honor?

25        THE COURT:  Yes, please.

1        MS. HERMANDORFER:  May it please the Court.  Whitney

2   Hermandorfer, Office of the Tennessee Attorney General, on

3   behalf of the plaintiff states with respect to our motion for

4   preliminary relief.

5        Your Honor, we bring this motion today because, come

6   August 1st, a new federal agency rule will transform schools

7   as we know them by imposing an unprecedented gender-identity

8   mandate on campuses pre-K through college.

9        Since 1972, Title IX's ban on sex-discriminate education

10  has helped level the playing field for women by ensuring their

11  full and fair access to school programs.  At the same time,

12  Title IX has always permitted schools to maintain separate

13  boy's and girl's bathrooms, locker rooms, and other intimate

14  facilities.

15       As the Sixth Circuit recently recognized in the L.W.

16  case, recognizing and respecting biological differences

17  between the sexes is not discrimination.

18       THE COURT:  And I believe Chief Judge Sutton quoted

19  Justice Ginsburg in *U.S. versus Virginia* in making that

20  pronouncement.  Is that accurate?  A 1996 case.

21       MS. HERMANDORFER:  That's an accurate statement, Your

22  Honor.

23       Justice Ginsburg in the VMI case, which, of course, was

24  about integrating VMI by allowing women in, she took for

25  granted that, of course, there would need to be accommodations

1    made to protect students' privacy.  And as Chief Judge Sutton

2    notes -- I want to get the language here -- Justice Ginsburg

3    said undoubtedly there would need to be those accommodations.

4        And that VMI case doesn't stand on its own.  It tracks a

5    long line of precedence recognizing that when the sexes are

6    not similarly situated because of biological differences, it

7    is not discriminatory to recognize those differences and

8    separate them out.

9        Now, this rule holds the opposite.  It was adopted over

10   enormous public opposition.  240,000 comments were filed.  And

11   it, nonetheless, makes it unlawful nationwide to divide

12   bathrooms and locker rooms by sex, contrary to most of

13   recorded history.

14       Under the rule, schools must instead separate intimate

15   facilities based on gender identity, a purely internal

16   subjective feeling of being any number of non-sex-related

17   genders.  This new gender identity mandate will not just apply

18   to students.  On the rule's terms, it applies to all staff and

19   all visitors to campus taking part in a school activity,

20   sports games, lectures, performances.

21       Moreover, a person's self-professed gender identity must

22   be taken at face value.  Indeed schools and students risk

23   their own Title IX punishment if they question or seek to

24   verify a person's access in an opposite sex space.  The rule

25   thus requires men and boys unfettered access to women and

1    girl's intimate facilities and vice versus.

2         The states seek immediate relief to stop this gender

3    identity mandate from taking place and will suffer irreparable

4    harm on several dimensions.

5         Of course, this Court looks to whether under 705, or the

6    preliminary injunction test, the four-part standard,

7    likelihood of success, irreparable harm, balance of the

8    equities.  We satisfy all factors amply, Your Honor, because

9    the Final Rule is prolifically unlawful under Title IX itself,

10   the federal Constitution, and the Administrative Procedures

11   Act.  And I'll touch on each of those in turn.

12        But with respect to irreparable harm, Your Honor heard

13   this morning from witnesses discussing the immense compliance

14   challenges associated with overhauling how schools have done

15   business for centuries in a matter of months.

16        THE COURT:  Well, the defendants would claim, at

17   least I assume through questions, that the potential loss of

18   federal funding is not likely to occur.  I don't know that

19   they'll represent that to the Court, but through the questions

20   to the witnesses, it's their position that because you have to

21   jump through all these procedural hurdles, you really don't

22   have irreparable harm or a likelihood of irreparable harm in

23   the case.

24        How would you respond to that position?

25        MS. HERMANDORFER:  A few responses, Your Honor.

1           THE COURT:  And I hate to jump out of order, but --

2           MS. HERMANDORFER:  I'm happy to take these issues in

3   whatever way Your Honor finds helpful.

4       I, frankly, don't understand the federal government's

5   position with respect to funding.  The rule itself mentions in

6   seven places that schools are subject to losing their funds

7   with express termination of funds mentioned at Fed. Reg. 33848

8   and Fed. Reg. 33805.  The government's brief, likewise,

9   mentions terminations of federal funding.

10      Now, if the government wants to stipulate today that they

11  will not terminate our funds, the states will be happy to so

12  stipulate.  But that is not what they are going to stipulate,

13  because this rule is an important policy initiative of the

14  federal government.  So I think it's just not an accurate

15  characterization of the rule itself to suggest federal funding

16  should not be a concern for the states.

17      And that's important.  Because as you heard from the

18  witnesses today, it's not just that the states will be harmed

19  down the road upon the completion of administrative procedures

20  when we lose upwards of $3 billion in funding, it's --

21          THE COURT:  This is just the State of Tennessee?

22          MS. HERMANDORFER:  That's just the State of

23  Tennessee.  It's many billions more across the plaintiffs'

24  states of course.

25      And I do want to make an important point that I'm sure

1     was clear to Your Honor based on the declarations and how they

2     interacted with the witness testimony.  The witness testimony

3     today really is intended to give Your Honor more of an

4     on-the-ground view of how this is being carried out and

5     affected.  Of course, Tennessee offered these witnesses as

6     exemplar witnesses.  These harms are playing out across all

7     six plaintiff states.

8         So the mere uncertainty of not knowing whether you're

9     going to win or lose an enforcement action down the road, as

10    you heard from both Mr. Thurman and Dr. Gentile, is itself a

11    harm when you're trying to set a budget.  You're trying to

12    give people job certainty and plan out the fiscal landscape of

13    the state.  So having this, you know, hanging over states'

14    heads itself inflicts budgetary harm.

15        THE COURT:  This reminds me a little of the drug

16    dealer who has an addict and he threatens the addict, unless

17    he complies with whatever his demands are, he's going to take

18    away the drugs.  We've got a situation where these states are

19    receiving billions of dollars of federal funding and there's,

20    if not a direct threat, at least an implicit threat of the

21    loss of that funding if you don't comply with changed terms

22    and changed rules.

23        MS. HERMANDORFER:  Well, Your Honor, it's even a

24    touch worse, because what we're talking about here, what is at

25    risk, you heard from the testimony today, these are the

1    neediest students that are going to be affected by losing

2    these billions.

3        So it is the federal government's position that allowing

4    men access to women's bathrooms is more important, I would

5    submit, based on the conduct and the way the rule is written,

6    than allowing funding for things you heard today, like, you

7    know, textbooks for needy children, scholarships, things of

8    that nature.

9        Now, of course, that is a policy decision Congress can

10   make, but there's been no congressional involvement here.

11   This is a final agency action that is purporting to implement

12   a statute from 1972.  But I submit to the Court what is

13   happening is a rewrite of that statute to fit a new situation

14   that is better addressed at the state and local level.

15       Now, my opposing counsel had a colloquy with the witness

16   about local school board policies on harassment, and I think

17   this is important to the equities balancing, Your Honor.  Of

18   course, local communities can decide how to address these very

19   thorny issues around gender identity and the way that

20   interacts with student privacy.  So I would submit the fact

21   that there's local policies in place that might be more

22   extensive is the way the system is supposed to work.  It's not

23   supposed to be a top-down federal government mandate to all

24   schools nationwide and one that is displacing the plaintiffs'

25   states' laws along several dimensions.

1    THE COURT:  Is it your position that by enforcing the

2    new rule that it would essentially violate Title IX -- the

3    statutory language of Title IX as well as the past rules?

4    MS. HERMANDORFER:  That's correct, Your Honor.  And I

5    can turn to that.  I can turn to the merits.

6    So where this has gone off the rails in terms of Title

7    IX, I would submit, is with the application of *Bostock* or the

8    purported application of *Bostock*.

9    THE COURT:  Let's talk about *Bostock* for just a

10   moment, because the government, the department, places almost

11   all their eggs in one basket on the holding in that case.

12   MS. HERMANDORFER:  That's right.

13   THE COURT:  But if you realize the way the opinion

14   was drafted, I'm sure there were various opinions circulated,

15   and Justice Alito provided a list of likely outcomes.  And

16   we'll get into that in a moment, because I think that list

17   that he provided is very important.

18   But in response to that, Justice Gorsuch then in his what

19   turned out to be the majority opinion said, No, no, no, we are

20   not extending Title VII to these other areas and you should

21   not be that concerned.  So we have that case in 2021, 2020?

22   MS. HERMANDORFER:  '20, I think so, Your Honor, yes,

23   sir.

24   THE COURT:  Then we have, from the Sixth Circuit, an

25   opinion that the department doesn't really discuss very much,

1    *Meriwether*, which may be, in terms of the interveners,

2    probably the most important case, by Judge Thapar, that

3    clearly adopts that position that Title VII should not be

4    extended to these areas and certainly not into free speech

5    areas, compel speech or what the teachers may say.

6         And, actually, that's one of the reasons I was asking

7    questions about the extent of the injunctive relief, because

8    these states are not in isolation.  States and the schools are

9    dealing with other states that are not plaintiffs in this

10   matter.

11               MS. HERMANDORFER:  That's right.

12               THE COURT:  So if this rule goes forward and if

13   you're successful in getting a stay just for the states that

14   are involved here, you're going to have an interaction between

15   students that may be subject to one rule and a different rule.

16        But Judge Thapar was pretty clear in that case in terms

17   of free speech rights.

18               MS. HERMANDORFER:  I agree.

19               THE COURT:  It appears that in this new rule,

20   teachers will really be hamstrung in terms of what they can

21   say and what they can't say.  And it would seem that what the

22   department is attempting to do is codify by rule a rule that

23   would reverse an opinion from the Sixth Circuit.

24        And then we have the L.W. case.  And what does Chief

25   Judge Sutton say in L.W. about the effect of extending Title

1    VII to other areas?  He specifically says, no, it's very clear

2    from *Bostock* that you could not do that and we're not doing

3    that, and he provides examples.

4         So what's the basis for extending *Bostock* other than a

5    new administration comes into effect and attempts to establish

6    a rule that was removed in 2016 -- after 2016.  Excuse me.

7              MS. HERMANDORFER:  I wholeheartedly agree with

8    Your Honor, the way you described what is occurring here in

9    terms of Meriwether and L.W.  Of course, those cases say what

10   they say.  L.W. says, "Precedent makes clear that *Bostock* does

11   not apply beyond Title VII."  And for that reason, among

12   others, I would refer Your Honor to the Tennessee district

13   court decision that our office obtained enjoining the prior

14   Title IX guidance, and that was exactly Judge Atchley's

15   reasoning as well.

16        Now, I do want to just step through, I think, the bases

17   for why this Final Rule is unlawful under the statute, and it

18   tracks, Your Honor, in the way you're laying out the

19   precedent.

20        So, of course, the only protected characteristic in

21   Section 1681(a) is, the prohibition reads, "You shall not be

22   subjected to discrimination on the basis of sex."

23        Now, this is a change, and the government now agrees that

24   sex refers to the biological differences between men and

25   women.  And you'll note, that is a different approach than,

1    for example, some of the circuit cases the government relies

2    on have taken that said, well, the term "sex" itself might

3    mean gender identity.  I think even the government has come

4    around to the acknowledgment that that's not just a tenable

5    reading.

6        Now, *Bostock*, you know, we don't get past go on *Bostock*

7    for the reasons you said.  L.W. says *Bostock* does not apply

8    beyond Title VII.  And that wasn't -- you know, this case has

9    been moving quickly.  I understand that the government only

10   referenced the panel phase of the L.W. decision.  Those

11   mistakes happen.  But L.W. is devastating for their theory on

12   *Bostock*, not only because it says *Bostock* can't apply beyond

13   Title VII, and that's just not a contextual dicta as the

14   government says.

15       *Bostock* -- and our office would know -- or L.W., our

16   office would know, *Bostock* was a core argument that the

17   plaintiffs are advancing.  They're importing Bostock's sex

18   means gender identity discrimination theory onto the equal

19   protection clause in that case, and that is what led to the

20   colloquy Chief Judge Sutton -- or to the portion of the

21   opinion Your Honor referenced saying --

22       THE COURT:  The discussion of suspect class?

23       MS. HERMANDORFER:  That's correct.  That is right on

24   point here.  And we know that because Title IX itself

25   throughout makes sex-based distinctions, both in the statute

1    and in the regulations that immediately followed Title IX.

2         And that's what Judge Thapar said in Meriwether, the

3    reason why you can't just import *Bostock* in Title VII onto the

4    Title IX analysis is because the statutes are materially

5    different.  And among those differences, you have the

6    exclusions in the remainder of 1681 itself, then you have the

7    1686 housing facilities provision that says nothing.

8         THE COURT:  Do the old rules or regulations interpret

9    what is meant by "living facility"?

10        MS. HERMANDORFER:  So I think there's no question,

11   Your Honor, that in the aftermath of the passage of Title IX,

12   it was well understood that bathrooms could be separated by

13   sex.

14        THE COURT:  Well, the reason I ask the question, if

15   you've ever been in a locker room --

16        MS. HERMANDORFER:  I played college sports,

17   Your Honor.  I have.

18        THE COURT:  A locker room is a big bathroom, isn't

19   it?

20        MS. HERMANDORFER:  It's a huge bathroom with about 40

21   shower nozzles in one giant room.

22        THE COURT:  And it's usually pretty dirty, if you're

23   a traveling team?

24        MS. HERMANDORFER:  Maybe more dirtier in the men's

25   than the women's.  I'm not sure.

1          THE COURT:  Perhaps.  But there's separate facilities

2     in the men's and the women's, right?  There are urinals in the

3     men's.  And I think there's reference to that in Chief Judge

4     Sutton's opinion.

5          MS. HERMANDORFER:  That's exactly right.

6          THE COURT:  So, again, getting back to my point with

7     some of the witnesses, if we have some rules for some states

8     and schools and some rules for others, you may have a

9     situation where you've got students coming in expecting one

10    thing in Tennessee or Kentucky and expecting something else in

11    New York.

12         MS. HERMANDORFER:  It puts -- I would say two things

13    on that, Your Honor, just to hit kind of a scope of relief

14    point directly.  It kind of works two ways.  It harms students

15    and it harms administrators.

16         So on the student piece, you know, when I played college

17    and high school ball, we traveled all over the country to

18    play, and so if we were traveling to a school that wouldn't

19    otherwise have this sex-segregated bathroom and visitor

20    policy -- or that would otherwise have sex-segregated

21    bathrooms but for the new Title IX rule, of course that's

22    putting Tennesseeans in a privacy-harming position.

23         Now, with respect to other students coming in, the

24    federal government has not -- all it asserts is that, well,

25    those are the breaks, you know, federal law preempts state

*PLAINTIFF STATES - Hermandorfer*                                        84

1    law, without thinking through the catch-22 that's putting

2    school administrators in.

3         In Tennessee, for example, and Kentucky for that matter,

4    there is civil liability around allowing a student of the

5    opposite sex to be in a sex-segregated facility associated

6    with his or her gender identity, and those are private damages

7    actions that are able to occur.  So either you have students

8    that are used to that in their states coming in and being

9    denied that or you have to make accommodations that would

10   violate, you know, Tennessee and Kentucky law, for example.

11        So it is a real catch-22 and an absolute compliance

12   conundrum to try to roll out different levels of this as a

13   federal mandate as opposed to kind of a school-by-school local

14   practice.

15             THE COURT:  So if we get back to the origins of

16   Title IX, we go back to 1972, and we look at definitions and

17   words that were used at the time, and we get to the point

18   where perhaps the department is now acknowledging male/female

19   gender, binary concepts, and if we assume that Title IX was

20   intended to level the playing field, as you indicate, by

21   providing opportunities for female students, including female

22   athletes -- we'll put that aside for now because I know there

23   are upcoming regulations -- increased opportunities for

24   students, and, again, if we assume that there are two genders,

25   male and female, I suppose we would have eight possibilities.

1    We would have male who identifies as male, female who

2    identifies as female, we'd have male who identifies as female,

3    female who identifies as male, female who identifies as both,

4    male who identifies as both, male who identifies as neither,

5    and female who identifies as neither.  And there may be more

6    than that.

7         MS. HERMANDORFER:  I think that is a conservative

8    estimate of what gender identity would encompass under the

9    Final Rule, frankly.

10        THE COURT:  I guess my question is, it's going to be

11   literally impossible to have two facilities because of those

12   different possibilities?

13        MS. HERMANDORFER:  I think that's right, Your Honor.

14   And that's one thing that strikes at the heart of one of the

15   fallacies of the Final Rule, I think.

16     So the Final Rule does not, like *Bostock*, limit itself to

17   so-called transgendered individuals who are a sex, identify as

18   one opposite gender, it encompasses gender identity, which it

19   then does not define, other than to say a person's subjective

20   internal sense of gender.  And as we note in our reply brief,

21   the medical authorities the government cites on this issue

22   themselves recognize that there are essentially limitless

23   possibilities to what someone's gender could be.

24        THE COURT:  Well, that's changed, though, hasn't it?

25   Because in DSM-III, there was a different definition that was

1    given to individuals, and now that definition has changed to

2    gender dysphoria, I believe, not a disorder, but something

3    that causes one to become uncomfortable.

4            MS. HERMANDORFER:  Right.

5            THE COURT:  So what was in effect in 2013 or prior to

6    2013 is different than the DSM manual today that refers to

7    this as a dysphoria.

8            MS. HERMANDORFER:  There have been significant

9    changes around those authorities' discussions of gender-based

10   disorders as the ADA and Rehab Act refer to them, Your Honor.

