## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

STATE OF TENNESSEE,
COMMONWEALTH OF KENTUCKY,
STATE OF OHIO, STATE OF INDIANA,
COMMONWEALTH OF VIRGINIA, and
STATE OF WEST VIRGINIA,

     *Plaintiffs,*

and

CHRISTIAN EDUCATORS ASSOCIA-
TION INTERNATIONAL, and A.C., by
her next friend and mother, Abigail Cross,

     *Intervenor-Plaintiffs,*

v.

MIGUEL CARDONA, in his official capac-
ity as Secretary of Education, and UNITED
STATES DEPARTMENT OF EDUCA-
TION,

     *Defendants.*

Case No. 2:24-cv-00072-DCR-CJS
District Judge Danny C. Reeves
Magistrate Judge Candace J. Smith

---

## THE STATES' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT
## AND SUPPORTING MEMORANDUM

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. ii

Introduction ............................................................................................................................. 1

Background .............................................................................................................................. 2

    A.  The Final Rule Distorts Title IX's Prohibition on "Sex" Discrimination ........................ 2

    B.  The States Sue and Obtain Preliminary Relief. .............................................................. 4

    C.  The States Now Seek Permanent Relief, Including Vacatur. ........................................ 6

Legal Standard ........................................................................................................................ 6

Argument ................................................................................................................................. 6

I.   The States Are Entitled to Summary Judgment on Each of Their Claims .......................... 7

    A.  The Final Rule Exceeds the Department's Authority to Implement Title IX. .................. 7

    B.  The Final Rule Violates the Constitution. ..................................................................... 18

    C.  The Final Rule Is Arbitrary and Capricious ................................................................. 20

II.  The States Are Entitled to Vacatur, a Permanent Injunction, and Declaratory Relief. ...... 23

    A.  This Court Should Vacate the Entire Final Rule. .......................................................... 23

    B.  This Court Should Also Grant Declaratory and Injunctive Relief to the States. ............. 24

Conclusion ............................................................................................................................. 25

Certificate of service ............................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ................................................................................................................. 19

*Adams v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) .................................................................................. 8, 9, 10, 15

*Arangure v. Whitaker*,
911 F.3d 333 (6th Cir. 2018) ...................................................................................................... 8

*Arkansas v. Dep't of Educ.*,
2024 WL 3518588 (E.D. Mo. July 24, 2024) ........................................................................... 5

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) .............................................................................................................. 11

*Bloomberg L.P. v. SEC*,
45 F.4th 462 (D.C. Cir. 2022) .................................................................................................. 21

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........................................................................................................ *passim*

*Cardona v. Tennessee*,
U.S. No. 24A79 (filed July 22, 2024) ....................................................................................... 5

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*,
2024 WL 3381901 (N.D. Tex. July 11, 2024) .............................................................. 5, 16, 17

*City of Cleveland v. Ohio*,
508 F.3d 827 (6th Cir. 2007) .................................................................................................... 20

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
144 S. Ct. 2440 (2024) ............................................................................................................. 23

*D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*,
638 F. Supp. 3d 821 (M.D. Tenn. 2022) ................................................................................. 10

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ...................................................................................................... 10, 17, 18

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015) ..................................................................................................... 20

ii

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) .......................................................................................... 25

*Encino Motorcars LLC v. Navarro,*
    579 U.S. 211 (2016) .......................................................................................... 20

*Friends of Animals v. Ross,*
    396 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................... 6

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) .......................................................................................... 12

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) ........................................................................ 8, 22

*Gross v. FBL Fin. Servs., Inc.,*
    557 U.S. 167 (2009) .......................................................................................... 14

*Grove City Coll. v. Bell,*
    465 U.S. 555 (1984) ..................................................................................... 15, 21

*Johnson v. Bauman,*
    27 F.4th 384 (6th Cir. 2022) .............................................................................. 8

*Kansas v. U.S. Dep't of Educ.,*
    2024 WL 3273285 (D. Kan. July 2, 2024) ............................................... 5, 9, 19

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) ............................................................................ 10

*Kiakombua v. Wolf,*
    498 F. Supp. 3d 1 (D.D.C. 2020) .................................................................... 23

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ...................................................................................... 10

*L.W. v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023) ......................................................................... 2, 15

*Landmark Hosp. of Salt Lake City v. Azar,*
    442 F. Supp. 3d 327 (D.D.C. 2020) .................................................................. 6

*Long Island Power Auth. v. FERC,*
    27 F.4th 705 (D.C. Cir. 2022) ........................................................................... 7

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ....................................................................................... 7

*Louisiana v. U.S. Dep't of Educ.*,
  2024 WL 2978786 (W.D. La. June 13, 2024) .................................................... 6

*Louisiana v. U.S. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) .................................................................. 21

*M.L.B. v. S.L.J.*,
  519 U.S. 102 (1996) ........................................................................... 12

*Meister v. U.S. Dep't of Agric.*,
  623 F.3d 363 (6th Cir. 2010) ................................................................. 9

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) .............................................................. 15, 19

*N. Haven Bd. of Ed. v. Bell*,
  456 U.S. 512 (1982) ........................................................................... 14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ........................................................................... 11

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) ........................................................................... 19

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024) ........................................................................ 24

*Ohio v. United States*,
  986 F.3d 618 (6th Cir. 2021) ................................................................. 6

*Pelcha v. MW Bancorp, Inc.*,
  988 F.3d 318 (6th Cir. 2021) .............................................................. 13, 14

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ............................................................................ 21

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ........................................................................... 19

*Sackett v. EPA*,
  598 U.S. 651 (2023) ........................................................................... 12

*Sierra Club v. EPA*,
  60 F.4th 1008 (6th Cir. 2023) ................................................................ 7

*Smith v. Org. of Foster Fams. for Equal. & Reform*,
  431 U.S. 816 (1977) ........................................................................... 12

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
    531 U.S. 159 (2001) ................................................................................................ 12

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ................................................................................................ 11

*Tennessee v. Cardona,*
    2024 WL 3453880 (6th Cir. July 17, 2024) ....................................................... *passim*

*Texas v. Cardona,*
    2024 WL 2947022 (N.D. Tex. June 11, 2024) ...................................................... 23

*Texas v. United States,*
    2024 WL 3405342 (N.D. Tex. July 11, 2024) ..................................................... 5, 9

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
    590 U.S. 604 (2020) ................................................................................................ 12

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) .................................................................................................. 7

*Van Buren v. United States,*
    593 U.S. 374 (2021) ................................................................................................ 16

*West Virgina v. EPA,*
    597 U.S. 697 (2022) ........................................................................................... 11, 12

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989) .................................................................................................. 12

*Wilson v. Comm'r. of Soc. Sec.,*
    378 F.3d 541 (6th Cir. 2004) .................................................................................... 7

**Statutes and Rules**

5 U.S.C.

    § 703 ....................................................................................................................... 24

    § 704 ......................................................................................................................... 7

    § 706(2) ................................................................................................................. 7, 23

    § 706(2)(A) ............................................................................................................. 20

    § 706(2)(B) ............................................................................................................. 18

    § 706(2)(C) ............................................................................................................... 7

v

20 U.S.C.

§ 1681 .................................................................................................................. 20

§ 1681(a) ......................................................................................................... 2, 13

§ 1681(b) .............................................................................................................. 16

§ 1682 .................................................................................................................... 9

§ 1686 .................................................................................................. 3, 14, 15, 20

28 U.S.C. § 2201(a) ................................................................................................ 24

Pub. L. No. 93-380, § 844 ...................................................................................... 14

Fed. R. Civ. P. 56(a) ................................................................................................ 6

