## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

| | |
|---|---|
| **State of Tennessee**; **Commonwealth of Kentucky**; **State of Ohio**; **State of Indiana**; **Commonwealth of Virginia**; and **State of West Virginia**, | |
| *Plaintiffs,* | |
| *and* | |
| **Christian Educators Association International**; **A.C.**, by her next friend and mother, Abigail Cross, | **Case No.** 2:24-cv-00072-DCR-CJS |
| *Intervenor-Plaintiffs,* | District Judge Danny C. Reeves |
| v. | Magistrate Judge Candace J. Smith |
| **Miguel Cardona**, in his official capacity as Secretary of Education; and **United States Department of Education**, | |
| *Defendants.* | |

## INTERVENOR-PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................ii

Introduction ................................................................................................................ 1

Statement of Facts ..................................................................................................... 1

Argument .................................................................................................................... 6

I.     The Rule's gender-identity mandate contradicts Title IX. ............................... 6

     A.     The Rule's new definition of "sex-based discrimination" in 34 C.F.R. § 106.10 is contrary to law, arbitrary, and capricious. ........................... 6

     B.     The Rule's new de-minimis harm provision in 34 C.F.R. § 106.31(a)(2) is contrary to law, arbitrary, and capricious. ....................................... 13

     C.     The Department's justifications are unavailing. ................................... 18

II.     The Rule is contrary to the First Amendment ............................................... 21

III.     This Court should vacate the Rule. ................................................................ 24

Conclusion ................................................................................................................ 25

Certificate of service ............................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*A.C. by M.C. v. Metropolitan School District of Martinsville,*
    75 F.4th 760 (7th Cir. 2023) ................................................................. 19

*Adams ex rel. Kasper v. School Board of St. Johns County,*
    57 F.4th 791 (11th Cir. 2022) .................................................. 11, 13, 16, 17, 18

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998) ............................................................................ 10

*Americans for Prosperity Foundation v. Bonta,*
    594 U.S. 595 (2021) ............................................................................ 22

*Arkansas v. Department of Education,*
    No. 4:24 CV 636 RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) ............... 1

*Arlington Central School District Board of Education v. Murphy,*
    548 U.S. 29 (2006) .............................................................................. 12

*B.P.J. v. West Virginia State Board of Education,*
    550 F. Supp. 3d 347 (S.D. W. Va. 2021) .............................................. 19

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ....................................................................... 16

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ........................................................... 3, 7, 8, 9, 11

*Brannum v. Overton County School Board,*
    516 F.3d 489 (6th Cir. 2008) .............................................................. 17

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ............................................................................ 24

*Carroll Independent School District v. Department of Education,*
    No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024) ............... 1

*Chamber of Commerce of U.S. v. Securities and Exchange Commission,*
    670 F. Supp. 3d 537 (M.D. Tenn. 2023) ............................................. 6

*Clark v. Martinez,*
    543 U.S. 371 (2005) ............................................................................ 10

*D.H. ex rel. A.H. v. Williamson County Board of Education,*
    638 F. Supp. 3d 821 (M.D. Tenn. 2022) ............................................. 17

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
    526 U.S. 629 (1999) ........................................................................ 4, 23

*DHS v. Regents of the University of California*,
    591 U.S. 1 (2020) ................................................................................. 19

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ............................................................................ 12

*Everson v. Michigan Department of Corrections*,
    391 F.3d 737 (6th Cir. 2004) ............................................................. 17

*Florida v. U.S. Department of Health and Human Serv*ices,
    No. 8:24-cv-1080, 2024 U.S. Dist. LEXIS 117619 (M.D. Fla. July 3, 2024) ..... 1

*G.G. ex rel. Grimm v. Gloucester County School Board*,
    822 F.3d 709 (4th Cir. 2016) ............................................................. 10

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ...................................................................... 11, 16

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) ............................................................. 19

*Janus v. American Federation of State, County, and Municipal Employees*,
    585 U.S. 878 (2018) ............................................................................ 21

*Kansas v. Department of Educ*ation,
    No. 5:24-cv-04041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) ........... 1, 25

*Kansas v. U.S. Department of Education*,
    No. 24-4041-JWB, 2024 WL 3471331 (D. Kan. July 19, 2024) ..................... 25

*Kent v. Johnson*,
    821 F.2d 1220 (6th Cir. 1987) ........................................................... 17

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) ............................................................. 12

*L.W. ex rel. Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) ............................................................. 13

*Long Island Power Authority v. Federal Energy Regulatory Commission*,
    27 F.4th 705 (D.C. 2022) ................................................................ 24, 25

*Louisiana v. Department of Education*,
    No. 3-23-CV-00563, 2024 WL 2978786 (W.D. La. May 13, 2024), *stay denied*
    No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024)................................. 1

*M.K. ex rel. Koepp v. Pearl River County School District*,
    No. 1:22-cv-25-HSO-BWR, 2023 WL 8851661 (S.D. Miss. Dec. 21, 2023)....... 7

*Mahanoy Area School District v. B.L. ex rel. Levy*,
    594 U.S. 180 (2021) .................................................................... 21, 23

*McGlone v. Bell*,
    681 F.3d 718 (6th Cir. 2012) ................................................................ 24

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ................................................................ 21

*Miller v. City of Cincinnati*,
    622 F.3d 524 (6th Cir. 2010) ................................................................ 24

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual*
    *Automobile Insurance Co.*, 463 U.S. 29 (1983).................................. 13

*Muldrow v. City of St. Louis*,
    144 S. Ct. 967 (2024) ................................................................... 14, 15

*National Cotton Council of America v. U.S. Environmental Protection Agency*,
    553 F.3d 927 (6th Cir. 2009) ................................................................ 25

*National Federation of Independent Business v. Sebelius*,
    567 U.S. 519 (2012) .......................................................................... 12

*Neal v. Board of Trustees of California State Universities*,
    198 F.3d 763 (9th Cir. 1999) ................................................................ 15

*Sackett v. Environmental Protection Agency*,
    598 U.S. 651 (2023) .......................................................................... 10

*Sossamon v. Texas*,
    563 U.S. 277 (2011) .......................................................................... 11

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ............................................................ 23

*Speech First, Inc. v. Khator*,
    603 F. Supp. 3d 480 (S.D. Tex. 2022) .................................................. 23

*Stollings v. Texas Tech University*,
   No. 5:20-CV-250-H, 2021 WL 3748964 (N.D. Tex. Aug. 25, 2021).................. 9

*Tennessee v. Becerra*,
   No. 1:24cv161-LG-BWR, 2024 WL 328388 (S.D. Miss. July 3, 2024) .............. 1

*Tennessee v. Cardona*,
   No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024).......................... 11, 19

*Tennessee v. Department of Education*,
   104 F.4th 577 (6th Cir. 2024) ........................................................................... 1

*Texas v. Becerra*,
   No. 6:24-cv-211-JDK, 2024 WL 3297147 (E.D. Tex. July 3, 2024).................. 1

