# SOUTH COASTAL COUNTIES LEGAL SERVICES, INC.

Fall River Law Office
22 Bedford Street
Fall River, MA 02720-3002

TEL (508) 676-6265 • (800) 244-9023
FAX (508) 676-5861

September 12, 2022

The Honorable Miguel A. Cardona
Secretary
U.S. Department of Education
400 Maryland Avenue S.W.
Washington D.C. 20202

*VIA Federal eRulemaking Portal*

**RE**: Comment on Proposed Rule Regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Docket ID: ED–2021–OCR–0166 (87 Fed. Reg. 41390 (July 12, 2022))

Dear Secretary Cardona,

South Coastal Counties Legal Services ("SCCLS") submits the following comment in response to the Department of Education's ("Department") proposed regulations published on July 12, 2022 amending Title IX of the Education Amendments of 1972 ("Title IX"). SCCLS supports the Department's overall effort to amend the current Title IX regulations to better align with Title IX's purpose to eradicate sex discrimination in federally funded education programs – including elementary and secondary institutions. SCCLS is particularly supportive of the increased protections for student with disabilities and students identifying as LGBTQ+. In consideration of the unique impact Title IX protections have on students with disabilities and LGBTQ+ students, SCCLS submits the following comments and recommendations.

## STATEMENT OF INTEREST

SCCLS is a private, non-profit law firm that provides free legal assistance in civil matters to low-income residents in Massachusetts residing in Barnstable, Bristol, Dukes, Nantucket, and Plymouth Counties, and parts of Norfolk County. Together with its wholly owned subsidiary, the Justice Center of Southeast Massachusetts, SCCLS operates community-based law offices in Fall River, New Bedford, Hyannis, and Brockton, Massachusetts.

Recognizing that the clients and communities we serve are marginalized, often under-resourced, underserved, and underrepresented, SCCLS's mission is to achieve justice for low-income clients through client-centered community based legal advocacy. In each of our practice areas, we seek to empower our clients to reach their legal objectives by recognizing that our clients are the experts of their own lives. Consistent with this mission, our Education Unit, and its work in the Civil Legal Aid to Victims of Crime project, advocates on behalf of low-income students in elementary and secondary institutions to empower our clients to achieve their educational goals and to dismantle policies and practices that operate as barriers to students obtaining equal

South Coastal Counties Legal Services is funded by individuals, corporations, municipalities, foundations, and the following partners:

        

SCCLS is a 501(c)(3), not for profit agency. All funds received by SCCLS are spent in accordance with the Legal Services Corporation Act of 1974, as amended 1977, 42 U.S.C. §§ 2996 et. seq., its implementing regulations, 45 C.F.R. § 1600 et. seq., and other applicable law.

access to educational opportunities. Many of our students are students with disabilities, students of color, and/or identify as LGBTQ+. We recognize that the students we represent hold multiple and intersecting identities that inform the experiences they have, the barriers they face, and the biases they are subjected to. To that end, in keeping with the mission and values of SCCLS, the Education Unit directly confronts the discriminatory systems affecting our clients based on their socio-economic status, disability, sex, gender identity, sexual orientation, national origin, and/or race - issues that remain persistent in our region.

SCCLS has an interest in the Department's amendments to the Title IX regulations, and in particular, the Department's clarification that Title IX prohibits a broader scope of discriminatory conduct thereby providing protections to a more inclusive population of students. *See* 87 Fed. Reg. 41531. SCCLS frequently represents students with disabilities and students who identify as LGBTQ+ who have experienced sex-based discrimination, including sexual harassment, within their educational setting. At the same time, many of our students experience other intersecting forms of discrimination, including racial and disability-based discrimination. We agree with the Department's observation that Title IX exists at the intersection of multiple harms. *See* 87 Fed. Reg. 41392.

In Southeastern Massachusetts, students with disabilities make up a disproportionately high percentage of the student body.[1] At the same time, on a national scale, individuals with disabilities are four times more likely than non-disabled individuals to experience some form of serious violent crime, including sexual assault.[2] Moreover, in national surveys, survivors of sexual assault often report they experienced their first sexual assault before they turned eighteen (18) years old.[3] The same is true in the communities we serve. In 2021, among reported sexual assault crimes, survivors under the age of 17 in Brockton,[4] Fall River,[5] and New Bedford[6] represented more than one third of all survivors in those communities. In addition, perpetration of sexual assault against individuals with disabilities is often committed by a non-family member acquaintance.[7] Accordingly, the research suggests that students with disabilities may be exposed to risks of sexual assault in school-based settings in alarmingly high numbers.

---

[1] In the 2021-2022 academic year, 18.9% of students in Massachusetts have a disability, while in Fall River 23.3% of students have a disability. In Brockton, students with disabilities make up 16.7% of the population, and in New Bedford 22.2% of the population is comprised of students with disabilities. *See Fall River School and District Profile*, Department of Elementary and Secondary Education (2021), *available at*
https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00950000&orgtypecode=5&leftNavId=305&; *Brockton School and District Profile*, Department of Elementary and Secondary Education (2021), *available at*
https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00440000&orgtypecode=5&leftNavId=305&; *New Bedford School and District Profile*, Department of Elementary and Secondary Education (2021), *available at*
https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=02010000&orgtypecode=5&leftNavId=305&

[2] Erika Harrell, *Crime Against Persons with Disabilities, 2009–2019 – Statistical Tables*, Dep't of Justice (Nov. 2021), *available at* https://bjs.ojp.gov/content/pub/pdf/capd0919st.pdf (concluding that "for persons with disabilities, the rate of violent crime, excluding simple assault, (17.9 per 1,000) was more than four times the rate for persons without disabilities (4.0 per 1,000)").

[3] Approximately 50% of female identifying rape survivors reported they were under the age of eighteen (18) when they were raped for the first time. Similarly, male identifying survivors make up approximately 57% of rape survivors who report being raped for the first time before they turned eighteen (18). These rates are consistent for survivors of unwanted sexual contact. Female identifying survivors under the age of eighteen (18) make up approximately 57% of survivors who report unwanted sexual contact for the first time, and male identifying survivors make up 43% who report unwanted sexual contact for the first time. *See* Kathleen C. Basile, Sharon G. Smith, Marcie-jo Kresnow, Srijana Khatiwada & Ruth W. Leemis, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence*, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention (2022), *available at* https://www.cdc.gov/violenceprevention/pdf/nisvs/nisvsReportonSexualViolence.pdf

[4] In Brockton, survivors under the age of 17 represented 51.8% of all survivors of sexual assault in 2021. *See* Massachusetts Crime Victim Statistics, 2021, *available at* https://masscrime.chs.state.ma.us/tops/report/violent-crimes/brockton/2021

[5] In Fall River, survivors under the age of 17 represented 34% of all survivors of sexual assault in 2021. *See* Massachusetts Crime Victim Statistics, 2021, *available at* https://masscrime.chs.state.ma.us/tops/report/violent-crimes/fall-river/2021

[6] In New Bedford, survivors under the age of 17 represented 44.5% of all survivors of sexual assault in 2021. *See* Massachusetts Crime Victim Statistics, 2021, *available at* https://masscrime.chs.state.ma.us/tops/report/violent-crimes/new-bedford/2021

[7] Harrell, *supra* note 2, at 6 (concluding that "he percentage of violent victimizations committed by a non-relative the victim knew was similar for victims with (33%) and without (30%) disabilities")

2

It is equally important to note that students with disabilities also experience other forms of sex-based discrimination, which impede their equal access to educational programs and opportunities. When determining whether to provide special education services, or what services to provide, decisions are often informed by gender biases and academic expectations rooted in problematic stereotypes.[8] As a result, female identifying students are underrepresented among students receiving special education services creating vast gender inequities.[9]

Separately, LGBTQ+ students make up a sizeable portion of the student population in Massachusetts. A 2015 Massachusetts Youth Risk Behavior Survey reported that 11.1% of students surveyed identified as gay, lesbian, bisexual, or questioning about their sexual orientation, and 2.9% identified as transgender or questioning their gender identity.[10] The same survey discovered that LGBTQ high school students in Massachusetts are nearly 3 times as likely to have experienced non-consensual sexual contact compared to their peers.[11] In addition, 28.2% of LGBTQ high school students reported they were bullied, which is more than double the rate of their peers.[12]

Given the high rate of sex-based discrimination, including sexual harassment, among young persons with disabilities and LGBTQ+ students, strong Title IX regulations are vital to ensuring the students we represent are able to benefit from and thrive in their educational programs free from sex-based discrimination and harassment. Accordingly, SCCLS is taking this opportunity to provide comments specific to the portions of the proposed regulations that address the needs of our clients who experience sex-based discrimination.

## I.    SCCLS Supports the Department's Proposed Rules to Increase Access to Title IX Processes and Protections for Students with Disabilities.

Through its proposed amendments, the Department is seeking to increase disabled students' access to Title IX processes and protections. By contrast, in its current form, the Title IX regulations are inadequate to provide disabled students with access to the Title IX process and do not afford disabled students the full benefit of Title IX protections. The inadequate protections are, in part, the product of the limited definition of sex-based discrimination, which limits sex-based discrimination to incidents that meet the narrow definition of sexual harassment. By clarifying the broader definition of sex-based discrimination, the Department is acknowledging that sex-based discrimination occurs in a myriad of ways and is not limited to sexual harassment. SCCLS agrees that this is consistent with Title IX's purpose.

In our work, SCCLS has observed instances where elementary and secondary institutions blatantly disregard their Title IX obligations. We have observed instances in which schools fail to accept complaints of sex discrimination, fail to investigate complaints, and/or fail to provide supportive measures. These failures have resulted in severe and significant set-backs for students, and have operated as a barrier to educational opportunities. In cases involving disabled students these institutions can justify their disregard of Title IX by pointing to the current regulations, which are non-inclusive and fail to recognize the ways that disabled students may report sex discrimination, comprehend information, participate in grievance processes, and/or require supportive measures to continue accessing and progressing in their education.

---

[8] Steven Severance & Erica Howell, *On Gender Disparities in Disability Identification and Special Education Services*, Journal of Gender and Power, Vol. 8, No. 2 (2017), *available at* http://gender-power.amu.edu.pl/JGP_Vol_8_No_2_C.pdf

[9] *Id.* at 28 (concluding, "thus, the gender imbalance is inequitable not because more boys are served per se; rather, it is inequitable because girls who otherwise qualify for, or would benefit from, special education services do not receive them").

[10] *Sexual Orientation and Gender Identify Among Massachusetts High School Students*, Massachusetts Commission on LGBTQ Youth (2015), *available* at https://www.mass.gov/doc/2015-youth-behavior-risk-study-sexual-orientation-and-gender-identity-among-massachusetts-high/download

[11] *How Sexual Harassment Hurts LGBTQ Youth in Massachusetts*, Massachusetts Commission on LGBTQ Youth (2015), *available at* https://www.mass.gov/doc/how-sexual-harassment-hurts-lgbtq-youth-in-ma-commission-on-lgbtq-youth/download

[12] Massachusetts Commission on LGBTQ Youth, *supra* note 10.

AR_004816

The Department's proposed amendments clarify recipient educational institutions – including elementary and secondary schools – have an obligation to comply with Title IX. Just as important, the proposed amendments would implement requirements aimed at affording students with disabilities access to a process that is currently inaccessible to them. In particular, SCCLS appreciates the opportunity to provide comments and recommendations on the following proposed amendments specific to Title IX's application to students with disabilities:

### A. SCCLS Supports the Department's Proposed Amendment to Clarify that Title IX Applies to All Forms of Sex Discrimination in Proposed 34 C.F.R. § 106.10.

The Department's clarification that Title IX applies to all forms of sex-based discrimination, rather than limited to sexual harassment, supports all students, but in particular students with disabilities. Students with disabilities experience sex-based discrimination in ways not limited to sexual harassment, including equal access to special education services. Decisions related to special education referrals, whether to provide special education services, and what services, if any, the school must provide, are informed and clouded by gender bias.[13] These biases occur as a result of academic and behavioral expectations that are grounded in gender stereotypes, among other things.[14] Students with disabilities who are subjected to sex-based discrimination in the context of special education, or an attempt to access any other educational opportunity, should be afforded Title IX protections. Accordingly, SCCLS supports the Department's decision to clarify the broader scope of Title IX and its application to all forms of sex-based discrimination.

### B. SCCLS Supports the Department's Proposed Amendment Eliminating the definition of "Formal Complaint" in 34 C.F.R. § 106.30 and Replacing it with the Definition of "Complaint" in Proposed 34 C.F.R. § 106.2.

The Department's proposed amendment to eliminate the definition of "Formal Complaint" and replace it with the definition of "Complaint" in 34 C.F.R. § 106.2 will create access to Title IX processes and protections for students with disabilities. A "formal complaint," as currently defined in 34 C.F.R. § 106.30, creates unnecessary hurdles for students with disabilities. Requiring a written complaint in and of itself creates barriers for all students, but poses specific barriers for students with disabilities who may require alternative means of communication. It is also a barrier for young students who may not be able to communicate effectively in writing. Additionally, requiring the complaint to contain specific language is overly prescriptive and allows educational institutions to easily disregard complaints of sex-based discrimination for failing to fully comply with each regulatory element. The current regulations do not contemplate alternative complaint mechanisms necessary to accommodate students' varied communication needs.

Relatedly, the current regulations do not require educational institutions to respond to incidents of sex-based harassment unless and until it has actual notice of the discriminatory conduct. SCCLS supports the proposed amendment to 34 C.F.R. § 106.44, which will further eliminate barriers for students with disabilities to report incidents of sex-based discrimination. Under the current regulations, students with disabilities may have difficulty reporting incidents of sex-based discrimination because they may not make a complaint to a person required to take action under Title IX. Depending on the nature of their disability, students with disabilities may not be able to report a complaint of sex-based discrimination to the Title IX Coordinator or their designee. Cognitive, communication, neurological, or mobility impairments, among other things, may operate as complete barriers. Moreover, students with disabilities may be more likely to communicate incidents of sex-based discrimination – and in particular sexual harassment, which are highly sensitive in nature – to a familiar, trusted, and accessible school faculty member. Additionally, many forms of sex-based discrimination likely do not trigger state mandated reporter laws. This coupled with the current regulations' restrictive

---

[13] Severance & Howell, *supra* note 8.
[14] *Id.*

AR_004817

reporting requirements likely leave many complaints by students with disabilities unacknowledged and unaddressed.

In that same vein, SCCLS also supports the Department's clarification in proposed regulation 34 C.F.R. § 106.6(g) that a parent, guardian, or authorized legal representative has the right to act on behalf of a complainant, including filing a complaint of discrimination. For the same reasons articulated above, this too, will increase students with disabilities' access to Title IX's protections – particularly students in elementary and secondary schools. Likewise, SCCLS supports the Department's proposed regulation 34 C.F.R. § 106.6(g), which also permits a parent, guardian, or other authorized legal representative to act on behalf of a respondent. Respondents with disabilities may also require additional support from a parent, guardian, or legal representative to meaningfully participate in the grievance process.

With respect to the complaint process, SCCLS believes eliminating the definition of "Formal Complaint" and replacing it with a new definition of "Complaint" is an improvement. However, SCCLS recommends that the Department go a step further to ensure that the needs of students with disabilities are fully contemplated. SCCLS suggests the Department state that it is permissible for a complainant to submit a complaint of sex-based discrimination in oral or written format, which includes adaptive communication formats. Adaptive communication formats may include sign language, physical gestures, drawings, or communicating through an aid or caregiver. Adaptive communication formats are vital for non-verbal students or students who are not literate in order to communicate their experience of sex-based discrimination and to access their Title IX protections. In turn, educational institutions should facilitate communication with students using adaptive formats if necessary to accommodate the student's disability and communication needs. Accordingly, SCCLS recommends the Department add the following language to the definition of complaint:

> Definition of complaint: "an oral or written request, *including requests using adaptive communication formats,* made to the recipient to initiate the recipient's grievance procedures for sex discrimination under § 106.45, and if applicable § 106.46." (emphasis added).

### C. SCCLS Supports the Department's Proposed Amendments 34 C.F.R. § 106.8(e) and 34 C.F.R. § 106.44(g)(7)(i) Requiring Title IX Coordinators to Consult with a Student's Individualized Education Program (IEP) Team and/or Section 504 Team.

The current Title IX regulations do not contemplate the needs of students with disabilities, and do not acknowledge the intersecting issues implicated when a student with disabilities experiences sex-based discrimination. The current regulations' disregard of students with disabilities is evidenced by the fact that the regulations do not even include a definition of a student with a disability. SCCLS supports the Department's inclusion of students with disabilities in the definition section, and its effort to make Title IX consistent and connected to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and the Individuals with Disabilities Education Act ("IDEA"). SCCLS encourages the Department to retain its proposed definition that includes "an individual with a disability who *would* be covered" by Section 504 or IDEA. *See* 87 Fed. Reg. 41400 (emphasis added). Some students with disabilities may not have a Section 504 Plan or an Individualized Education Program ("IEP"), but may have a disability or suspected disability that would qualify them for special education services and/or accommodations. Those students should be considered within the definition of disability for purposes of Title IX protections, and SCCLS recommends the Department retain the definition in proposed amendment 34 C.F.R. § 106.2.

In addition, the current regulations do not support students with disabilities when considering supportive measures – both for complainants with disabilities and respondents with disabilities. SCCLS supports the proposed amendment in 34 C.F.R. § 106.8(e) that would require Title IX Coordinators in elementary and secondary institutions to consult with a student's IEP team and/or Section 504 team. Likewise, SCCLS supports the Department's proposed amendment in 34 C.F.R. § 106.44(g)(7)(i) requiring that the Title IX Coordinator consult with the IEP or Section 504 team when putting supportive measures in place for a disabled student in an elementary or secondary institution.

AR_004818

We appreciate the Department's recognition that students with disabilities disproportionately experience sex-based harassment and that supportive measures need to consider a complainant's unique disability related needs, which cannot exist in conflict with a student's IEP or 504 Plan. We agree that coordination between the Title IX Coordinator and IEP or 504 Team is necessary to ensure that special education services and/or accommodations are being provided and will be adjusted to meet the complainant's needs in light of the discrimination they experienced.

Likewise, we agree that the same consideration should be afforded to respondents with disabilities. Title IX Coordinators should coordinate with a respondent's IEP or 504 Team so that supportive measures do not undermine or conflict with their special education services or accommodations. This requirement intersects with the Department's proposed amendment in 34 C.F.R. § 106.44(g)(2), which allows for supportive measures that burden the respondent so long as they are not punitive. SCCLS agrees with the Department that supportive measures that burden the respondent should not operate as a mechanism for punishment or disciplinary action while an investigation is pending. However, SCCLS recommends that the Department make clear the connection between proposed regulation 34 C.F.R. § 106.8(e) and 34 C.F.R. § 106.44(g)(2). In other words, if supportive measures burden the respondent, those supportive measures cannot be burdensome to the point that they interfere with the respondent's special education services and/or accommodations. Accordingly, SCCLS recommends that the Department include the following language in 34 C.F.R. § 106.44(g)(2), which limits the ability of a recipient to implement supportive measures that burden a respondent:

"including measures that interfere with a respondent accessing or receiving special education services or accommodations."

SCCLS also recommends the Department provide further clarification regarding what information contained in a student's education record can be accessed and how it can be used by the Title IX Coordinator. We caution the Department that the regulations as currently proposed are vague as to the specific process and instances in which a Title IX Coordinator may access a student's educational record while they are consulting with the student's IEP or 504 Team. To that end, SCCLS recommends that the Department make clear in 34 C.F.R. § 106.8(e) and 34 C.F.R. § 106.44(g)(7)(i) that a student's disability and/or diagnosis, IEP, 504 Plan, evaluations, and other materials related to special education services and/or accommodations, should only be considered by the Title IX Coordinator if the school has received prior consent consistent with 34 CFR § 99.30, and only in the context of providing supportive measures.

The privacy interests at stake and the personally identifiable information contained in these records implicate The Family Educational Rights and Privacy Act ("FERPA"). It is not clear that the Title IX Coordinator certainly has a "legitimate educational interest" in either the complainant or respondent's IEP, 504 Plan, evaluations, and other materials related to special education services and/or accommodations. Accordingly, SCCLS recommends the Department include the following language in 34 C.F.R. § 106.8(e) and 34 C.F.R. § 106.44(g)(7)(i):

"A recipient must obtain consent in accordance with 34 CFR § 99.30 before it allows a Title IX Coordinator, or their designee, to access a complainant or respondent's education record as they meet their obligation to consult with the student's IEP or 504 Team."

SCCLS's recommended language is consistent with the Department's proposed definition of "relevant", which defines relevant as "related to the allegations of sex discrimination under investigation as part of the grievance procedures in § 106.45, and if applicable § 106.46." *See* 87 Fed. Reg. 41418. The Department proposes making it clear that relevant information must be related to the "allegations of sex discrimination" by helping to determine whether the alleged sex discrimination occurred. Records pertaining to a student's disability, IEP, or 504 Plan are not inherently related to allegations of sex discrimination. Likewise, those records are not inherently related to the "investigation as part of the grievance procedures." Records pertaining to a student's eligibility for special education services or accommodations, or the nature of the services and accommodations being provided, should not be used as evidence to support credibility determinations or

6

decisions related to responsibility. SCCLS's recommended language is consistent with the Department's proposed regulation 34 C.F.R. § 106.45(b)(7), which furthers students' privacy interests by clarifying categories of excluded evidence that cannot be considered in the grievance process.

### D. SCCLS Supports the Department's Proposed Amendment 34 C.F.R. § 106.45(b)(5) Allowing Parties to Meaningfully Participate in Title IX Investigations and Grievance Processes.

SCCLS supports the Department's proposed amendment to 34 C.F.R. § 106.45(b)(5), which intends to balance the privacy interests of the parties, while simultaneously allowing parties access to services and support that will help them meaningfully participate in the grievance process. Complainants and respondents with disabilities may require additional support to participate in the grievance process, which may require communication with a disability related service provider, family member, confidential resource, and/or advisor. As discussed above, some students may only be able to communicate through an adaptive format, which may take the form of communication through another person. This naturally requires the student to communicate with this third party about the allegations in order to adequately participate in the grievance process. Similarly, a student with a disability may require support from a therapeutic provider or counselor, among other disability related service providers, to meaningfully engage in the grievance process. Moreover, it is especially pertinent for young students in elementary schools to be able to communicate with a family member, confidential source, or advisor so that they can understand the nature of the proceedings and allegations under investigation.

At the same time, SCCLS agrees with the Department's approach to require recipient educational institutions to take reasonable steps to protect the privacy of the parties and witnesses while the grievance process is pending. The Department's interest in privacy protection is bolstered by its proposed amendment to 34 C.F.R. § 106.2 that incorporates "peer retaliation" as a prohibited form of retaliation against the complainant. Likewise, 34 C.F.R. § 106.71, which prohibits intimidation of any person for the purpose of interfering with any right under Title IX, operates to protect parties and witnesses involved in a Title IX grievance process.

### E. SCCLS Disagrees with the Department's Proposed Amendment to 34 C.F.R. § 106.45(h)(2) that No Longer Requires a Notice of the Outcome of Complaint be Given in Writing to Both Parties.

SCCLS recommends that the Department require elementary and secondary institutions to provide oral *and* written notice of the outcome of a complaint to both parties following a completed investigation into whether sex-based discrimination occurred. Simply providing oral notice, as required in proposed amendment 34 C.F.R. § 106.45(h)(2), is inadequate to fully inform the complainant and respondent of the outcome of the complaint, the basis for the decision, and any applicable appeal rights. Elementary and secondary institutions are required to convey specific and detailed information to both parties, which is more effectively communicated in writing, as it provides both parties time to comprehend the outcome and any further steps available to dispute the decision. To be clear, SCCLS also recognizes the benefit of elementary and secondary institutions providing this information orally, as it allows the parties to ask questions and increase their understanding. Each form of communication is vital for the parties to fully understand the outcome.

As applied to students with disabilities, limiting notice to oral communication does not consider that some students may not communicate or comprehend information orally. Providing notice orally and in writing is more inclusive and more adequately addresses the communication and comprehension needs of all students. Moreover, SCCLS suggests that the Department clarify that recipient educational institutions must provide notice of the outcome of the complaint in adaptive formats if necessary to accommodate a student's disability.

Last, SCCLS recommends that elementary and secondary institutions provide oral and written notice to the parties *and* their parents. For young students, parents need to receive a determination notice so the student can understand the outcome and the basis for the school's decision. Moreover, students with disabilities may need their parents to receive notice of the outcome in order to understand the school's determination. Providing

7

notice to a disabled student's parent also affords them the opportunity to meaningfully participate in future IEP and/or Section 504 Team meetings, which may be affected by the outcome of a Title IX investigation.

## II.    SCCLS Supports the Department's Proposed Rules to Increase Access to Title IX Processes and Protections for LGBTQ+ Students.

SCCLS supports the Department's proposed amendment to clarify that Title IX applies to all forms of sex-based discrimination, including discrimination on the basis of sexual orientation, gender identity, and sex characteristics. The current regulations do not acknowledge LGBTQ+ students' identities or experiences of sex-based discrimination, and intentionally fail to offer supports and protections. In Massachusetts alone, LGBTQ+ students are bullied[15] and subjected to non-consensual sexual contact[16] at rates much higher than their peers. Without acknowledging and accounting for the fact that sex-based discrimination can originate from biases related to a student's sexual orientation, gender identity, or sex characteristics, the current regulations exclude many types of harmful and discriminatory conduct from Title IX's application. This intentional exclusion has real and harmful effects causing LGBTQ+ students to feel unsafe and skip school as a result.[17] Moreover, this exclusion sends a signal to recipient educational institutions that LGBTQ+ students are not entitled to civil rights protections, and in doing so, are less entitled to equal access to their educational programs. Recognition is important. SCCLS agrees with the Department's legal analysis that applying Title IX protections to all forms of sex-based discrimination is consistent with the purpose of Title IX and current legal precedent. The practical effect of this clarification will permit students, who were previously excluded from accessing Title IX processes and protections, the opportunity to assert their right to equal access in their educational programs.

## CONCLUSION

SCCLS supports the Department's efforts to amend the Title IX regulations to be more inclusive and accessible to students with disabilities and LGBTQ+ students. Individuals with disabilities and LGBTQ+ students experience sex-based discrimination, including sexual harassment, at much higher rates than their peers. For that reason alone, it is imperative the Department adopt the proposed amendments. Yet, we urge the Department to consider our recommendations to further Title IX's application, solidify the intersection of Title IX and federal disability law, and afford students with disabilities and LGBTQ+ students access to Title IX processes and protections.

Respectfully Submitted,

Jeannine Schoos, Esq.
BBO# 697084
South Coastal Counties Legal Services
22 Bedford Street
Fall River, MA 02720
(774) 488-5974
jschoos@sccls.org

---

[15] Massachusetts Commission on LGBTQ Youth, *supra* note 10.
[16] Massachusetts Commission on LGBTQ Youth, *supra* note 11.
[17] Massachusetts Commission on LGBTQ Youth, *supra* note 10 (noting that 14.4% LGBTQ+ students reported skipping school in the past month because they felt unsafe and 10% reported being threatened or injured with a weapon while at school).

AR_004821



September 12, 2022

*Submitted via regulations.gov*

The Honorable Miguel Cardona
Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington DC, 20202

The Honorable Catherine Lhamon
Assistant Secretary for Civil Rights
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

**RE:     Comments from educators regarding the U. S. Department of Education's proposed Title IX Rule (87 FR 41390; ED-2021-OCR-0166)**

Dear Secretary Miguel Cardona and Assistant Secretary Catherine Lhamon,

GLSEN and the National Center for Transgender Equality respectfully submit these 209 comments from individuals who self-reported they are a teacher, school administrator, or school staff, including 66 who self-reported that they identify at LGBTQI+ and 64 who self-reported that they are a parent, caregiver, or family of an LGBTQI+ person. These comments were collected via www.glsen.org/T9commentportal between Friday, August 26 and Monday, September 12, 2022 in response to the U. S. Department of Education's proposed Title IX Rule.

When provided, the names of LGBTQI+ respondents, respondents who experienced anti-LGBTQI+ discrimination or victimization, and respondents who identified as being connected to a LGBTQ+ student and/or survivor of LGBTQI+ related discrimination or victimization have been withheld to protect their privacy and out of an abundance of caution.

If you would like to discuss these comments, please contact GLSEN's Chief of Staff and Deputy Executive Director for Public Policy and Research, Aaron Ridings, at aaron.ridings@glsen.org. Thank you for your consideration.

Sincerely,

GLSEN
National Center for Transgender Equality

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: RI
Story Title: As a university educator
As a university educator, I believe it is essential that all students are supported and seen in their educational institutions. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. The Title IX rule should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should also clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: TX

Story Title: Make our schools safe for all LGBTQI+ students

I am a queer and transgender educator in Texas, and it is important to me that our schools are safe for all students, including all our LGBTQI+ students. I cannot teach all my students fairly and equally if the educational environment in which they are learning does not support and protect them fairly and equally.   A student cannot be expected to learn successfully in a space where, as result of LGBTQI+ discrimination within the educational environment, they might be: 1. bullied or harassed based on their sexual orientation, sexual traits, gender identity or gender expression 2. deadnamed or misgendered 3. forced to engage in social behavior that is contrary to their sexual or gender identity, such as conforming to narrow, gendered dress codes that serve no educational benefit  4. excluded from participation in sports other school activities due their their gender or sex traits, or from access to single-sex facilities that align with their self-identified gender, like bathrooms and changing rooms  All these forms of discrimination make a student feel isolated and can do real harm to both the student's well-being and their academic performance. While the proposed rule is a good start, it needs to very clearly state that LGBTQI+ student are protected from all of these forms of discrimination.   Additionally, we need this rule to also include provisions that require schools to clearly state in their non-discrimination policies that discrimination and harassment based on "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes" are prohibited. These specific categories need to be clearly stated so to be inclusive enough to protect all LGBTQI+ students.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CA

I was diagnosed as intersex well into my adulthood. Intersex students and staff need protection because nobody knows until they go through the intense process of diagnosis whether or not they are. Intersex people like myself deserve equal protection under the law.

AR_012913

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: MA
Story Title: At a time when transgender and other LGBTQI+ students…
At a time when transgender and other LGBTQI+ students are unfairly under attack and vilified in much of the United States for just wanting to be their true selves, it is critical that they have protection under federal law and Title IX. As a non-binary trans teacher, I want to do everything I can to support all of my students, especially those that are transgender, gender-queer, or otherwise marginalized for their gender identify and sexuality. I am extremely fortunate to work at a school that supports all students (and teachers!!) regardless of their background, but even then there are issues of bullying and students who feel at risk or suffer from trauma and mental health issues related to their identity along with all the ways they feel marginalized by recent waves of anti-trans and anti-queer legislation. This is further complicated for students who cannot be their true selves in their home but can use school as a safe place to be themselves and find community amongst other students. I am supportive of Title IX stating that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. However, it can go even further in its effectiveness to support LGBTQI+ students, by requiring schools' nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes, identify that students should be able to use changing rooms and bathrooms that correspond to their gender identity, prevent transgender students from being excluded from athletics, encourage gender neutral dress codes, and clarify that deadnaming and purposefully using a student's incorrect pronouns are acts of bullying. Please act to provide more support for these students that truly need it.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CO

Story Title: Because it's the decent thing to do

My life, and the lives of other transgender persons, does no harm to anyone, robs no one else or their liberties, and is solely the business of me, my partner, and my doctor.

AR_012915

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: Queer & Trans Students Deserve Protection

I have been out as a queer & trans person since I was a teenager, and I have the distinct privilege now of supporting LGBTQ+ youth in Illinois through my work at Youth Services, a community mental health organization in Glenview. The youth I support through weekly groups, community building events, and youth leadership teams are kind, thoughtful, strong, creative, caring, and dedicated to ensuring them and their peers get to live full, happy lives in charge of their bodies, their futures, and their community. Everyone deserves the bare minimum of consequences when not only their peers, but also their teachers, admin, parents, faith leaders, and representatives disrespect them and deny them their bodily autonomy and the right to explore & express who they are. I urge you to take action in standing with queer & trans students during this time of intensive targeting of queer & trans people's safety & agency.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: CA
Story Title: My students need this
My students need this because about 20% of them identify as LGBTQIA+. They know who the accepting and unaccepting teachers are within a week of setting foot on campus because for some of them, it can be a matter of life and death. They tell each other who they can be open around, and they find me fast, because as the only openly queer and non-gender-conforming teacher on campus, I stand out. That's on purpose. We're in an isolated semi-rural desert district with a huge number of staff belonging to the local evangelical megachurch. I might be the only safe adult they see.

AR_012917

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: TN
Story Title: Greetings,
I am a non-binary, queer individual living in a characteristically conservative portion of Upstate NY, and I support this measure. It is critical that folx be free of discrimination based upon sex, gender identity and sexual preference. There are so many ways that the world will beat us down in utterly ordinary circumstances, let alone in schools, where we are mandated to be for the first 15-17 years of our lives. I feel it is of the utmost importance not to allow federally-funded programs to benefit while supporting policies that encourage discrimination, harassment and bullying. Please, be well, everyone, take good care of yourselves and your kin, and find strength and solace in solidarity with one another.

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: OR
Story Title: Hi
I work part-time as a tutor here in the Central Texas area, particularly in the Dripping Springs
area. I assist middle and high school aged children with math and English. While I am not in the
school system proper, I spend enough time with kids that I see what's going on.  When I was in
high school, graduating in 2012, the very idea of someone being openly gay was huge news in
Texas, even if he was one of the most popular, beloved members of the class. One of the students
I tutor is gay and is actively exploring her gender identity. I highly doubt she'll transition to being
a transgendered man, but that's not my place to decide. Being a teenager and young adult is the
time to explore, experiment, and find yourself. To be your happiest self, and have that happiest
self contribute to society in wonderful ways.  I have so many friends who are trans adults who
had horror stories of their time in school, and even as a chronically ill cisman, I know how awful
bullying can be for something you cannot control.  I have seen firsthand how the lack of action
from authority can be interpreted, and often is, the same as approval. If no one stops them from
being transphobic, hateful, and harmful to their fellow students, that's basically the same as it
being okay. Please, do something to reach out and help them feel safe, so they can focus on
developing key social skills, and learn how to be a productive, innovative member of American
Society.  Deadnaming and INTENTIONALLY misgendering someone, for any reason, is awful.
Malicious, intentional acts done to cause harm to someone. That's bullying, full stop. These
actions should be treated as such. Intentional acts meant to cause harm, and be punished and held
accountable as such, by students and faculty alike. Please, consider how the lack of action is
harming children just wanting to understand themselves.  I, a white man who works at a
restaurant, the most average of average American from Hays County, Texas, want to see
LGBTQ+ people of all ages treated with respect. To be decent to everyone, regardless of gender
or sexual orientation. Please, do not let inaction continue to be a green light for those filled with
hate.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MN

Story Title: I am a Queer Trans Man Working In Education

I have been working in educational systems since 1995 and moving forward on inclusion for all students is the right thing to do. Currently, there are schools that are requiring teachers to remove rainbows from their classrooms because supporting LGBTQ+ students is a political statement. When trans students in Texas are being pulled out of classrooms to be questioned about their treatments, government organizations are causing trauma. This has to stop. Our LGBTQ+ students need to be protected by everyone.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NY
Story Title: Protect queer youth
I am an public school educator. Please protect our LGBTQIA youth in schools. This law is imperative to help protect them.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MI

Story Title: I am a queer transgender educator

I am a queer transgender educator, and I want all students to feel safe and seen in my classroom. As a student, I did not feel safe to be who I was, and spent years struggling with poor mental health as a result of feeling unseen and unloved. Once I was able to step out and proudly come out as the person I am, and begin to feel safer doing so, my life drastically improved. I want my students to be protected so that they don't have to spend years struggling and hurting before they can feel loved and seen. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. We need to do our jobs by allowing our students a safe place to explore their identities and feel fully seen. Thank you.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: Visibility matters

As a trans teacher, I have had a huge impact on my trans students, as well as their cisgender siblings, peers and families. For some, I've been their first visible trans grown up, while for others, I've helped them better understand their own gender or sexuality. Those students are among my most vulnerable, and need protections to ensure they are given the care they need to thrive.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: I am a queer educator

I am a queer educator. Having queer peers and community at school as a student, both before and after I came out, were vital to my self-understanding and growth. Having access to queer books served me in similar ways. Now, I have many students who are queer and trans. Many of them may not come from home environments where that is safe, and school gives them a place where they can explore their identities and be accepted as they do so in community with others. It is vital that we protect schools as a place that serve students, allowing them to grow into adults with self-understanding. That means giving these students protections at schools: protections that help them survive and protections that help them flourish.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: OH

Story Title: Queer and trans student

Queer and trans students deserve to be seen, heard, represented, and protected. Period.

AR_012925

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: OH

Story Title: Protection Matters

As a teacher myself, I fully support all the protection and acceptance we can give to queer and trans students. Often the focus of bullying and discrimination from both their peers and school personnel, they need the full protection of Title IX.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: LA

Story Title: As a transgender woman

As a transgender woman growing up in the 90's and early 2000's and living in Texas, I wasn't able to come out, and that led me to some very dark times. It is so important for kids to be able to express themselves authenticity to help reduce depression, suicidal thoughts and actions and to help them grow individually. Had I come out as a kid, I'm not sure if I would have made it to where I am today. Today I am very open and proud of the woman I have become.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NC

Story Title: I am a bi millennial

I am a bi millennial educator in the South. I want students to be seen and supported in the classroom. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. It should clarify that states enacting anti-LGBTQ+ legislation or banning LGBTQ+ content from curriculum will lose public funding.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NJ

Story Title: Queer Lives Matter

I am an educator and all of my students need to feel safe and happy. This means being who they are openly, without fear of hate or violence. This is more important now than ever.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: WI
Story Title: I am a queer educator
I am a queer educator from WI, a GSA advisor, and adult in schools who cares deeply about creating inclusive environments where all students can thrive in their learning. I cannot express how important it is for Title IX protections to extend explicitly to queer and trans students. The prevalence of harassment, bullying, and discrimination targeting the LGBTQI+ community in schools is unacceptable and it prevents young people from their right to an education. The rule in its current form could go even further to protect trans youth in particular from the constant harassment of misgendering that has been linked to all sorts of negative health outcomes. Thank you for your time, Anthony Jennaro

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: MA
Story Title: I am a LGBTQ educator
I am a LGBTQ educator, and I support the addition of protections for youth based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes.  I want all students in my school, and in other schools around the country, to have these protections

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MN

Story Title: Too many students fear their lifestyle

I work in a high school supporting kids in grades 9-12. Our support group is the first time they feel it is ok to figure out who they are.If we were not there for student s to protect and educate the I would fear more suicide deaths

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: Being a Queer Teacher

Hello.  I have been teaching in a mostly white, middle class public high school in upstate NY for 28 years.  I am the advisor of the Gay-Straight Alliance on campus and identify as Bisexual.  I've worked with LGBTQA students my entire career, and the struggle continues for these students to find acceptance and to create a safe learning environment where they can be open about who they are and how they identify themselves.  Transgendered students in particular need our help.  Please do all you can to protect the rights of LGBTQA students.  The fight for civil rights for all must continue!

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: FL

Story Title: The silent and vulnerable must be protected.

Having grown up in the 70s/80s, I didn't have anyone to look out for me as a gay youth. I had no role models in real life, on TV, in movies, or in books. As a result, I stayed in the closet until I was 27. When I became a teacher, I made sure not only be that accepting and respectful role model for all my students, but also to protect those disenfranchised who were LGBTQ and people of color. With how much politics and this conservative sense of freedom permeates everything we do in this country, we need to ensure that those LGBTQ students are protected from abuse, bullying, and marginalization. With almost half of LGBTQ students considering or committing suicide, it's imperative that we put things into place to keep them supported and safe from harm. Unfortunately, faith-based groups choose to ostracize and denigrate this population, depriving them of necessary protections (like safe space stickers) as well as books and materials geared toward the LGBTQ community. It's not enough for them to survive; they need to thrive.

AR_012934

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: NY
Story Title: Bullying Must Stop
Speaking as an LGBTQ+ elder and educator, I have experienced bullying, starting 75 years ago.
It's hard to believe that we're still dealing with it all these years later and that, in a supposedly
civilized country, we haven't found a way to protect LGBTQ+ students. Implementing the
proposed Title IX Rule is the least we can do. Thank you.

AR_012935

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: VA
Story Title: School Board Harassment
A few years ago our local Alliance Club wanted to use our School Logo for internal use but with PRIDE colors filling it in. The students wanted to go through the proper channels and wanted to make sure there would be no issues. So I, along with other staff, assisted them in going through the proper procedures. The request was completley written by the students and was hand submited by myself to the Principal of the school. They approved the use but informed us that due to the nature of our club and certain views of our community, they wanted to protect us by having it approved by the Superintendent.   The letter was then hand delivered to the Superintendent who also approved it but felt that the School Board needed to sign off on it as well. Once it was proposed to the School Board the board decided that the request needed to be made publicly at a public School Board Meeting. Before the meeting the confidential letter was leaked to a radio station along with the student's and a staff member's name.   Qucikly students were being told false information that the Alliance Club wanted to permanently change our School Logo to PRIDE colors. This caused club members to be harrased by other students as well as the community. Fast forward to the School Board Meeting and our District was divided down the middle with many people defending the LGBTQIA+ community but many more ripping apart these kids. A handful of students had the courage and bravery to stand in front of all of those adults and express the feelings of just wanting to be seen and respected. Most did so with tears in their eyes and quavering voices.   The School Board ended up postpning the vote for three month before the Club was allowed to use the Rainbow Logo internally. Only because it was determined that the School Board did not have a legal stance at the time to tell us we couldn't. But some Board members needed to voicetheir distain and even called the kids and the LGBTQIA+ Community abominations.   There is so much more to be said about these events. But this is a prime example of what our kids are still dealing with. Where the adults who are charged with lookig after the best interests of our School Districts will purposely share a student's name to the public to stir a frenzy against children who simply wanted to be respected. We have come a long way but our kids still need to be protected.

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: TX
Story Title: LGBTQI Protections
Data show that LGBTQ students are bullied more than any other group. Also, far right groups
have chosen LGBTQ persons as their target for harmful and hurtful rules and laws. These
students need more protection.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: As a teacher, I see the dangers

As a teacher, I see the dangers and pitfalls that are associated with anti-LGBTQ+ discrimination and bullying. The damage these policies do to children is incomprehensible. Every student, regardless of how they identify, is entitled to come to school and feel safe and supported. When we target a specific group to discriminate against a target is put on the back of those children. We tell the school community and community at large that it is okay to single out individuals who are LGBTQ+. This is a horrible precedent to set. In my opinion, who says that it will stop with LGBTQ+ individuals. People in other marginalized groups could be subjected to similar discrimination and bullying. Our kids are looking at us adults and paying attention, for better or worse. We need legislation that permanently protects the LGBTQ+ students in this country so that they are free to learn without the worry of being singled out.

AR_012938

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: All teens are vulnerable to gender and sexual orientation based harassment and violence

There was a time when I thought these issues were fading. That young people would eventually arrive in an environment where no one would delight in tormenting each other over real, or perceived, differences in gender or sexual orientation.   The last three years have horrified myself and the teenagers I work with. We hear people on the news say grotesque things about people we know and love. We witness local and state governments pass ludicrously biased legislation restricting the acknowledgement in schools of people and relationships that are simply real and as real as any other.   I always believed that the courts would maintain basic human rights, but the judicial system has become overwhelmed and corrupt. It does not function in service of all the citizens of this nation.   You must use whatever power you have to protect our children and our future from the wave of ignorance and fear. It has already cost lives and the sanity of many, queer and straight alike.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: AK

Story Title: The Most Marginalized Need the Most Support

In the fight for equity, and ultimately the fight for peace, we need to provide extra support for our Queer - Yes! capital Q - people. The victims of bullying, harassment, unfair treatment in all aspects of society, and even victims of violence, rape and murder, our Queer people need to be seen as a precious resource and uplifted as such. Mainstream society has too often shunned us, and made us feel as if we are abominations, going through a phase, or outright wrong. I say that we are those that have questioned our own bodies, identities, culture, and worldview to the point that we are refined observers of injustice and inequality. When we are born into a world that does not make room for who we know that we are. As such, we are the world's most adept critics. We are those that see and feel the oppression and are keen in changing it; yet, this requires support from leadership everywhere. Leadership everywhere means teachers, parents, school boards, government, and celebrity. One more thing to say about how we are the world's most adept critics - this then leads us to be critical not just of how bodies, identities, and orientations are treated - we are also more keen into seeing environmental oppression, racial oppression, all human rights oppressions. We are the arbiters of change for a more equitable, peaceful world. Thank you.

AR_012940

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: MA
Story Title: LGBTQ students need
LGBTQ students need to know that they are not alone in their schools.

AR_012941

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NC

Story Title: We are under attack.

I'm a school counselor at a small urban high school in Cary, NC. We have many students who identify as LGBTQIA+. We are a relatively safe space for students and still trying to get small concessions for students to feel more safe is a challenge. I know that at other schools where the climate is not as positive, students are facing so many obstacles. We need students and faculty to be protected from anti-LGBTQI+ bullying and discrimination. As an LGBTQIA+ person, I have dealt with being bullied when I was in school as a student. I only felt safe coming out as an adult when I moved to a city where there was a larger population of queer educators and when the Obama administration began to support LGBTQ rights. (Thank you for your influence, President Biden!) These students and staff face enormous pressures that people are only starting to understand and recognize. Because of the rates of teen suicide in the LGBTQIA+ community, this is a public health crisis and should be treated as one. I support that the rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. I also support that schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. I think it should go even further. We need this to be taken seriously because kids lives depend on it. Schools and school districts need to explicitly require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. Thank you for your time and efforts to improve the lives of all LGBTQIA+ students and staffs. Ryan Haymore, School Counselor

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: CA
Story Title: Teacher Training
Hello President Biden, I am in my 20th year as an elementary school teacher in California. The way to protect LGBTQ+ teachers is to have mandated training for teachers on LGBTQ+ issues.

AR_012943

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: Trans rights are hum

Trans rights are human rights.  Trans girls are girls.  Trans boys are boys.  Genderqueer folx are folx.  Why we're still discussing this like it's a topic of debate and not a fact in this, the year of our Lord 2022, is beyond me.   I'm a genderqueer high school teacher who has spent decades doing my best to protect kids from the stupidity of adult culture war nonsense, which has an immediate and immense impact on their emotional health and well-being and also leads to stigmatization, bullying, and violence against them.  Trans rights are human rights.  Trans girls are girls.  Trans boys are boys.  Genderqueer folx are folx.  Why we're still discussing this like it's a topic of debate and not a fact in this the year of our Lord 2022 is beyond me.   If we can't legislate to protect vulnerable young people, what's the point of having a government?  Isn't it your job to protect everyone but ESPECIALLY the most vulnerable among us?

AR_012944

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: Our students represe

Our students represent America. We cannot ignore or deny parts of America. Students of all identities and orientations need to be welcomed and celebrated in their classrooms and schools. It is known that students learn best when they are comfortable and acknowledged, and it is in their best interests that they are protected by law.

AR_012945

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: TX

Story Title: I am a queer teacher

I am a queer teacher in Texas and I believe that every student deserves to be supported and seen in the classroom. This bill is very important because it protects the rights of LGBTQ+ students- a group that is being heavily targeted right now. Most, if not all, students who identify as LGBTQ+ experience some form of bullying or discrimination at school. This bill would set a good precedent that this discrimination is never acceptable. The bill should include language that deadnaming and misgendering are harmful and illegal forms of sex-based bullying. I have seen the trauma that this causes students firsthand and think the bill should be amended to protect them from that harassment.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CA

Story Title: I'm a parent of trans adult

I'm a parent of transgender adult that cares about LGBTQI+ equality. Luckily, my child attended schools in an area that is open and supportive. Not all children are so fortunate. Schools need to be a safe space for all people -- whatever there gender identity and expression. Education is a fundamental human right. It's also a fundamental human right for everyone to be who they are without fear of discrimination and bullying.   The rule that makes it illegal to discriminate and bully based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is needed to ensure the safety of LGBTQI+ students. Unfortunately, this is because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school.  The rule is missing a few additional protections that would really help protect students.  The rule should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.  The rule should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. The rule should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls.  The rule should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.  Deadnaming, misgendering, and refusing to use the correct name or pronouns can put kids in danger.   Please protect our children by adding additional protections to the rule and approving the rule.   Thank you!

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: CA
Story Title: Everyone deserves…
Everyone deserves the right to a safe education.

AR_012948

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CA

Story Title: I am a teacher and I

I am a teacher and I believe all students should be supported, protected, and safe at school. Schools nondiscrimination policies should be required to list sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes. Students must be able to use the bathroom or locker room that corresponds with their gender identity. It needs to specify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. Protect our LGBTQI+ students!

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: IL
Story Title: Trans students add i
Trans students add important wisdom and perspectives to the community.

AR_012950

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: MA
Story Title: I'm a middle school counselor and this is so important!
Please vote to add this protection to Title 9!   The rule clearly states that discrimination and
bullying based on sexual orientation, gender identity, sex characteristics (including intersex
traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience
some form of anti-LGBTQI+ discrimination or bullying at school. This is true in my school.
Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from
happening again. This is really important because we know that when LGBTQI+ students tell
school staff this happened to them, many say nothing changes, or worse, that they are punished
or told they should change.  Here are some things the rule is missing: It should require school's
nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics
(including intersex traits), and sex stereotypes," since we know these policies are more effective
when they do. It should clearly say that students must be able to use the girls' or boys' bathroom
or locker room that corresponds with their gender identity, and the same goes for things like
separate gender student housing and classes. It should encourage dress codes to be gender neutral
by making clear that schools risk violating Title IX when they give different rules for boys and
girls. A separate rule will address school sports, but this one includes confusing language that
could be misread as saying that excluding transgender students from boys' and girls' school
sports teams is okay. All students should have access to the benefits of school sports. It should
clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are
harmful and illegal forms of sex-based bullying.

AR_012951

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: AZ
Story Title: All students need protection
All students need protection and the queer and trans student population even more so. They aren't the subject to much peer bullying anymore, just the government and school districts. It is much bigger and more severe now so we need to be extra careful with making sure they are safe.

AR_012952

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CO

Story Title: Let them learn!

My school has a large population of LGBTQ+ students who want nothing more than to be part of the group of peers. They want to be loved and accepted by the peers AND teachers. They want to participate in extra curricular activities and see themselves represented in the class materials. They deserve to be treated like every other student - with respect, love, kindness, understanding, and acceptance.

AR_012953

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: I'm an LGBTQI+ school

I'm an LGBTQI+ school administrator working in the public school system. More importantly, I was an LGBTQI+ student in a school community that neither accepted nor protected me from bullying and harassment. Schools should provide a safe, positive and supportive environment for students, and when they don't students need to be able to assert their right to that space. These rules make clear that school staff must take an active role in supporting LGBTQI+, particularly trans and GNC students. These students have become political pawns in a campaign to erase LGBTQI+ Individuals from our communities. We need to make it crystal clear that these students belong not only in our school communities, but as empowered and valued members of society writ large. While there are areas where these rules need to be strengthened, they offer an important step towards equity and inclusion and I urge the administration to finalize these rules.

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: NJ
Story Title: I'm a queer high school
I'm a queer high school math coach and independent researcher who knows it is essential to have
every 2SLGBTQIA+ student feel safe and seen in PK-12 Classrooms. My research is situated at
the intersection of 2SLGBTQIA+ identity and mathematics identity. Based on this expertise, I
can say that it is impossible for students to learn when the minimum standards of safety and
belonging are not met (this is according to the brain science related to how we learn). For this
reason, this rule is essential in all PK-12 (and beyond) settings. The rule, however, does not go
far enough. There is no requirement that schools have a nondiscrimination policy that lists sexual
orientation, gender identity, sex characteristics (including intersex folx), and sex stereotypes.
Having a stated nondiscrimination policy such as this has been found most effective in fostering
2SLGBTQIA+ safety, inclusion, and belonging. Similarly, the rule lacks a clear statement that
students must be able to use the bathroom or locker room, student housing facility and separately
gendered classes (like sex ed) that corresponds with their gender identity. The rule should also
include language that requires schools to adopt gender neutral dress codes and it should clarify
that things like deadnaming and misgendering students is harmful and are illegal forms of sex-
based bullying. Finally, the rules language in relation to sports is slightly confusing, which could
lead someone to misread the rule to say that excluding trans students from girls' and boys' sports
teams is OK, which is again, contrary to research based recommendations about safety, inclusion
and belonging for 2SLGBTQIA+ individuals.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: VA

Story Title: They're in your class whether you or they know it. Don't make the discovery traumatizing!

We can't let biases born from cis and heteronormativity dictate the procedures and pedagogy of not-knowing and looking away. Once they discover who they are, let's make sure that they've received positive messages about themselves.

AR_012956

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: IL
Story Title: Protect Trans Youth
Title IX should absolutely protect trans youth, especially when their own families will not.

AR_012957

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MN

Story Title: Faith

Many talk about Faith as a reason for withholding. But let me ask you, doesn't your faith speak to the acceptance of others? To do right by thy neighbor? To LOVE thy neighbor?! I have my God given Faith, empathy and understanding of what it takes to be a good person. Coming for my neighbors rights and freedoms goes against everything God stood for and what Jesus died for. We need to protect thy neighbor, not strip them of their basic human rights.

AR_012958

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: Support

I'm a gay teacher who wants everyone to feel supported and seen in the classroom. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. Here are some things the rule is missing or could do better and you can share your story or support for including these in the rule: It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: To let them be THEIR SELVES

If they don't express their selves they will become miserable. and i do not think you want to live in a world with miserable people that can not be them selves because they are scared that they are going to get bullied. i have been bullied by my sexuality that i could not help but say i was straight for 10 years because i knew i was going to be made fun. I finally came out as a Non-binary Pansexual, polymerous person

AR_012960

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NY
Story Title: Sports are for ALL!
Every kid deserves to play sports without discrimination! I support schools free of LGBTQIA+ Discrimination of kiddos!

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: LGBTQ Students

LGBTQ Students will remain marginalized in many parts of the country unless we protect them. We can not leave this to chance and we cannot leave this to individual communities to discriminate.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: GA
Story Title: I'm glad this rule would help protect trans students
I'm glad this rule would help protect trans students.  The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school.  I'm a former high school teacher, and I've seen some of this bullying first hand.  However, this rule should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.  It should also clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes.  It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls.  It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.  Lastly, this rule includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports.

AR_012963

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: Lives are on the Line

Schools are supposed to be safe places for everyone, yet hate crimes against transgender individuals continue to rise. Not fully including transgender and queer individuals in protective legislation sends a message that you don't see them as important or of value. It's demoralizing and hurtful in school, but out of school it literally has life or death consequences. The murder rates of transgender individuals rose in 2020 from 2019. Teaching people that it's not okay to mistreat others because of their gender expression starts in schools. Add transgender and queer protections to your legislation. You will literally save lives

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: PA

Story Title: All Students Deserve Cover Under Title IX

I am a bi-sexual marketing professional that works at a university in Pennsylvania. I work with a large group of student-workers in my role at the university and I want all my students to have the same rights under Title IX regardless of their sexual orientation, gender identity, or sex characteristics. They all deserve to both feel and be safe at our institution and any institution they attend and be able to seek help from the school when they are being bullied.   As it does not currently, it should be required that school's nondiscrimination policies list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.  Most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. Which is why it is important that the rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal.  It should also encourage dress codes to be gender neutral as it's not the schools place to decide what attire should be worn by which individual. It should also clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

AR_012965

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: NJ
Story Title: As an educator…
As an educator, I believe that the safety of all students must come first. This includes our trans
students. I am in favor of the Title IX change.

AR_012966

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: IL
Story Title: Protect LGBTQ+!Kids
The bullying and harassing of LGBTQ+ students is an epidemic in this country. We need to make schools safe for ALL kids. Please add LGBTQ protections to Title IX.

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+

State: IL

Story Title: Queer and Trans Students are at risk and under attack

These changes are critical to preserve the safety of students and their ability to learn. To argue
against them is to argue for and allow harm to students.

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: MI
Story Title: Every Day Is Uncertain
I am a high school teacher and the leading advocate for LGBTQI+ students in our district. In the
last 8 years, I have seen students be threatened and marginalized by peers, teachers,
administrators, and yes, their own families.  In many cases, these kids often face prejudice for
who they are and endure the negativity of other people's ignorance.   While things have improved
in the last 8 years where I work, there is still a lot left to do in order to create a safe and
welcoming learning environment for all kids. In this time, I also earned my doctorate in
Sociology - specializing in gender equity and intersectionally complex oppression. We need
federal policy that protects EVERYONE, regardless of where they are born or are growing up!
Given the ridiculously hateful state policies that criminalize safe and supportive environments.
In the last several months, I have also see the destruction that this type of persecution can create
in my own family.  My son and his partner were robbed of their business, home, and mental
health because my in-laws don't understand their child's gender identity. Truly hateful.

AR_012969

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: WA
Story Title: Every student deserves
Every student deserves to be welcomed, celebrated, and supported. Unfortunately there are many
places in our country that our queer or questioning students are bullied, discriminated against,
and harassed. Peers, staff, the surrounding community, and our school systems need to continue
to work to create safe spaces for LGBTQA+ students and staff. Everyone should be able to live
their life as themselves and this should be a protected right.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: OR

Story Title: SAVE LIVES

As a queer educator, I can tell you firsthand that our queer and trans students need to feel safe and affirmed in school. Data shows that by having just one affirming adult in a queer or trans students' life, suicide ideation decreases by 40%. Students spend many hours in school throughout the year. Many queer and trans students cannot be out safely at home. School should be a safe space so that they can learn effectively. Lawmakers who have zero understanding of child development are making harmful decisions about curriculum and policing teachers' abilities to create a safe space for learning because of misinformation and propaganda. Protect all queer and trans students across the US. Thanks

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CA

Story Title: I am a queer teacher

I am a queer teacher working at a diverse, low-income school in San Lorenzo, California. Fortunately, Bay Area culture is very accepting of LGBTQ+ individuals and therefore, a lot of LGBQT+ educators are attracted to California schools. Passing anti-LGBTQ+ discrimination and bullying laws would not only attract more LGBTQ+ educators into the field during this year's teacher shortage, but it will prevent unnecessary suicides or self-harming behavior from queer minors that are the frequent targets of bullying and hate speech. Although homophobic/transphobic folx are loud, you should not prioritize their opinion over the feelings and experiences of LGBTQ+ people. Ignoring or shutting down homophobes does not result in oppression and hate crimes against straight and cis people. In contrast, ignoring or shutting down LGBTQ+ people continues the violence and hate towards this minority group in society. We have to be a part of the change and prioritize inclusivity and love over hate and violence.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: As a former teacher

As a former teacher who led schools through the process of providing alternative bathroom options I can tell you that even the schools that think themselves progressive aren't serving the needs of all students.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: TX
Story Title: Research tells us
Research tells us that LGBTQ+youth are at great risk of attempting suicide, but that simple acts such as respecting their pronouns and protecting their right to be safe in their identity decreases the risk by as much as 50%. Why would we not want to save children's lives, and let them grow up to be happy and healthy as their true selves?!

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: WA

Story Title: I am a queer teacher

I am a queer teacher working at a diverse, low-income school in San Lorenzo, California. Fortunately, Bay Area culture is very accepting of LGBTQ+ individuals and therefore, a lot of LGBQT+ educators are attracted to California schools. Passing anti-LGBTQ+ discrimination and bullying laws would not only attract more LGBTQ+ educators into the field during this year's teacher shortage, but it will prevent unnecessary suicides or self-harming behavior from queer minors that are the frequent targets of bullying and hate speech. Although homophobic/transphobic folx are loud, you should not prioritize their opinion over the feelings and experiences of LGBTQ+ people. Ignoring or shutting down homophobes does not result in oppression and hate crimes against straight and cis people. In contrast, ignoring or shutting down LGBTQ+ people continues the violence and hate towards this minority group in society. We have to be a part of the change and prioritize inclusivity and love over hate and violence.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: WA

Story Title: Protect our LGBTQ+ kids!

I am the parent of a transgender girl. We are fortunate to live in a progressive city (but in a red state). There is so much hatred that is fueled by all of the anti-LGBTQ+ media rhetoric & state legislation going on right now. Our kids deserve protection no matter what state they live in. They deserve to be addressed by their preferred name, they deserve to use bathrooms/locker rooms that match their gender identity, and they deserve to play sports! Please protect our children -- they are a threat to no one.

Individual self-reported they are a teacher, school administrator, or school staff
Alex
State: NJ
Story Title: Gender protections NOW!
My students deserve the dignity of being recognized for who they are. Add protections for
gender language now!

AR_012977

Individual self-reported they are a teacher, school administrator, or school staff
Amalia
State: CA
Story Title: I support LGBTQ+ kid
I support LGBTQ+ kids and their safety in schools

Individual self-reported they are a teacher, school administrator, or school staff
Amie
State: IL
Story Title: I am a public school
I am a public school teacher. Support our students! They need protection like every other child to
be themselves and to be free of bullying or phobic actions.

Individual self-reported they are a teacher, school administrator, or school staff
Andi
State: IL
Story Title: I am a teacher from the Midwest
Through my tenure as a high school educator, I have see a growing number of students who have struggled in and out of the classroom. Our youth today face so many challenges and obstacles that can get in the way of academic success. I firmly believe that no one needs an additional hurdle to jump based solely on their gender or orientation!

Individual self-reported they are a teacher, school administrator, or school staff
State: CT
Story Title: Protecting LGBTQ+ Teens
As a teacher, I have seen firsthand how essential it is to provide protections for our LGBTQ youth. Within ten years at our small district, three students have lost their lives due to hate and countless others have endured bullying and harassment. We need laws that make it clear this is unacceptable.

Individual self-reported they are a teacher, school administrator, or school staff
Ann
State: NY
Story Title: It's discouraging
It's discouraging that as a society we have to put laws in place to ensure the protection of children, but as an educator I have, unfortunately, found first hand that we do. Anyone who claims to care about children must support this legislation.   To do otherwise diminishes us all as a society

Individual self-reported they are a teacher, school administrator, or school staff
Becca
State: KS
Story Title: These are real human
These are real human beings… children… loved ones that need care and looking after. We can't
deny their existence, we need to help.

AR_012983

Individual self-reported they are a teacher, school administrator, or school staff
Blair
State: CA
Story Title: True authentic self
As an educator, it is my hope and goal to welcome and celebrate all students. It is also imperative to show each of them that we all have gifts, talents, and being different and celebrating these differences makes the world a better place. When we listen to others,  share our authentic selves, lift each other up, so many problems would be solved. These are our future leaders, our children, our friends, how can we as a society not protect these children from being their authentic selves.

Individual self-reported they are a teacher, school administrator, or school staff
Brittany
State: TX
Story Title: We need protections
We need protections for queer and trans students bc it saves lives

AR_012985

Individual self-reported they are a teacher, school administrator, or school staff
Cynthia
State: FL
Story Title: I am an elementary school teacher
I am an elementary school teacher and know that in order for students to succeed, they first need
to be seen and supported.   Fully acknowledging a student's existence should not be controversial
or considered "inappropriate ".   To that end, this law should also include requiring schools to add
gender identity, sexual orientation, and sex  stereotypes to their non discrimination list.  Without
this basic right, LGBTQ students and their families will continue to feel excluded and unsafe: no
student or parent of a student should feel that way.  Additionally, deadnaming, correct pronoun
refusal, and misgendering should be considered illegal sex-based bullying. No one has the right
to undermine and ignore the existence of another, especially in a school setting.   Additionally, all
students should have access to all sports and bathrooms based on their gender identity. A
student's existence is not based on the opinions of others so the law must be clear to protect
students from those who would deny their right of autonomy and existence.   All students need
support, compassion, and acknowledgment of themselves in order to succeed in school and grow
in to healthy  adults. If we cannot protect all of our students in schools or choose to deny their
existence, what are we telling our LGBTQ students and families about their future in this
country?

Individual self-reported they are a teacher, school administrator, or school staff
Damie
State: NM
Story Title: Respect for all
All students, all children, all teachers, everyone deserves to be true to who they are. They deserve to be respected and not be afraid to show others who they are. Bullying is never ok. Parents need to do better to teach their children acceptance and to honor all people and celebrate people for who they are.

Individual self-reported they are a teacher, school administrator, or school staff
Dee
State: KY
Story Title: This is a good start… BUT
It should clarify that deadnaming, misgendering, & refusing to use the correct name or pronouns are harmful & illegal forms of sex-based bullying.

AR_012988

Individual self-reported they are a teacher, school administrator, or school staff
Elizabeth
State: MI
Story Title: Queer and trans stud
Queer and trans students deserve to be seen, heard, represented, and protected. Period.

Individual self-reported they are a teacher, school administrator, or school staff

Jaclyn

State: NJ

Story Title:

I believe everyone deserves to be appreciated and respected and have fair and equitable laws to promote equity for our LGBTQI family. With my ally ship I assist my school in upholding the rights for ALL of my LGBTQIA+ students and families. While seeking services fro those who dont have outside supports in the school system. Most services are far and limited. i do my best to be a clinical support and/or assist with resources. HOWEVER, WE NEED IDENTIFIED LAWS, CURRICULUMS, AND MANDATED TRAINING SO ALL EDUCATORS CAN ASSIST OUR STUDENTS. AS WELL AS MORE FACILITIES CAN BE LOCATED IN EACH STATE/COUNTY

AR_012990

Individual self-reported they are a teacher, school administrator, or school staff
Jean
State: IL
Story Title: I am a high school social worker
I am a high school social worker and I see how hard it is for our kids to find their way and to fit in. They ALL deserve to feel valued, accepted and SAFE at school. Please help us to help THEM.

Individual self-reported they are a teacher, school administrator, or school staff

Jessica

State: CA

Story Title: Students thrive when…

Students thrive when they feel normal, heard, seen, celebrate, and included. Luckily, atin public schools this includes LGBTQ+ students and staff. But we feel the everyday pressure to justify existing. Protections are desperately needed because we are still recovering as a society. It's been acceptable for too long that tolerance is enough. The issue with that is it still allows enough grey area for intolerance to grow. We must move towards protection, acceptance, and celebration. Please ensure stronger title IX protections.

Individual self-reported they are a teacher, school administrator, or school staff
Jordan
State: GA
Story Title: Support LGBTQ Youth
We must protect all children's rights to safe educational spaces. Expand the coverage!!!

Individual self-reported they are a teacher, school administrator, or school staff
karen
State: CA
Story Title: Every Person Deserves to feel SAFE and INCLUDED
As a school counselor I know how critical it is for ALL students to feel seen for their authentic selves! I know that one caring adult can save a life of a queer youth. We must be available, we must support - we in education are committed to care for our students and protect them in whatever ways we can. It starts with standing for diversity and inclusion.

Individual self-reported they are a teacher, school administrator, or school staff

kim

State: IL

Story Title: ALL deserve equal protection, and marginalized populations of people need specific mentioning!

Some people don't and won't include Queer and trans students as a protected group bc they are easily dismissed as being too young to know, or being rebellious, or not even considered people!! Leave no room for interpretation and be sure to make it clear that queer and trans students are protected!!

Individual self-reported they are a teacher, school administrator, or school staff
Layne
State: NC
Story Title: Because every child…
Because every child is someone's child. Every child should be treated with respect.

AR_012996

Individual self-reported they are a teacher, school administrator, or school staff
Lyndsey
State: OR
Story Title: Our babies are not ok....
I work as a middle school teacher and get to see and hear a diverese range of student voices everyday. The reality is that our LGBTQI+ students need us adult more than ever to amplify their voices and to protect them from discriminatory policies that are negatively impacting their lives...just a reminder, youth under 18 do not have the right to vote, so it is our job as a voting adults to vote for representatives who support all students in being free from discrimination and bullying in school. I want each every student to be given the same human right of an education free from discrimination and bias! We must enact legislation that protects students rights to be who they are - Lesbian, Gay, Bi-sexual, Transgender, Queer, Questioning, Intersex and more....everyone deserves an equitable education free from hate!

Individual self-reported they are a teacher, school administrator, or school staff
Megan
State: NJ
Story Title: Protect queer and trans students
Just because someone may be different doesn't mean we should treat them as less than.equality is equality.

AR_012998

Individual self-reported they are a teacher, school administrator, or school staff
Miles
State: OR
Story Title: Protect trans students
It is critical that young people be protected and supported by institutions as they discover who
they are. This is especially true for trans and queer youth who already face discrimination and
threats. I strongly support Title IX's protection of queer and trans youth in schools.

AR_012999

Individual self-reported they are a teacher, school administrator, or school staff
State: PA
Story Title: We Need Protections for Queer and Trans Students SO THEY CAN LIVE
I am a therapist in a public school in Philadelphia. I have seen first hand the damage that
bullying and microaggressions have on LGBTQI* people. People have suffered, died, denied
themselves and hurt so deeply. Please support legislation to affirm and protect our students. This
will save lives.

Individual self-reported they are a teacher, school administrator, or school staff

Paulo

State: OK

Story Title: I'm a teacher who wants…

I'm a teacher who wants everyone to feel supported and seen in the classroom. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. Area to improve: It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.

Individual self-reported they are a teacher, school administrator, or school staff
Robert
State: MA
Story Title: At a time when trans
At a time when transgender and other LGBTQI+ students are unfairly under attack and vilified in much of the United States for just wanting to be their true selves, it is critical that they have protection under federal law and Title IX. As a teacher, I want to do everything I can to support all of my students, especially those that are transgender, gender-queer, or otherwise marginalized for their gender identify and sexuality. I am extremely fortunate to work at a school that supports all students regardless of their background, but even then there are issues of bullying and students who feel at risk or suffer from trauma and mental health issues related to their identity. I am supportive of Title IX stating that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. However, it can go even further in its effectiveness to support LGBTQI+ students, by requiring schools' nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes, identify that students should be able to use changing rooms and bathrooms that correspond to their gender identity, prevent transgender students from being excluded from athletics, encourage gender neutral dress codes, and clarify that deadnaming and purposefully using a student's incorrect pronouns are acts of bullying. Please act to provide more support for these students that truly need it.

Individual self-reported they are a teacher, school administrator, or school staff
Roselinn
State: CA
Story Title: It is our responsibility to protect LGBTQIA+ students!
President Biden et al,  I voted for you. I believe in you. I know that in your heart of hearts you support ALL people from every group from small to tall. It's imperative that you use love and power to protect our children. This generation believes in acceptance at all levels, and we as parents must continue to support that way of thinking. To protect our LGBTQIA+ students and their friends at the highest level is a requirement to ensuring we raise a strong, healthy, loving contingent of individuals. We are at our strongest within a strong community of supporters, and lives are at stake. I implore you to take all measures to ensure a save environment for our children everywhere.

Individual self-reported they are a teacher, school administrator, or school staff
Sheena
State: OH
Story Title: Saving Lives
Honoring a students' pronouns, not using their dead names, and protecting them is key to saving lives. As a digital crisis counselor, a teacher, and a GLSEN board member, I've seen how important it is for students to have a safe place in school with caring and supportive adults to talk to.

Individual self-reported they are a teacher, school administrator, or school staff
Suzy
State: MI
Story Title: It is my duty as a teacher
It is my duty as a teacher to help students grow. To do this they must all feel safe & cared for. Having a GSA Club at our school and the Safe Space sticker on many teachers' doors helps build a living & supportive learning environment for ALL.

AR_013005

Individual self-reported they are a teacher, school administrator, or school staff
Tiffanie
State: TX
Story Title: From the Classroom to the Board Room, Queer & Trans Students Deserve to be Protected
I am a two-time teacher of the year and current board member who ran for school board because I was tired of having to beg elected officials to recognize the full humanity of our students. It is a moral imperative that we protect Queer and Trans students. These protections are tied to our shared humanity. We can't talk about needing more mental health services and the rising rates of death by suicide in young people while neglecting the harm we are complicit in when we fail to protect the humanity and dignity of Queer and Trans students, knowing that they die by suicide at higher rates. We can't purport to care about academic outcomes when our lack of protecting for Queer and Trans students promote physically, mentally, emotionally and socially dangerous environments where their amygdala's are hijacked, causing a flight, fight or freeze response and negatively impacting their ability to achieve academically or in any other capacity. We MUST do better. We must protect these students. No one is free until we are all free.

Individual self-reported they are a teacher, school administrator, or school staff
William
State: NJ
Story Title: High School GSA Advisor
I've noticed the rise in discrimination throughout the country. Luckily the area I live in seems to
be more tolerant. At the same time, we are hearing voices who are against any mention of
LGBTQ+ issues; local congressmen are spearheading policies that disallow teachers from
speaking on such things, as well as students reading about them.   Again, I am fortunate where
there is more support, but I also want to make sure that discussion and reading of such topics are
safe for students.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: Suffering
Our Trans and Queer youth are suffering through ongoing Hate Crimes, and it seems that no one cares. Please provide more in the form of legislation to protect our children.

AR_013008

Individual self-reported they are a teacher, school administrator, or school staff
State: WI
Story Title: It Matters That Teachers Are On Board
As a mother of a gay son & an advisor for our school's GSA, I feel passionate about supporting students in schools and educating staff about LGBTQ+ issues.  I've seen first-hand how well students thrive when given protections against bullying and harassment.  Students light up when they see themselves represented in our school's hallways.  Making it a practice to ask students' preferred names and pronouns gives staff an opportunity to explain why, so that all students hear their teachers speaking positively about our gender revolution and all students are given the respect they deserve.  Acceptance is a form of love.  It does not necessarily require agreement or even understanding.  Accepting, supporting, and caring for LGBTQ+ students saves lives.  It is every teacher's responsibility.  And for me, it is a great joy.

Individual self-reported they are a teacher, school administrator, or school staff
State: KS
Story Title: Kids Need Our Support
As a school teacher and administrator for 38 years, I cannot remember a time where a group of students have been more attacked or used as a political pawn than the current situation for LGBTQ+ students. What makes it so difficult is that those who openly support, or try to support these kids are then relentlessly attacked. All our marginalized groups need supported, but unfortunately, I believe the LGBTQ+ students may be the group in most need. If we truly believe that educational success comes from relationships with others, from being able to be their authentic selves, and from being able to explore their futures, then protections must be in place so they feel they are safe to do so. My daughter happens to be trans, so I have personally seen her struggles up close. She knows she has had an easier time than many, yet she has still encountered problems just trying to be herself. We owe it to everyone to create a place for them to belong.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Protect our students now!
I run the GSA for my high school in Taunton, Massachusetts. I am livid at the state of affairs in our country. Every day, more and more bigotry gets a free pass, or even enshrined into state law. Enough is enough! Enact federal protections for queer and trans students now! We cannot afford to waste any more time. These students' lives are at stake!

Individual self-reported they are a teacher, school administrator, or school staff
State: PA
Story Title: I have worked with queer and trans youth
I have worked with queer and trans youth for over 25 years. I see every day the impact of a positive or negative school experience, and it breaks my heart to witness the unnecessary pain these kids experience when they are exposed to discrimination and bullying. It's horrible when it comes from peers, but it's SO MUCH WORSE when it comes from the teachers, administrators, and school boards who are supposed to protect our kids.   Schools must make it clear that anti-LGBTQI+ bullying is illegal and will be immediately investigated and punished. Nondiscrimination policies should be required to specify sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," in order to be unambiguous. Dress codes should be gender neutral and not give different rules for boys and girls in dress and expression.  All students should have access to the benefits of school sports, and excluding transgender students from boys' and girls' sports teams should not be permitted.  The rule should make clear that the insidious and devastating practices of deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. No one can learn when they are putting all of their energy into simply surviving. All youth deserve to learn in a supportive and affirming environment so they can develop into healthy, productive adults who can make society a better place.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title:
Because they are people too.

AR_013013

Individual self-reported they are a teacher, school administrator, or school staff
State: TX
Story Title:
It is imperative that all students in PK-12 schools  are treated fairly and equitably in ways that do not discriminate. Our schools must be safe, inviting places for all students including and in particular, especially for students in the 2SLGBTQUI+ community, their families and friends. There should be no bullying or discrimination allowed.

Individual self-reported they are a teacher, school administrator, or school staff
State: HI
Story Title: Protect LGBTQIA2S+ Students
Our students deserve protection, support, and love. Misgendering is harmful and must be directly addressed.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: Advocate
I am a teacher in an elementary school. I continue to learn and grow to make sure that my classroom is a safe place where all students can thrive. We must advocate fiercely to protect LGBTQI+ students, so that they can access education without fear.

Individual self-reported they are a teacher, school administrator, or school staff
State: WI
Story Title: I am a teacher educa
I am a teacher educator who strongly believes that schools should be a safe and supportive place for people of all identities, including LGBTQIA+ identities. I support the Title IX rule.

AR_013017

Individual self-reported they are a teacher, school administrator, or school staff
State: CO
Story Title: Students need your help!
More than ever, people in our country are harming those they see as different. We must stand up and protecting them.

Individual self-reported they are a teacher, school administrator, or school staff
State: NY
Story Title:
Ensure the law includes protection about gendered pronouns use and respecting them.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title:
I'm a teacher who wants everyone to feel supported and seen in the classroom. LGBTQI+ discrimination and bullying in schools is illegal, but we know it still happens all the time. LGBTQI+ students who are transgender, nonbinary, students of color, and students with disabilities face particularly hostile school climates. The Biden Administration has proposed a Title IX rule that would make it clear that anti-LGBTQI+ discrimination and bullying is unacceptable and must be responded to quickly and effectively.  The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change.  Here are some things the rule is missing or could do better. These should be addressed:  It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.  It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes.  It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls.  A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports.  It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. Thank you for your addressing of this important educational issue.

Individual self-reported they are a teacher, school administrator, or school staff
State: PA
Story Title:
I am a teacher who wants everyone to feel supported and seen in our schools.

AR_013021

Individual self-reported they are a teacher, school administrator, or school staff
State: WA
Story Title:
I teach in a small rural community where students are often isolated and not supported.  We need to change this and ensure all students feel safe.

AR_013022

Individual self-reported they are a teacher, school administrator, or school staff
State: WA
Story Title: Community
Community means everyone, unified, working together for a better future.  Everyone has no alternative and schools should be for everyone.

Individual self-reported they are a teacher, school administrator, or school staff
State: MI
Story Title: All means all
I just believe that until the day that students are always treated the same no matter what they look like, sound like, think like, act like, or any other different characteristic that we need to ensure protections for any vulnerable group or individual.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: Teaching the Future
I am an educator. I have the privilege of working with 7th grade students for 75 minutes each day. I want all of my students to feel safe in my classroom. Please protect all students. Please protect my most vulnerable queer and trans students.

Individual self-reported they are a teacher, school administrator, or school staff
State: CO
Story Title: ALL Students Matter
As a school counselor and teacher for the last 24 years, I have seen first hand how not feeling accepted for who you are demolishes students' mental health. All students deserve to feel safe and accepted at school. If we are to educate our children they have to feel safe and valued at school.

AR_013026

Individual self-reported they are a teacher, school administrator, or school staff
State: NJ
Story Title: I'm a middle school counselor
I'm a middle school counselor, Advisor to our GSA, private psychotherapist and parent of an amazing young woman who identifies as gay. It is perplexing and downright disturbing that anyone would ever question the right of any student to feel safe and protected while at school. However, since there continue to be evidence of antidiscrimination and bullying toward LGBTQ+ students in our schools across the country, it is critical that there are laws and policies in place to provide the level of protection that all students deserve.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: Safe Schools for ALL
I'm a teacher and I want everyone to feel supported and seen in the classroom. I support the proposed Title IX rule that would make it clear that anti-LGBTQI+ discrimination and bullying is unacceptable and must be responded to quickly and effectively. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. But there are some things that could be even clearer: It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. Finally, it should clarify that ALL students should have access to the benefits of school sports, and provide guidance for transgender students to compete on teams that correspond to their gender identity.

AR_013028

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Kids can't learn if
Kids can't learn if they don't feel safe and seen. It's that simple. Under the law they have the right to a free education. They will be paying taxes just like everyone else. They deserve an equal education. It's the government's responsibility to put laws in place that protect them.

Individual self-reported they are a teacher, school administrator, or school staff
State: GA
Story Title: From an educator
I'm a middle school Language Arts teacher. I see firsthand how important it is for my students to feel seen and validated in the stories we read together, the books we have on our shelves, and in the ideas we discuss in class. Through writing, my students work to find their voices and develop their own identities. All children deserve schools where they feel safe to explore their identity, regardless of who they are or how they identify. It is our job as educators to help them grow into confident, capable adults who understand the power of their voice and their ability to make good in the world. It is important the laws are put in place to protect our LGBTQI+ students who are particularly vulnerable to bullying and harassment. Schools should work to be safe spaces where nondiscrimination policies include sexual orientation and gender identity, in addition to limiting ways in which gender plays a role within the building (bathrooms, gendered classes, dress code). Our children deserve spaces where they do not have to live in fear of deadnaming or forced pronoun adoption. When these conditions are met, we build spaces of tolerance that are better for everyone.

Individual self-reported they are a teacher, school administrator, or school staff
State: NM
Story Title: Some of my students
Some of my students are LGBTQ+, and they deserve to be protected. Some of my family are LGBTQ+, and they deserve to be protected. There are a lot of members of the community, and they deserve to be protected. They all have a right to be protected.

AR_013031

Individual self-reported they are a teacher, school administrator, or school staff
State: FL
Story Title: We need to make educational policy
We need to make educational policy that supports the whole child. I strongly support the Biden administration's proposed Title IX rule and encourage you to go further by requiring schools to explicitly include sexual orientation, gender identity, sex characteristics, and sex stereotypes in non-discrimination policies and to expressly grant access to school spaces and activities—including bathrooms, locker rooms, and extracurricular activities—that correspond to students' self-identified gender identities. Furthermore, persistently and intentionally misgendering and deadnaming students should be recognized in schools' anti-bullying policies as a form of harassment. These changes will improve the learning of all students and quite literally save the lives of some LGBTQIA+ students.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: I teach in a rural school district
I teach in a rural school district where change to school policy only comes if mandated by the legislature or ruled to do so by the courts. Otherwise, the status quo endures, which is damaging to students who are forever in the minority.

Individual self-reported they are a teacher, school administrator, or school staff
State: MA
Story Title: Protect Trans Students
When I was 15, back in the early 90s, one of my best friends came out as trans. It was an extremely unusual and brave thing to do then. My friend faced occasional taunting (Hey, is that a boy or a girl?) but thankfully not much more than that. They were extemely lucky and their story was unusual. I helped that we were in liberal eastern Massachusetts. Today trans and nonbinary identities have become more common, but many people are still wary and unsupportive of people who don't conform to the traditional gender binary. LGBTQIAA youth face bullying, harrassment and denial of gender-affirming care. Suicide rates are still way too high in the LGBTQIAA community. As a teacher, I have seen trans students thrive in a supportive environment. Trans and non-binary everywhere deserve legal protections against those who would try and tell them that they do not deserve the same respect due to every other human being.

Individual self-reported they are a teacher, school administrator, or school staff
State: NY
Story Title: As a GSA advisor
As a GSA advisor in a middle school, I hear first hand how difficult life can be for LGBTQ+ students.  We need to educate people so these children can come to school feeling safe and protected.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Protect Queer and Trans students
Because children deserve to be seen, to be safe and to be protected for who they are. Schools are safe havens and we must support out children's identities, believe what they tell us about who they are and protect them from the bigoted and hatred of the outside world.

Individual self-reported they are a teacher, school administrator, or school staff
State: MA
Story Title:
The thing that so many conservatives, transphobes, and TERFs are scared of is that trans people exist. Full stop. They come up with their bullshit conspiracy theories, they claim it's grooming, but in the end they've always existed and still do. And everyone who exists has a right to fair treatment and happiness. It doesn't matter if you go deep into the academic study of gender or you don't understand that stuff at all; trans people exist and that alone is enough to say that discrimination against them is wrong.

Individual self-reported they are a teacher, school administrator, or school staff
State: FL
Story Title: Protect All Students
As a teacher in Florida, I've seen the damage that these new anti-trans and lgbtq+ bills do to our students. I believe that all of our students deserve the same protections regardless of their identity and that these new bills are discriminatory in their nature. We need to respect everyone and thus need to ensure these students have protections from bigots who seek to push their beliefs on students.

Individual self-reported they are a teacher, school administrator, or school staff
State: NJ
Story Title: This is for all students
Every student needs to see that we will not stand for hate. Every student needs to see that we will do everything we can to foster safety and belonging. This must be a priority, and we have a duty of care to our future. As a long time educator I have seen the harm done in being silent. And I have seen what it means to demonstrate solidarity and to develop leaders who have empathy at the heart and soul of what they do.

Individual self-reported they are a teacher, school administrator, or school staff
State: VA
Story Title: I am teacher in a public school in Portsmouth, VA
Students are being harassed daily--teachers either don't recognize this or choose to ignore it. Education of our teachers is needed to prevent harassments of any students being bullied for gender or sexual affiliation.

AR_013040

Individual self-reported they are a teacher, school administrator, or school staff
State: NC
Story Title: I am a school counselor
I am a school counselor and I believe every student should be treated humanely, and be free from any form of harassment. I would like for every student to be supported and seen in the classroom and the hallways. Anti-LBGTQI+ behaviors are too often ignored by adults and students alike. This proposed rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. While this rule is important and historic, it should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. It should also clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. These are clearly equity and human rights issues, and I hope to see the rules strengthened in clear support of all LGBTQI+ students.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: In Honor of My Mother & My Students
I must speak up on behalf of our queer and trans students because I saw for myself how deeply damaging homophobia and hate are to LGBTQ+ people. My mother suffered clinical depression for years due to the oppression she faced as a deeply closeted lesbian. And as a proud sponsor of the Gay-Straight Alliance at the high school where I taught, our Be Yourself Club, my students shared stories with me that crushed my heart.  Rejected by their deeply religious (but not spiritual) parents, harassed and traumatized by homophobes at school, these students had never known what it felt like to have a safe space. Over a 7 years period, the student leaders of the club worked courageously to change the environment of the school from openly hostile to one of acceptance and support. Their work saved lives!  Now, because of the rise of the religious right, their hard fought progress is being threatened and LGBTQ+ students' lives will be at risk.  We must fight to hold the line. Our queer youth are a vital, precious, and integral part of the fabric of our nation.  I stand with them all against the anti-spiritual agents of hate. Stand with us too, in the name of all that is just, ethical, and kind to protect our collective futures!

Individual self-reported they are a teacher, school administrator, or school staff
State: OH
Story Title: Equality
We saw our rights crushed this summer with the overturning of Roe v. Wade. When one group's human rights are taken away, others' rights are sure to follow. History is on my side with this statement, and as a history teacher it is my obligation to teach our LGBTQI+ students (all students, really) and empower them to act politically to protect ALL human rights. Also, weaponized Christian Nationalism is a threat to us all, particularly the beautiful rainbow that is the LGBTQI+ community!

AR_013043

Individual self-reported they are a teacher, school administrator, or school staff
State: AL
Story Title:
I have no special story of homophobia or anything, but I've seen bits and pieces. I just want people to feel equal and good about themselves, and to go to school and be afraid to express themselves the way they want hurts.

AR_013044

Individual self-reported they are a teacher, school administrator, or school staff
State: ME
Story Title: All of our students need protections especially our Queer and Trans Students
I am a teacher educator. I work with future teachers, practicing teachers and K-12 students. In order to build safe communities of learning all student identities must be valued and protected. Students can't learn if they are questioning whether the learning space values their perspective and lived experience. We must do more to protect queer and trans students. The statistics on suicide for this student population is scary. We need schools to be safe spaces in order to combat this statistic.

Individual self-reported they are a teacher, school administrator, or school staff
State: MI
Story Title: My Community is Full of Hate
I am a teacher in a nearby semi-rural, heavily Republican school district. Racism, homophobia, and transphobia run rampant and are the topic of lengthy, brutal school board meetings. We have four school board candidates running under the slogan of "Education Not Indoctrination." Their campaign signs are all over town.   As a teacher of secondary students, my job is to reach all of my students to deliver curriculum. Kids cannot focus on content if they are constantly being berated and belittled by their peers, their community, and, even sometimes their teachers.  My heart breaks for these kids who are just trying to make it through their days.

AR_013046

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Our most vulnerable
Our most vulnerable students need to be protected.

AR_013047

Individual self-reported they are a teacher, school administrator, or school staff
State: KS
Story Title: Protect LGBTQIA students
I am a high school educator. I have worked at a Catholic school and in public schools for almost 10 years. I have been in the position to be a quiet supporter of queer students in the parochial district and a loud and proud supporter in the public schools. I much prefer being able to stand up and voice my support for my students. I have seen firsthand how much students need the support of allies in the staff and in the student population. They do not always have the support at home and are in the midst of figuring out their identity at the most important time of their lives - teenagers approaching adulthood. It is such a small ask to respect students' preferred names and pronouns. I want to help students feel safe, included, and accepted. I want to lower that percentage/number of suicides committed by LGBTQIA students who have not felt safe, included, and accepted in their communities. Students who have acceptance and support at school are less likely to engage in harmful behaviors. Two easy ways that my school has tried to be more inclusive is by having all seniors wear the same color of graduation gowns, making gender neutral bathrooms accessible to students who need them - also in a safe place (office area), and adopting a more gender neutral dress code. All students must wear a shirt with straps, have the midriff covered, and wear pants or the equivalent that goes to mid-thigh. I am still concerned about the handling of names and pronouns by the staff and with communication with parents. No one should be outed or misnamed or misgendered. Every effort should be to protect students.

Individual self-reported they are a teacher, school administrator, or school staff
State: WI
Story Title: Protect 2SLGBTQIA+ Students in Schools
I'm a teacher who has spent the last dozen years in rural districts, and I want every student to feel loved and accepted for who they are in my classroom. But one teacher alone can't change system, and that's where the administration's proposed rule comes in. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. I see this in my work, and it breaks my heart. I would also encourage the administration to consider requiring school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. Every student deserves a safe and affirming environment when they come to school. Please help make that a reality.

Individual self-reported they are a teacher, school administrator, or school staff
State: CO
Story Title: Queer and trans students
Queer and trans students need protections because adults are actively campaigning against their safety and well-being in every corner of this country. My state has a gay governor and we still have parents complaining that their third grade teacher included a pride flag in a short lesson about flags and cultures.

Individual self-reported they are a teacher, school administrator, or school staff
State: NJ
Story Title: I'm a teacher who wants…
I'm a teacher who wants everyone to feel supported and seen in the classroom. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. The new law/bill should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. I am so proud to work in a district in NJ that has had nongender bathrooms for years in all buildings.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Protect our queer and trans youth
I am an educator who has been teaching middle school and teaching teachers for over 20 years. As an educator who has worked with thousands of children, I know how important it is for students to be seen, affirmed and cared for. We must be committed to the well-being of our students. Students cannot learn if they don't feel accepted for who they are and don't feel safe at school. LGBTQ youth are more than four times as likely to attempt suicide than their peers (Johns et al., 2019; Johns et al., 2020), not because of their identities as LGBTQ, but largely as a result of bullying and non-affirming spaces. The proposed rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. We must show our queer and trans students that they matter. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change.  While the rule is an important start, the rule should also require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity. The rule also should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. Finally, the rule should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff
State: IN
Story Title: I spent 6 years as a substitute teacher
I spent 6 years as a substitute teacher in suburban St. Louis, Missouri. I was lucky enough to have several queer students in my various classes, and the idea that I would be functionally forbidden from keeping them safe in the classroom is horrifying. It is nigh impossible for a student to properly devote their attention to learning when they are faced with an omnipresent threat of physical and psychological harm. Codifying LGBTQ+ protections into Title IX rules would give teachers like my former colleagues the power and duty to stop such harassment, as well as the legal support to make such interventions mean something. This is especially important in the face of a rising tide of hysterical arguments backed by little science and less rationality. At their best, these arguments display a reasonable but unfounded concern for students' safety. At their too-common worst, they are simply anti-desegregation arguments with the serial numbers filed off. I implore the administration to enact full-throated protection for LGBTQ+ students under Title IX.

Individual self-reported they are a teacher, school administrator, or school staff
State: OH
Story Title: Kids need every form of support
I am a mathematics educator with 25 years of experience. I know and see the harm done when
students cannot be themselves and be treated as the beautiful people they are. Please be sure that
the final Title IX rule makes clear that discrimination based on sex stereotypes and sex
characteristics is illegal. Please ensure that students can use the restrooms that correspond with
their gender identity. Please ensure that dress codes are gender neutral. Please ensure that
deadnaming, misgendering, and refusal to use the correct pronouns are identified as sex-based
bullying and thus illegal. Thank you very much.

Individual self-reported they are a teacher, school administrator, or school staff
State: PA
Story Title: I'm a teacher who wants…
I'm a teacher who wants everyone to feel supported and seen in the classroom. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. The new law/bill should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. I am so proud to work in a district in NJ that has had nongender bathrooms for years in all buildings.

Individual self-reported they are a teacher, school administrator, or school staff and a parent,
caregiver, or family of an LGBTQI+ individual
State: MD
Story Title: All students deserve
All students deserve safe places to live and learn and be themselves. Queer and trans and
LGTBQIA+ students do not currently have that nationwide and federal protection is necessary,
as it is a civil right.

AR_013056

Individual self-reported they are a teacher, school administrator, or school staff and a parent,
caregiver, or family of an LGBTQI+ individual
State: IL
Story Title: All students should
All students should feel safe and supported at school. Schools are intended to be inclusive and
safe places for kids to grow and learn. This applies to ALL students. I support the Biden
administration's proposal to protect LGBTQI+ student's rights.

Individual self-reported they are a teacher, school administrator, or school staff and a parent,
caregiver, or family of an LGBTQI+ individual
State: WA
Story Title: What is Freedom?
So many people seem to think that somehow their religious freedom equates to oppressing
others; LGBTQIA2S students aren't "forcing" others to "join" them. They just want to exist. Be
safe. Have access to health care. Have access to due process if they are not safe. LIVE.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: PA
Story Title: Please protect LGBTQI+ students
These students' rights are just as valuable as any other student's rights are. They should not be discriminated against based on their sexual orientation or gender. I support this bill.

AR_013059

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: MD

Story Title:

There is a saying that I recently heard: compassion without understanding. It does not matter one bit if people don't fully understand another who is non-binary or trans, but it's time to protect our most vulnerable. LGBTQIA individuals are not new, it's not a fad, they exist and they always have since the dawn of time. We need to protect children first and foremost: ALL CHILDREN. And we need to support the families who love them and are trying to honor their existence. Stop the war against trans and lgbtqia individuals and better yet protect them from ignorant religious fanatics and white nationalistsz

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MD
Story Title: All students should
All students should be safe and feel safe schools regardless of their sexual identities and preferences.

AR_013061

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Protect trans kids!!!
Suicide rates for trans kids are so high!  Whether people agree on gender or not does not negate that trans kids are humans first and deserve to be treated with basic dignity.

AR_013062

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Humanity first!
Supporting and protecting our queer and LGBTQ students and community is humanity first and pro-life. LGBTQ youth, and transgender especially, have the highest rates of suicide. By not supporting and protecting them, we are not: One Nation, Under God, With Liberty And Justice, FOR ALL. They deserves the same rights and freedoms, the same safety and opportunity, the same respect and acceptance. To not support and protect our LGBTQ community and family is to encourage the continuation of the racist, homophobic, transphobic, and hate filled actions of those who are trying to limit and silence our loved ones. Life is hard enough, love wins and hate should be a thing of the past.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NY
Story Title: Yes we need protections
Queer & trans students are individuals who deserve respect. A federal law of protection sends the message that hare will not be tolerated. It has the power to change the tone. Current laws around the country diminish the existence of queer and trans people and that needs to change.

AR_013064

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MA
Story Title: Protect Our Students
I am an educator who believes all students deserve to be safe and protected! Our students have the right to be themselves and access education, extracurricular activities and all life has to offer as their authentic selves. Misgendering students and denying transgender students access to school spaces and activities is bullying. We need to protect our LGTIA+ students, faculty and staff!

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MD
Story Title: Protect LGBTQI+ rights!
I am a member of this community we call Planet Earth, where everybody should be included and valued for who they are. I am also an educator and I applaud the Biden administration for proposing a Title IX rule that protects LGBTQI+ rights. We need this law! We need a world free of discrimination. Thank you!

Individual self-reported they are a teacher, school administrator, or school staff and a parent,
caregiver, or family of an LGBTQI+ individual
State: TX
Story Title: It costs zero dollar
It costs zero dollars to be kind. It takes minimal effort to give everyone space to be themselves.

AR_013067

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: TX
Story Title: Safe education for all
All students deserve a safe place in education. Our world is changing and our kids are at the forefront. We cannot change who they are or how they feel but we can change schools to protect and serve all students and we must. It is our obligation to make education better for future generations because our country's future is literally at stake.

AR_013068

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MA
Story Title: LGBTQIA kids need our help
I stand with supporting and protecting all students-- specifically supporting and protecting students who identify as part of the LGBTQIA+ community.

AR_013069

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: IL

Story Title: Protect our students

As an educator, parent, and citizen, we must always make sure that the United States holds itself to it's highest ideals, that all humans are created equal and that all citizens are protected by our laws. Me must never let bigotry, fear, and religious fundamentalism deny fellow humans their life, liberty, and ability to pursue happiness. Repression must be opposed at every level.

AR_013070

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MI
Story Title: Protection Matters
As a teacher myself, I fully support all the protection and acceptance we can give to queer and trans students. Often the focus of bullying and discrimination from both their peers and school personnel, they need the full protection of Title IX.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Every child, all the time
I can't believe we are still debating whether all children need protections. It doesn't matter how you identify. If you are a minor you are in need of certain inalienable rights. Heck, if you are not a minor you are in need of the same rights. And you deserve them. Let's not even make this a debate. People are people. Give people what they need to live.

AR_013072

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: TX
Story Title:
No child should be discriminated against, particularly on the basis of sex. Keep LGBTQIA protections in title 9

AR_013073

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: LGBTQ+ in education building codes
I teach in Orange County California at a school that just opened a $67,000,000 STEM building. Did the school build in any facilities that make our gender neutral/gender fluid students feel welcome? No! If our goal was to send the message that they are not welcome at our school then we succeeded. Please write and pass some legislation, or expand Title IX to include building codes that encompass Diversity, Equity, and Inclusion.  It should not be legal to ask task payers for tens of millions of dollars and then only serve those who are already comfortable.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CA

Story Title: Queer and Trans kids need to be seen and protected

Queer and Trans students are under constant threat from homophobic teachers, students and community. They need their story told so they are not seen as other. Queer and trans kids are part of every school. Some may not feel ready to come out for their own safety. And others do so but pay a price. The more queer and trans kids are visible and protected, the better for everyone. Queer and trans people have made significant contributions to society and history and are making huge contributions today. These are stories that ALL students need to learn. As the mother of a transgender boy, I want him to be able to navigate the world freely and joyfully.

AR_013075

Individual self-reported they are a teacher, school administrator, or school staff and a parent,
caregiver, or family of an LGBTQI+ individual

State: NY

Story Title: Protect our students

As an educator, parent, and citizen, we must always make sure that the United States holds itself
to it's highest ideals, that all humans are created equal and that all citizens are protected by our
laws. Me must never let bigotry, fear, and religious fundamentalism deny fellow humans their
life, liberty, and ability to pursue happiness. Repression must be opposed at every level.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Inclusiveness for All
I am a school counselor who wants all of my students to feel supported. They need to feel that school is a safe and welcoming place for them. They need to know that they have the same opportunities as their peers and that there voices can be heard.

AR_013077

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MO
Story Title: My queer and trans students and family members deserve to be safe.
My queer and trans students and family members deserve to be safe in school and everywhere else.

AR_013078

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NJ
Story Title: All students deserve full protection under the law.
Every student is precious and therefore deserves to attend school in an environment that keeps them safe, and does not allow LGBTQIA+ discrimination and harassment.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IN
Story Title: I'm a parent and school counselor
I'm a parent of an elementary student and a school counselor working with high school students. The school where I work is a virtual charter school. Every week I talk to a student who has chosen my school because they did not feel safe in their prior school. They were bullied and all too often it was because they are a member of the LGBTQI+ community.   I am so excited to see a rule that will protect students from discrimination and bullying based on sexual orientation, gender identity, sex characteristics. Please consider expanding the rule to explicitly identify deadnaming, misgendering, and refusing to use the correct name or pronouns as sex-based harassment or bullying.  Thank you for working to keep all of our students safe at school.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IL
Story Title: Safety at School = Success
As both a teacher and the mom of a trans son, I have seen up close and personal how acceptance, accommodation, and a lack of both affects students at school.  Students cannot concentrate and learn well in an environment in which they don't feel safe. And currently far too many schools don't even do the minimum recommended/required to accommodate LGBTQ students. Students live in fear of discrimination and outing by teachers, peers, and a system that has no regard for them. The fixes are so easy, but many schools won't do them unless it is required. That's why this language is so important for their safety and educational success.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: ME
Story Title: All students need to achieve their full potential
I write as a straight, cis mom with a 30-year career in education. My brother is gay. My godchild is trans. My students identify in numerous ways, from straight and cis to nonbinary, trans, queer, and all the beautiful options in between. Their experiences and perspectives bring value to our community because I am blessed to teach in a school where every student is celebrated and safe. Every human being should rise up each day knowing that they are valued for their humanity, and able to be authentically themselves. When this is the case, students are more successful. They learn more, they achieve more, and they contribute more to the growth and power of our communities economically, civically, and culturally.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: PA
Story Title: Protection for queer and trans students
We need to make sure queer students are protected from bullying and garment. S as an educator that supports LGBTQ students and a parent of a cog that identifies in the community, I am very worried by the conservative right attacking educators, schools, student's and families. Queer youth deserve you feel safe at school, to feel accepted, and able to just live their lives as themselves. We need action to make sure bullying of a queer students is not allowed

AR_013083

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NJ
Story Title: As a parent of trans student
As a parent of transgender student and a school administrator I know how hard it is to come out and be accepted by all. People do not understand what it means to be transgender. Our society needs to be educated and by having laws that discrimate against transgender just makes it more difficult for them to be accepted. Anti trans laws tells people being transgender is wrong which is not. It is how people are born liking having blue vs brown eyes.

AR_013084

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MI
Story Title: Everyone deserves an education without discrimination
I believe that every single child deserves to be able to go to school and not be bullied, harassed, degraded, or assaulted. I'm also a parent and work in a public school district. We need to do much, much more to make school a place of safety and acceptance in addition to a place to learn.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: MA

Story Title: LGBTQ+ Students Need and Deserve Protections

I am both an educator and a parent of students who identify as LGBTQ+. Our students deserve to feel safe and accepted at schools, and have access and support for participation as their cisgender peers. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.

AR_013086

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IL
Story Title: Please help kids like mine...
I call them my kids, because I am their teacher. I teach high school in a very white, Republican, conservative county. I am the faculty sponsor of the high school Gender and Sexualities Alliance; we call it Diversity Club. Last week we had our first meeting. In a school of almost 900, we had 75 queer kids and allies show up. Most of these kids are not safe being out at home. Most of these kids have immediate and extended families who do not accept them as they are. Most of these kids lead double or very difficult lives. The rest of the student body mirrors the community...cis, hetero, conservative. There are parents who show up at board meetings because their cis kids are uncomfortable when I send out a student survey asking for preferred names and pronouns. The queer kids I teach are MY kids because they don't belong to anyone else. Please, please, please help my kids by creating and passing legislation that I can lean on when they are bullied by kids, parents, and even other teachers. I am here to help them, but when I have the law behind me, I'm just barely strong enough to help them fight. Thank you

AR_013087

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NM
Story Title: Everyone Belongs in School and Society
Everyone belongs in school and my classroom. Everyone has the right to be the person they are and no one gets a chance to tell anyone else that they aren't who they are. Queer and trans students are under attack in ways that have led to legal and pragmatic protections for other groups who have faced discrimination. Without those legal and pragmatic protections, the very students in our classrooms and people of our communities and society confront very real, oppressive, and harmful discrimination. It is time to address that discrimination now.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: VA
Story Title: Protect Trans Youth
I am a teacher who sponsors the GSA in my rural high school. As such, I hear stories and experiences from our LGBTQIA+ students pretty often. They're frightened to exist, and for good reason. In public, these kids are at risk. Often, they're even at risk in their own homes. In particular, trans women are far more likely to be victims of violent crime. Schools should be a safe place for all students-- that's where we can start fixing the atrocities that happen daily to this marginalized community. In particular, our laws need to do the following things: 1- Require schools to include sexual orientation and gender identity in their nondiscrimination clauses, and enforce those policies-- don't just give them lip service. I'm proud that my students helped to make that change here in Wythe County, where I teach. 2- Allow students to use whatever restroom is appropriate for them without jumping through hoops like paperwork or meetings. If misbehavior occurs, by all means, address it-- but trans girls aren't the threat the world portrays them to be. We all know that the perpetrators of most sexual violence are straight cisgender males.  3- Make school dress codes and activities gender neutral. I cannot think of a single reason to treat anyone differently based on their sex or gender identity in 2022. 4- Do NOT allow educators to deadname students, misuse their pronouns willfully, or . . . worst of all, to out them to their families without student consent. We have students who will be in literal danger if outed to their families, and we cannot be the creators of those situations.   As an educator who sees these children daily, please listen to my words. Students need support, acceptance, and protection. We can and must provide those.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: We are all People with a right to education, self-expression and our gifts
I am a teacher. I teach EVERYONE. From ancient times, multi-gender people have existed and been honored. We can do the same. All have gifts to share and develop. Be their foundation by providing safety and anti-discrimination. Thank you, Mr. President

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CA

Story Title: LGBTQ students need

LGBTQ students need protection and care - for many of them, school is their safe space. I am lucky to live in the most liberal and accepting of cities and my queer daughter will not worry much about being out and proud. I know that is not the case in other parts of America. Please protect our queer-identifying youth - they are a creative force and the fabric of the USA needs them!

AR_013091

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IN
Story Title: Trans and Queer Kids Deserve to Live
As a teacher for over 30 years, I have often seen students who start college believing every scrap of misinformation they have ever heard. One group often demonized by that misinformation is the LGBTQIA+ community. I have lost track of the number of times that I have had to explain to kids that LGBTQIA+ kids are not hunting down their peers, have no unified agenda against their peers, and deserve to live in peace. Protecting a group sends a message. I remember a time when I had to act to protect mixed race couples and Asians at the place where I taught. Years of messaging have reduced the amount of open hostility to these groups. I hope it can do the same for LGBTQIA+ people.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: ID

Story Title:

I am the parent of a genderfluid middle school student. In our last school district, my child was welcomed, quickly had their pronouns adopted and respected by the administration, and had their preferred name used everywhere, including all records. Since moving just a few miles away, we face night and day differences- constant pushback about preferred name and frequent dead naming, indifference about use of correct pronouns, weak responses to accusations of bullying, and unwillingness to follow their Gender support plan. Idaho students already face legal challenges relating to trans and genderqueer kids participation in sports, we desperately need federal support to ensure that the rights of  kids ins school are protected. Our zip code should not define my child's right to safe and respectful education due to their identity.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: PA

Story Title: I am an educator and parent of trans kid

I am an educator and parent of a trans kid. This rule is a great start! It does a lot of wonderful things for our kids. We need to make discrimination based on sexuality and gender identity illegal.   However, the rule needs to do more.   We need to protect our trans athletes (let's face it - most of these kids are not going to be college or professional athletes, but they all deserve the right to play!). As written, the rule seems to say it's ok to forbid trans kids from playing sports, and that's not ok.  We need to protect the right for kids to use the bathroom or locker room that matches their gender identity. I know kids to refuse to use the restroom at school because it's not safe. They hold it all day. We all deserve the right to the restroom!  We need to make dress codes gender neutral. Let's face it: dress codes have a lot more rules for girls than boys (trans or cis). It's a Title IX violation to make a girl miss class for dress code violations when those violations don't exist for boys. It's discrimination to make a trans kid miss class because they dress in ways that affirms their gender identity.   We need to make sure that school anti-discrimination codes clearly list that bullying and discrimination against LGBTQ kids is not acceptable AND we have to make schools take those codes seriously.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: OH
Story Title: Identity Matters
I am a teacher of middle and high school students. I believe all students (and adults) should feel welcome and supported as they are. Schools must support students who are bullied or harassed. Dress code should apply to all students equitably and not fall solely on the female students to adhere. We must ask ourselves what messages we send to students when we lead them to believe there is something wrong with who they are, while also teaching students to make choices that reflect their values while respecting others.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: GA
Story Title: I am a parent. I am
I am a parent. I am a teacher. I have family and friends who identify as Trans. I currently live in the deep South (Georgia) and I have Trans Godchildren who have it even worse (Florida). We cannot rely on states run by bigots who do not want to separate church and state to provide protections for those who I love. Please uphold the laws and protect school-aged children from discriminatory practices by institutions and bullying from hateful people. Discrimination policies should include gender identity to protect this vulnerable population.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: OR
Story Title: Not allowed to tell other students she is trans
My daughter is transgender. When she was in kindergarten she was asked to leave after transitioning. The school said they could not support her and there were parent complaints. When she was in first grade in Arizona she was very proud and excited about being transgender. She had already transitioned and the other students only knew her as girl. She would ask kids if they had heard about transgender and then told them all about it. We were told by the school district that this was a banned subject because of a parents right act. She was not allowed to saw the word transgender, draw pictures that showed she was transgender or tell others about going to Pride parade. This was very upsetting for her. After awhile we were able to get this changed. We had been talking with a lawyer but fortunately we did not have use a lawyer for this to change. However it remained an uncomfortable district to be in. We tried a third school in a different district and that was better. There still were bullies and the library would not carry any books about LBGTQIA topics.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: WI
Story Title: Queer and transgender
Queer and transgender students experience the highest rates of sexual harassment and assault and need to be protected by Title IX. The proposed policies could further support LGBTQI+ students by:  It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Every Student Deserves to be Safe and Supported
Hi, These protections are vital to keep all students safe.  Schools need to be inclusive places.  We know our LGBTQ+ youth are more at risk of bullying and even suicide.  Please, we need to do everything in our power to protect these children and show them how important and valued they are.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NC
Story Title:
Title IX should protect trans people. As an educator, I want everyone to feel supported and seen in my classroom. Diversity of expression makes learning environments richer, safer, and more productive. As the parent of LGBTQI+ children, I care deeply about equality and safety for all.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MD
Story Title:
Students need to feel safe and welcome in school in order to learn.  This isn't possible if school staff and fellow students aren't respecting and celebrating their differences.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MA
Story Title: Because our world is less safe for them
I am a parent and educator. While cisgender, I have never been the testosterone-fueled image of manliness the world thinks I'm supposed to be, and my children similarly fit not quite perfectly into the societally-defined boxes corresponding with their genders. While things have improved since I was in school, it is clear that our society still uses violence, humiliation, and intimidation to enforce gender norms. We need to use the power of policy to maintain the gains, and to continue and accelerate the progress of the last 30 years.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CA

Story Title: Safe and affirming spaces are critical for learning

As a former elementary teacher and now a mathematics teacher educator in the southeastern United States, I have witnessed the trauma that occurs when students don't feel safe or affirmed by teachers, peers, and even a subject they are learning. The unique experiences and identities we bring to the classroom should be a strength that can enhance learning, not something that is stifled in a desire for uniformity. Having lost friends to suicide and seeing learners begin to hide their light from not being safe or valued for who they are is heartbreaking and we need to do everything in our power to stop the discrimination and bullying. This environment harms everyone as we are unable to learn, listen, and grow from the experiences of our school community. Words are not enough, we need to hold school communities accountable for actions.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NY
Story Title: My students are at risk
My students are at risk of violence and hateful exclusion from peers and authorities simply for who they were born to be or who they have become or are becoming. Race and Gender are constructs of our culture and time period. They should never be used as a basis for evaluating a person as normal, acceptable or healthy.  Would anyone reading this gladly accept that their child, grandchild, or they themselves deserved to be hit, publicly ridiculed, refused access to the most basic human necessities, made to accept the brand of shame or revulsion by self-perceived majority groups? This nation was created by asylum seekers, pilgrims, outsiders, slaves, and other disenfranchised people. Whatever their other flaws may have been, the founders created a body of laws championing individual life, liberty, and the pursuit of happiness. These laws have always needed strengthening and shoring up, thus the amendments and proclamations that grant there shall be no slavery, that women are citizens with voting rights, etc.   Don't fail the continuity of a nation legally free from unjust persecution and state-sanctioned hate.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: VA
Story Title: Schools must be safe for all kids
I have taught in a public hoof school in Virginia for 18 years. Although our school policy is mandated to protect students of color and girls so they may have equal access to education, these students still face discrimination and harassment based on their skin color and/or gender. However, it is just open season on our LGBTQ students. While our administration encourages research-based practices to guide teachers in protecting these students, there is no mandate. We don't even address the mistreatment of LGBTQ students in our school climate survey.  These students are statistically more prone to suicide, depression, anxiety and lower school performance when schooled in an unsupportive environment. I support federal protections for these students. I also strongly believe trans students must be protected from dead naming and misgendering. Thank you.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: OR
Story Title: As a teacher, I'm af
As a teacher, I'm afraid I didn't see how important it was affirm my non-binary students identities until my own child came out to us last year. It helped me reflect on my oversights in the past and make sure to be a better ally and advocate in my own school and in my child's school going forward. My child says that being non-binary just feels right for them and I cannot tell you what a difference it's made in their confidence and day to day life to be living authentically. They are able to focus on school now and are doing so much better academically than when they were distracted by this "secret." It's life-saving to be able to affirm one's identity in school.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IA
Story Title: Protect all kids
All students, regardless of identifiers, need safe spaces to participate in activities. This provides sense of belonging, reduces mental health issues, and builds stronger communities. Please ensure that all students are allowed the same opportunities across our country.  I am an educator and the parent of a queer student. Our home is a safe space for my child and their friends. I can tell you as an educator and a parent that no child chooses an identity, especially one that brings on judgement and ridicule from peers and adults. They are young people finding their way in the world. They need our support and love as they develop not judgement and barriers. Many LGBTQIA+ youth already feel a lack of belonging and acceptance in the school & locals communities. Let's not add to that weight.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: SC

Story Title: I am the proud paren

I am the proud parent of two adult children that are members of the LGBTQI+ community. I am also a veteran public school teacher. I see the need to protect queer and Trans students from multiple sides. Students should feel free and comfortable to be their authentic selves and to feel safe enough to discover who they are. They should not feel threatened by other students or by the adults in the school. We need systems in place to help the students as well as their families feel loved and supported.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CO
Story Title: Mother and teacher wants guaranteed support for LGBTQ+ youth
I am a mother of three children. When I send my kids to school, I hope they come home safe. Every day, my high school daughter tells me about the anti gay slurs she hears regularly. As a 14 year old, she has never once had a teacher stick up for her in her identity. She has never once read a book about gay characters. She regularly gets physically threatened for being herself. In addition, my eight year old trans son is frequently asked to explain his gender, scared to use the bathroom, and is told that sharing that he is trans is "inappropriate" by staff and administration. I want my kids and my students to feel safe and loved in school!

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: PA
Story Title: Protect Queer and Trans Students!
As an educator and the mom of a non-binary kid, I demand their human rights and civil rights be protected, that they are safe in school, and free to express themselves without fear of bullying.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Our Duty to Protect
I am a high school teacher, and, as such, I work with teenagers. My number one job as an educator is to keep my students safe, because if a person doesn't feel safe, then they won't learn. I whole-heartedly support the Title 9 updates that would ensure the safety and respect of our most vulnerable, and often most mistreated, students. Trans and gender non-conforming kids should not be afraid to go to school, and they need to know the adults around them have their back. It is our job to as educators, parents, community members, and leaders to nurture and build strong kids and adolescents who will then go on to become thriving adults themselves. This is our chance to do that!!!

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: KY
Story Title: Protect Rights of Queer and Trans Kids
I'm writing in support of the new Title IX recommendations to protect students from bullying and harrassment regarding their gender or sexuality.  As an educator I see the anguish and torment that these students face daily.  They need additional legal protections.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NY
Story Title: Kids are at risk
As a teacher for 20 years and the mom of three kids, including two who identify as as LGBTQ, I cannot stress how important protecting LGBTQ youth is. We know that they are under a terrible assault. Which conflates sexual orientation and gender identity with sexual behaviors and labeled these as deviant. Identity is not up for debate but ignoring identity is deadly.

AR_013113

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: PA
Story Title:
I am a parent, a teacher, and a teacher educator. I work with prospective teachers to develop teaching practice that centers and affirms students. Queer and trans students deserve to be protected, to feel safe and supported and valued in schools, to see themselves reflected in curricula and school communities, and to be able to live and thrive. Schools must protect and affirm queer and trans students. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. Without safety and protections such as these students simply can't learn. While this rule does not go far enough, it is a start. Please support our children. Thanks

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CT
Story Title:
I am a high school teacher who has seen what supportive policies do to improve the lives of LGBTQI+ students everyday. Students who feel seen and heard connect with teachers and other students, becoming a part of a community. They are happier, more confident, and more able to deal with negative comments from those who are too closed-minded to accept them for themselves. School are supposed to be safe, caring and nurturing environments for all students. Our LGBTQI+ brethren have spent too long in the shadows, and deserve protection and acknowledgment.   As a mom of a trans child, it was such a relief to talk to school officials and receive support for changing to my child's preferred name and pronouns with little fanfare. My kid, starting at a new school, was made to feel welcome and comfortable from day 1. That's what I want for all kids, and that's the expectation we should have at every school in this country.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: MA

Story Title: My youngest brother

My youngest brother told us that he is trans a few years ago, when he was in his late 20s. For his entire childhood, he had felt alienated by the gender he had been assigned at birth, but it took until he was comfortable in his twenties and away from the K-12 experience to explore this. Learning more about his gender identity has been extremely positive, for him and the whole family, and I wish he has felt comfortable to do this earlier. I hope my students feel that comfort.

Individual self-reported they are a teacher, school administrator, or school staff and a parent,
caregiver, or family of an LGBTQI+ individual
State: WA
Story Title: I'm a faculty member
I'm a faculty member at a public university and parent whose children attend public school.
Every learner should feel supported and seen in their education. Schools must be safe for
LGBTQI+ students.

AR_013117

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title:
I am a high school teacher and I am an aunt of members of the LGBTQI+ community. All students need support and acceptance. The mental health of kids is deteriorating. I've been teaching for over twenty years. The trend has shifted from problems with gangs and teen moms, and has now turned to anxiety and depression. Don't let them down.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: LGBTQIA kids need our help
I stand with supporting and protecting all students-- specifically supporting and protecting students who identify as part of the LGBTQIA+ community.

AR_013119

RESEARCH THAT MATTERS

# SUICIDE THOUGHTS AND ATTEMPTS AMONG TRANSGENDER ADULTS Findings from the 2015 U.S. Transgender Survey

September 2019

Jody L. Herman
Taylor N.T. Brown
Ann P. Haas

UCLA School of Law
Williams Institute

# EXECUTIVE SUMMARY

Over the past 20 years, a growing body of research has focused on suicidality among transgender individuals, including prevalence estimates and risk factors associated with suicide thoughts and attempts. Studies of the transgender population demonstrate that the prevalence of suicide thoughts and attempts among transgender adults is significantly higher than that of the U.S. general population. For example, transgender adults have a prevalence of past-year suicide ideation that is nearly twelve times higher, and a prevalence of past-year suicide attempts that is about eighteen times higher, than the U.S. general population. The 2015 U.S. Transgender Survey (USTS), which is the largest survey of transgender people in the U.S. to date, found that 81.7 percent of respondents reported ever seriously thinking about suicide in their lifetimes, while 48.3 percent had done so in the past year. In regard to suicide attempts, 40.4 percent reported attempting suicide at some point in their lifetimes, and 7.3 percent reported attempting suicide in the past year.

Although the research literature to date agrees that transgender people are at an elevated risk of suicide thoughts and attempts, there is still much to learn about why transgender people are particularly at risk. In this report, we utilize data from the 2015 USTS to examine the key risk factors associated with lifetime and past-year suicide thoughts and attempts among a large and diverse sample of transgender people.

## DEMOGRAPHICS

Demographic trends related to suicide thoughts and attempts among USTS respondents reflected trends found in prior research of suicidality in the U.S. general population and among transgender people.

- Among USTS respondents, suicide thoughts and attempts were more likely to be reported among those of younger ages, Alaskan Native/American Indian or Biracial/Multiracial respondents, transgender men, pansexual respondents, and non-binary respondents assigned female at birth.

- Similar to trends in the U.S. population, we found a higher prevalence across all suicide-related measures among respondents who had lower educational attainment, were unemployed, or had lower annual household income. In terms of relationship status, respondents who were partnered and living together with their partners had the lowest prevalence of suicide thoughts and attempts.

## GENERAL RISK FACTORS

Transgender people have many of the same risk factors for suicidality as found in the U.S. general population, such as depression, substance use, and housing instability. Similar to these trends in the U.S. general population, we found an elevated prevalence of suicide thoughts and attempts among USTS respondents who

- Experienced serious psychological distress and reported heavy alcohol or illicit drug use (excluding marijuana);

- Reported poor general health compared to those who reported excellent health (19.9% versus 3.6% past year suicide attempts);

AR_026965

- Reported having a disability, experienced homelessness in the past year, or had ever been arrested for any reason.

## UNIQUE RISK FACTORS

In addition to general risk factors, transgender people have additional risk factors, such as experiences of discrimination, stigma, family rejection, and lack of access to gender-affirming health care. Findings regarding these unique factors include the following:

- Experiencing discrimination or mistreatment in education, employment, housing, health care, in places of public accommodations, or from law enforcement is associated with higher prevalence of suicide thoughts and attempts. For example, the prevalence of past-year suicide attempts by those who reported that they had been denied equal treatment in the past year because they are transgender was more than double that of those who had not experienced such treatment (13.4% compared to 6.3%).

- Those who reported that their spouses, partners, or children rejected them because they are transgender reported higher prevalence of lifetime and past-year suicide attempts. Those who reported rejection by their family of origin, for example, reported twice the prevalence of past-year suicide attempts compared to those who had not experienced such rejection (10.5% compared to 5.1%).

- Respondents who had been rejected by their religious communities or had undergone conversion therapy were more likely to report suicide thoughts and attempts. For instance, 13.1 percent of those who had experienced religious rejection in the past year had attempted suicide in the past year; by contrast, 6.3 percent of respondents who had experienced religious acceptance in the past year attempted suicide in the past year.

- Experiences of violence, including intimate partner violence (IPV) are associated with higher prevalence of suicide thoughts and attempts. Over 30 percent of those who were physically attacked in a place of public accommodation reported attempting suicide in the past year, which is over four times the prevalence among respondents who were not similarly attacked.

- Those who had "de-transitioned" at some point, meaning having gone back to living according to their sex assigned at birth, were significantly more likely to report suicide thoughts and attempts, both past-year and lifetime, than those who had never "de-transitioned." Nearly 12 percent of those who "de-transitioned" attempted suicide in the past year compared to 6.7 percent of those who have not "de-transitioned."

- People who are not viewed by others as transgender and those who do not disclose to others that they are transgender reported lower prevalence of suicide thoughts and attempts. For instance, 6.3 percent of those who reported that others can never tell they are transgender attempted suicide in the past year compared to 12.2 percent of those who reported that others can always tell they are transgender.

- The cumulative effect of minority stress is associated with higher prevalence of suicidality. For instance, 97.7 percent of those who had experienced four discriminatory or violence experiences in the past year (being fired or forced to resign from a job, eviction, experiencing homelessness, and physical attack) reported seriously thinking about suicide in the past year and 51.2 percent made a suicide attempt in the past year.

We also found that there are some factors that are associated with lower risk of suicide thoughts and attempts for USTS respondents:

- Respondents with supportive families reported lower prevalence of past-year and lifetime suicide thoughts and attempts.
- Those who wanted, and subsequently received, hormone therapy and/or surgical care had substantially lower prevalence of past-year suicide thoughts and attempts than those who wanted hormone therapy and surgical care and did not receive them.
- A lower proportion of respondents who lived in a state with a gender identity nondiscrimination statute reported past-year suicide thoughts and attempts than those who lived in states without such a statute.

Our findings underscore the urgency of research to identify promising intervention and prevention strategies to address suicidality in this population. USTS respondents have the elevated risk of suicide thoughts and attempts that one would expect based on general risk factors that affect the U.S. population, such as substance use and serious psychological distress. Yet, it's clear that minority stress experiences, such as family rejection, discrimination experiences, and lack of access to gender-affirming health care, create added risks for transgender people. Furthermore, the cumulative effect of experiencing multiple minority stressors is associated with dramatically higher prevalence of suicidality. Future research that supports the design and evaluation of suicide intervention and prevention strategies for the transgender population is urgently needed.

AR_026967

_____

# INTRODUCTION

Over the past 20 years, a growing body of research has focused on suicidality among transgender individuals, including prevalence estimates and risk factors associated with suicide thoughts and attempts. In a meta-synthesis of studies from the U.S. and Canada, Adams, Hitomi, and Moody reviewed 42 studies that appeared in peer-reviewed publications and in other literature from 1997 to 2016 with findings regarding suicide thoughts and attempts among transgender people.[1] They found a prevalence of lifetime suicide ideation of 55.5 percent (ranging from 28.9% to 96.5% across studies) and lifetime suicide attempts of 28.9 percent (ranging from 10.7% to 52.4% across studies). Additionally, they found 50.6 percent prevalence of suicide ideation in the past year (ranging from 30.8% to 80.2% across studies) and 10.7 percent prevalence of suicide attempts in the past year (ranging from 4.2% to 19.0% across studies).

Using data from the U.S. National Comorbidity Survey, a nationally representative sample, researchers have found a prevalence of lifetime suicide ideation in the U.S. population of 13.5 percent and lifetime suicide attempts of 4.6 percent.[2] According to the National Survey of Drug Use and Health, 4.3 percent of U.S. adults had suicidal thoughts in the past year, and 0.6 percent attempted suicide.[3] Comparing the findings of Adams and colleagues to these benchmarks, transgender adults have a prevalence of lifetime suicidal thoughts about four times higher, and lifetime suicide attempts about six times higher, than the U.S. population. In the past year, the prevalence of suicide ideation among transgender adults is nearly twelve times higher than in the U.S. population, and the prevalence of suicide attempts is about eighteen times higher.

Although the research literature to date has coalesced around the conclusion that transgender people are at an elevated risk of suicide thoughts and attempts, there is still much to learn about why transgender people are particularly at risk. Existing studies suggest that not only do transgender people have many of the same risk factors for suicidality found in the general population, such as depression and substance use, but in addition have risk factors related to minority stressors, such as experiences of discrimination, stigma, family rejection, and lack of access to gender-affirming health

_____

[1] Adams, N., Hitomi, M., & Moody, C. (2017). Varied Reports of Adult Transgender Suicidality: Synthesizing and Describing the Peer-Reviewed and Gray Literature. *Transgender Health*, *2*(1), 60-75. Their review included 32 studies of lifetime suicide attempts, 23 studies of lifetime suicide ideation, 5 studies of suicide attempts in the past year, and 5 studies of suicide ideation in the past year. In this report, suicide ideation and suicide thoughts refer to serious thoughts about suicide, including thoughts about suicide plans. The term suicidality includes suicide thoughts and behaviors, such as attempts.

[2] Kessler, R.C., Borges, G., & Walters, E.E. (1999). Prevalence of and Risk Factors for Lifetime Suicide Attempts in the National Comorbidity Survey. *Archives of General Psychiatry*, *56*(7), 617-626; Nock, M.K., & Kessler, R.C. (2006). Prevalence of and Risk Factors for Suicide Attempts Versus Suicide Gestures: Analysis of the National Comorbidity Survey. *Journal of Abnormal Psychology*, *115*(3), 616-623.

[3] Substance Abuse and Mental Health Services Administration. (2018). *Key substance use and mental health indicators in the United States: Results from the 2017 National Survey on Drug Use and Health* (HHS Publication No. SMA 18-5068, NSDUH Series H-53). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

AR_026968

care.[4] Minority stress experiences are commonly reported in studies of the transgender population, which puts this population at unique risk for suicide ideation and attempts.[5]

In 2008-2009, the National Center for Transgender Equality (NCTE) and the National LGBTQ Task Force fielded the National Transgender Discrimination Survey (NTDS) to better understand the lives and experiences of transgender adults in the United States.[6] The NTDS, which yielded about 6,500 respondents, asked a single suicide-related question, "Have you ever attempted suicide?" In 2014, the Williams Institute and the American Foundation for Suicide Prevention published a report that described the risk factors associated with lifetime suicide attempts for NTDS respondents. Our study found that the high prevalence of lifetime suicide attempts among NTDS respondents (41%) was exacerbated by discrimination experiences and other minority stressors, including family rejection and violence.[7] Our analysis was limited, however, by the limited number and scope of questions related to suicide in the NTDS questionnaire, including about mental health.

In August 2015, NCTE launched the U.S. Transgender Survey (USTS), a follow-up to the NTDS, which generated the largest survey sample of the U.S. transgender population to date (n=27,715).[8] The USTS included a new section on suicide thoughts and attempts that was based on validated measures from the National Survey of Drug Use and Health (NSDUH) and the U.S. National Comorbidity Survey Replication (NCS-R). Having addressed the limitations of the prior NTDS question on lifetime suicide attempts, and with a much larger sample, the USTS found that 40.4 percent of respondents had attempted suicide in their lifetimes, a difference of only one percentage point from NTDS. Suicide thoughts and attempts are individually distinct experiences and risk profiles for each differ.[9] Therefore, the inclusion of measures for both thoughts and attempts in USTS offers a fuller picture of suicidality among transgender people. In addition to lifetime suicide attempts, the USTS found that 81.7 percent of respondents had seriously thought about killing themselves in their lifetimes, and 48.3 percent had done so in the past year; 7.3 percent had attempted suicide in the past year.

---

[4] Meyer, I.H. (2003). Prejudice, Social Stress, and Mental Health in Lesbian, Gay, and Bisexual Populations: Conceptual Issues and Research Evidence. *Psychological Bulletin, 129*(5), 674-697; Bockting, W., Miner, M.H., Swinburne Romine, R.E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the U.S. transgender population. *American Journal of Public Health, 103*(5), 943-951; Testa, R. J., Habarth, J., Peta, J., Balsam, K., & Bockting, W. (2015). Development of the gender minority stress and resilience measure. *Psychology of Sexual Orientation and Gender Diversity, 2*(1), 65-77.

[5] *See*, for instance, Grant, J.M., Mottet, L.A., Tanis, J., Harrison, J., Herman, J.L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force; James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality.

[6] James, S.E., et al., (2016).

[7] Haas, A.P., Rodgers, P.L., & Herman, J.L. (2014). *Suicide Attempts among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey*. Los Angeles, CA: The Williams Institute and the American Foundation for Suicide Prevention.

[8] James, S.E., et al., (2016).

[9] Klonsky, E.D., May, A.M., & Saffer, B.Y. (2016). Suicide, Suicide Attempts, and Suicidal Ideation. *Annual Review of Clinical Psychology, 12*, 307-330.

In addition to providing new data about suicide-related behaviors, the USTS improved upon the NTDS by incorporating validated measures of mental and physical health, and revised measures assessing discrimination and other minority stress experiences, violence, conversion therapy, law enforcement interactions, incarceration experiences, civic participation, and other topics. This new wealth of data from the USTS has given us the opportunity to further examine the key risk factors associated with lifetime and past-year suicide thoughts and attempts among a large and diverse sample of transgender people. In this report, we present our findings, discuss their implications, and conclude by identifying issues that remain to be examined in future research.

AR_026970

# METHODS

The 2015 U.S. Transgender Survey was an online survey of transgender adults, ages 18 and over, which was fielded in August and September of 2015.[10] The survey was announced and distributed with the assistance of over 300 organizations across the United States and was made available in English and Spanish. The survey questionnaire contained over 300 items covering a wide range of topics, such as demographics, experiences at work and school, interactions with law enforcement, identity documents, politics and civic participation, violence, family relationships, gender-affirming health care, mental health, substance use, and suicide thoughts and attempts. The 27,715 respondents came from all 50 U.S. states, three U.S. territories, and overseas military bases.

Overall, the survey sample was young, with a median age of 26 years compared to 38 years for the U.S. population.[11] About a third of respondents identified as gender non-binary. The sample had generally higher educational attainment than the U.S. population, with 87 percent of USTS respondents having at least some college education compared to 56 percent of U.S. adults ages 18 to 24 and 60 percent of U.S. adults ages 25 and older.[12] Yet, respondents overall reported lower household income, with median household income of $35,000-$39,999 compared to $56,500 for U.S. households at that time.[13] The sample had a higher proportion of white (non-Hispanic) adults (82%) compared to the U.S. population (62%) and also had an unusually high number of 18 year-olds.[14] A weight was developed to adjust the survey sample to the racial and ethnic composition of the U.S., based on the 2014 American Community Survey, and to adjust for the overabundance of 18 year-old respondents. This survey weight was applied in all analyses for this report.[15]

The analyses presented in this report are mainly descriptive and rely on bivariate statistical techniques to assess the relationship between characteristics and experiences of USTS respondents and suicide thoughts and attempts. Specifically, we use Pearson's chi-square tests of independence to test the statistical significance of relationships. Due to the large sample size, nearly all chi-square tests were statistically significant at the $p<0.05$ level. Throughout the report, we note in the tables the relationships that were not found to be statistically significant.[16] In addition, in some cases seemingly small differences among groups were found to be statistically significant because of the large sample size.

---

[10] The USTS was for individuals who identify as transgender, trans, non-binary, crossdressers, and other gender minority identities. In keeping with *The Report of the 2015 U.S. Transgender Survey*, we use the term "transgender" to describe those whose gender identity differs from their sex assigned at birth. We use this as an "umbrella term" to describe USTS respondents, keeping in mind the diversity of gender identities in this sample. This work is based on data generated from the 2015 U.S. Transgender Survey, which was conducted by the National Center for Transgender Equality. To find out more about the U.S. Transgender Survey, visit http://www.ustranssurvey.org/reports.

[11] U.S. Census Bureau. (2015). *Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2015*, available at: https://factfinder.census.gov (last accessed August 18, 2019).

[12] James, S.E., et al., (2016).

[13] U.S. Census Bureau. (2015).

[14] James, S.E., et al., (2016).

[15] For a detailed description of the USTS methodology and survey sample, please refer to the relevant chapters and appendices in the USTS report, *The Report of the 2015 U.S. Transgender Survey*, available online at www.ustranssurvey.org.

[16] All frequencies, chi-square test statistics, and p-values are on file with the lead author.

Information reported by USTS participants about suicide ideation and suicide attempts should not be used as the basis of inferences about suicide deaths among transgender people. No jurisdiction in the U.S. routinely and systematically collects information about decedents' gender identity at the time of death, and as a result, little is known about death among transgender people, whether by suicide or any other manner or cause. Systematic data from general population studies show differences in demographic characteristics (in particular, age and gender), and suicide risk factors among people who die by suicide, compared to those who seriously consider or attempt suicide.[17] In the absence of specific information about whether transgender people show similar differences, no implications about suicide death should be drawn from findings presented in this report.

---

[17] DeJong, T.M., Overholser, J.C., & Stockmeier, C.A. (2010). Apples to oranges? A direct comparison between suicide attempters and suicide completers. *Journal of Affective Disorders*, *124*(1-2), 90-97; Brown, G.K., Beck, A.T., Steer, R.A., & Grisham, J.R. (2000). Risk factors for suicide in psychiatric outpatients: A 20-year prospective study. *Journal of Consulting and Clinical Psychology*. *68*(3), 371-377; Duberstein, P.R., Conwell, Y., & Caine, E.D. (1994). Age differences in the personality characteristics of suicide completers: Preliminary findings from a psychological autopsy study. *Psychiatry*, *57*(3), 213-224.

# FINDINGS

## DEMOGRAPHICS

As shown in Table 1, lifetime and past-year suicide thoughts and attempts were less commonly reported among older USTS respondents, a pattern that has also been observed in general population studies. Lifetime and past-year suicide thoughts and attempts were most commonly reported by Alaska Native/American Indian and Biracial/Multiracial respondents, and least commonly by White/ Middle Eastern/North African respondents. Respondents who were assigned male sex at birth had a lower prevalence of lifetime suicide thoughts and attempts compared to those assigned female at birth. Those assigned male had birth also had a lower prevalence of suicide thoughts in the past year, although no significant difference was found in the prevalence of past-year suicide attempts between respondents assigned male, or female, at birth. Comparing respondents of different gender identities, the highest prevalence of lifetime suicide thoughts and attempts was found among transgender men and non-binary respondents assigned female at birth, while crossdressers reported substantially lower prevalence of both lifetime and past-year suicide thoughts and attempts.[18] Higher prevalence across all suicide-related measures was found among respondents who had lower educational attainment, were unemployed, or had lower annual household income. In terms of relationship status, respondents who were partnered and living together with their partners had the lowest prevalence of suicide thoughts and attempts. Those who described their sexual orientation as heterosexual or straight had lower prevalence of suicide thoughts and attempts than respondents in other sexual orientation categories; pansexual respondents reported the highest prevalence on all suicide-related measures.[19]

**Figure 1. Suicide thoughts by age group**





---

[18] The Report of the 2015 U.S. Transgender Survey provides the following definition for "crossdresser": "While definitions of 'crossdresser' vary, many use this term to describe a person who dresses in a way that is typically associated with a gender different from the one they were thought to be at birth, but who may not identify with that gender or intend to live full time as that gender" (p. 40).

[19] Pansexual is defined, generally, as being attracted to people of all genders.

**Figure 2. Suicide attempts by age group**



With few exceptions, the demographic patterns seen in the USTS data were consistent with findings from our 2014 analysis of NTDS data.[20] While generally confirming our earlier findings related to demographic characteristics of transgender people regarding the highest, and lowest, prevalence of lifetime suicide attempts, the present analysis also shows a quite similar picture regarding past-year suicide thoughts and attempts.

**Table 1. Suicide thoughts and attempts by demographic characteristics**

|  |  | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
|  |  | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Current Age | 18 to 24 | 61.2 | 10.5 | 86.3 | 42.1 |
|  | 25 to 44 | 43.6 | 6.0 | 81.8 | 42.2 |
|  | 45 to 54 | 32.2 | 3.2 | 74.4 | 37.5 |
|  | 55 to 64 | 25.8 | 2.1 | 68.4 | 28.6 |
|  | 65 plus | 15.1 | 0.9 | 56.6 | 17.5 |
| Race/Ethnicity | Alaska Native/American Indian alone | 54.2 | 10.4 | 86.8 | 57.3 |
|  | Asian/NH/PI alone | 44.8 | 7.9 | 81.8 | 40.3 |
|  | Biracial/Multiracial | 53.9 | 10.4 | 88.0 | 50.4 |
|  | Black/African American alone | 47.6 | 8.7 | 81.2 | 46.6 |
|  | Latinx/Hispanic alone | 52.5 | 9.1 | 84.1 | 44.5 |
|  | White/ME/NA alone | 47.4 | 6.3 | 80.8 | 37.4 |
| Assigned Sex | Female | 50.9 | 7.2 | 85.1 | 42.7 |
|  | Male | 44.8 | 7.4 | 77.2 | 37.2 |
| Gender Identity | Crossdresser | 22.0 | 2.7 | 50.8 | 15.1 |
|  | Trans women | 46.8 | 8.4 | 79.4 | 39.9 |
|  | Trans men | 45.3 | 6.7 | 84.7 | 44.9 |
|  | GQ/NB (AFAB) | 57.0 | 7.6 | 85.5 | 40.6 |
|  | GQ/NB (AMAB) | 43.5 | 5.0 | 76.0 | 31.5 |

---

[20] Haas, A.P., et al., (2014).

**Table 1. Suicide thoughts and attempts by demographic characteristics (continued)**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Education | Less than high school | 63.1 | 17.3 | 85.0 | 51.8 |
| | High school grad (incl. GED) | 59.5 | 12.5 | 84.6 | 48.5 |
| | Some college (no degree)/Associate's | 53.7 | 8.5 | 84.9 | 44.1 |
| | Bachelor's degree | 40.4 | 4.0 | 78.6 | 33.7 |
| | Graduate or professional degree | 30.7 | 2.6 | 72.1 | 30.0 |
| Workforce Participation | Employed | 44.7 | 5.8 | 80.6 | 38.4 |
| | Unemployed | 62.5 | 12.6 | 87.1 | 46.4 |
| | Out of the labor force | 50.9 | 8.5 | 81.7 | 42.9 |
| Annual Household Income | $1 to $9,999 | 60.4 | 11.3 | 85.5 | 47.3 |
| | $10,000 to $19,999 | 55.2 | 10.4 | 86.7 | 48.5 |
| | $20,000 to $49,999 | 48.6 | 6.7 | 84.2 | 42.9 |
| | $50,000 to $100,000 | 42.6 | 5.3 | 78.8 | 36.2 |
| | $100,000 or more | 36.5 | 3.9 | 74.0 | 29.6 |
| Relationship Status | Partnered, living together | 39.5 | 4.4 | 79.3 | 40.0 |
| | Partnered, not living together | 56.0 | 10.5 | 85.5 | 43.5 |
| | Single | 51.5 | 8.0 | 81.9 | 39.5 |
| | Not listed above | 47.1 | 7.4 | 83.0 | 40.8 |
| Sexual Orientation | Asexual | 54.1 | 9.7 | 81.1 | 37.9 |
| | Bisexual | 48.0 | 7.2 | 81.1 | 40.1 |
| | Gay/Lesbian/Same Gender Loving | 43.8 | 6.4 | 79.6 | 37.3 |
| | Heterosexual/Straight | 33.6 | 4.8 | 73.2 | 38.7 |
| | Pansexual | 59.1 | 9.7 | 88.3 | 47.0 |
| | Queer | 49.2 | 6.3 | 83.9 | 39.2 |
| | Not listed above | 52.4 | 8.2 | 83.2 | 41.5 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## GENERAL RISK FACTORS

The USTS collected data on a number of factors that have long been established to contribute to suicide risk in the general population, including depression and other mental health conditions, substance use, physical health and disability, and stressful life circumstances, such as homelessness or encounters with law enforcement.[21] Prior analysis of the USTS data found that respondents reported experiencing such risk factors, such as serious psychological distress and homelessness,

---

[21] *See,* for instance, Van Orden, K. A., Witte, T. K., Cukrowicz, K. C., Braithwaite, S., Selby, E. A., & Joiner, T. E. (2010). The Interpersonal Theory of Suicide. *Psychological Review, 117*(2): 575-600; Russell, D., Turner, R. J. & Joiner, T. E. (2009). Physical Disability and Suicidal Ideation: A Community-Based Study of Risk/Protective Factors for Suicidal Thoughts. *Suicide and Life-Threatening Behavior, 39*(4), 440-451; Steele, I. H., Thrower, N., Noroian, P., & Saleh, F. M. (2018). Understanding Suicide Across the Lifespan: A United States Perspective of Suicide Risk Factors, Assessment & Management. *Psychiatry & Behavioral Science, 63*(1), 162-171.



at a prevalence much higher than the U.S. general population.[22] The relationship between these risk factors and suicide thoughts and attempts are shown in Table 2.

Similar to findings in the general population, experiencing serious psychological distress and heavy alcohol use or illicit drug use (excluding marijuana) are significant risk factors for suicide thoughts and attempts among USTS respondents, both lifetime and past-year. As shown in Figure 3, respondents who rated their general health as "poor" had a dramatically increased prevalence of lifetime and past-year suicide thoughts and attempts, compared to those who described their health as "excellent." For instance, while 3.6 percent of those who reported excellent general health attempted suicide in the past year, 19.9 percent of those who reported poor health attempted suicide in the past year.

**Figure 3. Suicide thoughts and attempts in the past year by general health**



In regard to HIV status, those who reported living with HIV were more likely than those who are HIV negative or don't know their status to have attempted suicide at some point in their lives, although this group was the least likely to have attempted suicide in the past year. Respondents who indicated not knowing their HIV status were more likely than others to report thinking about and attempting suicide in the past year. Respondents who reported having a disability, either by meeting the definition of disability according to the American Community Survey or by personally identifying as having a disability, had higher prevalence on all suicide-related measures than those without disabilities.

Similarly, experiencing homelessness was associated with a markedly higher prevalence of lifetime and past-year suicide thoughts and attempts compared to those who had not experienced homelessness. Notably, over 20 percent of respondents who experienced homelessness in the past year had attempted suicide during that time. Finally, those who had been arrested for any reason in the past year were more likely to report suicide thoughts and attempts, both lifetime and past-year.

[22] James, S.E., et al., (2016).

AR_026976

**Table 2. Suicide thoughts and attempts by general risk factors**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Serious psychological distress (Kessler-6) | No | 29.6 | 2.9 | 73.8 | 31.5 |
| | Yes | 77.8 | 14.1 | 94.3 | 54.2 |
| Heavy alcohol use | No | 48.0 | 6.9 | 81.4 | 39.5 |
| | Yes | 53.1 | 11.8 | 85.2 | 50.3 |
| Binge alcohol use | No | 47.3 | 6.8 | 80.8 | 38.5 |
| | Yes | 51.3 | 8.7 | 83.9 | 45.5 |
| Illicit drug use (excluding marijuana) | No | 47.2 | 6.6 | 81.0 | 39.1 |
| | Yes | 60.3 | 13.6 | 88.6 | 52.9 |
| General health | Excellent | 29.1 | 3.6 | 66.9 | 26.9 |
| | Very good | 39.1 | 4.5 | 77.6 | 33.9 |
| | Good | 51.9 | 7.6 | 84.8 | 42.1 |
| | Fair | 64.9 | 11.0 | 90.3 | 52.3 |
| | Poor | 77.7 | 19.9 | 95.8 | 65.0 |
| HIV status | Living with HIV | 35.1 | 6.0 | 72.6 | 48.4 |
| | HIV negative | 43.9 | 6.5 | 82.0 | 43.4 |
| | Don't know status | 53.7 | 8.2 | 81.7 | 36.8 |
| Disability (ACS) | No | 37.0 | 4.1 | 75.7 | 32.0 |
| | Yes | 65.9 | 12.2 | 91.2 | 53.0 |
| Disability (self-identify) | No | 42.2 | 5.4 | 78.2 | 35.0 |
| | Yes | 64.5 | 12.1 | 90.9 | 54.5 |
| Homelessness (ever) | No | 44.7 | 5.3 | 77.7 | 32.2 |
| | Yes | 56.6 | 11.8 | 91.0 | 59.3 |
| Homelessness (past year) | No | 45.4 | 5.6 | 80.8 | 38.2 |
| | Yes | 66.5 | 20.4 | 91.3 | 63.5 |
| Arrested any reason (past year) | No | 48.1 | 7.1 | 81.6 | 40.1 |
| | Yes | 58.5 | 19.0 | 88.1 | 58.1 |

AR_026977

## UNIQUE RISK FACTORS

As described above, transgender people have many of the same risk factors found in the U.S. general population. In addition, transgender people have risk factors that are unique to the transgender population, such as experiences related to disclosure of transgender status, access to gender affirming care, and exposure to minority stressors, such as experiences of discrimination, stigma, and family rejection. While cisgender people (i.e., people who are not transgender) sometimes experience discrimination and rejection for various reasons, the findings presented in this section describe the unique experiences of USTS respondents that were attributed to transgender status.

### "Outness" and Disclosure

In addition to general risk factors, transgender individuals have unique factors in their lives that may increase risk of suicide thoughts and attempts. One unique factor is disclosure of transgender status to family, friends, and others (i.e., being "out" as transgender). The USTS asked respondents about the degree to which they were "out" to various people in their lives. Table 3 presents findings about how "outness" is related to suicide thoughts and attempts. While being "out" to immediate or extended family, boss, co-workers, classmates, or health care providers was not related to past-year suicide attempts, being "out" was associated with lower prevalence of past-year suicide thoughts compared with not being "out." Being "out" to an increasing number of LGBT and non-LGBT friends, however, was associated with higher prevalence of suicide thoughts and attempts, both lifetime and past-year. Strikingly, in regard to every group of people in respondents' lives examined by the USTS, respondents who indicated they had not disclosed their transgender status to anyone were the least likely to have reported lifetime suicide attempts compared to those who had disclosed their status to others. This replicates our previously reported finding from the NTDS that respondents who had told no one that they are transgender, and respondents who were not "out" to family, friends, or others, were the least likely to have reported lifetime suicide attempts.

The USTS asked respondents whether they thought other people could tell that they are transgender. Twenty-four percent of USTS respondents reported that people can never tell they are transgender, whereas 2 percent reported that people can always tell that they are transgender.[23] Those who reported that others can always tell they are transgender had the highest prevalence of both lifetime and past-year suicide thoughts and attempts. Due to the larger sample size and revised questionnaire, this finding is generally more robust than our 2014 analysis of NTDS data, where respondents who reported that others could always tell they are transgender had only a slightly elevated risk of lifetime suicide attempts. It should be noted, however, that those who reported they had not disclosed their transgender status to anyone and those who reported that people can never tell they are transgender reported a prevalence of suicide thoughts and attempts much higher than the U.S. general population.

---

[23] James, S.E., et al., (2016).

AR_026978

## Table 3. Suicide thoughts and attempts by "outness," disclosure, and perception by others

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| "Out" to immediate family | None | 52.8 | 6.5 | 80.2 | 35.6 |
| | Some | 53.1 | 7.7 | 82.1 | 37.9 |
| | Most | 50.9 | 7.7 | 83.5 | 40.4 |
| | All | 44.7 | 7.4 | 82.1 | 42.6 |
| "Out" to extended family | None | 52.7 | 7.1 | 80.1 | 35.2 |
| | Some | 51.7 | 7.8 | 85.3 | 43.6 |
| | Most | 46.3 | 7.3 | 83.0 | 42.5 |
| | All | 38.1 | 6.6 | 80.0 | 43.1 |
| "Out" to LGBT friends | None | 41.7 | 6.6 | 72.3 | 32.4 |
| | Some | 45.3 | 5.5 | 79.0 | 35.2 |
| | Most | 50.4 | 5.9 | 82.2 | 38.2 |
| | All | 48.8 | 8.0 | 82.9 | 42.9 |
| "Out" to non-LGBT friends | None | 44.7 | 7.0 | 75.6 | 34.7 |
| | Some | 47.1 | 6.0 | 81.1 | 37.1 |
| | Most | 49.5 | 6.2 | 82.9 | 38.7 |
| | All | 49.4 | 9.0 | 83.8 | 47.1 |
| "Out" to boss | None | 48.8 | 6.5 | 80.3 | 36.2 |
| | Some | 44.8 | 6.4 | 81.6 | 41.5 |
| | Most | 44.0 | 6.9 | 80.0 | 39.5 |
| | All | 42.9 | 6.2 | 81.1 | 41.5 |
| "Out" to co-workers | None | 48.8 | 6.7 | 79.9 | 36.6 |
| | Some | 45.9 | 5.7 | 82.5 | 39.4 |
| | Most | 40.0 | 5.7 | 79.5 | 38.1 |
| | All | 42.9 | 6.4 | 80.2 | 42.1 |
| "Out" to classmates | None | 50.4 | 7.0 | 80.7 | 38.2 |
| | Some | 51.6 | 7.2 | 82.3 | 39.6 |
| | Most | 47.1 | 7.7 | 81.6 | 40.0 |
| | All | 46.1 | 8.7 | 82.2 | 46.8 |
| "Out" to health care providers | None | 53.4 | 7.6 | 81.2 | 36.5 |
| | Some | 50.0 | 6.6 | 82.8 | 39.1 |
| | Most | 45.9 | 6.0 | 80.8 | 40.6 |
| | All | 42.5 | 7.4 | 81.6 | 43.8 |
| People can tell I'm trans, even if I don't tell them | Always | 62.0 | 12.2 | 84.2 | 47.0 |
| | Most of the time | 49.6 | 9.6 | 82.3 | 42.2 |
| | Sometimes | 50.3 | 7.2 | 82.6 | 41.4 |
| | Rarely | 46.9 | 7.1 | 81.5 | 40.6 |
| | Never | 46.0 | 6.3 | 80.5 | 37.6 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## Social and Medical Gender Affirmation

USTS respondents were asked about whether they live full time according to their gender identity and whether and how they have accessed gender-affirming medical care (i.e., hormones or surgery). Table 4 shows how these gender affirmation milestones are related to suicide thoughts and attempts. Those who do not want to live full time according to their gender identity generally were at similar or lower risk of lifetime suicide attempts compared to those who do not live full time yet but want to someday. Those who began to live full time according to their gender identity more recently have a higher prevalence of past-year suicide thoughts and attempts than those who began living full time longer ago. For instance, those who began to live full time according to their gender identity within the past year had nearly double the prevalence of past year suicide attempts than those who began ten or more years ago.

There was no statistically significant relationship between suicide thoughts and attempts and current hormone use, but there was a significant relationship among people receiving hormone therapy based on where they got their hormones. Respondents who got their hormones only from licensed professionals were less likely to report past-year suicide thoughts and attempts and lifetime attempts than those who got their hormones from friends or other non-licensed sources. Those who wanted, and subsequently received, hormone therapy and/or surgical care had substantially lower prevalence of past-year suicide thoughts and attempts than those who wanted hormone therapy and surgical care but had not received them. For instance, 5.1 percent of those who wanted surgical care and received it attempted suicide in the past year compared to 8.5 percent of those who wanted surgical care but did not receive it.

The USTS asked respondents if they had ever gone back to living according to their sex assigned at birth, which was referred to as "de-transitioning." Eight percent of respondents reported having "de-transitioned" at some point for reasons such as pressure from family and friends and having experienced too much harassment or discrimination. Those who had "de-transitioned" at some point were significantly more likely to report suicide thoughts and attempts, both past-year and lifetime, than those who had never "de-transitioned."

**Table 4. Suicide thoughts and attempts by gender affirmation milestones**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Want to live in gender identity someday | No | 36.5 | 4.1 | 71.0 | 32.6 |
| | Yes | 55.3 | 7.4 | 81.9 | 35.6 |
| | Not sure | 45.5 | 5.2 | 75.9 | 31.0 |
| Years since began to live according to gender identity | 0 to 1 | 54.7 | 9.7 | 84.3 | 42.3 |
| | 2 to 5 | 50.7 | 7.9 | 86.0 | 46.3 |
| | 6 to 9 | 39.2 | 6.6 | 80.2 | 45.6 |
| | 10 plus | 31.5 | 5.2 | 78.4 | 43.1 |
| Currently taking hormones | No | 43.0 | 7.3 | 79.2 | 40.8 |
| | Yes | 42.7 | 6.5 | 82.1 | 42.6 |

AR_026980

**Table 4. Suicide thoughts and attempts by gender affirmation milestones (continued)**

|  |  | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
|  |  | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Where get hormones | Only licensed professionals | 41.6 | 5.8 | 81.7 | 41.6 |
|  | Professionals and friends /other | 53.7 | 11.6 | 87.0 | 51.4 |
|  | Only friends/other | 54.1 | 16.4 | 81.7 | 52.0 |
| Had/have hormones | Want them, haven't had | 57.9 | 8.9 | 84.4 | 41.1 |
|  | Want them, have had | 42.9 | 6.5 | 81.9 | 42.4 |
| Had/have surgery | Want, have not had | 54.8 | 8.5 | 83.9 | 41.5 |
|  | Want, have had | 38.2 | 5.1 | 79.0 | 39.5 |
| Ever "de-transitioned" | No | 44.2 | 6.7 | 81.6 | 41.8 |
|  | Yes | 57.3 | 11.8 | 86.0 | 52.5 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## Minority Stressors

### Family rejection and social support

Family rejection for being transgender can include such things as relationships ending, experiencing violence from a family member, being kicked out of the family home, not being allowed by their families to live according to their gender identity, and being forced to receive counseling or therapy. Table 5 shows findings for suicide thoughts and attempts related to these experiences. Respondents with supportive families were less likely to report suicide thoughts and attempts than those who reported that their spouses, partners, or children rejected them because they are transgender. Respondents who ever ran away from home as youth because of being transgender had more than double the prevalence of past year suicide attempts than those who had not had that experience. Those with supportive co-workers and classmates had a lower prevalence of suicide thoughts and attempts.

The availability and quality of resources for social support can have an impact on suicidality.[24] As one measure of social support resources, the USTS asked respondents about whether and how they socialize with other transgender people. Overall, there was no significant relationship between socializing with other transgender people and suicide thoughts or attempts. However, some significant relationships emerged when looking at specific ways in which respondents socialized with other transgender people. Those who socialize with other transgender people online were more likely to report suicide thoughts and attempts, while those who socialize with other transgender people in person were less likely to report suicide thoughts and attempts. Those who socialize with other transgender people in political activism had a higher prevalence of suicide thoughts and attempts than those who did not socialize with other transgender people in this way.

---

[24] See, for instance, Bauer, G. R., Pyne, J., Francino, M. C., & Hammond, R. (2013). Suicidality among trans people in Ontario: Implication for social work and social justice. *Service Social*, *59*(1), 35-62; Zeluf, G., Dhejne, C., Orre, C., Mannheimer, L. N., Deogan, C., Hoijer, J., Winzer, R., & Thorson, A. E. (2018). Targeted Victimization and Suicidality Among Trans People: A Web-Based Survey. *LGBT Health*, *5*(3), 180-190.

AR_026981

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 237 of 1019 -
Page ID#: 3142
Suicide Thoughts and Attempts Among Transgender Adults in the US | 18

**Table 5. Suicide thoughts and attempts by experiences of family rejection and social support**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Spouse or partner ended relationship | No | 46.8 | 6.4 | 81.5 | 39.2 |
| | Yes, only because I'm trans | 48.8 | 11.3 | 85.6 | 54.3 |
| | Yes, because I'm trans and other reasons | 46.6 | 8.4 | 83.4 | 46.7 |
| Child ended relationship | No | 34.6 | 4.2 | 74.1 | 35.9 |
| | Yes | 41.3 | 8.1 | 83.6 | 50.5 |
| Family support | Supportive | 41.9 | 5.8 | 79.3 | 37.3 |
| | Neutral | 50.8 | 7.4 | 84.2 | 42.4 |
| | Unsupportive | 60.3 | 13.1 | 89.9 | 54.0 |
| Rejected by family of origin | No | 42.2 | 5.1 | 77.3 | 33.1 |
| | Yes | 53.5 | 10.5 | 88.4 | 52.0 |
| Ever ran away from home | No | 45.6 | 6.4 | 81.2 | 38.4 |
| | Yes | 61.1 | 17.2 | 91.6 | 67.5 |
| Co-worker support | Supportive | 40.2 | 5.2 | 79.2 | 38.5 |
| | Neutral | 49.0 | 7.1 | 84.3 | 42.7 |
| | Unsupportive | 66.3 | 12.3 | 91.0 | 54.7 |
| Classmate support | Supportive | 45.1 | 6.2 | 79.9 | 39.5 |
| | Neutral | 53.1 | 8.8 | 84.4 | 43.3 |
| | Unsupportive | 65.9 | 16.5 | 90.3 | 55.0 |
| Socializing with other trans people | I do socialize | 48.5 | 7.2 | 81.7 | 40.4 |
| | I do not socialize | 46.5 | 7.7 | 81.4 | 39.9 |
| Socialize in political activism | No | 47.6 | 7.3 | 80.3 | 38.8 |
| | Yes | 49.9 | 7.2 | 84.7 | 43.7 |
| Socialize online | No | 40.8 | 6.2 | 77.2 | 36.9 |
| | Yes | 50.3 | 7.5 | 82.9 | 41.3 |
| Socialize in person | No | 51.6 | 8.4 | 82.8 | 41.5 |
| | Yes | 46.5 | 6.7 | 81.1 | 39.8 |
| Socialize in support groups | No | 49.1 | 7.1 | 82.1 | 39.6 |
| | Yes | 46.6 | 7.7 | 80.9 | 42.1 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## Religion

As can be seen in Table 6, lifetime suicide thoughts and attempts were marginally more common among respondents who had ever been a part of a religious or spiritual community, although this group showed marginally lower suicide thoughts and attempts in the past year. Elevated prevalence of both lifetime and past-year suicide thoughts and attempts was observed among respondents who had left a religious or spiritual community because they felt rejected, as well as those who reported experiencing religious rejection in the past year. Conversely, respondents who experienced religious acceptance in the past year were markedly less likely to report past-year suicide thoughts and attempts.

AR_026982

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 238 of 1019 -
Page ID#: 3143
Suicide Thoughts and Attempts Among Transgender Adults in the US  |  19

**Table 6. Suicide thoughts and attempts by experiences with religion**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Ever part of religious community | No | 49.7 | 8.1 | 80.7 | 38.6 |
| | Yes | 47.6 | 6.8 | 82.2 | 41.3 |
| Left religious community rejected | No | 45.9 | 5.8 | 80.2 | 36.8 |
| | Yes | 54.7 | 11.0 | 90.8 | 60.4 |
| Found accepting religious community | No | 59.3 | 12.2 | 92.6 | 60.8 |
| | Yes | 48.2 | 9.4 | 88.1 | 60.0 |
| Part of religious community (past year) | No | 50.0 | 6.7 | 83.8 | 41.8 |
| | Yes | 42.0 | 7.2 | 78.4 | 40.1 |
| Religious acceptance (past year) | No | 54.6 | 22.5 | 87.4 | 46.3 |
| | Yes | 39.6 | 6.3 | 79.3 | 41.5 |
| Religious rejection (past year) | No | 38.9 | 5.5 | 78.7 | 40.0 |
| | Yes | 46.1 | 13.1 | 84.1 | 49.1 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## Conversion therapy

A prior analysis of USTS data found that 18 percent of respondents reported that a psychologist, counselor, religious advisor, or other professional with whom they had discussed their gender identity attempted to stop them from being transgender.[25] Fourteen percent reported that such a professional had attempted to change their sexual orientation. As shown in Table 7, having either of these experiences is associated with a higher prevalence of both lifetime and past-year suicide thoughts and attempts. Whether the professional in question was a religious advisor or non-religious professional was not significantly related to these outcomes.

**Table 7. Suicide thoughts and attempts by experiences with conversion therapy**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Professional tried to stop them being trans | No | 45.7 | 6.4 | 81.3 | 38.7 |
| | Yes | 57.4 | 11.9 | 90.9 | 58.3 |
| Professional was a religious counselor | No | 57.3 | 11.1 | 91.4 | 58.4 |
| | Yes | 57.7 | 13.7 | 89.9 | 58.1 |
| Professional tried to change sexual orientation | No | 47.2 | 6.5 | 82.4 | 39.9 |
| | Yes | 59.4 | 12.2 | 92.9 | 63.1 |

NOTE: Text in blue indicates there is no statistically significant relationship.

---

[25] James, S.E., et al., (2016).

## Violence

Physical victimization, sexual violence, and intimate partner violence (IPV) have been shown to increase risk of suicidal ideation and behavior in the general population.[26] Prior research suggests that transgender people experience violence more often than the general population, including violence that is related to transgender status.[27] Table 8 presents findings regarding relationships between experiences of violence and suicide thoughts and attempts. Past-year suicide thoughts and attempts were considerably more prevalent among respondents who reported having experienced physical attacks during the past year, compared to respondents who did not have that experience. The large majority of respondents who reported they had been physically attacked attributed the attack to their transgender status. This group of respondents was significantly more likely to report lifetime suicide thoughts and attempts than those who did not have that experience.

Very similar results were obtained in relation to other types of violent experiences, including unwanted sexual contact and intimate partner violence (IPV), such as IPV centering on coercive control and also physically abusive IPV. In addition to other types of coercive control IPV, respondents were asked if an intimate partner had ever withheld hormones, threatened to "out" them, or told them they weren't a real man or women. Unwanted sexual contact and all aspects of IPV explored in the USTS were associated with a higher prevalence of suicide thoughts and attempts, both lifetime and in the past year.

**Table 8. Suicide thoughts and attempts by experiences with violence**

|  |  | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
|  |  | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Physically attacked, any reason (past year) | No | 45.2 | 5.6 | 80.1 | 36.7 |
|  | Yes | 68.7 | 18.4 | 92.4 | 64.9 |
| Physically attacked because trans (past year) | No | 46.2 | 6.0 | 80.5 | 37.7 |
|  | Yes | 70.1 | 20.9 | 93.8 | 69.2 |
| Unwanted sexual contact (ever) | No | 41.1 | 4.7 | 74.7 | 28.7 |
|  | Yes | 56.5 | 10.2 | 89.7 | 53.6 |
| Unwanted sexual contact (past year) | No | 45.8 | 5.9 | 80.4 | 38.2 |
|  | Yes | 70.6 | **19.4** | 93.2 | 59.8 |
| Coercive control IPV (ever) | No | 44.1 | 5.7 | 77.1 | 31.4 |
|  | Yes | 53.6 | 9.2 | 87.4 | 51.8 |
| Coercive control IPV, trans-related (ever) | No | 46.4 | 6.1 | 79.6 | 35.5 |
|  | Yes | 53.4 | 10.3 | 87.2 | 53.4 |

[26] Klomek A.B., Kleinman M., Altschuler E., Marrocco, F., Amakawa, L., & Gould, M.S. (2013). Suicidal adolescents' experiences with bullying perpetration and victimization during high school as risk factors for later depression and suicidality. *Journal of Adolescent Health, 53*(1), Supplement, S37–42.

[27] Stotzer, R. L. (2009). Violence against transgender people: A review of United States data. *Aggression and Violent Behavior, 14*(3), 170-179; Lombardi, E. L., Wilchins, R.A., Priesing, D., & Malouf, D. (2001). Gender violence: transgender experiences with violence and discrimination. *Journal of Homosexuality, 42*(1), 89-101.

AR_026984

Suicide Thoughts and Attempts Among Transgender Adults in the US  |  21

Table 8. Suicide thoughts and attempts by experiences with violence (continued)

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Physical IPV (ever) | No | 46.0 | 6.1 | 78.4 | 32.8 |
| | Yes | 52.7 | 9.4 | 87.9 | 54.3 |
| Severe physical IPV (ever) | No | 46.0 | 6.0 | 79.1 | 34.1 |
| | Yes | 55.8 | 11.2 | 89.9 | 60.2 |
| Any type of IPV (ever) | No | 43.7 | 5.7 | 75.8 | 29.4 |
| | Yes | 52.2 | 8.6 | 86.7 | 49.7 |

## Discrimination

The USTS collected data on discrimination experiences across many areas of life, such as school, work, health care, and public accommodations, including public restrooms. Prior research shows that such discrimination experiences are minority stressors, which negatively impact mental and physical health.[28] Tables 9a through 9g present findings related to the generally strong association of discrimination experiences and past-year and lifetime suicide thoughts and attempts.

*Denied equal treatment & verbal harassment*

As shown in Table 9, significantly large proportions of respondents who reported being denied equal treatment or being verbally harassed in the past year, either for any reason or specifically because of their transgender status, reported past-year suicide thoughts and attempts, compared to those who did not have these experiences.

Table 9. Suicide thoughts and attempts by experiences of being denied equal treatment and verbal harassment

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Denied equal treatment, any reason (past year) | No | 46.1 | 6.2 | 80.2 | 37.5 |
| | Yes | 60.2 | 12.8 | 89.8 | 55.7 |
| Denied equal treatment because trans (past year) | No | 46.2 | 6.3 | 80.3 | 37.8 |
| | Yes | 61.3 | 13.4 | 90.3 | 56.4 |
| Verbally harassed, any reason (past year) | No | 36.3 | 4.1 | 74.6 | 30.7 |
| | Yes | 58.4 | 10.0 | 87.7 | 48.5 |
| Verbally harassed because trans (past year) | No | 39.5 | 5.0 | 76.1 | 32.9 |
| | Yes | 58.8 | 10.0 | 88.4 | 49.4 |

---

[28] Tucker, R. P., Testa, R. J., Reger, M. A., Simpson, T. L., Shipherd, J. C., & Lehavot, K. (2018). Current and Military-Specific Gender Minority Stress Factors and Their Relationship with Suicide Ideation in Transgender Veterans. *Suicide Life-Threatening Behavior, 49*(1), 155-166; Testa, R. J. Michaels, M. S., Bliss, W., Rogers, M. L., Balsam, K. F., & Joiner, T. (2017). Suicidal ideation in transgender people: Gender minority stress and interpersonal theory factors. *Journal of Abnormal Psychology, 126*(1), 125-136.

AR_026985

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 241 of 1019 -
Page ID#: 3146
Suicide Thoughts and Attempts Among Transgender Adults in the US  |  22

*Education*

Table 10 shows that USTS respondents who reported negative experiences in K-12 educational settings, such as being verbally harassed, physically attacked, or sexually assaulted, had higher prevalence of lifetime and past-year suicide thoughts and attempts than respondents who did not have such experiences. Similar patterns emerge for those who left school due to mistreatment or were expelled. Notably, the group with the lowest prevalence of suicide thoughts and attempts—much lower than the overall USTS averages in some cases—are those who were not "out" or perceived by others to be transgender or lesbian, gay, bisexual, or queer (LGBQ) in K through 12. Yet, the prevalence of suicide thoughts and attempts in that group remains much higher than the U.S. general population. Those who reported harassment in college or who left college due to harassment had a higher prevalence of past-year and lifetime suicide attempts than those who did not have those experiences.

**Table 10. Suicide thoughts and attempts by experiences in educational settings**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Out or perceived as trans or LGBQ in K-12 | Out or perceived as trans/LGBQ | 51.8 | 8.0 | 85.1 | 44.2 |
| | Not out or perceived as trans/LGBQ | 36.5 | 4.4 | 70.5 | 27.1 |
| Verbally harassed in K-12, because trans | No | 51.2 | 7.9 | 83.1 | 41.6 |
| | Yes | 58.0 | 11.8 | 89.9 | 54.9 |
| Physically attacked in K-12, because trans | No | 53.6 | 8.4 | 85.1 | 43.5 |
| | Yes | 59.1 | 15.2 | 92.2 | 65.7 |
| Unwanted sexual in K-12, because trans | No | 53.8 | 8.8 | 86.1 | 45.9 |
| | Yes | 61.9 | **18.1** | 91.9 | 67.6 |
| Left K-12 due to mistreatment so bad | No | 53.0 | 8.7 | 85.6 | 44.7 |
| | Yes | 64.3 | 16.6 | 92.7 | 69.3 |
| Expelled from K-12 | No | 54.4 | 9.5 | 86.4 | 47.7 |
| | Yes | 63.2 | 18.2 | 94.2 | 67.8 |
| Any negative K-12 experience | No | 47.5 | 7.2 | 79.3 | 36.5 |
| | Yes | 57.1 | 10.9 | 89.0 | 52.5 |
| Verbally harassed in college because trans | No | 47.0 | 6.4 | 82.2 | 39.3 |
| | Yes | 57.7 | 10.3 | 91.7 | 57.2 |
| Left college due to mistreatment so bad | No | 56.0 | 9.1 | 91.1 | 54.8 |
| | Yes | 66.0 | 15.4 | 95.0 | 69.6 |

NOTE: Text in blue indicates there is no statistically significant relationship.

*Employment & Workplace*

Table 11 presents findings about the relationship between employment and workplace discrimination to suicide thoughts and attempts. As shown, losing a job because of one's transgender status (as opposed to losing a job for any reason) was significantly related to past-year and lifetime suicide thoughts and attempts. Respondents who reported negative past-year work experiences because of their transgender status, such as being fired or forced to resign, not being hired, and being harassed,

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 242 of 1019 -
Page ID#: 3147
Suicide Thoughts and Attempts Among Transgender Adults in the US | 23

attacked, or physically assaulted in the workplace had higher prevalence of past-year suicide thoughts and attempts than those who had not experienced these events. Those who took steps to avoid mistreatment at work, such as quitting their job or hiding their gender identity, were more likely to report suicide thoughts and attempts compared to those who did not take such steps to avoid mistreatment.

**Table 11. Suicide thoughts and attempts by experiences with employment and in the workplace**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Ever lost job, any reason | No | 48.3 | 7.3 | 80.0 | 36.4 |
| | Yes | 48.4 | 7.3 | 84.0 | 45.7 |
| Ever lost job because trans/GNC | No | 47.9 | 7.0 | 80.7 | 38.3 |
| | Yes | 51.5 | 9.2 | 88.5 | 55.1 |
| Denied promotion because trans (past year) | No | 50.8 | 7.7 | 83.1 | 40.3 |
| | Yes | 61.3 | 9.6 | 90.7 | 59.1 |
| Fired/forced to resign because trans (past year) | No | 50.8 | 7.5 | 83.2 | 40.5 |
| | Yes | 64.1 | 15.3 | 90.3 | 59.8 |
| Not hired because trans (past year) | No | 48.2 | 6.5 | 81.4 | 37.6 |
| | Yes | 62.2 | 12.4 | 90.7 | 54.6 |
| Took steps to avoid discrimination at work (past year) | No | 33.6 | 4.7 | 76.0 | 35.0 |
| | Yes | 54.5 | 7.5 | 85.2 | 42.2 |
| Any mistreatment by employer (past year) | No | 46.5 | 5.8 | 80.8 | 36.2 |
| | Yes | 60.1 | 10.4 | 90.6 | 54.9 |
| Harassed, attacked, sexual assault at work (past year) | No | 47.0 | 5.9 | 81.5 | 37.7 |
| | Yes | 64.6 | 12.2 | 92.1 | 56.6 |

NOTE: Text in blue indicates there is no statistically significant relationship.

*Housing*

Housing instability is a known risk factor for suicide thoughts and attempts in the general population.[29] Prior research suggests that transgender people have high prevalence of housing instability compared to the general population, including experiencing homelessness.[30] The figures in Table 12 show the impact of recent housing discrimination and instability on suicidality among USTS respondents. Those who reported being evicted or denied a home or apartment in the past year due to their transgender status had an especially high prevalence of past-year suicide thoughts and attempts, with those being evicted having nearly four times higher prevalence of attempted suicide in the past year compared to those who were not evicted. Similarly, respondents who had "couch

---

[29] Van Orden, K. A., et al., (2010).

[30] Begun, S. & Kattari, S.K. (2016). Conforming for survival: Associations between transgender visual conformity/passing and homelessness experiences. *Journal of Gay & Lesbian Social Services, 28*(1), 54-66; Spicer, S. S., Schwartz, A., & Barber, M.E. (2016). Special Issue on Homelessness and the Transgender Homeless Population. *Journal of Gay and Lesbian Mental Health, 14*(4), 267-270.

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 243 of 1019 -
Page ID#: 3148
Suicide Thoughts and Attempts Among Transgender Adults in the US | 24

surfed" during the past year, meaning they relied on short-term accommodations in the homes of friends or family members to avoid being homeless, had over three times the prevalence of past-year suicide attempts than those who were not in that position.

**Table 12. Suicide thoughts and attempts by experiences with housing**

|  |  | PAST 12 MONTHS | | LIFETIME | |
| --- | --- | --- | --- | --- | --- |
|  |  | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Evicted from home/apartment (past year) | No | 46.0 | 6.1 | 81.3 | 40.0 |
|  | Yes | 69.1 | 22.3 | 90.9 | 65.6 |
| Denied a home/apartment (past year) | No | 46.1 | 6.4 | 81.5 | 40.6 |
|  | Yes | 65.0 | 19.8 | 88.4 | 63.3 |
| Couch surfing (past year) | No | 44.4 | 5.5 | 80.6 | 37.8 |
|  | Yes | 69.0 | **18.8** | 90.9 | 64.3 |

*Health Care*

The initial USTS report found that many respondents encountered discrimination within health care settings.[31] As shown in Table 13, more respondents who were denied care from a health care provider in the past year reported suicide thoughts and attempts compared to those who were not denied care. Conversely, those who reported that their health care provider knew they were transgender and treated them with respect had significantly lower prevalence of suicide thoughts and attempts. Other negative-health-care-related experiences in the past year, such as not having health insurance, or being mistreated in any way by a health care provider, were also associated with a higher prevalence of past-year suicide thoughts and attempts.

**Table 13. Suicide thoughts and attempts by experiences in health care settings**

|  |  | PAST 12 MONTHS | | LIFETIME | |
| --- | --- | --- | --- | --- | --- |
|  |  | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Has health insurance | No | 56.4 | 10.5 | 85.6 | 47.4 |
|  | Yes | 47.0 | 6.7 | 81.1 | 39.2 |
| Doctor knew trans and treated with respect (past year) | No | 55.2 | 8.4 | 82.3 | 39.1 |
|  | Yes | 43.3 | 6.4 | 81.4 | 41.7 |
| Doctor refused to give trans-related care (past year) | No | 46.7 | 6.5 | 81.0 | 39.1 |
|  | Yes | 62.0 | 14.4 | 90.8 | 59.5 |
| Doctor refused to give other care (past year) | No | 47.2 | 6.8 | 81.4 | 39.8 |
|  | Yes | 68.2 | **18.8** | 91.8 | 68.6 |
| Any negative experience in doctor/health setting (past year) | No | 44.3 | 5.7 | 78.5 | 35.5 |
|  | Yes | 55.0 | 10.2 | 88.2 | 51.3 |

NOTE: Text in blue indicates there is no statistically significant relationship.

---

[31] James, S.E., et al., (2016).

AR_026988

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 244 of 1019 -
Page ID#: 3149
Suicide Thoughts and Attempts Among Transgender Adults in the US  |  25

*Public Accommodations*

Places of public accommodation, such as restaurants, public transportation, retail stores, hotels, and government agencies (DMV, Social Security Office) can be places of vulnerability for transgender people. In a prior analysis, nearly one-third of USTS respondents reported being denied equal treatment or service, verbally harassed, or physically assaulted in a place of public accommodation in the past year.[32] Twenty percent of USTS respondents had avoided places of public accommodation in the past year to avoid mistreatment.[33] As shown in Table 14, the present analysis shows that having negative experiences in places of public accommodation in the past year, or avoiding these places all together, is associated with a higher prevalence of suicide thoughts and attempts compared to respondents who did not have these experiences in the past year. Over 30 percent of those who were physically attacked in a place of public accommodation reported attempting suicide in the past year, which is over four times higher than the prevalence found among respondents who were not similarly attacked. Experiences in public restrooms reveal a similar pattern, with respondents who were denied access to restrooms, or harassed, physically attacked, or sexually assaulted in restrooms during the past year reporting more past-year suicide thoughts and attempts than those who did not have these experiences. Those who completely avoided using public restrooms in the past year had much higher prevalence of past-year suicide thoughts and attempts than those who did not avoid restrooms or only sometimes avoided them.

**Table 14.** Suicide thoughts and attempts by experiences in places of public accommodation

|  |  | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
|  |  | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Avoided public accom for fear of mistreatment (past year) | No | 44.9 | 6.1 | 79.7 | 37.1 |
|  | Yes | 62.1 | 11.9 | 90.5 | 54.0 |
| Denied equal treatment in public accom (past year) | No | 47.6 | 6.7 | 81.4 | 38.8 |
|  | Yes | 60.3 | 12.9 | 90.3 | 57.1 |
| Verbally harassed in public accom (past year) | No | 45.8 | 6.1 | 80.5 | 37.0 |
|  | Yes | 63.6 | 13.1 | 90.6 | 57.5 |
| Physically attacked in public accom (past year) | No | 48.4 | 7.0 | 82.0 | 40.0 |
|  | Yes | 75.1 | 30.9 | 93.1 | 74.5 |
| Any neg experience in public accom (past year) | No | 45.3 | 5.9 | 80.0 | 36.2 |
|  | Yes | 61.5 | 12.4 | 90.1 | 56.1 |
| Any neg experience with TSA (past year) | No | 38.1 | 4.7 | 76.0 | 32.1 |
|  | Yes | 50.7 | 7.3 | 82.8 | 41.7 |
| Told that you were in wrong restroom (past year) | No | 45.6 | 6.2 | 80.2 | 37.2 |
|  | Yes | 57.2 | 10.6 | 86.7 | 50.7 |
| Denied access to a restroom (past year) | No | 47.0 | 6.4 | 80.9 | 38.5 |
|  | Yes | 62.1 | 15.9 | 89.6 | 59.8 |

---

[32] James, S.E., et al., (2016).
[33] James, S.E., et al., (2016).

AR_026989

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 245 of 1019 -
Page ID#: 3150
Suicide Thoughts and Attempts Among Transgender Adults in the US  |  26

**Table 14. Suicide thoughts and attempts by experiences in places of public accommodation (continued)**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Harassed, attacked, sexual assault in restroom (past year) | No | 46.4 | 6.3 | 80.7 | 37.9 |
| | Yes | 62.8 | 14.2 | 89.4 | 59.1 |
| Any negative experience in restroom (past year) | No | 45.1 | 6.0 | 79.9 | 36.5 |
| | Yes | 57.5 | 11.0 | 86.8 | 51.3 |
| Avoided restrooms (past year) | Not avoided | 39.1 | 4.9 | 75.6 | 34.1 |
| | Sometimes avoided | 51.9 | 7.9 | 84.7 | 42.8 |
| | Always avoided | 63.7 | 12.9 | 89.4 | 51.1 |
| | Not listed above | 52.0 | 7.9 | 82.8 | 42.0 |

*Law Enforcement*

As can be seen in Table 15, respondents who described themselves as very uncomfortable seeking help from the police and those who reported being disrespected or mistreated by police in the past year all were more likely to report past year suicide thoughts and attempts than those who did not report having these experiences. Twenty-three percent of those who said they were not treated with respect in any past-year encounters with police attempted suicide in the past year. This is a prevalence nearly three times higher than those who reported having always been treated with respect by police in the past year.

**Table 15. Suicide thoughts and attempts by experiences with law enforcement**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| How comfortable are you seeking help from the police? | Very comfortable | 25.1 | 3.6 | 64.6 | 27.7 |
| | Somewhat comfortable | 35.2 | 4.2 | 73.6 | 31.6 |
| | Neutral | 43.9 | 6.0 | 79.9 | 37.3 |
| | Somewhat uncomfortable | 52.4 | 6.7 | 84.9 | 40.1 |
| | Very uncomfortable | 63.2 | 11.5 | 90.9 | 51.9 |
| Police treated you with respect (past year) | Never treated with respect | 68.7 | 23.1 | 91.6 | 67.0 |
| | Sometimes treated with respect | 59.3 | 13.7 | 90.5 | 58.7 |
| | Always treated with respect | 43.1 | 8.4 | 79.2 | 41.6 |
| Any mistreatment by police (past year) | No | 41.5 | 6.1 | 79.2 | 40.8 |
| | Yes | 62.3 | 17.6 | 90.7 | 60.9 |

**Protection against gender identity discrimination**

The Movement Advancement Project (MAP) has tracked state-level policies that positively or negatively impact the transgender population in the United States, including state statutes prohibiting

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 246 of 1019 -
Page ID#: 3151
Suicide Thoughts and Attempts Among Transgender Adults in the US   |   27

discrimination against transgender people in employment, housing, and public accommodations.[34] By providing at least some level of protection against discrimination based on gender identity, state nondiscrimination policies are thought to enhance the health and well-being of transgender people.[35] Because USTS respondents reported their state of residence, we were able to categorize respondents by whether they lived in states that had, or did not have, a statute prohibiting gender identity discrimination in employment, housing, and public accommodations at the time of the survey (2015).[36] As is shown in Table 16, a lower proportion of respondents who lived in a state with a gender identity nondiscrimination statute reported past-year suicide thoughts and attempts than those who lived in states without such a statute.

**Table 16. Suicide thoughts and attempts by presence of state gender identity nondiscrimination statutes in state of residence**

|  | PAST 12 MONTHS | |
|---|---|---|
|  | THOUGHTS | ATTEMPTS |
| No comprehensive statute | 49.9 | 7.8 |
| Has comprehensive statute | 46.8 | 6.7 |

## Cumulative effect of minority stressors

Minority stress can be exacerbated when multiple discriminatory experiences occur within a period of time. This can have a compounding effect on mental and physical health. To better understand this "cumulative effect" of minority stress experiences, we "scored" respondents using four selected discriminatory experiences that we considered to be of relatively high impact in one's life, were measured in the past-year time frame, and were attributed by the respondent to their transgender status: being fired or forced to resign from a job, eviction, experiencing homelessness, and physical attack. Respondents received a score of 0, which means they had none of these experiences, up to a score of 4, which means they had all four of these experiences in the past year.

Figure 4 shows how these scores were associated with suicide thoughts and attempts in the past year. With each added experience, the prevalence of suicide thoughts and attempts increases. Among those who had all four experiences in the past year, 97.7 percent had suicide thoughts in the past year and 51.2 percent made a suicide attempt. Additionally, Figure 4 shows that a higher number of discrimination experiences is associated with a higher prevalence of serious psychological distress. As was described earlier in this report, serious psychological distress is related to suicidality, so as the number of discriminatory experiences increases, the higher prevalence of serious psychological distress acts as a possible pathway for increased suicide thoughts and attempts.

---

[34] Movement Advancement Project. "Equality Maps." Available at http://www.lgbtmap.org/equality-maps/legal_equality_by_state (last accessed August 18, 2019).

[35] Hatzenbuehler, M.L. (2016). Structural Stigma and Health Inequalities: Research Evidence and Implications for Psychological Science. *American Psychologist*, 71(8), 742-751.

[36] Movement Advancement Project. "Equality Maps." Additional adjustments to the nondiscrimination maps to reflect the 2015 state policy landscape provided by Christy Mallory of the Williams Institute.

**Figure 4. Current serious psychological distress and past-year suicide thoughts and attempts by cumulative discrimination experiences in the past year**



Number of major discrimination experiences in the past year

ATTEMPTS    SERIOUS DISTRESS    THOUGHTS

## Other Potential Risk Factors

The broad scope of topics included in the USTS provided an opportunity to explore relationships between suicide thoughts and attempts and potential risk/protective factors that have not received much attention in prior research among transgender people. Table 17 describes relationships between suicide thoughts and attempts and non-binary identity disclosure, identity documents, sex work and other work in the underground economy, and political and civic participation.

Non-binary respondents were asked what they do when someone incorrectly assumes their gender. Those who always disclose that they are non-binary were more likely to report past-year suicide attempts and lifetime suicide thoughts and attempts, compared to those who do not always disclose that that are non-binary. Those who have no identity documents listing their correct name and gender had higher prevalence of suicide thoughts and attempts than those having some or all correct identity documents. Respondents who have engaged in sex work and who work in the underground economy reported a higher prevalence of suicide thoughts and attempts than those who have not engaged in those types of work. In regard to civic participation, those who believe they can influence government decisions were less likely to report suicide thoughts and attempts than those who believed they could not influence government decisions. Engaging in political activity, protests, and rallies were either not statistically significantly associated with suicide thoughts or attempts or the differences between those who do and do not engage in these activities were small.

AR_026992

## Table 17: Suicide thoughts and attempts by other potential risk factors

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Nonbinary respondents: When someone assumes wrong gender | Let them assume I'm man/woman | 52.6 | 6.9 | 81.4 | 34.8 |
| | Sometimes tell them I'm NB/GQ | 55.4 | 6.6 | 85.2 | 41.0 |
| | Always tell them I'm NB/GQ | 65.7 | 14.0 | 89.5 | 57.5 |
| Name and gender correct on IDs | All | 29.5 | 4.0 | 73.4 | 34.0 |
| | Some | 39.3 | 6.3 | 81.0 | 43.0 |
| | None | 54.2 | 8.1 | 83.4 | 40.7 |
| Ever engaged in sex work | No | 47.4 | 6.5 | 81.2 | 38.1 |
| | Yes | 55.2 | 12.8 | 85.6 | 57.4 |
| Engaged in sex work (past year) | No | 47.6 | 6.7 | 81.5 | 39.4 |
| | Yes | 61.1 | 17.3 | 85.4 | 57.8 |
| Drug sales/underground economy (ever) | No | 47.1 | 6.8 | 80.5 | 37.8 |
| | Yes | 57.6 | 10.7 | 90.4 | 59.5 |
| Drug sales/underground economy (past year) | No | 52.2 | 7.8 | 89.5 | 57.6 |
| | Yes | 66.9 | 16.3 | 91.5 | 63.3 |
| Someone like me can't influence government decisions | Strongly agree | 61.5 | 13.7 | 87.5 | 50.5 |
| | Agree | 53.4 | 6.9 | 83.5 | 40.8 |
| | Neither agree nor disagree | 48.8 | 7.0 | 82.0 | 39.3 |
| | Disagree | 42.9 | 5.1 | 79.7 | 36.8 |
| | Strongly disagree | 40.7 | 6.8 | 78.0 | 39.9 |
| Civic or political activity (past year) | No | 46.0 | 8.3 | 78.6 | 39.5 |
| | Yes | 49.1 | 6.8 | 82.9 | 40.7 |
| Attended political protest or rally (past year) | No | 48.0 | 7.4 | 80.5 | 38.9 |
| | Yes | 49.1 | 7.0 | 84.3 | 43.5 |

NOTE: Text in blue indicates there is no statistically significant relationship.

AR_026993

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 249 of 1019 -
Page ID#: 3154
Suicide Thoughts and Attempts Among Transgender Adults in the US   |   30

# DISCUSSION

The U.S. Transgender Survey provides a unique and valuable data source for understanding suicide risk factors among transgender people. Our findings underscore the urgency of research to identify promising intervention and prevention strategies to address suicide thoughts and attempts in this population. The prevalence of lifetime suicide attempts remained consistent with the prior iteration of the survey (i.e., 41% in the NTDS). Since the USTS sample is substantially younger than the U.S. population generally, one might assume that high overall prevalence of reported suicide thoughts and attempts is driven, at least in part, by age. However, as shown in Figures 6 and 7, USTS respondents reported substantially higher prevalence of suicide thoughts and attempts in each age group compared to the 2015 NSDUH, which is a representative sample of the U.S. population. Factors beyond age must explain the relatively high overall prevalence of suicide thoughts and attempts among USTS respondents.

**Figure 6. Suicide thoughts in the past year by age group, USTS v. NSDUH**



**Figure 7. Suicide attempts in the past year by age group, USTS v. NSDUH**



Our 2014 study examining risk factors for suicidality among NTDS respondents and our current study of USTS respondents found very similar relationships between demographic factors and discrimination experiences and suicide attempts. Overall, it is a consistent finding that those who are younger, assigned female at birth, have lower incomes and educational attainment, are not partnered, and do not identify as heterosexual or straight have higher prevalence of suicide attempts.

It is also a consistent finding that being "out" to others about being transgender can be an added risk factor in some circumstances, including being "out" to LGBT and non-LGBT friends. Additionally, the ways in which transgender people socialize with each other may be related to an increase or decrease in risk of suicide thoughts and attempts. Findings regarding "outness" and socializing may reflect added or reduced stress that results from negative or positive aspects of relationships that transgender people navigate. Alternately, other aspects of life that may be related to suicidality, such as isolation or living far from other transgender people, may necessitate making social connections in certain ways (e.g., online versus in person, or in ways that don't meet one's needs for socialization). Furthermore, it should be noted that not being "out" and socializing with trans people in ways that appear to be positive for suicide thoughts and attempts are both associated with a prevalence of suicidality much higher than the U.S. general population. This suggests that there are more complex factors that contribute to risk of suicide thoughts and attempts for these groups.

The present analysis indicates that the elevated risk of suicide thoughts and attempts among USTS respondents is related, in part, to the same risk factors that affect the U.S. population as a whole, including substance use and serious psychological distress. At the same time, it is also clear that minority stress experiences, such as family rejection, discrimination experiences, and lack of access to gender-affirming health care, create added risks for transgender people. In particular, "de-transitioning" is associated with a higher risk of suicide thoughts and attempts compared to those who are living their lives according to their gender identity and those who have not yet begun to, signaling that "de-transitioning" is a uniquely stressful experience for transgender people. Furthermore, the cumulative effect of experiencing multiple minority stressors dramatically increases serious psychological distress and suicidality.

A strength of this report, compared to our 2014 report using NTDS data, was our ability to look at timing of gender-affirming care and suicide thoughts and attempts in the past year time frame. We found that transgender people who want to have gender-affirming medical care (i.e., hormones and/or surgery) and are able to get it have a lower prevalence of suicide thoughts and attempts, particularly in the past year time frame. This finding is not surprising given that a thorough review of the 73 extant studies on mental and physical health outcomes for transgender people who have had gender-affirming medical care found that gender-affirming care effectively treats symptoms of gender dysphoria, improves well-being and quality of life, and reduces suicide risk factors, like depression and substance use, as well as reducing suicidality itself.[37] In our prior 2014 report using NTDS data, we were only able to look at gender-affirming care and lifetime suicide attempts, which is a time frame that does not allow the effects of receiving gender-affirming health care to be assessed.

---

[37] What We Know. (2017). *What does the scholarly research say about the effect of gender transition on transgender well-being?* New York: Cornell University, available at https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/#top (last accessed August 18, 2019).

AR_026995

# LIMITATIONS

The findings presented in this report have some notable limitations. USTS was a cross-sectional study that asked respondents to report information about suicide thoughts and attempts and other experiences across their lifetimes, and responses may have been affected by recall bias and temporal ordering. Additionally, the USTS sample, though large, diverse, and nationally well-distributed, was not randomly selected and thus cannot be considered nationally representative. Findings in this report should be understood to represent the nearly 28,000 USTS respondents rather than the full U.S. transgender population. Further, our analysis relied on bivariate techniques, which did not adjust for other respondent characteristics, like age, nor simultaneously account for other experiences, like discrimination and other factors that may help explain the relationship between the two variables presented. Despite these limitations, a major strength of this report is that we are able to present topically broad findings, which point to characteristics and experiences that are related to an elevated prevalence of suicide thoughts and attempts (i.e., risk factors). We then point to areas needing further examination to understand additional related factors that may contribute to that elevated prevalence and help target and design interventions.

AR_026996

# FUTURE RESEARCH

Future research that supports the design and evaluation of suicide intervention and prevention strategies for the transgender population is urgently needed. For instance, in-depth understanding of risk factors and the timing of suicide thoughts and attempts compared to gender affirmation milestones would help to target prevention and intervention strategies. We are currently limited by the availability and quality of data about the transgender population in the United States. Large surveys like the NTDS and USTS can provide a wealth of knowledge about the lives and experiences of transgender people in the United States, but are limited in their generalizability. This report has presented descriptive analyses that provide a broad view of suicide risk factors for USTS respondents. Additional, more topically-focused research utilizing multi-variate models is needed to provide better depth of understanding of particular risk factors. In addition to surveys like the NTDS and USTS that provide large samples and describe experiences relevant to the transgender population, large, nationally representative surveys, like the National Survey of Drug Use and Health, could provide valuable, population-based data about the transgender population and suicide risk if they were to include questions to identify transgender respondents. While much progress has been made, further research is needed to refine and field gender identity measures in large, nationally representative surveys.

The USTS provides the ability to create time lines of gender affirmation milestones, suicide attempts, and timing of discriminatory experiences, substance use, and experiences of serious psychological distress. With the large sample size, additional bivariate and multivariate models could be created to understand how gender affirmation milestones relate to timing of discriminatory experiences and measures of mental and physical health. This could inform research into suicide intervention and prevention by pinpointing particular time periods of vulnerability relative to gender affirmation milestones where intervention and prevention strategies would be most needed and most effective. Research that makes use of these rich data is highly recommended.

Over 20 percent of USTS respondents who have attempted suicide reported having done so five or more times. Our analyses in this report did not address multiple attempts. Indicators of past year and lifetime suicide attempts lump together respondents who have had one or more attempts, but respondents in this group are diverse in number of attempts and recent timing of attempts. Future research is needed that accounts for a broader range of co-existing and co-occurring experiences, including mapping out milestones of those reporting multiple attempts, to describe these diverse groups and their different risk profiles.

In this report, we found that cumulative discrimination experiences are associated with higher risk of suicide thoughts and attempts. The USTS gives us the ability to not only look at multiple discrimination experiences based on anti-transgender bias, but to also look at discrimination experiences based on other characteristics, such as race, age, and disability. Analyses using intersectional approaches could further elucidate the ways in which discrimination experiences based on multiple experiences and multiple characteristics affect suicidality. Studies that aim to assess effective strategies to decrease minority stress, including structural stigma, would help inform suicide prevention and intervention strategies that focus on alleviating such risk factors.

AR_026997

Finally, this report points to new areas of research that are promising for expanding knowledge about suicide risks, interventions, and prevention. For instance, the USTS provides a large sample and geographic coding down to the zip code level. It would be possible with this dataset to expand analyses of structural types of stigma, such as public policy environments, and its relationship to suicide. This study suggests that there is more to learn about the associations between suicidality and socializing with others, disclosure of transgender status, and civic and political participation. A better understanding is needed of how and why community connectedness, social isolation, HIV status, political and civic engagement, and disclosure of transgender status affect suicide thoughts and attempts, including through qualitative studies.

AR_026998

# AUTHORS

**Jody L. Herman**
A Scholar of Public Policy at the Williams Institute, Jody holds a Ph.D. in Public Policy and Public Administration from The George Washington University.

**Taylor N.T. Brown**
A Project Manager at the Williams Institute, Taylor holds a Masters of Public Policy from the University of Virginia.

**Ann P. Haas**
Professor Emerita in the Department of Health Sciences, Lehman College of the City University of New York, Ann holds a Ph.D. in Sociology from Fordham University.

**Acknowledgments**

The authors wish to thank Christy Mallory for her contribution to the analyses in this report and Kerith Conron, Jocelyn Samuels, Rachel Dowd, Winston Luhur, and Ilan Meyer for their thoughtful reviews and other contributions. The authors would also like to thank the National Center for Transgender Equality for access to the 2015 U.S. Transgender Survey dataset.

## ABOUT THE WILLIAMS INSTITUTE

The Williams Institute is dedicated to conducting rigorous, independent research on sexual orientation and gender identity law and public policy. A think tank at UCLA Law, the Williams Institute produces high-quality research with real-world relevance and disseminates it to judges, legislators, policymakers, media and the public. These studies can be accessed at the Williams Institute website.

**FOR MORE INFORMATION**
The Williams Institute, UCLA School of Law
1060 Veteran Avenue, Suite 134
Box 957092, Los Angeles, CA 90095-7092
williamsinstitute.law.ucla.edu

**RESEARCH THAT MATTERS**

AR_026999



**AUSTIN KNUDSEN**                    STATE OF MONTANA

Hon. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

September 12, 2022

**Re: Docket ID ED-2021-OCR-0166, RIN 1870-AA16**

**Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Secretary Cardona:

We submit these formal comments to duly note our opposition to the Department of Education's proposed rulemaking on Title IX of the Education Amendments of 1972 ("Title IX"). As a general matter, the Department has not provided sufficient reasoning for why it's embarking on a new Title IX rulemaking less than two years after the 2020 regulations went into effect. In May 2020, after thoroughly considering over 124,000 public comments, the Department issued its historic Title IX Regulations, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) ("2020 Rule"), to better align the Title IX regulations with the text and purpose of 20 U.S.C. § 1681, Supreme Court precedent and other case law, and to address the practical challenges facing students, employees, and schools with respect to sexual harassment allegations. For the first time in history, regulations regarding sexual harassment under Title IX were codified into law. The Department has not presented sufficient evidence that the current Title IX system requires modification. In many instances, moreover, the Department's Proposed Rule conflicts with the text, purpose, and longstanding interpretation of Title IX. It also negatively impacts free speech, academic freedom, and campus life. We also once again call for Assistant Secretary Lhamon to recuse herself from the rulemaking process.

## I. THE PROPOSED RULE WRONGLY INCLUDES "GENDER IDENTITY" IN THE DEFINITION OF "SEX."

### A. The proposed rule exceeds the Department's statutory authority.

The Department proposes defining "sex discrimination" under Title IX to include discrimination on the basis of "gender identity." 87 Fed. Reg. 41390, 41391, 41392, 41410 (July 12. 2022). With this proposal, the rule would make it unlawful for a school to deny participation in any education program or activity consistent with a student's "gender identity." 87 Fed. Reg. at 41410. These changes constitute a stunning affront to the purpose of Title IX, which is to provide equal access to education and prohibit denial of education benefits and opportunities on the basis of sex. "Sex" means what it has meant since the beginning of time: the immutable fact of being male or female.

The Department's reimagining of Title IX to cover discrimination on the basis of gender identity plainly exceeds its rulemaking authority under Title IX. Title IX prohibits discrimination "on the basis of sex" in any education program or activity receiving Federal financial assistance. Statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and the U.S. Department of Education's historic practice demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could only have been biological distinctions between male and female. A person's biological sex is relevant for Title IX considerations involving athletics, and distinctions based on sex are permissible (and may be required) because the sexes are—simply—not similarly situated for all purposes. *See* 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (noting Title IX expressly authorizes separation based on sex in certain circumstances). This is because biological females and biological males possess profound physiological differences that are relevant in certain circumstances. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (per Ginsburg, J.) ("Physical differences between men and women, however, are enduring.").

### B. The Proposed Rule fails to define the terms "sex" and "gender identity."

The proposed rule asserts that discrimination on the basis of sex includes discrimination on the basis of "gender identity," 87 Fed. Reg. at 41,410, but fails to define either. Without definitions for these terms, the rule is vague, arbitrary, and capricious.

Additionally, in the preamble to the current regulations, the Department stated: "Title IX and its implementing regulations include provisions that presuppose

2

sex as a binary classification, and provisions in the Department's current regulations
… reflect this presupposition." 85 Fed. Reg. 30,178.  It continued, "[i]n promulgating
regulations to implement Title IX, the Department expressly acknowledged
physiological differences between the male and female sexes." *Id.*

The Proposed Rule clearly attempts to change the starting point for all of Title
IX—the definition of sex.  Yet the Department provides no alternate definition(s) for
the public to evaluate and scrutinize.  It simply waives its hand and—by regulatory
fiat—alters a fundamental term, as if its novel definition was axiomatic.  As
discussed, the baseline, historical, scientific definition currently used by the
Department (biological sex) cannot include gender identity.

Without a definition, the concept of "gender identity"—already an extremely
amorphous concept—becomes a moving target.  It's also internally inconsistent to fail
to define a key term such as "sex" but then claim the Department understands sex to
include "gender identity.  As a result, the Proposed Rule fails to provide recipients
adequate notice of the types of discrimination they must address to meet their
obligations under Title IX.

### C. Defining sex discrimination to include gender identity will cause discrimination on the basis of sex.

#### 1. The Proposed Rule will harm students by eliminating single-sex facilities.

The Proposed Rule's inclusion of gender identity in its definition of sex
discrimination will harm students and violate Title IX.  Single-sex spaces, such as
bathrooms and locker rooms, are important for students to preserve bodily privacy
and personal dignity from exposure of one's body to members of the opposite sex.  This
would fall especially hard on young females because in addition to privacy and dignity
harms, girls and women are vulnerable in intimate spaces to being sexually harassed
and even assaulted by boys and men. For example, the NPRM fails to take into
consideration incidents such as one in Loudon County, Virginia in 2021 where a
transgender teenager was allowed access to the girls' restroom.[1] After the assault,
the perpetrator was transferred to another school where he allegedly assaulted a
second female student in early October.[2]

That also violates Title IX.  The ordinary public meaning of the term "sex" at
the time of Title IX's enactment (and now) was biological sex, male or female. That

---

[1] Caroline Downey, *Judge Rules Loudoun County Teen Sexually Assaulted Female Student in Girls'
Bathroom*, YAHOO NEWS (Oct. 26, 2021), https://news.yahoo.com/judge-rules-loudoun-county-teen-
131413442.html.

[2] *Id.*

AR_029018

too was the meaning given to the term when it was used in the Department's implementing regulations approved by Congress. *See, e.g., Bell*, 456 U.S. at 531–32; 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61. 34 C.F.R. § 106.33 permits schools to provide separate bathrooms, locker rooms, and showers "on the basis of sex," as long as the school provides comparable facilities for "each sex." So under Title IX's ordinary public meaning, the law *requires* a recipient to provide a "separate toilet, locker room, and shower facilities on the basis of sex" to regulate access based on *biological* sex.

### 2. *The Proposed Rule will deny equal access to athletics for women and girls and jeopardize their safety.*

The Department's Proposed Rule defeats the entire original purpose of Title IX and will have a devastating impact on women's athletics. Since its enactment in 1972, Title IX has led to an important increase in athletic opportunity for girls and women in sports.[3] In the name of equity, the proposed Rule travels backward to a pre-Title IX era when schools had no obligation to provide equal, safe, and fair athletic opportunities for women and girls. It mandates open access to every education program and activity based on the amorphous concept of "gender identity." So now, any school, college, or university that separates athletic teams based solely on biological sex will be actively committing a federal civil rights violation.

In turn, the Department's definition of discrimination will actually discriminate against female athletes by denying them equal athletic opportunity and endangering their safety. Forcing female athletes to compete against male athletes is unfair and ignores science.[4] Biological differences between males and females mean that girls and women are at an enormous disadvantage when competing against biological men in many sports. This also puts women and girls at greater risk of injury when competing against biological males in contact and combat sports.

---

[3] In 2021, 3.4 million girls played high school sports and 219,000 women played NCAA sports. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates) female participation rates in athletics have risen from 43% of the male participation rate (74,329 to 169,800) in 1982 to 78% (219,177 to 278,988) in 2021—almost doubling. NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx.

[4] Males typically have a 10-50% performance advantage, depending on the particular sport. Males have 45% more lean body mass, 33% more lower body muscle mass and 40% more upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output. By the ages of 14–15, many adolescent males have surpassed the best measurable elite female performances in nearly all sports. *See* Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med.* 2021 Feb;51(2): 199-214.

4

Several of the states have enacted legislation to protect athletic opportunities for women by prohibiting biological males from competing in female athletics. *See, e.g.*, H.B. 112, 2021 Leg. (Mt. 2021); H.B. 25, 87th Sess. (Tx. 2021); H.B. 3293, 2021 Leg., H.B. 500, 65th Leg., 2d Sess. (*Id.* 2020). Those laws undoubtedly conflict with the Department's Proposed Rule. *Cf. City of L.A. v. Barr*, 929 F.3d 1163, 1174 (9th Cir. 2019) ("[I]f Congress decides to impose conditions on the allocation of funds to the states, it 'must do so unambiguously … enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'") (quoting *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).

## D. The Proposed Rule infringes on parental rights.

Even more pernicious, the Proposed Rule would federally coerce schools to indoctrinate children into gender identity theories that are heavy on political asperity and light on scientific corroboration. This would require everyone in the school environment to accept that being a boy, girl, both, or neither is only a matter of subjective identity. Under this Proposed Rule, schools would have to treat any skepticism of "gender identity" as discrimination/harassment, which would effectively override the fundamental rights of parents to rear their own children in matters of reason, morality, and faith. Because it treats failure to affirm gender identity the same as traditional forms of discrimination (*e.g.*, excluding girls from the debate team), a school wouldn't need to obtain parental consent before pushing "gender affirmation" of whatever self-declared identity a child announces in school; the school would never have to disclose that affirmation program to the child's parents, and must—at any rate—pursue it even over parents' objections.

## II. THE PROPOSED RULE WILL INFRINGE UPON AND CHILL FREE SPEECH BY VASTLY EXPANDING THE DEFINITION OF SEXUAL HARASSMENT IN 34 C.F.R § 106.30.

The Department proposes changing the current definition of "sexual harassment" contained in 34 C.F.R § 106.30. The Department's new definition of hostile environment sexual harassment not only conflicts with Supreme Court precedent, but will have a detrimental impact on free speech, campus life, and the free exchange of ideas. When combined with the Department's proposed changes to the current due process protections, the proposed rule will chill protected speech— allowing unscrupulous students and ideologically biased bureaucrats to weaponize Title IX against those with whom they disagree on hotly contested issues of political, societal, religious, and moral importance. At private schools, where the First Amendment does not apply, the Department still lacks the power to compel schools to suppress speech that would violate the First Amendment.

5

## A. The Proposed Rule improperly deviates from the Supreme Court's Title IX threshold.

### 1. The *Gebser/Davis* standard

Not every unpleasant interaction in the course of an educational program or activity automatically amounts to a federal civil rights violation. The Supreme Court, in fact, has set a relatively high threshold for when sex-based speech rises to that level. The current regulations respect that threshold. The Proposed Rule does not.

In *Cannon v. Univ. of Chi.,* 441 U.S. 677, 680 (1979), the Supreme Court held that a judicially implied private right of action exists under Title IX. In *Franklin v. Gwinnett Cty. Pub. Sch.,* 503 U.S. 60, 62 (1992), the Court held that money damages are an available remedy in a private lawsuit alleging a school's intentional discrimination in violation of Title IX. The Court acknowledged in *Franklin* that sexual harassment and sexual abuse of a student by a teacher may mean the school itself engaged in intentional sex discrimination.

In *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998), the Court analyzed the conditions under which a school district will be liable for money damages for an employee sexually harassing a student. The *Gebser* Court began its analysis by stating that while *Franklin* acknowledged that a school employee sexually harassing a student may constitute the school itself committing intentional discrimination on the basis of sex, it was necessary to craft standards defining "the contours of that liability." *Gebser* held that where a school has "actual knowledge" of an employee sexually harassing a student but responds with "deliberate indifference" to such knowledge, the school itself has engaged in discrimination, subjecting the school to money damages in a private lawsuit under Title IX. The *Gebser* Court was particularly concerned about the possibility of requiring a school to pay money damages for harassment of which it was not aware and in amounts that exceeded the recipient's level of Federal funding. *Gebser*, 524 U.S. 289–90.

In 1999, the Court decided *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, (1999), and held that where sexual harassment is committed by a peer rather than an employee, the same standards of actual knowledge and deliberate indifference apply. The *Davis* Court additionally crafted a definition of when sex-based conduct becomes actionable sexual harassment, defining the conduct as "so severe, pervasive, and objectively offensive" that it denies its victims equal access to education. *Id.* at 651. *Davis* and *Gebser* built upon the Supreme Court's previous Title IX decisions in *Cannon* and *Franklin* to establish a three-part framework describing when a school's inadequate response to sexual harassment constitutes the school itself committing discrimination. The three parts of this framework are: definition of actionable sexual harassment, the school's actual knowledge, and the school's deliberate indifference (sufficiency of the school's response).

6

Nothing in the *Gebser* or *Davis* framework purports to restrict the *Gebser/Davis* framework only to private lawsuits for money damages. For example, a variety of courts have used the framework to award injunctive relief. *E.g.*, *Fitzgerald v. Barnstable Sch. Dist.*, 555 U.S. 246, 255 (2009) ("In addition, this Court has recognized an implied private right of action …. In a suit brought pursuant to this private right, both injunctive relief and damages are available.") (internal citations omitted; emphasis added); *Hill v. Cundiff*, 797 F.3d 948, 972–73 (11th Cir. 2015) (reversing summary judgment against plaintiff's claims for injunctive relief because a jury could find that the alleged conduct was "severe, pervasive, and objectively offensive" under Davis); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 322–23 (3d Cir. 2013) (upholding preliminary injunction against school for banning students from wearing bracelets because the school failed to show that the "bracelets would breed an environment of pervasive and severe harassment" under *Davis*); *Haidak v. Univ. of Mass. at Amherst*, 299 F. Supp. 3d 242, 270 (D. Mass. 2018) (denying plaintiff's request for a preliminary injunction because he failed to show that the school was deliberately indifferent to an environment of severe and pervasive discriminatory conduct under *Davis*), *aff'd in part, vacated in part, remanded by Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56 (1st Cir. 2019).

Accordingly, the starting place for describing a school's legal obligations under Title IX is adoption of the *Gebser/Davis* framework because that framework describes when sexual harassment amounts to a school, itself, discriminating on the basis of sex. The definition of "hostile environment sexual harassment" should, likewise, continue to align with the standard set by the Supreme Court's cases assessing liability under Title IX for money damages in private litigation. The Supreme Court's decisions in *Gebser* and *Davis* are based on a textual interpretation of Title IX and important policy rationales that the Department has failed to consider in its NPRM. The current Title IX regulations predominantly follow the *Davis* standard—and for good reason.

There are several key reasons why the Department shouldn't depart from the *Gebser/Davis* framework. The Court, importantly, held that Title IX governs misconduct by *recipients*, not by third parties such as teachers and students. Title IX was "designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner." *Gebser*, 524 U.S. at 292; *see also Cannon v. Univ. of Chicago*, 414 U.S. 677, 704 (1979) (primary congressional purpose behind the statutes was "to avoid the use of federal resources to support discriminatory practices"). So it's a recipient's own misconduct—not that of employees, students, or other third parties—that subjects the recipient to liability under Title IX.

Next, since Congress enacted Title IX under its Spending Clause authority, the obligations it imposes on recipients resemble those of a contract. *Gebser*, 524 U.S. at

7

AR_029022

286; *Davis*, 526 U.S. at 640. The Supreme Court reasoned in *Davis* that it follows from this that recipients must be on clear notice of what conduct is prohibited and that recipients must be held liable only for conduct over which they have control. *Id.* at 644–45. As its (now-repealed) 2001 Guidance said, the Department has an interest in providing recipients with "consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action." U.S. Dep't. of Education, Office for Civil Rights, *Revised Guidance on Sexual Harassment: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001), at vi.

Third, the Court reasoned in *Davis* that any interpretation of Title IX must leave room for flexibility in schools' disciplinary decisions and not place courts in the position of second-guessing disciplinary decisions made by administrators and faculty. *Davis*, 526 U.S. at 648.

Finally—and most importantly—the plain text of Title IX prohibits only discrimination that has the *effect of denying access* to the recipient's educational program or activities. *Id.* at 650–52. Title IX, therefore, does not prohibit sex-based misconduct that does not rise to that level of severity. All speech related considerations in the Final Rule should follow this principle.

The current Title IX regulations define sexual harassment as:

(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;
(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or
(3) "Sexual assault" as defined in 20 U.S.C. 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. 12291(a)(10), "domestic violence" as defined in 34 U.S.C. 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

34 C.F.R. § 106.30. The law currently applies the *Davis* standard verbatim for category 2 (hostile environment sexual harassment).

The Proposed Rule changes the definition of hostile environment sexual harassment to:

Unwelcome sex-based conduct that is sufficiently severe or pervasive, that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to

AR_029023

participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment).

87 Fed. Reg. at 41410. The Department's "tentative view" that this proposed hostile environment framework appropriately captures the key concepts articulated by the Supreme Court in *Davis* and protects the First Amendment rights and interests of students and employees is sorely mistaken. *Id.* at 41413.

The Department should withdraw its proposal to change the definition of hostile environment sexual harassment.

### 2. *The proposed definition of sexual harassment lowers the threshold for what counts as "harassment."*

Title IX prohibits *discrimination*—not offensive speech. The *Davis* standard forces recipients to punish true harassment under Title IX while leaving lesser disciplinary matters to school conduct codes (and applicable legal requirements such as the First Amendment). Incidents such as so-called "microaggressions," offensive jokes, and social media banter are not *per se,* or even putative, federal civil rights violations. But the proposed new definition radically lowers the threshold for what counts as "harassment." This will allow schools to investigate speech that is subjectively offensive to anyone—even if it is neither severe, nor pervasive, or nor objectively offensive. This will massively chill academic and campus debates over sex, gender identity, and other issues implicated by the Proposed Rule.[5]

Offensive speech is protected in many instances and contexts. Indeed, the preamble to the current regulations emphasizes that offensive speech is protected, particularly at the postsecondary level:

> The Supreme Court has also rejected the idea that "because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (internal citations omitted). Further, these protections apply even to highly offensive speech on campus: "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators*, 410 U.S. 667, 670 (1973) (internal citations omitted).

---

[5] *See, e.g.*, Cantu and Jussim, *Microaggressions, Questionable Science, and Free Speech*, TEX. REV. L. & POL. (Feb. 2021), *available at* https://ssrn.com/abstract=3822628.

9

85 Fed. Reg. at 30141 n. 623.  Higher education institutions differ from the workplace. In workplaces, it may be natural to ban offensive speech to maximize efficiency or prevent a hostile or offensive environment.  Colleges, however, exist for the very purpose of exchanging ideas and pursuing the truth—even if words and ideas offend listeners.  *See, e.g., Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) (holding hostile environment harassment code was unconstitutionally vague and overbroad and was not a valid prohibition of fighting words).  The Proposed Rule's new lower threshold will no doubt stifle the airing of controversial (but protected) ideas on campus.

As for elementary and secondary education, the *Davis* Court expressly required that conduct be severe *and* pervasive for Title IX liability.  This is because, unlike workplace conduct under Title VII, elementary and secondary school students frequently behave in ways that would be unacceptable among adult workers.  *Davis*, 526 U.S. at 651–52 (citing *Meritor*, 477 U.S. at 67).

### 3.  The Department has failed to provide adequate reasoning for the definition change to sexual harassment in § 106.30.

The Proposed Rule recognizes that the new definition of hostile environment sexual harassment abandons the verbatim *Davis* standard used in the current regulations, but reasons that that caselaw allows the Department to promulgate rules requiring conduct that—in its absence—would not constitute sex discrimination. 87 Fed. Reg. at 41413. The Department then adopts its new standard "because the [new] definition of 'sex-based harassment' covers a broader range of sexual misconduct than that covered … in the current regulations," and because "Title IX's plain language prohibits any discrimination on the basis of sex." *Id.* To be sure, the Department may adopt prophylactic requirements that are broader than the requirement to refrain from discrimination on the basis of sex.  But such prophylaxis must be designed to prevent *discrimination on the basis of sex*—not some other undefined classification.  Here, instead, the Department is attempting to redefine sex discrimination itself, broadening that discernable concept beyond recognition.  Because the NPRM neither defines the concept nor explains why it must be expanded so dramatically, the Proposed Rule reveals its own arbitrariness.

Next, the Department fails to explain why it dropped the "objectively offensive" element from the current definition.  *See* 34 C.F.R. 106.30 ("(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity"). The objectively offensive element is important because it judges the content by the standards of what a reasonable person would observe. Thus, in order for speech to create a hostile environment, it must offend a reasonable person. The Department has no good reason for dropping this crucial element of the *Davis* standard.

10

Finally, the Department fails to adequately explain why its new definition is tied to the Title VII framework. In fact, the only insight provided is the Department's tentative assertion that "this alignment will better facilitate recipients' ability to comply with their obligations" under both statutes. 87 Fed. Reg. at 41415. But elsewhere, the Department also admits that the analysis of whether a hostile environment exists is necessarily fact-specific and, among other things, must consider how a student—versus an employee—reasonably perceives the environment. Since the analyses differ for students and employees, it's unclear what benefits accrue to schools from similarity between the Title VII and Title IX formulations (especially where analysis of peer-on-peer discrimination is at issue). In contrast, the Preamble to the current regulations explained that aligning the Title VII and Title IX definitions of sexual harassment didn't further the purpose of Title IX or benefit students and employees participating in education programs or activities. 85 Fed. Reg. at 30151 (citing, *e.g.*, Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J. COLL. & UNIV. L. 385, 449 (2009) (arguing that restrictions on workplace speech "ultimately do not take away from the workplace's essential functions—to achieve the desired results, make the client happy, and get the job done" and free expression in the workplace "is typically not necessary for that purpose" such that workplaces are often "highly regulated environments" while "[o]n the other hand, freedom of speech and unfettered discussion are so essential to a college or university that compromising them fundamentally alters the campus environment to the detriment of everyone in the community" such that free speech and academic freedom are necessary preconditions to a university's success.).

The Department must provide a sufficient explanation.

## B. The proposed change to the definition of sexual harassment in § 106.30 will violate First Amendment rights and chill the free exchange of ideas.

The NPRM pays lip service to free speech in its preamble. *See* 87 Fed. Reg. at 41415 ("Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. See 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44. The Department emphasizes that in cases of alleged sex-based harassment, the protections of the First Amendment must be considered if, for example, issues of speech or expression.").

The Department has failed to heed the warnings of the past and account for the reasons why the current regulations were put into place. In the preamble to the 2020 regulations, the Department stated:

11

> The "Sexual Harassment" subsection of the "Section 106.30 Definitions"
> section of this preamble discusses in greater detail how the *Davis*
> definition of sexual harassment as "severe, pervasive, and objectively
> offensive" comports with First Amendment protections, and the way in
> which a broader definition, such as severe, persistent, or pervasive (as
> used in the 1997 Guidance and 2001 Guidance), has led to infringement
> of rights of free speech and academic freedom of students and faculty.

85 Fed. Reg. at 30036 n.88; *see also id.* at 30130 ("Failure to recognize and respect
principles of free speech and academic freedom has led to overly broad anti-
harassment policies that have resulted in chilling and infringement of constitutional
protections."). The current definition contained in § 106.30 captures categories of
misconduct likely to impede educational access while avoiding a chill on free speech
and academic freedom. The failure to recognize and respect free speech principles
and academic freedom has led to overly broad anti-harassment policies in the past
that have resulted in chilling and infringement of constitutional protections. Several
provisions in the Proposed Rule tread the same, anti-speech path.

> ### 1. *The Proposed Rule would modify 34 C.F.R. § 106.44 to require schools to respond to sex discrimination, regardless of whether schools know about it, and impose monitoring duties on Title IX coordinators, which would chill speech.*

The current regulations require that a recipient must possess "actual
knowledge" in order to be held liable under Title IX. *See* 34 CFR § 106.44(a) ("A
recipient with actual knowledge of sexual harassment in an education program or
activity of the recipient against a person in the United States, must respond promptly
in a manner that is not deliberately indifferent."); see also 85 Fed. Reg. at 30038
("These final regulations adopt the actual knowledge condition from the
*Gebser/Davis* framework so that these final regulations clearly prohibit a recipient's
own intentional discrimination, but adapt the *Gebser/Davis* condition of actual
knowledge to include notice to more recipient employees than what is required under
the Gebser/Davis framework, in a way that takes into account the different needs and
expectations of students in elementary and secondary schools, and in postsecondary
institutions, with respect to sexual harassment and sexual harassment allegations.");
*id.* at 30035 ("The withdrawn 2011 Dear Colleague Letter continued to recommend
that schools act upon constructive notice (rather than actual knowledge) and to hold
schools accountable under a strict liability standard rather than deliberate
indifference.").

The NPRM proposes modifying 34 C.F.R. 106.44(a) and (b) to say:

> (a) A recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects.
>
> (b) A recipient must …. Require its Title IX Coordinator to monitor the recipient's education program or activity for barriers to reporting information about conduct that may constitute sex discrimination under Title IX.

87 Fed. Reg. at 41572.

This new duty will lead to Title IX coordinators zealously policing protected speech as a prophylactic measure to avoid Title IX violations. Unsurprisingly, this will have a detrimental effect on campus culture and campus life.

### 2. Schools are expected to counter "derogatory" speech.

Under the Proposed Rule, schools must *counter* "derogatory opinions," making a non-response to any such opinions a potential Title IX violation. The NPRM says:

> For instance, although the First Amendment may prohibit a recipient from restricting the rights of students to express opinions about one sex that may be considered derogatory, the recipient can affirm its own commitment to nondiscrimination based on sex and take steps to ensure that competing views are heard. The age of the students involved and the location or forum in which such opinions are expressed may affect the actions a recipient can take consistent with the First Amendment.

87 Fed. Reg. at 41515. Institutions of higher education cannot suppress student thought on controversial issues simply because some students find it "offensive." Under the proposed rule (particularly in light of the lower threshold for hostile environment claims), cancel culture will become the norm on K-12 and college campuses, as students, teachers, and professors are threatened or punished for engaging in protected First Amendment speech on sex or LGBT issues. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.). And, even without official action to enforce these new rules, the threat of Title IX investigations will intimidate students and faculty into keeping quiet on controversial issues. Schools are likely to ostracize students who express disfavored political, moral, and social opinions, including on gender identity. But, as the Supreme Court has said:

13

Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.

*Id.* at 641. This principle has even more teeth at institutions of higher learning. *See Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.") (cleaned up).

The Department should withdraw this proposed change to protect free speech.

### 3. *The NPRM Removes the current prohibition in § 106.44(a) on using speech suppression to prevail in OCR investigations.*

The current regulations provide that: "The Department may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment." 34 CFR § 106.44(a). This means that institutions—public and private—cannot use Title IX as an excuse for suppressing protected student or faculty speech. The Proposed Rule removed this provision. See 87 Fed. Reg. at   41432, 41572-41575. The Department has not explained why it removed this provision and must do so. The Department should withdraw this proposal to prevent schools from using their obligations under federal civil rights law to shut down protected speech.

### 4. *The Proposed Rule's gender identity provisions turn protected speech into harassment.*

As discussed above, the proposed rule defines sex-based harassment to include offensive conduct on the basis of "gender identity." The proposed Rule effectively requires schools to micromanage and control the speech of all students, teachers, and staff. This now includes things like (1) compelling the use of each person's preferred

14

pronouns that may contradict the person's sex; and (2) characterizing as punishable harassment any objection to allowing male participation on girls sports teams.

The Proposed Rule vaguely defines both the hostile environment standard and the obligation of the school to provide "supportive measures." Under this paradigm, an accusation by a student or teacher of "sex-based harassment" could arise from any other student or teacher refusing to "validate" or "affirm" the person's "gender identity." This could happen when a student refuses to use another student's neo-pronoun or if a lesbian turns down a date with a man, who has "identified" as a woman and tells the man the objective fact that she doesn't date men.

This clearly violates students' and teachers' First Amendment rights to express their views on scientific, moral, and religious issues. *See Janus v. AFSCME*, Council 31, 138 S. Ct. 2448, 2464 (2018) ("Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and … a law commanding involuntary affirmation of objected-to beliefs would require even more immediate and urgent grounds than a law demanding silence) (internal quotations omitted); *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) ("Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination.") (internal quotations omitted)).

Even worse, it compels students and faculty to deny objective truth.[6]

### 5. The Proposes Rule removes the provision in 34 C.F.R. § 106.71(b)(1) that makes clear that exercise of rights protected under the First Amendment does not constitute retaliation

34 C.F.R. § 106.71 prohibits recipients or individuals from retaliating against individuals who participate in the Title IX process:

No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report

---

[6] Legend has it that when Galileo was put on trial for his heretic belief that the Earth revolved the Sun and eventually forced to recant, he muttered under his breath "*Eppur si muove*" or "it still moves."

15

or complaint of sex discrimination, or a report or formal complaint of
sexual harassment, for the purpose of interfering with any right or
privilege secured by title IX or this part, constitutes retaliation. The
recipient must keep confidential the identity of any individual who has
made a report or complaint of sex discrimination, including any
individual who has made a report or filed a formal complaint of sexual
harassment, any complainant, any individual who has been reported to
be the perpetrator of sex discrimination, any respondent, and any
witness, except as may be permitted by the FERPA statute, 20 U.S.C.
1232g, or FERPA regulations, 34 CFR part 99, or as required by law, or
to carry out the purposes of 34 CFR part 106, including the conduct of
any investigation, hearing, or judicial proceeding arising thereunder.
Complaints alleging retaliation may be filed according to the grievance
procedures for sex discrimination required to be adopted under
§ 106.8(c).

34 C.F.R. § 106.71(a). The regulations also, however, make clear that "the
exercise of rights protected under the First Amendment does not constitute
retaliation prohibited under paragraph (a) of this section." 34 C.F.R.
§ 106.71(b)(1).

The Proposed Rule eliminates § 106.71(b)(1). The NPRM reasons that
"106.71(b)(1) is redundant and its removal would be appropriate" because "[a]s
explained in the discussion of the definition of prohibited "sex-based
harassment" (proposed § 106.2), the Department has long made clear that it
enforces Title IX consistent with the requirements of the First Amendment."
This discussion and rationale are wholly inadequate. Removal of § 106.71(b)(1)
will chill free speech and infringe on First Amendment rights.

The NPRM fails to take into account the real-life examples of Title IX's
retaliation provisions being abused to chill free speech. For example, the saga
of Northwestern Professor Laura Kipnis is instructive:

In 2015, she published a polemic in *The Chronicle of Higher Education*
titled "Sexual Paranoia Strikes Academe." Kipnis argued that students'
sense of vulnerability on campus was expanding to an unwarranted
degree, partly owing to new enforcement policies around Title IX, which
prohibits sex discrimination at educational institutions that receive
federal funds. The new Title IX policies on sexual misconduct which
were then sweeping campuses perpetuated "myths and fantasies about
power," Kipnis wrote, which enlarged the invasive power of institutions
while undermining the goal of educating students in critical thinking
and resilience. "If you wanted to produce a pacified, cowering citizenry,
this would be the method," she concluded. Kipnis wrote of a philosophy

16

AR_029031

professor, Peter Ludlow, whom Northwestern disciplined for sexual harassment; Kipnis questioned the logic of the accusations against him. One of Ludlow's accusers, a graduate student (unnamed in Kipnis's essay), then joined a fellow graduate student in the philosophy department in filing Title IX complaints against Kipnis, under Northwestern's sexual-misconduct policy. Through her essay and a subsequent tweet about the essay, Kipnis was alleged to have violated the part of the sexual-misconduct policy prohibiting "retaliation"; additionally, she was alleged to have created a "hostile environment" and a "chilling effect" on complaints. Northwestern launched a formal Title IX investigation of Kipnis.

Most people under Title IX investigation don't speak publicly about it, even to defend themselves. But Kipnis responded by publishing a follow-up essay in the Chronicle, called "My Title IX Inquisition," decrying the investigation as a misuse of Title IX that allowed "intellectual disagreement to be redefined as retaliation." On the same day, Northwestern cleared Kipnis of wrongdoing, finding that "viewpoint expression" is not retaliation, and that a "reasonable person" in the complainant's position "would not suffer a hostile environment on account of" the essay and the tweet.[7]

The Department demonstrates absolutely no awareness of harmful instances such as this—and its effects on free speech and weaponization of the Title IX process. The Department fails to provide a reasoned explanation for eliminating § 106.71(b)(1).

### 6. The Proposed Rule plainly ignores the mountain of evidence demonstrating that it will chill free speech on campus.

The Proposed Rule is arbitrary and capacious because it wrongly believes its new definition of sexual harassment will not chill free speech. The Department claims that "Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. *See* 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44." 87 Fed. Reg. at 41415. But this proclamation is contradicted by a mountain of public evidence and the Department's past statements.

---

[7] Jeanie Suk Gersen, Laura Kipnis's Endless Trial by Title IX, THE NEW YORKER (Sept. 20, 2017); see also Laura Kipnis, *My Title IX Inquisition*, THE CHRONICLE OF HIGHER EDUCATION, May 29, 2015, http://laurakipnis.com/wp-content/uploads/2010/08/My-Title-IX-Inquisition-The-Chronicle-Review-.pdf.

AR_029032

Free speech was routinely suppressed or punished from 2011 to 2017 under Title IX. Through sub-regulatory guidance and administrative enforcement OCR created an expansive definition of sexual harassment that included "verbal conduct" (i.e., speech) such as "making sexual comments, jokes or gestures," "spreading sexual rumors," and "creating e-mails or Web sites of a sexual nature."[8] The environment became so precarious that Harvard Law School professor Jeannie Suk Gersen wrote in 2014 that law school faculty were increasingly reluctant to teach rape law for fear of offending or upsetting their students.[9] When the University of Montana sensibly incorporated the *Davis* standard into its sexual harassment policy, OCR objected.[10] OCR insisted in 2013 that the university establish policies to "encourage students to report sexual harassment early, before such conduct becomes severe or pervasive, so that it can take steps to prevent the harassment from creating a hostile environment."[11] The broad definition of sexual harassment was a so-called "national blueprint" for schools[12] and led OCR to regulate conduct that was not covered under Title IX.[13] Two scholars wrote that OCR's guidance required schools to regulate student conduct "that is not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination."[14]

The Department itself recognized this in 2020. *See, e.g.*, 85 Fed Reg. at 20036 ("The 'Sexual Harassment' subsection of the 'Section 106.30 Definitions' section of this preamble discusses in greater detail how the *Davis* definition of sexual harassment as 'severe, pervasive, and objectively offensive' comports with First Amendment protections, and the way in which a broader definition, such as severe, persistent, or pervasive (as used in the 1997 Guidance and 2001 Guidance), has led

---

[8] *Id.*

[9] THE NEW YORKER, Dec. 15, 2014, http://www.newyorker.com/news/news-desk/trouble-teaching-rape-law.; *see also* Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, The Chronicle of Higher Educ. (Jan. 6, 2017) (https:// www.chronicle.com/article/The-College-Sex-Bureaucracy/238805) (OCR's "broad definition" of sexual harassment has "grown to include most voluntary and willing sexual contact").

[10] U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to University of Montana, May 8, 2013, https://www2.ed.gov/documents/press-releases/montana-missoula-letter.pdf.

[11] BROOKINGS INSTITUTION, Jan. 24, 2019, https://www.brookings.edu/blog/brown-center-chalkboard/2019/01/24/the-department-of-educations-proposed-sexual-harassment-rules-looking-beyond-the-rhetoric/.

[12] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Departments of Education and Justice: National "Blueprint" for Unconstitutional Speech Codes, https://www.thefire.org/cases/departments-of-education-and-justice-national-requirement-for-unconstitutional-speech-codes/.

[13] *See, e.g.*, Jacob Gersen and Jeannie Suk, *The Sex Bureaucracy*, 104 CALIF. L. REV. 881, 902–03 (2016) (Asserting that the Obama OCR's guidance required schools to regulate student conduct "that [was] not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination" and concluding that OCR's guidance overstep[ped] OCR's jurisdictional authority).

[14] *E.g.*, Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, 104 CALIF. L. REV. 881, 902–03 (2016).

AR_029033

to infringement of rights of free speech and academic freedom of students and faculty.").

The Department's failure to recognize these incontrovertible facts renders its explanation insufficient, arbitrary, and capricious.

### III. THE PROPOSED RULE REMOVES KEY DUE PROCESS PROTECTIONS FROM THE CURRENT REGULATIONS.

Due process is a fundamental constitutional principle in American jurisprudence. Due process is a legal principle which has been shaped and developed through the process of applying and interpreting a written constitution. "Fair process" or "procedural justice" increases outcome legitimacy. Indeed, "[r]esearch demonstrates that people's views about their outcomes are shaped not solely by how fair or favorable an outcome appears to be but also by the fairness of the process through which the decision was reached. A fair process provided by a third party leads to higher perceptions of legitimacy; in turn, legitimacy leads to increased compliance with the law."[15]

As a result, due process protections are a critical part of a Title IX. Fair grievance procedures benefit both complainants and respondents, as well as recipients. Both parties benefit from equal opportunities to participate by setting forth their own views of the allegations. Everyone benefits from processes geared toward reaching factually accurate outcomes. The grievance process prescribed in the current regulations provides a fair process rooted in due process protections that improves the accuracy and legitimacy of the outcome for the benefit of both parties.

---

[15] Rebecca Holland-Blumoff, *Fairness Beyond the Adversary System: Procedural Justice Norms for Legal Negotiation*, 85 FORDHAM L. REV. 2081, 2084 (2017) (internal citations omitted).

AR_029034

Any Title IX grievance procedure mandated by the Department must comport with due process guarantees[16] as well as fundamental fairness.[17]

## A. The Proposed Rule removes or modifies important due process safeguards in the Title IX grievance process.

### 1. The Proposed Rule violates due process because it removes the provisions in 34 CFR § 106.45 requiring evidence to be provided to both parties.

The Department should withdraw its proposal to modify the provisions of 34 CFR § 106.45 relating to the opportunities of parties to inspect and review evidence during the grievance process. The current regulations require the recipient to:

> Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation.

34 CFR § 106.45.

---

[16] *See Goss v. Lopez*, 419 U.S. 565, 583–84 (1975) ("On the other hand, requiring effective notice and informal hearing permitting the student to give his [or her] version of the events will provide a meaningful hedge against erroneous action. At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect. He may then determine himself to summon the accuser, permit cross-examination, and allow the student to present his own witnesses. In more difficult cases, he may permit counsel. In any event, his discretion will be more informed and we think the risk of error substantially reduced."); Nicola A. Boothe-Perry, *Enforcement of Law Schools' Non-Academic Honor Codes: A Necessary Step Towards Professionalism?*, 89 NEB. L. REV. 634, 662–63 (2012) ("Thus, while well-settled that there is no specific procedure required for due process in school disciplinary proceedings, the cases establish the bare minimum requirements of: (1) adequate notice of the charges; (2) reasonable opportunity to prepare for and meet them; (3) an orderly hearing adapted to the nature of the case; and (4) a fair and impartial decision .... Where disciplinary measures are imposed pursuant to non-academic reasons (e.g., fraudulent conduct), as opposed to purely academic reasons, the courts are inclined to reverse decisions made by the institutions without these minimal procedural safeguards.") (internal citations omitted).

[17] *E.g.*, Kathryn M. Reardon, *Acquaintance Rape at Private Colleges and Universities: Providing for Victims' Educational and Civil Rights*, 38 SUFFOLK UNIV. L. REV. 395, 406–07 (2005) ("Courts around the nation have taken a relatively consistent stance on what type of process private colleges and universities owe to their students .... Courts expect that schools will adhere to basic concepts of fairness in dealing with students in disciplinary matters. Schools must employ the procedures set out in their own policies, and those policies must not be offensive to fundamental notions of fairness.").

The Department proposes allowing parties to be given, instead, an "oral description" of the evidence: "(4) Provide each party with a description of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, as well as a reasonable opportunity to respond." 87 Fed. Reg. at 41481. To maintain a transparent process, however, the parties need a complete understanding of the evidence obtained by the recipient and how a determination regarding responsibility is made. A written description places parties—particularly respondents—at a severe disadvantage, forcing them to trust that a school has provided a complete and accurate description of every piece of relevant evidence. We know from experience that the single-investigator model has a tremendous potential for abuse. *See* Part III(B), *infra*.

Additionally, this puts educational institutions in the position to pre-judge important issues such as relevance. It would, thus, permit these institutions to make a determination regarding relevance and then withhold evidence on that basis.

The Department should withdraw the proposal.

### 2. *The Department should require schools to maintain a consistent evidentiary standard in 34 CFR 106.45.*

The current regulations provide:

> Schools must use either "the preponderance of the evidence standard or the clear and convincing evidence standard, [and] apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and apply the same standard of evidence to all formal complaints of sexual harassment."

34 CFR § 106.45. The Proposed Rule tweaks the current evidentiary rule in 34 C.F.R. § 106.45: "Schools must "[u]se the preponderance of the evidence standard of proof to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred." 87 Fed. Reg. at 41576.

First, this creates an internal contradiction. One reason the NPRM gives for this provision is that "a singular imposition of a higher standard for sex discrimination complaints would impermissibly discriminate on the basis of sex." 87 Fed. Reg. at 41486. But the Proposed Rule permits using a lower standard for sex discrimination than for other complaints, including racial discrimination complaints.

21

So by the Rule's own logic, schools may discriminate on the basis of race by imposing a lower standard for racial than for sex discrimination. That makes no sense.

And, the Department fails to offer a justification for mandating that sex discrimination complaints be addressed under no higher standard than other complaints but—at the same time—refusing to mandate that they also be addressed under no lower a standard.

The Department should maintain the current evidentiary standard requirements set forth in 34 CFR 106.45. If it, however, does wish to change the current standard, it should not deviate further from the Proposed Rule. It's important that (1) recipients not use an evidentiary standard below the preponderance of the evidence; (2) a recipient's grievance process state up front which of the two permissible standards of evidence the recipient has selected and (3) apply that selected standard to all formal complaints of sexual harassment, including those against employees.

### 3. The Proposed Rule modifies 34 CFR § 106.45 to bring back the biased and unfair single-investigator model

The current regulations flatly prohibit the single investigator model. *See* 34 CFR § 106.45 ("The role of Title IX Coordinator and the role of the Title IX investigator must be distinct from the role of Title IX adjudicator."). This is because fundamental fairness to both parties requires that the intake of a report and formal complaint, the investigation (including party and witness interviews and collection of documentary and other evidence), drafting of an investigative report, and ultimate decision about responsibility should not be left in the hands of a single person (or team of persons each of whom performed all those roles). Rather, after the recipient has conducted its impartial investigation, a separate decision-maker must reach the determination regarding responsibility; that determination can be made by one or more decision-makers (such as a panel), but no decision-maker can be the same person who served as the Title IX Coordinator or investigator.

The Proposed Rule eliminates this prohibition and expressly permits the decision-maker to be the same person as the Title IX coordinator. Integrating the investigative and decision-making functions will (1) substantially impair the overall fairness of the grievance process; (2) decrease the reliability of fact-finding and the accuracy of outcomes; (3) lower party and public confidence in outcomes; and (4) decrease the accuracy of the determination regarding responsibility in Title IX cases because individuals who perform both roles may have confirmation bias and other prejudices that taint the proceedings, whereas separating those functions helps prevent bias and prejudice from impacting the outcome.

22

Prior to the current regulations, Both OCR and the White House pressured schools to employ the single investigator model.[18]    Schools housed these investigators/adjudicators in their Title IX offices, which had strong incentives to ensure the school stayed compliant with the DCLs to avoid losing federal funding. Many Title IX offices assumed every role in the process, acting as prosecutor, judge, jury, and appeals board

The biases of individuals in the single-investigator role had disastrous consequences. *See, e.g.*, Laura Kipnis, UNWANTED ADVANCES 33 (2017) ("The reality is that a set of incomprehensible directives, issued by a branch of the federal government, are being wielded in wildly idiosyncratic ways, according to the whims and biases of individual Title IX officers operating with no public scrutiny or accountability. Some of them are also all too willing to tread on academic and creative freedom as they see fit"). Even proponents of a strong role for Title IX coordinators acknowledged that corruption existed in the process.[19]

Indeed, courts have called the fairness of this model into question over the last few years. *See, e.g., Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1072–73 (Cal. App. 2018) (all decision makers "must make credibility determinations, and not simply approve the credibility determinations of the one Committee member who was also the investigator."); *Doe v. Miami Univ.*, 882 F.3d 579, 601, 605 (6th Cir. 2018) (court found "legitimate concerns" raised by the investigator's "alleged dominance on the three-person [decision-making] panel" because "she was the only one of the three with conflicting roles."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573 (D. Mass. 2016) (referring to the "obvious" "dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review"); *Doe v. Allee*, 30 Cal. App. 5th 1036, 1068 (Cal. App. 2019) ("As we have explained, in USC's system, no in-person hearing is ever held, nor is one required. Instead, the Title IX investigator interviews witnesses, gathers other evidence, and prepares a

---

[18] *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter).  In the "single investigator" model, there is no hearing. One person conducts interviews with each party and witness, and then makes the determination whether the accused is responsible. No one knows what the investigator hears or sees in the interviews except the people in the room at the time. This makes the investigator all-powerful. Neither accuser nor accused can guess what additional evidence to offer, or what different interpretations of the evidence to propose because they are completely in the dark about what the investigator is learning and are helpless to fend off the investigator's structural and personal biases as they get cooked into the evidence-gathering.

[19] *See, e.g.*, Association of Title IX Administrators (ATIXA), *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 3–4 (Feb. 17, 2017) (acknowledging that due process has been denied in some recipients' Title IX proceedings but insisting that "Title IX isn't the reason why due process is being compromised .... Due process is at risk because of the small pockets of administrative corruption ... and because of the inadequate level of training currently afforded to administrators. *College administrators need to know more about sufficient due process protections and how to provide these protections in practice*.") (emphasis added).

23

written report in which the investigator acts as prosecutor and tribunal, making factual findings, deciding credibility, and imposing discipline. The notion that a single individual, acting in these overlapping and conflicting capacities, is capable of effectively implementing an accused student's right of cross-examination by posing prepared questions to witnesses in the course of the investigation ignores the fundamental nature of cross-examination: adversarial questioning at an in-person hearing at which a neutral fact finder can observe and assess the witness' credibility.").

The Proposed Rule pays lip service to the concerns of the 2020 rule in ensuring that a person's experience investigating a claim of harassment does not bias him or her in a subsequent role of determining whether harassment occurred. It somehow concludes, however, that unifying the investigatory and adjudicatory roles does not raise a substantial risk of bias because "the recipient is not in the role of prosecutor seeking to prove a violation of its policy," but rather "the recipient's role is to ensure that its education program is free of unlawful sex discrimination, a role that does not create an inherent bias or conflict of interest in favor of one party or another." 87 Fed. Reg. at 41467.

Perhaps most shockingly, the Department wrongly claims that a separate adjudicator would not help the reliability of the grievance process. 87 Fed. Reg. at 41466–41467. It cites no evidence in support of this claim. *Id.* This rationale is inadequate and fails to account for the real-world evidence that led to the 2020 Regulations.

A separate, neutral adjudicator is also necessary because of the Title IX incentive structure. The incentive structure pushes recipients toward findings of fault. That is, if there is discrimination that a recipient fails to redress, they could lose federal funding, so they are incentivized to stamp out as many Title IX violations as possible. On the other hand, however, if there is non-discriminatory conduct that schools redress, it often costs the recipient nothing. It's common sense, moreover, that an investigator may come to hold views that favor one party or another during an investigation. A neutral decisionmaker is one of the best ways to ensure a fair process.

The Department's proposed change would return to the flawed and highly unfair system that led to the enactment of the 2020 Regulations.

### 4. The Proposed Rule violates Due Process by removing written notice provisions in 34 C.F.R. 106.45(b)(2)(i)(B).

The current regulations require the recipient to provide written notice of a formal complaint to a respondent. In that written notice, a respondent must be

24

provided with (1) presumption of innocence statement; (2) right to advisor of choice;
(3) penalty for false statements:

> The written notice must include a statement that the respondent is
> presumed not responsible for the alleged conduct and that a
> determination regarding responsibility is made at the conclusion of the
> grievance process. The written notice must inform the parties that they
> may have an advisor of their choice, who may be, but is not required to
> be, an attorney, under paragraph (b)(5)(iv) of this section, and may
> inspect and review evidence under paragraph (b)(5)(vi) of this section.
> The written notice must inform the parties of any provision in the
> recipient's code of conduct that prohibits knowingly making false
> statements or knowingly submitting false information during the
> grievance process.

34 CFR 106.45(b)(2)(i)(B). The Proposed Rule removes those three requirements from
the written notice:

> (c) Notice of allegations. Upon initiation of the recipient's grievance
> procedures, a recipient must provide notice of the allegations to the
> parties whose identities are known. (1) The notice must include: (i) The
> recipient's grievance procedures under this section, and if applicable
> § 106.46, and any informal resolution process under § 106.44(k); (ii)
> Sufficient information available at the time to allow the parties to
> respond to the allegations. Sufficient information includes the identities
> of the parties involved in the incident, the conduct alleged to constitute
> sex discrimination under Title IX, and the date and location of the
> alleged incident, to the extent that information is available to the
> recipient; and (iii) A statement that retaliation is prohibited.

87 Fed. Reg. at 41575. The Department has failed to provide any justification for why
it removed the requirements that recipients inform accused students about the
presumption of innocence, the right to counsel, or the penalties for false statements.

### 5. The Proposed Rule removes the due process protection of mandating live hearings for postsecondary settings.

The Title IX regulations currently require a live hearing at the postsecondary
level. 34 CFR § 106.45(b)(6)(i) ("For postsecondary institutions, the recipient's
grievance process must provide for a live hearing."). The Proposed Rule removes that
requirement. 87 Fed. Reg. at 41462, 41497, 41498. "A postsecondary institution's
sex-based harassment grievance procedures may, but need not, provide for a live
hearing."

AR_029040

Relatedly, under the current regulations the parties must be allowed at live hearings to ask questions directly through their advisors:

> At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally, notwithstanding the discretion of the recipient under paragraph (b)(5)(iv) of this section to otherwise restrict the extent to which advisors may participate in the proceedings.

34 C.F.R. § 106.45(b)(6)(i).

At the postsecondary level, live hearings are key to seeking truth and determining responsibility. Because most parties and witnesses are adults there, grievance procedures' live cross-examination at a hearing is both appropriate and worthwhile. The current regulations require institutions to provide a live hearing, and to allow the parties' advisors to cross-examine the other party and witnesses.

The current regulations balance the importance of cross-examination with any potential harm from personal confrontation between the complainant and the respondent by requiring questions to be asked by an advisor aligned with the party. Further, they allow either party to request that the recipient facilitate the parties being located in separate rooms during cross-examination while observing the questioning live via technological means. The current regulations thereby provide the benefits of cross-examination while avoiding any unnecessary trauma that could arise from personal confrontation between the complainant and the respondent.[20]

The Proposed Rule obviously doesn't require a live hearing. But it also now appears to only require schools to let parties submit written questions to each other on the limited topic of "credibility":

> This assessment of credibility includes either (i) Allowing the decisionmaker to ask the parties and witnesses, during individual

---

[20] *Cf. Baum*, 903 F.3d at 583 ("Universities have a legitimate interest in avoiding procedures that may subject an alleged victim to further harm or harassment. And in sexual misconduct cases, allowing the accused to cross-examine the accuser may do just that. But in circumstances like these, the answer is not to deny cross-examination altogether. Instead, the university could allow the accused student's agent to conduct cross-examination on his behalf. After all, an individual aligned with the accused student can accomplish the benefits of cross-examination— its adversarial nature and the opportunity for follow-up—without subjecting the accuser to the emotional trauma of directly confronting her alleged attacker.").

> meetings with the parties or at a live hearing, relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, before determining whether sex-based harassment occurred and allowing each party to propose to the decisionmaker or investigator relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, that the party wants asked of any party or witness and have those questions asked during individual meetings with the parties …

87 Fed. Reg. at 41577–41578. The wording of this provision is vague, but it appears that recipients can exclude questions between parties as long as credibility isn't in dispute. **We request further clarification as to when a recipient may exclude questions between the parties.** If the Department does not provide clarification, the Proposed Rule is arbitrary and capricious.

Finally, at the postsecondary level, the Proposed Rule imagines that college students will mostly "self-advocate" in harassment proceedings. Although students would be entitled to an advisor, postsecondary institutions would not have to permit parents to be involved in the process. The Department has failed to give any meaningful reason for excluding parents from these proceedings. Students in higher education would undoubtedly benefit from a parent's counsel and the Proposed Rule fails to provide a single reason for excluding parents from the process.

### 6. The Proposed Rule's "Supportive Measures" provision is internally inconsistent.

The proposed rule allows "supportive measures" that temporarily burden a respondent only during the pendency of the proceedings. 87 Fed. Reg. at 41421. This provision is internally contradictory because, elsewhere in the NPRM, it emphasizes the need for equitable treatment in the Title IX process between complainants and respondents. *Id.* at 41453. Here, however, both are not subject to the same rules and the Department has not acknowledged or explained that departure. This is also irrational because there's no basis for distinguishing between complainants and respondents on the basis of their conduct. Since respondents are afforded the presumption of innocence by the NPRM, *id.* at 41488, 41508, this makes no sense.

This provision is also flawed because there are no limits to how burdensome the supportive measures may be. In theory, a respondent could be suspended from all classes and dismissed from campus on the basis of an unproven allegation. A school wouldn't even need to find that the complainant is likely to prevail on his or her claim of discrimination to impose that *de facto* sanction.

AR_029042

**B. The totality of the Proposed Rule returns to the problematic paradigm from the 2011–17 era and fails to adequately consider the mountain of evidence that strong due process protections are necessary for Title IX grievances procedures.**

The current regulations in 34 CFR § 106.45 (and elsewhere) set forth clear legal obligations that require schools to promptly respond to allegations of sexual harassment, follow a fair grievance process to resolve those allegations, and provide remedies to victims. It guarantees victims and accused students strong, clear procedural rights in a predictable, transparent process designed to reach reliable outcomes.[21] When taken as a whole, the current regulations were enacted following regulatory and constitutional mess from 2011 to 2017. The proposed rule would re-institute many of those flawed policies.

OCR's 2011 *Dear Colleague Letter: Sexual Violence* ("2011 DCL") wreaked havoc on campuses across the country (The 2011 DCL was expanded upon by a 2014 *Questions and Answers on Title IX and Sexual Violence*). It was a Kafkaesque disciplinary disaster that resulted in hundreds of successful lawsuits against schools and widespread criticism from across the ideological spectrum. The 2011 DCL compelled schools to adopt the lowest standard of proof for proving sexual harassment and sexual assault claims—preponderance of the evidence—and pressured schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability.[22]

A laundry list of due process violations—reminiscent of Star Chamber—stacked the deck against accused students: schools failed to give students the complaint against them, or notice of the factual basis of charges, the evidence gathered, or the identities of witnesses; schools fail to provide hearings or to allow

---

[21] *See, e.g.,* U.S. Dep't of Educ. YouTube Channel, *OCR Webinar on Due Process Protections under the New Title IX Regulations* (July 21, 2020), https://youtu.be/48UwobtiKDI; U.S. Dep't of Educ. YouTube Channel, *OCR Title IX Webinar: Bias and Conflicts of Interest* (Jan 15, 2021), https://www.youtube.com/watch?v=vHppcOdrzCg.

[22] OCR found numerous institutions in violation of Title IX for failing to adopt the preponderance of the evidence standard in its investigations of sexual harassment, even though the notion that the preponderance of the evidence standard is the only standard that might be applied under Title IX was set forth in the 2011 Dear Colleague Letter and not in the Title IX statute, current regulations, or other guidance. *E.g.,* U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Harvard Law School 7, Dec. 10, 2014, https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf ("[I]n order for a recipient's grievance procedures to be consistent with the Title IX evidentiary standard, the recipient must use a preponderance of the evidence standard for investigating allegations of sexual harassment, including sexual assault/violence."); *see also* Blair A. Baker, *When Campus Sexual Misconduct Policies Violate Due Process Rights*, 26 CORNELL J. L. & PUB. POL'Y 533, 542 (2016) (The 2011 DCL "forced universities to change their former policies drastically, with regards to their specific procedures as well as the standard of proof, out of fear that the Department of Education will pursue their school for a violation of Title IX.").

the accused student's lawyer to attend or speak at hearings; schools barred the accused from putting questions to the accuser or witnesses, even through intermediaries; schools denied parties the right to see the investigative report or get copies for their lawyers for preparing an appeal; schools allowed appeals only on very narrow grounds such as new evidence or procedural error, providing no meaningful check on the initial decisionmaker. A study by the Foundation for Individual Rights in Education found that 73% of the top universities in America did not guarantee the presumption of innocence in campus proceedings.[23]

By 2014, OCR had stopped using the terms complainant/alleged victim and alleged perpetrator and replaced them with victim/survivor and perpetrator. OCR then began keeping a public list of the schools at which it was investigating possible Title IX violations, putting schools under a cloud of suspicion.

This resulted in a Title IX system that quite literally resembled Kafka's *The Trial*.[24] Here are just a few examples of the infamous system created during the 2011–17 paradigm:

- An athlete of color at Colorado State University-Pueblo was accused of sexually assaulting a female trainer, but not by her. Despite the trainer saying that she had not been raped, University officials pointed out that according to Title IX, they got to decide the accused student's fate and the student was found guilty and expelled.[25]

- At USC, a student-athlete was kicked out of school for abusing his girlfriend—despite the fact his girlfriend never reported any abuse and vehemently denied any abuse ever took place—after a neighbor saw the couple playfully roughhousing in the front yard.[26]

- A Howard University law professor was punished, following a 16-month investigation, because an exam question he wrote involving a bikini wax was deemed to have created an unsafe environment after a student "allegedly

---

[23] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Dec. 18, 2018, https://www.thefire.org/report-as-changes-to-title-ix-enforcement-loom-americas-top-universities-overwhelmingly-fail-to-guarantee-fair-hearings-for-students/.

[24] *See, e.g.*, COMMENTARY MAGAZINE, June 2017, https://www.commentarymagazine.com/articles/kc-johnson/kafka-u/.

[25] REASON, Apr. 19, 2016, https://reason.com/2016/04/19/female-student-said-im-fine-and-i-wasnt/.

[26] REASON, Aug. 2, 2017, https://reason.com/2017/08/02/student-athletes-torn-apart-by-title-ix/.

believed the question's premise somehow required her to reveal to the class whether she'd had a Brazilian wax."[27]

- A judge rebuked Brandeis University for denying fundamental due process rights to a student who was found guilty of sexual misconduct for a variety of non-violent offenses: most notably, because he had awakened his then-boyfriend with nonconsensual kisses.[28]

- Northwestern University Professor Laura Kipnis (herself a liberal feminist) faced a Title IX complaint and investigation simply for writing an essay about sex on campus and criticizing sexual harassment policies (the complaint alleged she created a "chilling environment" for reporting sexual harassment or assaults).[29]

- Carleton College suspended a student for drunken sex and then expelled the student as soon as he appealed the suspension, with the Dean writing to him that "the fact you continue to assert that it was okay to engage in sexual activity with a person in [Jane Doe's] condition is deeply troubling."[30]

- A University of Tennessee student was investigated for sexual harassment because he wrote his instructor's name wrong.[31]

- Resident Advisors at University of Massachusetts-Amherst told students that making jokes about Harambe, the dead gorilla and internet meme, could constitute a violation of Title IX.[32]

---

[27] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, July 6, 2017, https://www.thefire.org/a-sticky-situation-at-howard-university-brazilian-wax-test-question-nets-professor-a-504-day-title-ix-investigation-sanctions/.

[28] REASON, Apr. 1, 2016, https://reason.com/2016/04/01/judge-sides-with-gay-brandeis-student-gu/; https://www.washingtonexaminer.com/federal-judge-rebukes-lack-of-due-process-in-campus-sex-assault-procedures.

[29] THE CHRONICLE OF HIGHER EDUCATION, May 29, 2015, http://laurakipnis.com/wp-content/uploads/2010/08/My-Title-IX-Inquisition-The-Chronicle-Review-.pdf.

[30] REASON, Aug. 1, 2019, https://reason.com/2019/08/01/carleton-college-title-ix-expelled-football-student-lawsuit/.

[31] REASON, Oct. 12, 2016, https://reason.com/2016/10/12/ut-student-now-being-investigated-for-se/.

[32] REASON, Sept. 6, 2016, https://reason.com/2016/09/06/umass-amherst-harambe-jokes-are-racist-m/.

One of the more tragic ironies is that the 2011 DCL resulted in a disproportionate number of expulsions and scholarship losses for Black male students.[33]

The criticisms of the 2011–17 system spanned the ideological spectrum. Here are just a few examples:

- Four feminist law professors at Harvard wrote that the Biden/Lhamon Title IX system "put pressure on [schools] to stack the system so as to favor alleged victims over those they accuse and that "procedures for enforcing [definitions of sexual harassment] are frequently so unfair as to be truly shocking."[34]

- More than two dozen other Harvard Law School professors wrote a letter in 2014 objecting to the school's Title IX process as unfair.[35]

- A group of 16 law professors from the University of Pennsylvania argued "we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."[36]

- Janet Halley, a self-described feminist and professor at Harvard Law School told Congress that "the rate of complaints and sanctions against male (including transitioning to male) students of color is unreasonably high."[37]

---

[33] REALCLEAREDUCATION, Jan. 21, 2019, https://www.realcleareducation.com/articles/2019/01/21/black_men_title_nine_and_the_disparate_impact_of_discipline_policies_110308.html.

[34] Elizabeth Bartholet et al., *Fairness For All Students Under Title IX*, Aug. 21, 2017, https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf?sequence=1&isAllowed=y.

[35] BOSTON GLOBE, Oct. 14, 2014, https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html ("Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process").

[36] Open Letter from Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, WALL ST. J., Feb. 18, 2015, http://online.wsj.com/public/resources/documents/ 2015_0218_upenn.pdf (statement of 16 members of the University of Pennsylvania Law School faculty).

[37] THE COLLEGE FIX, Aug. 4, 2015, https://www.thecollegefix.com/shut-out-of-sexual-assault-hearing-critics-of-pro-accuser-legislation-flood-senate-committee-with-testimony/ ; Additionally, Harvard Law Professor Jeannie Suk Gersen wrote in The New Yorker in 2015 that the administrators and faculty members she'd spoken with who "routinely work on sexual-misconduct cases" said that "most of the complaints they see are against minorities." The New Yorker, Dec. 11, 2015, https://www.newyorker.com/news/news-desk/argument-sexual-assault-race-harvard-law-school.

- The past President of the American Civil Liberties Union remarked in 2015 that "OCR's distorted concept of sexual harassment actually does more harm than good to gender justice, not to mention to free speech."[38]

- The American College of Trial Lawyers issued a report concluding that OCR had imperiled due process and free speech.[39]

The due-process deficiencies in the 2011 DCL and 2014 Q&A led to over 600 lawsuits by accused students against their academic institutions.[40] These lawsuits, more often than not,[41] resulted in victories for accused students across the country in state and federal court, including key wins at the appellate level. *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 581 (6th Cir. 2020); *Doe v. Univ. of the Scis.*, 961 F.3d 203, 205 (3d Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th Cir. 2019); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 60 (1st Cir. 2019); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017); *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1070 (2018); *Doe v. Regents of Univ. of Cal.*, 28 Cal. App. 5th 44, 61 (2018).

The Department has proposed returning—in large part—to the problematic Title IX grievance system from the 2011–17 era. It has utterly failed to reconcile these past failures of OCR policy with its Proposed Rule.

---

[38] Shorenstein Center, *Nadine Strossen: "Free Expression: An Endangered Species on Campus?" Transcript*, https://shorensteincenter.org/nadine-strossen-free-expression-an-endangered-species-on-campus-transcript/.

[39] American College of Trial Lawyers, *Task Force on the Response of Universities and Colleges to Allegations of Sexual Violence, White Paper on Campus Sexual Assault Investigations*, 2017, https://www.actl.com/docs/defaultsource/defaultdocumentlibrary/positionstatementsandwhitepapers/task_force_allegations_of_sexual_violence_white_paper_final.pdf.

[40] *See Milestone: 600+ Title IX/Due Process Lawsuits in Behalf of Accused Students*, TITLE IX FOR ALL, Apr. 1, 2020, https://www.titleixforall.com/milestone-600-title-ix-due-process-lawsuits-in-behalf-of-accused-students; *see also* Diane Heckman, *The Assembly Line of Title IX Mishandling Cases Concerning Sexual Violence on College Campuses*, 336 WEST'S EDUC. L. REP. 619, 631 (2016) (stating that since 2014 "there has been an influx of lawsuits contending post-secondary schools have violated Title IX due to their failure to properly handle sexual assault claims. What is unusual is that both sexes are bringing such Title IX mishandling cases due to lack of or failure to follow proper process and due process from each party's perspective. A staggering number of cases involve incidents of alcohol or drug usage or intoxication triggering the issue of the negating a voluntary consent between the participants.") (internal citations omitted).

[41] *See* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. LEGIS. & PUB. POL'Y 49 (2019).

AR_029047

## IV.    ASSISTANT SECRETARY LHAMON MUST RECUSE FROM THE RULEMAKING PROCESS

Assistant Secretary Lhamon must recuse herself from the rulemaking process. The 2020 Rule was enacted in response to a constitutional and regulatory mess created by OCR from 2011 to 2016. As Assistant Secretary for Civil Rights from 2013 to 2017, Assistant Secretary Lhamon played a crucial role in creating this problem. OCR's infamous 2011 Dear Colleague Letter: Sexual Violence ("2011 DCL") and 2014 Questions and Answers on Title IX and Sexual Violence ("2014 Q&A") wreaked havoc on campuses across the country. OCR compelled schools to adopt the lowest standard of proof for proving sexual harassment and sexual assault claims—preponderance of the evidence—and pressured schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability.

At OCR, Assistant Secretary Lhamon pressured schools to employ the single investigator model that gives one person appointed by the school's Title IX coordinator authority both to investigate alleged misconduct and to determine guilt and innocence. OCR didn't merely put its thumb on the scale of justice under her leadership, it became a biased institution. Investigations were not an inquiry into discrete complaints, but instead fishing expeditions into every aspect of schools' adjudication process and campus life. By 2016, "the average investigation had been open for 963 days, up from an average in 2010 of 289 days." Former and current OCR investigators told the media "the perceived message from Washington was that once an investigation into a school was opened, the investigators in the field offices were not meant to be objective fact finders. Their job was to find schools in violation of Title IX."

Given her past statements and record, there's no possible way OCR or the Department can conduct the rulemaking process in accordance with the Administrative Procedure Act's requirements for reasoned decision-making. When the 2020 Rule was released, Assistant Secretary Lhamon claimed that it was "taking us back to the bad old days, when it was permissible to rape and sexually harass students with impunity." During her subsequent Senate Confirmation hearing, she confirmed that this was still her view. With her mind already made up regarding the 2020 Rule—and her attachment to the defective regime it replaced—her involvement would taint the rulemaking process with bias. *See, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (a strong showing of bad faith may require the administrative officials who participated in a decision to give testimony explaining their action); *United States v. Oregon*, 44 F.3d 758, 772 (9th Cir. 1994) (decisionmaker cannot possess "an unacceptable probability of actual bias"). Further, any future rationale for changing the 2020 Rule that's offered by the Department would be invalid because her statements prove the Department's outcome is pre-ordained. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573

(2019) (uncontested that decision resting on "pretextual basis" "warrant[s] a remand to the agency").

We brought this conflict of interest to the Department's attention via letter on April 5, 2022 (Attachment A), and then again on June 23, 2022 (Attachment B). The Proposed Rule, however, doesn't discuss these concerns. If the Department doesn't provide an adequate explanation regarding Assistant Secretary Lhamon's involvement, the rulemaking process is tainted and the Final Rule is arbitrary and capricious.

## V.    THE DEPARTMENT MUST CLARIFY THAT TAX-EXEMPT STATUS ALONE DOES NOT CONSTITUTE "FEDERAL FINANCIAL ASSISTANCE."

Title IX applies only to entities that are recipients of federal financial assistance. 20 U.S.C. § 1681(a). The current Title IX regulations define the term federal financial assistance:

Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:

(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility of any portion thereof; and

(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

34

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2(g).

Two federal district courts have now determined that an entity's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), constitutes federal financial assistance. *See E.H. v. Valley Christian Acad.*, 2022 U.S. Dist. LEXIS 132893, at *17 (C.D. Cal. July 25, 2022); *Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, 2022 U.S. Dist. LEXIS 130429, at *15 (D. Md. July 21, 2022). Both decisions held that 501(c)(3) status made private high schools indirect recipients of federal financial assistance, therefore, subjected them to Title IX.

Prior to these decisions, 501(c)(3) had never been considered federal financial assistance. Income tax exemptions are "conspicuously absent from [the] laundry list" of examples in 34 C.F.R. § 106.2(g). *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965, 971 (N.D. Ill. 2001); see also *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 n.2 (E.D.N.Y. 2012) (citing, *e.g.*, *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976)).

The Department should clarify in 34 C.F.R. § 106.2(g) that 501(c)(3) status does not constitute federal financial assistance. Extending Title IX to schools because of 501(c)(3) status would be a drastic extension of Title IX. It would force every private school enjoying tax-exempt status to comply with Title IX.

## VI. THE DEPARTMENT MUST ASSESS THE IMPACT OF THE PROPOSED REGULATIONS ON FAMILIES AND PARENTAL RIGHTS PURSUANT TO 5 U.S.C § 601.

Section 654 of the Treasury and General Government Appropriations Act, 1999, Pub. L. 105-277, codified at 5 U.S.C § 601, provides:

Before implementing policies and regulations that may affect family well-being, each agency shall assess such actions with respect to whether … the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children.

5 U.S.C § 601 (statutory notes). As discussed in Part I(D), the Proposed Rule infringes on parental rights because it treats failure to "affirm[] gender identity" the same as traditional forms of discrimination (*e.g.*, excluding girls from the debate team), a school wouldn't need to obtain parental consent before pushing "gender affirmation" of whatever self-declared identity a child announces in school; the school would never

AR_029050

have to disclose that affirmation program to the child's parents, and must—at any rate—pursue it even over parents' objections. The statute clearly provides that the Department must evaluate its proposed actions with respect to whether the "action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children." *Id.*

The Department must conduct the impact analysis as required by Pub. L. 105-277, codified at 5 U.S.C § 601, or the Proposed Rule is arbitrary, capricious, and not in accordance with law.

Sincerely,

AUSTIN KNUDSEN
ATTORNEY GENERAL OF MONTANA

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

DEREK SCHMIDT
ATTORNEY GENERAL OF KANSAS

LESLIE RUTLEDGE
ATTORNEY GENERAL OF ARKANSAS

DANIEL CAMERON
ATTORNEY GENERAL OF KENTUCKY

CHRISTOPHER M. CARR
ATTORNEY GENERAL OF GEORGIA

JEFF LANDRY
ATTORNEY GENERAL OF LOUISIANA

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA

LYNN FITCH
ATTORNEY GENERAL OF MISSISSIPPI

36

DOUG PETERSON
ATTORNEY GENERAL OF NEBRASKA

JOHN M. O'CONNOR
ATTORNEY GENERAL OF OKLAHOMA

ALAN WILSON
ATTORNEY GENERAL OF SOUTH
CAROLINA

MARK VARGO
ATTORNEY GENERAL OF SOUTH DAKOTA

JONATHAN SKRMETTI
ATTORNEY GENERAL OF TENNESSEE

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

SEAN D. REYES
ATTORNEY GENERAL OF UTAH

JASON MIYARES
ATTORNEY GENERAL OF VIRGINIA

37

AR_029052



**CALIFORNIA DEPARTMENT OF EDUCATION**

**TONY THURMOND**
*STATE SUPERINTENDENT OF*
*PUBLIC INSTRUCTION*

1430 N STREET, SACRAMENTO, CA 95814-5901 • 916-319-0800 • WWW.CDE.CA.GOV

August 25, 2022

The Honorable Suzanne Goldberg
Office of Civil Rights
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

Dear Acting Assistant Secretary Goldberg:

The California Department of Education (CDE) appreciates and supports the U.S. Department of Education's (ED's) Title IX proposed rule related to discrimination in the form of sexual harassment, sexual violence in educational environments, and discrimination based on sexual orientation, gender identity, and gender expression.

The CDE believes that all students, staff, and faculty should be treated fairly and be afforded a positive educational environment. In California, the definition of sexual harassment is comprehensive, covering all unwelcome conduct of a sexual nature that has the purpose or effect of having a negative impact on the individual's academic performance or of creating an intimidating, hostile, or offensive educational environment. That is also why we applaud ED's commitment to protect all students and employees from discrimination and retaliation in a prompt manner when entities become aware of troubling allegations.

Additionally, California is a state that prohibits discrimination based on sexual orientation, gender identity, and gender expression. The disregard of, or unwillingness to accept, a student's gender expression is a form of bullying and harassment. We know that when students' gender identities are respected, they thrive. That is why California strongly supports the updated protections for LQBTQIA+ students outlined in the proposed rule.

The CDE would like to suggest some changes to the proposed Title IX rule in order to provide greater clarity and efficiency for schools. The CDE has concerns related to the proposed language for 34 CFR 106.8(e), which states that if a student with an Individualized Education Program (IEP) is either the complainant or the respondent in a complaint of sex-based discrimination, the Title IX coordinator must consult with the

August 25, 2022
Page 2

student's "IEP team" to ensure compliance with the Individuals with Disabilities Education Act (IDEA) throughout the Title IX investigative process. This language may be confusing to the field, and difficult to implement, as explained below.

The first concern is with the language that states that the Title IX coordinator must consult specifically with "the IEP team." The "IEP team" is an often-changing group of people whose specific membership is identified only in the context of a particular IEP meeting for a particular student. Also, the proposed regulation could be read to suggest that the consultation needs to take place in the context of an *IEP meeting*, because that is the only occasion when the "IEP team" is assembled. Such an interpretation would result in the Title IX regulations imposing a new meeting requirement on IEP teams that does not otherwise exist in IDEA or its implementing regulations. We recommend that the proposed language "IEP team" be changed to "a school administrator familiar with the student's IEP" in order to (1) provide more specificity as to who should be consulted and (2) clarify that there is no expectation that the consultation must take place in the context of an additional IEP team meeting.

The second concern is that while it is reasonable to have the Title IX coordinator consult with a school administrator familiar with the IEP of a student who is a complainant or respondent, the proposed wording states that the purpose of doing so is to ensure compliance with "the requirements of IDEA." Instead, in our view the purpose would be to ensure that the Title IX investigation properly considers the impact of the student's disability. The CDE recommends changing the proposed regulation to strike the reference to "to help ensure that recipient complies with the requirements of IDEA" and add language clarifying that the purpose of the consultation is to "ensure that the Title IX investigation properly considers any impact of the student's disability."

Similarly, we have a concern regarding the language in the proposed 34 CFR 106.8(e) that states that if a student with a disability covered by Section 504 of the Rehabilitation Act is either the complainant or the respondent, the Title IX coordinator must consult with the "group of persons responsible for the student's placement decision," or "Section 504 team," to help ensure compliance with Section 504 throughout the Title IX investigative process. First, while IDEA specifically provides for an IEP team, IEP team meetings, and written IEPs, the Section 504 regulations do not specifically provide for a particular group of persons who are responsible for the student's placement or who would make up a student's "Section 504 team," nor do they specifically provide for Section 504 team meetings or a written Section 504 plan. We suggest that the references to a "group of persons responsible for the student's placement" and a "Section 504 team" be removed and replaced with a reference to a "a

school administrator familiar with the student's disability and written 504 plan, if any." Second, we recommend removing the reference to "to help ensure that the recipient complies with the requirements of Section 504." Instead, language might be added to clarify that the purpose of the consultation is to "ensure that the Title IX investigation properly considers any impact of the student's disability."

August 25, 2022
Page 3

The proposed 34 CFR 106.10 expands the scope of Title IX to include any discrimination on the basis of sex, including discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. California currently has a robust complaint and appeal system in place to address these types of formal complaints. Expanding the scope of the Title IX regulations would be duplicative and may cause confusion at the school and district level for these kinds of formal complaints. Title IX regulations should explicitly allow for flexibility for states like California that already have systems in place to address discrimination complaints to the same high standards set out in the rule. The California Code of Regulations, Title 5 (5 CCR), Section 4600 et seq. establishes Uniform Complaint Procedures (UCP) to be followed for complaints of discrimination, harassment, intimidation, and/or bullying based on a protected class. The regulations require each local educational agency (LEA) to adopt policies and procedures for accepting and investigating complaints of discrimination, harassment, intimidation, and/or bullying based on a protected characteristic. When investigating, LEAs must submit an investigation report to complainants within 60 days. In addition, California has established a state appeal process by which complainants may appeal the LEA's investigation report.

California greatly appreciates the opportunity to provide comment and support of the Title IX proposed rule. We believe it is vital to protect all students and staff in order to advance educational equity and opportunity for all. If additional information regarding this request is needed, please contact Joseph Saenz, Federal Policy Liaison, Government Affairs Division, by telephone at 916-591-6391 or by email at [ HYPERLINK "mailto:jsaenz@cde.ca.gov" ].

Sincerely,



Malia Vella
Deputy Superintendent of Superintendent's Initiatives
California Department of Education

**National PTA**
*every child. one voice.®*

September 1, 2022

*Submitted via www.regulations.gov*

Dr. Miguel Cardona                          Catherine E. Lhamon
Secretary of Education                       Assistant Secretary, Office for Civil Rights
U.S. Department of Education              U.S. Department of Education
400 Maryland Ave SW                         400 Maryland Ave SW
Washington, DC 20202                        Washington, DC 20202

**Re: ED Docket No. ED-2021-OCR-0166, RIN 1870-AA16, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance.**

Dear Secretary Cardona and Assistant Secretary Lhamon:

On behalf of the National Parent Teacher Association and our millions of members nationwide, we appreciate the opportunity to comment on the U.S. Department of Education's proposed rule implementing Title IX of the Education Amendments of 1972. Based on our experience working in schools and for children across the country, we believe the proposed rule represents a critical step towards helping to decrease harassment in our schools and ensure that schools are safe, supportive and inclusive environments for all of our students.

PTA is the oldest and largest child advocacy association in America, comprised of millions of parents, teachers, grandparents, caregivers, foster parents and other caring adults who share a commitment to improving the education, health and safety of all children. Our association believes all children deserve the opportunity to reach their full potential in safe and welcoming environments. As such, we support federal policies that protect against sexual harassment and sex discrimination in education, including policies that specifically protect LGBTQI+ youth, and local practices that create and maintain safe, affirming, and inclusive learning environments for all students.

**Response to Sexual Harassment & Sexual Violence Affecting Students**

National PTA and its constituent associations have long believed that every child deserves to go to school excited to learn in a safe and nurturing environment, without the fear of bullying, violence or discrimination. To that end, we support the strengthening of Title IX and other federal, state and local laws that identify, address the effects of, and prohibit sexual harassment and sexual violence impacting students. Our PTAs collaborate with school administrations, institutions of higher learning, and community partners to ensure that every school provides support services for victims of sexual harassment and sexual violence, presents awareness and prevention programs that address sexual harassment and sexual violence affecting students, and include training on the

AR_088215



responsibilities of educational institutions, as well as the rights of sexual violence and sexual harassment victims under Title IX and other laws and regulations.

The rule proposed by the Department of Education would strengthen Title IX protections in schools, clarify the responsibilities of educational institutions when sexual harassment occurs, encourage schools to provide support services for victims of sexual harassment and sexual violence, and require schools establish grievance procedures that are prompt and equitable. In particular, the proposed rule requires schools to address all types of sex-based harassment including those that occur on school grounds, or during school activities off campus and abroad. It requires schools to address the hostile environment created on campus even if the harassment occurred off-campus. It requires action from the school whenever the incident is so "severe" or "pervasive" that it limits a student's access to education, thereby violating the Title IX protection that "No person in the United States shall, on the basis of sex...be denied the benefits of...any education program or activity receiving Federal financial assistance."

Sexual harassment has devastating effects on students by negatively impacting their emotional and physical well-being, ultimately acting as a barrier to equal and free access to public education. Moreover, women and girls of color, disabled survivors, and LGBTQI+ survivors are at a disproportionately high risk of being denied the benefits of an education due to sexual harassment, as they face stereotypes casting them as less credible when they report sexual misconduct. Research shows that, of available reporting statistics, up to forty percent (40%) of middle and high school students report being victims of sexual violence or sexual harassment, but that this number is likely much higher because it does not account for the vast underreporting of sexual harassment. Research further indicates educational institutions are the most common location of peer sexual victimization. This reporting underscores the need for a fully inclusive definition of sexual harassment that encourages students to come forward when they are being harassed rather than remaining silent and potentially making them vulnerable to continued or escalating harassment and assault.

As experts in the field of family engagement and effective family-school partnerships, we also encourage the Department to include language in the final rule that ensures that the development of grievance procedures include parents, families, community members, students and other stakeholders. School community members are entitled to a transparent grievance procedure development process with ample opportunity to offer input and feedback. National PTA will continue to urge and support family engagement in schools and as it pertains to the development of grievance procedures that keep all students safe. We hope the Department will join in this important effort.

## Recognition of LGBTQ Individuals as a Protected Class

National PTA and its constituent associations believe that all children and youth should be able to attend school in a safe and inclusive environment free from discrimination and

AR_088216



violence. However, the reality is that too many LGBTQI+ students are bullied, are physically assaulted, and feel unsafe in school because of their actual or perceived sexual orientation or gender identity. We are committed to advocating for policies and protections for LGBTQI+ youth to make sure they have positive school experiences and the opportunity to reach their full potential.

We support the Department's proposed Title IX rule requiring schools to support students who report sex discrimination, by providing them with supportive measures and investigate complaints, and clarifying that anti-LGBTQI+ discrimination is prohibited sex discrimination under Title IX, including discrimination based on sexual orientation, gender identity, and sex characteristics (like intersex traits). Enumeration is essential to protecting as many students as possible from bullying, harassment and discrimination. The strength of an enumerated law or policy is that it underscores those students who research shows are most likely to be bullied and harassed and least likely to be protected under non-enumerated anti-bullying laws and policies. Enumeration provides teachers and school personnel with the tools they need to implement anti-bullying and harassment policies, making it easier for them to prevent bullying and intervene when incidents occur. Given that so many states have sought to pass laws—with many succeeding—threatening the well-being, safety, and educational opportunities of LGBTQI+ youth, it has become increasingly urgent for the Department to make clear that Title IX protects LGBTQI+ students from discrimination, harassment, violence, and bullying. In light of this, we strongly support the proposed Title IX rule clarifying that schools must protect students' access to sex-separated school activities and facilities, including bathrooms and locker rooms, consistent with their gender identity. This clarification will strengthen enforcement of Title IX's protection that no student be "excluded from participation in" "any education program or activity receiving Federal financial assistance" "on the basis of sex."

We also ask the Department to ensure that schools are required to enumerate sexual orientation, gender identity, sex characteristics, and sex stereotypes in their official nondiscrimination policies, and that these policies be made available and accessible to families in the community. We know that harassment and bullying policies that specifically mention sexual orientation, gender identity and gender expression are associated with: students feeling more safe; lower levels of bullying; decreased incidents of harassment related to sexual orientation; increased teacher/staff intervention; and a greater reporting of incidents. Indeed, the National School Climate survey shows that LGBTQ students in schools with enumerated policies were more than twice as likely to report that teachers intervened regularly compared to students in schools with generic anti-bullying policies, and more than three times as likely compared to students in schools with no policy at all. Our families, students, educators, school staff, administrators, and advocates need to understand their rights and responsibilities under Title IX, and ensuring that school policies on discrimination, harassment, and bullying are fully transparent and accessible is of critical importance to our association in their

AR_088217

**National PTA**
*everychild.onevoice.*®

efforts to help create safe, supportive, and inclusive schools and a positive school climate for all.

We appreciate the opportunity to provide comments on the Department's proposed Title IX rule and encourage the Department to ensure that parents, families, students and other stakeholders are fully engaged throughout the Title IX process. Our association believes all children deserve the opportunity to reach their full potential in safe and welcoming environments, and believe the proposals outlined above represent steps towards that goal. Please contact Kate Clabaugh, National PTA Director of Government Affairs, at kclabaugh@pta.org or (703) 944-1026 to answer any questions or provide further input as needed.

Sincerely,

Anna King
President
National PTA

Nathan R. Monell, CAE
Executive Director
National PTA

AR_088218



September 12, 2022

Assistant Secretary Catherine Lhamon
Office for Civil Rights
U.S. Department of Education

**Re: Docket ID ED-2021-OCR-0166**

Dear Assistant Secretary Lhamon,

Child Trends is a highly respected, nonpartisan research organization focused exclusively on improving the lives and prospects of children, youth, and their families. For more than 40 years, decision makers have relied on our rigorous research, unbiased analyses, and clear communication to improve public policies and interventions that serve children and families. Our researchers and evaluators have a deep bench of experience advising local, state, and federal agencies on how to advance education equity within our nation's schools, and how to create safer, more supportive school environments for our nation's children.

On July 17, 2022, the Office for Civil Rights (OCR) published proposed regulations regarding *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance.* The proposed regulations would restore and extend sexual harassment protections for students in both K-12 and higher education settings under Title IX of the Education Amendments of 1972. The proposed regulations are broadly consistent with research-based best practices for supporting students who have experienced harassment and would restore alignment between state anti-bullying and anti-harassment statutes and federal civil rights enforcement. Because Child Trends' education work has primarily focused on students in K-12 settings, our comments focus primarily on the implications for students in these settings.

Below, we detail our support for five of the proposed revisions to the regulation: (1) restoring the definition of harassment to align with other federal civil rights enforcement and state anti-bullying and anti-harassment statutes; (2) more explicitly including sexual orientation, gender identity, and pregnancy status under protections based on sex; (3) reducing barriers for students to report their experiences of harassment and receive assistance; (4) excluding confidential employees from reporting requirements; and (5) reorganizing and clarifying administrative and reporting requirements.

**Child Trends supports the proposed regulations' definition of harassment, which better aligns with enforcement of other civil rights laws (e.g., Title VI, IDEA), state anti-bullying and anti-harassment statutes, and OCR's historic implementation guidance.**

The 2020 regulations, currently in effect, use an unduly high bar for determining when behavior is considered harassment: They rely largely on court standards for issuing monetary damages rather than administrative enforcement.[1]

Prior to the 2020 regulations, though, the U.S. Department of Education (USED) consistently used the definition of harassment contained in the proposed regulations—namely, that harassment is behavior that "... creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school."[2] This definition is provided in at least six guidance documents issued by USED from 1994 to 2014, providing consistent protections under Title IX, Title VI, and the Individuals with Disabilities Education Act for harassment based on sex; race, color, or national origin; and disability, respectively. Schools have applied this broader definition since at least 1994. Moreover, this definition is reflected in the vast majority of state anti-bullying and anti-harassment statutes and regulations.[3]

The 2020 regulations—in which the definition of harassment contained in Title IX regulations is stricter than other federal civil rights laws and state statutes—establish a higher burden of harm for sexual harassment than for other forms of harassment, and places schools in the position of being legally mandated to hold different standards depending on the type of harassment incident. The proposed regulation would return consistency to the definition of harassment and help ensure that students receive support regardless of whether harassment is based on sex or another enumerated characteristic.

**Child Trends strongly supports the explicit inclusion of harassment based on sexual orientation and gender identity in the definition of sex-based harassment.**

Students who identify as lesbian, gay, bisexual, or transgender (LGBT) consistently report being bullied or harassed at significantly higher rates than their heterosexual and cisgender peers.[4] In 2010, USED made clear that Title IX protects students from harassment based on gender stereotypes, which includes much of the harassment LGBT students may face.[5] However, the existing Title IX regulations do not enumerate protections for LGBT students. Over the past decade, several research studies have demonstrated that clearly and specifically enumerating protections against harassment based on sexual orientation and gender identity reduces rates of bullying and suicidality—not only for LGBT students but

---

[1] U.S. Department of Education, Office for Civil Rights' response to the National School Boards Association, 2011. https://cdn-files.nsba.org/s3fs-public/reports/ED_Response_-_NSBA_Bullying_Letter_2011.pdf?4UUksgR3RQaYuOc0N8_ykcb8qwBnqikE

[2] U.S. Department of Education, Dear Colleague Letter on Bullying and Harassment 2010. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf. See also: harassment guidance from 1994, 1997, 2000, 2001, 2008, and 2014.

[3] National Association of State Boards of Education (2021). State Policy Database on School Health. https://statepolicies.nasbe.org/health/categories/social-emotional-climate/bullying-harassment-and-intimidation-policy

[4] Pampati, S., Andrzejewski, J., Sheremenko, G., Johns, M., Lesesne, C., & Rasberry, C. (2020). School Climate Among Transgender High School Students: An Exploration of School Connectedness, Perceived Safety, Bullying, and Absenteeism. *Journal of School Nursing*, 36(4): 293-303. https://stacks.cdc.gov/view/cdc/105974/cdc_105974_DS1.pdf

[5] Ibid 2

for all students.[6] Still, as of 2021, only 24 states included enumerated protections for sexual orientation and gender identity as part of their anti-bullying or anti-harassment statutes and regulations for schools.[7] Providing such enumeration in Title IX regulations would codify USED's existing practices and further affirm schools' responsibility to address harassment based on sexual orientation and gender identity.

Additionally, enumerating Title IX regulations to include sexual orientation and gender identity may support students' ability to create safe spaces for LGBT students. Gender and sexuality alliances (also known as gay-straight alliances or GSAs) are affinity groups, created by students, that have demonstrated evidence of improving students' senses of belonging, improving school climate, and reducing bullying and harassment.[8] As of 2018, only nine states and the District of Columbia had GSAs in more than half of their secondary schools.[9] In 2011, USED made clear that the Equal Access Act protects students' rights to form a GSA, provided that a school allows other such student-initiated groups.[10] However, students across the country have faced growing barriers in their efforts to form GSAs.[11] Where student GSA organizers have encountered opposition to their affinity group, the opposition could potentially be considered harassment under the proposed Title IX regulations; as such, the proposed regulations could provide a critical foundation from which students can continue to form these affirming and preventative clubs.

**Child Trends supports the proposed regulation's return to requiring schools to address harassment for which school staff have constructive knowledge, rather than the more narrow "actual knowledge" and "deliberate indifference" standard.**

---

[6] Hatzenbuehler, M. L., Flores, J. E., Cavanaugh, J. E., Onwuachi-Willig, A., & Ramirez, M. R. (2017). Anti-bullying policies and disparities in bullying: A state-level analysis. *American journal of preventive medicine*, 53(2), 184-191.; Hatzenbuehler, M. L., & Keyes, K. M. (2013). Inclusive anti-bullying policies and reduced risk of suicide attempts in lesbian and gay youth. *Journal of Adolescent Health*, 53(1), S21-S26; Meyer, I. H., Luo, F., Wilson, B. D., & Stone, D. M. (2019). Sexual orientation enumeration in state antibullying statutes in the United States: Associations with bullying, suicidal ideation, and suicide attempts among youth. *LGBT health*, 6(1), 9-14.; Russell, S. T., Day, J. K., Ioverno, S., & Toomey, R. B. (2016). Are school policies focused on sexual orientation and gender identity associated with less bullying? Teachers' perspectives. *Journal of school psychology*, 54, 29-38.
[7] Temkin, D., Lao, K., Nuñez, B., Kelley, C., Kelley, S., & Stuart-Cassel, V. (2022). Most state policies that address LGBTQ+ students in schools are affirming despite recent trends toward exclusion. Child Trends. DOI: 10.56417/8595e2094d
[8] Poteat, V. P., Sinclair, K. O., DiGiovanni, C. D., Koenig, B. W., & Russell, S. T. (2013). Gay–straight alliances are associated with student health: A multischool comparison of LGBTQ and heterosexual youth. *Journal of Research on Adolescence*, 23(2), 319-330.; Ioverno, S., Belser, A. B., Baiocco, R., Grossman, A. H., & Russell, S. T. (2016). The protective role of gay–straight alliances for lesbian, gay, bisexual, and questioning students: A prospective analysis. *Psychology of sexual orientation and gender diversity*, 3(4), 397.
[9] Gabriel, A., Stratford, B., Steed, H. (2021). Only 9 states and DC Report That More Than Half of Secondary Schools Have a Gender and Sexuality Alliance. Child Trends. https://www.childtrends.org/blog/only-9-states-and-the-district-of-columbia-report-that-more-than-half-of-secondary-schools-have-a-gender-and-sexuality-alliance
[10] See, Department of Education, Key Policy Letters from the Education Secretary and Deputy Secretary, 2011. https://www2.ed.gov/policy/elsec/guid/secletter/110607.html
[11] Natanson, H. (2022). LGBTQ clubs were havens for students. Now they're under attack. *The Washington Post*. https://www.washingtonpost.com/education/2022/06/28/gay-straight-alliance-indoctrination-school-club/

More than half of students who report being bullied on USED's School Crime Supplement to the National Crime Victimization Survey have never told an adult about their experiences.[12] Moreover, if and when a student who has been harassed or bullied does tell an adult, that adult must have an existing, strong relationship with the student. Students might approach any adult in the school building.[13] As such, limiting protections under Title IX to incidents for which schools have "actual knowledge" through only a limited number of school staff creates an unreasonably high standard under which many students who are experiencing harassment are left unprotected. The proposed regulations would return to a standard in which schools are obligated to address harassment about which they reasonably should know, including harassment reported to any nonconfidential employee; this will help ensure that schools take action on more cases of harassment.

**Child Trends supports the exclusion of confidential employees from reporting requirements but recommends expanding this exclusion to include those collecting research approved by an Institutional Review Board.**

Child Trends strongly recommends expanding the definition of employees protected under this category to not only include employees at postsecondary institutions, but also those at research institutions that are not associated with an institute of higher education, who may be collecting research in partnership with or contracted by a school system. For example, Child Trends is an independent, nonprofit research organization (501(c)3) that frequently conducts research in schools, including research on harassment and bullying; all research on human subjects must be reviewed by Child Trends' internal Institutional Review Board. Under the proposed definition of confidential employee, it is unclear whether harassment data collected by an independent organization such as Child Trends would be subject to reporting under Title IX when such data collection is done at the request of the school system. We strongly suggest revising the definition to eliminate reference to postsecondary institutions and instead apply it to any individual or entity conducting research approved by an IRB.

**Child Trends supports the reorganization and renaming of the administrative requirements section of the regulations to emphasize the importance of Title IX training that does not rely on sex stereotypes—including racialized sex stereotypes—and to broaden record-keeping requirements that ensure recipients operate education programs and activities free from racialized sex discrimination.**

Sex stereotypes that can introduce bias in Title IX sexual assault and harassment proceedings are complex and intersect with race and other dimensions of social identity in ways that may place particular groups of students at disproportionate risk. These stereotypes often portray women as "victims" and men as "perpetrators," despite research demonstrating that this is an oversimplification of people involved in nonconsensual sexual contact.[14] For Black male adolescents and young adults, the

---

[12] Burns, E., Mann, R., & Yanez, C. (2022). Student Reports of Bullying: Results From the 2019 School Crime Supplement to the National Crime Victimization Survey. *National Center for Education Statistics*. https://nces.ed.gov/pubs2022/2022031.pdf

[13] Blomqvist, K., Saarento-Zaprudin, S., & Salmivalli, C. (2020). Telling adults about one's plight as a victim of bullying: Student-and context-related factors predicting disclosure. Scandinavian journal of psychology, 61(1), 151-159.; Espelage, D. L., Rulison, K. L., Ingram, K. M., Valido, A., Schmeelk-Cone, K., & Wyman, P. A. (2022). Social networks of adolescent sexual violence perpetrators: peer friendship and trusted adult characteristics. Prevention science, 23(1), 154-166.

[14] Stemple, L., Flores, A., & Meyer, I. H. (2017). Sexual victimization perpetrated by women: Federal data reveal surprising prevalence. Aggression and Violent Behavior, 34, 302-311.

sex-based stereotype of sexual predator is particularly prevalent[15] and may place them at disproportionate risk of identification as respondents in Title IX sexual assault and harassment cases and for harsher disciplinary sanctions.[16] Beyond college campuses, available research, data, and history have clearly shown that Black men have long been victims of false accusations of rape.[17] However, as college campuses have not been required to collect data that allow for disaggregation by race and gender, the prevalence of Title IX complaints targeting Black men is not currently known.

Given the strong possibility of racial bias in Title IX sexual assault and harassment claims and proceedings and the personal and educational ramifications for both complainants and respondents, we recommend that recipients' Title IX training be required to comprehensively address racialized sex stereotypes. Relatedly, we support plans for broadening record-keeping requirements to cover records related to a recipient's actions in response to all forms of sex discrimination—not only sexual harassment—and for maintaining the seven-year retention period for records and the general types of records described in the current regulations. Additionally, to bring greater transparency to Title IX sexual assault and harassment processes and to ensure equitable application of supportive measures, remedies, and disciplinary sanctions, we suggest that recipients also be required to collect data on the race, ethnicity, gender, sexual orientation, and disability status of complainants and respondents. These data should be available for review and analysis by the recipients, and by external researchers, to monitor for patterns of bias—thereby helping recipients fulfill "Title IX and OCR's commitment to ensuring equal and nondiscriminatory access to education for students at all educational levels."

We appreciate the opportunity to provide comments and suggestions regarding *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, and we are able to expand on any of these points. For any questions regarding this letter, please contact Deborah Temkin, deputy chief operating officer and vice president for education and youth development at Child Trends (dtemkin@childtrends.org).

Sincerely,


/s/


Carol Emig
President
Child Trends

---

[15] Yoffe., E. (2017). *The Question of Race in Campus Sexual-Assault Cases*. The Atlantic. https://www.theatlantic.com/education/archive/2017/09/the-question-of-race-in-campus-sexual-assault-cases/539361/
[16] Trachtenberg, B. (2017). How university Title IX enforcement and other discipline processes (probably) discriminate against minority students. Nev. LJ, 18, 107; Swan, S. L. (2020). Discriminatory dualism in process: title IX, reverse title ix, and campus sexual assault. Okla. L. Rev., 73, 69; Perry, L. (2021). From Brock Turner to Brian Banks: Protecting victims and preserving due process in the new area of Title IX. DePaul J. Soc. Just., 14, 1.
[17] Gross, S., Possley, M., Stephens, K. (2017). Race and wrongful convictions in the United States. National Registry of Exonerations. https://www.law.umich.edu/special/exoneration/Documents/Race_and_Wrongful_Convictions.pdf



**THE REPORT OF THE**

# 2015 U.S. TRANSGENDER SURVEY



National Center for
TRANSGENDER
EQUALITY

AR_216995

## About the National Center for Transgender Equality

The National Center for Transgender Equality (NCTE) is the nation's leading social justice policy advocacy organization devoted to ending discrimination and violence against transgender people. NCTE was founded in 2003 by transgender activists who recognized the urgent need for policy change to advance transgender equality. NCTE now has an extensive record winning life-saving changes for transgender people. NCTE works by educating the public and by influencing local, state, and federal policymakers to change policies and laws to improve the lives of transgender people. By empowering transgender people and our allies, NCTE creates a strong and clear voice for transgender equality in our nation's capital and around the country.

© 2016 The National Center for Transgender Equality. We encourage and grant permission for the reproduction and distribution of this publication in whole or in part, provided that it is done with attribution to the National Center for Transgender Equality. Further written permission is not required.

## RECOMMENDED CITATION

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality.

# The Report of the
# 2015 U.S. Transgender Survey

by:

Sandy E. James

Jody L. Herman

Susan Rankin

Mara Keisling

Lisa Mottet

Ma'ayan Anafi

**December 2016**

AR_216997

# Table of Contents

Acknowledgements ....................................................................................................1

Executive Summary ...................................................................................................3

Chapter 1: Introduction .......................................................................................... 18

Chapter 2: Methodology ......................................................................................... 21

Chapter 3: Guide to Report and Terminology ....................................................39

Chapter 4: Portrait of USTS Respondents ..........................................................43

Chapter 5: Family Life and Faith Communities .................................................64

Chapter 6: Identity Documents ............................................................................ 81

Chapter 7: Health ...................................................................................................92

Chapter 8: Experiences at School....................................................................... 130

Chapter 9: Income and Employment Status...................................................... 139

Chapter 10: Employment and the Workplace .................................................... 147

Chapter 11: Sex Work and Other Underground Economy Work ...................... 157

Chapter 12: Military Service ................................................................................ 166

Chapter 13: Housing, Homelessness, and Shelter Access ............................... 175

Chapter 14: Police, Prisons, and Immigration Detention................................. 184

Chapter 15: Harassment and Violence ............................................................... 197

Chapter 16: Places of Public Accommodation and Airport Security............... 212

Chapter 17: Experiences in Restrooms ..............................................................224

Chapter 18: Civic Participation and Policy Priorities ...................................... 231

About the Authors................................................................................................. 241

Appendix A: Characteristics of the Sample........................................................243

Appendix B: Survey Instrument (Questionnaire) ............................................. 250

Appendix C: Detailed Methodology ................................................................... 291

# Acknowledgements

The report authors extend our gratitude to all the members of the transgender community who participated in the 2015 U.S. Transgender Survey and the hundreds of individuals and organizations that made this survey report possible.

The following individuals in particular are recognized for their contributions during one or more stages of the process, including survey development, implementation, distribution, data preparation and analysis, and reporting:

| | | | |
|---|---|---|---|
| Osman Ahmed | Andrew Cray | Chai Jindasurat | Gabriel Rodenborn |
| M. V. Lee Badgett | Kate D'Adamo | JoAnne Keatley | Shelby Rowe |
| Kellan Baker | Laura Durso | Elliot Kennedy | Brad Sears |
| Genny Beemyn | Jake Eleazer | Paul Lillig | Jama Shelton |
| Aaron Belkin | Gary J. Gates | Emilia Lombardi | Jillian Shipherd |
| Walter Bockting | Jaime Grant | Jenifer McGuire | Sharon Stapel |
| Kyler Broadus | Emily Greytak | Ilan Meyer | Michael Steinberger |
| David Chae | Ann Haas | Shannon Price Minter | Catalina Velasquez |
| Cecilia Chung | Jack Harrison-Quintana | Aaron Morris | Bianca Wilson |
| Loree Cook Daniels | Mark Hatzenbuehler | Asaf Orr | |
| Kerith Conron | Darby Hickey | Dylan Orr | |
| Ruby Corado | Lourdes Ashley Hunter | Sari Reisner | |

*The authors extend special gratitude to the following individuals for their contributions to the project:*

**Ignacio Rivera**, Survey Outreach Coordinator, for leading the survey outreach efforts and building a network of individuals and organizations that led to the unprecedented levels of participation in this survey.

**Andrew Flores** for assistance with questionnaire development and the weighting procedures to prepare the data for analysis.

**Daniel Merson** for continued work in cleaning the data set, re-coding the data, and providing population numbers for comparative purposes in the final report.

**Michael Rauch** for programming and implementation of the complex survey.

*Appreciation is also extended to **NCTE interns, law fellows, staff, and volunteers** who assisted with the project, including outreach across the country, development of outreach materials, and translation:*

| | | | |
|---|---|---|---|
| Bre Kidman | Mati Gonzalez Gil | Kory Masen | Cullen O'Keefe |
| Cyres Gibson | Romeo Jackson | Imari Moon | Nowmee Shehab |

*A special thanks is also extended to* **USTS Interns, Fellows, and Assistants** *for their work at various stages of the project:*

| | | | |
|---|---|---|---|
| Rodrigo Aguayo-Romero | Shabab Mirza | Jeymee Semiti | Venus Selenite |
| Willem Miller | Davida Schiffer | Danielle Stevens | |

*The authors also thank the* **USTS Advisory Committee** *(UAC) members, who devoted their time to the project by giving valuable recommendations around project development and community outreach:*

| | | | |
|---|---|---|---|
| Danni Askini | Brooke Cerda Guzman | Angelica Ross | Brynn Tannehill |
| Cherno Biko | Trudie Jackson | Nowmee Shehab | |
| Thomas Coughlin | Andrea Jenkins | Stephanie Skora | |

Additional acknowledgement goes to the **more than 300 transgender, LGBT, and allied organizations** that promoted and distributed the survey to its members throughout the country for completion.

*The authors also acknowledge current and former NCTE staff for their work on the project, particularly:*

**Theo George** and **Vincent Villano** for their pivotal work in survey project development and distribution through their respective roles in digital media and communication strategy.

**Arli Christian, Joanna Cifredo, K'ai Smith,** and **Harper Jean Tobin** for their contributions as report co-writers, including lending their subject-matter expertise and analysis to the findings included in this report.

*Various individuals and firms assisted in spreading the word about the survey, both prior to and during the data collection phase, and they also assisted with survey translation, design, and reporting. Thanks goes to:*

| | | |
|---|---|---|
| Sean Carlson | Anna Zuccaro | ThoughtWorks |
| Leah Furumo | Design Action Collective | TransTech Social Enterprises |
| Molly Haigh | Dewey Square Group | ZERN |

Additionally, NCTE would like to express special appreciation to **an anonymous donor** for providing the largest share of the funds needed to conduct and report on the U.S. Transgender Survey. Other important funders were the **Arcus Foundation**, the **Gill Foundation**, the **Human Rights Campaign Foundation**, and the **David Bohnett Foundation**. NCTE is also grateful to its other funders, many of which supported this project through general operating support, including the **Ford Foundation**, the **Evelyn & Walter Haas, Jr. Fund**, and the **Tides Foundation**.

Finally, NCTE would like to give special thanks to the **National LGBTQ Task Force**, for its previous partnership in conducting the National Transgender Discrimination Survey as a joint project from 2008 to 2011, as well as for its support of NCTE's re-development of it as the U.S. Transgender Survey.

AR_217000



# EXECUTIVE
## SUMMARY

# USTS Executive Summary

The 2015 U.S. Transgender Survey (USTS) is the largest survey examining the experiences of transgender people in the United States, with 27,715 respondents from all fifty states, the District of Columbia, American Samoa, Guam, Puerto Rico, and U.S. military bases overseas. Conducted in the summer of 2015 by the National Center for Transgender Equality, the USTS was an anonymous, online survey for transgender adults (18 and older) in the United States, available in English and Spanish. The USTS serves as a follow-up to the groundbreaking 2008–09 National Transgender Discrimination Survey (NTDS), which helped to shift how the public and policymakers view the lives of transgender people and the challenges they face. The report of the 2015 USTS provides a detailed look at the experiences of transgender people across a wide range of categories, such as education, employment, family life, health, housing, and interactions with the criminal justice system.

The findings reveal disturbing patterns of mistreatment and discrimination and startling disparities between transgender people in the survey and the U.S. population when it comes to the most basic elements of life, such as finding a job, having a place to live, accessing medical care, and enjoying the support of family and community. Survey respondents also experienced harassment and violence at alarmingly high rates. Several themes emerge from the thousands of data points presented in the full survey report.

## Pervasive Mistreatment and Violence

Respondents reported high levels of mistreatment, harassment, and violence in every aspect of life. One in ten (10%) of those who were out to their immediate family reported that a family member was violent towards them because they were transgender, and 8% were kicked out of the house because they were transgender.

The majority of respondents who were out or perceived as transgender while in school (K–12) experienced some form of mistreatment, including being verbally harassed (54%), physically attacked (24%), and sexually assaulted (13%) because they were transgender. Further, 17% experienced such severe mistreatment that they left a school as a result.

In the year prior to completing the survey, 30% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or expression, such as being verbally harassed or physically or sexually assaulted at work.

AR_217002

In the year prior to completing the survey, 46% of respondents were verbally harassed and 9% were physically attacked because of being transgender. During that same time period, 10% of respondents were sexually assaulted, and nearly half (47%) were sexually assaulted at some point in their lifetime.

# Severe Economic Hardship and Instability

The findings show large economic disparities between transgender people in the survey and the U.S. population. Nearly one-third (29%) of respondents were living in poverty, compared to 12% in the U.S. population. A major contributor to the high rate of poverty is likely respondents' 15% unemployment rate—three times higher than the unemployment rate in the U.S. population at the time of the survey (5%).

Respondents were also far less likely to own a home, with only 16% of respondents reporting homeownership, compared to 63% of the U.S. population. Even more concerning, nearly one-third (30%) of respondents have experienced homelessness at some point in their lifetime, and 12% reported experiencing homelessness in the year prior to completing the survey because they were transgender.

# Harmful Effects on Physical and Mental Health

The findings paint a troubling picture of the impact of stigma and discrimination on the health of many transgender people. A staggering 39% of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population. Among the starkest findings is that 40% of respondents have attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population (4.6%).

Respondents also encountered high levels of mistreatment when seeking health care. In the year prior to completing the survey, one-third (33%) of those who saw a health care provider had at least one negative experience related to being transgender, such as being verbally harassed or refused treatment because of their gender identity. Additionally, nearly one-quarter (23%) of respondents reported that they did not seek the health care they needed in the year prior to completing the survey due to fear of being mistreated as a transgender person, and 33% did not go to a health care provider when needed because they could not afford it.

AR_217003

# The Compounding Impact of Other Forms of Discrimination

When respondents' experiences are examined by race and ethnicity, a clear and disturbing pattern is revealed: transgender people of color experience deeper and broader patterns of discrimination than white respondents and the U.S. population. While respondents in the USTS sample overall were more than twice as likely as the U.S. population to be living in poverty, people of color, including Latino/a (43%), American Indian (41%), multiracial (40%), and Black (38%) respondents, were more than three times as likely as the U.S. population (12%) to be living in poverty. The unemployment rate among transgender people of color (20%) was four times higher than the U.S. unemployment rate (5%). People of color also experienced greater health disparities. While 1.4% of all respondents were living with HIV—nearly five times the rate in the U.S. population (0.3%)—the rate among Black respondents (6.7%) was substantially higher, and the rate for Black transgender women was a staggering 19%.

Undocumented respondents were also more likely to face severe economic hardship and violence than other respondents. In the year prior to completing the survey, nearly one-quarter (24%) of undocumented respondents were physically attacked. Additionally, one-half (50%) of undocumented respondents have experienced homelessness in their lifetime, and 68% have faced intimate partner violence.

Respondents with disabilities also faced higher rates of economic instability and mistreatment. Nearly one-quarter (24%) were unemployed, and 45% were living in poverty. Transgender people with disabilities were more likely to be currently experiencing serious psychological distress (59%) and more likely to have attempted suicide in their lifetime (54%). They also reported higher rates of mistreatment by health care providers (42%).

# Increased Visibility and Growing Acceptance

Despite the undeniable hardships faced by transgender people, respondents' experiences also show some of the positive impacts of growing visibility and acceptance of transgender people in the United States.

One such indication is that an unprecedented number of transgender people—nearly 28,000—completed the survey, more than four times the number of respondents in the 2008–09 NTDS. This number of transgender people who elevated their voices reflects the historic growth in visibility that the transgender community has seen in recent years. Additionally, this growing visibility has lifted up not only the voices of transgender men and women, but also people who are non-binary, which is a term that is often used to describe

AR_217004

people whose gender identity is not exclusively male or female, including those who identify as having no gender, a gender other than male or female, or more than one gender. With non-binary people making up over one-third of the sample, the need for advocacy that is inclusive of all identities in the transgender community is clearer than ever.

Respondents' experiences also suggest growing acceptance by family members, colleagues, classmates, and other people in their lives. More than half (60%) of respondents who were out to their immediate family reported that their family was supportive of them as a transgender person. More than two-thirds (68%) of those who were out to their coworkers reported that their coworkers were supportive. Of students who were out to their classmates, more than half (56%) reported that their classmates supported them as a transgender person.

O verall, the report provides evidence of hardships and barriers faced by transgender people on a day-to-day basis. It portrays the challenges that transgender people must overcome and the complex systems that they are often forced to navigate in multiple areas of their lives in order to survive and thrive. Given this evidence, governmental and private institutions throughout the United States should address these disparities and ensure that transgender people are able to live fulfilling lives in an inclusive society. This includes eliminating barriers to quality, affordable health care, putting an end to discrimination in schools, the workplace, and other areas of public life, and creating systems of support at the municipal, state, and federal levels that meet the needs of transgender people and reduce the hardships they face. As the national conversation about transgender people continues to evolve, public education efforts to improve understanding and acceptance of transgender people are crucial. The rates of suicide attempts, poverty, unemployment, and violence must serve as an immediate call to action, and their reduction must be a priority. Despite policy improvements over the last several years, it is clear that there is still much work ahead to ensure that transgender people can live without fear of discrimination and violence.

AR_217005

# Overview of Key Findings

## Family Life and Faith Communities

- **A majority of respondents (60%) who were out to the immediate family they grew up with said that their family was generally supportive of their transgender identity**, while 18% said that their family was unsupportive, and 22% said that their family was neither supportive nor unsupportive.

- **Those who said that their immediate families were supportive were less likely to report a variety of negative experiences related to economic stability and health**, such as experiencing homelessness, attempting suicide, or experiencing serious psychological distress**.**



Negative experiences among those with supportive and unsupportive families

- **One in ten (10%)** respondents who were out to their immediate family reported that **a family member was violent towards them** because they were transgender.

- **One in twelve (8%)** respondents who were out to their immediate family **were kicked out of the house**, and one in ten (10%) ran away from home.

- **Nineteen percent (19%) of respondents who had ever been part of a spiritual or religious community left due to rejection**. Forty-two percent (42%) of those who left later found a welcoming spiritual or religious community.

AR_217006

# Identity Documents

- **Only 11% of respondents reported that** *all* **of their IDs had the name and gender they preferred, while more than two-thirds (68%) reported that** *none* **of their IDs had the name and gender they preferred.**



**Updated name or gender on ID**
OUT OF THOSE WHO HAD ID AND WANTED TO UPDATE IT (%)

Driver's license/state-issued ID — 44% / 29%
Social Security records — 43% / 23%
Student records (current or last school attended) — 31% / 18%
Passport — 28% / 18%
Birth certificate — 18% / 9%

■ Updated name    ▨ Updated gender

- **The cost of changing ID documents was one of the main barriers respondents faced**, with 35% of those who have not changed their legal name and 32% of those who have not updated the gender on their IDs reporting that it was because they could not afford it.
- Nearly **one-third (32%)** of respondents **who have shown an ID with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.**

# Health Insurance and Health Care

- **One in four (25%) respondents experienced a problem in the past year with their insurance related to being transgender,** such as being denied coverage for care related to gender transition or being denied coverage for routine care because they were transgender.

- **More than half (55%) of those who sought coverage for transition-related surgery in the past year were denied,** and 25% of those who sought coverage for hormones in the past year were denied.

- **One-third (33%) of those who saw a health care provider in the past year reported having at least one negative experience related to being transgender,** with higher rates for people of color and people with disabilities. This included being refused treatment, verbally harassed, or physically or sexually assaulted, or having to teach the provider about transgender people in order to get appropriate care.

- In the past year, **23% of respondents did not see a doctor when they needed to because of fear of being mistreated as a transgender person,** and 33% did not see a doctor when needed because they could not afford it.

# Psychological Distress and Attempted Suicide

- **Thirty-nine percent (39%) of respondents experienced serious psychological distress** in the month before completing the survey (based on the Kessler 6 Psychological Distress Scale), compared with only 5% of the U.S. population.

- **Forty percent (40%) have attempted suicide** *in their lifetime,* **nearly nine times the rate in the U.S. population (4.6%).**

- **Seven percent (7%) attempted suicide** *in the past year*—**nearly twelve times the rate in the U.S. population (0.6%).**

# HIV

- Respondents were **living with HIV (1.4%) at nearly five times the rate in the U.S. population (0.3%).**

- **HIV rates were higher among transgender women (3.4%),** especially transgender women of color. **Nearly one in five (19%) Black transgender women were living with HIV,** and American Indian (4.6%) and Latina (4.4%) women also reported higher rates.

10

AR_217008

# Experiences in Schools

- **More than three-quarters (77%)** of those who were out or perceived as transgender at some point between Kindergarten and Grade 12 (K–12) **experienced some form of mistreatment**, such as being verbally harassed, prohibited from dressing according to their gender identity, disciplined more harshly, or physically or sexually assaulted because people thought they were transgender.

- **Fifty-four percent (54%)** of those who were out or perceived as transgender in K–12 **were verbally harassed, nearly one-quarter (24%) were physically attacked, and 13% were sexually assaulted in K–12 because of being transgender.**

- **Seventeen percent (17%) faced such severe mistreatment as a transgender person that they left a K–12 school.**

- **Nearly one-quarter (24%)** of people who were out or perceived as transgender in college or vocational school **were verbally, physically, or sexually harassed.**



**Experiences of people who were out as transgender in K–12 or believed classmates, teachers, or school staff thought they were transgender**

| EXPERIENCES | % OF THOSE WHO WERE OUT OR PERCEIVED AS TRANSGENDER |
|---|---|
| Verbally harassed because people thought they were transgender | 54% |
| Not allowed to dress in a way that fit their gender identity or expression | 52% |
| Disciplined for fighting back against bullies | 36% |
| Physically attacked because people thought they were transgender | 24% |
| Believe they were disciplined more harshly because teachers or staff thought they were transgender | 20% |
| Left a school because the mistreatment was so bad | 17% |
| Sexually assaulted because people thought they were transgender | 13% |
| Expelled from school | 6% |
| **One or more experiences listed** | **77%** |

AR_217009

# Income and Employment Status

- **The unemployment rate among respondents (15%) was three times higher than the unemployment rate in the U.S. population (5%),** with Middle Eastern, American Indian, multiracial, Latino/a, and Black respondents experiencing higher rates of unemployment.



**Unemployment rate**
RACE/ETHNICITY (%)

- **Nearly one-third (29%) were living in poverty, more than twice the rate in the U.S. population (12%).**

# Employment and the Workplace

- **One in six (16%)** respondents who have ever been employed—or 13% of all respondents in the sample—**reported losing a job because of their gender identity or expression** in their lifetime.

- **In the past year, 27%** of those who held or applied for a job during that year—19% of all respondents—**reported being fired, denied a promotion, or not being hired for a job they applied for because of their gender identity or expression.**

- **Fifteen percent (15%) of respondents who had a job in the past year were verbally harassed, physically attacked, and/or sexually assaulted** at work because of their gender identity or expression.

- **Nearly one-quarter (23%) of those who had a job in the past year reported other forms of mistreatment** based on their gender identity or expression during that year,

such as being forced to use a restroom that did not match their gender identity, being told to present in the wrong gender in order to keep their job, or having a boss or coworker share private information about their transgender status without their permission.

- **Overall, 30% of respondents who had a job in the past year reported being fired, denied a promotion, or experiencing some other form of mistreatment related to their gender identity or expression.**

- **More than three-quarters (77%)** of respondents who had a job in the past year **took steps to avoid mistreatment in the workplace**, such as hiding or delaying their gender transition or quitting their job.

## Housing, Homelessness, and Shelter Access

- **Nearly one-quarter (23%) of respondents experienced some form of housing discrimination in the past year**, such as being evicted from their home or denied a home or apartment because of being transgender.

- **Nearly one-third (30%) of respondents have experienced homelessness at some point in their lives.**

- **In the past year, one in eight (12%) respondents experienced homelessness** because of being transgender.

- **More than one-quarter (26%) of those who experienced homelessness in the past year avoided staying in a shelter because they feared being mistreated as a transgender person**. Those who did stay in a shelter reported high levels of mistreatment: **seven out of ten (70%)** respondents who stayed in a shelter in the past year reported some form of mistreatment, including being harassed, sexually or physically assaulted, or kicked out because of being transgender.

**Seven out of ten respondents who stayed in a shelter in the past year reported being mistreated because of being transgender.**



- Respondents were nearly **four times less likely to own a home (16%) compared to the U.S. population (63%)**.

AR_217011

# Sex Work and Other Underground Economy Work

- Respondents reported high rates of experience in the underground economy, including sex work, drug sales, and other work that is currently criminalized. **One in five (20%) have participated in the underground economy** for income at some point in their lives—including 12% who have done sex work in exchange for income—and 9% did so in the past year, with higher rates among women of color.

- Respondents who interacted with the police either while doing sex work or while the police mistakenly thought they were doing sex work reported high rates of police harassment, abuse, or mistreatment, with **nearly nine out of ten (86%) reporting being harassed, attacked, sexually assaulted, or mistreated in some other way by police**.

- **Those who have done income-based sex work were also more likely to have experienced violence.** More than three-quarters (77%) have experienced intimate partner violence and 72% have been sexually assaulted, a substantially higher rate than the overall sample. Out of those who were working in the underground economy at the time they took the survey, nearly half (41%) were physically attacked in the past year and over one-third (36%) were sexually assaulted during that year.

# Police Interactions and Prisons

- **Respondents experienced high levels of mistreatment and harassment by police.** In the past year, of respondents who interacted with police or law enforcement officers who thought or knew they were transgender, **more than half (58%) experienced some form of mistreatment.** This included being verbally harassed, repeatedly referred to as the wrong gender, physically assaulted, or sexually assaulted, including being forced by officers to engage in sexual activity to avoid arrest.

- **Police frequently assumed that respondents—particularly transgender women of color—were sex workers.** In the past year, of those who interacted with law enforcement officers who thought or knew they were transgender, one-third (33%) of Black transgender women and 30% of multiracial women said that an officer assumed they were sex workers.

- **More than half (57%)** of respondents said they would feel **uncomfortable asking the police for help** if they needed it.

- Of those who were arrested in the past year (2%), **nearly one-quarter (22%) believed they were arrested because they were transgender**.

AR_217012



Transgender women reporting that police assumed they were sex workers in the past year (out of those who interacted with officers who thought they were transgender)
RACE/ETHNICITY (%)

| | |
|---|---|
| Overall* | 11% |
| American Indian women | 23% |
| Asian women | 20% |
| Black women | 33% |
| Latina women | 25% |
| Middle Eastern women** | |
| Multiracial women | 30% |
| White women | 11% |

*Represents respondents of all genders who interacted with officers who thought they were transgender
**Sample size too low to report

- Respondents who were held in jail, prison, or juvenile detention in the past year faced **high rates of physical and sexual assault by facility staff and other inmates.** In the past year, nearly one-quarter (23%) were physically assaulted by staff or other inmates, and one in five (20%) were sexually assaulted. Respondents were over **five times more likely to be sexually assaulted by facility staff** than the U.S. population in jails and prisons, and over **nine times more likely to be sexually assaulted by other inmates**.

# Harassment and Violence

- **Nearly half (46%) of respondents were verbally harassed** in the past year because of being transgender.

- **Nearly one in ten (9%) respondents were physically attacked** in the past year because of being transgender.

- **Nearly half (47%) of respondents were sexually assaulted** at some point in their lifetime and **one in ten (10%) were sexually assaulted in the past year.** Respondents who have done sex work (72%), those who have experienced homelessness (65%), and people with disabilities (61%) were more likely to have been sexually assaulted in their lifetime.

- **More than half (54%) experienced some form of intimate partner violence**, including acts involving coercive control and physical harm.

- **Nearly one-quarter (24%) have experienced severe physical violence by an intimate partner, compared to 18% in the U.S. population.**

# Places of Public Accommodation

- Respondents reported being denied equal treatment or service, verbally harassed, or physically attacked at many places of public accommodation—places that provide services to the public, like retail stores, hotels, and government offices. Out of respondents who visited a place of public accommodation where staff or employees thought or knew they were transgender, **nearly one-third (31%) experienced at least one type of mistreatment in the past year in a place of public accommodation**. This included 14% who were denied equal treatment or service, 24% who were verbally harassed, and 2% who were physically attacked because of being transgender.

- **One in five (20%) respondents did not use at least one type of public accommodation** in the past year because they feared they would be mistreated as a transgender person.

| Denied equal treatment or service, verbally harassed, or physically attacked in public accommodations in the past year because of being transgender | |
| --- | --- |
| LOCATION VISITED | % OF THOSE WHO SAID STAFF KNEW OR THOUGHT THEY WERE TRANSGENDER |
| Public transportation | 34% |
| Retail store, restaurant, hotel, or theater | 31% |
| Drug or alcohol treatment program | 22% |
| Domestic violence shelter or program or rape crisis center | 22% |
| Gym or health club | 18% |
| Public assistance or government benefit office | 17% |
| Department of Motor Vehicles (DMV) | 14% |
| Nursing home or extended care facility | 14% |
| Court or courthouse | 13% |
| Social Security office | 11% |
| Legal services from an attorney, clinic, or legal professional | 6% |



# Experiences in Restrooms

The survey data was collected before transgender people's restroom use became the subject of increasingly intense and often harmful public scrutiny in the national media and legislatures around the country in 2016. Yet respondents reported facing frequent harassment and barriers when using restrooms at school, work, or in public places.

- **Nearly one in ten (9%) respondents reported that someone denied them access to a restroom in the past year.**

- In the past year, **respondents reported being verbally harassed (12%), physically attacked (1%), or sexually assaulted (1%)** when accessing a restroom.

AR_217014

- **More than half (59%)** of respondents **avoided using a public restroom** in the past year because they were afraid of confrontations or other problems they might experience.

- **Nearly one-third (32%)** of respondents **limited the amount that they ate and drank** to avoid using the restroom in the past year.

- **Eight percent (8%)** reported having a **urinary tract infection, kidney infection, or another kidney-related problem** in the past year as a result of avoiding restrooms.

**More than half (59%)** of respondents **avoided using a public restroom** in the past year because they were afraid of confrontations or other problems they might experience.



# Civic Participation and Party Affiliation

- **More than three-quarters (76%) of U.S. citizens of voting age in the sample reported that they were registered to vote in the November 2014 midterm election,** compared to 65% in the U.S. population.

- **More than half (54%)** of U.S. citizens of voting age **reported that they had voted in the midterm election,** compared to 42% in the U.S. population.

- **Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans**, compared to 27%, 43%, and 27% in the U.S. population, respectively.

**Political party affiliation**

| POLITICAL PARTY | % IN USTS | % IN U.S. POPULATION (GALLUP) |
|---|---|---|
| Democrat | 50% | 27% |
| Independent | 48% | 43% |
| Republican | 2% | 27% |



AR_217015

# CHAPTER 1

# Introduction

This report presents the findings of the 2015 U.S. Transgender Survey (USTS), a study conducted by the National Center for Transgender Equality (NCTE). With 27,715 respondents, it is the largest-ever survey examining the lives of transgender people in the United States. The USTS provides a detailed portrait of the experiences of transgender people across many areas, including health, family life, employment, and interactions with the criminal justice system.

The USTS serves as a follow-up to the National Transgender Discrimination Survey (NTDS), which was developed by NCTE and the National LGBTQ Task Force and conducted in 2008–09. The NTDS was the first comprehensive survey examining the lives and experiences of transgender and gender nonconforming people in the United States. With 6,456 respondents reporting on a range of experiences throughout their lives, the NTDS was a groundbreaking study. The results were published in the 2011 report, *Injustice at Every Turn*, and showed that discrimination against transgender people was pervasive in many areas of life, including education, employment, health care, and housing. The report also highlighted the resilience of transgender people in the face of such discrimination and found that family and peer support could have a substantially positive impact on a transgender person's quality of life. The report quickly became a vital source of information about transgender people and continues to serve as an important resource for advocates, policymakers, educators, service providers, media, and the general public.

AR_217016

Much has changed since the NTDS was conducted in 2008–09 and results were published in 2011, including increased visibility of transgender people in the media and in society in general. Despite making significant strides in the five years since the report was published, there is still a substantial amount of work to be done to address critical needs in transgender communities throughout the United States. Transgender people continue to experience discrimination and anti-transgender bias in virtually all areas of life.

The 2015 U.S. Transgender Survey was developed by the National Center for Transgender Equality to provide updated and more detailed data to inform a wide range of audiences about the experiences of transgender people, how things are changing, and what can be done to improve the lives of transgender individuals in the United States. It is the largest survey of transgender people conducted to date, far surpassing the previous survey, with 27,715 respondents. This study explores a wider range of topics than the previous survey and more deeply examines specific issue areas where transgender people are disparately impacted, such as health care, HIV/AIDS, housing, workplace discrimination, immigration, sex work, and police interactions. Additionally, by closely mirroring questions from federal and other existing surveys, this study seeks to fill in the gaps left by the lack of data collected about transgender people in national surveys. Since federal survey data is often used by government agencies to make key determinations about policies and programs that affect individuals in many areas of life, such as employment and health, it is important to provide specific data on the potential impact of such policies on transgender people. This report on the U.S. Transgender Survey data draws comparisons between transgender people and the U.S. population and examines disparities across multiple issue areas.

This report demonstrates that transgender people continue to face discrimination in numerous areas that significantly impact quality of life, financial stability, and emotional wellbeing, including employment, education, housing, and health care. Furthermore, many respondents experienced discrimination in multiple areas of their lives, the cumulative effect of which leads to severe economic and emotional hardship and can in turn have devastating effects on other outcome areas, such as health and safety.

Although issues impacting transgender people have become more visible in the years since the NTDS was published, the data overwhelmingly demonstrates that there is still a long way to go towards eliminating harmful discrimination and providing sustainable systems of support for transgender people throughout their lives. These findings are presented with the recognition that advocates, researchers, and transgender communities will greatly benefit from additional research conducted using this extensive data source. The authors encourage subsequent analyses to delve into areas of the data that this report is unable to address, and as before, will strive to make the dataset available for such analyses.

INTRODUCTION

AR_217017

# Report Roadmap

The next chapter of the report will give an overview of the study's methodology, which will be followed by a guide to this report, including information about terminology used throughout. These will be followed by chapters discussing respondents' experiences across a range of areas that impact transgender people's lives:

- Portrait of USTS Respondents
- Family Life and Faith Communities
- Identity Documents
- Health
- Experiences at School
- Income and Employment Status
- Employment and the Workplace
- Sex Work and Other Underground Economy Work
- Military Service
- Housing, Homelessness, and Shelter Access
- Police, Prisons, and Immigration Detention
- Harassment and Violence
- Places of Public Accommodation and Airport Security
- Experiences in Restrooms
- Civic Participation and Policy Priorities

The report also contains three appendices, which offer more detailed information related to the study:

Appendix A: Characteristics of the Sample

Appendix B: Survey Instrument (Questionnaire)

Appendix C: Detailed Methodology



# CHAPTER 2

# Methodology

The U.S. Transgender Survey is the largest survey ever conducted to examine the experiences of transgender people in the United States. The survey instrument was comprised of thirty-two sections reflecting 1,140 distinct variables that covered a broad array of topics, such as health and health care access, and experiences around employment, education, housing, law enforcement, and public accommodation.[1] The survey was developed by a team of researchers and advocates and administered online to transgender adults residing in the United States.[2] The survey was accessible via any web-enabled device (e.g., computer, tablet, netbook, smart phone), accessible for respondents with disabilities (e.g., through screen readers), and made available in English and Spanish. Rankin & Associates Consulting hosted the survey on several secure servers. The survey was accessed exclusively through a website created specifically for the promotion and distribution of the survey.[3] Data was collected over a 34-day period in the summer of 2015,[4] and the final sample included 27,715 respondents from all fifty states, the District of Columbia, American Samoa, Guam, Puerto Rico, and U.S. military bases overseas. The survey contained mainly closed-ended questions, but respondents were also offered the opportunity to provide write-in responses in fifty-three of the survey questions. Over 80,000 write-in responses were provided by respondents.

METHODOLOGY

21

# I. About the U.S. Transgender Survey

The U.S. Transgender Survey (USTS) was developed as the follow-up to the groundbreaking National Transgender Discrimination Survey (NTDS), which was the first study to comprehensively measure experiences and life outcomes of transgender people in the United States. Fielded in late 2008 to early 2009 by the National Center for Transgender Equality (NCTE) and the National LGBTQ Task Force ("the Task Force"), the NTDS provided data that has informed policymakers, advocates, and educators since its publication in 2011. However, the NTDS report acknowledged that the study had "just scratched the surface of this extensive data source" and encouraged advocates and researchers to conduct additional research to continue collecting data aimed at identifying and addressing the needs of transgender people.[5] The NTDS authors also examined the survey instrument and concluded that there were "imperfections" in the manner in which several questions had been posed.[6] The authors addressed areas for potential improvement with respect to both survey question design and substantive content in an "issues and analysis" section of the report.[7] These recommendations were considered in the development of the U.S. Transgender Survey.

In subsequent years, researchers have performed additional analyses using the NTDS public use dataset provided by NCTE and the Task Force. These analyses provided further insight into the experiences of transgender people, but also increased awareness of the questions that remained unanswered after the NTDS report was published. In some instances, there was insufficient information to draw nuanced comparisons between life outcomes of transgender people collected in the NTDS and the U.S. general population. In other cases,

the ability to form additional conclusions was limited due to a lack of follow-up questions. For example, the NTDS asked a single question about suicide attempts, which did not allow for a clear examination of suicidal thoughts and behaviors.[8] Additionally, given the deficiency of longitudinal data on outcomes specific to transgender people, there remained a need to collect data that could speak to the experiences of transgender people over time and how outcomes may have changed in the years since the NTDS was published. In these respects, the NTDS provided an important platform upon which to build the USTS to address identified areas for improvement and collect data that would enable new insights to be drawn about transgender people in the United States.

The study was renamed the U.S. Transgender Survey for several reasons. One was to clarify the geographical location of the intended study sample both during the data collection period and following report publication. The use of "U.S." signaled that this study was developed with the unique needs of transgender people in the United States and U.S. territories in mind, considering relevant policies, procedures, and practices applicable to residents of the United States at the time of the study in areas such as health care and insurance, income, employment, housing, and education. Recognizing the contextual differences between the experiences of transgender people in the U.S. and in other parts of the world, the research team sought to dispel any confusion arising from the use of "national" in the title. The new name was also intended to reflect the depth and breadth of the experiences of transgender people in the U.S. and elevate a variety of narratives beyond discrimination, including the resilience and resourcefulness of the transgender community in the face of hardship, as well as experiences of acceptance and affirmation. "Discrimination" was removed from the title to clarify that the survey was designed to capture all such experiences. Additionally, removing the word

AR_217020

reduced potential bias in respondents' answers or resulting from primarily attracting respondents who felt they had experienced discrimination.

# II. USTS Respondents

The study population included individuals who identified as transgender, trans, genderqueer, non-binary, and other identities on the transgender identity spectrum, in order to encompass a wide range of transgender identities, regardless of terminology used by the respondent. Although "transgender" was defined broadly for the purposes of this study as being inclusive of a wide range of identities—such as genderqueer, non-binary, and crossdresser—the research team recognized that many individuals for whom the study was intended may have used different terminology or definitions and might have assumed that the term "transgender" did not include them. To address this, promotional materials affirmed that the survey was inclusive of all transgender, trans, genderqueer, and non-binary people. Additionally, materials specified that the survey was for adults at any stage of their lives, journey, or transition to encourage participation among individuals with diverse experiences regarding their transgender identity. An in-depth description of survey respondents is available in the *Portrait of USTS Respondents* chapter.

The study included individuals aged 18 and older at the time of survey completion, as did the NTDS. The study was not offered to individuals under the age of 18 due to limitations created by specific risk factors and recommendations associated with research involving minors. These considerations, including requirements for parental/guardian consent, would have impacted the survey's scope and content and also reduced the literacy level at which the survey could be offered.[9] Furthermore, the current experiences and needs of transgender youth often differ from those of adults in a number of key areas, including experiences related to education, employment, accessing health care, and updating identity documents, and many of these experiences or needs could not be adequately captured in a survey that was not specifically tailored to transgender people under the age of 18.

The sample was limited to individuals currently residing in a U.S. state or territory, or on a U.S. military base overseas, since the study focused on the experiences of people who were subject to U.S. laws and policies at the time they completed the survey. Individuals residing outside of the U.S. may have vastly different experiences across a number of outcome measures based on each respective country's laws, policies, and culture, particularly in the areas of education, employment, housing, and health care. Additionally, many survey questions were taken from U.S. federal government surveys that also limit their sample population to individuals in the U.S., and the research team sought to examine a similar population with regard to geographical location to allow for comparisons to the U.S. general population.

# III. Developing the Survey Instrument

The USTS survey instrument was developed over the course of a year by a core team of researchers and advocates in collaboration with dozens of individuals with lived experience, advocacy and research experience, and subject-matter expertise. When developing the survey instrument, the research team focused on creating a questionnaire that could provide data to address both current and emerging needs of transgender people while gathering information about disparities

AR_217021

that often exist between transgender people and non-transgender people throughout the U.S. To achieve this, questions were included that would allow comparisons between the USTS sample and known benchmarks for the U.S. population as a whole or populations within the U.S. Consequently, questions were selected to best match those previously asked in federal government or other national surveys on a number of measures, such as measures related to income and health.[10] Changes were made to the language of comparable questions whenever it was required to more appropriately reflect issues pertaining to transgender people and language in common use in the transgender community while maintaining comparability to the best extent possible. However, in many cases, language was preserved to ensure that responses to a USTS question would maintain maximum comparability with surveys such as the U.S. Census Bureau's American Community Survey and Current Population Survey.

Several questions were also included in an attempt to provide comparability between the NTDS, where possible, to determine how certain outcomes may have changed since the NTDS data was collected in 2008–09. While the USTS provides crucial updated data, it is important to note that many of the questions asked in the NTDS were either not included in the USTS, or they were asked in a manner that reduced comparability with the NTDS. For example, many USTS questions asked about whether certain experiences occurred within the past year instead of asking whether those experiences occurred at any point during an individual's lifetime. These questions were included for both comparability with federal government or other national surveys and also to yield improved data regarding changing experiences in future iterations of the USTS. In such instances, the NTDS continues to provide the best available data regarding experiences that occurred over respondents' lifetime. The authors suggest referring to both the USTS and

the NTDS to gain a full picture of issues impacting transgender people.

The survey instrument was reviewed by researchers, members of the transgender community, and transgender advocates at multiple intervals throughout the development process. This included thorough reviews of sections that addressed specific subject matter and the entire questionnaire. The questionnaire was revised based on feedback from dozens of reviewers.

## a. Pilot Study

Prior to finalizing the survey instrument and launching the survey in field, a pilot study was conducted to evaluate the questionnaire. The pilot study was conducted among a small group of individuals with characteristics that were representative of the sample the study was intended to survey. The pilot study was administered through an online test site using the same platform and format in which the final survey later appeared. The purpose of the pilot study was to provide both a substantive and technical evaluation of the survey. Approximately 100 individuals were invited to complete and evaluate the survey online during a specified period of time. In order to receive access to the pilot study test site, invitees were required to confirm their participation by indicating that they met the following pilot study criteria: they were (1) 18 years or older, (2) transgender, (3) willing to provide feedback that would be used to make improvements to the survey, (4) available to take the survey online during specified dates, and (5) agreeing to not share the questions in the pilot study with anyone so as to not compromise the study. Forty (40) individuals confirmed their participation and received access to the pilot study test site. Thirty-two (32) people completed the study and submitted feedback on the questionnaire, including participants in fifteen states ranging in age from 19 to 78. Participants

reported identifying with a range of gender identities[11] and racial and ethnic identities, including 34% who identified as people of color.[12]

In addition to providing general feedback on individual questions and the entire questionnaire, pilot study participants were asked to address specific questions as part of their evaluation, including: (1) how long it took to complete the survey, (2) what they thought about the length of the survey, (3) whether any existing questions were confusing or difficult to answer, (4) whether they found any questions offensive or thought they should be removed or fixed, (5) whether they experienced technical or computer issues while taking the survey, and (6) what they thought about the statement explaining why the term "trans" was used throughout the survey.[13] All participant feedback was compiled, discussed, and used to further develop the questionnaire, such as through the revision of language and the addition of questions to more thoroughly examine an issue.

## b. Length

The final survey questionnaire contained a total of 324 possible questions in thirty-two discrete sections addressing a variety of subjects, such as experiences related to health and health care access, employment, education, housing, interactions with law enforcement, and places of public accommodation. The online survey platform allowed respondents to move seamlessly through the questionnaire and ensured they only received questions that were appropriate based on previous answers. This was accomplished using skip logic, which created unique pathways through the questionnaire, with each next step in a pathway being dependent on an individual respondent's answer choices. For example, respondents who reported that they had served in the U.S. Armed Forces, Reserves, or National Guard received a series of questions about their military service, but those who had not served

did not receive those questions. Due to the customized nature of the survey, the length varied greatly between respondents, and no respondent received all possible questions. Prior to the pilot study, estimates indicated a survey-completion time of 30–45 minutes. The completion-time estimate was extended to 60 minutes based on feedback from pilot study participants, and it was consistent with many reports during the fielding period.[14]

Despite observations about survey length discussed in the NTDS,[15] evolving data needs relating to issues affecting transgender people required an in-depth treatment of multiple issue areas. This often required multiple questions to thoroughly assess an issue—including in areas where the NTDS asked only one question—and resulted in a lengthier survey. Survey instrument length was assessed throughout its development to ensure it would be manageable for as many participants as possible. Furthermore, through multiple reviews and evaluations of the survey instrument—including the pilot study—survey takers reported that the length was appropriate for a survey addressing such a wide range of issues and the need for data outweighed concerns about the overall length of the survey.

# IV. Survey Distribution and Sample Limitations

The survey was produced and distributed in an online-only format after a determination that it would not be feasible to offer it in paper format due to the length and the complexity of the skip logic required to move through the questionnaire. With so many unique possibilities for a customized survey experience for each respondent, the intricate level of navigation through the survey

would have created an undue burden and confusion for many respondents. This could have led to questions being answered unnecessarily or being skipped completely, which could have increased the potential for missing data in the final dataset.[16] This made online programming the best option for ensuring that respondents received all of the questions that were appropriate based on their prior answers, decreasing the probability of missing data. However, the potential impact of internet survey bias on obtaining a diverse sample has been well documented in survey research,[17] with findings that online and paper surveys may reach transgender respondents with "vastly different health and life experiences."[18] With those considerations in mind, outreach efforts were focused on addressing potential demographic disparities in our final sample that could result from online bias and other issues relating to limited access. Although the intention was to recruit a sample that was as representative as possible of transgender people in the U.S., it is important to note that respondents in this study were not randomly sampled and the actual population characteristics of transgender people in the U.S. are not known. Therefore, it is not appropriate to generalize the findings in this study to all transgender people.

# V. Outreach

The main outreach objective was to provide opportunities to access the survey for as many transgender individuals as possible in different communities across the U.S. and its territories. Additionally, outreach efforts focused on reaching people who may have had limited access to the online platform and who were at increased risk of being underrepresented in such survey research. This included, but was not limited to, people of color, seniors, people residing in rural areas, and low-income individuals. The outreach strategy was

a multi-pronged approach to reach transgender people through various connections and points-of-access, including transgender- or LGBTQ-specific organizations, support groups, health centers, and online communities.

Outreach efforts began approximately six months prior to the launch of the data-collection period with a variety of tactics designed to raise awareness of the survey, inform people when it would be available, and generate opportunities for community engagement, participation, and support. A full-time Outreach Coordinator worked for a period of six months to develop and implement the outreach strategy along with a team of paid and volunteer interns and fellows.[19]

An initial phase of outreach involved developing lists of active transgender, LGBTQ, and allied organizations who served transgender people and would eventually support the survey by spreading the word through multiple communication platforms and in some cases providing direct access to the survey at their offices or facilities. Establishing this network of "supporting organizations" was an essential component of reaching a wide, diverse sample of transgender people.

Over 800 organizations were contacted by email, phone, and social media, and they were asked if they would support the survey by sharing information about it with their members and contacts. Specifically, supporting organizations were asked to share information through email blasts and social media channels, and the research team provided language and graphics for organizations to use in an effort to recruit appropriate respondents into the study. Of the organizations contacted, approximately half responded to requests for support, resulting in direct recruitment correspondence with nearly 400 organizations at regular intervals during the pre-data-collection period and while the survey was in the field.[20,21] These organizations

performed outreach that contributed to the far reach of the survey and unprecedented number of respondents.[22] The organizations were also featured on the survey website so potential respondents could determine whether organizations they knew and trusted had pledged support for the survey.

Nearly 400 organizations responded to outreach and confirmed their support for the survey. The remaining organizations did not respond directly to invitations to learn more about the survey and become supporters. Consequently, these organizations did not receive correspondence aimed at directly recruiting respondents prior to the survey launch or during the data-collection period. It is possible, however, that survey respondents were still made aware of the survey through those organizations. Since there is no information regarding whether these organizations shared information about the survey through their channels, it is difficult to assess the full scope of the outreach efforts.

## a. Advisory Committee

A significant element of outreach involved convening a USTS Advisory Committee (UAC). The UAC was created to increase community engagement in the survey project and raise awareness by connecting with transgender people in communities across the country through a variety of networks. The UAC was comprised of eleven individuals with advocacy, research, and lived experience from a wide range of geographical locations.[23] Members were invited to join the committee as advisors on survey outreach to facilitate the collection of survey data that would best reflect the range of narratives and experiences of transgender people in the U.S. Each member brought unique skills and expertise to contribute to the committee's objectives. UAC members participated in five monthly calls with members of the USTS outreach team from May

to September 2015. UAC monthly calls focused on providing project updates and identifying pathways by which outreach could be conducted to increase the survey's reach and promote participation from a diverse sample. Members suggested organizations, individuals, and other avenues through which to conduct outreach, shared ideas and strategies for improving outreach to specific populations of transgender people, and spread the word about the survey through their professional and personal networks.

## b. Survey-Taking Events

In an effort to increase accessibility of the survey, the outreach team worked with organizations across the country to organize events or venues where people could complete the survey. *Survey-Taking Events*,[24] or "survey events," were spaces in which organizations offered resources to provide access to the survey, such as computers or other web-enabled devices. These organizations provided a location in which to take the survey at one particular time or over an extended period of time, such as during specified hours over the course of several days.[25] The events were created with the intention of providing access to individuals with limited or no computer or internet access, those who may have needed assistance when completing the survey, or those who needed a safe place to take the survey. Additionally, the population that had previously been identified as being more likely to take a paper survey than an online survey were considered,[26] and the events were developed to target those individuals.

Given the potential variety of these survey events—including the types of available resources and times at which they were conducted—guidelines were needed to maintain consistency across the events and preserve the integrity of the data-collection process. A protocol was developed outlining the rules for hosting a survey event to advise hosts on best practices for ensuring

a successful data-collection process, including guidelines to prevent the introduction of bias into survey responses. The protocols described the steps for becoming a survey-event host and tips for how to conduct outreach about the event. The protocol also specified that hosts should inform NCTE of their event prior to hosting and report on how many people attended the event and how many people completed and submitted the survey. This was helpful information for evaluating the relative success and benefits of these events. All confirmed supporting organizations were invited to become survey event hosts, and those who accepted the invitation were sent the protocol. Seventy-one (71) organizations accepted the invitation and confirmed the date(s) and time(s) of their events.[27]

Survey events were promoted on the survey website and given a specific designation on the supporting organization map (described further in the "Survey Website" section), including information about where and when people could attend. Hosts were encouraged to promote their event through multiple channels and consider outreach methods beyond online avenues, such as direct mail or flyers, to better reach transgender people with limited or no internet access. Additionally, hosts were provided with flyer templates so they could promote the events in their facilities or through communications with their members or constituents. Of the organizations who confirmed their survey events, 46 reported information about attendance at the event. The hosts reported that 341 people attended their events, including transgender and non-transgender friends, family, and volunteers. Approximately 199 respondents completed the survey at these events.[28] However, survey responses indicate that additional unreported survey events or similar gatherings may have been held where participants had an opportunity to complete the survey.[29] Event-related information submitted by organizations following the fielding

period was not comprehensive enough to make a thorough determination as to whether the events had achieved their previously stated objectives.[30]

## c. Incentives

As an incentive for completing the survey, participants were offered a cash-prize drawing. Incentives, such as cash prizes are widely accepted as a means by which to encourage and increase participation in survey research.[31] Studies have shown that such incentives may have a positive effect on survey response rate, which is the proportion of individuals in the population of interest that participates in the survey.[32] Research has also found that lottery-style cash drawings may be beneficial in online surveys,[33] since they offer a practical method for providing incentives in surveys with a large number of respondents by eliminating the potential high cost of both the cash incentive and prize distribution.[34]

USTS respondents were offered the opportunity to enter into a drawing for one of three cash prizes upon completion of the survey, including one $500 cash prize and two $250 cash prizes.[35] After completing and submitting their anonymous survey responses, USTS respondents were re-directed away from the survey hosting site[36] to a web page on the NCTE-hosted USTS website. In addition to being thanked for their participation on this page, respondents received a message confirming that their survey had been submitted and any further information they gave would not be connected to their survey responses. Only individuals who completed and submitted the survey were eligible for one of the cash prizes. To enter into the prize drawing, respondents were required to check a box giving their consent to be entered.[37] Respondents were also asked to provide their contact information in order to be notified if selected in the drawing. The final drawing contained 17,683 entrants. Each entrant was assigned a number, and six numbers were randomly chosen by a non-NCTE party: three

AR_217026

numbers for the prize winners and three for alternates if necessary. The three prize winners were contacted and awarded their prizes upon acceptance.

# VI. Communications

Communications for the survey required a multifaceted approach and a coordinated effort with the outreach strategy to most effectively reach a wide range of transgender people and ensure a robust sample size. The goals of survey communications were to: (1) inform people that NCTE would be conducting a survey to further the understanding of the experiences of transgender people in the U.S initially gleaned through the NTDS, (2) communicate when the survey would be available to complete and how it could be accessed, and (3) find creative ways of reaching diverse populations of potential respondents. This involved raising awareness of the survey through several communication methods, including email, social media, and print media, as well as through additional unique campaigns. Many survey promotional materials were produced in English and Spanish to increase the accessibility of the survey.[38]

## a. Survey Website

A website was created and designed specifically for the promotion and distribution of the survey.[39] This website served as a platform for providing information about the survey starting several months prior to its release in the field, such as a description of the survey, information about the team working on the survey, frequently asked questions, and sample language and graphics for individuals and organizations to use for email and social media communications, including sample Facebook and Twitter postings. The website also featured an interactive map, which included information about organizations that had pledged to support the survey. Additionally, the map distinctly indicated information about organizations that were hosting survey-taking events, including the date, time, and location of such events. The website later served as the only platform through which the survey could be accessed and provided English and Spanish links to enter the survey, since there was no direct link available to the off-site hosting platform.

## b. Survey Pledge

The survey pledge campaign was developed to raise awareness about the survey and generate investment in the project. The campaign engaged potential participants and allies by inviting them to pledge to take the survey and/or spread the word about the survey. The survey pledge was a critical method of both informing people that the survey would be launching and sustaining engagement with potential respondents in the months leading up to the fielding period. Pledges received reminders about the survey launch date and availability through email communications. Beginning in January 2015, pledge palm cards were distributed at a variety of events across the country, including conferences and speaking engagements. The cards contained information about the upcoming survey and asked people to sign up to help by committing to: (1) spread the word about the survey; and/or (2) take the survey. Transgender and non-transgender individuals were asked to complete the pledge information, either through a palm card or directly online through the survey website. Individuals who completed pledge information received email communications throughout the pre-data-collection phase. Pledge information was collected continuously for several months, and by the time of the survey launch, over 14,000 people had pledged to take the survey. Additionally, more than 500 people pledged to promote the survey among their transgender friends and family.[40] The pledge proved to be

an effective method of assessing how many people had learned about the survey and were interested in completing it, where potential survey respondents were distributed geographically, and how more potential respondents could be effectively engaged.

## c. Photo Booth Campaign

In January 2015, a photo booth campaign was launched as another method for engaging people and raising awareness about the survey. Individuals and groups were asked to take photos holding one of two signs with messages expressing support for the survey.[41] USTS photo booths were conducted at several conferences and events across the country. More than 300 photos were collected and shared directly through NCTE's Facebook page. Photos were also sent to most participants so they could conduct their own promotion using their photos.

## d. Social Media

With the increased use of social media in the years since the previous survey (the NTDS), it was important to engage via these outlets to further the reach of the survey. Facebook and Twitter[42] became the primary social media outlets used throughout the survey project, and their use significantly amplified awareness, increasing the number of people who were exposed to the survey. A series of postings provided the ability to rapidly and succinctly communicate with individuals and groups who had an interest in contributing to the survey's success by completing the survey and spreading the word about it. Although social media reach fluctuated during the months leading up to the survey launch, over 96,000 Facebook users were estimated to have received NCTE's post announcing that the survey was live and available for completion on August 19, 2015.

## e. USTS Awareness Week

Prior to launching the survey in the field, communication was maintained with thousands of individuals and organizations who fell into three categories: (1) people who had signed up to take or spread the word about the survey ("pledge list"), (2) organizations that had committed to support the survey through outreach efforts ("supporting organization list"), and (3) people who had signed up to be in communication with NCTE about the organization's work and projects ("NCTE list").

Communication with the individuals and groups on these lists through targeted messages occurred at various intervals; however, one of the most important methods for promoting the survey was through USTS Awareness Week. This campaign was designed to share a significant amount of information about the survey over a concentrated period of time in close proximity to the launch of the survey. Awareness Week occurred during the week of July 27, 2015 and highlighted different aspects of the survey focusing on a different medium each day, including social media, email, and blogs. Awareness Week was introduced to the communication lists on July 15, and recipients were invited to access and download a planning kit for the campaign, which was available on the survey website. The planning kit included language and graphics for email and social media communications. Communications were sent on each of the days devoted to social media,[43] email,[44] and blogs[45] with appeals for organizations to share the information with their membership and individuals to share the information through their personal networks. Awareness Week proved to be one of the most effective methods for increasing the number of individuals who pledged to take the survey and likely increased the number of eventual respondents.[46]

## f. Additional Communications Methods

The overall approach to survey communications was diverse and captured many media forms. In addition to the previously stated campaigns and projects, communications involved working with a variety of individuals such as bloggers, artists, advocates, and others to create print blogs and videos promoting the survey. Op-eds were another medium that contributed to survey promotion, and media consultants and traditional media sources aided in expanding the survey's reach even further. Approximately 50 articles, blogs, and op-eds focused on the survey were produced and distributed by organizations, including NCTE, and individuals prior to the launch of the survey and during the data-collection period. The wide variety of approaches contributed to the number of individuals who were reached through all communications and likely impacted the final number of respondents in the sample.

# VII. Language and Translation

Throughout the survey questionnaire, the use of accessible language was balanced with preserving the meaning of each question to the greatest extent possible. This was of particular importance in maintaining comparability with questions from existing surveys that allowed conclusions to be drawn about how the experiences of the USTS sample compares to the U.S. population. In order to make assessments about USTS survey respondents in relation to the U.S. population, it was important that USTS respondents had similar interpretations of questions taken from other surveys as non-transgender survey takers had to those questions in federal surveys. In many places, language was revised to use terminology that would most appropriately speak to individuals in the many communities for which the survey was intended. However, several areas required difficult choices about keeping language that may have caused discomfort for some respondents. Throughout the questionnaire, language was avoided that could be interpreted as stigmatizing or characterized as a value judgment wherever possible while maintaining objectivity in crafting sound research questions. For example, at times survey questions referred to work or activities that were "currently considered illegal." Such deliberate language was used in an attempt to separate the issue of criminalization from the activity in question while maintaining comparability with other surveys. This was a difficult balance to achieve throughout the survey. Eliminating technical language was also necessary, unless it was widely used and accepted in transgender communities, such as some medical terminology. Short descriptions or parenthetical explanations were provided whenever technical language was required for those who may not have been familiar with the language. Additionally, hyperlinked explanations of specific terms were included when those terms could be interpreted in several ways or if similar explanations were provided in the federal surveys from which the questions were taken. For example, explanations were provided for the terms "active duty" when asking about military service and "household" when asking about income.

The research team remained conscious of individual and collective identities throughout the survey instrument drafting process, and attempted to use language that acknowledged the breadth and significance of individual identities while also making the questions accessible to the widest range of transgender people possible across the U.S. and in the territories. The questionnaire was reviewed and revised for consistent readability at an eighth-grade literacy level where possible,[47] although several

terms used in the survey were at a considerably higher literacy level. This included places where language was preserved for comparability with other surveys and when language describing transgender-specific experiences or procedures was used. Additionally, community members and researchers reviewed the survey and suggested revised language throughout the development process. This collaborative process was beneficial in providing collective insight on the best language to use in each particular instance based on lived experience and research expertise. The research team acknowledges, however, a continuing need to work towards identifying suitably inclusive terminology within an evolving language and community for future iterations of the survey.

The questionnaire was translated into Spanish by a translation service, and several native-Spanish-speaking community members and NCTE staff and interns reviewed and revised the language to use terminology that was most prevalent in Spanish-speaking transgender communities in the U.S. In many instances, it was difficult to find language that accurately captured the meaning of a question or specific terms, but in each case language was selected to convey interpretations as close to the English-language question interpretations as possible.

# VIII. Institutional Review

The study was vetted through an Institutional Review Board (IRB) process, which is meant to ensure confidentiality and protect the rights and welfare of individuals participating in a research study. The USTS underwent a full board review by the University of California Los Angeles (UCLA) IRB. As a requirement of approval, the questionnaire began with a study information

sheet describing aspects of the study and rights of individuals as participants in the study.[48] To be included in the study, participants were required to indicate their consent at the end of the information sheet. This process established that participants were fully informed about the risks and benefits of participating in the study and that their participation was voluntary. IRB review also required the submission of all recruitment materials leading up to the launch of the survey and throughout the time the survey was in the field.[49] This required the production of a large volume of messaging for the many different types of media through which people were invited to participate in the survey in both English and Spanish. It also required anticipating how messaging might need to change while the survey was in the field and submitting this language for pre-approval for later use as needed.

# IX. Survey Hosting

The survey was hosted online by Rankin & Associates Consulting, under the supervision of USTS research team member, Dr. Susan Rankin. Access to the survey was provided exclusively through the USTS website. All programming of the questionnaire and online administration of the survey was handled through Rankin & Associates Consulting, which managed the process of collecting the survey data throughout the 34-day fielding period.

The survey was anonymous, and maintaining privacy and confidentiality in the collection and maintenance of survey data was an important component of preserving participants' anonymity. Furthermore, as a condition of IRB approval, the research team was required to ensure that confidentiality protections were in place for the study and demonstrate sufficiency of data security protocols. Accordingly, data from online

AR_217030

participants was submitted through seven secure firewalled servers with forced 256-bit SSL (Secure Sockets Layer) security and Security-Enhanced Linux (SELinux) security extensions to encrypt and protect the survey data.  Given the volume of traffic on the seven servers during the initial launch of the survey, an eighth server was added. The survey was stored in an SQL database that could only be accessed locally. The servers themselves were only accessible using encrypted SSH (Secure Shell) connections originating from the local network. The servers were also in RAID (Redundant Array of Inexpensive Disks), which is a data storage virtualization technology that combines multiple physical disk drive components into a single logical unit for the purposes of data redundancy, performance improvement, or both, to reduce the chance of any data loss due to hardware failure. The servers performed nightly security audits from data acquired via the system logs and notified the system administrators.

Despite a successful data-collection period evidenced by the large final sample size, it is important to note issues that occurred in the initial days of the survey data-collection period, given the potential impact on the data collection and the final sample. Prior to the survey launch, the online platform had been assessed and capacity was predicted for the seven dedicated servers based on reasonable estimated response rates. However, in the first days of the data-collection period, exceptionally high levels of traffic to the survey far exceeded the predicted response rates and overwhelmed the capacity of the servers, causing significant delays in accessing and completing the survey. The resulting server delays occurred within hours of the survey launch on August 19, 2015, producing unusually long page-loading times and may have served as a barrier to completing the survey.[50] The survey team notified potential respondents of the delays through email and social media communication and updated the first page of the online survey questionnaire with

a note about the issues and information about the continued availability of the survey.[51] The hosting team added a server to process the high level of traffic and returned the survey to normal loading speeds within a couple days of the initial reports. Although high numbers of survey submissions were received throughout these days, it is likely that the server delays affected the completion and submission of some surveys or may have discouraged individuals from attempting to take the survey.

# X. Cleaning the Data

The dataset was cleaned following collection to remove survey responses that did not belong in the final sample.[52] Data cleaning is the process of detecting and removing some survey responses (e.g., duplicate responses, incomplete responses, illogical responses) in order to improve the quality of the sample. This dataset was "cleaned" using commonly accepted procedures.[53] The first step was to remove survey responses from individuals who did not consent to take the survey and those who did not meet the eligibility criteria, such as not being at least 18 years of age and not residing in the U.S. These survey respondents had been automatically sent to a disqualification page,[54] but their responses were included in the initial dataset. Incomplete responses were then removed from the sample based on a requirement that respondents minimally complete specific questions in Section 2 of the questionnaire to be included in the final dataset.[55] Duplicate survey responses were removed next, as were those with illogical responses, such as those with contradictory responses to related questions. Missing-data analyses were then conducted to determine the percentage of missing data.[56]

The next step of the process was recoding data, including re-categorization of answer choices

METHODOLOGY

33

AR_217031

in several questions for improved analysis or to match existing categories for comparison to other surveys. Answers were evaluated for those questions that allowed a write-in response when the selected option was "not listed above." In some cases, these answers were recoded into existing answer choices where appropriate, and in other cases, new answer categories were created for write-in responses that were frequently repeated. The recoding process included two coding teams. The first coding team conducted initial data recoding, and the second team reviewed the recoding and flagged areas of disagreement.  A simple percent agreement score was calculated to determine inter-rater reliability.[57]

Several survey weights were developed for presentation of results in the report.[58] A race and ethnicity weight was developed based on the Census Bureau's 2014 American Community Survey (ACS).[59] Additionally, given the disproportionally large number of respondents who reported an age of 18 years old, a weight was created to balance the representation in the sample of those respondents in relation to the rest of the sample.[60] The race and ethnicity weight and the 18-year-old weight were both included in a "standard weight" applied to the dataset. All results presented in this report are weighted based on the standard weight unless otherwise noted. Additional survey weights were created for the purposes of comparability with federal government and national data sources, including weights for age and educational attainment.[61] These weights were applied in addition to the standard weight when comparing the USTS sample to the U.S. population for items that are sensitive to age and educational attainment, such as individual and household income, and are noted accordingly as the "supplemental weight."

# XI. Data Analysis and Presentation of Findings

The data was first analyzed to tabulate individual responses to each of the questions in the survey. The respondents included in each tabulation differed throughout the survey due to certain questions only being asked of a particular set of respondents and/or due to some respondents choosing not to answer a question. Analyses were performed to explore how survey responses differed based on demographic characteristics—such as race, gender, and income—and non-demographic factors—such as experience with sex work, HIV status, and experiences of family support or rejection.

All findings in the report are presented as weighted percentages of the entire sample or of the subgroups being examined. For example, educational attainment is presented as a percentage of the whole sample, while much of the data related to HIV care represent percentages of those respondents who are living with HIV. In limited instances, unweighted frequencies are included where the additional information could be informative and to provide context for the weighted percentages reported.

Percentages are rounded to whole numbers, except in cases where a more exact comparison to national data sources was desired or where more precision was needed due to the reported percentages being small. When rounding to whole numbers, the following convention was generally followed: findings containing decimals of 0.50 and above were rounded up, and findings with 0.49 and below were rounded down (e.g., 1.50% was rounded to 2% and 1.49% was rounded to 1%). Additionally, a finding of 0.49% and below was generally labeled "less than 1%" or "<1%." Throughout the report, results are presented in

AR_217032

various figures and tables. The percentages in these figures and tables do not always add up to 100% due to respondents being able to select more than one answer to a question ("mark all that apply") or due to rounding.

Throughout the report, U.S. population findings are provided for comparison to USTS findings or to provide context for USTS findings, where available and/or applicable. Where USTS data is compared to data from existing research, the data source is specified. When providing U.S. population comparisons, the research team made efforts to limit the comparisons to adults (18 years and older) to most appropriately match the USTS sample. Whenever that was not possible, notes as to age ranges or other limitations are provided. Additionally, calculations made by the research team when necessary to present U.S. population findings are noted. Data in this report is generally presented without information regarding statistical testing.[62]

## ENDNOTES | CHAPTER 2: METHODOLOGY

1    The survey included questions related to the following topics (in alphabetical order): accessing restrooms; airport security; civic participation; counseling; education; employment; faith; family and peer support; health and health insurance; HIV; housing and homelessness; identity documents; immigration; income; intimate partner violence; military service; police and incarceration; policy priorities; public accommodations; sex work; sexual assault; substance use; suicidal thoughts and behaviors; unequal treatment, harassment, and physical attack; and voting.

2    Detailed information about survey methodology is available in *Appendix C (Detailed Methodology)*.

3    www.USTransSurvey.org

4    The survey was in the field between August 19 and September 21, 2015.

5    Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. (p. 11). DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

6    Grant et al., p. 182.

7    Grant et al.

8    See Haas, A. P., Rodgers, P. L., & Herman, J. L. (2014). *Suicide Attempts Among Transgender and Gender Non-Conforming Adults*. New York, NY & Los Angeles, CA: American Foundation for Suicide Prevention & Williams Institute.

9    See e.g., The GenIUSS Group. (2014). In J. L. Herman (Ed.), *Best Practices for Asking Questions to Identify Transgender and Other Gender Minority Respondents on Population-Based Surveys* (p. vii). Los Angeles, CA: Williams Institute. ("Adolescents may have particular difficulties with complex vocabulary and sentences. Therefore, questions designed for adolescents should take extra care to use plain language and simple sentences. Terms used in measures of sex and gender should be defined since adolescents, and cisgender (non-transgender) adolescents in particular, conflate the terms sex and gender, and have varying understanding of the term *transgender, masculine,* and *feminine.*"). Given the need to collect data about the unique experiences of transgender youth, it is important to design and conduct future studies focusing on the issue areas and needs most applicable to transgender youth.

10    Information about the source of survey questions used for comparison to the U.S. population can be found in *Appendix C (Detailed Methodology)*.

11    Forty-four (44%) of pilot participants identified as a woman or trans woman (MTF), 41% as a man or trans man (FTM), and 16% as non-binary or genderqueer.

12    These pilot participants identified as American Indian, Asian, multiracial, Black, Latino/a, and a racial/ethnic identity not listed above, in addition to 66% who identified as white.

13    The following statement was provided to explain why the word "trans" was used throughout the survey: We know that not everyone is comfortable with the word "transgender," but for this survey, we must use one word to refer to all trans and non-binary identities. Because of this we will use the word "trans" in this survey to refer to all trans and non-binary identities."

METHODOLOGY

AR_217033

14  A notable exception to the 30–60 minute estimate for completing the survey occurred during the first days of the survey's availability, when a high volume of survey takers overwhelmed multiple servers, causing lengthy delays when completing the survey. This is discussed further in the "Survey Hosting" section.

15  Grant et al., p. 13.

16  Post-NTDS analysis of respondents who had completed that survey online or in paper format found that surveys completed online were less likely to have missing data, providing further support for the decision to only offer the survey online. See Reisner, et al. (2014). Comparing in-person and online survey respondents in the U.S. National Transgender Discrimination Survey: Implications for transgender health research. *LGBT Health, 1*(2), 98–106.

17  See Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method* (4th ed.). Hoboken, NJ: John Wiley & Sons.

18  Reisner et al., p. 98. See note 16. This analysis also found that "[a] higher proportion of in-person respondents were young, male-to-female, people of color, publicly insured, with lower incomes and lower educational attainment than online respondents (all $p<0.05$). In-person respondents also were more likely than online respondents to be current daily smokers, to endorse substance use to cope with mistreatment, and to self-report as HIV-positive (all $p<0.05$)."

19  Although outreach efforts were instrumental in obtaining the largest sample of transgender respondents ever collected, a longer outreach period may have resulted in reaching more individuals in communities that are often underrepresented in online surveys.

20  A total of 827 organizations received at least one outreach email, and organizations received additional outreach emails and/or phone calls if no response was received. Out of those organizations, 392 confirmed their support, and 435 did not respond to any communications.

21  Correspondence included almost one dozen emails with asks to spread the word about the survey and with various information about the availability of the survey.

22  The research team attempted to ascertain the level of outreach engagement of supporting organizations; however, the limited amount of information received about the outreach did not allow a calculation of a response rate. Of the 392 organizations that pledged their support, 58 (15%) reported information on their outreach activities and estimated reaching over 20,000 transgender people through their channels. In the future, researchers are encouraged to collect consistent outreach activity data from supporting organizations that will help to better assess the effectiveness of outreach and response rate estimates.

23  Information about UAC members can be found in the *Acknowledgements* section of the report.

24  These events were promoted as "Survey-Taking Events" on recruitment materials and described accordingly (see note 25). However, it is possible that the name did not appropriately capture the nature of these vastly differing events. A lack of clarity may have decreased the number of people who attempted to access the survey through organizations who offered space or computers to complete the survey online.

25  Survey-Taking Events were described as "a function in which an organization or group opens its doors and provides access to its facilities (such as community centers and office buildings) to allow trans survey participants use of its resources (including computers, tablets, and internet access) to complete the USTS. This will occur during specified periods of time or throughout the time the survey is available on a drop-in basis. For example, a community center might participate by setting aside one Saturday from 9am–6pm where some or all of its computers are available for survey takers to use, or it might host people on Monday–Friday from 5pm–9pm each evening for a week, or longer."

26  A total of 435 NTDS respondents completed the survey in paper format (7% of the sample) and were found to differ from online survey takers in sociodemographic characteristics, health outcomes, and life experiences. Reisner et al., p. 98, 103. See note 16.

27  Although only 71 organizations confirmed their events, based on information reported at various intervals throughout the data-collection period, it appeared that more organizations hosted survey events or similar gatherings to complete the survey without reporting them to the survey outreach team. Additionally, it is also possible that individuals and organizations held informal parties where groups of friends could gather to complete the survey at the same time. Data regarding this sort of activity was not collected or received.

28  This completion rate is a conservative estimate based on reports that some individuals started the survey at the event and then left to complete it on their own at a later time.

29  Four hundred and seventeen (417) respondents answered "yes" in response to the following survey question: "Are you taking this survey at a survey event or meeting, such as one hosted by an LGBTQ or Trans organization or meeting?"

30  In future iterations of the USTS and other research studies, the research team suggests a more robust approach towards organizing, conducting, and monitoring survey events to increase the reach and availability of such events in providing access to the survey. Researchers are also encouraged to conduct follow-up analyses to

AR_217034

determine the demographic characteristics of individuals who completed the survey at events and whether these events were successful in capturing a similar demographic to those who had completed paper surveys in the previous survey. See Reisner, et al. (discussing the demographics of online and paper respondents in the NTDS).

31  See e.g., Göritz, A. S. (2006). Incentives in web studies: Methodological issues and a review. *International Journal of Internet Science, 1*(1), 58–70. (finding that "material incentives increase the odds of a person responding by 19% over the odds without incentives").

32  Pedersen, M. J. & Nielsen, C. V. (2016). Improving survey response rates in online panels: Effects of low-cost incentives and cost-free text appeal interventions. *Social Science Computer Review, 34*(2), 229–243.

33  Pedersen et al., pp. 237–238.

34  Singer, E. & Ye, C. (2013). The use and effects of incentives in surveys. *The ANNALS of the American Academy of Political and Social Science, 645*(1), 123–124.

35  Participants were informed of the cash prize incentives in several ways. The study information sheet placed at the beginning of the survey prior to obtaining each respondent's consent to enter the survey contained the following information in response to the question of whether respondents would be paid for their participation: "You will receive no payment for your participation. You will have the option to voluntarily enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250." The frequently asked questions section of the survey website also offered the following statement: "When you complete the survey, you will have the option to enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250. Because thousands of trans people across the country will complete the survey, we cannot offer payment to each participant." Additionally, some recruitment materials mentioned the cash-prize drawing, including email blasts.

36  The survey was hosted by Rankin & Associates Consulting. Further details are described in the "Survey Hosting" section.

37  The check box stated: "Enter me in the drawing for one of three cash prizes: one prize of $500 and two prizes of $250!"

38  Due to limited funding, it was not possible to translate all survey materials, such as email communications. Translation of all promotional materials may positively impact the response rate amongst respondents with limited English proficiency in future iterations of the study.

39  www.USTransSurvey.org

40  Final pledge numbers were 14,005 and 561 for survey takers and promoters, respectively.

41  Photo booth participants could choose from one of two signs indicating that the survey was coming in the summer of 2015 and stating the following: (1) "My Voice Counts: I'm Taking the #USTransSurvey" or (2) "Every Voice Counts: Spread the Word About the #USTransSurvey."

42  The Twitter hashtag used to promote the survey was #USTransSurvey.

43  For social media day, recipients received one of the following requests, based on whether they were organizations or individuals: (1) "Use the hashtag #USTransSurvey on social media asking your social networks to join us" or (2) "Please join Social Media day. We have sample copy and a variety of photos and graphics."

44  For email day, recipients received one of the following requests, based on whether they were organizations or individuals: (1) "Email a friend explaining why this is so important to you" or (2) "Download the sample email and send it to your membership list today."

45  For blog day, recipients were invited to share a blog written by Outreach Coordinator, Ignacio Rivera, cross post the blog on an organization's blog site, or draft a blog about the importance of the survey.

46  The number of individuals who pledged to take the survey on the pledge list increased from approximately 7,700 when the initial Awareness Week email was sent on July 15 to over 14,000 at the time the survey launched in the field. The 82% increase in the numbers of survey pledges is likely due to the increased exposure generated by Awareness Week communications.

47  The initial literacy level review and revision was conducted by a certified copy editor proficient in reading levels, and the questionnaire was determined to be at an eighth grade reading level.

48  Due to IRB requirements, the language in the study information sheet was generally at a higher literacy level than the rest of the questionnaire.

49  This included all materials aimed at "recruiting" or getting people to participate in a research study, such as website pages, flyers, emails, and social media messages.

50  The research team received reports that it took some individuals up to several hours to complete the survey on the first day, and others reported that they were not able to complete or submit their survey at all due to the technical issues.

AR_217035

51  The following note was added to the first page of the survey (in English and Spanish) to notify respondents of the delay: "Our servers have been overwhelmed by the number of enthusiastic participants and some are experiencing unusual delays. We apologize for the inconvenience as we work to address this issue. You can complete the survey now but may experience delays. However, the survey will be available to complete through at least September 21st, if you experience delays, we encourage you to return to this site in the coming days. If the survey is slow to respond, you can leave the page open and return later. If the survey times out, you can hit the 'back' button. However, if you close your browser, you may have to restart the survey."

52  A detailed description of the cleaning process is included in *Appendix C (Detailed Methodology)*.

53  Rahm, E. & Do, H. H. (2000). Data cleaning: Problems and current approaches. *IEEE Data Engineering Bulletin, 23*(4), 3–13.

54  Ineligible respondents were sent to one of two disqualification pages notifying them of their ineligibility and providing either an opportunity to visit the survey website for more information or giving information about their gender identity or expression and experiences related to gender identity or expression.

55  See *Appendix C (Detailed Methodology)* for more information on the Section 2 questions that were required to remain in the sample.

56  Missing-data analyses determined that there was less than 5% missing data on all but two questions. Therefore, the research team did not impute the missing data. See *Appendix C (Detailed Methodology)* for more information.

57  A modified version of an inter-rater reliability metric was used by the two teams that conducted the review. Each team included a principal researcher and an outside researcher. One researcher on each team conducted the initial coding and the other researcher reviewed the coding for approval or revisions. See *Appendix C (Detailed Methodology)* for more information.

58  "Weighting" is a common statistical technique used to adjust data with disproportionate sample sizes to be more representative of the population from which the sample was drawn. For example, the proportion of respondents aged 18–24 and 25–44 in a survey sample taken in the U.S. may differ from the proportion of those age groups in the total U.S. population. Therefore, weights are applied to survey data in order to make comparisons between the collected survey data and the total population. See *Appendix C (Detailed Methodology)* for more detailed information about weights applied to the survey data.

59  Studies using representative samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity, with transgender people more likely to be people of color. See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States*. Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health, 102*(1), 118–122. However, the USTS sample has a higher percentage of white respondents than the U.S. general population. To help correct for this sampling bias, the research team applied U.S. population weights for race and ethnicity. While this may still over-represent white respondents, this weighting procedure brings the sample closer to what is estimated to be the true population distribution for race and ethnicity for transgender people.

60  The weight for 18-year-old respondents was created with propensity scores developed using a regression discontinuity model. For more information on this process and other weighting procedures, see *Appendix C (Detailed Methodology)*.

61  The age, race, and educational attainment weights were created based on the Census Bureau's 2014 American Community Survey (ACS).

62  Due to the large sample size, bivariate statistical tests largely result in statistically significant differences among the groups being compared. Small group differences often will be found to be statistically significant, even when the differences are small and, therefore, not particularly meaningful. In writing the findings to this report, the research team considered other measures when pointing out meaningful differences among groups, such as a particular cell's contribution to an overall chi-square test statistic and effect sizes. These tests are on file with the research team. Future researchers are encouraged to use additional bivariate and multivariate modeling to provide more nuanced understanding of group differences.

AR_217036

# CHAPTER 3

# Guide to Report and Terminology

Throughout the report, the authors use a variety of terminology to refer to respondents in the sample or experiences that respondents reported. The authors also applied several conventions in the reporting of results. While explanations are often included in chapters to provide context and clarity, several terms and conventions that are used widely throughout the report are outlined in this chapter to make the report more accessible to a broad range of audiences.

GUIDE TO REPORT AND TERMINOLOGY

39

# I. Use of the Term "Transgender" in this Report

The term "transgender" is often used to describe people whose gender identity or expression differs from what is associated with the gender they were thought to be at birth. Although this term has often been described as an "umbrella term" that encompasses the spectrum of identities and captures the diversity of transgender people, the authors recognize that one term cannot reflect each individual's unique identity and some people prefer to use other terms to describe their gender identity. However, in order to make the report's findings clear and accessible, it was important to select a single term for consistent use throughout this report that could best represent the range of identities expressed in the USTS survey sample.

In promotional materials, the survey was described as being inclusive of all "transgender, trans, genderqueer, and non-binary" people, so that those who might have assumed that "transgender" did not include them would know their voice was welcomed. The survey also acknowledged the limitation of current language and used "trans"—a shorthand term that is widely accepted amongst transgender people—consistently throughout the questions. While respondents in this study identified with a wide range of terms— including more than 500 unique terms that were reported in response to survey questions—88% of respondents thought of themselves as transgender, and 86% expressed that they were "very comfortable," "somewhat comfortable," or "neutral" when asked how comfortable they were with the word "transgender" being used to describe them. This included 82% percent of non-binary respondents. This provides evidence of the term's continued broad usage and general acceptance. Based on this information, the

term *transgender* is used for the purposes of this report to represent the diverse identities of the individuals who made their voices heard by completing the survey.

# II. Other Transgender-Specific Terminology

## Non-binary:

This term is used by some to describe people whose gender is not exclusively male or female, including those who identify as having no gender, a gender other than male or female, or more than one gender. In this report, "non-binary respondents" refers to respondents who said that the term "non-binary/genderqueer" best describes their current gender identity in response to Q. 2.3.

## Crossdresser:

While definitions of "crossdresser" vary, many use this term to describe a person who dresses in a way that is typically associated with a gender different from the one they were thought to be at birth, but who may not identify with that gender or intend to live full time as that gender. In this report, the term "crossdressers" refers to respondents who said that the term "cross-dresser" best described their current gender identity in response to Q. 2.3.

## Gender transition:

This is a process in which a person begins to live according to their gender identity, rather than the gender they were thought to be at birth. Not all transgender people have transitioned or intend to do so, but many do. Gender transition looks different for every person. Possible steps in a gender transition may or may not include changing one's clothing, appearance, name

AR_217038

and identity documents (for example, a driver's license), or undergoing medical procedures such as hormone therapy to change one's physical characteristics. This report refers to gender transition in several places when discussing steps that may be included in one's gender transition, such as updating the name and gender on identity documents. Additionally, the report includes a variety of terms to refer to therapy/counseling, hormone therapy, surgical treatments, and other health services transgender people may undergo as part of their gender transition, including "health care related to gender transition" or "transition-related care." In this report, the term "respondents who have transitioned" refers to respondents who reported that they are living full time in response to Q. 1.12 (see below).

## Living full time:

Respondents in the sample who were described in the report as "living full time" are those who reported that they lived full time in a gender different than the gender they were thought to be at birth in response to Q. 1.12. For many people, living full time may include changing one's name, clothing, and/or appearance, or taking other actions related to their gender transition.

## Gender identity or expression:

Several questions throughout the report asked whether respondents thought that an experience had occurred due to their "transgender status/ gender identity" and/or "gender expression/ appearance." Both answer choices were included so that respondents could select what they felt best represented their experience. Since there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons were collapsed for reporting in one "gender identity/

expression" category. Additionally, several phrases are used interchangeably to describe experiences that respondents had as a result of biases due to being known or perceived to be transgender. These include, for example: "because they were transgender," "because of their transgender status," or "because of their gender identity or expression."

# III. Additional Terms and Conventions Used in the Report

## Sexual assault:

In this report, the term "sexual assault" refers to a variety of experiences of unwanted sexual contact. These may include, but are not limited to, oral, genital, or anal contact or penetration, forced fondling, and rape. Respondents were asked about their experiences with unwanted sexual contact or sexual assault in a number of different contexts. Definitions of these terms varied in some questions based on the context or, in some cases, on the national survey from which a question was adapted. Where applicable, the definition provided for "sexual assault" or "unwanted sexual contact" in each question is included in the report.

## Underground economy:

This terminology refers to fields of work that, in general, are currently criminalized in the United States. In this report, this term includes income-based sex work (including forms of work in the sex trade that are not criminalized, such as pornography), drug sales, and other income-based work that is currently criminalized. See *Sex Work and Other Underground Economy Income* chapter.

41

AR_217039

## Time period of reported experiences:

In the survey, respondents answered questions about experiences that occurred within a period of time prior to having taken the survey, such as in the past year or the past 30 days. The report refers to the time when these experiences occurred in comparison to the time when the respondent completed the survey. For example, respondents who had certain experiences within the 12 months prior to completing the survey were reported as having those experiences "in the past 12 months" or "in the past year." If a respondent had an experience that occurred within the 30 days prior to completing the survey, the experience was referred to as occurring "in the past month," "in the past 30 days," or "currently."

## Write-in responses:

At several places in the survey, respondents were given an opportunity to write in a response to a question. These write-in responses were reviewed for recoding to categorize the responses into existing answer choice categories or new categories when feasible. When it was possible to recode write-in answers into a new category, those answers were often listed in the report and labeled as a "write-in response." In many cases, it was not possible to recode the answers into existing or new categories, and these write-in-responses were included in categories such as "a reason not listed above." For more information about how write-in answers were recoded, refer to *Appendix C: Detailed Methodology.*

## U.S. population comparisons and other resources:

References to experiences of the U.S. population are included in the report for comparison and to provide context for findings where feasible. References to other research are also provided as resources in several places throughout the report. However, the list of references is not exhaustive, and should be not be treated as a comprehensive list of sources on any particular subject presented in this report.

## Stories included in the report:

Throughout the report, excerpts of stories are included in sections titled "In Our Own Voices." These stories, which were submitted by respondents after they completed the survey, are provided to support the findings of the report and offer important anecdotal evidence and context for respondents' reported experiences. These stories have been edited for length and clarity.

AR_217040

# CHAPTER 4
# Portrait of USTS Respondents

**W**ith 27,715 respondents, the U.S. Transgender Survey (USTS) is the largest survey ever conducted of transgender people in the United States, providing a rich understanding of numerous aspects of their lives and experiences. In this chapter, an overview of respondents' diverse gender identities and experiences with transitioning is presented. Additional characteristics of USTS respondents, such as race and ethnicity, age, educational attainment, and geographic location, are also presented. This information is discussed in the following sections:

I. Gender Identity and Expression
II. Experiences with Transitioning
III. Being Perceived as a Transgender Person by Others
IV. Outness
V. Race and Ethnicity
VI. Age
VII. Location
VIII. Primary Language Spoken in Home
IX. Religious or Spiritual Identity
X. Income and Employment Status
XI. Educational Attainment
XII. Disability
XIII. Citizenship and Immigration Status
XIV. Sexual Orientation
XV. Relationship Status

PORTRAIT OF USTS RESPONDENTS

# I. Gender Identity and Expression

## a. Identity

The word *transgender* is often used as an "umbrella term" intended to encompass the spectrum of identities and capture the diversity of people whose gender differs from the one they were thought to be at birth. However, language describing identity continues to evolve, and it is difficult to describe all of those identities using just one term. Acknowledging this wide range of identities, the survey asked respondents if they thought of themselves as "transgender." Eighty-eight percent (88%) of respondents reported that they thought of themselves as transgender, while the remaining 12% used other terms to describe their gender and related experiences.[1]

Respondents were also asked how comfortable they were with the word "transgender" being used to describe them on a five-point scale from "very comfortable" to "very uncomfortable." Eighty-six percent (86%) expressed that they were comfortable or neutral using this term, including 82% percent of non-binary respondents. Forty-three percent (43%) were "very comfortable," and only 14% expressed discomfort with being described as transgender[2] (Figure 4.1).

**Figure 4.1: Respondent's level of comfort with the word "transgender" being used to describe them**



Respondents were also offered a list of identity terms from which they could check all terms that described their gender identity, and they were also given an opportunity write in a gender that was not listed (Table 4.1). In addition to the listed terms, respondents wrote in more than 500 unique gender terms with which they identified.

**Table 4.1: Gender identity terms**

| Gender identity terms | % of respondents |
|---|---|
| Transgender | 65% |
| Trans | 56% |
| Trans woman (MTF, male to female) | 32% |
| Trans man (FTM, female to male) | 31% |
| Non-binary | 31% |
| Genderqueer | 29% |
| Gender non-conforming or gender variant | 27% |
| Gender fluid/fluid | 20% |
| Androgynous | 18% |
| Transsexual | 18% |
| Agender | 14% |
| Two-spirit | 7% |
| Bi-gender | 6% |
| Butch | 5% |
| Crossdresser | 5% |
| Multi-gender | 4% |
| Third gender | 4% |
| Intersex | 3% |
| Drag performer (king/queen) | 2% |
| A.G. or aggressive | 1% |
| Stud | 1% |
| Travesti | 1% |
| Bulldagger | <1% |
| Fa'afafine | <1% |
| Mahu | <1% |
| A gender not listed above | 12% |

## b. Gender Identity Categories Used for Analysis

Respondents were also asked to choose only one term that best described their current gender identity out of six possible terms (*woman, man, trans woman (MTF), trans man (FTM), non-binary/genderqueer, or crossdresser*) to determine the gender identity categories used for primary analysis.[3] Respondents

AR_217042

were grouped into four gender identity categories based on their responses. These four categories are used throughout this report to discuss the experiences of those who completed the survey: *transgender women*, *transgender men*, *non-binary people*, and *crossdressers*.[4] Those who said that *woman* or *transgender woman* best described their gender identity were included in the transgender women analytical category (33%), and those who said that *man* or *transgender man* best described their gender identity were included in the transgender men analytical category (29%). Overall, 62% of respondents were included in the transgender men and women categories. Three percent (3%) said that *crossdresser* best described their gender identity. More than one-third (35%) of respondents indicated that their gender identity was best described as *non-binary* or *genderqueer*, a term often used to describe people whose gender is not exclusively male or female, including those who identify with a gender other than male or female, as more than one gender, or as no gender[5] (Figure 4.2). Throughout the report, these respondents are referred to as "non-binary."



Figure 4.2: Gender identity

3%
Crossdressers

29%
Transgender men

35%
Non-binary people

% of respondents

33%
Transgender women

## c. Gender Assignment at Birth

Respondents were asked about the sex they were "assigned at birth, on [their] original birth certificate."[6] In this report, the term "respondents with male on their original birth certificate" is used

to describe respondents who were thought to be male when they were born (such as transgender women), and "respondents with female on their original birth certificate" is used to describe respondents who were thought to be female when they were born (such as transgender men). More than half (57%) of respondents had female on their original birth certificate, and 43% had male on their original birth certificate. Of those who were non-binary, 80% had female on their original birth certificate, and 20% had male on their original birth certificate.

## d. Development of Transgender Identity and Interactions with Other Transgender People

Respondents received questions related to the development of their transgender identity throughout their lives. A majority of respondents (60%) reported that they began to feel "different" from the sex on their original birth certificate at age 10 or younger, including 32% who began to feel different at age 5 or younger, and 28% who began to feel different between the ages of 6 and 10. Six percent (6%) reported that they began to feel different at age 21 or older (Figure 4.3).



Figure 4.3: Age they began to feel gender was different from the one on their original birth certificate

4%
21 to 25

2%
26 and over

13%
16 to 20

32%
5 and under

% of respondents

21%
11 to 15

28%
6 to 10

AR_217043

Respondents were also asked how old they were when they started to think of themselves as transgender, even if they did not know that word. One in ten (10%) reported that they began thinking of themselves as transgender at age 5 or younger. Sixteen percent (16%) began to think of themselves as transgender between the ages of 6 and 10, and 28% between the ages of 11 and 15. Eight percent (8%) reported beginning to think of themselves as transgender at age 26 or older (Figure 4.4).

Figure 4.4: Age they started to think they were transgender



Respondents were also asked at what age they began to tell others that they were transgender. One in ten (10%) respondents reported that they began to tell others that they were transgender between the ages of 11 and 15, and more than one-third (37%) did so between the ages of 16 and 20. Another 30% began telling people that they were transgender between the ages of 21 and 30, and 14% began telling people that they were transgender at age 31 or older. Additionally, 5% reported that they had not told anyone else that they were transgender (Figure 4.5).

Figure 4.5: Age they started to tell others that they were transgender



## e. Gender Identity and Current Age

The age profile of respondents[7] differed widely by gender identity categories, with nearly half (47%) of transgender men and women being aged 25–44, compared to 35% of non-binary respondents, and 29% of crossdressers. Non-binary respondents were more likely to be younger, with nearly two-thirds (61%) being aged 18–24, in contrast to transgender men (43%), transgender women (24%), and crossdressers (8%). One in five (20%) crossdressers were aged 65 or older, compared to only 5% of transgender women, 1% of non-binary respondents, and less than 1% of transgender men (Figure 4.6).

Figure 4.6: Gender identity by current age



# II. Experiences with Transitioning

Transitioning is a process by which a person begins to live in a gender that is different than the one on their original birth certificate. Not all transgender people have transitioned or intend to do so, but many do. Gender transition can involve many different aspects, including changing one's clothing, appearance, name, and identity documents (such as driver's licenses or passports) and asking people to use different pronouns (such as he, she, or they) than the ones associated with the gender on one's original birth certificate. Transitioning may also include undergoing medical procedures, such as hormone therapy or surgeries, to change one's physical characteristics. Some people make many of these changes while others do not, depending on their needs and resources. Additionally, some transgender people may desire and make some of these changes even if they do not intend to live full time in a gender that is different than the one on their original birth certificate. However, many people who want to take these steps are not able to do so because of financial constraints, safety concerns, fear of discrimination and rejection, and other barriers.

## a. Full-Time Status and Transition

Nearly two-thirds (62%) of respondents are currently living full time in a gender that was different from the one on their original birth certificate. Throughout the report, the process of living full time in a gender that is different than that on one's original birth certificate is described as "transitioning." Twenty-two percent (22%) of respondents reported that they wanted to transition someday, 13% were unsure, and 3% did not want to transition (Figure 4.7). Three-quarters (75%) of transgender men and women had transitioned, and 43% of non-binary respondents had transitioned (Figure 4.8).[8]



Figure 4.7: Transition status of respondents



Figure 4.8: Transition status of respondents
GENDER IDENTITY (%)

Respondents were also asked what gender they were living in on a day-to-day basis. Thirty-five percent (35%) of respondents reported that they currently lived as a man on a daily basis, 30% lived as a woman, 21% lived as neither a man nor a woman, and 15% lived part time in one gender and part time in another.

AR_217045

## b. Age of Transition

Those who have transitioned reported the age at which they began transitioning, or living full-time in a gender other than that on their original birth certificate. Nearly half (43%) reported that they began transitioning between the ages of 18 and 24, and nearly one-quarter (24%) transitioned between ages 25 and 34. Fifteen percent (15%) transitioned under the age of 18, and 18% transitioned at age 35 or older. Non-binary respondents and transgender men were more likely to have transitioned at a younger age, with 24% of non-binary respondents and 17% of transgender men transitioning under the age of 18, compared to 7% of transgender women (Figure 4.9).[9]

**Figure 4.9: Age began transitioning**
GENDER IDENTITY (%)



- ■ Under 18
- ■ 18 to 24
- ▨ 25 to 34
- ▨ 35 and over

## c. Number of Years Since Transitioning

The number of years since a respondent had transitioned was determined in order to provide valuable information and context for some of the respondents' experiences.[10] Nearly one-third (31%) of those who had transitioned had done so within one year of taking the survey, 38% had transitioned 2 to 5 years prior, 13% transitioned 6 to 9 years prior, and 18% had transitioned 10 or more years prior (Figure 4.10).

**Figure 4.10: Number of years since transitioning**



## d. Additional Questions for Non-Binary Respondents

Non-binary respondents received questions about what they tell other people about their gender identity. They were asked about what gender they were perceived to be by people who did not know they were non-binary. A majority reported that people usually assumed they were non-transgender women (58%), including 72% of non-binary respondents with female on their original birth certificate, and 2% of non-binary respondents with male on their birth certificate. Seventeen percent (17%) reported that other people assumed they were non-transgender men, including 77% of non-binary respondents with male on their original birth certificate, and 3% of non-binary respondents with female on their birth certificate. Nearly one in five (19%) reported that assumptions about their gender varied (Figure 4.11).

**Figure 4.11: Gender that people who do not know they are non-binary usually assume they are**



AR_217046

Non-binary respondents were asked how they responded when people in their life assumed their gender was something other than non-binary. Almost half (44%) reported that they usually let others assume they were a man or woman, and 53% sometimes corrected others and told them about their non-binary identity. Only 3% always told others that they were non-binary (Figure 4.12).

**Figure 4.12: Response when people assume that their gender is something other than non-binary**



Non-binary respondents who reported that they usually let others assume they are a man or woman or only sometimes tell people they are non-binary were asked for the main reasons they do not tell others about their non-binary identity. Respondents could select multiple reasons for choosing not to tell people about their non-binary identity. A majority of non-binary respondents reported that people do not understand so they do not try to explain it (86%) or that it is easier not to say anything (82%). Approximately two-thirds reported that their non-binary identity is often dismissed as not being a real identity or just a phase (63%), and others feared they might face violence (43%) (Table 4.2).

**Table 4.2: Main reasons for not telling people they are non-binary**

| Main reasons for not telling others about non-binary identity | % of non-binary respondents |
|---|---|
| Most people do not understand so they do not try to explain it | 86% |
| It is easier not to say anything | 82% |
| Most people dismiss it as not being a real identity or a "phase" | 63% |
| They might face violence | 43% |
| They are not ready to tell people they identify as non-binary | 35% |
| They might lose their job or not be able to get a job | 35% |
| They might not get the medical care they need | 24% |
| They might be hurt financially | 23% |
| They might face mistreatment at school | 18% |
| Their friends might reject them | 18% |
| They might become homeless | 12% |
| Their church or faith community might reject them | 6% |
| A reason not listed above | 18% |

## e. Pronouns

Eighty-four percent (84%) of respondents reported that the pronouns they used were different from those associated with the sex on their original birth certificate. Respondents reported a wide range of pronouns that they asked people to use when referring to them and could select more than one pronoun. The most widely used pronouns were "he/his" (37%), "she/her" (37%), and "they/their" (29%). One in five (20%) reported that they did not ask people to use specific pronouns when referring to them, and another 4% indicated that they used pronouns other than those provided in the answer choices. This included more than a dozen additional pronouns provided through write-in responses (Figure 4.13).

49



Figure 4.13: Pronouns respondents ask people to use

could tell they were transgender without being told "most of the time," 32% said others could "sometimes" tell, and 24% said that others could never tell (Figure 4.14).[11] Respondents' experiences with others' perception of their transgender status varied by gender identity (Figure 4.15).

Figure 4.14: How often people could tell they were transgender without being told



## III. Being Perceived as a Transgender Person by Others

Some transgender people find that others can routinely tell that they are transgender without being told, while others are generally perceived as the gender they identify with, and still others are perceived as the gender they were thought to be at birth. Many interactions and experiences of transgender people may be influenced by others' perceptions of them as being a transgender person. Transgender people who are visually or otherwise perceived by others as transgender or gender non-conforming may be more vulnerable to negative interactions in public or other settings.

To assess whether respondents were perceived as transgender, they were asked whether others could tell that they were transgender even without being told on a five-point scale from "always" to "never." Nearly one in ten (9%) reported that others

Figure 4.15: How often people could tell they were transgender without being told
GENDER IDENTITY (%)



AR_217048

# IV. Outness

Respondents were asked whether they thought different groups of people in their lives knew that they were transgender to determine if they were "out"[12] about their transgender identity to family members, friends, supervisors and colleagues at work, classmates, and health care providers. Respondents were asked whether all, most, some, or none of the people in their lives knew they were transgender in each of the groups of people in their lives. Results reflect only those respondents who had people from each group in their lives. Overall, 8% reported that they were out to all of the people in their lives, across all groups of people, 48% were out to most, 43% were out to some, and only 2% were out to none of the people in their lives.

Nearly two-thirds (62%) were out to all or most of the immediate family that they grew up with, and 38% were out to all or most of their extended family.[13] Regarding workplace environments, nearly one-half reported that none of their current supervisors (49%) or coworkers (42%) knew that they were transgender.[14] In terms of health care providers, although 40% reported that all of their health care providers knew that they were transgender, almost one-third (31%) indicated that none of their health care providers knew that they were transgender (Figure 4.16).

Of all groups of people the survey asked about, respondents were most likely to be out to all of their LGBT friends (62%). Respondents were also asked about the methods by which they socialize with other transgender people. Sixty-four percent (64%) reported that they socialized with other transgender people in person, and 79% socialized online. Nearly one-third (32%) said they interacted with transgender people in political activism, and 10% reported that they did not socialize with other transgender people.



**Figure 4.16: Outness to people in respondents' lives**

AR_217049

# V. Race and Ethnicity

Respondents received a question on race and ethnicity and were asked to select only one of the following categories that most accurately described their racial or ethnic identity:

- Alaska Native (received a write-in option)[15]

- American Indian (received a write-in option)[16]

- Asian or Asian American

- Biracial or multiracial (received a follow-up question)[17]

- Black or African American

- Latino/a or Hispanic

- Middle Eastern or North African

- Native Hawaiian or Pacific Islander

- White or European American

- A racial or ethnic identity not listed above (received a follow-up question)[18]

Throughout the report, respondents who identified as biracial, multiracial, or more than one racial or ethnic category are included in the multiracial group. Additionally, due to small sample sizes and for purposes of analysis, certain racial and ethnic groups were combined into single categories. American Indian and Alaska Native respondents are combined in one category and reported as "American Indian." Similarly, the Asian/Asian American and Native Hawaiian/Pacific Islander groups are also combined in one category and reported as "Asian."[19]

The USTS sample had a percentage of white respondents that is notably higher than the U.S. general population, which is common among internet-based surveys.[20] Therefore, a race and ethnicity weight was developed to more closely represent what is estimated to be the actual racial and ethnic distribution for the transgender population in the U.S., based on the Census

Bureau's 2014 American Community Survey (ACS).[21] Racial and ethnic categories were weighted to reflect the ACS distribution for race and ethnicity as part of the standard survey weight that was applied to all results presented in the report (Figure 4.17).[22]

Figure 4.17: Race and ethnicity of respondents



0.7% American Indian

5.1% Asian

12.6% Black

% of respondents

62.2% White

16.6% Latino/a

0.4% Middle Eastern

2.5% Multiracial

# VI. Age

The age of respondents in the sample ranged from 18 to 87. The overall age of respondents in the sample was generally younger than that in the U.S population. In addition to having a younger age distribution, a disproportionally large number of respondents reported an age of 18 years old. Therefore a weight was created to balance the representation in the sample of those 18-year-old respondents in relation to the rest of the sample. This weight was part of the standard survey weight that was applied to all results presented in this report (Figure 4.18). Additionally, for certain findings in this report, a "supplemental weight" was applied to adjust the USTS sample to reflect the age distribution for the U.S. population based on the ACS.[23]

AR_217050

**Figure 4.18: Age of respondents**




# VII. Location

The sample included respondents from all 50 states, the District of Columbia, American Samoa, Guam, Puerto Rico, and several U.S. military bases overseas. The geographic distribution of the sample generally mirrors that of the U.S. general population (Figure 4.19).

The sample was divided into regions based on the Census Bureau regions, which included the Northeast, Midwest, South, and West (Figure 4.20). These regional categories did not include U.S. territories or U.S. military bases overseas.

**Figure 4.19**




*Each dot on the maps represents the number of people in a zip code. Every dot corresponds to at least one person, and the size of each dot increases in accordance with the number of people in each zip code.*

PORTRAIT OF USTS RESPONDENTS

53

**Figure 4.20: Respondents' location by region**





Northeast (CT, ME, MA, NH, NJ, NY, PA, RI, VT)

Midwest (IA, IN, IL, KS, MI, MN, MS, NE, ND, OH, SD, WI)

South (AL, AR, DE, DC, FL, GA, KY, LA, MD, MS, NC, OK, SC, TN, TX, VA, WV)

West (AK, AZ, CA, CO, HI, ID, MT, NM, NV, OR, UT, WA, WY)

# VIII. Primary Language Spoken in Home

Respondents were asked about the primary language spoken in their home. Eighty-four percent (84%) reported that English was the only language spoken in their home, compared to 79% in the U.S. general population, as reported in the

American Community Survey (ACS).[25] Fourteen percent (14%) reported that English and another language were mainly spoken in their home, and 2% reported that a language other than English was the primary language spoken in their home. In addition to spoken languages, 0.4% of respondents also reported that American Sign Language was either the main language or one of the main languages used in their home.

Spanish (including Spanish Creole) was reported as the most common language spoken in their home other than English, with 10% of respondents reporting Spanish was the main language spoken in their home, exclusively or along with English. This was slightly lower than the percentage of those who spoke Spanish in the home in the U.S. general population (13%).[26] Each of the other identified languages were spoken by less than 1% of respondents.

# IX. Religious or Spiritual Identity

Respondents were asked about their current religious or spiritual identity and could select one or more identities from a provided list, or they could select a religious affiliation or spiritual identity not listed.[27,28] Sixty-three percent (63%) of respondents reported that they had a spiritual or religious identity, and 37% of respondents reported that they did not have a spiritual or religious identity.[29] Respondents were most likely to identify as agnostic (23%), atheist (22%), or Christian (21%), followed by a smaller percentage who identified as Pagan (9%), Buddhist (6%), or Jewish (4%). One-quarter (25%) of respondents identified as spiritual, but with no religious affiliation. Thirteen percent (13%) had no religious or spiritual affiliation, and 7% identified with a religious affiliation or spiritual identity that was not listed (Table 4.3).

Table 4.3: Current religious or spiritual identity

| Current religious or spiritual identity | % of respondents |
|---|---|
| Spiritual, but no religious affiliation | 25% |
| Agnostic | 23% |
| Atheist | 22% |
| Christian | 21% |
| Pagan | 9% |
| Buddhist | 6% |
| Jewish | 4% |
| Secular Humanist | 4% |
| Wiccan | 4% |
| Druid | 1% |
| Hindu | 1% |
| Muslim | 1% |
| Native American Traditional Practitioner or Ceremonial | 1% |
| Polytheist (write-in response) | 1% |
| Taoist | 1% |
| Baha'i | <1% |
| Confucian | <1% |
| Jain | <1% |
| Jehovah's Witness | <1% |
| Rastafarian | <1% |
| Scientologist | <1% |
| Shinto | <1% |
| Sikh | <1% |
| Tenrikyo | <1% |
| A religious affiliation or spiritual identity not listed above | 7% |
| No affiliation | 13% |

# X. Income and Employment Status

Respondents were asked about various aspects of their income using a series of questions based on the Current Population Survey (CPS).[30] Results for income and employment status are presented briefly in this section and discussed in greater detail in the *Income and Employment Status* chapter. In order to compare USTS respondents' income and employment data with data from the CPS and other national data sources, income and employment results are presented with the "supplement weight" applied.[31]

## a. Sources of Income

Nearly half (45%) of respondents received income from multiple sources, such as employment, Social Security income, or a pension. Thirty-six percent (36%) received income solely from their own employment or a partner or spouse's employment (not including underground economy work, such as sex work, drug sales, or other work that is currently criminalized). Nearly one in ten (9%) received income from Social Security, including disability, and 3% received income solely from a pension. Three percent (3%) reported that they were currently working in the underground economy, including 1% whose income came solely from underground economy work (Table 4.4).

Table 4.4: Current sources of income by single and multiple sources

| Sources of income | % of respondents (supplemental weight) |
|---|---|
| Employment only (from their own employer, partner/spouse's employer, or self-employment) | 36% |
| Social Security income/disability only | 9% |
| Pension/retirement only | 3% |
| Other sources of income only | 3% |
| No income | 2% |
| Sex work and other underground economy work only | 1% |
| Unemployment benefits/cash assistance only | 1% |
| Multiple sources | 45% |

AR_217053

## b. Individual and Household Income

Individual and household incomes for the USTS sample and the U.S. population were reported from 2014, the last full year prior to the survey for which annual income figures were available. Respondents reported lower incomes than the U.S. population (Figure 4.21 & Figure 4.22).[32]

**Figure 4.21: Individual income in 2014**



**Figure 4.22: Household income in 2014**



## c. Poverty

Nearly one-third (29%) of respondents were living in poverty,[33] more than twice the poverty rate among the general U.S. adult population (12%).[34]

## d. Employment Status

When asked about their current employment status, 35% of respondents reported that they currently had at least one full-time job, 15% had at least one part-time job, 15% were self-employed, and 11% were students. The unemployment rate for USTS respondents was 15%, three times the U.S. unemployment rate at the time of the survey (5%).[35]

# XI. Educational Attainment

Respondents were asked about the highest level of education or degree that they had completed. Thirteen percent (13%) of respondents had a high school diploma or GED, or did not complete high school. Forty percent (40%) had completed some college but had not obtained a degree, 9% had an associate's degree, and 38% had received a bachelor's degree or higher (Figure 4.23).

**Figure 4.23: Educational attainment (categories used in report)**



Throughout the report, educational attainment is reported according to the categories reflected in Figure 4.23. However, alternative categories are

also presented here for comparison to the U.S. population.[36] The USTS sample overall reflected higher educational attainment than the U.S. population, which is common among internet-based surveys.[37] To account for differences in educational attainment by age, USTS respondents are compared to the U.S. population for two age ranges: (1) ages 18 to 24 (Figure 4.24) and (2) ages 25 and older (Figure 4.25).[38]

**Figure 4.24: Educational attainment (ACS categories), ages 18 to 24**



# XII. Disability

Respondents received questions about their disability status based on questions from the American Community Survey (ACS) in order to compare those in the USTS sample to those with disabilities in the U.S. general population. Overall, 39% of respondents indicated that they had one or more disability as described in the ACS, compared to 15% of the general population.[39] Four percent (4%) of the sample reported that they were deaf or had serious difficulty hearing, similarly to the U.S. general population (4%).[40] Three percent (3%) reported that they were blind or had serious difficulty seeing even when wearing glasses, similarly to those in the U.S. population (3%).[41] USTS respondents were six times as likely to report having serious difficulty concentrating, remembering, or making decisions because of a physical, mental, or emotional condition (30%), in contrast to those in the U.S. population (5%).[42] Respondents were also almost four times as likely to report difficulty doing errands alone, such as visiting a doctor's office or shopping because of a physical, mental, or emotional condition (22%), compared to the U.S. population (6%) (Figure 4.26).[43]

**Figure 4.25: Educational attainment (ACS categories), age 25 and older**



**Figure 4.26: Disability status**



AR_217055

Respondents were also asked if they identified as a person with a disability to better capture disabilities that were not outlined in the ACS. Twenty-eight percent (28%) of the sample identified as a person with a disability.[44] Throughout the report, the experiences of "people with disabilities" reflect the experiences of these individuals.

# XIII. Citizenship and Immigration Status

Respondents were asked about their citizenship or immigration status. In addition to those who were citizens in the sample (97%), respondents reported a range of immigration statuses, including being permanent residents (1%), visa holders (1%), refugees (<1%), or undocumented residents (<1%) (Table 4.5).

**Table 4.5: Citizenship or immigration status**

| Citizenship or immigration status | % of respondents |
|---|---|
| U.S. citizen (by birth) | 94% |
| U.S. citizen (naturalized) | 3% |
| Permanent resident | 1% |
| A visa holder (such as F-1, J-1, H1-B, or U) | 1% |
| Undocumented resident | <1% |
| DACA (Deferred Action for Childhood Arrival) | <1% |
| Refugee status | <1% |
| Currently under a withholding of removal status | <1% |
| DAPA (Deferred Action for Parental Accountability) | <1% |
| Other documented status not listed | <1% |

Six percent (6%) of respondents were not citizens by birth, compared to 16% in the U.S. population.[45] This included approximately 3% who were naturalized citizens, 2% who were documented residents (such as permanent residents and visa holders), and <1% who were undocumented residents[46] (Table 4.6).

**Table 4.6: Citizenship or immigration status (collapsed)**

| Citizenship or immigration status | % in USTS | % in U.S. population (Census) |
|---|---|---|
| U.S. citizen (by birth) | 94% | 84% |
| U.S. citizen (naturalized) | 3% | 8% |
| Documented resident | 2% | 8% |
| Undocumented resident | <1% | |

Respondents who were not U.S. citizens by birth were asked if they had ever applied for asylum in the United States. Seven percent (7%) applied for asylum, including 3% who applied on the basis of their gender identity or sexual orientation. Of those who did not apply for asylum, 51% reported that they did not need asylum in order to stay in the United States because they had access to other avenues for becoming citizens, permanent residents, or visa holders.[47] Other respondents indicated that they did not know how to apply (17%) or did not apply for other reasons (Table 4.7).

**Table 4.7: Reasons for not applying for asylum**

| Reasons for not applying for asylum | % of those who did not apply for asylum |
|---|---|
| They had access to other legal statuses | 51% |
| They did not know how to apply | 17% |
| They did not want to apply | 16% |
| They did not need to or were not eligible | 12% |
| They were afraid to apply | 3% |
| They believed they were past the one-year deadline | 2% |
| A reason not listed above | 30% |

Nearly half (48%) of respondents who applied for asylum received it. Another 32% did not receive asylum but instead received a "withholding of removal" status, an alternative form of relief that allows someone to stay in the United States under certain conditions. One in five (20%) of these respondents were denied asylum (Figure 4.27). Of the respondents who were denied asylum (n=11, unweighted),[48] 31% reported that they were denied asylum because they were past the one-year deadline, 44% indicated that it was because the immigration official decided that they did not face danger in their country of origin, and 25% reported that it was because of a reason not listed.

2015 U.S. TRANSGENDER SURVEY

Figure 4.27: Outcome of asylum application



# XIV. Sexual Orientation

Respondents were asked which terms best described their sexual orientation. Respondents were most likely to identify as queer (21%), and they also identified as pansexual (18%), gay, lesbian, or same-gender-loving (16%), straight (15%), bisexual (14%), and asexual (10%) (Figure 4.28).

Figure 4.28: Sexual orientation



# XV. Relationship Status

Respondents were asked about their relationship status. Thirty-one percent (31%) were partnered and living together, 17% were partnered and not living together, 49% were single, 2% were in a polyamorous relationship, and 1% had a relationship status that was not listed. Respondents were also asked about their current legal marital status for the purpose of comparison to the U.S. adult population through the ACS. Eighteen percent (18%) of USTS respondents were currently married, in contrast to 52% in the U.S. adult population (Figure 4.29).[49] Almost three-quarters (72%) of respondents have never been married, which is more than twice as many as the U.S. adult population (30%).

Figure 4.29: Currently married
CURRENT AGE (%)



PORTRAIT OF USTS RESPONDENTS

AR_217057

**ENDNOTES** | CHAPTER 4: PORTRAIT OF USTS RESPONDENTS

1   Respondents who were among the 12% who did not "think of [themselves] as transgender" in Q. 1.10 were eligible for the survey based on answers they provided to questions Q. 1.11–1.18. See *Appendix C (Detailed Methodology)* for a discussion of eligibility. Many of those individuals identified other terms that better described their gender and experiences.

2   Although only 12% of respondents reported that they did not think of themselves as transgender in response to Q. 1.10, a slightly larger number (14%) expressed discomfort with the word "transgender" being used to describe them in Q. 2.4. This may have been due to respondents' differentiation between identity and the terminology used to describe their identity. For example, while a respondent may have identified with the word transgender, they may not have been comfortable using the term "transgender" and would have instead preferred another term to describe their identity.

3   See Q. 2.3.

4   While most respondents were categorized for analysis by gender identity based on their selection of the term that best described them in Q. 2.3 and their selection in Q. 2.1 (sex assigned at birth on their original birth certificate) alone, a small number of respondents (n=439) required further analysis of their survey responses to determine if they met the eligibility criteria for the survey and, if so, what the most appropriate gender identity categories were for analysis. This included, for example, respondents who indicated in Q. 2.1 that the gender on their original birth certificate was female and that they identified as a woman in Q. 2.3, or who indicated that the gender on their original birth certificate was male and that they identified as a man. This recoding process is described in further detail in *Appendix C (Detailed Methodology)*.

5   Respondents were also asked in an earlier question (Q. 1.11) if they identified "as more than one gender or as no gender (such as genderqueer or non-binary)," without asking them if that is the *best* term to describe their gender identity. Nearly half (47%) of respondents said that they identify as such. This means that some respondents who said that another term (such as transgender man, transgender woman, or crossdresser) best described their gender identity also identified as having more than one gender or as no gender.

6   Although the vast majority of people have either male or female on their original birth certificate, there are rare instances where the sex on a birth certificate is left blank or where a gender marker other than "male" or "female"

is listed at the time of birth. It is possible that some respondents had an original birth certificate that did not list them as "male" or "female" at the time of their birth. These respondents may not have been able to accurately answer this question. Respondents were required to select one response to the question about the sex listed on their original birth certificate in Q. 2.1—either "female" or "male"—in order to proceed, since this answer was used to determine subsequent questions that they would receive later in the survey.

7   The age of respondents in the sample is discussed in further detail in section VI of this chapter.

8   Note that Q. 1.12 asked whether respondents were currently living full time in a gender different from the one assigned to them at birth. Some non-binary respondents may have been living as a non-binary person full time (including people for whom living part time in one gender and part time in another gender is most consistent with their non-binary identity), but did not select "yes" because they assumed the survey was asking only about people who were living exclusively in a binary gender (male or female) that is different than the gender on their original birth certificate.

9   Although 6% of crossdressers reported that they had transitioned based on Q. 1.12, the sample size of crossdressers who had transitioned was too low to report on their experiences by age.

10  The number of years since transitioning was calculated based on respondents' current age as reported in Q. 2.13, and the age at which they began to transition, as reported in Q. 1.13.

11  Throughout this report, respondents' experiences with being perceived as transgender by others are reported according to three categories: those who said that people could tell they were transgender "always" or "most of time" (11%), those who said that others could "sometimes" tell (32%), and those who said that others could "rarely" or "never" tell (57%).

12  The term "out" is used here to describe a person who openly self-identifies as transgender in their private, public, and/or professional lives.

13  See the *Family Life and Faith Communities* chapter for a more detailed discussion of respondents' experiences with being out to the immediate family they grew up with and their extended family, as well as their experiences with being out to partners or spouses and children.

14  Respondents' experiences with being out in the workplace are further discussed in the *Employment and the Workplace* chapter.

AR_217058

15  Respondents who reported that "Alaska Native" most accurately described their racial or ethnic identity were asked to enter their enrolled or principal corporation.

16  Respondents who reported that "American Indian" most accurately described their racial or ethnic identity were asked to enter their enrolled or principal tribe.

17  Those who reported that "biracial/multiracial" best described their racial or ethnic identity received a follow-up question in which they could select one or more of the racial or ethnic identities listed above that best described them.

18  Those who selected "a racial/ethnic identity not listed above" were asked to specify their identity and then received a follow-up question asking them to select the racial/ethnic identity or identities that best described them from the list above, with the exception of the "identity not listed above" category.

19  Racial and ethnic categories are combined in a manner similar to that in the U.S. Census, which is important for the purposes of making racial and ethnic comparisons to the U.S. population. A notable exception to U.S. Census categorization is that Middle Eastern and white respondents are reported separately throughout the report. The U.S. Census also offers Asians and Native Hawaiians/Other Pacific Islanders as two separate racial categories. Additionally, this report includes a Latino/a category, and other racial and ethnic categories should be considered to be of "non-Hispanic" origin, based on U.S. Census categories.

20  The difference in racial and ethnic population distribution in the USTS sample and the U.S. general population may be due to sampling bias that is common in internet-based surveys and convenience samples. See e.g., Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method (4th ed.)*. Hoboken, NJ: John Wiley & Sons. See also the *Methodology* chapter and *Appendix C (Detailed Methodology)* for more information about potential internet-based survey sampling bias. See *Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for race and ethnicity in the USTS sample.

21  Prior research using representative samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity, with transgender people being more likely to be people of color. See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States.* Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health, 102*(1), 118–122. The USTS sample has a higher percentage of white respondents than the U.S. general population. To help correct for this sampling bias, weights for race and ethnicity were applied based on the racial and ethnic makeup of the U.S. population. While this may still over-

represent white respondents relative to the makeup of the transgender adult population, this weighting procedure brings the sample closer to what is estimated to be the true population distribution for race and ethnicity for transgender people. See the *Methodology* chapter and *Appendix C (Detailed Methodology)* for more information on weighting procedures applied to the sample. See also *Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for race and ethnicity in the USTS sample.

22  Although the ACS groups Middle Eastern and white people in one category, the experiences of Middle Eastern respondents are presented separately from white respondents throughout this report. Despite a low number of Middle Eastern respondents in the sample overall (<1%), it is important to report in a manner that best reflects the unique circumstances of transgender people who identify as Middle Eastern.

23  The weight for 18-year-old respondents was created with propensity scores developed using a regression discontinuity model. For more information on this process and other weighting procedures, such as the development and application of the "supplemental weight," see *Appendix C (Detailed Methodology). See Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for age in the USTS sample.

24  U.S. Census Bureau. (2015). *Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2015.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2015_PEPANNRES&src=pt.

25  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Language spoken at home by ability to speak English for the population 5 years and over.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_B16001&prodType=table. The percentages of people who reported on the primary language spoken in their home in the American Community Survey (ACS) were calculated by the research team. ACS findings include those in the U.S. population who are 5 years of age and older, in contrast to the USTS sample, which includes respondents who are 18 and older. Therefore, the comparison to the USTS sample should be interpreted with caution.

26  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Language spoken at home by ability to speak English for the population 5 years and over.* See note 25.

27  Q. 2.12 asked about religious or spiritual identity only, rather than current involvement in a faith community. More information about respondents' experiences in faith communities (including religious and spiritual communities) can be found in the *Family and Faith Communities* chapter.

AR_217059

28   In addition to the main drop-down list of affiliations, those who identified as Christian, Jewish, or Muslim were able to provide additional specificity for their identity from a drop-down list of more specific religious affiliations in Q. 2.12. Although respondents were provided with numerous categories to specify for Christian, Jewish, and Muslim faiths, these lists were not exhaustive and likely did not capture all religious or spiritual identities represented in the sample. Furthermore, while those who identified as Christian were given an option to write in a Christian affiliation that was not listed, Jewish and Muslim respondents did not receive that option, which may have limited the manner in which they were able to identify their religious or spiritual identity.

29   Respondents who reported that they did not have a religious or spiritual identity included those who selected agnostic, atheist, or no affiliation without selecting another religious or spiritual identity.

30   The Current Population Survey is used by the Bureau of Labor Statistics to make determinations about the state of employment in the United States.

31   The "supplemental weight" includes the standard survey weight for 18-year-olds and race and ethnicity, as well as additional weights for age and educational attainment that were created based on the Census Bureau's 2014 American Community Survey (ACS). This weight was applied when comparing the USTS sample to the U.S. population for items that were sensitive to age and educational attainment, such as employment status and individual and household income.

32   USTS respondents seem to have similar household sizes to the U.S. population. For instance, according to the CPS, 2015 Annual Social and Economic Supplement, 28% of U.S. households have a household size of one, whereas 29% of USTS respondents have a household size of one (supplemental weight applied). However, USTS respondents are less likely to be living with family members, rather than with unrelated members of the household. Sixty-four percent (64%, supplemental weight applied) of USTS respondents reported a family size of one compared to 24% in U.S. population as reported in the CPS. Available at: https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar15.pdf. Calculations were completed by the research team.

33   "Living in poverty" means living at or near the poverty line. The research team calculated the USTS poverty measure using the official poverty measure, as defined by the U.S. Census Bureau, which can be found at: https://www.census.gov/hhes/www/poverty/about/overview/measure.html. The income ranges in the USTS allowed for designation of respondents as living in or near poverty if their total family income fell under 125% of the official poverty line.

34   Proctor, B. D., Semega, J. L., & Kollar, M. A. (2016). *Income and Poverty in the United States: 2015.* (p. 13). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2016/demo/p60-256.pdf. Calculations were completed by the research team.

35   Bureau of Labor Statistics. (2015). *The Employment Situation—August 2015.* Available at: http://www.bls.gov/news.release/archives/empsit_09042015.pdf; Bureau of Labor Statistics. (2015). *The Employment Situation—September 2015.* Available at: http://www.bls.gov/news.release/archives/empsit_10022015.pdf.

36   The educational attainment results reported for USTS respondents likely overestimates the number of transgender people with a level of education beyond high school and/or some college. This may be due to the method by which the survey was administered (online only) and the sampling technique (convenience sampling). Population-based surveys in several states have found lower educational attainment or no difference in educational attainment among transgender people when compared to non-transgender people. Conron, et al. See note 21; Meyer, I .H., Brown, T. N. T., Herman, J. L., Reisner, S. L., & Bockting, W. O. (in press). Demographic characteristics and health outcomes among transgender adults in select U.S. regions in the Behavioral Risk Factor Surveillance System. *American Journal of Public Health.*

37   See the *Methodology* chapter and the detailed methodology explanation in *Appendix C (Detailed Methodology)* for more information about potential internet-based survey sampling bias. See also note 20.

38   U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Educational Attainment.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S1501&prodType=table.

39   U.S. Census Bureau. (2015). *2015 American Survey 1-Year estimates: Disability characteristics.* Available at: http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S1810&prodType=table. Calculations were completed by the research team.

40   U.S. Census Bureau. (2015). See note 39.

41   U.S. Census Bureau. (2015). See note 39.

42   U.S. Census Bureau. (2015). See note 39.

43   U.S. Census Bureau. (2015). See note 39.

44   The difference in the reported rate of those who had one or more listed ACS disabilities (39%) and those who identified as a person with a disability (28%) may be due to some individuals not being comfortable referring to themselves as a person with a disability. However, those who identified as people with a disability likely reflect a much wider range of disabilities.

45  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Sex by age by nativity and citizenship status.* Available at: https://factfinder. census.gov/faces/tableservices/jsf/pages/productview. xhtml?pid=ACS_15_1YR_B05003&prodType=table. Calculations were completed by the research team.

46  Documented and undocumented residents are often underrepresented in surveys for many reasons, including concerns about jeopardizing their residency by revealing information about their immigration status on a survey. When asking questions relating to citizenship and immigration status, the survey included statements reminding respondents that their answers were confidential and could not be used against them. However, it is likely that the number of documented and undocumented residents is underrepresented in this sample.

47  This percentage includes those who reported that they had access to other legal statuses and those who indicated that they were already citizens or permanent residents in Q. 9.8.

48  Due to the small sample size, the unweighted frequency is being presented alongside weighted percentages here to be clear that the percentages reflect the experiences of a small sample of respondents. While it is important to present these experiences in this report, the findings presented in this sentence should be interpreted with caution due to the small sample size.

49  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Sex by marital status by age for the population 15 years and over.* Available at: https://factfinder.census.gov/faces/tableservices/ jsf/pages/productview.xhtml?pid=ACS_15_1YR_ B12002&prodType=table. These findings, as presented in the ACS, include adults who are currently married with both spouses who are present and not present based on the ACS definitions. Calculations were completed by the research team.

PORTRAIT OF USTS RESPONDENTS

AR_217061

# CHAPTER 5

# Family Life and Faith Communities

2015 U.S. TRANSGENDER SURVEY

F amily life and the state of relationships with family members, including immediate and extended family, spouses and partners, and children, have been shown to impact life outcomes in many areas, such as physical and mental health, economic status, and housing stability.[1] Experiences of support and rejection within the family environment can have a profound effect on these outcomes for transgender people. The survey explored aspects of family relationships for transgender people, particularly the impact of family acceptance and rejection.

Since spiritual and religious communities (such as within a church, synagogue, mosque, or other faith community) can play a significant role within families and throughout an individual's life, the survey also examined respondents' experiences with faith communities.

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217062

**KEY FINDINGS**

▶ Sixty percent (60%) of respondents who were out to the immediate family they grew up with reported that they had supportive families, and 40% had families that were neutral or not supportive.

- One in ten (10%) reported that an immediate family member had been violent towards them because they were transgender.

- Fifteen percent (15%) ran away from home and/or were kicked out of the house because they were transgender.

▶ More than one-quarter (27%) of respondents who have been out to any of their past or current spouses or partners reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.

▶ Eighteen percent (18%) of respondents were parents.

▶ Twenty-one percent (21%) of respondents who were out to their children had a child who stopped speaking to them or spending time with them after coming out as transgender.

▶ One-half (50%) of respondents who were out to their family experienced at least one form of rejection from the immediate family they grew up with, their spouse or partner, and/or their children because they were transgender.

▶ Family support was associated with positive outcomes while family rejection was associated with negative outcomes. Respondents who were rejected were:

- Nearly twice as likely to have experienced homelessness (40%) as those who were not rejected (22%).

- Almost twice as likely to have engaged in sex work (16%) as those who were not rejected (9%).

- More likely to have attempted suicide (49%) than those who were not rejected (33%).

▶ Nearly one in five (19%) respondents who had ever been part of a spiritual or religious community left due to rejection. Forty-two percent (42%) of those who left found a welcoming spiritual or religious community.

FAMILY LIFE AND FAITH COMMUNITIES

AR_217063

# I. Outness to Family and Friends

Respondents received a series of questions to determine whether they were "out"[2] about their transgender identity to various family members and friends. Specifically, respondents were asked whether people in different groups knew they were transgender, including spouses and partners, children, immediate family they grew up with, extended family, LGBT[3] friends, and straight and non-transgender (non-LGBT) friends. Respondents then received questions regarding the impact that anti-transgender bias had on the relationships with most of the people in those groups.

Eighty-six percent (86%) of respondents reported having a current or former spouse or partner. Fifty-eight percent (58%) of those were out to their current spouse or partner and 53% had been out to at least one of their former spouses or partners. Overall, 88% of these respondents were or have been out to a current or former spouse or partner.

Of the 18% of respondents who had children, 69% reported being out to at least one child. This varied by race and ethnicity, with American Indian respondents (78%) reporting the highest level of outness, and Black (62%), Latino/a (62%), and Asian (55%) individuals being out to their children less often (Figure 5.1).

Respondents were asked whether they were currently out to all, most, some, or none of the people in several groups, including the immediate family they grew up with, extended family,[4] LGBT friends, and straight and non-transgender (non-LGBT) friends. Results for each group reflect only respondents who reported having people from that group in their lives.

More than half (53%) of respondents reported that they were out to all immediate family they grew up with. This number decreased to 49% when considering spouses or partners and children as part of the immediate family. Respondents were less likely to be out to extended family members, with 23% reporting that they were out to all extended family. Overall, less than one-quarter (22%) of respondents were out to all immediate family members—including spouses, partners and children—and extended family members.

Respondents were also asked whether their LGBT and non-LGBT friends knew that they were transgender. LGBT friends were the largest group of people among whom survey respondents were out, with 62% reporting that they were out to all of their LGBT friends. In contrast, less than one-third (32%) of respondents were out to all of their non-LGBT friends (Table 5.1).

**Table 5.1: Outness to family and friend groups**

| Family and friend groups | % of respondents who had people from the family or friend group in their lives | | |
|---|---|---|---|
| | All | Most or some | None |
| Lesbian, gay, bisexual, or transgender (LGBT) friends | 62% | 34% | 4% |
| Immediate family they grew up with (such as parents or siblings) | 53% | 25% | 22% |
| Immediate family they grew up with, spouses/partners, children | 49% | 43% | 8% |
| Straight, non-transgender (non-LGBT) friends | 32% | 56% | 12% |
| Extended family (such as aunts, uncles, and cousins) | 23% | 38% | 39% |
| Immediate family they grew up with, extended family, spouses/ partners, and children | 22% | 70% | 8% |

**Figure 5.1: Out to children**
RACE/ETHNICITY (%)



*Sample size too low to report

2015 U.S. TRANSGENDER SURVEY

# II. Relationships with Spouses or Partners

Those who were out to a spouse or partner were asked whether a spouse or partner had ended their relationship because they were transgender. More than a quarter (27%) reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.

Whether a relationship ended solely due to being transgender differed based on a respondents' current age, with those aged 45 and older being twice as likely to have this experience (Figure 5.2).

**Figure 5.2: Spouse/partner ended relationship solely because of transgender status**
CURRENT AGE (%)



The age at which a respondent transitioned also affected the likelihood of a relationship ending. Respondents who transitioned at age 35 or older were more than twice as likely to have their relationship end solely due to being transgender (24%) (Figure 5.3).

**Figure 5.3: Spouse/partner ended relationship solely because of transgender status**
AGE OF TRANSITION (%)



The likelihood of a relationship ending also differed by gender identity, with transgender women (18%) being more likely to have a relationship with a spouse or partner end solely because of being transgender than transgender men (9%), crossdressers (6%), and non-binary people (3%) (Figure 5.4).

**Figure 5.4: Spouse/partner ended relationship solely because of transgender status**
GENDER IDENTITY (%)



*More than one-quarter (27%) of respondents who were out to their spouse or partner reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.*

Respondents were also asked whether a current or former romantic or sexual partner had ever been violent toward them. More than half (54%) reported that they had experienced some form of intimate partner violence. Experiences with intimate partner violence are discussed further in the *Harassment and Violence* chapter.

## III. Parental Status and Related Children in the Household

Eighteen percent (18%) of people in the sample were parents,[5] and of those individuals, more than two-thirds (69%) reported that they were out as transgender to at least one of their children.

In comparison to the U.S. adult population, USTS respondents were substantially less likely to have related children living in their home. According to the Current Population Survey, 34% of adults in the U.S. population had at least one related child under the age of 18 living in their household in 2015,[6] which was more than twice as many

# In Our Own Voices

"When I finally had the courage to come out, my parents, who I knew would freak out, did the unthinkable. They assured me I had their complete support to be who I am. I was never prouder than in that moment."

"My father physically assaulted me and kicked me out of the house. He screamed at me, calling me pathetic, a waste, worthless, and so on. I sat in silence."

"When I was 20, I slipped up and accidentally outed myself to my parents. It was the worst mistake of my life. They spoke with a pastor who convinced them that I was possessed by demon. A couple of days later, they told me to leave and not come back. I spent the next six months homeless."

"Within an hour of coming out to my parents, I was kicked out into the cold with very few items and my car taken away. I was soon informed by my college that my parents had withdrawn my tuition for the upcoming spring semester. I was devastated."

"It took my family a while to come around. At first they didn't accept me, but they eventually saw how much happier I am and are now my biggest supporters."

AR_217066

as USTS respondents (14%).[7] These differences persisted across all age groups, with USTS respondents aged 25 to 44 being more than four times less likely to have a related child under the age of 18 living in their household (12%) than the corresponding age group in the U.S. population (54%) (Figure 5.5).

**Figure 5.5: Respondents with related children under 18 living in household**
AGE (%)



USTS respondents with a related child under 18 in household

Adults in the U.S. population with a related child under 18 in household (CPS)

# IV. Relationships with Children

Respondents who reported that they were out to at least one of their children were asked a question to determine whether being transgender had ever negatively impacted a relationship with their child. Specifically, they were asked whether any of their children had ever stopped speaking to or spending time with them because they were transgender. More than one in five (21%) reported that at least one of their children stopped speaking

*More than one in five (21%) of those who were out to their children reported that at least one of their children stopped speaking or spending time with them, temporarily or permanently.*

or spending time with them, at least for a period of time.

The likelihood of this experience differed by gender identity, with transgender women (28%) being more than four times as likely to report that their child stopped speaking or spending time with them as transgender men (6%) and non-binary respondents (6%) (Figure 5.6).

**Figure 5.6: Children stopped speaking or spending time with respondent because of transgender status**
GENDER IDENTITY (%)



Overall, of respondents who have had a spouse or partner and/or who have children, 28% have had a relationship with their spouse or partner or child end, at least temporarily.

# V. Family Acceptance and Support

Respondents who reported that they were out to all, most, or some of the immediate family they grew up with were asked to assess how supportive their family was of them as a transgender person using a five-point scale from "very supportive" to "very unsupportive." The categories were collapsed to create a new variable reflecting a supportive, neutral, or unsupportive family.[8]

More than half (60%) reported that their family was supportive, 18% had unsupportive families, and 22% had families that were neither supportive nor unsupportive ("neutral").

*Experiences varied widely between those with family support and those with unsupportive families, with family support being associated with a reduced likelihood of negative experiences. Respondents with family support were:*

- *More likely to be employed (65%) than those with unsupportive families (52%).*

- *Less likely to have ever done sex work (11%) than those with unsupportive families (16%).*

- *Less likely to have experienced homelessness (27%) than those with unsupportive families (45%).*

- *Less likely to report currently experiencing serious psychological distress[9] (31%) in contrast to those with unsupportive families (50%).*

- *Less likely to have attempted suicide (37%) than those with unsupportive families (54%).*

*More than half (60%) of those who were out to their immediate family reported that their family was supportive, while 18% said that their family was unsupportive.*

# VI. Relationships with Immediate Family/ Family of Origin[10]

Nearly half (44%) of respondents who were out to all, most, or some of the immediate family they grew up with (such as parents and siblings) reported that they had experienced at least one form of family rejection outlined in the survey. This rejection included relationships ending, family violence, being kicked out of the house, not being allowed to wear clothes matching their gender identity, and being sent to a professional to stop them from being transgender.

## A. Ended Relationships

Among those who were out to their immediate family, more than one-quarter (26%) reported that an immediate family member stopped speaking to them for a long time or ended their relationship altogether because they were transgender. This was higher among American Indian (38%), Middle Eastern (37%), and Black (30%) respondents, and lower for Asian (22%) respondents (Figure 5.7). Undocumented residents (39%) were also more likely to face this form of family rejection than documented non-citizens (22%) and citizens (26%).

AR_217068



**Figure 5.7: Immediate family member stopped speaking or ended relationship**
RACE/ETHNICITY (%)

*More than one-quarter (26%) of respondents reported that an immediate family member stopped speaking to them for a long time or ended their relationship altogether because they were transgender.*

Whether a family member stopped speaking to or ended a relationship with a respondent differed by age, with 18 to 24 year olds experiencing the least amount of family rejection of this nature (18%) compared to those in other age groups, such as 45 to 64 year olds (37%) (Figure 5.8).



**Figure 5.8: Immediate family member stopped speaking or ended relationship**
CURRENT AGE (%)

Those who transitioned in the last year (24%) were less likely to have a family member stop speaking to them or end a relationship than those who transitioned 2 to 5 years ago (29%), 6 to 9 years

ago (37%), and 10 or more years ago (43%) (Figure 5.9).



**Figure 5.9: Immediate family member stopped speaking or ended relationship**
YEARS SINCE TRANSITIONING (%)

## B. Family Violence

Among those who were out to their immediate family, one out of every ten (10%) respondents reported that a family member was violent towards them because they were transgender. Prevalence of family violence differed greatly depending on the time period during which a respondent transitioned, with those transitioning 10 or more years ago (15%) experiencing almost twice as much violence as those who transitioned in the past year (8%) (Figure 5.10).

FAMILY LIFE AND FAITH COMMUNITIES

AR_217069

Figure 5.10: Experienced violence by family member
YEARS SINCE TRANSITIONING (%)



*Family violence was associated with increased likelihood of negative experiences. Those who experienced family violence were:*

- *More than twice as likely to have experienced homelessness (59%) than those who did not experience family violence (29%).*

- *More likely to be currently experiencing serious psychological distress (53%) than those who did not experience family violence (35%).*

- *More likely to have attempted suicide in their lifetime (65%) than those who did not experience family violence (39%).*

American Indian respondents (20%) were twice as likely to experience family violence, and other people of color, such as Asian (15%) and Middle Eastern (14%) respondents, also experienced higher rates of violence (Figure 5.11).

## C. Kicked out of the House

Eight percent (8%) of respondents who were out to the immediate family they grew up with were kicked out of the house, which represents 6% of the whole sample. Those who transitioned 10 or more years ago were twice as likely to have been kicked out of the house (16%) as those who transitioned within the last year (7%) (Figure 5.12).

Figure 5.11: Experienced violence by family member
RACE/ETHNICITY (%)



Figure 5.12: Kicked out of the house by family
YEARS SINCE TRANSITIONING (%)



Undocumented residents were more than twice as likely to have experienced family violence (25%) as their documented non-citizen (13%) and citizen (9%) counterparts.

People of color were kicked out of the house at higher rates, with Middle Eastern respondents (17%) being twice as likely, and American Indian (14%), Black (12%), Latino/a (11%), multiracial (11%), and Asian (9%) respondents experiencing this form of rejection more than white respondents (6%) (Figure 5.13).

AR_217070

**Figure 5.13: Kicked out of the house by family**
RACE/ETHNICITY (%)



*Fourteen percent (14%) of respondents who were out to their immediate family reported that their family sent them to a professional—such as a therapist, counselor, or religious advisor—to stop them from being transgender.*

*Being kicked out of the house was associated with an increased likelihood of a range of negative experiences related to economic stability, mental health, and physical health. Respondents who were kicked out of the house were:*

- *More likely to be living in poverty (43%) than those who were not kicked out of the house (28%), and had lower incomes overall.*

- *Three times more likely to have ever done sex work (33%) than those who were not kicked out of the house (11%).*

- *Almost three times as likely to have experienced homelessness (74%) as those who were not kicked out of the house (28%).*

- *More than twice as likely to be living with HIV (3.5%) than those who were not kicked out of the house (1.5%).*

- *Substantially more likely to have attempted suicide (66%) than those who were not kicked out of the house (39%).*

- *More likely to be currently experiencing serious psychological distress (50%) than those who were not kicked out of the house (36%).*

## D. Not Allowed To Wear Clothes Matching One's Gender Identity

More than one-quarter (27%) of respondents who were out to the immediate family they grew up with were not allowed to wear clothes that matched their gender.

## E. Sent to a Professional to Stop Them from Being Transgender

Fourteen percent (14%) of respondents who were out reported that their immediate family had sent them to a professional—such as a therapist, counselor, or religious advisor—to stop them from being transgender. This represents 11% of the whole sample. Those who transitioned 6 or more years ago (20%) were twice as likely to be sent to a professional as those who transitioned within the last year (11%) (Figure 5.14).

**Figure 5.14: Sent to a professional to stop them from being transgender**
YEARS SINCE TRANSITIONING (%)



Rates differed by race and ethnicity, with nearly one-third of Middle Eastern respondents (31%) and nearly one-quarter of American Indian respondents (24%) being sent to a professional (Figure 5.15).

**Figure 5.15: Sent to a professional to stop them from being transgender**
RACE/ETHNICITY (%)



Additional details on respondents' experiences with professionals who attempted to change their gender identity are discussed further in the "Conversion Therapy and Other Pressures to De-Transition" section of the *Health* chapter.

# VII. Ran Away From Home

One out of every ten (10%) respondents who were out to their immediate family ran away from home because they were transgender. Almost one-third (32%) of those individuals ran away at age 15 or younger.

Respondents were more than twice as likely to have run away from home if they transitioned 10 or more years ago (19%) as compared to those who had transitioned within the past year (8%) (Figure 5.16).

**Figure 5.16: Ran away from home**
YEARS SINCE TRANSITIONING (%)



People of color were more likely to have run away from home, with Middle Eastern (25%), American Indian (18%), Black (15%), multiracial (14%), Asian (12%), and Latino/a (12%) respondents all reporting that they had run away at higher rates than white respondents (8%) (Figure 5.17).

**Figure 5.17: Ran away from home**
RACE/ETHNICITY (%)



Rates also differed according to citizenship status, with undocumented residents (36%) running away from home more than three times as often as citizens (10%) and more than documented non-citizen residents (14%).

AR_217072

Overall, 15% of those who were out to their immediate family, or 11% of the whole sample, ran away from home and/or were kicked out of the house.

# VIII. Supportive Family Behaviors

Those who were out to their immediate family were asked whether any of the immediate family they grew up with demonstrated support of them as a transgender person through any specific acts listed in the question, such as using preferred names, using correct pronouns, and providing financial support for their transition. Eighty-two percent (82%) of respondents reported that at least one immediate family member supported them through at least one of these acts, while 18% did not experience any of the supportive acts (Table 5.2).

**Table 5.2: Family support**

| Supportive family behaviors | % of respondents |
|---|---|
| Told respondent they respect and/or support them | 65% |
| Used their preferred name | 58% |
| Used the correct pronouns | 55% |
| Stood up for them with family, friends, or others | 36% |
| Did research to learn how to best support them | 33% |
| Gave money to help with gender transition | 18% |
| Supported them in another way | 11% |
| Provided help with changing name and/or gender on an ID document | 10% |
| **One or more experiences listed** | **82%** |

# IX. Family Rejection Overall

A variable was created to combine all forms of family rejection examined in the survey. This included whether the respondent had a spouse, partner, or child end a relationship, reported that their family was unsupportive, or had any of the five specific rejecting experiences outlined in section VI of this chapter. One half (50%) of respondents who were out to family members reported that they experienced some form of family rejection, which represents 46% of the overall sample.[11]

Experience with family rejection differed by the age at which a respondent transitioned, with 68% of those who transitioned at age 35 or older experiencing rejection, compared to 56% of those who transitioned under the age of 18 (Figure 5.18). Among respondents who transitioned ten or more years ago, 68% reported family rejection compared to 48% of those who transitioned in the past year (Figure 5.19).

**Figure 5.18: Any family rejection**
AGE OF TRANSITION (%)



AR_217073

**Figure 5.19: Any family rejection**
YEARS SINCE TRANSITIONING (%)



Family rejection also differed by gender identity, with transgender women (63%) experiencing rejection more than transgender men (55%), and transgender men and women (59%) experiencing nearly twice as much rejection as non-binary respondents (32%) (Figure 5.20).

**Figure 5.20: Any family rejection**
GENDER IDENTITY (%)



Family rejection among respondents of different racial or ethnic identities varied little, although American Indian (66%) respondents experienced higher levels of rejection (Figure 5.21).

**Figure 5.21: Any family rejection**
RACE/ETHNICITY (%)



*Respondents who experienced family rejection were:*

- *Almost twice as likely to have experienced homelessness (40%) as those who were not rejected (22%).*

- *Nearly twice as likely to have done in sex work (16%) as those who were not rejected (9%).*

- *More likely to have attempted suicide (49%) than those who were not rejected (33%).*

# X. Experiences with a Faith Community

The survey explored respondents' experiences with a spiritual or religious community ("faith community"), such as a church, synagogue, mosque, or other faith community. Two-thirds (66%) of the survey sample had been part of a faith community at some point in their life. Black (77%) and Middle Eastern (71%) respondents were more likely to have been part of a faith community than respondents of other races and ethnicities (Figure 5.22).

AR_217074

**Figure 5.22: Ever been part of a faith community**
RACE/ETHNICITY (%)



## A. Leaving a Faith Community Due to Fear of Rejection

More than one-third (39%) of respondents who have been part of a faith community left due to fear of being rejected because they were transgender. People of color, including Middle Eastern (54%), American Indian (51%), Black (49%), Latino/a (46%), Asian (43%), and multiracial (40%) respondents, were more likely to leave because they were afraid of rejection (Figure 5.23).

**Figure 5.23: Ever left faith community due to fear of rejection**
RACE/ETHNICITY (%)



## B. Leaving a Faith Community Due to Rejection

Nearly one in five (19%) respondents who had been part of a faith community left because they were actually rejected (in contrast to feared rejection as reported in the last subsection), which represents 12% of all respondents. Experiences varied based on the amount of time since transition, with nearly one-third (32%) of those who transitioned 10 or more years ago leaving a faith community due to rejection (Figure 5.24).

**Figure 5.24: Ever left faith community due to rejection**
YEARS SINCE TRANSITIONING (%)



People of color were rejected by their faith communities at higher rates, with one-third of American Indian respondents (33%) and almost one-quarter of Black (24%) and Middle Eastern (24%) individuals leaving for this reason (Figure 5.25).

*More than one-third (39%) of respondents who have been part of a faith community left because they feared rejection as a transgender person.*

**Figure 5.25: Ever left faith community due to rejection**
RACE/ETHNICITY (%)



Nearly one-third (30%) of those who had ever been part of a faith community reported that they had been part of such a community in the past year, which is 19% of the overall sample. Additionally, sixty percent (60%) of them were in a community where leaders or other members thought or knew they were transgender.

## D. Acceptance Within Faith Communities in the Past Year

Respondents whose faith community leaders or members thought or knew they were transgender were asked about a series of behaviors that signaled acceptance within the community in the past year. Ninety-four percent (94%) reported that community leaders and/or members accepted them for who they are as a transgender person, and more than three-quarters (80%) were told their religion or faith accepts them. Ninety-six percent (96%) of respondents who were in a faith community in the past year experienced at least one of the accepting behaviors (Table 5.3).

## C. Welcoming Communities and Experiences Within the Past Year

Of the people who had been rejected by a faith community, 42% found a new community that welcomed them as a transgender person. This differed by respondents' race or ethnicity, with American Indian respondents (54%) being more likely to find a welcoming community, and Latino/a (37%) and Asian (34%) respondents being least likely (Figure 5.26).

**Figure 5.26: Found new welcoming faith community after rejection**
RACE/ETHNICITY (%)



*Sample size too low to report

**Table 5.3: Acceptance within a faith community in the past year**

| Acceptance within faith community in past year | | | |
|---|---|---|---|
| | Many times | A few times | Once or twice |
| Community leaders and members accepted them for who they are as a transgender person | 75% | 11% | 8% |
| A leader or member of their faith community made them feel welcome as a transgender person | 72% | 12% | 9% |
| They were told that their religion or faith accepts them as a transgender person | 59% | 12% | 9% |
| **One or more experiences listed[12]** | **96%** | | |

AR_217076

## E. Rejection Within Faith Communities in the Past Year

Those with faith community leaders or members who thought or knew they were transgender were also asked about behaviors that signaled rejection in the past year. Among them, 6% were asked to meet with faith leaders to stop them from being transgender, and 5% were asked to stop coming to services or faith community functions (Table 5.4).

**Table 5.4: Rejection within a faith community in the past year**

| Rejection within faith community in past year | Many times | A few times | Once or twice |
|---|---|---|---|
| They were told that being transgender is a sin or that their religion does not approve of them | 5% | 5% | 7% |
| They were asked to meet with faith leaders to stop them from being transgender | 1% | 2% | 3% |
| Community leaders or members asked them to seek medical or psychological help to stop them from being transgender | 1% | 2% | 3% |
| They were asked to stop coming to services or faith community functions | 1% | 1% | 3% |
| **One or more experiences listed[13]** | | **18%** | |

Nearly one in five (18%) respondents who were in a faith community in the past year reported that they experienced at least one of the rejecting behaviors. Rejection was more likely among Asian (40%) and Black (25%) respondents (Figure 5.27).

*Nearly one in five (19%) respondents who had been part of a faith community left because they were rejected.*



**Figure 5.27: Any rejecting behavior by faith community in past year**
RACE/ETHNICITY (%)

*Sample size too low to report

# Conclusion

Results showed significant challenges in many areas of family life, including the retention of relationships with immediate and extended family, spouses and partners, and children. However, results also demonstrate that survey respondents were able to maintain relationships and successfully build family units despite those challenges. They further show the importance of family support in promoting positive experiences in many aspects of life. Results demonstrate that family rejection is strongly correlated with increased negative effects on a wide range of major life experiences, including income, homelessness, HIV infection, serious psychological distress, and suicidal behavior. Additionally, although many respondents experienced negative interactions within their faith communities, many others were able to find welcoming and supportive communities. While respondents' experiences varied overall, these findings reveal the substantial challenges facing many transgender people within their families and faith communities.

FAMILY LIFE AND FAITH COMMUNITIES

79

**ENDNOTES**  | CHAPTER 5: FAMILY LIFE AND FAITH COMMUNITIES

1  Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (pp. 88–105). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Huebner, D., Diaz, R. M., & Sanchez, J. (2010). Family acceptance in adolescence and the health of LGBT young adults. *Journal of Child and Adolescent Psychiatric Nursing, 23*(4), 205–213.

2  The term "out" is used here to describe a person who openly self-identifies as transgender in their private, public, and/or professional lives.

3  Lesbian, gay, bisexual, and transgender (LGBT).

4  See Q. 4.5 for descriptions of groups of family members.

5  A respondent's status as a parent was determined based on Q. 4.3, which asked if a respondent was out to any of their children. Eighty-two percent (82%) reported that they "do not have any children," and the remaining 18% answered "yes" or "no" to whether they were out to their children. This question established whether a respondent had at least one child, but did not determine the number of children, ages of children, or whether the children lived in the respondent's household.

6  U.S. Census Bureau. (2015). *Current Population Survey, Annual Social and Economic Supplement.*

7  The percentage of USTS respondents with related children under the age of 18 in the household is based on Q. 7.6.

8  "Very supportive" and "supportive" categories were collapsed into a single "supportive" category. "Very unsupportive" and "unsupportive" categories were collapsed into a single "unsupportive" category. See Q. 4.6.

9  The "serious psychological distress" measure was developed from the Kessler 6 scale. See Q. 12.2. See also *Health* chapter.

10  Section 4 asked about experiences with "immediate family [respondent] grew up with," and indicated that the definition included parents and siblings.

11  The figure of 50% of respondents experiencing family rejection is based on a variable created to reflect any family rejection among several questions, including: (1) Q. 4.2 (spouse/partner ended relationship), (2) Q. 4.4 (child stopped speaking or spending time with respondent), (3) Q. 4.6 (reported level of supportiveness of immediate family), and (4) acts listed in Q. 4.7.

12  The "any accepting behavior" variable was created based on respondents who had experienced an accepting behavior listed in Q. 5.7 once or twice, a few times, or many times.

13  The "any rejecting behavior" variable was created based on respondents who had experienced a rejecting behavior listed in Q. 5.7 once or twice, a few times, or many times.

# CHAPTER 6

# Identity Documents

Most non-transgender people take their identity documents (IDs) for granted, but for transgender people, updating and using IDs may present substantial challenges. Transgender people often need to update their IDs to reflect their gender and name. Changing the name listed on most state or federal IDs and records typically involves obtaining a legal name change from a court.[1] Changing the gender marker listed on most IDs and records generally requires documentation of gender transition from a health provider, though the requirements of this documentation may vary greatly for each type of ID and from jurisdiction to jurisdiction.[2] Previous researchers have documented barriers preventing transgender people from updating the name and gender on their IDs.[3]

This chapter explores respondents' experiences with their IDs and records, including updating their name and/or gender, and interactions with others related to updating and presenting their IDs and records. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

IDENTITY DOCUMENTS

AR_217079

KEY FINDINGS

▶ Eleven percent (11%) of respondents had their preferred name and gender on all IDs and records, while 68% reported that none of their IDs had the name and gender they preferred.

▶ Forty-nine percent (49%) did not have an ID or record with the name they preferred, and 67% did not have an ID or record with the gender they preferred.

▶ Thirty percent (30%) of respondents completed a legal name change.

▶ Thirty-four percent (34%) of people who were granted a legal name change reported that they had spent over $250, and 11% spent over $500.

▶ Thirty-five percent (35%) of those who did not try to change their legal name did not try because they could not afford it.

▶ Of those who wanted to update their driver's license or state ID, an estimated 44% were able to change their name on the license and an estimated 29% were able to change their gender.

▶ Of those who wanted to change the gender on their birth certificate, only an estimated 9% were able to do so.

▶ As a result of showing an ID with a name or gender that did not match their gender presentation, 25% of people were verbally harassed, 16% were denied services or benefits, 9% were asked to leave a location or establishment, and 2% were assaulted or attacked.

# I. Access to Legal Name Changes

Changing a name is a step in the transition process for some, but not all, transgender people. A legal name change order is almost always required to update the name listed on many forms of official IDs and records, such as driver's licenses, passports, and Social Security cards.[4] Legal name changes typically happen through a court order, and the process for obtaining a court order varies in each state and territory. Respondents were asked a series of questions about factors in their decision to legally change their name and their access to a legal name change.

Approximately one-third (36%) of respondents have tried to obtain a legal name change, and 30% were able to do so. This rate varied greatly according to gender identity, where transgender men and women (51%) were almost five times as likely to have tried or completed the name change process as non-binary people (11%). A vast majority (96%) of respondents who underwent the process did so through a court order, less than 1%

AR_217080

**Thirty percent (30%) of respondents completed the legal name change process.**

did so through the immigration or naturalization process, and 4% did so by other methods, including marriage, an informal or assumed name, or a process in another country. Eighty-eight percent (88%) of those who attempted to legally change their name were granted a name change. Those who attempted but did not complete the process reported a variety of reasons, such as being denied, running out of money, or giving up (Table 6.1).

Table 6.1: Outcome of legal name change attempt

| Outcome of legal name change attempt | % of those who attempted a legal name change |
|---|---|
| Court granted name change | 88% |
| Court denied name change | 1% |
| They are still in process of changing name | 6% |
| They stopped trying because they ran out of money | 2% |
| They gave up | 2% |
| Court initially denied, then later granted name change | <1% |
| Not listed above | <1% |

Forty-one percent (41%) of those who attempted a legal name change through a court did so at age 24 or younger, 45% between the ages of 25 and 44, 13% between the ages of 45 and 64, and less than 1% at age 65 or older.

Nearly two-thirds (64%) of respondents have never tried to change their legal name. These participants reported a variety of reasons for not engaging in the process, including 28% who felt that their name did not conflict with their gender identity (Table 6.2). This reason was more common among non-binary people (45%) and crossdressers (36%) than transgender men and women (10%).

Table 6.2: Reasons for not attempting to change legal name

| Reasons for not attempting to change legal name | % of those who had not attempted name change |
|---|---|
| They are not ready | 40% |
| They cannot afford it | 35% |
| Their name does not conflict with gender identity or expression | 28% |
| They do not know how | 24% |
| They were worried that changing their name would out them | 24% |
| They do not believe they are allowed | 3% |
| A reason not listed | 20% |

## a. Assistance with a Legal Name Change

The legal name change process can be complicated to navigate, and while many people undergo the process without help, some seek the assistance of others. Of people who tried or completed the name change process, 60% did so without help and 40% received help, including free help from a clinic or non-profit organization (17%), assistance from a from a friend (11%), or help from a paid attorney (9%) (Table 6.3).

Table 6.3: Assistance for people who tried or completed the legal name change process

| Type of assistance | % of those who attempted name change |
|---|---|
| None | 60% |
| Free help from a legal clinic or non-profit organization | 17% |
| Help from a friend | 11% |
| Legal help from a paid attorney | 9% |
| Help from another source | 7% |

## b. Interactions with Judges and Court Staff

Those who interacted with judges and court staff during the name change process reported widely varying experiences. Of the 84% who believed

IDENTITY DOCUMENTS

83

AR_217081

*More than one-third (35%) of respondents who did not try to legally change their name said that it was because they could not afford it.*

that the judges and/or court staff thought or knew they were transgender during their interaction, three-quarters (75%) felt they were always treated with respect, almost one-quarter (22%) felt they were only sometimes treated with respect, and 2% felt they were never treated with respect. Reports of only sometimes or never being treated with respect were higher for certain groups of people, including people who were currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (41%), and people who had not had any hormonal or surgical treatment (35%).

Respondents who interacted with judges or court staff who thought or knew they were transgender were asked about specific experiences during their interactions. Twenty-three percent (23%) were referred to by the wrong gender pronouns (such as he, she, or they) or title (such as Mr. or Ms.) during their interactions. Almost one in five (19%) people who interacted with judges or court staff were asked questions about their gender transition, such as whether they take hormones or have had any surgery. Nearly one in ten (9%) reported that they received unequal treatment or service, and 3% were verbally harassed. Overall, more than one-third (36%) of those who interacted with judges or court staff during the name change process reported having at least one of these experiences.

## c. Cost Associated with a Legal Name Change

The process of obtaining a legal name change may include many different fees, such as the cost of legal help, court fees, and newspaper publication. The survey asked respondents to recall how much they spent on the name change process. Approximately one-quarter (27%) of those who were granted a legal name change reported that the process cost less than $100, more than half (55%) reported it costing $100–$499, and 10% reported the process costing $500–$2,000 (Figure 6.1).

**Figure 6.1: Reported cost of a legal name change**



The cost of obtaining a legal name change may make the process inaccessible for some people. Thirty-five percent (35%) of people who had not tried to legally change their name reported that they did not try because they could not afford it. Additionally, of people who had attempted the legal name change process, 2% did not complete the process because they ran out of money.

AR_217082

## II. Experiences with Updating Name and Gender on IDs

Transgender individuals may seek to update the name on their IDs and records, the gender marker (such as M or F), or both. Only 11% of respondents reported that *all* of their IDs and records listed both the name and gender they preferred, and rates were lower for certain populations, such as undocumented individuals (4%), people aged 18–24 (5%), and people with no income (6%). More than two-thirds (68%) reported that *none* of their IDs or records had both the name and gender they preferred. The following sections will first discuss respondents' experiences with updating the name on their IDs or records, and then their experiences with updating the gender marker.

### a. Updating Name on IDs and Records

In order to change the name on IDs and records, one often needs to first obtain a legal name change. Generally, a court order granting a name change must then be presented to update each ID or record separately. Respondents were asked whether all, some, or none of their IDs and records reflected the name they preferred. Thirty percent (30%) of respondents had the name they preferred on all IDs and records, and 22% had the name they preferred on some IDs and records. Nearly half (49%) of respondents did not have any ID or record with the name they preferred. Non-citizens, including undocumented residents (68%), were more likely to say that none of their IDs or records reflected the name they preferred. Respondents with lower incomes were also more likely to say that none of their IDs or records had the name they preferred.

## In Our Own Voices

"I was intentionally misgendered and continually verbally harassed by DMV employees. Even after paying for proper identification to be issued, they refused to send the identification because my female photo didn't match my 'M' gender marker."

.........................................................

"As a non-binary person, not being able to change my gender on any of my identification documents is really disheartening, dysphoria inducing, and kind of dehumanizing. I'm not allowed to be me."

.........................................................

"My legal name and gender are not yet changed on any documents due to the price. The process for that should be easier or cheaper because that is the main thing that stops me from doing things that require ID."

.........................................................

"Because my state won't update the gender markers on its birth certificates, the only way to update my driver's license is by changing my information on a federal level with my passport. The problem is that now my documents don't match."

.........................................................

IDENTITY DOCUMENTS

AR_217083

Respondents were also asked about their experiences with updating the name on specific kinds of IDs or records, like driver's licenses and birth certificates. Among those respondents who had a driver's license or state ID and wanted to update their name on it, less than half (44%) were estimated[5] to have done so. An estimated 44% have changed their name on a work ID, and 43% have changed their name with the Social Security Administration. In contrast, less than one-third (31%) have changed their name on student records, 28% on their passport, and 18% on their birth certificate.

Respondents who transitioned were more likely to have changed the name on their IDs.[6] For example, while 44% of the whole sample had updated their name on their driver's license, 56% of those who had transitioned had updated their name on their driver's license. Transgender men and women who had transitioned were more likely to have updated their name on various types of IDs than non-binary respondents who had transitioned. For example, (61%) of transgender men and women who had transitioned changed their name their driver's license, in contrast to non-binary respondents who had transitioned (39%) (Figure 6.2).

*More than two-thirds (68%) of respondents did not have any ID or record that reflected both the name and gender they preferred.*

Those who indicated that some or all of their IDs listed the name they prefer were asked specific questions about their experiences updating the name on different kinds of IDs and records. For each type of ID or record, those respondents were asked if (1) they had been able to change the name on that ID, (2) they were in process of doing so, (3) they tried to change the name on the ID but were denied, or (4) they had not tried to change the name on that ID but wanted to do it someday.[7] Respondents were most likely to have successfully changed the name on their driver's license (87%), work ID (88%), and Social Security records (84%), and they were most likely to be denied a name change on their birth certificate (6%) (Figure 6.3).

Figure 6.2: Updated NAME on ID or record, by gender identity and transition status (estimated)



2015 U.S. TRANSGENDER SURVEY

AR_217084



Figure 6.3: Experiences updating **NAME** on specific IDs (among those who updated some or all of their IDs/records)

*The above chart reflects respondents who have been able to update some or all of their IDs only (omitting those who have not been able to update any IDs). It also does not include those who do not have the ID/record or do not want to update it. These numbers should not be reported without clearly stating that they represent only a subset of the respondents. For overall ability to change records, see Figure 6.2.*

## b. Updating Gender on IDs and Records

Updating the gender marker on any ID or record is typically a distinct process from updating the name, and may require documentation regarding gender transition from a healthcare provider, a court order of gender change, an updated birth certificate, or other documentation. Respondents were asked whether all, some, or none of their IDs and records listed the gender they preferred. More than two-thirds (67%) of respondents did not have any ID or record that listed the gender they preferred. Twelve percent (12%) of respondents had the gender they preferred on all IDs and records, and 21% of respondents had the gender they preferred on some IDs and records.

Respondents were also asked about their experiences with updating the gender on specific kinds of IDs or records, like driver's licenses and birth certificates. Among those respondents who had a driver's license or state ID and wanted

to update their gender on it, an estimated[8] less than one-third (29%) had done so, and only 9% were able to change their gender on their birth certificate. Twenty-three percent (23%) of those with a Social Security card who wanted to update their gender on it were estimated to have done so, and only 18% had updated their gender on their passport.

Respondents who had transitioned were more likely to have changed their gender on their IDs. For example, 29% of the overall sample have updated the gender on their driver's license, while 42% of those who have transitioned updated the gender marker on their driver's license. Transgender men and women who had transitioned (52%) were much more likely to have updated the gender on their driver's license, in contrast to non-binary respondents who had transitioned (9%) (Figure 6.4).

Figure 6.4: Updated GENDER on ID or record, by gender identity and transition status (estimated)



Those who indicated that some or all of their IDs listed the gender they preferred were asked specific questions about their experiences updating the gender on different kinds of IDs and records. For each type of ID or record, those respondents were asked if (1) they had been able to change the gender on that ID, (2) they were in process of doing so, (3) they tried to change the gender on the ID but were denied, or (4) they had not tried to change the gender on that ID but wanted to do it someday.[9] Respondents were most likely to change the gender on their driver's license (90%) and Social Security records (70%), and they were most likely to be denied a gender marker change on their birth certificate (15%) (Figure 6.5).

Figure 6.5: Experiences updating GENDER on specific IDs (among those who updated some or all of their IDs/Records)



*The above chart reflects respondents who have been able to update some or all of their IDs only (omitting those who have not been able to update any IDs). It also does not include those who do not have the ID/record or do not want to update it. These numbers should not be reported without clearly stating that they represent only a subset of the respondents. For overall ability to change records, see Figure 6.4.*

AR_217086

*Nearly one-third (32%) of respondents who did not have their preferred gender on any of their IDs or records reported that they could not afford to change them.*

Those who said that none of the IDs reflected the preferred gender were asked why that was the case. Twenty-five percent (25%) of these respondents believed they were not allowed to change the gender on their IDs or records, for reasons such as not having undergone medical treatment needed to change their gender on an ID or not having a doctor's letter. Nearly one-third (32%) of respondents indicated that none of their IDs or records had the gender they preferred because they could not afford it. Eighty-eight percent (88%) of non-binary individuals who indicated that none of their IDs or records had the gender they preferred reported that it was because the available gender options (male or female) did not fit their gender identity, in contrast to 4% of transgender men and women (Table 6.4).

**Table 6.4: Reasons for not changing gender on IDs or records**

| Reasons for not changing gender | % of those who reported having no IDs/records with the gender they preferred |
|---|---|
| They have not tried yet | 44% |
| The available gender options (male or female) do not fit their gender identity | 41% |
| They could not afford it | 32% |
| They were not ready | 30% |
| They did not know how | 26% |
| They believed they were not allowed | 25% |
| They worried that they might lose benefits or services | 25% |
| They worried that changing gender would out them | 25% |
| Their request was denied | 1% |
| A reason not listed | 10% |

# III. Experiences When Presenting Incongruent Identity Documents

Respondents were asked about their experiences when they have shown an ID with a name or gender that did not match the gender in which they present. Overall, nearly one-third (32%) of individuals who have shown IDs with a name or gender that did not match their presentation reported negative experiences, such as being harassed, denied services, and/or attacked.

One-quarter (25%) of these respondents reported being verbally harassed. Middle Eastern (44%) and American Indian (39%) respondents reported experiencing this more often than other racial or ethnic groups (Figure 6.6).

**Figure 6.6: Verbally harassed when using an ID with a name or gender that did not match their presentation**
RACE/ETHNICITY (%)



Sixteen percent (16%) of people who showed IDs with a name or gender that did not match the gender they present in were denied services or benefits. Transgender men and women were more likely to have been denied services or benefits (20%) compared to non-binary respondents (10%).

*Nearly one-third (32%) of individuals who have shown IDs that did not match their presentation reported negative experiences, such as being harassed, denied services, and/or attacked.*

Nine percent (9%) of people who showed an incongruent ID were asked to leave. Transgender women were more likely to have been asked to leave after presenting incongruent IDs (13%), compared to transgender men (9%) and non-binary people (6%).

Two percent (2%) of people who showed IDs with a name and gender that did not match the gender they present in were assaulted or attacked. These experiences differed by race and ethnicity. Middle Eastern respondents were almost five times as likely (9%) to report experiencing this, American Indians were three times as likely (6%), and Black respondents were twice as likely (4%) (Figure 6.7). Undocumented residents were also substantially more likely to report being assaulted or attacked (15%), in contrast to documented residents (3%) and citizens (2%).

**Figure 6.7: Assaulted or attacked when using an ID with a name or gender that did not match their presentation**
RACE/ETHNICITY (%)



# Conclusion

Findings indicate that respondents encountered substantial issues related to obtaining IDs and records that reflect their gender identity, including financial, procedural, and eligibility barriers. The data suggests that the cost of a legal name change presents a considerable challenge to getting a preferred name on identity documents. Results also indicate that the cost of updating gender markers and procedural requirements (such as providing documentation of certain medical procedures) are among the main barriers preventing respondents from updating the gender on their IDs and records. Further, results suggest that respondents who presented IDs that did not correspond with the gender they presented in were put at risk of harassment, assault, and other forms of negative treatment. Overall, these findings illustrate a variety of difficulties that arise during the name and gender change process and emphasize the importance of access to accurate identity documentation for the safety and well-being of transgender people.

2015 U.S. TRANSGENDER SURVEY

AR_217088

**ENDNOTES** | CHAPTER 6: IDENTITY DOCUMENTS

1   Forty-nine states and all five U.S. territories have a court order process for changing a legal name. Hawai'i is currently the only state with an administrative name change process. Additionally, a legal name change may be obtained through other processes, such as through naturalization or a common law name change. See NCTE's Identity Document Center for more information, available at: www.transequality.org/documents.

2   For more information on gender marker change requirements for state and federal IDs, see NCTE's Identity Document Center, available at www.transequality.org/documents.

3   Brown, T. N. T. & Herman, J. L. (2016). *Voter ID Laws and Their Added Costs for Transgender Voters.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Voter-ID-Laws-and-Their-Added-Costs-for-Transgender-Voters-March-2016.pdf; Hussey, H. (2015). *Expanding ID Card Access for LGBT Homeless Youth.* DC: Center for American Progress. Available at: https://cdn.americanprogress.org/wp-content/uploads/2015/10/01071118/IDhomelessLGBT.pdf; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (pp. 138–156). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

4   See NCTE's Identity Document Center, available at: www.transequality.org/documents.

5   Due to an error in skip logic in this section of the survey, a portion of the respondents who should have seen questions about updating identity documents—specifically, respondents who said that none of their documents had the name or gender they preferred—did not receive them. To create a denominator that included those individuals, the research team used question answers from the respondents who *did* see the questions to estimate the number of respondents from the full sample who did have the ID in question and wanted to update it. This estimated denominator was used to calculate the percentages of those who updated these IDs out of respondents in the full sample who had the ID and wanted to update it.

6   For the purposes of this report, "transitioned" is defined as living full-time in a gender different than the one on a person's original birth certificate, as indicated by the answer to Q. 1.12.

7   Respondents could also select from the following additional answer choices about changing their name: (1) "I do not have this ID/record" and (2) "I do not want to change this ID/record." If a respondent selected one of those answers, they were removed from the calculation. Therefore, results only reflect the answers of those who had a particular ID/record and wanted to change the record. See Q. 10.14.

8   See note 5 regarding the estimated calculations in this section.

9   Respondents could also select from the following additional answer choices about changing their gender: (1) "I do not have this ID/record" and (2) "I do not want to change this ID/record." If a respondent selected one of those answers, they were removed from the calculation. Therefore, results only reflect the answers of those who had a particular ID/record and wanted to change the record. See Q. 10.16.

AR_217089

# CHAPTER 7

# Health

Disparities in health and health care among transgender people have been documented in prior research.[1] The survey explored several areas related to health care, including respondents' overall physical and mental health, and their experiences accessing health care services, both related to gender transition and routine health care.

Results related to health and health care are presented in six sections:

A.   Routine and Transition-Related Health Care and Coverage

B.   Overall Health and Psychological Distress

C.   Conversion Therapy and Other Pressures to De-Transition

D.   Suicidal Thoughts and Behaviors

E.   Substance Use

F.   HIV Testing and Care

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

2015 U.S. TRANSGENDER SURVEY

AR_217090

# A. ROUTINE AND TRANSITION-RELATED HEALTH CARE AND COVERAGE

Previous studies indicate that transgender people face barriers to accessing quality, affordable health care. These barriers include lack of adequate insurance coverage, mistreatment by health providers, and health providers' discomfort or inexperience with treating transgender people.[2] Such barriers make it harder for transgender people to seek both routine health care that is unrelated to their transgender status, and health care related to gender transition ("transition-related care"). Transition-related care can include a variety of treatments, such as counseling, hormone therapy, and surgical procedures. While not every transgender person may need or want medical care related to gender transition, many do, and the specific treatments that they may undergo vary based on their individualized needs.

Respondents were asked about their experiences with health insurance coverage, including coverage for transition-related care. They were also asked about their experiences receiving general health care from doctors and other health providers, including how providers treated them as transgender people. Finally, respondents were asked about transition-related care they have had or wanted to have.

**KEY FINDINGS**

▶ One in four (25%) respondents experienced a problem with their insurance in the past year related to being transgender, such as being denied coverage for care related to gender transition.

   • One-quarter (25%) of those who sought coverage for hormones in the past year were denied, and 55% of those who sought coverage for transition-related surgery in the past year were denied.

▶ One-third (33%) of respondents who had seen a health care provider in the past year reported having at least one negative experience related to being transgender, such as verbal harassment, refusal of treatment, or having to teach the health care provider about transgender people to receive appropriate care.

▶ In the past year, 23% of respondents did not see a doctor when they needed to because of fear of being mistreated as a transgender person, and 33% did not see a doctor because of cost.

▶ While more than three-quarters (78%) of respondents wanted hormone therapy related to gender transition, only 49% had ever received it.

▶ One-quarter (25%) of respondents have undergone some form of transition-related surgery.

HEALTH

AR_217091

# I. Health Insurance

## a. Insurance Coverage and Source of Coverage

Respondents were asked a series of questions about health insurance coverage. Eighty-six percent (86%) reported that they were covered by a health insurance or health coverage plan, and 14% reported that they were uninsured. This compares to 89% of adults in the U.S. general population who were covered by a health insurance or health coverage plan in 2015, as reported in the American Community Survey (ACS).[3] Insurance coverage differed by region, with those in the South (20%) being more likely to be uninsured than those in the overall sample, compared to those in the Midwest (13%), West (11%), and Northeast (9%). Among people of color, Black (20%), American Indian (18%), and Latino/a (17%) respondents were more likely to be uninsured (Figure 7.1). Respondents who were not U.S. citizens were more likely to be uninsured, including nearly one-quarter (24%) of documented non-citizens and a majority (58%) of undocumented residents.

*Fourteen percent (14%) of respondents were uninsured, compared to 11% of adults in the U.S. population.*

The most common source of health insurance reported by respondents was an employer-sponsored insurance plan (either through the respondent's employer or someone else's employer) (53%). Fourteen percent (14%) of respondents had individual insurance plans that they or someone else purchased directly from an insurance company, through healthcare.gov, or from a health insurance marketplace, and 13% were insured through Medicaid (Table 7.1).

**Table 7.1: Type of health insurance or health coverage plan**

| Health insurance source | % in USTS | % in U.S. general population (ACS)[4] |
|---|---|---|
| Insurance through current or former employer or union (belonging to respondent or a family member) | 53% | 56% |
| Insurance they or someone else purchased directly from an insurance company or through a health insurance marketplace (such as healthcare.gov) | 14% | 16% |
| Medicaid | 13% | 15% |
| Medicare | 5% | 22% |
| TRICARE or other military health care | 2% | 3% |
| VA | 2% | 3% |
| Indian Health Service | <1% | 1%[5] |
| Another type of insurance | 6% | N/A |

More than one-quarter (26%) of respondents sought options for health insurance from a state or federal health insurance marketplace, such as through healthcare.gov, in the past year.[6] Of those who sought insurance through a marketplace, 42% purchased a plan. When acquiring health insurance through healthcare.gov or state marketplaces, most enrolled in a Medicaid plan (58%), 27% received a subsidy to buy a private plan, and 12% purchased a private plan without a subsidy.

**Figure 7.1: Uninsured**
RACE/ETHNICITY (%)



## b. Negative Experiences with Insurance Coverage

One in four (25%) respondents reported having problems with their insurance in the past year related to being transgender, such as being denied coverage for care related to gender transition. Among those who were insured and made the relevant requests of their insurer,[7] several problems were reported. Seventeen percent (17%) of respondents had an insurer refuse to change their name and/or gender in their insurance record when requested. Thirteen percent (13%) reported that they were denied coverage for services often considered to be gender-specific, including routine sexual or reproductive health screenings (such as Pap smears, prostate exams, and mammograms). Seven percent (7%) reported that they were denied coverage for other routine health care. More than half (55%) of respondents who sought transition-related surgery coverage were denied, and one-quarter (25%) of those who sought coverage for hormones were denied (Table 7.2).

Table 7.2: Negative action or policy by health insurer

| Negative action or policy | % of respondents who made such a request of their insurer |
|---|---|
| Denied coverage for transition-related surgery | 55% |
| Covered only some of the surgical care needed for transition (respondent could not get coverage for treatment they needed) | 42% |
| Denied coverage for transition-related hormone therapy | 25% |
| Covered surgery for transition, but had no surgery providers in their network | 21% |
| Refused to change records to list current name or gender | 17% |
| Denied coverage for care often considered gender-specific because of transgender status | 13% |
| Denied other routine health care because of transgender status | 7% |

Denials for hormone coverage differed by gender, with transgender men (32%) and non-binary people who had female on their original birth certificate (36%) more likely to report being denied hormone coverage than transgender women (18%) and non-binary people who had male on their original birth certificate (16%). Respondents who were insured solely through Medicare were least likely to be denied coverage for hormones (14%) (Figure 7.2).[8]



Figure 7.2: Denied coverage for hormone therapy in the past year
INSURANCE TYPE (%)

Transgender men (57%) were more likely to be denied surgery coverage than transgender women (54%) and non-binary people, including non-binary people with female on their original birth certificate (49%) and non-binary people with male on their original birth certificate (35%). With the exception of those who were solely covered by Medicare (48%), the rate of denials for surgery was similar among the different types of insurance providers (Figure 7.3).



Figure 7.3: Denied coverage for surgery in the past year
INSURANCE TYPE (%)

AR_217093

# II. Experiences with Health Care Providers

## a. Outness to Health Care Providers

Respondents were asked whether their current health care providers knew they were transgender. Of respondents who currently had health care providers, 40% reported that all of their current health care providers knew they were transgender, 13% reported that most knew, and 17% reported that some knew that they were transgender. Nearly one-third (31%) of respondents reported that none of their health care providers knew they were transgender.

## b. Treatment by Health Care Providers as a Transgender Person

Eighty-seven percent (87%) of respondents had seen a health care provider in the year prior to taking the survey. Those respondents received questions about how their health care provider interacted with them as a transgender person. Of those who had seen a provider in the past year, 62% said that at least one provider they saw knew they were transgender and treated them with respect. However, one-third (33%) of respondents who had seen a provider in the past year reported having at least one negative experience with a doctor or other health care provider related to being transgender. This included having to teach the provider about transgender people in order to receive appropriate care (24%), being asked invasive or unnecessary questions about being transgender not related to the reason for the visit (15%), or being refused transition-related health care (8%) (Table 7.3).

# In Our Own Voices

"My state Medicaid does not cover hormones or surgeries. With my very limited income, it is difficult to afford the treatment I need and I will most likely never be able to have surgeries."

........................................................

"I was consistently misnamed and misgendered throughout my hospital stay. I passed a kidney stone during that visit. On the standard 1–10 pain scale, that's somewhere around a 9. But not having my identity respected, that hurt far more."

........................................................

"Multiple medical professionals have misgendered me, denied to me that I was transgender or tried to persuade me that my trans identity was just a misdiagnosis of something else, have made jokes at my expense in front of me and behind my back, and have made me feel physically unsafe. I often do not seek medical attention when it is needed, because I'm afraid of what harassment or discrimination I may experience in a hospital or clinic."

........................................................

"When I was in college, I had my health insurance list me as male, and then they denied coverage for my routine pap smear and a gynecological prescription due to my gender."

........................................................

AR_217094

**Table 7.3: Negative experiences when seeing a health care provider in the past year**

| Negative experience | % of those who had seen a provider in the past year |
|---|---|
| They had to teach their health care provider about transgender people to get appropriate care | 24% |
| A health care provider asked them unnecessary or invasive questions about their transgender status that were not related to the reason for their visit | 15% |
| A health care provider refused to give them transition-related care | 8% |
| They were verbally harassed in a health care setting (such as a hospital, office, or clinic) | 6% |
| A health care provider used harsh or abusive language when treating them | 5% |
| A health care provider refused to give them care not related to gender transition (such as physicals or care for the flu or diabetes) | 3% |
| A health care provider was physically rough or abusive when treating them | 2% |
| They were physically attacked by someone during their visit in a health care setting (such as a hospital, office, or clinic) | 1% |
| They were sexually assaulted[9] in a health care setting (such as a hospital, office, or clinic) | 1% |
| One or more experiences listed | 33% |

Negative experiences with doctors and other health care providers varied by race and ethnicity. American Indian respondents (50%) reported the highest level of negative experiences, and rates among Middle Eastern (40%) and multiracial (38%) respondents were also higher (Figure 7.4).

**Figure 7.4: One or more negative experiences with health provider in the past year**
RACE/ETHNICITY (%)



Negative experiences with health care providers also varied by gender identity. Transgender men (42%) were more likely to report negative experiences than transgender women (36%) and non-binary respondents (24%). People with disabilities[10] (42%) were also more likely to have at least one negative experience in the past year, compared with respondents who did not identify as having a disability (30%).

## c. Providers' Knowledge About Transgender People

Respondents were asked about the health providers they saw for transgender-related care and for routine health care needs and the providers' level of knowledge about transgender health care. More than half (56%) of respondents currently had a provider specifically for transition-related care, such as hormone therapy. Of those, 65% reported that this provider knew "almost everything" or "most things" about providing health care for transgender people. Seventeen percent (17%) of respondents reported that their provider for transition-related care knew only "some" things about the subject, 8% said this provider knew "almost nothing," and 10% said they were not sure.

Fifty-one percent (51%) of respondents reported that they saw the same provider for transition-related care and other routine health care. One-third (33%) indicated that they have a separate provider for routine care who is different from the provider they see for transition-related care. Fifteen percent (15%) of respondents reported that they have no transition-related or routine health care provider.

Respondents with a separate provider for routine care were asked about that provider's level of knowledge about caring for transgender people. More than half (54%) of these respondents were unsure how much their provider knew about health care for transgender people, while others

AR_217095

indicated that their routine health care provider knew "some things" (16%) or "almost nothing" (24%). Only 6% of respondents reported that their routine care provider knew "almost everything" or "most things" about caring for transgender people.

## d. Barriers to Accessing Care

Respondents were asked about barriers to accessing health care, including cost of care, fear of being mistreated as a transgender person, and distance required to travel to see health providers for transition-related care.

Cost was a major factor in accessing health care, with one-third (33%) of respondents reporting that there was at least one time in the past year when they needed to see a doctor or other health care provider but did not because of cost. People of color, including multiracial (42%), American Indian (41%), Black (40%), and Latino/a (37%) respondents, were more likely to not have seen a doctor or other health care provider due to cost in the past year (Figure 7.5). People with disabilities (42%) were also more likely to not have seen a health provider when they needed to because of cost.

**Figure 7.5: Did not see health provider due to cost in the past year**
RACE/ETHNICITY (%)



*Nearly one-quarter (23%) of respondents reported that they avoided seeking health care they needed in the past year due to fear of being mistreated as a transgender person.*

Additionally, nearly one-quarter (23%) of respondents reported that at some point in the past year they needed health care but did not seek it due to fear of being disrespected or mistreated as a transgender person. American Indian (37%) and Middle Eastern (34%) respondents were more likely to not have gone to a doctor or other health care provider due to fear of being disrespected or mistreated as a transgender person (Figure 7.6).

**Figure 7.6: Did not see health provider due to fear of mistreatment in the past year**
RACE/ETHNICITY (%)



Fear of being disrespected or mistreated by a health care provider also differed by gender identity, with transgender men (31%) being more likely to avoid care out of fear of discrimination than transgender women (22%) and non-binary respondents (20%).

To examine the accessibility of respondents' health care providers, respondents were asked how far they had to travel to receive routine care and care

AR_217096

related to gender transition (transition-related care). Respondents reported having to travel further for transition-related care than routine care. While 63% indicated that they received routine care from providers within 10 miles of their home, less than half (45%) reported that they received transition-related health care within 10 miles of their home. Respondents were three times more likely to have to travel more than 50 miles for transgender-related care than for routine care (Figure 7.7).

**Figure 7.7: Distance to health care provider**



Transition-related health care
Routine health care

# III. Transition-Related Health Care

Respondents received questions about whether they had ever had, or wanted to have, a range of potential health care services related to gender transition.

## a. Counseling

More than three-quarters (77%) of respondents said they wanted counseling or therapy for their gender identity or gender transition at some point in their life, but only 58% of respondents have ever received counseling or therapy. While

transgender men and women (81%) were only slightly more likely to have ever wanted gender-related counseling than non-binary respondents (70%), transgender men and women were more than twice as likely to have actually had counseling (73%) as compared to non-binary respondents (31%). Access to counseling varied greatly by income, with those who reported having no individual income (39%) and those who earned an income of $1 to $9,999 (48%) being much less likely to have received counseling than those who earned $50,000 or more (76%) (Figure 7.8).

**Figure 7.8: Counseling/therapy for gender identity or transition**
**INDIVIDUAL INCOME (%)**



## b. Hormone Therapy

Seventy-eight percent (78%) of respondents wanted to receive hormone therapy at some point in their life, but only 49% of respondents have ever received it. Ninety-two percent (92%) of those who have ever received hormone therapy were currently still receiving it, representing 44% of all respondents. A large majority of transgender men and women (95%) have wanted hormone therapy, compared to 49% of non-binary respondents. Transgender men and women were about five times more likely to have ever had hormone therapy (71%) than non-binary respondents (13%).

AR_217097

*Seventy-eight percent (78%) of respondents wanted to receive hormone therapy at some point in their life, but only 49% of respondents have ever received it.*

There were also substantial differences in access to hormone therapy by income. Respondents who reported having no individual income (31%) or earning an income of $1 to $9,999 (37%) were about half as likely to have received hormone therapy as those who earned $25,000 or more (Figure 7.9).

**Figure 7.9: Hormone therapy for gender transition**
INDIVIDUAL INCOME (%)



Of respondents who have ever had hormone therapy, 4% started hormone therapy before the age of 18, 41% began between the ages of 18 and 24, 43% began between the ages of 25 and 44, and 13% began after age 45.

While the majority (91%) of respondents received their hormone medications only from licensed professionals, 6% received them from both licensed professionals and friends, and 2% reported receiving them only from friends, online sources, or other non-licensed sources.[11] Those who were uninsured were five times more likely to receive their hormones only from unlicensed sources (10%). Respondents who were currently working in the underground economy (such as sex work, drug sales, or other work that is currently criminalized) (8%), who have ever done sex work in their lifetime (5%), or who were living in poverty (4%), were more likely to receive their hormones only from unlicensed sources, as were transgender women (4%).

## c. Puberty-Blocking Hormones

Fifteen percent (15%) of respondents reported that at some point in their lives, they wanted puberty-blocking medications, which are hormone suppressors that are used to delay physical changes associated with puberty and were described as those usually being used by youth between the ages of 9 and 16. However, less than 1% of respondents reported ever having them.[12]

## d. Surgeries and Other Procedures

One in four (25%) reported having had some form of transition-related surgery.[13] Transgender men (42%) were more likely to have had any kind of surgery than transgender women (28%) or non-binary respondents (9%). Respondents who were living in poverty[14] (17%) were less likely to have had any surgery, as were those who had low incomes (Figure 7.10). Respondents who were uninsured (18%) were also less likely to have any surgery, while those who were insured through Medicare only were most likely (44%) (Figure 7.11).[15]

*One in four (25%) respondents reported having had some form of transition-related surgery.*

2015 U.S. TRANSGENDER SURVEY

AR_217098



Figure 7.10: Any surgery for gender transition
INDIVIDUAL INCOME (%)



Figure 7.11: Any surgery for gender transition
INSURANCE TYPE (%)

Respondents were asked a series of questions about whether they had received or wanted to have specific surgical and other procedures. Respondents received different questions based on the sex that they reported was listed on their original birth certificate.[16]

## i. Experiences of Respondents With Female on Their Original Birth Certificate

Of respondents who had female on their original birth certificates, 21% had a chest reduction or reconstruction[17] and 8% had a hysterectomy.[18] Only 2% reported having any genital surgery, such as metoidioplasty[19] (1%) or phalloplasty[20] (1%) (Table 7.4). These experiences differed greatly by gender identity, with transgender men (Figure 7.12) being

more likely to have had any of the procedures than non-binary respondents who had female on their original birth certificate (Figure 7.13).

Table 7.4: Procedures among respondents with female on their original birth certificate

| Type of procedure | Have had it | Want it some day | Not sure if they want this | Do not want this |
|---|---|---|---|---|
| Chest surgery reduction or reconstruction | 21% | 52% | 17% | 10% |
| Hysterectomy | 8% | 44% | 28% | 19% |
| Metoidioplasty | 1% | 15% | 37% | 47% |
| Phalloplasty | 1% | 11% | 31% | 56% |
| Other procedure not listed | 3% | 7% | 13% | 77% |



Figure 7.12: Procedures among transgender men

■ Have had it
■ Want it some day
▨ Not sure if they want this
□ Do not want this



Figure 7.13: Procedures among non-binary respondents with female on their original birth certificate

■ Have had it
■ Want it some day
▨ Not sure if they want this
□ Do not want this

AR_217099

Among those who had female on their original birth certificate respondents and who had undergone any of these surgical procedures, 3% had their first procedure before the age of 18. More than one-third (35%) had their first procedure between the ages of 18 and 24, 40% between the ages of 25 and 34, and 22% after the age of 34.

In addition to transition-related care, respondents who had female on their original birth certificate were also asked whether they had received a Pap smear in the past year. Only 27% reported that they had a Pap smear in the past year, compared to 43% in the U.S. adult population.[21,22]

## ii. Experiences of Respondents With Male on Their Original Birth Certificate

Among respondents who had male on their original birth certificate, hair removal or electrolysis was both the most commonly reported and the most commonly desired procedure. Forty-one percent (41%) have had hair removal or electrolysis, and 11% had received voice therapy, the second most commonly reported procedure. Regarding surgical procedures, 10% of respondents had undergone vaginoplasty and/or labiaplasty,[23] 9% had an orchiectomy,[24] 6% had undergone facial feminization surgery,[25] 8% had augmentation mammoplasty (top surgery),[26] 4% had a tracheal shave,[27] and 1% had undergone voice surgery (Table 7.5). These experiences varied by gender identity, with transgender women (Figure 7.14) being more likely to have had the procedures than non-binary respondents who had male on their original birth certificate (Figure 7.15).

**Table 7.5: Procedures among respondents with male on their original birth certificate**

| Type of procedure | Have had it | Want it some day | Not sure if they want this | Do not want this |
|---|---|---|---|---|
| Hair removal or electrolysis | 41% | 49% | 5% | 5% |
| Voice therapy (non-surgical) | 11% | 46% | 19% | 24% |
| Vaginoplasty or labiaplasty | 10% | 45% | 23% | 22% |
| Augmentation mammoplasty | 8% | 36% | 31% | 24% |
| Orchiectomy | 9% | 40% | 24% | 27% |
| Facial feminization surgery | 6% | 39% | 30% | 25% |
| Tracheal shave | 4% | 29% | 29% | 38% |
| Silicone injections[28] | 2% | 9% | 27% | 61% |
| Voice surgery | 1% | 16% | 32% | 51% |
| Other procedure not listed | 5% | 13% | 15% | 67% |

**Figure 7.14: Procedures among transgender women**



■ Have had it
■ Want it some day
Not sure if they want this
Do not want this



Figure 7.15: Procedures among non-binary respondents with male on their original birth certificate

Legend:
- Have had it
- Want it some day
- Not sure if they want this
- Do not want this

Two percent (2%) of respondents with male on their original birth certificate had their first transition-related procedure (not including hormone therapy) before the age of 18. Nearly one-quarter (23%) had their first procedure between the ages of 18 and 24, 32% had their first procedure between the ages 25 and 34, and 43% after the age of 34.

## e. Summary of Transition-Related Health Care

When examining the responses of all respondents, 91% reported that they had wanted counseling, hormones, and/or puberty blockers for their gender identity or gender transition at some point, but only 65% reported ever having any of them. Overall, 58% of respondents had received counseling. Approximately half (54%) had received hormone therapy and/or some form of surgery, including 49% who had hormone therapy and 25% who had undergone some form of transition-related surgery.

# B. OVERALL HEALTH AND PSYCHOLOGICAL DISTRESS

There is a well-documented link between experiences of discrimination and marginalization and poor physical and mental health outcomes. Populations that face widespread stigma and discrimination are more likely to report poor overall health and are more vulnerable to a variety of physical and mental health conditions.[29] Previous research has described substantial health disparities affecting transgender people and the impact that experiences of discrimination, rejection, and violence have on these disparities.[30]

**KEY FINDINGS**

▶ Twenty-two percent (22%) of respondents rated their health as "fair" or "poor," compared with 18% of the U.S. population.

▶ Thirty-nine percent (39%) of respondents were currently experiencing serious psychological distress, nearly eight times the rate in the U.S. population (5%).

AR_217101

# I. Current Health

Respondents were asked to rate their current overall health on a scale from "excellent" to "poor." Nearly half (45%) of respondents said their health was "excellent" or "very good" and one-third (33%) said it was "good." Twenty-two percent (22%) said it was "fair" or "poor" (Figure 7.16), compared with 18% of the U.S. general population (Figure 7.17).[31]

**Figure 7.16: General health rating**



**Figure 7.17: General health rating**



Respondents' self-reported health varied by gender identity, with non-binary respondents with female on their original birth certificate (35%) being less likely to report excellent or very good health compared to transgender men (47%), non-binary people with male on their original birth certificate (48%), transgender women (50%),

and crossdressers (57%). Reporting also differed by age, with older respondents more likely to report excellent or very good health than younger respondents, such as those aged 65 and older (60%) and 45–64 (53%), compared with those aged 25–44 (48%) and 18–24 (39%) (Figure 7.18).

**Figure 7.18: Reported overall health
CURRENT AGE (%)**



Family support was associated with an increased likelihood of reporting excellent or very good health. Respondents who were out to their immediate family and described their family as supportive were more likely to report excellent or very good health (52%) than those whose families were neutral (42%) or unsupportive (38%) (Figure 7.19).

**Figure 7.19: Reported overall health
LEVEL OF FAMILY SUPPORT (%)**



2015 U.S. TRANSGENDER SURVEY

AR_217102

*Thirty-nine percent (39%)
of respondents reported
currently experiencing serious
psychological distress, a rate
nearly eight times higher than
in the U.S. population (5%).*

# II. Serious Psychological Distress

Respondents were asked questions to assess their level of psychological distress in the past 30 days, based on the Kessler Psychological Distress Scale (K6), a scale that is widely used when assessing mental health outcomes and is included in the National Health Interview Survey (NHIS).[32] The K6 includes mental health screening questions and is designed to identify people who are experiencing serious psychological distress. The K6 questions asked respondents to rate how often they experienced several feelings related to psychological distress—such as hopelessness or worthlessness—during the past month on a scale that included "none of the time," "a little of the time," "some of the time," "most of the time," and "all of the time."[33]

Respondents who reported experiencing feelings related to psychological distress at least "a little of the time" for one or more of the K6 questions were asked how much the feelings interfered with their life or activities. Among them, 27% reported that the psychological distress interfered with their life or activities a lot during the past 30 days, and 58% said it interfered some or a little. Only 10% of respondents reported that it did not interfere with their life or activities during the past 30 days (Figure 7.20), in contrast to the 35% in the U.S. general population who reported no interference with their lives (Figure 7.21).[34]

Figure 7:20: Interference of psychological distress with life or activities among those who reported feelings of distress in the past 30 days



Figure 7:21: Interference of psychological distress with life or activities among those who reported feelings of distress in the past 30 days



A variable was developed from the K6 questions to reflect respondents' current serious psychological distress (serious psychological distress experienced in the 30 days prior to participating in the survey).[35] Thirty-nine percent (39%) of respondents reported currently experiencing serious psychological distress, which is nearly eight times the rate reported in the U.S. population (5%).[36] Current serious psychological distress varied by gender identity. Non-binary respondents (49%) were more likely to report serious psychological distress than transgender men and women (35%) and crossdressers (18%).

HEALTH

105

AR_217103

While all age groups of USTS respondents reported substantially more distress than their counterparts in the U.S. population, younger survey respondents were more likely to report current serious psychological distress. Fifty-three percent (53%) of USTS respondents aged 18 to 25 reported experiencing current serious psychological distress, which was more than six times as high as the rate among respondents who were 65 and older (8%) (Figure 7.22).[37] A similar pattern emerged in reporting of current serious psychological distress in the U.S. population, with those aged 18 to 25 (10%) being five times as likely to report experiencing serious psychological distress as those aged 65 and older (2%).[38]

**Figure 7:22: Currently experiencing serious psychological distress**
**CURRENT AGE (%)**



■ % in USTS
□ % in U.S. population (NSDUH)

Experiences with current psychological distress differed according to educational attainment. Respondents who had not completed high school (58%), those who had completed high school or a GED only (54%), and those with some college education (48%) were more likely to report currently experiencing serious psychological distress than respondents who had completed an associate's degree (32%) or higher (Figure 7.23).

# In Our Own Voices

"I spent decades torturing myself into depression because I was certain that coming out would destroy my life. I did everything I could to get my transness to go away but it left me physically and psychologically weak, and on the verge of suicide."

"I had suffered from anxiety and depression as a direct result of gender dysphoria. This caused me to become more and more unable to function in society as time went on. Only when my state expanded Medicaid was I finally able to start dealing with all of these issues so I could become a productive member of society."

"I have struggled with depression and anxiety ever since puberty. I've failed classes, isolated myself, and considered suicide because of this. A year ago, I felt hopeless and had daily suicidal thoughts, and today I've got a plan for the future and haven't had a serious suicidal thought in months. I firmly believe this is because of my transition. I feel so much more comfortable and happy than I've ever been."

2015 U.S. TRANSGENDER SURVEY

AR_217104

**Figure 7.23: Currently experiencing serious psychological distress**
EDUCATIONAL ATTAINMENT (%)



Respondents who had transitioned ten or more years prior to participating in the survey (24%) were substantially less likely to be currently experiencing serious psychological distress, in contrast to those who had transitioned within the past year (41%) (Figure 7.24). While psychological distress was higher among those early in their transition, it was higher yet among those who have not transitioned but wanted to. Nearly half (49%) of those who have not transitioned but wanted to were currently experiencing serious psychological distress, compared with 36% of those who had transitioned at any time prior to taking the survey.

**Figure 7.24: Currently experiencing serious psychological distress**
YEARS SINCE BEGAN TRANSITIONING (%)



Respondents who were living in poverty were more likely to currently be experiencing serious psychological distress (52%). People with disabilities (59%) were nearly twice as likely to currently experience psychological distress compared to those who did not identify as having a disability (31%).

*Psychological distress was associated with a variety of experiences of rejection, discrimination, and violence:*

- *Respondents who were out to their immediate families and described them as supportive (31%) were less likely to report serious psychological distress than those whose families were neutral (42%) or unsupportive (50%).*

- *Respondents who were fired or forced to resign, denied a promotion, or not hired in the past year because they were transgender (51%) were more likely to report current serious psychological distress than those who did not have those experiences in the past year (36%).*

- *Respondents who were physically attacked in the past year (59%) were more likely to be currently experiencing serious psychological distress than those who were not physically attacked in the past year (36%).*

- *Respondents who were sexually assaulted in the past year[35] (60%) were more likely to be currently experiencing serious psychological distress than those who were not sexually assaulted in the past year (37%).*

HEALTH

107

AR_217105

# C. CONVERSION THERAPY AND OTHER PRESSURES TO DE-TRANSITION

Many transgender people discuss their gender identity with professionals, such as health care providers or religious advisors. However, despite the medical consensus that efforts to change someone's gender identity or stop them from being transgender ("conversion therapy") are ineffective, harmful, and even abusive,[40] some professionals still attempt to do so. Additionally, some transgender people feel pressure to hide their gender identity or to go back to living according to the gender they were thought to be at birth ("de-transition") for a variety of other reasons. For example, some transgender people are pressured to avoid or put off their transition, or to de-transition after they have started their transition, by family members or employers, as well as religious advisors or health professionals. Others face significant discrimination when they begin transitioning, like losing their jobs or home or being rejected by their family or friends, and may decide to temporarily delay or even reverse their transition as a result.

The survey explored respondents' experiences discussing their gender identity with professionals, such as psychologists, counselors, and religious advisors, including pressure from those professionals to de-transition or stop being transgender. Experiences with de-transitioning were also examined. Respondents overall demonstrated high levels of resistance to such pressure and other forms of discrimination. Few respondents de-transitioned, and many of those who did de-transition did so only temporarily and were living according to their gender identity at the time of the survey.

**KEY FINDINGS**

▶ Thirteen percent (13%) of respondents reported that one or more professionals, such as a psychologist, counselor, or religious advisor, tried to stop them from being transgender.

▶ Eight percent (8%) of respondents had de-transitioned temporarily or permanently at some point, meaning that they went back to living as the gender they were thought to be at birth for a period of time.

▶ The majority of respondents who de-transitioned did so only temporarily, and 62% were currently living full time in a gender different than the one they were thought to be at birth.

▶ Respondents who de-transitioned cited a number of reasons for doing so, including facing too much harassment or discrimination after they began transitioning (31%), having trouble getting a job (29%), or pressure from a parent (36%), spouse (18%), or other family members (26%).

AR_217106

# I. Discussing Gender Identity with Professionals and Conversion Therapy

The survey examined a variety of experiences with professionals—such as psychologists, counselors, and religious advisors—with whom respondents had discussed their gender identity. Almost three-quarters of respondents (72%) reported that they had discussed their gender identity with such a professional.

Whether an individual discussed their gender identity with a professional differed by gender, with transgender men and women (84%) being more likely to do so than non-binary respondents (52%) and crossdressers (46%) (Figure 7.25).

*Nearly one in five (18%) of those who discussed their gender identity with a professional—or 13% of all respondents—reported that the professional tried to stop them from being transgender.*

from being transgender, and nearly one in ten (9%) respondents saw a non-religious/spiritual professional (such as a therapist or a counselor) who tried to stop them from being transgender.

The likelihood that a professional tried to stop a respondent from being transgender differed by race and ethnicity. While Middle Eastern (32%) and American Indian (27%) respondents were most likely to have this experience, rates were lower for Black (16%) and Asian (14%) respondents (Figure 7.26).



**Figure 7.25: Ever discussed gender identity with a professional**
GENDER IDENTITY (%)



**Figure 7.26: Professional tried to stop them from being transgender**
RACE/ETHNICITY (%)

Of all respondents who discussed their gender identity with a professional, nearly one in five (18%) reported that the professional tried to stop them from being transgender, representing 13% of all respondents in the sample.[41] Four percent (4%) of all respondents saw a religious/spiritual counselor or advisor who tried to stop them

More than three-quarters (78%) of respondents were under the age of 25 when they had this experience, 51% were 18 or younger, and 28% were 15 or younger.

AR_217107

Of the 4% who reported that a religious or spiritual counselor or advisor tried to stop them from being transgender, American Indian (9%) and Middle Eastern (7%) respondents were more likely to have such an experience with a religious or spiritual counselor or advisor (Figure 7.27).

**Figure 7.27: Religious counselor tried to stop them from being transgender**
RACE/ETHNICITY (%)



*Participants who had a professional try to stop them from being transgender were:*

- *Far more likely to currently be experiencing serious psychological distress (47%) than those who did not have the experience (34%).*

- *More likely to have attempted suicide (58%) than those who did not have the experience (39%).*

- *Nearly three times as likely to have run away from home (22%) than those who did not have the experience (8%).*

- *More likely to have ever experienced homelessness (46%) than those who did not have the experience (29%).*

- *More likely to have ever done sex work (18%) than those who did not have the experience (11%).*

## In Our Own Voices

"The doctor figured out I was trans and practiced conversion therapy without telling anyone, including my parents. I tried to tell my family that the doctor was not working, but nobody listened. I was sent there for over three years. I became so badly suicidal that I didn't go a minute without thinking of death."

"When I was 18, I had to leave where I grew up after threats of physical violence and conversion therapy from my family. My parents were abusive before they knew I was trans, but when they found out, they used that to hurt and control me more."

"[An] OB/GYN forced me onto birth control pills to 'fix' me into thinking I was a woman again. I ended up in the psychiatric ward of my local hospital on suicide watch after three days on birth control."

"I was kicked out of my parents' home. I ran out of what little money I had, and I had nowhere to go. My family offered to let me return to their home on the condition that I de-transition and live as a man. I accepted because I had no choice."

2015 U.S. TRANSGENDER SURVEY

AR_217108

Sixty-nine percent (69%) of respondents discussed their sexual orientation with a professional. Of those, 14% reported that a professional tried to change their sexual orientation, representing 10% of the overall sample.

# II. De-Transitioning

Respondents were asked whether they had ever "de-transitioned," which was defined as having "gone back to living as [their] sex assigned at birth, at least for a while." Eight percent (8%) of respondents reported having de-transitioned at some point. Most of those who de-transitioned did so only temporarily: 62% of those who had de-transitioned reported that they were currently living full time in a gender different than the gender they were thought to be at birth.

Transgender women were more likely to report having de-transitioned (11%), in contrast to transgender men (4%). Rates of de-transitioning also differed by race and ethnicity, with American Indian (14%), Asian (10%), and multiracial (10%) respondents reporting the highest levels of de-transitioning (Figure 7.28).

Respondents who had de-transitioned cited a range of reasons, though only 5% of those who had de-transitioned reported that they had done so because they realized that gender transition was not for them, representing 0.4% of the overall sample.[42] The most common reason cited for de-transitioning was pressure from a parent (36%). Twenty-six percent (26%) reported that they de-transitioned due to pressure from other family members, and 18% reported that they de-transitioned because of pressure from their spouse or partner. Other common reasons included facing too much harassment or discrimination after they began transitioning (31%), and having trouble getting a job (29%) (Table 7.6).

**Table 7.6: Reasons why respondents de-transitioned, at least for a little while**

| Reasons for de-transitioning | % of those who had ever de-transitioned |
|---|---|
| Pressure from a parent | 36% |
| Transitioning was too hard for them | 33% |
| They faced too much harassment or discrimination as a transgender person | 31% |
| They had trouble getting a job | 29% |
| Pressure from other family members | 26% |
| Pressure from a spouse or partner | 18% |
| Pressure from an employer | 17% |
| Pressure from friends | 13% |
| Pressure from a mental health professional | 5% |
| Pressure from a religious counselor | 5% |
| They realized that gender transition was not for them | 5% |
| Initial transition did not reflect the complexity of their gender identity (write-in response) | 4% |
| Financial reasons (write-in response) | 3% |
| Medical reasons (write-in response) | 2% |
| A reason not listed above | 35% |

**Figure 7.28: Ever de-transitioned**
RACE/ETHNICITY (%)



AR_217109

# D. SUICIDAL THOUGHTS AND BEHAVIORS

The prevalence of suicide attempts among transgender people is reported in the literature as being substantially higher than that in the U.S. general population. Previous studies identify a variety of risk and protective factors that affect the rates of suicidal thoughts and behaviors among transgender people, including family support, experiences of anti-transgender discrimination and violence, and access to health care, employment, and housing.[43]

The survey explored suicidal thoughts and behaviors among respondents both over the course of their lifetime and in the year prior to completing the survey. Respondents were asked whether they had seriously thought about, made a plan, or tried to kill themselves at any time in their lives or in the past twelve months to assess a range of suicidal thoughts and behaviors. Questions were patterned on the National Survey on Drug Use and Health[44] and National Comorbidity Survey Replication[45] to allow for comparison to the U.S. population.

**KEY FINDINGS**

▶ Forty percent (40%) of respondents have attempted suicide at some point in their life, compared to 4.6% in the U.S. population.

▶ Forty-eight percent (48%) of respondents have seriously thought about killing themselves in the past year, compared to 4% of the U.S. population, and 82% have had serious thoughts about killing themselves at some point in their life.

▶ Nearly one-quarter (24%) of respondents made plans to kill themselves in the past year, compared to 1.1% of the U.S. population.

▶ Seven percent (7%) of respondents attempted suicide in the past year, compared to 0.6% in the U.S. population.

▶ More than two-thirds (71%) of respondents who have attempted suicide have done so more than once in their lifetime, with 46% of those who have attempted suicide reporting three or more attempts.

## I. Suicidal Thoughts and Behaviors in the Past Year

Nearly half (48%) of all respondents reported that they had seriously thought about killing themselves in the past twelve months, compared to 4% of the U.S. general population.[46] Nearly one-quarter (24%) of respondents reported making plans to kill themselves in the past year, compared

to 1.1% in the U.S. population.[47]

Seven percent (7%) of all respondents attempted suicide in the past year, nearly twelve times the rate of attempted suicide in the U.S. population in the past year (0.6%).[48] The rate of attempted suicide in the past year was higher among people of color, including American Indian (10%), multiracial (10%), Black (9%), and Latino/a (9%) respondents (Figure 7.29). The rate of attempted suicide in the past year was also higher among people with disabilities (12%).

AR_217110



Figure 7.29: Attempted suicide in the past year
RACE/ETHNICITY (%)

*Seven percent (7%) of all respondents attempted suicide in the past year, nearly twelve times the rate of attempted suicide in the U.S. population (0.6%).*

Respondents who did not complete high school (17%) were more than twice as likely as the overall sample to have attempted suicide in the past year, and those who completed high school or a GED only (13%) were almost twice as likely to have attempted suicide in that time period (Figure 7.30).



Figure 7.30: Attempted suicide in the past year
EDUCATIONAL ATTAINMENT (%)

Respondents whose current income came only from work in the underground economy, such as sex work, drug sales, or other criminalized work, had a higher rate of suicide attempts in the past year (27%). Additionally, respondents who described their families as unsupportive (13%) were more than twice as likely to have attempted suicide in the past year as those who described their families as supportive (6%).

The rate of suicide attempt in the past year varied by age, with younger respondents being more likely to have attempted suicide in the past year, a similar pattern to that found in the general U.S. population.[49] One in ten (10%) USTS respondents aged 18–25 have attempted suicide in the past year, ten times the rate among those aged 65 and older (1%) (Figure 7.31). Similarly, those aged 18–25 in the U.S. population (1.6%) were eight times more likely to report having attempted suicide in the past year than those aged 65 and older (0.2%).[50]



Figure 7.31: Attempted suicide in the past year
CURRENT AGE (%)

◼ % in USTS
☐ % in U.S. population (NSDUH)

HEALTH

113

AR_217111

Of those who attempted suicide in the past year, 45% received medical attention[51] as a result, compared to 60% who attempted suicide and received medical attention in the U.S. population.[52] Thirty percent (30%) of respondents who attempted suicide stayed in a hospital for at least one night, compared to 41% of those who attempted suicide in the U.S. population.[53]

# II. Lifetime Suicidal Thoughts and Behaviors

Eighty-two percent (82%) of all respondents had seriously thought about killing themselves at some point in their lives, and 40% of respondents in the sample reported having attempted suicide at some point in their life. This lifetime suicide attempt rate is nearly nine times as high as the prevalence in the U.S. population (4.6%).[54]

Lifetime suicide attempt rates were higher for transgender men (45%) than for transgender women (40%) and non-binary respondents (39%), and crossdressers had a substantially lower rate of attempted suicide in their lifetime (15%). Lifetime suicide attempts were also higher among people of color, with American Indian (57%) respondents reporting the highest rates, followed by multiracial (50%), Black (47%), Latino/a (45%), and Middle Eastern (44%) respondents, in contrast to white (37%) respondents (Figure 7.32).

**Figure 7.32: Ever attempted suicide**
RACE/ETHNICITY (%)



*Forty percent (40%) of respondents have attempted suicide in their lifetime, nearly nine times the rate reported in the U.S. population (4.6%).*

People with disabilities (54%) in the sample were more likely to report attempting suicide. Lifetime suicide attempts also varied by level of education, with the highest rates among those who did not complete high school (52%), and the lowest rates among those with a bachelor's degree (34%) or higher (30%) (Figure 7.33).

**Figure 7.33: Ever attempted suicide**
EDUCATIONAL ATTAINMENT (%)



Among respondents who were out to the immediate family they grew up with, lifetime suicide attempts varied significantly by family support. A majority (54%) of those who described their families as unsupportive had attempted suicide in their lifetime, in contrast to 37% of those with supportive families.[55]

Lifetime suicide attempts were also higher for respondents who were physically attacked in the past year (65%), or have ever experienced homelessness (59%), done sex work (57%), lost their job for being transgender (55%), or been sexually assaulted[56] (54%).

More than two-thirds (71%) of all respondents who had ever attempted suicide did so more than once, including 46% who reported three or more attempts, and 21% who reported five or more attempts.

# III. Age of Suicide Attempts

## a. Age of First Attempt

Respondents who have attempted suicide (once or multiple times) were asked about the age of their first suicide attempt. More than one-third (34%) reported that their first attempt was at age 13 or younger. Thirty-nine percent (39%) reported that their first attempt occurred between the ages of 14 and 17, 20% reported that it occurred between age 18 and 24, and 8% reported that their first attempt was at age 25 or older.

## b. Age of Most Recent Attempt

Among respondents who reported a suicide attempt,[57] 6% reported that their most recent attempt happened at age 13 or younger. More than one-quarter (26%) reported the most recent attempt occurred between the ages of 14 and 17, 41% reported that it happened between the ages of 18 and 24, and 27% reported that their most recent attempt was at age 25 or older.

# E. SUBSTANCE USE

Substance use is an important indicator of mental health as well as physical wellbeing, and it may reflect an individual's level of exposure to a variety of risk and protective factors, such as family acceptance, homelessness, violence, and economic opportunity.[58] The survey explored patterns in respondents' substance use with questions informed by the National Survey on Drug Use and Health[59] to allow for comparison to substance use trends in the U.S. population. Respondents were asked whether they had ever consumed certain substances, including alcohol, tobacco, marijuana, and other drugs, such as cocaine, heroin, and methamphetamine. Respondents who reported using such substances received a series of follow-up questions about the frequency and quantity of their substance use.

**KEY FINDINGS**

▶ One-quarter (25%) of respondents used marijuana within the past month, compared to 8% of the U.S. population.

▶ Seven percent (7%) of respondents used prescription drugs that were not prescribed to them or used them not as prescribed ("nonmedical prescription drug use") in the past month, compared to 2% of the U.S. population.

▶ Four percent (4%) of respondents used illicit drugs (not including marijuana and nonmedical use of prescription drugs) in the past month, and 29% have used them in their lifetime.

▶ Overall, 29% of respondents reported illicit drug use, marijuana consumption, and/or nonmedical prescription drug use in the past month, nearly three times the rate in the U.S. population (10%).

HEALTH

AR_217113

# I. Alcohol Consumption

Ninety percent (90%) of respondents reported having a drink of alcohol, such as beer, wine, or hard liquor, at any point in their lives, compared to 86% in the U.S. adult population.[60] Sixty-three percent (63%) of respondents were currently using alcohol, meaning that they had consumed at least one alcoholic beverage within the 30 days prior to taking the survey, compared with 56% of the U.S. adult population.[61]

## a. Frequency of Current Alcohol Use

Respondents who were currently using alcohol were asked how many days they had used alcohol in the past month. Twenty-nine percent (29%) used alcohol on 1 or 2 days, and 28% had used alcohol on 3–5 days during the prior month. Nineteen percent (19%) used alcohol on 6–10 of the past 30 days, and 23% consumed alcohol on 11 or more days.

## b. Binge and Heavy Drinking

Current alcohol users were also asked for the number of days in the month when they consumed 5 or more drinks on the same occasion, meaning at the same time or within a couple of hours of each other ("binge drinking").[62] Twenty-seven percent (27%) of the sample reported binge drinking in the past month, slightly higher than the rate in the U.S. adult population in 2014 (25%).[63]

Respondents who were currently working in the underground economy, such as sex work, drug sales, or other criminalized work, were nearly twice as likely to engage in binge drinking as those in the overall sample, with nearly half (49%) reporting binge drinking at least one time in the past month.

Latino/a (32%), Middle Eastern (30%), and Black (30%) respondents were more likely to report binge drinking, while white (25%) and Asian (19%) respondents reported lower levels (Figure 7.34).



**Figure 7.34: Reported binge drinking in the past month**
RACE/ETHNICITY (%)

Nine percent (9%) of respondents reported binge drinking on one day during the month and 10% on 2–4 days. Seven percent (7%) of respondents reported binge drinking on 5 more days that month ("heavy drinking"), the same rate as the U.S. population (7%).[64] Respondents who were currently working in the underground economy (19%) were more than twice as likely to report heavy drinking in the past month as those in the overall sample.

# II. Tobacco Use

## a. Lifetime and Current Tobacco Use

Fifty-seven percent (57%) of respondents reported that they had smoked all or part of a cigarette at any point in their lives, lower than the rate in the U.S. population (63%).[65] Twenty-two percent (22%) were current smokers, meaning that they smoked at least one cigarette or part of a cigarette within thirty days of taking the survey, which compares to 21% of the U.S. population.[66]

Respondents who were currently working in the underground economy were more than twice as likely as the overall sample to have smoked tobacco within the past month, with 51% reporting current tobacco use.

## b. Frequency of Tobacco Use Among Current Users

Current smokers were also asked the number of days on which they had smoked tobacco in the past month. Twenty-nine percent (29%) of current users smoked tobacco on 4 days or fewer in the past month, and one-quarter (24%) smoked tobacco on 5–20 days. More than one-third (38%) of current smokers smoked tobacco daily during the past month, compared to 59% of current smokers in the U.S. population.[67]

Among daily smokers, nearly one-third (32%) smoked one or more packs each day. Smoking more than one pack a day was more likely to be reported by daily smokers aged 45–64 (54%) and 65 and over (50%) (Figure 7.35), as well as American Indian (44%) and white (40%) respondents (Figure 7.36).



**Figure 7.35: Daily smokers consuming one or more packs a day in the past month**
CURRENT AGE (%)

**Figure 7.36: Daily smokers consuming one or more pack a day in the past month**
RACE/ETHNICITY (%)



*Sample size too low to report

# III. E-Cigarettes or Vaping Products

More than one-third (36%) of respondents had used e-cigarettes or vaping products at some point in their lives. Lifetime use of these products was elevated among respondents who have worked in the underground economy, with 57% reporting past use. Thirty percent (30%) of respondents who had ever used e-cigarettes or vaping products used them within 30 days of taking the survey. An additional 40% used them more than 30 days prior but less than a year before taking the survey, and 29% had used them more than 12 months before taking the survey.

# IV. Marijuana Use

Nearly two-thirds (64%) of respondents reported having ever used marijuana,[68] compared with 47% of the general population.[69]

## a. Current Marijuana Use

One-quarter (25%) of the sample reported current use, meaning that they used marijuana within 30 days of taking the survey, compared to 8% of the U.S. general population.[70] Current marijuana use was elevated among those who were currently working in the underground economy (60%) and those who were living with HIV (48%).

## b. Frequency of Marijuana Use

Respondents who had used marijuana in the month before taking the survey were asked for the number of days in which they smoked marijuana during that period. More than one in five (22%) smoked marijuana on 1–2 days that month. Thirty percent (30%) smoked marijuana on 3–12 days, 26% on 13–28 days, and nearly one-quarter (23%) smoked marijuana on 29 or on all 30 of the past 30 days.

Among those who were currently working in the underground economy, approximately one-third (34%) reported using marijuana on 29–30 days in

HEALTH

117

the past month. Respondents who were living with HIV (34%) were also more likely to use marijuana on 29–30 days within that month.

# V. Illicit Drugs

Nearly one-third (29%) of respondents reported ever using illegal or illicit drugs, such as cocaine, crack, heroin, LSD, methamphetamine, or inhalants like poppers or whippits (but not including marijuana).[71] Prior use of illicit drugs was particularly high among respondents who have done sex work (56%) and those who have done underground economy work other than sex work (such as drug sales) (75%). Past illicit drug use was also higher among those who have lost a job because of being transgender (43%) or who have ever experienced homelessness (42%).

## a. Current Illicit Drug Use

Four percent (4%) of respondents in the sample reported current use of illicit drugs (not including marijuana), meaning they had consumed them within 30 days of taking the survey.

Respondents who were currently working in the underground economy (26%) were nearly nine times as likely as those who were not currently working in the underground economy (3%) to have used illicit drugs within the past month.

# VI. Nonmedical Prescription Drug Use

Approximately one-third (34%) of respondents have taken prescription drugs, such as Oxycontin, Xanax, Adderall, or Ambien, for "nonmedical use," meaning that the drugs were not prescribed to them or that they were not being taken as prescribed.

Among respondents who have worked in the underground economy, almost two-thirds (63%) reported nonmedical prescription drug use, compared with 26% of those who had no experience in the underground economy. Rates of nonmedical

*Almost one-third (29%) of respondents reported illicit drug use, marijuana consumption, and/or nonmedical prescription drug use in the past month, compared with 10% of the U.S. population.*

prescription drug use were particularly high among those who had done underground economy work other than sex work, such as drug sales, with 75% reporting nonmedical prescription drug use.

Younger respondents were more likely to report nonmedical prescription drug use, with those aged 25–44 (39%) being most likely, and those aged 65 and older (18%) being the least likely to report such prescription drug use (Figure 7.37).

**Figure 7.37: Nonmedical use of prescription drugs**
CURRENT AGE (%)



## a. Current Nonmedical Prescription Drug Use

Of respondents who reported nonmedical use of prescription drugs, over half (51%) had last engaged in such use more than a year before taking the survey, and 28% had done so within that year but more than a month earlier. More than one in five (21%) reported nonmedical prescription drug use within 30 days of taking the survey. This represents 7% of the overall sample, compared to 2% of the U.S. population.[72]

2015 U.S. TRANSGENDER SURVEY

AR_217116

# VI. Overall Current Drug Use

Almost one-third (29%) of respondents in the overall sample were currently using illicit drugs, marijuana, and/or prescription drugs not prescribed to them or not as prescribed, meaning they consumed them within 30 days of taking the survey. This was nearly three times higher than usage in the U.S. general population (10%).[73]

More than two-thirds (68%) of those currently working in the underground economy reported illicit drug use (including marijuana and prescription drug use) in the past month (Figure 7.38).

Figure 7:38: Substance use in the past month among respondents currently working in the underground economy



- ▓ % in USTS currently working in underground economy
- ▓ % in USTS not currently working in underground
- ░ % in U.S. population (NSDUH)

AR_217117

# F. HIV TESTING AND CARE

The prevalence of HIV and AIDS has been found in prior research to be higher among transgender people than in the U.S. general population.[74] The Centers for Disease Prevention and Control found that a number of factors increase transgender people's vulnerability to HIV, including social rejection and stigma, inadequate access to transgender-competent care, barriers to accessing education, employment, and housing, and high rates of intimate partner violence.[75] Respondents received a series of questions to examine experiences related to HIV testing, HIV care, and living with HIV. Several of the questions in this section of the survey were patterned on national surveys, including the National Health Interview Survey (NHIS)[76] and Behavioral Risk Factor Surveillance System (BRFSS),[77] so that answers could be compared to the U.S. population.

**KEY FINDINGS**

▷ More than half (55%) of the sample has been tested for HIV, compared to 34% of the U.S. adult population.

▷ Respondents reported that they were diagnosed with HIV at a rate of 1.4%, a substantially higher rate than in the U.S. population (0.3%).

▷ Transgender women were more than twice as likely to be living with HIV (3.4%) as the overall sample.

▷ Nearly one in five (19.0%) Black transgender women were living with HIV, and American Indian (4.6%) and Latina (4.4%) transgender women were more than three times as likely to be living with HIV as the overall sample.

# I. HIV Testing

Respondents were asked whether they had ever been tested for HIV, aside from testing obtained through the blood donation process. More than half (55%) of respondents had been tested for HIV, in comparison to 34% of the U.S. adult population.[78] This varied by gender identity, with transgender women (62%) and transgender men (58%) being more likely to be tested, compared to non-binary people (45%). Black respondents (70%) and American Indian (65%) respondents were more likely to have been tested than other people of color and white respondents (Figure 7.39).

**Figure 7.39: Ever been tested for HIV**
RACE/ETHNICITY (%)



2015 U.S. TRANSGENDER SURVEY

AR_217118

People who were currently working in the underground economy, including sex work and drug sales, were also more likely to have been tested (78%).

## a. Test Location

Those who were tested for HIV received tests in a wide range of locations, with nearly one-half (45%) being tested at their private doctor's or HMO office, more than one-quarter (26%) at a clinic, and 11% in a counseling or testing site. Testing locations followed a similar pattern in the U.S. general population, with a few exceptions. USTS respondents were almost three times as likely to have been tested at a counseling or testing site (11%) than those in the U.S. general population (4%),[79] and three times less likely to be tested as a hospital inpatient (Table 7.7).

Table 7.7: Locations where last tested for HIV

| Location | % in USTS | % in U.S. population (BRFSS) |
|---|---|---|
| Private doctor or HMO office | 45% | 47% |
| Clinic | 26% | 23% |
| Counseling or testing site | 11% | 4% |
| Hospital inpatient | 3% | 9% |
| Emergency room | 1% | 2% |
| Home | 1% | 2% |
| Jail, prison, or other correctional facility | <1% | 1% |
| Drug treatment facility | <1% | <1% |
| Somewhere else | 9% | 11% |
| Military (write-in response) | 2% | --- |
| Mobile clinic or testing site (write-in response) | 2% | --- |
| Do not know or not sure | --- | 1% |

## b. Year of Last Test

Thirty-eight percent (38%) of respondents who have ever been tested for HIV had most recently been tested in 2015 (the year the survey was conducted), and more than two-thirds (71%) had last been tested in 2013 or later (Figure 7.40).

Figure 7.40: Year of last HIV test



% of those who have been tested for HIV

38% 2015
22% 2014
11% 2013
6% 2012
3% 2011
20% 2010 or earlier

## c. Reason For Not Being Tested

Forty-five (45%) percent of respondents reported that they had not been tested for HIV. Of those who had not been tested, 86% reported that the main reason for not being tested was that exposure to HIV was unlikely, similarly to the rate in the U.S. general population (86%).[80] Respondents also reported a variety of additional reasons for not being tested (Table 7.8).

Table 7.8: Main reason for not being tested for HIV

| Reason | % of those who have not been tested in USTS | % of those who have not been tested in U.S. population (NHIS) |
|---|---|---|
| Unlikely they have been exposed to HIV | 86% | 86% |
| Their doctor/health care provider never mentioned getting an HIV test | 3% | --- |
| They did not know where to get tested | 1% | 0% |
| They did not want to think about HIV or being HIV-positive | 1% | 0% |
| They did not like needles | 1% | 0% |
| They were afraid to find out if they were HIV-positive | 1% | 0% |
| They were worried their name would be sent to the government if they tested positive | <1% | <1% |
| They were afraid of losing their job, insurance, home, friends, or family if people knew they were tested | <1% | <1% |
| Some other reason | 2% | 1% |
| No particular reason | 6% | 12% |

## II. HIV Status

The rate of respondents who were living with HIV (1.4%)[81,82] was more than four times as high as that in the U.S. general population (0.3%).[83] More than half (53%) were HIV negative,[84] and 46% had not been tested or did not know the results of their HIV test. This included 1% of those who were tested but did not know their status because they never received the results and less than 1% who received results that were unclear, which meant the test did not determine if they had HIV.

HIV status varied by gender identity, with transgender women being most likely to report they were living with HIV (3.4%), in contrast to transgender men (0.3%) and non-binary people (0.4%) (Figure 7.41).

**Figure 7.41: Living with HIV**
GENDER IDENTITY (%)



The rate of HIV differed by race and ethnicity, with Black respondents being almost five times as likely to be HIV positive or reactive (6.7%). American Indian (2.0%) and Latino/a (1.6%) participants also had higher rates of HIV compared to the sample and in contrast to Asian (0.5%) and white (0.4%) respondents (Figure 7.42).

# In Our Own Voices

"I have consulted with surgeons [for gender transition] only to be told they would charge me 50–100% more for the surgery because I am HIV positive. Every day is a double coming out process as transgender and being undetectably HIV positive."

......................................................

"The nurse refused to give me HIV testing because she said those funds were reserved for men who have sex with men and I'm 'not a real man.' She told me I was born female and just needed to accept reality."

......................................................

"I am a trans man who has been living with HIV for 25 years. I have good health insurance and get excellent trans-related and HIV-related health care. I have access to a great therapist who is an expert in gender issues and transitioning. All these factors contribute to my survival and my success."

......................................................

"My first time in jail, and possibly the time I became infected with HIV, was the scariest of all. There were so many times I was in jail and participated in unprotected sex out of fear and necessity. This is just one of the harsh realities for young vulnerable trans women like myself. It is truly bewildering that this reality was so commonly accepted among trans women of color."

......................................................

AR_217120

*The rate of respondents living with HIV (1.4%) was nearly five times higher than in the U.S. population (0.3%).*

**Figure 7.42: Living with HIV**
RACE/ETHNICITY (%)



Nearly one in five (19.0%) Black transgender women reported living with HIV, a rate that is more than thirteen times higher than that in the overall sample. American Indian (4.6%) and Latina (4.4%) transgender women also reported substantially higher rates of HIV (Figure 7.43).

**Figure 7.43: Living with HIV among transgender women**
RACE/ETHNICITY (%)



The rate of HIV also differed by current age, with it being highest among those aged 45–64 (3.3%) and also higher for the 25–44 age group (2.0%) (Figure 7.44).

**Figure 7.44: Living with HIV**
AGE (%)



Undocumented residents (15.0%) were more than ten times as likely to report that they were living with HIV as the overall sample, and documented non-citizens (3.6%) were also more likely. There were also substantial differences when examining rates of HIV by educational attainment. Those who did not complete high school (7.2%) were more than five times as likely to be living with HIV as those in the overall sample, in contrast to the lower rates for those with a bachelor's degree (0.7%) or a graduate or professional degree (0.8%) (Figure 7.45).

**Figure 7.45: Living with HIV**
EDUCATIONAL ATTAINMENT (%)



HEALTH

123

The rate of HIV was more than ten times higher for respondents whose current sole source of income was from underground economy work (15.0%), five times higher among those who have participated in sex work at any point in their lifetime (7.9%), and almost twice as high for those who have experienced homelessness (2.7%).

# III. HIV Health Care

Medical providers and HIV health care advocates often describe effective treatment and management of HIV in terms of the HIV care continuum or the HIV treatment cascade. The HIV care continuum describes stages of HIV medical care, including "diagnosis of HIV infection, linkage to care, retention in care, receipt of antiretroviral therapy, and achievement of viral suppression."[85] Respondents were asked whether they had received HIV-related health care in the year prior to the survey, and were also asked about other aspects of the HIV care continuum.

Most of the respondents who were living with HIV had received HIV-specific health care within the past year, not including care received during an emergency room visit or during a hospital stay. Eighty-nine percent (89%) of respondents living with HIV had seen a doctor or health care provider for HIV care in the past 12 months, and 87% received HIV care in the past 6 months.

Respondents who had not seen a doctor for HIV care *in the past 6 months* offered a range of reasons, including not being ready to find health care for HIV, not being able to afford HIV care, not feeling sick enough to look for HIV care, and their HIV is well controlled enough to only see a doctor once per year.[86] Similarly, those who had not seen a doctor for HIV care *in the past 12 months* offered a variety of reasons, including not having health insurance, not being able to afford HIV care, not

knowing where to go for HIV care, not feeling sick enough to look for health care, relying on a higher power or God to help with their HIV, only recently finding out about their HIV status, and other unspecified reasons.[87]

Of respondents who were living with HIV, 82% reported that they had their blood tested to determine their viral load and CD4 counts in the past 6 months. Five percent (5%) had most recently received such testing between 6 and 12 months ago, 6% were last tested more than a year ago, and 7% had never had a blood test for their viral load and CD4 counts.

Eighty-seven percent (87%) of respondents living with HIV have been prescribed anti-retroviral therapy (ART), which are medications that can reduce the amount of HIV in the body.[88] This is compared to 94% of those living with HIV in the general population.[89] Eighty-one percent (81%) of people living with HIV reported that they were currently taking their ART medications. Of those who had been prescribed ART, almost two-thirds (64%) reported taking it regularly and as prescribed all of the time, one-third (33%) took it most of the time, 2% rarely took it, and 1% never took it regularly and as prescribed. Approximately half (45%) of respondents who were not taking their ART medication all of the time—including those who took it most of the time, rarely, or never—reported that the main reason for not taking it as they were supposed to was that they forgot to take it. The remaining respondents (n=23, unweighted) reported several reasons why that they did not take their medication as prescribed, including not being able to afford the medication, not having health insurance, concerns about conflicts with other medications, concerns about weight gain, not wanting to take ART, and other reasons not listed in the question.

AR_217122

# Conclusion

Findings throughout the chapter indicated that respondents were impacted by substantial health-related disparities, including access to quality care and health outcomes. Respondents reported substantial barriers to receiving the care that they need, such as financial constraints, lack of health insurance or insurance that does not adequately address their health needs, and lack of access to health care providers who can administer health care respectfully and with a sufficient knowledge of transgender patients' needs. Furthermore, although some respondents were able to access health care related to gender transition, such as counseling, hormone therapy, or a variety of surgical procedures, a large number have not received such health care despite wanting to do so, often due to income and economic instability and lack of access to adequate health insurance insurance.

Results also suggest that insufficient access to quality care and coverage contributed to poor health outcomes among respondents. Respondents were substantially more likely to be living with HIV than the general population, with much higher rates among transgender women of color. Respondents were also more likely to report poor mental health outcomes, including higher rates of substance use, serious psychological distress, and suicide attempts. Findings demonstrated an association between poor health outcomes and a number of risk factors, such as economic instability, housing instability, lower educational attainment, and lack of family support.

**ENDNOTES** | CHAPTER 7: HEALTH

1   Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the US transgender population. *American Journal of Public Health, 103*(5), 943–951; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey. (pp. 72–87).* DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Institute of Medicine. (2011). *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding.* DC: National Academy of Sciences.

2   Kosenko, K., Rintamaki, L., Raney, S., Maness, K. (2013). Transgender patient perceptions of stigma in health care contexts. *Medical Care, 51*(9), 819–822; Poteat, T., German, D., & Kerrigan, D. (2013). Managing uncertainty: A grounded theory of stigma in transgender health encounters. *Social Science & Medicine, 84*(1), 22–29; Grant, et al. (2011). pp. 72–87; Lambda Legal. (2010). *When Health Care Isn't Caring: Lambda Legal's Survey of Discrimination Against LGBT People and People with HIV.* New York, NY: Lambda Legal.

3   U.S. Census Bureau. (2015). 2015 American Community Survey 1-Year Estimates. Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S2701&prodType=table.

4   U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Private Health Insurance Coverage By Type.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S2703&prodType=table; U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Public Health Insurance Coverage by Type.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S2704&prodType=table.

5   The estimate for the percentage of people who receive coverage through the Indian Health Service was calculated based on a 2015 statement that approximately 2.2 million American Indian and Alaska Native people were served by the Indian Health Service. https://www.ihs.gov/newsroom/factsheets/quicklook/.

6   Q. 11.9 specified that "[h]ealth insurance marketplaces are part of the new health care law, sometimes called 'Obamacare' or the 'Affordable Care Act,' where people can get insurance online, such as through healthcare.gov, over the phone, or in person."

7   "Insurer" here refers to insurers providing coverage under both private insurance plans (such as those purchased through an employer) and public plans (such as through Medicaid or Medicare).

AR_217123

8    The "other insurance" category includes TRICARE or other military coverage, VA, Indian Health Service, and other types of insurance not listed. See Table 7.1.

9    Respondents were asked if they had "experienced unwanted sexual contact (such as fondling, sexual assault, or rape) in a health care setting (such as a hospital, office, clinic)" in Q.12.7.

10    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

11    Respondents on active duty in military service were asked separately about where they received transition-related health care. These results are reported in the *Military Service* chapter.

12    Although 1.5% of respondents in the sample reported having taken puberty-blocking medication, the percentage reported here reflects a reduction in the reported value based on respondents' reported ages at the time of taking this medication. While puberty-blocking medications are usually used to delay physical changes associated with puberty in youth ages 9–16 prior to beginning hormone replacement therapy, a large majority (73%) of respondents who reported having taken puberty blockers in Q.12.9 reported doing so after age 18 in Q.12.11. This indicates that the question may have been misinterpreted by some respondents who confused puberty blockers with the hormone therapy given to adults and older adolescents. Therefore, the percentage reported here (0.3% or "less than 1%") represents only the 27% of respondents who reported taking puberty-blocking medication before the age of 18.

13    "Transition-related surgery" here includes all procedures listed in Table 7.4 and 7.5, with the exception of electrolysis and non-surgical voice therapy.

14    Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

15    The "other insurance" category in Figure 7.11 includes TRICARE or other military coverage, VA, Indian Health Service, and other types of insurance not listed. See Table 7.1.

16    Since the available surgical procedures related to transition generally vary based on individuals' sex assigned at birth (the gender they were thought to be when they were born), respondents received different questions about surgical procedures based on their response to Q. 2.1, which asked about the sex listed on respondents' original birth certificate. Respondents who said that they had female on their original birth certificate received Q. 12.15, and respondents who said they had male on their original birth certificate received Q. 12.18. Although the vast majority of respondents received only questions about medical procedures available to them, 2.7% of respondents indicated that they were intersex, and a portion of them may not have received questions about all the surgical procedures that best fit their health care needs.

17    Respondents were asked about having "top/chest surgery reduction or reconstruction" in Q. 12.15.

18    Respondents were asked about having a "hysterectomy/'hysto' (removal of the uterus, ovaries, fallopian tubes, and/or cervix)" in Q. 12.15.

19    Respondents were asked about having a "clitoral release/metoidioplasty/centurion procedure" in Q. 12.15. These are genital procedures that separate the clitoris from the labia.

20    Respondents were asked about having a "phalloplasty (creation of a penis)" in Q. 12.15. This is a genital procedure involving the construction of a larger phallus.

21    The U.S. Preventive Services Task Force currently recommends Pap smears every three years for adults who have a cervix and are between the ages 21 and 65. U.S. Preventive Services Task Force. (2012). *Cervical Cancer: Screening.* Available at: http://www.uspreventiveservicestaskforce.org/Page/Document/UpdateSummaryFinal/cervical-cancer-screening.

22    Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2015/samadult_freq.pdf

23    Respondents were asked about having a "vaginoplasty/labiaplasty/SRS/GRS/GCS" in Q. 12.18. A vaginoplasty is a surgical creation of a vagina. A labiaplasty is a surgical modification or construction of the labia.

24    Respondents were asked about having an "orchidectomy/'orchy'/removal of the testes" in Q. 12.18.

25    Respondents were asked about having "facial feminization surgery (such as nose, brow, chin, cheek)" in Q.12.18.

26    Respondents were asked about having "breast augmentation/top surgery" in Q. 12.18. This refers to an augmentation mammoplasty, which reshapes or increases the size of the breast.

27    Respondents were asked about having a "tracheal shave (Adam's apple or thyroid cartilage reduction)" in Q. 12.18.

28    Although silicone injections are sometimes used to modify one's appearance, they are often risky and can lead to disfigurement, injury, and even death. Such injections are illegal in the United States. However, due to barriers to affordable care, some transgender people turn to silicone injections as a less expensive or more easily accessible substitute for safer treatments.

29    See e.g., Pascoe, E. A. & Richman, L. S. (2009). Perceived discrimination and health: A meta-analytic review. *Psychological Bulletin, 135*(4), 531–554.

30    See e.g., Bariola, E. Lyons, A., Leonard, W., Pitts, M., Badcock, P., Couch, M. (2015). Demographic and psychosocial factors associated with psychological distress and resilience among transgender individuals. *American Journal of Public Health, 105*(10), 2108–2116; Nuttbrock, L., Brockting, W., Rosenblum, A., Hwahng, S., Mason, M., Macri, M., & Becker, J. (2014). Gender abuse and major depression among transgender women: A prospective study of vulnerability and resilience.

AR_217124

*American Journal of Public Health, 104*(11), 2191, 2198; Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the US transgender population. *American Journal of Public Health, 103*(5), 943–951; Institute of Medicine. (2011). *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding.* DC: National Academy of Sciences.

31    The general health rating among adults in the U.S. population was calculated by the research team using data from the Behavioral Risk Factor Surveillance System (BRFSS). Centers for Disease Control and Prevention. (2015). *BRFSS Prevalence & Trends Data.* Available at: http://www.cdc.gov/brfss/brfssprevalence.

32    The Kessler Psychological Distress Scale, or K6, assesses psychological distress based on how often in the past 30 days respondents felt so sad that nothing could cheer them up, nervous, restless or fidgety, hopeless, that everything was an effort, or worthless. See Q. 12.2. See the National Health Interview Survey for additional information about the K6 mental health screening instrument and measure of serious psychological distress in adults (available at: http://www.healthindicators.gov/Indicators/Serious-psychological-distress-adults-percent_50055/Profile).

33    The K6 scale rates how often feelings are experienced on the following scale: (0) none of the time, (1) a little of the time, (2) some of the time, (3) most of the time, and (4) all of the time. See Q. 12.2. A total score of 13 or above across all six measures indicates serious psychological distress.

34    Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2015/samadult_freq.pdf.

35    See note 33 for an explanation of how "serious psychological distress" is calculated based on the K6 scale.

36    Center for Behavioral Health Statistics and Quality. (2016). *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at: http://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015.pdf.

37    Serious psychological distress is related to age and educational attainment in the U.S. general population. (see note 33; http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6340a13.htm). Those who are younger and have lower educational attainment have a higher prevalence of serious psychological distress. When the "supplemental weight" is applied to the USTS sample's prevalence of serious psychological distress to adjust the sample to reflect the age and educational attainment of the U.S. adult population, the prevalence is reduced to 30%, six times the national prevalence for U.S. adults. Based on

studies using population-based samples of transgender adults, it is estimated that the transgender population is younger and has lower educational attainment than the U.S. adult population. Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). Race and Ethnicity of Adults who Identify as Transgender in the United States. Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. American Journal of Public Health, 102(1), 118–122. Therefore, the finding of 39% for prevalence of serious psychological distress is reported here using the standard weight only.

38    *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.86B. See note 36.

39    Results for respondents who were sexually assaulted here reflect those who reported that they had "experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)" in the past year (see Q. 18.3).

40    Substance Abuse and Mental Health Services Administration. (2015). *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth.* Available at: http://store.samhsa.gov/shin/content//SMA15-4928/SMA15-4928.pdf.

41    Additionally, eleven percent (11%) of respondents in the sample said they were sent to a therapist, counselor, or religious advisor by immediate family members to stop them from being transgender. See the "Sent to a Professional for Being Transgender" section of the *Family Life and Faith Communities* chapter for a discussion about respondents who were sent to a professional by their family.

42    Although 0.4% of the overall sample reported that gender transition was not for them, these respondents did identify as transgender, meeting all criteria for inclusion in the survey (see Q. 1.10–1.18).

43    Haas, A. P., Rodgers, P. L., & Herman, J. L. (2014). *Suicide Attempts Among Transgender and Gender Non-Conforming Adults.* New York, NY & Los Angeles, CA: American Foundation for Suicide Prevention & Williams Institute; Moody, C. & Smith, N. G. (2013). Suicide protective factors among trans adults. *Archives of Sexual Behavior 42*(5), 739–752; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 82). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

44    Lipari, R., Piscopo, K., Kroutil, L. A., & Miller, G. K. (2015). *Suicidal Thoughts and Behaviors Among Adults: Results from the 2014 National Survey on Drug Use and Health.* Rockville, MD: Substance Abuse and Mental Health Services Administration.

45    Kessler, R. C., Berglund, P., Chiu, W. T., Demler, O., Heeringa, S., Hiripi, E., . . . Zheng, H. (2004). The US National Comorbidity Survey Replication (NCS-R): design and field procedures. *International Journal of Methods in Psychiatric Research, 13*(2), 69–92.

AR_217125

46  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

47  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.69B. See note 36.

48  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

49  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

50  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

51  Whether or not a person receives medical attention following a suicide attempt is often used as a measure of the severity of the attempt. However, because many transgender people report avoiding medical professionals because of fear of mistreatment (see, for example, the previous section on "Experiences with Health Care Providers"), it may be difficult to use this measure to gauge the severity of the attempt among USTS respondents.

52  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.77B. See note 36.

53  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.77B. See note 36.

54  Kessler, R. C., Borges, G., & Walters, E. E. (1999). Prevalence of and risk factors for lifetime suicide attempts in the National Comorbidity Survey. *Archives of General Psychiatry, 56*(7), 617–626. See also Nock, M. K., Hwang, I., Sampson, N. A., & Kessler, R. C. (2010). Mental disorders, comorbidity and suicidal behavior: Results from the National Comorbidity Survey Replication. *Molecular Psychiatry, 15*(8), 868–876; Nock, M. K., Borges, G., Bromet, E. J., Cha, C. B., Kessler, R. C., & Lee, S. (2008). Suicide and suicidal behavior. *Epidemiologic Reviews, 30*(1), 133–154 (finding a lifetime prevalence of suicide ideation of 5.6–14.3%, a lifetime prevalence for suicide plans of 3.9%, a lifetime prevalence for suicide attempts of 1.9–8.7%).

55  Respondents who reported that they were out to all, most, or some of the immediate family they grew up with were asked to assess how supportive their family was using a five-point scale from "very supportive" to "very unsupportive". The categories were collapsed to create a new variable reflecting a supportive, neutral, or unsupportive family.

56  Results for respondents who were sexually assaulted here reflect those who reported that they had "experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)" in their lifetime (see Q.18.1).

57  The age of the most recent suicide attempt reported here includes responses from both respondents who reported a single attempt and those who reported multiple attempts. For respondents who reported a single suicide attempt, the age of the most recent suicide attempt is also the age of their first suicide attempt as reported in the previous section.

58  See e.g., Cleveland, M. J., Feinberg, M. E., Bontempo, D. E., & Greenberg, M. T. (2008). The role of risk and protective factors in substance use across adolescence. *Journal of Adolescent Health, 43*(2), 157–164; Kilpatrick, D. G., Ruggiero, K. J., Acierno, R., Saunders, B. E., Resnick, H. S., & Best, C. L. (2003). Violence and risk of PTSD, major depression, substance abuse/dependence, and comorbidity: Results from the National Survey of Adolescents. *Journal of Consulting and Clinical Psychology, 71*(4), 692–700.

59  Center for Behavioral Health Statistics and Quality. (2015). *2015 National Survey on Drug Use and Health Questionnaire.* Available at http://www.samhsa.gov/data/population-data-nsduh/reports?tab=39.

60  Center for Behavioral Health Statistics and Quality. (2015). *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.6B. Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at http://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015.pdf.

61  *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.6B. See note 60.

62  This report follows the 2014 National Survey on Drug Use and Health (NSDUH) definition for binge drinking, which is defined as "drinking five or more drinks on the same occasion on at least 1 day in the past 30 days." As this definition differs from the 2015 NSDUH definition, general population comparisons for binge and heavy drinking in this report will be drawn from the 2014 NSDUH data. Hedden, S. L., Kennet, J., Lipari, R., Medley, G., Tice, P., Copello, E. A. P., & Kroutil, L. A. (2015). *Behavioral Health Trends in the United States: Results from the 2014 National Survey on Drug Use and Health.* Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at: http://www.samhsa.gov/data/sites/default/files/NSDUH-FRR1-2014/NSDUH-FRR1-2014.pdf.

63  *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.46B. See note 60.

64  *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.46B. See note 60.

65  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 2.28B. See note 36.

66  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 2.16B. See note 36.

67  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 6.7B. See note 36.

68  Respondents were instructed to include products such as "weed, joints, hashish, hash, or hash oil" when reporting on marijuana use. See Q. 15.1.

69  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.35B. See note 36.

70  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.35B. See note 36.

AR_217126

71    For the purposes of this report, "illicit drugs" include those such as cocaine, crack, heroin, LSD, methamphetamine, and inhalants, but does not include marijuana or nonmedical use of prescription drugs. See Q. 15.1. This differs from illicit drugs as reported in the NSDUH, which includes "the misuse of prescription psychotherapeutics or the use of marijuana, cocaine (including crack), heroin, hallucinogens, inhalants, or methamphetamine." *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.30B. See note 36. Due to the difference between the two definitions, a comparison to the U.S. general population for the overall use of illicit drugs (not including marijuana or nonmedical use of prescription drugs) is not possible.

72    *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.22B. See note 36.

73    *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.30B. See note 36.

74    Centers for Disease Control and Prevention. (2016). *HIV and Transgender Communities.* Available at: http://www.cdc.gov/hiv/pdf/policies/cdc-hiv-transgender-brief.pdf; Baral, S. D., Poteat, T., Strömdahl, S., Wirtz, A. L., Guadamuz, T. E., & Beyrer, C. (2013). Worldwide burden of HIV in transgender women: a systematic review and meta-analysis. *The Lancet Infectious Diseases, 13*(3), 214—222; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 80). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Reisner, S. L., Poteat, T., Keatley, J., Cabral, M. Mothopeng, T., Dunham, E., Holland, C. E., Max, R., Baral, S. D. (2016). Global health burden and needs of transgender populations: a review. *The Lancet Infectious Diseases, 388*(10042), 412—436.

75    Centers for Disease Control and Prevention. (2016). *HIV and Transgender Communities.* Available at: http://www.cdc.gov/hiv/pdf/policies/cdc-hiv-transgender-brief.pdf.

76    Centers for Disease Control and Prevention (2015). *National Health Interview Survey: Survey Description.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2014/srvydesc.pdf .

77    Centers for Disease Control and Prevention (2014). *2015 Behavioral Risk Factor Surveillance System Questionnaire.* Available at: http://www.cdc.gov/brfss/questionnaires/pdf-ques/2015-brfss-questionnaire-12-29-14.pdf.

78    Centers for Disease Control and Prevention. (2015). *BRFSS Prevalence & Trends Data.* Available at: http://www.cdc.gov/brfss/brfssprevalence.

79    Centers for Disease Control and Prevention. (2016). *Behavioral Risk Factor Surveillance System: 2015 Codebook Report.* Available at: http://www.cdc.gov/brfss/annual_data/2015/pdf/codebook15_llcp.pdf.

80    Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: https://www.cdc.gov/nchs/nhis/nhis_2015_data_release.htm.

81    Percentages related to HIV status are presented with one decimal place throughout the section for more accurate comparison with general population figures.

82    The rate of respondents living with HIV includes those who were HIV-positive or reactive. Among respondents who had been tested, the rate of those who tested positive for HIV was 2.6%.

83    Centers for Disease Control and Prevention. (2015). HIV Surveillance Report, 2014; vol. 26. Table 18a. Available at: http://www.cdc.gov/hiv/library/reports/surveillance/. The HIV Surveillance Report provides data for those who were living with diagnosed HIV infection in the U.S. population in 2013. The U.S. population data includes those who are 15 years of age and older and does not include rate for those who are under 18, so it was not possible to exactly match the USTS sample with the U.S. population data. However, when estimating the impact of including 15—17 year olds in the U.S. population rate of those living with HIV, research team calculations estimated a difference of approximately 0.002% in the rate, which would not impact the rate of those living with HIV in the U.S. population as reported here.

84    Ninety-seven percent (97%) of those who were tested for HIV were HIV negative.

85    AIDS.Gov. (2015). *HIV Care Continuum.* Available at: https://www.aids.gov/federal-resources/policies/care-continuum.

86    Due to a low sample size, response figures could not be reported for those who had not seen a doctor for HIV care in the past 6 months.

87    Due to a low sample size, response figures could not be reported for those who had not seen a doctor for HIV care in the past 12 months.

88    See AIDS.Gov. (2015). *Overview of HIV Treatments.* Available at: https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/treatment-options/overview-of-hiv-treatments.

89    Centers for Disease Control and Prevention. (2016). *Behavioral and Clinical Characteristics of Persons Receiving Medical Care for HIV Infection—Medical Monitoring Project, United States, 2013 Cycle (June 2013-May 2014). HIV Surveillance Special Report 16.* Available at: http://www.cdc.gov/hiv/pdf/statistics/systems/mmp/cdc-hiv-hssr-mmp-2013.pdf.

AR_217127

# CHAPTER 8

# Experiences at School

**M**any schools provide supportive environments that promote learning and growth, while some schools can be unwelcoming and unsupportive for transgender students, whether in Kindergarten through 12th grade (K–12), or in technical or higher education institutions (such as a college or university). Other studies have shown that many students feel unsafe and have been verbally harassed or physically attacked because of their transgender identity.[1,2]

Survey respondents were asked whether they were out or perceived as transgender in K–12 and in higher education institutions. Those who said that they were out as transgender or that others thought they were transgender were asked additional questions about negative experiences based on their transgender status, including verbal harassment, physical and sexual assault, leaving school because of mistreatment, and expulsion. Throughout the chapter, notable differences in respondents' experiences based on demographic and other characteristics are reported.

AR_217128

KEY FINDINGS

▶ Twelve percent (12%) of respondents were out as transgender at some point from Kindergarten through the 12th grade.

▶ More than three-quarters (77%) of respondents who were out or perceived as transgender in K–12 had one or more negative experiences, such as being verbally harassed, prohibited from dressing according to their gender identity, or physically or sexually assaulted.

▶ Fifty-four percent (54%) of people who were out or perceived as transgender in K–12 were verbally harassed, and 24% were physically attacked.

▶ Seventeen percent (17%) of people who were out or perceived as transgender left a K–12 school because the mistreatment was so bad, and 6% were expelled.

▶ Twenty-four percent (24%) of people who were out or perceived as transgender in college or vocational school were verbally, physically, or sexually harassed.

# I. Outness in K–12

Twelve percent (12%) of respondents reported that they were out as transgender at some point between Kindergarten and the 12th grade (K–12). Of those who were not out as transgender, 28% said that they believed classmates, teachers, or school staff thought they were transgender.

All respondents, including those who were out or perceived as transgender in K–12, were also asked whether classmates, teachers, or school staff thought or knew that they were lesbian, gay, bisexual, or queer (LGBQ) in K–12. Three-quarters (75%) believed that classmates, teachers, or school staff thought or knew they were LGBQ. Younger respondents were much more likely to report that classmates, teachers, or staff in K–12 thought or knew they were LGBQ than older respondents,

such as 18- to 24-year-olds (85%) in contrast to 45- to 64-year-olds (51%) (Figure 8.1).

**Figure 8.1: Perceived as LGBQ in K–12**
CURRENT AGE (%)



EXPERIENCES AT SCHOOL

AR_217129

*More than three-quarters (77%) of those who were out or perceived as transgender had one or more negative experiences at school because they were transgender, such as being verbally harassed or physically attacked.*

# II. Treatment in K–12

Respondents who were out as transgender in K–12 or who said that others thought that they were transgender received additional questions about negative experiences in K–12, such as being verbally harassed, physically attacked, or expelled. Overall, 77% of those who were out or perceived as transgender had one or more of these negative experiences, while only 23% did not have any of these experiences (Table 8.1). American Indian (92%), Middle Eastern (84%), and multiracial (81%) respondents (Figure 8.2) and people with disabilities[3] (82%) were more likely to have one or more negative experiences.

**Figure 8.2: Had one or more negative experiences in K–12 (of those who were out or perceived as transgender)**
RACE/ETHNICITY (%)



*Poor treatment in school was associated with a variety of negative experiences. Respondents who were out or perceived as transgender in K–12 and had one or more negative experiences outlined in this chapter were:*

- *More likely to have attempted suicide (52%) than those who were out or perceived as transgender and did not have any of these negative experiences (37%).*

- *More likely to have experienced homelessness (40%) than those who were out or perceived as transgender and did not have any of the negative experiences (22%).*

- *More likely to currently be experiencing serious psychological distress (47%) than those who were out or perceived as transgender and did not have any of the negative experiences (37%).*

- *More likely to have ever worked in the underground economy, such as in sex work or drug sales (28%), compared with those who were out or perceived as transgender and did not have any of the negative experiences (18%).*

**Table 8.1: Experiences of people who were out as transgender in K–12 or believed classmates, teachers, or school staff thought they were transgender**

| Experiences | % of those who were out or perceived as transgender |
|---|---|
| Verbally harassed because people thought they were transgender | 54% |
| Not allowed to dress in a way that fit their gender identity or expression | 52% |
| Disciplined for fighting back against bullies | 36% |
| Physically attacked because people thought they were transgender | 24% |
| Believe they were disciplined more harshly because teachers or staff thought they were transgender | 20% |
| Left a school because the mistreatment was so bad | 17% |
| Sexually assaulted because people thought they were transgender | 13% |
| Expelled from school | 6% |
| **One or more experiences listed** | **77%** |

## a. Verbal Harassment

More than half (54%) of people who were out or perceived as transgender in K–12 were verbally harassed because they were transgender. Verbal harassment differed among people of color, with American Indian (69%) and Middle Eastern (61%) respondents being more likely to have this experience, and Latino/a (52%) and Black (51%) respondents being less likely (Figure 8.3).

**Figure 8.3: Verbally harassed in K–12 because people thought they were transgender**
RACE/ETHNICITY (%)



## Nearly one-quarter (24%) of those who were out or perceived as transgender in school were physically attacked because of being transgender.

**Figure 8.4: Physically attacked in K–12 because people thought they were transgender**
GENDER IDENTITY (%)



## b. Physical Attack

Nearly one-quarter (24%) were physically attacked because of being transgender. Transgender women (38%) were more likely to have been physically attacked than transgender men (20%) and non-binary people (16%) (Figure 8.4). American Indian respondents (49%) were more than twice as likely to have been physically attacked, and Middle Eastern (36%), multiracial (31%), and Black (28%) respondents were also more likely to have had this experience, in contrast to Latino/a (24%), white (23%), and Asian (17%) respondents (Figure 8.5).

**Figure 8.5: Physically attacked in K–12 because people thought they were transgender**
RACE/ETHNICITY (%)



EXPERIENCES AT SCHOOL

133

## c. Sexual Assault

Thirteen percent (13%) of people who were out or perceived as transgender in K–12 were sexually assaulted in school because they were transgender.[4] Transgender women (21%) and crossdressers (18%) were more likely to have been sexually assaulted than transgender men (9%) and non-binary people (10%) (Figure 8.6).

**Figure 8.6: Sexually assaulted in K–12 because people thought they were transgender**
GENDER IDENTITY (%)



Whether a respondent was sexually assaulted in K–12 varied by age, with older respondents such as 45- to 64-year-olds being more likely to have been sexually assaulted (22%) than younger respondents such as 25- to 44-year-olds (16%) (Figure 8.7).

**Figure 8.7: Sexually assaulted in K–12 because people thought they were transgender**
CURRENT AGE (%)



# In Our Own Voices

"I was constantly bullied and physically assaulted by my classmates. Teachers would often see it happen and make no move to intervene. The harassment continued, and I eventually had to change high schools three times, each time just as bad as the last, until I finally gave up on public schools."

..................................................

"I'd get hit by soda cans, spit balls, and paper airplanes of hate mail. Teachers weren't there or didn't care. I had to avoid social interactions like buses and school bathrooms because I didn't feel safe."

..................................................

"Every single day at college, I was harassed for being a visibly trans woman. People slowed their cars down to stare at me, they shouted slurs at me from their dorm windows, insulted me in class, and a lot more I'd rather not think about. It got so bad that I tried to kill myself twice over the course of three months. Getting out of that school has been the best thing to have happened to me."

..................................................

"In high school, the staff told me I could not use the men's bathroom because I'd make other students uncomfortable, even though I was out to everyone and none of the students were bothered by my gender."

..................................................

## d. Left School Due to Harassment

Seventeen percent (17%) of those who were out or perceived as transgender left a school because the mistreatment was so bad. Transgender women (22%) were more likely to have left a school because of mistreatment, in contrast to transgender men (15%) and non-binary people (15%) (Figure 8.8).

**Figure 8.8: Left school due to mistreatment in K–12**
GENDER IDENTITY (%)



American Indian (39%) and Middle Eastern (36%) respondents were more than twice as likely to have left a school because the mistreatment was so bad, and Black (22%) and multiracial (21%) respondents were also more likely to have left a school for this reason (Figure 8.9).

**Figure 8.9: Left school due to mistreatment in K–12**
RACE/ETHNICITY (%)



**Seventeen percent (17%) of people who were out or perceived as transgender in K–12 left a school because the mistreatment was so bad.**

## e. Expelled from School

Six percent (6%) of people who were out or perceived as transgender were expelled from school. Transgender women were nearly twice as likely to have been expelled, with one in ten (10%) reporting that experience (Figure 8.10). Further, respondents who were currently working in the underground economy (18%) were three times as likely to have been expelled from school.

**Figure 8.10: Expelled from school in K–12**
GENDER IDENTITY (%)



# III. Outness and Treatment in College or Vocational School

Of respondents who had attended college or vocational school, 46% said their classmates, professors, or staff at college or vocational school thought or knew they were transgender. Nearly one-quarter (24%) of respondents who indicated that classmates, professors, or staff at college or vocational school thought or knew they were transgender were verbally, physically, or sexually harassed. American Indian (37%), Black (28%), and Middle Eastern (27%) respondents were more likely to have had these experiences, while white (23%), Latino/a (23%), and Asian (22%) respondents were less likely (Figure 8.11).

**Figure 8.11: Verbally, physically, or sexually harassed in college or vocational school**
RACE/ETHNICITY (%)



Of respondents who were out or perceived as transgender and who experienced some form of harassment, 16% left college or vocational school because the harassment was so bad. This represents 2% of all respondents who attended a higher education institution. Of those who experienced some form of harassment, transgender women (21%) were more likely to

have left college or vocational school for this reason than transgender men (16%) and non-binary people (12%) (Figure 8.12). Respondents currently working in the underground economy were almost twice as likely (31%) to have left college because of harassment than other respondents. American Indian (23%), Latino/a (23%), Black (21%), and multiracial (20%) respondents were more likely to report leaving school for that reason (Figure 8.13).

**Figure 8.12: Left college or vocational school because harassment was so bad (of those who were harassed)**
GENDER IDENTITY (%)



**Figure 8.13: Left college or vocational school because harassment was so bad (of those who were harassed)**
RACE/ETHNICITY (%)



*Sample size too low to report

In addition to the 2% who left because the harassment was so bad, 1% of respondents who attended college or vocational school were expelled or forced out, and 5% left because of other reasons related to being transgender.

AR_217134

# IV. Current Outness and Support of Classmates

In addition to questions about being out to classmates at any time while they were in school, respondents were asked whether they currently had classmates, and whether those classmates knew that they were transgender. Of respondents who currently had classmates, only 15% said that all of their classmates knew that they were transgender, 10% said that most of them knew, 28% said that some of them knew, and nearly half (47%) said that none of their classmates knew that they were transgender.

Respondents who currently had classmates and reported that all, most, or some of their classmates knew that they were transgender were asked how supportive their classmates generally were of them as a transgender person. Responses were given on a five-point scale from "very supportive" to "very unsupportive." The categories were collapsed to create a new variable reflecting supportive, neutral, or unsupportive classmates.[5] More than half (56%) reported that their classmates were supportive, 39% had classmates that were neither supportive nor unsupportive, and only 5% reported that their classmates were unsupportive (Table 8.2).

**Table 8.2: Classmates' level of support of them as a transgender person**

| Level of support | % of those who reported that all, most, or some of their classmates knew they were transgender |
|---|---|
| Very supportive | 21% |
| Supportive | 35% |
| Neither supportive nor unsupportive | 39% |
| Unsupportive | 4% |
| Very unsupportive | 1% |

*More than half (56%) of those who had at least some classmates who knew they were transgender reported that their classmates were supportive.*

## Conclusion

Results indicated that the majority of those who were out or perceived as transgender in K–12 had one or more negative experiences, and that such experiences were correlated with a variety of poor outcomes, such as higher rates of attempted suicide, homelessness, and serious psychological distress. Although negative experiences were reported at all age groups, results found that older individuals were less likely to have been out as transgender in K–12 than younger respondents, but when out, they were more likely to have experienced negative treatment in schools. This indicates that school environments have improved for transgender people over the years, though high rates of mistreatment were reported even among younger respondents.

Additionally, results indicated that those who attended college or another higher education institution were out or perceived as transgender at high rates. However, they also suggest that transgender students in such institutions are subject to harmful experiences that lead to negative outcomes, such as having to leave school to avoid being harassed because of being transgender.

EXPERIENCES AT SCHOOL

AR_217135

**ENDNOTES** | CHAPTER 8: EXPERIENCES AT SCHOOL

1   Kosciw, J. G., Greytak, E. A., Palmer, N. A., & Boesen, M. J. (2014). *The 2013 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth in Our Nation's Schools.* New York, NY: Gay, Lesbian & Straight Education Network; Kosciw, J. G., Palmer, N. A., Kull, R. M., & Greytak, E. A. (2013). The effect of negative school climate on academic outcomes for LGBT youth and the role of in-school supports. *Journal of School Violence, 12*(1), 45–63.

2   Rankin, S. & Beemyn, G. (2012). Beyond a binary: The lives of gender-nonconforming youth. *About Campus, 17*(4), 2–10; Rankin, S., Weber, G., Blumenfeld, W., & Frazer, S. (2010). *2010 State of Higher Education for LGBT People.* Charlotte, NC: Campus Pride.

3   "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

4   This data is derived from responses to Q. 26.4, where respondents were asked if they had "experienced unwanted sexual contact because people thought [they were] trans."

5   "Very supportive" and "supportive" categories were collapsed into a single "supportive" category. "Very unsupportive" and "unsupportive" categories were collapsed into a single "unsupportive" category. See Q. 4.12.

AR_217136

# CHAPTER 9

# Income and Employment Status

High rates of poverty, unemployment, and economic vulnerability among transgender people have been documented in prior research.[1] These disparities can lead to numerous negative outcomes in housing, health, and many other aspects of life. The survey explored respondents' employment status and income sources with questions that were patterned on the Current Population Survey (CPS), a survey used by the Bureau of Labor Statistics to assess economic indicators and the state of the labor force in the United States.[2,3] The questions were used to compare the income and employment experiences of the USTS sample with those in the U.S. population.[4] Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217137

KEY FINDINGS

▶ The unemployment rate among respondents was 15%, three times higher than the U.S. unemployment rate at the time of the survey (5%).

..........................................................................................................................

▶ Nearly one-third (29%) of respondents were living in poverty, more than twice the rate in the U.S. adult population (12%).

..........................................................................................................................

▶ One in eight (12%) respondents reported an annual household income between $1 and $9,999, three times higher than the U.S. adult population in this income bracket (4%).

# I. Employment Status

Respondents were asked a series of questions about their current employment status. More than one-third (35%) currently had a full-time job, 15% had at least one part-time job, 15% were self-employed, and 11% were students (Table 9.1). Nine percent (9%) of those who were employed were working more than one full-time or part-time job, which represents 4% of the whole sample.

Two percent (2%) of respondents were currently employed doing sex work, selling drugs, or doing other work in the underground economy for income. Of these, 60% indicated that they were currently looking for work that is not criminalized.[5]

Of those who were working either full time or part time for an employer, 13% were members of a labor union or an employee association similar to a union (representing 6% of the full sample), while another 2% of those who were working for an employer were not union members but were covered by a union or employee association contract. This compares to 12% of wage and salary workers in the U.S. population who were members of a union or were not union members but were covered by a union or employee association contract.[6]

Table 9.1: Current employment status

| Employment status | % of respondents (supplemental weight) |
| --- | --- |
| Work full time for an employer | 35% |
| Work part time for an employer | 15% |
| Self-employed in own business, profession or trade, or operate a farm (not including underground economy) | 15% |
| Retired | 14% |
| Not employed due to disability | 13% |
| Student | 11% |
| Unemployed but looking for work | 11% |
| Unemployed and have stopped looking for work | 5% |
| Homemaker or full-time parent | 3% |
| Work for pay from sex work, selling drugs, or other work currently criminalized | 2% |
| Not listed above | 4% |

The national unemployment rate, as reported by the Bureau of Labor Statistics, is calculated out of only those who are currently "in the labor force." This includes people who are employed and those who are unemployed but looking for work. It does not include those who are unemployed but not looking for work, since they are considered to be out of the labor force. For the purposes of comparison, the unemployment rate for USTS respondents reported here was calculated in the same manner. The unemployment rate for

2015 U.S. TRANSGENDER SURVEY

AR_217138

*The unemployment rate for USTS respondents was 15%, three times the unemployment rate in the U.S. population.*

USTS respondents was 15%, three times the U.S. unemployment rate at the time of the survey (5%).[7] Nearly one-half (49%) of undocumented residents were unemployed. The unemployment rate was also higher among people with disabilities[8] (24%) and people of color, with Middle Eastern (35%), American Indian (23%), multiracial (22%), Latino/a (21%), and Black (20%) respondents being more likely to be unemployed. Unemployment rates among Asian, multiracial, Latino/a, and Black USTS respondents were between two and three times higher than Asian, Latino/a, multiracial, and Black people in the U.S. population (Figure 9.1).[9]

**Figure 9.1: Unemployment rate**
RACE/ETHNICITY (%)



- ▓ % in USTS (supplemental survey weight applied)
- ☐ % in U.S. population (ACS)

*U.S. population data for Middle Eastern people alone is not available. See note 10.*

# II. Sources of Income and Assistance

Respondents were asked about their income sources, and they reported a wide range of sources. In order to compare the USTS sample to the U.S. population in the CPS, the USTS data presented in Table 9.2 is limited to respondents ages 25 and older only. Compared to findings from the CPS, respondents' sources of income differed from the U.S. population in several categories. For instance, 57% of USTS respondents aged 25 and older had income from their own and/or their spouse's employment, compared to 67% of adults aged 25 and older in the U.S. population (Table 9.2).

**Table 9.2: Current sources of income (ages 25 and older only)**

| Income source | % in USTS (supplemental weight) | % in U.S. adult population (CPS) |
|---|---|---|
| Pay from respondent's and/or partner's full-time or part-time job | 57% | 67% |
| Self-employment income from own business, profession or trade, or farm (not including underground economy) | 18% | 7% |
| Social Security retirement, railroad retirement income, or Social Security disability benefits (SSDI) | 25% | 25% |
| Private pension, government employee pension, or other retirement income | 13% | 13% |
| Income from dividends, estates or trusts, royalties, rental income, savings, or bonds | 12% | 61% |
| Supplemental Security Income (SSI) | 7% | 3% |
| Regular contributions from people not living in household | 4% | 1% |
| Veterans disability benefits and other veterans benefits | 4% | 2% |
| Pay from sex work, selling drugs, or other work currently criminalized | 3% | -- |
| Cash assistance from welfare (such as TANF) or other public cash assistance program (not including SNAP or WIC) | 2% | 1% |
| Unemployment benefits | 2% | 2% |
| Child support or alimony | 1% | 2% |
| Workers' compensation or other disability | 1% | 1% |
| Income not listed above | 9% | -- |

Responses were examined to determine whether respondents had one source of income or multiple sources. Nearly one-half (45%) of all respondents reported having multiple sources of income. Thirty-seven percent (37%) reported that their sole source of income was from their own employment or their partner's employment. Nearly one in ten (9%) reported that their sole source of income was Supplemental Security Income (SSI) or disability, 1% received their only income from unemployment benefits or cash assistance programs, and 1% reported that their sole source of income was from underground economy work, including sex work, drug sales, or other work that is currently criminalized (Table 9.3).

Table 9.3: Current sources of income by single and multiple sources

| Income source | % of respondents (supplemental weight) |
|---|---|
| Employment only (from their own employment, partner/spouse's employment, or self-employment) | 37% |
| SSI/disability only | 9% |
| Pension/retirement only | 3% |
| Other sources only | 3% |
| Pay from sex work, selling drugs, or other work that is currently criminalized only | 1% |
| Unemployment benefits/cash assistance only | 1% |
| Multiple sources | 45% |

Fifteen percent (15%) of respondents reported receiving assistance through food stamps (SNAP)[11] and/or WIC.[12] Forty-one percent (41%) of respondents living with HIV received SNAP and/or WIC assistance. People with disabilities (29%), and Black (23%), American Indian (19%), and Latino/a (18%) respondents were also more likely to receive SNAP and/or WIC assistance (Figure 9.2).



Figure 9.2: Currently receive SNAP or WIC assistance RACE/ETHNICITY (%)

# III. Individual and Household Income and Poverty

Respondents also received questions about their individual[13] and household[14] incomes from the year 2014, which was the last full year prior to the survey for which they could provide annual income figures. They reported lower incomes overall than the U.S. population as a whole, as well as higher poverty rates. Most of the analysis and reporting in this chapter focuses on household income.

## a. Individual Income

When asked about their *individual* income, 8% of respondents reported that they had no individual income, compared to 10% in the U.S. adult population.[15,16] Nearly one-quarter (22%) of respondents reported that they had an income between $1 and $9,999 per year, compared to 15% in the U.S. adult population (Figure 9.3).[17]

*One in eight (12%) respondents reported that they had a household income between $1 and $9,999 per year, three times the rate in the U.S. population (4%).*

AR_217140

*Nearly one-third (29%) of respondents were living in poverty, more than twice the rate in the U.S. population (12%).*

# In Our Own Voices

**Figure 9.3: Individual income in 2014**



- ■ % in USTS (supplemental weight)
- □ % in U.S. adult population (CPS)

## b. Household Income

Turning to household income, 4% of respondents reported that they had no *household* income, which was four times higher than the rate of those with no income in the U.S. adult population (12%).[18] Additionally, one in eight (12%) respondents reported earning an annual household income between $1 and $9,999, which was three times as many when compared to the U.S. adult population (4%) (Figure 9.4).[19] Respondents were nearly twice as likely to have a household income of only $10,000 to $24,999 (22%) as those in the U.S. adult population (12%). Furthermore, respondents were less likely to have household incomes of $50,000 to $100,000 (23%) than those in the U.S. adult population (31%).

"The day I came out as transgender at work, I was let go. Since transitioning, employment has been difficult, with a 95% reduction in earnings."

..................................................

"I quit after seven months of unbearable working conditions. I have been struggling to keep afloat financially. I'm afraid of going to apply for unemployment or SNAP benefits because I know that I will be discriminated against. I'm on the brink of being homeless and my own family hasn't even reached out to help me."

..................................................

"I have had to live my life with no safety net or resources, and it's hard. I'm constantly battling homelessness, I rarely get hired because I'm mixed and visibly queer, and I end up having to rely on government assistance and friends with available couches."

..................................................

"In the nearly seven years since I transitioned, I have been unemployed, surviving off the charity of friends and family, and government assistance when I could get it. I have over 20 years of experience in my field, yet I cannot even land a part-time retail position."

..................................................

INCOME AND EMPLOYMENT STATUS

143

AR_217141



Figure 9.4: Household income in 2014

■ % in USTS (supplemental weight)
□ % in U.S. adult population (CPS)



Figure 9.5: Household income from $1 to $9,999
RACE/ETHNICITY (%)

More than half (53%) of respondents whose sole source of income was from the underground economy had a household income between $1 and $9,999 per year, more than four times the rate in the overall sample. Nearly one-third (31%) of those who were currently working in the underground economy and also had additional sources of income reported this low household income, nearly three times the rate of the overall sample. People with disabilities (21%) were nearly twice as likely as the overall sample, and those living with HIV (19%) and people of color, including Black (19%), Latino/a (18%), and American Indian (16%) respondents, were also more likely to have a household income between $1 and $9,999 (Figure 9.5).

## c. Poverty

Nearly one-third (29%) of respondents were living in poverty,[20] more than twice the rate of people living in poverty in the U.S. adult population at the time of the survey (12%).[21]

More than two-thirds (69%) of undocumented residents and nearly two-thirds (62%) of those currently working in the underground economy were living in poverty. Respondents living with HIV (51%) and people with disabilities (45%) were also more likely to be living in poverty. Among people of color, Latino/a (43%), American Indian (41%), multiracial (40%), and Black (38%) respondents were most likely to be living in poverty (Figure 9.6).

AR_217142

**Figure 9.6: Living in poverty**
RACE/ETHNICITY (%)



# Conclusion

The results indicate that respondents faced higher levels of unemployment and poverty compared to the U.S. adult population. They were three times more likely than the U.S. adult population to be unemployed, more than twice as likely to be living in poverty, and more than three times as likely to have an annual household income below $10,000. People of color, undocumented residents, people with disabilities, and respondents living with HIV were more likely to report being unemployed, living in poverty, and having low incomes, which indicate that these respondents have experienced substantial economic instability.

**ENDNOTES | CHAPTER 9: INCOME AND EMPLOYMENT STATUS**

1   Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 22). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Center for American Progress & Movement Advancement Project. (2015). *Paying an Unfair Price: The Financial Penalty for Being Transgender in America.* Available at: http://www.lgbtmap. org/file/paying-an-unfair-price-transgender.pdf.

2   U.S Census Bureau & Bureau of Labor Statistics. (2015). *Current Population Survey (CPS).*

3   This chapter provides an overview of respondents' income and employment status. Experiences in specific fields of work are discussed further in the *Sex Work and Other Underground Economy Work* and *Military Service* chapters. Experiences in employment settings, such being fired or harassed in the workplace, are discussed in more detail in the *Employment and the Workplace* chapter.

4   Throughout this chapter, findings regarding respondents' income and employment have been weighted with a supplemental survey weight to reflect the age and educational attainment of the U.S. population in addition to the standard survey weight. The USTS sample differs substantially from the U.S. population in regard to age and educational attainment. Therefore, this additional weight is applied to all percentages reported in this chapter in

order to provide a more accurate comparison to the U.S. general population. See the *Methodology* and *Portrait of USTS Respondents* chapters for more information about the supplemental survey weight.

5   Experiences of respondents with sex work and other underground economy work are discussed further in the *Sex Work and Other Underground Economy Work* chapter.

6   Bureau of Labor Statistics. (2016). *Union Affiliation of Employed Wage and Salary Workers by Selected Characteristics, 2014-2015 Annual Averages.* Available at: http://www.bls.gov/news.release/union2.t01.htm#union_ a01.f.1. The percentage of people in the U.S. who are members of a union or covered by a union or employee association contract includes those in the U.S. population who are 16 years of age and older, in contrast to the USTS sample, which includes respondents who are 18 and older. Therefore, the comparison to the USTS sample should be interpreted with caution.

7   Bureau of Labor Statistics. (2015). *The Employment Situation—August 2015.* Available at: http://www.bls.gov/ news.release/archives/empsit_09042015.pdf; Bureau of Labor Statistics. (2015). *The Employment Situation— September 2015.* Available at: http://www.bls.gov/news. release/archives/empsit_10022015.pdf. The national unemployment rate for August and September 2015, as published by the Bureau of Labor Statistics, includes those

in the U.S. population who are 16 years of age and older. The USTS sample includes respondents who are 18 and older. Therefore, the comparison between the national unemployment rate and the USTS unemployment rate sample should be interpreted with caution.

8  "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

9  The unemployment rate by race and ethnicity among adults in the U.S. population was calculated by the research team using CPS data available via the CPS Table Creator (http://www.census.gov/cps/data/cpstablecreator.html). CPS Table Creator data utilizes data from the March 2015 Current Population Survey Annual Social and Economic Supplement, in which the overall U.S. unemployment rate was 5.5%. This March 2015 national unemployment rate was higher than the national rate at the time of the survey (5.1% in August and September 2015), as outlined in this report (see the unemployment rate time series table available through the Bureau of Labor Statistics, available at http://data.bls.gov/timeseries/LNS14000000). Given the higher national unemployment rate in March 2015, the comparison of the national unemployment rate by race and ethnicity to the unemployment rate for USTS respondents by race and ethnicity as reported here likely reflects smaller differences in the unemployment rate than would have existed at the time of the survey. Therefore, these comparisons should be interpreted accordingly.

10  CPS data combines people of Middle Eastern descent and white people in a single "white/Caucasian" category, therefore Middle Eastern respondents in the U.S. population are included in the CPS percentage for this category.

11  See Q. 7.10. Respondents received the following definition for SNAP: "The Supplemental Nutrition Assistance Program (SNAP) is sometimes called the Food Stamp program. It helps people who have low or no income to buy food, usually with an EBT card." SNAP benefits are not considered income.

12  See Q. 7.10. Respondents received the following definition for WIC: "'WIC' stands for 'Women, Infants, and Children.' It's the short name for the Special Supplemental Nutrition Program for Women, Infants, and Children. WIC is a federal program to help women who are pregnant or breastfeeding and children less than five years old get health care and healthy food." WIC benefits are not considered income.

13  See Q. 7.12. Respondents received the following note describing individual income: "'Individual income' includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and other money income that you personally received in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

14  See Q. 7.14. Respondents received the following note describing household income: "'Household income' includes you and all members of your household who have lived with you during the past 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and members of your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

15  Current Population Survey (CPS). See note 2.

16  Those who report having "no income" in the USTS and CPS are a group with characteristics that are distinct from low-income earners, such as those who earn an income between $1 and $9,999. For example, they are more likely to be out of the labor force. Therefore, when differences in experiences by income level are highlighted in this report, the experiences of those who report no household income are generally presented separately from those of low-income earners.

17  Current Population Survey (CPS). See note 2.

18  Current Population Survey (CPS). See note 2.

19  Current Population Survey (CPS). See note 2.

20  The research team calculated the USTS poverty measure using the official poverty measure, as defined by the U.S. Census Bureau, which can be found at: https://www.census.gov/hhes/www/poverty/about/overview/measure.html. The income ranges in the USTS allowed for designation of respondents as in or near poverty if their total family income fell below 125% of the official poverty measure for purposes of comparison to the U.S. adult population. Respondents who are "living in poverty" represent those who are living at or near the poverty line.

21  Proctor, B. D., Semega, J. L., & Kollar, M. A. (2016). *Income and Poverty in the United States: 2015*. (p. 13). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2016/demo/p60-256.pdf. Calculations were completed by the research team.

# CHAPTER 10

# Employment and the Workplace

Access to employment is critical to people's ability to support themselves and their families. Prior research has shown that transgender people face pervasive mistreatment, harassment, and discrimination in the workplace and during the hiring process.[1] In addition to being fired, forced out of their jobs, or not hired for jobs because of their gender identity or expression, transgender people are also often subject to additional forms of mistreatment at work, such as being verbally harassed, being forced to present as the wrong gender in order to keep their jobs, or being physically attacked at work.[2]

Respondents were asked about being out in the workplace and the level of support they received from coworkers. They were also asked how they were treated in the workplace as a transgender person, including whether they had been fired, denied a promotion, or not hired because of being transgender, whether they had been harassed or faced other forms of mistreatment, and whether they had to take actions to avoid mistreatment, such as quitting their job or delaying their transition. Throughout the chapter, notable differences in respondents' experiences based on demographic and other characteristics are reported.

EMPLOYMENT AND THE WORKPLACE

AR_217145

**KEY FINDINGS**

▶ Sixteen percent (16%) of respondents who have ever been employed reported losing at least one job because of their gender identity or expression.

▶ Thirty percent (30%) of respondents who had a job in the past year reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace related to their gender identity or expression, such as being harassed or attacked.

▶ In the past year, 27% of those who held or applied for a job reported being fired, denied a promotion, or not hired for a job they applied for because of their gender identity or expression.

▶ Fifteen percent (15%) of respondents who had a job in the past year were verbally harassed, physically attacked, and/or sexually assaulted at work because of their gender identity or expression.

▶ Nearly one-quarter (23%) of those who had a job in the past year reported other forms of mistreatment based on their gender identity or expression during that year, such as being told by their employer to present as the wrong gender in order to keep their job or having employers or coworkers share private information about their transgender status with others without permission.

▶ More than three-quarters (77%) of respondents who had a job in the past year took steps to avoid mistreatment in the workplace, such as hiding or delaying their gender transition or quitting their job.

# I. Outness and Support in the Workplace

Respondents were asked whether their current bosses or supervisors and their current coworkers knew they were transgender. Of respondents who currently had bosses or supervisors, 35% said that all of their current bosses or supervisors knew they were transgender, 6% reported that most knew, and 10% indicated that some knew that they were transgender. Nearly half (49%) reported that none of their bosses or supervisors knew that they were transgender. Of respondents who currently had coworkers, less than one-quarter (23%) reported that all of their coworkers knew they were transgender, 11% reported that most of their coworkers knew, and 24% said that some of their coworkers knew they were transgender. Forty-two percent (42%) indicated that none of their coworkers knew that they were transgender.

Respondents who currently had coworkers and reported that all, most, or some of their coworkers knew that they were transgender were asked how supportive their coworkers generally were of them as a transgender person.[3] Responses were provided on a five-point scale from "very

AR_217146

supportive" to "very unsupportive." More than two-thirds (68%) of these respondents reported that their coworkers were supportive, 29% had coworkers who were neither supportive nor unsupportive, and only 3% had unsupportive coworkers (Figure 10.1).

**Figure 10.1: Level of support**



## II. Loss of Employment During Lifetime

Eighty-one percent (81%) of respondents had worked at a job or business at some point in their lifetime.[4] Those respondents were asked whether they had ever experienced a loss of employment, including losing a job, being laid off, being fired, or being forced to resign, and the reasons they believed this happened.

Overall, more than half (53%) of respondents who had ever held a job experienced a loss of employment for any reason. Respondents who were living with HIV (78%) and those who have done sex work (73%) were more likely to have lost a job at some point in their lifetime. American

Indian (66%) and Black (60%) respondents (Figure 10.2), transgender women (66%), and people with disabilities[5] (59%) were also more likely to have ever lost a job.

**Figure 10.2: Ever lost job for any reason**
RACE/ETHNICITY (%)



Respondents who had lost a job at some point in their lifetime were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity or expression (Table 10.1).

**Table 10.1: Reported reasons for losing a job**

| Reason for losing job | % of those who have ever lost job | % of those who have been employed |
|---|---|---|
| Age | 7% | 4% |
| Disability | 13% | 7% |
| Income level or education | 5% | 2% |
| Gender identity or expression | 30% | 16% |
| Race or ethnicity | 5% | 3% |
| Religion or spirituality | 2% | 1% |
| Sexual orientation | 13% | 7% |
| None of the above | 61% | 32% |

One in six (16%) respondents who have been employed reported that they had lost a job because of their gender identity or expression.[6] This represents 13% of the overall sample.

EMPLOYMENT AND THE WORKPLACE

American Indian (21%), multiracial (18%), and Black (17%) respondents were more likely than the overall sample to have lost a job because of their gender identity or expression (Figure 10.3). More than one-quarter of respondents who have done sex work (27%) and respondents living with HIV (26%) have lost a job because of being transgender. Transgender women (18%) were more likely than transgender men (14%) and non-binary people (7%) to have lost a job because of their gender identity or expression (Figure 10.4).

**Figure 10.3: Ever lost job because of being transgender RACE/ETHNICITY (%)**



**Figure 10.4: Ever lost job because of being transgender GENDER IDENTITY (%)**



# III. Firing, Hiring, and Promotions in the Past Year

Seventy percent (70%) of respondents had held and/or applied for a job in the past year. Those respondents were asked if they had negative experiences related to firing, hiring, and promotions in the past year.

Overall, approximately two-thirds (67%) of respondents who held or applied for a job in the past year reported that they were fired or forced to resign from a job, not hired for a job that they applied for, and/or denied a promotion (Table 10.2). Respondents currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (78%), and people with disabilities (75%) were more likely to have had one or more of these experiences in the past year. Black (75%) and Middle Eastern (74%) respondents were also more likely to have had one or more of these experiences in the past year, in contrast to white (63%) and American Indian (64%) respondents (Figure 10.5).

**Table 10.2: Fired, not hired, or denied a promotion for any reason in the past year**

| Occurrence in the past year | % of those who held or applied for job |
|---|---|
| Not hired for a job they applied for | 61% |
| Denied a promotion | 13% |
| Fired or forced to resign | 12% |
| **One or more experiences listed** | **67%** |

*More than one-quarter (27%) of those who held or applied for a job in the past year reported not being hired, being denied a promotion, or being fired during that year because of their gender identity or expression.*

Figure 10.5: Fired, not hired, or denied a promotion for
any reason in the past year
RACE/ETHNICITY (%)



Respondents who reported these experiences were
asked what they believed the reasons were for that
treatment. Forty-one percent (41%) of respondents who
were fired or forced to resign from a job, not hired for
a job that they applied for, or were denied a promotion
believed that it was due to their gender identity or
expression (Table 10.3). This means that 27% of all of
those who held or applied for a job in the past year (or
19% of the overall sample) reported not being hired for
a job they applied for, being denied a promotion, or
being fired from a job in the past year because of their
gender identity or expression.

Table 10.3: Reported reasons for not being hired, being
denied a promotion, or being fired in the past year

| Reported reasons for negative experience in the past year | Reasons for not being hired (% of those not hired) | Reasons for being denied promotion (% of those denied promotion) | Reasons for being fired (% of those fired) |
|---|---|---|---|
| Age | 21% | 16% | 6% |
| Disability | 7% | 9% | 15% |
| Income level or education | 21% | 13% | 6% |
| **Gender identity or expression** | **39%** | **49%** | **43%** |
| Race or ethnicity | 11% | 14% | 10% |
| Religion or spirituality | 1% | 3% | 2% |
| Sexual orientation | 10% | 16% | 14% |
| None of the above | 41% | 33% | 40% |

# In Our Own Voices

"Coworkers would gossip about
me as news about my trans status
spread through the workplace. I was
treated significantly differently once
people heard about me being trans.
Coworkers felt they had the right to
disrespect me because the owners
set the tone. I became a spectacle in
my own workplace."

"The day before I started work, HR
sent a mass email to everyone in the
office 'warning' them about my trans
status. I used the women's bathroom
since starting, but a month in to the
job, I was called to my manager's
office and told that I could not use
the women's bathroom. I did not
feel safe in the men's bathroom, so I
told the HR manager that due to city
law, I could not be denied access to
the bathroom matching my gender
identity. I was fired the next day for
no given reason."

"I changed jobs from a high-paying
one where I was not comfortable
being out as a trans person to a
much lower-paying one where I felt
that my identity would be respected.
Having a job where my gender
identity is respected consistently,
where I don't have to constantly
fight for myself or hide myself, has
improved my quality of life more than
any other aspect of my transition."

# IV. Responses to Firing Due to Transgender Status

Respondents who reported that they had been fired in the past year because of their gender identity or expression were asked how they responded. While more than two-thirds (69%) of these respondents did not take any formal action in response, 14% filed an official complaint (Table 10.4). Respondents who filed a complaint were asked where they filed it. More than half (53%) reported that they filed a complaint with their employer's human resources or personnel department. One-third (33%) of respondents who filed complaints did so with the federal Equal Employment Opportunity Commission (EEOC), the agency that enforces federal employment nondiscrimination laws (Table 10.5).

**Table 10.4: Response to being fired in the past year because of their gender identity or expression**

| Response to being fired | % of those fired because of their gender identity or expression |
|---|---|
| They did nothing | 69% |
| They contacted a lawyer (see Table 10.6) | 15% |
| They made an official complaint (see Table 10.5) | 14% |
| They contacted a transgender, LGBT, or other group | 10% |
| They contacted their union representative | 2% |
| Not listed above | 7% |

**Table 10.5: Location where respondent made an official complaint**

| Place complaint was filed | % of those who filed an official complaint |
|---|---|
| Employer's human resources or personnel department | 53% |
| Equal Employment Opportunity Commission (EEOC) | 33% |
| Employer's Equal Employment Opportunity (EEO) office | 18% |
| Local or state human rights commission | 17% |
| Supervisor or manager | 9% |
| Not listed above | 26% |

Fifteen percent (15%) of those who were fired in the past year because of their gender identity or expression responded by contacting a lawyer. These respondents were asked what happened after they contacted the lawyer. Nearly one-third (29%) reported that they were not able to hire the lawyer. Other respondents reported that the lawyer filed a lawsuit (21%), helped them file an official complaint (14%), called or wrote a letter to their employer (10%), or advised them not to take any action (10%) (Table 10.6).

**Table 10.6: Assistance provided to those who contacted a lawyer**

| Outcome of contacting lawyer | % of those who contacted a lawyer |
|---|---|
| They were not able to hire the lawyer | 29% |
| Lawyer filed a lawsuit | 21% |
| Lawyer helped them file an official complaint | 14% |
| Lawyer called or wrote a letter to employer | 10% |
| Lawyer advised them to take no action (write-in response) | 10% |
| Lawyer did nothing or did not follow up (write-in response) | 7% |
| Not listed above | 9% |

AR_217150

# V. Other Forms of Mistreatment in the Past Year

Respondents who held a job in the past year were asked a series of questions about other forms of mistreatment in the workplace that happened because they were transgender.

## a. Verbal Harassment, Physical Attack, and Sexual Assault

In the past year, 15% of respondents who had held a job during that year were verbally harassed, physically attacked, and/or sexually assaulted at work because of their transgender status.[7] Respondents currently working in the underground economy (34%), American Indian respondents (28%), and Middle Eastern respondents (26%) were more likely to report one or more of those experiences in the past year (Figure 10.6).

**Figure 10.6: Verbally harassed, physically attacked, or sexually assaulted at work in the past year**
RACE/ETHNICITY (%)



Fourteen percent (14%) of those who held a job in the past year were verbally harassed at work because they were transgender. Respondents who said that others can always or usually tell that they are transgender (23%) were more likely

to be verbally harassed at work in the past year, compared with those who said that others can sometimes (19%) and rarely or never (10%) tell they are transgender.

One percent (1%) of respondents were physically attacked at work in the past year because they were transgender, with higher numbers among respondents who were currently working in the underground economy (4%).

One percent (1%) reported that they were sexually assaulted at work in the past year because they were transgender. Asian (4%) and American Indian (2%) respondents and transgender women (2%) were more likely report this experience.

## b. Other Mistreatment in the Past Year

Respondents were asked if their employer, boss, or coworkers took other negative actions in the past year because of their transgender status, such as telling them to present as the wrong gender in order to keep their jobs, removing them from direct contact with clients, or sharing private information.

Nearly one-quarter (23%) of respondents who held a job in the past year reported that they experienced one or more of those actions in the past year because of their transgender status. One in six (16%) said that, because they were transgender, a boss or coworker shared personal information about them that should not have been shared. Six percent (6%) said that their boss gave them a negative review because they were transgender, 4% were told to present in the wrong gender in order to keep their job, and 4% said that they were not allowed to use the restroom consistent with their gender identity (Table 10.7).

**Table 10.7: Mistreatment at work due to being transgender in the past year**

| Mistreatment at work due to being transgender in the past year | % of those who had a job |
|---|---|
| Employer/boss or coworkers shared information about them they should not have | 16% |
| Employer/boss gave them a negative job review | 6% |
| Employer/boss forced them to resign | 4% |
| Employer/boss did not allow them to use the restroom they should be using based on their gender identity | 4% |
| Employer/boss told them to present in the wrong gender to keep their job | 4% |
| Employer/boss removed them from direct contact with clients, customers, or patients | 3% |
| Employer/boss could not work out an acceptable restroom situation with them | 3% |
| Employer/boss forced them to transfer to a different position or department at their job | 2% |
| **One or more experiences listed** | **23%** |

**Table 10.8: Actions taken to avoid anti-transgender discrimination at work in the past year**

| Actions taken to avoid anti-transgender discrimination at work in the past year | % of those who had a job |
|---|---|
| They had to hide their gender identity | 53% |
| They did not ask employer to use pronouns they prefer (such as he, she, or they) | 47% |
| They delayed their gender transition | 26% |
| They stayed in a job they would have preferred to leave | 26% |
| They hid the fact that they had already transitioned gender | 25% |
| They kept a job for which they were overqualified | 24% |
| They quit their job | 15% |
| They did not seek promotion or raise | 13% |
| They requested transfer to a different position or department | 6% |
| **One or more experiences listed** | **77%** |

## c. Efforts to Avoid Discrimination

Respondents who held a job in the past year were also asked a series of questions about actions they took in order to avoid discrimination at work in the past year, including hiding their gender identity, delaying their transition, and quitting their job. More than three-quarters (77%) took one or more actions to avoid discrimination (Table 10.8).

*More than three-quarters (77%) of respondents who had a job in the past year hid their gender identity at work, quit their job, or took other actions to avoid discrimination.*

Respondents who were living in poverty[8] (82%), non-binary respondents (81%), and people with disabilities (81%) were more likely to take one or more of these steps to avoid discrimination.

More than half (53%) reported having to hide their gender identity at work.[9] Nearly half (47%) said they did not ask their employer to refer to them with correct pronouns (such as he, she, or they) out of fear of discrimination. Non-binary respondents (66%) were nearly twice as likely to avoid asking to be referred to by their correct pronouns compared to transgender men and women (34%).

More than one-quarter (26%) said that they stayed at a job that they would have preferred to leave for fear of encountering discrimination elsewhere. American Indian (40%), Black (31%), and Latino/a (28%) respondents and respondents with disabilities (30%) were more likely to stay at a job that they would have preferred to leave in order to avoid discrimination.

AR_217152

One-quarter (25%) of respondents reported that they hid the fact that they had already transitioned. In the past year, more than one-third (36%) of transgender men hid their past gender transition in the workplace in order to avoid discrimination (Figure 10.7).

**Figure 10.7: Hid past transition to avoid discrimination in the past year**
GENDER IDENTITY (%)



Fifteen percent (15%) of respondents who held a job in the past year reported that they quit their job in order to avoid workplace discrimination. Those currently working in the underground economy (28%), American Indian respondents (23%), Black respondents (19%), and people with disabilities (21%) were more likely to quit their job to avoid discrimination (Figure 10.8).

**Figure 10.8: Quit job to avoid discrimination in the past year**
RACE/ETHNICITY (%)



# VI. Overall Negative Experiences in the Workplace

Overall, 30% of all respondents who held a job in the past year experienced some form of workplace discrimination during that year, including being fired or being denied a promotion because of their gender identity or expression, being harassed or assaulted at work, or experiencing one or more of the other forms of mistreatment discussed in section V of this chapter.[12] This represents 16% of all respondents. Further, 80% of respondents who held a job in the past year reported either experiencing some form of discrimination and/or taking steps to avoid discrimination at work, representing 41% of all respondents.

## Conclusion

Respondents reported high levels of workplace discrimination based on their gender identity or expression, including losing employment opportunities, being harassed, being assaulted, and facing other forms of mistreatment because of being transgender. Many reported losing their job due to anti-transgender bias, with the experience being more likely to occur among people of color, people with underground economy experience, and people with disabilities. Many respondents who applied for or held a job in the past year reported that they were fired, denied a promotion, or not hired for a job they applied for because of their gender identity or expression. Respondents also faced substantial levels of harassment and mistreatment on the job because of their gender identity or expression, including verbal harassment, physical and sexual assault, and breaches of confidentiality. A large number of respondents felt they had to take actions to avoid discrimination, such as quitting a job or hiding their transition, despite the potential impact on their wellbeing or financial stability.

EMPLOYMENT AND THE WORKPLACE

**ENDNOTES** | CHAPTER 10: EMPLOYMENT AND THE WORKPLACE

1    Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (pp. 50–71). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Sears, B. & Mallory, C. (2011). *Documented Evidence of Employment Discrimination & Its Effect on LGBT People.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute. law.ucla.edu/wp-content/uploads/Sears-Mallory-Discrimination-July-20111.pdf; Rainey, T. & Imse, E. E. (2015). *Qualified and Transgender: A Report on Results of Resume Testing for Employment Discrimination Based on Gender Identity.* DC: DC Office of Human Rights. Available at: http://ohr.dc.gov/sites/default/files/dc/sites/ ohr/publication/attachments/QualifiedAndTransgender_ FullReport_1.pdf.

2    Grant, et al.; Sears, et al.

3    Respondents were not asked about the level of support from their current boss or supervisor.

4    Q. 21.1 and other questions in this chapter asked only about jobs doing legal work and excluded underground economy work, such as sex work, drug sales, and other work that is currently illegal.

5    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

6    The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons are collapsed for reporting as "gender identity or expression."

7    Respondents were asked whether they had "experienced unwanted sexual contact (such as fondling, sexual assault, or rape)" at work because they were transgender in Q. 22.3.

8    Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment* chapter for more information about the poverty line calculation.

9    Respondents were asked if they "had to be in the closet about [their] gender identity in the past year" in order to avoid discrimination.

10   This figure does not include the experience of not being hired for a job in the past year, since this figure represents adverse actions in the workplace experienced by those who had a job only. It also does not include experiences of those who applied for a job but did not work a job in the past year.

AR_217154



# CHAPTER 11

# Sex Work and Other Underground Economy Work

**M**any people participate in sex work, drug sales, and other activities that are currently criminalized ("underground economy") to earn an income, or in exchange for food, a place to sleep, or other goods or services. The commercial sex trade exists in a variety of forms, including street-based sex work, pornography, and escort services.[1] Participation in the sex trade is often higher among those who have faced family rejection, poverty, or unequal opportunities in employment, housing, and education.[2] Previous studies have documented higher levels of participation in sex work among transgender people, and in particular people of color and those facing homelessness or poverty.[3] They have also found high rates of negative mental and physical health outcomes, police abuse, and experiences of violence among transgender people who have done sex work.[4]

Respondents were asked a series of questions about their participation in sex work and other underground economy work, and their interactions with law enforcement officers when they were doing sex work or when police thought that they were doing sex work. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217155

**KEY FINDINGS**

▶ One in five (20%) respondents have participated in the underground economy for income at some point in their lives, including in sex work, drug sales, and other currently criminalized work, and 9% did so in the past year.

▶ One in eight (12%) respondents have participated in sex work for income. Six percent (6%) have engaged in sexual activity for food, and 8% have done so for a place to sleep. Overall, nearly one in five (19%) respondents reported doing some type of sex work, such as for money, food, or a place to sleep.

▶ Three percent (3%) of all respondents have interacted with the police either while they were doing sex work or while police thought that they were doing sex work.

• Of those who interacted with the police while doing or thought to be doing sex work, 86% reported some form of police harassment, abuse, or mistreatment, including being verbally harassed, physically attacked, or sexually assaulted by police.

• Of those who interacted with the police while doing or thought to be doing sex work, 32% said that at least one of those interactions led to an arrest. Nearly half (44%) of respondents who were arrested said that police used condoms in their possession as evidence of sex work.

▶ One in eight (12%) respondents have earned income by selling drugs (11%) or by doing other work that is currently criminalized (2%), other than sex work.

# I. Overall Underground Economy Participation

Respondents were asked about their participation in sex work, drug sales, and other forms of work in areas that are currently criminalized, referred to throughout this report as underground economy work.

Overall, one in five (20%) respondents had participated in the underground economy for income at some point in their lives. Undocumented residents (38%) and respondents who have lost a job because of their gender identity or expression (37%) were more likely to have participated in the underground economy. Transgender women of color were also more likely to participate in the underground economy for income, including Black (44%), American Indian (41%), multiracial (38%), and Latina (30%) respondents (Figure 11.1).



Figure 11.1: Underground economy experience among transgender women
RACE/ETHNICITY (%)

AR_217156

*One in five (20%) respondents have participated in the underground economy at some point in their lives and 9% participated in the past year.*

Nearly one in ten (9%) respondents have participated in the underground economy for income in the past year (Table 11.1). Undocumented residents (29%) were more than three times as likely to have worked in the underground economy in the past year. Further, respondents who have been homeless in the past year (23%) were nearly three times as likely to have worked in the underground economy during that year.

**Table 11.1: Income-based underground economy experiences**

| Type of work | % of respondents (past year) | % of respondents (in lifetime) |
|---|---|---|
| Income-based sex work | 5% | 12% |
| Drug sales | 4% | 11% |
| Other criminalized work | 1% | 2% |
| Any underground economy work | 9% | 20% |

# II. Sex Work

## a. Income-Based Sex Work

One in eight (12%) respondents have done sex work for income at some point in their lifetime, meaning that they have exchanged sex or sexual activity for money or worked in the sex industry, such as in erotic dancing, webcam work, or pornography.

Of respondents who have done sex work for money in their lifetime, transgender women represent one-half (50%), non-binary people with female on their original birth certificates represent nearly one-quarter (23%), and transgender men represent 19% (Figure 11.2). While this chapter primarily highlights the experiences of transgender women of color due to their disproportionately high representation among those who have done sex work, it is also

important to recognize that non-binary people with female on their original birth certificates and transgender men account for a large proportion of those in the sample who have done sex work.

**Figure 11.2: Income-based sex work in lifetime**
GENDER IDENTITY (%)



Transgender women of color, including Black (42%), American Indian (28%), multiracial (27%), Latina (23%), and Asian (22%) women (Figure 11.3), were more likely to have participated in sex work than the overall sample. Undocumented residents (36%), those who have lost a job because of their gender identity or expression (25%), and those who have ever experienced homelessness (23%) were also more likely to have participated in sex work.

**Figure 11.3: Income-based sex work among transgender women**
RACE/ETHNICITY (%)



SEX WORK AND OTHER UNDERGROUND ECONOMY WORK

AR_217157

*One in eight (12%) respondents have done sex work for income, and 5% of respondents did so in the past year.*

*Respondents who have done income-based sex work during their lifetime were more likely to have experienced a number of challenges:*

- *Nearly half (45%) of respondents who have done income-based sex work were currently living in poverty, in contrast to 26% of those who have not done sex work.*

- *Nearly three-quarters (72%) of respondents who have done income-based sex work have been sexually assaulted in their lifetime, in contrast to those who have not done sex work (44%).*

- *More than three-quarters (77%) of respondents who have done income-based sex work have experienced some form of intimate partner violence, compared with 51% of those who have not done sex work.*

- *Respondents with sex work experience were nearly sixteen times as likely to be living with HIV (7.9%) as those who have never done sex work (0.5%), and nearly six times more likely than those in the overall sample (1.4%).*

Five percent (5%) of all respondents did sex work for income in the past year. More than half (55%) of those who did income-based sex work in the past year were transgender women, 22% were non-binary people with female on their original birth certificate, and 14% were transgender men (Figure 11.4).

Figure 11.4: Income-based sex work in past year
GENDER IDENTITY (%)



**1%** Crossdressers

**22%** Non-binary respondents with female on their original birth certificate

**14%** Trans men

**8%** Non-binary respondents with male on their original birth certificate

**55%** Trans women

% of those who did sex work in the past year

Respondents who experienced homelessness in the past year (17%) were more than three times as likely to have participated in sex work during that year compared to the overall sample. Respondents who were living with HIV (32%) and undocumented residents (29%) were substantially more likely to have participated in sex work in the past year. Additionally, transgender women of color reported higher rates of sex work participation in the past year, particularly Black transgender women (24%), who were almost five times as likely to have done sex work for income in the past year (Figure 11.5).

Figure 11.5: Income-based sex work in past year among transgender women
RACE/ETHNICITY (%)



AR_217158

Respondents who have done sex work for income reported working in a wide range of settings, including sex work advertised online (36%), webcam work (35%), and street-based sex work (21%) (Table 11.2). Among those who have done some type of sex work, transgender women (30%) were more likely than others with sex work experience to have done street-based sex work, with women of color, including American Indian (50%), Black (48%), and Latina (31%) women, being substantially more likely to participate in street-based sex work (Figure 11.6).

**Table 11.2: Type of income-based sex work**

| Type of sex work | % of those who have ever done sex work |
|---|---|
| Informal sex work through word of mouth, occasional hook ups with dates in my networks, or things like that | 38% |
| Sex work advertised online | 36% |
| Webcam work | 35% |
| Pornography (picture or video) | 28% |
| Fetish work | 24% |
| Street-based sex work | 21% |
| Phone sex | 14% |
| Escort, call girl, or rent boy with an agency | 12% |
| Erotic dancer or stripper | 11% |
| Sex work advertised in magazines or newspapers | 7% |
| Not listed above | 9% |



**Figure 11.6: Participation in street-based sex work among transgender women who have done sex work**
RACE/ETHNICITY (%)

- Overall (all respondents): 21%
- American Indian: 50%
- Asian: 29%
- Black: 48%
- Latina: 31%
- Middle Eastern*: 
- Multiracial: 25%
- White: 18%

*Sample size too low to report

## In Our Own Voices

"At 17, I ran away with no way of supporting myself. I turned to Internet prostitution, which allowed me to do things for myself that I couldn't [before], like buy girl clothes, pay out of pocket for my doctor to prescribe HRT, and put a roof over my head."

"Sometimes I slept in my truck when friends couldn't put me up at their house, and sometimes I would meet people at a bar and have sex with them to really just sleep over and shower."

"I couldn't find work. I watched one guy throw away my application literally 30 seconds after turning it in. I resorted to escorting. It's the only way to keep food in my belly and a roof over my head."

"I became a sex worker to support myself and pay for my transition. I did not want to do sex work, but I have had worse jobs that paid less."

"An officer attempted to arrest me on prostitution charges because I was at a street corner. It was roughly noon, I was holding a bag of food in my hand, and I was clearly waiting for the street light to change so I could cross the street."

AR_217159

*Nearly one in five (19%) respondents participated in sex work, such as for money, food, a place to sleep, or other goods or services.*

## b. Sex Work for Goods or Services

All survey respondents, including those who did not report doing sex work for income, were asked whether they had sex or engaged in sexual activity for food, for a place to sleep, for drugs, or in exchange for something else (Table 11.3).

**Table 11.3: Engaged in sexual activity in exchange for goods or services**

| Type of activity | % of respondents (past year) | % of respondents (in lifetime) |
|---|---|---|
| Engaged in sexual activity for food | 2% | 6% |
| Engaged in sexual activity for a place to sleep (in someone's bed, at their home, or in their hotel room) | 2% | 8% |
| Engaged in sexual activity for drugs | 1% | 5% |
| Engaged in sexual activity in exchange for something not listed above | 3% | 7% |

Six percent (6%) of respondents have ever engaged in sexual activity for food. Respondents living with HIV (32%) were more than five times as likely to have engaged in sexual activity for food. Undocumented residents (17%) and American Indian (15%), Black (12%), and multiracial (10%) respondents were also more likely to have engaged in sexual activity for food.

One in twelve (8%) respondents engaged in sexual activity for a place to sleep. Respondents who were living with HIV (28%), who have ever experienced homelessness (20%), or who were undocumented residents (17%) were more likely to have engaged in sexual activity for a place to sleep.

Overall, 19% participated in sex work, such as for money, food, a place to sleep, or other goods or services.

## c. Police Interactions

All survey respondents were asked if they had ever interacted with police either while doing sex work, or when police thought they were doing sex work. One percent (1%) of respondents said that they interacted with police while participating in sex work, and an additional 2% said they did so when police thought they were doing sex work. Overall, 3% of respondents have interacted with police while doing sex work or when police thought they were doing sex work.

Transgender women of color, including Black (15%), Middle Eastern (13%), American Indian (12%), multiracial (8%), and Latina (7%) women, were more likely than the overall sample to interact with police who *thought* they were doing sex work (Figure 11.7).

**Figure 11.7: Interacted with police who thought they were doing sex work among transgender women**
RACE/ETHNICITY (%)



AR_217160

Respondents who interacted with the police while doing sex work or when police thought they were doing sex work were asked about specific experiences they had with police. Eighty-six percent (86%) reported at least one negative experience during the interaction (Table 11.4).

Table 11.4: Interactions with police while doing or when police thought they were doing sex work

| Type of interaction | % of those who interacted with police who thought they were doing sex work, or while doing sex work |
|---|---|
| Officers kept using the wrong gender pronouns (such as he, she, or they) or the wrong title (such as Mr. or Ms.) | 69% |
| Officers verbally harassed them | 65% |
| Officers asked questions about their gender transition (such as hormones and surgical status) | 41% |
| Officers sexually assaulted them | 27% |
| Officers physically attacked them | 18% |
| Officers forced them to have sex or engage in sexual activity to avoid arrest | 14% |
| Arrested for drugs in their possession when police stopped them for doing sex work | 11% |
| One or more experiences listed | 86% |

More than two-thirds (69%) said that officers repeatedly referred to them as the wrong gender. This experience was more likely among transgender women (74%). Nearly two-thirds (65%) were verbally harassed by police.

More than one-quarter (27%) of respondents who had interacted with police in this context were sexually assaulted by an officer, including being fondled, raped, or experiencing another form of sexual assault.[6] Respondents who have ever experienced homelessness (34%) were more likely to be sexually assaulted by an officer. Fourteen percent (14%) also reported that they were forced to have sex or engage in sexual activity to avoid arrest.

## d. Arrest

Respondents who interacted with police while engaging in sex work or when police thought they were engaging in sex work were also asked if they were arrested during any of those interactions. Almost one-third (32%) reported being arrested during at least one interaction. Black respondents (50%) and transgender women (40%) were more likely to report that their interaction with the police led to an arrest.

Respondents who reported being arrested were asked how many times they were arrested while they were doing sex work or when police thought they were doing sex work. Approximately one-third (34%) were arrested once, 32% were arrested two or three times, and 35% were arrested four or more times (Figure 11.8).

Figure 11.8: Number of times arrested while doing or when police thought they were doing sex work



Respondents who were arrested while doing or while police thought they were doing sex work were also asked whether police considered items in their possession, such as condoms, as "evidence of prostitution." Forty-four percent (44%) said that the police considered condoms in their possession to be evidence of prostitution (Figure 11.9).

AR_217161



Figure 11.9: Items in possession considered as evidence when arrested (% of those arrested while doing or suspected of doing sex work)

Respondents were asked about the outcomes of their arrests. More than half (55%) of the respondents who were arrested pleaded guilty in connection to one or more of their arrests, while nearly half (48%) reported that the charges were dropped on at least one occasion (Figure 11.10).



Figure 11.10: Outcome of arrest (% of those arrested while doing or suspected of doing sex work)

# III. Drug Sales and Other Underground Economy Work

One in eight (12%) respondents have done work in the underground economy other than sex work at some point in their lifetime. This included those who had participated in drug sales (11%) and/or other work that is currently criminalized (2%).[7] Respondents who were living with HIV (27%), who have lost a job because of their gender identity or expression (22%), or have ever experienced homelessness (21%) were more likely to have been paid for underground economy work apart from sex work during their lifetime.

In the past year, 4% of all respondents have participated in drug sales, and 1% have participated in other underground economy work (other than drug sales or sex work) (see Table 11.1).

# Conclusion

Respondents reported substantial levels of involvement in sex work and other underground economy work, particularly people of color, those living with HIV, undocumented residents, and those who have experienced homelessness. Many respondents, especially transgender women of color, also reported that police often assumed they were doing sex work, even when they were not. The vast majority of those who interacted with the police while doing sex work or while suspected of doing sex work reported being mistreated by police, including being verbally harassed, physically attacked, or sexually assaulted by law enforcement officers.

**ENDNOTES** | CHAPTER 11: SEX WORK AND OTHER UNDERGROUND ECONOMY WORK

1   See Ditmore, M. & Thukral, J. (2011). *Behind Closed Doors: An Analysis of Indoor Sex Work in New York City*. New York, NY: Sex Workers Project at the Urban Justice Center). Available at: http://sexworkersproject.org/downloads/BehindClosedDoors.pdf; Ditmore, M. & Thukral, J. (2003). *Revolving Door: An Analysis of Street-Based Prostitution in New York*. NY, New York: Sex Workers Project at the Urban Justice Center. Available at: http://sexworkersproject.org/downloads/RevolvingDoor.pdf.

2   Amnesty International. (2016). *Amnesty International Policy on State Obligations to Respect, Protect and Fulfill the Human Rights of Sex Workers*. Available at: https://www.amnesty.org/en/documents/pol30/4062/2016/en.

3   Fitzgerald, E., Elspeth, S., & Hicky, D. *Meaningful Work: Transgender Experiences in the Sex Trade*. DC & NY, New York: Best Practices Policy, National Center for Transgender Equality, & Red Umbrella Project. Available at: http://www.transequality.org/sites/default/files/Meaningful%20Work-Full%20Report_FINAL_3.pdf; Amnesty International. (2016). *Amnesty International Policy on State Obligations to Respect, Protect and Fulfill the Human Rights of Sex Workers*. Available at: https://www.amnesty.org/en/documents/pol30/4062/2016/en.

4   Fitzgerald, et al. See note 3.

5   Respondents were asked whether they had "ever engaged in sex or sexual activity for money (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films)" in Q. 6.1 and whether they had done such work in the past year in Q. 6.2. This report uses the term "sex work" to refer to all work in the sex industry or involving the exchange of sexual activity for income, food, a place to sleep, or other goods or services. While many of forms of sex work are currently criminalized in the United States, some of them are not.

6   Respondents were asked whether they had "experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape)" in Q. 6.6.

7   Respondents were asked in Q. 6.11 if they had "ever been paid for selling drugs or other work that is currently considered illegal."

# CHAPTER 12

# Military Service

Prior research suggests that transgender people serve in the military at a higher rate than the U.S. general population.[1] USTS respondents with military experience were asked a series of questions about their service, their treatment as transgender service members, and their separation from the military. They were also asked about health care that they received through military providers and the Veterans Health Administration.

At the time that survey data was collected in 2015, the military still barred transgender people from serving openly in the military, and service members could be discharged simply for being transgender.[2] The Department of Defense announced that it was lifting the ban on June 30, 2016, with full implementation of specific policies related to transgender service members expected to be completed in 2017.[3] Despite the long-standing ban, thousands of transgender people have served and continue to serve in the military, many of them openly and with the support of their colleagues and commanders.

This chapter examines the experiences of current and former service members, including their interactions with leadership and health care providers as transgender people. It also explores veterans' unique experiences of separating from the military and accessing health care. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217164

KEY FINDINGS

▶ Nearly one in five (18%) respondents have served in the military, including veterans and those currently on active duty.

▶ Of current service members whose leadership or commanding officers knew or thought they were transgender, nearly one-quarter (23%) said that actions were taken to discharge them.

▶ Sixty percent (60%) of service members who separated from the military within the past ten years said that they might or would return to the military if the ban on transgender service members were lifted.

▶ Nearly one in five (19%) respondents who separated from the military more than ten years ago said they were discharged partly or completely because of their transgender status, and 19% left the military to avoid being mistreated or harassed as a transgender person.

# I. Current and Past Military Service

Nearly one in five (18%) respondents in the sample have served in the military, including respondents who were currently serving in the military on active duty (0.5%), and those who were currently on active duty for training in the Reserves or National Guard (2%).[4] Fifteen percent (15%) of respondents were veterans, compared with 8% in the U.S. population.[5]

Respondents in every age group were more likely to be veterans than their counterparts in the U.S. population. More than half (52%) of respondents over the age of 75 and 40% of respondents between the ages of 65 and 74 were veterans, compared with 22% and 18% of those age groups in the U.S. population, respectively.[6] One-quarter (25%) of respondents between the ages of 55 and 64 were veterans, more than three times higher than that age group in the U.S. population (8%).[7]

Fifteen percent (15%) of respondents between the ages of 35 and 54 were veterans, which was three times higher than the same age group in the U.S. population (5%)[8] (Figure 12.1).

**Figure 12.1: Veteran status**
AGE (%)



% in USTS (supplemental survey weight applied)

% in U.S. general population (ACS)

AR_217165

Among those with past or current military service, crossdressers (33%), transgender women (23%), and non-binary people with male on their original birth certificate (22%) were more likely to have served, compared with transgender men (8%) and non-binary people with female on their original birth certificate (2%) (Figure 12.2). White (21%), American Indian (20%), and Middle Eastern (20%) respondents were more likely to have served in the military, while Asian (7%) and Latino/a (7%) respondents were less likely (Figure 12.3). Multiracial respondents were ten times as likely as the overall sample to currently be on active duty, with 5% on active duty at the time they took the survey.

*Fifteen percent (15%) of respondents were veterans, compared with 8% in the U.S. population.*

Of those who reported military service, 2% were still serving. Nearly one-third (31%) of those who were no longer serving separated from military service within the past ten years, and 69% separated from military service more than ten years ago.

# II. Branch of Service

Current and former service members were asked to identify their current or most recent branch of service. Twenty-eight percent (28%) of these respondents currently or most recently served in the Army, 22% in the Navy, 18% in the Air Force, 7% in the Marine Corps, and 1% served in the Coast Guard. Nearly one-quarter (24%) served in the Reserves or the National Guard (Table 12.1).

**Figure 12.2: Past or current military service**
GENDER IDENTITY (%)



**Table 12.1: Current or most recent branch of service**

| Branch of service | % of current or former service members |
|---|---|
| Air Force | 18% |
| Air Force Reserve | 2% |
| Air National Guard | 2% |
| Army | 28% |
| Army Reserve | 8% |
| Army National Guard | 8% |
| Coast Guard | 1% |
| Coast Guard Reserve | <1% |
| Marine Corps | 7% |
| Marine Corps Reserve | 1% |
| Navy | 22% |
| Navy Reserve | 3% |

**Figure 12.3: Past or current military service**
RACE/ETHNICITY (%)



AR_217166

# III. Outness or Being Perceived as Transgender

Current service members[9] were asked how many people in the military (with the exception of other transgender people) thought or knew that they were transgender.[10]

More than half (52%) of current service members said that, as far as they knew, no one else thought or knew that they were transgender. Approximately one-third (34%) of current service members indicated that a few or some people in the military thought or knew that they were transgender, and 13% indicated that most or all people in the military thought or knew that they were transgender (Figure 12.4).[11]

**Figure 12.4: Number of people in the military who thought or knew that respondent was transgender**



*More than half (52%) of current service members said that, as far as they knew, no one else thought or knew that they were transgender.*

# IV. Leadership Response to Transgender Status

Among current service members who said that a few, some, most, or all others in the military thought or knew they were transgender, 48% indicated that their leadership or commanding officer thought or knew that they were transgender.

These respondents were asked about the ways in which their leadership or commanding officer responded to them being transgender, and they selected one or more response. Many reported that their leadership or commanding officer responded to their transgender status in a variety of positive ways, including supporting their name change (47%) and supporting their transition-related medical treatment (36%). Thirty percent (30%) reported that their leadership or commanding officer ignored their transgender status or looked the other way. Approximately one-quarter (23%) reported that their leadership or commanding officer had taken actions to discharge them (Table 12.2).

One-third (33%) of these respondents wrote in responses describing additional actions their leadership or commanding officers took because they thought or knew the respondent was transgender. Their write-in responses included several positive actions, such as supporting their social transition or their use of pronouns and uniforms that were consistent with their gender identity. These respondents also offered several additional negative actions, such as forcing respondents to present in a way that was inconsistent with their gender identity, forbidding them from discussing their transgender status with anyone else, passing them over for awards and duties, and subjecting them to administrative discipline.

MILITARY SERVICE

169

AR_217167

**Table 12.2: Response of leadership and/or commanding officer to being transgender**

| Leadership or commanding officers' response | % of current service members whose commanding officer thought/knew they were transgender |
|---|---|
| Supported name change | 47% |
| Supported medical treatment | 36% |
| Ignored or looked the other way | 30% |
| Took actions to discharge them | 23% |
| Not listed above | 33% |

# V. Separation from Military Service

Veterans were divided into two groups for the purposes of analysis: those who separated within the past ten years and those who separated more than ten years prior to taking the survey. The two groups were given distinct questions based on a consideration of the types of experiences a service member may have encountered during their service and the changing nature of the military.[12]

## a. Type of Discharge

Respondents who separated from military service more than ten years ago[13] were asked about the reasons for their separation from service, including the type of discharge they received. More than three-quarters (79%) of these respondents reported being honorably discharged, and the remaining 21% reported a variety of other types of discharges (Table 12.3).

**Table 12.3: Type of discharge**

| Discharge | % of veterans who separated more than 10 years ago |
|---|---|
| Honorable | 79% |
| General | 7% |
| Medical | 6% |
| Other-than-honorable | 3% |
| Entry level separation | 2% |
| Bad conduct | 1% |
| Retired | 1% |
| Dishonorable | <1% |
| Not listed above | 2% |

# In Our Own Voices

"I began to accept myself as a woman. I was happier than I ever had been before. But the army didn't share my enthusiasm. A year after returning from deployment, I was kept in under penal conditions. I was demoted from a sergeant to a private, the lowest rank in the army."

·······················································

"I am repeatedly harassed in my workplace, and am continually required to conceal my transgender status. When I sought assistance from the Equal Opportunity Office, I was told that they were unable to help because transgender individuals are not protected against harassment in the military."

·······················································

## b. Discharged Because of Transgender Status

While 81% of respondents who had separated from service more than ten years prior reported that they did not believe their discharge was related to being transgender, 19% believed their discharge was either partially related (14%) or completely related (5%) to being transgender.

Respondents who indicated that their discharge was related to being transgender were less likely to have been honorably discharged. Eighty-six percent (86%) of those who said their discharge was not related to their transgender status were honorably discharged, while only 45% of those who

AR_217168

said their discharge was partially related to being transgender and 51% of those who indicated that it was completely related were honorably discharged.

Respondents with female on their original birth certificate (24%) were more likely to say that their discharge was partially or completely related to being transgender than those with male on their original birth certificate (17%). Latino/a (28%) and Black (24%) respondents were also more likely to report that their transgender status was a factor in their discharge, compared with white (16%) respondents.

Even though these discharges took place more than ten years ago, the experience of being discharged partly or completely because of one's transgender status was associated with a variety of negative outcomes affecting respondents at the time they took the survey. Respondents who were currently living in poverty (29%) or currently working in the underground economy (34%) were more likely to say that their discharge was completely or partially connected to their transgender status, as were respondents who were currently experiencing serious psychological distress (28%).

## c. Separated to Transition or Avoid Harassment

Nearly one in ten (9%) respondents who separated from military service more than ten years ago left the service in order to transition, and an additional 19% said they left the service to avoid being mistreated or harassed as a transgender person.

Differences emerged by race, where Latino/a (28%) and Black respondents (26%) were more likely to have left to avoid mistreatment or harassment.

Approximately one-third (32%) of those who were currently living in poverty and more than one-third of those who have done sex work (38%) also left the military to avoid mistreatment or harassment.

# VI. Name Change on Discharge Papers

Respondents who separated from military service more than ten years earlier were also asked if they had changed their name on their military discharge papers, known as the DD 214. Two percent (2%) applied for and received an updated DD 214 with a new name, or they received a DD 215 (an alternative form used to correct errors in a DD 214) with their new name. Six percent (6%) applied for a name change on their military discharge papers, but their request was denied. The remaining 92% had not tried to change their name on their military discharge papers.

# VII. Health Care Treatment from Military Providers

Current service members and veterans who separated from military service within the ten years prior to taking the survey were asked whether they had received health care related to gender transition from a military provider, not including the Veterans Health Administration. Twelve percent (12%) had received mental health treatment related to gender transition from a military provider, and 4% had received medical treatment related to gender transition other than mental health treatment, such as hormone therapy or surgical care, from a military provider.

Even though this survey was conducted prior to the Department of Defense's announcement of plans to allow transgender people to serve openly, more than one-quarter (28%) of all current service members reported taking hormones for their gender identity or gender transition at the time they participated in the survey. Among these

MILITARY SERVICE

171

current service members, 28% reported getting their hormones from an on-post medical doctor and/or pharmacy. Nearly three-quarters (74%) received their hormones through an off-post medical doctor, and 57% received them through an off-post pharmacy (Table 12.4).

Table 12.4: Source of hormones

| Source of hormones | % of current service members who take hormones |
|---|---|
| Off-post medical doctor | 74% |
| Off-post pharmacy | 57% |
| On-post pharmacy | 15% |
| Friends, online, or other non-licensed sources | 15% |
| On-post medical doctor | 13% |

Current services members were asked whether a military medical provider, including any mental health provider, had reported to their commanding officer that they were transgender or recommended them for discharge. Of current service members whose providers knew they were transgender,[14] 86% reported no action being taken by military medical or mental health providers. However, 8% said that their provider reported their transgender status to their commander, and 12% said that their provider recommended them for discharge.

# VIII. Veterans Health Care

Veterans who separated from the military more than ten years ago were asked about their experiences receiving health care through the Veterans Health Administration (VA).[15]

Forty percent (40%) of former service members have received health care through the VA, 75% of whom were currently receiving care through the VA. Of those who received health care through the

VA at any point, more than half (56%) received care related to gender transition.

Nearly three-quarters (72%) indicated that they were out to their VA providers as transgender. Of those who were out to their VA providers as transgender, almost half (47%) reported that they were always treated respectfully as a transgender person, and 40% said that they received mostly respectful care. Eleven percent (11%) reported that they were sometimes treated respectfully, and 3% said that they were never treated respectfully (Figure 12.5).

Figure 12.5: Frequency of respectful treatment at the VA



% of veterans who were out as transgender to their VA provider

3% Never
11% Sometimes
47% Always
40% Mostly

# IX. Impact of Repealing Ban on Transgender Service

At the time the survey was taken, the military had not yet announced it would let transgender people serve openly. Current military service members were asked what they would do if the military allowed transgender people to serve openly. Nearly one-quarter (24%) said that they would start to transition while still serving, and 18% said that they would finish the transition that they

had already started while continuing to serve. Additionally, 21% reported that they had already transitioned (Table 12.5).

**Table 12.5:** **What respondent would do if open service in the military was allowed for transgender people**

| What they would do if allowed to serve openly | % of current service members |
|---|---|
| They would start to transition while still serving | 24% |
| They have already transitioned | 21% |
| They would finish the transition they already started and continue to serve | 18% |
| They would leave the military to transition and not return | 6% |
| They do not want to transition | 6% |
| They would leave the military to transition and then return to service | 3% |
| They would not finish the transition they already started and continue to serve | 1% |
| Not listed above | 21% |

Veterans who separated from the military within the past ten years were asked whether they would return to military service if transgender people were allowed to serve. Nearly one-third (30%) of these respondents indicated that they would return, 30% said that they might return, and the remaining 39% reported that they would not return to military service. Transgender men (42%) were more likely than transgender women (25%) and non-binary people (18%) to say that they would return to service.

# Conclusion

Despite a ban on transgender service members at the time the survey was administered, nearly one in five respondents reported having served in the military, and respondents were nearly twice as likely to be veterans as the general U.S. population. The findings indicated that a majority of current service members were interested in serving openly as transgender people, including those who would transition during their military service. Responses also indicated diverse experiences of acceptance and rejection of transgender people in military and veteran settings by military officials, direct superiors, and health care providers. The results suggest that lifting the ban on transgender service members and implementing new policies could lead to a substantial number of current and former service members continuing or resuming their military service.

MILITARY SERVICE

AR_217171

**ENDNOTES** | CHAPTER 12: MILITARY SERVICE

1   Gates, G. J. & Herman, J. L. (2014). *Transgender Military Service in the United States*. Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Transgender-Military-Service-May-2014.pdf; Blosnich, J. R., Brown, G. R., Shipherd, J. C., Kauth, M., Piegari, R. I., & Bossarte, R. M. (2013). Prevalence of gender identity disorder and suicide risk among transgender veterans utilizing Veterans Health Administration care. *American Journal of Public Health, 103*(10), e27–e32; Shipherd, J. C., Mizock, L., Maguen, S., & Green, K. E. (2012). Male-to-female transgender veterans and VA health care utilization. *International Journal of Sexual Health, 24*(1), 78–87.

2   Although the ban is described in this chapter as being one that prevented "transgender people from serving openly in the military," in actuality, the ban categorically barred transgender people from serving, regardless of whether or not they were open about being transgender. However, it is clear that tens of thousands of transgender people chose to serve in the military despite the ban, and many had to hide their identity to do so. Therefore, the ban is being described here as relating to open service as a transgender person.

3   See e.g., Rosenberg, M. (2016, June 30). Transgender people will be allowed to serve openly in military. *The New York Times*. Available at: http://www.nytimes.com/2016/07/01/us/transgender-military.html.

4   In this section of this chapter, the percentages of respondents who have served or are currently serving in the U.S. Armed Forces have been weighted to reflect the age and educational attainment of the U.S. population in addition to the standard survey weight. The USTS sample differs substantially from the U.S. population in regard to age and educational attainment, and therefore, this additional weight is applied in order to provide a more accurate comparison to the percentage of U.S. adults who have served in the armed forces, as reported in the American Community Survey. See the *Methodology* and *Portrait of USTS Respondents* chapters for more information about the application of the supplemental survey weight.

5   U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Veteran status*. Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S2101&prodType=table.

6   U.S. Census Bureau. See note 5.

7   U.S. Census Bureau. See note 5.

8   U.S. Census Bureau. See note 5.

9   "Current service members" includes individuals who were (1) currently serving on active duty, (2) only on active duty for training in the Reserves or National Guard, or (3) no longer on active duty but had been in the past and were still serving in the military. See Q. 2.17.

10   Q. 8.9 asked, "How many people in the military (who aren't trans) believe you are trans?" In the context of the questions in this section, this question was intended to assess how many people were out as transgender in the military by determining if other non-transgender people thought or knew that they were transgender.

11   This question (Q. 8.9) did not distinguish between service members who were not out or perceived as transgender because they were not living according to their gender identity, and those who were already living full time according to their gender identity but did not disclose the fact that they had previously transitioned. However, 47% of service members who said that no one in the military thought or knew they were transgender also reported that they were living full-time in Q. 1.12, suggesting that a substantial number of respondents who were not out to others in the military were living according to their gender identity without disclosing their past transition.

12   During the development of the survey questionnaire, the research team consulted with individuals and groups with subject-matter expertise in LGBT military service in general, and transgender military service in particular. After consultation, the research team chose to divide those who had separated from service into two groups to evaluate the experiences that each group might have had based on their time of service and separation. It was determined that those who had separated from service within the past ten years were serving in a time of changing societal and military culture and policies—including the repeal of "Don't Ask, Don't Tell," permitting lesbian, gay, and bisexual (but not transgender) service members to serve openly—and may have had different experiences as a result. This group may have also had different experiences with transitioning, receiving medical care for transition- and non-transition-related health care, and eligibility to return to service. The two groups were directed to specific questions accordingly.

13   Those who separated within the past ten years should have received questions 8.12–8.21 (which covered the reasons for separation and the nature of their discharge, VA health care, and military discharge papers) to evaluate the differences in experiences between them and those who separated more than ten years prior to participating in the survey. However, due to a programming error, respondents who separated within the past ten years did not receive these questions. Therefore, results of questions that addressed veterans' issues only reflected the experiences of those who separated more than ten years prior and likely underestimated certain experiences reported in this section.

14   Thirty-seven percent (37%) of current service members said that the question did not apply to them, as none of their military health providers knew that they were transgender, while 63% indicated that at least one military health provider knew they were transgender.

15   Veterans who separated from the military within the past ten years did not receive this question due to a programming error. See note 13.

AR_217172

# CHAPTER 13

# Housing, Homelessness, and Shelter Access

H ousing is one of the most vital needs all people share. However, many transgender people have faced discrimination when seeking housing, and are vulnerable to actions such as eviction because of their transgender status. Such discrimination, in addition to family rejection and other risk factors, can lead to housing instability and higher rates of homelessness.[1] For transgender people who experience homelessness, shelters present additional problems and often are unsafe environments. Previous studies have found that shelters frequently turn transgender people away because of their gender identity, or require them to stay in facilities that are inappropriate for their gender, often putting them at further risk of violence and harassment.[2]

This chapter explores respondents' current living arrangements and their experiences with homelessness, as well as with specific forms of housing discrimination and instability occurring in the past year because of their transgender status. It also examines respondents' experiences with homelessness in the past year, including access to shelters and the treatment they received in those shelters as transgender people. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217173

**KEY FINDINGS**

▶ Only 16% of respondents owned their homes, in contrast to 63% in the U.S. population.

▶ Nearly one-third (30%) of respondents have experienced homelessness at some point in their lives. One in eight (12%) experienced homelessness in the past year because of being transgender.

▶ Nearly one-quarter (23%) of respondents experienced some form of housing discrimination in the past year, such as being evicted from their home or denied a home or apartment because of being transgender.

▶ More than one-quarter (26%) of respondents who were homeless in the past year avoided staying in homeless shelters because they feared they would be mistreated as a transgender person. Additionally, six percent (6%) were denied access to a shelter, including 4% who were denied access due to being transgender.

▶ Seventy percent (70%) of those who stayed in a shelter in the past year reported some form of mistreatment because of being transgender.

  • More than half (52%) of those who stayed at a shelter in the past year were verbally harassed, physically attacked, and/or sexually assaulted because of being transgender.

  • Nearly one in ten (9%) respondents were thrown out once the shelter staff found out that they were transgender, and 44% decided to leave the shelter because of poor treatment or unsafe conditions.

  • One-quarter (25%) decided to dress or present as the wrong gender in order to feel safe in a shelter, and 14% said that the shelter staff forced them to dress or present as the wrong gender in order to stay at the shelter.

AR_217174

# I. Current Living Arrangements

Respondents were asked what their current living arrangements were at the time they participated in the survey. Nearly half (44%) of respondents were living in a house, apartment, or condo they rented, either alone or with others, which was the most commonly reported living arrangement. Seventeen percent (17%) had not yet left home and were living with their parents or the family they grew up with (Table 13.1).

Table 13.1: Current living arrangements

| Current living arrangements | % of respondents |
|---|---|
| Living in house, apartment, or condo they rent (alone or with others) | 44% |
| Living with parents or family they grew up with because they have not yet left home | 17% |
| Living in house, apartment, or condo they own (alone or with others) | 16% |
| Living temporarily with friends or family because they cannot afford their own housing | 9% |
| Living in campus or university housing | 7% |
| Living with a partner, spouse, or other person who pays for the housing | 5% |
| Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing | <1% |
| Living in a shelter (including homeless, domestic violence, or other type of emergency shelter) or in a hotel or motel with an emergency shelter voucher | <1% |
| Living in transitional housing or a halfway house | <1% |
| Living in a hotel or motel that they pay for | <1% |
| Living in military barracks | <1% |
| Living in a nursing home or other adult care facility | <1% |
| Living in a foster group home or other foster care | <1% |
| Living in a hospital | <1% |
| Not listed above | 2% |

In contrast to the 63% homeownership rate in the U.S. at the time of the survey,[3] USTS respondents were nearly four times less likely to own a home, with only 16% reporting that they were living in a house, apartment, or condo that they owned. A large difference in the rate of homeownership was consistent across age groups (Figure 13.1).[4]



Figure 13.1: Homeownership rate
CURRENT AGE (%)

Respondents also reported substantial housing instability. Nearly one in ten (9%) respondents were living temporarily with friends or family because they could not afford their own housing. Approximately half of one percent (0.53%) of respondents were homeless at the time they participated in the survey, including those who were living in a shelter (other than a domestic violence shelter), or on the street. This was three times the rate of current homelessness among adults in the U.S. population (0.18%), as reported by the Department of Housing and Urban Development.[5]

AR_217175

# II. Homelessness During One's Lifetime

Nearly one-third (30%) of respondents have experienced homelessness during their lifetime, including those who have stayed in a shelter, lived on the street, lived out of a car, or stayed temporarily with family or friends because they could not afford housing. The homelessness rate was substantially higher among respondents whose immediate family had kicked them out of the house, with nearly three-quarters (74%) of these respondents experiencing homelessness. The homelessness rate was also nearly twice as high among respondents who have done sex work (59%) and those living with HIV (59%), as well as respondents who have lost their job because of their gender identity or expression (55%). Transgender women of color, including American Indian (59%), Black (51%), multiracial (51%), and Middle Eastern (49%) women, also experienced especially high rates of homelessness (Figure 13.2).

Figure 13.2: Lifetime homelessness rate among transgender women
RACE/ETHNICITY (%)



# III. Housing Discrimination and Homelessness in the Past Year

Respondents were asked about specific experiences with housing discrimination and instability in the past year, such as being evicted or being homeless, because they were transgender (Table 13.2).[6]

Table 13.2: Housing situations that occurred in the past year because of being transgender

| Housing situation | % of people to whom situation applied |
|---|---|
| They had to move back in with family members or friends | 20% |
| They slept in different places for short periods of time (such as on a friend's couch) | 15% |
| They had to move into a less expensive home or apartment | 13% |
| They experienced homelessness | 12% |
| They were denied a home or apartment | 6% |
| They were evicted from a home or apartment | 5% |
| **One or more experiences listed** | **30%** |

One in eight (12%) respondents reported experiencing homelessness in the past year as a result of anti-transgender bias. Those currently working in the underground economy (such as sex work, drug sales, and other work that is currently criminalized) (37%), undocumented residents (32%), and those living with HIV (27%) were more likely to report experiencing homelessness in the past year because they were transgender. Transgender women of color, including Black (31%), American Indian (27%), multiracial (18%), and Latina (18%) women, were substantially more likely to report being homeless in the past year because of being transgender (Figure 13.3).

AR_217176



Figure 13.3: Homelessness in the past year because of being transgender among transgender women RACE/ETHNICITY (%)

- Overall (all respondents): 12%
- American Indian: 27%
- Asian: 13%
- Black: 31%
- Latina: 18%
- Middle Eastern*: (no data)
- Multiracial: 18%
- White: 12%

*Sample size too low to report

Six percent (6%) of respondents were denied a home or apartment in the past year because they were transgender, with transgender women of color, including Black (17%), multiracial (15%), and Latina (11%) women, being more likely to have this experience (Figure 13.4).



Figure 13.4: Denial of home/apartment in the past year due to being transgender among transgender women RACE/ETHNICITY (%)

- Overall (all respondents): 6%
- American Indian: 10%
- Asian: 10%
- Black: 17%
- Latina: 11%
- Middle Eastern*: (no data)
- Multiracial: 15%
- White: 6%

*Sample size too low to report

# In Our Own Voices

"I was ejected from my apartment while I was out of town after my landlord discovered I was trans. The apartment was empty when I returned home."

........................................................

"I lost my job after I came out as transgender. I became homeless for about year. I never stayed in a shelter because I feared harassment."

........................................................

"When I was 18, I ran away from my abusive parents who had been violent toward me because of my sexuality and gender expression. I became homeless for several years, traveling all over the country, stealing food and sleeping in abandoned buildings."

........................................................

"When I go to shelters, I am admonished and told that I should return to 'being a woman' in order to use the shelter system."

........................................................

"I've tried shelters. The men's ones aren't safe for trans men: if those men find out who you are, you're opening yourself up to physical and sexual violence. And when I turned to the women's shelters, I was too masculine to make the women comfortable."

........................................................

HOUSING, HOMELESSNESS, AND SHELTER ACCESS

179

AR_217177

*Five percent (5%) of respondents were evicted from their home in the past year because of anti-transgender bias.*

Five percent (5%) of respondents were evicted from their home or apartment in the past year because of anti-transgender bias. Differences emerged by demographic characteristics, where undocumented residents (18%), people with disabilities[7] (8%), and people of color, including American Indian (9%) and Black (9%) respondents, were more likely to report this experience.

Overall, nearly one-third (30%) of respondents to whom these housing situations applied—23% of all respondents—experienced one or more forms of housing discrimination or instability in the past year because they were transgender. Respondents who were currently working in the underground economy (59%) and those who had been kicked out of the house by their family at some point in their lives because they were transgender (59%) were nearly twice as likely to report one or more of these experiences. Undocumented residents (50%) and transgender women of color were also more likely have had one or more of these experiences, including Black (49%), multiracial (39%), American Indian (39%), and Latina (37%) women (Figure 13.5).

**Figure 13.5: Any housing discrimination and/or instability in past year due to being transgender among transgender women**
RACE/ETHNICITY (%)



*Sample size too low to report

# IV. Shelters

## a. Access to Shelters

Respondents who experienced homelessness in the past year because of their transgender status were asked whether they had gone to a homeless shelter during that year (Table 13.3).

**Table 13.3: Experiences with homeless shelters in the past year**

| Experiences with homeless shelters | % of people who were homeless |
|---|---|
| They sought shelter and stayed at one or more shelters | 10% |
| They sought shelter and were denied access to one or more shelters | 6% |
| They did not seek shelter, because they feared mistreatment as a transgender person | 26% |
| They did not seek shelter for other reasons | 59% |

One in ten (10%) respondents sought shelter and stayed at one or more shelters in the past year. Higher percentages were noted among respondents living with HIV (22%) and American Indian (23%) and Black (15%) respondents.

More than one-quarter (26%) did not seek shelter because they feared being mistreated as a transgender person in the past year. Asian (43%) and American Indian (37%) respondents were more likely to report avoiding a shelter for this reason, in contrast to other people of color, such as Black (25%) and Latino/a (22%) respondents (Figure 13.6). Respondents currently working in the underground economy (36%), and respondents whose families had kicked them out of the house for being transgender (35%) were more likely to avoid seeking shelter for fear of being mistreated.

Figure 13.6: Did not seek shelter for fear of mistreatment as a transgender person in the past year RACE/ETHNICITY (%)



*Sample size too low to report

Six percent (6%) of respondents were denied access to a shelter in the past year. Transgender women of color were more likely to be denied access to a shelter, with multiracial women (30%) being five times as likely, and Black women (13%) being more than twice as likely. Those who were currently working in the underground economy (13%) were also more likely to be denied access to a shelter.

Respondents who were denied access to one or more shelters in the past year were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity. Nearly three-quarters (74%) believed that they were denied access to a shelter because of their gender identity or expression.[8] This represents 4% of those who were homeless in the past year (Table 13.4).

*Seven out of ten (70%) respondents who stayed at a shelter in the past year faced some form of mistreatment, such as being forced out, harassed, or attacked because of being transgender.*

Table 13.4: Reported reasons for being denied access to one or more shelters

| Reason for denial | % of those denied access to shelter |
| --- | --- |
| Age | 7% |
| Disability | 8% |
| Income level or education | 5% |
| Gender identity or expression | 74% |
| Race or ethnicity | 4% |
| Religion or spirituality | 4% |
| Sexual orientation | 17% |
| None of the above | 19% |

## b. Treatment in Shelters

Respondents who stayed at one or more shelters in the past year received questions about how they were treated at the shelter(s) as a transgender person. Seventy percent (70%) encountered at least one negative experience based on their transgender status in the past year, such as being forced out, harassed, or attacked because they were transgender.

Nearly one in ten (9%) respondents who stayed at a shelter in the past year were thrown out after the shelter staff found out that they were transgender. Forty-four percent (44%) decided to leave the shelter because of poor treatment or unsafe conditions, even though they had no other place to go. One-quarter (25%) of respondents decided to dress or present as the wrong gender in order to feel safe in a shelter, and 14% said that the shelter staff forced them to dress or present as the wrong gender in order to stay at the shelter (Table 13.5).

HOUSING, HOMELESSNESS, AND SHELTER ACCESS

AR_217179

**Table 13.5: Experiences while staying in homeless shelters in the past year**

| Experiences while staying in homeless shelters | % of people who stayed in a shelter |
|---|---|
| They left because of poor treatment or unsafe conditions, even though they had nowhere else to go | 44% |
| They decided to dress or present as the wrong gender to feel safe in shelter | 25% |
| The shelter required them to dress or present as the wrong gender | 14% |
| They were thrown out after shelter staff learned they were transgender | 9% |
| **One or more experiences listed** | **58%** |

Respondents who stayed at a homeless shelter in the past year were also asked whether they were verbally harassed, physically attacked, or sexually assaulted[9] at the shelter because they were transgender. Nearly half (49%) reported that they were verbally harassed because they were transgender. Nearly one-fifth (19%) were physically attacked, and 17% were sexually assaulted at the shelter because they were transgender (Table 13.6).

**Table 13.6: Verbal harassment, physical attack, and sexual assault in homeless shelters in the past year because they were transgender**

| Experiences while staying in homeless shelters | % of people who stayed in a shelter |
|---|---|
| Verbally harassed | 49% |
| Physically attacked | 19% |
| Sexually assaulted | 17% |
| **One or more experiences listed** | **52%** |

# Conclusion

Respondents reported high rates of homelessness both in their lifetime and the past year. The results also indicated that a substantial number of respondents experienced housing discrimination and housing instability in the past year based on their transgender status, with higher rates among transgender women of color, people living with HIV, people who have been kicked out of their homes by their families, and respondents currently working in the underground economy. Many of those who experienced homelessness in the past year reported that they avoided using a shelter because they feared being mistreated as a transgender person, and those who did use a shelter in the past year faced high rates of mistreatment based on their transgender status, such as being kicked out of the shelter, being verbally harassed, physically attacked, or sexually assaulted.

**ENDNOTES** | CHAPTER 13: HOUSING, HOMELESSNESS, AND SHELTER ACCESS

1    See e.g., Davidson, C. (2014). Gender minority and homelessness. *In Focus: A Quarterly Research Review of the National Health Care for the Homeless Council*, 3(1). Available at: http://www.nhchc.org/wp-content/uploads/2014/10/in-focus_transgender_sep2014_final.pdf; Durso, L. E. & Gates, G. J. (2012). *Serving Our Youth: Findings from a National Survey of Service Providers Working with Lesbian, Gay, Bisexual, and Transgender Youth who are Homeless or at Risk of Becoming Homeless.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Durso-Gates-LGBT-Homeless-Youth-Survey-July-2012.pdf; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 112). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

2    Grant, et al.; Rooney, C., Durso, L. E., & Gruberg, S. (2016). *Discrimination Against Transgender Women Seeking Access to Homeless Shelters.* DC: Center for American Progress. Available at: https://www.americanprogress.org/issues/lgbt/report/2016/01/07/128323/discrimination-against-transgender-women-seeking-access-to-homeless-shelters/.

3    U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Homeownership Rate by Age of Householder.* The ACS homeownership rate include ages 15 and older, in contrast to the USTS rate, which includes respondents who are 18 and older. Because the ACS includes people under 18 years of age, an exact comparison to the USTS sample could not be made. Therefore, this comparison should be interpreted with caution.

4    U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Homeownership Rate by Age of Householder.* The ACS homeownership rate for the "under 25" age group includes those who are 15–24 years of age, in contrast to the USTS rate, which includes respondents who are 18–24 years of age. See note 3.

5    The homelessness point-in-time estimate is based on January 2015 data. Department of Housing and Urban Development. (2015). *2015 Annual Homelessness Assessment Report (AHAR) to Congress.* Available at: https://www.hudexchange.info/resources/documents/2015-AHAR-Part-1.pdf. Calculation is based on the 436,921 people over the age of 18 who were homeless on a given night in 2015 and the January 2015 estimated adult population (247,492,492).

6    Respondents were given the choice of answering "yes," "no," or "does not apply to me" for each housing scenario listed in Q. 23.2. They were instructed to select "does not apply to me" if the housing situation could not have happened to them in the past year. For example, those who did not rent a home in the past year could not have been evicted, and were instructed to select "does not apply to me" for that question. The results reported in this section do not include those who answered "does not apply to me" for each of the housing situations.

7    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

8    The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons were collapsed for reporting as "gender identity or expression."

9    Respondents were asked if they had experienced "unwanted sexual contact (such as fondling, sexual assault, or rape)" in Q. 24.4.

AR_217181



# CHAPTER 14

# Police, Prisons, and Immigration Detention

Transgender people, particularly transgender people of color, face elevated levels of negative interactions with law enforcement officers and the criminal justice system. This includes higher rates of police mistreatment,[1] incarceration,[2] and physical and sexual assault in jails and prisons.[3] Furthermore, when navigating the United States immigration system, many transgender people, including those who are seeking asylum based on their gender identity, face the prospect of being placed into unsafe immigration detention centers. While in immigration detention, transgender people are often placed in facilities that do not match their gender identity or face extended periods of solitary confinement, leaving them vulnerable to physical and sexual abuse, denial of medical treatment, and other dangerous conditions.[4]

This chapter explores respondents' experiences with police and other law enforcement officers, in jail, prison, or juvenile detention centers, and in immigration detention, including experiences of physical and sexual assault during interactions with law enforcement and while incarcerated. Many of the questions in this section were modeled on the Bureau of Justice Statistics' National Inmate Survey. Results in this chapter are presented in three sections: (A) Interactions with Law Enforcement Officers, (B) Incarceration in Jail, Prison, or Juvenile Detention, and (C) Experiences in Immigration Detention. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

# A. INTERACTIONS WITH LAW ENFORCEMENT OFFICERS

**KEY FINDINGS**

▶ Of respondents who interacted with police or law enforcement officers who thought or knew they were transgender in the past year, 57% said they were never or only sometimes treated respectfully. Further, 58% reported some form of mistreatment, such as being repeatedly referred to as the wrong gender, verbally harassed, or physical or sexually assaulted.

..................................................................................................................................

▶ More than half (57%) of respondents said they were either somewhat or very uncomfortable asking the police for help.

..................................................................................................................................

▶ Two percent (2%) of respondents were arrested in the past year, and of those arrested, 22% believed they were arrested because they were transgender.

## I. Law Enforcement Interactions in the Past Year

Forty percent (40%) of respondents said that they interacted with the police or other law enforcement officers in the past year. Of those, 65% said that they believed none of the officers thought or knew they were transgender, and 35% said that some or all of the officers thought or knew they were transgender (Figure 14.1).

Respondents who said that some or all of the law enforcement officers thought or knew they were transgender were then asked whether they were treated with respect during the interactions. More than half of these respondents (57%) said that they were never or only sometimes treated with respect, and 43% reported that they were always treated with respect (Figure 14.2).

**Figure 14.2: Frequency of respectful treatment by police or other law enforcement officers in the past year**



Respondents who were currently working in the underground economy (80%) were more likely to

**Figure 14.1: Interaction with officers who thought or knew respondents were transgender**



AR_217183

report never or only sometimes being treated with respect, as were those who were currently living in poverty[5] (69%). Non-binary respondents (70%) and transgender men (62%) were more likely to report having never or only sometimes been treated with respect than transgender women (51%) (Figure 14.3). People of color were also more likely to report never or only sometimes being treated with respect, particularly American Indian (72%) and Black (70%) respondents (Figure 14.4).

**Figure 14.3: Never or only sometimes treated with respect by law enforcement officers in the past year**
GENDER IDENTITY (%)



**Figure 14.4: Never or only sometimes treated with respect by law enforcement officers in the past year**
RACE/ETHNICITY (%)



*Sample size too low to report

Respondents who said that some or all of the officers they interacted with thought or knew they were transgender were also asked whether they experienced specific forms of mistreatment in their interactions with law enforcement officers in the past year, such as being repeatedly referred to as the wrong gender, verbally harassed, or physically attacked. More than half (58%) of these respondents reported having experienced one or more forms of mistreatment (Table 14.1).

**Table 14.1: Mistreatment by police or other law enforcement officers in the past year**

| Experiences of mistreatment in the past year | % of those who interacted with officers who thought or knew they were transgender in the past year |
|---|---|
| Officers kept using the wrong gender pronouns (such as he/him or she/her) or wrong title (such as Mr. or Ms.) | 49% |
| Verbally harassed by officers | 20% |
| Officers asked questions about gender transition (such as about hormones or surgical status) | 19% |
| Officers assumed they were sex workers | 11% |
| Physically attacked by officers | 4% |
| Sexually assaulted by officers | 3% |
| Forced by officers to engage in sexual activity to avoid arrest | 1% |
| **One or more experiences listed** | **58%** |

People of color, including American Indian (74%), multiracial (71%), Latino/a (66%), and Black (61%) respondents, were more likely to have experienced one or more forms of mistreatment (Figure 14.5). Respondents who were homeless in the past year (78%), those who were currently unemployed (75%), and people with disabilities[6] (68%) were also more likely to report one or more of these experiences.

*More than half (58%) of respondents who interacted with a law enforcement officer who thought or knew that they were transgender were verbally harassed, physically or sexually assaulted, or mistreated in another way in the past year.*

Figure 14.5: Experienced one or more forms of mistreatment by law enforcement officers in the past year
RACE/ETHNICITY (%)



*Sample size too low to report

Verbal harassment was frequently reported by respondents who interacted with police or other law enforcement officers who thought or knew they were transgender. In the past year, one in five (20%) of these respondents reported verbal harassment by an officer. Those who had been homeless in the past year were twice as likely to be verbally harassed by an officer (40%), and those who were currently working in the underground economy were more than twice as likely to be verbally harassed (51%).

In the past year, more than one in ten (11%) respondents who interacted with law enforcement officers who thought or knew they were transgender reported that an officer assumed that they were sex workers. Transgender women of color were more likely to report that an officer assumed they were sex workers, including Black (33%), multiracial (30%), Latina (25%), American Indian (23%), and Asian (20%) women (Figure 14.6).

Figure 14.6: Law enforcement officer assumed they were a sex worker in the past year among transgender women
RACE/ETHNICITY (%)



*Sample size too low to report

Respondents who interacted with law enforcement officers who thought or knew they were transgender in the past year also reported being physically or sexually assaulted. Six percent (6%) of these respondents were physically attacked, sexually assaulted,[7] and/or forced to engage in sexual activity to avoid arrest by an officer. Respondents who were currently working in the underground economy (27%) and those who were homeless in the past year (17%) were more

POLICE, PRISONS, AND IMMIGRATION DETENTION

AR_217185

likely to report one or more of these experiences. Transgender women of color, including American Indian (20%), Black (17%), and multiracial (16%) women, were also more likely to report one or more of these experiences (Figure 14.7).

**Figure 14.7: Physically attacked, sexually assaulted, and/or forced to engage in sexual activity to avoid arrest in the past year among transgender women RACE/ETHNICITY (%)**



*Sample size too low to report

# II. Comfort Interacting with Law Enforcement Officers

All respondents were asked how comfortable they would feel asking for help from the police if they needed it. Twenty-nine percent (29%) reported that they would either be very comfortable or somewhat comfortable asking for help from the police, and 15% said they were neutral. A majority (57%) of the sample said that they were somewhat uncomfortable or very uncomfortable asking for help from the police (Figure 14.8).

## In Our Own Voices

"When I began to live in my correct gender, I was stopped by police and forced to strip in public in front of them as well as being verbally harassed, threatened with arrest, and accused of being a sex worker."

..................................................

"While I was in solitary, a cop asked me about my gender. I told him I was male, and he told me I sounded female. Next thing I knew, I was being taken to the jail doctor to spread my legs and have him confirm my gender. It was humiliating."

..................................................

"I was in [jail] for 12 days housed with male detainees. Upon being booked, I was escorted to the shower area where I was forced to strip down and shower with male inmates who made sexual advances towards me while mocking me for being different. I feared for my life and the guards were of no help because they mocked me for being transgender."

..................................................

"When I was booked, the officers asked very intrusive questions about my genitalia in a very nonprofessional manner and laughed about it. They ended up booking me into an all-female solitary confinement cell, kept calling me 'miss,' and gave me female colors even though I pass full time as male."

..................................................

AR_217186

Figure 14.8: Comfort asking the police for help



*A majority (57%) of respondents said they would be somewhat or very uncomfortable asking for help from the police if they needed it.*

## III. Arrest

Two percent (2%) of all respondents reported having been arrested in the past year. Almost one-quarter (22%) of those who were arrested believed that they were arrested because they were transgender.

Respondents who were homeless in the past year (6%) were more likely to be arrested during that year. Transgender women of color, including Black (6%), American Indian (6%), and multiracial (3%) women, were also more likely to be arrested in the past year (Figure 14.10).

Middle Eastern (70%), Black (67%), and multiracial (67%) respondents were more likely to say that they were either somewhat or very uncomfortable asking for help from the police (Figure 14.9). Respondents with disabilities (70%) and those who were living in poverty (67%) were also more likely to be somewhat or very uncomfortable asking for help from the police.

Figure 14.9: Somewhat or very uncomfortable asking the police for help
RACE/ETHNICITY (%)



Figure 14.10: Arrested in the past year for any reason among transgender women
RACE/ETHNICITY (%)



AR_217187

# B. INCARCERATION IN JAIL, PRISON, OR JUVENILE DETENTION

KEY FINDINGS

▶ Two percent (2%) of respondents were held in jail, prison, or juvenile detention in the past year.

▶ Nearly one-third (30%) of respondents who were incarcerated were physically and/or sexually assaulted by facility staff and/or another inmate in the past year.

▶ During the past year, more than one-third (37%) of respondents who were taking hormones before their incarceration were prevented from taking their hormones while incarcerated.

## I. Overall Incarceration Rates

Two percent (2%) of respondents were incarcerated (held in jail, prison, or juvenile detention) in the past year. Twelve percent (12%) of undocumented respondents were incarcerated in the past year. Transgender women of color, including Black (9%) and American Indian (6%) women, were more likely to have been incarcerated in the past year (Figure 14.11), as were respondents who had been homeless in the past year (7%).

Respondents who were incarcerated in the past year were asked what type of jail, prison, or juvenile detention facility they were in, and they made one or more selections. Most of these respondents were incarcerated in a local jail (64%) and/or held in a holding cell (58%) (Figure 14.12).

**Figure 14.12: Types of incarceration facilities**



**Figure 14.11: Incarcerated in the past year among transgender women**
RACE/ETHNICITY (%)



AR_217188

# II. Physical and Sexual Assault During Incarceration

Respondents who were incarcerated in jail, prison, or juvenile detention in the past year were asked whether they had been physically or sexually assaulted[8] by facility staff or other inmates during that time period. One in five (20%) respondents reported being sexually assaulted by facility staff or other inmates. This rate was five to six times higher than the rates of sexual assault by facility staff or other inmates reported by the U.S. incarcerated population in prisons (4%) and in jails (3.2%).[9] Nearly one-quarter (23%) were physically assaulted.[10] Overall, 30% were physically and/or sexually assaulted in the past year while incarcerated (Figure 14.13). Physical and sexual assault by staff or other inmates is explored separately in the following sections.

**Figure 14.13: Physical and sexual assault by staff or inmates in the past year during incarceration**



## a. Physical and Sexual Assault by Facility Staff

One in five (20%) respondents who were incarcerated in jail, prison, or juvenile detention in the past year were physically and/or sexually assaulted by facility staff during that time (Figure 14.14).

**Figure 14.14: Physical and sexual assault by facility staff during the past year**



Almost one in five (18%) respondents who were incarcerated in the past year were physically assaulted by facility staff during their time in jail, prison, or juvenile detention. Respondents who were physically assaulted by facility staff in the past year were asked how many times it happened. More than half (53%) reported that they had been physically assaulted once, 12% reported that it happened twice, 16% said that it happened between three and seven times, and nearly one in five (19%) reported that it happened eight or more times (Figure 14.15).

**Figure 14.15: Number of physical assaults by facility staff**



Eleven percent (11%) were sexually assaulted by facility staff in the past year during their time in jail, prison, or juvenile detention. The rate among USTS respondents was five to six times higher than the rates of sexual assault by facility staff reported by the U.S. incarcerated population in prisons (2.4%) and in jails (1.8%).[11] Respondents who were sexually assaulted by facility staff in the past year were asked how many times it happened. Nearly half (49%) said that it happened once, 9% reported that it happened twice, 19% said it happened between three and seven times, and almost one-quarter (23%) said that it happened eight or more times (Figure 14.16).

**Figure 14.16: Number of sexual assaults by facility staff**



## b. Physical and Sexual Assault by Other Inmates

Twenty-two percent (22%) of respondents who were incarcerated in jail, prison, or juvenile detention in the past year reported that they were physically and/or sexually assaulted by other inmates during that time (Figure 14.17).

**Figure 14.17: Physical and sexual assault by other inmates during the past year**



One in six (16%) respondents who were incarcerated in the past year were physically assaulted by another inmate during their time in jail, prison, or juvenile detention. Respondents who were physically assaulted by another inmate in the past year were asked how many times it happened. Fewer than half (43%) of those respondents were physically assaulted once, 13% were physically assaulted twice, 34% said that it happened between three and seven times, and one in ten (10%) said it happened eight or more times (Figure 14.18).

*Respondents who were incarcerated were five to six times more likely than the general incarcerated population to be sexually assaulted by facility staff, and nine to ten times more likely to be sexually assaulted by another inmate.*

AR_217190

Figure 14.18: Number of physical assaults by another inmate



Figure 14.19: Number of sexual assaults by another inmate



Seventeen percent (17%) of respondents who were incarcerated in the past year reported that they were sexually assaulted by another inmate during their time in jail, prison, or juvenile detention. The rate among USTS respondents was nine to ten times higher than the rates of sexual assault by other inmates reported by the U.S. incarcerated population in prisons (2%) and in jails (1.6%).[12]

Respondents who were sexually assaulted by another inmate in the past year were asked how many times it happened. Forty-three percent (43%) of those respondents were sexually assaulted once, and 16% were sexually assaulted twice. Nearly one in five (18%) said it happened between three and seven times, and nearly one-quarter (23%) said that it happened eight or more times (Figure 14.19).

# III. Hormone Therapy During Incarceration

Over half (58%) of respondents who were incarcerated in the past year had been taking hormones before their time in jail, prison, or juvenile detention. Of those, 82% had a prescription for those hormones. More than one-third (37%) of respondents who had been taking hormones before their incarceration were prohibited from taking their hormones in the past year while in jail, prison, or juvenile detention.

*In the past year, more than one-third (37%) of respondents who had been taking hormones before being incarcerated were prohibited from taking those hormones while in jail, prison, or juvenile detention.*

POLICE, PRISONS, AND IMMIGRATION DETENTION

AR_217191

# C. EXPERIENCES IN IMMIGRATION DETENTION

KEY FINDINGS

▶ Four percent (4%) of respondents who were not U.S. citizens by birth had been held in immigration detention at some point in their lives.

▶ More than half (52%) of respondents who were held in immigration detention were segregated from other people in detention, including 42% who were held in solitary confinement.

▶ Forty-five percent (45%) of respondents who were in immigration detention experienced some form of mistreatment, such as being physically or sexually assaulted or being denied access to hormones.

## I. Placement in Immigration Detention

Respondents who were not U.S. citizens by birth were asked if they had ever been held in immigration detention, such as being held in an Immigration and Customs Enforcement (ICE) detention center or a local jail just for immigration court proceedings.[13] Four percent (4%) (n=30, unweighted)[14] had been held in immigration detention. More than two-thirds (69%) of those who were held in immigration detention said that staff, guards, or others thought or knew that they were transgender or lesbian, gay, or bisexual (LGB).

## II. Isolation and Solitary Confinement

Respondents who were detained were asked whether they had been segregated from others who were also in detention. Of the thirty respondents who answered this question, more than half (52%) reported being isolated in one or more ways. Seventeen percent (17%) were held in a separate area for transgender and/or LGB people, such as a pod, unit, tank, or other housing area. Forty-two percent (42%) were held in solitary confinement.

Those who were held in solitary confinement were asked how long they were held in confinement. Of the nine respondents who had been in solitary confinement, forty percent (40%) were held for 14 days or less (up to two weeks). More than one-quarter (28%) were held for 1–3 months, while 14% were held in solitary confinement for over six months (Figure 14.20).

AR_217192

Figure 14.20: Duration of solitary confinement (n=9, unweighted)



* Due to the small sample size, these findings should be interpreted with caution.

Table 14.2: Mistreatment and assault in immigration detention

| Form of mistreatment or assault (n=29, unweighted) | % of those detained |
|---|---|
| Denied access to hormones | 29% |
| Physically assaulted | 23% |
| Denied gender-appropriate clothing | 22% |
| Threatened with sexual assault | 19% |
| Sexually assaulted | 15% |
| **One or more experiences listed** | **45%** |

* Due to the small sample size, these findings should be interpreted with caution.

# III. Mistreatment and Assault in Immigration Detention

Those who were placed in immigration detention were asked about any mistreatment they faced while they were there, such as being physically or sexually assaulted, threatened with sexual assault, or denied access to hormones or gender-appropriate clothing. Of the twenty-nine respondents who answered these questions, 45% reported one or more of these experiences from their time in immigration detention.

Approximately one-quarter (23%) were physically assaulted and 15% were sexually assaulted by staff or detention officers or by other detainees or inmates, while 19% were threatened with sexual assault. Nearly one-third (29%) were denied access to hormone treatment (Table 14.2).

# Conclusion

Respondents reported frequent contact with the law enforcement and criminal justice systems, as well as high rates of mistreatment by police, physical and sexual abuse in jails and prisons, and denial of medical treatment while incarcerated. Experiences with law enforcement varied by demographic groups, with transgender people of color, those who have experienced homelessness, people with disabilities, and low-income transgender people reporting higher rates of discomfort with and mistreatment by police and other law enforcement officers. Results also indicated substantial levels of mistreatment and abuse in jail, prisons, and juvenile detention centers. Additionally, the experiences of respondents who were placed in immigration detention included harmful conditions and mistreatment, such as lengthy periods of solitary confinement and physical and sexual assault by detention staff and other detainees.

AR_217193

**ENDNOTES** | CHAPTER 14: POLICE, PRISONS, AND IMMIGRATION DETENTION

1   Center for American Progress & Movement Advancement Project. (2016). *Unjust: How the Broken Criminal Justice System Fails LGBT People.* Available at: http://www.lgbtmap.org/file/lgbt-criminal-justice.pdf.

2   Center for American Progress & Movement Advancement Project. (2016). *Unjust: How the Broken Criminal Justice System Fails LGBT People.* Available at: http://www.lgbtmap.org/file/lgbt-criminal-justice.pdf; Lydon, J. (2015). *Coming out of Concrete Closets: A Report on Black & Pink's National LGBTQ Survey.* Available at: http://www.blackandpink.org/wp-content/upLoads/Coming-Out-of-Concrete-Closets.-Black-and-Pink.-October-21-2015..pdf.

3   Beck, A. J. (2014). *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12; Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates.* DC: Bureau of Justice Statistics. Available at: https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

4   Human Rights Watch. (2016). *"Do You See How Much I'm Suffering Here?": Abuse Against Transgender Women in US Immigration Detention.* NY, New York: Human Rights Watch. Available at: https://www.hrw.org/sites/default/files/report_pdf/us0316_web.pdf; Jeanty, J. & Tobin, H. J. (2013). *Our Moment for Reform: Immigration and Transgender People.* DC: National Center for Transgender Equality. Available at: http://www.transequality.org/sites/default/files/docs/resources/OurMoment_CIR_en.pdf.

5   Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

6   "Respondents with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

7   Respondents received the following answer choice in Q. 28.5: "I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape)."

8   Respondents were asked in Q. 28.10 and Q. 28.12 whether they were "physically forced, pressured, or made to feel that [they] had to have sex or sexual contact" with facility staff or with another inmate. This question was based on the language used by the Bureau of Justice's National Inmate Survey to allow for comparison with the general incarcerated population. Beck, A. J., Berzofsky, M., Caspar, R., & Krebs, C. (2013). *Sexual Victimization in Prisons and Jails Reported by Inmates 2011–12.* DC: Bureau of Justice Statistics. Available at: https://www.bjs.gov/content/pub/pdf/svpjri1112.pdf.

9   Beck et al. See note 8. The Bureau of Justice Statistics (BJS) presents data separately for people incarcerated in state and federal prisons and people incarcerated in jails, but they do not present data for those held in juvenile detention facilities. USTS data includes the experiences of those who were incarcerated in jail, prison, and juvenile detention. Therefore, data from the U.S. incarcerated population in this section is provided as a benchmark for experiences among USTS respondents and should be interpreted with caution.

10  The National Inmate Survey does not ask about physical assault that does not involve sexual violence.

11  Beck et al. See note 8.

12  Beck et al. See note 8.

13  This section discusses the specific experiences of those held in immigration detention. General information about citizenship and immigration status, including experiences with applications for asylum, is provided in the *Portrait of USTS Respondents* chapter.

14  Although a small number of respondents in the sample (n=30, unweighted) had been held in an immigration detention facility, it was important to highlight their experiences in this report. Due to the small sample size, unweighted frequencies are presented alongside weighted percentages in this section to be clear that the percentages reflect the experiences of a small number of respondents. While it is important to present these experiences in this report, the findings presented in this section should be interpreted with caution due to the small sample size.

AR_217194

# CHAPTER 15

# Harassment and Violence

The freedom to participate in public life without fear of discrimination, harassment, and violence has been shown to have wide-ranging impacts on health, economic stability, and other key aspects of life.[1] Transgender people, however, are often vulnerable to mistreatment in public spaces, resulting in barriers to civic and economic participation.[2] Transgender people also face high rates of violence, including physical attacks, sexual assault, and intimate partner violence.[3]

Respondents were asked about their experiences in the past year with unequal treatment or service[4] in businesses, government agencies, and other public places (more broadly than just in public accommodations, which are covered in the *Places of Public Accommodation and Airport Security* chapter), as well their experiences with verbal harassment.[5] They also received questions about experiences with being physically attacked or sexually assaulted in a variety of settings. Finally, they were asked about experiences with intimate partner violence. Questions were informed by several national surveys, including the National Crime Victimization Survey and the National Intimate Partner and Sexual Violence Survey.[6] Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217195

**KEY FINDINGS**

▶ Nearly half (48%) of all respondents in the sample reported being denied equal treatment, verbally harassed, and/or physically attacked in the past year because of being transgender.

  • One in seven (14%) respondents reported that they were denied equal treatment or service in a public place in the past year because of being transgender.

  • Nearly half (46%) of respondents reported that they were verbally harassed in the past year because of being transgender.

  • Nearly one in ten (9%) respondents reported that they were physically attacked in the past year because of being transgender.

................................................................................................................

▶ Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime.

................................................................................................................

▶ One in ten (10%) respondents in the survey were sexually assaulted in the past year.

................................................................................................................

▶ More than half (54%) of respondents experienced some form of intimate partner violence.

  • More than one-third (35%) experienced physical violence by an intimate partner, compared to 30% of the U.S. adult population. Nearly one-quarter (24%) experienced severe physical violence by a current or former partner, compared with 18% of the U.S. population.

# I. Overall Experiences of Unequal Treatment, Harassment, and Physical Attack

Respondents were asked if they had been denied equal treatment or service, verbally harassed, or physically attacked in the past year for any reason, regardless of whether it happened because they were transgender. This section of the chapter will examine respondents' overall experiences in the past year, and is followed by separate sections examining denial of equal treatment, verbal harassment, and physical attacks in greater detail.

Fifty-eight percent (58%) of respondents said that they were denied equal treatment or service, verbally harassed, and/or physically attacked in the past year for any reason. Respondents who were currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (82%), and people with disabilities[7] (69%) were more likely to report one or more of these experiences. Middle Eastern (70%), multiracial (70%), and American Indian (69%) respondents were also more likely to report one or more of these experiences (Figure 15.1).

AR_217196



Figure 15.1: Unequal treatment, verbal harassment, and/or physical attack for any reason in the past year RACE/ETHNICITY (%)

Respondents who had one or more of these experiences were then asked what they believed the reasons were for that treatment. Eighty-four percent (84%) believed that it happened because of their gender identity or expression. This means that 48% of all respondents in the survey reported that they were denied equal treatment or service, verbally harassed, and/or physically attacked because of being transgender in the past year (Table 15.1).

Table 15.1: Denial of equal treatment, verbal harassment, and physical attack in the past year

| Experience | Had experience for any reason (% of respondents) | Had experience because of being transgender (% of respondents) |
|---|---|---|
| Denied equal treatment | 16% | 14% |
| Verbally harassed | 54% | 46% |
| Physically attacked | 13% | 9% |
| One or more experiences listed | 58% | 48% |

*Nearly half (48%) of respondents reported that they were denied equal treatment or service, verbally harassed, and/or physically attacked because of being transgender in the past year.*

Those who said that others could usually or always tell that they were transgender (66%) were more likely to report having one or more of these experiences because of being transgender, in contrast to those who said that others could rarely or never tell that they were transgender (39%) (Figure 15.2).



Figure 15.2: Denial of equal treatment, verbal harassment, and physical attack in the past year OTHERS' PERCEPTION OF TRANSGENDER STATUS (%)

■ % of those who said others could *always or usually* tell they were transgender

▨ % of those who said others could *sometimes* tell they were transgender

░ % of those who said others could *rarely or never* tell they were transgender

Almost three-quarters (73%) of respondents who were currently working in the underground economy reported being denied equal treatment, verbally harassed, and/or physically attacked in the past year because of being transgender (Figure 15.3).

AR_217197

**Figure 15.3: Unequal treatment, harassment, and physical attack in the past year**
CURRENT PARTICIPATION IN THE UNDERGROUND ECONOMY (%)



■ % of those who are currently working in the underground economy
▨ % of those who are not currently working in the underground economy

# II. Unequal Treatment or Service

Sixteen percent (16%) of respondents were denied equal treatment or service in the year before taking the survey, such as at a place of business, government agency, or other public place, for any reason, regardless of whether it was related to being transgender.

People of color were more likely to have experienced unequal treatment or service. Almost one-third (30%) of American Indian respondents reported being denied equal treatment or service at a public place in the past year. Middle Eastern (23%), multiracial (22%), and Black (20%) respondents also reported higher rates (Figure 15.4). Undocumented residents (39%) were more than twice as likely to have been denied equal treatment or service as those in the overall sample, in contrast to documented non-citizens (20%) and citizens (16%).

**Figure 15.4: Denial of equal treatment or service for any reason in the past year**
RACE/ETHNICITY (%)



Respondents who were denied equal treatment or service were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity or expression (Table 15.2).

**Table 15.2: Reported reasons for denial of equal treatment or service**

| Reason for experience[e] | % of those denied equal treatment | % of whole sample |
|---|---|---|
| Age | 14% | 2% |
| Disability | 14% | 2% |
| Income level or education | 13% | 2% |
| **Gender identity or expression** | **88%** | **14%** |
| Race or ethnicity | 24% | 4% |
| Religion or spirituality | 5% | 1% |
| Sexual orientation | 36% | 6% |
| None of the above | 2% | <1% |

Fourteen percent (14%) of all respondents said they had been denied equal treatment or service in the past year because of their gender identity or expression.[9]

Respondents also reported that they had been denied equal treatment or service because of their race or ethnicity. Among people of color, Black (15%), Asian (9%), and multiracial (8%) respondents were

AR_217198

most likely to report being denied equal treatment or service because of their race or ethnicity (Figure 15.5).

**Figure 15.5: Denial of equal treatment or service in the past year because of race or ethnicity**
RACE/ETHNICITY (%)



# III. Verbal Harassment

Respondents were asked if anyone had verbally harassed them in the past year for any reason, regardless of whether it was related to being transgender. More than half (54%) reported that they had experienced verbal harassment. Those who were currently working in the underground economy (77%) were more likely to experience verbal harassment. Among people of color, Middle Eastern (67%), multiracial (66%), and American Indian (65%) respondents were more likely to have been verbally harassed in the past year (Figure 15.6).

**Figure 15.6: Verbal harassment for any reason in the past year**
RACE/ETHNICITY (%)



# In Our Own Voices

"When people have tried to grope me in the street or have verbally harassed me, it's usually either because they see me as a sexual target or because they can't figure out whether I am a 'man' or a 'woman' and they think they have the right to demand an explanation."

......................................................

"I was sexually assaulted at my university. I was also attacked and stalked. The university didn't do anything to help me. Instead, it threatened to punish me. I lived in terror the entire time I was on campus. I was denied a rape kit because I was transgender and the police were completely uninterested."

......................................................

"I was found in a ditch after being brutally raped for three days. I was taken to an ER. There I met an officer who told me I deserved it for attempting to be a woman and should have died. He also refused to take a report."

......................................................

"I was a victim of spousal abuse for over ten years. This grew worse when I transitioned, as [my transition] became an easy justification for verbally, emotionally and physically abusing me."

......................................................

"My trans status was used as a tool to [make me] stay with my former partner. She would say things such as 'no one else would ever love you.'"

......................................................

HARASSMENT AND VIOLENCE

201

AR_217199

Respondents who were verbally harassed were asked what they believed the reasons were for that treatment (Table 15.3).

**Table 15.3: Reported reasons for verbal harassment**

| Reason for experience | % of those verbally harassed | % of whole sample |
|---|---|---|
| Age | 10% | 5% |
| Disability | 10% | 5% |
| Income level or education | 7% | 4% |
| **Gender identity or expression** | **84%** | **46%** |
| Race or ethnicity | 16% | 9% |
| Religion or spirituality | 5% | 3% |
| Sexual orientation | 42% | 23% |
| None of the above | 8% | 4% |

Nearly half (46%) of respondents in the overall sample reported they were verbally harassed in the past year because of being transgender.

Among people of color, Black (29%), Asian (27%), Middle Eastern (25%), and multiracial (18%) respondents were most likely to report being verbally harassed because of their race or ethnicity (Figure 15.7).

**Figure 15.7: Verbal harassment in the past year because of race or ethnicity**
RACE/ETHNICITY (%)



Respondents were asked if they had been verbally harassed in public *by strangers* because of being transgender in the past year.[10] One-third (33%) of all respondents reported having this experience in

the past year. Transgender women of color were more likely to be harassed by strangers because of their gender identity or expression, particularly multiracial (51%) and American Indian (47%) women (Figure 15.8). Those who said that others could always or usually tell that they were transgender, even without being told (55%), were substantially more likely to have been verbally harassed by strangers, in contrast to those who said that people could rarely or never tell that they were transgender (22%).

**Figure 15.8: Verbal harassment in public by strangers in the past year among transgender women**
RACE/ETHNICITY (%)



# IV. Physical Attack

Thirteen percent (13%) of respondents said that someone had physically attacked them in the past year, such as by grabbing them, throwing something at them, punching them, or using a weapon against them for any reason.

Those who were currently working in the underground economy (41%) were more than three times as likely to report being physically attacked in the past year. Undocumented residents (24%) were almost twice as likely to report being physically attacked. Experiences of physical attack also varied by race and ethnicity, with American Indian (25%), Middle Eastern (25%), and multiracial

AR_217200

(19%) respondents being more likely to report a physically attack in the past year (Figure 15.9).

**Figure 15.9: Physical attack for any reason in the past year**
RACE/ETHNICITY (%)



Those who had been physically attacked in the past year were asked what they believed the reasons were for that attack (Table 15.4).

**Table 15.4: Reported reasons for physical attack**

| Reason for experience | % of those physically attacked | % of whole sample |
|---|---|---|
| Age | 7% | 1% |
| Disability | 8% | 1% |
| Income level or education | 5% | 1% |
| **Gender identity or expression** | **66%** | **9%** |
| Race or ethnicity | 11% | 1% |
| Religion or spirituality | 3% | <1% |
| Sexual orientation | 32% | 4% |
| None of the above | 25% | 3% |

Nearly one in ten (9%) respondents in the overall sample reported being physically attacked in the past year because of being transgender.  American Indian (19%), Middle Eastern (14%), multiracial respondents (12%), and Asian respondents (11%) were more likely to report being attacked because of being transgender (Figure 15.10), as were undocumented residents (23%).

**Figure 15.10: Physical attack in the past year because of being transgender**
RACE/ETHNICITY (%)



Respondents also reported that they had been physically attacked because of their race or ethnicity. Among people of color, Middle Eastern (6%), American Indian (4%), Black (4%), and Asian (4%) respondents were most likely to report being physically attacked because of their race or ethnicity (Figure 15.11).

**Figure 15.11: Physical attack in the past year because of race or ethnicity**
RACE/ETHNICITY (%)



Five percent (5%) of respondents in the overall sample were physically attacked in public *by strangers* because of being transgender.[11] Undocumented residents (20%) and respondents currently working in the underground economy (20%) were four times more likely to report this experience than the overall sample. Transgender women of color were also more likely to report this experience, particularly American Indian (19%), Middle Eastern (12%), and multiracial (11%) women

AR_217201

**Figure 15.12: Physical attack in public by strangers in
the past year among transgender women**
RACE/ETHNICITY (%)



Respondents who were physically attacked for
any reason in the past year were asked how many
times they had been attacked. Forty-five percent
(45%) were attacked once that year, and 25%
were attacked twice. Thirteen percent (13%) were
attacked three times, and 16% were attacked four
or more times that year (Figure 15.13).

**Figure 15.13: Number of physical attacks in the
past year**



These respondents were also asked to specify
how they were attacked. Nearly three-quarters
(73%) of those who were physically attacked in the
past year reported that someone had grabbed,
punched, or choked them. Twenty-nine percent
(29%) reported that someone threw an object at
them, like a rock or a bottle. Nearly one-third (29%)

of those who reported being physically attacked
were sexually assaulted.[12] (Table 15.5).

**Table 15.5: Means of physical attack in the past year**

| Type of physical attack | % of those physically attacked |
|---|---|
| By being grabbed, punched, or choked | 73% |
| By having something thrown at them (such as a rock or bottle) | 29% |
| By being sexually assaulted | 29% |
| With another weapon (like a baseball bat, frying pan, scissors, or stick) | 7% |
| With a knife | 5% |
| With a gun | 3% |
| Not listed above | 9% |

Three percent (3%) of respondents who were
physically attacked reported being attacked with a
gun in the past year. Transgender women of color,
particularly Black (11%) and Latina (11%) women, were
nearly four times as likely to report that they were
attacked with a gun (Figure 15.14). Respondents
currently working in the underground economy
(10%) were more than three times as likely to have
been attacked with a gun, and those whose only
source of income was from underground economy
work (16%) were more than five times as likely to
have been attacked with a gun.

**Figure 15.14: Attacked with a gun among transgender
women who were physically attacked in the past year**
RACE/ETHNICITY (%)



*Sample size too low to report

AR_217202

*Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime.*

# V. Sexual Assault

In addition to questions about being physically attacked in the past year, respondents were asked questions about their experiences with sexual assault during their lifetime and in the past year,[13] informed by questions from the National Intimate Partner and Sexual Violence Survey (NISVS).[14]

Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime. This included any experiences with "unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape."[15,16]

Respondents who have participated in sex work (72%), those who have experienced homelessness (65%), and people with disabilities (61%) were more likely to have been sexually assaulted in their lifetime. Among people of color, American Indian (65%), multiracial (59%), Middle Eastern (58%), and Black (53%) respondents were most likely to have been sexually assaulted in their lifetime (Figure 15.15). Experiences also varied across gender, with transgender men (51%) and non-binary people with female on their original birth certificate (58%) being more likely to have been sexually assaulted, in contrast to transgender women (37%) and non-binary people with male on their original birth certificate (41%) (Figure 15.16). Among transgender men and non-binary people with female on their original birth certificates, rates of sexual assault were higher among people of color, particularly American Indian, Middle Eastern, and multiracial people (Figure 15.17 & Figure 15.18).



Figure 15.15: Lifetime sexual assault
RACE/ETHNICITY (%)



Figure 15.16: Lifetime sexual assault
GENDER IDENTITY (%)



Figure 15.17: Lifetime sexual assault among transgender men
RACE/ETHNICITY (%)

HARASSMENT AND VIOLENCE

205

AR_217203

Figure 15.18: Lifetime sexual assault among non-binary people with female on their original birth certificate
RACE/ETHNICITY (%)



*One in ten (10%) respondents in the survey were sexually assaulted in the past year.*

One in ten (10%) respondents in the survey were sexually assaulted in the past year.[17,18] Respondents who were currently working in the underground economy (36%) were more than three times as likely to have been sexually assaulted in the past year.

Respondents who reported this experience were then asked who had committed the sexual assault. Approximately one-third (34%) of those who were sexually assaulted said that a current or former partner had sexually assaulted them. One-quarter (25%) of sexual assault survivors reported that a relative was the perpetrator. Nearly one-third (30%) of sexual assault survivors reported that a stranger committed the assault (Table 15.6).

Table 15.6: Person who committed sexual assault

| Person who committed sexual assault | % of respondents who have been sexually assaulted |
| --- | --- |
| A friend or acquaintance | 47% |
| A partner or ex-partner | 34% |
| A stranger | 30% |
| A relative | 25% |
| A coworker | 5% |
| A health care provider or doctor | 4% |
| A teacher or school staff member | 3% |
| A law enforcement officer | 2% |
| A boss or supervisor | 2% |
| A person not listed above | 12% |

# VI. Intimate Partner Violence

## a. Overall Intimate Partner Violence

Respondents who reported ever having had a romantic or sexual partner received questions about their experiences with harm involving a current or former intimate partner, including physical, emotional, or financial harm, many of which were based on questions in the National Intimate Partner and Sexual Violence Survey (NISVS).[19] Such acts of harm as described in the survey are defined as "intimate partner violence."[20]

Overall, more than half (54%) of all respondents experienced some form of intimate partner violence in their lifetime. Over three-quarters (77%) of respondents who have done sex work and nearly three-quarters (72%) of those who have been homeless experienced intimate partner violence. Undocumented residents (68%), people with disabilities (61%), and people of color, including American Indian (73%), multiracial (62%), and Middle Eastern (62%) respondents, were also more likely to report this experience (Figure 15.19).

2015 U.S. TRANSGENDER SURVEY

AR_217204

Figure 15.19: Intimate partner violence
RACE/ETHNICITY (%)



Table 15.7: Intimate partner violence involving coercive control, including intimidation, emotional and financial harm, and physical harm to others

| Type of intimate partner violence involving coercive control | % of respondents |
|---|---|
| Told them that they were not a "real" woman or man | 25% |
| Tried to keep them from seeing or talking to family or friends | 23% |
| Stalked | 16% |
| Kept them from leaving the house when they wanted to go | 15% |
| Threatened to call the police on them | 11% |
| Threatened to "out" them | 11% |
| Kept them from having money for their own use | 9% |
| Hurt someone they love | 9% |
| Threatened to hurt a pet or threatened to take a pet away | 6% |
| Would not let them have their hormones | 3% |
| Would not let them have other medications | 3% |
| Threatened to use their immigration status against them | 1% |
| **One or more experiences listed** | **44%** |
| **One or more experiences related to being transgender listed** | **27%** |

## b. Intimidation, Emotional, and Financial Harm

Respondents received two sets of questions covering a range of experiences with intimate partner violence. The first set of questions involved experiences with coercive control, including intimidation, emotional and financial harm, and physical harm to others who were important to respondents. Sixteen percent (16%) of respondents reported that they had been stalked, compared to 6% in the U.S. population.[21] One in four (25%) respondents were told that they were not a "real" woman or man by a partner, 23% were kept from seeing or talking to family or friends, and 15% were kept from leaving the house when they wanted to go (Table 15.7).

**More than half (54%) of all respondents experienced some form of intimate partner violence in their lifetime.**

Overall, nearly half (44%) of respondents in the sample experienced some form of intimate partner violence involving coercive control, including intimidation, emotional, and financial harm. Experience with this type of intimate partner violence differed by race, with American Indian (66%), Middle Eastern (56%), and multiracial (51%) respondents reporting higher rates of these experiences (Figure 15.20). Respondents who have done sex work (66%), have experienced homelessness (62%), or were undocumented (60%) were also more likely to have experienced intimate partner violence of this form.

HARASSMENT AND VIOLENCE

AR_217205

**Figure 15.20: Intimate partner violence involving intimidation, emotional, and financial harm RACE/ETHNICITY (%)**



## c. Intimate Partner Violence Involving Physical Harm

Respondents received additional questions about experiences of intimate partner violence involving physical harm inflicted on them (Table 15.8).

**Table 15.8: Intimate partner violence involving physical harm**

| Type of intimate partner violence | % of USTS respondents | % in U.S. population (NISVS) |
|---|---|---|
| Pushed or shoved | 30% | 23% |
| Slapped | 24% | 19% |
| Made threats to physically harm them | 20% | -- |
| Forced them to engage in sexual activity | 19% | -- |
| Hit them with a fist or something hard | 16% | 12% |
| Slammed them against something | 14% | 9% |
| Hurt them by pulling their hair | 11% | 6% |
| Kicked | 10% | 6% |
| Tried to hurt them by choking or suffocating them | 7% | 9% |
| Beat them | 6% | 6% |
| Used a knife or gun against them | 3% | 3% |
| Burned them on purpose | 2% | 1% |
| **Any physical violence** | **35%** | **30%** |
| **Any severe physical violence** | **24%** | **18%** |
| **One or more experiences listed** | **42%** | **---** |

Furthermore, more than a quarter (27%) of survey respondents reported acts of coercive control related to their transgender status, including being told that they were not a "real" woman or man, threatened with being "outed" by revealing their transgender status, or prevented from taking their hormones. Transgender women of color, including American Indian (57%) and multiracial (39%) women, were more likely to report acts of harm related to their transgender status (Figure 15.21).

Overall, 42% of all survey respondents reported experiencing some form of intimate partner violence involving physical harm, including the threat of physical violence, over their lifetime. Respondents who have done sex work (67%) or who have experienced homelessness (61%) were more likely to report intimate partner violence involving physical harm, as were undocumented (59%), American Indian (61%), multiracial (54%), and Middle Eastern (49%) respondents (Figure 15.22).

**Figure 15.21: Intimate partner violence related to transgender status among transgender women RACE/ETHNICITY (%)**



AR_217206

**Figure 15.22: Intimate partner violence involving physical harm**
RACE/ETHNICITY (%)



More than one-third (35%) experienced some form of physical violence by an intimate partner, as defined by the National Intimate Partner and Sexual Violence Survey,[22] compared to 30% of the U.S. adult population.[23] Moreover, nearly one-quarter (24%) of respondents reported having experienced severe physical violence from a partner, compared to 18% in the U.S. population.[24]

# Conclusion

The findings indicated that respondents faced high levels of unequal treatment, harassment, and physical attacks in the past year, with higher rates of these experiences reported among people of color, respondents currently working in the underground economy, and those who reported that others can tell that they are transgender. Respondents also experienced high rates of sexual assault in their lifetime and in the past year, and were more likely than the U.S. population to experience physical intimate partner violence. People of color and undocumented residents were more likely to report experiences of sexual assault and intimate partner violence, as were respondents who have worked in the underground economy or who have experienced homelessness.

**ENDNOTES** | CHAPTER 15: HARASSMENT AND VIOLENCE

1   Langton, L. & Truman, J. (2014). *Socio-Emotional Impact of Violent Crime*. DC: Bureau of Justice Statistics. Available at: http://www.bjs.gov/content/pub/pdf/sivc.pdf; Lick, D. J., Durso, L. E., & Johnson, K. L. (2013). Minority stress and physical health among sexual minorities. *Perspectives on Psychological Science, (8)*521. Available at: http://pps.sagepub.com/content/8/5/521.full.pdf+html.

2   See e.g., Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. (pp. 124–135). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

3   See e.g., Grant et al., 100, 127; Beemyn, G. & Rankin, S. (2011). *The Lives of Transgender People*. New York, NY: Columbia University Press.

4   This chapter discusses general experiences with unequal treatment in public places in the past year, which includes both public accommodations as well as other public spaces. For findings related to unequal treatment in specific public places, such as stores, restaurants, and government agencies, see the *Places of Public Accommodation and Airport Security* chapter.

5   This chapter discusses overall experiences with verbal harassment in the past year. Findings related to verbal harassment in specific settings are discussed in other chapters, such as the *Experiences at School*, *Employment and the Workplace*, and *Health* chapters.

HARASSMENT AND VIOLENCE

AR_217207

6    Truman, J. L. & Morgan, R. E. (2016). *Criminal Victimization, 2015.* DC: Bureau of Justice Statistics; Breiding, M. J., Smith, S. G., Basile, K. C., Walters, M. L., Chen, J., & Merrick, M. T. (2014). Prevalence and characteristics of sexual violence, stalking, and intimate partner violence victimization—National Intimate Partner and Sexual Violence Survey, United States, 2011. *MMWR, 63*(8). Available at: http://www.cdc.gov/mmwr/pdf/ss/ss6308.pdf.

7    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

8    Respondents were asked to select all the reasons that applied to their experience.

9    The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons are collapsed for reporting as "gender identity or expression."

10    Only respondents who reported that they were verbally harassed because of their transgender status, gender identity, gender expression, or appearance received this question (Q. 17.6), which asked: "In the past year, did strangers verbally harass you in public because of your trans status, gender identity, or gender expression?" Results are reported out of the full sample.

11    Only respondents who reported that they were physically attacked because of their transgender status, gender identity, gender expression, or appearance received this question (Q. 17.10), which asked: "In the past year, did strangers physically attack you in public because of your trans status, gender identity, or gender expression?" Results are reported out of the full sample.

12    In Q. 17.8, respondents were asked if they were physically attacked with "unwanted sexual contact (such as rape, attempted rape, being forced to penetrate)."

13    Q.18.1 asked if respondents had ever "experienced unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape."

14    Breiding et al. See note 6.

15    Respondents were asked if they had ever "experienced unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape" in Q. 18.1. This definition of sexual assault encompassed several categories of sexual violence as outlined in the National Intimate Partner and Sexual Violence Survey (NISVS). See note 16.

16    Due to differences between Q. 18.1 and the NISVS questions about sexual violence, a direct comparison to the U.S. population was not feasible for this report. However, as context for USTS respondents' experience with sexual assault, NISVS findings indicate that an estimated 11% of adults in the U.S. population have been raped in their lifetime, 19% have experienced unwanted sexual contact, 10% have experienced sexual coercion, and 4% were forced to penetrate someone. Breiding et al. See note 6. The figures for the prevalence of sexual violence during one's lifetime in the U.S. population were calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS, as reported by the Centers for Disease Control. Since NISVS respondents could report experiences with multiple forms of sexual violence, an NISVS respondent's experiences could be reflected in several categories of sexual violence. The research team was unable to avoid double counting respondents who reported more than one experience in the NISVS, and therefore, were unable to combine the percentages of NISVS respondents who experienced *any* form of sexual violence to match the broader USTS category of "unwanted sexual contact," and make a direct comparison. Therefore, findings for the U.S. population in regard to rape, unwanted sexual contact, sexual coercion, and being forced to penetrate are presented separately, and comparisons between the NISVS and USTS findings should be interpreted with caution.

17    The 10% rate of sexual assault in the past year reported in this section was based on Q. 18.3. This differs from the rate of sexual assault in the past year reported in the "Physical Attack" section of this chapter (4%), which was based on Q. 17.8. This difference is likely due to the number of respondents in the sample who received each question based on skip-logic patterns. While all respondents in the sample received Q. 18.3, a limited number of respondents received Q. 17.8 based on their answer to Q. 17.3. Respondents who indicated that they had been physically attacked in Q. 17.3, received a follow-up question asking how they were physically attacked (Q. 17.8), which included an answer choice of "unwanted sexual contact." Those respondents who did not identify their experience of unwanted sexual contact as a form of physical attack would not have received the follow-up question regarding the method of the attack, if they had not received another form of physical attack. Additionally, the difference in reporting may partly result from the more inclusive examples of unwanted sexual contact provided in Q. 18.3 ("such as oral, genital, or anal contact, penetration, forced fondling, or rape"), in contrast to the definition of unwanted sexual contact in Q. 17.8 ("such as rape, attempted rape, being forced to penetrate").

AR_217208

18    Due to differences between Q. 18.3 (sexual assault in the past year) and the NISVS questions about sexual violence, a direct comparison to the U.S. population was not feasible for this report. However, as context for USTS respondents' experience with sexual assault, NISVS findings indicate that an estimated 1.9% of adults in the U.S. population experienced unwanted sexual contact in the past year and an estimated 1.7% experienced sexual coercion in the past year. These figures were calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS. Additionally, an estimated 1.6% of women were raped in the past year. Due to the small number of men who reported being raped in the past year, a reliable estimate was not available for men. An estimated 1.7% of men were forced to penetrate a perpetrator in the past year, while the number of women who were forced to penetrate a perpetrator was too low to produce a reliable estimate. Breiding et al. See note 6. Since NISVS respondents could report experiences with multiple forms of sexual violence, an NISVS respondent's experiences could be reflected in several categories of sexual violence. The research team was unable to avoid double counting respondents who reported more than one experience in the NISVS, and therefore, were unable to combine the percentages of NISVS respondents who experienced *any* form of sexual violence to match the broader USTS category of "unwanted sexual contact," and make a direct comparison. Therefore, findings for the U.S. population in regard to rape, unwanted sexual contact, sexual coercion, and being forced to penetrate are presented separately, and comparisons between the NISVS and USTS findings should be interpreted with caution.

19    Breiding et al. See note 6.

20    See Q. 19.2 and Q. 19.3 for a list of acts described as forms of intimate partner violence.

21    Breiding et al. See note 6.

22    The NISVS measure for "any physical violence" includes all of the actions listed in Table 15.8, except for forced sexual activity and threats of physical violence.

23    The figures for the prevalence of intimate partner violence involving physical violence and/or severe physical violence in the U.S. population was calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS, as reported by the Centers for Disease Control and Prevention. See Breiding et al. See note 6.

24    According to the NISVS, "severe physical violence" includes being hurt by having one's hair pulled, being hit with a fist or something hard, kicked, slammed against something, choked or suffocated, beaten, burned, or attacked with a knife or gun.

HARASSMENT AND VIOLENCE

211



# CHAPTER 16

# Places of Public Accommodation and Airport Security

P ublic accommodations are places of business or other locations generally open to the public, which provide essential services that allow people to meet basic needs and participate in civic life, including government agencies, retail stores, and restaurants.[1] For transgender people, places of public accommodation are potentially unwelcoming or unsafe. Prior research has found that transgender people may face unequal treatment or harassment in public settings such as retail stores.[2] The survey explored respondents' experiences in specific types of public accommodations in the past year and found that respondents were denied equal treatment, verbally harassed, and physically attacked in several of these locations.

Respondents were also asked questions about their experiences in airports related to their gender identity or expression in the past year, given numerous reports of transgender people being subjected to excessive scrutiny and searches by Transportation Security Administration (TSA) officers when going through airport security screening.[3] Widely used body scanners often flag transgender people's bodies and gender-related clothing or items for additional screening, which can lead to unnecessary searches and make them vulnerable to harassment and discriminatory treatment by TSA officers and bystanders.[4]

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217210

KEY FINDINGS

▶ Of respondents who said that staff or employees at a place of public accommodation they visited thought or knew that they were transgender, nearly one-third (31%) experienced at least one type of negative experience, including being denied equal treatment or service (14%), verbally harassed (24%), and/or physically attacked (2%) in the past year.

- Among those who visited a retail store, restaurant, hotel, or theater and said that staff or employees thought or knew that they were transgender, 31% were denied equal treatment, verbally harassed, and/or physically attacked there.

- Approximately one-third (34%) of respondents had one or more of these negative experiences in the past year when using public transportation where employees thought or knew they were transgender.

- Nearly one-quarter (22%) of respondents had one or more of these experiences in the past year when visiting a domestic violence shelter or program or a rape crisis center where employees thought or knew they were transgender.

▶ One in five (20%) respondents did not use one or more places of public accommodation in the past year because they thought they would be mistreated as a transgender person.

▶ Additionally, 43% of respondents who went through airport security in the past year experienced a problem related to being transgender, such as being patted down or searched because of a gender-related item, having the name or gender on their ID questioned, or being detained.

# I. Overall Experiences in Places of Public Accommodation

Respondents received questions about their experiences in places of public accommodation, such as hotels, restaurants, or government agencies in the past year. They were first asked whether they had visited or used services in specific kinds of public accommodations, and they then received follow-up questions based on their responses. For each type of location that they had visited in the past year, respondents were asked whether they thought that staff or employees at the location knew or thought they were transgender. They were also asked whether they had been denied equal treatment, verbally harassed, or physically attacked at the selected type of location because they were transgender.

Nearly all respondents in the sample (96%) had visited or used services in at least one of the places of public accommodation outlined in this chapter in the past year. Of those who had visited or used services, 50% reported that they thought the staff or employees knew or thought they were transgender at one or more of the locations. Nearly one-third (31%) of those who said that staff or employees knew or thought they were transgender experienced negative treatment in at least one of the locations, including being denied equal treatment or service, verbally harassed, or physically attacked (Table 16.1).

**Table 16.1: Overall experiences in any place of public accommodation in the past year because of being transgender**

| Experience at a place of public accommodation | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 14% |
| Verbally harassed | 24% |
| Physically attacked | 2% |
| **One or more experiences listed** | **31%** |

Respondents' experiences in each type of public accommodation visited or used in the past year are described in detail throughout the chapter (Table 16.2). Those who had not visited a specific type of public accommodation were asked whether they did not visit or use services at that place because they were afraid of being mistreated as a transgender person. Overall, one in five (20%) reported that they did not visit or use services at one or more of these locations because they thought they would be mistreated as a transgender person.

**Table 16.2: Negative experiences in places of public accommodation in the past year because of being transgender**

| Location visited | % of those who believe staff knew or thought they were transgender |
|---|---|
| Public transportation | 34% |
| Retail store, restaurant, hotel, or theater | 31% |
| Drug or alcohol treatment program | 22% |
| Domestic violence shelter or program or rape crisis center | 22% |
| Gym or health club | 18% |
| Public assistance or government benefit office | 17% |
| DMV (Department of Motor Vehicles) | 14% |
| Nursing home or extended care facility | 14% |
| Court or courthouse | 13% |
| Social Security office | 11% |
| Legal services from an attorney, clinic, or legal professional | 6% |

# II. Public Transportation

Two-thirds (66%) of the sample used public transportation services in the past year, such as a bus, train, subway, or taxi. Two percent (2%) of respondents did not use public transportation in the past year for fear of mistreatment as a transgender person. Twenty-four percent (24%) of those who used public transportation believed that the employees knew or thought they were transgender. Of those, 34% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender while using public transportation (Table 16.3).

**Table 16.3: Experiences on public transportation in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 4% |
| Verbally harassed | 32% |
| Physically attacked | 3% |
| **One or more experiences listed** | **34%** |

Non-binary people (39%) were more likely to have experienced negative treatment than transgender men and women (32%) when using public transportation (Figure 16.1). These experiences also varied by race and ethnicity, with American Indian (48%), multiracial (45%), and Asian (39%) respondents being more likely to have a negative experience (Figure 16.2). Those who were currently working in the underground economy (such as sex work, drug sales, or other work that is currently criminalized) (49%) and those who were living in poverty (39%) were also more likely to report such an experience.

**Figure 16.1: Negative experiences on public transportation in the past year**
GENDER IDENTITY (%)

**Figure 16.2: Negative experience on public transportation in the past year**
RACE/ETHNICITY (%)

*Sample size too low to report

*Nearly one-third (31%) of respondents who visited a store, restaurant, hotel, or theater where the staff knew or thought they were transgender were mistreated because of their gender identity or expression.*

# III. Retail Store, Restaurant, Hotel, or Theater

Ninety-one percent (91%) of respondents visited or used services in a retail store, restaurant, hotel, or theater in the past year. One percent (1%) of respondents reported not visiting a retail store, restaurant, hotel, or theater in the past year because they were afraid of mistreatment as a transgender person. Approximately one-third (34%) of those who visited or used services at these locations believed that the staff or employees knew or thought they were transgender. Of those, 31% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.4).

**Table 16.4: Experiences in a retail store, restaurant, hotel, or theater in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 24% |
| Physically attacked | 1% |
| **One or more experiences listed** | **31%** |

American Indian (49%), multiracial (41%), Black (36%), and Asian (36%) respondents were more likely to have a negative experience (Figure 16.3). Those who were currently working in the underground economy (52%), those who were living in poverty level (37%), and people with disabilities[5] (39%) were also more likely to have such experiences in these locations.



Figure 16.3: Experiences in a retail store, restaurant, hotel, or theater in the past year because of being transgender
RACE/ETHNICITY (%)

## IV. Drug or Alcohol Treatment Program

Two percent (2%) of the sample visited or used services at a drug or alcohol treatment program in the past year. One percent (1%) of respondents did not go to a treatment center in the past year because of fear of mistreatment as a transgender person. Of those who visited or used services at a treatment program, 58% believed that the staff or employees knew or thought they were transgender. Of those, 22% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.5).

Table 16.5: Experiences in a drug or alcohol treatment program in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 13% |
| Physically attacked | 1% |
| **One or more experiences listed** | **22%** |

# In Our Own Voices

"When I attempted to change my gender marker on my state ID, I was denied three times. All three times I was harassed. In one incident, the manager of the DMV location made fun of me and started laughing and talked so loud that other patrons at the DMV also began to laugh."

......................................................

"A year ago I had my Social Security updated to reflect my new name and gender. I was treated with respect at all times. The woman working in the Social Security office wrote 'congratulations' and drew a heart on my copy of the documentation."

......................................................

"A TSA officer referred to me as 'it' when I couldn't walk through their security screen following top surgery. I had to argue with TSA that a male employee needed to do the pat down and I was informed that a woman would be more appropriate. I stood my ground after repeatedly being told that I was not a man."

......................................................

"I was subjected to a longer TSA screening while they searched my bag, pulled out my intimate items, and called over friends to look and laugh. I had to remove my wig to prove I was the same person. I was humiliated."

......................................................

AR_217214

Those who were currently working in the underground economy (34%) and those who were living in poverty (27%) were more likely to report having a negative experience in a drug or alcohol treatment program.

# V. Domestic Violence Shelter, Domestic Violence Program, or Rape Crisis Center

One percent (1%) of the sample visited or used services at a domestic violence (DV) shelter, DV program, or rape crisis center in the past year. Two percent (2%) of respondents did not go to a DV shelter or program or rape crisis center in the past year because they were afraid they would be mistreated as a transgender person. Of those who went to one of these locations, more than half (59%) believed that the staff or employees knew or thought they were transgender. Of those, nearly one-quarter (22%) reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.6).

**Table 16.6: Experiences in a DV shelter, DV program, or rape crisis center in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 16% |
| Verbally harassed | 11% |
| Physically attacked | 2% |
| **One or more experiences listed** | **22%** |

Transgender women (28%) were more likely to report having a negative experience at a DV shelter, DV program, or rape crisis center (Figure 16.4).

*Nearly one in four (22%) respondents who went to a domestic violence shelter or program or rape crisis center where staff knew or thought they were transgender experienced mistreatment of some kind.*

**Figure 16.4: Negative experiences in domestic violence shelter in the past year**
**GENDER IDENTITY (%)**



*Sample size too low to report

# VI. Gym or Health Club

More than one-third (35%) of the sample had visited or used services at a gym or health club in the past year. Fourteen percent (14%) of respondents did not go to a gym or health club in the past year because they were afraid of mistreatment as a transgender person. Of those respondents who had visited a gym or health club, 28% believed that the staff or employees knew or thought they were transgender. Of those, 18% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.7).

AR_217215

Table 16.7: Experiences in a gym or health club in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 7% |
| Verbally harassed | 13% |
| Physically attacked | 1% |
| **One or more experiences listed** | **18%** |

Respondents who were currently working in the underground economy were nearly twice as likely to report having a negative experience in a gym or health club (35%).

# VII. Public Assistance or Government Benefits Office

Twelve percent (12%) of the sample had visited or used services at a public assistance or government benefits office in the past year, such as for receiving Supplemental Nutrition Assistance Program (SNAP or food stamps) or Women, Infants, and Children (WIC) benefits. Two percent (2%) of respondents did not go to such an agency in the past year because they feared mistreatment as a transgender person. Over one-third (36%) of those who visited or used services at these locations believed that the staff or employees knew or thought they were transgender. Of those, 17% reported being denied equal treatment or service or being verbally harassed because of being transgender (Table 16.8).

Table 16.8: Experiences in a public assistance or government benefits office in the past year because or being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 9% |
| **One or more experiences listed** | **17%** |

American Indian (25%), multiracial (22%), Black (20%), and Latino/a (20%) respondents reported higher rates of mistreatment, in contrast to 15% of white respondents (Figure 16.5). People with disabilities (21%) and those who were currently working in the underground economy (24%) were also more likely to report having a negative experience in a public assistance or government benefits office.

Figure 16.5: Negative experiences in a public assistance or government benefits office in the past year
RACE/ETHNICITY (%)



*Sample size too low to report

AR_217216

# VIII. DMV

Nearly half (44%) of the sample visited or used services at a DMV (Department of Motor Vehicles) in the past year. Three percent (3%) of respondents did not go to a DMV in the past year because of fear of mistreatment as a transgender person. More than one-third (36%) of those who visited this location believed that the staff or employees knew or thought they were transgender. Of those, 14% reported being denied equal treatment or service or being verbally harassed because of being transgender (Table 16.9).

Table 16.9: Experiences in a DMV in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 9% |
| Verbally harassed | 7% |
| **One or more experiences listed** | **14%** |

# IX. Nursing Home or Extended Care Facility

Four percent (4%) of the sample visited or used services at a nursing home or extended care facility in the past year. One percent (1%) of respondents did not go to a nursing home or extended care facility in the past year because they were afraid of mistreatment as a transgender person. Twenty-two percent (22%) of those who visited or used services in this location believed that the staff or employees knew or thought they were transgender. Of those, 14% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.10).

*Nearly one in five (18%) respondents who went to a gym or health club where staff knew or thought they were transgender experienced mistreatment of some kind.*

Table 16.10: Experiences in a nursing home or extended care facility in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 6% |
| Verbally harassed | 11% |
| Physically attacked | 1% |
| **One or more experiences listed** | **14%** |

# X. Court or Courthouse

Approximately one in four (22%) respondents in the sample visited or used services at a court or courthouse in the past year. Two percent (2%) of respondents did not go to a court or courthouse in the past year because they were afraid of mistreatment as a transgender person. One-half (50%) of those who visited or used services there believed that court staff or employees knew or thought they were transgender. Of those, 13% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.11).

PLACES OF PUBLIC ACCOMMODATION AND AIRPORT SECURITY

219

AR_217217

**Table 16.11: Experiences in court or a courthouse in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 8% |
| Verbally harassed | 8% |
| Physically attacked | <1% |
| One or more experiences listed | 13% |

Those who were currently working in the underground economy (37%) were substantially more likely to report having a negative experience in court or a courthouse, and the rate was also higher among people with disabilities (19%).

# XI. Social Security Office

Nearly one in four respondents (19%) visited or used services at a Social Security office in the past year, such as for updating the name or gender on their records, receiving or changing a Social Security card, or accessing public benefits. Four percent (4%) of respondents did not go to a Social Security office in the past year for fear of mistreatment as a transgender person. Fifty-seven percent (57%) of those who went to a Social Security office believed that the staff or employees knew or thought they were transgender. Of those, 11% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.12).

**Table 16.12: Experiences in a Social Security office in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 8% |
| Verbally harassed | 5% |
| Physically attacked | <1% |
| One or more experiences listed | 11% |

Asian (15%), Black (15%), and Latino/a (14%) respondents were more likely to report having a negative experience in a Social Security office (Figure 16.6). Respondents who were currently working in the underground economy (36%) and people with disabilities (16%) were also more likely to have such an experience.

**Figure 16.6: Negative experience in a Social Security office in the past year**
RACE/ETHNICITY (%)



*Sample size too low to report

AR_217218

# XII. Legal Services from an Attorney, Clinic, or Legal Professional

Twelve percent (12%) of the sample visited or used legal services from an attorney, clinic, or legal professional in the past year. Two percent (2%) of respondents did not visit or use such services in the past year due to fear of mistreatment as a transgender person. Fifty-seven percent (57%) of those who sought services from an attorney, legal clinic, or legal professional believed that the staff or employees knew or thought they were transgender. Of those respondents, 6% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.13).

Table 16.13: Experiences with legal services from an attorney, clinic, or legal professional in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 4% |
| Verbally harassed | 3% |
| **One or more experiences listed** | **6%** |

Non-binary respondents (12%) were more than twice as likely to report having a negative experience when seeking legal services, in contrast to transgender men and women (5%) (Figure 16.7). Those who were currently working in the underground economy (23%) were almost four times as likely to report a negative experience as the overall sample.



Figure 16.7: Negative experiences with legal services from an attorney, clinic, or legal professional in the past year
GENDER IDENTITY (%)

*Sample size too low to report

# XIV. Experiences with Airport Security

In addition to the questions regarding mistreatment in and avoidance of public accommodations, respondents were asked about their experiences traveling through airport security in the United States in the past year. More than half (53%) of respondents reported having gone through airport security during that time period. These respondents were asked about specific experiences and interactions with Transportation Security Administration (TSA) officers during the security screening process.

*Forty-three percent (43%) of those who went through airport security in the past year experienced at least one problem related to their gender identity or expression.*

PLACES OF PUBLIC ACCOMMODATION AND AIRPORT SECURITY

221

AR_217219

Forty-three percent (43%) of those who went through airport security in the past year experienced at least one issue related to their gender identity or expression, such as TSA officers using the wrong pronoun or title to refer to them, searching their bodies or belongings because of a gender-related item, or detaining them (Table 16.14).

**Table 16.14: Issues when going through airport security in the past year**

| Airport security issue | % of those who had gone through airport security |
|---|---|
| TSA officers used the wrong pronouns (such as he, she, or they) or title (such as Mr. or Ms.) | 29% |
| They were patted down due to gender-related clothing/items (such as a binder or packer) | 17% |
| They were patted down by TSA officers of the wrong gender | 14% |
| TSA officers questioned the name or gender on ID | 11% |
| TSA officers loudly announced or questioned their gender, body parts, or sensitive items (e.g., binder, packer) | 6% |
| Their bag was searched due to a gender-related item (such as a binder or packer) | 5% |
| They were asked to remove or lift clothing to show binder, undergarment, or other sensitive area | 4% |
| They were taken to a separate room for questioning or examination | 4% |
| They were verbally harassed by TSA officers | 2% |
| They experienced unwanted sexual contact (beyond typical pat down by TSA officers) | 1% |
| They were detained for over an hour | 1% |
| They missed their flight due to screening | 1% |
| TSA officers called the police about them | <1% |
| They were physically attacked attacked by TSA officers | <1% |
| They were not allowed to fly | <1% |
| **One or more experiences listed** | **43%** |

More than half (56%) of Middle Eastern and 50% of multiracial respondents who went through airport security in the past year reported one or more of

these experiences (Figure 16.8). Respondents who said that others can always or usually (61%) or sometimes (53%) tell that they are transgender were more likely to report one or more of these experiences, in comparison to those who said that others can rarely or never tell that they are transgender without being told (35%). Experiences also differed by gender, with transgender men (52%) being more likely to report one or more of these experiences than transgender women (31%). Respondents who said that none of their IDs reflect the name and/or gender they prefer (51%) were also more likely to report negative experiences in airport security related to their gender identity.

**Figure 16.8: Negative experience in airport security in the past year**
RACE/ETHNICITY (%)



## Conclusion

Responses indicated that many respondents faced mistreatment in places of public accommodation, including being denied equal treatment or service, verbally harassed, and/or physically attacked in one or more of the locations. People of color and respondents currently working in the underground economy were more likely to report mistreatment. A substantial number of respondents also did

AR_217220

not visit or use services in places of public accommodation altogether because of fear of being mistreated as a transgender person. Additionally, findings demonstrated that many transgender people experienced mistreatment related to their gender identity when passing through airport security and, as a result, were at risk of potential harm while traveling through airports.

**ENDNOTES** | CHAPTER 16: PLACES OF PUBLIC ACCOMMODATION AND AIRPORT SECURITY

1   The legal definitions of public accommodations vary according to local, state, and federal laws, but frequently include places open to the public, such as restaurants, stores, hotels, places of public transportation, and government agencies.

2   See e.g., Equal Rights Center. (2016). *Room for Change*. DC: Equal Rights Center. Available at: http://www.equalrightscenter.org/site/DocServer/Contents.pdf?docID=2681.

3   See e.g., Charles, C. (2015, October 1). Dear TSA, my body is not an anomaly. *The Advocate*. Available at: http://www.advocate.com/commentary/2015/10/01/dear-tsa-my-body-not-anomaly; Ennis, D. (2015, October 21). Traveling while trans: Women share their stories. *The Advocate*. Available at: http://www.advocate.com/transgender/2015/10/21/traveling-while-trans-women-share-their-stories; Rogers, K. (2015, September 22). T.S.A. defends treatment of transgender air traveler. *New York Times*. Available at: http://www.nytimes.com/2015/09/23/us/shadi-petosky-tsa-transgender.html.

4   TSA body scanners examine each passenger's body based on the gender the officer perceives the passenger to be. As a result, transgender people's body parts, or items such as chest binders (compression garments) and prosthetics (such as packers and breast forms), may get flagged. This often causes transgender passengers to be outed or to face additional searches and scrutiny. See note 3.

5   "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

AR_217221



# CHAPTER 17

# Experiences in Restrooms

Safe access to public restrooms is a basic necessity and essential for most people's participation in civic life, the workplace, and school.[1] Many transgender people, however, face harassment and violence when seeking to use public restrooms, or they are excluded from restrooms by policies or staff.[2] Lack of safe restroom access has been linked to medical problems such as kidney infections, urinary tract infections, and stress-related conditions.[3] Transgender people who are denied equal access to restrooms consistent with their gender identity are vulnerable to harassment, violence, and poor mental health, including higher levels of suicidal thoughts and behaviors.[4]

This chapter explores respondents' experiences in restrooms in public places, at work, and at school, including experiences with denial of access, harassment, and violence, as well as avoidance of public restrooms. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

It is important to note that the survey was conducted between August and September 2015, more than six months before the state of North Carolina passed a law in March 2016 restricting transgender people's restroom access, and before similar legislation was introduced in at least 23 other states in 2016.[5] This legislation prompted substantial media coverage and public scrutiny of transgender people's restroom access. Widespread anecdotal evidence suggests that this climate had an adverse effect on the experiences of transgender people in restrooms and their perceptions of safety when accessing and using public restrooms. As a result, data collected after March 2016 would likely differ from USTS survey results, with potentially higher numbers of respondents reporting negative experiences in public restrooms.

KEY FINDINGS

▶ Nearly one-quarter (24%) of respondents said that someone had questioned or challenged their presence in a restroom in the past year.

▶ Nearly one in ten (9%) respondents reported that someone denied them access to a restroom in the past year.

▶ One in eight (12%) respondents were verbally harassed, physically attacked, or sexually assaulted when accessing or using a restroom in the past year.

▶ More than half (59%) avoided using a public restroom in the past year because they were afraid of having problems.

▶ Nearly one-third (32%) limited the amount they ate or drank to avoid using the restroom in the past year.

▶ Eight percent (8%) reported having a urinary tract infection, kidney infection, or another kidney-related problem in the past year as a result of avoiding restrooms.

# I. Access to Restrooms

Nearly one-quarter (24%) of respondents said that someone told them or asked them if they were using the wrong restroom in the past year, and nearly one in ten (9%) said that someone stopped them from entering or denied them access to a restroom in the past year. American Indian (18%), Asian (13%), and Middle Eastern (12%) respondents were more likely to report that someone stopped them from entering or denied them access to a restroom in the past year (Figure 17.1). Undocumented residents (23%) and respondents currently working in the underground economy, such as sex work, drug sales, and other work that is currently criminalized (20%), were more than twice as likely to be denied access to restrooms than those in the overall sample.



**Figure 17.1: Denied access to a restroom in the past year**
RACE/ETHNICITY (%)

EXPERIENCES IN RESTROOMS

225

AR_217223

*Nearly one in ten (9%) respondents said that someone stopped them from entering or denied them access to a restroom in the past year.*

# II. Verbal Harassment, Physical Attack, and Sexual Assault

Twelve percent (12%) of respondents reported being verbally harassed, physically attacked, and/or sexual assaulted[6] when accessing or while using a restroom in the past year. These experiences were more frequently reported by undocumented residents (34%), respondents currently working in the underground economy (25%), and American Indian (24%) and multiracial (16%) respondents (Figure 17.2).



Figure 17.2: Verbal harassment, physical attack, and/or sexual assault in a restroom in the past year
RACE/ETHNICITY (%)

## a. Verbal Harassment

One out of eight (12%) respondents were verbally harassed in a restroom in the past year.

Respondents who were verbally harassed in restrooms were asked for the places where the harassment had occurred. Eighty-nine percent (89%) were verbally harassed in a restroom at a public place, such as a restaurant, shopping mall, or movie theater, and 20% were verbally harassed in a school restroom (Table 17.1).

Table 17.1: Location of verbal harassment in restroom in past year

| Restroom location | % of respondents who were verbally harassed |
| --- | --- |
| Public place (such as a restaurant, shopping mall, or movie theater) | 89% |
| School | 20% |
| Workplace | 14% |
| Another location | 5% |

## b. Physical Attack

One percent (1%) of the sample (228 respondents, unweighted) was physically attacked in a restroom in the past year. Undocumented residents (4%) and American Indian respondents (3%) were more likely to be physically attacked in a restroom.

Respondents who were physically attacked were asked where they had experienced the physical attack. Eighty-six percent (86%) were physically attacked in a restroom at a public place, such as a restaurant, shopping mall, or movie theater, and over one-quarter (27%) said they were physically attacked in a restroom at school (Table 17.2).

Table 17.2: Location of physical attack in restroom in past year

| Restroom location | % of respondents who were physically attacked |
| --- | --- |
| Public place (such as a restaurant, shopping mall, or movie theater) | 86% |
| School | 27% |
| Workplace | 14% |
| Another location | 9% |

AR_217224

## c. Sexual Assault

Approximately one percent (0.6%) of the sample (139 respondents, unweighted) reported being sexually assaulted in a restroom in the past year. Those currently working in the underground economy were more likely to have had this experience (4%). Additionally, transgender women of color, including Asian (3.2%), Middle Eastern (3.2%), American Indian (2.8%), and multiracial (2.4%) women were more likely to have been sexually assaulted in a restroom in the past year (Figure 17.3).

**Figure 17.3: Sexual assault in a restroom in the past year among transgender women**
RACE/ETHNICITY (%)



More than three-quarters (78%) of respondents who were sexually assaulted reported that the sexual assault occurred in a restroom at a public place, and 19% were sexually assaulted at a school restroom (Table 17.3).

**Table 17.3: Location of sexual assault in restroom in past year**

| Restroom location | % of respondents who were sexually assaulted |
|---|---|
| Public place (such as a restaurant, shopping mall, or movie theater) | 78% |
| School | 19% |
| Workplace | 14% |
| Another location | 18% |

# III. Overall Access to and Treatment in Restrooms

Overall, in the year prior to taking the survey, 26% of all respondents were denied access to restrooms, had their presence in a restroom questioned, and/or were verbally harassed, physically attacked, or sexually assaulted in a restroom. This was nearly twice as high for undocumented residents (50%) and was also higher for respondents currently working in the underground economy (39%). It was also higher among American Indian (36%) and multiracial (32%) respondents (Figure 17.4). Respondents who said that others could always or usually tell they were transgender without being told (45%) or sometimes tell they were transgender (38%) were more likely to report one or more of these experiences, in contrast to those who said that others could rarely or never tell that they were transgender (16%).

**Figure 17.4: Any reported problem in a restroom in the past year**
RACE/ETHNICITY (%)



AR_217225

# IV. Avoidance of Public Restrooms

Even prior to the increased public scrutiny and conversations in North Carolina and across the country about anti-transgender bathroom legislation in 2016, 59% of respondents reported that in the past year they had either sometimes (48%) or always (11%) avoided using a restroom, such as in public, at work, or at school, because they were afraid of confrontations or other problems.

Transgender men (75%) were far more likely to report sometimes or always avoiding using a public restroom, in contrast to transgender women (53%) and non-binary respondents (53%) (Figure 17.5). Undocumented residents were also more likely to report sometimes or always avoiding using a public restroom in the past year (72%). Eighty percent (80%) of respondents who said that others could always or usually tell that they were transgender and 72% of those who said that others can sometimes tell they are transgender reported avoiding using public restroom, in contrast to 48% of those who said that others can rarely or never tell that they are transgender.

**Figure 17.5: Sometimes or always avoided bathrooms in the past year**
**GENDER IDENTITY (%)**



# In Our Own Voices

"I either have to 'hold it' or break down and use a male restroom in a public place. I'm not allowed to use the female restroom and have been confronted multiple times when attempting to."

......................................................

"I went into the men's bathroom, being a man and all. I was using a stall, and I came out only to find one person who apparently thought it was okay to go after me. I was just washing my hands when he first punched me in the back and then went for my vagina. I nearly passed out due to the blow."

......................................................

"I walked into a stall to do my business like I had done so many times before. This time, though, someone recognized me. He and his buddies circled around me as I tried to exit the restroom and pushed me around between them. A police officer walked into the restroom and tried to protest their harassment. The men responded by ripping my pants down. The officer shot me a disgusted look and left the room."

......................................................

"I spent high school having to use the nurse's bathroom, because if I used the boys' bathroom, I would get reprimanded, and the same would happen if I went into the girls' bathroom since I was living as a boy. Going to the nurse's office always felt like a walk of shame, like there was no dignified place for me simply because I'm transgender."

......................................................

AR_217226

*Nearly one-third (32%) of the sample avoided drinking or eating so that they would not need to use the restroom, and 8% reported having a urinary tract infection or kidney-related medical problem as a result of avoiding restrooms in the past year.*

Respondents were also asked if they had experienced any physical problems as a result of avoiding restrooms in public places, at work, or at school. Nearly one-third (32%) of the sample avoided drinking or eating so that they would not need to use the restroom, and 8% reported having a urinary tract infection or kidney-related medical problem as a result of avoiding restrooms in the past year (Table 17.4).

**Table 17.4: Physical problems due to avoiding public restrooms in the past year**

| Physical problem | % of respondents who avoided using restrooms | % of all respondents |
|---|---|---|
| Did not use the restroom when needed to ("held it") | 89% | 55% |
| Avoided drinking or eating | 52% | 32% |
| Urinary tract infection | 12% | 8% |
| Kidney infection | 2% | 1% |
| Other kidney-related problems | 2% | 1% |
| Kidney-related problem and/or a urinary tract infection | 13% | 8% |
| A problem not listed | 2% | 1% |

## Conclusion

Responses suggest that using restrooms in public places, at work, or at school presents serious challenges for transgender people. Respondents faced numerous barriers and problems when attempting to use a public restroom, including being verbally harassed, physically attacked, sexually assaulted, or denied access to the restroom altogether. In many instances, these experiences were more frequently reported by people of color. A majority of people had avoided using public restrooms in the past year due to fear of encountering confrontations and other problems, which led to a range of health issues, including urinary tract infections and kidney-related problems.

EXPERIENCES IN RESTROOMS

229

AR_217227

**ENDNOTES** | CHAPTER 17: EXPERIENCES IN RESTROOMS

1   Department of Labor & Occupational Safety and Health Administration. (2015). *Best Practices: A Guide to Restroom Access for Transgender Workers.* Available at: https://www.osha.gov/Publications/OSHA3795.pdf.

2   Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management & Social Policy, 19*(1), 65–85.

3   Herman, J. L. See note 2.

4   Seelman, K. L. (2016). Transgender adults' access to college bathrooms and housing and the relationship to suicidality. *Journal of Homosexuality, 63*(10), 1378–1399.

5   Movement Advancement Project, Equality Federation Institute, Freedom for All Americans, & National Center for Transgender Equality. (2016). *The Facts: Bathroom Safety, Nondiscrimination Laws, and Bathroom Ban Laws.* Available at: http://www.lgbtmap.org/file/bathroom-ban-laws.pdf.

6   Respondents were asked if they had experienced "unwanted sexual contact" when accessing or while using a bathroom in Q. 20.3 and Q. 20.6.

7   Movement Advancement Project et al. See note 5.

AR_217228

# CHAPTER 18

# Civic Participation and Policy Priorities

Voting and other forms of participation in the political process are important methods by which people involve themselves in their communities and can have a voice in governance at the local, state, and federal levels. They are also significant avenues by which individuals and groups can affect change and influence the policies and procedures that impact their lives.

Respondents received questions about voting in the previous national election (November 2014)[1] to assess levels of voting and determine reasons for not participating, including potential barriers to voting such as voter identification laws. Relevant questions were patterned on the November 2014 Voting and Registration Supplement of the Current Population Survey (CPS). Additionally, respondents were asked questions about their political engagement, political party affiliation, and policy priorities as they relate to issues that impact transgender people, some of which were patterned on the Gallup U.S. Daily Tracking Poll. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217229

**KEY FINDINGS**

▶ More than three-quarters (76%) of U.S. citizens of voting age in the sample reported that they were registered to vote in the November 2014 midterm election, compared to 65% of individuals in the U.S. population who reported that they were registered.

..................................................................................................................

▶ More than half (54%) of U.S. citizens of voting age in the sample reported that they had voted in the election, compared to 42% of those who reported they had voted in the U.S. population.

..................................................................................................................

▶ Over one-quarter (27%) of those who said they had not been registered to vote said that the main reason was that they were not interested in the election or not involved in politics.

..................................................................................................................

▶ Three percent (3%) of those who said they were *not registered to vote* reported that the main reason was that they wanted to avoid harassment by election officials because they were transgender.

..................................................................................................................

▶ Nineteen percent (19%) of those who reported they were registered but did not vote said that they thought their vote would not make a difference or they were not interested in the election, compared to 16% of those in the U.S. population.

..................................................................................................................

▶ Three percent (3%) of those who reported *being registered to vote but not voting* said that the main reason was that they wanted to avoid harassment by election officials because they were transgender.

..................................................................................................................

▶ When asked about what they believed the most important policy priorities were for transgender people, respondents most often identified addressing violence against transgender people (25%), health insurance coverage (15%), and racism (11%) as their top priorities.

# I. Voter Registration and Voting

## a. Voter Registration

Survey respondents were asked about voting in relation to the November 4, 2014 midterm election, which was the national election held in closest proximity to the survey. More than three-quarters (76%) of U.S. citizens in the survey sample who were of voting age at the time of the election[2] reported that they were registered to vote, compared to 65% of those individuals in the U.S. population.[3] The number of reported registered voters differed by race or ethnicity, with Middle Eastern (71%), Latino/a (70%), and Asian (65%) respondents being less likely to be registered than American Indian (77%), white (78%), and Black (79%) respondents (Figure 18.1).

AR_217230

**Figure 18.1: Registered to vote**
RACE/ETHNICITY (%)



Naturalized citizens (69%) were less likely to report being registered than citizens who were born in the United States (76%). There were also differences in voting registration based on respondents' sources of income, with only 48% of those whose sole source of income was from the underground economy—including sex work, drug sales, and other work that is currently criminalized—reporting being registered. Respondents whose only source of income was from unemployment benefits or other cash assistance programs such as TANF[4] (65%) were also less likely to be registered (Figure 18.2).

**Figure 18.2: Registered to vote**
SOURCES OF INCOME (%)



## b. Reasons for Not Registering to Vote

Respondents who said they were not registered to vote in the November 4, 2014 election were asked to identify the main reason why they were not registered based on categories outlined in the Current Population Survey (CPS) and additional experiences they might have had as a transgender person. More than one-quarter (27%) of those in the sample who reported that they were not registered to vote said that they were not interested in the election or not involved in politics, which was the most frequently selected reason for not being registered. Sixteen percent (16%) did not know where or how to register, and 15% indicated that they did not meet registration deadlines. One in eight (12%) felt that their vote would not make a difference and therefore did not register (Table 18.1).[5]

Additionally, respondents reported not being registered to vote because they wanted to avoid anti-transgender harassment by election officials (3%), because they did not have their current name updated on their Social Security card (2%), and because they thought their state's voter identification law would stop them from voting (1%). Avoiding anti-transgender harassment by election officials was a more common reason for transgender men and women (5%) than for crossdressers (2%) and non-binary respondents

*Three percent (3%) of respondents who were citizens and of voting age at the time of the 2014 midterm election were not registered to vote because they wanted to avoid anti-transgender harassment by election officials.*

CIVIC PARTICIPATION AND POLICY PRIORITIES

233

AR_217231

(1%) (Figure 18.3). Those who reported that people could always or usually tell they were transgender even without being told were more than twice as likely to report this reason (8%), in contrast to those who said people could rarely or never tell they were transgender without being told (3%). Black respondents (7%) were also more likely to report that they did not register to vote in order to avoid harassment by election officials (Figure 18.4).

**Table 18.1: Main reason for not being registered to vote on November 4, 2014**

| Reasons for not being registered to vote | % of USTS citizens not registered to vote |
|---|---|
| They were not interested in the election or not involved in politics | 27% |
| They did not know where or how to register | 16% |
| They did not meet registration deadlines | 15% |
| They felt their vote would not make a difference | 12% |
| They did not live in place long enough or meet residency requirements | 5% |
| They were not eligible to vote (due to criminal/felony conviction or other reason) | 3% |
| Permanent illness or disability | 2% |
| Difficulty with English | <1% |
| Other reasons (including): | 19% |
| They wanted to avoid harassment by election officials because they were transgender | 3% |
| They did not have an identity document (ID) and thought they needed one to register | 2% |
| Their current name did not match the name on their Social Security card | 2% |
| They thought their state's voter ID law would stop them from voting | 1% |
| Protest or philosophical reasons (write-in response) | 1% |



**Figure 18.3: Not registered due to avoiding anti-transgender harassment**
GENDER IDENTITY (%)

**Figure 18.4: Not registered due to avoiding anti-transgender harassment**
RACE/ETHNICITY (%)



## c. Voting in the 2014 Election

More than half (54%) of U.S. citizens in the sample who were of voting age at the time of the election reported that they voted in the election, compared to 42% of those in the U.S. population.[6] Among people of color, Asian respondents (44%) were least likely to report having voted, and Latino/a (48%) and Black (50%) respondents were also less likely to report voting (Figure 18.5).

*More than half (54%) of respondents who were citizens and of voting age at the time of the 2014 midterm election reported that they voted in the election, compared to 42% in the U.S. population.*

AR_217232



**Figure 18.5: Voted in election**
RACE/ETHNICITY (%)

Overall 54%, American Indian 56%, Asian 44%, Black 50%, Latino/a 48%, Middle Eastern 53%, Multiracial 53%, White 56%

## In Our Own Voices

"Lawmakers pushed through voter ID reforms in my state, requiring every voter to present a photo ID with a gender marker. Since I was unable to do so, I was a victim of 'de facto' disenfranchisement and voter intimidation tactics that are now, unfortunately, all too common."

"When changing my name on my voter registration, the DMV put in the wrong name. I don't know how to fix it and I'm scared that if I try to vote (something I really want to do!) I won't be able to because the voter registration has the wrong name."

"I had to try twice to get my county to change my name in the voter registration, which is extremely embarrassing as people are essentially shouting that you're trans in a public place. Some accused me of attempting voter fraud when all I wanted to do was try to make sure I had the best candidates who would protect my rights."

Respondents who were living in poverty[7] (41%) were also less likely to say they had voted, as were those who were currently working in the underground economy (40%), unemployed (42%), or out of the labor force (50%).

### d. Reasons for Not Voting

Respondents who reported being registered but did not vote in the November 4, 2014 election were asked to identify the main reason why they did not vote, based on categories outlined in the CPS and additional experiences they might have had as a transgender person. Nearly one in five (19%) respondents who reported they were registered but did not vote reported that they were not interested or felt their vote would not make a difference, compared to 16% of such voters in the U.S. population.[8] Respondents were also more than twice as likely to report not voting due to registration problems, such as not receiving an absentee ballot or not being registered in the current location (5%), than registered voters in the U.S. general population (2%) (Table 18.2).

Among those who provided additional reasons for not voting that were not included in the CPS, 3% of respondents reported that they wanted to avoid harassment by election officials because they were transgender. Transgender men and women

(4%) were more likely to report that they did not vote because they wanted to avoid harassment by an election official than non-binary respondents (<1%) (Figure 18.6). Two percent (2%) of those who did not vote said that the main reason was that

their ID did not match their current name or gender or that their photo did not match their appearance, and 1% said that the main reason was that their current name or gender that did not match their voter registration.

Table 18.2: Main reason for not voting on November 4, 2014

| Reasons included in the Current Population Survey (CPS): | % of USTS respondents who were registered but did not vote | % in U.S. population who were registered but did not vote (CPS) |
|---|---|---|
| They were not interested or felt their vote would not make a difference | 19% | 16% |
| They forgot to vote or send in an absentee ballot | 19% | 8% |
| They were too busy or had a conflicting work or school schedule | 16% | 28% |
| They were out of town or away from home | 12% | 10% |
| They did not like the candidates or campaign issues | 8% | 8% |
| Registration problems (e.g., they did not receive an absentee ballot or they were not registered in their current location) | 5% | 2% |
| Illness or disability (own or family's) | 5% | 11% |
| Inconvenient hours, polling place, or hours or lines too long | 3% | 2% |
| Transportation problems | 3% | 2% |
| Bad weather conditions | <1% | <1% |
| Other reasons | 10% | 9% |
| **Additional reasons not included in the CPS:** | | |
| They wanted to avoid harassment by election officials because they were transgender | 3% | --- |
| Their ID did not match their current name or gender, or they had an old photo | 2% | --- |
| Name or gender on ID did not match voter registration | 1% | --- |
| They did not have the ID they needed to vote | 1% | --- |
| They did not know the process for voting or did not know about the candidates (write-in response) | 1% | --- |
| Protest or philosophical reasons (write-in response) | 1% | --- |
| They were not allowed by a poll worker or election official because they were transgender | <1% | --- |

AR_217234

Figure 18.6: Did not vote due to avoiding anti-transgender harassment
GENDER IDENTITY (%)



have some influence on government decisions than those who believed they could not influence government decisions.

Figure 18.7: Perception of ability to influence government decisions



# II. Political Engagement and Party Affiliation

Respondents received a question about political affairs to examine how much of an influence they believed they could have on government decisions. Specifically, they were asked to rate on five-point scale from "strongly agree" to "strong disagree" what they thought about the following statement: "Someone like me can't really influence government decisions." Nearly half (44%) of respondents disagreed or strongly disagreed with the statement, and approximately one-third (32%) agreed or strongly agreed with the statement (Figure 18.7). This means that there were more respondents who thought that they could

*Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans, compared to 27%, 43%, and 27% in the U.S. general population, respectively.*

Respondents were also asked about their political party affiliation with questions that were patterned on the Gallup U.S. Daily Tracking Poll, including whether they consider themselves a Republican, Democrat, or Independent. Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans, compared to 27%, 43%, and 27% in the U.S general population, respectively (Figure 18.8).[9] Respondents who did not identify as Democrats or Republicans wrote in several political parties and political movements, including socialist or democratic socialist (4%), Green Party (2%), Libertarian (1%), and anarchist (1%). For comparison with the Gallup Daily Tracking Poll, these respondents are included as Independents in Figure 18.8.

Those who identified as Independents were also asked whether they lean more to the Democratic Party or the Republican Party. Overall, 79% in the sample reported that they were Democrats or lean towards the Democratic Party, 4% were Republicans or lean towards the Republican Party,

and 17% were Independents who do not lean towards the Democratic or Republican parties. This compares to 44% in the U.S. population who are Democrats or lean towards the Democratic Party, 45% who are Republicans or lean towards the Republican Party, and 11% who are Independents and do not lean towards either party (Figure 18.9).[10]

When asked about their political views, more than half (55%) of the sample described themselves as "very liberal," 27% selected "liberal," 15% selected "moderate," 2% selected "conservative," and only 1% described themselves as "very conservative."

**Figure 18.8: Consider themselves a Republican, Democrat, or Independent**





**Figure 18.9: Democratic or Republican party affiliation and leaning**





# III. Policy Priorities

The survey explored respondents' opinions on the most important policy priorities for transgender people in the U.S. and asked for those issues to be ranked from "very important" to "not very important." Violence against transgender people was most widely selected as being a very important issue (94%). Insurance coverage for transgender-related health care (90%), police mistreatment of transgender people (88%), and

AR_217236

employment (87%) were also commonly selected as very important priorities (Table 18.3).

**Table 18.3: Respondents' policy priorities**

| Issue | Very important | Important | Not very important |
|---|---|---|---|
| Violence against transgender people | 94% | 5% | 1% |
| Insurance coverage for transgender-related health care | 90% | 9% | 1% |
| Police mistreatment of transgender people | 88% | 11% | 1% |
| Employment | 87% | 13% | 1% |
| Training health care providers about transgender health | 86% | 13% | 1% |
| Housing and homelessness | 85% | 14% | 1% |
| Poverty | 84% | 15% | 1% |
| Bullying and discrimination in schools | 84% | 15% | 1% |
| Racism | 83% | 15% | 3% |
| Mistreatment in prisons or jails | 82% | 16% | 2% |
| Identity documents | 79% | 20% | 1% |
| HIV/AIDS | 68% | 29% | 3% |
| Parenting and adoption rights | 68% | 28% | 4% |
| Conversion therapy | 68% | 22% | 10% |
| Immigration reform | 60% | 30% | 10% |
| Marriage recognition | 55% | 32% | 13% |
| Military (open service for transgender people) | 49% | 33% | 18% |

Respondents were also asked for their top three policy priorities. One-quarter (25%) reported that violence against transgender people was the top policy priority for them, and more than half (54%) reported that it was one of their top three priorities. Fifteen percent (15%) reported that health insurance coverage was the most important priority for them, and 11% reported that racism was the most important policy priority for them (Table 18.4).

**Table 18.4: Top policy priorities**

| Respondents' most important priority | % of respondents |
|---|---|
| Violence against transgender people | 25% |
| Insurance coverage for transgender-related health care | 15% |
| Racism | 11% |
| Employment | 7% |
| Identity documents | 7% |
| Poverty | 6% |
| Bullying and discrimination in schools | 5% |
| Training health care providers about transgender health | 5% |
| Police mistreatment of transgender people | 5% |
| Housing and homelessness | 4% |
| Mistreatment in prisons or jails | 2% |
| HIV/AIDS | 1% |
| Conversion therapy | 1% |
| Military (open service for transgender people) | 1% |
| Immigration reform | 1% |
| Parenting and adoption rights | 1% |
| Marriage recognition | 1% |

# Conclusion

Participation in the political process through activities such as voting is a vital component of influencing policies that impact lives and communities at the local, state, and national levels throughout the U.S. However, the process may be inaccessible at times or may otherwise present a difficult avenue through which policy priorities and day-to-day needs can be expressed. The results indicate that while a majority of eligible respondents had registered to vote in the most recent national election, only half had engaged in the process by voting, providing reasons such as not believing their vote would make a difference or

AR_217237

wanting to avoid potential harassment by election officials as a transgender person. Respondents were substantially more likely to identify with the Democratic Party or lean towards the Democratic Party than other political parties. Policy priorities that respondents identified as most important are those directly related to the safety and wellbeing of transgender people, including violence against transgender people, health insurance and health care, police treatment of transgender people, racism, employment, and housing.

**ENDNOTES** | CHAPTER 18: CIVIC PARTICIPATION AND POLICY PRIORITIES

1    Questions referred to the midterm elections held on Tuesday, November 4, 2014, and respondents received the explanation that "[t]his was the election in November 2014 to elect members of the U.S. Congress and state-level offices." See Q. 29.1 and 29.2.

2    Voter registration and voting results reported in this chapter are based on the responses of U.S. citizens in the sample who were aged 18 or older at the time of the election to provide the most appropriate comparison to Current Population Survey data on registration and voting in the U.S. population.

3    Reported voter registration in the U.S. is among U.S. citizens aged 18 and over. U.S. Census Bureau. (2014, November). *Current Population Survey: Reported Voting and Registration, by Sex and Single Years of Age: November 2014.* Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html.

4    TANF (the Temporary Assistance for Needy Families program) is a federal cash assistance program.

5    Although the Current Population Survey asked about the main reason for not registering to vote on November 4, 2014, U.S. population data for that question was not available at the time of this report.

6    The number of USTS respondents who voted represents 70% of those in the sample who were registered to vote in the election. According to the CPS, 42% of citizen voters aged 18 and older voted in the 2014 election, which represents 65% of registered voters. U.S. Census Bureau. (2014, November). *Current Population Survey. Reported*

*Voting and Registration, by Sex and Single Years of Age: November 2014.* Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html. See also File, T. (2015). *Who Votes? Congressional Elections and the American Electorate: 1978-2014.* (p. 2). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2015/demo/p20-577.pdf.

7    Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

8    U.S. Census Bureau. (2014, November). *Current Population Survey. Voting and Registration in the Election of November 2014.* Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html.

9    This data is based on Gallup Poll results from September 9–13, 2015, the poll in closest proximity to when the survey was in the field. Gallup Poll. (2015, September 9–13). *Party Affiliation.* Available at: http://www.gallup.com/poll/15370/party-affiliation.aspx.

10    Gallup Poll. (2015, September 9–13). *Party Affiliation.* Available at: http://www.gallup.com/poll/15370/party-affiliation.aspx.

AR_217238

# About the Authors

### Sandy E. James

As Survey Project Manager at the National Center for Transgender Equality, Sandy led the research team in developing, fielding, analyzing, and presenting the 2015 U.S. Transgender Survey. After a decade-long career as a forensic toxicologist, Sandy launched a new career as a civil rights advocate focused on law, research, and policy to advance transgender rights. He has worked on numerous projects involving trans-related legislation, policy, and research, including extensive work with data from the 2008–09 National Transgender Discrimination Survey. Sandy has been published in *The Georgetown Journal of Gender and the Law* and the *LGBTQ Policy Journal at the Harvard Kennedy School.* Sandy received a J.D and M.A in American Government from Georgetown University, where he is also currently pursuing his Ph.D.

### Jody L. Herman

Jody L. Herman is a Scholar of Public Policy at the Williams Institute at the UCLA School of Law. She holds a Ph.D. in Public Policy and Public Administration in the field of Gender and Social Policy from the George Washington University, where she also earned her M.A. in Public Policy with a concentration in Women's Studies. Her doctoral dissertation focused on the problems transgender and gender non-conforming people face when using public restrooms and the development of anti-discrimination protections in public accommodations based on gender identity and expression. She has worked on issues of poverty, women's rights, voting rights, and anti-discrimination policy development with non-profit research, advocacy, and direct-service organizations in the United States and Mexico. She served as a co-author on the groundbreaking report *Injustice at Every Turn*, based on the National Transgender Discrimination Survey conducted by the National Gay and Lesbian Task Force and the National Center for Transgender Equality. Her research at the Williams Institute focuses on the prevalence and impact of interpersonal and structural discrimination based on gender identity or expression.

### Sue Rankin

Sue Rankin is the principal of Rankin & Associates Consulting. She retired from the Pennsylvania State University in 2013 after 36 years, where she most recently served as an Associate Professor of Education, and Associate in the Center for the Study of Higher Education. Sue earned her B.S. from Montclair State University in 1978, and an M.S. and Ph.D. from the Pennsylvania State University. She has presented and published widely on the impact of sexism, racism, and heterosexism in the academy and in intercollegiate athletics. Her current research focuses on the assessment of institutional climate and providing program planners and policymakers with recommended strategies to improve the campus climate for under-served communities. Her recent publications include *The State of Higher Education for LGBT People* and *The Lives of Transgender People* in 2010 and an *NCAA Student-Athlete Climate Study* in 2011. In addition to serving as a consultant for the National Transgender Discrimination Survey in 2011, she has collaborated with over 170 institutions in implementing assessments and developing strategic plans regarding social justice issues.

ABOUT THE AUTHORS

241

AR_217239

## Mara Keisling

Mara Keisling is the founding Executive Director of the National Center for Transgender Equality, one of the nation's leading social justice organizations winning life-saving change for transgender people. After a 25-year career in survey research, Mara helped found NCTE and quickly became one of the nation's foremost authorities on transgender issues. Mara has led organizational and coalition efforts that have won significant advances in transgender equality throughout the country, especially in federal law and policy. Under her leadership, NCTE has won well over 100 federal policy changes that have improved the lives of transgender people. Mara was a co-author of *Injustice at Every Turn: The Report of the National Transgender Discrimination Survey*. A native of Pennsylvania and a transgender woman, Mara holds a B.A. from Pennsylvania State University and conducted her graduate studies in American Government at Harvard University.

## Lisa Mottet

Lisa Mottet joined the National Center for Transgender Equality as the Deputy Executive Director in 2013, helping to grow NCTE from 5 staff to now 15 staff. She helps guide the organization's local, state, and federal policy advocacy, while also helping to oversee communications and development. In her previous position as Director of the Transgender Civil Rights Project at the National LGBTQ Task Force (formerly the National Gay and Lesbian Task Force), where she served for 12 years, she was a member of the research team for the National Transgender Discrimination Survey, and co-authored the report of its findings, *Injustice at Every Turn* (2011). As a long-time ally to the transgender community, Lisa was a major figure in promoting trans-inclusion in the LGBT movement and, while at the Task Force, she helped engineer the addition of "gender identity" to the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, which became law in 2009, and to the Employment Non-Discrimination Act. Her thoughts and guidance on trans-inclusion were recorded in the 2008 publication, *Opening the Door to Transgender Inclusion: The Nine Keys to Making LGBT Organizations Fully Transgender-Inclusive*. Also while at the Task Force, Lisa co-authored *Transitioning Our Shelters: A Guide to Making Homeless Shelters Safe for Transgender People*. Lisa graduated from the University of Washington in 1998 and received her J.D. from the Georgetown University Law Center in 2001.

## Ma'ayan Anafi

Ma'ayan Anafi is a Policy Counsel at the National Center for Transgender Equality. As part of the NCTE team, Ma'ayan has worked to strengthen and preserve nondiscrimination protections for transgender communities, with a focus on efforts to defeat anti-transgender state legislation and the implementation of federal nondiscrimination laws in health care, employment, education, and housing. Ma'ayan obtained a J.D. from Harvard Law School and a B.A. from the University of Toronto. An Autistic and non-binary transgender person, Ma'ayan is the co-leader of the DC chapter of the Autistic Self-Advocacy Network.

AR_217240



# Appendix A

## Demographic Description and Other Characteristics of the Sample

Throughout the report, findings were presented with the standard or supplemental survey weight applied. These weights adjusted the sample to reflect the U.S. population in regard to age, race, and educational attainment and also adjusted for disproportionate representation of 18-year-olds in the sample. In this appendix, unweighted tabulations of selected demographic and other variables are presented to provide a description of the sample before weights were applied. This includes recoded variables, which are indicated as such. See the *Methodology* chapter and *Appendix C: Detailed Methodology* for a description of the weights used in this report.

APPENDIX A

AR_217241

| Q1.4. What U.S. state or territory do you currently live in? | Unweighted frequency | Unweighted % |
|---|---|---|
| U.S. military base outside of the U.S. | 32 | 0.1% |
| Alabama | 228 | 0.8% |
| Alaska | 84 | 0.3% |
| American Samoa | 2 | 0.0% |
| Arizona | 537 | 1.9% |
| Arkansas | 222 | 0.8% |
| California | 3453 | 12.5% |
| Colorado | 669 | 2.4% |
| Connecticut | 319 | 1.2% |
| Delaware | 84 | 0.3% |
| District of Columbia | 214 | 0.8% |
| Florida | 1099 | 4.0% |
| Georgia | 614 | 2.2% |
| Guam | 2 | 0.0% |
| Hawai'i | 69 | 0.3% |
| Idaho | 155 | 0.6% |
| Illinois | 1082 | 3.9% |
| Indiana | 452 | 1.6% |
| Iowa | 219 | 0.8% |
| Kansas | 197 | 0.7% |
| Kentucky | 274 | 1.0% |
| Louisiana | 274 | 1.0% |
| Maine | 182 | 0.7% |
| Maryland | 662 | 2.4% |
| Massachusetts | 1195 | 4.3% |
| Michigan | 894 | 3.2% |
| Minnesota | 670 | 2.4% |
| Mississippi | 82 | 0.3% |
| Missouri | 509 | 1.8% |
| Montana | 72 | 0.3% |
| Nebraska | 165 | 0.6% |
| Nevada | 206 | 0.7% |
| New Hampshire | 225 | 0.8% |
| New Jersey | 550 | 2.0% |
| New Mexico | 213 | 0.8% |
| New York | 1779 | 6.4% |
| North Carolina | 686 | 2.5% |
| North Dakota | 46 | 0.2% |
| Ohio | 941 | 3.4% |
| Oklahoma | 215 | 0.8% |

| Q1.4. What U.S. state or territory do you currently live in? (continued) | Unweighted frequency | Unweighted % |
|---|---|---|
| Oregon | 1152 | 4.2% |
| Pennsylvania | 1171 | 4.2% |
| Puerto Rico | 27 | 0.1% |
| Rhode Island | 119 | 0.4% |
| South Carolina | 233 | 0.8% |
| South Dakota | 43 | 0.2% |
| Tennessee | 416 | 1.5% |
| Texas | 1490 | 5.4% |
| Utah | 270 | 1.0% |
| Vermont | 163 | 0.6% |
| Virginia | 723 | 2.6% |
| Washington | 1667 | 6.0% |
| West Virginia | 83 | 0.3% |
| Wisconsin | 541 | 2.0% |
| Wyoming | 44 | 0.2% |
| **Total** | **27715** | **100%** |

| Q1.4. U.S. region of current residence (recode based on Census regions) | Unweighted frequency | Unweighted % |
|---|---|---|
| Northeast | 5703 | 21% |
| Midwest | 5759 | 21% |
| South | 7599 | 27% |
| West | 8591 | 31% |
| **Total** | **27652** | **100%** |

| Q1.10. Do you think of yourself as transgender? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 3270 | 12% |
| Yes | 24445 | 88% |
| **Total** | **27715** | **100%** |

| Q1.11. Do you identify as more than one gender or as no gender? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 14362 | 52% |
| Yes | 13353 | 48% |
| **Total** | **27715** | **100%** |

| Q1.12. Do you currently live full-time in a gender that is different from the one assigned to you at birth? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 11135 | 40% |
| Yes | 16580 | 60% |
| **Total** | **27715** | **100%** |

AR_217242

| Q1.14. Someday do you want to live full time in a gender that is different from the one assigned to you at birth?* | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 770 | 7% |
| Yes | 6497 | 58% |
| Not sure | 3862 | 35% |
| **Total** | **11129** | **100%** |

*Asked of those who responded "No" to Q1.12.*

| Q1.16. Have you seriously thought about living in a gender that is different from the one assigned to you at birth (transitioning gender)?* | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 251 | 33% |
| Yes | 519 | 67% |
| **Total** | **770** | **100%** |

*Asked of those who responded "No" to Q1.12 and Q1.14.*

| Q1.17. Do you consider yourself to be a cross-dresser? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25225 | 91% |
| Yes | 2490 | 9% |
| **Total** | **27715** | **100%** |

| Q1.18. Do you live part of the time in one gender and part of the time in another gender? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 19063 | 69% |
| Yes | 8652 | 31% |
| **Total** | **27715** | **100%** |

| Q2.1. What sex were you assigned at birth, on your original birth certificate? | Unweighted frequency | Unweighted % |
|---|---|---|
| Female | 15858 | 57% |
| Male | 11857 | 43% |
| **Total** | **27715** | **100%** |

| Q2.1 & Q2.3. Gender categories used for analysis (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Crossdressers | 758 | 3% |
| Transgender women | 9238 | 33% |
| Transgender men | 7950 | 29% |
| Non-binary people, assigned female at birth | 7844 | 28% |
| Non-binary people, assigned male at birth | 1925 | 7% |
| **Total** | **27715** | **100%** |

| Q2.1 & Q2.3. Gender categories (collapsed recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Transgender men and women | 17188 | 64% |
| Non-binary people | 9769 | 36% |
| **Total** | **26957** | **100%** |

| Q2.4. How comfortable are you with the word "transgender" being used to describe you? | Unweighted frequency | Unweighted % |
|---|---|---|
| Very comfortable | 12189 | 44% |
| Somewhat comfortable | 7413 | 27% |
| Neutral | 4129 | 15% |
| Somewhat uncomfortable | 3116 | 11% |
| Very uncomfortable | 830 | 3% |
| **Total** | **27677** | **100%** |

| Q2.5. What gender pronouns do you ask people to use to refer to you? | Unweighted frequency | Unweighted %* |
|---|---|---|
| He, his | 9981 | 36% |
| She, hers | 10138 | 37% |
| They, their | 8026 | 29% |
| Ze, hir | 466 | 2% |
| No pronouns. I ask people only to use my name. | 1095 | 4% |
| I don't ask people to use specific pronouns. | 5619 | 20% |
| Pronouns not listed above | 1162 | 4% |

*Multiple choices were allowed, so percentages do not add to 100%.*

| Q2.6. What gender do you currently live in on a day-to-day basis? | Unweighted frequency | Unweighted % |
|---|---|---|
| Man | 9418 | 34% |
| Woman | 8271 | 30% |
| Neither man nor woman/ Genderqueer/Non-binary | 5721 | 21% |
| Part time one gender/part time another gender | 4305 | 16% |
| **Total** | **27715** | **100%** |

| Q2.7. People can tell I am trans even if I don't tell them. | Unweighted frequency | Unweighted % |
|---|---|---|
| Always | 549 | 2% |
| Most of the time | 2629 | 10% |
| Sometimes | 9139 | 33% |
| Rarely | 8986 | 33% |
| Never | 6346 | 23% |
| **Total** | **27649** | **100%** |

APPENDIX A

245

AR_217243

| Q2.8. What best describes your current sexual orientation? | Unweighted frequency | Unweighted % |
|---|---|---|
| Asexual | 2984 | 11% |
| Bisexual | 4129 | 15% |
| Gay | 1316 | 5% |
| Heterosexual/Straight | 3363 | 12% |
| Lesbian | 3037 | 11% |
| Same-gender loving | 264 | 1% |
| Pansexual | 5056 | 18% |
| Queer | 5706 | 21% |
| Demisexual* | 287 | 1% |
| A sexual orientation not listed above | 1573 | 6% |
| **Total** | **27715** | **100%** |

*Added to the response list from write-in responses.

| Q2.9-Q2.11. Race/ethnicity (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Alaska Native alone | 17 | 0.1% |
| American Indian alone | 302 | 1.1% |
| Asian/Asian American alone | 721 | 2.6% |
| Biracial/Multiracial | 1513 | 5.5% |
| Black/African American alone | 796 | 2.9% |
| Latino/a/Hispanic alone | 1473 | 5.3% |
| Middle Eastern/North African alone | 132 | 0.5% |
| Native Hawaiian/Pacific Islander alone | 62 | 0.2% |
| White/European American alone | 22658 | 81.8% |
| A racial/ethnic identity not listed above | 41 | 0.2% |
| **Total** | **27715** | **100%** |

| Q2.12. Religious/spiritual identity (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Not religious/spiritual | 10460 | 38% |
| Religious/spiritual | 17195 | 62% |
| **Total** | **27655** | **100%** |

| Q2.13. Age ranges (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| 18 to 24 | 11840 | 43% |
| 25 to 44 | 10987 | 40% |
| 45 to 64 | 4085 | 15% |
| 65 and over | 803 | 3% |
| **Total** | **27715** | **100%** |

| Q2.15. What is your current relationship status? | Unweighted frequency | Unweighted % |
|---|---|---|
| Partnered, living together | 8762 | 31.6% |
| Partnered, not living together | 4630 | 16.7% |
| Single | 13219 | 47.7% |
| Not listed above | 404 | 1.5% |
| Aromantic/not active/platonic* | 67 | 0.2% |
| Open relationship* | 53 | 0.2% |
| Poly* | 535 | 1.9% |
| Single, divorced* | 11 | 0.0% |
| Single, widowed* | 28 | 0.1% |
| **Total** | **27709** | **100%** |

*Added to the response list from write-in responses.

| Q2.16. What is your current legal marital status? | Unweighted frequency | Unweighted % |
|---|---|---|
| Married | 4671 | 16.9% |
| Legally recognized civil union | 67 | 0.2% |
| Registered domestic partnership | 238 | 0.9% |
| Widowed | 216 | 0.8% |
| Divorced | 2538 | 9.2% |
| Separated | 456 | 1.7% |
| Single, never married | 19463 | 70.4% |
| **Total** | **27649** | **100%** |

| Q2.17. Have you ever served on active duty in the U.S. Armed Forces, Reserves, or National Guard? | Unweighted frequency | Unweighted % |
|---|---|---|
| Never served in the military | 25263 | 91.3% |
| Only active duty for training in the Reserves or National Guard | 298 | 1.1% |
| Now on active duty | 129 | 0.5% |
| On active duty in the past, but not now | 1976 | 7.1% |
| **Total** | **27666** | **100%** |

| Q2.18. What is your citizenship or immigration status in the U.S.? | Unweighted frequency | Unweighted % |
|---|---|---|
| U.S. citizen, birth | 26684 | 96.3% |
| U.S. citizen, naturalized | 555 | 2.0% |
| Permanent Resident | 249 | 0.9% |
| A visa holder (such as F-1, J-1, H1-B, and U) | 115 | 0.4% |
| DACA (Deferred Action for Childhood Arrival) | 16 | 0.1% |
| DAPA (Deferred Action for Parental Accountability) | 1 | 0.0% |
| Refugee status | 6 | 0.0% |
| Other documented status not mentioned above | 40 | 0.1% |
| Currently under a withholding of removal status | 3 | 0.0% |
| Undocumented resident | 46 | 0.2% |
| **Total** | **27715** | **100%** |

| Q2.20. Disability (questions based on American Community Survey, with the exception of the last question) | Unweighted frequency | Unweighted %* |
|---|---|---|
| Are you deaf or have serious difficulty hearing? | 1072 | 4% |
| Are you blind or have serious difficulty seeing even when wearing glasses? | 679 | 2% |
| Because of a physical mental or emotional condition, do you have serious difficulty concentrating, remembering, or making decisions? | 8471 | 31% |
| Do you have serious difficulty walking or climbing stairs? | 1729 | 6% |
| Do you have difficulty dressing or bathing? | 924 | 3% |
| Because of a physical, mental, or emotional condition, do you have difficulty doing errands alone, such as visiting a doctor's office or shopping? | 6200 | 23% |
| Do YOU identify as a person with a disability? | 7764 | 28% |

*Multiple choices were allowed, so percentages do not add to 100%.

| Q2.20. Any disability (recode) (based on American Community Survey questions only, not including self-identification) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 16305 | 60% |
| Yes | 10913 | 40% |
| **Total** | **27218** | **100** |

| Q2.21. What is the main language that people speak in your home? | Unweighted frequency | Unweighted % |
|---|---|---|
| English only | 24958 | 90.1% |
| Language(s) other than English | 285 | 1.0% |
| English and other language(s) | 2461 | 8.9% |
| Total | 27704 | 100% |

| Q2.22. What is the highest level of school or degree you have completed? | Unweighted frequency | Unweighted % |
|---|---|---|
| Less than 8th grade | 48 | 0.2% |
| 8th grade | 54 | 0.2% |
| Some high school, no diploma or GED | 804 | 2.9% |
| GED | 661 | 2.4% |
| High school graduate | 2806 | 10.1% |
| Some college, no degree (including currently in college) | 10486 | 37.8% |
| Associate degree in college—Occupational/vocational program | 858 | 3.1% |
| Associate degree in college—Academic program | 1475 | 5.3% |
| Bachelor's degree | 5291 | 19.1% |
| Some graduate work, no graduate degree | 1652 | 6.0% |
| Master's degree (M.A, M.S., MBA) | 2562 | 9.2% |
| Doctoral degree (e.g., Ph.D., Ed.D.) | 504 | 1.8% |
| Professional degree (e.g., MD, JD) | 514 | 1.9% |
| **Total** | **27715** | **100%** |

| Q2.23. What are your current living arrangements? | Unweighted frequency | Unweighted % |
|---|---|---|
| Living in house/apartment/condo I OWN alone or with others (with a mortgage or that you own free and clear) | 4697 | 17.0% |
| Living in house/apartment/condo I RENT alone or with others | 11507 | 41.5% |
| Living with a partner, spouse, or other person who pays for the housing | 1443 | 5.2% |
| Living temporarily with friends or family because I can't afford my own housing | 2229 | 8.0% |
| Living with parents or family I grew up with because I have not yet left home | 5149 | 18.6% |
| Living in a foster group home or other foster care | 10 | 0.0% |
| Living in campus/university housing | 1821 | 6.65% |
| Living in a nursing home or other adult care facility | 9 | 0.0% |
| Living in a hospital | 2 | 0.0% |
| Living in military barracks | 31 | 0.1% |
| Living in a hotel or motel that I pay for myself | 37 | 0.1% |
| Living in a hotel or motel with an emergency shelter voucher | 6 | 0.0% |

APPENDIX A

AR_217245

| Q2.23. What are your current living arrangements? (continued) | Unweighted frequency | Unweighted % |
|---|---|---|
| Living in transitional housing/halfway house | 48 | 0.2% |
| Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing | 91 | 0.3% |
| Living in a homeless shelter | 36 | 0.1% |
| Living in a domestic violence shelter | 6 | 0.0% |
| Living in a shelter that is not a homeless shelter or domestic violence shelter | 3 | 0.0% |
| A living arrangement not listed above | 126 | 0.5% |
| Mobile housing (RV, camper, etc.)* | 40 | 0.1% |
| A place owned/rented by someone else* | 176 | 0.6% |
| A group home or treatment facility* | 13 | 0.1% |
| At home/with family for other reasons* | 186 | 0.7% |
| Nomadic* | 16 | 0.1% |
| Commune/co-op/collective* | 28 | 0.1% |
| **Total** | **27710** | **100%** |

*Added to the response list from write-in responses.

| Q2.24. Is there at least one telephone INSIDE your home that is currently working and is not a cell phone? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 18255 | 66% |
| Yes | 9313 | 34% |
| **Total** | **27568** | **100%** |

| Q2.24. Do you have a cell phone? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 882 | 3% |
| Yes | 26744 | 97% |
| **Total** | **27626** | **100%** |

| Q14.1 & Q14.2 HIV status (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| HIV positive | 179 | 0.7% |
| HIV negative | 13869 | 50.2% |
| Don't know/not tested | 13606 | 49.2% |
| **Total** | **27654** | **100%** |

| Q7.7 Employment status | Unweighted frequency | Unweighted %* |
|---|---|---|
| Work for pay from sex work, selling drugs, or other work that is currently considered illegal | 516 | 1.9% |
| Work full-time for an employer | 9560 | 34.5% |
| Work part-time for an employer | 6735 | 24.3% |
| Self-employed in your own business, profession or trade, or operate a farm (not including sex work, selling drugs, or other work that is currently considered illegal) | 3868 | 14.0% |
| Unemployed but looking for work | 3991 | 14.4% |
| Unemployed and have stopped looking for work | 1247 | 4.5% |
| Not employed due to disability | 2255 | 8.1% |
| Student | 8639 | 31.2% |
| Retired | 1107 | 4.0% |
| Homemaker or full-time parent | 549 | 2.0% |
| Not listed above | 1240 | 4.5% |
| Seasonal work/odd jobs/other part-time work* | 136 | 0.5% |
| Volunteer* | 76 | 0.3% |
| Internship* | 66 | 0.2% |

*Multiple choices were allowed, so percentages do not add to 100%.

| Q7.8. Respondent is member of a union (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25997 | 94% |
| Yes | 1691 | 6% |
| **Total** | **27688** | **100%** |

| Q7.8 & Q7.9. Respondent is a union member or under a union contract (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25623 | 92% |
| Yes | 2082 | 8% |
| **Total** | **27705** | **100%** |

| Q7.10. Do you currently receive assistance from food stamps (SNAP) or WIC? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25060 | 91% |
| Yes | 2606 | 9% |
| **Total** | **27666** | **100%** |

| Q7.11. Current sources of income (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Pay from sex work, selling drugs, or other work that is currently considered illegal only | 143 | 0.6% |
| Pay from employment only | 10519 | 40.4% |
| Pay from pension or retirement only | 227 | 0.9% |
| SSI or disability income only | 903 | 3.5% |
| Unemployment benefits or cash assistance only | 207 | 0.8% |
| Other income source only | 1165 | 4.5% |
| Multiple income sources | 12183 | 46.8% |
| No income | 664 | 2.6% |
| **Total** | **26011** | **100%** |

| Q7.12. Individual income in 2014 (includes all income sources except food stamps (SNAP) or WIC) | Unweighted frequency | Unweighted % |
|---|---|---|
| No income | 3913 | 14.4% |
| $1 to $5,000 | 4647 | 17.1% |
| $5,000 to $7,499 | 1665 | 6.1% |
| $7,500 to $9,999 | 1444 | 5.3% |
| $10,000 to $12,499 | 1743 | 6.4% |
| $12,500 to $14,999 | 1184 | 4.4% |
| $15,000 to $17,499 | 843 | 3.1% |
| $17,500 to $19,999 | 772 | 2.9% |
| $20,000 to $24,999 | 1568 | 5.8% |
| $25,000 to $29,999 | 1071 | 4.0% |
| $30,000 to $34,999 | 1163 | 4.3% |
| $35,000 to $39,999 | 888 | 3.3% |
| $40,000 to $49,999 | 1355 | 5.0% |
| $50,000 to $59,999 | 1049 | 3.9% |
| $60,000 to $74,999 | 1070 | 3.9% |
| $75,000 to $99,999 | 1118 | 4.1% |
| $100,000 to $149,999 | 998 | 3.7% |
| $150,000 or more | 636 | 2.3% |
| **Total** | **27127** | **100%** |

| Q7.12 - Q7.14 Household income in 2014 (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No income | 996 | 3.9% |
| $1 to $5,000 | 1433 | 5.7% |
| $5,000 to $7,499 | 811 | 3.2% |
| $7,500 to $9,999 | 869 | 3.4% |
| $10,000 to $12,499 | 1109 | 4.4% |
| $12,500 to $14,999 | 897 | 3.6% |
| $15,000 to $17,499 | 725 | 2.9% |
| $17,500 to $19,999 | 725 | 2.9% |
| $20,000 to $24,999 | 1571 | 6.2% |
| $25,000 to $29,999 | 1220 | 4.8% |
| $30,000 to $34,999 | 1367 | 5.4% |
| $35,000 to $39,999 | 1224 | 4.8% |
| $40,000 to $49,999 | 1872 | 7.4% |
| $50,000 to $59,999 | 1806 | 7.1% |
| $60,000 to $74,999 | 2096 | 8.3% |
| $75,000 to $99,999 | 2360 | 9.3% |
| $100,000 to $149,999 | 2418 | 9.6% |
| $150,000 or more | 1797 | 7.1% |
| **Total** | **25296** | **100%** |

| Q29.1 & Q29.2 Registered to vote on November 4, 2014 (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 8468 | 31% |
| Yes | 19215 | 69% |
| **Total** | **27683** | **100%** |

| Q29.1. Did you vote in the election held on Tuesday, November 4, 2014? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 13846 | 50% |
| Yes | 13805 | 50% |
| **Total** | **27651** | **100%** |

APPENDIX A

249



# Appendix B

Survey Instrument (Questionnaire)

2015 U.S. TRANSGENDER SURVEY

250

AR_217248

*The survey was offered online only. The questionnaire has been reproduced here to best reflect what respondents saw when completing the survey. Programming notes are indicated in italics.*

## QUESTIONNAIRE:

The National Center for Transgender Equality welcomes you to the 2015 U.S. Trans Survey, the follow up to the National Transgender Discrimination Survey: Injustice At Every Turn. We thank you for participating in this survey. Every voice counts in documenting and better understanding the lives and experiences of trans people in the United States, and we appreciate yours.

Sincerely,

The National Center for Transgender Equality Survey Team



## UNIVERSITY OF CALIFORNIA LOS ANGELES
### Study information sheet

2015 U.S. Trans Survey

This study has been commissioned by the National Center for Transgender Equality (NCTE). A research team made up of Jody L. Herman, Ph.D. and Susan Rankin, Ph.D. are conducting this study. Your participation in this study is voluntary.

### WHY IS THIS STUDY BEING DONE?

This study is being conducted to better understand the demographics, health, and experiences of trans people in the United States. The findings of this study will be used for the benefit of the trans community and the research community.

### WHAT WILL HAPPEN IF I TAKE PART IN THIS RESEARCH STUDY?

If you volunteer to participate in this study, the researchers ask that you participate in an online survey. The purpose of the survey is to gather information about you and your experiences as a trans person in the United States. You will be one of over 700,000 possible participants who may take part in this survey, which is the current best estimate of the total number of trans-identified adults in the United States.

### HOW LONG WILL I BE IN THE RESEARCH STUDY?

Participation in the study will take between 30 and 60 minutes.

### ARE THERE ANY RISKS OR DISCOMFORTS THAT I CAN EXPECT FROM THIS STUDY?

Participating in this study poses no risks that are not ordinarily encountered in daily life. Any information you provide in the survey will be confidential. Some of the questions asked of you as part of this survey may make you feel uncomfortable. You may refuse to answer questions posed to you by skipping the question. You may stop your participation in this study at any time by exiting the survey. Should you need them, there will be a list of resources, including hotlines, provided at the end of the survey.

### ARE THERE ANY BENEFITS IF I PARTICIPATE?

The results of the research will be used for the benefit of the trans community in the United States and the research community. You will not directly benefit from your participation in the research.

### WILL I BE PAID FOR MY PARTICIPATION?

You will receive no payment for your participation. You will have the option to voluntarily enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250.

### HOW WILL INFORMATION ABOUT ME AND MY PARTICIPATION BE KEPT CONFIDENTIAL?

Your survey response will be anonymous, so no information that can be used to identify you will be collected unless you voluntarily provide it. Any information that is obtained in connection with this study and that can identify you will remain confidential. If you do voluntarily provide any information that could be used to identify you, the research team will maintain your confidentiality by taking precautions to minimize any risk to your privacy from participating in this survey.

You will be given the option at the end of the survey to be directed to a separate page on a secure website if you wish to provide your contact information to receive survey results from NCTE, be entered into the drawing for one of three cash prizes, or share your personal story with NCTE. NCTE will NOT be provided with any responses from your survey in connection with your contact information. NCTE will only know that you have participated in the survey. NCTE will not provide to the research team any information that could be used to identify you, such as your name. Therefore, you will remain anonymous to the research team.

AR_217249

Results of this research study that are reported in published form will not name you or identify you as a participant. If you choose to self-identify anywhere on the survey and provide a written response, a different name will be created and used instead of your name if quoting you directly in any publication and any content of quotes that could be used to identify you will be removed.

**CAN THE RESEARCHERS REMOVE ME FROM THIS STUDY?**

The researchers will not remove you from the study. You may remove yourself from the study by exiting the survey. If you exit the survey, your responses will not be recorded or used in the study.

**WHAT ARE MY RIGHTS IF I TAKE PART IN THIS STUDY?**

Taking part in this study is your choice. You can choose whether or not you want to participate. Whatever decision you make, there will be no penalty to you.

- You have a right to have all of your questions answered before deciding whether to take part in the study.
- If you decide to take part in the study, you have the right to exit the study at anytime by exiting the survey.
- If you decide at any point to stop participating in this study, you have the right to exit the study at any time by exiting the survey.

**WHO CAN I CONTACT IF I HAVE QUESTIONS ABOUT THIS STUDY?**

The Research Team:

You may contact Jody L. Herman at (310) 267-4382 or Susan Rankin at (814) 625-2780 with any questions or concerns about the research or your participation in this study.

UCLA Office of the Human Research Protection Program (OHRPP):

If you have questions about your rights while taking part in this study, or you have concerns or suggestions and you want to talk to someone other than the researchers about the study, you may contact the UCLA OHRPP by phone: (310) 825-7122 or U.S. mail: UCLA OHRPP, 11000 Kinross Ave., Suite 102, Box 951694, Los Angeles, CA 90095-1694.

If you agree to take part in this study, as described in detail above, please click on the "**I AGREE**" button below. By clicking on the "**I AGREE**" button, you will indicate your consent to participate in this study.

If you do not agree to take part in this study, as described above, please click on the "**I DO NOT AGREE**" button below.

☐ **I AGREE**
I agree and give my consent to participate in this study.

☐ **I DO NOT AGREE**
I do not agree to participate in this study.

*Respondents who selected "do not agree" were sent a disqualification page #2.[1]*

## Survey Instructions

Please read and answer each question carefully. For each answer, click on the appropriate oval and/or fill in the appropriate blank. If you want to change an answer, click on the oval of your new answer and/or edit the appropriate blank, and your previous response will be erased.

You may decline to answer specific questions. The survey will take between 30-60 minutes to complete.

There will be several places in the survey where you will see a word or phrase that is underlined and bolded. You can click on those words or phrases and a definition or additional information will be offered.

In order to clear a response choice, please use the back button on your browser.

**WARNING: If you use the back button on your browser to return to a previous question, the responses you have entered for each page you clicked back on will be erased. For instance, if you click back three pages in the survey, your answers on those three pages will be erased. Responses before those three pages would stay the same.**

In the survey, please do not provide any information that could be used to identify you, such as your name or contact information. All of your answers are confidential and cannot be used against you.

**You must hit the "submit" button on the last page of the survey for your responses to be included in the final analyses.**

## Section 1

**1.1** Please make an ID in question 1.1. The research team will use the ID for their analysis. It will not be used to identify you.

Enter the first and last letter of your preferred first name. For example, if your first name is "Robert", enter "RT".

*[Text box]*

Enter the first letter of your preferred last name. For example, if your last name is "Smith", enter "S".

*[Text box]*

**1.2** It is important that people only complete this survey one time so that we can gather accurate information. You will only be entered into the prize drawing once, even if you complete this survey more than once. Have you already completed this survey before? *[Must answer to continue.]*

No

Yes *[Sent to disqualification page #1][2]*

**1.3** Are you 18 years of age or older? *[Must answer to continue.]*

No *[Sent to disqualification page #2][3]*

Yes

AR_217250

**1.4** What U.S. state or territory do you currently live in? *[Must answer to continue.]*

*[Drop-down list of all U.S. states and territories.]*

I do not live in a U.S. state or territory. *[Sent to disqualification page #1]*[5]

**1.5** How did you hear about this survey? **(Mark all that apply.)**

Email from an organization (listserv, e-newsletter)

Social networking site (such as Facebook)

Organization website (such as NCTE)

I was told about it in person (at an organization, event, or support group)

Flier or print advertisement

Word of mouth (e-mail from a friend, a friend told you about it)

Not listed above (please specify) _____

**1.6** Are you taking this survey at a survey event or meeting, such as one hosted by an LGBTQ or Trans organization or meeting?

No

Yes

**1.7** How are you taking this survey?

On my home computer/laptop

On my work computer

On a public computer (such as in a computer lab or library)

On my mobile phone or tablet

On a friend's or family member's mobile phone, tablet, or computer

Not listed above (please specify) _____

**1.8** Not including for this survey, do you use the internet or email, at least occasionally? **(Mark all that apply.)**

No *[Respondents could not select "No" in combination with any other option.]*

Yes, the internet

Yes, email

**1.9** If a national survey company, like Gallup, asked you the following question: "We are asking only for statistical purposes: Do you, personally, identify as lesbian, gay, bisexual, or transgender?" How would you answer?

I would answer No

I would answer Yes

I would not answer the question

**PLEASE READ AND RESPOND CAREFULLY TO THE FOLLOWING QUESTIONS.**

This is a survey for people who are transgender, trans, or non-binary. It doesn't matter if you have transitioned gender or if you plan to. To see if this survey is for you, please answer the following questions.

**1.10** Do you think of yourself as transgender? *[Must answer to continue.]*

No

Yes

**1.11** Do you identify as more than one gender or as no gender (such as genderqueer or non-binary)? *[Must answer to continue.]*

No

Yes

**1.12** Do you currently live full-time in a gender that is different from the one assigned to you at birth? *[Must answer to continue.]*

No *[Skip to 1.14]*

Yes

**1.13** How old were you when you started to live full-time in a gender that is different from the one assigned to you at birth? *[Only respondents who selected "Yes" in response to 1.12 received this question.]*

*[Drop-down list of all ages from "1" through "99," and "100 and above" as final response choice]*

**1.14** Someday do you want to live full-time in a gender that is different from the one assigned to you at birth? *[Respondents who selected "No" in response to 1.12 must answer to continue.]*

No *[Skip to 1.16]*

Yes

Not sure

**1.15** What are the main reasons that you don't live full-time in a gender that is different from the one assigned to you at birth? **(Mark all that apply.)** *[Only respondents who selected "Yes" or "Not sure" in response to 1.14 received this question.]*

My spouse and/or kids might reject me.

My parents might reject me.

I might lose my job or not be able to get a job.

I might face mistreatment at school.

My friends might reject me.

I might not get the medical care I need.

I might be hurt financially.

I might become homeless.

My church or faith community might reject me.

APPENDIX B

253

I might face violence.

I am not ready to transition.

A reason not listed above
(please specify) _____

**1.16** Have you seriously thought about living in a gender that is different from the one assigned to you at birth (transitioning gender)? *[Respondents who selected "No" in response to 1.13 must answer to continue.]*

No

Yes

**1.17** Do you consider yourself to be a cross-dresser? *[Must answer to continue.]*

No

Yes

**1.18** Do you live part of the time in one gender and part of the time in another gender? *[Must answer to continue.]*

No

Yes

*[Respondents who answered "No" to 1.10, 1.11, 1.12, 1.14, 1.16, 1.17, and 1.18 were sent to disqualification page #1.]*[5]

## Section 2

**2.1** What sex were you assigned at birth, on your original birth certificate? *[Must answer to continue.]*

Female

Male

**2.2** Which of these terms do you identify with? **(Mark all that apply.)**

A.G. or aggressive

Agender

Androgynous

Bi-gender

Butch

Bulldagger

Cross dresser

Drag performer (king/queen)

Fa'afafine

Gender non-conforming or gender variant

Genderqueer

Gender fluid/fluid

Intersex

Mahu

Multi-gender

Non-binary

Third gender

Stud

Transgender

Trans

Trans man (FTM, female to male)

Transsexual

Trans woman (MTF, male to female)

Travesti

Two-spirit

A gender not listed above
(please specify) _____

**2.3** If you had to choose only one of the following terms, which best describes your current gender identity? **(Please choose only one answer.)**

Cross-dresser

Woman

Man

Trans woman (MTF)

Trans man (FTM)

Non-binary/Genderqueer *[Respondents who selected this answer received questions 2.3_1, 2.3_2, and 2.3_3.]*

**2.3_1** For people in your life who don't know that you're non-binary/genderqueer, what gender do they usually think you are? *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 received this question.]*

Man

Woman

Trans Man

Trans Woman

Non-Binary/Genderqueer

They can't tell

It varies

**2.3_2** When people in your life assume you are something other than non-binary/genderqueer (such as a man or a woman), how do you respond? *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 received this question.]*

I **usually** let them assume I am a man or a woman

I **sometimes** tell them I identify as non-binary/genderqueer (or whatever words I use)

I **always** tell them I identify as non-binary/genderqueer (or whatever words I use) *[Skip to 2.4.]*

AR_217252

**2.3_3** What are the main reasons that you don't tell people you identify as non-binary/genderqueer? **(Mark all that apply).** *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 and either selected "I usually let them assume I am a man or a woman" or "I sometimes tell them I identify as non/binary genderqueer" in response to 2.3_2 received this question.]*

 Most people don't understand so I don't try to explain it.

 Most people dismiss it as not being a real identity or a "phase."

 It is just easier not to say anything.

 I am not ready to tell people I identify as non-binary/genderqueer.

 I might lose my job or not be able to get a job.

 I might face mistreatment at school.

 My friends might reject me.

 I might not get the medical care I need.

 I might be hurt financially.

 I might become homeless.

 My church or faith community might reject me.

 I might face violence.

 A reason not listed above
 (please specify) _____

**2.4** How comfortable are you with the word "transgender" being used to describe you?

 Very comfortable

 Somewhat comfortable

 Neutral

 Somewhat uncomfortable

 Very uncomfortable

*[All respondents received the following message.]* **We know that not everyone is comfortable with the word "transgender," but for this survey, we must use one word to refer to all trans and non-binary identities. Because of this we will use the word "trans" in this survey to refer to all trans and non-binary identities.**

**2.5** What gender pronouns do you ask people to use to refer to you? *[Respondents could mark all answers that applied.]*

 He, his

 She, hers

 They, their

 Ze, hir

 No pronouns. I ask people only to use my name.

 I don't ask people to use specific pronouns.

 Pronouns not listed above (please specify) _____

**2.6** What gender do you currently live in on a day-to-day basis?

 Man

 Woman

 Neither man nor woman/Genderqueer/Non-binary

 Part time one gender/part time another gender

**2.7** People can tell I am trans even if I don't tell them.

 Always

 Most of the time

 Sometimes

 Rarely

 Never

**2.8** What best describes your current sexual orientation?

 Asexual

 Bisexual

 Gay

 Heterosexual/Straight

 Lesbian

 Same-gender loving

 Pansexual

 Queer

 A sexual orientation not listed above (please specify)_____

**2.9** Although the choices listed below may not represent your full identity or use the language you prefer, for this survey please select the choice that most accurately describes your racial/ethnic identity. **(Please choose only one answer.)**

 Alaska Native

  Enter your enrolled or principal corporation:
  _____ *[required]*

 American Indian

  Enter your enrolled or principal tribe:
  _____ *[required]*

 Asian/Asian American

 Biracial/Multiracial *[respondents received follow-up question 2.10]*

 Black/African American

 Latino/a/Hispanic

 Middle Eastern/North African

 Native Hawaiian/Pacific Islander

 White/European American

 A racial/ethnic identity not listed above (please specify)
 _____ *[respondents received follow-up question 2.11]*

APPENDIX B

255

**2.10** You said that you are biracial or multiracial. Please choose the racial/ethnic identities that best describe you. **(Mark all that apply.)**

*[Only respondents who selected "Biracial/Multiracial" in 2.9 received this question.]*

Alaska Native

Enter your enrolled or principal corporation:
_____ *[required]*

American Indian

Enter your enrolled or principal tribe:
_____ *[required]*

Asian/Asian American

Black/African American

Latino/a/Hispanic

Middle Eastern/North African

Native Hawaiian/ Pacific Islander

White/European American

A racial/ethnic identity not listed above
(please specify) _____

**2.11** You said that you had a racial/ethnic identity that was not listed above. Please choose the racial/ethnic identities that best describe you. **(Mark all that apply.)**

*[Only respondents who selected "A racial/ethnic identity not listed above" in 2.9 received this question.]*

Alaska Native

Enter your enrolled or principal corporation:
_____ *[required]*

American Indian

Enter your enrolled or principal tribe:
_____ *[required]*

Asian/Asian American

Black/African American

Latino/a/Hispanic

Middle Eastern/North African

Native Hawaiian/ Pacific Islander

White/European American

**2.12** What is your current religious or spiritual identity? **(Mark all that apply.)**

Agnostic

Atheist

Baha'i

Buddhist

Christian (Please click here to specify) *[Respondents received the following drop-down list.]*

African Methodist Episcopal

African Methodist Episcopal Zion

Assembly of God

Baptist

Catholic/Roman Catholic

Church of Christ

Church of God in Christ

Christian Orthodox

Christian Methodist Episcopal

Christian Reformed Church (CRC)

Episcopalian

Evangelical

Greek Orthodox

Lutheran

Mennonite

Moravian

Nondenominational Christian

Pentecostal

Presbyterian

Protestant

Protestant Reformed Church (PR)

Quaker

Reformed Church of America (RCA)

Russian Orthodox

Seventh Day Adventist

The Church of Jesus Christ of Latter-day Saints

United Methodist

Unitarian Universalist

United Church of Christ

A Christian affiliation not listed above
(please specify) _____

Confucianist

Druid

Hindu

Jain

Jehovah's Witness

Jewish (Please click here to specify) *[Respondents received the following drop-down list.]*

Conservative

Orthodox

Reform

Muslim (Please click here to specify) *[Respondents received the following drop-down list.]*

Ahmadi

Shi'ite

Sufi

Sunni

Native American Traditional Practitioner or Ceremonial

Pagan

AR_217254

Rastafarian

Scientologist

Secular Humanist

Shinto

Sikh

Taoist

Tenrikyo

Wiccan

Spiritual, but no religious affiliation

No affiliation

A religious affiliation or spiritual identity not listed above (please specify) _____

**2.13** What is your current age?

*[Drop-down list of all ages from "18" through "99," and "100 and above" as final response choice]*

**2.14** What month and year were you born?

Month *[Drop-down list of all months]*

Year *[Drop-down list with years 1997–1915, and earlier as final response choice]*

**2.15** What is your current relationship status?

Partnered, living together

Partnered, not living together

Single

Not listed above (please specify) _____

**2.16** What is your current legal marital status?

Married

Legally recognized civil union

Registered domestic partnership

Widowed

Divorced

Separated

Single, never married

**2.17** Have you ever served on active duty in the U.S. Armed Forces, Reserves, or National Guard? *As a reminder, your answers are confidential and cannot be used against you.*

Never served in the military

Only on active duty for training in the Reserves or National Guard

Now on active duty[6]

On active duty in the past, but not now

**2.18** What is your citizenship or immigration status in the U.S.? *As a reminder, your answers are confidential and cannot be used against you.*

U.S. citizen, birth *[Respondents directed to 2.19]*

U.S. citizen, naturalized

Permanent Resident

A visa holder (such as F-1, J-1, H1-B,  and U)

DACA (Deferred Action for Childhood Arrival)

DAPA (Deferred Action for Parental Accountability)

Refugee status

Other documented status not mentioned above

Currently under a withholding of removal status

Undocumented resident

**2.19** In what U.S. state or territory were you born? *[Only respondents who selected "U.S. citizen, birth" in 2.18 received this question.]*

I was not born in a U.S. state or territory.

*[Drop-down list for all U.S. states and territories for other response choices. Respondents who selected "New York" received an additional drop-down choice for "New York City."]*

**2.20** Please answer each question below. **(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| Are you deaf or have serious difficulty hearing? | O | O |
| Are you blind or have serious difficulty seeing even when wearing glasses? | O | O |
| Because of a physical mental or emotional condition, do you have serious difficulty concentrating, remembering, or making decisions? | O | O |
| Do you have serious difficulty walking or climbing stairs? | O | O |
| Do you have difficulty dressing or bathing? | O | O |
| Because of a physical, mental, or emotional condition, do you have difficulty doing errands alone, such as visiting a doctor's office or shopping? | O | O |
| Do YOU identify as a person with a disability? | O | O |

**2.21** What is the main language that people speak in your home?

English only

Language(s) other than English

Armenian

Chinese

French

German

Greek

AR_217255

Italian

Japanese

Korean

Persian

Polish

Portuguese or Portuguese Creole

Russian

Serbo-Croatian

Spanish or Spanish Creole

Tagalog

Vietnamese

Yiddish

A language not listed above
(_____)

English and other language(s)

Armenian

Chinese

French

German

Greek

Italian

Japanese

Korean

Persian

Polish

Portuguese or Portuguese Creole

Russian

Serbo-Croatian

Spanish or Spanish Creole

Tagalog

Vietnamese

Yiddish

A language not listed above
(_____)

**2.22** What is the highest level of school or degree you have completed?

Less than 8th grade

8th grade

Some high school, no diploma or GED

GED

High school graduate

Some college, no degree (including currently in college)

Associate degree in college – Occupational/vocational program

Associate degree in college – Academic program

Bachelor's degree

Some graduate work, no graduate degree

Master's degree (M.A, M.S., MBA)

Doctoral degree (e.g., Ph.D., Ed.D.)

Professional degree (e.g., MD, JD)

**2.23** What are your current living arrangements?

Living in house/apartment/condo I OWN alone or with others (with a mortgage or that you own free and clear)

Living in house/apartment/condo I RENT alone or with others

Living with a partner, spouse, or other person who pays for the housing

Living temporarily with friends or family because I can't afford my own housing

Living with parents or family I grew up with because I have not yet left home

Living in a foster group home or other foster care

Living in campus/university housing

Living in a nursing home or other adult care facility

Living in a hospital

Living in military barracks

Living in a hotel or motel that I pay for myself

Living in a hotel or motel with an emergency shelter voucher

Living in transitional housing/halfway house

Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing *[Skip to 2.25]*

Living in a homeless shelter *[Skip to 2.25]*

Living in a domestic violence shelter *[Skip to 2.25]*

Living in a shelter that is not a homeless shelter or domestic violence shelter *[Skip to 2.25]*

A living arrangement not listed above (please specify) _____

**2.24** Is there at least one telephone INSIDE your home that is currently working and is not a cell phone?

No

Yes

**2.25** Do you have a cell phone?

No

Yes

**2.26** What is the zip code where you currently live? _____

## Section 3

**3.1** At about what age did you begin to feel that your gender was "different" from your assigned birth sex?

*[Drop-down list of ages]*

**3.2** At about what age did you start to think you were trans (even if you did not know the word for it)?

*[Drop-down list of ages]*

**3.3** At about what age did you first start to tell others that you were trans (even if you did not use that word)?

I have not told others that I am trans.

*[Drop-down list of ages for other responses]*

**3.4** How do you socialize with other trans people? **(Mark all that apply.)**

In political activism

Socializing in person

Socializing on-line (such as Facebook or Twitter)

In support groups

I don't socialize with other trans people *[Respondents could not select this answer in combination with any other option.]*

Not listed above (please specify) _____

## Section 4

**These are questions about the people in your life and whether they know you are trans.**

**4.1** Have any of your spouses/partners known that you are trans during your relationship with them? **(Mark all that apply).**

I have never had a spouse/partner *[Respondents could not select this answer in combination with any other option. Skip to 4.3 if selected.]*

No *[Respondents could not select this answer in combination with any other option. Skip to 4.3 if selected.]*

Yes, my current spouse/partner knows I am trans

Yes, at least one of my former spouses or partners knew I was trans

**4.2** Have any of your spouses/partners ended your relationship because you are trans? *[Only respondents who indicated that at least one of their past or current spouses knew they were trans in 4.1 received this question.]*

No

Yes, only because I was trans.

Yes, because I was trans and other reasons.

**4.3** Do any of your children know you are trans?

I do not have any children *[Skip to 4.5]*

No *[Skip to 4.5]*

Yes

**4.4** Have any of your children ever stopped speaking to you or spending time with you because you are trans?

No

Yes

**4.5** How many people in each group below currently know you are trans? (**Please provide an answer in each row.**)

| | I currently have no people like this in my life | All know that I am trans | Most know that I am trans | Some know that I am trans | None know that I am trans |
|---|---|---|---|---|---|
| Immediate family you grew up with (mother, father, sisters, brothers, etc.) | O | O | O | O | O |
| Extended family (aunts, uncles, cousins, etc.) | O | O | O | O | O |
| Lesbian, gay, bisexual, or trans (LGBT) friends | O | O | O | O | O |
| Straight, non-trans (non-LGBT) friends | O | O | O | O | O |
| Current boss/manager/supervisor | O | O | O | O | O |
| Current coworkers | O | O | O | O | O |
| Current classmates | O | O | O | O | O |
| Current health care providers | O | O | O | O | O |

**4.6** You said some or all of your immediate family you grew up with (mother, father, sisters, brothers, etc.) know that you are trans. On average, how supportive are they of you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

Very supportive

Supportive

Neither supportive nor unsupportive

Unsupportive

Very unsupportive

**4.7** Did any of your immediate family members you grew up with (mother, father, sisters, brothers, etc.) do any of these things to you because you are trans? **(Mark all that apply.)** *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

Stopped speaking to you for a long time or ended your relationship

Were violent towards you

Kicked you out of the house

AR_217257

Did not allow you to wear the clothes that matched your gender

Sent you to a therapist, counselor, or religious advisor to stop you from being trans

None of the above *[Respondents could not select this answer in combination with any other option.]*

**4.8** Did any of your immediate family members you grew up with (mother, father, sisters, brothers, etc.) do any of these things to **support** you? **(Mark all that apply.)** *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

Told you that they respect and/or support you

Used your preferred name

Used your correct pronouns (such as he/she/they)

Gave you money to help with any part of your gender transition

Helped you change your name and/or gender on your identity documents (ID), like your driver's license (such as doing things like filling out papers or going with you to court)

Did research to learn how to best support you (such as reading books, using online information, or attending a conference)

Stood up for me with family, friends, or others

Supported you in another way not listed above (please specify)_____

None of the above *[Respondents could not select this answer in combination with any other option.]*

**4.9** Did you ever run away from home because you are trans? *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

No *[Skip to 4.11]*

Yes

**4.10** At what age did you run away from home because you are trans? *[Only respondents who selected "Yes" in 4.9 received this question.]*

*[Drop-down list of ages]*

**4.11** On average, how supportive are your co-workers with you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their coworkers knew they were trans received this question.]*

Very supportive

Supportive

Neither supportive nor unsupportive

Unsupportive

Very unsupportive

**4.12** On average, how supportive are your classmates with you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their classmates knew they were trans received this question.]*

Very supportive

Supportive

Neither supportive nor unsupportive

Unsupportive

Very unsupportive

## Section 5

**These questions are about your experiences with your church, synagogue, mosque, or other faith community.**

**5.1** Have you ever been part of a spiritual/religious community (such as a church, synagogue, mosque, or other faith community)?

No *[Skip to 6.1]*

Yes

**5.2** Have you ever left your spiritual/religious community because you **were afraid** they might reject you because you are a trans person?

No

Yes

**5.3** Have you ever left your spiritual/religious community because they **did reject** you because you are a trans person?

No *[Skip to 5.5]*

Yes

**5.4** After you stopped attending, did you find a spiritual/religious community that welcomed you as a trans person? *[Only respondents who selected "Yes" in 5.4 received this question.]*

No

Yes

**5.5 Now just thinking about the past year,** have you been part of a spiritual/religious community?

No *[Skip to 6.1]*

Yes

**5.6 In the past year**, did any leaders or other members of your spiritual/religious community think or know you were trans?

No *[Skip to 6.1]*

Yes

**5.7 In the past year,** how often did leaders or other members of your spiritual/religious community... **(Please provide an answer in each row.)**

| In the past year... | Never | Once or twice | A few times | Many times |
|---|---|---|---|---|
| Make you feel welcome as a trans person attending services/faith community functions? | ○ | ○ | ○ | ○ |
| Accept you for who you are as a trans person? | ○ | ○ | ○ | ○ |
| Tell you that your religion/faith accepts you as a trans person? | ○ | ○ | ○ | ○ |
| Tell you that your being trans is a sin or that your religion does not approve of your being trans? | ○ | ○ | ○ | ○ |
| Ask you to meet with spiritual/religious leaders to stop you from being trans? | ○ | ○ | ○ | ○ |
| Ask you to seek medical/psychological help to stop you from being trans? | ○ | ○ | ○ | ○ |
| Ask you to stop coming to services or faith community functions? | ○ | ○ | ○ | ○ |

## Section 6

**These are questions about work for pay in the sex industry and sex work. As a reminder, your answers are confidential and cannot be used against you.**

**6.1** Have you ever engaged in sex or sexual activity **for money** (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films)?

No *[Skip to 6.4]*

Yes

**6.2 Now just thinking about the past year,** have you engaged in sex or sexual activity for money (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films) in the past year? *[Only respondents who selected "Yes" in 6.1 received this question.]*

No

Yes

**6.3** What type of sex work or work in the sex industry have you **ever** done? **(Mark all that apply).** *[Only respondents who selected "Yes" in 6.1 received this question.]*

Street-based sex work

Sex work advertised online

Sex work advertised in magazines or newspapers

Informal sex work through word of mouth, occasional hook ups with dates in my networks, or things like that

Escort/call girl/rent boy with an agency

Pornography/picture or video

Phone sex

Webcam work

Erotic dancer/stripper

Fetish work (Domme, sub, switch)

Not listed above (please specify) _____

**6.4** Have you engaged in sex or sexual activity for any of the following? **(Please mark all that apply in each row.)** *[Respondents could not select "No" in combination with any other option.]*

| | No | Yes, within the past year | Yes, but more than a year ago |
|---|---|---|---|
| I engaged in sex or sexual activity for food | ○ | ○ | ○ |
| I engaged in sex or sexual activity for a place to sleep in someone's bed, at their home, or in their hotel room | ○ | ○ | ○ |
| I engaged in sex or sexual activity for drugs | ○ | ○ | ○ |
| For something not listed above (please specify) _____ *[Response recorded as "No" if text left blank.]* | ○ | ○ | ○ |

**6.5** Did you ever interact with the police while doing sex work or **when police thought** you were doing sex work? *[Respondents could select multiple answer choices, but could not select "No" in combination with any other option.]*

No *[Skip to 6.11]*

Yes, while I was doing sex work.

Yes, when police thought I was doing sex work.

**6.6** When you interacted with police while doing sex work or when police thought you were doing sex work, did you experience any of the following? **(Please provide an answer in each row.)**

| | No | Yes |
|---|---|---|
| Officers kept calling me by the wrong gender pronouns (such as he/him or she/her) or the wrong title (such as Mr. or Ms.). | ○ | ○ |
| Officers asked me questions about my gender transition (such as hormones and surgical status). | ○ | ○ |
| Officers verbally harassed me. | ○ | ○ |
| Officers physically attacked me. | ○ | ○ |
| Officers forced me to have sex or sexual activity to avoid arrest. | ○ | ○ |
| I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape). | ○ | ○ |
| I was arrested for drugs in my possession when police stopped me for doing sex work. | ○ | ○ |

**6.7** Have you ever been arrested for doing sex work or **when police thought** you were doing sex work? *[Only respondents who selected "Yes, while I was doing sex work" and/or "Yes, when police thought I was doing sex work" in 6.5 received this*

APPENDIX B

261

*question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No *[Skip to 6.11]*

Yes, while I was doing sex work

Yes, when the police thought I was doing sex work

**6.8** How many times have you been arrested for doing sex work or when police thought you were doing sex work?

*[Drop-down list of 1–10 and "11 or more"]*

**6.9** When police arrested you, did they consider things in your possession such as condoms or sex toys as "evidence of prostitution"? *[Respondents could select multiple answer choices.]*

No

Yes, condoms

Yes, sex toys

Yes, items not listed above (please specify)

_____

I don't know

**6.10** Did any of these things happen when you were arrested? **(Mark all that apply.)**

The charges were dropped.

I pled guilty.

I went to trial and was found not guilty.

I went to trial and was found guilty.

Something not listed above (please specify) _____

**6.11** Have you ever been paid for selling drugs or other work that is currently considered illegal? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 7.1]*

Yes, selling drugs

Yes, other work (please specify) _____

**6.12 Now just thinking about the past year,** were you paid for selling drugs or other work that is currently considered illegal in the past year? **(Mark all that apply.)** *[Only respondents who selected an answer choice other than "No" received this question. Respondents could not select "No" in combination with any other option.]*

No

Yes, selling drugs

Yes, other work (please specify) _____

## Section 7

These questions are about your household, your income, and your current job. As a reminder, your answers are confidential and cannot be used against you. These questions are based on national surveys that we will use to compare with the U.S. population.

**7.1** How many adults (age 18 or older) live in your household,[7] including yourself? (Do not include neighbors or others who do not live with you in your house, apartment, or single housing unit.) For more information, click on **household** above.

1 *[Skip to 7.5]*

2

3

4

5

6

7

8

9 or more

**7.2** How are the other adults (age 18 or older) who live in your household related to you? **(Mark all that apply.)**

Spouse (legally married)

Partner (not legally married)

Child or children

Grandchild or grandchildren

Parent(s) (Mother/Father/Step-Parent(s))

Brother(s)/Sister(s)/Step-Brother(s)/Step-Sister(s)

Other relative(s) (Aunt, Cousin, Nephew, Mother-in-law, etc.)

Foster child or foster children

Housemate(s)/Roommate(s)

Roomer(s)/Boarder(s)

Other non-relative(s)

Not listed above (please specify) _____

**7.3** How many adults in your household are related to you[8] by birth (blood relatives), adoption, or legal marriage? Don't include partners who aren't legally married to you or adults who aren't related to you. We will ask about them later.

0 *[Skip to 7.5]*

1

2

3

4

5

6

7

8

9 or more

AR_217260

**7.4** Is any person aged 65 or older named on the lease, mortgage, or deed[8] for your household?

No

Yes

**7.5** How many babies and other children under age 18 live in your household?

0 *[Skip to 7.7]*

1

2

3

4

5

6

7

8

9 or more

**7.6** How many of the children under age 18 who live in your household are related to you[9] by birth (blood relatives) or adoption? Don't include children who aren't related to you by birth or legal adoption. We will ask about them later.

0

1

2

3

4

5

6

7

8

9 or more

**7.7** What is your current employment status? **(Mark all that apply.)**

Work for pay from sex work, selling drugs, or other work that is currently considered illegal

*[Respondents who selected this answer choice received the following question.] Are you actively looking for legal work outside sex work, selling drugs , or other work that is currently considered illegal*

No

Yes

Work full-time for an employer

*[Respondents who selected this answer choice received the following question.] Do you have more than one full-time job?*

No

Yes

Work part-time for an employer

*[Respondents who selected this answer choice received the following question.] Do you have more than one part-time job?*

No

Yes

Self-employed in your own business, profession or trade, or operate a farm (not including sex work, selling drugs, or other work that is currently considered illegal)

Unemployed but looking for work

Unemployed and have stopped looking for work

Not employed due to disability

Student

Retired

Homemaker or full-time parent

Not listed above (please specify) _____

**7.8** On any of your full-time or part-time jobs, are you a member of a labor union or of an employee association similar to a union? *[Only respondents who selected "Work full-time for an employer" and/or "Work part-time for an employer" in 7.7 received this question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No

Yes in a part-time job *[Skip to 7.10]*

Yes in a full-time job *[Skip to 7.10]*

**7.9** On any of your full-time or part-time jobs, are you covered by a union or employee association contract? *[Only respondents who selected "Work full-time for an employer" and/or "Work part-time for an employer" in 7.7 AND selected "No" in 7.8 received this question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No

Yes in a part-time job

Yes in a full-time job

**7.10** Do you currently receive assistance from FOOD STAMPS (SNAP)[11] or WIC[12]? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No

Yes, assistance from food stamps (SNAP)[13]

Yes, assistance from WIC[14,15]

**7.11** What are your current sources of income? **(Mark all that apply.)**

Pay from sex work, selling drugs, or other work that is currently considered illegal

Pay from your full-time or part-time job

Pay from your partner's/spouse's full-time or part-time job

AR_217261

Self-employment income from your own business, profession or trade, or farm (not including underground economy)

Income from dividends, estates or trusts, royalties, or rental income

Interest income (on savings or bonds)

Cash assistance from welfare (such as TANF) or other public cash assistance program (DO NOT include food stamps (SNAP) or WIC)

Unemployment benefits

Child support or alimony

Social security retirement or railroad retirement income

Private pension or government employee pension

Other retirement income

Social security disability benefits (SSDI)

Supplemental security income (SSI)

Workers' comp or other disability

Veteran's disability benefits and other Veteran's benefits

Regular contributions from people who don't live in the household

Income not listed above,
(please specify) _____

**7.12** What was your total combined **Individual Income**[16] (before taxes) **in 2014**? This includes all income sources **except** food stamps (SNAP) or WIC.

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

60,000 to 74,999

75,000 to 99,999

100,000 to 149,999

150,000 or more

**7.13** What was your total combined **Family Income**[17] (before taxes) **in 2014**? This includes all income from all family members who are related to you by legal marriage, birth, or adoption and who have lived with you during the last 12

months. **Don't include** food stamps (SNAP) or WIC. *[Only respondents who selected an answer choice other than "0" in 7.3 (related adults in household) and/or selected an answer choice other than "0" in 7.6 (related children in household) received this question.]*

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

60,000 to 74,999

75,000 to 99,999

100,000 to 149,999

150,000 or more

**7.14** How much was your total combined **HOUSEHOLD INCOME**[18] (before taxes) **in 2014**? This includes income from all members of your household from all sources **except** food stamps (SNAP) or WIC. *[Only respondents with non-related adults and/or non-related children in their household received this question. Respondents received this question if they indicated that they had non-related adults in their household (they selected "2" or more in 7.1 and selected a higher number in response to 7.3 than in response to 7.1) and/or they indicated that they had non-related children in the household (they selected "1" or more in 7.5 and selected a higher number in response to 7.6 than in response to 7.5).]*

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

60,000 to 74,999

75,000 to 99,999

100,000 to 149,999

150,000 or more

## Section 8

*[Only respondents who selected an answer choice other than "never served in the military" in 2.17 received question in this section.]*

**You said earlier that you currently serve or have served on active duty in U.S. Armed Forces, Reserves, or National Guard. These are questions about your military service. As a reminder, your answers are confidential and cannot be used against you.**

**8.1** What is your current or most recent branch of service?

Air Force

Air Force Reserve

Air National Guard

Army

Army Reserve

Army National Guard

Coast Guard

Coast Guard Reserve

Marine Corps

Marine Corps Reserve

Navy

Navy Reserve

**8.2** Are you still serving in the military? *[Only respondents who selected "on active duty in the past, but not now" in 2.17 received this question.]*

No

Yes *[Skip to 8.4]*

**8.3** Did you separate from military service within the last 10 years? *[Only respondents who selected "on active duty in the past, but not now" in 2.17 received this question.]*

Yes

No *[Skip to 8.12]*

**8.4** While serving in the military, have you ever received **mental health** treatment related to a gender transition from a military provider (do not include VA)? *[Only respondents who selected "Yes" in 8.2 or selected "Yes" in 8.3 received this question.]*

No

Yes

**8.5** While serving in the military, have you ever received **medical** treatment related to a gender transition from a military provider (do not include VA)? *[Only respondents who selected "Yes" in 8.2 or selected "Yes" in 8.3 received this question.]*

No

Yes

**8.6** Has any military medical or mental health provider reported to your commanding officer that you are trans or recommended you for discharge? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 8.2 received this question. Respondents could not select "No" in combination with any other option.]*

No

Yes, reported that I was trans

Yes, recommended me for discharge

Does not apply to me, none of these providers knew that I was trans

**8.7** If trans people were allowed to serve openly, which of these would apply to you? *[Only respondents who selected "Yes" in 8.2 received this question.]*

I would start to transition while still serving

I would finish the transition that I have already started while still serving

I would not finish the transition that I have already started while still serving

I would leave military service so that I could transition, and not return.

I would leave military service so that I could transition, then return to service after transition

I do not want to transition

I have already transitioned

None of the options listed above

**8.8** If trans people were allowed to serve openly, I would return to service: *[Only respondents who selected "Yes" in 8.3 received this question.]*

Yes

No

Maybe

**8.9** How many people in the military (who aren't trans) believe you are trans? *[Only respondents would selected "Yes" in 8.2 received this question.]*

None *[Skip to 9.1]*

A few

Some

Most

All

AR_217263

**8.10** Does your leadership or commanding officer (or both) think or know you are trans? *[Only respondents who selected "Yes" in 8.2 and an answer choice other than "None" in 8.9 received this question.]*

No *[Skip to 9.1]*

Yes

**8.11** How has your leadership or commanding officer (or both) reacted to you being trans? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 8.10 received this question.]*

Supported my name change

Supported my medical treatment

Ignored it or looked the other way

Took actions to discharge me

Not listed above (please specify) _____

*[Only respondents who selected "No" in 8.2 and "No" in 8.3 received questions 8.12–8.21]*

**8.12** What was your character of discharge?

Entry Level Separation

Honorable

General

Medical

Other-than-honorable

Bad Conduct

Dishonorable

None of the options listed above (please specify) _____

**8.13** Do you believe your discharge was related to being trans?

No

Yes, partially

Yes, completely

**8.14** Did you leave the service in order to transition?

No

Yes

**8.15** Did you leave the service to avoid mistreatment/harassment?

No

Yes

**8.16** Did any military medical or mental health provider tell your commander that you are trans or recommend you for discharge? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No

Yes, reported that I was trans.

Yes, recommended me for discharge.

Does not apply to me, none of these providers knew that I was trans.

**8.17** Did you ever get any type of health care through the VA?

No *[Skip to 8.21]*

Yes

**8.18** Did you ever get health care related to a gender transition through the VA?

No

Yes

**8.19** Do you currently get any type of health care through the VA?

No

Yes

**8.20** As a trans person, have you received respectful care at the VA?

Never

Sometimes

Mostly

Always

Does not apply to me, the VA staff do not know I'm trans

**8.21** Have you changed your name on your DD214 military discharge papers?

Yes, I received an updated DD214 with new name.

Yes, I received a DD215 (amended) with new name.

No, I was denied.

No, I never tried.

## Section 9

*[Only respondents who selected any answer choice other than "U.S. citizen, birth" in 2.18 received questions in this section.]*

**You said earlier that you are not a U.S. citizen by birth. These are questions about immigration experiences you may have had. As a reminder, your answers are confidential and cannot be used against you.**

**9.1** Have you ever been held in immigration detention (such as being held in an Immigration and Customs Enforcement (ICE) detention center or local jail just for immigration court proceedings)?

No *[Skip to 9.6]*

Yes

**9.2** While you were in immigration detention, do you believe staff, guards, or others thought or knew you were trans or lesbian, gay, or bisexual (LGB)?

No

Yes

**9.3** When you were in immigration detention, separated from others who were also in detention? (**Mark all that apply.**) *[Respondents could not choose "No" in combination with any other option.]*

No *[Skip to 9.5]*

Yes, in solitary confinement

Yes, in a separate area for trans or LGB people (such as a pod, unit, tank, or other housing area) *[Skip to 9.5]*

Not listed above (please specify) _____ *[Skip to 9.5]*

**9.4** In total, how long were you held in solitary confinement? *[Only respondents who selected "Yes, in solitary confinement" received this question.]*

Up to 14 days (up to two weeks)

15 days to 30 days (three or four weeks)

31 days to 90 days (1-3 months)

91 days to 180 days (3-6 months)

181 days to one year (more than 6 months up to a year)

More than 1 year

**9.5** When you were in immigration detention, did any of these things happen to you? (**Mark all that apply.**) *[Respondents could not select "None of these things happened to me" in combination with any other option.]*

I was physically assaulted.

*[Respondents who selected this answer choice received the following question.]* Were you physically assaulted by:

Staff or detention officers

Other detainees or inmates

I was sexually assaulted.

*[Respondents who selected this answer choice received the following question.]* Were you sexually assaulted by:

Staff or detention officers

Other detainees or inmates

I was threatened with sexual assault

*[Respondents who selected this answer choice received the following question.]* Were you threatened with sexual assault by:

Staff or detention officers

Other detainees or inmates

I was denied access to hormones that I use.

I was denied gender-appropriate clothing.

None of these things happened to me.

**9.6** Have you ever applied for asylum in the United States? *[Respondents could select multiple answer choices but could not select "No" in combination with any other answer choice.]*

No *[Skip to 9.8]*

Yes, because I am trans or LGB

Yes, for another reason

**9.7** Did you receive asylum in the United States? *[Only respondents who selected "Yes, because I am trans or LGB" or "Yes, for another reason" received this question.]*

Yes *[Skip to 10.1]*

No *[Skip to 9.9]*

No, but I received a "withholding of removal" status. *[Skip to 10.1]*

**9.8** Why didn't you apply for asylum? *[Only respondents who selected "No" in 9.6 received this question.]*

I didn't know how to apply.

I have access to other legal statuses.

I didn't want to apply.

I was afraid to apply.

I believed I was past the 1 year deadline.

A reason not listed above (please specify) _____

**9.9** Why didn't you receive asylum? *[Only respondents who selected "No" in 9.7 received this question.]*

I was past the 1 year deadline.

The immigration official decided that I didn't face danger in my country.

A reason not listed above (please specify) _____

## Section 10

**These are questions about legal name change and your current identification documents, such as your birth certificate or driver's license.**

**10.1** Did you ever try **OR** complete the process to get a legal name change to match your gender identity?

No *[Skip to 10.12]*

Yes

**10.2** How did you try to change your name?

With a court order

During the immigration/naturalization process *[Skip to 10.13]*

By another method (Please tell us what method) _____ *[Skip to 10.13]*

**10.3** For your legal name change, did you interact with judges or court staff? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

No *[Skip to 10.7]*

Yes

**10.4** Do you believe the judges or court staff you interacted with thought or knew you were trans? *[Only respondents who selected "Yes" in 10.3 received this question.]*

No *[Skip to 10.7]*

Yes

**10.5** When you interacted with judges or court staff, were you treated with respect? *[Only respondents who selected "Yes" in 10.4 received this question.]*

I was never treated with respect

I was sometimes treated with respect

I was always treated with respect

**10.6** When you interacted with judges or court staff, did you experience any of the following? **(Please provide an answer in each row.)** *[Only respondents who selected "Yes" in 10.4 received this question.]*

|  | No | Yes |
|---|---|---|
| I was verbally harassed. | ○ | ○ |
| I received unequal treatment/service. | ○ | ○ |
| They kept calling me by the wrong gender pronouns (such as he/him or she/her) or a wrong title (Mr. or Ms.). | ○ | ○ |
| I was asked questions about my gender transition (such as hormones and surgical status). | ○ | ○ |

**10.7** Did the court grant your name change? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

Yes, the court granted my name change. *[Skip to 10.9]*

No, the court denied my name change.

No, I ran out of money to complete the process. *[Skip to 10.9]*

No, I gave up. *[Skip to 10.9]*

Not sure yet. I am still in the process of getting my court ordered name change.*[Skip to 10.9]*

Not listed above (please specify) _____ *[Skip to 10.9]*

**10.8** Why did the court deny your name change? *[Only respondents who selected "No, the court denied my name change" in 10.7 received this question.]*

*[Text box]*

**10.9** How old were you when you went to court to get your legal name change? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

*[Drop-down list of ages]*

**10.10** Did you get legal help to change your name? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

No

Yes, I got legal help from a paid attorney.

Yes, I got help for free from a legal clinic or non-profit organization.

Yes, I got help from a friend.

Yes, I got help from some other source.

**10.11** How much did your legal name change cost? Please include the cost of legal help, court fees, newspaper publication, etc. *[Only respondents who selected "Yes, the court granted my name change" in 10.7 received this question.]*

$0

$1 - $99

$100 - $249

$250 - $499

$500 - $749

$750 - $999

$1,000 - $2,000

More than $2,000

I do not remember the cost of my legal name change.

**10.12** Why you have not tried to legally change your name? **(Mark all that apply.)** *[Only those who selected "No" in 10.1 received this question.]*

I feel like my name doesn't conflict with my gender identity or expression.

I am not ready.

I cannot afford it.

I don't know how.

I believe I am not allowed (for example, because of my criminal record, immigration status, or residency).

I am worried that changing my name would out me.

A reason not listed above (please specify) _____

**10.13** Thinking about how your **NAME** is listed on all of your IDs and records that list your name, such as your birth certificate, driver's license, passport, etc. Which of the statements below is most true? *[All respondents received this question.]*

All of my IDs and records list the name I prefer.

Some of my IDs and records list the name I prefer.

None of my IDs and records list the name I prefer. *[Skip to 10.15]*

**10.14** Which of these IDs/records have you changed to list your preferred **NAME**? **(Please provide an answer in each row.)** *[Only respondents who selected "All of my IDs and records list the name I prefer" or "Some of my IDs and records list the name I prefer" in 10.13 received this question.]*

AR_217266

| | I do not have this ID/ record | I changed my NAME on this ID/record | I was denied a NAME change on this ID/ record | I am in the process of chang- ing my NAME on this ID/record | I have not tried to change my NAME on this ID/ record but I want to | I do not want to change my NAME on this ID/ record |
|---|---|---|---|---|---|---|
| Birth certificate | ○ | ○ | ○ | ○ | ○ | ○ |
| Driver's license and/ or state issued non-driver ID | ○ | ○ | ○ | ○ | ○ | ○ |
| Social Security records | ○ | ○ | ○ | ○ | ○ | ○ |
| Passport | ○ | ○ | ○ | ○ | ○ | ○ |
| Student records (current or last school attended) | ○ | ○ | ○ | ○ | ○ | ○ |
| Work ID | ○ | ○ | ○ | ○ | ○ | ○ |

**10.15** Thinking about how your **GENDER** is listed on all of your IDs and records that list your gender, such as your birth certificate, driver's license, passport, etc. Which of the statements below is most true? *[All respondents received this question.]*

　　All of my IDs and records list the gender I prefer.

　　Some of my IDs and records list the gender I prefer.

　　None of my IDs and records list the gender I prefer. *[Skip to 10.17]*

**10.16** Which of these IDs/records have you changed to list your preferred **GENDER**? **(Please provide an answer in each row.)** *[Only respondents who selected "All of my IDs and records list the gender I prefer" or "Some of my IDs and records list the gender I prefer" in 10.15 received this question.]*

| | I do not have this ID/ record | I changed my GENDER on this ID/ record | I was denied a GENDER change on this ID/re- cord | I am in the pro- cess of chang- ing my GENDER on this ID/re- cord | I have not tried to change my GENDER on this ID/ record but I want to | I do not want to change my GENDER on this ID/ record |
|---|---|---|---|---|---|---|
| Birth certificate | ○ | ○ | ○ | ○ | ○ | ○ |
| Driver's license and/or state issued non-driv- er ID | ○ | ○ | ○ | ○ | ○ | ○ |
| Social Security records | ○ | ○ | ○ | ○ | ○ | ○ |
| Passport | ○ | ○ | ○ | ○ | ○ | ○ |
| Student records (current or last school attended) | ○ | ○ | ○ | ○ | ○ | ○ |

**10.17** You said that none of your IDs or records list the gender you prefer. Why haven't you changed your gender on your IDs or records? **(Mark all that apply.)** *[Only respondents who selected "None of my IDs and records list the gender I prefer" in 10.15 received this question.]*

　　The gender options that are available (male or female) do not fit my gender identity.

　　I have not tried yet.

　　My request was denied.

　　I am not ready.

　　I cannot afford it.

　　I do not know how.

　　I believe I am not allowed. (For example, I have not had the medical treatment needed to change my gender on ID. Or I can't get a doctor's letter or other letter that is needed to update the gender.)

　　I am worried that if I change my gender, I might not be able to get some benefits or services. These might include medical, insurance, employment, etc.

　　I am worried that changing my gender would out me.

　　A reason not listed above (please specify)_____

**10.18** When I have shown IDs with my name or gender that do not match the gender I present as... **(Mark all that apply.)** *[All respondents received this question. Respondents could not select "I have had none of the above problems" or "This does not apply to me. I have only shown IDs that match" in combination with any other option.]*

　　I have been verbally harassed.

　　I have been assaulted/attacked.

　　I have been asked to leave.

　　I have been denied services or benefits.

　　I have had none of the above problems.

　　This does not apply to me. I have only shown IDs that match.

# Section 11

These are questions about your current health insurance coverage, your health care providers, and the health insurance marketplace (such as healthcare.gov).

**11.1** Are you currently covered by any health insurance or health coverage plan?

　　No *[Skip to 11.4]*

　　Yes

**11.2** What type of health insurance or health coverage plan do you have? **(Mark all that apply.)**

　　Insurance through my current or former employer or union

　　Insurance through someone else's current or former employer or union

　　Insurance I or someone else purchased through

AR_217267

HealthCare.Gov or a Health Insurance Marketplace (sometimes called "Obamacare")

Insurance I or someone else purchased directly from an insurance company

Medicare (for people 65 and older, or people with certain disabilities)

Medicaid (government-assistance plan for those with low incomes or a disability)

TRICARE or other military health care

VA (including those who have ever used or enrolled for VA health care)

Indian Health Service

Any other type of health insurance or health coverage plan (please specify) _____

**11.3 In the past year,** did any of these things happen with your health insurance company? (**Please provide an answer in each row.** If you didn't try to get the kind of care listed or if you never tried to change your records, choose "I have not asked for this.")

| In the past year... | Yes | No | I have not asked for this |
|---|---|---|---|
| My health insurance company wouldn't change my records to list my current name or gender. | ○ | ○ | ○ |
| My health insurance company denied me hormone therapy for transition. | ○ | ○ | ○ |
| My health insurance company denied me surgery for transition. | ○ | ○ | ○ |
| My health insurance company covers only some of the surgical care I need for my transition. | ○ | ○ | ○ |
| My health insurance company covers surgery for transition, but has no surgery providers in their network. | ○ | ○ | ○ |
| My health insurance company denied me gender-specific health care (such as Pap smears, prostate exams, mammogram, etc.) because I am trans. | ○ | ○ | ○ |
| My health insurance company denied me other routine health care because I am trans. | ○ | ○ | ○ |

**11.4** Thinking about the doctor or provider you go to for your **trans-related** health care (such as hormone treatment), how much do they know about providing health care for trans people?

I don't have a trans-related doctor or health care provider right now *[Skip to 11.7]*

They know almost everything about trans healthcare

They know most things about trans healthcare

They know some things about trans healthcare

They know almost nothing about trans healthcare

I am not sure

**11.5** How far do you travel to see your trans-related health care provider?

Less than 10 miles

10-25 miles

25-50 miles

50-75 miles

75-100 miles

Over 100 miles

**11.6** Do you also go to your **trans-related** health care provider for your routine health care, like physicals, flu, diabetes, etc.?

Yes, I see my trans health care provider for my routine health care *[Skip to 11.9]*

No, I see a different doctor or health care provider for my routine healthcare

No, I do not get any routine health care *[Skip to 11.9]*

**11.7** How much does your *routine health care* provider (who you see for physicals, flu, diabetes, etc.) know about health care for trans people? *[Only respondents who selected "No, I see a different doctor or health care provider for my routine healthcare" received this question.]*

I don't have a routine health care provider *[Skip to 11.9]*

They know almost everything about trans health care

They know most things

They know some things

They know almost nothing

I am not sure

**11.8** How far do you travel to see your routine health care provider? *[Only respondents who selected "No, I see a different doctor or health care provider for my routine healthcare" received this question.]*

Less than 10 miles

10-25 miles

25-50 miles

50-75 miles

75-100 miles

Over 100 miles

**11.9 In the past year,** did you look for health insurance from a state or federal health insurance marketplace? (Health insurance marketplaces are part of the new health care law, sometimes called "Obamacare" or the "Affordable Care Act," where people can get insurance online, such as through healthcare.gov, over the phone, or in person.)

No *[Skip to 12.1]*

Yes

**11.10** Did you buy insurance or enroll in a state Medicaid program through a health insurance marketplace? *[Only respondents who selected "Yes" in 11.9 received this question.]*

No *[Skip to 12.1]*

Yes

**11.11** What type of insurance coverage did you buy? *[Only respondents who selected "Yes" in 11.10 received this question.]*

Coverage through a state Medicaid program

Coverage through a private plan with a subsidy, so I pay a lower price because of my income

Coverage through a private plan without a subsidy

Not listed above (please specify) _____

## Section 12

**These are questions about your health, experiences with doctors or health care providers, and health care.**

**12.1** Would you say that in general your health is...

Excellent

Very good

Good

Fair

Poor

**12.2** The following questions ask about how you have been feeling **during the past 30 days**. For each row, please select the column that best describes how often you had this feeling. **(Please provide an answer in each row.)**

| During the past 30 days, how often did you feel... | All of the time | Most of the time | Some of the time | A little of the time | None of the time |
|---|---|---|---|---|---|
| ...so sad that nothing could cheer you up? | O | O | O | O | O |
| ...nervous? | O | O | O | O | O |
| ...restless or fidgety? | O | O | O | O | O |
| ...hopeless? | O | O | O | O | O |
| ...that everything was an effort? | O | O | O | O | O |
| ...worthless? | O | O | O | O | O |

**12.3** We just asked about a number of feelings you had **during the past 30 days**. Altogether, how MUCH did these feelings interfere with your life or activities? *[Only respondents who selected an answer choice other than "None of the time" in 12.2 received this question.]*

A lot

Some

A little

Not at all

**12.4** Was there a time **in the past 12 months** when you needed to see a doctor but could not because of cost?

No

Yes

**12.5** Was there a time in the **past 12 months** when you needed to see a doctor but did not because you thought you would be disrespected or mistreated as a trans person?

No

Yes

**12.6 In the past year**, have you seen a doctor or health care provider?

No *[Skip to 12.8]*

Yes

**12.7 In the past year**, did you have any of these things happen to you, as a trans person, when you went to see a doctor or health care provider? **(Please provide an answer in each row.)** *[Only respondents who selected "Yes" in 12.6 received this question.]*

| In the past year... | No | Yes |
|---|---|---|
| My doctor knew I was trans and treated me with respect. | O | O |
| I had to teach my doctor or other health-care provider about trans people so that I could get appropriate care. | O | O |
| A doctor or other health care provider refused to give me trans-related care. | O | O |
| A doctor or other health care provider refused to give me other health care (such as for like physicals, flu, diabetes). | O | O |
| My doctor asked me unnecessary/invasive questions about my trans status that were not related to the reason for my visit. | O | O |
| A doctor or other health care provider used harsh or abusive language when treating me. | O | O |
| A doctor or other health care provider was physically rough or abusive when treating me. | O | O |
| I was verbally harassed in a health care setting (such as a hospital, office, clinic) | O | O |
| I was physically attacked by someone during my visit in a health care setting (such as a hospital, office, clinic). | O | O |
| I experienced unwanted sexual contact (such as fondling, sexual assault, or rape) in a health care setting (such as a hospital, office, clinic). | O | O |

**12.8** Have you **ever wanted** any of the health care listed below for your gender identity or gender transition? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

Counseling/Therapy

Hormone Treatment/HRT

Puberty Blocking Hormones (usually used by youth ages 9-16)

None of the above

**12.9** Have you **ever had** any of the health care listed below for your gender identity or gender transition? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

Counseling/Therapy

Hormone Treatment/HRT

Puberty Blocking Hormones (usually used by youth ages 9-16)

None of the above

**12.10** At what age did you begin hormone treatment/HRT treatment? *[Only respondents who selected "Hormone Therapy/HRT" in 12.9 received this question.]*

　　*[Drop-down list of ages]*

**12.11** At what age did you begin taking Puberty Blocking Hormones? *[Only respondents who selected "Puberty Blocking Hormones" in 12.9 received this question.]*

　　*[Drop-down list of ages]*

**12.12** Are you currently taking hormones for your gender identity or gender transition?

　　No *[Skip to 12.15]*

　　Yes

**12.13** Where do you currently get your hormones? *[Only respondents who selected "Yes" in 12.12 and did not select "Now on active duty" in 2.17 received this question.]*

　　I only go to licensed professionals (like a doctor) for hormones

　　In addition to licensed professionals, I also get hormones from friends, online, or other non-licensed sources

　　I ONLY get hormones from friends, online, or other non-licensed sources

**12.14** Where do you currently get your hormones? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 12.12 and selected "Now on active duty" in 2.17 received this question.]*

　　On-post medical doctor

　　Off-post medical doctor

　　On-post pharmacy

　　Off-post pharmacy

　　Through friends, online, or other non-licensed sources (not through a doctor or medical provider)

　　Another source not listed above (please specify) _____

**12.15** Have you had or do you want any of the health care listed below for gender transition? **(Please give an answer in each row.)** *[Only respondents who selected "Female" in 2.1 received this question.]*

|  | Have had it | Want it some day | Not sure if I want this | Do not want this |
|---|---|---|---|---|
| Top/chest surgery reduction or reconstruction | O | O | O | O |
| Hysterectomy/"hysto" (removal of the uterus, ovaries, fallopian tubes, and/or cervix) | O | O | O | O |
| Clitoral release/metoidioplasty/ centurion procedure | O | O | O | O |
| Phalloplasty (creation of a penis) | O | O | O | O |
| Other procedure not listed: _____ | O | O | O | O |

**12.16** You said that you had at least one procedure for your gender transition. At what age did you have your first procedure (other than hormones)? *[Only respondents who selected "Have had it" at least once in 12.15 received this question.]*

　　*[Drop-down list of ages]*

**12.17** Have you had a Pap smear or Pap test in the past year? *[Only respondents who selected "Female" in 2.1 received this question.]*

　　No

　　Yes

**12.18** Have you had or do you want any of the health care listed below for gender transition? **(Please provide an answer in each row.)** *[Only respondents who selected "Male" in 2.1 received this question.]*

|  | Have had it | Want it some day | Not sure if I want this | Do not want this |
|---|---|---|---|---|
| Hair removal/electrolysis | O | O | O | O |
| Breast augmentation / top surgery | O | O | O | O |
| Silicone injections | O | O | O | O |
| Orchidectomy / "orchy" / removal of testes | O | O | O | O |
| Vaginoplasty/labiaplasty/SRS/GRS/GCS | O | O | O | O |
| Trachea shave (Adam's apple or thyroid cartilage reduction) | O | O | O | O |
| Facial feminization surgery (such as nose, brow, chin, cheek) | O | O | O | O |
| Voice therapy (non-surgical) | O | O | O | O |
| Voice surgery | O | O | O | O |
| Other procedure not listed: | O | O | O | O |

**12.19** You said that you had at least one procedure for your gender transition. At what age did you have your first procedure (other than hormones)? *[Only respondents who selected "Have had it" at least once for a procedure other than "voice therapy (non-surgical)" in 12.15 received this question.]*

　　*[Drop-down list of ages]*

**12.20** Have you ever de-transitioned? In other words, have you ever gone back to living as your sex assigned at birth, at least for a while?

　　I have never transitioned. *[Skip to 13.1]*

　　No *[Skip to 13.1]*

　　Yes

**12.21** Why did you de-transition? In other words, why did you go back to living as your sex assigned at birth? **(Mark all that apply.)**

　　Pressure from spouse or partner

　　Pressure from a parent

AR_217270

Pressure from other family members

Pressure from friends

Pressure from my employer

Pressure from a religious counselor

Pressure from a mental health professional

I had trouble getting a job.

I realized that gender transition was not for me.

I faced too much harassment/discrimination.

It was just too hard for me.

Not listed above (please specify)_____

## Section 13

**These are questions about experiences you may have had with some professionals, such as psychologists, counselors, religious advisors.**

**13.1** Did you ever discuss your gender identity or trans identity with a professional (such as a psychologist, counselor, religious advisor)?

No *[Skip to 13.5]*

Yes

**13.2** Did any professional (such as a psychologist, counselor, religious advisor) try to make you identify only with your sex assigned at birth (in other words, try to stop you being trans)?

No *[Skip to 13.5]*

Yes

**13.3** How old were you the first time a professional tried to make you identify only with your sex assigned at birth (in other words, try to stop you being trans)? *[Only respondents who selected "Yes" in 13.2 received this question.]*

*[Drop-down list of ages]*

**13.4** Was this person a religious or spiritual counselor/advisor? *[Only respondents who selected "Yes" in 13.2 received this question.]*

No

Yes

**13.5** Did you ever discuss your **sexual orientation** with any professional (such as a psychologist, counselor, religious advisor)?

No *[Skip to 14.1]*

Yes

**13.6** Did any professional (such as a psychologist, counselor, religious advisor) ever try to change your **sexual orientation**

or who you are attracted to (such as try to make you straight/heterosexual)? *[Only respondents who selected "Yes" in 13.5 received this question.]*

No

Yes

## Section 14

**These are questions about HIV testing and care.**

**14.1** This question is about the test for HIV, the virus that causes AIDS. Except for tests you may have had as part of blood donations, have you ever been tested for HIV?

No *[Skip to 14.3]*

Yes

**14.2** What was the result of your most recent HIV test? *[Only those who selected "Yes" in 14.1 received this question.]*

HIV positive or reactive, meaning I have HIV. *[Skip to 14.4]*

HIV negative, meaning I do not have HIV. *[Skip to 14.4]*

HIV test results were unclear, meaning the test could not determine if I have HIV. *[Skip to 14.4]*

I don't know. I never received the results. *[Skip to 14.4]*

**14.3** Here is a list of reasons why some people have not been tested for HIV (the virus that causes AIDS). Which one of these would you say is the MAIN reason why you have not been tested? *[Only respondents who selected "No" in 14.1 received this question.]*

It's unlikely I've been exposed to HIV.

I was afraid to find out if I was HIV positive (that you had HIV).

I didn't want to think about HIV or about being HIV positive.

I was worried my name would be sent to the government if I tested positive.

I didn't know where to get tested.

I don't like needles.

I was afraid of losing my job, insurance, home, friends, or family if people knew I was tested for AIDS infection.

My doctor/health care provider never mentioned getting an HIV test.

Some other reason

No particular reason

**14.4_1** Where were you last tested? *[Only respondents who selected "Yes" in 14.1 received this question.]*

Private doctor or HMO office

Counseling and testing site

Emergency room

Hospital inpatient

AR_217271

Clinic

Jail or prison (or other correctional facility)

Drug treatment facility

At home

Somewhere else

A place not listed above
(please specify) _____

**14.4_2** Not including blood donations, in what month and year was your last HIV test? *[Only respondents who selected "Yes" in 14.1 received this question.]*

Month *[Drop-down list of all months]*

Year *[Drop-down list with years 2015–1984 and "before 1984" as a final option]*

*[Only respondents who selected "HIV positive or reactive, meaning I have HIV" in 14.2 received questions 14.5–14.13.]*

**14.5** In the past 12 MONTHS, have you seen a doctor or health care provider for HIV care? Don't include care you received during emergency room visits or while staying in the hospital.

No

Yes *[Skip to 14.7]*

**14.6** What is the main reason you haven't seen a doctor or health care provider for HIV care in the past 12 months? *[Only respondents who selected "No" in 14.5 received this question.]*

I couldn't afford it.

I have no health insurance.

I only recently found out I have HIV.

I have needed other types of medical or mental health care.

I didn't know where to go for HIV care.

I wasn't ready to look for health care for HIV.

I didn't feel sick enough to look for health care.

My family or partner would find out I have HIV.

I believed that I would be mistreated because I am trans.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

**14.7** In the past 6 MONTHS, have you seen a doctor or health care provider for HIV care? Don't include care you received during emergency room visits or while staying in the hospital. *[Only respondents who selected "Yes" in 14.5 received this question.]*

No

Yes *[Skip to 14.9]*

**14.8** What is the main reason that you haven't seen a doctor or health care provider for HIV care in the past 6 months? *[Only*

respondents who selected "No" in 14.7 received this question.]*

I couldn't afford it.

I have no health insurance.

I have needed other types of medical or mental health care.

I didn't know where to go for HIV care.

I wasn't ready to look for health care for HIV.

I didn't feel sick enough to look for health care.

My family or partner would find out I have HIV.

I believed that I would be mistreated because I am trans.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

**14.9** When was your last blood test to determine your viral load and CD4 counts?

Within the past 6 months

Within the past year

More than a year ago

I have never had a blood test for my viral load and CD4 count.

**14.10** Have you ever been prescribed anti-retroviral therapy, which are the pills that reduce the amount of HIV in your body (often called ART)?

No

Yes

**14.11** Are you currently taking anti-retroviral therapy (ART)?

No *[Skip to 14.13]*

Yes

**14.12** Do you take your anti-retroviral therapy (ART) like you're supposed to (regularly and as prescribed)?

Never

Rarely

Most of the time

All of the time *[Skip to 15.1]*

**14.13** What is the main reason that are you not taking or not regularly taking anti-retroviral therapy (ART) all of the time? *[Only respondents who selected "No" in 14.11 or "Never," "Rarely," or "Most of the time" in 14.12 received this question.]*

I can't afford it.

I have no health insurance.

I only recently found out I have HIV.

My doctor or health care provider said I didn't need it.

I am afraid it would conflict with my hormones.

I am afraid it would conflict with my other medications.

I would gain weight.

AR_217272

I don't know where to get it.

I don't want to take anti-retroviral therapy (ART).

I don't feel sick enough to take anti-retroviral therapy (ART).

My family, partner, or friends would find out I have HIV.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

## Section 15

**These are questions about your use of alcohol, tobacco, marijuana, or other drugs.**

**15.1** Have you **ever** had a drink[19] of any type of alcoholic beverage, smoked part or all of a cigarette, or used any of the other following substances? **(Please provide an answer in each row.)**

| | No | Yes |
|---|---|---|
| Alcohol[20] (such as beer, wine, or hard liquor) | ○ | ○ |
| Cigarettes[21] (tobacco only) | ○ | ○ |
| E-cigarettes or vaping products[22] | ○ | ○ |
| Marijuana or hashish[23] (such as weed, joints, hash, hash oil) | ○ | ○ |
| Illegal or illicit drugs[24] (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits) | ○ | ○ |
| Prescription drugs[25] (such as Oxycontin, Xanax, Adderall, Ambien) that weren't prescribed to you, or that you didn't take as prescribed. | ○ | ○ |

*[Only respondents who selected "Yes" under "Alcohol (such as beer, wine, or hard liquor)" in 15.1 received questions 15.2–15.4]*

**15.2** How long has it been since you last drank an alcoholic beverage[26]?

　Within the past 30 days

　More than 30 days ago but within the past 12 months

　More than 12 months ago

**15.3** During the past 30 days, on how many days did you drink one or more drinks[27] of an alcoholic beverage? *[Only respondents who selected "Within the past 30 days" in 15.2 received this question.]*

　*[Drop-down list of numbers 1–30]*

**15.4** During the past 30 days, on how many days did you have 5 or more drinks[28] on the same occasion? By 'occasion,' we mean at the same time or within a couple of hours of each other. *[Only respondents who selected "Within the past 30 days" in 15.2 received this question.]*

　*[Drop-down list of numbers 1–30]*

*[Only respondents who selected "Yes" under "Cigarettes (tobacco only)" in 15.1 received questions 15.5–15.7]*

**15.5** How long has it been since you last smoked part or all of a cigarette?

　Within the past 30 days

　More than 30 days ago but within the past 12 months

　More than 12 months ago

**15.6** During the past 30 days, on how many days did you smoke part or all of a cigarette? *[Only respondents who selected "Within the past 30 days" in 15.5 received this question.]*

　*[Drop-down list of numbers 1–30]*

**15.7** On the days you smoked cigarettes during the past 30 days, how many cigarettes did you smoke per day, on average? *[Only respondents who selected "Within the past 30 days" in 15.5 received this question.]*

　Less than one cigarette per day

　1 cigarette per day

　2 to 5 cigarettes per day

　6 to 15 cigarettes per day (about ½ pack)

　16 to 25 cigarettes per day (about 1 pack)

　26 to 35 cigarettes per day (about 1 ½ packs)

　More than 35 cigarettes per day (about 2 packs or more)

**15.8** How long has it been since you last used E-Cigarettes or vaping products? *[Only respondents who selected "Yes" under "E-cigarettes or vaping products" in 15.1 received this question.]*

　Within the past 30 days

　More than 30 days ago but within the past 12 months

　More than 12 months ago

**15.9** How long has it been since you **last** used marijuana or hashish? *[Only respondents who selected "Yes" under "Marijuana or hashish (such as weed, joints, hash, hash oil)" in 15.1 received this question.]*

　Within the past 30 days

　More than 30 days ago but within the past 12 months

　More than 12 months ago

**15.10** During the past 30 days, on how many days did you use marijuana or hashish? *[Only respondents who selected "Within the past 30 days" in 15.9 received this question.]*

　*[Drop-down list of numbers 1–30]*

**15.11** How long has it been since you last used any illegal/illicit drug (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits)? *[Only respondents who selected "Yes" under "Illegal or illicit drugs (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits)" in 15.1 received this question.]*

　Within the past 30 days

　More than 30 days ago but within the past 12 months

　More than 12 months ago

**15.12** How long has it been since you last used any prescription drugs not as prescribed or not prescribed to you? *[Only respondents who selected "Yes" under "Prescription drugs (such as Oxycontin, Xanax, Adderall, Ambien) that weren't prescribed to you, or that you didn't take as prescribed" in 15.1 received this question.]*

Within the past 30 days

More than 30 days ago but within the past 12 months

More than 12 months ago

## Section 16

**These are questions about suicidal thoughts and behaviors. Talking about suicidal thoughts or behaviors sometimes brings up difficult emotions. If you experience any difficult emotions because of these questions we encourage you to get help from someone you trust or call one of the anonymous helplines listed at the end of the section.**

**16.1** The next few questions are about thoughts of suicide. **At any time in the past 12 months** did you **seriously think about trying to kill yourself**?

No *[Skip to 16.6]*

Yes

**16.2** During the past 12 months, did you **make any plans** to kill yourself? *[Only respondents who selected "Yes" in 16.1 received this question.]*

No

Yes

**16.3** During the past 12 months, did you **try** to kill yourself? *[Only respondents who selected "Yes" in 16.1 received this question.]*

No *[Skip to 16.8]*

Yes

**16.4** During the past 12 months, did you get medical attention from a doctor or other health professional as a result of an attempt to kill yourself? *[Only respondents who selected "Yes" in 16.3 received this question.]*

No *[Skip to 16.9]*

Yes

**16.5** Did you stay in a hospital overnight or longer because you tried to kill yourself? *[Only respondents who selected "Yes" in 16.4 received this question.]*

No *[Skip to 16.9]*

Yes *[Skip to 16.9]*

**16.6 At any time in your life**, have you **seriously thought** about trying to kill yourself? *[Only respondents who selected "No" in 16.1 received this question.]*

No *[Skip to 17.1]*

Yes

**16.7** At any time in your life, did you **make any plans** to kill yourself? *[Only respondents who selected "Yes" in 16.6 received this question.]*

No

Yes

**16.8** At any time in your life, did you **try** to kill yourself? *[Only respondents who said "Yes" in 16.6 received this question.]*

No *[Skip to 17.1]*

Yes

**16.9** How many times have you tried to kill yourself in your lifetime? *[Only respondents who selected "Yes" in 16.3 "or "Yes" to 16.8 received this question.]*

*[Drop-down list of numbers 1–25 and "more than 25" as last option]*

**16.10** How old were you when you tried to kill yourself? *[Only respondents who selected "1" in 16.9 received this question.]*

*[Drop-down list of ages]*

**16.11** How old were you the **first time** you tried to kill yourself? *[Only respondents who selected a value other than "1" in 16.9 received this question.]*

*[Drop-down list of ages]*

**16.12** How old were you the **last time** you tried to kill yourself?

*[Drop-down list of ages]*

If you are experiencing any difficult emotions after answering these questions and would like to talk to someone, please contact one of the anonymous resources below:

**National Suicide Prevention Helpline**
1-800-273-8255
http://www.suicidepreventionlifeline.org/

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**The Trevor Project**
The Trevor Project is a phone and internet chat hotline for LGBTQ people. For those participating in this survey, The Trevor Project will speak or chat with people of all ages.
1-866-488-7386
http://www.thetrevorproject.org/section/get-help

AR_217274

## Section 17

**These are questions about being treated unequally, harassed, or physically attacked.**

**17.1 In the past year,** have you been denied equal treatment or service, such as at a place of business, government agency, or public place for any reason?

No

Yes

**17.2 In the past year,** did anyone verbally harass you for any reason?

No

Yes

**17.3 In the past year,** did anyone physically attack you (such as grab you, throw something at you, punch you, use a weapon) for any reason?

No

Yes

**17.4** You said that you were denied equal treatment or service **in the past year.** Do you believe any of those experiences were because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 17.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.5** You said that you have been verbally harassed **in the past year.** Do you believe any of those experiences were because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 17.2 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.6 In the past year,** did strangers verbally harass you in public because of your trans status, gender identity, or gender expression? *[Only respondents who selected "Trans status/ gender identity" or "Gender expression/appearance" in 17.5 received this question.]*

No

Yes

*[Only respondents who selected "Yes" in 17.3 received questions 17.7–17.10.]*

**17.7 In the past year,** how many times were you physically attacked? _____

*[Drop-down list of numbers]*

**17.8** How were you physically attacked? **(Mark all that apply.)**

With a gun

With a knife

With another weapon (like a baseball bat, frying pan, scissors, or stick)

By something thrown (such as a rock or bottle)

By someone grabbing, punching, or choking you

Unwanted sexual contact (such as rape, attempted rape, being forced to penetrate)

Not listed above

**17.9** When you were physically attacked **in the past year,** do you believe any of those experiences were because of your... **(Mark all that apply).** *[Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.10** In the past year, did strangers physically attack you in public because of your trans status, gender identity, or gender expression? *[Only respondents who selected "Trans status/ gender identity" or "Gender expression/appearance" in 17.9 received this question.]*

No

Yes

APPENDIX B

277

AR_217275

## Section 18

These are questions about unwanted sexual contact. Some people get sexual attention that they don't want and don't ask for. It could come from someone they know well - a romantic or sexual partner, a friend, a teacher, a coworker, a supervisor, or a family member. These questions are based on national surveys that we will use to compare with the U.S. population. If you experience any difficult emotions because of these questions we encourage you to get help from someone you trust or call one of the anonymous helplines listed at the end of the section.

**18.1** Have you ever experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)?

No *[Skip to 19.1]*

Yes

**18.2** Who did this to you? **(Mark all that apply.)**

A partner/ex-partner

A relative

A friend/acquaintance

A law enforcement officer

A health care provider/doctor

A stranger

A boss or supervisor

A co-worker

A teacher or school staff member

A person not listed above

**18.3** Now just thinking about **the past year**, have you experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)?

No

Yes

If you are experiencing any difficult emotions after answering these questions and would like to talk to someone, please contact one of the anonymous resources below:

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**FORGE Transgender Sexual Violence Project**
414-559-2123
http://forge-forward.org/anti-violence/for-survivors/ to list of resources

**National Sexual Assault Hotline**
800-656-HOPE (4673)
https://ohl.rainn.org/online/

## Section 19

These are questions about any harm caused by a current or former romantic or sexual partner. This could include physical, emotional, or financial harm.

**19.1** Have you ever had a romantic or sexual partner?

No *[Skip to 20.1]*

Yes

**19.2** Have any of your romantic or sexual partners ever...? **(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| Tried to keep you from seeing or talking to your family or friends | O | O |
| Kept you from having money for your own use | O | O |
| Kept you from leaving the house when you wanted to go | O | O |
| Hurt someone you love | O | O |
| Threatened to hurt a pet or threatened to take a pet away from you | O | O |
| Wouldn't let you have your hormones | O | O |
| Wouldn't let you have other medications | O | O |
| Threatened to call the police on you | O | O |
| Threatened to "out" you | O | O |
| Told you that you weren't a "real" woman or man | O | O |
| Stalked you | O | O |
| Threatened to use your immigration status against you | O | O |

**19.3** Have any of your romantic or sexual partners ever...? **(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| Made threats to physically harm you | O | O |
| Slapped you | O | O |
| Pushed or shoved you | O | O |
| Hit you with a fist or something hard | O | O |
| Kicked you | O | O |
| Hurt you by pulling your hair | O | O |
| Slammed you against something | O | O |
| Forced you to engage in sexual activity | O | O |
| Tried to hurt you by choking or suffocating you | O | O |
| Beaten you | O | O |
| Burned you on purpose | O | O |
| Used a knife or gun on you | O | O |

AR_217276

## Section 20

**These are questions about your experiences with bathrooms while in public places, at work, or at school.**

**20.1 In the past year,** did anyone tell or ask you if you were using the wrong bathroom?

No

Yes

**20.2 In the past year,** did anyone stop you from entering or deny you access to a bathroom?

No

Yes

**20.3 In the past year,** were you verbally harassed, physically attacked, or experience unwanted sexual contact when accessing or while using a bathroom? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 20.7]*

Yes, verbally harassed

Yes, physically attacked

Yes, experienced unwanted sexual contact

**20.4** You said that you were **verbally harassed** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, verbally harassed" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.5** You said that you were **physically attacked** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, physically attacked" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.6** You said that you **experienced unwanted sexual contact** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, experienced unwanted sexual contact" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.7 In the past year,** did you avoid going to the bathroom because you were afraid of having problems using them? This would include bathrooms in public, at work, or at school.

I have never avoided them *[Skip to 21.1]*

I have sometimes avoided them

I have always avoided them

Not listed above (please specify) _____

**20.8** Did you experience any of the following because you avoided using bathrooms in public places, at work, or at school? **(Mark all that apply.)** *[Only respondents who selected an answer choice other than "I have never avoided them" in 20.8 received this question.]*

Not going when needed ("holding it")

I avoided drinking or eating

Urinary tract infection

Kidney infection

Other kidney-related problems

I have never had physical problems from avoiding bathrooms

Not listed above (please specify) _____

## Section 21

**These are questions about things that might have happened to you at your job or business, or while you were looking for work.**

**21.1** Have you ever worked at a job or business? Do not include sex work, selling drugs, or other work that is currently considered illegal.

No *[Skip to 21.6]*

Yes

**21.2** Have you ever lost a job or been laid off?

No *[Skip to 21.4]*

Yes

**21.3** Do you believe that you were ever laid off or lost a job because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 21.2 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.4** Have you ever been fired or forced to resign from a job?

No *[Skip to 21.6]*

Yes

**21.5** Do you believe that you were ever fired or forced to resign because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 21.4 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.6 Now just thinking about the past year,** did you apply for a job and/or work at a job or business? Do not include sex work, selling drugs, or other work that is currently considered illegal. **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 22.1]*

Yes, I applied for a job

Yes, I worked at job or business

**21.7 In the past year,** how many times have you been... **(Please provide an answer in each row.)**

| In the past year... | 0 times | 1 time | 2 times | 3 times | 4 times | 5 or more times |
|---|---|---|---|---|---|---|
| Denied a promotion at a job | O | O | O | O | O | O |
| Not hired for a job you applied for | O | O | O | O | O | O |
| Fired or forced to resign from a job | O | O | O | O | O | O |

**21.8_1** Do you believe that any of the times that you were **denied a promotion at a job** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Denied a promotion at a job" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.8_2** Do you believe that any of the times that you were **not hired for a job you applied for** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Not hired for a job you applied for" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.8_3** Do you believe that any of the times that you were **fired or forced to resign from a job** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Fired or forced to resign from a job" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

*[Only respondents who selected "Trans status/gender identity" or "gender expression/appearance" in 21.8_3 received questions 21.9–21.11.]*

**21.9** Now just thinking about when you were **fired or forced to resign from a job** because of your gender identity, trans status, and/or gender expression in the past year, please describe your response. **(Mark all that apply.)**

I did nothing *[Skip to 22.1]*

I contacted a lawyer.

I contacted a trans, LGBT, or other non-profit group. *[Skip to 22.1]*

I contacted my union representative. *[Skip to 22.1]*

I made an official complaint.

Not listed above (please specify) _____ *[Skip to 22.1]*

**21.10** You said that you contacted a lawyer in response to being **fired or forced to resign from a job** in the past year. What did the lawyer do to help you? *[Only respondents who selected "I contacted a lawyer" in 21.9 received this question.]*

I was not able to hire the lawyer.

The lawyer called or wrote a letter to my employer.

The lawyer helped me file an official complaint.

The lawyer filed a lawsuit for me.

Not listed above (please specify) _____

**21.11** You said that you made an official complaint in response to being **fired or forced to resign from a job** in the past year. Where did you make the official complaint? **(Mark all that apply.)** *[Only respondents who selected "I made an official complaint" in 21.9 received this question.]*

EEOC (Equal Employment Opportunity Commission

Local/State Human Rights Commission

The Human Resources or Personnel department of the employer

Equal Employment Opportunity (EEO) office of the employer

Not listed above (please specify) _____

## Section 22

*[Only respondents who selected "Yes, I worked at a job or business" in 21.6 received questions 22.1–22.3.]*

**22.1 In the past year, to avoid** trans discrimination at work... **(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| I asked for a transfer to a different position/department at my job in the past year | ○ | ○ |
| I stayed in a job I'd prefer to leave in the past year | ○ | ○ |
| I didn't seek a promotion or a raise in the past year | ○ | ○ |
| I quit my job in the past year | ○ | ○ |
| I had/have a job for which I am over-qualified (in the past year) | ○ | ○ |
| I had to be in the closet about my gender identity in the past year | ○ | ○ |
| I delayed my gender transition in the past year | ○ | ○ |
| I did not ask my employer to use the pronouns I prefer in the past year (such as he, she, or they) | ○ | ○ |
| I hid the fact that I have transitioned gender already in the past year | ○ | ○ |

**22.2 In the past year,** did any of these things happen to you because of trans discrimination at work? **(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| My employer/boss forced me to resign in the past year. | ○ | ○ |
| My employer/boss forced me to transfer to a different position/department at my job in the past year. | ○ | ○ |
| My employer/boss removed me from direct contact with clients, customers, or patients in the past year. | ○ | ○ |
| My employer/boss told me to present in the wrong gender in order to keep my job in the past year. | ○ | ○ |
| My employer/boss gave me a negative job review in the past year. | ○ | ○ |
| My employer/boss and I could not work out an acceptable bathroom situation in the past year. | ○ | ○ |
| My employer/boss did not let me use the bathroom I should be using based on my gender identity in the past year. | ○ | ○ |
| My employer/boss or coworkers shared information about me that they should not have in the past year. | ○ | ○ |

**22.3 In the past year,** did any of these things happen to you at work because you are trans? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

I was verbally harassed

I was physically attacked

I experienced unwanted sexual contact (such as fondling, sexual assault, or rape)

None of the above

AR_217279

## Section 23

**These are questions about experiences you may have had with housing.**

**23.1** Have you ever experienced homelessness? Experiencing homelessness includes such things as staying in a shelter, living on the street, living out of a car, or staying temporarily with family or friends because you can't afford housing.

No

Yes

**23.2 Now just thinking about the past year,** have you had any of these housing situations **because you are trans? (Please provide an answer in each row.)**

Please choose "Does not apply to me" if you could not have had that housing situation in the past year. For example, if you didn't rent a home in the past year, you would answer "Does not apply to me" to the first question because you could not have been evicted.

| In the past year... | Yes | No | Does not apply to me |
|---|---|---|---|
| I was evicted from my home/apartment. | ○ | ○ | ○ |
| I was denied a home/apartment. | ○ | ○ | ○ |
| I experienced homelessness.[29] | ○ | ○ | ○ |
| I had to move back in with family members or friends. | ○ | ○ | ○ |
| I had to move into a less expensive home/apartment. | ○ | ○ | ○ |
| I slept in different places for short periods of time, such as on a friend's couch. | ○ | ○ | ○ |

## Section 24

*[Only respondents who selected "I experienced homelessness" in 23.2 received questions 24.1–24.4.]*

**24.1** When you experienced homelessness **this past year,** did you seek shelter in a homeless shelter? **(Mark all that apply.)** *[Respondents could not select a "No" answer in combination with a "Yes" answer.]*

Yes, and I stayed at one or more shelters. *[Skip to 24.3]*

Yes, but I was denied access to one or more shelters.

No, because I feared I would be mistreated as a trans person *[Skip to 25.1]*

No, for other reasons *[Skip to 25.2]*

**24.2** Do you believe that you were denied access to a homeless shelter in the past year because of your ... **(Mark all that apply.)** *[Only respondents who selected "Yes, but I was denied access to one or more shelters" in 24.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**24.3 In the past year,** did any of these things happen to you in the homeless shelter? **(Please provide an answer in each row.)** *[Only respondents who selected "Yes, and I stayed at one or more shelters" in 24.1 received this question.]*

| | No | Yes |
|---|---|---|
| I was thrown out after they learned I was trans. | ○ | ○ |
| I decided to dress/present as the wrong gender to feel safe in a shelter. | ○ | ○ |
| They required me to dress/present as the wrong gender in the shelter. | ○ | ○ |
| I decided to leave a shelter because of poor treatment or unsafe conditions, even though I had no place to go. | ○ | ○ |

**24.4 In the past year,** did any of these things happen to you in a homeless shelter because you are trans? **(Mark all that apply.)** *[Only respondents who selected "Yes, and I stayed at one or more shelters" in 24.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

I was verbally harassed

I was physically attacked

I experienced unwanted sexual contact (such as fondling, sexual assault, or rape)

None of the above

## Section 25

**These are questions about your experiences in places of public accommodations, such as hotels, restaurants, or government agencies.**

**25.1 In the past year,** have you visited or used services in any of these places? **(Mark all that apply.)** *[Respondents could not select "I have not visited or used services in any of these places" in combination with any other option.]*

Domestic violence shelter/DV program/Rape crisis center

Drug/alcohol treatment program

DMV or RMV (Department or Registry of Motor Vehicles)

Social Security office (such as for name or gender change, Social Security card, public benefits)

Public assistance/government benefits office (such as SNAP, WIC)

Gym/health club

Legal services from an attorney, clinic, or legal professional

Court/court house

Nursing home/extended care facility

Public transportation (such as bus, train, subway, taxi)

Retail store, restaurant, hotel, theater

I have not visited or used services in any of these places.

**25.2 In the past year**, did you **NOT** visit or use services at these places because you thought you would be mistreated as a trans person? **(Please give an answer for each place.)** *[Respondents received this question for each of the locations that they did not select in 25.1.]*

|  | No | Yes (I did NOT visit because I thought I would be mistreated) |
|---|---|---|
| *[Location not selected in 25.1]* | ○ | ○ |

**25.3 In the past year**, when you visited or used services at these places, do you think the staff or employees knew or thought you were trans? **(Please give an answer for each place.)** *[Respondents received this question for each of the locations that they selected in 25.1.]*

|  | No | Yes |
|---|---|---|
| *[Location selected in 25.1]* | ○ | ○ |

**25.4 In the past year**, when you visited or used services at these places, did any of these things happen to you because you are trans? **(Please provide an answer for each location.)** *[Respondents received this question for each of the locations that they selected in 25.1.]*

|  | Denied equal treatment or service | Verbally harassed | Physically attacked | None of these things happened to me at this place |
|---|---|---|---|---|
| *[Location selected in 25.1]* | ○ | ○ | ○ | ○ |

# Section 26

**These are questions about experiences you may have had in school.**

**26.1** Were you out as trans in school at any time between Kindergarten and 12th grade?

No

Yes *[Skip to 26.3]*

**26.2** Do you believe that any of your classmates, teachers, or school staff in Kindergarten through 12ᵗʰ grade (K-12) **thought** you were trans? *[Only respondents who selected "No" in 26.1 received this question.]*

No

Yes

**26.3** Do you believe that any of your classmates, teachers or school staff in K-12 thought or knew you were lesbian, gay, bisexual, or queer (LGBQ)?

No

Yes

**26.4** Did any of these happen to you while in K-12? (If any of these things were done to you in K-12 by classmates, teachers, or school staff, please answer "yes.") **(Please provide an answer in each row.)** *[Only respondents who selected "Yes" in 26.1 or "Yes" in 26.2 received this question.]*

|  | NO | YES |
|---|---|---|
| I was verbally harassed because people thought I was trans. | ○ | ○ |
| I was physically attacked because people thought I was trans. | ○ | ○ |
| I experienced unwanted sexual contact because people thought I was trans | ○ | ○ |
| I wasn't allowed to dress in the way that fit my gender identity/expression. | ○ | ○ |
| I was disciplined for fighting back against bullies. | ○ | ○ |
| I believe I was disciplined more harshly because teachers/staff thought I was trans. | ○ | ○ |
| I left a school because the mistreatment was so bad. | ○ | ○ |
| I was expelled from school. | ○ | ○ |

**26.5** Did any of these happen to you while in K-12? (If any of these things were done to you in K-12 by classmates, teachers, or school staff, please answer "yes.") **(Please provide an answer in each row.)** *[Only respondents who selected "No" in 26.1, AND "No" in 26.2, AND "Yes" in 26.3 received this question.]*

|  | YES | NO |
|---|---|---|
| I was verbally harassed because people thought I was LGBQ. | ○ | ○ |
| I was physically attacked because people thought I was LGBQ. | ○ | ○ |
| I experienced unwanted sexual contact because people thought I was LGBQ. | ○ | ○ |
| I wasn't allowed to dress in a way that fit my gender identity/expression. | ○ | ○ |
| I was disciplined for fighting back against bullies. | ○ | ○ |
| I left a school because the mistreatment was so bad. | ○ | ○ |
| I was expelled from school. | ○ | ○ |

*[Only respondents who selected a level of educational attainment higher than "high school graduate" in 2.22 received questions 26.6–26.9.]*

APPENDIX B

**26.6** Now just thinking about classmates, professors, or staff at your college or vocational school, did they think or know you were trans?

No *[Skip to 26.9]*

Yes

**26.7** Were you harassed (verbally, physically, or sexually) at college or vocational school because people thought or knew you were trans? *[Only respondents who selected "Yes" in 26.6 received this question.]*

No *[Skip to 26.9]*

Yes

**26.8** Did you have to leave your college or vocational school because the harassment was so bad? *[Only respondents who selected "Yes" in 26.7 received this question.]*

No

Yes

**26.9** Did you leave or were you forced to leave a college or vocational school because you are trans? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No

Yes, I left school because the mistreatment was so bad.

Yes, I was expelled or forced out.

Yes, I left for other trans-related reasons.

## Section 27

**These are questions about things that may have happened to you when going through airport security.**

**27.1 In the past year**, have you gone through airport security in the United States?

No *[Skip to 28.1]*

Yes

**27.2** When you went through airport security in the past year, did a TSA officer do any of these things to you? **(Mark all that apply.)** *[List was randomized for each respondent. Respondents could not select "None of the above" in combination with any other option.]*

They questioned the name or gender on my ID.

They used the wrong pronouns with me (he/him or she/her) or wrong title (Mr. or Ms.)

They patted me down due to gender-related clothing or items (such as a binder, packer).

I was patted down by a TSA officer of the wrong gender.

They searched my bag due to a gender-related item (such as binder, packer).

They asked me to remove or lift clothing to show a binder, undergarment, or other sensitive area.

They took me to a separate room for questioning/ examination.

They announced or questioned loudly my gender, body parts, or sensitive items (such as a binder, packer).

They called the police about me.

I missed my flight due to screening.

I was not allowed to fly.

They detained me for over an hour.

They verbally harassed me.

They physically attacked me.

I experienced unwanted sexual contact (beyond a typical pat down by a TSA officer)

None of the above

## Section 28

**These are questions about things that happened to you with police, in jail, in prison, or in a juvenile detention center.**

**28.1** If you needed help from the police, how comfortable would you feel asking them for help?

Very comfortable

Somewhat comfortable

Neutral

Somewhat uncomfortable

Very uncomfortable

**28.2 In the past year**, did you interact with the police or other law enforcement officers?

No *[Skip to 28.8]*

Yes

**28.3 In the past year**, do you believe the police or other law enforcement officers you interacted with thought or knew you were trans?

None of the officers thought or knew I was trans. *[Skip to 28.6]*

Some officers thought or knew I was trans, some did not.

All officers thought or knew I was trans.

**28.4 In the past year**, when you interacted with police or other law enforcement officers, were you treated with respect?

I was never treated with respect.

I was sometimes treated with respect.

I was always treated with respect.

AR_217282

**28.5 In the past year,** when you interacted with police or other law enforcement officers, did any of these things happen to you? **(Please give an answer in each row.)**

| In the past year... | No | Yes |
|---|---|---|
| Officers kept called me by the wrong gender pronouns (such as he/him or she/her) or wrong title (Mr. or Ms.) | ○ | ○ |
| Officers asked me questions about my gender transition (such as hormones and surgical status). | ○ | ○ |
| Officers assumed I was a sex worker. | ○ | ○ |
| Officers verbally harassed me. | ○ | ○ |
| Officers physically attacked me. | ○ | ○ |
| Officers forced me to engage in sexual activity to avoid arrest | ○ | ○ |
| I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape) | ○ | ○ |

**28.6 In the past year,** were you arrested for any reason?

No *[Skip to 28.8]*

Yes

**28.7 In the past year,** do you believe that you were arrested because you were trans?

No

Yes

**28.8 In the past year,** at any time were you held in jail, prison, or juvenile detention?

No *[Skip to 29.1]*

Yes

*[Only respondents who selected "Yes" in 28.8 received questions 28.9–28.20.]*

**28.9 In the past year,** what types of jail, prison or juvenile detention facility were you in? **(Mark all that apply.)**

Federal prison

State prison

Local jail

Holding cell

State juvenile system

Locally or privately-operated juvenile facilities

Other correctional facility
(please specify) _____

**28.10 In the past year,** during your time in jail, prison or juvenile detention facility were you physically forced, pressured, or made to feel that you had to have sex or sexual contact with any **facility staff**?

No *[Skip to 28.12]*

Yes

**28.11 In the past year,** how many times did this happen to you? *[Only respondents who selected "Yes" in 28.10 received this question.]*

*[Drop-down list of numbers 1–10 and "11 or more"]*

**28.12 In the past year,** during your time in jail, prison or juvenile detention facility, were you physically forced, pressured, or made to feel that you had to have sex or sexual contact with **another inmate**?

No *[Skip to 28.14]*

Yes

**28.13 In the past year,** how many times did this happen to you? *[Only respondents who selected "Yes" in 28.12 received this question.]*

*[Drop-down list of numbers 1–10 and "11 or more"]*

**28.14 In the past year,** during your time in jail, prison or juvenile detention facility were you **physically** assaulted or attacked by **facility staff**?

No *[Skip to 28.16]*

Yes

**28.15 In the past year,** how many times did this happen to you? *[Only respondents who selected "Yes" in 28.14 received this question.]*

*[Drop-down list of numbers 1–10 and "11 or more"]*

**28.16 In the past year,** during your time in jail, prison or juvenile detention facility were you **physically** assaulted or attacked by **another inmate**?

No *[Skip to 28.18]*

Yes

**28.17 In the past year,** how many times did this happen to you? *[Only respondents who selected "Yes" in 28.16 received this question.]*

*[Drop-down list of numbers 1–10 and "11 or more"]*

**28.18** Before your time in jail, prison, or juvenile detention, were you taking hormones?

No *[Skip to 29.1]*

Yes

**28.19** Did you have a prescription for the hormones you were taking?

No

Yes

APPENDIX B

285

**28.20 In the past year**, during your time in jail, prison, or juvenile detention, were you not allowed to take your hormones?

No

Yes

## Section 29

**Now we have some questions about voting and registration.**

**29.1** In any election, some people are not able to vote because they are sick or busy or have some other reason, and others do not want to vote. Did you vote in the election held on <u>Tuesday, November 4, 2014</u>[38]?

No

Yes *[Skip to 30.1]*

**29.2** Were you registered to vote in the <u>November 4, 2014 election</u>[39]? *[Only respondents who selected "No" in 29.1 received this question.]*

No

Yes *[Skip to 29.4]*

**29.3** Which of the following was the MAIN reason you were not registered to vote? **(Please choose only one response.)** *[Only respondents who selected "No" in 29.2 received this question.]*

Not eligible to vote because I am not a U.S. citizen.

I wanted to avoid being harassed by election officials because I am trans.

My current name does not match social security card.

I thought my state's voter ID law could stop me from voting.

I don't have ID and thought I would need one to register.

Did not meet registration deadlines.

Did not know where or how to register

Did not live here long enough/did not meet residency requirements.

Permanent illness or disability

Difficulty with English

Not interested in the election or not involved in politics.

My vote would not make a difference.

Not eligible to vote because of a criminal/felony conviction.

Not eligible to vote for a reason other than a criminal/felony conviction.

A reason not listed above (please specify) _____

**29.4** What was the MAIN reason you did not vote? **(Please choose only one response.)** *[Only respondents who selected "Yes" in 29.2 received this question.]*

I wanted to avoid being harassed by election officials because I am trans.

Illness or disability (own or family's)

Out of town or away from home

Forgot to vote (or send in absentee ballot)

Not interested, felt my vote wouldn't make a difference

Too busy, conflicting work or school schedule

Transportation problems

Didn't like candidates or campaign issues.

Registration problems (for example, I didn't receive an absentee ballot or wasn't registered in current location)

Bad weather conditions

Inconvenient hours, polling place, or hours or lines too long

I didn't have the identification documents (ID) I needed to vote.

My identification documents (ID) do not match my current name, gender, or have an old photo.

My gender/name on my identification document (ID) does not match my voter registration.

I was not allowed to vote by a poll worker or election official because I am trans.

A reason not listed above (please specify) _____

## Section 30

**These are questions about civic and political activities.**

**30.1** Do you agree or disagree with the following statement about political affairs in this country?

Someone like me can't really influence government decisions.

Strongly agree

Agree

Neither agree nor disagree

Disagree

Strongly disagree

**30.2** People may be involved in civic and political activities. In the last <u>Presidential election in 2012</u>[32] did you... **(Please provide an answer in each row.)** *[Response choices were randomized, keeping the first two and last two grouped together in the following order.]*

| In the last Presidential election in 2012 did you ... | No | Yes |
|---|---|---|
| Volunteer or work for a Presidential campaign | | |
| Volunteer or work for another political candidate, issue, or cause | | |
| Give money to a Presidential campaign | | |
| Give money to another political candidate, issue, or cause | | |

AR_217284

**30.3 In the past 12 months have you... (Please provide an answer in each row.)** *[Response choices were randomized.]*

| In the past 12 months, have you... | No | Yes |
|---|---|---|
| Attended a political protest or rally | | |
| Contacted a government official | | |
| Worked with others in your community to solve a problem | | |
| Served on a community board | | |
| Written a "letter to the editor" | | |
| Commented about politics on a message board or Internet site | | |
| Hold a publicly elected office | | |

**30.4** In politics, as of today, do you consider yourself a Republican, a Democrat, or an Independent?

Republican *[Skip to 30.6]*

Democrat *[Skip to 30.6]*

Independent

Other party (please specify) _____

**30.5** As of today, do you lean more to the Democratic Party or the Republican Party? *[Only respondents who selected "Independent" or "Other party" in 30.4 received this question.]*

Democratic

Republican

Neither/Other

**30.6** How would you describe your political views?

Very conservative

Conservative

Moderate

Liberal

Very liberal

## Section 31

This question asks for your opinion on the most important policy priorities for trans people in the United States.

**This is a two-part question:**

**31.1** For each issue below that affects trans people in the U.S., please mark how important it is. **(Please provide an answer in each row.)** *[Response choices were randomized. Respondents could select up to 3 response choices in the last column.]*

| | Very Important | Important | Not very Important |
|---|---|---|---|
| HIV/AIDS | O | O | O |
| Identity documents (ID) (updating name and gender) | O | O | O |
| Bullying/discrimination in schools | O | O | O |
| Police mistreatment of trans people | O | O | O |
| Mistreatment in prisons/jails | O | O | O |
| Immigration reform | O | O | O |
| Military (ability to be openly trans) | O | O | O |
| Training health care providers about trans health | O | O | O |
| Insurance coverage for trans-related health care | O | O | O |
| Employment | O | O | O |
| Housing and homelessness | O | O | O |
| Violence against trans people | O | O | O |
| Parenting and adoption rights | O | O | O |
| Marriage recognition | O | O | O |
| Conversion Therapy | O | O | O |
| Racism | O | O | O |
| Poverty | O | O | O |

**31.2** Of these issues, please select your top 3 most important issues.

Issue#1 *[Drop-down list of issues listed in 31.1]*

Issue#2 *[Drop-down list of issues listed in 31.1]*

Issue#3 *[Drop-down list of issues listed in 31.1]*

## Section 32

**32.1** Is there anything else that you would like to tell us about your experiences of acceptance or discrimination so we can better understand your experiences?

No *[Responses were submitted and respondents were directed to the Thank You Page hosted by NCTE.]*

Yes

**32.2** Please tell us anything else that you would like to tell us about your experiences of acceptance or discrimination so we can better understand your experiences. Please do not provide any information that could be used to identify you, such as your name or contact information. Your response will be anonymous. *[Only respondents who selected "Yes" in 32.1 received this question.]*

[Text box]

Please enter your survey responses by clicking on the submit button below:

SUBMIT

APPENDIX B

*[Once completed, responses were submitted and respondents were directed to the Thank You Page hosted by NCTE.]*

## Thank You Page

THANK YOU FOR MAKING YOUR VOICE HEARD

YOUR SURVEY HAS BEEN SUBMITTED

Want to be one of the first to get the survey results?

Want to win one of the cash prizes?

Give us your info here.

This information will not be connected to your survey responses.

    Preferred name

    Email address

    Zip Code (required)

    Phone (optional)

    [ ] Send me the results of the survey when you release them!

    [ ] Enter me in the drawing for one of three cash prizes: one prize of $500 and two prizes of $250!

SUBMIT

## RESOURCES

We recognize that answering some of the questions on this survey may have been hard. If you are experiencing any difficult emotions after answering the questions and would like to talk to someone, please contact one of the anonymous resources below:

**National Suicide Prevention Helpline**
1-800-273-8255
http://www.suicidepreventionlifeline.org/

**FORGE Transgender Sexual Violence Project**
414-559-2123
http://forge-forward.org/anti-violence/for-survivors/ to list of resources

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**The Trevor Project**
The Trevor Project is a phone and internet chat hotline for LGBTQ people. For those participating in this survey, The Trevor Project will speak or chat with people of all ages.
1-866-488-7386
http://www.thetrevorproject.org/section/get-help

**National Sexual Assault Hotline**
800-656-HOPE (4673)
https://ohl.rainn.org/online/

---

## ENDNOTES | APPENDIX B

1.   Respondents who were sent to disqualification page #2 received the following message: "Based on your answers, you are not eligible to complete this survey. Thank you for your interest in participating in this study. For more information about this project please visit the NCTE website: http://www.ustranssurvey.org."

2.   Respondents who were sent to disqualification page #1 received the following message: "Thank you for your survey responses. We're interested to learn more about your identity and experiences. If you would like to tell us more, please respond to the following questions. Please **do not** provide any information that could be used to identify you, such as your name or contact information.

    Tell us about your gender identity or expression. *[Text box.]*

    Tell us about your experiences related to your gender identity or expression. *[Text box.]*"

3.   See note 1.

4.   See note 2.

5.   See note 2.

6.   Respondents received the following hyperlinked definition for "active duty": "Active duty means full-time service, other than active duty for training as a member of the Army, Navy, Air Force, Marine Corps, Coast Guard, or as a commissioned officer of the Public Health Service or the National Oceanic and Atmospheric Administration, or its predecessors, the Coast and Geodetic Survey or Environmental Science Service Administration. Active duty also applies to a person who is a cadet attending one of the five United States Military Service Academies. For a person with service in the military Reserves or National Guard, mark the "Only on active duty for training in the Reserves or National Guard" box if the person has never been called up for active duty, mobilized, or deployed. For

2015 U.S. TRANSGENDER SURVEY

AR_217286

a person whose only service was as a civilian employee or civilian volunteer for the Red Cross, USO, Public Health Service, or War or Defense Department, mark the 'Never served in the military' box. For Merchant Marine service, count only the service during World War II as active duty and no other period of service."

7   Respondents received the following hyperlinked definition for "household": "A household includes all the adults who live with you in the same house, apartment, group of rooms, or room that is used as one home. If you live in group housing, such as a dormitory, only include yourself and your adult family members who live with you."

8   Respondents received the following hyperlinked note regarding the term "related to you": "include only adults you're related to by blood, legal adoption, or legal marriage that is recognized by the U.S. government. Do not include your unmarried partner or unrelated adults. Later we will ask about the people not included here."

9   Respondents received the following hyperlinked note regarding the term "named on the lease, mortgage, or deed": "This includes people who are listed on the lease, mortgage, or deed for your home. If your home is not owned or rented by anyone who lives with you, include any adult in the home except roomers, boarders, or paid employees."

10   Respondents received the following hyperlinked note regarding the term "related to you": "Do not include children that are not related to you by birth or by legal adoption. For instance, your unmarried partner's children would not be included here unless you have legally adopted them. We ask about these members of your household elsewhere in the survey."

11   Respondents received the following hyperlinked definition for "SNAP": "The Supplemental Nutrition Assistance Program (SNAP) is sometimes called the Food Stamp program. It helps people who have low or no income to buy food, usually with an EBT card."

12   Respondents received the following hyperlinked definition for "WIC": "'WIC' stands for 'Women, Infants, and Children.' It's the short name for the Special Supplemental Nutrition Program for Women, Infants, and Children. WIC is a federal program to help women who are pregnant or breastfeeding and children less than five years old get health care and healthy food."

13   Respondents who selected this answer choice received the message and clicked "OK" to proceed: "Please note that for upcoming questions about income, don't include food stamps (SNAP) as income."

14   Respondents who selected this answer choice received the message and clicked "OK" to proceed: "For upcoming questions about income, don't include assistance from WIC as income."

15   Respondents who selected multiple answer choices in this question received the following message and clicked "OK" to proceed: "Please note that for upcoming questions

about income, don't include assistance from food stamps (SNAP) or WIC as income."

16   Respondents received the following hyperlinked definition for "individual income": "Individual income" includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and other money income that you personally received in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

17   Respondents received the following hyperlinked definition for "Family income": "'Family income' includes you and members of your family related by legally-recognized marriage, by birth, or by adoption who have lived with you during the last 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and family members in your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

18   Respondents received the following hyperlinked definition for "Household income": "'Household income' includes you and all members of your household who have lived with you during the past 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and members of your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

19   Respondents received the following hyperlinked note regarding the term "had a drink": "Please do not include any time when you only had a sip or two from a drink."

20   Respondents received the following hyperlinked definition for "alcohol": "Alcoholic beverages, such as beer, wine, brandy, and mixed drinks."

21   Respondents received the following hyperlinked definition for "cigarettes": "Cigarettes made of tobacco. Do not include electronic cigarettes (E-cigs)."

22   Respondents received the following hyperlinked definition for "e-cigarettes or vaping products": "This includes electronic cigarettes (e-cigs or e-cigarettes), personal vaporizer (PV), or electronic nicotine delivery system (ENDS), all of which are battery-powered vaporizers that feel similar to tobacco smoking."

23   Respondents received the following hyperlinked definition for "marijuana or hashish": "Marijuana is also called pot or grass. Marijuana is usually smoked, either in cigarettes, called joints, or in a pipe. It is sometimes cooked in food. Hashish is a form of marijuana that is also called 'hash.' It is usually smoked in a pipe. Another form of hashish is hash oil."

24  Respondents received the following hyperlinked definition for "illegal or illicit drugs": "Drugs like cocaine, crack, heroin, LSD, and meth that are considered to be illegal. Inhalants are liquids, sprays, and gases that people sniff or inhale to get high or to make them feel good, like poppers or whippits. We are not interested in times when you inhaled a substance accidentally— such as when painting, cleaning an oven, or filling a car with gasoline."

25  Respondents received the following hyperlinked definition for "prescription drugs": "Use of prescription drugs in any way a doctor did not direct you to use them. When you answer this question, please think only about your use of the prescription drug in any way a doctor did not direct you to use it, including:

    • Using it without a prescription of your own

    • Using it in greater amounts, more often, or longer than you were told to take it

    • Using it in any other way a doctor did not direct you to use it"

29  Respondents received the following hyperlinked definition for "homelessness": "Experiencing homelessness includes such things as staying in a shelter, living on the street, living out of a car, or staying temporarily with family or friends because you can't afford housing."

26  Respondents received the following note regarding the term "drank an alcoholic beverage": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

27  Respondents received the following note regarding the term "drink one or more drinks": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

28  Respondents received the following note regarding the term "drinks": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

30  Respondents received the following hyperlinked note: "This was the election in November 2014 to elect members of the U.S. Congress and state-level offices."

31  Respondents received the following hyperlinked note: "This was the election in November 2014 to elect members of the U.S. Congress and state-level offices."

32  Respondents received the following hyperlinked note regarding this term: "This was the presidential election in 2012 between Mitt Romney and Barack Obama."

2015 U.S. TRANSGENDER SURVEY

AR_217288



# Appendix C

## Detailed Methodology

## Survey Sources

When developing the survey instrument, the research team focused on creating a questionnaire that could provide data to address both current and emerging needs of transgender people while gathering information about disparities that often exist between transgender people and non-transgender people throughout the United States. To achieve this, questions were included that would allow comparisons between the U.S. Transgender Survey (USTS) sample and known benchmarks for the U.S. population as a whole or populations within the U.S. Consequently, questions were selected to best match those previously asked in federal government or other national surveys on a number of measures, such as measures related to income and health. Questions in the USTS survey instrument were drawn from federally administered national population-based surveys, either exactly as they appeared in the source survey or with modifications, as follows:

| USTS Questions | Source Survey |
|---|---|
| 2.16–2.22; 11.1 & 11.2 | American Community Survey (ACS) |
| 2.24 & 2.25; 15.1–15.12; 16.1–16.5 | National Survey on Drug Use and Health (NSDUH) |
| 7.1–7.14 | Current Population Survey (CPS) |
| 12.1; 12.4; 12.6; 12.17; 14.4 | CDC's Behavioral Risk Factor Surveillance System (BRFSS) |
| 12.2 & 12.3; 14.1; 14.3 | National Health Interview Survey (NHIS) |
| 16.6–16.12 | National Comorbidity Survey Replication (NCS-R) |
| 17.7 & 17.8 | National Crime Victimization Survey (NCVS) |
| 18.1–18.3; 19.2 & 19.3 | National Intimate Partner and Sexual Violence Survey (NISVS) |
| 28.10–28.17 | National Inmate Survey (NIS) |
| 29.1–29.4 | Current Population Survey (CPS) 2014 November Supplement |
| 30.4–30.6 | Gallup Daily Tracking Poll (U.S. Political and Economic Daily Tracking) |

# Data Cleaning

Data cleaning is the process of detecting and removing some survey responses (e.g., duplicate responses, incomplete responses, illogical responses) in order to improve the quality of the sample. Cleaning of the USTS data proceeded in the following steps: (1) flagging and removal of respondents not eligible to take the survey, (2) flagging and removal of incomplete responses, (3) flagging and removal of duplicate responses, and (4) flagging and removal of illogical responses.

The first step was to remove survey responses from individuals who did not meet basic eligibility criteria for the survey. Respondents had to consent to take the survey, be at least 18 years of age, and reside in the U.S., a U.S. territory, or on a U.S. military base. Additionally, respondents needed to identify as transgender—including non-binary identities—or meet other criteria related to their

gender identity or expression. Additionally, respondents were asked if they had already completed this survey before. Respondents who indicated that they had completed the survey before were also ineligible to take the survey. Skip logic was added to the survey to send respondents who did not meet these basic eligibility criteria to a disqualification page, but their responses were included in the initial dataset and had to be removed. Additional analyses of the dataset were completed to remove ineligible respondents. Respondents who provided a month and year of birth that indicated they were under 18 at the time they took the survey were flagged and removed from the dataset. Additional analyses of responses related to gender identity and transition status in Sections 1 and 2 of the survey were completed to flag additional ineligible respondents, which included those who did not identify as transgender or with a range of other gender-related experiences associated with transgender communities. Please see the "Variable Recoding Process" section below for a more detailed description of this process. In all, 10,304 responses were removed from the initial dataset due to being ineligible to take the survey.

Incomplete responses were then removed from the sample based on a requirement that respondents minimally complete Section 1 and specific demographic questions in Section 2 of the questionnaire. Missing data was otherwise allowed provided respondents completed these questions. The required Section 2 questions were as follows: 2.1, 2.3, 2.6, 2.8, 2.9, either 2.13 or 2.14, 2.15, 2.18, 2.19, 2.22, 2.23, and 2.26. It was determined that these questions would provide key information about respondents, including questions used to determine eligibility, and these questions were used to set a minimal level of survey "completeness" the research team was willing to accept for a respondent to remain in the dataset. In all 515 respondents were removed for incomplete survey responses.

Duplicate survey responses were then flagged and removed. Duplicates were determined based on all quantitative responses in the survey. Qualitative ("write-in") responses were not considered when determining whether a response was a duplicate. In all, 329 responses were considered duplicates and were removed from the final dataset.

Finally, respondents who provided more than one illogical response were flagged and removed from the final dataset. An illogical response is one that provides information that contradicts other information provided by a respondent. For instance, the USTS survey included 16 questions related to respondents' age, including current age, age they first disclosed to others they are transgender, age of suicide attempts, and ages of other milestones or experiences. An example of an illogical response would be a respondent who reported they attempted suicide at an age older than their current age. An illogical response could be due to an accidental miscode on the part of the respondent, meaning they accidentally filled out a question incorrectly, or could be evidence that a respondent is not taking the survey in earnest. The research team considered a respondent having more than one illogical response as evidence that the respondent may not have been taking the survey in earnest. In all, 53 respondents had more than one illogical response and were removed from the final dataset.[1]

| Total initial sample: | 38,916 |
|---|---|
| Total cases removed: | 11,201 |
| Did not consent to take survey | 223 |
| Not eligible: under 18 years of age | 6,168 |
| Not eligible: had already taken survey | 1,072 |
| Not eligible: did not live in U.S., territory, or military base | 1,052 |
| Not eligible: gender identity or expression did not meet minimum criteria | 1,789 |
| Duplicate responses | 329 |
| Incomplete responses | 515 |
| Illogical responses | 53 |
| Final sample: | 27,715 |

# Missing Data and Imputation

When a dataset has substantial amounts of missing data, such as over 5% missing data, researchers should consider techniques to impute the missing data.[2] The research team conducted an analysis to determine whether missing data should be imputed in the USTS dataset. The percentage of missing data due to item non-response (not including intentionally missing data due to skip logic) on any original quantitative variable (not including recoded variables or "write-in" variables) was less than 5%, with the exception of two variables. Question 14.4 regarding the month of respondents' last HIV test had 5.9% missing data (Q. 14.4: "Not including blood donations, in what month was your last HIV test?"). This item may have had relatively higher item non-response because respondents may have been more likely to recall the year of their last HIV test, which was also requested in Q. 14.4, than the month. Question 7.11 regarding respondents' sources of income had 6.2% missing data (Q. 7.11: "What are your current sources of income?"). This may reflect a general reluctance to provide financial information that is routinely found in item non-response to income-related questions in population-based surveys. The research team determined that due to the low amount of missing data, including minimal missing data on questions that routinely have high item non-response in population-based surveys (e.g., individual and household income), missing data imputation was not necessary for this report. Future researchers are encouraged to investigate the impact of data imputation when using this dataset.

# Variable Recoding Process

The initial final dataset contained 1,140 unique variables based on 324 items respondents could have received in the survey. Most of these variables required quantitative or qualitative recoding for use in the study. Quantitative recodes, such as for creating variables to reflect how "out" a respondent was about their transgender identity, were completed by one primary researcher and the syntax for that recode was reviewed by another researcher. Any errors in the syntax that were found in the review were submitted to the primary researcher in order to make corrections. The primary researcher completed any corrections and the variable was then considered a final recode. In all, the research team produced over 2,000 recodes used to generate the findings presented in this report.

Respondents to the survey had many opportunities to write in responses to questions by selecting an answer such as "none of the above" and writing in a unique response or responding to an open-ended question. The research team reviewed approximately 80,000 write-in responses for recoding. The recoding process included two coding teams that conducted initial coding, which was reviewed by another coding team and areas of disagreement were flagged. A simple percent agreement score was calculated to assess inter-rater reliability. For nearly all variables that were recoded, the coding team and the review team had 90% or higher agreement, two variables had agreement between 80% and 90%, and three fell below 80% agreement (Q. 1.7 (79%), Q. 9.3 (67%), and Q. 21.11 (70%)).

In the case of a question with write-in responses where only one answer option was allowed, write-in responses were reviewed to see if they could be recoded into existing answer options. If substantial numbers of respondents wrote in the same response, a new answer option could be added to the question to reflect those responses. If it was not feasible for a response to be recoded into an existing answer option or to be combined with others to create a new answer option, the response remained in the "none of the above" category as a unique response. In the case of a question that allowed multiple choices, a similar process took place. However, if a substantial number of responses could be grouped into a new answer option and a new variable was created to describe those responses, those respondents also remained in the "none of the above" category. Therefore, new answer options based on write-in questions that allowed multiple answer choices should be viewed as a subset of the "none of the above" category.

A different recoding process was established in order to recode respondents into four gender identity categories: transgender women, transgender men, non-binary people, and crossdressers. To categorize respondents based on gender identity, the research team relied on respondents' self-selected gender category in Q. 2.3, which was cross-tabulated with Q. 2.1 to identify transgender men and transgender women. For instance, the researchers would categorize someone assigned female at birth in Q. 2.1 who identifies as a man in Q. 2.3 as a transgender man and would categorize someone assigned male at birth in Q. 2.1 who identifies as a woman in Q. 2.3 as a transgender woman. In a few cases (n=439), a respondent selected female in Q. 2.1 and woman in Q. 2.3 or selected male in Q. 2.1 and man in Q. 2.3. These respondents required additional analysis of their survey responses in order to determine if they met the eligibility criteria for the survey, and if so, to categorize them as transgender men, transgender women, non-binary people, or crossdressers. The research team relied on questions in Sections 1, 2, and 12 to help make these determinations. Members

AR_217292

of the research team completed initial recoding of these respondents to indicate whether they were eligible for the survey, and if so, in which of these categories they should be included. These initial recodes were reviewed by other members of the research team. When initial recoders and reviewers were not in agreement on a recode, the team met to discuss the disagreements and made a final decision on the recode as a group. In all, 250 respondents were determined to be ineligible for the survey based on this recoding and review process and were removed from the final dataset.

# Weights

The USTS sample was a purposive sample that was created using direct outreach, modified venue-based sampling, and "snowball" sampling. As a non-probability sample, generalizability is limited, meaning it is unclear whether the findings presented in this report would hold true for the transgender population of the U.S. as a whole. In addition, prior research has found that online surveys have a known bias, particularly in regard to demographic representation. Online samples tend to over-represent those who are white, young, more highly educated, and with higher incomes.[3] In order to address these biases, at least in part, the research team created and utilized weights to adjust the USTS sample in certain ways in order to better represent what is believed to be the actual population characteristics of transgender people in the U.S. and in order to make more accurate comparisons with population-based samples of the U.S. population.

Prior research using probability samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity and age, with those that identify as transgender being more likely to be people of color and younger than the general population.[4] Studies have found no difference in educational attainment or lower educational attainment and have found lower incomes among transgender people as compared to non-transgender people.[5] The USTS sample has a higher percentage of white, young, and more highly educated respondents than the U.S. general population, which may be due, at least in part, to internet survey bias. However, the younger age is also likely due to the transgender population being younger overall. The USTS sample also has higher incidence of low incomes as compared to the U.S. population, which goes against the typical internet survey bias. Based on the existing research about the transgender population, there is not adequate information available to attempt to correct for bias in the sample based on age, educational attainment, or income. However, there is sufficient evidence to indicate that the race and ethnicity of the USTS sample does not reflect the racial and ethnic makeup of the U.S. transgender population as a whole.

"Weighting" is a common statistical technique used to adjust data drawn from a sample of a population to be more representative of the population from which the sample was drawn. For example, in a survey sample of the U.S. population, the proportion of respondents aged 18–24 may differ from the proportion of that age group in the U.S. population as a whole, in which case weights are commonly applied to adjust the sample to be more representative of the U.S. population. To help correct for sampling bias in the USTS sample in regard to race and ethnicity, U.S. population weights based on the American Community Survey for race and ethnicity were created as part of the standard weight applied to all findings in this report. While this may still over-represent white respondents relative to the makeup of the transgender adult population, this weighting procedure brings the sample closer to what is believed to be the true population distribution for race and ethnicity for

AR_217293

transgender people in the U.S. The standard weight also includes an adjustment to the 18-year-old category, described in more detail below. Additional survey weights were created for the purposes of comparability with federal government and national data sources, including weights for age and educational attainment.[6] These weights were applied in addition to the standard weight when comparing the USTS sample to the U.S. population for items that are sensitive to age and educational attainment, such as individual and household income, and are noted accordingly as the "supplemental weight." Weighted percentages for these and other variables can be found in the *Portrait of USTS Respondents* chapter. Unweighted frequencies and percentages for these and other variables can be found in *Appendix A (Characteristics of the Sample)*.

In addition to the potential biases described above, the USTS had a high volume of respondents who indicated that their age was 18 years old, and respondents who, based on their birth date, were 17 years old.[7] It was suspected that the increased binning of 18-year-olds may be attributable to multiple factors, including a higher prevalence of respondents who were younger than 18 at the time of the survey. This resulted in 18-year-olds comprising 9% of the sample, compared to 19-year-olds comprising 6% of the sample. It is impossible to determine the source of this binning entirely, but in order to correct for it, the research team created a weight to adjust the 18-year-olds in the sample so that respondents reporting that age appeared more like the 19-year-old respondents in both sample size and other demographics. The rationale behind this adjustment is that a person's year of birth is likely randomly distributed around the date in which they took the survey. This would imply that the composition of 18-year-olds should strongly match the composition of 19-year-olds.

A sample matching and weighting procedure was used to balance the composition of 18-year-old respondents to 19-year-old respondents. This process is done by using the Covariate Balance Propensity Score (CBPS), which treats the 18-year-olds as a "treatment group" and 19-year-olds as a baseline "control group."[8] The estimation procedure then tries to achieve balance on covariates used in the model while simultaneously accounting for the conditional probability of being in one group over the other. The former process reduces observable differences among 18-year-olds to make their demographic composition reflect 19-year-olds.[9] The latter process weights the data such that the two groups are of equivalent size. After weighting, the size of the 18-year-old sample comprises 6%, which is the same as the 19-year-old sample. Any observed demographic differences between 18- and 19-year-olds were minimized, and many failed to reach statistical significance.

The goal of this weighting process is to up-weight respondents who are most likely 18 years old by making them observationally equivalent to the age cohort closest to them (i.e., 19-year-olds) and to down-weight respondents who are less likely to actually be 18 years old. This way, if respondents who were binned at 18 years of age are really younger than 18 years of age, it would be expected that their responses would diverge from 19-year-olds as that age gap increases.[10] The weighting process down-weights 18-year-old respondents as they diverge from 19-year-olds, minimizing the influence of that group on findings. This adjustment for 18-year-olds was included in the standard survey weight applied to all findings in this report.

AR_217294

**ENDNOTES** | APPENDIX C

1   Respondents sometimes provided responses that seemed unlikely, for instance running away from home at a very young age, such as two years old. These types of responses were only considered to be illogical responses if they contradicted other responses. In the case of responses that were considered unlikely, they were allowed to remain in the dataset. These outliers were negligible in the overall findings in that only a handful of outliers are found in any given variable and, therefore, they do not skew the findings. Findings based on age and other variables are often presented in ranges, which also helps to mitigate any influence of outliers.

2   Dong, Y. & Pang, C. Y. J. (2013). Principled missing data methods for researchers. *SpringerPlus, 2*, 222.

3   Online survey bias is related to demographic differences in internet access. See e.g., Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method* (4th ed.). Hoboken, NJ: John Wiley & Sons; Smith, A. (2014). *African Americans and Technology Use: A Demographic Portrait.* DC: The Pew Research Center; Herman, J. L. & Hess, D. R. (2009). *Internet Access and Voter Registration.* DC: Project Vote.

4   See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States.* Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health, 102*(1), 118–122; Meyer, I. H., Brown, T. N. T., Herman, J. L., Reisner, S. L., & Bockting, W. O. (in press). Demographic characteristics and health outcomes among transgender adults in select regions in the Behavioral Risk Factor Surveillance System. *American Journal of Public Health.* (accepted); Harris, B.C. (2015). *Likely Transgender Individuals in U.S. Federal Administrative Records and the 2010 Census,* Working Paper #2015-03. DC: Center for Administrative Records Research and Applications Working Papers. Available at: https://www.census.gov/srd/carra/15_03_Likely_Transgender_Individuals_in_ARs_and_2010Census.pdf.

5   See note 4.

6   The weights for race, age, and educational attainment were created based on the Census Bureau's 2014 American Community Survey (ACS).

7   Respondents who are younger than 18 were removed from the final dataset and, therefore, are excluded from all reporting because they were not eligible to participate in the study.

8   Imai, K. & Ratkovic, M. (2014). Covariate balancing propensity score. *Journal of the Royal Statistical Society, Series B, 76*(1), 243–263.

9   Variables used for covariate balance were based on the following questions: Q. 1.4; Q. 1.10; Q. 1.11; Q. 1.12; Q. 1.14; Q. 1.16; Q. 1.17; Q. 1.18; Q. 2.1; Q. 2.3; Q. 2.4; Q. 2.5; Q. 2.6; Q. 2.7; Q. 2.9; Q. 2.16; Q. 2.17; Q. 2.18; Q. 2.19; Q. 2.22; Q. 2.23; Q. 3.1; Q. 3.2; Q. 3.3; Q. 4.1; Q. 4.3; Q. 4.5; Q. 6.1; Q. 7.7; Q. 7.12; Q. 7.13; Q. 7.14; Q. 10.1; Q. 11.1; Q. 11.2; Q. 12.1; Q. 12.8; Q. 12.12; Q. 12.20; Q. 13.1; Q. 14.1; Q. 15.2; Q. 15.9; Q. 16.3; Q. 16.8; Q. 17.1; Q. 17.2; Q. 17.4; Q. 17.5; Q. 17.6; Q. 17.3; Q. 17.9; Q. 18.1; Q. 18.3; Q. 19.1; Q. 20.1; Q. 20.2; Q. 20.7; Q. 21.1; Q. 21.2; Q. 21.7; Q. 23.1; Q. 23.2; Q. 26.1; Q. 26.6; Q. 27.1; Q. 28.1; Q. 28.2; Q. 29.1; Q. 29.2; Q. 30.4; and Q. 30.6.

10  Prior to weighing, the demographic characteristics of 18-year-olds were more similar to respondents who were identified as being 17 years of age and had less similarity to 19-year-olds. After weighting, there are many more similarities between 18- and 19-year-olds and far less commonality with 17-year-olds.

AR_217295

Updated December 2017

**THE REPORT OF THE**



2015 U.S. TRANSGENDER SURVEY



National Center for TRANSGENDER EQUALITY

ustranssurvey.org I transequality.org

AR_217296



UNIVERSITY
of HAWAIʻI®
SYSTEM

Office of Institutional Equity
University of Hawaii System
1960 East-West Rd., BioMed A210
Honolulu, Hawaii 96822
Phone: (808) 956-8629
Email: institutional.equity@hawaii.edu

September 9, 2022

TO:            U.S. Department of Education

FROM:        Jennifer Rose
              Director
              Office of Institutional Equity
              Vice President for Administration

SUBJECT:     **Docket ID: ED-2021-OCR-0166**

**Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

The University of Hawaiʻi (the "University") is committed to maintaining safe and respectful campus environments where everyone can strive toward their academic, career, and personal goals. Consistent with those principles, the University supports the underlying purpose of Title IX and its implementing regulations.

The University believes that, overall, the Department of Education's proposed regulations benefit institutions by respecting their educational mission and rejecting highly prescriptive, adversarial processes.

In support of further improvements, the University respectfully submits the following comments regarding the proposed regulations.

Hostile Environment Harassment. Proposed 34 CFR § 106.2 defines Hostile Environment Harassment as "Unwelcome sex-based conduct that is sufficiently severe or pervasive, that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment) [.]" The University supports this change as it clarifies how this term is defined for the purposes of Title IX. It also encourages a uniform approach to Hostile Environment Harassment, noting that this concept evolved through jurisprudence interpreting other Federal statutes prohibiting discrimination, including Title VII and Title VI.

Use and Adaptation of Clery Act Definitions. Proposed 34 CFR § 106.2 provides definitions within the text itself instead of cross-referencing the applicable provisions in VAWA and the Clery Act. The University supports these changes, which clarify how these terms are defined for the purposes of Title IX.

Scope. Proposed 34 CFR § 106.10 includes "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." The University supports these changes, which further define the scope of Title IX. The University notes that these changes are also well-aligned with protections under Hawai'i state law.

Informal Resolution Process. Proposed 34 CFR § 106.44 (k)(1) provides that "At any time prior to determining whether sex discrimination occurred under § 106.45, and if applicable § 106.46, a recipient may offer to a complainant and respondent an informal resolution process, unless there are allegations that an employee engaged in sex discrimination toward a student or such a process would conflict with Federal, State or local law."

The University suggests that institutions should be afforded broader discretion to determine when informal resolution may be appropriate, provided that institutions document parties' voluntary, informed consent to participate in the process. The University recognizes the benefits of parties exercising agency while engaging in institutional processes. Creating undue barriers to autonomy or limiting parties' choices could create a sense of powerlessness or risk retraumatization. By contrast, offering parties options for meaningful participation in institutional processes fosters a sense of empowerment. Furthermore, institutions are best prepared to meet their communities' unique needs when given latitude to consider case-specific circumstances and relevant cultural practices, such as Ho'oponopono.

The University also requests confirmation that the Department intends to prohibit informal resolution where "there are allegations that an employee engaged in sex discrimination toward a student[.]" Proposed 34 CFR § 106.44 (k)(1) (emphasis added); see also NPRM Preamble at 235. The University makes this request based on an apparent conflict between Proposed 34 CFR § 106.44 (k)(1) and language in the preamble, which states the tentative view that "a recipient must not offer an informal resolution process to resolve allegations that an employee engaged in sex-based harassment toward a student. In that circumstance, the Department is concerned that it is too difficult to ensure that mediation or other forms of informal resolution would be truly voluntary on the part of a student who reports sex-based harassment[.]" NPRM Preamble at 237-238 (emphasis added). The University would appreciate clarification but recommends giving institutions latitude to determine whether informal resolution may be appropriate.

Exclusion of Evidence. Proposed 34 CFR § 106.45(f)(4) provides that "If a party does not respond to questions related to their credibility, the decision maker must not rely on any statement of that party that supports that party's position." The University is concerned that this proposed provision will prevent a decision maker from considering statements that are probative, reliable, and otherwise permitted under the regulations. The University is also concerned that such a rule may undermine parties' trust in the grievance process and may have a chilling effect. The University suggests that a party's refusal to respond to questions should factor into

Office of Institutional Equity | University of Hawaii System | 1960 East-West Rd., BioMed A210 | Honolulu, Hawaii 96822
Phone: (808) 956-8629 | Email: institutional.equity@hawaii.edu

AR_221385

credibility assessments, but should not, as a blanket rule, prevent a decision maker from considering statements that are otherwise permitted under the regulations.

<u>Optional Live Hearing</u>. Proposed 34 CFR § 106.46(g) provides that "A postsecondary institution's sex-based harassment grievance procedures may, but need not, provide for a live hearing." The University supports making the live hearing process optional for postsecondary institutions. This change moves away from highly prescriptive, adversarial processes that run contrary to schools' core educational purpose.

Thank you for considering these comments.

Office of Institutional Equity | University of Hawaii System | 1960 East-West Rd., BioMed A210 | Honolulu, Hawaii 96822
Phone: (808) 956-8629 | Email: institutional.equity@hawaii.edu

AR_221386

# UNIVERSITY *of* WASHINGTON

*Ana Mari Cauce*
*Professor of Psychology*
PRESIDENT

The Honorable Miguel Cardona, Ed.D.
Secretary of Education
U.S. Department of Education

September 9, 2022

Re: Docket ID ED-2021-OCR-0166 Proposed Rulemaking on Title IX

Dear Secretary Cardona,

The University of Washington (UW) thanks the Department of Education (Department) for the opportunity to provide comments in response to the Notice of Proposed Rulemaking (NPRM) published on July 12, 2022. The UW is a flagship university where we currently enroll approximately 60,000 students and employ approximately 53,000 individuals, making the university one of the top five employers in the state of Washington. We take seriously our responsibility to protect all of our students and employees from sex- and gender-based discrimination, harassment, and violence and are committed to fair and impartial investigations, adjudications, and conduct proceedings that protect due process. We respectfully submit our comments in that spirit.

**The UW applauds the many positive changes** in the proposed regulations. These changes are detailed below and include, among other things, the broader scope of discrimination and less prescriptive grievance procedures. The UW also seeks clarification on a number of technical aspects of the proposed regulations; these are also spelled out in the comments below.

**Of gravest concern** to the University of Washington, however, is the Department's proposed regulations on **mandatory reporting** (34 C.F.R. § 106.44(c) "notification requirements"). This proposed change would result in **nearly all employees being required to report** any possible sex- or gender-based violence or harassment, even if the survivor does not want such a report. This proposed requirement **directly contradicts nearly a decade of research** on such policies and is seemingly rooted in the unfounded assumption that broad mandatory reporting policies are both necessary and effective for addressing sex- and gender-based violence and harassment. On behalf of the UW and personally, I urge the Department to carefully review the evidence and research, which suggests that such broad requirements do little (if anything) to prevent or address the harm caused by harassment and violence but instead often further harm a survivor, and eliminate this requirement. We include alternative protocol suggestions in our complete comments.

Thank you for the opportunity to respond to the proposed regulations, and we include detailed comments following this letter.

Sincerely,

*Ana Mari Cauce*

Ana Mari Cauce
President
University of Washington

**University of Washington (UW) Response to the
2022 Notice of Proposed Rulemaking on Title IX**

The comments below have been prepared by the UW's Office of the Title IX Coordinator in consultation with partners across the University who assist in implementing and facilitating the University's system of policies, programs, and services that collectively protect educational access, advance gender equity, and prevent and respond to sex- and gender-based violence, harassment, and discrimination. Our comments are divided into three sections, which include **our responses to three[1] of the directed questions**.

- First, we identify those elements of the proposed regulations representing both significant and positive change in the ongoing quest to achieve gender equity. The broader scope of discrimination, the broader geographical and jurisdictional application, the less prescriptive grievance procedures, and the important role of informal resolution options are among other valuable and positive elements of the NPRM.
- Second, we identify our primary concern with the proposed regulations. The proposal to expand mandated reporting, while well-intentioned, will not enhance our ability to prevent or remedy instances of discrimination, harassment, and violence. It will instead undermine the agency of complainants; exacerbate some complainants' experience of harm where they've already experienced trauma, harm, or other nonconsensual experiences; and erode trust among faculty, advisors, and students.
- Third, and last, we outline specific areas of the proposed regulations that are problematic from an operational and compliance perspective. We ask the Department of Education (Department) to remove these requirements from the regulations, to confirm institutional flexibility in these areas, or to provide clarity to aid recipients' compliance with the regulations.

## I. THE UW SUPPORTS MANY CHANGES IN THE PROPOSED REGULATIONS.

The UW supports numerous elements of the proposed regulations and believes these will ultimately promote sex and gender equity at institutions of higher education. Specifically, we applaud the Department for the following proposed regulations.

- Scope of Discrimination. The proposed 106.10[2] broadens the scope of regulations to include discrimination on the basis of sex, sex stereotypes, sex characteristics, pregnancy and related conditions, sexual orientation, and gender identity. The UW already prohibits discrimination on these bases through an executive order[3] applicable to all UW community members and through our student conduct code.[4] Accordingly, such a proposed change aligns with the UW's values and commitments. Further, Washington law[5] as well as Title VII[6] prohibit discrimination on these same bases.

---

[1] We do not answer the **first directed question**.
[2] To aid in readability, the University only uses full citations to the proposed regulations when referencing language in the preamble. Full citation form is not utilized in referencing the proposed regulations themselves. Instead, the University writes "proposed [number of the proposed regulation]."
[3] Nondiscrimination and Affirmative Action, Executive Order 31, available at https://www.washington.edu/admin/rules/policies/PO/EO31.html
[4] Washington Administrative Code (WAC) 478-121 *et seq.*
[5] *See, e.g.,* Revised Code of Washington (RCW) 49.60 *et seq.*
[6] As explained in the Supreme Court's decision, *Bostock v. Clayton County*, 590 U.S. ___, 140 S.Ct. 1731 (2020), Title VII also prohibits discrimination on the basis of sexual orientation and/or gender identity.

AR_221444

- <u>Broader Application and Jurisdictional Scope.</u> Proposed regulation 106.11's broader application of Title IX would include all locations where UW students study abroad as well as everywhere students and employees conduct fieldwork if the alleged conduct impacts a program or activity within the United States. Since August 14, 2020, alleged conduct impacting our community which occurred abroad has been investigated and adjudicated under UW policies and processes that do not incorporate the federal Title IX regulations. We believe Title IX *is* the appropriate framework to apply to sex discrimination allegations impacting our education programs and activities regardless of where the sites and programs from which such allegations arise are located. Further, we appreciate the Department's recognition that though alleged conduct may occur outside of an institution's programs or activities—such as in off-campus housing and at off-campus events and activities—any such conduct may create a hostile environment within the institution's program or activities. Again, we believe Title IX appropriately applies more broadly, which the Department's proposed regulations reflect.

- <u>Definition of Complainant.</u> The proposed definition of "complainant" in proposed 106.2 would better represent those individuals with allegations of sex discrimination who may be permitted to make a complaint and engage in a grievance procedure. Rather than submitting a complaint only to have such a complaint dismissed under the 2020 federal Title IX regulations (and instead investigated at the UW under a separate university process), the proposed definition would allow individuals who felt compelled to leave the institution due to their experiences of sex discrimination to have their complaint investigated pursuant to Title IX. The UW welcomes this proposed definitional change.

- <u>Less Prescriptive Grievance Procedures.</u> The UW is fully committed to protecting due process rights, and we appreciate the flexibility and latitude in the grievance procedures in proposed sections 106.45 and 106.46. As a publicly funded university and state agency, there are some processes and situations in which the UW is required to follow the Washington State Administrative Procedures Act (APA).[7] The 2020 federal Title IX regulations imposed specific requirements that did not comport well with the APA. The two laws (2020 Title IX regulations and APA) required different procedural steps and/or different timelines that when combined— and in order to provide equitable timelines for the parties—resulted in an even longer grievance procedure. The UW has long been required to hold hearings in certain cases where the APA applies, and the UW appreciates the Department's giving institutions flexibility with respect to how cross-examination occurs when a hearing is held. The UW also appreciates that the proposed 106.45 and 106.46 rightly acknowledge that institutions of higher education employ a variety of employees: part-time, full-time, classified, union represented, tenured, and student employees which, as the proposed regulations point out, "may be entitled to unique grievance procedures based on their respective employment designations."[8] Further, due to the additional laws and contracts governing our employees, including but not limited to the Faculty Code and no fewer than 15 collective bargaining agreements, grievance procedures that allow the

---

[7] RCW 34.05 *et seq.*

[8] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,459 (July 12, 2022) (to be codified at 34 C.F.R. pt. 106). To aid in readability, the University hereinafter refers to the NPRM, fully cited as—Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390-41,567 (July 12, 2022) (to be codified at 34 C.F.R. pt. 106)—as "Preamble" and writes "Preamble at [page number of the NPRM]."

UW NPRM Comment – page [ PAGE   \* MERGEFORMAT ]

necessary latitude to meet all requirements beyond those outlined in federal Title IX regulations place the UW in a better position to respond in a more timely manner to complaints.

- <u>Preponderance of the Evidence Standard.</u> The Department, through its **fourth directed question**, specifically requested feedback on the proposed 106.45(h)(1). The UW has traditionally employed the preponderance of evidence standard as the most equitable one and the one that best balances due process and safety in university-environment proceedings. We will continue to use that standard.

- <u>Informal Resolution Options.</u> Though the UW has not yet been able to offer informal resolution as an option to complainants and respondents, many individuals at the UW recognize the value and importance of this alternative and are committed to developing informal resolution options. We are encouraged that informal resolution remains an option through proposed regulation 106.44(k), particularly even in the absence of a (formal) complaint. We believe the notice requirements in proposed 106.44(k) adequately ensure a participating respondent understands the allegations and process requirements.

  Despite our support for this proposed regulation, the UW seeks clarification that an informal resolution facilitator could serve as a witness **only** "for purposes other than providing information obtained solely through the informal resolution process."[9] By adding the additional word, "only," the Department would further clarify the limits of any informal resolution facilitator's role as a potential witness.

## II. THE MANDATORY REPORTING AND RELATED REQUIREMENTS IN PROPOSED 106.44(c)(2) AND 106.44(f)(5) WILL DIRECTLY HARM COMPLAINANTS.

Proposed 106.44(c)(2)(ii) requires that any non-confidential employee who has responsibility for administrative leadership, teaching, or advising notify the Title IX Coordinator when such an employee has information about a *student* being subjected to conduct that may constitute sex discrimination. Proposed 106.44(c)(2)(iii) modifies this requirement when the employee with administrative leadership, teaching, or advising responsibilities learns that an *employee* may have been subject to conduct constituting sex discrimination, although it still *allows* institutions to require Title IX Coordinator notification. Proposed 106.44(c)(2)(iv) similarly allows institutions to create a policy requiring all *non-confidential* employees to notify the Title IX Coordinator whenever they have information about conduct constituting sex discrimination.

These proposed regulations greatly expand the current requirement that officials who have the "authority to institute corrective measures" notify the Title IX Coordinator of potential reports or allegations of sexual harassment.[10] ***Such a change is <u>neither trauma-informed nor survivor-centered</u>; the change also <u>ignores years of research</u> in this area, removes agency and empowerment from those who experienced sex discrimination, <u>infantilizes adult college students</u>, and will be <u>more harmful to complainants/survivors</u> than the regulations they intend to replace.*** We ask the Department to amend the proposed regulations to better account for research regarding mandatory reporting in this area.

---

[9] Proposed 106.44(k)(3)(viii).
[10] 34 C.F.R. § 106.30(a).

**A. Research Supports That Requiring Employees To Share Information Without a Complainant's Consent Harms Complainants.**

Nearly a decade of peer-reviewed research in the area of "mandatory reporting" in response to sex- and gender-based violence, harassment, and discrimination demonstrates the importance of protecting survivors' autonomy. This research outlines numerous problems with the concept of mandatory reporting.[11] Furthermore, evidence does not suggest mandated reporting has been an effective strategy for preventing and responding to harassment and violence.[12] For example, in an article published in *The Chronicle of Higher Education*, researchers in this area outlined the significant problems with requiring trusted instructors to report to the Title IX Coordinator all instances of suspected sex discrimination, even when the student does not expect or want that reporting to occur. Reporting under these circumstances, which arise frequently, effectively ***forces the trusted instructor or other employee to betray the student's trust***. Requiring that trusted faculty and advisors disclose a student's experiences without that student's consent violates autonomy and potentially subjects that student to an arduous grievance process the student explicitly wanted to avoid.[13] Research suggests that ***when control and choice is taken from a complainant/survivor/victim, that individual is more likely to experience post-traumatic stress, depression, and/or anxiety***.[14] Indeed, other research supported that the mere existence of mandatory reporting policies can cause harm, for example, by preventing survivors from seeking treatment and support because doing so will jeopardize their safety and control and/or will result in their further stigmatization and humiliation.[15]

In line with this research, UW employees who were asked to provide perspectives about the proposed regulations based on their current roles and professional expertise were immediately concerned about the Department's requirement that so many individuals would become mandatory reporters. UW employees expressed beliefs that students would hesitate to share their experiences with *any* employee for fear that their privacy would be violated and that the UW would be forced to respond to a situation where the student does not want the larger institution's involvement. UW employees noted the mandatory reporting requirement would likely most negatively impact communities who have historically experienced marginalization and are already reticent to disclose experiences of sex- and gender-based violence and harassment, such as students of color, students who are immigrants, students with disabilities, and students who identify as LGBTQIA+. This could ***result in decreased resource utilization within the most vulnerable communities.***

We anticipate the Department will receive numerous comments on this proposed change, particularly from researchers and experts in this area. We urge the Department to consider and modify the

---

[11] *See, e.g.*, Kathryn J. Holland, Jennifer J. Freyd, and Elizabeth A. Armstrong, *Mandatory reporting is exactly not what victims need: Proposed Title IX regulations intended to help students will only make things worse*, CHRON. OF HIGHER EDUC. (July 22, 2022), at https://www.chronicle.com/article/mandatory-reporting-is-exactly-not-what-victims-need

[12] Kathryn J. Holland, Lilia M. Cortina, & Jennifer J. Freyd, *Compelled disclosure of college sexual assault*, 73(3) AM. PSYCHOLOGIST 256-268 (2018).

[13] Kathryn J. Holland, Jennifer J. Freyd, and Elizabeth A. Armstrong, *Mandatory reporting is exactly not what victims need: Proposed Title IX regulations intended to help students will only make things worse*, CHRON. OF HIGHER EDUC. (July 22, 2022), at https://www.chronicle.com/article/mandatory-reporting-is-exactly-not-what-victims-need

[14] Emily R. Dworkin, Charlotte D. Brill, & Sarah E. Ullman, *Social reactions to disclosure of interpersonal violence and psychopathology: A systematic review and meta-analysis*, 72 CLINICAL PSYCHOLOGY REV. 101750 (2019).

[15] Kathryn J. Holland, Lilia M. Cortina, & Jennifer J. Freyd, *Compelled disclosure of college sexual assault*, 73(3) AM. PSYCHOLOGIST 256-268 (2018).

AR_221447

proposed regulations to account for the research and knowledge of those experts best positioned to explain the harm these proposed regulations will likely cause.

**B. UW Policies Emphasize Providing Support, Resources, and Reporting Options to Complainants.**

The UW encourages the Department to consider the UW's current model of employee categories and revise the proposed regulations to reflect something more in alignment with our model. The UW has identified three categories of employees—confidential employees, employees providing support, and officials required to report. Depending on an employee's categorization, they have different obligations and expectations.

- <u>Confidential Employees.</u> Confidential employees, as their name implies, are mental and physical health professionals as well as confidential advocates; this category of employees all have legally-defined privileges or confidentiality obligations that prevent the disclosure of client information without express permission or as required by law.

- <u>Employees Providing Support.</u> Employees providing support comprise the largest category of employees; this category includes most instructors, advisors, and administrators. Employees providing support receive guidance on how best to respond to someone who discloses an experience of sex- or gender-based violence.[16] These employees are then encouraged to take action to direct that person to expert support and reporting options. These employees are not required to disclose the identity of a complainant unless the complainant gives them permission to do so; instead, they are asked to contact the UW's violence prevention and response team to share limited information and ensure the complainant receives the UW's Know Your Rights & Resources guide and information about the UW's confidential advocates.

- <u>Officials Required to Report.</u> Officials Required to Report are those employees with the authority to take corrective measures as outlined by the current Title IX regulations. This category of employees includes individuals who report directly to the UW's president and/or provost, those with delegated authority to impose a full range of corrective actions, and those who have specific compliance-oriented and investigative responsibilities. These Officials Required to Report are, as their name implies, required to report all information they receive about potential instances of sex- and gender-based violence and harassment, including any known identities of complainants and respondents.

A system such as ours allows the majority of UW employees to support the individuals who trust them enough to disclose a situation of sex- or gender-based violence or harassment. In nearly all circumstances, it allows the person who experienced the behavior to choose whether to be identified or to remain anonymous. ***The UW is highly invested in not undermining the autonomy*** of someone who ***has already been subjected to harassment or violence on the basis of their sex or gender.***

If the Department adheres to its broader stance on required reporting,[17] the Department should instead require employees to ask students if they wish for their name to be shared with the Title IX Coordinator

---

[16] *See, e.g.*, the UW's four-minute video on Title IX & Responding with Care available on [ HYPERLINK "https://www.washington.edu/titleix/supporting-students-employees/" ]. How to respond with care and in an appropriate way is also covered in the UW's *Husky Prevention and Response* courses, which all employees and all new students are required to complete.

[17] Preamble at 41,438.

AR_221448

in order to address the conduct or behaviors. If students decline (i.e., state they do not wish their name to be shared), then the employee should instead be required to provide resources and reporting options to the student and then inform the Title IX Coordinator that they have provided the information to a student (but withhold the student's name as requested). The Department's stated belief—that post-secondary "students are differently situated than employees and may be less capable of self-advocacy"[18]—is infantilizing in its assumption that students are unable to make decisions or clearly state preferences themselves and ignores that many students (like employees) have different experiences in self-advocacy based on their identities and other life experiences. The UW, in its commitment to educate a diverse student body to become responsible global citizens and future leaders,[19] considers its students to be adults and treats them as such.

### C. Proposed 106.44(f)(5) Also Could Further Harm a Complainant and Does Not Appropriately Balance Potential Harms.

The Department acknowledges that individuals may wish to report conduct that comprises sex discrimination without making a complaint to initiate a grievance procedure. The Department's solution to addressing its requirement that an institution respond even when a complainant does not want to engage in a process is to explain to complainants that their telling specific individuals, including trusted instructors and advisors, may obligate the institution to take further action.[20] This solution forces a complainant to engage in an undesirable calculus: they can either choose to tell someone what they are experiencing in order to seek help or supportive measures—and thereby invite the risk that their autonomy and privacy will be violated—or remain silent and suffer.

If the complainant decides to seek help, which likely results in the Title IX Coordinator being informed of the alleged sex discrimination, proposed 106.44(f)(5) then requires a Title IX Coordinator to determine whether to initiate a complaint themselves in order to address conduct that may constitute sex discrimination. The Department imagines that, for some cases, the only way to end the discrimination and prevent its recurrence may be through the imposition of disciplinary sanctions[21]—which cannot occur absent a grievance procedure and is unlikely to result in any finding of responsibility if a complainant does not want to participate. ***Thus, by mandating reporting and mandating that every instance of sex discrimination be addressed and remedied, the Department sets up Title IX Coordinators to be asked repeatedly to either undermine complainant autonomy and create further harm or violate the regulations by neither investigating nor responding to allegations of sex discrimination.*** Such an act will erode trust in Title IX Coordinators, which will further impact their ability to accomplish their responsibilities.

The UW asks the Department to revise its proposed regulations to instead, in the absence of a complainant's desire to initiate a complaint, require a Title IX Coordinator when informed of an incident to conduct an individualized assessment considering potential harm to both the complainant and the community and to document that such assessment occurred and its outcome. When contemplating taking action against a complainant's wishes, the dynamics and context of each situation must be considered to weigh and balance potential additional harm to the complainant with the University's obligation to provide a safe and nondiscriminatory environment for all community members. This suggested revised approach would allow the Department to center the interests of the complainant,

---

[18] Preamble at 41,438.

[19] *See* UW Vision Statement, available at https://www.washington.edu/about/visionvalues/

[20] Preamble at 41,427.

[21] Preamble at 41,447.

AR_221449

who has been most negatively impacted by the sex discrimination. Without an approach that balances potential harm to the complainant in initiating a proceeding with the potential harm to the community in not initiating it, the Department unduly creates tension among complainant autonomy, mandatory reporting, and the need for prompt and effective actions. This tension may not be easily navigated by an institution like the UW, whose Office of the Title IX Coordinator identifies survivor choice as a primary guiding value.[22]

### III. ASPECTS OF THE PROPOSED REGULATIONS ARE INSUFFICIENTLY CLEAR TO BE IMPLEMENTED IN A MANNER THAT ALLOWS COMPLIANCE AND AVOIDS LITIGATION.

Lastly, the UW would like to outline a number of areas where the proposed regulations are problematic from an operational and/or compliance perspective. *We seek clarity and/or confirmation of institutional flexibility* with respect to the following ten areas, organized in five sections:

**Definitions**
- Definition of and standards for what constitutes sex discrimination;
- The application of the hostile environment definition of sex-based harassment;
- A specific definition of sexual assault;

**Prompt and Effective Action**
- The requirement to address, prevent, and remedy sex discrimination;
- The provision of supportive measures;

**Grievance Procedures**
- The need to assess complaints before any initiation of grievance procedure;
- The framework for dismissals and any appeal thereof;
- The application of proposed 106.46;

**Pregnancy Provisions**
- Standards for providing modifications, support, and/or accommodation to individuals who are pregnant and/or experiencing pregnancy-related conditions; and

**Posting Training Materials**
- The requirement to post training materials.

While some of these areas are new, others exist in the current Title IX regulations. We ask the Department to clarify or remove these sections with the goal of improving consistency and comprehensibility.

### A. The Proposed Regulations Do Not Include a Definition of and Standards Related to Sex Discrimination and Could Better Define Sex-Based Harassment, Including Sexual Assault.

The UW asks the Department to clarify its definition of sex discrimination and what standards need to be applied in determining whether sex discrimination is, in fact, present. We further ask the Department to provide additional standards in interpreting the five factors to be considered under sex-based harassment, and we ask the Department to provide, in the final regulations, the definition of sexual assault rather than refer institutions to a Federal Bureau of Investigation (FBI) guide.

---

[22] *See* UW Office of the Title IX Coordinator Mission & Vision, available at https://www.washington.edu/titleix/about-title-ix/

UW NPRM Comment – page [ PAGE   \* MERGEFORMAT ]

AR_221450

1. ***The absence of a definition of or standards for what constitutes "sex discrimination" obscures recipients' responsibilities.***

***Without a clear definition or standard against which to measure alleged behavior, an investigation*** and/or adjudication process, as is proposed in 106.45 and 106.46, ***cannot determine whether that definition has been met or whether a standard was violated***. Thus, the UW requests the Department clearly define "sex discrimination" and the standards used to determine in presence, including providing guidance to assess complaints.

Presently, the proposed regulations do not define succinctly or clearly the conduct, behaviors, or actions that would constitute sex discrimination. Proposed 106.2 includes a definition of a subset of sex discrimination—sex-based harassment—but not of sex discrimination itself. Proposed 106.10 clarifies that sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity—but still does not set forth standards for determining what constitutes "discrimination." When the proposed regulations would impose on an institution the responsibility to "take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects,"[23] it is imperative the institution understand what amounts to sex discrimination (to be able to identify when such discrimination may be occurring or has already occurred) in order to prevent and remedy such discrimination.

Based on proposed regulation 106.31(a)(1), an institution could surmise sex discrimination would likely be found when a person is "excluded from participation in" or "denied the benefits of" any academic, extracurricular, research, occupational training, or other education program or activity. Proposed 106.31(a)(1) also suggests there are additional ways a person may "otherwise be subjected to discrimination," though it is unclear what those include. Based on the proposed regulations, it appears sex discrimination may occur anytime someone is treated differently because of sex and that person experiences more than *de minimis* harm.[24] However, the proposed regulations also do not clearly define or provide standards for determining what constitutes "*de minimis* harm." The preamble references case law for the proposition that *de minimis* harm may include emotional stress and/or dignitary harm,[25] but it is unclear on what standard such an evaluation should be made with respect to Title IX. Title VII typically requires that an adverse action occur,[26] which is arguably a higher bar than experiencing *de minimis* harm and more akin to being "excluded from participation" or denied an articulable benefit.

If a student's statements that they were treated differently because of sex and experienced emotional harm[27] sufficiently state a prima facie claim of sex discrimination under Title IX, then institutions will

---

[23] Proposed 106.44(a)

[24] *See* Proposed 106.31(a)(2).

[25] Preamble at 41,535.

[26] The preamble explicitly differentiates between Title VII and Title IX, noting that both the Department and the courts interpret the two laws differently, because educational and work environments are different from one another. However, litigation under Title VII—and what constitutes an adverse action and/or what being treated differently on the basis of a protected class means—has been on-going for decades. If Title VII's adverse action requirement was carried into the Title IX sex discrimination definition, it would be rare that any differential treatment was severe enough to comprise an adverse action in situations involving only students.

[27] If such a statement is sufficient to allege sex discrimination and then require the provision of supportive measures and institutional responsibilities to address, prevent, and respond to the allegation, we hope and assume the Department would first allow an institution to assess how the student was treated differently and the severity of alleged harm prior to triggering any responsibility to provide supportive measures and to take other action.

AR_221451

experience no end to sex discrimination allegations that require, based on the proposed regulations, an institution to act, prevent the discrimination, and remedy the harm *even in the absence* of any assessment or investigation. A student who makes such a statement would further be entitled to supportive measures, regardless of whether there is any merit to their statement. A clear definition and standard are necessary in the regulations—even if the Code of Federal Regulations refers to standards established elsewhere—because the Department, as it proposes, will require institutions to address all reports, regardless of any merit and/or in the absence of any investigation.

2. ***The definition of hostile environment harassment includes consideration of factors that do not align with Title VII; the Department needs to further explain these factors to avoid their inconsistent application.***

Though the Department states its intent for the hostile environment category of "sex-based harassment" in Title IX to more closely align with Title VII,[28] the Department outlines several factors to consider in determining whether sex-based harassment occurred that are not considered when assessing whether sexual harassment occurred under Title VII.

In discussing the five factors to consider in determining whether a hostile environment has been created, the Department—in the preamble—offers numerous examples; not all of these would appropriately be considered within current Title VII or Title IX frameworks. This includes cases where the conduct of numerous individuals toward the same complainant collectively constitute sex discrimination, but the conduct of any individual alone would not rise to the level of sex-based harassment or amount to sex discrimination.[29] In such an example, where the individual actions of each person may be problematic but alone would not constitute sex discrimination or sex-based harassment, an institution's responsibility to address, prevent, and remedy that behavior is not sufficiently detailed. Additional guidance on the interpretation of these five factors—including how they might result in similar or different[30] findings in relation to the Title VII definition of sexual harassment—would be beneficial. From a compliance perspective, clearly articulated standards applied in a consistent manner are essential to maintain consistent outcomes and avoid litigation.

3. ***We respectfully request the Department explicitly include the definition of "sexual assault" institutions of higher education are required to employ.***

Proposed regulation 106.2's definition of specific offenses of sex-based harassment points institutions to the uniform crime reporting system of the FBI to define "sexual assault." The Department explains in the preamble that stakeholders experienced confusion regarding the cross-reference to definitions; the Department also notes that rather than include cross-references to statutory provisions, it would include language from those other statutory definitions to clarify how terms are to be defined for Title IX.[31] While the Department does this for dating violence, domestic violence, and stalking, the Department still refers to the uniform crime reporting system of the FBI in defining "sexual assault." The uniform crime reporting program's website is convoluted, and it is difficult to locate the Department's intended definition of sexual assault. We ask that the Department—instead of referencing the crime

---

[28] *See* Preamble at 41,415.
[29] *See* Preamble at 41,417.
[30] If Title IX's sex-based harassment standard differs from Title VII's sexual harassment standard, multiple standards would need to be applied when employees' actions are being considered; this would result in confusion and lead to potentially different outcomes when applying both Title VII and Title IX in employee matters.
[31] Preamble at 41,410.

AR_221452

reporting system—simply include the definition of sexual assault that the Department wants institutions to use. This will also ensure that should the FBI revise its definitions prior to any new Title IX regulations going into effect, institutions will be able to work with a stable definition.

### B. We Seek Clarification to Understand Fully the Department's Intent Regarding Prompt and Effective Action.[32]

Proposed 106.44 obligates an institution to take "prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects." The Department states an institution has a "legal duty to operate its education program or activity in a manner in which people are not subjected to sex discrimination."[33]

#### 1. We seek clarification as to whether the proposed regulations impose a requirement that institutions take action to prevent and remedy any and every report of what a reporter believes to be sex discrimination.

The Department—though stating it would not obligate an institution to respond to sex discrimination that has not yet occurred[34]—nevertheless imposes an obligation in proposed 106.44(f) for the Title IX Coordinator to address *every* report of sex discrimination, potentially *even when insufficient information is provided* to understand what is being reported or potentially even before any assessment about what has been reported may occur. Indeed, the Department states that even "outside the context of a recipient's grievance procedures for complaints of sex discrimination, the Department reaffirms that 'prompt' action to end sex discrimination … 'is necessary to further Title IX's nondiscrimination mandate.'"[35] The Department further notes an institution's Title IX Coordinator must take other appropriate prompt and effective steps to ensure sex discrimination does not continue to occur *even in the case that a complaint is dismissed*[36]—which may occur *after the institution has determined already the conduct alleged would not constitute sex discrimination* under Title IX.[37] Such requirements are illogical. Requiring that a Title IX Coordinator act in response to a report of sex discrimination (without first assessing the alleged conduct through an investigation or otherwise) or take action even after a complaint was dismissed because what was alleged was determined to not constitute sex discrimination[38] does not make sense and—hence—would require an unfathomable amount of resources.

If what the Department means is that: 1) an institution should not actively or purposely prevent the Title IX Coordinator from learning of possible sex discrimination; 2) an institution is responsible to address alleged sex discrimination after an assessment or investigation yields evidence such discrimination existed; and 3) there is no required action if what's been alleged on its face would not constitute sex

---

[32] This section, III.B., and the next section, III.C., collectively comprise the UW's response to the **second directed question**.
[33] Preamble at 41,433.
[34] Preamble at 41,434.
[35] Preamble at 41,434.
[36] *See* Proposed 106.45(d)(4)(iii). This proposed section includes language that states what a recipient must, at a minimum, do; not all of these actions make sense when a report does not adequately allege sex discrimination.
[37] *See* Proposed 106.45(d)(1)(iv); *see* Preamble at 41,474.
[38] Refer to section III.C.1. for additional information about UW's robust intake assessment process, which involves an intake meeting between a complainant and legally-trained investigator. The UW believes that through this intake meeting, complaints may be appropriately assessed, and an investigator may determine accurately whether a complainant alleges sex discrimination.

AR_221453

discrimination, then the UW is in agreement. The UW, however, objects to any requirement to respond to alleged sex discrimination until at least some type of assessment—if not an investigation[39]—of a report occurs. Similarly, the UW also objects to any requirement (or any interpretation of a requirement) promulgated through Title IX regulations that it must respond to a report or complaint that, after it conducts an assessment or investigation, does not meet a definition of and standards for sex discrimination, regardless of what a complainant asserts.[40] Indeed, our position is supported elsewhere in the preamble: for example, the preamble states that nothing in the proposed regulations would require an institution to address sex-based harassment that does not meet the definition of sex-based harassment.[41]

In discussing proposed 106.44(f)(6), the Department again notes the Title IX Coordinator must take steps, even beyond the provision of supportive measures or remedies, to ensure sex discrimination does not continue or recur outside of the institution's grievance procedures.[42] We ask the Department to clarify that proposed 106.44(f)(6) applies **only after the Title IX Coordinator assesses the information[43] of which they were notified and determines whether a response is merited.** In some cases, if the complainant decides not to initiate a grievance procedure (which would require an investigation at the UW) and the reported conduct does not rise to the level where a Title IX Coordinator believes it necessary to override a complainant's wishes, then the UW asks the Department to provide flexibility and recognize that the "appropriate prompt and effective steps" in proposed 106.44(f)(6) may be to take no action because whomever notified the Title IX Coordinator of conduct that may constitute sex discrimination was mistaken in believing sex discrimination may have occurred.

The UW takes seriously its responsibility to ensure its environments are free from sex discrimination. However, prior to *requiring* an institution to remedy a situation, the Department should clarify that an institution **must first assess an allegation or report to determine** what is alleged or reported and **whether that constitutes sex discrimination**. While institutions may aim to address a broader range of potentially problematic behavior, *requiring* institutions to respond fully to every situation and every allegation, even those that do not adequately or plausibly allege sex discrimination, would instead result in the expenditure of unnecessary resources and require burdensome remedies in the absence of actual sex discrimination, thereby diverting resources from where they are most needed.

---

[39] We assert an investigation is the *only* way to affirmatively determine whether evidence supports the presence of sex discrimination; however, absent an investigation occurring, some type of an assessment is needed to gather at least enough information to determine the potential severity or persistence of conduct described in a report that initially lacks adequate information on its own.

[40] While there are many instances in which the UW already does and will continue to respond to situations in ways beyond what is required through federal regulations or any other compliance-based mechanism, the UW also seeks to protect its finite employee and financial resources. In so doing, the UW wants to ensure the proposed regulations do not require a response simply because a complainant uses specific words (e.g. "sex discrimination" or "sex-based harassment") that compel a response under Title IX when a Title IX response may not be warranted.

[41] Preamble at 41,411.

[42] Preamble at 41,446.

[43] The preamble, on page 41,446, describes an "assessment" in which the Title IX Coordinator reviews video footage and visitor logs; at UW, we believe that such actions implicate due process and cannot be taken without a respondent being put on notice of an investigation.

AR_221454

**2. We seek clarification to understand fully the Department's intended use of supportive measures; alternatively, we seek confirmation that supportive measures are not required when Title IX is not implicated.**

In addition to the requirement that an institution take action in response to any report of sex discrimination, the proposed regulations require the provision of "supportive measures, as appropriate, to the complainant or respondent to the extent necessary to restore or preserve that party's access to [an] education program or activity."[44] Though the proposed regulations note supportive measures are to be provided "as appropriate" and as "available and reasonable,"[45] the UW asks the Department to confirm that **before supportive measures are provided, an institution has the flexibility to assess** any **report or complaint of sex discrimination and determine whether the alleged conduct may constitute sex discrimination**. When the report or complaint does not include allegations that may constitute sex discrimination, we ask the Department to confirm that an institution is not obligated to provide supportive measures because Title IX is not implicated.

The reason we request such clarification is because proposed 106.45(d)(4) requires that when a complaint is dismissed, an institution still, among other things, *must* provide a complainant with supportive measures as appropriate.[46] The Department proposes that an institution may dismiss a complaint of sex discrimination and/or some of its allegations if the institution determines that the alleged conduct—*even if proven*—would not constitute sex discrimination under Title IX.[47] Thus, where it is determined that a complainant has alleged conduct that would not constitute sex discrimination or fall under Title IX, it follows that an institution *should not be required* to provide supportive measures to a complainant whose experience would be something other than sex discrimination under Title IX.

## C. The Grievance Procedures in Proposed 106.45 and 106.46 Require Clarification to Avoid Internal Contradictions and Confusion.

Generally, the UW agrees with the Department's restructuring of the grievance procedures and removal of the most prescriptive elements that exist within the current Title IX regulations' grievance process. Despite our general agreement, the proposed regulations and guidance through the preamble—in explaining the proposed grievance procedures—are not sufficiently clear in outlining all requirements.

**1. We seek confirmation that a recipient may first assess a complaint to determine whether it is subject to the grievance procedures before providing any notice to parties.**

Proposed 106.45(c) states, "Upon initiation of the recipient's grievance procedures, a recipient must provide notice of the allegations to the parties whose identities are known." Proposed 106.45(c) then outlines the requirements of appropriate notice. The proposed regulations, in 106.2, define "complaint" as "an oral or written request to the recipient to initiate the recipient's grievance procedures as described in 106.45, and if applicable 106.46." It is unclear what an institution may do between the receipt of such a complaint and the initiation of its grievance procedures or whether—to the Department—the complaint *automatically triggers* the grievance procedure including notice. We ask the regulations' language be clarified to allow institutional flexibility such that institutions may first assess a complaint for adequacy and specificity in alleging sex discrimination *before* providing notice. As

---

[44] Proposed 106.44(g).
[45] Proposed 106.44(g)(1).
[46] *See* Preamble at 41,474.
[47] Preamble at 41,474.

written now, it is unclear whether an institution could be at risk of litigation if, before initiating a grievance procedure, it initially engages in a process to assess the complaint.

When the UW receives a discrimination complaint, verbally or in writing, an intake is scheduled, so an investigator may speak with the complainant to determine if their concerns would fall within the purview of UW policies and procedures. Once this determination is made, the UW will then provide notice to the parties that an investigation is opening. Even if a robust intake procedure is not contemplated or required by the proposed regulations, an institution of higher education must still gather enough information, so it can include "sufficient information ... to allow the parties to respond to the allegations."[48] The Department provides a caveat regarding the notice in that information in the notice should include the identities of the parties involved, the conduct alleged to constitute sex discrimination, and the date and location of the alleged incident *to the extent it is known to the institution*.[49] Thus, an institution only needs to notify parties to the extent the complaint (or complainant) provided that information to the institution; taking this proposed regulation to its logical conclusion would mean an institution may issue a notice that simply states, "[Respondent's name], you are under investigation because it has been alleged that you engaged in sex discrimination" if that is the only information available. Such notice is effectively meaningless and would not allow a respondent to respond to the allegation in a meaningful matter. Instead, **the regulations should confirm that an institution may first assess a complaint,** including whether the institution has jurisdiction, **before it initiates any grievance procedure and provides notice**. This assessment allows the institution to appropriately and meaningfully provide notice to parties that a grievance procedure has been initiated and would establish a better process by which to manage dismissals, as discussed next.

### 2. We ask the Department to clarify and confirm that if a matter is dismissed prior to a respondent being notified, then no notification of dismissal or appeal for the respondent is necessary; we seek further clarification regarding appeal rights following dismissals.

Proposed 106.45(d) permits an institution to dismiss, for a variety of reasons, a complaint of sex discrimination. Such reasons include: the inability to identify the respondent; the university's lack of jurisdiction over a respondent; a complainant's voluntary withdrawal of a complaint or specific allegations in a complaint; and/or a determination that the conduct alleged in the complaint would not constitute sex discrimination even if such allegations are proven.[50] With the exception of a complainant's voluntary withdrawal of a complaint or specific allegations in a complaint resulting in dismissal, the UW believes it would be inappropriate (or impossible, when a respondent's identity is unknown) to initiate a grievance procedure or provide notice in these circumstances where the Department would permit dismissal. The UW ordinarily would not initiate an investigation or grievance procedure in any of these circumstances due to a lack of jurisdiction. In the absence of a grievance procedure, notice would not be required, and dismissal would not be necessary.

The Department's proposed regulations, guidance, and preamble regarding dismissals contain internal contradictions and thus establish requirements that do not make sense. Proposed 106.45(d)(2) states, "if the dismissal occurs after the respondent has been notified of the allegations, then the recipient must also notify the respondent of the dismissal and the basis for the dismissal...." However, proposed 106.45(d)(3) then compels an institution to notify all parties that a dismissal may be appealed and contains further requirements regarding the appeal. Proposed 106.46(d) further requires that a post-

---

[48] Proposed 106.45(c)(ii).
[49] Proposed 106.45(c)(ii).
[50] Proposed 106.45(d)(1).

secondary institution notify the parties, simultaneously, of the dismissal and its basis. We ask the Department to revise the proposed regulations in both sections 106.45(d) and 106.46(d) and **to confirm that if a matter is dismissed prior to a respondent being notified, then no appeal**—and hence, no notification of the dismissal and/or right to appeal—**for the respondent is necessary** or appropriate.

The Department's proposed 106.45(d)(2)—which requires a respondent be notified of a dismissal *only if* they were notified of the allegations—is logical in that a respondent who was never notified they were accused of sex discrimination, including sex-based harassment, need not be notified that a complaint will not be pursued. When a respondent has not been notified of any allegations, much less when the identity of the respondent is not known, it would be inappropriate and potentially problematic to notify an individual (who is not even a respondent because of the absence of a procedure) that a complaint is being dismissed. In such a case, the respondent would be informed a complainant raised a concern but such a concern will not be pursued.

Potential harm may occur when a respondent is notified of a dismissal when the respondent has not been notified of the initiation of a grievance process. For example, a respondent whose conduct would not yet rise to the level of constituting sex discrimination may escalate their conduct, further harming a complainant, if the respondent negatively reacts to their being reported. Such a situation is easily imaginable where a respondent's reported conduct borders on—but does not yet meet the definition of—for example, dating or domestic violence. Further, telling a respondent, who may not have otherwise known they were reported, invites the possibility of retaliation between parties. By ensuring a robust assessment of any complaint before providing the parties notice, an institution would appropriately ensure a complaint adequately alleges sex discrimination on its face and avoid creating other problematic issues by initiating an unnecessary grievance procedure.[51]

As written now, proposed 106.46(d)(1) seems to suggest a respondent must be notified of the dismissal of a complaint and basis thereof *even if* they were never notified of the complaint. In addition to the potential harm described in the paragraph above, these notifications also would be incredibly confusing to an individual who may, in one communication, be notified that: 1) they were identified as a respondent in a complaint that did not adequately allege sex discrimination; 2) the complaint was dismissed because an allegation was not stated sufficiently; and 3) they may appeal the dismissal determination. Where an institution does not contemplate initiating an investigation in response to a complaint, it is highly unlikely that a respondent would wish to appeal that decision. Furthermore, offering an appeal right to a respondent, even without notice of a complaint or any intent to initiate a grievance procedure, would—at best—create confusion and—at worst—invite retaliation and/or further harm to a complainant.

Therefore, we ask the Department to **revise proposed 106.46(d)(1)** to reflect that notice of a **dismissal is necessary only if a respondent was notified of the initiation of a grievance procedure**. We further ask the Department to **revise 106.45(d)(3)** be revised to reflect that **respondents only be notified of an appeal following a dismissal if the respondent was notified of the initiation of any grievance procedure**.

Finally, since the proposed regulations do not sufficiently outline what is required for any appeal process related to the dismissal of a complaint or on what grounds an appeal based on a complaint's dismissal would be granted, we ask the Department to provide guidance in these areas.

---

[51] Preamble at 41,477-41,478.

AR_221457

**3. The Department should amend 106.46, as aspects of this proposed regulation should apply any time sex-based harassment is alleged and not only when either party is a student.**

Proposed 106.46 establishes grievance procedures for sex-based harassment involving student complainants and/or student respondents. Given the Department's stated intent of providing discretion and flexibility to institutions in light of an institution's use of many categories of employees (faculty, unionized employees, contract employees, etc.) who may be entitled to unique grievance procedures based on their employment designation,[52] the Department should reconsider its proposed 106.46 to specify what is necessary in the case of *any complaint* of sex-based harassment at an institution of higher education and what is necessary for *a complaint that a student respondent* engaged in sex-based harassment. At present, it is not clear what elements of proposed 106.46 are intended to protect student complainants versus what elements of proposed 106.46 are intended to provide due process to student respondents.

Proposed 106.46 presently contains requirements that would need to be added to already-existing processes involving employee respondents, which seems counter-intuitive to the Department's goal of providing the appropriate flexibility and discretion—a goal stated no fewer than twenty times in the preamble[53]—for recipient institutions.

Applying the grievance procedures in proposed 106.46 would ensure that student complainants are guaranteed specific guardrails on any process concerning sex-based harassment in which they participate. However, applying the proposed 106.46 grievance procedure in matters involving sex-based harassment allegations against employee respondents would require the development of two separate processes for employees: one that is utilized when a student is the complainant and a second that is utilized for any non-student complainant. This would be confusing, cumbersome, and more expensive; it would also require significant negotiations with faculty governance structures and labor unions. Instead, we request that the department *identify key process pieces that must be incorporated into employee sex-based harassment grievance procedures **regardless of who the complainant is***. Those elements could include: written notice of allegations to all parties[54]; written notice of all meetings and investigative interviews[55]; the requirement to gather and consider relevant evidence from both parties; and the provision of a brief written determination of the results of an investigation to all parties. [56]

While some of what is proposed in section 106.46 should be provided regardless of whether the complainant or respondent is a student or employee, other aspects of proposed 106.46 should not be required when the respondent is an employee. For example, we do not believe it is necessary that an appeal process be required for employee respondents accused of sex-based harassment, as doing so would differentiate allegations of sex-based harassment from what is required for other allegations such as race-based or disability-based harassment or may require two appeal procedures if a collective bargaining agreement allows the respondent (but not complainant) an opportunity to appeal. Or, in the case of at-will employees, the proposed regulations would permit an appeal procedure for allegations of sex-based harassment, even where such at-will employees may be terminated for significantly less severe allegations and/or substantiated conduct.

---

[52] *See* Preamble at 41,459.
[53] *See* Preamble at 41,457, 41,460, 41,473, and 41,546.
[54] *See* Proposed 106.46(c).
[55] *See* Proposed 106.46(e)(1).
[56] *See* Proposed 106.46(h).

AR_221458

If proposed section 106.46 otherwise remains unchanged, the UW seeks clarification that a proposed 106.46-compliant procedure involving *both a student complainant and student respondent* may differ from a proposed 106.46-compliant procedure involving *a student complainant and employee respondent*. Washington law requires a live hearing, presided over by someone other than the investigator, for student respondents in cases involving possible suspension or dismissal. This is true for both those matters involving sex-based harassment or sex or gender-based violence as well as those matters involving other severe academic or behavioral misconduct. These Washington laws do not apply uniformly to employee respondents. Because the UW must conduct a live hearing and, hence, may not utilize a single-investigator model in some cases but would prefer to use a single-investigator model when not otherwise prohibited by Washington law, we seek confirmation from the Department that a single 106.46-compliant procedure would not be required for both student and employee respondents. To elaborate and answer the Department's **third directed question**,[57] the UW favors utilizing a single-investigator model where due process and/or Washington law do not require otherwise. We believe that a well-trained, single investigator is properly equipped to conduct fair and impartial investigations which properly consider relevant evidence and protect parties' due process rights.

### D. Proposed Requirements Regarding Modifications for Individuals Experiencing Pregnancy and Related Conditions Create Confusing and Inconsistent Standards.

Proposed 106.40 establishes a number of requirements related to pregnancy and pregnancy-related conditions that will likely result in confusion and litigation. To avoid this, we ask the Department to confirm institutional flexibility in providing modifications for individuals who are pregnant and/or have related conditions. The UW is committed to ensuring its pregnant students and employees do not experience discrimination and are provided with the modifications and/or accommodations they need to remain in their educational and work environments. The UW is simultaneously committed to ensuring its instructors, supervisors, and other employees support students' and employees' pregnancy and pregnancy-related healthcare needs while holding them to appropriate academic and professional standards.

### 1. The proposed regulations incorporate a number of standards to meet the needs of individuals who are pregnant that, in practice, would create conflicting policies and procedures.

Various provisions of the proposed regulations set forth differing and potentially inconsistent standards regarding modifications and accommodations for individuals who are pregnant or experiencing related conditions. For example, proposed 106.40(b)(3)(iii) states that students must be granted leave for "the period of time deemed medically necessary by the student's physician or other licensed healthcare provider." Yet, if a modification "would fundamentally alter the recipient's education program or activity,"[58] such modification does not need to be offered or implemented—which may be the case when a student, through their medical provider, requests a length of leave that would fundamentally alter the education program or activity.

For example, to maintain sequenced curriculum for clinical or cohort programs, or for those requiring external internships or placements, it may be necessary for a student to take an amount of leave longer than that which is medically necessary *and* longer than that student wishes to take. Under the proposed regulations, it is unclear whether an institution may effectively compel a student to take a longer period of leave than is medically necessary to avoid fundamentally altering that student's program or to best

---

[57] *See* Preamble at 41,544.
[58] Proposed 106.40(b)(4)(i).

AR_221459

ensure a student's success in their program where courses must be sequenced. It is also unclear who is responsible for any additional expenses incurred as a result of medically necessary leave. For example, a longer leave period could result in additional student loan and interest expenses that are incurred when (re-)enrollment is postponed to accommodate structured cohort modeled education, particularly in clinical healthcare programs. The UW asks the Department to *confirm institutional flexibility* when addressing issues tangential to the amount of medically necessary leave for pregnancy or a pregnancy-related condition, particularly *when the requested leave would fundamentally alter a program*.

Proposed regulation 106.40(b)(5) also would require that an institution treat pregnancy or related conditions "in the same manner and under the same policies as any other temporary disability or physical condition"; however, how a temporary disability is handled would not align with required modifications for pregnancy in all cases. Simply put, the Department outlines *a number of requirements and standards that do not consistently coincide*. Thus, institutions would be forced to choose with which standard to comply. The UW requests the Department emphasize institutional flexibility in addressing and responding to the needs of individuals who are pregnant and/or experiencing pregnancy-related conditions.

The Department *must either clarify its requirement* that institutions treat pregnancy or a pregnancy-related condition as it would any other temporary disability *or revise its requirement* to offer greater institutional flexibility.[59] If a Title IX Coordinator is required to grant modifications to a student who is pregnant or experiencing a pregnancy-related condition as requested by that student's medical provider, the Department *already* establishes a process that differs from how the UW otherwise considers and grants accommodations for students with disabilities. While a medical provider may certify a student's disability, the medical provider is not—in all situations—able to specify that a student receive a specific accommodation; instead, the interactive process involves on-going consultation and evaluation. Thus, while a student may request one accommodation, the UW may, after an interactive process, eventually provide another accommodation that sufficiently eliminates the barrier to the student's access. In other words, a request for leave is a specific accommodation request that may not always be granted in the case of a disability or temporary disability because specific accommodation requests are not always granted. Instead, another accommodation that enables an individual to access their course or course material may be deemed more appropriate than what was originally requested. If the Department intends to require institutions grant whatever specific accommodation—in the form of leave—a healthcare provider requests, the *Department is establishing a requirement that departs from* how institutions address *temporary disabilities* *while simultaneously compelling* the institution to follow that same standard.

### 2. The proposed regulations require clarification for when institutions must provide and implement reasonable modifications for individuals who are pregnant or experiencing pregnancy-related conditions.

Proposed regulation 106.40(b)(3)(i)(B) provides that an institution must provide students "with the option of reasonable modifications to the recipient's policies, practices, or procedures because of pregnancy or related conditions." Proposed regulation 106.40(b)(3)(ii) similarly requires institutions to provide students, because of pregnancy or related conditions, "voluntary reasonable modifications" to policies, practices, or procedures. The UW requests the Department confirm this requirement to provide modifications or accommodations applies *if and only when* an institution learns of such a need in a reasonable and sufficiently timely manner. If the Department is inclined to provide a specific timeframe

---

[59] *See* Proposed 106.40(b)(5).

AR_221460

rather than allowing flexibility based on the complexity of the request, the UW also asks that an overly prescriptive timeline be avoided, as some modifications and/or accommodations may require longer than a week—or even two weeks—for assessment and implementation. ***Some situations are complex and take time to address***, and the proposed regulations do not offer guidance regarding whether any burden may be placed on a student to help identify the means by which an appropriate solution could be implemented. In current circumstances where some—but not all—course requirements may be met online or asynchronously, the UW seeks further ***clarification regarding*** not only ***the timeframe in which modifications or accommodations must be requested*** but also with respect to the limits of the Department's requirements. While we strive to ensure accessible education and programming to meet the needs of all of our students, we also ask the Department to acknowledge there are logistical limits to our being able to do so.

**E.  Proposed section 106.8(f)(3) imposes undue administrative burdens on institutions.**

Proposed section 106.8(f)(3) maintains the current regulations' requirement that the Title IX Coordinator post on the recipient's website all materials, including those created by third parties, used to provide training to 1) all employees; 2) investigators, decisionmakers, and other persons responsible for implementing the grievance procedures or who have the authority to modify or terminate supportive measures; 3) facilitators of informal resolution processes; and 4) the Title IX Coordinator and designees. We believe this regulation does little to ensure an institution's employees involved in the administration of Title IX are appropriately trained and instead imposes additional burdens on an institution while providing little benefit. We ask that the proposed regulations be modified such that institutions are required to post a statement on their websites that interested parties may request a copy of training materials, particularly those our employees receive when attending trainings presented by third-party organizations, either as per an institution's relevant public records act or by emailing the Title IX Coordinator.

**IV. CONCLUSION**

In conclusion, the UW applauds many of the Department's proposed changes and reiterates the UW's commitment to fulfilling its Title IX requirements; in fact, we believe we already do and seek to continue to go beyond what is federally required. We believe many of the proposed regulations would codify policies already in place at the UW and expand the federal Title IX regulations to better ensure Title IX accomplishes its goal of prohibiting sex discrimination in education programs and activities. However, we believe the proposed regulations' imposition of mandated reporting requirements on all employees would impede the UW's ability to provide autonomy to its students and employees and/or support its students' wishes as they deal with and encounter sex discrimination. In addition, several areas of the proposed regulations require clarification and/or revision to aid institutions in implementing, complying with, and avoiding litigation as a result of Title IX responsibilities and requirements.

AR_221461

# PUBLIC SUBMISSION

**As of:** May 13, 2024
**Received:** September 09, 2022
**Status:** Posted
**Posted:** October 28, 2022
**Category:** Institution of Higher Education
**Tracking No.** l7v-0mha-ojrz
**Comments Due:** September 12, 2022
**Submission Type:** Web

**Docket:** ED-2021-OCR-0166
Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

**Comment On:** ED-2021-OCR-0166-0001
Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

**Document:** ED-2021-OCR-0166-193913
Comment on FR Doc # 2022-13734

---

## Submitter Information

**Email:** Kristen.roe@montgomerycollege.edu
**Government Agency Type:** Local
**Government Agency:** Montgomery College

---

## General Comment

The proposed regulations provide welcomed clarification that through Title IX, institutions of higher education are required to address sex-based harassment that is inclusive of sexual harassment (including dating violence, domestic violence, sexual assault and stalking) and not exclusive of other forms of sex-based discrimination. Montgomery College is supportive of the Department's efforts to clarify the scope of sex discrimination covered by Title IX, including recipients' obligations to prevent and address discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. While it is the culture of Montgomery College to create an environment free from sex-based discrimination in all its forms, this clarification of the regulatory scope of Title IX is welcomed as reinforcement of the expressed values and practices of our institution.

We feel that the proposed rule provides a clear framework for guiding our prevention of and response to sex-based harassment in our educational programs and activities. Montgomery College agrees with the Department that the proposed rule is not a departure from or broadening of Title IX as it was originally envisioned, but rather a clarification of what it was always intended to address. It is impossible to adequately and comprehensively address gender discrimination in the form of sexual misconduct and sexual harassment without also addressing sex-based harassment.

The College is supportive of the proposed regulations concerning harassment that creates a hostile environment that is sufficiently severe or pervasive that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to participate in or benefit from the recipient's education program or activity. (Proposed S. 106.2) The 2020 regulations severely limited the scope of hostile environment sexual harassment behaviors that could be addressed through the grievance process by establishing a standard of so severe, pervasive and objectively offensive that it effectively denied a person equal access to the recipient's education program or activity. The Department has proposed a better definition of hostile environment in an educational program or activity. This will enable Montgomery College to respond to a broader range of sexual harassment hostile environment complaints that are brought forward for processing through our Title IX grievance process. The new definition will allow the College to be more responsive to the complaints we receive by allowing a greater number of complaints to proceed through the Title IX formal and informal grievance processes.

The College is supportive of the proposed rule to allow former students or employees who are not participating or attempting to participate in the recipient's education program or activity to file a complaint. As a community college, we know that our students move in and out of our programs over time. The ability of the College to respond to a complaint from a former student or employee who isn't currently engaging in the educational program or activity is reasonable and would effectively help the College better address reports of discrimination in its educational program or activities. Although the proposed rule permits dismissal of a complaint if the respondent is not participating in the recipient's education program or activity and is not employed by the recipient, there is some concern that, without some limitation on the period in which a complaint can be filed, the institution's efforts to identify or locate witnesses, collect relevant evidence, etc., and otherwise take the steps necessary to conduct a prompt and equitable resolution of complaints may be hampered.

Montgomery College is supportive of the addition of a new requirement to increase reporting of student disclosures of pregnancy and related conditions. The proposed rule states that recipients must ensure that when a student tells an employee of their pregnancy or related condition, the employee must provide information on how to contact the Title IX Coordinator. While this is the current practice of our institution, a more formal requirement for employees to make referrals is reasonable and could lead to additional referrals and earlier support for students experiencing pregnancy and related conditions.

Montgomery College is supportive of the Department's continued expectation as articulated in the proposed rule that institutions act to end sex discrimination that is alleged to have occurred in its educational program or activity, prevent its recurrence, and remedy its effects.



September 10, 2022

Hon. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

**Docket Number: ED-2021-OCR-0166**

**Re: Notice of Proposed Rulemaking (NPRM) – Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

**Federal Registry No: 2022-13734**

**Submitted electronically**

Dear Secretary Cardona:

The Association of Christian Schools International (ACSI) is the largest Protestant school association and serves 2,250 member schools in the United States alone with a total of some 5,000 member schools around the globe.  Through extended services and resources beyond formal membership, ACSI has the privilege of serving and influencing over 25,000 Christian schools all over the world. ACSI exists to strengthen Christian schools and equip Christian educators worldwide as they prepare students academically and inspire them to become devoted followers of Jesus Christ.

The Christian faith teaches the dignity of each human person, each of whom is made in the image of God and thus deserving of respect. This imperative of love and respect for every human person inspired Christians to rescue foundlings in pagan Rome, found hospitals, promote education, serve the poor, and promote liberty of conscience. Thus, Christian schools stand for human dignity and do not condone bullying or discrimination. The Christian faith does not permit the mistreatment of individuals made in God's image.

In terms of sexuality, the Christian faith teaches that human flourishing calls for sex to be reserved for marriage only, and that marriage is a covenant between one man and one woman for one lifetime with children as God may give. It is worth noting that Orthodox and Catholic Christians teach that marriage is also a sacrament, thus implicating marriage as a means of God's grace, His "unmerited favor towards sinners." And, all three branches of Christianity – Protestant, Orthodox, and Catholic – have a high view of marriage and, consequently, a strong conviction against divorce except in limited, specific circumstances.

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL
Phone 719.528.6906 | Fax 719.531.0631 | ACSI.org
731 Chapel Hills Drive  Colorado Springs, CO  80920

AR_233141

Christian schools therefore teach, and Christian individuals do their best to live out, these timeless, proven truths which, in fact, promote *individual*, personal flourishing in ways that a real and loving God intended. Naturally, individual flourishing in community also promotes the *common* good and contributes in positive ways to a thriving society.

These Christian standards are part and parcel of a Christian faith and practice that reflects the Good News of the Gospel of Jesus Christ: a loving God has created an understandable order designed to benefit His special creation, each human person. He provided a Redeemer who took the punishment each individual deserves for his sin precisely so each person may enjoy God's free offer of forgiveness. God offers each human person a clear conscience simply upon our asking and our turning away from sin and toward what He intends for our good. Proverbs 13 promises that "he who confesses and forsakes them [i.e., his transgressions] will find compassion." Proverbs chapter three summarizes: "Fear the Lord and turn away from evil. It will be healing to your body and refreshment to your bones" (NASB).

In this regard, the federal Constitution guarantees freedom of conscience in the First Amendment which forbids the federal government from establishing an official religion and compels the federal government to respect the free exercise of religion. The *first* line of the *first* item in the Bill of Rights is "Congress *shall make no law* respecting an establishment of religion, or prohibiting the free exercise thereof." Christians, like all others, have a lawful, inherent right to expect the full freedom to live out their faith and, as a practical example in just one area of concern, to be treated equally – not as second class citizens – in government programs of general applicability. The Supreme Court has made this non-religious-discrimination requirement clear in cases such as *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 137 S. Ct. 2012 (2017) and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020).

As federal actors, the U.S. Department of Education (USDE) has an obligation to ensure that those rights are respected.

On June 23, 2022, the 50th anniversary of Title IX of the Education Amendments of 1972, the USDE announced it would issue a Notice of Proposed Rulemaking (NPRM) related to Title IX which it did formally on July 12, 2022 with 60 days for public comment. The NPRM came slightly more than one year after a USDE request for public input in June 2021 sparked by two Executive Orders: Executive Order 13988, *Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation* (published January 25, 2021), and Executive Order 14021, *Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity* (published March 11, 2021). In particular, the latter sought review of agency actions that "are or may be inconsistent with governing law, including Title IX."

ACSI submitted public comment on June 10, 2021, in response to the request for public input. Regrettably, the NPRM repeats, and, in many ways, worsens the errors of the original Executive Order which we examined in our original submission. The NPRM thus would formalize those errors into regulation as we explain below.

AR_233142

The NPRM, like Executive Order 13988 from which it springs, erroneously attempts to apply the Supreme Court's decision in *Bostock v. Clayton County,* 140 S. Ct. 1731 (2020) to the wholly unrelated law in Title IX of the Education Amendments of 1972 when the decision itself is clearly limited to employment issues specific to Title VII of the Civil Rights Act, to wit:

> *The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind. The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual "because of such individual's sex."* Bostock v. Clayton County, *140 S. Ct. 1731 (2020) at 1753.*

Not only did the Court make clear that its ruling applied *only* to Title VII, it emphasized that: "Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these." *Ibid.*

Our own public comment in June 2021 urged the Department to reverse course, but, in addition, on July 15, 2022, a federal court enjoined enforcement on procedural grounds of the guidance in a Notice of Interpretation of June 22, 2021, which the Department issued ahead of the 2022 NPRM. The legal challenge to the Department's reasoning was brought by 20 state attorneys general, led by Tennessee. The preliminary injunction is thus in place in nearly half the states.

In addition, for the last 50 years, Congress has had every opportunity to redefine the concept of sex within Title IX. It has refused to do so. Thus, the Executive Branch has plain evidence from the Judicial and the Legislative Branches that it has no authority to reinterpret Title IX in the way the NPRM attempts to do.

The NPRM, then, was issued based on a misapplication of a Supreme Court decision which itself explicitly applied only to Title VII of the Civil Rights Act and no other statute. That wrongful approach became part of a Notice of Interpretation which was challenged by 20 states and subsequently enjoined by a federal court as the case proceeds. It was issued despite Congressional refusal to change the meaning of sex. And, further, the NPRM goes well beyond sexual orientation to include discrimination on the basis of "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."

One reason the Court did not apply its ruling in *Bostock* beyond Title VII of the Civil Rights Act is clearly stated in the citation above: the Court did not evaluate any other law. *Bostock* was about discrimination in employment (Title VII) whereas Title IX is about sex discrimination in educational programs. The Court did not attempt to determine the implications for free speech (use of pronouns) or privacy (bathrooms, locker rooms, dormitories) or religious liberty (human dignity that respects the human person and the truth about marriage) in an *employment* case. And yet that is precisely what

AR_233143

the NPRM attempts to do without authority here in the case of education where all of these are seriously implicated.

**We note that the NPRM did not change the current regulation governing the exemption for religious schools guaranteed in the statute. This is a good thing.** However, the NPRM could consider adding how the Department would protect faith-informed institutions and their participants from the wrongful application of its requirements. For example, despite Title IX's religious exemption, over the spring and summer of 2022, the U.S. Department of Agriculture (USDA) attempted to impose on religious schools non-discrimination categories from which they are exempt. The USDA relented only when litigation was brought in Florida that led it to issue clarifying guidance.

Thus, there is reason for the Department of Education separately to acknowledge the existence of the religious exemption and the fact that religious institutions are or may well be exempt from its wrongful application of Title IX to sexual orientation and gender identity precisely because religious institutions respect human dignity, acknowledge the reality of biological sex, and teach that sexuality is best channeled into marriages of one man and one woman for one lifetime with children as God may give.

We would also urge the Department within the bounds of its authority to encourage other federal agencies to adopt the Department's standard for the Title IX religious exemption, namely that schools are not required to seek written assurance of their exemption or lose their right to the exemption in the event of a complaint or investigation. To require pre-approval, as the Department itself has attempted in the past, is unlawful and lacks statutory authority.

Along these lines, the Department does have the authority to pledge that it will not allow or participate in any retaliatory action against religious institutions which assert their statutory right to the Title IX exemption. In the past, the Department has taken actions, now rectified, that were widely interpreted as hostile to religious institutions which asserted their statutory Title IX exemption. **It would therefore be appropriate for the Department to make a statement which could be a part of the Final Rule to the effect that it will not engage in such hostility nor encourage others to do so.**

The Department must be careful to recognize – and not to restrict – the right of religious Americans and religious institutions to full participation in American life. This includes religious institutions which choose to be recipients of federal financial assistance (in accord with the Supreme Court's multiple rulings barring discrimination in programs of general applicability). At minimum, the Department must make clear that it is not discrimination to teach and to live out the reality that sexuality is best reserved for marriage, that all children deserve to use a restroom that respects their privacy, and thus gives them the human dignity that they do, in fact, possess.

**ACSI thus recommends that the NPRM withdraw its proposed changes that expand the meaning of sex to include "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity" in Section 106.10.**

We note that the NPRM puts off possible new regulations covering sports. However, Section 106.31's expansive revisions prohibit "more than a *de minimis* harm" when treating the sexes differently or

separating them, and then defines "more than a *de minimis* harm" at Section 106.31(a)(2) to include a policy or practice "that prevents a person from participating in an education program or activity consistent with the person's **gender identity**." (Emphasis added). This would surely be used to compel schools to allow a student who may identify as transgender to play on teams aligned with the student's gender identity, not a student's biological sex. **We recommend the Department withdraw its proposed changes to Section 106.31.**

Finally, we note that Section 654 of the Treasury and General Government Appropriations Act of 1999 (Public Law 105-277) requires agencies to conduct a family impact assessment of "proposed agency actions on family well-being" including assessing whether –

(1) the action strengthens or erodes the stability or safety of the family, and, particularly, the marital commitment;

(2) the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children;

These standards seem relevant here and **we urge the Department to conduct such an assessment as part of its responsibilities related to the NPRM.**

Thank you for the opportunity to express our views.

Respectfully submitted,

P. George Tryfiates
Vice President for Public Policy & Legal Affairs



OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA

302 W. WASHINGTON ST. IGCS 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

# TODD ROKITA
ATTORNEY GENERAL

September 12, 2022

Dr. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

*Re: Title IX Notice of Proposed Rulemaking Docket ID ED-2021-OCR-0166*

Dear Secretary Cardona:

As you are aware, State Attorneys General play a critical role in preserving federalism and the constitutionally prescribed balance of power between the States and the federal government. The threat of federal overreach is particularly acute with statutes such as Title IX that regulate education, where, as Congress recognized when enacting the Department of Education Organization act, "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." 20 U.S.C.A. § 3401(3) (Pub. L. 96–88, title I, § 101(3), Oct. 17, 1979, 93 Stat. 669). To that end, we have steadfastly fought to protect the rights of girls and women under Title IX against attacks from this Administration, including by obtaining an injunction against your efforts to weaken Title IX through administrative "guidance." *Tennessee et al. v. United States Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *1 (E.D. Tenn. July 15, 2022).

Rather than protect the rights of girls and women, your Notice of Proposed Rulemaking (hereinafter, "Proposed Rule") redefining the term "sex" in Title IX from "biological sex" to mean "gender identity" harms the rights of women and girls. Your erroneous reliance on the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), destroys the progress made to protect the rights of girls and women under Title IX over the past fifty years. Worse, your misguided and illegal efforts seek to preempt protections afforded girls and women by individual States. Just as we are successfully fighting your gross violation and disregard of federalism and the law in courts, so too will we fight the overreach in your Proposed Rule.

The Proposed Rule is unlawful for many reasons, but this letter will address only three specific legal defects:

1

1. The Proposed Rule's reliance on *Bostock v. Clayton County* is erroneous and contradicts the Department of Education's General Counsel's prior guidance on the subject.

2. The Proposed Rule's attempt to preempt State laws protecting the rights of girls and women lacks grounding in a clear statement of authority by Congress.

3. The Proposed Rule's restriction of the role of parents in directing their children's education violates parents' constitutional rights.

## 1. *Bostock* does not apply to Title IX.

In seeking to expand the definition of "discrimination on the basis of sex" from biological sex, which was the meaning intended by Congress when it passed Title IX in 1972, to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity,"[1] the Proposed Rule ignores fifty years of precedent limiting the term to biological sex. Indeed, the Proposed Rule attempts to rewrite Title IX's fifty-year-old definition of "sex" to mean gender identity, a 180-degree change from the position taken by the Department on the exact same issue one year earlier.

The Proposed Rule cites *Bostock v. Clayton County.* as the legal basis for reinterpreting the term "sex" to mean gender identity,[2] but that misconstrues and improperly extends *Bostock*, which did not redefine the term "sex." As noted by The Department's General Counsel in 2021, the Supreme Court expressly limited its decision in *Bostock* to Title VII and merely held that under Title VII, discrimination on the basis of "sexual orientation," "gender identity," or "transgender" status was prohibited because discrimination involving these characteristics "necessarily and intentionally applies sex-based rules."[3] *Bostock* "assum[ed]" that the term "sex" means "biological distinctions between male and female." 140 S. Ct. at 1739, 1746–47.

*Bostock* also narrowly addressed employment termination and explicitly refrained from addressing key items under Title IX, such as "sex-segregated bathrooms, locker rooms, and dress codes."[4] Indeed, *Bostock* expressly stated that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court. 140 S. Ct. at 1753. *Bostock*'s holding thus "extends no further than Title VII." *Pelcha v. MW Bancorp.*, 988 F.3d 318, 324 (6th Cir. 2021); *see Tennessee v. U.S. Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) ("in applying *Bostock* to Title IX, the Department overlooked the caveats expressly recognized by the Supreme Court and created new law").

In addition, Title IX expressly recognizes the biological differences between male and female students. Its text explicitly states that, "[n]otwithstanding anything to the contrary in this chapter, nothing contained herein shall be construed to prohibit any educational

---

[1] 87 Fed. Reg. at 41398.
[2] 140 S. Ct. 173 (2020).
[3] *Id.* at 1745.
[4] *Id.* at 1753; *see also U.S. Dep't of Justice, Application of Bostock*, at 4 ("*Bostock* does not require any changes to . . . sex-specific facilities or policies.").

AR_254562

institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Regulations embrace the same understanding when they provide that Title IX recipients "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

The Proposed Rule departs most significantly from *Bostock* when it protects gender identity at the expense of biological sex, saying that "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than *de minimis* harm on the basis of sex" and therefore violates Title IX.[5] The Proposed Rule undermines Title IX: Schools cannot "provide equal athletic opportunity for the [members of both] sexes" if the Department functionally forbids them from acknowledging two biologically distinct sexes.[6]

Since Title IX's enactment in 1972, participation of girls and women in sports has exploded. In 2021, 3.4 million girls played high school sports, and 219,000 women played NCAA sports.[7] The Proposed Rule's departure from the sex dichotomy ignores science. The athletic performance advantage of men over women is typically 10-50% depending on the sport.[8] The reason for male athletic advantage is biology: males on average have 45% higher lean body mass, 33% higher lower body muscle mass, 40% higher upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output.[9] The result is that by the age of 14-15, many adolescent males athletes have surpassed the best measurable elite (i.e., Olympic and world-championship level) female performances in nearly all sports.[10]

Male athletic advantages, which begin with surges in testosterone in the womb and during a mini-puberty stage during the first six months after birth, cannot be suppressed to an extent that would allow meaningful competition between males who identify as women and biological females.[11] Early surges of testosterone lead, for instance, to higher bone density in

---

[5] 87 Fed. Reg. at 41571.

[6] 87 Fed. Reg. at 41537; *See* NPRM § 106.41(c).

[7] NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates), female participation rates rose from 43% of the male participation rate (74,329 to 169,800) to 78% (219,177 to 278,988) in 2021—almost doubling.

[8] Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med.* 2021 Feb;51(2): 199-214.

[9] *Id.*

[10] *Id.*

[11] *Id.*; Wiik, A., Lundberg, T.R., Rullman, E., Andersson, D.P., Holmberg, M., Mandic, M., Brismar, T.B., Dahlqvist Leinhard, O., Chanpen, S., Flanagan, J.N., Arver, S., Gustaffson, T., Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals, *J. Clin. Endocrinol. Metab.* 2020 Mar 1;105(3):dgz247. *See, e.g.,* Pedersen, Ultrasound evidence of sexual difference in fetal size in first trimester, *Br. Med. J.* 1980 281(6250): 1253; Persson et al., Impact of fetal and maternal factors on the normal growth of the biparietal diameter, *Scandinavian Association of Obstetricians and Gynaecologists* 1978 78: 21-27; Schwartzler et al., Sex-specific antenatal reference growth charts for uncomplicated singleton pregnancies at 15—40 weeks of gestation, *Ultrasound in Obstetrics and Gynaecology* 2004 23(1): 23-29; Broerre-Brown, et al., Sex-specific differences in fetal and infant growth patterns: a prospective population-based cohort study, *Biology of Sex Differences* 2016 7: 65; Galjaard, et al., Sex differences in fetal growth and immediate birth outcomes in a low-risk Caucasian population, 2019 *Biology of Sex Differences* 10: 48; Gilsanz, et al., Differential

3

the spine and larger axial skeletons in infant males.[12] Male athletic-performance advantages are observable well before adolescence.[13] Even with pre-puberty hormone suppression, biological males who identify as women will still have a height advantage, among other advantages, over biological females.[14] Of course, height is a key factor in athletic success in many sports.

In short, females and males are biologically distinct, and those key biological differences cannot be undone, leaving females at an enormous competitive disadvantage when facing biological males in sports. Permitting males who identify as women to compete against biological females would subject biological females to far more than *de minimis* harm on the basis of sex.

## 2. The Proposed Rule's attempt to preempt State laws protecting the rights of girls and women confuses spending conditions for law, undermines representative government, and violates the *Pennhurst* clear-statement rule.

The Proposed Rule also seeks to preempt State laws that protect the rights of girls and women based on biological sex. "The Department proposes eliminating § 106.6(h) entirely and simplifying § 106.6(b) to clarify that all Title IX regulations preempt State or local law."[15]

The Supremacy Clause, which authorizes federal preemption in some circumstances, provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI. Title IX and its implementing regulations, however, simply impose conditions on federal grants. And conditions on federal grants are not "law" under the Supremacy Clause. Historically, "regulation was traditionally a matter of public congressional enactment" and Congress was "reluctan[t] . . . to use conditions as a means of national domestic regulation." Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 91 n.* (2021). Attaching conditions to federal grants affords a way to incent desired behavior without commanding it. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent," *i.e.*,

---

Effect of Gender on the Sizes of the Bones in the Axial and Appendicular Skeletons, *J. of Clin. Endocrin. And Metabol.* 1997 21(3): 415-430; Lanciotti, et al., Up-To-Date Review About Minipuberty and Overview on Hypothalamic-Pituitary-Gonadal Axis Activation in Fetal and Neonatal Life, *Frontiers in Endocrinology* 2018 9:410; Boas, et al., Postnatal penile length and growth rate correlate to serum testosterone levels: a longitudinal study of 1962 normal boys, *Eur. J. of Endocrin.* 2006 154(1): 125-129; Kiviranta, et al., Transient Postnatal Gonadal Activation and Growth Velocity in Infancy, *Pediatrics* 2016 138(1): e20153561; Becker, et al., Hormonal 'minipuberty' influences the somatic development of boys but not of girls up to the age of 6 years, *Clin. Endocrin.* 2015 83: 694-701.
[12] *Id*.
[13] Catley, M.J., Tomkinson, G.R., Normative health-related fitness values for children: analysis of 85347 test results on 9-17-year-old Australians since 1985. *Br. J. Sports Med.* 2013 Jan;47(2):98-108 (showing 9-yr. old males 9.8% faster in short sprints, 16.6% faster in mile run, 9.5% better standing long jump, completed 33% more push-ups in 30 seconds and had a 13.8% stronger grip); Tambalis K.D., Panagiotakos, D.B., Psarra, G., Daskalakis, S., Kavouras, S.A., Geladas, N., Tokmakidis, S., Sidossis, L.S., Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method, *Eur. J. Sport Sci.* 2016 Sep;16(6):736-46 (6-yr. old boys when compared to 6-yr. old girls completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position).
[14] Boogers, L.S., Wiepjes, C.M., Klink, D.T., Hellinga, I., van Trotsenburg, A.S.P., de Heijer, M., Hannema, S.E., Trans girls grow tall: adult height is unaffected by GnRH analogue and estradiol treatment, *J. Clin. Endocrinol. Metab.* 2022 Jun 6:dgac349. Doi: 10.1210/cinlnem/dgac349.
[15] 87 Fed. Reg. at 41404.

4

the consent of the individual accepting a federal grant, as opposed to the consent of the people writ large. *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562, 1570 (2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981)).

The distinction is critical to a proper understanding of the spending power and its limits. In sum, "the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). In other words, "Congress' *legislative* powers *cannot be avoided* by simply opting out," but "Congress' power to spend money is *not a legislative* power." David Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 498 (2007). That limitation protects critical state interests. Thus, "unlike statutory provisions that are grounded in Congress' *legislative* powers, spending terms and conditions are obligatory and enforceable only if voluntarily accepted." *Id.* at 500. The "knowing acceptance" standard preserves the vertical balance of power between States and the federal government, "ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

For this reason, the Supreme Court has set limits on the conditions that Congress may impose on federal funding. For instance, Congress may impose "conditions that define the limits of the government spending program" but not "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *United States Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). And while Congress may financially induce States to accept policy changes, it may not impose conditions "so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).

Critically, a grantee need not accept a federal contract in the first instance, and if it does, the remedy for violation of its terms is a matter between the grantee and the United States. Thus, "when a federal statute does not directly require adherence to its provisions, but instead proposes them as terms of a contractual promise, it is not giving them the obligation of law." Hamburger, *supra*, at 132. Because "conditions do not purport to bind . . . in the manner of law," "[n]o federal condition, by whatever means adopted, should be understood to defeat the obligation of contrary state law." *Id.* at 131. Otherwise, "[i]n shifting legislative power to . . . private decisions, conditions displace public representative self-government . . . with private barter." *Id.* at 92. Treating grant conditions as "law" that trumps a generally applicable state exercise of the police power thus threatens a fundamental alteration of the relationships among citizens, their States, and the federal government, whereby the federal government may induce citizens and political subdivisions to violate state law with impunity.

The Supreme Court has never countenanced such a capacious understanding of congressional spending power, and the Department should not attempt to exercise such power here. It is worth observing that neither of the two existing Title IX regulations that purport to preempt state law, 34 CFR § 106.6(b) & (h), have been contested and upheld. And indeed, when the Department promulgated § 106.6(h) in 2020, it did not cite any Supreme Court cases upholding its authority to use spending conditions to preempt state law. Each of the cases it cited upheld preemption under Commerce Clause legislation, not spending power legislation. *See* 85 Fed. Reg. 97,30454 fn. 1653 (May 19, 2020) (codified at 34 C.F.R. § 106.6 (2020)) (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (FDA regulations authorized by the Public Health Service Act); *Geier v. Am. Honda*

5

*Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (National Traffic and Motor Vehicle Safety Act); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 396 (1986) (FCC regulations authorized by the Communications Act); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (National Traffic and Motor Vehicle Safety Act).

Furthermore, unlawful coercion occurs in violation of the Tenth Amendment where Congress uses its taxing-and-spending power to enter the arena of general police power and override contrary state laws. So, for example, in *Linder v. United States*, 268 U.S. 5 (1925), the Court rejected use of the power to tax for the general welfare to regulate the practice of medicine. It said that "[o]bviously, direct control of medical practice in the states is beyond the power of the federal government," which meant that "[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure." *Id.* at 18; *see also United States v. Doremus*, 249 U.S. 86, 93 (1919) (invalidating a federal regulation of physicians predicated on the taxing power because it invaded the police power of States and observing, "[o]f course Congress may not in the exercise of federal power exert authority wholly reserved to the states").

The Proposed Rule's preemption threat constitutes just such an invasion of core state police power. As the Supreme Court has observed, "States traditionally have been accorded the widest latitude in ordering their internal governmental processes, and school boards, as creatures of the State, obviously must give effect to policies announced by the state legislature." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 476 (1982) (citation omitted). Congress noted in the Department of Education Organization Act that "in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States." 20 USC § 3401(4); *see also* 20 USC § 3403(a)&(b) ("The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States"). Indeed, the Department's own website acknowledges that "[e]ducation is primarily a State and local responsibility in the United States." The Federal Role in Education," U.S. Department of Education, June 15, 2021, https://www2.ed.gov/about/overview/fed/role.html.

Moreover, because the Proposed Rule would suspend state police power regulations without the State's consent, it undermines state sovereignty in a way that implicates the Republican Form of Government Clause. While the federal government may "induce the states to adopt policies that the Federal Government itself could not impose," it cannot induce citizens (corporate or otherwise) or political subdivisions to violate state law. A "republican form of government" is one where the people are governed by legislatively enacted laws, not one where a different sovereign tempts some citizens or political subdivisions to exempt themselves from state laws. Manifestly, "the purchase of submission is not what traditionally was understood as a republican form of government." Hamburger, *supra*, at 147. That observation is particularly apt where the submission is not undertaken by the State itself, but by a citizen or political subdivision being paid by the federal government to violate state law. And while the Supreme Court has never directly enforced the Guarantee Clause against the United States, it has observed that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992). Where Congress (or the Executive Branch) "actively interfere[s] in the states' republican self-governance," courts do not face unanswerable questions about how the United States itself should "guarantee" republican government. Hamburger, *supra*, at 147.

6

Even assuming that the Department could theoretically use spending conditions to preempt state law, any attempt to do so would run afoul of basic preemption doctrine, including the presumption against preemption, which is grounded in the structural disfavor of preemption. *See e.g., Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "In all preemption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "[W]here a statute regulates [a] field traditionally occupied by states, such as health, safety, and land use, a 'presumption against preemption' adheres." *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)). Courts "assume that a federal law does not preempt the states' police power absent a clear and manifest purpose of Congress." *Atay*, 842 F.3d at 699; *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000). The presumption against preemption is particularly strong in areas of core state responsibility, including (as described above) education.

Next, under the clear-statement rule of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), the Department cannot change the conditions attached to federal funds without statutory text expressly authorizing it to do so. No one takes seriously the idea that, from the get-go, grant recipients understood Title IX to make a clear statement that gender identity discrimination was prohibited. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295–96 (2006) (observing that the Court must consider conditions on federal grants "from the perspective of a state official who is engaged in the process of deciding" whether to accept grant funds and "ask whether such a state official would clearly understand" the asserted condition). Put another way, preempting state and local laws protecting girls and women based on biological sex would breach the contractual agreement by which States and their educational entities accepted federal funds under Title IX and other federal statutes.

The Proposed Rule erroneously relies on *Bostock* to claim falsely that the term "sex" has always meant gender identity, and that States and their officials "would clearly understand" as much. But when Title IX was enacted in 1972, "sex" carried a "narrow, traditional interpretation." *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085–86 (7th Cir. 1984). The Supreme Court did not apply Title VII to transgender employees until 2020. And even then, the majority stopped short of holding that its reasoning would condemn "sex-segregated bathrooms," "locker rooms," "dress codes," or "anything else of the kind" under Title VII. *Bostock*, 140 S. Ct. at 1753. So recent a decision under Title VII cannot be the basis for invaliding separate-sex sports policies under Title IX, especially given the differences between the two statutes.

When Title IX was enacted, the term "sex," scientific in nature, referred to the "two divisions" of organisms, "designated *male* and *female*," classified "according to their reproductive functions." *The American Heritage Dictionary of the English Language* 1187 (1980). Title IX reflects Congress's understanding that "sex" refers to a binary, biological characteristic. It even distinguishes between institutions, organizations, and activities open to "only students of one sex" and those open to "students of both sexes." 20 U.S.C. § 1681(a)(2); *see also* § 1681(a)(5), (a)(6), (a)(7), (a)(8), (a)(9), (b). And as examples of organizations and activities open to "one sex," Title IX lists the "Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls," "father-son" activities, "mother-daughter" activities, and "beauty pageants." § 1681(a)(6)(B), (a)(7), (a)(8), (a)(9). Title IX also speaks of "separate living facilities for the different sexes," authorizing separate

7

showers, bathrooms, and bunks. § 1686. All of these provisions presume two discrete sexes with different anatomies and physiologies—not "gender identity," *i.e.*, an "individual's self-identification as being male, female, neither gender, or a blend of both genders." *The American Heritage Dictionary of the English Language* (5th ed. 2022).

Preempting state laws governing education would unlawfully "diminish the responsibility for education which is reserved to the States" and thereby violate a host of constitutional limits and doctrines. Preemption should therefore be removed from the Proposed Rule.

### 3. The Proposed Rule would sharply restrict a parent's right to direct their child's education and thereby violate parents' constitutional rights.

The Proposed Rule would allow school officials to provide counseling to any student about gender identity issues, to allow the child to choose a gender identity without regard to biological sex, and even to refer a child for medical attention, all without parental notice. By requiring public elementary and secondary schools to affirm a child's gender identity without parental approval or knowledge, the Proposed Rule would strip parents of the right to direct education decisions relating to their children, as protected by a century of Supreme Court precedent and the Department of Education's own Organization Act.

The right of parents to direct the education and upbringing of their children is deeply rooted in our Nation's history and traditions, as the Supreme Court recently reaffirmed. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2257 (2022) (reaffirming "the right to make decisions about the education of one's children"). In *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), where the Court upheld the right of parents to educate their children in a private religions school, the Court observed that "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Congress embraced this conception of parental rights in the Department's organizing act, where it found that "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role."[16]

Many cases apply this right. *See Meyer v. Nebraska*, 262 U.S. 390 (1923) (affirming the right of parents to teach their children German); *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972) (permitting parents to educate children at home); *Parham v. J. R.*, 442 U.S. 584, 621 (1979) (upholding a juvenile civil commitment process that depended substantially on parental judgment because, "[f]or centuries it has been a canon of the common law that parents speak for their minor children" and "[t]he statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition."); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (invalidating presumption of grandparent visitation over parental objection because "the liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Zelman v. Simmons-Harris*, 536 U.S. 639, 680 n. 5 (2002) (upholding school choice scholarships in part because "[t]his Court has held that parents have the fundamental liberty to choose how and in what manner to educate their children.").

---

[16] 20 U.S.C.A. § 3401(3).

Ignoring this "fundamental liberty," the Proposed Rule strips parents of their rights by requiring public elementary and secondary schools to affirm a child's gender identity without the approval or knowledge of parents. It even goes so far as to encourage school officials, without prior parental knowledge or consent, to provide counseling to children about gender identity issues and even refer a child for medical attention and procedures such as sex change surgery. The concern seems to be that many parents will discourage their children from adopting a gender identity at odds with biological sex. And the solution is to keep the parents in the dark and permit federally funded schools to do the work of raising the children. The Constitution does not permit such parental bypass.

The Court's decision in *Parham v. J. R.*, 442 U.S. 584 (1979), is particularly instructive on this point, as it addressed methods of treating children with mental health issues. The Court permitted the juvenile commitment procedures at issue over the objections of children committed to mental hospitals principally because those procedures required parental assent. Of critical importance here, the Court observed that, "[s]imply because the decision of a parent is not agreeable to a child, or because it involves risks, does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* at 603. As if anticipating the Proposed Rule, the Court recognized that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.* Even more to the point: "The fact that a child may . . . complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Id.* at 604. In the end, "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id.* The Proposed Rule, however, proceeds as if the opposite were true by preventing parents from making decisions for their children.

Perhaps even worse, the Proposed Rule requires schools to hide information relating to a child's professed gender identity from parents even as it disclaims any obligation of a grant recipient to "[r]estrict any other rights guaranteed against government action by the U.S. Constitution."[17] The Department needs to concern itself with everyone's constitutional rights, not merely those that it prefers.

<div align="center">***</div>

The Proposed Rule threatens to destroy Title IX. Our States will ensure that American women and girls are treated with more respect than this Administration offers in the proposed rule.

Respectfully,

*[signature]*

TODD ROKITA
ATTORNEY GENERAL OF INDIANA

---

[17] 34 C.F.R. §106.6(d).



STEVE MARSHALL
Attorney General of Alabama



MARK BRNOVICH
Attorney General of Arizona



LESLIE RUTLEDGE
Attorney General of Arkansas



CHRIS CARR
Attorney General of Georgia



DEREK SCHMIDT
Attorney General of Kansas



DANIEL CAMERON
Attorney General of Kentucky



JEFF LANDRY
Attorney General of Louisiana



LYNN FITCH
Attorney General of Mississippi



AUSTIN KNUDSEN
Attorney General of Montana



DOUGLAS J. PETERSON
Attorney General of Nebraska

JOHN M. O'CONNOR
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

10

AR_254570

MARK VARGO
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

KEN PAXTON
Attorney General of Texas

SEAN REYES
Attorney General of Utah

JASON MIYARES
Attorney General of Virginia

PATRICK MORRISEY
Attorney General of West Virginia

11

AR_254571

STATE OF TENNESSEE

# Office of the Attorney General



**Jonathan Skrmetti**
**Attorney General and Reporter**

P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-3491
Facsimile: (615) 741-2009

September 12, 2022

**SUBMITTED ELECTRONICALLY**
**VIA REGULATIONS.GOV**

The Honorable Miguel Cardona
Secretary of Education
Department of Education Building
400 Maryland Ave., SW
Washington, D.C. 20202

**Re:     Docket No. ED-2021-OCR-0166 ("Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance")**

Dear Secretary Cardona,

The People and State of Tennessee, joined by nineteen co-signing States, appreciate the opportunity to comment on the U.S. Department of Education's recent proposal to amend the federal regulations implementing Title IX.  *See* Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* ("Proposal"), 87 Fed. Reg. 41,390 (July 12, 2022).  We share the Department's interest in providing every primary, secondary, and post-secondary student an educational environment free from harassment and incongruous discrimination.  Unfortunately, the Department's proposed rule changes would force educators to pursue that end through unreasonable, unlawful, and counter-productive means.

As you are doubtless aware, Title IX's general prohibition on sex-based discrimination, *see* 20 U.S.C. § 1681(a), applies to "all the operations" of nearly every school in the country, *id.* § 1687; *see* 34 C.F.R. § 106.2(g).  Read in that light, the Department's proposed amendments to 34 C.F.R. Part § 106 give us pause.  In particular, the Department intends to expand the "scope" of Title IX by specifying that "[d]iscrimination on the basis of sex" in 20 U.S.C. § 1681 includes "discrimination on the basis of … gender identity," Proposal at 41,571 (proposed 34 C.F.R. § 106.10), despite Congress omitting the term "gender identity" from all of Title IX's numerous provisions.

State of Tennessee Comments
ED-2021-OCR-0166
Page 2

The Department has also proposed equally atextual additions to 34 C.F.R. § 106.31(a).  At present, 34 C.F.R. § 106.31(a) largely tracks the language of Title IX itself, stating in relevant part that:

> Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

To this, the Department proposes adding:

> In the limited circumstances in which Title IX or [34 C.F.R. pt. 106] permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or this part.  Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).

These new rules lack statutory foundation and will trench on constitutional rights.  They will also negatively impact countless students, teachers, and school administrators in ways the Department has failed to address — or even recognize.  We thus offer the following comments with the hope that the Department will reconsider the proposed rules and avoid potential litigation:

## I.    The Department's proposed rules conflict with Title IX and violate the Constitution.

The Department has an obligation to "reasonably explain[]" how its rules fit within its lawful administrative authority.  *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 596 (D.C. Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).  But because the Department has disregarded the text of Title IX and multiple constitutional restraints, there can be no reasonable explanation for its proposals.

### A.    The Department has not grounded its proposed rules in the text, structure, or purpose of Title IX.

The Department cannot lawfully promulgate rules that conflict with Title IX.  *E.g.*, *Children's Health Def. v. FCC*, 25 F.4th 1045, 1052 (D.C. Cir. 2022).  Title IX's meaning comes from its terms, "read in context," and in light of "the problem Congress sought to solve."  *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004)).  On every level of analysis, however, the Department's proposed rules run counter to the statute.  *See Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-00308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) (noting that the Department's proposed policies "create[] rights for students and obligations for regulated entities … that appear nowhere in … Title IX").

State of Tennessee Comments
ED-2021-OCR-0166
Page 3

To begin with, Title IX explicitly addresses "sex," not gender identity. It starts by prohibiting discrimination "on the basis of sex" and "sex" alone. 20 U.S.C. § 1681. It then identifies examples of "sex"-based discrimination to which the prohibition does *not* apply. *See id.* § 1681(a). Following this, the statute clarifies that discrimination "on the basis of sex" does *not* encompass the "maintain[ence of] separate living facilities for the different sexes." 20 U.S.C. § 1686.

These repeated references to "sex" must be read "in accord with the ordinary public meaning of ['sex'] at the time of [Title IX was] enact[ed]." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). And at that time, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020) (Niemeyer, J. dissenting), *cert. denied*, 141 S. Ct. 2878 (2021). In 1961, the Oxford English Dictionary defined "Sex" as "[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these." 9 Oxford English Dictionary 578 (1961). In 1970, the American College Dictionary defined "Sex" to mean "the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished." The American College Dictionary 1109 (1970). A year later, Webster's Third New International Dictionary defined "Sex" to mean "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction." Webster's Third New International Dictionary 2081 (1971). The year after Title IX became law, Random House defined "Sex" as "either the male or female division of a species, esp. as differentiated with reference to the reproductive functions." The Random House College Dictionary 1206 (rev. ed. 1973). And a few years after that, the American Heritage Dictionary defined "Sex" as "[t]he property or quality by which organisms are classified according to their reproductive functions." American Heritage Dictionary 1187 (1976). Each of these sources indicates that Title IX uses "sex" as a reference to the categories of "male" and "female," which "simply are not physiologically the same." *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (citing and discussing *United States v. Virginia*, 518 U.S. 515 (1996)).

Linguistic context and statutory structure both confirm that Congress meant "sex" as a reference to this biological dichotomy, not the abstruse concept of gender identity. Advocates for gender-identity-based public policy often stress that a person's "innermost concept of" gender may fluctuate over time and defy biology's "male" or "female" binary. *See, e.g.*, *Sexual Orientation and Gender Identity Definitions*, Human Rights Campaign (last visited Sept. 8, 2022).[1] Title IX, by contrast, speaks of permitting sex-based discrimination among "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girls," "the membership of which has traditionally been limited to persons of one [or the other] sex." 20 U.S.C. § 1681(a)(6)(B). The statute also describes how an institution may change "from ... admit[ting] only students of one sex" (that is, male *or* female) "to ... admit[ting] students of both sexes," (male *and* female). 20 U.S.C. § 1681(a)(2). In addition to implying that "sex" means "sex," those provisions foreclose any reading of "sex" that incorporates gender identity. It would make no sense to reference schools that "admit students of *both* [gender identities]," *id.*, if in fact such "identities" have "no fixed number" and populate an "infinite" spectrum of "possibilities,"

---

[1] https://www.hrc.org/resources/sexual-orientation-and-gender-identity-terminology-and-definitions (attached hereto as Exhibit A).

State of Tennessee Comments
ED-2021-OCR-0166
Page 4

Veronica Zambon, *What Are Some Different Types of Gender Identity?*, Medical News Today (Updated May 12, 2022) ("Medically reviewed by Francis Kuehnle, NSN, RN-BC").[2]

Clues from history cut against the Department as well. To begin with, "[t]he phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications." Ryan T. Anderson, Ph.D, & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do* (Heritage Found. Backgrounder No. 3201, 2017).[3] In fact, "the word 'gender'" itself "had been coined only recently in contradistinction to sex." *Id.* It thus comes as no surprise that the earliest Title IX rulemaking codified sex-separated "toilet, locker room, and shower facilities" without a whiff of discussion about gender identity. HEW, *Nondiscrimination on Basis of Sex*, 40 Fed. Reg. 24,127, 24,141 (June 4, 1975) (now codified at 34 C.F.R. § 106.33); *see* HEW, *Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 39 Fed. Reg. 22,227, 22,230 (June 20, 1974) (proposing the rule without explanation); 40 Fed. Reg. at 24,141 (finalizing the rule without justification or response to commentary). And those same regulations (again) implied that "sex" would naturally differentiate athletes by virtue of "competitive skill" and raise safety issues when "the activity involved is a contact sport" — something that cannot be said of gender identity. 40 Fed. Reg. at 24,134 (discussing 45 C.F.R. § 86.41, predecessor to 34 C.F.R. § 106.41).

Finally, reading "sex" to mean "sex" neatly aligns with Title IX's indisputable aim: ending the "corrosive and unjustified discrimination against *women*" that was "overt and socially acceptable within the academic community" in the early 1970s. 118 Cong. Rec. 5803 (1972) (remarks of Senator Bayh) (emphasis added). *That* invidious, sex-based discrimination prompted a series of congressional hearings, which eventually inspired the legislation. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696 n.16 (1979). And in recognition of this fact, the courts have long construed Title IX as conferring a "special benefit" on "persons discriminated against" because they are biologically female — not because they *identify* as women. *Id.* at 694; *see also id.* at 680 ("Petitioner's complaints allege that her applications for admission to medical school were denied by the respondents because she *is* a woman." (emphasis added)).

The Department nonetheless insists that discrimination "on the basis of sex" necessarily *includes* discrimination "on the basis of gender identity" under the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *See, e.g.*, Proposal at 41,530–32. That's wrong. The *Bostock* case concerned a funeral home employee who had been fired "simply for being … transgender." 140 S. Ct. at 1737. The question was whether that firing constituted discrimination "because of ... sex" under Title VII. *Id.* at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "proceed[ed] on the assumption that 'sex'" was a "biological distinction[] between male and female," nothing more or less. *Id.* at 1739. In fact, it explicitly "agree[d]" with the defendants that "transgender status" is a "distinct concept[] from sex." *Id.* at 1747. Even so, the Court held that the firing violated Title VII specifically because a male employee was punished for behavior permitted for the employee's female colleagues. *Id.* at 1744.

In reaching that holding, however, the Court explicitly declined to address sex segregation at schools under Title IX. *See id.* at 1753; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021)

---

[2] https://www.medicalnewstoday.com/articles/types-of-gender-identity (attached hereto as Exhibit B).

[3] https://www.heritage.org/sites/default/files/2017-03/BG3201.pdf (attached hereto as Exhibit C).

State of Tennessee Comments
ED-2021-OCR-0166
Page 5

(recognizing *Bostock*'s "narrow reach"). And for good reason: Title VII is *not* Title IX. *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Whereas Title VII prohibits any adverse employment action "because of … sex," full stop, 42 U.S.C. § 2000e-2, Title IX explicitly *permits* discrimination "on the basis of sex" in numerous circumstances, 20 U.S.C. § 1681(a)(1)–(9). More importantly, Title IX dictates that "maintaining separate living facilities for the different sexes" is *not* sex-based discrimination in the first place. 20 U.S.C. § 1686. The Department fails to account for those distinctions in its misapplication of *Bostock*.

Moreover, even if the Department had the correct reading of *Bostock*, its rules would still conflict with Title IX. Most strikingly, the Department wants to mandate accommodation of a person's gender identity *even* when "Title IX … permits different treatment or separation on the basis of sex." Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). The Department has neither identified a textual basis for that rule nor explained how it follows from *Bostock* or any other precedent. And although the rule includes a carveout in cases where discrimination is "otherwise permitted by Title IX or [34 C.F.R. part 106]," *id.*, the Department has not explained how the rule's general prohibition and exception work together. The regulation seems to contemplate circumstances where "Title IX … permits different treatment … on the basis of sex" but does *not* "otherwise permit" a failure to accommodate "gender identity." *Id.* What are those circumstances? If the Department believes they exist, it should specify them now rather than cause "unfair surprise" through sporadic, after-the-fact applications. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2404 (2019) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 159 (2007)).

Indeed, the Department's "erratic[]" and "inconsistent[]" approach to the gender-identity issue only heightens the need for a cogent and clearly articulated interpretation of Title IX, grounded in the statute's actual terms. *Nat'l Treasury Emps. Union v. FLRA*, 399 F.3d 334, 337 (D.C. Cir. 2005) (quoting *Am. Fed'n of Gov't Employees v. FLRA*, 712 F.2d 640, 643 n.17 (D.C.Cir.1983)). If the Department cannot provide that logical underpinning, it must abandon its rulemaking proposal.

Further, the Department repeatedly relies upon a 2021 Notice of Interpretation that the U.S. District Court for the Eastern District of Tennessee has preliminarily enjoined the Department from enforcing against twenty States, including Tennessee and several other signatories to this letter. *E.g.*, Proposal at 41,531–33 (citing Dep't of Educ., *Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of* Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021)); *see Tennessee*, 2022 WL 2791450, at \*24. In its filings in that case, the Department has agreed that it may "not cite, reference, treat as binding, or otherwise rely upon" the 2021 Notice of Interpretation in any enforcement or administrative action against the twenty States. Notice of Compliance at 2, *Tennessee*, ECF No. 97. To comply with the preliminary injunction, the Department cannot continue to treat the enjoined 2021 Notice of Interpretation as binding. Further, if the Department insists on pursuing its rulemaking proposal, the Department must "make appropriate changes" to the proposed rule, *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142 (6th Cir. 2022), that acknowledge how such proposed rulemaking "creates rights for students and obligations for regulated entities not to discriminate based on … gender identity that appear nowhere in *Bostock*, Title IX, or its [current] implementing regulations." *Tennessee*, 2022 WL 2791450, at \*21.

State of Tennessee Comments
ED-2021-OCR-0166
Page 6

### B.   The proposed rules would infringe on the constitutional rights and interests of students, parents, school faculty, and the States.

The Department has also failed to account for the impact its proposed rules will have on fundamental constitutional rights and interests.  Attempting to expand the reach of its preferred policies, the Department says it will require schools to "take prompt and effective action to end any sex discrimination …, prevent its recurrence, and remedy its effects."  Proposal at 41,572 (proposed 34 C.F.R. § 106.44(a)).  In practice, that means policing interactions among students, parents, and faculty to compel public accommodation of each person's highly individualized, potentially fluid, and unverifiable gender identity.  *See id.* at 41,571 (proposed 34 C.F.R. §§ 106.10, 106.31(a)(2)).  This will trench on multiple constitutional rights and interests in ways that are easy to predict.

*First*, state-run public colleges will have to compel speech in violation of the First Amendment.  This issue will predictably arise from the forced used of certain pronouns and other referential terms.  *Meriwether*, 992 F.3d at 498.  Advocates for transgender rights have repeatedly stressed that the language others use to refer to a person is "pivotal to [that person's] gender identity and how [he or she] relate[s] to the world," *Pronouns*, The Center (last visited Sept. 8, 2022),[4] and that referring to someone with language that does *not* fit that person's gender identity can thus cause feelings of "exhaust[ion]," "demoralize[ation]," and "invalidat[ion]," Sabra L. Katz-Wise, *Misgendering: What It Is and Why It Matters*, Harvard Health Blog (July 23, 2021).[5]  In light of this, the Department's rules suggest that any failure to police referential speech could be considered "sex discrimination" if it "prevents a person from participating in an education program or activity consistent with the person's gender."  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  If that is the case, however, the new prohibitions will necessarily compel public schools to violate the First Amendment.  There can be no doubt that some college faculty will resist referring to students and colleagues by their "preferred pronouns."  *See, e.g., Meriwether*, 992 F.3d at 498–503.  And whether motivated by faith, pedagogical theory, or simple disagreement, those speakers will have a right to express themselves under the First Amendment.  *See id.* at 506.  Indeed, "[i]f professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity." *Id.*  Yet the Department's rules *require* schools to wield such power without so much as acknowledging the ensuing First Amendment problem.

*Second*, school administrators may feel forced — or empowered — to insert themselves into constitutionally protected family affairs.  The Department must recognize that "[t]here [is] a 'private realm of family life which the state cannot enter,' that has been afforded both substantive and procedural protection[s]" under our Constitution.  *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)) (citation and footnote calls omitted).  Those protections extend to cover the rights of parents to "bring up" their children as they deem fit, including through instruction on matters of behavior and ethics.  *See M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)); *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 822 (2011) (Thomas, J., dissenting) (explaining "the founding generation['s]" fundamental belief that "parents had absolute authority … to direct the proper development of their

---

[4] https://gaycenter.org/pronouns/#more (attached hereto as Exhibit D).
[5] https://www.health.harvard.edu/blog/misgendering-what-it-is-and-why-it-matters-202107232553 (attached hereto as Exhibit E).

State of Tennessee Comments
ED-2021-OCR-0166
Page 7

[minor] children"). All parents thus retain a constitutionally protected right to guide their own children on matters of identity, including the decision to adopt or reject various gender norms and behaviors.

The Department's proposed rules threaten that right by requiring school administrators to "take prompt and effective action" to accommodate the stated gender identity of each student — including very small children. Proposal at 41,571–72 (proposed 34 C.F.R. § 106.44(a)). At a minimum, those provisions bind school faculty to treat such children "consistent with [their] gender ident[ies]" on school grounds, even if that conflicts with a parent's preferences or nurturing judgment. *Id.* at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). But the rules could go much further. For example, parents have already reported instances of school administrators, clothed in Title IX's auspices, taking extreme measures to ensure gender-identity "affirmance" in the *home*. *See* Kaylee McGhee White, *Biden's New Title IX Rules Deputize Teachers to Override Parents on Gender Identity*, Independent Women's Forum (Aug. 16, 2022).[6] Nothing could be more noxious to the "enduring American tradition" that grants parents the "primary role … in the upbringing of their children." *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)).

*Finally*, the Department's novel attempt to expand Title IX would push the statute beyond Congress's lawmaking authority. Congress does not have the ability to set education policy directly. Instead, it enacted Title IX through its broader power to tax and spend in pursuit of the "general Welfare." U.S. Const. art. I, § 8, cl. 1. But the exercise of that power comes with special limitations. Most notably, when Congress aims to direct State and local policy via the Spending Clause, it must do so through "clear[ ]statement[s]" in the legislation itself. *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014) ("Clarity is demanded *whenever* Congress legislates through the spending power …."); *see also Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) ("Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous …."). Only then can States "voluntarily and knowingly accept[]" or decline any obligations attached to federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In this case, however, the Department wants to read new gender identity protections into Title IX without grounding them in clear statutory text. *See supra* Part I.A; *Tennessee*, 2022 WL 2791450, at *21. And the Department's reliance on *Bostock* provides no retort, for reasons already stated. *See supra* at 4–5. The upshot is that the new regulations would push Title IX beyond what the Constitution allows.

These constitutional concerns warrant greater attention if the Department intends to defend its new rules as anything other than arbitrary. The bedrock principles of administrative law require that all Title IX regulations reasonably fit the statute's language after the "ordinary tools of statutory construction" have been brought to bear. *Air Transp. Ass'n of Am., Inc. v. USDA*, 37 F.4th 667, 672 (D.C. Cir. 2022). One of those tools is the canon of constitutional avoidance, which requires that statutes "be construed to avoid serious constitutional doubts," whenever possible. *Branner v. Scott Cnty.*, 14 F.4th 585, 592 (6th Cir. 2021) (quoting *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 516 (2009)). Yet the constitutional issues just discussed receive scant, if any, consideration in the Department's rulemaking proposal. We urge the Department to consider and address those issues or else abandon this rulemaking exercise.

---

[6] https://www.iwf.org/2022/08/16/bidens-new-title-ix-rules-deputize-teachers-to-override-parents-on-gender-identity/ (attached hereto as Exhibit F).

State of Tennessee Comments
ED-2021-OCR-0166
Page 8

## II.     The Department has ignored crucial policy issues that undermine its proposed rules.

Even if the Department could fit its new regulations within the proper constitutional and statutory boundaries, it still has not grappled with several knotty issues of policy.  In wielding its rulemaking authority, the Department must "'reasonably consider[] the relevant issues' and factors" bearing on its course, *Advocates*, 41 F.4th at 586 (quoting *Prometheus*, 141 S. Ct. at 1158), and it must draw "rational connection[s] between the facts" and its proposed rules, *id.* (quoting *State Farm*, 463 U.S. at 43).  The Proposal fails to do so in multiple critical respects.

### A.     The Department has not considered or addressed the difficulties of authenticating gender identity.

The Department's first and most fundamental error is a failure to consider how school administrators can put these new rules into practice.  Specifically, although the Department wants students to "participat[e] in ... education program[s and] activit[ies] consistent with th[ier] gender identit[ies]," Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)), it does not explain how school faculty should go about *determining* each student's gender identity.

That is no small feat.  As already mentioned, the proponents of transgender rights often stress that gender identity "differ[s] from sex" precisely because it cannot be "define[d]" or verified as a matter of "genetic[s]" or biology.  Zambon, *supra*.  Instead, gender identity comes from "the inside," and "only the person themselves can determine what their gender identity is."  *Id.*; *see also id.* ("The term gender identity refers to the personal sense of an individual's own gender.");  Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 862 (Dec. 2015) ("[G]ender identity is internal ....").[7]  Although "[p]eople *may* use clothing, appearances, and behaviors to express the gender that they identify with," they also may not — it is up to them.  Zambon, *supra*.  In addition, and again unlike sex, gender identity cannot be "divided along the binary lines of 'man' and 'woman.'"  *Id.*  Instead, it is thought to exist on a "spectrum," from which a person may choose any number of gender identities — or none at all — and may alter that choice at a moment's notice, "shift[ing] between, or ... outside of, society's expectations."  *Id.*; *accord* Jason Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, Pediatrics, Oct. 2018, at 2[8]; *see also* Zambon, *supra* (identifying and defining various gender identities, including "agender," "bigender," "omnigender," "polygender," "genderqueer," and "gender outlaw," to name just a few).

How, then, can teachers and school administrators determine and accommodate each student's gender identity?  Should students be required "to meet with ... trained and licensed ... counselors" and be assigned to sex-separated facilities, events, and activities on a "case-by-case basis"?  *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 524 (3d Cir. 2018).  Or should faculty simply accept and rely on each student's own reporting of what it means to live "consistent with [that student's] gender identity"?  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  If the Department proposes the latter, then how (if at all) should schools account for a student's mental and emotional maturity or possible ulterior motives?  More pointedly, if *outwardly* identifying as a girl grants access to the girls' locker room after gym class, what will stop pubescent males from taking advantage of that means of

---

[7] https://www.apa.org/practice/guidelines/transgender.pdf (attached hereto as Exhibit G)
[8] https://perma.cc/EE6U-PN66 (attached hereto as Exhibit H).

State of Tennessee Comments
ED-2021-OCR-0166
Page 9

access? *Cf.* Expert Declaration and Report of Kenneth V. Lanning at 10, 13, *Carcaño v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016) (No. 1:16-cv-00236-TDS-JEP), ECF No. 149-14 [hereinafter "Lanning Report"] (attached hereto as Exhibit I) (noting that "some adolescent high school boys or college males … might want to get into the girls' locker room" without "realiz[ing] that such activity is illegal" or "consider[ing] its effect on victims," *id.* at 10). The Department's proposed rules seem to require "prompt and effective action" to enable that very scenario. Proposal at 41,572 (proposed 34 C.F.R. § 106.44(a)).

Unless the Department addresses this problem, it cannot claim to have "reasonably considered" every "relevant issue[]" arising from its Proposal. *Advocates*, 41 F.4th at 586 (quoting *Prometheus*, 141 S. Ct. at 1158). And until the Department can produce a cogent response, it should refrain from finalizing new rules.

**B.    The Department's proposal dismisses well-founded concerns regarding student and faculty safety.**

On a related note, the Department has not adequately accounted for the risks these new regulations could pose to student and faculty safety. Schools at every level of the education system have long provided sex-separated facilities — including locker rooms, restrooms, and dormitories — as a means of protecting *all* students, staff, and visitors in their most vulnerable moments. But what makes these places private also makes them susceptible to abuse by bad actors. Public restrooms and locker rooms, in particular, have long been designed to feature deliberately obstructed sightlines, few entrances or exits, and a categorical exemption from most forms of surveillance. Add the fact that most people using these facilities are partially or completely undressed, and the potential for voyeurism, harassment, and even violent crime should be obvious.

Contrary to the Department's apparent assumptions, last year's nationally recognized story of a "15-year-old [Virginia] boy" who "sexually assault[ed] a female classmate in a school bathroom" was no anomaly. Laura Wainman & Nicole DiAntoniao, *Teen Boy Sexually Assaulted Classmate in a School Bathroom, Judge Says*, WUSA 9 (Oct. 26, 2021).[9] News reports and court records have long illustrated the unfortunate truth "that public toilets … are often the locale of [numerous crimes]," *People v. Young*, 214 Cal. App. 2d 131, 135 (Cal. Dist. Ct. App. 1963), specifically because they provide offenders the opportunity to "seek out victims in a planned and deliberate way," Expert Opinion of Sheriff Tim Hutchinson (Retired) at 6, *Carcaño*, ECF No. 149-15 [hereinafter "Hutchinson Report"] (attached hereto as Exhibit K). Take, for example, the recent report from Detroit of a fifteen-year-old male suspect "hid[ing] inside a stall" in a women's restroom "for about 20 minutes" before attacking a twenty-nine-year-old female. *See, e.g.*, Amber Ainsworth, *15-Year-Old Boy Charged After Trying to Sexually Assault Woman in Downtown Plymouth Public Bathroom*, Fox 2 Detroit (Nov. 24, 2021).[10] And the sixteen-year-old Michigan girl allegedly groped by "a man [who] came up behind her in the women's bathroom" at a bookstore. Roxanne Werly, *Surveillance Video Released Following Alleged Bathroom Assault*,

---

[9] https://www.wusa9.com/article/news/legal/teen-found-guilty-loudoun-county-bathroom-sexual-assault/65-e383c241-afd1-4539-8fa3-4ccb01562ea9 (attached hereto as Exhibit J).
[10] https://www.fox2detroit.com/news/15-year-old-boy-charged-after-trying-to-sexually-assault-woman-in-downtown-plymouth-public-bathroom (attached hereto as Exhibit L).

State of Tennessee Comments
ED-2021-OCR-0166
Page 10

UpNorthLive (Nov. 9, 2017).[11]  And the seven-year-old San Francisco girl accosted by a male suspect "in the female restroom at [a public] park."  Nick Smith, *Young Girl Assaulted in SF Park Bathroom*, ABC 7 News (Nov. 22, 2014).[12]  And the Los Angeles man who reportedly "walked into the women's restroom" at a restaurant "and sexually assaulted" a ten-year-old "as she got out of a stall."  Juan Flores, *Man Sought in Sexual Assault of Girl, 10, in Denny's Restroom*, DTLA 5 Morning News (updated Jan. 7, 2014).[13]  And the nightmare experienced by the eight-year-old Oklahoma girl locked inside a restroom by "a mostly naked man" who reportedly "got between her and the door[,] … wrapped a … coat around her neck[,] and began choking her."  *Update: Homeless Man Suspected of Attacking Child in Gas Station Bathroom*, Oklahoma's News 4 (Sept. 16, 2013).[14]  In each of those instances, and countless others, *see, e.g.*, Hutchinson Report at 7–8, 20–23, a male perpetrator exploited a bathroom's privacy-enhancing features to prey on a vulnerable female victim.

The Department nonetheless fails to recognize that its new rules will *enable* this nefarious conduct.  At present, a woman encountering a male in a "sex-segregated space … do[es] not have to wait until the man has already assaulted her before she can fetch security."  Cambridge Radical Feminist Network, *There Is Nothing Progressive About Removing Women-Only Bathrooms*, Medium (Jan. 13, 2019) [hereinafter "CRFM"].[15]  But if a person's self-reported (and potentially multifaceted or shifting) gender identity can determine the bathrooms he may use, that safety valve will be bolted shut.  *See id.*  Some women may not even have recourse *following* abuse if their male perpetrators had every right to be present, expose themselves, or witness others changing in a restroom or locker room space.  *See, e.g.*, *Man in Women's Locker Room Cites Gender Rule*, King 5 Seattle (Feb. 16, 2016).[16]  In fact, the victims of voyeurism might not even realize when it has occurred or have any hope of identifying a suspect afterwards.  *See, e.g.*, *Man Dressed as Woman Arrested for Spying into Mall Bathroom Stall, Police Say*, 4 Washington (last updated Nov. 18, 2015).[17]

Given that "children often delay reporting of sexual abuse until adulthood" and "only about 30% of sex crimes are reported overall," Hutchinson Report at 10, the Department cannot credibly dismiss these security concerns as "unsubstantiated," Proposal at 41,535; *see also* Hutchinson Report at 11 (noting additional reasons why schools and localities may not observe "an increase in reported offenses" following implementation of a gender-identity-based bathroom policy, including the ever-

---

[11] https://upnorthlive.com/news/local/gallery/surveillance-video-released-following-bathroom-assault (attached hereto as Exhibit M).

[12] https://abc7news.com/sfpd-search-suspect-man/407219/ (attached hereto as Exhibit N).

[13] https://ktla.com/news/man-sought-in-sexual-assault-of-girl-10-in-palmdale-restroom/ (attached hereto as Exhibit O).

[14] https://kfor.com/news/police-okc-homeless-man-attacks-8-year-old-girl-in-bathroom/ (attached hereto as Exhibit P).

[15] https://medium.com/@camradfems/there-is-nothing-progressive-about-removing-women-only-bathrooms-37729064cfb7 (attached hereto as Exhibit Q).

[16] https://www.king5.com/article/news/local/seattle/man-in-womens-locker-room-cites-gender-rule/281-65533111 (attached hereto as Exhibit R).

[17] https://www.nbcwashington.com/news/local/man-dressed-as-woman-arrested-for-spying-into-mall-bathroom-stall-police-say/1979764/#:~:text=Richard%20Rodriguez%2C%2030%2C%20filmed%20a,been%20filming%20her%2C%20police%20said (attached hereto as Exhibit S).

State of Tennessee Comments
ED-2021-OCR-0166
Page 11

present incentive "to minimize the appearance of a sex offense problem"); Lanning Report at 10–11
(explaining the many reasons why "nuisance" sex offenses go unreported, unrecorded, uninvestigated,
and unprosecuted). Rather, they are the factually grounded and predictable outgrowth of an all-comers
approach to bathrooms and other living facilities. And although "many women and young children
would choose to leave a facility without reporting a sex offense, the scars from the crime would live
on forever with these victims." Hutchinson Report at 11.

The Department will doubtless respond that these crimes can occur with or without sex-segregated
living spaces. It may even note that most sexual crimes and offenses against children occur at home,
not in public restrooms or locker rooms. Respectfully, that is no response at all. The problem with
the Proposal is *not* that it fails to prevent these crimes in all instances; the problem with the Proposal
is that it demonstrably *facilitates* these crimes in at least *some* instances by stripping away crucial
safeguards. "[E]xisting trespassing, indecent exposure, peeping and other laws deter at least some" of
the abovementioned offenses if and when facilities have clear and enforced sex designations. *Id.* But
"[i]f someone c[an] enter a public facility based entirely upon their 'internal sense of gender,' then law
enforcement personnel, bystanders, and potential victims would have to be able to read minds … to
determine whether a man entering a women's facility was really transgender or was instead there to
commit a sex offense." *Id.* And even after an incident — particularly voyeurism or exposure — has
occurred, "offenders aren't as likely to be observed by or reported to police." *Id.*; *see id.* at 12.

Nor can the Department counter with any hard, contradictory data to allay these concerns. The law
requires the Department to identify "the most critical factual material … used to support" its new
rules *before* they are finalized, specifically for the purpose of "expos[ing]" such material "to refutation"
in the public comment process. *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006)
(quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 684
(D.C. Cir. 1984)). "An agency commits serious procedural error when it fails to reveal … the technical
basis for a proposed rule in time to allow for meaningful commentary." *Connecticut Light & Power Co.
v. NRC*, 673 F.2d 525, 530–31 (D.C. Cir. 1982). In this instance, the Department has declined to
provide any credible empirical analysis supporting its new policies. That silence speaks volumes.
Indeed, how can the Department conclude that "the benefits" of these new rules "far outweigh [their]
estimated costs," Proposal at 41,547, when it fails to account for even the possibility that abolishing
sex-separated facilities could increase crime and deter students and faculty from using public
accommodations? *See id.* at 41,561.

### C. The Department has not adequately accounted for the sex-based discrimination that will *result* from its proposed rule.

Finally, the Department has all but ignored the discrimination its new rules will visit on Title IX's
primary intended beneficiaries: female students. Despite generally prohibiting invidious sex-based
discrimination, the law has long preserved certain female-only spaces and activities precisely because
they *benefit* female students and enrich their educational experiences. *See* 20 U.S.C. § 1681(a)(1)–(9);
*id.* § 1686; *see also* Proposal at 41,534 ("The Department's regulations have recognized limited contexts
in which recipients are permitted to employ sex-specific rules or to separate students on the basis of
sex because the Department has determined that in those contexts such treatment does not generally
impose harm on students." (citing 34 CFR §§ 106.33, 106.34(a)(3))). If male students can nonetheless
enter those same spaces and engage in those same activities by merely professing a particular gender
identity, female students will necessarily be harmed.

State of Tennessee Comments
ED-2021-OCR-0166
Page 12

*First*, female students will suffer mental, emotional, and developmental harm from the loss of female-only dormitories, bathrooms, locker rooms, and showers. "[L]eaving aside the risk of assault, sex-segregated bathrooms give women the peace of mind of knowing they can use the bathroom, attend to their menstrual needs and to small children, with a degree of privacy and dignity that would otherwise not exist." CRFM, *supra*. And the loss of that private space will fall most heavily on "those individuals who — due to having a history of sexual assault, or for religious reasons — do not feel comfortable using a shared intimate space with male strangers." *Id.* Some female students may thus feel compelled to avoid certain bathrooms and other facilities, or even school altogether, which would undermine Title IX's principal aim. This concern is not hypothetical. By way of example, a group of young female students in Nebraska recently walked out of their high school classes to protest the loss of their sex-segregated bathrooms under a policy inspired by the statements of this Department. *See* Tara Campbell, *Transgender Rights Clash Prompts Walkout at CB Abraham Lincoln High*, 6 News WOWT (Apr. 11, 2019).[18] Yet the Department's proposal does not acknowledge this issue, much less explain why the purported interest of transgender students should take precedence over the interest of the female students that Title IX was enacted to serve.

*Second*, female students will be deprived of opportunities to participate in safe and fair athletics. The Department once championed those opportunities, *see, e.g.*, U.S. Dep't of Ed., *Athletics* (last visited Sept. 8, 2022),[19] and its Proposal apparently contemplates a separate rulemaking on "the question of what criteria, if any, [schools] should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team," Proposal at 41,537. Nevertheless, an overarching policy allowing all students to "participat[e] in" school "program[s and] activit[ies] consistent with th[eir] gender identity" could effectively guarantee male students an absolute right to play women's sports. Proposal at 41,571. That is not fair to female athletes.

Following puberty, in particular, the androgenized bodies of male athletes give them "categorically different strength, speed, and endurance" as measured by both elite and average performance. Doriane Lambelet Coleman & Wickliffe Shreve, Comparing Athletic Performances the Best Women to Boys and Men (last visited Sept. 9, 2022)[20]; *see also* Lydia C. Hallam & Fabiano T. Amorim, *Expanding the Gap: an Updated Look into Sex Differences in Running Performance*, Frontiers in Physiology, Jan. 2022, at 2 (explaining that "[t]he sex gap in sports performance is primarily rooted in biological differences between the sexes, namely in relation to male[s'] superior skeletal muscle mass, oxidative capacities and lower fat mass").[21] To illustrate, the Olympic gold medalist Tori Bowie — an incredible female sprinter — has run the one-hundred-meters in a lifetime-best 10.78 seconds. *Id.* In 2017, no fewer than 15,000 male runners beat that mark in recorded competition. *Id.* That example "is far from the exception. It's the rule." *Id.* In fact, "the sex gap is smaller between elite males and females compared to sub-elite and recreational runners." Hallam & Amorim, *supra*. And it persists "across sporting

---

[18] https://www.wowt.com/content/news/Transgender-rights-clash-prompts-walkout-at-CB-Abraham-Lincoln-High-508449271.html (attached hereto as Exhibit T).

[19] https://www2.ed.gov/about/offices/list/ocr/frontpage/pro-students/issues/sex-issue04.html (attached hereto as Exhibit U).

[20] https://law.duke.edu/sites/default/files/centers/sportslaw/comparingathleticperformances.pdf (attached hereto as Exhibit V).

[21] https://www.frontiersin.org/articles/10.3389/fphys.2021.804149/full (attached hereto as Exhibit W).

State of Tennessee Comments
ED-2021-OCR-0166
Page 13

events," with "the best male athletes consistently outperform[ing] their female peers" by anywhere "between 5 and 17%, depending on the sporting discipline, event duration and competitive standard." *Id.* Both the National Collegiate Athletic Association and the U.S. Olympic and Paralympic Committee have recognized this, which is why those organizations seek to "balanc[e] fairness, inclusion and safety for all who compete" by limiting the participation of transgender athletes based on testosterone levels. *Board of Governors Updates Transgender Participation Policy*, NCAA Media Center (Jan. 19, 2022).[22]

The Department's rules, by contrast, could push schools to allow students to choose their sports and teams based on self-reported gender identity alone. *See* Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). The result would threaten decades worth of gains in women's athletics and all the character-building benefits that have come along with those gains. For every male athlete permitted in women's competition, a female athlete is denied that same opportunity. *See* Editorial Staff, *16 Penn Swim Team Members Ask School, Ivy League to Refrain from Litigation to Allow Lia Thomas to Race at NCAAs*, Swimming World (Feb. 3, 2022).[23] For every male athlete who sets a new women's performance record, a female predecessor is robbed of a signature achievement. *See id.* And for every new policy implemented to ensure these results, legions of female athletes are affirmed in their belief that speaking out for their own rights and interests will only invite hostility and ridicule. *See id.*

Again, the Department has not delineated clear limits to its new policies. *See supra* at 5. But if its past pronouncements are any indication, it would rather dictate orthodoxy with respect to gender identity than actually prohibit discrimination in education on the basis of sex. Be that as it may, the law requires the Department to reason through the abovementioned issues before promulgating its new rules. To do any less would be an arbitrary and capricious exercise of administrative power and would have no legitimacy in our constitutional system.

\* \* \*

Thank you, again, for your consideration of these concerns. Any further failure to "clearly disclose[]" or "adequately sustain[]" the new rules, especially in light of the deficiencies detailed above, will justify Tennessee and the co-signing States in taking further action to protect their citizens' rights and interests under the Administrative Procedure Act. *Oncor Elec. Delivery Co. LLC v. NLRB*, 887 F.3d 488, 493 (D.C. Cir. 2018) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)); *see also Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 926 (D.C. Cir. 2013) (noting that agency action must be both "reasonable and reasonably explained" (citing *Motor Vehicle Manufacturers Assn. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)). We therefore urge the Department to comply with the law or else abandon this misguided rulemaking.

---

[22] https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx (attached hereto as Exhibit X).
[23] https://www.swimmingworldmagazine.com/news/penn-swim-team-members-ask-school-ivy-league-to-refrain-from-litigation-to-allow-lia-thomas-to-race-at-ncaas/ (attached hereto as Exhibit Y).

State of Tennessee Comments
ED-2021-OCR-0166
Page 14

Sincerely,

Jonathan Skrmetti
Tennessee Attorney General & Reporter


Steve Marshall
Alabama Attorney General

Treg R. Taylor
Alaska Attorney General

Mark Brnovich
Arizona Attorney General

Leslie C. Rutledge
Arkansas Attorney General

Chris Carr
Georgia Attorney General

Todd Rokita
Indiana Attorney General

Derek Schmidt
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Austin Knudsen
Montana Attorney General

Douglas J. Peterson
Nebraska Attorney General

State of Tennessee Comments
ED-2021-OCR-0166
Page 15

John M. O'Conner
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Mark Vargo
South Dakota Attorney General

Ken Paxton
Texas Attorney General

Sean D. Reyes
Utah Attorney General

Jason S. Miyares
Virginia Attorney General

Patrick Morrisey
West Virginia Attorney General

 **U.S. Equal Employment Opportunity Commission**

# Sexual Orientation and Gender Identity (SOGI) Discrimination

In *Bostock v. Clayton County, Georgia,* No. 17-1618 (S. Ct. June 15, 2020),**[1]** the Supreme Court held that firing individuals because of their sexual orientation or transgender status violates Title VII's prohibition on discrimination because of sex. The Court reached its holding by focusing on the plain text of Title VII. As the Court explained, "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." For example, if an employer fires an employee because she is a woman who is married to a woman, but would not do the same to a man married to a woman, the employer is taking an action because of the employee's sex because the action would not have taken place but for the employee being a woman. Similarly, if an employer fires an employee because that person was identified as male at birth but uses feminine pronouns and identifies as a female, the employer is taking action against the individual because of sex since the action would not have been taken but for the fact the employee was originally identified as male.

The Court also noted that its decision did not address various religious liberty issues, such as the First Amendment, Religious Freedom Restoration Act, and exemptions Title VII provides for religious employers.

AR_270754

# SOGI Discrimination & Work Situations

The law forbids sexual orientation and gender identity discrimination when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, and any other term or condition of employment.

# SOGI Discrimination & Harassment

It is unlawful to subject an employee to workplace harassment that creates a hostile work environment based on sexual orientation or gender identity.  Harassment can include, for example, offensive or derogatory remarks about sexual orientation (e.g., being gay or straight).  Harassment can also include, for example, offensive or derogatory remarks about a person's transgender status or gender transition.

Although accidental misuse of a transgender employee's name and pronouns does not violate Title VII, intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment.

While the law doesn't prohibit simple teasing, offhand comments, or isolated incidents that aren't very serious, harassment is unlawful when it is so frequent or severe that it creates a hostile work environment or when it results in an adverse employment decision (such as the victim being fired or demoted).

The harasser can be the victim's supervisor, a supervisor in another area, a co-worker, or someone who is not an employee of the employer, such as a clientor customer.

# SOGI Discrimination & Employment Policies/Practices

As a general matter, an employer covered by Title VII is not allowed to fire, refuse to hire, or take assignments away from someone (or discriminate in any other way)

because customers or clients would prefer to work with people who have a different sexual orientation or gender identity. Employers also are not allowed to segregate employees based on actual or perceived customer preferences. (For example, it would be discriminatory to keep LGBTQ+ employees out of public-facing positions, or to direct these employees toward certain stores or geographic areas.)

Prohibiting a transgender person from dressing or presenting consistent with that person's gender identity would constitute sex discrimination.

Courts have long recognized that employers may have separate bathrooms, locker rooms, and showers for men and women, or may choose to have unisex or single-use bathrooms, locker rooms, and showers. The **Commission has taken the position (https://www.eeoc.gov/sites/default/files/migrated_files/decisions/0120133395.txt)** that employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity. In other words, if an employer has separate bathrooms, locker rooms, or showers for men and women, all men (including transgender men) should be allowed to use the men's facilities and all women (including transgender women) should be allowed to use the women's facilities.

# SOGI Discrimination & Retaliation

It is illegal for an employer to retaliate against, harass, or otherwise punish any employee for:

- opposing employment discrimination that the employee reasonably believed was unlawful;

- filing an EEOC charge or complaint;

- or participating in any investigation, hearing, or other proceeding connected to Title VII enforcement.

Retaliation is anything that would be reasonably likely to discourage workers from protesting discrimination.

# Laws the Commission Enforces

- 42 U.S.C. § 2000e-2 (Section 703)

    This is the section of the law that was at issue in *Bostock* and applies to the private sector, state and local governments, employment agencies, and labor organizations. *Bostock* made clear that section 703's prohibition of discrimination based on sex includes sexual orientation and transgender status.

- 42 U.S.C. § 2000e-16 (Section 717)

    Section 717 covers employees of the federal government. The Commission has applied *Bostock* in federal sector decisions under section 717. (See **https://www.eeoc.gov/federal-sector/reports/federal-sector-cases-involving-transgender-individuals (https://www.eeoc.gov/federal-sector/reports/federal-sector-cases-involving-transgender-individuals)** .)

# What to Do if You Think You Have Been Discriminated Against

If you believe you have been discriminated against, you may take action to protect your rights under Title VII by filing a complaint:

- **Private sector and state/local government employees** may file a charge of discrimination by contacting the EEOC at 1-800-669-4000 or going to **https://www.eeoc.gov/how-file-charge-employment-discrimination (https://www.eeoc.gov/how-file-charge-employment-discrimination)** .

- **Federal government employees** may initiate the complaint process by contacting an EEO counselor at your agency; more information is available at **https://www.eeoc.gov/federal-sector/overview-federal-sector-eeo-complaint-process (https://www.eeoc.gov/federal-sector/overview-federal-sector-eeo-complaint-process)** .

AR_270757

# Other Laws

Other laws that also may apply:

- Federal contractors and sub-contractors are covered by a separate, explicit prohibition on transgender or sexual orientation discrimination in employment pursuant to Executive Order (E.O.) 13672 enforced by the U.S. Department of Labor's **Office of Federal Contract Compliance Programs (https://www.dol.gov/agencies/ofccp)** .

- State or local fair employment laws also may prohibit discrimination based on sexual orientation or transgender status.  Contact information for state and local fair employment agencies can be found on the page for EEOC's **field office (https://www.eeoc.gov/field-office)** covering that state or locality.

[**1**] This also served as the decision for *Altitude Express, Inc., et al. v. Zarda et al*. (No. 17–1623) and *R. G. & G. R. Harris Funeral Homes, Inc. v. EEOC et al.* (No. 18–107).



**(https://www.eeoc.gov/sites/default/files/2022-06/LGBTQI%20Civil%20Rights%20Infographic.pdf)**

*Download Infographic (PDF)* **(https://www.eeoc.gov/sites/default/files/2022-06/LGBTQI%20Civil%20Rights%20Infographic.pdf)**

# From the EEOC Newsroom

**A Message from EEOC Chair Charlotte A. Burrows for 2024 Pride Month (https://www.eeoc.gov/wysk/message-eeoc-chair-charlotte-burrows-2024-pride-month)**

**EEOC Sues Two Employers for Sex Discrimination (https://www.eeoc.gov/newsroom/eeoc-sues-two-employers-sex-discrimination)**

**Honolulu Restaurant and HR Company to Pay $115,000 in EEOC Sexual Harassment Lawsuit (https://www.eeoc.gov/newsroom/honolulu-restaurant-and-hr-company-pay-115000-eeoc-sexual-harassment-lawsuit)**

**Columbia River Healthcare to Settle EEOC Harassment Charge (https://www.eeoc.gov/newsroom/columbia-river-healthcare-settle-eeoc-harassment-charge)**

**Amerigo Italian Restaurant Owner Companies Pay $60,000 in EEOC Discrimination Suit (https://www.eeoc.gov/newsroom/amerigo-italian-restaurant-owner-companies-pay-60000-eeoc-discrimination-suit)**

**TA Dedicated to Pay $460,000 in EEOC Sexual Orientation and Retaliation Suit (https://www.eeoc.gov/newsroom/ta-dedicated-pay-460000-eeoc-sexual-orientation-and-retaliation-suit)**

**EEOC Sues Sis-Bro, Inc. for Gender Identity Discrimination and Harassment (https://www.eeoc.gov/newsroom/eeoc-sues-sis-bro-inc-gender-identity-discrimination-and-harassment)**

**Sandia Transportation Reaches $97,500 Settlement with EEOC in Harassment Case (https://www.eeoc.gov/newsroom/sandia-transportation-reaches-97500-settlement-eeoc-harassment-case)**

**T.C. Wheelers to Pay $25,000 to Settle EEOC Sex Harassment Lawsuit (https://www.eeoc.gov/newsroom/tc-wheelers-pay-25000-settle-eeoc-sex-harassment-lawsuit)**

**EEOC Sues Mariscos El Puerto and La Catrina for Sexual Harassment, Discrimination, and Harassment Against Gay and Lesbian Worker (https://www.eeoc.gov/newsroom/eeoc-sues-mariscos-el-puerto-and-la-catrina-sexual-harassment-discrimination-and)**

**EEOC Sues Culver's Restaurants of Cottage Grove for Multiple Forms of Harassment (https://www.eeoc.gov/newsroom/eeoc-sues-culvers-restaurants-cottage-grove-multiple-forms-harassment)**

# Employer Coverage

15 or more employees

# Time Limits

180 days to **file a charge (https://www.eeoc.gov/employees/charge.cfm)** *(may be extended by state laws)*

Federal employees have 45 days to **contact an EEO Counselor (https://www.eeoc.gov/federal/fed_employees/complaint_overview.cfm)**

# For more information, see:

- Supreme Court Decision in ***Bostock v Clayton County* (https://www.supremecourt.gov/opinions/19pdf/17-1618_hfci.pdf)**

- **Title VII of the Civil Rights Act of 1964 (https://www.eeoc.gov/laws/statutes/titlevii.cfm)**

- **FAQs on Sex Discrimination (including Sexual Orientation and Gender Identity discrimination) (https://www.eeoc.gov/laws/guidance/sex-discrimination)**

- **Fact Sheet: Facility/Bathroom Access and Gender Identity (https://www.eeoc.gov/laws/guidance/fact-sheet-facilitybathroom-access-and-gender-identity)**

- **Youth@Work: FAQs on Sex Discrimination (including Sexual Orientation and Gender Identity discrimination) (https://www.eeoc.gov/youth/sex-discrimination-faqs)**

# EEOC Enforcement & Litigation

- **Statistics (https://www.eeoc.gov/statistics/lgbtq-based-sex-discrimination-charges)**

- **Fact Sheet: Notable EEOC Litigation Regarding Title VII & Discrimination Based on Sexual Orientation and Gender Identity (https://www.eeoc.gov/fact-sheet-notable-eeoc-litigation-regarding-title-vii-discrimination-based-sexual-orientation-and)**

# Resources for Federal Employees

- **EEOC, MSPB, OPM, & OSC -- Addressing Sexual Orientation and Gender Identity Discrimination in Federal Civilian Employment (https://op.bna.com/gr.nsf/id/llbe-9x5qcw/$File/OPM%20EEOC%20MSPB%20OSC%20Guide.pdf)**

AR_270762

- **EEOC -- Processing EEO Discrimination Complaints Involving SOGI Discrimination Filed By Federal Employees (https://www.eeoc.gov/federal-sector/management-directive/processing-complaints-discrimination-lesbian-gay-bisexual-and)**

- **EEOC -- Federal-Sector EEO Cases Involving Sexual Orientation or Gender Identity (SOGI) Discrimination (https://www.eeoc.gov/federal-sector/federal-sector-eeo-cases-involving-sexual-orientation-or-gender-identity-sogi)**

- **EEOC -- Discrimination in Federal Government Based on Marital Status, Political Affiliation, Status as a Parent, Sexual Orientation, and Gender Identity (https://www.eeoc.gov/federal-sector/facts-about-discrimination-federal-government-employment-based-marital-status)**

- Executive Orders **13087 (https://www.eeoc.gov/executive-order-13087)** & **13672 (https://www.govinfo.gov/content/pkg/CFR-2015-title3-vol1/pdf/CFR-2015-title3-vol1-eo13672.pdf)**

  

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH
2022, VOL. 23, NO. S1, S1–S258
https://doi.org/10.1080/26895269.2022.2100644

REPORT

OPEN ACCESS

# Standards of Care for the Health of Transgender and Gender Diverse People, Version 8

E. Coleman[1], A. E. Radix[2,3], W. P. Bouman[4,5], G. R. Brown[6,7], A. L. C. de Vries[8,9], M. B. Deutsch[10,11], R. Ettner[12,13], L. Fraser[14], M. Goodman[15], J. Green[16], A. B. Hancock[17], T. W. Johnson[18], D. H. Karasic[19,20], G. A. Knudson[21,22], S. F. Leibowitz[23], H. F. L. Meyer-Bahlburg[24,25], S. J. Monstrey[26], J. Motmans[27,28], L. Nahata[29,30], T. O. Nieder[31], S. L. Reisner[32,33], C. Richards[34,35], L. S. Schechter[36], V. Tangpricha[37,38], A. C. Tishelman[39], M. A. A. Van Trotsenburg[40,41], S. Winter[42], K. Ducheny[43], N. J. Adams[44,45], T. M. Adrián[46,47], L. R. Allen[48], D. Azul[49], H. Bagga[50,51], K. Başar[52], D. S. Bathory[53], J. J. Belinky[54], D. R. Berg[55], J. U. Berli[56], R. O. Bluebond-Langner[57,58], M.-B. Bouman[9,59], M. L. Bowers[60,61], P. J. Brassard[62,63], J. Byrne[64], L. Capitán[65], C. J. Cargill[66], J. M. Carswell[32,67], S. C. Chang[68], G. Chelvakumar[69,70], T. Corneil[71], K. B. Dalke[72,73], G. De Cuypere[74], E. de Vries[75,76], M. Den Heijer[9,77], A. H. Devor[78], C. Dhejne[79,80], A. D'Marco[81,82], E. K. Edmiston[83], L. Edwards-Leeper[84,85], R. Ehrbar[86,87], D. Ehrensaft[19], E. Eisfeld[88], S. E. Green[97], B. P. Hall[98,99], T. L. D. Hardy[100,101], M. S. Irwig[32,102], L. A. Jacobs[103], A. C. Janssen[23,104], K. Johnson[105,106], D. T. Klink[107,108], B. P. C. Kreukels[9,109], L. E. Kuper[110,111], E. J. Kvach[112,113], M. A. Malouf[114], R. Massey[115,116], T. Mazur[117,118], C. McLachlan[119,120], S. D. Morrison[121,122], S. W. Mosser[123,124], P. M. Neira[125,126], U. Nygren[127,128], J. M. Oates[129,130], J. Obedin-Maliver[131,132], G. Pagkalos[133,134], J. Patton[135,136], N. Phanuphak[137], K. Rachlin[103], T. Reed[138†], G. N. Rider[55], J. Ristori[93], S. Robbins-Cherry[4], S. A. Roberts[32,139], K. A. Rodriguez-Wallberg[140,141], S. M. Rosenthal[142,143], K. Sabir[144], J. D. Safer[60,145], A. I. Scheim[146,147], L. J. Seal[35,148], T. J. Sehoole[149], K. Spencer[55], C. St. Amand[150,151], T. D. Steensma[9,9], J. F. Strang[152,153], G. B. Taylor[154], K. Tilleman[155], G. G. T'Sjoen[74,156], L. N. Vala[157], N. M. Van Mello[9,158], J. F. Veale[159], J. A. Vencill[160,161], B. Vincent[162], L. M. Wesp[163,164], M. A. West[165,166] and J. Arcelus[5,167]

[1]Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [2]Callen-Lorde Community Health Center, New York, NY, USA; [3]Department of Medicine, NYU Grossman School of Medicine, New York, NY, USA; [4]Nottingham Centre for Transgender Health, Nottingham, UK; [5]School of Medicine, University of Nottingham, Nottingham, UK; [6]James H. Quillen College of Medicine, East Tennessee State University, Johnson City, TN, USA; [7]James H. Quillen VAMC, Johnson City, TN, USA; [8]Department of Child and Adolescent Psychiatry, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, Netherlands; [9]Center of Expertise on Gender Dysphoria, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, The Netherlands; [10]Department of Family & Community Medicine, University of California—San Francisco, San Francisco, CA, USA; [11]UCSF Gender Affirming Health Program, San Francisco, CA, USA; [12]New Health Foundation Worldwide, Evanston, IL, USA; [13]Weiss Memorial Hospital, Chicago, IL, USA; [14]Independent Practice, San Francisco, CA, USA; [15]Emory University Rollins School of Public Health, Atlanta, GA, USA; [16]Independent Scholar, Vancouver, WA, USA; [17]The George Washington University, Washington, DC, USA; [18]Department of Anthropology, California State University, Chico, CA, USA; [19]University of California San Francisco, San Francisco, CA, USA; [20]Independent Practice at dankarasic.com; [21]University of British Columbia, Vancouver, Canada; [22]Vancouver Coastal Health, Vancouver, Canada; [23]Ann & Robert H. Lurie Children's Hospital of Chicago, Chicago, IL, USA; [24]New York State Psychiatric Institute, New York, NY, USA; [25]Department of Psychiatry, Columbia University, New York, NY, USA; [26]Ghent University Hospital, Gent, Belgium; [27]Transgender Infopunt, Ghent University Hospital, Gent, Belgium; [28]Centre for Research on Culture and Gender, Ghent University, Gent, Belgium; [29]Department of Pediatrics, The Ohio State University College of Medicine, Columbus, OH, USA; [30]Endocrinology and Center for Biobehavioral Health, The Abigail Wexner Research Institute at Nationwide Children's Hospital, Columbus, OH, USA; [31]University Medical Center Hamburg-Eppendorf, Interdisciplinary Transgender Health Care Center Hamburg, Institute for Sex Research, Sexual Medicine and Forensic Psychiatry, Hamburg, Germany; [32]Harvard Medical School, Boston, MA, USA; [33]Harvard T. H. Chan School of Public Health, Boston, MA, USA; [34]Regents University London, UK; [35]Tavistock and Portman NHS Foundation Trust, London, UK; [36]Rush University Medical Center, Chicago, IL, USA; [37]Division of Endocrinology, Metabolism & Lipids, Department of Medicine, Emory University School of Medicine, Atlanta, GA, USA; [38]Atlanta VA Medical Center, Decatur, GA, USA; [39]Boston College, Department of Psychology and Neuroscience, Chestnut Hill, MA, USA; [40]Bureau GenderPRO, Vienna, Austria; [41]University Hospital Lilienfeld—St. Pölten, St. Pölten, Austria; [42]School of Population Health, Curtin University, Perth, WA, Australia; [43]Howard Brown Health, Chicago, IL, USA; [44]University of Toronto, Ontario Institute for Studies in Education, Toronto, Canada; [45]Transgender Professional Association for Transgender Health (TPATH); [46]Asamblea Nacional de Venezuela, Caracas, Venezuela; [47]Diverlex Diversidad e Igualdad a Través de la Ley, Caracas, Venezuela;

**CONTACT** Dr Eli Coleman, PhD Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA
†Deceased.

© 2022 The Author(s). Published with license by Taylor & Francis Group, LLC.
This is an Open Access article distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives License (http://creativecommons.org/licenses/by-nc-nd/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited, and is not altered, transformed, or built upon in any way.

[48]University of Nevada, Las Vegas, NV, USA; [49]La Trobe Rural Health School, La Trobe University, Bendigo, Australia; [50]Monash Health Gender Clinic, Melbourne, Victoria, Australia; [51]Monash University, Melbourne, Victoria, Australia; [52]Department of Psychiatry, Hacettepe University, Ankara, Turkey; [53]Independent Practice at Bathory International PLLC, Winston-Salem, NC, USA; [54]Durand Hospital, Guemes Clinic and Urological Center, Buenos Aires, Argentina; [55]National Center for Gender Spectrum Health, Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [56]Oregon Health & Science University, Portland, OR, USA; [57]NYU Langone Health, New York, NY, USA; [58]Hansjörg Wyss Department of Plastic Surgery, New York, NY, USA; [59]Department of Plastic Surgery, Amsterdam UMC Location Vrije Universiteit Amsterdam, , Amsterdam, Netherlands; [60]Icahn School of Medicine at Mount Sinai, New York, NY, USA; [61]Mills-Peninsula Medical Center, Burlingame, CA, USA; [62]GrS Montreal, Complexe CMC, Montreal, Quebec, Canada; [63]Université de Montreal, Quebec, Canada; [64]University of Waikato/Te Whare Wānanga o Waikato, Hamilton/Kirikiriroa, New Zealand/Aotearoa; [65]The Facialteam Group, Marbella International Hospital, Marbella, Spain; [66]Independent Scholar; [67]Boston's Children's Hospital, Boston, MA, USA; [68]Independent Practice, Oakland, CA, USA; [69]Nationwide Children's Hospital, Columbus, OH, USA; [70]The Ohio State University, College of Medicine, Columbus, OH, USA; [71]School of Population & Public Health, University of British Columbia, Vancouver, BC, Canada; [72]Penn State Health, PA, USA; [73]Penn State College of Medicine, Hershey, PA, USA; [74]Center for Sexology and Gender, Ghent University Hospital, Gent, Belgium; [75]Nelson Mandela University, Gqeberha, South Africa; [76]University of Cape Town, Cape Town, South Africa; [77]Department of Endocrinology, Amsterdam UMC Location Vrije Universiteit Amsterdam, , Amsterdam, Netherlands; [78]University of Victoria, Victoria, BC, Canada; [79]ANOVA, Karolinska University Hospital, Stockholm, Sweden; [80]Department of Medicine Huddinge, Karolinska Institutet, Stockholm, Sweden; [81]UCTRANS—United Caribbean Trans Network, Nassau, The Bahamas; [82]D M A R C O Organization, Nassau, The Bahamas; [83]University of Pittsburgh School of Medicine, Pittsburgh, PA, USA; [84]Pacific University, Hillsboro, OR, USA; [85]Independent Practice, Beaverton, OR, USA; [86]Whitman Walker Health, Washington, DC, USA; [87]Independent Practice, Maryland, USA; [88]Transvisie, Utrecht, The Netherlands; [89]Department of Clinical Experimental and Health Psychology, Ghent University, Gent, Belgium; [90]The Jed Foundation, New York, NY, USA; [91]Hetrick-Martin Institute, New York, NY, USA; [92]Institute for Sexual and Gender Health, Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [93]Andrology, Women Endocrinology and Gender Incongruence, Careggi University Hospital, Florence, Italy; [94]Department of Urology, Cedars-Sinai Medical Center, Los Angeles, CA, USA; [95]Departments of Urology and Anatomy, University of California San Francisco, San Francisco, CA, USA; [96]Institute of Family and Sexuality Studies, Department of Neurosciences, KU Leuven, Leuven, Belgium; [97]Mermaids, London/Leeds, UK; [98]Duke University Medical Center, Durham, NC, USA; [99]Duke Adult Gender Medicine Clinic, Durham, NC, USA; [100]Alberta Health Services, Edmonton, Alberta, Canada; [101]MacEwan University, Edmonton, Alberta, Canada; [102]Beth Israel Deaconess Medical Center, Boston, MA, USA; [103]Independent Practice, New York, NY, USA; [104]Northwestern Feinberg School of Medicine, Chicago, IL, USA; [105]RMIT University, Melbourne, Australia; [106]University of Brighton, Brighton, UK; [107]Department of Pediatrics, Division of Pediatric Endocrinology, Ghent University Hospital, Gent, Belgium; [108]Division of Pediatric Endocrinology and Diabetes, ZNA Queen Paola Children's Hospital, Antwerp, Belgium; [109]Department of Medical Psychology, Amsterdam UMC Location Vrije Universiteit Amsterdam, , Amsterdam, Netherlands; [110]Department of Psychiatry, Southwestern Medical Center, University of Texas, Dallas, TX, USA; [111]Department of Endocrinology, Children's Health, Dallas, TX, USA; [112]Denver Health, Denver, CO, USA; [113]University of Colorado School of Medicine, Aurora, CO, USA; [114]Malouf Counseling and Consulting, Baltimore, MD, USA; [115]WPATH Global Education Institute; [116]Department of Psychiatry & Behavioral Sciences, Emory University School of Medicine, Atlanta, GA, USA; [117]Jacobs School of Medicine and Biomedical Sciences, University at Buffalo, Buffalo, NY, USA; [118]John R. Oishei Children's Hospital, Buffalo, NY, USA; [119]Professional Association for Transgender Health, South Africa; [120]Gender DynamiX, Cape Town, South Africa; [121]Division of Plastic Surgery, Seattle Children's Hospital, Seattle, WA, USA; [122]Division of Plastic Surgery, Department of Surgery, University of Washington Medical Center, Seattle, WA, USA; [123]Gender Confirmation Center, San Francisco, CA, USA; [124]Saint Francis Memorial Hospital, San Francisco, CA, USA; [125]Johns Hopkins Center for Transgender Health, Baltimore, MD, USA; [126]Johns Hopkins Medicine Office of Diversity, Inclusion and Health Equity, Baltimore, MD, USA; [127]Division of Speech and Language Pathology, Department of Clinical Science, Intervention and Technology, Karolinska Institutet, Stockholm, Sweden; [128]Speech and Language Pathology, Medical Unit, Karolinska University Hospital, Stockholm, Sweden; [129]La Trobe University, Melbourne, Australia; [130]Melbourne Voice Analysis Centre, East Melbourne, Australia; [131]Stanford University School of Medicine, Department of Obstetrics and Gynecology, Palo Alto, CA, USA; [132]Department of Epidemiology and Population Health, Stanford, CA, USA; [133]Independent PracticeThessaloniki, Greece; [134]Military Community Mental Health Center, 424 General Military Training Hospital, Thessaloniki, Greece; [135]Talkspace, New York, NY, USA; [136]CytiPsychological LLC, San Diego, CA, USA; [137]Institute of HIV Research and Innovation, Bangkok, Thailand; [138]Gender Identity Research and Education Society, Leatherhead, UK; [139]Division of Endocrinology, Boston's Children's Hospital, Boston, MA, USA; [140]Department of Reproductive Medicine, Karolinska University Hospital, Stockholm, Sweden; [141]Department of Oncology-Pathology, Karolinska Institute, Stockholm, Sweden; [142]Division of Pediatric Endocrinology, UCSF, San Francisco, CA, USA; [143]UCSF Child and Adolescent Gender Center; [144]FtM Phoenix Group, Krasnodar Krai, Russia; [145]Mount Sinai Center for Transgender Medicine and Surgery, New York, NY, USA; [146]Epidemiology and Biostatistics, Dornsife School of Public Health, Drexel University, Philadelphia, PA, USA; [147]Epidemiology and Biostatistics, Schulich School of Medicine and Dentistry, Western University, Ontario, Canada; [148]St George's University Hospitals NHS Foundation Trust, London, UK; [149]Iranti, Johannesburg, South Africa; [150]University of Houston, Houston, TX, USA; [151]Mayo Clinic, Rochester, MN, USA; [152]Children's National Hospital, Washington, DC, USA; [153]George Washington University School of Medicine, Washington, DC, USA; [154]Atrium Health Department of Obstetrics and Gynecology, Division of Female Pelvic Medicine and Reconstructive Surgery, Charlotte, NC, USA; [155]Department for Reproductive Medicine, Ghent University Hospital, Gent, Belgium; [156]Department of Endocrinology, Ghent University Hospital, Gent, Belgium; [157]Independent Practice, Campbell, CA, USA; [158]Department of Obstetrics and Gynaecology, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, Netherlands; [159]School of Psychology, University of Waikato/Te Whare Wānanga o Waikato, Hamilton/Kirikiriroa, New Zealand/Aotearoa; [160]Department of Psychiatry & Psychology, Mayo Clinic, Rochester, MN, USA; [161]Division of General Internal Medicine, Mayo Clinic, Rochester, MN, USA; [162]Trans Learning Partnership at https://spectra-london.org.uk/trans-learning-partnership, UK; [163]College of Nursing, University of Wisconsin MilwaukeeMilwaukee, WI, USA; [164]Health Connections Inc., Glendale, WI, USA; [165]North Memorial Health Hospital, Robbinsdale, MN, USA; [166]University of Minnesota, Minneapolis, MN, USA; [167]Bellvitge Biomedical Research Institute (IDIBELL), L'Hospitalet de Llobregat, Barcelona, Spain.

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH    S3

## ABSTRACT

**Background:** Transgender healthcare is a rapidly evolving interdisciplinary field. In the last decade, there has been an unprecedented increase in the number and visibility of transgender and gender diverse (TGD) people seeking support and gender-affirming medical treatment in parallel with a significant rise in the scientific literature in this area. The World Professional Association for Transgender Health (WPATH) is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health. One of the main functions of WPATH is to promote the highest standards of health care for TGD people through the Standards of Care (SOC). The SOC was initially developed in 1979 and the last version (SOC-7) was published in 2012. In view of the increasing scientific evidence, WPATH commissioned a new version of the Standards of Care, the SOC-8.

**Aim:** The overall goal of SOC-8 is to provide health care professionals (HCPs) with clinical guidance to assist TGD people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment.

**Methods:** The SOC-8 is based on the best available science and expert professional consensus in transgender health. International professionals and stakeholders were selected to serve on the SOC-8 committee. Recommendation statements were developed based on data derived from independent systematic literature reviews, where available, background reviews and expert opinions. Grading of recommendations was based on the available evidence supporting interventions, a discussion of risks and harms, as well as the feasibility and acceptability within different contexts and country settings.

**Results:** A total of 18 chapters were developed as part of the SOC-8. They contain recommendations for health care professionals who provide care and treatment for TGD people. Each of the recommendations is followed by explanatory text with relevant references. General areas related to transgender health are covered in the chapters Terminology, Global Applicability, Population Estimates, and Education. The chapters developed for the diverse population of TGD people include Assessment of Adults, Adolescents, Children, Nonbinary, Eunuchs, and Intersex Individuals, and people living in Institutional Environments. Finally, the chapters related to gender-affirming treatment are Hormone Therapy, Surgery and Postoperative Care, Voice and Communication, Primary Care, Reproductive Health, Sexual Health, and Mental Health.

**Conclusions:** The SOC-8 guidelines are intended to be flexible to meet the diverse health care needs of TGD people globally. While adaptable, they offer standards for promoting optimal health care and guidance for the treatment of people experiencing gender incongruence. As in all previous versions of the SOC, the criteria set forth in this document for gender-affirming medical interventions are clinical guidelines; individual health care professionals and programs may modify these in consultation with the TGD person.

## KEYWORDS

adolescents; assessment; children; communication; education; endocrinology; eunuch; gender diverse; health care professional; institutional settings; intersex; mental health; nonbinary; population; postoperative care; primary care; reproductive health; sexual health; SOC8; Standards of Care; surgery; terminology; transgender; voice

# Table of contents

|  |  | Page No. |
|---|---|---|
| | **Introduction** | **S5** |
| **Chapter 1.** | **Terminology** | **S11** |
| **Chapter 2.** | **Global Applicability** | **S15** |
| **Chapter 3.** | **Population Estimates** | **S23** |
| **Chapter 4.** | **Education** | **S27** |
| **Chapter 5.** | **Assessment of Adults** | **S31** |
| **Chapter 6.** | **Adolescents** | **S43** |
| **Chapter 7.** | **Children** | **S67** |
| **Chapter 8.** | **Nonbinary** | **S80** |
| **Chapter 9.** | **Eunuchs** | **S88** |
| **Chapter 10.** | **Intersex** | **S93** |
| **Chapter 11.** | **Institutional Environments** | **S104** |
| **Chapter 12.** | **Hormone Therapy** | **S110** |
| **Chapter 13.** | **Surgery and Postoperative Care** | **S128** |
| **Chapter 14.** | **Voice and Communication** | **S137** |
| **Chapter 15.** | **Primary Care** | **S143** |
| **Chapter 16.** | **Reproductive Health** | **S156** |
| **Chapter 17.** | **Sexual Health** | **S163** |
| **Chapter 18.** | **Mental Health** | **S171** |
| | **Acknowledgements** | **S177** |
| | **References** | **S178** |
| | **Appendix A: Methodology** | **S247** |
| | **Appendix B: Glossary** | **S252** |
| | **Appendix C: Gender-Affirming Hormonal Treatments** | **S254** |
| | **Appendix D: Summary Criteria for Hormonal and Surgical Treatments for Adults and Adolescents** | **S256** |
| | **Appendix E: Gender-Affirming Surgical Procedures** | **S258** |

AR_275095

## INTRODUCTION

### *Purpose and use of the Standards of Care*

The overall goal of the World Professional Association for Transgender Health's (WPATH) Standards of Care—Eighth Edition (SOC-8) is to provide clinical guidance to health care professionals to assist transgender and gender diverse (TGD) people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment. This assistance may include but is not limited to hormonal and surgical treatments, voice and communication therapy, primary care, hair removal, reproductive and sexual health, and mental health care. Healthcare systems should provide medically necessary gender-affirming health care for TGD people: See Chapter 2—Global Applicability, Statement 2.1.

WPATH is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health. Founded in 1979, the organization currently has over 3,000 health care professionals, social scientists, and legal professionals, all of whom are engaged in clinical practice, research, education and advocacy that affects the lives of TGD people. WPATH envisions a world wherein people of all gender identities and gender expressions have access to evidence-based health care, social services, justice, and equality.

One of the main functions of WPATH is to promote the highest standards of health care for individuals through the Standards of Care (SOC) for the health of TGD people. The SOC-8 is based on the best available science and expert professional consensus. The SOC was initially developed in 1979, and the last version was published in 2012.

Most of the research and experience in this field comes from a North American and Western European perspective; thus, adaptations of the SOC-8 to other parts of the world are necessary. Suggestions for approaches to cultural relativity and cultural competence are included in this version of the SOC.

WPATH recognizes that health is not only dependent upon high-quality clinical care but also relies on social and political climates that ensure social tolerance, equality, and the full rights of citizenship. Health is promoted through public policies and legal reforms that advance tolerance and equity for gender diversity and that eliminate prejudice, discrimination, and stigma. WPATH is committed to advocacy for these policy and legal changes. Thus, health care professionals who provide care to TGD people are called upon to advocate for improved access to safe and licensed gender-affirming care while respecting the autonomy of individuals.

While this is primarily a document for health care professionals, individuals, their families, and social institutions may also use the SOC-8 to understand how it can assist with promoting optimal health for members of this diverse population.

The SOC-8 has 18 chapters containing recommendations for health care professionals working with TGD people. Each of the recommendations is followed by explanatory text with relevant references. The recommendations for the initiation of gender-affirming medical and/or surgical treatments (GAMSTs) for adults and adolescents are contained in their respective chapters (see Assessment for Adults and Adolescent chapters). A summary of the recommendations and criteria for GAMST can be found in Appendix D.

### *Populations included in the SOC-8*

In this document, we use the phrase transgender and gender diverse (TGD) to be as broad and comprehensive as possible in describing members of the many varied communities that exist globally of people with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. This includes people who have culturally specific and/or language-specific experiences, identities or expressions, which may or may not be based on or encompassed by Western conceptualizations of gender or the language used to describe it.

WPATH SOC-8 expands who is included under the TGD umbrella, and the settings in which these guidelines should be applied to promote equity and human rights.

AR_275096

Globally, TGD people encompass a diverse array of gender identities and expressions and have differing needs for gender-affirming care across their lifespan that is related to individual goals and characteristics, available health care resources, and sociocultural and political contexts. When standards of care are absent for certain groups this vacuum can result in a multiplicity of therapeutic approaches, including those that may be counterproductive or harmful. The SOC-8 includes recommendations to promote health and well-being for gender diverse groups that have often been neglected and/or marginalized, including nonbinary people, eunuch, and intersex individuals.

The SOC-8 continues to outline the appropriate care of TGD youth, which includes, when indicated, the use of puberty suppression and, when indicated, the use of gender-affirming hormones.

Worldwide, TGD people commonly experience transphobia, stigmatization, ignorance, and refusal of care when seeking health care services, which contributes to significant health disparities. TGD people often report having to teach their medical providers how to care for them due to the latter's insufficient knowledge and training. Intersectional forms of discrimination, social marginalization, and hate crimes against TGD people lead to minority stress. Minority stress is associated with mental health disparities exemplified by increased rates of depression, suicidality, and non-suicidal self-injuries than rates in cisgender populations. Professionals from every discipline should consider the marked vulnerability of many TGD people. WPATH urges health care authorities, policymakers, and medical societies to discourage and combat transphobia among health care professionals and ensure every effort is made to refer TGD people to professionals with experience and willingness to provide gender-affirming care.

### Flexibility in the SOC

The SOC-8 guidelines are intended to be flexible to meet the diverse health care needs of TGD people globally. While adaptable, they offer standards for promoting optimal health care and for guiding treatment of people experiencing gender incongruence. As in all previous versions of the SOC, the criteria put forth in this document for gender-affirming interventions are clinical guidelines; individual health care professionals and programs may modify them in consultation with the TGD person. Clinical departures from the SOC may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health care professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm-reduction strategies. These departures should be recognized as such, explained to the patient, and documented for quality patient care and legal protection. This documentation is also valuable for the accumulation of new data, which can be retrospectively examined to allow for health care—and the SOC—to evolve.

The SOC-8 supports the role of informed decision-making and the value of harm reduction approaches. In addition, this version of the SOC recognizes and validates various expressions of gender that may not necessitate psychological, hormonal, or surgical treatments. Health care professionals can use the SOC to help patients consider the full range of health services open to them in accordance with their clinical needs for gender expression.

### Diversity versus Diagnosis

The expression of gender characteristics, including identities, that are not stereotypically associated with one's sex assigned at birth is a common and a culturally diverse human phenomenon that should not be seen as inherently negative or pathological. Unfortunately, gender nonconformity and diversity in gender identity and expression is stigmatized in many societies around the world. Such stigma can lead to prejudice and discrimination, resulting in "minority stress." Minority stress is unique (additive to general stressors experienced by all people), socially based, and chronic, and may make TGD individuals more vulnerable to developing mental health concerns such as anxiety and depression. In addition to prejudice and discrimination in society at large, stigma can contribute to abuse and

neglect in one's interpersonal relationships, which in turn can lead to psychological distress. However, these symptoms are socially induced and are not inherent to being TGD.

While Gender Dysphoria (GD) is still considered a mental health condition in the Diagnostic and Statistical Manual of Mental Disorders, (DSM-5-TR) of the American Psychiatric Association. Gender incongruence is no longer seen as pathological or a mental disorder in the world health community. Gender Incongruence is recognized as a condition in the International Classification of Diseases and Related Health Problems, 11th Version of the World Health Organization (ICD-11). Because of historical and current stigma, TGD people can experience distress or dysphoria that may be addressed with various gender-affirming treatment options. While nomenclature is subject to change and new terminology and classifications may be adopted by various health organizations or administrative bodies, the medical necessity of treatment and care is clearly recognized for the many people who experience dissonance between their sex assigned at birth and their gender identity.

Not all societies, countries, or health care systems require a diagnosis for treatment. However, in some countries these diagnoses may facilitate access to medically necessary health care and can guide further research into effective treatments.

### Health care services

The goal of gender-affirming care is to partner with TGD people to holistically address their social, mental, and medical health needs and well-being while respectfully affirming their gender identity. Gender-affirming care supports TGD people across the lifespan—from the very first signs of gender incongruence in childhood through adulthood and into older age—as well as people with concerns and uncertainty about their gender identity, either prior to or after transition.

Transgender health care is greater than the sum of its parts, involving holistic inter- and multidisciplinary care between endocrinology, surgery, voice and communication, primary care, reproductive health, sexual health and mental

health disciplines to support gender-affirming interventions as well as preventive care and chronic disease management. Gender-affirming interventions include puberty suppression, hormone therapy, and gender-affirming surgeries among others. It should be emphasized there is no 'one-size-fits-all' approach and TGD people may need to undergo all, some, or none of these interventions to support their gender affirmation. These guidelines encourage the use of a patient-centered care model for initiation of gender-affirming interventions and update many previous requirements to reduce barriers to care.

Ideally, communication and coordination of care should occur between providers to optimize outcomes and the timing of gender-affirming interventions centered on the patient's needs and desires and to minimize harm. In well-resourced settings, multidisciplinary consultation and care coordination is often routine, but many regions worldwide lack facilities dedicated to transgender care. For these regions, if possible, it is strongly recommended that individual care providers create a network to facilitate transgender health care that is not available locally.

Worldwide, TGD people are sometime forced by family members or religious communities to undergo conversion therapy. WPATH strongly recommends against any use of reparative or conversion therapy (see statements 6.5 and 18.10).

### Health care settings

The SOC-8 are guidelines rooted in the fundamental rights of TGD people that apply to all settings in which health care is provided regardless of an individual's social or medical circumstances. This includes a recommendation to apply the standards of care for TGD people who are incarcerated or living in other institutional settings.

Due to a lack of knowledgeable providers, untimely access, cost barriers and/or previous stigmatizing health care experiences, many TGD people take non-prescribed hormone therapy. This poses health risks associated with the use of unmonitored therapy in potentially supratherapeutic doses and the potential exposure to blood-borne illnesses if needles are shared for administration. However, for many individuals, it is the only means of acquiring medically necessary

gender-affirming treatment that is otherwise inaccessible. Non-prescribed hormone use should be approached with a harm-reduction lens to ensure individuals are connected with providers who can prescribe safe and monitored hormone therapy.

In some countries, the rights of TGD are increasingly being recognized, and gender clinics are being established that can serve as templates for care. In other countries, however, such facilities are lacking and care may be more fragmented and under-resourced. Nonetheless, different models of care are being pioneered, including efforts to decentralize gender-affirming care within primary care settings and establish telehealth services to reduce barriers and improve access. Regardless of the method of care delivery, the principles of gender-affirming care as outlined in the SOC-8 should be adapted to align with local sociocultural, political, and medical contexts.

### Methodology

This version of the Standards of Care (SOC-8) is based upon a more rigorous and methodological evidence-based approach than previous versions. This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion. Evidence-based guidelines include recommendations intended to optimize patient care that are informed by a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility.

While evidence-based research provides the basis for sound clinical practice guidelines and recommendations, it must be balanced by the realities and feasibility of providing care in diverse settings. The process for development of the SOC-8 incorporated the recommendations on clinical practice guideline development set forth by the National Academies of Medicine and the World Health Organization, which addressed transparency, conflict-of-interest policy, committee composition, and group process.

The SOC-8 guidelines committee was multidisciplinary and consisted of subject matter experts, health care professionals, researchers, and stakeholders with diverse perspectives and geographic representation. A guideline methodologist assisted with the planning and development of questions and systematic reviews with additional input provided by an international advisory committee and during the public comment period. All committee members completed conflict of interest declarations. Recommendations in the SOC-8 are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. Consensus on the final recommendations was attained using the Delphi process that included all members of the guidelines committee and required that recommendation statements were approved by at least 75% of members. A detailed overview of the SOC-8 Methodology is included in Appendix A.

### SOC-8 Chapters Summary

The SOC-8 represents a significant advancement from previous versions. Changes in this version are based upon a fundamentally different methodology, significant cultural shifts, advances in clinical knowledge, and appreciation of the many health care issues that can arise for TGD people beyond hormone therapy and surgery.

These updated guidelines continue the process started with the SOC-7 in 2011 to broaden in scope and move from a narrow focus on psychological requirements for "diagnosing transgenderism" and medical treatments for alleviation of gender dysphoria to gender-affirming care for the whole person. WPATH SOC-8 expands guidelines specifying who is included under the TGD umbrella, what should and should not be offered with gender-affirming care, and the settings in which these guidelines should be applied to promote equity and human rights.

The SOC-8 has several new chapters such as the Assessment of Adults, Education, Eunuchs, and a Nonbinary chapter. In addition, the chapter for children and adolescents of the SOC-7 has been divided into two different chapters. Overall, the SOC-8 is considerably longer than previous versions and provides a more in-depth introduction and recommendations for health care professionals. A summary of every chapter of the SOC-8 can be found below:

### Chapter 1—Terminology
This new chapter lays the framework for language used in the SOC-8 and offers consensually agreed upon recommendations for the use of terminology. The chapter provides (1) terms and definitions, and (2) best practices for utilizing them. This document is accompanied by a glossary (see Appendix B) of common terms and language to provide a framework for use and interpretation of the SOC-8.

### Chapter 2—Global Applicability
This chapter references key literature related to development and delivery of health care services, broader advocacy care for TGD people from beyond Western Europe and North America and provides recommendations for adapting and translating the SOC-8 to varied contexts.

### Chapter 3—Population Estimates
This chapter updates the population estimates of TGD people in society. Based on the current evidence, this proportion may range from a fraction of a percent to several percentage points depending on the inclusion criteria, age group, and geographic location.

### Chapter 4—Education
This new chapter provides a general review of the literature related to education in TGD health care. It offers recommendations at governmental, nongovernmental, institutional and provider levels to increase access to competent, compassionate health care. The intent is to lay the groundwork in the education area and invite a much broader and deeper discussion among educators and health care professionals.

### Chapter 5—Assessment of Adults
This new chapter provides guidance on the assessment of TGD adults who are requesting gender-affirming medical and surgical treatments (GAMSTs). It describes and updates the assessment process as part of a patient-centered approach and the criteria that health care professionals may follow in order to recommend GAMSTs to TGD adults.

### Chapter 6—Adolescents
This new chapter is dedicated to TGD adolescents, is distinct from the child chapter, and has been created for this 8th edition of the Standards of Care given (1) the exponential growth in adolescent referral rates; (2) the increase in studies available specific to adolescent gender diversity-related care; and (3) the unique developmental and gender-affirming care issues of this age group. This chapter provides recommendations regarding the assessment process of adolescents requiring GAMSTs as well as recommendations when working with TGD youth and their families.

### Chapter 7—Children
This new chapter pertains to prepubescent gender diverse children and focuses on developmentally appropriate psychosocial practices and therapeutic approaches.

### Chapter 8—Nonbinary
This new chapter in the SOC-8 consists of a broad description of the term nonbinary and its usage from a biopsychosocial, cultural, and intersectional perspective. The need for access to gender-affirming care, specific gender-affirming medical interventions, as well as an appropriate level of support is discussed.

### Chapter 9—Eunuchs
This new chapter describes the unique needs of eunuchs, and how the SOC can be applied to this population.

### Chapter 10—Intersex
This chapter focuses on the clinical care of intersex individuals. It addresses the evolving terminology, prevalence, and diverse presentations of such individuals and provides recommendations for providing psychosocial and medical care with their evidence-based explanations.

### Chapter 11—Institutional Environments
This chapter has been expanded to include both carceral and non-carceral settings and has been built upon the last 3 versions of the SOC. This chapter describes how the SOC-8 can be applied to individuals living in these settings.

### Chapter 12—Hormone Therapy

This chapter describes the initiation of gender-affirming hormone therapy, the recommended regimens, screening for health concerns before and during hormone therapy, and specific considerations regarding hormone therapy prior to surgery. It includes an expanded discussion about the safety of gonadotropin releasing hormone (GnRH) agonists in youth, various hormone regimens, monitoring to include the development of potential therapy-related health concerns, and guidance on how hormone providers should collaborate with surgeons.

### Chapter 13—Surgery and Postoperative Care

This chapter describes a spectrum of gender-affirming surgical procedures for the diverse and heterogeneous community of individuals who identify as TGD. It provides a discussion about the optimal surgical training in GAS procedures, post-surgical aftercare and follow-up, access to surgery by adults and adolescents, and individually customized surgeries.

### Chapter 14—Voice and Communication

This chapter describes professional voice and communication support and interventions that are inclusive of and attentive to all aspects of diversity and no longer limited only to voice feminization and masculinization. Recommendations are now framed as affirming the roles and responsibilities of professionals involved in voice and communication support.

### Chapter 15—Primary Care

This chapter discusses the importance of primary care for TGD individuals, including topics of cardiovascular and metabolic health, cancer screening, and primary care systems.

### Chapter 16—Reproductive Health

This chapter provides recent data on fertility perspectives and parenthood goals in gender diverse youth and adults, advances in fertility preservation methods (including tissue cryopreservation), guidance regarding preconception and pregnancy care, prenatal counseling, and chest feeding. Contraceptive methods and considerations for TGD individuals are also reviewed.

### Chapter 17—Sexual Health

This new chapter acknowledges the profound impact of sexual health on physical and psychological well-being for TGD people. The chapter advocates for sexual functioning, pleasure, and satisfaction to be included in TGD-related care.

### Chapter 18—Mental Health

This chapter discusses principles of care for managing mental health conditions in TGD adults and the nexus of mental health care and transition care. Psychotherapy may be beneficial but should not be a requirement for gender-affirming treatment, and conversion treatment should not be offered.

**CHAPTER 1 Terminology**

This chapter will lay the framework for language used in the SOC-8. It offers recommendations for use of terminology. It provides (1) terms and definitions, and (2) best practices for utilizing them. This document is accompanied by a glossary of common terms and language to provide a framework for use and interpretation of the SOC-8. See Appendix B for glossary.

### Terminology

In this document, we use the phrase transgender and gender diverse (TGD) to be as broad and comprehensive as possible in describing members of the many varied communities globally of people with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. This includes people who have culturally specific and/or language-specific experiences, identities or expressions, and/or that are not based on or encompassed by Western conceptualizations of gender, or the language used to describe it. TGD is used for convenience as a shorthand for transgender and gender diverse.

The decision to use transgender and gender diverse resulted from an active process and was not without controversy. Discussions centered on avoiding over-emphasis on the term transgender, integrating nonbinary gender identities and experiences, recognizing global variations in understandings of gender, avoiding the term gender nonconforming, and recognizing the changing nature of language because what is current now may not be so in coming years. Thus, the term transgender and gender diverse was chosen with the intent to be most inclusive and to highlight the many diverse gender identities, expressions, experiences, and health care needs of TGD people. A Delphi process was used wherein SOC-8 chapter authors were anonymously and iteratively surveyed over several rounds to obtain consensus on terms. The SOC-8 presents standards of care that strive to be applicable to TGD people globally, no matter how a person self-identifies or expresses their gender.

### Context

The language selected in this chapter may not be (nor ever could be) comprehensive of every culture and geographic region/locale. Differences and debates over appropriate terms and specific terminologies are common, and no single term can be used without controversy. The goal of this chapter is to be as inclusive as possible and offer a shared vocabulary that is respectful and reflective of varied experiences of TGD people while remaining accessible to health practitioners and providers, and the public, for the purposes of this document. Ultimately, access to transition-related health care should be based on providing adequate information and obtaining informed consent from the individual, and not on what words TGD people, or their service providers, use to describe their identities. Using language and terminology that is respectful and culturally responsive is a basic foundation in the provision of affirming care, as is reducing the stigma and harm experienced by many TGD people seeking health care. It is vital for service providers to discuss with service users what language is most comfortable for them and to use that language whenever possible.

This chapter explains why current terms are being used in preference to others. Rather than use specific terms for medical, legal, and advocacy groups, the aim is to foster a shared language and understanding in the field of TGD health, and the many related fields (e.g., epidemiology, law), in order to optimize the health of transgender and gender diverse people.

Sex, gender, gender identity, and gender expression are used in the English language as descriptors that can apply to all people—those who are TGD, and those who are not. There are complex reasons why very specific language may be the *most* respectful, *most* inclusive, or *most* accepted by global TGD communities, including the presence or absence of words to describe these concepts in languages other than English; the structural relationship between sex and gender; legal landscapes at the local, national, and international levels; and the consequences of historical and present-day stigma that TGD people face.

---

**Statements of Recommendations**

1.1- We recommend health care professionals use culturally relevant language (including terms to describe transgender and gender diverse people) when applying the Standards of Care in different global settings.

1.2- We recommend health care professionals use language in health care settings that uphold the principles of safety, dignity, and respect.

1.3- We recommend health care professionals discuss with transgender and gender diverse people what language or terminology they prefer.

---

Because at present, the field of TGD health is heavily dominated by the English language, there are two specific problems that constantly arise in setting the context for terminology. The first problem is that words exist in English that do not exist in other languages (e.g., "sex" and "gender" are only represented by one word in Urdu and many other languages). The second problem is that there are words that exist outside of English that do not have a direct translation into English (e.g., *travesti, fa'afafine, hijra, selrata, muxe, kathoey, transpinoy, waria, machi*). Practically, this means the heavy influence of English in this field impacts both what terms are widely used and which people or identities are most represented or validated by those terms. The words used also shape the narratives that contribute to beliefs and perceptions. While in past versions of the Standards of Care, World Professional Association for Transgender Health (WPATH) has used only transgender as a broadly defined umbrella term, version 8 broadens this language to use TGD as the umbrella term throughout the document (see Chapter 2—Global Applicability).

Furthermore, the ever-evolving nature of language is impacted by external factors and the social, structural, and personal pressures and violence enacted on TGD people and their bodies. Many of the terms and phrases used historically have been marred by how, when, and why they were used in discussing TGD people, and have thus fallen out of use or are hotly contested among TGD people, with some individuals preferring terms others find offensive. Some wish that these Standards of Care could provide a coherent set of universally accepted terms to describe TGD people, identities, and related health services. Such a list, however, does not and cannot exist without exclusion of some people and without reinforcing structural oppressions, with regards to race,

national origin, Indigenous status, socioeconomic status, religion, language(s) spoken, and ethnicity, among other intersectionalities. It is very likely that at least some of the terminology used in SOC-8 will be outdated by the time version 9 is developed. Some people will be frustrated by this reality, but it is hoped it will be seen instead as an opportunity for individuals and communities to develop and refine their own lexicons and for people to develop a still more nuanced understanding of the lives and needs of TGD people, including TGD people's resilience and resistance to oppression.

Finally, law and the work of legal professionals are within the remit of these Standards of Care. As such, language used most widely in international law is included here to help with the development of the functional definitions of these terms and encourage their usage in legal contexts in lieu of more antiquated and/or offensive terms. The currently most thorough document in international human rights law uses the term "gender diverse."[1]

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 1.1

**We recommend health care professionals use culturally relevant language (including terms to describe transgender and gender diverse people) when applying the Standards of Care in different global settings.**

Culturally relevant language is used to describe TGD people in different global settings. For example, the concepts of sex, gender, and gender diversity differ across contexts, as does the language used to describe them. Thus, the language used when caring

for TGD people in Thailand is not going to be the same as that used for TGD care in Nigeria. When applying the Standards of Care globally, we recommend health care professionals (HCPs) utilize local language and terms to deliver care in their specific cultural and/or geographical locale.

Gender affirmation refers to the process of recognizing or affirming TGD people in their gender identity—whether socially, medically, legally, behaviorally, or some combination of these (Reisner, Poteat et al., 2016). Health care that is gender-affirming or trans-competent utilizes culturally specific language in caring for TGD people. Gender-affirming care is not synonymous with transition-related care. Provision of transition-related care, such as medical gender affirmation via hormones or surgery, does not alone ensure provision of gender-affirming care, nor does it indicate the quality or safety of the health care provided.

Consultation and partnerships with TGD communities can help to ensure relevancy and inclusivity of the language used in providing health care locally in a particular context and setting.

## Statement 1.2

**We recommend health care professionals use language in health care settings that upholds the principles of safety, dignity, and respect.**

Safety, dignity, and respect are basic human rights (International Commission of Jurists, 2007). We recommend HCPs utilize language and terminology that uphold these human rights when providing care for TGD people. Many TGD people have experienced stigma, discrimination, and mistreatment in health care settings, resulting in suboptimal care and poor health outcomes (Reisner, Poteat et al., 2016; Safer et al., 2016; Winter, Settle et al., 2016). Such experiences include misgendering, being refused care or denied services when sick or injured and having to educate HCPs to be able to receive adequate care (James et al., 2016). Consequently, many TGD people feel unsafe accessing health care. They may avoid health care systems and seek other means of getting health-related needs met, such as taking hormones without a medical prescription or monitoring and relying on peers for medical advice. Furthermore, previous negative experiences in health care settings are associated with future avoidance of care among TGD people.

Many TGD people have been treated unjustly, with prejudice, and without dignity or respect by HCPs, and lack of trust is often a barrier to care. Using language grounded in the principles of safety, dignity, and respect in health care settings is paramount to ensure the health, well-being, and rights of TGD people globally. Language is a significant component of gender-affirming care, but language alone does not resolve or mitigate the systematic abuse and sometimes violence TGD people face globally in care settings. Language is but one important step toward patient/client-centered and equitable health care among TGD people. Other concrete actions HCPs can take include obtaining informed consent and refraining from making assumptions about a person's needs based on their gender or TGD status.

## Statement 1.3

**We recommend health care professionals discuss with transgender and gender diverse people what language or terminology they prefer.**

In providing health care to TGD people, we recommend HCPs discuss with their patients what language or terminology they prefer be used when referring to them. This discussion includes asking TGD people how they would like to be addressed in terms of name and pronouns, how they self-identify their gender, and about the language that should be used to describe their body parts. Utilizing affirming language or terminology is a key component of TGD-affirming care (Lightfoot et al., 2021; Vermeir et al., 2018). Furthermore, these discussions and communications can serve to build rapport and reduce the mistrust many TGD people feel toward HCPs and experience within health care systems. Discussions and usage of language or terminology can also facilitate engagement and retention in care that is not specifically TGD-related, such as uptake of routine preventive screenings and any necessary medical follow-up of findings. In electronic health records, organ/anatomical inventories can be standardly used to inform appropriate clinical care, rather than relying solely on assigned sex at birth and/or gender identity designations.

HCPs and health care settings can implement standardized procedures to facilitate these conversations such as: using intake forms that include chosen pronouns and name, inviting

all staff (regardless of gender, i.e., cisgender, TGD) to use pronouns in introductions, having pronouns accompany names on a document for all patients, and not using gendered honorifics (e.g., Ms., Mr.). Policies for HCPs and health care settings can be put in place to ensure a TGD person's privacy and right to confidentiality, including when they disclose being a TGD person, and if/how to appropriately document. For example, a clinic policy may be to record this information as private and confidential between HCPs and patients/clients, and that it should only be disclosed on a "need to know" basis.

## Note

1.  A/73/152, Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity

## CHAPTER 2 Global Applicability

People who defy cultural boundaries of sex and gender have existed in cultures worldwide since ancient times, sometimes acknowledged in local language terms (Feinberg, 1996). In contrast to the more recent pathologization of gender diversity as an illness, some cultures traditionally celebrated and welcomed this diversity (e.g., Nanda, 2014; Peletz, 2009). Today, the English language umbrella term transgender and gender diverse (TGD) describes a huge variety of gender identities and expressions, and therefore a population with diverse health care experiences and needs. Together, TGD people represent important aspects of human diversity the World Professional Association for Transgender Health (WPATH) asserts should be valued and celebrated. TGD people continue to make vital contributions to the societies in which they live, although often these are unrecognized.

Disturbingly, many TGD people in the modern world experience stigma, prejudice, discrimination, harassment, abuse and violence, resulting in social, economic and legal marginalization, poor mental and physical health, and even death—a process that has been characterized as a stigma-sickness slope (Winter, Diamond et al., 2016). Experiences such as these (and the anticipation or fear of encountering such experiences) leads to what Meyer has described as minority stress (Meyer, 2003; see also Bockting et al., 2013 writing specifically about TGD people), and are associated with poor physical (e.g. Rich et al, 2020) and psychological (e.g., Bränström et al., 2022; Scandurra et al., 2017; Shipherd et al., 2019, Tan et al., 2021) health outcomes.

Violence against TGD people is a particular problem. Seen from a global perspective, it is widespread, diverse in nature (emotional, sexual and physical, e.g., see Mujugira et al., 2021), and involves a range of perpetrators (including State actors). Statistics on murder, the form of violence most extreme in its consequences, are alarming. Worldwide, there were over 4,000 documented killings between January 2008 and September 2021; a statistic widely regarded as flawed by under-reporting (TGEU, 2020).

Since the publication of the Standards of Care Version 7 (SOC-7), there have been dramatic changes in perspectives on TGD people and their health care. Mainstream global medicine no longer classifies TGD identities as a mental disorder. In the Diagnostic and Statistical Manual Version 5 (DSM-5) from the American Psychiatric Association (APA, 2013), the diagnosis of Gender Dysphoria focuses on any distress and discomfort that accompanies being TGD, rather than on the gender identity itself. A text revision (DSM-5-TR) was published in 2022. In the International Classification of Diseases, Version 11 (ICD-11), the diagnostic manual of the World Health Organization (WHO, 2019b), the Gender Incongruence diagnosis is placed in a chapter on sexual health and focuses on the person's experienced identity and any need for gender-affirming treatment that might stem from that identity. Such developments, involving a depathologization (or more precisely a de-psychopathologization) of transgender identities, are fundamentally important on a number of grounds. In the field of health care, they may have helped support a care model that emphasizes patients' active participation in decision-making about their own health care, supported by primary health care professionals (HCPs) (Baleige et al., 2021). It is reasonable to suppose these developments may also promote more socially inclusive policies such as legislative reform regarding gender recognition that facilitates a rights-based approach, without imposing requirements for diagnosis, hormone therapy and/or surgery. TGD people who have changed gender markers on key documents enjoy better mental health (e.g., Bauer et al., 2015; Scheim et al., 2020). A more rights-based approach in this area may contribute greatly to the overall health and well-being of TGD people (Arístegui et al., 2017).

Previous editions of the SOC have revealed much of the recorded clinical experience and knowledge in this area is derived from North American and Western European sources. They have focused on gender-affirming health care in high income countries that enjoy relatively well-resourced health care systems (including those with trained mental health providers, endocrinologists, surgeons and other specialists) and where services are often funded publicly or (at least for some patients) through private insurance.

S16  E. COLEMAN ET AL.

For many countries, health care provision for TGD people is aspirational; with resourcing in this area limited or non-existent, and services often unavailable, inappropriate, difficult to access and/or unaffordable. Few if any HCPs (primary or specialist) may exist. Funding for gender-affirming health care may be absent, with patients often bearing the full costs of whatever health care they access. Health care providers often lack clinical and/or cultural competence in this area. Training for work with these patients may be limited (e.g., Martins et al., 2020). For all these reasons and because of mainstream "Western" medicine's historical view of TGD people as mentally disordered (a perspective that has only recently changed), TGD people have commonly found themselves disempowered as health care consumers.

Health care providers have found the relevant literature is largely North American and European, which present particular challenges for persons working in health care systems that are especially poorly resourced. Recent initiatives that often involve TGD stakeholders as partners are changing this situation somewhat by providing a body of knowledge about good practice in other regions, including how to provide effective, culturally-competent TGD health care in low- and middle-income countries outside the global north.

Within the field, a wide range of valuable health care resources have been developed in recent years. Dahlen et al (2021) review twelve international clinical practice guidelines; over half those reviewed originate from professional bodies based in North America (e.g., Hembree et al., 2017) or Europe (e.g., T'Sjoen et al., 2020). Three are from WHO (the most recent being WHO, 2016). Nowadays, there are numerous other resources, not on Dahlen et al.'s list, that explicitly draw on expertise from regions outside North America and Europe. Examples can be found in Asia and the Pacific (APTN, 2022; Health Policy Project et al., 2015), the Caribbean (PAHO, 2014), Thailand, Australia (Telfer et al., 2020), Aotearoa New Zealand (Oliphant et al., 2018), and South Africa (Tomson et al., 2021) (see also TRANSIT (UNDP et al., 2016)). These resources have commonly been created through the initiatives of or in partnership with TGD communities locally or internationally. This partnership approach, focused on meeting local needs in culturally safe and competent ways, can also have broad international relevance. Some of these publications may be of particular value to those planning, organizing and delivering services in low-income, low-resource countries. There are likely to be other resources published in languages other than English of which we are unaware.

Globally, TGD identities may be associated with differing conceptual frameworks of sex, gender, and sexuality and exist in widely diverse cultural (and sometimes spiritual) contexts and histories. Considering the complex relationships between social and cultural factors, the law, and the demand for and provisions of gender-affirming health care, the SOC-8 should be interpreted through a lens that is appropriate for and within the context of each HCP's individual practice while maintaining alignment to the core principles that underscore it (APTN and UNDP, 2012; Health Policy Project et al., 2015; PAHO, 2014).

It is within this context and by drawing broadly on the experiences of TGD people and health care providers internationally that we consider the global applicability of SOC-8 within this chapter. We set out key considerations for HCPs and conclude by recommending core principles and practices fundamental to contemporary health care for TGD people, regardless of where they live or whether there are resources available to those who seek to provide such health care.

Statement 2.1

**We recommend health care systems should provide medically necessary gender-affirming health care for transgender and gender diverse people.**

Medical necessity is a term common to health care coverage and insurance policies globally. A common definition of medical necessity as used by insurers or insurance companies is "Health care services that a physician and/or health care professional, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically

**Statements of Recommendations**

2.1- We recommend health care systems should provide medically necessary gender-affirming health care for transgender and gender diverse people.

2.2- We recommend health care professionals and other users of the Standards of Care, Version 8 (SOC-8) apply the recommendations in ways that meet the needs of local transgender and gender diverse communities, by providing culturally sensitive care that recognizes the realities of the countries they are practicing in.

2.3- We recommend health care providers understand the impact of social attitudes, laws, economic circumstances, and health systems on the lived experiences of transgender and gender diverse people worldwide.

2.4- We recommend translations of the SOC focus on cross-cultural, conceptual, and literal equivalence to ensure alignment with the core principles that underpin the SOC-8.

2.5- We recommend health care professionals and policymakers always apply the SOC-8 core principles to their work with transgender and gender diverse people to ensure respect for human rights and access to appropriate and competent health care, including:

*General principles*
- Be empowering and inclusive. Work to reduce stigma and facilitate access to appropriate health care for all who seek it;
- Respect diversity. Respect all clients and all gender identities. Do not pathologize differences in gender identity or expression;
- Respect universal human rights including the right to bodily and mental integrity, autonomy and self-determination; freedom from discrimination, and the right to the highest attainable standard of health.

*Principles around developing and implementing appropriate services and accessible health care*
- Involve transgender and gender diverse people in the development and implementation of services;
- Become aware of social, cultural, economic, and legal factors that might impact the health (and health care needs) of transgender and gender diverse people, as well as the willingness and the capacity of the person to access services;
- Provide health care (or refer to knowledgeable colleagues) that affirms gender identities and expressions, including health care that reduces the distress associated with gender dysphoria (if this is present);
- Reject approaches that have the goal or effect of conversion and avoid providing any direct or indirect support for such approaches or services.

*Principles around delivering competent services*
- Become knowledgeable (get training, where possible) about the health care needs of transgender and gender diverse people, including the benefits and risks of gender-affirming care;
- Match the treatment approach to the specific needs of clients, particularly their goals for gender identity and expression;
- Focus on promoting health and well-being rather than solely the reduction of gender dysphoria, which may or may not be present;
- Commit to harm reduction approaches where appropriate;
- Enable the full and ongoing informed participation of transgender and gender diverse people in decisions about their health and well-being;
- Improve experiences of health services including those related to administrative systems and continuity of care.

*Principles around working towards improved health through wider community approaches*
- Put people in touch with communities and peer support networks;
- Support and advocate for clients within their families and communities (schools, workplaces, and other settings) where appropriate.

appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury, or disease; and (c) not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease." The treating HCP asserts and documents that a proposed treatment is medically necessary for treatment of the condition (American Medical Association, 2016).

Generally, "accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, designated Medical Specialty Societies and/or legitimate Medical Colleges' recommendations, and the views of physicians and/or HCPs practicing in relevant clinical areas.

Medical necessity is central to payment, subsidy, and/or reimbursement for health care in parts of the world. The treating HCP may assert and document that a given treatment is medically necessary for the prevention or treatment of the condition. If health policies and practices challenge the medical necessity of a treatment, there may be an opportunity to appeal to a governmental agency or other entity for an independent medical review.

It should be recognized gender diversity is common to all human beings and is not pathological. However, gender incongruence that causes clinically significant distress and impairment often requires medically necessary clinical

interventions. In many countries, medically necessary gender-affirming care is documented by the treating health professional as treatment for Gender Incongruence (HA60 in ICD-11; WHO, 2019b) and/or as treatment for Gender Dysphoria (F64.0 in DSM-5-TR; APA, 2022).

There is strong evidence demonstrating the benefits in quality of life and well-being of gender-affirming treatments, including endocrine and surgical procedures, properly indicated and performed as outlined by the Standards of Care (Version 8), in TGD people in need of these treatments (e.g., Ainsworth & Spiegel, 2010; Aires et al., 2020; Aldridge et al., 2020; Almazan & Keuroghlian, 2021; Al-Tamimi et al., 2019; Balakrishnan et al., 2020; Baker et al., 2021; Buncamper et al., 2016; Cardoso da Silva et al., 2016; Eftekhar Ardebili, 2020; Javier et al., 2022; Lindqvist et al., 2017; Mullins et al., 2021; Nobili et al., 2018; Owen-Smith et al., 2018; Özkan et al., 2018; T'Sjoen et al., 2019; van de Grift, Elaut et al., 2018; White Hughto & Reisner, Poteat et al., 2016; Wierckx, van Caenegem et al., 2014; Yang, Zhao et al., 2016). Gender-affirming interventions may also include hair removal/transplant procedures, voice therapy/surgery, counseling, and other medical procedures required to effectively affirm an individual's gender identity and reduce gender incongruence and dysphoria. Additionally, legal name and sex or gender change on identity documents can also be beneficial and, in some jurisdictions, are contingent on medical documentation that patients may call on practitioners to produce.

Gender-affirming interventions are based on decades of clinical experience and research; therefore, they are not considered experimental, cosmetic, or for the mere convenience of a patient. They are safe and effective at reducing gender incongruence and gender dysphoria (e.g., Aires et al., 2020; Aldridge et al., 2020; Al-Tamimi et al., 2019; Balakrishnan et al., 2020; Baker et al., 2021; Bertrand et al., 2017; Buncamper et al., 2016; Claes et al., 2018; Eftekhar Ardebili, 2020; Esmonde et al., 2019; Javier et al., 2022; Lindqvist et al., 2017; Lo Russo et al., 2017; Marinkovic & Newfield, 2017; Mullins et al., 2021; Nobili et al., 2018; Olson-Kennedy, Rosenthal et al., 2018; Özkan et al., 2018; Poudrier et al., 2019; T'Sjoen et al., 2019; van de Grift, Elaut et al., 2018; White Hughto & Reisner, Poteat et al., 2016; Wierckx, van Caenegem et al., 2014; Wolter et al., 2015; Wolter et al., 2018).

Consequently, WPATH urges health care systems to provide these medically necessary treatments and eliminate any exclusions from their policy documents and medical guidelines that preclude coverage for any medically necessary procedures or treatments for the health and well-being of TGD individuals. In other words, governments should ensure health care services for TGD people are established, extended or enhanced (as appropriate) as elements in any Universal Health Care, public health, government-subsidized systems, or government-regulated private systems that may exist. Health care systems should ensure ongoing health care, both routine and specialized, is readily accessible and affordable to all citizens on an equitable basis.

Medically necessary gender-affirming interventions are discussed in SOC-8. These include but are not limited to hysterectomy +/- bilateral salpingo-oophorectomy; bilateral mastectomy, chest reconstruction or feminizing mammoplasty; nipple resizing or placement of breast prostheses; genital reconstruction, for example, phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses, penectomy, orchiectomy, vaginoplasty, and vulvoplasty; hair removal from the face, body, and genital areas for gender affirmation or as part of a preoperative preparation process; gender-affirming facial surgery and body contouring; voice therapy and/or surgery; as well as puberty blocking medication and gender-affirming hormones; counseling or psychotherapeutic treatment as appropriate for the patient and based on a review of the patient's individual circumstances and needs.

### Statement 2.2

**We recommend health care professionals and other users of the Standards of Care, Version 8 (SOC-8) apply the recommendations in ways that meet the needs of local transgender and gender diverse communities, by providing culturally sensitive care that recognizes the realities of the countries they are practicing in.**

TGD people identify in many different ways worldwide, and those identities exist within a cultural context. In English speaking countries, TGD people variously identify as *transsexual,*

*trans, gender nonconforming, gender queer or diverse, nonbinary,* or indeed *transgender and/or gender diverse,* as well as by other identities; including (for many identifying inside the gender binary) *male* or *female.* (e.g., James et al., 2016; Strauss et al., 2017; Veale et al., 2019).

Elsewhere, identities include but are not limited to *travesti* (across much of Latin America), *hijra* (across much of South Asia), *khwaja sira* (in Pakistan), *achout* (in Myanmar), *maknyah, paknyah* (in Malaysia), *waria* (Indonesia) *kathoey, phuying kham phet, sao praphet song* (Thailand), *bakla, transpinay, transpinoy* (Philippines), *fa'afafine* (Samoa), *mahu* (French Polynesia, Hawai'i), *leiti* (Tonga), *fakafifine* (Niue), *pinapinaaine* (Tuvalu and Kiribati), *vakasalewalewa* (Fiji), *palopa* (Papua Niugini), *brotherboys* and *sistergirls* (Aboriginal and Torres Strait Islander people in Australia), and *akava'ine* (Cook Islands) (e.g., APTN and UNDP, 2012; Health Policy Project et al., 2015; Kerry, 2014). There are also a large number of *two spirit* identities across North America (e.g., *nadleehi* in Navajo (Diné) culture) (Sheppard & Mayo, 2013). The identities to which each of these terms refer are often culturally complex and may exist in a spiritual or religious context. Depending on the cultures and the identities concerned, some may be regarded as so-called "third genders" lying beyond the gender binary (e.g., Graham, 2010; Nanda, 2014; Peletz, 2009). Some TGD identities are less firmly established than others. In many places worldwide, the visibility of transgender men and nonbinary trans masculine identities is relatively recent, with few or no applicable traditional terms in local languages (Health Policy Project et al., 2015). Regardless of where or with whom HCPs work (including those working with ethnic minority persons, migrants and refugees), they need to be aware of the cultural context in which people have grown up and live as well as the consequences for health care.

Worldwide the availability, accessibility, acceptability and quality of health care vary greatly, with resulting inequities within and across countries (OECD, 2019). In some countries, formal health care systems exist alongside established traditional and folk health care systems, with indigenous models of health underpinning the importance of holistic health care (WHO, 2019a).

HCPs should be aware of the traditions and realities within which health care is available and provide support that is sensitive to the local needs and identities of TGD people and provide them with culturally competent and safe care.

Statement 2.3

**We recommend health care providers understand the impact of social attitudes, laws, economic circumstances, and health systems on the lived experiences of transgender and gender diverse people worldwide.**

TGD people's lived experiences vary greatly, depending on a range of factors, including social, cultural (including spiritual), legal, economic and geographic. When TGD people live in environments that affirm their gender and/or cultural identities, then these experiences can be very positive. Families are particularly important in this regard (e.g., Pariseau et al., 2019; Yadegarfard et al., 2014; Zhou et al., 2021). However, when viewed from a global perspective, the circumstances in which TGD people live are often challenging. They are commonly denied widely accepted rights in international human rights law. These include rights to education, health and protection from medical abuses, work and an adequate standard of living, housing, freedom of movement and expression, privacy, security, life, family, freedom from arbitrary deprivation of liberty, fair trial, treatment with humanity while in detention, and freedom from torture, inhuman or degrading treatment or punishment (International Commission of Jurists, 2007, 2017).

It is widely accepted that denial of rights can impact sexual and gender minority health and well-being (e.g., OHCHR et al., 2016; WHO, 2015). We therefore reaffirm here the importance of the rights listed above for TGD people and note WPATH's previous rights advocacy, including through numerous policy documents (e.g., WPATH, 2016, 2017, 2019). HCPs can play an important role in rights advocacy, including the right to quality gender-affirming health care that is appropriate, affordable, and accessible.

Across the world, a large number of studies detail the challenges TGD people face in their lives, and the impact on their health and well-being (e.g., Aurat Foundation, 2016;

Bhattacharya & Ghosh, 2020; Chumakov et al., 2021; Coleman et al., 2018; Heylens, Elaut et al., 2014; Human Rights Watch, 2014; James et al, 2016; Lee, Operario et al., 2020; Luz et al., 2022; McNeil et al., 2012, 2013; Motmans et al., 2017; Muller et al., 2019; Scandurra et al., 2017; Strauss et al., 2019; Suen et al., 2017; Valashany & Janghorbani, 2019; Veale et al., 2019; Wu et al., 2017). The research shows TGD people often experience stigma and prejudice as well as discrimination and harassment, abuse and violence, or they live in anticipation and fear of such actions. Social values and attitudes hostile to TGD people, often communicated to young people in school curricula (e.g., Olivier & Thurasukam, 2018), are also expressed in family rejection (e.g., Yadegarfard et al., 2014), and perpetuated in laws, policies and practices that limit freedom to express one's gender identity and sexuality and hinder access to housing, public spaces, education, employment and services (including health care). The end result is TGD people are commonly deprived of a wide range of opportunities available to their cisgender counterparts and are pushed to the margins of society, without family supports. To make matters worse, across much of the world TGD people's access to legal gender recognition is restricted or non-existent (e.g., ILGA World, 2020a; TGEU, 2021; UNDP and APTN, 2017). In some countries, such barriers nowadays draw on support from "gender-critical theorists" (as critiqued by e.g., Madrigal-Borloz, 2021; Zanghellini, 2020).

Gender identity change efforts (gender reparative or gender conversion programs aimed at making the person cisgender) are widespread, cause harm to TGD people (e.g., APTN, 2020a, 2020b, 2020c, 2021; Bishop, 2019; GIRES et al., 2020; Turban, Beckwith et al., 2020), and (like efforts targeting sexual orientation) are considered unethical (e.g., APS, 2021; Trispiotis and Purshouse, 2021; Various, 2019, 2021). These efforts may be viewed as a form of violence. The UN independent expert on protection against violence and discrimination based on sexual orientation and gender identity has called for a global ban on such practices (Madrigal-Borloz, 2020). An increasing number of jurisdictions are outlawing such work (ILGA World, 2020b).

Inequities arise from a range of factors, including economic considerations and values underpinning the provision of health care systems, particularly with regard to the emphasis placed on public-, private- and self-funding of health care. Lack of access to appropriate and affordable health care can lead to a greater reliance on informal knowledge systems. This includes information about self-administration of hormones, which, in many cases, is undertaken without necessary medical monitoring or supervision (e.g., Do et al., 2018; Liu et al., 2020; Rashid et al., 2022; Reisner et al., 2021; Winter & Doussantousse, 2009).

In some parts of the world, large numbers of transgender women employ silicone as a means of modifying their bodies, drawing on the services of silicone "pumpers" and/or attending pumping "parties", often within their communities. The immediate results of silicone pumping contrast with significant downstream health risks (e.g., Aguayo-Romero et al., 2015; Bertin et al., 2019; Regmi et al., 2021), particularly where industrial silicone or other injectable substances have been used and where surgical removal may be difficult.

Finally, sexual health outcomes for TGD people are poor. HIV prevalence for transgender women reporting to clinical organizations in metropolitan areas is approximately 19% worldwide, which is 49 times higher than the background prevalence rate in the general population (Baral et al., 2013). Sexual health outcomes for transgender men are also problematic (e.g., Mujugira et al., 2021).

Statement 2.4

**We recommend translations of the SOC focus on cross-cultural, conceptual and literal equivalence to ensure alignment with the core principles that underpin the SOC-8.**

Much of the research literature on TGD people is produced in high-income and English-speaking countries. global northern perspectives about TGD people (including those related to health care needs and provision) dominate this literature. A May 2021 Scopus database search undertaken by the current authors shows 99% of the literature on transgender health care comes out of Europe, North America, Australia, or New Zealand. Overall, 96% of the literature is in the English language. TGD people of the Global

South have received relatively little attention in the English language literature, and the work of those HCPs who interact with them has often gone unrecognized and unpublished or has not been translated into English. Applying resources produced in the global north risks overlooking the relevance and nuance of local knowledge, cultural frameworks and practices, and missed opportunities to learn from the work of others.

When translating the principles set out in the SOC, we recommend following best practice guidelines for language translation to ensure high quality written resources are produced that are culturally and linguistically appropriate to the local situation. It is important translators have knowledge about TGD identities and cultures to check that literal translations are culturally competent and safe for local TGD people. It is also important translation should follow established processes for quality assurance (Centers for Medicare & Medicaid Services, 2010; Sprager & Martinez, 2015)

<u>Statement 2.5</u>
**We recommend health care professionals and policymakers always apply the SOC-8 core principles to their work with transgender and gender diverse people to ensure respect for human rights and access to appropriate and competent health care, including:**

*General principles*

- Be empowering and inclusive. Work to reduce stigma and facilitate access to appropriate health care, for all who seek it;
- Respect diversity. Respect all clients and all gender identities. Do not pathologize differences in gender identity or expression;
- Respect universal human rights, including the right to bodily and mental integrity, autonomy, and self-determination; freedom from discrimination and the right to the highest attainable standard of health.

*Principles around developing and implementing appropriate services and accessible health care*

- Involve TGD people in the development and implementation of services;

- Become aware of social, cultural, economic, and legal factors that might impact the health (and health care needs) of transgender and gender diverse people, as well as the willingness and capacity of the person to access services;
- Provide health care (or refer to knowledgeable colleagues) that affirms gender identities and expressions, including health care that reduces the distress associated with gender dysphoria (if this is present);
- Reject approaches that have the goal or effect of conversion, and avoid providing any direct or indirect support for such approaches or services

*Principles around delivering competent services*

- Become knowledgeable (get training, where possible) about the health care needs of transgender and gender diverse people, including the benefits and risks of gender-affirming care;
- Match the treatment approach to the specific needs of clients, particularly their goals for gender identity and expression;
- Focus on promoting health and well-being rather than solely the reduction of gender dysphoria, which may or may not be present;
- Commit to harm reduction approaches where appropriate;
- Enable the full and ongoing informed participation of transgender and gender diverse people in decisions about their health and well-being;
- Improve experiences of health services, including those associated with administrative systems and continuity of care.

*Principles around working towards improved health through wider community approaches*

- Put people in touch with communities and peer support networks;
- Support and advocate for clients within their families and communities (schools, workplaces, and other settings) where appropriate.

We have already cited research detailing the broad range of challenges TGD people may face; social economic and legal obstacles, as well those related to health care access. While overall health care services are diverse across the world (in terms of availability, accessibility, and quality), those services available to TGD people are often inadequate. Numerous reports from diverse regions worldwide show, while TGD people may report positive health care experiences, many others do not (e.g., Callander et al., 2019; Costa, da Rosa Filho et al., 2018; Do et al., 2018; Gourab et al., 2019; Health Policy Project et al., 2015; Liu et al., 2020; Motmans et al., 2017; Muller et al., 2019; PAHO, 2014; Reisner et al., 2021; Strauss et al., 2017; TGEU, 2017). Mainstream health care options often do not meet their needs for general, sexual, or gender-affirming health care. Standard patient management procedures at clinics and hospitals often fail to recognize the gender identities of their TGD patients (including where outside of the binary their patients identify). Patients may be housed in wards that are gender inappropriate for them, putting them at risk of sexual harassment. TGD patients often encounter unsupportive or hostile attitudes from HCPs and ancillary staff and may even be refused service. Of great concern, HCPs in some parts of the world are involved in gender identity change efforts of the sort described earlier in this chapter.

Throughout the world, there are many other barriers to the provision of gender-affirming health care. Health care professionals may often be unwilling to provide the services TGD people seek. In some countries, there may be laws or regulations inhibiting or preventing them from doing so. When general practitioners and other health care providers do not have access to clear guidelines in their own language, they may be deterred from providing services. Even in situations where health care is available, patients may find it difficult to access because of distance, gatekeeping practices, supply and demand issues that result in long wait lists or cost increases. Indeed, gender-affirming procedures may not be incorporated into a universal health care provision or be covered by private insurance, even though similar procedures may be covered for cisgender patients.

For all these reasons, many TGD people avoid formal health care services whenever they can. Their own communities commonly fill the void, acting as important resources for their members. They provide social and emotional support, often in an otherwise hostile environment. In addition, they often act as reservoirs of shared information about available options for health care, including parallel and informal health care options outside of (and more accessible and affordable than) mainstream medicine. As we saw earlier in this chapter, this often includes sharing of information about silicone and other injectable substances for bodily transformation and about hormones that are self-administered without necessary medical monitoring or supervision. WHO notes TGD individuals who self-administer gender-affirming hormones would benefit from access to evidence-based information, quality products, and sterile injection equipment (WHO, 2021). Access to such information can form part of a broader harm reduction approach (e.g., Idrus & Hyman, 2014).

Putting the important core principles outlined above into practice can improve health care experiences and promote respect for TGD people in all local contexts. This can occur regardless of the realities of a health care system (including the cultural, social, legal, economic context in which health care is provided), the level of provision available, or the TGD people seeking such services.

## CHAPTER 3 Population Estimates

In the previous edition of its Standards of Care, Version 7, World Professional Association for Transgender Health (WPATH) identified only a small number of articles attempting to estimate the size of the transgender and gender diverse (TGD) population and characterized the state-of-the-science as "a starting point" requiring further systematic study (Coleman et al., 2012). Since then, the literature on this topic has expanded considerably as evidenced by a number of recent reviews that have sought to synthesize the available evidence (Arcelus et al., 2015; Collin et al., 2016; Goodman et al., 2019; Meier & Labuski, 2013; Zhang et al., 2020).

In reviewing epidemiologic data pertaining to the TGD population, it may be best to avoid the terms "incidence" and "prevalence." Avoiding these and similar terms may preclude inappropriate pathologizing of TGD people (Adams et al., 2017; Bouman et al., 2017). Moreover, the term "incidence" may not be applicable in this situation because it assumes TGD status has an easily identifiable time of onset, a prerequisite for calculating incidence estimates (Celentano & Szklo, 2019). For all the above reasons, we recommend using the terms "number" and "proportion" to signify the absolute and the relative size of the TGD population.

Perhaps the most important consideration in reviewing this literature is the variable definition applied to the TGD population (Collin et al., 2016; Meier & Labuski, 2013). In clinic-based studies, the data on TGD people are typically limited to individuals who received transgender-related diagnoses or counseling or those who requested or underwent gender-affirming therapy, whereas survey-based research typically relies on a broader, more inclusive definition based on self-reported gender identities.

Another methodological consideration in assessing the size and distribution of the TGD population is the need to understand what constitutes the sampling frame. As noted in recent reviews (Goodman et al., 2019; Zhang et al., 2020), many of the published studies, especially those conducted more than a decade ago, first assessed the number of patients seen at a particular clinical center and then divided that number by an approximated population size. This was unlikely to produce an accurate estimate because the numerator in the calculations is not necessarily included in the denominator, and the true size of the denominator often remains unknown.

With these considerations in mind, it is advisable to focus specifically on recent (published within the last decade) peer-reviewed studies that utilized sound methodology in identifying TGD people within a well-defined sampling frame. For all of the above reasons, the present chapter is focused on studies that met the following inclusion criteria 1) appeared in press in 2009 or later; 2) used a clear definition of TGD status; 3) calculated proportions of TGD people based on a well-defined population denominator; and 4) were peer-reviewed. These types of studies can provide more accurate contemporary estimates.

The available studies can be assigned into three groups 1) those that reported proportions of TGD people among individuals enrolled in large health care systems; 2) those that presented results from population surveys of predominantly adult participants; and 3) those that were based on surveys of youth conducted in schools. Of these three categories, the most informative and methodologically sound studies are summarized below. Additional details about these and other similar studies can be found in recent literature reviews (Goodman et al., 2019; Zhang et al., 2020).

Among studies that estimated the size of the TGD population enrolled in large health care systems, all were conducted in the US, and all relied on information obtained from electronic health records. Four of those health system-based studies relied exclusively on diagnostic codes to ascertain the TGD population; two studies (Blosnich et al., 2013; Kauth et al., 2014) used data from the Veterans Health Affairs system, which provides care to over 9 million people, and two studies (Dragon et al., 2017; Ewald et al., 2019) used claims data from Medicare, the federal health insurance program that primarily covers people 65 years of age or older. The proportions of TGD people reported in these diagnostic code-based studies ranged from approximately 0.02% to 0.03%. Another more recent publication also used Medicare data along with commercial insurance claims to identify TGD people and applied expanded inclusion criteria to supplement

diagnostic codes with information on procedures and hormone therapy (Jasuja et al., 2020). Using this methodology, the proportion of TGD people among all persons enrolled in the participating health plans was 0.03%. The sixth health systems-based study (Quinn et al., 2017) was conducted at Kaiser Permanente plans in the states of Georgia and California; these plans provide care to approximately 8 million members enrolled through employers, government programs, or individually. The TGD population in the Kaiser Permanente study was ascertained across all age groups using both diagnostic codes and free-text clinical notes. The proportions of TGD people identified at Kaiser Permanente were higher than the corresponding proportions reported in the Veterans Health Affairs and Medicare studies with the most recent estimates ranging from 0.04 to 0.08%.

In contrast to results from the health system-based studies, findings from surveys that relied on self-reported TGD status produced much higher estimates. Two US studies took advantage of the Behavioral Risk Factor Surveillance Study (BRFSS), which is an annual telephone survey conducted in all 50 states and US territories (Conron et al., 2012; Crissman et al., 2017). The first study used data from the 2007–2009 BRFSS cycles in the state of Massachusetts, and the second study used the 2014 BRFSS data from 19 states and the territory of Guam. Both studies reported that approximately 0.5% of adult participants (at least 18 years of age) responded *"Yes"* to the question *"Do you consider yourself to be transgender?"*

An internet-based survey administered to a sample of the Dutch population 15–70 years of age (Kuyper & Wijsen, 2014) asked participants to score the following two questions using a 5-point Likert scale: *"Could you indicate to which degree you psychologically experience yourself as a man?"* and *"Could you indicate to which degree you psychologically experience yourself as a woman?"* The respondents were considered "gender ambivalent" if they gave the same score to both statements and "gender incongruent" when they reported a lower score for their sex assigned at birth than for their gender identity. The proportions of participants reporting incongruent and ambivalent gender identity were 1.1% and 4.6%, respectively, for persons who were assigned male at birth (AMAB), and 0.8% and 3.2%, respectively, for persons assigned female at birth (AFAB).

A similarly designed study estimated the proportion of TGD residents in the Flanders region of Belgium using a sample drawn from the country's National Register (Van Caenegem, Wierckx et al., 2015). Participants were asked to score the following statements: *"I feel like a woman"* and *"I feel like a man"* on a 5-point Likert scale. Using the same definitions applied in the Dutch study (Kuyper & Wijsen, 2014), the proportion of gender incongruent individuals was 0.7% for AMAB people and 0.6% for AFAB people. The corresponding estimates for gender ambivalence among AMAB and AFAB people were 2.2% and 1.9%, respectively.

A more recent population-based study evaluated the proportion of TGD people among approximately 50,000 adult residents of Stockholm County, Sweden (Åhs et al., 2018). The numerator was determined by asking participants the following question: *"I would like hormones or surgery to be more like someone of a different sex."* Two additional items were designed to identify individuals experiencing gender incongruence: *"I feel like someone of a different sex"* and *"I would like to live as or be treated as someone of a different sex."* The need for either hormone therapy or gender-affirming surgery was reported by 0.5% of participants. Individuals who expressed feeling like someone of a different sex and those who wanted to live as or be treated as a person of another sex constituted 2.3% and 2.8% of the total sample, respectively.

Population-based data outside of North America and Western Europe are less common. One recent study offers valuable data from a large representative survey of 6,000 adults in Brazil (Spizzirri et al., 2021). Gender identity of participants was assessed based on the following three questions 1) *"Which of the following options best describes how you currently feel?"* (Options: I feel I am a man, I feel I am a woman, and I feel I am neither a man nor a woman); 2) *"What is the sex on your birth certificate?"* (Options: male, female, and undetermined); and 3) *"Which of*

these situations do you most closely relate to?" (Options: I was born male, but I have felt female since childhood; I was born female, but I have felt male since childhood; I was born male, and I feel comfortable with my body; I was born female, and I feel comfortable with my body). Based on the responses to these three questions, the authors determined 1.9% of the survey respondents were TGD (0.7% defined as transgender, and 1.2% defined as nonbinary).

The literature on the population proportions of TGD youth (persons under 19 years of age) includes several survey studies conducted in schools. A 2012 national cross-sectional survey in New Zealand collected information on TGD identity among high school students (Clark et al., 2014). Among over 8,000 survey participants, 1.2% self-identified as TGD and 2.5% reported they were not sure. Another study of schoolchildren was based on a 2016 survey of 9th and 11th grade students (ages 14–18 years) in the US state of Minnesota (Eisenberg et al., 2017). Of the nearly 81,000 survey respondents, 2.7% reported being TGD. A more recent study (Johns et al., 2019) presented results of the Youth Risk Behavior Survey (YRBS), which is conducted biennially among local, state, and nationally representative samples of US high school students in grades 9–12 (approximate age range 13–19 years). The 2017 YRBS cycle was carried out in 10 states and 9 large urban areas and included the following sequence: "Some people describe themselves as transgender when their sex at birth does not match the way they think or feel about their gender. Are you transgender?" Among nearly 120,000 participants across the 19 sites, 1.8% responded "Yes, I am transgender," and 1.6% responded "I am not sure if I am transgender."

Another recently published school-based study in the US presented results of a 2015 survey conducted in Florida and California with the aim of identifying gender diverse children and adolescents in a sample of just over 6,000 students in grades 9–12 (Lowry et al., 2018). "High gender-nonconforming" was used to define AMAB children who reported being very/mostly/somewhat feminine or AFAB children who reported being very/mostly/somewhat masculine. Based on these definitions, the proportions of

TGD participants were reported to be 13% among AMAB students, 4% among AFAB students, and 8.4% overall.

Only one study examined the proportion of self-identified TGD children in a younger age group. Shields et al. analyzed the data from a 2011 survey of 2,700 students in grades 6–8 (age range 11–13 years) across 22 San Francisco public middle schools (Shields et al., 2013). Thirty-three children self-identified as TGD based on the question "What is your gender?" where the possible responses were "female, male, or transgender." The resulting proportion of transgender survey respondents was 1.3%. However, this definition would exclude TGD persons self-identifying as nonbinary and those who do not explicitly identify as transgender.

Taken together, these data indicate among health system-based studies that relied on diagnostic codes or other evidence documented in the medical records (Blosnich et al., 2013; Dragon et al., 2017; Ewald et al., 2019; Kauth et al., 2014; Quinn et al., 2017), the proportions of TGD people reported in recent years (2011–2016) ranged from 0.02% to 0.08%. By contrast, when the TGD status was ascertained based on self-report, the corresponding proportions were orders of magnitude higher and reasonably consistent, if the studies used similar definitions. When the surveys specifically inquired about "transgender" identity, the estimates ranged from 0.3% to 0.5% among adults and from 1.2% to 2.7% in children and adolescents. When the definition was expanded to include broader manifestations of gender diversity, such as gender incongruence or gender ambivalence, the corresponding proportions were higher: 0.5% to 4.5% among adults and 2.5% to 8.4% among children and adolescents.

As reviewed elsewhere (Goodman et al., 2019), another noteworthy observation is the continuous increase in both the size and the composition of the TGD population with upward trends in the proportion of TGD people observed in health care systems, through population-based surveys, as well as in the data on legal gender recognition. The higher estimates observed in more recent literature support some of the previous publications indicating the size of TGD population was

AR_275116

---

**Summary of reported proportions of TGD people in the general population**

Health systems-based studies: 0.02–0.1%
Survey-based studies of adults: 0.3–0.5% (transgender), 0.3–4.5% (all TGD)
Survey-based studies of children and adolescents: 1.2–2.7% (transgender), 2.5–8.4% (all TGD)

---

likely underestimated in earlier studies (Olyslager & Conway, 2008).

The temporal trends in AMAB to AFAB ratio have also been reported in studies analyzing referrals to clinics as well as data from integrated health systems; this ratio has changed from predominantly AMAB in previous decades to predominantly AFAB in recent years, especially among TGD youth (Aitken et al., 2015; de Graaf, Carmichael et al., 2018; de Graaf, Giovanardi et al. 2018; Steensma et al., 2018; Zhang et al., 2021). The trend towards a greater proportion of TGD people in younger age groups and the age-related differences in the AMAB to AFAB ratio likely represent the "cohort effect," which reflects sociopolitical advances, changes in referral patterns, increased access to health care and to medical information, less pronounced cultural stigma, and other changes that have a differential impact across generations (Ashley 2019d; Pang et al., 2020; Zhang et al., 2020).

Despite recent improvements in the quality of published studies, an important limitation of the existing literature is the relative paucity of peer-reviewed publications from regions outside of Western Europe or North America. Some of the relevant information on global estimates can be obtained from reports supported by the governments or non-governmental organizations (Fisher et al., 2019; Kasianczuk & Trofymenko, 2020), but these reports may be difficult to systematically identify and evaluate until they appear in peer-reviewed literature. Other barriers to evaluating the global distribution of the TGD populations include inadequate access to demographic data and over-representation of English-language journals in the world literature.

These limitations notwithstanding, the available highest-quality data clearly indicate TGD people represent a sizable and growing proportion of the general population. Based on the credible evidence available to date, this proportion may range from a fraction of a percent to several percentage points depending on the inclusion criteria, age group, and geographic location. Accurate estimates of the proportion, distribution, and composition of the TGD population as well as a projection of resources required to adequately support the health needs of TGD people should rely on systematically collected high-quality data, which are now increasingly available. Continuous and routine collection of these data is needed to decrease variability and minimize over- and under-estimation of the reported results. For example, far more accurate and precise estimates should become available when population censuses begin systematically collecting and reporting data on sex assigned at birth and gender identity, including asexual and nonbinary categories, using the now well-validated two-step method. The first such census-based estimate was released by the national statistical office of Canada. Based on the 2021 census data, 100,815 of 30.5 million Canadians self-identified as transgender or nonbinary; this accounted for 0.33% of the population 15 years of age or older (Statistics Canada, 2022). Consistent with the published literature, the proportions of transgender and nonbinary people were much higher for Generation Z (born between 1997 and 2006, 0.79%) and millennials (born between 1981 and 1996, 0.51%) than for Generation X (born between 1966 and 1980, 0.19%), baby boomers (born between 1946 and 1965, 0.15%), and the Interwar and Greatest Generations (born in 1945 or earlier, 0.12%). While these results represent the highest quality data available to date, it is not clear how the population proportions reported in Canada may compare with those in other countries. The variability in the definitions of what constitutes the TGD population and the differences in data collection methods can be reduced further by improving international collaborations.

## CHAPTER 4 Education

This chapter will provide a general review of the literature related to education in transgender and gender diverse (TGD) health care. Recommendations are offered at governmental, nongovernmental, institutional, and provider levels with the goal of increasing access to competent, compassionate health care. In turn, this increased access should improve health outcomes in TGD populations. As this is a novel chapter in the World Professional Association for Transgender Health (WPATH) Standards of Care, the intent is to lay the groundwork for the education area and invite a broader and deeper discussion among educators and health professionals.

Health professionals involved in transgender care encompass a broad range of disciplines. Health professional education varies considerably by country or region in terms of structure, licensure, and policy. Published literature on education in TGD health care is predominantly from North America, Europe, Australia and New Zealand. This chapter does not provide a review of the education literature for each discipline, the needs specific to each discipline (which can be found in the relevant chapters), or the needs specific to each country/region's health education system. Greater understanding and research are needed on the intersection of health education systems, licensure, and transgender health across the world.

On a global level, TGD health education is imperative if national and international health disparities are to be addressed. Cultural competency related to TGD communities continues to be lacking. The World Bank Group (2018) reports widespread discrimination, harassment, violence, and abuse affecting TGD people. They also report TGD people face the highest rates of violence and discrimination (World Bank Group, 2018). Although many higher income countries have national antidiscrimination laws with gender identity as a protected characteristic, discrimination in the workplace, in education, and in health care remains problematic (World Bank Group, 2018).

Across disciplines, curricula at all levels—undergraduate, graduate, residency, or continuing education—historically have ignored TGD cultural or clinical education. The Joint Commission (US) has recommended health care organizations "provide educational programs and forums that support the unique needs of the LGBT community" and "offer educational opportunities that address LGBT health issues" (The Joint Commission, 2011). However, this is not enforced.

On an individual level, several questions need answers. What type of education interventions can most effectively address transphobia and lead to long-standing changes in attitudes? What interventions translate into increasing the number of care providers in this area as well as the number of TGD people receiving care? Does clinical exposure increase the confidence of providers over time? What educational interventions lead to improved health outcomes in the TGD population and, if so, when and how did these interventions accomplish this? Although health professions have begun to incorporate TGD health into education using a variety of modalities and at varying levels of training, efforts differ by health profession and are neither systemic nor systematic in nature (e.g., Brennan et al., 2012; Chinn, 2013; Eliason et al., 2010; Lim et al., 2015; Obedin-Maliver et al., 2011; Rondahl, 2009).

Attaining cultural humility with the full appreciation of the intersectionality of humanity is an ultimate educational goal. That said, this initial call for education is focused on building the foundation in cultural awareness and cultural competency that is currently weak or non-existent in much of the world.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

---

**Statements of Recommendations**

4.1- We recommend all personnel working in governmental, nongovernmental, and private agencies receive cultural-awareness training focused on treating transgender and gender diverse individuals with dignity and respect.

4.2- We recommend all members of the health care workforce receive cultural-awareness training focused on treating transgender and gender diverse individuals with dignity during orientation and as part of annual or continuing education.

4.3- We recommend institutions involved in the training of health professionals develop competencies and learning objectives for transgender and gender diverse health within each of the competency areas for their specialty.

---

Recommendation 4.1

**We recommend all personnel working in governmental, nongovernmental, and private agencies receive cultural-knowledge training focused on treating transgender and gender diverse individuals with dignity and respect.**

Article 1 of the United Nations Universal Declaration of Human Rights states, "All human beings are born free and equal in dignity and rights" (United Nations, 1948). Only recently has this fundamental statement included the recognition that TGD rights are human rights (UNOCHR, 2018). Globally, training at all levels about TGD communities continues to be lacking. As recently as 2002, only 3% of Fortune 500 companies had antidiscrimination protection for TGD employees, and none offered insurance coverage for gender-affirming health care (Human Rights Campaign Foundation, 2017). By 2022, 91% of Fortune 500 companies included gender identity in US non-discrimination policies, and 66% offered TGD-inclusive insurance coverage. However, only 72% provide any form of lesbian, gay, bisexual, transgender and queer/questioning (LGBTQ) cultural knowledge training for their workforce (Human Rights Campaign Foundation, 2022). This lack of understanding fosters discrimination across the board. Taken together, these inconsistencies negatively affect the health of individuals and communities and exacerbate the health disparities and inequities they face. In Britain, only 28% of TGD workers felt the senior leadership were committed to TGD equality; only 21% of TGD employees would consider reporting transphobic harassment in the workplace (Stonewall, 2018). For those who are openly TGD, 34% were excluded by their co-workers, 35% were abused by customers, 24% were denied promotion due to their gender identity, and 11% were fired (Stonewall, 2018). In southeastern Europe, the World Bank stated there is widespread discrimination, harassment, violence, and abuse, and TGD people in that region faced the highest rates of violence and discrimination (World Bank Group, 2018). Often the discrimination went unreported with 60% of individuals not filing a report because of a lack of faith the complaint would be addressed, a fear of further discrimination or ridicule, and a reluctance to be outed (World Bank Group, 2018). Although many countries in the region have national antidiscrimination laws with gender identity as a protected characteristic, discrimination in the workplace, in education, and in health care remains problematic (World Bank Group, 2018). It is the responsibility of the governmental, nongovernmental, and private agencies in these countries with anti-discrimination laws to ensure the rights of the TGD population. They are, therefore, obligated to find ways in which discrimination and stigma can be decreased. One of these is through education. Local cultures that foster anti-TGD attitudes are often a barrier to this needed education. Although cultural competency trainings have led to equivocal results, Shepherd (2019) recommends that providing cultural knowledge training that prioritizes local cultural issues and focuses on the values of openness, non-judgment, and responsiveness may lead to the desired results. Implementing cultural knowledge training requires a leadership willing to prioritize the training and to dedicate the time, money, and human capital to delivering initial and ongoing training.

Recommendation 4.2

**We recommend all members of the health care workforce receive cultural-knowledge training focused on treating transgender and gender diverse individuals with dignity during orientation and as part of annual or continuing education.**

Across disciplines, curricula at all levels—undergraduate, graduate, residency, or continuing

AR_275119

education—historically have ignored TGD cultural or clinical education. Factors contributing to this lack of inclusion include lack of faculty knowledge, experience, comfort with the subject matter, faculty bias, limited space within the existing curriculum, and lack of guidance on how to integrate the topics (McDowell & Bower, 2016). Research into the lack of and need for such education does not specifically address TGD health concerns. Rather, the existing literature subsumes TGD health education within the broader discussion of the lack of LGBTQ-focused cultural and clinical-competency training. As an example, nursing baccalaureate programs included only an average of 2.12 hours of instruction on LGBTQ health (Lim et al., 2015). A fair assumption is that the amount of time devoted to TGD-specific health issues constituted only a fraction of this time.

Within the broader context of LGBTQ competency, the lack of TGD cultural- and clinical-competency training is a long-known shortfall of health care education (Aldridge et al., 2021). In the US, the Department of Health and Human Services' *Healthy People 2020,* (United States Department of Health and Human Services (2013, April 10)), the National Academy of Medicine (The Institute of Medicine, 2011), and the Joint Commission (The Joint Commission, 2011) all recognized lack of education negatively impacts the ability of LGBTQ people, including TGD individuals, to obtain appropriate, medically necessary care. The UK's House of Commons Women and Equalities Committee found lack of education contributed to TGD health disparities in the National Health Service (House of Commons Women and Equalities Committee, 2015, December 8). The lack of TGD health care education has been identified in the US (Obedin-Maliver et al., 2011), UK (Tollemache et al., 2021), South Africa (de Vries et al., 2020; Taylor et al., 2018; Wilson et al., 2014), Canada (Bauer et al., 2014), Australia (Riggs & Bartholomaeus, 2016), Sweden, Spain, Serbia, Poland (Burgwal et al., 2021), and Pakistan (Martins et al., 2020) among other countries.

In addition to developing curriculum, Shepherd (2022) states both clinical and organizational components are necessary to improve clinical encounters and consumer satisfaction. On an organizational level, it must be feasible as well as locally and practically oriented (Shepherd, 2022). On an individual level, in addition to knowledge training, health care professionals are better served employing generic traits that focus on the values of openness, non-judgment, and responsiveness (Shepherd, 2018).

Recommendation 4.3.

**We recommend institutions involved in the training of health professionals develop competencies and learning objectives for transgender and gender diverse health within each of the competency areas for their specialty.**

Each health profession has its own educational institutions, administrative, and licensing bodies, which vary by country and specialization within the profession. No major health professional organizations, educational institutions, or licensing bodies appear to require training in TGD health. While these organizations increasingly recommend including LGBTQ intersex health, rarely do they specify competencies, skills, or learning objectives for working with TGD people within their specialty. Published material on health professional education in TGD health is focused primarily on nursing, medicine, and mental health and is predominantly from North America, Europe, Australia, and New Zealand. An increased understanding of transgender health and medical/health professional education systems and requirements globally is essential.

Despite the increasing visibility of TGD people, access to knowledgeable and culturally- competent health professionals remain an overwhelming need around the world (James et al., 2016; Lerner et al., 2020; Müller, 2017). Lack of knowledgeable providers is a major barrier to gender-affirming care for transgender persons (Puckett et al., 2018; Safer et al., 2016) and contributes to large health disparities (Giffort & Underman, 2016; Reisman et al., 2019). The lack of adequate professional education in TGD health is a global problem (Do & Nguyen, 2020; Martins et al., 2020; Parameshwaran et al., 2017) that occurs at all levels of training (Dubin et al., 2018) and traverses health disciplines (Glick et al., 2020; Gunjawate et al., 2020; Johnson & Federman,

S30    E. COLEMAN ET AL.

2014) and medical specialties (Fung et al., 2020; Korpaisarn and Safer, 2018).

Challenges remain as studies to date have small sample sizes, involve one-time training, include multiple disciplines at multiple career levels, focus on short-term outcomes, and often cover all LGBTQI topics rather than TGD-specific ones that are usually acquired post-licensure and are not the focus of most currently studied educational interventions (Dubin et al., 2018).

To successfully implement the recommendations, institutions may need to consider developing 1) systemic and systematic approaches to developing and implementing competencies for each health discipline across the professional lifespan; 2) standardized assessments for learners, with input from the TGD community; and 3) allotment of curricular resources, including trained faculty, as well as time in accordance with clear, consensual learning objectives (Dubin et al., 2018; Pratt-Chapman, 2020). In addition, evaluations of these interventions should not only focus on outcomes but also strive to understand how, when, and why these outcomes are occurring (Allen et al., 2021).

## CHAPTER 5 Assessment of Adults

This chapter provides guidance for the assessment of transgender and gender diverse (TGD) adults who are requesting medically necessary gender-affirming medical and/or surgical treatments (GAMSTs) to better align their body with their gender identity (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1).

TGD adults are people at or above the age of majority in their country, who have some form of gender diversity. The developmental elements of the adolescent chapter, including the importance of parental/caregiver involvement, may be relevant for the care of young adults too, even if they are above the age of majority.

This chapter includes all forms of gender identities and transitions including, but not limited to, male, female, gender diverse, nonbinary, agender, and eunuch. The population of TGD adults is heterogeneous and will vary according to their clinical need, biological, psychological, and social situations, as well as their access to health care. As such, any assessment for GAMSTs will need to be adapted to the scientific, clinical, and community knowledge base of the presenting gender identity as well as local circumstances. This chapter recognizes individuals may experience different local levels of clinical or regulatory oversight when the state or others are providing health care.

An individual's gender identity is an internal identification and experience. The role of the assessor is to assess for the presence of gender incongruence and identify any co-existing mental health concerns, to offer information about GAMSTs, to support the TGD person in considering the effects/risks of GAMSTs, and to assess if the TGD person has the capacity to understand the treatment being offered and if the treatment is likely to be of benefit. The assessor can also assist a TGD person to consider choices that could improve their GAMST outcomes. The GAMST assessment approach described in this chapter recognizes the lived experience and self-knowledge of the TGD person and the clinical knowledge of the assessing health care professional (HCP). Consequently, with this approach, the decision to move forward with GAMSTs is shared between the TGD person and the

assessing HCP, with both playing a key part in collaborative decision-making.

Some systems use a model of care for TGD adults seeking GAMSTs that prioritizes the TGD adult as the decision maker with the HCP acting as an advisor, barring serious contraindications. These models are used when considering hormone therapy rather than surgery and are often called "informed consent" models (Deutsch, 2011, 2016a). Many such models utilize an abbreviated assessment that focuses primarily on the ability of a TGD person to grant informed consent and to utilize information about GAMSTs to inform their medical decision-making. There is significant variability in such models across jurisdictions, systems, and HCPs (Deutsch, 2011; Morenz et al., 2020). Informed consent models have been used for some time for hormone prescription in many local settings.

This chapter is intended to offer flexible global guidance that must be adapted to local circumstances. HCPs will need to determine which assessment approaches best meet the needs in their local settings. The evaluation of these approaches is best undertaken in collaboration with TGD people.

Since TGD people represent a diverse array of gender identities and expressions and have differing needs for GAMSTs, no single assessment process will fit every person or every situation. Some TGD people may need a comparatively brief assessment process for GAMSTs. For TGD adults with a complex presentation or for those who are requesting less common treatments or treatments with limited research evidence, more comprehensive assessments with different members of a multidisciplinary team will be required. Assessments may be in person or through telehealth. While psychometric assessment tools have been used in some instances, they are not a required part of the assessment for GAMSTs. Counseling or psychotherapy can be helpful when requested by a TGD person. However, counseling or psychotherapy specifically focused on their TGD identity is not a requirement for the assessment or initiation of GAMSTs. Genital exams are not a prerequisite for initiation of GAMTs and should be performed only when clinically indicated.

GAMSTs can be delivered in diverse settings. Settings will depend on available health care systems within each country and may include nationalized/public health care, private sector settings, community health care settings, and charitable institutions. Local and regional circumstances may therefore influence the availability of health care. Regardless of the setting, health care offered to TGD people should be of the highest possible quality. World Professional Organization for Transgender Health (WPATH) advocates for assessment and treatment to be readily available. Access to assessment and treatment for TGD people seeking GAMSTs is critical given the clear medical necessity of these interventions and the profound benefits they offer to TGD people (Aldridge et al., 2020; Byne et al., 2012). The guidance in this chapter will need to be adapted according to local, as well as individual, clinical, and social circumstances.

The statements below are based on significant background literature, including literature demonstrating the strong positive impact of access to GAMSTs; available empirical evidence; a favorable risk-benefit ratio; and consensus of professional best practice. The empirical evidence base for the

---

**Statements of Recommendations**

5.1- We recommend health care professionals assessing transgender and gender diverse adults for physical treatments:

5.1.a- Are licensed by their statutory body and hold, at a minimum, a master's degree or equivalent training in a clinical field relevant to this role and granted by a nationally accredited statutory institution.

5.1.b- For countries requiring a diagnosis for access to care, the health care professional should be competent using the latest edition of the World Health Organization's International Classification of Diseases (ICD) for diagnosis. In countries that have not implemented the latest ICD, other taxonomies may be used; efforts should be undertaken to utilize the latest ICD as soon as practicable.

5.1.c- Are able to identify co-existing mental health or other psychosocial concerns and distinguish these from gender dysphoria, incongruence, and diversity.

5.1.d- Are able to assess capacity to consent for treatment.

5.1.e- Have experience or be qualified to assess clinical aspects of gender dysphoria, incongruence, and diversity.

5.1.f- Undergo continuing education in health care relating to gender dysphoria, incongruence, and diversity.

5.2- We suggest health care professionals assessing transgender and gender diverse adults seeking gender-affirming treatment liaise with professionals from different disciplines within the field of transgender health for consultation and referral, if required.

*The following recommendations are made regarding the requirements for gender-affirming medical and surgical treatment (all should be met):*

5.3- We recommend health care professionals assessing transgender and gender diverse adults for gender-affirming medical and surgical treatment:

5.3.a- Only recommend gender-affirming medical treatment requested by a TGD person when the experience of gender incongruence is marked and sustained.

5.3.b- Ensure fulfillment of diagnostic criteria prior to initiating gender-affirming treatments in regions where a diagnosis is necessary to access health care.

5.3.c- Identify and exclude other possible causes of apparent gender incongruence prior to the initiation of gender-affirming treatments.

5.3.d- Ensure that any mental health conditions that could negatively impact the outcome of gender-affirming medical treatments are assessed, with risks and benefits discussed, before a decision is made regarding treatment.

5.3.e- Ensure any physical health conditions that could negatively impact the outcome of gender-affirming medical treatments are assessed, with risks and benefits discussed, before a decision is made regarding treatment.

5.3.f- Assess the capacity to consent for the specific physical treatment prior to the initiation of this treatment.

5.3.g- Assess the capacity of the gender diverse and transgender adult to understand the effect of gender-affirming treatment on reproduction and explore reproductive options with the individual prior to the initiation of gender-affirming treatment.

5.4- We suggest, as part of the assessment for gender-affirming hormonal or surgical treatment, professionals who have competencies in the assessment of transgender and gender diverse people wishing gender-related medical treatment consider the role of social transition together with the individual.

5.5- We recommend transgender and gender diverse adults who fulfill the criteria for gender-affirming medical and surgical treatment require a single opinion for the initiation of this treatment from a professional who has competencies in the assessment of transgender and gender diverse people wishing gender-related medical and surgical treatment.

5.6- We suggest health care professionals assessing transgender and gender diverse people seeking gonadectomy consider a minimum of 6 months of hormone therapy as appropriate to the TGD person's gender goals before the TGD person undergoes irreversible surgical intervention (unless hormones are not clinically indicated for the individual).

5.7- We recommend health care professionals assessing adults who wish to detransition and seek gender-related hormone intervention, surgical intervention, or both, utilize a comprehensive multidisciplinary assessment that will include additional viewpoints from experienced health care professional in transgender health and that considers, together with the individual, the role of social transition as part of the assessment process.



assessment of TGD adults is limited. It primarily includes an assessment approach that uses specific criteria that are examined by an HCP in close cooperation with a TGD adult and does not include randomized controlled trials or long-term longitudinal research (Olsen-Kennedy et al., 2016). This is understandable given the complexity and ethical considerations of allocating patients in need of care to different assessment groups and the lack of funding for research and other resources to assess long-term outcomes of assessment approaches.

The creation of this guidance has been a complex undertaking. The criteria in this chapter have been significantly revised from SOC-7 to reduce requirements and unnecessary barriers to care. It is hoped that future research will explore the effectiveness of this model as well as evolving assessment models for hormone therapy and for surgery that will allow continued improvements to be made.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

### Statement 5.1.
**We recommend health care professional assessing transgender and gender diverse adults for gender-affirming treatments:**

### Statement 5.1.a
**Are licensed by their statutory body and hold, at a minimum, a master's degree or equivalent training in a clinical field relevant to this role and granted by a nationally accredited statutory institution.**

TGD people, as with all other people seeking health care, should have the highest quality of care accessible that is commensurate with the quality of care provided to all people utilizing health services (The Yogyakarta Principles, 2017). As this will vary around the globe, the nature of the professional completing an assessment for GAMSTs will vary according to the nature of health care in the local setting as well as the regulatory requirements set by licensing and registration boards. It

is important the health care provided includes an assessment conducted by a competent, statutorily regulated HCP who has the competence to identify gender incongruence and conditions that can be mistaken for gender incongruence and who can support the TGD person throughout the assessment process (RCGP, 2019). Assessors must be able to refer to HCPs licensed to provide GAMSTs.

HCPs should have at a minimum a masters-level qualification in a clinical field related to transgender health or equivalent further clinical training and be statutorily regulated; examples include a mental health professional (MHP), general medical practitioner, nurse, or other qualified HCP. In some settings, statutorily regulated HCPs with lower levels of qualification may practice under the clinical supervision of a qualified HCP who takes ultimate clinical responsibility for the quality and accuracy of the completed GAMST assessment. For additional information see Chapter 4—Education.

Accessing a competent, statutorily regulated, HCP with expertise in GAMST assessment can sometimes be difficult. Consequently, ensuring continuity of care and minimizing gaps in accessible care or significantly delayed care (e.g., a long waiting list) may require that a statutorily regulated HCP without expertise provide care and support the assessment of a TGD person for GAMSTs. Avoiding unnecessary delays in care is critically important. However, TGD people should be supported to access care with an experienced HCP as soon as possible (RCGP, 2019).

Established practice requires the competence to identify and diagnose gender incongruence (Hembree et al., 2017; Reed et al., 2016; T'Sjoen et al., 2020) and the ability to identify differentials or conditions that may be mistaken as gender incongruence (Byne et al., 2018; Dhejne et al., 2016; Hembree et al., 2017). Established practice also strongly emphasizes the need for ongoing continuing education in the assessment and provision of care of TGD people (American Psychological Association, 2015; T'Sjoen et al., 2020). For more information see Chapter 4—Education.

### Statement 5.1.b
**For countries requiring a diagnosis for access to care, the health care professional should be competent using the latest edition of the World Health**

Organization's International Classification of Diseases (ICD) for diagnosis. In countries that have not implemented the latest ICD, other taxonomies may be used; efforts should be undertaken to utilize the latest ICD as soon as practicable.

In some countries, a diagnosis of gender incongruence may be necessary to access GAMSTs (as described below). HCPs assessing TGD people in those countries should be competent to diagnose gender incongruence using the most current classification system necessary for TGD people to access GAMSTs. The ICD-11 (WHO, 2019a) is a classification system that focuses on the TGD person's experienced identity and any need for GAMSTs and does not consider a TGD identity to be a mental illness.

Statement 5.1.c
Are able to identify co-existing mental health or other psychosocial concerns and distinguish these from gender dysphoria, incongruence, and diversity.

Gender diversity is a natural variation in people and is not inherently pathological (American Psychological Association, 2015). However, assessment is best provided by an HCP who possesses some expertise in mental health in order to identify conditions that can be mistaken for gender incongruence. Such conditions are rare and, when present, are often psychological in nature (Byne et al., 2012; Byne et al., 2018; Hembree et al., 2017).

The need to include an HCP with some expertise in mental health does not require the inclusion of a psychologist, psychiatrist, or social worker in each assessment. Instead, a general medical practitioner, nurse, or other qualified HCP could also fulfill this requirement if they have sufficient expertise to identify gender incongruence, recognize mental health concerns, distinguish between these concerns and gender dysphoria, incongruence, and diversity, assist a TGD person in care planning and preparation for GAMSTs, and refer to a mental health professional (MHP), if needed. As discussed in greater depth in the mental health chapter, MHPs have an important role to play in the care of TGD people. For example, the prejudice and discrimination experienced by some TGD people (Robles et al., 2016) can lead to depression, anxiety, or worsening of other mental health conditions. In such cases, an

MHP can diagnose, clarify, and treat mental health conditions. MHPs and HCPs with expertise in mental health are well-placed to assess for GAMSTs, as well as to support TGD people who require or request mental health input or support during their transition. For additional information see Chapter 18—Mental Health.

Statement 5.1.d
Are able to assess capacity to consent for treatment.

An assessment for GAMSTs must include an examination of the TGD person's ability to consent to the proposed treatment. Consent requires the cognitive capacity to understand the risks and benefits of a treatment and the potential negative and positive outcomes. It also requires the ability to retain that information for the purposes of making the decision (using aids as necessary) as well as the cognitive ability to use that understanding to make an informed decision (American Medical Association, 2021; Applebaum, 2007).

Some TGD individuals will have the capacity to grant consent immediately during the assessment. Some TGD individuals may need a longer process to be able to consent through ongoing discussion and the practice of medical decision-making skills. The presence of psychiatric illness or mental health symptoms do not pose a barrier to GAMSTs unless the psychiatric illness or mental health symptoms affect the TGD person's capacity to consent to the specific treatment being requested or affect their ability to receive treatment. This is especially important because GAMSTs have been found to reduce mental health symptomatology for TGD people (Aldridge et al., 2020).

Health care systems can consider GAMSTs for individuals who may not be able to directly consent if an appropriate legal guardian or regulator-approved independent decision maker with the power to determine health care treatment grants consent and confirms the proposed treatment is in alignment with the TGD individual's needs and wishes.

Statement 5.1.e
Have experience or be qualified to assess clinical aspects of gender dysphoria, incongruence, and diversity. For supporting text, see Statement 5.1.f.

### Statement 5.1.f
**Undergo continuing education in health care relating to gender dysphoria, incongruence, and diversity.**

As in any other area of clinical practice, it is vital HCPs who are providing assessment for the initiation of GAMSTs are knowledgeable and experienced in the health care of TGD people. If this is not possible in the local context, the HCP providing the assessment should work closely with an HCP who is knowledgeable and experienced. As part of their clinical practice, HCPs should commit to ongoing training in TGD health care, become a member of relevant professional bodies, attend relevant professional meetings, workshops or seminars, consult with an HCP with relevant experience, and/or engage with the TGD community. This is particularly important in TGD health care as it is a relatively new field, and the knowledge and terminology are constantly changing (American Psychological Association, 2015; Thorne, Yip et al., 2019). Consequently, keeping up to date in the areas of TGD health is vital for anyone involved in an assessment for GAMSTs.

### Statement 5.2
**We suggest health care professionals assessing transgender and gender diverse adults seeking gender-affirming treatment liaise with professionals from different disciplines within the field of transgender health for consultation and referral, if required.**

If required and if possible, assessment for GAMST should be conducted by a multidisciplinary team (Costa, Rosa-e-Silva et al., 2018; Hembree et al., 2017; Karasic & Fraser, 2018; T'Sjoen et al., 2020) with team members who have timely and adequate contact with one another. This could include an MHP, an endocrinologist, a primary care provider, a surgeon, a voice and communication specialist, TGD peer navigator, and others. In some cases, a multidisciplinary team may not be required; however, should a multidisciplinary team be needed, it is critical HCPs be able to access colleagues from different disciplines in a timely manner to complete the GAMST assessment and best support the needs of the TGD person. It is also critical TGD people be supported with follow-up appointments with any HCP who was involved during the assessment for GAMSTs, prior to, during, and after the initiation of gender-affirming treatments.

The following recommendations are made regarding the requirements for gender-affirming medical and surgical treatment (all should be met):

### Statement 5.3
**We recommend health care professionals assessing transgender and gender diverse adults for gender-affirming medical and surgical treatment:**

### Statement 5.3.a
**Only recommend gender-affirming medical treatment requested by a TGD person when the experience of gender incongruence is marked and sustained.**

To access GAMSTs, a TGD person's gender incongruence must be marked and sustained. This can include a need for GAMSTs and a desire to be accepted as a person of the experienced gender. Consequently, a consideration of the nature, length and consistency of gender incongruence is important. This can include such factors as a change of name and identity documents, telling others about one's gender, health care documentation, or changes in gender expression. However, marked and sustained gender incongruence can exist in the absence of disclosure to others by the TGD person (Brumbaugh-Johnson & Hull, 2019; Saeed et al., 2018; Sequeira et al., 2020). An abrupt or superficial change in gender identity or lack of persistence is insufficient to initiate gender-affirming treatments, and further assessment is recommended. In such circumstances, ongoing assessment is helpful to ensure the consistency and persistence of gender incongruence before GAMSTs are initiated.

While marked and sustained gender incongruence should be present, it is not necessary for TGD people to experience severe levels of distress regarding their gender identity to access gender-affirming treatments. In fact, access to gender-affirming treatment can act as a prophylactic measure to prevent distress (Becker et al., 2018; Giovanardi et al., 2021; Nieder et al., 2021; Nobili et al., 2018; Robles et al., 2016). A TGD adult can have sustained gender incongruence without significant distress and still benefit from GAMSTs.

Established clinical practice examines the persistence of gender incongruence when considering the initiation of GAMSTs (Chen & Loshak, 2020). In a review of 200 clinical notes, Jones, Brewin et al. (2017) identified the importance of the "stability of gender identity" when planning care. Providing GAMSTs to TGD people with persistent gender incongruence has been associated with low rates of patient regret and high rates of patient satisfaction (Becker et al., 2018; El-Hadi et al., 2018; Staples et al., 2020; Wiepjes et al., 2018). However, while the ICD 11 (WHO, 2019a) requires the presence of marked and persistent gender incongruence for a diagnosis of gender incongruence to be made, there is little specific evidence concerning the length of persistence required for treatment in adults. HCPs involved in an assessment of a TGD person for GAMSTs are encouraged to give due consideration to the life stage, history, and current circumstances of the adult being assessed.

### Statement 5.3.b
**Ensure fulfillment of diagnostic criteria prior to initiating gender-affirming treatments in regions where a diagnosis is necessary to access health care.**

A diagnosis of gender incongruence may be necessary in some regions to access transition-related care. When a diagnosis is necessary to access GAMSTs, the assessment for GAMSTs will involve determining and assigning a diagnosis. In these instances, HCPs should have competence using the latest International Classification of Diseases and Related Health Problems (ICD) (WHO, 2019a). In regions where a diagnosis is necessary to access health care, a diagnosis of HA60 *Gender Incongruence of Adolescence or Adulthood* should be determined prior to gender-affirming interventions. Gender-affirming interventions secondary to a diagnosis of *HA6Z Gender Incongruence, Unspecified* may be considered in the context of a more comprehensive assessment by the multidisciplinary team.

There is evidence the use of rigid assessment tools for "transition readiness" may reduce access to care and are not always in the best interest of the TGD person (MacKinnon et al., 2020). Therefore, in situations where the assignment of a diagnosis is mandatory to access care, the process should be approached with trust and transparency between the HCP and the TGD individual requesting GAMST, with the needs of the TGD individual in mind. Indeed, high quality relationships between TGD people and their HCPs are associated with lower emotional distress and better outcomes (Kattari et al., 2016). Because many TGD people fear HCPs will erroneously conflate transgender identity with mental illness (Ellis et al., 2015), a diagnostic assessment should be undertaken with sensitivity to facilitate the best relationship between the provider and the TGD individual.

### Statement 5.3.c
**Identify and exclude other possible causes of apparent gender incongruence prior to the initiation of gender-affirming treatments.**

In rare cases, TGD individuals might have a condition that may be mistaken for gender incongruence or may have another reason for seeking treatment aside from the alleviation of gender incongruence. In these cases, and when there is ambiguity regarding the diagnosis of gender incongruence, a more detailed and comprehensive assessment is important. For example, further assessment might be required to determine if gender incongruence persists outside of an acute psychotic episode. If gender incongruence persists after an acute psychotic episode resolves, GAMSTs may be considered as long as the TGD person has the capacity to consent to and undergo the specific treatment. If gender incongruence does not persist and only occurs during such an episode, treatment should not be considered. It is important such circumstances be identified and excluded prior to the initiation of GAMSTs (Byne et al., 2012, 2018; Hembree et al., 2017). It is important to understand, however, TGD people may present with gender incongruence and with a mental health condition, autistic spectrum disorder, or other neurodiversity (Glidden et al., 2016). Indeed, some mental health conditions, such as anxiety (Bouman et al., 2017), depression (Heylens, Elaut et al., 2014; Witcomb et al., 2018), and self-harm (Arcelus et al., 2016; Claes et al., 2015) are more prevalent in TGD people who have not accessed GAMSTs. Recent longitudinal studies suggest mental health symptoms experienced by TGD people tend to improve following GAMSTs (Aldridge et al., 2020; Heylens, Verroken et al., 2014;

White Hughto & Reisner, 2016). There is no evidence to suggest a benefit of withholding GAMSTs from TGD people who have gender incongruence simply on the basis that they have a mental health or neurodevelopmental condition. For more information see Chapter 18—Mental Health.

Statement 5.3.d
**Ensure any mental health conditions that could negatively impact the outcome of gender-affirming medical treatments are assessed, with risks and benefits discussed, before a decision is made regarding treatment.**

Like their cisgender counterparts, TGD people may have mental health problems. Treatment for mental health problems can and should occur in conjunction with GAMSTs when medical transition is needed. It is vital gender-affirming care is not impeded unless, in some extremely rare cases, there is robust evidence that doing so is necessary to prevent significant decompensation with a risk of harm to self or others. In those cases, it is also important to consider the risks delaying GAMSTs poses to a TGD person's mental and physical health (Byne et al., 2018).

In general, social and medical transition of TDG people are both associated with a reduction in mental health problems (Aldridge et al., 2020; Bouman et al., 2017; Durwood et al., 2017; Glynn et al., 2016; Hughto & Reisner, 2016; Wilson et al., 2015; Witcomb et al., 2018). Unfortunately, the loss of social support and the physical and financial stress that can be associated with the initiation of GAMSTs may exacerbate pre-existing mental health problems and warrant additional support from the treating HCP (Budge et al., 2013; Yang, Wang et al., 2016). An assessment of mental health symptoms can improve transition outcomes, particularly when the assessment is used to facilitate access to psychological and social support during transition (Byne et al., 2012). A delay of transition in rare circumstances may be considered if, for example, the TGD person is unable to engage with the process of transition or would be unable to manage aftercare following surgery, even with support. Where a delay in GAMST as a last resort has been found to be necessary,

the HCP should offer resources and support to improve mental health and facilitate re-engagement with the GAMST process as soon as practicable. It should be noted access to medical transition for TGD people facilitates social transition and improves safety in public (Rood et al., 2017). In turn, the degree to which TGD people's appearance conforms to their gender identity is the best predictor of quality of life and mental health outcomes following medical transition (Austin & Goodman, 2017). Delaying access to GAMSTs due to the presence of mental health problems may exacerbate symptoms (Owen-Smith et al., 2018) and damage rapport; consequently, this should be done only when all other avenues have been exhausted.

Statement 5.3.e
**Ensure any physical health conditions that could negatively impact the outcome of gender-affirming medical treatments are assessed, with risks and benefits discussed, before a decision is made regarding treatment.**

In rare cases, GAMSTs, such as hormonal and surgical interventions, may have iatrogenic consequences or may exacerbate pre-existing physical health conditions (Hembree et al., 2017). In these instances, care should be taken, whenever possible, to manage pre-existing physical health conditions while initiating (if appropriate) or continuing gender-affirming treatments. Any interruptions in treatment should be as brief as possible and with treatment re-initiated as soon as practicable. Limited data and inconsistent findings suggest an association between cardiovascular and metabolic risks and hormone therapy in TGD adults (Getahun, 2018; Iwamoto, Defreyne et al., 2019; Iwamoto et al., 2021; Spanos et al., 2020). Because of the possible harm related to long-term treatment and the probable benefits expected from the preventive measures applied before and during hormone treatment, a careful assessment of physical health conditions prior to initiation of treatment is important. Some specific conditions, such as a history of hormone-sensitive cancer, may require further assessment and management that may preclude hormone treatment (Center of Excellence for Transgender Health, 2016; Hembree et al., 2017).

Similar concerns may be present for TGD adults who wish to access surgical interventions. Each gender-affirming surgical intervention has specific risks and potentially unfavorable consequences (Bryson & Honig, 2019; Nassiri et al., 2020; Remington et al., 2018). However, intervention-specific risks associated with the presence of specific physical conditions have not been well researched. Thus, the kinds of medical concerns raised by TGD people during the assessment are typically no different from those of any other surgical candidate.

Taking into consideration the mental and physical health disparities (Brown & Jones, 2016) and barriers to health care (Safer et al., 2016) experienced by TGD people, the assessment of physical conditions by HCPs should not be limited to a history of medical interventions. If the TGD person has physical health conditions, it is important these conditions are managed while initiating or continuing GAMSTs whenever possible. Any interruption in treatment should be made with a view toward re-initiating treatment as soon as practicable. It is also important HCPs develop a treatment strategy for managing physical conditions that facilitates health and promotes consistent adherence to a treatment plan.

### Statement 5.3.f
**Assess the capacity to consent for the specific gender-affirming treatments prior to the initiation of this treatment.**

The practice of informed consent to treatment is central to the provision of health care. Informed consent is couched in the ethical principle that recipients of health care should understand the health care they receive and any potential consequences that could result. The importance of informed consent is embedded in many legislative and regulatory practices that guide HCPs around the world (Jefford & Moore, 2008). It is not possible to know all the potential consequences of a health care treatment; instead, considering what would be "reasonable" to expect is often used as a minimum criterion for consent (Jefford & Moore, 2008; Spatz et al., 2016) and remains the case with GAMSTs. Being able to consent to a health care procedure or clinical intervention requires several complex cognitive processes.

Consent requires the cognitive capacity to understand the risks and benefits of a treatment and the potential negative and positive outcomes in addition to the ability to retain that information for the purposes of making the decision (using aids as necessary) and the cognitive ability to use that understanding to make an informed decision (American Medical Association, 2021; Applebaum, 2007). It is vital the TGD person and the assessing HCP consider a priori the nature of the treatment sought and the potential positive and negative effects it may have on the biological, psychological, and social domains of the TGD person's life.

It is important to recognize mental illness, in particular symptoms of cognitive impairment or psychosis, can impact a person's ability to grant consent for GAMSTs (Hostiuc et al., 2018). However, the presence of such symptoms does not necessarily equate to an inability to give consent because many people with significant mental health symptoms are able to understand the risks and benefits of treatment enough to make an informed decision (Carpenter et al., 2000). Instead, it is important a careful assessment is carried out that examines each TGD person's ability to comprehend the nature of the specific GAMST being considered, consider treatment options, including risks and benefits, appreciate the potential short- and long-term consequences of the decision, and communicate their choice in order to receive the treatment (Grootens-Wiegers et al., 2017).

There may be instances in which an individual lacks the capacity to consent to health care, such as during an acute episode of psychosis or in situations where an individual has long-term cognitive impairment. However, limits to capacity to consent to treatment should not prevent individuals from receiving appropriate GAMSTs. For some, understanding the risks and benefits may require the use of repeated explanations in jargon-free language over time or the use of diagrams to facilitate explanation and aid comprehension. A comprehensive and thorough assessment undertaken by the multidisciplinary health care team can further inform this process. For others, an alternative decision maker, such as a legal guardian or regulator-approved,

AR_275129

independent decision maker may need to be appointed. These situations need to be considered on a case-by-case basis with the aim of ensuring the most affirmative and least restrictive health care is provided to the individual. Also see Chapter 11—Institutional Environments.

### Statement 5.3.g

**Assess the capacity of the gender diverse and transgender adult to understand the effect of gender-affirming treatment on reproduction and explore reproductive options with the individual prior to the initiation of gender-affirming treatment.**

As gender-affirming medical interventions often affect reproductive capacity, HCPs should ensure a TGD person is aware of the implications for reproduction of the treatments and is familiar with gamete storage and assistive reproductive options. Gender-affirming hormone treatments have been shown to impact reproductive functions and fertility, although the consequences are heterogenous for people of all birth-assigned sexes (Adeleye et al., 2019; Jindarak et al., 2018; Taub et al., 2020). There may be individual differences and fluctuations in these effects on TGD adults. It is therefore essential that HCPs inform a TGD person about the possible impact of the treatment on their reproductive potential during the assessment and as part of the evaluation of the person's capacity to consent for GAMSTs. Reproductive options should be considered and discussed prior to the initiation of gender-affirming treatments. Because the literature is unclear about the possibility of conception while on hormone therapy, information about the necessity of using contraception to avoid unwanted pregnancy and the different methods of contraception available may need to be provided (Light et al., 2014; Schubert & Carey,2020).

Cross-sectional studies in clinical and nonclinical samples from different populations consistently report TGD adults express parental desire and wish to pursue fertility preservation with varying rates that are related to age, gender, and the duration of gender-affirming hormone treatment (Auer et al., 2018; De Sutter et al., 2002; Defreyne, Van Schuvlenbergh et al., 2020; Wierckx, Stuyver et al., 2012). In a small sample,

provision of fertility information was found to have an influence on decision-making related to the use of fertility preservation (Chen et al., 2019). Although there was no comparison made between groups who did and did not receive fertility counseling, high fertility preservation rates occurred following comprehensive fertility counseling among transgender individuals (Amir et al., 2020). Further, one study suggested consultation with a specialist reduced regret related to the decision about whether to pursue fertility preservation procedures (Vyas et al., 2021). For more information see Chapter 16— Reproductive Health.

### Statement 5.4

**We suggest, as part of the assessment for gender-affirming hormonal or surgical treatment, professionals who have competencies in the assessment of transgender and gender diverse people wishing gender-related medical treatment consider the role of social transition together with the individual.**

Social transition can be extremely beneficial to many TGD people although not all TGD people are able to socially transition or wish to socially transition (Bränström & Pachankis, 2021; Koehler et al., 2018; Nieder, Eyssel et al., 2020). Consequently, some TGD people seek gender-affirming interventions after social transition, some before, some during, and some in the absence of social transition.

Social transition and gender identity disclosure can improve the mental health of a TGD person seeking gender-affirming interventions (Hughto et al., 2020; McDowell et al., 2019). In addition, chest and facial surgeries prior to hormone therapy can facilitate social transition (Altman, 2012; Davis & Colton Meier, 2014; Olson-Kennedy, Warus et al. 2018; Van Boerum et al., 2019). As part of the assessment process, HCPs should discuss which social role is most comfortable for the TGD person, if a social transition is planned, and the timing for any planned social transition (Barker & Wylie, 2008). It is imperative during the assessment process, HCPs are respectful of the wide diversity of gendered social roles, including nonbinary as well as binary identities and presentations, which vary

according to cultural, local community, and individual understandings.

Not everyone who requests GAMSTs will wish to or be able to socially transition. Little is known about TGD people who do not socially transition before, during, or after medical treatment, as this has not been systematically studied. The most frequent reasons that have been identified for avoiding social transition are fear of being abandoned by family or friends, fearing economic loss (Bradford et al., 2013), and being discriminated against and stigmatized (Langenderfer-Magruder et al., 2016; McDowell et al., 2019; White Hughto et al., 2015). However, some people do not pursue social transition because they feel hormonal or surgical treatments offer enough subjective improvement to reduce gender dysphoria.

If there is no clear plan for social transition or if social transition is unwanted, additional assessment is important to determine the specific nature and advisability of the treatment request, especially if surgical treatment is requested. Additional assessment can offer the TGD person an opportunity to consider the possible effects of not socially transitioning while still obtaining GAMSTs. Given the lack of data on health outcomes for TGD people who do not socially transition (Evans et al., 2021; Levine, 2009; Turban, Loo et al., 2021), GAMSTs should be approached cautiously in such circumstances.

### Statement 5.5

**We recommend transgender and gender diverse adults who fulfill the criteria for gender-affirming medical and surgical treatment require a single opinion for the initiation of this treatment from a professional who has competencies in the assessment of transgender and gender diverse people wishing gender-related medical and surgical treatment.**

Previous versions of the SOC guidelines have required TGD individuals to be assessed for GAMSTs by two qualified HCPs. It was believed having two independent opinions was best practice as it ensured safety for both TGD people and HCPs. For example, it was assumed that seeing two HCPs offered assuredness for both TGD people and their assessing HCPs when pursuing irreversible medical interventions.

However, the limited research in the area indicates two opinions are largely unnecessary. For example, Jones, Brewin et al. (2017) reviewed the case notes of experienced HCPs working within a state-funded gender service and found there was an overwhelming correlation between both opinions—arguably making one of them redundant. Further, Bouman et al. (2014) determined the requirement for two independent assessors reflected paternalism in health care services and raised a potential breach of the autonomy of TGD individuals. The authors posited when clients are adequately prepared and assessed under the care of a multidisciplinary team, a second independent assessment is unnecessary.

Consequently, if written documentation or a letter is required to recommend gender-affirming medical and surgical treatment (GAMST), TGD people seeking treatments including hormones, and genital, chest, facial and other gender-affirming surgeries require a single written opinion/signature from an HCP competent to independently assess and diagnose (Bouman et al., 2014; Yuan et al, 2021). Further written opinions/signatures may be requested where there is a specific clinical need.

### Statement 5.6

**We suggest health care professionals assessing transgender and gender diverse people seeking gonadectomy consider a minimum of 6 months of hormone therapy as appropriate to the TGD person's gender goals before the TGD person undergoes irreversible surgical intervention (unless hormones are not clinically indicated for the individual).**

The Endocrine Society Clinical Practice Guidelines advise a period of consistent hormone treatment prior to genital surgery (Hembree et al., 2017). While there was limited supportive research, this recommendation was considered to be good clinical practice as it allows a more reversible experience prior to the irreversible experience of surgery. For example, there can be changes in sexual desire after genital surgery that removes the testicles (Lawrence, 2005; Wierckx, Van de Peer et al., 2014). In this context, reversible testosterone suppression can offer a TGD person a period of time to experience the absence of testosterone and decide if this feels right for



them. It should be noted the effects of reduced estrogen on a TGD person's sexual desire and functioning following an oophorectomy is less well documented.

Surgery that removes gonads is an irreversible procedure that leads to loss of fertility and loss of the effects of endogenous sex steroids. Both effects must be discussed as a component of the assessment process. For additional information see Chapter 16—Reproductive Health. Of course, hormones are not clinically indicated for TGD adults who do not want them or in cases where they are contraindicated due to health reasons. For more information see Chapter 13—Surgery and Postoperative Care.

## Statement 5.7

**We recommend health care professionals assessing adults who wish to detransition and seek gender-related hormone intervention, surgical intervention, or both, utilize a comprehensive multidisciplinary assessment that will include additional viewpoints from experienced health care professionals in transgender health and that considers, together with the individual, the role of social transition as part of the assessment process.**

Many TGD adults may consider a range of identities and elements of gender presentation while they are exploring their gender identity and are considering transition options. Accordingly, people may spend some time in a gender identity or presentation before they discover it does not feel comfortable and later adapt it or shift to an earlier identity or presentation (Turban, King et al., 2021). Some TGD adults may also experience a change in gender identity over time so that their needs for medical treatment evolve. This is a healthy and reasonable process for determining the most comfortable and congruent way of living, which is informed by the person's gender identity and the context of their life. This process of identity exploration should not necessarily be equated with regret, confusion, or poor decision-making because a TGD adult's gender identity may change without devaluing previous transition decisions (MacKinnon et al., 2021; Turban, Loo et al., 2021). TGD adults should be assisted in this exploration and any other changes

in their identity (Expósito-Campos, 2021). While exploration continues, gender-affirming treatments that are irreversible should be avoided until clarity about long-term goals and outcomes is achieved.

The decision to detransition appears to be rare (Defreyne, Motmans et al., 2017; Hadje-Moussa et al., 2019; Wiepjes et al., 2018). Estimates of the number of people who detransition due to a change in identity are likely to be overinflated due to research blending different cohorts (Expósito-Campos, 2021). For example, detransition research cohorts often include TGD adults who chose to detransition because of a change in their identity as well as TGD adults who chose to detransition without a change in identity. While little research has been conducted to systematically examine variables that correlate with a TGD adult's decision to halt a transition process or to detransition, a recent study found the vast majority of TGD people who opted to detransition did so due to external factors, such as stigma and lack of social support and not because of changes in gender identity (Turban, King et al., 2021). TGD adults who have not experienced a change in identity may choose to halt transition or to detransition because of oppression, violence, and social/relational conflict, surgical complications, health concerns, physical contraindications, a lack of resources, or dissatisfaction with the results (Expósito-Campos, 2021). In such cases, MHPs are well placed to assist the TGD person with these challenges.

While the choice to detransition is proportionally rare, it is expected an overall increase in the number of adults who identify as TGD would result in an increase in the absolute number of people seeking to halt or reverse a transition. However, while the absolute numbers may increase, the percentage of people seeking to halt or reverse permanent physical changes should remain static and low. The existence of these rare requests must not be used as a justification to interrupt critical, medically necessary care, including hormone and surgical treatments, for the vast majority of TGD adults.

Due to the limited research in this area, clinical guidance is based primarily on individual case studies and the expert opinion of HCPs

working with TGD adults (Expósito-Campos, 2021; Richards & Barrett, 2020). Accordingly, if a TGD adult has undergone permanent physical changes and seeks to undo them, the assessing HCP should be a member of a comprehensive multidisciplinary assessment team. A multidisciplinary team allows for the contribution of additional viewpoints from HCPs experienced in transgender health. In collaboration with the TGD adult, the multidisciplinary team is encouraged to thoroughly understand the motivations for the original treatment and for the decision to detransition. Any concerns with the previous physical changes should be carefully explored and a significant effort made to ensure similar concerns are not replicated by the reversal.

To ensure the greatest likelihood of satisfaction and comfort with a reversal of permanent physical changes, the TGD adult and the multidisciplinary team should explore the role of social transition in the assessment and in preparation for the reversal. In such instances, it is highly likely a prolonged period of living in role will be necessary before further physical changes are recommended. HCPs should support the TGD adult through any social changes, as well as any feelings of failure, shame, depression, or guilt in deciding to make such a change. In addition, people should be supported in coping with any prejudice or social difficulties they may have experienced that could have led to a decision to detransition or that may have resulted from such a decision. It is also important to help the person remain engaged with health care throughout the process (Narayan et al., 2021).

While available research shows consistent positive outcomes for the majority of TGD adults who choose to transition (Aldridge et al., 2020; Byne et al., 2012; Gorin-Lazard et al., 2012; Owen-Smith et al., 2018; White Hughto & Reisner, 2016), some TGD adults may decompensate or experience a worsened condition following transition. Little research has been conducted to systematically examine variables that correlate with poor or worsened biological, psychological, or social conditions following transition (Hall et al., 2021; Littman, 2021); however, this occurrence appears to be rare (Hall et al., 2021; Wiepjes et al., 2018). In cases where people decompensate after physical or social transition and then remain in a poorer biological, psychological, or social state than they were in prior to transition, serious consideration should be given as to whether transition is helpful at this time, for this person, or both. In cases where treatment is no longer supported, assistance should be arranged to support the person to manage the process of stopping treatment and to manage any concomitant difficulties (Narayan et al., 2021).

It is vital that people who detransition, for any reason, be supported. It should be remembered, however, this is a rare occurrence and the literature shows consistently positive outcomes for the vast majority of TGD adults who transition to a gender that is comfortable for them, including those who receive GAMSTs (Byne et al., 2012; Green & Fleming, 1990; Lawrence, 2003; Motmans et al., 2012; Van de Grift, Elaut et al., 2018).



## CHAPTER 6 Adolescents

### Historical context and changes since previous Standards of Care

Specialized health care for transgender adolescents began in the 1980s when a few specialized gender clinics for youth were developed around the world that served relatively small numbers of children and adolescents. In more recent years, there has been a sharp increase in the number of adolescents requesting gender care (Arnoldussen et al., 2019; Kaltiala, Bergman et al., 2020). Since then, new clinics have been founded, but clinical services in many places have not kept pace with the increasing number of youth seeking care. Hence, there are often long waitlists for services, and barriers to care exist for many transgender youth around the world (Tollit et al., 2018).

Until recently, there was limited information regarding the prevalence of gender diversity among adolescents. Studies from high school samples indicate much higher rates than earlier thought, with reports of up to 1.2% of participants identifying as transgender (Clark et al., 2014) and up to 2.7% or more (e.g., 7–9%) experiencing some level of self-reported gender diversity (Eisenberg et al., 2017; Kidd et al., 2021; Wang et al., 2020). These studies suggest gender diversity in youth should no longer be viewed as rare. Additionally, a pattern of uneven ratios by assigned sex has been reported in gender clinics, with adolescents assigned female at birth (AFAB) initiating care 2.5–7.1 times more frequently as compared to adolescents who are assigned male at birth (AMAB) (Aitken et al., 2015; Arnoldussen et al., 2019; Bauer et al., 2021; de Graaf, Carmichael et al., 2018; Kaltiala et al., 2015; Kaltiala, Bergman et al., 2020).

A specific World Professional Association for Transgender Health's (WPATH) Standards of Care section dedicated to the needs of children and adolescents was first included in the 1998 WPATH Standards of Care, 5th version (Levine et al., 1998). Youth aged 16 or older were deemed potentially eligible for gender-affirming medical care, but only in select cases. The subsequent 6th (Meyer et al., 2005) and 7th (Coleman et al., 2012) versions divided medical-affirming treatment for adolescents into three categories and presented eligibility criteria regarding age/puberty stage—namely fully reversible puberty delaying blockers as soon as puberty had started; partially reversible hormone therapy (testosterone, estrogen) for adolescents at the age of majority, which was age 16 in certain European countries; and irreversible surgeries at age 18 or older, except for chest "masculinizing" mastectomy, which had an age minimum of 16 years. Additional eligibility criteria for gender-related medical care included a persistent, long (childhood) history of gender "non-conformity"/dysphoria, emerging or intensifying at the onset of puberty; absence or management of psychological, medical, or social problems that interfere with treatment; provision of support for commencing the intervention by the parents/caregivers; and provision of informed consent. A chapter dedicated to transgender and gender diverse (TGD) adolescents, distinct from the child chapter, has been created for this 8th edition of the Standards of Care given 1) the exponential growth in adolescent referral rates; 2) the increased number of studies specific to adolescent gender diversity-related care; and 3) the unique developmental and gender-affirming care issues of this age group.

Non-specific terms for gender-related care are avoided (e.g., gender-affirming model, gender exploratory model) as these terms do not represent unified practices, but instead heterogenous care practices that are defined differently in various settings.

### Adolescence overview

Adolescence is a developmental period characterized by relatively rapid physical and psychological maturation, bridging childhood and adulthood (Sanders, 2013). Multiple developmental processes occur simultaneously, including pubertal-signaled changes. Cognitive, emotional, and social systems mature, and physical changes associated with puberty progress. These processes do not all begin and end at the same time for a given individual, nor do they occur at the same age for all persons. Therefore, the lower and upper borders of adolescence are imprecise and cannot be defined exclusively by age. For example, physical pubertal changes may

begin in late childhood and executive control neural systems continue to develop well into the mid-20s (Ferguson et al., 2021). There is a lack of uniformity in how countries and governments define the age of majority (i.e., legal decision-making status; Dick et al., 2014). While many specify the age of majority as 18 years of age, in some countries it is as young as 15 years (e.g., Indonesia and Myanmar), and in others as high as 21 years (e.g., the U.S. state of Mississippi and Singapore).

**For clarity, this chapter applies to adolescents from the start of puberty until the legal age of majority (in most cases 18 years), however there are developmental elements of this chapter, including the importance of parental/caregiver involvement, that are often relevant for the care of transitional-aged young adults and should be considered appropriately.**

Cognitive development in adolescence is often characterized by gains in abstract thinking, complex reasoning, and metacognition (i.e., a young person's ability to think about their own feelings in relation to how others perceive them; Sanders, 2013). The ability to reason hypothetical situations enables a young person to conceptualize implications regarding a particular decision. However, adolescence is also often associated with increased risk-taking behaviors. Along with these notable changes, adolescence is often characterized by individuation from parents and the development of increased personal autonomy. There is often a heightened focus on peer relationships, which can be both positive and detrimental (Gardner & Steinberg, 2005). Adolescents often experience a sense of urgency that stems from hypersensitivity to reward, and their sense of timing has been shown to be different from that of older individuals (Van Leijenhorst et al., 2010). Social-emotional development typically advances during adolescence, although there is a great variability among young people in terms of the level of maturity applied to inter- and intra-personal communication and insight (Grootens-Wiegers et al., 2017). For TGD adolescents making decisions about gender-affirming treatments—decisions that may have lifelong consequences—it is critical to understand how all these aspects of development may impact decision-making for a given young person within their specific cultural context.

### Gender identity development in adolescence

Our understanding of gender identity development in adolescence is continuing to evolve. When providing clinical care to gender diverse young people and their families, it is important to know what is and is not known about gender identity during development (Berenbaum, 2018). When considering treatments, families may have questions regarding the development of their adolescent's gender identity, and whether or not their adolescent's declared gender will remain the same over time. For some adolescents, a declared gender identity that differs from the assigned sex at birth comes as no surprise to their parents/caregivers as their history of gender diverse expression dates back to childhood (Leibowitz & de Vries, 2016). For others, the declaration does not happen until the emergence of pubertal changes or even well into adolescence (McCallion et al., 2021; Sorbara et al., 2020).

Historically, social learning and cognitive developmental research on gender development was conducted primarily with youth who were not gender diverse in identity or expression and was carried out under the assumption that sex correlated with a specific gender; therefore, little attention was given to gender identity development. In addition to biological factors influencing gender development, this research demonstrated psychological and social factors also play a role (Perry & Pauletti, 2011). While there has been less focus on gender identity development in TGD youth, there is ample reason to suppose, apart from biological factors, psychosocial factors are also involved (Steensma, Kreukels et al., 2013). For some youth, gender identity development appears fixed and is often expressed from a young age, while for others there may be a developmental process that contributes to gender identity development over time.

Neuroimaging studies, genetic studies, and other hormone studies in intersex individuals demonstrate a biological contribution to the development of gender identity for some

individuals whose gender identity does not match their assigned sex at birth (Steensma, Kreukels et al., 2013). As families often have questions about this very issue, it is important to note it is not possible to distinguish between those for whom gender identity may seem fixed from birth and those for whom gender identity development appears to be a developmental process. Since it is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person, a comprehensive clinical approach is important and necessary (see Statement 3). Future research would shed more light on gender identity development if conducted over long periods of time with diverse cohort groups. Conceptualization of gender identity by shifting from dichotomous (e.g., binary) categorization of male and female to a dimensional gender spectrum along a continuum (APA, 2013) would also be necessary.

Adolescence may be a critical period for the development of gender identity for gender diverse young people (Steensma, Kreukels et al., 2013). Dutch longitudinal clinical follow-up studies of adolescents with childhood gender dysphoria who received puberty suppression, gender-affirming hormones, or both, found that none of the youth in adulthood regretted the decisions they had taken in adolescence (Cohen-Kettenis & van Goozen, 1997; de Vries et al., 2014). These findings suggest adolescents who were comprehensively assessed and determined emotionally mature enough to make treatment decisions regarding gender- affirming medical care presented with stability of gender identity over the time period when the studies were conducted.

When extrapolating findings from the longer-term longitudinal Dutch cohort studies to present-day gender diverse adolescents seeking care, it is critical to consider the societal changes that have occurred over time in relation to TGD people. Given the increase in visibility of TGD identities, it is important to understand how increased awareness may impact gender development in different ways (Kornienko et al., 2016). One trend identified is that more young people are presenting to gender clinics with nonbinary identities (Twist & de Graaf, 2019). Another phenomenon occurring in clinical practice is the increased number of adolescents seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender diversity during their childhood years. One researcher attempted to study and describe a specific form of later-presenting gender diversity experience (Littman, 2018). However, the findings of the study must be considered within the context of significant methodological challenges, including 1) the study surveyed parents and not youth perspectives; and 2) recruitment included parents from community settings in which treatments for gender dysphoria are viewed with scepticism and are criticized. However, these findings have not been replicated. For a select subgroup of young people, susceptibility to social influence impacting gender may be an important differential to consider (Kornienko et al., 2016). However, caution must be taken to avoid assuming these phenomena occur prematurely in an individual adolescent while relying on information from datasets that may have been ascertained with potential sampling bias (Bauer et al., 2022; WPATH, 2018). It is important to consider the benefits that social connectedness may have for youth who are linked with supportive people (Tuzun et al., 2022)(see Statement 4).

Given the emerging nature of knowledge regarding adolescent gender identity development, an individualized approach to clinical care is considered both ethical and necessary. As is the case in all areas of medicine, each study has methodological limitations, and conclusions drawn from research cannot and should not be universally applied to all adolescents. This is also true when grappling with common parental questions regarding the stability versus instability of a particular young person's gender identity development. While future research will help advance scientific understanding of gender identity development, there may always be some gaps. Furthermore, given the ethics of self-determination in care, these gaps should not leave the TGD adolescent without important and necessary care.

### Research evidence of gender-affirming medical treatment for transgender adolescents

A key challenge in adolescent transgender care is the quality of evidence evaluating the effectiveness of medically necessary gender-affirming medical

and surgical treatments (GAMSTs) (see medically necessary statement in the Global chapter, Statement 2.1), over time. Given the lifelong implications of medical treatment and the young age at which treatments may be started, adolescents, their parents, and care providers should be informed about the nature of the evidence base. It seems reasonable that decisions to move forward with medical and surgical treatments should be made carefully. Despite the slowly growing body of evidence supporting the effectiveness of early medical intervention, the number of studies is still low, and there are few outcome studies that follow youth into adulthood. Therefore, a systematic review regarding outcomes of treatment in adolescents is not possible. A short narrative review is provided instead.

At the time of this chapter's writing, there were several longer-term longitudinal cohort follow-up studies reporting positive results of early (i.e., adolescent) medical treatment; for a significant period of time, many of these studies were conducted through one Dutch clinic (e.g., Cohen-Kettenis & van Goozen, 1997; de Vries, Steensma et al., 2011; de Vries et al., 2014; Smith et al., 2001, 2005). The findings demonstrated the resolution of gender dysphoria is associated with improved psychological functioning and body image satisfaction. Most of these studies followed a pre-post methodological design and compared baseline psychological functioning with outcomes after the provision of medical gender-affirming treatments. Different studies evaluated individual aspects or combinations of treatment interventions and included 1) gender-affirming hormones and surgeries (Cohen-Kettenis & van Goozen, 1997; Smith et al., 2001, 2005); 2) puberty suppression (de Vries, Steensma et al., 2011); and 3) puberty suppression, affirming hormones, and surgeries (de Vries et al., 2014). The 2014 long-term follow-up study is the only study that followed youth from early adolescence (pretreatment, mean age of 13.6) through young adulthood (posttreatment, mean age of 20.7). This was the first study to show gender-affirming treatment enabled transgender adolescents to make age-appropriate developmental transitions while living as their affirmed gender with satisfactory objective and subjective outcomes in adulthood (de Vries et al., 2014). While the study employed a small (n = 55), select, and socially supported sample, the results were convincing. Of note, the participants were part of the Dutch clinic known for employing a multidisciplinary approach, including provision of comprehensive, ongoing assessment and management of gender dysphoria, and support aimed at emotional well-being.

Several more recently published longitudinal studies followed and evaluated participants at different stages of their gender-affirming treatments. In these studies, some participants may not have started gender-affirming medical treatments, some had been treated with puberty suppression, while still others had started gender-affirming hormones or had even undergone gender-affirming surgery (GAS) (Achille et al., 2020; Allen et al., 2019; Becker-Hebly et al., 2021; Carmichael et al., 2021; Costa et al., 2015; Kuper et al., 2020, Tordoff et al., 2022). Given the heterogeneity of treatments and methods, this type of design makes interpreting outcomes more challenging. Nonetheless, when compared with baseline assessments, the data consistently demonstrate improved or stable psychological functioning, body image, and treatment satisfaction varying from three months to up to two years from the initiation of treatment.

Cross-sectional studies provide another design for evaluating the effects of gender-affirming treatments. One such study compared psychological functioning in transgender adolescents at baseline and while undergoing puberty suppression with that of cisgender high school peers at two different time points. At baseline, the transgender youth demonstrated lower psychological functioning compared with cisgender peers, whereas when undergoing puberty suppression, they demonstrated better functioning than their peers (van der Miesen et al., 2020). Grannis et al. (2021) demonstrated transgender males who started testosterone had lower internalizing mental health symptoms (depression and anxiety) compared with those who had not started testosterone treatment.

Four additional studies followed different outcome designs. In a retrospective chart study, Kaltiala, Heino et al. (2020) reported transgender

 

adolescents with few or no mental health challenges prior to commencing gender-affirming hormones generally did well during the treatment. However, adolescents with more mental health challenges at baseline continued to experience the manifestations of those mental health challenges over the course of gender-affirming medical treatment. Nieder et al. (2021) studied satisfaction with care as an outcome measure and demonstrated transgender adolescents were more satisfied the further they progressed with the treatments they initially started. Hisle-Gorman et al. (2021) compared health care utilization pre- and post-initiation of gender-affirming pharmaceuticals as indicators of the severity of mental health conditions among 3,754 TGD adolescents in a large health care data set. Somewhat contrary to the authors' hypothesis of improved mental health, mental health care use did not significantly change, and psychotropic medication prescriptions increased. In a large non-probability sample of transgender-identified adults, Turban et al. (2022) found those who reported access to gender-affirming hormones in adolescence had lower odds of past-year suicidality compared with transgender people accessing gender-affirming hormones in adulthood.

Providers may consider the possibility an adolescent may regret gender-affirming decisions made during adolescence, and a young person will want to stop treatment and return to living in the birth-assigned gender role in the future. Two Dutch studies report low rates of adolescents (1.9% and 3.5%) choosing to stop puberty suppression (Brik et al., 2019; Wiepjes et al., 2018). Again, these studies were conducted in clinics that follow a protocol that includes a comprehensive assessment before the gender-affirming medical treatment is started. At present, no clinical cohort studies have reported on profiles of adolescents who regret their initial decision or detransition after irreversible affirming treatment. Recent research indicate there are adolescents who detransition, but do not regret initiating treatment as they experienced the start of treatment as a part of understanding their gender-related care needs (Turban, 2018). However, this may not be the predominant perspective of people who

detransition (Littman, 2021; Vandenbussche, 2021). Some adolescents may regret the steps they have taken (Dyer, 2020). Therefore, it is important to present the full range of possible outcomes when assisting transgender adolescents. Providers may discuss this topic in a collaborative and trusting manner (i.e., as a "potential future experience and consideration") with the adolescent and their parents/caregivers before gender-affirming medical treatments are started. Also, providers should be prepared to support adolescents who detransition. In an internet convenience sample survey of 237 self-identified detransitioners with a mean age of 25.02 years, which consisted of over 90% of birth assigned females, 25% had medically transitioned before age 18 and 14% detransitioned before age 18 (Vandenbussche, 2021). Although an internet convenience sample is subject to selection of respondents, this study suggests detransitioning may occur in young transgender adolescents and health care professionals should be aware of this. Many of them expressed difficulties finding help during their detransition process and reported their detransition was an isolating experience during which they did not receive either sufficient or appropriate support (Vandenbussche, 2021).

To conclude, although the existing samples reported on relatively small groups of youth (e.g., n = 22-101 per study) and the time to follow-up varied across studies (6 months–7 years), this emerging evidence base indicates a general improvement in the lives of transgender adolescents who, following careful assessment, receive medically necessary gender-affirming medical treatment. Further, rates of reported regret during the study monitoring periods are low. Taken as a whole, the data show early medical intervention—as part of broader combined assessment and treatment approaches focused on gender dysphoria and general well-being—can be effective and helpful for many transgender adolescents seeking these treatments.

### Ethical and human rights perspectives

Medical ethics and human rights perspectives were also considered while formulating the

**Statements of Recommendations**

6.1- We recommend health care professionals working with gender diverse adolescents:

6.1.a- Are licensed by their statutory body and hold a postgraduate degree or its equivalent in a clinical field relevant to this role granted by a nationally accredited statutory institution.

6.1.b- Receive theoretical and evidenced-based training and develop expertise in general child, adolescent, and family mental health across the developmental spectrum.

6.1.c- Receive training and have expertise in gender identity development, gender diversity in children and adolescents, have the ability to assess capacity to assent/consent, and possess general knowledge of gender diversity across the life span.

6.1.d- Receive training and develop expertise in autism spectrum disorders and other neurodevelopmental presentations or collaborate with a developmental disability expert when working with autistic/neurodivergent gender diverse adolescents.

6.1.e- Continue engaging in professional development in all areas relevant to gender diverse children, adolescents, and families.

6.2- We recommend health care professionals working with gender diverse adolescents facilitate the exploration and expression of gender openly and respectfully so that no one particular identity is favored.

6.3- We recommend health care professionals working with gender diverse adolescents undertake a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns and seek medical/surgical transition-related care, and that this be accomplished in a collaborative and supportive manner.

6.4- We recommend health care professionals work with families, schools, and other relevant settings to promote acceptance of gender diverse expressions of behavior and identities of the adolescent.

6.5- We recommend against offering reparative and conversion therapy aimed at trying to change a person's gender and lived gender expression to become more congruent with the sex assigned at birth.

6.6- We suggest health care professionals provide transgender and gender diverse adolescents with health education on chest binding and genital tucking, including a review of the benefits and risks.

6.7- We recommend providers consider prescribing menstrual suppression agents for adolescents experiencing gender incongruence who may not desire testosterone therapy, who desire but have not yet begun testosterone therapy, or in conjunction with testosterone therapy for breakthrough bleeding.

6.8- We recommend health care professionals maintain an ongoing relationship with the gender diverse and transgender adolescent and any relevant caregivers to support the adolescent in their decision-making throughout the duration of puberty suppression treatment, hormonal treatment, and gender- related surgery until the transition is made to adult care.

6.9- We recommend health care professionals involve relevant disciplines, including mental health and medical professionals, to reach a decision about whether puberty suppression, hormone initiation, or gender-related surgery for gender diverse and transgender adolescents are appropriate and remain indicated throughout the course of treatment until the transition is made to adult care.

6.10- We recommend health care professionals working with transgender and gender diverse adolescents requesting gender-affirming medical or surgical treatments inform them, prior to initiating treatment, of the reproductive effects including the potential loss of fertility and available options to preserve fertility within the context of the youth's stage of pubertal development.

6.11- We recommend when gender-affirming medical or surgical treatments are indicated for adolescents, health care professionals working with transgender and gender diverse adolescents involve parent(s)/guardian(s) in the assessment and treatment process, unless their involvement is determined to be harmful to the adolescent or not feasible.

*The following recommendations are made regarding the requirements for gender-affirming medical and surgical treatment (All of them must be met):*

6.12- We recommend health care professionals assessing transgender and gender diverse adolescents only recommend gender-affirming medical or surgical treatments requested by the patient when:

6.12.a- The adolescent meets the diagnostic criteria of gender incongruence as per the ICD-11 in situations where a diagnosis is necessary to access health care. In countries that have not implemented the latest ICD, other taxonomies may be used although efforts should be undertaken to utilize the latest ICD as soon as practicable.

6.12.b- The experience of gender diversity/incongruence is marked and sustained over time.

6.12.c- The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.

6.12.d- The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed.

6.12.e- The adolescent has been informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.

6.12.f- The adolescent has reached Tanner stage 2 of puberty for pubertal suppression to be initiated.

6.12.g- The adolescent had at least 12 months of gender-affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender-affirming treatment unless hormone therapy is either not desired or is medically contraindicated.

adolescent SOC statements. For example, allowing irreversible puberty to progress in adolescents who experience gender incongruence is not a neutral act given that it may have immediate and lifelong harmful effects for the transgender young person (Giordano, 2009; Giordano & Holm, 2020; Kreukels & Cohen-Kettenis, 2011). From a human rights perspective, considering gender diversity as a normal and expected variation within the broader diversity of the human experience, it is an adolescent's right to participate in their own decision-making

process about their health and lives, including access to gender health services (Amnesty International, 2020).

### Short summary of statements and unique issues in adolescence

These guidelines are designed to account for what is known and what is not known about gender identity development in adolescence, the evidence for gender-affirming care in adolescence, and the unique aspects that distinguish adolescence from other developmental stages.

*Identity exploration*: A defining feature of adolescence is the solidifying of aspects of identity, including gender identity. Statement 6.2 addresses identity exploration in the context of gender identity development. Statement 6.12.b accounts for the length of time needed for a young person to experience a gender diverse identity, express a gender diverse identity, or both, so as to make a meaningful decision regarding gender-affirming care.

*Consent and decision-making*: In adolescence, consent and decision-making require assessment of the individual's emotional, cognitive, and psychosocial development. Statement 6.12.c directly addresses emotional and cognitive maturity and describes the necessary components of the evaluation process used to assess decision-making capacity.

*Caregivers/parent involvement*: Adolescents are typically dependent on their caregivers/parents for guidance in numerous ways. This is also true as the young person navigates through the process of deciding about treatment options. Statement 6.11 addresses the importance of involving caregivers/parents and discusses the role they play in the assessment and treatment. No set of guidelines can account for every set of individual circumstances on a global scale.

### Statement 6.1
**We recommend health care professionals working with gender diverse adolescents:**

a. **Are licensed by their statutory body and hold a postgraduate degree or its equivalent in a clinical field relevant to this role granted by a nationally accredited statutory institution.**
b. **Receive theoretical and evidenced-based training and develop expertise in general**
child, adolescent, and family mental health across the developmental spectrum.
c. **Receive training and have expertise in gender identity development, gender diversity in children and adolescents, have the ability to assess capacity to assent/consent, and possess general knowledge of gender diversity across the life span.**
d. **Receive training and develop expertise in autism spectrum disorders and other neurodevelopmental presentations or collaborate with a developmental disability expert when working with autistic/neurodivergent gender diverse adolescents.**
e. **Continue engaging in professional development in all areas relevant to gender diverse children, adolescents, and families.**

When assessing and supporting TGD adolescents and their families, care providers/health care professionals (HCPs) need both general as well as gender-specific knowledge and training. Providers who are trained to work with adolescents and families play an important role in navigating aspects of adolescent development and family dynamics when caring for youth and families (Adelson et al., 2012; American Psychological Association, 2015; Hembree et al., 2017). Other chapters in these standards of care describe these criteria for professionals who provide gender care in more detail (see Chapter 5—Assessment for Adults; Chapter 7—Children; or Chapter 13—Surgery and Postoperative Care). Professionals working with adolescents should understand what is and is not known regarding adolescent gender identity development, and how this knowledge base differs from what applies to adults and prepubertal children. Among HCPs, the mental health professional (MHP) has the most appropriate training and dedicated clinical time to conduct an assessment and elucidate treatment priorities and goals when working with transgender youth, including those seeking gender-affirming medical/surgical care. Understanding and managing the dynamics of family members who may share differing perspectives regarding the history and needs of the

young person is an important competency that MHPs are often most prepared to address.

When access to professionals trained in child and adolescent development is not possible, HCPs should make a commitment to obtain training in the areas of family dynamics and adolescent development, including gender identity development. Similarly, considering autistic/neurodivergent transgender youth represent a substantial minority subpopulation of youth served in gender clinics globally, it is important HCPs seek additional training in the field of autism and understand the unique elements of care autistic gender diverse youth may require (Strang, Meagher et al., 2018). If these qualifications are not possible, then consultation and collaboration with a provider who specializes in autism and neurodiversity is advised.

### Statement 6.2

**We recommend health care professionals working with gender diverse adolescents facilitate the exploration and expression of gender openly and respectfully so that no one particular identity is favored.**

Adolescence is a developmental period that involves physical and psychological changes characterized by individuation and the transition to independence from caregivers (Berenbaum et al., 2015; Steinberg, 2009). It is a period during which young people may explore different aspects of identity, including gender identity.

Adolescents differ regarding the degree to which they explore and commit to aspects of their identity (Meeus et al., 2012). For some adolescents, the pace to achieving consolidation of identity is fast, while for others it is slower. For some adolescents, physical, emotional, and psychological development occur over the same general timeline, while for others, there are certain gaps between these aspects of development. Similarly, there is variation in the timeline for gender identity development (Arnoldussen et al., 2020; Katz-Wise et al., 2017). For some young people, gender identity development is a clear process that starts in early childhood, while for others pubertal changes contribute to a person's experience of themselves as a particular gender (Steensma, Kreukels et al., 2013), and for many others a process may begin well after pubertal

changes are completed. Given these variations, there is no one particular pace, process, or outcome that can be predicted for an individual adolescent seeking gender-affirming care.

Therefore, HCPs working with adolescents should promote supportive environments that simultaneously respect an adolescent's affirmed gender identity and also allows the adolescent to openly explore gender needs, including social, medical, and physical gender-affirming interventions should they change or evolve over time.

### Statement 6.3

**We recommend health care professionals working with gender diverse adolescents undertake a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns and seek medical/surgical transition-related care, and that this be accomplished in a collaborative and supportive manner.**

Given the many ways identity may unfold during adolescence, we recommend using a comprehensive biopsychosocial assessment to guide treatment decisions and optimize outcomes. This assessment should aim to understand the adolescent's strengths, vulnerabilities, diagnostic profile, and unique needs to individualize their care. As mentioned in Statement 6.1, MHPs have the most appropriate training, experience, and dedicated clinical time required to obtain the information discussed here. The assessment process should be approached collaboratively with the adolescent and their caregiver(s), both separately and together, as described in more detail in Statement 6.11. An assessment should occur prior to any medically necessary medical or surgical intervention under consideration (e.g., puberty blocking medication, gender-affirming hormones, surgeries). See medically necessary statement in Chapter 2—Global Applicability, Statement 2.1; see also Chapter 12—Hormone Therapy and Chapter 13—Surgery and Postoperative Care.

Youth may experience many different gender identity trajectories. Sociocultural definitions and experiences of gender continue to evolve over time, and youth are increasingly presenting with a range of identities and ways of describing their experiences and gender-related needs (Twist & de

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH ⊕ S51

Graaf, 2019). For example, some youth will realize they are transgender or more broadly gender diverse and pursue steps to present accordingly. For some youth, obtaining gender-affirming medical treatment is important while for others these steps may not be necessary. For example, a process of exploration over time might not result in the young person self-affirming or embodying a different gender in relation to their assigned sex at birth and would not involve the use of medical interventions (Arnoldussen et al., 2019).

The most robust longitudinal evidence supporting the benefits of gender-affirming medical and surgical treatments in adolescence was obtained in a clinical setting that incorporated a detailed comprehensive diagnostic assessment process over time into its delivery of care protocol (de Vries & Cohen-Kettenis, 2012; de Vries et al., 2014). Given this research and the ongoing evolution of gender diverse experiences in society, a comprehensive diagnostic biopsychosocial assessment during adolescence is both evidence-based and preserves the integrity of the decision-making process. In the absence of a full diagnostic profile, other mental health entities that need to be prioritized and treated may not be detected. There are no studies of the long-term outcomes of gender-related medical treatments for youth who have not undergone a comprehensive assessment. Treatment in this context (e.g., with limited or no assessment) has no empirical support and therefore carries the risk that the decision to start gender-affirming medical interventions may not be in the long-term best interest of the young person at that time.

As delivery of health care and access to specialists varies globally, designing a particular assessment process to adapt existing resources is often necessary. In some cases, a more extended assessment process may be useful, such as for youth with more complex presentations (e.g., complicating mental health histories (Leibowitz & de Vries, 2016)), co-occurring autism spectrum characteristics (Strang, Powers et al., 2018), and/or an absence of experienced childhood gender incongruence (Ristori & Steensma, 2016). Given the unique cultural, financial, and geographical factors that exist for specific populations, providers should design assessment models that are flexible and allow for appropriately timed care for as many

young people as possible, so long as the assessment effectively obtains information about the adolescent's strengths, vulnerabilities, diagnostic profile, and individual needs. Psychometrically validated psychosocial and gender measures can also be used to provide additional information.

The multidisciplinary assessment for youth seeking gender-affirming medical/surgical interventions includes the following domains that correspond to the relevant statements:

- **Gender Identity Development:** Statements 6.12.a and 6.12.b elaborate on the factors associated with gender identity development within the specific cultural context when assessing TGD adolescents.
- **Social Development and Support; Intersectionality:** Statements 6.4 and 6.11 elaborate on the importance of assessing gender minority stress, family dynamics, and other aspects contributing to social development and intersectionality.
- **Diagnostic Assessment of Possible Co-Occurring Mental Health and/or Developmental Concerns:** Statement 6.12.d elaborates on the importance of understanding the relationship that exists, if at all, between any co-occurring mental health or developmental concerns and the young person's gender identity/gender diverse expression.
- **Capacity for Decision-Making:** Statement 6.12.c elaborates on the assessment of a young person's emotional maturity and the relevance when an adolescent is considering gender affirming-medical/surgical treatments.

## Statement 6.4
**We recommend health care professionals work with families, schools, and other relevant settings to promote acceptance of gender diverse expressions of behavior and identities of the adolescent.**

Multiple studies and related expert consensus support the implementation of approaches that promote acceptance and affirmation of gender diverse youth across all settings, including families, schools, health care facilities, and all other organizations and communities with which they

interact (e.g., Pariseau et al., 2019; Russell et al., 2018; Simons et al., 2013; Toomey et al., 2010; Travers et al., 2012). Acceptance and affirmation are accomplished through a range of approaches, actions, and policies we recommend be enacted across the various relationships and settings in which a young person exists and functions. It is important for the family members and community members involved in the adolescent's life to work collaboratively in these efforts unless their involvement is considered harmful to the adolescent. Examples proposed by Pariseau et al. (2019) and others of acceptance and affirmation of gender diversity and contemplation and expression of identity that can be implemented by family, staff, and organizations include:

1. Actions that are supportive of youth drawn to engaging in gender-expansive (e.g., nonconforming) activities and interests;
2. Communications that are supportive when youth express their experiences about their gender and gender exploration;
3. Use of the youth's asserted name/pronouns;
4. Support for youth wearing clothing/uniforms, hairstyles, and items (e.g., jewelry, makeup) they feel affirm their gender;
5. Positive and supportive communication with youth about their gender and gender concerns;
6. Education about gender diversity issues for people in the young person's life (e.g., family members, health care providers, social support networks), as needed, including information about how to advocate for gender diverse youth in community, school, health care, and other settings;
7. Support for gender diverse youth to connect with communities of support (e.g., LGBTQ groups, events, friends);
8. Provision of opportunities to discuss, consider, and explore medical treatment options when indicated;
9. Antibullying policies that are enforced;
10. Inclusion of nonbinary experiences in daily life, reading materials, and curricula (e.g., books, health, and sex education classes, assigned essay topics that move beyond the binary, LGBTQ, and ally groups);

11. Gender inclusive facilities that the youth can readily access without segregation from nongender diverse peers (e.g., bathrooms, locker rooms).

We recommend HCPs work with parents, schools, and other organizations/groups to promote acceptance and affirmation of TGD identities and expressions, whether social or medical interventions are implemented or not as acceptance and affirmation are associated with fewer negative mental health and behavioral symptoms and more positive mental health and behavioral functioning (Day et al., 2015; de Vries et al., 2016; Greytak et al., 2013; Pariseau et al., 2019; Peng et al., 2019; Russell et al., 2018; Simons et al., 2013; Taliaferro et al., 2019; Toomey et al., 2010; Travers et al., 2012). Russell et al. (2018) found mental health improvement increases with more acceptance and affirmation across more settings (e.g., home, school, work, and friends). Rejection by family, peers, and school staff (e.g., intentionally using the name and pronoun the youth does not identify with, not acknowledging affirmed gender identity, bullying, harassment, verbal and physical abuse, poor relationships, rejection for being TGD, eviction) was strongly linked to negative outcomes, such as anxiety, depression, suicidal ideation, suicide attempts, and substance use (Grossman et al., 2005; Klein & Golub; 2016; Pariseau et al., 2019; Peng et al., 2019; Reisner, Greytak et al., 2015; Roberts et al., 2013). It is important to be aware that negative symptoms increase with increased levels of rejection and continue into adulthood (Roberts et al., 2013).

Neutral or indifferent responses to a youth's gender diversity and exploration (e.g., letting a child tell others their chosen name but not using the name, not telling family or friends when the youth wants them to disclose, not advocating for the child about rejecting behavior from school staff or peers, not engaging or participating in other support mechanisms (e.g., with psychotherapists and support groups) have also been found to have negative consequences, such as increased depressive symptoms (Pariseau et al., 2019). For these reasons, it is important not to ignore a youth's gender questioning or delay consideration of the youth's gender-related

care needs. There is particular value in professionals recognizing youth need individualized approaches, support, and consideration of needs around gender expression, identity, and embodiment over time and across domains and relationships. Youth may need help coping with the tension of tolerating others' processing/adjusting to an adolescent's identity exploration and changes (e.g., Kuper, Lindley et al., 2019). It is important professionals collaborate with parents and others as they process their concerns and feelings and educate themselves about gender diversity because such processes may not necessarily reflect rejection or neutrality but may rather represent efforts to develop attitudes and gather information that foster acceptance (e.g., Katz-Wise et al., 2017).

### Statement 6.5

**We recommend against offering reparative and conversion therapy aimed at trying to change a person's gender and lived gender expression to become more congruent with the sex assigned at birth.**

Some health care providers, secular or religious organizations, and rejecting families may undertake efforts to thwart an adolescent's expression of gender diversity or assertion of a gender identity other than the expression and behavior that conforms to the sex assigned at birth. Such efforts at blocking reversible social expression or transition may include choosing not to use the youth's identified name and pronouns or restricting self-expression in clothing and hairstyles (Craig et al., 2017; Green et al., 2020). These disaffirming behaviors typically aim to reinforce views that a young person's gender identity/expression must match the gender associated with the sex assigned at birth or expectations based on the sex assigned at birth. Activities and approaches (sometimes referred to as "treatments") aimed at trying to change a person's gender identity and expression to become more congruent with the sex assigned at birth have been attempted, but these approaches have not resulted in changes in gender identity (Craig et al., 2017; Green et al., 2020). We recommend against such efforts because they have been found to be ineffective

and are associated with increases in mental illness and poorer psychological functioning (Craig et al., 2017; Green et al., 2020; Turban, Beckwith et al., 2020).

Much of the research evaluating "conversion therapy" and "reparative therapy" has investigated the impact of efforts to change gender expression (masculinity or femininity) and has conflated sexual orientation with gender identity (APA, 2009; Burnes et al., 2016; Craig et al., 2017). Some of these efforts have targeted both gender identity and expression (AACAP, 2018). Conversion/reparative therapy has been linked to increased anxiety, depression, suicidal ideation, suicide attempts, and health care avoidance (Craig et al., 2017; Green et al., 2020; Turban, Beckwith et al., 2020). Although some of these studies have been criticized for their methodologies and conclusions (e.g., D'Angelo et al., 2020), this should not detract from the importance of emphasizing efforts undertaken a priori to change a person's identity are clinically and ethically unsound. We recommend against any type of conversion or attempts to change a person's gender identity because 1) both secular and religion-based efforts to change gender identity/expression have been associated with negative psychological functioning that endures into adulthood (Turban, Beckwith et al., 2020); and 2) larger ethical reasons exist that should underscore respect for gender diverse identities.

It is important to note potential factors driving a young person's gender-related experience and report of gender incongruence, when carried out in the context of supporting an adolescent with self-discovery, is not considered reparative therapy as long as there is no a priori goal to change or promote one particular gender identity or expression (AACAP, 2018; see Statement 6.2). To ensure these explorations are therapeutic, we recommend employing affirmative consideration and supportive tone in discussing what steps have been tried, considered, and planned for a youth's gender expression. These discussion topics may include what felt helpful or affirming, what felt unhelpful or distressing and why. We recommend employing affirmative responses to these steps and discussions, such as those identified in SOC-8 Statement 6.4.

## Statement 6.6

**We suggest health care professionals provide transgender and gender diverse adolescents with health education on chest binding and genital tucking, including review of the benefits and risks.**

TGD youth may experience distress related to chest and genital anatomy. Practices such as chest binding, chest padding, genital tucking, and genital packing are reversible, nonmedical interventions that may help alleviate this distress (Callen-Lorde, 2020a, 2020b; Deutsch, 2016a; Olson-Kennedy, Rosenthal et al., 2018; Transcare BC, 2020). It is important to assess the degree of distress related to physical development or anatomy, educate youth about potential nonmedical interventions to address this distress, and discuss the safe use of these interventions.

Chest binding involves compression of the breast tissue to create a flatter appearance of the chest. Studies suggest that up to 87% of trans masculine patients report a history of binding (Jones, 2015; Peitzmeier, 2017). Binding methods may include the use of commercial binders, sports bras, layering of shirts, layering of sports bras, or the use of elastics or other bandages (Peitzmeier, 2017). Currently, most youth report learning about binding practices from online communities composed of peers (Julian, 2019). Providers can play an important role in ensuring youth receive accurate and reliable information about the potential benefits and risks of chest binding. Additionally, providers can counsel patients about safe binding practices and monitor for potential negative health effects. While there are potential negative physical impacts of binding, youth who bind report many benefits, including increased comfort, improved safety, and lower rates of misgendering (Julian, 2019). Common negative health impacts of chest binding in youth include back/chest pain, shortness of breath, and overheating (Julian, 2019). More serious negative health impacts such as skin infections, respiratory infections, and rib fractures are uncommon and have been associated with chest binding in adults (Peitzmeier, 2017). If binding is employed, youth should be advised to use only those methods considered safe for binding—such as binders specifically designed for the gender diverse population—to reduce the risk of serious negative health effects. Methods that are considered unsafe for binding include the use of duct tape, ace wraps, and plastic wrap as these can restrict blood flow, damage skin, and restrict breathing. If youth report negative health impacts from chest binding, these should ideally be addressed by a gender-affirming medical provider with experience working with TGD youth.

Genital tucking is the practice of positioning the penis and testes to reduce the outward appearance of a genital bulge. Methods of tucking include tucking the penis and testes between the legs or tucking the testes inside the inguinal canal and pulling the penis back between the legs. Typically, genitals are held in place by underwear or a gaff, a garment that can be made or purchased. Limited studies are available on the specific risks and benefits of tucking in adults, and none have been carried out in youth. Previous studies have reported tight undergarments are associated with decreased sperm concentration and motility. In addition, elevated scrotal temperatures can be associated with poor sperm characteristics, and genital tucking could theoretically affect spermatogenesis and fertility (Marsh, 2019) although there are no definitive studies evaluating these adverse outcomes. Further research is needed to determine the specific benefits and risks of tucking in youth.

## Statement 6.7

**We recommend providers consider prescribing menstrual suppression agents for adolescents experiencing gender incongruence who may not desire testosterone therapy, who desire but have not yet begun testosterone therapy, or in conjunction with testosterone therapy for breakthrough bleeding.**

When discussing the available options of menstrual-suppressing medications with gender diverse youth, providers should engage in shared decision-making, use gender-inclusive language (e.g., asking patients which terms they utilize to refer to their menses, reproductive organs, and genitalia) and perform physical exams in a sensitive, gender-affirmative manner (Bonnington et al., 2020; Krempasky et al., 2020). There is no formal research evaluating how menstrual

suppression may impact gender incongruence and/or dysphoria. However, the use of menstrual suppression can be an initial intervention that allows for further exploration of gender-related goals of care, prioritization of other mental health care, or both, especially for those who experience a worsening of gender dysphoria from unwanted uterine bleeding (see Statement 6.12d; Mehringer & Dowshen, 2019). When testosterone is not used, menstrual suppression can be achieved via a progestin. To exclude any underlying menstrual disorders, it is important to obtain a detailed menstrual history and evaluation prior to implementing menstrual-suppressing therapy (Carswell & Roberts, 2017). As part of the discussion about menstrual-suppressing medications, the need for contraception and information regarding the effectiveness of menstrual-suppressing medications as methods of contraception also need to be addressed (Bonnington et al., 2020). A variety of menstrual suppression options, such as combined estrogen-progestin medications, oral progestins, depot and subdermal progestin, and intrauterine devices (IUDs), should be offered to allow for individualized treatment plans while properly considering availability, cost and insurance coverage, as well as contraindications and side effects (Kanj et al., 2019).

Progestin-only hormonal medication are options, especially in trans masculine or nonbinary youth who are not interested in estrogen-containing medical therapies as well as those at risk for thromboembolic events or who have other contraindications to estrogen therapy (Carswell & Roberts, 2017). Progestin-only hormonal medications include oral progestins, depo-medroxyprogesterone injection, etonogestrel implant, and levonorgestrel IUD (Schwartz et al., 2019). Progestin-only hormonal options vary in terms of efficacy in achieving menstrual suppression and have lower rates of achieving amenorrhea than combined oral contraception (Pradhan & Gomez-Lobo, 2019). A more detailed description of the relevant clinical studies is presented in Chapter 12—Hormone Therapy. HCPs should not make assumptions regarding the individual's preferred method of administration as some trans masculine youth may prefer vaginal rings or IUD implants (Akgul et al., 2019). Although hormonal

medications require monitoring for potential mood lability, depressive effects, or both, the benefits and risks of untreated menstrual suppression in the setting of gender dysphoria should be evaluated on an individual basis. Some patients may opt for combined oral contraception that includes different combinations of ethinyl estradiol, with ranging doses, and different generations of progestins (Pradhan & Gomez-Lobo, 2019). Lower dose ethinyl estradiol components of combined oral contraceptive pills are associated with increased breakthrough uterine bleeding. Continuous combined oral contraceptives may be used to allow for continuous menstrual suppression and can be delivered as transdermal or vaginal rings.

The use of gonadotropin releasing hormone (GnRH) analogues may also result in menstrual suppression. However, it is recommended gender diverse youth meet the eligibility criteria (as outlined in Statement 6.12) before this medication is considered solely for this purpose (Carswell & Roberts, 2017; Pradhan & Gomez-Lobo, 2019). Finally, menstrual-suppression medications may be indicated as an adjunctive therapy for breakthrough uterine bleeding that may occur while on exogenous testosterone or as a bridging medication while awaiting menstrual suppression with testosterone therapy. When exogenous testosterone is employed as a gender-affirming hormone, menstrual suppression is typically achieved in the first six months of therapy (Ahmad & Leinung, 2017). However, it is vital adolescents be counseled ovulation and pregnancy can still occur in the setting of amenorrhea (Gomez et al., 2020; Kanj et al., 2019).

Statement 6.8

**We recommend health care professionals maintain an ongoing relationship with the gender diverse and transgender adolescent and any relevant caregivers to support the adolescent in their decision-making throughout the duration of puberty suppression treatment, hormonal treatment, and gender-related surgery until the transition is made to adult care.**

HCPs with expertise in child and adolescent development, as described in Statement 6.1, play an important role in the continuity of care for

young people over the course of their gender-related treatment needs. Supporting adolescents and their families necessitates approaching care using a developmental lens through which understanding a young person's evolving emotional maturity and care needs can take place over time. As gender-affirming treatment pathways differ based on the needs and experiences of individual TGD adolescents, decision-making for these treatments (puberty suppression, estrogens/androgens, gender-affirmation surgeries) can occur at different points in time within a span of several years. Longitudinal research demonstrating the benefits of pubertal suppression and gender-affirming hormone treatment (GAHT) was carried out in a setting where an ongoing clinical relationship between the adolescents/families and the multidisciplinary team was maintained (de Vries et al., 2014).

Clinical settings that offer longer appointment times provide space for adolescents and caregivers to share important psychosocial aspects of emotional well-being (e.g., family dynamics, school, romantic, and sexual experiences) that contextualize individualized gender-affirming treatment needs and decisions as described elsewhere in the chapter. An ongoing clinical relationship can take place across settings, whether that be within a multidisciplinary team or with providers in different locations who collaborate with one another. Given the wide variability in the ability to obtain access to specialized gender care centers, particularly for marginalized groups who experience disparities with access, it is important for the HCP to appreciate the existence of any barriers to care while maintaining flexibility when defining how an ongoing clinical relationship can take place in that specific context.

An ongoing clinical relationship that increases resilience in the youth and provides support to parents/caregivers who may have their own treatment needs may ultimately lead to increased parental acceptance—when needed—which is associated with better mental health outcomes in youth (Ryan, Huebner et al., 2009).

### Statement 6.9
**We recommend health care professionals involve relevant disciplines, including mental health and medical professionals, to reach a decision about whether puberty suppression, hormone initiation, or gender-related surgery for gender diverse and transgender adolescents are appropriate and remain indicated throughout the course of treatment until the transition is made to adult care.**

TGD adolescents with gender dysphoria/gender incongruence who seek gender-affirming medical and surgical treatments benefit from the involvement of health care professionals (HCPs) from different disciplines. Providing care to TGD adolescents includes addressing 1) diagnostic considerations (see Statements 6.3, 6.12a, and 6.12b) conducted by a specialized gender HCP (as defined in Statement 6.1) whenever possible and necessary; and 2) treatment considerations when prescribing, managing, and monitoring medications for gender-affirming medical and surgical care, requiring the training of the relevant medical/surgical professional. The list of key disciplines includes but is not limited to adolescent medicine/primary care, endocrinology, psychology, psychiatry, speech/language pathology, social work, support staff, and the surgical team.

The evolving evidence has shown a clinical benefit for transgender youth who receive their gender-affirming treatments in multidisciplinary gender clinics (de Vries et al., 2014; Kuper et al., 2020; Tollit et al., 2019). Finally, adolescents seeking gender-affirming care in multidisciplinary clinics are presenting with significant complexity necessitating close collaboration between mental health, medical, and/or surgical professionals (McCallion et al., 2021; Sorbara et al., 2020; Tishelman et al., 2015).

As not all patients and families are in the position or in a location to access multidisciplinary care, the lack of available disciplines should not preclude a young person from accessing needed care in a timely manner. When disciplines are available, particularly in centers with existing multidisciplinary teams, disciplines, or both, it is recommended efforts be made to include the relevant providers when developing a gender care team. However, this does not mean all disciplines are necessary to provide care to a particular youth and family.

If written documentation or a letter is required to recommend gender-affirming medical and surgical treatment (GAMST) for an adolescent, only one letter of assessment from a member of the multidisciplinary team is needed. This letter needs to reflect the assessment and opinion from the team that involves both medical HCPs and MHPs (American Psychological Association, 2015; Hembree et al., 2017; Telfer et al., 2018). Further assessment results and written opinions may be requested when there is a specific clinical need or when team members are in different locations or choose to write their own summaries. For further information see Chapter 5—Assessment for Adults, Statement 5.5.

## Statement 6.10

**We recommend health care professionals working with transgender and gender diverse adolescents requesting gender-affirming medical or surgical treatments inform them, prior to the initiation of treatment, of the reproductive effects, including the potential loss of fertility and available options to preserve fertility within the context of the youth's stage of pubertal development.**

While assessing adolescents seeking gender-affirming medical or surgical treatments, HCPs should discuss the specific ways in which the required treatment may affect reproductive capacity. Fertility issues and the specific preservation options are more thoroughly discussed in Chapter 12—Hormone Therapy and Chapter 16—Reproductive Health.

It is important HCPs understand what fertility preservation options exist so they can relay the information to adolescents. Parents are advised to be involved in this process and should also understand the pros and cons of the different options. HCPs should acknowledge adolescents and parents may have different views around reproductive capacity and may therefore come to different decisions (Quain et al., 2020), which is why HCPs can be helpful in guiding this process.

HCPs should specifically pay attention to the developmental and psychological aspects of fertility preservation and decision-making competency for the individual adolescent. While adolescents may think they have made up their minds concerning their reproductive capacity, the possibility their opinions about having

biologically related children in the future might change over time needs to be discussed with an HCP who has sufficient experience, is knowledgeable about adolescent development, and has experience working with parents.

Addressing the long-term consequences on fertility of gender-affirming medical treatments and ensuring transgender adolescents have realistic expectations concerning fertility preservation options or adoption cannot not be addressed with a one-time discussion but should be part of an ongoing conversation. This conversation should occur not only before initiating any medical intervention (puberty suppression, hormones, or surgeries), but also during further treatment and during transition.

Currently, there are only preliminary results from retrospective studies evaluating transgender adults and the decisions they made when they were young regarding the consequences of medical-affirming treatment on reproductive capacity. It is important not to make assumptions about what future adult goals an adolescent may have. Research in childhood cancer survivors found participants who acknowledged missed opportunities for fertility preservation reported distress and regret surrounding potential infertility (Armuand et al., 2014; Ellis et al., 2016; Lehmann et al., 2017). Furthermore, individuals with cancer who did not prioritize having biological children before changing their minds have reported "changing their minds" in survivorship (Armuand et al., 2014).

Given the complexities of the different fertility preservation options and the challenges HCPs may experience discussing fertility with the adolescent and the family (Tishelman et al., 2019), a fertility consultation is an important consideration for every transgender adolescent who pursues medical-affirming treatments unless the local situation is such that a fertility consultation is not covered by insurance or public health care plans, is not available locally, or the individual circumstances make this unpreferable.

## Statement 6.11

**We recommend when gender-affirming medical or surgical treatments are indicated for adolescents, health care professionals working with transgender and gender diverse adolescents**

**involve parent(s)/guardian(s) in the assessment and treatment process, unless their involvement is determined to be harmful to the adolescent or not feasible.**

When there is an indication an adolescent might benefit from a gender-affirming medical or surgical treatment, involving the parent(s) or primary caregiver(s) in the assessment process is recommended in almost all situations (Edwards-Leeper & Spack, 2012; Rafferty et al., 2018). Exceptions to this might include situations in which an adolescent is in foster care, child protective services, or both, and custody and parent involvement would be impossible, inappropriate, or harmful. Parent and family support of TGD youth is a primary predictor of youth well-being and is protective of the mental health of TGD youth (Gower, Rider, Coleman et al., 2018; Grossman et al., 2019; Lefevor et al., 2019; McConnell et al., 2015; Pariseau et al., 2019; Ryan, 2009; Ryan et al., 2010; Simons et al., 2013; Wilson et al., 2016). Therefore, including parent(s)/caregiver(s) in the assessment process to encourage and facilitate increased parental understanding and support of the adolescent may be one of the most helpful practices available.

Parent(s)/caregiver(s) may provide key information for the clinical team, such as the young person's gender and overall developmental, medical, and mental health history as well as insights into the young person's level of current support, general functioning, and well-being. Concordance or divergence of reports given by the adolescent and their parent(s)/caregiver(s) may be important information for the assessment team and can aid in designing and shaping individualized youth and family supports (De Los Reyes et al., 2019; Katz-Wise et al., 2017). Knowledge of the family context, including resilience factors and challenges, can help providers know where special supports would be needed during the medical treatment process. Engagement of parent(s)/caregiver(s) is also important for educating families about various treatment approaches, ongoing follow-up and care needs, and potential treatment complications. Through psychoeducation regarding clinical gender care options and participation in the assessment process, which may unfold over time, parent(s)/caregiver(s) may better understand their adolescent child's gender-related experience and needs (Andrzejewski et al., 2020; Katz-Wise et al., 2017).

Parent/caregiver concerns or questions regarding the stability of gender-related needs over time and implications of various gender-affirming interventions are common and should not be dismissed. It is appropriate for parent(s)/caregiver(s) to ask these questions, and there are cases in which the parent(s)/caregiver(s)' questions or concerns are particularly helpful in informing treatment decisions and plans. For example, a parent/caregiver report may provide critical context in situations in which a young person experiences very recent or sudden self-awareness of gender diversity and a corresponding gender treatment request, or when there is concern for possible excessive peer and social media influence on a young person's current self-gender concept. Contextualization of the parent/caregiver report is also critical, as the report of a young person's gender history as provided by parent(s)/caregiver(s) may or may not align with the young person's self-report. Importantly, gender histories may be unknown to parent(s)/caregiver(s) because gender may be internal experience for youth, not known by others unless it is discussed. For this reason, an adolescent's report of their gender history and experience is central to the assessment process.

Some parents may present with unsupportive or antagonistic beliefs about TGD identities, clinical gender care, or both (Clark et al., 2020). Such unsupportive perspectives are an important therapeutic target for families. Although challenging parent perspectives may in some cases seem rigid, providers should not assume this is the case. There are many examples of parent(s)/caregiver(s) who, over time with support and psychoeducation, have become increasingly accepting of their TGD child's gender diversity and care needs.

Helping youth and parent(s)/caregiver(s) work together on important gender care decisions is a primary goal. However, in some cases, parent(s)/caregiver(s) may be too rejecting of their adolescent child and their child's gender needs to be part of the clinical evaluation process. In these situations, youth may require the engagement of larger systems of advocacy and support to move

forward with the necessary support and care (Dubin et al., 2020).

### Statement 6.12

**We recommend health care professionals assessing transgender and gender diverse adolescents only recommend gender-affirming medical or surgical treatments requested by the patient when:**

### Statement 6.12.a

**The adolescent meets the diagnostic criteria of gender incongruence as per the ICD-11 in situations where a diagnosis is necessary to access health care. In countries that have not implemented the latest ICD, other taxonomies may be used although efforts should be undertaken to utilize the latest ICD as soon as practicable.**

When working with TGD adolescents, HCPs should realize while a classification may give access to care, pathologizing transgender identities may be experienced as stigmatizing (Beek et al., 2016). Assessments related to gender health and gender diversity have been criticized, and controversies exist around diagnostic systems (Drescher, 2016).

HCPs should assess the overall gender-related history and gender care-related needs of youth. Through this assessment process, HCPs may provide a diagnosis when it is required to get access to transgender-related care.

Gender incongruence and gender dysphoria are the two diagnostic terms used in the World Health Organization's International Classification of Diseases (ICD) and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM), respectively. Of these two widely used classification systems, the DSM is for psychiatric classifications only and the ICD contains all diseases and conditions related to physical as well as mental health. The most recent versions of these two systems, the DSM-5 and the ICD-11, reflect a long history of reconceptualizing and de-psychopathologizing gender-related diagnoses (American Psychiatric Association, 2013; World Health Organization, 2019a). Compared with the earlier version, the DSM-5 replaced gender identity disorder with gender dysphoria, acknowledging the distress experienced by some people stemming from the incongruence between experienced gender identity and the sex assigned at birth. In the most recent revision, the DSM-5-TR, no changes in the diagnostic criteria for gender dysphoria are made. However, terminology was adapted into the most appropriate current language (e.g., birth-assigned gender instead of natal-gender and gender-affirming treatment instead of gender reassignment (American Psychiatric Association, 2022). Compared with the ICD 10th edition, the gender incongruence classification was moved from the Mental Health chapter to the Conditions Related to Sexual Health chapter in the ICD-11. When compared with the DSM-5 classification of gender dysphoria, one important reconceptualization is distress is not a required indicator of the ICD-11 classification of gender incongruence (WHO, 2019a). After all, when growing up in a supporting and accepting environment, the distress and impairment criterion, an inherent part of every mental health condition, may not be applicable (Drescher, 2012). As such, the ICD-11 classification of gender incongruence may better capture the fullness of gender diversity experiences and related clinical gender needs.

Criteria for the ICD-11 classification gender incongruence of adolescence or adulthood require a marked and persistent incongruence between an individual's experienced gender and the assigned sex, which often leads to a need to "transition" to live and be accepted as a person of the experienced gender. For some, this includes hormonal treatment, surgery, or other health care services to enable the individual's body to align as much as required, and to the extent possible, with the person's experienced gender. Relevant for adolescents is the indicator that a classification cannot be assigned "prior to the onset of puberty." Finally, it is noted "that gender variant behaviour and preferences alone are not a basis for assigning the classification" (WHO, ICD-11, 2019a).

Criteria for the DSM-5 and DSM-5-TR classification of gender dysphoria in adolescence and adulthood denote "a marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration' (criterion A, fulfilled when 2 of 6 subcriteria are manifest; DSM-5, APA, 2013; DSM 5-TR, APA, 2022).

Of note, although a gender-related classification is one of the requirements for receiving medical gender-affirming care, such a classification alone does not indicate a person needs medical-affirming care. The range of youth experiences of gender incongruence necessitates professionals provide a range of treatments or interventions based on the individual's needs. Counseling, gender exploration, mental health assessment and, when needed, treatment with MHPs trained in gender development may all be indicated with or without the implementation of medical-affirming care.

<u>Statement 6.12.b</u>
**The experience of gender diversity/incongruence is marked and sustained over time.**

Identity exploration and consolidation are experienced by many adolescents (Klimstra et al., 2010; Topolewska-Siedzik & Cieciuch, 2018). Identity exploration during adolescence may include a process of self-discovery around gender and gender identity (Steensma, Kreukels et al., 2013). Little is known about how processes that underlie consolidation of gender identity during adolescence (e.g., the process of commitment to specific identities) may impact a young person's experience(s) or needs over time.

Therefore, the level of reversibility of a gender-affirming medical intervention should be considered along with the sustained duration of a young person's experience of gender incongruence when initiating treatment. Given potential shifts in gender-related experiences and needs during adolescence, it is important to establish the young person has experienced several years of persistent gender diversity/incongruence prior to initiating less reversible treatments such as gender-affirming hormones or surgeries. Puberty suppression treatment, which provides more time for younger adolescents to engage their decision-making capacities, also raises important considerations (see Statement 6.12f and Chapter 12—Hormone Therapy) suggesting the importance of a sustained experience of gender incongruence/diversity prior to initiation. However, in this age group of younger adolescents, several years is not always practical nor necessary given the premise of the treatment as a means to buy time while avoiding distress from irreversible pubertal changes. For youth who have experienced a shorter duration of gender incongruence, social transition-related and/or other medical supports (e.g., menstrual suppression/androgen blocking) may also provide some relief as well as furnishing additional information to the clinical team regarding a young person's broad gender care needs (see Statements 6.4, 6.6, and 6.7).

Establishing evidence of persistent gender diversity/incongruence typically requires careful assessment with the young person over time (see Statement 6.3). Whenever possible and when appropriate, the assessment and discernment process should also include the parent(s)/caregiver(s) (see Statement 6.11). Evidence demonstrating gender diversity/incongruence sustained over time can be provided via history obtained directly from the adolescent and parents/caregivers when this information is not documented in the medical records.

The research literature on continuity versus discontinuity of gender-affirming medical care needs/requests is complex and somewhat difficult to interpret. A series of studies conducted over the last several decades, including some with methodological challenges (as noted by Temple Newhook et al., 2018; Winters et al., 2018) suggest the experience of gender incongruence is not consistent for all children as they progress into adolescence. For example, a subset of youth who experienced gender incongruence or who socially transitioned prior to puberty over time can show a reduction in or even full discontinuation of gender incongruence (de Vries et al., 2010; Olson et al., 2022; Ristori & Steensma, 2016; Singh et al., 2021; Wagner et al., 2021). However, there has been less research focused on rates of continuity and discontinuity of gender incongruence and gender-related needs in pubertal and adolescent populations. The data available regarding broad unselected gender-referred pubertal/adolescent cohorts (from the Amsterdam transgender clinic) suggest that, following extended assessments over time, a subset of adolescents with gender incongruence presenting for gender care elect not to pursue gender-affirming medical care

(Arnoldussen et al., 2019; de Vries, Steensma et al., 2011). Importantly, findings from studies of gender incongruent pubertal/adolescent cohorts, in which participants who have undergone comprehensive gender evaluation over time, have shown persistent gender incongruence and gender-related need and have received referrals for medical gender care, suggest low levels of regret regarding gender-related medical care decisions (de Vries et al., 2014; Wiepjes et al., 2018). Critically, these findings of low regret can only currently be applied to youth who have demonstrated sustained gender incongruence and gender-related needs over time as established through a comprehensive and iterative assessment (see Statement 6.3).

## Statement 6.12.c
**The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.**

The process of informed consent includes communication between a patient and their provider regarding the patient's understanding of a potential intervention as well as, ultimately, the patient's decision whether to receive the intervention. In most settings, for minors, the legal guardian is integral to the informed consent process: if a treatment is to be given, the legal guardian (often the parent[s]/caregiver[s]) provides the informed consent to do so. In most settings, assent is a somewhat parallel process in which the minor and the provider communicate about the intervention and the provider assesses the level of understanding and intention.

A necessary step in the informed consent/assent process for considering gender-affirming medical care is a careful discussion with qualified HCPs trained to assess the emotional and cognitive maturity of adolescents. The reversible and irreversible effects of the treatment, as well as fertility preservation options (when applicable), and all potential risks and benefits of the intervention are important components of the discussion. These discussions are required when obtaining informed consent/assent. Assessment of cognitive and emotional maturity is important because it helps the care team understand the adolescent's capacity to be informed.

The skills necessary to assent/consent to any medical intervention or treatment include the ability to 1) comprehend the nature of the treatment; 2) reason about treatment options, including the risks and benefits; 3) appreciate the nature of the decision, including the long-term consequences; and 4) communicate choice (Grootens-Wiegers et al., 2017). In the case of gender- affirming medical treatments, a young person should be well-informed about what the treatment may and may not accomplish, typical timelines for changes to appear (e.g., with gender-affirming hormones), and any implications of stopping the treatment. Gender-diverse youth should fully understand the reversible, partially reversible, and irreversible aspects of a treatment, as well as the limits of what is known about certain treatments (e.g., the impact of pubertal suppression on brain development (Chen and Loshak, 2020)). Gender-diverse youth should also understand, although many gender-diverse youth begin gender- affirming medical care and experience that care as a good fit for them long-term, there is a subset of individuals who over time discover this care is not a fit for them (Wiepjes et al., 2018). Youth should know such shifts are sometimes connected to a change in gender needs over time, and in some cases, a shift in gender identity itself. Given this information, gender diverse youth must be able to reason thoughtfully about treatment options, considering the implications of the choices at hand. Furthermore, as a foundation for providing assent, the gender-diverse young person needs to be able to communicate their choice.

The skills needed to accomplish the tasks required for assent/consent may not emerge at specific ages per se (Grootens-Wiegers et al., 2017). There may be variability in these capacities related to developmental differences and mental health presentations (Shumer & Tishelman, 2015) and dependent on the opportunities a young person has had to practice these skills (Alderson, 2007). Further, assessment of emotional and cognitive maturity must be conducted separately for each gender-related treatment decision (Vrouenraets et al., 2021).

The following questions may be useful to consider in assessing a young person's emotional and

cognitive readiness to assent or consent to a specific gender-affirming treatment:

- Can the young person think carefully into the future and consider the implications of a partially or fully irreversible intervention?
- Does the young person have sufficient self-reflective capacity to consider the possibility that gender-related needs and priorities can develop over time, and gender-related priorities at a certain point in time might change?
- Has the young person, to some extent, thought through the implications of what they might do if their priorities around gender do change in the future?
- Is the young person able to understand and manage the day-to-day short- and long-term aspects of a specific medical treatment (e.g., medication adherence, administration, and necessary medical follow-ups)?

Assessment of emotional and cognitive maturity may be accomplished over time as the care team continues to engage in conversations about the treatment options and affords the young person the opportunity to practice thinking into the future and flexibly consider options and implications. For youth with neurodevelopmental and/or some types of mental health differences, skills for future thinking, planning, big picture thinking, and self-reflection may be less-well developed (Dubbelink & Geurts, 2017). In these cases, a more careful approach to consent and assent may be required, and this may include additional time and structured opportunities for the young person to practice the skills necessary for medical decision-making (Strang, Powers et al., 2018).

For unique situations in which an adolescent minor is consenting for their own treatment without parental permission (see Statement 6.11), extra care must be taken to support the adolescent's informed decision-making. This will typically require greater levels of engagement of and collaboration between the HCPs working with the adolescent to provide the young person appropriate cognitive and emotional support to consider options, weigh benefits and potential challenges/costs, and develop a plan for any needed (and potentially ongoing) supports associated with the treatment.

Statement 6.12.d
**The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and/or gender-affirming medical treatments have been addressed.**

Evidence indicates TGD adolescents are at increased risk of mental health challenges, often related to family/caregiver rejection, non-affirming community environments, and neurodiversity-related factors (e.g., de Vries et al., 2016; Pariseau et al., 2019; Ryan et al., 2010; Weinhardt et al., 2017). A young person's mental health challenges may impact their conceptualization of their gender development history and gender identity-related needs, the adolescent's capacity to consent, and the ability of the young person to engage in or receive medical treatment. Additionally, like cisgender youth, TGD youth may experience mental health concerns irrespective of the presence of gender dysphoria or gender incongruence. In particular, depression and self-harm may be of specific concern; many studies reveal depression scores and emotional and behavioral problems comparable to those reported in populations referred to mental health clinics (Leibowitz & de Vries, 2016). Higher rates of suicidal ideation, suicide attempts, and self-harm have also been reported (de Graaf et al., 2020). In addition, eating disorders occur more frequently than expected in non-referred populations (Khatchadourian et al., 2013; Ristori et al., 2019; Spack et al., 2012). Importantly, TGD adolescents show high rates of autism spectrum disorder/characteristics (Øien et al., 2018; van der Miesen et al., 2016; see also Statement 6.1d). Other neurodevelopmental presentations and/or mental health challenges may also be present, (e.g., ADHD, intellectual disability, and psychotic disorders (de Vries, Doreleijers et al., 2011; Meijer et al., 2018; Parkes & Hall, 2006).

Of note, many transgender adolescents are well-functioning and experience few if any mental health concerns. For example, socially transitioned pubertal adolescents who receive medical

gender- affirming treatment at specialized gender clinics may experience mental health outcomes equivalent to those of their cisgender peers (e.g., de Vries et al., 2014; van der Miesen et al., 2020). A provider's key task is to assess the direction of the relationships that exist between any mental health challenges and the young person's self-understanding of gender care needs and then prioritize accordingly.

Mental health difficulties may challenge the assessment and treatment of gender-related needs of TGD adolescents in various ways:

1. First, when a TGD adolescent is experiencing acute suicidality, self-harm, eating disorders, or other mental health crises that threaten physical health, safety must be prioritized. According to the local context and existing guidelines, appropriate care should seek to mitigate the threat or crisis so there is sufficient time and stabilization for thoughtful gender-related assessment and decision-making. For example, an actively suicidal adolescent may not be emotionally able to make an informed decision regarding gender-affirming medical/surgical treatment. If indicated, safety-related interventions should not preclude starting gender-affirming care.

2. Second, mental health can also complicate the assessment of gender development and gender identity-related needs. For example, it is critical to differentiate gender incongruence from specific mental health presentations, such as obsessions and compulsions, special interests in autism, rigid thinking, broader identity problems, parent/child interaction difficulties, severe developmental anxieties (e.g., fear of growing up and pubertal changes unrelated to gender identity), trauma, or psychotic thoughts. Mental health challenges that interfere with the clarity of identity development and gender-related decision-making should be prioritized and addressed.

3. Third, decision-making regarding gender-affirming medical treatments that have life-long consequences requires

thoughtful, future-oriented thinking by the adolescent, with support from the parents/caregivers, as indicated (see Statement 6.11). To be able to make such an informed decision, an adolescent should be able to understand the issues, express a choice, appreciate and give careful thought regarding the wish for medical-affirming treatment (see Statement 6.12c). Neurodevelopmental differences, such as autistic features or autism spectrum disorder (see Statement 6.1d, e.g., communication differences; a preference for concrete or rigid thinking; differences in self-awareness, future thinking and planning), may challenge the assessment and decision-making process; neurodivergent youth may require extra support, structure, psychoeducation, and time built into the assessment process (Strang, Powers et al., 2018). Other mental health presentations that involve reduced communication and self-advocacy, difficulty engaging in assessment, memory and concentration difficulties, hopelessness, and difficulty engaging in future-oriented thinking may complicate assessment and decision-making. In such cases, extended time is often necessary before any decisions regarding medical-affirming treatment can be made.

4. Finally, while addressing mental health concerns is important during the course of medical treatment, it does not mean all mental health challenges can or should be resolved completely. However, it is important any mental health concerns are addressed sufficiently so that gender-affirming medical treatment can be provided optimally (e.g., medication adherence, attending follow-up medical appointments, and self-care, particularly during a postoperative course).

Statement 6.12.e
**The adolescent has been informed of the reproductive effects, including the potential loss of fertility, and available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.**

For guidelines regarding the clinical approach, the scientific background, and the rationale, see Chapter 12—Hormone Therapy and Chapter 16—Reproductive Health.

### Statement 6.12.f

**The adolescent has reached Tanner stage 2 of puberty for pubertal suppression to be initiated.**

The onset of puberty is a pivotal point for many gender diverse youth. For some, it creates an intensification of their gender incongruence, and for others, pubertal onset may lead to gender fluidity (e.g., a transition from binary to nonbinary gender identity) or even attenuation of a previously affirmed gender identity (Drummond et al., 2008; Steensma et al., 2011, Steensma, Kreukels et al., 2013; Wallien & Cohen-Kettenis, 2008). The use of puberty-blocking medications, such as GnRH analogues, is not recommended until children have achieved a minimum of Tanner stage 2 of puberty because the experience of physical puberty may be critical for further gender identity development for some TGD adolescents (Steensma et al., 2011). Therefore, puberty blockers should not be implemented in prepubertal gender diverse youth (Waal & Cohen-Kettenis, 2006). For some youth, GnRH agonists may be appropriate in late stages or in the post-pubertal period (e.g., Tanner stage 4 or 5), and this should be highly individualized. See Chapter 12—Hormone Therapy for a more comprehensive review of the use of GnRH agonists.

Variations in the timing of pubertal onset is due to multiple factors (e.g., sex assigned at birth, genetics, nutrition, etc.). Tanner staging refers to five stages of pubertal development ranging from prepubertal (Tanner stage 1) to post-pubertal, and adult sexual maturity (Tanner stage 5) (Marshall & Tanner, 1969, 1970). For assigned females at birth, pubertal onset (e.g., gonadarche) is defined by the occurrence of breast budding (Tanner stage 2), and for birth-assigned males, the achievement of a testicular volume of greater than or equal to 4 mL (Roberts & Kaiser, 2020). An experienced medical provider should be relied on to differentiate the onset of puberty from physical changes such as pubic hair and apocrine body odor due to sex steroids produced by the adrenal gland (e.g., adrenarche) as adrenarche does not warrant the use of puberty-blocking medications (Roberts & Kaiser, 2020). Educating parents and families about the difference between adrenarche and gonadarche helps families understand the timing during which shared decision-making about gender-affirming medical therapies should be undertaken with their multidisciplinary team.

The importance of addressing other risks and benefits of pubertal suppression, both hypothetical and actual, cannot be overstated. Evidence supports the existence of surgical implications for transgender girls who proceed with pubertal suppression (van de Grift et al., 2020). Longitudinal data exists to demonstrate improvement in romantic and sexual satisfaction for adolescents receiving puberty suppression, hormone treatment and surgery (Bungener et al., 2020). A study on surgical outcomes of laparoscopic intestinal vaginoplasty (performed because of limited genital tissue after the use of puberty blockers) in transgender women revealed that the majority experienced orgasm after surgery (84%), although a specific correlation between sexual pleasure outcomes and the timing of pubertal suppression initiation was not discussed in the study (Bouman, van der Sluis et al., 2016), nor does the study apply to those who would prefer a different surgical procedure. This underscores the importance of engaging in discussions with families about the future unknowns related to surgical and sexual health outcomes.

### Statement 6.12.g

**The adolescent had at least 12 months of gender-affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender-affirming treatment unless hormone therapy is either not desired or is medically contraindicated.**

GAHT leads to anatomical, physiological, and psychological changes. The onset of the anatomic effects (e.g., clitoral growth, breast growth, vaginal mucosal atrophy) may begin early after the initiation of therapy, and the peak effect is expected at 1–2 years (T'Sjoen et al., 2019). To

ensure sufficient time for psychological adaptations to the physical change during an important developmental time for the adolescent, 12 months of hormone treatment is suggested. Depending upon the surgical result required, a period of hormone treatment may need to be longer (e.g., sufficient clitoral virilization prior to metoidioplasty/phalloplasty, breast growth and skin expansion prior to breast augmentation, softening of skin and changes in facial fat distribution prior to facial GAS) (de Blok et al., 2021).

For individuals who are not taking hormones prior to surgical interventions, it is important surgeons review the impact of hormone therapy on the proposed surgery. In addition, for individuals undergoing gonadectomy who are not taking hormones, a plan for hormone replacement can be developed with their prescribing professional prior to surgery.

## Consideration of ages for gender-affirming medical and surgical treatment for adolescents

Age has a strong, albeit imperfect, correlation with cognitive and psychosocial development and may be a useful objective marker for determining the potential timing of interventions (Ferguson et al., 2021). Higher (i.e., more advanced) ages may be required for treatments with greater irreversibility, complexity, or both. This approach allows for continued cognitive/emotional maturation that may be required for the adolescent to fully consider and consent to increasingly complex treatments (see Statement 6.12c).

A growing body of evidence indicates providing gender-affirming treatment for gender diverse youth who meet criteria leads to positive outcomes (Achille et al., 2020; de Vries et al., 2014; Kuper et al., 2020). There is, however, limited data on the optimal timing of gender-affirming interventions as well as the long-term physical, psychological, and neurodevelopmental outcomes in youth (Chen et al., 2020; Chew et al., 2018; Olson-Kennedy et al., 2016). Currently, the only existing longitudinal studies evaluating gender diverse youth and adult outcomes are based on a specific model (i.e., the Dutch approach) that involved a comprehensive initial assessment with follow-up. In this approach, pubertal suppression was considered at age 12, GAHT at age 16, and

surgical interventions after age 18 with exceptions in some cases. It is not clear if deviations from this approach would lead to the same or different outcomes. Longitudinal studies are currently underway to better define outcomes as well as the safety and efficacy of gender-affirming treatments in youth (Olson-Kennedy, Garofalo et al., 2019; Olson-Kennedy, Rosenthal et al., 2019). While the long-term effects of gender-affirming treatments initiated in adolescence are not fully known, the potential negative health consequences of delaying treatment should also be considered (de Vries et al., 2021). As the evidence base regarding outcomes of gender-affirming interventions in youth continues to grow, recommendations on the timing and readiness for these interventions may be updated.

Previous guidelines regarding gender-affirming treatment of adolescents recommended partially reversible GAHT could be initiated at approximately 16 years of age (Coleman et al., 2012; Hembree et al., 2009). More recent guidelines suggest there may be compelling reasons to initiate GAHT prior to the age of 16, although there are limited studies on youth who have initiated hormones prior to 14 years of age (Hembree, 2017). A compelling reason for earlier initiation of GAHT, for example, might be to avoid prolonged pubertal suppression, given potential bone health concerns and the psychosocial implications of delaying puberty as described in more detail in Chapter 12— Hormone Therapy (Klink, Caris et al., 2015; Schagen et al., 2020; Vlot et al., 2017; Zhu & Chan, 2017). Puberty is a time of significant brain and cognitive development. The potential neurodevelopmental impact of extended pubertal suppression in gender diverse youth has been specifically identified as an area in need of continued study (Chen et al., 2020). While GnRH analogs have been shown to be safe when used for the treatment of precocious puberty, there are concerns delaying exposure to sex hormones (endogenous or exogenous) at a time of peak bone mineralization may lead to decreased bone mineral density. The potential decrease in bone mineral density as well as the clinical significance of any decrease requires continued study (Klink, Caris et al., 2015; Lee, Finlayson et al.,

2020; Schagen et al., 2020). The potential negative psychosocial implications of not initiating puberty with peers may place additional stress on gender diverse youth, although this has not been explicitly studied. When considering the timing of initiation of gender-affirming hormones, providers should compare the potential physical and psychological benefits and risks of starting treatment with the potential risks and benefits of delaying treatment. This process can also help identify compelling factors that may warrant an individualized approach.

Studies carried out with trans masculine youth have demonstrated chest dysphoria is associated with higher rates of anxiety, depression, and distress and can lead to functional limitations, such as avoiding exercising or bathing (Mehringer et al., 2021; Olson-Kennedy, Warus et al., 2018; Sood et al., 2021). Testosterone unfortunately does little to alleviate this distress, although chest masculinization is an option for some individuals to address this distress long-term. Studies with youth who sought chest masculinization surgery to alleviate chest dysphoria demonstrated good surgical outcomes, satisfaction with results, and minimal regret during the study monitoring period (Marinkovic & Newfield, 2017; Olson-Kennedy, Warus et al., 2018). Chest masculinization surgery can be considered in minors when clinically and developmentally appropriate as determined by a multidisciplinary team experienced in adolescent and gender development (see relevant statements in this chapter). The duration or current use of testosterone therapy should not preclude surgery if otherwise indicated. The needs of some TGD youth may be met by chest masculinization surgery alone. Breast augmentation may be needed by trans feminine youth, although there is less data about this procedure in youth, possibly due to fewer individuals requesting this procedure (Boskey et al., 2019; James, 2016). GAHT, specifically estrogen, can help with development of breast tissue, and it is recommended youth have a minimum of 12 months of hormone therapy, or longer as is surgically indicated, prior to breast augmentation unless hormone therapy is not clinically indicated or is medically contraindicated.

Data are limited on the optimal timing for initiating other gender-affirming surgical treatments in adolescents. This is partly due to the limited access to these treatments, which varies in different geographical locations (Mahfouda et al., 2019). Data indicate rates of gender-affirming surgeries have increased since 2000, and there has been an increase in the number of TGD youth seeking vaginoplasty (Mahfouda et al., 2019; Milrod & Karasic, 2017). A 2017 study of 20 WPATH-affiliated surgeons in the US reported slightly more than half had performed vaginoplasty in minors (Milrod & Karasic, 2017). Limited data are available on the outcomes for youth undergoing vaginoplasty. Small studies have reported improved psychosocial functioning and decreased gender dysphoria in adolescents who have undergone vaginoplasty (Becker et al., 2018; Cohen-Kettenis & van Goozen, 1997; Smith et al.,2001). While the sample sizes are small, these studies suggest there may be a benefit for some adolescents to having these procedures performed before the age of 18. Factors that may support pursuing these procedures for youth under 18 years of age include the increased availability of support from family members, greater ease of managing postoperative care prior to transitioning to tasks of early adulthood (e.g., entering university or the workforce), and safety concerns in public spaces (i.e., to reduce transphobic violence) (Boskey et al., 2018; Boskey et al., 2019; Mahfouda et al., 2019). Given the complexity and irreversibility of these procedures, an assessment of the adolescent's ability to adhere to post-surgical care recommendations and to comprehend the long-term impacts of these procedures on reproductive and sexual function is crucial (Boskey et al., 2019). Given the complexity of phalloplasty, and current high rates of complications in comparison to other gender-affirming surgical treatments, it is not recommended this surgery be considered in youth under 18 at this time (see Chapter 13—Surgery and Postoperative Care).

Additional key factors that should be taken into consideration when discussing the timing of interventions with youth and families are addressed in detail in statements 6.12a-f. For a summary of the criteria/recommendations for medically necessary gender-affirming medical treatment in adolescents, see Appendix D.

## CHAPTER 7 Children

These Standards of Care pertain to prepubescent gender diverse children and are based on research, ethical principles, and accumulated expert knowledge. The principles underlying these standards include the following 1) childhood gender diversity is an expected aspect of general human development (Endocrine Society and Pediatric Endocrine Society, 2020; Telfer et al., 2018); 2) childhood gender diversity is not a pathology or mental health disorder (Endocrine Society and Pediatric Endocrine Society, 2020; Oliphant et al., 2018; Telfer et al., 2018); 3) diverse gender expressions in children cannot always be assumed to reflect a transgender identity or gender incongruence (Ehrensaft, 2016; Ehrensaft, 2018; Rael et al., 2019); 4) guidance from mental health professionals (MHPs) with expertise in gender care for children can be helpful in supporting positive adaptation as well as discernment of gender-related needs over time (APA, 2015; Ehrensaft, 2018; Telfer et al., 2018); 5) conversion therapies for gender diversity in children (i.e., any "therapeutic" attempts to compel a gender diverse child through words, actions, or both to identify with, or behave in accordance with, the gender associated with the sex assigned at birth are harmful and we repudiate their use (APA, 2021; Ashley, 2019b, Paré, 2020; SAMHSA, 2015; Telfer et al., 2018; UN Human Rights Council, 2020).

Throughout the text, the term "health care professional" (HCP) is used broadly to refer to professionals working with gender diverse children. Unlike pubescent youth and adults, prepubescent gender diverse children are not eligible to access medical intervention (Pediatric Endocrine Society, 2020); therefore, when professional input is sought, it is most likely to be from an HCP specialized in psychosocial supports and gender development. Thus, this chapter is uniquely focused on developmentally appropriate psychosocial practices, although other HCPs, such as pediatricians and family practice HCPs may also find these standards useful as they engage in professional work with gender diverse children and their families.

This chapter employs the term "gender diverse" given that gender trajectories in prepubescent children cannot be predicted and may evolve over time (Steensma, Kreukels et al., 2013). At the same time, this chapter recognizes some children will remain stable in a gender identity they articulate early in life that is discrepant from the sex assigned at birth (Olson et al., 2022). The term, "gender diverse" includes transgender binary and nonbinary children, as well as gender diverse children who will ultimately not identify as transgender later in life. Terminology is inherently culturally bound and evolves over time. Thus, it is possible terms used here may become outdated and we will find better descriptors.

This chapter describes aspects of medical necessary care intended to promote the well-being and gender-related needs of children (see medically necessary statement in the Global Applicability chapter, Statement 2.1). This chapter advocates everyone employs these standards, to the extent possible. There may be situations or locations in which the recommended resources are not fully available. HCPs/teams lacking resources need to work toward meeting these standards. However, if unavoidable limitations preclude components of these recommendations, this should not hinder providing the best services currently available. In those locations where some but not all recommended services exist, choosing not to implement potentially beneficial care services risks harm to a child (Murchison et al., 2016; Telfer et al., 2018; Riggs et al., 2020). Overall, it is imperative to prioritize a child's best interests.

A vast empirical psychological literature indicates early childhood experiences frequently set the stage for lifelong patterns of risk and/or resilience and contribute to a trajectory of development more or less conducive to well-being and a positive quality of life (Anda et al., 2010; Masten & Cicchetti, 2010; Shonkoff & Garner, 2012). The available research indicates, in general, gender diverse youth are at greater risk for experiencing psychological difficulties (Ristori & Steensma, 2016) than age- matched cisgender peers as a result of encountering destructive experiences, including trauma and maltreatment stemming from gender diversity-related rejection and other harsh, non-accepting interactions (Barrow & Apostle, 2018; Giovanardi et al., 2018; Gower, Rider, Brown et al., 2018; Grossman & D'Augelli, 2006; Hendricks & Testa, 2012; Reisner, Greytak

et al., 2015; Roberts et al., 2014; Tishelman & Neumann-Mascis, 2018). Further, literature indicates prepubescent children who are well accepted in their gender diverse identities are generally well-adjusted (Malpas et al., 2018; Olson et al., 2016). Assessment and treatment of children typically emphasizes an *ecological* approach, recognizing children need to be safe and nurtured in each setting they frequent (Belsky, 1993; Bronfenbrenner, 1979; Kaufman & Tishelman, 2018; Lynch & Cicchetti, 1998; Tishelman et al., 2010; Zielinski & Bradshaw, 2006). Thus, the perspective of this chapter draws on basic psychological literature and knowledge of the unique risks to gender diverse children and emphasizes the integration of an ecological approach to understanding their needs and to facilitating positive mental health in all gender care. This perspective prioritizes fostering well-being and quality of life for a child throughout their development. Additionally, this chapter also embraces the viewpoint, supported by the substantial psychological research cited above, that psychosocial gender-affirming care (Hidalgo et al., 2013) for prepubescent children offers a window of opportunity to promote a trajectory of well-being that will sustain them over time and during the transition to adolescence. This approach potentially can mitigate some of the common mental health risks faced by transgender and gender diverse (TGD) teens, as frequently described in literature (Chen et al., 2021; Edwards-Leeper et al., 2017; Haas et al., 2011; Leibowitz & de Vries, 2016; Reisner, Bradford et al., 2015; Reisner, Greytak et al., 2015).

Developmental research has focused on understanding various aspects of gender development in the earliest years of childhood based on a general population of prepubescent children. This research has typically relied on the assumption that child research participants are cisgender (Olezeski et al., 2020) and has reported gender identity stability is established in the preschool years for the general population of children, most of whom are likely not gender diverse (Kohlberg, 1966; Steensma, Kreukels et al., 2013). Recently, developmental research has demonstrated gender diversity can be observed and identified in young prepubescent children (Fast & Olson, 2018; Olson & Gülgöz, 2018; Robles et al., 2016). Nonetheless, empirical study in this area is limited, and at this time there are no psychometrically sound assessment measures capable of reliably and/or fully ascertaining a prepubescent child's self-understanding of their own gender and/or gender-related needs and preferences (Bloom et al., 2021). Therefore, this chapter emphasizes the importance of a nuanced and individualized clinical approach to gender assessment, consistent with the recommendations from various guidelines and literature (Berg & Edwards-Leeper, 2018; de Vries & Cohen-Kettenis, 2012; Ehrensaft, 2018; Steensma & Wensing-Kruger, 2019). Research and clinical experience have indicated gender diversity in prepubescent children may, for some, be fluid; there are no reliable means of predicting an individual child's gender evolution (Edwards-Leeper et al., 2016; Ehrensaft, 2018; Steensma, Kreukels et al., 2013), and the gender-related needs for a particular child may vary over the course of their childhood.

It is important to understand the meaning of the term "assessment" (sometimes used synonymously with the term "evaluation"). There are multiple contexts for assessment (Krishnamurthy et al., 2004) including rapid assessments that take place during an immediate crisis (e.g., safety assessment when a child may be suicidal) and focused assessments when a family may have a circumscribed question, often in the context of a relatively brief consultation (Berg & Edwards-Leeper, 2018). The term assessment is also often used in reference to "diagnostic assessment," which can also be called an "intake" and is for the purpose of determining whether there is an issue that is diagnosable and/or could benefit from a therapeutic process. This chapter focus on comprehensive assessments, useful for understanding a child and family's needs and goals (APA, 2015; de Vries & Cohen-Kettenis, 2012; Srinath et al., 2019; Steensma & Wensing-Kruger, 2019). This type of psychosocial assessment is not necessary for all gender diverse children, but may be requested for a number of reasons. Assessments may present a useful opportunity to start a process of support for a gender diverse child and their family, with the understanding that gender diverse children benefit when their family dynamics include

**Statements of Recommendations**

7.1- We recommend health care professionals working with gender diverse children receive training and have expertise in gender development and gender diversity in children and possess a general knowledge of gender diversity across the life span.

7.2- We recommend health care professionals working with gender diverse children receive theoretical and evidenced-based training and develop expertise in general child and family mental health across the developmental spectrum.

7.3- We recommend health care professionals working with gender diverse children receive training and develop expertise in autism spectrum disorders and other neurodiversity or collaborate with an expert with relevant expertise when working with autistic/neurodivergent, gender diverse children.

7.4- We recommend health care professionals working with gender diverse children engage in continuing education related to gender diverse children and families.

7.5- We recommend health care professionals conducting an assessment with gender diverse children access and integrate information from multiple sources as part of the assessment.

7.6- We recommend health care professionals conducting an assessment with gender diverse children consider relevant developmental factors, neurocognitive functioning, and social skills.

7.7- We recommend health care professionals conducting an assessment with gender diverse children consider factors that may constrain accurate reporting of gender identity/gender expression by the child and/or family/caregiver(s).

7.8- We recommend health care professionals consider consultation, psychotherapy, or both for a gender diverse child and family/caregivers when families and health care professionals believe this would benefit the well-being and development of a child and/or family.

7.9- We recommend health care professionals offering consultation, psychotherapy, or both to gender diverse children and families/caregivers work with other settings and individuals important to the child to promote the child's resilience and emotional well-being.

7.10- We recommend health care professionals offering consultation, psychotherapy, or both to gender diverse children and families/caregivers provide both parties with age-appropriate psychoeducation about gender development.

7.11- We recommend that health care professionals provide information to gender diverse children and their families/caregivers as the child approaches puberty about potential gender affirming medical interventions, the effects of these treatments on future fertility, and options for fertility preservation.

7.12- We recommend parents/caregivers and health care professionals respond supportively to children who desire to be acknowledged as the gender that matches their internal sense of gender identity.

7.13- We recommend health care professionals and parents/caregivers support children to continue to explore their gender throughout the pre-pubescent years, regardless of social transition.

7.14- We recommend the health care professionals discuss the potential benefits and risks of a social transition with families who are considering it.

7.15- We suggest health care professionals consider working collaboratively with other professionals and organizations to promote the well-being of gender diverse children and minimize the adversities they may face.

acceptance of their gender diversity and parenting guidance when requested. Comprehensive assessments are appropriate when solicited by a family requesting a full understanding of the child's gender and mental health needs in the context of gender diversity.

In these circumstances, family member mental health issues, family dynamics, and social and cultural contexts, all of which impact a gender diverse child, should be taken into consideration (Barrow & Apostle, 2018; Brown & Mar, 2018; Cohen-Kettenis et al., 2003; Hendricks & Testa, 2012; Kaufman & Tishelman, 2018; Ristori & Steensma, 2016; Tishelman & Neumann-Mascis, 2018). This is further elaborated upon in the text below.

It is important HCPs working with gender diverse children strive to understand the child and the family's various aspects of identity and experience: racial, ethnic, immigrant/refugee status, religious, geographic, and socio-economic, for example, and be respectful and sensitive to cultural context in clinical interactions (Telfer et al., 2018). Many factors may be relevant to culture and gender, including religious beliefs, gender-related expectations, and the degree to which gender diversity is accepted (Oliphant et al., 2018). Intersections between gender diversity, sociocultural diversity, and minority statuses can be sources of strength, social stress, or both (Brown & Mar, 2018; Oliphant et al., 2018; Riggs & Treharne, 2016).

Each child, family member, and family dynamic is unique and potentially encompasses multiple cultures and belief patterns. Thus, HCPs of all disciplines should avoid stereotyping based on preconceived ideas that may be incorrect or biased (e.g., that a family who belongs to a religious organization that is opposed to appreciating gender diversity will necessarily be unsupportive of their child's gender diversity) (Brown & Mar, 2018). Instead, it is essential to approach each family openly and understand each family member and family pattern as distinct.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

### Statement 7.1

**We recommend the health care professionals working with gender diverse children receive training and have expertise in gender development and gender diversity in children and possess general knowledge of gender diversity across the life span.**

HCPs working with gender diverse children should acquire and maintain the necessary training and credentials relevant to the scope of their role as professionals. This includes licensure, certification, or both by appropriate national and/or regional accrediting bodies. We recognize the specifics of credentialing and regulation of professionals vary globally. Importantly, basic licensure, certification, or both may be insufficient in and of itself to ensure competency working with gender diverse children, as HCPs specifically require in-depth training and supervised experience in childhood gender development and gender diversity to provide appropriate care.

### Statement 7. 2

**We recommend health care professionals working with gender diverse children receive theoretical and evidenced-based training and develop expertise in general child and family mental health across the developmental spectrum.**

HCPs should receive training and supervised expertise in general child and family mental health across the developmental spectrum from toddlerhood through adolescence, including evidence-based assessment and intervention approaches. Gender diversity is not a mental health disorder; however, as cited above, we know mental health can be adversely impacted for gender diverse children (e.g., through gender minority stress) (Hendricks & Testa, 2012) that may benefit from exploration and support; therefore, mental health expertise is highly recommended. Working with children is a complex endeavor, involving an understanding of a child's developmental needs at various ages, the ability to comprehend the forces impacting a child's well-being both inside and outside the family (Kaufman & Tishelman, 2018), and an ability to fully assess when a child is unhappy or experiencing significant mental health difficulties, related or unrelated to gender. Research has indicated high levels of adverse experiences and trauma in the gender diverse community of children, including susceptibility to rejection or even maltreatment (APA, 2015; Barrow & Apostle, 2018; Giovanardi et al., 2018; Reisner, Greytak et al., 2015; Roberts et al., 2012; Tishelman & Neumann-Mascis, 2018). HCPs need to be cognizant of the potential for adverse experiences and be able to initiate effective interventions to prevent harm and promote positive well-being.

### Statement 7.3

**We recommend health care professionals working with gender diverse children receive training and develop expertise in autism spectrum disorders and other neurodiversity or collaborate with an expert with relevant expertise when working with autistic/neurodivergent, gender diverse children.**

The experience of gender diversity in autistic children as well as in children with other forms of neurodivergence may present extra clinical complexities (de Vries et al., 2010; Strang, Meagher et al., 2018). For example, autistic children may find it difficult to self-advocate for their gender-related needs and may communicate in highly individualistic ways (Kuvalanka et al., 2018; Strang, Powers et al., 2018). They may have varied interpretations of gender-related experiences given common differences in communication and thinking style. Because of the unique needs of gender diverse neurodivergent children, they may be at high risk for being misunderstood (i.e., for their communications to be misinterpreted). Therefore, professionals providing support to these children can best serve them by receiving training and developing expertise in autism and related neurodevelopmental presentations and/or collaborating with autism specialists (Strang, Meagher et al., 2018). Such training is especially relevant as research has documented

higher rates of autism among gender diverse youth than in the general population (de Vries et al., 2010; Hisle-Gorman et al., 2019; Shumer et al., 2015).

## Statement 7.4

**We recommend health care professionals working with gender diverse children engage in continuing education related to gender diverse children and families.**

Continuing professional development regarding gender diverse children and families may be acquired through various means, including through readings (journal articles, books, websites associated with gender knowledgeable organizations), attending on-line and in person trainings, and joining peer supervision/consultation groups (Bartholomaeus et al., 2021).

Continuing education includes 1) maintaining up-to-date knowledge of available and relevant research on gender development and gender diversity in prepubescent children and gender diversity across the life span; 2) maintaining current knowledge regarding best practices for assessment, support, and treatment approaches with gender diverse children and families. This is a relatively new area of practice and health care professionals need to adapt as new information emerges through research and other avenues (Bartholomaeus et al., 2021).

## Statement 7.5

**We recommend health care professionals conducting an assessment with gender diverse children access and integrate information from multiple sources as part of the assessment.**

A comprehensive assessment, when requested by a family and/or an HCP can be useful for developing intervention recommendations, as needed, to benefit the well-being of the child and other family members. Such an assessment can be beneficial in a variety of situations when a child and/or their family/guardians, in coordination with providers, feel some type of intervention would be helpful. Neither assessments nor interventions should ever be used as a means of covertly or overtly discouraging a child's gender diverse expressions or identity. Instead, with appropriately trained providers, assessment can be an effective means of better understanding how to support a child and their family without privileging any particular gender identity or expression. An assessment can be especially important for some children and their families by collaborating to promote a child's gender health, well-being, and self-fulfillment.

A comprehensive assessment can facilitate the formation of an individualized plan to assist a gender diverse prepubescent children and family members (de Vries & Cohen-Kettenis, 2012; Malpas et al., 2018; Steensma & Wensing-Kruger, 2019; Telfer et al., 2018; Tishelman & Kaufman, 2018). In such an assessment, integrating information from multiple sources is important to 1) best understand the child's gender needs and make recommendations; and 2) identify areas of child, family/caregiver, and community strengths and supports specific to the child's gender status and development as well as risks and concerns for the child, their family/caregivers and environment. Multiple informants for both evaluation and support/intervention planning purposes may include the child, parents/caregivers, extended family members, siblings, school personnel, HCPs, the community, broader cultural and legal contexts and other sources as indicated (Berg & Edwards-Leeper, 2018; Srinath, 2019).

An HCP conducting an assessment of gender diverse children needs to explore gender-related issues but must also take a broad view of the child and the environment, consistent with the ecological model described above (Bronfenbrenner, 1979) to fully understand the factors impacting a child's well-being and areas of gender support and risk (Berg & Edwards-Leeper, 2018; Hendricks & Testa, 2012; Kaufman & Tishelman, 2018; Tishelman & Neumann-Mascis, 2018). This includes understanding the strengths and challenges experienced by the child/family and that are present in the environment. We advise HCPs conducting an assessment with gender diverse children to consider incorporating multiple assessment domains, depending on the child and the family's needs and circumstances. Although some of the latter listed domains below do not directly address the child's gender (see items 7–12 below), they need to be accounted for in a gender assessment, as indicated by clinical judgment, to understand the complex web of factors

that may be affecting the child's well-being in an integrated fashion, including gender health, consistent with evaluation best practices a (APA, 2015; Berg & Edwards-Leeper, 2018; Malpas et al., 2018) and develop a multi-pronged intervention when needed.

Summarizing from relevant research and clinical expertise, assessment domains often include 1) a child's asserted gender identity and gender expression, currently and historically; 2) evidence of dysphoria, gender incongruence, or both; 3) strengths and challenges related to the child, family, peer and others' beliefs and attitudes about gender diversity, acceptance and support for child; 4) child and family experiences of gender minority stress and rejection, hostility, or both due to the child's gender diversity; 5) level of support related to gender diversity in social contexts (e.g., school, faith community, extended family); 6) evaluation of conflict regarding the child's gender and/or parental/caregiver/sibling concerning behavior related to the child's gender diversity; 7) child mental health, communication and/or cognitive strengths and challenges, neurodivergence, and/or behavioral challenges causing significant functional difficulty; 8) relevant medical and developmental history; 9) areas that may pose risks (e.g., exposure to domestic and/or community violence, any form of child maltreatment; history of trauma; safety and/or victimization with peers or in any other setting; suicidality); 10) co-occurring significant family stressors, such as chronic or terminal illness, homelessness or poverty; 11) parent/caregiver and/or sibling mental health and/or behavioral challenges causing significant functional difficulty; and 12) child's and family's strengths and challenges.

A thorough assessment incorporating multiple forms of information gathering is helpful for understanding the needs, strengths, protective factors, and risks for a specific child and family across environments (e.g., home/school). Methods of information gathering often include 1) interviews with the child, family members and others (e.g., teachers), structured and unstructured; 2) caregiver and child completed standardized measures related to gender; general child well-being; child cognitive and communication skills and developmental disorders/disabilities; support and acceptance by parent/caregiver, sibling, extended family and peers; parental stress; history of childhood adversities; and/or other issues as appropriate (APA, 2020; Berg & Edwards-Leeper, 2018; Kaufman & Tishelman, 2018; Srinath, 2019).

Depending on the family characteristics, the developmental profile of the child, or both, methods of information gathering also may also benefit from including the following 1) child and/or family observation, structured and unstructured; and 2) structured and visually supported assessment techniques (worksheets; self-portraits; family drawings, etc.) (Berg & Edwards-Leeper, 2018).

Statement 7.6

**We recommend that health care professionals conducting an assessment with gender diverse children consider relevant developmental factors, neurocognitive functioning and language skills.**

Given the complexities of assessing young children who, unlike adults, are in the process of development across a range of domains (cognitive, social, emotional, physiological), it is important to consider the developmental status of a child and gear assessment modalities and interactions to the individualized abilities of the child. This includes tailoring the assessment to a child's developmental stage and abilities (preschoolers, school age, early puberty prior to adolescence), including using language and assessment approaches that prioritize a child's comfort, language skills, and means of self-expression (Berg & Edwards-Leeper, 2018; Srinath, 2019). For example, relevant developmental factors, such as neurocognitive differences (e.g., autism spectrum conditions), and receptive and expressive language skills should be considered in conducting the assessment. Health care professionals may need to consult with specialists for guidance in cases in which they do not possess the specialized skills themselves (Strang et al., 2021).

Statement 7.7

**We recommend health care professionals conducting an assessment with gender diverse children consider factors that may constrain accurate reporting of gender identity/gender expression by the child and/or family/caregiver(s).**

HCPs conducting an assessment with gender diverse children and families need to account for developmental, emotional, and environmental factors that may constrain a child's, caregiver's, sibling or other's report or influence their belief systems related to gender (Riggs & Bartholomaeus, 2018). As with all child psychological assessments, environmental and family/caregiver reactions (e.g., punishment), and/or cognitive and social factors may influence a child's comfort and/or ability to directly discuss certain factors, including gender identity and related issues (Srinath, 2019). Similarly, family members may feel constrained in freely expressing their concerns and ideas depending on family conflicts or dynamics and/or other influences (e.g., cultural/religious; extended family pressure) (Riggs & Bartholomaeus, 2018).

Statement 7.8

**We recommend health care professionals consider consultation, psychotherapy, or both for a gender diverse child and family/caregivers when families and health care professionals believe this would benefit the well-being and development of a child and/or family.**

The goal of psychotherapy should never be aimed at modifying a child's gender identity (APA, 2021; Ashley, 2019b; Paré, 2020; SAMHSA, 2015; UN Human Rights Council, 2020), either covertly or overtly. Not all gender diverse children or their families need input from MHPs as gender diversity is not a mental health disorder (Pediatric Endocrine Society, 2020; Telfer et al., 2018). Nevertheless, it is often appropriate and helpful to seek psychotherapy when there is distress or concerns are expressed by parents to improve psychosocial health and prevent further distress (APA, 2015). Some of the common reasons for considering psychotherapy for a gender diverse child and family include the following 1) A child is demonstrating significant conflicts, confusion, stress or distress about their gender identity or needs a protected space to explore their gender (Ehrensaft, 2018; Spivey and Edwards-Leeper, 2019); 2) A child is experiencing external pressure to express their gender in a way that conflicts with their self-knowledge, desires, and beliefs (APA, 2015); 3) A child is struggling with mental health concerns, related to or independent of their gender

(Barrow & Apostle, 2018); 4) A child would benefit from strengthening their resilience in the face of negative environmental responses to their gender identity or presentation (Craig & Auston, 2018; Malpas et al., 2018); 5) A child may be experiencing mental health and/or environmental concerns, including family system problems that can be misinterpreted as gender congruence or incongruence (Berg & Edwards-Leeper, 2018); and 6) A child expresses a desire to meet with an MHP to get gender-related support. In these situations, the psychotherapy will focus on supporting the child with the understanding that the child's parent(s)/caregiver(s) and potentially other family members will be included as necessary (APA, 2015; Ehrensaft, 2018; McLaughlin & Sharp, 2018). Unless contraindicated, it is extremely helpful for parents/guardians to participate in some capacity in the psychotherapy process involving prepubescent children as family factors are often central to a child's well-being. Although relatively unexplored in research involving gender diverse children, it may be important to attend to the relationship between siblings and the gender diverse child (Pariseau et al., 2019; Parker & Davis-McCabe, 2021).

HCPs should employ interventions tailor-made to the individual needs of the child that are designed to 1) foster protective social and emotional coping skills to promote resilience in the face of potential negative reactions to the child's gender identity, expressions, or both (Craig & Austin, 2016; Malpas et al., 2018; Spencer, Berg et al., 2021); 2) collaboratively problem-solve social challenges to reduce gender minority stress (Barrow & Apostle, 2018; Tishelman & Neumann-Mascis, 2018); 3) strengthen environmental supports for the child and/or members of the immediate and extended family (Kaufman & Tishelman, 2018); and 4) provide the child an opportunity to further understand their internal gender identity experiences (APA, 2015; Barrow & Apostle, 2018; Ehrensaft, 2018; Malpas et al., 2018; McLaughlin & Sharp, 2018). It is helpful for HCPs to develop a relationship with a gender diverse child and family that can endure over time as needed. This enables the child/family to establish a long-term trusting relationship throughout childhood whereby the HCP can offer support and guidance as a child matures and as potentially

different challenges or needs emerge for the child/family (Spencer, Berg et al., 2021; Murchison et al., 2016). In addition to the above and within the limits of available resources, when a child is neurodivergent, an HCP who has the skill set to address both neurodevelopmental differences and gender is most appropriate (Strang et al., 2021).

As outlined in the literature, there are numerous reasons parents/caregivers, siblings, and extended family members of a prepubescent child may find it useful to seek psychotherapy for themselves (Ehrensaft, 2018; Malpas et al., 2018; McLaughlin & Sharp, 2018). As summarized below, some of these common catalysts for seeking such treatment occur when one or more *family members* 1) desire education around gender development (Spivey & Edwards-Leeper, 2019); 2) are experiencing significant confusion or stress about the child's gender identity, expression, or both (Ashley, 2019c; Ehrensaft, 2018); 3) need guidance related to emotional and behavioral concerns regarding the gender diverse child (Barrow & Apostle, 2018; 4) need support to promote affirming environments outside of the home (e.g., school, sports, camps) (Kaufman & Tishelman, 2018); 5) are seeking assistance to make informed decisions about social transition, including how to do so in a way that is optimal for a child's gender development and health (Lev & Wolf-Gould, 2018); 6) are seeking guidance for dealing with condemnation from others, including political entities and accompanying legislation, regarding their support for their gender diverse child (negative reactions directed toward parents/caregivers can sometimes include rejection and/or harassment/abuse from the social environment arising from affirming decisions (Hidalgo & Chen, 2019); 7) are seeking to process their own emotional reactions and needs about their child's gender identity, including grief about their child's gender diversity and/or potential fears or anxieties for their child's current and future well-being (Pullen Sansfaçon et al., 2019); and 8) are emotionally distressed and/or in conflict with other family members regarding the child's gender diversity (as needed, HCPs can provide separate sessions for parents/caregivers, siblings and extended family members for support, guidance, and/or psychoeducation)

(McLaughlin & Sharp, 2018; Pullen Sansfaçon et al., 2019; Spivey & Edwards-Leeper, 2019).

<u>Statement 7.9</u>
**We recommend health care professionals offering consultation, psychotherapy, or both to gender diverse children and families/caregivers work with other settings and individuals important to the child to promote the child's resilience and emotional well-being.**

Consistent with the ecological model described above and, as appropriate, based on individual/family circumstances, it can be extremely helpful for HCPs to prioritize coordination with important others (e.g., teachers, coaches, religious leaders) in a child's life to promote emotional and physical safety across settings (e.g., school settings, sports and other recreational activities, faith-based involvement) (Kaufman & Tishelman, 2018). Therapeutic and/or support groups are often recommended as a valuable resource for families/caregivers and/or gender diverse children themselves (Coolhart, 2018; Horton et al., 2021; Malpas et al., 2018; Murchison et al., 2016).

<u>Statement 7.10</u>
**We recommend HCPs offering consultation, psychotherapy, or both to gender diverse children and families/caregivers provide both parties with age appropriate psycho-education about gender development.**

Parents/caregivers and their gender diverse child should have the opportunity to develop knowledge regarding ways in which families/caregivers can best support their child to maximize resilience, self-awareness, and functioning (APA, 2015; Ehrensaft, 2018; Malpas, 2018; Spivey & Edwards-Leeper, 2019). It is neither possible nor is it the role of the HCP to predict with certainty the child's ultimate gender identity; instead, the HCP's task is to provide a safe space for the child's identity to develop and evolve over time without attempts to prioritize any particular developmental trajectory with regard to gender (APA, 2015; Spivey & Edwards-Leeper, 2019). Gender diverse children and early adolescents have different needs and experiences than older adolescents, socially and physiologically, and those differences should be reflected in the individualized approach HCPs

provide to each child/family (Keo-Meir & Ehrensaft, 2018; Spencer, Berg et al., 2021).

Parents/caregivers and their children should also have the opportunity to develop knowledge about gender development and gender literacy through age-appropriate psychoeducation (Berg & Edwards-Leeper, 2018; Rider, Vencill et al., 2019; Spencer, Berg et al., 2021). Gender literacy involves understanding the distinctions between sex designated at birth, gender identity, and gender expression, including the ways in which these three factors uniquely come together for a child (Berg & Edwards-Leeper, 2018; Rider, Vencill et al., 2019; Spencer, Berg et al., 2021). As a child gains gender literacy, they begin to understand their body parts do not necessarily define their gender identity and/or their gender expression (Berg & Edwards-Leeper, 2018; Rider, Vencill et al., 2019; Spencer, Berg et al., 2021). Gender literacy also involves learning to identify messages and experiences related to gender within society. As a child gains gender literacy, they may view their developing gender identity and gender expression more positively, promoting resilience and self-esteem, and diminishing risk of shame in the face of negative messages from the environment. Gaining gender literacy through psychoeducation may also be important for siblings and/or extended family members who are important to the child (Rider, Vencill et al., 2019; Spencer, Berg et al., 2021).

### Statement 7.11
**We recommend health care professionals provide information to gender diverse children and their families/caregivers as the child approaches puberty about potential gender-affirming medical interventions, the effects of these treatments on future fertility, and options for fertility preservation.**

As a child matures and approaches puberty, HCPs should prioritize working with children and their parents/caregivers to integrate psychoeducation about puberty, engage in shared decision-making about potential gender-affirming medical interventions, and discuss fertility-related and other reproductive health implications of medical treatments (Nahata, Quinn et al., 2018; Spencer, Berg et al., 2021). Although only limited

empirical research exists to evaluate such interventions, expert consensus and developmental psychological literature generally support the notion that open communication with children about their bodies and preparation for physiological changes of puberty, combined with gender-affirming acceptance, will promote resilience and help to foster positive sexuality as a child matures into adolescence (Spencer, Berg et al., 2019). All these discussions may be extended (e.g., starting earlier) to include neurodivergent children, to ensure there is enough time for reflection and understanding, especially as choices regarding future gender- affirming medical care potentially arise (Strang, Jarin et al., 2018). These discussions could include the following topics:

- Review of body parts and their different functions;
- The ways in which a child's body may change over time with and without medical intervention;
- The impact of medical interventions on later sexual functioning and fertility;
- The impact of puberty suppression on potential later medical interventions;
- Acknowledgment of the current lack of clinical data in certain areas related to the impacts of puberty suppression;
- The importance of appropriate sex education prior to puberty.

These discussions should employ developmentally appropriate language and teaching styles, and be geared to the specific needs of each individual child (Spencer, Berg et al., 2021).

### Statement 7.12
**We recommend parents/caregivers and health care professionals respond supportively to children who desire to be acknowledged as the gender that matches their internal sense of gender identity.**

Gender social transition refers to a process by which a child is acknowledged by others and has the opportunity to live publicly, either in all situations or in certain situations, in the gender identity they affirm and has no singular set of parameters or actions (Ehrensaft et al., 2018).

Gender social transition has often been conceived in the past as binary—a girl transitions to a boy, a boy to a girl. The concept has expanded to include children who shift to a nonbinary or individually shaped iteration of gender identity (Chew et al., 2020; Clark et al., 2018). Newer research indicates the social transition process may serve a protective function for some prepubescent children and serve to foster positive mental health and well-being (Durwood et al., 2017; Gibson et al., 2021; Olson et al., 2016). Thus, recognition that a child's gender may be fluid and develop over time (Edwards-Leeper et al., 2016; Ehrensaft, 2018; Steensma, Kreukels et al., 2013) is not sufficient justification to negate or deter social transition for a prepubescent child when it would be beneficial. Gender identity evolution may continue even after a partial or complete social transition process has taken place (Ashley, 2019e; Edwards-Leeper et al., 2018; Ehrensaft, 2020; Ehrensaft et al., 2018; Spivey & Edwards-Leeper, 2019). Although empirical data remains limited, existing research has indicated children who are most assertive about their gender diversity are most likely to persist in a diverse gender identity across time, including children who socially transition prior to puberty (Olson et al., 2022; Rae et al., 2019; Steensma, McGuire et al., 2013). Thus, when considering a social transition, we suggest parents/caregivers and HCPs pay particular attention to children who consistently and often persistently articulate a gender identity that does not match the sex designated at birth. This includes those children who may explicitly request or desire a social acknowledgement of the gender that better matches the child's articulated gender identity and/ or children who exhibit distress when their gender as they know it is experienced as incongruent with the sex designated at birth (Rae et al., 2019; Steensma, Kreukels et al., 2013).

Although there is a dearth of empirical literature regarding best practices related to the social transition process, clinical literature and expertise provides the following guidance that prioritizes a child's best interests (Ashley, 2019e; Ehrensaft, 2018; Ehrensaft et al, 2018; Murchison et al., 2016; Telfer et al., 2018): 1) social transition should originate from the child and reflect the child's wishes in the process of making the decision to initiate a social transition process; 2) an HCP may assist exploring the advantages/benefits, plus potential challenges of social transition; 3) social transition may best occur in all or in specific contexts/settings only (e.g., school, home); and 4) a child may or may not choose to disclose to others that they have socially transitioned, or may designate, typically with the help of their parents/caregivers, a select group of people with whom they share the information.

In summary, social transition, when it takes place, is likely to best serve a child's well-being when it takes place thoughtfully and individually for each child. A child's social transition (and gender as well) may evolve over time and is not necessarily static, but best reflects the cross-section of the child's established self-knowledge of their present gender identity and desired actions to express that identity (Ehrensaft et al., 2018).

A social transition process can include one or more of a number of different actions consistent with a child's affirmed gender (Ehrensaft et al., 2018), including:

- Name change;
- Pronoun change;
- Change in sex/gender markers (e.g., birth certificate; identification cards; passport; school and medical documentation; etc.);
- Participation in gender-segregated programs (e.g., sports teams; recreational clubs and camps; schools; etc.);
- Bathroom and locker room use;
- Personal expression (e.g., hair style; clothing choice; etc.);
- Communication of affirmed gender to others (e.g., social media; classroom or school announcements; letters to extended families or social contacts; etc.).

Statement 7.13

**We recommend health care professionals and parents/caregivers support children to continue to explore their gender throughout the pre-pubescent years, regardless of social transition.**

It is important children who have engaged in social transition be afforded the same opportunities as other children to continue considering

meanings and expressions of gender throughout their childhood years (Ashley 2019e; Spencer, Berg et al., 2021). Some research has found children may experience gender fluidity or even detransition after an initial social transition. Research has not been conclusive about when in the life span such detransition is most likely to occur, or what percentage of youth will eventually experience gender fluidity and/or a desire to detransition—due to gender evolution, or potentially other reasons (e.g., safety concerns; gender minority stress) (Olson et al., 2022; Steensma, Kreukels et al., 2013). A recent research report indicates in the US, detransition occurs with only a small percentage of youth five years after a binary social transition (Olson et al., 2022); further follow-up of these young people would be helpful. Replication of these findings is important as well since this study was conducted with a limited and self-selected participant pool in the US and thus may not be applicable to all gender diverse children. In summary, we have limited ability to know in advance the ways in which a child's gender identity and expressions may evolve over time and whether or why detransition may take place for some. In addition, not all gender diverse children wish to explore their gender (Telfer et al., 2018). Cisgender children are not expected to undertake this exploration, and therefore attempts to force this with a gender diverse child, if not indicated or welcomed, can be experienced as pathologizing, intrusive and/or cisnormative (Ansara & Hegarty, 2012; Bartholomaeus et al., 2021; Oliphant et al., 2018).

## Statement 7.14

**We recommend health care professionals discuss the potential benefits and risks of a social transition with families who are considering it.**

Social transition in prepubescent children consists of a variety of choices, can occur as a process over time, is individualized based on both a child's wishes and other psychosocial considerations (Ehrensaft, 2018), and is a decision for which possible benefits and challenges should be weighted and discussed.

A social transition may have potential benefits as outlined in clinical literature (e.g., Ehrensaft et al., 2018) and supported by research (Fast &

Olson, 2018; Rae et al., 2019). These include facilitating gender congruence while reducing gender dysphoria and enhancing psychosocial adjustment and well-being (Ehrensaft et al., 2018). Studies have indicated socially transitioned gender diverse children largely mirror the mental health characteristics of age matched cisgender siblings and peers (Durwood et al., 2017). These findings differ markedly from the mental health challenges consistently noted in prior research with gender diverse children and adolescents (Barrow & Apostle, 2018) and suggest the impact of social transition may be positive. Additionally, social transition for children typically can only take place with the support and acceptance of parents/caregivers, which has also been demonstrated to facilitate well-being in gender diverse children (Durwood et al., 2021; Malpas et al., 2018; Pariseau et al., 2019), although other forms of support, such as school-based support, have also been identified as important (Durwood et al., 2021; Turban, King et al., 2021). HCPs should discuss the potential benefits of a social transition with children and families in situations in which 1) there is a consistent, stable articulation of a gender identity that is incongruent with the sex assigned at birth (Fast & Olson, 2018). This should be differentiated from gender diverse expressions/behaviors/interests (e.g., playing with toys, expressing oneself through clothing or appearance choices, and/or engaging in activities socially defined and typically associated with the other gender in a binary model of gender) (Ehrensaft, 2018; Ehrensaft et al., 2018); 2) the child is expressing a strong desire or need to transition to the gender they have articulated as being their authentic gender (Ehrensaft et al., 2018; Fast & Olson, 2018; Rae et al., 2019); and 3) the child will be emotionally and physically safe during and following transition (Brown & Mar, 2018). Prejudice and discrimination should be considerations, especially in localities where acceptance of gender diversity is limited or prohibited (Brown & Mar, 2018; Hendricks & Testa, 2012; Turban, King et al., 2021). Of note, there can also be possible risks to a gender diverse child who does not socially transition, including 1) being ostracized or bullied for being perceived as not conforming to prescribed community

gender roles and/or socially expected patterns of behavior; and 2) living with the internal stress or distress that the gender they know themselves to be is incongruent with the gender they are being asked to present to the world.

To promote gender health, the HCP should discuss the potential challenges of a social transition. One concern often expressed relates to fear that a child will preclude considering the possible evolution of their gender identity as they mature or be reluctant to initiate another gender transition even if they no longer feel their social transition matches their current gender identity (Edwards-Leeper et al., 2016; Ristori & Steensma, 2016). Although limited, recent research has found some parents/caregivers of children who have socially transitioned may discuss with their children the option of new gender iterations (for example, reverting to an earlier expression of gender) and are comfortable about this possibility (Olson et al., 2019). Another often identified social transition concern is that a child may suffer negative sequelae if they revert to the former gender identity that matches their sex designated at birth (Chen et al., 2018; Edwards-Leeper et al., 2019; Steensma & Cohen-Kettenis, 2011). From this point of view, parents/caregivers should be aware of the potential developmental effect of a social transition on a child.

HCPs should provide guidance to parents/caregivers and supports to a child when a social gender transition is being considered or taking place by 1) providing consultation, assessment, and gender supports when needed and sought by the parents/caregivers; 2) aiding family members, as needed, to understand the child's desires for a social transition and the family members' own feelings about the child's expressed desires; 3) exploring with, and learning from, the parents/caregivers whether and how they believe a social transition would benefit their child both now and in their ongoing development; 4) providing guidance when parents/caregivers are not in agreement about a social transition and offering the opportunity to work together toward a consistent understanding of their child's gender status and needs; 5) providing guidance about safe and supportive ways to disclose their child's social transition to others and to facilitate their child transitioning in their various social environments (e.g., schools,

extended family); 6) facilitating communication, when desired by the child, with peers about gender and social transition as well as fortifying positive peer relationships; 7) providing guidance when social transition may not be socially accepted or safe, either everywhere or in specific situations, or when a child has reservations about initiating a transition despite their wish to do so; there may be multiple reasons for reservations, including fears and anxieties; 8) working collaboratively with family members and MHPs to facilitate a social transition in a way that is optimal for the child's unfolding gender development, overall well-being, and physical and emotional safety; and 9) providing psychoeducation about the many different trajectories the child's gender may take over time, leaving pathways open to future iterations of gender for the child, and emphasizing there is no need to predict an individual child's gender identity in the future (Malpas et al., 2018).

All of these tasks incorporate enhancing the quality of communication between the child and family members and providing an opportunity for the child to be heard and listened to by all family members involved. These relational processes in turn facilitate the parents/caregivers' success in making informed decisions about the advisability and/or parameters of a social transition for their child (Malpas et al., 2018).

One role of HCPs is to provide guidance and support in situations in which children and parents/caregivers wish to proceed with a social transition but conclude that the social environment would not be accepting of those choices, by 1) helping parents/caregivers define and extend safe spaces in which the child can express their authentic gender freely; 2) discussing with parents/caregivers ways to advocate that increase the likelihood of the social environment being supportive in the future, if this is a realistic goal; 3) intervening as needed to help the child/family with any associated distress and/or shame brought about by the continued suppression of authentic gender identity and the need for secrecy; and 4) building both the child's and the family's resilience, instilling the understanding that if the social environment is having difficulty accepting a child's social transition and affirmed gender identity, it is not because of some shortcoming in the child but because of



insufficient gender literacy in the social environment (Ehrensaft et al., 2018).

<u>Statement 7.15</u>
**We suggest health care professionals consider working collaboratively with other professionals and organizations to promote the well-being of gender diverse children and minimize the adversities they may face.**

All children have the right to be supported and respected in their gender identities (Human Rights Campaign, 2018; Paré, 2020; SAMHSA, 2015). As noted above, gender diverse children are a particularly vulnerable group (Barrow & Apostle, 2018; Cohen-Kettenis et al., 2003; Giovanardi et al., 2018; Gower, Rider, Coleman et al., 2018; Grossman & D'Augelli, 2007; Hendricks & Testa, 2012; Reisner, Greytak et al., 2015; Ristori & Steensma, 2016; Roberts et al., 2012; Tishelman & Neumann-Mascis, 2018). The responsibilities of HCPs as advocates encompass acknowledging social determinants of health are critical for marginalized minorities (Barrow & Mar, 2018; Hendricks & Testa, 2012). Advocacy is taken up by all HCPs in the form of child and family support (APA, 2015; Malpas et al., 2018).

Some HCPs may be called on to move beyond their individual offices or programs to advocate for gender diverse children in the larger community, often in partnership with stakeholders, including parents/caregivers, allies, and youth (Kaufman & Tishelman, 2018; Lopez et al., 2017; Vanderburgh, 2009). These efforts may be instrumental in enhancing children's gender health and promoting their civil rights (Lopez et al., 2017).

HCP's voices may be essential in schools, in parliamentary bodies, in courts of law, and in the media (Kuvalanka et al., 2019; Lopez et al., 2017; Whyatt-Sames, 2017; Vanderburgh, 2009). In addition, HCPs may have a more generalized advocacy role in acknowledging and addressing the frequent intentional or unintentional negating of the experience of gender diverse children that may be transmitted or communicated by adults, peers, and in media (Rafferty et al., 2018). Professionals who possess the skill sets and find themselves in appropriate situations can provide clear de-pathologizing statements on the needs and rights of gender diverse children and on the damage caused by discriminatory and transphobic rules, laws, and norms (Rafferty et al., 2018).

# CHAPTER 8 Nonbinary

Nonbinary is used as an umbrella term referring to individuals who experience their gender as outside of the gender binary. The term nonbinary is predominantly but not exclusively associated with global north contexts and may sometimes be used to describe indigenous and non-Western genders. The term nonbinary includes people whose genders are comprised of more than one gender identity simultaneously or at different times (e.g., bigender), who do not have a gender identity or have a neutral gender identity (e.g., agender or neutrois), have gender identities that encompass or blend elements of other genders (e.g., polygender, demiboy, demigirl), and/or who have a gender that changes over time (e.g., genderfluid) (Kuper et al., 2014; Richards et al., 2016; Richards et al., 2017; Vincent, 2019). Nonbinary people may identify to varying degrees with binary-associated genders, e.g., nonbinary man/woman, or with multiple gender terms, e.g., nonbinary and genderfluid (James et al., 2016; Kuper et al., 2012). Nonbinary also functions as a gender identity in its own right (Vincent, 2020). It is important to acknowledge this is not an exhaustive list, the same identities can have different meanings for different people, and the use of terms can vary over time and by location.

Genderqueer, first used in the 1990s, is an identity category somewhat older than nonbinary—which first emerged in approximately the late 2000s (Nestle et al., 2002; Wilchins, 1995). Genderqueer may sometimes be used synonymously with nonbinary or may communicate a specific consciously politicized dimension to a person's gender. While transgender is used in many cultural contexts as an umbrella term inclusive of nonbinary people, not all nonbinary people consider themselves to be transgender for a range of reasons, including because they consider being transgender to be exclusively within the gender binary or because they do not feel "trans enough" to describe themselves as transgender (Garrison, 2018). Some nonbinary people are unsure or ambivalent about whether they would describe themselves as transgender (Darwin, 2020; Vincent, 2019).

In the context of the English language, nonbinary people may use the pronouns they/them/theirs, or neopronouns which include e/em/eir, ze/zir/hir, er/ers/erself among others (Moser & Devereux, 2019; Vincent, 2018). Some nonbinary people use a combination of pronouns (either deliberately mixing usage, allowing free choice, or changing with social context), or prefer to avoid gendered pronouns entirely, instead using their name. Additionally, some nonbinary people use she/her/hers, or he/him/his, sometimes or exclusively, whilst in some regions in the world descriptive language for nonbinary people does not (yet) exist. In contexts outside of English, a wide range of culturally specific linguistic adaptations and evolutions can be observed (Attig, 2022; Kirey-Sitnikova, 2021; Zimman, 2020). Also of note, some languages use one pronoun that is not associated with sex or gender while others gender all nouns. These variations in language are likely to influence nonbinary people's experience of gender and how they interact with others.

Recent studies suggest nonbinary people comprise roughly 25% to over 50% of the larger transgender population, with samples of youth reporting the highest percentage of nonbinary people (Burgwal et al., 2019; James et al., 2016; Watson, 2020). In recent studies of transgender adults, nonbinary people tend to be younger than transgender men and transgender women and in studies of both youth and adults, nonbinary people are more likely to have been assigned female at birth (AFAB). However, these findings should be interpreted with caution as there are likely a number of complex, sociocultural factors influencing the quality, representativeness, and accuracy of this data (Burgwal et al., 2019; James et al., 2016; Watson, 2020; Wilson & Meyer, 2021) (see also Chapter 3—Population Estimates).

## Understanding gender identities and gender expressions as a non-linear spectrum

Nonbinary genders have long been recognized historically and cross-culturally (Herdt, 1994; McNabb, 2017; Vincent & Manzano, 2017). Many gender identity categories are culturally specific and cannot be easily translated from their context, either linguistically or in relation to the Western paradigm of gender. Historical settler colonial interactions with indigenous people with



non-Western genders remain highly relevant as cultural erasure and the intersections of racism and cisnormativity may detrimentally inform the social determinants of health of indigenous gender diverse people. From the 1950s, gender was used to reference the socially constructed categorization of behaviors, activities, appearance, etc. in relation to a binary model of male/man/masculine, and female/woman/feminine within contemporary Western contexts. However, gender now has a wider range of possible meanings, appreciating interrelated yet distinguishable concepts, including gendered biology (sex), gender roles, gender expression, and gender identity (Vincent, 2020). Aspects of gender expression that might traditionally be understood culturally as "masculine", "feminine", or "androgynous" may be legitimately expressed among people of any and all gender identities, whether nonbinary or not. For example, a nonbinary individual presenting in a feminine manner cannot be taken to imply they will necessarily later identify as a woman or access interventions associated with transgender women, such as vaginoplasty. A person's gender nonconformity in relation to cultural expectations should neither be viewed as a cause for concern nor assumed to be indicative of clinical complexity—for example, a nonbinary person assigned male at birth (AMAB) wearing feminine-coded clothing, using she/her pronouns, but keeping a masculine-coded first name.

Modeling gender as a spectrum offers greater nuance than a binary model. However, there remain significant limitations in a linear spectrum model that can lead to uncritical generalizations about gender. For example, while it is intuitive to position the "binary options" (man/male, woman/female) at either end of such a continuum, doing so situates masculinity as oppositional to femininity, failing to accommodate gender neutrality, the expression of masculinity and femininity simultaneously, and genderqueer or non-Western concepts of gender. It is essential HCPs do not view nonbinary genders as "partial" articulations of transgender manhood (in nonbinary people AFAB) or transgender womanhood (in nonbinary people AMAB), or definitively as "somewhere along the spectrum of masculinity/femininity"; some nonbinary individuals consider themselves outside male/female dichotomization altogether. A *non-linear* spectrum indicates differences of gender expression, identity, or needs around gender affirmation between clients should not be compared for the purposes of situating them along a linear spectrum. Additionally, the interpretation of gender expression is subjective and culturally defined, and what may be experienced or viewed as highly feminine by one person may not be viewed as such by another (Vincent, 2020). HCPs benefit from avoiding assumptions about how each client conceptualizes their gender and by being prepared to be led by a given client's personal understanding of gender as it relates to the client's gender identity, expression, and any need for medical care.

The gender development process experienced by all transgender and gender diverse (TGD) people regardless of their relationship to a gender binary appear to share similar themes (e.g., awareness, exploration, meaning making, integration), but the timing, progression, and personal experiences associated with each of these processes vary both within and across groups of transgender and nonbinary people (Kuper, Wright et al., 2018; Kuper, Lindley et al., 2019; Tatum et al., 2020). Sociocultural and intersectional perspectives can be helpful at contextualizing gender development and social transition, including how individual experiences are shaped by the social and cultural context and how they interact with additional domains of identity and personal experience.

### The need for access to gender-affirming care

Some nonbinary people seek gender-affirming care to alleviate gender dysphoria or incongruence and increase body satisfaction through medically necessary interventions (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1). Some nonbinary people may feel a certain treatment is necessary for them—see also Chapter 5—Assessment of Adults (Beek et al., 2015; Jones et al., 2019; Köhler et al., 2018), whilst others do not (Burgwal & Motmans, 2021; Nieder, Eyssel et al., 2020), and the proportion of nonbinary people who seek gender-affirming care and the specific goals of

that care, remains unclear. It is the role of the health care professional to provide information about existing medical options (and their availability) that might help alleviate gender dysphoria or incongruence and increase body satisfaction without making assumptions about which treatment options may best fit each individual person.

Motivations for accessing (or not accessing) gender-affirming medical interventions, including hormone treatment, surgeries, or both are heterogeneous and potentially complex (Burgwal & Motmans, 2021; Vincent, 2019, 2020) and should be explored collaboratively before making decisions about physical interventions. The need of an individual to access gender-affirming medical procedures cannot be predicted by their gender role, expression, or identity. For example, some transgender women have no need of vaginoplasty, while some nonbinary individuals AMAB may need and benefit from that same intervention. Further, nonbinary people seeking gender-affirming care associated closely with a transition pathway from their assigned sex/gender to the other binarily-recognized category (i.e., estrogen therapy and vaginoplasty for someone AMAB) does not undermine the validity of their nonbinary identity.

While barriers to care remain widespread for many transgender people, nonbinary people appear to experience particularly high rates of difficulty accessing both mental health and gender-affirming medical care (Clark et al., 2018; James, 2016). Many nonbinary people report having experiences with health care professionals who were not affirming of their nonbinary gender, including experiences where health care professionals convey beliefs that their gender is not valid, or they are fundamentally more difficult to provide care for (Valentine, 2016; Vincent, 2020). Nonbinary people may face provider assumptions that they do not need or want gender-affirming treatment (Kcomt et al., 2020; Vincent, 2020) and have described experiencing pressure to present themselves as transgender men or transgender women (within a binary framework of gender) in order to access treatment (Bradford et al., 2019; Taylor et al., 2019). At times, nonbinary people find themselves educating the provider from whom they are seeking services despite the inappropriateness of providers relying primarily on their patients for education (Kcomt et al., 2020). In comparison to transgender men and transgender women, Burgwal and Motmans (2021) found that nonbinary people experienced more fear of prejudice from health care providers, less confidence in the services provided, and greater difficulty knowing where to go to for care. Studies in both Europe and US have shown that nonbinary individuals tend to delay care more often than binary transgender men or transgender women, with fear of insensitive or incompetent treatment being the most cited reason (Burgwal & Motmans, 2021; Grant et al., 2011). Nonbinary people also appear less likely to disclose their gender identity to their health care providers than other transgender people (Kcomt et al., 2020).

### The need for an appropriate level of support

Providing gender-affirming care to nonbinary people goes beyond the provision of specific gender-affirming interventions such as hormone therapy or surgery and involves supporting the overall health and development of nonbinary people. Minority stress models have been adapted to conceptualize how the gender-related stressors experienced by transgender people are associated with physical and mental health disparities (Delozier et al., 2020; Testa et al., 2017). Nonbinary people appear to experience minority stressors that are both similar to and unique from those experienced by transgender men and transgender women. Johnson (2020) reported that experiences of invalidation are particularly high among nonbinary people, e.g., statements or actions conveying a belief that nonbinary identities are not "real" or are the result of a "fad" or "phase," and nonbinary people appear less likely than transgender men and transgender women to have their correct pronouns used by others. Similarly, nonbinary people have described feeling "invisible" to others (Conlin, 2019; Taylor, 2018) and one study found that nonbinary youth reported lower levels of self-esteem in comparison to young transgender men and transgender women (Thorne, Witcomb et al., 2019).

While many TGD people report experiences of discrimination, victimization, and interpersonal rejection (James, 2016) including bullying within

samples of youth (Human Rights Campaign, 2018; Witcomb et al., 2019), the prevalence of these experiences may vary across groups and appears influenced by additional intersecting characteristics. For example, Newcomb (2020) found transgender women and nonbinary youth AMAB experienced higher levels of victimization than transgender men and nonbinary youth AFAB, with nonbinary youth AMAB reporting the highest levels of traumatic stress. In a second study, Poquiz (2021) found transgender men and transgender women experienced higher levels of discrimination than nonbinary people. This intersectional complexity is also likely contributing to the variability in findings from studies comparing the physical and mental health of nonbinary and transgender men and transgender women, with some studies indicating more physical and mental health concerns among nonbinary people, some reporting less concerns, and some reporting no difference between groups (Scandurra, 2019).

Given nonbinary identity narratives may be less widely available than more binary-oriented identity narratives, nonbinary people may have less resources available to explore and articulate their gender-related sense of self. For example, this might include access to community spaces and interpersonal relationships where nonbinary identity can be explored, or access to language and concepts that allow more nuanced consideration of nonbinary experiences (Bradford et al., 2018; Fiani & Han, 2019; Galupo et al., 2019). Clinical guidance is now developing to assist providers in adapting gender-affirming therapeutic care to meet these unique experiences of nonbinary people (Matsuno, 2019; Rider, Vencill et al., 2019).

### Gender-affirming medical interventions for nonbinary people

In contexts where a particular medical intervention does not have established precedent, it is important that before the intervention is considered, the individual is provided with an overview of the available information, including recognition of potential knowledge limits. It is equally important to undertake and document a comprehensive discussion of the physical changes needed and the potential limitations in achieving those attributes, as well as the implication that any given intervention may or may not enhance an individual's ability to express their gender.

With regards to estrogen therapy for nonbinary people AMAB, it is important to note the possibility of breast growth cannot be avoided (Seal, 2017). Although the extent of growth is highly variable, this should be made clear if a nonbinary person seeks some of the other changes associated with estrogen therapy (such as softening of skin and reduction in facial hair growth) but does not want or is ambivalent about breast growth. Likewise, for nonbinary people AFAB who may wish to access testosterone to acquire some changes but not others, it should be recognized that if facial hair development is needed, genital growth is inevitable (Seal, 2017). The time frame for taking testosterone means these changes are likely also to be accompanied by an irreversible vocal pitch drop, although the extent of each is individual (Vincent, 2019; Ziegler et al., 2018). A vocal pitch drop without the development of body hair is another such challenge. For some nonbinary people, hair removal is a very important part of their gender affirmation (Cocchetti, Ristori, Romani et al., 2020).

If hormonal therapy is discontinued and gonads are retained, many physical changes will revert to pre-hormone therapy status as gonadal hormones once again take effect, including reversal of amenorrhea and body hair development in nonbinary people AFAB and reduction in muscular definition and erectile dysfunction in nonbinary people AMAB. Other changes will be permanent such as "male-pattern" baldness, genital growth, and facial hair growth in nonbinary people AFAB or breast development in nonbinary people AMAB (Hembree et al., 2017). These will require further interventions to reverse, such as electrolysis or mastectomy and are sometimes described as "partially reversible" (Coleman et al., 2012). As the implications of using low-dose hormone therapy are not documented in this patient population, it is important to consider monitoring for cardiovascular risk and bone health if low-dose hormone therapy is used. For more detailed information see Chapter 12—Hormone Therapy.

If neither testosterone nor estrogen expression is needed, inhibition of estrogen and/or testosterone

---

**Statements of Recommendations**

8.1- We recommend health care professionals provide nonbinary people with individualized assessment and treatment that affirms their experience of gender.

8.2- We recommend health care professionals consider gender-affirming medical interventions (hormonal treatment or surgery) for nonbinary people in the absence of "social gender transition."

8.3- We recommend health care professionals consider gender-affirming surgical interventions in the absence of hormonal treatment, unless hormone therapy is required to achieve the desired surgical result.

8.4- We recommend health care professionals provide information to nonbinary people about the effects of hormonal therapies/surgery on future fertility and discuss the options for fertility preservation prior to starting hormonal treatment or undergoing surgery.

---

production is possible. The implications of this with regards to increased cardiovascular risk, reduced bone mineralization, and risk of depression should be discussed and measures taken to mitigate risk (Brett et al., 2007; Vale et al., 2010; Wassersug & Johnson, 2007). For more information see also Chapter 9—Eunuchs and Chapter 12—Hormone Therapy. Exploration of medical and/or social transition independently of each other and options to explore hormones, surgery, or both independently of each other should be available to everyone, whether the person is a transgender man, transgender woman, or a nonbinary person.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 8.1

**We recommend health care professionals provide nonbinary people with individualized assessment and treatment that affirms their nonbinary experiences of gender.**

An individualized assessment with a nonbinary person starts with an understanding of how they experience their own gender and how this impacts their goals for the care they are seeking. How individuals conceptualize their gender-related experiences are likely to vary across groups and cultures and may incorporate experiences associated with other intersecting aspects of identity (e.g., age, sexuality, race, ethnicity, socioeconomic status, disability status) (Kuper et al., 2014; Subramanian et al., 2016).

HCPs should avoid making a priori assumptions about any client's gender identity, expression, or needs for care. They should also be mindful that a client's nonbinary experience of gender may or may not be relevant to the assessment and treatment-related goals. The extent to which the client's gender is relevant to their treatment goals should determine the level of detail at which their gender identity is explored. For example, when seeking care for a presenting concern wholly unrelated to gender, simply determining the correct name and pronouns may be sufficient (Knutson et al., 2019). When addressing a concern for which current or past hormonal or surgical status is relevant, more detail may be needed, even if the concern is not specifically gender-related.

Clinical settings need to be welcoming, reflective of the diversity of genders, and affirm the experiences of gender of nonbinary people to be culturally competent. Ensuring clinic and provider information (e.g., websites), forms (e.g., intake surveys), and other materials are inclusive of nonbinary identities and experiences conveys that nonbinary people are welcome and recognized (Hagen & Galupo, 2014). Using free text fields for gender identity and pronouns is more inclusive than using a list of response options. Ensuring privacy at the reception desk, setting up alternatives for listing legal names in digital databases (in cultural contexts where this is necessary), installing gender-neutral toilets, and setting up alternatives to calling out the legal name in the waiting room are additional examples of transgender and gender diverse (TGD) cultural competency (Burgwal et al., 2021). In care settings, it is important preferences for names, pronouns, and other gender-related terms are asked and used both initially and on a regular basis as they may vary over time and circumstance.

HCPs are encouraged to adopt an approach that focuses on strengths and resilience.

Increasingly, critiques are emerging regarding HCPs over-focus on gender-related distress as it is also important to consider experiences of increased comfort, joy, and self-fulfilment that can result from self-affirmation and access to care (Ashley, 2019a; Benestad, 2010). In addition to utilizing diagnoses when/where required to facilitate access to care, HCPs are encouraged to collaboratively explore with clients this broader range of potential gender-related experiences and how they may fit with treatment options (Motmans et al., 2019). For all TGD people, resiliency factors such as supportive relationships, participation in communities that include similar others, and identity pride are essential to consider as they are associated with a range of positive health outcomes (Bowling et al., 2019; Budge, 2015; Johns et al., 2018).

Awareness of the limitations that exist in the tools providers have historically used to assess transgender people's experience of dysphoria is important as they may be particularly pronounced for many nonbinary people. Most gender-related measures assume clients experience their gender in a binary way, among other concerns (e.g., Recalled Gender Identity Scale, Utrecht Gender Dysphoria Scale). While several newer measures have been developed in an attempt to better capture the experiences of nonbinary people (McGuire et al., 2018; McGuire et al., 2020), open-ended discussion is likely to provide a deeper and more accurate understanding of each individual's unique experiences of dysphoria and their associated care needs. Similarly, while more recent iterations of diagnostic categories (i.e., "gender dysphoria" in the DSM 5 and "gender incongruence" in ICD-11) were intended to be inclusive of people with nonbinary experiences of gender, they may not adequately capture the full diversity and scope of experiences of gender-related distress, particularly for nonbinary people. In addition to distress associated with aspects of one's physical body and presentation (including features that may be existing or absent), distress may arise from how one experiences their own gender, how one's gender is perceived within social situations, and from experiences of minority stress associated with one's gender (Winters & Ehrbar, 2010). Nonbinary peoples' experiences in each of these areas may or may not be similar to those of transgender men or women.

A person-centered approach for affirming care includes specific discussion of how different interventions may or may not shift the client's comfort with their own experience of gender, and how their gender is perceived by others. Nonbinary people can face challenges in reconciling their personal identities with the limits of the medical treatments available and can also encounter confusion and intolerance from society regarding their gender presentations (Taylor et al., 2019). Emerging research suggests the medical treatment needs of nonbinary people are particularly diverse, with some reporting needs for treatments that have typically been associated with transition trajectories historically associated with transgender men and women and some reporting alternative approaches (e.g., low dose hormone therapy, surgery without hormone therapy), some reporting a lack of interest in medical treatment, and some reporting feeling unsure about their needs (Burgwal & Motmans, 2021; James et al., 2016). Conceptualizing assessment as an ongoing process is particularly important given gender-related experiences and associated needs may shift throughout the lifespan. Given the ongoing evolution in treatment options and knowledge of treatment effects, particularly for nonbinary people, clients will benefit from providers who regularly seek up-to-date knowledge and convey these updates to their clients.

Statement 8.2

**We recommend health care professionals consider medical interventions (hormonal treatment or surgery) for nonbinary people in the absence of "social gender transition."**

Previous requirements for accessing hormonal treatment and surgery, such as "living in a gender role that is congruent with one's gender identity," do not reflect the lived experiences of many TGD people (Coleman et al., 2012). Due to the entrenched nature of the gender binary in most contemporary Western cultures, one can typically only be understood by others as a man or woman within most settings (Butler, 1993). Hence, the visibility and understanding of nonbinary embodiments and expressions is limited. This is due to gendered cues

being almost always understood in reference to a gender binary (Butler, 1993). Presently, it can be difficult for nonbinary people to be reliably recognized as their gender via visual cues associated with their gender expression (e.g., clothing, hair). However, androgyny or gender nonconformity may be communicated by the mixing or combining of cultural markers with traditionally masculine or feminine connotations. Because there is no commonly recognized "nonbinary category" within most contemporary Western, global north cultural contexts, nonbinary visibility often necessitates explicit sharing of one's gender with others or the use of cues that may be interpreted as gender nonconformity (but not necessarily nonbinary).

For these reasons, framing access to medical care in the context of someone experiencing a "social gender transition" where they are "living in a gender role that is congruent with one's gender identity" is not in line with the way many TGD people understand themselves and their personal transition process. For some, "living in a gender role that is congruent with one's gender identity" does not involve changes in name, pronouns, or gender expression even as medical intervention may be necessary. Even if a person is able to live in ways that are congruent with their gender identity, it may be difficult for an outside observer to assess this without learning directly from that person how they understand their own experience in this regard. Expectation of "social gender transition" may be unhelpful when considering eligibility for gender-affirming care, such as hormones and surgery, and rigid expectations of what a "social gender role transition" "should" look like can be a barrier to care for nonbinary people. There is no logical requirement gender-affirming medical interventions can only be done once a person legally changes their name, changes the gender marker on their identity documents, or wears or refrains from wearing particular items of clothing. Nonbinary people may struggle to access recognition of their genders on formal documentation, which may negatively affect their mental health or well-being (Goetz & Arcomano, 2021). TGD people may benefit from specific support in accessing (or retaining) their gender marker of preference. A requirement that someone disclose their gender identity in all circles of their lives (family, work, school, etc.) in order to access medical care may not be consistent with their goals and can place them at risk if it is not safe to do so.

Statement 8.3

**We recommend health care professionals consider gender-affirming surgical interventions in the absence of hormonal treatment unless hormone therapy is required to achieve the desired surgical result.**

The trajectory of "hormones before surgery" is an option across a range of surgical interventions. Some nonbinary people will seek gender-affirming surgical treatment to alleviate gender incongruence and increase body satisfaction (Beek et al., 2015; Burgwal & Motmans, 2021; Jones et al., 2019; Koehler et al., 2018), but do not want hormonal treatment or are unable to undergo hormonal therapy due to other medical reasons (Nieder, Eyssel et al., 2020). Currently, it is unknown for which proportion of nonbinary people these options apply.

Perhaps the surgery which has some specific association with nonbinary people (rather than sought by transgender men or undergone by some cisgender women) is mastectomy in nonbinary people AFAB who have not taken testosterone—although testosterone is not a requirement for this type of surgery—and some nonbinary people AFAB may need breast reduction (McTernan et al., 2020). An example of a surgery for which at least a period of hormone therapy may be necessary is metoidioplasty that enhances the enlarged clitoris produced by testosterone therapy. See Chapter 13—Surgery and Postoperative Care for more detail on whether hormone therapy is necessary for various surgeries. Procedures addressing the internal reproductive system include hysterectomy, unilateral or bilateral salpingo-oophorectomy, and vaginectomy. Hormone therapy is not required for any of these procedures, but hormone replacement therapy (either with estrogens, testosterone, or both) is advisable in those individuals undergoing a total gonadectomy to prevent adverse effects on their cardiovascular and musculoskeletal systems (Hembree et al., 2017; Seal, 2017). For phalloplasty, while there is no surgical requirement per se for a minimum period of testosterone

treatment, virilization (or the absence of virilization) of the clitoris and labia minora may impact the choice of surgical technique and influence surgical options. For more information see Chapter 13—Surgery and Postoperative Care.

Nonbinary AMAB clients should be informed commencing estrogen therapy post-surgically with no prior history of estrogen therapy may influence (perhaps adversely) the surgical result (Kanhai, Hage, Asscheman et al., 1999; Kanhai, Hage, Karim et al., 1999). Nonbinary people AMAB requesting a bilateral orchiedectomy do not require estrogen therapy to achieve a better outcome (Hembree et al., 2017). In these contexts, it is good practice to inform clients of the risks and benefits of hormone replacement therapy (estrogens, testosterone, or both) in preventing adverse effects on the cardiovascular and musculoskeletal system as well as alternative treatment options, such as calcium plus vitamin D supplementation to prevent osteoporosis (Hembree et al., 2017; Seal, 2017; Weaver et al., 2016). See also Chapter 9—Eunuchs for those who choose to forgo hormone replacement therapy. In the case of vaginoplasty, individuals should be advised lack of testosterone-blocking therapy may cause postoperative hair growth in the vagina when hair-bearing skin graft and flaps have been used (Giltay & Gooren, 2000).

Additional surgical requests for nonbinary people AMAB include penile-preserving vaginoplasty, vaginoplasty with preservation of the testicle(s), and procedures resulting in an absence of external primary sexual characteristics (i.e., penectomy, scrotectomy, orchiectomy, etc.). The surgeon and individual seeking treatment are advised to engage in discussions so as to understand the individual's goals and expectations as well as the benefits and limitations of the intended (or requested) procedure, to make decisions on an individualized basis and collaborate with other health care providers who are involved (if any).

Statement 8.4.
**We recommend health care professionals provide information to nonbinary people about the effects of hormonal therapies/surgery on future fertility and discuss the options for fertility preservation prior to starting hormonal treatment or undergoing surgery.**

All nonbinary individuals who seek gender-affirming hormonal therapies should be offered information and guidance about fertility options (Hembree et al., 2017; De Roo et al., 2016; Defreyne, Elaut et al., 2020; Defreyne, van Schuvlenbergh et al., 2020; Nahata et al., 2017; Quinn et al., 2021). It is important to discuss the potential impact of hormone therapy on fertility prior to initiation. This discussion should include fertility preservation options, the extent to which fertility may or may not be regained if hormone therapy is ceased, and the fact that hormone therapy per se is not birth control. For more information see Chapter 16—Reproductive Health.

Recent studies suggest that nonbinary individuals are less likely to access care and make their needs for potential interventions heard (Beek et al., 2015; Taylor et al., 2019). As such, it stands to reason that any gender diverse individual should be offered information on current options and techniques for fertility preservation, ideally prior to commencing hormonal treatment as the quality of the sperm or eggs may be impacted by exposure to hormones (Hamada et al., 2015; Payer et al., 1979). However, this should in no way preclude making inquiries and seeking more information at a later time, as there is evidence that fertility is still possible for individuals taking estrogen and testosterone (Light et al., 2014). A decision by a nonbinary or gender diverse person that fertility preservation or counseling is not needed should not be used as a basis for denying or delaying access to hormonal treatment.

## CHAPTER 9 Eunuchs

Among the many people who benefit from gender-affirming medical care, those who identify as eunuchs are among the least visible. The 8th version of the Standards of Care (SOC) includes a discussion of eunuch individuals because of their unique presentation and their need for medically necessary gender-affirming care (see Chapter 2—Global Applicability, Statement 2.1).

Eunuch individuals are those assigned male at birth (AMAB) and wish to eliminate masculine physical features, masculine genitals, or genital functioning. They also include those whose testicles have been surgically removed or rendered nonfunctional by chemical or physical means and who identify as eunuch. This identity-based definition for those who embrace the term eunuch does not include others, such as men who have been treated for advanced prostate cancer and reject the designation of eunuch. We focus here on those who identify as eunuchs as part of the gender diverse umbrella.

As with other gender diverse individuals, eunuchs may also seek castration to better align their bodies with their gender identity. As such, eunuch individuals are gender nonconforming individuals who have needs requiring medically necessary gender-affirming care (Brett et al., 2007; Johnson et al., 2007; Roberts et al., 2008). Eunuch individuals identify their gender identities in various ways. Many eunuch individuals see their status as eunuch as their distinct gender identity with no other gender or transgender affiliation. The focus of this chapter is on the treatment and care for those who identify as eunuchs. Health care professionals (HCPs) will encounter eunuchs requesting hormonal interventions, castration, or both to become eunuchs. These individuals may also benefit from a eunuch community because of the identification—with or without actual castration.

While there is a 4000-year history of eunuchs in society, the greatest wealth of information about contemporary eunuch-identified people is found within the large online peer-support community that congregates on sites such as the Eunuch Archive (www.eunuch.org), which was established in 1998. The moderators of this site attempt to maintain both medical and historical accuracy in its discussion forums, although there is certainly misinformation as well. According to the website, as of January 2022, there have been over 130,000 registered members from various parts of the world and frequently over 90% of those reading the site are "guests" rather than members. The website lists over 23,000 threads and nearly 220,000 posts. For example, two threads giving instructions for self-castration by injection of different toxins directly into the testicles have about 2,500 posts each, and each has been read well over one million times. Beginning in 2001, there have been 20 annual international gatherings of the Eunuch Archive community in Minneapolis in addition to many regional gatherings elsewhere. While the topic of castration is of interest to the great majority of people who participate in the discussions, it is a minority of the membership who seriously seek or have undergone castration. Many former Eunuch Archive members have achieved their goals and no longer participate.

Because of misconceptions and prejudice about historic eunuchs, the invisibility of contemporary eunuchs, and the social stigma that affects all gender and sexual minorities, few eunuch individuals come out publicly as eunuch and many will tell no one and will share only with like-minded people in an online community or are known as such only to close family and friends (Wassersug & Lieberman, 2010). The stereotypes of eunuchs are often highly negative (Lieberman 2018), and eunuchs may suffer the same minority stress as other stigmatized groups (Wassersug & Lieberman, 2010). Research into minority stress affecting gender diverse people should therefore include eunuchs.

The current set of recommendations is directed at professionals working with individuals who identify as eunuchs (Johnson & Wassersug, 2016; Vale et al., 2010) requesting medically necessary gender-affirming medical and/or surgical treatments (GAMSTs). Although not a specific diagnostic category in the ICD or DSM, eunuch is a useful construct as it speaks to the specifics of eunuch experience while also connecting it to the experience of gender incongruence more broadly. Eunuch individuals will present themselves clinically in various ways. They wish for

**Statements of Recommendations**

9.1- We recommend health care professionals and other users of the Standards of Care 8th guidelines should apply the recommendations in ways that meet the needs of eunuch individuals

9.2- We recommend health care professionals should consider medical intervention, surgical intervention, or both for eunuch individuals when there is a high risk that withholding treatment will cause individuals harm through self-surgery, surgery by unqualified practitioners, or unsupervised use of medications that affect hormones.

9.3- We recommend health care professionals who are assessing eunuch individuals for treatment have demonstrated competency in assessing them.

9.4- We suggest health care professionals providing care to eunuch individuals include sexuality education and counseling.

a body that is compatible with their eunuch identity—a body that does not have fully functional male genitalia. Some other eunuch individuals feel acute discomfort with their male genitals and need to have them removed to feel comfortable in their bodies (Johnson et al., 2007; Roberts et al., 2008). Others are indifferent to having male external genitalia as long as they are only physically present and do not function to produce androgens and male secondary sexual features (Brett et al., 2007). Hormonal means may be used to suppress the production of androgens, although orchiectomy provides a permanent solution for those not wishing genital functioning (Wibowo et al., 2016). Some eunuch individuals desire lower testosterone levels achieved with orchiectomy, but many will elect some form of hormone replacement to prevent adverse effects associated with hypogonadism. Most who elect hormone therapy choose either a full or partial replacement dose of testosterone. A smaller number elect estrogen.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

## Statement 9.1.

**We recommend health care professionals and other users of the Standards of Care, Version 8 guidelines should apply the recommendations in ways that meet the needs of eunuch individuals.**

Eunuch individuals are part of the population of gender diverse people who experience gender incongruence and may also seek gender-affirming care. Like other transgender and gender diverse

(TGD) individuals, eunuchs require access to affirming care to gain comfort with their gendered self. Each section of the SOC addresses the needs of diverse individuals, and eunuchs can be included within that group. They may have commonality with some nonbinary individuals in that social transition may not be a desired option, and hormone therapy may not play the same role as it might in a social transition or transition within the binary (Wassersug & Lieberman, 2010).

Like other gender diverse individuals, eunuch individuals may be aware of their identity in childhood or adolescence. Due to the lack of research into the treatment of children who may identify as eunuchs, we refrain from making specific suggestions.

Eunuch individuals may seek medical or surgical care (hormone suppression, orchiectomy, and, in some cases, penectomy) to achieve physical, psychological, or sexual changes (Wassersug & Johnson, 2007). It is important all patients, including both eunuchs and those seeking castration, establish and maintain a relationship with an HCP that is built upon trust and mutual understanding. Given a lack of awareness of eunuchs within the general medical community and the fear among many individuals seeking castration they will not be accepted, many do not receive appropriate primary care and screening tests (Jäggi et al., 2018). Increased awareness and education among medical providers will help address the need to be informed about the need to include eunuchs in discussions of gender diversity (Deutsch, 2016a). It goes without saying that eunuchs require and deserve the same primary care services as the general population. The topic of screening tests for cancers, such as prostate and breast, is an important area for

discussion as the risks of hormone-related cancers are likely different among male-assigned people whose testosterone and estrogen levels are not in the male range. Due to a lack of studies looking at the prevalence and incidence of hormone-related cancers in the eunuch population, there is no evidence to guide how often to screen for hormone-related cancers with prostate exams, PSA measurements, mammograms, etcetera.

The large literature on prostate cancer patients who have been medically or surgically castrated provides information about some of the effects of post-pubertal castration (such as potential osteoporosis, depression, or metabolic syndrome), but voluntary eunuchs may interpret the results very differently from those castrated for medical reasons. Chemical or surgical castration may be experienced as a source of distress to cis men with prostate cancer, while the same treatment may be affirming and a source of comfort for eunuch individuals. Similarly, transmasculine people who have a mastectomy to gain comfort with their bodies experience that surgery differently from ciswomen who undergo mastectomy to treat breast cancer (Koçan & Gürsoy, 2016; van de Grift et al., 2016). The prostate cancer information is well summarized by Wassersug et al. (2021) who provide references that explore the large literature on the subject. Such information on the effects of castration should be made available to those seeking castration.

Following an assessment as per the SOC-8, medical options requested by the patient can be considered and prescribed, if appropriate. These options can be tailored to the individual to create a plan that reflects their specific needs and preferences. The number and type of interventions applied and the order in which these take place may differ from person to person. These options are consistent with both the assessment and surgery chapters of the SOC-8. Treatment options for eunuchs to consider include:

- Hormone suppression to explore the effects of androgen deficiency for eunuch individuals wishing to become asexual, nonsexual, or androgynous;
- Orchiectomy to stop testicular production of testosterone;

- Orchiectomy with or without penectomy to alter their body to match their self-image;
- Orchiectomy followed by hormone replacement with testosterone or estrogen.

Per statement 5.6 in Chapter 5—Assessment of Adults, eunuch individuals seeking gonadectomy consider a minimum of 6 months of hormone therapy as appropriate to the TGD person's gender goals before the TGD person undergoes irreversible surgical intervention (unless hormones are not clinically indicated for the individual).

Statement 9.2.

**We recommend health care professionals consider medical intervention, surgical intervention, or both for eunuch individuals when there is a high risk that withholding treatment will cause individuals harm through self-surgery, surgery by unqualified practitioners, or unsupervised use of medications that affect hormones.**

The same assessment process recommended in the SOC-8 ought to apply to eunuchs (see Chapter 5—Assessment of Adults). The Eunuch Archive has a large number of posts from individuals finding great difficulty in seeking medical providers who will perform castration surgery. There are a large number of eunuch individuals who have performed self-surgery or have had surgery performed by people who are not credentialed medical providers (Johnson & Irwig, 2014). There are also clinical reports of eunuch individuals who have self-castrated and accounts of patients who have misled medical providers to obtain castration (Hermann & Thorstenson, 2015; Mukhopadhyay & Chowdhury, 2009). There is no doubt when members of this population are denied access to quality medical treatment, they will take actions that may cause them great harm, such as bleeding and infection that may require hospital admission (Hay, 2021; Jackowich et al., 2014; Johnson & Irwig, 2014). Because of these serious problems and harm caused through self-surgery, surgery by unqualified practitioners or the unsupervised use of medications that affect hormones, it is important health care providers create a welcoming environment and consider various treatment options after careful assessment

to avoid the problems that lack of access to treatment and withholding treatment will cause.

When desired, castration can be achieved either chemically or surgically. For some, chemical castration can be an appropriate trial prior to undergoing surgical castration to determine how the individual feels when hypogonadal (Vale et al., 2010). Chemical castration is usually reversible if the medications are discontinued (Wassersug et al., 2021). The most common types of medications used to lower testosterone levels are antiandrogens and estrogen.

The two most commonly used antiandrogens, cyproterone acetate and spironolactone, are oral. Estrogen is sometimes prescribed for prostate cancer patients to lower serum testosterone levels via negative feedback at the hypothalamus and pituitary gland. Estrogens and antiandrogens may not fully suppress testosterone levels into the female or castrate range, and oral estrogens increase the risk of venous thromboembolism. Although not commonly used due to cost, gonadotropin releasing hormone (GnRH) agonists are a very effective method for suppressing the production of sex steroids and fertility (Hembree et al., 2017). When selecting a medication, we advise using those which have been studied in multiple transgender populations (i.e., estrogen, cyproterone acetate, GnRH agonists) rather than medications with little to no peer-reviewed scientific studies (i.e., bicalutamide, rectal progesterone, etc.) (Angus et al., 2021; Butler et al., 2017; Efstathiou et al., 2019; Tosun et al., 2019).

Many eunuch individuals pursue hormone replacement therapy following castration as they do not desire the complete suppression of hormone levels and consequent problems, such as the increased risk of osteoporosis. The two main options for replacement of sex steroids are testosterone and estrogen that may be used in full or partial replacement doses. The majority elect testosterone as they present as male and are not interested in feminization. A minority elect estrogen at a high enough dose to prevent osteoporosis, but low enough avoid most feminization. They may identify as nonbinary, agender, or other (Johnson et al., 2007; Johnson & Wassersug, 2016).

Although studies on hormone replacement therapy in eunuchs are lacking, findings from cisgender men treated for prostate cancer can be informative regarding the effects of hormone therapy. In a randomized controlled trial of 1,694 cisgender men treated for locally advanced or metastatic prostate cancer, one group received a GnRH agonist and the other received transdermal estrogen (Langley et al., 2021). Cisgender men who received the GnRH agonist developed signs and symptoms of both androgen and estrogen deficiency, whereas men who received the estrogen patch only developed androgen-depleting symptoms. Both groups had high rates of sexual side effects (91%), and weight gain was similar among the groups. Compared with cisgender men receiving the GnRH agonist, cisgender men treated with estrogen patches had a higher self-reported quality of life, lower rates of hot flushes (35% vs. 86%), and higher rates of gynecomastia (86% vs. 38%). Metabolically, cisgender men receiving estrogen patches had favorable changes with a lower mean fasting glucose, fasting total cholesterol, systolic and diastolic blood pressure. Conversely, cisgender men receiving the GnRH agonist experienced the opposite effects. Based on this study, eunuchs may consider a low dose of transdermal estrogen therapy to avoid adverse estrogen-depleting effects, which include hot flashes, fatigue, metabolic effects, and loss of bone mineral density (Hembree et al., 2017; Langley et al., 2021). For further information see Chapter 12—Hormone Therapy.

Statement 9.3.

**We recommend health care professionals who are assessing eunuch individuals for treatment have demonstrated competency in assessing them.**

A frequent topic on the discussion boards of the Eunuch Archive is the difficulty of finding practitioners who are able to understand their needs. Eunuchs and those seeking castration usually are less visible than other gender minorities (Wassersug & Lieberman, 2010). Due to stigma and fear of rejection by the medical community, they may not voluntarily disclose their identity and desires to their medical or mental health providers. In some environments, medical providers may not be aware eunuchs exist and may not even know they have treated eunuch-identified patients.

The SOC section on assessment is applicable to eunuch individuals. Like other gender diverse individuals, those seeking castration can engage in an informed consent process in which qualified providers conduct assessments to ensure individuals are capable of providing informed consent prior to medical interventions and to ensure a mental health problem is not the etiology of the desire. As with other sexual and gender minorities, working with eunuchs requires an understanding that they are a diverse population, and that each person is eunuch in their own way (Johnson et al., 2007). The person seeking services benefits from the professional's accepting stance, open inquiry, suspension of judgment, and flexible expectations, combined with professional competency and expertise.

To provide appropriate treatment, providers must establish trust and respect by creating an inclusive environment for eunuch-identified people. For eunuch-identified individuals, the ideal intake form would ask the assigned sex and identified gender and offer multiple gender options, including "eunuch" and "other." Individuals may identify with more than one option and should be able to select more than one.

HCPs may be involved in the assessment, psychotherapy (if desired), preparation, and follow-up for medical and surgical gender-affirming interventions. They may also provide support for partners and families. Eunuch-identified individuals who want the support of a qualified mental health provider will benefit from a therapist who meets the experience and criteria set out in Chapter 4—Education.

While some individuals seeking or considering castration come to counseling or therapy because they want emotional support or help with decision-making, many come to providers for an assessment in preparation for specific medical interventions (Vale et al., 2010).

Statement 9.4.

**We suggest health care professionals providing care to eunuch individuals include sexuality education and counseling.**

Several research studies have contributed to our knowledge of contemporary eunuch-identified people and have explored demographic characteristics and sexuality (Handy et al., 2015; Vale et al., 2013; Wibowo et al., 2012, 2016). Medical and MHPs should assume eunuchs are sexual people capable of sexual activity, pleasure, and relationships, unless they report otherwise (Wibowo et al., 2021). Research has shown there is great diversity among eunuchs regarding the level of desire, type of preferred physical or sexual contact, and nature of preferred relationships (Brett et al., 2007; Johnson et al., 2007; Roberts et al., 2008). While some enjoy active sex lives with or without romantic relationships, others identify as asexual or aromantic and are relieved by the loss of libido achieved through surgical or chemical castration (Brett et al., 2007). Each person is different, and one's genital status does not determine sexual or romantic attraction (Walton et al., 2016; Yule et al., 2015).

Regardless of the type of chemical suppression or surgery a person has undergone, they may be capable of sexual pleasure and sexual activity. Contrary to popular belief, eunuchs are not necessarily asexual or nonsexual (Aucoin & Wassersug, 2006). Safe sex education is necessary for all people who engage in sexual activity that could involve an exchange of body fluids. See Chapter 17—Sexual Health for information regarding sex education and safe sex options for people with diverse genders and sexualities. In addition, fertility preservation should be discussed when considering medical interventions that might impact the possibilities for future parenthood. For more considerations see Chapter 16—Reproductive Health.

## CHAPTER 10 Intersex

The Standards of Care, Version 7 included a chapter on the applicability of the standards to people with physical intersexuality who become gender-dysphoric and/or change their gender because they differ from transgender individuals without intersexuality in phenomenological presentation, life trajectories, prevalence, etiology, and stigma risks. The current chapter provides an update and adds recommendations on the medically necessary clinical approach to the management of individuals with intersexuality in general (see medical necessity statement in Chapter 2—Global Applicability, Statement 2.1). Because a newborn with an atypical sexual differentiation may already present with clinical challenges, including the need for family education and support from early on, the decision-making on gender assignment, subsequent clinical gender management, components of which—especially genital surgery—may be controversial, and a later risk of gender dysphoria development and gender change that is markedly increased (Sandberg & Gardner, 2022).

### Terminology

"Intersex" (from Latin, literal translation "between the sexes") is a term grounded in the binary system of sex underlying mammalian (including human) reproduction. In medicine, the term is colloquially applied to individuals with markedly atypical, congenital variations in the reproductive tract. Some variations, often labeled "genital ambiguity," preclude the simple recognition of somatic sex as male or female and, in resource-rich societies, may require a comprehensive physical, endocrine, and genetic work-up, before a sex/gender is "assigned." In recent years "intersex" has also become an identity label adopted by some individuals with intersex conditions and a subset of (non-intersex) individuals with a non-binary gender identity (Tamar-Mattis et al., 2018).

At a 2005 international consensus conference on intersex management, intersex conditions were subsumed under a new standard medical term, "Disorders of Sex Development" (DSD), defined as "congenital conditions in which development of chromosomal, gonadal, or anatomical sex is atypical" (Hughes et al., 2006). DSD covers a much wider range of conditions than those traditionally included under intersexuality and comprises conditions such as Turner syndrome and Klinefelter syndrome, which are much more prevalent. In addition, many affected individuals dislike the term "disorder," viewing it as inherently stigmatizing (Carpenter, 2018; Griffiths, 2018; Johnson et al., 2017; Lin-Su, et al., 2015; Lundberg et al., 2018; Tiryaki et al., 2018). Health care professionals (HCPs) also vary in their acceptance of the term (Miller et al., 2018). The wide-spread alternative reading of DSD as "Differences in Sex Development" can be seen as less pathologizing, but is semantically unsatisfactory as this term does not distinguish the typical genital differences between males and females from atypical sexual differentiation. Other recent attempts to come up with less obviously stigmatizing terms such as "Conditions Affecting Reproductive Development" (CARD; Delimata et al., 2018) or "Variations of/in Sex Characteristics" (VSC; Crocetti, et al., 2021) are also not specific to intersexuality.

Given these definitional issues, in this chapter we are using the term "intersexuality" (or "intersex") to refer to congenital physical manifestations only. This is done for both descriptive clarity and historical continuity. This choice is not meant to indicate an intention on our part to take sides in the ongoing discussion regarding the concept of sex/gender as a bipolar system or as a continuum, which may vary with considerations of context and utility (Meyer-Bahlburg, 2019). In 21st century societies, the concepts of sex and gender are in a process of evolution.

### Prevalence

The prevalence of intersex conditions depends on the definition used. Obvious genital atypicality ("ambiguous genitalia") occurs with an estimated frequency ranging from approximately 1:2000—1:4500 people (Hughes et al., 2007). The most inclusive definitions of DSD estimate a prevalence of up to 1.7% (Blackless et al., 2000). Although these numbers are high in aggregate, the individual conditions associated with the intersex variations tend to be much rarer. For instance, androgen insensitivity syndrome (AIS) occurs in approximately 1 in 100,000 46,XY births (Mendoza & Motos, 2013), and classic congenital adrenal

hyperplasia (CAH) in approximately 1 in 15,000 46,XX births (Therrell, 2001). Prevalence figures for individual syndromes may vary dramatically between countries and ethnic groups.

### Presentation

The presentation of individuals with intersex traits varies widely. Intersexuality can be recognized during prenatal ultrasound imaging, although most individuals will be identified during genital examinations at birth. In resource-rich societies, such children will undergo extensive medical diagnostic procedures within the first weeks of life. Taking into consideration the specific medical diagnosis, physical and hormonal findings, and information from long-term follow-up studies about gender outcome, joint decision-making between the health-care team and the parents generally leads to the newborn being assigned to the male or female sex/gender. Some individuals with intersexuality come to the attention of specialists only around the age of puberty, for instance, when female-raised adolescents are evaluated for primary amenorrhea.

HCPs assisting individuals with both intersexuality and gender uncertainty need to be aware that the medical context in which such individuals have grown up is typically very different from that of non-intersex TGD people. There are many different syndromes of intersexuality, and each syndrome can vary in its degree of severity. Thus, hormonal and surgical treatment approaches vary accordingly.

Some physical manifestations of intersexuality may require early urgent intervention, as in cases of urinary obstruction or of adrenal crisis in CAH. Most physical variations among individuals with intersexuality neither impair function, at least in the early years, nor risk safety for the individual. Yet, the psychosocial stigma associated with atypical genital appearance often motivates early genital surgery (commonly labeled 'corrective' or 'normalizing') long before the individual reaches the age of consent. This approach is highly controversial because it conflicts with ethical principles supporting a person's autonomy (Carpenter, 2021; Kon, 2015; National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, 1979). In addition, among the manifestations without immediate safety concerns, some individuals, when older, may opt for a range of medical interventions to optimize function and appearance. The specifics of medical treatments are far beyond the scope of what can be addressed in this chapter, and the interested reader should consult the respective endocrine and surgical literature.

Some intersex conditions are associated with a greater variability in long-term gender identity outcome than others (Dessens et al., 2005). For instance, the incidence of a non-cisgender gender identity in 46,XX individuals with CAH assigned female may be as high as 5–10% (Furtado et al., 2012). The substantial biological component underlying gender identity is a critical factor that must be considered when offering psychosocial, medical, and surgical interventions for individuals with intersex conditions.

There is also ample evidence people with intersexuality and their families may experience psychosocial distress (de Vries et al., 2019; Rosenwohl-Mack et al., 2020; Wolfe-Christensen et al., 2017), in part related to psychosocial stigma (Meyer-Bahlburg, Khuri et al., 2017; Meyer-Bahlburg, Reyes-Portillo et al., 2017; Meyer-Bahlburg et al., 2018).

### Intersexuality in the psychiatric nomenclature

Since 1980, the American psychiatric nomenclature recognized individuals with intersexuality who meet the criteria for gender identity variants; however, their diagnostic categorization changed with successive DSM editions. For instance, in DSM-III (American Psychiatric Association, 1980), the Axis-I category of "transsexualism" could not be applied to such individuals in adulthood, but such children were labeled "gender identity disorder of childhood," with the medical intersex condition to be specified in Axis III. In DSM-IV-TR (American Psychiatric Association, 2000), individuals with intersexuality were excluded from the Axis-I category of "gender identity disorder" regardless of age and, instead, grouped with other conditions under the category "gender identity disorder not otherwise specified." In DSM-5 (American Psychiatric Association, 2013), which moved away from the multiaxial

**Statements of Recommendations**

10.1- We suggest a multidisciplinary team, knowledgeable in diversity of gender identity and expression as well as in intersexuality, provide care to individuals with intersexuality and their families.

10.2- We recommend health care professionals providing care for transgender youth and adults seek training and education in the aspects of intersex care relevant to their professional discipline.

10.3- We suggest health care professionals educate and counsel families of children with intersexuality from the time of diagnosis onward about the child's specific intersex condition and its psychosocial implications.

10.4- We suggest both providers and parents engage children/individuals with intersexuality in ongoing, developmentally appropriate communications about their intersex condition and its psychosocial implications.

10.5- We suggest health care professionals and parents support children/individuals with intersexuality in exploring their gender identity throughout their life.

10.6- We suggest health care professionals promote well-being and minimize the potential stigma of having an intersex condition by working collaboratively with both medical and non-medical individuals/organizations.

10.7- We suggest health care professionals refer children/individuals with intersexuality and their families to mental-health providers as well as peer and other psychosocial supports as indicated.

10.8- We recommend health care professionals counsel individuals with intersexuality and their families about puberty suppression and/or hormonal treatment options within the context of the individual's gender identity, age, and unique medical circumstances.

10.9- We suggest health care professionals counsel parents and children with intersexuality (when cognitively sufficiently developed) to delay gender-affirming genital surgery, gonadal surgery, or both, so as to optimize the children's self-determination and ability to participate in the decision based on informed consent.

10.10- We suggest only surgeons experienced in intersex genital or gonadal surgery operate on individuals with intersexuality.

10.11- We recommend health care professionals who are prescribing or referring for hormonal therapies/surgeries counsel individuals with intersexuality and fertility potential and their families about a) known effects of hormonal therapies/surgery on future fertility; b) potential effects of therapies that are not well studied and are of unknown reversibility; c) fertility preservation options; and d) psychosocial implications of infertility.

10.12- We suggest health care professionals caring for individuals with intersexuality and congenital infertility introduce them and their families, early and gradually, to the various alternative options of parenthood.

---

system, "gender identity disorder" was re-defined as "gender dysphoria" and applied regardless of age and intersex status, but individuals with intersexuality received the added specification "with a disorder of sex development" (Zucker et al., 2013). The just published text revision of DSM-5 (American Psychiatric Association, 2022) keeps the term gender dysphoria. Note, however, the recent revision of the International Classification of Diseases [ICD-11; World Health Organization, 2019a] has moved "gender incongruence" from the chapter "Mental, Behavioral, or Neurodevelopmental Disorders" to a new chapter "Conditions Related to Sexual Health."

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

### Statement 10.1
**We suggest a multidisciplinary team, knowledgeable in diversity of gender identity and expression as well as in intersexuality, provide care to individuals with intersexuality and their families.**

Intersexuality, a subcategory of DSD, is a complex congenital condition that requires the involvement of experts from various medical and behavioral disciplines (Hughes et al., 2006). Team composition and function can vary depending on team location, local resources, diagnosis, and the needs of the individual with intersexuality and her/his/their family. The ideal team includes pediatric subspecialists in endocrinology, surgery and/or urology, psychology/psychiatry, gynecology, genetics, and, if available, personnel trained in social work, nursing, and medical ethics (Lee et al., 2006). The structure of the team can be in line with 1) the traditional multidisciplinary medical model; 2) the interprofessional model; or 3) the transdisciplinary model. Although these structures can appear similar, they are in fact very different and can exert varying influences on how the team functions (Sandberg & Mazur, 2014). The 2006 Consensus Statement makes no decision about which model is best—multidisciplinary, interdisciplinary, or transdisciplinary—and only states the models "imply different degrees of collaboration and professional

autonomy" (Lee, Nordenström et al., 2016). Since the publication of the Consensus Statement in 2006, such teams have been created both in Europe and in the US. A listing of teams in the US can be found on the DSD-Translational Network (DSD-TRN) website. There are also teams in a number of European countries (Thyen et al., 2018). While there are barriers to the creation of teams as noted by Sandberg and Mazur (2014), multidisciplinary teams help address a number of problems that have undermined the successful care of individuals with an intersex diagnosis and their families, such as the scattered nature of services, the limited or absent communication between professionals, and the resulting fragmented nature of the explanations individuals receive that cause more confusion than clarity.

Most individuals born with intersexuality will be identified at birth or shortly thereafter, while others will be identified at later times in the life cycle, for example at puberty (see Brain et al., 2010, Table 1). When this happens the team approach will be modified based on the diagnosis and the age of the person. In some circumstances, the composition of the team can be expanded to include other specialists as needed.

It has been reported children seen by a multidisciplinary team were significantly more likely to receive nearly the full range of services rather than only those services offered by a single provider (Crerand et al., 2019). Parents who received such care positively endorsed psychosocial services and the team approach and reported receiving more information than those who did not interact with such a team (Crerand et al., 2019).

### Statement 10.2

**We recommend health care professionals providing care for transgender youth and adults seek training and education in the aspects of intersex care relevant to their professional discipline.**

Results from interviews with medical trainees (Liang et al., 2017; Zelin et al., 2018) and from programmatic self-audits and surveys (DeVita et al., 2018; Khalili et al., 2015) suggest medical training programs are not adequately preparing practitioners to provide competent care to individuals presenting with gender dysphoria and

intersexuality. Professional and stakeholder attendees of intersex-specific events have identified ongoing education and collaboration as an important professional development need (Bertalan et al., 2018; Mazur et al., 2007). This may be especially true for adult care providers who may have less clinical guidance or support in assisting those individuals who are transitioning from pediatric to adult care (Crouch & Creighton, 2014).

However, there are few guidelines for training or assessing practitioner competency in managing these topics, and those that are available primarily apply to mental health professionals (MHPs) (Hollenbach et al., 2014), with the exception of a primary care guide (National LGBTQIA + Health Education Center, 2020).

For HCPs wanting to improve their competency, seeking consultation from experts may be an option when formal education or empirical guidelines are otherwise unavailable. Given the relative widespread adoption of multidisciplinary expert teams in the treatment of intersexuality (Pasterski et al., 2010), individuals serving on these teams are well positioned to consult with and educate other health care staff who may not have received adequate training (Hughes et al., 2006). Therefore, it is recommended the training of other professionals be a central component of team development (Auchus et al., 2010) and members of multidisciplinary teams receive training specific to team-based work, including strategies for engaging in interprofessional learning (Bisbey, et al., 2019; Interprofessional Education Collaborative Expert Panel, 2011).

### Statement 10.3

**We suggest health care professionals educate and counsel families of children with intersexuality from the time of diagnosis onward about the child's specific intersex condition and its psychosocial implications.**

Full disclosure of medical information to families of children with intersex conditions through education and counseling should begin at the time of diagnosis and should be consistent with guidance from multiple international consensus guidelines. One of the most challenging issues presented by a newborn with intersexuality, particularly

when associated with noticeable genital ambiguity, is sex assignment and from the parents' perspective, the gender of rearing (Fisher, Ristori et al., 2016). Given this is a very stressful situation for most parents, it is generally recommended the decisions about sex/gender should be made as quickly as a thorough diagnostic evaluation permits (Houk & Lee, 2010). However, the criteria for sex/gender decisions have changed over time. In the second half of the 20th century, the decisions were biased towards female assignment, because feminizing genital surgery was seen as easier and less side-effect prone than masculinizing surgery. Yet, in certain intersex conditions, for instance 46,XY 5α-RD-2 deficiency, female sex/gender assignment was found to be associated with high rates of later gender dysphoria and gender change (Yang et al., 2010). Therefore, since the International Consensus Conference on Intersex Management in 2005, sex/gender assignment takes into consideration the gradually accumulating data on long-term gender outcome in the diverse conditions of intersexuality.

The practice of disclosure seeks to enable more fully informed decision-making about care. Additionally, while shame and stigma surrounding intersexuality is associated with poorer psychosocial outcomes, open and proactive communication of health information has been proposed as a strategy to reduce those risks (de Vries et al., 2019). Depending on the person's diagnosis and developmental stage, intersex conditions may differentially impact individuals and their health care needs. Intersex-health-related communication must therefore be continuous and tailored to the individual. Research on decision-making in intersex care suggests families are influenced by how clinical teams communicate (Timmermans et al., 2018). In keeping with the SOC, we encourage providers to adopt normalizing, affirming language and attitudes across education and counseling functions. For example, describing genital atypia as a "variation" or "difference" is more affirming than using the terms "birth defect" or "abnormality."

All HCPs involved in an individual's care can provide essential education and information to families. In multidisciplinary teams, the type of education may align with an HCP's area of expertise, for example, a surgeon educating the individual on their anatomy, an endocrinologist teaching the specifics of hormonal development, or an MHP conveying the spectrums of gender and sexual identity. Other HCPs may need to provide comprehensive education. Families should receive information that is pertinent to the individual's specific intersex variation, when known. All HCPs can supplement this information with patient-centered resources available from support groups. People with intersexuality have also been hired as team members to provide education using their lived experience.

Consensus guidelines also recommend families be offered ongoing peer and professional psychosocial support (Hughes et al., 2006) that may involve counseling with a focus on problem-solving and anticipatory guidance (Hughes et al., 2006). For example, families may seek guidance in educating other people—siblings, extended family, and caregivers—about the specific intersex condition of an individual. Other families may need support or mental health care to manage the stress of intersex treatment. Adolescents may benefit from guidance on how to disclose information to peers as well as from support when navigating dating and sex. Providing counseling may also involve guiding families and individuals of all ages through a shared decision-making process around medical or surgical care. Providers may employ decision aids to support this process (Sandberg et al., 2019; Weidler et al., 2019).

Statement 10.4

**We suggest both providers and parents engage children/individuals with intersexuality in ongoing, developmentally appropriate communications about their intersex condition and its psychosocial implications.**

Communicating health information is a multi-directional process that includes the transfer of information from providers to patients, from parents to patients, as well as from patients back to their providers (Weidler & Peterson, 2019). While much emphasis has been placed on communicating to parents around issues of diagnosis and surgical decision-making, youth with DSD have reported barriers to engaging with health care providers and may not always turn

to their parents for support (Callens et al., 2021). To prepare individuals to be fully engaged and autonomous in their treatment, it is critical both providers and parents communicate continuously with children/individuals.

Providers must set an expectation as soon as possible for ongoing, open communication between all parties, especially since parents may experience distress due to the uncertainty associated with DSD and may seek quick fixes (Crissman et al., 2011; Roberts et al., 2020). Models of shared decision-making as well as related decisional tools have been developed to support ongoing communication between HCPs and families/individuals (Karkazis et al., 2010; Sandberg et al., 2019; Siminoff & Sandberg, 2015; Weidler et al., 2019). In addition to setting an expectation for dialogue, providers can also set the tone of communication. Providers can help parents and individuals tolerate diagnostic uncertainty while simultaneously providing education on anatomic variations, modeling openness to gender and sexual identity, and welcoming the child's/individual's questions. As they age, children/individuals may have questions or need age-appropriate information on issues of sex, menstruation, fertility, the need for hormone treatment (adrenal/sex), bone health, and cancer risk.

Parents also play a critical role in educating their children and may be the first people to disclose health information to their child (Callens et al., 2021). As part of expectation-setting around communication, providers should prepare parents to educate their child and members of their support system about the intersex diagnosis and treatment history. Some parents report difficulties in knowing how much to disclose to others as well as to their own children (Crissman et al., 2011; Danon & Kramer, 2017). The stress parents experience while raising children with an intersex condition is increased when parents adopt an approach that minimizes disclosure/discussion of their child's diagnosis (Crissman et al., 2011). The level of stress also varies by developmental stage, with parents of adolescents reporting higher rates of stress (Hullman et al., 2011). Therefore, HCPs should assist parents in developing strategies specific to their child's developmental stage

that address their psychosocial or cultural concerns and values (Danon & Kramer, 2017; Weidler & Peterson, 2019). Finally, broader research on sexuality and gender variance has found—counter to the associations between shame/stigma and negative health outcomes—supportive family behaviors (including talking with children about their identity and connecting them with peers) predicted greater self-esteem and better health outcomes in individuals (Ryan et al., 2010).

### Statement 10.5

**We suggest health care professionals and parents support children/individuals with intersexuality in exploring their gender identity throughout their life.**

Psychological, social, and cultural constructs all intersect with biological factors to form an individual's gender identity. As a group, individuals with intersexuality show increased rates of gender nonconforming behavior, gender-questioning, and cross-gender wishes in childhood, dependent in part on the discrepancy between the prenatal sex-hormonal milieu in which the fetal brain has differentiated and the sex assigned at birth (Callens et al., 2016; Hines, et al., 2015; Meyer-Bahlburg et al., 2016; Pasterski et al., 2015). Gender identity problems are observed at different rates in individuals with different intersex conditions (de Vries et al., 2007). More recently, some individuals have been documented to develop a nonbinary identity, at least privately (Kreukels et al., 2018). Although the majority of people with intersexuality may not experience gender dysphoria or wishes for gender transition, they may still have feelings of uncertainty and unanswered questions regarding their gender (Kreukels et al., 2018). Questions about gender identity may arise from such factors as genital appearance, pubertal development, and knowledge of items such as the diagnostic term of the medical condition, gonadal status, sex chromosome status, and a history of genital surgery. Therefore, HCPs need to be accessible for clients to discuss such questions and feelings, openly converse about gender diversity, and adopt a less binary approach to gender. HCPs are advised to guide parents as well in supporting their children in exploring gender.

Furthermore, such support should not be confined to the childhood years. Rather, individuals should be given the opportunity to explore their gender identity throughout their lifetime, because different phases may come with new questions regarding gender (for example, puberty/adolescence, childbearing age). Children in general may have questions regarding their gender identity at salient points during their maturation and evolution. When faced with additional stressors, for example, genital ambiguity, genital examinations and procedures, as well as the intersectionality of cultural bias and influences, individuals with intersexuality may need support and should be encouraged to seek educated professional assistance and guidance when needed. Also, HCPs should inquire regularly to determine if their clients with intersexuality need such support. When people experience gender incongruence, gender-affirming interventions may be considered. Procedures that should be applied in such interventions are described in other chapters.

### Statement 10.6

**We suggest health care professionals promote well-being and minimize the potential stigma of having an intersex condition by working collaboratively with both medical and non-medical individuals/organizations.**

Individuals with intersexuality are reported to experience stigma, feelings of shame, guilt, anger, sadness and depression (Carroll et al., 2020; Joseph et al., 2017; Schützmann et al., 2009). Higher levels of psychological problems are observed in this population than in the general population (Liao & Simmonds, 2014; de Vries et al., 2019). In addition, parental fear of stigmatization and adjustment to their child's diagnosis must not be overlooked by the clinical team. Parents may benefit from supportive counseling to assist them both in managing clinical decision-making (Fleming et al., 2017; Rolston et al., 2015; Timmermans et al., 2019) as well as understanding the impact of clinical decisions on their view of their child (Crissman et al., 2011; Fedele et al., 2010).

Thyen et al. (2005) found repeated genital examinations appear to be correlated with shame, fear and pain and may increase the likelihood of developing post-traumatic stress disorder (PTSD) later in life (Alexander et al., 1997; Money & Lamacz, 1987). Exposure to repeated genital examinations, fear of medical interventions, and parental and physician secrecy about being intersex ultimately undermine the self-empowerment and self-esteem of the person with intersexuality (Meyer-Bahlburg et al., 2018; Thyen et al., 2005; Tishelman et al., 2017; van de Grift, Cohen-Kettenis et al., 2018). For recommendations on how to conduct genital examinations to minimize adverse psychological side effects see Tishelman et al. (2017).

There is an active movement within the intersex community to alleviate stigma and to return human rights and dignity to intersex people rather than viewing them as medical anomalies and curiosities (Yogyakarta Principles, 2007, 2017). Chase (2003) summarizes the major reasons for the intersex advocacy movement and outlines how stigma and emotional trauma are the outcome of ignorance and the perceived need for secrecy. Public awareness of intersex conditions is very limited, and images and histories of individuals with intersexuality are still presented as "abnormalities of nature". We, therefore, advise HCPs to actively educate their colleagues, individuals with intersexuality, their families, and communities, raise public awareness, and increase knowledge about intersexuality. Societal awareness and knowledge regarding intersexuality may help reduce discrimination and stigmatization. Tools and education/information materials may also help individuals with intersexuality disclose their condition, if desired (Ernst et al., 2016).

HCPs should be able to recognize and address stigmatization in their clients (Meyer-Bahlburg et al., 2018) and should encourage people with intersexuality of various ages to connect via support groups. There is a need for developing specific techniques/methods for assisting clients to cope with stigma related to intersex.

### Statement 10.7

**We suggest health care professionals refer children/individuals with intersexuality and their families to mental health professionals as well as peer and other psychosocial supports as indicated.**

For almost all parents, the birth of a child with intersexuality is entirely unexpected and comes as a shock. Their inability to respond immediately to the ubiquitous question, "Is your baby a boy or a girl?", their lack of knowledge about the child's condition, the uncertainty regarding the child's future, and the pervasive intersex stigma are likely to cause distress, sometimes to the level of PTSD and may lead to prolonged anxiety and depression (Pasterski et al., 2014; Roberts et al., 2020; Wisniewski & Sandberg, 2015). This situation may affect parental care and long-term outcome of their child with intersexuality (Schweizer et al., 2017). As these children grow up, they are also at risk of experiencing intersex stigma in its three major forms (enacted, anticipated, internalized) in all spheres of life (Meyer-Bahlburg et al., 2018), along with other potential difficulties such as body image problems, gender-atypical behavior, and gender identity questioning. Many may face the additional challenge presented by the awareness of the incongruence between their assigned gender and biological characteristics such as sexual karyotype, gonads, past and/or current sex-hormonal milieu, and reproductive tract configuration. This situation may also adversely affect the individuals' mental health (Godfrey, 2021; Meyer-Bahlburg, 2022). A recent online study of a very large sample of LGBTQ youth indicated that LGBTQ youth who categorized themselves as having a physical intersex variation had a rate of mental health problems that was higher than the rate in LGBTQ youth without intersexuality (Trevor Project, 2021). As intersex conditions are rare, parents of such children and later the individuals themselves may experience their situation as unique and very difficult for others to understand. Thus, based on clinical experience, there is a consensus among HCPs who are experienced in intersex care, that social support is a crucial component of intersex care, not only through professional support by MHPs (Pasterski et al., 2010), but also, importantly, through support groups of individuals with intersex conditions (Baratz et al., 2014; Cull & Simmonds, 2010; Hughes et al., 2006; Lampalzer et al., 2021). A detailed international listing of DSD and intersex peer support and advocacy groups with their websites has been provided by Lee, Nordenström et al. (2016). Given the heterogeneity of intersex conditions and treatment regimens, an individual with intersexuality may find it most helpful to associate with a support group that includes members with the same or similar condition as that of the individual. It is important HCPs specializing in intersex care also collaborate closely with such support groups so that occasional differences in opinions regarding specific aspects of care can be resolved through detailed discussions. Close contacts between HCPs and support groups also facilitate community-based participatory research that benefits both sides.

Statement 10.8

**We recommend health care professionals counsel individuals with intersexuality and their families about puberty suppression and/or hormonal treatment options within the context of the individual's gender identity, age, and unique medical circumstances.**

While many people with intersexuality have a gender identity in line with their XX or XY karyotype, there is sufficient heterogeneity that HCPs should be able to provide customized approaches. For example, among XX individuals with virilizing CAH, a larger than expected minority have a male gender identity (Dessens et al., 2005). Among XY individuals with partial androgen insensitivity syndrome, gender identity can vary significantly (Babu & Shah, 2021). Furthermore, among XY individuals with $5\alpha$-reductase-2 ($5\alpha$-RD-2) deficiency and with 17-beta-hydroxysteroid dehydrogenase-3 deficiency who are assigned the female sex at birth, a large fraction (56–63% and 39–64%, respectively) change from a typical female gender role to a typical male gender role as they age (Cohen-Kettenis, 2005).

People with intersexuality have a wide range of medical options open to them depending on their gender identity and its alignment with anatomy. These options include puberty suppression medication, hormonal treatment, and surgeries, all customized to the unique circumstances of the individual (Weinand & Safer, 2015; Safer & Tangpricha, 2019) (for further information see Chapter 6—Adolescents and Chapter 12—Hormone Therapy). Specifically, when functional gonads are present, puberty may be temporarily suspended by using gonadotropin-releasing hormone (GnRH) analogues. Such intervention can

facilitate the necessary passage of time needed by the individual to explore gender identity and to actively participate in sex designation, especially for conditions in which sex role change is common (i.e., in female-raised individuals with 5α-RD-2 deficiency; Cocchetti, Ristori, Mazzoli et al., 2020; Fisher, Castellini et al., 2016).

HCPs can counsel individuals and their families directly if the providers have sufficient expertise and can leverage expertise needed to determine both a course of treatment appropriate for the individual and the logistics involved in implementing the chosen therapeutic option.

Statement 10.9

**We suggest health care professionals counsel parents and children with intersexuality (when cognitively sufficiently developed) to delay gender-affirming genital surgery, gonadal surgery, or both, so as to optimize the children's self-determination and ability to participate in the decision based on informed consent.**

International human rights organizations have increasingly expressed their concerns that surgeries performed before a child can participate meaningfully in decision-making may endanger the child's human rights to autonomy, self-determination, and an open future (e.g., Human Rights Watch, 2017). Numerous medical and intersex advocacy organizations as well as several countries have joined these international human rights groups in recommending the delay of surgery when medically feasible (Dalke et al., 2020; National Academies of Sciences, Engineering, and Medicine, 2020). However, it is important to note some anatomic variations, such as obstruction of urinary flow or exposure of pelvic organs, pose an imminent risk to physical health (Mouriquand et al., 2016). Others, such as menstrual obstruction or long-term malignancy risk in undescended testes, have eventual physical consequences. A third group of variations, i.e., variations in the appearance of external genitals or vaginal depth, pose no immediate or long-term physical risk. The above recommendation addresses only those anatomic variations that, if left untreated, have no immediate adverse physical consequences and where delaying surgical treatment poses no physical health risk.

Non-urgent surgical care for individuals with these variations is complex and often contested, particularly when an individual is an infant or a young child and cannot yet participate in the decision-making process. Older people with intersexuality have reported psychosocial and sexual health problems, including depression, anxiety, and sexual and social stigma (de Vries et al., 2019; Rosenwohl-Mack et al., 2020). Some studies have suggested individuals with a specific variation (e.g., 46,XX CAH) agree with surgery being performed before adolescence (Bennecke et al., 2021). Recent studies suggest some adolescents and adults are satisfied with the appearance and function of the genitals after childhood surgery (Rapp et al., 2021). A child's genital difference can also become a source of stress for parents, and there is research that reports a correlation of surgery to create binary genitals with a limited amount of reduction in parental distress (Wolfe-Christensen et al., 2017), although a minority of parents may report decisional regret (Ellens et al., 2017). Consequently, some organizations recommend surgery be offered to very young children (American Urological Association, 2019; Pediatric Endocrine Society, 2020).

This shows the division within the medical field regarding its management guidelines for early genital surgery. The authors of this chapter also did not reach complete consensus. Some intersex specialists consider it potentially harmful to insist on a universal deferral of early genital surgery for genital variations without immediate medical risks. Reasons supporting this view include 1) intersex conditions are highly heterogeneous with respect to type and severity as well as associated gonadal structure, function, and malignancy risk; 2) societies and families vary tremendously in gender norms and intersex stigma potential; 3) early surgery may present certain technical advantages; and 4) a review of surveys of individuals with intersexuality (most of whom had previously undergone genital surgery) show the majority endorse surgery before the age of consent, especially in the case of individuals with 46,XX CAH and less strongly for individuals with XY intersex conditions (Meyer-Bahlburg, 2022). Experts supporting this view call for an individualized approach to

decisions regarding genital surgery and its timing. This approach has been adopted by medical societies with high rates of intersex specialists (Bangalore Krishna et al., 2021; Pediatric Endocrine Society, 2020; Speiser et al., 2018; Stark et al., 2019) and by certain support organizations (CARES Foundation; Krege et al., 2019).

Nonetheless, long-term outcome studies are limited and most studies reporting positive outcomes lack a non-surgical comparison group (Dalke, et al., 2020; National Academies of Sciences, Engineering, and Medicine, 2020). There is also no evidence surgery protects children with intersex conditions from stigma (Roen, 2019). Adults with intersexuality do experience stigma, depression, and anxiety related to their genitalia, but can also experience stigma whether or not they have surgery (Ediati et al., 2017; Meyer-Bahlburg, Khuri et al., 2017; Meyer-Bahlburg et al., 2018). There is also evidence surgeries may lead to significant cosmetic, urinary, and sexual complications extending into adulthood (Gong & Cheng, 2017; National Academies of Sciences, Engineering, and Medicine, 2020). Recent studies suggest some groups of individuals may have particularly negative experiences with gonadectomy, although this risk has to be weighed against that of gonadal malignancy (Duranteau et al., 2020; Rapp et al., 2021). People with intersex conditions are also far more likely than the general population to be transgender, to be gender diverse, or to have gender dysphoria (Almasri et al., 2018; Pasterski et al., 2015). Genital surgeries of young children may therefore irreversibly reinforce a binary sex assignment that is not aligned with the persons' future. These findings, together with human rights perspectives, support the call for the delay in the decision for surgery until the individual can decide for him/her/themselves.

Systematic long-term follow-up studies are urgently needed to compare individuals with the same intersex conditions who differ in the age at surgery or have had no surgery with regard to gender identity, mental health, and general quality of life.

### Statement 10.10

**We suggest only surgeons experienced in intersex genital or gonadal surgery operate on individuals with intersexuality.**

Intersex conditions are rare, and intersex genital and gonadal anatomy are heterogeneous. Surgeries have been associated with a risk of significant long-term complications (e.g., National Academies of Sciences, Engineering, and Medicine, 2020), and most surgical training programs do not prepare trainees to provide this specialized care (Grimstad, Kremen et al., 2021). In recognition of the complexity of surgical care across the lifespan, standards produced by expert and international consensus recommend this care be provided by multidisciplinary teams of experts (Krege et al, 2019; Lee, Nordenström et al., 2016; Pediatric Endocrine Society, 2020). Therefore, we advise surgical care be limited to intersex-specialized, multidisciplinary settings that include surgeons experienced in intersex care.

### Statement 10.11

**We recommend health care professionals who are prescribing or referring for hormonal therapies/surgeries counsel individuals with intersexuality and fertility potential and their families about a) known effects of hormonal therapies/surgery on future fertility; b) potential effects of therapies that are not well studied and are of unknown reversibility; c) fertility preservation options; and d) psychosocial implications of infertility.**

Individuals with certain intersex conditions may have reproductively functional genitalia but experience infertility due to atypical gonadal development. Others may have functioning gonads with viable germ cells but an inability to achieve natural fertility secondary to incongruent internal or external genitalia (van Batavia & Kolon, 2016). Pubertal suppression, hormonal treatment with sex steroid hormones, and gender affirming surgeries may all have an adverse impact on future fertility. The potential consequences of the treatment and fertility preservation options should therefore be reviewed and discussed.

Individuals with functioning testes should be advised prolonged treatment with estrogen and suppression of testosterone, as studied in TGD people without intersexuality, may cause testicular atrophy and a reduction in sperm count (Mattawanon et al., 2018). Although interruption

of such gender affirming hormonal treatment may improve sperm quality, a complete reversal of semen impairment cannot be guaranteed (Sermondade et al., 2021). The principal fertility preservation option for individuals with functioning testes is cryopreservation of sperm collected through masturbation or vibratory stimulation (de Roo et al., 2016). Although there are no data for success in humans, there is a proposal to offer direct testicular extraction and cryopreservation of immature testicular tissue to adolescents who have not yet undergone spermarche (Mattawanon et al., 2018).

Individuals with functioning ovaries should be advised testosterone therapy usually results in cessation of both menses and ovulation, often within a few months of initiating therapy. There are major gaps in knowledge regarding the potential effects of testosterone on oocytes and subsequent fertility. In transgender people, one study reported testosterone treatment may be associated with the development of polycystic ovarian morphology (Grynberg et al., 2010). However, other researchers have not found evidence of polycystic ovarian syndrome (PCOS) among transgender men receiving gender affirming hormone therapy based on metabolic (Chan et al., 2018) or histologic parameters (de Roo et al., 2017). Individuals with an intact uterus and functioning ovaries may regain their fertility potential if testosterone therapy is discontinued.

Fertility preservation options in post-pubertal people with intersexuality and functioning ovaries include hormonal stimulation for mature oocyte cryopreservation or ovarian tissue cryopreservation. Alternatively, stimulated oocyte extraction has been reported even for a transgender man continuing testosterone therapy (Greenwald, 2021). Similarly, oocyte cryopreservation after ovarian stimulation has been reported in a transgender boy receiving GnRHa therapy (Rothenberg et al., 2019). It should be noted ovarian stimulation, temporary cessation of GnRHa, testosterone treatment, or both, as well as gynecological procedures, can all be psychologically distressing to individuals, with the stress reaction being influenced by mental health, gender identity, and other medical experience. Applicability of certain interventions may depend on the support of other people in the individual's social network, including potential partners.

Statement 10.12

**We suggest health care professionals caring for individuals with intersexuality and congenital infertility introduce them and their families, early and gradually, to the various alternative options of parenthood.**

For people with intersex characteristics, the likelihood of infertility may be recognized in infancy, childhood, adolescence as well as in adulthood, without first engaging in attempts to conceive. For many individuals, a diagnosis of infertility accompanies the intersex diagnosis (Jones, 2019). For some individuals, assisted heterologous fertilization (e.g., oocyte or sperm donation) may be an option. Multiple adoption pathways exist. Some may require commitment and a considerable investment of time. Individuals who are either not interested in engaging in the efforts to achieve fertility previously described or for whom fertility is not possible can benefit from early exposure to the options available for adoption and alternative parenthood. While uterus transplantation has had preliminary success in people with Mullerian agenesis (Richards et al., 2021), there is no protocol to date that avoids exposure of the developing fetus to the risks associated with the medications used to avoid transplant rejection.

# CHAPTER 11 Institutional Environments

This chapter addresses care for transgender and gender diverse (TGD) individuals who reside in institutions. By definition, institutions are facilities or establishments in which people live and receive care in a congregate or large group setting, where individuals may or may not have freedom of movement, individual consent, or agency. Carceral facilities (correctional facilities, immigration detention centers, jails, juvenile detention centers) and noncarceral facilities (long-term care facilities, in-patient psychiatric facilities, domiciliaries, hospice/palliative care, assisted living facilities) are residential institutions where health care access for transgender persons may be provided. Much of the evidence in support of proper care of TGD persons comes from carceral settings. However, the recommendations put forth here apply to all institutions that house TGD individuals, both carceral and noncarceral (Porter et al., 2016). All of the recommendations of the Standards of Care apply equally to people living in both types of institutions. People should have access to these medically necessary treatments irrespective of their housing situation within an institution (Brown, 2009). Care for an institutionalized person must consider the individual does not have the access that non-institutionalized persons have to securing care on their own. For that reason,

institutionalized persons must be supported in being able to receive the Standards of Care established by the World Professional Association for Transgender Health (WPATH).

TGD residents in carceral facilities report the lack of access to medically necessary transgender-specific health care (see Chapter 2—Global Applicability, Statement 2.1), which is ranked as their number one concern while incarcerated (Brown, 2014; Emmer et al., 2011). The systemic racial inequities inherent in many carceral environments (Sawyer, 2020), racial disparities in health outcomes (Nowotny et al., 2017), and the overrepresentation of TGD people of color in some facilities (Reisner et al., 2014) punctuate a need for facility leadership to attend to transitional care access issues. Controlled studies show clinically significant health and mental health disparities for justice-involved transgender people compared to matched groups of transgender people who have not been incarcerated or jailed (Brown and Jones, 2015). Too often the agencies, structures, and personnel that provide care are lacking in knowledge, training, and capacity to care for gender diverse people (Clark et al., 2017). Discrimination against TGD residents in palliative care settings, including hospice, is common, and the needs of TGD patients or their surrogates have been ignored in these settings (Stein et al., 2020). This is one reason why lesbian, gay, bisexual and transgender (LGBT)

---

### Statements of Recommendations

11.1- We recommend health care professionals responsible for providing gender-affirming care to individuals residing in institutions (or associated with institutions or agencies) recognize the entire list of recommendations of the SOC-8 apply equally to people living in institutions.

11.2- We suggest institutions provide all staff with training on gender diversity.

11.3- We recommend medical professionals charged with prescribing and monitoring hormones for TGD individuals living in institutions who need gender-affirming hormone therapy do so without undue delay and in accordance with the SOC-8.

11.4- We recommend staff and professionals charged with providing health care to TGD individuals living in institutions recommend and support gender-affirming surgical treatments in accordance with the SOC-8 when sought by the individual, without undue delay.

11.5- We recommend administrators, health care professionals, and all others working in institutions charged with the responsibility of caring for TGD individuals allow those individuals who request appropriate clothing and grooming items to obtain such items concordant with their gender expression.

11.6- We recommend all institutional staff address TGD individuals by their chosen names and pronouns at all times.

11.7- We recommend institutional administrators, health care professionals, and other officials responsible for making housing decisions for TGD residents consider the individual's housing preference, gender identity and expression, and safety considerations rather than solely their anatomy or sex assignment at birth.

11.8- We recommend institutional personnel establish housing policies that ensure the safety of TGD residents without segregating or isolating these individuals.

11.9- We recommend institutional personnel allow TGD residents the private use of shower and toilet facilities upon request.

patients may choose to hide their sexual and/or gender identity when they enter a nursing home, despite the fact that prior to their admission to the facility they had been living publicly as a LGBT-identified person (Carroll, 2017; Serafin et al., 2013).

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable. The majority of the available literature related to institutions focuses on those who are incarcerated in jails, prisons, or other carceral environments. Literature about other institutional types were also considered and referenced where available. We hope future investigations will address this relative lack of data from noncarceral institutions. The recommendations summarized above are generalizable to a variety of institutional settings that have characteristics in common, including extended periods of stay, loss of or limited agency, and reliance on institutional staff for some or all of the basic necessities of life.

### Statement 11.1

**We recommend health care professionals responsible for providing gender-affirming care to individuals residing in institutions (or associated with institutions or agencies) recognize the entire list of recommendations of the SOC-8, apply equally to TGD people living in institutions.**

Just as people living in institutions require and deserve mental and medical health care in general and in specialty areas, we recognize TGD people are in these institutions and thus need care specific to TGD concerns. We recommend the application of the Standards of Care (SOC) to people living in institutions as basic principles of health care and ethics (Beauchamp & Childress, 2019; Pope & Vasquez, 2016). Additionally, numerous courts have long upheld the need to provide TGD-informed care based in the WPATH SOC to people living in institutions as well (e.g., Koselik v. Massachusetts, 2002; Edmo v. Idaho Department of Corrections, 2020). Agencies that

provide staffing for long-term, in-home services should also be aware of the applicability of the Standards of Care.

### Statement 11.2

**We suggest institutions provide all staff with training on gender diversity.**

Because TGD care affects a small percentage of the population, it requires specialized training as outlined in this SOC Version 8. While the level of training will vary based on the staff member's role within the institutional setting, all staff will need training in addressing residents appropriately while other clinical staff may need more intensive training and/or consultation. These training recommendations also apply to agencies that supply staffing for in-home, long-term care. Misgendering institutionalized residents, not allowing for gender appropriate clothing, shower facilities, or housing, and not using chosen names communicates a lack of respect for TGD residents who may experience repeated indignities as emotionally traumatic, depressing, and anxiety-producing. By providing all institutional staff with training on gender diversity and basic competence in transgender-related health care issues, these harms can be prevented (Hafford-Letchfield et al., 2017). Surveys indicate individuals working with incarcerated individuals as well as in workers in noncarceral settings like palliative care have significant knowledge gaps (Stein et al., 2020; White et al., 2016). Hafford-Letchfield et al. (2017) showed benefit to training residential long-term care staff when such training began with "recognizing LBGT issues" and existed in "care homes". If the assigned health care providers lack the expertise to assess and/or treat gender diverse persons under their charge, outside consultation should be sought from professionals with expertise in the provision of gender-affirming health care (Brömdal et al., 2019; Sevelius and Jenness, 2017).

### Statement 11.3

**We recommend medical professionals charged with prescribing and monitoring hormones for TGD individuals living in institutions who need gender-affirming hormone therapy do so**

**without undue delay and in accordance with the SOC-8.**

TGD persons may be admitted to institutions in need of evaluation for gender-affirming hormonal care or may develop this need after they have resided in an institutional setting for varying degrees of time. It is not uncommon for TGD persons to be denied access to hormonal care for months or years after making such needs known or to be undertreated and poorly monitored, delaying the necessary titration of medications for safety and efficacy (Keohane, 2018; Kosilek v. Massachusetts, 2002; Monroe v. Baldwin et al., 2019). This can result in significant negative mental health outcomes to include depression, anxiety, suicidality, and surgical self-treatment risks (Brown, 2010). As with all medically necessary health care, access to gender-affirming hormone therapies should be provided in a timely fashion when indicated for a TGD resident, in both carceral and noncarceral institutional environments. Medical professionals shall appropriately titrate hormones based on laboratory results and clinical outcomes to ensure results are within the range of recommended standards within the field of endocrinology. Such labs shall be taken at a frequency so as not to delay appropriate titration.

TGD elderly people living in long-term care facilities have unique needs (Boyd, 2019; Caroll, 2017; Porter, 2016). When elderly individuals request hormonal treatment, while physicians should assess pre-existing conditions, rarely do such conditions absolutely contraindicate administering hormones in this population (Ettner, 2013). People with gender incongruence in institutions may also have coexisting mental health conditions (Brown and Jones, 2015; Cole et al., 1997). These conditions should be evaluated and treated appropriately as part of the overall assessment. Persons receiving hormones must be closely medically monitored to avoid potential drug interactions and polypharmacy (Hembree et al., 2017).

TGD persons who enter an institution on an appropriate regimen of gender-affirming hormone therapy should be continued on the same or similar therapies and monitored according to the SOC Version 8. A "freeze frame" approach is inappropriate and dangerous (Kosilek v. Massachusetts, 2002). A "freeze frame" approach is the outmoded practice of denying hormones to people who are not already on them or keeping TGD persons on the same dose of hormones throughout their institutionalization that they were receiving upon admission, even if that dose was an initiation (low) dose. TGD persons who are deemed appropriate for de novo gender-affirming hormone therapy should be started on such therapy just as they would be outside of an institution (Adams v. Federal Bureau of Prisons, No. 09-10272 [D. MO June 7, 2010]; Brown 2009). The consequences of abrupt withdrawal of hormones or lack of initiation of hormone therapy when medically necessary include a significant likelihood of negative outcomes (Brown, 2010; Sundstrom and Fields v. Frank, 2011), such as surgical self-treatment by autocastration, depressed mood, increased gender dysphoria, and/or suicidality (Brown, 2010; Maruri, 2011).

If an individual in an institution does receive gender-affirming hormones and/or surgeries, decisions regarding housing in sex-segregated facilities may need to be reassessed for the safety and well-being of the TGD person (Ministry of Justice [UK], 2016).

Statement 11.4

**We recommend staff and professionals charged with providing health care to TGD individuals living in institutions recommend and support gender-affirming surgical treatments in accordance with SOC-8, when sought by the individual, without undue delay.**

TGD people with gender dysphoria should have an appropriate treatment plan to provide medically necessary surgical treatments that contain similar elements provided to persons who reside outside institutions (Adams v. Federal Bureau of Prisons, No. 09-10272 [D. MO June 7, 2010]; Brown 2009; Edmo v. Idaho Department of Corrections, 2020). The consequences of denial or lack of access to gender- affirming surgeries for residents of institutions who cannot access such care outside of their institutions may be serious, including substantial worsening of gender dysphoria symptoms, depression, anxiety, suicidality, and the possibility of surgical self-treatment

(e.g., autocastration or autopenectomy; Brown, 2010; Edmo v. Idaho Department of Corrections, 2020; Maruri, 2011). It is not uncommon for residents of institutions to be denied access to evaluation for gender-affirming surgery as well as denial of the treatment itself, even when medically necessary (Kosilek v. Massachusetts/ Dennehy, 2012; Edmo v. Idaho Department of Corrections, 2020). The denial of medically necessary evaluations for and the provision of gender-affirming surgical treatments and necessary aftercare is inappropriate and inconsistent with these Standards of Care.

Statement 11.5

**We recommend administrators, health care professionals, and all others working in institutions charged with the responsibility of caring for TGD individuals allow those individuals who request appropriate clothing and grooming items to obtain such items concordant with their gender expression.**

Gender expression refers to people having hairstyles, grooming products, clothing, names, and pronouns associated with their gender identity in their culture and/or community (American Psychological Association, 2015; Hembree et al., 2017). Gender expression is the norm among most people within a culture or a community. Social transition is the process of TGD persons beginning and continuing to express their gender identity in ways that are authentic and socially perceptible. Often, social transition involves behavior and public presentation differing from what is usually expected for people assigned a given legal gender marker at birth. A gender marker is the legal label for a person's sex that is typically assigned or designated at birth on official documents (American Psychological Association, 2015). This is most commonly recorded as male or female but also intersex or "X" in some nations and jurisdictions. TGD individuals need the same rights to gender expression afforded cisgender people living both outside and inside institutional settings. Staff acceptance of social transition also sets a tone of respect and affirmation that may enhance respect and affirmation with others residing in the institution, thereby increasing

safety and reducing some aspects of gender incongruence.

Research indicates social transition and congruent gender expression have a significant beneficial effect on the mental health of TGD people (Bockting & Coleman, 2007; Boedecker, 2018; Devor, 2004; Glynn et al., 2016; Russell et al., 2018). To allow for expressing gender identity, these recommendations include being allowed to wear gender congruent clothing and hairstyles, to obtain and use gender-appropriate hygiene and grooming products, to be addressed by a chosen name or legal last name (even if unable to change the assigned name legally yet), and to be addressed by a pronoun consistent with one's identity. These elements of gender expression and social transition, individually or collectively as indicated by the individual's needs, reduce gender dysphoria/incongruence, depression, anxiety, self-harm ideation and behavior, suicidal ideation and attempts (Russell et al., 2018). Furthermore, these elements of congruent gender expression enhance well-being and functioning (Glynn et al., 2016).

Statement 11.6

**We recommend all institutional staff address TGD individuals by their chosen names and pronouns at all times.**

Given that an increasing percentage of people openly identify as gender diverse, there is a need to develop and implement practices and policies that meet the needs of these people irrespective of where they live (McCauley et al., 2017). For example, institutions should utilize medical and administrative records systems for their residents that track gender markers consistent with gender identity and not solely sex assigned at birth. In developing these recommendations, there was recognition that gender expansiveness can challenge some institutional norms where TGD people live. However, all institutions have the responsibility to provide for the safety and well-being of all persons living therein (Australia, 2015; Corrective Services New South Wales, 2015; Edmo v. Idaho Department of Corrections, 2020; Kosilek v. Massachusetts, 2002; NCCHC, 2015). Sevelius and colleagues (2020) demonstrated correct pronoun usage is gender-affirming for

transgender women and correlates with positive mental health and HIV-related health outcomes. If a resident of an institution has legally changed names, the institutional records should be changed to reflect those changes.

## Statement 11.7

**We recommend institutional administrators, health care professionals, and other officials responsible for making housing decisions for TGD residents consider the individual's housing preference, gender identity and expression, and safety considerations, rather than solely their anatomy or sex assignment at birth.**

The separation of people based on sex assigned at birth, a policy almost universally implemented in institutional settings (Brown and McDuffie, 2009; Routh et al., 2017), can create an inherently dangerous environment (Ledesma & Ford, 2020). Gender diverse people are extremely vulnerable to stigmatization, victimization, neglect, violence, and sexual abuse (Banbury, 2004; Beck, 2014; Jenness and Fenstermaker, 2016; Malkin & DeJong, 2018; Oparah, 2012; Stein et al., 2020). This systemic sex-segregated rigidity often fails to keep TGD people safe and may impede access to gender-affirming health care (Stohr, 2015). As a result, institutions should follow procedures that routinely evaluate the housing needs and preferences of TGD inmates (e.g., Federal Bureau of Prisons, 2016). Likewise, the Prison Rape Elimination Act specifically cites TGD individuals as a vulnerable population and directs prisons nationwide in the US to consider the housing preferences of these inmates (Bureau of Justice Assistance, 2017).

## Statement 11.8

**We recommend institutional personnel establish housing policies that ensure the safety of transgender and gender diverse residents without segregating or isolating these individuals.**

Assigning placement for a TGD resident solely on the basis of their genital anatomy or sex assigned at birth is misguided and places people at risk for physical and/or psychological harm (Scott, 2013; Simopoulos & Khin, 2014; Yona & Katri, 2020). It is well established within carceral settings, transgender individuals are far more

likely than other prisoners to be sexually harassed, assaulted, or both (James et al., 2016; Jenness & Fenstermaker, 2016; Malkin & DeJong, 2019). While placement decisions need to address security concerns, shared decision-making that includes the input of the individual should be made on a case-by-case basis (Federal Bureau of Prisons, 2016; Jenness and Smyth, 2011). Some transgender women prefer to reside in a male facility while others feel safer in a female facility. Given the range of gender identities, expression and transition status is so heterogeneous among gender diverse people, keeping residents safe requires flexible decision-making processes (Yona & Katri, 2020). One of the fears older LBGT individuals have living in long-term care is mistreatment by roommates (Jablonski et al., 2013). Consequently, housing in nursing homes and assisted living facilities should consider assigning rooms to elders based on their self-identified gender without regard to birth assignment or surgical history and in collaboration with the TGD patient.

Solitary confinement, sometimes referred to as administrative segregation in carceral facilities, refers to physical isolation of individuals during which they are confined in their cells for approximately twenty-three hours each day. The use of isolation is employed in some carceral facilities as a disciplinary measure as well as a means of protecting prisoners who are considered a risk to themselves or others or who are at risk of sexual assault by other inmates. However, isolating prisoners for safety concerns, if necessary, should be brief, as isolation can cause severe psychological harm and gross disturbances of functioning (Ahalt et al., 2017; Scharff Smith, 2006). National prison standards organizations as well as The United Nations consider isolation longer than 15 days to be torture (NCCHC, 2016; United Nations, 2015).

## Statement 11.9

**We recommend institutional personnel allow transgender and gender diverse residents the private use of shower and toilet facilities, upon request.**

The necessity and importance of privacy is universal irrespective of gender identity. TGD

individuals report avoiding public restrooms, limiting the amount they eat and drink so as not to have to use a public facility, often leading to urinary tract infections and kidney-related problems (James et al., 2016). TGD individuals in institutions are often deprived of privacy in bathroom and shower use, which can result in psychological harm and/or physical and sexual abuse (Bartels and Lynch, 2017; Brown, 2014; Cook-Daniels, 2016; Mann, 2006). Similarly, in carceral environments, pat downs, strip searches and body cavity searches should be conducted by staff members of the same sex with the understanding this may not be possible in extreme emergencies. The incidental viewing of searches by other employees should be avoided (Bureau of Justice Assistance, 2017). Private use of shower and toilet facilities for incarcerated transgender people is also required by some laws, including for instance the United States' federal Prison Rape Elimination Act in the US.

The population of aging/older TGD persons who need to be served by institutions is increasing (Carroll, 2017; Witten & Eyler, 2016). Many long-term care and other facilities catering to the needs of the aging need to take into consideration the needs of their non-cisgender residents (Ettner, 2016; Ettner & Wiley, 2016). Surveys of HCPs working with elders in hospice and palliative care settings as well as other long-term care facilities report patients who identify as TGD often do not get their basic needs met, are discriminated against in their medical care access, or are physically and/or emotionally abused (Stein et al., 2020) A survey of retirement and residential care providers in Australia found little experience with or understanding of the issues facing this population. Indeed, many elderly TGD residents admitted to concealing their gender identity, bowing to the fear of insensitive treatment or frank discrimination (Cartwright et al., 2012; Cook-Daniels, 2016; Grant et al., 2012; Horner et al., 2012; Orel & Fruhauf, 2015).

## CHAPTER 12 Hormone Therapy

Transgender and gender diverse (TGD) persons may require medically necessary gender-affirming hormone therapy (GAHT) to achieve changes consistent with their embodiment goals, gender identity, or both (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1). This chapter describes hormone therapy recommendations for TGD adults and adolescents. Please refer to Chapter 5—Assessment of Adults and Chapter 6—Adolescents for the assessment criteria related to initiation of hormone therapy for adults and adolescents, respectively. A summary of the recommendations and assessment criteria can be found in Appendix D.

Ever since the first World Professional Association for Transgender Health (WPATH) Standards of Care (SOC) was published in 1979 and in subsequent updates of the SOC, including SOC version 7, GAHT has been accepted as medically necessary (Coleman et al., 2012). WPATH endorsed the Endocrine Society's guidelines for GAHT for TGD persons in 2009 and 2017 (Hembree et al., 2009; Hembree et al., 2017). The European Society for Sexual Medicine has also published a position statement on hormone management in adolescent and adult TGD people (T'Sjoen et al., 2020). When provided under medical supervision, GAHT in adults is safe (Tangpricha & den Heijer, 2017; Safer & Tangpricha, 2019). However, there are some potential long-term risks, and careful monitoring and screening are required to reduce adverse events (Hembree et al., 2017; Rosenthal, 2021).

In general, the goal is to target serum levels of the sex steroids to match the levels associated with the individual's gender identity, although optimal target ranges have not been established (Hembree et al., 2017). Health care professionals (HCPs) can use serum testosterone and/or estradiol levels to monitor most sex steroid treatments. However, conjugated estrogens or synthetic estrogen use cannot be monitored. The assumption that the estrone/estradiol ratio should be monitored was not supported in a recent cohort study as there was no relationship between estrone concentration and change in body fat or breast development seen in a European cohort of 212 adult transgender women during a 1-year follow-up of hormone treatment (Tebbens et al., 2021). This study demonstrated higher estrone concentrations or higher estrone/estradiol ratios are not associated with antagonistic effects on feminization (fat percentage and breast development) (Tebbens et al., 2021). Thus, monitoring of the estrone to estradiol ratio is not supported by the current published evidence. Previously used conjugated estrogens have been abandoned in favor of bioidentical estrogens. Even if several studies have shown a significantly greater risk of thromboembolic and cardiovascular complications with the use of oral conjugated estrogens compared with oral estradiol in postmenopausal women, no randomized controlled trials have taken place, either in postmenopausal women or in transgender people undergoing estrogen treatment (Smith et al., 2014).

The approach to GAHT differs and depends on the developmental stage of the individual at the time of initiation of hormone therapy as well as their treatment goals. Hormone therapy is not recommended for children who have not begun endogenous puberty. In eligible youth (as per Chapter 6—Adolescents) who have reached the early stages of puberty, the focus is usually to delay further pubertal progression with gonadotropin releasing hormone agonists (GnRHas) until an appropriate time when GAHT can be introduced. In these cases, pubertal suppression is considered medically necessary. Eligible adults may initiate GAHT if they fulfill the criteria as per Chapter 5—Assessment for Adults. In addition, health care providers should discuss fertility and fertility preservation procedures prior to initiating GAHT. See Chapter 16—Reproductive Health.

GAHT with feminine embodiment goals typically consists of estrogen and an androgen-lowering medication (Hembree et al., 2017). Although there are anecdotal reports of progesterone use for breast development and mood management, there is currently insufficient evidence the potential benefits of progesterone administration outweigh the potential risks (Iwamoto, T'Sjoen et al., 2019). Masculinizing GAHT typically consists of testosterone. Both WPATH and the Endocrine Society recommend monitoring levels of sex

hormones. While GAHT is customized to meet the individual needs of the TGD person, typically hormone levels are maintained at a concentration sufficient to support good bone health and are not supraphysiologic (Hembree et al., 2017; Rosen et al., 2019).

---

### Statements of Recommendations

12.1- We recommend health care professionals begin pubertal hormone suppression in eligible* transgender and gender diverse adolescents after they first exhibit physical changes of puberty (Tanner stage 2).

12.2- We recommend health care professionals use gonadotropin releasing hormone (GnRH) agonists to suppress endogenous sex hormones in eligible* transgender and gender diverse people for whom puberty blocking is indicated.

12.3- We suggest health care professionals prescribe progestins (oral or injectable depot) for pubertal suspension in eligible* transgender and gender diverse youth when GnRH agonists are either not available or are cost prohibitive.

12.4- We suggest health care professionals prescribe GnRH agonists for suppression of sex steroids without concomitant sex steroid hormone replacement in eligible* transgender and gender diverse adolescents seeking such intervention and who are well into or have completed pubertal development (past Tanner stage 3) but are either unsure about or do not want to begin sex steroid hormone therapy.

12.5- We recommend health care professionals prescribe sex hormone treatment regimens as part of gender-affirming treatment for eligible* transgender and gender diverse adolescents who are at least Tanner stage 2, with parental/guardian involvement unless their involvement is determined to be harmful or unnecessary to the adolescent.

12.6- We recommend health care professionals measure hormone levels during gender-affirming treatment to ensure endogenous sex steroids are lowered and administered sex steroids are maintained at levels appropriate for the treatment goals of transgender and gender diverse people according to the Tanner stage.

12.7- We recommend health care professionals prescribe progestogens or a GnRH agonist for eligible* transgender and gender diverse adolescents with a uterus to reduce dysphoria caused by their menstrual cycle when gender-affirming testosterone use is not yet indicated.

12.8- We recommend health care providers involve professionals from multiple disciplines who are experts in transgender health and in the management of the care required for transgender and gender diverse adolescents.

12.9- We recommend health care professionals institute regular clinical evaluations for physical changes and potential adverse reactions to sex steroid hormones, including laboratory monitoring of sex steroid hormones every 3 months during the first year of hormone therapy or with dose changes until stable adult dosing is reached followed by clinical and laboratory testing once or twice a year once an adult maintenance dose is attained.

12.10- We recommend health care professionals inform and counsel all individuals seeking gender-affirming medical treatment about the options available for fertility preservation prior to initiating puberty suppression and prior to treating with hormone therapy.

12.11- We recommend health care professionals evaluate and address medical conditions that can be exacerbated by lowered endogenous sex hormone concentrations and treatment with exogenous sex hormones before beginning treatment for transgender and gender diverse people.

12.12- We recommend health care professionals educate transgender and gender diverse people undergoing gender-affirming treatment about the onset and time course of the physical changes induced by sex hormonal treatment.

12.13- We recommend health care professionals not prescribe ethinyl estradiol for transgender and gender diverse people as part of a gender-affirming hormonal treatment.

12.14- We suggest health care professionals prescribe transdermal estrogen for eligible* transgender and gender diverse people at higher risk of developing venous thromboembolism based on age > 45 years or a previous history of venous thromboembolism, when gender-affirming estrogen treatment is recommended.

12.15- We suggest health care professionals not prescribe conjugated estrogens in transgender and gender diverse people when estradiol is available as a component of gender-affirming hormonal treatment.

12.16- We recommend health care professionals prescribe testosterone-lowering medications (either cyproterone acetate, spironolactone, or GnRH agonists) for eligible* transgender and gender diverse people with testes who are taking estrogen as part of a hormonal treatment plan if the individual's goal is to approximate circulating sex hormone concentrations in cisgender women.

12.17- We recommend health care professionals monitor hematocrit (or hemoglobin) in transgender and gender diverse people treated with testosterone.

12.18- We suggest health care professionals collaborate with surgeons regarding hormone use before and after gender-affirmation surgery.

12.19- We suggest health care professionals counsel transgender and gender diverse people about the various options available for gender-affirmation surgery unless surgery is not indicated or is medically contraindicated.

12.20- We recommend health care professionals initiate and continue gender-affirming hormone therapy for eligible* transgender and gender diverse people who require this treatment due to demonstrated improvement in psychosocial functioning and quality of life.

12.21- We recommend health care professionals maintain existing hormone therapy if the transgender and gender diverse individual's mental health deteriorates and assess the reason for the deterioration, unless contraindicated.

*For eligibility criteria for adolescents and adults, please refer to Chapter 5—Assessment for Adults and Chapter 6—Adolescents and Appendix D.*

In most cases, GAHT is maintained throughout life. It is not known if doses of GAHT should be reduced in older TGD people. Discontinuation of hormone therapy may result in bone loss in TGD individuals and will definitely do so in individuals whose gonads have been removed (Wiepjes et al., 2020). Routine primary care should also be performed (see Chapter 15—Primary Care). Epidemiology studies have reported an increased incidence of cardiovascular disease and venous thromboembolism (VTE) in TGD people receiving estrogen, most notably in older people and with different preparations of GAHT (Irwig, 2018; Maraka et al., 2017). TGD individuals treated with testosterone may also have increased adverse cardiovascular risks and events, such as increased myocardial infarction, blood pressure, decreased HDL-cholesterol, and excess weight (Alzahrani et al., 2019; Irwig, 2018; Kyinn et al., 2021). Health care professionals (HCPs) should discuss lifestyle and pharmacologic therapy with patients who are at the highest risk of developing cardiovascular disease (see Chapter 15—Primary Care). Polycythemia is another disorder that may present in TGD people taking testosterone (Antun et al., 2020). Therefore, it is important to continuously monitor for the development of conditions that can be exacerbated by GAHT throughout life (Hembree et al., 2017).

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

### Gender-Affirming Hormone Therapy in Youth

The following sections will discuss hormone therapy in TGD youth. Depending on the developmental stage of the youth, this hormone therapy generally comprises two phases, namely pubertal suppression followed by the addition of GAHT. During the first phase, pubertal development is halted to allow the youth to explore their gender identity and embodiment goals to prepare for the next phase, which may include GAHT. This section will discuss the recommendations for the use of gonadotropin releasing hormone agonists (GnRHas) as well as alternate approaches to pubertal suppression and will be followed by recommendations for GAHT. Sections that are applicable to youth and adults will follow in the next section.

### Statement 12.1

**We recommend health care professionals begin pubertal hormone suppression in eligible\* transgender and gender diverse adolescents only after they first exhibit physical changes of puberty (Tanner stage 2).**

In general, the goal of GnRHa administration in TGD adolescents is to prevent further development of the endogenous secondary sex characteristics corresponding to the sex designated at birth. Since this treatment is fully reversible, it is regarded as an extended time for adolescents to explore their gender identity by means of an early social transition (Ashley, 2019e). Treatment with GnRHas also has therapeutic benefit since it often results in a vast reduction in the level of distress stemming from physical changes that occur when endogenous puberty begins (Rosenthal, 2014; Turban, King et al., 2020).

For those prepubertal TGD children who have been persistent in their gender identity, any amount of permanent development of secondary sex characteristics could result in significant distress. While one might consider use of a GnRHa to prevent initiation of puberty in such individuals who remain at Tanner Stage 1, this use of GnRHa has not been recommended (Hembree et al., 2017). When a child reaches an age where pubertal development would normally begin (typically from 7-8 to 13 years for those with ovaries and from 9 to 14 years for those with testes), it would be appropriate to screen the child more frequently, perhaps at 4-month intervals, for signs of pubertal development (breast budding or testicular volume > 4 cc). Given the typical tempo of pubertal development (3.5–4 years for completion), it would be very unlikely for permanent pubertal changes to develop if one is only in puberty for 4 months or less. Thus, with frequent follow-up, the initiation of puberty can easily be detected before there are irreversible physical changes, and GnRHa can be started at that time with great efficacy. Of note, following initiation of a GnRHa, there is typically

a regression of one Tanner stage. Thus, if there is only Tanner stage 2 breast development, it typically fully regresses to the prepubertal Tanner stage 1; the same is typically true with Tanner stage 2 testes (often not even discernable to the patient and is not associated with development of secondary sex characteristics).

Given GnRHas work through GnRH receptor desensitization, if there's no uptick in endogenous GnRH stimulation of the pituitary (the first biochemical sign of puberty), there's no need for GnRH receptor desensitization. In addition, because of the wide variability in the timing of the start of puberty (as noted above), it is hard to justify using a GnRHa that might have some unknown risk if there's no physiological benefit before pubertal onset. Using a GnRHa with a child at Tanner stage 1 would only be indicated in cases of constitutional delay in growth and puberty, likely alongside the start of GAHT.

However, the use of a GnRHa could be considered in a child who, due to a constitutional delay in growth and puberty, starts GAHT while still in Tanner Stage 1. Initiating GAHT may activate the hypothalamic-pituitary gonadal axis in the beginning but may also mask the effects on the body of this activation. To avoid body changes with the potential to exacerbate an individual's gender incongruence, the GnRHa can be started as an adjunctive therapy to the GAHT shortly after the initiation of the GAHT to provide for pubertal development of the identified phenotype.

In addition, the suppression of the development of secondary sex characteristics is most effective when sex hormonal treatment is initiated in early to mid-puberty when compared with the initiation of sex hormonal treatment after puberty is completed (Bangalore-Krisha et al., 2019). Correspondingly, for adolescents who have already completed endogenous puberty and are considering starting GAHT, GnRHas can be used to inhibit physical functions, such as menses or erections, and can serve as a bridge until the adolescent, guardian(s) (if the adolescent is not able to consent independently), and treatment team reach a decision (Bangalore-Krishna et al., 2019; Rosenthal, 2021).

The onset of puberty occurs through reactivation of the hypothalamic-pituitary-gonadal axis.

Clinical assessment of the stages of puberty is based on physical features that reflect that reactivation. In individuals with functioning ovaries, Tanner stage 2 is characterized by the budding of the mammary gland. The development of the mammary gland occurs from exposure to estrogen produced by the ovaries. In individuals with functioning testes, Tanner stage 2 is characterized by an increase in testicular volume (typically greater than 4 ml). The growth of the testes is mediated through the gonadotropins luteinizing hormone (LH) and follicle stimulating hormone (FSH). In the later stages, the testes produce enough testosterone to induce masculinization of the body.

Statement 12.2

**We recommend health care professionals use GnRH agonists to suppress endogenous sex hormones in eligible\* transgender and gender diverse people for whom puberty blocking is indicated. For supporting text, see Statement 12.4.**

Statement 12.3

**We suggest health care professionals prescribe progestins (oral or injectable depot) for pubertal suspension in eligible\* transgender and gender diverse youth when GnRH agonists are not available or are cost prohibitive. For supporting text, see Statement 12.4.**

Statement 12.4.

**We suggest health care professionals prescribe GnRH agonists to suppress sex steroids without concomitant sex steroid hormone replacement in eligible transgender and gender diverse adolescents seeking such intervention who are well into or have completed pubertal development (past Tanner stage 3) but are unsure about or do not wish to begin sex steroid hormone therapy.**

GnRHas reduce gonadotrophin and sex steroid concentrations in TGD adolescents and thus halt the further development of secondary sex characteristics (Schagen et al., 2016). Their use is generally safe with the development of hypertension being the only short-term adverse event reported in the literature (Delemarre-van de Waal & Cohen-Kettenis, 2006; Klink, Bokenkamp et al., 2015). GnRHas prevent the pituitary gland from

secreting LH and FSH (Gava et al., 2020). When the gonadotropins decrease, the gonad is no longer stimulated to produce sex hormones (estrogens or androgens), and the sex hormone levels in the blood decrease to prepubertal levels. GnRHa treatment leads to partial regression of the initial stages of the already developed secondary sex characteristics (Bangalore et al., 2019). TGD adolescents with functioning ovaries will experience diminished growth of breast tissue, and if treatment is started at Tanner stage 2, the breast tissue may disappear completely (Shumer et al., 2016). Menarche can be prevented or discontinued following the administration of GnRHas in adolescents with a uterus. In TGD adolescents with functioning testes, testicular volume will regress to a lower volume.

When GnRHa treatment is started in adolescents at the later phases of pubertal development, some physical changes of pubertal development, such as late-stage breast development in TGD adolescents with functioning ovaries and a lower voice and growth of facial hair in TGD adolescents with functioning testes, will not regress completely, although any further progression will be stopped (Delemarre-van de Waal & Cohen-Kettenis, 2006). GnRHas have been used since 1981 for the treatment of central precocious puberty (Comite et al., 1981; Laron et al., 1981), and their benefits are well established (please also see the statements in Chapter 6—Adolescents). The use of GnRHas in individuals with central precocious puberty is regarded as both safe and effective, with no known long-term adverse effects (Carel et al., 2009). However, the use of GnRHas in TGD adolescents is considered off-label because they were not initially developed for this purpose. Nonetheless, data from adolescents prescribed GnRHas in a similar dose and fashion demonstrate effectiveness in delaying the onset of puberty although the long-term effects on bone mass have not been well established (Klink, Caris et al., 2015). Although long-term data are more limited in TGD adolescents than in adolescents with precocious puberty, data collection specifically in this population are ongoing (Klaver et al., 2020; Lee, Finlayson et al., 2020; Millington et al., 2020; Olson-Kennedy, Garofalo et al., 2019).

We recognize even though GnRHas are a medically necessary treatment, they may not be available for eligible adolescents because it is not covered by health insurance plans in some countries or may be cost-prohibitive. Therefore, other approaches should be considered in these cases, such as oral or injectable progestin formulations. In addition, for adolescents older than 14 years, there are currently no data to inform HCPs whether GnRHas can be administered as monotherapy (and for what duration) without posing a significant risk to skeletal health. This is because the skeleton will not have any exposure to adequate levels of sex steroid hormones (Rosenthal, 2021).

A prolonged hypogonadal state in adolescence, whether due to medical conditions such as hypergonadotropic hypogonadism, iatrogenic causes such as GnRHa monotherapy or physiological conditions such as conditional delay of growth and development, is often associated with an increased risk of poor bone health later in life (Bertelloni et al., 1998; Finkelstein et al., 1996). However, bone mass accrual is a multifactorial process that involves a complex interplay between endocrine, genetic, and lifestyle factors (Anai et al., 2001). When deciding on the duration of GnRHa monotherapy, all contributing factors should be considered, including factors such as pretreatment bone mass, bone age, and pubertal stage from an endocrine perspective and height gain, as well as psychosocial factors such as mental maturity and developmental stage relative to one's adolescent cohort and the adolescent's individual treatment goals (Rosenthal, 2021). For these reasons, a multidisciplinary team and an ongoing clinical relationship with the adolescent and the family should be maintained when initiating GnRHa treatment (see Statements 6.8, 6.9, and 6.12 in Chapter 6—Adolescents). The clinical course of the treatment, e.g., the development of bone mass during GnRHa treatment and the adolescent's response to treatment, can help to determine the length of GnRHa monotherapy.

## Statement 12.5

**We recommend health care professionals prescribe sex hormone treatment regimens as part of gender-affirming treatment in eligible\***

transgender and gender diverse adolescents who are at least Tanner stage 2, with parental/guardian involvement unless their involvement is determined to be harmful or unnecessary to the adolescent. For supporting text, see Statement 12.6.

Statement 12.6
We recommend health care professionals measure hormone levels during gender-affirming treatment to ensure endogenous sex steroids are lowered and administered sex steroids are maintained at a level appropriate for the treatment goals of transgender and gender diverse people according to the Tanner stage.

Sex steroid hormone therapy generally comprises two treatment regimens, depending on the timing of the GnRHa treatment. When GnRHa treatment is started in the early stages of endogenous pubertal development, puberty corresponding with gender identity or embodiment goals is induced with doses of sex steroid hormones similar to those used in peripubertal hypogonadal adolescents. In this context, adult doses of sex steroid hormones are typically reached over approximately a 2-year period (Chantrapanichkul et al., 2021). When GnRHa treatment is started in late- or postpubertal transgender adolescents, sex steroid hormones can be given at a higher starting dose and increased more rapidly until a maintenance dose is achieved, resembling treatment protocols used in transgender adults (Hembree et al., 2017). An additional advantage of GnRHa treatment is sex steroid hormones do not have to be administered in supraphysiological doses, which would otherwise be needed to suppress endogenous sex steroid production (Safer & Tangpricha, 2019). For TGD individuals with functioning testes, GnRHa treatment (or another testosterone-blocking medication) should be continued until such time as the TGD adolescent/young adult ultimately undergoes gonadectomy, if this surgical procedure is pursued as a medically necessary part of their gender-affirming care. Once adult levels of testosterone are reached in TGD individuals with functioning ovaries who have been initially suppressed with GnRHa's, testosterone alone at physiological doses is typically sufficient to lower ovarian estrogen secretion, and

GnRHas can be discontinued as discussed below (Hembree et al., 2017). For TGD adolescents with functioning ovaries who are new to care, GAHT can be accomplished with physiological doses of testosterone alone without the need for concomitant GnRHa administration (Hembree et al., 2017).

Gender-affirming sex steroid hormone therapy induces the development of secondary sex characteristics of the gender identity. Also, the rate of bone mineralization, which decreases during treatment with GnRHa's, rapidly recovers (Klink, Caris et al., 2015). During GnRHa treatment in early-pubertal TGD adolescents, the bone epiphyseal plates are still unfused (Kvist et al., 2020; Schagen et al., 2020). Following the initiation of sex steroid hormone treatment, a growth spurt can occur, and bone maturation continues (Vlot et al., 2017). In postpubertal TGD adolescents, sex steroid hormone treatment will not affect height since the epiphyseal plates have fused, and bone maturation is complete (Vlot et al., 2017).

In TGD adolescents with functioning testes, the use of 17-ß-estradiol for pubertal induction is preferred over that of synthetic estrogens, such as the more thrombogenic ethinyl estradiol (see Appendix D (Asscheman et al., 2015). It is still necessary to either continue GnRHa's to suppress endogenous testosterone production or transition to another medication that suppresses endogenous testosterone production (Rosenthal et al., 2016). Breast development and a female-typical fat distribution are among a number of physical changes that occur in response to estrogen treatment. See Appendix C—Table 1.

For TGD adolescents seeking masculinizing treatment, androgens are available as injectable preparations, transdermal formulations, and subcutaneous pellets. For pubertal induction, the use of testosterone-ester injection is generally recommended by most experts initially because of cost, availability, and experience (Shumer et al., 2016). It is advised to continue GnRHas at least until a maintenance level of testosterone is reached. In response to androgen treatment, virilization of the body occurs, including a lowering of the voice, more muscular development particularly in the upper body, growth of facial and body hair, and clitoral enlargement (Rosenthal et al., 2016). See Appendix C—Table 1.

In almost all situations, parental/caregiver consent should be obtained. Exceptions to this recommendation, in particular when caregiver or parental involvement is determined to be harmful to the adolescent, are described in more detail in Chapter 6—Adolescents (see Statement 6.11) where the rationale for involving parents/caregivers in the consent process is also described.

## Statement 12.7

**We recommend health care professionals prescribe progestogens or a GnRH agonist for eligible\* transgender and gender diverse adolescents with a uterus to reduce dysphoria caused by their menstrual cycle when gender-affirming testosterone use is not yet indicated.**

Menstrual suppression is a treatment option commonly needed by TGD individuals who experience distress related to menses or the anticipation of menarche. Statement 6.7 in Chapter 6—Adolescents describes this in more detail. To achieve amenorrhea, menstrual suppression can be initiated as a solo option before initiating testosterone or alongside testosterone therapy (Carswell & Roberts, 2017). Some youth, who are not ready for testosterone therapy or are not yet at an appropriate pubertal/developmental stage to begin such treatment, will benefit from the induction of amenorrhea (Olson-Kennedy, Rosenthal et al., 2018). Adolescents who experience an exacerbation of dysphoria related to the onset of puberty may elect to be treated with GnRHas for pubertal suppression (also see the Adolescents chapter).

Progestogens may be effective in adolescents whose goal is solely menstrual suppression. Continuous administration of progestin-only oral pills (including the contraceptive and noncontraceptive options), medroxyprogesterone injections, or levonorgestrel intrauterine device can be used for induction of amenorrhea (Pradhan & Gomez-Lobo, 2019). TGD individuals with functioning ovaries who start testosterone therapy may have 1–5 menstrual cycles before amenorrhea is achieved (Taub et al., 2020). Once amenorrhea is achieved, some TGD individuals with functioning ovaries may also choose to continue progestin treatment for birth control if relevant to their sexual practices.

TGD individuals with functioning ovaries and a uterus should be counseled about the potential for breakthrough menstrual bleeding in the first few months after initiating menstrual suppression. With GnRHa therapy, breakthrough bleeding may occur 2–3 weeks after initiation of the medication. For individuals seeking contraception or for those who continue to experience menstrual bleeding on progestin therapy, an estrogen combination with progestin may be considered for the maintenance of amenorrhea, yet they should be counseled on the possible side effect of breast development (Schwartz et al., 2019).

## Statement 12.8

**We recommend health care providers involve professionals from multiple disciplines who are experts in transgender health and in the management of the care of transgender and gender diverse adolescents.**

As with the care of adolescents, we suggest where possible a multidisciplinary expert team of medical and mental health professionals (MHPs) be assembled to manage this treatment. In adolescents who pursue GAHT (given this is a partly irreversible treatment), we suggest initiating treatment using a schedule of gradually increasing doses after a multidisciplinary team of medical and MHPs has confirmed the persistence of GD/gender incongruence and has established the individual possesses the mental capacity to give informed consent (Hembree et al., 2017). Specific aspects concerning the assessment of adolescents and the involvement of their caregivers and a multidisciplinary team are described in more detail in Chapter 6—Adolescents.

If possible, TGD adolescents should have access to experts in pediatric transgender health from multiple disciplines including primary care, endocrinology, fertility, mental health, voice, social work, spiritual support, and surgery (Chen, Hidalgo et al., 2016; Eisenberg et al., 2020; Keo-Meier & Ehrensaft, 2018). Individual providers are encouraged to form collaborative working relationships with providers from other disciplines to facilitate referrals as needed for the individual youth and their family (Tishelman et al., 2015). However, the lack of available

experts and resources should not constitute a barrier to care (Rider, McMorris et al., 2019). Helpful support for adolescents includes access to accurate, culturally informed information related to gender and sexual identities, transition options, the impact of family support, and connections to others with similar experiences and with TGD adults through online and in person support groups for adolescents and their family members (Rider, McMorris et al., 2019).

Many TGD adolescents have been found to experience mental health disparities and initial mental health screening (e.g., PHQ-2, GAD) can be employed as indicated (Rider, McMorris et al., 2019). Providers should keep in mind being transgender or questioning one's gender does not constitute pathology or a disorder. Therefore, individuals should not be referred for mental health treatment exclusively on the basis of a transgender identity. HCPs and MHPs who treat these youths and make referrals should, at a minimum, be familiar with the impact of trauma, gender dysphoria, and gender minority stressors on any potential mental health symptomatology, such as disordered eating, suicidal ideation, social anxiety. These health care providers should also be knowledgeable about the level of readiness of inpatient mental health services in their region to provide competent, gender-affirming care to TGD youth (Barrow & Apostle, 2018; Kuper, Wright et al., 2018; Kuper, Mathews et al., 2019; Tishelman & Neumann-Mascis, 2018). Statements 6.3, 6.4, and 6.12d in Chapter 6—Adolescents address this in more detail. Because parents of these youth commonly experience high levels of anxiety immediately after learning their youth is TGD, and their response to their child predicts that child's long-term physical and mental health outcomes, appropriate referrals for mental health support of the parents can be of great utility (Coolhart et al., 2017; Pullen Sansfaçon et al., 2015; Taliaferro et al., 2019).

### Statement 12.9
**We recommend health care professionals organize regular clinical evaluations for physical changes and potential adverse reactions to sex steroid hormones, including laboratory monitoring of sex steroid hormones every 3 months during the first year of hormone therapy or with dose changes until a stable adult dosing is reached followed by clinical and laboratory testing once or twice a year once an adult maintenance dose is attained.**

Sex steroid hormone therapy is associated with a broad array of physical and psychological changes (Irwig, 2017; Tangpricha & den Heijer, 2017) (see Appendix C—Table 1). After sex steroid hormone therapy has been initiated, the HCP should regularly assess the progress and response of the individual to the treatment (also see Chapter 6—Adolescents). This evaluation should assess the presence of any physical changes as well as the impact of treatment on gender dysphoria (if present) and psychological well-being (see Appendix C—Table 1). Clinical visits provide important opportunities for HCPs to educate patients about the typical time course required for physical changes to manifest and encourage realistic expectations. During the first year of hormone therapy, sex steroid hormone doses are often increased. A major factor guiding the dose is the serum level of the corresponding sex steroid hormone. In general, the goal is to target serum levels of the sex steroids to match the levels associated with the individual's gender identity, although optimal target ranges have not been established (Hembree et al., 2017).

In addition to assessing the positive changes associated with sex steroid hormone therapy, the HCP should regularly assess whether the treatment has caused any adverse effects (see Appendix C—Table 2)**.** Examples of adverse signs and symptoms include androgenic acne or bothersome sexual dysfunction (Braun et al., 2021; Kerckhof et al., 2019). GAHT also has the potential to adversely influence several laboratory tests. For example, spironolactone may cause hyperkalemia, although it is an uncommon and transient phenomenon (Millington et al., 2019). Testosterone increases the red blood cell count (hematocrit), which may occasionally cause erythrocytosis (Antun et al., 2020) (see Statement 12.17) (Hembree et al., 2017). Both estrogen and testosterone can alter lipid parameters, such as high-density protein lipoprotein (HDL) cholesterol and triglycerides (Maraka et al., 2017). See Appendix C—Tables 3 and 4.

The frequency of clinical evaluations should be individualized and guided by the individual's response to treatment. We suggest clinical assessments be performed approximately every 3 months during the first year of hormone therapy in patients who are stable and are not experiencing significant adverse effects (Appendix C—Table 5). We suggest rather than recommend testing be carried out every 3 months in the first year to allow some flexibility on the timing of these tests as there is no strong evidence or evidence from published studies supporting specific testing intervals. If an individual does experience an adverse effect, more frequent laboratory testing and/or clinical visits are often needed. Given the potential harm associated with sex hormone levels that exceed expected ranges in humans, we strongly recommend regular testing be performed as a standard practice when initiating GAHT in TGD individuals. Once a person has reached a stable adult dose of sex steroid hormone with no significant adverse effects, the frequency of clinic visits can be reduced to one to two per year (Hembree et al., 2017).

#### Statement 12.10

**We recommend health care professionals inform and counsel all individuals seeking gender-affirming medical treatment about options for fertility preservation prior to initiating puberty suppression and prior to administering hormone therapy.**

Pubertal suppression and hormone treatment with sex steroid hormones may have potential adverse effects on a person's future fertility (Cheng et al., 2019) (see also Chapter 6—Adolescents and Chapter 16—Reproductive Health). Although some TGD people may not have given much thought to their future reproductive potential at the time of their initial assessment to begin medical therapy, the potential implications of the treatment and fertility preservation options should be reviewed by the hormone prescriber and discussed with the person seeking these therapies (Ethics Committee of the American Society for Reproductive Medicine et al., 2015; De Roo et al., 2016).

Individuals with testes should be advised prolonged treatment with estrogen often causes testicular atrophy and a reduction in sperm count and other semen parameters (Adeleye et al., 2018). Nonetheless, there are major gaps in knowledge, and findings regarding the fertility of trans feminine people who take estrogen and antiandrogens are inconsistent (Cheng et al., 2019). In one study, heterogeneity in testicular histology was evident whether patients discontinued or continued therapy prior to orchiectomies (Schneider et al., 2015). For example, the discontinuation of estrogen and antiandrogens for six weeks resulted in complete spermatogenesis in 45% of individuals with the remainder showing meiotic arrest or spermatogonial arrest (Schneider et al., 2015). However, serum testosterone levels confirmed to be within female reference ranges leads to complete suppression of spermatogenesis in most transgender women (Vereecke et al., 2020). The principal fertility preservation option for patients with functioning testes is sperm cryopreservation, also known as sperm banking (Mattawanon et al., 2018). For prepubertal patients, suppression of puberty with GnRHs pauses the maturation of sperm (Finlayson et al., 2016).

Individuals with functioning ovaries should be advised testosterone therapy usually results in the cessation of menses and ovulation, often within a few months of initiation (Taub et al., 2020). There are also major gaps in knowledge regarding the potential effects of testosterone on oocytes and subsequent fertility of TGD patients (Eisenberg et al., 2020; Stuyver et al., 2020). One study found testosterone treatment may be associated with polycystic ovarian morphology, whereas other studies reported no metabolic (Chan et al., 2018) or histologic (De Roo et al., 2017; Grynberg et al., 2010) evidence of polycystic ovary syndrome (PCOS) following treatment with testosterone, and some studies have found a pre-existing higher prevalence of PCOS in transgender patients with ovaries (Baba, 2007; Gezer et al., 2021). TGD patients with an intact uterus and ovaries often regain their fertility potential if testosterone therapy is discontinued (Light et al., 2014). Indeed, a live birth after assisted reproductive technology has been reported following hormone-stimulated egg retrieval from a TGD

individual who did not discontinue testosterone therapy (Greenwald et al., 2021; Safer and Tangpricha, 2019). Other fertility preservation options for TGD patients with ovaries are oocyte cryopreservation and embryo cryopreservation with sperm from a partner or donor. The above options require hormonal stimulation for egg retrieval and the use of assisted reproductive technology.

For early pubertal transgender youth, suppression of puberty with GnRHa's pauses the maturation of germ cells, although a recent report noted ovarian stimulation of a TGD adolescent treated with a GnRHa's in early puberty (and continued during ovarian stimulation) resulted in a small number of mature oocytes that were cryopreserved (Rothenberg et al., 2019). Treating an TGD adolescent with functioning testes in the early stages of puberty with a GnRHa not only pauses maturation of germ cells but will also maintains the penis in a prepubertal size. This will likely impact surgical considerations if that person eventually undergoes a penile-inversion vaginoplasty as there will be less penile tissue to work with. In these cases, there is an increased likelihood a vaginoplasty will require a more complex surgical procedure, e.g., intestinal vaginoplasty (Dy et al., 2021; van de Grift et al., 2020). Such considerations should be included in any discussions with patients and families considering use of pubertal blockers in early pubertal adolescents with functioning testes.

### Statement 12.11

**We recommend health care professionals evaluate and address medical conditions that can be exacerbated by lowered endogenous sex hormone concentrations and treatment with exogenous sex hormones before beginning treatment in transgender and gender diverse people.**

TGD people seeking masculinization must be informed about the possibilities, consequences, limitations, and risks associated with testosterone treatment. Testosterone therapy is contraindicated during pregnancy or while attempting to become pregnant given its potential iatrogenic effects on the fetus. Relative contraindications to testosterone therapy include severe hypertension, sleep apnea, and polycythemia since these conditions can be exacerbated by testosterone. Monitoring blood pressure and lipid profiles should be performed before and after the onset of testosterone therapy. The increase in blood pressure typically occurs within 2 to 4 months following the initiation of testosterone therapy (Banks et al., 2021). Patients who develop hypercholesterolemia and/or hypertriglyceridemia may require treatment with dietary modifications, medication, or both.

TGD people seeking feminizing treatment with a history of thromboembolic events, such as deep vein thrombosis and pulmonary embolism, should undergo evaluation and treatment prior to the initiation of hormone therapy. This is because estrogen therapy is strongly associated with an increased risk of thromboembolism, a potentially life-threatening complication. In addition, risk factors that can increase the risk of thromboembolic conditions, such as smoking, obesity, and sedentary lifestyle, should be modified. In patients with nonmodifiable risk factors, such as a known history of thrombophilia, a past history of thrombosis, or a strong family history of thromboembolism, treatment with transdermal estrogen concomitant with anticoagulants may decrease the risk of thromboembolism. However, there are limited data to guide treatment decisions. The presence of a disease at baseline such as a hormone sensitive cancer, coronary artery disease, cerebrovascular disease, hyperprolactinemia, hypertriglyceridemia, and cholelithiasis should be evaluated prior to the initiation of gender-affirming hormone therapy as relative risks may be shifted in association with exogenous hormone treatment (Hembree et al., 2017).

### Statement 12.12

**We recommend health care professionals educate transgender and gender diverse people undergoing gender-affirming treatment about the onset and time course of physical changes induced by sex hormone treatment.**

The effects of testosterone treatment are multiple and may include the appearance of increased body and facial hair, male pattern baldness, increased muscle mass and strength, decreased fat mass, deepening of the voice, interruption of

menses (if still present), increased prevalence and severity of acne, clitoral enlargement, and increased sexual desire (Defreyne, Elaut et al., 2020; Fisher, Castellini et al., 2016; Giltay & Gooren, 2000; T'Sjoen et al., 2019; Yeung et al., 2020). Other testosterone-associated changes include increased lean body mass, skin oiliness, (de Blok et al., 2020; Hembree et al., 2017; Kuper, Mathews et al., 2019; Taliaferro et al., 2019; Tishelman & Neumann-Mascis, 2018) (see Appendix C—Table 1).

Estrogen treatment induces breast development. However, fewer than 20% of individuals reach Tanner breast stages 4–5 after 2 years of treatment (de Blok et al., 2021). Additional changes include decreases in testicular volume, lean body mass, skin oiliness, sexual desire, spontaneous erections, facial hair, and body hair along with increased subcutaneous body fat) (see Appendix C—Table 1). In adult patients, estrogen does not alter a person's voice or height (Iwamoto, Defreyne et al., 2019; Wiepjes et al., 2019).

The time course and extent of physical changes vary among individuals and are related to factors such as genetics, age of initiation, and overall state of health (Deutsch, Bhakri et al., 2015; van Dijk et al., 2019). Knowledge of the extent and timing of sex hormone–induced changes, if available, may prevent the potential harm and expense of unnecessary treatment changes, dosage increases, and premature surgical procedures (Dekker et al., 2016).

### Statement 12.13

**We recommend health care professionals not prescribe ethinyl estradiol for transgender and gender diverse people as part of a gender-affirming hormonal treatment. For supporting text, see Statement 12.15.**

### Statement 12.14

**We suggest health care professionals prescribe transdermal estrogen for eligible\* transgender and gender diverse people at higher risk of developing venous thromboembolism based on age >45 years or a previous history of venous thromboembolism, when gender-affirming estrogen treatment is recommended. For supporting text, see Statement 12.15).**

### Statement 12.15

**We suggest health care professionals not prescribe conjugated estrogens in transgender and gender diverse people when estradiol is available as part of a gender- affirming hormonal treatment.**

Determining the safest and most efficacious estrogen compound and route of administration for TGD people is an important topic. The recommended estrogen-based regimens are presented in Appendix C—Table 4. The Amsterdam Medical Center (AMC) first reported 45 events of VTE occurring in 816 transgender women, notably an expected incidence ratio of VTE 20-fold higher than that reported in a reference population (van Kesteren et al., 1997). Following this report, the AMC clinic recommended the use of transdermal estradiol for transgender women older than 40 years of age, which subsequently lowered the incidence of VTE (Nota et al., 2019; Toorians et al., 2003). Other studies suggested ethinyl estradiol is associated with a higher risk of blood clotting due to an increased resistance to the anticoagulating effects of activated protein C (APC) and elevated concentrations of the clotting factors protein C and protein S (Toorians et al., 2013). Other studies published within the past 15 years from other clinics reported transgender women taking other forms of estrogen had lower rates of VTE than transgender women taking ethinyl estradiol (Asscheman et al., 2013). Furthermore, a 2019 systematic review concluded ethinyl estradiol administration was associated with the highest risk of VTE in transgender women, while an association between progesterone use and VTE was also identified (Goldstein et al., 2019).

The 2017 Endocrine Society guidelines did not recommend conjugated equine estrogens (CEEs) as a treatment option because blood levels of conjugated estrogens cannot be measured in transgender women making it difficult to prevent supraphysiologic dosing of estrogen and thereby increasing the potential risk of VTE (Hembree et al., 2017). A retrospective study from the UK examined the risks of oral CEE versus oral estradiol valerate versus oral ethinyl estradiol and found up to a 7-fold increase in the percentage of transgender women in the oral CEE group

who developed VTE compared with transgender women using other forms of estrogen (Seal et al., 2012). In a nested, case-control study, over 80,000 cisgender women aged 40–79 who developed a VTE were matched to approximately 390,000 cisgender women without VTE; the results showed oral estradiol use had a lower risk of VTE than conjugated estrogens, and transdermal estrogen was not associated with an increased risk of VTE (Vinogradova et al., 2019).

A systematic review evaluated several formulations of estrogen and identified a retrospective and a cross-sectional study that made head-to-head comparisons of the risks associated with different formulations (Wierckx, Mueller et al., 2012; Wierckx et al., 2013). No identified studies evaluating the risk of different formulations of estrogen employed a prospective interventional design. The retrospective study examined 214 transgender women taking transdermal estradiol (17β-estradiol gel 1.5 mg/d or estradiol patch 50 mcg/d) or a daily intake of oral estrogens (estradiol 2 mg/d, estriol 2 mg/d, ethinyl estradiol 50 mcg/day, or ethinyl estradiol 30–50 mcg in an oral contraceptive) (Wierckx et al., 2013). Within a 10-year observation period, 5% of the cohort developed a VTE, 1.4% (3 of 214) experienced a myocardial infarction (MI), and 2.3% (5 of 214) a transient ischemic attack or cerebrovascular accident (TIA/CVA). The prevalence of VTE, MI and TIA/CVA was increased following the initiation of estrogen therapy. However, the authors did not report differences between regimens of estrogen in terms of these endpoints.

The same group of investigators conducted a cross-sectional study that examined 50 transgender women (mean age 43 ± 10) taking oral estrogen (estradiol valerate 2 mg/d, estriol 2 mg/d or ethinyl estradiol 50–120 mcg/day) or using transdermal estradiol (17β-estradiol 1.5 mg/day or estradiol 50 mcg/day) over a follow-up duration of 9.2 years (Wierckx, Mueller et al., 2012). Twelve percent (n = 6) developed either a VTE, MI, or a TIA/CVA. Two of the participants were taking conjugated estrogen 0.625 mg/d (one person in combination with cyproterone acetate), 2 participants were taking ethinyl estradiol 20–50 mcg/d, 1 was taking cyproterone acetate 50 mg/d, while the estrogen regimen used by the sixth participant was not defined. None of the subjects taking oral estradiol or transdermal estradiol developed a VTE, MI, or TIA/CVA.

One prospective study examined the route of estrogen administration in 53 transgender women in a multicenter study carried out throughout Europe. Transgender women younger than 45 years of age (n = 40) received estradiol valerate 4 mg/d in combination with cyproterone acetate (CPA) 50 mg/d and transgender women older than 45 years of age (n = 13) received transdermal 17β-estradiol, also with CPA. No VTE, MI, or TIA/CVA was reported after a 1-year follow-up in either the oral or transdermal estrogen group. An additional retrospective study from Vienna found no occurrences of VTE among 162 transgender women using transdermal estradiol who were followed for a mean of 5 years (Ott et al., 2010).

We are strongly confident in our recommendation against the use of ethinyl estradiol based on historical data from the Amsterdam clinic demonstrating a reduction in the incidence of VTE after discontinuing the use of ethinyl estradiol and the recent systematic review demonstrating an increased risk of VTE in transgender women taking ethinyl estradiol (Weinand & Safer, 2015). We are confident in our recommendation against the use of CEE based on the 2012 study by Seal et al. demonstrating an increased risk of VTE in transgender women taking CEE compared with other formulations of estrogen and with data from cisgender women on hormone replacement therapy (Canonico et al., 2007; Seal et al., 2012). Prospective and retrospective studies in transgender women have reported occurrences of VTE/MI/CVA only in those taking CEE or ethinyl estradiol. Since estradiol is inexpensive, more widely available, and appears safer than CEE in limited studies, the committee recommends against using CEE when estradiol is an available treatment option. The quality of studies may be limited to prospective, cohort or cross-sectional study designs; however, the stronger level of recommendation is based on the consistent evidence supporting the association between the use of ethinyl estradiol and CEE and a greater risk of VTE/MI/CVA in transgender women.

We are also confident in our recommendation for the administration of transdermal preparations of estrogen in older transgender women

(age > 45 years) or those with a previous history of VTE. The confidence in our recommendation is based on the decreased incidence of VTE reported from the Amsterdam clinic when transgender women are switched to using transdermal preparations after age 40 (van Kesteren et al., 1997). Furthermore, the prospective, multicenter cohort study ENIGI found no incidence of VTE/MI/CVA in transgender women who are routinely switched to transdermal estrogen at age 45 (Dekker et al., 2016). In addition, a study by Ott et al. demonstrated no incidence of VTE in 162 transgender women treated with estradiol patches (Ott et al., 2010).

With the exception of cyproterone acetate (note this is not approved for use in the US because of concerns of potential hepatotoxicity), the use of progestins in hormone therapy regimens remains controversial. To date, there have been no quality studies evaluating the role of progesterones in hormone therapy for transgender patients.

We are aware some practitioners who prescribe progestins, including micronized progesterone, are under the impression there may be improvements in breast and/or areolar development, mood, libido, and overall shape for those seeking it along with other benefits yet to be demonstrated (Deutsch, 2016a; Wierckx, van Caenegem et al., 2014). However, these improvements remain anecdotal, and there are no quality data to support such progestin use. An attempted systematic review we commissioned for this version of the SOC failed to identify enough data to make a recommendation in favor of any progestins. Instead, existing data suggest harm is associated with extended progestin exposure (Safer, 2021).

For cisgender women who have a uterus, progestins in combination with estrogens are necessary to avoid the endometrial cancer risk associated with the administration of unopposed estrogen. For cisgender women who do not have a uterus, progestins are not used. The best data for the concerns related to progestin use come from comparisons between the above two cisgender populations, which we acknowledge is not necessarily generalizable to this population. Although not definitive of a class effect for all progestins, medroxyprogesterone added to combined equine estrogens is associated with greater breast cancer and cardiac risks (Chlebowski 2020; Manson, 2013). It is important to note data from the Women's Health Initiative (WHI) studies may not be generalizable to transgender populations. Compared with the cisgender women in the studies, transgender populations seeking hormone therapy tend to be younger, do not use equine estrogen, and hormone therapy in these cases address current mental health and quality of life and not solely risk prevention (Deutsch, 2016a).

Potential adverse effects of progestins include weight gain, depression, and lipid changes. Micronized progesterone may be better tolerated and may have a more favorable impact on the lipid profile than medroxyprogesterone (Fitzpatrick et al., 2000). When paired with estrogens for transgender women, the progestin cyproterone acetate is associated with elevated prolactin, decreased HDL cholesterol, and rare meningiomas—none of which are seen when estrogens are paired with GnRH agonists or spironolactone (Bisson, 2018; Borghei-Razavi, 2014; Defreyne, Nota et al., 2017; Sofer et al., 2020).

Thus, data to date do not include quality evidence supporting a benefit of progestin therapy for transgender women. However, the literature does suggest a potential harm of some progestins, at least in the setting of multi-year exposure. If, after a discussion of the risks and benefits of progesterone treatment, there is a collaborative decision to begin a trial of progesterone therapy, the prescriber should evaluate the patient within a year to review the patient's response to this treatment.

## Statement 12.16

**We recommend health care professionals prescribe testosterone-lowering medications (either cyproterone acetate, spironolactone, or GnRH agonists) for eligible\* transgender and gendered diverse people with testes taking estrogen as part of a hormonal treatment plan if their individual goal is to approximate levels of circulating sex hormone in cisgender women.**

Most gender clinics in the US and Europe prescribe estrogen combined with a testosterone-lowering medication (Mamoojee et al., 2017) (see Appendix C—Table 5). In the

US, spironolactone is the most commonly prescribed testosterone-lowering medication, while GnRHas are commonly used in the UK, and cyproterone acetate are most often prescribed in the rest of Europe (Angus et al., 2021; Kuijpers et al., 2021). The rationale for adding a testosterone-lowering medication is two-fold 1) to lower testosterone levels to within the reference range of cisgender women; and 2) to reduce the amount of estrogen needed to achieve adequate physical effects. Each testosterone-lowering medication has a different side effect profile. Spironolactone is an antihypertensive and potassium-sparing diuretic, and thus may lead to hyperkalemia, increased frequency of urination, and a reduction in blood pressure (Lin et al., 2021). Cyproterone acetate has been associated with the development of meningioma and hyperprolactinemia (Nota et al., 2018). GnRHa's, while very effective in lowering testosterone levels, can result in osteoporosis if doses of estrogen given concurrently are insufficient (Klink, Caris et al., 2015).

One systematic review identified one study that reported findings from a head-to-head comparison of the testosterone-lowering medications cyproterone acetate and leuprolide (Gava et al., 2016). Two studies compared a group of transgender women taking estrogen plus testosterone-lowering medications with a group who received only estrogen. The systematic review did not provide sufficient evidence to suggest any of the three testosterone-lowering medications had a better safety profile in terms of improved outcomes in bone health, testosterone levels, potassium levels, or in the incidence of hyperprolactinemia or meningiomas (Wilson et al., 2020). Therefore, no recommendation can be given. The review did report spironolactone-based regimens were associated with a 45% increase in prolactin levels, whereas cyproterone-based regimens increased prolactin levels by more than 100%. However, the clinical significance of elevated prolactin levels is not clear because the rates of prolactinomas were not significantly elevated in either the spironolactone- or CPA-treated groups (Wilson et al., 2020). One retrospective, cohort study from a single center in the US reported no clinically significant

increases in prolactin levels in 100 transgender women treated with estrogen plus spironolactone (Bisson et al., 2018). A retrospective study from the Netherlands of 2,555 transgender women taking primarily CPA with various formulations of estrogen reported an increased standardized incidence ratio of meningiomas in patients who used cyproterone acetate after gonadectomy for many years when compared with the general Dutch population (Nota et al., 2018). Furthermore, in a shorter study in Belgium, 107 transgender women had transient elevations in prolactin levels following treatment with cyproterone acetate, which declined to normal after discontinuation (Defreyne, Nota et al., 2017). A recent publication, not included in the systematic review, examined 126 transgender women taking spironolactone, GnRHas, or cyproterone and concluded cyproterone was associated with higher prolactin levels and a worse lipid profile than spironolactone or GnRHas (Sofer et al., 2020). After balancing the costs and accessibility of measuring prolactin levels against the clinical significance of an elevated level, a decision was made not to make a recommendation for or against monitoring prolactin levels at this time. HCPs should therefore make individualized clinical decisions about the necessity to measure prolactin levels based on the type of hormone regimen and/or the presence of symptoms of hyperprolactinemia or a pituitary tumor (e.g., galactorrhea, visual field changes).

Cyproterone has also been linked to meningiomas. Nine cases of meningioma have been reported in the literature among transgender women primarily taking cyproterone acetate (Mancini et al., 2018). This increased risk has also been identified in cisgender populations. In 2020, the European Medicines Agency published a report recommending cyproterone products with daily doses of 10 mg or more should be restricted because of the risk of developing meningioma (European Medicines Agency, 2020). Most likely this association is a specific effect of cyproterone acetate and has not been extrapolated to include other testosterone-lowering drugs. In the US, where cyproterone acetate is not available, the North American Association of Central Cancer Registries (NAACCRs) database did not identify an increased risk of brain tumors (not specific to

meningiomas) among transgender women (Nash et al., 2018). Furthermore, there was not an increase in the hazard ratio of brain tumors in the Kaiser cohort of 2,791 transgender women compared with cisgender controls (Silverberg et al., 2017). No long-term studies have reported on the risk of meningiomas and prolactinomas in transgender women taking GnRHas.

Our strong recommendation for the use of testosterone-lowering medications as part of a hormone regimen for transgender individuals with testes is based on the global practice of using these medications in addition to estrogen therapies as well as the relatively minimal risk associated with these therapies. However, we are not able to make a recommendation favoring one testosterone-lowering medication over another at this time. The published data thus far raises some concerns about the risk of meningiomas with the prolonged use (>2 years) and higher doses (>10mg daily) of cyproterone acetate (Nota et al., 2018; Ter Wengel et al., 2016; Weill et al., 2021).

Bicalutamide is an antiandrogen that has been used in the treatment of prostate cancer. It competitively binds to the androgen receptor to block the binding of androgens. Data on the use of bicalutamide in trans feminine populations is very sparse and safety data is lacking. One small study looked at the use of bicalutamide 50 mg daily as a puberty blocker in 23 trans feminine adolescents who could not obtain treatment with a GnRH analogue (Neyman et al., 2019). All adolescents experienced breast development which is also commonly seen in men with prostate cancer who are treated with bicalutamide. Although rare, fulminant hepatotoxicity resulting in death has been described with bicalutamide (O'Bryant et al., 2008). Given that bicalutamide has not been adequately studied in trans feminine populations, we do not recommend its routine use.

The administration of 5α-reductase inhibitors block the conversion of testosterone to the more potent androgen dihydrotestosterone. The Food & Drug Administration (FDA) approved indications of finasteride administration include benign prostatic hypertrophy and androgenetic alopecia. Data on the use of 5α-reductase inhibitors in trans feminine populations is very sparse (Irwig,

2021). It is unclear whether this class of medication could have any clinical benefit in trans feminine individuals whose testosterone and dihydrotestosterone levels have already been lowered with estrogen and an antiandrogen. We therefore do not recommend their routine use in trans feminine populations. Finasteride may be an appropriate treatment option in trans masculine individuals experiencing bothersome alopecia resulting from higher dihydrotestosterone levels. Nonetheless, treatment with a 5α-reductase inhibitor may impair clitoral growth and the development of facial and body hair in trans masculine individuals. Studies are needed to assess the efficacy and safety of 5α-reductase inhibitors in transgender populations.

### Statement 12.17

**We recommend health care professionals monitor hematocrit (or hemoglobin) levels in transgender and gender diverse people treated with testosterone.**

There are good quality data suggesting a rise in hematocrit (or hemoglobin) is associated with TGD persons treated with testosterone (Defreyne et al., 2018). The testosterone regimens in the systematic review included testosterone esters ranging from the equivalent of 25–250 mg SC/IM weekly, testosterone undecanoate 1000 mg every 12 weeks, or testosterone gel 50 mg applied daily to the skin (Defreyne et al., 2018; Gava et al., 2018; Giltay et al., 2000; Meriggiola et al., 2008; Pelusi et al., 2014; T'Sjoen et al., 2005; Wierckx, van Caenegem et al., 2014; Wierckx, van de Peer et al., 2014). The expected rise should be consistent with reference ranges in cisgender males.

### Statement 12.18

**We suggest health care professionals collaborate with surgeons regarding hormone use before and after gender-affirmation surgery. For supporting text, see Statement 12.19.**

### Statement 12.19

**We suggest health care professionals counsel eligible* transgender and gender diverse people about the various options for gender-affirmation surgery unless surgery is either not indicated or is medically contraindicated.**

Despite the absence of evidence, perioperative clinical standards for gender-affirmation surgeries have included cessation of hormone therapy for 1–4 weeks before and after surgery, most commonly genital surgeries (Hembree et al., 2009). Such practice was meant to mitigate the risk of VTE associated with exogenous estrogen administration (Hembree et al., 2009). Estrogen and testosterone could then be resumed at some point postoperatively.

After careful examination, investigators have found no perioperative increase in the rate of VTE among transgender individuals undergoing surgery, while being maintained on sex steroid treatment throughout when compared with that among patients whose sex steroid treatment was discontinued preoperatively (Gaither et al., 2018; Hembree et al., 2009; Kozato et al., 2021; Prince & Safer, 2020). Sex steroid treatment is especially important after gonadectomy to avoid the sequelae of hypogonadism, the risk of developing osteoporosis, and for the maintenance of mental health and quality of life (Fisher, Castellini et al., 2016; Rosen et al., 2019). Thus, hormone providers and surgeons should educate patients about the necessity for continuous exogenous hormone therapy after gonadectomy.

To be able to educate patients and serve as clinical advocates, HCPs should be knowledgeable about the risks and benefits of gender-affirmation surgeries and should also be cognizant of the performance measures and surgical outcomes of the surgeons to whom they might refer patients (Beek, Kreukels et al., 2015; Colebunders et al., 2017; Wiepjes et al., 2018). In general, most medically necessary surgeries can be thought of as involving three regions: the face, chest/breasts, and genitalia (internal and external). Additional medically necessary procedures include body contouring and voice surgery. See medical necessity statement in Chapter 2—Global Applicability, Statement 2.1).

Multiple procedures are available for facial gender-affirming surgeries including, but not limited to chondrolanryngoplasty, rhinoplasty, contouring or augmentation of the jaw, chin, and forehead, facelift, hair removal and hair transplantation (see Chapter 13—Surgery and Postoperative Care). Procedures available for

chest/breast surgery include breast augmentation, double mastectomy with nipple grafts, periareolar mastectomy, and liposuction. The most common gender-affirmation surgery for TGD individuals with endogenous breast development is masculinizing chest surgery (mastectomy) (Horbach et al., 2015; Kailas et al., 2017).

Internal genital surgery procedures include but are not limited to orchiectomy, hysterectomy, salpingo-oophorectomy, vaginoplasty, and colpectomy/vaginectomy (Horbach et al., 2015; Jiang et al., 2018). The inner lining in vaginoplasty is typically constructed from penile skin, skin grafts, a combination of both, or a bowel segment. Removal of the uterus/ovaries can be performed individually or all at once (hysterectomy, salpingo-oophorectomy, and colpectomy). If colpectomy is performed, a hysterectomy must also be performed. The ovaries may remain in situ, upon patient request. A potential benefit of leaving one or both ovaries is fertility preservation, while the downside is the potential for the development of ovarian pathology, including cancer (De Roo et al., 2017).

External genital surgery procedures include but are not limited to vulvoplasty, metoidioplasty, and phalloplasty (Djordjevic et al., 2008; Frey et al., 2016). Hair removal is generally necessary before performing external genital procedures (Marks et al., 2019). Vulvoplasty can include the creation of the mons, labia, clitoris, and urethral opening. Urethral lengthening is an option for both metoidioplasty and phalloplasty, but is associated with a greatly increased complication rate (Schechter & Safa, 2018). Wound care and physical therapy are necessary for managing wounds resulting from the donor sites for phalloplasty (van Caenegem, Verhaeghe et al., 2013). Pelvic physical therapy can also be an important adjunct intervention after surgery for managing voiding and sexual function (Jiang et al., 2019). Dialogue, mutual understanding, and clear communication in a common language between patients, HCPs, and surgeons will contribute to well-considered decisions about the available surgical procedures.

Statement 12.20

**We recommend health care professionals initiate and continue gender-affirming hormone**

therapy for eligible* transgender and gender diverse people who wish this treatment due to demonstrated improvement in psychosocial functioning and quality of life. For supporting text, see Statement 12.21.

Statement 12.21
**We recommend health care professionals maintain existing hormone therapy if the transgender and gender diverse individual's mental health deteriorates and assess the reason for the deterioration, unless contraindicated.**

Several mental health disparities have been documented in the transgender population including depression, suicidality, anxiety, decreased self-esteem, and post-traumatic stress disorder (Arcelus et al., 2016; Becerra-Culqui et al, 2018; Bouman et al., 2017; Eisenberg et al., 2017; Heylens, Elaut et al., 2014; Witcomb et al., 2018). The gender minority stress model provides evidence of several mediators and moderators of these disparities (Hendricks & Testa, 2012; Meyer, 2003). Mediators and moderators of mental health disparities unique to transgender people include experiences of discrimination, victimization, misgendering, family rejection, and internalized transphobia (Hendricks & Testa, 2012). Factors that have a positive effect on mental health include family acceptance, supportive social and romantic relationships, transgender community connectedness, protection by affirming and inclusive policies, policies of affirmation and inclusion, possession of updated legal name/gender documentation, and achievement of physical gender transition based on individualized embodiment goals (Bauer et al., 2015; Bockting et al., 2013; Bouman et al., 2016; Davey et al., 2014; de Vries et al., 2014; Du Bois et al., 2018; Gower, Rider, Brown et al., 2018; Hendricks & Testa, 2012; Keo-Meier et al., 2015; Meier et al., 2013; Pflum et al., 2015; Ryan et al., 2010; Smith et al., 2018).

Hormone therapy has been found to positively impact the mental health and quality of life of TGD youth and adults who embark on this treatment (Aldridge et al., 2020; Allen et al., 2019; Bauer et al., 2015; Nobili et al., 2018; Russell et al., 2018; Ryan, 2009). In many cases, hormone therapy is considered a lifesaving intervention (Allen et al., 2019; Grossman & D'Augelli, 2006; Moody et al., 2015). Several studies have found associations between the initiation of hormone therapy and improved mental health in youth and adults (Aldridge et al., 2020; Costa et al., 2016; de Vries et al., 2014; Kuper et al., 2020; Nguyen et al., 2018; White Hughto & Reisner, 2016), including improvements in quality of life (Gorin-Lazard et al., 2012; Gorin-Lazard et al., 2013; Murad et al., 2010; Newfield et al., 2006; Nobili et al., 2018; White Hughto & Reisner, 2016), a reduction in anxiety and depression (Aldridge et al., 2020; Colizzi et al., 2014; Davis & Meier, 2014; de Vries, Steensma et al., 2011; Gómez-Gil et al., 2012; Rowniak et al., 2019), decreased stress, and decreased paranoia (Keo-Meier & Fitzgerald, 2017). A prospective, controlled trial using the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) demonstrated significant improvement in multiple domains of psychological functioning in transgender men after only 3 months of testosterone treatment (Keo-Meier et al., 2015). Although there are higher rates of autism symptoms in the transgender population, these symptoms have not been found to increase after the initiation of hormone therapy (Nobili et al., 2020).

As a reduction in depressive symptoms may correlate with a decrease in the risk of suicide, withholding hormone therapy based on the presence of depression or suicidality may cause harm (Keo-Meier et al., 2015; Levy et al., 2003). Turban, King et al. (2020) found a decrease in the odds of lifetime suicidal ideation in adolescents who required pubertal suppression and had access to this treatment compared with those with a similar desire with no such access (Turban, King et al., 2020). A recent systematic review found pubertal suppression in TGD adolescents was associated with an improved social life, decreased suicidality in adulthood, improved psychological functioning and quality of life (Rew et al., 2020). Because evidence suggests hormone therapy is directly linked to decreased symptoms of depression and anxiety, the practice of withholding hormone therapy until these symptoms are treated with traditional psychiatry is considered to have iatrogenic effects



(Keo-Meier et al., 2015). If psychiatric treatment is indicated, it can be started or adjusted concurrently without discontinuing hormone therapy.

*For eligibility criteria for adolescents and adults, please refer to Chapter 5—Assessment for Adults and Chapter 6—Adolescents as well as Appendix D.*

AR_275218

## CHAPTER 13 Surgery and Postoperative Care

Medically necessary gender-affirmation surgery (GAS) refers to a constellation of procedures designed to align a person's body with their gender identity (see Chapter 2—Global Applicability for medical necessity, Statement 2.1). This chapter describes surgery and postoperative care recommendations for TGD adults and adolescents. Please refer to Chapter 5—Assessment of Adults and Chapter 6—Adolescents for the assessment criteria related to surgery for adults and adolescents, respectively. A summary of the recommendations and assessment criteria can be found in Appendix D.

Recognizing the diverse and heterogeneous community of individuals who identify as transgender and gender diverse (TGD), gender-affirming surgical interventions may be categorized along a spectrum of procedures for individuals assigned male at birth (AMAB) and assigned female at birth (AFAB).

In appropriately selected TGD individuals, the current literature supports the benefits of GAS. While complications following GAS occur, many are either minor or can be treated with local care on an outpatient basis (Canner et al., 2018; Gaither et al., 2018; Morrison et al., 2016). In addition, complication rates are consistent with those of similar procedures performed for different diagnoses (i.e., non-gender-affirming procedures).

In individuals AFAB, gender-affirming chest surgery or "top surgery" (i.e. "subcutaneous mastectomy") has been studied in prospective (Agarwal et al., 2018; Frederick et al., 2017; Top & Balta, 2017; van de Grift, Elaut et al., 2017; van de Grift et al., 2016), retrospective (Bertrand et al., 2017; Claes et al., 2018; Esmonde et al., 2019; Lo Russo et al., 2017; Marinkovic & Newfield, 2017; Poudrier et al., 2019; Wolter et al., 2015; Wolter et al., 2018), and cross-sectional cohort studies (Olson-Kennedy, Warus et al., 2018; Owen-Smith et al., 2018; van de Grift, Elaut et al., 2018; van de Grift, Elfering et al., 2018). The efficacy of top surgery has been demonstrated in multiple domains, including a consistent and direct increase in health-related quality of life, a significant decrease in gender dysphoria, and a consistent increase in satisfaction with body and appearance. Additionally, rates of regret remain very low, varying from 0 to 4%. While the effect of top surgery on additional outcome measures such as depression, anxiety, and sexual function also demonstrated a benefit, the studies were of insufficient strength to draw definitive conclusions. Although further investigation is needed to draw more robust conclusions, the evidence demonstrates top surgery to be a safe and effective intervention.

In individuals AMAB, fewer studies have been published regarding gender-affirming breast surgery ("breast augmentation") and include 2 prospective (Weigert et al., 2013; Zavlin et al., 2018), 1 retrospective cohort (Fakin et al., 2019), and 3 cross-sectional cohort studies (Kanhai et al., 2000; Owen-Smith et al., 2018; van de Grift et al., 2018). All the studies reported a consistent and direct improvement in patient satisfaction, including general satisfaction, body image satisfaction, and body image following surgery. Owen-Smith et al. (2018) demonstrated a positive trend toward improvement in both depression and anxiety scores with increasing levels of gender-affirming interventions. However, there was no statistical comparison between individuals who underwent top surgery and any other group.

Gender-affirming vaginoplasty is one of the most frequently reported gender-affirming surgical interventions; 8 prospective (Buncamper et al., 2017; Cardoso da Silva et al., 2016; Kanhai, 2016; Manero Vazquez et al., 2018; Papadopulos, Zavlin et al., 2017; Tavakkoli Tabassi et al., 2015; Wei et al., 2018; Zavlin et al., 2018), 15 retrospective cohort (Bouman, van der Sluis et al., 2016; Buncamper et al., 2015; Hess et al., 2016; Jiang et al., 2018; LeBreton et al., 2017; Manrique et al., 2018; Massie et al., 2018; Morrison et al., 2015; Papadopulos, Lelle et al., 2017; Raigosa et al., 2015; Salgado et al., 2018; Seyed-Forootan et al., 2018; Sigurjonsson et al., 2017; Simonsen et al., 2016; Thalaivirithan et al., 2018), and 3 cross-sectional cohort studies have recently been reported (Castellano et al., 2015; Owen-Smith et al., 2018; van de Grift, Elaut et al., 2018).

Although different assessment measurements were used, the results from all studies consistently reported both a high level of patient satisfaction (78–100%) as well as satisfaction with sexual function (75–100%). This was especially evident

**Statements of Recommendations**

13.1- We recommend surgeons who perform gender-affirming surgical procedures have the following credentials:
13.1.a- Training and documented supervision in gender-affirming procedures;
13.1.b- Maintenance of an active practice in gender-affirming surgical procedures;
13.1.c- Knowledge about gender diverse identities and expressions;
13.1.d- Continuing education in the field of gender-affirmation surgery
13.1.e- Tracking of surgical outcomes.
13.2- We recommend surgeons assess transgender and gender diverse people for risk factors associated with breast cancer prior to breast augmentation or mastectomy.
13.3- We recommend surgeons inform transgender and gender diverse people undergoing gender-affirming surgical procedures about aftercare requirements, travel and accommodations, and the importance of postoperative follow-up during the preoperative process.
13.4- We recommend surgeons confirm reproductive options have been discussed prior to gonadectomy in transgender and gender diverse people.
13.5- We suggest surgeons consider offering gonadectomy to eligible* transgender and gender diverse adults when there is evidence they have tolerated a minimum of 6 months of hormone therapy (unless hormone replacement therapy or gonadal suppression is not clinically indicated or the procedure is inconsistent with the patient's desires, goals, or expressions of individual gender identity).
13.6- We suggest health care professionals consider gender-affirming genital procedures for eligible* transgender and gender diverse adults seeking these interventions when there is evidence the individual has been stable on their current treatment regime (which may include at least 6 months of hormone treatment or a longer period if required to achieve the desired surgical result, unless hormone therapy is either not desired or is medically contraindicated).
13.7- We recommend surgeons consider gender-affirming surgical interventions for eligible* transgender and gender diverse adolescents when there is evidence a multidisciplinary approach that includes mental health and medical professionals has been involved in the decision-making process.
13.8- We recommend surgeons consult a comprehensive, multidisciplinary team of professionals in the field of transgender health when eligible* transgender and gender diverse people request individually customized (previously termed "non-standard") surgeries as part of a gender-affirming surgical intervention.
13.9- We suggest surgeons caring for transgender men and gender diverse people who have undergone metoidioplasty/phalloplasty encourage lifelong urological follow-up.
13.10- We recommend surgeons caring for transgender women and gender diverse people who have undergone vaginoplasty encourage follow-up with their primary surgeon, primary care physician, or gynecologist.
13.11- We recommend patients who regret their gender-related surgical intervention be managed by an expert multidisciplinary team.

*For eligibility criteria for adolescents and adults, please refer to the Assessment for Adults and Adolescents chapters and Appendix D.*

when using more recent surgical techniques. Gender-affirming vaginoplasty was also associated with a low rate of complications and a low incidence of regret (0–8%).

Recent literature reflects the increased clinical interest in metoidioplasty and phalloplasty as reflected by 3 prospective cohort (Garaffa et al., 2010; Stojanovic et al., 2017; Vukadinovic et al., 2014), 6 retrospective cohort (Cohanzad, 2016; Garcia et al., 2014; Simonsen et al., 2016; van de Grift, Pigot et al., 2017; van der Sluis et al., 2017; Zhang et al., 2015), and 4 cross-sectional studies (Castellano et al., 2015; Owen-Smith et al., 2018; van de Grift, Elaut et al., 2018; Wierckx, Van Caenegem et al., 2011), which reviewed the risks and benefits of these procedures.

In terms of urinary function, between 75 and 100% of study participants were able to void while standing. In terms of sexual function,

between 77 and 95% of study participants reported satisfaction with their sexual function. Most of these studies report high overall levels of postoperative satisfaction (range 83–100%), with higher rates of satisfaction in studies involving newer surgical techniques. Two prospective and two retrospective cohort studies specifically assessed regret following surgery and found no transgender men experienced regret. While study limitations were identified, the reported results were consistent and direct.

In recent years, facial GAS (FGAS) has received increased attention, and current literature supports its benefits. Eight recent publications include 1 prospective cohort (Morrison et al., 2020), 5 retrospective cohort (Bellinga et al., 2017; Capitán et al., 2014; Noureai et al., 2007; Raffaini et al., 2016; Simon et al., 2022), and 2 cross-sectional studies (Ainsworth & Spiegel, 2010; van de Grift, Elaut

et al., 2018). All 8 studies clearly demonstrated individuals were very satisfied with their surgical results (between 72% and 100% of individuals). Additionally, individuals were significantly more satisfied with the appearance of their face compared with individuals who had not undergone surgery. One prospective, international, multicenter, cohort study found facial GAS significantly improves both mid- and long-term quality of life (Morrison et al., 2020). The results were direct and consistent, but somewhat imprecise because of certain study limitations. While gender-affirming facial surgery for AFAB individuals is an emerging field, current limited data points toward equal benefits in select patients. Future studies are recommended.

Additional procedures and/or interventions such as hair removal (prior to facial and/or genital surgery) may be required as part of the preoperative process. See Chapter 15—Primary Care. Furthermore, consultation with pelvic floor physical therapy may be important (or required) both before and after surgery.

**Representative surgical interventions include (for complete list, see appendix E and the end of this chapter):**

AMAB: facial feminization surgery (including chondrolaryngoplasty/vocal cord surgery), gender-affirming breast surgery, body contouring procedures, orchiectomy, vagino/vulvoplasty (with/without depth), aesthetic procedures, and procedures designed to prepare individuals for surgery (i.e., hair removal).

AFAB: facial masculinization surgery, gender-affirming chest surgery, hysterectomy/oophorectomy, metoidioplasty (including placement of testicular prosthesis), phalloplasty (including placement of testicular/penile prostheses), body contouring procedures, aesthetic procedures, and procedures designed to prepare individuals for surgery (i.e., hair removal).

It is important surgeons understand the indication(s) and the timing for GAS. This is especially important when caring for adolescents (see Chapter 6—Adolescents).

It is important the surgeon and the patient participate in a shared decision-making approach that includes 1) a multidisciplinary approach; 2) an understanding of the patient's goals and expectations; 3) a discussion regarding the surgical options and associated risks and benefits; and 4) an informed plan for aftercare (see Chapter 5—Assessment for Adults). These recommendations are designed to facilitate an individualized approach to care.

Appropriate aftercare is essential for optimizing outcomes (Buncamper et al., 2015; Lawrence, 2003), and it is important patients are informed about postoperative needs (including local wound care, activity restrictions, time off from work or school, etc.). In addition, it is important the surgeon is available to provide and facilitate postoperative care, refer to specialty services, or both as needed. This may include the need for ongoing support (i.e., both from the caregiver as well as the primary care provider, mental health professionals (MHPs), or both), as well as the need for routine primary care (i.e., breast/chest cancer screening, urologic/gynecologic care, etc.).

With the increase both in public interest and in the number of gender-affirming surgical procedures (Canner et al., 2018; Ross, 2017; Shen et al., 2019), additional training, tracking of outcomes, and continuing medical education for surgeons are necessary (Schechter et al., 2017).

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 13.1

**We recommend surgeons who perform gender-affirming surgical procedures have the following credentials:**

a. **Training and documented supervision in gender-affirming procedures;**
b. **Maintenance of an active practice in gender-affirming surgical procedures;**
c. **Knowledge about gender diverse identities and expressions;**
d. **Continuing education in the field of gender-affirmation surgery;**
e. **Tracking of surgical outcomes.**

AR_275221

Surgeons offering GAS may have a variety of surgical specialty training and backgrounds. The most common surgical specialties include plastic surgery, urology, gynecology, otolaryngology and oro-maxillofacial surgery (Jazayeri et al., 2021). Consistent with other surgical domains, we recommend only surgeons who are certified or eligible to be certified by their respective national professional boards offer GAS. Furthermore, it is recommended surgeons offering care for TGD people have received documented training in gender-affirming procedures and principles of gender-affirming care (Schechter et al., 2017; Schechter & Schechter, 2019). The latter includes, but is not limited, to knowledge about gender diverse identities and expressions, and how those affect patient goals, expectations, and outcomes. It is important surgeons offering GAS be familiar with the available procedures and can provide informed consent. If surgeons do not offer a requested procedure, they may offer a referral for a second opinion. Surgeons offering GAS are expected to participate in continuing education activities in the field of GAS (i.e., meetings, conferences, seminars, etc.) to maintain current knowledge. We further recommend surgical outcomes be tracked and communicated to the patients as part of the informed consent (Schechter et al., 2017).

In addition, hospitals, institutions, and physician offices that offer GAS need to be knowledgeable regarding cultural competencies (i.e., language, terminology, etc.). This may require ongoing and regular staff education.

## Statement 13.2

**We recommend surgeons assess transgender and gender diverse people for risk factors associated with breast cancer prior to breast augmentation or mastectomy.**

Prior to breast augmentation or mastectomy, individuals need to be informed about and assessed for breast cancer risk factors, including genetic mutations (i.e., BRCA1, BRCA2), family history, age, radiation, exposure to estrogen, and the amount of breast tissue anticipated to remain after surgery (Brown, Lourenco et al., 2021; Brown & Jones, 2015; Colebunders et al., 2014; Gooren et al., 2013; Salibian et al., 2021; Weyers et al., 2010). Breast cancer screening balances the

identification of cancer with the selection of appropriate imaging, tests, and procedures. Currently, evidence-based screening guidelines specific for TGD individuals do not exist (Salibian et al., 2021), however, recent guidelines have been proposed by the American College of Radiology (Brown, Lourenco et al., 2021). Because the risk of cancer in individuals seeking gender-affirming breast augmentation or mastectomy is similar to that in the general population (even in the setting of hormone use), existing cancer screening guidelines need to be followed (Brown & Jones, 2015; Gooren et al., 2013; Salibian et al., 2021; Weyers et al., 2010). Professionals need to be familiar with updates to these guidelines as they are subject to change. Individuals who undergo gender-affirming surgery of the chest should have ongoing breast cancer surveillance, which should be overseen by their primary care providers.

## Statement 13.3

**We recommend surgeons inform transgender and gender diverse people undergoing gender-affirming surgical procedures about aftercare requirements, travel and accommodations, and the importance of postoperative follow-up during the preoperative process.**

Details about the timing, technique, and duration of the aftercare requirements are shared with patients in the preoperative period such that appropriate planning may be undertaken. This includes a discussion regarding the anticipated staging of surgical procedures (and associated travel requirements). Given the small number of surgeons who specialize in GAS, it is common for patients to travel for their procedures. Prior to surgery, surgeons should provide patients with a postoperative follow-up schedule. The surgeon should discuss the duration of the patient's travel dates, the anticipated inpatient versus outpatient stay, and the potential need for flexibility in travel arrangements (especially if complications occur). Given the complexity and cost of travel and lodging, changes in the care plan should be shared with the patient as early as possible. Surgeons should facilitate continuity of care with a local provider upon returning home.

Aftercare and postsurgical follow-up are important. Gender-affirming surgical procedures

often have specific aftercare requirements, such as postsurgery resources (stable, safe housing; resources for travel and follow-up care), instructions in health-positive habits (e.g., personal hygiene, healthy living, prevention of urinary tract infections (UTIs) and sexually-transmitted infections (STIs) (Wierckx, Van Caenegem et al., 2011)), postsurgery precautions or limitations on activities of daily life (e.g., bathing, physical activity, exercise, nutritional guidance, resumption of sexual activity) (Capitán et al., 2020), postsurgery resumption of medications (i.e., anticoagulants, hormones, etc.), and detailed postsurgery self-care activities (e.g., postvaginoplasty dilation and douching regimens, activation of a penile prosthesis, strategies to optimize postphalloplasty urination, recommendations for hair transplant care) (Capitán et al., 2017; Falcone et al., 2018; Garcia, 2018; Hoebeke et al., 2005). Some aspects of postsurgery self-care activities may be introduced prior to surgery and are reinforced after surgery (Falcone et al., 2018). As issues such as wound disruptions, difficulty with dilation, and UTIs may occur (Dy et al., 2019), the follow-up period provides an opportunity to intervene, mitigate, and prevent complications (Buncamper et al., 2016; Garcia, 2021).

### Statement 13.4

**We recommend surgeons confirm reproductive options have been discussed prior to gonadectomy in transgender and gender diverse people.**

Infertility is often a consequence of both gender-affirming hormone therapy (temporary) and GAS (permanent), and fertility preservation is discussed prior to medical interventions, surgical interventions, or both (Defreyne, van Schuylenbergh et al., 2020; Jahromi et al., 2021; Jones et al., 2021). Surgical interventions that alter reproductive anatomy or function may limit future reproductive options to varying degrees (Nahata et al., 2019). It is thus critical to discuss infertility risk and fertility preservation (FP) options with transgender individuals and their families prior to initiating any of these interventions and on an ongoing basis thereafter (Hembree et al., 2017).

For specific recommendations regarding reproductive options, see Chapter 16—Reproductive Health.

### Statement 13.5

**We suggest surgeons consider offering gonadectomy to eligible\* transgender and gender diverse adults when there is evidence they have tolerated a minimum of 6 months of hormone therapy (unless hormone replacement therapy or gonadal suppression is not clinically indicated or the procedure is inconsistent with the patient's desires, goals, or expressions of individual gender identity). For supporting text, see Statement 13.6.**

### Statement 13.6

**We suggest health care professionals consider gender-affirming genital procedures in eligible\* transgender and gender diverse adults seeking these interventions when there is evidence the individual has been stable on their current treatment regime (which may include at least 6 months of hormone treatment or a longer period if required to achieve the desired surgical result unless hormone therapy is either not desired or is medically contraindicated).**

GAHT leads to anatomical, physiological, and psychological changes. The onset of the anatomic effects (e.g., clitoral growth, vaginal mucosal atrophy) may begin early after the initiation of therapy, and the peak effect is expected at 1–2 years (T'Sjoen et al., 2019). Depending upon the surgical result required, a period of hormone treatment may be required (e.g., sufficient clitoral virilization prior to metoidioplasty/phalloplasty) or preferred for psychological reasons, anatomical reasons, or both (breast growth and skin expansion prior to breast augmentation, softening of skin and changes in facial fat distribution prior to facial GAS) (de Blok et al., 2021).

For individuals who are not taking hormones prior to surgical interventions, it is important surgeons review the impact of this on the proposed surgery.

For individuals undergoing gonadectomy who are not taking hormones, a plan for hormone replacement can be developed with their prescribing professional prior to surgery.

## Statement 13.7

**We recommend surgeons consider gender-affirming surgical interventions for eligible\* transgender and gender diverse adolescents when there is evidence a multidisciplinary approach that includes mental health and medical professionals has been involved in the decision-making process.**

Substantial evidence (i.e., observational studies (Monstrey et al., 2001; Stojanovic et al., 2017), literature reviews and expert opinions (Esteva de Antonio et al., 2013; Frey et al., 2017; Hadj-Moussa et al., 2019; Pan & Honig, 2018), established guidelines (Byne et al., 2018; Chen, Fuqua et al., 2016; Hembree et al., 2017; Karasic & Fraser, 2018; Klein, Paradise et al., 2018; Weissler et al., 2018), and a thematic content analysis (Gerritse et al., 2018), support the importance of a multidisciplinary (i.e., medical, mental health, and surgery) approach to transgender health care.

A multidisciplinary approach is especially important in managing mental health issues if these are experienced by a TGD person undergoing GAS (de Freitas et al., 2020; Dhejne et al., 2016; van der Miesen et al., 2016). In addition, primary care providers and medical specialists can help support decisions regarding the timing of surgery, surgical outcomes and expectations, perioperative hormone management, and optimization of medical conditions (Elamin et al., 2010; Hembree et al., 2017).

For specific recommendations regarding presurgical assessment in adolescents, see Chapter 6—Adolescents.

## Statement 13.8

**We recommend surgeons consult a comprehensive, multidisciplinary team of professionals in the field of transgender health when eligible\* transgender and gender diverse people request individually customized (previously termed "non-standard") surgeries as part of a gender-affirming surgical intervention.**

Gender identities may present along a spectrum, and the expression of a person's identity may vary quite widely amongst individuals (Beek et al., 2015; Koehler et al., 2018). While the overall goal of a particular procedure usually includes reduction of gender dysphoria (van de Grift, Elaut et al., 2017) or achieving gender congruence, gender diverse presentations may lead to individually customized surgical requests some may consider "non-standard" (Beek et al., 2015; Bizic et al., 2018). Individually customized surgical requests can be defined as 1) a procedure that alters an individual's gender expression without necessarily aiming to express an alternative, binary gender; 2) the "non-standard" combination of well-established procedures; or 3) both.

This is designed to help counsel and inform the patient as well as to ensure their goals can be achieved. The patient and their surgeon need to work together to ensure the patient's expectations are realistic and achievable, and the proposed interventions are safe and technically feasible. The patient and their surgical team need to engage in a shared decision-making process (Cavanaugh et al., 2016). This informed consent process needs to address the irreversibility of some procedures, the newer nature of some procedures, and the limited information available about the long-term outcomes of some procedures.

## Statement 13.9

**We suggest surgeons caring for transgender men and gender diverse people who have undergone metoidioplasty/phalloplasty encourage lifelong urological follow-up.**

Postoperative complications following metoidioplasty/phalloplasty comprise the urinary tract and sexual function (Kang et al., 2019; Monstrey et al., 2009; Santucci, 2018; Schardein et al., 2019). Reported urethral complications (related to urethral lengthening) include urethral strictures 35–58%, urethral fistulae 15–70% (Monstrey et al., 2009; Santucci, 2018; Schardein et al., 2019), diverticulae, mucocele due to vaginal remnant, and hair growth within the neourethra (Berli et al., 2021; Veerman et al., 2020). Complications related to sexual function include limited to absent tactile and/or erogenous sensation, difficulties with orgasm function, and complications with penile prosthetics (Kang et al., 2019; Santucci, 2018). Penile prosthesis-related complications are estimated to involve infection (incidence 8–12%),

malfunction, urethral erosion, skin extrusion, and dislocation of its bone fixation (Falcone et al., 2018; Kang et al., 2019; Morrison et al., 2016). Although most urethral and prosthetic complications occur in the immediate and intermediate postoperative period, complications can occur at any time. Early detection may reduce morbidity (e.g., urethral strictures resulting in fistulae, pending erosion of a penile prosthetic leading to infection and requiring total explant) (Blecher et al., 2019).

Routine follow-up to assess for early evidence of urethral stricture (or other urinary issues) includes bladder ultrasound measurement of post-void residual volume (to screen for and stage neourethral stricture), fluoroscopic urethrography (to identify and stage neourethral strictures, fistulae, and diverticulae), and cystourethroscopy to examine the urethra and bladder. TGD men may also have routine urologic issues that need not be related to gender transition (urinary calculi, hematuria, and genitourinary malignancies; fertility preservation) (Sterling & Garcia, 2020a, 2020b).

## Statement 13.10

**We recommend surgeons caring for transgender women and gender diverse people who have undergone vaginoplasty encourage follow-up with their primary surgeon, primary care physician, or gynecologist.**

Vaginoplasty is a safe procedure (Hontscharuk, Alba, Hamidian Jahromi et al., 2021). While complications may occur, most are self-limited or can be treated with minor interventions (Hontscharuk, Alba, Hamidian Jahromi et al., 2021). Minor complications include issues such as the formation of granulation tissue, intravaginal hair growth, delayed wound healing or wound disruption (or both), aesthetic concerns, and introital stenosis (Ferrando, 2020; Kloer et al., 2021). While these complications are usually self-limited, they may impact patient well-being after surgery. Additionally, these issues may go either undiagnosed or may be misdiagnosed if patients are not able to access care provided by professionals with expertise in the field of transgender health. We recommend patients be followed by their primary surgeon in person

and at regular intervals—for example at two weeks, three months, six months, and one year after surgery—although more follow-up may be indicated for some individuals.

Additional gynecologic care is conducted throughout the TGD person's lifetime and can be managed in many settings. A speculum exam to check for granulation tissue, hair, and lesions can be performed by the primary care provider, gynecologist, or GAS surgeon and may be necessary outside of the immediate postoperative period (Grimstad, McLaren et al., 2021; Suchak et al., 2015; van der Sluis et al., 2020). After confirmation by laboratory testing, UTIs, STIs, and other fluctuations in the vaginal microbiome may be treated following relevant guidelines formulated for cisgender populations (Hooton, 2012; Sherrard et al., 2018). Manual prostate checks are performed based on relevant guidelines formulated for cisgender populations via the vaginal canal, as the prostate is located on the anterior wall of the vagina (Carter et al., 2013).

Other complications include issues such as stenosis of the neovaginal canal, rectovaginal fistulae, and inflammation (intestinal vaginoplasty) (Bustos et al., 2021). These require a combination of nonsurgical and surgical treatment with consultation and possible referral back to the primary surgeon with other surgical consultants (i.e., colorectal surgeon), if required. In addition, as pelvic floor dysfunction may affect 30–40% of patients both prior to and following vaginoplasty, the availability of pelvic floor physical therapists is an important adjunct in the postoperative period (Jiang et al., 2019).

## Statement 13.11

**We recommend patients who regret their gender-related surgical intervention be managed by an expert multidisciplinary team.**

The percentage of individuals who regret their GAS is very low (between 0.3% and 3.8%) (De Cuypere & Vercruysse, 2009; Defreyne, Motmans et al., 2017; Hadj-Moussa et al., 2019; Hadj-Moussa, Agarwal et al., 2018; Hadj-Moussa, Ohl et al., 2018; Landén et al., 1998; Narayan et al., 2021; van de Grift, Elaut et al., 2018; Wiepjes et al., 2018). The highest incidence of

regret was reported at a time when surgical techniques were less refined, the role of multidisciplinary care was less established, and the *Standards of Care* did not exist or were not widely known (Landén et al., 1998). Regret can be temporarily or permanent and may be classified as (Narayan et al., 2021) social regret (caused by difficulties in familial, religious, social, or professional life), medical regret (due to long-term medical complications, disappointment in surgical results or inadequate preoperative decision-making), and true gender-related regret (mostly based on patient experienced misdiagnosis, insufficient exploration of gender identity, or both). This classification is in accordance with previously discussed positive and negative predictive factors (De Cuypere & Vercruysse, 2009; Gils & Brewaeys, 2007; Pfäfflin & Junge, 1998).

A multidisciplinary team can help identify the etiology of regret as well as the temporal stability of the surgical request (Narayan et al., 2021). Following this evaluation and in consideration of the individual's circumstances, medical and/or surgical interventions with the intent of either continuing transition or performing surgical procedures to return anatomy to that of the sex assigned at birth may be indicated. For further information see Chapter 5—Assessment of Adults.

*For eligibility criteria for adolescents and adults, please refer to the Assessment for Adults and Adolescent chapters and Appendix D*

## GENDER-AFFIRMING SURGICAL PROCEDURES

As the field's understanding of the many facets of gender incongruence expands, and as technology develops which allows for additional treatments, it is imperative to understand this list is not intended to be exhaustive. This is particularly important given the often lengthy time periods between updates to the SOC, during which evolutions in understanding and treatment modalities may occur.

**FACIAL SURGERY**

| | |
|---|---|
| Brow | • Brow reduction<br>• Brow augmentation<br>• Brow lift |
| Hair line advancement and/or hair transplant | |
| Facelift/mid-face lift (following alteration of the underlying skeletal structures) | |
| Facelift/mid-face lift (following alteration of the underlying skeletal structures) | • Platysmaplasty |
| Blepharoplasty | • Lipofilling |
| Rhinoplasty (+/- fillers) | |
| Cheek | • Implant<br>• Lipofilling |
| Lip | • Upper lip shortening<br>• Lip augmentation (includes autologous and non-autologous) |
| Lower jaw | • Reduction of mandibular angle<br>• Augmentation |
| Chin reshaping | • Osteoplastic<br>• Alloplastic (implant-based) |
| Chondrolaryngoplasty | • Vocal cord surgery (see voice chapter) |

**BREAST/CHEST SURGERY**

| | |
|---|---|
| Mastectomy | • Mastectomy with nipple-areola preservation/reconstruction as determined medically necessary for the specific patient<br>• Mastectomy without nipple-areola preservation/reconstruction as determined medically necessary for the specific patient |
| Liposuction | |
| Breast reconstruction (augmentation) | • Implant and/or tissue expander<br>• Autologous (includes flap-based and lipofilling) |

**GENITAL SURGERY**

| | |
|---|---|
| Phalloplasty (with/without scrotoplasty) | • With/without urethral lengthening<br>• With/without prosthesis (penile and/or testicular)<br>• With/without colpectomy/colpocleisis |
| Metoidioplasty (with/without scrotoplasty) | • With/without urethral lengthening<br>• With/without prosthesis (penile and/or testicular)<br>• With/without colpectomy/colpocleisis |
| Vaginoplasty (inversion, peritoneal, intestinal) | • May include retention of penis and/or testicle |
| Vulvoplasty | • May include procedures described as "flat front" |

**GONADECTOMY**

| | |
|---|---|
| Orchiectomy | |
| Hysterectomy and/or salpingo-oophorectomy | |

**BODY CONTOURING**

| | |
|---|---|
| Liposuction | |
| Lipofilling | |
| Implants | • Pectoral, hip, gluteal, calf |
| Monsplasty/mons reduction | |

**ADDITIONAL PROCEDURES**

| | |
|---|---|
| Hair removal: Hair removal from the face, body, and genital areas for gender affirmation or as part of a preoperative preparation process. (see Statement 15.14 regarding hair removal) | • Electrolysis<br>• Laser epilation |
| Tattoo (i.e., nipple-areola) | |
| Uterine transplantation | |
| Penile transplantation | |

## CHAPTER 14 Voice and Communication

Human beings engage in communication practices not only to exchange ideas about the outside world, but also to present themselves as sociocultural beings and to negotiate forms of address, referral and treatment by others that allow them to feel safe and respected (Azul et al., 2022). The human voice is widely regarded as one of the key modalities that contributes to the communication of gender as one of the dimensions of human diversity. However, other aspects and ways of communicating (e.g., articulation, word choice, gesture, listener perceptions and attributions) need to be considered as well (Azul, 2015; Azul & Hancock, 2020). Throughout this chapter "voice and communication" is used as a phrase encompassing the meaning-making practices in which each of the participants of a social encounter engage according to their own needs, wishes, identifications, and capacities.

While a binary understanding of gender has dominated the research literature in this area, the approach recommended in this chapter implies a broadly inclusive view of gender identification (e.g., trans feminine, trans masculine, gender fluid, nonbinary, genderqueer, agender) and the understanding that gender does not exist in isolation, but intersects with other aspects of human diversity (e.g., First Nation status, ethnicity/race, sexuality, dis/ability, faith/religion/spirituality). The recommendations in this chapter apply to all transgender and gender diverse (TGD) people who are seeking professional voice and communication support, including children, adolescents, younger and older adults, and people who wish to transition or detransition, irrespective of their intervention choices.

Not every TGD person experiences challenges with or wants professional support for their voice and communication, but those who do often encounter barriers in accessing care. Although the percentages vary by country and TGD subpopulation, the statistics support the concern TGD people are not able to access voice and communication services when and how they desire (Eyssel et al., 2017; James et al., 2016; Oğuz et al., 2021; Södersten et al., 2015; Veale et al., 2019). In these studies, the percentage of TGD people wishing to receive voice and communication training or voice surgery is generally higher than the percentage of people who have undergone these interventions. With few exceptions, access to voice training is usually greater than access to voice surgery. Groups of TGD people who are further marginalized in their societies, such as TGD people of marginalized race/ethnicity, experience discrimination and limited access to care at even greater rates (James et al., 2016; Xavier et al., 2005).

Cost, not knowing where to access services, and services not being available are amongst the most common barriers cited by research participants. According to studies in the US (Hancock & Downs, 2021; Kennedy & Thibeault, 2020), Turkey (Oğuz et al., 2021), and Aotearoa/New Zealand (Veale et al., 2019), lack of accurate information about options for voice and communication services among TGD people is a significant and ubiquitous barrier to care. Notably, in Sweden, all TGD people are offered support for their voice and communication when a diagnosis of gender incongruence is made (Södersten et al., 2015). Additionally, cultural responsiveness of providers is only slowly improving (Hancock & Haskin, 2015; Jakomin et al., 2020; Matthews et al., 2020; Sawyer et al., 2014). Hancock and Downs (2021) have conducted preliminary work to identify specific barriers to voice and communication services and develop effective means for eliminating them.

This chapter is intended to provide guidance for health care professionals (HCPs) to support and foster well-being in all TGD people who are experiencing challenges or distress regarding their own voice and communication practices and/or regarding responses and attributions they receive from others (Azul et al., 2022).

A number of different approaches TGD people can use to modify their voice and communication, either individually or in combination include self-initiated change, which may be supported by resources TGD people use to guide their voice use and communication practice; behavioral change supported by voice and communication specialists (hereafter referred to as "voice and communication training"); and change as a result of androgen hormonal treatment and/or laryngeal surgery. The currently existing research evidence

does not include self-initiated change, but is focused on the latter three approaches.

A "voice and communication specialist" is someone who has knowledge regarding the ongoing and dynamic agency of speaker and listener practices, relevant professional interventions including behavioral, hormonal, and surgical, and relevant processes related to biophysiology, sociocultural meaning-making, and external material forces (Azul & Hancock, 2020). This specialist is capable of conducting appropriate assessments to inform the TGD person's choice and support the exploration of goals and intervention options by providing guidance in a culturally responsive, person-centered approach. This specialist has knowledge and skills in behavioral voice and communication intervention approaches.

Practices amenable to behavioral change include: speaking and singing voice, mindfulness, relaxation, respiration, pitch and pitch range, voice quality, resonance/timbre, loudness, projection, facial expression, gesture, posture, movement, introducing self to others, describing identifications and requesting culturally responsive treatment and forms of address by others, assertive and resilient responses to misattributions, practicing implementation of voice use and communication practices with different people and in different everyday settings (e.g., Hancock & Siegfriedt, 2020; Mills & Stoneham, 2017).

Voice and communication services are offered as part of a complete and coordinated approach to health, including support for medical, psychological, and social needs (Södersten et al., 2015); however, there are no prerequisites (e.g., hormone use, pursuit of surgeries, or duration living in a gender role). The overall purposes of voice and communication support for TGD people are:

- To educate clients about the factors that influence functional voice and communication practices and the communication of the speaker's identity (speaker, listener, professional practices, external material, biophysiological, and sociocultural factors);
- To enable clients to communicate their sense of sociocultural belonging (e.g., in terms of gender) in everyday encounters in a manner that matches the client's desired self-presentation and to develop, maintain and habituate voices, vocal qualities, and communication practices that support the clients' goals in a manner that does not harm the voice production mechanism;
- To provide training in functional voice production for clients who present with restrictions of voice function (e.g., as a result of overextending their voice production mechanism);
- To support clients with developing the capacity to assertively negotiate desired forms of address and referral from others (e.g., names, pronouns, titles) and to respond to misattributions in a skillful manner that contributes to increasing and maintaining the client's well-being;
- To support clients to develop the problem-solving skills needed to manage anxiety, stress, and dysphoria in collaboration with mental health providers; and to navigate barriers to practice or real-life use of one's preferred voice and communication.
- To provide, or refer clients to, supportive resources that facilitate developing voice and communication skills, vocal awareness, and well-being.
- To refer clients to, or collaborate with, other specialists such as mental health practitioners, laryngeal surgeons, and endocrinologists, who may be more equipped to meet the specific needs of that client. This may be especially relevant in cases where clients face unique challenges due to multiple barriers to their health and well-being or when the client wishes to pursue laryngeal surgery or hormone therapy.

Two types of laryngeal surgeries are relevant for TGD populations: those for raising voice pitch (e.g., glottoplasty with retro-displacement of the anterior commissure, cricothyroid approximation (CTA), feminization laryngoplasty, laser-assisted voice adjustment (LAVA)) (Anderson, 2007; Anderson, 2014; Brown, 2000; Casado, 2017; Geneid, 2015; Gross, 1999; Kelly et al., 2018; Kanagalingam, 2005; Kim, 2017; Kim, 2020; Kocak, 2010; Kunachak, 2000; Mastronikolis, 2013; Mastronikolis et al., 2013; Matai, 2003; Meister,

---

**Statements of Recommendations**

14.1- We recommend voice and communication specialists assess current and desired vocal and communication function of transgender and gender diverse people and develop appropriate intervention plans for those dissatisfied with their voice and communication.

14.2- We recommend voice and communication specialists working with transgender and gender diverse people receive specific education to develop expertise in supporting vocal functioning, communication, and well-being in this population.

14.3- We recommend health care professionals in transgender health working with transgender and gender diverse people who are dissatisfied with their voice or communication consider offering a referral to voice and communication specialists for voice-related support, assessment, and training.

14.4- We recommend health care professionals consider working with transgender and gender diverse people who are considering undergoing voice surgery consider offering a referral to a voice and communication specialist who can provide pre- and/or postoperative support.

14.5- We recommend health care professionals in transgender health inform transgender and gender diverse people commencing testosterone therapy of the potential and variable effects of this treatment on voice and communication.

---

2017; Mora, 2018; Neumann, 2004; Nuyen et al., 2022; Orloff, 2006; Pickuth, 2000; Remacle, 2011; Thomas & MacMillan, 2013; Tschan, 2016; Van Borsel, 2008; Wagner, 2003; Wendler, 1990; Yang, 2002) and for lowering voice pitch (e.g., thyroplasty type III, vocal fold injection augmentation) (Bultynck et al, 2020; Isshiki et al., 1983; Kojima, et al. 2008; Webb et al., 2021). Reported acoustic benefits of pitch-raising surgery include increased voice pitch (average frequency ($f_o$)) and increased Min $f_o$ (the lowest frequency in physiological voice range). TGD people's self-rating ratings show general satisfaction with voice postsurgery, although individuals who are interested in more comprehensive changes to vocal self-presentation may need to engage in behavioral interventions with a voice and communication specialist in addition to laryngeal surgery (Brown, Chang et al. 2021; Kelly et al., 2018; Nuyen et al., 2022). Potential harms of pitch-raising surgery can be assessed and addressed in voice training by a voice and communication specialist. Reported harms of pitch-raising surgery include voice problems such as dysphonia, weak voice, restricted speaking voice range especially upper range (lowered Max $f_o$, in the physiological voice range), hoarseness, vocal instability, and lowering of frequency values over time (Kelly et al., 2018; Song & Jiang, 2017), although the rate of these outcomes is inconsistent.

Research on pitch-lowering surgeries is limited. However, studies including eight TGD people who elected to undergo thyroplasty type III after continued dissatisfaction with hormonal treatment (Bultynck et al., 2020) and one person who received injection augmentation after testosterone therapy and voice training (Webb

et al., 2020), reported statistically significant lowering of fundamental frequency, perceived as pitch.

Estrogen treatment in TGD people has not been associated with measurable voice changes (Mészáros et al., 2005), while testosterone treatment in TGD people has been found to result in both desired and undesired changes in gender- and function-related aspects of voice production (Azul, 2015; Azul et al., 2017, 2018, 2020; Azul & Neuschaefer-Rube, 2019; Cosyns et al., 2014; Damrose, 2008; Deuster, Di Vicenzo et al., 2016; Deuster, Matulat et al. 2016; Hancock et al., 2017; Irwig et al., 2017; Nygren et al., 2016; Van Borsel et al., 2000; Yanagi et al., 2015; Ziegler et al., 2018). Desired changes associated with testosterone treatment include lowered voice pitch, increased male attributions to voice, and increased satisfaction with voice. Reported dissatisfaction with testosterone treatment include lack of or insufficient lowering of voice pitch, dysphonia, weak voice, restricted singing pitch range, and vocal instability. These areas can be assessed and addressed in voice training by a voice and communication specialist.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 14.1.

**We recommend voice and communication specialists assess current and desired vocal and**

**communication function of transgender and gender diverse people and develop appropriate intervention plans for those dissatisfied with their voice and communication.**

Voice and communication specialists may assess satisfaction with the presentation of sociocultural positionings in communicative encounters, including gender and other intersecting identifications, taking into consideration that these may or may not be static over time; attributions received from others, and how these relate to the individual's identifications, wishes, and well-being; ratings of voice and speech naturalness; and voice and communication function in relation to vocal demands. Assessments may vary in nature (e.g., client-reported outcome measures, perceptual, acoustic, aerodynamic, endoscopic) according to their purpose (Davies et al., 2015; Leyns et al., 2021; Oates & Dacakis, 1983). For example, laryngeal visualization is used when individuals present with a concomitant voice problem, (e.g., muscle tension dysphonia) (Palmer et al., 2011) or experience voice difficulties, which may or may not be secondary to medical gender-affirming interventions of androgen therapy or laryngeal surgery (Azul et al., 2017).

Voice and communication specialists inform intervention-seeking TGD people who are dissatisfied with their voice and communication about available interventions that support TGD people with their voice, communication, and well-being. The nature of each option, including potential outcomes and permanence, is presented objectively to provide the TGD person respect and autonomy in decision-making. Appropriate intervention plans are individualized and feasible and should be inclusive of any professional services available. Goals may evolve over the course of the support period as the TGD person explores modifications to voice and communication, assesses their satisfaction with achieved change and refines their goals.

## Statement 14.2.

**We recommend voice and communication specialists working with transgender and gender diverse people receive specific education to develop expertise in supporting vocal functioning, communication, and well-being in this population.**

Academic and licensing credentials of voice and communication specialists (e.g., speech-language pathologists, speech therapists, singing voice teachers, voice coaches) vary by location but typically do not specify criteria for working with specific populations. Standard curricula in formal education for these professions often do not include specific or adequate training for working with TGD populations (Jakomin et al., 2020; Matthews et al., 2020). General knowledge and skills related to the vocal mechanism and interpersonal communication are foundational but insufficient for conducting culturally responsive, person-centered care for TGD people that is effective, efficient, inclusive, and accessible (Hancock, 2017; Russell & Abrams, 2019).

Professionals in this area should receive comprehensive education that invites them to develop self-awareness, cultural humility, and cultural responsiveness in order to be respectful of and attentive to gender diversity and other aspects of a client's identifications that can take a variety of forms and imply a range of different support needs (Azul, 2015; Azul et al., 2022). Client preferences for use of names, formal forms of address, gender entry, and pronouns need to be respected in all communication with and about the client (including medical records, reports, emails). Education also needs to inform the setting up of a training space or clinic and administrative practices that are designed to be welcoming to TGD people and allow TGD people to feel safe and respected when raising concerns or issues with the voice and communication support team.

Voice and communication specialists working with TGD people will need working knowledge of applicable intervention principles, mechanisms, and effectiveness, competence in teaching and modeling voice and communication modification skills, and a basic understanding of transgender health, including hormonal and surgical treatments and trans-specific psychosocial issues. Education needs to include methodologies and practices that have been developed within TGD communities and shown to be effective and should ideally be presented by or in collaboration with TGD people with lived experience of voice and communication support.

**Statement 14.3.**

**We recommend health care professionals in transgender health working with transgender and gender diverse people who are dissatisfied with their voice or communication consider offering a referral to voice and communication specialists for voice-related support, assessment, and training.**

A voice and communication specialist is well positioned to provide information and guidance to the TGD person expressing dissatisfaction with their voice or communication when available. There is evidence voice and communication specialists provide support in such a way that a client's satisfaction with voice and communication can be achieved, thereby reducing gender dysphoria and improving communication-related quality of life (Azul, 2016; Block, 2017; Deuster, Di Vincenzo et al., 2016; Hancock, 2017; Hancock et al., 2011; Hardy et al., 2013; Kelly et al., 2018; McNamara, 2007; McNeill et al., 2008; Owen & Hancock, 2010; Pasricha et al., 2008; Söderpalm et al., 2004; Watt et al., 2018).

There is empirical evidence that behavioral voice support for TGD AMAB people is effective with regard to achieving the targeted voice changes (Oates, 2019). Seven studies prior to 2020 provide empirical evidence for the effectiveness of voice training, although it is somewhat weak (Carew et al., 2007; Dacakis, 2000; Gelfer & Tice, 2013; Hancock et al., 2011; Hancock & Garabedian, 2013; McNeill et al., 2008; Mészáros et al., 2005). Voice training methods across these seven studies were similar and indicated voice training can be effective at increasing average fundamental frequency (average pitch), fundamental frequency range (pitch range), satisfaction with voice, self-perception and listener perception of vocal femininity, voice-related quality of life, and social and vocational participation. Weaknesses of the identified studies include lack of randomized controlled trials evaluating voice training, small sample sizes, inadequate long-term follow-up, and lack of control of confounding variables. In 2021, another systematic review of the effects of behavioral speech training for AMAB people reached similar conclusions (Leyns et al., 2021).

Until recently, there was almost no research exploring the effectiveness of voice training with TGD AFAB people. There is, however, some promising, although weak evidence of effectiveness from a case study (Buckley et al., 2020) and one uncontrolled prospective study of group voice training (Mills et al., 2019).

**Statement 14.4.**

**We recommend health care professionals working with transgender and gender diverse people who are considering undergoing voice surgery consider offering a referral to a voice and communication specialist who can provide pre- and/or postoperative support.**

This statement does not intend to require TGD people receive presurgical voice training. Rather, it is recommended that every available support be offered to provide individualized informational counseling critical to person-centered care. The recommendation is for the TGD person's consideration to be informed as necessary by individualized informational counseling based on voice assessment, trial voice training, and discussion of expected voice outcomes and risks of surgery with a voice and communication specialist.

For most types of laryngeal surgery, voice training is recommended both prior to surgery to ensure preparation of the vocal mechanism for the surgical intervention and postsurgery to ensure a return to functional voice production (Branski et al., 2006; Park et al., 2021). For pitch-raising surgery in particular, another reason a trial of voice training is recommended is because there are indications certain measures improve with training but not with pitch-raising surgery (e.g., factors relevant to intonation and naturalness, such as maximum $f0$ pitch in speech range; Kelly et al., 2018).

The number and quality of research studies evaluating pitch-lowering surgeries are currently insufficient, particularly with regard to comparing outcomes with and without other interventions (i.e., testosterone) (Bultynck et al., 2020). There are more techniques and studies of pitch-raising surgeries, but the quality of the evidence is still low. Outcomes from pitch-raising surgeries have been compared to outcomes from having no surgery (Anderson, 2007, 2014; Brown et al., 2000;

Geneid et al., 2015; Gross, 1999; Kim, 2017; Kocak et al., 2010; Kunachak et al., 2000; Matai et al., 2003; Meister et al., 2017; Neumann & Welzel, 2004; Orloff et al., 2006; Pickuth et al., 2000; Remacle et al., 2011; Thomas & Macmillan, 2013; Tschan et al., 2016; Van Borsel et al., 2008; Yang et al., 2002), another type of surgical technique (Mora, 2018), voice training alone (Kanagalingam, 2005; Mastronikolis, 2013; Wagner, 2003) and surgery in conjunction with voice training (Casado, 2017; Kelly et al., 2018).

In the 11 studies reporting whether participants had voice training prior to pitch-raising surgery, most participants had prior voice training, but remained dissatisfied with voice and sought surgical intervention. Thus, most studies of surgical outcomes reflect the combined effects of voice training and surgical intervention. Attributes predicting which clients will pursue surgery after training are unknown.

### Statement 14.5.

**We recommend health care professionals in transgender health inform transgender and gender diverse people commencing testosterone therapy of the potential and variable effects of this treatment on voice and communication.**

The research on the effects of androgen treatment on voice and communication of TGD people points to diverse and unpredictable effects on individual clients. While a number of studies have revealed effects on voice that matched TGD people's expectations and wishes, there is high quality evidence demonstrating TGD people are not always satisfied with the vocal outcomes of testosterone therapy, and many experience difficulties such as inadequate pitch lowering, compromised voice quality, vocal loudness, vocal endurance, pitch range, and flexibility (Azul, 2015, 2016, 2017, 2018; Cosyns et al., 2014; Nygren et al., 2016; Ziegler et al., 2018). A recent meta-analysis of 19 studies examining the effects of at least 1 year of testosterone therapy estimated 21% of participants did not achieve cisgender male normative frequencies, 21% of participants reported incomplete voice-gender congruence and voice problems, and 16% were not completely satisfied with their voice (Ziegler, 2018).

For people who wish to be treated with androgens, accurate informational counseling prior to commencing treatment should enable the development of realistic expectations to avoid disappointment regarding the permanent impact of hormone treatment on voice and communication. In addition, TGD people who do not have access to or do not wish to be treated with testosterone, but want to change their voice and those who are dissatisfied with the outcomes of testosterone treatment can be advised by a voice and communication specialist of alternative and additional support options (e.g., behavioral voice and communication training; pitch-lowering surgery).

## CHAPTER 15 Primary Care

Primary care is the broadest of health care disciplines and is defined as the "provision of integrated, accessible health care services by health care professionals who are accountable for addressing a large majority of personal health care needs, developing a sustained partnership with patients, and practicing in the context of family and community." (Institute of Medicine, 1996).

Primary care providers (PCPs) encompass a wide range of health care professionals (HCPs) who deliver this care, including general and family medical practitioners, nurse practitioners, advanced practice nurses, physician associates/assistants, and internists. PCPs are represented by a variety of educational backgrounds, training, and specialties. Given the type of degree and the nature of the specialty, the scope of practice varies, and not all providers may be trained or qualified to directly provide the full breadth of transgender health care, such as mental health, genital/pelvic care, or postoperative care, following gender-affirming procedures. Physicians and other providers receive little education in transgender and gender-diverse (TGD) health at any time during their training (Dubin et al., 2018), and thus most skills are currently acquired in practice, either informally or through brief continuing education opportunities, see also Chapter 4—Education. However, if providers are competent to deliver similar care for cisgender patients, they should develop competency in caring for TGD patients. The competencies outlined below are all to be understood as being within the provider's scope of licensure and practice. However, all PCPs should be able to manage the comprehensive health of TGD patients either directly or by appropriate referral to other HCPs, including other specialists, for evaluation and treatment. There is no evidence competency in caring for TGD patients can only be achieved through a formal or certification process. In explicitly stating recommended competencies, however, PCP's and TGD persons across all settings can share a standard set of expectations of the knowledge, skills, and cultural competence required for the care of TGD persons.

Due to the unique medical, surgical, and social conditions faced by TGD people, PCPs need distinct competencies in the care of TGD persons, apart from what is expected of all PCP's who may otherwise care for a diverse population that includes ethnic, racial, or sexual minorities. Professional bodies from a range of generalist disciplines have issued position statements and guidelines specific to the care of TGD people (American College of Obstetricians and Gynecology, 2021; Italian Society of Gender, Identity and Health (SIGIS); the Italian Society of Andrology and Sexual Medicine (SIAMS); the Italian Society of Endocrinology (SIE), 2021; Polish Sexological Society, 2021; the Southern African HIV Clinicians' Society, 2021). Wylie et al. (2016) state "For the most part, the general health and well-being of transgender people should be attended to within the primary care setting, without differentiation from services offered to cisgender (non-transgender) people for physical, psychological, and sexual health issues. Specific care for gender transition is also possible in primary care." There are many examples of these services being provided safely and effectively outside of specialist care in diverse cities such as Toronto and Vancouver in Canada, New York and Boston in the US, and in Sydney, Australia, (Radix & Eisfeld, 2014; Reisner, Radix et al., 2016; Spanos et al., 2021).

### Hormone therapy

Whether TGD patients receive medically necessary gender-affirming hormone therapy (GAHT) from a specialist, e.g., an endocrinologist, or a PCP may depend on the availability of knowledgeable and welcoming providers and country-level factors, such as health care regulations and health services funding (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1). In much of the world, specialty services for TGD people are partly or wholly unavailable, which reinforces the need for all health providers to undertake

training in the provision of gender-affirming care. In some countries, PCPs may be required to refer TGD patients to specialist services (e.g., gender identity clinics) resulting in unacceptable delays to access GAHT (Royal College of General Practitioners, 2019).

Hormone-related therapy encompasses a range of interventions, such as puberty suppression and hormone initiation or hormone maintenance. With training, gender-affirming hormone therapy can be managed by most PCPs. Regardless of whether they serve as the primary hormone prescriber, all PCPs should be familiar with the medications, suggested monitoring, and potential side effects associated with GAHT (see Chapter 12—Hormone Therapy). PCPs should be able to make appropriate referrals to appropriate providers for all transition-related services they do not themselves provide.

This chapter supports the argument GAHT can be prescribed by PCPs or other non-specialists—"Considering barriers to health care access and the importance of GAHT to this population, it is imperative that PCPs are able and willing to provide GAHT for TGD patients." (Shires, 2017).

PCPs are commonly called upon to provide care for a broad range of conditions and needs, including those with which they may have had limited or no prior experience. Often this involves accessing commonly used and readily available reference sources, such as professional society guidelines or obtaining a subscription to online knowledge bases. PCPs are advised to use a similar approach when asked to provide basic GAHT care by using the Standards of Care as well as other readily accessed resources (Cheung et al., 2019; Hembree et al., 2017; Oliphant et al., 2018; T'Sjoen et al., 2020). It should be noted most of the commonly used medications in gender-affirming regimens are familiar to everyday primary care practice, including, but not limited to, testosterone, estradiol, progesterone and other progestagens, and spironolactone.

### Mental health

PCPs should be able and willing to assess and provide mental health support for TGD people and GAHT that can alleviate gender dysphoria and allow gender expression. At the very least, they should be aware of these needs and consult additional specialty support if needed.

### Preventive care

General practitioners are versed to provide comprehensive primary and secondary cancer prevention as a part of routine primary care. Evidence-based cancer prevention guidelines vary globally due to differences in national guidelines and levels of access to screening modalities at the local level. To date, research on the long-term impact of GAHT on cancer risk is limited (Blondeel et al., 2016; Braun et al., 2017). We have insufficient evidence to estimate the prevalence of cancer of the breast or reproductive organs among TGD populations (Joint et al., 2018). However, cancer screening should commence, in general, according to local guidelines. Several modifications are discussed in detail, below, depending on the type and duration of hormone use, surgical intervention, or both. In caring for transgender patients, the PCP should maintain an updated record of which organs are present in TGD patients so that appropriate, routine screening can be offered.

This organ inventory should be updated based on the surgical history or any development that has occurred due to taking gender-affirming hormones. Not all PCP's provide care across the lifespan. However, if providers routinely care for children, adolescents, or elder cisgender persons, they should develop competency in transgender care that is applicable to these age groups. If they are unable to do so, then PCPs should be able to make appropriate referrals to other HCPs who care for these populations.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

**Statements of Recommendations**

15.1- We recommend health care professionals obtain a detailed medical history from transgender and gender diverse people that includes past and present use of hormones, gonadal surgeries, as well as the presence of traditional cardiovascular and cerebrovascular risk factors with the aim of providing regular cardiovascular risk assessment according to established, locally used guidelines.

15.2- We recommend health care professionals assess and manage cardiovascular health in transgender and gender diverse people using a tailored risk factor assessment and cardiovascular/cerebrovascular management methods.

15.3- We recommend health care professionals tailor sex-based risk calculators used for assessing medical conditions to the needs of transgender and gender diverse people, taking into consideration the length of hormone use, dosing, serum hormone levels, current age, and the age at which hormone therapy was initiated.

15.4- We recommend health care professionals counsel transgender and gender diverse people about their tobacco use and advise tobacco/nicotine abstinence prior to gender-affirming surgery.

15.5- We recommend health care professionals discuss and address aging-related psychological, medical, and social concerns with transgender and gender diverse people.

15.6- We recommend health care professionals follow local breast cancer screening guidelines developed for cisgender women in their care of transgender and gender diverse people who have received estrogens, taking into consideration the length of time of hormone use, dosing, current age, and the age at which hormones were initiated.

15.7- We recommend health care professionals follow local breast cancer screening guidelines developed for cisgender women in their care of transgender and gender diverse people with breasts from natal puberty who have not had gender-affirming chest surgery.

15.8- We recommend health care professionals apply the same respective local screening guidelines (including the recommendation not to screen) developed for cisgender women at average and elevated risk for developing ovarian or endometrial cancer in their care of transgender and gender diverse people who have the same risks.

15.9- We recommend against routine oophorectomy or hysterectomy solely for the purpose of preventing ovarian or uterine cancer for transgender and gender diverse people undergoing testosterone treatment and who have an otherwise average risk of malignancy.

15.10- We recommend health care professionals offer cervical cancer screening to transgender and gender diverse people who currently have or previously had a cervix following local guidelines for cisgender women.

15.11- We recommend health care professionals counsel transgender and gender diverse people that the use of antiretroviral medications is not a contraindication to gender-affirming hormone therapy.

15.12- We recommend health care professionals obtain a detailed medical history from transgender and gender diverse people that includes past and present use of hormones, gonadal surgeries as well as the presence of traditional osteoporosis risk factors to assess the optimal age and necessity for osteoporosis screening.

15.13- We recommend health care professionals discuss bone health in transgender and gender diverse people including the need for active weight bearing exercise, healthy diet, calcium, and vitamin D supplementation.

15.14- We recommend health care professionals offer transgender and gender diverse people referrals for hair removal from the face, body, and genital areas for gender-affirmation or as part of a preoperative preparation process.

## Statement 15.1

**We recommend health care professionals obtain a detailed medical history from transgender and gender diverse people, that includes past and present use of hormones, gonadal surgeries, as well as the presence of traditional cardiovascular and cerebrovascular risk factors with the aim of providing regular cardiovascular risk assessment according to established, locally used guidelines. For supporting text, see Statement 15.3.**

## Statement 15.2

**We recommend health care professionals assess and manage cardiovascular health in transgender and gender diverse people using a tailored risk factor assessment and cardiovascular/cerebrovascular management methods. For supporting text, see Statement 15.3.**

## Statement 15.3

**We recommend health care professionals tailor sex-based risk calculators used for assessing medical conditions to the needs of transgender and gender diverse people, taking into consideration the length of hormone use, dosing, serum hormone levels, current age, and the age at which hormone therapy was initiated.**

Cardiovascular disease (CVD) and stroke are the leading causes of mortality worldwide (World Health Organization, 2018). Extensive data among racial, ethnic, and sexual minorities in multiple settings demonstrate significant disparities in the prevalence of CVD and its risk factors as well as in the outcomes to medical interventions. Structural factors such as access to care, socio-economic status, and allostatic load related to minority stress contribute to these disparities (Flentje et al., 2020; Havranek et al., 2015; Streed et al., 2021). TGD people often experience social, economic, and discriminatory conditions similar to other minority populations with known increased cardiovascular risk (Carpenter et al., 2020; James et al., 2016; Reisner, Radix et al., 2016). TGD persons of racial, ethnic, and sexual

minorities have been shown to experience increased impact related to intersectional stress. Conversely, access to gender-affirming care, including GAHT, may buffer against the elevation of CVD risk due to the improvement in quality of life and reduction in gender dysphoria and incongruence (Defreyne et al., 2019; Martinez et al., 2018). PCPs can significantly improve TGD health through screening and prevention of CVD and its associated risk conditions—such as tobacco use, diabetes mellitus, hypertension, dyslipidemia, and obesity.

The few, primarily US based, studies evaluating the prevalence of CVD, stroke, or CVD risk in TGD persons independent of GAHT indicate an elevated CV risk, including high rates of undiagnosed and untreated CV risk factors with inadequate CV prevention when compared with cisgender populations (Denby et al., 2021; Malhotra et al., 2022; Nokoff et al., 2018). In one population-based study, TGD people had greater odds of discrimination, psychological distress, and adverse childhood experience, and these were associated with increased odds of having a cardiovascular condition (Poteat et al., 2021).

In US studies that are based on data from the Behavioral Risk Factor Surveillance System, both transgender men and transgender women show a higher prevalence of myocardial infarction (MI), stroke, or any CVD compared with cisgender men, cisgender women or both. Results vary based on the adjustment of data for additional variables, including race, income, or cardiovascular risk factors (Alzahrani et al., 2019; Caceres et al., 2020; Nokoff et al., 2018). Gender nonbinary persons also have higher odds of CVD (Downing & Przedworski, 2018). Data on hormone use was not collected in these studies, which are also limited by the use of self-reported health histories. In the US, TGD individuals presenting for GAHT may have higher rates of undiagnosed and untreated CVD risk factors compared with the cisgender population (Denby et al., 2021), although this may not be applicable globally.

A large 2018 case control study from several US centers that used 10:1 cisgender matched controls found no statistically significant difference in rates of MI or stroke between transgender women and cisgender men, and no difference in

rates of MI, stroke, or venous thromboembolism (VTE) between transgender men and cisgender men or women. There was a statistically significant hazard ratio of 1.9 for VTE among transgender women when compared with cisgender men. A subcohort of transgender women who initiated GAHT during (versus prior to) the 6-year study window did show an increased risk of stroke. Increases in rates of VTE in the overall cohort of transgender women and in rates of stroke in the initiation subcohort of transgender women demonstrated calculated numbers-needed-to-harm (not reported in the paper) between 71-123 (Getahun et al., 2018). Other studies have demonstrated no increase in CV events or stroke among transgender men undergoing testosterone therapy, although studies are limited by their small sample size, relatively short follow-up, and the younger age of the sample population (Martinez et al., 2020; Nota et al., 2019).

European and US studies in transgender women who have accessed feminizing GAHT increasingly indicate a higher risk of CVD, stroke, or both, compared with cisgender women and, in some studies, cisgender men (Getahun et al., 2018; Nota et al., 2019; Wierckx et al., 2013). Many of these studies had significant limitations, such as variably adjusting for CV-related risk factors, small sample sizes—especially involving older transgender women—and variable duration and types of GAHT (Connelly et al., 2019; Defreyne et al., 2019, Martinez et al., 2020). Furthermore, the overall increased risk was small. In many of these studies, the majority of transgender women who experienced cardiac events or stroke were over 50 years old, had one or more CVD risk factors, and were taking a variety of hormone regimens, including, but not limited, to ethinyl estradiol, a synthetic estrogen that confers significant elevations in thrombotic risk and is not recommended for use in feminizing regimens (Gooren et al., 2014; Martinez et al., 2020). Current limited evidence suggests estrogen-based GAHT is associated with an increased risk of myocardial infarction and stroke, but whether this small risk is a result of GAHT or an effect of pre-existing CV risk is unclear. There are no known studies that specifically address CVD and

related conditions in nonbinary individuals, individuals who use subphysiologic doses of gender-affirming hormones, or in adults previously treated with puberty suppression.

PCPs can best address CVD risk during GAHT by assessing TGD people for CVD and modifiable CVD risk factors, such as diabetes mellitus, hypertension, hyperlipidemia, obesity, and smoking, as well as by addressing the impact of minority stress on cardiovascular risk (Streed et al., 2021). In addition, PCPs can mitigate transgender cardiovascular health disparities by providing a timely diagnosis and treatment of risk conditions and by tailoring their management in a way that supports ongoing gender-affirming interventions.

Risk assessment guidelines vary based on the national or international context and scientific affiliation of guideline developers. CVD prevention guidelines also vary in terms of the nature and frequency of the risk assessment for otherwise healthy adults under age 40 (Arnett et al., 2019; Piepoli et al., 2020; Précoma et al., 2019; Streed et al., 2021; WHO, 2007). Over age 40, when cardiovascular risk increases, guidelines clearly recommend scheduled risk assessments using a calculated prediction of ten-year total CVD risk based on risk prediction equations from large population samples. Examples of risk calculators include SCORE (recommended by the European Guidelines on CVD Prevention), Pooled Cohort Studies Equations (2013 AHA ACC Guideline on the Assessment of CVD risk), Framingham Risk scores, and the World Health Organization (WHO) Risk Prediction Charts. The WHO charts were developed based on information from the countries in each WHO subregion. In many low resource settings, facilities are not available to measure cholesterol or serum glucose, and alternative predication charts are available without these measures.

Of note, all current cardiovascular risk calculators are gendered, using sex as a significant risk variable. There is currently insufficient data on cardiovascular risk interventions across the lifespan in TGD persons with medical and surgical interventions to adjust these predictive equations. Nonetheless, it is clear both sex assigned at birth and medical transition can affect the parameters used to calculate cardiovascular risk (Connelly et al., 2019; Defreyne et al., 2019; Maraka et al., 2017; Martinez et al., 2020). Providers can take a variety of approaches to using cardiovascular risk calculators in TGD persons, including employing the risk calculator for the sex assigned at birth, affirmed gender, or a weighted average of the two, taking into consideration total lifetime exposure to GAHT. Although data are lacking, using the affirmed gender for transgender adults with a history of pubertal-age GAHT initiations is likely to be most appropriate. Patients with a history of submaximal GAHT use or prolonged periods of time postgonadectomy without hormone replacement before roughly age 50 may require an even more nuanced approach. Providers should be aware of the characteristics and limitations of the risk calculator in use and should engage patients in shared decision-making regarding these specific considerations.

There are currently no studies comparing the prevalence of dyslipidemia between transgender and cisgender samples, while controlling for hormone use. As noted previously, data in other populations demonstrate the presence of psychosocial stress during childhood and remote adulthood favor adiposity and abnormal lipid metabolism. Both testosterone- and estrogen-based GAHT affect lipid metabolism, although evidence is limited by the variety of hormone regimens and additional variables (Connelly et al., 2019; Defreyne et al., 2019; Deutsch, Glidden et al., 2015; Maraka et al., 2017; Martinez et al., 2020;). On balance, estrogen tends to increase high-density lipoprotein (HDL) cholesterol and triglycerides with variable effects on low density lipoprotein (LDL) cholesterol, while testosterone variably affects triglycerides, decreases HDL cholesterol and increases LDL cholesterol. The method of administration may also affect this pattern, particularly in relation to oral versus transdermal estrogen and their impact on triglycerides (Maraka et al., 2017). In general, the effect sizes of these differences are minimal, and the overall impact on cardio- and cerebrovascular outcomes is unclear. There are no studies examining hormone effects in TGD people with pre-existing dyslipidemia with hormone use starting over age 50, or investigating effects beyond 2-5 years of therapy.

Studies comparing the prevalence of hypertension between TGD and cisgender samples that controlled for hormone use are lacking. Data in other populations demonstrate chronic and acute psychosocial stress, including experiences of discrimination can mediate hypertension (Din-Dzietham et al., 2004; Spruill, 2010). In US studies that were based on the Behavioral Risk Factor Surveillance System, a large national US health survey, there were no differences in reported hypertension between transgender men or women compared with cisgender samples (Alzahrani et al., 2019; Nokoff et al., 2018).

Studies of testosterone—and estrogen-based GAHT have shown inconsistent effects on systolic and diastolic blood pressure. A retrospective study of the effects of estrogen- and testosterone-based GAHT regimens on blood pressure found a slight reduction in systolic blood pressure with the initiation of estrogen-based regimens; while there was a slight elevation (4 mm Hg) in mean systolic blood pressure on long term follow-up of testosterone-based regimens, this difference was at the margin of statistical significance and of limited clinical relevance (Banks et al., 2021). A systematic review concluded, given the limited quality of the studies, there is insufficient data to reach conclusions on the effects of gender-affirming hormone therapy on blood pressure (Connelly et al., 2021). Spironolactone, often used as an androgen blocker in feminizing GAHT, is a potassium sparing diuretic and may increase potassium when used in conjunction with ACE inhibitors or angiotensin receptor blocker medications, as well as salt substitutes. There are no studies examining hormone effects in TGD people with pre-existing hypertension with hormone use starting over age 50, or investigating effects beyond 2–5 years of therapy. Transgender persons receiving GAHT should undergo any additional blood pressure screening or monitoring indicated by WPATH guidelines for GAHT.

There are limited data comparing the prevalence of diabetes mellitus between TGD and cisgender samples independent of hormone use. Recent data from the STRONG cohort study (Islam et al., 2021) found the prevalence and incidence of type 2 diabetes was more common in the trans feminine cohort compared with cisgender females but not cisgender male controls. No significant differences in the prevalence or incidence of type 2 diabetes were observed in the trans masculine cohort and in TGD persons overall after starting hormone therapy. However, the mean follow-up for both cohorts was 2.8 and 3.1 years, respectively (Islam et al., 2021). Data in other populations, including sexual minorities, indicates chronic and acute psychosocial stress can mediate the development and control of type 2 diabetes (Beach et al., 2018; Kelly & Mubarak, 2015).

US studies based on the Behavioral Risk Factor Surveillance System found no differences in reported diabetes between transgender men, transgender women and nonbinary persons compared with cisgender persons (Alzahrani et al., 2019; Caceres et al., 2020; Nokoff et al., 2018). Several small studies have shown a higher-than-expected prevalence of polycystic ovarian syndrome or hyperandrogenemia among transgender men (Feldman et al., 2016), conditions associated with insulin resistance and diabetes risk. While studies of both testosterone- and estrogen-based GAHT show varying effects on weight/body fat, glucose metabolism, and insulin resistance (Defreyne et al., 2019), most do not demonstrate any increase in prediabetes or diabetes (Chan et al., 2018; Connelly et al., 2019). There are no studies examining hormone effects in TGD people with pre-existing diabetes, with hormone use starting over age 50, or investigating effects beyond 2–5 years of therapy. There are currently no studies specifically addressing diabetes in adults previously treated with puberty suppression.

While intermediate-outcome studies of the effects of GAHT on blood pressure and lipids are helpful for hypothesis generation and for studying etiology, future studies should focus on cardiovascular outcomes of interest, with a specific focus on individual predictors such as age, route and dose of hormones used, and total lifetime exposure to GAHT. Interpretation of data should always consider whether cisgender controls were of the same natal sex or identified gender.

Statement 15.4

**We recommend health care professionals counsel transgender and gender diverse people about**

**their tobacco use and advise tobacco/nicotine abstinence prior to gender-affirming surgery.**

Tobacco use is a leading contributor to cardiovascular disease, pulmonary disease, and cancer worldwide (World Health Organization, 2020). TGD persons have a higher prevalence of tobacco use compared with cisgender individuals, which varies across the gender spectrum (Azagba et al., 2019; Buchting et al., 2017). This pattern is consistent with other populations experiencing minority stress (Gordon et al., 2021). PCPs can promote protective factors against tobacco use, including reducing exposure to personal or structural discrimination, having gender-affirming identification, and having health insurance (Kidd et al., 2018; Shires & Jafee, 2016).

The health risks of tobacco use affect TGD persons disproportionately, primarily due to decreased access to culturally competent, affordable screening, and treatment of tobacco-related diseases (Shires & Jafee, 2016). Smoking may further increase cardiovascular and VTE risk for TGD individuals taking feminizing GAHT (Hontscharuk, Alba, Manno et al., 2021). Smoking also doubles or triples the risk of general surgery complications, such as wound healing, scarring, and infection (Yoong et al., 2020) and increases these risks for those accessing gender-affirming surgeries. Data in cisgender populations show quitting smoking prior to surgery and maintaining abstinence for six weeks postoperatively significantly reduces complications (Yoong et al., 2020).

There are currently few studies of smoking cessation programs specifically focused on TGD persons (Berger & Mooney-Somers, 2017). However, limited evidence suggests PCPs can enhance smoking cessation efforts by addressing the effects of minority stress (Gamarel et al., 2015) and incorporating gender-affirming interventions, such as GAHT (Myers & Safer, 2016).

HCPs should take into consideration the significant barriers people habituated to nicotine encounter when attempting cessation. Nicotine replacement therapy and/or other cessation adjuncts should be made available, with an emphasis on individual preferences and a recognition of underlying behavioral health factors that contribute to continued nicotine use. Decision-making regarding approaches to GAHT or surgery should include consideration of the "first do no harm" principle of medical practice, with the realities of an individual patient's abilities and needs.

Statement 15.5
**We recommend health care professionals discuss and address aging-related psychological, medical, and social concerns with transgender and gender diverse people.**

Aging presents specific social, physical, and mental health challenges for TGD persons. While the literature on aging and transgender elders is limited, many older TGD adults have experienced a lifetime of stigma, discrimination, and repression of identified gender (Fabbre & Gaveras, 2020; Witten, 2017). This experience affects TGD elders' interactions with health care systems (Fredriksen-Goldsen et al., 2014; Kattari & Hasche, 2016; Walker et al., 2017). Transgender elders are more likely than cisgender LGB peers to report poor physical health, even when controlling for socio-demographic factors (Fredriksen-Goldsen 2011; Fredriksen-Goldsen et al., 2014). Reduced access to culturally competent care and the sequelae of minority stress often result in delayed care, potentially exacerbating chronic conditions common with aging (Bakko & Kattari, 2021; Fredriksen-Goldsen et al., 2014).

Although there are few studies on gender-affirming medical interventions among TGD elders, evidence suggests older adults experience a significantly higher quality of life with medical transition even when compared with younger TGD adults (Cai et al., 2019). Although age itself is not an absolute contraindication or limitation to gender-affirming medical or surgical interventions, TGD elders may not be aware of the current range of social, medical or surgical options available that can help them meet their individual needs (Hardacker et al., 2019; Houlberg, 2019).

While studies on mental health among TGD elders are limited, those over age fifty experience significantly higher rates of depressive symptoms and perceived stress compared with cisgender LGB and heterosexual older adults (Fredriksen-Goldsen 2011, Fredriksen-

Goldsen et al., 2014). Risk factors specific to TGD elders include gender- and age-related discrimination, general stress, identity concealment, victimization, and internalized stigma, while social support and community belonging appear protective (Fredriksen-Goldsen et al., 2014; Hoy-Ellis & Fredriksen-Goldsen, 2017; White Hughto & Reisner, 2018). PCPs can assist patients by encouraging spirituality, self-acceptance and self-advocacy, and an active healthy lifestyle, all of which are associated with resilience and successful aging (McFadden et al., 2013; Witten, 2014).

TGD elders often face social isolation, loss of support systems, and disconnection from close friends and children (Fredriksen-Goldsen 2011; Witten, 2017). The most common aging concerns among TGD persons are losing the ability to care for themselves followed by having to go into a nursing home or assisted living facility (Henry et al., 2020). While long-term care settings offer the helpful needed assistance, they also have the potential for physical or emotional abuse, for denial of GAHT and routine care, for being "outed," and being prevented from living and dressing according to one's affirmed gender (Auldridge et al., 2012; Pang et al., 2019; Porter et al., 2016). TGD elders identify senior housing, transportation, social events, support groups as being the most needed services (Auldridge et al., 2012; Witten, 2014).

Despite barriers, most TGD persons engage in successful aging strengthened by self-acceptance, caring relationships, and advocacy (Fredriksen-Goldsen 2011; Witten, 2014). PCPs should address core health issues facing TGD elders, including mental health, gender-affirming medical interventions, social support, and end of life/long-term care.

Beyond the independent impact of factors such as minority stress and social determinants of health in later years, data are lacking on specific health issues facing transgender people who use GAHT later in life, individuals who began GAHT at a younger age, and those seeking to continue or begin GAHT in their sixth, seventh, eighth, or later decades. With an increasing proportion of transgender people beginning GAHT at younger ages, including some who begin at the time of puberty, studies to examine the impact of decades of such treatment on long-term health are ever more important.

Statement 15.6

**We recommend health care professionals follow local breast cancer screening guidelines developed for cisgender women in their care of transgender and gender diverse people who have received estrogens, taking into consideration length of time of hormone use, dosing, current age, and the age at which hormones were initiated.**

TGD individuals taking estrogen-based GAHT will develop breasts, and therefore warrant consideration for breast cancer screening. Exogenous estrogen may be one of multiple factors that contribute to breast cancer risk in cisgender people. Two cohort studies have been published evaluating breast cancer prevalence among transgender women in the Netherlands (Gooren et al., 2013) and the US (Brown & Jones, 2015). Both were retrospective cohorts of clinical samples using a diagnosis of breast cancer as the outcome of interest and cisgender controls as a comparison group. Neither study involved prospective screening for breast cancer, and both had significant methodological limitations. Numerous guidelines have been published (Deutsch, 2016a) recommending some combination of "age plus length of estrogen exposure" as the determinant of need to commence screening. These recommendations are based on expert consensus only and are evidentiarily weak.

BRCA1 and 2 mutations increase the risk of breast cancer, however the role sex hormone exposure plays, if any, in this increased risk is unclear (Rebbeck et al., 2005) The degree of increase in risk, if any, from gender-affirming estrogen therapy is unknown. Patients with a known BRCA1 mutation should be counseled about the unknowns and shared decision-making with informed consent should occur between the patient and provider, recognizing the numerous benefits of GAHT.

Breast cancer screening among transgender women should also take into consideration the likelihood that a transgender woman's breasts may be denser on mammography. Dense breasts, a history of injecting breasts with fillers such as silicone, and breast implants may complicate the interpretation of mammographic findings (Sonnenblick et al., 2018). Therefore, special

techniques should be used accordingly. People who have injected particles such as silicone or other fillers for breast augmentation may also develop complications, such as sclerosing lipogranulomas, which obscure normal tissue on mammography or ultrasound.

## Statement 15.7
**We recommend health care professionals follow local breast cancer screening guidelines developed for cisgender women in their care of transgender and gender diverse people with breasts from natal puberty who have not had gender-affirming chest surgery.**

For TGD people assigned female at birth and who developed breasts via natal puberty, there are theoretical concerns about whether direct exposure to testosterone and exposure to aromatized estrogen resulting from testosterone therapy are risk factors for the development of breast cancer. Limited retrospective data has not demonstrated increased risk for breast cancer among transgender men (Gooren et al., 2013; Grynberg et al., 2010), however prospective and comparison data are lacking. Most people in this group will have some breast tissue remaining, and therefore it is important for providers to be aware breast cancer risk is not zero in this population. The timing and approach to breast cancer screening in this group who have had chest surgery is currently not established, and, similar to cisgender men with significant family history or BRCA gene mutation, screening via MRI or ultrasound may be appropriate. Because the utility and performance of these approaches have not been studied and because self- and HCP-led chest/breast screening exams are not recommended in cisgender women due to potential harms of both false-positive results and over-detection (detection of a cancer which would have regressed on its own with no need for intervention), any approach to screening in this group should occur in the context of shared decision-making between patients and providers regarding the potential harms, benefits, and unknowns of these approaches.

## Statement 15.8
**We recommend health care professionals apply the same respective local screening guidelines (including the recommendation not to screen) developed for cisgender women at average and elevated risk for developing ovarian or endometrial cancer in their care of transgender and gender diverse people who have the same risks.**

Current consensus guidelines do not recommend routine ovarian cancer screening for cisgender women. Case reports of ovarian cancer among transgender men have been reported (Dizon et al., 2006; Hage et al., 2000). There is currently no evidence testosterone therapy leads to an increased risk of ovarian cancer, although long-term prospective studies are lacking (Joint et al., 2018).

## Statement 15.9
**We recommend against routine oophorectomy or hysterectomy solely for the purpose of preventing ovarian or uterine cancer for transgender and gender diverse people undergoing testosterone treatment and who have an otherwise average risk of malignancy.**

TGD people with ovaries who are taking testosterone-based GAHT are often in an oligo- or anovulatory state, or otherwise experience shifts in luteal phase function and progesterone production. This condition combined with the possible increased estrogen exposure from aromatization of exogenous testosterone raises the concern for excessive or unopposed endometrial estrogen exposure, although the clinical significance is unknown. Histologic studies of the endometrium in TGD people taking testosterone have found atrophy rather than hyperplasia (Grimstad et al., 2018; Grynberg et al., 2010; Perrone et al., 2009). In a large cohort of trans masculine people who underwent a hysterectomy with oophorectomy, benign ovarian histopathology was noted in all cases (n = 85) (Grimstad et al., 2020). While prospective outcome data are lacking, there is insufficient evidence at this time to support a recommendation transgender men undergo routine hysterectomy or oophorectomy solely to prevent endometrial or ovarian cancer. Certainly, unexplained signs/symptoms of endometrial or ovarian cancer should be evaluated appropriately.

## Statement 15.10
**We recommend health care professionals offer cervical cancer screening to transgender and**

gender diverse people who currently have or previously had a cervix, following local guidelines for cisgender women.

Individuals with a cervix should undergo routine cervical cancer screening and prevention according to age-based regional practices and guidelines. This includes vaccination against the human papilloma virus (HPV) and screening according to local guidelines, including cytologic, high-HPV co-testing if available. It is important HCPs be mindful of performing pelvic speculum examinations in a manner that minimizes pain and distress for transgender masculine people.

TGD people with a cervix are less likely to have had conventional cervical cancer screening, either because the exam can cause worsening of dysphoria and/or because general practitioners and patients are misinformed about the need for this screening (Agenor et al., 2016; Potter et al., 2015). In addition, testosterone therapy can result in atrophic changes of the genital tract, and the duration of testosterone use has been associated with a greater likelihood of obtaining an inadequate sample for cytologic screening of cervical cancer (Peitzmeier et al., 2014). Alternatives to speculum exams and cervical cytology, such as provider- or self-collected high-risk HPV swabs, may be of particular benefit for screening people with a cervix. Research underway in the US is investigating the use of self-collected vaginal high-risk HPV testing among transgender masculine populations. HPV swabs were found to be highly acceptable among transgender men with a sensitivity to high-risk HPV of 71.4% (negative predictive value of 94.7%) and a specificity of 98.2% (Reisner et al., 2018). Further study is needed to evaluate the harms of HPV primary screening in transgender men in terms of the potential increased harms associated with invasive examinations and colposcopies.

### Statement 15.11
**We recommend health care professionals counsel transgender and gender diverse people that the use of antiretroviral medications is not a contraindication to gender-affirming hormone therapy.**

Human immunodeficiency virus (HIV) prevalence is disproportionately high in TGD populations. A recent large metanalysis found a global odds ratio for HIV infection of sixty-six for trans feminine individuals and 6.8 for trans masculine individuals (Stutterheim et al., 2021). PCPs have unique opportunities to provide crucial education and implement prevention strategies, especially related to decreasing HIV burden among TGD people. Mistrust of health care providers due to past experiences of discrimination and transphobia impacts HIV prevention and disrupts the linkage to care efforts (Sevelius et al., 2016). Stigma, lack of adequate training, and innate power hierarchies within medical establishments, all contribute to ambivalence and uncertainty among HCPs when caring for TGD people (Poteat et al., 2013). Finally, a lack of inclusiveness and gender-affirming practices in the health care setting may lead to TGD people feeling unsafe discussing sensitive topics, such as HIV diagnosis and avoiding care out of fear (Bauer et al., 2014; Gibson et al., 2016; Seelman et al., 2017).

HCPs should be aware of this broader context within which many TGD people are seeking care for either gender-affirming hormones, HIV pre-exposure chemoprophylaxis/treatment (PrEP), or both. There may be various misconceptions about the safety of taking gender-affirming hormones concurrently with antiretroviral therapy for HIV chemoprophylaxis or treatment.

Direct study of antiretroviral/gender-affirming hormone therapy (ART/GAHT) interactions has been limited. A subanalysis of transgender women and trans feminine persons in the multinational iPrEx trial found poor effectiveness in this group in the intention-to-treat analysis, although effectiveness was similar to that in cisgender gay men among those transgender participants who adhered to the medication as prescribed, suggesting that uptake and adherence to PrEP remain challenging in this population. Two studies of the effects of GAHT on tenofovir diphosphate (Grant et al., 2021) and tenofovir diphosphate and emtricitabine (Shieh et al., 2019) found the significantly lowered ART drug levels were unlikely to be of clinical significance. Overall, data on the interactions between hormonal contraceptives and antiretrovirals are reassuring in terms of the impact of hormones on ART (Nanda

et al., 2017). Because estradiol is partially metabolized by cytochrome P450 (CYP) 3A4 and 1A2 enzymes, potential drug interactions with other medications that induce or inhibit these pathways, such as non-nucleoside reverse transcriptase inhibitors (NNRTIs, e.g., efavirenz (EFV) and nevirapine (NVP)), may exist (Badowski et al., 2021). However, the preferred first-line ART regimens in most countries include integrase inhibitors, which have minimal to no drug interactions with gender-affirming hormones and can be used safely (Badowski, 2021; Department of Health and Human Services. Panel on Antiretroviral Guidelines for Adults and Adolescents, 2021). If concerns exist about potential interactions, HCPs should monitor blood hormone levels as needed. Therefore, TGD people living with HIV and taking antiretroviral medications should be counseled that taking antiretrovirals alongside GAHT is safe.

### Statement 15.12
**We recommend health care professionals obtain a detailed medical history from transgender and gender diverse people that includes past and present use of hormones, gonadal surgeries as well as the presence of traditional osteoporosis risk factors, to assess the optimal age and necessity for osteoporosis screening. For supporting text, see Statement 15.13.**

### Statement 15.13
**We recommend health care professionals discuss bone health with transgender and gender diverse people including the need for active weight bearing exercise, healthy diet, calcium, and vitamin D supplementation.**

Estrogen and testosterone both support bone formation and turnover. Decreased sex hormone levels are associated with a greater risk of osteoporosis in older age (Almeida et al., 2017). TGD individuals may receive medical and/or surgical interventions that have the potential to influence bone health, such as sex hormone treatment, androgen blockade, and gonadectomy. Therefore, a detailed medical history, including past and present use of hormones along with gonadal surgeries, is necessary to establish the need for osteoporosis screening.

Several observational studies have compared bone mineral density (BMD) of TGD adults before and after gender-affirming hormone therapy along with in TGD individuals compared with sex-at-birth matched cisgender controls.

Low BMD may exist before the initiation of hormones. One study showed a lower mean areal BMD at the femoral neck, total hip, and spine in transgender women than in age-matched cisgender male controls (Van Caenegem, Taes et al., 2013). Another study revealed a high prevalence of low BMD scores among TGD youth before starting puberty blockers (Lee, Finlayson et al., 2020). The authors of both studies concluded low rates of physical activity may be an important contributor to these findings.

Acceleration of bone loss can occur after gonadectomy if hormones are stopped or if hormones levels are suboptimal. In one study, thirty percent of transgender women who had undergone gonadectomy had low bone mass, and this correlated with lower 17-ß estradiol levels and adherence to GAHT (Motta et al., 2020).

Investigation of the effects of GAHT on BMD have revealed TGD women receiving estrogen therapy show improvements in BMD. A systematic review and meta-analysis on the impact of sex hormones on bone health of transgender individuals included 9 eligible studies in transgender women (n = 392) and 8 eligible studies in transgender men (n = 247) published between 2008 and 2015. The meta-analysis revealed transgender women showed a statistically significant increase in lumbar spine BMD (but not femoral neck BMD) compared with baseline measures. Among transgender men, there were no statistically significant changes in the lumbar spine, femoral neck, and total hip BMD at 12 and 24 months after starting testosterone compared with baseline measures (Singh-Ospina et al., 2017). Since the publication of this study, the European Network for Investigation of Gender Incongruence (ENIGI) study, a multicenter prospective observational study (Belgium, Norway, Italy, and the Netherlands) published results on BMD outcomes for 231 transgender women and 199 transgender men one year after initiating GAH (Wiepjes et al., 2017). Transgender women had an increase in BMD of the lumbar spine, total hip and

femoral neck, and increased BMD of the total hip occurred in transgender men. One study reported no fractures in transgender individuals at 12 months following initiation of hormones in 53 transgender men and 53 transgender women (Wierckx, van Caenegem et al., 2014). No studies suggest GAHT should be an indication for enhanced osteoporosis screening. Rather, gaps in GAHT in those who have undergone prior gonadectomy would be a consideration for such screening.

Clinical practice guidelines include recommendations for osteoporosis screening in TGD individuals (Deutsch, 2016a; Hembree et al., 2017; Rosen et al., 2019). For TGD people, both the International Society for Clinical Densitometry and the Endocrine Society suggest consideration of baseline BMD screening before initiation of hormones. Further recommendations for BMD screening are based on several factors including sex reported at birth and age along with the presence of traditional risk factors for osteoporosis, such as prior fracture, high risk medication use, conditions associated with bone loss, and low body weight (Rosen et al., 2019). Specifically, the ISCD guidelines state BMD testing is indicated for TGD individuals if they have a history of gonadectomy or therapy that lowers endogenous gonadal steroid levels prior to the initiation of GAHT, hypogonadism with no plan to take GAHT or known indications for BMD testing (Rosen et al., 2019). However, the evidentiary basis for these recommendations is weak.

The recommended screening modality for osteoporosis is dual energy x-ray absorptiometry (DXA) of the lumbar spine, total hip, and femoral neck (Kanis, 1994). However in many low- and middle-income countries, BMD tests using DXA are not available, and routine DXA-based screening is conducted in few countries, the US being an exception.

PCPs should discuss ways to optimize bone health with TGD people. In addition, PCPs should provide information about the importance of nutrition and exercise on maintaining bone health. TGD individuals with (or at risk) for osteoporosis should be informed about the benefits of weight bearing exercise along with strength and resistance exercises in limiting bone loss

(Benedetti et al., 2018). Nutrition is integral to bone health. Nutritional deficiencies, including insufficient calcium intake and low vitamin D, can result in low bone mineralization. Vitamin D and calcium supplementation have been shown to reduce hip as well as total fracture incidence (Weaver et al., 2016). Although relevant to all populations, this discussion is pertinent as a high prevalence of hypovitaminosis D has been observed in TGD populations (Motta et al., 2020; Van Caenegem, Taes et al., 2013).

<u>Statement 15.14</u>
**We recommend health care professionals offer transgender and gender diverse people referrals for hair removal from the face, body, and genital areas for gender-affirmation or as part of a preoperative preparation process.**

Hair removal is necessary both for the elimination of facial hair (Marks et al., 2019) as well as in preparation for certain gender-affirming surgeries (GAS) such as vaginoplasty, phalloplasty, and metoidioplasty (Zhang et al., 2016). Preoperative permanent hair removal is required for any skin area that will either be brought into contact with urine (e.g., used to construct a neo-urethra) or be moved to reside within a partially closed cavity within the body (e.g., used to line the neovagina) (Zhang et al., 2016). Hair removal techniques used in gender-affirming care are electrolysis hair removal (EHR) and laser hair removal (LHR) (Fernandez et al., 2013). EHR is currently the only US Food and Drug Administration–approved method of permanent hair removal, whereas LHR is approved for permanent hair reduction (Thoreson et al., 2020).

EHR involves the use of an electric current with a very fine probe that is manually inserted sequentially into individual hair follicles (Martin et al., 2018). Since this method uses direct mechanical destruction of the blood supply to the hair, it can be used on all hair colors and skin types (Martin et al., 2018). EHR is time consuming and costly as it requires each hair follicle to be treated individually, but is effective for permanent hair removal. For genital permanent hair removal prior to GAS, this treatment needs to be performed by a practitioner competent in genital hair removal as this method differs

from that of the face and body. EHR is more painful than LHR, with possible side effects of erythema, crusting, and swelling (Harris et al., 2014). Postinflammatory hyperpigmentation is a risk for dark-skinned individuals (Richards & Meharg, 1995). Pain can be controlled with topical local anesthetic and cooling techniques, and tolerance to EHR does develop to some degree with many persons able to tolerate longer sessions (Richards & Meharg, 1995).

LHR uses laser energy to target hair follicles. It is beneficial for larger surface areas. The mechanism is photo-thermolysis, whereby light from a laser selectively targets melanin in the hair shaft (Gao et al., 2018). This energy is converted to heat, which damages the follicles within the skin that produce hairs and results in the destruction of hair growth. Further treatments are needed to achieve best results and are typically spaced six weeks apart to allow for hair cycling (Zhang et al., 2016). Because LHR targets melanin, results may be limited for those with grey, blonde, or red hair.

There are specific considerations for using LHR in dark-skinned individuals (Fitzpatrick skin types IV to VI) (Fayne et al., 2018)). The higher melanin content of the epidermis can compete with the target chromophore of the light or laser, which is the melanin in the hair shaft of the hair follicle. For selective thermolysis to occur, heat diffuses from the hair shaft to the follicular stem cells to cause damage. In darker skin types, rather than reaching the target melanin in the hair shaft, light is absorbed in the epidermis where it is then converted to heat. This may result in poorer clinical outcomes and a higher rate of thermally induced adverse effects, such as hypo- or hyperpigmentation, blistering, and crust formation (Fayne et al., 2018). The selection of laser wavelength is critical in reducing this risk, with longer wavelength recommended to minimize the absorption of light in epidermal melanin and thus maximize efficacy and minimize adverse effects in patients with dark skin (Zhang et al., 2016). Side effects from LHR can include the feeling of sunburnt after treatment, as well as inflammation, redness, hyperpigmentation, and swelling. Flashing lights have been known to induce seizures in susceptible patients, so patients should be screened for this risk. Pain and discomfort during the procedure can also represent a significant barrier, and PCPs should be prepared to prescribe topical or systemic analgesics, such as a eutectic mixture of local anesthetics (EMLA) or a low dose systemic opioid. For genital GAS, some have recommended a 3-month wait after the last planned hair removal treatment before proceeding with surgery to confirm that no further hair regrowth will occur (Zhang et al., 2016).

## CHAPTER 16 Reproductive Health

All humans, including transgender individuals, have the reproductive right to decide whether or not to have children (United Nations Population Fund, 2014). Medically necessary gender-affirming hormonal treatments (GAHTs) and surgical interventions (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1) that alter reproductive anatomy or function may limit future reproductive options to varying degrees (Hembree et al., 2017; Nahata et al., 2019). It is thus critical to discuss infertility risk and fertility preservation (FP) options with transgender individuals and their families prior to initiating any of these treatments and to continue these conversations on an ongoing basis thereafter (Hembree et al., 2017). Established FP options, such as embryo, oocyte, and sperm cryopreservation, may be available for postpubertal transgender individuals (Nahata et al., 2019). Research protocols for ovarian and testicular tissue cryopreservation have also been developed and studied (Borgström et al., 2020; Nahata et al., 2019; Rodriguez-Wallberg, et al., 2019). Whereas the use of embryos, mature oocytes, and sperm have all proven to be efficacious when employed within clinical treatments, cryopreserved gonadal tissues would require either future retransplantation aimed at obtaining fully functional gametes or the application of laboratory methods for culture, which are still under development in basic science research settings. Of note, recent American Society for Reproductive Medicine guidelines have lifted the experimental label on ovarian tissue cryopreservation, but evidence remains limited in prepubertal children (Practice Committee of the American Society for Reproductive Medicine, 2019).

Individualized care should be provided in the context of each person's parenthood goals. Some research suggests transgender and gender diverse (TGD) people may be less likely to desire genetically related children or children at all when compared with cisgender peers (Defreyne, van Schuvlenbergh et al., 2020; Russell et al., 2016; von Doussa et al., 2015). Yet, several other studies have shown many TGD individuals 1) desire

genetically related children; 2) regret missed opportunities for FP; and 3) are willing to delay or interrupt hormone therapy to preserve fertility and/or conceive (Armuand, Dhejne et al., 2017; Auer et al., 2018; De Sutter et al., 2002; Defreyne, van Schuylenbergh et al., 2020; Tornello & Bos, 2017).

Many barriers to FP have been reported, such as cost (which is exacerbated when insurance coverage is lacking), urgency to start treatment, inability to make future-oriented decisions, inadequate provider knowledge/provider biases that affect offering FP, and difficulties accessing FP (Baram et al., 2019; Defreyne, van Schuylenbergh et al., 2020). Additionally, transgender individuals may have worsening dysphoria due to various steps in the FP process that are inseparably connected with the gender assigned at birth (Armuand, Dhejne, et al., 2017; Baram et al., 2019). When available, a multidisciplinary team approach, where both medical and mental health providers collaborate with gender-affirming fertility specialists, can help overcome some of these barriers (Tishelman et al., 2019). TGD individuals should be educated about the distinction between fertility (utilizing one's own gametes/reproductive tissues) and pregnancy. In addition to fertility considerations, efforts to ensure equitable high-quality care for all forms of family planning and building throughout the full reproductive continuum must be maintained. This includes procreative options such as perinatal care, pregnancy, delivery, and postpartum care, as well as family planning and contraceptive options to prevent unplanned pregnancies, and pregnancy termination if sanctioned (Bonnington et al., 2020; Cipres et al., 2017; Krempasky et al., 2020; Light et al., 2018; Moseson, Fix et al., 2020). TGD people who wish to carry a pregnancy should undergo standard of care preconception care and prenatal counseling and should receive counseling about breast/chest feeding in environments supportive of people with diverse gender identities and experiences (MacDonald et al., 2016; Obedin-Maliver & Makadon, 2016).

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and

**Statements of Recommendations**

16.1- We recommend health care professionals who are treating transgender and gender diverse people and prescribing or referring patients for hormone therapies/surgeries advise their patients about:

16.1.a- Known effects of hormone therapies/surgery on future fertility;

16.1.b- Potential effects of therapies that are not well studied and are of unknown reversibility;

16.1.c- Fertility preservation (FP) options (both established and experimental);

16.1.d- Psychosocial implications of infertility.

16.2- We recommend health care professionals refer transgender and gender diverse people interested in fertility preservation to providers with expertise in fertility preservation for further discussion.

16.3- We recommend transgender care teams partner with local reproductive specialists and facilities to provide specific and timely information and fertility preservation services prior to offering medical and surgical interventions that may impact fertility.

16.4- We recommend health care professionals counsel pre- or early-pubertal transgender and gender diverse youth seeking gender-affirming therapy and their families that currently evidence-based/established fertility preservation options are limited.

16.5- We recommend transgender and gender diverse people with a uterus who wish to carry a pregnancy undergo preconception care, prenatal counseling regarding use and cessation of gender-affirming hormones, pregnancy care, labor and delivery, chest/breast feeding supportive services, and postpartum support according to local standards of care in a gender-affirming way.

16.6. We recommend medical providers discuss contraception methods with transgender and gender diverse people who engage in sexual activity that can result in pregnancy.

16.7. We recommend providers who offer pregnancy termination services ensure procedural options are gender-affirming and serve transgender people and those of diverse genders.

harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

## Statement 16.1

**We recommend health care professionals who are treating transgender and gender diverse people and prescribing or referring patients for hormone therapies/surgeries advise their patients about:**

a. **Known effects of hormone therapies/surgeries on future fertility;**
b. **Potential effects of therapies that are not well studied and are of unknown reversibility;**
c. **Fertility preservation (FP) options (both established and experimental;**
d. **Psychosocial implications of infertility.**

### TGD individuals assigned female at birth

GAHT may negatively impact future reproductive capacity (Hembree et al., 2017). Based on current evidence in transgender men and gender diverse people assigned female at birth, these risks are as follows:

Gonadotropin-releasing hormone agonists (GnRHas) may be used for pubertal suppression to prevent further pubertal progression until adolescents are ready for masculinizing treatment. GnRHas may also be used for menstrual suppression. GnRHas impact the maturation of gametes but do not cause permanent damage to gonadal function. Thus, if GnRHas are discontinued, oocyte maturation would be expected to resume.

There are few studies detailing the effects of testosterone therapy on reproductive function in transgender men (Moravek et al., 2020). Restoration of normal ovarian function with oocyte maturation after testosterone interruption has been demonstrated in transgender men who have achieved natural conception. A retrospective study on oocyte cryopreservation showed no differences in the total number of oocytes retrieved or in the number of mature oocytes between transgender men and age- and BMI-matched cisgender women (Adeleye et al., 2018, 2019). The first results have recently been published evaluating live birth rates after controlled ovarian stimulation in transgender men compared with cisgender women (Leung et al., 2019). Testosterone was discontinued prior to ovarian stimulation. Overall, the results concerning the influence of testosterone on reproductive organs and their function appear to be reassuring. However, there have been no prospective studies to date evaluating the effect of long-term hormone therapy on fertility (i.e., started in adolescence) or in those treated with GnRHas in early puberty followed by testosterone therapy. It is important to take into consideration that required medications and procedures for cryopreserving oocytes (a

pelvic examination, vaginal ultrasound monitoring, and oocyte retrievals) may lead to increasing gender dysphoria in transgender men (Armuand, Dhejne et al., 2017).

Surgical interventions among transgender men will have obvious implications for reproductive capacity. If patients desire a hysterectomy, the option should be offered of preserving the ovaries to retain the possibility of having a genetically related child. Alternatively, if the ovaries are removed either separately or concurrently with the hysterectomy, egg freezing should be offered prior to surgery and/or ovarian tissue cryopreservation can be done at the time of oophorectomy. Although this procedure is no longer considered experimental, many transgender men may desire *in vitro* maturation of primordial follicles, which is still investigational. Studies evaluating oocyte function have shown oocytes isolated from transgender men with testosterone exposure at the time of oophorectomy can be matured *in vitro* to develop normal metaphase II meiotic spindle structure (De Roo et al., 2017; Lierman et al., 2017).

### TGD individuals assigned male at birth

Based on current evidence in transgender women and gender diverse people assigned male at birth (AMAB), the influence of medical treatment is as follows:

GnRHas inhibit spermatogenesis. Data suggest discontinuation of treatment results in a re-initiation of spermatogenesis, although this may take at least 3 months and most likely longer (Bertelloni et al., 2000). Furthermore, the psychological burden of re-exposure to testosterone should be considered.

Anti-androgens and estrogens result in an impaired sperm production (de Nie et al., 2020; Jindarak et al., 2018; Kent et al., 2018). Spermatogenesis might resume after discontinuation of prolonged treatment with anti-androgens and estrogens, but data are limited (Adeleye et al., 2019; Alford et al., 2020; Schneider et al., 2017). Testicular volumes diminish under the influence of gender-affirming hormone treatment (Matoso et al., 2018). Semen quality in transgender women may also be negatively affected by specific life-style factors, such as a low frequency of masturbation, wearing the genitals tight against the body (e.g., with use of tight undergarments for tucking) (Jung & Schuppe, 2007; Mieusset et al., 1985, 1987; Rodriguez-Wallberg, Häljestig et al., 2021).

Statement 16.2
**We recommend health care professionals refer transgender and gender diverse people interested in fertility preservation to providers with expertise in fertility preservation for further discussion.**

Research shows many transgender adults desire biological children (De Sutter et al., 2002; Defreyne, van Schuylenbergh et al., 2020; Wierckx, Van Caenegem et al., 2012), yet FP rates remain widely variable, particularly in youth (< 5%–40%) (Brik et al., 2019; Chen et al., 2017; Chiniara et al., 2019; Nahata et al., 2017; Segev-Becker et al., 2020). In a recent survey, many youth acknowledged their feelings about having a biological child might change in the future (Strang, Jarin et al., 2018). Non-elective sterilization is a violation of human rights (Ethics Committee of the American Society for Reproductive Medicine, 2015; Equality and Human Rights Commission, 2021; Meyer III et al., 2001) and due to advances in social attitudes, fertility medicine, and affirmative transgender health care, opportunities for biological parenthood during transition should be supported for transgender people. Due to the influence clinical opinion may have on transgender or nonbinary people's FP and on parenting decisions, FP options should be explored by health care providers alongside options such as fostering, adoption, coparenting, and other parenting alternatives (Bartholomaeus & Riggs, 2019). Transgender patients who have been offered this type of discussion and have been given the choice to undergo procedures for FP have reported the experience to be an overall positive one (Armuand, Dhejne et al., 2017; De Sutter et al., 2002; James-Abra et al., 2015).

In other patient populations, fertility referrals and formal fertility programs have been shown to increase FP rates and improve patient satisfaction (Kelvin et al., 2016; Klosky, Anderson et al., 2017; Klosky, Wang et al., 2017;

AR_275249

Shnorhavorian et al., 2012) Physician attitudes have been investigated, and recent studies indicate both an awareness and a desire to provide fertility-related information to children and their families (Armuand et al., 2020). However, barriers have also been identified, including lack of knowledge, comfort, and resources (Armuand, Nilsson et al., 2017; Frederick et al., 2018). Thus, the need for appropriate training of health care providers has been highlighted, with emphasis placed on fertility counseling and offering FP options to all at-risk individuals in an unbiased way (Armuand, Nilsson et al., 2017). Parents' recommendations have also been shown to significantly influence FP rates in adolescent and young adult males with cancer (Klosky, Flynn et al., 2017). While there are clear clinical differences in these populations, these findings can help inform best practices for fertility counseling and FP referrals for transgender individuals.

### Statement 16.3

**We recommend transgender care teams partner with local reproductive specialists and facilities to provide specific and timely information and fertility preservation services prior to offering medical and surgical interventions that may impact fertility.**

Cryopreservation of sperm and oocytes are established FP techniques and can be offered to pubertal, late pubertal, and adult birth assigned males and birth assigned females, respectively, preferably prior to the initiation of GAHT (Hembree et al., 2017; Practice Committee of the American Society for Reproductive Medicine, 2019). Cryopreservation of embryos can be offered to adult (post-pubertal) TGD people who wish to have a child and have an available partner. The future use of cryopreserved gametes is also dependent on the gametes and reproductive organs of the future partner (Fischer, 2021; Maxwell et al., 2017)

Although semen parameters have been shown to be compromised when FP is performed after initiation of GAH medication (Adeleye et al., 2019), one small study showed when the treatment was discontinued, semen parameters were comparable to those in TGD patients who had

never undergone GAH treatment. With regard to ovarian stimulation, oocyte vitrification yield and subsequent use of the oocytes in in-vitro fertilization (IVF), there is no reason to anticipate a different outcome in assisted reproductive technology (ART) treatments for TGD patients than that obtained in cisgender patients undergoing ART—other than individual confounding factors related to (in)fertility—when gametes are banked prior to any medical treatment (Adeleye et al., 2019). The use of oocytes in ART treatment resulted in similarly successful outcomes in TGD compared with controlled, matched cisgender patients (Adeleye et al., 2019; Leung et al., 2019; Maxwell et al., 2017).

Although these are established options, few pubertal, late pubertal or adult TGD people undergo FP (Nahata et al., 2017), and many experience challenges while undergoing FP interventions. Not only is access and cost of these methods a barrier (particularly in regions without insurance coverage), but these procedures are often physically and emotionally uncomfortable, and many express concerns about postponing the transitioning process (Chen et al., 2017; De Sutter et al., 2002; Nahata et al., 2017; Wierckx, Stuyver et al., 2012). Especially for the birth assigned females, the invasiveness of endovaginal ultrasound follow-up of the ovarian stimulation and oocyte retrieval procedures (and associated psychological distress) have been cited as a barrier (Armuand, Dhejne et al., 2017; Chen et al., 2017). There is also the concern young adults going through transitioning may not have a clear vision of parenting and are therefore likely to decline the opportunity to use FP at that time—while as adults, they may have different opinions about parenthood (Cauffman & Steinberg, 2000). The reduction of gender dysphoria during transitioning could also influence the decision-making process surrounding FP (Nahata et al., 2017). Based on research showing TGD youths' fertility perspectives may change over time (Nahata et al., 2019; Strang, Jarin et al., 2018), FP options should be discussed on an ongoing basis.

### Statement 16.4

**We recommend health care professionals counsel pre- or early-pubertal transgender and**

**gender diverse youth seeking gender-affirming therapy and their families that currently evidence-based/established fertility preservation options are limited.**

For prepubertal and early-pubertal children, FP options are limited to the storage of gonadal tissue. Although this option is available for TGD children in the same way that it is available for cisgender prepubertal and early-pubertal oncological patients, there is no literature describing the utilization of this approach in the transgender population. Ovarian tissue autotransplantation has resulted in over 130 live births in cisgender women. Most of these patients conceived naturally without ART (Donnez & Dolmans, 2015; Jadoul et al., 2017), and the majority stored their ovarian tissue either as adults or during puberty. Although the recent American Society for Reproductive Medicine guideline has lifted the experimental label from ovarian tissue cryopreservation (Practice Committee of the American Society for Reproductive Medicine, 2019), there are very few case reports describing a successful pregnancy in a woman following the transplantation of ovarian tissue cryopreserved before puberty. Demeestere et al. (2015) and Rodriguez-Wallberg, Milenkovic et al. (2021) described cases of successful pregnancies following transplantation of tissue procured at the age of 14, and recently Matthews et al. (2018) described the case of a girl diagnosed with thalassemia who had ovarian tissue stored at the age of 9 and transplantation 14 years late. She subsequently conceived through IVF and delivered a healthy baby.

Currently, the only future clinical application for storing ovarian tissue is autotransplantation, which might be undesirable in a transgender man (due to the potentially undesirable effects of estrogen). A laboratory procedure that would make it possible to mature oocytes *in vitro* starting with ovarian tissue would be the ideal future application of stored ovarian tissue for transgender people, but this technique is currently only being investigated and optimized in basic science research settings (Ladanyi et al., 2017; Oktay et al., 2010).

Prepubertal procurement of testicular tissue has been documented as a low-risk procedure (Borgström et al., 2020; Ming et al., 2018). Some authors have also described this approach as a theoretical option in transgender people (De Roo et al., 2016; Martinez et al., 2017; Nahata, Curci et al., 2018). However, there are no reports in the literature describing the clinical or investigational utilization of this FP option for TGD patients. Moreover, the viability of the clinical application of autotransplantation of testicular tissue remains unknown in humans, and *in vitro* maturation techniques are still in the realm of basic science research. Thus, specialists currently consider this technique experimental (Picton et al., 2015). The possibility of storing gonadal tissue should be discussed prior to any genital surgery that would result in sterilization, although the probability of being able to use this tissue must be clearly addressed.

Statement 16.5

**We recommend transgender and gender diverse people with a uterus who wish to carry a pregnancy undergo preconception care and prenatal counseling regarding the use and cessation of gender-affirming hormones, pregnancy care, labor and delivery, chest/breast feeding supportive services, and postpartum support according to local standards of care in a gender-affirming way.**

Most transgender men and gender diverse people (AFAB) retain their uterus and ovaries and thus can conceive and carry a pregnancy even after long-term testosterone use (Light et al., 2014). Many transgender men desire children (Light et al., 2018; Wierckx, van Caenegem et al., 2012) and are willing to carry a pregnancy (Moseson, Fix, Hastings et al., 2021; Moseson, Fix, Ragosta et al., 2021). ART has expanded the opportunity for many transgender men to conceive and fulfill their family planning wishes (De Roo et al., 2017; Ellis et al., 2015; Maxwell et al., 2017). Some transgender men report psychological isolation, dysphoria related to the gravid uterus and chest changes, and depression (Charter, 2018; Ellis et al., 2015; Hoffkling et al., 2017; Obedin-Maliver & Makadon, 2016). Conversely, other studies have reported some positive experiences during pregnancy as well (Fischer, 2021; Light et al., 2014). Mental health providers should be involved to provide support, and counseling should be

provided addressing when to stop and when to resume gender-affirming hormones, what options are available for the mode of delivery and for chest/breast feeding (Hoffkling et al., 2017). Finally, system-level and interpersonal-level interventions should be implemented to ensure person-centered reproductive health care for all people (Hahn et al., 2019; Hoffkling et al., 2017; Moseson, Zazanis et al., 2020; Snowden et al., 2018).

Given the potential harmful effects of testosterone on the developing embryo, discontinuing testosterone or masculinizing hormone therapy prior to conception and during the entire pregnancy is recommended. However, the optimal time for both the discontinuation of testosterone prior to pregnancy and its resumption after pregnancy is unknown. Since stopping gender-affirming hormones may cause distress and exacerbate dysphoria in transgender men, when and how to stop this therapy should be discussed during prenatal counseling (Hahn et al., 2019). Because information about the duration of testosterone exposure and the risk of teratogenicity is lacking, testosterone use should be discontinued prior to attempting pregnancy and before stopping contraception. Moreover, there is limited information regarding health outcomes of infants born to transgender men. Small case series attempting to evaluate this question have revealed no adverse physical or psychosocial differences between infants born to transgender men and infants in the general population (Chiland et al., 2013).

**Chest/Breast feeding**

In the limited studies evaluating lactation and chest/breast feeding, the majority of transgender men and TGD individuals AFAB who chose to chest/breast feed postpartum were successful, with research suggesting induction of lactation is in part dependent on preconception counseling and experienced lactation nursing support (MacDonald et al., 2016; Wolfe-Roubatis & Spatz, 2015). Specifically, transgender men and TGD people who use testosterone should be informed 1) although quantities are small, testosterone does pass through chest/breast milk; and 2) the impact on the developing neonate/child is unknown, and therefore gender-affirming testosterone use is not recommended during lactation but may be resumed after discontinuation of

chest/breast feeding (Glaser et al., 2009). Transgender men and other TGD individuals AFAB should be made aware some patients who carry a pregnancy may experience undesired chest growth and/or lactation even after chest reconstruction and should therefore be supported if they desire to suppress lactation (MacDonald et al., 2016).

There is limited information concerning lactation in transgender women as well as other TGD AMAB but many also express the desire to chest/breast feed. While there is a case report of a transgender woman successfully lactating and chest/breast feeding her infant after hormonal support using a combination of estrogen, progesterone, domperidone, and breast pumping (Reisman & Goldstein, 2018), the nutritional and immunological profile of chest/breast milk under these conditions has not been studied. Therefore, patients need to be informed about the risks and benefits of this approach to child feeding (Reisman & Goldstein, 2018).

<u>Statement 16.6</u>
**We recommend medical providers discuss contraception methods with transgender and gender diverse people who engage in sexual activity that can result in pregnancy.**

Many TGD individuals may retain reproductive capacity, and they (if they retain a uterus, ovaries, and tubes) or their sexual partners (for sperm producing individuals) may experience unplanned pregnancies (James et al., 2016; Light et al., 2014; Moseson, Fix et al., 2020). Therefore, intentional family planning counseling, including contraception and abortion conducted in gender-expansive ways is needed (Klein, Berry-Bibee et al., 2018; Obedin-Maliver, 2015; Stroumsa & Wu, 2018). TGD people AFAB may not use contraception due to an erroneous assumption that testosterone is a reliable form of contraception (Abern & Maguire, 2018; Ingraham et al., 2018; Jones, Wood et al., 2017; Potter et al., 2015). However, based on current understanding, testosterone should not be considered a reliable form of contraception because of its incomplete suppression of the hypothalamic-pituitary-adrenal axis (Krempasky et al., 2020). Furthermore, pregnancies have occurred while individuals are amenorrheic due

to testosterone use, which may outlast active periods of administration (Light et al., 2014). Pregnancy can also occur in TGD people after long-term testosterone use (at least up to 10 years), although the effect on oocytes and baseline fertility is still unknown (Light et al., 2014).

TGD people AFAB may use a variety of contraceptive methods (Abern & Maguire, 2018; Bentsianov et al., 2018; Bonnington et al., 2020; Chrisler et al., 2016; Cipres et al., 2017; Jones, Wood et al., 2017; Krempasky et al., 2020; Light et al., 2018).These methods may be used explicitly for pregnancy prevention, menstrual suppression, abnormal bleeding, or other gynecological needs (Bonnington et al., 2020; Chrisler et al., 2016; Krempasky et al., 2020; Schwartz et al., 2019). Contraceptive research gaps within this population are profound. No studies have examined how the use of exogenous androgens (e.g., testosterone) may modify the efficacy or safety profile of hormonal contraceptive methods (e.g., combined estrogen and progestin hormonal contraceptives, progestin-only based contraceptives) or non-hormonal and barrier contraceptive methods (e.g., internal and external condoms, non-hormonal intrauterine devices, diaphragms, sponges, etc.).

Gender diverse individuals who currently have a penis and testicles may engage in sexual activity with individuals who have a uterus, ovaries, and tubes of any gender. Gender diverse people who have a penis and testicles can produce sperm even while on gender-affirming hormones (i.e., estrogen), and although semen parameters are diminished among those who are currently using or who have previously used gender-affirming hormones, azoospermia is not complete and sperm activity is not totally suppressed (Adeleye et al., 2019; Jindarak et al., 2018; Kent et al., 2018). Therefore, contraception needs to be considered if pregnancy is to be avoided in penis-in-vagina sexual activity between a person with a uterus, ovaries, and tubes and one with a penis and testicles, irrespective of the use of gender-affirming hormones by either partner. Currently, contraceptive methods available for use by the sperm-producing partner are primarily mechanical barriers (i.e., external condoms, internal condoms), permanent sterilization (i.e., vasectomy), and gender-affirming surgery (e.g., orchiectomy, which also results in sterilization). Contraceptive counseling that considers sperm producing, egg producing, and gestating partners (as relevant) is recommended.

Statement 16.7

**We recommend providers who offer pregnancy termination services ensure procedural approaches are gender-affirming and serve transgender people and those of diverse genders.**

Unplanned pregnancies and abortions have been reported among TGD individuals with a uterus (Abern & Maguire, 2018; Light et al., 2014; Light et al., 2018; Moseson, Fix et al., 2020) and documented through surveys of abortion-providing facilities (Jones et al., 2020). However, the population-based epidemiology of abortion provision and the experiences and preferences of TGD individuals AFAB undergoing abortion still represents a critical gap in research (Fix et al., 2020; Moseson, Fix et al., 2020; Moseson, Lunn et al., 2020). Nonetheless, given that pregnancy capacity exists among many TGD people and pregnancies may not always be planned or desired, access to safe, legal, and gender-affirming pregnancy medical and surgical termination services is necessary.

## CHAPTER 17 Sexual Health

Sexual health has a profound impact on physical and psychological well-being, regardless of one's sex, gender, or sexual orientation. However, stigma about sex, gender and sexual orientation influences individual's opportunities to live out their sexuality and to receive appropriate sexual health care. Specifically, in most societies, cisnormativity and heteronormativity lead to the assumption that all people are cisgender and heterosexual (Bauer et al., 2009), and that this combination is superior to all other genders and sexual orientations (Nieder, Güldenring et al., 2020; Rider, Vencill et al., 2019). Hetero-cis-normativity negates the complexity of gender, sexual orientation, and sexuality and disregards diversity and fluidity. This is all the more important since sexual identities, orientations, and practices of transgender and gender diverse (TGD) people are characterized by an enormous diversity (Galupo et al., 2016; Jessen et al., 2021; Thurston & Allan, 2018; T'Sjoen et al., 2020). Likewise, a strong cross-cultural tendency toward allonormativity—the assumption that all people experience sexual attraction or interest in sexual activity—negates the diverse experiences of TGD people, especially those who locate themselves on the asexual spectrum (McInroy et al., 2021; Mollet, 2021; Rothblum et al., 2020).

The World Health Organization (WHO, 2010) emphasizes sexual health depends on respect for the sexual rights of all people, including the right to express diverse sexualities and to be treated respectfully, safely, and with freedom from discrimination and violence. Sexual health discourses have focused on agency and body autonomy, which include consent, sexual pleasure, sexual satisfaction, partnerships, and family life (Cornwall & Jolly, 2006; Lindley et al., 2021). In light of this, the WHO defines sexual health as "a state of physical, emotional, mental, and social well-being in relation to sexuality and not merely the absence of disease, dysfunction, or infirmity. Sexual health requires a positive and respectful approach to sexuality and sexual relationships as well as the possibility of having pleasurable and safe sexual experiences, free of coercion, discrimination, and violence. For sexual health to be attained and maintained, the sexual rights of all persons must be respected, protected, and fulfilled" (WHO, 2006, p. 5). This includes individuals on the asexual spectrum, who may not experience sexual attraction to others but may still choose to be sexual at times (e.g., via self-stimulation) and/or experience interest in forming and building romantic relationships (de Oliveira et al., 2021).

Scientific attention to the sexual experiences and behaviors of TGD people has grown in recent years (Gieles et al., 2022; Holmberg et al., 2019; Klein & Gorzalka, 2009; Kloer et al., 2021; Mattawanon et al., 2021; Stephenson et al., 2017; Tirapegui et al., 2020; Thurston & Allan, 2018). This expansion within the literature reflects a sex-positive framework (Harden, 2014), a framework that recognizes both the positive aspects such as sexual pleasure (Laan et al., 2021) and potential risks associated with sexuality (Goldhammer et al., 2022; Mujugira et al., 2021). Studies of TGD people's sexuality, however, often lack validated measures, an appropriate control group, or a prospective design (Holmberg et al., 2019). Additionally, most focus exclusively on sexual functioning (Kennis et al., 2022), and thus neglecting sexual satisfaction and broader operationalizations of sexual pleasure beyond functioning. The effects of current TGD-related medical treatments on sexuality are heterogeneous (Özer et al., 2022; T'Sjoen et al., 2020), and there has been little research on the sexuality of TGD adolescents (Bungener et al., 2017; Maheux et al., 2021; Ristori et al., 2021; Stübler & Becker-Hebly, 2019; Warwick et al., 2022). While sex-positive approaches to counseling and treatment for sexual difficulties experienced by TGD individuals have been proposed (Fielding, 2021; Jacobson et al., 2019; Richards, 2021), to date there is insufficient research on the effectiveness of such interventions. Focusing on the promotion of sexual health, the World Association for Sexual Health (WAS) asserts the importance of sexual pleasure and considers self-determination, consent, safety, privacy, confidence, and the ability to communicate and negotiate sexual relations as major facilitators (Kismödi et al., 2017). WAS asserts sexual pleasure is integral to sexual rights and human rights (Kismödi et al., 2017). To contribute to

---

**Statements of Recommendations**

17.1- We recommend health care professionals who provide care to transgender and gender diverse people acquire the knowledge and skills needed to address sexual health issues (relevant to their care provision).

17.2- We recommend health care professionals who provide care to transgender and gender diverse people discuss the impact of gender-affirming treatments on sexual function, pleasure, and satisfaction.

17.3- We recommend health care professionals who provide care to transgender and gender diverse people offer the possibility of including the partner(s) in sexuality-related care, if appropriate.

17.4- We recommend health care professionals counsel transgender and gender diverse people about the potential impact of stigma and trauma on sexual risk behavior, sexual avoidance, and sexual functioning.

17.5- We recommend any health care professional who offers care that may impact sexual health provide information, ask about the expectations of the transgender and gender diverse individual and assess their level of understanding of possible changes.

17.6.-We recommend health care professionals who provide care to transgender and gender diverse people counsel adolescents and adults regarding prevention of sexually transmitted infections.

17.7- We recommend health care professionals who provide care to transgender and gender diverse people follow local and World Health Organization guidelines for human immunodeficiency virus/sexual transmitted infections (HIV/STIs) screening, prevention, and treatment.

17.8- We recommend health care professionals who provide care to transgender and gender diverse people address concerns about potential interactions between antiretroviral medications and hormones.

---

the sexual health of TGD people, health care professionals (HCPs) need both transgender-related expertise and sensitivity (Nieder, Güldenring et al., 2020). With the goal of improving sexual health care for TGD people to an ethically-sound, evidence-based and high-quality level, HCPs must provide their health services with the same care (i.e., with transgender-related expertise), respect (i.e., with transgender-related sensitivity), and investment in sexual pleasure and sexual satisfaction as they provide for cisgender people (Holmberg et al., 2019).

In many societies, nonconforming gender expressions can elicit strong (emotional) reactions, including in HCPs. Thus, when initiating a health-related contact or establishing a therapeutic relationship, a nonjudgmental, open and welcoming manner is most likely ensured when HCPs reflect on their emotional, cognitive, and interactional reactions to the person (Nieder, Güldenring et al., 2020). In addition, transgender-related expertise refers to identifying the impact the TGD person's intersectional identities and experiences of marginalization and stigma may have had on their whole self (Rider, Vencill et al., 2019). To adequately address the specific physical, psychological, and social conditions of TGD people, HCPs must be aware these conditions are generally overlooked due to hetero-cis-normativity, lack of knowledge, and lack of skills (Rees et al., 2021). It is also important to consider cultural norms in relation to sexuality. For example, in some African cultures, the

idea of sex as taboo restricts the number of acceptable terms to be used when taking a sexual history (Netshandama et al., 2017). Culturally respectful language can facilitate talking openly about one's sexual history and reduce ambiguity or shame (Duby et al., 2016). In addition, HCPs must be sensitive to the history of (mis)use of sexual identity and orientation as a gatekeeping function to exclude transgender people from gender-affirming health care (Nieder & Richter-Appelt, 2011; Richards et al., 2014). The following recommendations aim to improve sexual health care for TGD people.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

## Statement 17.1
**We recommend health care professionals who provide care to transgender and gender diverse people acquire the knowledge and skills to address sexual health issues (relevant to their care provision).**

It is important HCPs addressing the sexual health of TGD people be familiar with commonly used terminology (see Chapter 1—Terminology) and invite those seeking care to explain terms with which the provider may not be familiar. In this context, it is also important HCPs (are

prepared to) take a sexual history and offer treatment (according to their competencies) in a gender-affirming way with a sex-positive approach (Centers for Disease Control, 2020; Tomson et al., 2021). However, HCP's should apply greater importance to the terminology that the TGD person uses for their own body over more traditionally accepted or used medical terminology (Wesp, 2016). When talking about sexual practices, it is advisable to focus on body parts (e.g., "Do you have sex with people with a penis, people with a vagina, or both?"; ACON, 2022) and what role they play in their sexuality (e.g., "During Sex, do any parts of your body enter your partners body, such as their genitals, anus, or mouth?"; ACON, 2022).

### Statement 17.2

**We recommend health care professionals who provide care to transgender and gender diverse people discuss the impact of gender-affirming treatments on sexual function, pleasure, and satisfaction.**

To achieve gender-affirming care, it is crucial HCPs providing transition-related medical interventions be sufficiently informed about the possible effects on sexual function, pleasure, and satisfaction (T'Sjoen et al., 2020). Since clinical data indicate that TGD people score significantly lower in sexual pleasure compared to cisgender individuals, this is even more important (Gieles et al., 2022). If the HCP cannot provide information about the effects of their treatment on sexual function, pleasure, and satisfaction, they are at least expected to refer the individual to someone qualified to do so. If the sexuality-related effects of their treatment are unknown, HCPs should inform their patients accordingly. As introduced above, the sexuality of TGD people often challenges heteronormative views. Nevertheless, there is a large amount of literature (e.g., Bauer, 2018; Laube et al., 2020; Hamm & Nieder, 2021; Stephenson et al., 2017) highlighting the spectrum character of sexuality that does not fit into expectations of what male and female sexuality entails (neither cis- nor transgender), let alone that of gender diverse people (e.g., nonbinary, agender, genderqueer). Thus, these aspects should be carefully considered by HCPs as

cisnormativity, heteronormativity, and transition-related medical interventions, all have a strong impact on sexual health.

Sexual pleasure has been well documented as a factor in improving sexual, mental, and physical health outcomes (Anderson, 2013). Next to sexual function, HCPs providing sexual health care must address sexual pleasure and satisfaction as a key factor within sexual health. Historically sexual health care has been disease focused, and this is particularly true for research and clinical practice in working with TGD patients. Although competent sexual health care regarding HIV and STIs is necessary, integration of valuing sexual pleasure of TGD patients is also necessary. Calls for integrating sexual pleasure as a focal point in STI prevention education and interventions rest on the understanding that pleasure is a motivator of behavior (Philpott et al., 2006). TGD people are concerned about their sexual pleasure and need HCPs who are knowledgeable about the diversity of sexual practices and anatomical functioning particular to TGD health care.

### Statement 17.3

**We recommend health care professionals who provide care to transgender and gender diverse people offer the possibility of including the partner(s) in sexuality-related care, if appropriate.**

When appropriate and relevant to clinical concerns, inclusion of a sexual and/or romantic partner(s) in sexual health care decision-making can increase TGD patients' sexual well-being and satisfaction outcomes (Kleinplatz, 2012). TGD people may choose a range of transition-related medical interventions, and these interventions may have mixed results in shifting experiences of anatomical dysphoria (Bauer & Hammond, 2015). When discussing the impact of medical interventions on sexual functioning, pleasure, and satisfaction, inclusion of partner(s) can increase knowledge of potential changes and encourage communication between partners (Dierckx et al., 2019). Because the process of transitioning is often not a completely solitary endeavor, the inclusion of sexual and/or romantic partners in transition-related health care can facilitate the process of "co-transitioning" (Lindley et al., 2020;

Siboni et al., 2022; Theron & Collier, 2013) and can also support sexual growth and adjustment both in the individual as well as in the relationship. Social and psychological barriers to sexual functioning and pleasure, including experiences of gender dysphoria, stigmatization, lack of sexual and relationship role models, and limited skills, can have negative impacts on overall sexual health (Kerckhof et al., 2019). Supportive, gender-affirming sexual communication between partners improves sexual satisfaction outcomes for TGD people (Stephenson et al., 2017; Wierckx, Elaut et al., 2011).

Inclusion of sexual and/or romantic partners offers an additional opportunity to set realistic expectations, disseminate helpful and accurate information, and facilitate gender-affirming positive communication related to sexual health. Ultimately, however, it is important to recognize individual choices related to gender health and transition are the patients to make, not a partner's decision. It is important the inclusion of partners in sexual health-related care occur only when appropriate and as desired by patients. Contraindications might include interpersonal dynamics that are abusive or violent, in which case patient safety overrides partner involvement. Finally, it is critical HCPs treat all people in an affirming and inclusive manner, including sexual and romantic partners. This means, for example, monitoring and addressing assumptions and potential biases about the gender or sexual orientation of a patient's partner(s) or a patient's relationship structure.

### Statement 17.4

**We recommend health care professionals counsel transgender and gender diverse people about the potential impact of stigma and trauma on sexual risk behavior, sexual avoidance, and sexual functioning.**

The TGD community is disproportionately impacted by stigma, discrimination, and violence (de Vries et al., 2020; European Union Agency for Fundamental Rights, 2020; McLachlan, 2019). These experiences are often traumatic in nature (Burnes et al., 2016; Mizock & Lewis, 2008) and can create barriers to sexual health, functioning, and pleasure (Bauer & Hammond, 2015). For example, stigmatizing narratives about

transgender sexualities can increase dysphoria and sexual shame, increasing potential avoidance of the sexual communication needed for safety and optimizing pleasure (Stephenson et al., 2017). Research demonstrates stigma, a history of sexual violence, and body image concerns can negatively impact sexual self-esteem and agency, for example the ability to assert what is pleasurable or to negotiate condom use (Clements-Nolle et al., 2008; Dharma et al., 2019). Additionally, gender dysphoria can be exacerbated by past trauma experiences and ongoing trauma-related symptoms (Giovanardi et al., 2018). It may be difficult for some TGD individuals to engage sexually using the genitals with which they were born, and they may choose to avoid such stimulation altogether, disrupting arousal and/or orgasmic processes (Anzani et al., 2021; Bauer & Hammond, 2015; Iantaffi & Bockting, 2011) or result in complex feelings about orgasm (Chadwick et al., 2019). HCPs providing gender-affirming counseling and interventions must be knowledgeable about the spectrum of sexual orientations and identities (including asexual identities and practices) to avoid assumptions based in heteronormative, cisnormative, allonormative modes of behavior or satisfaction while also affirming the potential impacts of stigma and trauma on sexual health and pleasure (Nieder, Güldenring et al., 2020). Some level of disconnect or dissociation may at times be present, particularly in the case of acute trauma symptoms (Colizzi et al., 2015). It is important HCPs be aware of these potential impacts on sexual health, functioning, pleasure, and satisfaction, so they may refer patients as needed to trauma-informed sexual counselors, mental health providers, or both, who may be of further assistance and may also normalize and validate TGD patients exploring multiple diverse pathways of healing and accessing sexual pleasure.

### Statement 17.5

**We recommend any health care professional who offers care that may impact sexual health provide information, ask about the expectation of the transgender and gender diverse individual, and assess their level of understanding of possible changes.**



Transition-related care can affect sexual function, pleasure, and satisfaction, both in positive and negative ways (Holmberg et al., 2018; Kerckhof et al., 2019; Thurston & Allan, 2018; Tirapegui et al., 2020). On the positive side, gender-affirming care can help TGD people improve their sexual functioning and increase their sexual pleasure and satisfaction (Kloer et al., 2021; Özer et al., 2022; T'Sjoen et al., 2020). On the negative side, however, data indicate problematic sexual health outcomes due to hormonal and surgical treatments (Holmberg et al., 2018; Kerckhof et al., 2019, Stephenson et al., 2017; Weyers et al., 2009). Transition-related hormones may affect mood, sexual desire, the ability to have an erection and ejaculation, and genital tissue health, which in turn can impact sexual function, pleasure and sexual self-expression (Defreyne, Elaut et al., 2020; Garcia & Zaliznyak, 2020; Kerckhof et al., 2019; Klein & Gorzalka, 2009; Wierckx, Elaut et al., 2014). TGD people who wish to use their original genital anatomy for penetrative sex may benefit from medications that address sexual health side effects of hormone therapy, such as erectile dysfunction, medications for TGD persons taking estrogen or antiandrogens, and topical estrogen and/or moisturizers for TGD persons experiencing vaginal atrophy or dryness due to testosterone therapy.

Sexual desire, arousal, and function may also be affected by the use of psychotropic drugs (Montejo et al., 2015). As some TGD people are prescribed medication to treat depression (Heylens, Elaut et al., 2014), anxiety (Millet et al., 2017) or other mental health concerns (Dhejne et al., 2016), their potential side effects on sexual health should be considered.

Many gender-affirming surgeries can have significant effects on erogenous sensation, sexual desire and arousal as well as sexual function and pleasure. The impact of these changes for patients may be mixed (Holmberg et al., 2018). Chest surgeries (breast reduction, mastectomy, and breast augmentation) and body contouring surgeries, for example, may offer desired changes in form and appearance thereby reducing psychological distress that can disrupt sexual functioning but may adversely affect erogenous sensation (Bekeny et al., 2020; Claes et al., 2018; Rochlin et al., 2020). Genital surgeries in particular can potentially affect sexual function and pleasure in adverse ways, although they are likely to be experienced positively as the patient's body becomes more aligned with their gender, potentially opening new avenues for sexual pleasure and satisfaction (Hess et al., 2018; Holmberg et al., 2018; Kerckhof et al., 2019).

There are numerous examples of this in the extant literature:

- Surgery may result in a decrease, a total loss, or a possible increase in erogenous stimulation and/or experienced sensation compared with the patient's presurgery anatomy (Garcia, 2018; Sigurjónsson et al., 2017).
- A particular surgical option may be associated with specific limitations to sexual function that may manifest immediately, in the future, or at both timepoints, and which patients should consider before finalizing their choice when considering different surgical options (Frey et al., 2016; Garcia, 2018; Isaacson et al., 2017).
- Postsurgical complications can adversely affect sexual function by either decreasing the quality of sexual function (e.g., discomfort or pain with sexual activity) or by precluding satisfactory intercourse (Kerckhof et al., 2019; Schardein et al., 2019).

In general, satisfaction with any medical treatment is heavily influenced by the patient's expectations (Padilla et al., 2019). Furthermore, when patients have unrealistic expectations before treatment, they are much more likely to be dissatisfied with the outcome, their care, and with their HCP (Padilla et al., 2019). Therefore, it is important to both provide patients with adequate information about their treatment options and to understand and consider what is important to the patient with regard to outcomes (Garcia, 2021). Finally, it is important the HCP ensure patients understand the potential adverse effects of a treatment on their sexual function and pleasure so that a well-informed decision can be made. This is relevant for both meeting the standard of informed consent (i.e.,

discussion and understanding) and for providing an opportunity to offer further clarification to patients and, if desired, to their partners (Glaser et al., 2020).

### Statement 17.6

**We recommend health care professionals who provide care to transgender and gender diverse people counsel adolescents and adults regarding prevention of sexually transmitted infections.**

The WHO (2015) recommends HCPs implement brief sexuality-related communication in primary care for all adolescents and adults. Therefore, TGD persons who are sexually active or considering sexual activity may benefit from sexuality-related communication or counseling for the purpose of HIV/STI prevention. These conversations are particularly important as TGD persons are disproportionately impacted by human immunodeficiency virus (HIV) and other sexually transmitted infections (STIs) relative to cisgender persons (Baral et al., 2013; Becasen et al., 2018; Poteat et al., 2016). However, few data are available for non-HIV STIs, such as chlamydia, gonorrhea, syphilis, viral hepatitis, and herpes simplex virus (Tomson et al., 2021). The United Nations Joint Programme on HIV/AIDS estimates transgender women are 12 times more likely than other adults to be living with HIV (UNAIDS, 2019). A meta-analysis estimated a pooled global HIV prevalence of 19% among transgender women who have sex with men (Baral et al., 2013). HIV/STI risk is concentrated among TGD subgroups at the confluence of multiple biological, psychological, interpersonal, and structural vulnerabilities. In particular, transfeminine persons who have sex with cisgender men, belong to minoritized racial/ethnic groups, live in poverty, and engage in survival sex work are at elevated HIV/STI risk (Becasen et al., 2018; Poteat et al., 2015; Poteat et al., 2016). Less is known about HIV/STI risk among transgender men or gender diverse persons AFAB. Small studies in high-income countries indicate a laboratory-confirmed HIV prevalence of 0-4% among transmasculine people (Becasen et al., 2018; Reisner & Murchison, 2016). Almost no research has been conducted with transmasculine people who have sex with cisgender men in high-HIV-prevalence countries. Despite limited epidemiologic data, transmasculine persons who have sex with cisgender men frequently report HIV/STI risk related to receptive vaginal and/or anal sex (Golub et al., 2019; Reisner et al., 2019; Scheim et al., 2017) and may be more susceptible to HIV acquisition from vaginal intercourse than (pre-menopausal) cisgender women due to hormone-related vaginal atrophy.

HCPs will need to supplement general guidelines by developing the knowledge and skills needed for discussing sexual health issues with TGD people, such as the use of gender-affirming language (see Statement 17.1 in this chapter). It is critical HCPs avoid assumptions about HIV/STI risk based solely on a patient's gender identity or anatomy. For example, many transgender people are not sexually active, and TGD persons may use prosthetics or toys for sex. To provide appropriate prevention counseling, HCPs should inquire about the specific sexual activities TGD people engage in, and the body parts (or prosthetics) involved in those activities (ACON, 2022). Well-prepared HCPs (including, but not limited to mental health providers) may also engage in in-depth counseling with their patients to address the underlying drivers of HIV/STI risk (see Statement 17.3 in this chapter).

In all cases, HCPs should be sensitive to the collective and individual histories of TGD people (e.g., stereotypes and stigma about trans sexualities and gender dysphoria) and should explain to patients the reasons for sexuality-related inquiries and the voluntary nature of such inquiries. In discussing HIV/STI prevention, HCPs should refer to the full range of prevention options including barrier methods, post-exposure prophylaxis, pre-exposure prophylaxis, and HIV treatment to prevent onwards transmission (WHO, 2021). Trans-specific considerations for pre-exposure prophylaxis are addressed in Statement 17.8.

### Statement 17.7

**We recommend health care professionals who provide care to transgender and gender diverse people follow local and World Health Organization guidelines for human immunodeficiency virus/sexual transmitted infections (HIV/STIs) screening, prevention, and treatment.**

Like cisgender patients, TGD adolescents and adults should be offered screening for HIV/STIs in accordance with existing guidelines and based on their individual risk of HIV/STI acquisition, considering anatomy and behavior rather than gender identity alone. Where local or national guidelines are unavailable, WHO (2019a) offers global recommendations; more frequent screening is recommended for transgender people who have sex with cisgender men as a key population affected by HIV.

Gender-affirming genital surgeries and surgical techniques have implications for STI risks and screening needs, as outlined in recent guidelines from the US Centers for Disease Control (Workowski et al., 2021). For instance, transfeminine persons who have had penile inversion vaginoplasty using only penile and scrotal skin to line the vaginal canal are likely at lower risk of urogenital Chlamydia trachomatis *(C. trachomatis)* and Neisseria gonorrhoeae *(N. gonorrhoeae)*, but newer surgical techniques that employ buccal or urethral mucosa or peritoneum flaps could in theory increase susceptibility to bacterial STIs relative to the use of penile/scrotal skin alone (Van Gerwen et al., 2021). Routine STI screening of the neovagina (if exposed) is recommended for all transfeminine persons who have had vaginoplasty (Workowski et al., 2021). For transmasculine persons who have had metoidioplasty with urethral lengthening, but not vaginectomy, testing for bacterial urogenital STIs should include a cervical swab because infections may not be detected in urine (Workowski et al., 2021).

Further, it is important for HCPs to offer testing at multiple anatomical sites as STIs in transgender patients are often extragenital (Hiransuthikul et al., 2019; Pitasi et al., 2019). Consistent with WHO (2020) recommendations, self-collection of samples for STI testing should be offered as an option, particularly if patients are uncomfortable or unwilling to undergo provider-collected sampling due to gender dysphoria, trauma histories, or both. Where relevant, integration of HIV/STI testing with regular serology used to monitor hormone therapy may better facilitate access to care (Reisner, Radix et al., 2016; Scheim & Travers, 2017).

## Statement 17.8

**We recommend health care professionals who provide care to transgender and gender diverse people address concerns about potential interactions between antiretroviral medications and hormones.**

For TGD adolescents and adults at substantial risk of HIV infection (generally defined as an ongoing serodiscordant relationship or condomless sex outside of a mutually monogamous relationship with a known HIV-negative partner; WHO, 2017), pre-exposure prophylaxis (PrEP) is an important HIV prevention option (Golub et al., 2019; Sevelius et al., 2016; WHO, 2021). To encourage uptake of PrEP, in 2021 the US Centers for Disease Control recommended all sexually active adolescents and adults be informed about PrEP and offered it if requested (CDC, 2021). For treatment among people living with HIV, transgender-specific guidelines are available in some settings (e.g., Panel on Antiretroviral Guidelines for Adults and Adolescents, 2019).

For both HIV prevention and treatment, there are antiretroviral dosing and administration considerations specific to TGD persons. For oral PrEP, only daily dosing is currently recommended for TGD persons as studies demonstrating the effectiveness of event-driven PrEP with emtricitabine/tenofovir disoproxil fumarate (TDF) have been limited to cisgender men (WHO, 2019c). In addition, while emtricitabine/tenofovir alafenamide (TAF) is a new oral PrEP option, as of early 2022 it is not recommended for people at risk of HIV acquisition through receptive vaginal sex due to a lack of evidence (CDC, 2021). Finally, long-acting injectable formulations of both PrEP and HIV treatment are increasingly available (e.g., cabotegravir for PrEP), and while they are recommended for all patients who might benefit from injectable options, indicated injection sites (i.e., the gluteal muscle) may be unsuitable for individuals who have used soft tissue fillers (Rael et al., 2020).

There is little evidence supporting the occurrence of drug-drug interactions between gender-affirming hormones and PrEP medications. A few small studies, primarily relying on self-reported PrEP use, have shown reduced PrEP drug concentrations in transgender women undergoing hormone therapy, although

Case: 2:24-cv-00072-DCR-CJS   Doc #: 132-2   Filed: 08/16/24   Page: 839 of 1019 -
Page ID#: 3744

concentrations remained in the protective range (Yager & Anderson, 2020). A subsequent drug-drug interaction study using directly observed PrEP therapy failed to detect an impact of hormone therapy on PrEP drug concentrations in transgender women and found transgender women and men taking hormone therapy achieved high levels of protection against HIV infection (Grant et al., 2020). Most importantly, for many TGD people, no impact of PrEP on hormone concentrations has been detected. With regard to HIV treatment, specific antiretroviral medications may impact hormone concentrations; however, these can be managed by selecting alternative agents, monitoring and adjusting hormone dosing, or both (Cirrincione et al., 2020) as detailed in guidelines from the US Department of Health and Human Services (Panel on Antiretroviral Guidelines for Adults and Adolescents, 2019). Nevertheless, concerns about drug-drug interactions, particularly interactions that may limit hormone concentrations, represent a barrier to the implementation and adherence to antiretroviral therapy for HIV prevention or treatment (Radix et al., 2020; Sevelius et al., 2016). Therefore, it is advisable for HCPs to proactively address such concerns with those who are candidates for PrEP or HIV treatment. Integration of PrEP or HIV treatment with hormone therapy may further reduce barriers to implementation and adherence (Reisner, Radix et al., 2016). Integration may be achieved through colocation or through coordination with an HIV specialist if the primary care provider does not have the necessary expertise. Some TGD persons may benefit from standalone PrEP or sexual health services that provide greater privacy and flexibility, and thus differentiated service delivery models are needed (Wilson et al., 2021).

## CHAPTER 18 Mental Health

This chapter is intended to provide guidance to health care professionals (HCPs) and mental health professionals (MHPs) who offer mental health care to transgender and gender diverse (TGD) adults. It is not meant to be a substitute for chapters on the assessment or evaluation of people for hormonal or surgical interventions. Many TGD people will not require therapy or other forms of mental health care as part of their transition, while others may benefit from the support of mental health providers and systems (Dhejne et al., 2016).

Some studies have shown a higher prevalence of depression (Witcomb et al., 2018), anxiety (Bouman et al., 2017), and suicidality (Arcelus et al., 2016; Bränström & Pachankis, 2022; Davey et al., 2016; Dhejne, 2011; Herman et al., 2019) among TGD people (Jones et al., 2019; Thorne, Witcomb et al., 2019) than in the general population, particularly in those requiring medically necessary gender-affirming medical treatment (see medically necessary statement in Chapter 2—Global Applicability, Statement 2.1). However, transgender identity is not a mental illness, and these elevated rates have been linked to complex trauma, societal stigma, violence, and discrimination (Nuttbrock et al., 2014; Peterson et al., 2021). In addition, psychiatric symptoms lessen with appropriate gender-affirming medical and surgical care (Aldridge et al., 2020; Almazan and Keuroghlian; 2021; Bauer et al., 2015; Grannis et al., 2021) and with interventions that lessen discrimination and minority stress (Bauer et al., 2015; Heylens, Verroken et al., 2014; McDowell et al., 2020).

Mental health treatment needs to be provided by staff and implemented through the use of systems that respect patient autonomy and recognize gender diversity. MHPs working with transgender people should use active listening as a method to encourage exploration in individuals who are uncertain about their gender identity. Rather than impose their own narratives or preconceptions, MHPs should assist their clients in determining their own paths. While many transgender people require medical or surgical interventions or seek mental health care, others do not (Margulies et al., 2021). Therefore, findings from research involving clinical populations should not be extrapolated to the entire transgender population.

Addressing mental illness and substance use disorders is important but should not be a barrier to transition-related care. Rather, these interventions to address mental health and substance use disorders can facilitate successful outcomes from

---

### Statements of Recommendations

18.1- We recommend mental health professionals address mental health symptoms that interfere with a person's capacity to consent to gender-affirming treatment before gender-affirming treatment is initiated.

18.2- We recommend mental health professionals offer care and support to transgender and gender diverse people to address mental health symptoms that interfere with a person's capacity to participate in essential perioperative care before gender-affirmation surgery.

18.3- We recommend when significant mental health symptoms or substance abuse exists, mental health professionals assess the potential negative impact that mental health symptoms may have on outcomes based on the nature of the specific gender-affirming surgical procedure.

18.4- We recommend health care professionals assess the need for psychosocial and practical support of transgender and gender diverse people in the perioperative period surrounding gender- affirmation surgery.

18.5- We recommend health care professionals counsel and assist transgender and gender diverse people in becoming abstinent from tobacco/nicotine prior to gender-affirmation surgery.

18.6- We recommend health care professionals maintain existing hormone treatment if a transgender and gender diverse individual requires admission to a psychiatric or medical inpatient unit, unless contraindicated.

18.7- We recommend health care professionals ensure if transgender and gender diverse people need in-patient or residential mental health, substance abuse or medical care, all staff use the correct name and pronouns (as provided by the patient), as well as provide access to bathroom and sleeping arrangements that are aligned with the person's gender identity.

18.8- We recommend mental health professionals encourage, support, and empower transgender and gender diverse people to develop and maintain social support systems, including peers, friends, and families.

18.9- We recommend health care professionals should not make it mandatory for transgender and gender diverse people to undergo psychotherapy prior to the initiation of gender-affirming treatment, while acknowledging psychotherapy may be helpful for some transgender and gender diverse people.

18.10- We recommend "reparative" and "conversion" therapy aimed at trying to change a person's gender identity and lived gender expression to become more congruent with the sex assigned at birth should not be offered.

transition-related care, which can improve quality of life (Nobili et al., 2018).

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

## Statement 18.1

**We recommend mental health professionals address mental health symptoms that interfere with a person's capacity to consent to gender-affirming treatment before gender-affirming treatment is initiated.**

Because patients generally are assumed to be capable of providing consent for care, whether the presence of cognitive impairment, psychosis, or other mental illness impairs the ability to give informed consent is subject to individual examination (Applebaum, 2007). Informed consent is central to the provision of health care. The health care provider must educate the patient about the risks, benefits, and alternatives to any care that is offered so the patient can make an informed, voluntary choice (Berg et al., 2001). Both the primary care provider or endocrinologist prescribing hormones and the surgeon performing surgery must obtain informed consent. Similarly, MHPs obtain informed consent for mental health treatment and may consult on a patient's capacity to give informed consent when this is in question. Psychiatric illness and substance use disorders, in particular cognitive impairment and psychosis, may impair an individual's ability to understand the risks and benefits of the treatment (Hostiuc et al., 2018). Conversely, a patient may also have significant mental illness, yet still be able to understand the risks and benefits of a particular treatment (Carpenter et al., 2000). Multidisciplinary communication is important in challenging cases, and expert consultation should be utilized as needed (Karasic & Fraser, 2018). For many patients, difficulty understanding the risks and benefits of a particular treatment can be overcome with time and careful explanation. For some patients, treatment of the underlying condition that is interfering with the capacity to

give informed consent—for example treating an underlying psychosis—will allow the patient to gain the capacity to consent to the required treatment. However, mental health symptoms such as anxiety or depressive symptoms that do not affect the capacity to give consent should not be a barrier for gender-affirming medical treatment, particularly as this treatment has been found to reduce mental health symptomatology (Aldridge et al., 2020).

## Statement 18.2

**We recommend mental health professionals offer care and support to transgender and gender diverse people to address mental health symptoms that interfere with a person's capacity to participate in essential perioperative care before gender-affirmation surgery.**

The inability to adequately participate in perioperative care due to mental illness or substance use should not be viewed as an obstacle to needed transition care, but should be seen as an indication mental health care and social support be provided (Karasic, 2020). Mental illness and substance use disorders may impair the ability of the patient to participate in perioperative care (Barnhill, 2014). Visits to health care providers, wound care, and other aftercare procedures (e.g., dilation after vaginoplasty) may be necessary for a good outcome. A patient with a substance use disorder might have difficulty keeping necessary appointments to the primary care provider and the surgeon. A patient with psychosis or severe depression might neglect their wound or not be attentive to infection or signs of dehiscence (Lee, Marsh et al., 2016). Active mental illness is associated with a greater need for further acute medical and surgical care after the initial surgery (Wimalawansa et al., 2014).

In these cases, treatment of the mental illness or substance use disorder may assist in achieving successful outcomes. Arranging more support for the patient from family and friends or a home health care worker may help the patient participate sufficiently in perioperative care for surgery to proceed. The benefits of mental health treatments that may delay surgery should be weighed against the risks of delaying surgery and should



include an assessment of the impact on the patients' mental health delays may cause in addressing gender dysphoria (Byne et al., 2018).

Statement 18.3

**We recommend when significant mental health symptoms or substance abuse exists, mental health professionals assess the potential negative impact mental health symptoms may have on outcomes based on the nature of the specific gender-affirming surgical procedure.**

Gender-affirming surgical procedures vary in terms of their impact on the patient. Some procedures require a greater ability to follow preoperative planning as well as engage in peri- and postoperative care to achieve the best outcomes (Tollinche et al., 2018). Mental health symptoms can influence a patient's ability to participate in the planning and perioperative care necessary for any surgical procedure (Paredes et al., 2020). The mental health assessment can provide an opportunity to develop strategies to address the potential negative impact mental health symptoms may have on outcomes and to plan support for the patient's ability to participate in the planning and care. Gender-affirming surgical procedures have been shown to relieve symptoms of gender dysphoria and improve mental health (Owen-Smith et al., 2018; van de Grift, Elaut et al., 2017). These benefits are weighed against the risks of each procedure when the patient and provider are deciding whether to proceed with the treatment. HCPs can assist TGD people in reviewing preplanning and perioperative care instructions for each surgical procedure (Karasic, 2020). Provider and patient can collaboratively determine the necessary support or resources needed to assist with keeping appointments for perioperative care, obtaining necessary supplies, addressing financial issues, and handling other preoperative coordination and planning. In addition, issues surrounding appearance-related and functional expectations, including the impact of these various factors on gender dysphoria, can be explored.

Statement 18.4

**We recommend health care professionals assess the need for psychosocial and practical support of transgender and gender diverse people in the perioperative period surrounding gender-affirmation surgery.**

Regardless of specialty, all HCPs have a responsibility to support patients in accessing medically necessary care. When HCPs are working with TGD people as they prepare for gender-affirming surgical procedures, they should assess the levels of psychosocial and practical support required (Deutsch, 2016b). Assessment is the first step in recognizing where additional support may be needed and enhancing the ability to work collaboratively with the individual to successfully navigate the pre-, peri-, and postsurgical periods (Tollinche et al., 2018). In the perioperative period, it is important to help patients optimize functioning, secure stable housing, when possible, build social and family supports by assessing their unique situation, plan ways of responding to medical complications, navigate the potential impact on work/income, and overcome additional hurdles some patients may encounter, such as coping with electrolysis and tobacco cessation (Berli et al., 2017). In a complex medical system, not all patients will be able to independently navigate the procedures required to obtain care, and HCPs and peer navigators can support patients through this process (Deutsch, 2016a).

Statement 18.5

**We recommend health care professionals counsel and assist transgender and gender diverse people in becoming abstinent from tobacco/nicotine prior to gender-affirmation surgery.**

Transgender populations have higher rates of tobacco and nicotine use (Kidd et al., 2018). However, many are unaware of the well-documented smoking-associated health risks (Bryant et al., 2014). Tobacco consumption increases the risk of developing health problems (e.g., thrombosis) in individuals receiving gender-affirming hormone treatment, particularly estrogens (Chipkin & Kim, 2017).

Tobacco use has been associated with worse outcomes in plastic surgery, including overall complications, tissue necrosis, and the need for surgical revision (Coon et al., 2013). Smoking also increases the risk for postoperative infection (Kaoutzanis et al., 2019). Tobacco use has been shown to affect

the healing process following any surgery, including gender-related surgeries (e.g., chest reconstructive surgery, genital surgery) (Pluvy, Garrido et al., 2015). Tobacco users have a higher risk of cutaneous necrosis, delayed wound healing, and scarring disorders due to hypoxia and tissue ischemia (Pluvy, Panouilleres et al., 2015). In view of this, surgeons recommend stopping the use of tobacco/nicotine prior to gender-affirmation surgery and abstaining from smoking up to several weeks postoperatively until the wound has completely healed (Matei & Danino, 2015). Despite the risks, cessation may be difficult. Tobacco smoking and nicotine use is addictive and is also used as a coping mechanism (Matei et al., 2015). HCPs who see patients longitudinally before surgery, including mental health and primary care providers, should address the use of tobacco/nicotine with individuals in their care, and either assist TGD people in accessing smoking cessation programs or provide treatment directly (e.g., varenicline or bupropion).

### Statement 18.6

**We recommend health care professionals maintain existing hormone treatment if a transgender and gender diverse individual requires admission to a psychiatric or medical inpatient unit, unless contraindicated.**

TGD people entering inpatient psychiatric, substance use treatment, or medical units should be maintained on their current hormone regimens. There is an absence of evidence supporting routine cessation of hormones prior to medical or psychiatric admissions. Rarely, a newly admitted patient may be diagnosed with a medical complication necessitating suspension of hormone treatment, for example an acute venous thromboembolism (Deutsch, 2016a). There is no strong evidence for routinely stopping hormone treatment prior to surgery, and the risks and benefits for each individual patient should be assessed before doing so (Boskey et al., 2018).

Hormone treatment has been shown to improve quality of life and to decrease depression and anxiety (Aldridge et al., 2020; Nguyen et al., 2018; Nobili et al., 2018; Owen-Smith et al., 2018, Rowniak et al., 2019). Access to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt (Bauer

et al., 2015). Halting a patient's regularly prescribed hormones denies the patient of these salutary effects, and therefore may be counter to the goals of hospitalization.

Some providers may be unaware of the low risk of harm and the high potential benefit of continuing transition-related treatment in the inpatient setting. A study of US and Canadian medical schools revealed that students received an average of 5 hours of LGBT-related course content over their entire four years of education (Obedin-Maliver et al., 2011). According to a survey of Emergency Medicine physicians, who are often responsible for making quick decisions about medications as patients are being admitted, while 88% reported caring for transgender patients, only 17.5% had received any formal training about this population (Chisolm-Straker et al., 2018). As education about transgender topics increases, more providers will become aware of the importance of maintaining transgender patients on their hormone regimens during hospitalization.

### Statement 18.7

**We recommend health care professionals ensure if transgender and gender diverse people need inpatient or residential mental health, substance abuse, or medical care, all staff use the correct name and pronouns (as provided by the patient), as well as provide access to bathroom and sleeping arrangements that are aligned with the person's gender identity.**

Many TGD patients encounter discrimination in a wide range of health settings, including hospitals, mental health treatment settings, and drug treatment programs (Grant et al., 2011). When health systems fail to accommodate TGD individuals, they reinforce the longstanding societal exclusion many have experienced (Karasic, 2016). Experiences of discrimination in health settings lead to avoidance of needed health care due to anticipated discrimination (Kcomt et al., 2020).

The experience of discrimination experienced by TGD individuals is predictive of suicidal ideation (Rood et al., 2015; Williams et al., 2021). Gender minority stress associated with rejection and nonaffirmation has also been associated with suicidality (Testa et al., 2017). Denial of access to gender appropriate bathrooms has been

associated with increased suicidality (Seelman, 2016). However, the use of chosen names for TGD people has been associated with lower depression and suicidality (Russell et al., 2018). Structural as well as internalized transphobia must be addressed to reduce the incidence of suicide attempts in TGD people (Brumer et al., 2015). To successfully provide care, health settings must minimize the harm done to patients because of transphobia by respecting and accommodating TGD identities.

## Statement 18.8

**We recommend mental health professionals encourage, support, and empower transgender and gender diverse people to develop and maintain social support systems, including peers, friends, and families.**

While minority stress and the direct effects of discriminatory societal discrimination can be harmful to the mental health of TGD people, strong social support can help lessen this harm (Trujillo et al., 2017). TGD children often internalize rejection from family and peers as well as the transphobia that surrounds them (Amodeo et al., 2015). Furthermore, exposure to transphobic abuse may be impactful across a person's lifespan and may be particularly acute during the adolescent years (Nuttbrock et al., 2010).

The development of affirming social support is protective of mental health. Social support can act as a buffer against the adverse mental health consequences of violence, stigma, and discrimination (Bockting et al., 2013), can assist in navigating health systems (Jackson Levin et al., 2020), and can contribute to psychological resilience in TGD people (Bariola et al., 2015; Başar and Öz, 2016). Diverse sources of social support, especially LGBTQ + peers and family, have been found to be associated with better mental health outcomes, well-being, and quality of life (Bariola et al., 2015; Başar et al., 2016; Kuper, Adams et al., 2018; Puckett et al., 2019). Social support has been proposed to facilitate the development of coping mechanisms and lead to positive emotional experiences throughout the transition process (Budge et al., 2013).

HCPs can support patients in developing social support systems that allow them to be recognized and accepted as their authentic identity and help them cope with symptoms of gender dysphoria. Interpersonal problems and lack of social support have been associated with a greater incidence of mental health difficulties in TGD people (Bouman, Davey et al., 2016; Davey et al., 2015) and have been shown to be an outcome predictor of gender-affirming medical treatment (Aldridge et al., 2020). Therefore, HCPs should encourage, support, and empower TGD people to develop and maintain social support systems. These experiences can foster the development of interpersonal skills and help with coping with societal discrimination, potentially reducing suicidality and improving mental health (Pflum et al., 2015).

## Statement 18.9

**We recommend health care professionals should not make it mandatory for transgender and gender diverse people to undergo psychotherapy prior to the initiation of gender-affirming treatment, while acknowledging psychotherapy may be helpful for some transgender and gender diverse people.**

Psychotherapy has a long history of being used in clinical work with TGD people (Fraser, 2009b). The aims, requirements, methods and principles of psychotherapy have been an evolving component of the Standards of Care from the initial versions (Fraser, 2009a). At present, psychotherapeutic assistance and counseling with adult TGD people may be sought to address common psychological concerns related to coping with gender dysphoria and may also help some individuals with the coming-out process (Hunt, 2014). Psychological interventions, including psychotherapy, offer effective tools and provide context for the individual, such as exploring gender identity and its expression, enhancing self-acceptance and hope, and improving resilience in hostile and disabling environments (Matsuno and Israel, 2018). Psychotherapy is an established alternative therapeutic approach for addressing mental health symptoms that may be revealed during the initial assessment or later during the follow-up for gender-affirming medical interventions. Recent research shows, although mental health symptoms are reduced following gender-affirming medical treatment, levels of anxiety remain high (Aldridge et al., 2020) suggesting psychological therapy can play a role in helping

individuals suffering from anxiety symptoms following gender-affirming treatment.

In recent years, the uses and potential benefits of specific psychotherapeutic modalities have been reported (Austin et al., 2017; Budge, 2013; Budge et al., 2021; Embaye, 2006; Fraser, 2009b; Heck et al., 2015). Specific models of psychotherapy have been proposed for adult transgender and nonbinary individuals (Matsuno & Israel, 2018). However, more empiric data is needed on the comparative benefits of different psychotherapeutic models (Catelan et al., 2017). Psychotherapy can be experienced by transgender persons as a fearful as well as a beneficial experience (Applegarth & Nuttall, 2016) and presents challenges to the therapist and to alliance formation when it is associated with gatekeeping for medical interventions (Budge, 2015).

Experience suggests many transgender and nonbinary individuals decide to undergo gender-affirming medical treatment with little or no use of psychotherapy (Spanos et al., 2021). Although various modalities of psychotherapy may be beneficial for different reasons before, during, and after gender-affirming medical treatments and varying rates of desire for psychotherapy have been reported during different stages of transition (Mayer et al., 2019), a requirement for psychotherapy for initiating gender-affirming medical procedures has not been shown to be beneficial and may be a harmful barrier to care for those who do not need this type of treatment or who lack access to it.

### Statement 18.10
**We recommend "reparative" and "conversion" therapy aimed at trying to change a person's gender identity and lived gender expression to become more congruent with the sex assigned at birth should not be offered.**

The use of "reparative" or "conversion" therapy or gender identity "change" efforts is opposed by many major medical and mental health organizations across the world, including the World Psychiatric Association, Pan American Health Organization, American Psychiatric and American Psychological Associations, Royal College of Psychiatrists, and British Psychological Society. Many states in the US have instituted bans on practicing conversion therapy with minors. Gender identity change efforts refers to interventions by MHPs or others that attempt to change gender identity or expression to be more in line with those typically associated with the person's sex assigned at birth (American Psychological Association, 2021).

Advocates of "conversion therapy" have suggested it could potentially allow a person to fit better into their social world. They also point out some clients specifically ask for help changing their gender identities or expressions and therapists should be allowed to help clients achieve their goals. However, "conversion therapy" has not been shown to be effective (APA, 2009; Przeworski et al., 2020). In addition, there are numerous potential harms. In retrospective studies, a history of having undergone conversion therapy is linked to increased levels of depression, substance abuse, suicidal thoughts, and suicide attempts, as well as lower educational attainment and less weekly income (Ryan et al., 2020; Salway et al., 2020; Turban, Beckwith et al., 2020). In 2021, the American Psychological Association resolutions states that "scientific evidence and clinical experience indicate that GICEs [gender identity change efforts] put individuals at significant risk of harm" (APA, 2021).

While there are barriers to ending gender identity "change" efforts, education about the lack of benefit and the potential harm of these practices may lead to fewer providers offering "conversion therapy" and fewer individuals and families choosing this option.

## Acknowledgements

Karen A. Robinson, Professor of Medicine at Johns Hopkins University and Director of the School's Evidence-based Practice Center and her staff for conducting all systematic reviews and their assistance in the development of the recommendations that underpin the SOC-8. *Ethical considerations*: Carol Bayley, Simona Giordano, and Sharon Sytsma. *Legal perspectives*: Jennifer Levi and Phil Duran. *Reference checkers*: Taymy Caso, Oscar Dimant, Zil Goldstein, Ali Harris, Nat Thorne. *Editors*: Margueritte White, Jun Xia. *Administrative support*: Blaine Vella, Taylor O'Sullivan and Jamie Hicks. Finally, we like to thank all participants who provided comments during the public comment period and GATE (Global Action for Trans Equality), the Asia Pacific Transgender Network Foundation (APTN), The International Lesbian, Gay, Bisexual, Trans and Intersex Association (ILGA), and Transgender Europe (TGEU) for their helpful and constructive feedback on an earlier version of the SOC-8.

## Conflict of Interest

Conflict of interests were reviewed as part of the selection process for committee members and at the end of the process before publication. No conflicts of interest were deemed significant or consequential.

## Ethical Approval

This manuscript does not contain any studies with human participants performed by any of the authors.

## Funding

This project was partly funded from a grant of the Tawani Foundation. Most of the expenses went to pay the Evidence-based Practice Center of Johns Hopkins University for their work. Editors and reference checkers were paid nominal fees. Committee members were not paid for their contributions. Some travel expenses for committee chairs were covered by the World Professional Association for Transgender Health (WPATH). WPATH staff and other internal expenses were covered by the Association's budget.

# References

Abern, L., & Maguire, K. (2018). Contraception knowledge in transgender individuals: Are we doing enough? [9F]. *Obstetrics & Gynecology*, *131*, 65S. https://doi.org/10.1097/01.AOG.0000533319.47797.7e.

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results. *International Journal of Pediatric Endocrinology*, *2020*(1). https://doi.org/10.1186/s13633-020-00078-2.

ACON. (2022). *Sexual Health–Parts and Practices.* https://www.transhub.org.au/clinicians/sexual-health

Adams, N., Pearce, R., Veale, J., Radix, A., Castro, D., Sarkar, A., & Thom, K. C. (2017). Guidance and ethical considerations for undertaking transgender health research and institutional review boards adjudicating this research. *Transgender Health*, *2*(1), 165–175. https://doi.org/10.1089/trgh.2017.0012.

Adeleye, A. J., Cedars, M. I., Smith, J., & Mok-Lin, E. (2019). Ovarian stimulation for fertility preservation or family building in a cohort of transgender men. *Journal of Assisted Reproduction and Genetics*, *36*(10), 2155–2161. https://doi.org/10.1007/s10815-019-01558-y.

Adeleye, A. J., Reid, G., Kao, C. N., Mok-Lin, E., & Smith, J. F. (2018). Semen parameters among transgender women with a history of hormonal treatment. *Urology*, *124*, 136–141. https://doi.org/10.1016/j.urology.2018.10.005.

Adelson, S. L., & American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). (2012). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *Journal of the American Academy of Child & Adolescent Psychiatry*, *51*(9), 957–974. https://doi.org/10.1016/j.jaac.2012.07.004.

Agarwal, C. A., Scheefer, M. F., Wright, L. N., Walzer, N. K., & Rivera, A. (2018). Quality of life improvement after chest wall masculinization in female-to-male transgender patients: A prospective study using the BREAST-Q and Body Uneasiness Test. *Journal of Plastic Reconstructive & Aesthetic Surgery*, *71*(5), 651–657. https://doi.org/10.1016/j.bjps.2018.01.003.

Agenor, M., Peitzmeier, S. M., Bernstein, I. M., McDowell, M., Alizaga, N. M., Reisner, S. L., Pardee, D. J., & Potter, J. (2016). Perceptions of cervical cancer risk and screening among transmasculine individuals: Patient and provider perspectives. *Culture, Health and Sexuality*, *18*(10), 1192–1206. https://doi.org/10.1080/13691058.2016.1177203.

Aguayo-Romero, R. A., Reisen, C. A., Zea, M. C., Bianchi, F. T., & Poppen, P. J. (2015). Gender affirmation and body modification among transgender persons in Colombia. *International Journal of Transgenderism*, *16*(2), 103–115. https://doi.org/10.1080/15532739.2015.1075930.

Ahalt, C., Haney, C., Rios, S., Fox, M. P., Farabee, D., & Williams, B. (2017). Reducing the use and impact of solitary confinement in corrections. *International Journal of Prisoner health*, *13*(1), 41–48. https://doi.org/10.1108/IJPH-08-2016-0040.

Ahmad, S., & Leinung, M. (2017). The response of the menstrual cycle to initiation of hormonal therapy in transgender men. *Transgender Health*, *2*(1), 176–179. https://doi.org/10.1089/trgh.2017.0023.

Åhs, J. W., Dhejne, C., Magnusson, C., Dal, H., Lundin, A., Arver, S., Dalman, C., & Kosidou, K. (2018). Proportion of adults in the general population of Stockholm County who want gender-affirming medical treatment. *PLoS One*, *13*(10), e0204606. https://doi.org/10.1371/journal.pone.0204606.

Ainsworth, T. A., & Spiegel, J. H. (2010). Quality of life of individuals with and without facial feminization surgery or gender reassignment surgery. *Quality of Life Research*, *19*(7), 1019–1024. https://doi.org/10.1007/s11136-010-9668-7.

Aires, M. M., de Vasconcelos, D., & Moraes, B. T. D. (2020). Chondrolaryngoplasty in transgender women: Prospective analysis of voice and aesthetic satisfaction. *International Journal of Transgender Health*, *22*(4), 394–402. https://doi.org/10.1080/26895269.2020.1848690.

Aitken, M., Steensma, T. D., Blanchard, R., VanderLaan, D. P., Wood, H., Fuentes, A., Spegg, C., Wasserman, L., Ames, M., Fitzsimmons, C. L., Leef, J. H., Lishak, V., Reim, E., Takagi, A., Vinik, J., Wreford, J., Cohen-Kettenis, P. T., de Vries, A. L., Kreukels, B. P., & Zucker, K. J. (2015). Evidence for an altered sex ratio in clinic-referred adolescents with gender dysphoria. *The Journal of Sexual Medicine*, *12*(3), 756–763. https://doi.org/10.1111/jsm.12817.

Akgul, S., Bonny, A. E., Ford, N., Holland-Hall, C., & Chelvakumar, G. (2019). Experiences of gender minority youth with the intrauterine system. *The Journal of Adolescent Health*, *65*(1), 32–38. https://doi.org/10.1016/j.jadohealth.2018.11.010.

Alderson, P. (2007). Competent children? Minors' consent to health care treatment and research. *Social Science & Medicine*, *65*(11), 2272–2283. https://doi.org/10.1016/j.socscimed.2007.08.005.

Aldridge, Z., Patel, S., Guo, B., Nixon, E., Bouman, W. P., Witcomb, G., & Arcelus, J. (2020). Long term effect of gender affirming hormone treatment on depression and anxiety symptoms in transgender people: A prospective cohort study, *Andrology*, 1–9. https://doi.org/10.1111/andr.12884.

Aldridge, Z., Thorne, N., Marshall, E., English, C., Yip, A. K. T., Nixon, E., Witcomb, G. L., Bouman, W. P., & Arcelus, J. (2022). Understanding factors that affect well-being in trans people "later" in transition: A qualitative study. *Quality of Life Research*, https://doi.org/10.1007/s11136-022-03134-x.

Alexander, T. (1997). *The medical management of intersexed children: An analogue for childhood sexual abuse.* Intersex Society of North America. https://isna.org/articles/analog/

Alford, A. V., Theisen, K. M., Kim, N., Bodie, J. A., & Pariser, J. J. (2020). Successful ejaculatory sperm


cryopreservation after cessation of long-term estrogen therapy in a transgender female. *Urology*, 136, e48–e50. https://doi.org/10.1016/j.urology.2019.08.021.

Allen, L. M., Hay, M., & Palermo, C. (2021). Evaluation in health professions education—Is measuring outcomes enough? *Medical Education*, 56(1), 127–136. https://doi.org/10.1111/medu.14654.

Allen, L. R., Watson, L. B., Egan, A. M., & Moser, C. N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, 7(3), 302–311. https://doi.org/10.1037/cpp0000288.

Almasri, J., Zaiem, F., Rodriguez-Gutierrez, R., Tamhane, S. U., Iqbal, A. M., Prokop, L. J., Speiser, P. W., Baskin, L. S., Bancos, I., & Murad, M. H. (2018). Genital reconstructive surgery in females with congenital adrenal hyperplasia: A systematic review and meta-analysis. *The Journal of Clinical Endocrinology & Metabolism*, 103(11), 4089–4096. https://doi.org/10.1210/jc.2018-01863.

Almazan, A. N., & Keuroghlian, A. S. (2021). Association between gender-affirming surgeries and mental health outcomes. *JAMA Surgery*, 156(7), 611–618. https://doi.org/10.1001/jamasurg.2021.0952.

Almeida, M., Laurent, M. R., Dubois, V., Claessens, F., O'Brien, C. A., Bouillon, R., Vanderschueren, D., & Manolagas, S. C. (2017). Estrogens and androgens in skeletal physiology and pathophysiology. *Physiology Reviews*, 97(1), 135–187. https://doi.org/10.1152/physrev.00033.2015.

Al-Tamimi, M., Pigot, G. L., van der Sluis, W. B., van de Grift, T. C., van Moorselaar, R. J. A., Mullender, M. G., Weigert, R., Buncamper, M. E., Ozer, M., de Haseth, K. B., Djordjevic, M. L., Salgado, C. J., Belanger, M., Suominen, S., Kolehmainen, M., Santucci, R. A., Crane, C. N., Claes, K. E. Y., & Bouman, M. B. (2019). The surgical techniques and outcomes of secondary phalloplasty after metoidioplasty in transgender men: An international, multi-center case series. *The Journal of Sexual Medicine*, 16(11), 1849–1859. https://doi.org/10.1016/j.jsxm.2019.07.027.

Altman, K. (2012). Facial feminization surgery: Current state of the art. *International Journal of Oral and Maxillofacial Surgery*, 41(8), 885–894. https://doi.org/10.1016/j.ijom.2012.04.024.

Alzahrani, T., Nguyen, T., Ryan, A., Dwairy, A., McCaffrey, J., Yunus, R., Forgione, J., Krepp, J., Nagy, C., Mazhari, R., & Reiner, J. (2019). Cardiovascular disease risk factors and myocardial infarction in the transgender population. *Circulation: Cardiovascular Quality and Outcomes*, 12(4), e005597. https://doi.org/10.1161/CIRCOUTCOMES.119.005597.

American Academy of Child and Adolescent Psychiatry (AACAP). Sexual Orientation and Gender Identity Issues Committee. (2018). *Conversion therapy policy statement.* https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx.

American College of Obstetricians and Gynecology. (2021). Health Care for transgender and gender diverse individuals: ACOG Committee Opinion, Number 823. *Obstetrics and Gynecology*, 137, e75. https://doi.org/10.1097/AOG.0000000000004294.

American Medical Association. (2016). *Definitions of "screening" and "medical necessity" H-320.953.* Council on Medical Service. https://policysearch.ama-assn.org/policyfinder/detail/H-320.953

American Medical Association. (2021). *Ethics: Informed consent.* https://www.ama-assn.org/delivering-care/ethics/informed-consent.

American Psychiatric Association. (1980). *Diagnostic and statistical manual of mental disorders* (3rd ed.). American Psychiatric Association

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders* (4th ed., text rev.). American Psychiatric Association

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). American Psychiatric Association. https://doi.org/10.1176/appi.books.9780890425596.

American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). American Psychiatric Association. https://doi.org/10.1176/appi.books.97808904257.

American Psychological Association. (2015). Guidelines for professional practice with transgender and gender non-conforming people. *American Psychologist*, 70(9), 832–864. https://doi.org/10.1037/a0039906.

American Psychological Association. (2021). *APA guidelines for psychological assessment and evaluation.* https://www.apa.org/about/policy/guidelines-psychological-assessment-evaluation.pdf

American Psychological Association. (2021). *APA resolution on gender identity change efforts.* https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf

American Urological Association (AUA) Board of Directors. (2019). *Pediatric decision making and differences of sex development: A Societies for Pediatric Urology and American Urological Association Joint Position Statement—American Urological Association.* (n.d.). https://www.auanet.org/guidelines/guidelines/joint-statement-on-dsd

Amir, H., Yaish, I., Oren, A., Groutz, A., Greenman, Y., & Azem, F. (2020). Fertility preservation rates among transgender women compared with transgender men receiving comprehensive fertility counselling. *Reproductive Biomedicine Online*, 41(3), 546–554. https://doi.org/10.1016/j.rbmo.2020.05.003.

Amnesty International. (2020). *Amnesty International UK and Liberty joint statement on puberty blockers.* https://www.amnesty.org.uk/press-releases/amnesty-international-uk-and-liberty-joint-statement-puberty-blockers

Amodeo, A. L., Vitelli, R., Scandurra, C., Picariello, S., & Valerio, P. (2015). Adult attachment and transgender identity in the Italian context: Clinical implications and suggestions for further research. *International Journal of Transgenderism*, 16(1), 49–61. https://doi.org/10.1080/15532739.2015.1022680.

Anai, T., Miyazaki, F., Tomiyasu, T., Matsuo, T. (2001). Risk of irregular menstrual cycles and low peak bone mass during early adulthood associated with age at menarche. *Pediatrics International*, *43*(5), 483–488. https://doi.org/10.1046/j.1442-200x.2001.01442.x.

Anda, R. F., Butchart, A., Felitti, V. J., & Brown, D. W. (2010). Building a framework for global surveillance of the public health implications of adverse childhood experiences. *American Journal of Preventive Medicine*, *39*(1), 93–98. https://doi.org/10.1016/j.amepre.2010.03.015.

Anderson, J. (2007). Endoscopic laryngeal web formation for pitch elevation. *The Journal of Otolaryngology*, *36*(1), 6–12. https://doi.org/10.2310/7070.2006.0153.

Anderson, J. A. (2014). Pitch elevation in transgendered patients: Anterior glottic web formation assisted by temporary injection augmentation. *Journal of Voice*, *28*(6), 816–821. https://doi.org/10.1016/j.jvoice.2014.05.002.

Anderson, R. M. (2013). Positive sexuality and its impact on overall well-being. *Bundesgesundheitsblatt, Gesundheitsforschung, Gesundheitsschutz*, *56*(2), 208–214. https://doi.org/10.1007/s00103-012-1607-z.

Andrzejewski, J., Pampati, S., Steiner, R. J., Boyce, L., & Johns, M. M. (2020). Perspectives of transgender youth on parental support: Qualitative findings from the resilience and transgender youth study. *Health Education & Behavior*, 109019812096550. https://doi.org/10.1177/1090198120965504.

Angus, L. M., Nolan, B. J., Zajac, J. D., & Cheung, A. S. (2020). A systematic review of antiandrogens and feminization in transgender women. *Clinical Endocrinology*, *94*(5), 743–752. https://doi.org/10.1111/cen.14329.

Ansara, Y. G., Hegarty, P., (2012). Cisgenderism in psychology: Pathologising and misgendering children from 1999 to 2008. *Psychology & Sexuality*, *3*, 137–160. https://doi.org/10.1080/19419899.2011.576696.

Antun, A., Zhang, Q., Bhasin, S., Bradlyn, A., Flanders, W. D., Getahun, D., & Goodman, M. (2020). Longitudinal changes in hematologic parameters among transgender people receiving hormone therapy. *Journal of the Endocrine Society*, *4*(11), 1–11. https://doi.org/10.1210/jendso/bvaa119.

Anzani, A., Lindley, L., Prunas, A., & Galupo, P. (2021). "I Use All the Parts I'm Given": A qualitative investigation of trans masculine and nonbinary individuals' use of body during sex. *International Journal of Sexual Health*, *33*(1), 58–75. https://doi.org/10.1080/19317611.2020.1853300.

Applebaum, P. S. (2007). Assessment of patients' competence to consent to treatment. *New England Journal of Medicine*, *357*(18), 1834–1840. https://doi.org/10.1056/NEJMcp074045.

Applegarth, G., & Nuttall, J. (2016). The lived experience of transgender people of talking therapies. *International Journal of Transgenderism*, *17*(2), 66–72. https://doi.org/10.1080/15532739.2016.1149540.

APTN & UNDP. (2012). *Lost in transition: transgender people, rights and HIV vulnerability in the Asia-Pacific region*. Asia Pacific Transgender Network. https://weareaptn.org/resource/lost-in-transition-transgender-people-rights-and-hiv-vulnerability-in-the-asia-pacific-region/

APTN. (2020a). *Conversion therapy practices*. Asia Pacific Transgender Network. https://weareaptn.org/wp-content/uploads/2021/03/Conversion-Therapy-2020-Indonesia_28Dec.pdf

APTN. (2020b). *Conversion therapy practices: Malaysia*. Asia Pacific Transgender Network. https://weareaptn.org/wp-content/uploads/2021/03/Conversion-Therapy-2020-Malaysia_29Dec.pdf

APTN. (2020c). *Conversion therapy practices: Sri Lanka*. Asia Pacific Transgender Network. https://weareaptn.org/wp-content/uploads/2021/03/Conversion-Therapy-2020-SriLanka_28Dec.pdf

APTN. (2021). *Conversion therapy practices: India*. Asia Pacific Transgender Network. https://weareaptn.org/wp-content/uploads/2021/06/Conversion-Therapy-India_CountrySnapshot_FinalMay2021-2.pdf

APTN. (2022). *Towards transformative healthcare: Asia Pacific trans health and rights module*. Asia-Pacific Transgender Network https://weareaptn.org/resource/towards-transformative-healthcare-asia-pacific-trans-health-and-rights-module/

Arcelus, J., Bouman, W. P., Van Den Noortgate, W., Claes, L., Witcomb, G., & Fernandez-Aranda, F. (2015). Systematic review and meta-analysis of prevalence studies in transsexualism. *European Psychiatry*, *30*(6), 807–815. https://doi.org/10.1016/j.eurpsy.2015.04.005.

Arcelus, J., Claes, L., Witcomb, G. L., Marshall, E., & Bouman, W. P. (2016). Risk factors for non-suicidal self-injury among trans youth. *Journal of Sexual Medicine*, *13*(3), 402–412. https://doi.org/10.1016/j.jsxm.2016.01.003.

Arístegui, I., Radusky, P., Zalazar, V., Romero, M., Schwartz, J., & Sued, O. (2017). Impact of the gender identity law in Argentinean transgender women. *International Journal of Transgenderism*, *18*(4), 446–456. https://doi.org/10.1080/15532739.2017.1314796.

Armuand, G., Dhejne, C., Olofsson, J. I., & Rodriguez-Wallberg, K. A. (2017). Transgender men's experiences of fertility preservation: A qualitative study. *Human Reproduction*, *32*(2), 383–390. https://doi.org/10.1093/humrep/dew323.

Armuand, G., Dhejne, C., Olofsson, J. I., Stefenson, M., & Rodriguez-Wallberg, K. A. (2020). Attitudes and experiences of health care professionals when caring for transgender men undergoing fertility preservation by egg freezing: A qualitative study. *Therapeutic Advances in Reproductive Health*, *14*, 1–12. https://doi.org/10.1177/2633494120911036.

Armuand, G. M., Nilsson, J., Rodriguez-Wallberg, K. A., Malmros, J., Arvidson, J., Lampic, C., & Wettergren, L. (2017). Physicians' self-reported practice behaviour regarding fertility-related discussions in paediatric oncology in Sweden. *Psychooncology*, *26*(10), 1684–1690. https://doi.org/10.1002/pon.4507.

Armuand, G. M., Wettergren, L., Rodriguez-Wallberg, K. A., & Lampic, C. (2014). Desire for children, difficulties achieving a pregnancy, and infertility distress 3 to 7 years after cancer diagnosis. *Support Care Cancer*, *22*(10), 2805–2812. https://doi.org/10.1007/s00520-014-2279-z.

Arnett, D. K., Blumenthal, R. S., Albert, M. A., Buroker, A. B., Goldberger, Z. D., Hahn, E. J., Himmelfarb, C. D., Khera, A., Lloyd-Jones, D., McEvoy, J. W., Michos, E. D., Miedema, M. D., Muñoz, D., Smith, S. C., Jr., Virani, S. S., Williams, K. A., Sr., Yeboah, J., & Ziaeian, B. (2019). 2019 ACC/AHA Guideline on the Primary Prevention of Cardiovascular Disease: A report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines. Circulation, 140(11), e596–e646. https://doi.org/10.1161/CIR.0000000000000678.

Arnoldussen, M., Steensma, T. D., Popma, A., van der Miesen, A. I. R., Twisk, J. W. R., & de Vries, A. L. C. (2020). Re-evaluation of the Dutch approach: Are recently referred transgender youth different compared to earlier referrals? European Child & Adolescent Psychiatry. https://doi.org/10.1007/s00787-020-01691-5.

Ashley, F. (2019a). Gatekeeping hormone replacement therapy for transgender patients is dehumanising. Journal of Medical Ethics, 45(7), 480–482. https://doi.org/10.1136/medethics-2018-105293.

Ashley, F. (2019b). Homophobia, conversion therapy, and care models for trans youth: Defending the gender-affirmative approach. Journal of LGBT Youth, 17(4), 361–383. https://doi.org/10.1080/19361653.2019.1665610.

Ashley, F. (2019c). Puberty blockers are necessary, but they don't prevent homelessness: Caring for transgender youth by supporting unsupportive Parents/guardians. The American Journal of Bioethics, 19, 87–89. https://doi.org/10.1080/15265161.2018.1557277.

Ashley, F. (2019d). Shifts in assigned sex ratios at gender identity clinics likely reflect changes in referral patterns. The Journal of Sexual Medicine, 16(6), 948–949. https://doi.org/10.1016/j.jsxm.2019.03.407.

Ashley, F. (2019e). Thinking an ethics of gender exploration: Against delaying transition for transgender and gender creative youth. Clinical Child Psychology and Psychiatry, 24(2), 223–236. https://doi.org/10.1177/1359104519836462.

Asscheman, H., T'Sjoen, G., Lemaire, A., Mas, M., Meriggiola, M. C., Mueller, A., Kuhn, A., Dhejne, C., Morel-Journel, N., & Gooren, L. J. (2014). Venous thrombo-embolism as a complication of cross-sex hormone treatment of male-to-female transsexual subjects: A review. Andrologia, 46(7), 791–795. https://doi.org/10.1111/and.12150.

Attig, R. (2022). A call for community-informed translation: Respecting Queer self-determination across linguistic lines. Translation and Interpreting Studies. Advance online publication. https://doi.org/10.1075/tis.21001.att.

Auchus, R. J., Witchel, S. F., Leight, K. R., Aisenberg, J., Azziz, R., Bachega, T. A., Baker, L. A., Baratz, A. B., Baskin, L. S., Berenbaum, S. A., Breault, D. T., Cerame, B. I., Conway, G. S., Eugster, E. A., Fracassa, S., Gearhart, J. P., Geffner, M. E., Harris, K. B., Hurwitz, R. S., & Katz, A. L. (2010). Guidelines for the development of comprehensive care centers for congenital adrenal hyperplasia: Guidance from the CARES foundation initiative. International Journal of Pediatric Endocrinology, 2010. https://doi.org/10.1155/2010/275213.

Aucoin, M. W., & Wassersug, R. J. (2006). The sexuality and social performance of androgen-deprived (castrated) men throughout history: Implications for modern day cancer patients. Social Science & Medicine, 63(12), 3162–3173. https://doi.org/10.1016/j.socscimed.2006.08.007.

Auer, M. K., Fuss, J., Nieder, T .O., Briken, P., Biedermann, S. V., Stalla, G..K., Beckmann, M. W., & Hildebrandt, T. (2018). Desire to have children among transgender people in Germany: A cross-sectional multi-center study. The Journal of Sexual Medicine, 15(5), 757–767. https://doi.org/10.1016/j.jsxm.2018.03.083.

Auldridge, A., Tamar-Mattis, A., Kennedy, S., Ames, E., & Tobin, H. J. (2012). Improving the lives of transgender older adults: Recommendations for policy and practice national center for transgender equality; services and advocacy for GLBT elders. https://www.sageusa.org/resource-posts/improving-the-lives-of-transgender-older-adults/accessed3/14/2022

Aurat Foundation. (2016). Silent no more: Transgender community in Pakistan: Research study. https://www.aidsdatahub.org/sites/default/files/resource/transgender-community-pakistan-2016.pdf

Austin, A., & Goodman, R. (2017). The impact of social connectedness and internalized transphobic stigma on self-esteem among transgender and gender non-conforming adults. Journal of Homosexuality, 64(6), 825–841. https://doi.org/10.1080/00918369.2016.1236587.

Austin, A., Craig, S. L., & Alessi, E. J. (2017). Affirmative cognitive behavior therapy with transgender and gender nonconforming adults. Psychiatric Clinics of North America, 40(1), 141–156. https://doi.org/10.1016/j.psc.2016.10.003.

Austin, A., Craig, S. L., & McInroy, L. B. (2016). Toward transgender affirmative social work education. Journal of Social Work Education, 52(3), 297–310. https://doi.org/10.1080/10437797.2016.1174637.

Australian Psychological Society. (2021). Use of psychological practices that attempt to change or suppress a person's sexual orientation or gender. Australian Psychological Society position statement. https://psychology.org.au/getmedia/7bb91307-14ba-4a24-b10b-750f85b0b729/updated_aps_position_statement_conversion_practices.pdf

Azagba, S., Latham, K., & Shan, L. (2019). Cigarette, smokeless tobacco, and alcohol use among transgender adults in the United States. International Journal of Drug Policy, 73, 163–169. https://doi.org/10.1016/j.drugpo.2019.07.024.

Azul, D. (2015). Transmasculine people's vocal situations: A critical review of gender-related discourses and empirical data. International Journal of Language & Communication Disorders, 50(1), 31–47. https://doi.org/10.1111/1460-6984.12121.

Azul, D. (2016). Gender-related aspects of transmasculine people's vocal situations: Insights from a qualitative content analysis of interview transcripts. International Journal of Language & Communication Disorders, 51(6), 672–684. https://doi.org/10.1111/1460-6984.12239.

Azul, D., Arnold, A., & Neuschaefer-Rube, C. (2018). Do transmasculine speakers present with gender-related voice

problems? Insights from a participant-centered mixed-methods study. *Journal of Speech, Language, and Hearing Research*, *61*(1), 25–39. https://doi.org/10.1044/2017_JSLHR-S-16-0410.

Azul, D., & Hancock, A. B. (2020). Who or what has the capacity to influence voice production? Development of a transdisciplinary theoretical approach to clinical practice addressing voice and the communication of speaker socio-cultural positioning. *International Journal of Speech-Language Pathology*, *22*(5), 559–570. https://doi.org/10.1080/17549507.2019.1709544.

Azul, D., Hancock, A. B., Lundberg, T., Nygren, U., & Dhejne, C. (2022). Supporting well-being in gender diverse people: A tutorial for implementing conceptual and practical shifts towards culturally-responsive, person-centered care in speech-language pathology. *American Journal of Speech-Language Pathology*, Advance online publication. https://doi.org/10.1044/2022_AJSLP-21-00322.

Azul, D., & Neuschaefer-Rube, C. (2019). Voice function in gender-diverse people assigned female at birth: Results from a participant-centered mixed-methods study and implications for clinical practice. *Journal of Speech, Language, and Hearing Research*, *62*(9), 3320–3338. https://doi.org/10.1044/2019_JSLHR-S-19-0063.

Azul, D., Nygren, U., Södersten, M., & Neuschaefer-Rube, C. (2017). Transmasculine people's voice function: A review of the currently available evidence. *Journal of Voice*, *31*(2), 261.e9–261.e23. https://doi.org/10.1016/j.jvoice.2016.05.005.

Babu, R., & Shah, U. (2021). Gender identity disorder (GID) in adolescents and adults with differences of sex development (DSD): A systematic review and meta-analysis. *Journal of Pediatric Urology*, *17*(1), 39–47. https://doi.org/10.1016/j.jpurol.2020.11.017.

Badowski, M. E., Britt, N., Huesgen, E. C., Lewis, M. M., Miller, M. M., Nowak, K., & Smith, R. O. (2021). Pharmacotherapy considerations in transgender individuals living with human immunodeficiency virus. *Pharmacotherapy: The Journal of Human Pharmacology and Drug Therapy*, *41*(3), 299–314. https://doi.org/10.1002/phar.2499.

Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society*, *5*(4), bvab011. https://doi.org/10.1210/jendso/bvab011.

Bakko, M., & Kattari, S. K. (2021). Differential access to transgender inclusive insurance and healthcare in the United States: challenges to health across the life course. *Journal of Aging & Social Policy*, *33*(1), 67–81. https://doi.org/10.1080/08959420.2019.1632681.

Balakrishnan, T. M., Nagarajan, S., & Jaganmohan, J. (2020). Retrospective study of prosthetic augmentation mammo-plasty in transwomen. *Indian Journal of Plastic Surgery: Official Publication of the Association of Plastic Surgeons of India*, *53*(1), 42–50. https://doi.org/10.1055/s-0040-1709427.

Baleige, A., de la Chenelie, M., Dassonneville, C., & Martin, M. J. (2021). Following ICD-11, rebuilding mental health care for transgender persons: Leads from field experimentations in Lille, France. *Transgender Health*, *7*(1), 1–6. https://doi.org/10.1089/trgh.2020.0143.

Banbury, S. (2004). Coercive sexual behaviour in British prisons as reported by adult ex-prisoners. *The Howard Journal of Criminal Justice*, *43*(2), 113–130. https://doi.org/10.1111/j.1468-2311.2004.00316.x.

Banks, K., Kyinn, M., Leemaqz, S. Y., Sarkodie, E., Goldstein, D., & Irwig, M.S. (2021). Blood pressure fffects of gender-affirming hormone therapy in transgender and gender-diverse adults. *Hypertension*, *77*(6), 2066–2074. https://doi.org/10.1161/HYPERTENSIONAHA.120.16839.

Bangalore Krishna, K., Fuqua, John S., Rogol, Alan D., Klein, Karen O., Popovic, J., Houk, Christopher P., Charmandari, E., & Lee, Peter A. (2019). Use of gonadotropin-releasing hormone analogs in children: Update by an international consortium. *Hormone Research in Paediatrics*, *91*(6), 357–372. https://doi.org/10.1159/000501336.

Bangalore Krishna, K., Kogan, B. A., Mazur, T., Hoebeke, P., Bogaert, G., & Lee, P. A. (2021). Individualized care for patients with intersex (differences of sex development): Part 4/5.Considering the Ifs, Whens, and Whats regarding sexual-reproductive system surgery. *Journal of Pediatric Urology*, *17*(3), 338–345. https://doi.org/10.1016/j.jpurol.2021.02.011.

Baral, S. D., Poteat, T., Strömdahl, S., Wirtz, A. L., Guadamuz, T. E., & Beyrer, C. (2013). Worldwide burden of HIV in transgender women: A systematic review and meta-analysis. *The Lancet Infectious Diseases*, *13*(3), 214–222. https://doi.org/10.1016/S1473-3099(12)70315-8.

Baram, S., Myers, S. A., Yee, S., & Librach, C. L. (2019). Fertility preservation for transgender adolescents and young adults: A systematic review. *Human Reproduction Update*, *25*(6), 694–716. https://doi.org/10.1093/humupd/dmz026.

Baratz, A. B., Sharp, M. K., & Sandberg, D. E. (2014). Disorders of sex development peer support. *Understanding Differences and Disorders of Sex Development (DSD)*, *27*, 99–112. https://doi.org/10.1159/000363634.

Barker, H., & Bariola, E., Lyons, A., Leonard, W., Pitts, M., Badcock, P., & Couch, M. (2015). Demographic and psychosocial factors associated with psychological distress and resilience among transgender individuals. *American Journal of Public Health*, *105*(10), 2108–2116. https://doi.org/10.2105/AJPH.2015.302763.

Barnhill, J. W. (2014). Perioperative care of the patient with psychiatric disease. In C. R. MacKenzie, C. N. Cornell, & D. G. Memtsoudis (Eds.), *Perioperative care of the orthopedic patient* (pp. 197–205). Springer.

Barrow, K., & Apostle, D. (2018). Addressing mental health conditions often experienced by transgender and gender expansive children. In C. E. Keo-Meier & D. E. Ehrensaft (Eds.), *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive*

children. American Psychological Association. https://www.jstor.org/stable/j.ctv1chrwv9

Bartels, L., & Lynch, S. (2017).. Transgender prisoners in Australia: An examination of the issues, law and policy. *Flinders Law Journal*, 19(2), 185–231. http://classic.austlii.edu.au/au/journals/FlinLawJl/2017/8.pdf

Bartholomaeus, C., & Riggs, D. W. (2019). Transgender and non-binary Australians' experiences with healthcare professionals in relation to fertility preservation. *Culture, Health and Sexuality*, 22(2), 129–145. https://doi.org/10.1080/13691058.2019.1580388.

Bartholomaeus, C., Riggs, D. W., & Sansfaçon, A. P. (2020). Expanding and improving trans affirming care in Australia: Experiences with healthcare professionals among transgender young people and their parents. *Health Sociology Review*, 30(1), 58–71. https://doi.org/10.1080/14461242.2020.1845223.

Başar, K., & Öz, G. (2016). Resilience in individuals with gender dysphoria: Association with perceived social support and discrimination. *Türk Psikiyatri Dergisi*, 27(4), 225–234.

Başar, K., Öz, G., & Karakaya, J. (2016). Perceived discrimination, social support, and quality of life in gender dysphoria. *Journal of Sexual Medicine*, 13(7), 1133–1141. https://doi.org/10.1016/j.jsxm.2016.04.071.

Bauer, R. (2018). Bois and grrrls meet their daddies and mommies on gender playgrounds: Gendered age play in the les-bi-trans-queer BDSM communities. *Sexualities*, 21(1–2), 139–155. https://doi.org/10.1177/1363460716676987.

Bauer, G. R., & Hammond, R. (2015). Toward a broader conceptualization of trans women's sexual health. *The Canadian Journal of Human Sexuality*, 24(1), 1–11. https://doi.org/10.3138/cjhs.24.1-CO1.

Bauer, G. R., Hammond, R., Travers, R., Kaay, M., Hohenadel, K. M., & Boyce, M. (2009). "I don't think this is theoretical; this is our lives": How erasure impacts health care for transgender people. *Journal of Association in Nurses in AIDS Care*, 20(5), 348–361. https://doi.org/10.1016/j.jana.2009.07.004.

Bauer, G. R., Lawson, M. L., & Metzger, D. L. (2022). Do clinical data from transgender adolescents support the phenomenon of "rapid-onset gender dysphoria"? *The Journal of Pediatrics*, 243, 224–227. https://doi.org/10.1016/j.jpeds.2021.11.020.

Bauer, G., Pacaud, D., Couch, R., Metzger, D., Gale, L., Gotovac, S., Mokashi, A., Feder, S., Raiche, J., Speechley, K. N., Temple Newhook, J., Ghosh, S., Sansfacon, A., Susset, F., & Lawson, M. & Trans Youth CAN! Research Team. (2021). Transgender youth referred to clinics for gender-affirming medical care in Canada. *Pediatrics*, 148(5), e2020047266. https://doi.org/10.1542/peds.2020-047266.

Bauer, G. R., Scheim, A. I., Deutsch, M. B., & Massarella, C. (2014). Reported emergency department avoidance, use, and experiences of transgender persons in Ontario, Canada: Results from a respondent-driven sampling survey. *Annals of Emergency Medicine*, 63(6), 713–720. https://doi.org/10.1016/j.annemergmed.2013.09.027.

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. *BMC Public Health*, 15, 525. https://doi.org/10.1186/s12889-015-1867-2.

Beach, L. B., Elasy, T. A., & Gonzales, G. (2018). Prevalence of self-reported diabetes by sexual orientation: Results from the 2014 Behavioral Risk Factor Surveillance System. *LGBT Health*, 5(2), 121–130. https://doi.org/10.1089/lgbt.2017.0091.

Beauchamp, T. L., & Childress, J. F. (2019). *Principles of biomedical ethics* (8th ed.). Oxford University Press.

Becasen, J. S., Denard, C. L., Mullins, M. M., Higa, D. H., & Sipe, T. A. (2018). Estimating the prevalence of HIV and sexual behaviors among the US transgender population: A systematic review and meta-analysis, 2006–2017. *American Journal of Public Health*, 109(1), e1–e8. https://doi.org/10.2105/AJPH.2018.304727.

Becerra-Culqui, T. A., Liu, Y., Nash, R., Cromwell, L., Flanders, W. D., Getahun, D., Giammattei, S. V., Hunkeler, E. M., Lash, T. L., Millman, A., Quinn, V. P., Robinson, B., Roblin, D., Sandberg, D. E., Silverberg, M. J., Tangpricha, V., & Goodman, M. (2018). Mental health of transgender and gender nonconforming youth compared with their peers. *Pediatrics*, 141(5), e20173845. https://doi.org/10.1542/peds.2017-3845.

Beck, A. J. (2014). *Sexual victimization in prisons and jails reported by inmates, 2011–12.* PREA Data Collection Activities

Becker, I., Auer, M., Barkmann, C., Fuss, J., Möller, B., Nieder, T. O., Fahrenkrug, S., Hildebrandt, T., & Richter-Appelt, H. (2018). A cross-sectional multicenter study of multidimensional body image in adolescents and adults with gender dysphoria before and after transition-related medical interventions. *Archives of Sexual Behaviour*, 47(8), 2335–2347. https://doi.org/10.1007/s10508-018-1278-4.

Becker-Hebly, I., Fahrenkrug, S., Campion, F., Richter-Appelt, H., Schulte-Markwort, M., & Barkmann, C. (2021). Psychosocial health in adolescents and young adults with gender dysphoria before and after gender-affirming medical interventions: A descriptive study from the Hamburg Gender Identity Service. *European Child & Adolescent Psychiatry*, 30(11), 1755–1767. https://doi.org/10.1007/s00787-020-01640-2.

Beek, T. F., Cohen-Kettenis, P. T., & Kreukels, B. P. (2016). Gender incongruence/gender dysphoria and its classification history. *International Review of Psychiatry* 28(1), 5–12. https://doi.org/10.3109/09540261.2015.1091293.

Beek, T. F., Kreukels, B. P. C., Cohen-Kettenis, P. T., & Steensma, T. D. (2015). Partial treatment requests and underlying motives of applicants for gender affirming interventions. *The Journal of Sexual Medicine*, 12(11), 2201–2205. https://doi.org/10.1111/jsm.13033.

Bekeny, J. C., Zolper, E. G., Fan, K. L., & Del Corral, G. (2020). Breast augmentation for transfeminine patients: Methods, complications, and outcomes. *Gland Surgery*, 9(3), 788–796. https://doi.org/10.21037/gs.2020.03.18.

Bellinga, R. J., Capitán, L., Simon, D., & Tenorio, T. (2017). Technical and clinical considerations for facial feminization surgery with rhinoplasty and related procedures. *JAMA Facial Plastic Surgery*, *19*(3), 175–181. https://doi.org/10.1001/jamafacial.2016.1572.

Belsky, J. (1993). Etiology of child maltreatment: A developmental-ecological analysis. *Psychological Bulletin*, *114*(3), 413–434. https://doi.org/10.1037/0033-2909.114.3.413.

Benedetti, M. G., Furlini, G., Zati, A., & Letizia Mauro, G. (2018). The effectiveness of physical exercise on bone density in osteoporotic patients. *Biomed Research International*, *2018*, 4840531. https://doi.org/10.1155/2018/4840531.

Benestad, E. E. P. (2010). From gender dysphoria to gender euphoria: An assisted journey. *Sexologies*, *19*(4), 225–231. https://doi.org/10.1016/j.sexol.2010.09.003.

Bennecke, E., Bernstein, S., Lee, P., van de Grift, T. C., Nordenskjöld, A., Rapp, M., Simmonds, M., Streuli, J. C., Thyen, U., & Wiesemann, C. (2021). Early genital surgery in disorders/differences of sex development: Patients' perspectives. *Archives of Sexual Behavior*. https://doi.org/10.1007/s10508-021-01953-6.

Bentsianov, S., Gordon, L., Goldman, A., Jacobs, A., & Steever, J. (2018). Use of copper intrauterine device in transgender male adolescents. *Contraception*, *98*(1), 74–75. https://doi.org/10.1016/j.contraception.2018.02.010.

Berenbaum, S. A. (2018). Evidence needed to understand gender identity: Commentary on Turban & Ehrensaft (2018). *Journal of Child Psychology and Psychiatry, and Allied Disciplines*, *59*(12), 1244–1247. https://doi.org/10.1111/jcpp.12997.

Berenbaum, S., Beltz, A., & Corley, R. (2015). The importance of puberty for adolescent development: Conceptualization and measurement. *Advances in Child Development and Behavior*, *48*, 53–92. http://dx.doi.org/10.1016/bs.acdb.2014.11.002.

Berg, J. W., Appelbaum, P. S., Lidz, C. W., & Parker, L. (2001). *Informed consent: Legal theory and clinical practice* (2nd ed.). Oxford University Press.

Berg, D & Edwards-Leeper, L. (2018). Child and family assessment. In C. E. Keo-Meier & D. E. Ehrensaft (Eds.), *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive children* (pp.101–124). American Psychological Association. https://www.jstor.org/stable/j.ctv1chrwv9

Berger, I., & Mooney-Somers, J. (2017). Smoking cessation programs for lesbian, gay, bisexual, transgender, and intersex people: A content-based systematic review. *Nicotine & Tobacco Research*, *19*(12), 1408–1417. https://doi.org/10.1093/ntr/ntw216.

Berli, J. U., Knudson, G., Fraser, L., Tangpricha, V., Ettner, R., Ettner, F. M., Safer, J. D., Graham, J., Monstrey, S., & Schechter, L. (2017). What surgeons need to know about gender confirmation surgery when providing care for transgender individuals: A review. *JAMA Surgery*, *152*(4), 394–400. https://doi.org/10.1001/jamasurg.2016.5549.

Berli, J. U., Monstrey, S., Safa, B., & Chen, M. (2021). Neourethra creation in gender phalloplasty: Differences in techniques and staging. *Plastic Reconstructive Surgery*, *147*(5), 801e–811e. https://doi.org/10.1097/PRS.0000000000007898.

Bertalan, R., Lucas-Herald, A., Kolesinska, Z., Berra, M., Cools, M., Balsamo, A., & Hiort, O. (2018). Evaluation of DSD training schools organized by cost action BM1303 "DSDnet." *Orphanet Journal of Rare Diseases*, *13*(1). https://doi.org/10.1186/s13023-018-0967-3.

Bertelloni, S., & Mul, D. (2008). Treatment of central precocious puberty by GnRH analogs: Long-term outcome in men. *Asian Journal of Andrology*, *10*(4), 525–534. https://doi.org/10.1111/j.1745-7262.2008.00409.x.

Bertelloni, S., Baroncelli, G. I., Ferdeghini, M., Menchini-Fabris, F., & Saggese, G. (2000). Final height, gonadal function and bone mineral density of adolescent males with central precocious puberty after therapy with gonadotropin-releasing hormone analogues. *European Journal of Pediatrics*, *159*(5), 369–374. https://doi.org/10.1007/s004310051289.

Bertin, C., Abbas, R., Andrieu, V., Michard, F., Rioux, C., Descamps, V., & Bouscarat, F. (2019). Illicit massive silicone injections always induce chronic and definitive silicone blood diffusion with dermatologic complications. *Medicine*, *98*(4), e14143. https://doi.org/10.1097/MD.0000000000014143.

Bertrand, B., Perchenet, A. S., Colson, T. R., Drai, D., & Casanova, D. (2017). Female-to-male transgender chest reconstruction: A retrospective study of patient satisfaction. *Annales de Chirurgie Plastique Esthétique*, *62*(4), 303–307. https://doi.org/10.1016/j.anplas.2017.05.005.

Bhattacharya, S., & Ghosh, D. (2020). Studying physical and mental health status among hijra, kothi and transgender community in Kolkata, India. *Social Science & Medicine*, 265, 113412. https://doi.org/10.1016/j.socscimed.2020.113412.

Bisbey, T. M., Reyes, D. L., Traylor, A. M., & Salas, E. (2019). Teams of psychologists helping teams: The evolution of the science of team training. *American Psychologist*, *74*(3), 278–289. https://doi.org/10.1037/amp0000419.

Bishop, A. (2019). *Harmful treatment: the global reach of so-called conversion therapy*. Outright Action International. https://outrightinternational.org/sites/default/files/ExecSumm_SinglePagesRandL.pdf

Bisson, J. R., Chan, K. J., & Safer, J. D. (2018). Prolactin levels do not rise among transgender women treated with estradiol and spironolactone. *Endocrine Practice*, *24*(7), 646–651. https://doi.org/10.4158/EP-2018-0101.

Bizic, M. R., Jeftovic, M., Pusica, S., Stojanovic, B., Duisin, D., Vujovic, S., Rakic, V., & Djordjevic, M. L. (2018). Gender Dysphoria: Bioethical aspects of medical treatment. *Biomed Research International*, *2018*, 9652305. https://doi.org/10.1155/2018/9652305.

Blackless, M., Charuvastra, A., Derryck, A., Fausto-Sterling, A., Lauzanne, K., & Lee, E. (2000). How sexually dimor-

phic are we? Review and synthesis. *American Journal of Human Biology*, 12(2), 151. https://doi.org/10.1002/(sici)1520-6300(200003/04)12:2<151::aid-ajhb1>3.3.co;2-6.

Blecher, G. A., Christopher, N., & Ralph, D. J. (2019). Prosthetic placement after phalloplasty. *Urologic Clinics of North America*, 46(4), 591–603. https://doi.org/10.1016/j.ucl.2019.07.013.

Block, C. (2017). Making a case for transmasculine voice and communication training. *Perspectives of the ASHA Special Interest Groups*, 2(3), 33–41. https://doi.org/10.1044/persp2.SIG3.33.

Blondeel, K., de Vasconcelos, S., García-Moreno, C., Stephenson, R., Temmerman, M., & Toskin, I. (2018). Violence motivated by perception of sexual orientation and gender identity: A systematic review. *Bulletin of the World Health Organization*, 96(1), 29–41L. https://doi.org/10.2471/BLT.17.197251.

Bloom, T. M., Nguyen, T. P., Lami, F., Pace, C. C., Poulakis, Z., Telfer, M., Taylor, A., Pang, K. C., & Tollit, M. A. (2021). Measurement tools for gender identity, gender expression, and gender dysphoria in transgender and gender-diverse children and adolescents: A systematic review. *The Lancet Child & Adolescent Health*. https://doi.org/10.1016/s2352-4642(21)00098-5.

Blosnich, J. R., Brown, G. R., Shipherd, J. C., Kauth, M., Piegari, R. I., & Bossarte, R. M. (2013). Prevalence of gender identity disorder and suicide risk among transgender veterans utilizing veterans health administration care. *American Journal of Public Health*, 103(10), e27–e32. https://doi.org/10.2105/AJPH.2013.301507.

Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the US transgender population. *American Journal of Public Health*, 103(5), 943–951. https://doi.org/10.2105/AJPH.2013.301241.

Bockting, W., & Coleman, E. (2016). *Developmental stages of the transgender coming-out process: Toward an integrated identity*. In R. Ettner, S. Monstrey, & E. Coleman (Eds.), *Principles of transgender medicine and surgery* (pp. 137–158). Routledge/Taylor & Francis Group.

Boedecker, A. L. (2011). *The transgender guidebook: Keys to a successful transition*. Boedecker.

Bonnington, A., Dianat, S., Kerns, J., Hastings, J., Hawkins, M., De Haan, G., & Obedin-Maliver, J. (2020). Society of family planning clinical recommendations: Contraceptive counseling for transgender and gender diverse people who were female sex assigned at birth. *Contraception*, 102(2), 70–82. https://doi.org/10.1016/j.contraception.2020.04.001.

Borgström, B., Fridström, M., Gustafsson, B., Ljungman, P., & Rodriguez-Wallberg, K. A. (2020). A prospective study on the long-term outcome of prepubertal and pubertal boys undergoing testicular biopsy for fertility preservation prior to hematologic stem cell transplantation. *Pediatric Blood Cancer*, 67(9), e28507. https://doi.org/10.1002/pbc.28507.

Borghei-Razavi, H., Fragoza-Padilla, V., Hargus, G., Bakhti, S., & Schick, U. (2014). Meningioma: The unusual growth

in a transsexual patient after estrogen-progesterone therapy. *SOJ Neurology*, 1(1), 1–3. https://doi.org/10.15226/2374-6858/1/2/00109

Boskey, E. R., Taghinia, A. H., & Ganor, O. (2019). Association of surgical risk with exogenous hormone use in transgender patients: A systematic review. *JAMA Surgery* 154(2), 159–169. https://doi.org/10.1001/jamasurg.2018.4598.

Boskey, E., Taghinia, A., & Ganor, O. (2018). Public accommodation laws and gender panic in clinical settings. *AMA Journal of Ethics*, 20(11), 1067–1074. https://doi.org/10.1001/amajethics.2018.1067.

Bouman, M. B., van der Sluis, W. B., van Woudenberg Hamstra, L. E., Buncamper, M. E., Kreukels, B. P. C., Meijerink, W., & Mullender, M. G. (2016). Patient-reported esthetic and functional outcomes of primary total laparoscopic intestinal vaginoplasty in transgender women with penoscrotal hypoplasia. *Journal of Sexual Medicine*, 13(9), 1438–1444. https://doi.org/10.1016/j.jsxm.2016.06.009.

Bouman, W. P., Claes, L., Brewin, N., Crawford, J. R., Millet, N., Fernandez-Aranda, F., & Arcelus, J. (2017). Transgender and anxiety: A comparative study between transgender people and the general population. *International Journal of Transgenderism*, 18(1), 16–26. https://doi.org/10.1080/15532739.2016.1258352.

Bouman, W. P., Davey, A., Meyer, C., Witcomb, G. L., & Arcelus, J. (2016). Predictors of psychological well-being among treatment seeking transgender individuals. *Sexual and Relationship Therapy*, 31(3), 359–375. https://doi.org/10.1080/14681994.2016.1184754.

Bouman, W. P., Richards, C., Addinall, R. M., Arango de Montis, I., Duisin, D., Estiva, I., Fisher, A., Harte, F., Khoury, B., Lu, Z., Marais, A., Mattila, A., Nayarana, R. D., Nieder, T. O., Robles-Garcia, R., Roque Guerra, A., Tereshkevich, D., T'Sjoen, G., & Wilson, D. (2014). Yes and yes again: Are standards of care which require two signatures for genital reconstructive surgery ethical? *Sex and Relationship Therapy*, 29(4), 377–389. https://doi.org/10.1080/14681994.2014.954993.

Bouman, W. P., Schwend, A. S., Motmans, J., Smiley, A., Safer, J. D., Deutsch, M. B., Adams, N. J., & Winter, S. (2017). Language and trans health. *International Journal of Transgenderism*, 18(1), 1–6. https://doi.org/10.1080/15532739.2016.1262127.

Bowling, J., Baldwin, A., & Schnarrs, P. W. (2019). Influences of health care access on resilience building among transgender and gender non-binary individuals. *International Journal of Transgenderism*, 20(2–3), 205–217. https://doi.org/10.1080/15532739.2019.1595807.

Boyd, J. (2019). *Aging in place, caregiving, and long-term care for transgender adults*. In C. Hardacker, K. Ducheny, & M. Houlber (Eds), *Transgender and gender nonconforming health and aging* (pp. 175–190). Springer.

Bradford, J., Reisner, S. L., Honnold, J. A., & Xavier, J. (2013). Experiences of transgender-related discrimination and implications for health: Results from the Virginia Transgender Health Initiative Study. *American Journal of*

outcomes. *Laryngoscope*, *131*(7), 1588–1593. https://doi.org/10.1002/lary.29050.

Brumbaugh-Johnson, S. M., & Hull, K. E. (2019). Coming out as transgender: Navigating the social implications of a transgender identity. *Journal of Homosexuality*, *66*(8), 1148–1177. https://doi.org/10.1080/00918369.2018.1493253.

Bryant, L., Damarin, A. K., & Marshall, Z. (2014). Tobacco control recommendations identified by LGBT Atlantans in a community-based research project. *Progress in Community Health Partnerships: Research, Education, and Action*, *8*(3), 259–260. https://doi.org/10.1353/cpr.2014.0041.

Bryson, C., & Honig, S. C. (2019). Genitourinary complications of gender-affirming surgery. *Current Urology Reports*, *20*(6). https://doi.org/10.1007/s11934-019-0894-4.

Buchting, F. O., Emory, K. T., Kim, Y., Fagan, P., Vera, L. E., & Emery, S. (2017). Transgender use of cigarettes, cigars, and e-cigarettes in a national study. *American Journal of Preventive Medicine*, *53*(1), e1–e7. https://doi.org/10.1016/j.amepre.2016.11.022.

Buckley, D. P., Dahl, K. L., Cler, G. J., & Stepp, C. E. (2020). Transmasculine voice modification: A case study. *Journal of Voice*, *34*(6), 903–910. https://doi.org/10.1016/j.jvoice.2019.05.003.

Budge, S. L. (2013). Interpersonal psychotherapy with transgender clients. *Psychotherapy*, *50*(3), 356–359. https://doi.org/10.1037/a0032194.

Budge, S. L. (2015). Psychotherapists as gatekeepers: An evidence-based case study highlighting the role and process of letter writing for transgender clients. *Psychotherapy Theory Research Practice Training*, *52*(3), 287–297 https://doi.org/10.1037/pst0000034.

Budge, S. L., Adelson, J. L., & Howard, K. A. (2013). Anxiety and depression in transgender individuals: The roles of transition status, loss, social support, and coping. *Journal of Consult Clinical Psychology*, *81*(3), 545–557. https://doi.org/10.1037/a0031774.

Budge, S. L., Katz-Wise, S. L., Tebbe, E. N., Howard, K. A. S., Schneider, C. L., & Rodriguez, A. (2012). Transgender emotional and coping processes: Facilitative and avoidant coping throughout gender transitioning. *The Counseling Psychologist*, *41*(4), 601–647. https://doi.org/10.1177/0011000011432753.

Budge, S. L., Sinnard, M. T., & Hoyt, W. T. (2021). Longitudinal effects of psychotherapy with transgender and nonbinary clients: A randomized controlled pilot trial. *Psychotherapy (Chic.)*, *58*(1), 1–11. https://doi.org/10.1037/pst0000310.

Bultynck, C., Cosyns, M., T'Sjoen, G., Van Borsel, J., & Bonte, K. (2020). Thyroplasty type III to lower the vocal pitch in trans men. *Otolaryngology–Head and Neck Surgery*, *164*(1), 157–159. https://doi.org/10.1177/0194599820937675.

Buncamper, M. E., Honselaar, J. S., Bouman, M. B., Özer, M., Kreukels, B. P., & Mullender, M. G. (2015). Aesthetic and functional outcomes of neovaginoplasty using penile skin in male-to-female transsexuals. *Journal of Sexual Medicine*, *12*(7), 1626–1634. https://doi.org/10.1111/jsm.12914.

Buncamper, M. E., van der Sluis, W. B., de Vries, M., Witte, B. I., Bouman, M. B., & Mullender, M. G. (2017). Penile inversion vaginoplasty with or without additional full-thickness skin graft: To graft or not to graft? *Plastic and Reconstructive Surgery*, *139*(3), 649e–656e. https://doi.org/10.1097/PRS.0000000000003108.

Buncamper, M. E., van der Sluis, W. B., van der Pas, R. S. D., Özer, M., Smit, J. M., Witte, B. I., Bouman, M. B., & Mullender, M. G. (2016). Surgical outcome after penile inversion vaginoplasty: A retrospective study of 475 transgender women. *Plastic and Reconstructive Surgery*, *138*(5), 999–1007. https://doi.org/10.1097/PRS.0000000000002684.

Bungener, S. L., de Vries, A. L. C., Popma, A., & Steensma, T. D. (2020). Sexual experiences of young transgender persons during and after gender-affirmative treatment. *Pediatrics*, *146*(6), e20191411. https://doi.org/10.1542/peds.2019-1411.

Bureau of Justice Assistance, United States. (2017). *Prison Rape Elimination Act of 2003*. U.S. G.P.O. https://www.prearesourcecenter.org/about/prison-rape-elimination-act.

Burgwal, A., Gvianishvili, N., Hård, V., Kata, J., Nieto, I. G., Orre, C., Smiley, A., Vidić, J., & Motmans, J. (2019). Health disparities between binary and non-binary trans people: A community-driven survey. *International Journal of Transgenderism*, *20*(2–3). https://doi.org/10.1080/15532739.2019.1629370.

Burgwal, A., Gvianishvili, N., Hård, V., Kata, J., Nieto, I. G., Orre, C., Smiley, A., Vidić, J., & Motmans, J. (2021). The impact of training in transgender care on healthcare providers competence and confidence: A cross-sectional survey. *Healthcare*, *9*(8), 967. https://www.mdpi.com/2227-9032/9/8/967

Burgwal, A., & Motmans, J. (2021). Trans and gender diverse people's experiences and evaluations with general and trans-specific healthcare services: A cross-sectional survey. *International Journal of Impotence Research*, *33*, 679–686. https://doi.org/10.1038/s41443-021-00432-9.

Burnes, T. R., Dexter, M. M., Richmond, K., Singh, A. A., & Cherrington, A. (2016). The experiences of transgender survivors of trauma who undergo social and medical transition. *Traumatology*, *22*(1), 75–84. https://doi.org/10.1037/trm0000064.

Bustos, S. S., Bustos, V. P., Mascaro, A., Ciudad, P., Forte, A. J., Del Corral, G., & Manrique, O. J. (2021). Complications and patient-reported outcomes in transfemale vaginoplasty: An updated systematic review and meta-analysis. *Plastic and Reconstructive Surgery—Global Open*, *9*(3), e3510. https://doi.org/10.1097/GOX.0000000000003510.

Butler, J. (1993). *Bodies that matter. On the discursive limits of "sex"*. Routledge.

Butler, J., Anstrom, K. J., Felker, G. M., Givertz, M. M., Kalogeropoulos, A. P., Konstam, M. A., Mann, D. L., Margulies, K. B., McNulty, S. E., Mentz, R. J., Redfield, M. M., Tang, W. H. W., Whellan, D. J., Shah, M., Desvigne-Nickens, P., Hernandez, A. F., & Braunwald, E. (2017). Efficacy and safety of spironolactone in acute

heart failure. *JAMA Cardiology*, *2*(9), 950. https://doi.org/10.1001/jamacardio.2017.2198.

Byne, W., Bradley, S. J., Coleman, E., Eyler, A. E., Green, R., Menvielle, E. J., Meyer-Bahlburg, F. L., Pleak, R. R., & Tompkins, D. A. (2012). Report of the American Psychiatric Association task force on treatment of gender identity disorder. *Archives of Sexual Behavior*, *41*(4), 759–796. https://doi.org/10.1007/s10508-012-9975-x.

Byne, W., Karasic, D. H., Coleman, E., Eyler, A. E., Kidd, J. D., Meyer-Bahlburg, H. F. L., Pleak, R. R., & Pula, J. (2018). Gender dysphoria in adults: An overview and primer for psychiatrists. *Transgender Health*, *3*(1), 57–70. https://doi.org/10.1089/trgh.2017.0053.

Caceres, B. A., Streed, C. G.Jr., Corliss, H. L., Lloyd-Jones, D. M., Matthews, P. A., Mukherjee, M., Poteat, T., Rosendale, N., Ross, L. M., & American Heart Association Council on Cardiovascular and Stroke Nursing; Council on Hypertension; Council on Lifestyle and Cardiometabolic Health; Council on Peripheral Vascular Disease; and Stroke Council. (2020). Assessing and addressing cardiovascular health in LGBTQ adults: A scientific statement *The American Heart Association*. *Circulation*, *142*(19), e321–e332. https://doi.org/10.1161/CIR.0000000000000914.

Cai, X., Hughto, J. M., Reisner, S. L., Pachankis, J. E., & Levy, B. R. (2019). Benefit of gender-affirming medical treatment for transgender elders: Later-life alignment of mind and body. *LGBT Health*, *6*(1), 34–39. https://doi.org/10.1089/lgbt.2017.0262.

Callander, D., Wiggins, J., Rosenberg, S., Cornelisse, V. J., Duck-Chong, E., Holt, M., Pony, M., Vlahakis, E., MacGibbon, J., & Cook, T. (2019). *The 2018 Australian trans and gender diverse sexual health survey: report of findings*. The Kirby Institute, University of New South Wales. https://genderrights.org.au/wp-content/uploads/2020/03/ATGDSexualHealthSurveyReport_v7.pdf

Callen Lorde. (2020a). *Safer binding* http://callen-lorde.org/graphics/2018/09/Safer-Binding_2018_FINAL.pdf.

Callen Lorde. (2020b). *Safer tucking*. http://callen-lorde.org/graphics/2018/09/HOTT-Safer-Tucking_Final.pdf.

Callens, N., Kreukels, B. P. C., & van de Grift, T. C. (2021). Young voices: Sexual health and transition care needs in adolescents with intersex/differences of sex development—A pilot study. *Journal of Pediatric and Adolescent Gynecology*, *34*(2), 176–189.e2. https://doi.org/10.1016/j.jpag.2020.11.001.

Callens, N., Van Kuyk, M., van Kuppenveld, J. H., Drop, S. L. S., Cohen-Kettenis, P. T., & Dessens, A. B. (2016). Recalled and current gender role behavior, gender identity and sexual orientation in adults with disorders/differences of sex development. *Hormones and Behavior*, *86*, 8–20. https://doi.org/10.1016/j.yhbeh.2016.08.008.

Canner, J. K., Harfouch, O., Kodadek, L. M., Pelaez, D., Coon, D., Offodile, A. C., 2nd, Haider, A. H., & Lau, B. D. (2018). Temporal trends in gender-affirming surgery among transgender patients in the United States. *JAMA Surgery*, *153*(7), 609–616. https://doi.org/10.1001/jamasurg.2017.6231.

Canonico, M., Oger, E., Plu-Bureau, G., Conard, J., Meyer, G., Lévesque, H., & Scarabin, P. Y. (2007). Hormone

therapy and venous thromboembolism among postmenopausal women: Impact of the route of estrogen administration and progestogens: The ESTHER study. *Circulation*, *115*(7), 840–845. https://doi.org/10.1161/CIRCULATIONAHA.106.642280.

Capitán, L., Gutierrez Santamaria, J., Simon, D., Coon, D., Bailon, C., Bellinga, R. J., Tenorio, T., & Capitán-Canadas, F. (2020). Facial gender confirmation surgery: A protocol for diagnosis, surgical planning, and postoperative management. *Plastic and Reconstructive Surgery*, *145*(4), 818e–828e. https://doi.org/10.1097/PRS.0000000000006686.

Capitán, L., Simon, D., Kaye, K., & Tenorio, T. (2014). Facial feminization surgery: The forehead. Surgical techniques and analysis of results. *Plastic and Reconstructive Surgery*, *134*(4), 609–619. https://doi.org/10.1097/PRS.0000000000000545.

Capitán, L., Simon, D., Meyer, T., Alcaide, A., Wells, A., Bailon, C., Bellinga, R. J., Tenorio, T., & Capitán-Canadas, F. (2017). Facial feminization surgery: Simultaneous hair transplant during forehead reconstruction. *Plastic and Reconstructive Surgery*, *139*(3), 573–584. https://doi.org/10.1097/PRS.0000000000003149.

Cardoso da Silva, D. C., Schwarz, K., Fontanari, A. M., Costa, A. B., Massuda, R., Henriques, A. A., Salvador, J., Silveira, E., Rosito, T. E., & Rodrigues Lobato, M. I. (2016). WHOQOL-100 before and after sex reassignment surgery in Brazilian male-to-female transsexual individuals. *Journal of Sexual Medicine*, *13*(6), 988–993. https://doi.org/10.1016/j.jsxm.2016.03.370.

Carel, J. C., Eugster, E. A., Rogol, A., Ghizzoni, L., & Palmert, M. R. (2009). Consensus statement on the use of gonadotropin-releasing hormone analogs in children. *Pediatrics*, *123*(4), e752–e762. https://doi.org/10.1542/peds.2008-1783.

CARES Foundation. (2020). *Statement on surgery*. https://www.caresfoudation.org/treatment/surgery.php

Carew, L., Dacakis, G., & Oates, J. (2007). The effectiveness of oral resonance therapy on the perception of femininity of voice in male-to-female transsexuals. *Journal of Voice*, *21*(5), 591–603. https://doi.org/10.1016/j.jvoice.2006.05.005.

Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., Skageberg, E. M., Khadr, S., & Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLoS One*, *16*(2), e0243894. https://doi.org/10.1371/journal.pone.0243894.

Carpenter, M. (2018). Intersex variations, human rights, and the International Classification of Diseases. *Health and Human Rights Journal*, *20*(2), 205–214.

Carpenter, M. (2021). Intersex human rights, sexual orientation, gender identity, sex characteristics and the Yogyakarta Principles plus 10. *Culture, Health & Sexuality*, *23*(4), 516–532. https://doi.org/10.1080/13691058.2020.1781262.

Carpenter, C. S., Eppink, S. T., & Gonzales, G. (2020). Transgender status, gender identity, and socioeconomic

outcomes in the United States. *ILR Review*, 73(3), 573–599. https://doi.org/10.1177/0019793920902776.

Carpenter, W. T., Gold, J. M., Lahti, A. C., Queern, C. A., Conley, R. R., Bartko, J. J., Kovnik, J., & Applebaum, P. S. (2000). Decisional capacity for informed consent in schizophrenia research. *Archives of General Psychiatry*, 57(6), 533–538. 10-1001/pubs.ArchGenPsychiatry-ISSN-0003-990x-57-6-yoa9156.

Carroll, L. (2017). Therapeutic issues with transgender elders. *Psychiatric Clinics of North America*, 40(1), 127–140. https://psycnet.apa.org/doi/10.1016/j.psc.2016.10.004.

Carroll, L., Graff, C., Wicks, M., & Diaz Thomas, A. (2020). Living with an invisible illness: A qualitative study exploring the lived experiences of female children with congenital adrenal hyperplasia. *Quality of Life Research: An International Journal of Quality of Life Aspects of Treatment, Care and Rehabilitation*, 29(3), 673–681. https://doi.org/10.1007/s11136-019-02350-2.

Carswell, J. M., & Roberts, A. L. (2017). Induction and maintenance of amenorrhea in transmasculine and non-binary adolescents. *Transgender Health*, 2, 195–201. https://doi.org/10.1089/trgh.2017.0021.

Carter, H. B., Albertsen, P. C., Barry, M. J., Etzioni, R., Freedland, S. J., Greene, K. L., Holmberg, L., Kantoff, P., Konety, B. R., Murad, M. H., Penson, D. F., & Zietman, A. L. (2013). Early detection of prostate cancer: AUA Guideline. *Journal of Urology*, 190(2), 419–426. https://doi.org/10.1016/j.juro.2013.04.119.

Cartwright, C., Hughes, M., & Lienert, T. (2012). End-of-life care for gay, lesbian, bisexual and transgender people. *Culture, Health & Sexuality*, 14(5), 537–548. https://doi.org/10.1080/13691058.2012.673639.

Casado, J. C., Rodríguez-Parra, M. J., & Adrián, J. A. (2017). Voice feminization in male-to-female transgendered clients after Wendler's glottoplasty with vs. without voice therapy support. *European Archives of Oto-Rhino-Laryngology*, 274(4), 2049–2058. https://doi.org/10.1007/s00405-016-4420-8.

Castellano, E., Crespi, C., Dell'Aquila, C., Rosato, R., Catalano, C., Mineccia, V., Motta, G., Botto, E., & Manieri, C. (2015). Quality of life and hormones after sex reassignment surgery. *Journal of Endocrinological Investigation*, 38(12), 1373–1381. https://doi.org/10.1007/s40618-015-0398-0.

Catelan, R. F., Costa, A. B., & Lisboa, C. S. M. (2017). Psychological interventions for transgender persons: A scoping review. *International Journal of Sexual Health*, 29(4), 325–337. https://doi.org/10.1080/19317611.2017.1360432.

Cauffman, E., & Steinberg, L. (2000). (Im)maturity of judgment in adolescence: Why adolescents may be less culpable than adults. *Behavioral Sciences & the Law*, 18(6), 741–760. https://doi.org/10.1002/bsl.416.

Cavanaugh, T., Hopwood, R., & Lambert, C. (2016). Informed consent in the medical care of transgender and gender-nonconforming patients. *AMA Journal of Ethics*, 18(11), 1147–1155. https://doi.org/10.1001/journalofethics.2016.18.11.sect1-1611.

Celentano, D. D., & Szklo, M. (2019). *Gordis Epidemiology*. Elsevier.

Census Organization of India. (2015). *Population census 2011*. https://www.census2011.co.in

Center of Excellence for Transgender Health. (2016). *Guidelines for the primary and gender-affirming care of transgender and gender nonbinary people* (2nd ed.). Center of Excellence for Transgender Health, UCSF. https://transcare.ucsf.edu/guidelines.

Centers for Disease Control. (2020). *Transforming health: Patient-centered HIV prevention and care*. https://www.cdc.gov/hiv/clinicians/transforming-health/health-care-providers/sexual-history.html.

Centers for Disease Control. (2021). Preexposure prophylaxis for the prevention of HIV infection in the United States—2021 update clinical practice guideline. https://www.cdc.gov/hiv/pdf/risk/prep/cdc-hiv-prep-guidelines-2021.pdf

Centers for Medicare and Medicaid Services. (2010). *Toolkit Part 11: Guidelines for translation*. https://www.cms.gov/Outreach-andEducation/Outreach/WrittenMaterialsToolkit/ToolkitPart11

Chadwick, S. B., Francisco, M., van Anders, S. M. (2019). When orgasms do not equal pleasure: Accounts of "bad" orgasm experiences during consensual sexual encounters. *Archives of Sexual Behavior*, 48, 2435–2459. https://doi.org/10.1007/s10508-019-01527-7.

Chan, K. J., Liang J. J., Jolly, D., Weinand, J. D., & Safer J. D. (2018). Exogenous testosterone does not induce or exacerbate the metabolic features associated with PCOS among transgender men. *Endocrine Practice* 24(6), 565–572. https://doi.org/10.4158/EP-2017-0247.

Chang, J., Brown, S. K., Hu, S., Sivakumar, G., Sataluri, M., Goldberg, L., Courey, M. S. (2021). Effect of Wendler glottoplasty on acoustic measures of voice. *Laryngoscope*. 131(3), 583–586. https://doi.org/10.1002/lary.28764.

Chantrapanichkul, P., Stevenson, M. O., Suppakitjanusant, P., Goodman, M., & Tangpricha, V. (2021). Serum hormone concentrations in transgender individuals receiving gender-affirming hormone therapy: A longitudinal retrospective cohort Study. *Endocrine Practice*, 27(1), 27–33. https://doi.org/10.4158/EP-2020-0414.

Charter, R. (2018). The transgender parent: Experiences and constructions of pregnancy and parenthood for transgender men in Australia. *International Journal of Transgenderism*, 19(1), 64–77. https://doi.org/10.1080/15532739.2017.1399496.

Chase, C. (2003). What is the agenda of the intersex patient advocacy movement? *The Endocrinologist*, 13(3), 240–242. https://doi.org/10.1097/01.ten.0000081687.21823.d4.

Chen, D., Abrams, M., Clark, L., Ehrensaft, D., Tishelman, A. C., Chan, Y.-M., Garofalo, R., Olson-Kennedy, J., Rosenthal, S. M., & Hidalgo, M. A. (2021). Psychosocial characteristics of transgender youth seeking gender-affirming medical treatment: Baseline findings from the trans youth care study. *Journal of Adolescent Health*, 68(6), 1104–1111. https://doi.org/10.1016/j.jadohealth.2020.07.033.

S190   E. COLEMAN ET AL.

Chen, D., Hidalgo, M. A., Leibowitz, S., Leininger, J., Simons, L., Finlayson, C., & Garofalo, R. (2016). Multidisciplinary care for gender-diverse youth: A narrative review and unique model of gender-affirming care. *Transgender Health*, 1(1), 117–123. https://doi.org/10.1089/trgh.2016.0009.

Chen, D., Kyweluk, M. A., Sajwani, A., Gordon, E. J., Johnson, E. K., Finlayson, C. A., & Woodruff, T. K. (2019). Factors affecting fertility decision-making among transgender adolescents and young adults. *LGBT Health*, 6(3), 107–115. https://doi.org/10.1089/lgbt.2018.0250.

Chen, D., Matson, M., Macapagal, K., Johnson, E. K., Rosoklija, I., Finlayson, C., Fisher, C. B., & Mustanski, B. (2018). Attitudes toward fertility and reproductive health among transgender and gender-nonconforming adolescents. *Journal of Adolescent Health*. 63(1), 62–68. https://doi.org/10.1016/j.jadohealth.2017.11.306.

Chen, D., Simons, L., Johnson, E. K., Lockart, B. A., & Finlayson, C. (2017). Fertility preservation for transgender adolescents. *Journal of Adolescent Health* 61(1), 120–123 https://doi.org/10.1016/j.jadohealth.2017.01.022.

Chen, D., Strang, J. F., Kolbuck, V. D., Rosenthal, S. M., Wallen, K., Waber, D. P., Steinberg, L., Sisk, C. L., Ross, J., Paus, T., Mueller, S. C., McCarthy, M. M., Micevych, P. E., Martin, C. L., Kreukels, B. P. C., Kenworthy, L., Herting, M. M., Herlitz, A., Haraldsen, I. R. J. H., & Dahl, R. (2020). Consensus parameter: Research methodologies to evaluate neurodevelopmental effects of pubertal suppression in transgender youth. *Transgender Health*, 5(4), 246–257. https://doi.org/10.1089/trgh.2020.0006.

Chen, M., Fuqua, J., & Eugster, E. A. (2016). Characteristics of referrals for gender dysphoria over a 13-year period. *Journal of Adolescent Health*, 58(3), 369–371. https://doi.org/10.1016/j.jadohealth.2015.11.010.

Chen, S., & Loshak, H. (2020). *Primary care initiated gender-affirming therapy for gender dysphoria: A review of evidence based guidelines*. Canadian Agency for Drugs and Technologies in Health. https://www.ncbi.nlm.nih.gov/books/NBK563451/.

Cheng, P. J., Pastuszak, A. W., Myers, J. B., Goodwin, I. A., & Hotaling, J. M. (2019). Fertility concerns of the transgender patient. *Translational Andrology and Urology*, 8(3), 209–218. https://doi.org/10.21037/tau.2019.05.09.

Cheung, A. S., Wynne, K., Erasmus, J., Murray, S., & Zajac, J. D. (2019). Position statement on the hormonal management of adult transgender and gender diverse individuals. *Medical Journal of Australia*. 211(3):127–33. https://doi.org/10.5694/mja2.50259.

Chew, D., Anderson, J., Williams, K., May, T., & Pang, K. (2018). Hormonal treatment in young people with gender dysphoria: A systematic review. *Pediatrics*, 141(4), e20173742. https://doi.org/10.1542/peds.2017-3742.

Chew, D., Tollit, M. A., Poulakis, Z., Zwickl, S., Cheung, A. S., & Pang, K. C. (2020). Youths with a non-binary gender identity: A review of their sociodemographic and clinical profile. *Lancet Child Adolescent Health* 4, 322–330. https://doi.org/10.1016/S2352-4642(19)30403-1.

Chiland, C., Clouet, A. M., Golse, B., Guinot, M., & Wolf, J. P. (2013). A new type of family: Transmen as fathers thanks to donor sperm insemination. A 12-year follow-up exploratory study of their children. *Neuropsychiatrie de l'Enfance et de l'Adolescence*, 61(6), 365–370. https://doi.org/10.1016/j.neurenf.2013.07.001.

Chiniara, L. N., Viner, C., Palmert, M., & Bonifacio, H. (2019). Perspectives on fertility preservation and parenthood among transgender youth and their parents. *Archives of Disease in Childhood*, 104(8), 739–744. https://doi.org/10.1136/archdischild-2018-316080.

Chinn, P. (2013). Commentary lesbian, gay, bisexual and transgender health: Disparities we can change. *Nurse Educator*, 38(3), 94–95. https://doi.org/10.1097/NNE.0b013e31828dc235.

Chipkin, S. R., & Kim, F. (2017). Ten most important things to know about caring for transgender patients. *American Journal of Medicine*, 130(11), 1238–1245. https://doi.org/10.1016/j.amjmed.2017.06.019.

Chisolm-Straker, M., Willging, C., Daul, A. D., McNamara, S., Sante, S. C., Shattuck, D. G., & Crandall, C. S. (2018). Transgender and gender-nonconforming patients in the emergency department: What physicians know, think, and do. *Annals of Emergency Medicine*, 71(2), 183–188. https://doi.org/10.1016/j.annemergmed.2017.09.042.

Chlebowski, R. T., Anderson, G. L., Aragaki, A. K., Manson, J. E., Stefanick, M. L., Pan, K., Barrington, W., Kuller, L. H., Simon, M. S., Lane, D., Johnson, K. C., Rohan, T. E., Gass, M., Cauley, J. A., Paskett, E. D., Sattari, M., & Prentice, R. L. (2020). Association of menopausal hormone therapy with breast cancer incidence and mortality during long-term follow-up of the women's health initiative randomized clinical trials. *JAMA*, 324(4), 369–380. https://doi.org/10.1001/jama.2020.9482.

Chrisler, J. C., Gorman, J. A., Manion, J., Murgo, M., Barney, A., Adams-Clark, A., Newton, J. R., & McGrath, M. (2016). Queer periods: Attitudes toward and experiences with menstruation in the masculine of centre and transgender community. *Culture, Health & Sexuality*, 18(11), 1238–1250. https://doi.org/10.1080/13691058.2016.1182645.

Chumakov, E. M., Ashenbrenner, Y. V., Petrova, N. N., Zastrozhin, M. S., Azarova, L. A., & Limankin, O. V. (2021). Anxiety and depression among transgender people: Findings from a cross-sectional online survey in Russia. *LGBT Health*, 8(6), 412–419. https://doi.org/10.1089/lgbt.2020.0464.

Cipres, D., Seidman, D., Cloniger, C., 3rd, Nova, C., O'Shea, A., & Obedin-Maliver, J. (2017). Contraceptive use and pregnancy intentions among transgender men presenting to a clinic for sex workers and their families in San Francisco. *Contraception*, 95(2), 186–189. https://doi.org/10.1016/j.contraception.2016.09.005.

Cirrincione, L. R., Senneker, T., Scarsi, K. K., & Tseng, A. (2020). Drug interactions with gender-affirming hormone therapy: Focus on antiretrovirals and direct acting antivirals. *Expert Opinion on Drug Metabolism & Toxicology*,

16(7), 565–581. https://doi.org/10.1080/17425255.2020.1777278.

Claes, K. E. Y., D'Arpa, S., & Monstrey, S. J. (2018). Chest surgery for transgender and gender nonconforming individuals. Clinics in Plastic Surgery, 45(3), 369–380. https://doi.org/10.1016/j.cps.2018.03.010.

Claes, L., Bouman, W. P., Witcomb, G., Thurston, M., & Arcelus, J. (2015). Non-suicidal self-injury in transsexualism: Associations with psychological symptoms, victimization, interpersonal functioning and perceived social support. Journal of Sexual Medicine, 12(1), 168–179. https://doi.org/10.1111/jsm.12711.

Clark, B. A., Marshall, S. K., & Saewyc, E. M. (2020). Hormone therapy decision-making processes: Transgender youth and parents. Journal of Adolescence, 79, 136–147. https://doi.org/10.1016/j.adolescence.2019.12.016.

Clark, B. A., Veale, J. F., Townsend, M., Frohard-Dourlent, H., & Saewyc, E. (2018). Non-binary youth: Access to gender-affirming primary health care. International Journal of Transgenderism, 19(2), 158–169, https://doi.org/10.1080/15532739.2017.1394954.

Clark, K. A., White Hughto, J. M., & Pachankis, J. E. (2017). "What's the right thing to do?" Correctional healthcare providers' knowledge, attitudes and experiences caring for transgender inmates. Social Science & Medicine (1982), 193, 80–89. https://doi.org/10.1016/j.socscimed.2017.09.052.

Clark, T. C., Lucassen, M. F., Bullen, P., Denny, S. J., Fleming, T. M., Robinson, E. M., & Rossen, F. V. (2014). The health and well-being of transgender high school students: Results from the New Zealand adolescent health survey (Youth'12). Journal of Adolescent Health, 55(1), 93–99. https://doi.org/10.1016/j.jadohealth.2013.11.008.

Clements-Nolle, K., Guzman, R., & Harris, S. G. (2008). Sex trade in a male-to-female transgender population: Psychosocial correlates of inconsistent condom use. Sexual Health, 5(1), 49–54. https://doi.org/10.1071/SH07045.

Cocchetti, C., Ristori, J., Mazzoli, F., Prunas, A., Bertelloni, S., Magini, A., Vignozzi, L., Maggi, M., & Fisher, A. D. (2020). 5α-Reductase-2 deficiency: Is gender assignment recommended in infancy? Two case-reports and review of the literature. Journal of Endocrinological Investigation, 43(8), 1131–1136. https://doi.org/10.1007/s40618-020-01193-w.

Cocchetti, C., Ristori, J., Romani, A., Maggi, M., & Fisher, A. D. (2020). Hormonal treatment strategies tailored to non-binary transgender individuals. Journal of Clinical Medicine, 9(6), 1609. https://doi.org/10.3390/jcm9061609.

Cohanzad, S. (2016). Extensive metoidioplasty as a technique capable of creating a compatible analogue to a natural penis in female transsexuals. Aesthetics in Plastic Surgery, 40(1), 130–138. https://doi.org/10.1007/s00266-015-0607-4.

Cohen-Kettenis, P. T. (2005). Gender change in 46,XY persons with 5α-reductase-2 deficiency and 17β-hydroxysteroid dehydrogenase-3 deficiency. Archives of Sexual Behavior, 34(4), 399–410. https://doi.org/10.1007/s10508-005-4339-4.

Cohen-Kettenis, P. T., Owen, A., Kaijser, V. G., Bradley, S. J., & Zucker, K. J. (2003). Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: A cross-national, cross-clinic comparative analysis. Journal of Abnormal Child Psychology, 31(1), 41–53. https://doi.org/10.1023/a:1021769215342.

Cohen-Kettenis, P. T., & van Goozen, S. H. (1997). Sex reassignment of adolescent transsexuals: A follow-up study. Journal of the American Academy of Child & Adolescent Psychiatry, 36(2), 263–271. https://doi.org/10.1097/00004583-199702000-00017.

Colebunders, B., Brondeel, S., D'Arpa, S., Hoebeke, P., & Monstrey, S. (2017). An update on the surgical treatment for transgender patients. Sexual Medicine Reviews, 5(1), 103–109. https://doi.org/10.1016/j.sxmr.2016.08.001.

Colebunders, B., T'Sjoen, G., Weyers, S., & Monstrey, S. (2014). Hormonal and surgical treatment in trans-women with BRCA1 mutations: A controversial topic. Journal of Sexual Medicine, 11(10), 2496–2499. https://doi.org/10.1111/jsm.12628.

Coleman, E., Allen, M. P., & Ford, J. V. (2018). Gender variance and sexual orientation among male spirit mediums in Myanmar. Archives of Sexual Behavior, 47(4), 987–998. https://doi.org/10.1007/s10508-018-1172-0.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W. J., Monstrey, S., Adler, R. K., Brown, G. R., Devor, A. H., Ehrbar, R., Ettner, R., Eyler, E., Garofalo, R., Karasic, D. H., Lev, A. I., Mayer, G., Meyer-Bahlburg, H., Hall, B. P., Pfaefflin, F., Rachlin, K., Robinson, B., Schechter, L. S., Tangpricha, V., van Trotsenburg, M., Vitale, A., Winter, S., Whittle, S., Wylie, K. R., & Zucker, K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, Version 7. International Journal of Transgenderism, 13(4), 165–232. https://doi.org/10.1080/15532739.2011.700873.

Colizzi, M., Costa, R., & Todarello, O. (2014). Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: Results from a longitudinal study. Psychoneuroendocrinology, 39, 65–73. https://doi.org/10.1016/j.psyneuen.2013.09.029.

Colizzi, M., Costa, R., & Todarello, O. (2015). Dissociative symptoms in individuals with gender dysphoria: Is the elevated prevalence real? Psychiatry Research, 226(1), 173–180. https://doi.org/10.1016/j.psychres.2014.12.045.

Collin, L., Reisner, S. L., Tangpricha, V., & Goodman, M. (2016). Prevalence of transgender depends on the "case" definition: A systematic review. The Journal of Sexual Medicine, 13(4), 613–626. https://doi.org/10.1016/j.jsxm.2016.02.001.

Comite, F., Cutler, G. B., Jr., Rivier, J., Vale, W. W., Loriaux, D. L., & Crowley, W. F., Jr. (1981). Short-term treatment of idiopathic precocious puberty with a long-acting analogue of luteinizing hormone-releasing hormone. A preliminary report. New England Journal of Medicine, 305(26), 1546–1550. https://doi.org/10.1056/nejm198112243052602.

Comparison of State Correctional Policies in the United States. Sexuality Research and Social Policy, 16(4), 393–407. https://doi.org/10.1007/s13178-018-0354-9.

Conlin, S. E., Douglass, R. P., Larson-Konar, D. M., Gluck, M. S., Fiume, C., & Heesacker, M. (2019). Exploring nonbinary gender identities: A qualitative content analysis. *Journal of LGBT Issues in Counseling*, 13(2), 114–133. https://doi.org/10.1080/15538605.2019.1597818.

Connelly, P. J., Clark, A., Touyz, R. M., & Delles, C. (2021). Transgender adults, gender-affirming hormone therapy and blood pressure: A systematic review. *Journal of Hypertension*, 39(2), 223–230. https://doi.org/10.1097/HJH.0000000000002632.

Connelly, P. J., Marie Freel, E., Perry, C., Ewan, J., Touyz, R. M., Currie, G., & Delles, C. (2019). Gender-affirming hormone therapy, vascular health and cardiovascular disease in transgender adults. *Hypertension*, 74(6), 1266–1274. https://doi.org/10.1161/HYPERTENSIONAHA.119.13080.

Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health*, 102(1), 118–122. https://doi.org/10.2105/AJPH.2011.300315.

Cook-Daniels, L. (2016). *Understanding transgender elders*. In D. A. Harley, & P. B. Tester, *Handbook of LGBT elders* (pp. 285–308). Springer.

Coolhart, D. (2018). Helping families move from distress to resilience. In C. E. Keo-Meier & D. E. Ehrensaft (Eds.), *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive children*. American Psychological Association. https://www.jstor.org/stable/j.ctv1chrwv9

Coolhart, D., Ritenour, K., & Grodzinski, A. (2017). Experiences of ambiguous loss for parents of transgender male youth: A phenomenological exploration. *Contemporary Family Therapy*, 40(1), 28–41. https://doi.org/10.1007/s10591-017-9426-x.

Coon, D., Tuffaha, S., Christensen, J., & Bonawitz, S. C. (2013). Plastic surgery and smoking: A prospective analysis of incidence, compliance, and complications. *Plastic and Reconstructive Surgery*, 131(2), 385–391. https://doi.org/10.1097/PRS.0b013e318277886a.

Cornwall, A., & Jolly, S. (2006). Introduction: Sexuality matters. *IDS Bulletin*, 37(5), 1–11. https://doi.org/10.1111/j.1759-5436.2006.tb00295.x.

Corrective Services New South Wales. (2015). *Section 7.23 Management of transgender and intersex inmates*, Operations Procedures Manual, Sydney, NSW

Costa, A. B., da Rosa Filho, H. T., Pase, P. F., Fontanari, A. M. V., Catelan, R. F., Mueller, A., Cardoso, D., Soll, B., Schwarz, K., Schneider, M. A., Gagliotti, D. A. M., Saadeh, A., Lobato, M. I. R., Nard, H. C., & Koller, S. H. (2018). Healthcare needs of and access barriers for Brazilian transgender and gender diverse people. *Journal of Immigrant and Minority Health*, 20(1), 115–123. https://doi.org/10.1007/s10903-016-0527-7.

Costa, L. B. F., Rosa-e-Silva, A. C. J. D. S., Medeiros, S. F. D., Nacul, A. P., Carvalho, B. R. D., Benetti-Pinto, C. L., Ylea, D. A., Maciel, G. A. R., Soares, J. M., & Maranhão, T. M. D. O. (2018). Recommendations for the use of testosterone in male transgender. *Revista Brasileira de Ginecologia e Obstetrícia*, 40, 275–280. https://doi.org/10.1055/s-0038-1657788.

Costa, R., Carmichael, P., & Colizzi, M. (2016). To treat or not to treat: Puberty suppression in childhood-onset gender dysphoria. *Nature Reviews Urology*, 13(8), 456–462. https://doi.org/10.1038/nrurol.2016.128.

Costa, R., Dunsford, M., Skagerberg, E., Holt, V., Carmichael, P., & Colizzi, M. (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *The Journal of Sexual Medicine*, 12(11), 2206–2214. https://doi.org/10.1111/jsm.13034.

Cosyns, M., Van Borsel, J., Wierckx, K., Dedecker, D., Van de Peer, F., Daelman, T., Laenen, S., & T'Sjoen, G. (2014). Voice in female-to-male transsexual persons after long-term androgen therapy. *The Laryngoscope*, 124(6), 1409–1414. https://doi.org/10.1002/lary.24480.

Craig, S. L., Austin, A., 2016. The AFFIRM open pilot feasibility study: A brief affirmative cognitive behavioral coping skills group intervention for sexual and gender minority youth. *Children and Youth Services Review* 64, 136–144. https://doi.org/10.1016/j.childyouth.2016.02.022.

Craig, S. L., Austin, A., Rashidi, M., & Adams, M. (2017). Fighting for survival: The experiences of lesbian, gay, bisexual, transgender, and questioning students in religious colleges and universities. *Journal of Gay & Lesbian Social Services*, 29(1), 1–24. https://doi.org/10.1080/10538720.2016.1260512.

Crerand, C. E., Kapa, H. M., Litteral, J. L., Nahata, L., Combs, B., Indyk, J. A., Jayanthi, V. R., Chan, Y. M. ., Tishelman, A. C., & Hansen-Moore, J. (2019). Parent perceptions of psychosocial care for children with differences of sex development. *Journal of Pediatric Urology*, 15(5), 522.e1–522.e8. https://doi.org/10.1016/j.jpurol.2019.06.024.

Crissman, H. P., Berger, M. B., Graham, L. F., & Dalton, V. K. (2017). Transgender demographics: A household probability sample of US adults, 2014. *American Journal of Public Health*, 107(2), 213–215. https://doi.org/10.2105/AJPH.2016.303571.

Crissman, H. P., Warner, L., Gardner, M., Carr, M., Schast, A., Quittner, A. L., Kogan, B., & Sandberg, D. E. (2011). Children with disorders of sex development: A qualitative study of early parental experience. *International Journal of Pediatric Endocrinology*, 2011(1), 10. https://doi.org/10.1186/1687-9856-2011-10.

Crocetti, D., Monro, S., Vecchietti, V., & Yeadon-Lee, T. (2020). Towards an agency-based model of intersex, variations of sex characteristics (VSC) and DSD/dsd health. *Culture, Health & Sexuality*, 23(4), 500–515. https://doi.org/10.1080/13691058.2020.1825815.

Crouch, N. S., & Creighton, S. M. (2014). Transition of care for adolescents with disorders of sex development. *Nature Reviews Endocrinology*, 10(7), 436–442. https://doi.org/10.1038/nrendo.2014.62.

Cull, M. L., & Simmonds, M. (2010). Importance of support groups for intersex (disorders of sex development) patients, families and the medical profession. *Sexual Development*, 4(4-5), 310–312. https://doi.org/10.1159/000313889.

D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. *Archives of Sexual Behavior*, 50(1), 7–16. https://doi.org/10.1007/s10508-020-01844-2.

Dacakis, G. (2000). Long-term maintenance of fundamental frequency increases in male-to-female transsexuals. *Journal of Voice*, 14(4), 549–556. https://doi.org/10.1016/s0892-1997(00)80010-7.

Dahlen, S., Connolly, D., Arif, I., Junejo, M. H., Bewley, S., & Meads, C. (2021). International clinical practice guidelines for gender minority/trans people: Systematic review and quality assessment. *BMJ Open*, 11(4), e048943. https://doi.org/10.1136/bmjopen-2021-048943.

Dalke, K. B., Baratz, A. B., & Greenberg, J. A. (2020). Protecting children with intersex traits: Legal, ethical, and human rights considerations. In M. Legato (Ed.), *The Plasticity of Sex* (pp. 207–224). Academic Press. https://doi.org/10.1016/b978-0-12-815968-2.00010-4.

Damrose, E. J. (2008). Quantifying the impact of androgen therapy on the female larynx. *Auris, Nasus, Larynx*, 36(1), 110–112. https://doi.org/10.1016/j.anl.2008.03.002.

Danon, L. M., & Krämer, A. (2017). Between concealing and revealing intersexed bodies: Parental strategies. *Qualitative Health Research*, 27(10), 1562–1574. https://doi.org/10.1177/1049732317697100.

Darwin, H. (2020). Challenging the cisgender/transgender binary: Nonbinary people and the transgender label. *Gender & Society*, 34(3), 357–380. https://doi.org/10.1177/0891243220912256.

Davey, A., Arcelus, J., Meyer, C., & Bouman, W. P. (2016). Self-injury among trans individuals and matched controls: Prevalence and associated factors. *Health & Social Care in the Community*, 24(4), 485–494. https://doi.org/10.1111/hsc.12239.

Davey, A., Bouman, W. P., Arcelus, J., Meyer, C. (2014). Social support and psychological wellbeing: A comparison of patients with gender dysphoria and matched controls. *Journal of Sexual Medicine*, 11(12), 2976–2985. https://doi.org/10.1111/jsm.12681.

Davey, A., Bouman, W. P., Meyer, C., & Arcelus, J. (2015). Interpersonal functioning among individuals with gender dysphoria. *Journal of Clinical Psychology*, 71(12), 1173–1185. https://doi.org/10.1002/jclp.22209.

Davies, S., Papp, V. G., & Antoni, C. (2015). Voice and communication change for gender nonconforming individuals: Giving voice to the person inside. *International Journal of Transgenderism*, 16(3), 117–159. https://doi.org/10.1080/15532739.2015.1075931.

Davis, S. A., & Colton Meier, S. (2014). Effects of testosterone treatment and chest reconstruction surgery on mental health and sexuality in female-to-male transgen-

der people. *International Journal of Sexual Health*, 26(2), 113–128. https://doi.org/10.1080/19317611.2013.833152.

Day, J. K., Perez-Brumer, A., & Russell, S. T. (2018). Safe schools? Transgender youth's school experiences and perceptions of school climate. *Journal of Youth and Adolescence*, 47(8), 1731–1742. https://doi.org/10.1007/s10964-018-0866-x.

de Blok, C. J. M., Dijkman, B. A. M., Wiepjes, C. M., Staphorsius, A. S., Timmermans, F. W., Smit, J. M., Dreijerink, K. M. A., & den Heijer, M. (2021). Sustained breast development and breast anthropometric changes in 3 years of gender-affirming hormone treatment. *Journal of Clinical Endocrinology & Metabolism*, 106(2), e782–e790. https://doi.org/10.1210/clinem/dgaa841.

de Blok, C. J. M., Staphorsius, A. S., Wiepjes, C. M., Smit, J. M., Nanayakkara, P. W. B., & den Heijer, M. (2020). Frequency, determinants, and satisfaction of breast augmentation in trans women receiving hormone treatment. *The Journal of Sexual Medicine*, 17(2), 342–348. https://doi.org/10.1016/j.jsxm.2019.10.021.

De Cuypere, G., & Vercruysse, H. (2009). Eligibility and readiness criteria for sex reassignment surgery: Recommendations for revision of the WPATH standards of care. *International Journal of Transgenderism*, 11(3), 194–205. https://doi.org/10.1080/15532730903383781.

de Freitas, L. D., Leda-Rego, G., Bezerra-Filho, S., & Miranda-Scippa, A. (2020). Psychiatric disorders in individuals diagnosed with gender dysphoria: A systematic review. *Psychiatry Clinical Neuroscience*, 74(2), 99–104. https://doi.org/10.1111/pcn.12947.

de Graaf, N. M., Carmichael, P., Steensma, T. D., & Zucker, K. J. (2018). Evidence for a change in the sex ratio of children referred for gender dysphoria: Data from the Gender Identity Development Service in London (2000–2017). *The Journal of Sexual Medicine*, 15(10), 1381–1383. https://doi.org/10.1016/j.jsxm.2018.08.002.

de Graaf, N. M., Giovanardi, G., Zitz, C., & Carmichael, P. (2018). Sex ratio in children and adolescents referred to the Gender Identity Development Service in the UK (2009–2016). *Archives of Sexual Behavior*, 47(5), 1301–1304. https://doi.org/10.1007/s10508-018-1204-9.

de Graaf, N. M., Steensma, T. D., Carmichael, P., VanderLaan, D. P., Aitken, M., Cohen-Kettenis, P. T., de Vries, A. L. C., Kreukels, B. P. C., Wasserman, L., Wood, H., & Zucker, K. J. (2020). Suicidality in clinic-referred transgender adolescents. *European Child & Adolescent Psychiatry*. https://doi.org/10.1007/s00787-020-01663-9.

De Los Reyes, A., Ohannessian, C. M., & Racz, S. J. (2019). Discrepancies between adolescent and parent reports about family relationships. *Child Development Perspectives*, 13(1), 53–58. https://doi.org/10.1111/cdep.12306.

de Nie, I., Meißner, A., Kostelijk, E. H., Soufan, A. T., Voorn-de Warem, I. A. C., den Heijer, M., Huirne, J., & van Mello, N. M. (2020). Impaired semen quality in trans women: Prevalence and determinants. *Human Reproduction*, 35(7), 1529–1536. https://doi.org/10.1093/humrep/deaa133.

de Oliveira, L., Carvalho, J., Sarikaya, S., Urkmez, A., Salonia, A., Russo, G. I., & EAU-YAU Men's Health Working group. (2021). Patterns of sexual behavior and psychological processes in asexual persons: A systematic review. *International Journal of Impotence Research, 33*(6), 641–651. https://doi.org/10.1038/s41443-020-0336-3.

de Roo, C., Lierman, S., Tilleman, K., Peynshaert, K., Braeckmans, K., Caanen, M., Lambalk, C. B., Weyers, S., T'Sjoen, G., Cornelissen, R., & De Sutter, P. (2017). Ovarian tissue cryopreservation in female-to-male transgender people: Insights into ovarian histology and physiology after prolonged androgen treatment. *Reproductive Biomedicine Online, 34*(6), 557–566. https://doi.org/10.1016/j.rbmo.2017.03.008.

de Roo, C., Tilleman, K., T'Sjoen, G., & De Sutter, P. (2016). Fertility options in transgender people. *International Review of Psychiatry, 28*(1), 112–119. https://doi.org/10.3109/09540261.2015.1084275.

De Sutter, P., Kira, K., Verschoor, A., & Hotimsky (2002). The desire to have children and the preservation of fertility in transsexual women: A survey. *International Journal of Transgenderism, 6*(3), 3–97.

de Vries, A. L. C., & Cohen-Kettenis, P. T. (2012). Clinical management of gender dysphoria in children and adolescents: The Dutch approach. *Journal of Homosexuality, 59*(3), 301–320. https://doi.org/10.1080/00918369.2012.653300.

de Vries, A. L. C., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2007). Disorders of sex development and gender identity outcome in adolescence and adulthood: Understanding gender identity development and its clinical implications. *Pediatric Endocrinology Reviews, 4*(4), 343–351.

de Vries, A. L. C., Doreleijers, T. A. H., Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Psychiatric comorbidity in gender dysphoric adolescents. *Journal of Child Psychology and Psychiatry, 52*(11), 1195–1202. https://doi.org/10.1111/j.1469-7610.2011.02426.x.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics, 134*(4), 696–704. https://doi.org/10.1542/peds.2013-2958.

de Vries, A. L. C., Noens, I. L. J., Cohen-Kettenis, P. T., van Berckelaer-Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders, 40*(8), 930–936. https://doi.org/10.1007/s10803-010-0935-9.

de Vries, A. L. C., Richards, C., Tishelman, A. C., Motmans, J., Hannema, S. E., Green, J., & Rosenthal, S. M. (2021). Bell v Tavistock and Portman NHS Foundation Trust [2020] EWHC 3274: Weighing current knowledge and uncertainties in decisions about gender-related treatment for transgender adolescents. *International Journal of Transgender Health, 22*(3), 1–8. https://doi.org/10.1080/26895269.2021.1904330.

de Vries, A. L. C., Roehle, R., Marshall, L., Frisén, L., van de Grift, T. C., Kreukels, B. P. C., Bouvattier, C., Köhler, B., Thyen, U., Nordenström, A., Rapp, M., & Cohen-Kettenis, P. T. (2019). Mental health of a large group of adults with disorders of sex development in six European countries. *Psychosomatic Medicine, 81*(7), 629–640. https://doi.org/10.1097/psy.0000000000000718.

de Vries, A. L. C., Steensma, T. D., Cohen-Kettenis, P. T., VanderLaan, D. P., & Zucker, K. J. (2015). Poor peer relations predict parent- and self-reported behavioral and emotional problems of adolescents with gender dysphoria: A cross-national, cross-clinic comparative analysis. *European Child & Adolescent Psychiatry, 25*(6), 579–588. https://doi.org/10.1007/s00787-015-0764-7.

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *The Journal of Sexual Medicine, 8*(8), 2276–2283. https://doi.org/10.1111/j.1743-6109.2010.01943.x.

de Vries, E., Kathard, H., & Müller, A. (2020). Debate: Why should gender-affirming health care be included in health science curricula? *BMC Medical Education, 20*(1), 51. https://doi.org/10.1186/s12909-020-1963-6.

Defreyne, J., Elaut, E., Kreukels, B., Fisher, A. D., Castellini, G., Staphorsius, A., & T'Sjoen, G. (2020). Sexual desire changes in transgender individuals upon initiation of hormone treatment: Results from the longitudinal European Network for the Investigation of Gender Incongruence. *The Journal of Sexual Medicine, 17*(4), 812–825. https://doi.org/10.1016/j.jsxm.2019.12.020.

Defreyne, J., Motmans, J., & T'Sjoen, G. (2017). Healthcare costs and quality of life outcomes following gender affirming surgery in trans men: A review. *Expert Review of Pharmacoeconomics & Outcomes Research, 17*(6), 543–556. https://doi.org/10.1080/14737167.2017.1388164.

Defreyne, J., Nota, N., Pereira, C., Schreiner, T., Fisher, A. D., den Heijer, M., & T'Sjoen, G. (2017). Transient elevated serum prolactin in trans women is caused by Cyproterone Acetate treatment. *LGBT Health, 4*(5), 328–336. https://doi.org/10.1089/lgbt.2016.0190.

Defreyne, J., Van de Bruaene, L. D., Rietzschel, E., Van Schuylenbergh, J., & T'Sjoen, G. G. (2019). Effects of gender-affirming hormones on lipid, metabolic, and cardiac surrogate blood markers in transgender persons. *Clinical Chemistry, 65*(1), 119–134. https://doi.org/10.1373/clinchem.2018.288241.

Defreyne, J., Van Schuylenbergh, J., Motmans, J., Tilleman, K. L., & T'Sjoen, G. G. (2020). Parental desire and fertility preservation in assigned female at birth transgender people living in Belgium. *Fertility and Sterility 113*(1), 149–157. https://doi.org/10.1016/j.fertnstert.2019.09.002.

Defreyne, J., Vantomme, B., Van Caenegem, E., Wierckx, K., De Blok, C. J. M., Klaver, M., & T'Sjoen, G. (2018). Prospective evaluation of hematocrit in gender-affirming hormone treatment: Results from European Network for the Investigation of Gender Incongruence. *Andrology, 6*(3), 446–454. https://doi.org/10.1111/andr.12485.

Dekker, M. J., Wierckx, K., Van Caenegem, E., Klaver, M., Kreukels, B. P., Elaut, E., & T'Sjoen, G. (2016). A



European Network for the investigation of gender incongruence: Endocrine part. *The Journal of Sexual Medicine*, 13(6), 994–999. https://doi.org/10.1016/j.jsxm.2016.03.371.

Delemarre-van de Waal, H. A., & Cohen-Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology*, 155(Suppl. 1), S131–S137. https://doi.org/10.1530/eje.1.02231.

Delimata, N., Simmonds, M., O'Brien, M., Davis, G., Auchus, R., & Lin-Su, K. (2018). Evaluating the term 'disorders of sex development': A multidisciplinary debate. *Social Medicine*, 12(1):98–107.

Delozier, A. M., Kamody, R. C., Rodgers, S., & Chen, D. (2020). Health disparities in transgender and gender expansive adolescents: A topical review from a minority stress framework. *Journal of Pediatric Psychology*, 45(8), 842–847. https://doi.org/10.1093/jpepsy/jsaa040.

Demeestere, I., Simon, P., Dedeken, L., Moffa, F., Tsépélidis, S., Brachet, C., Delbaery, A., Devreker, A. F., & Ferster, A. (2015). Live birth after autograft of ovarian tissue cryopreserved during childhood. *Human Reproduction*, 30(9), 2107–2109. https://doi.org/10.1093/humrep/dev128.

Denby, K. J., Cho, L., Toljan, K., Patil, M., & Ferrando, C. A. (2021). Assessment of cardiovascular risk in transgender patients presenting for gender-affirming care. *The American Journal of Medicine*, 134(8), 1002–1008. https://doi.org/10.1016/j.amjmed.2021.02.031.

Department of Health and Human Services. Panel on Antiretroviral Guidelines for Adults and Adolescents. (2019) *Guidelines for the use of antiretroviral agents in adults and adolescents with HIV*. Transgender People and HIV. https://clinicalinfo.hiv.gov/en/guidelines/adult-and-adolescent-arv/transgender-people-hiv

Dessens, A. B., Slijper, F. M. E., & Drop, S. L. S. (2005). Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. *Archives of Sexual Behavior*, 34(4), 389–397. https://doi.org/10.1007/s10508-005-4338-5.

Deuster, D., Di Vincenzo, K., Szukaj, M., Am Zehnhoff-Dinnesen, A., & Dobel, C. (2016). Change of speech fundamental frequency explains the satisfaction with voice in response to testosterone therapy in female-to-male gender dysphoric individuals. *European Archives of Oto-Rhino-Laryngology*, 273(8), 2127–2131. https://doi.org/10.1007/s00405-016-4043-0.

Deuster, D., Matulat, P., Knief, A., Zitzmann, M., Rosslau, K., Szukaj, M., Dinnesen, A., & Schmidt, C. M. (2016). Voice deepening under testosterone treatment in female-to-male gender dysphoric individuals. *European Archives of Oto-Rhino-Laryngology*, 273(4), 959–965. https://doi.org/10.1007/s00405-015-3846-8.

Deutsch, M. B. (2011). Use of the informed consent model in the provision of cross-sex hormone therapy: A survey of the practices of selected clinics. *International Journal of Transgenderism*, 13, 140–146. https://doi.org/10.1080/15532739.2011.675233.

Deutsch, M. B. (2016a). *Guidelines for the primary and gender-affirming care of transgender and gender nonbinary people* (2nd ed.). University of California, San Francisco, Department of Family and Community Medicine Center of Excellence for Transgender Health. https://transcare.ucsf.edu/guidelines

Deutsch, M. B. (2016b). Gender-affirming surgeries in the era of insurance coverage: Developing a framework for psychosocial support and care navigation in the perioperative period. *Journal of Health Care for the Poor and Underserved*, 27(2), 386–391. https://doi.org/10.1353/hpu.2016.0092.

Deutsch, M. B., Bhakri, K., & Kubicek, K. (2015). Effects of cross-sex hormone treatment on transgender women and men. *Obstetric Gynecology*, 125(3), 605–610. https://doi.org/10.1097/AOG.0000000000000692.

Deutsch, M. B., Glidden, D. V., Sevelius. J., Keatley. J., McMahan, V., & Guanira. J., (2015). HIV pre-exposure prophylaxis in transgender women: A subgroup analysis of the iPrEx trial. *The Lancet HIV*, 2(12), e512-e9. https://doi.org/10.1016/S2352-3018(15)00206-4.

Devor, A. (2004). Witnessing and mirroring: A fourteen stage model of transsexual identity formation. *Journal of Gay & Lesbian Mental Health*, 8(1), 41–67. https://doi.org/10.1080/19359705.2004.9962366.

DeVita, T., Bishop, C., & Plankey, M. (2018). Queering medical education: Systematically assessing LGBTQI health competency and implementing reform. *Medical Education Online*, 23(1), 1510703. https://doi.org/10.1080/10872981.2018.1510703.

Dharma, C., Scheim, A. I., & Bauer, G. R. (2019). Exploratory factor analysis of two sexual health scales for transgender people: Trans-specific condom/barrier negotiation self-efficacy (T-barrier) and trans-specific sexual body image worries (T-worries). *Archives of Sexual Behavior*, 48(5), 1563–1572. https://doi.org/10.1007/s10508-018-1383-4.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS One*, 6(2), e16885. https://doi.org/10.1371/journal.pone.0016885.

Dhejne, C., Van Vlerken, R., Heylens, G., & Arcelus, J. (2016). Mental health and gender dysphoria: A review of the literature. *International Review of Psychiatry*, 28(1), 44–57. https://doi.org/10.3109/09540261.2015.1115753.

Dick, B., & Ferguson, B. J. (2015). Health for the world's adolescents: A second chance in the second decade. *Journal of Adolescent Health*, 56(1), 3–6. https://doi.org/10.1016/j.jadohealth.2014.10.260.

Dierckx, M., Mortelmans, D., & Motmans, J. (2019). Role ambiguity and role conflict among partners of trans people. *Journal of Family Issues*, 40(1), 85–110. https://doi.org/10.1177/0192513X18800362.

Din-Dzietham, R., Nembhard, W. N., Collins, R., & Davis, S. K. (2004). Perceived stress following race-based discrimination at work is associated with hypertension in

African–Americans. The metro Atlanta heart disease study, 1999–2001. *Social Science & Medicine*, *58*(3), 449–461. https://doi.org/10.1016/S0277-9536(03)00211-9.

Dizon, D. S., Tejada-Berges, T., Koelliker, S., Steinhoff, M., & Granai, C. O. (2006). Ovarian cancer associated with testosterone supplementation in a female-to-male transsexual patient. *Gynecologic and Obstetric Investigation*, *62*(4), 226–228. https://doi.org/10.1159/000094097.

Djordjevic, M. L., Majstorovic, M., Stanojevic, D., Bizic, M., Ducic, S., Kojovic, V., & Perovic, S. (2008). One-stage repair of severe hypospadias using combined buccal mucosa graft and longitudinal dorsal skin flap. *European Journal of Pediatric Surgery*, *18*(6), 427–430. https://doi.org/10.1055/s-2008-1038929.

Do, T. T., Nguyen, T. V. A., Vu, X. T., & Nguyen, T. P. T. (2018). Seeking healthcare as a transgender woman in Vietnam: Access barriers and the situation of hormone use. *Regional Journal of Southeast Asian Studies*, *3*(2), 30–58. http://www.rjseas.org/journalview/5

Donnez, J., & Dolmans, M. M. (2015). Ovarian cortex transplantation: 60 reported live births brings the success and worldwide expansion of the technique towards routine clinical practice. *Journal of Assisted Reproduction and Genetics*, *32*(8), 1167–1170. https://doi.org/10.1007/s10815-015-0544-9.

Downing, J. M., & Przedworski, J. M. (2018). Health of transgender adults in the U.S., 2014–2016. *American Journal of Preventive Medicine*, *55*(3), 336–344. https://doi.org/10.1016/j.amepre.2018.04.045.

Dragon, C. N., Guerino, P., Ewald, E., & Laffan, A. M. (2017). Transgender Medicare beneficiaries and chronic conditions: Exploring fee-for-service claims data. *LGBT Health*, *4*(6), 404–411. https://doi.org/10.1089/lgbt.2016.0208.

Drescher, J., Cohen-Kettenis, P. T., & Reed, G. M. (2016). Gender incongruence of childhood in the ICD-11: Controversies, proposal, and rationale. *The Lancet Psychiatry*, *3*(3), 297–304. https://doi.org/10.1016/S2215-0366(15)00586-6.

Drescher, J., Cohen-Kettenis, P., & Winter, S. (2012). Minding the body: situating gender identity diagnoses in the ICD-11. *International Review of Psychiatry*, *24*(6), 568–577. https://doi.org/10.3109/09540261.2012.741575.

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow-up study of girls with gender identity disorder. *Developmental Psychology*, *44*(1), 34–45. https://doi.org/10.1037/0012-1649.44.1.34.

DSD-TRN—Differences or Disorders of Sex Development Translational Research Network. (n.d.). http://dsdtrn.org/.

Du Bois, S. N., Yoder, W., Guy, A. A., Manser, K., & Ramos, S. (2018). Examining associations between state-level transgender policies and transgender health. *Transgender Health*, *3*(1), 220–224. https://doi.org/10.1089/trgh.2018.0031.

Dubin, S. N., Nolan, I. T., Streed, C. G.Jr., Greene, R. E., Radix, A. E., & Morrison, S. D. (2018). Transgender health care: improving medical students' and residents'
training and awareness. *Advances in Medical Education and Practice*, *9*, 377–91. https://doi.org/10.2147/AMEP.S147183.

Dubin, S., Lane, M., Morrison, S., Radix, A., Belkind, U., Vercler, C., & Inwards-Breland, D. (2020). Medically assisted gender affirmation: When children and parents disagree. *Journal of Medical Ethics*, *46*(5), 295–299. https://doi.org/10.1136/medethics-2019-105567.

Duby, Z., Hartmann, M., Mahaka, I., Munaiwa, O., Nabukeera, J., Vilakazi, N., Mthembu, F., Colvin, C. J., Mensch, B., & van der Straten, A. (2015). Lost in Translation: Language, terminology, and understanding of penile-anal intercourse in an HIV prevention trial in South Africa, Uganda, and Zimbabwe. *The Journal of Sex Research*, *53*(9), 1096–1106. https://doi.org/10.1080/00224499.2015.1069784.

Duranteau, L., Rapp, M., van de Grift, T. C., Hirschberg, A. L., & Nordenskjöld, A. (2021). Participant- and clinician-reported long-term outcomes after surgery in individuals with complete androgen insensitivity syndrome. *Journal of Pediatric and Adolescent Gynecology*, *34*(2), 168–175. https://doi.org/10.1016/j.jpag.2020.11.012.

Durwood, L., Eisner, L., Fladeboe, K., Ji, C. G., Barney, S., McLaughlin, K. A., & Olson, K. R. (2021). Social support and internalizing psychopathology in transgender youth. *Journal of Youth and Adolescence*, *50*(5), 841–854. https://doi.org/10.1007/s10964-020-01391-y.

Durwood, L., McLaughlin, K. A., & Olson, K. R. (2017). Mental health and self-worth in socially transitioned transgender youth. *Journal of the American Academy of Child & Adolescent Psychiatry*, *56*(2), 116–123. https://doi.org/10.1016/j.jaac.2016.10.016.

Dy, G. W., Granieri, M. A., Fu, B. C., Vanni, A. J., Voelzke, B., Rourke, K. F., Elliott, S. P., Nikolavsky, D., & Zhao, L. C. (2019). Presenting complications to a reconstructive urologist after masculinizing genital reconstructive surgery. *Urology*, *132*, 202–206. https://doi.org/10.1016/j.urology.2019.04.051.

Dyer, C. (2020). Children are "highly unlikely" to be able to consent to taking puberty blockers, rules High Court. *BMJ*, m4699. https://doi.org/10.1136/bmj.m4699.

Ediati A., Juniarto, A. Z., Birnie, E., Okkerse, J., Wisniewski, A., Drop, S., Dessens, A. (2017). Ediati, A., Juniarto, A. Z., Birnie, E., Okkerse, J., Wisniewski, A., Drop, S., Faradz, S. M. H., & Dessens, A. (2017). Social stigmatisation in late identified patients with disorders of sex development in Indonesia. *BMJ Paediatrics Open*, *1*(1), e000130. https://doi.org/10.1136/bmjpo-2017-000130.

Edmo v. Idaho Department of Corrections, Corizon, Inc. et al.; case number 1:17-cv-151-BLW, 2020.

Edwards-Leeper, L., Feldman, H. A., Lash, B. R., Shumer, D. E., & Tishelman, A. C. (2017). Psychological profile of the first sample of transgender youth presenting for medical intervention in a U.S. pediatric gender center. *Psychology of Sexual Orientation and Gender Diversity*, *4*(3), 374–382.

Edwards-Leeper, L., Leibowitz, S., & Sangganjanavanich, V. F. (2016). Affirmative practice with transgender and gen-


der nonconforming youth: Expanding the model. *Psychology of Sexual Orientation and Gender Diversity*, 3(2), 165–172. https://doi.org/10.1037/sgd0000167.

Edwards-Leeper, L., & Spack, N. P. (2012). Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service" (GeMS) in a major pediatric center. *Journal of Homosexuality*, 59(3), 321–336. https://doi.org/10.1080/00918369.2012.653302.

Efstathiou, E., Davis, J. W., Pisters, L., Li, W., Wen, S., McMullin, R. P., Gormley, M., Ricci, D., Titus, M., Hoang, A., Zurita, A. J., Tran, N., Peng, W., Kheoh, T., Molina, A., Troncoso, P., & Logothetis, C. J. (2019). Clinical and biological characterisation of localised high-risk prostate cancer: Results of a randomised pre-operative study of a luteinising hormone-releasing hormone agonist with or without abiraterone acetate plus prednisone. *European Urology*, 76(4), 418–424. https://doi.org/10.1016/j.eururo.2019.05.010.

Eftekhar Ardebili, M., Janani, L., Khazaei, Z., Moradi, Y., & Baradaran, H. R. (2020). Quality of life in people with transsexuality after surgery: A systematic review and meta-analysis. *Health and Quality of Life Outcomes*, 18, 264. https://doi.org/10.1186/s12955-020-01510-0.

Ehrensaft, D. (2016). *The gender creative child: Pathways for nurturing and supporting children who live outside gender boxes*. The Experiment.

Ehrensaft, D. (2018). Exploring gender expansive expressions. In Keo-Meier, C., & Ehrensaft, D. (Eds), *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive children*. American Psychological Association.

Ehrensaft, D., Giammattei, S. V., Storck, K., Tishelman, A. C., & Keo-Meier, C. (2018). Prepubertal social gender transitions: What we know; what we can learn—A view from a gender affirmative lens. *International Journal of Transgenderism*, 19(2), 251–268. https://doi.org/10.1080/15532739.2017.1414649.

Eisenberg, M. E., Gower, A. L., McMorris, B. J., Rider, G. N., Shea, G., & Coleman, E. (2017). Risk and protective factors in the lives of transgender/gender nonconforming adolescents. *Journal of Adolescent Health*, 61(4), 521–526. https://doi.org/10.1016/j.jadohealth.2017.04.014.

Eisenberg, M. E., McMorris, B. J., Rider, G. N., Gower, A. L., & Coleman, E. (2020). "It's kind of hard to go to the doctor's office if you're hated there." A call for gender-affirming care from transgender and gender diverse adolescents in the United States. *Health & Social Care in the Community*, 28(3), 1082–1089. https://doi.org/10.1111/hsc.12941.

Elamin, M. B., Garcia, M. Z., Murad, M. H., Erwin, P. J., & Montori, V. M. (2010). Effect of sex steroid use on cardiovascular risk in transsexual individuals: A systematic review and meta-analyses. *Clinical Endocrinology*, 72(1), 1–10. https://doi.org/10.1111/j.1365-2265.2009.03632.x.

El-Hadi, H., Stone, J., Temple-Oberle, C., & Harrop, A. R. (2018). Gender-affirming surgery for transgender indi-

viduals: Perceived satisfaction and barriers to care. *Plastic Surgery*, 26(4), 263–268. https://doi.org/10.1177/2292550318767437.

Eliason, M. J., Dibble, S., & DeJoseph, J. (2010). Nursing's silence on lesbian, gay, bisexual, and transgender issues: The need for emancipatory efforts. *Advances in Nursing Science*, 33(3), 206–218.218. https://doi.org/10.1097/ANS.0b013e3181e63e49.

Ellens, R. E. H., Bakula, D. M., Mullins, A. J., Scott Reyes, K. J., Austin, P., Baskin, L., Bernabé, K., Cheng, E. Y., Fried, A., Frimberger, D., Galan, D., Gonzalez, L., Greenfield, S., Kolon, T., Kropp, B., Lakshmanan, Y., Meyer, S., Meyer, T., Mullins, L. L., & Nokoff, N. J. (2017). Psychological adjustment of parents of children born with atypical genitalia 1 Year after genitoplasty. *Journal of Urology*, 198(4), 914–920. https://doi.org/10.1016/j.juro.2017.05.035.

Ellis, S. A., Wojnar, D. M., & Pettinato, M. (2015). Conception, pregnancy, and birth experiences of male and gender variant gestational parents: It's how we could have a family. *Journal of Midwifery and Women's Health*, 60(1), 62–69. https://doi.org/10.1111/jmwh.12213.

Ellis, S. J., Wakefield, C. E., McLoone, J. K., Robertson, E. G., & Cohn, R. J. (2016). Fertility concerns among child and adolescent cancer survivors and their parents: A qualitative analysis. *Journal of Psychosocial Oncology*, 34(5), 347–362. https://doi.org/10.1080/07347332.2016.1196806.

Embaye, N. (2006). Affirmative psychotherapy with bisexual transgender people. *Journal of Bisexuality*, 6(1-2), 51–63. https://doi.org/10.1300/J159v06n01_04.

Emmer, P., Lowe, A., & Marshall, R. B. (2011). *This is a prison, glitter is not allowed : Experiences of trans and gender variant people in Pennsylvania's Prison Systems : A report by the hearts on a wire collective*. Hearts On A Wire Collective.

Endocrine Society, Pediatric Endocrine Society. (2020). *Position statement: Transgender health*. Endocrine Society.

Ernst, M. E., Sandberg, D. E., Keegan, C., Quint, E. H., Lossie, A. C., & Yashar, B. M. (2016). The lived experience of MRKH: Sharing health information with peers. *Journal of Pediatric and Adolescent Gynecology*, 29(2), 154–158. https://doi.org/10.1016/j.jpag.2015.09.009.

Equality and Human Rights Commission. (2021) Guide on Article 8 of the European Convention on Human Rights (2021). *Right to respect for private and family life, home and correspondence*. https://www.equalityhumanrights.com/en/human-rights-act/article-8-respect-your-private-and-family-life

Esmonde, N., Heston, A., Jedrzejewski, B., Ramly, E., Annen, A., Guerriero, J., Hansen, J., & Berli, J. (2019). What is "nonbinary" and what do I need to know? A primer for surgeons providing chest surgery for transgender patients. *Aesthetic Surgery Journal*, 39(5), NP106–NP112. https://doi.org/10.1093/asj/sjy166.

Esteva de Antonio, I., Gómez-Gil, E., & GIDSEEN Group (2013). Coordination of healthcare for transsexual per-

sons: A multidisciplinary approach. *Current Opinions Endocrinology, Diabetes and* Obesity, *20*(6), 585–591. https://doi.org/10.1097/01.med.0000436182.42966.31.

Ethics Committee of the American Society for Reproductive Medicine. (2015). Access to fertility services by transgender persons: An Ethics Committee opinion. *Fertility and Sterility, 104*(5), 1111–1115. https://doi.org/10.1016/j.fertnstert.2015.08.021.

Ettner, R. (2013). Care of the elderly transgender patient. *Current Opinion in Endocrinology, Diabetes and Obesity, 20*(6), 580–584. https://doi.org/10.1097/01.med.0000436183.34931.a5.

Ettner, R., & Wylie, K. (2013). Psychological and social adjustment in older transsexual people. *Maturitas, 74*(3), 226–229. https://doi.org/10.1016/j.maturitas.2012.11.011.

Ettner, R., Monstrey, S., & Coleman, E. (2016). *Theories of the etiology of transgender identity.* In R. Ettner, S. Monstrey, & E. Coleman (Eds.), *Principles of Transgender Medicine and Surgery* (pp. 17–29). Routledge.

European Medicines Agency. (2020). *Restrictions in use of cyproterone due to meningioma risk.* https://www.ema.europa.eu/en/documents/referral/cyproterone-article-31-referral-restrictions-use-cyproterone-due-meningioma-risk_en-0.pdf

European Union Agency for Fundamental Rights. (2020). *EU-LGBTI II: A long way to go for LGBTI equality.* Publications Office of the European Union.

Evans, S., Crawley, J., Kane, D., & Edmunds, K. (2021). The process of transitioning for the transgender individual and the nursing imperative: A narrative review. *Journal of Advanced Nursing, 77*(12), 4646–4660. https://doi.org/10.1111/jan.14943.

Ewald, E. R., Guerino, P., Dragon, C., Laffan, A. M., Goldstein, Z., & Streed, C. (2019). Identifying Medicare beneficiaries accessing transgender-related care in the era of ICD-10. *LGBT Health, 6*(4), 166–173. https://doi.org/10.1089/lgbt.2018.0175.

Expósito-Campos, P. (2021). A typology of gender detransition and its implications for healthcare providers. *Journal of Sex & Marital Therapy, 47*(3), 270–280. https://doi.org/10.1080/0092623X.2020.1869126.

Eyssel, J., Koehler, A., Dekker, A., Sehner, S., & Nieder, T. O. (2017). Needs and concerns of transgender individuals regarding interdisciplinary transgender healthcare: A non-clinical online survey. *PloS One, 12*(8), e0183014. https://doi.org/10.1371/journal.pone.0183014.

Fabbre, V. D., & Gaveras, E. (2020). The manifestation of multilevel stigma in the lived experiences of transgender and gender nonconforming older adults. *American Journal of Orthopsychiatry, 90*(3), 350. https://doi.org/10.1037/ort0000440.

Fakin, R. M., Zimmermann, S., Kaye, K., Lunger, L., Weinforth, G., & Giovanoli, P. (2019). Long-term outcomes in breast augmentation in trans-women: A 20-year experience. *Aesthetic Surgery Journal, 39*(4), 381–390. https://doi.org/10.1093/asj/sjy143.

Falcone, M., Garaffa, G., Gillo, A., Dente, D., Christopher, A. N., & Ralph, D. J. (2018). Outcomes of inflatable penile prosthesis insertion in 247 patients completing female to male gender reassignment surgery. *BJU International, 121*(1), 139–144. https://doi.org/10.1111/bju.14027.

Fast, A. A., & Olson, K. R. (2017). Gender development in transgender preschool children. *Child Development, 89*(2), 620–637. https://doi.org/10.1111/cdev.12758.

Fayne, R. A., Perper, M., Eber, A. E., Aldahan, A. S., & Nouri, K. (2018). Laser and light treatments for hair reduction in Fitzpatrick skin types IV–VI: A comprehensive review of the literature. *American Journal of Clinical Dermatology, 19*(2), 237–252. https://doi.org/10.1007/s40257-017-0316-7.

Fedele, D. A., Kirk, K., Wolfe-Christensen, C., Phillips, T. M., Mazur, T., Mullins, L. L., Chernausek, S. D., & Wisniewski, A. B. (2010). Primary caregivers of children affected by disorders of sex development: Mental health and caregiver characteristics in the context of genital ambiguity and genitoplasty. *International Journal of Pediatric Endocrinology, 2010*, 1–7. https://doi.org/10.1155/2010/690674.

Federal Bureau of Prisons. (2016). *Transgender clinical care.* https://www.bop.gov/resources/pdfs/trans_guide_dec_2016.pdf

Feinberg, L. (1996). *Transgender warriors; Making history from Joan of Arc to Marsha P. Johnson and Beyond.* Beacon Press.

Feldman, J., Brown, G. R., Deutsch, M. B., Hembree, W., Meyer, W., Meyer-Bahlburg, H. F., Tangpricha, V., T'Sjoen, G., & Safer, J. D. (2016). Priorities for transgender medical and healthcare research. *Current Opinion in Endocrinology, Diabetes, and Obesity, 23*(2), 180–187. https://doi.org/10.1097/MED.0000000000000231.

Ferguson, H. J., Brunsdon, V. E. A. & Bradford, E. E. F. (2021). The developmental trajectories of executive function from adolescence to old age. *Science Reports, 11*, 1382. https://doi.org/10.1038/s41598-020-80866-1.

Fernandez, A. A., França, K., Chacon, A. H., & Nouri, K. (2013). From flint razors to lasers: A timeline of hair removal methods. *Journal of Cosmetic Dermatology, 12*(2), 153–162. https://doi.org/10.1111/jocd.12021.

Ferrando, C. A. (2020). Adverse events associated with gender affirming vaginoplasty surgery. *American Journal of Obstetrics and Gynecology, 223*(2), 267.e1–267.e6. https://doi.org/10.1016/j.ajog.2020.05.033.

Fiani, C. N., & Han, H. J. (2019). Navigating identity: Experiences of binary and non-binary transgender and gender non-conforming (TGNC) adults. *International Journal of Transgenderism, 20*(2-3), 181–194. https://doi.org/10.1080/15532739.2018.1426074.

Fielding, L. (Ed.). (2021). *Trans sex: Clinical approaches to trans sexualities and erotic embodiments* (Vol. 1). Routledge. https://doi.org/10.4324/9780429318290.

Finlayson, C., Johnson, E. K., Chen, D., Dabrowski, E., Gosiengfiao, Y., Campo-Engelstein, L., & Woodruff, T. K. (2016). Proceedings of the working group session on fertility preservation for individuals with gender and sex diversity. *Transgender Health, 1*(1), 99–107. https://doi.org/10.1089/trgh.2016.0008.



Fischer, O. J. (2021). Non-binary reproduction: Stories of conception, pregnancy, and birth. *International Journal of Transgender Health*, 22 (1–2), 77–88. https://doi.org/10.1080/26895269.2020.1838392.

Fisher, A. D., Castellini, G., Ristori, J., Casale, H., Cassioli, E., Sensi, C., & Maggi, M. (2016). Cross-sex hormone treatment and psychobiological changes in transsexual persons: Two-year follow-up data. *The Journal of Clinical Endocrinology & Metabolism*, 101(11), 4260–4269. https://doi.org/10.1210/jc.2016-1276.

Fisher, A. D., Ristori, J., Fanni, E., Castellini, G., Forti, G., & Maggi, M. (2016). Gender identity, gender assignment and reassignment in individuals with disorders of sex development: A major of dilemma. *Journal of Endocrinological Investigation*, 39(11), 1207–1224. https://doi.org/10.1007/s40618-016-0482-0.

Fisher, C. M., Waling, A., Kerr, L., Bellamy, R., Ezer, P., & Mikolajczak, G. (2019). *6th National Survey of Australian Secondary Students and Sexual Health 2018* (ARCSHS Monograph Series No. 113). Australian Research Centre in Sex, Health & Society.

Fitzpatrick, L. A., Pace, C., Wiita, B. (2000). Comparison of regimens containing oral micronized progesterone or medroxyprogesterone acetate on quality of life in post-menopausal women: A cross-sectional survey. *Journal of Womens Health & Gender-Based Medicine*. 9(4), 381–387. https://doi.org/10.1089/15246090050020691.

Fix, L., Durden, M., Obedin-Maliver, J., Moseson, H., Hastings, J., Stoeffler, A., & Baum, S. E. (2020). Stakeholder perceptions and experiences regarding access to contraception and abortion for transgender, non-binary, and gender-expansive individuals assigned female at birth in the U.S. *Archives of Sexual Behaviour*, 49(7), 2683–2702. https://doi.org/10.1007/s10508-020-01707-w.

Fleming, L., Knafl, K., & Van Riper, M. (2017). How the child's gender matters for families having a child with congenital adrenal hyperplasia. *Journal of Family Nursing*, 23(4), 516–533. https://doi.org/10.1177/1074840717735499.

Flentje, A., Heck, N. C., Brennan, J. M., & Meyer, I. H. (2020). The relationship between minority stress and biological outcomes: A systematic review. *Journal of Behavioral Medicine*, 43(5), 673–694. https://doi.org/10.1007/s10865-019-00120-6.

Fraser, L. (2009a). Psychotherapy in the world professional association for transgender health's standards of care: Background and recommendations. *International Journal of Transgenderism*, 11(2), 110–126. https://doi.org/10.1080/15532730903008057.

Fraser, L. (2009b). Depth psychotherapy with transgender people. *Sex and Relationship Therapy*, 24(2), 126–142. https://doi.org/10.1080/14681990903003878.

Frederick, M. J., Berhanu, A. E., & Bartlett, R. (2017). Chest surgery in female to male transgender individuals. *Annals of Plastic Surgery*, 78(3), 249–253. https://doi.org/10.1097/SAP.0000000000000882.

Frederick, N. N., Campbell, K., Kenney, L. B., Moss, K., Speckhart, A., & Bober, S. L. (2018). Barriers and facilitators to sexual and reproductive health communication between pediatric oncology clinicians and adolescent and young adult patients: The clinician perspective. *Pediatric Blood and Cancer*, 65(8), e27087. https://doi.org/10.1002/pbc.27087.

Fredriksen-Goldsen, K. I. (2011). Resilience and disparities among lesbian, gay, bisexual, and transgender older adults. *The Public Policy and Aging Report*, 21(3), 3. https://doi.org/10.1093/ppar/21.3.3.

Fredriksen-Goldsen, K. I., Cook-Daniels, L., Kim, H. J., Erosheva, E. A., Emlet, C. A., Hoy-Ellis, C. P., Goldsen, J., & Muraco, A. (2014). Physical and mental health of transgender older adults: An at-risk and underserved population. *The Gerontologist*, 54(3), 488–500. https://doi.org/10.1093/geront/gnt021.

Frey, J. D., Poudrier, G., Thomson, J. E., & Hazen, A. (2017). A historical review of gender-affirming medicine: Focus on genital reconstruction surgery. *Journal of Sexual Medicine*, 14(8), 991–1002. https://doi.org/10.1016/j.jsxm.2017.06.007.

Fung, R., Gallibois, C., Coutin, A., & Wright, S. (2020). Learning by chance: Investigating gaps in transgender care education amongst family medicine, endocrinology, psychiatry and urology residents. *Canadian Medical Education Journal*, 11(4), e19–e28. https://doi.org/10.36834/cmej.53009.

Furtado, P. S., Moraes, F., Lago, R., Barros, L. O., Toralles, M. B., & Barroso, U. (2012). Gender dysphoria associated with disorders of sex development. *Nature Reviews Urology*, 9(11), 620–627. https://doi.org/10.1038/nrurol.2012.182.

Gaither, T. W., Awad, M. A., Osterberg, E. C., Murphy, G. P., Romero, A., Bowers, M. L., & Breyer, B. N. (2018). Postoperative complications following primary penile inversion vaginoplasty among 330 male-to-female transgender patients. *Journal of Urology*, 199(3), 760–765. https://doi.org/10.1016/j.juro.2017.10.013.

Galupo, M. P., Henise, S. B., & Mercer, N. L. (2016). "The labels don't work very well": Transgender individuals' conceptualizations of sexual orientation and sexual identity. *International Journal of Transgenderism*, 17(2), 93–104. https://doi.org/10.1080/15532739.2016.1189373.

Galupo, M. P., Pulice-Farrow, L., Clements, Z. A., & Morris, E. R. (2019). "I love you as both and I love you as neither": Romantic partners' affirmations of nonbinary trans individuals. *International Journal of Transgenderism*, 20(2-3), 315–327. https://doi.org/10.1080/15532739.2018.1496867.

Gamarel, K. E., Mereish, E. H., Manning, D., Iwamoto, M., Operario, D., & Nemoto, T. (2015). Minority stress, smoking patterns, and cessation attempts: Findings from a community-sample of transgender women in the San Francisco Bay area. *Nicotine & Tobacco Research*, 18(3), 306–313. https://doi.org/10.1093/ntr/ntv066.

Gao, Y., Maurer, T., & Mirmirani, P. (2018). Understanding and addressing hair disorders in transgender individuals. *American Journal of Clinical Dermatology*, 19(4), 517–527. https://doi.org/10.1007/s40257-018-0343-z.

Garaffa, G., Ralph, D. J., & Christopher, N. (2010). Total urethral construction with the radial artery-based forearm free flap in the transsexual. *BJU International*, *106*(8), 1206–1210. https://doi.org/10.1111/j.1464-410X.2010.09247.x.

Garcia, M. M. (2018). Sexual function after shallow and full-depth vaginoplasty: Challenges, clinical findings, and treatment strategies—Urologic perspectives. *Clinical Plastic Surgery*, *45*(3), 437–446. https://doi.org/10.1016/j.cps.2018.04.002.

Garcia, M. M. (2021). Decision-making in masculinizing surgery and feminizing surgery. In D. Nikolavsky & S. A. Blakely (Eds.), *Urological Care for the Transgender Patient: A Comprehensive Guide* (pp. 7–21). Springer.

Garcia, M. M., & Zaliznyak, M. (2020). Effects of feminizing hormone therapy on sexual function of transgender women. *Journal of Urology*, *203*(Suppl. 4), e672–e672. https://doi.org/10.1097/JU.0000000000000900.020.

Garcia, M. M., Christopher, N., De Luca, F., Spilotros, M., & Ralph, D. J. (2014). Overall satisfaction, sexual function, and the durability of neophallus dimensions following staged female to male genital gender confirming surgery: The Institute of Urology, London U.K. experience. *Translational Andrology and Urology*, *3*(2), 156–162. https://doi.org/10.3978/j.issn.2223-4683.2014.04.10.

Gardner, M., & Steinberg, L. (2005). Peer influence on risk taking, risk preference, and risky decision making in adolescence and adulthood: An experimental study. *Developmental Psychology*, *41*(4), 625–635. https://doi.org/10.1037/0012-1649.41.4.625.

Garrison, S. (2018). On the limits of "trans enough": Authenticating trans identity narratives. *Gender & Society*, *32*(5), 613–637. https://doi.org/10.1177/0891243218780299.

Gava, G., Cerpolini, S., Martelli, V., Battista, G., Seracchioli, R., & Meriggiola, M. C. (2016). Cyproterone acetate vs leuprolide acetate in combination with transdermal oestradiol in transwomen: A comparison of safety and effectiveness. *Clinical Endocrinology*, *85*(2), 239–246. https://doi.org/10.1111/cen.13050.

Gava, G., Mancini, I., Alvisi, S., Seracchioli, R., & Meriggiola, M. C. (2020). A comparison of 5-year administration of cyproterone acetate or leuprolide acetate in combination with estradiol in transwomen. *European Journal of Endocrinology*, *183*(6), 561–569. https://doi.org/10.1530/EJE-20-0370.

Gava, G., Mancini, I., Cerpolini, S., Baldassarre, M., Seracchioli, R., & Meriggiola, M. C. (2018). Testosterone undecanoate and testosterone enanthate injections are both effective and safe in transmen over 5 years of administration. *Clinical Endocrinology*, *89*(6), 878–886. https://doi.org/10.1111/cen.13821.

Gelfer, M. P., & Tice, R. M. (2013). Perceptual and acoustic outcomes of voice therapy for male-to-female transgender individuals immediately after therapy and 15 months later. *Journal of Voice*, *27*(3), 335–347. https://doi.org/10.1016/j.jvoice.2012.07.009.

Geneid, A., Rihkanen, H., & Kinnari, T. J. (2015). Long-term outcome of endoscopic shortening and stiffening of the vocal folds to raise the pitch. *European Archives of Oto-Rhino-Laryngology*, *272*(12), 3751–3756. https://doi.org/10.1007/s00405-015-3721-7.

Gerritse, K., Hartman, L., Antonides, M. F., Wensing-Kruger, A., de Vries, A. L. C., & Molewijk, B. C. (2018). Moral challenges in transgender care: A thematic analysis based on a focused ethnography. *Archives of Sexual Behaviour*, *47*(8), 2319–2333. https://doi.org/10.1007/s10508-018-1287-3.

Getahun, D., Nash, R., Flanders, W. D., Baird, T. C., Becerra-Culqui, T. A., Cromwell, L., Hunkeler, E., Lash, T. L., Millman, A., Quinn, V. P., Robinson, B., Roblin, D., Silverberg, M. J., Safer, J., Slovis, J., Tangpricha, V., & Goodman, M. (2018). Cross-sex hormones and acute cardiovascular events in transgender persons: A cohort study. *Annals of Internal Medicine*, *169*(4), 205–213. https://doi.org/10.7326/M17-2785.

Gezer, E., Piro, B., Cantürk, Z., Çetinarslan, B., Sözen, M., Selek, A., Işik, A. P., & Seal, L. J. (2021). The comparison of gender dysphoria, body image satisfaction and quality of life between treatment-naive transgender males with and without polycystic ovary syndrome. *Transgender Health*. Advance online publication. https://doi.org/10.1089/trgh.2021.0061

Gibson, D. J., Glazier, J. J., Olson, K. R. (2021). Evaluation of anxiety and depression in a community sample of transgender youth. *JAMA Network Open* 4, e214739. https://doi.org/10.1001/jamanetworkopen.2021.4739.

Gieles, N. C., van de Grift, T. C., Elaut, E., Heylens, G., Becker-Hebly, I., Nieder, T. O., Laan, E. T. M., & Kreukels, B. P. C. (2022). Pleasure please! Sexual pleasure and influencing factors in transgender persons: An ENIGI follow-up study. *International Journal of Transgender Health*, Advance online publication. https://doi.org/10.1080/26895269.2022.2028693.

Giffort, D. M., & Underman, K. (2016). The relationship between medical education and trans health disparities: A call to research. *Sociology Compass*, *10*(11), 999–1013. https://doi.org/10.1111/soc4.12432.

Gils, L., & Brewaeys, A. (2007). Surgical treatment of gender dysphoria in adults and adolescents: Recent developments, effectiveness, and challenges. *Annual Review of Sex Research*, *18*, 178–184.

Giltay, E. J., & Gooren, L. J. (2000). Effects of sex steroid deprivation/administration on hair growth and skin sebum production in transsexual males and females. *Journal of Clinical Endocrinology and Metabolism*, *85*(8), 2913–2921. https://doi.org/10.1210/jcem.85.8.6710.

Giltay, E. J., Gooren, L. J. G., Emeis, J. J., Kooistra, T., & Stehouwer, C. D. A. (2000). Oral, but not transdermal, administration of estrogens lowers tissue-type plasminogen activator levels in humans without affecting endothelial synthesis. *Arteriosclerosis, Thrombosis, and Vascular Biology*, *20*(5), 1396–1403. https://doi.org/10.1161/01.ATV.20.5.1396.

Giordano, S. (2008). Lives in a chiaroscuro. Should we suspend the puberty of children with gender identity disorder? *Journal of Medical Ethics*, *34*(8), 580–584. https://doi.org/10.1136/jme.2007.021097.

Giordano, S., & Holm, S. (2020). Is puberty delaying treatment 'experimental treatment'?. *International Journal of Transgender Health*, 21(2), 113–121. https://doi.org/10.1080/26895269.2020.1747768.

Giovanardi, G., Mirabella, M., Di Giuseppe, M., Lombardo, F., Speranza, A. M., & Lingiardi, V. (2021). Defensive functioning of individuals diagnosed with gender dysphoria at the beginning of their hormonal treatment. *Frontiers in Psychology*, 12, 665547. https://doi.org/10.3389/fpsyg.2021.665547.

Giovanardi, G., Vitelli, R., Maggiora Vergano, C., Fortunato, A., Chianura, L., Lingiardi, V., & Speranza, A. M. (2018). Attachment patterns and complex trauma in a sample of adults diagnosed with gender dysphoria. *Frontiers in Psychology*, 9, 60. https://doi.org/10.3389/fpsyg.2018.00060.

GIRES, LGBT Foundation, Mermaids, Ozanne Foundation, and Stonewall. (2020). *Conversion therapy and gender identity survey*. Stonewall. https://www.stonewall.org.uk/system/files/2020_conversion_therapy_and_gender_identity_survey.pdf

Glaser, R. L. M. F., Newman, M. M., Parsons, M. M., Zava, D. P., & Glaser-Garbrick, D. (2009). Safety of maternal testosterone therapy during breast feeding. *International Journal of Pharmaceutical Compounding*, 13(4), 314–317.

Glaser, J., Nouri, S., Fernandez, A., Sudore, R. L., Schillinger, D., Klein-Fedyshin, M., & Schenker, Y. (2020). Interventions to improve patient comprehension in informed consent for medical and surgical procedures: An updated systematic review. *Medical Decision Making*, 40(2), 119–143. https://doi.org/10.1177/0272989x19896348.

Glick, J. C., Leamy, C., Molsberry, A. H., & Kerfeld, C. I. (2020). Moving toward equitable health care for lesbian, gay, bisexual, transgender, and queer patients: Education and training in physical therapy education. *Journal of Physical Therapy Education*, 34(3), 192–197. 10.1097/JTE.0000000000000140.

Glidden, D., Bouman, W. P., Jones, B., & Arcelus, J. (2016). Autistic spectrum disorders and gender dysphoria: A systematic review. *Sexual Medicine Reviews*, 4(1), 3–14. https://doi.org/10.1016/j.sxmr.2015.10.003.

Glynn, T. R., Gamarel, K. E., Kahler, C. W., Iwamoto, M., Operario, D., & Nemoto, T. (2016). The role of gender affirmation in psychological well-being among transgender women. *Psychology of Sexual Orientation and Gender Diversity*, 3(3), 336. https://doi.org/10.1037/sgd0000171.

Godfrey, L. M. (2021). Mental health outcomes among individuals with 46,XY disorders of sex development: A systematic review. *Journal of Health Psychology*, 26(1), 40–59. https://doi.org/10.1177/1359105320909863.

Goetz, T. G., & Arcomano, A. C. (2022). "X" marks the transgressive gender: A qualitative exploration of legal gender-affirmation. *Journal of Gay & Lesbian Mental Health*, Advance online publication. https://doi.org/10.1080/19359705.2021.2008572.

Goldhammer, H., Marc, L. G., Psihopaidas, D., Chavis, N. S., Massaquoi, M., Cahill, S., Rebchook, G., Reisner, S., Mayer, K. A., Cohen, S. M., & Keuroghlian, A. S. (2022). HIV care continuum interventions for transgender women: A topical review. *Public Health Reports*, Advance online publication. https://doi.org/10.1177/00333549211065517.

Goldstein, Z., Khan, M., Reisman, T., & Safer, J. D. (2019). Managing the risk of venous thromboembolism in transgender adults undergoing hormone therapy. *Journal of Blood Medicine*, 10, 209–216. https://doi.org/10.2147/JBM.S166780.

Golub, S. A., Fikslin, R. A., Starbuck, L., & Klein, A. (2019). High rates of PrEP eligibility but low rates of PrEP access among a national sample of transmasculine individuals. *Journal of Acquired Immune Deficiency Syndromes*, 82(1), e1–e7. https://doi.org/10.1097/qai.0000000000002116.

Gomez, A. M., Đỗ, L., Ratliff, G. A., Crego, P. I., & Hastings, J. (2020). Contraceptive beliefs, needs, and care experiences among transgender and nonbinary young adults. *The Journal of Adolescent Health*, 67(4), 597–602. https://doi.org/10.1016/j.jadohealth.2020.03.003.

Gómez-Gil, E., Zubiaurre-Elorza, L., Esteva, I., Guillamon, A., Godás, T., Cruz Almaraz, M., & Salamero, M. (2012). Hormone-treated transsexuals report less social distress, anxiety and depression. *Psychoneuroendocrinology*, 37(5), 662–670. https://doi.org/10.1016/j.psyneuen.2011.08.010.

Gong, E. M., & Cheng, E. Y. (2017). Current challenges with proximal hypospadias: We have a long way to go. *Journal of Pediatric Urology*, 13(5), 457–467. https://doi.org/10.1016/j.jpurol.2017.03.024.

Goodman, M., Adams, N., Corneil, T., Kreukels, B., Motmans, J., & Coleman, E. (2019). Size and distribution of transgender and gender nonconforming populations: A narrative review. *Endocrinology and Metabolism Clinics*, 48(2), 303–321. https://doi.org/10.1016/j.ecl.2019.01.001.

Gooren, L. J., van Trotsenburg, M. A., Giltay, E. J., & van Diest, P. J. (2013). Breast cancer development in transsexual subjects receiving cross-sex hormone treatment. *The Journal of Sexual Medicine*, 10(12), 3129–3134. https://doi.org/10.1111/jsm.12319.

Gooren, L. J., Wierckx, K., & Giltay, E. J. (2014). Cardiovascular disease in transsexual persons treated with cross-sex hormones: Reversal of the traditional sex difference in cardiovascular disease pattern. *European Journal of Endocrinology*, 170(6), 809–819. https://doi.org/10.1530/EJE-14-0011.

Gordon, A. R., Fish, J. N., Kiekens, W. J., Lightfoot, M., Frost, D. M., & Russell, S. T. (2021). Cigarette smoking and minority stress across age cohorts in a national sample of sexual minorities: Results from the Generations Study. *Annals of Behavioral Medicine*, 55(6), 530–542. https://doi.org/10.1093/abm/kaaa079.

Gorin-Lazard, A., Baumstarck, K., Boyer, L., Maquigneau, A., Gebleux, S., Penochet, J., Pringuey, D., Albarel, F., Morange, I., Loundou, A., Berbis, J., Auquier, P., Lançon, C., & Bonierbale, M. (2012). Is hormonal therapy associated with better quality of life in transsexuals? A cross-sectional study. *The Journal of Sexual Medicine*, 9(2), 531–541. https://doi.org/10.1111/j.1743-6109.2011.02564.x.

Gorin-Lazard, A., Baumstarck, K., Boyer, L., Maquigneau, A., Penochet, J. C., Pringuey, D., & Auquier, P. (2013).

Hormonal therapy is associated with better self-esteem, mood, and quality of life in transsexuals. *The Journal of Nervous and Mental Disease*, 201(11), 996–1000. https://doi.org/10.1097/nmd.0000000000000046.

Gourab, G., Khan, M. N. M., Hasan, A. M. R., Sarwar, G., Irfan, S. D., & Reza, M. M. (2019). The willingness to receive sexually transmitted infection services from public healthcare facilities among key populations at risk for human immunodeficiency virus infection in Bangladesh: Qualitative study. *PLOS One*, 14(9), e0221637. https://doi.org/10.1371/journal.pone.0221637.

Gower, A. L., Rider, G. N., Brown, C., McMorris, B. J., Coleman, E., Taliaferro, L. A., & Eisenberg, M. E. (2018). Supporting transgender and gender diverse youth: Protection against emotional distress and substance use. *American Journal of Preventive Medicine*, 55(6), 787–794. https://doi.org/10.1016/j.amepre.2018.06.030.

Gower, A. L., Rider, G. N., Coleman, E., Brown, C., McMorris, B. J., & Eisenberg, M. E. (2018). Perceived gender presentation among transgender and gender diverse youth: Approaches to analysis and associations with bullying victimization and emotional distress. *LGBT Health*, 5(5), 312–319. https://doi.org/10.1089/lgbt.2017.0176.

Graham, S. (2010). *Gender diversity in Indonesia: sexuality, Islam and queer selves*. Routledge.

Grannis, C., Leibowitz, S. F., Gahn, S., Nahata, L., Morningstar, M., Mattson, W. I., Chen, D., Strang, J. F., & Nelson, E. E. (2021). Testosterone treatment, internalizing symptoms, and body image dissatisfaction in transgender boys. *Psychoneuroendocrinology*, 132, 105358. https://doi.org/10.1016/j.psyneuen.2021.105358.

Grant, J., Lisa, A., Mottet, J., Tanis, D., With, J., Harrison, J., Herman, M., & Keisling, M. H. (2011). *Injustice at every turn: A report of the National Transgender Discrimination Survey*. https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf

Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2016). *Injustice at every turn: A report of the National Transgender Discrimination Survey 2011*. Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force. https://thetaskforce.org/static_html/downloads/reports/reports/Ntds_full.pdf

Grant, R. M., Pellegrini, M., Defechereux, P. A., Anderson, P. L., Yu, M., Glidden, D. V., O'Neal, J., Yager, J., Bhasin, S., Sevelius, J., & Deutsch, M. B. (2020). Sex hormone therapy and tenofovir diphosphate concentration in dried blood spots: Primary results of the interactions between antiretrovirals and transgender hormones study. *Clinical Infectious Diseases*, 73(7), e2117–e2123. https://doi.org/10.1093/cid/ciaa1160.

Green, A. E., Price-Feeney, M., Dorison, S. H., & Pick, C. J. (2020). Self-reported conversion efforts and suicidality among US LGBTQ youths and young adults, 2018. *American Journal of Public Health*, 110(8), 1221–1227. https://doi.org/10.2105/ajph.2020.305701.

Green, R., & Fleming, D. T. (1990). Transsexual surgery follow-up: Status in the 1990s. *Annual Review of Sex Research*, 1(1), 163–174. https://doi.org/10.1080/10532528.1990.10559859.

Greenwald, P., Dubois, B., Lekovich, J., Pang, J. H., & Safer, J. D. (2021). Successful in vitro fertilization in a cisgender female carrier using oocytes retrieved from a transgender man maintained on testosterone. *AACE Clinical Case Reports*, 8(1), 19–21. https://doi.org/10.1016/j.aace.2021.06.007.

Greytak, E. A., Kosciw, J. G., & Boesen, M. J. (2013). Putting the "T" in "Resource": The benefits of LGBT-related school resources for transgender youth. *Journal of LGBT Youth*, 10(1–2), 45–63. https://doi.org/10.1080/19361653.2012.718522.

Griffiths, D. A. (2018). Shifting syndromes: Sex chromosome variations and intersex classifications. *Social Studies of Science*, 48(1), 125–148. https://doi.org/10.1177/0306312718757081.

Grimstad, F. W., Fowler, K. G., New, E. P., Ferrando, C. A., Pollard, R. R., Chapman, G., Gray, M., & Lobo, V. G. (2020). Ovarian histopathology in transmasculine persons on testosterone: A multicenter case series. *The Journal of Sexual Medicine*, 17(9), 1807–1818. https://doi.org/10.1016/j.jsxm.2020.05.029.

Grimstad, F., Fowler, K., New, E., Unger, C., Pollard, R., Chapman, G., Hochberg, L., Gomez-Lobo, V., Gray, M. (2018). Evaluation of uterine pathology in transgender men and gender nonbinary persons on testosterone. *Journal of Pediatric and Adolescent Gynecology*, 31(2), 217. https://doi.org/10.1016/j.jpag.2018.02.009.

Grimstad, F., Kremen, J., Streed, C. G., & Dalke, K. B. (2021). The health care of adults with differences in sex development or intersex traits is changing: Time to prepare clinicians and health systems. *LGBT Health*, 8(7), 439–443. https://doi.org/10.1089/lgbt.2021.0018.

Grimstad, F., McLaren, H., & Gray, M. (2021). The gynecologic examination of the transfeminine person after penile inversion vaginoplasty. *American Journal of Obstetrics and Gynecology*, 224(3), 266–273. https://doi.org/10.1016/j.ajog.2020.10.002.

Grootens-Wiegers, P., Hein, I. M., van den Broek, J. M., & de Vries, M. C. (2017). Medical decision-making in children and adolescents: Developmental and neuroscientific aspects. *BMC Pediatrics*, 17(1). https://doi.org/10.1186/s12887-017-0869-x.

Gross, M. (1999). Pitch-raising surgery in male-to-female transsexuals. *Journal of Voice*, 13(2), 246–250. https://doi.org/10.1016/s0892-1997(99)80028-9.

Grossman, A. H., & D'Augelli, A. R. (2006). Transgender youth: Invisible and vulnerable. *Journal of Homosexuality*, 51(1), 111–128. https://doi.org/10.1300/J082v51n01_06.

Grossman, A. H., & D'Augelli, A. R. (2007). Transgender youth and life-threatening behaviors. *Suicide and Life-Threatening Behavior*, 37(5), 527–537. https://doi.org/10.1521/suli.2007.37.5.527.

Grossman, A. H., D'Augelli, A. R., Howell, T. J., & Hubbard, S. (2005). Parent' reactions to transgender youth' gender



nonconforming expression and identity. *Journal of Gay & Lesbian Social Services*, *18*(1), 3–16. https://doi.org/10.1300/j041v18n01_02.

Grossman, A. H., Park, J. Y., Frank, J. A., & Russell, S. T. (2019). Parental responses to transgender and gender nonconforming youth: Associations with parent support, parental abuse, and youths' psychological adjustment. *Journal of Homosexuality*, *68*(8), 1–18. https://doi.org/10.1080/00918369.2019.1696103.

Grynberg, M., Fanchin, R., Dubost, G., Colau, J. C., Bremont-Weil, C., Frydman, R., & Ayoubi, J. M. (2010). Histology of genital tract and breast tissue after long-term testosterone administration in a female-to-male transsexual population. *Reproductive Biomedicine Online*, *20*(4), 553–558. https://doi.org/10.1016/j.rbmo.2009.12.021.

Gunjawate, D. R., B. Kumar, R., Ravi, R., & Kunnath, L. S. (2020). Knowledge and attitudes toward transgender community among speech-language pathologists in India: A questionnaire-based exploration. *International Journal of Transgender Health*, *21*(4), 455–462. https://doi.org/10.1080/26895269.2020.1753135.

Guyatt, G., Oxman, A. D., Akl, E. A., Kunz, R., Vist, G., Brozek, J., Norris, S., Falck-Ytter, Y., Glasziou, P., & de-Beer, H. (2011). GRADE guidelines: 1. Introduction—GRADE evidence profiles and summary of findings tables. *Journal of Clinical Epidemiology*, *64*(4), 383–394. https://doi.org/10.1016/j.jclinepi.2010.04.026.

Haas, A. P., Eliason, M., Mays, V. M., Mathy, R. M., Cochran, S. D., D'Augelli, A. R., Silverman, M. M., Fisher, P. W., Hughes, T., Rosario, M., Russell, S. T., Malley, E., Reed, J., Litts, D. A., Haller, E., Sell, R. L., Remafedi, G., Bradford, J., Beautrais, A. L., & Brown, G. K. (2010). Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations. *Journal of Homosexuality*, *58*(1), 10–51. https://doi.org/10.1080/00918369.2011.534038.

Hadj-Moussa, M., Agarwal, S., Ohl, D. A., & Kuzon, W. M. (2018). Masculinizing genital gender confirmation surgery. *Sexual Medicine Reviews*, *7*(1), 141–155. https://doi.org/10.1016/j.sxmr.2018.06.004.

Hadj-Moussa, M., Ohl, D. A., & Kuzon, W. M., Jr.(2018). Feminizing genital gender-confirmation surgery. *Sexual Medicine Reviews*, *6*(3), 457–468.e452. https://doi.org/10.1016/j.sxmr.2017.11.005.

Hafford-Letchfield, T., Simpson, P., Willis, P. B., & Almack, K. (2018). Developing inclusive residential care for older lesbian, gay, bisexual and trans (LGBT) people: An evaluation of the Care Home Challenge action research project. *Health & Social Care in the Community*, *26*(2), e312–e320. https://doi.org/10.1111/hsc.12521.

Hage, J. J., Dekker, J., Karim, R. B., Verheijen, R. H. M., & Bloemena, E. (2000). Ovarian cancer in female-to-male transsexuals: Report of two cases. *Gynecologic Oncology*, *76*(3), 413–415. https://doi.org/10.1006/gyno.1999.5720.

Hagen, D. B., & Galupo, M. P. (2014). Trans* individuals' experiences of gendered language with health care providers: Recommendations for practitioners. *International Journal of Transgenderism*, *15*(1), 16–34. https://doi.org/10.1080/15532739.2014.890560.

Hahn, M., Sheran, N., Weber, S., Cohan, D., & Obedin-Maliver, J. (2019). Providing patient-centered perinatal care for transgender men and gender-diverse individuals: A collaborative multidisciplinary team approach. *Obstetrics and Gynecology*, *135*(5), 959–963. https://doi.org/10.1097/AOG.0000000000003506.

Hall, R., Mitchell, L., & Sachdeva, J. (2021). Access to care and frequency of detransition among a cohort discharged by a UK national adult gender identity clinic: Retrospective case-note review. *BJPsych Open*, *7*(6). https://doi.org/10.1192/bjo.2021.1022.

Hamada, A., Kingsberg, S., Wierckx, K., T'Sjoen, G., De Sutter, P., Knudson, G., & Agarwal, A. (2015). Semen characteristics of transwomen referred for sperm banking before sex transition: A case series. *Andrologia*, *47*(7), 832–838. https://doi.org/10.1111/and.12330.

Hamm, J. A., & Nieder, T. O. (2021). Trans*-sexualität neu denken: Eine partizipative interviewstudie zu gelingender sexualität ohne genitalangleichung. *Zeitschrift für Sexualforschung*, *34*(02), 69–78. https://doi.org/10.1055/a-1477-0412.

Hancock, A. B. (2017). An ICF perspective on voice-related quality of life of American transgender women. *Journal of Voice*, *31*(1), 115.e1–115.e8. https://doi.org/10.1016/j.jvoice.2016.03.013.

Hancock, A. B., Childs, K. D., & Irwig, M. S. (2017). Trans male voice in the first year of testosterone therapy: Make no assumptions. *Journal of Speech, Language, and Hearing Research*, *60*(9), 2472–2482. https://doi.org/10.1044/2017_JSLHR-S-16-0320.

Hancock, A. B., & Downs, S. C. (2021). Listening to gender-diverse people of color: Barriers to accessing voice and communication care. *American Journal of Speech-Language Pathology*. https://doi.org/10.1044/2021_AJSLP-20-00262.

Hancock, A. B., & Garabedian, L. M. (2013). Transgender voice and communication treatment: A retrospective chart review of 25 cases. *International Journal of Language & Communication Disorders*, *48*(1), 54–65. https://doi.org/10.1111/j.1460-6984.2012.00185.x.

Hancock, A., & Haskin, G. (2015). Speech-language pathologists' knowledge and attitudes regarding lesbian, gay, bisexual, transgender, and queer (LGBTQ) populations. *American Journal of Speech-Language Pathology*, *24*(2), 206–221. https://doi.org/10.1044/2015_AJSLP-14-0095.

Hancock, A. B., Krissinger, J., & Owen, K. (2011). Voice perceptions and quality of life for transgender people. *Journal of Voice*, *25*(5), 553–558. https://doi.org/10.1016/j.jvoice.2010.07.013.

Hancock, A. B., & Siegfriedt, L. L. (2020). *Transforming voice and communication with transgender and gender-diverse people: An evidence-based process*. Plural Publishing.

Handy, A. B., Wassersug, R. J., Ketter, J. T. J., & Johnson, T. W. (2015). The sexual side of castration narratives: Fiction written by and for eunuchs and eunuch "wan-

nabes." *The Canadian Journal of Human Sexuality*, 24(2), 151–159. https://doi.org/10.3138/cjhs.242-A4.

Hardacker, C. T., Chyten-Brennan, J., & Komar, A. (2019). Transgender physiology, anatomy, and aging: A provider's guide to gender-affirming surgeries. In C. Hardacker, K. Ducheny, & M. Houlberg (Eds.), *Transgender and gender nonconforming health and aging* (pp. 37–60). Springer.

Harden, K. P. (2014). A sex-positive framework for research on adolescent sexuality. *Perspectives on Psychological Science*, 9(5), 455–469. https://doi.org/10.1177/1745691614535934.

Harris, K., Ferguson, J., & Hills, S. (2014). A comparative study of hair removal at an NHS hospital: Luminette intense pulsed light versus electrolysis. *Journal of Dermatological Treatment*, 25(2), 169–173. https://doi.org/10.3109/09546634.2012.715239.

Havranek, E. P., Mujahid, M. S., Barr, D. A., Blair, I. V., Cohen, M. S., Cruz-Flores, S., Davey-Smith, G., Dennison-Himmelfarb, C. R., Lauer, M. S., Lockwood, D. W., Rosal, M., & Yancy, C. W. (2015). American Heart Association Council on Quality of Care and Outcomes Research, Council on Epidemiology and Prevention, Council on Cardiovascular and Stroke Nursing, Council on Lifestyle and Cardiometabolic Health, and Stroke Council. *Social Determinants of Risk and Outcomes for Cardiovascular Disease: A Scientific Statement From the American Heart Association*. Circulation, 132(9), 873–898. https://doi.org/10.1161/CIR.0000000000000228.

Hay, M. (2021, February 20). Meet the men who risk it all to have their balls cut off. *The Daily Beast*. https://www.thedailybeast.com/inside-the-dangerous-global-network-of-backstreet-castrators-cutters-and-eunuch-makers

Health Policy Project, Asia-Pacific Transgender Network and United Nations Development Program. (2015). *Blueprint for the provision of comprehensive care for trans people and trans communities*. https://weareaptn.org/2017/06/01/blueprint-for-the-provision-of-comprehensive-care-for-trans-people/

Heck, N. C., Croot, L. C., & Robohm, J. S. (2015). Piloting a psychotherapy group for transgender clients: Description and clinical considerations for practitioners. *Professional Psychology: Research and Practice*, 46(1), 30–36. https://doi.org/10.1037/a0033134.

Hembree, W. C., Cohen-Kettenis, P., Delemarre-van de Waal, H. A., Gooren, L. J., Meyer, W. J., Spack, N. P., Tangpricha, V., & Montori, V. M. (2009). Endocrine treatment of transsexual persons: An endocrine society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, 94(9), 3132–3154. https://doi.org/10.1210/jc.2009-0345.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W.J, Hassan Murad, M, Rosenthal, S. M., Safer, J. D., Tangpricha, V., & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society Clinical Practice Guideline. *The Journal of Clinical*

Endocrinology & Metabolism, 102(11), 3869–3903. https://doi.org/10.1210/jc.2017-01658.

Hendricks, M. L., & Testa, R. J. (2012). A conceptual framework for clinical work with transgender and gender nonconforming clients: An adaptation of the Minority Stress Model. *Professional Psychology: Research and Practice*, 43(5), 460–467. https://doi.org/10.1037/a0029597.

Henry, R. S., Perrin, P. B., Coston, B. M., & Witten, T. M. (2020). Transgender and gender non-conforming adult preparedness for aging: Concerns for aging, and familiarity with and engagement in planning behaviors. *International Journal of Transgender Health*, 21(1), 58–69. https://doi.org/10.1080/15532739.2019.1690612.

Herdt, G. (1994). *Third sex, third gender. Beyond sexual dimorphism in culture and history*. The MIT Press.

Herman, J. L., Brown, T. N. T., & Haas, A. P. (2019). *Suicide thoughts and attempts among transgender adults. Findings from the 2015 US Transgender Survey*. Williams Institute UCLA School of Law. https://escholarship.org/content/qt1812g3hm/qt1812g3hm.pdf

Hermann, M., & Thorstenson, A. (2015). A rare case of male-to-eunuch gender dysphoria. *Sexual Medicine*, 3(4), 331–333. https://doi.org/10.1002/sm2.81.

Hess, J., Henkel, A., Bohr, J., Rehme, C., Panic, A., Panic, L., Rossi Neto, R., Hadaschik, B., & Hess, Y. (2018). Sexuality after male-to-female gender affirmation surgery. *BioMed Research International*, 2018, 1–7. https://doi.org/10.1155/2018/9037979.

Hess, J., Hess-Busch, Y., Kronier, J., Rubben, H., & Rossi Neto, R. (2016). Modified preparation of the neurovascular bundle in male to female transgender patients. *Urology International*, 96(3), 354–359. https://doi.org/10.1159/000443281.

Heylens, G., Elaut, E., Kreukels, B. P. C., Paap, M. C. S., Cerwenka, S., Richter-Appelt, H., Cohen-Kettenis, P. T., Haraldsen, I. R., & De Cuypere, G. (2014). Psychiatric characteristics in transsexual individuals: Multicentre study in four European countries. *British Journal of Psychiatry*, 204(2), 151–156. https://doi.org/10.1192/bjp.bp.112.121954.

Heylens, G., Verroken, C., De Cock, S., T'Sjoen, G., & De Cuypere, G. (2014). Effects of different steps in gender reassignment therapy on psychopathology: A prospective study of persons with a gender identity disorder. *The Journal of Sexual Medicine*, 11(1), 119–126. https://doi.org/10.1111/jsm.12363.

Hidalgo, M. A., & Chen, D. (2019). Experiences of gender minority stress in cisgender parents of transgender/gender-expansive prepubertal children: A qualitative study. *Journal of Family Issues*, 40(7), 865–886. https://doi.org/10.1177/0192513x19829502.

Hidalgo, M. A., Ehrensaft, D., Tishelman, A. C., Clark, L. F., Garofalo, R., Rosenthal, S. M., Spack, N. P., & Olson, J. (2013). The gender affirmative model: What we know and what we aim to learn. *Human Development*, 56(5), 285–290. https://doi.org/10.1159/000355235.



Hines, M., Constantinescu, M., & Spencer, D. (2015). Early androgen exposure and human gender development. *Biology of Sex Differences*, 6(1). https://doi.org/10.1186/s13293-015-0022-1.

Hiransuthikul, A., Janamnuaysook, R., Sungsing, T., Jantarapakde, J., Trachunthong, D., Mills, S., & Phanuphak, N. (2019). High burden of chlamydia and gonorrhoea in pharyngeal, rectal and urethral sites among Thai transgender women: Implications for anatomical site selection for the screening of STI. *Sexually Transmitted Infections*, 95(7), 534. https://doi.org/10.1136/sextrans-2018-053835.

Hisle-Gorman, E., Landis, C. A., Susi, A., Schvey, N. A., Gorman, G. H., Nylund, C. M., & Klein, D. A. (2019). Gender dysphoria in children with autism spectrum disorder. *LGBT Health*, 6(3), 95–100. https://doi.org/10.1089/lgbt.2018.0252.

Hisle-Gorman, E., Schvey, N. A., Adirim, T. A., Rayne, A. K., Susi, A., Roberts, T. A., & Klein, D. A. (2021). Mental healthcare utilization of transgender youth before and after affirming treatment. *The Journal of Sexual Medicine*, 18(8), 1444–1454. https://doi.org/10.1016/j.jsxm.2021.05.014.

Hoebeke, P., Selvaggi, G., Ceulemans, P., De Cuypere, G., T'Sjoen, G., Weyers, S., Decaestecker, K., & Monstrey, S. (2005). Impact of sex reassignment surgery on lower urinary tract function. *European Urology*, 47(3), 398–402. https://doi.org/10.1016/j.eururo.2004.10.008.

Hoffkling, A., Obedin-Maliver, J., & Sevelius, J. (2017). From erasure to opportunity: A qualitative study of the experiences of transgender men around pregnancy and recommendations for providers. *BMC Pregnancy Childbirth*, 17(Suppl. 2), 332. https://doi.org/10.1186/s12884-017-1491-5.

Hollenbach, A., Eckstrand, K., Dreger, A., & AAMC Advisory Committee on Sexual Orientation, Gender Identity, and Sex Development. (2014). *Implementing curricular and institutional climate changes to improve health care for individuals who are LGBT, gender nonconforming, or born with DSD: A resource for medical educators*. Association of American Medical Colleges.

Holmberg, M., Arver, S., & Dhejne, C. (2019). Supporting sexuality and improving sexual function in transgender persons. *Nature Reviews Urology*, 16(2), 121–139. https://doi.org/10.1038/s41585-018-0108-8.

Hontscharuk, R., Alba, B., Hamidian Jahromi, A., & Schechter, L. (2021). Penile inversion vaginoplasty outcomes: Complications and satisfaction. *Andrology*, 9(6), 1732–1743. https://doi.org/10.1111/andr.13030.

Hontscharuk, R., Alba, B., Manno, C., Pine, E., Deutsch, M. B., Coon, D., & Schechter, L. (2021). Perioperative transgender hormone management: Avoiding venous thromboembolism and other complications. *Plastic and Reconstructive Surgery*, 147(4), 1008–1017. https://doi.org/10.1097/PRS.0000000000007786.

Hooton, T. M. (2012). Clinical practice. Uncomplicated urinary tract infection. *New England Journal of Medicine*, 366(11), 1028–1037. https://doi.org/10.1056/NEJMcp1104429.

Horbach, S. E., Bouman, M. B., Smit, J. M., Ozer, M., Buncamper, M. E., & Mullender, M. G. (2015). Outcome of vaginoplasty in male-to-female transgenders: A systematic review of surgical techniques. *The Journal of Sexual Medicine*, 12(6), 1499–1512. https://doi.org/10.1111/jsm.12868.

Horner, B., McManus, A., Comfort, J., Freijah, R., Lovelock, G., Hunter, M., & Tavener, M. (2012). How prepared is the retirement and residential aged care sector in Western Australia for older non-heterosexual people?. *Quality in Primary Care*, 20(4), 263–274.

Hostiuc, S., Rusu, M. C., Negoi, I., & Drima, E. (2018). Testing decision-making competency of schizophrenia participants in clinical trials. A meta-analysis and meta-regression. *BMC Psychiatry*, 18(1), 2. https://doi.org/10.1186/s12888-017-1580-z.

Horton, C. (2021). Parent advocacy groups for trans children. In A. Goldberg, & G. Beemyn (Eds.), *The SAGE encyclopedia of trans studies*. Sage.

Houk, C. P., & Lee, P. A. (2010). Approach to assigning gender in 46,XX Congenital Adrenal Hyperplasia with male external genitalia: Replacing dogmatism with pragmatism. *The Journal of Clinical Endocrinology & Metabolism*, 95(10), 4501–4508. https://doi.org/10.1210/jc.2010-0714.

Houlberg, M. (2019). Endocrinology, hormone replacement therapy (HRT), and aging. In *Transgender and gender nonconforming health and aging* (pp. 21–35). Springer.

House of Commons Women and Equalities Committee. (2015, December 8). *Transgender equality: First report of session 2015–2016*. https://publications.parliament.uk/pa/cm201516/cmselect/cmwomeq/390/390.pdf

Hoy-Ellis, C. P., & Fredriksen-Goldsen, K. I. (2017). Depression among transgender older adults: General and minority stress. *American Journal of Community Psychology*, 59(3–4), 295–305. https://doi.org/10.1002/ajcp.12138.

Hughes, I. A. (2005). Consensus statement on management of intersex disorders. *Archives of Disease in Childhood*, 91(7), 554–563. https://doi.org/10.1136/adc.2006.098319.

Hughes, I. A., Nihoul-Fékété, C., Thomas, B., & Cohen-Kettenis, P. T. (2007). Consequences of the ESPE/LWPES guidelines for diagnosis and treatment of disorders of sex development. *Best Practice & Research Clinical Endocrinology & Metabolism*, 21, 351–365. https://doi.org/10.1016/j.beem.2007.06.003.

Hughto, J. M. W., Gunn, H. A., Rood, B. A., & Pantalone, D. W. (2020). Social and medical gender affirmation experiences are inversely associated with mental health problems in a U.S. non-probability sample of transgender adults. *Archives of Sexual Behavior*. https://doi.org/10.1007/s10508-020-01655-5.

Hullmann, S. E., Fedele, D. A., Wolfe-Christensen, C., Mullins, L. L., & Wisniewski, A. B. (2011). Differences in adjustment by child developmental stage among caregivers of children with disorders of sex development. *International Journal of Pediatric Endocrinology*, 2011(1). https://doi.org/10.1186/1687-9856-2011-16.

Human Rights Campaign, (2018a). *Gender expansive youth report*. Human Rights Campaign, US.

Human Rights Campaign. (2018b). *LGBTQ youth report*. https://www.hrc.org/resources/2018_lgbtq-youth-report

Human Rights Campaign Foundation. (2017). *Corporate equality index 2018: Rating workplaces on lesbian, gay, bisexual, transgender, and queer equality.* https://assets2.hrc.org/files/assets/resources/CEI-2018-FullReport.pdf

Human Rights Campaign Foundation. (2022). *Corporate equality index 2022: Rating workplaces on lesbian, gay, bisexual, transgender, and queer equality.* https://www.hrc.org/resources/corporate-equality-index

Human Rights Watch. (2014). "I'm scared to be a woman": Human rights abuses against transgender people in Malaysia. https://features.hrw.org/features/HRW_reports_2014/Im_Scared_to_Be_a_Woman/index.htm

Human Rights Watch. (2017). *"I want to be like nature made me": Medically unnecessary surgeries on intersex children in the U.S.* https://www.hrw.org/sites/default/files/report_pdf/lgbtintersex0717_web_0.pdf

Hunt, J. (2014). An initial study of transgender people's experiences of seeking and receiving counselling or psychotherapy in the UK. *Counselling and Psychotherapy Research, 14*(4), 288–296. https://doi.org/10.1080/14733145.2013.838597.

Iantaffi, A., & Bockting, W. O. (2011). Views from both sides of the bridge? Gender, sexual legitimacy and transgender people's experiences of relationships. *Culture Health & Sexuality, 13*(3), 355–370. https://doi.org/10.1080/13691058.2010.537770.

Idrus, N. I., & Hymans, T. D. (2014). Balancing benefits and harm: Chemical use and bodily transformation among Indonesia's transgender waria. *International Journal of Drug Policy, 25*(4), 789–797.

ILGA World. (2020a). *Trans legal mapping report 2019: recognition before the law.* https://ilga.org/downloads/ILGA_World_Trans_Legal_Mapping_Report_2019_EN.pdf

ILGA World. (2020b). *Curbing deception: a world survey on legal regulation of so-called "conversion therapies".* https://ilga.org/downloads/ILGA_World_Curbing_Deception_world_survey_legal_restrictions_conversion_therapy.pdf

Ingraham, N., Wingo, E., & Roberts, S. C. M. (2018). Inclusion of LGBTQ persons in research related to pregnancy risk: A cognitive interview study. *BMJ Sexual & Reproductive Health.* https://doi.org/10.1136/bmjsrh-2018-200097.

International Commission of Jurists. (2007). *Yogyakarta principles—Principles on the application of international human rights law in relation to sexual orientation and gender identity.* www.yogyakartaprinciples.org

International Commission of Jurists. (2017). *The Yogyakarta Principles Plus 10—Additional principles and state obligation on the application of International Human Rights Law in relation to sexual orientation, gender expression and sex characteristics to complement the Yogyakarta Principles.* http://yogyakartaprinciples.org/wp-content/uploads/2017/11/A5_yogyakartaWEB-2.pdf

Interprofessional Education Collaborative Expert Panel. (2011). *Core competencies for interprofessional collaborative practice: Report of an expert panel.* Interprofessional Education Collaborative.

Irwig, M. S. (2017). Testosterone therapy for transgender men. *The Lancet Diabetes & Endocrinology, 5,* 301–311. https://doi.org/10.1016/S2213-8587(16)00036-X.

Irwig, M. S. (2018). Cardiovascular health in transgender people. *Reviews in Endocrine and Metabolic Disorders, 19*(3), 243–251. https://doi.org/10.1007/s11154-018-9454-3.

Irwig, M. S., Childs, K., & Hancock, A. B. (2017). Effects of testosterone on the transgender male voice. *Andrology, 5*(1), 107–112. https://doi.org/10.1111/andr.12278.

Irwig, M. S. (2021). Is there a role for 5α-reductase inhibitors in transgender individuals? *Andrology, 9*(6), 1729–1731. https://doi.org/10.1111/andr.12881.

Isaacson, D., Aghili, R., Wongwittava, N., & Garcia, M. (2017). How big is too big? The girth of bestselling insertive sex toys to guide maximal neophallus dimensions. *The Journal of Sexual Medicine, 14*(11), 1455–1461. https://doi.org/10.1016/j.jsxm.2017.09.012.

Islam, N., Nash, R., Zhang, Q., Panagiotakopoulos, L., Daley, T., Bhasin, S., Getahun, D., Sonya Haw, J., McCracken, C., Silverberg, M. J., Tangpricha, V., Vupputuri, S., & Goodman, M. (2021). Is there a link between hormone use and diabetes incidence in transgender people? Data from the STRONG cohort. *The Journal of Clinical Endocrinology & Metabolism, 107*(4), e1549–e1557. https://doi.org/10.1210/clinem/dgab832.

Isshiki, N., Taira, T., & Tanabe, M. (1983). Surgical alteration of the vocal pitch. *The Journal of Otolaryngology, 12*(5), 335–340. https://pubmed.ncbi.nlm.nih.gov/6644864/

Iwamoto, S. J., Defreyne, J., Rothman, M. S., Van Schuylenbergh, J., Van de Bruaene, L., Motmans, J., & T'Sjoen, G. (2019). Health considerations for transgender women and remaining unknowns: A narrative review. *Therapeutic Advances in Endocrinology and Metabolism, 10,* 204201881987116. https://doi.org/10.1177/2042018819871166.

Iwamoto, S. J., Grimstad, F., Irwig, M. S., & Rothman, M. S. (2021). Routine screening for transgender and gender diverse adults taking gender-affirming hormone therapy: A narrative review. *Journal of General Internal Medicine, 36*(5), 1380–1389. https://doi.org/10.1007/s11606-021-06634-7.

Iwamoto, S. J., T'Sjoen, G., Safer, J. D., Davidge-Pitts, C. J., Wierman, M. E., Glodowski, M. B., & Rothman, M. S. (2019). Letter to the editor: "Progesterone is important for transgender women's therapy—Applying evidence for the benefits of progesterone in ciswomen". *The Journal of Clinical Endocrinology & Metabolism, 104*(8), 3127–3128. https://doi.org/10.1210/jc.2019-00249.

Jablonski, R. A., Vance, D. E., & Beattie, E. (2013). The invisible elderly: Lesbian, gay, bisexual, and transgender older adults. *Journal of Gerontological Nursing, 39*(11), 46–52. https://doi.org/10.3928/00989134-20130916-0.

Jackowich, R. A., Vale, R., Vale, K., Wassersug, R. J., & Johnson, T. W. (2014). Voluntary genital ablations:

Contrasting the cutters and their clients. *Sexual Medicine*, 2(3), 121–132. https://doi.org/10.1002/sm2.33.

Jackson Levin, N., Kattari, S. K., Piellusch, E. K., & Watson, E. (2020). "We just take care of each other": Navigating 'chosen family' in the context of health, illness, and the mutual provision of care amongst queer and transgender young adults. *International Journal of Environmental Research and Public Health*, 17(19), 7346. https://doi.org/10.3390/ijerph17197346.

Jacobson, G. J., Niemira, J. C., & Violeta, K. J. (Eds.). (2019). *Sex, sexuality, and trans identities: Clinical guidance for psychotherapists and counselors*. Jessica Kingsley Publishers.

Jadoul, P., Guilmain, A., Squifflet, J., Luyckx, M., Votino, R., Wyns, C., & Dolmans, M. M. (2017). Efficacy of ovarian tissue cryopreservation for fertility preservation: Lessons learned from 545 cases. *Human Reproduction*, 32(5), 1046–1054. https://doi.org/10.1093/humrep/dex040.

Jäggi, T., Jellestad, L., Corbisiero, S., Schaefer, D. J., Jenewein, J., Schneeberger, A., Kuhn, A., & Garcia Nuñez, D. (2018). Gender minority stress and depressive symptoms in transitioned Swiss transpersons. *BioMed Research International*, 2018, 8639263. https://doi.org/10.1155/2018/8639263.

Jahromi, A. H., Horen, S. R., Dorafshar, A. H., Seu, M. L., Radix, A., Anderson, E., Green, J., Fraser, L., Johannesson, L., Testa, G., Schechter, L. S. M., & Schechter, L. (2021). Uterine transplantation and donation in transgender individuals; Proof of concept. *International Journal of Transgender Health*, 22(4), 349–359. https://doi.org/10.1080/26895269.2021.1915635.

Jakomin, J. R., Ziegler, A., Rio, C., & Suddarth, R. (2020). Opportunities to learn transgender voice and communication therapy in graduate speech-language pathology education: Preliminary e-survey findings. *Perspectives*, 5(4), 876–883. https://doi.org/10.1044/2020_PERSP-20-00047.

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L, & Anafi, M. (2016). *The report of the 2015 U.S. Transgender Survey*. https://transequality.org/sites/default/files/docs/usts/USTS-AIAN-Report-Dec17.pdf

James-Abra, S., Tarasoff, L., Green, D., Epstein, R., Anderson, S., Marvel, S., Steele, L. S., Ross, L. (2015). Trans people's experiences with assisted reproduction services: A qualitative study. *Human Reproduction*, 30(6), 1365–1374. https://doi.org/10.1093/humrep/dev087.

Jasuja, G. K., de Groot, A., Quinn, E. K., Ameli, O., Hughto, J. M., Dunbar, M., Deutsch, M., Streed, C. G., Paasche-Orlos, M., Wolfe, H. L., & Rose, A. J. (2020). Beyond gender identity disorder diagnosis codes: An examination of additional methods to identify transgender individuals in administrative databases. *Medical Care*, 58(10), 903. https://doi.org/10.1097/MLR.0000000000001362.

Javier, C., Crimston, C. R., & Barlow, F. K. (2022). Surgical satisfaction and quality of life outcomes reported by transgender men and women at least one year post gender-affirming surgery: A systematic literature review.

*International Journal of Transgender Health*, 23(3), 255–273. https://doi.org/10.1080/26895269.2022.2038334.

Jazayeri, H. E., Lopez, J., Sluiter, E. C., O'Brien-Coon, D., Bluebond-Langner, R., Kuzon, W. M., Jr., Berli, J. U., Monstrey, S. J., Deschamps-Braly, J. C., Dorafshar, A. H., & Schechter, L. S. (2021). Discussion: Promoting centers for transgender care. *Journal of Oral and Maxillofacial Surgery*, 79(1), 3–4. https://doi.org/10.1016/j.joms.2020.09.027.

Jefford, M., & Moore, R. (2008). Improvement of informed consent and the quality of consent documents. *The Lancet. Oncology*, 9(5), 485–493. https://doi.org/10.1016/S1470-2045(08)70128-1.

Jenness, V., & Smyth, M. (2011). The passage and implementation of the Prison Rape Elimination Act: Legal endogeneity and the uncertain road from symbolic law to instrumental effects. *Stanford Law & Policy Review*, 22, 489. https://doi.org/10.1177/0891243215611856.

Jenness, V., & Fenstermaker, S. (2016). Forty years after Brownmiller: Prisons for men, transgender inmates, and the rape of the feminine. *Gender & Society*, 30(1), 14–29. https://doi.org/10.1177/0891243215611856.

Jessen, R. S., Waehre, A., David, L., & Stänicke, E. (2021). Negotiating gender in everyday life: Toward a conceptual model of gender dysphoria in adolescents. *Archives of Sexual Behavior*, 50(8), 3489–3503. https://doi.org/10.1007/s10508-021-02024-6.

Jiang, D. D., Gallagher, S., Burchill, L., Berli, J., & Dugi, D., 3rd. (2019). Implementation of a pelvic floor physical therapy program for transgender women undergoing gender-affirming vaginoplasty. *Obstetrics and Gynecology*, 133(5), 1003–1011. https://doi.org/10.1097/AOG.0000000000003236.

Jiang, D., Witten, J., Berli, J., & Dugi, D., 3rd. (2018). Does depth matter? Factors affecting choice of vulvoplasty over vaginoplasty as gender-affirming genital surgery for transgender women. *The Journal of Sexual Medicine*, 15(6), 902–906. https://doi.org/10.1016/j.jsxm.2018.03.085.

Jindarak, S., Nilprapha, K., Atikankul, T., Angspatt, A., Pungrasmi, P., Iamphongsai, S., Promniyom, P., Suwajo, P., Scvaggi, G., & Tiewtranon, P. (2018). Spermatogenesis abnormalities following hormonal therapy in transwomen. *Biomed Research International*, 2018, 7919481. https://doi.org/10.1155/2018/7919481.

Johns, M. M., Beltran, O., Armstrong, H. L., Jayne, P. E., & Barrios, L. C. (2018). Protective factors among transgender and gender variant youth: A systematic review by socioecological level. *The Journal of Primary Prevention*, 39(3), 263–301. https://doi.org/10.1007/s10935-018-0508-9.

Johns, M. M., Lowry, R., Andrzejewski, J., Barrios, L. C., Demissie, Z., McManus, T., Rasberry, C. N., Robin, L., & Underwood, J. M. (2019). Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students—19 states and large urban school districts, 2017. *Morbidity and Mortality Weekly Report*, 68(3), 67. https://doi.org/10.15585/mmwr.mm6803a3.

Johnson, E. K., Rosoklija, I., Finlayson, C., Chen, D., Yerkes, E. B., Madonna, M. B., Holl, J. L., Baratz, A. B., Davis, G., & Cheng, E. Y. (2017). Attitudes towards "disorders of sex development" nomenclature among affected individuals. *Journal of Pediatric Urology*, 13(6), 608.e1–608.e8. https://doi.org/10.1016/j.jpurol.2017.03.035.

Johnson, K. C., LeBlanc, A. J., Deardorff, J., Bockting, W. O. (2020). Invalidation experiences among non-binary adolescents. *Journal of Sex Research*, 57(2), 222–233. https://doi.org/10.1080/00224499.2019.1608422.

Johnson, L., & Federman, E. J. (2014). Training, experience, and attitudes of VA psychologists regarding LGBT issues: Relation to practice and competence. *Psychology of Sexual Orientation and Gender Diversity*, 1(1). https://doi.org/10.1037/sgd0000019.

Johnson, T. W., & Irwig, M. S. (2014). The hidden world of self-castration and testicular self-injury. *Nature Reviews Urology*, 11(5), 297–300. https://doi.org/10.1038/nrurol.2014.84.

Johnson, T. W., & Wassersug, R. J. (2016). Recognition of gender variants outside the binary in WPATH Standards of Care, Version 7.0. *International Journal of Transgenderism*, 17(1), 1–3. https://doi.org/10.1080/15532739.2015.1114442.

Johnson, T. W., Brett, M. A., Roberts, L. F., & Wassersug, R. J. (2007). Eunuchs in contemporary society: Characterizing men who are voluntarily castrated (Part I). *The Journal of Sexual Medicine*, 4(4), 930–945. https://doi.org/10.1111/j.1743-6109.2007.00521.x.

Joint United Nations Programme on HIV/AIDS (UNAIDS). (2019). *UNAIDS Data 2019*. https://www.unaids.org/sites/default/files/media_asset/2019-UNAIDS-data_en.pdf

Joint, R., Chen, Z. E., & Cameron, S. (2018). Breast and reproductive cancers in the transgender population: A systematic review. *BJOG: An International Journal of Obstetrics and Gynaecology*, 125(12), 1505–1512. https://doi.org/10.1111/1471-0528.15258.

Jones, C. (2019). Intersex, infertility and the future: Early diagnoses and the imagined life course. *Sociology of Health & Illness*, 42(1), 143–156. https://doi.org/10.1111/1467-9566.12990.

Jones, T., de Bolger, T., Dune, A., Lykins, A., & G. Hawkes. (2015). *Female-to-Male (FtM) transgender people's experiences in Australia: A national study*. Springer.

Jones, B. A., Bouman, W. P., Haycraft, E., & Arcelus, J. (2019). Gender congruence and body satisfaction in non-binary transgender people: A case control study. *International Journal of Transgenderism*, 20(2-3), 263–274. https://doi.org/10.1080/15532739.2018.1538840.

Jones, B. A., Bouman, W. P., Haycraft, E., & Arcelus, J. (2019). Mental health and quality of life in non-binary transgender adults: A case control study. *International Journal of Transgenderism*, 20(2-3), 251–262. https://doi.org/10.1080/15532739.2019.1630346.

Jones, B. A., Brewin, N., Richards, C., Van Eijk, M., Stephenson-Allen, A., & Arcelus, J. (2017). Investigating the outcome of the initial assessment at a national transgender health service: Time to review the process?. *International Journal of Transgenderism*, 18(4), 427–432. https://doi.org/10.1080/15532739.2017.1372838.

Jones, B. P., Rajamanoharan, A., Vali, S., Williams, N. J., Saso, S., Thum, M. Y., Ghaem-Maghami, S., Quiroga, I., Diaz-Garcia, C., Thomas, P., Wilkinson, S., Yazbek, J., & Smith, J. R. (2021). Perceptions and motivations for uterus transplant in transgender women. *JAMA Network Open*, 4(1), e2034561. https://doi.org/10.1001/jamanetworkopen.2020.34561.

Jones, R. K., Witwer, E., & Jerman, J. (2020). Transgender abortion patients and the provision of transgender-specific care at non-hospital facilities that provide abortions. *Contraception: X*, 2, 100019. https://doi.org/10.1016/j.conx.2020.100019.

Jones, K., Wood, M., & Stephens, L. (2017). Contraception choices for transgender males. *Journal of Family Planning and Reproductive Health Care*, 43(3), 239–240. https://doi.org/10.1136/jfprhc-2017-101809.

Joseph, A. A., Kulshreshtha, B., Shabir, I., Marumudi, E., George, T. S., Sagar, R., Mehta, M., & Ammini, A. C. (2016). Gender issues and related social stigma affecting patients with a disorder of sex development in India. *Archives of Sexual Behavior*, 46(2), 361–367. https://doi.org/10.1007/s10508-016-0841-0.

Julian, J. M., Salvetti, B., Held, J. I., Murray, P. M., Lara-Rojas, L., & Olson-Kennedy, J. (2021). The impact of chest binding in transgender and gender diverse youth and young adults. *Journal of Adolescent Health*, 68(6), 1129–1134. https://doi.org/10.1016/j.jadohealth.2020.09.029.

Jung, A., & Schuppe, H. C. (2007). Influence of genital heat stress on semen quality in humans. *Andrologia*, 39(6), 203–215. https://doi.org/10.1111/j.1439-0272.2007.00794.x.

Kailas, M., Lu, H. M. S., Rothman, E. F., & Safer, J. D. (2017). Prevalence and types of gender-affirming surgery among a sample of transgender endocrinology patients prior to state expansion of insurance coverage. *Endocrine Practice*, 23(7), 780–786. https://doi.org/10.4158/EP161727.OR.

Kaltiala, R., Bergman, H., Carmichael, P., de Graaf, N. M., Egebjerg Rischel, K., Frisén, L., Schorkopf, M., Suomalainen, L., & Waehre, A. (2020). Time trends in referrals to child and adolescent gender identity services: A study in four Nordic countries and in the UK. *Nordic Journal of Psychiatry*, 74(1), 40–44. https://doi.org/10.1080/08039488.2019.1667429.

Kaltiala, R., Heino, E., Työläjärvi, M., & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, 74(3), 213–219. https://doi.org/10.1080/08039488.2019.1691260.

Kaltiala-Heino, R., Sumia, M., Työläjärvi, M., & Lindberg, N. (2015). Two years of gender identity service for minors: Overrepresentation of natal girls with severe problems in adolescent development. *Child and Adolescent Psychiatry and Mental Health*, 9(1). https://doi.org/10.1186/s13034-015-0042-y.

Kanagalingam, J., Georgalas, C., Wood, G. R., Ahluwalia, S., Sandhu, G., & Cheesman, A. D. (2005). Cricothyroid



approximation and subluxation in 21 male-to-female transsexuals. *The Laryngoscope*, 115(4), 611–618. https://doi.org/10.1097/01.mlg.0000161357.12826.33.

Kang, A., Aizen, J. M., Cohen, A. J., Bales, G. T., & Pariser, J. J. (2019). Techniques and considerations of prosthetic surgery after phalloplasty in the transgender male. *Translational Andrology and Urology*, 8(3), 273–282. https://doi.org/10.21037/tau.2019.06.02.

Kanhai, R. C. (2016). Sensate vagina pedicled-spot for male-to-female transsexuals: The experience in the first 50 patients. *Aesthetic Plastic Surgery*, 40(2), 284–287. https://doi.org/10.1007/s00266-016-0620-2.

Kanhai, R. C., Hage, J. J., Asscheman, H., & Mulder, J. W. (1999). Augmentation mammaplasty in male-to-female transsexuals. *Plastic and Reconstructive Surgery*, 104(2), 542–549; discussion 550–541. https://doi.org/10.1097/00006534-199908000-00039.

Kanhai, R. C., Hage, J. J., Karim, R. B., & Mulder, J. W. (1999). Exceptional presenting conditions and outcome of augmentation mammaplasty in male-to-female transsexuals. *Annals of Plastic Surgery*, 43(5), 476–483. https://doi.org/10.1097/00000637-199911000-00003.

Kanhai, R. C., Hage, J. J., & Mulder, J. W. (2000). Long-term outcome of augmentation mammaplasty in male-to-female transsexuals: A questionnaire survey of 107 patients. *British Journal of Plastic Surgery*, 53(3), 209–211. https://doi.org/10.1054/bjps.1999.3298.

Kanis, J. A. (1994). Assessment of fracture risk and its application to screening for postmenopausal osteoporosis: Synopsis of a WHO report. *Osteoporosis International*, 4(6), 368–381. https://doi.org/10.1007/BF01622200.

Kanj, R. V., Conard, L. A. E., Corathers, S. D., & Trotman, G. E. (2019). Hormonal contraceptive choices in a clinic-based series of transgender adolescents and young adults. *The International Journal of Transgenderism*, 20(4), 413–420. https://doi.org/10.1080/15532739.2019.1631929.

Karasic, D. H. (2016). Protecting transgender rights promotes transgender health. *LGBT Health*, 3(4), 245–247. https://doi.org/10.1089/lgbt.2016.0072.

Kaoutzanis, C., Winocour, J., Gupta, V., Yeslev, M., Ganesh Kumar, N., Wormer, B., Grotting, J. C., & Higdon, K. K. (2019). The effect of smoking in the cosmetic surgery population: Analysis of 129,007 patients. *Aesthetic Surgery Journal*, 39(1), 109–119. https://doi.org/10.1093/asj/sjy088

Karasic, D. H. (2019). Mental health care for the adult transgender patient. In C. A. Ferrando (Ed.), *Comprehensive care of the transgender patient* (pp. 8–11). Elsevier.

Karasic, D. H., & Fraser, L. (2018). Multidisciplinary care and the standards of care for transgender and gender nonconforming individuals. *Clinics in Plastic Surgery*, 45(3), 295–299. https://doi.org/10.1016/j.cps.2018.03.016.

Karkazis, K., Tamar-Mattis, A., & Kon, A. A. (2010). Genital surgery for disorders of sex development: Implementing a shared decision-making approach. *Journal of Pediatric Endocrinology and Metabolism*, 23(8), 789–805. https://doi.org/10.1515/jpem.2010.129.

Kasianczuk, M., & Trofymenko, O. (2020). *Size estimation for transgender people in Ukraine/SE "Center of Social Expertises named fter Yu. Saenko" of the Institute of Sociology of the National Academy of Sciences of Ukraine.-Kyiv, 2020*. https://www.researchgate.net/publication/348325593_POPULATION_SIZE_ESTIMATION_FOR_TRANSGENDER_PEOPLE_IN_UKRAINE

Kattari, S. K., & Hasche, L. (2016). Differences across age groups in transgender and gender non-conforming people's experiences of health care discrimination, harassment, and victimization. *Journal of Aging and Health*, 28(2), 285–306. https://doi.org/10.1177/0898264315590228.

Kattari, S. K., Walls, N. E., Speer, S. R., & Kattari, L. (2016). Exploring the relationship between transgender-inclusive providers and mental health outcomes among transgender/gender variant people. *Social Work in Health Care*, 55(8), 635–650. https://doi.org/10.1080/00981389.2016.1193099.

Katz-Wise, S. L., Budge, S. L., Fugate, E., Flanagan, K., Touloumtzis, C., Rood, B., Perez-Brumer, A., & Leibowitz, S. (2017). Transactional pathways of transgender identity development in transgender and gender-nonconforming youth and caregiver perspectives from the Trans Youth Family Study. *International Journal of Transgenderism*, 18(3), 243–263. https://doi.org/10.1080/15532739.2017.1304312.

Kaufman, R. & Tishelman, A. C. (2018). Creating a network of professionals. In C. E. Keo-Meier & D. E. Ehrensaft (Eds.), *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive children*. American Psychological Association. https://www.jstor.org/stable/j.ctv1chrwv9

Kauth, M. R., Shipherd, J. C., Lindsay, J., Blosnich, J. R., Brown, G. R., & Jones, K. T. (2014). Access to care for transgender veterans in the Veterans Health Administration: 2006–2013. *American Journal of Public Health*, 104(S4), S532–S534. https://doi.org/10.2105/AJPH.2014.302086.

Kcomt, L., Gorey, K. M., Barrett, B. J., & McCabe, S. E. (2020). Healthcare avoidance due to anticipated discrimination among transgender people: A call to create trans-affirmative environments. *Elsevier*, 11, 100608. https://doi.org/10.1016/j.ssmph.2020.100608.

Kelly, S. J., & Ismail, M. (2015). Stress and type 2 diabetes: A review of how stress contributes to the development of type 2 diabetes. *Annual Review of Public Health*, 36, 441–462. https://doi.org/10.1146/annurev-publhealth-031914-122921.

Kelly, V., Hertegård, S., Eriksson, J., Nygren, U., & Södersten, M. (2018). Effects of gender-confirming pitch-raising surgery in transgender women a long-term follow-up study of acoustic and patient-reported data. *Journal of Voice*, 33(5), 781–791. https://doi.org/10.1016/j.jvoice.2018.03.005.

Kelvin, J. F., Thom, B., Benedict, C., Carter, J., Corcoran, S., Dickler, M. N., Goodman, K. A., Margolies, A., Matasar, M. J., Noy, A & Goldfarb, S. B. (2016). Cancer

and fertility program improves patient satisfaction with information received. *Journal of Clinical Oncology*, 34(15), 1780–1786. https://doi.org/10.1200/JCO.2015.64.5168.

Kennedy, E., & Thibeault, S. L. (2020). Voice-gender incongruence and voice health information-seeking behaviors in the transgender community. *American Journal of Speech-Language Pathology*, 29(3), 1563–1573. https://doi.org/10.1044/2020_AJSLP-19-00188.

Kennis, M., Duecker, F., T'Sjoen, G., Sack, A. T., & Dewitte, M. (2022). Sexual self-concept discrepancies mediate the relation between gender dysphoria sexual esteem and sexual attitudes in binary transgender individuals. *The Journal of Sex Research*, 59(4), 524–536. https://doi.org/10.1080/00224499.2021.1951643.

Kent, M. A., Winoker, J. S., & Grotas, A. B. (2018). Effects of feminizing hormones on sperm production and malignant changes: Microscopic examination of post orchiectomy specimens in transwomen. *Urology*, 121, 93–96. https://doi.org/10.1016/j.urology.2018.07.023.

Keohane v. Jones (Florida Department of Corrections), Case No.4:16-cv-511-MW-CAS, N. D. Fla, 2018.

Keo-Meier, C. L., & Ehrensaft, D. (2018). Introduction to the gender affirmative model. In C. Keo-Meier & D. Ehrensaft (Ed.), *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive children* (pp. 3–19). Washington, DC: American Psychological Association.

Keo-Meier, C. L., & Fitzgerald, K. M. (2017). Affirmative psychological testing and neurocognitive assessment with transgender adults. *The Psychiatric Clinics of North America*, 40(1), 51–64. https://doi.org/10.1016/j.psc.2016.10.011.

Keo-Meier, C. L., Herman, L. I., Reisner, S. L., Pardo, S. T., Sharp, C., & Babcock, J. C. (2015). Testosterone treatment and MMPI-2 improvement in transgender men: A prospective controlled study. *Journal of Consulting and Clinical Psychology*, 83(1), 143–156. https://doi.org/10.1037/a0037599.

Kerckhof, M. E., Kreukels, B. P. C., Nieder, T. O., Becker-Hébly, I., van de Grift, T. C., Staphorsius, A. S., Elaut, E. (2019). Prevalence of sexual dysfunctions in transgender persons: Results from the ENIGI follow-up study. *The Journal of Sexual Medicine*, 16(12), 2018–2029. https://doi.org/10.1016/j.jsxm.2019.09.003.

Kerry, S. (2014). Sistergirls/brotherboys: The status of indigenous transgender Australians. *International Journal of Transgender Health*, 15(3–4), 173–186. https://doi.org/10.1080/15532739.2014.995262.

Khalili, J., Leung, L. B., & Diamant, A. L. (2015). Finding the perfect doctor: Identifying lesbian, gay, bisexual, and transgender–competent physicians. *American Journal of Public Health*, 105(6), 1114–1119. https://doi.org/10.2105/AJPH.2014.302448.

Khatchadourian, K., Amed, S., & Metzger, D. L. (2014). Clinical management of youth with gender dysphoria in Vancouver. *The Journal of Pediatrics*, 164(4), 906–911. https://doi.org/10.1016/j.jpeds.2013.10.068.

Kidd, J. D., Dolezal, C., & Bockting, W. O. (2018). The relationship between tobacco use and legal document gender-marker change, hormone use, and gender-affirming surgery in a United States sample of trans-feminine and trans-masculine individuals: Implications for cardiovascular health. *LGBT Health*, 5(7), 401–411. https://doi.org/10.1089/lgbt.2018.0103.

Kidd, K. M., Sequeira, G. M., Douglas, C., Paglisotti, T., Inwards-Breland, D. J., Miller, E., & Coulter, R. (2021). Prevalence of gender-diverse youth in an urban school district. *Pediatrics*, 147(6), e2020049823. https://doi.org/10.1542/peds.2020-049823.

Kim, H. T. (2020) Vocal feminization for transgender women: Current strategies and patient perspectives. *International Journal of General Medicine*, 13, 43–52.https://doi.org/10.2147/IJGM.S205102.

Kim, H. T. (2017). A new conceptual approach for voice feminization: 12 years of experience. *The Laryngoscope*, 127(5), 1102–1108. https://doi.org/10.1002/lary.26127.

Kirey-Sitnikova, Y. (2021). Prospects and challenges of gender neutralization in Russian. *Russian Linguistics*, 45(2), 143–158. https://doi.org/10.1007/s11185-021-09241-6.

Kismödi, E., Corona, E., Maticka-Tyndale, E., Rubio-Aurioles, E., & Coleman, E. (2017). Sexual Rights as Human Rights: A guide for the WAS Declaration of Sexual Rights. *International Journal of Sexual Health*, 29(Suppl 1), 1–92. https://doi.org/10.1080/19317611.2017.1353865.

Klaver, M., de Mutsert, R., van der Loos, M., Wiepjes, C. M., Twisk, J. W. R., den Heijer, M., & Klink, D. T. (2020). Hormonal treatment and cardiovascular risk profile in transgender adolescents. *Pediatrics*, 145(3), e20190741. https://doi.org/10.1542/peds.2019-0741.

Klein, A., & Golub, S. A. (2016). Family rejection as a predictor of suicide attempts and substance misuse among transgender and gender nonconforming adults. *LGBT Health*, 3(3), 193–199. https://doi.org/10.1089/lgbt.2015.0111.

Klein, C., & Gorzalka, B. B. (2009). Sexual functioning in transsexuals following hormone therapy and genital surgery: A review. *Journal of Sexual Medicine*, 6(11), 2922–2939. https://doi.org/10.1111/j.1743-6109.2009.01370.

Klein, D. A., Berry-Bibee, E. N., Baker, K. K., Malcolm, N. M., Rollison, J. M., & Frederiksen, B. N. (2018). Providing quality family planning services to LGBTQIA individuals: A systematic review. *Contraception*, 97(5). https://doi.org/10.1016/j.contraception.2017.12.016.

Klein, D. A., Paradise, S. L., & Goodwin, E. T. (2018). Caring for transgender and gender-diverse persons: What clinicians should know. *AFP Journal*, 98(11), 645–653. https://www.ncbi.nlm.nih.gov/pubmed/30485050

Kleinplatz, P. J. (Ed.). (2012). *New directions in sex therapy: Innovations and alternatives* (2nd ed.). Routledge/Taylor & Francis Group.

Klimstra, T. A., Hale, W. W.III., Raaijmakers, Q. A. W., Branje, S. J. T., & Meeus, W. H. J. (2009). Identity formation in adolescence: Change or stability? *Journal of Youth and Adolescence*, 39(2), 150–162. https://doi.org/10.1007/s10964-009-9401-4.

Klink, D., Bokenkamp, A., Dekker, C., & Rotteveel, J. (2015). Arterial hypertension as a complication of triptorelin treatment in adolescents with gender dysphoria. *Endocrinology and Metabolism International Journal*, 2(1), 36–38. https://doi.org/10.15406/emij.2015.02.00008.

Klink, D., Caris, M., Heijboer, A., van Trotsenburg, M., & Rotteveel, J. (2015). Bone mass in young adulthood following gonadotropin-releasing hormone analog treatment and cross-sex hormone treatment in adolescents with gender dysphoria. *The Journal of Clinical Endocrinology & Metabolism*, 100(2), E270–E275. https://doi.org/10.1210/jc.2014-2439.

Kloer, C., Parker, A., Blasdel, G., Kaplan, S., Zhao, L., & Bluebond-Langner, R. (2021). Sexual health after vaginoplasty: A systematic review. *Andrology*, 9(6), 1744–1764. https://doi.org/10.1111/andr.13022.

Klosky, J. L., Anderson, L. E., Russell, K. M., Huang, L., Zhang, H., Schover, L. R., Simmons, J. L., & Kutteh, W. H. (2017). Provider influences on sperm banking outcomes among adolescent males newly diagnosed with cancer. *Journal of Adolescent Health*, 60(3), 277–283. https://doi.org/10.1016/j.jadohealth.2016.10.020.

Klosky, J. L., Flynn, J. S., Lehmann, V., Russell, K. M., Wang, F., Hardin, R. N., Eddinger, J. R., Zhang, H., Schenck, L. A., & Schover, L. R. (2017). Parental influences on sperm banking attempts among adolescent males newly diagnosed with cancer. *Fertility and Sterility*, 108(6), 1043–1049. https://doi.org/10.1016/j.fertnstert.2017.08.039.

Klosky, J. L., Wang, F., Russell, K. M., Zhang, H., Flynn, J. S., Huang, L., Wasilewaski-Masker, K., Landier, W., Leonard, M., Albritton, K. H., Gupta, A. A., Casilas, J., Colte, O., Kutteh, W. H., & Schover, L. R. (2017). Prevalence and predictors of sperm banking in adolescents newly diagnosed with cancer: Examination of adolescent, parent, and provider factors influencing fertility preservation outcomes. *Journal of Clinical Oncology*, 35(34), 3830–3865. https://doi.org/10.1200/JCO.2016.70.4767.

Knutson, D., Koch, J. M., & Goldbach, C. (2019). Recommended terminology, pronouns, and documentation for work with transgender and non-binary populations. *Practice Innovations*, 4(4), 214–224. https://doi.org/10.1037/pri0000098.

Koçak, I., Akpınar, M. E., Cakır, Z. A., Doğan, M., Bengisu, S., & Celikoyar, M. M. (2010). Laser reduction glottoplasty for managing androphonia after failed cricothyroid approximation surgery. *Journal of Voice*, 24(6), 758–764. https://doi.org/10.1016/j.jvoice.2009.06.004.

Kocan, S., & Gursoy, A. (2016). Body image of women with breast cancer after mastectomy: A qualitative research. *Journal of Breast Health*, 12(4), 145–150. https://doi.org/10.5152/tjbh.2016.2913.

Koehler, A., Eyssel, J., & Nieder, T. O. (2018). Genders and individual treatment progress in (non-)binary trans individuals. *The Journal of Sexual Medicine*, 15(1), 102–113. https://doi.org/10.1016/j.jsxm.2017.11.007.

Kohlberg, L. (1966). A cognitive-developmental analysis of children's sex-role concepts and attitudes. In E. E. Maccoby (Ed.), *The development of sex*. Tavistock Publications.

Kojima, T., Shoji, K., Isshiki, N., & Nakamura, K. (2008). Thyroplasty type III for treatment of voice problem in GID of female-to-male type. *Practica Oto-Rhino-Laryngologica*, 101(1), 39–43. https://doi.org/10.5631/jibirin.101.39.

Kon, A. (2015). Ethical issues in decision-making for infants with disorders of sex development. *Hormone and Metabolic Research*, 47(05), 340–343. https://doi.org/10.1055/s-0035-1547269.

Kornienko, O., Santos, C., Martin, C., & Granger, K. (2016). Peer influence on gender identity development in adolescence. *Developmental Psychology*, 52(10), 1578–1592. https://doi.org/10.1037/dev0000200.

Korpaisarn, S., & Safer, J. D. (2018). Gaps in transgender medical education among healthcare providers: A major barrier to care for transgender persons. *Reviews in Endocrine and Metabolic Disorders*, 19(3), 271–275. https://doi.org/10.1007/s11154-018-9452-5.

Kosilek v. Mass. Department of Corrections/ Kathleen Dennehy; Kosilek v. Spencer, 889 F.Supp.2d 190 (D. Mass. Sept. 4, 2012); "Kosilek II."

Kosilek v. Massachusetts, 221 F. Supp. 2d 156 (D Mass 2002).

Kozato, A., Fox, G. C., Yong, P. C., Shin, S. J., Avanessian, B. K., Ting, J., Yiwei, L., Subha, K., Safer, J. D., & Pang, J. H. (2021). No venous thromboembolism increase among transgender female patients remaining on estrogen for gender-affirming surgery. *The Journal of Clinical Endocrinology & Metabolism*, 106(4), e1586–e1590. https://doi.org/10.1210/clinem/dgaa966.

Krege, S., Eckoldt, F., Richter-Unruh, A., Köhler, B., Leuschner, I., Mentzel, H. J., Moss, A., Schweizer, K., Stein, R., Werner-Rosen, K., Wieacker, P., Wiesemann, C., Wünsch, L., & Richter-Appelt, H. (2019). Variations of sex development: The first German interdisciplinary consensus paper. *Journal of Pediatric Urology*, 15(2), 114–123. https://doi.org/10.1016/j.jpurol.2018.10.008.

Krempasky, C., Harris, M., Abern, L., & Grimstad, F. (2020). Contraception across the transmasculine spectrum. *American Journal of Obsterics and Gynecology*, 222(2), 134–143. https://doi.org/10.1016/j.ajog.2019.07.043.

Kreukels, B. P. C., Köhler, B., Nordenström, A., Roehle, R., Thyen, U., Bouvattier, C., de Vries, A. L. C., Cohen-Kettenis, P. T., Köhler, B., Cohen-Kettenis, P., de Vries, A., Arlt, W., Wiesemann, C., Slowikowska-Hilczer, J., de la Perriere, A. B., Sultan, C., Paris, F., Bouvattier, C., Thyen, U., & Reisch, N. (2018). Gender dysphoria and gender change in disorders of sex development/intersex conditions: Results From the dsd-LIFE study. *The Journal of Sexual Medicine*, 15(5), 777–785. https://doi.org/10.1016/j.jsxm.2018.02.021.

Kreukels, B. P., & Cohen-Kettenis, P. T. (2011). Puberty suppression in gender identity disorder: the Amsterdam experience. *Nature Reviews Endocrinology*, 7(8), 466–472. https://doi.org/10.1038/nrendo.2011.78.

Krishnamurthy, R., VandeCreek, L., Kaslow, N. J., Tazeau, Y. N., Miville, M. L., Kerns, R., Stegman, R., Suzuki, L., & Benton, S. A. (2004). Achieving competency in psychological assessment: Directions for education and training. *Journal of Clinical Psychology*, 60(7), 725–739. https://doi.org/10.1002/jclp.20010.

Kunachak, S., Prakunhungsit, S., & Sujjalak, K. (2000). Thyroid cartilage and vocal fold reduction: A new phonosurgical method for male-to-female transsexuals. *The Annals of Otology, Rhinology, and Laryngology*, 109(11), 1082–1086. https://doi.org/10.1177/000348940010901116.

Kuper, L. E., Adams, N., & Mustanski, B. S. (2018). Exploring cross-sectional predictors of suicide ideation, attempt, and risk in a large online sample of transgender and gender nonconforming youth and young adults. *LGBT Health*, 5(7), 391–400. https://doi.org/10.1089/lgbt.2017.0259.

Kuper, L. E., Lindley, L., & Lopez, X. (2019). Exploring the gender development histories of children and adolescents presenting for gender affirming medical care. *Clinical Practice in Pediatric Psychology*, 7(3), 217–228. https://doi.org/10.1037/cpp0000290.

Kuper, L. E., Mathews, S., & Lau, M. (2019). Baseline mental health and psychosocial functioning of transgender adolescents seeking gender-affirming hormone therapy. *Journal of Developmental & Behavioral Pediatrics*, 40(8), 589–596. https://doi.org/10.1097/DBP.0000000000000697.

Kuper, L. E., Nussbaum, R., & Mustanski, B. (2012). Exploring the diversity of gender and sexual orientation identities in an online sample of transgender individuals. *Journal of Sex Research*, 49(2-3), 244–254. https://doi.org/10.1080/00224499.2011.596954.

Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy. *Pediatrics*, 145(4). https://doi.org/10.1542/peds.2019-3006.

Kuper, L. E., Wright, L., & Mustanski, B. (2014). Stud identity among female-born youth of color: Joint conceptualizations of gender variance and same-sex sexuality. *Journal of Homosexuality*, 61(5), 714–731. https://doi.org/10.1080/00918369.2014.870443.

Kuper, L. E., Wright, L., & Mustanski, B. (2018). Gender identity development among transgender and gender nonconforming emerging adults: An intersectional approach. *International Journal of Transgenderism*, 19(4), 436–455. https://doi.org/10.1080/15532739.2018.1443869.

Kuijpers, S., Wiepjes, C. M., Conemans, E. B., Fisher, A. D., T'Sjoen, G., & den Heijer, M. (2021). Toward a lowest effective dose of cyproterone acetate in trans women: Results from the ENIGI study. *The Journal of Clinical Endocrinology & Metabolism*, 106(10), e3936–e3945. https://doi.org/10.1210/clinem/dgab427.

Kuvalanka, K. A., Bellis, C., Goldberg, A. E., & McGuire, J. K. (2019). An exploratory study of custody challenges experienced by affirming mothers of transgender and gender-nonconforming children. *Family Court Review*, 57(1), 54–71. https://doi.org/10.1111/fcre.12387.

Kuvalanka, K. A., Mahan, D. J., McGuire, J. K., & Hoffman, T. K. (2017). Perspectives of mothers of transgender and gender-nonconforming children with autism spectrum disorder. *Journal of Homosexuality*, 65(9), 1167–1189. https://doi.org/10.1080/00918369.2017.1406221.

Kuyper, L., & Wijsen, C. (2014). Gender identities and gender dysphoria in the Netherlands. *Archives of Sexual Behavior*, 43(2), 377–385. https://doi.org/10.1007/s10508-013-0140-y.

Kvist, O., Luiza Dallora, A., Nilsson, O., Anderberg, P., Sanmartin Berglund, J., Flodmark, C. E., & Diaz, S. (2021). A cross-sectional magnetic resonance imaging study of factors influencing growth plate closure in adolescents and young adults. *Acta Paediatrica*, 110(4), 1249–1256. https://doi.org/10.1111/apa.15617.

Kyinn, M., Banks, K., Leemaqz, S. Y., Sarkodie, E., Goldstein, D., & Irwig, M. S. (2021). Weight gain and obesity rates in transgender and gender-diverse adults before and during hormone therapy. *International Journal of Obesity*, 45(12), 2562–2569. https://doi.org/10.1038/s41366-021-00935-x.

Laan, E. T. M., Klein, V., Werner, M. A., van Lunsen, R. H. W., & Janssen, E. (2021). In pursuit of pleasure: A biopsychosocial perspective on sexual pleasure and gender. *International Journal of Sexual Health*, 33(4), 516–536. https://doi.org/10.1080/19317611.2021.1965689.

Ladanyi, C., Mor, A., Christianson, M. S., Dhillon, N., & Segars, J. H. (2017). Recent advances in the field of ovarian tissue cryopreservation and opportunities for research. *Journal of Assisted Reproduction and Genetics*, 34(6), 709–722. https://doi.org/10.1007/s10815-017-0899-1.

Lampalzer, U., Briken, P., & Schweizer, K. (2021). Psychosocial care and support in the field of intersex/diverse sex development (dsd): Counseling experiences, localization and needed improvements. *International Journal of Impotence Research*, 33(2), 228–242.

Landén, M., Wålinder, J., Hambert, G., & Lundstrom, B. (1998). Factors predictive of regret in sex reassignment. *Acta Psychiatrica Scandinavica*, 97(4), 284–289. https://doi.org/10.1111/j.1600-0447.1998.tb10001.x.

Langenderfer-Magruder, L., Whitfield, D. L., Walls, N. E., Kattari, S. K., & Ramos, D. (2014). Experiences of intimate partner violence and subsequent police reporting among lesbian, gay, bisexual, transgender, and queer adults in Colorado. *Journal of Interpersonal Violence*, 31(5), 855–871. https://doi.org/10.1177/0886260514556767.

Langley, R. E., Gilbert, D. C., Duong, T., Clarke, N. W., Nankivell, M., Rosen, S. D., Mangar, S., Macnair, A., Sundaram, S. K., Laniado, M. E., Dixit, S., Madaan, S., Manetta, C., Pope, A., Scrase, C. D., Mckay, S., Muazzam, I. A., Collins, G. N., Worlding, J., & Williams, S. T. (2021). Transdermal oestradiol for androgen suppression in prostate cancer: Long-term cardiovascular outcomes from the randomised Prostate Adenocarcinoma Transcutaneous Hormone (PATCH) trial programme. *The Lancet*, 397(10274), 581–591. https://doi.org/10.1016/s0140-6736(21)00100-8.

Laron, Z., Zeev, Z., Kauli, R., Comaru-Schally, A., & Schally, A. (1981). D-Trp6-analogue of luteinising hormone releasing hormone in combination with cyproterone acetate to treat precocious puberty. *The Lancet*, *318*(8253), 955–956. https://doi.org/10.1016/s0140-6736(81)91155-7.

Laube, J. S., Auer, M. K., Biedermann, S. V., Schröder, J., Hildebrandt, T., Nieder, T. O., Briken, P., & Fuss, J. (2020). Sexual behavior, desire, and psychosexual experience in gynephilic and androphilic trans women: A cross-sectional multicenter study. *The Journal of Sexual Medicine*, *17*(6), 1182–1194. https://doi.org/10.1016/j.jsxm.2020.01.030.

Lawrence, A. A. (2003). Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Archives of Sexual Behaviour*, *32*(4), 299–315. https://doi.org/10.1023/a:1024086814364.

Lawrence, A. A. (2005). Sexuality after male-to-female sex reassignment surgery. *Archives of Sexual Behaviour*, *34*(2), 147–166. https://doi.org/10.1007/s10508-005-1793-y.

LeBreton, M., Courtois, F., Journel, N. M., Beaulieu-Prevost, D., Belanger, M., Ruffion, A., & Terrier, J. E. (2017). Genital sensory detection thresholds and patient satisfaction with vaginoplasty in male-to-female transgender women. *Journal of Sexual Medicine*, *14*(2), 274–281. https://doi.org/10.1016/j.jsxm.2016.12.005.

Ledesma, E., & Ford, C. L. (2020). Health implications of housing assignments for incarcerated transgender women. *American Journal of Public Health*, *110*(5), 650–654. https://doi.org/10.2105/ajph.2020.305565.

Lee, D. S., Marsh, L., Garcia-Altieri, M. A., Chiu, L. W., & Awad, S. S. (2016). Active mental illnesses adversely affect surgical outcomes. *The American Surgeon*, *82*(12), 1238–1243. https://doi.org/10.1177/000313481608201233.

Lee, H., Operario, D., van den Berg, J. J., Yi, H., Choo, S., & Kim, S. S. (2020). Health disparities among transgender adults in South Korea. *Asia Pacific Journal of Public Health*, *32*(2-3), 103–110. https://doi.org/10.1177/1010539520912594.

Lee, J. Y., Finlayson, C., Olson-Kennedy, J., Garofalo, R., Chan, Y. M., Glidden, D. V., & Rosenthal, S. M. (2020). Low bone mineral density in early pubertal transgender/gender diverse youth: Findings from the Trans Youth Care Study. *Journal of Endocrine Society*, *4*(9), https://doi.org/10.1210/jendso/bvaa065.

Lee, P. A., Houk, C. P., Ahmed, S. F., & Hughes, I. A. (2006). Consensus statement on management of intersex disorders. International Consensus Conference on Intersex. *Pediatrics*, *118*(2):e488-500. https://doi.org/10.1542/peds.2006-0738.

Lee, P. A., Nordenström, A., Houk, C. P., Ahmed, S. F., Auchus, R., Baratz, A., Baratz Dalke, K., Liao, L. M., Lin-Su, K., Looijenga, L. H. J.3rd, Mazur, T., Meyer-Bahlburg, H. F. L., Mouriquand, P., Quigley, C. A., Sandberg, D. E., Vilain, E., & Witchel, S. (2016). Global Disorders of sex development update since 2006: Perceptions, approach and care. *Hormone Research in Paediatrics*, *85*(3), 158–180. https://doi.org/10.1159/000442975.

Lefevor, G. T., Sprague, B. M., Boyd-Rogers, C. C., & Smack, A. C. P. (2018). How well do various types of support buffer psychological distress among transgender and gender nonconforming students? *International Journal of Transgenderism*, *20*(1), 39–48. https://doi.org/10.1080/15532739.2018.1452172.

Lehmann, V., Keim, M. C., Nahata, L., Shultz, E. L., Klosky, J. L., Tuinman, M. A., & Gerhardt, C. A. (2017). Fertility-related knowledge and reproductive goals in childhood cancer survivors: short communication. *Human Reproduction*, *32*(11), 2250–2253. https://doi.org/10.1093/humrep/dex297.

Leibowitz, S., & de Vries, A. L. (2016). Gender dysphoria in adolescence. *International Review of Psychiatry*, *28*(1), 21–35. https://doi.org/10.3109/09540261.2015.1124844.

Lerner, J. E., Martin, J. I., & Gorsky, G. S. (2020). More than an apple a day: Factors associated with avoidance of doctor visits among transgender, gender nonconforming, and nonbinary people in the USA. *Sexuality Research and Social Policy*, *18*(2), 409–426. https://doi.org/10.1007/s13178-020-00469-3.

Leung, A., Sakkas, D., Pang, S., Thornton, K., & Resetkova, N. (2019). Assisted reproductive technology outcomes in female-to-male transgender patients compared with cisgender patients: A new frontier in reproductive medicine. *Fertility and Sterility*, *112*(5), 858–865. https://doi.org/10.1016/j.fertnstert.2019.07.014.

Lev, A. I. & Wolf-Gould, C. (2018). Collaborative treatment across disciplines. In C. E. Keo-Meier & D. E. Ehrensaft (Eds.), *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive children*. American Psychological Association. https://www.jstor.org/stable/j.ctv1chrwv9

Levine, S. B. (2009). Real-life test experience: Recommendations for revisions to the Standards of Care of the World Professional Association for Transgender Health. *International Journal of Transgenderism*, *11*(3), 186–193. https://doi.org/10.1080/15532730903383773.

Levine, S. B., Brown, G., Coleman, E., Cohen-Kettenis, P. T., Hage, J., Van Maasdam, J., Petersen, M., Pfafflin, F., & Schaefer, L. C. (1998). The standards of care for gender identity disorders—Fifth edition. *International Journal of Transgenderism 2*, 2, http://www.symposion.com/ijt/ijtc0405.htm

Levy, A., Crown, A., & Reid, R. (2003). Endocrine intervention for transsexuals. *Clinical Endocrinology*, *59*(4), 409–418. https://doi.org/10.1046/j.1365-2265.2003.01821.x.

Leyns, C., Papeleu, T., Tomassen, P., T'Sjoen, G., & D'haeseleer, E. (2021). Effects of speech therapy for transgender women: A systematic review. *International Journal of Transgender Health*, *22*(4), 360–380. https://doi.org/10.1080/26895269.2021.1915224.

Liang, J. J., Gardner, I. H., Walker, J. A., & Safer, J. D. (2017). Observed deficiencies in medical student knowledge of transgender and intersex health. *Endocrine Practice*, *23*(8), 897–906. https://doi.org/10.4158/EP171758.O.

Liao, L, & Simmonds M. (2014). A values-driven and evidence-based health care psychology for diverse sex

Case: 2:24-cv-00072-DCR-CJS Doc #: 132-2 Filed: 08/16/24 Page: 883 of 1019 - Page ID#: 3788

development. *Psychology & Sexuality*, *5*(1), 83–101. https://doi.org/10.1080/19419899.2013.831217.

Lieberman, T. (2018). *Painting dragons: What storytellers need to know about writing Eunuch Villains*. Bogotá: Glyph Torrent.

Lierman, S., Tilleman, K., Braeckmans, K., Peynshaert, K., Weyers, S., T'Sjoen, G., & De Sutter, P. (2017). Fertility preservation for trans men: Frozen-thawed in vitro matured oocytes collected at the time of ovarian tissue processing exhibit normal meiotic spindles. *Journal of Assisted Reproduction and Genetics*, *34*(11), 1449–1456. https://doi.org/10.1007/s10815-017-0976-5.

Light, A. D., Obedin-Maliver, J., Sevelius, J. M., & Kerns, J. L. (2014). Transgender men who experienced pregnancy after female-to-male gender transitioning. *Obstetrics and Gynecology*, *124*(6), 1120–1127. https://doi.org/10.1097/AOG.0000000000000540.

Light, A., Wang, L. F., Zeymo, A., & Gomez-Lobo, V. (2018). Family planning and contraception use in transgender men. *Contraception*, *98*(4), 266–269. https://doi.org/10.1016/j.contraception.2018.06.006.

Lightfoot, S., Kia, H., Vincent, A., Wright, D. K., & Vandyk, A. (2021). Trans-affirming care: An integrative review and concept analysis. *International Journal of Nursing Studies*, *123*, 104047. https://doi.org/10.1016/j.ijnurstu.2021.104047.

Lim, F., Johnson, M., & Eliason, M. (2015). A national survey of faculty knowledge, experience, and readiness for teaching lesbian, gay, bisexual and transgender health in baccalaureate nursing programs. *Nursing Education Perspectives*, *36*(3), 144–152. https://doi.org/10.5480/14-1355.

Lindley, L., Anzani, A., Prunas, A., & Galupo, M. P. (2021). Sexual satisfaction in trans masculine and nonbinary individuals: A qualitative investigation. *The Journal of Sex Research*, *58*(2), 222–234. https://doi.org/10.1080/00224499.2020.1799317.

Lindqvist, E. K., Sigurjonsson, H., Möllermark, C., Tinder, J., Farnebo, F., & Kalle Lundgren, T. (2017). Quality of life improves early after gender reassignment surgery in transgender women. *European Journal of Plastic Surgery*, *40*, 223–226. https://doi.org/10.1007/s00238-016-1252-0.

Lin-Su, K., Lekarev, O., Poppas, D., & Vogiatzi, M. G. (2015). Congenital adrenal hyperplasia patient perception of 'disorders sex development' nomenclature. *International Journal of Pediatric Endocrinology*, *2015*(1), 9. https://doi.org/10.1186/s13633-015-0004-4.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *13*(8), e0202330. https://doi.org/10.1371/journal.pone.0202330.

Littman, L. (2021). Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners. *Archives of Sexual Behavior*, *50*(8), 3353–3369. https://doi.org/10.1007/s10508-021-02163-w.

Liu, Y., Xin, Y., Qi, J., Wang, H., Hong, T., Yang, X., Li, B., Change, X., Knudson, G., Zhao, Z., & Pan, B. (2020). The desire and status of gender-affirming hormone therapy and surgery in transgender men and women in China: A national population study. *The Journal of Sexual Medicine*, *17*(11), 2291–2298. https://doi.org/10.1177/1010539520912594.

Lopez, X., Marinkovic, M., Eimicke, T., Rosenthal, S. M., & Olshan, J. S. (2017). Statement on gender-affirmative approach to care from the pediatric endocrine society special interest group on transgender health. *Current Opinion in Pediatrics*, *29*(4), 475–480. https://doi.org/10.1097/MOP.0000000000000516.

Lo Russo, G., Tanini, S., & Innocenti, M. (2017). Masculine chest-wall contouring in FtM transgender: A personal approach. *Aesthetic Plastic Surgery*, *41*(2), 369–374. https://doi.org/10.1007/s00266-017-0796-0.

Lowry, R., Johns, M. M., Gordon, A. R., Austin, S. B., Robin, L. E., & Kann, L. K. (2018). Nonconforming gender expression and associated mental distress and substance use among high school students. *JAMA Pediatrics*, *172*(11), 1020–1028. https://doi.org/10.1001/jamapediatrics.2018.2140.

Lundberg, T., Hegarty, P., & Roen, K. (2018). Making sense of 'Intersex' and 'DSD': How laypeople understand and use terminology. *Psychology & Sexuality*, *9*(2), 161–173. https://doi.org/10.1080/19419899.2018.1453862.

Luz, P. M., Jalil, E. M., Castilho, J., Velasque, L., Ramos, M., Ferreira, A. C. G., Wilson, E. C., Valdilea, G., Veloso, B. D., Moodie, E. E. M., & Grinsztejn, B. (2022). Association of discrimination, violence, and resilience with depressive symptoms among transgender women in Rio de Janeiro, Brazil: A cross-sectional analysis. *Transgender Health*, *7*(1), 101–106. https://doi.org/10.1089/trgh.2020.0171.

Lynch, M., & CicchettI, D. (1998). An ecological-transactional analysis of children and contexts: The longitudinal interplay among child maltreatment, community violence, and children's symptomatology. *Development and Psychopathology*, *10*(2), 235–257. https://doi.org/10.1017/s095457949800159x.

MacDonald, T., Noel-Weiss, J., West, D., Walks, M., Biener, M., Kibbe, A., & Myler, E. (2016). Transmasculine individuals' experiences with lactation, chestfeeding, and gender identity: A qualitative study. *BMC Pregnancy Childbirth*, *16*, 106–110. https://doi.org/10.1186/s12884-016-0907-y.

MacKinnon, K. R., Ashley, F., Kia, H., Lam, J. S. H., Krakowsky, Y., & Ross, L. E. (2021). Preventing transition "regret": An institutional ethnography of gender-affirming medical care assessment practices in Canada. *Social Science & Medicine*, *291*, 114477. https://doi.org/10.1016/j.socscimed.2021.114477.

MacKinnon, K. R., Ng, S. L., Grace, D., Sicchia, S. R., & Ross, L. E. (2019). Protocols as curriculum? Learning health advocacy skills by working with transgender patients in the context of gender-affirming medicine. *Advances in Health Sciences Education*, *25*(1), 7–18. https://doi.org/10.1007/s10459-019-09899-0.

Madrigal-Borloz, V. (2021). *Report on gender: the law of inclusion and practices of exclusion. Report of the UN—*

*Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity*, submitted to the 47th UN Human Rights Council and 76th UN General Assembly. https://www.ohchr.org/Documents/Issues/SexualOrientation/IESOGI/Reports_on_Gender_Final_Summary.pdf

Madrigal-Borloz, V. (2020). *Practices of so-called "conversion therapy"—Report of the UN independent expert on protection against violence and discrimination based on sexual orientation and gender identity*, Submitted to the 44th session of the UN Human Rights Council. Geneva: United Nations Office of the High Commissioner for Human Rights. https://undocs.org/A/HRC/44/53

Maheux, A. J., Zhou, Y., Thoma, B. C., Salk, R. H., & Choukas-Bradley, S. (2021). Examining sexual behavior among U.S. transgender adolescents. *The Journal of Sex Research*, *58*(8), 1050–1060. https://doi.org/10.1080/00224499.2020.1855408.

Mahfouda, S., Moore, J. K., Siafarikas, A., Hewitt, T., Ganti, U., Lin, A., & Zepf, F. D. (2019). Gender-affirming hormones and surgery in transgender children and adolescents. *Lancet Diabetes Endocrinology*, *7*(6), 484–498. https://doi.org/10.1016/S2213-8587(18)30305-X.

Malhotra, A., Kort, S., Lauther, T., Mann, N., Skopicki, H. A., & Parikh, P. B. (2022). Prevalence and predictors of cardiovascular disease and risk factors in transgender persons in the United States. *Critical Pathways in Cardiology*, *21*(1), 42–46. https://doi.org/10.1097/HPC.0000000000000271.

Malkin, M. L., & DeJong, C. (2018). Protections for transgender inmates under PREA: A comparison of state correctional policies in the United States. *Sexuality Research and Social Policy*, *16*(4), 393–407. https://doi.org/10.1007/s13178-018-0354-9.

Malpas, J., Glaeser, E., & Giammattei, S. V. (2018). Building resilience in transgender and gender expansive children, families, and communities: A multidimensional family approach. In C. Keo-Meier & D. Ehrensaft (Eds.), *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive children* (pp. 141–156). American Psychological Association. https://doi.org/10.1037/0000095-009.

Mamoojee, Y., Seal, L. J., & Quinton, R. (2017). Transgender hormone therapy: Understanding international variation in practice. *Lancet Diabetes & Endocrinology*, *5*(4), 243–246. https://doi.org/10.1016/S2213-8587(17)30068-2.

Mancini, I., Rotilio, A., Coati, I., Seracchioli, R., Martelli, V., & Meriggiola, M. C. (2017). Presentation of a meningioma in a transwoman after nine years of cyproterone acetate and estradiol intake: Case report and literature review. *Gynecological Endocrinology*, *34*(6), 456–459. https://doi.org/10.1080/09513590.2017.1395839.

Manero Vazquez, I., Garcia-Senosiain, O., Labanca, T., & Gómez-Gil, E. (2018). Aesthetic refinement in the creation of the clitoris, its preputial hood, and labia minora in male-to-female transsexual patients. *Annals of Plastic Surgery*, *81*(4), 393–397. https://doi.org/10.1097/SAP.0000000000001532.

Mann, R. (2006). The treatment of transgender prisoners, not just an American problem—Comparative analysis of American, Australian, and Canadian prison policies concerning the treatment of transgender prisoners and a "universal" recommendation to improve treatment. *Law & Sexuality: A Review Lesbian, Gay, Bisexual & Transgender Legal Issues*, *15*, 92–133.

Manrique, O. J., Sabbagh, M. D., Ciudad, P., Martinez-Jorge, J., Kiranantawat, K., Sitpahul, N., Nippoldt, T. B., Charafeddine, A., & Chen, H. C. (2018). Gender-confirmation surgery using the pedicle transverse colon flap for vaginal reconstruction: A clinical outcome and sexual function evaluation study. *Plastic and Reconstructive Surgery*, *141*(3), 767–771. https://doi.org/10.1097/PRS.0000000000004122.

Manson, J. E., Chlebowski, R. T., Stefanick, M. L., Aragaki, A. K., Rossouw, J. E., Prentice, R. L., Anderson, G., Howard, B. V., Thomson, C. A., LaCroix, A. Z., Wactawski-Wende, J., Jackson, R. D., Limacher, M., Margolis, K. L., Wassertheil-Smoller, S., Beresford, S. A., Cauley, J. A., Eaton, C. B., Gass, M., …& Wallace, R. B. (2013). Menopausal hormone therapy and health outcomes during the intervention and extended poststopping phases of the Women's Health Initiative randomized trials. *The Journal of the American Medical Association*, *310*(13), 1353–1368.

Maraka, S., Singh Ospina, N., Rodriguez-Gutierrez, R., Davidge-Pitts, C. J., Nippoldt, T. B., Prokop, L. J., & Murad, M. H. (2017). Sex steroids and cardiovascular outcomes in transgender individuals: A systematic review and meta-analysis. *The Journal of Clinical Endocrinology & Metabolism*, *102*(11), 3914–3923. https://doi.org/10.1210/jc.2017-01643.

Margulies, I. G., Chuang, C., Travieso, R., Zhu, V., Persing, J. A., Steinbacher, D. M., & Zellner, E. G. (2021). Preferences of transgender and gender-nonconforming persons in gender-confirming surgical care: A cross-sectional study. *Annals of Plastic Surgery*, *86*(1), 82–88. https://doi.org/10.1097/SAP.0000000000002351.

Marinkovic, M., & Newfield, R. S. (2017). Chest reconstructive surgeries in transmasculine youth: Experience from one pediatric center. *International Journal of Transgenderism*, *18*(4), 376–381. https://doi.org/10.1080/15532739.2017.1349706.

Marks, D. H., Peebles, J. K., & Dommasch, E. (2019). Hair reduction for transgender persons: What dermatologists should know and how they can help. *JAMA Dermatology*, *155*(5), 525–526. https://doi.org/10.1001/jamadermatol.2019.0149.

Marsh, C., McCracken, M., Gray, M., Nangia, A., Gay, J., & Roby, K. F. (2019). Low total motile sperm in transgender women seeking hormone therapy. *Journal of Assisted Reproduction and Genetics*, *36*(8), 1639–1648. https://doi.org/10.1007/s10815-019-01504-y.

Marshall, W. A., & Tanner, J. M. (1969). Variations in pattern of pubertal changes in girls. *Archives of Disease in Childhood*, *44*(235), 291–303.

Masten, A. S., & Cicchetti, D. (2010). Developmental cascades. *Development and Psychopathology*, 22(3), 491–495. https://doi.org/10.1017/s0954579410000222.

Martin, K. A., Chang, R. J., Ehrmann, D. A., Ibanez, L., Lobo, R. A., Rosenfield, R. L., Shapiro, J., Montori, V. M.,& Swiglo, B. A. (2008). Evaluation and treatment of hirsutism in premenopausal women: An Endocrine Society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, 93(4), 1105–1120. https://doi.org/10.1210/jc.2007-2437.

Martinez, C., Rikhi, R., Haque, T., Fazal, A., Kolber, M., Hurwitz, B. E., Schneiderman, N., & Brown, T. T. (2020). Gender identity, hormone therapy, and cardiovascular disease risk. *Current Problems in Cardiology*, 45(5), 100396. https://doi.org/10.1016/j.cpcardiol.2018.09.003.

Martinez, F., & International Society for Fertility Preservation–ESHRE–ASRM Expert Working Group. (2017). Update on fertility preservation from the Barcelona International Society for Fertility Preservation-ESHRE-ASRM 2015 expert meeting: Indications, results and future perspectives. *Fertility and Sterility*, 108(3), 407–415.e11. https://doi.org/10.1016/j.fertnstert.2017.05.024.

Martins, R. S., Saleh, R., Kamal, H., Gillani, M., Merchant, A. A., Munir, M. M., Ifikar, H. K., Shah, Z., Hussain, M. H. Z., Azhar, M., Qadri, F., & Saleem, S. (2020). The need for transgender healthcare medical education in a developing country. *Advances in Medical Education and Practice*, 11, 405. https://doi.org/10.2147/AMEP.S255483.

Maruri, S. (2011). Hormone therapy for inmates: A metonym for transgender rights. *Cornell Journal of Law and Public Policy*, 20(3), 10.

Massie, J. P., Morrison, S. D., Van Maasdam, J., & Satterwhite, T. (2018). Predictors of patient satisfaction and postoperative complications in penile inversion vaginoplasty. *Plastic and Reconstructive Surgery*, 141(6), 911e–921e. https://doi.org/10.1097/PRS.0000000000004427.

Mastronikolis, N. S., Remacle, M., Biagini, M., Kiagiadaki, D., & Lawson, G. (2013). Wendler glottoplasty: An effective pitch raising surgery in male-to-female transsexuals. *Journal of Voice*, 27(4), 516–522. https://doi.org/10.1016/j.jvoice.2013.04.004.

Matai, V., Cheesman, A. D., & Clarke, P. M. (2003). Cricothyroid approximation and thyroid chondroplasty: A patient survey. *Otolaryngology—Head and Neck Surgery*, 128(6), 841–847. https://doi.org/10.1016/S0194-5998(03)00462-5.

Matei, S., & Danino, M. A. (2015). Smoking and plastic surgery: A Montreal perspective. *Annales de Chirurgie Plastique et Esthétique*, 60(1), e71–e72. https://doi.org/10.1016/j.anplas.2014.09.012.

Matoso, A., Khandakar, B., Yuan, S., Wu, T., Wang, L. J., Lombardo, K. A., & Yakirevich, E. (2018). Spectrum of findings in orchiectomy specimens of persons undergoing gender confirmation surgery. *Human Pathology*, 76, 91–99. https://doi.org/10.1016/j.humpath.2018.03.007.

Matsuno, E. (2019). Nonbinary-affirming psychological interventions. *Cognitive and Behavioral Practice*, 26(4), 617–628. https://doi.org/10.1016/j.cbpra.2018.09.003.

Matsuno, E., & Israel, T. (2018). Psychological interventions promoting resilience among transgender individuals: Transgender resilience intervention model (TRIM). *The Counseling Psychologist*, 46(5), 632–655. https://doi.org/10.1177/0011000018787261.

Mattawanon, N., Charoenkwan, K., & Tangpricha, V. (2021). Sexual dysfunction in transgender people: A systematic review. *Urology Clinics of North America*, 48(4), 437–460. https://doi.org/10.1016/j.ucl.2021.06.004.

Mattawanon, N., Spencer, J. B., Schirmer, D. A., & Tangpricha, V. (2018). Fertility preservation options in transgender people: A review. *Reviews in Endocrine and Metabolic Disorders*, 19(3), 231–242. https://doi.org/10.1007/s11154-018-9462-3.

Matthews, J. J., Olszewski, A., & Pettereit, J. (2020). Knowledge, training, and attitudes of students and speech-language pathologists about providing communication services to individuals who are transgender. *American Journal of Speech-Language Pathology*, 29(2), 597–610. https://doi.org/10.1044/2020_AJSLP-19-00148.

Matthews, S. J., Picton, H., Ernst, E., & Andersen, C. Y. (2018). Successful pregnancy in a woman previously suffering from β-thalassemia following transplantation of ovarian tissue cryopreserved before puberty. *Minerva Obstetrics and Gynecology*, 70(4), 432–435. https://doi.org/10.23736/S0026-4784.18.04240-5.

Maxwell, S., Noyes, N., Keefe, D., Berkeley, A. S., & Goldman, K. N. (2017). Pregnancy outcomes after fertility preservation in transgender men. *Obstetrics and Gynecology*, 129(6), 1031–1034. https://doi.org/10.1097/AOG.0000000000002036.

Mayer, T. K., Koehler, A., Eyssel, J., & Nieder, T. O. (2019). How gender identity and treatment progress impact decision-making, psychotherapy and aftercare desires of trans persons. *Journal of Clinical Medicine*, 8(5), 749. https://doi.org/10.3390/jcm8050749.

Mazur, T., Cohen-Kettenis, P. T., Meyer, W. J., Meyer-Bahlburg, H. F., & Zucker, K. J. (2007). Survey of HBIGDA membership on treatment of disorders of sex development (DSD). *International Journal of Transgenderism*, 10(2), 99–108. https://doi.org/10.1080/15532730802018227.

McCallion, S., Smith, S., Kyle, H., Shaikh, M. G., Wilkinson, G., & Kyriakou, A. (2021). An appraisal of current service delivery and future models of care for young people with gender dysphoria. *European Journal of Pediatrics*, 180(9), 2969–2976. https://doi.org/10.1007/s00431-021-04075-2.

McCauley, E., Eckstrand, K., Desta, B., Bouvier, B., Brockmann, B., & Brinkley-Rubenstein, L. (2017). Exploring healthcare experiences for incarcerated individuals who identify as transgender in a southern jail. *Transgender Health*, 3(1), 34–41. https://doi.org/10.1089/trgh.2017.0046.

McConnell, E. A., Birkett, M. A., & Mustanski, B. (2015). Typologies of social support and associations with mental health outcomes among LGBT youth. *LGBT Health*, 2(1), 55–61. https://doi.org/10.1089/lgbt.2014.0051.

McDowell, A., & Bower, K. M. (2016). Transgender health care for nurses: An innovative approach to diversifying nursing curricula to address health inequities. *Journal of Nursing Education*, 55(8). 476–479. https://doi.org/10.3928/01484834-20160715-11.

McDowell, A., Raifman, J., Progovac, A. M., & Rose, S. (2020). Association of nondiscrimination policies with mental health among gender minority individuals. *JAMA Psychiatry*, 77(9), 952–958. https://doi.org/10.1001/jamapsychiatry.2020.0770.

McDowell, M. J., Hughto, J. M. W., & Reisner, S. L. (2019). Risk and protective factors for mental health morbidity in a community sample of female-to-male trans-masculine adults. *BMC Psychiatry*, 19(1). https://doi.org/10.1186/s12888-018-2008-0.

McFadden, S. H., Frankowski, S., Flick, H., & Witten, T. M. (2013). Resilience and multiple stigmatized identities: Lessons from transgender persons' reflections on aging. In J. D. Sinnott (Ed.), *Positive psychology: Advances in understanding adult motivation* (pp. 247–267). Springer.

McGuire, J. K., Beek, T. F., Catalpa, J. M., & Steensma, T. D. (2018). The Genderqueer Identity (GQI) Scale: Measurement and validation of four distinct subscales with trans and LGBQ clinical and community samples in two countries. *International Journal of Transgenderism*, 20(2–3), 289–304. https://doi.org/10.1080/15532739.2018.1460735.

McGuire, J. K., Berg, D., Catalpa, J. M., Morrow, Q. J., Fish, J. N., Nic Rider, G., Steensma, T., Cohen-Kettenis, P. T., & Spencer, K. (2020). Utrecht Gender Dysphoria Scale—Gender Spectrum (UGDS-GS): Construct validity among transgender, nonbinary, and LGBQ samples. *International Journal of Transgender Health*, 21(2), 194–208. https://doi.org/10.1080/26895269.2020.1723460.

McInroy, L. B., Beaujolais, B., Craig, S. L., & Eaton, A. D. (2021). The self-identification, LGBTQ+ identity development, and attraction and behavior of asexual youth: Potential implications for sexual health and internet-based service provision. *Archives of Sexual Behavior*, 50(8), 3853–3863. https://doi.org/10.1007/s10508-021-02064-y.

McLachlan, C. (2019). Que(e)ring trans and gender diversity. *South African Journal of Psychology*, 49(1), 10–13. Urology Clinics North America https://doi.org/10.1177/0081246318780774.

McLaughlin, R. J., & Sharp, R. N. (2018). Working with parents/guardians and caregivers when conflicts arise. In C. Keo-Meier & D. Ehrensaft (Eds.), *The gender affirmative model: An Interdisciplinary approach to supporting transgender and gender expansive children* (pp. 157–172). American Psychological Association. https://doi.org/10.1037/0000095-009

McNabb, C. (2017). *Nonbinary gender identities: History, culture, resources.* Rowman & Littlefield.

McNamara, C. (2007). Re-inhabiting an uninhabitable body: Interventions in voice production with transsexual men. *Research in Drama Education: The Journal of Applied Theatre and Performance*, 12(2), 195–206. https://doi.org/10.1080/13569780701321070.

McNeil, J., Bailey, L., Ellis, S., & Regan, M. (2013). *Speaking from the margins: trans mental health and wellbeing in Ireland.* Transgender Equality Network Ireland (TENI). https://www.atlanticphilanthropies.org/wp-content/uploads/2015/09/teni-speaking-from-the-margins-report.pdf

McNeil, J., Bailey, L., Ellis, S., Morton, J., & Regan, M. (2012). *UK trans mental health study* 2012. Scottish Transgender Alliance, Trans Resource and Empowerment Centre, TransBareAll, Traverse Research, Sheffield Hallam University. Scottish Trans Alliance https://www.scottishtrans.org/wp-content/uploads/2013/03/trans_mh_study.pdf

McNeill, E. J. M., Wilson, J. A., Clark, S., & Deakin, J. (2008). Perception of voice in the transgender client. *Journal of Voice*, 22(6), 727–733. https://doi.org/10.1016/j.jvoice.2006.12.010.

McTernan, M., Yokoo, K., & Tong, W. (2020). A comparison of gender-affirming chest surgery in nonbinary versus transmasculine patients. *Annals of Plastic Surgery*, 84(5S Suppl. 4), S323–S328. https://doi.org/10.1097/SAP.0000000000002254.

Meeus, W., van de Schoot, R., Keijsers, L., & Branje, S. (2011). Identity statuses as developmental trajectories: A five-wave longitudinal study in early-to-middle and middle-to-late adolescents. *Journal of Youth and Adolescence*, 41(8), 1008–1021. https://doi.org/10.1007/s10964-011-9730-y.

Mehringer, J., & Dowshen, N. L. (2019). Sexual and reproductive health considerations among transgender and gender-expansive youth. *Current Problems in Pediatric and Adolescent Health Care*, 49(9), 100684. https://doi.org/10.1016/j.cppeds.2019.100684.

Mehringer, J. E., Harrison, J. B., Quain, K. M., Shea, J. A., Hawkins, L. A., & Dowshen, N. L. (2021). Experience of chest dysphoria and masculinizing chest surgery in transmasculine youth. *Pediatrics*, 147(3), e2020013300. https://doi.org/10.1542/peds.2020-013300.

Meier, S. C., & Labuski, C. M. (2013). *The Demographics of the Transgender Population.* In A. K. Baumle (Ed.), *International handbook on the demography of sexuality* (pp. 289–327). Springer.

Meier, S. C., Sharp, C., Michonski, J., Babcock, J. C., & Fitzgerald, K. (2013). Romantic relationships of female-to-male trans men: A descriptive study. *International Journal of Transgenderism*, 14(2), 75–85. https://doi.org/10.1080/15532739.2013.791651.

Meijer, J. H., Eeckhout, G. M., van Vlerken, R. H., & de Vries, A. L. (2017). Gender dysphoria and co-existing psychosis: Review and four case examples of successful gender affirmative treatment. *LGBT Health*, 4(2), 106–114. https://doi.org/10.1089/lgbt.2016.0133.

Meister, J., Hagen, R., Shehata-Dieler, W., Kühn, H., Kraus, F., & Kleinsasser, N. (2016). Pitch elevation in male-to-

female transgender persons—The Würzburg approach. *Journal of Voice*, 31(2), 244.e7–244.e15. https://doi.org/10.1016/j.jvoice.2016.07.018.

Mendoza, N., & Motos, M. A. (2013). Androgen insensitivity syndrome. *Gynecological Endocrinology*, 29(1), 1–5. https://doi.org/10.3109/09513590.2012.705378.

Meriggiola, M. C., Armillotta, F., Costantino, A., Altieri, P., Saad, F., Kalhorn, T., & Pelusi, G. (2008). Effects of testosterone undecanoate administered alone or in combination with letrozole or dutasteride in female to male transsexuals. *The Journal of Sexual Medicine*, 5(10), 2442–2453. https://doi.org/10.1111/j.1743-6109.2008.00909.x.

Mészáros, K., Vitéz, L. C., Szabolcs, I., Góth, M., Kovács, L., Görömbei, Z., & Hacki, T. (2005). Efficacy of conservative voice treatment in male-to-female transsexuals. *Folia Phoniatrica et Logopaedica*, 57(2), 111–118. https://doi.org/10.1159/000083572.

Meyer, W.III., Bockting W., Cohen-Kettenis P., Coleman E., DiCeglie D., Devor H., Gooren L., Hage J., Kirk S., Kuiper B., Laub D., Lawrence A., Menard Y., Patton J., Schaefer L., Webb A., & Wheeler C. (2001). The standards of care for gender identity disorders—Sixth version. *International Journal of Transgenderism*, 5(1). http://www.symposium.com/ijt/soc_01/index.htm

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: conceptual issues and research evidence. *Psychological Bulletin*, 129(5), 674–697. https://doi.org/10.1037/0033-2909.129.5.674.

Meyer-Bahlburg, H. F. L. (2019). "Diagnosing" gender? Categorizing gender-identity variants in the Anthropocene. *Archives of Sexual Behavior* 48(7), 2027–2035. https://doi.org/10.1007/s10508-018-1349-6.

Meyer-Bahlburg, H. F. L. (2022). The timing of genital surgery in somatic intersexuality: Surveys of patients' preferences. *Hormone Research in Paediatrics*, 95, 12–20. https://doi.org/10.1159/000521958.

Meyer-Bahlburg, H. F. L., Baratz Dalke, K., Berenbaum, S. A., Cohen-Kettenis, P. T., Hines, M., & Schober, J. M. (2016). Gender assignment, reassignment and outcome in disorders of sex development: Update of the 2005 Consensus Conference. *Hormone Research in Paediatrics*, 85(2), 112–118. https://doi.org/10.1159/000442386.

Meyer-Bahlburg, H. F. L., Khuri, J., Reyes-Portillo, J., & New, M. I. (2017). Stigma in medical settings as reported retrospectively by women with congenital adrenal hyperplasia (CAH) for their childhood and adolescence. *Journal of Pediatric Psychology*, 42(5), 496–503. https://doi.org/10.1093/jpepsy/jsw034.

Meyer-Bahlburg, H. F. L., Khuri, J., Reyes-Portillo, J., Ehrhardt, A. A., & New, M. I. (2018). Stigma associated with classical congenital adrenal hyperplasia in women's sexual lives. *Archives of Sexual Behavior*, 47(4), 943–951. https://doi.org/10.1007/s10508-017-1003-8.

Meyer-Bahlburg, H. F. L., Reyes-Portillo, J. A., Khuri, J., Ehrhardt, A. A., & New, M. I. (2017). Syndrome-related stigma in the general social environment as reported by women with classical congenital adrenal hyperplasia. *Archives of Sexual Behavior*, 46(2), 341–351. https://doi.org/10.1007/s10508-016-0862-8.

Mieusset, R., Bujan, L., Mansat, A., Pontonnier, F., & Grandjean, H. (1987). Effects of artificial cryptorchidism on sperm morphology. *Fertility and Sterility*, 47(1), 150–155. https://doi.org/10.1016/s0015-02821649951-6.

Mieusset, R., Grandjean, H., Mansat, A., & Pontonnier, F. (1985). Inhibiting effect of artificial cryptorchidism on spermatogenesis. *Fertility and Sterility*, 43(4), 589–594. https://doi.org/10.1016/S0015-0282(16)48502-X.

Miller, L., Leeth, E. A., Johnson, E. K., Rosoklija, I., Chen, D., Aufox, S. A., & Finlayson, C. (2018). Attitudes towards 'disorders of sex development' nomenclature among physicians, genetic counselors, and mental health clinicians. *Journal of Pediatric Urology*, 14(5), 418.e1–418.e7. https://doi.org/10.1016/j.jpurol.2018.08.009.

Millet, N., Longworth, J., & Arcelus, J. (2017). Prevalence of anxiety symptoms and disorders in the transgender population: A systematic review of the literature. *International Journal of Transgenderism*, 18(1), 27–38. https://doi.org/10.1080/15532739.2016.1258353.

Millington, K., Liu, E., & Chan, Y. M. (2019). The utility of potassium monitoring in gender-diverse adolescents taking spironolactone. *Journal of the Endocrine Society*, 3(5), 1031–1038. https://doi.org/10.1210/js.2019-00030.

Millington, K., Schulmeister, C., Finlayson, C., Grabert, R., Olson-Kennedy, J., Garofalo, R., & Chan, Y. M. (2020). Physiological and metabolic characteristics of a cohort of transgender and gender-diverse youth in the United States. *Journal of Adolescent Health*, 67(3), 376–383. https://doi.org/10.1016/j.jadohealth.2020.03.028.

Mills, M., & Stoneham, G. (2017). *The voice book for trans and non-binary people.* Jessica Kingsley Publishers.

Mills, M., Stoneham, G., & Davies, S. (2019). Toward a protocol for transmasculine voice: A service evaluation of the voice and communication therapy group program, including long-term follow-pp for trans men at the London Gender Identity Clinic. *Transgender Health*, 4(1), 143–151. https://doi.org/10.1089/trgh.2019.0011.

Milrod, C., & Karasic, D. H. (2017). Age is just a number: WPATH-affiliated surgeons' experiences and attitudes toward vaginoplasty in transgender females under 18 years of age in the United States. *The Journal of Sexual Medicine*, 14(4), 624–634. https://doi.org/10.1016/j.jsxm.2017.02.007.

Ming, J. M., Chua, M. E., Lopes, R. I., Maloney, A. M., Gupta, A. A., & Lorenzo, A. J. (2018). Cryopreservation of testicular tissue in pre-pubertal and adolescent boys at risk for infertility: A low risk procedure. *Journal of Pediatric Urology*, 14(3), 274.e271–274.e275. https://doi.org/10.1016/j.jpurol.2018.02.016.

Ministry of Justice. (2016.) *Care and management of transgender offenders. (n.d.).* GOV.UK. Retrieved May 31, 2022, from https://www.gov.uk/government/publications/care-and-management-of-transgender-offenders

Mizock, L., & Lewis, T. K. (2008). Trauma in transgender populations: Risk, resilience, and clinical care. *Journal of*

*Emotional Abuse*, 8(3), 335–354. https://doi.org/10.1080/10926790802262523.

Mollet, A. L. (2021). "It's easier just to say I'm queer": Asexual college students' strategic identity management. *Journal of Diversity in Higher Education*. Advance online publication. https://doi.org/10.1037/dhe0000210.

Money, J., & Lamacz, M. (1987). Genital examination and exposure experienced as nosocomial sexual abuse in childhood. *The Journal of Nervous and Mental Disease*, 175(12), 713–721. https://doi.org/10.1097/00005053-198712000-00002.

Monroe (aka Patterson) v. Baldwin, Illinois Department of Corrections et al, Case No. 1:19-cv-01060, 2019.

Monstrey, S., Hoebeke, P., Dhont, M., De Cuypere, G., Rubens, R., Moerman, M., Hamdi, M., Van Landuyt, K., & Blondeel, P. (2001). Surgical therapy in transsexual patients: A multi-disciplinary approach. *Acta Chirurgica Belgica*, 101(5), 200–209. https://www.ncbi.nlm.nih.gov/pubmed/11758101

Monstrey, S., Hoebeke, P., Selvaggi, G., Ceulemans, P., Van Landuyt, K., Blondeel, P., Hamdi, M., Roche, N., Weyers, S., & De Cuypere, G. (2009). Penile reconstruction: Is the radial forearm flap really the standard technique? *Plastic and Reconstructive Surgery*, 124(2), 510–518. https://doi.org/10.1097/PRS.0b013e3181aeeb06.

Montejo, A. L., Montejo, L., & Navarro-Cremades, F. (2015). Sexual side-effects of antidepressant and antipsychotic drugs. *Current Opinion in Psychiatry*, 28(6), 418–423. https://doi.org/10.1097/yco.0000000000000198.

Moody, C., Fuks, N., Peláez, S., & Smith, N. G. (2015). "Without this, I would for sure already be dead": A qualitative inquiry regarding suicide protective factors among trans adults. *Psychology of Sexual Orientation and Gender Diversity*, 2(3), 266. https://doi.org/10.1037/sgd0000130.

Mora, E., Cobeta, I., Becerra, A., & Lucio, M. J. (2018). Comparison of cricothyroid approximation and glottoplasty for surgical voice feminization in male-to-female transsexuals. *The Laryngoscope*, 128(9), 2101–2109. https://doi.org/10.1002/lary.27172.

Moravek, M. B., Kinnear, H. M., George, J., Batchelor, J., Shikanov, A., Padmanabhan, V., & Randolph, J. F. (2020). Impact of exogenous testosterone on reproduction in transgender men. *Endocrinology*, 161(3), bqaa014. https://doi.org/10.1210/endocr/bqaa014.

Morenz, A. M., Goldhammer, H., Lambert, C. A., Hopwood, R., & Keuroghlian, A. S. (2020). A blueprint for planning and implementing a transgender health program. *Annals of Family Medicine*, 18(1), 73–79. https://doi.org/10.1370/afm.2473.

Morrison, S. D., Capitán-Canadas, F., Sanchez-Garcia, A., Ludwig, D. C., Massie, J. P., Nolan, I. T., Swanson, M., Rodriguez-Conesa, M., Friedrich, J. B., Cederna, P. S., Bellinga, R. J., Simon, D., Capitán, L., & Satterwhite, T. (2020). Prospective quality-of-life outcomes after facial feminization surgery: An international multicenter study. *Plastic and Reconstructive Surgery*, 145(6), 1499–1509. https://doi.org/10.1097/PRS.0000000000006837.

Morrison, S. D., Satterwhite, T., Grant, D. W., Kirby, J., Laub, D. R., Sr., & VanMaasdam, J. (2015). Long-term outcomes of rectosigmoid neocolporrhaphy in male-to-female gender reassignment surgery. *Plastic and Reconstructive Surgery*, 136(2), 386–394. https://doi.org/10.1097/PRS.0000000000001459.

Morrison, S. D., Shakir, A., Vyas, K. S., Kirby, J., Crane, C. N., & Lee, G. K. (2016). Phalloplasty: A review of techniques and outcomes. *Plastic and Reconstructive Surgery*, 138(3), 594–615. https://doi.org/10.1097/PRS.0000000000002518.

Moser, C., & Devereux, M. (2019). Gender neutral pronouns: A modest proposal. *International Journal of Transgenderism*, 20(2-3), 331–332. https://doi.org/10.1080/15532739.2016.1217446.

Moseson, H., Fix, L., Hastings, J., Stoeffler, A., Lunn, M. R., Flentje, A., Lubensky, M. E., Capriotti, M. R., Ragosta, S., & Obedin-Maliver, J. (2020). Pregnancy intentions and outcomes among transgender, nonbinary, and gender-expansive people assigned female or intersex at birth in the United States: Results from a national, quantitative survey. *International Journal of Transgender Health*, 22(1–2), 30–41. https://doi.org/10.1080/26895269.2020.1841058.

Moseson, H., Fix, L., Hastings, J., Stoeffler, A., Lunn, M. R., Flentje, A., Lubensky, M. E., Capriotti, M. R., Ragosta, S., Forsberg, H., & Obedin-Maliver, J. (2021). Pregnancy intentions and outcomes among transgender, nonbinary, and gender-expansive people assigned female or intersex at birth in the United States: Results from a national, quantitative survey. *International Journal of Transgender Health*, 22(1-2), 30–41, https://doi.org/10.1080/26895269.2020.1841058.

Moseson, H., Fix, L., Ragosta, S., Forsberg, H., Hastings, J., Stoeffler, A., Lunn, M. R., Flentje, A., Capriotti, M. R., Lubensky, M. E., & Obedin-Maliver, J. (2021). Abortion experiences and preferences of transgender, nonbinary, and gender-expansive people in the United States. *American Journal of Obstetrics and Gynecology*, 224(4), 376. https://doi.org/10.1016/j.ajog.2020.09.035.

Moseson, H., Lunn, M. R., Katz, A., Fix, L., Durden, M., Stoeffler, A., Hastings, J., Cudlitz, L., Goldberg, E., Lesser-Lee, B., Letcher, L., Reyes, A., Flentje, A., Capprotti, M., Lubensky, M. E., & Obedin-Maliver, J. (2020). Development of an affirming and customizable electronic survey of sexual and reproductive health experiences for transgender and gender nonbinary people. *PLoS One*, 15(5), e0232154. https://doi.org/10.1371/journal.pone.0232154.

Moseson, H., Zazanis, N., Goldberg, E., Fix, L., Durden, M., Stoeffler, A., Hastings, J., Cudlitz, L., Goldberg, E., Lesser-Lee, B., Letcher, L., Reyes, A., & Obedin-Maliver, J. (2020). The imperative for transgender and gender nonbinary inclusion: Beyond women's health. *Obstetrics and Gynecology*, 135(5), 1059–1068. https://doi.org/10.1097/aog.0000000000003816.

Motmans, J., Meier, P., Ponnet, K., & T'Sjoen, G. (2012). Female and male transgender quality of life: Socioeconomic

and medical differences. *The Journal of Sexual Medicine*, *9*(3), 743–750. https://doi.org/10.1111/j.1743-6109.2011.02569.x.

Motmans, J., Nieder, T. O., & Bouman, W. P. (2019). Transforming the paradigm of nonbinary transgender health: A field in transition. *International Journal of Transgenderism*, *20*(2-3), 119–125. https://doi.org/10.1080/15532739.2019.1640514.

Motmans, J., Wyverkens, E., & Defreyne, J. (2017). *Being transgender in Belgium: Ten years later*. Institute for the Equality of Women and Men. https://igvm-iefh.belgium.be/sites/default/files/118_-_being_transgender_in_belgium.pdf

Motta, G., Marinelli, L., Barale, M., Brustio, P. R., Manieri, C., Ghigo, E., Procopio, M., & Lanfranco, F. (2020). Fracture risk assessment in an Italian group of transgender women after gender-confirming surgery. *Journal of Bone Mineral Metabolism*, *38*(6), 885–893. https://doi.org/10.1007/s00774-020-01127-9.

Mouriquand, P. D. E., Gorduza, D. B., Gay, C.-L., Meyer-Bahlburg, H. F. L., Baker, L., Baskin, L. S., Bouvattier, C., Braga, L. H., Caldamone, A. C., Duranteau, L., El Ghoneimi, A., Hensle, T. W., Hoebeke, P., Kaefer, M., Kalfa, N., Kolon, T. F., Manzoni, G., Mure, P.-Y., Nordenskjöld, A., & Pippi Salle, J. L. (2016). Surgery in disorders of sex development (DSD) with a gender issue: If (why), when, and how? *Journal of Pediatric Urology*, *12*(3), 139–149. https://doi.org/10.1016/j.jpurol.2016.04.001.

Movement Advancement Project. Conversion "Therapy" Bans. (2021). https://www.lgbtmap.org/equality-maps/conversion_therapy

Mujugira, A., Kasiita, V., Bagaya, M., Nakyanzi, A., Bambia, F., Nampewo, O., Kamusiime, B., Mugisha, J., Nalumansi, A., Twesigye, C. C., Muwonge, T. R., Baeten, J. M., Wyatt, M. A., Tsai, A. C., Ware, N. C., & Haberer, J. E. (2021). "You are not a man": A multi-method study of trans stigma and risk of HIV and sexually transmitted infections among trans men in Uganda. *Journal of the International AIDS Society*, *24*(12), e25860. https://doi.org/10.1002/jia2.25860.

Mukhopadhyay, A., & Chowdhury, R. (2009). The eunuch patient. *Tropical Doctor*, *39*(1), 63–64. https://doi.org/10.1258/td.2008.080016.

Müller, A. (2017). Scrambling for access : Availability , accessibility , acceptability and quality of healthcare for lesbian , gay , bisexual and transgender people in South Africa. *BMC International Health and Human Rights*, *17*(1), 16. https://doi.org/10.1186/s12914-017-0124-4.

Müller, A., & Daskilewicz, K., & The Southern and East African Research Collective on Health (2019). '*Are we doing alright? Realities of violence, mental health, and access to healthcare related to sexual orientation and gender identity and expression in eSwatini: Research report based on a community-led study in nine countries*'. COC Netherlands. https://eswatiniminorities.org/wp-content/uploads/2019/07/SOGIE-and-wellbeing_02_eSwatini.pdf

Mullins, E. S., Geer, R., Metcalf, M., Piccola, J., Lane, A., Conard, L. A. E., & Kowalcyk Mullins, T. L. (2021). Thrombosis risk in transgender adolescents receiving gender-affirming hormone therapy. *Paediatrics*, *147*(4), e2020023549. https://doi.org/10.1542/peds.2020-023549.

Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J., & Montori, V. M. (2010). Hormonal therapy and sex reassignment: A systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology*, *72*(2), 214–231. https://doi.org/10.1111/j.1365-2265.2009.03625.x.

Murchison, G., Adkins, D., Conard, L. A., Ph, R., Ehrensaft, D., Elliott, T., Hawkins, L. A., Lopez, X., Newby, H., Ng, H., Vetters, R., Wolf-Gould, C., Brown, J., Hanneman, T., Kahn, E. (2016). *Supporting & caring for transgender children*. Human Rights Campaign.

Myers, S. C., & Safer, J. D. (2017). Increased rates of smoking cessation observed among transgender women receiving hormone treatment. *Endocrine Practice*, *23*(1), 32–36. https://doi.org/10.4158/EP161438.OR.

Nahata, L., Chen, D., Moravek, M. B., Quinn, G. P., Sutter, M. E., Taylor, J., Tishelman, A. C., & Gomez-Lobo, V. (2019). Understudied and under-reported: Fertility issues in transgender youth—A narrative review. *Journal of Paediatrics*, *205*, 265–271. https://doi.org/10.1016/j.jpeds.2018.09.009.

Nahata, L., Curci, M. B., & Quinn, G. P. (2018). Exploring fertility preservation intentions among transgender youth. *Journal of Adolescent Health*, *62*(2), 123–125. https://doi.org/10.1016/j.jadohealth.2017.11.288.

Nahata, L., Quinn, G. P., & Tishelman, A. C. (2018). Counseling in pediatric populations at risk for infertility and/or sexual function concerns. *Pediatrics*, *142*(2), e20181435. https://doi.org/10.1542/peds.2018-1435.

Nahata, L., Tishelman, A. C., Caltabellotta, N. M., & Quinn, G. P. (2017). Low fertility preservation utilization among transgender youth. *Journal of Adolescent Health*, *61*(1), 40–44. https://doi.org/10.1016/j.jadohealth.2016.12.012.

Nanda, K., Stuart, G. S., Robinson, J., Gray, A. L., Tepper, N. K., & Gaffield, M. E. (2017). Drug interactions between hormonal contraceptives and antiretrovirals. *AIDS*, *31*(7), 917–952. https://doi.org/10.1097/QAD.0000000000001392.

Nanda, S. (2014). *Gender diversity: cross cultural variations* (2nd ed.). Waveland Press.

Narayan, S. K., Hontscharuk, R., Danker, S., Guerriero, J., Carter, A., Blasdel, G., Bluebond-Langner, R., Ettner, R., Radix, A., Schechter, L., & Berli, J. U. (2021). Guiding the conversation-types of regret after gender-affirming surgery and their associated etiologies. *Annals of Translational Medicine*, *9*(7), 605. https://doi.org/10.21037/atm-20-6204.

Nash, R., Ward, K. C., Jemal, A., Sandberg, D. E., Tangpricha, V., & Goodman, M. (2018). Frequency and distribution of primary site among gender minority cancer patients: An analysis of U.S. national surveillance data. *Cancer Epidemiology*, *54*, 1–6. https://doi.org/10.1016/j.canep.2018.02.008.

Nassiri, N., Maas, M., Basin, M., Cacciamani, G. E., & Doumanian, L. R. (2021). Urethral complications after gender reassignment surgery: A systematic review. *International Journal of Impotence Research*, *33*(8), 793–800. https://doi.org/10.1038/s41443-020-0304-y.

National Academies of Sciences, Engineering, and Medicine. (2020). *Understanding the well-being of LGBTQI+ populations*. The National Academies Press. https://doi.org/10.17226/25877

National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. (1979). *The Belmont report: Ethical principles and guidelines for the protection of human subjects of research*. U.S. Department of Health and Human Services.

National Commission on Correctional Heath Care. (2016). *Solitary confinement (isolation)*. https://www.ncchc.org/solitary-confinement.

National LGBTQIA+ Health Education Center. (2020). *Affirming primary care for intersex people*. https://www.lgbtqiahealtheducation.org/publication/affirming-primary-care-for-intersex-people-2020/

Nestle, J., Howell, C., & Wilchins, R. (Eds.). (2002). *Genderqueer. Voices from behind the sexual binary*. Alyson Books.

Netshandama, V. O., Mavhandu-Mudzusi, A. H., & Matshideze, P. (2017). Deconstructing matula (taboo), a multi-stakeholder narrative about LGBTI. *South African Journal of Higher Education*, *31*(4). https://doi.org/10.20853/31-4-1328.

Neumann, K., & Welzel, D. (2004). The importance of the voice in male-to-female transsexualism. *Journal of Voice*, *18*(1), 153–167. https://doi.org/10.1016/S0892-1997(03)00084-5.

Newcomb, M. E., Hill, R., Buehler, K., Ryan, D. T., Whitton, S. W., & Mustanski, B. (2020). High burden of mental health problems, substance use, violence, and related psychosocial factors in transgender, non-binary, and gender diverse youth and young adults. *Archives of Sexual Behavior*, *49*(2), 645–659. https://doi.org/10.1007/s10508-019-01533-9.

Newfield, E., Hart, S., Dibble, S., & Kohler, L. (2006). Female-to-male transgender quality of life. *Quality of Life Research*, *15*(9), 1447–1457. https://doi.org/10.1007/s11136-006-0002-3.

Neyman, A., Fuqua, J. S., & Eugster, E. A. (2019). Bicalutamide as an androgen blocker with secondary effect of promoting feminization in male-to-female transgender adolescents. *The Journal of Adolescent Health*, *64*(4), 544–546. https://doi.org/10.1016/j.jadohealth.2018.10.296.

Nguyen, H. B., Chavez, A. M., Lipner, E., Hantsoo, L., Kornfield, S. L., Davies, R. D., & Epperson, C. N. (2018). Gender-affirming hormone use in transgender individuals: Impact on behavioral health and cognition. *Current Psychiatry Reports*, *20*(12), 1–9. https://doi.org/10.1007/s11920-018-0973-0.

Nieder, T. O., & Richter-Appelt, H. (2011). Tertium non datur– either/or reactions to transsexualism amongst health care professionals: the situation past and present, and its relevance to the future. *Psychology & Sexuality*, *2*(3), 224–243. https://doi.org/10.1080/19419899.2010.545955.

Nieder, T. O., Eyssel, J., & Köhler, A. (2020). Being trans without medical transition: Exploring characteristics of trans individuals from Germany not seeking gender-affirmative medical interventions. *Archives of Sexual Behavior*, *49*(7), 2661–2672. https://doi.org/10.1007/s10508-019-01559-z.

Nieder, T. O., Güldenring, A., Woellert, K., Briken, P., Mahler, L., & Mundle, G. (2020). Ethical aspects of mental health care for lesbian, gay, bi-, pan-, asexual, and transgender people: A case-based approach. *The Yale Journal of Biology and Medicine*, *93*(4), 593–602. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7513438/

Nieder, T. O., Mayer, T. K., Hinz, S., Fahrenkrug, S., Herrmann, L., & Becker-Hebly, I. (2021). Individual treatment progress predicts satisfaction with transition-related care for youth with gender dysphoria: A prospective clinical cohort study. *The Journal of Sexual Medicine*, *18*(3), 632–645. https://doi.org/10.1016/j.jsxm.2020.12.010.

Nilsson, J., Jervaeus, A., Lampic, C., Eriksson, L. E., Widmark, C., Armuand, G. M., Malmors, M., Heyman, M., & Wettergren, L. (2014). 'Will I be able to have a baby?' Results from online focus group discussions with childhood cancer survivors in Sweden. *Human Reproduction*, *29*(12), 2704–2711. https://doi.org/10.1093/humrep/deu280.

Nobili, A., Glazebrook, C., & Arcelus, J. (2018). Quality of life of treatment-seeking transgender adults: A systematic review and meta-analysis. *Reviews in Endocrine and Metabolic Disorders*, *19*(3), 199–220. https://doi.org/10.1007/s11154-018-9459-y.

Nobili, A., Glazebrook, C., Bouman, W. P., Baron-Cohen, S., & Arcelus, J. (2020). The stability of autistic traits in transgender adults following cross-sex hormone treatment. *International Journal of Transgender Health*, *21*(4), 431–439. https://doi.org/10.1080/26895269.2020.1783738.

Nokoff, N. J., Scarbro, S., Juarez-Colunga, E., Morea, K. L.,& Kempe, A. (2018). Health and cardiometabolic disease in transgender adults in the United States: Behavioral Risk Factor Surveillance System 2015. *Journal of the Endocrine Society*, *2*(4), 349–360. https://doi.org/10.1210/js.2017-00465.

Nota, N. M., Wiepjes, C. M., de Blok, C. J. M., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2019). Occurrence of acute cardiovascular events in transgender individuals receiving hormone therapy. *Circulation*, *139*(11), 1461–1462. https://doi.org/10.1161/circulationaha.118.038584.

Nota, N. M., Wiepjes, C. M., de Blok, C. J. M., Gooren, L. J. G., Peerdeman, S. M., Kreukels, B. P. C., & den Heijer, M. (2018). The occurrence of benign brain tumours in transgender individuals during cross-sex hormone treatment. *Brain*, *141*(7), 2047–2054. https://doi.org/10.1093/brain/awy108.

Noureai, S. A., Randhawa, P., Andrews, P. J., & Saleh, H. A. (2007). The role of nasal feminization rhinoplasty in male-to-female gender reassignment. *Archives of Facial Plastic Surgery, 9*(5), 318–320. https://doi.org/10.1001/archfaci.9.5.318.

Nowotny, K. M., Rogers, R. G., & Boardman, J. D. (2017). Racial disparities in health conditions among populations compared with the general population. *SSM—Population Health, 3*, 487–496. https://doi.org/10.1016/j.ssmph.2017.05.011.

Nuttbrock, L., Bockting, W., Rosenblum, A., Hwahng, S., Mason, M., Macri, M., & Becker, J. (2014). Gender abuse, depressive symptoms, and substance use among transgender women: A 3-year prospective study. *American Journal of Public Health, 104*(11), 2199–2206. https://doi.org/10.2105/AJPH.2014.302106.

Nuttbrock, L., Hwahng, S., Bockting, W., Rosenblum, A., Mason, M., Macri, M., & Becker, J. (2010). Psychiatric impact of gender-related abuse across the life course of male-to-female transgender persons. *Journal of Sex Research, 47*(1), 12–23. https://doi.org/10.1080/00224490903062258.

Nuyen, B. A., Qian, Z. J., Campbell R. D., Erickson-DiRenzo E., Thomas J., & Sung C. K. (2022) Feminization laryngoplasty: 17-year review on long-term outcomes, safety, and technique. *Otolaryngology—Head and Neck Surgery, 167*(1), 112–117. https://doi.org/10.1177/01945998211036870.

Nygren, U., Nordenskjöld, A., Arver, S., & Södersten, M. (2016). Effects on voice fundamental frequency and satisfaction with voice in trans men during testosterone treatment—A longitudinal study. *Journal of Voice, 30*(6), 766.e23–766.e34. https://doi.org/10.1016/j.jvoice.2015.10.016.

Oates, J. (2019). *Evidence-based practice in voice training for transwomen.* In R. K. Adler, S. Hirsch, & J. Pickering (Eds.), *Voice and communication therapy for the transgender/Gender Diverse client: A comprehensive clinical guide* (pp. 87–103). Plural Publishing.

Oates, J. M. & Dacakis, G. (1983). Speech pathology considerations in the management of transsexualism—A review. *British Journal of Disorders of Communication. 18*(3), 139–151. https://doi.org/10.3109/13682828309012237.

O'Bryant, C. L., Flaig, T. W., & Utz, K. J. (2008). Bicalutamide-associated fulminant hepatotoxicity. *Pharmacotherapy, 28*(8), 1071–1075. https://doi.org/10.1592/phco.28.8.1071.

Obedin-Maliver, J. (2015). Time for OBGYNs to care for people of all genders. *Journal of Women's Health (Larchmt), 24*(2), 109–111. https://doi.org/10.1089/jwh.2015.1518.

Obedin-Maliver, J., & Makadon, H. (2016). Transgender men and pregnancy. *Obstetric Medicine, 9*(1), 4–8. https://doi.org/10.1177/1753495X15612658.

Obedin-Maliver, J., Goldsmith, E. S., Stewart, L., White, W., Tran, E., Brenman, S., & Lunn, M. R. (2011). Lesbian, gay, bisexual, and transgender-related content in undergraduate medical education. *The Journal of the American Medical Association, 306*(9), 971–977. https://doi.org/10.1001/jama.2011.1255.

OECD. (2019). *Health at a glance 2019: OECD indicators.* OECD Publishing. https://doi.org/10.1787/4dd50c09-en.

Oğuz, Ö., Ayran, B., & Yelken, K. (2020). Clinical considerations in speech and language therapy in Turkish transgender population. *Journal of Voice, 35*(4), 662.e9–662. e13. https://doi.org/10.1016/j.jvoice.2019.12.011.

OHCHR, ILO, UNDP, UNESCO, UNFPA, UNHCR, & UNAIDS. (2016). *Ending violence and discrimination against lesbian, gay, bisexual, transgender and intersex people.* https://www.ohchr.org/Documents/Issues/Discrimination/Joint_LGBTI_Statement_ENG.PDF

Øien, R. A., Cicchetti, D. V., & Nordahl-Hansen, A. (2018). Gender dysphoria, sexuality and autism spectrum disorders: A systematic map review. *Journal of Autism and Developmental Disorders, 48*(12), 4028–4037. https://doi.org/10.1007/s10803-018-3686-7.

Oktay, K., Buyuk, E., Rodriguez-Wallberg, K. A., & Sahin, G. (2010). In vitro maturation improves oocyte or embryo cryopreservation outcome in breast cancer patients undergoing ovarian stimulation for fertility preservation. *Reproductive Biomedicine Online, 20*(5), 634–638. https://doi.org/10.1016/j.rbmo.2010.01.012.

Olde Dubbelink, L. M. E., & Geurts, H. M. (2017). Planning skills in autism spectrum disorder across the lifespan: A meta-analysis and meta-regression. *Journal of Autism and Developmental Disorders, 47*(4), 1148–1165. https://doi.org/10.1007/s10803-016-3013-0.

Olezeski, C. L., Pariseau, E. M., Bamatter, W. P., & Tishelman, A. C. (2020,). Assessing gender in young children: Constructs and considerations. *Psychology of Sexual Orientation and Gender Diversity, 7*(3), 293–303. https://doi.org/10.1037/sgd0000381.

Oliphant, J., Veale, J., Macdonald, J., Carroll, R., Johnson, R., Harte, M., Stephenson, C., & Bullock, J. (2018). *Guidelines for gender affirming healthcare for gender diverse and transgender children, young people and adults in Aotearoa, New Zealand.* Transgender Health Research Lab. https://patha.nz/Guidelines

Olivier, S., & Thurasukam, O. (2018). *Lesbian, gay, transgender, bisexual, intersex and queer (LGBTIQ+) youth in Thailand.* Save the Children Fund. https://resourcecentre.savethechildren.net/node/13480/pdf/lgbtiqyouth_in_thailand_save_the_children_2018.pdf

Olson, K. R., Blotner, C., Alonso, D., Lewis, K., Edwards, D., Durwood, L., 2019. Family discussions of early childhood social transitions. *Clinical Practice in Pediatric Psychology 7*, 229–240. https://doi.org/10.1037/cpp0000289.

Olson, K. R., Durwood, L., DeMeules, M., McLaughlin, K. A., 2016. Mental health of transgender children who are supported in their identities. *Pediatrics, 137*, e20153223. https://doi.org/10.1542/peds.2015-3223.

Olson, K. R., Durwood, L., Horton, R., Gallagher, N. M., & Devor, A. (2022). Gender identity 5 years after social transition. *Pediatrics.* Advance Online Publication. https://doi.org/10.1542/peds.2021-056082.

Olson, K. R., Gülgöz, S., 2018. Early findings from the TransYouth Project: Gender development in transgender children. *Child Development Perspectives*, 12, 93–97. https://doi.org/10.1111/cdep.12268.

Olson-Kennedy, J., Chan, Y. M., Rosenthal, S., Hidalgo, M. A., Chen, D., Clark, L., & Garofalo, R. (2019). Creating the Trans Youth Research Network: A collaborative research endeavor. *Transgender Health*, 4(1), 304–312. https://doi.org/10.1089/trgh.2019.0024.

Olson-Kennedy, J., Chan, Y.-M., Garofalo, R., Spack, N., Chen, D., Clark, L., Ehrensaft, D., Hidalgo, M., Tishelman, A., & Rosenthal, S. (2019). Impact of early medical treatment for transgender youth: Protocol for the longitudinal, observational Trans Youth Care Study. *JMIR Research Protocols*, 8(7), e14434. https://doi.org/10.2196/14434.

Olson-Kennedy, J., Cohen-Kettenis, P. T., Kreukels, B. P. C., Meyer-Bahlburg, H. F. L., Garofalo, R., Meyer, W., & Rosenthal, S. M. (2016). Research priorities for gender nonconforming/transgender youth. *Current Opinion in Endocrinology & Diabetes and Obesity*, 23(2), 172–179. https://doi.org/10.1097/MED.0000000000000236.

Olson-Kennedy, J., Rosenthal, S. M., Hastings, J., & Wesp, L. (2018). *Health considerations for gender non-conforming children and transgender adolescents*. Guidelines for the primary care of transgender and gender nonbinary people. http://transhealth.ucsf.edu/guidelines/youth

Olson-Kennedy, J., Warus, J., Okonta, V., Belzer, M., & Clark, L. F. (2018). Chest reconstruction and chest dysphoria in transmasculine minors and young adults: Comparisons of nonsurgical and postsurgical cohorts. *JAMA Pediatrics*, 172(5), 431–436. https://doi.org/10.1001/jamapediatrics.2017.5440.

Olyslager, F., & Conway, L. (2008). Transseksualiteit komt vaker voor dan u denkt. Een nieuwe kijk op de prevalentie van transseksualiteit in Nederland en België. *Tijdschrift voor Genderstudies*, 11(2), 39–51.

Oparah, J. (2012). Feminism and the (trans)gender entrapment of gender nonconforming prisoners. *UCLA Women's Law Journal*, 18(2), 239–271. https://doi.org/10.5070/L3182017822.

Orel, N. A., & Fruhauf, C. A. (2015). *The lives of LGBT older adults: Understanding challenges and resilience* (p. 256). American Psychological Association.

Orloff, L. A., Mann, A. P., Damrose, J. F., & Goldman, S. N. (2006). Laser-assisted voice adjustment (LAVA) in transsexuals. *The Laryngoscope*, 116(4), 655–660. https://doi.org/10.1097/01.mlg.0000205198.65797.59.

Ott, J., Kaufmann, U., Bentz, E. K., Huber, J. C., & Tempfer, C. B. (2010). Incidence of thrombophilia and venous thrombosis in transsexuals under cross-sex hormone therapy. *Fertility and Sterility*, 93(4), 1267–1272. https://doi.org/10.1016/j.fertnstert.2008.12.017.

Owen, K., & Hancock, A. B. (2010). The role of self- and listener perceptions of femininity in voice therapy. *International Journal of Transgenderism*, 12(4), 272–284. https://doi.org/10.1080/15532739.2010.550767.

Owen-Smith, A. A., Gerth, J., Sineath, R. C., Barzilay, J., Becerra-Culqui, T. A., Getahun, D., Giammattei, S., Hunkeler, E., Lash, T. L., Millman, A., Nash, R., Quinn, V. P., Robinson, B., Roblin, D., Sanchez, T., Silverberg, M. J., Tangpricha, V., Valentine, C., Winter, S., Woodyatt, C., Song, Y., & Goodman, M. (2018). Association between gender confirmation treatments and perceived gender congruence, body image satisfaction, and mental health in a cohort of transgender individuals. *The Journal of Sexual Medicine*, 15(4), 591–600. https://doi.org/10.1016/j.jsxm.2018.01.017.

Özer, M., Toulabi, S. P., Fisher, A. D., T'Sjoen, G., Buncamper, M. E., Monstrey, S., Bizic, M. R., Djordjevic, M., Falcone, M., Christopher, N. A., Simon, D., Capitán, L., & Motmans, J. (2022). ESSM position statement "Sexual Wellbeing After Gender Affirming Surgery." *Sexual Medicine*, 10(1), 100471. https://doi.org/10.1016/j.esxm.2021.100471.

Özkan, Ö., Çinpolat, A., Doğan, N. U., Bektaş, G., Dolay, K., Gürkan, A., Arıcı, C., & Doğan, S. (2018). Vaginal reconstruction with the modified rectosigmoid colon: Surgical technique, long-term results and sexual outcomes. *Journal of Plastic Surgery and Hand Surgery*, 52(4), 210–216. https://doi.org/10.1080/2000651248 6X.2018.1444616.

Padilla, J. A., Feng, J. E., Anoushiravani, A. A., Hozack, W. J., Schwarzkopf, R., & Macaulay, W. B. (2019). Modifying patient expectations can enhance total hip arthroplasty postoperative satisfaction. *Journal of Arthroplasty*, 34(7s), S209–s214. https://doi.org/10.1016/j.arth.2018.12.038.

PAHO. (2014). *Blueprint for the provision of comprehensive care for trans persons and their communities in the Caribbean and other anglophone countries*. John Snow, Inc. https://iris.paho.org/handle/10665.2/31360

Palmer, D., Dietsch, A., & Searl, J. (2011). Endoscopic and stroboscopic presentation of the larynx in male-to-female transsexual persons. *Journal of Voice*, 26(1), 117–126. https://doi.org/10.1016/j.jvoice.2010.10.014.

Palmert, M. R., & Dunkel, L. (2012). Delayed puberty. *New England Journal of Medicine*, 366(5), 443–453. https://doi.org/10.1056/NEJMcp1109290.

Pan, S., & Honig, S. C. (2018). Gender-affirming surgery: Current concepts. *Current Urology Reports*, 19(8), 62. https://doi.org/10.1007/s11934-018-0809-9.

Panel on Antiretroviral Guidelines for Adults and Adolescents. (2019). *Guidelines for the use of antiretroviral agents in adults and adolescents with HIV: Transgender people with HIV*. Department of Health and Human Services: https://clinicalinfo.hiv.gov/en/guidelines/adult-and-adolescent-arv/transgender-people-hiv.

Pang, C., Gutman, G., & de Vries, B. (2019). Later life care planning and concerns of transgender older adults in Canada. *The International Journal of Aging and Human Development*, 89(1), 39–56. https://doi.org/10.1177/0091415019843520.

Pang, K. C., de Graaf, N. M., Chew, D., Hoq, M., Keith, D. R., Carmichael, P., & Steensma, T. D. (2020).

Association of media coverage of transgender and gender diverse issues with rates of referral of transgender children and adolescents to specialist gender clinics in the UK and Australia. *JAMA Network Open*, *3*(7), e2011161-e2011161. https://doi.org/10.1001/jamanetworkopen.2020.11161.

Papadopulos, N. A., Lelle, J. D., Zavlin, D., Herschbach, P., Henrich, G., Kovacs, L., Ehrenberger, B., Kluger, A. K., Machens, H. G., & Schaff, J. (2017). Quality of life and patient satisfaction following male-to-female sex reassignment surgery. *The Journal of Sexual Medicine*, *14*(5), 721–730. https://doi.org/10.1016/j.jsxm.2017.01.022.

Papadopulos, N. A., Zavlin, D., Lelle, J. D., Herschbach, P., Henrich, G., Kovacs, L., Ehrenberger, B., Machens, H. G., & Schaff, J. (2017). Male-to-female sex reassignment surgery using the combined technique leads to increased quality of life in a prospective study. *Plastic and Reconstructive Surgery*, *140*(2), 286–294. https://doi.org/10.1097/PRS.0000000000003529.

Parameshwaran, V., Cockbain, B. C., Hillyard, M., & Price, J. R. (2017). Is the lack of specific lesbian, gay, bisexual, transgender and queer/questioning (LGBTQ) health care education in medical school a cause for concern? Evidence from a survey of knowledge and practice among UK medical students. *Journal of Homosexuality*, *64*(3), 367–381. https://doi.org/10.1080/00918369.2016.1190218.

Paré, F. (2020). *Outlawing trans reparative therapy*. EScholarship@McGill. https://escholarship.mcgill.ca/concern/theses/wh246x33v

Paredes, A. Z., Hyer, J. M., Diaz, A., Tsilimigras, D. I., & Pawlik, T. M. (2020). The impact of mental illness on postoperative outcomes among Medicare beneficiaries: A missed opportunity to help surgical patients? *Annals of Surgery*, *272*(3), 419–425. https://doi.org/10.1097/SLA.0000000000004118.

Pariseau, E. M., Chevalier, L., Long, K. A., Clapham, R., Edwards-Leeper, L., & Tishelman, A. C. (2019). The relationship between family acceptance-rejection and transgender youth psychosocial functioning. *Clinical Practice in Pediatric Psychology*, *7*(3), 267. https://doi.org/10.1037/cpp0000291.

Park, C., Brown, S., & Courey, M. (2021). Trans woman voice questionnaire scores highlight specific benefits of adjunctive glottoplasty with voice therapy in treating voice feminization. *Journal of Voice*. https://doi.org/10.1016/j.jvoice.2021.07.017.

Parkes, G., & Hall, I. (2006). Gender dysphoria and cross-dressing in people with intellectual disability: A literature review. *Mental Retardation*, *44*(4), 260–271. https://doi.org/10.1352/0047-6765(2006)44[260:GDACIP]2.0.CO;2.

Parker, E., & Davis-McCabe, C. (2021). The sibling experience: Growing up with a trans sibling. *Australian Journal of Psychology*, *73*(2), 188–199.

Pasricha, N., Dacakis, G., & Oates, J. (2008). Communicative satisfaction of male-to-female transsexuals. *Logopedics,*

*Phoniatrics, Vocology*, *33*(1), 25–34. https://doi.org/10.1080/14015430701514500.

Pasterski, V., Mastroyannopoulou, K., Wright, D., Zucker, K. J., & Hughes, I. A. (2014). Predictors of posttraumatic stress in parents of children diagnosed with a disorder of sex development. *Archives of Sexual Behavior*, *43*(4), 369–375. https://doi.org/10.1007/s10508-013-0196-8.

Pasterski, V., Prentice, P., & Hughes, I. A. (2010). Consequences of the Chicago consensus on disorders of sex development (DSD): Current practices in Europe. *Archives of Disease in Childhood*, *95*(8):618. https://doi.org/10.1136/adc.2009.163840.

Pasterski, V., Zucker, K. J., Hindmarsh, P. C., Hughes, I. A., Acerini, C., Spencer, D., Neufeld, S., & Hines, M. (2015). Increased cross-gender identification independent of gender role behavior in girls with congenital adrenal hyperplasia: Results from a standardized assessment of 4- to 11-year-old children. *Archives of Sexual Behavior*, *44*(5), 1363–1375. https://doi.org/10.1007/s10508-014-0385-0.

Payer, A. F., Meyer, W. J., 3rd, & Walker, P. A. (1979). The ultrastructural response of human Leydig cells to exogenous estrogens. *Andrologia*, *11*(6), 423–436. https://doi.org/10.1111/j.1439-0272.1979.tb02232.x.

Pediatric Endocrine Society (PES). (2020). *Position statement on genital surgery in individuals with differences of sex development (DSD)/intersex traits*. https://pedsendo.org/clinical-resource/position-statement-on-genital-surgery-in-individuals-with-differences-of-sex-development-dsd-intersex-traits/.

Peitzmeier, S., Gardner, I., Weinand, J., Corbet, A., & Acevedo, K. (2016). Health impact of chest binding among transgender adults: A community-engaged, cross-sectional study. *Culture, Health & Sexuality*, *19*(1), 64–75. https://doi.org/10.1080/13691058.2016.1191675.

Peitzmeier, S. M., Reisner, S. L., Harigopal, P., & Potter, J. (2014). Female-to-male patients have high prevalence of unsatisfactory Paps compared to non-transgender females: Implications for cervical cancer screening. *Journal of General Internal Medicine*, *29*(5), 778–784. https://doi.org/10.1007/s11606-013-2753-1.

Peletz, M. (2009). *Gender pluralism: southeast Asia since early modern times*. Routledge.

Pelusi, C., Costantino, A., Martelli, V., Lambertini, M., Bazzocchi, A., Ponti, F., & Meriggiola, M. C. (2014). Effects of three different testosterone formulations in female-to-male transsexual persons. *The Journal of Sexual Medicine*, *11*(12), 3002–3011. https://doi.org/10.1111/jsm.12698.

Peng, K., Zhu, X., Gillespie, A., Wang, Y., Gao, Y., Xin, Y., Qi, J., Ou, J., Zhong, S., Zhao, L., Liu, J., Wang, C., & Chen, R. (2019). Self-reported rates of abuse, neglect, and bullying experienced by transgender and gender-nonbinary adolescents in China. *JAMA Network Open*, *2*(9), e1911058. https://doi.org/10.1001/jamanetworkopen.2019.11058.

Perez-Brumer, A., Hatzenbuehler, M. L., Oldenburg, C. E., & Bockting, W. (2015). Individual- and structural-level



risk factors for suicide attempts among transgender adults. *Behavioral Medicine, 41*(3), 164–171. https://doi.org/10.1080/08964289.2015.1028322.

Perrone, A. M., Cerpolini, S., Maria Salfi, N. C., Ceccarelli, C., De Giorgi, L. B., Formelli, G., & Meriggiola, M. C. (2009). Effect of long-term testosterone administration on the endometrium of female-to-male (FtM) transsexuals. *The Journal of Sexual Medicine, 6*(11), 3193–3200. https://doi.org/10.1111/j.1743-6109.2009.01380.x.

Perry, D., & Pauletti, R. (2011). Gender and adolescent development. *Journal of Research on Adolescence, 21*(1), 61–74. https://doi.org/10.1111/j.1532-7795.2010.00715.x.

Peterson, A. L., Bender, A. M., Sullivan, B., & Karver, M. S. (2021). Ambient discrimination, victimization, and suicidality in a non-probability US sample of LGBTQ adults. *Archives of Sexual Behavior, 50*(3), 1003–1014. https://doi.org/10.1007/s10508-020-01888-4.

Pfäfflin, F., & Junge, A. (1998). *Sex reassignment: thirty years of international follow-up studies after sex reassignment surgery: a comprehensive review, 1961–1991* (Translated from German into American English by Roberta B. Jacobson and Alf B. Meier). Symposion Publishing http://web.archive.org/web/20070503090247/http:/www.symposion.com/ijt/pfaefflin/1000.htm

Pflum, S. R., Testa, R. J., Balsam, K. F., Goldblum, P. B., & Bongar, B. (2015). Social support, trans community connectedness, and mental health symptoms among transgender and gender nonconforming adults. *Psychology of Sexual Orientation and Gender Diversity, 2*(3), 281–286. https://doi.org/10.1037/sgd0000122.

Philpott, A., Knerr, W., & Boydell, V. (2006). Pleasure and prevention: When good sex is safer sex. *Reproductive Health Matters, 14*(28), 23–31. https://doi.org/10.1016/S0968-8080(06)28254-5.

Pickuth, D., Brandt, S., Neumann, K., Berghaus, A., Spielmann, R. P., & Heywang-Köbrunner, S. H. (2000). Value of spiral CT in patients with cricothyroid approximation. *The British Journal of Radiology, 73*(872), 840–842. https://doi.org/10.1259/bjr.73.872.11026858.

Picton, H. M., Wyns, C., Anderson, R. A., Goossens, E., Jahnukainen, K., Kliesch, S., Mitchell, R. T., Pennings, G., Rives, N., Tournaye, H., van Pelt, A. M. M., & Schlatt, S. (2015). A European perspective on testicular tissue cryopreservation for fertility preservation in prepubertal and adolescent boys. *Human Reproduction, 30*(11), 2463–2475. https://doi.org/10.1093/humrep/dev190.

Piepoli, M. F., Abreu, A., Albus, C., Ambrosetti, M., Brotons, C., Catapano, A. L. Corra. U., Cosyns, B., Deatong, C., Graham. I., Hoes, A., Lochen,. M., Matrone, B., Redon, J., Sattar, Y., & Tiberi, M. (2020). Update on cardiovascular prevention in clinical practice: A position paper of the European Association of Preventive Cardiology of the European Society of Cardiology. *European Journal of Preventive Cardiology, 27*(2), 181–205. https://doi.org/10.1177/2047487319893035.

Pitasi, M. A., Kerani, R. P., Kohn, R., Murphy, R. D., Pathela, P., Schumacher, C. M., Tabidze, I., & Llata, E. (2019). Chlamydia, Gonorrhea, and Human Immunodeficiency Virus infection among transgender women and transgender men attending clinics that provide sexually transmitted disease services in six US cities. *Sexually Transmitted Diseases, 46*(2), 112–117. https://doi.org/10.1097/olq.0000000000000917.

Pluvy, I., Garrido, I., Pauchot, J., Saboye, J., Chavoin, J. P., Tropet, Y., Grolleau, J. L., & Chaput, B. (2015). Smoking and plastic surgery, part I. Pathophysiological aspects: Update and proposed recommendations. *Annales de Chirurgie Plastique Esthétique, 60*(1), e3–e13. https://doi.org/10.1016/j.anplas.2014.06.011.

Pluvy, I., Panouillères, M., Garrido, I., Pauchot, J., Saboye, J., Chavoin, J. P., Tropet, Y., Grolleau, J. L., & Chaput, B. (2015). Smoking and plastic surgery, part II. Clinical implications: A systematic review with meta-analysis. *Annales de Chirurgie Plastique Esthétique, 60*(1), e15–e49. https://doi.org/10.1016/j.anplas.2014.09.011.

Pope, K. S., & Vasquez, M. J. T. (2016). *Ethics in psychotherapy and counseling: A practical guide.* Wiley.

Poquiz, J. L., Coyne, C. A., Garofalo, R., & Chen, D. (2021). Comparison of gender minority stress and resilience among transmasculine, transfeminine, and nonbinary adolescents and young adults. *Journal of Adolescent Health, 68*(3), 615–618. https://doi.org/10.1016/j.jadohealth.2020.06.014.

Porter, K. E., Brennan-Ing, M., Chang, S. C., Dickey, L. M., Singh, A. A., Bower, K. L., & Witten, T. M. (2016). Providing competent and affirming services for transgender and gender nonconforming older adults. *Clinical Gerontologist, 39*(5), 366–388. https://doi.org/10.1080/07317115.2016.1203383.

Poteat, T. C., Divsalar, S., Streed, C. G., Feldman, J. L., Bockting, W. O., & Meyer, I. H. (2021). Cardiovascular disease in a population-based sample of transgender and cisgender adults. *American Journal of Preventive Medicine, 61*(6), 804–811. https://doi.org/10.1016/j.amepre.2021.05.019.

Poteat, T., German, D., & Kerrigan, D. (2013). Managing uncertainty: A grounded theory of stigma in transgender health care encounters. *Social Science & Medicine, 84*, 22–29, https://doi.org/10.1016/j.socscimed.2013.02.019.

Poteat, T., Scheim, A., Xavier, J., Reisner, S., & Baral, S. (2016). Global epidemiology of HIV infection and related syndemics affecting transgender people. *JAIDS Journal of Acquired Immune Deficiency Syndromes, 72*, S210–S219. https://doi.org/10.1097/QAI.0000000000001087.

Poteat, T., Wirtz, A. L., Radix, A., Borquez, A., Silva-Santisteban, A., Deutsch, M. B., & Operario, D. (2015). HIV risk and preventive interventions in transgender women sex workers. *The Lancet, 385*(9964), 274–286. https://doi.org/10.1016/S0140-6736(14)60833-3.

Potter, J., Peitzmeier, S. M., Bernstein, I., Reisner, S. L., Alizaga, N. M., Agénor, M., & Pardee, D. J. (2015). Cervical cancer screening for patients on the female-to-male spectrum: A narrative review and guide for clinicians. *Journal of General Internal Medicine, 30*(12), 1857–1864. https://doi.org/10.1007/s11606-015-3462-8.

Poudrier, G., Nolan, I. T., Cook, T. E., Saia, W., Motosko, C. C., Stranix, J. T., Thomson, J. E., Gothard, M. D., & Hazen, A. (2019). Assessing quality of life and patient-reported satisfaction with masculinizing top surgery: A mixed-methods descriptive survey study. *Plastic and Reconstructive Surgery*, 143(1), 272–279. https://doi.org/10.1097/PRS.0000000000005113.

Practice Committee of the American Society for Reproductive Medicine. (2019). Fertility preservation in patients undergoing gonadotoxic therapy or gonadectomy: A committee opinion. *Fertility and Sterility*, 112(6), 1022–1033. https://doi.org/10.1016/j.fertnstert.2013.08.012.

Pradhan, S., & Gomez-Lobo, V. (2019). Hormonal contraceptives, intrauterine devices, gonadotropin-releasing hormone analogues and testosterone: Menstrual suppression in special adolescent populations. *Journal of Pediatric and Adolescent Gynecology*, 32(5S), S23–S29. https://doi.org/10.1016/j.jpag.2019.04.007.

Pratt-Chapman, M. L. (2020). Implementation of sexual and gender minority health curricula in health care professional schools: A qualitative study. *BMC Medical Education*, 20, 1–14. https://doi.org/10.1186/s12909-020-02045-0.

Précoma, D. B., Oliveira, G., Simão, A. F., Dutra, O. P., Coelho, O. R., Izar, M., Póvoa, R., Giuliano, I., Alencar Filho, A. C., Machado, C. A., Scherr, C., Fonseca, F., Santos Filho, R., Carvalho, T., Avezum, Á., Jr., Esporcatte, R., Nascimento, B. R., Brasil, D. P., Soares, G. P., Villela, P. B., … Mourilhe-Rocha, R. (2019). Updated cardiovascular prevention guideline of the Brazilian Society of Cardiology—2019. *Arquivos Brasileiros de Cardiologia*, 113(4), 787–891. https://doi.org/10.5935/abc.20190204.

Prince, J. C. J., & Safer, J. D. (2020). Endocrine treatment of transgender individuals: Current guidelines and strategies. *Expert Review of Endocrinology & Metabolism*, 15(6), 395–403. https://doi.org/10.1080/17446651.2020.1825075.

Prison systems in the United States. *Journal of Correctional Health Care : The Official Journal of the National Commission on Correctional Health Care*, 15(4), 280–291. https://doi.org/10.1177/1078345809340423-hi.

Przeworski, A., Peterson, E., & Piedra, A. (2021). A systematic review of the efficacy, harmful effects, and ethical issues related to sexual orientation change efforts. *Clinical Psychology: Science and Practice*, 28(1), 81–100. https://doi.org/10.1111/cpsp.12377.

Puckett, J. A., Cleary, P., Rossman, K., Mustanski, B., & Newcomb, M. E. (2018). Barriers to gender-affirming care for transgender and gender nonconforming individuals. *Sexuality Research and Social Policy*, 15(1), 48–59. https://doi.org/10.1007/s13178-017-0295-8.

Puckett, J. A., Matsuno, E., Dyar, C., Mustanski, B., & Newcomb, M. E. (2019). Mental health and resilience in transgender individuals: What type of support makes a difference? *Journal of Family Psychology*, 33(8), 954. https://doi.org/10.1037/fam0000561.

Pullen Sansfaçon, A., Kirichenko, V., Holmes, C., Feder, S., Lawson, M. L., Ghosh, S., Ducharme, J., Temple Newhook, J., Suerich-Gulick, F. (2019). Parents/guardians' journeys to acceptance and support of gender-diverse and trans children and youth. *Journal of Family Issues*, 41(8), 1214–1236. https://doi.org/10.1177/0192513X19888779.

Pullen Sansfaçon, A., Robichaud, M.-J., & Dumais-Michaud, A.-A. (2015). The experience of parents who support their children's gender variance. *Journal of LGBT Youth*, 12, 39–63. https://doi.org/10.1080/19361653.2014.935555.

Quain, K. M., Kyweluk, M. A., Sajwani, A., Gruschow, S., Finlayson, C., Gordon, E. J., Johnson, E. K., Persky, R., Dowshen, N., & Chen, D. (2021). Timing and delivery of fertility preservation information to transgender adolescents, young adults, and their parents. *The Journal of Adolescent Health*, 68(3), 619–622. https://doi.org/10.1016/j.jadohealth.2020.06.044.

Quinn, G. P., Tishelman, A. C., Chen, D., & Nahata, L. (2021). Reproductive health risks and clinician practices with gender diverse adolescents and young adults. *Andrology*, 9(6), 1689–1697. https://doi.org/10.1111/andr.13026.

Quinn, V. P., Nash, R., Hunkeler, E., Contreras, R., Cromwell, L., Becerra-Culqui, T. A., Getahun, D., Giammattei, S., Lash, T. L., Millman, A., Robinson, B., Roblin, D., Silverberg, M. J., Slovis, J., Tangpricha, V., Tolsma, D., Valentine, C., Wads, K., Winter, S., & Goodman, M. (2017). Cohort profile: Study of Transition, Outcomes and Gender (STRONG) to assess health status of transgender people. *BMJ Open*, 7(12), e018121. https://doi.org/10.1136/bmjopen-2017-018121.

Radix, A. E., Harris, A. B., & Goldstein, Z. G. (2020). How can we improve uptake of oral HIV pre-exposure prophylaxis for transgender individuals? *Expert Review of Anti-infective Therapy*, 18(9), 835–838. https://doi.org/10.1080/14787210.2020.1759418.

Radix, A., & Eisfeld, J. (2014). Informierte zustimmung in der trans*-gesundheitsversorgung. *Zeitschrift für Sexualforschung*, 27(01), 31–43. https://doi.org/10.1055/s-0034-1366129.

Rae, J. R., Gülgöz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. *Psychological Science*, 30(5), 669–681. https://doi.org/10.1177/0956797619830649.

Rael, C. T., Martinez, M., Giguere, R., Bockting, W., MacCrate, C., Mellman, W., Valente, P., Greene, G. J., Sherman, S. G., Footer, K. H. A., D'Aquila, R. T., Carballo-Diéguez, A., & Hope, T. J. (2019). Transgender women's concerns and preferences on potential future long-acting biomedical HIV prevention strategies: The case of injections and implanted medication delivery devices (IMDDs). *AIDS and Behavior*, 24(5), 1452–1462. https://doi.org/10.1007/s10461-019-02703-5.

Raffaini, M., Magri, A. S., & Agostini, T. (2016). Full facial feminization surgery: Patient satisfaction assessment based on 180 procedures involving 33 consecutive pa-

tients. *Plastic and Reconstructive Surgery*, 137(2), 438–448. https://doi.org/10.1097/01.prs.0000475754.71333.f6.

Rafferty, J., & Committee on Psychosocial Aspects of Child and Family Health. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*, 142(4), e20182162. https://doi.org/10.1542/peds.2018-2162.

Raigosa, M., Avvedimento, S., Yoon, T. S., Cruz-Gimeno, J., Rodriguez, G., & Fontdevila, J. (2015). Male-to-female genital reassignment surgery: A retrospective review of surgical technique and complications in 60 patients. *The Journal of Sexual Medicine*, 12(8), 1837–1845. https://doi.org/10.1111/jsm.12936.

Rapp, M., Duranteau, L., van de Grift, T. C., Schober, J., Hirschberg, A. L., Krege, S., & DSD- Life group. (2021). Self- and proxy-reported outcomes after surgery in people with disorders/differences of sex development (DSD) in Europe (dsd-LIFE). *Journal of Pediatric Urology*, 17(3), 353–365. https://doi.org/10.1016/j.jpurol.2020.12.007.

Rashid, A., Afiqah, S. N., & Iguchi, Y. (2022). Use of hormones among trans women in the west coast of peninsular Malaysia: A mixed methods study. *Transgender Health*, 7(3), 242–249. https://doi.org/10.1089/trgh.2020.0119.

RCGP. (2019). *The role of the GP in caring for gender-questioning and transgender patients: RCGP Position Statement*. https://www.rcgp.org.uk/-/media/Files/Policy/A-Z-policy/2019/RCGP-position-statement-providing-care-for-gender-transgender-patients-june-2019.ashx?la=en

Rebbeck, T. R., Friebel, T., Wagner, T., Lynch, H. T., Garber, J. E., Daly, M. B., Isaacs, C., Olopade, O. I., Neuhausen, S. L., van 't Veer, L., Eeles, R., Evans, D. G., Tomlinson, G., Matloff, E., Narod, S. A., Eisen, A., Domchek, S., Armstrong, K., & Weber, B. L. (2005). Effect of short-term hormone replacement therapy on breast cancer risk reduction after bilateral prophylactic oophorectomy in BRCA1 and BRCA2 mutation carriers: The PROSE study group. *Journal of Clinical Oncology*, 23(31), 7804–7810. https://doi.org/10.1200/JCO.2004.00.8151.

Reed, G. M., Drescher, J., Krueger, R. B., Atalla, E., Cochran, S. D., First, M. B., Cohen-Kettenis, P. T., Arango-de Montis, I., Parish, S. J., Cottler, S., Briken, P., & Saxena, S. (2016). Disorders related to sexuality and gender identity in the ICD-11: Revising the ICD-10 classification based on current scientific evidence, best clinical practices, and human rights considerations. *World Psychiatry*, 15(3), 205–221. https://doi.org/10.1002/wps.20354.

Rees, S. N., Crowe, M., & Harris, S. (2021). The lesbian, gay, bisexual and transgender communities' mental health care needs and experiences of mental health services: An integrative review of qualitative studies. *Journal of Psychiatric and Mental Health Nursing*, 28(4), 578–589. https://doi.org/10.1111/jpm.12720.

Regmi, P. R., van Teijlingen, E., & Neupane, S. R. (2021). Silicone use among Nepali transgender women: The haz- ards of beauty. *Journal of Health Research*, 35(2) 160–171. https://doi.org/10.1108/JHR-08-2019-0192.

Reisman, T., Dacarett-Galeano, D., & Goldstein, Z. (2019). Transgender care and medical education. In L. Poretsky & W. C. Hembree (Eds.), *Transgender Medicine* (pp. 283–292). Humana Press, Cham. https://doi.org/10.1007/978-3-030-05683-4_14.

Reisman, T., & Goldstein, Z. (2018). Case report: Induced lactation in a transgender woman. *Transgender Health*, 3(1), 24–26. https://doi.org/10.1089/trgh.2017.0044.

Reisner, S. L., & Murchison, G. R. (2016). A global research synthesis of HIV and STI biobehavioural risks in female-to-male transgender adults. *Global Public Health*, 11(7-8), 866–887. https://doi.org/10.1080/17441692.2015.1134613.

Reisner, S. L., Bradford, J., Hopwood, R., Gonzalez, A., Makadon, H., Todisco, D., Cavanaugh, T., VanDerwarker, R., Grasso, C., Zaslow, S., Boswell, S. L., & Mayer, K. (2015). Comprehensive transgender healthcare: The gender affirming clinical and public health model of Fenway Health. *Journal of Urban Health*, 92(3), 584–592. https://doi.org/10.1007/s11524-015-9947-2.

Reisner, S. L., Deutsch, M. B., Peitzmeier, S. M., White Hughto, J. M., Cavanaugh, T. P., Pardee, D. J., McLean, S. A., Panther, L. A., Gelman, M., Mirmiaga, M. J., & Potter, J. E. (2018). Test performance and acceptability of self- versus provider-collected swabs for high-risk HPV DNA testing in female-to-male trans masculine patients. *PLoS One*, 13(3), e0190172. https://doi.org/10.1371/journal.pone.0190172.

Reisner, S. L., Greytak, E. A., Parsons, J. T., & Ybarra, M. L. (2015). Gender minority social stress in adolescence: Disparities in adolescent bullying and substance use by gender identity. *Journal of Sex Research*, 52(3), 243–256. https://doi.org/10.1080/00224499.2014.886321.

Reisner, S. L., Moore, C. S., Asquith, A., Pardee, D. J., Sarvet, A., Mayer, G., & Mayer, K. H. (2019). High risk and low uptake of pre-exposure prophylaxis to prevent HIV acquisition in a national online sample of transgender men who have sex with men in the United States. *Journal of the International AIDS Society*, 22(9), e25391. https://doi.org/10.1002/jia2.25391.

Reisner, S. L., Poteat, T., Keatley, J., Cabral, M., Mothopeng, T., Dunham, E., Holland, C. E., & Baral, S. D. (2016). Global health burden and needs of transgender populations: A review. *Lancet* 388(10042), 412–436. https://doi.org/10.1016/S0140-6736(16)00684-X.

Reisner, S. L., Radix, A., & Deutsch, M. B. (2016). Integrated and gender-affirming transgender clinical care and research. *Journal of Acquired Immune Deficiency Syndromes*, 72, S235–S242. https://doi.org/10.1097/QAI.0000000000001088.

Reisner, S. L., Vetters, R., Leclerc, M., Zaslow, S., Wolfrum, S., Shumer, D., & Mimiaga, M. J. (2015). Mental health of transgender youth in care at an adolescent urban community health center: A matched retrospective cohort study. *The Journal of Adolescent Health*, 56(3), 274–279. https://doi.org/10.1016/j.jadohealth.2014.10.264.

Reisner, S. L., Silva-Santisteban, A., Salazar, X., Vilela, J., D'Amico, L., & Perez-Brumer, A. (2021). "Existimos": Health and social needs of transgender men in Lima, Peru. *PLoS One*, 16(8), e0254494. https://doi.org/10.1371/journal.pone.0254494.

Remacle, M., Matar, N., Morsomme, D., Veduyckt, I., & Lawson, G. (2011). Glottoplasty for male-to-female transsexualism: Voice results. *Journal of Voice*, 25(1), 120–123. https://doi.org/10.1016/j.jvoice.2009.07.004.

Remington, A. C., Morrison, S. D., Massie, J. P., Crowe, C. S., Shakir, A., Wilson, S. C., Vyas, K. S., Lee, G. K., & Friedrich, J. B. (2018). Outcomes after phalloplasty. *Plastic and Reconstructive Surgery*, 141(2), 220e–229e. https://doi.org/10.1097/PRS.0000000000004061.

Rew, L., Young, C. C., Monge, M., & Bogucka, R. (2021). Puberty blockers for transgender and gender diverse youth—A critical review of the literature. *Child and Adolescent Mental Health*, 26(1), 3–14. https://doi.org/10.1111/camh.12437.

Rich, A., Scheim, A., Koehoorn, M., & Poteat, T. (2020). Non-HIV chronic disease burden among transgender populations globally: A systematic review and narrative synthesis. *Preventive Medicine Reports*, 20, 101259. https://doi.org/10.1016/j.pmedr.2020.101259.

Richards, C. (2021). *Trans and sexuality: An existentially-informed inquiry with implications for counselling psychology*. Routledge.

Richards, C., & Barrett, J. (2020). *Trans and non-binary gender healthcare for psychiatrists, psychologists, and other mental health professionals*. Royal College of Psychiatrists/Cambridge University Press.

Richards, C., Barker, M. J., Lenihan, P., & Iantaffi, A. (2014). Who watches the watchmen? A critical perspective on the theorization of trans people and clinicians. *Feminism & Psychology*, 4, 248–258. https://doi.org/10.1177/0959353514526220.

Richards, C., Bouman, W. P., & Barker, M.-J. (2017). *Genderqueer and non-binary genders*. Palgrave MacMillan. https://doi.org/10.1057/978-1-137-51053-2.

Richards, C., Bouman, W. P., Seal, L., Barker, M. J., Nieder, T. O., & T'Sjoen, G. (2016). Non-binary or genderqueer genders. *International Review of Psychiatry*, 28(1), 95–102. https://doi.org/10.3109/09540261.2015.1106446.

Richards, E. G., Farrell, R. M., Ricci, S., Perni, U., Quintini, C., Tzakis, A., & Falcone, T. (2021). Uterus transplantation: State of the art in 2021. *Journal of Assisted Reproduction and Genetics*, 38(9), 2251–2259. https://doi.org/10.1007/s10815-021-02245-7.

Richards, R. N., & Meharg, G. E. (1995). Electrolysis: Observations from 13 years and 140,000 hours of experience. *Journal of the American Academy of Dermatology*, 33(4), 662–666. https://doi.org/10.1016/0190-9622(95)91290-8.

Rider, G. N., McMorris, B. J., Gower, A. L., Coleman, E., Brown, C., & Eisenberg, M. E. (2019). Perspectives from nurses and physicians on training needs and comfort working with transgender and gender-diverse youth. *Journal of Pediatric Health Care*, 33(4), 379–385. https://doi.org/10.1016/j.pedhc.2018.11.003.

Rider, G. N., Vencill, J. A., Berg, D. R., Becker-Warner, R., Candelario-Pérez, L., & Spencer, K. G. (2019). The gender affirmative lifespan approach (GALA): A framework for competent clinical care with nonbinary clients. *International Journal of Transgenderism*, 20(2-3), 275–288. https://doi.org/10.1080/15532739.2018.1485069.

Riggs, D. W., & Treharne, G. J. (2016). Decompensation: A novel approach to accounting for stress arising from the effects of ideology and social norms. *Journal of Homosexuality*, 64(5), 592–605. https://doi.org/10.1080/0918369.2016.1194116.

Riggs, D. W., & Bartholomaeus, C. (2016). Australian mental health nurses and transgender clients: Attitudes and knowledge. *Journal of Research in Nursing*, 21(3), 212–222. https://doi.org/10.1177/1744987115624483.

Riggs, D. W., & Bartholomaeus, C. (2018a). Fertility preservation decision making amongst Australian transgender and non-binary adults. *Reproductive Health*, 15(1), 181. https://doi.org/10.1186/s12978-018-0627-z.

Riggs, D. W., & Bartholomaeus, C. (2018b). Gaslighting in the context of clinical interactions with parents of transgender children. *Sexual and Relationship Therapy*, 33(4), 382–394. https://doi.org/10.1080/14681994.2018.1444274.

Riggs, D. W., Bartholomaeus, C., & Sansfaçon, A. P. (2019). "If they didn't support me, I most likely wouldn't be here": Transgender young people and their parents negotiating medical treatment in Australia. *International Journal of Transgender Health*, 21(1), 3–15. https://doi.org/10.1080/15532739.2019.1692751.

Ristori, J., & Steensma, T. D. (2016). Gender dysphoria in childhood. *International Review of Psychiatry*, 28(1), 13–20. https://doi.org/10.3109/09540261.2015.1115754.

Ristori, J., Fisher, A. D., Castellini, G., Sensi, C., Cipriani, A., Ricca, V., & Maggi, M. (2019). Gender dysphoria and anorexia nervosa symptoms in two adolescents. *Archives of Sexual Behavior*, 48(5), 1625–1631. https://doi.org/10.1007/s10508-019-1396-7.

Ristori, J., Rossi, E., Cocchetti, C., Mazzoli, F., Castellini, G., Vignozzi, L., Ricca, V., Maggi, M., & Fisher, A. D. (2021). Sexual habits among Italian transgender adolescents: A cross-sectional study. *International Journal of Impotence Research*, 33(7), 687–693. https://doi.org/10.1038/s41443-021-00427-6.

Roberts, A. L., Rosario, M., Corliss, H. L., Koenen, K. C., & Austin, S. B. (2012). Childhood gender nonconformity: A risk indicator for childhood abuse and posttraumatic stress in youth. *Pediatrics*, 129(3), 410–417. https://doi.org/10.1542/peds.2011-1804.

Roberts, A. L., Rosario, M., Slopen, N., Calzo, J. P., & Austin, S. B. (2014). Childhood gender nonconformity, bullying victimization, and depressive symptoms across adolescence and early adulthood: An 11-year longitudinal study. *Journal of the American Academy of Child & Adolescent Psychiatry*, 52(2), 143–152. https://doi.org/10.1016/j.jaac.2012.11.006.

Roberts, C. M., Sharkey, C. M., Bakula, D. M., Perez, M. N., Delozier, A. J., Austin, P. F., Baskin, L. S., Chan, Y.-

M., Cheng, E. Y., Diamond, D. A., Fried, A. J., Kropp, B., Lakshmanan, Y., Meyer, S. Z., Meyer, T., Nokoff, N. J., Palmer, B. W., Paradis, A., Reyes, K. J. S., & Tishelman, A. (2020). Illness uncertainty longitudinally predicts distress among caregivers of children born with DSD. *Journal of Pediatric Psychology, 45*(9), 1053–1062. https://doi.org/10.1093/jpepsy/jsaa069.

Roberts, L. F., Brett, M. A., Johnson, T. W., & Wassersug, R. J. (2008). A passion for castration: Characterizing men who are fascinated with castration, but have not been castrated. *The Journal of Sexual Medicine, 5*(7), 1669–1680. https://doi.org/10.1111/j.1743-6109.2007.00636.x.

Roberts, S. A., & Kaiser, U. B. (2020). Genetics in endocrinology: Genetic etiologies of central precocious puberty and the role of imprinted genes. *European Journal of Endocrinology, 183*(4), R107–R117. https://doi.org/10.1530/EJE-20-0103.

Robles, R., Fresán, A., Vega-Ramírez, H., Cruz-Islas, J., Rodríguez-Pérez, V., Domínguez-Martínez, T., & Reed, G. M. (2016). Removing transgender identity from the classification of mental disorders: A Mexican field study for ICD-11. *The Lancet Psychiatry, 3*(9), 850–859. https://doi.org/10.1016/s2215-0366(16)30165-1.

Rochlin, D. H., Brazio, P., Wapnir, I., & Nguyen, D. (2020). Immediate targeted nipple-areolar complex reinnervation: Improving outcomes in gender-affirming mastectomy. *Plastic and Reconstructive Surgery—Global Open, 8*(3), e2719. https://doi.org/10.1097/gox.0000000000002719.

Rodriguez-Wallberg, K. A., Häljestig, J., Arver, S., Johansson, A. L. V., & Lundberg, F. E. (2021). Sperm quality in transgender women before or after gender affirming hormone therapy—A prospective cohort study. *Andrology, 9*(6), 1773–1780. https://doi.org/10.1111/andr.12999.

Rodriguez-Wallberg, K. A., Marklund, A., Lundberg, F., Wikander, I., Milenkovic, M., Anastacio, A., Seryounitis, F., Wanggren, K., Ekengren, T. L., Lind, T., & Borgström, B. (2019). A prospective study of women and girls undergoing fertility preservation due to oncologic and non-oncologic indications in Sweden–Trends in patients' choices and benefit of the chosen methods after long-term follow up. *Acta Obstetricia et Gynecologica Scandinavica, 98*(5), 604–615. https://doi.org/10.1111/aogs.13559.

Rodriguez-Wallberg, K. A., Milenkovic, M., Papaikonomou, K., Keros, V., Gustafsson, B., Sergouniotis, F., Wikander, I., Perot, R., Borgström, B., Ljungman, P., & Barbany, G. (2021). Successful pregnancies after transplantation of ovarian tissue retrieved and cryopreserved at time of childhood acute lymphoblastic leukemia—A case report. *Haematologica, 106*(10), 2783–2787. https://doi.org/10.3324/haematol.2021.278828.

Roen, K. (2019). Intersex or diverse sex development: Critical review of psychosocial health care research and indications for practice. *Journal of Sex Research, 56*(4–5), 511–528. https://doi.org/10.1080/00224499.2019.1578331.

Rolston, A. M., Gardner, M., Vilain, E., & Sandberg, D. E. (2015). Parental reports of stigma associated with child's disorder of sex development. *International Journal of Endocrinology, 2015*, 980121. https://doi.org/10.1155/2015/980121.

Rondahl, G. (2009). Students' inadequate knowledge about lesbian, gay, bisexual and transgender persons. *International Journal of Nursing Education Scholarship, 6*(1), 11. https://doi.org/10.2202/1548-923X.1718.

Rood, B. A., Puckett, J. A., Pantalone, D. W., & Bradford, J. B. (2015). Predictors of suicidal ideation in a statewide sample of transgender individuals. *LGBT Health, 2*(3), 270–275. https://doi.org/10.1089/lgbt.2013.0048.

Rood, B. A., Reisner, S. L., Puckett, J. A., Surace, F. I., Berman, A. K., & Pantalone, D. W. (2017). Internalized transphobia: Exploring perceptions of social messages in transgender and gender-nonconforming adults. *International Journal of Transgenderism, 18*(4), 411–426. https://doi.org/10.1080/15532739.2017.1329048.

Rosen, H. N., Hamnvik, O. R., Jaisamrarn, U., Malabanan, A. O., Safer, J. D., Tangpricha, V., Wattanachanya, L., & Yeap, S. S. (2019). Bone densitometry in transgender and gender non-conforming (TGNC) individuals: 2019 ISCD official position. *Journal of Clinical Densitometry, 22*(4), 544–553. https://doi.org/10.1016/j.jocd.2019.07.004.

Rosenthal, S. M. (2014). Approach to the patient: Transgender youth: endocrine considerations. *The Journal of Clinical Endocrinology & Metabolism, 99*(12), 4379–4389. https://doi.org/10.1210/jc.2014-1919.

Rosenthal, S. M. (2016). Transgender youth: Current concepts. *Annals of Pediatric Endocrinology & Metabolism, 21*(4), 185–192. https://doi.org/10.6065/apem.2016.21.4.185.

Rosenthal, S. M. (2021). Challenges in the care of transgender youth: An endocrinologist's view. *Nature Reviews Endocrinology, 17*(10), 581–591 https://doi.org/10.1038/s41574-021-00535-9.

Rosenwohl-Mack, A., Tamar-Mattis, S., Baratz, A. B., Dalke, K. B., Ittelson, A., Zieselman, K., & Flatt, J. D. (2020). A national study on the physical and mental health of intersex adults in the U.S. *PLoS One, 15*(10), e0240088. https://doi.org/10.1371/journal.pone.0240088.

Ross, A. (2017). *Gender confirmation surgeries rise 20% in first ever report*. American Society of Plastic Surgeons, Press Releases.

Rothblum, E. D., Krueger, E. A., Kittle, K. R., & Meyer, I. H. (2020). Asexual and non-asexual respondents from a U.S. population-based study of sexual minorities. *Archives of Sexual Behavior, 49*(2), 757–767. https://doi.org/10.1007/s10508-019-01485-0.

Rothenberg, S. S., Witchel, S. F., & Menke, M. N. (2019). Oocyte cryopreservation in a transgender male adolescent. *New England Journal of Medicine, 380*(9), 886–887. https://doi.org/10.1056/NEJMc1813275.

Routh, D., Abess, G., Makin, D., Stohr, M. K., Hemmens, C., & Yoo, J. (2015). Transgender inmates in prisons. *International Journal of Offender Therapy and Comparative Criminology, 61*(6), 645–666. https://doi.org/10.1177/0306624x15603745.

Rowniak, S., Bolt, L., & Sharifi, C. (2019). Effect of cross-sex hormones on the quality of life, depression and anxiety

S230   E. COLEMAN ET AL.

of transgender individuals: A quantitative systematic review. *JBI Evidence Synthesis*, *17*(9), 1826–1854. https://doi.org/10.11124/JBISRIR-2017-003869.

Royal College of General Practitioners. (2019). *The role of the GP in caring for gender-questioning and transgender patients: RCGP position statement*. https://www.rcgp.org.uk/policy/rcgp-policy-areas/transgender-care.aspx

Russell, A. M., Galvin, K. M., Harper, M. M., & Clayman, M. L. (2016). A comparison of heterosexual and LGBTQ cancer survivors' outlooks on relationships, family building, possible infertility, and patient-doctor fertility risk communication. *Journal of Cancer Survivorship*, *10*(5), 935–942. https://doi.org/10.1007/s11764-016-0524-9.

Russell, M. R., & Abrams, M. (2019). Transgender and non-binary adolescents: The role of voice and communication therapy. *Perspectives of the ASHA Special Interest Groups*, *4*(6), 1298–1305. https://doi.org/10.1044/2019_PERSP-19-00034.

Russell, S. T., Pollitt, A. M., Li, G., & Grossman, A. H. (2018). Chosen name use is linked to reduced depressive symptoms, suicidal ideation, and suicidal behavior among transgender youth. *Journal of Adolescent Health*, *63*(4), 503–505. https://doi.org/10.1016/j.jadohealth.2018.02.003.

Ryan, C. (2009). *Supportive families, healthy children: Helping families with lesbian, gay, bisexual & transgender (LGBT) children*. http://familyproject.sfsu.edu

Ryan, C., Huebner, D., Diaz, R. M., & Sanchez, J. (2009). Family rejection as a predictor of negative health outcomes in white and Latino lesbian, gay, and bisexual young adults. *Pediatrics*, *123*(1), 346–352. https://doi.org/10.1542/peds.2007-3524.

Ryan, C., Russell, S. T., Huebner, D., Diaz, R., & Sanchez, J. (2010). Family acceptance in adolescence and the health of LGBT young adults. *Journal of Child and Adolescent Psychiatric Nursing*, *23*(4), 205–213. https://doi.org/10.1111/j.1744-6171.2010.00246.x.

Ryan, C., Toomey, R. B., Diaz, R. M., & Russell, S. T. (2020). Parent-initiated sexual orientation change efforts with LGBT adolescents: Implications for young adult mental health and adjustment. *Journal of Homosexuality*, *67*(2), 159–173. https://doi.org/10.1080/00918369.2018.1538407.

Saeed, A., Mughal, U., & Farooq, S. (2017). It's complicated: Sociocultural factors and the disclosure decision of transgender individuals in Pakistan. *Journal of Homosexuality*, *65*(8), 1051–1070. https://doi.org/10.1080/00918369.2017.1368766.

Safer, J. D. (2021). Research gaps in medical treatment of transgender/nonbinary people. *The Journal of Clinical Investigation*, *131*(4), e142029. https://doi.org/10.1172/JCI142029.

Safer, J. D., & Tangpricha, V. (2019). Care of the transgender patient. *Annals of Internal Medicine*, *171*(1), ITC1–ITC16. https://doi.org/10.7326/aitc201907020.

Safer, J. D., Coleman, E., Feldman, J., Garofalo, R., Hembree, W., Radix, A., & Sevelius, J. (2016). Barriers to healthcare for transgender individuals. *Current Opinion in Endocrinology & Diabetes and Obesity*, *23*(2), 168–171. https://doi.org/10.1097/med.0000000000000227.

Salgado, C. J., Nugent, A., Kuhn, J., Janette, M., & Bahna, H. (2018). Primary sigmoid vaginoplasty in transwomen: Technique and outcomes. *Biomed Research International*, *2018*, 4907208. https://doi.org/10.1155/2018/4907208.

Salibian, A. A., Axelrod, D. M., Smith, J. A., Fischer, B. A., Agarwal, C., & Bluebond-Langner, R. (2021). Oncologic considerations for safe gender-affirming mastectomy: Preoperative imaging, pathologic evaluation, counseling, and long-term screening. *Plastic and Reconstructive Surgery*, *147*(2), 213e–221e. https://doi.org/10.1097/PRS.0000000000007589.

Salway, T., Ferlatte, O., Gesink, D., & Lachowsky, N. J. (2020). Prevalence of exposure to sexual orientation change efforts and associated sociodemographic characteristics and psychosocial health outcomes among Canadian sexual minority men. *The Canadian Journal of Psychiatry*, *65*(7), 502–509. https://doi.org/10.1177/0706743720902629.

Sandberg, D. E., & Gardner, M. (2022). Differences/disorders of sex development: Medical conditions at the intersection of sex and gender. *Annual Review of Clinical Psychology*, *18*, 201–231. https://doi.org/10.1146/annurev-clinpsy-081219-101412.

Sandberg, D. E., & Mazur, T. (2014). A noncategorical approach to the psychosocial care of persons with DSD and their families. In B. P. C. Kreukels, T. D. Steensma, & A. L. C. de Vries (Eds.), *Gender dysphoria and disorders of sex development: Progress in care and knowledge* (pp. 93–114). Springer. https://doi.org/10.1007/978-1-4614-7441-8_5.

Sandberg, D. E., Gardner, M., Kopec, K., Urbanski, M., Callens, N., Keegan, C. E., Yashar, B. M., Fechner, P. Y., Shnorhavorian, M., Vilain, E., Timmermans, S., & Siminoff, L. A. (2019). Development of a decision support tool in pediatric differences/disorders of sex development. *Seminars in Pediatric Surgery*, *28*(5), 150838. https://doi.org/10.1016/j.sempedsurg.2019.150838.

Sanders, R. A. (2013). Adolescent psychosocial, social, and cognitive development. *Pediatrics in Review*, *34*(8), 354–359. https://doi.org/10.1542/pir.34-8-354.

Santucci, R. A. (2018). Urethral complications after transgender phalloplasty: Strategies to treat them and minimize their occurrence. *Journal of Clinical Anatomy*, *31*(2), 187–190. https://doi.org/10.1002/ca.23021.

Sawyer, J., Perry, J. L., & Dobbins-Scaramelli, A. (2014). A survey of the awareness of speech services among transgender and transsexual individuals and speech-language pathologists. *International Journal of Transgenderism*, *15*(3–4), 146–163. https://doi.org/10.1080/15532739.2014.995260.

Sawyer, W. (2020). *Visualizing the racial disparities in mass incarceration*. Prison Policy Initiative.

Scandurra, C., Amodeo, A. L., Valerio, P., Bochicchio, V., & Frost, D. M. (2017). Minority stress, resilience, and mental health: A study of Italian transgender people. *Journal of Social Issues*, *73*(3), 563–585. https://doi.org/10.1111/josi.12232.

Scandurra, C., Mezza, F., Maldonato, N. M., Bottone, M., Bochicchio, V., Valerio, P., & Vitelli, R. (2019). Health

of non-binary and genderqueer people: A systematic review. *Frontiers in Psychology*, 10, 1453.

Schagen, S. E. E., Wouters, F. M., Cohen-Kettenis, P. T., Gooren, L. J., & Hannema, S. E. (2020). Bone development in transgender adolescents treated with GnRH analogues and subsequent gender-affirming hormones. *The Journal of Clinical Endocrinology & Metabolism*, 105(12). https://doi.org/10.1210/clinem/dgaa604.

Schagen, S. E., Cohen-Kettenis, P., Delemarre-van de Waal, H. A., & Hannema, S. E. (2016). Efficacy and safety of gonadotropin-releasing hormone agonist treatment to suppress puberty in gender dysphoric adolescents. *The Journal of Sexual Medicine*, 13 (7), 1125–1132. https://doi.org/10.1016/j.jsxm.2016.05.004.

Schardein, J. N., Zhao, L. C., & Nikolavsky, D. (2019). Management of vaginoplasty and phalloplasty complications. *Urology Clinics of North America*, 46(4), 605–618. https://doi.org/10.1016/j.ucl.2019.07.012.

Schechter, L. S., & Safa, B. (2018). Introduction to phalloplasty. *Clinics in Plastic Surgery*, 45(3), 387–389. https://doi.org/10.1016/j.cps.2018.03.014.

Schechter, L. S., & Schechter, R. B. (2019). Training surgeons in gender confirmation surgery. *Journal of Craniofacial Surgery*, 30(5), 1380–1382. https://doi.org/10.1097/SCS.0000000000005477.

Schechter, L. S., D'Arpa, S., Cohen, M. N., Kocjancic, E., Claes, K. E. Y., & Monstrey, S. (2017). Gender confirmation surgery: Guiding principles. *The Journal of Sexual Medicine*, 14(6), 852–856. https://doi.org/10.1016/j.jsxm.2017.04.001.

Scheim, A. I., & Travers, R. (2017). Barriers and facilitators to HIV and sexually transmitted infections testing for gay, bisexual, and other transgender men who have sex with men. *AIDS Care*, 29(8), 990–995. https://doi.org/10.1080/09540121.2016.1271937.

Scheim, A. I., Bauer, G. R., & Travers, R. (2017). HIV-related sexual risk among transgender men who are gay, bisexual, or have sex with men. *Journal of Acquired Immune Deficiency Syndromes*, 74(4), e89–e96. https://doi.org/10.1097/qai.0000000000001222.

Scheim, A. I., Perez-Brumer, A. G., & Bauer, G. R. (2020). Gender-concordant identity documents and mental health among transgender adults in the USA: A cross-sectional study. *The Lancet Public Health*, 5(4), e196–e203. https://doi.org/10.1016/S2468-2667(20)30032-3.

Schneider, F., Kliesch, S., Schlatt, S., & Neuhaus, N. (2017). Andrology of male-to-female transsexuals: Influence of cross-sex hormone therapy on testicular function. *Andrology*, 5(5), 873–880. https://doi.org/10.1111/andr.12405.

Schneider, F., Neuhaus, N., Wistuba, J., Zitzmann, M., Heß, J., Mahler, D., & Kliesch, S. (2015). Testicular functions and clinical characterization of patients with gender dysphoria (GD) undergoing sex reassignment surgery (SRS). *Journal of Sexual Medicine*, 12(11), 2190–2200. https://doi.org/10.1111/jsm.13022.

Schubert, F. D., & Carey, J. M. (2020). Data unclear on pregnancy risk in transmasculine individuals on testosterone. *American Journal of Obstetrics and Gynecology*, 222(4), 393–394. https://doi.org/10.1016/j.ajog.2019.12.014.

Schützmann, K., Brinkmann, L., Schacht, M., & Richter-Appelt, H. (2007). Psychological distress, self-harming behavior, and suicidal tendencies in adults with disorders of sex development. *Archives of Sexual Behavior*, 38(1), 16–33. https://doi.org/10.1007/s10508-007-9241-9.

Schwartz, A. R., Russell, K., & Gray, B. A. (2019). Approaches to vaginal bleeding and contraceptive counseling in transgender and gender nonbinary patients. *Obstetrics and Gynecology*, 134(1), 81–90. https://doi.org/10.1097/aog.0000000000003308.

Schweizer, K., Brunner, F., Gedrose, B., Handford, C., & Richter-Appelt, H. (2016). Coping with diverse sex development: Treatment experiences and psychosocial support during childhood and adolescence and adult well-being. *Journal of Pediatric Psychology*, 42(5), 504–519. https://doi.org/10.1093/jpepsy/jsw058.

Scott, S. (2013). "One is not born, but becomes a woman": A fourteenth amendment argument in support of housing male-to female transgender inmates in female facilities. *University of Pennsylvania Journal of Constitutional Law*, 15(4), 1259–1297. https://scholarship.law.upenn.edu/jcl/vol15/iss4/6

Seal, L. (2017). Adult endocrinology. In C. Richards, W. P. Bouman, & M.-J. Barker (Eds.), *Genderqueer and non-binary genders* (pp. 183–223). Palgrave MacMillan.

Seal, L. J., Franklin, S., Richards, C., Shishkareva, A., Sinclaire, C., & Barrett, J. (2012). Predictive markers for mammoplasty and a comparison of side effect profiles in transwomen taking various hormonal regimens. *The Journal of Clinical Endocrinology & Metabolism*, 97(12), 4422–4428. https://doi.org/10.1210/jc.2012-2030.

Seelman, K. L. (2016). Transgender adults' access to college bathrooms and housing and the relationship to suicidality. *Journal of Homosexuality*, 63(10), 1378–1399. https://doi.org/10.1080/00918369.2016.1157998.

Seelman, K. L., Colón-Diaz, M. J., LeCroix, R. H., Xavier-Brier, M., & Kattari, L. (2017). Transgender non-inclusive healthcare and delaying care because of fear: Connections to general health and mental health among transgender adults. *Transgender Health*, 2(1), 17–28. https://doi.org/10.1089/trgh.2016.0024.

Segev-Becker, A., Israeli, G., Elkon-Tamir, E., Perl, L., Sekler, O., Amir, H., Interator, H., Dayan, S. C., Chorna, E., Weintrob, N., & Oren, A. (2020). Children and adolescents with gender dysphoria in Israel: Increasing referral and fertility preservation rates. *Endocrine Practice*, 26(4), 423–428. https://doi.org/10.4158/EP-2019-0418.

Sequeira, G. M., Ray, K. N., Miller, E., & Coulter, R. W. S. (2020). Transgender youth's disclosure of gender identity to providers outside of specialized gender centers. *Journal of Adolescent Health*, 66(6), 691–698. https://doi.org/10.1016/j.jadohealth.2019.12.010.

Serafin, J., Smith, G. B., & Keltz, T. (2013). Lesbian, gay, bisexual, and transgender (LGBT) elders in nursing homes: It's time to clean out the closet. *Geriatric Nursing*, 34(1), 81–83.

Sermondade, N., Benaloun, E., Berthaut, I., Moreau, E., Prades, M., Béranger, A., Chabbert-Buffet, N., Johnson, N., Lévy, R., & Dupont, C. (2021). Reproductive functions and fertility preservation in transgender women: A French case series. *Reproductive BioMedicine Online*, 43(2), 339–345. https://doi.org/10.1016/j.rbmo.2021.04.016.

Sevelius, J., & Jenness, V. (2017). Challenges and opportunities for gender-affirming healthcare for transgender women in prison. *International Journal of Prisoner Health*, 13(1), 32–40. https://doi.org/10.1108/ijph-08-2016-0046.

Sevelius, J. M., Chakravarty, D., Dilworth, S. E., Rebchook, G., & Neilands, T. B. (2020). Gender affirmation through correct pronoun usage: Development and validation of the transgender women's importance of pronouns (TW-IP) scale. *International Journal of Environmental Research and Public Health*, 17(24), 9525. https://doi.org/10.3390/ijerph17249525.

Sevelius, J. M., Deutsch, M. B., & Grant, R. (2016). The future of PrEP among transgender women: The critical role of gender affirmation in research and clinical practices. *Journal of the International AIDS Society*, 19(7S6), 21105. https://doi.org/10.7448/IAS.19.7.21105.

Seyed-Forootan, K., Karimi, H., & Seyed-Forootan, N. S. (2018). Autologous fibroblast-seeded amnion for reconstruction of neo-vagina in male-to-female reassignment surgery. *Aesthetic Plastic Surgery*, 42(2), 491–497. https://doi.org/10.1007/s00266-018-1088-z.

Shen, J. K., Seebacher, N. A., & Morrison, S. D. (2019). Global interest in gender affirmation surgery: A Google trends analysis. *Plastic and Reconstructive Surgery*, 143(1), 254e–256e. https://doi.org/10.1097/PRS.0000000000005160.

Shepherd, S. M. (2018). Cultural Awareness training for health professionals may have unintended consequences. *The British Medical Journal Opinion*. https://blogs.bmj.com/bmj/2018/01/22/stephane-m-shepherd-cultural-awarenesstraining-

Shepherd, S. M. (2019). Cultural awareness workshops: limitations and practical consequences. *BMC Medical Education*, 19(1), 1–10. https://doi.org/10.1186/s12909-018-1450-5.

Shepherd, S. M. (2022). Introducing an integrated model of cross-cultural assessment. *Australasian Psychiatry*, https://doi.org/10.1177/10398562211068373.

Sheppard, M., & Mayo, J. B.Jr. (2013). The social construction of gender and sexuality: Learning from two spirit traditions. *The Social Studies*, 104(6), 259–270. https://doi.org/10.1080/00377996.2013.788472.

Sherrard, J., Wilson, J., Donders, G., Mendling, W., & Jensen, J. S. (2018). 2018 European (IUSTI/WHO) International Union against sexually transmitted infections (IUSTI) World Health Organisation (WHO) guideline on the management of vaginal discharge. *International Journal of STD and AIDS*, 29(13), 1258–1272. https://doi.org/10.1177/0956462418785451.

Shieh, E., Marzinke, M. A., Fuchs, E. J., Hamlin, A., Bakshi, R., Aung, W., Breakey, J., Poteat, T., Brown, T., Bumpus, N. N., & Hendrix, C. W. (2019). Transgender women on oral HIV pre-exposure prophylaxis have significantly lower tenofovir and emtricitabine concentrations when also taking oestrogen when compared to cisgender men. *Journal of the International AIDS Society*, 22:e25405. https://doi.org/10.1002/jia2.25405.

Shields, J. P., Cohen, R., Glassman, J. R., Whitaker, K., Franks, H., & Bertolini, I. (2013). Estimating population size and demographic characteristics of lesbian, gay, bisexual, and transgender youth in middle school. *Journal of Adolescent Health*, 52(2), 248–250. https://doi.org/10.1016/j.jadohealth.2012.06.016.

Shipherd, J. C., Berke, D., & Livingston, N. A. (2019). Trauma recovery in the transgender and gender diverse community: extensions of the minority stress model for treatment planning. *Cognitive and Behavioral Practice*, 26(4), 629–646. https://doi.org/10.1016/j.cbpra.2019.06.001.

Shires, D. A., & Jaffee, K. D. (2016). Structural discrimination is associated with smoking status among a national sample of transgender individuals. *Nicotine & Tobacco Research*, 18(6), 1502–1508. https://doi.org/10.1093/ntr/ntv221.

Shires, D. A., Stroumsa, D., Jaffee, K. D., & Woodford, M. R. (2017). Primary care providers' willingness to continue gender-affirming hormone therapy for transgender patients. *Family Practice*, 35(5), 576–581. https://doi.org/10.1093/fampra/cmx119.

Shonkoff, J. P., Garner, A. S., Siegel, B. S., Dobbins, M. I., Earls, M. F., Garner, A. S., McGuinn, L., Pascoe, J., & Wood, D. L. (2011). The lifelong effects of early childhood adversity and toxic stress. *Pediatrics*, 129(1), e232–e246. https://doi.org/10.1542/peds.2011-2663.

Shnorhavorian, M., Kroon, L., Jeffries, H., & Johnson, R. (2012). Creating a standardized process to offer the standard of care: continuous process improvement methodology is associated with increased rates of sperm cryopreservation among adolescent and young adult males with cancer. *Junior of Pediatric and Hematology/Oncology*, 34(8), e315–319. https://doi.org/10.1097/MPH.0b013e3182678e3a.

Shumer, D. E., & Tishelman, A. C. (2015). The role of assent in the treatment of transgender adolescents. *International Journal of Transgenderism*, 16(2), 97–102. https://doi.org/10.1080/15532739.2015.1075929.

Shumer, D. E., Nokoff, N. J., & Spack, N. P. (2016). Advances in the care of transgender children and adolescents. *Advances in Pediatrics*, 63(1), 79–102. https://doi.org/10.1016/j.yapd.2016.04.018.

Siboni, L., Rucco, D., Prunas, A., & Anzani, A. (2022). "We faced every change together". Couple's intimacy and sexuality experiences from the perspectives of transgender and non-binary individuals' partners. *Journal of Sex & Marital Therapy*, 48(1), 23–46. https://doi.org/10.1080/0092623x.2021.1957733.

Sigurjonsson, H., Mollermark, C., Rinder, J., Farnebo, F., & Lundgren, T. K. (2017). Long-term sensitivity and patient-reported functionality of the neoclitoris after gender reassignment surgery. *Journal of Sexual Medicine*, 14(2), 269–273. https://doi.org/10.1016/j.jsxm.2016.12.003.

Silverberg, M. J., Nash, R., Becerra-Culqui, T. A., Cromwell, L., Getahun, D., Hunkeler, E., & Goodman, M. (2017).

Cohort study of cancer risk among insured transgender people. *Annals of Epidemiology*, 27(8), 499–501. https://doi.org/10.1016/j.annepidem.2017.07.007.

Siminoff, L., & Sandberg, D. (2015). Promoting shared decision making in disorders of sex development (DSD): Decision aids and support tools. *Hormone and Metabolic Research*, 47(05), 335–339. https://doi.org/10.1055/s-0035-1545302.

Simon, D., Capitán, L., Bailón, C., Bellinga, R. J., Gutiérrez Santamaría, J., Tenório, T., Sánchez-García, A., & Capitán-Cañadas, F. (2022). Facial gender confirmation surgery: The lower jaw. Description of surgical techniques and presentation of results. *Plastic and Reconstructive Surgery*, 149(4), 755e–766e. https://doi.org/10.1097/prs.0000000000008969.

Simons, L., Schrager, S. M., Clark, L. F., Belzer, M., & Olson, J. (2013). Parental support and mental health among transgender adolescents. *Journal of Adolescent Health*, 53(6), 791–793. https://doi.org/10.1016/j.jadohealth.2013.07.019.

Simonsen, R. K., Giraldi, A., Kristensen, E., & Hald, G. M. (2016). Long-term follow-up of individuals undergoing sex reassignment surgery: Psychiatric morbidity and mortality. *Nordic Journal of Psychiatry*, 70(4), 241–247. https://doi.org/10.3109/08039488.2015.1081405.

Simopoulos, E. F., & Khin Khin, E. (2014). Fundamental principles inherent in the comprehensive care of transgender inmates. *The Journal of the American Academy of Psychiatry and the Law*, 42(1), 26–36. http://jaapl.org/content/42/1/26

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). A follow-up study of boys with gender identity disorder. *Frontiers in Psychiatry*, 12, 632784. https://doi.org/10.3389/fpsyt.2021.632784.

Singh-Ospina, N., Maraka, S., Rodriguez-Gutierrez, R., Davidge-Pitts, C., Nippoldt, T. B., Prokop, L. J., & Murad, M. H. (2017). Effect of sex steroids on the bone health of transgender individuals: A systematic review and meta-analysis. *Journal Clinical Endocrinology and Metabolism*, 102(11), 3904–3913. https://doi.org/10.1210/jc.2017-01642.

Smith, A. J., Hallum-Montes, R., Nevin, K., Zenker, R., Sutherland, B., Reagor, S., & Brennan, J. M. (2018). Determinants of transgender individuals' well-being, mental health, and suicidality in a rural state. *Journal of Rural Mental Health*, 42(2), 116. https://doi.org/10.1037/rmh0000089.

Smith, P. (2006). The effects of solitary confinement on prison inmates: A brief history and review of the literature. *Crime and Justice*, 34(1), 441–528. https://doi.org/10.1086/500626.

Smith, N. L., Blondon, M., Wiggins, K. L., Harrington, L.B/, van Hylckama Vlieg, A., Floyd, J. S., Hwang, M., Bis, J. C., McKnight, B., Rice, K.M, Lumley, T., Rosendaal, F. R., Heckbert, S. R., & Psaty, B. M. (2014). Lower risk of cardiovascular events in postmenopausal women taking oral estradiol compared with oral conjugated equine estrogens. *JAMA Internal Medicine*, 174(1), 25–31. https://doi.org/10.1001/jamainternmed.2013.11074.

Smith, Y. L., van Goozen, S. H., & Cohen-Kettenis, P. T. (2001). Adolescents with gender identity disorder who were accepted or rejected for sex reassignment surgery: A prospective follow-up study. *Journal of the American Academy of Child & Adolescent Psychiatry*, 40(4), 472–481. https://doi.org/10.1097/00004583-200104000-00017.

Smith, Y. L., Van Goozen, S. H., Kuiper, A. J., & Cohen-Kettenis, P. T. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological Medicine*, 35(1), 89–99. https://doi.org/10.1017/s0033291704002776.

Snowden, J. M., Guise, J., & Kzhimannil, K. B. (2018). Promoting inclusive and person-centered care: Starting with birth. *Birth*, 45, 232–235. https://doi.org/10.1111/birt.12351.

Söderpalm, E., Larsson, A., & Almquist, S. A. (2004). Evaluation of a consecutive group of transsexual individuals referred for vocal intervention in the west of Sweden. *Logopedics, Phoniatrics, Vocology*, 29(1), 18–30. https://doi.org/10.1080/14015430310021618.

Södersten, M., Nygren, U., Hertegård, S., & Dhejne, C. (2015). Interdisciplinary program in Sweden related to transgender voice. *Perspectives on Voice and Voice Disorders*, 25(2). 87–97. https://doi.org/10.1044/vvd25.2.87.

Sofer, Y., Yaish, I., Yaron, M., Bach, M. Y., Stern, N., & Greenman, Y. (2020). Differential endocrine and metabolic effects of testosterone suppressive agents in transgender women. *Endocrine Practice*, 26(8), 883–890. https://doi.org/10.4158/EP-2020-0032.

Song, T. E., & Jiang, N. (2017). Transgender phonosurgery: A systematic review and meta-analysis. *Otolaryngology—Head and Neck Surgery*, 156(5), 803–808. https://doi.org/10.1177/0194599817697050.

Sonnenblick, E. B., Shah, A. D., Goldstein, Z., & Reisman, T. (2018). Breast imaging of transgender individuals: A review. *Current Radiology Reports*, 6(1), 1. https://doi.org/10.1007/s40134-018-0260-1.

Sood, R., Chen, D., Muldoon, A. L., Chen, L., Kwasny, M. J., Simons, L. K., Gangopadhyay, N., Corcoran, J. F., & Jordan, S. W. (2021). Association of chest dysphoria with anxiety and depression in transmasculine and nonbinary adolescents seeking gender-affirming care. *Journal of Adolescent Health*, 68(6), 1135–1141. https://doi.org/10.1016/j.jadohealth.2021.02.024.

Sorbara, J. C., Chiniara, L. N., Thompson, S., & Palmert, M. R. (2020). Mental health and timing of gender-affirming care. *Pediatrics*, 146(4), e20193600. https://doi.org/10.1542/peds.2019-3600.

Spack, N. P., Edwards-Leeper, L., Feldman, H. A., Leibowitz, S., Mandel, F., Diamond, D. A., & Vance, S. R. (2012). Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics*, 129(3), 418–425. https://doi.org/10.1542/peds.2011-0907.

Spanos, C., Bretherton, I., Zajac, J. D., & Cheung, A. S. (2020). Effects of gender-affirming hormone therapy on insulin resistance and body composition in transgender individuals: A systematic review. *World Journal of Diabetes*, 11(3), 66–77. https://doi.org/10.4239/wjd.v11.i3.66.

Spanos, C., Grace, J. A., Leemaqz, S. Y., Brownhill, A., Cundill, P., Locke, P., Wong, P., Zajac, J. D., & Cheung, A. S. (2021). The informed consent model of care for accessing gender-affirming hormone therapy is associated with high patient satisfaction. *Journal of Sexual Medicine*, *18*(1), 201–208. https://doi.org/10.1016/j.jsxm.2020.20.020.

Spatz, E. S., Krumholz, H. M., & Moulton, B. W. (2016). The new era of informed consent: Getting to a reasonable-patient standard through shared decision making. *The Journal of the American Medical Association*, *315*(19), 2063–2064. https://doi.org/10.1001/jama.2016.3070.

Speiser, P. W., Arlt, W., Auchus, R. J., Baskin, L. S., Conway, G. S., Merke, D. P., Meyer-Bahlburg, H. F. L., Miller, W. L., Murad, M. H., Oberfield, S. E., & White, P. C. (2018). Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An Endocrine Society* Clinical Practice Guideline. *The Journal of Clinical Endocrinology & Metabolism*, *103*(11), 4043–4088. https://doi.org/10.1210/jc.2018-01865.

Spencer, K. G., Berg, D. R., Bradford, N. J., Vencill, J. A., Tellawi, G., & Rider, G. N. (2021). The gender-affirmative life span approach: A developmental model for clinical work with transgender and gender-diverse children, adolescents, and adults. *Psychotherapy*, *58*(1), 37–49. https://doi.org/10.1037/pst0000363.

Spivey, L. A., & Edwards-Leeper, L. (2019). Future directions in affirmative psychological interventions with transgender children and adolescents. *Journal of Clinical Child & Adolescent Psychology*, *48*, 343–356. https://doi.org/10.1080/15374416.2018.1534207.

Spizzirri, G., Eufrásio, R., Lima, M. C. P., de Carvalho Nunes, H. R., Kreukels, B. P., Steensma, T. D., & Abdo, C. H. N. (2021). Proportion of people identified as transgender and non-binary gender in Brazil. *Scientific Reports*, *11*(1), 2240. https://doi.org/10.1038/s41598-021-81411-4.

Sprager, L., & O. N. Martinez, Jr. (2015). Beyond translation: Promoting a new national standard for equity in health materials translated from English. *NAM Perspectives*. https://doi.org/10.31478/201509b.

Spruill, T. M. (2010). Chronic psychosocial stress and hypertension. *Current Hypertension Reports*, *12*(1), 10–16. https://doi.org/10.1007/s11906-009-0084-8.

Srinath, S., Jacob, P., Sharma, E., & Gautam, A. (2019). Clinical practice guidelines for assessment of children and adolescents. *Indian Journal of Psychiatry*, *61*(Suppl. 2), 158–175. https://doi.org/10.4103/psychiatry.IndianJPsychiatry_580_18.

Staples, J. M., Bird, E. R., Gregg, J. J., & George, W. (2020). Improving the gender-affirmation process for transgender and gender-nonconforming individuals: Associations among time since transition began, body satisfaction, and sexual distress. *The Journal of Sex Research*, *57*(3), 375–383. https://doi.org/10.1080/00224499.2019.1617829.

Stark, T., Shoag, J. E., & Poppas, D. P. (2019). Eliminating early surgery for disorders of sex development: Risking adverse outcomes in 46, XX CAH. *Journal of Urology*, *201*(5), 871–873. https://doi.org/10.1097/ju.0000000000000023.

Statistics Canada. (2022). *Census of population Canada.* https://www150.statcan.gc.ca/n1/daily-quotidien/220427/dq220427b-eng.htm

Steensma, T. D., Biemond, R., de Boer, F., & Cohen-Kettenis, P. T. (2011). Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study. *Clinical Child Psychology and Psychiatry*, *16*(4), 499–516. https://doi.org/10.1177/1359104510378303.

Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Gender transitioning before puberty? *Archives of Sexual Behavior*, *40*(4), 649–650. https://doi.org/10.1007/s10508-011-9752-2.

Steensma, T. D., Cohen-Kettenis, P. T., & Zucker, K. J. (2018). Evidence for a change in the sex ratio of children referred for gender dysphoria: Data from the center of expertise on gender dysphoria in Amsterdam (1988–2016). *Journal of Sex & Marital Therapy*, *44*(7), 713–715. https://doi.org/10.1080/0092623X.2018.1437580.

Steensma, T. D., Kreukels, B. P., de Vries, A. L., & Cohen-Kettenis, P. T. (2013). Gender identity development in adolescence. *Hormones and Behavior*, *64*, 288–297. https://doi.org/10.1016/j.yhbeh.2013.02.020.

Steensma, T. D., McGuire, J. K., Kreukels, B. P., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child & Adolescent Psychiatry*, *52*(6), 582–590. https://doi.org/10.1016/j.jaac.2013.03.016.

Steensma, T. D., & Wensing-Kruger, S. A. (2019). Gender dysphoria. In T. H. Ollendick, S. W. White, & B. A. White (Eds), *The Oxford handbook of clinical child and adolescent psychology*. Oxford Library of Psychology

Steensma, T. D., Zucker, K. J., Kreukels, B. P. C., VanderLaan, D. P., Wood, H., Fuentes, A., & Cohen-Kettenis, P. T. (2013). Behavioral and emotional problems on the teacher's report form: A cross-national, cross-clinic comparative analysis of gender dysphoric children and adolescents. *Journal of Abnormal Child Psychology*, *42*(4), 635–647. https://doi.org/10.1007/s10802-013-9804-2.

Stein, G. L. (2020) Experiences of lesbian, gay, bisexual, and transgender patients and families in hospice and palliative care: Perspectives of the palliative care team. *Journal of Palliative Medicine*, *23*(6), 817–824. https://doi.org/10.1089/jpm.2019.0542.

Steinberg, L. (2009). Should the science of adolescent brain development inform public policy? *American Psychologist*, *64*(8), 739–750. https://doi.org/10.1037/0003-066x.64.8.739.

Stephenson, R., Riley, E., Rogers, E., Suarez, N., Metheny, N., Senda, J., Saylor, K. M., & Bauermeister, J. A. (2017). The sexual health of transgender men: A scoping review. *The Journal of Sex Research*, *54*(4-5), 424–445. https://doi.org/10.1080/00224499.2016.1271863.

Sterling, J., & Garcia, M. M. (2020a). Cancer screening in the transgender population: A review of current guidelines, best practices, and a proposed care model.


*Translational Andrological Urology*, 9(6), 2771–2785. https://doi.org/10.21037/tau-20-954.

Sterling, J., & Garcia, M. M. (2020b). Fertility preservation options for transgender individuals. *Translational Andrological Urology*, 9(Suppl. 2), S215–S226. https://doi.org/10.21037/tau.2019.09.28.

Stohr, M. K. (2015). The Hundred Years' war: The etiology and status of assaults on transgender women in men's prisons. *Women & Criminal Justice*, 25(1-2), 120–129. https://doi.org/10.1080/08974454.2015.1026154.

Stojanovic, B., Bizic, M., Bencic, M., Kojovic, V., Majstorovic, M., Jeftovic, M., Stanojevic, D., & Djordjevic, M. L. (2017). One-stage gender-confirmation surgery as a viable surgical procedure for female-to-male transsexuals. *Translational Andrological Urology*, 14(5), 741–746. https://doi.org/10.1016/j.jsxm.2017.03.256.

Stonewall. (2018). *LGBT in Britain: Work report*. https://www.stonewall.org.uk/system/files/lgbt_in_britain_work_report.pdf

Strang, J. F., Jarin, J., Call, D., Clark, B., Wallace, L. G., Anthony, L. G., Kenworthy, L., & Gomez-Lobo, V. (2018). Transgender Youth Fertility Attitudes Questionnaire: Measure development in nonautistic and autistic transgender youth and their parents. *Journal of Adolescent Health*, 62(2), 128–135. https://doi.org/10.1016/j.jadohealth.2017.07.022.

Strang, J. F., Meagher, H., Kenworthy, L., de Vries, A. L., Menvielle, E., Leibowitz, S., Janssen, A., Cohen-Kettenis, P., Shumer, D., Edwards-Leeper, L., Pleak, R., Spack, N., Karasic, D., Schreier, H., Balleur, A., Tishelman, A., Ehrensaft, D., Rodnan, L., Kuschner, E. ,… Caretto, A., Lewis, H., & Anthony, L. (2018). Initial clinical guidelines for co-occurring Autism Spectrum Disorder and Gender Dysphoria or Incongruence in adolescents. *Journal of Clinical Child & Adolescent Psychology*, 47(1), 105–115. https://doi.org/10.1080/15374416.2016.1228462.

Strang, J. F., Powers, M. D., Knauss, M., Sibarium, E., Leibowitz, S. F., Kenworthy, L., Sadikova, E., Wyss, S., Willing, L., Caplan, R., Pervez, N., Nowak, J., Gohari, D., Gomez-Lobo, V., Call, D., & Anthony, L. G. (2018). "They thought it was an obsession": Trajectories and perspectives of autistic transgender and gender-diverse adolescents. *Journal of Autism Developmental Disorders*, 48(12), 4039–4055. https://doi.org/10.1007/s10803-018-3723-6.

Strang, J. F., Knauss, M., van der Miesen, A., McGuire, J. K., Kenworthy, L., Caplan, R., Freeman, A., Sadikova, E., Zaks, Z., Pervez, N., Balleur, A., Rowlands, D. W., Sibarium, E., Willing, L., McCool, M. A., Ehrbar, R. D., Wyss, S. E., Wimms, H., Tobing, J., & Thomas, J. (2021). A clinical program for transgender and gender-diverse neurodiverse/autistic adolescents developed through community-based participatory design. *Journal of Clinical Child & Adolescent Psychology*, 50(6), 730–745. https://doi.org/10.1080/15374416.2020.1731817.

Strauss, P., Cook, A., Winter, S., Watson, V., Wright Toussaint, D., & Lin, A. (2017). *Trans Pathways: the mental health experiences and care pathways of trans young people. Summary of results*. Telethon Kids Institute https://www.telethonkids.org.au/globalassets/media/documents/brain--behaviour/trans-pathwayreport-web.pdf

Streed, C. G., Beach, L. B., Caceres, B. A., Dowshen, N. L., Moreau, K. L., Mukherjee, M., Poteat, T., Radix, A., Reisner, S. L., & Singh, V. (2021). Assessing and addressing cardiovascular health in people who are transgender and gender diverse: A scientific statement from the American Heart Association. *Circulation*, 144(6). https://doi.org/10.1161/CIR.0000000000001003.

Stroumsa, D., & Wu, J. P. (2018). Welcoming transgender and nonbinary patients: Expanding the language of "women's health". *American Journal of Obstetrics and Gynecology*, 219(6), 585.e581–585.e585. https://doi.org/10.1016/j.ajog.2018.09.018.

Stübler, M. L., & Becker-Hebly, I. (2019). [Sexual experiences and sexual orientation among transgender adolescents]. *Zeitschrift für Sexualforschung*, 32(01), 5–16. https://doi.org/10.1055/a-0838-8965.

Stutterheim, S. E., van Dijk, M., Wang, H., & Jonas. K. J. (2021) The worldwide burden of HIV in transgender individuals: An updated systematic review and meta-analysis. *PLoS One*, 16(12): e0260063. https://doi.org/10.1371/journal.pone.0260063.

Subramanian, T., Chakrapani, V., Selvaraj, V., Noronha, E., Narang, A., & Mehendale, S. (2016). Mapping and size estimation of hijras and other trans-women in 17 states of India: First level findings. *International Journal of Health Sciences and Research*, 6(4), 345–353. https://www.ijhsr.org/IJHSR_Vol.6_Issue.4_April2016/48.pdf

Substance Abuse and Mental Health Services Administration. (2015). *Ending conversion therapy: Supporting and affirming LGBTQ youth*. HHS Publications.

Suchak, T., Hussey, J., Takhar, M., & Bellringer, J. (2015). Postoperative trans women in sexual health clinics: Managing common problems after vaginoplasty. *Journal of Family Planning and Reproductive Health Care*, 41(4), 245–247. https://doi.org/10.1136/jfprhc-2014-101091.

Suen, Y. T., Chan, R. C. H., & Wong, E. M. Y. (2018). Mental health of transgender people in Hong Kong: A community-driven, large-scale quantitative study documenting demographics and correlates of quality of life and suicidality. *Journal of Homosexuality*, 65(8), 1093–1113. https://doi.org/10.1080/00918369.2017.1368772.

Sundstrom and Fields v. Frank USDC D WI, Case No. 06-C-112, 2011.

Taliaferro, L. A., McMorris, B. J., Rider, G. N., & Eisenberg, M. E. (2019). Risk and protective factors for self-harm in a population-based sample of transgender youth. *Archives of Suicide Research*, 23(2), 203–221. https://doi.org/10.1080/13811118.2018.1430639.

Tamar-Mattis, S., Gamarel, K. E., Kantor, A., Baratz, A., Tamar-Mattis, A., & Operario, D. (2018). Identifying and counting individuals with differences of sex development conditions in population health research. *LGBT Health*, 5(5), 320–324. https://doi.org/10.1089/lgbt.2017.0180.

Tan, K. K. H., Treharne, G. J., Ellis, S. J., Schmidt, J. M., & Veale, J. F. (2021). Enacted stigma experiences and protective factors are strongly associated with mental health outcomes

of transgender people in Aotearoa/New Zealand. *International Journal of Transgender Health*, 22(3), 269–280. https://doi.org/10.1080/15532739.2020.1819504.

Tangpricha, V., & den Heijer, M. (2017). Oestrogen and anti-androgen therapy for transgender women. *Lancet Diabetes & Endocrinology*, 5(4), 291–300. https://doi.org/10.1016/S2213-8587(16)30319-9.

Tatum, A. K., Catalpa, J., Bradford, N. J., Kovic, A., & Berg, D. R. (2020). Examining identity development and transition differences among binary transgender and genderqueer nonbinary (GQNB) individuals. *Psychology of Sexual Orientation and Gender Diversity*, 7(4), 379–385. https://doi.org/10.1037/sgd0000377.

Taub, R. L., Ellis, S. A., Neal-Perry, G., Magaret, A. S., Prager, S. W., & Micks, E. A. (2020). The effect of testosterone on ovulatory function in transmasculine individuals. *American Journal of Obstetrics and Gynecology*, 223(2), 229–e1. https://doi.org/10.1016/j.ajog.2020.01.059.

Tavakkoli Tabassi, K., Djavan, B., Hosseini, J., Ghoreifi, A., Ershadi, M., & Hosseini, E. (2015). Fold-back perineoscrotal flap plus penile inversion vaginoplasty for male-to-female gender reassignment surgery in circumcised subjects. *European Journal of Plastic Surgery*, 38(1), 43–48. https://doi.org/10.1007/s00238-014-1038-1.

Taylor, A. K., Condry, H., and Cahill, D. (2018). Implementation of teaching on LGBT health care. *Clinical Teacher*, 15(2),141–144. https://doi.org/10.1111/tct.12647.

Taylor, J., Zalewska, A., Gates, J. J., & Millon, G. (2019). An exploration of the lived experiences of non-binary individuals who have presented at a gender identity clinic in the United Kingdom. *International Journal of Transgenderism*, 20(2-3), 195–204. https://doi.org/10.1080/15532739.2018.1445056.

Telfer, M. M., Tollit, M. A., Pace, C. C., & Pang, K. C. (2018). Australian standards of care and treatment guidelines for transgender and gender diverse children and adolescents. *Medical Journal of Australia*, 209(3), 132–136. https://doi.org/10.5694/mja17.01044.

Telfer, M. M., Tollit, M. A., Pace, C. C., & Pang, K. C. (2020). *Australian standards of care and treatment guidelines for trans and gender diverse children and adolescents, Version 1.3*. The Royal Children's Hospital. https://www.rch.org.au/uploaded-Files/Main/Content/adolescent-medicine/australian-standards-of-care-and-treatment-guidelines-for-trans-and-gender-diverse-children-and-adolescents.pdf

Temple Newhook, J., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., Sinnott, M.-L., Jamieson, A., & Pickett, S. (2018). A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children. *International Journal of Transgenderism*, 19(2), 212–224. https://doi.org/10.1080/15532739.2018.1456390.

Ter Wengel, P. V., Martin, E., Gooren, L., Den Heijer, M., & Peerdeman, S. M. (2016). Meningiomas in three male-to-female transgender subjects using oestrogens/progestogens and review of the literature. *Andrologia*, 48(10), 1130–1137. https://doi.org/10.1111/and.12550.

Testa, R. J., Michaels, M. S., Bliss, W., Rogers, M. L., Balsam, K. F., & Joiner, T. (2017). Suicidal ideation in transgender people: Gender minority stress and interpersonal theory factors. *Journal of Abnormal Psychology*, 126(1), 125–136. https://doi.org/10.1037/abn0000234.

Testa, R. J., Sciacca, L. M., Wang, F., Hendricks, M. L., Goldblum, P., Bradford, J., & Bongar, B. (2012). Effects of violence on transgender people. *Professional Psychology: Research and Practice*, 43(5), 452. https://doi.org/10.1037/a0029604.

TGEU. (2017). *Overdiagnosed but underserved. Trans healthcare in Georgia, Poland, Serbia, Spain, and Sweden: trans health survey*. Transgender Europe. https://tgeu.org/healthcare/

TGEU. (2021). *Trans rights map 2021*. Transgender Europe. https://transrightsmap.tgeu.org/home/

Thalaivirithan, B. M., Sethu, M., Ramachandran, D. K., Kandasamy, M., & Janardhanam, J. (2018). Application of embryonic equivalents in male-to-female sex reassignment surgery. *India Journal of Plastic Surgery*, 51(2), 155–166. https://doi.org/10.4103/ijps.IJPS_62_18.

The Institute of Medicine. (2011). *The health of lesbian, gay, bisexual, and transgender people: Building a foundation for better understanding*. http://www.nationalacademies.org/hmd/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx

The Joint Commission. (2011). *Advancing effective communication, cultural competence, and patient- and family-centered care for the lesbian, gay, bisexual and transgender (LGBT) community* [Field Guide]. https://www.jointcommission.org/assets/1/18/LGBTFieldGuide_WEB_LINKED_VER.pdf

The Yogyakarta Principles. (2017). *The Yogyakarta Principles Plus 10: Additional principles and state obligations on the application of international human rights law in relation to sexual orientation, gender identity, gender expression, and sex characteristics to complement the Yogyakarta Principles*. http://yogyakartaprinciples.org/wp-content/uploads/2017/11/A5_yogyakartaWEB-2.pdf

Therell, B. L. (2001). Newborn screening for congenital adrenal hyperplasia. *Endocrinology and Metabolism Clinics of North America*, 30(1), 15–30. https://doi.org/10.1016/s0889-8529(08)70017-3.

Theron, L., & Collier, K. L. (2013). Experiences of female partners of masculine-identifying trans persons. *Culture, Health & Sexuality*, 15, 62–75. https://doi.org/10.1080/13691058.2013.788214.

Thomas, J. P., & Macmillan, C. (2013). Feminization laryngoplasty: Assessment of surgical pitch elevation. *European Archives of Oto-Rhino-Laryngology*, 270(10), 2695–2700. https://doi.org/10.1007/s00405-013-2511-3.

Thoreson, N., Marks, D. H., Peebles, J. K., King, D. S., & Dommasch, E. (2020) Health insurance coverage of permanent hair removal in transgender and gender-minority patients. *JAMA Dermatology*. 2156(5), 561–565. https://doi.org/10.1001/jamadermatol.2020.0480.

Thorne, N., Witcomb, G. L., Nieder, T., Nixon, E., Yip, A., & Arcelus, J. (2019). A comparison of mental health

symptomatology and levels of social support in young treatment seeking transgender individuals who identify as binary and non-binary *International Journal of Transgenderism*, 20(2-3), 241–250. https://doi.org/10.1080/15532739.2018.1452660.

Thorne, N., Yip, A. K.-T., Bouman, W. P., Marshall, E., & Arcelus, J. (2019). The terminology of identities between, outside and beyond the gender binary—A systematic review. *The International Journal of Transgenderism*, 20(2-3), 138–154. https://doi.org/10.1080/15532739.2019.1640654.

Thurston, M. D., & Allan, S. (2018). Sexuality and sexual experiences during gender transition: A thematic synthesis. *Clinical Psychological Review*, 66, 39–50. https://doi.org/10.1016/j.cpr.2017.11.008.

Thyen, U., Ittermann, T., Flessa, S., Muehlan, H., Birnbaum, W., Rapp, M., Marshall, L., Szarras-Capnik, M., Bouvattier, C., Kreukels, B. P. C., Nordenstroem, A., Roehle, R., & Koehler, B. (2018). Quality of health care in adolescents and adults with disorders/differences of sex development (DSD) in six European countries (dsd-LIFE). *BMC Health Services Research*, 18(1). https://doi.org/10.1186/s12913-018-3342-0.

Thyen, U., Richter-Appelt, H., Wiesemann, C., Holterhus, P.-M., & Hiort, O. (2005). Deciding on gender in children with intersex conditions. *Treatments in Endocrinology*, 4(1), 1–8. https://doi.org/10.2165/00024677-200504010-00001.

Timmermans, S., Yang, A., Gardner, M., Keegan, C. E., Yashar, B. M., Fechner, P. Y., Shnorhavorian, M., Vilain, E., Siminoff, L. A., & Sandberg, D. E. (2018). Does patient-centered care change genital surgery decisions? The strategic use of clinical uncertainty in disorders of sex development clinics. *Journal of Health and Social Behavior*, 59(4), 520–535. https://doi.org/10.1177/0022146518802460.

Timmermans, S., Yang, A., Gardner, M., Keegan, C. E., Yashar, B. M., Fechner, P. Y., Shnorhavorian, M., Vilain, E., Siminoff, L. A., & Sandberg, D. E. (2019). Gender destinies: Assigning gender in disorders of sex development—Intersex clinics. *Sociology of Health & Illness*, 41(8), 1520–1534. https://doi.org/10.1111/1467-9566.12974.

Tirapegui, F. I., Acar, Ö., & Kocjancic, E. (2020). Sexual function after gender-affirming genital reconstruction. *Current Sexual Health Reports*, 12(4), 411–420. https://doi.org/10.1007/s11930-020-00294-0.

Tiryaki, S., Tekin, A., Yagmur, İ., Özen, S., Özbaran, B., Gökşen, D., … Avanoğlu, A. (2018). Parental perception of terminology of disorders of sex development in Western Turkey. *Journal of Clinical Research in Pediatric Endocrinology*, 10(3), 216–222. https://doi.org/10.4274/jcrpe.0007.

Tishelman, A. C., Shumer, D. E., Nahata, L. (2017). Disorders of sex development: Pediatric psychology and the genital exam. *Journal of Pediatric Psychology*, 42(5), 530–543. https://doi.org/10.1093/jpepsy/jsw015.

Tishelman, A. C., Haney, P., Greenwald O'Brien, J., & Blaustein, M. E. (2010). A framework for school-based psychological evaluations: Utilizing a "trauma lens." *Journal of Child & Adolescent Trauma*, 3(4), 279–302. https://doi.org/10.1080/19361521.2010.523062.

Tishelman, A. C., Kaufman, R., Edwards-Leeper, L., Mandel, F. H., Shumer, D. E., & Spack, N. P. (2015). Serving transgender youth: Challenges, dilemmas, and clinical examples. *Professional Psychology: Research and Practice*, 46(1), 37–45. https://doi.org/10.1037/a0037490.

Tishelman, A. C., Sutter, M. E., Chen, D., Sampson, A., Nahata, L., Kolbuck, V. D., & Quinn, G. P. (2019). Health care provider perceptions of fertility preservation barriers and challenges with transgender patients and families: Qualitative responses to an international survey. *Journal of Assisted Reproduction and Genetics*, 36(3), 579–588. https://doi.org/10.1007/s10815-018-1395-y.

Tishelman, A., & Neumann-Mascis, A. (2018). *Gender-related trauma*. In *The gender affirmative model: An interdisciplinary approach to supporting transgender and gender expansive children* (pp. 85–100). American Psychological Association.

Tollemache, N., Shrewsbury, D., & Llewellyn, C. (2021). Que (e) rying undergraduate medical curricula: A cross-sectional online survey of lesbian, gay, bisexual, transgender, and queer content inclusion in UK undergraduate medical education. *BMC Medical Education*, 21(1), 100. https://doi.org/10.1186/s12909-021-02532-y.

Tollinche, L. E., Walters, C. B., Radix, A., Long, M., Galante, L., Goldstein, Z. G., Kapinos, Y., & Yeoh, C. (2018). The perioperative care of the transgender patient. *Anesthesia and Analgesia*, 127(2), 359–366. https://doi.org/10.1213/ANE.0000000000003371.

Tollit, M. A., Feldman, D., McKie, G., & Telfer, M. M. (2018). Patient and parent experiences of care at a pediatric gender service. *Transgender Health*, 3(1), 251–256. https://doi.org/10.1089/trgh.2018.0016.

Tollit, M. A., Pace, C. C., Telfer, M., Hoq, M., Bryson, J., Fulkoski, N., Cooper, C., & Pang, K. C. (2019). What are the health outcomes of trans and gender diverse young people in Australia? Study protocol for the Trans20 longitudinal cohort study. *BMJ Open*, 9(11), e032151. https://doi.org/10.1136/bmjopen-2019-032151.

Tomson, A., McLachlan, C., Wattrus, C., Adams, K., Addinall, R., Bothma, R., Jankelowitz, L., Kotze, E., Luvuno, Z., Madlala, N., Matyila, S., Padavatan, A., Pillay, M., Rakumakoe, M. D., Tomson-Myburgh, M., Venter, W. D. F., & De Vries, A. (2021). Southern African HIV clinicians society gender-affirming healthcare guideline for South Africa. *Southern African Journal of HIV Medicine*, 22(1). https://doi.org/10.4102/sajhivmed.v22i1.1299.

Toomey, R. B., Ryan, C., Diaz, R. M., Card, N. A., & Russell, S. T. (2010). Gender-nonconforming lesbian, gay, bisexual, and transgender youth: School victimization and young adult psychosocial adjustment. *Developmental Psychology*, 46(6), 1580–1589. https://doi.org/10.1037/a0020705.

Toorians, A. W. F. T., Thomassen, M. C. L. G. D., Zweegman, S., Magdeleyns, E. J. P., Tans, G., Gooren, L. J. G., & Rosing,

J. (2003). Venous thrombosis and changes of hemostatic variables during cross-sex hormone treatment in transsexual people. *The Journal of Clinical Endocrinology & Metabolism, 88*(12), 5723–5729. https://doi.org/10.1210/jc.2003-030520.

Top, H., & Balta, S. (2017). Transsexual mastectomy: Selection of appropriate technique according to breast characteristics. *Balkan Medical Journal, 34*(2), 147–155. https://doi.org/10.4274/balkanmedj.2016.0093.

Topolewska-Siedzik, E., & Cieciuch, J. (2018). Trajectories of identity formation modes and their personality context in adolescence. *Journal of Youth and Adolescence, 47*(4), 775–792. https://doi.org/10.1007/s10964-018-0824-7.

Tordoff, D. M., Wanta, J. W., Collin, A., Stepney, C., Inwards-Breland, D. J., & Ahrens, K. (2022). Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care. *JAMA Network Open, 5*(2), e220978. https://doi.org/10.1001/jamanetworkopen.2022.0978.

Tornello, S. L., & Bos, H. (2017). Parenting intentions among transgender individuals. *LGBT Health, 4*(2), 115–120. https://doi.org/10.1089/lgbt.2016.0153.

Tosun, N. L., Fieberg, A. M., Eberly, L. E., Harrison, K. A., Tipp, A. R., Allen, A. M., & Allen, S. S. (2019). Exogenous progesterone for smoking cessation in men and women: A pilot double-blind, placebo-controlled randomized clinical trial. *Addiction, 114*(10), 1800–1813. https://doi.org/10.1111/add.14645.

TransCare. (2020). *Bind, pack and tuck.* http://www.phsa.ca/transcarebc/care-support/transitioning/bind-pack-tuck-pad

Travers, R., Bauer, G., Pyne, J., Bradley, K., Gale, L., & Papadimitriou, M. (2012). *Impacts of strong parental support for trans youth: A report prepared for Children's Aid Society of Toronto and Delisle Youth Services.* Trans Pulse Project. https://transpulseproject.ca/wp-content/uploads/2012/10/Impacts-of-Strong-Parental-Support-for-Trans-Youth-vFINAL.pdf.

Trevor Project. (2021). *The mental health and well-being of LGBTQ Youth who are Intersex.* https://www.thetrevorproject.org/wp-content/uploads/2021/12/Intersex-Youth-Mental-Health-Report.pdf

Trispiotis, I., & Purshouse, C. (2022). 'Conversion therapy' as degrading treatment. *Oxford Journal of Legal Studies, 42*(1), 104–132. https://doi.org/10.1093/ojls/gqab024.

Trujillo, M. A., Perrin, P. B., Sutter, M., Tabaac, A., & Benotsch, E. G. (2017). The buffering role of social support on the associations among discrimination, mental health, and suicidality in a transgender sample. *International Journal of Transgenderism, 18*(1), 39–52. https://doi.org/10.1080/15532739.2016.1247405.

Tschan, S., Honegger, F., & Storck, C. (2016). Cricothyroid joint anatomy as a predicting factor for success of cricoid-thyroid approximation in transwomen. *The Laryngoscope, 126*(6), 1380–1384. https://doi.org/10.1002/lary.25518.

T'Sjoen, G., Arcelus, G., Gooren, L., Klink, D. T., & Tangpricha, V. (2019). Endocrinology of transgender medicine. *Endocrine Reviews, 40*(1), 97–117.https://doi.org/10.1210/er.2018-00011.

T'Sjoen, G., Arcelus, J., De Vries, A. L. C., Fisher, A. D., Nieder, T. O., Özer, M., & Motmans, J. (2020). European Society for Sexual Medicine position statement "Assessment and hormonal management in adolescent and adult trans people, with attention for sexual function and satisfaction." *The Journal of Sexual Medicine, 17*(4), 570–584. https://doi.org/10.1016/j.jsxm.2020.01.012.

T'Sjoen, G. G., Beguin, Y., Feyen, E., Rubens, R., Kaufman, J. M., & Gooren, L. (2005). Influence of exogenous oestrogen or (anti-) androgen administration on soluble transferrin receptor in human plasma. *Journal of Endocrinology, 186*(1), 61–67. https://doi.org/10.1677/joe.1.06112.

Turban, J. L., Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *JAMA Psychiatry, 77*(1), 68–76. https://doi.org/10.1001/jamapsychiatry.2019.2285.

Turban, J. L., Carswell, J., & Keuroghlian, A. S. (2018). Understanding pediatric patients who discontinue gender-affirming hormonal interventions. *JAMA Pediatrics, 172*(10), 903–904. https://doi.org/10.1001/jamapediatrics.2018.1817.

Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, e20191725. https://doi.org/10.1542/peds.2019-1725.

Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One, 17*(1), e0261039. https://doi.org/10.1371/journal.pone.0261039.

Turban, J. L., King, D., Reisner, S. L., Keuroghlian, A. S. (2019). Psychological attempts to change a person's gender identity from transgender to cisgender: Estimated prevalence across US States, 2015. *American Journal of Public Health* 109, 1452–1454. https://doi.org/10.2105/AJPH.2019.305237.

Turban, J. L., King, D., Li, J. J., & Keuroghlian, A. S. (2021). Timing of social transition for transgender and gender diverse youth, K-12 harassment, and adult mental health outcomes. *Journal of Adolescent Health, 69*(6), 991–998. https://doi.org/10.1016/j.jadohealth.2021.06.001.

Turban, J. L., Loo, s. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors leading to "detransition" among transgender and gender diverse people in the United States: A mixed-methods analysis. *LGBT Health, 8*(4), 273–280. https://doi.org/10.1089/lgbt.2020.0437.

Tuzun, Z., Başar, K., & Akgul, S. (2022). Social connectedness matters: Depression and anxiety in transgender youth during the COVID-19 pandemic. *The Journal of Sexual Medicine, 19*(4), 650–660. https://doi.org/10.1016/j.sxm.2022.01.522.

Twist, J., & de Graaf, N. (2019). Gender diversity and non-binary presentations in young people attending the



United Kingdom's national Gender Identity Development Service. *Clinical Child Psychology and Psychiatry*, 24(2), 277–290. https://doi.org/10.1177/1359104518804311.

UN Human Rights Council. (2020). *Practices of so-called "conversion therapy": Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity*. https://doi.org/10.1163/2210-7975_HRD-9970-2016149.

UNDP & APTN. (2017). *Legal gender recognition: a multi-country legal and policy review in Asia*. Asia-Pacific Transgender Network. https://weareaptn.org/resource/legal-gender-recognition-a-multi-country-legal-and-policy-review-in-asia/

UNDP, IRGT. (2016). *Implementing comprehensive HIV and STI programmes with transgender people: Practical guidance for collaborative interventions*. United Nations Development Programme. https://www.unfpa.org/sites/default/files/pub-pdf/TRANSIT_report_UNFPA.pdf

United Nations Population Fund. (2014). *Reproductive rights are human rights: A handbook for national human rights institutions*. https://www.ohchr.org/documents/publications/nhrihandbook.pdf

United Nations. (1948). Universal Declaration of Human Rights. Retrieved from http://www.un.org/en/universal-declaration-human-rights/

United Nations. (2015). *The United Nations standard minimum rules for the treatment of prisoners*. https://www.unodc.org/documents/justice-and-prison-reform/GA-RESOLUTION/E_ebook.pdf

United States Department of Health and Human Services. (2013). *Lesbian, gay, bisexual and transgender health*. https://www.healthypeople.gov/2020/topics-objectives/topic/lesbian-gay-bisexual-and-transgender-health

Valashany, B. T., & Janghorbani, M. (2018). Quality of life of men and women with gender identity disorder. *Health and Quality of Life Outcomes*, 16(1), 167. https://doi.org/10.1186/s12955-018-0995-7.

Vale, K., Siemens, I., Johnson, T. W., & Wassersug, R. J. (2013). Religiosity, childhood abuse, and other risk factors correlated with voluntary genital ablation. *Canadian Journal of Behavioural Science/Revue Canadienne Des Sciences Du Comportement*, 45(3), 230–237. https://doi.org/10.1037/a0031122.

Valentine, V. (2016). *Non-binary people's experiences of using UK gender identity clinics*. S. T. E. Network. https://www.scottishtrans.org/wp-content/uploads/2016/11/Non-binary-GIC-mini-report.pdf

Van Batavia, J. P., & Kolon, T. F. (2016). Fertility in disorders of sex development: A review. *Journal of Pediatric Urology*,12(6), 418–425. https://doi.org/10.1016/j.jpurol.2016.09.015.

Van Boerum, M. S., Salibian, A. A., Bluebond-Langner, R., & Agarwal, C. (2019). Chest and facial surgery for the transgender patient. *Translational Andrology and Urology*, 8(3), 219–227. https://doi.org/10.21037/tau.2019.06.18.

Van Borsel, J., De Cuypere, G., Rubens, R., & Destaerke, B. (2000). Voice problems in female-to-male transsexuals.

*International Journal of Language & Communication Disorders*, 35(3), 427–442. https://doi.org/10.1080/136828200410672.

Van Borsel, J., Van Eynde, E., De Cuypere, G., & Bonte, K. (2008). Feminine after cricothyroid approximation? *Journal of Voice*, 22(3), 379–384. https://doi.org/10.1016/j.jvoice.2006.11.001.

Van Caenegem, E., Taes, Y., Wierckx, K., Vandewalle, S., Toye, K., Kaufman, J. M., Schreiner, T., Haraldsen, I., & T'Sjoen, G. (2013). Low bone mass is prevalent in male-to-female transsexual persons before the start of cross-sex hormonal therapy and gonadectomy. *Bone*, 54(1), 92–97. https://doi.org/10.1016/j.bone.2013.01.039.

Van Caenegem, E., Verhaeghe, E., Taes, Y., Wierckx, K., Toye, K., Goemaere, S., Zmierczak, H. G., Hoebeke, P., Monstrey, S., & T'Sjoen, G. (2013). Long-term evaluation of donor-site morbidity after radial forearm flap phalloplasty for transsexual men. *The Journal of Sexual Medicine*, 10(6), 1644–1651. https://doi.org/10.1111/jsm.12121.

Van Caenegem, E., Wierckx, K., Elaut, E., Buysse, A., Dewaele, A., Van Nieuwerburgh, F., De Cuypere, G., & T'Sjoen, G. (2015). Prevalence of gender nonconformity in Flanders, Belgium. *Archives of Sexual Behavior*, 44(5), 1281–1287. https://doi.org/10.1007/s10508-014-0452-6.

Van Caenegem, E., Wierckx, K., Taes, Y., Schreiner, T., Vandewalle, S., Toye, K., Lapauw, B., Lapauw, J. M., & T'Sjoen, G. (2015). Body composition, bone turnover, and bone mass in trans men during testosterone treatment: 1-year follow-up data from a prospective case-controlled study (ENIGI). *European Journal of Endocrinology*, 172(2), 163–171. https://doi.org/10.1530/EJE-14-0586.

Van de Grift, T. C., Cohen-Kettenis, P. T., de Vries, A. L. C., & Kreukels, B. P. C.; on behalf of dsd-LIFE. (2018). Body image and self-esteem in disorders of sex development: A European multicenter study. *Health Psychology*, 37(4), 334–343. https://doi.org/10.1037/hea0000600.

Van de Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., De Cuypere, G., Richter-Appelt, H., & Kreukels, B. P. C. (2017). Effects of medical interventions on gender dysphoria and body image: A follow-up study. *Psychosomatic Medicine*, 79(7), 815–823. https://doi.org/10.1097/PSY.0000000000000465.

Van de Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., & Kreukels, B. P. C. (2018). Surgical satisfaction, quality of life, and their association after gender-affirming surgery: A follow-up study. *Journal of Sexual and Marital Therapy*, 44(2), 138–148. https://doi.org/10.1080/0092623X.2017.1326190.

Van de Grift, T. C., Elfering, L., Greijdanus, M., Smit, J. M., Bouman, M. B., Klassen, A. F., & Mullender, M. G. (2018). Subcutaneous mastectomy improves satisfaction with body and psychosocial function in trans men: Findings of a cross-sectional study using the BODY-Q chest module. *Plastic Reconstructive Surgery*, 142(5), 1125–1132. https://doi.org/10.1097/PRS.0000000000004827.

S240   E. COLEMAN ET AL.

Van de Grift, T. C., Kreukels, B. P. C., Elfering, L., Özer, M., Bouman, M.-B., Buncamper, M. E., Smit, J. M., & Mullender, M. G. (2016). Body image in transmen: Multidimensional measurement and the effects of mastectomy. *The Journal of Sexual Medicine*, 13(11), 1778–1786. https://doi.org/10.1016/j.jsxm.2016.09.003.

Van de Grift, T. C., Pigot, G. L. S., Boudhan, S., Elfering, L., Kreukels, B. P. C., Gijs, L., Buncamper, M. E., Ozer, M., van der Sluis, W., Meuleman, E. J. H., Bouman, M. B., & Mullender, M. G. (2017). A longitudinal study of motivations before and psychosexual outcomes after genital gender-confirming surgery in transmen. *Journal of Sexual Medicine*, 14(12), 1621–1628. https://doi.org/10.1016/j.jsxm.2017.10.064.

Van de Grift, T., Van Gelder, Z., Mullender, M., Steensma, T., de Vries, ALC., & Bouman, M. (2020). Timing of puberty suppression and surgical options for transgender youth. *Pediatrics*, 146(5), e20193653. https://doi.org/10.1542/peds.2019-3653.

Van Der Miesen, A. I., Hurley, H., & De Vries, A. L. (2016). Gender dysphoria and autism spectrum disorder: A narrative review. *International Review of Psychiatry*, 28(1), 70–80. https://doi.org/10.3109/09540261.2015.1111199.

Van der Miesen, A., Steensma, T. D., de Vries, A., Bos, H., & Popma, A. (2020). Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers. *The Journal of Adolescent Health*, 66(6), 699–704. https://doi.org/10.1016/j.jadohealth.2019.12.018.

Van der Sluis, W. B., de Haseth, K. B., Elfering, L., Özer, M., Smit, J. M., Budding, A. E., van Bodegraven, A. A., Buncamper, M. E., de Boer, N. K. H., Mullender, M. G., & Bouman, M. B. (2020). Neovaginal discharge in transgender women after vaginoplasty: A diagnostic and treatment algorithm. *International Journal of Transgender Health*, 21(4), 367–372. https://doi.org/10.1080/26895269.2020.1725710.

Van der Sluis, W. B., Smit, J. M., Pigot, G. L. S., Buncamper, M. E., Winters, H. A. H., Mullender, M. G., & Bouman, M. B. (2017). Double flap phalloplasty in transgender men: Surgical technique and outcome of pedicled anterolateral thigh flap phalloplasty combined with radial forearm free flap urethral reconstruction. *Microsurgery*, 37(8), 917–923. https://doi.org/10.1002/micr.30190.

Van Dijk, D., Dekker, M., Conemans, E. B., Wiepjes, C. M., de Goeij, E. G. M., Overbeek, K. A., & T'Sjoen, G. (2019). Explorative prospective evaluation of short-term subjective effects of hormonal treatment in trans people—Results from the European Network for the Investigation of Gender Incongruence. *The Journal of Sexual Medicine*, 16(8), 1297–1309. https://doi.org/10.1016/j.jsxm.2019.05.009.

Van Gerwen, O. T., Aryanpour, Z., Selph, J. P., & Muzny, C. A. (2021). Anatomical and sexual health considerations among transfeminine individuals who have undergone vaginoplasty: A review. *International Journal of STD and AIDS*, 33(2), 106–113. https://doi.org/10.1177/09564624211046997.

Van Kesteren, P. J., Asscheman, H., Megens, J. A., & Gooren, L. J. (1997). Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clinical Endocrinology*, 47(3), 337–342. https://doi.org/10.1046/j.1365-2265.1997.2601068.x.

Van Leijenhorst, L., Zanolie, K., Van Meel, C. S., Westenberg, P. M., Rombouts, S. A. R. B., & Crone, E. A. (2009). What motivates the adolescent? Brain regions mediating reward sensitivity across adolescence. *Cerebral Cortex*, 20(1), 61–69. https://doi.org/10.1093/cercor/bhp078.

Vandenbussche, E. (2021). Detransition-related needs and support: A cross-sectional online survey. *Journal of Homosexuality*, 69(9), 1602–1620. https://doi.org/10.1080/00918369.2021.1919479.

Vanderburgh, R. (2009). Appropriate therapeutic care for families with pre-pubescent transgender/gender-dissonant children. *Child Adolescent Social Work Journal*, 26, 135–154. https://doi.org/10.1007/s10560-008-0158-5.

Various. (2019). *Memorandum of understanding on conversion therapy in the UK. Version 2, Revision A.* British Association of Counselling and Psychotherapy. https://www.bacp.co.uk/events-and-resources/ethics-and-standards/mou/

Various. (2021). *U. S. joint statement on ending conversion therapy.* https://usjs.org/usjs-current-draft/

Veale, J., Byrne, J., Tan, K., Guy, S., Yee, A., Nopera, T., & Bentham, R. (2019). *Counting ourselves: The health and wellbeing of trans and non-binary people in Aotearoa, New Zealand.* https://countingourselves.nz/wp-content/uploads/2020/01/Counting-Ourselves_Report-Dec-19-Online.pdf

Veerman, H., de Rooij, F. P. W., Al-Tamimi, M., Ronkes, B. L., Mullender, M. G., M, B. B., van der Sluis, W. B., & Pigot, G. L. S. (2020). Functional outcomes and urological complications after genital gender affirming surgery with urethral lengthening in transgender men. *Journal of Urology*, 204(1), 104–109. https://doi.org/10.1097/JU.0000000000000795.

Vereecke, G., Defreyne, J., Van Saen, D., Collect, S., Van Dorpe, J., T'Sjoen, G., & Gooseens, E. I. (2021). Characterisation of testicular function and spermatogenesis in transgender women. *Human Reproduction*, 36(1), 5–15. https://doi.org/10.1093/humrep/deaa254.

Vermeir, E., Jackson, L. A., & Marshall, E. G. (2018). Improving healthcare providers' interactions with trans patients: Recommendations to promote cultural competence. *Healthcare Policy*, 14(1), 11–18. https://doi.org/10.12927/hcpol.2018.25552.

Vincent, B. (2018). *Transgender Health: A Practitioner's Guide to Binary and Non-Binary Trans Patient Care.* Jessica Kingsley Publishers.

Vincent, B. (2019). Breaking down barriers and binaries in trans healthcare: The validation of non-binary people. *International Journal of Transgenderism*, 20(2-3), 132–137. https://doi.org/10.1080/15532739.2018.1534075.

Vincent, B. (2020). *Non-binary genders: Navigating communities, identities, and healthcare.* Policy Press.

Vincent, B., & Manzano, A. (2017). History and Cultural Diversity. In C. Richards, W. P. Bouman, & M. J. Barker (Eds.), *Genderqueer and non-binary genders.* Palgrave Macmillan.

Vinogradova, Y., Coupland, C., & Hippisley-Cox, J. (2019). Use of hormone replacement therapy and risk of venous thromboembolism: Nested case-control studies using the QResearch and CPRD databases. *British Medical Journal, 364,* k4810. https://doi.org/10.1136/bmj.k4810.

Vlot, M. C., Klink, D. T., den Heijer, M., Blankenstein, M. A., Rotteveel, J., & Heijboer, A. C. (2017). Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents. *Bone, 95,* 11–19. https://doi.org/10.1016/j.bone.2016.11.008.

Von Doussa, H., Power, J., & Riggs, D. (2015). Imagining parenthood: The possibilities and experiences of parenthood among transgender people. *Culture Health & Sexuality, 17*(9), 1119–1131. https://doi.org/10.1080/13691058.2015.1042919.

Vrouenraets, L. J. J. J., de Vries, A. L. C., de Vries, M. C., van der Miesen, A. I. R., & Hein, I. M. (2021). Assessing medical decision-making competence in transgender youth. *Pediatrics, 148*(6). https://doi.org/10.1542/peds.2020-049643.

Vukadinovic, V., Stojanovic, B., Majstorovic, M., & Milosevic, A. (2014). The role of clitoral anatomy in female to male sex reassignment surgery. *Scientific World Journal, 2014,* 437378. https://doi.org/10.1155/2014/437378.

Vyas, N., Douglas, C. R., Mann, C., Weimer, A. K., & Quinn, M. M. (2021). Access, barriers, and decisional regret in pursuit of fertility preservation among transgender and gender-diverse individuals. *Fertility and Sterility, 115*(4), 1029–1034. https://doi.org/10.1016/j.fertnstert.2020.09.007.

Waal, H. A. D., & Cohen-Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology, 155*(1), S131–S137. https://doi.org/10.1530/eje.1.02231.

Wagner, I., Fugain, C., Monneron-Girard, L., Cordier, B., & Chabolle, F. (2003). Pitch-raising surgery in fourteen male-to-female transsexuals. *The Laryngoscope, 113*(7), 1157–1165. https://doi.org/10.1097/00005537-200307000-00011.

Wagner, S., Panagiotakopoulos, L., Nash, R., Bradlyn, A., Getahun, D., Lash, T. L., Roblin, D., Silverberg, M. J., Tangpricha, V., Vupputuri, S., & Goodman, M. (2021). Progression of gender dysphoria in children and adolescents: A longitudinal study. *Pediatrics, 148*(1), e2020027722. https://doi.org/10.1542/peds.2020-027722.

Walker, R. V., Powers, S. M., & Witten, T. M. (2017). Impact of anticipated bias from healthcare professionals on perceived successful aging among transgender and gender nonconforming older adults. *LGBT Health, 4*(6), 427–433. https://doi.org/10.1089/lgbt.2016.0165.

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child & Adolescent Psychiatry, 47*(12), 1413–1423. https://doi.org/10.1097/CHI.0b013e31818956b9.

Walton, M. T., Lykins, A. D., & Bhullar, N. (2016). Beyond heterosexual, bisexual, and homosexual: A diversity in sexual identity expression. *Archives of Sexual Behavior, 45*(7), 1591–1597. https://doi.org/10.1007/s10508-016-0778-3.

Wang, Y., Yu, H., Yang, Y., Drescher, J., Li, R., Yin, W., Yu, R., Wang, S., Deng, W., Jia, Q., Zucker, K. J., & Chen, R. (2020). Mental health status of cisgender and gender-diverse secondary school students in China. *JAMA Network Open, 3*(10), e2022796. https://doi.org/10.1001/jamanetworkopen.2020.22796.

Warwick, R. M., Araya, A. C., Shumer, D. E., & Selkie, E. M. (2022). Transgender youths' sexual health and education: A qualitative analysis. *Journal of Pediatric and Adolescent Gynecology, 35*(2), 138–146. https://doi.org/10.1016/j.jpag.2021.09.011.

Wassersug, R. J., & Johnson, T. W. (2007). Modern-day Eunuchs: Motivations for and consequences of contemporary castration. *Perspectives in Biology and Medicine, 50*(4), 544–556. https://doi.org/10.1353/pbm.2007.0058.

Wassersug, R. J., & Lieberman, T. (2010). Contemporary castration: why the modern day eunuch remains invisible. *BMJ, 341*(2), c4509–c4509. https://doi.org/10.1136/bmj.c4509.

Wassersug, R. J., Walker, L. M., & Robinson, J. W. (2018). *Androgen deprivation therapy : an essential guide for prostate cancer patients and their loved ones.* Demos Health.

Watson, R. J., Wheldon, C. W., & Puhl, R. M. (2020). Evidence of diverse identities in a large national sample of sexual and gender minority adolescents. *Journal of Research on Adolescence, 30*(S2), 431–442. https://doi.org/10.1111/jora.12488.

Watt, S. O., Tskhay, K. O., & Rule, N. O. (2018). Masculine voices predict well-being in female-to-male transgender individuals. *Archives of Sexual Behavior, 47*(4), 963–972. https://doi.org/10.1007/s10508-017-1095-1.

Weaver, C. M., Alexander, D. D., Boushey, C. J., Dawson-Hughes, B., Lappe, J. M., LeBoff, M. S., Liu, S., Looker, A. C., Wallace, T. C., & Wang, D. D. (2016). Calcium plus vitamin D supplementation and risk of fractures: An updated meta-analysis from the National Osteoporosis Foundation. *Osteoporosis International, 27*(1), 367–376. https://doi.org/10.1007/s00198-015-3386-5.

Webb, H., Free, N., Oates, J., & Paddle, P. (2020). The use of vocal fold injection augmentation in a transmasculine patient unsatisfied with voice following testosterone therapy and voice training. *Journal of Voice, 36*(4), 588.e1–588.e6. S0892-1997(20)30298-8. https://doi.org/10.1016/j.jvoice.2020.08.011.

Wei, S. Y., Li, F. Y., Li, Q., Li, S. K., Zhou, C. D., Zhou, Y., Cao, Y. J., Zhang, S. Y., & Zhao, Y. (2018). Autologous buccal micro-mucosa free graft combined with posterior scrotal flap transfer for vaginoplasty in male-to-female transsexuals: A pilot study. *Aesthetic Plastic Surgery,*

42(1), 188–196. https://doi.org/10.1007/s00266-017-0977-x.

Weidler, E. M., Baratz, A., Muscarella, M., Hernandez, S. J., & van Leeuwen, K. (2019). A shared decision-making tool for individuals living with complete androgen insensitivity syndrome. *Seminars in Pediatric Surgery*, 28(5), 150844. https://doi.org/10.1016/j.sempedsurg.2019.150844.

Weidler, E. M., & Peterson, K. E. (2019). The impact of culture on disclosure in differences of sex development. *Seminars in Pediatric Surgery*, 28(5), 150840. https://doi.org/10.1016/j.sempedsurg.2019.150840.

Weigert, R., Frison, E., Sessiecq, Q., Al Mutairi, K., & Casoli, V. (2013). Patient satisfaction with breasts and psychosocial, sexual, and physical well-being after breast augmentation in male-to-female transsexuals. *Plastic Reconstructive Surgery*, 132(6), 1421–1429. https://doi.org/10.1097/01.prs.0000434415.70711.49.

Weill, A., Nguyen, P., Labidi, M., Cadier, B., Passeri, T., Duranteau, L., Bernat, A. L., Yoldjian, I., Fontanel, S., Froelich, S., & Coste, J. (2021). Use of high dose cyproterone acetate and risk of intracranial meningioma in women: Cohort study. *British Medical Journal (Clinical Research Edition.)*, 372, n37. https://doi.org/10.1136/bmj.n37.

Weinand, J. D., & Safer, J. D. (2015). Hormone therapy in transgender adults is safe with provider supervision; A review of hormone therapy sequelae for transgender individuals. *Journal of Clinical and Translational Endocrinology*, 2(2):55–60. https://doi.org/10.1016/j.jcte.2015.02.003.

Weinhardt, L. S., Stevens, P., Xie, H., Wesp, L. M., John, S. A., Apchemengich, I., Kioko, D., Chavez-Korell, S., Cochran, K. M., Watjen, J. M., & Lambrou, N. H. (2017). Transgender and gender nonconforming youths' public facilities use and psychological well-being: A mixed-method study. *Transgender Health*, 2(1), 140–150. https://doi.org/10.1089/trgh.2017.0020.

Weissler, J. M., Chang, B. L., Carney, M. J., Rengifo, D., Messa, C. A. t., Sarwer, D. B., & Percec, I. (2018). Gender-affirming surgery in persons with gender dysphoria. *Plastic Reconstructive Surgery*, 141(3), 388e-396e. https://doi.org/10.1097/PRS.0000000000004123.

Wendler, J. (1990). *Vocal pitch elevation after transsexualism male to female*. In: Proceedings of the Union of the European Phoniatricians, Salsomaggiore.

Wesp, L. (2016). *Transgender patients and the physical examination, gender affirming health program, UCSF*. https://transcare.ucsf.edu/guidelines/physical-examination

Weyers, S., Elaut, E., De Sutter, P., Gerris, J., T'Sjoen, G., Heylens, G., De Cuypere, G., & Verstraelen, H. (2009). Long-term assessment of the physical, mental, and sexual health among transsexual women. *The Journal of Sexual Medicine*, 6(3), 752–760. https://doi.org/10.1111/j.1743-6109.2008.01082.x.

Weyers, S., Villeirs, G., Vanherreweghe, E., Verstraelen, H., Monstrey, S., Van den Broecke, R., & Gerris, J. (2010). Mammography and breast sonography in transsexual

women. *European Journal of Radiology*, 74(3), 508–513. https://doi.org/10.1016/j.ejrad.2009.03.018.

White Hughto, J. M., & Reisner, S. L. (2016). A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgender Health*, 1(1), 21–31. https://doi.org/10.1089/trgh.2015.0008.

White Hughto, J. M., & Reisner, S. L. (2018). Social context of depressive distress in aging transgender adults. *Journal of Applied Gerontology*, 37(12), 1517–1539. https://doi.org/10.1177/0733464816675819.

White Hughto, J. M., Reisner, S. L., & Pachankis, J. E. (2015). Transgender stigma and health: A critical review of stigma determinants, mechanisms, and interventions. *Social Science & Medicine*, 147, 222–231. https://doi.org/10.1016/j.socscimed.2015.11.010.

Whyatt-Sames, J. (2017). Being brave: Negotiating the path of social transition with a transgender child in foster care. *Journal of GLBT Family Studies*, 13(4), 309–332. https://doi.org/10.1080/1550428X.2016.1241167.

Wibowo, E., Johnson, T., & Wassersug, R. (2016). Infertility, impotence, and emasculation—Psychosocial contexts for abandoning reproduction. *Asian Journal of Andrology*, 18(3), 403. https://doi.org/10.4103/1008-682x.173937.

Wibowo, E., Wassersug, R., Warkentin, K., Walker, L., Robinson, J., Brotto, L., & Johnson, T. (2012). Impact of androgen deprivation therapy on sexual function: A response. *Asian Journal of Andrology*, 14(5), 793–794. https://doi.org/10.1038/aja.2012.60.

Wibowo, E., Wong, S. T. S., Wassersug, R. J., & Johnson, T. W. (2021). Sexual function after voluntary castration. *Archives of Sexual Behavior*, 50(8), 3889–3899. https://doi.org/10.1007/s10508-021-02094-6.

Wiepjes, C. M., de Blok, C. J., Staphorsius, A. S., Nota, N. M., Vlot, M. C., de Jongh, R. T., & den Heijer, M. (2020). Fracture risk in trans women and trans men using long-term gender-affirming hormonal treatment: A nationwide cohort study. *Journal of the American Society for Bone and Mineral Research*, 35(1), 64–70. https://doi.org/10.1002/jbmr.3862.

Wiepjes, C. M., den Heijer, M., & T'Sjoen, G. G. (2019). Bone health in adult trans persons: An update of the literature. *Current Opinion in Endocrinology, Diabetes and Obesity*, 26(6), 296–300. https://doi.org/10.1097/MED.0000000000000502.

Wiepjes, C. M., Nota, N. M., de Blok, C. J. M., Klaver, M., de Vries, A. L. C., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M. B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). The Amsterdam cohort of Gender Dysphoria study (1972-2015): Trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine*, 15(4), 582–590. https://doi.org/10.1016/j.jsxm.2018.01.016.

Wiepjes, C. M., Vlot, M. C., Klaver, M., Nota, N. M., de Blok, C. J., de Jongh, R. T., Lips, P., Heijboer, A. C., Fisher, A. D., Schreiner, T., T'Sjoen, G., & den Heijer, M. (2017). Bone mineral density increases in trans persons after 1 year of hormonal treatment: A multicenter prospective



observational study. *Journal of Bone Mineral Research*, *32*(6), 1252–1260. https://doi.org/10.1002/jbmr.3102.

Wierckx, K., Elaut, E., Declercq, E., Heylens, G., De Cuypere, G., Taes, Y., Kaufman, J. M., & T'Sjoen, G. (2013). Prevalence of cardiovascular disease and cancer during cross-sex hormone therapy in a large cohort of trans persons: A case-control study. *European Journal of Endocrinology*, *169*(4), 471–478. https://doi.org/10.1530/EJE-13-0493.

Wierckx, K., Elaut, E., Van Caenegem, E., Van De Peer, F., Dedecker, D., Van Houdenhove, E., & T'Sjoen, G. (2011). Sexual desire in female-to-male transsexual persons: Exploration of the role of testosterone administration. *European Journal of Endocrinology*, *165*(2), 331–337. https://doi.org/10.1530/EJE-11-0250.

Wierckx, K., Elaut, E., Van Hoorde, B., Heylens, G., De Cuypere, G., Monstrey, S., Weyers, S., Hoebeke, P., & T'Sjoen, G. (2014). Sexual desire in trans persons: Associations with sex reassignment treatment. *The Journal of Sexual Medicine*, *11*(1), 107–118. https://doi.org/10.1111/jsm.12365.

Wierckx, K., Mueller, S., Weyers, S., Van Caenegem, E., Roef, G., Heylens, G., & T'Sjoen, G. (2012). Long-term evaluation of cross-sex hormone treatment in transsexual persons. *Journal of Sexual Medicine*, *9*(10), 2641–2651. https://doi.org/10.1111/j.1743-6109.2012.02876.x.

Wierckx, K., Stuyver, I., Weyers, S., Hamada, A., Agarwal, A., De Sutter, P., & T'Sjoen, G. (2012). Sperm freezing in transsexual women. *Archives of Sexual Behaviour*, *41*(5), 1069–1071. https://doi.org/10.1007/s10508-012-0012-x.

Wierckx, K., Van Caenegem, E., Elaut, E., Dedecker, D., Van de Peer, F., Toye, K.,T'Sjoen, G. (2011). Quality of life and sexual health after sex reassignment surgery in transsexual men. *Journal of Sexual Medicine*, *8*(12), 3379–3388. https://doi.org/10.1111/j.1743-6109.2011.02348.x.

Wierckx, K., Van Caenegem, E., Pennings, G., Elaut, E., Dedecker, D., Van de Peer, F., Weyers, S., De Sutter, P., & T'Sjoen, G. (2012). Reproductive wish in transsexual men. *Human Reproduction*, *27*(2), 483–487. https://doi.org/10.1093/humrep/der406.

Wierckx, K., Van Caenegem, E., Schreiner, T., Haraldsen, I., Fisher, A. D., Toye, K., Kaufman, J. M., & T'Sjoen, G. (2014). Cross-hormone therapy in trans persons is safe and effective at short-time follow-up: Results from the European network for the investigation of gender incongruence. *Journal of Sexual Medicine*, *11*(8), 1999–2011. https://doi.org/10.1111/jsm.12571.

Wierckx, K., Van de Peer, F., Verhaeghe, E., Dedecker, D., Van Caenegem, E., Toye, K., & T'Sjoen, G. (2014). Short- and long-term clinical skin effects of testosterone treatment in trans men. *Journal of Sexual Medicine*, *11*(1), 222–229. https://doi.org/10.1111/jsm.12366.

Wilchins, R. A. (1995). A note from your Editrix. *In Your Face: Political Activism against Gender Oppression*, *1*(1), 4.

Williams, A. J., Jones, C., Arcelus, J., Townsend, E., Lazaridou, A., & Michail, M. (2021). A systematic review and meta-analysis of victimisation and mental health

prevalence among LGBTQ + young people with experiences of self-harm and suicide. *PLoS One*, *16*(1), 1–26 https://doi.org/10.1371/journal.pone.0245268.

Wilson, B. D., & Meyer, I. H. (2021). *Nonbinary LGBTQ Adults in the United States*. UCLA School of Law Williams Institute.

Wilson, D., Marais, A., de Villiers, A., Addinall, R., & Campbell, M. M. (2014). Transgender issues in South Africa, with particular reference to the Groote Schuur Hospital Transgender Unit. *South African Medical Journal*, *104*(6), 449. https://doi.org/10.7196/SAMJ.8392.

Wilson, E. C., Chen, Y. H., Arayasirikul, S., Raymond, H. F., & McFarland, W. (2016). The impact of discrimination on the mental health of trans* female youth and the protective effect of parental support. *AIDS Behavior*, *20*(10), 2203–2211. https://doi.org/10.1007/s10461-016-1409-7.

Wilson, E. C., Chen, Y. H., Arayasirikul, S., Wenzel, C., & Raymond, H. F. (2015). Connecting the dots: Examining transgender women's utilization of transition-related medical care and associations with mental health, substance use, and HIV. *Journal of Urban Health*, *92*(1), 182–192. https://doi.org/10.1007/s11524-014-9921-4.

Wilson, E. C., Turner, C. M., Sanz-Rodriguez, C., Arayasirikul, S., Gagliano, J., Woods, T., Palafox, E., Halfin, J., Martinez, L., Makoni, B., Eskman, Z. (2021). Expanding the pie–differentiated PrEP delivery models to improve PrEP uptake in the San Francisco Bay area. *Journal of Acquired Immune Deficiency* Syndromes, *88*(1), S39–S48. https://doi.org/10.1097/QAI.0000000000002809.

Wilson, L. M., Baker, K. E., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2020). Effects of antiandrogens on prolactin levels among transgender women on estrogen therapy: A systematic review. *International Journal of Transgender Health*, *21*(4), 391–402. https://doi.org/10.1080/15532739.2020.1819505.

Wimalawansa, S. M., Fox, J. P., & Johnson, R. M. (2014). The measurable cost of complications for outpatient cosmetic surgery in patients with mental health diagnoses. *Aesthetic Surgery Journal*, *34*(2), 306–316. https://doi.org/10.1177/1090820X13519100.

Winter, S., & Doussantousse, S. (2009). Trans people, hormones, and health risks in Southeast Asia: A Lao study. *International Journal of Sexual Health*, *21*(1), 35–48. https://doi.org/10.1080/19317610802554141.

Winter, S., Diamond, M., Green, J., Karasic, D., Reed, T., Whittle, S., & Wylie, K. (2016). Transgender people: Health at the margins of society. *The Lancet*, *388*(10042), 390–400. https://doi.org/10.1016/S0140-6736(16)00683-8.

Winter, S., Settle, E., Wylie, K., Reisner, S., Cabral, M., Knudson, G., & Baral, S. (2016). Synergies in health and human rights: A call to action to improve transgender health. *The Lancet*, *388*(10042), 318–321. https://doi.org/10.1016/S0140-6736(16)30653-5.

Winters, K., & Ehrbar, R. D. (2010). Beyond conundrum: Strategies for diagnostic harm reduction. *Journal of Gay*

S244   E. COLEMAN ET AL.

& *Lesbian Mental Health*, 14(2), 130–138. https://doi.org/10.1080/19359705.2009.544922.

Winters, K., Temple Newhook, J., Pyne, J., Feder, S., Jamieson, A., Holmes, C., Sinnott, M.-L., Pickett, S., & Tosh, J. (2018). Learning to listen to trans and gender diverse children: A Response to Zucker (2018) and Steensma and Cohen-Kettenis (2018). *International Journal of Transgenderism*, 19(2), 246–250. https://doi.org/10.1080/15532739.2018.1471767.

Wisniewski, A. B, & Sandberg, D. E. (2015). Parenting children with disorders of sex development (DSD): A developmental perspective beyond gender. *Hormone and Metabolic Research*, 47(5), 375–379. https://doi.org/10.1055/s-0034-1398561.

Witcomb, G. L., Bouman, W. P., Claes, L., Brewin, N., Crawford, J., & Arcelus, J. (2018). Levels of depression in transgender people and its predictors: Results of a large matched control study with transgender people accessing clinical services. *Journal of Affective Disorders*, 235, 308–315. https://doi.org/10.1016/j.jad.2018.02.051.

Witcomb, G. L., Claes, L., Bouman, W. P., Nixon, E., Motmans, J., & Arcelus, J. (2019). Experiences and psychological wellbeing outcomes associated with bullying in treatment-seeking transgender and gender-diverse youth. *LGBT Health*, 6(5), 216–226. https://doi.org/10.1089/lgbt.2018.0179.

Witten, T. M., & Eyler, E. (2016). *Care of aging transgender and Gender Nonconforming Patients*. In R. Ettner, S. Monstrey, & E. Coleman (Eds.), *Principles of transgender medicine and surgery* (2nd ed., pp. 344–378). Routledge.

Witten, T. M. (2014). It's not all darkness: Robustness, resilience, and successful transgender aging. *LGBT Health*, 1(1), 24–33. https://doi.org/10.1089/lgbt.2013.0017.

Witten, T. M. (2017). Health and well-being of transgender elders. *Annual Review of Gerontology and Geriatrics*, 37(1), 27–41. https://doi.org/10.1891/0198-8794.37.27.

Wolfe-Christensen, C., Wisniewski, A. B., Mullins, A. J., Reyes, K. J., Austin, P., Baskin, L., Bernabé, K., Cheng, E., Fried, A., Frimberger, D., Galan, D., Gonzalez, L., Greenfield, S., Kolon, T., Kropp, B., Lakshmanan, Y., Meyer, S., Meyer, T., Nokoff, N. J., & Palmer, B. (2017). Changes in levels of parental distress after their child with atypical genitalia undergoes genitoplasty. *Journal of Pediatric Urology*, 13(1), 32.e1–32.e6. https://doi.org/10.1016/j.jpurol.2016.10.024.

Wolfe-Roubatis, E., & Spatz, D. L. (2015). Transgender men and lactation: What nurses need to know. *MCN American Journal of Maternal/Child Nursing*, 40(1), 32–38. https://doi.org/10.1097/nmc.0000000000000097.

Wolter, A., Diedrichson, J., Scholz, T., Arens-Landwehr, A., & Liebau, J. (2015). Sexual reassignment surgery in female-to-male transsexuals: an algorithm for subcutaneous mastectomy. *Journal of Plastic and Reconstructive Aesthetic Surgery*, 68(2), 184–191. https://doi.org/10.1016/j.bjps.2014.10.016.

Wolter, A., Scholz, T., Pluto, N., Diedrichson, J., Arens-Landwehr, A., & Liebau, J. (2018). Subcutaneous mastectomy in female-to-male transsexuals: Optimizing perioperative and operative management in 8 years clinical experience. *Journal of Plastic Reconstructive Aesthetic & Surgery*, 71(3), 344–352. https://doi.org/10.1016/j.bjps.2017.09.003.

Wong, W. I., van der Miesen, A. I. R., Li, T. G. F., MacMullin, L. N., & VanderLaan, D. P. (2019). Childhood social gender transition and psychosocial well-being: A comparison to cisgender gender variant children. *Clinical Practice in Pediatric Psychology*, 7(3), 241–253. https://doi.org/10.1037/cpp0000295.

Workowski, K. A., Bachmann, L. H., Chan, P. A., Johnston, C. M., Muzny, C. A., Park, I., Reno, H., Zenilman, J. M., & Bolan, G. A. (2021). Sexually transmitted infections treatment guidelines, 2021. *Morbidity and Mortality Weekly Report Recommendations and Reports*, 70(4). https://doi.org/10.15585/mmwr.rr7004a1.

World Bank Group. (2018). Life on the margins: Survey results of the experiences of LGBTI people in Southeastern Europe. http://documents.worldbank.org/curated/en/123651538514203449/pdf/130420-REPLACEMENT-PUBLIC-FINAL-WEB-Life-on-the-Margins-Survey-Results-of-the-Experiences-of-LGBTI-People-in-Southeastern-Europe.pdf

World Health Organization. (1992). *International Statistical Classification of Diseases and Related Health Problems* (10th revision). World Health organization.

World Health Organization. (2006). *Defining sexual health: Report of a technical consultation on sexual health*. World Health Organization

World Health Organization. (2007). *Prevention of cardiovascular disease: guidelines for assessment and management of total cardiovascular risk*. World Health Organization.

World Health Organization. (2010). *Developing sexual health programmes: A framework for action*. World Health Organization. https://www.who.int/reproductivehealth/publications/sexual_health/rhr_hrp_10_22/en/

World Health Organization. (2015a). *Brief sexuality-related communication: recommendations for a public health approach* World Health Organisation. https://apps.who.int/iris/bitstream/handle/10665/170251/9789241549004_eng.pdf.

World Health Organisation. (2015b). *Sexual health, human rights and the law*. World Health Organisation. https://www.who.int/reproductivehealth/publications/sexual_health/sexual-health-human-rights-law/en/

World Health Organisation. (2016). *Consolidated guidelines on HIV prevention, diagnosis, treatment and care for key populations: 2016 update*. World Health Organisation. https://www.who.int/publications/i/item/9789241511124

World Health Organization. (2018). *ICD-11—Mortality and morbidity statistics*. World Health Organization. https://icd.who.int/browse11/l-m/en

World Health Organization. (2019a). *International Statistical Classification of Diseases and Related Health Problems* (11th ed.). World Health Organization. https://icd.who.int/browse11/lm/en#/http://id.who.int/icd/entity/90875286

AR_275335

World Health Organization. (2019b). *Consolidated guidelines on HIV testing services*, https://www.who.int/publications/i/item/978-92-4-155058-1

World Health Organization. (2019c). *What's the 2 + 1+1? Event-driven oral pre-exposure prophylaxis to prevent HIV for men who have sex with men: Update to WHO's recommendation on oral PrEP*. World Health Organization. https://apps.who.int/iris/bitstream/handle/10665/325955/WHO-CDS-HIV-19.8-eng.pdf?ua=1

World Health Organization. (2019d). *WHO global report on traditional and complementary medicine*. World Health Organization. https://apps.who.int/iris/handle/10665/312342.

World Health Organization. (2020). Tobacco. http://www.who.int/health-topics/tobacco#tab=tab_1

World Health Organization. (2021a). *Consolidated guidelines on HIV prevention, testing, treatment, service delivery and monitoring: recommendations for a public health approach*. World Health Organization https://www.who.int/publications/i/item/9789240031593

World Health Organization. (2021b). *Consolidated guideline on self-care interventions for health and wellbeing, Version 2.3*. World Health Organization. https://app.magicapp.org/#/guideline/Lr21gL

WPATH. (2016). *Position statement on medical necessity of treatment, sex reassignment, and insurance coverage in the U.S.A.* https://www.wpath.org/media/cms/Documents/Web%20Transfer/Policies/WPATH-Position-on-Medical-Necessity-12-21-2016.pdf

WPATH. (2017). *WPATH identity recognition statement*. https://www.wpath.org/media/cms/Documents/Web%20Transfer/Policies/WPATH%20Identity%20Recognition%20Statement%2011.15.17.pdf

WPATH. (2019). *WPATH statement on Yogyakarta Principles Plus 10 and healthcare delivery*. https://www.wpath.org/media/cms/Documents/Public%20Policies/2019/WPATH%20Statement%20on%20Yogykarta%20Principles%20Plus%2010.pdf

WPATH Position Statement. (2018). *WPATH position on "Rapid Onset Gender Dysphoria (ROGD)."* https://www.wpath.org/media/cms/Documents/Public%20Policies/2018/9_Sept/WPATH%20Position%20on%20Rapid-Onset%20Gender%20Dysphoria_9-4-2018.pdf

Wu, L. J., Qi, J., Cai, Y., Liu, S. Y., Zhu, M., Zhong, P. P., Xin, Y., & Feng, S. Q. (2017). *Chinese transgender population general survey report*. LGBT Center and Department of Sociology, Peking University. https://chinadevelopmentbrief.cn/wp-content/uploads/2020/04/2017-Chinese-Transgender-Population-General-Survey-Report.pd

Wylie, K. (2008). Are the criteria for the 'real-life experience'(R-LE) stage of assessment for GID useful to patients and clinicians? *International Journal of Transgenderism*, 10(3–4), 121–131. https://doi.org/10.1080/15532730802297314.

Wylie, K., Knudson, G., Khan, S. I., Bonierbale, M., Watanyusakul, S., & Baral, S. (2016). Serving transgender people: Clinical care considerations and service delivery

models in transgender health. *The Lancet*, 388(10042), 401–411.

Xavier, J. M., Robbin, M., Singer, B., & Budd, E. (2005). A needs assessment of transgendered people of color living in Washington, DC. In W. O. Bockting, & E. Avery (Eds.), *Transgender health and HIV prevention: Needs assessment studies from transgender communities across the United States* (pp. 31–47). The Haworth Medical Press. https://doi.org/10.1300/J485v08n02_04

Yadegarfard, M., Meinhold-Bergmann, M. E., & Ho, R. (2014). Family rejection, social isolation, and loneliness as predictors of negative health outcomes (depression, suicidal ideation, and sexual risk behavior) among Thai male-to-female transgender adolescents. *Journal of LGBT Youth*, 11(4), 347–363. https://doi.org/10.1080/19361653.2014.910483.

Yager, J. L., & Anderson, P. L. (2020). Pharmacology and drug interactions with HIV PrEP in transgender persons receiving gender affirming hormone therapy. *Expert Opinion on Drug Metabolism & Toxicology*, 16(6), 463–474. https://doi.org/10.1080/17425255.2020.1752662.

Yanagi, Y., Ishikawa, Y., Nakamura, K., Komazawa, D., & Watanabe, Y. (2015). Voice changes over time in a female-to-male transsexual receiving hormone therapy. *The Japan Journal of Logopedics and Phoniatrics*, 56(3), 250–256. https://doi.org/10.5112/jjlp.56.250.

Yang, C. Y., Palmer, A. D., Murray, K. D., Meltzer, T. R., & Cohen, J. I. (2002). Cricothyroid approximation to elevate vocal pitch in male-to-female transsexuals: Results of surgery. *Annals of Otology, Rhinology and Laryngology*, 111(6), 477–485. https://doi.org/10.1177/000348940211100602.

Yang, J. H., Baskin, L. S., & DiSandro, M. (2010) Gender identity in disorders of sex development: review article. *Urology*,75(1):153–159. https://doi.org/10.1016/j.urology.2009.07.1286.

Yang, X., Wang, L., Gu, Y., Song, W., Hao, C., Zhou, J., Zhang, Q., & Zhao, Q. (2016). A cross-sectional study of associations between casual partner, friend discrimination, social support and anxiety symptoms among Chinese transgender women. *Journal of Affective Disorders*, 203, 22–29. https://doi.org/10.1016/j.jad.2016.05.051.

Yang, X., Zhao, L., Wang, L., Hao, C., Gu, Y., Song, W., Zhao, Q., & Wang, X. (2016). Quality of life of transgender women from China and associated factors: A cross-sectional study. *Journal of Sexual Medicine*, 13(6), 977–987. https://doi.org/10.1016/j.jsxm.2016.03.369.

Yeung, H., Ragmanauskaite, L., Zhang, Q., Kim, J., Tangpricha, V., Getahun, D., & Goodman, M. (2020). Prevalence of moderate to severe acne in transgender adults: A cross-sectional survey. *Journal of the American Academy of Dermatology*, 83(5), 1450–1452. https://doi.org/10.1016/j.jaad.2020.02.053.

Yogyakarta Principles.org. (2007). *Yogyakarta principles*. https://yogyakarta.org

Yona, L., & Katri, I. (2020). The limits of transgender incarceration reform. *Yale Journal of Law and Feminism*, 31(2), 201–246. http://hdl.handle.net/20.500.13051/7128

Yoong, S. L., Tursan d'Espaignet, E., Wiggers, J., St Claire, S., Mellin-Olsen, J., & Grady A et al. (2020). *Tobacco and postsurgical outcomes: WHO tobacco knowledge summaries.* World Health Organization

Yuan, N., Chung, T., Ray, E. C., Sioni, C., Jimenez-Eichelberger, A., & Garcia, M. M. (2021). Requirement of mental health referral letters for staged and revision genital gender-affirming surgeries: An unsanctioned barrier to care. *Andrology*, 9(6), 1765–1772. https://doi.org/10.1111/andr.13028.

Yule, M. A., Brotto, L. A., & Gorzalka, B. B. (2015). A validated measure of no sexual attraction: The Asexuality Identification Scale. *Psychological Assessment*, 27(1), 148–160. https://doi.org/10.1037/a0038196.

Zanghellini, A. (2020). Philosophical problems with the gender-critical feminist argument against trans inclusion. *Sage Open*, 10(2), 2158244020927029. https://doi.org/10.1177/2158244020927029.

Zavlin, D., Schaff, J., Lelle, J. D., Jubbal, K. T., Herschbach, P., Henrich, G., Ehrenberger, B., Kovacs, L., Machens, H. G., & Papadopulos, N. A. (2018). Male-to-female sex reassignment surgery using the combined vaginoplasty technique: Satisfaction of transgender patients with aesthetic, functional, and sexual outcomes. *Aesthetic Plastic Surgery*, 42(1), 178–187. https://doi.org/10.1007/s00266-017-1003-z.

Zelin, N. S., Hastings, C., Beaulieu-Jones, B. R., Scott, C., Rodriguez-Villa, A., Duarte, C., Calahan, C., & Adami, A. J. (2018). Sexual and gender minority health in medical curricula in new England: A pilot study of medical student comfort, competence and perception of curricula. *Medical Education Online*, 23(1), 1461513. https://doi.org/10.1080/10872981.2018.1461513.

Zielinski, D. S., & Bradshaw, C. P. (2006). Ecological influences on the sequelae of child maltreatment: A review of the literature. *Child Maltreatment*, 11(1), 49–62. https://doi.org/10.1177/1077559505283591.

Zhang, Q., Goodman, M., Adams, N., Corneil, T., Hashemi, L., Kreukels, B., Motmans, J., Snyder, R., & Coleman, E. (2020). Epidemiological considerations in transgender health: A systematic review with focus on higher quality data. *International Journal of Transgender Health*, 21(2), 125–137. https://doi.org/10.1080/26895269.2020.1753136.

Zhang, Q., Rechler, W., Bradlyn, A., Flanders, W. D., Getahun, D., Lash, T. L., McCracken, C., Nash, R., Panagiotakopoulous, L., Roblin, D., Sandberg, D., Silverberg, M., Tangpricha, V., Vupputuri, S., & Goodman, M. (2021). Changes in size and demographic composition of transgender and gender nonbinary population receiving care at integrated health systems. *Endocrine Practice*, 27(5), 390–395. https://doi.org/10.1016/j.eprac.2020.11.016.

Zhang, W. R., Garrett, G. L., Arron, S. T., & Garcia, M. M. (2016). Laser hair removal for genital gender affirming surgery. *Translational Andrology and Urology*, 5(3), 381–387. https://doi.org/10.21037/tau.2016.03.27.

Zhang, Y. F., Liu, C. Y., Qu, C. Y., Lu, L. X., Liu, A. T., Zhu, L., Wang, H., Lin, Z. H., Zhao, Y. Z., Zhu, X. H., & Hua, J. (2015). Is vaginal mucosal graft the excellent substitute material for urethral reconstruction in female-to-male transsexuals? *World Journal of Urology*, 33(12), 2115–2123. https://doi.org/10.1007/s00345-015-1562-z.

Zhou, Y., Furutani, M., Athurupana, R., & Nakatsuka, M. (2021). Relation between identity disclosure to family members and mental health in Japanese transgender people. *Acta Medica Okayama*, 75(5), 611–623. https://doi.org/10.18926/AMO/62227.

Zhu, J., & Chan, Y. M. (2017). Adult consequences of self-limited delayed puberty. *Pediatrics*, 139(6). https://doi.org/10.1542/peds.2016-3177.

Ziegler, A., Henke, T., Wiedrick, J., & Helou, L. B. (2018). Effectiveness of testosterone therapy for masculinizing voice in transgender patients: A meta-analytic review. *International Journal of Transgenderism*, 19(1), 25–45. https://doi.org/10.1080/15532739.2017.1411857.

Zimman, L. (2020). Transgender language, transgender moment: Toward a trans linguistics. In K. Hall, & R. Barrett, (Eds.), *The Oxford handbook of language and sexuality* (pp. 1–23). Oxford University Press. http://lalzimman.org/PDFs/Zimman2020TransLanguageTransMoment.pdf

Zucker, K. J., Cohen-Kettenis, P. T., Drescher, J., Meyer-Bahlburg, H. F. L., Pfäfflin, F., & Womack, W. M. (2013). Memo outlining evidence for change for gender identity disorder in the DSM-5. *Archives of Sexual Behavior*, 42(5), 901–914. https://doi.org/10.1007/s10508-013-0139-4.

## Appendix A METHODOLOGY

### 1. Introduction

This version of the Standards of Care (SOC-8) is based upon a more rigorous and methodological evidence-based approach than previous versions. This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion. Evidence-based guidelines include recommendations intended to optimize patient care and are informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options. Evidence-based research provides the basis for sound clinical practice guidelines and recommendations but must be balanced by the realities and feasibility of providing care in diverse settings. The process for development of the SOC-8 incorporated recommendations on clinical practice guideline development from the National Academies of Medicine and The World Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process. (Institute of Medicine Committee on Standards for Developing Trustworthy Clinical Practice, 2011; World Health Organization, 2019a).

The SOC-8 revision committee was multidisciplinary and consisted of subject matter experts, health care professionals, researchers and stakeholders with diverse perspectives and geographic representation. All committee members completed conflict of interest declarations.*

A guideline methodologist assisted with the planning and development of questions, and an independent team undertook systematic reviews that were used to inform some of the statements for recommendations. Additional input to the guidelines was provided by an international advisory committee, legal experts, and feedback received during a public comment period. Recommendations in the SOC-8 are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. Consensus of the final recommendations was attained using a Delphi process that included all members of the Standards of Care Revision committee and required that recommendation statements were approved by 75% of members. Supportive and explanatory text of the evidence for the statements were written by chapter members. Drafts of the chapters were reviewed by the Chair and the Co-Chairs of the SOC Revision Committee to ensure the format was consistent, evidence was properly provided, and recommendations were consistent across chapters. An independent team checked the references used in the SOC-8 before the guidelines were fully edited by a single professional. A detailed overview of the SOC-8 Methodology is described below.

### 2. Difference between the methodology of the SOC-8 and previous editions

The main differences in the methodology of the SOC-8 when compared with other versions of the SOC are:

- The involvement of a larger group of professionals from around the globe;
- A transparent selection process to develop the guidelines steering committee as well as to select chapter leads and members;
- The inclusion of diverse stakeholders in the development of the SOC-8
- Management of conflicts of interest
- The use of a Delphi process to reach agreement on the recommendations among SOC-8 committee members
- The involvement of an independent body from a reputable university to help develop the methodology and undertake independent systematic literature reviews where possible
- Recommendations were graded as either "recommend" or "suggest" based upon the strength of the recommendations.
- The involvement of an independent group of clinical academics to review citations.
- The involvement of international organizations working with the transgender and gender diverse (TGD) community, members of WPATH and other professional organizations as well as the general public who provided feedback through a public comment period regarding the whole SOC-8.

### 3. Overview of SOC-8 development Process

The steps for updating the Standards of Care are summarized below:

1. Establishing Guideline Steering Committee including Chair, and Co-Chairs (July 19, 2017)
2. Determining chapters (scope of guidelines)
3. Selecting Chapter Members based upon expertise (March 2018)
4. Selecting the Evidence Review Team: John Hopkins University (May 2018)
5. Refining topics included in the SOC-8 and review questions for systematic reviews
6. Conducting systematic reviews (March 2019)
7. Drafting the recommendation statements
8. Voting on the recommendation statements using a Delphi process (September 2019–February 2022)
9. Grading of the recommendations statements
10. Writing the text supporting the statements
11. Independently validating the references used in the supportive text
12. Finalizing a draft SOC-8 (December 1, 2021)
13. Feedback on the statements by International Advisory Committee
14. Feedback on the entire draft of the SOC-8 during a public comment period (November 2021–January 2022)
15. Revision of Final Draft based on comments (January 2022- May 2022)
16. Approval of final Draft by Chair and Co-Chairs (June 10, 2022)
17. Approval by the WPATH Board of Directors
18. Publication of the SOC-8
19. Dissemination and translation of the SOC-8

### 3.1. Establishment of Guideline Steering Committee

The WPATH Guideline Steering Committee oversaw the guideline development process for all chapters of the Standards of Care. Except for the Chair (Eli Coleman) who was appointed by the WPATH board to maintain a continuity from previous SOC editions, members of the Guideline Steering Committee were selected by the WPATH Board from WPATH members applying for these positions. Job descriptions were developed for the positions of Co-Chairs, Chapter Leads, Chapter Members and Stakeholder. WPATH members were eligible to apply by completing an application form and submitting their CV. The Board of WPATH voted for the position of co-chair (one member of the board did not participate in view of conflict of interest). The chairs and co-chairs selected the chapter leads and members (as well as stakeholders) based on the application form and CVs.

The Guideline Steering Committee for Standards of Care 8th Version are:

- Eli Coleman, PhD (Chair) Professor, Director and Academic Chair, Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School (USA)
- Asa Radix, MD, PhD, MPH (Co-chair) Senior Director, Research and Education Callen-Lorde Community Health Center Clinical Associate Professor of Medicine New York University, USA
- Jon Arcelus, MD, PhD (Co-chair) Professor of Mental Health and Well-being Honorary Consultant in Transgender Health University of Nottingham, UK
- Karen A. Robinson, PhD (Lead, Evidence Review Team) Professor of Medicine, Epidemiology and Health Policy & Management Johns Hopkins University, USA

### 3.2. Determination of topics for chapters

The Guideline Steering Committee determined the chapters for inclusion in the Standards of Care by reviewing the literature and by reviewing the previous edition of the SOC. The chapters in the Standards of Care 8th Version:

1. Terminology
2. Global Applicability
3. Population estimates
4. Education*
5. Assessment of Adults
6. Adolescent
7. Children
8. Nonbinary
9. Eunuch
10. Intersex
11. Institutional environments
12. Hormone Therapy
13. Surgery and Postoperative Care
14. Voice and communication
15. Primary care
16. Reproductive Health
17. Sexual Health
18. Mental Health

* The Education Chapter was originally intended to cover both education and ethics. A decision was made to create a separate committee to write a chapter on ethics. In the course of writing the chapter, it was later determined topic of ethics was best placed external to the SOC8 and required further in-depth examination of ethical considerations relevant to transgender health.

### 3.3. Selection of chapter members

A call for applications to be part of the SOC-8 review committee (chapter lead or member) was sent to the WPATH membership. The Chairs of the Guideline Steering Committee appointed the members for each chapter, ensuring representation from a variety of disciplines and perspectives.

Chapter Leads and Members were required to be WPATH Full Members in good standing and content experts in transgender health, including in at least one chapter topic. Chapter Leads reported to the Guideline Steering Committee and were responsible for coordinating the participation of Chapter Members. Chapter members reported directly to the Chapter Lead.

Each chapter also included stakeholders as members who bring perspectives of transgender health advocacy or work in the community, or as a member of a family that included a transgender child, sibling, partner, parent, etc. Stakeholders were not required to be full members of WPATH.

The Chapter Members were expected to:

- Participate in the development refinement of review questions
- Read and provide comments on all materials from the Evidence Review Team
- Critically review draft documents, including the draft evidence report
- Review and assess evidence and draft recommendations
- Participate in the Delphi consensus process
- Develop the text to back up the recommendation statements
- Grade each statement to describe the strength of the recommendation
- Review and address the comments from the Chairs during the whole process
- Develop the content of the chapters
- Review comments from public comments and assist in the development of a revision of guidelines
- Provide input and participate in the dissemination of guidelines

Training and orientation for Chapter Leads and Members was provided, as needed. Training content included formulation and refinement of questions (i.e., use of PICO), reviewing the evidence, developing recommendation state-

ments, grading the evidence and the recommendations, and information about the guideline development program and process.

A total of 26 chapter-leads were appointed (some chapters required co-leads), 77 chapter members and 16 stakeholders. A total of 127 were selected. During the SOC process, 8 people left, due to personal or work-related issues. Therefore, there were 119 final authors of the SOC-8.

### 3.4. Selection of the evidence review team

The WPATH Board issued a request for applications to become the Evidence Review Team. For Standards of Care 8th Version the WPATH Board engaged the Evidence Review Team at Johns Hopkins University under the leadership of Karen Robinson.

- Karen A. Robinson, PhD (Lead, Evidence Review Team) Professor of Medicine, Epidemiology and Health Policy & Management Johns Hopkins University, USA

Dr Robinson also guided the steering committee in the development of the SOC-8 by providing advice and training in the development of PICO questions, statements, and the Delphi process as well as undertaking a very rigorous systematic literature review where direct evidence was available.

### Conflict of interest

Members of the Guideline Steering Committee, Chapter Leads and Members, and members of the Evidence Review Team were asked to disclose any conflicts of interest. Also reported, in addition to potential financial and competing interests or conflicts, are personal or direct reporting relationships with a chair, co-chair or a WPATH Board Member or the holding of a position on the WPATH Board of Directors.

### 3.5. Refinement of topics and review of questions

The Evidence Review Team abstracted the recommendation statements from the prior version of the Standards of Care. With input from the Evidence Review Team, the Guideline Steering Committee and Chapter Leads determined:

- Recommendation statements that needed to be updated
- New areas requiring recommendation statements

### 3.6. Conduct the systematic reviews

Chapter Members developed questions to help develop recommendation statements. For the questions eligible for systematic review, the Evidence Review Team drafted review questions, specifying the Population, Interventions, Comparisons, and Outcomes (PICO elements). The Evidence Review Team undertook the systematic reviews. The Evidence Review Team presented evidence tables and other

results of the systematic reviews to the members of the relevant chapter for feedback.

### Protocol

A separate detailed systematic review protocol was developed for each review question or topic, as appropriate. Each protocol was registered on PROSPERO.

### Literature search

The Evidence Review Team developed a search strategy appropriate for each research question including MEDLINE®, Embase™, and the Cochrane Central Register of Controlled Trials (CENTRAL). The Evidence Review Team searched additional databases as deemed appropriate for the research question. The search strategy included MeSH and text terms and was not limited by language of publication or date.

The Evidence Review Team hand searched the reference lists of all included articles and recent, relevant systematic reviews. The Evidence Review Team searched ClinicalTrials. gov for any additional relevant studies.

Searches were updated during the peer review process.

The literature included in the systematic review was mostly based on quantitative studies conducted in Europe, the US or Australia. We acknowledge a bias towards perspectives from the global north that does not pay sufficient attention to the diversity of lived experiences and perspectives within transgender and gender diverse (TGD) communities across the world. This imbalance of visibility in the literature points to a research and practice gap that needs to be addressed by researchers and practitioners in the future in order to do justice to the support needs of all TGD people independent of gender identification.

### Study selection

The Evidence Review Team, with input from the Chapter Workgroup Leads, defined the eligibility criteria for each research question a priori.

Two reviewers from the Evidence Review Team independently screened titles and abstracts and full-text articles for eligibility. To be excluded, both reviewers needed to agree that the study met at least one exclusion criteria. Reviewers resolved differences regarding eligibility through discussion.

### Data extraction

The Evidence Review Team used standardized forms to abstract data on general study characteristics, participant characteristics, interventions, and outcome measures. One reviewer abstracted the data, and a second reviewer confirmed the abstracted data.

### Assessment of risk of bias

Two reviewers from the Evidence Review Team independently assessed the risk of bias for each included study. For

randomized controlled trials, the Cochrane Risk of Bias Tool was used. For observational studies, the Risk of Bias in Non-Randomized Studies—of Interventions (ROBINS-I) tool was used. Where deemed appropriate, existing recent systematic reviews were considered and evaluated using ROBIS.

### Data synthesis and analysis

The Evidence Review Team created evidence tables detailing the data abstracted from the included studies. The members of the Chapter Workgroups reviewed and provided comments on the evidence tables.

### Grading of the evidence

The Evidence Review Team assigned evidence grades using the GRADE methodology. The strength of the evidence was obtained using predefined critical outcomes for each question and by assessing the limitations to individual study quality/risk of bias, consistency, directness, precision, and reporting bias.

### 3.7. Drafting of the Recommendation Statements

Chapter Leads and Members drafted recommendation statements. The statements were crafted to be feasible, actionable, and measurable.

Evidence-based recommendation statements were based on the results of the systematic, and background literature reviews plus consensus-based expert opinions.

The Chair and Co-Chairs and Chapter Leads reviewed and approved all recommendation statements for clarity and consistency in wording. During this review and throughout the process any overlap between chapters was also addressed.

Many chapters had to work closely together to ensure consistency of their recommendations. For example, since there are now separate chapters for childhood and adolescence, to ensure consistency between chapters, some authors were part of both chapters. For a similar reason, when applicable, a workgroup collaborated with other Chapter Workgroups on topics shared between the chapters (i.e., Assessment of Children, Assessment of Adults, Hormone Therapy, Surgery and Postoperative Care and Reproductive Health).

### 3.8. Approval of the recommendations using the Delphi process

Formal consensus for all statements was obtained using the Delphi process (a structured solicitation of expert judgements in three rounds). For a recommendation to be approved, a minimum of 75% of the voters had to approve the statement. A minimum of 65% of the SOC-8 members had to take part in the Delphi process for each statement. People who did not approve the statement had to provide information as to the reasons for their disapproval, so the statement could be modified (or removed) according to this feedback. Once modified, the statement was put through the Delphi process again. If after 3 rounds the statement

was not approved, the statement was removed from the SOC. Every member of the SOC voted for each statement. There was a response rate between (74.79% and 94.96%) for the statements.

### 3.9. Grading criteria for statements

Once the statements passed the Delphi process, chapter members graded each statement using a process adapted from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework. This a transparent framework for developing and presenting summaries of evidence and provides a systematic approach for making clinical practice recommendations (Guyatt et al., 2011). The statements were graded based on factors such as:

- The balance of potential benefits and harms
- Confidence in that balance or quality of evidence
- Values and preferences of providers and patients
- Resource use and feasibility

The statements were classified as:

- Strong recommendations ("we recommend") are for those interventions/therapy/strategies where:
  - the evidence is of high quality
  - estimates of the effect of an intervention/therapy/strategy (i.e., there is a high degree of certainty effects will be achieved in practice)
  - there are few downsides of therapy/intervention/strategy
  - there is a high degree of acceptance among providers and patients or those for whom the recommendation applies.
- Weak recommendations ("we suggest") are for those interventions/therapy/strategies where:
  - there are weaknesses in the evidence base
  - there is a degree of doubt about the size of the effect that can be expected in practice
  - there is a need to balance the potential upsides and downsides of interventions/therapy/strategies
  - there are likely to be varying degrees of acceptance among providers and patients or those for whom the recommendation applies.

### 3.10. Writing of the text supporting the statements

Following the grading of the statements, the Chapter Workgroups wrote the text providing the rationale or reasoning for the recommendation. This included providing the available evidence, providing details about potential benefits and harms, describing uncertainties, and information about implementation of the recommendation, including expected barriers or challenges among others. References use APA-7 style, to support the information in the text. Links to resources are also provided, as appropriate. The text, including whether a recommendation has been described as strong or weak, was reviewed and approved by the Chair and Co-Chairs.

### 3.11. External validation of references used to support the statements

A group of independent clinical academics working in the field of transgender health reviewed the references used in every chapter in order to validate that the references were appropriately used to support the text. Any queries regarding the references were sent back to the chapters for review.

### 3.12. Finalizing a draft SOC-8

A final SOC-8 draft was made available for comments.

### 3.13. Distribute Standards of Care for review by international advisors

The statements of the recommendations of Standards of Care 8th were circulated among the broader Standards of Care Revision Committee and the WPATH International Advisory Group, which included the Asia Pacific Transgender Network (APTN), the Global Action for Transgender Equality (GATE), the International Lesbian, Gay, Bisexual, Transgender, Intersex Association (ILGA), and Transgender Europe (TGEU).

### 3.14. Public comment period

The revised draft version of the Standards of Care document was posted online for comment from the public, including WPATH members, on the WPATH website. A 6-week period was allocated for comments. A total of 1,279 people made comments on the draft with a total of 2,688 comments.

### 3.15. Revision of final draft based on comments

The Chapter Leads and Guideline Steering Committee considered the feedback and made any necessary revisions. All public comments were read and, where appropriate, integrated into the background text.

As part of this process, 3 new Delphi statements were developed and 2 were modified enough to require a new vote by the SOC-8 committee. This meant a new Delphi process was initiated in January 2022. The results of this

Delphi process were accepted by the chapters, and the new statements were added or modified accordingly. The new supportive text was added.

All the new versions of the chapters were reviewed again by the Chair and Co-Chairs and changes or modifications were suggested. Finally, once the Chairs and the Chapter Members were satisfied with the draft, the chapter was finalized.

All new references were double checked by an independent member.

### 3.16. Approval of final draft by Chair and Co-Chairs

Modifications were reviewed by the Chairs and were accepted by them.

### 3.17. Approval by the WPATH Board of Directors

The final document was presented to the WPATH Board of Directors for approval and it was approved on the 20th of June 2022.

### 3.18. Publication of the SOC-8 and dissemination of the Standards of Care

The Standards of Care was disseminated in a number of venues and in a number of formats including publication in the International Journal of Transgender Health (the official scientific journal of WPATH).

### 4. Plan to Update

A new edition of the SOC (SOC-9) will be developed in the future, when new evidence and/or significant changes in the field necessitating a new edition is substantial.

*The development of SOC-8 was a complex process at a time of COVID-19 and political uncertainties in many parts of the world. Members of the SOC-8 worked on the SOC-8 on top of their day-to-day job, and most of the meetings took place out of their working time and during their weekends via Zoom. There were very few face-to-face meetings, most of them linked to WPATH, USPATH or EPATH conferences. Committee members of the SOC-8 were not paid as part of this process.

## Appendix B GLOSSARY

**CISGENDER** refers to people whose current gender identity corresponds to the sex they were assigned at birth.

**DETRANSITION** is a term sometimes used to describe an individual's retransition to the gender stereotypically associated with their sex assigned at birth.

**EUNUCH** refers to an individual assigned male at birth whose testicles have been surgically removed or rendered non-functional and who identifies as a eunuch. This differs from the standard medical definition by excluding those who do not identify as eunuch.

**EUNUCH-IDENTIFIED:** An individual who feels their true self is best expressed by the term eunuch. Eunuch-identified individuals generally desire to have their reproductive organs surgically removed or rendered non-functional.

**GENDER:** Depending on the context, gender may reference gender identity, gender expression, and/or social gender role, including understandings and expectations culturally tied to people who were assigned male or female at birth. Gender identities other than those of men and women (who can be either cisgender or transgender) include transgender, nonbinary, genderqueer, gender neutral, agender, gender fluid, and "third" gender, among others; many other genders are recognized around the world.

**GENDER-AFFIRMATION** refers to being recognized or affirmed in a person's gender identity. It is usually conceptualized as having social, psychological, medical, and legal dimensions. Gender affirmation is used as a term in lieu of transition (as in medical gender-affirmation) or can be used as an adjective (as in gender-affirming care).

**GENDER-AFFIRMATION SURGERY** (GAS) is used to describe surgery to change primary and/or secondary sex characteristics to affirm a person's gender identity.

**GENDER BINARY** refers to the idea there are two and only two genders, men and women; the expectation that everyone must be one or the other; and that all men are males, and all women are females.

**GENDER DIVERSE** is a term used to describe people with gender identities and/or expressions that are different from social and cultural expectations attributed to their sex assigned at birth. This may include, among many other culturally diverse identities, people who identify as nonbinary, gender expansive, gender nonconforming, and others who do not identify as cisgender.

**GENDER DYSPHORIA** describes a state of distress or discomfort that may be experienced because a person's gender identity differs from that which is physically and/or socially attributed to their sex assigned at birth. Gender Dysphoria is also a diagnostic term in the DSM-5 denoting an incongruence between the sex assigned at birth and experienced gender accompanied by distress. Not all transgender and gender diverse people experience gender dysphoria.

**GENDER EXPANSIVE** is an adjective often used to describe people who identify or express themselves in ways that broaden the socially and culturally defined behaviors or beliefs associated with a particular sex. Gender creative is also sometimes used. The term gender variant was used in the past and is disappearing from professional usage because of negative connotations now associated with it.

**GENDER EXPRESSION** refers to how a person enacts or expresses their gender in everyday life and within the context of their culture and society. Expression of gender through physical appearance may include dress, hairstyle, accessories, cosmetics, hormonal and surgical interventions as well as mannerisms, speech, behavioral patterns, and names. A person's gender expression may or may not conform to a person's gender identity.

**GENDER IDENTITY** refers to a person's deeply felt, internal, intrinsic sense of their own gender.

**GENDER INCONGRUENCE** is a diagnostic term used in the ICD-11 that describes a person's marked and persistent experience of an incompatibility between that person's gender identity and the gender expected of them based on their birth-assigned sex.

**INTERSEX** refers to people born with sex or reproductive characteristics that do not fit binary definitions of female or male.

**MISGENDER/MISGENDERING** refers to when language is used that does not correctly reflect the gender with which a person identifies. This may be a pronoun (he/him/his, she/her/hers, they/them/theirs) or a form of address (sir, Mr.).

**NONBINARY** refers to those with gender identities outside the gender binary. People with nonbinary gender identities may identify as partially a man and partially a woman or identify as sometimes a man and sometimes a woman, or identify as a gender other than a man or a woman, or as not having a gender at all. Nonbinary people may use the pronouns they/them/theirs instead of he/him/his or she/her/hers. Some nonbinary people consider themselves to be transgender or trans; some do not because they consider transgender to be part of the gender binary. The shorthand NB or "enby" is sometimes used as a descriptor for nonbinary. Examples of nonbinary gender identities are genderqueer, gender diverse, genderfluid, demigender, bigender, and agender.

**RETRANSITION** refers to second or subsequent gender transition whether by social, medical, or legal means. A retransition may be from one binary or nonbinary gender to another binary or nonbinary gender. People may retransition more than once. Retransition may occur for many reasons, including evolving gender identities, health concerns, family/societal concerns, and financial issues.

**SEX ASSIGNED AT BIRTH** refers to a person's status as male, female, or intersex based on physical characteristics. Sex is usually assigned at birth based on appearance of the external genitalia. AFAB is an abbreviation for "assigned female at birth." AMAB is an abbreviation for "assigned male at birth."

**SEXUAL ORIENTATION** refers to a person's sexual identity, attractions, and behaviors in relation to people on the basis of their gender(s) and or sex characteristics and those of their partners. Sexual orientation and gender identity are distinct terms.

**TRANSGENDER** or trans are umbrella terms used to describe people whose gender identities and/or gender expressions are not what is typically expected for the sex to which they were assigned at birth. These words should always be used as adjectives (as in "trans people") and never as nouns (as in "transgenders") and never as verbs (as in "transgendered").

**TRANSGENDER MEN** or **TRANS MEN** or **MEN OF TRANS EXPERIENCE** are people who have gender identities as men and who were assigned female at birth. They may or may not have undergone any transition. FTM or Female-to-Male are older terms that are falling out of use. **TRANSGENDER WOMEN** or **TRANS WOMEN** or **WOMEN OF TRANS EXPERIENCE** are people who have gender identities as women and who were assigned male at birth. They may or may not have undergone any transition. MTF or Male-to-Female are older terms that are falling out of use.

**TRANSITION** refers to the process whereby people usually change from the gender expression associated with their assigned sex at birth to another gender expression that better matches their gender identity. People may transition socially by using methods such as changing their name, pronoun, clothing, hair styles, and/or the ways that they move and speak. Transitioning may or may not involve hormones and/or surgeries to alter the physical body. Transition can be used to describe the process of changing one's gender expression from any gender to a different gender. People may transition more than once in their lifetimes.

**TRANSPHOBIA** refers to negative attitudes, beliefs, and actions concerning transgender and gender diverse people as a group. Transphobia may be enacted in discriminatory policies and practices on a structural level or in very specific and personal ways. Transphobia can also be internalized, when transgender and gender diverse people accept and reflect such prejudice about themselves or other transgender and gender diverse people. While transphobia sometimes may be a result of unintentional ignorance rather than direct hostility, its effects are never benign. Some people use the term anti-transgender bias in place of transphobia.

AR_275344

## Appendix C GENDER-AFFIRMING HORMONAL TREATMENTS

**Table 1.** Expected time course of physical changes in response to gender-affirming hormone therapy

| Testosterone Based Regimen | | |
|---|---|---|
| **Effect** | **Onset** | **Maximum** |
| Skin Oiliness/acne | 1–6 months | 1–2 years |
| Facial/body hair growth | 6–12 months | >5 years |
| Scalp hair loss | 6–12 months | >5 years |
| Increased muscle mass/ strength | 6–12 months | 2–5 years |
| Fat redistribution | 1–6 months | 2–5 years |
| Cessation of menses | 1–6 months | 1–2 years |
| Clitoral enlargement | 1–6 months | 1–2 years |
| Vaginal atrophy | 1–6 months | 1–2 years |
| Deepening of voice | 1–6 months | 1–2 years |
| **Estrogen and testosterone-lowering based regimens** | | |
| **Effect** | **Onset** | **Maximum** |
| Redistribution of body fat | 3–6 months | 2–5 years |
| Decrease in muscle mass and strength | 3–6 months | 1–2 years |
| Softening of skin/ decreased oiliness | 3–6 months | Unknown |
| Decreased sexual desire | 1–3 months | Unknown |
| Decreased spontaneous erections | 1–3 months | 3–6 months |
| Decreased sperm production | Unknown | 2 years |
| Breast growth | 3–6 months | 2–5 years |
| Decreased testicular volume | 3–6 months | Variable |
| Decreased terminal hair growth | 6–12 months | > 3 years |
| Increased scalp hair | Variable | Variable |
| Voice changes | None | |

Adapted from Hembree et al., 2017.

**Table 2.** Risks associated with gender affirming hormone therapy (bolded items are clinically significant) (Updated from SOC-7)

| RISK LEVEL | Estrogen-based regimens | Testosterone-based regimens |
|---|---|---|
| Likely increased risk | **Venous Thromboembolism Infertility** Hyperkalemia[s] Hypertriglyceridemia Weight Gain | **Polycythemia Infertility** Acne Androgenic Alopecia Hypertension Sleep Apnea Weight Gain Decreased HDL Cholesterol and increased LDL Cholesterol |
| Likely increased risk with presence of additional risk factors | Cardiovascular Disease Cerebrovascular Disease Meningioma[c] Polyuria/Dehydration[s] Cholelithiasis | Cardiovascular Disease Hypertriglyceridemia |
| Possible increased risk | Hypertension Erectile Dysfunction | |
| Possible increased risk with presence of additional risk factors | Type 2 Diabetes Low Bone Mass/ Osteoporosis Hyperprolactinemia | Type 2 Diabetes Cardiovascular Disease |
| No increased risk or inconclusive | Breast and Prostate Cancer | Low Bone Mass/ Osteoporosis Breast, Cervical, Ovarian, Uterine Cancer |

[c]cyproterone-based regimen
[s]spironolactone-based regimen

**Table 3.** Gender-Affirming Hormone Regimens In Transgender And Gender Diverse Youth (Adapted from the Endocrine Society Guidelines; Hembree et al., 2017)

**Induction of female puberty (estrogen-based regimen) with oral 17ß-estradiol**
Initiate at 5µg/kg/d and increase every 6 months by 5 µg/kg/d up to 20 µg/kg/d according to estradiol levels
Adult dose = 2-6 mg/day
In postpubertal TGD adolescents, the dose of 17ß-estradiol can be increased more rapidly:
1 mg/d for 6 months followed by 2 mg/d and up according to estradiol levels

**Induction of female puberty (estrogen-based regimen) with transdermal 17ß-estradiol**
Initial dose 6.25-12.5 µg/24 h (cutting 24 g patch to ¼ then ½)
Titrate up by every 6 months by 12.5 µg/24 h according to estradiol levels
Adult dose = 50-200 µg/24 hours
For alternatives once at adult dose (Table 4)

**Induction of male puberty (testosterone-based regimen) with testosterone esters**
25 mg/m²/2 weeks (or alternatively half this dose weekly)
Increase by 25 mg/m²/2 weeks every 6 months until adult dose and target testosterone levels are achieved. See alternatives for testosterones (Table 4)

**Table 4.** Hormone regimens in transgender and gender diverse adults*

| Estrogen-based regimen (Transfeminine) | |
|---|---|
| Estrogen | |
| Oral or sublingual | |
| Estradiol | 2.0-6.0 mg/day |
| Transdermal | |
| Estradiol transdermal patch | 0.025-0.2 mg/day |
| Estradiol gel various | ‡ daily to skin |
| Parenteral | |
| Estradiol valerate or cypionate | 5-30 mg IM every 2 weeks 2-10 IM every week |
| Anti-Androgens | |
| Spironolactone | 100–300 mg/day |
| Cyproterone acetate | 10 mg/day** |
| GnRH agonist | 3.75–7.50 mg SQ/IM monthly |
| GnRH agonist depot formulation | 11.25/22.5 mg SQ/IM 3/6 monthly |

‡ Amount applied varies to formulation and strength

| Testosterone-Based Regimen (Transmasculine) | |
|---|---|
| **Transgender males** | |
| Testosterone | |
| Parenteral | |
| Testosterone enanthate/ cypionate | 50–100 IM/SQ weekly or 100–200 IM every 2 weeks |
| Testosterone undecanoate | 1000 mg IM every 12 weeks or 750 mg IM every 10 weeks |
| Transdermal testosterone | |
| Testosterone gel | 50-100 mg/day |
| Testosterone transdermal patch | 2.5–7.5 mg/day |

*Doses are titrated up or down until sex steroid hormone levels are in the therapeutic range. Hormone regimens do not reflect all formulations that are available in all pharmacies throughout the world. Hormone regimens may have to be adapted to what is available in local pharmacies.
**Kuijpers et al (2021).

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH  S255

**Table 5.** Hormone monitoring of transgender and gender diverse people receiving gender-affirming hormone therapy (Adapted from the Endocrine Society Guidelines)

**Transgender male or trans masculine (including gender diverse/nonbinary) individuals**

1. Evaluate patient approximately every 3 months (with dose changes) in the first year and 1 to 2 times per year thereafter to monitor for appropriate physical changes in response to testosterone.
2. Measure serum total testosterone every 3 months (with dose changes) until levels are at goal
   a. For parenteral testosterone, the serum total testosterone should be measured midway between injections. The target level is 400-700 ng/dL. Alternatively, measure peak and trough peaks to ensure levels remain in the range of reference men.
   b. For parenteral testosterone undecanoate, testosterone should be measured just before injection. If the level is < 400 ng/dL, adjust the dosing interval.
   c. For transdermal testosterone, the testosterone level can be measured no sooner than after 1 week of daily application (at least 2 hours after application of product).
3. Measure hematocrit or hemoglobin concentrations at baseline and approximately 3 months (with dose changes) for the first year and then one to two times a year.

**Transgender Female or trans feminine (including gender diverse/nonbinary) individuals**

1. Evaluate patient approximately every 3 months (with dose changes) in the first year and one to two times per year thereafter to monitor for appropriate physical changes in response to estrogen.
   a. Serum testosterone levels should be less than 50 ng/dL.
   b. Serum estradiol should be in the range of 100-200 pg/mL.
2. For individuals receiving spironolactone, serum electrolytes, in particular potassium, and kidney function, in particular creatinine, should be monitored.
3. Follow primary care screening per primary care chapter recommendations

## Appendix D SUMMARY CRITERIA FOR HORMONAL AND SURGICAL TREATMENTS FOR ADULTS AND ADOLESCENTS

The SOC-8 guidelines are intended to be flexible in order to meet the diverse health care needs of TGD people globally. While adaptable, they offer consensus-based standards derived from the best available scientific evidence for promoting optimal health care and guiding the treatment of people experiencing gender incongruence. As in all previous versions of the SOC, the criteria put forth in this document for gender affirming interventions are clinical guidelines; individual health care professionals and programs, in consultation with the TGD person, may modify them. Clinical departures from the SOC may occur due to a TGD person's unique anatomic, social, or psychological situation; an experienced health care professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm-reduction strategies. These departures should be recognized as such, discussed with the TGD person, and documented. This documentation is also valuable for the accumulation of new data, which can be retrospectively examined to allow for health care—and the SOC—to evolve. This summary criteria needs to be read in conjunction with the relevant chapters (see Adult Assessment and Adolescent chapters).

### SUMMARY CRITERIA FOR ADULTS

#### Related to the assessment process

- Health care professionals assessing transgender and gender diverse adults seeking gender-affirming treatment should liaise with professionals from different disciplines within the field of trans health for consultation and referral, if required*
- If written documentation or a letter is required to recommend gender affirming medical and surgical treatment (GAMST), only one letter of assessment from a health care professional who has competencies in the assessment of transgender and gender diverse people is needed.

#### Criteria for hormones

a. Gender incongruence is marked and sustained;
b. Meets diagnostic criteria for gender incongruence prior to gender-affirming hormone treatment in regions where a diagnosis is necessary to access health care;
c. Demonstrates capacity to consent for the specific gender-affirming hormone treatment;
d. Other possible causes of apparent gender incongruence have been identified and excluded;
e. Mental health and physical conditions that could negatively impact the outcome of treatment have been assessed, with risks and benefits discussed;
f. Understands the effect of gender-affirming hormone treatment on reproduction and they have explored reproductive options.

#### Criteria for surgery

a. Gender incongruence is marked and sustained;
b. Meets diagnostic criteria for gender incongruence prior to gender-affirming surgical intervention in regions where a diagnosis is necessary to access health care;
c. Demonstrates capacity to consent for the specific gender-affirming surgical intervention;
d. Understands the effect of gender-affirming surgical intervention on reproduction and they have explored reproductive options;
e. Other possible causes of apparent gender incongruence have been identified and excluded;
f. Mental health and physical conditions that could negatively impact the outcome of gender-affirming surgical intervention have been assessed, with risks and benefits have been discussed;
g. Stable on their gender affirming hormonal treatment regime (which may include at least 6 months of hormone treatment or a longer period if required to achieve the desired surgical result, unless hormone therapy is either not desired or is medically contraindicated).*

*These were graded as suggested criteria

### SUMMARY CRITERIA FOR ADOLESCENTS

#### Related to the assessment process

- A comprehensive biopsychosocial assessment including relevant mental health and medical professionals;
- Involvement of parent(s)/guardian(s) in the assessment process, unless their involvement is determined to be harmful to the adolescent or not feasible;
- If written documentation or a letter is required to recommend gender-affirming medical and surgical treatment (GAMST), only one letter of assessment from a member of the multidisciplinary team is needed. This letter needs to reflect the assessment and opinion from the team that involves both medical and mental health professionals (MHPs).

#### Puberty blocking agents

a. Gender diversity/incongruence is marked and sustained over time;
b. Meets the diagnostic criteria of gender incongruence in situations where a diagnosis is necessary to access health care;
c. Demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment;
d. Mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed; sufficiently so that gender-affirming medical treatment can be provided optimally.
e. Informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility;
f. Reached Tanner stage 2.

### Hormonal treatments

a. Gender diversity/incongruence is marked and sustained over time;
b. Meets the diagnostic criteria of gender incongruence in situations where a diagnosis is necessary to access health care;
c. Demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment;
d. Mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed; sufficiently so that gender-affirming medical treatment can be provided optimally.
e. Informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility;
f. Reached Tanner stage 2.

### Surgery

a. Gender diversity/incongruence is marked and sustained over time;
b. Meets the diagnostic criteria of gender incongruence in situations where a diagnosis is necessary to access health care;
c. Demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment;
d. Mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed; sufficiently so that gender-affirming medical treatment can be provided optimally.
e. Informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility;
f. At least 12 months of gender-affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender-affirming treatment unless hormone therapy is either not desired or is medically contraindicated.

## Appendix E GENDER-AFFIRMING SURGICAL PROCEDURES

As the field's understanding of the many facets of gender incongruence expands, and as technology develops which allows for additional treatments, it is imperative to understand this list is not intended to be exhaustive. This is particularly important given the often lengthy time periods between updates to the SOC, during which evolutions in understanding and treatment modalities may occur.

| FACIAL SURGERY | |
|---|---|
| Brow | • Brow reduction<br>• Brow augmentation<br>• Brow lift |
| Hair line advancement and/or hair transplant | |
| Facelift/mid-face lift (following alteration of the underlying skeletal structures) | |
| Facelift/mid-face lift (following alteration of the underlying skeletal structures) | • Platysmaplasty |
| Blepharoplasty | |
| Rhinoplasty (+/- fillers) | • Lipofilling |
| Cheek | • Implant<br>• Lipofilling |
| Lip | • Upper lip shortening<br>• Lip augmentation (includes autologous and non-autologous) |
| Lower jaw | • Reduction of mandibular angle<br>• Augmentation |
| Chin reshaping | • Osteoplastic<br>• Alloplastic (implant-based) |
| Chondrolaryngoplasty | • Vocal cord surgery (see voice chapter) |
| **BREAST/CHEST SURGERY** | |
| Mastectomy | • Mastectomy with nipple-areola preservation/reconstruction as determined medically necessary for the specific patient<br>• Mastectomy without nipple-areola preservation/reconstruction as determined medically necessary for the specific patient |
| Liposuction | |
| Breast reconstruction (augmentation) | • Implant and/or tissue expander<br>• Autologous (includes flap-based and lipofilling) |
| **GENITAL SURGERY** | |
| Phalloplasty (with/without scrotoplasty) | • With/without urethral lengthening<br>• With/without prosthesis (penile and/or testicular)<br>• With/without colpectomy/colpocleisis |
| Metoidioplasty (with/without scrotoplasty) | • With/without urethral lengthening<br>• With/without prosthesis (penile and/or testicular)<br>• With/without colpectomy/colpocleisis |
| Vaginoplasty (inversion, peritoneal, intestinal) | • May include retention of penis and/or testicle |
| Vulvoplasty | • May include procedures described as "flat front" |
| GONADECTOMY | |
| Orchiectomy | |
| Hysterectomy and/or salpingo-oophorectomy | |
| **BODY CONTOURING** | |
| Liposuction | |
| Lipofilling | |
| Implants | • Pectoral, hip, gluteal, calf |
| Monsplasty/mons reduction | |
| **ADDITIONAL PROCEDURES** | |
| Hair removal: Hair removal from the face, body, and genital areas for gender affirmation or as part of a preoperative preparation process. (see Statement 15.14 regarding hair removal) | • Electrolysis<br>• Laser epilation |
| Tattoo (i.e., nipple-areola) | |
| Uterine transplantation | |
| Penile transplantation | |



# Exclusionary bathroom policies harm transgender students

APR 17, 2019

**Tanya Albert Henry**
Contributing News Writer

For the sake of transgender students' physical and mental health, the AMA and other medical societies are urging a federal appeals court to uphold an Oregon school district's policy allowing transgender students to use bathrooms and locker rooms that match their gender identities.

## Membership Moves Medicine™

- Free access to JAMA Network™ and CME
- Save hundreds on insurance
- Fight for physicians and patient rights

Join the AMA Today

Denying transgender students this access endangers their health, safety and well-being, leads to negative health outcomes and heightens stigma and discrimination, says the amicus brief filed by the AMA, the Oregon Medical Association and a dozen other mental health and health care organizations. They filed the brief in the 9th U.S. Circuit Court of Appeals.

A group of parents of cisgender students filed a lawsuit challenging the Oregon school district's policy, saying it violated their children's right to privacy. Last summer, a federal district court judge in Oregon ruled the policy didn't violate cisgender students' privacy. Now those parents are appealing the decision in the case, Parents for Privacy v. Dallas School District No. 2.

AMA policy supports transgender individuals' use of public restrooms in line with their gender identities, and the amicus brief informs the federal court about gender dysphoria and transgender health research.

URL: https://www.ama-assn.org/delivering-care/population-care/exclusionary-bathroom-policies-harm-transgender-students
Copyright 1995 - 2024 American Medical Association. All rights reserved.

AR_275350



For example, living one's life in accordance with one's gender identity is often critical to mental health. That can include adopting a new name, dressing in a way associated with one's gender identity, and using restrooms and other single-sex facilities consistent with the identity, the brief says.

"Exclusionary policies require transgender individuals to live one facet of their lives in contradiction with their gender identity," the brief explains. Such "policies threaten to exacerbate the risk of anxiety and depression, low self-esteem, engaging in self-injurious behaviors, suicide, substance use, homelessness and eating disorders, among other adverse outcomes."

And these are risks that are already higher among transgender people. The brief points to the Report of the 2015 U.S. Transgender Survey from the National Center for Transgender Equality, which surveyed 27,000 transgender people and found that 40% reported a suicide attempt. That rate is nine times higher than in the general U.S. population.

## Exposed to harassment and abuse

Transgender students may have transitioned before arriving at a school and forcing them to use facilities that do not match how they live and are recognized in the world may forcibly out them to their peers as transgender. That is harmful, the AMA brief tells the court.

"These policies rob transgender individuals of the personal choice of whether and when to reveal their status. It is often anxiety-inducing and fraught," the brief states.

The compelled disclosure also opens up students to potential harassment and abuse. Nearly 70% of transgender survey respondents reported verbal harassment and 9% reported at physical assault in gender-segregated bathrooms, the brief says, citing research from 2013.

## UTIs, constipation can result

Exclusionary policies also force transgender students to decide whether to violate the policy and potentially face disciplinary actions; use a bathroom that doesn't match their gender identity or use a special bathroom that no other students are required to use; or not use any restroom.

None are good choices, the AMA brief tells the court, saying that "this difficult choice produces heightened anxiety and distress around restroom use, which may make it difficult for transgender individuals to concentrate or focus at school or work and potentially cause them to eschew social activities or everyday tasks."

URL: https://www.ama-assn.org/delivering-care/population-care/exclusionary-bathroom-policies-harm-transgender-students
Copyright 1995 - 2024 American Medical Association. All rights reserved.

AR_275351



And students who avoid using the restroom can have medical consequences, the brief states, including recurrent urinary tract infections and constipation, as well as the possibility of more serious health complications, including hematuria and chronic kidney disease.

## Welcoming school, better outcomes

On the flip side, numerous studies show that more welcoming, safer school environments result in lower rates of depression, suicidality and other negative health outcomes, the AMA tells the court, concluding that the court should uphold the lower court ruling that kept the Oregon school policy in place.

URL: https://www.ama-assn.org/delivering-care/population-care/exclusionary-bathroom-policies-harm-transgender-students
Copyright 1995 - 2024 American Medical Association. All rights reserved.



Home / Resources / Department Information / Equal Opportunity & Access

# Legal Advisory

Legal Advisory regarding application of California's antidiscrimination statutes to transgender youth in schools.

---

This advisory replaces LO: 1-04, dated April 30, 2004, regarding application of California's antidiscrimination statutes to transgender youth in schools. The purpose of this advisory is to provide California school districts with updated guidance on the minimum requirements for compliance with California's prohibition on gender identity discrimination.

State and federal law generally prohibits discrimination, harassment, intimidation and bullying of students based on their actual or perceived sex, gender, sexual orientation, gender identity or expression, race, color, ancestry, national origin, ethnic group identification, age, religion, marital or parental status, physical or mental disability or genetic information, or association with a person or group with one or more of these actual or perceived characteristics. (Education Code sections 220, 234.1; 42 U.S.C. sections 2000d-2000e-17, 2000h-2000h-6.)

In addition, Education Code Section 234.1, as amended by AB 9 (Ch. 728, Statutes of 2011), and Section 235, mandate that school districts("districts"), including charter or alternative schools, adopt a policy prohibiting discrimination, harassment, intimidation and bullying based on the above categories at school or in any school activity related to school attendance or under the authority of the district. Education Code Section 234.1 further requires districts to adopt a process requiring school personnel to immediately intervene, when it is safe to do so, whenever they witness acts of discrimination, harassment, intimidation or bullying based on the characteristics specified in Education Code sections 220 or 234.1 or Penal Code Section 422.55, including gender identity.

Education Code Section 221.5 specifically prohibits discrimination on the basis of sex with regard to enrollment in classes or courses, career counseling and availability of physical education activities or sports to both sexes.

In 2013, AB 1266 amended Education Code Section 221.5 to clarify that students must be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with their gender identity, regardless of the gender listed in their student records. Even prior to the passage of AB 1266, the U.S. Department of Education's Office for Civil Rights and U.S. Department of Justice's Civil Rights Division investigated a civil rights complaint based on *federal* law against Arcadia Unified School District by a transgender student. The district agreed to provide transgender and gender-nonconforming students with equal access to district facilities, programs and activities consistent with their gender identity. (*See* Resolution Agreement ⧉ (PDF))

AR_275860

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-2    Filed: 08/16/24    Page: 932 of 1019 - Page ID#: 3837

Therefore, California and federal law require schools to afford students equal opportunity and access to the school's facilities, activities, and programs, in a manner that is consistent with each student's gender identity, irrespective of whether the student's gender identity matches the student's assigned sex at birth. Education Code Section 210.7 (defining "gender" to include "a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth."). Creating that type of school environment will help ensure that all students will be provided an environment that will nurture their growth, both academically and developmentally.

The Department has prepared FAQs which address key issues regarding the requirements and implementation of AB 1266. These issues are: (1) privacy with respect to the student's transgender status; (2) names and pronouns; (3) school records; (4) dress codes and uniforms; (5) restrooms and locker rooms; (6) physical education classes and school sports; and (7) protection from harassment.  The FAQs also contain a glossary of definitions and list of helpful resources, including a model board policy and administrative regulation developed by the California School Boards Association for adoption by districts. It is recommended that these materials are reviewed by superintendents, principals, administrators and the local educational agency officer appointed pursuant to Education Code Section 234.1(g) to ensure compliance with the educational equity and nondiscrimination requirements of Education Code Section 200 et seq. and 5 California Code of Regulations Section 4900 et seq.

California law requires that schools provide all students with a safe, supportive and inclusive learning environment, free from discrimination, harassment, and bullying. Examples of harassment and abuse commonly experienced by transgender students include, but are not limited to, being teased for failing to conform to sex stereotypes, being deliberately referred to by the name and/or pronouns associated with the student's assigned sex at birth, being deliberately excluded from peer activities, and having personal items stolen or damaged. School district efforts to prevent and address harassment must include strong local policies and procedures for handling complaints of harassment, consistent and effective implementation of those policies, and encouraging members of the school community to report incidents of harassment. Beyond investigating incidents, schools should implement appropriate corrective action to end the harassment and monitor the effectiveness of those actions.

If you have further questions regarding this legal advisory, please contact us.

**Questions: School Health and Safety Office | shso@cde.ca.gov | 916-319-0914**

Last Reviewed: Thursday, February 29, 2024

AR_275861



## Administrative Regulation 5161
## GENDER IDENTITY AND GENDER NON-CONFORMITY - STUDENTS

**Responsible Office**: Office of School Leadership

**PURPOSE**

This administrative regulation establishes protocols and informs staff regarding transgender and gender non-conforming students in the Washoe County School District ("District" or "WCSD").

**REGULATION**

1. The District is committed to addressing the health and safety needs of all students, including those needs related to a student's actual or perceived gender identity. A safe and respectful environment is necessary for students to have equal access to all school programs and activities and is integral to student success. The District acknowledges its role in providing student with an understanding, appreciation of, and respect for the differences of others.

2. This administrative regulation does not anticipate every situation that might occur and, therefore, the needs of each student must be assessed on a case-by-case basis. In all cases, the goal is to foster the safe and healthy development of the transgender or gender non-conforming student while maximizing the student's social integration into the school setting and minimizing stigmatization of the student.

3. The District will not require proof of medical treatments as a prerequisite for respecting a student's gender identity or expression.

4. If a student has demonstrated a consistent, insistent, and persistent gender presentation over a period of time, school staff and volunteers shall not question whether that student's asserted gender identity is genuinely held.

5. Rights and Protections

   a. Right to Privacy –

      i. Transgender and gender non-conforming students have a right to privacy, including keeping private their sexual orientation, gender identity, transgender status, or gender non-conforming presentation at school. Transgender and gender non-conforming students have the right to discuss and express their gender identity and expression openly and to decide when, with whom, and how much to share their private information.

      ii. Staff shall not disclose information that may reveal a student's transgender or gender non-conforming status to others, including parents/guardians or other staff members, unless there is a specific

"need to know," they are legally required to do so, or the student has authorized such disclosure.

   iii. Staff must be mindful of the confidentiality and privacy rights of students when contacting parents/guardians so as to not reveal, imply or refer to a student's actual or perceived sexual orientation, gender identity, or gender expression.

b. Names/Pronouns – Students have the right to be addressed by the names and pronouns that correspond to their gender identity.  Using the student's declared name and pronoun promotes the safety and wellbeing of the student. When possible, the requested name shall be included in the District's electronic database in addition to the student's legal name, in order to inform faculty and staff, to include substitute teachers and classroom volunteers, of the name and pronoun to use when addressing the student.

   i. A student is not required to change his/her official school record or obtain a court-ordered name or gender change in order to be addressed at school by the name and pronoun which corresponds to their gender identity.  Such a request may be made by the student or by the student's parent/guardian.

   ii. If a student obtains a court order changing his/her name or recognized gender, the student or student's parent/guardian should notify the school of the court order and the official school records will be modified as appropriate in accordance with the court order.

c. Restroom Access – Students shall have access to the restroom that corresponds to their gender identity as expressed by the student and asserted at school.  Transgender and gender non-conforming students shall not be forced to use the restroom corresponding to their physiological or biological sex at birth, nor an alternative restroom such as in the health clinic.

   i. If a transgender or gender non-conforming student or the student's parent/guardian provides notice to the school principal of a reason or desire for increased privacy and/or safety with regard to restroom use, regardless of the underlying reasons, the school shall take reasonable steps to provide a reasonable accommodation for the student, including but not limited to, providing the student access to gender neutral unisex restroom facilities or a single stall restroom.  However, no student shall be compelled to use such bathroom.

d. Locker Rooms or Other Facilities – Students shall have access to use facilities that correspond to their gender identity as expressed by the student and asserted at school, irrespective of the gender listed on the

student's records, including but not limited to locker rooms. Transgender and gender non-conforming students shall not be forced to use the locker room corresponding to their physiological or biological sex at birth.

    i. If a transgender or gender non-conforming student or the student's parent or /guardian provides notice to school officials a reason or desire for increased privacy and/or safety with regard to locker room use, regardless of the underlying reason, the student shall be provided access to a reasonable alternative locker room.  The use of such accommodations shall be a matter of choice for a student and no student shall be compelled to use such accommodations. Such accommodations may include but not limited to:

        1. Use of a private area in the public area (e.g., a nearby restroom stall with a door, an area separated by a curtain, a P.E. instructor's office in the locker room, or a nearby gender neutral restroom);

        2. A separate changing schedule (either utilizing the locker room before or after the other students); or

        3. Use of a nearby private area (e.g., a nearby restroom, a nurse's office).

e. Physical Education Class and Athletics – Transgender and gender non-conforming students shall be permitted to participate in physical education classes and intramural sports in a manner that is consistent with their gender identity.

f. Interscholastic Competitive Sports Teams – Participation in interscholastic athletics by transgender and gender non-conforming students in a manner consistent with their gender identity will be addressed on a case-by-case basis, consistent with the rules and bylaws governing interscholastic sports competition, the Nevada Interscholastic Activities Association (NIAA), Title IX, and any other applicable laws, rules or bylaws.

g. Dress Code – The District shall not implement a dress code that is gender-based.  Transgender and/or gender non-conforming students have the right to dress in accordance with the gender identity or gender expression that they consistently assert at school and within the requirements of the school's dress code or site-based school uniform policy.

h. Yearbook Photos – Schools shall offer one of two alternatives in order to accommodate the needs of transgender and gender non-conforming students: (1) Allow students the option to select their preferred picture attire or "uniform", regardless of their biological sex and which is consistent with the student's asserted gender identity; or (2) Adopt a standardized, gender neutral picture "uniform" such as a cap and gown.

i. Academic Programming – the District discourages, within academic programming, the separation of students based upon gender unless it serves a compelling instructional or academic interest.

j. Gender Segregation in Other Activities – In other circumstances where students are separated by gender in school activities (e.g. class discussions, field trips, etc.), transgender and gender non-conforming students shall be permitted to participate in accordance with their gender identity that is asserted at school. Activities that may involve the need for accommodation to address student privacy concerns will be addressed on a case-by-case basis. In such circumstances, staff shall make a reasonable effort to provide an available and reasonable accommodation for the student that can address any such concerns.

k. Official Records – the District is required to maintain a mandatory permanent record which includes the legal name of the student, as well as the student's gender.  The District shall only change a student's official records to reflect a change in legal name or gender upon receipt of documentation that such legal name and/or gender have been changed in accordance with Nevada legal requirements.

6. Terminology

a. The following are examples of ways in which transgender and gender nonconforming youth describe their lives and gendered experiences: trans, transsexual, transgender, male-to-female (MTF), female-to-male (FTM), bi-gender, two-spirit, trans man, and trans woman.

b. Faculty and staff may inquire which terms students may prefer and avoid terms that make these students uncomfortable; a good general guideline is to employ those terms which the students use to describe themselves.

7. Discrimination, Harassment and Bullying Complaints

a. Concerns and/or complaints should be brought to the attention of the school principal immediately.  The District provides several reporting mechanisms to include:

   i. Online at:  www.wcsdbullying.com

   ii. By phone via Secret Witness at:  775-329-6666

   iii. Written or verbal to the school principal or other staff member

b. A formal complaint of discrimination, harassment, intimidation or bullying based upon a student's transgender or gender non-conforming status, or a student's sex, gender, sexual orientation or gender identity may be brought under Board Policy 9200, Harassment and Discrimination Prohibited, Board Policy 5700, Safe and Respectful Learning Environment, the associated administrative regulations and the procedures set forth

therein.  Incidents and/or allegations shall be given immediate attention which include, but are not limited to, the following:

    i.  Intervening immediately to stop the discrimination, harassment, bullying and/or violent behavior;

    ii.  Investigating the incident;

    iii.  Determining and enforcing corrective actions, as appropriate;

    iv.  Monitoring to ensure the behavior does not persist.

c.  The intentional or persistent refusal to respect a student's gender identity, such as by referring to the student by a name or pronoun that does not correspond to the student's gender identity, may be considered a violation of Board Policy 9200, Harassment and Discrimination Prohibited, as well as this administrative regulation.

## DEFINITIONS

1. These definitions are provided not for the purpose of labeling students but to assist in understanding this document and the legal obligations of faculty and staff.

   a. Gender Expression - The manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice or mannerisms.

   b. Gender Identity: An individual's understanding, outlook, feelings and sense of being masculine, feminine, both or neither, regardless of one's biological sex.

   c. Gender Nonconforming - A term for people whose gender expression differs from stereotypical expectations, such as "feminine" boys, "masculine" girls, and those who are perceived as androgynous. This includes people who identify outside traditional gender categories or identify as both genders. Other terms that can have similar meanings include gender diverse or gender expansive.

   d. Gender Non-conforming / Variant: an individual who is, or is perceived to have, characteristics or behaviors that do not conform to societal expectations of gender expression.  Gender non-conforming or variant individuals may or may not identify as lesbian, gay, bisexual, transgender or questioning.

   e. Sexual Orientation means having or being perceived as having an orientation, such as heterosexuality, homosexuality or bisexuality. Individuals may identify their sexual orientation as heterosexual, lesbian, gay, bisexual, questioning, or in other terms. Not all transgender youth identify as gay, lesbian, bisexual or questioning, and not all gay, lesbian,

bisexual and questioning youth display gender non-conforming characteristics.

   f. Transgender – A term used to describe a person whose gender identity or expression is different from that traditionally associated with an assigned sex at birth. Other terms that can have similar meanings are transsexual and trans.

   g. Transition - The process in which a person goes from living and identifying as one gender to living and identifying as another.

## DESIRED OUTCOMES

1. The District, through this administrative regulation, seeks to foster an educational environment that is safe and free from discrimination for all students, faculty and staff, parents/guardians, volunteers and visitors, regardless of gender identity or gender expression.

2. This administrative regulation:

   a. Seeks to facilitate compliance with local, state, and federal laws concerning bullying, harassment and discrimination and to ensure that school and district policies do not discriminate against transgender and gender non-conforming students.

   d. Documents the District's intent to reduce the stigmatization of and improve the educational integration of transgender and gender non-conforming students, maintain the privacy of all students, and foster cultural competence and professional development for faculty and staff.

   e. Will support healthy communication between the District and parents/guardians to further the successful educational development and well-being of every student.

## IMPLEMENTATION GUIDELINES & ASSOCIATED DOCUMENTS

1. This administrative regulation reflects the goals of the District's Strategic Plan and aligns/complies with the governing documents of the District, to include:

   a. Board Policy 9200, Harassment and Discrimination Prohibited

   b. Board Policy 5700, Safe and Respectful Learning Environment

2. This administrative regulation complies with Nevada Revised Statutes (NRS) and Nevada Administrative Code (NAC), to include:

   a. Chapter 386, Local Administrative Organization

      i. NRS 386.420 – 386.470, Nevada Interscholastic Activities Association

   b. Chapter 388, System of Public Instruction

       i. NRS 388.121 – 388.145, Provision of Safe and Respectful Learning Environment

   c. Chapter 392, Pupils

3. This administrative regulation complies with federal laws and regulations to include:

   a. Title VI of the Civil Rights Act of 1964

   b. Title IX of the Education Amendments of 1972

**REVIEW AND REPORTING**

1. This document shall be reviewed as part of the bi-annual review and reporting process, following each regular session of the Nevada Legislature. The Board of Trustees shall receive notification of any required changes to the associated policy.

2. Administrative regulations, and/or other associated documents, will be developed as necessary to implement this document. The Board of Trustees and Superintendent shall receive notification of the adoption and/or revision of any associated administrative regulations.

**REVISION HISTORY**

| Date | Revision | Modification |
|------|----------|--------------|
| 2/12/2015 | 1.0 | Adopted |
| 4/3/2019 | 2.0 | Revised to add language referring to "insistent, persistent, and consistent" demonstration of gender |



# IOC FRAMEWORK ON FAIRNESS, INCLUSION AND NON-DISCRIMINATION ON THE BASIS OF GENDER IDENTITY AND SEX VARIATIONS

## INTRODUCTION

Every person has the right to practise sport without discrimination and in a way that respects their health, safety, and dignity. At the same time, the credibility of competitive sport – and particularly high-level organised sporting competitions – relies on a level playing field, where no athlete has an unfair and disproportionate advantage over the rest.

Through this Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations, the International Olympic Committee (IOC) seeks to promote a safe and welcoming environment for everyone, consistent with the principles enshrined in the Olympic Charter. The Framework also acknowledges the central role that eligibility criteria play in ensuring fairness, particularly in high-level organised sport in the women's category.

This Framework is issued as part of the IOC's commitment to respecting human rights (as expressed in Olympic Agenda 2020+5) and as part of the action taken to foster gender equality and inclusion.

In issuing this Framework, the IOC recognises that it must be in the remit of each sport and its governing body to determine how an athlete may be at a disproportionate advantage against their peers, taking into consideration the nature of each sport. The IOC is therefore not in a position to issue regulations that define eligibility criteria for every sport, discipline or event across the very different national jurisdictions and sport systems.

Therefore, the aim of this Framework is to offer sporting bodies – particularly those in charge of organising elite-level competition – a principled approach to develop their criteria that are applicable to their sport. Sports bodies will also need to consider particular ethical, social, cultural and legal aspects that may be relevant in their context.

This Framework was developed following an extensive consultation with athletes and stakeholders concerned. This included members of the athlete community, International Federations and other sports organisations, as well as human rights, legal and medical experts. It replaces and updates previous IOC statements on this matter, including the 2015 Consensus Statement.

This Framework recognises both the need to ensure that everyone, irrespective of their gender identity or sex variations, can practise sport in a safe, harassment-free environment that recognises and respects their needs and identities, and the interest of everyone – particularly athletes at elite level – to participate in fair competitions where no participant has an unfair and disproportionate advantage over the rest.

AR_277290



International
Olympic
Committee

# IOC FRAMEWORK ON FAIRNESS, INCLUSION AND NON-DISCRIMINATION ON THE BASIS OF GENDER IDENTITY AND SEX VARIATIONS

## INTRODUCTION

Every person has the right to practise sport without discrimination and in a way that respects their health, safety, and dignity. At the same time, the credibility of competitive sport – and particularly high-level organised sporting competitions – relies on a level playing field, where no athlete has an unfair and disproportionate advantage over the rest.

Through this Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations, the International Olympic Committee (IOC) seeks to promote a safe and welcoming environment for everyone, consistent with the principles enshrined in the Olympic Charter. The Framework also acknowledges the central role that eligibility criteria play in ensuring fairness, particularly in high-level organised sport in the women's category.

This Framework is issued as part of the IOC's commitment to respecting human rights (as expressed in Olympic Agenda 2020+5) and as part of the action taken to foster gender equality and inclusion.

In issuing this Framework, the IOC recognises that it must be in the remit of each sport and its governing body to determine how an athlete may be at a disproportionate advantage against their peers, taking into consideration the nature of each sport. The IOC is therefore not in a position to issue regulations that define eligibility criteria for every sport, discipline or event across the very different national jurisdictions and sport systems.

Therefore, the aim of this Framework is to offer sporting bodies – particularly those in charge of organising elite-level competition – a principled approach to develop their criteria that are applicable to their sport. Sports bodies will also need to consider particular ethical, social, cultural and legal aspects that may be relevant in their context.

This Framework was developed following an extensive consultation with athletes and stakeholders concerned. This included members of the athlete community, International Federations and other sports organisations, as well as human rights, legal and medical experts. It replaces and updates previous IOC statements on this matter, including the 2015 Consensus Statement.

This Framework recognises both the need to ensure that everyone, irrespective of their gender identity or sex variations, can practise sport in a safe, harassment-free environment that recognises and respects their needs and identities, and the interest of everyone – particularly athletes at elite level – to participate in fair competitions where no participant has an unfair and disproportionate advantage over the rest.

AR_277290



Lastly, the IOC also recognises that most high-level organised sports competitions are staged with men's and women's categories competing separately. In this context, the principles contained herein aim to ensure that competition in each of these categories is fair and safe and that athletes are not excluded solely on the basis of their transgender identity or sex variations.

Where eligibility criteria must be set in order to regulate the participation in the women's and men's categories, the establishment and implementation of such criteria should be carried out as part of a comprehensive approach grounded on the respect for internationally recognised human rights, robust evidence and athlete consultation. In so doing, precaution should be used to avoid causing harm to the health and well-being of athletes.

## PRINCIPLES

This Framework should be considered as a coherent whole and should be taken into consideration by International Federations and other sports organisations when exercising their responsibility in establishing and implementing eligibility rules for high-level organised competition in their respective sports, disciplines and events and, more generally, in ensuring safe and fair competition in the context of inclusion and non-discrimination on the basis of gender identity and sex variations.

While these principles have been drafted with the specific needs of high-level organised sports competitions in mind, the general principles of inclusion and non-discrimination reflected below should be promoted and defended at all levels of sport.

## 1. INCLUSION

1.1. Everyone, regardless of their gender identity, expression and/or sex variations should be able to participate in sport safely and without prejudice.

1.2. Measures should be put in place with a view to making sporting environments and facilities welcoming to people of all gender identities.

1.3. Sports organisations should work together to advance inclusion and prevent discrimination based on gender identity and/or sex variations, through training, capacity-building and campaigns that are informed by affected stakeholders.

1.4. Mechanisms to prevent harassment and abuse in sport should be further developed by taking into account the particular needs and vulnerabilities of transgender people and people with sex variations.

AR_277291



1.5.    Where sports organisations choose to establish eligibility criteria in order to determine the participation conditions for men's and women's categories for specific contests in high-level organised sports competitions, these criteria should be established and applied in a manner that respects the principles included in this Framework. Individuals or parties responsible for issuing such criteria should be appropriately trained in order to ensure that these issues are handled in a manner consistent with these principles.

1.6.    The design, implementation and evaluation of these measures and mechanisms should be done in consultation with a cross-section of affected athletes.

## 2.  PREVENTION OF HARM

2.1    The physical, psychological and mental well-being of athletes should be prioritised when establishing eligibility criteria.

2.2.    Sports organisations should identify and prevent negative direct and indirect impacts on athletes' health and well-being that may come from the design, implementation and or interpretation of eligibility criteria.

## 3.  NON-DISCRIMINATION

3.1    Eligibility criteria should be established and implemented fairly and in a manner that does not systematically exclude athletes from competition based upon their gender identity, physical appearance and/or sex variations.

3.2    Provided they meet eligibility criteria that are consistent with principle 4, athletes should be allowed to compete in the category that best aligns with their self-determined gender identity.

3.3    Criteria to determine disproportionate competitive advantage may, at times, require testing of an athlete's performance and physical capacity. However, no athlete should be subject to targeted testing because of, or aimed at determining, their sex, gender identity and/or sex variations.

## 4.  FAIRNESS

4.1    Where sports organisations elect to issue eligibility criteria for men's and women's categories for a given competition, they should do so with a view to:

   a)  Providing confidence that no athlete within a category has an unfair and disproportionate competitive advantage (namely an advantage gained by altering one's

AR_277292



body or one that disproportionately exceeds other advantages that exist at elite-level competition);

b) preventing a risk to the physical safety of other athletes; and

c) preventing athletes from claiming a gender identity different from the one consistently and persistently used, with a view to entering a competition in a given category.


## 5.   NO PRESUMPTION OF ADVANTAGE

5.1  No athlete should be precluded from competing or excluded from competition on the exclusive ground of an unverified, alleged or perceived unfair competitive advantage due to their sex variations, physical appearance and/or transgender status.

5.2  Until evidence (per principle 6) determines otherwise, athletes should not be deemed to have an unfair or disproportionate competitive advantage due to their sex variations, physical appearance and/or transgender status.


## 6.   EVIDENCE-BASED APPROACH

6.1  Any restrictions arising from eligibility criteria should be based on robust and peer reviewed research that:

a) demonstrates a consistent, unfair, disproportionate competitive advantage in performance and/or an unpreventable risk to the physical safety of other athletes;

b) is largely based on data collected from a demographic group that is consistent in gender and athletic engagement with the group that the eligibility criteria aim to regulate; and

c) demonstrates that such disproportionate competitive advantage and/or unpreventable risk exists for the specific sport, discipline and event that the eligibility criteria aim to regulate.

6.2  Should eligibility criteria prevent an athlete from entering a given competition, such athlete should:

a) be allowed to participate in other disciplines and events for which they are eligible, in the same gender category; and

AR_277293



b) be able to contest the ultimate decision of International Federations or other sports organisations through an appropriate internal mediation mechanism, such as ombudsperson, and/or procedures before the Court of Arbitration for Sport, to seek remedy.

## 7. PRIMACY OF HEALTH AND BODILY AUTONOMY

7.1  Athletes should never be pressured by an International Federation, sports organization, or any other party (either by way of the eligibility criteria or otherwise) to undergo medically unnecessary procedures or treatment to meet eligibility criteria.

7.2  Criteria to determine eligibility for a gender category should not include gynaecological examinations or similar forms of invasive physical examinations, aimed at determining an athlete's sex, sex variations or gender.

7.3  Sports organisations should seek to educate coaches, managers and other members of the entourage to prevent interpretations of their eligibility criteria that can lead to harm.

## 8. STAKEHOLDER-CENTRED APPROACH

8.1  When drafting, reviewing, evaluating and updating eligibility criteria, sports organisations should meaningfully consult with a cross-section of athletes who may be negatively affected in order to prevent harm.

8.2  Any decisions affecting an athlete's ability to compete should follow the basic standards of procedural fairness, including neutrality and impartiality.

8.3  Sports organisations should put in place internal mechanisms that offer athletes and other affected stakeholders accessible, legitimate, safe and predictable avenues to raise concerns and grievances connected to gender-based eligibility.

## 9. RIGHT TO PRIVACY

9.1  Sports organisations should ensure transparency in their decision-making processes on eligibility while working to preserve the privacy of individuals who may be affected by such restrictions. This includes all personally identifiable information processed in the context of eligibility decisions which should be handled in compliance with applicable laws and international standards.

9.2  Medical information about an athlete, including testosterone levels, that is collected in the context of anti-doping or otherwise, must be handled in compliance with applicable privacy laws and should be used only for the purposes disclosed to the athlete at the time such information is collected.

AR_277294



9.3    Informed consent should be acquired from athletes prior to the collection of data that is obtained for the purpose of determining eligibility to compete in the men's or women's category.

9.4    Sports organisations should avoid public disclosure of athletes' confidential health and other personal information in the absence of the athlete's consent. In addition, sports organisations should consult with the athletes concerned on the best ways to publicly communicate about their eligibility.

## 10.  PERIODIC REVIEWS

10.1    Eligibility criteria should be subject to predictable periodic review to reflect any relevant ethical, human rights, legal, scientific, and medical developments in this area and should include the affected stakeholder's feedback on their application.

*******

AR_277295

HHS Public Access
Author manuscript
*Am J Prev Med.* Author manuscript; available in PMC 2018 October 01.

Published in final edited form as:
*Am J Prev Med.* 2018 October ; 55(4): 433–444. doi:10.1016/j.amepre.2018.04.049.

# Lifetime Economic Burden of Intimate Partner Violence Among U.S. Adults

Cora Peterson, PhD[1], Megan C. Kearns, PhD[1], Wendy LiKamWa McIntosh, MPH[1], Lianne Fuino Estefan, PhD, MPH[1], Christina Nicolaidis, MD, MPH[2], Kathryn E. McCollister, PhD[3], Amy Gordon, MS[2], and Curtis Florence, PhD[1]

[1]National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia;

[2]School of Social Work, Portland State University, Portland, Oregon;

[3]Department of Public Health Sciences, University of Miami Miller School of Medicine, Miami, Florida

## Abstract

**Introduction:** This study estimated the U.S. lifetime per-victim cost and economic burden of intimate partner violence.

**Methods:** Data from previous studies were combined with 2012 U.S. National Intimate Partner and Sexual Violence Survey data in a mathematical model. Intimate partner violence was defined as contact sexual violence, physical violence, or stalking victimization with related impact (e.g., missed work days). Costs included attributable impaired health, lost productivity, and criminal justice costs from the societal perspective. Mean age at first victimization was assessed as 25 years. Future costs were discounted by 3%. The main outcome measures were the mean per-victim (female and male) and total population (or economic burden) lifetime cost of intimate partner violence. Secondary outcome measures were marginal outcome probabilities among victims (e.g., anxiety disorder) and associated costs. Analysis was conducted in 2017.

**Results:** The estimated intimate partner violence lifetime cost was $103,767 per female victim and $23,414 per male victim, or a population economic burden of nearly $3.6 trillion (2014 US$) over victims' lifetimes, based on 43 million U.S. adults with victimization history. This estimate included $2.1 trillion (59% of total) in medical costs, $1.3 trillion (37%) in lost productivity among victims and perpetrators, $73 billion (2%) in criminal justice activities, and $62 billion (2%) in other costs, including victim property loss or damage. Government sources pay an estimated $1.3 trillion (37%) of the lifetime economic burden.

**Conclusions:** Preventing intimate partner violence is possible and could avoid substantial costs. These findings can inform the potential benefit of prioritizing prevention, as well as evaluation of implemented prevention strategies.

Address correspondence to: Cora Peterson, PhD, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Mailstop F-62, 4770 Buford Highway, Atlanta GA 30341. cora.peterson@cdc.hhs.gov.
SUPPLEMENTAL MATERIAL
Supplemental materials associated with this article can be found in the online version at doi:10.1016/j.amepre.2018.04.049.

Peterson et al. Page 2

## INTRODUCTION

In 2012, an estimated 26% of U. S. women and 10% of men reported their lives had been impacted (e.g., missed work or post-traumatic stress disorder [PTSD] symptoms) by contact sexual violence, physical violence, or stalking by an intimate partner.[1] Even more adults reported other forms of intimate partner violence (IPV), including noncontact sexual violence and psychological aggression.[1] IPV victimization is associated with poor short- and long-term physical and mental health outcomes.[2–4]

Few studies have quantified the IPV per-victim cost, which at a minimum includes victims' impaired health, lost productivity, and criminal justice costs,[5,6] and no study has addressed victims' long-term health costs. A 1995 National Violence Against Women analysis estimated the cost of IPV limited to acute and short-term follow-up medical costs and included only female victims ($838 per rape, $816 per physical assault, and $294 per stalking victimization [1995 US$][6]; or, $1,210, $1,178, and $424 as 2014 US$[7]). Following the methodology and presentation of a recent study that estimated the per-person lifetime cost of rape,[8] this study aims to combine previous studies' data with current administrative and surveillance data to estimate the U.S. per-victim lifetime cost and population economic burden of IPV.

## METHODS

### Study Sample

Mathematical model inputs included: number of U.S. adults (aged ≥ 18 years) with any lifetime and past 12 months IPV exposure, selected attributable, or marginal, health and other outcomes associated with IPV from administrative data and previous studies, and the marginal cost of those outcomes. Marginal outcome refers to the proportion of victims with an outcome beyond the proportion among nonvictims, and is used to calculate the attributable cost of IPV.

The main outcome measures were: (1) lifetime IPV cost per victim, and (2) lifetime IPV cost in the U.S. population (or economic burden) of currently non-institutionalized adults (hereafter, U.S. population), calculated as the lifetime cost per victim multiplied by the estimated victim population. Medical, lost productivity, and criminal justice costs were included. This analysis used the societal cost perspective (i.e., all payers), a lifetime time horizon, and assumed first IPV victimization occurred at victim average age of 25 years.[9] Future costs were discounted by 3%.[10] Costs are presented as 2014 US$ unless otherwise noted, inflated using selected indices.[7,11] Analysis was conducted in 2017 using publicly available data.

### Measures

The economic burden is based on the 2012 U. S. National Intimate Partner and Sexual Violence Survey (NISVS) estimated number of males and females with lifetime IPV exposure, defined as contact sexual violence, physical violence, or stalking by an intimate partner and related impact[1] (Table 1, Appendix Tables 1–5, available online, report expanded data and calculations). Contact sexual violence included rape, being made to penetrate,

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

AR_277560

sexual coercion, and unwanted sexual contact. Physical violence included being slapped, pushed, hit, kicked, hurt by pullinghair, slammed against something, attempting to hurt by choking or suffocating, beaten, burned on purpose, or a perpetrator using a knife or gun. Stalking included repeated harassing or threatening behaviors (e.g., watch-ing, following, orcontacting), causing the victim to be very fearful or concerned for safety; IPV-related impacts included being fear-ful; concerned for safety; PTSD symptoms; injury; needing medi-calcare; contracting sexually transmitted infection (STI); becoming pregnant; need for housing, advocate, or legal services; missing ≥1 day of work or school; or contactingacris is hotline.

IPV outcomes, identified through a targeted literature search, were included based on reference studies' U.S. population representativeness and study design (Appendix Table 3, available online). Studies addressing female and male victims were priori-tized. Reported outcomes had to facilitate calculation of victims' marginal probability of the outcome; for example, outcome prevalence among non-victims and an AOR of the relationship between the outcome and respondents' IPV exposure, controlling for relevant factors.[44] Studies that aligned with this study's exposure definition were prioritized. Unit costs represented the attributable cost of analyzed outcomes based on direct comparison of affected and unaffected individuals (Appendix Table 4, available online). Comprehensive lifetime unit costs that included medical care and lost work productivity and controlled for related conditions (e.g., depression and anxiety) were prioritized. Some lifetime costs were estimated from annual costs by multiplying the annual cost over the age range of respondents in the cost reference study, bounded by this study's average age at first victimization (25 years)[9] and current population life expectancy (79 years[45]; Appendix Table 5, available online). Prevention costs were excluded whenever possible.

A previous NISVS analysis limited to short-term lost productivity costs reported that female and male victims of IPV, sexual violence, or stalking each lost days from school and work valued at $1,063 (females) and $357 (males) (Table 1).[9] Average annual data from 2006–2015 National Crime Victimization Survey indicated 15.3% ($n$=137,155 survey-weighted) of IPV victimizations (rape or sexual assault, robbery, aggravated assault, and simple assault) included victim property loss or damage, valued at a mean $1,181 per victimization (applied in this study as per-victim cost, which is an underestimate for victims with multiple victimizations; Table 1; unpublished data, U.S. Department of Justice). Among IPV victimizations ($n$=745,946 female and $n$=151,910 male, surveyed-weighted) from annual average 2006–2015 National Crime Victimization Survey data, 1.9% of female and 0% of male victimizations required treatment for nonfatal injuries in a doctor's office, 6.6% of females and 4.6% of males required treatment in an emergency department, and 0.2% of females and 0.1% of males were admitted as inpatients (all applied as per-victim estimates in this study; Table 1; unpublished data, U.S. Department of Justice). Unit costs were the estimated payment for a doctor's visit[12] and the lifetime medical and lost productivity costs for an emergency department visit or admission for physical assault or sexual assault[13] (Table 1). In 2012, there were an estimated 1,256 murders (992 females, 264 males) perpetrated by intimate partners (Appendix Table 3, available online).[14,15] Unit costs were medical care and lost productivity due to homicide.[13]

*Am J Prev Med.* Author manuscript; available in PMC 2018 October 01.

A 2010–2012 NISVS analysis indicated 26.2% of females with lifetime IPV vaginal rape exposure had rape-related pregnancy.[17] Data from a study of a convenience sample of females (*n*=148) seeking a protection order from an intimate partner reported the outcome of IPV rape-related pregnancies (*n*=32; i. e., 81% live birth, 16% abortion, 3% still born).[16] Unit costs were estimated payments for medical treatment for medically assisted abortion,[19] pregnancy and delivery,[18] and stillborn hospital birth[20] applied to the estimated number of female IPV vaginal rape victims in 2012 NISVS1,[1,16,17,46] (i.e., cost of child-rearing not included; Table 1).

A nationally representative U.S. study of adult (aged ≥ 18 years) married or common law respondents (*n*=2,254) reported statistically significantly higher prevalence of anxiety disorder (including PTSD) among females but not males who reported victimization by a current intimate partner.[3] A longitudinal study of young adults (*n*=1,516) assessed the impact of incident dating violence and reported a significantly greater prevalence of depression among females but not males.[22] That study's results are broadly supported by other studies with only female respondents, which did not report data amenable for inclusion in this study's model.[47,48] Unit costs were medical and lost productivity costs for anxiety disorder (including PTSD)[21] and depression[23] (Table 1).

Data from 18 states in the 2005 Behavioral Risk Factor Surveillance System survey (*n*=70,156 respondents) indicated significantly higher self-reported prevalence of alcohol abuse and smoking, as well as medically diagnosed asthma, coronary heart disease, joint disease, and stroke among females and males aged ≥ 18 years with lifetime exposure to threatened, attempted, or completed physical violence and nonconsensual sex perpetrated by a current or former intimate partner.[4] Unit costs were the estimated lost work productivity value and medical payments for excess alcohol use,[24,25] smoking,[29] asthma,[30] cardiovascular disease,[37–39] and joint pain[36] (Table 1). Another nationally representative U.S. study of adults (aged 18 years), indicated higher self-reported prevalence of recent cannabis use among females and males recently victimized by an intimate partner,[26] assessed here as the medical and lost productivity cost of illicit drug use.[27]

A large random sample of females (*n*=1,928) aged 18 64 years at one U.S. managed care plan who reported recent IPV-had significantly higher medically diagnosed prevalence of headaches, gastroesophageal reflux, STI, and urinary tract infections[34] (Table 1). Unit costs were the estimated lost work productivity value and medical payments for moderate pain,[36] gastroesophageal reflux,[35] STI,[40–43] and urinary tract infections.[43] Another large survey of females (*n*=1,152) aged 18 65 years consecutively surveyed at family practice clinics indicated-a higher prevalence of blindness or glaucoma among females with current IPV compared with females with no IPV exposure.[31] Unit costs were the medical[32] and lost productivity[33] cost of blindness and visual impairment.

Similar to a previous study,[8] authors used a top-down accounting approach to estimate the cost of IPV-related criminal justice activities. Authors' annual IPV-related criminal justice expenditure estimate was $5.7 billion (or $80,632 per convicted IPV perpetrator, both as 2012 US$; Table 2 and Appendix Table 2, available online; included in the model as $83,294 in 2014 US$ [Table 1]).[49–60] Department of Justice funding for victims' services

(e.g., transitional housing) at the federal, state, and local levels was included via this method. With this approach authors could not identify the per-victim cost of such services, and it was not feasible to selectively exclude federal grant money that funds IPV prevention programs[61] or civil court proceedings.[62] This approach neither accounts for public criminal justice expenditures outside of dedicated budgets,[63] nor nonpublic expenditures on related activities. Lost productivity because of incarceration was the annual production value of the U.S. non-institutional population[64] multiplied by authors' average estimated number of years IPV perpetrators are incarcerated (2.3 years) (Table 1, Table 2, Appendix Tables 2, 4, and 5, available online).

### Statistical Analysis

Authors multiplied the marginal probability of selected outcomes by associated unit costs to estimate the per-person lifetime cost of IPV for females and males. The sex-specific, per-person estimated cost of IPV was multiplied by the estimated number of females and males with lifetime IPV exposure to estimate the total U.S. lifetime economic burden of IPV. Government costs were assessed as total criminal justice costs plus the estimated government share of all medical spending (i.e., 59.8%).[65]

## RESULTS

The present-value, per-victim IPV lifetime cost was $81,960, or $3.6 trillion for all victims, based on 32 million U.S. females and 12 million males with any lifetime victimization (Table 1). The per-victim cost was $103,767 for females and $23,414 for males, representing outcomes differences (e.g., rape-related pregnancy) and differences in the proportion of affected victims by sex for particular outcomes (Table 1).

The economic burden estimate included $2.1 trillion (59% of total) in medical costs, $1.3 trillion (37%) in lost productivity among victims and perpetrators, $73 billion (2%) in criminal justice activities, and $62 billion (2%) in other costs, including victim property loss or damage. Government sources pay an estimated $1.3 trillion (37%) of the economic burden (Table 1).

## DISCUSSION

The per-victim lifetime cost ($103,767 for females, $23,414 for males) is the estimated cost of IPV exposure. A recent study using NISVS data and similar methods estimated the lifetime per-victim cost of rape, including intimate partner perpetrators, to be $122,461 (2014 US$).[8] Other comparative cost estimates include the lifetime per-victim cost of nonfatal child maltreatment[66] ($210,012 as 2010 US$, or $225,408 as 2014 US$[7]) and smoking[29] ($219,889 for males and $106,050 for females as 2000 US$, or $292,010 and $139,119 as 2014 US$,[7] respectively).

The per-victim estimate could change with new information about victim outcomes or unit costs. Barring substantial changes to the per-victim cost, the lifetime economic burden estimate ($3.6 trillion) will remain relatively stable, as it is based on the number of U.S. adults with lifetime IPV victimization and IPV-related impact; such a large population

AR_277563

experiences modest incremental demographic changes. The estimated number of victims with IPV exposure in the past 12 months (5,244,000 females and 2,150,000 males[1]) had a lesser effect on the economic burden—only through criminal justice and fatalities costs. The economic burden represents costs over adult victims' lifetimes; therefore, it includes costs already experienced among older living adult victims and future costs among younger living adult victims. Although it is unknown what proportion of victims in the previous 12 months were first-time victimizations, applying this study's per-victim cost estimate yields an approximate annual economic burden of $594 billion. A comparative study estimated the annual economic burden of child maltreatment was $124 $585 billion (2010 US$; or $133–$628 billion as 2014 US$[7]).[66]

## Limitations

This study used outcome data from observational studies but assumed IPV was the cause of victims' higher observed prevalence of various outcomes; the status of these outcomes as risk factors for, correlates with, or outcomes of IPV is complex.[48] This means if victims and perpetrators experiencing costs related to IPV would have incurred the same costs because of other risk factors, then this study has overstated the cost attributable to IPV. Future longitudinal analysis of IPV and health outcomes might address this issue, along with issues related to timing of IPV exposure and the effects of multiple victimizations. This study did not include non-monetary elements, sometimes presented as intangible costs—a monetized version of victims' pain and suffering.[67] Costs to victims' and perpetrators' friends and families were not included. Costs to employers and insurance companies were not measured. Government costs were underestimated because reduced tax revenue due to victims' lost work productivity was not included.

The lifetime cost of some outcomes was inferred from annual cost data (Appendix Table 5, available online), which is a major limitation; this assumes an accurate distribution of patients at all stages of a particular outcome (i.e., acute, recurring, remission) in reference studies' annual estimates and, when applied to individuals, may overstate lifetime medical costs. For example, the annual cost of depression and other conditions was uniformly applied to affected victims for multiple years. Based on available data, it was not possible to assign costs by victim demographics or time since IPV exposure. The depression cost estimate referred to major depressive disorder, which represents severe depression. Reference cost studies on non-IPV populations were used for unit costs; such populations may differ in demographic distribution from the IPV victim population. This study did not address the possibility that incarcerating perpetrators could result in fewer IPV victims or victimizations.

Health outcomes that could be linked to specific costs were included, though authors did not attempt to assign a cost to increased risk factors (e.g., IPV victims have higher prevalence of activity limitations and HIV risk factors[4,34]). The cost of nonfatal suicide attempts was not included independent of anxiety and depression costs.[48] The model applied a unit cost of illicit drugs to the marginal prevalence of cannabis use among IPV victims; state-based legalization of non-medical cannabis use (first occurred in late 2012) may decrease the applicability of this unit cost for this outcome in future years. This analysis focused on the

AR_277564

prevalence and cost of formally defined health conditions as assessed in previous studies, such as anxiety (including PTSD) defined by the Composite International Diagnostic Interview 2.1.[26] How ever, a much higher proportion of IPV victims have reported individual symptoms of PTSD (e.g., nightmares, feeling numb or detached[1]). Several lost productivity unit estimates included employed respondents only, and valued respondents' productivity using the human capital approach (i.e., lost wages)—rather than value per statistical life approach—which undervalues lost productivity. Several lost productivity estimates from previous studies did not include mortality. Long-term lost productivity among IPV victims not diagnosed with any of the analyzed outcomes was not included.

Discounting assumed victims' mean age at first IPV victimization was 25 years, which underestimates costs among victims with first victimization at less than 25 years and overestimates costs among victims with first victimization at more than 25 years. First victimization occurs in adolescence for some IPV victims.[1] If first IPV exposure age was instead 18 years, the estimated lifetime cost would increase (per victim: female=$104,238, male=$24,298; data not shown). At an alternative 7% discount rate, the present value cost per victim would be lower (female=$73,378, male=$19,812; data not shown).

Too few reference studies met quality and reporting criteria for a meaningful deterministic sensitivity analysis (e.g., range test per outcome), and too few reported measures of dispersion for a meaningful probabilistic sensitivity analysis (e.g., distribution test based on CIs; Appendix Table 3, available online). Identifiable cost double-counting includes: HIV costs appear in both STI and illicit drug use unit costs, and some anxiety and substance use costs are included in the depression cost (Appendix Tables 3 and 4, available online). A small portion of the illicit drug and excess alcohol unit costs comprised research and prevention activities.[24,25,27,28] Some reference studies focused on outcomes among adults who experienced current or recent IPV or recent outcomes (e.g., STI) rather than lifetime assessment (Appendix Table 3, available online). The short-term lost productivity estimate included lifetime stalking and sexual violence victimizations by non-intimate partners.[9]

This study is notably limited by inexact timelines related to intimate partner victimizations during victims' lifetimes, number of victimizations per victim, number of victims per perpetrator, onset of attributable health outcomes, and treatment of those outcomes and related conditions. This study's acute cost estimates (e.g., short-term medical care) are per victim, rather than per victimization, which underestimates consequences among victims with multiple victimizations.[68] Owing to available data, this study did not address costs among specific subpopulations of IPV victims, including men who have sex with men. This study did not include IPV effects on non-rape pregnancies (e.g., higher prevalence of preterm birth[69]) or on children exposed to IPV (e.g., child abuse and neglect[70]) because population prevalence data are lacking.[71] Some health outcomes measured to be more prevalent among female victims have not been assessed among male victims (e.g., blindness).

Author Manuscript

AR_277565

# CONCLUSIONS

Despite limitations, this study's estimate of IPV per-victim lifetime cost ($103,767 for females, $23,414 for males) included more comprehensive information on victims' lifetime mental and physical health compared with previous estimates and provides IPV cost estimates by impact category. Findings on the cost of IPV can support the need for prevention programs and inform intervention evaluations, identifying cost-effective approaches to eliminate IPV and its substantial impact on public health and public safety. The Centers for Disease Control and Prevention's technical packages help communities use the best available evidence on strategies to stop sexual partner violence and IPV before it starts, including prevention efforts among adolescents and young adults, and support survivors to lessen harms.[72,73]

## Supplementary Material

Refer to Web version on PubMed Central for supplementary material.

## ACKNOWLEDGMENTS

The authors thank Manon Ruben and Peggy Nygren for their work on a literature review to inform this study. The authors thank Jennifer L. Truman, Lynn Langton, and Rachel E. Morgan at the U.S. Department of Justice, Bureau of Justice Statistics, for assistance with data from the National Crime Victimization Survey.

Cristina Nicolaidis, Kathryn McCollister, and Amy Gordon were supported to conduct a literature review for this study through the Centers for Disease Control and Prevention contract 200–2015-F-88070 to Quality Resource Systems Inc.

The findings and conclusions in this report are those of the authors and do not necessarily represent the official position of the Centers for Disease Control and Prevention.

Cora Peterson led the study design and interpretation of results, led data analysis, drafted and edited the manuscript, and approved the final manuscript as submitted. Megan C. Kearns conceptualized the study design, managed the literature review to inform the analyses, assisted with study design and interpretation of results, drafted and edited the manuscript, and approved the final manuscript as submitted. Wendy L. McIntosh managed the literature review to inform the analyses, assisted with study design and interpretation of results, drafted and edited the manuscript, and approved the final manuscript as submitted. Lianne Fuino Estefan managed the literature review to inform the analyses, assisted with study design and interpretation of results, drafted and edited the manuscript, and approved the final manuscript as submitted. Christina Nicolaidis led the literature review to inform the analyses, assisted with the study design and interpretation of results, edited the manuscript, and approved the final manuscript as submitted. Kathryn E. McCollister led the literature review to inform the analyses, assisted with the study design and interpretation of results, edited the manuscript, and approved the final manuscript as submitted. Amy Gordon assisted with the study design and interpretation of results, assisted with the literature review to inform the analyses, edited the manuscript, and approved the final manuscript as submitted. Curtis Florence assisted with the study design and interpretation of results, drafted and edited the manuscript, and approved the final manuscript as submitted.

No financial disclosures were reported by the authors of this paper.

# REFERENCES

1. Smith SG, Chen J, Basile KC, et al. The National Intimate Partner and Sexual Violence Survey (NISVS): 2010–2012 State Report. Atlanta, GA: National Center for Injury Prevention and Control, CDC, 2017.
2. Houston E, McKirnan DJ. Intimate partner abuse among gay and bisexual men: risk correlates and health outcomes. J Urban Health. 2007;84(5):681–690. 10.1007/s11524-007-9188-0. [PubMed: 17610158]

AR_277566

3. Afifi TO, MacMillan H, Cox BJ, Asmundson GJ, Stein MB, Sareen J. Mental health correlates of intimate partner violence in marital relationships in a nationally representative sample of males and females. J Interpers Violence. 2009;24(8):1398–1417. 10.1177/0886260508322192. [PubMed: 18718882]

4. Breiding MJ, Black MC, Ryan GW. Chronic disease and health risk behaviors associated with intimate partner violence 18 U.S. states/territories, 2005. Ann Epidemiol. 2008;18(7):538–544. 10.1016/j.annepidem.2008.02.005. [PubMed: 18495490]

5. Corso PS, Mercy JA, Simon TR, Finkelstein EA, Miller TR. Medical costs and productivity losses due to interpersonal and self-directed violence in the United States. Am J Prev Med. 2007;32(6):474–482. 10.1016/j.amepre.2007.02.010. [PubMed: 17533062]

6. CDC. Costs of Intimate Partner Violence Against Women in the United States. Atlanta, GA: CDC, 2003.

7. U.S. Bureau of Economic Analysis. Table 1.1.4. Price Indexes for Gross Domestic Product. www.bea.gov/itable/. Published December 22, 2015. Accessed December 28, 2015.

8. Peterson C, DeGue S, Florence C, Lokey CN. Lifetime economic burden of rape among U.S. adults. Am J Prev Med. 2017;52(6):691–701. 10.1016/j.amepre.2016.11.014. [PubMed: 28153649]

9. Peterson C, Liu Y, Kresnow MJ, et al. Short-term lost productivity per victim: intimate partner violence, sexual violence, or stalking. Am J Prev Med. 2018;(55)1:106–110.

10. Gold M Panel on cost-effectiveness in health and medicine. Med Care. 1996;34(12 suppl):DS197–DS199. [PubMed: 8969326]

11. U.S. Bureau of Economic Analysis. Table 2.5.4: Price Indexes for Personal Consumption Expenditures by Function. www.bea.gov/itable/. Published August 6, 2015. Accessed December 28, 2015.

12. Machlin SR, Adams SA. Statistical Brief #484: Expenses for Office-Based Physician Visits by Specialty, 2013. Rockville, MD: Agency for Healthcare Research and Quality, 2015.

13. CDC. Web-based Injury Statistics Query and Reporting System (WISQARS), Cost of Injury Reports 2010, Both Sexes, All Ages, United States. www.cdc.gov/injury/wisqars/index.html.

14. U.S. Federal Bureau of Investigation. Table 10. Expanded Homicide Data-Murder Circumstances by Relationship 2012. Washington, DC: U.S. Department of Justice; 2012 https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-the-u.s.−2012/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_10_murder_circumstances_by_relationship_2012.xls.

15. U.S. Federal Bureau of Investigation. Table 1. Expanded Homicide Data-Murder victims by race and sex, 2012. Washington, DC: U.S. Department of Justice; 2012 https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-the-u.s.−2012/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_1_murder_victims_by_race_and_sex_2012.xls.

16. McFarlane J, Malecha A, Watson K, et al. Intimate partner sexual assault against women: frequency, health consequences, and treatment outcomes. Obstet Gynecol. 2005;105(1):99–108. 10.1097/01.AOG.0000146641.98665.b6. [PubMed: 15625149]

17. Basile KC, Smith SG, Liu Y, Kresnow MJ, Fasula AM, Gilbert L, Chen J. Rape-related pregnancy and association with reproductive coercion in the U.S. Am J Prev Med. In press.

18. Truven Health Analytics. The Cost of Having a Baby in the United States. Ann Arbor, MI: Truven Health Analytics, 2013.

19. Jerman J, Jones RK. Secondary measures of access to abortion services in the United States, 2011 and 2012: gestational age limits, cost, and harassment. Womens Health Issues. 2014;24(4):e419–e424. 10.1016/j.whi.2014.05.002. [PubMed: 24981401]

20. Gold KJ, Sen A, Xu X. Hospital costs associated with stillbirth delivery. Matern Child Health J. 2013;17(10):1835–1841. 10.1007/s10995-012-1203-8. [PubMed: 23242573]

21. Greenberg PE, Sisitsky T, Kessler RC, et al. The economic burden of anxiety disorders in the 1990s. J Clin Psychiatry. 1999;60(7):427–435. 10.4088/JCP.v60n0702. [PubMed: 10453795]

22. Ackard DM, Eisenberg ME, Neumark-Sztainer D. Long-term impact of adolescent dating violence on the behavioral and psychological health of male and female youth. J Pediatrics. 2007;151(5):476–481. 10.1016/j.jpeds.2007.04.034.

AR_277567

23. Greenberg PE, Fournier AA, Sisitsky T, Pike CT, Kessler RC. The economic burden of adults with major depressive disorder in the United States (2005 and 2010). J Clin Psychiatry. 2015;76(2): 155–162. 10.4088/JCP.14m09298. [PubMed: 25742202]

24. Sacks JJ, Gonzales KR, Bouchery EE, Tomedi LE, Brewer RD. 2010 national and state costs of excessive alcohol consumption. Am J Prev Med. 2015;49(5):e73–e79. 10.1016/j.amepre. 2015.05.031. [PubMed: 26477807]

25. Bouchery EE, Harwood HJ, Sacks JJ, Simon CJ, Brewer RD. Economic costs of excessive alcohol consumption in the U.S., 2006. Am J Prev Med. 2011;41(5):516–524. 10.1016/j.amepre. 2011.06.045. [PubMed: 22011424]

26. Afifi TO, Henriksen CA, Asmundson GJ, Sareen J. Victimization and perpetration of intimate partner violence and substance use disorders in a nationally representative sample. J Nerv Ment Dis. 2012;200 (8):684–691. 10.1097/NMD.0b013e3182613f64. [PubMed: 22850303]

27. U.S. Department of Justice. The Economic Impact of Illicit Drug Use on American Society. Washington, DC: National Drug Intelligence Center, 2011.

28. HHS. Results from the 2007 National Survey on Drug Use and Health: National Findings (NSDUH Series H-34, DHHS Publication No. SMA 08–4343). Rockville, MD: Substance Abuse and Mental Health Services Administration, Office of Applied Studies, 2009.

29. Sloan F, Ostermann J, Picone G, Conover C, Taylor D. The Price of Smoking. Cambridge, MA: MIT Press, 2004.

30. Barnett SB, Nurmagambetov TA. Costs of asthma in the United States: 2002–2007. J Allergy Clin Immunol. 2011;127(1):145–152. 10.1016/j.jaci.2010.10.020. [PubMed: 21211649]

31. Coker AL, Smith PH, Fadden MK. Intimate partner violence and disabilities among women attending family practice clinics. J Womens Health (Larchmt). 2005;14(9):829–838. 10.1089/jwh. 2005.14.829. [PubMed: 16313210]

32. Frick KD, Gower EW, Kempen JH, Wolff JL. Economic impact of visual impairment and blindness in the United States. Arch Ophthalmol. 2007;125(4):544–550. 10.1001/archopht.125.4.544. [PubMed: 17420375]

33. Rein DB, Zhang P, Wirth KE, et al. The economic burden of major adult visual disorders in the United States. Arch Ophthalmol. 2006;124 (12):1754–1760. 10.1001/archopht.124.12.1754. [PubMed: 17159036]

34. Bonomi AE, Anderson ML, Reid RJ, Rivara FP, Carrell D, Thompson RS. Medical and psychosocial diagnoses in women with a history of intimate partner violence. Arch Intern Med. 2009;169(18):1692–1697. 10.1001/archinternmed.2009.292. [PubMed: 19822826]

35. Sandler RS, Everhart JE, Donowitz M, et al. The burden of selected digestive diseases in the United States. Gastroenterology. 2002;122 (5):1500–1511. 10.1053/gast.2002.32978. [PubMed: 11984534]

36. Gaskin D, Richard R. Appendix C: the economic costs of pain in the United States. Institute of Medicine Committee on Advancing Pain Research, Care, and Education Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research. Washington, DC: National Academies Press, 2011.

37. Birnbaum H, Leong S, Kabra A. Lifetime medical costs for women: cardiovascular disease, diabetes, and stress urinary incontinence. Womens Health Issues. 2003;13(6):204–213. 10.1016/ j.whi.2003.07.001. [PubMed: 14675789]

38. Mozaffarian D, Benjamin EJ, Go AS, et al. Heart disease and stroke statistics 2016 update: a report from the American Heart Association. Circulation. 2016;133(4):e38–e360. 10.1161/CIR. 0000000000000350. [PubMed: 26673558]

39. Song X, Quek RG, Gandra SR, Cappell KA, Fowler R, Cong Z. Productivity loss and indirect costs associated with cardiovascular events and related clinical procedures. BMC Health Serv Res. 2015;15:245 10.1186/s12913-015-0925-x. [PubMed: 26104784]

40. Chesson HW, Ekwueme DU, Saraiya M, Watson M, Lowy DR, Markowitz LE. Estimates of the annual direct medical costs of the prevention and treatment of disease associated with human papillomavirus in the United States. Vaccine. 2012;30(42):6016–6019. 10.1016/j.vaccine. 2012.07.056. [PubMed: 22867718]

AR_277568

41. Owusu-Edusei K, Jr., Chesson HW, Gift TL, et al. The estimated direct medical cost of selected sexually transmitted infections in the United States, 2008. Sex Transm Dis. 2013;40(3):197–201. 10.1097/OLQ.0b013e318285c6d2. [PubMed: 23403600]

42. Owusu-Edusei K, Jr., Roby TM, Chesson HW, Gift TL. Productivity costs of nonviral sexually transmissible infections among patients who miss work to seek medical care: evidence from claims data. Sex Health. 2013;10(5):434–437. 10.1071/SH13021. [PubMed: 23987746]

43. Foxman B, Barlow R, D'Arcy H, Gillespie B, Sobel JD. Urinary tract infection: self-reported incidence and associated costs. Ann Epidemiol. 2000;10(8):509–515. 10.1016/S1047-2797(00)00072-7. [PubMed: 11118930]

44. Zhang J, Yu KF. What's the relative risk? A method of correcting the odds ratio in cohort studies of common outcomes. JAMA. 1998;280 (19):1690–1691. 10.1001/jama.280.19.1690. [PubMed: 9832001]

45. Xu J, Murphy SL, Kochanek KD, Bastian BA. Deaths: final data for 2013. Natl Vital Stat Rep. 2016;64(2):1–119. [PubMed: 26905861]

46. Breiding MJ, Smith SG, Basile KC, Walters ML, Chen J, Merrick MT. Prevalence and characteristics of sexual violence, stalking, and intimate partner violence victimization-National Intimate Partner and Sexual Violence Survey, United States, 2011. MMWR Surveill Summ. 2014;63(8):1–18.

47. Beydoun HA, Beydoun MA, Kaufman JS, Lo B, Zonderman AB. Intimate partner violence against adult women and its association with major depressive disorder, depressive symptoms and postpartum depression: a systematic review and meta-analysis. Soc Sci Med. 2012;75(6):959–975. 10.1016/j.socscimed.2012.04.025. [PubMed: 22694991]

48. Devries KM, Mak JY, Bacchus LJ, et al. Intimate partner violence and incident depressive symptoms and suicide attempts: a systematic review of longitudinal studies. PLoS Med. 2013;10(5):e1001439 10.1371/journal.pmed.1001439. [PubMed: 23671407]

49. Kyckelhahn T Table 1. Percent distribution of expenditure for the justice system by type of government, FY 2012. Justice Expenditure and Employment Extracts, NCJ 248628. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2015.

50. U.S. Federal Bureau of Investigation. Table 29. Estimated number of arrests. Crime in the United States 2013. Washington, DC: U.S. Department of Justice; 2012 https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.−2013/tables/table-29/table_29_estimated_number_-of_arrests_united_states_2013.xls.

51. U.S. Department of Justice. National Crime Victimization Survey: Violent victimizations by police reporting and perpetrator type. Generated using the NCVS Victimization Analysis Tool. https://www.bjs.gov/index.cfm?ty=nvat.

52. Glaze L, Kaeble D. Table 1. Estimated number of persons supervised by adult correctional systems, by correctional status, 2000, 2005, and 2010–2013. Correctional Populations in the United States, 2013, NCJ 248479. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics; 2014 https://www.bjs.gov/content/pub/pdf/cpus13.pdf.

53. George T Domestic Violence Sentencing Conditions and Recidivism (NCJ 247243). Olympia, WA: Washington State Center for Court Research, 2010.

54. Herberman E, Bonczar T. Table 6. Rate of parole exits, by type of exit, 2008–2013. Probation and Parole in the United States, NCJ 248029. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2013.

55. Motivans M Table 7.11 Average time to first release and percent of sentence served for federal prisoners released by standard methods, October 1, 2011–September 30, 2012. Federal Justice Statistics, 2012 Statistical Tables, NCJ 248470. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2015.

56. Reaves B Table 21. Adjudication outcome for felony defendants in the 75 largest counties, by most serious arrest charge. Felony Defendants in Large Urban Counties, 2009–Statistical Tables, NCJ 243777. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2013.

57. Reaves B Table 24. Most severe type of sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009. Felony Defendants in Large Urban Counties,

AR_277569

2009—Statistical Tables, NCJ 243777. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics; 2013 www.bjs.gov/content/pub/pdf/fdluc09.pdf.

58. Reaves B Table 25. Length of prison sentence received by defendants convicted of a felony in the 75 largest counties, by most serious conviction offense, 2009. Felony Defendants in Large Urban Counties, 2009—Statistical Tables, NCJ 243777. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics; 2013 www.bjs.gov/content/pub/pdf/fdluc09.pdf.

59. Reaves B Table 26. Length of jail sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009. Felony Defendants in Large Urban Counties, 2009—Statistical Tables, NCJ 243777. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics; 2013 www.bjs.gov/content/pub/pdf/fdluc09.pdf.

60. Reaves B Table 27. Length of probation sentence received by convicted defendants in the 75 largest counties, by most serious conviction offense, 2009. Felony Defendants in Large Urban Counties, 2009—Statistical Tables, NCJ 243777. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics; 2013 www.bjs.gov/content/pub/pdf/fdluc09.pdf.

61. U.S. Department of Justice. FY 2012 OVW Grant Awards by Program. www.justice.gov/ovw/awards/fy-2012-ovw-grant-awards-program. Published 2016. Accessed October 2, 2017.

62. U.S. Department of Justice. Justice Expenditure and Employment Extracts, NCJ 248628: JEE Extracts definitions of Terms and Concepts. Washington, DC: U.S. Department of Justice, 2015.

63. Henrichson C, Delaney R. The Price of Prisons: What Incarceration Costs Taxpayers. New York: Vera Institute of Justice, 2012.

64. Grosse SD, Krueger KV, Mvundura M. Economic productivity by age and sex: 2007 estimates for the United States. Med Care. 2009;47(7 suppl 1):S94–S103. 10.1097/MLR.0b013e31819c9571. [PubMed: 19536021]

65. Woolhandler S, Himmelstein DU. Paying for national health insurance—and not getting it. Health Aff (Millwood). 2002;21(4):88–98. 10.1377/hlthaff.21.4.88. [PubMed: 12117155]

66. Fang X, Brown DS, Florence CS, Mercy JA. The economic burden of child maltreatment in the United States and implications for prevention. Child Abuse Negl. 2012;36(2):156–165. 10.1016/j.chiabu.2011.10.006. [PubMed: 22300910]

67. McCollister KE, French MT, Fang H. The cost of crime to society: new crime-specific estimates for policy and program evaluation. Drug Alcohol Depend. 2010;108(1–2):98–109. 10.1016/j.drugalcdep.2009.12.002. [PubMed: 20071107]

68. Tjaden P, Thoennes N. Full Report of the Prevalence, Incidence, and Consequences of Violence Against Women: Findings From the National Violence Against Women Survey. Washington, DC: U.S. Department of Justice; 2000 10.1037/e514172006-001.

69. Shah PS. Maternal exposure to domestic violence and pregnancy and birth outcomes: a systematic review and meta-analyses. J Womens Health (Larchmt). 2010;19(11):2017 10.1089/jwh.2010.2051. [PubMed: 20919921]

70. Taylor CA, Guterman NB, Lee SJ, Rathouz PJ. Intimate partner violence, maternal stress, nativity, and risk for maternal maltreatment of young children. Am J Public Health. 2009;99(1):175–183. 10.2105/AJPH.2007.126722. [PubMed: 19008518]

71. Kimber M, McTavish JR, Couturier J, et al. Consequences of child emotional abuse, emotional neglect and exposure to intimate partner violence for eating disorders: a systematic critical review. BMC Psychol. 2017;5(1):33 10.1186/s40359-017-0202-3. [PubMed: 28938897]

72. Basile K, DeGue S, Jones K, et al. STOP SV: A Technical Package to Prevent Sexual Violence. Atlanta, GA: National Center for Injury Prevention and Control, CDC; 2016.

73. Niolon P, Kearns M, Dills J, et al. Preventing Intimate Partner Violence Across the Lifespan: A Technical Package of Programs, Policies, and Practices. Atlanta, GA: National Center for Injury Prevention and Control, CDC, 2017.

AR_277570

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Peterson et al.

Am J Prev Med. Author manuscript; available in PMC 2018 October 01.

Page 13

AR_277571

**Table 1.**

Outcomes and Costs of IPV Per Victim and U.S. Population (2014 US$)

| Measure | Marginal outcome among victims[a,b] | | Marginal lifetime cost per outcome, $[c] | Lifetime cost, $[d] | | | |
| | | | | Per victim | | | |
| | Females | Males | | Females | Males | Population | % of total |
|---|---|---|---|---|---|---|---|
| Total[e] | | | | | | | |
| Victims[f] | $n$=31,598,000[1] | $n$=11,769,000[1] | 81,960 | 103,767 | 23,414 | 3,554,379,074,198 | 100.00 |
| Medical cost | — | — | 48,690 | 65,165 | 4,458 | 2,091,167,801,520 | 58.8 |
| Lost productivity cost | — | — | 30,156 | 36,065 | 14,291 | 1,328,157,006,028 | 37.4 |
| Criminal justice cost | — | — | 1,680 | 1,376 | 2,497 | 72,854,951,254 | 2.0 |
| Other[g] | — | — | 1,434 | 1,161 | 2,168 | 62,199,315,396 | 1.7 |
| Government cost as % of total | — | — | 30,865 | 40,389 | 5,294 | 1,326,323,457,095 | 37.3 |
| Acute outcomes | | | | | | | |
| Victim property loss/damage | | 15.3[h] | 1,181[g] | 180 | 180 | 7,821,902,886 | 0.2 |
| Victim short-term lost productivity | 100.0 | 100.0 | 730[9] | 1,063 | 357 | 37,787,735,510 | 1.1 |
| Injuries treated by location | — | — | — | 1,553 | 1,026 | 61,161,905,372 | 1.7 |
| Doctor's office | 1.9[h] | 0[h] | 168[12] | 3 | 0 | 100,426,284 | 0.0 |
| ED treat-and-release | 6.6[h] | 4.6[h] | 7,053 | 469 | 323 | 18,619,253,405 | 0.5 |
| Medical | — | — | 2,860[13] | 190 | 131 | 7,551,939,243 | 0.2 |
| Lost productivity | — | — | 4,192[13] | 279 | 192 | 11,067,314,162 | 0.3 |
| Hospitalization | 0.2[h] | 0.1[h] | 157,658 | 306 | 190 | 11,911,486,138 | 0.3 |
| Medical | — | — | 30,871[13] | 60 | 60 | 2,600,906,583 | 0.1 |
| Lost productivity | — | — | 126,787[13] | 246 | 130 | 9,310,579,555 | 0.3 |
| Victim fatalities | 0.02[14,15] | 0.01[14,15] | 1,671,227 | 316 | 205 | 12,404,636,131 | 0.3 |
| Medical | — | — | 11,707[13] | 2 | 1.44 | 86,894,883 | 0.0 |
| Lost productivity | — | — | 1,659,520[13] | 314 | 204 | 12,317,741,248 | 0.3 |
| Rape-related pregnancy | — | — | | 770 | 0 | 24,316,192,319 | 0.7 |
| Birth | 4.6[1,16,17,46] | NA | 15,867[18] | 734 | 0 | 23,208,451,647 | 0.7 |

Am J Prev Med. Author manuscript; available in PMC 2018 October 01.

Peterson et al.

| Measure | Marginal outcome among victims[a,b] | | Marginal lifetime cost per outcome, $[c] | Lifetime cost, $[d] | | | |
|---|---|---|---|---|---|---|---|
| | | | | Per victim | | | |
| | Females | Males | | Females | Males | Population | % of total |
| Abortion | 0.9[1,16,17,46] | NA | 518[19] | 5 | 0 | 149,578,053 | 0.0 |
| Stillbirth | 0.2[1,16,17,46] | NA | 17,687[18,20] | 30 | 0 | 958,162,619 | 0.0 |
| Long-term outcomes | | | | | | | |
| Victim mental health | — | — | — | 56,837 | 0 | 1,795,944,335,055 | 50.5 |
| Anxiety disorder (including PTSD) | 9.1[3] | 0[3] | 70,283 | 6,388 | 0 | 201,848,962,281 | 5.7 |
| Medical | — | — | 62,295[21] | 5,662 | 0 | 178,907,708,598 | 5.0 |
| Lost productivity | — | — | 7,988[21] | 726 | 0 | 22,941,253,683 | 0.6 |
| Depression | 15.3[22] | 0[22] | 328,788 | 50,449 | 0 | 1,594,095,372,774 | 44.8 |
| Medical | — | — | 153,906[23] | 23,615 | 0 | 746,197,091,989 | 21.0 |
| Lost productivity | — | — | 174,882[23] | 26,834 | 0 | 847,898,280,785 | 23.9 |
| Victim substance use | — | — | — | 7,683 | 17,254 | 445,823,059,179 | 12.5 |
| Alcohol abuse | 2.9[4] | 7.3[4] | 18,317 | 532 | 1,342 | 32,615,553,466 | 0.9 |
| Medical | — | — | 2,081[24,25] | 60 | 153 | 3,705,786,354 | 0.1 |
| Lost productivity | — | — | 13.176[24,25] | 383 | 966 | 23,460,634,936 | 0.7 |
| Other | — | — | 3,060[24,25] | 89 | 224 | 5,449,132,176 | 0.2 |
| Illicit drug use | 0.9[26] | 2.6[26] | 208,355 | 1,809 | 5,344 | 120,052,305,766 | 3.4 |
| Medical | — | — | 12.737[27,28] | 111 | 327 | 7,338,707,792 | 0.2 |
| Lost productivity | — | — | 129,533[27,28] | 1,125 | 3,322 | 74,635,871,014 | 2.1 |
| Other | — | — | 66,085[27,28] | 574 | 1,695 | 38,077,726,961 | 1.1 |
| Smoking | 10.6[4] | 10.2[4] | 80,782 | 5,342 | 10,567 | 293,155,199,947 | 8.2 |
| Medical | — | — | 5,427[29] | 359[i] | 710[i] | 19,695,870,448 | 0.6 |
| Lost productivity | — | — | 61,872[29] | 4,091[i] | 8,093[i] | 224,531,049,165 | 6.3 |
| Other | — | — | 13,483[29] | 892[i] | 1,764[i] | 48,928,280,335 | 1.4 |
| Victim physical health | — | — | — | 34,216 | 2,475 | 1,110,298,477,848 | 31.2 |
| Asthma | 3.5[4] | 1.9[4] | 90,150 | 3,173 | 1,670 | 119,922,014,198 | 3.4 |
| Medical | — | — | 82,688[30] | 2,910 | 1,532 | 109,995,506,175 | 3.1 |
| Lost productivity | — | — | 7,462[30] | 263 | 138 | 9,926,508,023 | 0.3 |

AR_277572

Peterson et al.

Am J Prev Med. Author manuscript; available in PMC 2018 October 01.

| Measure | Marginal outcome among victims[a,b] | | Lifetime cost, $[d] | | | | |
| | Females | Males | Marginal lifetime cost per outcome, $[c] | Per victim | | | |
| | | | | Females | Males | Population | % of total |
|---|---|---|---|---|---|---|---|
| Blindness or glaucoma | 1.9[31] | NR | 495,731 | 9,320 | 0 | 294,495,270,353 | 8.3 |
| Medical | — | — | 30.13[32] | 566 | 0 | 17,900,245,166 | 0.5 |
| Lost productivity | — | — | 465,599[33] | 8,754 | 0 | 276,595,025,187 | 7.8 |
| Gastroesophageal reflux disease | 4.4[34] | NR | 15,886 | 700 | 0 | 22,126,987,748 | 0.6 |
| Medical | — | — | 15,223[35] | 671 | 0 | 21,203,709,288 | 0.6 |
| Lost productivity | — | — | 663[35] | 29 | 0 | 923,278,459 | 0.0 |
| Headache | 7.0[34] | NR | 84,375 | 5,867 | 0 | 185,399,330,079 | 5.8 |
| Medical | — | — | 46.017[36] | 3,200 | 0 | 101,113,331,173 | 2.2 |
| Lost productivity | — | — | 38,358[36] | 2,667 | 0 | 84,285,998,906 | 2.4 |
| Heart disease | 1.2[4] | 0.0[4] | 611,338 | 7,407 | 0 | 234,060,532,626 | 6.6 |
| Medical | — | — | 576,253[37] | 7,119 | 0 | 224,940,548,425 | 6.3 |
| Lost productivity | — | — | 23,364[38,39] | 289 | 0 | 9,119,984,201 | 0.3 |
| Joint conditions | 6.7[4] | 4.4[4] | 18,220 | 1,214 | 805 | 47,841,993,692 | 1.3 |
| Medical | — | — | 16,049[36] | 1,070 | 709 | 42,143,572,430 | 1.2 |
| Lost productivity | — | — | 2,170[36] | 145 | 96 | 5,698,421,262 | 0.2 |
| Sexually transmitted infections | 2.4[34] | NR | 1,116 | 26 | 0 | 833,986,814 | 0.0 |
| Medical | — | — | 819[40,41] | 19 | 0 | 612,168,053 | 0.0 |
| Lost productivity | — | — | 297[42] | 7 | 0 | 221,818,761 | 0.0 |
| Stroke | 1.0[4] | 0.0[4] | 611,338 | 5,699 | 0 | 180,070,935,989 | 5.1 |
| Medical | — | — | 576,253[37] | 5,481 | 0 | 173,176,780,404 | 4.9 |
| Lost productivity | — | — | 35,085[38,39] | 218 | 0 | 6,894,155,585 | 0.2 |
| Urinary tract infection | 9.2[34] | NR | 422 | 39 | 0 | 1,231,234,030 | 0.0 |
| Medical | — | — | 136[43] | 13 | 0 | 395,815,201 | 0.0 |
| Lost productivity | — | — | 286[43] | 26 | 0 | 835,418,828 | 0.0 |
| Convicted perpetrators | — | — | | 1,917 | 1,917 | 83,137,022,217 | 2.3 |
| Criminal justice | 1.0[j] | | 83,294[k] | 802 | 802 | 34,777,224,293 | 1.0 |
| Lost productivity | 1.0[j] | | 115,825[l] | 1,115 | 1,115 | 48,359,797,924 | 1.4 |

AR_277573

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Note: Appendix Tables 1–5 (available online) show how data as reported in reference studies were used to calculate data as presented in this table.

[a]Combined marginal outcomes for males and females reflect estimates from studies that controlled for victim sex. Appendix Table 3 (available online) provides details. Intimate partner violence defined as contact sexual violence, physical violence, or stalking by an intimate partner and IPV-related impact.[1]

[b]Values are percentages, unless otherwise indicated.

[c]All marginal costs without references are calculated from other data in the table; for example, category sums.

[d]Per victim cost is marginal outcome probability multiplied by marginal cost. Population cost by outcome is the number of victims by sex multiplied by the per-victim cost. Total per-victim by sex and total population costs are the sum of all per-victim (by sex) and population costs by outcome.

[e]"Total" rows are sum of category costs below; e.g., "victim total cost" is sum of "medical," "productivity," "criminal justice," and "other" cost categories, which each represent sum of subcategories (e.g., "other" category includes property damage/loss) (Appendix Table 1, available online, provides details).

[f]Details of reference studies reported in Appendix Table 3 (available online; outcomes), Appendix Table 4 (available online; costs), and Appendix Table 5 (available online; discounted cost calculations).

[g]Includes victim property damage/loss and "other" costs attributable to smoking and alcohol abuse (Appendix Table 1, available online, provides details).

[h]Unpublished data from the U.S. Department of Justice. Estimate is per victimization, rather than per victim. Appendix Tables 3 and 4 (available online) provide details.

[i]Sex-specific estimates applied (Appendix Tables 1 and 4, available online, provide details).

[j]See Table 2.

[k]This is the per convicted perpetrator lifetime cost reported in Table 2 ($80,632 as 2012 US$) as 2014 US$.

[l]See Appendix Table 4 (available online).

ED, emergency department; IPV, intimate partner violence; NA, not applicable; NR, not reported; PTSD, post-traumatic stress disorder.

Am J Prev Med. Author manuscript; available in PMC 2018 October 01.

Peterson et al.

AR_277574

Peterson et al.

Am J Prev Med. Author manuscript; available in PMC 2018 October 01.

**Table 2.**

Estimated Criminal Justice Costs Related to IPV Among U.S. Adults (2012 US$)

| Measure | Input | Unit cost, $[a] | Attributable to IPV Proportion of total, % | Annual cost, $ | Per convicted perpetrator lifetime cost, $ |
|---|---|---|---|---|---|
| Annual IPV victims | | | | | 80,632[n] |
| Females, $n$ | 5,244,000[1] | — | — | — | — |
| Males, $n$ | 2,150,000[1] | — | — | — | — |
| Total U.S. Government justice system annual spending, $ | 265,160,340,000[49] | — | — | 5,739,944,705[m] | — |
| Police protection | | | | | |
| Annual spending, $ | 126,434,125,000[49] | 11,283[g] | 2.1[k] | 2,633,042,810[n] | — |
| Annual arrests, all offenses, $n$ | 11,205,833[50] | — | — | — | — |
| Annual arrests, intimate partner perpetrators, $n$ | 233,366[d] | — | — | — | — |
| Judicial and legal | | | | | |
| Annual spending, $ | 57,935,169,000[49] | 5,170[h] | 2.1[k] | 1,206,523,794[n] | — |
| Annual arrests, all offenses, $n$ | 11,205,833[50] | — | — | — | — |
| Estimated intimate partner perpetrators, $n$ | 233,336[d] | — | — | — | — |
| Annual arrests, murder offense, $n$ | 10,571[50] | — | — | — | — |
| Estimated intimate partner perpetrators, $n$ | 1,256[14,15] | — | — | — | — |
| Annual arrests, rape offense, $n$ | 21,007[50] | — | — | — | — |
| Estimated intimate partner perpetrators, % | 7[51] | — | — | — | — |
| Annual arrests, robbery offense, $n$ | 94,403[50] | — | — | — | — |
| Estimated intimate partner perpetrators, % | 12[51] | — | — | — | — |
| Annual arrests, aggravated assault offense, $n$ | 372,685[50] | — | — | — | — |
| Estimated intimate partner perpetrators, % | 15[51] | — | — | — | — |
| Annual arrests, simple assault offense, $n$ | 1,093,258[50] | — | — | — | — |
| Estimated intimate partner perpetrators, % | 15[51] | — | — | — | — |
| Corrections | | | | | |

AR_277575

Am J Prev Med. Author manuscript; available in PMC 2018 October 01.

Peterson et al.

| Measure | Input | Unit cost, $[a] | Attributable to IPV Proportion of total, % | Annual cost, $ | Per convicted perpetrator lifetime cost, $ |
|---|---|---|---|---|---|
| Annual spending, $ | 80,791,046,000[49] | 11,641[i] | 1.0[l] | 1,900,378,101[o] | — |
| Total corrections population, $n$ [b] | 6,940,500[52] | — | — | — | — |
| Corrections spending per intimate partner perpetrator, $ | — | 26,969[j] | — | — | — |
| Convicted intimate partner perpetrator (annual), all offenses, $n$ | 71,187[e] | — | — | — | — |
| IPV victims with corrections-sentenced perpetrator, % | 1.0[f] | — | — | — | — |
| Average corrections duration per convicted intimate partner perpetrator, all offenses, years[c] | 2.3[e] | — | — | — | — |

[a]Unit cost refers to per arrest or person in the corrections population.

[b]Total corrections population refers to individuals in prison, jail, probation, parole, not limited to intimate partner perpetrators. Parole defined in source as a period of conditional supervised release in the community following a prison term.

[c]Estimated corrections duration per IPV perpetrator calculated as the sum of parole, prison, and probation terms for the estimated proportion of selected offense types (murder, rape, robbery aggravated assault, simple assault) committed by intimate partners. Includes estimated years in prison, rather than prison sentence received (Appendix Table 2, available online, provides details).

[d]Calculated from number or proportion of arrests for murder, rape, robbery, aggravated assault, and simple assault estimated as intimate partner perpetrators (e.g., 7% of rape offenses).

[e]Calculations and sources reported in Appendix Table 2 (available online).

[f]Calculated as the estimated annual number of IPV victims (5,244,000 + 2,150,000 = 7,394,000) divided by the estimated number of convicted intimate partner perpetrators (71,187) annually.

[g]Calculated as total annual police protection spending ($126 billion) divided by total annual arrests (11,205,833).

[h]Calculated as total annual judicial and legal spending ($58 billion) divided by total annual arrests (11,205,833).

[i]Calculated as total annual corrections spending ($81 billion) divided by total annual corrections population (6,940,500).

[j]Corrections spending per IPV perpetrator calculated as average annual spending per person in the corrections population ($11,641) multiplied by the estimated average corrections duration per intimate partner violence perpetrator (2.3 years), with annual costs after the first year discounted to present value by 3% (Appendix Table 2, available online, provides details).

[k]Calculated as the estimated number of intimate partner perpetrator arrests (233,336) among total arrests (11,205,833).

[l]Calculated as the estimated annual number of convicted intimate partner perpetrators (71,187) as a proportion of the total annual corrections population (6,940,500).

[m]Calculated as sum of annual police protection, judicial and legal, and corrections spending attributable to IPV.

[n]Calculated as total annual spending by category multiplied by estimated proportion attributable to IPV.

AR_277576

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

[o] Calculated as estimated annual number of convicted intimate partner perpetrators (71,187) multiplied by total estimated discounted corrections cost per intimate partner perpetrator ($26,969).

[p] Calculated as estimated total annual justice system spending attributable to IPV ($5.7 billion) divided by annual number of convicted intimate partner perpetrators (71,187). IPV, intimate partner violence.

Peterson et al.

*Am J Prev Med.* Author manuscript; available in PMC 2018 October 01.

AR_277577

Violence Prevention  Centers for Disease
Control and Prevention



# Violence Prevention

Violence Prevention Home

# Fast Facts: Preventing Sexual Violence

## What is sexual violence?



Sexual violence is sexual activity when consent is not obtained or freely given. It is a serious public health problem in the United States that profoundly impacts lifelong health, opportunity, and well-being. Sexual violence impacts every community and affects people of all genders, sexual orientations, and ages. Anyone can experience or perpetrate sexual violence. The perpetrator of sexual violence is usually someone the survivor knows, such as a friend, current or former intimate partner, coworker, neighbor, or family member. Sexual violence can occur in person, online, or through technology, such as posting or sharing sexual pictures of someone without their consent, or non-consensual sexting.

For more information about sexual violence definitions please see Sexual Violence Surveillance: Uniform Definitions and Recommended Data Elements, Version 2.0 📄 [2.01 MB, 136 Pages, 508].

For information about child sexual abuse, please see Preventing Child Sexual Abuse.

## How big is the problem?

Sexual violence affects millions of people each year in the United States. Researchers know the numbers underestimate this problem because many cases are unreported. Survivors may be ashamed, embarrassed, or afraid to tell the police, friends, or family about the violence. Victims may also keep quiet because they have been threatened with further harm if they tell anyone or do not think anyone will help them. The data shows:

- **Sexual violence is common.** Over half of women and almost 1 in 3 men have experienced sexual violence involving physical contact during their lifetimes. One in 4 women and about 1 in 26 men have experienced completed or attempted rape. About 1 in 9 men were made to penetrate someone during his lifetime. Additionally, 1 in 3 women and about 1 in 9 men experienced sexual harassment in a public place.

- **Sexual violence starts early.** More than 4 in 5 female rape survivors reported that they were first raped before age 25 and almost half were first raped as a minor (i.e., before age 18). Nearly 8 in 10 male rape survivors reported that they were made to penetrate someone before age 25 and about 4 in 10 were first made to penetrate as a minor.

- **Sexual violence disproportionately affects some groups.** Women and racial and ethnic minority groups experience a higher burden of sexual violence. For example, more than 2 in 5 non-Hispanic American Indian or Alaska Native and non-Hispanic multiracial women were raped in their lifetime.

- **Sexual violence is costly.** Recent estimates put the lifetime cost of rape at $122,461 per survivor, including medical costs, lost productivity, criminal justice activities, and other costs.







## What are the consequences?

Sexual violence consequences are physical, like bruising and genital injuries, sexually transmitted infections, and pregnancy (for women) and psychological, such as depression, anxiety, and suicidal thoughts.

The consequences may be chronic. Survivors may suffer from post-traumatic stress disorder and experience re-occurring reproductive, gastrointestinal, cardiovascular, and sexual health problems.

Sexual violence is also linked to negative health behaviors. Sexual violence survivors are more likely to smoke, abuse alcohol, use drugs, and engage in risky sexual activity.

The trauma from sexual violence may impact a survivor's employment in terms of time off from work, diminished performance, job loss, or inability to work. These issues disrupt earning power and have a long-term effect on the economic well-being of survivors and their families. Coping and completing everyday tasks after victimization can be challenging. Survivors may have difficulty maintaining personal relationships, returning to work or school, and regaining a sense of normalcy.

Additionally, sexual violence is connected to other forms of violence. For example, girls who have been sexually abused are more likely to experience additional sexual violence and violence types and become victims of intimate partner violence in adulthood. Bullying perpetration in early middle school is linked to sexual harassment perpetration in high school.

## How can we prevent sexual violence?

Certain factors may increase or decrease the risk for perpetrating or experiencing sexual violence. To prevent sexual violence, we must understand and address the factors that put people at risk for or protect them from violence. We must also understand how historical trauma and structural inequities impact health.

CDC developed, STOP SV: A Technical Package to Prevent Sexual Violence 🖻 [3 MB, 48 Pages, 508] to help communities use the best available evidence to prevent sexual violence. This resource is available in English and Spanish 🖻 [17MB, 48 Pages, 508] and can impact individual behaviors and relationship, family, school, community, and societal factors that influence risk and protective factors for violence.

Different violence types are connected and often share root causes. Sexual violence is linked to other violence types through shared risk and protective factors. Addressing and preventing one violence type may have an impact on preventing other violence types.



## References

1. Basile KC, Smith SG, Breiding MJ, Black MC, & Mahendra, R. (2014). Sexual violence surveillance: uniform definitions and recommended data elements, Version 2.0. Atlanta (GA): National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

2. Basile KC, Smith SG, Kresnow M, Khatiwada S, & Leemis RW. (2022). The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

3. Peterson C, DeGue S, Florence C, Lokey C. (2017). Lifetime Economic Burden of Rape in the United States. American Journal of Preventive Medicine 52(6): 691-701.

4. Basile KC and Smith SG. (2011). Sexual Violence Victimization of Women: Prevalence, Characteristics, and the Role of Public Health and Prevention. American Journal of Lifestyle Medicine (5): 407-417.

5. Basile KC, Clayton HB, Rostad WL, & Leemis RW. (2020). Sexual violence victimization of youth and health risk behaviors. American Journal of Preventive Medicine, 58(4), 570-579.

6. Preventing Multiple Forms of Violence: A Strategic Vision for Connecting the Dots. (2016). Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

7. Espelage DL, Basile KC, Hamburger ME. (2012). Bullying perpetration and subsequent sexual violence perpetration among middle school students. Journal of Adolescent Health 50(1): 60-65.

Page last reviewed: June 22, 2022

AR_277580

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

### Dear Colleague Letter on Transgender Students
### <u>Notice of Language Assistance</u>

If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: <u>Ed.Language.Assistance@ed.gov</u>.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: <u>Ed.Language.Assistance@ed.gov</u>.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: <u>Ed.Language.Assistance@ed.gov</u>。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: <u>Ed.Language.Assistance@ed.gov</u>.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 <u>Ed.Language.Assistance@ed.gov</u> 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: <u>Ed.Language.Assistance@ed.gov</u>.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: <u>Ed.Language.Assistance@ed.gov</u>.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

May 13, 2016

Dear Colleague:

Schools across the country strive to create and sustain inclusive, supportive, safe, and nondiscriminatory communities for all students. In recent years, we have received an increasing number of questions from parents, teachers, principals, and school superintendents about civil rights protections for transgender students. Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulations prohibit sex discrimination in educational programs and activities operated by recipients of Federal financial assistance.[1] This prohibition encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status. This letter summarizes a school's Title IX obligations regarding transgender students and explains how the U.S. Department of Education (ED) and the U.S. Department of Justice (DOJ) evaluate a school's compliance with these obligations.

ED and DOJ (the Departments) have determined that this letter is *significant guidance*.[2] This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how the Departments evaluate whether covered entities are complying with their legal obligations. If you have questions or are interested in commenting on this guidance, please contact ED at ocr@ed.gov or 800-421-3481 (TDD 800-877-8339); or DOJ at education@usdoj.gov or 877-292-3804 (TTY: 800-514-0383).

Accompanying this letter is a separate document from ED's Office of Elementary and Secondary Education, *Examples of Policies and Emerging Practices for Supporting Transgender Students*. The examples in that document are taken from policies that school districts, state education agencies, and high school athletics associations around the country have adopted to help ensure that transgender students enjoy a supportive and nondiscriminatory school environment. Schools are encouraged to consult that document for practical ways to meet Title IX's requirements.[3]

**Terminology**

- *Gender identity* refers to an individual's internal sense of gender. A person's gender identity may be different from or the same as the person's sex assigned at birth.

- *Sex assigned at birth* refers to the sex designation recorded on an infant's birth certificate should such a record be provided at birth.

- *Transgender* describes those individuals whose gender identity is different from the sex they were assigned at birth. A *transgender male* is someone who identifies as male but was assigned the sex of female at birth; a *transgender female* is someone who identifies as female but was assigned the sex of male at birth.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

☐ *Gender transition* refers to the process in which transgender individuals begin asserting the sex that corresponds to their gender identity instead of the sex they were assigned at birth. During gender transition, individuals begin to live and identify as the sex consistent with their gender identity and may dress differently, adopt a new name, and use pronouns consistent with their gender identity. Transgender individuals may undergo gender transition at any stage of their lives, and gender transition can happen swiftly or over a long duration of time.

**Compliance with Title IX**

As a condition of receiving Federal funds, a school agrees that it will not exclude, separate, deny benefits to, or otherwise treat differently on the basis of sex any person in its educational programs or activities unless expressly authorized to do so under Title IX or its implementing regulations.[4] The Departments treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations. This means that a school must not treat a transgender student differently from the way it treats other students of the same gender identity. The Departments' interpretation is consistent with courts' and other agencies' interpretations of Federal laws prohibiting sex discrimination.[5]

The Departments interpret Title IX to require that when a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, the school will begin treating the student consistent with the student's gender identity. Under Title IX, there is no medical diagnosis or treatment requirement that students must meet as a prerequisite to being treated consistent with their gender identity.[6] Because transgender students often are unable to obtain identification documents that reflect their gender identity (*e.g.*, due to restrictions imposed by state or local law in their place of birth or residence),[7] requiring students to produce such identification documents in order to treat them consistent with their gender identity may violate Title IX when doing so has the practical effect of limiting or denying students equal access to an educational program or activity.

A school's Title IX obligation to ensure nondiscrimination on the basis of sex requires schools to provide transgender students equal access to educational programs and activities even in circumstances in which other students, parents, or community members raise objections or concerns. As is consistently recognized in civil rights cases, the desire to accommodate others' discomfort cannot justify a policy that singles out and disadvantages a particular class of students.[8]

*1. Safe and Nondiscriminatory Environment*

Schools have a responsibility to provide a safe and nondiscriminatory environment for all students, including transgender students. Harassment that targets a student based on gender identity, transgender status, or gender transition is harassment based on sex, and the Departments enforce Title IX accordingly.[9] If sex-based harassment creates a hostile environment, the school must take prompt and effective steps to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. A school's failure to treat students consistent with their gender identity may create or contribute to a hostile environment in violation of Title IX. For a more detailed discussion of Title IX

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

requirements related to sex-based harassment, see guidance documents from ED's Office for Civil Rights (OCR) that are specific to this topic.[10]

### 2. Identification Documents, Names, and Pronouns

Under Title IX, a school must treat students consistent with their gender identity even if their education records or identification documents indicate a different sex. The Departments have resolved Title IX investigations with agreements committing that school staff and contractors will use pronouns and names consistent with a transgender student's gender identity.[11]

### 3. Sex-Segregated Activities and Facilities

Title IX's implementing regulations permit a school to provide sex-segregated restrooms, locker rooms, shower facilities, housing, and athletic teams, as well as single-sex classes under certain circumstances.[12] When a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity.[13]

☐ **Restrooms and Locker Rooms**. A school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity.[14] A school may not require transgender students to use facilities inconsistent with their gender identity or to use individual-user facilities when other students are not required to do so. A school may, however, make individual-user options available to all students who voluntarily seek additional privacy.[15]

☐ **Athletics.** Title IX regulations permit a school to operate or sponsor sex-segregated athletics teams when selection for such teams is based upon competitive skill or when the activity involved is a contact sport.[16] A school may not, however, adopt or adhere to requirements that rely on overly broad generalizations or stereotypes about the differences between transgender students and other students of the same sex (*i.e.*, the same gender identity) or others' discomfort with transgender students.[17] Title IX does not prohibit age-appropriate, tailored requirements based on sound, current, and research-based medical knowledge about the impact of the students' participation on the competitive fairness or physical safety of the sport.[18]

☐ **Single-Sex Classes**. Although separating students by sex in classes and activities is generally prohibited, nonvocational elementary and secondary schools may offer nonvocational single-sex classes and extracurricular activities under certain circumstances.[19] When offering such classes and activities, a school must allow transgender students to participate consistent with their gender identity.

☐ **Single-Sex Schools**. Title IX does not apply to the admissions policies of certain educational institutions, including nonvocational elementary and secondary schools, and private undergraduate colleges.[20] Those schools are therefore permitted under Title IX to set their own

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sex-based admissions policies. Nothing in Title IX prohibits a private undergraduate women's college from admitting transgender women if it so chooses.

- **Social Fraternities and Sororities**. Title IX does not apply to the membership practices of social fraternities and sororities.[21] Those organizations are therefore permitted under Title IX to set their own policies regarding the sex, including gender identity, of their members. Nothing in Title IX prohibits a fraternity from admitting transgender men or a sorority from admitting transgender women if it so chooses.

- **Housing and Overnight Accommodations**. Title IX allows a school to provide separate housing on the basis of sex.[22] But a school must allow transgender students to access housing consistent with their gender identity and may not require transgender students to stay in single-occupancy accommodations or to disclose personal information when not required of other students. Nothing in Title IX prohibits a school from honoring a student's voluntary request for single-occupancy accommodations if it so chooses.[23]

- **Other Sex-Specific Activities and Rules**. Unless expressly authorized by Title IX or its implementing regulations, a school may not segregate or otherwise distinguish students on the basis of their sex, including gender identity, in any school activities or the application of any school rule. Likewise, a school may not discipline students or exclude them from participating in activities for appearing or behaving in a manner that is consistent with their gender identity or that does not conform to stereotypical notions of masculinity or femininity (*e.g.*, in yearbook photographs, at school dances, or at graduation ceremonies).[24]

### 4. Privacy and Education Records

Protecting transgender students' privacy is critical to ensuring they are treated consistent with their gender identity. The Departments may find a Title IX violation when a school limits students' educational rights or opportunities by failing to take reasonable steps to protect students' privacy related to their transgender status, including their birth name or sex assigned at birth.[25] Nonconsensual disclosure of personally identifiable information (PII), such as a student's birth name or sex assigned at birth, could be harmful to or invade the privacy of transgender students and may also violate the Family Educational Rights and Privacy Act (FERPA).[26] A school may maintain records with this information, but such records should be kept confidential.

- **Disclosure of Personally Identifiable Information from Education Records**. FERPA generally prevents the nonconsensual disclosure of PII from a student's education records; one exception is that records may be disclosed to individual school personnel who have been determined to have a legitimate educational interest in the information.[27] Even when a student has disclosed the student's transgender status to some members of the school community, schools may not rely on this FERPA exception to disclose PII from education records to other school personnel who do not have a legitimate educational interest in the information. Inappropriately disclosing (or requiring students or their parents to disclose) PII from education records to the school community may

AR_279309

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

violate FERPA and interfere with transgender students' right under Title IX to be treated consistent with their gender identity.

☐ **Disclosure of Directory Information**. Under FERPA's implementing regulations, a school may disclose appropriately designated directory information from a student's education record if disclosure would not generally be considered harmful or an invasion of privacy.[28] Directory information may include a student's name, address, telephone number, date and place of birth, honors and awards, and dates of attendance.[29] School officials may not designate students' sex, including transgender status, as directory information because doing so could be harmful or an invasion of privacy.[30] A school also must allow eligible students (*i.e.*, students who have reached 18 years of age or are attending a postsecondary institution) or parents, as appropriate, a reasonable amount of time to request that the school not disclose a student's directory information.[31]

☐ **Amendment or Correction of Education Records**. A school may receive requests to correct a student's education records to make them consistent with the student's gender identity. Updating a transgender student's education records to reflect the student's gender identity and new name will help protect privacy and ensure personnel consistently use appropriate names and pronouns.

o Under FERPA, a school must consider the request of an eligible student or parent to amend information in the student's education records that is inaccurate, misleading, or in violation of the student's privacy rights.[32] If the school does not amend the record, it must inform the requestor of its decision and of the right to a hearing. If, after the hearing, the school does not amend the record, it must inform the requestor of the right to insert a statement in the record with the requestor's comments on the contested information, a statement that the requestor disagrees with the hearing decision, or both. That statement must be disclosed whenever the record to which the statement relates is disclosed.[33]

o Under Title IX, a school must respond to a request to amend information related to a student's transgender status consistent with its general practices for amending other students' records.[34] If a student or parent complains about the school's handling of such a request, the school must promptly and equitably resolve the complaint under the school's Title IX grievance procedures.[35]

* * *

We appreciate the work that many schools, state agencies, and other organizations have undertaken to make educational programs and activities welcoming, safe, and inclusive for all students.

Sincerely,

| /s/ | /s/ |
|-----|-----|
| Catherine E. Lhamon | Vanita Gupta |
| Assistant Secretary for Civil Rights | Principal Deputy Assistant Attorney General for Civil Rights |
| U.S. Department of Education | U.S. Department of Justice |

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[1] 20 U.S.C. §§ 1681–1688; 34 C.F.R. Pt. 106; 28 C.F.R. Pt. 54. In this letter, the term *schools* refers to recipients of Federal financial assistance at all educational levels, including school districts, colleges, and universities. An educational institution that is controlled by a religious organization is exempt from Title IX to the extent that compliance would not be consistent with the religious tenets of such organization. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a).

[2] Office of Management and Budget, Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf.

[3] ED, *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 13, 2016), www.ed.gov/oese/oshs/emergingpractices.pdf. OCR also posts many of its resolution agreements in cases involving transgender students online at www.ed.gov/ocr/lgbt.html. While these agreements address fact-specific cases, and therefore do not state general policy, they identify examples of ways OCR and recipients have resolved some issues addressed in this guidance.

[4] 34 C.F.R. §§ 106.4, 106.31(a). For simplicity, this letter cites only to ED's Title IX regulations. DOJ has also promulgated Title IX regulations. *See* 28 C.F.R. Pt. 54. For purposes of how the Title IX regulations at issue in this guidance apply to transgender individuals, DOJ interprets its regulations similarly to ED. State and local rules cannot limit or override the requirements of Federal laws. *See* 34 C.F.R. § 106.6(b).

[5] *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 79 (1998); *G.G. v. Gloucester Cnty. Sch. Bd.*, No. 15-2056, 2016 WL 1567467, at *8 (4th Cir. Apr. 19, 2016); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 572-75 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000); *Schroer v. Billington*, 577 F. Supp. 2d 293, 306-08 (D.D.C. 2008); *Macy v. Dep't of Justice*, Appeal No. 012012082 (U.S. Equal Emp't Opportunity Comm'n Apr. 20, 2012). *See also* U.S. Dep't of Labor (USDOL), Training and Employment Guidance Letter No. 37-14, *Update on Complying with Nondiscrimination Requirements: Discrimination Based on Gender Identity, Gender Expression and Sex Stereotyping are Prohibited Forms of Sex Discrimination in the Workforce Development System* (2015), wdr.doleta.gov/directives/attach/TEGL/TEGL_37-14.pdf; USDOL, Job Corps, Directive: Job Corps Program Instruction Notice No. 14-31, *Ensuring Equal Access for Transgender Applicants and Students to the Job Corps Program* (May 1, 2015), https://supportservices.jobcorps.gov/Program%20Instruction%20Notices/pi_14_31.pdf; DOJ, Memorandum from the Attorney General, *Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* (2014), www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/18/title_vii_memo.pdf; USDOL, Office of Federal Contract Compliance Programs, Directive 2014-02, *Gender Identity and Sex Discrimination* (2014), www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html.

[6] *See Lusardi v. Dep't of the Army*, Appeal No. 0120133395 at 9 (U.S. Equal Emp't Opportunity Comm'n Apr. 1, 2015) ("An agency may not condition access to facilities—or to other terms, conditions, or privileges of employment—on the completion of certain medical steps that the agency itself has unilaterally determined will somehow prove the bona fides of the individual's gender identity.").

[7] *See G.G.*, 2016 WL 1567467, at *1 n.1 (noting that medical authorities "do not permit sex reassignment surgery for persons who are under the legal age of majority").

[8] 34 C.F.R. § 106.31(b)(4); *see G.G.*, 2016 WL 1567467, at *8 & n.10 (affirming that individuals have legitimate and important privacy interests and noting that these interests do not inherently conflict with nondiscrimination principles); *Cruzan v. Special Sch. Dist. No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (rejecting claim that allowing a transgender woman "merely [to be] present in the women's faculty restroom" created a hostile environment); *Glenn*, 663 F.3d at 1321 (defendant's proffered justification that "other women might object to [the plaintiff]'s restroom use" was "wholly irrelevant"). *See also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (recognizing that "mere negative attitudes, or fear . . . are not permissible bases for" government action).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[9] *See, e.g.,* Resolution Agreement, *In re Downey Unified Sch. Dist., CA,* OCR Case No. 09-12-1095, (Oct. 8, 2014), www.ed.gov/documents/press-releases/downey-school-district-agreement.pdf (agreement to address harassment of transgender student, including allegations that peers continued to call her by her former name, shared pictures of her prior to her transition, and frequently asked questions about her anatomy and sexuality); Consent Decree, *Doe v. Anoka-Hennepin Sch. Dist. No. 11, MN* (D. Minn. Mar. 1, 2012), www.ed.gov/ocr/docs/investigations/05115901-d.pdf (consent decree to address sex-based harassment, including based on nonconformity with gender stereotypes); Resolution Agreement, *In re Tehachapi Unified Sch. Dist., CA,* OCR Case No. 09-11-1031 (June 30, 2011), www.ed.gov/ocr/docs/investigations/09111031-b.pdf (agreement to address sexual and gender-based harassment, including harassment based on nonconformity with gender stereotypes). *See also Lusardi,* Appeal No. 0120133395, at *15 ("Persistent failure to use the employee's correct name and pronoun may constitute unlawful, sex-based harassment if such conduct is either severe or pervasive enough to create a hostile work environment").

[10] *See, e.g.,* OCR, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001), www.ed.gov/ocr/docs/shguide.pdf; OCR, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010), www.ed.gov/ocr/letters/colleague-201010.pdf; OCR, *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011), www.ed.gov/ocr/letters/colleague-201104.pdf; OCR, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf.

[11] *See, e.g.,* Resolution Agreement, *In re Cent. Piedmont Cmty. Coll., NC,* OCR Case No. 11-14-2265 (Aug. 13, 2015), www.ed.gov/ocr/docs/investigations/more/11142265-b.pdf (agreement to use a transgender student's preferred name and gender and change the student's official record to reflect a name change).

[12] 34 C.F.R. §§ 106.32, 106.33, 106.34, 106.41(b).

[13] *See* 34 C.F.R. § 106.31.

[14] 34 C.F.R. § 106.33.

[15] *See, e.g.,* Resolution Agreement, *In re Township High Sch. Dist. 211, IL,* OCR Case No. 05-14-1055 (Dec. 2, 2015), www.ed.gov/ocr/docs/investigations/more/05141055-b.pdf (agreement to provide any student who requests additional privacy "access to a reasonable alternative, such as assignment of a student locker in near proximity to the office of a teacher or coach; use of another private area (such as a restroom stall) within the public area; use of a nearby private area (such as a single-use facility); or a separate schedule of use.").

[16] 34 C.F.R. § 106.41(b). Nothing in Title IX prohibits schools from offering coeducational athletic opportunities.

[17] 34 C.F.R. § 106.6(b), (c). An interscholastic athletic association is subject to Title IX if (1) the association receives Federal financial assistance or (2) its members are recipients of Federal financial assistance and have ceded controlling authority over portions of their athletic program to the association. Where an athletic association is covered by Title IX, a school's obligations regarding transgender athletes apply with equal force to the association.

[18] The National Collegiate Athletic Association (NCAA), for example, reported that in developing its policy for participation by transgender students in college athletics, it consulted with medical experts, athletics officials, affected students, and a consensus report entitled *On the Team: Equal Opportunity for Transgender Student Athletes* (2010) by Dr. Pat Griffin & Helen J. Carroll (*On the Team*), https://www.ncaa.org/sites/default/files/NCLR_TransStudentAthlete%2B(2).pdf. *See* NCAA Office of Inclusion, *NCAA Inclusion of Transgender Student-Athletes* 2, 30-31 (2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf (citing *On the Team*). The *On the Team* report noted that policies that may be appropriate at the college level may "be unfair and too complicated for [the high school] level of competition." *On the Team* at 26. After engaging in similar processes, some state interscholastic athletics associations have adopted policies for participation by transgender students in high school athletics that they determined were age-appropriate.

[19] 34 C.F.R. § 106.34(a), (b). Schools may also separate students by sex in physical education classes during participation in contact sports. *Id.* § 106.34(a)(1).

[20] 20 U.S.C. § 1681(a)(1); 34 C.F.R. § 106.15(d); 34 C.F.R. § 106.34(c) (a recipient may offer a single-sex public nonvocational elementary and secondary school so long as it provides students of the excluded sex a "substantially

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

equal single-sex school or coeducational school").

[21] 20 U.S.C. § 1681(a)(6)(A); 34 C.F.R. § 106.14(a).

[22] 20 U.S.C. § 1686; 34 C.F.R. § 106.32.

[23] *See, e.g.*, Resolution Agreement, *In re Arcadia Unified. Sch. Dist., CA*, OCR Case No. 09-12-1020, DOJ Case No. 169-12C-70, (July 24, 2013), www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadiaagree.pdf (agreement to provide access to single-sex overnight events consistent with students' gender identity, but allowing students to request access to private facilities).

[24] *See* 34 C.F.R. §§ 106.31(a), 106.31(b)(4). *See also*, *In re Downey Unified Sch. Dist., CA*, *supra* n. 9; *In re Cent. Piedmont Cmty. Coll., NC*, *supra* n. 11.

[25] 34 C.F.R. § 106.31(b)(7).

[26] 20 U.S.C. § 1232g; 34 C.F.R. Part 99. FERPA is administered by ED's Family Policy Compliance Office (FPCO). Additional information about FERPA and FPCO is available at www.ed.gov/fpco.

[27] 20 U.S.C. § 1232g(b)(1)(A); 34 C.F.R. § 99.31(a)(1).

[28] 34 C.F.R. §§ 99.3, 99.31(a)(11), 99.37.

[29] 20 U.S.C. § 1232g(a)(5)(A); 34 C.F.R. § 99.3.

[30] Letter from FPCO to Institutions of Postsecondary Education 3 (Sept. 2009), www.ed.gov/policy/gen/guid/fpco/doc/censuslettertohighered091609.pdf.

[31] 20 U.S.C. § 1232g(a)(5)(B); 34 C.F.R. §§ 99.3. 99.37(a)(3).

[32] 34 C.F.R. § 99.20.

[33] 34 C.F.R. §§ 99.20-99.22.

[34] *See* 34 C.F.R. § 106.31(b)(4).

[35] 34 C.F.R. § 106.8(b).

List of Citations for Administrative Record
Nondiscrimination on the Basis of Sex in Education Programs or Activities
Receiving Federal Financial Assistance
89 Fed. Reg. 33474 (April 29, 2024)

**Federal Cases**

- 303 Creative LLC v. Elenis, 600 U.S. 570 (2023)
- A.C. by M.C. v. Metro. Sch. Dist. of Martinsville, 75 F.4th 760 (7th Cir. 2023)
- A.P. v. Fayette Cnty. Sch. Dist., No. 21-12562, 2023 WL 4174070 (11th Cir. 2023)
- Adams v. Sch. Bd. of St. Johns Cnty., 57 F.4th 791 (11th Cir. 2022)
- Adams v. Sch. Bd. of St. Johns Cnty., 968 F.3d 1286 (11th Cir. 2020), vacated and superseded, 3 F.4th 1299 (11th Cir. 2021), reh'g en banc pending, 9 F.4th 1369 (11th Cir. 2021)
- Adams v. Univ. of North Carolina-Wilmington, 640 F.3d 550 (4th Cir. 2011)
- Addington v. Texas, 421 U.S 418 (1979)
- Aguilar v. Avis Rent A Car Sys., Inc., 21 Cal. 4th 121 (1999)
- Air Transp. Ass'n of Am. v. FAA, 169 F.3d 1 (D.C. Cir. 1999)
- Alaska Factory Trawler Ass'n v. Balridge, 831 F.2d 1456 (9th Cir. 1987)
- Albeiz v. Kaminski, No. 09–1127, 2010 WL 2465502 (E.D. Wisc. June 14, 2010)
- Alexander v. Choate, 469 U.S. 287 (1985)
- Alexander v. Sandoval, 532 U.S. 275 (2001)
- Am. Fuel & Petrochemical Manufacturers v. E.P.A., 937 F.3d 559 (D.C. Cir. 2019)
- Anderson v. G.D.C., Inc., 281 F.3d 452 (4th Cir. 2002)
- Arceneaux v. Vanderbilt Univ., 25 Fed. Appx. 345 (6th Cir. 2001)
- Archut v. Ross Univ. Sch. of Veterinary Medicine, 580 Fed. Appx. 90 (3rd Cir. 2014)
- Arizona v. U.S., 567 U.S. 387 (2012)
- Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291 (2006)
- Arnold v. Barbers Hill Indep. Sch. Dist., 479 F. Supp. 3d 511 (S.D. Tex. 2020)
- Ashmore v. Hilton, 834 So. 2d 1131 (La. Ct. App. 2002)
- Asiana Airlines v. FAA, 134 F.3d 393 (D.C. Cir. 1998)
- Ass'n of Nat'l Advertisers, Inc. v. FTC, 627 F.2d 1151 (D.C. Cir. 1979)
- Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104 (1st Cir. 1997)
- Averett v. Hardy, No. 19-00116, 2023 WL 2471361 (W.D. Ky. Mar. 10, 2023)
- B.P.J. v. W. Va. State Bd. of Educ., 550 F. Supp. 3d 347 (S.D. W. Va. 2021)
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316, 2023 WL 111875 (S.D. W. Va. Jan. 5, 2023)
- Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112(9th Cir. 2001)
- Bailey v. Metro. Ambulance Servs., Inc., 992 F.3d 1265 (11th Cir. 2021)
- Balakrishnan v. Regents of the Univ. of California, 99 Cal.App.5th 513 (Cal. Ct. App. 2024)
- Banner Health v. Burwell, 55 F.Supp.3d 1 (D.D.C. 2014)
- Barker v. Riverside Cty. Office of Educ., 584 F.3d 821 (9th Cir. 2009)
- Barker v. Taft Broadcasting Co., 549 F.2d at 401 (6th Cir. 1977)
- Barnes v. Gorman, 536 U.S. 181 (2002)
- Barnett Bank of Marion Cnty, N.A. v. Nelson, 517 U.S. 25 (1996)

AR_280865

- Barnett v. Kapla, No. 20-03748, 2020 WL 7428321 (N.D. Cal. Dec. 18, 2020)
- Barnhardt v. Open Harvest Co-op, 742 F.3d 365 (8th Cir. 2014)
- Barrett v. Whirlpool Corp., 556 F.3d 502 (6th Cir. 2009)
- Baxter v. Palmigiano, 425 U.S. 308 (1976)
- Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78 (1978)
- Bd. of Dirs. of Rotary Internat'l v. Rotary Club of Duarte, 481 U.S. 537 (1987)
- Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ., 208 F. Supp. 3d 850 (S.D. Ohio 2016)
- Bd. of Educ. v. Melrose Municipal Sch. (Ct. App. N.M. 1987)
- Bd. of Educ. v. State Bd. of Educ. (Kimbrough), 497 N.E.2d 984 (Ill. 1986)
- Behne v. Union Cnty. Coll., No. 14–6929, 2018 WL 566207 (D.N.J. Jan. 26, 2018)
- Bennett v. Ky. Dep't of Educ., 470 U.S. 656 (1985)
- Bigge v. Dist. Sch. Bd. of Citrus Cnty., Fla., No. 11–00210, 2011 WL 6002927 (M.D. Fl. Nov. 28, 2011)
- Blackburn v. Fisk Univ., 443 F.2d 121 (6th Cir. 1971)
- Blunt v. Lower Merion Sch. Dist., 767 F.3d 247 (3d Cir. 2014)
- Bd. of Regents v. Roth, 408 U.S. 564 (1972)
- Boermeester v. Carry, 15 Cal.5th 72, 95 (Cal. 2023), cert. denied, 144 S. Ct. 497 (2023)
- Bostock v. Clayton Cnty., 590 U.S. 644 (2020)
- Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988)
- Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)
- Bray v. Alexandria Women's Health Clinic, 506 U.S. 263 (1993)
- Brine v. Univ. of Iowa, 90 F.3d 271, 274 (8th Cir. 1996), cert. denied, 519 U.S. 1149 (1997)
- Brock v. Roadway Exp., Inc., 481 U.S. 252 (1987)
- Brooks v. Skinner, 139 F.Supp. 3d 869 (S.D. Ohio 2015)
- Brown v. Arizona, 82 F.4th 863 (9th Cir. 2023), cert. denied, 144 S. Ct. 1346, 218 L. Ed. 2d 423 (2024)
- Brown v. City of Tucson, 336 F.3d 1181 (9th Cir. 2003)
- Brown v. Hot, Sexy, and Safer Products, Inc., 68 F.3d 525 (1st Cir. 1995)
- Brown v. Univ. of Mass. Amherst, No. 22-30068, 2023 WL 2383779 (D. Mass. Mar. 6, 2021)
- Bryant v. Aiken Regional Medical Centers, Inc., 333 F.3d 536 (4th Cir. 2003)
- Bryant v. Indep. Sch. Dist. No I-38, 334 F.3d 928 (10th Cir. 2003)
- Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341 (2001)
- Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n, 96 F.4th 707 (4th Cir. 2024)
- Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n, No. 20-3132, 2022 WL 2869041 (D. My. Jul. 21, 2022)
- Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)
- Bushco v. Shurtleff, 729 F.3d 1294 (10th Cir. 2013)
- Butler v. Oak Creek-Franklin Sch. Dist., 172 F. Supp. 2d 1102 (E.D. Wis. 2001)
- Butler v. Rector & Bd. of Visitors of Coll. of William & Mary, 121 Fed. App'x 515 (4th Cir. 2005)
- C.V. v. Waterford Township Bd. of Ed., 225 N.J. 289 (2023)
- C.G on behalf of C.G. v. Siegfried, 38 F.4th 1270 (10th Cir. 2022)
- C.R. v. Eugene School District 4J, 835 F.3d 1142 (9th Cir. 2016)
- Cablevision Sys. Corp. v. FCC, 649 F.3d 695 (D.C. Cir. 2011)

- Cafeteria & Rest. Workers v. McElroy, 367 U.S. 886 (1961)
- California v. Green, 399 U.S. 149 (1970)
- Cameron v. EMW Women's Surgical Ctr., P.S.C., 595 U.S. 267 (2022)
- Cannon v. Univ. of Chicago, 441 U.S. 677 (1979)
- Canton v. Benton Pub. Sch., No. 00-00215, 2002 WL 562638 (E.D. Ark. Apr. 11, 2002)
- Carney v. Adams, 592 U.S. 53 (2020)
- Centro Legal de la Raza v. Exec. Off. for Immigr. Rev., 524 F.Supp.3d 919 (N.D. Cal. 2021)
- Chambers v. D.C., 35 F.4th 870 (D.C. Cir. 2022), judgment entered, No. 19-7098, 2022 WL 2255692 (D.C. Cir. June 23, 2022)
- Chaplin v. Consol. Edison Co., 628 F. Supp. 143 (S.D.N.Y. 1986)
- Chen Through Chen v. Albany Unified Sch. Dist., 56 F.4th 708 (9th Cir. 2022), cert. denied sub nom. Epple v. Albany Unified Sch. Dist., 143 S. Ct. 2641 (2023)
- Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984)
- Chiara v. Town of New Castle, 126 A.D.3d 111 (App. Div. 2015)
- Christian Legal Society Chapter of the Univ. of California, Hastings College of Law v. Martinez, 561 U.S. 661 (2010)
- Cianciotto ex rel. D.S. v. N.Y.C. Dep't of Educ., 600 F. Supp. 3d 434 (S.D.N.Y. 2022)
- Cigar Ass'n of Am. v. U.S. Food & Drug Admin., 480 F. Supp. 3d 256 (D.D.C. 2020), judgment entered, No. 16-01460, 2020 WL 12957025 (D.D.C. Aug. 24, 2020), and aff'd sub nom. Cigar Ass'n of Am. v. U.S. Food & Drug Admin., 5 F.4th 68 (D.C. Cir. 2021)
- City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432 (1985)
- City of Hoboken v. Chevron Corp., 45 F.4th 699 (3d Cir. 2022)
- City of New York v. F.C.C., 486 U.S. 57 (1988)
- City of Stoughton v. EPA, 858 F.2d 747 (D.C. Cir. 1998)
- Clark v. Arizona, 548 U.S. 735 (2006)
- Clark v. Ariz. Interscholastic Ass'n, 695 F.2d 1126 (9th Cir. 1982)
- Clayton v. Trustees of Princeton Univ., 519 F. Supp. 802 (D.N.J. 1981)
- Cleveland Bd. of Education v. LaFleur, 414 U.S. 632 (1974)
- Cloud v. Trustees of Boston Univ., 720 F.2d 721 (1st Cir. 1983)
- Cmty. Nutrition Inst. v. Block, 749 F.2d 50 (D.C. Cir. 1984)
- Cohen v. Brown Univ., 991 F.2d 888 (1st Cir. 1993)
- Cohen v. San Bernardino Valley College, 92 F.3d 968 (9th Cir. 1996)
- Cole v. Tansy, 926 F.2d 955 (10th Cir. 1991)
- Coleman v. Bobby Dodd Inst, No. 17-00029, 2017 WL 2486080 (M.D. Ga. June 8, 2017)
- Collins Sec. Corp. v. SEC, 562 F.2d 820 (D.C. Cir. 1977)
- Conley v. Nw. Fla. State Coll., 145 F. Supp. 3d 1073 (N.D. Fla. 2015)
- Connecticut v. Doehr, 501 U.S. 1 (1991)
- Conner v. Schrader-Bridgeport Int'l Inc., 227 F.3d 179 (4th Cir. 2000)
- Consolidated Rail Corp. v. Darrone, 465 U.S. 624 (1984)
- Corso v. Creighton Univ., 731 F.2d 529 (8th Cir. 1984)
- Coveney v . President & Trustees of College of Holy Cross, 388 Mass. 16 (1983)
- Crandell v. N.Y. Coll., Osteopathic Med., 87 F. Supp. 2d 304 (S.D.N.Y. 2000)
- Crane v. Kentucky, 476 U.S. 683 (1986)

AR_280867

- Crews v. City of Mt. Vernon, 567 F.3d 860 (7th Cir. 2009)
- Crenshaw v. Erskine College, 432 S.C. 1 (2020)
- Cruzan v. Special Sch. Dist. # 1, 294 F.3d 981 (8th Cir. 2002)
- Cummings v. Walsh Constr. Co., 561 F. Supp. 872 (S.D. Ga. 1983)
- D.F. ex rel. Finkle v. Bd. of Educ. Of Syosset Cent. Sch. Dist., 386 F.Supp.2d 119 (E.D.N.Y. 2005)
- D.J. v. Sch. Bd. of Henrico Cnty., 488 F.Supp.3d 307 (E.D. Va. 2020)
- Dahmer v. Western Kentucky Univ., No. 18- 00124, 2019 WL 1781770 (W.D. Ky. Apr. 23, 2019)
- Dambrot v. Central Michigan Univ., 55 F.3d 1177 (6th Cir. 1995)
- Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629 (1999)
- Dean v. Raplee, 39 N.E. 952 (N.Y. 1895)
- DeGroote v. Arizona Bd. of Regents, No. 18-00310, 2020 WL 10357074 (D. Ariz. Feb. 7, 2020)
- DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008)
- Delaware Dep't of Nat. Res. & Env't Control v. E.P.A., 785 F.3d 1 (D.C. Cir. 2015), as amended (July 21, 2015)
- Delaware v. Van Arsdall, 475 U.S. 673 (1986)
- Dep't of Homeland Sec. v. Regents of the Univ. of California, 140 S. Ct. 1891 (2020)
- Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)
- Dillon v. Pulaski Co. Special Sch. Dist., 594 F.2d 699 (8th Cir. 1979)
- Dismukes v. Brandeis Univ., No. 19-11049, 2021 WL 1518828 (D Mass 2021)
- DiStiso v. Cook, 691 F.3d 226 (2d Cir. 2012)
- Dixon v. Ala. St. Bd. of Educ., 294 F.2d 150 (5th Cir. 1961)
- Dixon v. Love, 431 U.S. 105 (1977)
- Dodds v. U.S. Dep't of Educ., 845 F.3d 217 (6th Cir. 2016)
- Dobbs v. Jackson Women's Health Organization, 597 U.S. 215 (2022)
- Doe 12 v. Baylor U., 336 F. Supp. 3d 763 (W.D. Tex. 2018)
- Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd., 384 F. Supp. 3d 598 (E.D. Va. 2019)
- Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd., 832 F. App'x 802 (4th Cir. 2020)
- Doe 2 v. Citadel, 421 S.C. 140, 152, 805 S.E.2d 578 (Ct. App. 2017), reh'g denied (Sept. 27, 2017), cert. denied (Mar. 28, 2018)
- Doe by Watson v. Russell Cty. Sch. Bd., 292 F.Supp.3d 690 (W.D. Va. 2018)
- Doe ex rel. Doe v. Derby Bd. of Educ., 451 F. Supp. 2d 438 (D. Conn. 2006)
- Doe v. Alger, 228 F. Supp. 3d 713 (W.D. Va. 2016)
- Doe v. Allee, 30 Cal. App. 5th 1036 (Ct. App. 2019)
- Doe v. Baum, 903 F.3d 575 (6th Cir. 2018)
- Doe v. Bd. of Regents of Univ. of Wis., 615 F. Supp. 3d 877 (W.D. Wis. 2022)
- Doe v. Bd. of Supervisors of Univ. of La. Sys., 650 F.Supp.3d 452 (M.D. La. 2023)
- Doe v. Belmont Univ., 334 F. Supp. 3d 877 (M.D. Tenn. 2018)
- Doe v. Belmont Univ., 367 F.Supp.3d 732 (MD Tenn. 2019)
- Doe v. Boyertown Area Sch. Dist., 897 F.3d 518 (3d Cir. 2018)
- Doe v. Brandeis, 177 F. Supp. 3d 561 (D. Mass. 2016)
- Doe v. Brown Univ., 896 F.3d 127 (1st Cir. 2018)
- Doe v. Claremont McKenna College, 24 Cal. App. 5th 1055 (CA Ct of Appeal, Second Civ., 2018)
- Doe v. Coastal Carolina Univ., 522 F. Supp. 3d 173 (D.S.C. 2021)

- Doe v. Coventry Bd. of Ed., 603 F. Supp. 2d 226 (2009)
- Doe v. Cummins, 662 F. App'x 437 (6th Cir. 2016)
- Doe v. Dallas Ind. Sch. Dist., No. 01-1092, 2002 WL 1592694 (N.D. Tex. July 16, 2002)
- Doe v. DiGenova, 779 F.2d 74 (D.C. Cir. 1985)
- Doe v. East Haven Bd. of Educ., 200 Fed.Appx. 46 (2d Cir. 2006)
- Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257 (4th Cir. 2021), cert. denied, 143 S. Ct. 442 (2022)
- Doe v. Fairfax Cnty. Sch. Bd., 403 F. Supp. 3d 508 (E.D. Va. 2019)
- Doe v. Galster, 768 F.3d 611 (7th Cir. 2014)
- Doe v. Haas, 427 F. Supp. 3d 336 (E.D.N.Y. 2019)
- Doe v. Hamden Bd. of Ed., No. 06–1680, 2008 WL 2113345 (D. Conn. May 19, 2008)
- Doe v. Harvard Univ., 462 F. Supp. 3d 51 (D. Mass. 2020)
- Doe v. Hobart & William Smith Colls., 546 F. Supp. 3d 250 (W.D.N.Y. 2021)
- Doe v. Ind. Wesleyan Univ., No. 20-00039, 2020 WL 2474483 (N.D. In. May 12, 2020)
- Doe v. Loyola Univ. Md., No. 20-1227, 2021 WL 1174707 (D. Md. Mar. 29, 2021)
- Doe v. Mass. Dep't of Corr., No. 17-12255, 2018 WL 2994403 (D. Mass. June 14, 2018)
- Doe v. Mass. Inst. of Tech., 46 F.4th 61 (1st Cir. 2022)
- Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545 (3d Cir. 2017)
- Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018)
- Doe v. Michigan State Univ., 989 F.3d 418 (6th Cir. 2021)
- Doe v. Mississippi, No. 16-00063, 2018 WL 3570229 (S.D. Miss. July 24, 2018)
- Doe v. Morehouse Coll., Inc., 622 F. Supp. 3d 1279 (N.D. Ga. 2022)
- Doe v. N. Michigan Univ., 393 F. Supp. 3d 683 (W.D. Mich. 2019)
- Doe v. Oberlin College, 963 F.3d 580 (6th Cir. 2020)
- Doe v. Ohio Univ., No. 21-858, 2022 WL 899687 (S.D. Oh. Mar. 28, 2022)
- Doe v. Princeton Univ., No. 19-07853, 2020 WL 7383192 (D.N.J. Dec. 16, 2020)
- Doe v. Princeton Univ., 30 F.4th 335 (3d Cir. 2022)
- Doe v. Purdue Univ., 928 F.3d 652 (7th Cir. 2019)
- Doe v. Quinnipiac Univ., 404 F. Supp. 3d 643 (D. Conn. 2019)
- Doe v. Regents of Univ. of Cal. (UCLA), 23 F.4th 930 (9th Cir. 2022)
- Doe v. Rocky Mountain Classical Acad., No. 19-03530, 2022 WL 16556255 (D. Colo. Sept. 30, 2022)
- Doe v. Rollins College No. 18-1069, 2019 WL 11703979 (M.D. Fla. Apr. 10, 2019)
- Doe v. Rollins College, No. 18-1069, 2020 WL 10090795 (M.D. Fla. Mar. 9, 2020)
- Doe v. Salisbury Univ., 123 F. Supp. 3d 748 (D. Md. 2015)
- Doe v. Sch. Dist. No. 1, Denver, Colo., 970 F.3d 1300 (10th Cir. 2020)
- Doe v. Snyder, 28 F.4th 103 (9th Cir. 2022)
- Doe v. Starpoint Cent. Sch. Dist., No. 23-207, 2023 WL 2859134 (W.D.N.Y. Apr. 10, 2023)
- Doe v. Stephens, 851 F.2d 1457 (D.C. Cir. 1988)
- Doe v. Syracuse Univ., No. 22-00644, 2023 WL 4105481 (N.D.N.Y. June 21, 2023)
- Doe v. Tex. Christian Univ., 601 F. Supp. 3d 78 (N.D. Tex. 2022)
- Doe v. The Citadel, No. 22-1843, 2023 WL 3944370 (4th Cir. Jun. 12, 2023)
- Doe v. The League Sch. of Greater Boston, No. 16-11940, 2018 WL 2077595 (D. Mass. May 3, 2018)
- Doe v. Trustees of Boston College, 942 F.3d 527 (1st Cir. 2019)
- Doe v. Trustees of the Univ. of Pennsylvania, 270 F. Supp. 3d 799 (E.D. Pa. Sep. 13, 2017)

AR_280869

- Doe v. Univ. of Ark.-Fayetteville, 974 F.3d 858 (8th Cir. 2020)
- Doe v. Univ. of Cincinnati, 872 F.3d 393 (6th Cir. 2017)
- Doe v. Univ. of Conn., No. 20-00092, 2020 WL 406356 (D. Conn. Jan. 23, 2020)
- Doe v. Univ. of Denver, 1 F.4th 822 (10th Cir. 2021)
- Doe v. Univ. of Ky., 357 F. Supp. 3d 620 (E.D. Ky. 2019)
- Doe v. Univ. of Ky., 860 F.3d 365 (6th Cir. 2017)
- Doe v. Univ. of Mich., 325 F. Supp. 3d 821 (E.D. Mich. 2018)
- Doe v. Univ. of Neb., 451 F. Supp. 3d 1062 (D. Neb. 2020)
- Doe v. Univ. of Notre Dame, No. 17-00298, 2017 WL 1836939 (N.D. Ind. May 8, 2017)
- Doe v. Univ. of Or., No. 17-01103, 2018 WL 1474531 (D. Or. Mar. 26, 2018)
- Doe v. Univ. of S. Cal., 200 Cal. Rptr. 3d 851 (Cal. Ct. App. 2016)
- Doe v. Univ. of S. Ind., 43 F.4th 784 (7th Cir. 2022)
- Doe v. Univ. of Scis, 961 F.3d 203 (3d Cir. 2020)
- Doe v. Univ. of So. Cal., 241 Cal. Rptr. 3d 146 (Cal. Ct. App. Dec. 11, 2018)
- Doe v. Univ. of Denver, 952 F.3d 1182 (10th Cir. 2020)
- Doe v. Univ. of Sciences, 961 F.3d 203 (3d Cir. 2020)
- Doe v. Va. Polytechnic Inst. & State Univ., 77 F.4th 231 (4th Cir. Aug. 8, 2023)
- Doe v. Valencia Coll., 903 F.3d 1220 (11th Cir. 2018)
- Doe v. Westmont Coll., 246 Cal. Rptr. 3d 369 (Cal. Ct. App. Apr. 23, 2019)
- Doe v. William Marsh Rice Univ., 67 F.4th 702 (5th Cir. 2023)
- Doe v. Yale Univ, 564 F.Supp.3d 11 (D.Conn. 2021)
- Doherty v. Bice, No. 18-10898, 2020 WL 5548790 (S.D.N.Y. Sept. 16, 2020)
- Doherty v. S. Coll. of Optometry, 862 F.2d 570 (6th Cir. 1988)
- Donobue v. Baker, 976 F. Supp. 136 (D.N.Y. 1997)
- Donovan v. Ritchie, 68 F.3d 14 (1st Cir. 1995)
- Dowd v. United Steelworkers of America, Local No. 286, 253 F. 3d 1093 (8th Cir. 2001)
- Du Bois v. Board of Regents of Univ. of MN
- Du Bois v. Board of Regents of Univ. of Minn., 987 F.3d 1199 (8th Cir. 2021)
- DTH Media Corp. v. Folt, 374 N.C. 292 (2020)
- Edmo v. Corizon, Inc., 935 F.3d 757, 771 (9th Cir. 2019)
- E.E.O.C. v. WC&M Enters., Inc., 496 F.3d 393 (5th Cir. 2007)
- E.E.O.C. v. Abercrombie & Fitch Stores, Inc, 575 U.S. 768 (2015)fai
- E.E.O.C. v. Arabian Am. Oil Co (Aramco), 499 U.S. 244 (1991)
- E.E.O.C. v. Bd. of Governors of State Colleges and Universities, 957 F.2d 424 (1992)
- E.E.O.C. v. Firestone Fibers & Textiles Co., 515 F.3d 307 (4th Cir. 2008)
- E.E.O.C. v. Houston Funding II, Ltd., 717 F.3d 425 (5th Cir. 2013)
- E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560 (6th Cir. 2018)
- E.E.O.C. v. SunDance Rehabilitation Corp., 466 F.3d 490 (6th Cir. 2006)
- E.E.O.C. v. L. B. Foster, 123 F.3d 746 (3d Cir. 1997)
- E.H. v. Valley Christian Acad., 616 F. Supp. 3d 1040 (C.D. Cal. 2022)
- E.M. v. Austin Indep. Sch. Dist., No. 17–00387, 2018 WL 627391 (W.D. Tex., Jan. 30, 2018
- Earwood v. Continental Se. Lines, Inc., 539 F.2d 1349 (4th Cir. 1976)
- Emeldi v. Univ. of Or., 673 F.3d 1218 (9th Cir. 2012)

AR_280870

- Emily O. v. Regents of the Univ. of Cali., No. 20-08159, 2021 WL 1535539 (C.D. Cali. Mar. 9, 2021)
- Estate of Lance v. Lewisville Indep. Sch. Dist, 743 F.3d 982 (5th Cir. 2014)
- Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969)
- Fain v. Brooklyn Coll. Univ. of N.Y., 493 N.Y.S.2d 13 (N.Y. App. Div. 1985)
- Fairchild v. Quinnipiac Univ., 16 F.Supp.3d 89 (D. Conn. 2014)
- Faragher v. City of Boca Raton, 524 U.S. 775 (1998)
- Farmer v. Kansas State Univ., No. 16-02256, 2017 WL 980460 (D. Kan. Mar. 14, 2017) aff'd, 918 F.3d 1094 (10th Cir. 2019)
- Faparusi v. Case Western Reserve University, 711 Fed.Appx. 269 (6th Cir. 2017)
- Fed. Deposit Ins. Corp. v. Mallen, 486 U.S. 230 (1988)
- Felder v. Casey, 487 U.S. 131 (1988)
- Feminist Majority Found. v. Hurley, 911 F.3d 674 (4th Cir. 2018)
- Fennell v. Marion Indep. Sch. Dist., 804 F.3d 398 (5th Cir. 2015)
- Ferris v. Delta Airlines Inc., 277 F.3d 128 (2d Cir. 2001)
- Fidelity Fed. S. & L. v. De la Cuesta, 458 U.S. 141 (1982)
- Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246 (2009)
- Fla. v. Bostick, 501 U.S. 429 (1991)
- Flaim v. Med. Coll. of Ohio, 418 F.3d 629 (6th Cir. 2005)
- Flor v. Univ. of N.M., 469 F. Supp. 3d 1143 (D.N.M. 2020)
- Florida Lime & Avocado Growers Inc. v. Paul, 373 U.S. 132 (1963)
- Florida State Univ. Bd. of Regents, 414 So. 2d 1102 (Fla. Dist. Ct. App. 1982)
- Fogleman v. Mercy Hospital, 283 F.3d 561 (3d Cir. 2002)
- Fox v. Pittsburg State Univ., 257 F. Supp. 3d 1112 (D. Kan. 2017)
- Franklin v. Gwinnett Cnty. Pub. Sch., 503 U.S. 60 (1992)
- Frazier v. Fairhaven Sch. Comm., 276 F.3d 52 (1st Cir. 2002)
- Free v. Bland, 369 U.S. 663 (1962)
- Freightliner Corp. v. Myrick, 514 U.S. 280 (1995)
- Frisby v. Schultz, 487 U.S. 474 (1988)
- Frost v. Univ. of Louisville, 392 F. Supp. 3d 793 (W.D. Ky. 2019), appeal dismissed, No. 19-5624, 2019 WL 9051185 (6th Cir. Dec. 19, 2019)
- G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd., 822 F.3d 709 (4th Cir. 2016)
- G.P. v. Lee Cnty. Sch. Bd., 737 Fed.Appx. 910 (11th Cir. 2018)
- Gagne v. Trustees of Ind. Univ., 692 N.E.2d 489 (Ind. Ct. App. 1998)
- Garcia v. San Antonio Metro. Transit Auth., 469 U. S. 528 (1985)
- Gardner v. Schumacher, 547 F.Supp.3d 995 (D.N.M. 2021)
- Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998)
- Gilbert v. Homar, 520 U.S. 924 (1997)
- Gomes v. Maine, 365 F. Supp. 2d 6 (D. Me. 2005)
- Gonzalez v. McEuen, 435 F. Supp. 460 (C.D. Cal. 1977)
- Good News Club v. Milford Cent. Sch., 533 U.S. 98 (2001)
- Goodwin v. Pennridge Sch. Dist., 389 F.Supp.3d 304 (E.D. Pa. 2019)
- Gorman v. Univ. of R.I., 837 F.2d 7 (1st Cir. 1988)
- Goss v. Lopez, 419 U.S. 565 (1975)

[ PAGE  \* MERGEFORMAT ]

AR_280871

- Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172 (10th Cir. 2001)
- Grabowski v. Arizona Bd. of Regents, 69 F.4th 1110 (9th Cir. 2023)
- Grafton v. Brooklyn Law Sch., 478 F.2d 1137 (2d Cir. 1973)
- Grandee Beer Distributors, Inc. v. NLRB, 630 F.2d 928 (2d Cir. 1980)
- Greier v. Am. Honda Motor Co., 529 U.S. 861 (2000)
- Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020)
- Grove City Coll. v. Bell, 465 U.S. 555 (1984)
- Guardians Ass'n. v. Civil Service Comm'n of New York City, 463 U.S. 582 (1983)
- Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56 (1st Cir. 2019)
- Hall v. Millersville Univ., 22 F.4th 397 (3d Cir. 2022)
- Hammons v. Univ. of Maryland Medical System Corp., 649 F.Supp.3d 104 (D. My. 2023)
- Hannah v. Larche, 363 U.S. 420 (1960)
- Harnett v. Fielding Graduate Inst., 400 F. Supp. 2d 570 (S.D.N.Y. 2005), aff'd in part, rev'd in part & remanded, 198 F. App'x 89 (2d Cir. 2006)
- Harper v. Poway Unified Sch. Dist., 445 F.3d. 1166 (9th Cir. 2006)
- Harrington v. Lesley Univ., 554 F.Supp.3d 211 (D. Mass. 2021)
- Harris v. Blake, 798 F.2d 419 (10th Cir. 1986)
- Harris v. Forklift Systems, 510 U.S. 17 (1993)
- Harry & Bryant Co. v. Fed. Trade Comm'n, 726 F.2d 993 (4th Cir. 1984)
- Harvey v. Palmer College of Chiropractic, 363 N.W.2d 443 (Iw. 1984
- Hayden v. Greensburg Cmty. Sch. Corp., 743 F.3d 569 (7th Cir. 2014)
- Hayut v. SUNY, 352 F.3d 733 (2d Cir. 2003)
- Health & Hosp. Corp. of Marion Cnty. v. Talevski, 599 U.S. 166 (2023)
- Hecox v. Little, 479 F. Supp. 3d 930 (D. Idaho 2020), appeal argued, No. 20-35815 (9th Cir. Nov. 22, 2022)
- Hecox v. Little, 79 F.4th 1009(9th Cir. 2023)
- Henderson v. Bd. of Super. Of Southern Univ. and A&M Coll., 663 F.Supp.3d 542 (M.D. La. 2023)
- Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982)
- Herman & McLean v. Huddleston, 459 U.S. 375 (1983)
- Herman v. U. of S.C., 341 F. Supp. 226 (D.S.C. 1971), aff'd per curiam, 457 F.2d 902 (4th Cir. 1972)
- Hewitt v. Commissioner, 21 F.4th 1336 (11th Cir. 2021)
- Hicks v. City of Tuscaloosa, Ala., 870 F.3d 1253 (11th Cir. 2017)
- Hill v. Blount Cnty. Bd. of Educ., 203 F.Supp.3d 871 (E.D. Tenn. 2016)
- Hill v. Bd. of Trustees, 182 F. Supp. 2d 621 (W.D. Mich. 2001)
- Hill v. Cundiff, 797 F.3d 948 (11th Cir. 2015)
- Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707 (1985)
- Hines v. Davidowitz, 312 U.S. 52 (1941)
- Hively v. Ivy Tech Cmty. Coll. of Indiana, 853 F.3d 339 (7th Cir. 2017)
- Holcomb v. Iona College, 521 F.3d 130 (2nd Cir. 2008)
- Holloway v. Arthur Andersen & Co., 566 F.2d 659 (9th Cir. 1977), overruling recognized by Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000)
- Home Box Office, Inc. v. FCC, 567 F.2d 9 n.58 (D.C. Cir. 1977)
- Horner v. Ky. High Sch. Athletic Ass'n, 43 F.3d 265 (6th Cir. 1994)

AR_280872

- Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171 (2012)
- HUD v. Gruzdaitis, HUDALJ 02-96-0377-8, 1998 WL 482759 (HUD ALJ, Aug. 14, 1998)
- HUD v. Weber, HUDALJ 05-91-0819-1, 1993 WL 42262 (HUD ALJ, Feb. 18, 1993)
- HUD v. Williams, HUDALJ 02-89-0459-1, 1991 WL 442796 (HUD ALJ, March 22, 1991)
- Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557 (1995)
- Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392 (9th Cir. 1995)
- Immigrant Legal Res. Ctr. v. Wolf, 491 F. Supp. 3d 520 (N.D. Cal. 2020)
- In re Grand Jury Matter, 762 F. Supp. 333 (S.D. Fla. 1991)
- In re Grand Jury Subpoena, 198 F. Supp. 2d 1113 (D. Alaska 2002)
- In re Motion to Compel Compliance with Subpoena Directed to Minnesota Dep't  of Health, 423 F.Supp.3d 670 (D. Minn. 2019)
- In re Winship, 397 U.S. 358 (1970)
- Int'l Fabricare Inst. V. EPA, 972 F.2d 384 (D.C. Cir. 1992)
- InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ., 534 F. Supp. 3d 785 (E.D. Mich. 2021)
- InterVarsity Christian Fellowship/USA v. Univ. of Iowa, 408 F. Supp. 3d 960 (S.D. Iowa 2019) aff'd, 5 F.4th 855 (8th Cir. 2021
- J.M. v. Hilldale Independent Sch. Dist. No. 1-29, 397 Fed. App'x 445 (10th Cir. 2010)
- Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005)
- Jackson v. Willoughby Eastlake Sch. Dist.,  No. 16-3100, 2018 WL 1468666 (N.D. Ohio Mar. 23, 2018)
- Jauquet v. Green Bay Area Catholic Educ., Inc., 996 F.3d 802 (7th Cir. 2021)
- Jennings v. Univ. of N.C., 482 F.3d 686 (4th Cir. 2007)
- Jensen v. Eveleth Taconite Co., 824 F. Supp. 847 (D. Minn. 1993)
- Johnny's Icehouse, Inca v. Amateur Hockey Ass'n of Ill., Inc., 134 F. Supp. 2d 965 (N.D. Ill. 2001)
- Johnson v. Watkins, 803 F. Supp. 2d 561 (S.D. Miss. 2011)
- Jones v. State Bd. of Educ., 407 F.2d 834 (6th Cir. 1969)
- Jones v. UPS Ground Freight, 683 F.3d 1283 (11th Cir. 2012)
- Jordan v. McKenna, 573 So. 2d 1371 (Miss. 1990)
- K.T. v. Culver-Stockton College, 865 F.3d 1054 (8th Cir. 2017)
- Kalinsky v. State Univ. of N.Y. at Binghamton, 557 N.Y.S.2d 577 (N.Y.A.D. 3 Dept., 1990)
- Kaltenberger v. Ohio Coll. of Podiatric Med., 162 F.3d 432 (6th Cir. 1998)
- Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ., 397 F.Supp.3d 97 (D. Mass. 2019)
- Karanik v. Cape Fear Academy, Inc., 608 F.Supp. 3d 268 (E.D.N.C. 2022)
- Karanik v. Cape Fear Academy, Inc., No. 21-169, 2022 WL 16556774 (E.D.N.C. 2022)
- Karasek v. Regents of Univ. of Ca., 534 F.Supp.3d 1136 (N.D. Cal. 2021)
- Katz v. Dole, 709 F.2d 251 (4th Cir. 1983)
- Keefe v. Adams, 840 F.3d 523 (8th Cir. 2016)
- Keene v. Rodgers, 316 F. Supp. 217 (D. Me. 1970)
- Kengerski v. Harper, 6 F.4th 531, 534 (3d Cir. 2021)
- Kern Cty. Farm Bureau v. Allen, 450 F.3d 1072 (9th Cir. 2006)
- Khan v. Midwestern Univ., 147 F.Supp.3d 718 (2015)
- Khan v. Yale Univ., 347 Conn. 1 (Conn. June 27, 2023)
- King v. Eastern Michigan Univ., 221 F. Supp. 2d 783 (E.D. Mich. 2002)

AR_280873

- King v. Smith, 392 U.S. 309 (1968)
- Kinsman v. Fla. State Univ. Bd. Of Trustees, No.15-235, 2015 WL 11110848 (M.D. Fla. Aug. 12, 2015)
- Kinsman v. Fla State Univ. Bd. Of Trustees, No. 6:15-cv-16, 2015 WL 11110542 (M.D. Fl April 27, 2015)
- Kiobel v. Royal Dutch Petroleum, 569 US 108 (2013)
- Kluge v. Brownsburg Cmty. Sch. Corp., 548 F. Supp. 3d 814 (S.D. Ind. 2021), aff'd, 64 F.4th 861 (7th Cir. 2023), vacated on denial of reh'g, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023)
- Knott v. Mo. Pac. Ry. Co., 527 F.2d 1249 (8th Cir. 1975)
- Koenke v. Saint Joseph's Univ., No. 19-4731, 2021 WL 75778 (E.D. Pa. Jan. 8, 2021)
- Koeppel v. Romano, 252 F. Supp. 3d 1310 (M.D. Fla. 2017) aff'd sub nom. Doe v. Valencia Coll., 903 F.3d 1220 (11th Cir. 2018)
- Kollaritsch v. Mich. State Univ. Bd. of Trustees, 944 F.3d 613 (6th Cir. 2020)
- Kolstad v. Amer. Dental Assoc. 527 U.S. 526 (1999)
- Kunche v. Univ. of Dubuque, 579 F.Supp.3d 1071 (SD Iowa 2022)
- Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist., 69 F.4th 350 (6th Cir. 2023)
- Kuritzky v. Emory Univ., 294 Ga.App. 370 (2008)
- L.E. v. Lakeland Joint Sch. Dist. 272, 403 F. Supp. 3d 888 (D. Idaho 2019)
- L.L. v. Evesham Twship. Bd. of Educ., 710 Fed. Appx. 545 (3d Cir. 2017)
- L.M. v. Town of Middleborough, 677 F.Supp.3d 29 (D. Mass. 2023)
- Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384 (1993)
- Larimer v. International Business Machines Corp., 370 F.3d 698 (7th Cir. 2004)
- Lee v. Natomas Unified Sch. Dist., 93 F. Supp. 3d 1160 (E.D. Cal 2015)
- Lee v. Univ. of N.M., 449 F. Supp. 3d 1071 (D.N.M. 2020)
- Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin., 741 F.3d 1309 (D.C. Cir. 2014)
- Lipsett v. Univ. of P. R., 864 F.2d 881 (1st Cir. 1988)
- Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 140 S. Ct. 2367 (2020)
- Long v. Murray Cnty. Sch. Dist., 522 Fed. Appx. 576 (11th Cir. 2013)
- Lopez v. Metro. Gov't. of Nashville and Davidson Cnty., 594 F. Supp.2d 862 (M.D. Tenn. 2009)
- Lopez v. San Luis Valley, Bd. of Co-op. Educ. Services, 977 F. Supp. 1422 (D. Colo. 1997)
- Louisiana Independent Pharmacies Ass'n v. Express Scripts, Inc., 41 F. 4th 473 (5th Cir. 2022)
- Lucey v. Bd. of Regents of Nevada, 380 Fed. App'x. 608 (9th Cir. 2010)
- M.D. v. Bowling Green Indep. Sch. Dist., No. 15-00014, 2017 WL 390280 (W.D. Ky. Jan. 27, 2017)
- M.H.D. v. Westminster Sch., 172 F.3d 797 (11th Cir. 1999)
- Mackey v. Montrym, 443 U.S. 1 (1979)
- Madrill v. Sch. Dist. No. 11 (Ct. App. Colo. 1985)
- Madsen v. Women's Health Ctr., 512 U.S. 753 (1994)
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, 141 S. Ct. 2038 (2021)
- Mangla v. Brown University, 135 F.3d 80 (1st Cir. 1998)
- Mann Construction, Inc. v. U.S., 27 F.4th 1138 (6th Cir. 2022)
- Marshall v. Ohio Univ., No. 15–00775, 2015 WL 1179955 (S.D. Ohio Mar. 13, 2015)
- Mathews v. Eldridge, 424 U.S. 319 (1976)
- Matter of Doe v. Purchase College State Univ. of New York, 192 A.D.3d 1100 (N.Y. App. Div. 2021)

AR_280874

- Maxon v. Fuller Theological Seminary, No. 20-56156, 2021 WL 5882035 (9th Cir. Dec. 13, 2021)
  Mayor of Baltimore v. Azar, 973 F.3d 258 (4th Cir. 2020)
- McGinest v. GTE Service Corp., 360 F. 3d 1103 (9th Cir. 2004)
- McGlotten v. Connally, 338 F. Supp. 448 (D.D.C. 1972)
- McGuinness v. Univ. of N.M. Sch. of Med., 170 F.3d 974 (10th Cir. 1998)
- McKennon v. Nashville Banner Publishing Co., 513 U.S. 352 (1995)
- McNeil v. Sherwood School District 88J, 918 F.3d 700 (9th Cir, 2019)
- MediNatura, Inc. v. Food & Drug Admin., 496 F. Supp. 3d 416 (D.D.C. 2020), aff'd, 998 F.3d 931 (D.C. Cir. 2021)
- Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996)
- Meece v. Atl. Se. Airlines, Inc., No. 04-3698, 2006 WL 2228937 (N.D. Ga. Aug. 2, 2006)
- Menaker v. Hofstra University, 935 F.3d 20 (2d Cir. 2019)
- Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986)
- Meriwether v. Hartop, 992 F.3d 492 (6th Cir. 2021)
- Messeri v. DiStefano, 480 F. Supp. 3d 1157 (D. Colo. 2020)
- Metro. Life Ins. Co. v. Kelley, 890 F. Supp. 746 (N.D. Ill. 1995)
- Metz v. Dilley (In re Dilley), 339 B.R. 1 (B.A.P. 1st Cir. 2006)
- Meyer v. Nebraska, 262 U.S. 390 (1923)
- Mich. Prot. & Advocacy Serv. v. Babin, 18 F.3d 337 (6th Cir. 1994)
- Michigan v. Lucas, 500 U.S. 145 (1991)
- Miller v. Woodharbor Molding & Millworks, Inc., 80 F. Supp. 2d 1026 (N.D. Iowa 2000)
- Mistretta v. U.S. , 488 U.S. 361 (1989)
- Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288 (1960)
- Mitra v. Univ. of Med. & Dentistry of N.J., 719 A.2d 693 (N.J. Super. Ct. App. Div. 1998)
- Mock v. Univ. of Tenn. at Chattanooga, No. 14-1687-II (Tenn. Ch. Ct. Aug. 10, 2015)
- Moe v. Grinnell Coll., 556 F. Supp. 3d 916 (S.D. Iowa 2021)
- Monteiro Tempe Union High Sch. Dist., 158 F.3d 1022, 1025 (9th Cir. 1998)
- Montgomery v. Indep. Sch. Dist. No. 709, 109 F. Supp. 2d 1081 (D. Minn. 2000)
- Morrison v Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010)
- Morrissey v. Brewer, 408 U.S. 471 (1972)
- Moylan v. Maries Cnty., 792 F.2d 746 (8th Cir. 1986)
- Munoz v. Strong, No. 20-984, 2021 WL 5548081 (W.D. Mich. June 23, 2021)
- Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll., No. 19-10812, 2019 WL 5810308 (E.D. La. Nov. 7, 2019)
- Murrell v. Sch. Dist. No. 1, 186 F.3d 1238 (10th Cir.1999)
- Musacchio v. U.S. , 577 U.S. 237 (2016)
- N.C. Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755 (4th Cir. 2012)
- Nash v. Auburn Univ., 812 F.2d 655 (11th Cir. 1987)
- Nat'l Lifeline Ass'n v. FCC, 921 F.3d 1102 (D.C. Cir. 2019)
- Nat'l Pork Producers Council v. Ross, 598 U.S. 356 (2023)
- Nat'l Retired Teachers Ass'n v. U.S. Postal Serv., 430 F. Supp. 141 (D. D.C. 1977)
- Nathanson v. Med. Coll. of Pa., 926 F.2d 1368 (3d Cir. 1991)
- Nat'l Ass'n of Home Builders v. EPA, 682 F.3d 1032 (D.C. Cir. 2012)

AR_280875

- NCAA v. Smith, 525 U.S. 459 (1999)
- Neese v. Becerra, No. 23-10078 (5th Cir. 2023) - Def. Brief
- Neese v. Becerra, No. 23-10078 (5th Cir. 2023) - Def. Reply Brief
- Neese v. Becerra, 640 F. Supp. 3d 668 (N.D. Tex. 2022)
- Neese v. Becerra, No. 21-163, 2022 WL 1265925 (N.D. Tex. Apr. 26, 2022)
- Nelson v. Colorado, 581 U.S. 128 (2017)
- Nevada Dep't of Hum. Res. v. Hibbs, 538 U.S. 721 (2003)
- New Jersey v. T.L.O., 469 U.S. 325 (1985)
- New York v. U.S. Dep't of Educ., 477 F. Supp. 3d 279 (S.D.N.Y. 2020)
- New York v. U.S., 505 U.S. 144 (1992)
- Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669 (1983)
- Newsome v. Batavia Loc. Sch. Dist., 842 F.2d 920 (6th Cir. 1988)
- Nissen v. Cedar Falls Cmty. Sch. Dist., No. 20-2098,2022 WL 873612 (ND Iowa Mar. 23, 2022)
- Noakes v. Case Western Reserve Univ, No. 21-01776, 2022 WL 17811630 (N.D. Ohio, Dec 19, 2022)
- Noelle-Marie Harrington v. City of Attleboro, No. 15-12769, 2018 WL 475000 (D. Mass. Jan. 17, 2018)
- Nokes v. Miami Univ., No. 17-00482, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017)
- North Haven Bd. of Education v. Bell, 456 U.S. 512 (1982)
- North v. West Virginia Bd. of Regents, 233 S.E.2d 411 (W. Va. 1977)
- Nungesser v. Columbia U., 244 F. Supp. 3d 345 (S.D.N.Y. 2017), appeal withdrawn, No. 17–900, 2017 WL 4404575 (2d Cir. July 10, 2017)
- O'Brien v. Mass. Bay Transp. Auth., 162 F.3d 40 (1st Cir. 1998)
- O'Connor v. Davis, 126 F.3d 112 (2d Cir. 1997)
- Ober v. EPA, 84 F.3d 304 (9th Cir. 1996)
- Oden v. Northern Marianas College, 440 F.3d 1085 (9th Cir. 2006)
- Oliveras-Sifre v. Puerto Rico Dept. of Health, 214 F.3d 23 (1st Cir. 2000)
- Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843 (9th Cir. 2014)
- Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999)
- Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998)
- Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049 (2020)
- Overbrook Land Holdings, LLC v. Commissioner, 28 F.4th 700 (6th Cir 2022)
- Overdam v. Texas A&M Univ., 43 F.4th 522 (5th Cir. 2022)
- Pacheco v. St. Mary's Univ., No. 15-cv-1131, 2017 WL 2670758 (June 20, 2017)
- Palko v. Connecticut, 302 U.S. 319 (1937)
- Pangea Legal Servs. v. U.S. Dep't of Homeland Sec., 501 F. Supp. 3d 792 (N.D. Cal. 2020)
- Paralyzed Veterans of Am. v. Civil Aeronautics Bd., 752 F.2d 694 (D.C. Cir. 1985)
- Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist., No. 22-cv-78, 2022 WL 4356109 (N.D. IA, Sept. 20, 2022)
- Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist., 83 F.4th 658 (8th Cir. 2023)
- Parents Defending Educ. v. Olentangy Loc. Sch. Dist., 684 F.Supp.3d 684 (S.D. Ohio 2023)
- Parents for Priv. v. Barr, 949 F.3d 1210 (9th Cir.), cert. denied, 141 S. Ct. 894 (2020)
- Parr v. Woodmen of the World Life Ins., 791 F.2d 888, 892 (11th Cir. 1986)
- Patane v. Clark, 508 F.3d 106 (2d Cir. 2007)

AR_280876

- Patterson v. Hudson Area Sch., 551 F.3d 438 (6th Cir. 2009)
- Paul v. Davis, 424 U.S. 693 (1976)
- Pederson v. La. State Univ., 213 F.3d 858 (5th Cir. 2000)
- Peltier v. Charter Day Sch., Inc., 384 F.Supp.3d 579 (E.D. NC, 2019)
- Peltier v. Charter Day Sch., Inc., 37 F.4th 104 (4th Cir. 2022), cert. denied, 143 S. Ct. 2657 (2023)
- Pennhurst State Sch. & Hospital v. Halderman, 451 U.S. 1 (1981)
- Pennsylvania v. DeVos, 480 F.Supp.3d 47 (D.D.C. 2020)
- Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633 (1990)
- Perlot v. Green, 609 F. Supp. 3d 1106 (D. Idaho 2022)
- Peterson v. City of Greenville, 373 U.S. 244 (1963)
- Petrosino v. Bell Atl., 385 F.3d 210 (2d Cir. 2004)
- Phillips v. St. George's Univ., No. 07-1555, 2007 WL 3407728 (E.D.N.Y. Nov. 15, 2007)
- Pierce v. Soc'y of Sisters, 268 U.S. 510 (1925)
- Planned Parenthood of Hous. v. Sanchez, 403 F.3d 324 (5th Cir. 2005)
- Plummer v. Univ. of Houston, 860 F.3d 767 (5th Cir. 2017)
- Plyler v. Doe, 457 U.S. 202 (1982)
- Pogorzelska v. VanderCook Coll. of Music, No. 19-05683, 2023 WL 3819025 (N.D. Ill. June 5, 2023)
- Polite v. Dougherty Cnty. Sch. Sys., 314 F. App'x 180 (11th Cir. 2008)
- Portland Cement 486 F.2d 375 (D.C. Cir. 1973)
- Porto v. Town of Tewksbury, 488 F.3d 67 (1st Cir. 2007)
- Powell v. Montana State Univ., No. 17-00015, 2018 WL 6728061 (D. Mont. Dec. 21, 2018)
- Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79 (2d Cir. 2004)
- Prasad v. George Washington Univ., No. 15-1779, 2019 WL 2605095 (D.D.C. June 25, 2019)
- Pratt v. Indian River Cent. Sch. Dist., 803 F. Supp. 2d 135 (N.D.N.Y. 2011)
- Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)
- Prof'l Plant Growers Ass'n v. Dep't of Agric., 942 F.Supp. 27 (D.D.C. 1996)
- Pryor v. United Airlines, Inc., 791 F.3d 488 (4th Cir. 2014)
- PSI Upsilon of Phil v. Univ. of Penn, 404 Pa. Super 604 (May 16, 1991)
- Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993)
- Qualls v. Cunningham, 183 Fed. Appx. 564 (7th Cir. 2006)
- Radwan v. Manuel, 55 F.4th 101 (2d Cir. 2022)
- Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906 (8th Cir. 2003)
- Religious Sisters of Mercy v. Azar, No. 16-00386, 00432, 2021 WL 191009 (D.N.D. 2021)
- Rendell-Baker v. Kohn, 457 U.S. 830 (1982)
- Reno v. ACLU, 521 U.S. 844 (1997)
- Republican Nat'l Comm. v. Fed. Election Comm'n, 76 F.3d 400 (D.C. Cir. 1996)
- Republican Party v. Pritzker, 973 F.3d 760 (7th Cir. 2020)
- Retail Clerks v. Schermerhorn, 375 U.S. 96 (1963)
- Rice v. Santa Fe Elevator Corp., 331 U.S. 218 (1947)
- Richardson v. N.Y. Dep't of Correctional Serv., 180 F.3d 426 (2d Cir. 1999)
- Rios v. Direct Mail Express, 435 F. Supp.2d 1199 (S.D. Fla 2006)
- RJR Nabisco Inc. v. European Cmty, 136 S. Ct. 2090 (2016)
- Roberts v. Glenn Indus. Group, Inc., 998 F.3d 111 (4th Cir. 2021)

AR_280877

- Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)
- Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486 (M.D. Fla. 1991)
- Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist., 605 F.3d 703 (9th Cir. 2010)
- Roe v. Critchfield, No. 23-00315, 2023 WL 6690596 (D. Idaho Oct. 12, 2023)
- Roe v. Cypress-Fairbanks Indep. Sch. Dist., No. 20-20657, 2022 WL 16918818 (Nov. 14, 2022)
- Roe v. Marshall Univ. Bd. of Governors, 668 F. Supp. 3d 461 (S.D.W. Va. 2023)
- Roe v. Wade, 410 U.S. 113 (1973)
- Rollins v. Cardinal Stritch Univ., 626 N.W.2d 464 (MN 2001)
- Ross v. Corp. of Mercer Univ., 506 F. Supp. 2d 1325, 1357 (M.D. Ga. 2007)
- Rossley v. Drake Univ., 336 F.Supp.3d 959 (SD Iowa 2018)
- Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114 (10th Cir. 2008)
- Rowles v. Curators of Univ. of Mo., 983 F.3d 345(8ir Cir. 2020)
- Ruane v. Shippensburg Univ., 871 A.2d 859 (Pa. Cmwlth. App. 2005)
- Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47 (2006)
- S.B. ex rel. A.L. v. Bd. of Educ. Of Hartford Cty., 819 F.3d 69, 75-76 (4th Cir. 2016)
- S.C. v. Met. Gov't of Nashville, No. 3:17-cv-01098, 2022 WL 127978 (M.D. TN, Jan. 12, 2022)
- S.H. v. Lower Merion Sch. Dist., 729 F.3d 248 (3d Cir. 2013)
- S.S. v. E. Ky. Univ., 532 F.3d 445 (6th Cir. 2008)
- Sable Commc'ns of Cal., Inc. v. FCC, 492 U.S. 115 (1989)
- Salisbury v. Hickman, 974 F. Supp. 2d 1282 (E.D. Cal. 2013)
- Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist. 647 F.3d 156 (5th Cir. 2011)
- Santosky v. Kramer, 455 U.S. 745 (1982)
- Saphir by and through Saphir v. Broward Cnty. Public Sch.s, 744 Fed.Appx. 634 (11th Cir. 2018)
- Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200 (3d Cir. 2001)
- Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273 (1987)
- Schaer v. Brandeis Univ., 716 N.E.2d 1055 (Mass. App. 1999)
- Schaumleffel v. Muskingum Univ., No. 17-463, 2018 WL 1173043 (S.D. Ohio Mar. 6, 2018)
- Schrader v. Emporia State Univ., No. 19-2387, 2021 WL 4284543 (D. KS Sept. 21, 2021)
- Se. Comm. Coll. v. Davis, 442 U.S. 397 (1979)
- Sea Island Broad. Corp. of S.C. v. FCC, 627 F.2d 240 (D.C. Cir.), cert. denied, 449 U.S. 834 (1980)
- Seiwert v. Spencer-Owen Cmty. Sch. Corp., 497 F. Supp. 2d 942 (S.D. Ind. 2007)
- Sewell v. Monroe City Sch. Bd., 974 F.3d 977 (5th Cir. 2020)
- Shaboon v. Duncan, 252 F.3d 722 (5th Cir. 2001)
- Shank v. Carleton College, No. 19-3047, 2021 WL 1228068 (8th Cir., April 2, 2021)
- Sharif by Salahuddin v. New York State Educ. Dept., 709 F. Supp. 345 (S.D.N.Y. 1989)
- Sheppard v. Visitors of Va. State Univ., 993 F.3d 230 (4th Cir. 2021)
- Sierra Club v. E.P.A., No. 15-1246, 2017 WL 3027081 (D.C. Cir. July 18, 2017)
- Sill v. Pa. State Univ., 462 F.3d 463 (3d Cir. 1972)
- Silva v. Baptist Health S. Florida, Inc., 856 F.3d 824 (11th Cir. 2017)
- Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170 (10th Cir. 2007)
- Slater v. Douglas Cnty., 743 F. Supp. 2d 1188 (D. Or. 2010)
- Smith v. Metro. Sch. Dist. Perry Twp., 128 F.3d 1014 (7th Cir. 1997)
- Smith v. Stechel, 510 F.2d 1162 (9th Cir. 1975)

AR_280878

- Smock v. Bd. of Regents of Univ. of Mich., 353 F. Supp. 3d 651 (E.D. Mich. 2018)
- Smolsky v. Consol. Rail Corp., 780 F. Supp. 283 (E.D. Pa. 1991), reconsideration denied, 785 F. Supp. 71 (E.D. Pa. 1992)
- Smyth v. Lubbers, 398 F. Supp. 777 (W.D. Mich. 1975)
- Snyder-Hill v. Ohio State Univ., 48 F.4th 686 (6th Cir. 2022) reh'g denied, 54 F.4th 963 (6th Cir. 2022), cert. denied, 143 S. Ct. 2659 (2023)
- Sommers v. Budget Mktg., Inc., 667 F.2d 748 (8th Cir. 1982)
- Somoza v. Univ. of Denver, 513 F.3d 1206 (10th Cir. 2008)
- Soper v. Hoben, 195 F.3d 845, 855 (6th Cir. 1999)
- Soule by Stanescu v. Connecticut Ass'n of Sch., Inc., No. 20--00201, 2021 WL 1617206 (D. Conn. Apr. 25, 2021), aff'd, 57 F.4th 43 (2d Cir. 2022), and vacated and remanded sub nom. Soule v. Connecticut Ass'n of Sch., Inc., 90 F.4th 34 (2d Cir. 2023)
- Southwell v University of Incarnate Word, No. 04-97-00817, 974 S.W.2d 351 (July 15, 1998)
- Speake v. Grantham, 317 F. Supp. 1253 (S.D. Miss. 1970)
- Speech First Inc v Cartwright, 32 F.4th 1110 (11th Cir. 2022)
- Speech First v. Fenves, 979 F.3d 319 (5th Cir. 2020)
- Speech First v. Khator, No. 22-00582, 2022 WL 1638773 (S.D. Tex. May 20, 2022)
- Speech First, Inc. v. Cartwright, 32 F.4th 1110 (11th Cir. 2022)
- Spencer v. Univ. of N.M. Bd. of Regents, No. 15-00141, 2016 WL 10592223 (D.N.M. Jan. 11, 2016)
- St. Mary Med. Ctr. v. Becerra, 581 F. Supp. 3d 119 (D.D.C. 2022)
- State v. Hinchliffe, 186 Vt. 487 (2009)
- State v. Richards, 127 Idaho 31 (Ct. App. 1995)
- State v. Thorne, 333 S.E.2d 817 (1985)
- Stiles ex. rel. D.S. v. Grainger Cnty., Tenn., 819 F.3d 834, 849 (6th Cir. 2016)
- Stiles v. Brown Univ., No. 21--00497 (D.R.I. Jan. 25, 2022)
- Stilwell v. Off. of Thrift Supervision, 569 F.3d 514 (D.C. Cir. 2009)
- Stover v. Coll. Of William & Mary, 635 F. Supp. 3d 429 (E.D. Va. 2022)
- Sturgis v. Copiah Cty. Sch. Dist., No. 10–00455, 2011 WL 4351355 (S.D. Miss. Sept. 15, 2011)
- Swearingen v. Pleasanton Unified Sch. Dist., 641 F. Supp. 3d 1141 (D. Kan. 2022)
- Swingle v. Henderson, 142 F. Supp. 2d 625 (D.N.J. 2001)
- T.C. v. Hempfield Area Sch. Dist., No. 17-1507, 2018 WL 3707419 (W.D. Penn. Aug. 03, 2018)
- T. C. on behalf of her minor children SC v. Met. Gov't of Nashville & Davidson Cty., Tenn, Nos. 3:17-cv-01098, 2018 WL 3348728 (M.D. Tenn. July 9, 2018)
- T.E. v. Pine Bush Cent. Sch. Dist., 58 F.Supp.3d 332 (S.D.N.Y. 2014)
- T.Y. v. Shawnee Mission Sch. Dist., No. 17-2589, 2018 WL 2722501 (D. Kan. June 6, 2018)
- Tabura v. Kellogg USA, 880 F.3d 544 (10th Cir. 2018)
- Tennessee v. U.S. Dep't of Educ., 615 F. Supp. 3d 807 (E.D. Tenn. 2022)
- Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc., 173 F.3d 988 (6th Cir. 1999)
- Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1980)
- Theno v. Tonganoxie Unified Sch. Dist. No. 464, 377 F. Supp. 2d 952 (D. Kansas 2005)
- Thomas v. Bd. of Regents of Univ. of Nebraska, No. 20-3081, 2022 WL 1491102 (D. Neb. May. 11, 2022)

AR_280879

- Thompson v. Clark, 741 F.2d 401 (D.C. Cir. 1984)
- Thompson v. N. Am. Stainless, LP, 562 U.S. 170 (2011)
- Thorne v. Bailey, 846 F.2d 241 (4th Cir. 1988)
- Threat v. City of Cleveland, 6 F.4th 672 (6th Cir. 2021)
- Tinker v. Des Moines Independent Cmty. Sch. Dist., 393 U.S. 503 (1969)
- Townsend v. Swank, 404 U.S. 282 (1971)
- Troxel v. Granville, 530 U.S. 57 (2000)
- Truax v. Raich, 239 U.S. 33 (1915)
- Tucker v. Univ. of New Mexico Bd. of Regents, 618 F. Supp. 3d 1201 (D.N.M. 2022)
- Tn. v. U.S. Dep't of Arg., 665 F.Supp.3d 880 (E.D. Tn. 2023)
- U.S. Telecom Ass'n v. FCC, 825 F.3d 674 (D.C. Cir. 2016)
- U.S. v. Articles of Drug Consisting of 203 Paper Bags, 818 F.2d 569 (7th Cir. 1987)
- U.S. v. Darby, 312 U.S. 100 (1941)
- U.S. v. Joy, 192 F.3d 761 (7th Cir. 1999)
- U.S. v. Scarpa, 913 F.2d 993 (2d Cir. 1990)
- U.S. v. South Carolina, 720 F.3d 518 (4th Cir. 2013)
- U.S. v. Miami Univ., 294 F.3d 797 (6th Cir. 2002)
- U.S. v. Virginia, 518 U.S. 515 (1996)
- U.S. v. Wardlow, 830 F.3d 817 (8th Cir. 2016)
- U.S. v. Yung, 37 F.4th 70 (3d Cir. 2022)
- Ulane v. Eastern Airlines, 742 F.2d 1081 (7th Cir. 1984), not followed as dicta by Hively v. Ivy Tech Cmty. Coll. of Indiana, 853 F.3d 339 (7th Cir. 2017)
- Univ. of Michigan v. Ewing, 474 U.S. 214 (1985)
- Vance v. Terrazas, 444 U.S. 252 (1980)
- Vanderhurst v. Colo. Mountain Coll. Dist., 16 F. Supp. 2d 1297 (D. Colo. 1998)
- Varlesi v. Wayne State Univ., 909 F. Supp. 2d 827 (E.D. Mich. 2012)
- Vengalattore v. Cornell Univ., 36 F.4th 87 (2d Cir. 2022)
- Victim Rights Law Center v. Cardona, 552 F.Supp.3d 104 (D. Mass 2021)
- Victim Rights Law Center v. Rosenfelt, 988 F.3d 556 (1st Cir. 2021)
- Videckis v. Pepperdine Univ., 150 F. Supp. 3d 1151 (C.D. Cal. 2015)
- Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498-99 (1982)
- Vinson v. Taylor, 753 F.3d 141 (D.C. Cir. 1985)
- Viscecchia v. Alrose Allegria LLC, 117 F. Supp. 3d 243 (E.D.N.Y. 2015)
- Vlaming v. W. Point Sch. Bd., 10 F.4th 300 (4th Cir. 2021)
- Vlaming v. W. Point Sch. Bd., 302 Va. 504 (Va. 2023)
- W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943)
- Walker v. City of Lakewood, 272 F.3d 1114 (9th Cir. 2001)
- Wallace v. Pyro Mining Co., 789 F. Supp. 867 (W.D. Ky. 1990), aff'd, 951 F.2d 351 (6th Cir. 1991)
- Walsh v. Hodge, 975 F.3d 475, 487 (5th Cir. 2020), cert. denied, 141 S.Ct. 1693 (2021)
- Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305 (1985)
- Wamer v. Univ. of Toledo, 27 F.4th 461 (6th Cir. 2022)
- Watson v. Beckel, 242 F.3d 1242 (10th Cir. 2001)

AR_280880

- Weckhorst v. Kansas State Univ., 241 F. Supp. 3d 1154 (D. Kan. 2017) aff'd sub nom, Farmer v. Kansas State Univ., 918 F. 3d 1094 (10th Cir. 2019)
- Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138 (2d. Cir. 2002)
- Wellner v. Minnesota State Junior College Bd., 487 F.2d 153 (8th Cir. 1973)
- West Virginia v. EPA, 597 U.S. 697 (2022)
- Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034 (7th Cir. 2017) abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker, 973 F.3d 760, 762 (7th Cir. 2020)
- White v. Gaston Cnty. Bd. of Educ., No. 16-552, 2018 WL 1652099 (W.D.N.C. Apr. 5, 2018)
- Whiteside v. Kay, 446 F. Supp. 716 (W.D. La. 1978)
- Williams v. Bd. of Regents of Univ. Sys. of Georgia, 477 F.3d 1282 (11th Cir. 2007)
- Williams v. Howell Cheney Technical High Sch., No. 12-00043, 2012 WL 5507259 (D. Conn. Nov. 14, 2012)
- Williams v. Indep. Sch. Dist. No. 5 of Tulsa Cty., No. 19-00499, 2021 WL 164523 (N.D. Ok. Apr. 27, 2021)
- Williams v. Kincaid, 45 F.4th 759 (4th Cir. 2022), cert. denied, 143 S. Ct. 2414 (June 30, 2023)
- Williams v. Port Huron Sch. Dist., 455 Fed. Appx. 612 (6th Cir. 2012)
- Williamson v. City of Houston, Tex., 148 F.3d 462 (5th Cir. 1998)
- Willingham v. Macon Tel. Pub. Co., 507 F.3d 1084 (5th Cir. 1975)
- Wilson v. Beaumont Ind. Sch. Dist., 144 F. Supp. 2d 690 (E.D. Tex. 2001)
- Winegar v. Des Moines Indep. Comm. Sch. Dist., 20 F.3d 895 (8th Cir. 1994)
- Winnick v. Manning, 460 F.2d 545 (2d Cir. 1972)
- Wisconsin v. Yoder, 406 U.S. 205 (1972)
- Women's Student Union v. U.S. Dep't of Educ., No. 21-01626, 2021 WL 3932000 (N.D. Cali. Sept. 2, 2021)
- Woodby v. INS, 385 U.S. 37 (1966)
- Wooley v. Maynard, 430 U.S. 705 (1977)
- Wort v. Vierling, slip op. (C.D. Ill. Sept. 4, 1984), aff'd on other grounds, 778 F.2d 1233 (7th Cir.1985)
- Wyeth v. Levine, 555 U.S. 555 (2009)
- Wynne v. Tufts Univ. Sch. of Med. (Wynne I), 932 F.2d 19 (1st Cir. 1991)
- Wynne v. Tufts Univ. Sch. of Med. (Wynne II), 976 F.2d 791 (1st Cir. 1992)
- Xiaolu Peter Yu v. Vassar Coll., 97 F.Supp.3d 448 (S.D.N.Y. 2015)
- Yakus v. U.S., 321 U.S. 414 (1944)
- Yeager v. FirstEnergy Generation Corp., 777 F.3d 362 (6th Cir. 2015)
- Yeasin v. Univ. of Kansas, 360 P.3d 423 (Kan. App. 2015)
- Young v. United Parcel Service, Inc., 575 U.S. 206 (2015)
- Yu v. Univ. of La Verne, 196 Cal. App. 4th 779 (2011)
- Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655 (2d Cir. 2012)
- Zinermon v. Burch, 494 U.S. 113 (1990)
- Zukle v. Regents of Univ. of Calif., 166 F.3d 1041 (9th Cir. 1999)

**Federal Court Filings**

- Arnold v. Barbers Hill, No. 20-cv-01802 (S.D. Tex. July 23, 2021) - U.S. Statement of Interest

[ PAGE  \* MERGEFORMAT ]

AR_280881

- Boyertown Area Sch. Dist. v. Doe, 897 F.3d 518 (No. 17-3113) - Amicus Curiae Brief of the National PTA, GLSEN, American School Counselor Assoc. National Assoc. of School Psychologists, Delaware PTA, New Jersey PTA, and Penn. PTA in Support of Appellees,
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Ed. Amicus Brief in Support of Rehearing En Banc
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Appellant Rehearing En Banc
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - App Response Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - NWLC Amicus Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - U.S. Amicus Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - App Response to U.S. Amicus Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Order Granting Rehearing En Banc
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Amicus Brief in Support of Reversal
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Response to Amicus Brief in Support of Reversal
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Appellant Supp Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Appellee Supp Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Opinion
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316 (S.D. W.Va. 2021) - Cmplt.
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316 (S.D. W.Va. 2021) - U.S. Statement of Interest
- B.P.J. v. W. Va. State Bd. of Educ., No. 23–1078 (4th Cir. Apr. 3, 2023) – U.S. Amicus Brief
- B.P.J. v. W. Va. State Bd. of Educ., No. 23–1078 (4th Cir. 2023) – Appellant Motion for Stay Pending Appeal
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316 (S.D. W.Va. 2021) - Stark Dec.
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316 (S.D. W.Va. 2021) - Memo in Support of Motion for PI
- Chicago Alliance Against Sex. Expl. v. Cardona, No. 21-1853 (1st Cir. 2022) - Appellant Response to Motion to Hold
- Czerwienski v. Harvard case. No. 22-10202 (D. Mass 2022) - U.S. Statement of Interest
- Doe nka ME v. Edgewood Indep. Sch. Dist., No. 16--01233 (2018) – Expert Report
- Equality Fla. v. DeSantis, No. 22-134 (N.D. Fla. 2022) - Complt.
- Equality Fla. v. DeSantis, No. 22-134 (N.D. Fla. 2022) - Def. MTD
- Equality Fla. v. DeSantis, No. 22-134 (N.D. Fla. 2022) - Order on MTD
- E.H. v. Valley Christian Acad., No. 21-07574 (C.D. Cal. 2021) - Order Granting in Part MTD and Judicial Notice
- Fairfax Cnty. Sch. Bd. v. Doe, No 21-968 (2022) - U.S. Amicus Brief
- Farmer v. Kansas State Univ., No. 16--02256 (D. Ka. 2016) – U.S. Statement of Interest
- G.G. v. Gloucester Cnty. Sch. Bd., No. 15-2056 (4th Cir. 2015) – U.S. Amicus Brief
- G.G. v. Gloucester Cnty. Sch. Bd., No. 15-2056 (4th Cir. 2015) – U.S. Statement of Interest
- Gloucester Cnty. Sch. Bd. v. G.G., No. 16-273 (2017) – Amicus Brief
- Grimm v. Gloucester Cnty. Sch. Bd., No. 19-1952 (4th Cir. Nov. 25, 2019) - InterAct Amicus Brief
- Grimm v. Gloucester Cnty. Sch. Bd., No. 19-1952 (4th Cir. Nov. 25, 2019) - Rehearing Amicus Brief of Sch. Administrators from Twenty-Nine States and the Dist. of Columbia in Support of Plaintiff-Appellee Gavin Grimm
- Harris v. Forklift Systems, No. 92-1168 (U.S. 1993) - Reply Brief of Petitioner
- Hecox v. Little, No. 20-35813, 35815 (10th Cir. 2020) - interAct Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - App. Opening Brief

AR_280882

- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - Reply Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - App. Response Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - 2nd Supp. Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - SSA Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - ACLU Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - NASW Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - U.S. Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - ADF Memo
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2023) - Opinion
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - Petition for Rehearing En Banc
- Kollaritsch v. Mich. State Univ. Bd. of Trustees (2020) - Petition for Cert
- L.C. v. Williamsburg Cnty. Sch. Dist., 2018-CP-45-00359 (S.C. Ct. Com. Pl. Aug. 14, 2018) - Compl.
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 (2021) - Petition for Cert
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 (2021) - Petitioner Brief
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 (2021) - Opp'n Brief
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 (2021) - Reply Petitioner Brief
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255  (2021) - U.S. Amicus Brief
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 141 S. Ct. 2038 (2021) - Sch. Bd. Amicus Brief
- Peltier v. Charter Day Sch., Inc., No. 20-1001(L), 20-1023 (4th Cir. Nov. 18, 2021) - Rehearing En Banc Brief for the U.S. as Amicus Curiae
- Peltier v. Charter Day Sch., Inc., No. 20-1001(L), 20-1023 (4th Cir. Nov. 18, 2021) - En Banc Opinion
- Peltier v. Charter Day School No. 20-1001 (4th Cir. 2020) Appellants Opening Brief (May 4, 2020)
- Peltier v. Charter Day School No. 20-1001 (4th Cir. 2020) Opening and Response Brief of Plaintiffs-Appellees (Jul.6, 2020)
- Peltier v. Charter Day School No. 20-1001 (4th Cir. 2020) Appellants' Response and Reply Brief (Sept. 14, 2020)
- Peltier v. Charter Day School No. 20-1001 (4th Cir. 2020) Reply Brief of Plaintiffs-Appellees (Oct. 2, 2020)
- PA v. DeVos, No. 20--01468 (D. D.C. 2020) - Defs Suppl Br Opp. to PI
- PA v. DeVos, No. 20--01468 (D. D.C. 2020) - ED Mem Supp Defs Cross-MSJ
- PA v. DeVos, No. 20--01468 (D. D.C. 2020) - ED Opp'n to PI
- PA v. DeVos, No. 20--01468 (D. D.C. 2020) - Plf MSJ
- Sch. of the Ozarks, Inc. v. Biden, No. 21-2270 (8th Cir. 2021) – Appellees Brief
- Sch. of the Ozarks v. Biden, No. 21-3089 (W.D. Miss. 2021) - Defs Sugg. Opp'n Mot PI
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – U.S. Amicus Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – Appellant Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – App. Response Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – App. Third Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – App. Fourth Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5125 (6th Cir. 2022) - Opinion
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 17-01098 (M.D. Tenn. 2022)

AR_280883

- *Soule v. Conn. Assoc. of Schools, Inc.* 90 F.4th 34, 2023 WL 3248356. En Banc Brief for States of New York, Hawai'i, California, Colorado, Delaware, Illinois, Maine, Massachusetts, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia as Amici Curiae in Support of Appellees,
- Spaw v. Stepping Stone Sch., No. 20--00741 (W.D. Tx. 2020) – Amended Complaint
- Tedeschi v. Wagner College, 49 N.Y.2d 652 (1980)
- Texas v. U.S., No. 16--00054 (N.D. Tex. March 3, 2017) - Plf's Notice of Voluntary Dismissal
- Tx v. Cardona, No. 23- 00604 (N.D. Tex. Jun. 14, 2023) - Cmplt.
- Tn. v. U.S. Dep't of Educ., No. 22-5807 (6th Cir. 2022) - Amicus Brief of Amici Curiae of 19 states ISO neither party
- Tn. v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Defense of Freedom Inst. Amicus Br.
- Tn. v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - FML Amicus Brief
- Tn. v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Mountain States Legal Foundation Amicus Brief
- Tn. v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - NEA et al. Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Reply in Support of Motion for Reconsideration
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Appellant Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Appellant Reply Brief
- TN v.  U.S. Dep't of Ed., No. 22-8507 (6th Cir.) - Brief of Intervenors-Appellees, Jan. 24, 2023
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Thomas More Soc, et al. Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Tx. Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - WLF Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - LONANG Inst. Amicus Brief
- TN v. ED, No. 21-00308 (E.D. Tn. 2021) - Cmplt.
- TN v. ED, No. 21-00308 (E.D. Tn. 2021) - Intervenors-Plfs Proposed Verified Cmplt.
- TN v. ED, No. 21-00308 (E.D. Tn. 2021) - Motion to Request Ruling on Motion to InterveneTn. v. U.S. Dep't of Agr., No. 22-257 (E.D. Tn. 2023) - Opinion
- Tooley v. Van Buren Pub. Sch., No. 14--13466 (E.D. Mich. 2015) - U.S. Statement of Interest
- Thomas v. Bd. Of Regents of the Univ. of Neb., No. 20--0381 (D. Neb. June 11, 2021) - U.S. Statement of Interest
- Thomas v. Bd. Of Regents of the Univ. of Neb., No. 20--0381 (D. Neb. June 11, 2021) - Brief in Support of MTD
- U.S. v. Texas, No. 22-58 (2023) – Brief for Petitioners
- Victim Rights Law Center v. DeVos, No. 20--11104 (D. Mass. 2020) - Def Opp'n to PI
- Victim Rights Law Center v. DeVos, No. 20--11104 (D. Mass. 2020) - Def Pre-Trial Brief
- Victim Rights Law Center v. DeVos, No. 20--11104 (D. Mass. 2020) – FACE Amicus Brief
- Victim Rights Law Center v. Cardona, No. 20-11104 (D. Mass 2021) - Findings of Fact, Rulings of Law, and Order for Judgment (Jul. 28, 2021)
- Victim Rights Law Center v. Cardona, No. 20-11104 (D. Mass 2021) - Consent Motion to Hold Appeal in Abeyance
- Williams v. Kincaid, 45 F.4th 759 (4th Cir. 2022) - Appellees Pet for Rehearing En Banc
- W. Va. v. B.P.J., No. 22-800 (2023) - App. to Vacate Injunction
- W. Va. v. B.P.J., No. 22-800 (2023) - Amicus Brief in Support of Applicants

AR_280884

- Women's Student Union v. U.S. Dep't of Educ., No. 21-01626 (N.D. Cali. 2021) - Cmplt.
- Women's Student Union v. U.S. Dep't of Educ., No. 21-01626 (N.D. Cali. 2021) - Plfs' motion to stay appeal

**Federal Statues**

- 5 U.S.C. § 551
- 5 U.S.C. § 552
- 5 U.S.C. § 601
- 18 U.S.C. § 1591
- 20 U.S.C. § 407
- 20 U.S.C. § 1400 et seq
- 20 U.S.C. § 1070a
- 20 U.S.C. § 1092 - Institutional and Financial Assistance Information for Students
- 20 U.S.C. § 1138
- 20 U.S.C. § 1221 - Short Title; Applicability; Definitions
- 20 U.S.C. § 1221e-3 - General Authority of Secretary
- 20 U.S.C. § 1232 – Regulations
- 20 U.S.C. § 1401 – Definitions
- 20 U.S.C. § 1681 – Sex
- 20 U.S.C. § 1682 - Federal Administrative Enforcement; Report to Congressional Committees
- 20 U.S.C. § 1683 - Judicial Review
- 20 U.S.C. § 1684 - Blindness or Visual Impairment; Prohibition against Discrimination
- 20 U.S.C. § 1685 - Authority under other Laws Unaffected
- 20 U.S.C. § 1686 - Interpretation with Respect to Living Facilities
- 20 U.S.C. § 1687 - Interpretation of Program or Activity
- 20 U.S.C. § 1688 - Neutrality with Respect to Abortion
- 20 U.S.C. § 1689 - Task Force on Sexual Violence in Education
- 20 U.S.C. § 7111–7122
- 20 U.S.C. § 7271–7275
- 20 U.S.C. § 7281
- 20 U.S.C. § 3403
- 20 U.S.C. § 3474 - Rules and Regulations
- 20 U.S.C. § 7801 – Definitions
- 22 U.S.C. § 2151
- 26 U.S.C. § 501
- 29 U.S.C. § 151–169
- 29 U.S.C. § 201 et seq
- 29 U.S.C. § 207 - Maximum Hours
- 29 U.S.C. § 701 et seq
- 34 U.S.C. § 12291 – Definitions and Grant Provisions
- 42 U.S.C. § 2000bb et seq
- 42 U.S.C. § 2000d et seq
- 42 U.S.C. § 2000e et seq

[ PAGE  \* MERGEFORMAT ]

- 42 U.S.C. § 2000gg
- 42 U.S.C. § 6101 et seq
- 42 U.S.C. § 12101 et seq
- 42 U.S.C. § 12202
- 42 U.S.C. § 1320d et seq
- 42 U.S.C. § 19403
- 42 U.S.C. § 18001 et seq
- 42 U.S.C. § 18116

**Federal Regulations**

- 24 C.F.R. § 100.600 - Quid Pro Quo and Hostile Environment Harassment
- 26 C.F.R. § 38
- 28 C.F.R. Pt. 35, App. C
- 29 C.F.R. § 38.7 – Discrimination Prohibited Based on Sex
- 29 C.F.R. § 38.8 – Discrimination Prohibited Based on Pregnancy
- 34 C.F.R. § 86.31 – Education Programs or Activities
- 34 C.F.R. § 97.104
- 34 C.F.R. § 97.108
- 34 C.F.R. § 97.113
- 34 C.F.R. § 99.1 – To Which Educational Agencies or Institutions do these Regulations Apply
- 34 C.F.R. § 99.7
- 34 C.F.R. § 100.6 – Compliance Information
- 34 C.F.R. § 100.7 – Conduct of Investigations
- 34 C.F.R. § 100.8 – Procedure for Effecting Compliance
- 34 C.F.R. § 100.9 – Hearings
- 34 C.F.R. § 100.10 – Decisions and Notices
- 34 C.F.R. § 100.11 – Judicial Review
- 34 C.F.R. § 101.1 – Scope of Rules
- 34 C.F.R. § 104.33 – Free Appropriate Public Education
- 34 C.F.R. § 104.34 – Educational Setting
- 34 C.F.R. § 104.35 – Evaluation and Placement
- 34 C.F.R. § 104.36 – Procedural Safeguards
- 34 C.F.R. § 106.1 – Purpose and Effective Date
- 34 C.F.R. § 106.2 – Definitions
- 34 C.F.R. § 106.12-15
- 34 C.F.R. § 106.21
- 34 C.F.R. § 106.32
- 34 C.F.R. § 106.40
- 34 C.F.R. § 106.41
- 34 C.F.R. § 106.57
- 34 C.F.R. § 110.34 – Prohibition against Intimidation or Retaliation
- 34 C.F.R. § 270.7 – What Definitions Apply to this Program
- 34 C.F.R. § 300.17 – Free Appropriate Public Education

[ PAGE  \* MERGEFORMAT ]

- 34 C.F.R. § 300.300 – Parental Consent
- 34 C.F.R. § 300.301 – Initial Evaluations
- 34 C.F.R. § 300.302 – Screening for Instructional Purposes is not Evaluation
- 34 C.F.R. § 300.303 – Reevaluations
- 34 C.F.R. § 300.304 – Evaluation Procedures
- 34 C.F.R. § 300.305 – Additional Requirements for Evaluation and Reevaluations
- 34 C.F.R. § 300.306 – Determination of Eligibility
- 34 C.F.R. § 300.307 – Specific Learning Disabilities
- 34 C.F.R. § 300.308 – Additional Group Members
- 34 C.F.R. § 300.309 – Determining the Existence of a Specific Learning Disability
- 34 C.F.R. § 300.310 – Observation
- 34 C.F.R. § 300.311 – Specific Documentation for Eligibility Determination
- 34 C.F.R. § 300.320 – Definition of Individualized Education Program
- 34 C.F.R. § 300.321 – IEP Team
- 34 C.F.R. § 300.322 – Parent Participation
- 34 C.F.R. § 300.323 - When IEPs Must be in Effect
- 34 C.F.R. § 300.324 - Development, Review, and Revision of IEP
- 34 C.F.R. § 300.325 - Private Sch. Placements by Public Agencies
- 34 C.F.R. § 300.326 - [Reserved]
- 34 C.F.R. § 300.327 - Educational Placements
- 34 C.F.R. § 300.328 - Alternative Means of Meeting Participation
- 34 C.F.R. § 668, Subpart D, App. A
- 34 C.F.R. § 668.22
- 34 C.F.R. § 668.46 Institutional Security Policies and Crime Statistics
- 45 C.F.R. § 46.104
- 45 C.F.R. § 75.303
- 45 C.F.R. § 86
- 45 C.F.R. § 86.1 – Purpose and Effective Date
- 45 C.F.R. § 86.2
- 45 C.F.R. § 86.41 – Athletics
- 45 C.F.R. § 86.71 – Enforcement Procedures
- 24 C.F.R. § 5.2003
- 28 C.F.R. § 42.601
- 28 C.F.R. § 42.613
- 29 C.F.R. § 825.220
- 29 C.F.R. § 1691.1
- 29 C.F.R. § 1697.13
- 34 C.F.R. § 99.31
- 34 C.F.R. § 99.3
- 34 C.F.R. § 99.5
- 34 C.F.R. § 100.7
- 34 C.F.R. § 104.44
- 34 C.F.R. § 300.23

AR_280887

- 45 C.F.R. § 668.46
- 39 Fed. Reg. 22228, 22235-36 (Jun. 20, 1974)
- 40 Fed. Reg. 24128, 24141-42 (Jun. 5, 1975)
- 40 Fed. Reg. 24128-34 (Jun. 4, 1975)
- 40 Fed. Reg. 52655-57 (Nov. 11, 1975)
- 44 Fed. Reg. 17168 (1979)
- 44 Fed. Reg. 71413-23 (Dec. 11, 1979)
- 45 Fed. Reg. 30803 (May 9, 1980)
- 45 Fed. Reg. 30955-65 (May 9, 1980)
- 47 Fed. Reg. 32526-57 (Jul. 28, 1982)
- 58 Fed. Reg. 51565 (Oct. 4, 1993)
- 59 Fed. Reg. 11448 (Mar. 10, 1994)
- 62 Fed. Reg. 12034 (Mar. 13, 1997)
- 65 Fed. Reg. 66092 (Nov. 2, 2000)
- 65 Fed. Reg. 68050 (Nov. 13, 2000)
- 66 Fed. Reg. 5512 (Jan. 19, 2001)
- 67 Fed. Reg. 41455 (June 18, 2002)
- 73 Fed. Reg. 74806, 74832–33 (Dec. 9, 2008)
- 79 Fed. Reg. 35418 (Jun. 20, 2014)
- 79 Fed. Reg. 62752, 62770-73 (Oct. 20, 2014)
- 81 Fed. Reg. 10968 (May 16, 2016)
- 81 Fed. Reg. 31439 (Dec. 29, 2016)
- 81 Fed. Reg. 46807 (July 18, 2016)
- 81 Fed. Reg. 87130 (Dec. 2, 2016)
- 83 Fed. Reg. 37242 (Jul. 31, 2018)
- 83 Fed. Reg. 47490 (Sept. 21, 2018)
- 83 Fed. Reg. 61462 (Nov. 29, 2018)
- 84 Fed. Reg. 31392 (Jul. 1, 2019)
- 84 Fed. Reg. 49540 (Sept. 20, 2019)
- 84 Fed. Reg. 49788 (Sept. 23, 2019)
- 85 Fed. Reg. 13934 (Jun. 26, 2020)
- 85 Fed. Reg. 30026 (May 19, 2020)
- 85 Fed. Reg. 30182 (May 19, 2020)
- 85 Fed. Reg. 37160, 37199 (June 19, 2020)
- 86 Fed. Reg. 27429 (May 20, 2021)
- 86 Fed. Reg. 32637 (Jun. 22, 2021)
- 87 Fed. Reg. 65426 (Oct. 28, 2022)
- 88 Fed. Reg. 32300 (May 19, 2023)
- 88 Fed. Reg. 43820 (Jul. 10, 2023)
- 88 Fed. Reg. 54714 (Aug. 11, 2023)
- 88 Fed. Reg. 67750 (Oct. 2, 2023)
- Fed. R. Evid. § 412

AR_280888

**Executive Orders**

- Exec. Order No. 12212, 45 Fed. Reg. 29557 (May 2, 1980)
- Exec. Order No. 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993)
- Exec. Order No. 13132, 64 Fed. Reg. 43255 (Aug. 4, 1999)
- Exec. Order No. 13152, 87 Fed. Reg. 26115 (May 2, 2000)
- Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011)
- Exec. Order No. 13988, 86 Fed. Reg. 7023 (Jan. 25, 2021)
- Exec. Order No. 14021, 86 Fed. Reg. 13803 (Mar. 11, 2021)
- Exec. Order No. 14076, 87 Fed. Reg. 42053 (Jul. 8, 2022)
- Exec. Order No. 14079, 87 Fed. Reg. 49505 (Aug. 3, 2022)

**Websites**

- U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, Elementary/ Secondary Information System, [ HYPERLINK "http://nces.ed.gov/ccd/elsi/" ]
- U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, Characteristics of Postsecondary Students (Aug. 2023), available at [ HYPERLINK "https://nces.ed.gov/programs/coe/indicator/csb/postsecondary-students" ]
- U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, College Enrollment Rates (May 2023), available at [ HYPERLINK "https://nces.ed.gov/programs/coe/indicator/cpb/college-enrollment-rate" ]
- U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, IPEDS Data Center, available at [ HYPERLINK "https://nces.ed.gov/ipeds/datacenter/InstitutionByName.aspx" ]
- U.S. Dep't of Educ., Office for Civil Rights, Case Resolutions Regarding Sex Discrimination, available at [ HYPERLINK "https://www2.ed.gov/about/offices/list/ocr/frontpage/caseresolutions/sex-cr.html" ]
- U.S. Dep't of Educ., Office for Civil Rights, Civil Rights Data Collection for the 2017-2018 Sch. Year, available at [HYPERLINK "https://civilrightsdata.ed.gov/data"]U.S. Dep't of Educ., Office for Civil Rights, Civil Rights Data Collection for the 2020-2021 Sch. Year, available at [HYPERLINK "https://civilrightsdata.ed.gov/data"] U.S. Dep't of Educ., Office of Civil Rights, Religious Exemptions Letters, available at [ HYPERLINK "https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html" ]
- U.S. Dep't of Educ., Office of Civil Rights, Resolution Agreements, available at [ HYPERLINK "https://www2.ed.gov/about/offices/list/ocr/frontpage/caseresolutions/sex-cr.html" ]
- U.S. Dep't of Labor, Bureau of Labor Statistics, May 2022 National Industry-Specific Occupational Employment and Wage Estimates: Sector 61—Educational Services, available at [ HYPERLINK "https://www.bls.gov/oes/current/naics2_61.htm" ]
- U.S. Dep't of Justice, Reproductive Rights, available at [ HYPERLINK "https://www.justice.gov/reproductive-rights" ]
- Johns Hopkins Medicine, Menstrual Conditions, available at [ HYPERLINK "https://www.hopkinsmedicine.org/health/conditions-and-diseases/menstrual-conditions" ]
- U.S. Dep't. of Justice, Federal Bureau of Investigation, Crime in the United States: 1996 Uniform Crime Reports (1997), available at [ HYPERLINK "https://ucr.fbi.gov/crime-in-the-u.s/1997" ]

[ PAGE  \* MERGEFORMAT ]

- North American Industry Classification System (NAICS), available at [ HYPERLINK "https://www.census.gov/naics/" ]

[ PAGE  \* MERGEFORMAT ]

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/349053442

Henningham, M. and Jones, T. (2021). Intersex students, sex-based relational learning & isolation. Sex Education. https://doi.org/10.1080/14681811.2021.1873123



**Article** · February 2021

DOI: 10.1080/14681811.2021.1873123

| CITATIONS | | READS |
|---|---|---|
| 12 | | 309 |

2 authors:

Mandy Henningham
The University of Sydney
**12** PUBLICATIONS **41** CITATIONS

SEE PROFILE

Tiffany Jones
Macquarie University
**208** PUBLICATIONS **2,735** CITATIONS

SEE PROFILE

All content following this page was uploaded by Tiffany Jones on 26 October 2021.

The user has requested enhancement of the downloaded file.





**Sex Education**

Sexuality, Society and Learning

ISSN: (Print) (Online) Journal homepage: https://www.tandfonline.com/loi/csed20

# Intersex students, sex-based relational learning & isolation

Mandy Henningham & Tiffany Jones

**To cite this article:** Mandy Henningham & Tiffany Jones (2021) Intersex students, sex-based relational learning & isolation, Sex Education, 21:5, 600-613, DOI: 10.1080/14681811.2021.1873123

**To link to this article:** https://doi.org/10.1080/14681811.2021.1873123

Published online: 04 Feb 2021.

Submit your article to this journal ⏏

Article views: 324

View related articles ⏏

View Crossmark data ⏏

Citing articles: 1 View citing articles ⏏

AR_280993

SEX EDUCATION
2021, VOL. 21, NO. 5, 600–613
https://doi.org/10.1080/14681811.2021.1873123





# Intersex students, sex-based relational learning & isolation

Mandy Henningham [a] and Tiffany Jones [b]

[a]Faculty of Arts and Social Sciences, University of Sydney, Sydney, Australia; [b]School of Education, Macquarie University, Sydney, Australia

**ABSTRACT**

Stigma is an important contributor to social isolation and has negative wellbeing and health impacts. People with intersex variations experience stigma based on multiple factors – family-based silencing and stigma; lack of adequate puberty education normalising body diversity at school; and medically imposed stigma from 'corrective' interventions. This article outlines theory concerning sex-based relational socialisation in schools for friendships and other relationships. It explores the literature on social isolation and exclusion and on students with intersex variations. It reports on the sex-based relational learning informed by the schooling experiences of 86 people with intersex variations aged 22–71 years, recruited from diverse international contexts. Students with intersex variations desired friendships with students of a different assigned sex more frequently than did endosex students. They had different friendship and dating patterns and greater experience of social isolation compared to endosex students in both primary/elementary and high/secondary school contexts. Almost all participants found surgical intervention to be inappropriate and the inappropriateness of the gender in which they are brought up was a strong predictor of negative sex-based relational learning experiences and social isolation. Data provide important arguments for young people with intersex variations to have greater bodily, sex and gender determining autonomy in school and related settings.

**ARTICLE HISTORY**
Received 12 July 2020
Accepted 5 January 2021

**KEYWORDS**
Intersex; student; isolation; friendship; dating

## Introduction

Intersex is an umbrella term used to describe individuals born with medically 'atypical' sex characteristics: whether these be anatomical, hormonal and/or chromosomal variations (Jones 2017). Intersex-led advocacy groups define intersex variations broadly, including variations affecting other primary and/or secondary sex characteristics and thus social and institutional experiences in ways relevant to rights advocacy.

This paper understands 'sex' as being the human interpretation of bodies' primary and/or secondary sex anatomical characteristics (internal and external genitalia but also gonads, height, hair, muscle and fat distribution etc), hormones and/or chromosomes used with respect to assignments such as male/M, female/F, other/X. 'Gender', in contrast, is framed in terms of social roles and identities, including feminine, masculine and non-binary forms of expression. Both 'endosex' (an intersex-led advocacy term for people whose sex traits are

---

**CONTACT** Mandy Henningham ✉ mandy.henningham@sydney.edu.au

© 2021 Informa UK Limited, trading as Taylor & Francis Group

medically 'typical/dyadic') and intersex individuals may be cisgender (gender aligns with assigned sex), transgender (gender differs) or of any sexual orientation (Feder 2009).

A review of the international research on people with intersex variations found intended to focus strongly on medical and health issues in north-American contexts using Western medical or, more recently, critical lenses, Henningham et al (2017). Specifically educational studies were rare (Jones 2018). This paper considers school-based socialisation for people with intersex variations internationally with an emphasis on relational (rather than medical) matters concerning sex traits learned experientially in schooling. It begins by outlining theory relating to sex-based relational socialisation in schools, then discusses the literature on social isolation and students with intersex variations. Finally, it reports on findings from a survey which retrospectively explored intersex students' experiences of school-based socialisation.

## Theorising sex-based relational socialisation in school

Sociological and psychological theory from Australian (Jones 2020) and German (Jürgensen et al. 2010) sources argues that young people learn sex-based relational roles at school through both the direct and hidden school curriculum as they relate to sex and puberty. In both conservative and liberal schools, the ideologically dominant types of school world-wide, students generally learn that friendship is to be formed with people of the same sex (Apple 2006; Jones 2020; Kemmis, Cole, and Suggett 1983). A conservative schooling approach often promotes a sex segregationist stance which manifests in single-sex schooling and sex-differentiated learning (e.g. home-economics for female students vs. vocational learning for males), extra-curricular/sports (e.g. male-only football leagues) and grouping or lining-up practices (Jones 2020). A liberal schooling approach is associated with more indirect learning about same-sex friendship preferences through default choice and gender subjection. Although same-sex friendships are not 'enforced', studying and learning from people of the same sex in similar subject areas and with similar attire is implicitly rewarded through social approval (Jones 2020; Jürgensen et al. 2010; Tait 2019; Ullman 2017).

Beyond this, students generally learn that gendered behaviour is necessary to maintain same-sex friendships, from the normalisation of gendered activities through to outright policing and bullying (Jürgensen et al. 2010; Tait 2019). Additionally, in both conservative and liberal schools, students learn that dating and sexual relationships are to take place with people of an 'opposite' sex in line with a two-sex binary model. Conservative schools may directly teach that heteronormative procreative marriage as a goal, based on religious expectations or other reasoning (Elia and Eliason 2010; Jones 2020) while more progressive schools may achieve the same goal simply by overlooking alternatives (Ferfolja and Ullman 2017; Irvine 2002; Kondakov 2013; Rasmussen 2006). As a result, students who desire or experience romantic or sexual relationships beyond heteronormative expectations may feel alone or isolated.

## Social isolation

Nearly half of 20,000 participants in a recent US study reported sometimes or always feeling alone and 40% felt isolated (Cigna 2018). When social isolation and loneliness are

frequent, chronic and involuntarily imposed, they can impact wellbeing and health (Holt-Lunstad et al. 2015; Sutin et al. 2018). A recent meta-analysis found that lack of social connection heightens health risks as much as smoking or alcohol use disorders, and that loneliness and social isolation are twice as harmful to physical and mental health as obesity (Holt-Lunstad et al. 2015). Furthermore, an absence of social relationships and behaviours may affect later development (Lacey, Kumari, and Bartley 2014; Makinodan et al. 2012).

Socially isolated children tend to have lower educational attainment, be part of a less advantaged social class in adulthood and are more likely to be psychologically distressed as adults (Lacey, Kumari, and Bartley 2014). A major cause of social isolation is stigma due to difference or disability and the attending awkwardness that others or the stigmatised individual may feel about it (Biordi and Nicholson 2013). These forms of stigma are experienced by people with intersex variations due to a lack of understanding and/or acceptance of bodily diversity.

People with intersex variations experience negative responses in many facets of life. This includes family-based silencing about inherited sex differences and familial stigma (Jones 2017); poor quality puberty education at school which can stigmatise sex traits beyond those discussed (Jones 2016); and medically imposed stigma that creates the pressure to conform to sex norms that one does not fit (Davis 2015; Sanders and Carter 2015). The inclusive education movement has proactively sought to combat social isola-tion and stigmatisation for LGBTI students broadly (Badgett et al. 2014; Poteat et al. 2017; UNESCO 2015). However, relatively little research considers people with intersex varia-tions' social sex-based learning.

### School experience as an intersex student

Educational research is growing on people with intersex variations (Bromdal et al. 2016; Jones 2016; Sanders and Carter 2015) and their experience during the schooling years (Jürgensen et al. 2010; Lux et al. 2009). Studies to date have predominantly taken place in contexts such as Australia, Germany, New Zealand, North America and the UK. Bromdal et al. (2016), for example, consider how myths and ignorance about human sex result in intersex bodies inhabiting the space of the 'embarrassing other' in Australian and New Zealand school sexuality education. They assert that the 'norm' creating technologies of medical and educational institutions regulate intersex bodies and call for educators to discuss intersex in terms of how power comes to accrue to particular bodies. A small UK study of young intersex women documented participants' uncertainty, confusion and insecurity about how they fitted into identity and friendship circles (Sanders and Carter 2015). Participants wanted to enjoy secure and safe friendships and relationships, but remained guarded about their intersex variation(s) in order to prevent bullying.

Other school experiences have been looked at by Jones (2016) and Jürgensen et al. (2010). Jones (2016) found that 75% of Australian intersex students were bullied during school; however, most of the bullying occurred over participants' physical difference as the result of (undisclosed) intersex variations, not perpetrators' knowledge of participants having intersex variations. In the same study, 46% of intersex students experienced depression or had thoughts of suicide while only 24% reported having a positive experi-ence of schooling. Intersex students called for better bullying prevention policy and more

staff intervention and school support if they were attacked (Jones 2016). Jürgensen et al. (2010) looked at friendship development among German intersex students, finding they tended to befriend both boys and girls at school, whilst endosex students privileged same-sex friendships.

## Methodology and method

This study's design was informed by constructivist grounded theory, an approach which allows for the exploration of issues on which there is little existing research (Grbich 2007). We sought to provide a platform on which participants could directly tell their stories, establishing the basis for future work (Huberman and Miles 2002). Constructivist grounded theory is underpinned by a relativist ontology, which presupposes the existence of multiple social realities in line with post-modern thinking (Charmaz and Bryant 2011; Kenny and Fourie 2015).

Such an approach centres participants' and researchers' co-constructions of knowledge and the mutual interpretation of meaning towards the interpretive depiction of participants' experiences (Kenny and Fourie 2015). In this study, this approach foregrounded people with intersex variations' experiences through the use of an intersex studies lens (Jones 2018). Prioritising individual narratives allows for a deeper understanding of lived experience. It also disrupts the traditional psycho-medical theorising that can occur in research on people with intersex variations conducted using a more formal institutionalised approach.

Data were collected by means of an online survey hosted by SurveyMonkey. The survey instrument used closed (quantitative) questions to gather demographic data. Open-ended (qualitative) questions were also asked about experiences from infancy to adulthood to enable story-focussed chronological theorising (Charmaz and Bryant 2011; Huberman and Miles 2002; Kenny and Fourie 2015). The questionnaire used was piloted with two people with intersex variations to ensure sensitivity and practical coherence.

Recruitment targeted self-selected English-speaking participants aged 18 years and over, with medically recognised intersex diagnoses or traits. Online advertisements, international support organisation newsletters and webpages were used to recruit participants over an eleven-month period in 2015.

Constructivist coding guidelines advocate the imaginative interaction with data using 'at least two stages' of coding: initial/open coding and re/focused coding phases, both of which were used in this study. The openness of this approach insists on a willingness to 'tolerate ambiguity' (i.e. to 'not know') so as to be open to the creation of new categories (Charmaz 2006; Charmaz and Bryant 2011; Kenny and Fourie 2015). With reference to the chief concerns of participants, selected words and phrases were turned into initial coding categories using gerunds such as 'experiencing', 'revealing', 'questioning' and 'desiring' so as to establish the 'what', 'how' and 'when' of these concerns. Memo writing was then used to compare these categories against data from other participant statements to test the validity, cohesion and usefulness of the coding frame. Once this has been completed, the process moved to a phase of theoretical sampling (Chun Tie, Birks, and Francis 2019) or focused coding (Charmaz and Bryant 2011).

This sought to examine and reorganise the initial data by identifying significant and/or recurring codes that carry the weight of the analysis, gain traction and generate 'analytic

momentum' giving rise to larger, more abstract concepts (or emergent categories) and labels which allowed theory to develop (Charmaz 2008). Once established, significant codes were identified as provisional theoretical categories for 'theoretical sampling'; the consideration and testing of all theoretical connections in the data using an 'abductive logic'. Further memo-ing then took place to identifying patterns relating to these key concerns, including determining conditions, progression and consequences, until theoretical saturation was reached. This resulted in a conceptual understanding (as opposed to an explanation) of the studied social processes, interwoven as a narrative or story encompassing key categories, conditions, relationships and consequences (Hallberg and Lillemor 2006; Kenny and Fourie 2015).

The study was approved by the Human Research Ethics Committee of the University of Sydney (project number 2014/225).

## Findings

### Sex and gender

The study adhered to key ethical considerations for intersex research (Jones et al. 2016) by granting a degree of control and freedom to participants by permitting them to opt out at any time and by keeping all questions optional. A total of 86 participants were included in the analysis. They varied between 22 and 71 years of age with a mean of 43 years. Participants came from North America (n = 47), Europe (n = 20), Asia-Pacific (12) and Africa (n = 1). Collectively, they were born in 19 countries but at the time of data collection most were in North America (n = 38), the UK (n = 10), Canada (n = 9) and Australia (n = 8). The majority (43) of participants had been assigned-female/F-at-birth (AFAB) and 31 had been assigned-male/M-at-birth (AMAB). The remaining participants (n = 3) had been assigned multiple times during infancy, or had not been assigned and a few opted not to disclose (n = 3).

When asked about gender identity 60 participants responded. Thirty-one of them identified as women; nine added details like 'female probably', 'ambiguous female', 'butch female' and 'agender/female'. A smaller number of participants (n = 10) identified as male: 1 added 'male of centre, but I prefer to opt out of gender descriptors'. Other participants challenged biological category and social role assignment based on a two-sex/gender binary model, identifying as intersex (n = 7), fluid (n = 3), no gender (n = 2) or using multiple identities subjectively (n = 7), one was 'fluid and playful'; another would 'dress in an androgynous attire and love having all the wrong sticky out body parts'.

### The gender in which participants were brought up and gender affirmation

Of the 62 participants who answered both questions regarding assigned sex and gender identity, 58% (n = 21) of those who were assigned-female/F-at-birth (AFAB, n = 36) felt the gender in which they were brought up was appropriate. In contrast, only 23% (n = 6) of participants who were AMAB (n = 26) felt that the gender they were brought up with was appropriate. The finding that AMAB participants brought up as boys were more likely to claim that this gender was inappropriate was statistically significant (p < 0.05). When asked 'How do you feel about the gender you were raised [brought up with]?',

participants overwhelmingly responded that they did not fit traditional gender roles. Some spoke of struggling to fit in with other members of their sex and/or gender, or feeling like another gender altogether, making comments like 'I thought I was an 'it'' or " … if I tried out for girls" sports, I dominated them in a very masculine way, I was called a freak'. Some wished they had been brought up gender neutral. Others did not mind their sex having been assigned but desired greater choice of gender expression saying, for example, 'I think it is helpful to assign a gender at birth, but the "door should be left open" allowing the child to develop naturally'.

Participants felt influenced to enact particular forms of gender expression by their family and displayed negativity towards their parents. Eighteen indicated feeling shame, and nine anger. Three felt left out of identity processes, typically reflecting 'it was my body, but I couldn't choose anything'. Only three participants were happy with the gender in which they had been brought up. One participant said that being AMAB meant he could more easily identify with the gay male community. Another, who had been brought up gender neutral at home but not at school said, 'I picked my clothes from a certain age on, I picked if I wanted a haircut, I asked for my preferred toys. I just had to be a "girl" in public at school … '. Being involved in sex and gender decision-making processes and given agency to determine their expression and interests created a positive experience of being intersex. Another participant felt accepted within broader notions of how sex and gender relate: 'I tended to be somewhat of a tomboy growing up but that was treated as a normal and acceptable variation of being a girl'. Importantly, the three participants who were happiest with the gender they had been brought up with were encouraged to be themselves regardless of how they did or did not align with heterosexual binary sex-gender norms.

Participants who affirmed a different gender identity were asked, 'At what age did you begin to think that instead of being the gender you were raised [in], you should have been another gender?'. There were 38 responses to this question. 71% (n = 27) reported wanting to be a different gender under the age of 11 years, most commonly at about 3–5 years. When asked at what age did they firmly decide to affirm their gender, 12% (n = 5) affirmed their gender at 16–19 years and 37% (n = 15) at 20 years or older. Three participants had waited this long to affirm their gender identity out of fear or inner conflict: 'I fought with myself over it throughout my twenties, transitioned at 30'. Therefore, most firm decisions on gender affirmation were made later in life, despite discomfort being felt at an earlier age.

### Navigating social isolation at primary/elementary school

Participants were asked about the impact of intersex status with respect to friendships at primary/elementary school. Of the 51 who responded, 30.7% (n = 16) stated their intersex status did not affect their primary/elementary school relationships, 30.7% (n = 16) felt isolated and 11.5% (n = 6) felt 'different' to their peers. Four had experienced bullying and three reported becoming depressed. Three participants reported they deliberately kept themselves to themselves and three described how they gravitated towards other 'social outcasts'.

Participants were asked the question, 'In primary/elementary school, how would you describe your feelings about your intersex variation? How did you experience and express these feelings? Explain'. Seven themes were identified from the analysed participant responses (n-50). Thirteen participants described feeling like a loner; a further five described feeling

extremely negative due to bullying. One of them commented, 'At each new school I was inevitably physically and verbally bullied. I remember my childhood as a miserable and defeated period of my life'. Four participants experienced depression and thoughts of suicide, including one assigned-female/F-at-birth (AFAB) participant who stated 'Anger was not allowed as a female. I was alone and very depressed … [I] tried to kill myself at 15 … I was not taken to a doctor or ER'. Four participants reported becoming aggressive towards others, three became withdrawn. Four felt unable to fit in with same-sex peers. Two felt they were pretending to be someone they were not. One AMAB participant reflected: 'Whenever I got called out for being effeminate or looking or acting girlish, I would try and act super masculine. I was terrified'.

Boys were sometimes pushed about or bullied by male peers (n = 3). One AMAB participant stated, 'All the boys wanted to do was call me sissy, faggot and bash the shit out of me'. Another outcast from the boys group sought refuge with girls:

> I generally did not conform well to male gender roles. I was often bullied and picked on for this. I did have a few friends, almost all girls and sometimes attended all girl sleepovers which made me feel accepted and comforted.

These statements suggest the importance of performing masculine behaviours in order to achieve acceptance by boys. Girls who mentioned not fitting in described not going through puberty like everyone else (n = 2) or being perceived as lesbian (n = 1). One of them stated:

> Things got progressively worse from age 10 to 14, as it was obvious something was odd/ wrong since I wasn't going through puberty 'like the other girls'. I was constantly bullied over it and it reinforced people's belief that I would become a lesbian.

Four participants described stigma-based secrecy and a further three experienced shame about themselves, their body or their intersex variation. For example, one recalled feeling 'paranoid about people finding out [so I] kept to the [toilet] cubicles'.

Only five participants reported encountering no problems at primary school. One felt confident about their peers, one felt 'normal' and another felt their intersex status did not affect their school life.

### Desired friendships in primary/elementary school

Participants were asked who they had been friends with during primary school. Those who responded to this question (n = 65) stated they had mostly sought friendship with girls only (n = 31), followed by both boys and girls (n = 20), and lastly boys only (n = 14). Overall, respondents mostly sought friendships with someone different to their assigned sex and gender (n = 18). Furthermore, those who had been brought up as boys were more likely to befriend girls (n = 12) compared to those who had been brought up as girls (n = 6).

Participants could select descriptors to subjectively describe their school friendships/ perceived social status. Overall, 75% (n = 51) of participants reported having a below average numbers of friends. A cross-tabulation and chi-square test examined how many friends participants perceived themselves to have against the appropriateness of the gender in which they were brought up. More than half of the participants who perceived the gender in which they had been brought up was inappropriate reported having

Table 1. Appropriateness of the gender in which participants had been brought up and having an average number of friends (primary/elementary school) (n = 68).

| Had about the average number of friends | Gender appropriate | Gender inappropriate | Pearson Chi-square | df |
|---|---|---|---|---|
| Yes | 13 | 4 | | |
| Noa | 17 | 34 | 9.623 | 1 |

ap < 0.02

a below average numbers of primary school friends (p < 0.02, see table 1), and increased bullying for being different (p < 0.16).

Participants were also asked to describe their experiences at school overall; responses mostly focussed on their feelings about peer relationships. Feelings of isolation were experienced by 15 participants, five of whom mentioned feeling like an outcast. Nine participants discussed feeling different, feeling alone or alienated. Four felt confused or frustrated about their gender identity or gender roles and expectations. One participant who had been brought up as a girl reflected, 'I wondered if I should have been born a boy, so I felt very alone'. Another described feeling frustrated that they had been treated like a boy, another had always felt at odds with the gender in which they were brought up and yet another described the difficulties of feeling transgender:

> I knew about trans and I figured that's what I was from a very early age (around 5) didn't know anything about my body just that it was strange, and I couldn't tell anyone. So, [I] kept very secret and tried to act normal, as in masculine.

Six participants experienced depression, captured in quotes such as: 'I felt alone and thought I must be some kind of alien. I became suicidal at age 13 and again at age 15'. One participant reported feeling they had been 'over-treated with psychiatric intervention' by two therapists, both of whom had misdiagnosed their childhood post-traumatic stress disorder arising from sexual abuse as generalised anxiety disorder. Another participant described concealing depression: 'I was very good at pretending to be happier and more outgoing than I was. I didn't show what I was going through on the inside'.

Four participants described being bullied at primary school. One said, 'I was teased for my gender non-conformity. It is not like I was walking around with my pants down. I also felt the whole picking [sic] order was strange and stupid'. Another stated that even though they were bullied, they had lots of friends. Of three participants who discussing not fitting in with their peers at primary school, one mentioned not fitting in with their same-sex classmates at school. Another, however, described not fitting in as an advantage, ' … as I was navigating who and what I was [sic], it made me realise I didn't fit in anywhere, which allowed me to fit in everywhere'.

### Navigating social isolation in high/secondary school

Questions for primary school were repeated for high school attendance to allow comparisons, but were expanded to include questions about dating. Analysis revealed that the question 'In high school, how would you describe your feelings about your intersex variation?' elicited nine themes relating to feeling 'othered'. Common responses were depression, being bullied, pretending to fit in, secrecy and shame, aggression/anger, and avoiding school or school

activities. 14 participants described themselves as loners at high school. One said, 'I did my best to stay away from most people, keeping to myself as much as possible'. Half of the participants who were self-described loners also experienced feeling depressed or having suicidal thoughts. One said, 'I was often depressed and spent most of my time with girls even though most people didn't see me as a girl'.

Eight participants had experienced bullying at high school; four due to not conforming to dominant gender expectations or heteronormativity, including one who said, 'I was bullied and teased about being gay and fem, high school was hell'. Another explained, 'I went to a conservative Catholic high school. You did not express feelings of difference without risk. If you were gay you stayed in a hole in the ground,' Table 2 shows the relationship between reared gender appropriateness and being teased in high school. Eight participants engaged in behaviours to fit in with their peers – feigning interest in particular gendered acts or traits to gain approval. Two AFAB participants discussed having had 'lots of sex' to 'prove' their femininity: one described 'wearing the highest heels with the shortest skirt; having sex with boys starting at age 15', the other 'playing the role of a good girl'. As in primary/elementary school, boys described defending masculinity (or being bullied for a lack of it). One participant enjoyed experimenting with gender despite some stigma, secrecy and guilt.

My greatest experience in high school was when I went to a Halloween party dressed as a girl. . . . Many of the boys asked me to dance and for the first time I was popular. I also felt a bit guilty, but [sic]did allow two of the boys to kiss me. Yet it felt wrong as I knew I was not a girl or a boy.

Others attempted to connect with other outcasts or minorities, with varying levels of success. For example, one participant said they '...felt connected with LGBT students but still didn't feel like I really fit in or was relatable'. Another found belonging as 'I was active in theatre, where everyone was different'.

Stigma-based secrecy was mentioned by eight participants. Participants described repressing thoughts about their intersex body (n = 2), lying or avoiding questions about their body (n = 3), or had been told to keep their intersex status a secret (n = 3). One stated 'I had not started my periods and I felt like I had to keep it a secret'; another explained they '... always felt like I had a secret and I was not 'real''. A further two mentioned feeling shame one reflecting how they

Got bullied a lot, showered with my shorts on or when people would leave. Was the smallest of the boys, stood out as well for being from a different ethic [sic] group, being socially awkward, ashamed of my body, stayed in my bedroom most of my teenage years feeling really angry and dysphoria [sic].

Table 2. Relationship between the appropriateness of the gender in which participants had been brought up and being bullied for being different in high school.

|  | Value | Df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 6.317[a] | 1 | .012 | | |
| Continuity Correction[b] | 5.023 | 1 | .025 | | |
| Likelihood Ratio | 6.364 | 1 | .012 | | |
| Fisher's Exact Test | | | | .016 | .012 |
| Linear-by-Linear Association | 6.224 | 1 | .013 | | |
| N of Valid Cases | 68 | | | | |

a.0 cells (.0%) have expected count less than 5. The minimum expected count is 8.38.
b.Computed only for a 2 × 2 table

Five participants felt aggression: one 'lashed out' due to being bullied, two described expressing anger towards others, another turned the rage inwards, reflecting 'I did a lot of drugs and put cigarettes out on my body. I put myself in dangerous situations with dangerous people so that I would die. I wanted to die accidentally on purpose'. Another three participants described denial, for example: 'I was in total denial. I am not sure I even understood my condition very well'. Multiple students skipped school or school activities; four specifically described the difficulties of Physical Education (PE) classes where the strategies they employed to avoid communal showering/changing after sport included showering with shorts on, creating conflict with the teachers, or avoiding the class entirely. Only one participant reported that knowing they were intersex had no impact on their primary or high school sex-based social learning and experiences.

### Desired friendships at high/secondary school

50 participants (73% of those responding to the question) reported having a below average numbers of friends at high school, with those who felt the gender they had been brought up was inappropriate, being over-represented in this group.

In the context of romantic and sexual relationship formation during high school, the complexities of sexuality and gender identity were discussed by 17 participants. Four participants described not dating; one had no interest in romantic or sexual relationships; one questioned why it was so easy for others to form such relationships compared to themself; and two were too uncomfortable with the idea, citing being 'too body conscious' and 'too confused'. Other participants described same-sex attraction or non-heteronormative sexuality: one lesbian was out to friends, another feared disclosure, another embraced their individual sexual relations to others 'Women were always curious if because they liked me were [sic] they gay or straight, to which I would reply; 'Neither, you just like me!". Two participants discussed being popular with another sex: 'I felt lonely at times. I was very tall. But I felt people thought I was attractive and asked me out'. Participants of varying genders feigned gender conformity by engaging in heteronormative sex. One of them said, '[since] any "feminine" activities or behaviours drew negative attention. I had to pretend to be overly masculine in order to maintain relationships'. Two participants talked about feeling severely depressed by gender dysphoria and another felt confused about gender.

Eleven participants did report having close friendships at high school. For two of them, the number of friends had increased since primary school. Two others discussed how befriending other outcasts proved a good way to make new friends. One said, '[I] had a few friends who were also ostracised dorks. We banded together'. Whilst this participant was content with few friendships and nonconformity, others 'played a lot of sports and started drinking and using marijuana to help cope and to become "more popular"'. One participant remembered spending 'more time at home than what was normal' and another desired to escape: 'as an outsider, I escaped reading books and keeping to myself. It became more obvious in my teens that I wasn't a "normal" girl'.

Experiencing delayed/lack of puberty during high school was discussed by six participants One experienced bullying due to delayed puberty while another mentioned feeling ' more normal' compared to their peers who were going through puberty. One participant described

how hormone replacement therapy (HRT) had increased their isolation, because 'I did not understand the changes my peers were going through, why was I not experiencing them'.

Five participants reported no mental health concerns or difficulties with relationships during high school, but four experienced feelings of anger, using sport as an outlet for aggression, reacting violently to bullying, and simply feeling angry. Eight participants discussed an intensification of bullying in high school for reasons such as developing later or differently to endosex teenagers. One of them said, 'I was bullied for not developing breasts, for growing sideburns and a moustache, etc. People equated it to sexual orientation, and I was on the receiving end of much humiliation, speculation, etc'.

Eight participants described experiencing depression during high school. Two connected this to a lack of friends; two to gender dysphoria; two to suicidality and feeling withdrawn, numb and defeated. One participant reflected, 'I pretended to be a normal, happy girl [but] I was really very depressed and felt like I didn't fit in anywhere'. Six participants described disclosing their intersex status to friends. Three chose not to; one of them simply stated, 'I did not know how to talk about being intersex, so I did not disclose to anyone'. Others chose to disclose their intersex status with sometimes undesired results: 'I disclosed my intersex variation to my closest friends from primary school towards the end of high school and they drifted away in the following months'. Developmental sex and sexuality differences, therefore, amplified the barriers to developing social relationships for intersex high school students, whose strategic outreach to others was often hindered by a lack of support from schools, family and peers in framing intersex variations affirmatively.

### Dating and sex

Of the 68 participants who answered a question about dating, 83% stated they did not feel comfortable dating during adolescence and 61% had not been sexually active as teenagers. Some participants described having other interests and priorities. For example, one said, 'I had no dates in my teens. I threw myself into sport and had no sexual awareness'. Other participants actively avoided romantic or sexual relationships due to being intersex, making comments like, '[I] dated a couple of times, kissed and cuddled, but nothing sexual, I was too scared she would find out I wasn't really a boy'. Three participants avoided sex because of their sexual orientation. One woman stated, 'There was no way I was going to be open to a boyfriend or be sexually active. I was also attracted to girls which confused me more about my sex of rearing and sexual orientation'. Six participants expressed no interest in sex at all, with one of them describing how this led to homophobic ridicule: 'My sister insisted that I was a homosexual because I showed no interest in sex'.

Thirty-nine percent of participants (n = 26) were sexually active as teenagers. Seven of them, however, said surgery made their experience of sex painful or less pleasurable. One AFAB woman said, 'I was sexually active after vaginoplasty, but didn't tell my male partners. It was very painful'. Three participants used sex to affirm or gain some control over their gender and social identity. One of them said:

> I had heard a certain guy was fairly small in size and knew I had a small vagina. Even though I had no interest in him whatsoever and he actually repulsed me, I felt I had to get this milestone over with to be considered a real girl and not a fake being.

This same participant continued to experience low self-esteem about being intersex, using sex to replace relationships in her late teenage years and early twenties, 'I started sleeping with anyone who would have me, certain that no one would ever want a relationship with me and that one night stands were the best I could hope for'. Another participant described how she had 'started having sex at 15 in order TO TRY TO [sic] feel comfortable as a girl and to prove to them and to me that I REALLY [sic] was a girl'. Another AFAB participant explained that for her, 'Sex was validation and control over others. I didn't actually have sex that was good and non-dissociative until decades later, after I transitioned and got new partners who wanted me the way that I actually was'. Across the sample, participants described learning as adults that positive relationships derived from building trust over time and sometimes, exposure to alternative communities that placed value on bodily diversity.

## Conclusion

This paper has explored experiences of schooling among people with intersex variations with a focus on sex-based relational socialisation. Both in the way, they were brought up within their assigned gender role, and in their experiences at primary school, students with intersex variations generally learned they did not necessarily fit in with people of the same sex and/or that 'same-sex' was a concept it was hard to define. Consequently, their friendship formation and sense of self, more generally, went against the grain of other children's relational norms – increasing isolation.

In high school, some students with intersex variations learned to overplay or avoid engaging in the gender behaviours necessary to maintain 'normative' same-sex friendships, thereby mitigating the risk of exclusion, isolation or bullying. Others became part of alternative friendship groups (e.g. hanging with outcasts and minorities). High school students with intersex variations learned that dating and sexual relationships based on a two-sex binary model would likely exclude them. Their bodies and desires were not reflected in school-based puberty or sex education. More affirming alternatives did become available to some participants in adulthood, however.

Finally, data from this study suggest that difficulties socially navigating intersex experience in school may worsen for individuals who are not, as young people, given an adequate say in sex assignment, gender identity development and/or expression. Educational institutions should encourage the agentic involvement of intersex young people in decision-making to facilitate relationship formation. Efforts to enhance school-based inclusion through a focus on diverse bodies and friendship formation irrespective of sex and gender could be fruitful. In time, this may lead to a break down in stigma giving rise to intersex school-based exclusion and the development of socially isolated lifestyles.

## Disclosure statement

No potential conflict of interest was reported by the authors.

## ORCID

Mandy Henningham    http://orcid.org/0000-0002-0080-4370
Tiffany Jones    http://orcid.org/0000-0003-2930-7017

## References

Apple, M. W. 2006. *Educating the Right Way*. New York: Routledge.
Badgett, M. V., S. Nezhad, K. Waaldijk, and Y. van der Meulen Rodgers. 2014. *The Relationship between LGBT Inclusion and Economic Development*. Los Angeles: Williams Institute.
Biordi, D. L., and N. R. Nicholson. 2013. "Social Isolation." In *Chronic Illness*, edited by I. M. Lubkin and P. D. Larse, 85–115. Burlington: Jones and Bartlett.
Bromdal, A., M. L. Rasmussen, F. Sanjakdar, L. Allen, and K. Quinlivan. 2016. "Intersex Bodies in Sexuality Education." In *The Palgrave Handbook of Sexuality Education*, edited by L. Allen and M. L. Rasmussen, 369–390. London: Palgrave.
Charmaz, K. 2006. *Constructing Grounded Theory*. London: SAGE.
Charmaz, K. 2008. "Grounded Theory as an Emergent Method." In *Handbook of Emergent Methods*, edited by S. N. Hesse-Biber and P. Leavy, 155–170. New York: Guilford.
Charmaz, K., and A. Bryant. 2011. "Grounded Theory and Credibility." In *Qualitative Research*, edited by D. Silverman, 291–309. London: SAGE.
Chun Tie, Y., M. Birks, and K. Francis. 2019. "Grounded Theory Research." *SAGE Open Medicine* 7 (1): 2050312118822927. doi:10.1177/2050312118822927.
Cigna. 2018. *US Loneliness Index*. Bloomfield: Cigna.
Davis, G. 2015. *Contesting Intersex*. New York: NYU.
Elia, J. P., and M. Eliason. 2010. "Discourses of Exclusion." *LGBT Youth* 7 (1): 29–48. doi:10.1080/19361650903507791.
Feder, E. K. 2009. "Imperatives of Normality." *GLQ* 15 (2): 225–247. doi:10.1215/10642684-2008-135.
Ferfolja, T., and J. Ullman. 2017. "Gender and Sexuality in Education and Health." *Sex Education* 17 (3): 235–241. doi:10.1080/14681811.2017.1306379.
Grbich, C. 2007. *Qualitative Data Analysis*. London: SAGE.
Hallberg, and R. M. Lillemor. 2006. "The Core Category of Grounded Theory." *International Qualitative Studies on Health and Well-being* 1 (3): 141–148. doi:10.1080/17482620600858399.
Henningham, M., and T. Jones. 2017. "Cut It Out: Rethinking Surgical Intervention on Intersex Infants." In *Bent Street*, edited by T. Jones, 55–67. Melbourne: Clouds of Magellan.
Holt-Lunstad, J., T. B. Smith, M. Baker, T. Harris, and D. Stephenson. 2015. "Loneliness and Social Isolation as Risk Factors for Mortality." *Perspectives on Psychological Science* 10 (2): 202–212. doi:10.1177/1745691614568352.
Huberman, A., and M. Miles. 2002. *Qualitative Researcher's Companion. Thousand*. Oaks: SAGE.
Irvine, J. 2002. *Talk about Sex*. London: University of California.
Jones, T. 2016. "The Needs of Students with Intersex Variations." *Sex Education* 16 (6): 602–618. doi:10.1080/14681811.2016.1149808.
Jones, T. 2017. "Intersex and Family: Supporting Family Members with Intersex Variations." *Family Strengths* 17 (2): 1–29.
Jones, T. 2018. "Intersex Studies: A Systematic Review of International Health Literature." *SAGE Open* 8 (2): 1–19. doi:10.1177/2158244017745577.
Jones, T. 2020. *A Student-centred Sociology of Australian Education: Voice of Experience*. Cham: Springer.
Jones, T., B. Hart, M. Carpenter, G. Ansara, W. Leonard, and J. Lucke. 2016. *Intersex: Stories and Statistics from Australia*. London: Open Book Publisher.

Jürgensen, M., E. Kleinemeier, A. Lux, T. D. Steensma, P. T. Cohen-Kettenis, O. Hiort, and U. Thyen. 2010. "Psychosexual Development in Children with Disorder of Sex Development." *Pediatric Endocrinology and Metabolism* 23 (6): 565–578.

Kemmis, S., P. Cole, and D. Suggett. 1983. *Orientations to Curriculum and Transition*. Melbourne: Victorian Institute of Secondary Education.

Kenny, M., and R. Fourie. 2015. "Contrasting Classic, Straussian and Constructivist Grounded Theory." *TQR* 20 (8): 1270–1289.

Kondakov, A. 2013. "Resisting the Silence." *Law and Society* 28 (1): 403–424.

Lacey, R. E., M. Kumari, and M. Bartley. 2014. "Social Isolation in Childhood and Adult Inflammation." *Psychoneuroendocrinology* 50 (1): 85–94. doi:10.1016/j.psyneuen.2014.08.007.

Lux, A., S. Kropf, E. Kleinemeier, M. Jürgensen, and U. Thyen, The DSD Network Working Group. 2009. "Clinical Evaluation Study of the German Network of Disorders of Sex Development/intersexuality." *BMC Public Health* 9 (1): 110.DOI:10.1186/1471-2458-9-110.

Makinodan, M., K. M. Rosen, S. Ito, and G. Corfas. 2012. "A Critical Period for Social Experience - Dependent Oligodendrocyte Maturation and Myelination." *Science* 337 (6100): 1357–1360. doi:10.1126/science.1220845.

Poteat, P., H. Yoshikawa, J. Calzo, S. Russell, and S. Horn. 2017. "Gay-Straight Alliances as Settings for Youth Inclusion and Development: Future Conceptual and Methodological Directions for Research on These and Other Student Groups in Schools." *Educational Researcher* 46 (9): 508–516. doi:10.3102/0013189X17738760.

Rasmussen, M. L. 2006. *Becoming Subjects*. New York: Taylor and Francis.

Sanders, C., and B. Carter. 2015. "A Qualitative Study of Communication between Young Women with Disorders of Sex Development and Health Professionals." *Advances in Nursing* 2015 (1): 1–7. doi:10.1155/2015/653624.

Sutin, A., Y. Stephan, M. Luchetti, and A. Terracciano. 2018. "Loneliness and Risk of Dementia." *Gerontology Psychological Sciences* 2018 (1): 1–9.

Tait, G. 2019. *Making Sense of Education*. New York: Cambridge University Press.

Ullman, J. 2017. "Teacher Positivity Towards Gender Diversity: Exploring Relationships and School Outcomes for Transgender and Gender-diverse Students." *Sex Education* 17 (3): 276–289. doi:10.10 80/14681811.2016.1273104.

UNESCO. 2015. *From Insult to Inclusion*. Bangkok: UNES. https://bangkok.unesco.org/content/insult-inclusion-asia-pacific-report-school-bullying-violence-and-discrimination-basis