11       So, you know, I think Your Honor touched on just if you

12   take the logic of their *Bostock* position to its conclusion,

13   there would be any number of facilities that would be

14   required.

15       And I think getting back to what Title IX did and in the

16   immediate kind of aftermath, the 1975 regulations, which the

17   Supreme Court has held are significantly probative because of

18   the unique congressional review and hearing procedures that

19   occurred after the enactment of those regulations.  So those

20   regulations themselves authorized sex-separated dorms.  And we

21   know now, the government agrees, "sex" means male and female.

22   It authorized sex separate in the next regulation, codified at

23   106.34, sex-separated bathrooms, locker rooms, and shower

24   facilities.

25       It then in the next -- I think it's two down, .36, I

1    believe, Your Honor, or maybe .34 -- I'm sorry -- 106.34, it

2    talks about separating classes by sex.  And it says you cannot

3    segregate by sex certain classes, your math and science, those

4    types of classes, but then there are other provisions about

5    what you can sex separate, and those things are physical

6    education classes where biological differences would matter in

7    practice, sexual education classes, or I think the regulation

8    says human sexuality, choirs based on the tenor of voice, and,

9    of course, there's the athletics piece.

10       So the government has no plausible answer for what

11   Congress was doing if we think *Bostock* applies to Title IX.

12   Because as the 11th Circuit en banc held in Adams, if you just

13   apply a *Bostock* reasoning in the way the government is

14   proposing -- and I'll get to why their *Bostock* piece just

15   doesn't make sense on its own terms.  But even accepting that

16   *Bostock* could apply, it would explode all of these

17   distinctions that Congress set out in the statute that are

18   sex-based.

19       Now, the government tries to handle that by positing what

20   I submit is just a completely nonsensical theory on what is

21   going on in Title IX and the regulations.  They say, Well, the

22   general nondiscrimination mandate posits that any sex

23   separation that harms a student is unlawful.  That's why they

24   think -- they don't accept that bathrooms falls within the

25   living facilities statute, which has problems we lay out in

1    our brief.

2        So they have to think that -- they have to submit that

3    Congress intentionally authorized discrimination haphazardly

4    throughout Title IX.  So in their view, it was more important

5    to Congress to make clear that boys cannot be in Girl Scouts,

6    which is covered by the 1681 exclusions, it's more important

7    that boys cannot be in Girl Scouts than boys cannot be in

8    shower facilities.

9        To state that is to refute it, Your Honor.  That's not

10   what's going on in Title IX.  Instead, what the distinctions

11   reflect are not a haphazard discrimination regime, but the

12   reality that Justice Ginsburg set out in the passage you

13   quoted, that there are sex-based differences, and

14   acknowledging those differences and separating the sexes based

15   on them is not discrimination full stop under Title IX or any

16   other statute.

17       And so this is how this brings us to *Bostock* and why

18   their reading of *Bostock* reads out intentional discrimination

19   altogether.

20       So, of course, *Bostock* itself says, quote, it does not

21   purport to address bathrooms, locker rooms, or anything of the

22   kind.  And as Your Honor posited, that wasn't a throwaway,

23   that was a direct response to the core of Justice Alito's

24   dissent in that case, which was, if you accept this position

25   on transgender-based firings, you're going to have to accept

1     it for bathrooms and the like.  And Justice Gorsuch

2     emphatically said no.

3          But *Bostock* -- and the Final Rule quotes this on I.D.

4     Number 428.  *Bostock* defines discrimination as treating

5     individuals worse than others who are similarly situated.

6     That's the Black Letter definition of discrimination that runs

7     throughout Title VII, Title IX, Title VI, all of the other

8     discrimination statutes.  You need the similarly situated

9     piece or else you can't attribute the difference in treatment

10    to intentional discrimination.

11         Now, the one fundamental question defendants cannot

12    answer in this case is where is the worst treatment of

13    similarly situated persons when it comes to bathrooms?  They

14    can't answer that question because there is none and there is

15    no discrimination.

16         If we just take a boy that identifies as a girl, for

17    example, like all other boys, he can use the boy's bathroom.

18    They want to compare that boy with a girl because he

19    identifies as a girl and say, Well, if you were a girl, you'd

20    be able to use the girl's bathroom.  So switch his gender to a

21    girl, he gets to use the girl's bathroom, *Bostock* resolves

22    this issue.

23         But, of course, the whole basis for the separation is

24    that he is a biological boy who is not similarly situated to a

25    girl.  So to say you can compare those two with respect to

1    access to that facility is assuming away what you need to show

2    in an intentional discrimination case, and that is different

3    treatment of similarly situated persons.

4        Now, how did they try to end around this?  It's with this

5    new de minimus harm concept that they have unveiled in this

6    rule for the first time.  It's hard, you know, to fully know

7    what to say about it.  I've read that passage of the rule many

8    times.  But, of course, there is no de minimus harm concept in

9    Title IX or, you know, Title VII.

10       So as best as I can tell, what they're doing is, they're

11   saying any time sex-separation policies play out and have an

12   effect on a transgendered individual, for example, for ease of

13   reference, that causes harm, that is discriminatory, and

14   because that's discriminatory on the basis of gender identity,

15   gender identity equals sex, *Bostock*.  That's, I think, the

16   logic.

17       THE COURT:  Let me use a different example rather

18   than the locker room facility.

19       Let's take a band trip out of state.  You have a hundred

20   band members but you only have a limited number of hotel rooms

21   that they can use at a facility.  In other words, transgender

22   male who decides he identifies as female, does the band

23   director then have to place him in a room with a girl, a room

24   with two girls?  What's the situation there under the new

25   rule?

1          MS. HERMANDORFER:  The new rule does not really shed

2     light on the scope of the housing facility statute,

3     Your Honor.  Maybe my friends on the other side can give some

4     additional context.

5        I do seem to recall that there are cases involving forced

6     placement of high school students on school trips in two rooms

7     with members of the opposite sex under a Title IX theory.

8          THE COURT:  That's one of the concerns that one of

9     the interveners has in the case, A.C.

10         MS. HERMANDORFER:  That's exactly right.  And that

11    concern is not unfounded with respect to how they're

12    interpreting the logic of what they think *Bostock* requires.

13       And what they're doing with this de minimus harm

14    standard, I submit, is they're plucking language from cases

15    where there was unquestionably discrimination.  *Bostock* is one

16    of those cases.  You had two similarly situated people.  The

17    Court made it clear, these two employees were similarly

18    situated with respect to the job.  The only thing that was

19    different was the transgender status.

20         THE COURT:  Hence discrimination because of.

21         MS. HERMANDORFER:  Exactly.  When you don't have the

22    similarly situated treatment, you cannot attribute it to sex

23    because the person based on sex is not being treated any

24    differently than anybody else.  Both sexes are treated the

25    same vis-à-vis one another, everyone within the sex is treated

1    the same.

2         So what they have to do is say, this policy, nonetheless,

3    even though it's facially neutral and nondiscriminatory, plays

4    out in a way that inflicts harm on particular students based

5    on their gender identity or who associate with a different

6    gender identity.

7         And where I think they're getting that from is they're

8    getting that from cases that say that we're trying to parse

9    out what type of bad treatment do you need to have a

10   cognizable claim of discrimination.  So *Burlington Northern* is

11   a case they cite and, I think, rest heavily on.  There you had

12   it was a retaliation case.

13        So I submit the de minimus harm standard is really

14   converting this into a disparate impact or an accommodation

15   regime and reading out discrimination altogether.

16        And we know the Sixth Circuit has advised recently in the

17   *Doe* case -- and that's 926 F.3d. 235 -- that Title IX just not

18   only doesn't allow disparate impact liability, certainly the

19   Final Rule doesn't purport to rest on that.  So if that's

20   what's going on, that would be impermissible to justify the

21   rule on that basis now.

22        So the department's position is not a plausible textual

23   reading on its face, and certainly it's not so clear as to

24   satisfy either the Major Questions Doctrine or the Spending

25   Clause Clear Statement Rule.  And it speaks for itself, based

1    on the commentary and the public opposition, that telling

2    every schoolchild in America that members of the opposite sex

3    can potentially be in the bathroom whether they're children or

4    adult visitors on campus is fundamentally -- it's hard to

5    think of a much more major question than that, Your Honor,

6    and it's certainly one Congress has not authorized clearly,

7    and indeed, there have been multiple proposals rejected along

8    these lines.

9            THE COURT:  So the rule by the department -- let's go

10   back a moment.  School shootings that have happened over the

11   past few years, schools have attempted to harden the outside

12   of the schools as a result, through the doors, through other

13   ways.  I know there was a shooting in Tennessee --

14           MS. HERMANDORFER:  That's correct.

15           THE COURT:  -- involving a transgender student.

16   There's been a lot of criticism because law enforcement did

17   not provide a lot of information about some of the writings of

18   that student.  But regardless, schools across the country,

19   Texas, Florida, Tennessee, have had school shootings and

20   they've attempted to harden the outside of the schools to

21   protect students.

22     Chief Judge Sutton recognizes the vital interest that

23   states have in protecting students in the L.W. case.  But the

24   department's position is essentially, if you get through the

25   front door, you've got access to the bathrooms regardless of

*PLAINTIFF STATES - Hermandorfer*                                    94

1    your purpose in entering a school?

2          MS. HERMANDORFER:  I think it's hard to read the rule

3    any other way than that given what they say about what gender

4    identity means and that it can't be verified through any

5    invasive documentation or written documentation requests.

6          And certainly there's a -- if you just think about how

7    this is going to play out, I mean, people are going to

8    over-comply, lest they risk Title IX not only federal funding

9    down the road -- you know, that's one thing.  There's a

10   private cause of action in this statute, DOJ enforcement of

11   this statute that jumps over many of the steps my opposing

12   counsel talked about.

13         So schools are going to be put in this catch-22.

14   Students are going to be afraid to speak up if there's a

15   man -- you know, A.C.'s experience goes into detail on the

16   type of privacy harms that are in place.

17         THE COURT:  Well, part of the problem -- and we'll

18   get to this with the intervener.  But, of course, part of the

19   problem with A.C.'s case is this was as a result of a court

20   order in West Virginia that allowed the student to

21   participate.

22         But my question is, wouldn't the current rules that the

23   department seeks to enforce basically codify that activity?

24   All those things that happened to A.C., it effectively says

25   that's okay.

1              MS. HERMANDORFER:  I'm glad Your Honor asked this,

2     because I do think -- I've looked at a lot of rules in my

3     practice.  This is one of the most egregious cases of not

4     addressing an important aspect of the problem that I've ever

5     seen.  And it's not only egregious, it's insulting, what the

6     department said about the bona fide good faith held privacy

7     and safety concerns of citizens across this country.

8              So I guess taking safety first.  Tennessee's comment --

9     and this is at I.D. Number 519 through 521 -- laid out in

10    great detail instances of safety harms and crimes occurring

11    against women in the privacy of bathrooms.  And, of course,

12    what makes these places private is also what makes them

13    susceptible to abuse by bad actors.  You're often in there

14    with no one else to supervise or to cry out to.

15             So Tennessee said, you need to take into account that if

16    you give carte blanche for any man to be -- and I don't want

17    to just -- in terms of the privacy piece, I don't want to

18    discount the privacy invasion that men feel when women,

19    likewise, are in their restrooms.  But on the safety piece,

20    it's easier to think about just given the biological

21    differences between men and how they can overpower women

22    generally.  And Tennessee's comment laid out at least nine

23    examples of concrete events occurring in bathrooms.

24             And what we said in that comment -- and this is

25    important, I think, to understanding their response and how it

1    just completely whiffs -- is that we are not asserting that

2    transgendered people are more susceptible to violence or are

3    going to be the ones perpetrating.  What we said is, this

4    policy gives cover and it puts just enough doubt in people's

5    minds about whether people should be in the places they are to

6    make it susceptible to abuse.  And that was just one comment

7    among thousands along those lines in terms of the safety

8    concerns.

9        Now, the response that you'll see in the rule -- this is

10   a 1,500-page rule.  The response is on page 433, and it's one

11   sentence.  It says, "The department disagrees with commenters

12   who allege there is evidence that transgender students pose a

13   safety risk to cisgender students.  These are unsubstantiated

14   and generalized."

15       It's APA Law 101 that you can't just disagree that

16   evidence exists when prolific evidence has been proffered to

17   you as the agency, and so they try to change the conversation

18   by saying transgender students aren't going to pose a safety

19   risk, but, again, that misses the point.

20       Now on privacy.  The privacy response is equally

21   concerning.  There are more cases than you can count

22   recognizing the privacy interests members of the sexes have in

23   not being seen in intimate settings with members of the

24   opposite sex.  They occur across contexts, prisons, Justice

25   Ginsburg's, you know, acknowledgment in VMI.  Chief Judge

1    Sutton cites some of those cases in the L.W. passage.

2        And I think if you poll any member, most people on the

3    street, Would you feel like your privacy is invaded if you are

4    in an intimate locker room or shower with a stranger of the

5    opposite sex who can view you, I think the answer would

6    usually be yes.

7        Now, again, instead of grappling with those privacy

8    harms, the department says, the mere -- it dismisses, page

9    I.D. 433, that the mere presence of a transgender person

10   compromises anyone's legitimate privacy interests.  And later

11   down that same passage it says, "Courts have rejected that

12   preferences or discomfort of some can justify unconstitutional

13   discrimination."

14       So what those passages together are saying, it's not

15   legitimate for you to have a privacy concern about being seen

16   by a member of the opposite sex.  That's -- let's just say --

17   they're saying that that's some sort of transgender-directed

18   bigotry and not a deeply held privacy interest.

19       And, again, I submit, given what we know about the state

20   of the cases, at a minimum, it warranted more than the

21   back-of-the-hand treatment that this rule gave those concerns

22   that were shared by thousands and that we've seen play out

23   with respect to A.C. in particular.

24       So those are some of the reasons why this is just

25   arbitrary and capricious even if you get past the statutory

1    problems.

2        I do want to touch on the First Amendment piece here,

3    Your Honor, that you asked about.  Of course, the definition

4    of "harassment" under the 2024 rule self-consciously expands

5    beyond what the 2020 rule did, which tracked the Davis case

6    verbatim.  And I don't want to belabor this point.  I know

7    this might feature in intervenor plaintiffs' presentation.

8    But just to talk briefly about one concrete way we know that

9    this plays out, and that's with pronouns.

10       Tennessee has a law, for example, Kentucky too,

11   protecting teachers' ability to use biologically accurate

12   pronouns as a matter of state law, and rather than address how

13   this rule interacts with Meriwether, which held that pronouns

14   are -- the use of pronouns or not is a matter of deeply held

15   belief that expresses a viewpoint on a matter of public

16   concern.

17       And having accepted that that's First Amendment interest

18   in using pronouns or not, the Final Rule declines to address

19   so-called what it calls misgendering, i.e., using biologically

20   accurate pronouns that do not reflect gender identity.  It

21   says, talking about using pronouns in that way would be too

22   fact specific, so we're not going to do it, other than to say

23   a stray remark or a mistake probably won't be covered.

24       But we know from EEOC's enforcement actions -- this is an

25   active enforcement occurring in Tennessee, the Arlington

1    Community School District, which we've cited as Exhibit C to

2    our reply brief -- the 2016 "Dear Colleague" letter that was

3    later enjoined requires, on page 3, to use pronouns and names

4    associated with gender identity.  The 2021 fact sheet that was

5    enjoined in our prior case in EDTN, page 2, two examples using

6    pronouns.

7        So to say the least, pronouns are on the department's

8    radar and --

9        THE COURT:  This is under active investigation

10   currently?

11       MS. HERMANDORFER:  That's my understanding of the

12   2023 filed OCR complaint, Your Honor.  And there's also a

13   separate lawsuit that Your Honor can -- I think if you look at

14   the top of the OCR complaint we filed, you can see the

15   district court caption number.

16       THE COURT:  It's 224-2128.

17       MS. HERMANDORFER:  That's correct, Your Honor.

18       So I'll rest on the briefs on the First Amendment piece,

19   because I do think the interveners, you know, having educators

20   directly have personal experiences with that.  But I will say,

21   just from the state perspective, you know, opposing counsel,

22   the government comes back and says, we have no interest in

23   this matter, but, again, employees are being held to this

24   catch-22 where they -- and currently, state employees, for

25   example, in the state special schools, have this right, this

1    access, and the LEAs, this protection of Tennessee state law,

2    and the Final Rule is going to override that.

3        Finally, unless Your Honor has any further questions on

4    the merits-related topics, I can turn to scope of relief and

5    harms.

6            THE COURT:  Yes, ma'am, that's fine.

7            MS. HERMANDORFER:  So the states have asserted four

8    buckets of irreparable harm here.  The first is compliance

9    costs, which Sixth Circuit precedent holds unrecoverable

10   compliance costs are a form of irreparable harm, and the

11   government doesn't dispute that proposition.  It just says our

12   compliance costs are --

13           THE COURT:  Not as much as you would portray them to

14   be?

15           MS. HERMANDORFER:  You know, Your Honor, I don't even

16   know if they say that.  I think what they are saying is, Well,

17   even if they're a lot, you already have to comply with federal

18   law, so it's kind of just routine, part of doing business.  I

19   would submit that this rule is anything but routine in terms

20   of the requirements it's imposing on states.

21       So we heard in the testimony today -- and this is just in

22   Tennessee -- to train 130,000 employees on the meaning of this

23   new sex discrimination gender identity mandate, 148 school

24   districts have to adopt their own policies, some of them

25   through -- all of them through public meetings.  1,900

1    schools.  The college piece, that's 28,000 educators you need

2    to educate.  And that's just the educators, that's not staff

3    that are also subject to training.