Fed. R. Civ. P. 57 ................................................................................................... 24

**Other Authorities**

34 C.F.R.

§ 106.2 ........................................................................................................... *passim*

§ 106.8 .................................................................................................................. 24

§ 106.10 ......................................................................................................... *passim*

§ 106.11 ................................................................................................................ 19

§ 106.33 ......................................................................................................... *passim*

§ 106.33 ..................................................................................... 3, 14, 9, 21, 22

§ 106.34 ..................................................................................................... 9, 21, 22

§ 106.34(a)(3) ................................................................................................... 3, 14

§ 106.41(b) .................................................................................................. 3, 14, 21

§ 106.44 .................................................................................................................. 24

§ 106.44(f)(1) ....................................................................................................... 18

§ 106.45 .................................................................................................................. 24

§ 106.46 .................................................................................................................. 24

34 C.F.R. § 106.44(a) (2023) ............................................................................................18

40 Fed. Reg. 24,128 (June 4, 1975) ...............................................................................21

89 Fed. Reg. 33,474 (Apr. 29, 2024)

    33,493 ........................................................................................................................19

    33,528 ...........................................................................................................4, 8, 18, 25

    33,756 ........................................................................................................................16

    33,808 ........................................................................................................................22

    33,811 ........................................................................................................................16

    33,814 ........................................................................................................................14

    33,816-19 ...........................................................................................9, 10, 20, 21, 22

    33,820 ........................................................................................................................22

    33,821 ..................................................................................................................10, 12

    33,822 ........................................................................................................................12

    33,861-62 ...................................................................................................................24

    33,883 ........................................................................................................................16

    33,884 .........................................................................................................4, 18, 19, 24

    33,885-86 ...............................................................................................................4, 24

    33,889 ........................................................................................................................18

## INTRODUCTION

Defendants' attempt to unilaterally amend the meaning of Title IX "sex" discrimination is not going well. By now, this Court and five others have held that the Final Rule—which imposes a variety of new mandates covering an undefined list of so-called "sex-based" characteristics—is likely unlawful. Among those is the Sixth Circuit, which concluded that the Rule's core gender-identity provisions should remain enjoined pending review because they "likely … exceed[]" the Department's "authority." *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024). The decision to maintain the injunction of the "central provisions of the Rule" was unanimous. *Id.* at *3.

Chief Judge Sutton commended this Court's preliminary-relief and partial-stay opinions as "thorough," *id.* at *2, and for good reason. This Court's ninety-three-page opinion detailed the flaws in law, logic, and process that infect the Final Rule in its entirety. *See generally* PI Op., Doc. 100; Stay Op., Doc. 117. Yet due to the interim and geographically tailored nature of the relief granted, the Final Rule's unlawful mandates continue to burden Plaintiff States, their school districts, schools, and residents. To advance this case toward resolution and full relief, the States now seek a final judgment declaring the Final Rule unlawful, vacating the Rule under the APA, and enjoining Secretary Miguel Cardona and the Department (collectively, the Department) and other federal officials from enforcing the Final Rule and its unlawful reading of Title IX against the States.

Summary judgment is proper for largely the same reasons this Court has already given. *First*, the Final Rule unlawfully imports the Supreme Court's *Bostock* decision into Title IX and imposes *ultra vires* gender-identity mandates that not only vitiate protections for women but also clash with Title IX's many sex-based distinctions. *Second*, the Final Rule unlawfully regulates educators' and students' speech in contravention of the First Amendment and the Supreme Court's careful limits on Title IX harassment liability. *Third*, the Final Rule unlawfully ignores substantial comments about the privacy,

1

safety, and financial costs of the Department's Title IX overhaul. The resulting Title IX regime bears no resemblance to the law that Congress passed and schools have enforced for fifty years. And it turns the statute on its head by penalizing women in areas where safety and access matter most.

Because these dispositive flaws infect the entire Final Rule, outright vacatur should follow. So too, this Court should issue declaratory and injunctive relief to ensure the Department does not continue to distort, apply, and enforce Title IX to Plaintiff States' detriment. The States readily satisfy the showing needed to obtain injunctive relief for the same reasons preliminary relief was warranted.

In short, Title IX does not license unelected officials to unilaterally saddle the nation's schools with controversial gender-identity mandates that trample States' rights, schools' longstanding practices, and students' safety and privacy interests. This Court should reiterate its prior reasoning enforcing Title IX's proper bounds and grant final judgment to Plaintiff States.

## BACKGROUND

### A.    The Final Rule Distorts Title IX's Prohibition on "Sex" Discrimination.

1.    As this Court is intimately familiar with this case, the States largely incorporate the relevant background sections of their complaint and briefing. *See* Compl. ¶¶ 2-185, Doc. 1; PI Op. 2-7. To summarize, Congress enacted Title IX as an "antidote" to "the continuation of corrosive and unjustified discrimination against women … in[] all facets of education." 118 Cong. Rec. 5,803 (1972) (statement of Sen. Bayh). Title IX furthers women's educational attainment and access by prohibiting discrimination "on the basis of sex." 20 U.S.C. § 1681(a). The term "sex," the Department assumes, refers to the biological differences between men and women. Opp. to PI Mot., Doc. 73 at 9.

Title IX does not require identical treatment of the sexes in every context. To the contrary, Title IX contains several exceptions to the sex-discrimination bar that reflect "'enduring' differences between men and women." *L.W. v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (quoting *United States*

*v. Virginia*, 518 U.S. 515, 533 (1996)), *cert. granted* 2024 WL 3099532 (U.S. June 24, 2024).   To "preserv[e]" "personal privacy," 118 Cong. Rec. 5,807 (Sen. Bayh), Title IX expressly allows schools to "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686. Title IX also carves out exceptions for certain traditional male-only or female-only activities. *Id.* § 1681(a)(6)-(9).

The initial 1975 regulations likewise treated "sex" as a binary, *see, e.g.*, 34 C.F.R. §§ 106.33, 106.34(a)(3), and permitted certain sex-segregated spaces.  These included "housing," *id.* § 106.32; "toilet, locker room, and shower facilities," *id.* § 106.33; "physical education classes," *id.* § 106.34(a)(1); "[sexual-education] sessions," *id.* § 106.34(a)(3); boys' and girls' choirs, *id.* § 106.34(a)(4); and athletic teams, § 106.41(b).  In short, for over forty years, Title IX's "equal access" mandate had not required absolute sex-"desegregation." 117 Cong. Rec. 30,407 (1971).

2.      It was only in President Obama's second term that Title IX's settled meaning began shifting.  In 2014, the Department unveiled sparsely reasoned guidance asserting that Title IX bars discrimination based solely on "gender identity."  *See* Compl. ¶¶ 78-80 (discussing guidance documents).  Later guidance reiterated this conclusion while stating that "gender identity is different" from "sex … assigned at birth." Doc. 19-1 at 5-6 (citation omitted).

The Trump Department rescinded that gender-identity guidance because it lacked "extensive legal analysis" and was inconsistent with Title IX's "express language." Compl. ¶ 84 (citation omitted). For largely the same reasons, the Department reaffirmed this position after *Bostock v. Clayton County*, 590 U.S. 644 (2020), read Title VII's prohibition on sex discrimination to bar an employer's firing an employee because of sexual orientation or transgender identification. *Id.* at 651-52; Compl. ¶ 96.

3.      On his first day, President Biden directed every federal agency to regulate consistently with the position that "laws that prohibit sex discrimination—including Title IX [and its] implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation." Compl.

3

¶¶ 98-99 (citation omitted).  After failing to enshrine that view through improper guidance, *id.* ¶¶ 100-07, the effort to "rewrite a law that Congress duly passed" culminated in the Final Rule, PI Op. 8.