*Texas v. Cardona*,
   No. 4:23-CV-00604-O, 2024 WL 2947022
   (N.D. Tex. June 11, 2024) ................................................ 1, 7, 10, 11, 13, 18, 19

*Texas v. Equal Employment Opportunity Commission*,
   633 F. Supp. 3d 824 (N.D. Tex. 2022)............................................................. 9

*Tinker v. Des Moines Independent Community School District*,
   393 U.S. 503 (1969) ........................................................................................ 21

*United States v. Virginia*,
   518 U.S. 515, 533 (1996) ............................................................................. 2, 17

*West Virginia v. Evironmental Protection Agency*,
   597 U.S. 697 (2022) ........................................................................................ 16

## Statutes

117 Congressional Record 30,407 (1971) (Sen. Bayh) ................................................ 2

118 Congressional Record 5807 (1972) (Sen. Bayh) .................................................. 2

Education Amendments of 1972,
   Pub. L. 92–318, title IX, § 901, June 23, 1972, 86 Stat. 373 (now codified at
   20 U.S.C. § 1681 et seq.) ........................................................................ 1

Kentucky Revised Statutes § 158.191........................................................................ 5

## Other Authorities

Antonin Scalia and Bryan A. Garner,
   Reading Law: The Interpretation of Legal Texts (2012) ................................. 15

Brief for the U.S. as Amicus Curiae in Support of Plaintiff-Appellant and Urging Reversal 27–28, *B.P.J. v. West Virginia State Board of Education*, 98 F.4th 541 (4th Cir. 2024) (Nos. 23-1078(L), 23-1130), 2023 WL 2859726 ......... 20, 21

Department of Justice and Department of Education, Dear Colleague Letter on Transgender Students (May 13, 2016) ................ 10

John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70 (2006) ............................................................ 15

Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967 (2021) ................................................................. 15

Statement of Interest of the United States of America, *Wood v. Florida Department of Education*, No. 4:23-cv-00526., 2024 WL 3380723 (N.D. Fla. June 27, 2024) .................................................. 23

U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017) ......................................................... 2

U.S. Department of Justice and U.S. Department of Education, Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families (June 2021) ....................................................................... 20

Women's Sports Foundation, 50 Years of Title IX (May 2022) ................................... 2

## **Rules**

Federal Rules of Civil Procedure 56 ............................................................. 6

Section 1557 of the Affordable Care Act .................................................... 1

## **Regulations**

34 C.F.R. § 106.10 ......................................................................... 6, 20, 21

34 C.F.R. § 106.11 ............................................................................. 20, 21

34 C.F.R. § 106.31 ............................................................. 8, 13, 14, 18, 20

34 C.F.R. § 106.32 ................................................................................ 4, 8

34 C.F.R. § 106.33 ............................................................................ 4, 8, 11

34 C.F.R. § 106.34 ................................................................................... 8

34 C.F.R. § 106.37 ............................................................................................... 8

34 C.F.R. § 106.41 ............................................................................... 4, 9, 20, 21

Enforcement of Title IX of the Education Amendments of 1972 With Respect to
    Discrimination Based on Sexual Orientation and Gender Identity in Light of
    *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) .................. 20

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance,
    87 Fed. Reg. 41,390 (July 12, 2022) ............................................................. 9, 19

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474
    (April 29, 2024) ................................ 3, 4, 5, 6, 7, 9, 13, 14, 15, 17, 18, 21, 22, 23

Nondiscrimination on the Basis of Sex,
    40 Fed. Reg. 24,128, 24,134 (June 4, 1975) (now codified at 34 C.F.R.
    § 106.41(c)(1)) ....................................................................................................... 3

## **Codes**

20 U.S.C. § 1681 .............................................................. 1, 2, 4, 7, 8, 12, 15

20 U.S.C. § 1686 ............................................................................... 2, 7, 11

5 U.S.C. § 706 .................................................................................... 6, 24

Tennessee Code Annotated § 49-2-805 ............................................................. 5

Tennessee Code Annotated § 49-6-5102 ........................................................... 5

West Virginia Code § 18-2-25d ...................................................................... 5

# INTRODUCTION

In April 2024, the Department of Education sidestepped Congress and issued a sweeping new Title IX rule that tried to reshape America's educational system to reflect the Department's gender ideology. Since then, this Court and four others quickly enjoined the Rule; two appellate courts affirmed the scope of those injunctions; another court rejected the Rule's core logic by vacating the Department's Title IX guidance documents; and three courts rejected the Rule's unlawful Title IX interpretation when applied to Section 1557 of the Affordable Care Act.[1] All these courts got it right. This Court should now follow its prior decision and vacate the Department's unlawful Title IX rule nationwide, protecting the privacy and First Amendment rights of students and staff across the country.

# STATEMENT OF FACTS

*Title IX.* In 1972, Congress enacted Title IX, which forbids education programs receiving federal financial assistance from discriminating "on the basis of sex." Educ. Amends. of 1972, Pub. L. 92–318, title IX, § 901, June 23, 1972, 86 Stat. 373 (now codified at 20 U.S.C. § 1681 et seq.). Congress did so after "years of intense legislative debate premised on the fixed biological dichotomy between

---

[1] ECF No. 100 at 14; ECF No. 123 at 9; *Louisiana v. Dep't of Educ.*, No. 3-23-CV-00563, 2024 WL 2978786, at *21 (W.D. La. May 13, 2024), *stay denied* No. 24-30399, 2024 WL 3452887, at *2–3 (5th Cir. July 17, 2024); *Kansas v. Dep't of Educ.*, No. 5:24-cv-04041-JWB, 2024 WL 3273285, at *21 (D. Kan. July 2, 2024); *Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *37 (N.D. Tex. June 11, 2024); *Carroll Indep. Sch. Dist. v. Dep't of Educ.*, No. 4:24-cv-00461-O, 2024 WL 3381901, at *7 (N.D. Tex. July 11, 2024); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 615 (6th Cir. 2024); *Arkansas v. Dep't of Educ.*, No. 4:24 CV 636 RWS, 2024 WL 3518588, at *1 (E.D. Mo. July 24, 2024); *Florida v. U.S. Dep't of Health & Human Servs.*, No. 8:24-cv-1080, 2024 U.S. Dist. LEXIS 117619, *20-21 (M.D. Fla. July 3, 2024); *Tennessee v. Becerra*, No. 1:24cv161-LG-BWR, 2024 WL 3283887, *14 (S.D. Miss. July 3, 2024); *Texas v. Becerra*, No. 6:24-cv-211-JDK, 2024 WL 3297147, at *12 (E.D. Tex. July 3, 2024).

males and females[.]" ECF No. 100 at 6; *see id.* at 2–8 (discussing legislative history).

In its five decades, Title IX has produced striking results. Before Title IX in 1970, only 66% of working women had high-school diplomas; in 2016, it was 94%.[2] In 1972, only 7% of high-school varsity athletes were women; by 2018, it was 43%.[3] Girls now benefit from opportunities to pursue advanced education, attend college, and develop skills associated with competitive athletics.