4        So the declarations themselves lay out harms, and the

5    government comes back and says, Well, you haven't adequately

6    quantified them.  But I would like to direct Your Honor's

7    attention to two cases that I think shows our declarations are

8    more than sufficient for the compliance cost piece.

9        The first is the *Kentucky versus EPA* case.  Of course,

10   the government cites that case, which was later stayed by the

11   Sixth Circuit panel that concluded the compliance costs that

12   the district court held were not sufficient actually were

13   sufficient to show irreparable harm.  And if you go to the

14   declaration in those cases, Your Honor, they say things

15   like -- and I'm reading from Kentucky's declaration, which I

16   believe --

17           THE COURT:  This was a Western District case, I

18   believe, if I'm not mistaken.

19           MS. HERMANDORFER:  I think it's Eastern District,

20   Your Honor.

21           THE COURT:  In Frankfort?

22           MS. HERMANDORFER:  That's correct, in Frankfort.

23   It's 23-cv-7.

24       So the declarations I think are most easily pulled on ECF

25   there, and Declaration 10-1, ECF number, is Kentucky's

1    declaration.  And Kentucky says, you know, the expanded rule

2    definition will, quote, cost Kentucky financially.  The

3    Cabinet, must, quote, immediately assess compliance and will,

4    quote, require significant time and resources and legal and

5    technical analyses.

6         The private decs in that case, which are at ECF 17-1,

7    were of a piece.  Members will need to hire consultants and

8    lawyers at significance expense, spend resources on

9    consultants and attorneys, et cetera.

10        I'm not going to belabor the point.  But those

11   declarations were held sufficient by the Sixth Circuit at the

12   stay phase to warrant injunctive relief, and ours are more

13   robust, if anything, and supplemented with the testimony you

14   heard here today.  The compliance costs are going to be

15   immense and they're going to run across all six states and

16   divert valuable resources immediately.

17        And as Your Honor has recognized in a prior order, these

18   are costs occurring right now.  It's not as though you can

19   just comply with the wave of a magic wand on August 1st.  This

20   takes time, it takes money, it takes personnel.

21        The second bucket of harm we've asserted is our federal

22   funding harm.  We've touched on this.  I'm not going to hit it

23   more than to say, in the Biden 2 case that we cite in our

24   briefing, the government ran a similar argument to what I

25   think it might be running here, which is, well, you're not

1    harmed because all you have to do is comply with the Final

2    Rule and you won't lose your funding, and the Sixth Circuit

3    rejected that as a Hobson's choice in language we cite in our

4    reply brief.

5         Now the sovereignty harms.  As the L.W. opinion

6    recognized, any time a state's duly enacted laws are thwarted

7    by court order or federal policy, that inflicts irreparable

8    harm to the sovereignty of those states.  And that is what is

9    playing out here in spades, Your Honor.  We have laws about

10   pronouns, we have laws about sports, we have laws about

11   facilities, among other things that are being trumped by this

12   Final Rule, and the preferences of our state citizens are

13   being overridden by unelected federal officials at the

14   national level.

15        So that's sovereign harm under L.W., under *Kentucky*

16   *versus Biden*, and the Tennessee case.  And our prior

17   department of ed has a very good discussion collecting cases

18   on this, Your Honor, about sovereignty harms and how they can

19   be irreparable.

20        And the last harms are probably the most important, and

21   that's just the privacy and safety of the welfare of our

22   citizens.

23        As A.C.'s declaration and as our comment letter laid out,

24   the privacy harms are real, the safety threat is real, and it

25   is part and parcel of the state's job in our quasi-sovereign

1    interests to protect our citizens, and the Final Rule is

2    prohibiting us from doing that in many number of cases.

3          Then when we talk about equity balancing, this really

4    is -- this is a who decides question, Your Honor.  The

5    question is, what harm does it inflict on the federal

6    government to allow these policies to be set at the state and

7    local level, like they've mentioned with respect to Metro

8    Nashville Public Schools?

9          There are many students with differing gender identities

10   protected already by different states in voluntary policies

11   that schools have adopted.  And if those are the policies that

12   those states and communities want to further, as Chief Judge

13   Sutton said in L.W., that's how the system is supposed to

14   work.

15         So the question is, is there going to be irreparable harm

16   or adverse public interest in pausing what is an unprecedented

17   rule?  And, you know, my opposing counsel in colloquy with the

18   witness was asking has there ever been a time when Tennessee's

19   funding was pulled under Title IX.  I mean, if that's the

20   logic we're applying, then there's never been a time when the

21   federal government has required men to use women's bathrooms

22   and women to use men's bathrooms in history.

23               THE COURT:  So this is kind of like the guy that

24   jumps off the top of a tall building and halfway down someone

25   asks him how he's doing and he says, Okay so far.

1    Is that where we are here, we're just waiting for the

2    other shoe to drop?

3         MS. HERMANDORFER:  Certainly, August 1st a whole --

4    not just one shoe will drop, Your Honor.

5         So there's going to be -- as Chief Judge Pryor said in

6    his opinion in Adams, for all of recorded history, there have

7    been sex-separated facilities, and it's not going to harm the

8    public interest to make sure that before we upend centuries of

9    practice that the federal government has authority to carry

10   that out through rulemaking.

11        On the scope of relief.  The government agrees in its

12   brief -- and I'll address 705 second.  I'll take the

13   injunction first.  And, of course, the difference is, the

14   injunction is operating on enforcement and anybody associated

15   with carrying out the rule.  It's an in personam injunction,

16   whereas the 705 stay operates on the Final Rule itself.

17        The government agrees that injunction relief should grant

18   the parties complete relief.  And for the reasons we've

19   discussed, there are schools whose students are going to be

20   going throughout the country, and Tennessee has no less an

21   interest in protecting them on road trips than it does

22   protecting them in their own schools.  And, of course, if

23   something were to happen on an away trip, I think it's fair to

24   think about the upshot of those harms and the treatment and

25   all of that would be occurring back in Tennessee too.

1          So I think Your Honor would be well within the bounds of

2     equity to take cognizance of the unique way this rule is

3     affecting students across the country in issuing an

4     injunction.  But, of course, secondarily, we would submit

5     that, at a minimum, the rule should be enjoined within each of

6     the six plaintiff states statewide.

7          THE COURT:  Well, as you know, and as the department

8     cites in its brief, again, we go back to Chief Judge Sutton

9     who indicated an opinion that before -- and he certainly does

10    not favor nationwide injunctions, but he's indicated that

11    before that should occur, the district court should think

12    twice and then think twice again.  And, of course, that's one

13    of the reasons for me asking some of the witnesses questions

14    about interactions with other states and how we try to

15    untangle the mess that we might create.  Injunction would only

16    affect six states.

17         MS. HERMANDORFER:  What I would say is, the states

18    acknowledge the ask here, and that's a heavy burden to carry,

19    but we have carried it because -- and there's a good

20    discussion of this in the Career Colleges opinion that we cite

21    in our brief on scope of relief in some of the last few pages.

22    And this is a very recent Fifth Circuit opinion.  And it's

23    discussing 705, which the Fifth Circuit has held is not party

24    specific.  It operates on the rule's effective date as the

25    text of 705 itself lays out.

1       And, of course, the Court there reported that the Supreme

2   Court has issued a 705 nationwide stay itself as recently as

3   2016 in the Clean Power Plan rule.  And what the Fifth Circuit

4   said is, when we're thinking about the scope of relief, if the

5   federal government sets out a nationwide mandate, it should

6   not be surprised when it receives a nationwide response.  And

7   so 705, we submit, is an independent basis to pause this rule

8   temporarily.

9       And there were -- the law review article we cite in our

10  reply brief, Your Honor -- and, you know, this is a developing

11  issue in 705.  I would say there's not a lot of precedent on

12  it.  But certainly, if you're applying the equity factors to

13  the extent nationwide injunctive relief is appropriate,

14  because of the unique way this rule is going to operate, so to

15  705 relief would be.

16      In terms of severability, I think Ms. Ballard put it best

17  today when she responded with puzzlement about the notion that

18  you could implement part of the rule but not the other part.

19      What the government is suggesting would be, you could

20  stay core aspects of what constitutes sex discrimination but

21  then, I suppose, train people on or implement the procedures

22  about how to process sex discrimination complaints without

23  people knowing whether conduct constitutes sex discrimination.

24      There's a bevy of regulations around what I think they're

25  referring to is the part that could be implemented.  I take

1    their argument to be maybe the procedural piece.  I mean,

2    those regulations define things like who can be the

3    complainant.  If you just look at 106.2, the definitional

4    section of the rule, who can be a complainant?  What counts as

5    relevant evidence?

6        You can't train people on what evidence is relevant

7    without knowing what constitutes sex discrimination, or, at a

8    minimum, you would train them and then retrain them.  And

9    we've already discussed, I mean, we're talking upwards of

10   200,000 employees in Tennessee alone.

11       So severability posits that it would be practical and

12   appropriate for the part of the rule to go into effect and it

13   would be separable from the other parts of the rule that are

14   enjoined or temporarily stayed.

15       And here, the argument may very well be able to show at

16   the end of this case that parts are severable than others,

17   assuming we get some sort of relief here, Your Honor.  But at

18   this preliminary phase, there's just too much

19   interconnectedness and too much compliance messiness to

20   justify that type of a disposition were Your Honor inclined to

21   stay the parts of the rule that we've challenged here.

22       THE COURT:  All right.  Thank you.

23       I do want to hear from the intervener plaintiffs before

24   we take a lunch break.  We may go a little beyond the 12:00

25   hour, but I'll hear from the interveners.

1     I understand that you won't be repeating a lot of the

2   same information.

3          MR. FRAMPTON:  That's right, Your Honor.

4          THE COURT:  We'll come back after lunch, and I'll

5   hear from the defendants at that point, and then we'll follow

6   up with any responses.

7       Mr. Frampton, you may proceed.

8          MR. FRAMPTON:  Thank you, Your Honor.

9       May it please the Court.  Hal Frampton on behalf of the

10  intervener plaintiffs.

11      And as I said, I will do my best not to repeat.

12  Ms. Hermandorfer covered a great deal of ground, so I'm simply

13  going to highlight the issues that are most pertinent to the

14  interveners and try to answer some of the questions that

15  Your Honor raised in your colloquies with Ms. Hermandorfer.

16      And let me start with your question about the band trip

17  and whether that would be covered by the Final Rule or not.

18  And we have every reason to believe that it would be covered

19  and that it would require the band director to assign a male

20  student who identifies as female, like B.P.J, to room with a

21  female student.  And here's how we get there.

22      If you look at new Section 106.31(a)(2), it is clear that

23  it sets as sort of the baseline rule that adopting a policy or

24  engaging in a practice that prevents a person from

25  participating in an education program or activity consistent

1    with the person's gender identity subjects a person to more

2    than de minimus harm on the basis of sex, and that makes it

3    presumptively illegal.  The only way you get out of that is if

4    it is one of the enumerated exceptions.

5         One of the enumerated exceptions is Section 1686

6    regarding living facilities.  But elsewhere in the Final Rule,

7    the government has made it crystal clear that they interpret

8    living facilities very narrowly, so narrowly, in fact, that

9    it's not going to cover a bathroom or a locker room or other

10   areas where people do things associated with living.

11        So we have every reason to believe that that would --

12   that exception would not apply to the band trip.  And

13   certainly, if the government wants to stipulate otherwise,

14   they're welcome to, but they've not made any statements in

15   that regard.  So that's where the band trip comes in.

16        And I would also note -- I know Your Honor raised the

17   issue of the B.P.J case and how that affects what's happening

18   to intervener A.C., and I think there are a few sort of points

19   there.

20        First and foremost, the B.P.J case deals only with

21   athletics.  It deals only with whether B.P.J. can compete on

22   the women's team.  It does not purport to address intimate

23   facilities.  On its face, it doesn't even address locker

24   rooms, bathrooms, showers, anything like that.  It doesn't.

25   And it certainly doesn't address the band trip or anything

1    else that A.C. might do.  It doesn't address a PE class, which

2    is part of A.C.'s declaration.  And up until the Final Rule,

3    PE classes involving contact sports were allowed to be sex

4    separated under 106.34.  So it only affects so many things.

5        The second thing I'd note about the B.P.J injunction is

6    it is an as-applied injunction.  It applies only to the

7    student B.P.J.  It does not otherwise vitiate West Virginia's

8    law, but the Final Rule would.  So the Final Rule has a much

9    broader effect than simply the injunction in B.P.J.

10        And, finally, I would simply note that that B.P.J

11   injunction is not final.  That case was stayed.  I think it

12   was last week, it might have been the week before.  But the

13   case has been stayed for the State of West Virginia to seek

14   certiorari.  So that decision is not final.

15        But, again, what the Final Rule would do is take the

16   result in that case and apply it nationwide and apply it to

17   students other than B.P.J.  And that's why A.C. is affected by

18   the Final Rule detrimentally despite the fact that there's

19   this injunction in place.

20        And the two areas where it affects A.C. particularly are

21   the intimate facilities.  And I think the result there really

22   highlights how arbitrary and atextual the more than de minimus

23   harm standard is.  Because it says that someone like B.P.J, a

24   male who identifies as a female, it automatically inflicts

25   more than de minimus harm to keep B.P.J from accessing the

1    women's shower, the women's locker rooms.

2        But you take someone like A.C., and she's gone through in

3    her declaration, I don't think she's atypical for a

4    15-year-old girl in explaining that it is harmful to her to

5    have to change clothes and shower in front of someone who is

6    anatomically male, and that prevents her from having full

7    access.

8             THE COURT:  Is that even debatable?

9             MR. FRAMPTON:  I don't think it should be.

10            THE COURT:  Well, we'll see here in a moment.

11            MR. FRAMPTON:  I don't think it should be.

12            THE COURT:  It seems to me that it's not really a

13   debatable issue, this right of privacy that these 15-year-olds

14   are entitled to, that that should be invaded.

15       Shouldn't adults be standing up rather than 15-year-olds

16   and being brave about this?

17            MR. FRAMPTON:  Couldn't agree more, Your Honor.

18   Couldn't agree more.  Yes, they should be.

19       But it's so arbitrary to say that that harm that A.C.

20   faces automatically doesn't count, which is what the Final

21   Rule says, and deserves no consideration whatsoever.  You

22   certainly don't get that from the statute.  You don't get that

23   from the regulatory history, the 1975 regs that, as

24   Ms. Hermandorfer pointed out, are presumptively valid in how

25   they interpret the statute.

1    And, in fact, in some of the government's briefing, they

2    seem to sort of admit that where they get it from is

3    organizations like WPATH, the World Professional Association

4    for Transgender Health.  That's sort of where this is coming

5    from, and yet nothing in Title IX allows the department to

6    rewrite Title IX based on WPATH's prerogative, or any

7    organization's prerogative.

8    And, in fact, in the L.W. case, Chief Judge Sutton was

9    very clear that the medical and scientific evidence here is,

10   at best, conflicting.  It's certainly not a monolith to the

11   point that an agency could write this into Title IX.  And the

12   Sixth Circuit in that case refused to write the government's

13   view of the science into the Equal Protection Clause.  There's

14   no reason to go and write it into Title IX.

15   Your Honor, I do think it's worth -- because the

16   government takes us to task a bit for talking about athletics

17   so much in our briefing and in A.C.'s declaration, so I do

18   want to note for the Court that if you look at the actual text

19   of the new regulations -- I don't mean the commentary, I mean

20   if you look at the actual text of the regulations -- it does

21   in fact have an effect on athletics.  And I'll tell you how we

22   get there.

23   You start at Section 106.41(a), which is the general

24   provision in the Title IX regs saying that you can't

25   discriminate on the basis of sex in athletics.  New Section

1    106.10, which is sort of the *Bostock* section of the new

2    regulations that imports *Bostock* wholesale into Title IX, is

3    going to apply to 106.41(a) and is going to now require that

4    for purposes of athletics, you essentially import the "you

5    can't notice sex" mandate from *Bostock*.  So it's going to

6    affect athletics.

7         In fact, the government has already said in its briefing

8    in B.P.J that it takes the position that 106.41(a) requires

9    allowing males who identify as female to compete on women's

10   sports teams.  By adding in new Section 106.10, that's just

11   cementing that result and giving it a regulatory cache that it

12   didn't already have and giving them a new reg to cite for that

13   proposition.

14        THE COURT:  So I suppose your argument would be, if

15   we do go back to the point of gender being two sexes, it's

16   binary, two sexes, we have in 1972 Congress deciding that we

17   needed to level the playing field to give women equal

18   opportunities that had not been provided at that point, and,

19   quite frankly, did not continue later after 1972 in athletics

20   and in other areas.  So that was the genesis of the statute,

21   1972.  And at that time, I believe when we look at the text,

22   that's Congress's opinion, two sexes, male and female.

23        If we then develop regulations that will create a sub

24   class of males that will take away opportunities from females,

25   we are eliminating opportunities for females.

1        MR. FRAMPTON:  No question, Your Honor.  That is the

2   effect.  And A.C.'s declaration goes through all of the ways

3   that she and other girls in West Virginia have been displaced

4   by that very phenomenon.

5        THE COURT:  It's not happening -- at least the

6   stories that we're hearing, it's not happening in the reverse.

7   We're not having women taking away opportunities from men in

8   athletics or in other areas.

9        MR. FRAMPTON:  Correct.  That's exactly right.  It's

10  a one-way ratchet because --

11       THE COURT:  So in your opinion or in your argument,

12  it would stand the effect or the intention of Title IX on its

13  head?