Promulgated over immense opposition and after two years of consideration, the Final Rule imposes a series of unlawful provisions that "permeate[] the remaining regulations," PI Op. 90:

- **§ 106.10** imports *Bostock*'s reasoning into Title IX by specifying that discrimination "on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  89 Fed. Reg. 33,886; *see id.* at 33,802.  This "broad" list is "not exhaustive" but extends to "any discrimination that depends in part on consideration of a person's sex."  *Id.* at 33,803.

- **§ 106.31(a)** sets out an "example[]" of a "way[] that sex discrimination may occur" in violation of § 106.10.  *Id.*  It specifies that, apart from the "limited"—and narrowly construed—exclusions for sex-segregated activities in Title IX itself, schools commit prohibited discrimination when they "prevent[] a person from participating in an education program or activity consistent with the person's gender identity."  *Id.* at 33,887.

- **§ 106.2** expands the definition of prohibited harassment to include "hostile-environment harassment," defined as any "[u]nwelcome, sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity."  *Id.* at 33,884.  The provision folds in § 106.10's expanded "bases" for "sex" discrimination.  *Id.*

"[N]umerous" other provisions exacerbate the Final Rule's distortions.  *Tennessee*, 2024 WL 3453880, at *3 (citation omitted); States' Supp. Stay Opp'n, *id.* (No. 24-5588), ECF No. 37.  The Rule's grievance, training, recordkeeping, and complaint processing requirements, for example, all incorporate its new definitions of "sex discrimination."  *See Tennessee*, 2024 WL 3453880, at * 3.

**B.    The States Sue and Obtain Preliminary Relief.**

The States filed this suit on the Final Rule's publication in the Federal Register and quickly moved for preliminary relief.  *See* Compl. (Apr. 30, 2024); PI Mot., Doc. 19 (May 3, 2024).  After this Court granted their intervention motion, Plaintiff-Intervenors likewise sought preliminary relief.  The States presented argument and three witnesses at a hearing, as well as reams of written testimony from seventeen declarants.  *See* PI Mot. Decls., Docs. 19-2 to -16; Doc. 92-1 to -2.  That evidence detailed

4

the harms to the States from the Final Rule and confirmed that anything other than relief against the entire Rule would confuse compliance and duplicate costs.  PI Op. 79-87; Stay Op. 24-26.

This Court then granted preliminary relief against the entire Final Rule in a ninety-three-page opinion.  The Court determined that the States were likely to prevail on their claims that the Rule's sex-discrimination and harassment provisions contravene Title IX and the U.S. Constitution.  PI Op. 91-92.  It also found that the Final Rule was "arbitrary in the truest sense of the word."  *Id.* at 90, 92. As for irreparable harm, this Court held that the Final Rule would inflict several injuries on the States, including unrecoverable compliance costs, threatened federal-funding losses, interference with States' sovereign interests, and impeding the States' interests in protecting citizen welfare.  *Id.* at 79-87.  The Court further held that an injunction maintaining the status quo would not prejudice the Department or the public since the regulations have been "unchanged for approximately 50 years."  *Id.* at 88.

The Court limited its preliminary relief to Plaintiff States and their schools.  But, because the Final Rule's flaws "permeate" the new regulations, this Court granted relief against the entire Rule and expanded on its reasoning in a "thorough" subsequent opinion.  *Id.* at 88-91; *see generally* Stay Op.  The Sixth Circuit upheld the scope of this Court's relief, including because the Department had not "contemplate[d] enforcement of the Rule without *any* of the core provisions" nor justified the Rule's costs based on a "*different* definition of sex discrimination."  *Tennessee*, 2024 WL 3453880, at *4.  The Department has renewed its request for a partial stay in the Supreme Court, *see Cardona v. Tennessee*, U.S. No. 24A79 (filed July 22, 2024), while the Sixth Circuit has set argument for the October sitting.

The five other district courts to resolve requests for preliminary relief have sided with this Court and issued a stay and/or injunction against the entire Final Rule.  *Arkansas v. Dep't of Educ.*, 2024 WL 3518588 (E.D. Mo. July 24, 2024); *Texas v. United States*, 2024 WL 3405342 (N.D. Tex. July 11, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 2024 WL 3381901 (N.D. Tex. July 11, 2024); *Kansas*

*v. U.S. Dep't of Educ.*, 2024 WL 3273285 (D. Kan. July 2, 2024); *Louisiana v. U.S. Dep't of Educ.*, 2024 WL 2978786 (W.D. La. June 13, 2024).  To date, no reviewing court has upheld the Final Rule.

### C.     The States Now Seek Permanent Relief, Including Vacatur.

The Department noticed its appeal and then sought to stall this case indefinitely pending the outcome of appellate proceedings.  Docs. 103, 115.  Plaintiff States and Intervenors objected to that approach, which would deny them the full relief the APA contemplates—vacatur of the Final Rule. Docs. 118, 120.  Instead, they requested prompt resolution to avoid prolonging harms from the Rule's illegality, including those beyond the scope of preliminary relief.  Doc. 120 at 3.  The Court denied the Department's motion for a stay of proceedings and entered a summary-judgment schedule.  Doc. 121.

## LEGAL STANDARD

Summary judgment is ordinarily proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In APA cases, "summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020) (citation omitted).  Thus, the "entire case … is a question of law," and the district court "sits as an appellate tribunal."  *Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 7 (D.D.C. 2019) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  Under the APA, the reviewing court must "'hold unlawful and set aside agency action, findings, and conclusions found to be'—among other prohibitions—'not in accordance with law[,]' 'contrary to [the C]onstitution[],'" or arbitrary and capricious. *Ohio v. United States*, 986 F.3d 618, 623 (6th Cir. 2021) (quoting 5 U.S.C. § 706(2)).

## ARGUMENT

The Final Rule is unlawful on multiple fronts, any one of which would entitle the States to summary judgment.  Because these flaws strike at the core of the Final Rule and infect the governing

regulations in their entirety, vacatur of the entire Final Rule is warranted.  This Court likewise should issue declaratory and injunctive relief to prevent the Department and related federal officials from enforcing their unlawful interpretation of Title IX against Plaintiff States' interests.

## I.    The States Are Entitled to Summary Judgment on Each of Their Claims.

The APA directs courts to set aside and vacate "final agency action" that is unlawful.  5 U.S.C. §§ 704, 706(2); *see Sierra Club v. EPA*, 60 F.4th 1008, 1021 (6th Cir. 2023) ("Reviewing courts certainly have the power to vacate an agency action they find unlawful."); *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022).  To pass APA muster, agencies cannot exceed their lawful authority, act "contrary to constitutional right," or engage in "arbitrary [or] capricious" decision-making. 5 U.S.C. § 706(2).  The Final Rule commits all three errors.

### A.    The Final Rule Exceeds the Department's Authority to Implement Title IX.

Federal agencies act lawfully only when they move within their statutory limits and act consistently with their regulations.  *See* 5 U.S.C. § 706(2)(C); *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).  Now that *Chevron* is off the table, *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), courts must "independently interpret" statutory provisions "fix[ing] the boundaries of … delegated authority" to an agency and "ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries."  *Id.* at 2263 (cleaned up).  The Department far overstepped its authority by finalizing a Rule that contravenes Title IX's text, structure, history, and implementing regulations.