Title IX recognizes the "enduring" "differences between men and women." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*). The statute does not "requir[e] integration of dormitories between the sexes" or mandate co-ed locker rooms or football teams. 117 Cong. Rec. 30,407 (1971) (Sen. Bayh). The statute repeatedly describes sex in biological and binary terms. It permits schools to go from admitting "students of one sex" to "students of both sexes." 20 U.S.C. § 1681(a)(2). It exempts "father-son or mother-daughter activities," while requiring that "if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex." *Id.* § 1681(a)(8). And Title IX must be construed to allow "separate living facilities for the different sexes." *Id.* § 1686. This construction rule requires respect for "personal privacy." 118 Cong. Rec. 5807 (1972) (Sen. Bayh). In short, "sex" in 1972 meant male or female.

Three years later, the Department's predecessor promulgated regulations that "required" schools "to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and

---

[2] U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017), https://perma.cc/B2C8-47QB.
[3] Women's Sports Found., 50 Years of Title IX at 12 (May 2022), https://perma.cc/TN74-PJ4S.

abilities of members of both sexes.'" Nondiscrimination on the Basis of Sex, 40 Fed. Reg. 24,128, 24,134 (June 4, 1975) (now codified at 34 C.F.R. § 106.41(c)(1)).

*The New Rule.* Now, the Department says Title IX also covers gender-identity discrimination, citing *Bostock v. Clayton County*, 590 U.S. 644 (2020), as justification. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (April 29, 2024). The Rule imposes a gender-identity mandate through two key provisions.

First, it states that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes … and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). "[S]ex discrimination," the Department says, is "any discrimination that depends" even "in part on consideration of a person's sex." *Id.* at 33,803. So Title IX applies to any consideration of gender identity because that "necessarily involves consideration of a person's sex, even if [the word "sex"] is understood to mean only physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*." *Id.* at 33,802 (citation omitted).

Second, the Rule creates a new form of sex-based discrimination applicable only based on gender identity. 89 Fed. Reg. at 89,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). To do so, the Department crafted a new "de minimis harm" standard that permits certain sex distinctions and forbids others depending on whether, in the Department's view, the distinction causes more than de minimis harm. *Id.* at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). And under the Rule, any policy or "practice that prevents a person from participating in an education program or activity consistent with the person's gender identity" causes more than de minimis harm. *Id.*

Together, sections 106.10 and 106.31(a)(2) create the Rule's gender-identity mandate: while "sex separation … is not presumptively unlawful," sex distinctions

3

cannot deny "a transgender student access to a sex-separate facility or activity consistent with that student's gender identity[.]" 89 Fed. Reg. at 33,818. To account for the statute's numerous provisions allowing consideration of sex, the Rule carves out specific exceptions. The Rule allows sex-based distinctions (based on biology, not gender identity) to ensure sex-specific "living facilities"—understood to mean only "housing," 34 C.F.R. § 106.32(a), not locker rooms and showers, *id.* § 106.33. The Rule also tries to exempt things like sororities and fraternities, girl and boy scouts, 20 U.S.C. § 1681(a)(1)–(9), and "separate [athletics] teams for members of each sex," 34 C.F.R. § 106.41(b).

The Rule also imposes a "broader standard" for hostile-environment claims. 89 Fed. Reg. at 33,498. Harassment now need only be severe or pervasive. Complainants need not "demonstrate any particular harm," or show the conduct denied them access to the educational program. *Id.* at 33,511. Harassment can be anything students deem "unwelcome" or that "limits" students' access to a benefit. *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2). The Department recognizes that this standard is "broader" than the Supreme Court's Title IX interpretation in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 641 (1999). *Id.* at 33,498. Combined with § 106.10, § 106.2 now requires students and staff to endorse gender-identity ideology by using pronouns based on gender identity (not sex) and by restricting speech saying sex is a binary concept.

*Intervenors.* A.C. is a female athlete and high-school student in West Virginia. App. to Int.-Pls.' Br. in Supp. of their Mot. for Summ. J (App.), 002, A.C. ¶¶ 1–2 ("A.C."). She throws shot put and discus, runs the 4 x 100 relay, and plays in the marching band. App. 002, 011, ¶¶ 2, 63. When A.C. was in middle school, a boy who identified as a girl named B.P.J. competed on her school track team. App. 003, ¶¶ 7–8. B.P.J. regularly beat A.C. and other girls. App. 003–007, ¶¶ 9–35. So far, B.P.J. has displaced nearly 300 girls in over 700 individual instances. App.

108, Rouleau Supp. B.P.J. changed in the girls' locker room and sexually harassed A.C. and her teammates. App. 007–010, A.C. ¶¶ 40–49, 51–61. A.C. does not want to compete against or share private spaces with any boy, no matter how they identify. App. 006, 008–009, 011–012, ¶¶ 28, 48-50, 63–69. But the new rules purport to preempt a West Virginia law that prohibits males from competing on women's sports teams. W. Va. Code § 18-2-25d.

Christian Educators Association International ("Christian Educators") is a membership organization for Christian educators. App. 015, Schmus ¶¶ 4–7. Some of its members want to express their religious belief that sex is an immutable characteristic. *See generally*, App. 038, Keaton; App. 046, McKay; App. 054, Moore; App. 060, Taylor; App. 067, Winkler; App. 076, Parker; App. 083, Field. Many of these members have received requests to use pronouns reflecting gender identity, not sex, and they fear the new Rule will compel them to speak these words while prohibiting them from expressing their religious beliefs. *Id.* Some members also fear that their schools will open shared restrooms to the opposite sex or force them to share intimate spaces like hotel rooms with the opposite sex. App. 034–035, Campbell ¶¶ 28–32; App. 064–065, Taylor ¶¶ 39–47; App. 073, Winkler ¶¶ 43–45; App. 080, Parker ¶¶ 29–31. Christian Educators seeks to protect its members' constitutional and statutory rights to speak, use sex-based pronouns, and access single-sex restrooms. App. 025, 026–027, Schmus ¶¶ 70, 79–81; *see* Tenn. Code Ann. § 49-6-5102(b)(1) (pronouns); Tenn. Code Ann. § 49-2-805(a) (restrooms); Ken. Rev. Stat. § 158.191(5) (pronouns).

*Procedural History.* After this Court allowed A.C. and Christian Educators to intervene, ECF No. 50, Intervenors, and the Plaintiff States each sought to stay the Rule's August 1 effective date and to preliminarily enjoin the Rule's enforcement. ECF No. 19, No. 63. The Court granted the motions, staying and

5

enjoining the Department from enforcing the Rule within Indiana, Kentucky, Ohio, Tennessee, Virginia, and West Virginia. ECF No. 100 at 14.

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In an APA case, "'the entire case on review is a question of law, and only a question of law,' to be based on the administrative record[.]" *Chamber of Com. of U.S. v. SEC*, 670 F. Supp. 3d 537, 551 (M.D. Tenn. 2023) (cleaned up). When agency action is "contrary to [law]," the reviewing court must "hold [it] unlawful and set [it] aside." 5 U.S.C. § 706. Here, the Final Rule is both contrary to law and arbitrary and capricious because it contradicts Title IX and violates the First Amendment and the fundamental right to bodily privacy. As a result, this Court should vacate the Final Rule and enjoin its enforcement.