14       MR. FRAMPTON:  No question.  That is exactly what it

15  would do.  It would turn Title IX on its head.  It would

16  subvert the very purpose of the statute and use a statute that

17  was designed to give women and girls opportunities in

18  athletics that they did not have in 1972, roll back the clock

19  and start taking those away again.  And they've given it

20  regulatory approval though 106.10 as that's going to apply to

21  106.41(a).

22       The second way that it works is that in 106.31(a)(2),

23  they essentially say, as I read it earlier, any practice that

24  fails to treat someone in accordance with their gender

25  identity automatically causes more than de minimus harm unless

*INTERVENOR PLAINTIFFS - Frampton*                                        116

1    it's within one of these enumerated exceptions, and they don't

2    except 106.41(a).  And so the only reasonable understanding of

3    that is, well, more than de minimus harm must apply to

4    106.41(a).

5        So both ways you get an effect on athletics and a

6    subversion, as Your Honor put it, of the statute.

7        But here's the thing.  If they're right that athletics

8    are not affected, if they're right about that, and I don't

9    think they are for the reasons that I've just given you, but

10   if they are, that only highlights again the arbitrariness of

11   the more than de minimus harm standard.

12       Because what they're saying is, look, you can't -- you

13   can't inflict more than de minimus harm as we, the department,

14   have defined it in this sort of ideological fashion unless

15   it's in one of these enumerated areas, and we think you can

16   have more than de minimus harm in athletics because there's a

17   long history of regulating athletics in a sex-separated

18   fashion.

19       The problem is, there's an equally long history, equally

20   long history -- they both go back to the 1975 regs -- of

21   regulating intimate spaces in a way that allows for sex

22   separation, of regulating PE classes in a way that allows for

23   sex separate.

24            THE COURT:  The Javits Amendments?

25            MR. FRAMPTON:  Well, yeah.  What I'm speaking about

1    is simply that there's no statutory difference that would

2    allow for sex separation causing more than de minimus harm

3    only in athletics and not anywhere else.  That simply doesn't

4    make any sense.

5         The Javits Amendments didn't say you can sex separate

6    athletics, it just said you have to regulate Title IX and you

7    should include provisions for athletics.  So that is not a

8    statutory basis to treat athletics and intimate spaces

9    separately.  In fact, the 1975 regs treated them the same.

10   That was everyone's understanding, as Ms. Hermandorfer argued,

11   that that was simply not discrimination under the statute.

12        Well, let me move to our First Amendment issues with

13   respect to the teacher declarants that we have submitted.  We

14   do have two that have submitted declarations involving

15   intimate spaces.  That's Brett Campbell and Joshua Taylor.

16   You can look at those.

17        But I will talk about the pronoun issue because this

18   affects all of the teachers that we've submitted.  They all

19   have conscientious objections to using what they regard to be

20   inaccurate pronouns.  And as Ms. Hermandorfer argued, there's

21   absolutely no doubt that using inaccurate pronouns is going to

22   be required by this Final Rule.  And she gave you the reasons.

23   Let me give you a couple more.

24        One is, the government has already told us in its amicus

25   brief in the *Kluge* case out of the Seventh Circuit.  That was

*INTERVENOR PLAINTIFFS - Frampton*                                          118

a case in which a teacher sought a religious accommodation

under Title VII declining to use names and pronouns that he

regarded as inaccurate.  The government submitted an amicus

brief to the Seventh Circuit in that case and said, Hey, if

you accommodate this teacher -- you accommodate this teacher,

you are risking Title IX liability.  So there's absolutely no

doubt where the government comes down on this issue.

Second, you just run it through the text of the new rule.

Again, any policy or practice that doesn't treat someone in

accordance with their gender identity automatically causes

more than de minimus harm.

And then you run it through the definition of "hostile

environment harassment."  Well, is declining to use the

pronouns that someone requested, is that unwelcome?

Certainly.

Is it subjectively and objectively offensive?  Well, it's

subjectively offensive.  And I would submit that by telling us

that it causes more than de minimus harm, that's telling us

it's objectively offensive.  I don't see how those hang

together if it doesn't, at least in the government's view.

Is it severe or pervasive?  Well, pronouns are pervasive.

Does it limit or deny a person's ability to participate

in the educational program?  Well, you have to look at the way

the government interprets that phrase.  And they told us.  At

89 Fed. Reg. 33511, they said no particular limitation is

1    required.  You don't need someone to have their grades drop or

2    to have trouble attending class.  All you need is -- and this

3    is their quote -- some impact on the person and that's going

4    to be sufficient.

5         Well, it's no stretch of the imagination that people are

6    going to claim some impact from a teacher declining to use

7    their pronouns.  But, of course, that then runs headlong into

8    *Meriwether* and causes all sorts of First Amendment problems.

9         THE COURT:  What does the new rule say with regard to

10   how a teacher is supposed to identify a person and their

11   particular pronouns, and can that change over time?  Can I

12   come in one day and say, I want to be called Cosmos?

13        MR. FRAMPTON:  Well, Your Honor, given that it's

14   really clear in the Final Rule that you're not allowed to

15   inquire too deeply into these matters, my suggestion to the

16   Court would be, a teacher is running a heck of a risk if that

17   teacher doesn't simply accept what the student is telling

18   them.

19        THE COURT:  The reason I ask you the question is

20   because the definitions have changed.  And I'm looking at the

21   DSM-IV.

22        MR. FRAMPTON:  Okay.  So we're in gender identity

23   disorder, not gender dysphoria?

24        THE COURT:  Exactly.

25        So the diagnostic features indicates there are two

1   components of gender identity disorder, both of which must be

2   present to make the diagnosis.  There must be evidence of a

3   strong and persistent cross-gender identification, which is a

4   desire to be or the insistence that one is of the other sex.

5       So if we're applying this standard, it may be a little

6   bit easier to make an objective determination if you're a

7   teacher.  If we take away this definition and we use "gender

8   dysphoria" and the definition, it would appear that that can

9   change from week to week, day to day.

10      MR. FRAMPTON:  It certainly can, Your Honor.  And the

11  American Psychological Association has things saying as much.

12      The key feature, as I recall, from the DSM-5 definition

13  is simply the clinically significant distress and not any kind

14  of objective assessment of the person's identity.  They're

15  simply looking at the distress and saying, well, if there's

16  distress associated with any gender issue, that's going to

17  count.  And that could certainly change from day to day, week

18  to week.  It's not something that's static by any stretch.

19      One of the things I -- two more points on this that I

20  think are important.  And one is simply the breadth of the

21  harassment definition.

22      This is not simply about teachers interacting with

23  students in class.  The Final Rule in the commentary on 106.2

24  is clear that because of a school's disciplinary control over

25  a teacher, pretty much any interaction between a teacher and a

1    student is subject to the harassment standard.  So this is

2    informal conversations in the hallway, conversations in the

3    lunchroom, on the baseball field, at the grocery store, even

4    online.  So it's not simply a matter of what has to happen in

5    class.

6          And the last thing I'll note on this is that the harm is

7    not remotely speculative.  There was some suggestion of that

8    in the government's brief.  But if you look at the actual

9    declarations that our teachers have submitted, you look at

10   someone like Joshua Taylor.  He's in Coffee County Central

11   High School, which has 50, 5-0, students who identify as

12   transgender.  He's had 10 requests to use pronouns that he

13   deems to be inaccurate.  This is a ubiquitous phenomenon.  You

14   look at someone like Brett Campbell.  He's got three students

15   in his class.  Now all of our teachers have had requests to

16   use language that they deem inappropriate with students.

17         And, again, I believe you heard Ms. Ballard testify

18   earlier that in Tennessee where all of these teachers are,

19   schools go back the end of July/beginning of August, the rule

20   goes into effect August 1st.  This is an issue these teachers

21   are going to be dealing with day one when they return for the

22   next school year.  It's not remotely speculative that this is

23   going to be something that they're going to have to deal with

24   and it's going to harm them.  Nor is it speculative that

25   declining to use someone's preferred pronouns is going to

1    cause a stir and potentially trigger a Title IX complaint.

2          You look at Michelle Keaton's declaration.  She talks

3    about the blow-back she's gotten when she's declined to use a

4    student's pronouns, which right now is protected by Tennessee

5    law with other students and teachers, essentially reading her

6    the riot act.  Josh Taylor talks about a very unpleasant

7    parent-teacher conference dealing with these issues.

8          So this is something that they are going to deal with and

9    is going to cause contention and is going to trigger someone

10   filing a Title IX complaint on them.  And all of the

11   declarations go through just how seriously the schools that

12   these folks are in take Title IX compliance.  This isn't some

13   optional thing.  This is something they're trained on.  This

14   is something the school districts emphasize.

15         And, in fact, they are required to report each other if

16   they see some kind of violation.  So as soon as someone sees

17   one of our teachers decline to use pronouns, that person has

18   an obligation to make a report.  So, again, this is a harm

19   that will be felt and will be felt very quickly.

20         THE COURT:  So your argument is this is not only

21   chilling a person's speech but it's compelling speech

22   against their --

23         MR. FRAMPTON:  Absolutely.  In the same way that

24   *Meriwether* was a compelled speech case.

25         Your Honor, the last thing I would bring up that is

1    particularly relevant to our teachers is the extent to which

2    the discriminatory harassment -- the hostile environment

3    harassment definition is so vague and overbroad that it chills

4    speech on a variety of issues of public concern affecting

5    gender identity.  It's an overbreadth claim, so it has to

6    chill constitutionally protected expression, cut a wider swath

7    than the Constitution would allow.

8         And the key case that we'd direct your attention to --

9    and I think the government knows it's the key case because

10   they tried to distinguish it, I would suggest unsuccessfully,

11   in the Final Rule itself -- is *Speech First against Cartwright*

12   out of the Eleventh Circuit, which dealt with a similarly

13   overbroad policy.

14        And what I would really direct the Court's attention to

15   there -- because there's a lot going on in that case and

16   there's a lot going on in the Final Rule itself.  But what the

17   Court in *Cartwright* really honed in on was that the school --

18   the University of Central Florida's harassment policy said

19   that anything that, quote, unreasonably alters another

20   student's educational experience could potentially run afoul

21   of the policy.

22        And I'll read you what the Court said about it.  It said,

23   "What does it mean for one student's speech to unreasonably

24   alter another student's educational experience?  Both terms,

25   'unreasonably' and 'alter,' are pretty amorphus.  Their

1    application would likely vary from one student to another, and

2    the University's totality and known circumstances approach to

3    determining whether particular speech crosses the line only

4    makes matters worse."

5         Well, Your Honor, that "some impact" language that I

6    quoted from the Final Rule is no more specific or limiting

7    than "unreasonably alter."  If anything, it's less.  At least

8    "unreasonably alter" has some kind of reasonableness

9    limitation, "some effect" doesn't.  So that renders it vague

10   and overbroad.  And you can see it playing out.

11        We submitted a declaration, for example, from Amy McKay.

12   She is a teacher in the -- I believe it's in the Memphis area.

13   She's a former college athlete, former high school coach,

14   cares deeply about issues relating to women's athletics.  She

15   wants to be able to talk in casual conversations and

16   appropriate circumstances about the importance of protecting

17   the integrity of women's sports, but if she does that, she's

18   at risk of a harassment complaint.

19        And soon as she says, I think it's unfair for males to

20   compete against females in women's sports, I think it's

21   effectively cheating, she's at a point where that speech could

22   offend someone and she could be subject to a harassment

23   complaint, and the discriminatory harassment policy doesn't

24   clamp that down.  So it's going to have a chilling effect.

25   And all of our teachers have noted the way that their speech

1    is going to be chilled.

2         The government has got two principal responses to that,

3    if I'm understanding their briefing correctly, neither of

4    which is effective.

5         The first thing they say is, Well, look, we added a

6    requirement that the speech be objectively offensive, we added

7    that into the Final Rule and so that is going to be an

8    appropriate limiting principle.

9         I think there are three problems with that argument.

10        First, the government is playing with loaded dice.

11   They've already told us in new 106.31(a)(2) that they think

12   that any treatment that isn't consistent with a person's

13   gender identity causes more than de minimus harm.  That's

14   obviously going to inform what is deemed to be objectively

15   offensive.

16        And their citation to the *L.M. against the Town of

17   Middleboro* case in the Final Rule really gives up the game.

18   That was a case in which a student wore a shirt to school that

19   said "There are only two genders" on it and was punished by

20   the school.  The government is citing that case with approval

21   for the proposition that this is the kind of speech that a

22   school district would still be able to prohibit.  So I think

23   we know the extent to which they're going to chill expression

24   on issues related to gender identity and call it objectively

25   offensive.

1        Second, in the speech context -- and conduct might be

2   different, but in the speech context, objective offensiveness

3   is not a constitutionally relevant limitation, because the

4   Constitution, the First Amendment allows all kinds of speeches

5   that people deem to be offensive.  And that's why the two

6   constitutional standards that tend to apply in the school

7   environment the most are the Tinker standard for student

8   speech and the Pickering standard for employee speech.

9   Neither one of them allows you to clamp down on speech simply

10  because it's objectively offensive.  They both require -- they

11  phrase it differently, but they both require a high level of

12  disruption or something like that.  Offensiveness never cuts

13  it.

14       So simply writing "offensiveness" into the Final Rule is

15  not a constitutionally meaningful limitation.  That doesn't

16  suddenly make it work under the First Amendment.  And they

17  also still didn't deal with that "some effect" language that

18  causes a significant constitutional problem.

19       The second thing I understand the government to say in

20  response is, Well, but we've told you in the Final Rule that

21  on a case-by-case basis we will respect First Amendment

22  rights.  So, you know, trust us, we won't interpret this

23  policy, as broad as it is, to violate anyone's First Amendment

24  rights.  And the problem is, the Sixth Circuit has already

25  told us that doesn't cut it.

1    And the case I would cite to you for that proposition is

2    *Dambrot against Central Michigan University*, 55 F.3rd. 1177.

3    That's a Sixth Circuit case from 1995 dealing with a school

4    harassment policy that had a sort of First Amendment savings

5    clause in it.  And the Sixth Circuit said in a very helpful

6    discussion that that kind of savings clause doesn't change the

7    fact that the policy is overbroad.  We look past that and look

8    at whether a reasonable teacher would understand what kind of

9    speech is allowed and restricted and they wouldn't allow that

10   there.  So, Your Honor, the policy is vague and overbroad and

11   can't stand under the First Amendment.

12       Your Honor, those were the issues that were particularly

13   important to our clients.  I'm happy to answer any questions

14   the Court may have.

15       THE COURT:  In *Meriwether*, I believe Judge Thapar

16   writing for the Court rejected the overbreadth argument

17   specifically because the teacher had been subject to -- he

18   questioned whether he was in violation, and he went through a

19   long process.  And the person that made the administrative

20   decision turned out to be the president who then reviewed the

21   decision of two people that had been appointed in his stead.

22       MR. FRAMPTON:  Yes.

23       THE COURT:  So in that case, the Court found that

24   it's not vague here because the professor was able to follow

25   the procedures.

1          MR. FRAMPTON:  Right.

2          THE COURT:  The person's rights were violated, but he

3     followed the procedures.

4          MR. FRAMPTON:  That's right.

5        And obviously with the Final Rule, no one is going to be

6     able to get a straight answer from the federal government as

7     to what kind of speech is allowed or not.  They tried to do

8     that from the comments to the Final Rule, and it was not

9     forthcoming.

10         THE COURT:  One other question for you.

11         MR. FRAMPTON:  Yes, Your Honor.

12         THE COURT:  I'll give you another hypothetical.

13       There's a former University of Kentucky swimmer that

14    speaks out on these issues.

15         MR. FRAMPTON:  There is.

16         THE COURT:  Her name is Riley Gaines, I believe.

17         MR. FRAMPTON:  Yes, sir.

18         THE COURT:  Could she be hired under this standard of

19    not being able to speak out based upon her comments being very

20    much against this particular rule?  Could a school hire her or

21    would they hire her for fear of being in violation of --

22         MR. FRAMPTON:  Your Honor, given her public advocacy,

23    I think they would really have to think twice about that.

24    They're taking on a Title IX liability or certainly taking on

25    a big old Title IX fight that's going to cost them a great

1    deal of money and time and effort if they were to hire someone

2    making those kinds of -- I mean, public statements with which

3    a majority of the country agrees, but public statements that

4    according to the department are more than de minimus harm.

5              THE COURT:  It's a bit totalitarianism, wouldn't you

6    say?

7              MR. FRAMPTON:  Indeed, Your Honor.

8              THE COURT:  Thank you.

9         We'll take a recess until 1:15 this afternoon.  We'll

10    resume at that time with responses by the defendant.

11        (Recess taken from 12:22 p.m. to 1:15 p.m.)

12             THE COURT:  Thank you.  We'll continue with the

13    motions hearing in Covington Civil Action 24-72, the State of

14    Tennessee and others versus Miguel Cardona in his capacity as

15    Secretary of Education of the U.S. Department of Education.

16        Before lunch, we completed the arguments on behalf of the

17    plaintiffs and intervening plaintiffs, so at this time, I'll

18    turn to counsel for the defendants for any response.

19             MS. TULIS:  Good afternoon, Your Honor.

20             THE COURT:  Good afternoon.

21             MS. TULIS:  The case before you today concerns three

22    separate provisions of the Final Rule.

23        The first provision, to be codified at Section 106.10,

24    describes the scope of Title IX's prohibition of

25    discrimination on the basis of sex.  This provision is a

1    straightforward application of the reasoning of *Bostock* in

2    which the Supreme Court interpreted materially identical

3    language in Title VII.  As the Supreme Court explained in

4    *Bostock*, discrimination based on homosexuality or transgender

5    status necessarily entails discrimination based on sex.  The

6    first cannot happen without the second.  That's from 590 U.S.