#### 1.    The Rule Unlawfully Expands the Meaning of "Sex" Discrimination.

"[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).  Here, the Department has done just that by re-defining Title IX's longstanding reference to discrimination "on the basis of sex." PI Op. 24-25.  The chief offenders are § 106.10 and § 106.31(a).  Respectively, they (i) use *Bostock* to justify extending Title IX to gender identity among other new bases, and (ii) specify that it constitutes

7

sex discrimination to require individuals to access sex-segregated facilities and other programs or activities based on their sex rather than subjective gender identity. As this Court previously indicated, all the "'traditional tools' of statutory interpretation" confirm that these mandates are "contrary to [Title IX's] clear meaning." *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) (citation omitted); *see* PI Op. 17-20. And they likewise violate the agency's existing regulations. PI Op. 25-26.

This Court has also correctly rejected the Department's attempt to narrow the States' challenge to § 106.31(a) and § 106.2's hostile-environment harassment definition. Stay Op. 5. The States have always objected to the Final Rule's importation of *Bostock*'s reasoning via § 106.10, full stop; that provision's "not exhaustive" list of new protected bases is itself unlawful and harms the States by increasing schools' confusion, liability, and the resources required for them to process Title IX complaints. The provision also mandates any manner of consequences the States oppose, like requiring that boys share rooms with girls on school trips and participate in contact sports with girls in P.E. Moreover, as the Final Rule instructs—and as demonstrated by the Department's enforcement practice, Doc. 110 at 5-7—§§ 106.31(a) and 106.2 provide "examples of prohibited sex discrimination" under § 106.10, 89 Fed. Reg. at 33,528, 33,884. So both incorporate § 106.10's "impermissible definition of 'discrimination on the basis of sex,'" and both fail with it. PI Op. 88-90.

### a.    Title IX and the Implementing Regulations Foreclose the Department's Interpretation.

*Title IX*. The analysis can begin and end with the "ordinary meaning" of Title IX's text. *Johnson v. Bauman*, 27 F.4th 384, 388-89 (6th Cir. 2022) (citation omitted); *see also Tennessee*, 2024 WL 34533880, at *2-3. As this Court reasoned, giving "discrimination" "on the basis of sex" its ordinary meaning, Title IX prohibits "treating an individual *worse* than others who are similarly situated" "'based on biological sex.'" PI Op. 18-19 (quoting *Texas v. Cardona*, 2024 WL 2947022, at *32 (N.D. Tex. June 11, 2024)); *see also Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815 (11th Cir. 2022); *accord Grimm v.*

8

*Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632-33 (4th Cir. 2020) (Niemeyer, J., dissenting) (collecting definitions).

Title IX's structure supports this interpretation by "explicitly authoriz[ing] institutions to treat males and females differently in certain situations … based on biological sex." PI Op. 19-20. Some Title IX provisions, for example, exempt activities like "boy or girl conferences" and organizations like Boy Scouts and Girl Scouts that have traditionally been limited to "one sex." *Id.* at 20. Another provision allows covered entities to provide "separate living facilities for the different sexes." *Id.* (quoting 20 U.S.C. § 1686). These provisions confirm that "sex" refers to "the character of being male and female" and that Title IX's prohibition of sex "discrimination" does not extend to separating living facilities based on sex. *Id.* Indeed, these provisions would be rendered "meaningless" if they permitted separation based on another characteristic. *Adams*, 57 F.4th at 813; *accord* PI Op. 25-28.

If additional evidence were needed, the "history is clear that Congress was referring to … biological sex." *Kansas*, 2024 WL 3273285, at *9. Congress's purpose in enacting Title IX was "to root out … unequal treatment between men and women for admissions opportunities, scholarships, and sports." *Id.*; *accord Texas v. United States*, 2024 WL 3405342, at *7. And Title IX provides that agencies must issue regulations "consistent with achievement of the[se] objectives." 20 U.S.C. § 1682.

<u>*Regulations*</u>. For similar reasons, the Department's reading of Title IX violates the "elemental principle of administrative law that agencies are bound to follow their own regulations." *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (citation omitted). The Final Rule maintains, as-is, the 1975 regulations that allow schools to separate "toilet, locker room, and shower facilities," among other things, based on sex, instead of gender identity or other characteristics. *See* 89 Fed. Reg. at 33,816, 33,818-20 (discussing 34 C.F.R. §§ 106.33-.34); Compl. ¶¶ 148-51. The Department's *Bostock* reading rests on the theory that, in doing so, §§ 106.33-.34 impermissibly discriminate based on

9

sex in their application to transgender-identifying students—and always have. 89 Fed. Reg. at 33,816, 33,818. Yet the Department says these regulations interpret Title IX's general non-discrimination mandate. 89 Fed. Reg. at 33,821. And it concedes that the fact Congress did not disapprove these regulations "strongly implies that [they] accurately reflect congressional intent." *Id.* at 33,816-17 (quoting *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984)). The upshot of the Rule's assumptions—that Congress greenlighted regulations in conflict with the central provision of a statute it enacted three years earlier—indicts the Department's extension of *Bostock* to Title IX. At minimum, the Rule's view of those regulations as allowing schools to have but not enforce sex-based categories does not "fall within the bounds of reasonable interpretation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (cleaned up); *cf. D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 835 (M.D. Tenn. 2022).

### b. The Major-Questions Doctrine and Other Canons Confirm that the Department's Interpretation Is Impermissible.

Several other interpretive doctrines confirm the illegality of the Department's interpretation.

*Spending Clause.* Title IX is a Spending Clause statute. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). So the Spending-Clause clear-statement rule forbids the Department from conditioning Title IX funds on recipients' embracing its redefinition of sex discrimination absent "clear" direction from "Congress *itself.*" *Kentucky v. Yellen*, 54 F.4th 325, 353-54 (6th Cir. 2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)); *see also* PI Op. 30-32. Title IX is a Spending Clause statute. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). This "clear-statement rule" applies with special force when a federal-funding condition "encroach[es] upon a traditional state power," like regulating education. *Id.* at 354 (citation omitted).

As this Court, the Sixth Circuit, and other circuits have explained, Title IX lacks the requisite clarity to support §§ 106.10, 106.31(a), and the Rule's other affected provisions. PI Op. 30-32; *Tennessee*, 2024 WL 3453880, at *3; *see also Adams*, 57 F.4th at 816-17. The Department has countered that

Title IX "unambiguously prohibits any form of sex-based discrimination" and that the "Final Rule merely clarifies [that prohibition's] scope." Opp. to PI Mot. 19-20. That argument is specious because (1) "sex" does not mean "gender identity," as the Department long acknowledged and still assumes, Opp. to PI Mot. 9, and (2) *Bostock* does not transform Title IX's prohibition on sex-discrimination into a bar on gender-identity-discrimination, much less one that clearly requires upending bathroom policies. *Cf.* Defs.' Suppl. Br., *Alabama v. Cardona*, No. 2:24-cv-533 (N.D. Ala. June 17, 2024), ECF No. 35 (admitting § 1686's application to bathrooms is "ambiguous").

Beyond the clear-statement rule, the Final Rule runs afoul of the Spending Clause in other important ways: (i) the Rule impermissibly coerces the States due to its link to billions in state funding, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78, 580-82 (2012) (opinion of Roberts, C.J., joined by Breyer & Kagan, JJ.); (ii) perverts Title IX's "purpose" to protect women from sex discrimination, *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987); and (iii) risks requiring States to unconstitutionally infringe students' and teachers' First Amendment expression and religious practice, *see id.* at 210-11. All provide further bases for invaliding the Final Rule under the Spending Clause.