## I.   The Rule's gender-identity mandate contradicts Title IX.

### A.   The Rule's new definition of "sex-based discrimination" in 34 C.F.R. § 106.10 is contrary to law, arbitrary, and capricious.

**1.** While the Rule assumes that "sex" means biological differences, it refuses to define the term. 89 Fed. Reg. at 33,802. That alone makes the Rule arbitrary and capricious. As this Court has explained, "the term ["sex"] ordinarily was understood [in 1972] to mean the character of being either male or female," and that is its unambiguous meaning in Title IX. ECF No. 100 at 18–20 (cleaned up). Numerous other courts agree. *See supra* n.1.

Yet the Rule declares that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). To justify this new definition, the Department

contends that "on the basis of sex" means the same thing as "because of such individual's … sex," so *Bostock*'s logic must apply to Title IX. ECF No. 91 at 5. *See* 89 Fed. Reg. at 33,807; *see also id.* at 33,803 ("the bases in § 106.10 [are] examples to clarify the scope of Title IX's coverage of sex discrimination, which includes any discrimination that depends in part on consideration of a person's sex."). But as the Sixth Circuit recently explained in this very case, *Bostock*'s logic applies to Title VII, not Title IX. ECF No. 123 at 5. That is correct for many reasons.

*First,* "the statutes use materially different language." *Id*. While Title VII forbids discrimination "because of such individual's" sex, Title IX says "no person" shall be subject to discrimination "on the basis of sex." 20 U.S.C. § 1681(a).  This general language differs from Title VII's "victim-centric" focus on individuals. ECF. 117 at 6-7. Other courts have noted similar textual distinctions. *See Texas*, 2024 WL 2947022, at *31 (Title IX's general "subjected to discrimination" language "suggests a negative distinction or differential treatment for the wrong reasons"); *M.K. ex rel. Koepp v. Pearl River Cnty. Sch. Dist.*, No. 1:22-cv-25-HSO-BWR, 2023 WL 8851661, at *8 (S.D. Miss. Dec. 21, 2023) (indefinite article "the—indicates that *the* basis of the discrimination [in Title IX] must be the student's sex.").

Importantly, Title IX forbids *only* sex-based discrimination in "any education program" (like classrooms and sports), whereas Title VII forbids discrimination directed against any individual based on *various traits* "with respect to … employment." So Title IX's text contemplates unique aspects of sex-based distinctions in unique educational spaces (such as sports). In contrast, Title VII treats an individual's sex in employment like race and religion, where none of these factors are "relevant." *Bostock*, 590 U.S. at 660.

The textual differences don't stop there. Title IX includes a construction rule that forecloses applying *Bostock* to Title IX. 20 U.S.C. § 1686 (Title IX's core antidiscrimination rule cannot "be construed" to prohibit "maintaining separate

living facilities for the different sexes"). Even the Department recognizes it cannot impose its gender-identity mandate on school "housing." *See* 89 Fed. Reg. at 33,821 (recognizing Rule's gender-identity mandate cannot apply to "living facilities" or the "the Department's housing provision at [34 C.F.R.] § 106.32(b)(1)").

Finally, § 106.10 does not merely explain what the Department understands "sex" to mean in light of *Bostock*'s but-for-causation logic; § 106.10 defines "sex-based discrimination." *Contra* 89 Fed. Reg. at 33,803. Redefining Title IX's core rule by referencing additional attributes contradicts the statute.

*Second*, and independently, Title IX often applies to the two sexes as groups. Unlike *Bostock*'s Title VII assessment, Title IX *does* operate by "ensur[ing] equal treatment between groups of men and women," *Bostock*, 590 U.S. at 671, or, put differently, "achiev[ing] classwide equality between the sexes[,]" *id.* at 664.

In provision after provision, Title IX and longstanding regulations allow schools to "treat[] males and females comparably as groups." *Id.* at 665 (rejecting this reading of Title VII). The statute exempts "father-son or mother-daughter activities" so long as "opportunities for reasonably comparable activities [are] provided for students of [both sexes]." 20 U.S.C. § 1681(a)(8). Schools "may provide separate housing on the basis of sex," but the housing for each sex must be "[c]omparable in quality and cost to the student." 34 C.F.R. § 106.32(b)(ii); *see also id.* § 106.32(c)(2) (similar). "[T]oilet, locker room, and shower facilities" must likewise be comparable as between the two sexes. 34 C.F.R. § 106.33. The list goes on. *See, e.g., id.* at § 106.31(c) (school assisting with foreign scholarships available to only one sex must "make[] available reasonable opportunities for similar studies for members of the other sex"); *id.* at § 106.34(b)(2) (when school provides permissible "single-sex class or extracurricular activity," it "may be required to provide a substantially equal [opportunity] for students of the excluded sex"); *id.* § 106.37(c) (athletic scholarships require "reasonable opportunities ... for members

8

of each sex in proportion to the number of students of each sex participating …").
And, importantly, schools must "provide equal athletic opportunity for members of
both sexes," *id.* § 106.41(c), but need not provide exactly the same sports or teams
to boys and girls, *id.* § 106.41(b); *cf.* Nondiscrimination on the Basis of Sex in
Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed.
Reg. 41,390, 41,462 (July 12, 2022) (explaining that Title IX complaints frequently
involve "analysis of available data and information" pertaining to "equal
opportunity" for males and females as groups).

      Even the Rule recognizes this difference sometimes, allowing the
Department to issue athletic regulations that deprive students of opportunities
based on sex if "the regulations are otherwise reasonable and require a recipient to
provide equal athletics opportunities in its program as a whole." 87 Fed. Reg. at
41,538; *see* 89 Fed. Reg. at 33,818 (adopting this rationale). The Rule distinguishes
athletics because prior regulations "have always permitted" sex distinctions there
based on "unique considerations." 89 Fed. Reg. at 33,819. But even longstanding
regulations cannot alter Title IX's text. If Title IX itself does not allow sex-based
distinctions, an agency could not permit them itself. But Title IX *does* allow such
distinctions: the athletics regulations (like the others adopted in 1975) show that
Title IX is not blind to sex. Unlike *Bostock*'s understanding of Title VII, Title IX
calls for schools to "treat[] males and females comparably as groups[,]" 590 U.S. at
665, when it comes to matters of privacy and physical differences.

      **2.** Even if *Bostock*'s but-for-causation rationale applies to Title IX, the Rule
goes too far in defining "sex-based discrimination" to include considerations like
"sex stereotypes," "gender identity" and "sex characteristics." Multiple courts have
recognized that *Bostock* did not create any new protected classes. *Texas v. EEOC*,
633 F. Supp. 3d 824, 831 (N.D. Tex. 2022); *Stollings v. Texas Tech Univ.*, No. 5:20-
CV-250-H, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021); *accord Texas*, 2024

WL 2947022, at *31 ("As the text makes plain, sexual orientation and gender identity are statuses," not protected classes).