7    at 669.

8         Section 106.10 does not address the extent to which there

9    may be permissible sex separation under Title IX.

10   Sex-separate spaces and activities are addressed by a separate

11   provision of the rule, to be codified at 106.31(a)(2).

12        Then the third provision of the rule is the definition of

13   sex-based hostile environment harassment, to be codified at

14   106.2.  The definition of "hostile environment harassment" in

15   the rule tracks the harassment standard that the education

16   department used for decades prior to 2020 and aligns with

17   similar standards used for decades in the enforcement of other

18   civil rights statutes.

19        These are three separate provisions which have different

20   bases and serve different functions.

21        I want to be clear at the outset for the purposes of all

22   my arguments today, the Court can assume for purposes of the

23   case that sex is binary and assigned at birth, so there's no

24   issue here that requires the Court to assume otherwise.

25        I want to start with 106.10 and the application of

*DEFENDANTS - Tulis*                                                        131

1    *Bostock.*

2         THE COURT:  Good.  Could I stop you for just a

3    moment?

4         MS. TULIS:  Yes.

5         THE COURT:  Could we go back really to the statute

6    itself, and let me just ask, what was the purpose of Title IX

7    at the time of implementation?

8         MS. TULIS:  Your Honor, I think Title IX's purpose

9    was to guarantee equal treatment of students and other people

10   in recipients' purview on the basis of sex.

11        THE COURT:  Well, was the purpose of Title IX to

12   increase opportunities for biological females and level the

13   playing field for those females at the time that the statute

14   was adopted?

15        MS. TULIS:  Your Honor, definitely one of the

16   purposes of the statute with respect to -- was to increase

17   opportunities and guarantee equal opportunities for women.

18   That is definitely a core purpose of parts of the statute.

19        THE COURT:  And if you fail to do that through

20   implementing rules, are you failing to enforce the most basic

21   duty of the statute?

22        MS. TULIS:  Your Honor, I take Your Honor's question

23   to be going to whether the rule today does comply with that

24   purpose that Your Honor has articulated.  And the government

25   certainly disagrees that there is any portion of this rule

1    that is contrary to that purpose of the statute.

2         But going back to 106.10, what's crucial here is that we

3    have to start with the statute's plain language.  That's what

4    the Supreme Court did in *Bostock*.  It did not have to look

5    farther than the plain language to determine that prohibiting

6    discrimination on the basis of sex necessarily meant

7    prohibiting discrimination on the basis of transgender status

8    or sexual orientation.

9              THE COURT:  Is that issue in any of the legislative

10   history of the statute?

11             MS. TULIS:  Your Honor, as the Supreme Court held in

12   *Bostock*, you don't need to look to legislative history here.

13   The courts need to look to legislative history --

14             THE COURT:  No, but this is a different statute we're

15   dealing with.

16             MS. TULIS:  Your Honor, I believe following the

17   reasoning of the Supreme Court in *Bostock*, the Court would

18   only need to look to legislative history if there was some

19   ambiguity in the language of the statute.

20             THE COURT:  Didn't Chief Judge Sutton indicate

21   clearly that these are two different statutory provisions?

22             MS. TULIS:  Your Honor, are you referring to L.W.,

23   that case?

24             THE COURT:  Yes, ma'am.

25             MS. TULIS:  Yes, Your Honor.

1    So L.W. was discussing a very different context.  In that

2    case, the issue was an equal protection claim, and the

3    argument reads that somehow *Bostock* would compel the

4    recognition of transgender status as a quasi-suspect class.

5    So nothing in L.W. required the Court there to decide the very

6    narrow question of whether discrimination on the basis of sex,

7    as that phrase is used in Title IX, means something different

8    than discrimination because of sex in Title VII.

9           THE COURT:  But you say that the rule is an

10   application of the reasoning in *Bostock* not an application of

11   the holding in *Bostock*, correct?

12          MS. TULIS:  The reasoning in *Bostock*, yes,

13   Your Honor.

14          THE COURT:  But not the holding?

15          MS. TULIS:  Your Honor, the holding in *Bostock* was

16   about Title VII.  That's clear.

17          THE COURT:  Let's go to the majority opinion written

18   by Justice Gorsuch, who's responding to the dissent at page

19   1753 of the Supreme Court edition, 140 Supreme Court.

20          MS. TULIS:  Yes, Your Honor.

21          THE COURT:  And what did Justice Gorsuch say in

22   addressing the concern that the employers might worry that the

23   decision would sweep beyond Title VII to other state laws that

24   prohibit sex discrimination?

25          MS. TULIS:  Your Honor, what the Court said there --

1      and I'm looking at the second column on that page -- "The

2      employers worry that our decision will sweep beyond Title VII

3      to other federal or state laws that prohibit sex

4      discrimination."  And under Title VII itself, they say,

5      "Sex-segregated bathrooms, locker rooms, and dress codes will

6      prove unsustainable after our decision today, but none of

7      these other laws are before us.  We have not had the benefit

8      of adversarial testing about the meaning of their terms, and

9      we do not prejudge any such question today.  Under Title VII,

10     too, we do not purport to address bathrooms, locker rooms, or

11     anything else of the kind."

12              THE COURT:  All right.

13              MS. TULIS:  And, Your Honor, we submit that that

14     reasoning is completely consistent with 106.10.

15          Like *Bostock*, the department in 106.10 is not purporting

16     to address bathrooms, locker rooms, or anything else of the

17     kind, it is simply interpreting the plain text of the statute,

18     plain text which is materially indistinguishable from the text

19     of Title VII at issue in *Bostock*.

20              THE COURT:  Then let me ask the question.  Do the

21     states have any concern or should they have any concern with

22     prohibiting individuals of different genders, binary genders,

23     from using the same bathrooms or locker rooms?  In other

24     words, can the states say, under the proposed rule, we have

25     the authority, regardless of how you identify, to prohibit you

1     from using the same bathroom or locker room if you are of a

2     different gender biologically?

3          If you're of a different gender biologically, can the

4     states say, you cannot use the same rest rooms or locker

5     rooms?

6               MS. TULIS:  Your Honor, that question goes to a

7     different part of the rule, which is the provision to be

8     codified at 106.31(a)(2), and that provision of the rule

9     expressly addresses sex-separated situations.

10          That provision states, "In the limited circumstances in

11    which Title IX or this part permits different treatment or

12    separation on the basis of sex, a recipient must not carry out

13    such different treatment or separation in a manner that

14    discriminates on the basis of sex by subjecting a person to

15    more than de minimus harm, except as permitted by 20 U.S.C.

16    1681(a)(1) through (9) and the corresponding regulations at

17    Sections 106.12 through 106.15, 20 U.S.C. 1686 and its

18    corresponding regulation, Section 106.32(b)(1), or Section

19    106.41(b).  Adopting a policy or engaging in a practice that

20    prevents a person from participating in an education program

21    or activity consistent with the person's gender identity

22    subjects a person to more than de minimus harm on the basis of

23    sex."

24          That's the provision that Your Honor is referring to.

25               THE COURT:  I understand.

1      So under that provision and what you've just read, it

2   sets a very low bar for de minimus harm.  And so if you have

3   an individual that identifies as female but biologically is

4   male, under what you've just read, it states that would be a

5   violation of the rule if the state said, no, you can't use the

6   same locker room or bathroom?

7           MS. TULIS:  Your Honor, my understanding is that

8   this -- yes, preventing a person from using a sex-separate

9   bathroom consistent with their gender identity would be in

10  conflict with this section of the rule, 106.31(a)(2).  But to

11  the extent there was any determination that plaintiffs were

12  entitled to relief with respect to that claim, any relief to

13  those bathroom-specific complaints would, at most, run against

14  106.31(a)(2), it would not run against 106.10 or the rule as a

15  whole.

16      You know, in *Bostock* the Supreme Court held you couldn't

17  fire someone for being transgender under Title VII.  106.10

18  similarly means that you can't ban a kid from band practice

19  for being transgender or put a kid in detention for being gay.

20  And to my understanding, the plaintiffs and interveners in

21  this case don't disagree with that proposition.  Most, if not

22  all, of the arguments that have been raised today, my

23  understanding is, go to 106.31(a)(2) and that specific

24  provision regarding sex-separate spaces, not the general

25  nondiscrimination provision at 106.10.

1          THE COURT:  So in answer to my question, the answer

2     would be, yes, you agree with me, but with regard to

3     106.31(a)(2)?

4          MS. TULIS:  Your Honor, that section --

5          THE COURT:  So that is a concern for the plaintiffs

6     in this matter?

7          MS. TULIS:  My understanding is the plaintiffs'

8     concern is that 106.31(a)(2) would require recipients to not

9     prevent someone from using a sex-separate facility consistent

10    with their gender identity with the exception of the

11    provisions mentioned in that section, which are laid out by

12    section and regulation.

13         THE COURT:  All right.  So if an individual comes

14    into a school and identifies as female but is in fact male,

15    the gender is male, binary male, but identifies as a female,

16    and there are two rest rooms in the school in the entryway,

17    and he says, because I identify -- or he didn't even have to

18    say it, I suppose.  If he goes into the women's rest room, you

19    would say he could do that, but if he goes -- but if he would,

20    the states would say, no, you can't do that, you cannot do

21    that because of the privacy interest involved?

22         MS. TULIS:  Your Honor, I don't think that's quite

23    correct, and I'm going to explain why.

24         THE COURT:  Okay.

25         MS. TULIS:  I think Your Honor's question appears to

1    presume that someone could essentially decide on the spot that

2    they wanted to claim a particular gender identity that was

3    different than their sex assigned at birth and that would just

4    entitle them to use --

5         THE COURT:  Yes, ma'am, based upon the different

6    definition of gender dysphoria that's now been adopted in

7    DSM-5, I believe.

8         MS. TULIS:  Your Honor, I just want to clarify that

9    gender dysphoria is in the DSM-5, it's a condition that's

10   identified there.  Some transgender people do suffer from

11   gender dysphoria, but not all transgender people.  So gender

12   identity -- someone having a gender identity that doesn't

13   match the sex assigned at birth does not necessarily mean they

14   have gender dysphoria.

15        And with respect to the gender identity question, I think

16   Your Honor's concern about essentially people abusing this

17   rule somehow or recipients not being able to have any way of

18   actually determining which rest room someone could be entitled

19   to use, the rule addresses that, and they make clear that it's

20   fine to ask for some kind of confirmation of someone's gender

21   identity, written confirmation, for instance, from a

22   counselor.

23        THE COURT:  Okay.  So let's assume I'm a visitor to

24   the school and you ask me for that confirmation and I said,

25   Yes, that's the way I identify.  I'd like to go into this

1    women's rest room and just observe for a while.  Is that okay

2    with you?

3             MS. TULIS:  Your Honor, I don't know that the rule

4    addresses that specific scenario, but as I said, the rule

5    makes clear --

6             THE COURT:  How would you interpret the rule?

7    Because these states are going to have to interpret the rule,

8    and that goes to the issue of whether this rule is vague.

9             MS. TULIS:  Your Honor, my understanding is that a

10   recipient could require some kind of confirmation beyond just

11   the say-so of someone on the spot.  So if they did not have,

12   for instance, knowledge of that person's consistent

13   identification as a particular gender, I don't believe the

14   rule would prohibit them from asking for some kind of written

15   confirmation.

16            THE COURT:  Well, the schools are facing having to

17   provide education to their teachers, to school administrators

18   on the impact of this rule, and they have to do that by August

19   1st, unless enjoined.  And if I'm in a setting where if you

20   can't tell me what the limitations are as counsel in this

21   case, how can the schools be expected to hire someone to teach

22   the number of teachers that they have if we just take

23   Tennessee, for example?

24        I'm assuming that there may be some different opinions

25   about how you go about determining what the person's gender

1    identity might be.  People usually don't carry cards in their

2    pocket saying, This is the way I identify.  There has to be

3    something more than that.

4        Would you agree?

5        MS. TULIS:  Your Honor, the rule gives recipients

6    some flexibility to make their determinations on policies in

7    this regard, but --

8        THE COURT:  Okay.  What are the limitations on the

9    schools' ability to make those policies and where are they in

10   the rule?

11       MS. TULIS:  Yes, Your Honor.  The rule specifies that

12   written confirmation is not a problem under the rule.  It does

13   specify there be certain instances in which the recipient

14   could require unduly burdensome documentation that would be

15   outside the scope of what's permitted by the rule because it

16   would be more than necessary for the purpose essentially and

17   cause harm itself.

18       THE COURT:  All right.  Let me give you another

19   hypothetical, because I want to see exactly how vague this

20   rule is or see if we can get to this point.

21       A student from a divorced family, parents are divorced.

22   The student says, I identify as female.  His gender is male,

23   but he identifies as female.  The mother says, and she is the

24   custodian of the child, No, he's not.  Don't you dare allow

25   him to identify as female.  The father, who doesn't live with

*DEFENDANTS - Tulis*                                                      141

1      the child through the divorce, says, Yes, he is.  So the

2      school has conflicting opinions, one from the student and

3      different opinions from the parents.  How do the schools

4      resolve that issue?

5              MS. TULIS:  Your Honor, I apologize that I cannot

6      speak to that specific scenario.

7              THE COURT:  And if you can't, then they can't either,

8      correct?

9              MS. TULIS:  Your Honor, the Department of Education

10     regularly answers questions and offers guidance about applying

11     its rules and regulations.

12             THE COURT:  So we're two months out from these rules

13     going into effect.  You know this is a key issue in the case,

14     and that is the vagueness of these rules, but you can't answer

15     the hypothetical.

16             MS. TULIS:  Your Honor, I am not an expert from the

17     Department of Education, unfortunately.  I am a litigator, and

18     I can tell you what the rule says and what the Department of

19     Education's resources are to help recipients interpret it.

20         But I also want to emphasize again that we're talking

21     here about one provision of the rule, which in the

22     government's view is not vague, is clear, it sets a clear

23     standard.  No standard can account for every hypothetical, it

24     can only give guidance and set a standard to be applied with

25     terms that are understood in the law and in practice, and that

1     has been done here.

2          To the extent recipients need more guidance, they can ask

3     for that from the Department of Education, but it doesn't mean

4     that the rule is vague simply because it doesn't explain how

5     every specific hypothetical scenario would play out.

6          THE COURT:  If there are two reasonable outcomes of

7     an interpretation of a rule, would you agree that the rule

8     itself may be vague?  If there are two reasonable

9     interpretations.

10          MS. TULIS:  Your Honor, in this case, I'm not sure

11     what the two interpretations we'd be looking at would be.  I

12     think there's a difference between a rule being vague in its

13     meaning and there being inability to answer its application to

14     fact-specific scenarios in every case.  A rule can be clear

15     and you still might not be able to predict how it is going to

16     play out in every fact-specific scenario.

17          THE COURT:  I'm sorry.  Go ahead, please.

18          MS. TULIS:  Your Honor, addressing the "hostile

19     environment harassment" definition in 106.2, which I believe

20     was addressed by interveners as well as plaintiffs.  They've

21     raised concerns about that definition's implications for First

22     Amendment interests.  But this definition is consistent with

23     one that has been applied by the Department of Education for

24     many, many years prior to 2020.  It's also consistent with the

25     standards that -- with similar standards that courts and the

1    EEOC have applied in the context of other civil rights

2    statutes.

3         Recipients have always had to balance their First

4    Amendment obligations to teachers and students against their

5    obligations to prevent and address harassment under Title IX.

6    That's nothing new, and this standard does not create a new

7    problem for recipients.

8         THE COURT:  Let me get back to the comment that I

9    made earlier as we were finishing the morning session.

10        It appears to me that when you develop a rule that

11   essentially prohibits or chills the speech of a teacher both

12   within the school and outside of the school, you limit what

13   the teacher can say and the way that they can say it.  It

14   seems to be not only in violation of the holding in

15   *Meriwether*, but it seems to be a bit totalitarian to me.  In

16   other words, you're basically telling these teachers they

17   cannot comment upon issues of public importance, even if those

18   interests of public importance are areas in which they teach.

19        MS. TULIS:  Your Honor, the rule doesn't say that,

20   and I don't think it anywhere implies that.

21        The standard set forth at 106.2, the definition of

22   "hostile environment harassment" has a number of factors that

23   would have to be met before harassment could be found, and

24   this is a definition that is meant to guide recipients in how

25   to prevent discrimination in their programs.

1          It is not something that limits the topics of individual

2    speech.  It is not something that bars any particular speech.

3    It has requirements that anything that would constitute

4    harassment has to be subjectively and objectively offensive,

5    has to be severe or pervasive, it has to -- contrary to some

6    of the other cases cited by the plaintiffs and interveners, it

7    has to actually limit or deny a person's ability to

8    participate in an educational program.  And the department

9    further has listed many factors that would have to be met

10   before you could find all of these things were satisfied.

11         THE COURT:  Let's take, then, the facts presented in

12   the *Meriwether* case, and you tell me whether those factors

13   would constitute a violation of the current rule, this

14   professor who refused, based on religious reasons, to refer to

15   the student by the student's requested pronoun.

16         MS. TULIS:  So, Your Honor, in *Meriwether*, based on

17   the facts found by the Court in that case -- and just to

18   refresh everyone's recollection, that case was a First

19   Amendment case, and the Court was discussing Title IX in that

20   context only to the extent that the school tried to invoke

21   their obligations under Title IX as a compelling interest

22   allowing them to restrict the professor's speech.

23         And in that case, it wasn't simply -- what was being

24   challenged was not a broad harassment policy that has very

25   clear factors that would have to be met to find harassment,

1    but an actual decision, you know, telling the professor, you
2    can't do this, you have to do that.