*Major-questions doctrine.* The major-questions doctrine means the Department must have "clear congressional authorization" to enshrine novel mandates of vast "political significance." *West Virginia v. EPA*, 597 U.S. 697, 730, 723 (2022) (citation omitted); *see also* PI Op. 29-30. That rule readily applies to the Department's nationwide gender-identity mandates. In Plaintiff States alone, the Rule would affect the education of hundreds of thousands of students, *see, e.g.*, Thompson Decl., Doc. 19-3 ¶ 3; Coons Decl., Doc. 19-11 ¶ 3, impinging on States' "historic[] sovereign[ty]" in this area, PI Op. 29 (quoting *United States v. Lopez*, 514 U.S. 549, 564 (1995)). And the questions it decides—like whether males must be permitted access to female facilities, and vice versa—remain matters of "earnest and profound debate across the country." *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023) (quoting *West*

11

*Virginia*, 597 U.S. at 732).  The Court was right, moreover, not to "ignore that the regulatory writ [the Department] newly uncovered conveniently enabled it to enact [a new definition of sex discrimination] that … Congress considered and rejected multiple times." *West Virginia*, 597 U.S. at 731 (citation omitted); *see also* PI Op. 29-30; Compl. ¶ 10 & n.1.  All of this renders "the oblique form of the claimed delegation all the more suspect." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).

 *Federalism*.  Under the federalism canon, Congress must "make its intention" to displace States' traditional spheres of authority "'unmistakably clear in the language of [a] statute.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (quotations omitted).  That is no low hurdle: The text itself must contain "exceedingly clear language." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020); *see also Sackett v. EPA*, 598 U.S. 651, 679 (2023).  The Final Rule "squarely implicates the plaintiff-States' powers and abilities to govern themselves as sovereign and independent entities."  PI Op. 62-63; *see also id.* at 56-63.  Yet, the Department points to nothing in Title IX, much less "clear … language," authorizing such an intrusion.

 *Avoidance*.  Further, the Final Rule's significant constitutional defects support rejecting the Department's interpretation. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-732 (2001).  The Final Rule suggests, for example, that schools may be required to accommodate a student's stated gender identity, regardless of parental opposition. *See, e.g.*, 89 Fed. Reg. at 33,821-22.  But this would facially infringe the constitutional rights of parents to "[]bring[ up]" their children as they deem fit. *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citation omitted); *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977).  And the Rule's hostile-environment harassment definition likewise runs afoul of the First Amendment.  The court should construe Title IX to avoid "the[se] significant constitutional … questions." *Solid Waste Agency*, 531 U.S. at 174.

### c. *Bostock* Cannot Save the Department's Interpretation.

The Final Rule purports not to dispute that "sex" means "sex." But its application of *Bostock* to Title IX's distinct language and structure effectively reads out that limited term, replacing it with "all things 'inextricably bound up' with 'sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.'" Stay Op. 9-10 (quoting Opp. to PI Mot. 9; 89 Fed. Reg. 33,886). As this Court and the Sixth Circuit panel correctly reasoned, the "Department's integration of *Bostock* is fatally flawed." *Id.* at 9; *see also Tennessee*, 2024 WL 3453880, at *2-3.

*First*, the statutes "use materially different language: discrimination 'because of' sex in Title VII and discrimination 'on the basis of' sex in Title IX." *Tennessee*, 2024 WL 3453880, at *3 (citing 42 U.S.C. § 2000e-2(a)(1); 20 U.S.C. § 1681(a)). The Supreme Court read "because of" in Title VII to incorporate "but-for causation," meaning sex must be merely "one but-for cause of [the challenged] decision to trigger the law." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). But the ordinary meaning of Title IX's phrase "on the basis of" "indicates a foundational criterion upon which distinctions are made"—sex. Stay Op. 6-7. And § 1681(a)'s use of the article "the" before "basis of" indicates that sex must be more than "'one'" cause; it must be "*the* determinative reason." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Bostock*, 590 U.S. at 656).

Indeed, this Circuit has held that the meaning of the same causal phrase—"because of"—may differ between statutory schemes. In *Pelcha*, it held that showing an employee was terminated "because of" the employee's age under the Age Discrimination in Employment Act required proving that "age was the 'reason' that the employer decided to act." *Id.* (citation omitted). Declining to apply *Bostock*'s weaker but-for test, the court pointed to the Supreme Court's "limit[ation of *Bostock*] only to Title VII itself" and to that Court's interpretation of the same language in the ADEA to mean the employee's protected trait not only "played a role in [the employer's decisionmaking] process," but also "*had a*

*determinative influence on the outcome.*"  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *Pelcha*, 988 F.3d at 324 (quoting *Gross*, 557 U.S. at 176).  The case for giving the distinct causal phrase "on the basis of" a different meaning is even stronger.

More broadly, Title IX takes a more nuanced approach to discrimination "on the basis of sex" in the educational setting than does Title VII's but-for standard for hiring and firing.  Sometimes Title IX allows outright segregation, as in traditionally single-sex schools (§ 1681(a)(5)), Boys and Girls State (§ 1681(a)(7)), and greek life (§ 1681(a)(6)).  Other times it allows sex separation, so long as males and females are treated equally on a group level.  *E.g.*, § 1681(a)(8) (parent-child dances).  And other times it says it is not discriminatory to treat males and females differently based on privacy concerns or physical differences.  *E.g.*, § 1686 (living facilities); § 1681(a)(4) (military academies); Pub. L. No. 93-380, § 844 (sports). Because the rule reads sex discrimination to mean gender-identity discrimination, it bizarrely treats these provisions as cases where Congress expressly *allowed discrimination* against students whose sex and gender identities differ.  *See* 89 Fed. Reg. at 33,814-21.  Absent is any explanation of why a rational Congress would want to stop males from attending Girls State (a statutory exception) but let them undress and shower with females (not a statutory exception, according to the Rule).

*Second*, the Rule's *Bostock* position also implausibly discards the original Title IX implementing regulations.  The agency's predecessor wrote those regulations, Congress reviewed them, and Congress declined to disapprove them.  *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 530-35 (1982).  Many remain intact today.  They explain that schools can have separate bathrooms and sex-ed classes for males and females.  34 C.F.R. §§ 106.33, 106.34(a)(3).  And schools can separate males and females in all sports after school and in contact sports like "wrestling" and "boxing" during school.  §§ 106.34(a)(1), 106.41(b).  But if the government is right that all gender-identity discrimination is sex discrimination under Title IX, then these early regulations would be invalid—even though they have

14

long been thought to "accurately reflect" Title IX's original meaning. *Grove City*, 465 U.S. at 568.

*Third*, as the Sixth Circuit panel confirmed in this case, this Circuit's precedents hold that "Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for … Title IX." *Tennessee*, 2024 WL 3453880, at *2; *see also L.W.*, 83 F.4th at 484. Beyond the "because of" / "on the basis of" distinction, the two statutes "differ[] … in important respects." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). They "serve different goals," for example, and pursue them in different ways. *Tennessee*, 2024 WL 3453880, at *3. Title VII presumes that sex is irrelevant to employment decisions, thus tolerating no intentional reliance even "in part on an … employee's sex when deciding to discharge the employee." *Bostock*, 590 U.S. at 660. Title IX, by contrast, assumes that differentiation by sex can sometimes be "necessary to the success of [a covered] program." 118 Cong. Rec. 5,807 (1972) (statement of Sen. Bayh).