But the Rule's new definition does just that, elevating "gender identity" and other characteristics to protected-class status under Title IX. As this Court explained, "[b]y preceding these new classifications with 'on the basis of,' a plain reading of § 106.10 coupled with the Department's *Bostock* interpretation would necessarily lead to the conclusion that Title IX also prohibits all things 'inextricably bound up' with "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." ECF No. 117 at 10.[4] By elevating gender identity to the same level as sex, the Rule tries to create a new protected class. That is contrary to law even under *Bostock*.

**3.** Title IX is clear, but the Rule would fail even if Title IX were ambiguous. When "competing plausible interpretations" exist, *Clark v. Martinez*, 543 U.S. 371, 381 (2005), courts should construe a statute "to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score," *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (cleaned up). And Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power[.]" *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (cleaned up). When Congress enacts statutes based on its spending power, "Congress must speak with a clear voice before it imposes new mandates on the States." *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *3 (6th Cir. July 17, 2024).[5]

---

[4] In fact, the Department has been trying to create this new class for nearly a decade. *See, e.g.*, Dep't of Justice & Dep't of Educ., Dear Colleague Letter on Transgender Students (May 13, 2016) (declaring Department will "treat a student's gender identity as the student's sex[.]"); *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 720 (4th Cir. 2016) (adopting *Auer* deference based on claimed ambiguity in "how a school should determine whether a transgender individual is a male or female[.]").

[5] Relatedly, Congress could not have intended to delegate the important question about the meaning of sex discrimination to unelected bureaucrats. So the

The Rule's gender-identity mandate is not "unmistakably clear in the language of [Title IX]." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up). In 1972, no one understood "discrimination on the basis of sex" to require schools to ignore sex in favor of gender identity. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815 (11th Cir. 2022) (en banc). Indeed, both Title IX's construction rule and longstanding regulations have recognized sex-specific privacy interests for fifty years. 20 U.S.C. § 1686; *e.g.*, 34 C.F.R. § 106.33.

This, too, distinguishes *Bostock,* which did not confront the clear-statement rule or the major-questions doctrine because *Bostock* did not involve spending-clause legislation or agency action. In fact, *Bostock* admitted "many, maybe most, applications of Title VII's sex provision were 'unanticipated' at the time of the law's adoption." *Bostock*, 590 U.S. at 679; *see id.* at 649 ("unexpected consequences"), 660 (calling its holding "momentous"). "*Bostock*'s holding cannot be reconciled with an argument that Congress spoke clearly on this 'unexpected' condition Defendants ask the Court to read into Title IX." *Texas*, 2024 WL 2947022, at *42.

The Department has argued (ECF No. 73 at 19) that Congress merely needs to "make the existence of the condition itself" "explicitly obvious." But that raises the generality level too high. It is not enough to "unambiguously notify" recipients that conditions exist; recipients must have clear notice of what conditions require. *Sossamon v. Texas*, 563 U.S. 277, 283 (2011). For example, a statute allowing "reasonable attorneys' fees as part of the costs" created a funding condition; but it still did not give clear notice that recipients must pay an opposing party's expert fees. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Similarly, a statute that forbade using funds to "directly or indirectly offset a reduction in [a State's] net tax revenue" created a condition; but it still did not give

---

Department's reading of Title IX also violates the major-questions doctrine. *See infra* at 15–16.

clear notice because the statute "le[ft] the [recipients] in the dark about when [the agency] may deem them to have violated the [condition]." *Kentucky v. Yellen*, 54 F.4th 325, 328 (6th Cir. 2022).

The Rule also exceeds Congress's spending power, which occurs when "pressure turns into compulsion." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012) (*NFIB*) (opinion of Roberts, C.J.) (cleaned up). And compulsion characterizes the Rule. The Plaintiff States here have "no real option but to acquiesce," *Id.* at 582, as demonstrated by their high compliance costs and potential funding loss. ECF No. 100 at 79–86.

**4.** The Rule's expanded definition of sex-based discrimination is also arbitrary and capricious. "[I]t is arbitrary to rely on *Bostoc*k's reasoning as a source of support for upending" the meaning of "on the basis of sex," 20 U.S.C. § 1681(a), "when the text, structure, purpose, and history of the statutes vary considerably." ECF 100 at 68. The Department tries to counter that *Bostock* and its but-for-causation test only identify bases of discrimination. But elsewhere, the Department says *Bostock* controls applications too, requiring gender identity to control bathrooms, locker rooms, and sports-team access. *See supra* 3–4. The Department can't have it both ways. If the Department has changed its mind about how *Bostock* applies to Title IX, it must say so and explain why. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (agency must "display awareness that it is changing position"). Failure to do so is "arbitrary and capricious." *See id.* at 222.

Similarly, the Department acts arbitrarily by denying § 106.10's effect on sex-specific private spaces and athletics. That "entirely fail[s] to consider [these] important aspect[s] of the problem[.]" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Specifically, the Rule admits that the Title IX athletic regulations require equal treatment for groups, but the Rule never explains why it elsewhere demands sex-blindness for

12

individuals. Nor does the Rule acknowledge the many other provisions that focus on group equality. *See supra* 8. Regulated parties are left to square the circle about why or how *Bostock* can be transplanted into Title IX. That lacks reason.

*Finally*, the Rule wrongly equates sex with "sex stereotypes" in its new definition. The Department doesn't dispute that sex does not mean "sex stereotypes," and that "recognizing and respecting biological sex differences does not amount to stereotyping." ECF 100 at 24 (quoting *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023)); *accord Adams*, 57 F.4th 791, 809–810. But the Rule fails to explain why it treats "sex stereotypes" the same as "sex."

### B. The Rule's new de-minimis harm provision in 34 C.F.R. § 106.31(a)(2) is contrary to law, arbitrary, and capricious.

As this Court has explained, "[t]he truth is that the two sexes are not fungible." ECF No. 100 at 2 (cleaned up). Title IX recognizes as much. "The drafters of Title IX recognized that "safeguarding … equal educational opportunities for men and women necessarily requires differentiation and separation' of the sexes at times." *Id.* at 19 (quoting *Texas*, 2024 WL 2947022, at *32)). The upshot: Title IX's respect for longstanding sex distinctions contradicts the Rule's equating these distinctions to "discrimination" causing "more than de minimis harm." 89 Fed. Reg. at 33,887. Yet the Department has created a new form of disparate-impact discrimination that allows gender identity to trump sex, making these long-recognized sex distinctions unlawful. This is contrary to law.