3         And one of the things that the *Meriwether* court found,
4    and the reason why they discounted the University's attempt to
5    rely on Title IX to provide a compelling interest in their
6    actions, was that they found that actually the professor's
7    challenged words did not create the kind of hostile
8    environment that would be a problem under Title IX, basically.
9    So they discounted it -- let me get the actual language for
10   you.

11        They rejected the reasoning because there was no
12   indication at this stage of the litigation that *Meriwether's*
13   speech inhibited Doe's education or ability to succeed in the
14   classroom.  So they rejected that there was some compelling
15   interest in infringing on the speech of the professor because
16   there wasn't the harm that would have had to underlie any kind
17   of claim under Title IX.

18             THE COURT:  And the person making the decision --
19   Bauer, I think, was his name -- even admitted that the
20   professor's conduct was not severe and pervasive, correct?

21             MS. TULIS:  Your Honor --

22             THE COURT:  Looking at page 511.

23             MS. TULIS:  Yes, Your Honor.  If that is -- I mean,
24   Your Honor, I would have to look at that page.

25        But to the extent there was a finding that the behavior

*DEFENDANTS - Tulis*                                                      146

1    wasn't severe or pervasive, again, that would be something

2    that would mean whatever was going on there wouldn't have

3    fallen within the definition of harassment that's at issue in

4    this case.

5            THE COURT:  And this was conduct that occurred

6    throughout the course of a semester with the student, correct?

7    Because the student objected early on in the semester.  The

8    professor explained his reasoning.  The professor went to the

9    school to try to reach some accommodation.  They continued

10   throughout the remainder of the semester.  And the student

11   actually received the highest grade in the class but still

12   made a claim against the professor for harassment.

13           MS. TULIS:  Your Honor, I don't believe it was -- I

14   think what happened was that the school -- yeah, the school

15   found this --

16           THE COURT:  They issued a Title IX report against

17   him.

18           MS. TULIS:  Right.  But the Court in this case

19   determined that that wasn't supported, basically.

20           THE COURT:  Correct.  But the school found that there

21   was a problem.

22       But my question is whether this fact pattern that -- the

23   Sixth Circuit found this was a violation of the First

24   Amendment, this professor's right of free speech.  This rule

25   that you're attempting to invoke August 1st would cover this

1     factual situation and find this to be a violation, wouldn't

2     it?

3              MS. TULIS:  No, Your Honor, I don't think that's

4     necessarily true.  I think the fact that the recipient, as the

5     Court found, may have made a mistake doesn't show that the

6     standard itself is somehow overbroad -- substantially

7     overbroad or invalid.

8              THE COURT:  Well, maybe I'm asking the question

9     incorrectly.

10         My question would be whether the fact pattern, not the

11     result that was reached, not the investigation that was

12     performed by the school or its retaliatory action against the

13     professor, or the Sixth Circuit's subsequent holding, but

14     whether the fact pattern, the professor's actions, would in

15     fact be a violation of the new rule as its written?

16              MS. TULIS:  Your Honor, I can only go with the facts

17     that were actually, you know, found by the Court in

18     *Meriwether*.  And based on the facts, the Court found that

19     there wasn't essentially a severe or pervasive situation and

20     that it did not actually inhibit the student's educational

21     experience.  That wouldn't satisfy a harassment standard under

22     the rule.

23              THE COURT:  All right.

24              MS. TULIS:  Your Honor, there were some questions

25     about the application of 106.31(a)(2), the bathrooms rule, and

*DEFENDANTS - Tulis*                                                        148

1    I'm happy to turn to those, or I'm happy to turn to other

2    issues.

3              THE COURT:  Whatever you prefer.

4              MS. TULIS:  I'm sorry?

5              THE COURT:  Whichever you prefer in whatever order

6    you wish.

7              MS. TULIS:  With respect to 106.31(a)(2), there were

8    some suggestions that the rule would somehow allow for

9    individuals to use it opportunistically to enter male or

10   female -- I guess female bathrooms and somehow use that to

11   abuse people who were using that bathroom, and there's simply

12   no basis for that.  And the suggestion that anyone could just

13   declare a particular gender identity to take advantage of the

14   rule is responded to by the rule's specification that

15   recipients can confirm gender identity.

16             THE COURT:  Well, then let me ask this.  Let's use

17   the example of the intervener A.C. in this case.

18        You have a situation where you have a male student who

19   identifies as female who gets an injunction to allow

20   participation on a sports team, correct?

21             MS. TULIS:  Yes, Your Honor.  That was an athletics

22   case, yes.

23             THE COURT:  And then by virtue of that, he would seek

24   to use the locker room of the female students?

25             MS. TULIS:  I'm sorry, Your Honor?

*DEFENDANTS - Tulis*                                                    149

1       THE COURT:  As a result of the injunction that he

2    received of being allowed to participate as a female on a

3    female team, he was using the locker room of the female

4    participants on that track team.

5       MS. TULIS:  Your Honor, I may be misremembering

6    B.P.J., but my understanding is the question in that case went

7    to the inclusion of B.P.J on a sex-separate female athletic

8    team.  It did not specifically address bathroom facilities or

9    locker room facilities, it was about sex-separate athletic

10   teams.

11      THE COURT:  All right.  Well, then I'll change the

12   hypothetical.

13      Let's assume for a moment that a student such as -- is it

14   B.M.J.?  B.M.J., isn't it?

15      MS. TULIS:  In the A.C. case?

16      THE COURT:  Yes.

17      MS. TULIS:  I think it's B.P.J.

18      THE COURT:  B.P.J., all right.

19      Let's assume a student identified by the initials B.P.J.

20   is male but identifies as female, he obtains an injunction to

21   participate on a girl's track team, track and field team, and

22   as a result of his ability to participate on that team also

23   insists on using the locker room facility and the rest room

24   facility that the girls were using that were also on the track

25   and field team.

1          How does the rule address that issue?

2          MS. TULIS:  Your Honor, are you asking about the

3    interplay between a court injunction and the rule in this

4    case?

5          THE COURT:  No, ma'am.  I'm asking you a very simple,

6    straightforward question.  And the question is whether a

7    student -- call him whatever you want to, ABC -- male,

8    identifies as female, participates on a girl's track team,

9    only girls, he's the only male but identifies as female.  He

10   travels with the team, he does all these other things with the

11   team, he places first in all the events that the team

12   participates in, but he also insists on using the locker room

13   and the rest room facilities that the girls are using for that

14   track team.

15        What does the rule say about that?  Is that authorized,

16   or can the state say, huh-uh, can't do it?

17        MS. TULIS:  Your Honor, let me try to break this

18   down.  My understanding --

19        THE COURT:  Why don't you just answer and then you

20   can break it down.

21        MS. TULIS:  Your Honor, in this case, the rule would

22   address a recipient's obligations with respect to the

23   bathrooms, locker rooms in its facilities, right.  So to the

24   extent that a recipient -- setting aside the athletics

25   question because this rule doesn't address athletics.  Just

1    locker rooms, bathrooms, those are affected by the rule.

2    Those are affected by 106.31(a)(2).  That's a recipient's

3    responsibility with respect to the program's activities within

4    its control, with respect to the facilities within its

5    control.

6         Whether the athletics -- the participation on the

7    athletics team, that's a separate question that hasn't been

8    addressed in this rulemaking, and so I think -- I apologize,

9    Your Honor, if I was getting confused, because this rule

10   addresses bathrooms, it doesn't address athletics.

11        THE COURT:  My question addresses bathrooms.  It may

12   involve athletics, but it doesn't necessarily require

13   athletics.

14        MS. TULIS:  Correct, Your Honor.  And that's why I --

15   I apologize if I was unclear in my answer.

16        THE COURT:  You're very unclear.  You're very

17   unclear.

18        MS. TULIS:  I apologize.

19        Your Honor, the rule would require a recipient, that is,

20   a school district or a school, to allow someone to use the

21   rest room or the locker room --

22        THE COURT:  It would allow a school -- it would allow

23   the student, but could the school say, no, can't do it?

24        MS. TULIS:  The recipient would be required --

25        THE COURT:  Is the school, is required.

1           MS. TULIS:  -- to not prevent --

2           THE COURT:  -- to allow the person -- not prevent is

3     to allow.

4           MS. TULIS:  -- to not prevent someone from using a

5     sex-separate bathroom or locker room consistent with their

6     gender identity, that's correct.

7           THE COURT:  All right.

8        So I would assume you would agree that that implicates

9     the privacy interest of the female students under that

10    hypothetical?

11          MS. TULIS:  Your Honor, as the Department of

12    Education recognized in the rule, there are privacy interests

13    at issue in locker rooms and other spaces like that.  And what

14    the --

15          THE COURT:  Is that a yes or a no?

16          MS. TULIS:  Yes.  There are privacy interests -- the

17    department recognizes there are privacy interests of all

18    students in those types of spaces, yes.

19          THE COURT:  How much weight is given to the privacy

20    interest of those students compared to the interest of the

21    male student who identifies as female in using those

22    facilities?  What balancing approach was used in promulgating

23    this rule?

24          MS. TULIS:  Your Honor, the department looked at the

25    record before it on those privacy interests and it

1    acknowledged them, and it determined that the privacy

2    interests that were at play would not be harmed merely by

3    complying with the rule, and that to the extent there were

4    privacy interests of any students, those could be accommodated

5    while still complying with the rule.

6              THE COURT:  How so?

7              MS. TULIS:  Your Honor, the rule mentions that

8    recipients can allow any student who doesn't feel comfortable

9    using a shared space for their bathroom to use single

10   occupancy bathrooms.  It notes that students can -- that all

11   students should have the opportunity, you know, to be able to

12   have the privacy they need.  What the rule -- what the

13   department did not accept was that there was some specific

14   harm to cisgender students from the presence of transgender

15   students in a single-sex space.

16             THE COURT:  But you're removing from that answer

17   undressing, dressing, and actually the bathroom facilities

18   themselves.

19             MS. TULIS:  I'm sorry.  I'm removing, Your Honor?

20             THE COURT:  Yeah.  You're not including that in the

21   analysis.

22             MS. TULIS:  Your Honor, the department considered all

23   the situations.  And my understanding is that, you know, just

24   the fact that there might be someone undressing in a stall or

25   another part of the bathroom --

1            THE COURT:  Most locker rooms don't necessarily have

2     stalls with doors.  At least men's locker rooms don't.

3     Perhaps women's do.

4         Have you ever been to a rural area of Kentucky,

5     Tennessee, Ohio, Indiana and looked at these schools?

6            MS. TULIS:  I'm not sure of those specific -- yes.

7     In Ohio I have, yes.  I think.

8            THE COURT:  So you know generally what the facilities

9     are like for locker rooms?

10           MS. TULIS:  Yes, Your Honor.  I used locker rooms in

11    high school.

12           THE COURT:  Okay, great.  All right.  So let's use

13    you as an example.

14        Would it cause you any privacy concerns if you were

15    changing clothes, putting on your uniform, let's say you're

16    high school or junior high, and a man walks in and he starts

17    doing the same thing?

18           MS. TULIS:  Your Honor, I will tell you, I don't

19    think my personal views are relevant to the rule that's before

20    the Court.  But I will say, you know, I am definitely someone

21    who it does not -- it is not really respect to what people's

22    sex or gender is, but I just am a more private person.  So,

23    yes, I would be someone who would choose the shower with a

24    curtain.  But that's me.

25           THE COURT:  All right.  So would it be reasonable

1    that there would be other individuals in that situation that

2    would have similar feelings to yours?  Let's say 15-year-old

3    girls.

4            MS. TULIS:  Your Honor, the point that I was trying

5    to make right here is, sure, I have privacy concerns, like

6    many do, and that's going to exist whether or not

7    someone whose --

8            THE COURT:  My point is getting to the argument that

9    the plaintiffs made earlier today, and that is, there were all

10   these comments that were submitted to this proposed rule, and

11   the department gave those comments short riff, basically just

12   by turning its hand and saying, well, those aren't really

13   concerns or those concerns are outweighed by other concerns.

14   You didn't really address that, or at least not that I can

15   find, in the history of the rule.

16        And while you're looking for that, let me ask you one

17   other question I was thinking about over the lunch hour.

18        Plaintiffs talked about the number of comments that were

19   submitted to this proposed rule.  I don't have the number in

20   front of me now.  But my question for you is whether the

21   department has ever received this number of comments, or

22   perhaps more, on any proposed rule dealing with Title IX?

23           MS. TULIS:  Your Honor, I don't know about that.  I

24   apologize.  I don't have a frame of reference for every rule

25   on Title IX or anything else.

1     I do know that I'm not sure what the plaintiffs -- that

2   plaintiffs represented the total number of comments.  I do

3   know that the department received comments in both directions

4   on this rule.  There were concerns and there were very

5   supportive comments.  There were comments that thought the

6   department didn't go far enough; there were comments that

7   thought the rule was right on point; there were comments that

8   had concerns regarding the rule; there were comments that were

9   grateful for the rule, the proposed rule.

10          THE COURT:  Tell me about the comments that you

11   received by those individuals or entities that felt that this

12   proposed rule did not go far enough.  What would they consist

13   of.  Give me an example.

14          MS. TULIS:  I'm sorry?

15          THE COURT:  Give me an example of something that did

16   not go far enough in this rule.

17          MS. TULIS:  Well, Your Honor, I was reading a comment

18   earlier today that some individuals wanted the department

19   actually to go further in 106.10, which is really the one that

20   just follows *Bostock*, and they wanted it to address separation

21   of students based on sex, and the department did not do that

22   in 106.10.  It did that separately in 106.31(a)(2).

23          THE COURT:  It wanted to address?

24          MS. TULIS:  I apologize.  It wanted the department to

25   address separation of students based on sex in 106.10 itself,

*DEFENDANTS - Tulis*                                                      157

1   the general provision describing the scope of prohibited sex

2   discrimination.

3           THE COURT:  And what about the other direction, what

4   kind of comments did you receive?

5           MS. TULIS:  I'm sorry, Your Honor.  There were

6   comments that expressed -- as Your Honor noted, there were

7   concerns about privacy interests, there were concerns about

8   bathrooms compliance with that part of the rule, among other

9   things.  I mean, the rule goes into great detail regarding the

10  comments received.

11          THE COURT:  I don't think I'm registering my question

12  with you, so I'll hold that for a response from the

13  plaintiffs.  They may be able to identify concerns that did

14  not go far enough, because it seems that this rule went pretty

15  far in extending the reach of Title IX.

16          MS. TULIS:  Your Honor, just to step back a minute.

17  Again, the only provision that really we've been discussing

18  for the past several minutes is 106.31(a)(2), which is one

19  part of a large rule.  And that provision is based on,

20  actually, a very well-established principle in discrimination

21  case law, which is that separate or different treatment

22  constitutes discrimination only if it causes cognizable harm.

23  That was recently re-articulated by the Supreme Court in

24  *Muldrow v. City of St. Louis*.  So that provision really just

25  articulates that well-established principle.

1    It then had to apply it.  And it applied it after making

2    a determination -- it granted an empirical determination that

3    limiting a student's ability to participate in sex-separate

4    facilities or activities consistent with their gender identity

5    causes more than de minimus harm.  That does not mean there

6    might not be other circumstances where recipients might also

7    have to take into account harm, but it made that determination

8    and it applied it.  That's really what it does.

9        I don't think -- that's not -- that's not departing from

10   well-established case law.  It's taking a principle that's

11   well-established in discrimination case law -- discrimination

12   is different treatment that causes harm -- and it's making a

13   reasonable determination based on the evidence before the

14   department about a predictable circumstance when that harm

15   will occur.

16       That's what the department's required to do under the

17   Administrative Procedure Act is to make a reasonable

18   determination based on the record before it.  It did so, and

19   then it determined that, nonetheless, it recognized in the

20   statute that Congress had accepted certain circumstances,

21   certain contexts from the general prohibition on sex

22   discrimination, and in those contexts, even if the sex

23   separation causes more than de minimus harm, it's permitted.

24   And that's what that provision reflects.

25       THE COURT:  You said "participate in sex-separate

*DEFENDANTS - Tulis*                                                                159

1    facilities."  I believe that was the phrase you used.

2          MS. TULIS:  Your Honor, let me use the exact language

3    of the rule.  I was paraphrasing.

4       "Adopting a policy or engaging in a practice that

5    prevents a person from participating in an education program

6    or activity consistent with the person's gender identity

7    subjects a person to more than de minimus harm on the basis of

8    sex."  That's the exact language.  I apologize for my

9    paraphrasing.

10         THE COURT:  All right.

11         MS. TULIS:  Your Honor, there were some questions

12   earlier today about the scope of relief that plaintiffs would

13   be entitled to in this case if Your Honor were to find that

14   some portions of the rule were invalid.  And, again, let's be

15   clear, plaintiffs have not challenged the vast majority of

16   this very large rule, including any of the procedures

17   regarding complaints of discrimination and all the details

18   regarding those.

19      The case law is very clear that a court needs to try to

20   save the portions of the statute or regulation that are lawful

21   even if it finds some portion is invalid.

22      In this case, the department has made clear that these

23   provisions are severable, and they are also completely

24   logically severable for the reasons I've discussed.  They

25   address separate issues, they rely on separate reasoning, and

1    there would be no basis for the Court to enjoin the whole rule

2    based on concerns regarding a very small portion of it.

3           THE COURT:  Would it be logical if the Court finds

4    that these provisions that are an issue here that we've been

5    discussing, the substantive parts of the rule, were either

6    invalid or were in violation of the First Amendment, or

7    whatever the situation may be, in other words, to invalidate

8    the substantive part of the rule but not the procedural part

9    of the rule?

10          MS. TULIS:  Your Honor, I don't think the rule can be

11   divided up that neatly.