Further, as the Eleventh Circuit noted in rejecting *Bostock*'s applicability to a school bathroom policy, "the school is not the workplace." *Adams*, 57 F.4th at 808. Consistent with its purpose, Title IX expressly authorizes "separate" spaces and other differential treatment "for the different sexes." 20 U.S.C. § 1686; *see also Meriwether*, 992 F.3d at 510 n.4. Such distinctions are doubtless why *Bostock* limited its holding to Title VII's prohibition on discriminatory hiring and firing and stressed that the decision did "not purport to address bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. And they are why the Department itself first concluded that *Bostock* did not apply to Title IX. *See* Compl. ¶ 96. "No less importantly," the Spending Clause's requirement of clarity applies to Title IX's funding regime, whereas "[t]he same is not true of Title VII." *Tennessee*, 2024 WL 3453880, at *3.

*Fourth*, importing *Bostock* into Title IX produces a series of implausible results by "transform[ing] the familiar prohibition of sex-based discrimination into a sweeping anti-discrimination mandate, capable of regulating conduct that neither implicates the male/female dichotomy nor relates

to sex at all." Stay Op. 10. This "fallout," which "underscores the implausibility of the [Department's] interpretation," is "'extra icing on a cake already frosted.'" *Van Buren v. United States*, 593 U.S. 374, 394 (2021) (citation omitted). Take the Court's hypothetical of a male student who arguably experiences gender-identity-based discrimination when his teacher fails to accommodate his "hypermasculine self-identity" by refusing to call him "Bruce" instead of his given name, "Taylor." PI Op. 27. The fact that such treatment—unrelated to the student's sex—could violate Title IX under the Rule underlines that the Department's interpretation of Title IX is untethered from the statutory text.

And the coupling of § 106.10's other categories with the Department's *Bostock* interpretation produces further absurdities. The Rule's bar of discrimination "on the basis of … sex characteristics," which include "physiological sex-based characteristics," 89 Fed. Reg. at 33,811, could allow a male student with a high voice to cry foul if his choir teacher assigned him a traditionally female part within his vocal range. Stay Op. 11-12. *But for* his high voice, he could sing the traditionally male part he desired. And a recipient could face liability for failing to accommodate the "desire to chest/breast feed" of a transgender-identifying male who *but for* "sex stereotypes," including "expectations regarding … pregnancy or related conditions," like "lactation," 89 Fed. Reg. at 33,756, 33,883, might automatically receive such accommodation. Stay Op. 11 (citation omitted); *see also* Fed. Reg. at 33,819.

Section 106.31(a) might "serve[] as a clever, albeit transparent, attempt to neutralize [some of] the … absurdities" resulting from "creat[ing] a series of new protected classes not contemplated by the drafters of Title IX." Stay Op. 8. But this smokescreen cannot disguise the fact that "even if sex is not formally redefined," the Rule "functionally redefine[s it] based on gender identity" and other characteristics. *Carroll Indep. Sch. Dist.*, 2024 WL 3381901, at *4-6. In fact, § 106.31(a) exposes the Rule's distortion of a statute focused on *equalizing* opportunities for *women* by "grant[ing] preferential treatment to transgender students." Stay Op. 9. *Cf.* 20 U.S.C. § 1681(b) (Title IX shall not "be

16

interpreted to require … grant[ing] preferential or disparate treatment to the members of one sex").

As the Court has highlighted, the Department's interpretation would require discrimination based on gender identity, despite purporting to prohibit it. Consider that there are two groups who would be able to access female facilities "but for" their biological sex—males who identify as male and males who identify as female. Stay Op. 8. The Department plays policymaker by requiring schools to allow the latter group to use female facilities while refusing the same privilege to the former group *based on those students' gender identity. Id.* at 8-9; PI Op. 27-28. This "arguably reflect[s] discrimination on the basis of gender identity, which *would* result in a violation of the new regulations." PI Op. 27. But "as [the Department] see[s] it, gender identity discrimination is 'not what [the non-transgender] student[s are] facing' so there is no Title IX violation." *Carroll Indep. Sch. Dist.*, 2024 WL 3381901, at *4. This "favoritism" is an "impermissible result," *id.* at *5; PI Op. 27—one that illustrates that the Department's selective invocation of *Bostock* cannot validate its misinterpretation of Title IX.

### 2.    The Rule Unlawfully Expands the Meaning of "Harassment."

The Final Rule's definition of "hostile-environment harassment" likewise exceeds the Department's authority to implement Title IX. PI Op. 49-56. And contrary to the Department's prior assertion, this definition's flaws infect the provision in its entirety. Stay Op. 13-14; PI Op. 43.

The Supreme Court defined Title IX's sexual-harassment obligations in *Davis ex rel. LaShonda D. v. Monroe County Board of Educ.*, 526 U.S. 629, 652 (1999). There the Court held that recipients violate Title IX only if they have "actual knowledge" of sexual harassment and are "deliberately indifferent" to it. *Id.* at 650. Alleged harassment, moreover, must be "so severe, pervasive, *and* objectively offensive that it *denies* its victims … equal access to education." *Id.* at 652. That excludes "a single instance of one-on-one peer harassment," even if "sufficiently severe," and harassment that causes "a mere 'decline in grades'" or a refusal to attend school or a school activity. *Id.* (citations omitted).

The Final Rule expands Title IX's harassment coverage far beyond these strictures.  *See* Compl. ¶¶ 175-83.  It newly defines punishable harassment as conduct that—from the complainant's view— is so "severe *or* pervasive" as to "*limit*[] . . . a person's ability to participate in or benefit from the recipient's education program or activity."  89 Fed. Reg. at 33,884 (34 C.F.R. § 106.2) (emphases added).  That means the Rule will reach isolated incidents or a pattern of non-severe conduct, even though *Davis* recognized that Title VII's "severe *or* pervasive" standard was inappropriate because "schools are unlike the adult workplace."  526 U.S. at 651.  And the Rule's extension of harassment to conduct that "limits," rather than "denies," a person's educational access will cover the decline in grades or refusal to participate in school that *Davis* expressly excluded.  *Id.* at 652.  The Rule also eliminates *Davis*'s requirement that the school have "actual knowledge" of the harassment and be "deliberately indifferent" to it.  89 Fed. Reg. at 33,889 (proposed § 106.44(f)(1)); *cf.* 34 C.F.R. § 106.44(a) (2023).  All these provisions take § 106.2's harassment definition far beyond *Davis*'s limits.

### B.    The Final Rule Violates the Constitution.

The Final Rule's multiple constitutional failings independently render it unlawful.  *See* 5 U.S.C. § 706(2)(B); *see* PI Op. 32-56.  *First*, if Title IX means what the Department says in the Final Rule, then Title IX's prohibition on sex discrimination transgresses the Spending Clause.  *See supra* p 10.

*Second*, the Final Rule's expanded discrimination and harassment mandates raise significant free-speech problems that directly affect the States' employees and students and override state law.  It is difficult to improve on this Court's prior analysis detailing the Final Rule's speech-harming effects, which the States fully adopt here.  These harms include mandated use of pronouns, which will flow both from § 106.10 itself as well as § 106.2's incorporation of that provision into covered bases of hostile-environment harassment.  *See* Compl. ¶¶ 81-82, 213 & note 30 (detailing prior enforcement along those lines).  As this Court noted, any such pronoun mandate would violate this Circuit's

interpretation of the First Amendment as protecting at least the rights of professors at public universities to decline to use inaccurate pronouns when teaching. *See Meriwether*, 992 F.3d at 498-500, 505.