**1.** Section 106.31(a)(2)'s new form of discrimination subverts Title IX's sex-based protections and is "arbitrary in the truest sense of the word." ECF No. 100 at 90. First, the new de-minimis-harm language appears nowhere in Title IX's text. Second, the new provision's reasoning is circular: "more than de minimis harm" is "legally cognizable injury," 89 Fed. Reg. at 33,814, and an injury is cognizable under Title IX if it "impose[s] more than de minimis harm," *id.* at 33,811. Third,

13

the Rule makes "more than de minimis harm" discrimination available based on gender identity alone. *Id.* at 33,887. Only in that context are sex-based distinctions per se illegal—except when they aren't. The de-minimis-harm provision, after all, allows sex and gender-identity distinctions for Title IX's statutory exemptions, "living facilities," and athletics. *Id.* None of that makes sense.

Fourth and perhaps most problematic, the Department's new form of discrimination elevates gender identity above sex. For example, take a boy who identifies as male but wants to use the female restroom because it is much more convenient. He unquestionably is excluded based on sex and suffers an injury. *See* ECF 117 at 8. But Title IX allows it to protect girls' privacy. Under the new Rule too, that harm is "de minimis." *E.g.*, 89 Fed. Reg. at 33,820.

Now assume the same boy identified as a girl. Same policy. Same exclusion. Same privacy interests. Yet for the Department, a different injury. While a sex-based exclusion to protect privacy is de minimis, a sex-based exclusion applied to someone who happens to identify as transgender is more than de minimis. That "add[s] words" and "impose[s] a new requirement" that Title IX does not. *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024). And far from employing an "objective standard," the Rule says harm is cognizable only if it implicates a person's "subjective, deep-core sense of self." *Compare* 89 Fed. Reg. at 33,815, *with id.* at 33,809; *see also Muldrow*, 144 S. Ct. at 974–75 (explaining elevated harm showing leads to subjective evaluations of what counts as "significant"). Nothing in Title IX's text distinguishes between sex-based exclusions "causing significant disadvantages and [sex-based exclusions] causing not-so-significant ones." *Muldrow*, 144 S. Ct. at 974.

To make matters worse, this result undermines Title IX's very purpose: to alleviate "discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999). By having gender identity trump

sex-based privacy protections, the new standard makes it impossible for students and particularly female students to "participat[e] in" or receive "the benefits of" educational programs. 20 U.S.C. § 1681. But courts should prefer "textually permissible interpretation[s] that further[] rather than obstruct[] the document's purpose …" Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012) (explaining presumption-against-ineffectiveness canon); *see also* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968–76 (2021) (explaining how textualists can consider "the problem to which the statute was addressed, and also the way in which the statute is a remedy for that problem."); John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70 (2006) ("[T]extualists recognize that the relevant context for a statutory text includes the mischiefs the authors were addressing."). The de-minimis-harm standard falters at this most basic level.

Fifth, the Rule's de-minimis-harm standard creates absurd results. Under the Rule's logic, Congress *intended* schools to sometimes impose more than de minimis harm. 89 Fed. Reg. at 33,818 (explaining that statutory carveouts allow "sex-specific policies and practices … that may cause more than de minimis harm to a protected individual"). That "throwaway reasoning" would mean Congress cared more about sex designating "Boy Scouts or Girl Scouts" than privacy in female-only showers and locker rooms. ECF 100 at 25. That cannot be right and goes entirely unexplained. All this underscores that the new de-minimis harm standard contradicts not just Title IX's text, purpose, and structure but common sense too.

**2.** The Rule's new form of sex-based discrimination also violates the clear-statement rule, contravenes the major-questions doctrine, and exceeds Congress's spending power. *See supra* at 10–12 (summarizing these doctrines).

First, the new type of "sex-based discrimination" is not "unmistakably clear in the language of [Title IX]." *Gregory*, 501 U.S. at 460. And second, it imposes

sweeping new requirements on schools, which must refer to "gender identity" instead of sex in all manner of formerly sex-specific circumstances. But courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). So even apart from Spending Clause problems, the Rule would be unlawful. Like HHS's nationwide eviction ban, the Labor Department's nationwide vaccine mandate, or the EPA's attempt to restructure the nation's energy industry, imposing a novel gender-identity mandate on all schools is a matter of "staggering" "economic and political significance" for which Congress has given the Department no clear authority. *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (cleaned up). Our nation has engaged in a sustained debate about allowing men to access women's sports and private spaces. *E.g.*, *Adams*, 57 F.4th 791. Congress would not hide this extremely controversial public-policy question in Title IX without making itself clear. Meanwhile, this question's economic significance is also massive—subjecting schools nationwide to losing billions in federal funding. ED cannot adopt this major policy change by administrative fiat.

**3.** The Rule's de-minimis-harm proviso also violates students' and staff's constitutional and statutory privacy rights. As this Court recognized, "students of both sexes would experience violations of their bodily privacy by students of a different sex if the Final Rule became effective." ECF No. 100 at 74. Thus, the Rule violates students' fundamental right "to be free from forced exposure of one's person to strangers of the opposite sex." *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987). *See also* ECF 63-1 at 21-22 (explaining point).

Because being undressed before the opposite sex is "especially demeaning and humiliating," even prisoners can't be forced to do it. *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 757 (6th Cir. 2004). So it's no surprise that the Sixth Circuit has applied privacy rights to school restrooms, showers, and locker rooms where

students appear in their "underwear." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 495 (6th Cir. 2008); *accord Adams*, 57 F.4th at 805 (collecting cases). After all, schoolchildren have at least as much privacy rights as adult prisoners to shower, change clothes, and use the restroom without the gaze of the opposite sex. Yet the Department incredibly says no one has a "legitimate privacy interest" in sharing these spaces with members of the opposite sex so long as they identify as the same sex. 89 Fed. Reg. at 33,820.

Nothing—much less a compelling interest—justifies this intrusion on bodily privacy. As the Supreme Court recognized in *VMI*, stopping sex discrimination is perfectly consistent with "afford[ing] members of each sex privacy from the other[.]" 518 U.S. at 550 n.19. In fact, the government's real interest runs in the opposite direction of the Rule. Enforcing sex-designated spaces—not destroying them—"advances the important governmental objective" of protecting citizens' privacy. *Adams*, 57 F.4th at 804–07; *accord D.H. ex rel. A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 834–35 (M.D. Tenn. 2022).

A.C. illustrates the point. To participate in school activities like band and sports, she and her female classmates have to share hotel rooms, change into skintight clothes with minimal privacy, and use the bathroom in shared spaces. App. 093–094, A.C. Supp. ¶¶ 10–21. By introducing males into these spaces, the Rule makes a mockery of Title IX's promise of equal educational opportunity.

**4.** Section 106.31(a)(2) is also arbitrary and capricious for numerous reasons.

*First,* the Department never seriously engaged with how the Rule threatens the privacy interests mentioned above. *Supra* 16–17. *E.g. Texas*, 2024 WL 2947022, at *34. Defendants' requirement that "schools must permit biological men into women's intimate spaces … is not only impossible to square with Title IX, but with the broader guarantee of education protection." *Id.* Yet the Department continues to pretend biological differences are irrelevant.