12          THE COURT:  I think the plaintiffs agree with you on

13   that, that it cannot be divided up equally.

14          MS. TULIS:  Your Honor, my point is that there are

15   many substantive provisions of this rule; plaintiffs take

16   issue with essentially three of them.  There's many

17   definitions they don't take issue with.  In 106.2 there are

18   the procedures -- the grievance procedures provisions they

19   don't take issue with.  So it's not simply that the grievance

20   procedures are carved out and they take issue with everything

21   else, it's really three provisions.

22          And in issuing relief in this case, it's important that

23   Your Honor issue relief that is no broader than is necessary

24   to give full relief to the parties to the case.

25          There was some suggestion here that a nationwide

1    injunction would be necessary in order to address the

2    interests of the parties.  That hasn't been established.

3        The parties here are interveners who, my understanding of

4    their motion, seeks relief --

5            THE COURT:  The parties include interveners.

6            MS. TULIS:  Sorry.  The first set of parties -- I'll

7    start with the interveners.

8            THE COURT:  Yes, ma'am.

9            MS. TULIS:  They have sought relief with respect to

10   the specific individual A.C. as well as, my understanding is,

11   members of the Christian Educators Association who live in the

12   states or work in the states that -- who reside in the states

13   that are parties to this lawsuit.

14       The states in turn, their injuries are not the same as

15   the interveners.  The states are asserting injuries -- they do

16   not have standing to assert injuries of individuals.  They can

17   assert injuries on behalf of the state.  And you had testimony

18   today trying to explain what those injuries were in terms of

19   compliance costs or their predictions about what might happen

20   with funding if they were found to be in violation of the

21   rule.

22           THE COURT:  Would you agree -- I hate to keep

23   interrupting you.  But would you agree that a concern the

24   states have is loss of funding?  Or a concern the states

25   should have a loss of funding if this rule is implemented and

1      they don't follow it?

2              MS. TULIS:  Your Honor, what's before Your Honor

3      today is a motion for preliminary junction, and it's the

4      plaintiff's burden on a motion for preliminary injunction to

5      establish entitlement to preliminary relief based on very

6      strict elements, and one of them is a showing of imminent

7      irreparable harm, not just a showing that there may be

8      irreparable harm a year down the road if certain events come

9      to pass but irreparable harm that is imminent.

10             And with respect to any potential loss of federal

11     funding, that's not only speculative, but there is no basis to

12     find it could possibly be imminent even if every single one of

13     the steps that plaintiffs imagine might happen actually

14     happened.

15             THE COURT:  Is that because of the length of time the

16     procedure would take?

17             Let's assume for a moment that the states say, we're not

18     going to follow this rule on August 1st, we're not going to do

19     it, and you say, on behalf of the department, you need to

20     follow the rule, and you go through this procedure that was

21     outlined through the questions that were asked of the

22     witnesses.  And this starts on August 1st.  At the end of the

23     process, the states are penalized by the loss of funds.

24             So when does the injury occur, when the loss of funds

25     occur or when the action takes place that results in the loss

1    of funds?

2          MS. TULIS:  First, Your Honor, my understanding is

3    that Title IX is enforcing its recipients, and so -- a

4    recipient would be like a school district.

5          THE COURT:  Yes, ma'am.

6          MS. TULIS:  Yes.  So if a particular school district

7    did not comply with Title IX, there would have to be some kind

8    of investigation commenced to determine, like, if that was

9    actually the case if someone suggested they were not complying

10   with Title IX.

11         THE COURT:  Ma'am, I understand the questions that

12   were asked by your co-counsel in the case in terms of the

13   procedure and the length of time it takes.  I'm accepting that

14   as being the situation, that it takes a long time for these to

15   play out.  But the question really is a really simple one.

16         And that is, on August 1st, the states say, this rule is

17   in effect, we're not going to comply.  We think this violates

18   all kind of provisions.  This crazy judge didn't issue this

19   injunction that we asked for.  The rule is now in effect,

20   we're going to have to comply with it.  We haven't educated

21   anyone about how to apply and we're just not going to do it.

22   And you go through this process, the meat grinding process.

23   But they say on August 1st, we're not going to do it, and

24   based on that action on August 1st, eventually they're

25   penalized by the loss of federal funds.

1          When does the injury occur, when they lose the federal

2     funds three years from now or when they say to you, We're not

3     going to follow this?

4          MS. TULIS:  Your Honor, to the extent their claimed

5     injury is loss of federal funds, the injury does not occur

6     until that loss of federal funds actually occurs.

7          THE COURT:  All right.  So your position is, it

8     wouldn't occur until somewhere down the line, and, therefore,

9     they could not have a claim for irreparable injury until they

10    lose those funds?

11         MS. TULIS:  Your Honor, our position is, they

12    certainly couldn't have a claim for preliminary relief in a

13    showing of imminent irreparable harm with respect to that

14    funding theory.

15         THE COURT:  So they are in danger of losing federal

16    funds if they don't comply with what you're asking that they

17    comply with?

18         MS. TULIS:  Your Honor, any recipient that doesn't

19    comply with Title IX theoretically faces a loss of federal

20    funding.

21         THE COURT:  Yes, ma'am, I understand that.

22         MS. TULIS:  But, again, preliminary relief is a high

23    bar -- preliminary injunction is a high bar and the

24    irreparable injury has to be concrete, particularized, and

25    imminent.

1          THE COURT:  Yes, ma'am.

2      Do you know how many injunction hearings and cases I've

3  handled in my career?

4          MS. TULIS:  I'm sure very, very many.  I apologize

5  for stating the obvious, Your Honor.

6          And with respect to that kind of relief -- just going

7  back to the scope of relief again.  The states here, the harms

8  they're claiming, even if the Court were to decide it needed

9  to issue an injunction to remedy those harms, for instance, a

10  fear that they would lose funding because there's a state law

11  requiring a bathroom practice that conflicts with the rule,

12  remedying that harm requires no more than -- would require no

13  more than enjoining enforcement of the portion of the rule

14  addressing bathrooms with respect to the states that are here

15  before Your Honor.  It would not require issuing a nationwide

16  injunction or enjoining other portions of the rule.

17          THE COURT:  I'm sorry, do you need to confer?  I'm

18  sorry.

19          MS. TULIS:  And once the Court has determined, based

20  on the structure and text of the regulation, that it is, as

21  we've shown, severable, then the district court can -- if it

22  determines it needs parts of that rule to be enjoined, it's

23  the district court's -- as Your Honor well knows, I won't

24  recite the standard to you, but your injunction would specify

25  what the parties needed to know.

1      Your Honor, I just want to address some of the materials

2   that were put on and reply to the extent plaintiffs have

3   alluded to fears of enforcement based on complaints filed by

4   individuals that address some of these issues.

5      They put as an exhibit to their reply on Office of Civil

6   Rights complaint.

7           THE COURT:  It's Exhibit 3 to the reply that was just

8   filed this past --

9           MS. TULIS:  Or a response to a complaint, I guess it

10   was.  I apologize, Your Honor.

11      And basically, that was -- all that is is the department

12   receiving a complaint from someone, determining that there's a

13   possible -- and this complaint raised many issues --

14   determining there's a possible violation of Title IX and that

15   it will look into it basically.  It's not an enforcement

16   proceeding, it's not an enforcement action, it's not a finding

17   that the recipient violated Title IX.

18           THE COURT:  It's that first step that you were about

19   to talk about just a few moments ago.

20           MS. TULIS:  Yes.  And nothing in that letter,

21   contrary to the plaintiff's suggestion, relied on the guidance

22   that was enjoined by the district court in Tennessee.

23      Your Honor, just to be clear to make sure we're all on

24   the same page regarding athletics.  The interveners have

25   raised some questions about athletics, and I understand

*DEFENDANTS - Tulis*                                                              167

1    they're very concerned about that issue.  I know that A.C. in

2    particular is very concerned about athletics.  But this rule

3    is crystal clear that it doesn't address sex-separate athletic

4    teams.

5           THE COURT:  It's kind of like *Bostock* saying we're

6    not addressing Title IX, isn't it?

7           MS. TULIS:  Well, I think it's as clear as *Bostock*

8    was about what it's not addressing, you know, and it explains

9    why it did that.

10   And I think as Your Honor was talking about some of the

11   particular purposes in Title IX with respect to sports, that's

12   one reason we've always had these athletics regulations at

13   106.41 that address the specific context of sports and

14   athletic teams.  And the rule makes very clear that it is not

15   dealing with sex-separate athletic teams right now, that's

16   going to be dealt with in a separate rulemaking, and any

17   relief or injury that is being brought up by interveners with

18   respect to athletics is simply not properly before the Court.

19   This rule just doesn't address it.  There are athletic

20   regulations in place.

21          THE COURT:  Well, I think the argument that was being

22   made by the intervener was that this does have impact on

23   athletics.  Locker room facilities will have a direct impact

24   upon athletics.  There may be impacts upon other activities,

25   such as the band example that I used earlier, traveling, the

*DEFENDANTS - Tulis*                                                          168

1    band that's traveling to a competition that has to rent a

2    certain number of rooms.

3         MS. TULIS:  Your Honor, I'm glad you brought that up.

4    I would like to address that, yes.

5         THE COURT:  Address it in the context of Section

6    1686, if you could.  Because Section 1686 says,

7    notwithstanding anything to the contrary contained in this

8    chapter, nothing contained herein shall be construed to

9    prohibit any educational institution receiving federal funds

10   under this act from maintaining separate living facilities for

11   the different sexes.

12        MS. TULIS:  Yes, Your Honor, that's true.  That's

13   absolutely correct.

14        THE COURT:  So your position would be that this

15   applies to dorm rooms, for example, that schools could

16   maintain separate living facilities, dorm rooms?

17        MS. TULIS:  Dorms, yes.

18        THE COURT:  But the same reasons that you could have

19   separate living facilities in dorms would not extend to locker

20   rooms, and it would not extend, I would assume, to temporary

21   living facilities, such as a hotel or motel that students are

22   using when they're traveling on a trip.

23        MS. TULIS:  So, Your Honor, I think locker rooms,

24   you're right, the rule addresses locker rooms.  But hotel

25   and --

*DEFENDANTS - Tulis*                                                        169

1            THE COURT:  But it's contrary to 1686, isn't it?

2            MS. TULIS:  Your Honor, I'll address both those

3     points in turn.  I think it's two separate points here.

4        1686 addresses living facilities.  The department

5     determined, based on the history of the regulations and what

6     Congress actually said, that bathrooms were not encompassed

7     within living facilities.  The original bathrooms regulation

8     at 106.33 was promulgated pursuant to the department's general

9     authority under 20 U.S.C. 1681 and 82, not pursuant to 1686,

10    and that was the department's determination.  I understand

11    Your Honor -- Your Honor can disagree with that determination,

12    but that was their determination.

13           THE COURT:  I think we're losing common sense in some

14    of these arguments.  What's the old saying?  In theory there's

15    no difference between a practice and theory, but in practice

16    there is.

17       So we're talking about -- let's talk about a dorm room.

18    What does a dorm room consist of generally?

19           MS. TULIS:  I think it depends on the dorm,

20    Your Honor.

21           THE COURT:  It does depend on the dorm.  You can have

22    some dorms that have a certain group of female students that

23    share a bathroom.  There can be a common shower area in a

24    men's dormitory, private facilities for showering, for going

25    to the bathroom.  So those are privacy concerns that were

1     addressed in 1686, right?

2        But your position is that those same privacy concerns are

3     not as important if you have students that are traveling on a

4     trip or students that are participating in athletics that are

5     using a locker room facility.  Somehow those are diminished

6     expectations of privacy.

7             MS. TULIS:  Your Honor, we're not conceding that at

8     all.  And I don't think that's -- I don't think that there is

9     a determination that Congress's reasoning in 1686 was that

10    particular thing or that it meant to include bathrooms.

11       But I just would really like to distinguish this

12    traveling on a trip to hotel rooms, because I think that's a

13    very different scenario because it doesn't involve the

14    recipient's facilities, you know, kids going to standard

15    hotels rooms.

16       There is nothing in the rule, that I'm aware of

17    certainly, that would prevent a recipient, a school, from

18    assigning particular students to stay with particular students

19    if they had to stay in rooms.  There's nothing that says you

20    have to make person A stay in the same room as person B

21    regardless.  I mean, that's a determination schools can make.

22    It doesn't have to do with the recipient maintaining living

23    facilities, or bathrooms for that matter.

24       With respect to Your Honor's question, again, the

25    department explained its reasoning for why it didn't find that

1    the regulation at 106.33 was a living facilities regulation

2    under the statute.  You know, I understand that Your Honor

3    finds that unconvincing, but the department set forth its

4    reasoning there and --

5         THE COURT:  I'm still trying to understand it.  Maybe

6    that's why I don't find it convincing is I don't understand

7    the reasoning.

8         MS. TULIS:  Your Honor, I think it's just based on

9    the text of the statute, that there were specific carveouts

10   that Congress did with respect to the exceptions at 1681(a)(1)

11   through (9) and 1686, and that it didn't have one of those for

12   bathrooms and locker rooms, and that that wasn't understood by

13   the department even at the time that the original regulation

14   was promulgated as being a subcategory of living facilities,

15   but rather something separate.

16        THE COURT:  Before you get to the next point, what is

17   the harm that would be suffered if the rules that are

18   currently in effect remain in effect?

19        MS. TULIS:  Your Honor, the harm is to the

20   government's ability to issue and enforce its regulations,

21   that it has gone through notice and common rulemaking here, it

22   has made determinations about what should be in the rule after

23   that whole process pursuant to the APA.  And the government

24   has made determinations that there are significant harms to a

25   number of students that would occur absent these rule changes.

1      So the harm is to the government's --

2           THE COURT:  I'm going to the balancing of interest.

3      So I've heard what the plaintiffs assert that their harm

4      would be if the Court does not enjoin this rule.  So my

5      question for you is:  What is the harm to the government if

6      the rule is enjoined?  And you're saying it's the government's

7      ability to enforce its regulations.  In other words, we are

8      the government and don't disagree with us.  And the second is,

9      harm to a number of students that would occur.

10          Can you further explain that harm?

11          MS. TULIS:  Yes, Your Honor.

12     As the department goes into some detail in the rule,

13     there have been findings by a number of respected medical

14     organizations that discrimination against individuals who are

15     transgender, including sex separation that prevents them from

16     using the facilities consistent with their gender identity,

17     causes real harm, serious harm.

18          THE COURT:  Now, that's the kind of argument that was

19     rejected in L.W., wasn't it, by Judge Sutton, about the use of

20     experts and expert opinions on those issues?  In that case, it

21     was medical opinions.

22          MS. TULIS:  Your Honor, my understanding, again, L.W

23     was an equal protection case and they were interpreting the

24     Equal Protection Clause.  In this case --

25          THE COURT:  In an injunction context.  Balancing

1    harms.

2         MS. TULIS:  Yes, Your Honor.

3         Here the department had, as Your Honor noted, a very

4    extensive record that it looked at, and it made these

5    determinations based on that record, based on feedback from

6    the public, based on the experience of medical organizations,

7    based on other court opinions that had found these harms.  And

8    those real harms are part of the public interest.  So the

9    balance of equities and the public interest merge for the

10   government.

11        So, yes, it is in the government's interest to be able to

12   promulgate and enforce its regulations that have gone through

13   notice and common rulemaking and reflect the determinations of

14   the executive branch.  But it is also in the public's interest

15   to address harms that are going to occur if protections aren't

16   in place that the department determined were necessary.

17        Your Honor, I would just summarize here.

18        Again, there's three parts of this rule that are at issue

19   today, only three parts.

20        The first one, 106.10, is a straightforward application

21   of the reasoning of *Bostock*.  There is no logical or

22   meaningful way to distinguish the language that the Supreme

23   Court interpreted in *Bostock* from the language that the

24   department is interpreting here on this very narrow question

25   of what discrimination on the basis of sex means.

1       Another provision, the one that defines sex-based hostile

2   environment harassment at 106.2, is a standard that is in

3   accordance with the department's enforcement of Title IX prior

4   to 2020 for many decades.  It aligns with similar standards

5   used by courts and EEOC in other civil rights contexts, and it

6   does not include any provision that would require a recipient

7   to infringe on the First Amendment rights of teachers or

8   students.

9       The third provision, 106.31(a)(2), is the only provision

10  that is before the Court that affects the issue of bathrooms

11  that's taken up so much discussion today.  And that provision,

12  likewise, is based on a well-established principle in case law

13  on discrimination, that different treatment is unlawful

14  discrimination when it causes cognizable harm.

15      THE COURT:  You seem a bit offended that I've taken

16  up so much time on the privacy interest of young girls,

17  15-year-old girls that are in middle school.

18      MS. TULIS:  Not at all, Your Honor.  I acknowledge

19  that is a concern that is addressed extensively in the rule

20  because it is a concern of many.

21      My point was just that if we want to focus on those

22  concerns, we're focusing on a particular provision, and that

23  while this is a long rule and there is more than one provision

24  challenged by the plaintiffs and interveners, the focus for

25  the Court, if the Court wants to address those concerns in

*DEFENDANTS - Tulis*                                              175

1    some way, is on 106.31(a)(2) and no other portion of the rule.

2          THE COURT:  You indicate that the harm that's to be

3    balanced in this case is harm of certain students.  You have

4    not identified those students as the students that were

5    intended to be the beneficiaries of the statute originally,

6    have you?

7          MS. TULIS:  Your Honor, as the department sets forth

8    in the rule, Title IX is supposed to protect the rights of all

9    students and to protect all students from sex discrimination,

10   and that includes students who identify as a gender different

11   from their sex assigned at birth.