And as this Court further explained, the Final Rule's expansive incorporation of other controversial topics risks compelling or chilling speech in ways that violate deeply held—and constitutionally protected—conscience and religious beliefs. For example, the United States has claimed that Title IX means a public high school cannot accommodate a teacher's religious objection to using names associated with students' gender identities by permitting use of all students' last names. PI Op. 44-46 (citing Amicus Brief, *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861 (7th Cir. Filed Nov. 8, 2021)). And when asked at oral argument in *Kansas* whether a student could face harassment liability under the Rule for asserting that "sex and gender are the same [and/or] they are immutable," the Department "state[d] that it would depend on the facts and specific circumstances." 2024 WL 3273285, at *14. The harassment definition thus flouts the First Amendment from both directions: It violates the tenet that the "government may not compel a person to speak its own preferred messages," *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), while also "chill[ing] protected speech," PI Op. 56. Such free-speech harms are compounded by the Final Rule's expansion to speech that occurs even online, off campus, and—through § 106.11—out of the country. *See* PI Op. 12, 55-56; 89 Fed. Reg. at 33,493, 33,884.

Worse still, the Final Rule enshrines impermissible viewpoint discrimination by permitting only certain stances on gender identity and deeming others discrimination. PI Op. 42-48. The government "may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). Nor may it use the "'threat of invoking legal sanctions and other means of coercion to achieve the suppression' of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (cleaned up). But the Rule "attempts

19

to compel speakers to affirm the concept of gender identity, while punishing or silencing those with a different perspective." PI Op. 48. That is "plainly impermissible." *Id.*

###    C.    The Final Rule Is Arbitrary and Capricious.

The Final Rule also rests on flawed—or absent—reasoning, making it arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007).

*First*, the Department fails to offer a "reasoned explanation" for departing from its longstanding view of the meaning of "sex" in Title IX. *See Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 221 (2016). In the Department's telling, *Bostock* magically revealed that Title IX protects "a series of new … classes not contemplated by the drafters of Title IX" or by the Department itself for at least the statute's first four decades. Stay Op. 8. And despite *Bostock*'s expressly declining to "address bathrooms, locker rooms, or anything else of the kind," 590 U.S. at 681, and despite Title IX's expressly providing for sex-"separate living facilities," 20 U.S.C. § 1686, the Department claims that *Bostock* clarifies that it violates Title IX to exclude certain students from living facilities, like bathrooms and locker rooms, based on sex. As the Court explained, this reliance on *Bostock* is "arbitrary" given (a) the Department's history of interpreting sex to refer to a male-female binary, (b) the "var[iance]" between "the text, structure, purpose, and history" of Title VII and Title IX, and (c) the Supreme Court's own disclaimer of *Bostock*'s relevance outside Title VII and to bathrooms. PI Op. 67-69.

*Second*, the Department engages in "contradictory reasoning" by inexplicably deeming some categories of sex separation impermissible "de minimis harm" while blessing others. PI Op. 72; 89 Fed. Reg. at 33,816, 33,818-19; *see also Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015). The Department points to Congress's allowing sex-separation in "living facilities" and the exceptions in 20 U.S.C. § 1681 as its only justification for omitting residential facilities and § 1681(1)-(9)'s programs from § 106.31(a)'s coverage. 89 Fed. Reg. at 33,816-19. At the same time,

the Department applies § 106.31(a) to other "living facilities" like bathrooms, toilets, and showers, *see* Doc. 92 at 3-5—facilities which, like housing, its existing regulations allow to be sex separated, 34 C.F.R. §§ 106.33-34. The Department offers no rhyme or reason for this scheme. *Supra* pp. 9-10.

As for why § 106.31(a) applies to bathrooms, locker rooms, choirs, sex-ed classes, *and* "contact sports in physical education classes" (34 C.F.R. §§ 106.33-34) but not to athletic teams (§ 106.41(b)), the Department explains only that the athletics regulations are "longstanding" and that "athletic competition raises unique considerations." 89 Fed. Reg. at 33,817-19. But the Department's predecessor adopted—and Congress approved—the regulations governing all these categories at the *same* time. *See Grove City*, 465 U.S. at 568; 40 Fed. Reg. 24,128, 24,141, 24,142-43 (June 4, 1975). So the Department's "longstanding" explanation flops. Nor can it explain why sex-separate athletic teams present "unique considerations" that "contact sports" in P.E. classes do not, requiring only the latter regulations to yield to § 106.31(a). This "level of rulemaking arbitrariness" violates the APA. PI Op. 72.

*Third*, the Department fails to adequately "consider and respond to significant comments." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The Final Rule claims "nothing in the[] regulations" conflicts with the First Amendment. Compl. ¶ 179 (collecting examples). Yet its new definition of harassment relies on Title VII EEOC guidance that facially implicates speech rights. Compl. ¶¶ 180-81. Instead of clarifying the definition's application, the Final Rule says it lacks facts needed to address "specific examples." *Id.* at 33,509, 33,512. But elsewhere the Rule provides examples for "illustrative purposes." *Id.* at 33,512. "[B]are acknowledgement is no substitute for reasoned consideration," *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024), and an agency cannot adopt rules with sweeping consequences yet shun pleas for guidance, *see Bloomberg L.P. v. SEC*, 45 F.4th 462, 476-77 (D.C. Cir. 2022). Even worse, the Department "[n]ot only … fail[ed] to meaningfully address First Amendment concerns," "*but it also intentionally opted to leave the vague terms undefined.*" PI Op. 54.

*Fourth*, the Department "entirely fail[s] to consider [certain] important aspect[s] of the problem" or address relevant evidence that "runs counter" to its cost-benefit determination. PI Op. 67 (citation omitted). These missteps betray "the political preferences of an outcome-oriented rule." PI Op. 77. For one, the Rule "ignores significant evidence … regarding the safety and privacy interests at stake." PI Op. 72. Tennessee's comment, for example, "identi[fied]] numerous instances of males attacking females in public restrooms that were designated for females only" and argued the Rule would facilitate such attacks. *Id.* at 72 (citing Doc. 1-3 at 11); *see also* Compl. ¶¶ 168-70, 257. Instead of rebutting this evidence, the Department "[dis]agree[s]" with a strawman—"that transgender students pose a safety risk to cisgender students"—and rejects the "legitima[cy]" of the long-recognized privacy interest in shielding one's "nude or partially nude body" from exposure to "the opposite biological sex." 89 Fed. Reg. at 33,820; *Grimm*, 972 F.3d at 633-34 (Neimeyer, J., dissenting); *see also* PI Op. 73-75. Nor does the Department explain how a school can "make and enforce rules that protect all students' safety and privacy" while providing "any person" unverified access to opposite-sex facilities. 89 Fed. Reg. at 33,816, 33,820; *see also* PI Op. 75-76. Nor does it address the infrastructure costs associated with this balancing act. 89 Fed. Reg. at 33,820; *see also* PI Op. 76.

The Department also ignores additional conflicts between the Rule's new normal and the reality of sex differences. The Department rejects the view that the Final Rule will result in men "limit[ing] educational opportunities for girls and women," 89 Fed. Reg. at 33,808, by ignoring evidence that this has already happened, *see* Compl. ¶ 172. And the Department fails to consider evidence of the biological differences between men and women that have long justified not only sex-separate facilities, but certain sex-separate classes and "contact sports." Compl. ¶ 13; 34 C.F.R. §§ 106.33-34.

## II.     The States Are Entitled to Vacatur, a Permanent Injunction, and Declaratory Relief.

### A.     This Court Should Vacate the Entire Final Rule.

Section 706 of the APA instructs that reviewing courts "shall … hold unlawful and set aside agency action" that violates an agency's organic statute, the U.S. Constitution, or the APA's bar on arbitrary-and-capricious and procedurally invalid decision-making.  5 U.S.C. § 706(2).  A vacatur order—unlike an injunction and other in personam relief—would act on the Final Rule itself by denying it legally operative effect and treating it as void as to all regulated parties.  Vacatur is the "ordinary result" in APA cases challenging a Final Rule's statutory or constitutional authority and aligns with the APA's history and "countless decisions" from the Supreme Court that have "vacated agency actions, including agency rules."  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2462-64, 2467-70 (2024) (Kavanaugh, J., concurring) (collecting authorities); *see also Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (Jackson, J.) (vacatur of a rule "for everyone" is normal APA remedy).