17

*Second*, the Department failed to consider reliance interests. The Rule's position that schools and educators had "notice that its policy of separating male and female bathrooms," locker rooms, and showers "violate[d] Title IX" is "untenable." *Adams*, 57 F.4th at 816. Schools built sex-designated facilities consistent with Title IX as they understood it for five decades. Absent relief from this Court, schools will have to construct single-user facilities to protect student and staff privacy. While the Department insists otherwise, this failure underscores the inaccuracy of the Department's compliance cost estimate.

*Third*, the Department failed to explain why it requires schools to open up all private spaces to students and staff who identify as the opposite sex, but not to students and staff who identify as nonbinary. 89 Fed. Reg. at 33,818. This cannot be squared with the Rule's determination that *Bostock* forbids applying any sex distinction to persons who identify as nonbinary. *Id.* at 33,807.

*Finally*, the Rule "fails" to "answer[ ]" whether Title IX would prohibit schools and educators from "treat[ing] a student according to [his or her] biological sex [if] requested by the parents to do so." *Texas*, 2024 WL 2947022, at *41 n.135. This Court agrees. ECF 100 at 63–66. But parents have the fundamental right to determine whether to affirm a student's "gender identity" when it differs from the child's sex. *Id.* Defendants fail to recognize the "private realm of family life which the state cannot enter[.]" *Id.* at 66.

## C.   The Department's justifications are unavailing.

To defend the Rule, the Department claims that § 106.10 is innocuous and that the Rule will not affect sports. *See* ECF No. 104 at 5 (claiming § 106.10 does not harm plaintiffs when it comes to "sex-separate facilities like bathrooms."); ECF No. 91 at 1 (denying Rule's effect on sports). Neither defense holds up.

**1.** This Court and the Sixth Circuit have correctly rejected the Department's contention that § 106.10 causes no harm. *See* ECF No. 117 at 12; *Tennessee*, 2024 WL 3453880, at *2. The Department's litigation position contradicts (1) its own reasoning in the Rule's preamble and (2) the Department's prior positions aired publicly and in court.

*First*, the Rule itself invokes cases that have (incorrectly) read *Bostock* to require schools to open restrooms and athletics based on gender identity. 89 Fed. Reg. at 33,807 (citing, *inter alia*, *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020)); *id.* at 33,818 (incorporating 87 Fed. Reg. at 41,535, which relied on, *inter alia*, *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 356 (S.D. W. Va. 2021)). Having used these cases to justify § 106.10, the Department cannot plausibly maintain that § 106.10 "is not the cause of Plaintiffs' claimed harms[.]" ECF No. 104 at 5. The Rule must be judged on its own terms, not based on post hoc positions. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020).

*Second*, the Department has spent the past three years arguing that *Bostock* requires schools to open school restrooms and sports based on gender identity. In its now-vacated 2021 guidance documents, the Department identified restrooms, personal pronouns, and athletic teams based on biological sex as examples of unlawful discrimination, citing *Bostock*.[6] And just last year, DOJ argued that *Bostock* requires gender identity to control over sex in Title IX athletics. Br. for the U.S. as Amicus Curiae in Supp. of Pl.-Appellant and Urging Reversal 27–28, *B.P.J.*

---

[6] *See Texas*, 2024 WL 2947022, at *32–33 (vacating Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021); U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families (June 2021), https://perma.cc/KA47-U9LJ.

*v. W. Va. State Bd. of Educ.*, 98 F.4th 541 (4th Cir. 2024) (Nos. 23-1078(L), 23-1130), 2023 WL 2859726 ("BPJ Brief"). The Department cannot whitewash its prior positions to claim that redefining "sex" does not affect these areas.

**2.** Nor are women's sports safe from the Rule. To be sure, § 106.31(a)(2) exempts the athletics provision at 34 C.F.R. § 106.41(b), which (the Rule claims) will be amended in a separate rulemaking. But *this* Rule already affects athletics. It does so in three moves. First, § 106.10 broadly redefines sex discrimination throughout the Rule to include gender identity. Second, § 106.11 makes clear that "this part" including § 106.10 "applies … to *all sex discrimination* occurring under a recipient's education program or activity …" (emphasis added). Third, § 106.31(a)(2) only exempts § 106.41(b), not § 106.41(a), which bans sex discrimination "in any interscholastic, intercollegiate, club or intramural athletics…" The net result is that § 106.10's general default rule redefining sex still applies to athletics, and that new default rule still applies to § 106.41(a), which also explicitly covers athletics.

To be sure, this Court said earlier that schools may still "separate athletic teams for the sexes" based on the current athletic regulations in § 106.41 until the administration's Proposed Athletics Rule is finalized. ECF 100 at 78–79. But that overlooks §§ 106.10 and 106.11's broad reach; these sections would redefine sex-based discrimination everywhere in Title IX's regulations unless explicitly exempted by the new Rule. And as the Court has recognized, *id.* at 77 n.16, the Rule itself requires schools to open up sports based on gender identity, which creates enormous problems for female athletes like A.C. who will face unfair competition and be forced to tolerate males in their locker rooms.

The Department has not disavowed this interpretation. Nor could it. *Cf.* ECF 100 at 25 (rejecting the Department's effort to limit the broad effect of the "new definition of discrimination on the basis of sex" in § 106.10 (cleaned up)). In fact,

the Department has already interpreted § 106.41(a) incorrectly to require opening women's sports based on gender identity. BPJ Brief at 27-28. Sections 106.10 and 106.11 create an independent default rule doing the same while also redefining sex in § 106.41(a) to ensure it explicitly opens sports based on gender identity. In light of these changes imposed on athletics, Intervenors need relief against this Rule no matter whether the administration finalizes the Proposed Athletics Rule.

## II.   The Rule is contrary to the First Amendment.

**A.** Students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). "*Tinker*'s demanding standard" protects student speech unless schools show it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 188, 193 (2021). The First Amendment also protects public employee speech on matters of public concern, including "gender identity"— "a hotly contested matter of public concern," *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021). The government bears an even "heavier burden" to justify compelling speech. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 907 (2018).

The Rule violates these principles for two main reasons. *First*, the gender-identity mandate expands the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes." 89 Fed. Reg. at 33,886. The Department doesn't even define "gender identity," except to say it "describe[s] an individual's sense of their [sic] gender." *Id.* at 33,809. *Second*, the Rule creates an amorphous, "broader standard" for hostile-environment claims. *Id.* at 33,498. Harassment need only be severe *or* pervasive. Complainants need not show "any particular harm" or denial to an educational program. *Id.* at 33,511. Harassment can be anything

students consider "unwelcome" or that "limits" their ability to benefit. *Id.* at 33,884. And the Rule's harassment definition applies to speech online or outside the country. *Id.* at 33,535, 33,886.