12         THE COURT:  Well, then I'll ask you the question that

13   I'd asked earlier of your opposing counsel and see if you

14   agree or disagree with this analysis.

15      You acknowledge the binary concept of gender, male and

16   female.

17         MS. GHEIBI:  Your Honor, for the Court's purposes

18   today, that is the assumption that we are proceeding on for

19   all our discussions today.

20         THE COURT:  So you accept the definition male and

21   female.  If we assume that the statute -- you may disagree

22   with this.  But if you assume that the statute, when passed in

23   1972, was intended to increase opportunities and level the

24   playing field for female students, that's one group, and if

25   you assume that male students who identify as female -- and I

1    know that you're not talking about sports -- but if we assume

2    that we have a group of male students who identify as female,

3    you're taking away opportunities from the group to be

4    protected, you're diminishing those opportunities for that

5    protected group, aren't you?

6              MS. TULIS:  Your Honor, as Your Honor noted, that

7    particular concern that Your Honor is addressing went to --

8    definitely went to the discussions of the athletics

9    regulations, which are not before Your Honor today.  As the

10   department has explained, Title IX protects all students from

11   sex discrimination.

12             THE COURT:  And if you have a female student or group

13   of students who feels that their privacy is being invaded by

14   allowing males to come into a locker room or a bathroom and

15   they're just not going to participate as a result of that, you

16   have indirectly diminished the opportunities for female

17   students, haven't you?

18             MS. TULIS:  Your Honor, I can't -- I can't concede

19   that hypothetical because I don't believe that's in the

20   record.  To the extent Your Honor is suggesting that there's

21   evidence that --

22             THE COURT:  So if you have, for example, a group of

23   students from West Virginia, track and field, that just refuse

24   to compete against a male student, in part because they're not

25   going to use the same locker rooms and bathrooms, you wouldn't

1   acknowledge that that's lessening the opportunities for those

2   students?

3            MS. TULIS:  Your Honor --

4            THE COURT:  You don't have to acknowledge.  If you

5   feel like that there's no basis for anyone to ever believe

6   that that might happen, you certainly don't have to concede

7   the point.

8            MS. TULIS:  Your Honor, I won't -- the rule and the

9   requirements of the rule, no, we do not concede that that

10  lessens opportunities for women under Title IX.

11           THE COURT:  All right.  Thank you.

12           MS. TULIS:  If Your Honor has no further questions,

13  we'll rest on our briefs.

14           THE COURT:  Thank you.

15      I'll hear briefly in rebuttal from plaintiffs and

16  interveners, if they have any additional information they'd

17  like to provide.

18      We'll begin with Ms. Hermandorfer.

19           MS. HERMANDORFER:  May I proceed, Your Honor?

20           THE COURT:  Yes, ma'am.

21           MS. HERMANDORFER:  I will try to keep this brief on

22  the last point about privacy harms.

23      So I heard my opposing counsel mention that the rule

24  acknowledged the privacy interest of non- -- I guess of, in

25  her words, cisgender students.  I can read you the full

1    acknowledgement.  This is what the language says.

2        This is page I.D. 433, the middle column.  "The

3    department does not agree with commenters who alleged there

4    was evidence that transgender students pose a safety risk to

5    cisgender students or that the mere presence of a transgender

6    person in a single-sex space compromises anyone's legitimate

7    privacy interest."  That's the discussion.

8        On the verification point Your Honor mentioned.  I also

9    heard my opposing counsel say that schools could require

10   documentation of gender identity.  What the rule says is, in

11   the very right-hand column on page I.D. 432, it says that

12   sometimes schools are able to rely on consistent assertions of

13   gender identity or written documentation.  But that's

14   certainly not permitted, because the next sentence says,

15   "However, requiring a student to submit to invasive medical

16   inquiries or burdensome documentation requirements to

17   participate in a recipient's education program or activity

18   consistent with their gender identity imposes more than

19   de minimus harm."

20       So, in other words, requiring written, in their words,

21   burdensome documentation -- it's not defined -- itself

22   inflicts more than de minimus harm in their view that would

23   violate Title IX.

24       So how schools are supposed to both protect privacy

25   interests and verify that everyone should be in the bathroom

1    they are supposed to be in and also comply with that language

2    is anyone's guess.

3        Now, on the distinction that opposing counsel drew

4    between the various provisions of the regulatory text at issue

5    here, I believe I heard her, you know, set up that 106.10 is

6    separate from 106.31's sex-separate discussion.  And that, I

7    submit, is -- it's hard to understand how that would be

8    carried out.

9        If you think about how this Final Rule came about, before

10   there was any mention of this whole de minimus harm notion --

11   which the fact that that is purely separable from the

12   provision implementing on the basis of sex in their view shows

13   that it's really coming from nowhere, it's coming out of thin

14   air.

15       Putting that to the side, courts like the Fourth Circuit

16   and the Seventh Circuit and the Eleventh Circuit decision that

17   was reversed en banc in Adams, they had no 106.31, they had no

18   sex-separate regulation.  They were only interpreting on the

19   basis of sex.  And they were using that -- they were using

20   this *Bostock* theory to posit that not allowing someone to

21   participate consistent with gender identity itself violated

22   *Bostock* and itself was discrimination on the basis of sex.

23       So even if Your Honor were to set aside this whole

24   de minimus harm concept in 106.31, that would leave you with

25   106.10, which says gender identity discrimination equals sex

1    discrimination.  And whether there's a separate regulation or

2    not, we know courts and the department's enforcement practices

3    posit that that separate provision would, likewise, be

4    violated by sex-separated enforcement of private spaces.

5        On dorms, Your Honor, for a clear statute or purportedly

6    clear implementation of Title IX in a clear text, I'm not

7    quite sure I understand how a school is supposed to apply the

8    housing facilities or living facilities statute in that

9    portion of the rule.  There would be, I guess, a dorm room

10   that only had rooms, and down the hall there would be a

11   different rule for bathrooms.  This whole slicing and dicing

12   just, I think, indicts the implausibility that Congress wanted

13   to set up a distinction between a dorm room and a bathroom or

14   a shower for purposes of what constituted discrimination.

15       And if you think about some of the regulations that were

16   also adopted in 1975, the story only gets worse for the

17   government.  Because in their view, it would be discrimination

18   not to allow a boy who does not have female biological parts

19   to attend the sex ed class with females, that's unlawful sex

20   discrimination, but the boy would not -- the school would not

21   be precluded from keeping that boy from a beauty pageant or a

22   mother/father dance or the Girl Scouts or the other bases of

23   exclusion that they say somehow discrimination is permitted.

24       So, again -- and even the department can't get its story

25   straight on dorms.  In the 2016 "Dear Colleague" letter, at

1    page 4, the department read the housing -- living facilities

2    provision differently and said you are not allowed to enforce

3    sex separation in dorms.  That was 2016.  That might be one of

4    the areas where some of these commenters thought the rule

5    should go far enough.  After all, the department used to think

6    you could not separate sexes in dorms.

7         I told you that there was one fundamental question in

8    this case that really cut to the heart of it, and that is,

9    where is the disparate treatment of similarly situated

10   individuals?  And I didn't hear my opposing counsel propose an

11   answer to that, which is the dispositive reason why there is

12   no intentional discrimination, as even *Bostock* defined that

13   term, when schools enforce sex-separated spaces.

14        And the last point I'd say on balancing the equities.  So

15   this is a complicated issue in terms of how to balance the

16   privacy interest of students who do not feel comfortable in

17   spaces with members of the opposite sex and the harms that

18   some of those students who identify as a different gender

19   feel.  And that shows why, you know, separation of powers and

20   requiring things to be done the right way under our system

21   isn't just a theory, it matters in practice, and that's

22   because legislative compromise are how you accommodate these

23   competing interests.

24        So the fact that the rule has converted a statute for its

25   own purposes, which as Your Honor pointed out, it's not just

1    that it's extending, it's completely subverting and turning on

2    its head the purposes of Title IX, which were to protect and

3    level the playing field for women.

4            THE COURT:  Ms. Hermandorfer, have there been

5    legislative proposals to address gender identity in the last

6    ten years at the national level?

7            MS. HERMANDORFER:  There have, Your Honor.  They're

8    cited in our complaint, I believe, proposed and rejected.

9            THE COURT:  So your position is, that's the proper

10   legislative process rather than to use a statute that's been

11   in existence for the number of years that this has, 52 years,

12   and attempt to engraft something that did not pass through the

13   legislative process using the rulemaking procedure?

14           MS. HERMANDORFER:  That's right, Your Honor.  It

15   comes down to, as Chief Judge Sutton would call it, a who

16   decides question.  And it's our unelected regulators from

17   Washington making nationwide policy through rulemaking that

18   gives short shrift to many interests as we've discussed today,

19   or is this to be done at the state and local level where

20   communities can vindicate their values or where Congress can

21   adopt solutions that are accommodating or balancing all of the

22   interests instead of pursuing one interest group's interests

23   over all else.

24       So for the reasons we've given, we submit that we've

25   shown a significant likelihood of success on the merits and

1    that preliminary relief should issue forthwith from

2    Your Honor.

3         Thank you so much.

4              THE COURT:  Thank you.

5         Mr. Frampton, if you have some response to government's

6    arguments, I'll hear from you.

7              MR. FRAMPTON:  Thank you, Your Honor.  I will be

8    brief.

9         Let me just begin.  There was a colloquy between

10   Your Honor and the government about what the holding was in

11   L.W. with respect to the application of *Bostock* beyond

12   Title VII.  I would just refer the Court -- we'll recite this

13   when our reply brief comes due here in just a little bit, but

14   I would refer the Court to the government's cert petition in

15   that case, in the L.W. case, where they say, on no less than

16   three occasions, that one of the holdings of L.W. is that

17   *Bostock* does not apply beyond Title VII.  And I would suggest

18   that I think they got it right in their cert position and are

19   getting it wrong here.

20             THE COURT:  Is the government equitably estopped from

21   making the argument here in light of that statement in the

22   cert petition?

23             MR. FRAMPTON:  Potentially, Your Honor.  I know that

24   estoppel typically runs to questions of fact rather than

25   questions of law.

1    THE COURT:  Typically not against the government as

2    well.

3         MR. FRAMPTON:  Fair enough.  Fair enough.

4    Your Honor, it was puzzling to me when the government

5    seemed to indicate that the fact pattern in *Meriwether* would

6    not violate the Final Rule because it ignored new Section

7    106.31(a)(2) which said that not treating someone consistent

8    with their gender identity automatically causes more than

9    de minimus harm.  Obviously, declining to use someone's

10   self-selected pronouns is going to be inconsistent with their

11   asserted gender identity and automatically cause more than

12   de minimus harm, which, frankly, flies in the face of the

13   holding in *Meriwether*.

14        THE COURT:  Would it also be pervasive if it occurs

15   over the course of a semester?

16        MR. FRAMPTON:  Of course it would, Your Honor.

17   Pronouns are pervasive.  That's the nature -- the nature of

18   the beast is that we refer to each other in a variety of ways,

19   particularly if this is a student-teacher relationship.

20        And it also flies in the face of the government's own

21   position, as I said, in their amicus brief in Kluge, where

22   they said that if you accommodate someone who is in

23   *Meriwether*'s position, you're risking a Title IX violation.

24        So I think there are a number of reasons to be skeptical

25   of the government's answer to --

1   THE COURT:  That was the reason for my question about

2   Ms. Gaines that I asked before the lunch break.

3   MR. FRAMPTON:  Absolutely, Your Honor.

4   There was some discussion with the government about

5   whether the rule would be used opportunistically.  And I'd

6   simply note, the privacy concerns that people like A.C. would

7   have exist regardless of whether the rule is being used

8   opportunistically or is simply being used as the government

9   intends for it to be used, because you've still got an

10  adolescent girl being forced to shower and change in front of

11  someone who's anatomically male, and those privacy concerns

12  exist regardless.

13  The next thing I heard the government say on that point

14  that was interesting is they said, you know, we care about

15  privacy and a school can give students additional privacy.

16  Well, Your Honor, of course, in theory and in a perfect world,

17  a school can build the Taj Mahal of locker rooms that's going

18  to have, you know, perfectly private stalls for every student,

19  but that's not the world that we live in.

20  And the question before the Court is what does this Final

21  Rule require, and what this Final Rule requires is that you

22  allow the male student into the female shower, understanding

23  that in many of those situations, there will not be privacy.

24  It's no answer to say, well, the school could do more than

25  that if it wanted to.

1    Title IX, which was supposed to protect those girls, is

2    saying you have to let the male in, and if you want to do more

3    than that, it's on you, school.  That's the opposite of what

4    Title IX really does.

5    They also said that -- this was another puzzling answer

6    that had to do with the assigning of hotel rooms on the band

7    camp trip.  They said, I think, nothing in the rule that would

8    prevent assigning person A versus person B.  But, again, we

9    have new Section 106.31(a) saying adopting a policy or

10   engaging in a practice that doesn't treat someone consistent

11   with their gender identity automatically causes more than

12   de minimus harm.

13   So a straightforward application of that is, if you're on

14   the band trip and a school is assigning hotel rooms by sex,

15   you know, we're going to put two boys in a room, two girls in

16   a room, well, then under new Section 106.31(a)(2), you have to

17   treat the male student who identifies as female as female.

18   So the application is pretty straightforward there, and I

19   didn't understand the government's response on that point, and

20   I don't see how they get around their own regulatory language.

21   THE COURT:  I believe the reference was that it was a

22   different section that applied.  It wasn't carved out.

23   MR. FRAMPTON:  Well, I mean, they seem to say that it

24   wouldn't be a living facility, which would be a carveout.  And

25   if it's not a living facility, then it's subject to the more

1   than de minimus harm standard in 106.31(a)(2), and you're

2   going to be stuck with having to treat the student according

3   to their gender identity rather than their sex.

4       They said that the harassment standard is similar to

5   others, and that sort of ignores that -- in the Final Rule

6   itself, they admitted that they were broadening the harassment

7   standard.  And they further didn't deal with that "some

8   effect" language that I pointed out to the Court earlier,

9   which makes the case effectively indistinguishable from

10  *Cartwright*.

11      And I would say, they also tipped their hand with the

12  citation to *L.M. against Middleboro* where they are approving

13  of punishing a student simply for saying there are only two

14  genders and that's how their harassment policy is going to

15  apply.

16      On athletics, they're ignoring the fact that 106.41(a) is

17  still in the regulations and that 106.10 affects how you

18  interpret that, it has to.  It now says that gender identity

19  is part of the statute.  It imports *Bostock* into athletics

20  reasoning.  So I think they haven't really addressed that and

21  you're going to have an effect on athletics.

22      And those were my specific points.

23      I would just say, at a fundamental level, Your Honor,

24  Title IX is a statutory and regulatory regime that recognizes

25  the validity and enduring importance of sex-based

1    distinctions.  The Final Rule ignores that and elevates gender

2    identity over sex in areas where sex is what really matters,

3    and that's going to harm women, girls, and teachers like the

4    people that we've presented to the Court.

5         THE COURT:  Thank you.

6         MR. FRAMPTON:  Thank you, Your Honor.

7         THE COURT:  One other question, counsel,

8    Mr. Frampton.  When do you anticipate submitting your reply

9    brief?

10        MR. FRAMPTON:  Your Honor, it is due next week under

11   the local rules.  I don't recall off the top of my head which

12   day next week.  I want to say next Wednesday or Thursday.  If

13   that time frame is problematic to the Court, I'm certainly

14   happy to address that.

15        THE COURT:  That's fine.  Whatever the local rules

16   provide, you'll have the time to submit your brief.  The

17   matter will stand submitted upon that brief being filed in the

18   case.  I don't see a need for further briefing on any of these

19   issues.

20        MR. FRAMPTON:  Thank you, Your Honor.

21        THE COURT:  I do appreciate counsel's attendance

22   today, their responsiveness to my questions, and all of the

23   materials.  I also appreciate the witnesses that appeared

24   today that testified in this matter.  The motions will be

25   taken under advisement pending submission of those final

189

1    briefs.

2        We'll be in recess.

3        (Proceedings concluded at 2:40 p.m.)

4                              *  *  *

5

6                    C E R T I F I C A T E

7        I, LAUREN I. GOOTEE, RMR, CRR, certify that the
foregoing is a correct transcript from the record of
8    proceedings in the above-entitled case.

9

10   _/s/ Lauren I. Gootee_              June 27, 2024_
     LAUREN I. GOOTEE, RMR, CRR         Date of Certification
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **INDEX**

2     <u>**PLAINTIFFS' WITNESSES**</u>

3     **CHRISTY BALLARD**
      Direct Examination by Mr. Griffin................ Page 5
4     Cross-Examination by Ms. Gheibi.................. Page 25
      Redirect Examination by Mr. Griffin............. Page 31
5
6     **DAVID THURMAN**
      Direct Examination by Mr. Griffin................ Page 34
      Cross-Examination by Ms. Gheibi.................. Page 48
7     Redirect Examination by Mr. Griffin............. Page 51

8     **STEVEN GENTILE, Ed.D.**
      Direct Examination by Mr. Griffin................ Page 53
9     Cross-Examination by Ms. Gheibi.................. Page 62

10

      Plaintiff States by Ms. Hermandorfer............ Page 72
11    Intervenor Plaintiffs by Mr. Frampton........... Page 109
      Defendants by Ms. Tulis......................... Page 129
12    Plaintiff States' Rebuttal by Ms. Hermandorfer... Page 177
      Intervenor Plaintiffs' Rebuttal by Mr. Frampton.. Page 183

13

14

15

16

17

18

19

20

21

22

23

24

25