For reasons this Court has set out at length and the Sixth Circuit has affirmed, the entire Final Rule should be vacated.  The Department's lack of statutory authority to adopt the Final Rule renders the Rule invalid and requires vacatur since an "illegitimate agency action is void *ab initio*" regardless of further agency justification.  *Texas v. Cardona*, 2024 WL 2947022, at *47.  Here, "[b]y relying so heavily on its *Bostock* "reasoning, the Final Rule was constructed on a foundation of quicksand" that no amount of additional analysis could salvage.  Stay Op. 5.  The same goes for the Department's pervasive arbitrariness and procedural faults, which render the rule "invalid in its entirety."  *Id.* at 90.

The Final Rule's legal defects extend beyond § 106.10, § 106.31(a), and § 106.2 to "numerous" other provisions that incorporate or reference the Final Rule's unlawful distortions.  *Tennessee*, 2024 WL 3453880, at *3; *see supra* pp. 4-5.  That the Final Rule's invalid provisions "irreparably taint[]" the vast majority of the remaining provisions is no accident.  Stay Op. 13.  The Final Rule's core purpose

23

was to implement the Department's expanded views of sex discrimination (§ 106.10 and § 106.31(a)) and harassment (§ 106.2). To bring about this sea change, the Final Rule adds a host of new compliance obligations that recipients must follow—including modifying complaint-processing and grievance procedures, mandatory training requirements, recordkeeping duties, and much more. *See, e.g.*, 89 Fed. Reg. at 33,885-86, 33,888-95 (proposed §§ 106.8, .44-46); *see* Stay Op. 14; *Tennessee*, 2024 WL 3453880, at *3 (listing provisions affected by §§ 106.2, 106.10, and 106.31(a)).

The Department's severability argument does not change the analysis. A "severability provision" like the Final Rule's cannot "solve[] the agency's problem" when a rule's remainder would function arbitrarily. *Ohio v. EPA*, 144 S. Ct. 2040, 2054-55 (2024). And here, the Final Rule would be "incoherent" without impermissible judicial policymaking. Stay Op. 15. Further, the Final Rule substantially justifies its significant costs by referencing its gender-identity mandates' alleged benefits. 89 Fed. Reg. at 33,861-62. The Department has not justified its costly approach under "a *different* definition of sex discrimination." *Tennessee*, 2024 WL 3453880, at *4; *see also Ohio v. EPA*, 144 S. Ct. at 2055. Having "embedded" its unlawful distortion of sex discrimination into nearly every nook and cranny of the Final Rule, the Department must now face the remedial consequences. Stay Op. 2.

**B.    This Court Should Also Grant Declaratory and Injunctive Relief to the States.**

Plaintiff States also are entitled to declaratory and injunctive relief to help ensure that the Department does not enforce its unlawful reading of Title IX against Plaintiff States' interests.

*Declaratory relief*. Both the Declaratory Judgment Act and the APA contemplate declaratory relief that establishes the legal rights of interested parties. 28 U.S.C. § 2201(a); 5 U.S.C. § 703. "The existence of another adequate remedy," moreover, "does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. Here, the States have established that the Final Rule and its statutory interpretations violate Title IX, the APA, and the U.S. Constitution. This Court should

declare that (1) the Final Rule is unlawful because Title IX's prohibition on "sex" discrimination does not include the bases or conduct covered by § 106.02's hostile-environment harassment definition, § 106.10, or § 106.31(a)'s regulation of sex-segregated facilities and programs; (2) the Final Rule is unlawful because it violates the Spending Clause and the First Amendment; (3) the Final Rule is unlawful because it is arbitrary and capricious, and (4) Plaintiff States, their political subdivisions, and their recipient schools are entitled to funding irrespective of compliance with the Rule.

*Injunctive relief.* This Court also should permanently enjoin enforcement of the Final Rule's unlawful mandates and interpretations against Plaintiff States, their political subdivisions, and their schools. As with preliminary relief, a plaintiff seeking a permanent injunction "must demonstrate (1) that it has suffered an irreparable injury; (2) that remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiff States satisfy each factor, as this Court already has amply explained. *See* PI Op. 15-88. To protect the States' interests, this Court should permanently enjoin the Department and other responsible federal officials from enforcing the Final Rule and the *ultra vires* interpretations of Title IX it incorporates.

## CONCLUSION

In sum, the Court should grant Plaintiff States' motion for summary judgment. It should declare the Final Rule and its interpretations and challenged applications of Title IX unlawful, and it should declare that the States are entitled to receive Title IX funding, regardless of non-compliance with the Rule's unlawful requirements. The Court should also vacate the entire Final Rule and permanently enjoin the Department and other responsible officials from enforcing its unlawful interpretations of Title IX against the States, their political subdivisions, and their resident institutions.

Dated: July 26, 2024

**RUSSELL COLEMAN**
  Attorney General

*/s/ Justin D. Clark*
JUSTIN D. CLARK
  Civil Chief
VICTOR B. MADDOX
  Counsel for Special Litigation
LINDSEY R. KEISER
  Assistant Attorney General
**Kentucky Office of the Attorney General**
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
victor.maddox@ky.gov
justind.clark@ky.gov
lindsey.keiser@ky.gov

*Counsel for the Commonwealth of Kentucky*

Respectfully Submitted,

**JONATHAN SKRMETTI**
  Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE*
  Solicitor General
WHITNEY D. HERMANDORFER*
  Director of Strategic Litigation
STEVEN J. GRIFFIN*
  Senior Counsel for Strategic Litigation &
  Assistant Solicitor General
VIRGINIA N. ADAMSON*
  Counsel for Strategic Litigation &
  Assistant Solicitor General
BRIAN DANIEL MOUNCE*
  Counsel for Strategic Litigation &
  Assistant Solicitor General
**Office of the Tennessee Attorney General**
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3491
matt.rice@ag.tn.gov
whitney.hermandorfer@ag.tn.gov
steven.griffin@ag.tn.gov
jenna.adamson@ag.tn.gov
brian.mounce@ag.tn.gov

*Counsel for the State of Tennessee*

**THEODORE E. ROKITA**
  Attorney General

*/s/ James A. Barta*
JAMES A. BARTA*
  Solicitor General
CORRINE L. YOUNGS*
  Policy Director and Legislative Counsel
JOSHUA DAVID*
  Deputy Attorney General - Policy
**Indiana Attorney General's Office**
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709

**DAVE YOST**
  Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
  Solicitor General
MATHURA SRIDHARAN*
  Deputy Solicitor General
**Office of the Ohio Attorney General**
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

26

james.barta@atg.in.gov
corrine.youngs@atg.in.gov
joshua.david@atg.in.gov

*Counsel for the State of Indiana*


**JASON S. MIYARES**
  Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER*
  Principal Deputy Solicitor General
BRENDAN T. CHESTNUT*
  Deputy Solicitor General
**Virginia Attorney General's Office**
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for the Commonwealth of Virginia*


*\*Admitted pro hac vice*

**PATRICK MORRISEY**
  Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS*
  Solicitor General
**Office of the West Virginia Attorney General**
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of July 2024 a true and correct copy of the foregoing document was served on all counsel of record via the Court's electronic filing system, which provided copies of the foregoing to all counsel of record.

/s/ Whitney D. Hermandorfer
WHITNEY D. HERMANDORFER