This all violates protections against overbreadth, vagueness, compelled speech, and viewpoint discrimination. The overbreadth doctrine prohibits a law that has "a substantial number" of unconstitutional "applications … in relation to" its "plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). But the Rule forces students and teachers, like members of Christian Educators, to use inaccurate pronouns and avoid saying sex is binary. Even the Rule admits that "misgendering" can be considered illegal harassment. 89 Fed. Reg. at 33,516. Plus, that harassment need not be severe. *Id.* at 33,498. Pervasiveness is enough, and pronoun usage is pervasive, given its "ubiquity" in conversation. ECF No. 100 at 52–53. Likewise, the Rule applauded punishing a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS," because that speech "invades the rights of others." *Id.* at 33,504. So teachers reasonably fear that nearly anything they say about sex or gender issues could be construed as sex stereotyping or harassment. *See, e.g.*, App. 098–099, Taylor Supp. ¶¶ 5–12; App. 103–104, McKay Supp. ¶¶ 6–14.

Nor can the Department feign confusion about the Rule's effect. The Department has already filed amicus briefs saying teachers can create Title IX liability when they refuse to use gender-identity-based pronouns. ECF No. 100 at 44–46. And just recently, DOJ argued that a school policy requiring teachers to use gender-neutral titles like "teacher" or "coach," but not honorifics and pronouns based on gender identity, creates a hostile environment under Title VII. Statement of Interest of the United States of America, *Wood v. Fla. Dep't of Educ.*, No. 4:23-cv-00526., 2024 WL 3380723 (N.D. Fla. June 27, 2024). That supposed Title VII

standard "aligns closely with the definition of hostile environment sexual harassment" the Rule applies to Title IX. 89 Fed. Reg. at 33,474.

The Rule is also overbroad because it requires schools to police speech far beyond the *Davis* standard, which made schools liable under Title IX for deliberate indifference to sexual harassment "so severe, pervasive, *and* objectively offensive that it effectively *bars* the victim's access to an educational opportunity or benefit." 526 U.S. at 633 (emphasis added). It crafted this rule to honor First Amendment protections, responding to the dissent's concerns that "it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims" based on free speech. *Id.* at 649. Jettisoning it forces teachers to police protected student speech without telling them where the line is. *See, e.g.*, App. 099–100, Taylor Supp. ¶¶ 14–15. The Rule's harassment definition sweeps up speech even off campus or outside the United States, disregarding that courts should be "skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *B.L.*, 594 U.S. at 189–90. So even abroad, teachers cannot express the basic view that sex is binary. *See, e.g.*, App. 080, Parker ¶ 32. In fact, courts regularly invalidate harassment definitions like the Rule's as overbroad. *E.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114–15, 1125 (11th Cir. 2022); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482, n.6 (S.D. Tex. 2022).

Finally, the Rule imposes gag orders during harassment grievance proceedings "to protect the privacy of the parties and witnesses." 89 Fed. Reg. at 33,891 (34 C.F.R. § 106.45(b)(5)). But this prior restraint—which prohibits discussing the case with the media or publicly criticizing the recipient's handling of the process—bears a "heavy presumption against its constitutional validity" and requires substantive and procedural safeguards. *See McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012). The Rule's gag orders meet none of these requirements.

From overbreadth to vagueness, the latter requires laws to give "fair warning of proscribed conduct" and disallows terms that give officials "unbridled discretion." *Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010) (cleaned up). The Rule fails. The Department's "broader" harassment definition means nearly any statement about gender identity—an undefined term—could subject students or employees to harassment claims. And this Court has recognized, the Rule's "reliance on amorphous and undefined terms make it 'vague and overbroad in a way that impermissibly chills protected speech." ECF 117 at 14.

**B.** The provisions are arbitrary and capricious. The Department insists its First Amendment disclaimers satisfy First Amendment obligations. Yet, the Department fails to fully address the chill its new definition will cause, its lax procedural protections, gag-order requirements, or other First Amendment issues.

## III.   This Court should vacate the Rule.

Under the APA, this Court must "set aside" agency action found unlawful. 5 U.S.C. § 706. This vacatur is "the normal remedy" under the APA, particularly when agency action is so contrary to law that further agency explanation "cannot rehabilitate" it. *Long Island Power Auth. v. Fed. Energy Regul. Comm'n*, 27 F.4th 705, 717 (D.C. 2022). And since Christian Educators has members in all fifty states, ECF No. 21-7 at ¶ 9, vacating the Final Rule nationwide is the only way to afford Christian Educators complete relief. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (order should "provide complete relief to the plaintiffs"). Plus, this Court has already found irreparable harm and the public interest favoring Intervenors. ECF No. 100 at 87–88. That conclusion still holds. So the proper remedy is to vacate the Rule nationwide. *See, e.g.*, *Nat'l Cotton Council of Am. v. U.S. EPA,* 553 F.3d 927, 940 (6th Cir. 2009) (vacating agency rule nationwide).

Alternatively, this Court should at least enjoin the Rule to protect A.C. and every Christian Educators member. For A.C., the injunction should cover her school and any school she visits through band, track, or other school-sponsored extra-curricular activity. App. 093–094, A.C. Supp. ¶¶ 10–22 (detailing travel). For Christian Educators, the injunction should cover each member's school. A district court in Kansas recently ordered similar relief, enjoining "implementation and enforcement of the Final Rule at any school attended by a member" of plaintiff organizations. *Kansas*, 2024 WL 3273285, at *21. This Court should do likewise.

Notably, though, the Kansas court admitted how the injunction would create "patchwork enforcement" problems, but found it "a problem of [the Department's] own making" when it decided to "upend[] the operations of virtually every school in the nation by upsetting the decades-long understanding of important parts of Title IX[.]" *Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3471331, at *4 (D. Kan. July 19, 2024). But this underscores the need to issue the "normal [APA] remedy" here: nationwide vacatur that avoids confusion and best protects affected parties from harm. *Long Island Power Auth.*, 27 F.4th at 717.

Vacatur should also apply to the *entire* Rule. This Court has already rejected the Department's severability arguments. The Rule's importation of *Bostock* "necessarily embeds a new meaning of sex discrimination into the entire Final Rule." ECF No. 117 at 16. Its provisions are "inescapabl[y] interconnected[]" because the gender-identity mandate, which "fundamentally redefines the scope and application of Title IX," undergirds them all. *Id.* at 20–21.

## CONCLUSION

Intervenor-Plaintiffs respectfully request that the Court grant this motion, vacate the Rule, or enter the requested injunction, and award judgment as a matter of law in their favor.

Respectfully submitted this 26th day of July, 2024.

<div style="display:flex">
<div>

Edward L. Metzger III
Kentucky Bar No. 94138
OMEGA LAW PLLC
P.O. Box 559
Union, KY 41091
(859) 898-2140
Lee@nkylaw.net

</div>
<div>

*/s/ Natalie D. Thompson*

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Natalie D. Thompson**
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

</div>
</div>

*Counsel for Intervenor-Plaintiffs*

*\*Admitted pro hac vice*

*\*\*Admitted pro hac vice; practice supervised by one or more D.C. Bar members while D.C. Bar application is pending.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2024, a copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system. I further certify that the foregoing document was served using the CM/ECF system on all counsel of record.

*/s/ Natalie D. Thompson*
Natalie D. Thompson
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org