> *Hearing children, parents, and members of the school staff uttering the word 'fag'*

Some parents described situations in which the behavior of school staff or other parents was overtly hostile toward them:

> *The school psychologist has been openly hostile…to both me and to my son.*

> *Teacher refused to work with us on communication issues between her and our daughter.*

> *A very conservative religious parent became upset because my partner was the Brownie troop leader at our school. She withdrew her daughter from the troop. Then, months later, she called the Girl Scouts to say that my partner was teaching inappropriate religious material (on Judaism) at a Catholic school.*

Often it was parents' children, not themselves, who experienced such behavior at school:

> *My daughter was bullied by a lunch lady who insisted that every child has a daddy. When I followed up with the teacher, principal, and assistant superintendent they all conveyed to me that this was simply a 'misunderstanding' and a great deal of time and effort was spent to help me understand the lunch lady's perspective and 'background.' I repeatedly indicated that I want my child to be safe and respected at school and this includes respecting her family (two moms) experience.*

> *My youngest daughter in 7th grade had a recent experience where one on her teacher said my daughter had a 'weird family'*

> *My 9 year old daughter received pro-Christian, anti-gay literature in her backpack from a classmate. The child's mother indicated to the child that the pamphlets were because my child had parents that were going to hell-but that the mother loved my child anyway.*

> *Teasing comments made by classmates of my son about having two mothers*

> *At the fifth grade graduation my child did not want me to attend, and would not state a specific reason. Only to say that the other children gave her a hard time about me since I am not her birth mother.*

One parent, who was also a teacher at her/his child's school, described an incident of verbal and physical violence:

> *My main problem is with other parents, I keep my personal life private because I work at the school my children attend. As a teacher, I don't feel I have to announce anything but other parents who have assumed that I'm a lesbian have made a point of spreading the word. There was also a teacher who thought it was her place to 'out' me to the other teachers at a*

AR_283673

*meeting that I was not at. I have had to file a police report on a parent for putting their hands on my son and screaming and calling me a 'stupid lesbian bitch' in the office while my stepson's class was passing.*

**General Sense of Discomfort in School.** There were some parents who did not experience overt mistreatment or exclusion, but described experiencing a general discomfort at their children's schools. Feeling uncomfortable in their school community was often connected to feeling like a minority or outsider among other parents:

*At a gymnastics meet there was a parent night and every parent was from a two person heterosexual white family and I felt uncomfortable because I was single and gay. We had introductions before the meet to the audience and it was so heterogeneous that anything different stood out.*

*Nothing has happened. I'm just not as comfortable sitting at events with my partner.*

*Parents get very quiet when I or my partner show up.*

*Some parents and staff are uncomfortable around our family.*

This discomfort was also connected to encountering other individuals' lack of knowledge about LGBT people and families. For example, one parent remarked: "His teacher thought since I was his biological mother that I should be the only one making the decisions regarding our son. I quickly set her straight." Below are additional comments:

*Mostly, I find the mistreatment in having to over-explain that my family is normal and that we do normal things like eat dinner at the table most nights, wash clothes and help with homework. I've had teachers ask me what we really do at home as though it's some big homo-erotic mystery.*

*"What do you mean, Johnny has two mothers?" That can't be right.*

*I feel that his last teacher was just confused and mixed both my partner and I up.*

**Parenting Skills Questioned by Members of the School Community.** A few parents (5%) described experiences in which school staff or other parents at their child's school questioned their parenting abilities specifically because they were LGBT:

*An incident occurred with a teacher and one of the children. It was not sexual in nature, but the principal made a point to tell any other authorities that her parents were lesbians and tried to say the problem was possibly our daughter's fault because her parents were lesbian.*

*I had cross words with the principal regarding an attendance issue with my child and her need to be kept home periodically due to issues with her disability. He made a crack about attendance but I perceived it as a slur re our abilities as*

AR_283674

*gay parents…*

*Our daughter's teacher told me that we should not have any more children when my daughter showed some signs of stress when we began foster-parenting our youngest daughter. This is none of her business and clearly a sign that she was uncomfortable with the configuration of our family…*

*The counselor said that I needed to have a member of the opposite sex talk to my child about making relationships with the opposite sex. Since my child would probably not feel comfortable talking with me; as I did not understand those sorts of relationships.*

**Mistreatment Based on Other Characteristics.** There were a few parents (5%) who noted that they had experienced difficulty or mistreatment at their child's school because of other characteristics or issues not specifically related to being LGBT, such as their status as a single parent or their family income:

*[One parent] was organizing a get-together for all the parents of my son's class. When I explained to her that, being a single parent, it's difficult for me to attend night meetings without my children, she said that, "obviously, you're not committed to your son's education." When I challenged her for raising her voice at my son, she called me a "coward" for bringing the issue up in an email.*

*Actually, the difficulty is more because I am a single, working mother and this is a very affluent school.*

*My battles with the school haven't been about glbt issues. They have been about Christian bias i.e. their obsession with Christmas holiday activities.*

*The school discriminates more against our child because he is Black than because we are gay. Race is a much bigger issue!*

*Mostly it is that it is a very small school and is part of a Catholic church, and most of the kids go to church there, as well as attend school. It is very 'clique-ish' and non-Catholics, in general, have a hard time fitting in. Sometimes I don't know if people are "snobby" acting because of that or because they know I'm a lesbian.*

The universe of these comments is important in that it illustrates the many different and often subtle ways schools may discriminate against LGBT families. Furthermore, it illustrates how such negative interactions from school personnel and other members of the school community may negatively affect the family-school relationship among these families. Furthermore, even though the parent may have been the target of the anti-LGBT interaction, a child's exposure to the events is yet another form of a hostile climate for students with LGBT parents and may have serious consequences for their feelings of safety, their access to a quality education and their ability to learn. In

84

fact, of the small percentage of parents who reported any occurrence of such negative events in the past 12 months, about half (52%) reported that their child had been present.

It is important to note that although the percent of parents who experienced mistreatment from school personnel was relatively low, it was not nonexistent. About 1 in 20 parents reported having negative experiences with their child's teachers, principal or other school staff. Schools must ensure that all members of the school community are treated with respect and are free from harm—thus, even one parent in twenty experiencing mistreatment at school is too many.

### Effects of Parents' Negative Experiences on Family-School Relationship

Given the importance of the family-school relationship for children's achievement, we wanted to examine whether the negative experience of LGBT parents with members of the school community had a deleterious effect on their involvement in their child's education, including involvement in school activities and communication with school personnel. Parents' experiences of mistreatment, anti-LGBT comments or negative comments about their parenting were not related to parent-school communication or parent-school involvement.[91] Although negative experiences were not related to the level of involvement in the parent-teacher organization activities, they were related to parents' comfort in attending meetings of the organization. Higher frequency of mistreatment and hearing anti-LGBT comments in school were both related to decreased parental comfort attending parent-teacher organization meetings.[92]

Frequency of parents' negative experiences was further related to their feelings of exclusion from the school community. As shown in Figures 38a and 38b, parents who reported that they did not feel able to participate fully in their child's school as an LGBT parent or that they were not fully acknowledged by the school as an LGBT family were more likely to report all types of maltreatment in school in the past year.[93] For example, among those parents who had felt not able to participate in their child's school, over half (58%) of parents had experienced some incident of mistreatment compared to only about a quarter (26%) of other parents (see Figure 38a). We found the same relationship betweeen negative school experiences and parents' feeling not fully acknowledged as an LGBT famiy at their child's school—parents who expressed having such feelings of exclusion were much more likely to report negative experiences at school, such as mistreatment or hearing negative comments about being LGBT (see Figure 38b).

Negative interactions with school staff may also hinder the relationship between the LGBT parent and school personnel. For this reason, we examined the relationship between parents' negative experiences with specific school personnel and their reported comfort level in talking to them about their family. For all three types of school



Figure 38a. Negative Treatment at School and Parents' Feelings of Exclusion

Feeling Not Fully Able to Participate in School Community



Figure 38b. Negative Treatment at School and Parents' Feelings of Exclusion

Feeling Not Fully Acknowledged as an LGBT Family

86

AR_283677

personnel about whom parents were asked, the level of comfort in talking with the school personnel was related to whether or not the parent had had any negative interactions with them (see Figure 39).[94] For example, among parents who had never experienced any negative treatment from their child's teacher, 90% reported that they would be somewhat or very comfortable talking to their child's teacher about their family. Among parents who had had some negative incident with the teacher related to their LGBT family, a significantly lower percentage (77%) reported the same level of comfort in talking about their family.

**Figure 39.** Relationship Between Negative Experiences With and Comfort Talking to School Personnel about One's Family



AR_283678

# Notes

91    To examine the relationship of parents' negative experiences and parent-school communication and involvement, we examined bivariate correlations between these reported activities and the overall level of mistreatment, hearing anti-LGBT comments and hearing negative comments about parenting using the computed average across the five types of school community members (i.e., teacher, principal, other school staff, students and parents). Because of the large number of correlations, both a conservative error term was used ($p<.001$) and the magnitude of the relationship was considered (small/moderate effect of $r=.2$ or greater).

92    Mistreatment, $r=-.29$; Negative comments, $r=-.23$, $p<.001$ for both.

93    The graphics represent a correlational relationship. The correlation coefficients between "not fully able to participate" and negative experiences were: Mistreatment, $r=.45$; Negative Comments, $r=.30$; Negative Parenting Comments, $r=.17$, and Other Negative Experiences, $r=.56$. For "not fully acknowledged," the correlation coefficients were: Mistreatment, $r=.48$; Negative Comments, $r=.34$; Negative Parenting Comments, $r=.25$, and Other Negative Experiences, $r=.49$. All significant at $p<.001$.

94    To examine the relationship of parents' negative experiences with school personnel and comfort speaking to the same school personnel about their family, we computed a dichotomous variable for each school personnel type where 0 indicated no negative experience and 1 indicated any of the three types of negative experience (mistreatment, negative comments about being LGBT and negative comments about parenting) within each type of school personnel (teacher, principal and other school personnel). We used a dichotomous indicator because the variance among the negative experiences variables for school personnel was so low. We then performed a series of chi-square analyses, negative experiences x comfort. for teachers, $\chi^2=10.1$, $\phi=.13$, $p<.001$; for principals, $\chi^2=13.6$, $\phi=.15$, $p<.001$, and for other school staff, $\chi^2=12.9$, $\phi=.15$, $p<.001$.

AR_283679



## Inclusivity of LGBT Issues in School and Other School Supports

GLSEN's research related to the school experiences of LGBT students indicates that few schools have positive LGBT resources, such as inclusive curriculum or a safe school policy that includes specific protections based on sexual orientation and/or gender identity.[95] For students with LGBT parents, this lack of supportive resources may also negatively affect their school experience. Furthermore, LGBT families may be invisible in representations of family life. If an elementary school library does not include books that represent different types of families, including LGBT families, then those students with LGBT parents may feel excluded or that their family is somehow strange. If a school record only allows for "mother's name and father's name," LGBT parents may feel that they are not accepted into the school community as non-LGBT parents would be. We asked parents how inclusive overall was their child's school of LGBT families and of other kinds of families that are often considered "nontraditional," such as a single-parent headed family. About two-thirds of the parents thought that the school was somewhat or very inclusive of LGBT families (68%), yet a higher percentage (85%) thought that the school was inclusive of other kinds of families (see Figure 40). Elementary school parents were more likely to believe that the school was inclusive on both indicators than other parents, although the difference was more striking regarding inclusivity of LGBT families (see Figure 41).[96] Parents whose child attended a non-religious private school were also more likely to rate the school as more inclusive (see also Figure 41).[97] Specifically, these private school parents were higher

AR_283680



**Figure 40. Parents' Reports on Inclusivity of Their Child's School: LGBT and Other "Nontraditional" Families**



**Figure 41. Parents' Reports on Inclusivity of Their Child's School by School Characteristics**

AR_283681

than all other parents in their ratings on inclusion of LGBT families and were higher than elementary school parents on inclusivity of other nontraditional families.

### Access to Information About LGBT Families and Other LGBT-Related Topics

Many advocates of multicultural education, such as the National Association of Multicultural Education, believe that an inclusive curriculum promotes equity for all students, regardless of culture, race/ethnicity, gender and sexual orientation and that it enables the individual to believe in one's own intrinsic worth and in one's own culture.[98] Thus, GLSEN advocates that curricula and other school-based resources that provide positive representations of LGBT people, history and events are important indicators of school climate and positively affect students' experiences at school.

Students and parents were asked about the presence of LGBT-inclusive curricula and resources in their school. Less than a third of both students (27%) and parents (29%) reported that the school curriculum included representations of LGBT people, history or events in the past school year. Among students who had been taught about LGBT-related topics in a class, History/Social Studies, English and Health were the classes most often mentioned as being inclusive of LGBT topics (see Table 23). Many of these students also mentioned other classes, such as Psychology, Sex Education, Media, and Religious Studies, which were not categories explicitly listed on the survey. Among students who said that LGBT-related topics were included in their classroom curricula, 77% thought that these were represented in a somewhat or very positive manner (see Figure 42), which translates into less than a quarter (21%) of all students in our survey reporting that positive representations of LGBT people, history or events were included in their classroom activities.

Students were also specifically asked if representations of LGBT families were included in classroom activities when the topic of family entered into the curriculum. Less than a third (30%) of all students said that representations of LGBT families were included in the curriculum when the topic of families came up during class activities (see Figure 43). Students in the Northeast and the West were far more likely to report that representations of families with LGBT parents were included in their class activities or curriculum. More than a third (37%) of students in the West and 40% in the Northeast said that representations of LGBT families were included in classroom activities, compared to less than a fifth of students in the Midwest (14%) and South (13%).[99]

With regard to parents' perspectives, the prevalence of an inclusive curriculum varied by the type of school. As shown in Figure 44, High school parents were much more likely than middle school and elementary school parents to report that their child's curriculum was inclusive of LGBT issues (44% v. 28% and 24%, respectively).[100] The

91

## Table 23. Most Commonly Reported Subject Areas in which LGBT Issues are Included

### Student Reports

(percent of those reporting any LGBT inclusion)

| Grade Level | Subject Area | Percent of Students |
|---|---|---|
| Middle School (Grades 6–8) | Other Classes | 50% |
| | Health Education | 44% |
| | History/Social Studies | 25% |
| | Science; English | 19% |
| High School (Grades 9–12) | History/Social Studies | 50% |
| | English | 46% |
| | Health Education | 42% |
| | Other Classes | 25% |

### Parental Reports

(percent of those reporting any LGBT inclusion)

| Grade Level | Subject Area | Percent of Students |
|---|---|---|
| Elementary School | Family-Related Curriculum | 61% |
| | History | 34% |
| | Reading/Language Arts/English | 19% |
| Middle School | Family-Related Curriculum | 30% |
| | History | 30% |
| | Health | 22% |
| High School | Health | 90% |
| | History | 24% |
| | English | 22% |

92

AR_283683

nature of the curricular inclusion also varied somewhat by the school level. As also shown in Table 23, parents of high school students were most likely to report History, Health and English as subjects in which LGBT issues were discussed, similar to results from the student survey. Parents of elementary and middle school students, however, were also likely to report inclusion in family-related curriculum.

As with other resources, parents with a child at a non-religious private school were also more likely to report LGBT-inclusive material in school than other parents (see Figure 45)—half of these parents (51%) compared to about a quarter of other parents (25% and 28%, respectively).[101]

## Supportive Student Clubs

Existing research has shown that the presence of Gay-Straight Alliances (GSAs) and other types of student clubs that address LGBT student issues may have a positive impact on school climate and the experiences of LGBT students.[102] Student clubs that provide support to LGBT students may also be a resource and source of support for students from LGBT families. For example, these types of clubs may provide a space in which students with LGBT parents can talk openly about their experience, regardless of their own sexual orientation or gender identity. Thus, students were asked about the presence of supportive student clubs at their school. Only about a third (34%) said that their school had a GSA or other kind of student club that addressed LGBT student issues. Students in high school were much more likely to report that their school had a GSA or other supportive student club than students in middle school (48% vs. 15%).[103] In addition, students with LGBT parents were more likely than the general population of students to report that their school had a student club that addresses LGBT issues (34% vs. 22%).[104]

## Supportive Members of the School Community

For any student, having a supportive adult at school can have great benefits for the student's academic experience. For students with LGBT parents, supportive teachers or staff may be even more important, particularly if she or he receives negative reactions from other members of the school community because of her or his family. The vast majority (87%) of students reported that they had at least one teacher or other school staff member who was supportive of LGBT issues, such as students with LGBT parents and more than half (55%) said they had six or more supportive school staff people. Furthermore, about half (51%) could identify at least one school staff person who was open about being lesbian, gay, bisexual and/or transgender.

Students were also asked several questions about their comfort level with regard to being open about their family or having an LGBT parent. Figure 46 illustrates the level of comfort students reported with various members of the school community: teacher(s), principal, counselor or psychologist, nurse, librarian, close friends and other

AR_283684

classmates. The vast majority of students reported feeling somewhat or very comfortable talking with close friends about their family (82%) yet only about half reported being comfortable talking with other classmates (52%). Among the adult members of the school community, about two-thirds reported that they would be comfortable talking to a teacher or their school counselor or psychologist (65% and 62%, respectively).

Students were also asked how comfortable they would be with other interactions between their family and members of the school community: inviting friends home, inviting friends to spend time with their family, introducing their parents to the parents of their friends and having their parents attending school events. Overall, as shown in Figure 47, students reported being comfortable with these other family-school intersections.

Given the importance of the family-school relationship for student academic success, it was also important to examine whether the LGBT parents in our survey believed that teachers in their child's school were supportive of LGBT issues. Two-thirds (67%) of parents reported that there were supportive teachers (at least a few) at their child's school and a third (33%) reported that most or all of the teachers were supportive of LGBT issues. Elementary school parents reported, on average, a greater number of supportive teachers than middle and high school parents, and parents of children attending non-religious private schools also reported more supportive teachers (see Figure 48).[105]

Parents differed in their reports of supportive teachers based on the region and locale in which they lived. As shown in Figure 49, parents from the South reported fewer supportive teachers than parents for other regions.[106] Parents from urban schools identified more supportive teachers than parents from suburban and small town/rural schools (see also Figure 49).[107]

### Safe School Policies

Having a policy or procedure for reporting incidents of harassment in school is an important tool for making schools safer for all students. When such policies or procedures exist and are enforced, schools send a message to the student population that victimizing behaviors will not be tolerated. Comprehensive safe schools policies that enumerate categories of protections, such as sexual orientation and gender identity/expression, may provide students with greater protection against bullying and harassment in that they offer explicit protections. Although almost three-quarters (73%) of students reported that their school had some type of policy for dealing with incidents of harassment and assault, far fewer reported that their school's policy explicitly mentioned sexual orientation and/or gender identity/expression (see Table 24).

94

Although safe school policies would have the most direct benefit for the student population, it is also important for all parents to know what type of safe school policy their child's school has as it provides parents with an understanding of the level of protection that their child is afforded in school. Also, in the event of their child being bullied or harassed in school, knowledge of the school's policy may also provide parents with the foundation for addressing the problem with school personnel. In addition, for LGBT parents, whether or not a school's policy includes sexual orientation or gender identity/expression may be an additional indicator of how welcoming the school is of their type of family, as well as an additional level of protection for their child if she or he is harassed because of having LGBT parents. As shown in Table 25, whereas three-quarters of LGBT parents reported that their child's school had some type of safe school policy, less than half of parents (42%) reported that the policy specifically included language about sexual orientation and/or gender identity/expression. Although there were no significant differences across school level with regard to safe school policies, there were significant differences across school type. Parents whose children attended a non-religious private school were much more likely than other parents to report that the school had a comprehensive policy—nearly two-thirds (63%) compared to about a third for both public school parents and religious school parents (38% and 33%, respectively).[108]

### *Other School Supports*

Parents and students were also asked about other types of school activities or characteristics that may be supportive for LGBT families. Having other LGBT people who are part of the school community may provide a greater sense of attachment to the school and may be a resource for some LGBT parents. As shown in Figure 44, over half (61%) of the parents in the survey reported that there were other LGBT families who were part of the school and nearly half (47%) reported that there were teachers who openly identified as LGBT. Although parents' knowledge of other LGBT people at school did not vary across elementary, middle and high schools, it did differ across type of school. Parents with a child in a non-religious private school were much more likely than other parents to report that there were other LGBT families in the school community and that there were LGBT school personnel (see Figure 45).[109]

Another consideration for LGBT parents in assessing their child's school climate would be whether school personnel had had any training on LGBT issues.[110] Overall, few parents (10%) reported being aware of such trainings (see also Figures 44 and 45) and this low percentage was consistent across school levels. However, with regard to school type, the percentage of public school parents reporting such trainings was lower than private school parents (both religious and other).[111]

95

With regard to student reports, few students reported having access to LGBT-inclusive resources at their school. Less than a fifth (14%) reported that LGBT-related topics were included in any of their textbooks, and only a little more than a quarter (29%) said that their school library contained materials that included LGBT-related topics. Furthermore, less than half (45%) of students said that they were able to use school computers to access websites about LGBT-related information. Students were more likely to report that they had supports in the form of other students with LGBT parents. More than half (58%) of students in our survey reported knowing at least one other student at their school who had an LGBT parent or parents. Outside of school, almost two-thirds (62%) had at least one friend with an LGBT parent and 15% had more than 10 friends with an LGBT parent.



**Figure 42. Students' Reports on Quality of Representations of LGBT-Related Issues in Class**

Very Negatve 8%
Somewhat Negative 15%
Very Positive 44%
Somewhat Positive 33%

**Figure 43. Students' Reports on Representation of LGBT Families in Family-Related Curriculum**

Never 70%
Some of the Time 26%
Most of the Time 3%
All of the Time 1%

**Figure 44. Parents' Reports of Other LGBT-Related Resources in School by School Level**



Legend:
- Other LGBT Families
- LGBT Teachers
- Inclusive Curriculum
- Educator Trainings

Percentage of Parents Reporting Each Resource

| | Total | Elementary School | Middle School | High School |
|---|---|---|---|---|
| Other LGBT Families | 61% | 64% | 59% | 54% |
| LGBT Teachers | 47% | 44% | 48% | 55% |
| Inclusive Curriculum | 29% | 24% | 28% | 44% |
| Educator Trainings | 10% | 10% | 10% | 7% |

96

**Figure 45. Parents' Reports of Other LGBT-Related Resources in School by School Type**



**Figure 46. Percentage of Students Who Were "Somewhat" or "Very Comfortable" Talking with School Community Members About Their LGBT Parents or Family**



97

AR_283688



**Figure 47.** Percentage of Students Who Were "Somewhat" or "Very Comfortable" re: Various School and Home Activities



**Figure 48.** Parents' Report on Teachers Supportive of LGBT Issues by Characteristics

AR_283689



**Figure 49. Parents' Report on Teachers Supportive of LGBT Issues by Locale and Region**

How many teachers or other school staff do you know who are supportive of LGBT issues?

## Table 24. Students' Reports Regarding Safe School Policies

|  | Total |
|---|---|
| No Policy [a] | 27% |
| Any Policy | 73% |
| Comprehensive Policy | 35% |
| Generic Policy [b] | 38% |

[a] Includes those students who indicated they did not know if there was a policy or not.
[b] Includes those students who indicated they did not know if the policy included specific enumeration.

## Table 25. Parents' Reports Regarding Safe School Policies by School Type

|  | Total | Public | Private–Religious | Private Other |
|---|---|---|---|---|
| No Policy [a] | 25% | 26% | 23% | 21% |
| Any Policy | 75% | 74% | 77% | 79% |
| Comprehensive Policy | 42% | 38% | 33% | 63% |
| Generic Policy [b] | 33% | 36% | 44% | 13% |

[a] Includes those parents who indicated they did not know if there was a policy or not.
[b] Includes those parents who indicated they did not know if the policy included specific enumeration.

AR_283690

### *Utility of School Resources and Supports*

In addition to documenting whether or not schools have institutional supports for LGBT families, such as supportive faculty, inclusive curricula, or Gay-Straight Alliances, it is also important to examine how such institutional supports may benefit LGBT parents and their children.

Even though most parents have a more limited day-to-day relationship with their child's school, the quality of the family-school relationship could be affected by the nature of LGBT-related resources and supports, particularly educator trainings regarding LGBT issues and comprehensive safe school policies.

**Supportive Educators.** The presence of school staff who were supportive of students with LGBT parents was related to students' academic achievement. As shown in Figure 50, as the number of supportive school staff increased, students' reported grade point averages (GPAs) also increased.[112] For example, students who could identify many (six or more) supportive staff at their school reported a GPA half a grade higher than students with no supportive school staff (3.4 versus 2.9).

A greater number of supportive educators was also related to fewer missed days of school due to safety concerns.[113] For example, almost a fifth (16%) of students who said they had no supportive staff reported missing school because they felt unsafe, compared to 10% of those who had many supportive staff at their school.

Given the relationships between the presence of supportive educators and student's academic achievement and sense of safety, it is important for schools to provide training for educators about LGBT-related issues, including how to provide appropriate support to students with LGBT parents. Such training may foster a more positive school climate for LGBT parents as well as students.



**Figure 50.** Student Achievement and Supportive School Staff

AR_283691

**Figure 51. Parents' Reports of LGBT-Related Educator Trainings in School and Indicators of School Climate**







AR_283692

Even though the minority of parents reported that their child's school had training related to LGBT issues, there were significant relationships between trainings and various aspects of school climate. Parents who reported that the school had such training were less likely to report that they were not acknowledged by the school as LGBT families and more likely to rate the school as inclusive of LGBT families as well as inclusive of other "nontraditional" families (see Figure 51).[114] With regard to harassment or mistreatment, these parents were also less likely to report that they themselves had experienced mistreatment in school related to being LGBT and less likely to report that their child had told them about being bullied or harassed in school (see also Figure 51).[115]

For parents who reported their child had been bullied or harassed in school, whether or not the school had had LGBT-related training was not related to the frequency with which parents addressed the problem with school staff. However, those parents who reported that the school had had training were more likely to report that addressing the problem with school personnel was indeed effective (see also Figure 51).[116]

It is possible that the parents in this study may have made an assumption that school personnel had had training related to LGBT issues as a result of their more positive experiences with the school. However, these results regarding educator trainings may be an indication that such trainings have a positive effect on how school personnel address LGBT issues in school. Future research is needed to understand the effect of educator trainings on school climate for LGBT parents and their children.

**Safe School Policies.** Parents' ratings on their school's inclusivity varied by the type of safe school policy the school reportedly had (see Figure 52). Parents from schools with comprehensive policies were least likely to feel unacknowledged as an LGBT family and most likely to rate the school as more inclusive not only of LGBT families but of other types of "nontraditional" families as well.[117] Furthermore, there was no evidence that having a generic policy was any different than having no policy whatsoever. Parents from schools with comprehensive policies were also less likely to report that they themselves had experienced mistreatment in school related to being LGBT.[118] Overall, parents whose child's school had a comprehensive safe school policy reported the lowest level of mistreatment and there were no differences between the no-policy and generic-policy groups (see also Figure 52).

There were no significant differences by school policy with regard to parents' reports of child harassment in school. Also, among parents whose children had been harassed, there were no differences in the frequency with which they talked to the school about the harassment. However, school policy appeared to make a difference in how parents felt the school handled issues related to child harassment. As also shown in Figure 52, parents from schools with comprehensive

102

**Figure 52. Parents' Reports of Safe School Policy and Indicators of School Climate**







AR_283694

policies reported school personnel as most receptive to them when they addressed the issue of their child being harassed in school, followed by parents from schools with a generic policy.[119] Parents from schools with a comprehensive policy were also most likely to report that addressing child harassment with staff was effective.[120] Furthermore, there were no differences between the no-policy and generic-policy groups in effectiveness. Thus, although the presence of a comprehensive policy may not necessarily influence whether or not a parent decides to speak with school officials about their child's experiences of harassment, its existence may affect how school officials address the concerns of the LGBT parents who do bring the issue to their attention.

Although there were few significant differences in students' reports of school climate by type of school policy, there was a general trend in the data that students in schools with a comprehensive safe school policy reported fewer negative experiences in school. For example, Figure 53 illustrates that students in schools with comprehensive policies typically reported a lower incidence of mistreatment than students in schools with a generic policy or no policy at all. The difference was, in fact, significant for mistreatment by teachers—students in schools with comprehensive policies were less likely than other students to report mistreatment by a teacher.[121]

**State Safe School Legislation.** A growing number of states across the country have added explicit protections for LGBT students in their state education anti-discrimination and harassment statutes. As with school-level policies, whereas such laws perhaps have primary importance for protecting students from bullying and harassment, they may also afford protection to the children of LGBT parents with regard to harassment related to their actual or perceived sexual orientation and harassment related to their family constellation. Currently, ten states plus the District of Columbia prohibit discrimination or harassment on the basis of sexual orientation in schools and four of these states also include protections on the basis of gender identity.[122] Ten states currently have statewide "anti-bullying" laws that do not explicitly define "bullying" or list categories of students who should be protected from specific and prevalent forms of bullying.[123] Many safe school advocates believe that general anti-bullying laws are insufficient in protecting students from harassment and discrimination in schools because they are too vague and do not provide teachers and administrators with clear legal guidance. Proponents of general bullying laws often argue that enumerated categories do not necessarily provide stronger protection and are not necessary for protective safe schools legislation.

Given there were significant differences in LGBT parents' reports of school climate regarding the type of school-level safe schools policy, it is important to examine school climate for LGBT families and state-level safe schools legislation.[124] With regard to students' experiences in school, the existence of comprehensive safe schools legislation

**Figure 53. Safe School Policies and Students' Experiences of Mistreatment in School**



**Figure 54. State Safe Schools Legislation and Students' Reports of Biased Remarks**



AR_283696

**Figure 55. State Safe School Legislation and Indicators of School Climate for LGBT Parents**



was related to their reports of hearing certain types of biased language in school. As shown in Figure 54, students in states with comprehensive legislation were less likely to report hearing high frequencies of homophobic remarks and racist remarks than all other students. With regard to remarks about having LGBT parents, however, students from states with no safe school legislation were significantly higher than students from states with any type of safe school law and there were no differences between those from states with generic laws and those from states with comprehensive laws.[125]

With regard to parents' reports on school climate, although there were no significant differences across state legislations groups with regard to parental mistreatment and child harassment, there were differences in parental reports on school inclusivity.[126] Parents from states with comprehensive legislation were least likely to report not feeling acknowledged by the school community as an LGBT family and were most likely to report that the school was inclusive of LGBT families (see Figure 55). Furthermore, there is no evidence that generic safe schools legislation has any benefits over having no

106

legislation on these indicators of climate. Although there may be many contributing factors that might result in differences across states by type of safe school legislation, these findings nevertheless lend evidence to the claim that comprehensive safe school laws may be more effective than generic laws or no law at all in creating safer schools for LGBT students and families.

## Notes

95 See Kosciw, J. & Diaz, E. (2006). *The 2005 National School Climate Survey: The experiences of lesbian, gay, bisexual and transgender students in our nation's schools.* New York: GLSEN.

96 Percentages shown in the Figure are for illustrative purposes. Because the two inclusivity variables were highly correlated, differences between groups were tested by a multivariate analysis of variance. The multivariate effect was significant, Pillai's trace=.07, $F(4,1118)$=10.6, $p$<.001. Univariate effects were considered at $p$<.01.

97 Percentages shown in the Figure are for illustrative purposes. Because the two inclusivity variables were highly correlated, differences between groups were tested by a multivariate analysis of variance. The multivariate effect was significant, Pillai's trace=.09, $F(4,1120)$=13.4, $p$<.001. Univariate effects were considered at $p$<.01.

98 To learn more about the National Association of Multicultural Education, go to: http://www.nameorg.org/resources/FAQs.htm. (Accessed August 27, 2007).

99 Percentages shown in Figure for illustrative purposes. Group differences were examined using one-way analyses of variance. Findings were significant: $F(3, 141)$=3.3, $p$=.021, univariate effects were considered at $p$<.05.

100 Chi-square test was performed: $\chi^2$=17.6, $p$<.001, $df$=2, Cramer's V=.17.

101 Chi-square test was performed: $\chi^2$=22.9, $p$<.001, $df$=4, Cramer's V=.20.

102 Goodenow, C., Szalacha, L., & Westhimer, K. (2006). School support groups, other school factors, and the safety of sexual minority adolescents. *Psychology in the Schools*, 43(5), 573–589.

Harris Interactive & GLSEN (2005). *From teasing to torment: School climate in America, a survey of teachers and students.* New York: GLSEN.

Kosciw, J. G. & Diaz, E. M. (2006). *2005 National School Climate Survey: The experiences of lesbian, gay, bisexual, and transgender youth in our nation's schools.* New York: GLSEN.

Russell, S. T., McGuire, J. K., Laub, C., & Manke, E. (2006). *LGBT student safety: Steps schools can take. California Safe Schools Coalition Research Briefs No. 3.* San Francisco: California Safe Schools Coalition.

Szalacha, L. A. (2003). Safer sexual diversity climates: Lessons learned from an evaluation of Massachusetts safe schools program for gay and lesbian students. *American Journal of Education*, 110(1), 58–88.

103 Differences were examined using independent samples t-tests and percentages are for illustrative purposes. The t-statistic was significant: t= -4.6, $df$=147.3, $p$<.001.

104 Harris Interactive, Inc. & GLSEN Study: 2005 Data File. New York; GLSEN. Chi-square nonparametric test was performed to compare the percentages of students in the current study who reported that their school had a GSA with the percentages of students from the national population. $\chi^2$=13.2, $df$=1, $p$<.001.

105 School level: $\chi^2$=22.3, $p$<.001, $df$=6, Cramer's V=.14; School type: $\chi^2$=70.4, $p$<.001, $df$=6, Cramer's V=.25.

106 Chi-square test was performed: $\chi^2$=26.9, $p$<.001, $df$=9, Cramer's V=.13.

107 Chi-square test was performed: $\chi^2$=23.6, $p$<.001, $df$=9, Cramer's V=.14.

108 Chi-square test was performed: $\chi^2$=24.3, $p$<.001, $df$=4, Cramer's V=.15.

109 Other LGBT Families: $\chi^2$=14.3, $p$<.001, $df$=2, Cramer's V=.16; LGBT school personnel: $\chi^2$=28.1, $p$<.001, $df$=2, Cramer's V=.23.

110 This question was worded: "Does the staff at your child's school receive any sort of training in how to support students with LGBT families?"

111 $\chi^2$=18.8, $p$<.001, $df$=2, Cramer's V=.18.

112 The figure represents a correlational relationship. Pearson correlation: $r$=.21, $p$<.05.

113 Pearson correlation: $r$=-.19, $p$<.05.

114 Analysis excluded those parents who did not know whether the school had had educator trainings. Percentages shown in Figure for illustrative purposes. To examine differences between those parents who reported training and those who did not on feeling acknowledged and perceptions of inclusivity, independent-sample t-tests were conducted. Group differences were significant for not feeling acknowledged (t=6.4, $df$=132, $p$<.01) and for both inclusive regarding LGBT families (t=-7.4, $df$=175, $p$<.01) and inclusive regarding other "nontraditional" families (t=-3.8, $df$=174, $p$<.01).

AR_283698

115   Independent-sample t-test was employed to examine group differences. For parental mistreatment, we used the mean of the five mistreatment variables as an overall indicator of mistreatment by teachers, by principal, by other school staff, by students and by other parents. The t-statistic was significant for both mistreatment ($t$=-2.8, $df$=175, $p$<.01) and child reports of harassment in general ($t$=-2.2, $df$=174, $p$<.05) and child reports of harassment LGBT-related ($t$=-3.2, $df$=175, $p$<.01).

116   Analysis excluded those parents who did not know whether the school had had educator training. Percentages shown in Figure for illustrative purposes. To examine differences between those parents who reported training and those who did not on effectiveness of addressing harassment and receptiveness of school staff, independent-sample t-tests were conducted. Group differences were significant only for effectiveness of addressing harassment: $t$=-2.74, $df$=82, $p$<.01.

117   Percentages shown in Figure for illustrative purposes. To examine mean differences by type of policy (no policy, generic policy and comprehensive policy) on the acknowledgement and inclusivity variables, one-way analyses of variance were conducted. Group differences were significant for acknowledgement [$F(2,570)$=7.7, $p$<.001] and for both inclusive regarding LGBT families [$F(2,564)$=27.4, $p$<.001] and inclusive regarding other "nontraditional" families [$F(2,570)$=9.9, $p$<.001]. Univariate effects were considered at $p$<.01.

118   Percentages shown in Figure for illustrative purposes. For parental mistreatment, we used the mean of the five mistreatment variables as an overall indicator of mistreatment by teachers, by principal, by other school staff, by students and by other parents. Group differences regarding mistreatment were examined using one-way analyses of variance. Findings for overall mistreatment were significant: $F(2,575)$=4.8, $p$<.01, univariate effects were considered at $p$<.05.

119   Percentages shown in Figure for illustrative purposes. Group differences were examined using one-way analyses of variance. There were significant mean differences on receptiveness to parents addressing harassment with staff: $F(2,253)$= 7.4, $p$<.001. Given that the smaller sample size of parents who reported their child had been harassed and that the parent had addressed the issue with school personnel, univariate effects were considered at $p$<.05 rather than the more conservative $p$<.01 used in other full sample analyses.

120   Percentages shown in Figure for illustrative purposes. Group differences were examined using one-way analyses of variance. There were significant mean differences on effectiveness of addressing harassment with staff: $F(2,253)$= 13.2, $p$<.001. Given that the smaller sample size of parents who reported their child had been harassed and that the parent had addressed the issue with school personnel, univariate effects were considered at $p$<.05 rather than the more conservative $p$<.01 used in other full sample analyses.

121   To examine group differences on school policy on students' reports of harassment and mistreatment, a series of multivariate analyses of variance (MANOVAs) were performed. The multivariate effect for the five mistreatment dependent variables (mistreatment because of having LGBT parents from teacher, principal, other school staff, other parents, or peers) was marginally significant, Pillai's trace=.12, $F(10,290)$=1.8, $p$<.10. The univariate effect for mistreatment from teachers was significant ($p$<.05), and the univariate effects for mistreatment from principal and from peers were marginally significant ($p$<.10). The univariate effects for mistreatment by other school staff and from other parents were not statistically significant. Figure 52 shows percentages of high mistreatment by policy group only for illustrative purposes. In that no student reported high levels (sometimes or greater) of mistreatment by the school principal, the marginal effect for that variable is not shown.

122   States that include protection based on sexual orientation are: California, Connecticut, Iowa, Maine, Massachusetts, Minnesota, New Jersey, Vermont, Washington, and Wisconsin. States that also include protection on the basis of gender identity are California, Iowa, Maine, Minnesota and New Jersey. For more information on state laws as well as a state-by-state analysis of school safety protections, see GLSEN's report, *State of the States 2004: A Policy Analysis of Lesbian, Gay, Bisexual and Transgender (LGBT) Safer School Issues*. Available from the GLSEN website: www.glsen.org.

123   States that have generic legislation are: Arizona, Arkansas, Colorado, Georgia, Louisiana, Oklahoma, Oregon, Illinois, New Hampshire, Rhode Island and West Virginia. Also see GLSEN's State of the States 2004 report.

124   Of the states with comprehensive legislation, Iowa and Maine passed their legislation after data collection for this survey was completed, and thus, they were not included in the Comprehensive group but in the No Legislation group for analytical purposes. Similarly, Arizona passed their generic legislation after data collection was completed and were also included in the No Legislation group.

125   Percentages shown in Figure for illustrative purposes. To examine mean differences by type of state law (no law, generic law and comprehensive law), one-way analyses of variance were conducted. Group differences were significant for homophobic remarks [$F(2,152)$=12.6, $p$<.01], racist remarks [$F(2,151)$=14.4, $p$<.01] and remarks about having LGBT parents [$F(2,151)$=10.2, $p$<.01]. Univariate effects were considered at $p$<.05.

126   Percentages shown in Figure for illustrative purposes. To examine mean differences by type of state law (no law, generic law and comprehensive law) on the acknowledgement and inclusivity variables, one-way analyses of variance were conducted. Group differences were significant for acknowledgement [$F(2,572)$=5.6, $p$<.01] and for inclusive regarding LGBT families [$F(2,565)$=7.4, $p$<.001]. Univariate effects were considered at $p$<.01. For the acknowledgement variable, mean differences were significant only between the comprehensive law group and the no law group. For the inclusivity variable, mean differences were significant only between the comprehensive law group and the other two groups.

AR_283699

110

AR_283701

## Limitations

Before discussing the implications of the current study, it is important to note some of the limitations. We employed two methods for obtaining participants and each of the two methods had differing success rates for the parent and the student surveys. In contrast to our previous research on LGBT students, obtaining students with LGBT parents via the Internet was less successful in this study and more rigorous recruitment was needed via community groups for LGBT families, family events and summer camps. For parents, the Internet survey resulted in a greater number of respondents than did the paper surveys by way of community groups and family events. It may be that students with LGBT parents are less likely to be connected to community listservs and other email lists, the primary route for announcing our on-line survey. Many community groups for LGBT families were no longer active or only existed in "virtual" capacities (e.g., through email lists or listservs), and it may be that there are fewer physical community-based supports (e.g., groups with regular meetings or family activities). For LGBT parents, it may be that they are more likely to subscribe to e-mail lists and belong to LGBT parenting listservs. Furthermore, it may be that the flexibility of taking an on-line survey at one's own convenience is more suitable for a parent's busy schedule.

LGBT families who were represented in this study had some connection with the LGBT community, either through a national organization for LGBT parents and/or their children, and local community groups or services for this population. Thus, the results in this report may not be representative of those families who may not be aware of such community supports or who cannot access them. For example, many of the parents and students who completed the survey were attending summer vacation events that attract families from all over the country. Yet some families may not have the time or financial resources to attend such events. Similarly, given that the student survey was only for those attending secondary school, it is difficult to know how certain common adolescent developmental characteristics, such as individuation from family, play a role in participation in the survey. For example, some adolescents with LGBT parents may not be interested in attending events for children of LGBT parents because they do not want to attend family-related functions, in general, or they may not feel the need to connect with other students based on a shared parental characteristic.

As mentioned in the Methods section, although the majority of students identified as heterosexual, the student sample may have had a higher representation of students identifying as lesbian, gay or bisexual than might be expected from national percentages. Given that a large portion of the survey respondents learned about the survey via GLSEN's website and given that GLSEN provides information and resources for LGBT-identified students, it is likely that the percentages of students in this study who identified as lesbian,

AR_283702

gay or bisexual is greater than would be expected in the general population of adolescents with LGBT parents. In fact, this hypothesis is borne out by the fact that more students who learned about the study via GLSEN's website identified as lesbian or gay than students who took the paper version of the survey. Furthermore, it is possible that LGBT students who happen to have LGBT parents may be more comfortable with their sexual orientation and gender identity and may be more connected to LGBT community organizations such as GLSEN or COLAGE (Children Of Lesbians And Gays Everywhere) through which they learned abut the current study. It is also worth noting that the higher percentage of LGB-identified students in the sample may also be a reflection of the fact that LGBT adolescents in the foster care system may often be placed with and perhaps adopted by LGBT-identified adults[127] and that LGBT adolescents are in the foster care system in significant numbers.[128] Given the number of LGB-identified students in the sample, the overall view of school climate depicted in this report, related to issues of sexual orientation and gender identity/expression, could be somewhat skewed—LGB students were more likely than non-LGB students to report victimization in school based on their gender, sexual orientation and gender identity/expression.Yet there were no differences by sexual orientation on students' reports of bias in school related to having LGBT parents. Further research is needed that examines the intersection of LGBT identity of students and LGBT family status as it relates to student school experiences.

Although examining demographic differences among families was not the main purpose of this study, a larger sample size would have allowed for more comparisons in educational experiences across different types of families (e.g., families with gay fathers versus lesbian mothers, adoptive versus non-adoptive families). Among the parent sample, for example, the most common type of family constellation was two lesbian parents with a child in elementary school. Furthermore, it is important to note that there were very few parents in the study who identified as transgender and because of this small representation, we were not able to discern whether transgender parents differed significantly in their interactions with their children's schools. Among the student sample, there were few students who identified as transgender and only a small number of students of color, which limited our ability to examine whether the school experiences for these students were different than other students in the study. More large scale research is needed to examine in greater detail how the family-school connection may vary by family composition.

It is important to note that the level of analysis for this study was not at the family-level and the parents and students who participated in the surveys were not necessarily from the same families. For this reason, we were not able to examine any relationship between student reports and parent reports. Future research is needed that can explore how parental involvement or intervention with the school

112

may affect the child's experience of school climate. Lastly, the data from our survey is largely cross-sectional, meaning that the data was collected at one point in time. Thus, with the possible exception of the policy analyses, we cannot determine causality. For example, we cannot make definitive statements regarding the effectiveness of having supportive school staff, although we can say that there was a positive relationship between the number of supportive staff and parental involvement in the school.

## Conclusions and Recommendations

The results of this survey help to further the discussion of LGBT issues in K–12 education by highlighting the experiences of LGBT parents and their children. Furthermore, it highlights how schools must understand school climate and school safety not only for students but for other members of the school community, such as parents. Educational experts maintain that the family-school relationship is an important factor in academic success for the student. To the extent that certain parents are excluded or not welcome in school activities or are mistreated by school staff and other parents, they may feel that they have less access to school information or educational resources for their children or may not have the same rights to voice problems or concerns than other parents, which in turn, could have negative consequences for student academic performance. LGBT parents in this study were more likely to report having problems with students in the school or parents of other students than they were to report having problems with school personnel (the principal, teachers and other staff). It is important for school personnel to understand that harassment by students of anyone in the school community, whether it be a student or a parent of a student, should not be tolerated. Furthermore, school personnel must consider that their responsibility for maintaining a safe environment for all members of the school community extends beyond students, teachers and staff. Parents must be held accountable for their actions while on school premises and mistreatment by parents of students while at school is the responsibility of the school. Parent-teacher organizations must also address issues of school climate and educate parents about school safety and their responsibility for creating and maintaining a safe and welcoming environment for all parents as well.

Many LGBT parents in the survey carefully considered certain characteristics of a school when deciding on their child's enrollment, perhaps in order to ensure a safer and better learning environment for their children. Although the majority of parents reported that their child attended public school, the percentage of parents whose children were enrolled in private school (both religious and non-religious) was higher than the national percentage. Furthermore, nearly half of all parents in the study reported that they made the decision to enroll their child in a particular school for reasons other

113

AR_283704

than it was their local school. Although the most common reason for school selection was the academic reputation of the school, another common reason was the diversity of the school population. In addition, nearly half of the parents also sought out information about the school regarding how the school would address LGBT issues and the majority of these parents said this information was very important in their decision-making. LGBT parents may choose diverse schools or assess the reputation of the school regarding LGBT issues as protective measures to ensure a more positive school experience for their child or a more positive family-school connection. Such protective measures may also be more important for parents with younger age children as elementary school parents in our study were more likely to base their school selection on these factors.

It is important to reiterate that not all LGBT parents may have the ability to select the school their child attends. Sending one's child to a non-public school may involve a financial commitment that many parents may not be able to afford. Some public school districts, particularly smaller districts, may not have multiple schools at each level from which parents could choose. Some districts may not allow parents to enroll their child in a school that is not their designated school. Furthermore, some parents may not feel comfortable speaking with their school about LGBT issues for a myriad of reasons prior to enrollment. For example, a parent may not be open about being LGBT or feel safe in their community as an LGBT person, or a parent may anticipate that the reaction will not be positive and to do so would negatively affect their child's school experience.

LGBT parents in the survey often reported being very involved in school activities and having frequent communication with school personnel about their child's education. In fact, these parents were more likely than parents nationally to volunteer in school activities, attend parent-teacher conferences and belong to the parent-teacher organization. As with decision-making about school enrollment, LGBT parents may be more involved in their child's school in order to have greater information about what their child is experiencing in school and to ensure that she or he is safe.

In our previous research with secondary students, both LGBT and non-LGBT, students often heard homophobic remarks and other kinds of biased language in school. The students in our current study were no exception and most reported hearing these types of remarks frequently in their schools. However, these students also appeared to experience certain unique forms of harassment. A substantial percentage of students heard negative remarks about having an LGBT parent—remarks that may or may not have been directed specifically at them and many students also reported being verbally harassed because of having LGBT parents. In addition, it was not uncommon for some students to have been harassed because of their sexual orientation or because their peers assumed they were gay or lesbian because of their parents. Although these incidents

114

were not experienced by the majority of students in the survey, they were the most commonly reported forms of harassment—higher than harassment based on religion, race/ethnicity or disability, for example. It is particularly disturbing that many students reported being mistreated because of having LGBT parents by other parents in the school. These findings again raise the concern that schools must hold all members of the school community—school personnel, students and parents alike—accountable for their actions when they add to a hostile environment for students.

As we have found in previous studies with LGBT students, most students with LGBT parents do not report harassment to school authorities and often think that school personnel will not effectively address the problem. In contrast to the experiences of LGBT students, most of the LGBT students with LGBT parents had told their parent or guardian when victimized in school and most also reported that the parent or guardian addressed the matter with the school. Furthermore, most parents in the study reported that they had addressed the harassment with the school. Thus, in contrast to other populations of students such as LGBT students who may not be "out" to family members, it appears that students with LGBT parents may have more supports in that they may feel they can talk to their parents about negative experiences in school, particularly if these experiences are related to their family or perhaps even to their own sexual orientation or gender identity/expression. When parents intervened, they most often felt that that school personnel were very receptive and that the intervention was effective. Parents, however, may not be the best judge of the effectiveness of talking with school personnel on their child's behalf and students were not asked in the study how effective they felt their parental intervention was. Future research is needed, particularly at the family-level, that examines the relationship between student's experiences in school, parent's knowledge of their child's school experience and the effect that parental involvement and intervention has on the student's academic experience.

The findings from the survey remind us that school climate is much more than a safety issue; it is also an issue of a student's right to an education. Students in our survey who experienced frequent harassment because of having LGBT parents, or because of their own sexual orientation or gender expression reported skipping classes and missing more days of school than other students. Thus, steps that schools take to improve school climate are also an investment in better educational outcomes.

Results from this study also highlight the important role that institutional supports can play in making schools safer for these students. Students whose school had a comprehensive safe school policy were less likely to report mistreatment because of having LGBT parents. The results of the parents survey provide further evidence of the importance of institutional supports regarding LGBT issues in school. Parents who

115

reported that their child's school had a comprehensive policy were more likely to report that addressing their child's harassment was an effective intervention, relative to other parents. Parents themselves reported a lower frequency of mistreatment in school when the school had a comprehensive policy. Results also provide evidence regarding the importance of supportive staff in the school experiences of students with LGBT parents. As the number of supportive school staff increased, students' reported grade point averages increased, and their frequency of missing school because of feeling unsafe decreased. The results also provide evidence supporting school personnel trainings on LGBT issues. Those parents who reported their child's school had such a training were less likely to report that their child had been bullied or harassed in school, both in general and specifically related to their family. In addition, parental reports of educator trainings were associated with a more positive response from school personnel when parents addressed their child's harassment.

As with school-level policies, state-level comprehensive safe school legislation was associated with better school climate for LGBT families. Students in states with comprehensive legislation were less likely to hear homophobic and racist remarks in their schools and LGBT parents in these states were more likely to feel included in the school community. Unfortunately, while some states have made progress in implementing such laws, the majority of our nation's students remained unprotected at the state level.

It is clear that there is an urgent need for action to create a safer school climate for all students. There are steps that all concerned stakeholders can take to remedy the situation. Results from this study illustrate the ways in which the presence of effective legislation or policy and in-school resources and supports can have positive effects on school climate, students' sense of safety, and, ultimately, on students' academic achievement and educational aspirations. Furthermore, these results show how such school resources also enhance the family-school relationship, which in turn could further benefit for student achievement. Therefore, we recommend educators and education leaders and policymakers:

- Advocate for comprehensive anti-bullying and anti-discrimination legislation at the state and federal level that specifically enumerate sexual orientation and gender identity/expression as protected categories alongside others such as race, faith and age;

- Adopt and implement comprehensive anti-bullying policies in individual schools and districts, with clear and effective systems for reporting and addressing incidents that students experience;

- Provide training for school staff to improve rates of intervention regarding bullying and harassment, and increase the number of supportive faculty and staff available to students;

AR_283707

- Include multicultural diversity training into professional development that includes information about LGBT families;
- Support student clubs, such as GSAs, that address LGBT issues in education; and
- Increase student access to appropriate and accurate information regarding LGBT people, history and events.

Parent-teacher associations must also acknowledge the diversity of their school communities and take steps to ensure that no one experiences mistreatment—students and parents alike. Thus, we advocate that they:

- Endorse policies and practices about appropriate and acceptable conduct for parents at school, and
- Offer educational programs for parents in the school community that include information about LGBT families.

Taken together, such measures can move us towards a future in which every child learns to respect and accept all people, regardless of sexual orientation or gender identity/expression and a future in which parents and school personnel can work together to promote a positive learning environment for all children.

## Notes

127  A report from the Evan B. Donaldson Institute has shown that agencies focusing on "special needs" children and youth were much more likely to accept applications from gays and lesbians than other agency types which is noteworthy in that many of the LGBTQ youth in foster care would be considered "special needs" children. Source: Brodzinsky, D.M. (2003) *Adoption by lesbians and gays: A national survey of adoption agency policies, practices, and attitudes.* New York: Evan B. Donaldson Adoption Institute. http://www.adoptioninstitute.org/whowe/ Gay%20and%20Lesbian%20Adoption1.html.

128  Sullivan, C.; Sommer, S., & Moff, J. (2001). *Youth in the margins: A report on the unmet needs of lesbian, gay, bisexual, and transgender adolescents in foster care.* New York: Lambda Legal. Accessed from: http://www.lambdalegal.org/our-work/publications/page.jsp?itemID=32009148.

AR_283708



**Gay, Lesbian and Straight Education Network**
**90 Broad Street**
**2nd Floor**
**New York, NY 10004**
**www.glsen.org**



ISBN-13: 978-1-934092-02-6
ISBN-10: 1-934092-02-9

EAN

51500 >

9 781934 092026

HHS Public Access
Author manuscript
*J Sch Psychol.* Author manuscript; available in PMC 2016 June 30.

Published in final edited form as:
*J Sch Psychol.* 2016 February ; 54: 29–38. doi:10.1016/j.jsp.2015.10.005.

# Are School Policies Focused on Sexual Orientation and Gender Identity Associated with Less Bullying? Teachers' Perspectives

**Stephen T. Russell**,
University of Texas at Austin, United States

**Jack K. Day**,
University of Texas at Austin, United States

**Salvatore Ioverno**, and
Sapienza University, Italy

**Russell B. Toomey**
University of Arizona, United States

## Abstract

Bullying is common in U.S. schools and is linked to emotional, behavioral, and academic risk for school-aged students. School policies and practices focused on sexual orientation and gender identity (SOGI) have been designed to reduce bullying and show promising results. Most studies have drawn from students' reports: We examined teachers' reports of bullying problems in their schools along with their assessments of school safety, combined with principals' reports of SOGI-focused policies and practices. Merging two independent sources of data from over 3,000 teachers (*California School Climate Survey*) and nearly 100 school principals (*School Health Profiles*) at the school level, we used multi-level models to understand bullying problems in schools. Our results show that SOGI-focused policies reported by principals do not have a strong independent association with teachers' reports of bullying problems in their schools. However, in schools with more SOGI-focused policies, the association between teachers' assessments of school safety and bullying problems is stronger. Recent developments in education law and policy in the United States and their relevance for student well-being are discussed.

School bullying has received significant public attention in recent years. There has been rising concern that experiences of bullying are linked to emotional, behavioral, and academic risk for school-aged youth (Hong & Espelage, 2012), as well as growing interest in school policies and practices that can reduce bullying in schools (Hatzenbeuhler & Keyes, 2013; Russell, Kosciw, Horn, & Saewyc, 2010). School policies and practices focused on sexual orientation and gender identity (SOGI) emerged in the last decades in response to the well-documented problem of bullying and lack of school safety for lesbian, gay, bisexual, transgender, queer and questioning (LGBTQ) students (Collier, Beusekom, Bos, & Sandfort, 2013; Russell et al., 2010). Research has identified SOGI-focused policies that are associated with lower rates of bullying (e.g., Kosciw, Greytak, Palmer, & Boesen, 2014; O'Shaughnessy, Russell, Heck, Calhoun, & Laub, 2004; Russell et al., 2010). Such policies and practices include enumerated school nondiscrimination and anti-bullying policies; the availability of health, psychological, and social services designed to address the unique

AR_284774

Author Manuscript

needs of LGBTQ students; teacher professional development to address SOGI issues; and the presence of safe spaces and school clubs such as gay-straight alliances (GSAs; see Russell et al., 2010 for a review of research on SOGI-focused policies and practices).

In addition to SOGI-focused policies and practices, the climate of safety in schools is an important factor related to bullying. Multiple studies document the strong association between students' perceptions of feeling unsafe and their bullying experiences at school (Berkowitz & Benbenishty, 2012; Glew, Fan, Katon, & Rivara, 2007; Srabstein & Piazza, 2008), and there is evidence that there is less bullying in schools characterized by safe school environments (Espelage, Low, & Jimerson, 2014; Hong & Espelage, 2012). Thus, as illustrated in the conceptual model in Figure 1, both the presence of policies and practices designed to reduce bullying (path A) as well as the safety climate of schools (path B) should be associated with lower bullying or fewer bullying problems in schools. Because SOGI-focused policies and practices are intended to create the broader context for positive school climates and less bullying, the association between school safety and bullying may be stronger in the absence of such policies and practices (illustrated by the moderating path, C).

In this study we used multi-level models to examine teachers' perceptions of bullying at school, taking into consideration their reports of the overall safety climate of schools along with differences across schools in SOGI-focused policies and practices reported by school principals. This approach is distinct for several reasons. First, most research on bullying, school safety, and SOGI-focused policies and practices in schools has relied on student-level data. Relatively little research has used administrative reports of school policies, or has considered teachers' perspectives of school bullying (Espelage et al., 2014; Yoon & Bauman, 2014). Because of their position within schools, teachers' roles extend beyond instruction and exist at the heart of everyday interactions among students. They are in a unique and typically overlooked position to provide a point of view regarding bullying in schools that takes into account their understanding of the climate of school safety and students' experiences (Troop-Gordon & Ladd, 2015). Second, an important finding that has emerged from studies of bullying and school safety is that not all schools are the same: Rates of bullying and school safety vary notably across schools (Russell & McGuire, 2008; Toomey, McGuire, & Russell, 2012). These differences across schools have been shown to be partly attributable to educational policies and practices designed to create safe and supportive school climates (Russell & McGuire, 2008; Toomey et al., 2012), yet few studies account for differences across schools in policies and practices.

In the following sections we first review what is known about SOGI-focused policies and practices. We then consider prior research on bullying and school safety, including a review of the small existing body of research that focuses explicitly on teachers and other school personnel, and their role in creating safe schools and reducing bullying. We presented analyses that strategically combined two independent state-wide databases from California, one from school principals and one from teachers, merged at the school level. These data allowed us to model teachers' perceptions of the school climate with respect to bullying, accounting for their perspectives on safety, as well as differences across schools in SOGI-focused policies and practices as reported by principals.

AR_284775

## SOGI-Focused Policies and Practices

Several SOGI-focused policies and practices have been shown to promote school safety and reduce bullying. Some relevant studies have been conducted with samples of LGBT students, and others have shown the efficacy of SOGI-focused policies and practices in samples of general student populations.

First, at the most basic policy level, enumerated policies that prohibit discrimination and bullying based on sexual orientation and gender identity or expression have been linked with multiple positive outcomes for students. Students in schools with enumerated policies report stronger connections to school, more safety, and less bullying or harassment (O'Shaughnessy et al., 2004; Kosciw et al., 2014), and among LGBTQ youth, fewer suicide attempts (Goodenow, Szalacha, & Westheimer, 2006; Hatzenbuehler & Keyes, 2013). Such SOGI-focused policies create a policy context for other practices in schools that support school safety and reduce bullying (Black, Fedewa, & Gonzales, 2012; Russell & McGuire, 2008).

Second, with enumerated policies as a foundation, the availability of SOGI-focused information, resources, and curricula is another area of school policy and practice associated with positive school climates (Lipkin, 1999). A study of over 6,000 students in 17 California schools found that students who reported that they knew where to go for "information and support about sexual orientation, gender identity, or LGBT issues" reported hearing fewer LGBT-related slurs at school; independently, the proportion of students who reported knowing where to go for information and support was associated with rates of reported LGBT-related slurs across schools (Russell & McGuire, 2008). LGBTQ Students in a national study who reported having learned about LGBTQ issues at school reported: (a) fewer homophobic slurs; (b) less homophobic victimization; (c) more feelings of safety; and (d) more supportive conversations with teachers at school (Kosciw et al., 2014).

Yet most public school districts across the United States have not institutionalized policies and programs to address anti-LGBTQ bullying, nor to promote safety in school for LGBTQ youth (Rienzo, Button, Sheu, & Li, 2006). For example, the majority of LGBTQ students in the national study (89.9%) reported that they do not have access to comprehensive resources related to sexual orientation and gender identity at school (Kosciw et al., 2014). Further, according to nation-wide data from principals from the *School Health Profile* surveys (Demissie et al., 2013), the presence of SOGI-focused policies varies widely across U.S. states. The percentage of schools that facilitate access to providers who have experience providing health and social and psychological services to LGBTQ youth ranged from 29% to 63% across states, and the proportion of schools that provide materials about HIV, sexually transmitted disease, pregnancy prevention information relevant to LGBTQ youth ranges widely from 8% to 44% across states (Demissie et al., 2013). These studies document that access to resources and support regarding LGBTQ youth and issues greatly varies across schools and states, but is important for creating a climate of safety at schools and for preventing bullying.

Russell et al.                                                                                     Page 4

Third, training for teachers on SOGI issues also has been identified as an important strategy
to promote school safety and reduce bullying (Sawyer, Porter, Lehman, Anderson, &
Anderson, 2006) and many schools offer SOGI-specific professional development
opportunities to teachers and staff (e.g., Demissie et al., 2013). Such training is needed
because school personnel have reported discomfort addressing SOGI issues in the
classroom, and some even report a belief that harassment is caused or exacerbated by the
victims themselves (Human Rights Watch, 2001). A state-wide study in Massachusetts
showed that students reported a safer diversity climate in schools in which teachers were
trained in LGBTQ youth violence and suicide prevention (Szalacha, 2003). Importantly,
bullying intervention research shows that when teachers intervene in bullying, they model
these skills for students and increase students' confidence to address bullying (Hirschstein,
Edstrom, Frey, Snell & MacKenzie, 2007), and reduce the negative effects of a hostile
school (Greytak, Kosciw, & Boesen, 2013; Russell, Seif, & Truong, 2001). A recent U.S.
survey of LGBTQ secondary school students (Kosciw et al., 2014) found that students who
reported a greater number of supportive school personnel also reported feeling more safe at
school, less truancy, a greater sense of connectedness, and higher grade point averages.

Finally, the availability of safe spaces, including youth-led GSAs or similar student clubs, is
linked with school safety and lower bullying for LGBTQ as well as heterosexual students.
Students in schools with GSAs report fewer homophobic remarks, less harassment and
bullying based on sexual orientation or gender identity, are less likely to miss school because
of feeling unsafe, and are more likely to feel a sense of belonging to their school (e.g.,
Toomey & Russell, 2013; Kosciw et al., 2014). In a state-wide study in Massachusetts,
Szalacha (2003) found that the presence of a GSA (not necessarily membership or
participation in it) was a strong predictive factor in perceived school safety for LGBTQ as
well as heterosexual students. Another study documented that the presence of a GSA
reduced sexual prejudice among heterosexual students (Horn & Szalacha, 2009). Further,
several studies have found associations between the presence of a GSA and lower
engagement in health-risk behaviors such as smoking, drinking, or risky sexual behavior
(e.g., Poteat, Sinclair, DiGiovanni, & Russell 2013), and mental health outcomes (e.g.,
depressive symptoms; Toomey, Ryan, Diaz, & Russell, 2011).

In summary, a number of SOGI-related policies and practices have been shown to be
associated with student safety and well-being, and less bullying. Notably, most studies have
treated these policies and practices separately: Few studies account for multiple SOGI-
focused school policies and practices (for exceptions see Kosciw et al., 2014;
O'Shaughnessy et al., 2004; Szalacha, 2003).

## School Safety: Teachers' Perspectives

In recent years there has been a growing shift to move beyond a focus on the individual
student to examine the climate of schools as a crucial factor for understanding student safety
and well-being (Horn, Kosciw, & Russell, 2009; Szalacha, 2003). For example, in studying
peer groups within schools, Poteat (2008) found that youth who were in homophobic peer
groups were more likely to respond aggressively to personal victimization by calling another
peer a homophobic epithet, whereas youth in less homophobic peer groups were less likely

AR_284777

to respond to victimization with aggression. Other studies have documented differences across schools in youths' experiences of school safety. Data from a national study showed that a substantial proportion of the statistical variability in perceptions of school safety was between schools (an intraclass correlation of 8%; Russell & McGuire, 2008). In a large sample of California high school students, over 10% of the variance in perceptions of safety for LGBTQ students was between schools (Russell & McGuire, 2008), and 13% – 18% of the variance in perceptions of safety for gender non-conforming students was between schools (Toomey et al., 2012). Compared to other studies of school-level variability in adolescent health and behavior data (e.g., Anderman, 2002; Murray & Blitstein, 2003), this variability in safety across schools is notable and nontrivial.

This attention to school-level differences underscores the relevance of studying teachers' perspectives regarding school climate and bullying, as well as administrative information about school policies and practices. Teachers generally tend to underestimate bullying in schools compared to students (e.g., Bradshaw, Sawyer, & O'Brennan, 2007); nevertheless, the evidence suggests that there is strong correspondence between teachers and students in assessments of bullying and school climate. A recent study (Espelage, Polanin, & Low, 2014) used multi-informant multilevel modeling and found an overlap between teachers, staff, and students in their perceptions of school environment: In schools where teachers perceived aggression problems, students reported greater bullying, victimization, and aggression. Other research has examined teachers' perceptions of the administrative climate of schools and found that when teachers believe that policies are effectively articulated and implemented, they may also perceive or observe lower levels of bullying in their schools. For example, in one study, teachers' perceptions of administrator commitment to bullying prevention was associated with less frequent bullying in schools (e.g., Low & Van Ryzin, 2014).

Teachers play an important role in promoting safety and reducing bullying in schools. Studies show that there are lower levels of bullying or a reduction in bullying behavior over time in elementary schools in which students perceive more support from teachers (Gage, Prykanowski, & Larson, 2014) or are more willing to report bullying to teachers (Cortes & Kochenderfer-Ladd, 2014). Similar results have been found among middle and high school-aged students (Turner, Reynolds, Lee, Subasic, & Bromhead, 2014). The role that teachers play in actively reducing bullying is influenced both by their perceptions of the problem of bullying in their schools (e.g., Holt & Keyes, 2004) as well as their perceptions of the overall school climate. For example, a recent study (Oldenburg et al., 2014) showed that higher victimization rates in classrooms are associated with a greater tendency among teachers to attribute the cause of the bullying to factors outside of their control and, consequently, to feel less confident about their abilities to intervene in bullying. Espelage and colleagues (2014) reported that staff and teachers' commitment to prevent bullying was associated with less bullying, fighting and peer victimization. Likewise, Low and Ryzin, (2014) examined school climate as a moderator of bullying prevention efforts over 1-year period and found a reduction in bullying in schools in which staff and teachers had clear commitment to bullying prevention and perceived a more positive psychosocial school climate. Thus, although teachers may perceive less bullying than students overall, there is evidence that

their perspectives on bullying are reliable and related to their perceptions of the school administration and climate.

Finally, there are other characteristics of teachers (Hold & Keyes, 2004) and of schools (Kasen, Berenson, Cohen, & Johnson, 2004) that may influence bullying problems or teachers' perspectives of them. Programs that focus directly on bullying prevention are generally effective in reducing bullying (Ttofi & Farrington, 2010). Further, teachers with more classroom experience and from racial/ethnic minority backgrounds may have more awareness of bullying (Gregory et al., 2010), and bullying may be more common in schools in disadvantaged communities (Gregory et al., 2010) and with low overall academic performance.

## The Current Study

In the current study we examined differences across schools in SOGI-focused policies and practices as they relate to teachers' perceptions of bullying at school. We included teachers' perceptions of school safety, and examined whether a lack of safety in school is associated with more bullying in the absence of SOGI-focused policies and practices:

$H_1$: More SOGI-focused policies and practices will be associated with fewer bullying problems as reported by teachers across schools (Figure 1, path A).

$H_2$: Teachers' reports of school safety will be negatively associated with reports of bullying problems (path B).

$H_3$: The association between school safety and bullying problems will be stronger in the absence of SOGI-focused policies and practices (path C).

## Methods

### Sample

We merged two independent surveys with overlapping samples, one based on school principal reports and the other on reports from teachers. School-level data are based on principal reports from the 2010 California *School Health Profile* (SHP), developed by the Center for Disease Control and Prevention and collected in public schools across the United States biennially (Demissie et al., 2013). Teacher-level data came from the *California School Climate Survey* (CSCS), collected in the years following the SHP data, between 2011 and 2013. The CSCS is administered in all schools across California at least every two years, though teacher participation is voluntary, in conjunction with the *California Healthy Kids Survey* (CHKS), and in compliance with the No Child Left Behind Act (http://cscs.wested.org). In addition to these surveys we merged a third source of data: Administrative data regarding school academic and demographic characteristics that are publicly available from the California Department of Education (CDE).

### Measures

**Bullying problems**—Teacher perceptions of bullying, our outcome, is assessed through responses to the CSCS question, "At this school, how much of a problem is harassment or

AR_284779

Russell et al.

bullying among students?" The item is measured on a scale from 0 (*insignificant problem*) to 3 (*severe problem*).

**SOGI-focused policies**—The presence or absence of SOGI-focused policies within schools were reported in the SHP. Principals reported on five SOGI-focused policies (1 = policy is present, 0 = policy is not present) by answering the prompt: "Does your school…" (1) "prohibit harassment based on perceived or actual SOGI;" (2) "encourage staff to attend professional development on safe and supportive school environments;" (3) "identify safe spaces for LGBTQ youth;" (4) either "facilitate access to providers not on school property who have experience in providing health services, including HIV/STD testing and counseling, to LGBTQ youth" or "facilitate access to providers not on school property who have experience in providing social and psychological services to LGBTQ youth" (1 = positive response to either); and (5) "have a student-led club to create a safe school environment for all youth, regardless of SOGI." We created an index measure by taking the sum score of these items (0 = no SOGI-focused policies; 5 = all 5 policies; $M = 3.59$). Descriptive statistics for each item are reported in Table 2.

**School safety**—An index of school safety was created with teacher responses to 7 items from the CSCS ($\alpha = .87$): (1) "school is a safe place for students" (0 = *strongly agree*, 3 = *strongly disagree*); (2) "school is a safe place for staff" (0 = *strongly agree*, 3 = *strongly disagree*); (3) "How much of a problem at this school is physical fighting between students" (0 = *insignificant problem*, 3 = *significant problem*); (4) "How much of a problem at this school is gang-related activity" (0 = *insignificant problem*, 3 = *significant problem*); (5) "How much of a problem at this school is weapons possession (0 = *insignificant problem*, 3 = *significant problem*); (6) "How much of problem at this school is vandalism" (0 = *insignificant problem*, 3 = *significant problem*); and (7) "How much of a problem at this school is theft" (0 = *insignificant problem*, 3 = *significant problem*). The mean for this construct was calculated from the standardized z-score of each of the items, and the scale was reverse coded (lower scores reflect lower evaluations of safety).

**Teacher and school characteristics**—At the teacher level, we include data from the CSCS on teachers' race/ethnicity (1 = white, 0 = non-white) and the number of years they have worked at their respective schools (0 = less than 1 year, 1 = 1 to 2 years, 2 = 3 to 5 years, 3 = 6 to 10 years, 4 = over 10 years). At the school level we use data available from the CDE, including the percentage of students eligible for free and reduced meal programs (as a proxy for school socioeconomic status), and school Academic Performance Index (API), a measure of a school's academic performance based on statewide assessments that summarize student performance across multiple content areas into a single index that ranges from 200 to 1,000. Finally, we included principal reports from the SHP of the presence of a bullying prevention program ("Does your school have … a program to prevent bullying," 1 = yes, 0 = no).

## Analytic Strategy

A total of 154 schools participated in both the SHP in 2010 and CHKS in 2011–2013; 96 had corresponding CSCS data with a total of 3,756 teachers within these schools (although

multiple imputation was used to account for missing data, sample sizes for descriptive statistics and models vary from the total sample size because of missing data across all variables). Enrollment within these schools ranged from 106 to 4,540 students ($M = 1,814$, $SD = 659$). In 53% of the schools, more than 50% of students are eligible for the free and reduced meal program. Nine percent (9%) of the teachers worked at their school less than one year, 28% worked between 1 to 5 years, 26% between 6 and 10 years, and 37% ten years or more. Most of the teachers in our sample identified as White (74%), with the next largest racial/ethnic group being Hispanic or Latino/a (11%). The racial composition of the analytic sample is representative of the full sample of teachers that completed the CSCS between 2011 and 2013.

Years worked and free and reduced lunch were reverse-coded to simplify interpretation, and continuous variables (years worked and school safety) were grand mean centered ($M = 2.73$ and $M = -.15$, respectively).

We iteratively fit multilevel models with the meologit command to account for the categorical nature of our outcome variable using Stata MP 13 (Rabe-Hesketh & Skrondal, 2012). Multilevel analyses were employed to account for the nested nature of the data, and to test for the associations between school-level SOGI-focused policies and teacher reported assessments of school safety with bullying problems (Raudenbush & Byrk, 2002). We first estimated an unconditional model to assess the amount of variance explained by differences between schools (the intraclass correlation – ICC). We next ran a conditional model including teacher-level indicators, (i.e., covariates accounting for teacher demographics and teachers' perceptions of school safety and implementation; Figure 1 path A), followed by a model including school-level indicators (i.e., items related to SOGI-focused policies; Figure 1 path B). Finally, we defined a model that included a cross-level interaction between the SOGI summary measure the school safety scale (Figure 1 path C). Only final models with significant interactions are presented below, though results for each model are presented in Table 3.

In order to identify whether individual SOGI-focused policies were most strongly linked to teachers' perceptions of bullying problems, in follow-up analyses we tested the full model with cross-level interaction for each SOGI-focused policy individually. Simple slopes analyses were conducted using the margins command in Stata to decompose the significant interaction effect (Preacher, Curran, & Bauer, 2006), with the slopes of school safety estimated for each level of SOGI-focused policies. Because the results do not differ substantively from logistic analyses, we illustrate and report the simple slopes from tests of a linear model for ease of interpretation.

Missing data were determined to be MAR and imputed using the multiple imputation procedure in Stata (mi imput); listwise deletion would have resulted in a loss of 46% of the sample (Acock, 2005; Allison, 2002; Rubin, 1996). Fifty (50) imputed datasets were created, seeded at 29,390 for replicability (Allison, 2001; McKnight, McKnight, Sidani, & Figueredo, 2007). Parameters were estimated using maximum likelihood estimation with robust standard errors.

## Results

Results for each model and for the ICC of teacher perceptions of bullying problems are reported in Table 3. A majority of the variance in bullying problems (83%) is explained by between-teacher variation, yet a notable 17% of the variance in bullying problems is attributable to differences between schools. This is an important initial finding: Simply put, independent of the diversity of teachers' perspectives on bullying at their school, on average some schools have greater bullying problems than others.

The first hypothesis, tested with a conditional model with only level 2 indicators, was not supported: Principal reports of SOGI-focused policies were unrelated to teachers' perceptions of bullying problems ($OR = .99$, $p = .576$). Further, the presence of a bullying program was also unrelated to bullying problems ($OR = 1.00$, $p = .997$). Notably, neither report by principals – of SOGI-focused policies nor of the presence of bullying programs – were correlated with teachers' perceptions of bullying problems ($r = .04$ and $r = .01$, respectively; see Table 1).

Consistent with our second hypothesis tested with a conditional model with only level 1 indicators, school safety was associated with bullying problems. The main effect shows lower odds of reporting that bullying is a problem at higher levels of school safety ($OR = .14$, $p \leq .001$). Additionally, fewer years worked as a teacher was associated with higher odds that teachers perceived bullying as a problem ($OR = 1.11$, $p \leq .001$).

To test the third hypothesis we modeled the interaction between principal-reported SOGI-focused policies and teacher-reported school safety. The interaction between SOGI-focused policies and school safety was significant ($OR = 1.13$, $p = 0.010$; see Table 3). Additionally, schools with lower proportions of students eligible for free or reduced meal programs had higher odds that teachers reported bullying as a problem ($OR = 2.07$, $p = .042$); all other significant covariates from previous models remained significant. The interaction is illustrated in Figure 2: Consistent with our hypothesis, the association between safety and bullying problems is stronger in schools with no SOGI-focused policies. Further, compared to safe schools, unsafe schools had fewer bullying problems in the presence of all five SOGI-focused policies and practices. Simple slope tests revealed that the slopes for schools with no SOGI-focused polices ($b = -.73$, $p \leq .001$) and five SOGI-focused policies ($b = -.56$, $p \leq .001$) significantly differed from zero. Analyses of covariance between bullying problems and school safety reveal greater variance in the absence of SOGI-focused policies and practices ($F = 287.79$, $p \leq .001$).

Follow-up analyses of individual SOGI-focused policies showed that only the interaction between school safety and having a safe space for LGBTQ youth on campus was significant ($OR = 1.34$, $p = .041$). These results point to the importance of safe spaces in the context of school safety, but also suggest that the presence of multiple policies may have more influence than any single policy on its own.

## Discussion

We capitalized on a unique opportunity to combine databases otherwise not typically used in research to address a pressing question about the role of SOGI-focused policies in association with bullying. We find that SOGI-focused school policies and practices do not have a robust independent influence on teachers' perspectives on bullying problems in schools. Yet the relationship between perceptions of school safety and bullying is moderated by SOGI-focused policies. Importantly, in schools that need it the most—those judged as least safe by teachers—reports of bullying are lower in the presence of more SOGI-focused policies.

An important preliminary finding was that teachers' perceptions of bullying vary substantially across schools (17% of the variance was at the school level). In educational research, variance between schools greater than 5% is an indication of distinct differences in school climate and culture (Anderman, 2002; Murray & Blitstein, 2003). In such cases, the role of school policies and practices are more likely to have potential to explain school-level variance.

We expected that SOGI-focused policies and programs would have a direct association with teachers' reports of school bullying, but found no strong effect. This result is disappointing, especially given the substantial variation between schools in teachers' reports of bullying. One possible explanation is that there may be other school characteristics, policies, or practices that play a stronger role in explaining differences across schools in teachers' perceptions of bullying (notably, the strongest school-level correlate was the proportion of students receiving free or reduced cost meal programs). Second, the results may be a product of shared method variance (Podsakoff, MacKenzie, Lee, & Podsakoff, 2003) given that the teacher-reported measures were generally stronger in association with teachers' reports of bullying than the measures taken from administrative data or principals' reports. Further, several studies that focus only on individual student reports (not taking into account differences across schools) find robust links between SOGI-focused policies and lower reports of bullying (Black et al., 2012; Chesir-Teran & Hughes, 2009; Goodenow et al., 2006). Perhaps those associations are stronger because they take into account variability across students and their personal experiences of bullying: Visible SOGI-focused policies may be especially salient to students who are bullied. By contrast, our study relied on teachers' global assessment of school bullying which may not be as sensitive as individual students' reports (Bradshaw, Sawyer, & O'Brennan, 2007).

We conducted additional analyses of each SOGI-focused policy separately to identify potential differences across policies. The results showed that having safe spaces for LGBTQ students was associated with fewer reports by teachers of bullying problems when teachers judged schools to be unsafe, but the effect was not as strong as for the sum score of all five policies, suggesting that the combination of multiple policies has the strongest influence on bullying problems. Overall, our results are consistent with a solid body of research based on studies of students that shows that SOGI-focused policies and practices influence a number of positive outcomes, including bullying (Kosciw et al., 2014; O'Shaughnessy et al., 2004). Those studies indicate that SOGI-focused policies and practices matter not only for LGBTQ

*J Sch Psychol.* Author manuscript; available in PMC 2016 June 30.

students, but for all students in schools where they are implemented (e.g., Poteat et al., 2013; 2014).

Our study contributes to this body of research in several respects. The current study represents an important shift to expand emphasis beyond the nearly exclusive focus on students' experiences to include teachers' perspectives: We modeled the perspectives of over 3,700 teachers on bullying and school safety, linked to data on SOGI-focused policies and practices that were independently reported by school principals. Research on bullying and school safety has typically focused on the individual student level rather than the institutional or school climate level, and therefore efforts to improve student experiences logically focus on changing the perceptions, behaviors, or experiences of individual students. As a result of the focus on students, responsibility for personal safety may be placed on the individual student rather than on the school and its personnel – we may inadvertently "blame the victims" of unsafe school climates. Indeed, there are anecdotal reports consistent with this argument (Human Rights Watch, 2001). Student-focused strategies may divert attention from the responsibility of schools to ensure the safety of all students.

Our results may help illuminate contradictory and counter-intuitive findings from prior studies. In one study of California schools, students' reports of SOGI-focused policies were associated with more (rather than less) bullying (Russell & McGuire, 2008), and a second study of California students found that SOGI-focused policies were associated with less (rather than more) safety (Toomey et al., 2012). Those studies may have captured schools at different stages in the process of incorporating SOGI-focused or other school safety changes, and the results might be explained by the introduction of SOGI-focused policies or practices in schools that have greater problems with bullying to begin with. Our study, which is based on larger-scale data collected from independent sources but from the same schools, suggests that adopting multiple SOGI-focused programs and practices may be most beneficial to schools that are least safe, or where they are needed most. The best way to account for such complexities will be large-scale, multi-site studies that trace changes in school policies and teachers' perspectives and students' experiences across time.

## Limitations

The SHP offers unique SOGI-focused school policy and practice data, but the CSCS includes no questions specific to SOGI-focused policies or practices, or to the experiences of LGBTQ students. Ideal would be to have SOGI-specific measures from teachers, including policies and practices as well as discriminatory or anti-LGBTQ bullying and indicators of the LGBTQ climate of schools. SOGI-focused policies and practices may have distinct relevance to LGBTQ students; indeed, much of the research on such programs and practices has been based on samples designed to reach LGBTQ students (e.g., Kosciw et al., 2014; Russell & McGuire, 2008; Toomey et al., 2012). Future studies could link administrative and policy information about schools with students' reports about their experiences of bullying; such studies should ideally include measures of anti-LGBTQ bullying as well as the LGBTQ identities of students.

AR_284784

Unique data sources were strategically combined, but each had limitations, a challenge that is typical in the analysis of secondary data (Russell & Matthews, 2011). First, the combined sample included 96 schools and over 3,700 teachers, but had only a 62% overlap between the principal (SHP) and teacher (CSCS) surveys. Technical reports note the low response rate among teachers (indeed, there were some schools with data for the SHP for which no teacher data are available even though the school participated in the CHKS; see Austin & Bailey, 2008). Thus, the design is novel and includes an unusually large sample of teachers, but represents only a small portion of public schools and teachers in California. A second limitation pertains to measures: We relied on a single-item measure of bullying problems in schools, and the scale that we used to measure school safety is based on available items in the survey and has not been validated in other studies. Third, the measures of SOGI-focused policies and practices reported by principals simply indicate the presence or absence of each policy or practice, and we have no further information on implementation of these policies and practices. Thus, we are unable to distinguish between schools in which policies are actively publicized, promoted, and/or enforced, and those that are simply adopted by a governing body and ignored. Additionally, we cannot rule out that principals in our study were more likely to report SOGI-focused policies and practices because of real or perceived bullying problems in schools.

We also noted that 4 of the 96 school principals reported that their school did not "prohibit harassment based on a student's perceived or actual sexual orientation or gender identity," yet California passed a state law more than a decade ago (AB537, The Student Safety and Violence Prevention Act of 2000) that establishes state-wide non-discrimination in education based on actual or perceived sexual orientation and gender identity or expression. Future studies might investigate the school safety climate in schools where principals' indicated that their policies are out of compliance with state laws (in our case, we re-analyzed our data dropping those 4 schools to ensure that the associations we found were not due to those unusual cases; results were unchanged).

Finally, the data we use were collected between 2010 and 2013; although these remain relatively recent sources of data, the pace of social change with regard to SOGI issues has been dramatic, and it is likely that there have been changes in recent years in the numbers of SOGI-focused policies and practices in schools in California, as well as across the United States and other parts of the world. For example, the Fair, Accurate, Inclusive, and Respectful (FAIR) Education Act was passed as California law in 2011 and directs the inclusion of political, economic, and social contributions of LGBTQ people in educational textbooks and social studies curricula in California public schools. It is possible that even 5 years later more schools in California will have implemented SOGI-focused policies.

## Conclusion

Efforts to reduce harassment and bullying in U.S. schools using systemic strategies began to take hold a decade ago. Two federal laws in the United States would have provided explicit protections to LGBTQ students in public schools: the Safe Schools Improvement Act (SSIA) introduced in 2007 (SSIA, 2007), and the Student Non-Discrimination Act (SNDA) introduced in 2011 (SNDA, 2011), though both died in committee (SSIA, 2013; SNDA,

2013). These federal policies would have the effect of establishing enumerated non-discrimination and anti-bullying policies for all students in the nation. Although our study and others (Russell & McGuire, 2008) shows that the influence of such broad policies may have only an indirect influence on bullying in schools, policies provide the context for implementation of other safe schools strategies that do directly influence school climate and student wellbeing. Our study, with others, shows that the structural conditions of schools matter to reduce bullying, and highlights the importance of efforts to ensure and implement an equitable learning environment for all students.

## References

Acock A. Working with missing values. Journal of Marriage and Family. 2005; 67:1012–1028.

Akaike H. New look at the statistical model identification. IEEE Transactions of Automatic Control. 1974; 19:716–723.

Allison, PD. Missing Data. Thousand Oaks, CA: Sage Publications, Inc; 2001.

Anderman EM. School effects on psychological outcomes during adolescence. Journal of Educational Psychology. 2002; 94:795–809.

Berkowitz R, Benbenishty R. Perceptions of teachers' support, safety, and absence from school because of fear among victimize, bullies, and bully-victims. American Journal of Orthopsychiatry. 2012; 82:67–74. [PubMed: 22239395]

Black WW, Fedewa AL, Gonzalez KA. Effects of "safe school" programs and policies on the social climate for sexual-minority youth: A review of the literature. Journal of LGBT Youth. 2012; 9:321–339.

Bradshaw CP, Sawyer AL, O'Brennan LM. Bullying and peer victimization at school: Perceptual differences between students and school staff. School Psychology Review. 2007; 36:361–382.

Bradshaw CP, Waasdorp TE, O'Brennan LM, Gulemetova M. Teachers' and education support professionals' perspectives on bullying and prevention: Findings from a national education association study. School Psychology Review. 2013; 42:280. [PubMed: 25414539]

Chesir-Teran D. Conceptualizing and assessing heterosexism in high schools: A setting-level approach. American Journal of Community Psychology. 2003; 31:267–279. [PubMed: 12866684]

Chesir-Teran D, Hughes D. Heterosexism in high school and victimization among lesbian, gay, bisexual, and questioning students. Journal of Youth and Adolescence. 2009; 38:963–975. [PubMed: 19636739]

Collier KL, van Beusekom G, Bos HMW, Sandfort TGM. Sexual orientation and gender identity/expression related peer victimization in adolescence: A systematic review of associated psychosocial and health outcomes. The Journal of sex Research. 2013; 50:299–317. [PubMed: 23480074]

Cortes KI, Kochenderfer-ladd B. To tell or not to tell: What influences children's decisions to report bullying to their teachers? School Psychology Quarterly. 2014; 29:336–348. [PubMed: 25198616]

Demissie, Z.; Brener, ND.; McManus, T.; Shanklin, SL.; Hawkin, J.; Kann, L. School health profiles 2012: Characteristics of health programs among secondary schools. Atlanta, GA: Centers for Disease Control and Prevention; 2013.

Espelage DL, Low SK, Jimerson SR. Understanding school climate, aggression, peer victimization, and bully perpetration: Contemporary science, practice, and policy. School Psychology Quarterly. 2014; 29:233–237. [PubMed: 25198615]

Espelage DL, Polanin JR, Low SK. Teacher and staff perceptions of school environment as predictors of student aggression, victimization, and willingness to intervene in bullying situations. School Psychology Quarterly. 2014; 29:287–305. [PubMed: 25089334]

Gage, Na; Prykanowski, DA.; Larson, A. School climate and bullying victimization: A latent class growth model analysis. School Psychology Quarterly. 2014; 29:256–271. [PubMed: 24933216]

Glew GM, Fan M, Katon W, Rivara FP. Bullying and school safety. The Journal of Pediatrics. 2007; 152:123–128. [PubMed: 18154913]

AR_284786

GLSEN & Harris Interactive. The principal's perspective: School safety, bullying and harassment, asurvey of public school principals. New York: GLSEN; 2008.

Goodenow C, Szalacha LA, Westheimer K. School support groups, other school factors, and the safety of sexual minority adolescents. Psychology in the Schools. 2006; 43:573–589.

Gregory A, Cornell D, Fan X, Sheras P, Shih TH, Huang F. Authoritative school discipline: High school practices associated with lower bullying and victimization. Journal of Educational Psychology. 2010; 102:483–496.

Greytak EA, Kosciw JG, Boesen MJ. Educating the educator: Creating supportive school personnel through professional development. Journal of School Violence. 2013; 12:80–97.

Hatzenbuehler ML, Keyes KM. Inclusive anti-bullying policies and reduced risk of suicide attempts in lesbian and gay youth. Journal of Adolescent Health. 2013; 53:S21–S26. [PubMed: 23790196]

Heck NC, Flentje A, Cochran BN, Youth TL. Offsetting risks : High school Gay-Straight Alliances and lesbian, gay, bisexual, and transgender (LGBT) youth. School Psychology Quarterly. 2011; 26:161–174.

Hirschstein MK, Edstrom LVS, Frey KS, Snell JL, MacKenzie EP. Walking the talk in bullying prevention: Teacher implementation variables related to initial impact of the Steps to Respect program. School Psychology Review. 2007; 36:3–21.

Holt, MK.; Keyes, MA. Teachers' attitudes toward bullying. In: Espelage, D.; Swearer, SM., editors. Bullying in American schools: A social-ecological perspective on prevention and intervention. Mahwah, NJ: Erlbaum; 2004. p. 121-140.

Hong JS, Espelage DL. A review of research on bullying and peer victimization in school: An ecological system analysis. Aggression and Violent Behavior. 2012; 17:311–322.

Horn SS, Kosciw JG, Russell ST. New research on lesbian, gay, bisexual, and transgender youth: Studying lives in context. Journal of Youth and Adolescence. 2009; 38:863–866. [PubMed: 19636731]

Horn SS, Szalacha LA. School differences in heterosexual students' attitudes about homosexuality and prejudice based on sexual orientation. European Journal of Developmental Sciences. 2009; 3:66–81.

Horn, S.; Sullivan, S. Addressing anti-LGBT bias in schools: Changing educators' knowledge, beliefs, and behaviours through professional development. Paper presented at the American Educational Research Association Annual Meeting; Vancouver, BC. 2012 Apr.

Human Rights Watch. Hatred in the hallways: Violence and discrimination against lesbian, gay, bisexual, and transgender students in U.S. schools. New York: Human Rights Watch; 2001.

Kasen, S.; Berenson, K.; Cohen, P.; Johnson, JG. The effects of school climate on change in aggressive and other behaviors related to bullying. In: Espelage, D.; Swearer, SM., editors. Bullying in American schools: A social-ecological perspective on prevention and intervention. Mahwah, NJ: Erlbaum; 2004. p. 187-210.

Kosciw, JG.; Greytak, EA.; Palmer, NA.; Boesen, MJ. The 2013 National School Climate Survey: The experiences of lesbian, gay, bisexual and transgender youth in our nation's schools. New York: GLSEN; 2014.

Lipkin, A. Understanding homosexuality, changing schools. Boulder, CO: Westview Press; 1999.

Low S, Van Ryzin MJ, Brown EC, Smith BH, Haggerty KP. Engagement matters: Lessons from assessing classroom implementation of steps to respect: A bullying prevention program over a one-year period. Prevention Science. 2014; 15:165–176. [PubMed: 23456311]

Low S, Van Ryzin MJ. The moderating effects of school climate on bullying prevention efforts. School Psychology Quarterly. 2014; 29:306–319. [PubMed: 25089333]

McKnight, PE.; McKnight, KM.; Sidani, S.; Figueredo, AJ. Missing data: A gentle introduction. New York, NY: Guilford Press; 2007.

Migliaccio T. Teacher engagement with bullying: Managing an identity within a school. Sociological Spectrum. 2015; 35:84–108.

Murray DM, Blitstein JL. Methods to reduce the impact of intraclass correlation in group-randomized trials. Evaluation Review. 2003; 27:79–103. [PubMed: 12568061]

AR_284787

O'Shaughnessy, M.; Russell, S.; Heck, K.; Calhoun, C.; Laub, C. Safe place to learn: Consequences of harassment based on actual or perceived sexual orientation and gender non-conformity and steps for making schools safer. San Francisco, CA: California Safe Schools Coalition; 2004.

Oldenburg B, van Duijn M, Sentse M, Huitsing G, van der Ploeg R, Salmivalli C, Veenstra R. Teacher characteristics and peer victimization in elementary schools: A classroom-level perspective. Journal of Abnormal Child Psychology. 2014; 43:33–34. [PubMed: 24395617]

Podsakoff PM, MacKenzie SB, Lee J-Y, Podsakoff NP. Common method biases in behavioral research: A critical review of the literature and recommended remedies. Journal of Applied Psychology. Oct. 2003 88:879–903. [PubMed: 14516251]

Poteat P. Contextual and moderating effects of the peer group climate on use of homophobic epithets. School Psychology Review. 2008; 37:188–201.

Poteat VP, Sinclair KO, DiGiovanni CD, Koenig BW, Russell ST. Gay–Straight Alliances are associated with student health: A multischool comparison of LGBTQ and heterosexual youth. Journal of Research on Adolescence. 2013; 23:319–330.

Poteat VP, Yoshikawa H, Calzo JP, Gray ML, DiGiovanni CD, Lipkin A, Shaw MP. Contextualizing Gay-Straight Alliances: Student, advisor, and structural factors related to positive youth development among members. Child Development. 2014; 86(1):176–193. [PubMed: 25176579]

Preacher KJ, Curran PJ, Bauer DJ. Computational tools for probing interaction effects in multiple linear regression, multilevel modeling, and latent curve analysis. Journal of Educational and Behavioral Statistics. 2006; 31:437–448.

Rabe-Hesketh, S.; Skrondal, A. Multilevel and longitudinal modeling using Stata. 3rd. College Station, TX: Stata Press; 2012.

Raudenbush, SW.; Byrk, AS. Hierarchical linear models: Applications and data analysis methods. 2nd. Newbury Park, CA: Sage; 2002.

Rienzo BA, Button JW, Sheu JJ, Li Y. The politics of sexual orientation issues in American Schools. Journal of School Health. 2006; 76:93–97. [PubMed: 16475984]

Rubin DB. Multiple imputation after 18+ years (with discussion). Journal of the American Statistical Association. 1996; 91:473–489.

Russell ST, Kosciw J, Horn S, Saewyc E. Safe schools policy for LGBTQ students. Social Policy Report. 2010; 24(4):1–17. Retrieved from http://www.srcd.org/sites/default/files/documents/spr_24_4_final.pdf.

Russell, ST.; Matthews, EM. Using archival data to study adolescence and adolescent development. In: Trzeniwski, K.; Donnellan, MB.; Lucas, RE., editors. Obtaining and analyzing archival data: Methods and illustrations. Washington, DC: APA Books; 2011. p. 163-176.

Russell ST, Ryan C, Toomey RB, Diaz RM, Sanchez J. Lesbian, gay, bisexual, and transgender adolescent school victimization: Implications for young adult health and adjustment. Journal of School Health. 2011; 81:223–230. [PubMed: 21517860]

Russell, ST.; McGuire, JK. The school climate for lesbian, gay, bisexual, and transgender (LGBT) students. In: Shinn, M.; Yoshikawa, H., editors. Toward positive youth development: Transforming schools and community programs. New York: Oxford University Press; 2008. p. 133-149.

Russell ST, Seif H, Truong NL. School outcomes of sexual minority youth in the United States: Evidence from a national study. Journal of Adolescence. 2001; 24:111–127. [PubMed: 11259074]

Russell ST, Sinclair KO, Poteat VP, Koenig BW. Adolescent health and harassment based on discriminatory bias. American Journal of Public Health. 2012; 102:493–495. [PubMed: 22390513]

Saewyc E, Konishi C, Rose H, Homma Y. School-based strategies to reduce suicidal ideation, suicide attempts, and discrimination among sexual minority and heterosexual adolescents in Western Canada. International Journal of Child, Youth and Family Studies. 2014; 5:89–112.

Safe Schools Improvement Act of 2007, H.R. 3132, 110th Congress (2007–2008)

Safe Schools Improvement Act of 2013, S. 403, 113th Congress (2013–2014)

Sandoval J, London MD, Rey T. Status of suicide prevention in California schools. Death Studies. 1994; 18:595–608.

Sawyer RJ, Porter JD, Lehman TC, Anderson C, Anderson KM. Education and Training Needs of School Staff Relevant to Preventing Risk Behaviors and Promoting Health Behaviors Among Gay,

AR_284788

Lesbian, Bisexual, and Questioning Youth. Journal of HIV/AIDS Prevention in Children and Youth. 2006; 7:55–73.

Sinclair KO, Bauman S, Poteat VP, Koenig B, Russell ST. Cyber and bias-based harassment: Associations with academic, substance use, and mental health problems. Journal of Adolescent Health. 2012; 50:521–523. [PubMed: 22525118]

Srabstein J, Piazza T. Public health, safety, and educational risks associated with bullying behaviors in American adolescents. International Journal of Adolescent Medicine and Health. 2008; 20:223–233. [PubMed: 18714558]

Student Non-Discrimination Act of 2011, H.R.998, 112th Congress (2011–2012)

Student Non-Discrimination Act of 2013, H.R.1652, 113th Congress (2013–2014)

Szalacha LA. Safer sexual diversity climates: Lessons learned from an evaluation of Massachusetts safe schools program for gay and lesbian students. American Journal of Education. 2003; 110:58–88.

Toomey RB, McGuire JK, Russell ST. Heteronormativity, school climates, and safety for gender nonconforming students. Journal of Adolescence. 2012; 35:187–196. [PubMed: 21481925]

Toomey RB, Russell ST. Gay-Straight Alliances, social justice involvement, and school victimization of lesbian, gay, bisexual, and queer youth: Implications for school well-being and future civic engagement. Youth & Society. 2013; 45:500–522. [PubMed: 26224893]

Toomey RB, Ryan C, Diaz RM, Russell ST. High school Gay–Straight Alliances (GSAs) and young adult well-being: An examination of GSA presence, participation, and perceived effectiveness. Applied Developmental Science. 2011; 15:175–185. [PubMed: 22102782]

Troop-Gordon W, Ladd GW. Teachers' victimization-related beliefs and strategies: Associations with students' aggressive behavior and peer victimization. Journal of Abnormal Child Psychology. 2015; 43:45–60. [PubMed: 24362767]

Ttofi MM, Farrington DP. Effectiveness of school-based programs to reduce bullying: A systematic and meta-analytic review. Journal of Experimental Criminology. 2010; 7:27–56.

Turner I, Reynolds KJ, Lee E, Subasic E, Bromhead D. Well-being, school climate, and the social identity process: A latent growth model study of bullying perpetration and peer victimization. School Psychology Quarterly. 2014; 29:320–335. [PubMed: 24933217]

Yoon J, Bauman S. Teachers: A critical but overlooked component of bullying prevention and intervention. Theory Into Practice. 2014; 53:308–314.

AR_284789

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript



**Figure 1.**
Conceptual model illustrating moderation of school safety by SOGI-focused policies and practices.

AR_284790

Russell et al.



**Figure 2.**
Interaction between school safety scale and SOGI-focused policies

AR_284791

Russell et al. Page 19

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

**Table 1**

Correlation matrix and descriptive statistics for items included in final analytic model

| | Bullying Problems | Years Worked | Race (white) | Safety Scale | SOGI Policies | Bullying Policy | FRMP | API |
|---|---|---|---|---|---|---|---|---|
| Bullying Problems | 1.000 | | | | | | | |
| Years Worked | -0.050** | 1.000 | | | | | | |
| Race (white) | -0.010 | 0.105*** | 1.000 | | | | | |
| Safety Scale | -0.531*** | -0.001 | 0.068*** | 1.000 | | | | |
| SOGI-Focused Policies | 0.042* | -0.017 | 0.024 | -0.064*** | 1.000 | | | |
| Bullying Prevention Policy | 0.011 | 0.072*** | 0.065*** | 0.078*** | -0.027 | 1.000 | | |
| Free/reduced Meal Program (FRMP) | 0.157*** | -0.055*** | -0.120*** | -0.460*** | -0.031 | -0.020 | 1.000 | |
| Academic Performance Index (API) | -0.218*** | 0.070*** | 0.124*** | 0.547*** | -0.133*** | 0.197*** | -0.789*** | 1.000 |
| *Mean / %* | 1.45 | 2.73 | — | -.15 | 3.55 | 72.39% | 45.39% | 794.27 |
| *SD* | .77 | 1.29 | — | .77 | 1.31 | — | — | 82.10 |
| *n* | 3,408 | 3,418 | 3,398 | 3,445 | 3,756 | 3,756 | 2,417 | 3,634 |

*Note.* Bullying problems (0 = insignificant problem, 3 = severe problem); Safety scale, constructed with standardized z-scores and reverse coded (-3.16 = school is unsafe, 1.01 = school is safe); Bullying prevention policy is presented as percentage of principals that endorse that school has policy; Free/reduced meal program is presented as the average percentage of eligible students within schools; Academic Performance Index (API) measures schools' academic performance ranging from 200 (low) to 1,000 (high). Means, standard deviations, and *n*s are based on data prior to imputation to account for missing data. Therefore, sample sizes vary.

AR_284792

Russell et al.

**Table 2**

Frequencies and percentages of SOGI-focused policies across schools, and teachers in those schools.

| | Schools | | Teachers | |
|---|---|---|---|---|
| | % | *k* | % | *n* |
| SOGI-Focused policies (summary) | — | 96 | — | 3,404 |
| LGBTQ prohibit harassment | 95.83 | 92 | 97.09 | 3,404 |
| LGBTQ professional development | 67.02 | 63 | 71.76 | 3,201 |
| LGBTQ safe space | 67.00 | 57 | 69.28 | 3,311 |
| LGBTQ health services | 64.89 | 61 | 73.00 | 3,307 |
| Student SOGI club | 42.71 | 41 | 52.79 | 3,404 |
| Bullying program | 70.83 | 68 | 72.08 | 3,404 |

*Note.* *k* refers to the number of schools, and *n* to the total number of teachers within these schools, in which each respective policy is present. *n*s for individual items are based on data prior to imputation to account for missing data. Therefore, sample sizes vary.

AR_284793

**Table 3**

Multilevel model with ordinal outcome for teacher and school-level effects on teachers reports of bullying being a problem.

| | Unconditional Model | Conditional Model with Level 1 Indicators | Conditional Model with Level 2 Indicators | Full Model with Interactions |
|---|---|---|---|---|
| | OR (SE) | OR (SE) | OR (SE) | OR (SE) |
| *Teacher Level Indicators* | | | | |
| Years worked | — | 1.11***(.03) | 1.11***(.03) | 1.12***(.03) |
| Race / Ethnicity | — | 1.09 (.09) | 1.06 (.09) | 1.06 (.09) |
| School safety scale | — | .14***(.01) | .14***(.01) | .09***(.02) |
| *School Level Indicators* | | | | |
| Free/reduced meal program | — | — | 1.84 (.62) | 2.07#(.73) |
| Academic Performance Index | — | — | 1.00 (.00) | 1.00 (.00) |
| Bullying program | — | — | .99 (.21) | 1.00 (.21) |
| SOGI-Focused policies | — | — | 0.96 (.06) | .97 (.06) |
| School safe × SOGI policies | — | — | — | 1.13**(.05) |
| Residual variance | .83 (.16) | .56 (.11) | .52 (.12) | .48 (.11) |
| *ICC* | .17 (.03) | — | — | — |

*Note.*

*
$p \le .050$,

**
$p \le .010$,

***
$p \le .001$

*J Sch Psychol.* Author manuscript; available in PMC 2016 June 30.

AR_284794

**HHS Public Access**

Author manuscript

*J Sch Health.* Author manuscript; available in PMC 2019 April 01.

Published in final edited form as:

*J Sch Health.* 2018 April ; 88(4): 306–314. doi:10.1111/josh.12606.

# Gender expression, violence, and bullying victimization: findings from probability samples of high school students in 4 US school districts

**Allegra R. Gordon, ScD, MPH**,

Fellow, Division of Adolescent & Young Adult Medicine, Boston Children's Hospital and Harvard Medical School, 300 Longwood Avenue (AU-Box 17, BCH 3189), Boston, MA 02115

**Kerith J. Conron, ScD**,

Blachford-Cooper Distinguished Scholar and Research Director, The Williams Institute, UCLA School of Law, Los Angeles, CA 90095-1476

**Jerel P. Calzo, PhD, MPH**,

Associate Professor, Graduate School of Public Health, Core Investigator, Institute for Behavioral and Community Health, San Diego State University, San Diego, CA 92182-4162

**Matthew T. White, PhD**,

Statistician – Department of Clinical Research Center, Boston Children's Hospital, Boston, MA 02115

**Sari L. Reisner, ScD**, and

Assistant Professor of Pediatrics, Harvard Medical School, Assistant Professor, Department of Epidemiology, Harvard T.H. Chan School of Public Health, 300 Longwood Avenue, Boston, MA 02115

**S. Bryn Austin, ScD**

Professor, Department of Social & Behavioral Sciences, Harvard T.H. Chan School of Public Health, Professor, Division of Adolescent and Young Adult Medicine, Boston Children's Hospital, Boston, MA 02115

## Abstract

**BACKGROUND**—Young people may experience school-based violence and bullying victimization related to their gender expression, independent of sexual orientation identity. However, the associations between gender expression and bullying and violence have not been examined in racially and ethnically diverse population-based samples of high school students.

**METHODS**—This study includes 5469 students (13–18 years) from the 2013 Youth Risk Behavior Surveys conducted in 4 urban school districts. Respondents were 51% Hispanic/Latino, 21% black/African-American, 14% white. Generalized additive models were used to examine the functional form of relationships between self-reported gender expression (range: 1=Most gender conforming, 7=Most gender nonconforming) and 5 indicators of violence and bullying

Corresponding Author: Allegra R. Gordon, Phone: (617) 355-0922, argordon@mail.harvard.edu.

victimization. We estimated predicted probabilities across gender expression by sex, adjusting for sexual orientation identity and potential confounders.

**RESULTS—**Statistically significant quadratic associations indicated that girls and boys at the most gender conforming and nonconforming ends of the scale had elevated probabilities of fighting and fighting-related injury, compared to those in the middle of the scale (p < .05). There was a significant linear relationship between gender expression and bullying victimization; every unit increase in gender nonconformity was associated with 15% greater odds of experiencing bullying (p < .0001).

**CONCLUSIONS—**School-based victimization is associated with conformity and nonconformity to gender norms. School violence prevention programs should include gender diversity education.

## Keywords

bullying; child & adolescent health; public health; stress; violence; special populations

There has been heightened attention to bullying and violence victimization in US schools, particularly for lesbian, gay, bisexual, and transgender (LGBT) youth.[1-5] Less is known about bullying and violence directed at adolescents who do not conform to societal expectations for masculine or feminine appearance and behavior (that is, have a nonconforming gender expression). Some research suggests that youths with a nonconforming gender expression are also at high risk of bullying victimization, discrimination, and violence.[2,6,7] A 2013 national convenience sample of LGBT high school students found that 55% of respondents had been verbally harassed and 11% had been physically assaulted at school due to their gender expression.[2] However, data from heterogeneous population-based samples of youth are lacking.

There is a particular need to understand links between victimization and perceived gender expression for youth of all sexual orientation identities. Evidence indicates that sexual minority youth are more likely to be gender nonconforming.[8-10] Yet, gender expression is distinct from sexual orientation identity and many heterosexual youth also report gender nonconformity.[11,12] Thus, to increase our understanding of the stigma-related factors that contribute to adolescent experiences of bullying and violence, it is essential to investigate the relationship between gender expression and victimization, and its potential implications for adolescent health, independently of sexual orientation identity. Indeed, violence and bullying victimization toward those perceived as gender nonconforming have been associated with adverse mental and physical health outcomes, including depression and suicidality, not only among sexual minorities[13] but across all sexual orientation identities, including heterosexuals.[12,14]

In addition to a need for research on gender expression and victimization for those of all sexual orientation identities, few studies have been able to examine violence and bullying victimization across the full range of gender expression (from highly gender conforming to highly gender nonconforming). The relationship between having a highly *conforming* gender expression and violence or bullying is especially poorly understood, although there is evidence that pressures to conform to gender norms may also impact health risks for more

AR_284954

Gordon et al.                                                                                          Page 3

gender conforming adolescents. For example, men who report greater conformity to masculinity norms are more likely to engage in risk-taking, including high-risk alcohol use and more frequent tobacco use,[15–17] and to have engaged in intimate partner violence.[18] Few studies have quantified relationships between conformity to femininity norms and risk-taking or violence exposure, although qualitative research has linked conventional feminine gender ideologies in girls and women to increased tolerance of sexual risk behavior and risk of intimate partner violence.[19,20]

Leveraging data from the 2013 Youth Risk Behavior Surveillance System on gender expression in school contexts, this study sought to address these gaps by examining the association between self-reported gender expression and school-based victimization within ethnically diverse probability samples of public high school students from 4 urban locations.

## METHODS

### Participants

The current study used 2013 Youth Risk Behavior Survey (YRBS) data from 4 jurisdictions that included a novel measure of perceived gender expression (described below): Broward County, FL; Chicago, IL; Los Angeles, CA; and San Diego, CA (N = 6000). Each survey used a 2-stage cluster sample design to produce a representative sample of 9th through 12th grade students.[21] The surveys were conducted following local parental permission procedures. Due to small sample size, participants who were 12 years of age were excluded. Individuals missing responses on key variables were excluded from the analysis (gender expression, 4.9%; sex, <1%; key covariates, 3.1%). In addition, respondents missing information on each outcome were excluded from outcome-specific analyses. Final unweighted analytic samples ranged from N = 5412 to N = 5469.

### Measures

**Sex**—Respondents were asked "What is your sex?" with response options male or female. No jurisdiction included a question on gender identity or other items that would permit identification of transgender respondents.

**Gender expression (GE)**—Perceived GE was assessed with a self-report question, based on a 2-item measure developed for adolescents[22] and adapted and tested for use in YRBS questionnaires by making it specific to school contexts.[23] This item purposefully solicits self-report perceptions, given the central role that such perceptions play in stigmatization processes.[22,24] Respondents were asked: "A person's appearance, style, dress, or the way they walk or talk may affect how people describe them. How do you think other people at school would describe you?" with response options ranging on a seven-point scale from "very feminine" to "very masculine." Responses were recoded based on respondent sex to create a continuous variable indicating degree of conformity or nonconformity to societal norms of GE (range: 1 = most gender conforming, 7 = most gender nonconforming).

**School-based violence and bullying victimization**—In the jurisdictions in this study, 6 items assessed violence and bullying victimization. Three items asked about experiences

AR_284955

Gordon et al.                                                                                      Page 4

of physical violence in the past year ("How many times were you in a physical fight on school property?" "How many times has someone threatened or injured you with a weapon such as a gun, knife, or club on school property?" "How many times were you in a physical fight in which you were injured and had to be treated by a doctor or nurse?"), with 5 to 8 response options. One item asked about perceived safety ("During the past 30 days, on how many days did you **not** go to school because you felt you would be unsafe at school or on your way to or from school?"). Each outcome was dichotomized (0 = no occurrence, 1 = at least one occurrence). Two dichotomous items asked about bullying victimization in the past year: "During the past 12 months, have you ever been bullied on school property?" and "During the past 12 months, have you ever been electronically bullied?" The distribution of these 2 items was similar across GE, and thus, the items were combined into a single indicator of any past year bullying victimization (in-school or electronic; 0 = no, 1 = yes).

**Sexual orientation identity and other demographic characteristics**—Sexual orientation identity was assessed with the question: "Which of the following best describes you?" (heterosexual (straight), gay or lesbian, bisexual, not sure). Race/ethnicity was assessed using two survey questions: "Are you Hispanic or Latino?" (yes or no) and "What is your race?" (select all that apply). Responses were classified as Hispanic/Latino, black/African-American, white, Asian/Pacific Islander, and another race/multiracial. Age was assessed via self-report in years.

### Data Analysis

We conducted descriptive analyses and hypothesis testing using SAS version 9.3 procedures designed to account for the complex sampling design and survey weights (eg, PROC SURVEYLOGISTIC).[25] Following descriptive analyses, we used generalized additive models (GAMs; SAS PROC GAM) to examine the functional form (that is, function that describes the shape of the relationship between variables) of the associations between GE score and the proportion reporting each outcome. GAMs help in examining potential non-linear associations by relaxing assumptions of linearity and generating smoothed curves of association with 95% confidence intervals.[26] Based on patterns observed in GAMs, we used logistic regression models including linear, quadratic, and cubic polynomial functions of GE as predictors of the odds of reporting each form of victimization, adjusted for age, sex, race/ethnicity, and sexual orientation identity. Sex-by-GE and sexual orientation identity-by-GE interactions were included to examine whether sex or sexual orientation identity, respectively, modified the associations between GE and each outcome. Finally, the predicted probability of endorsing each outcome across the GE spectrum was calculated as the inverse logit of the model-based estimate; probabilities were calculated at the average sample age (16.1 years), weighting the racial/ethnic and sexual orientation identity variables by their marginal distributions.

## RESULTS

The analytic sample included 2921 girls and 2548 boys in high school who participated in a 2013 YRBS in one of the 4 included jurisdictions. Weighted socio-demographic characteristics of respondents are shown in the first column of Table 1. Table 1 also presents

AR_284956

Gordon et al.                                                                                      Page 5

the weighted distributions of each of the five violence and bullying victimization outcomes by sociodemographic characteristics and by GE.

Figure 1 depicts the weighted distribution of GE across sex and sexual orientation identity in this sample. A higher proportion of male than female participants were located at the most gender nonconforming end of the spectrum (for example, 6% vs. 1%, respectively, for those with a GE score = 7). Greater gender nonconformity was also associated with sexual minority identities: there were higher proportions of those identifying as gay/lesbian (13%) or unsure (9%) than those identifying as heterosexual (3%) at the most nonconforming end of the spectrum. Conversely, a higher proportion of heterosexual respondents (35%) than sexual minority respondents (16% for gay/lesbian, 13% for bisexual, and 18% for unsure) located themselves at the most gender conforming end of the spectrum (GE score = 1).

GAM analyses and subsequent multivariable logistic models demonstrated statistically significant quadratic associations between GE and fighting and fight-related injury needing treatment, for both boys and girls (Figures 2a, 2b). Notably, sex was significantly associated with both outcomes, with boys having a higher probability of fighting (p < .001) and of injury in a fight (p = .006) across all levels of GE; no sex-by-GE interactions were observed for these outcomes. The J-shaped relationship between GE and fighting, in particular, suggests that the most gender conforming and the most gender nonconforming respondents had an elevated risk of fighting, relative to respondents in the middle of the GE spectrum (Figure 2a). For example, the adjusted predicted probability (95% confidence interval) of having been in at least one fight was 6.8% (5.3%, 8.7%) for girls and 11.8% (9.4%, 13.5%) for boys at the most gender conforming end of the scale (GE = 1) compared to their more moderately conforming peers (GE = 2: 5.1% [4.1%, 6.3%] for girls and 8.9% [7.4%, 10.8%] for boys). At the most nonconforming end of the GE range (GE = 7), the probability of having been in a fight was 14.4% (8.7%, 22.9%) for girls and 23.5% (15.4%, 34.1%) for boys.

There was a significant sex-by-GE interaction when modeling the risk of being threatened or injured with a weapon (interaction p-values < .05). GAM analyses suggested a significant quadratic relationship between GE and this outcome for girls and a significant cubic relationship between GE and this outcome for boys (Figure 2c). Among girls, the quadratic model indicated a pronounced elevated probability of victimization with a weapon for the most gender nonconforming girls (36% predicted probability for the most nonconforming girls compared to 4% for those in mid-range of GE). Among boys, the cubic model indicated increased probability of victimization with a weapon for boys at the most conforming end of the range (5.7% if GE = 1 compared to 3.9% if GE = 2), and an overall elevated probability among the nonconforming boys, tapering off for the most nonconforming (15.5% if GE = 6, 11.8% if GE = 7).

In contrast to the above outcomes, a linear relationship best fit the association between GE and bullying victimization and missing school due to feeling unsafe (Figures 3a, 3b). Greater gender nonconformity was significantly associated with higher odds of having experienced in-school or electronic bullying victimization in the past year or having missed school for safety reasons in the past month (both p < .001). Girls had a higher probability of being

AR_284957

bullied across all levels of GE (p < .001). Sex-by-GE interaction terms were only significant for missing school (p < .001): the most gender conforming boys were less likely, while the most nonconforming boys were more likely, than girls to have missed school for safety reasons. There were no significant interactions between sexual orientation identity and GE for any outcome; thus, these interaction terms were not included in final models.

## DISCUSSION

In probability samples of public high school students from four urban locations, the odds of being targeted for bullying and violence were found to significantly differ by gender expression, after adjusting for the effects of sexual orientation identity. The J-shaped relationships for violence-related outcomes suggest increased risk for youths who are perceived by others at school as highly gender conforming as well as those perceived as highly gender nonconforming. In contrast, there was a linear relationship between gender nonconformity and odds of in-school or electronic bullying or missing school due to feeling unsafe.

These findings expand the existing literature on gender nonconformity and violence and discrimination among adolescents. Previously, most of this research has focused on sexual minorities.[2,6,7,13] We found associations between gender nonconformity and violence and bullying even after accounting for sexual orientation identity. Further, sexual minorities were more likely to report a nonconforming gender expression; however, the majority of respondents at the gender nonconforming end of the scale were heterosexual, underscoring the importance of these issues for both heterosexual and sexual minority youth. These findings add support to prior studies conducted in a predominantly white, middle-income cohort that demonstrated increased risk of childhood abuse and bullying victimization among gender nonconforming heterosexual and sexual minority young people.[12,14] Our findings indicate similar associations in an ethnically diverse adolescent sample. Although sample size limitations precluded an examination of differences by race/ethnicity in this analysis, future research is needed that explores these intersections.

We also observed modestly elevated odds of fighting, injury needing treatment, and missing school due to feeling unsafe for boys and girls reporting the highest levels of gender conformity. For the boys in the sample, this aligns with a robust body of work describing male conformity to masculinity norms as a predictor of aggression, violence perpetration, and violence victimization among men.[27-30] Conformity to masculinity norms in adolescence and young adulthood has also been associated with heavier alcohol use,[15,31] which raises risk of experiencing or perpetrating violence.[32,33] One study even found differences in injury-risk behaviors associated with conformity to masculinity norms in children as young as 3–6 years old.[34] However, few studies have specifically examined the experience of adolescents who report that they are *perceived* as having a highly conforming gender expression, which may be distinct from an individual's adherence to conventional masculine and/or feminine ideologies.

In this study, there was some suggestion that the violence-related risks of highly gender conforming girls followed a pattern similar to that of the boys in the sample. Literature on

AR_284958

Gordon et al.                                                                                                          Page 7

violence and female conformity to femininity norms has largely focused on sexual and romantic relationships, including sexual risks and intimate partner violence.[19,36] There is much still to be understood about the relationship between high degrees of gender conformity and violence perpetration as well as victimization, particularly given that perpetrators may also be victims of bullying and discrimination.[37,38] The factors underlying the related but distinct outcomes examined may vary by gender in ways that are beyond the scope of this study. For example, highly gender conforming girls may be experiencing elevated levels of sexual harassment compared to girls in the middle of the spectrum, which may lead some to miss school due to feeling unsafe. Elevated odds of having been in a physical fight may be related to fighting back in response to harassment, may indicate exposure to intimate partner violence,[39] or may be related to other forms of social group conflict.[35] For example, Brown and Tappan[35] described shifting femininity ideologies among US middle school age girls in conjunction with a rise in media images of teenage girls in physical fights, which could also have implications for the links between perceived gender conformity and physical fighting in girls.

Sex-by-gender expression interactions were found for two outcomes: having being threatened or injured with a weapon and having missed school due to feeling unsafe. For the outcome of threat or injury with a weapon, the cubic effect among boys was distinct from all other observed patterns, and the elevated risk among girls at the most nonconforming end of the spectrum was substantially higher than for all other outcomes except bullying. This differing shape may be driven by relatively sparse data for this outcome but also could be related to differences in the social environments and social experiences of boys and girls who reported being at the most nonconforming end of the scale compared to those who were slightly less nonconforming. These differences might reflect community-level differences in availability of guns, school violence policies, or local drug-related or law enforcement activity. Although this study adjusted for clustering by region and school, there may be other factors related to sex and perceived gender expression that remained unmeasured.

Overall, the prevalence of violence and bullying victimization in this four school district sample was similar to levels reported on the 2013 national YRBS, with the exception of physical fighting, which was reported by 9% of our sample compared to 25% of respondents nationwide.[36] The lower prevalence of physical fighting in our sample is notable, and may suggest key differences between the districts in this sample and the US in general that could have implications for reducing exposure to violence and should be examined in future research.

We note several limitations to this study. First, all measures are self-reported and there may be additional factors we could not account for that might lead some students to report higher levels of gender conformity or nonconformity, including factors also linked to violence or bullying victimization (such as characteristics of perpetrators). Further, gender expression is multidimensional, and our measure represents only one approach to the measurement of perceived masculine and feminine expression; although survey research requires brief, validated measures such as this one, alternate strategies for assessing gender expression at the population level should be explored in future research. In addition, the YRBS questionnaires did not include measures allowing for the identification of transgender youth,

AR_284959

a group that may be heavily impacted by gender expression-related discrimination. Efforts have already begun—and should be expanded—to promote visibility of transgender youth on population-based surveys such as the YRBS.[37,38]

Second, as a cross-sectional study, temporal ordering of these relationships cannot be determined. There is robust evidence that gender nonconformity may be targeted by peers for discrimination and victimization,[2,6,14] but there is also the possibility that prior victimization experiences may impact reported or actual gender expression. In a study of 5th graders, peer victimization in the fall term predicted decreased engagement in gender nonconforming behaviors in the spring for boys, while among girls, victimization predicted decreased engagement in both conforming and nonconforming activities.[39] Longitudinal research is necessary to disentangle these relationships. Third, generalizability is limited as this sample comes from four urban school districts that were motivated to include a novel measure of gender expression. Yet, even in these jurisdictions that may already have been more attuned to issues of gender diversity in their student body, greater gender nonconformity was strongly associated with elevated odds of victimization, suggesting that these may be underestimates of the experiences of youth nationwide. Future uptake of this item by additional jurisdictions or as part of the national YRBS will allow for greater generalizability to the US high school student population, and will also permit needed examination of gender expression differences by race/ethnicity and geographic area.

## IMPLICATIONS FOR SCHOOL HEALTH

To our knowledge, this study is the first to use a geographically diverse population-based sample to better understand experiences related to gender expression, bullying, and violence in school contexts for 9th through 12th grade students. Based on these findings, schools should consider the following in efforts to address and prevent bullying and violence:

- Both girls and boys who are more gender nonconforming may be at elevated risk of violence and bullying victimization in school settings;

- These preventable experiences of stigmatization and discrimination based on gender expression impact not only LGBT students, but students of all sexual orientation identities;

- Given our finding that highly gender conforming youth may be at elevated risk of fighting and victimization, school-based violence prevention programs should incorporate curriculum celebrating gender diversity and identifying the negative effects of gender stereotypes across a full spectrum of gender expression.

In our study's probability sample, which was predominantly youth of color, findings emphasize the need for future research focused on the intersections of gender expression, racial/ethnic background, and sexual orientation identity. This will have additional implications for the development and implementation of effective anti-violence and anti-bullying initiatives that address the interplay of multiple forms and multiple levels of stigma and discrimination in school contexts (from state- and district-level policies pertaining to gender and sexual diversity to individual experiences of bullying or violence at school). Inclusion of gender expression norms and gender diversity in relation to other social

determinants of health within school violence prevention efforts may offer new insights and pathways toward promoting school health and mitigating the social stressors that drive health inequities.

### Human Subjects Approval Statement

The Boston Children's Hospital Institutional Review Board determined that protocol approval was not necessary because the study used de-identified data from secondary sources.

## Acknowledgments

The authors thank the 2013 Youth Risk Behavior Survey participants and the US Centers for Disease Control and Prevention for the data used in this study. AR Gordon is supported by NIH F32DA042505. JP Calzo is supported by NIH K01DA034753. SB Austin is supported by NIH R01 HD066963 and R01 HD057368 and by the Maternal and Child Health Bureau, Health Resources Services Administration, US Department of Health & Human Services (T71-MC00009; T76-MC00001). The funders played no role in the study design, collection, analysis, interpretation of data, or writing of the manuscript.

## References

1. Birkett M, Russell ST, Corliss HL. Sexual-orientation disparities in school: the mediational role of indicators of victimization in achievement and truancy because of feeling unsafe. Am J Public Health. 2014; 104(6):1124–1128. [PubMed: 24825216]

2. Kosciw, JG., Greytak, EA., Palmer, NA., Boesen, MJ. The 2013 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth in Our Nation's Schools. New York, NY: GLSEN; 2014. Available at: http://www.glsen.org/article/2013-national-school-climate-survey. Accessed April 19, 2015.

3. Mueller AS, James W, Abrutyn S, Levin ML. Suicide ideation and bullying among us adolescents: examining the intersections of sexual orientation, gender, and race/ethnicity. Am J Public Health. 2015; 105(5):980–985. [PubMed: 25790421]

4. Olweus D. School bullying: development and some important challenges. Annu Rev Clin Psychol. 2013; 9:751–780. [PubMed: 23297789]

5. Russell ST, Ryan C, Toomey RB, Diaz RM, Sanchez J. Lesbian, gay, bisexual, and transgender adolescent school victimization: implications for young adult health and adjustment. J Sch Health. 2011; 81(5):223–230. [PubMed: 21517860]

6. Gordon AR, Meyer IH. Gender nonconformity as a target of prejudice, discrimination, and violence against LGB individuals. J LGBT Health Res. 2007; 3(3):55–71.

7. Toomey RB, Ryan C, Diaz RM, Card NA, Russell ST. Gender-nonconforming lesbian, gay, bisexual, and transgender youth: school victimization and young adult psychosocial adjustment. Dev Psychol. 2010; 46(6):1580–1589. [PubMed: 20822214]

8. Rieger G, Linsenmeier JAW, Gygax L, Bailey JM. Sexual orientation and childhood gender nonconformity: Evidence from home videos. Dev Psychol. 2008; 44(1):46–58. [PubMed: 18194004]

9. Rieger G, Savin-Williams RC. Gender nonconformity, sexual orientation, and psychological well-being. Arch Sex Behav. 2012; 41(3):611–621. [PubMed: 21350914]

10. Bailey JM, Zucker KJ. Childhood sex-typed behavior and sexual orientation: a conceptual analysis and quantitative review. Dev Psychol. 1995; 31(1):43–55.

11. Plöderl M, Fartacek R. Childhood gender nonconformity and harassment as predictors of suicidality among gay, lesbian, bisexual, and heterosexual Austrians. Arch Sex Behav. 2007; 38(3):400–410. [PubMed: 18040769]

12. Roberts AL, Rosario M, Corliss HL, Koenen KC, Austin SB. Childhood gender nonconformity: a risk indicator for childhood abuse and posttraumatic stress in youth. Pediatrics. 2012; 129(3):410–417. [PubMed: 22351893]

AR_284961

13. Friedman MS, Koeske GF, Silvestre AJ, Korr WS, Sites EW. The impact of gender-role nonconforming behavior, bullying, and social support on suicidality among gay male youth. J Adolesc Health. 2006; 38(5):621–623. [PubMed: 16635780]

14. Roberts AL, Rosario M, Slopen N, Calzo JP, Austin SB. Childhood gender nonconformity, bullying victimization, and depressive symptoms across adolescence and early adulthood: an 11-year longitudinal study. J Am Acad Child Adolesc Psychiatry. 2013; 52(2):143–152. [PubMed: 23357441]

15. Iwamoto DK, Cheng A, Lee CS, Takamatsu S, Gordon D. "Man-ing" up and getting drunk: the role of masculine norms, alcohol intoxication and alcohol-related problems among college men. Addict Behav. 2011; 36(9):906–911. [PubMed: 21620570]

16. Pachankis JE, Westmaas JL, Dougherty LR. The influence of sexual orientation and masculinity on young men's tobacco smoking. J Consult Clin Psychol. 2011; 79(2):142–152. [PubMed: 21443320]

17. Courtenay WH. Engendering health: a social constructionist examination of men's health beliefs and behaviors. Psychol Men Masc. 2000; 1(1):4–15.

18. Santana MC, Raj A, Decker MR, La Marche A, Silverman JG. Masculine gender roles associated with increased sexual risk and intimate partner violence perpetration among young adult men. J Urban Health. 2006; 83(4):575–585. [PubMed: 16845496]

19. Jewkes R, Morrell R. Sexuality and the limits of agency among South African teenage women: theorising femininities and their connections to HIV risk practises. Soc Sci Med. 2012; 74(11): 1729–1737. [PubMed: 21696874]

20. Kerrigan D, Andrinopoulos K, Johnson R, Parham P, Thomas T, Ellen JM. Staying strong: gender ideologies among African-American adolescents and the implications for HIV/STI prevention. J Sex Res. 2007; 44(2):172–180. [PubMed: 17599274]

21. US Centers for Disease Control and Prevention. Methodology of the youth risk behavior surveillance system — 2013. MMWR Morb Mortal Wkly Rep. 2013; 62(1):1–25. [PubMed: 23302815]

22. Wylie S, Corliss HL, Boulanger V, Prokop LA, Austin SB. Socially assigned gender nonconformity: a brief measure for use in surveillance and investigation of health disparities. Sex Roles. May.2010

23. Greytak, EA., Gill, A., Conron, KJ., et al. Identifying transgender and other gender minority respondents on population-based surveys: special considerations for adolescents, race/ethnicity, socioeconomic status, and intersex status. In: Herman, JL., editor. Best Practices for Asking Questions to Identify Transgender and Other Gender Minority Respondents on Population-based Surveys. Los Angeles, CA: The Williams Institute; 2014. p. 29-43.Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/geniuss-report-sep-2014.pdf. Accessed March 1, 2015.

24. Goffman, E. Stigma: Notes on the Management of Spoiled Identity. Englewood Cliffs, NJ: Prentice-Hall; 1963.

25. SAS Institute Inc.. SAS Software, Version 9.3 of the SAS System for Windows. Cary, NC: SAS Institute Inc; 2011.

26. Hastie, T., Tibshirani, R. Generalized Additive Models. New York, NY: Chapman and Hall; 1990.

27. Hong L. Toward a transformed approach to prevention: breaking the link between masculinity and violence. J Am Coll Health. 2000; 48(6):269–279. [PubMed: 10863870]

28. Moore TM, Stuart GL. A review of the literature on masculinity and partner violence. Psychol Men Masc. 2005; 6(1):46.

29. Katz J. Reconstructing masculinity in the locker room: the Mentors in Violence Prevention Project. Harv Educ Rev. 1995; 65(2):163–175.

30. Mahalik JR, Locke BD, Ludlow LH, et al. Development of the conformity to masculine norms inventory. Psychol Men Masc. 2003; 4(1):3–25.

31. Mahalik JR, Burns SM. Predicting health behaviors in young men that put them at risk for heart disease. Psychol Men Masc. 2011; 12(1):1–12.

AR_284962

32. Wells S, Flynn A, Tremblay PF, Dumas T, Miller P, Graham K. Linking masculinity to negative drinking consequences: the mediating roles of heavy episodic drinking and alcohol expectancies. J Stud Alcohol Drugs. 2014; 75(3):510–519. [PubMed: 24766763]

33. Lisco CG, Leone RM, Gallagher KE, Parrott DJ. "Demonstrating masculinity" via intimate partner aggression: the moderating effect of heavy episodic drinking. Sex Roles. 2015; 73(1):73–71. [PubMed: 26456996]

34. Granié M-A. Gender stereotype conformity and age as determinants of preschoolers' injury-risk behaviors. Accid Anal Prev. 2010; 42(2):726–733. [PubMed: 20159100]

35. Brown LM, Tappan MB. Fighting like a girl fighting like a guy: gender identity, ideology, and girls at early adolescence. New Dir Child Adolesc Dev. 2008; (120):47–59.

36. Kann L, Kinchen S, Shanklin S, et al. Youth Risk Behavior Suveillance – United States, 2013. MMWR Morb Mortal Wkly Rep. 2014; 63(4):1–168. [PubMed: 24402465]

37. Federal Interagency Working Group on Improving Measurement of Sexual Orientation and Gender Identity in Federal Surveys. Toward a Research Agenda for Measuring Sexual Orientation and Gender Identity in Federal Surveys: Findings, Recommendations, and Next Steps. Washington, DC: Federal Committee on Statistical Methodology; 2016. Available at: https://fcsm.sites.usa.gov/files/2014/04/SOGI_Research_Agenda_Final_Report_20161020.pdf. Accessed October 31, 2016

38. The GenIUSS Group. Best Practices for Asking Questions to Identify Transgender and Other Gender Minority Respondents on Population-Based Surveys. Los Angeles, CA: The Williams Institute; 2014. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/geniuss-report-sep-2014.pdf. Accessed March 1, 2015

39. Ewing Lee EA, Troop-Gordon W. Peer socialization of masculinity and femininity: differential effects of overt and relational forms of peer victimization. Br J Dev Psychol. 2011; 29(Pt 2):197–213. [PubMed: 21592148]

AR_284963

Gordon et al.

Page 12



**Figure 1.**
Gender Expression among High School Students by Sex and Sexual Orientation Identity in 4 Urban School Districts (2013 Youth Risk Behavior Surveys; N = 5469)

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

AR_284964

Gordon et al.                                                                 Page 13







**Figure 2. Predicted Probabilities of Fighting or Violence Victimization in School Settings by Perceived Gender Expression and Sex among High School Students in 4 Urban School Districts (2013 Youth Risk Behavior Surveys; N = 5469)**

Note.

Graphs show predicted probabilities separately by sex (girls=dashed line; boys=solid line). Shaded areas represent 95% confidence intervals around predicted probabilities. All models account for clustering by school district, are weighted to account for sampling design, and are adjusted for age, race/ethnicity, and sexual orientation identity. Models: (2a) probability of having been in a physical fight in past year; (2b) probability of injury in a physical fight, needing treatment by a doctor or nurse in the past year; and (2c) probability of having been threatened or injured with a weapon in the past year. In all models, a main effect of sex was observed; in Model 2c, there was also a significant interaction between sex and gender expression. There were no significant interactions between sexual orientation identity and gender expression.

*J Sch Health.* Author manuscript; available in PMC 2019 April 01.

AR_284965



**Figure 3. Predicted Probabilities of Bullying or Missing School for Safety Reasons by Perceived Gender Expression and Sex (girls=dashed line; boys=solid line) among High School Students in 4 Urban School Districts (2013 Youth Risk Behavior Surveys; N = 5469)**

Note.

Graphs show predicted probabilities separately by sex (girls=dashed line; boys=solid line). Shaded areas represent 95% confidence intervals around predicted probabilities. All models account for clustering by school district, are weighted to account for sampling design, and are adjusted for age, race/ethnicity, and sexual orientation identity. Models: (3a) probability of experiencing at-school or electronic bullying victimization in past year; and (3b) probability of having missed school 1+ days in past month due to feeling unsafe. In all models, a main effect of sex was observed; additionally, in Model 3b, there was a significant interaction between sex and gender expression. There were no significant interactions between sexual orientation identity and gender expression.

AR_284966

Gordon et al.    Page 15

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**Table 1**

Demographic Characteristics and Reported School-related Violence and Bullying Victimization among 2013 Youth Risk Behavior Survey Respondents (ages 13–18 years) from 4 Urban School Districts[a]

| | Total, % | In 1+ physical fights (past yr.) | Threat/injury w. weapon (past yr.) | Injured in fight, needed trt. (past yr.) | Missed school because felt unsafe (past mo.) | Any bullying vict. (past yr.) |
|---|---|---|---|---|---|---|
| | % (N) | (N=5412) % | (N=5448) % | (N=5437) % | (N=5424) % | (N=5469) % |
| **Overall** | 100 (5469) | 8.8 | 5.6 | 3.7 | 7.7 | 17.9 |
| **Sex** | | | | | | |
| Female | 50.5 (2921) | 6.5 | 4.7 | 2.8 | 8.2 | 20.7 |
| Male | 49.5 (2548) | 11.1 | 6.5 | 4.5 | 7.1 | 15.0 |
| **Race/Ethnicity** | | | | | | |
| Hispanic/Latino | 55.9 (2793) | 8.2 | 5.6 | 3.5 | 7.5 | 17.6 |
| Black/African American | 21.0 (1076) | 13.7 | 6.9 | 5.9 | 9.6 | 15.5 |
| White | 13.5 (812) | 4.6 | 4.2 | 1.6 | 7.5 | 21.8 |
| Asian/Pacific Islander | 6.4 (504) | 6.2 | 3.1 | 2.5 | 4.9 | 19.6 |
| Multi/Another | 3.2 (284) | 9.6 | 6.7 | 3.2 | 5.5 | 18.3 |
| **Sexual orientation identity** | | | | | | |
| Heterosexual | 88.6 (4855) | 8.2 | 4.9 | 3.2 | 6.9 | 15.8 |
| Gay/Lesbian | 1.9 (104) | 20.4 | 19.8 | 10.9 | 21.8 | 29.7 |
| Bisexual | 5.6 (302) | 14.8 | 8.3 | 6.3 | 10.7 | 34.0 |
| Not Sure | 3.9 (208) | 8.8 | 9.6 | 7.4 | 13.1 | 35.1 |
| **Gender expression score[b]** | | | | | | |
| 1 | 33.7 (1816) | 9.9 | 5.2 | 3.7 | 7.0 | 14.7 |
| 2 | 32.5 (1866) | 6.1 | 3.4 | 2.3 | 5.4 | 15.6 |
| 3 | 14.9 (802) | 7.3 | 4.9 | 3.1 | 7.9 | 20.6 |
| 4 | 10.3 (564) | 8.0 | 7.1 | 4.0 | 8.5 | 25.2 |
| 5 | 3.0 (164) | 13.9 | 10.6 | 6.9 | 13.6 | 26.2 |
| 6 | 1.8 (96) | 14.3 | 16.1 | 6.2 | 14.2 | 21.7 |
| 7 | 3.8 (161) | 24.4 | 16.0 | 12.5 | 21.6 | 26.2 |

Note.

For all demographic variables and outcomes % is weighted; n is unweighted

AR_284967

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

[a] Broward Co., FL; Chicago, IL; Los Angeles, CA; San Diego, CA

[b] Gender expression score range: 1 = Most gender conforming; 7 = Most gender nonconforming

AR_284968

**HHS Public Access**
Author manuscript
*Prof Psychol Res Pr.* Author manuscript; available in PMC 2016 January 20.

Published in final edited form as:
*Prof Psychol Res Pr.* 2015 ; 46(1): 37–45. doi:10.1037/a0037490.

# Serving Transgender Youth: Challenges, Dilemmas and Clinical Examples

**Amy C. Tishelman, Ph.D.**[1], **Randi Kaufman, Psy.D.**[1], **Laura Edwards-Leeper, Ph.D.**[2], **Francie H. Mandel, LICSW**[3], **Daniel E. Shumer, M.D.**[3], and **Norman P. Spack, M.D.**[1]

[1]Boston Children's Hospital and Harvard Medical School

[2]Pacific University School of Professional Psychology

[3]Boston Children's Hospital

## Abstract

Historically, many gender variant individuals have lived in a chronic state of conflict between self-understanding and physical being, one in which there was a continual misalignment between others' perceptions of them and their internal self-perception of gender. Only recently have professionals from mental health and medical realms come together to provide services to these youth. This paper describes an innovative program: the first mental health and medical multidisciplinary clinic housed in a pediatric academic center in North America to serve the needs of gender variant youth. We describe our model of care, focusing on the psychologist's role within a multidisciplinary team and the mental health needs of the youth and families assisted. We highlight clinical challenges and provide practice clinical vignettes to illuminate the psychologist's critical role.

### Keywords

transgender; gender dysphoria; gender non-conforming; youth; adolescent

## Introduction

Historically, many gender variant individuals have lived in a chronic state of conflict between self-understanding and physical being, with a continual misalignment between others' perceptions of them and their internal self-perception of gender. Only recently have professionals from mental health and medical realms come together to provide services to youth and, hopefully, some validation. As with other newly evolving fields of study, initial interventions were applied without the benefit of much research or precedent for guidance, and at times in an atmosphere of professional division (see Drescher & Byne, 2012, for a summary of continued controversies).

Correspondence regarding this article may be sent to the lead author at: Amy C. Tishelman, Ph.D., Boston Children's Hospital, 333 Longwood Avenue, 6th Floor, Endocrinology, Boston, MA 02115.

The Gender Management Services-Disorders of Sexual Development Program (GeMS-DSD) evolved due to the dearth of available services for two distinct populations: a) youth with Disorders of Sexual Development (DSD) and b) gender variant youth. DSD refer to biological conditions in which anatomic sexual development is atypical (Houk, Hughes, Ahmed, & Lee, 2006) whereas gender variance refers to gender expression and/or identity inconsistent with prevailing societal expectations and norms (Kulick, 1999). The term transgender typically refers to those individuals for whom genotype and phenotype are mismatched. Therefore, biologically male children may self-identify as female and vice versa, or youth may not fit neatly into either category. This paper will focus on the gender variant group served by GeMS-DSD. We highlight clinical challenges, and provide clinical vignettes to illuminate the psychologist's critical role. Please refer to the online supplemental materials for further description of terms relevant to gender, sex and sexuality, and a summary of suggested psychosocial evaluation recommendations.

The development of the GeMS-DSD Program was made possible because the initiative of an endocrinologist with prior expertise treating transgender adults, and a strong passion to assist gender variant youth without access to care. As with any novel program, a vision and a sense of possibility are essential aspects of effective action. With a strong belief in the need for such a program in a multidisciplinary hospital setting, the GeMS-DSD service was developed, partially dependent upon the persuasive abilities of the founding physicians, but also within the structure of an institution that encouraged care for underserved youth and with clinic directors and hospital administrators who fostered innovation. The GeMS-DSD program became the first multidisciplinary mental health and medical program housed in a pediatric academic center in North America to serve youth with DSD or gender variance, and has forged a path for the development of other clinics in the United States. Many mental health professionals, medical students, pediatric house officers, endocrine fellows, and staff endocrinologists have participated in our program.

## Program Development

The development of GeMS-DSD was a shared effort, requiring extensive multidisciplinary collaboration. Consultation was sought from urology, endocrinology, medical ethics, genetics, neonatology, gynecology, psychology, and hospital administration. When the program opened, it was co-directed by a pediatric urologist with expertise treating children with DSD and a pediatric endocrinologist, working in tandem with a psychologist to provide evaluations and services for gender variant youth and their families. The remainder of the discussion will focus on the gender variant group in the GeMS program, with an emphasis on the crucial role of psychologists within this multidisciplinary team.

In order to develop our mental health protocols, our hospital supported the GeMS psychologist receiving training in Amsterdam from Peggy Cohen-Kettenis, PhD and her team, pioneers in assessing and treating transgender youth. The purpose of the trip was to learn and adapt the Dutch protocol for use in the United States. The Amsterdam group opened the first specialized gender identity clinic for children and adolescents in 1987 (deVries & Cohen-Kettenis, 2012) and have published numerous studies based on their protocol and interventions (e.g., Delemarre-van de Waal & Cohen-Kettenis, 2006; deVries,

AR_284972

Steensma, Doreleijers, & Cohen-Kettenis, 2011; Wallien & Cohen-Kettenis, 2008; deVries & Cohen-Kettenis, 2012). During the training trip, the GeMS psychologist and endocrinologist participated in the first international Adolescent Gender Identity Research Group Meeting. Psychological measures were selected collaboratively for clinics to use in the evaluation of transgender youth, based on shared experience with this population, while each clinic adapted and added measures as needed for individual sites.

When opened, the GeMS clinic was flooded with inquiries from families, not only from the local region, but also from across the nation and internationally. Notably, before the GeMS program existed, the demand for services was largely invisible. In addition, children and families struggled to identify resources (many of which were predominantly non-existent) without the aid of trained professionals, while sometimes coping with significant and multifaceted psychosocial challenges. These could include a range of issues such as managing family responses, including anxieties and discord related to atypical gender expressions and/or disclosures of children; managing peer, school and other social circumstances in contexts that were often less than accepting; and managing mental health issues. Numerous articles have been published outlining similar multifaceted issues gender nonconforming children and families may face (e.g., Dreger, 2009; Ehrensaft, 2007; Malpas, 2011; Menvielle, 2012). In response to the increasing volume of cases a social worker joined the team to conduct pre-screening telephone intakes, aid families in finding resources, and to help develop written clinic protocols in collaboration with the psychologist.

## Clinic Practice

The GeMS program, based on the model of care first developed and shaped in Amsterdam, continues to be adapted over time in response to new developments in the field and service demands. Our protocol relies on existing guidelines and standards for working with transgender individuals developed by various disciplines. For example, the World Professional Association for Transgender Health (WPATH) Standards of Care (Coleman et al., 2011), the Endocrine Society Guidelines (Hembree et al., 2009), the Report of the American Psychological Association (APA) Task Force on Gender Identity and Gender Variance (2009; http://www.apa.org/pubs/info/reports/gender-identity.aspx), and the American Counseling Association Competencies for Counseling with Transgendered Clients (2010) each offer valuable recommendations for working with the transgender population. Generally, these guidelines and standards are similar in that they all recommend supporting transgender individuals in their affirmed gender identity, which often includes assisting in medical interventions that will help make the individual's body congruent with their affirmed gender. The APA Task Force report (APA, 2009) states support for the "efficacy, benefit, and medical necessity of gender-transition treatments for appropriately evaluated individuals…" (p.67), a statement consistent with the goals of the GeMS team.

Nevertheless, many of these guidelines do not focus on issues specific to transgender youth. The Society for Adolescent Health and Medicine (2013) has issued recommendations for promoting the health and well-being of lesbian, gay, bisexual and transgender adolescents, and the American Academy of Child and Adolescent Psychiatry (2012) has published practice parameters addressing gay, lesbian, bisexual, gender nonconforming and gender

AR_284973

discordant children and adolescents. The APA also published a helpful and accessible pamphlet regarding gender identity and gender expression, with some information about transgender youth (http://www.apa.org/topics/sexuality/transgender.pdf). They note that "it may be helpful to consult with mental health and medical professionals familiar with gender issues in children" (p. 3), while also emphasizing that "identifying as transgender does not constitute a mental disorder" (p. 3) and that "it is not helpful to force the child to act in a more gender-conforming way" (p. 3). This position is aligned with our gender affirming approach to care (see Hidalgo et al., 2013 for an elaboration of a gender affirming model) which views gender variations as part of an expected diversity, and not pathology. Mental health challenges may emerge related to cultural and social responses to a child or co-exist with gender non-conformity. Consistent with much literature (e.g., Hidalgo et al., 2013; Steensma, McGuire, Kreukels, Beelman & Cohen-Kettenis, 2013; Wallien & Cohen-Kettenis, 2008) we view gender as sometimes fluid over time, recognizing that not all gender non-conforming children fit neatly into male or female identities, and that gender identity (internal sense of self) and gender expression (outward expression of gender) may modify over time. Members of the GeMS team have played a role in the development of standards and guidelines, including as a member of the active APA Task Force to develop guidelines for psychological practice with transgender and gender non-conforming clients.

As time has elapsed, and our clinical expertise has developed, we have advanced to a more flexible, individualized approach to care than was utilized at the clinic's inception, which may evolve further with increasing research to inform best practices. Within our current model we continue to prioritize evaluation and treatment, mental health and readiness for medical treatment, but allow for a variable structure and account for the unique circumstances of the youth and family. Therefore, the model set forth below is adaptable, serving as a guide for care as opposed to an inelastic protocol. Clinical discretion and family needs are prioritized, as deemed appropriate by the psychologist working within a multidisciplinary team. In addition, as the field evolves, our future practices may vary from those delineated. However, we anticipate that our fundamental approach will endure, and can be described as the intertwining of mental health and medical expertise, each informing the other to best assist families and youth.

**Intake**

The initial telephone intake, conducted by a GeMS clinical social worker, includes gathering a substantial amount of information and allows the parent and/or guardian the opportunity to tell their story to a knowledgeable professional, often for the first time. The information includes reasons for concerns about gender variance, current crises, and developmental, medical, and mental health history. Other services include support, psycho-education, explanation of protocols, outside referrals and scheduling a clinic appointment when appropriate. We believe that it is imperative for a qualified and experienced clinician to be the first point of clinical contact to set the roadmap for future care, and to act as an identified trusted individual to whom the family can turn. The intake frequently plants the seeds of hope, providing relief for families who have been enduring the stress of a situation for which they have had little preparation, often within a context of isolation. A description of the patient population presenting in GeMS through the year 2010 indicated that the mean age at

intake was approximately 14, with a slight preponderance of genotypic female to male patients, many of whom (approximately 44%) presented with a significant psychiatric history (Spack et al, 2012).

It is important to note that the earliest we medically treat children is when puberty has just begun, medically defined as Tanner Stage 2 (Marshall and Tanner, 1969, 1970). A youth's chronological age is less relevant than their biological development and a cognitive level necessary to adequately assent to treatment. However, we do not accept new patients for treatment older than eighteen.

In the case of younger children who are not yet approaching puberty, guidance is often sought for gender related challenges, in which case we provide psycho-education, and offer referrals for families to receive supportive mental health counseling. These services may assist the youth in clarifying their gender identity, and help youth and families navigate the many anticipated and unanticipated issues they may confront, including whether or not to initiate a social transition (presenting in social settings as the affirmed gender). Children may experience anxiety and depression, often secondary to the social and familial ramifications of their gender questioning and/or atypical presentation, and a mental health professional with relevant expertise can be tremendously helpful.

When a child is seeking services closer to puberty, our current model typically recommends three to six months of psychotherapy. For some children who feel a compelling sense of urgency in light of impending physiological changes, this recommendation may be modified, especially when complicating factors are absent and the child is well supported. This aspect of the model reflects our recognition that many youth and/or parents seeking services in our clinic are in the early stages of gender exploration and consideration of medical intervention options, and need a safe forum in which to learn more about the issues involved, and treatment available. Further, we have found psychotherapy exceedingly helpful for treating co-occurring mental health issues and for exploring the child and/or adolescents' thought processes, family functioning, strengths and support systems. In addition, psychotherapy enables a deeper exploration of the child's Gender Dysphoria (GD), the range of gender expression and gender identity questioning, and whether the subjective experience fits more into a model of binary identity (e.g., male/female) versus a fluidity of gender and gender nonconformity. Mental health intervention can also support problem-solving regarding the medical and social challenges that lie ahead. It helps facilitate discussion between families and other support systems (schools, extended family, religious/sectarian community affiliates) as next steps are contemplated. Many authors also have noted the importance of mental health services (e.g., Bernal & Coolhart, 2011; Menvielle, 2012; Turek, 2011). Drescher & Byne (2012) emphasize that "the majority of adolescent persisters do well when they receive family and professional support for early interventions" (p. 504). Therefore, GeMS patients are asked to continue working with their outside mental health provider during the course of medical treatment in our clinic.

One of the purposes of the puberty blocking medical intervention (described below) is to buy time for the adolescent to continue exploring gender identity issues without the added stress of a puberty that is inconsistent with their self-identity. In our view, it is often

AR_284975

Tishelman et al.                                                                 Page 6

unrealistic to expect an adolescent to sort through the myriad of issues related to gender
variance without the help of a professional. Many of the challenges adolescents face regard
the reactions of others to their gender identity and/or expression, but can also include
gender-related questioning and confusion (see Cohen-Kettenis, Steensma & de Vries, 2011,
for an interesting discussion of psychological interventions for adolescents with GD).

**Psychological Evaluation**

The goals of evaluation, conducted by a licensed psychologist, are to further understand the
child and family's needs, and to inform medical treatment interventions. Before initiating
the evaluation, we typically request a letter from the child's outside community therapist
composed with the aid of a guide we provide. The therapist is asked to address their
understanding of the patient's gender identity history, including length of time the patient
has had gender questioning feelings, how long he/she has been living in the role of a
different gender (if at all), and how persistent his/her identification with a different gender
has been, if ever, over the course of time. The letter includes the therapist's impression of
the patient's supports, the therapist's perception of other mental health issues or
developmental concerns, and finally, the therapist's perception of benefits/drawbacks related
to medical intervention.

Assuming that the therapist's letter is generally supportive of medical intervention,
following review by our mental health clinicians, we move forward with an on-site
psychological evaluation. This evaluation consists of extensive interviews of youth and
families, and measures of anxiety, depression, self-concept, behavioral and social
functioning, autism spectrum disorder (ASD), and gender identity. With consent, outreach is
often made to collateral informants, and we review relevant documents (e.g.,
neuropsychological evaluations), as appropriate.

In the clinical interview, we address what the youth and parents hope to accomplish from the
evaluation, family and developmental history, school and academic history, mental health
and medical history, substance use, and trauma history. We gather an extensive gender
history including the youth's subjective experience of gender across time, gender
presentation, gender role expression, and sexual orientation. Considerable attention is paid
to factors that make these cases more complicated, such as patients presenting with features
of ASD, severe psychiatric concerns (e.g., suicidality, self-harming behaviors, psychosis,
violence and aggression, and history of abuse/trauma), and/or complicated family factors
(e.g., divorced parents, unsupportive family members). We assess support structures and
strengths, familial attitudes about non-traditional gender roles and sexual orientation
preferences, religious, cultural and ethnic background, and additional individual and family
stressors. The youth's age at first signs of GD or disclosures is always noted; families may
be caught off guard when their children first disclose gender questioning close to
adolescence or after the onset of puberty, and often the evaluations of these youth and
families are particularly complex.

Consistent with psychological evaluations in general, the rationale for numerous measures
and methods of information gathering is to obtain the most authentic and comprehensive
clinical picture possible. This is particularly critical, given that the results and clinical

AR_284976

formulation play the primary role in deciding whether to move forward with a potentially life-changing medical intervention for the adolescent. We synthesize and interpret the information obtained, and use the evaluation as a way to understand the youth and family's state of mind, ambivalences, and overt and covert pressures. We also want to ensure that, to the extent possible, a youth's cultural and social environment will support their chosen gender identity and provide a safety net as they move forward. A full clinical report is written that integrates the information, and provides a formulation and recommendations. The team psychologist then meets with the family to review this information. Medical interventions that often follow are either in the form of puberty blockers, and/or cross-sex hormone therapy, described below.

As noted above, continuing psychotherapy for youth is typically recommended by our protocol. At times we recommend family treatment and/or support groups to help with the family's adjustment to their child's transition. The GeMS team then remains in contact with community providers as clinical care dictates. In addition, youth treated in our program return for regular clinic visits, meeting with both mental health and medical team members, in order to provide continuity of care and further assist adolescents and family members as needed.

**Medical Intervention**

Medical intervention with transgender youth in GeMS occurs under the auspices of a subdivision within the Endocrine Department. In brief, as alluded to above, with children who have recently begun puberty, puberty-blocking hormones are often prescribed. These are administered in the form of subcutaneous implants in the upper arm, which last two to three years, or monthly injections. These treatments are not routinely covered by health insurance in the United States and may range in cost from $120 to over $1,000 per month. Other medical services, laboratory tests, and sometimes cross-sex hormones may be covered by insurance.

In the absence of pubertal blockers, biological males with affirmed female identities may experience significant growth, permanent facial hair and vocal changes, and intolerable erections. A voice that has deepened cannot be raised through hormone therapy, and requires difficult and expensive speech therapy, in order to affect a higher voice. Similarly, without such intervention, biological females who identify as male may experience menstruation and breast development; the latter can only be modified through surgery. Nevertheless, an adolescent who has initiated puberty blockers can decide to terminate the intervention and allow physiological changes to occur as they would have, had the medical intervention never been initiated.

Only with an older adolescent, typically around age sixteen, are irreversible interventions initiated, and only after psychotherapy and a careful psychological evaluation has taken place. In this way, we try to ensure that an adolescent is not ambivalent, and that these interventions are well thought through and understood without coercion from others, and with full consent. When these conditions are met, an adolescent may be placed on cross-sex hormones (estrogen for genetic males and testosterone for genetic females), to facilitate a more complete transition into that individual's affirmed gender. When natal puberty has

*Prof Psychol Res Pr*. Author manuscript; available in PMC 2016 January 20.

AR_284977

been previously blocked, the cross-sex hormones are even more effective in rendering a more gender consonant, "typical" presentation. For male-to-female (MTF) patients, treating with pubertal suppression in early puberty followed by estrogen in later adolescence causes enhanced breast development, vocal quality consistent with the affirmed gender, no development of a protruding larynx or "Adam's Apple", absence of male-typical facial or body hair, and diminished masculinization of the body frame and facial bones. For female-to-male (FTM) patients, pubertal suppression in early puberty followed by treatment with testosterone later in adolescence leads to development of facial and body hair, deepening of the voice, masculinization of the body frame and facial bones, no need for mastectomies, and no menarche (see Delmarre-van de Waal & Cohen-Kettenis, 2006 and Shumer & Spack, 2013 for further information).

A common scenario is for GeMS to recommend puberty blockers, when the youth and/or the parent may feel that it would be best to start cross-sex hormone therapy instead. The delay of puberty, rather than the immediate onset of the puberty of choice (utilizing cross-sex hormones) is sometimes difficult for the youth or family to accept. This is an area where we currently have little research to guide us, and the decision of whether to block puberty, or instead move forward with an affirmed gender (i.e., cross–sex hormones) must be weighed carefully. Aside from the irreversible nature of cross-sex hormone initiation, this intervention has significant ramifications for fertility, while puberty blockers do not (Lazar, L, Meyerovitch,, de Vries,, Phillip & Lebanthal, 2014).

Anecdotally, we have found that the GeMS evaluation has been invaluable by providing information to guide subsequent psychosocial and medical decision-making. In general, adolescence is marked by a search for identity and personal transformation, and at times impetuous decision-making. Given the implications of social transition and medical intervention, coupled with the developmental challenges of identity consolidation, we feel the need to progress with care and forethought, to ensure that all interventions proceed safely, to minimize medical and psychosocial contraindications or complications, and to make sure it is the appropriate timeframe for intervention. We also want to ensure that the child/adolescent who may be gender variant does not feel compelled to choose a gender (male/female), when in actuality they may not fit into a typically recognized gender identity. Nevertheless, these considerations always need to be balanced by the very real physiological ticking clock, especially for the younger child on the verge of a puberty that they deeply want to avoid.

## Challenges and Dilemmas of Psychosocial Practice

### Child and Family Expectations

When confronted by a gender variant child, a parent may be caught very much off guard, with no ability to rehearse the best response to such an unanticipated circumstance. In addition, for a parent, it may feel like a loss of the daughter or son to whom they became so bonded. Moreover, some families are aware of their child's GD in early childhood while others are surprised to learn about it when their child is in their teens. Both instances carry particular emotional impact for families. Many parents are resilient and loving in the face of these challenges, but may experience an understandable drive for rapid certainty and

AR_284978

solutions. We have also encountered parents who are resistant to accepting this diagnostic picture, and believe their child's gender variance is a phase, or a manifestation of some other psychological issue that can be resolved, thus resolving the gender variance. Unfortunately, the problems and issues that often exist for gender variant children and their families are nuanced and indeterminate, and the resolutions may evolve through a time consuming process without a known end. This can add to the stress and consequent pressure to "solve" the issues (see Bernal & Coolhart, 2012, Dreger, 2009, Menvielle, 2012 and Turek, 2011 for further discussion of family issues).

It can be particularly challenging when two parents or guardians with legal custody are in dissent about how to proceed, especially in contentious divorce situations when communication is minimal or hostile, yet medical consensus needs to be reached. Typically, our program requires consent of both parents before medical treatment can go forward and mental health and/or medical clinicians may need to be proactive in trying to resolve disputes with sensitivity.

## Psychosocial Considerations

Any number of psychological, social and cultural factors can impinge upon youth and their family, and influence decision-making, expectations and emotional reactions. The Report of the APA Task Force on Gender Identity and Gender Variance (2009) summarizes some of these factors, including general behavior problems, peer related problems and other mental health issues. Below we outline some of the common issues we have encountered in our work.

Not infrequently, children and adolescents are involved in meaningful activities, which will be likely impacted by a gender transition. Prominent among these are youth sports teams, which are typically grouped by gender. Adolescents are often loath to lose these areas of gratification, along with the opportunity for social bonding. Other hobbies and interests that are often impacted include dancing, theatre, cheer leading and sleep-away camp, and children and families may be unable to forecast how they will weather these transitions. Therefore, a child may face the dilemma of losing the opportunity to sustain an ability or talent they value in order to live in a gender they embrace.

A youth's environment and culture is essential to consider when evaluating treatment options. Ideally, the family and community should provide every child safety, love and solace, and the support a gender questioning child and/or adolescent needs (as any youth does) to thrive into a healthy maturity. However, such youth often struggle for acceptance within their families and communities. We know from prior research (Dean, et al., 2000; Fitzpatrick, Jones, & Schmidt, 2005; Gibson & Catlin, 2011; Grossman & D'Augelli, 2007; Hass, et. al., 2010; Spack et al., 2012) that many children with GD become deeply anxious and depressed, and resort to suicide attempts. Others are at risk of leaving home and living a life with high costs and risks, including of exploitation, abuse, and as victims of violence, while obtaining hormones illicitly without the oversight of a qualified medical professional.

Even when families and children seek professional service and care, external factors beyond their control can impede access. Many geographic areas still lack basic services for children

AR_284979

with GD, and traveling for access to medical care is not always an option for families living within modest means. Furthermore, schools and religious institutions vary in level of comfort dealing with transgender children, and may not have the understanding or training to navigate the complexities of their transgender student or member's needs. Learning to deal with social issues such as bullying and isolation, and practical issues such as bathroom and locker use, requires open and honest dialogue with experts familiar with gender issues; not all communities are able or willing to avail themselves to this kind of discussion.

One positive outgrowth of the Internet and widespread coverage of transgender issues is mainstream access to information about gender variance and dysphoria. Families can become much less isolated by accessing on-line social networks and organizations such as Parents, Families, and Friends of Lesbians and Gays (PFLAG), even when there is not a chapter in their vicinity. However, the increased availability of differing professional standards and practices can sometimes also confuse families, who may specifically seek out professionals who seem open to providing services desired by the patient or parents, even if they are inconsistent with typical practice standards. This could result in circumventing the input of mental health professionals, or providing irreversible intervention for a young or ambivalent child.

**Mental health**

Sadly, we know that transgender youth are at risk for anxiety, depression, self-harm, suicidal ideation, psychiatric hospitalizations, homelessness, exploitation, and abuse (Dean, et al., 2000; Fitzpatrick, Jones, & Schmidt, 2005; Gibson & Catlin, 2011; Grossman & D'Augelli, 2007; Hass, et. al., 2010Grossman & D'Augelli, 2007; Spack et al., 2012). In addition, the spectrum of issues that can present in any child or adolescent can present in gender variant youth, including history of trauma, oppositional defiant disorder/conduct disorder, and learning disabilities. These youth may do poorly in school, and/or have difficulty with socializing, and negotiating the normal developmental challenges of adolescence. Optimally, a pubescent child and adolescent should be stable, safe, and supported in advance of receiving medical interventions such as puberty blockers or cross-sex hormones. Yet, for many, medical intervention is an antidote for some of their mental health problems. This poses a dilemma for the clinician, who may be averse to going forward with medical intervention, but feel compelled to do so in case that is the critical step needed to jump start a child's recovery. Such intervention should only take place once the crisis of active suicidal ideation, behavior and/or self-harm has receded, and following a full psychosocial evaluation if it had not taken place already, as well as with close monitoring to ensure that the child is safe and that the dangers continue to remit. Delays can be particularly difficult and contribute to a child's distress because of the limited physiological time frame. At the very least, psychological services should help to ensure adequate support systems before any medical intervention occurs, and puberty blockers can buy time and allow for a child to make thoughtful decisions about his or her gender.

Finally, there appears to be a higher than expected incidence of co-occurring GD with ASDs based on clinical experience as well as research, although more empirical study needs to be completed (e.g. deVries, Noens, Cohen-Kettenis, van Berckelaer-Onnes, & Doreleijers,

2010; Drescher, 2012; Spack et al, 2012). Very often adolescents on the autism spectrum know they are different from peers, but have only recently identified gender identity as a factor contributing to this divergence. Sometimes they and their families believe that a gender transition will solve all problems, and/or latch on to gender as the sole reason they are unlike their peers. Similarly, parents may believe that the GD is a manifestation of the ASD, and resist treatment. Parents of youth on the autism spectrum may be concerned that their child's intense focus on gender is a fleeting concern, particularly if their child has a history of transitory preoccupations. When children with an ASD are evaluated, it is often more difficult to discern the degree of gender variance given the relatively concrete and binary thought processes and communication patterns that typify this population. A child with an ASD already has challenges in social realms and is faced with an additional unique and complex set of social circumstances. A comprehensive evaluation should help sort through these issues and it may be necessary to move forward cautiously. However, it is our opinion that treatment not be withheld indefinitely as these youth experience the same biological time constraints characteristic of all pubescent individuals, and therefore need to receive optimally timed interventions to the extent possible.

## Service Gaps and Evolution of Practice

Watching clinical services grow is rewarding, especially when they translate into more contented and peaceful lives for youth and their families. Nevertheless, evidence-based practices are aspirational when a new field emerges with no guiding clinical precedent. Controversies among providers in the mental health and medical fields are abundant. Drescher & Byne (2012) and Stein (2012) provide excellent discussions of issues of consensus versus continued controversies. These include differing assumptions regarding whether early intervention with gender variant youth can encourage desistance, and whether that is an appropriate practice. Other areas of debate include the age at which children (or adolescents) should be encouraged or permitted to socially transition; whether cross-sex hormones and surgery should be offered to youth, and if so, at what age; whether parental consent be required for these medical interventions; and whether mental health involvement be required, including psychological evaluation, prior to each stage of medical intervention. These issues are complex and providers in the field continue to be at odds in their efforts to work in the best interest of the youth they serve. Addressing each of these controversies goes beyond the scope of this paper; however, the GeMS team continues to stay abreast of these issues and actively participates in ongoing discussion and research (see Schwartz, D., 2012; Ehrensaft, D., Minter, S.P., 2012; Zucker, K.J., Wood, H., Singh, D., & Bradley, S.J., 2012; and Shwartz, D., 2012 for discussions of some of the issues and differing viewpoints).

An important priority going forward is to develop research to enhance our understanding of what typifies this population of children, and their developmental course and patterns, and to examine the long-term outcomes of treatment. The field needs to better comprehend which children are most likely to have a life-long and persistent identification with a different gender than the one they were assigned versus those who cease to self-identify as transgender over the course of time. Although some information is available (e.g., American Psychiatric Association, 2013; Steensma, McGuire, Kreukels, Beekman, & Cohen-Kettenis, 2013; Zucker, Wood, Singh, & Bradley, 2012) much more research in this area is needed.

AR_284981

Other high priority areas for systematic examination include the effects and side effects of various medical interventions, especially given that they are initiated with youth who may be on a lifetime course of hormone treatment, and psychosocial outcomes for youth who receive medical intervention during adolescence.

Finally, we can only report on children with access to services; youth may not have access because of geography and lack of availability, lack of financial means, and/or because of social structures that do not support them. As noted earlier, these children are at risk to be exploited, to be runaways, street youth and sex workers, and to self-medicate and self-harm. Prevention and outreach, to shelter at-risk youth from damaging and avoidable traumas, and to improve access to mental health services, should be one of the highest priorities for health care providers.

## Clinical Case-Composites

**The following represent composites, not actual cases, to serve as examples of how GeMS has addressed common clinical scenarios**

### Case Scenario # 1: Early Puberty

**Referral Information:** M. is a 10 year old Black natal female who identifies as male. He and his parents came to the clinic stating a desire to initiate puberty blockers to avoid feminizing.

**History:** Although only 10, M's pediatrician had put his pubertal development as Tanner Stage 2 (pubertal), and he was developing breasts. He had been living as a boy at school and elsewhere for two years, and was quite concerned that his pubertal changes might alert others to his natal gender, and was very also very assertive about his desire to avoid the onset of menstruation. He had been in therapy for two years, and was also being treated by a psychiatrist for anxiety symptoms. His therapist had written a letter in support of M living in his affirmed gender.

**Psychological Evaluation:** The formal psychological evaluation indicated that M had a longstanding identification as male, which emerged in his early preschool years, as well as ongoing GD, which predominantly took the form of anxiety. His anxiety diminished, according to him and his family, as well as his therapist and psychiatrist, as he transitioned socially and began to live and be treated as a male at home and at school. Information from school revealed that he was viewed as normal and high functioning in all areas. As an example of a response to gender-related questions, M stated that he was not a transgender boy, but just a regular boy. M did report significant anxieties related to social situations, as well as to bathing and bathroom situations. M resides with two biological parents who were both supportive and in accord with pursuing medical treatment, although they reported that it initially had been difficult for them to accept his social transition.

**Recommendations:** Given his long-standing history of GD, positive adjustment at school, the consistency of data obtained from the his psychiatrist, psychologist, both parents and himself, the GeMS team recommended puberty blockers as well as continued psychological treatment to help diminish his anxiety and problem-solve social situations as they may arise.

Author Manuscript

AR_284982

Continuing follow-up with the GeMS psychologist indicated that his anxiety diminished as his impending puberty was forestalled, with strong acceptance for his affirmed gender from his family and others.

## 2. Case Scenario # 2: Parent: Adolescent Conflict

**Referral Information:** E. is a 17 year old Hispanic natal male who came to the clinic with her parents, who immigrated to the United States soon after E's birth. E was hoping to be able to be treated with puberty blockers and female hormones, while her parents were unified in believing that psychotherapy could resolve her GD, and were hoping to have this confirmed by a psychological evaluation.

**History:** E's parents were invested in her remaining male, partially due to the elevation of male status in their traditional culture. Reportedly, E. had been interested in receiving care for her gender dysphoria for several years prior to the current appointment, to avoid the onset of pubertal changes she was already experiencing. However, her parents had been resistant. She had been in therapy with a psychologist for many years, and her therapist was instrumental in helping to persuade her parents to bring her to the clinic.

**Psychological Evaluation:** The evaluation revealed that E had identified as female since the age of 5, including using female pronouns, attempting to wear female underwear, playing with traditionally female toys, and identifying with female characters during pretend play. At present, E wore female clothing and had grown her hair, but appeared androgynous due to a deep voice and some light facial hair. She was generally assumed to be male at school and elsewhere, although her closest friends used her female name and pronouns at her request. The psychological evaluation revealed a strong cross-sex identification as female, and mild depression.

**Recommendation:** Puberty blockers were recommended, with possible cross-sex hormones in about six months. The psychologist spent considerable time with E's parents and with E, reviewing the results of the evaluation, and the basis for the recommendations. E's parents were distressed during discussion to learn that there was some urgency to proceed quickly, believing incorrectly that medical intervention could reverse pubertal changes. The treatment recommendations also included family therapy, to facilitate positive communication within the family and provide support and psycho-education for E's parents. We also recommended a continuation of psychotherapy for E., to help her adjust to personal and social changes, provide support, and to help her cope with family discord. E. continues to be seen by the psychologist in our clinic for consultation, and is adjusting well to the initiation of hormone treatment.

## Case # 3. Ambivalence and Mental Health Complexity

**Referral Information:** L. is a 16 year old White European American natal female who presents as male, and has chosen a male name and male pronouns. He has been in therapy since the age of 8, and was initially evaluated and put on pubertal blockers in our clinic at age 13. His mother called the clinic requesting that L. be considered for cross-sex hormones.

AR_284983

L. was not seen for a full evaluation as he is an ongoing patient in our service, but for a screening related to his mother's request that cross-sex hormonal treatment be initiated.

**History:** L. was adopted at the age of 1, and his early history is not known. He has been diagnosed with depression, anxiety, and Conduct Disorder. He has a history of self-harm related to depression, academic pressure, and of being bullied in school. His social, academic, and emotional functioning tends to be poor, and he is emotionally and behaviorally dysregulated, with periods of rage at school and at home, and some known drug use. He was recently suspended at school for cheating and for provoking physical altercations. His mother believes that cross-sex hormones would alleviate his distress and dysregulation,

**Psychological Screening:** L's therapist, when contacted with the family's consent, indicated that L. appears ambivalent about his affirmed gender, and therefore did not believe that cross-sex hormones should be initiated. Other aspects of our evaluation also suggested ambivalence on L's part. Although he ultimately agreed with his mother that he should start testosterone, he began the evaluation by suggesting it was "too early" to start them. In addition L. reported that he binds his breasts on occasion (1 × per week) to present convincingly as male, but mostly does not, and that he has been involved in an ongoing heterosexual romantic relationship as a male. He stated that this relationship has been very gratifying, and indicated concern about losing his girlfriend when he started testosterone. Although he stated that he wants to be viewed as male, L also stated that he did not look forward to the changes that testosterone would cause.

**Recommendations:** Given that L was initially resistant to the initiation of cross-sex hormones, and that his mother initiated the consultation, along with L's ambivalence about the changes that testosterone would precipitate, cross-sex hormones were not recommended at this juncture. Instead, we recommended that L. continue to sort out his desires in his therapy relationship, while also addressing some of his other concerning behavioral and mental health issues. We also recommended family therapy, as it appeared that parental anxieties and pressures may have been impacting L's choices. We agreed to consult with L and his family again in 3 to 6 months.

**Case #4.: Autistic Spectrum Disorder**

**Referral Information:** B. is a 12 year old White European American natal male, Tanner stage 1, who has been increasingly presenting as female for approximately six months to one year. She and her parents presented in our clinic seeking an evaluation and recommendations for treatment.

**History:** B. was diagnosed with high functioning ASD at the age of 7, after experiencing social difficulties for several years. Although intellectually bright, B. has not done well in school. B. spends much of her spare time on the computer, investigating various subjects and reporting the details to her parents. Her parents worry about her poor academic progress and her socialization, and she has been in treatment since her initial diagnosis. B. disclosed

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

that she was a girl to her therapist and her parents 6 months earlier, after increasing depression and suicidal feelings.

**Psychological Evaluation:** The evaluation revealed that B. strongly identified as female. B. stated that this feeling had begun within the past year at the start of the school year. Her parents indicated that they would support her if she were truly transgender, but expressed concern that B. may be unhappy socially and using a transgender diagnosis as a means to attempt to resolve her social isolation, and as a result of self-hatred. They also expressed concern that B.'s identification as female is a passing phase, similar to other passing phases/obsessions she experienced throughout her life, rather than an enduring identification, and that B had limited understanding of the impact of changing genders. B.'s therapist was unsure of whether B. should be treated with hormones yet, expressing similar concerns to her parents. School reports indicated that B. was sometimes taunted by peers, apathetic about schoolwork, often inattentive, and increasingly isolated. All data consistently indicated depression and anxiety.

**Recommendations:** Because of the complexities of B.'s situation, including a relatively recent identification as female, and limited social understanding, we recommended continued psychotherapy and monitoring of her GD, with treatment addressing her depression and anxiety, without immediate medical intervention. We also recommended that her therapist consult with her school to problem-solve solutions to isolation and bullying, and interventions to increase gratifying activities for B. outside the home. We recommended a psychiatric consultation for possible psychopharmacological intervention as well, and a return visit in 3 months to monitor B's progress and her gender identification in light of the new interventions.

## Supplementary Material

Refer to Web version on PubMed Central for supplementary material.

## References

American Academy of Child and Adolescent Psychiatry. Practice parameters on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. Journal of the American Academy of Child and Adolescent Psychiatry. 2012; 51 (9): 957–974. [PubMed: 22917211]

American Counseling Association Competencies for Counseling with Transgender Clients. Journal of LGBT Issues in Counseling. 2010; 4 (3–4):135–159.

American Psychiatric Association. Diagnostic and statistical manual of mental disorders. 4. Washington, DC: Author; 2000. Text Revision

American Psychiatric Association. Diagnostic and statistical manual of mental Disorders. 5. Washington, DC: Author; 2013.

American Psychological Association, Task Force on Gender Identity and Gender Variance. Report of the Task Force on Gender Identity and Gender Variance. Washington, DC: Author; 2009.

Bernal AT, Coolhart D. Treatment and ethical considerations with transgender children and youth in family therapy. Journal of Family Psychotherapy. 2012; 23 (4):287–303.

Cohen-Kettenis PT, Steensma TD, de Vries AL. Treatment of adolescents with GD in the Netherlands. Child and Adolescent Psychiatric Clinics of North America. 2011; 20:689–700. [PubMed: 22051006]

AR_284985

Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Fedlman J, Zucker K. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. International Journal of Transgenderism. 2011; 13:165–232.

Dean L, Meyer IH, Robinson K, Sell RL, Sember R, Silenzio VMB, Xavier J. Lesbian, gay, bisexual, and transgender health: Findings and concerns. Journal of the Gay and Lesbian Medical Association. 2000; 4(3):102–151.

Delmarre-van de Waal HA, Cohen-Kettenis PT. Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. European Journal of Endocrinology. 2006; 155:131–137. [PubMed: 16793959]

deVries AL, Cohen-Kettenis PT. Clinical management of gender dysphora in children and adolescents: The Dutch approach. Journal of Homosexuality. 2012; 59 (3):301–320. [PubMed: 22455322]

deVries AL, Noens IL, Cohen-Kettenis PT, van Berckelaer-Onnes IA, Doreleijers TA. Asperger Spectrum Disorders in Gender Dysphoric Children and Adolescents. Journal of Autism and Developmental Disorders. 2010; 40(8):930–6. [PubMed: 20094764]

deVries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppresssion in adolescents with Gender Identity Disorder: A prospective follow-up study. The Journal of Sexual Medicine. 2011; 8(8):2276–83. [PubMed: 20646177]

Dreger A. Gender identity disorder in childhood: Inconclusive advice to parents. Hastings Center Report. 2009; 39:26–29. [PubMed: 19213192]

Drescher J, Byne W. Gender Dysphoric/Gender Variant (GD/GV) children and adolescents: Summarizing what we know and what we have left to learn. Journal of Homosexuality. 2012; 59 (3):501–510. [PubMed: 22455333]

Ehrensaft D. Raising girlyboys: A parent's perspective. Studies in Gender and Sexuality. 2007; 8:269–302.

Ehrensaft D. From gender identity disorder to gender identity creativity: true gender self child therapy. Journal of Homosexuality. 2012; 59:337–356. [PubMed: 22455324]

Fitzpatrick KK, Euton SJ, Jones JN, Schmidt NB. Gender role, sexual orientation, and suicide risk. Journal of Affective Disorders. 2005; 87(1):35–42. [PubMed: 15893824]

Gibson B, Catlin AJ. Care of the child with the desire to change gender-part I. Urologic Nursing. 2011; 31(4):222–9. [PubMed: 21913596]

Grossman AH, D'Augelli AR. Transgender youth and life-threatening behaviors. Suicide and Life-Threatening Behavior. 2007; 37(5):527–537. [PubMed: 17967119]

Haas AP, Eliason M, Mays VM, Mathy RM, Cochran SD, D'Augelli, Clayton PJ. Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations. Journal of Homosexuality. 2010; 58(1):10–51. [PubMed: 21213174]

Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ III, Spack NP, Montori VM. Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. Journal of Clinical Endocrinology Metabolism. 2009; 94(9):3132–3154. [PubMed: 19509099]

Hidalgo MA, Ehrensaft D, Tishelman AC, Clark L, Garafalo R, Rosenthal SM, Spack NP, Olson J. The gender affirmative model: What we know and what we aim to learn. Human Development. 2013; 56:285–290.

Houk CP, Hughes IA, Ahmed SF, Lee PA. Summary of consensus statement on intersex disorders and their management. Pediatrics. 2006; 118 (2):753–757. http://www.apa.org/topics/sexuality/transgender.pdf. [PubMed: 16882833]

Kulick D. Transgender and language. GLQ: A Journal of Lesbian & Gay Studies. 1999; 4:604–623.

Lazar L, Meyerovitch J, de Vries L, Phillip M, Lebanthal Y. Treated and untreated women with idiopathic precocious puberty: long-term follow-up and reproductive outcome between the third and fifth decades. Clinical Endocrinologyy. 2014; 80 (4):570–576.

Malpas J. Between pink and blue: A multi-dimensional family approach to gender nonconforming children and their families. Family Process. 2011; 50 (4):453–470. [PubMed: 22145719]

Marshall WA, Tanner JM. Variations in pattern of pubertal changes in girls. Archives of Disease in Childhood. 1969; 44:291–303. [PubMed: 5785179]

AR_284986

Marshall WA, Tanner JM. Variations in the pattern of pubertal changes in boys. Archives of Disease in Childhood. 1970; 45:13–23. [PubMed: 5440182]

Menvielle E. A comprehensive program for children and gender variant behaviors and gender identity disorders. Journal of Homosexuality. 2012; 59:357–368. [PubMed: 22455325]

Minter SP. Supporting transgender children: New legal, social, and medical approaches. Journal of Homosexuality. 2012; 59(3):422–433. [PubMed: 22455328]

Schwartz D. Listening to children imagining gender. Journal of Homosexuality. 2012; 59(3):460–479. [PubMed: 22455331]

Shumer DE, Spack NP. Current management of gender identity disorder in childhood and adolescence: Guidelines, barriers and areas of controversy. Current Opinion in Endocrinology, Diabetes, & Obesity. 2013; 20 (1):69–73.

Society for Adolescent Health and Medicine. Recommendations for promoting the health and well-being of Lesbian, Gay, Bisexual and transgender Adolescents: A position paper of the Society for Adolescent Health and Medicine. Journal of Adolescent Health. 2013; 52:506–510. [PubMed: 23521897]

Spack NP, Edwards-Leeper L, Feldman HA, Leibowitz S, Mandel F, Diamond DA, Vance SR. Children and adolescents with Gender Identity Disorder referred to a pediatric medical center. Pediatrics. 2012; 129:418–425.10.1542/peds.2011-0907 [PubMed: 22351896]

Steensma TD, McGuire JK, Kreukels BPC, Beekman AJ, Cohen-Kettenis PT. Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. Journal of the American Academy of Child & Adolescent Psychiatry. 2013; 52 (6):582–590. [PubMed: 23702447]

Stein D. Commentary of the treatment of gender variant and gender dysphoric children and adolescents: Common themes and ethical reflections. Journal of Homosexuality. 2012; 59:480–500. [PubMed: 22455332]

Turek C. Considerations for affirming gender nonconforming boys and their families: New approaches, new challenges. Child and Adolescent Psychiatric Clinics of North America. 2011; 20:767–777. [PubMed: 22051012]

Wallien MS, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. Journal of the American Academy of Child and Adolescent Psychiatry. 2008; 47:1413–1423. [PubMed: 18981931]

Zucker KJ, Wood H, Singh D, Bradley SJ. A developmental, biopsychosocial model for the treatment of children with Gender Identity Disorder. Journal of Homosexuality. 2012; 59 (3):369–397. [PubMed: 22455326]

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

AR_284987



United States Government Accountability Office

Report to the Chairman,
Committee on Education and Labor,
House of Representatives

November 2021

# K-12 EDUCATION

# Students' Experiences with Bullying, Hate Speech, Hate Crimes, and Victimization in Schools



A Century of Non-Partisan Fact-Based Work

AR_285044

# GAO@100
# Highlights

Highlights of GAO-22-104341, a report to the Chairman, Committee on Education and Labor, House of Representatives

November 2021

# K-12 EDUCATION

## Students' Experiences with Bullying, Hate Speech, Hate Crimes, and Victimization in Schools

## Why GAO Did This Study

Hostile behaviors, including bullying, harassment, hate speech and hate crimes, or other types of victimization like sexual assault and rape, in schools can negatively affect K-12 students' short- and long-term mental health, education, income, and overall well-being. According to Education's guidance, incidents of harassment or hate, when motivated by race, color, national origin, sex (including sexual orientation and gender identity), or disability status can impede access to an equal education. In certain circumstances, these kinds of incidents may violate certain federal civil rights laws, which Education's OCR is tasked with enforcing in K-12 schools.

GAO was asked to review hostile behaviors in K-12 schools. This report examines (1) the prevalence and nature of hostile behaviors in K-12 public schools; (2) the presence of K-12 school programs and practices to address hostile behaviors; and (3) how Education has addressed complaints related to these issues in school years 2010-11 through 2019-20.

GAO conducted descriptive and regression analyses on the most recent available data for two nationally generalizable federal surveys: a survey of 12- to 18-year-old students for school years 2014-15, 2016-17, and 2018-19, and a survey of schools for school years 2015-16 and 2017-18. GAO also analyzed 10 years of civil rights complaints filed with OCR against schools; reviewed relevant federal laws, regulations, and documents; and interviewed relevant federal and national education and civil rights organization officials. GAO incorporated technical comments from Education as appropriate.

View GAO-22-104341. For more information, contact Jacqueline M. Nowicki at (617) 788-0580 or nowickij@gao.gov.

## What GAO Found

Students experience a range of hostile behaviors at schools nationwide, according to GAO's analysis of nationally generalizable surveys of students and schools. About one in five students aged 12 to 18 were bullied annually in school years 2014-15, 2016-17, and 2018-19. Of students who were bullied in school year 2018-19, about one in four students experienced bullying related to their race, national origin, religion, disability, gender, or sexual orientation. About one in four of all students aged 12 to 18 saw hate words or symbols written in their schools, such as homophobic slurs and references to lynching. Most hostile behaviors also increased in school year 2017-18, according to our analysis of the school survey. Hate crimes—which most commonly targeted students because of their race and national origin—and physical attacks with a weapon nearly doubled (see figure). Sexual assaults also increased during the same period.

**Hostile Behaviors in K-12 Public Schools, School Years 2015-16 to 2017-18**



**Estimated percentage increase of incidents in K-12 public schools**

├─────────┤ Error bars display 95 percent confidence interval for estimates

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Nearly every school used programs or practices to address hostile behaviors, and schools' adoption of them increased from school year 2015-16 to 2017-18, according to our analysis of the school survey. About 18,000 more schools implemented social emotional learning and about 1,200 more used in-school suspensions. Additionally, 2,000 more schools used school resource officers (SRO)—career officers with the ability to arrest students—in school year 2017-18. SROs' involvement in schools, such as solving problems, also increased.

The Department of Education resolved complaints of hostile behaviors faster in recent years, due in part to more complaints being dismissed and fewer complaints being filed. In the 2019-20 school year, 81 percent of such resolved complaints were dismissed, most commonly because Education's Office for Civil Rights (OCR) did not receive consent to disclose the complainant's identity to those they filed the complaint against. Complaints of hostile behaviors filed with OCR declined by 9 percent and 15 percent, respectively, in school years 2018-19 and 2019-20. Civil rights experts GAO interviewed said that in recent years they became reluctant to file complaints on students' behalf because they lost confidence in OCR's ability to address civil rights violations in schools. The experts cited, in part, Education's rescission of guidance to schools that clarified civil rights protections, such as those for transgender students. Since 2021, Education has started reviewing or has reinterpreted some of this guidance.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 6 |
| | Students Experience a Range of Hostile Behaviors at Schools Nationwide | 14 |
| | Nearly Every School Has Used Programs or Practices to Address Hostile Behaviors | 26 |
| | Recently, Education Resolved Complaints of Hostile Behaviors Faster, Due in Part to More Dismissals and Fewer Complaints Filed | 41 |
| | Agency Comments | 52 |
| Appendix I | Objective, Scope, and Methodology | 53 |
| Appendix II | Regression Analysis | 59 |
| Appendix III | GAO Contact and Staff Acknowledgments | 84 |
| Tables | | |
| | Table 1: Selected Department of Education Documents and Resources on Addressing Discrimination, Including Harassment | 11 |
| | Table 2: Estimated Number of Hate Crimes in K-12 Public Schools, School Years 2015-2016 to 2017-2018 | 22 |
| | Table 3: Estimated Percentage of K-12 Public Schools with School Resource Officers (SRO) That Had Agreements on Roles and Responsibilities, School Years 2015-2016 to 2017-2018 | 40 |
| | Table 4: Average Number of Days to Resolve Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights (OCR) by Resolution Type, School Years 2010-2011 to 2019-2020 | 44 |

AR_285046

Table 5: Variables Included in GAO's Regression Model on the
Department of Education's School Crime Supplement
(SCS) to the Department of Justice's National Crime
Victimization Survey, School Years 2014-2015, 2016-
2017, and 2018-2019                                        61
Table 6: Associations of Regression Model Variables with Bullying
based on the Department of Education's School Crime
Supplement to the Department of Justice's National Crime
Victimization Survey, School Years 2014-2015, 2016-
2017, and 2018-2019                                        63
Table 7: Created Variables Used in the Regression Analysis of the
Department of Education's School Survey on Crime and
Safety (SSOCS), School Years 2015-2016 and 2017-
2018                                                       69
Table 8: Variables Included in Our Regression Models Using the
Department of Education's School Survey on Crime and
Safety (SSOCS), School Years 2016-2017 and 2017-
2018                                                       76
Table 9: Associations of Multinomial Logistic Regression Model
Variables based on the Department of Education's School
Survey on Crime and Safety, School Years 2015-2016
and 2017-2018                                              78
Table 10: Associations of Poisson and Binary Logistic Regression
Model Variables for the Department of Education's School
Survey on Crime and Safety, School Years 2015-2016
and 2017-2018                                              81

Figures

Figure 1: Estimated Percentage of Students Who Were Bullied, by
Presence or Availability of Alcohol, Drugs, Weapons, and
Gangs in Their Schools, School Year 2018-2019             16
Figure 2: Estimated Percentage of Students Experiencing Bullying
Related to Identity in K-12 Public Schools, School Years
2014-2015, 2016-2017, and 2018-2019                        18
Figure 3: Estimated Percentage of Students Targeted by a Hate-
Related Word in K-12 Public Schools, by Identity, School
Years 2014-2015, 2016-2017, and 2018-2019                 20
Figure 4: Estimated Number of K-12 Public Schools Where at
Least One Hate Crime Occurred by Student Identities
Targeted, School Years 2015-2016 and 2017-2018            22
Figure 5: Example of K-12 Public School Response to Hate        23

AR_285047

Figure 6: Estimated Number of Rapes or Attempted Rapes and Sexual Assaults in K-12 Public Schools, School Years 2015-2016 to 2017-2018 — 24

Figure 7: Estimated Number of Physical Attacks with Weapons and Threats of Attack with Weapons in K-12 Public Schools, School Years 2015-2016 to 2017-2018 — 25

Figure 8: Estimated Number of Physical Attacks without Weapons in K-12 Public Schools, School Years 2015-2016 to 2017-2018 — 26

Figure 9: Estimated Percentage of K-12 Public Schools with Student Programs to Address Hostile Behaviors and Promote School Safety, School Years 2015-2016 and 2017-2018 — 28

Figure 10: Estimated Percentage of K-12 Public Schools with Diversity Groups, School Years 2015-2016 and 2017-2018 — 30

Figure 11: Estimated Percentage of K-12 Public Schools Offering Training to Teachers, Staff, and Parents to Address Hostile Behaviors and Promote School Safety, School Years 2015-2016 and 2017-2018 — 31

Figure 12: Estimated Percentage of K-12 Public Schools with Available Mental Health Services, School Year 2017-2018 — 33

Figure 13: Estimated Percentage of Disciplinary Actions Most Commonly Available and Used to Address Issues in K-12 Public Schools, School Years 2015-2016 and 2017-2018 — 34

Figure 14: Security Mechanisms Most Commonly Used to Maintain Safety in K-12 Public Schools Increased, School Years 2015-2016 and 2017-2018 — 36

Figure 15: Examples of Security Mechanisms in K-12 Public Schools — 37

Figure 16: School Resource Officers' (SRO) Most Common Activities (Estimated), School Years 2015-2016 and 2017-2018 — 39

Figure 17: Average Resolution Time (days) of Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020 — 42

Figure 18: Department of Education's Office for Civil Rights' (OCR) Complaint Processing Procedures and Resolution Types — 43

AR_285048

Figure 19: Percentage of Resolved Complaints of Hostile Behaviors in K-12 Schools Filed with Education's Office for Civil Rights, by Resolution Type, School Years 2010-2011 to 2019-2020                46

Figure 20: Five Most Common Reasons for Dismissals of Complaints of Hostile Behaviors in K-12 Schools by Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020                47

Figure 21: Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020                49

AR_285049

## Abbreviations

| | |
|---|---|
| Education | U.S. Department of Education |
| Health and Human Services | U.S. Department of Health and Human Services |
| Justice | U.S. Department of Justice |
| OCR | Education Office for Civil Rights |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SCS | School Crime Supplement to the National Crime Victimization Survey |
| Section 504 | Section 504 of the Rehabilitation Act of 1973 |
| SRO | School Resource Officer |
| SSOCS | School Survey on Crime and Safety |
| Title II | Title II of the Americans with Disabilities Act of 1990 |
| Title VI | Title VI of the Civil Rights Act of 1964 |
| Title IX | Title IX of the Education Amendments of 1972 |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

AR_285050

# GAO@100

### U.S. GOVERNMENT ACCOUNTABILITY OFFICE
*A Century of Non-Partisan Fact-Based Work*

441 G St. N.W.
Washington, DC 20548

November 24, 2021

The Honorable Robert C. "Bobby" Scott
Chairman
Committee on Education and Labor
House of Representatives

Dear Mr. Chairman:

Every year millions of K-12 students experience hostile behaviors including bullying, hate speech, and hate crimes while in school. In recent years, the U.S. Departments of Education and Justice have issued reminders to schools about their obligations to address harassment and discrimination targeting Muslim, Asian-American, Jewish, LGBTQI+, and immigrant students.[1] According to Education's guidance, incidents of harassment or hate, when motivated by race, color, national origin, sex (including sexual orientation and gender identity), or disability status can impede access to an equal education.[2] In certain circumstances, these kinds of incidents may violate one or more federal civil rights laws or regulations.

Hostile behaviors, like sexual assault, rape, and hate crimes, are generally underreported to authorities, according to Justice's Bureau of Justice Statistics and the Federal Bureau of Investigation.[3, 4] In other cases, allegations are reported but ignored for years. For example, a

---

[1]While a number of variations on this acronym are currently in use to describe individuals with diverse sexual orientations and gender identities, in this report, we define LGBTQI+ as lesbian, gay, bisexual, transgender, queer, questioning, or intersex. The "plus" is meant to be inclusive of identities that may not be covered by the acronym LGBTQI, including asexual, non-binary, and individuals who identify their sexual orientation or gender identity in other ways.

[2]Title VI of the Civil Rights Act of 1964 does not explicitly cover discrimination on the basis of religion. In certain cases, Education may become involved in investigations of allegation of discrimination or harassment based on religion and national origin. Education does, however, collect information on harassment based on religion.

[3]U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Criminal Victimization, NCJ 255113 (2020).

[4]Federal Bureau of Investigation, FBI Baltimore Launches Hate Crimes Awareness Campaign (Baltimore, Md.: 2021), accessed October 19, 2021, https://www.fbi.gov/contact-us/field-offices/baltimore/news/press-releases/fbi-baltimore-launches-hate-crimes-awareness-campaign.

AR_285051

2019 investigation by Education's Office for Civil Rights (OCR) revealed that sexual harassment, sexual assault, and rape of students by other students and staff in Chicago Public Schools persisted for years, creating a hostile environment as the district failed to respond to allegations.[5] OCR reported that the district "management, handling, and oversight of complaints of . . . sexual harassment [of students] have been in a state of disarray." Further, OCR reported that the "the district's investigations were poorly managed and were often conducted by staff who were not properly trained." According to OCR, over the course of the investigation, "the district acknowledged systemic failures to ensure a prompt and equitable response to student sexual harassment complaints," which was "consistent with OCR's . . . review of the information produced in connection with 2,800 student on student complaints and 357 adult on student complaints." More recently, in September 2021, Justice reported that school and district officials in Utah's Davis School District "had actual knowledge of at least 212 incidents in which Black students were called the n-word across 27 schools, as well as additional incidents of race-based harassment of Black or Asian-American students."[6] For example, according to Justice, Black students in the Davis School District reported that "White and other non-Black students routinely called Black students the n-word . . . [said] that their skin was dirty and looked like feces . . . taunted Black students with monkey noises, [and] touch[ed] and pull[ed] their hair."[7] Justice also found that school and district officials ignored student and parent complaints about hostile behaviors, and "were deliberately indifferent to known racial harassment of students." Justice's investigation also "found that the district disregarded student witnesses who corroborated allegations and took no or minimal action to eliminate the hostile environment. For example, one school received a complaint that a teacher constantly ridiculed a Hispanic student and taunted him for working at a taco truck (though the student did not)." Justice's

---

[5]U.S. Department of Education, Office for Civil Rights, Letter to the Chicago Public Schools District, 05-15-1178 and 05-17-1062 (2019).

[6]U.S. Department of Justice, Civil Rights Division, Education Opportunities Section, Letter to the Davis School District, DJ 169-77-26 SS:WP:AV:JJ and USAO:2019V00231 (2021).

[7]Among other examples, Justice reported that "peers taunted Black students . . . repeatedly referencing slavery and lynching, and telling Black students 'go pick cotton' and 'you are my slave'" and that a "White student dressed as Hitler for Halloween, marched in a parade throughout his elementary school while performing the Nazi salute, and no school staff stopped him or reported his costume and behavior to school administration."

AR_285052

investigation "uncovered systemic failures in the district's handling of complaints of racial student-on-student and staff-on-student harassment."

Exposure to such harassment and victimization can have lifelong consequences for students' overall well-being if left unaddressed.[8] These may include: depression, anxiety, involvement in interpersonal violence or sexual violence, substance abuse, poor social functioning, and poor school performance, including lower grade point averages, standardized test scores, and poor attendance. The Centers for Disease Control (CDC) reported that youth who report frequently bullying others and youth who report being frequently bullied are at increased risk for suicide-related behavior. It also reported that the serious and lasting negative effects on mental health and overall well-being affect youth involved in bullying in any way including: those who bully others, those who are bullied, as well as those who both bully others and are bullied by others (bully-victims). According to CDC, even youth who have observed but not participated in bullying behavior report significantly more feelings of helplessness and less sense of connectedness and support from responsible adults (parents/schools) than youth who are have not witnessed bullying behavior.

Some federal agencies have long recognized the importance of providing resources for students, parents, school staff, and others struggling with such issues. For example, stopbullying.gov, a federal government website managed by the Department of Health and Human Services, provides information from various government agencies on what bullying is, what cyberbullying is, who is at risk, and how to prevent and respond to bullying. These include, among other things, information on how to file complaints with Education and Justice, how to find counselors and local mental health services, how to document and report cyberbullying, and contact information for the National Suicide Prevention Lifeline. Health and Human Services' Substance Abuse and Mental Health Services Administration (SAMHSA) is responsible for maintaining the National Suicide Prevention Lifeline—(800) 273-8255.[9] The Lifeline is a network of over 150 crisis centers nationwide that offer free, confidential support from trained counselors for individuals in crisis. More recently, In October

---

[8]K. Wang, et al., *Indicators of School Crime and Safety: 2019,* NCES 2020-063/NCJ 254485 (Washington, D.C.: National Center for Education Statistics, U.S. Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice, 2020).

[9]42 U.S.C. § 290bb-36c

AR_285053

2021, Education and Justice also released information on supporting students at the risk of self-harm during the COVID-19 pandemic, including students being bullied related to physical or mental health disabilities.[10] The document includes steps schools can take to create a supportive environment for students, as well as contact information and links to Health and Human Services-recommended crisis resources such as the National Suicide Prevention Lifeline and information on where to find 24/7 crisis intervention and suicide prevention services for LGBTQI+ youth.

You asked us to examine hostile behaviors, such as bullying, harassment, hate, and victimization in K-12 public schools. This report examines: (1) the prevalence and nature of hostile behaviors in K-12 public schools; (2) the presence of K-12 school programs and practices to address hostile behaviors; and (3) how Education has addressed complaints related to these issues in school years 2010-11 through 2019-20.

To address the first two objectives, we analyzed the most recent data from two nationally generalizable federal surveys. To address the third objective, we analyzed 10 years of Education's OCR case management system data. The surveys and case management system are:

- **School Crime Supplement to the National Crime Victimization Survey (student survey).** We analyzed data from Education's biennial survey of students between the ages of 12 to 18 for school years 2014-15, 2016-17, and 2018-19, the most recent available.[11] We conducted a descriptive analysis of the data to learn about the prevalence of hostile behaviors in K-12 public schools, and practices and programs schools use to address these behaviors. We also conducted a regression analysis to examine the relationship between

---

[10]U.S. Department of Justice Civil Right Division and U.S. Department of Education Office for Civil Rights, Supporting and Protecting the Rights of Students at Risk of Self-Harm in the Era of COVID-19 (2021), accessed November 18, 2021, https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-students-self-harm-covid-19.pdf.

[11]With a 95 percent confidence interval, we estimated that there were approximately 22 million students ages 12 to 18 (20,986,567 to 23,972,017) in school year 2014-15; 22 million students ages 12 to 18 (21,218,217 to 23,327,983) in school year 2016-17; and 23 million students ages 12 to 18 (21,733,074 to 24,488,300) in school year 2018-19. In general, the number of students ages 12 to 18 attending K-12 public schools in the United States has remained similar for the time periods we analyzed.

AR_285054

the prevalence of bullying and hate, and school characteristics, such as size, grade level, and demographics.

- **School Survey on Crime and Safety (school survey).** We analyzed data from Education's survey of K-12 schools for school years 2015-16 and 2017-18, the most recent available.[12] We conducted a descriptive analysis to learn about the prevalence of hostile behaviors and school practices and programs to address these behaviors, such as teacher and student training, disciplinary actions, and security mechanisms, in K-12 public schools. Additionally, we conducted a regression analysis to examine the association between the incidence of bullying, harassment, hate, and victimization, and school practices and programs.

- **OCR Case Management System.** We analyzed data from Education's OCR case management system to identify trends in the types and numbers of complaints, resolutions, and processing times of hostile behaviors in K-12 schools related to race, color, national origin, sex, or disability status for school years 2010-11 through 2019-20.

We assessed the reliability of these data by reviewing existing documentation about the data and performing electronic testing on required data elements and determined they were sufficiently reliable for the purposes of our analysis.

In addition, we conducted a search of recent media articles published between January 2019 and September 2020 to identify reported incidents of bullying, harassment, hate, and victimization of K-12 students related to race, color, national origin, religion, sex, or disability status. We randomly selected examples of these reported incidents and used them for illustrative purposes in the report. We did not independently verify these incidents. Finally, we reviewed relevant federal agency documentation, regulations, and laws; and interviewed relevant federal and national education officials and civil rights organization experts. See appendix I for detailed information about our methodology.

We conducted this performance audit from May 2020 to November 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain

---

[12]Respondents to the school survey are primarily principals and other knowledgeable school administrators. With a 95 percent confidence interval, we estimated 83,591 schools (83,532 to 83,651) in school year 2015-16 and 82,288 schools (82,190 to 82,385) in school year 2017-18. In general, the number of public schools in the United States has remained similar for the time periods we analyzed.

AR_285055

sufficient, appropriate evidence to provide a reasonable basis for our findings, and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Hostile Behaviors

For the purposes of this report, the term hostile behaviors is used as an umbrella term to capture a range of behaviors. These behaviors are not necessarily mutually exclusive, and can overlap. We defined these terms as follows:[13]

- **Bullying.** Unwanted, aggressive behavior among school-aged children that involves an observed or perceived power imbalance, physically or socially.[14] The behavior can be repeated, or has the potential to be repeated, over time. Such behavior can involve verbal, social, or physical incidents—for example, students being made fun of, called names, or insulted; being the subject of rumors; being threatened with harm; being pushed, shoved, tripped, or spit on; being made to do things they did not want to; being excluded from activities on purpose; or having their property destroyed on purpose.

- **Cyberbullying.** Bullying that occurs when willful and repeated harm is inflicted through the use of computers, cell phones, or other electronic devices.

- **Harassment.** Conduct that is unwelcome and denies or limits a student's ability to participate in or benefit from a school's education program. All students can be victims of harassment and the harasser can share the same characteristics as the victim.

- **Hate speech.** Words or symbols—either verbally directed at students or written on school surfaces—that express or incite hatred against a

---

[13]Unless otherwise noted, we used Education's definitions as listed in the School Survey on Crime and Safety for school year 2017-18.

[14]We developed our bullying definition based on how the term is used in questions from Education's School Crime Supplement to Justice National Crime Victimization Survey and the School Survey on Crime and Safety.

AR_285056

group or individuals based on their belonging to a specific identity group.[15]

- **Hate crimes.** A committed criminal offense that is motivated, in whole or in part, by the offender's bias(es) against a race, ethnicity, national origin, religion, disability, sex, sexual orientation, or gender identity.

- **Physical attack or fight.** An actual and intentional touching or striking of another person against their will, or the intentional causing of bodily harm to an individual.

- **Rape.** Forced sexual intercourse (vaginal, anal, or oral penetration). This includes sodomy and penetration with a foreign object. All students, regardless of sex or gender identity, can be victims of rape.

- **Sexual assault.** An incident that includes threatened rape, fondling, indecent liberties, or child molestation. All students, regardless of sex or gender identity, can be victims of sexual assault.

- **Victimization.** Victimization includes direct personal experience of threats or harm, such as sexual assault, rape, or physical assault.[16]

Hostile behaviors may negatively affect students' short- and long-term mental health, education, income, and overall well-being.[17] These issues may persist into adulthood and may affect students who bully, as well as students who witness the bullying (see text box).

---

[15]We developed our hate speech definition based on academic literature as well as how the term is used in questions from Education's School Crime Supplement to the National Crime Victimization Survey for school year 2018-19 and the School Survey on Crime and Safety for school year 2017-18.

[16]For the purposes of this report, victimization is used as an umbrella term for sexual assault, rape, and physical attacks.

[17]National Academies of Sciences, Engineering, and Medicine, *Preventing Bullying Through Science, Policy, and Practice* (Washington, D.C.: 2016), accessed July 27, 2021, https://doi.org/10.17226/23482.

AR_285057

**Effects of Hostile Behaviors on K-12 Students**

Students who experience hostile behaviors are more likely to experience:

- Depression and anxiety
- Interrupted sleep and eating disorders
- Loss of interest in activities they used to enjoy
- Physical health complaints
- Decreased academic achievement and school participation

Students who bully others are more likely to:

- Abuse alcohol and other drugs in adolescence and as adults
- Get into fights, vandalize property, and drop out of school
- Engage in early sexual activity
- Have criminal convictions and traffic citations as adults
- Be abusive toward their romantic partners, spouses, or children as adults

Students who witness bullying are more likely to:

- Have increased use of tobacco, alcohol, or other drugs
- Have increased mental health problems, including depression and anxiety
- Miss or skip school

Source: www.stopbullying.gov. | GAO-22-104341

AR_285058

## Relevant Federal Civil Rights Laws Enforced by Education

Education's OCR is responsible for enforcing certain federal civil rights laws.[18] These include:

- Title VI of the Civil Rights Act of 1964 (Title VI), which prohibits discrimination on the basis of race, color, or national origin in programs or activities that receive federal assistance;[19]

- Title IX of the Education Amendments of 1972 (Title IX), which prohibits sex discrimination in programs or activities that receive federal financial assistance;[20] and

- Section 504 of the Rehabilitation Act of 1973 (Section 504) and Title II of the Americans with Disabilities Act of 1990 (Title II), which prohibit discrimination on the basis of disability.[21] Section 504 prohibits discrimination in programs or activities that receive federal financial assistance, and Title II prohibits discrimination by public entities, whether or not they receive federal financial assistance.

According to Education's guidance, schools might violate Title VI, Section 504, or Title II and related regulations enforced by Education when the hostile behavior that targets a victim based on an identity protected under

---

[18]The U.S. Departments of Justice and Health and Human Services also play a role in addressing hostile behaviors in schools. Justice's Educational Opportunities Section has jurisdiction to address certain complaints of prohibited harassment or other prohibited activity in public schools, as well as private schools that receive federal funding from Justice. In addition, Health and Human Services manages the website stopbullying.gov, which provides information about preventing and responding to bullying. Health and Human Services' SAMHSA funds and manages the National Suicide Prevention Lifeline, (800) 273-8255. This report focuses on OCR's enforcement of the civil rights laws listed above.

[19]42 U.S.C. § 2000d et seq. Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. Although Title VI does not prohibit discrimination on the basis of religion, according to Education, Title VI protects students of any religion from discrimination, including harassment, based on a student's actual or perceived shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity.

[20]20 U.S.C. § 1681 et seq.

[21]Section 504: 29 U.S.C. § 794; Title II: 42 U.S.C. § 12131 et seq. OCR also enforces the Age Discrimination Act of 1975, which prohibits discrimination based on age in programs or activities that receive federal financial assistance, and the Boy Scouts of America Equal Access Act of 2001, which prohibits public schools or state or local education agencies from excluding groups officially affiliated with the Boy Scouts of America from meeting on school premises or in school facilities if the opportunity is available to other youth or community groups. OCR's enforcement of these two Acts is excluded from this report.

AR_285059

relevant federal law is sufficiently serious that it limits the ability of a student to participate in or benefit from a school's program or activities, and is not adequately addressed by school employees. Relevant protected classes in this context include race, national origin, color, or disability.[22]

Under Title IX, a recipient must follow Education's implementing regulations, as amended in 2020, which require, among other things, that a recipient with actual knowledge of sexual harassment respond promptly in a manner that is not deliberately indifferent.[23]

According to Education's guidance, OCR's enforcement of these laws is primarily focused on responding to complaints of alleged violations. Anyone can file a complaint with OCR if they experienced, witnessed, or heard about an alleged violation. Once a complaint is received, OCR evaluates it to determine if an investigation is warranted, and if a violation is found, how the school district should address it. In addition to responding to complaints, OCR may also initiate investigations to examine potential systemic violations based on sources other than complaints.

In addition to responding to complaints of alleged civil rights violations, in recent years, Education has published several reminders detailing schools' responsibilities to address discrimination in schools, often in response to hostile incidents happening in schools (see table 1). For example, in a recent factsheet, Education described incidents that OCR could investigate, such as if students record and post on social media videos of themselves yelling "virus spreaders!" at their Asian American classmates, and then, after being made aware of the video, school

---

[22]Other federal or state laws may provide additional legal protections. For example, the Department of Justice has jurisdiction over Title IV of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, sex, religion, or national origin by public elementary and secondary schools and public institutions of higher education. 42 U.S.C. § 2000c et seq.

[23]Sexual harassment is defined under 34 C.F.R. § 106.30 in Education's Title IX implementing regulations. 34 C.F.R. § 106.44 outlines recipient's obligations to respond to sexual harassment.

AR_285060

administrators refuse to investigate or take any action to protect Asian American students from further harassment.[24]

**Table 1: Selected Department of Education Documents and Resources on Addressing Discrimination, Including Harassment**

| Date | Statute | Title and focus | Link |
|------|---------|-----------------|------|
| 10/13/2021 | Section 504 of the Rehabilitation Act of 1973 (Section 504)<br><br>Americans with Disabilities Act of 1990 (Title II) | **Supporting and Protecting the Rights of Students at Risk of Self-Harm in the Era of COVID-19**<br><br>Education's Office for Civil Rights (OCR) and Justice's Civil Rights Division (CRT) issued a reminder for schools that students with mental health disabilities are protected by federal civil rights laws and shared resources for students at risk of self-harm. | https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-students-self-harm-covid-19.pdf |
| 8/19/2021 | Title VI of the Civil Rights Act of 1964 (Title VI) | **Confronting Discrimination Based on National Origin and Immigration Status**<br><br>Education's OCR and Justice's CRT issued an updated resource on confronting discrimination based on national origin and immigration status. | https://www2.ed.gov/about/offices/list/ocr/docs/confronting-discrimination-national-origin-immigration-status |
| 6/23/2021 | Title IX of the Education Amendments of 1972 (Title IX) | **Dear Educator Letter on 49th Anniversary of Title IX**<br><br>Education's OCR clarified Title IX's protection against discrimination based on sexual orientation or gender identity. | https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf |
| 6/23/2021 | Title IX | **Confronting Anti-Lesbian, Gay, Bisexual, Transgender, Queer, Question, or Intersex+ (LGBTQI+) Harassment in Schools**<br><br>Education's OCR and the Justice's CRT explained that discrimination against students based on their sexual orientation or gender identity is a form of sex discrimination. | https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf |

[24]U.S. Department of Education Office for Civil Rights and U.S. Department of Justice, Civil Rights Division, *Confronting COVID-19-Related Harassment in Schools A Resource for Families* (2021), accessed November 3, 2021, https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-aapi-202105.pdf.

AR_285061

| Date | Statute | Title and focus | Link |
|------|---------|-----------------|------|
| 5/26/2021 | Title VI<br>Title IX<br>Section 504 | **Letter to Educators regarding Discrimination Against Asian American and Pacific Islander Students**<br>Education's OCR issued a reminder of schools' obligations to address increased harassment and violence directed at Asian American and Pacific Islanders. | https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202105-aapi.pdf |
| 1/19/2021 | Title VI | **Questions and Answers on Executive Order 13899 (Combatting Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of 1964**<br>Education's OCR provided information on Executive Order 13899, Title VI, and enforcement of Title VI by OCR in cases involving anti-Semitism. | https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf |
| 6/26/2020 | Title VI | **56th Anniversary of the Civil Rights Act of 1964**<br>As a result of recent events that contributed to racial discord and strife, Education issued a reminder to schools of their responsibilities to investigate discrimination based on race, color, or national origin. | https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/20200625-qa-titlevi-56thanniversary.pdf |
| 3/4/2020 | Title VI | **Letter from Assistant Secretary Marcus to Education Leaders on Preventing and Addressing Potential Discrimination Associated with COVID-19**<br>Education reminded schools about their responsibilities to ensure healthy, safe, and free from bias or discrimination, particular in regards to COVID-19-related harassment of Asian Americans, including persons perceived to be of Chinese-American or Asian descent. | https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/20200304-covid-19-outbreak-statement.pdf |

GAO-22-104341  K-12 Education

AR_285062

| Date | Statute | Title and focus | Link |
|---|---|---|---|
| 6/6/2016 | Title VI | **Combatting Discrimination against Asian American, Native Hawaiian, and Pacific Islander (AANHPI) and Muslim, Arab, Sikh, and South Asian (MASSA) students** <br><br> Education's OCR, Justice's CRT, and the White House Initiative on Asian Americans and Pacific Islanders outlined technical assistance for combating discrimination against AANHPI and MASSA. | www.ed.gov/about/offices/list/ocr/docs/aanhpi-massa-factsheet-201606.pdf |
| 10/21/2014 | Title II <br><br> Section 504 | **Dear Colleague Letter on Bullying of Students with Disabilities** <br><br> Education's OCR reminded schools of the rights of students with disabilities, particular in regards to bullying | http://www2.ed.gov/about/offices/list/ocr/letters/colleague-bullying-201410.pdf |
| 10/26/2010 | Title VI <br><br> Title IX <br><br> Section 504 <br><br> Title II | **Dear Colleague Letter on Bullying and Harassment** <br><br> Education's OCR reminded schools that student misconduct that falls under a school's anti-bullying policy also may trigger responsibilities under one or more of the federal antidiscrimination laws enforced by OCR. As of 2020, OCR noted that this document is inconsistent in some respects to Education's regulations implementing Title IX and Executive Orders 13988 and 14021. | https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf |

Source: GAO Analysis of Selected Department of Education Documents and Resources | GAO-22-104341

AR_285063

# Students Experience a Range of Hostile Behaviors at Schools Nationwide

## Bullying Is Widespread in Schools Nationwide

In general, bullying occurred in nearly every school, with about one in five students aged 12 to 18 (an estimated 5.2 million students in school year 2018-19) bullied each year, according to the most recent data available from nationally generalizable surveys of schools and students.[25, 26, 27] Specifically, we estimate that:

- School officials were aware of students being bullied regularly in about 30 percent of schools and occasionally in about 64 percent of schools.[28]

---

[25] The School Survey on Crime and Safety surveys a representative sample of schools. The School Crime Supplement surveys a representative sample of students as part of the National Crime Victimization Survey. We analyzed the school survey for school years 2015-16 and 2017-18 and the student survey for school years 2014-15, 2016-17, and 2018-19. We conducted descriptive analyses and regression analyses to better understand the prevalence of bullying, harassment, or violence. Unless otherwise stated, all data comparisons are statistically significant. Because the design used a probability procedure based on random selections, the sample is only one of a large number of samples that might have been drawn. Since each sample could have provided different estimates, we express our confidence in the precision of the particular sample's results as a 95 percent confidence interval. All estimates from the survey are subject to sampling error. See appendix I for more information on sampling error for survey estimates. See appendix II for more information on the regression methodology.

[26] The 95 percent confidence interval for the estimated number of students bullied is 4.7 to 5.8 million students in school year 2018-19.

[27] For the purposes of this report, students who said that they experienced any of the following behaviors were counted as having been bullied: being made fun of (e.g., name calling or insults); spreading rumors; threatening harm; being pushed, shoved, tripped, or spit on; being coerced to do things (e.g., give money); being excluded from activities on purpose; or having property destroyed. Education's school survey defined bullying as any unwanted aggressive behavior(s) by another youth or group of youths that involves an observed or perceived power imbalance and is repeated multiple times or is highly likely to be repeated. Bullying occurs among youth who are not siblings or current dating partners.

[28] For the purposes of this report, bullying is "regular" if a school responded that it occurs daily, weekly, or monthly. The 95 percent confidence interval for the estimated percentage of schools reporting regular bullying is 29.9 to 30.5 percent in school year 2017-18. For schools reporting occasional bullying, the 95 percent confidence interval is 63.9 to 64.5 percent in school year 2017-18.

AR_285064

- School officials were aware of students being cyberbullied regularly in about 30 percent of schools and occasionally in about 52 percent of schools.[29]

- Fewer than one-half of all bullied students (44 percent in school year 2018-19) reported the bullying to a teacher or another adult at school.[30]

Our regression analysis of the student survey found that certain school characteristics were associated with more bullying, while controlling for other student and school characteristics.[31] For example:

- middle school students were more likely to be bullied than high school students, and

- students in schools with 300 or fewer students were more likely to report being bullied than were students in schools with 1,000 or more students.

Our descriptive and regression analyses of the student survey found that certain aspects of school climate were associated with more bullying. Our descriptive analysis found that students who observed the presence or availability of drugs, alcohol, or weapons at school reported being bullied more than students who did not (see fig. 1).

Even when controlling for key student and school characteristics, our regression analyses found that certain aspects of school climate were associated with more bullying. For example:

- Schools experiencing widespread disorder in the classroom, student verbal abuse and disrespect of teachers, gang activities, and student racial/ethnic tensions were also more likely to report that bullying and cyberbullying occurred daily, weekly, or monthly, according to the school survey.

---

[29]The 95 percent confidence interval for the estimated percentage of schools reporting regular cyberbullying is 29.8 to 30.3 percent and occasional cyberbullying is 51.9 to 52.8 percent in school year 2017-18.

[30]The 95 percent confidence interval for the percentage of students who reported being bullied to an adult is 40 to 47 percent in school year 2018-19.

[31]All regression analysis results in this report are associational and do not imply a causal relationship. See appendix II for more details.

GAO-22-104341  K-12 Education

AR_285065

- Students who observed the presence or availability of drugs, alcohol, or weapons in their schools were also more likely to be bullied, according to the student survey.

**Figure 1: Estimated Percentage of Students Who Were Bullied, by Presence or Availability of Alcohol, Drugs, Weapons, and Gangs in Their Schools, School Year 2018-2019**



Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey for school year 2018-19.  |  GAO-22-104341

## Bullying Related to Students' Identity

Of the estimated 5.2 million students bullied in school year 2018-19, one in four students (an estimated 1.3 million students) experienced bullying related to their race, national origin, religion, disability, gender, or sexual orientation, according to the student survey (see text box).[32] Figure 2 shows the student identities that bullying most commonly targeted in schools.

---

[32]The 95 percent confidence interval for the estimated number of students that experienced bullying related to their race, national origin, religion, disability, gender, or sexual orientation is about 1 million to 1.5 million in school year 2018-19. We did not assess whether these incidents could constitute unlawful discrimination or hate crimes under federal or state law. The School Crime Supplement to the National Crime Victimization Survey asks survey respondents about gender and does not include questions about sex.

AR_285066

**Examples of Media Reports of Bullying or Harassment of K-12 Students Related to Race, National Origin, Religion, Disability, Sex, Gender Identity, or Sexual Orientation, January 2019 to September 2020**

- Students were sent a video of a fellow classmate wearing blackface and using a racial slur. After reporting it, one student was harassed by fellow students.

- A homophobic message was attached to the picture of a student on social media. When the victim confronted the perpetrator, the confrontation escalated into a physical fight.

- A transgender student emailed a teacher to ask that the teacher refer to her with female pronouns. The teacher refused and told the student to either identify as a man or switch classes.

- A Muslim student was physically attacked, subjected to anti-Muslim slurs, and had her hijab yanked off of her head on video.

- A Jewish student was harassed by another student who was using anti-Semitic slurs and Holocaust related threats. It culminated with the student making a swastika with tape on the classroom wall.

- A teacher at a high school was accused of criminal sexual conduct.

- Two high-school students pushing and hitting a student with autism were captured on video.

Source: GAO analysis of selected news media reports. | GAO-22-104341

AR_285067

**Figure 2: Estimated Percentage of Students Experiencing Bullying Related to Identity in K-12 Public Schools, School Years 2014-2015, 2016-2017, and 2018-2019**



Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey for school years 2014-15, 2016-17, and 2018-19  |  GAO-22-104341

According to the school survey, the percentage of schools affected by racial or ethnic tension increased, from an estimated 58 percent to 61 percent from school years 2015-16 to 2017-18.[33] The estimated percentage of schools where students were sexually harassed or

---

[33]The 95 percent confidence interval for the percent of schools affected by racial or ethnic tension regularly is 5.92 to 6.28 for 2015-16 (estimate 6.10) and 6.33 to 6.70 in school year 2017-18 (estimate 6.51). For those affected occasionally, the confidence interval is 51.44 to 52.45 (estimate 51.94) in school year 2015-16 and 53.57 to 54.32 (estimate 53.94) in school year 2017-18.

GAO-22-104341  K-12 Education

AR_285068

experienced harassment related to their sexual orientation or gender identity increased similarly during the same time period.[34]

## Hate Speech: Words or Symbols That Express or Incite Hatred

We estimate that about one in four students aged 12 to 18 (about 5.8 million students in 2018-19) saw hate words or symbols written at school in 2014-15, 2016-17, and 2018-19, according to the student survey.[35] These could include racial and homophobic slurs, anti-Semitic slurs and symbols, references to lynching and the Holocaust, and anti-immigrant rhetoric.

We estimate that about 7 percent of students (about 1.6 million students in school year 2018-19) were subjected to hate speech related to their race, religion, ethnic background/national origin, disability, gender, or sexual orientation.[36] Figure 3 shows the student identities that hate-related words most commonly targeted in schools, with race being the most common identity, by far. The textbox below lists examples of hate speech verbally directed at students from our analysis of media reports published in 2019 and 2020.

---

[34]Data on harassment related to disability status and religion were not collected in the 2015-16 survey, therefore we were unable to test for any patterns in these incidents.

[35]The 95 percent confidence interval for the estimated number of students that saw hate words or symbols written in their schools is 5.2 to 6.3 million in school year 2018-19.

[36]The survey asked students if anyone had called them an insulting or bad name having to do with their race, religion, ethnic background or national origin, disability, gender, or sexual orientation. The survey subsequently referred to these as "hate-related words." The 95 percent confidence interval for the estimated number of students that were targets of hate speech in their schools is 6.19 to 8.24 percent or 1.4 to 1.9 million in school year 2018-19.

AR_285069

**Figure 3: Estimated Percentage of Students Targeted by a Hate-Related Word in K-12 Public Schools, by Identity, School Years 2014-2015, 2016-2017, and 2018-2019**



Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey for school years 2014-15, 2016-17, and 2018-19. | GAO-22-104341

AR_285070

---

**Examples From Media Reports of Hate Speech Verbally Directed at Students**

Students reported being taunted using phrases such as:

- Chinese virus or Asian virus (referring to COVID-19)
- Build that wall
- Go back to your country
- Where is your passport?
- We are going to call ICE on you
- Wall jumper
- I'm going to lynch you
- Savages
- Burn in the oven

---

Source: GAO analysis of media reports published from January 2019 to September 2020. | GAO-22-104341

---

## Hate Crimes: Criminal Offenses Motivated, in Whole or in Part, by Bias

We estimate that the number of hate crimes in schools and the number of schools where at least one hate crime occurred almost doubled from 2015-16 to 2017-18, according to our analysis of the school survey (see table 2).[37] Figure 4 shows the number of schools where hate crimes occurred and the student identities targeted, with hate crimes motivated by race or color the most common, by far.

---

[37]In school year 2015-16, of the estimated 83,591 schools nationwide, an estimated 875 schools had at least one hate crime occur. The 95 percent confidence interval for schools nationwide is 83,532 to 83,651 and for number of schools where at least one hate crime occurred is 829 to 922. In school year 2017-18, of the estimated 82,288 schools nationwide, an estimated 1,597 schools had at least one hate crime occur. The 95 percent confidence interval for schools nationwide is 82,190 to 82,385, and for number of schools where at least one hate crime occurred is 1,532 to 1,663.

AR_285071

**Table 2: Estimated Number of Hate Crimes in K-12 Public Schools, School Years 2015-2016 to 2017-2018**

|  | 2015-16 | 2017-18 | Change |
|---|---|---|---|
| Number of hate crimes | 3,166 | 5,732 | + 81% |
|  | (2,900 to 3,432) | (5,228 to 6,235) | (59 to 103%) |
| Number of schools where at least one hate crime occurred | 875 | 1597 | + 82% |
|  | (829 to 922) | (1532 to 1663) | (70 to 95%) |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for 2015-16 and 2017-18 | GAO-22-10434

Note: Numbers in parentheses provide 95 percent confidence intervals.

**Figure 4: Estimated Number of K-12 Public Schools Where at Least One Hate Crime Occurred by Student Identities Targeted, School Years 2015-2016 and 2017-2018**



Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: To maintain confidentiality, data necessary to estimate the number of schools affected by crimes targeting students because of the students' gender, gender identity, disability, and religion in 2015-16 were not available.

Some schools and district officials have responded to incidents of hate speech or hate crimes by issuing statements condemning the incidents,

AR_285072

implementing new teacher and staff training, conducting listening sessions with students or parents, establishing protocols for addressing hate speech on campus, or creating spaces in their schools that celebrate diversity. For example, a school district worked with an organization with experience in matters of equity to study, among other things, students' experiences at school with regard to social, cultural, and racial identities, including instance of hostile behaviors. Figure 5 shows an example of a high school's response to hate-related incidents.

**Figure 5: Example of K-12 Public School Response to Hate**



After experiencing incidents of racism, high school community members made a statement against hate.

Source: Calvert High School. | GAO-22-104341

## Rape and Sexual Assault

An estimated 1,064 rapes or attempted rapes occurred in 726 schools in school year 2017-18, similar to 2015-16 data, according to the school survey.[38] We also found that sexual assaults other than rape increased by an estimated 17 percent during the same time period (see fig. 6).[39] In addition, during this period:

---

[38]The 95 percent confidence interval for the number of rapes in 2017-18 is 1009 to 1120. The 95 percent confidence interval for the number of schools reporting rape in school year 2017-18 is 689 to 763.

[39]The 95 percent confidence interval for the percentage increase in sexual assaults other than rape in school year 2017-18 is 9.25 to 25.02 percent.

AR_285073

- The number of schools reporting at least one sexual assault increased, from an estimated 2,805 schools to 4,247 schools.[40]

- An estimated 939 schools reported sexual misconduct from staff against students.[41]

**Figure 6: Estimated Number of Rapes or Attempted Rapes and Sexual Assaults in K-12 Public Schools, School Years 2015-2016 to 2017-2018**



Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18.  |  GAO-22-104341

---

[40]The 95 percent confidence interval for the number of schools reporting sexual assaults is 4,141 to 4,353 in school year 2017-18 and 2,716 to 2,894 in school year 2015-16. With a 95 percent confidence interval, the percentage of schools reporting at least one sexual assault was about 3.4 percent (2.6 to 4.2 percent) in school year 2015-16 and about 5.2 percent (5 to 5.3 percent) in school year 2017-18.

[41]The 95 percent confidence interval for number of schools reporting sexual misconduct is 895 to 982 in school year 2017-18. In school year 2015-16, Education's School Survey on Crime and Safety did not ask about sexual misconduct.

AR_285074

## Physical Attacks

We found that the estimated number of physical attacks in schools with and without weapons increased from school year 2015-16 to 2017-18 (see figs. 7 and 8).[42] While the number of physical attacks with weapons are much less prevalent, they almost doubled during this time period.[43] Physical attacks without weapons were the most common type of incident, by far.

Figure 7: Estimated Number of Physical Attacks with Weapons and Threats of Attack with Weapons in K-12 Public Schools, School Years 2015-2016 to 2017-2018



Source. GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18.  |  GAO-22-104341

---

[42]With a 95 percent confidence interval, there were about 5,326 (4,968 to 5,684) incidents of physical attack with a weapon in school year 2015-16 and 10,472 (9,673 to 11,270) incidents of physical attack with a weapon in school year 2017-18. With a 95 percent confidence interval, there were about 567,049 (556,750 to 577,349) incidents of physical attack without a weapon in school year 2015-16 and 597,268 (587,740 to 606,796) incidents of physical attack without a weapon in school year 2017-18.

[43]With a 95 percent confidence interval, the number of physical attacks with weapons nearly doubled (an estimated 96.63 percent increase) (76.65 to 116.62 percent) in school year 2017-18.

AR_285075

**Figure 8: Estimated Number of Physical Attacks without Weapons in K-12 Public Schools, School Years 2015-2016 to 2017-2018**



Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18.  |  GAO-22-104341

# Nearly Every School Has Used Programs or Practices to Address Hostile Behaviors

## Programs Have Been Common in Schools in Recent Years, and Their Adoption Increased in School Year 2017-18

Nationwide, in school years 2015-16 and 2017-18, schools used a variety of programs and approaches—including programs and training for students, teachers, and staff; diversity groups; mental health services; disciplinary action; security mechanisms; and school resource officers—to help address hostile behaviors and to create positive school environments.[44] In addition, schools added more programs and practices to address hostile behaviors in school year 2017-18.

### Training and Programs for Students

We estimate that nearly all schools offered students programs, including social emotional learning, peer mediation, and restorative circles, to address hostile behaviors in school years 2015-16 and 2017-18,

---

[44]We analyzed Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. We conducted descriptive analyses and regression analyses to better understand the presence of school programs and practices that could address bullying, harassment, or violence, and the relationship between those programs and practices and these issues. Unless otherwise stated, all data comparisons presented are statistically significant.

AR_285076

according to our analysis of the school survey (see fig. 9).[45] From school year 2015-16 to 2017-18, the percentage of schools that used such programs generally increased. Schools that offered these programs to students had slightly less bullying occur regularly than schools that did not offer such programs.[46] According to subject matter experts we interviewed, schools that experience bullying on a regular basis—daily, weekly, and monthly—benefit from programming for students, which help improve school climates.

[45]According to Education's School Survey on Crime and Safety for school year 2017-18, restorative circles are a formal mediation process led by a facilitator that brings affected parties of a problem together to explore what happened, reflect on their roles, find a solution, and ultimately restore harmony to individual relationships and the larger community.

[46]For the purposes of this report, bullying is "regular" if it occurs daily, weekly, and monthly. With a 95 percent confidence interval, an estimated 30 percent of schools (29.7 to 30.3) where regular bullying occurred had student programs, compared to 32 percent of schools (31.3 percent to 33.4 percent) where regular bullying occurred without such programs. While the comparison between schools where regular bullying occurred with student programming and schools without those programs are statistically different, the difference may not be of practical importance. An estimated 65 percent of schools (64.4 to 65.05) where occasional bullying occurred had student programs, compared to 56 percent (54.9 to 57.3) where bullying occasionally occurred without such programs.

AR_285077

**Figure 9: Estimated Percentage of K-12 Public Schools with Student Programs to Address Hostile Behaviors and Promote School Safety, School Years 2015-2016 and 2017-2018**



Student program



Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

AR_285078

There was an increase of about 17 percent (or about 5,000) in schools offering diversity groups in school year 2017-18 (see fig. 10), and schools where bullying regularly occurred added LGBTQI+ and cultural clubs at higher rates than those with occasional bullying.[47] For example, between school years 2015-16 and 2017-18, in schools where bullying regularly occurred:

- The number of schools with the presence of LGBTQI+ clubs increased by an estimated 55 percent, compared to a 32 percent increase where bullying happened occasionally.[48]

- The number of schools with the presence of cultural clubs increased by an estimated 22 percent, compared to a 9 percent increase where bullying happened occasionally.[49]

---

[47]For the purposes of this report, schools with diversity groups were those with at least one of the following: LGBTQI+ groups, cultural groups, or clubs for students with disabilities. The 95 percent confidence interval for the percentage increase, from school years 2015-16 to 2017-18, in number of schools that offered diversity groups to students is 15.1 to 18.3 percent. In addition to LGBTQI+ and cultural clubs, schools offered clubs for students with disabilities. From 2015-16 to 2017-18, we found that the number of schools with the presence of clubs for students with disabilities increased by an estimated 18.5 percent (15.3 to 22) in schools with regular bullying, compared to a 23 percent (20.4 to 25.5) increase where bullying happened occasionally. These comparisons are not statistically significant.

[48]The 95 percent confidence interval for the percentage increase, from school year 2015-2016 to 2017-18, in number of schools with LGBTQI+ groups where bullying regularly occurred is 50.8 to 60 and in schools where bullying happened occasionally is 28.7 to 35.3. From school years 2015-16 to 2017-18, we found that an estimated 4,336 schools (4,079 to 4,592) added these groups, up from an estimated 10,329 schools (10,182 to 10,475) that had these groups in school year 2015-16. We found that schools that never experienced bullying added these groups at higher rates (an estimated 98 percent), however these schools represented the smallest number of schools (an estimated 178 schools) compared to schools where bullying regularly and occasionally occurred (an estimated 4,157).

[49]The 95 percent confidence interval for the percentage increase, from school years 2015-2016 to 2017-18, in number of schools with cultural clubs where bullying regularly occurred is 17.9 to 25.4 and in schools where bullying happened occasionally is 6 to 11.5. From school years 2015-16 to 2017-18, we found that an estimated 2,205 schools (1,851 to 2,560) added these groups, up from an estimated 17,907 schools (17,653 to 18,160) that had these groups in school year 2015-16. We found that schools that never experienced bullying added these groups at lower rates (an estimated -2.9 percent), representing about 29 fewer schools, compared to about 2,235 schools where bullying regularly and occasionally occurred.

GAO-22-104341  K-12 Education

AR_285079

**Figure 10: Estimated Percentage of K-12 Public Schools with Diversity Groups, School Years 2015-2016 and 2017-2018**



Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18.  |  GAO-22-104341

Note: For the purposes of this report, schools with diversity groups were those with at least one of the following: LGBTQI+ groups, cultural groups, or clubs for students with disabilities.

## Training for Teachers and Staff

We estimate that nearly all schools offered teacher and staff training to address hostile behaviors and to build positive school environments in school years 2015-16 and 2017-18, according to our analysis of the school survey. In school year 2017-18, of schools that offered teacher and staff training on bullying policies, an estimated 29 percent had regular bullying and 65 percent had occasional bullying, compared to an estimated 37 and 57 percent, respectively, that did not offer this training.[50] We would expect to see less regular bullying (e.g., daily, weekly, or monthly incidents) in schools with training and more occasional bullying, according to subject matter experts. This is because, if the behavior is reduced, but not completely extinguished, the reduction in the regular

---

[50]The 95 percent confidence interval for schools that offered teacher and staff training on bullying policies with regular bullying is 28.44 to 29.16, and for schools with occasional bullying is 65.5 to 66 for school year 2017-18. The 95 percent confidence interval for schools that did not offer teacher and staff training on bullying policies with regular bullying is 36.1 to 37.9, and for schools with occasional bullying is 56 to 57.9 for school year 2017-18.

AR_285080

category would result in more schools reporting occasional bullying. As shown in figure 11, the percentage of schools that added such trainings generally increased in school year 2017-18.

**Figure 11: Estimated Percentage of K-12 Public Schools Offering Training to Teachers, Staff, and Parents to Address Hostile Behaviors and Promote School Safety, School Years 2015-2016 and 2017-2018**



Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

AR_285081

Federal technical assistance and resources are also available to schools and districts to help address hostile behaviors (see textbox).

---

**Federal Efforts to Help Address Hostile Behaviors**

Education, along with other federal partners, have developed initiatives to help schools and districts address hostile behaviors. For example, a federal government website—stopbullying.gov—provides information on federal laws and training materials on bullying prevention programs (see figure). Additionally, stopbullying.gov lists resources for students in crisis—such as the National Suicide Prevention Lifeline's toll-free number, (800) 273-8255—and provides information for reporting incidents to Education and Justice. Education has also provided school leaders with information on preventing and addressing civil rights violations. For example, Education's National Center on Safe Supportive Learning Environments provides information and technical assistance to states, districts, and schools, among others, focused on improving school learning environments and conditions for learning. Education has also developed initiatives to address specific issues. For example, in 2020, Education launched a new civil rights initiative to combat sexual assault in K-12 public schools to address the rise of sexual assault in schools. According to Education officials, for this initiative, they have conducted compliance reviews that examine school district's handling of sexual assault cases.

**Example of Federal Training from** stopbullying.gov





Source: stopbullying.gov. | GAO-22-104341

---

## Mental Health Services

Mental health services were available in many schools to promote safe environments in school year 2017-18 (see fig. 12).[51] For school years 2015-16 and 2017-18, schools offering mental health services were also more likely to have higher rates of crime and violence than in schools

---

[51]With a 95 percent confidence interval, 51.24 percent of schools (50.9-51.6) offered mental health assessments, and 38.31 percent of schools (38-38.63) offered mental health treatments in school year 2017-18. Education changed how they asked about mental health services in the school survey after school year 2015-16. We do not have comparable data for school year 2015-16.

AR_285082

without mental health services, according to our regression analysis of the school survey.[52]

**Figure 12: Estimated Percentage of K-12 Public Schools with Available Mental Health Services, School Year 2017-2018**



Mental health services

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school year 2017-18.  |  GAO-22-104341

Disciplinary Actions

Schools have at their disposal a range of disciplinary actions to address hostile behaviors.[53] Figure 13 shows the percentages of schools that have disciplinary actions available and percentage of schools that use them.

---

[52]All regression analysis results in this report are associational and do not imply a causal relationship. See appendix II for more details.

[53]In 2018, we reported that Black students, boys, and students with disabilities were more likely to be disciplined than their peers. *GAO, K-12 Education: Discipline Disparities for Black Students, Boys, and Students with Disabilities*, GAO-18-258 (Washington, D.C.: Mar. 22, 2018).

AR_285083

**Figure 13: Estimated Percentage of Disciplinary Actions Most Commonly Available and Used to Address Issues in K-12 Public Schools, School Years 2015-2016 and 2017-2018**



Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

GAO-22-104341  K-12 Education

AR_285084

Monitoring and Security Mechanisms

Most schools generally increased the use of security mechanisms and protocols to maintain safe school environments and to provide students with avenues to report safety concerns from school years 2015-16 to 2017-18, according to our analysis of the school survey (see fig. 14). Figure 15 shows examples of schools' security mechanisms.

Regarding security mechanisms, according to our regression analysis of the student survey for school years 2014-15, 2016-17 and 2018-19 we found that:

- Students attending schools where there were options to anonymously report hostile behaviors were also less likely to hear hate-related speech or to get into fights.

- Students attending schools where staff supervised students in hallways were also less likely to say they experienced or witnessed emotional bullying or heard hate speech.

GAO-22-104341  K-12 Education

AR_285085

**Figure 14: Security Mechanisms Most Commonly Used to Maintain Safety in K-12 Public Schools Increased, School Years 2015-2016 and 2017-2018**



Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

AR_285086

**Figure 15: Examples of Security Mechanisms in K-12 Public Schools**



Left picture shows an anonymous drop box where students can report hostile behaviors—e.g., bullying, harassment, hate, or violence. Center picture features a sign that reminds visitors to check in with the administrative office and that they are under surveillance. Right picture features a sign requiring visitors to check in with administrative office.

Source: GAO. | GAO-22-104341

## School Resource Officers

The number of schools with school resource officers (SRO) increased by over 2,000 schools from school year 2015-16 to 2017-18.[54] Unlike other school security personnel (e.g., security guards or adult hall monitors), SROs are career sworn law enforcement officers with the authority to arrest, have specialized training, and are to work in collaboration with school organizations.[55] In school year 2017-18, an estimated 51 percent of schools nationwide had SROs present at least once a week compared to 48 percent in school year 2015-16, according to our analysis of the

---

[54]The 95 percent confidence interval for the number of more schools that used SROs in school year 2017-18 is 1,776 to 2,674. With a 95 percent confidence interval, about 39,911 schools (39,573 to 40,248), or about 48 percent (47.3 to 48.2 percent), had SROs in school year 2015-16 compared to about 42,136 schools (41,863 to 42,409), or about 51 percent (50.9 to 51.5 percent) had SROs in school year 2017-18.

[55]U.S. Department of Education, *Survey on School Crime and Safety,* 2019 (Washington, D.C.: September 2019).

AR_285087

school survey.[56] Subject matter experts told us that SROs are often added in response to hostile behaviors. This is in line with our data analysis, which found that schools that had SROs had more frequent incidents of regular bullying, harassment, or sexual harassment, compared to schools that did not use SROs.[57] SROs' involvement in particular activities to address hostile behaviors in schools also increased from school year 2015-16 to 2017-18 (see fig.16).

According to our regression analysis of the school survey, for school years 2015-16 and 2017-18, schools reporting sworn law enforcement (including SRO) participation in school activities were also more likely to have higher rates of crime and violence in schools compared to schools which did not have participation.

[56]The 95 percent confidence interval for the percentage of schools that had SROs in school year 2017-18 is 50.9 to 51.4 percent and in school year 2015-16 is 47.3 to 48.2 percent.

[57]Similar to our regression analysis, this relationship does not imply causation. In school year 2017-18, with a 95 percent confidence interval, 34 percent of schools (33.8 to 34.6) had SROs and regular bullying, compared to 26 percent of schools (25.6 to 26.4) without SROs; 73 percent of schools (72.2 to 73.1) had SROs and harassment incidents, compared to 65 percent of schools (64 to 65.6) without SROs; and 7 percent of schools (6.9 to 7.3) had SROs and sexual harassment incidents, compared to 3.8 percent of schools (2.6 to 5.2) without SROs.

GAO-22-104341  K-12 Education

AR_285088

**Figure 16: School Resource Officers' (SRO) Most Common Activities (Estimated), School Years 2015-2016 and 2017-2018**

SRO activity



Estimated percentage of K-12 public schools with school resource officer activities

Error bars display 95 percent confidence interval for estimates

2015-16

2017-18

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: SROs provide information to school authorities about the legal definitions of behavior for recording or reporting purposes (e.g., defining assault for school authorities).

Schools vary in the types of activities SROs are involved in. About two-thirds of schools had written agreements in place to govern SROs' relationship with schools; the remainder did not.[58] Further, most SROs carry firearms, chemical sprays, and/or physical restraints. Over one-third of officials from schools that had written agreements did not know whether the agreements include information about SROs' roles and responsibilities in administering student discipline, making arrests, or using firearms in the school (see table 3). The use of body cameras

---

[58]With a 95 percent confidence interval, an estimated 63.74 percent of schools (63.32-64.15) had some type of written agreement on SROs' roles and responsibilities and 36.26 percent of schools (35.85-36.68) did not in school year 2017-18.

AR_285089

approximately doubled, with over one-third of SROs wearing them in school year 2017-18 compared to about 15 percent in school year 2015-16.[59]

**Table 3: Estimated Percentage of K-12 Public Schools with School Resource Officers (SRO) That Had Agreements on Roles and Responsibilities, School Years 2015-2016 to 2017-2018**

| SRO agreement | 2015-2016 | | | 2017-2018 | | |
|---|---|---|---|---|---|---|
| | **Yes** | **No** | **Don't know** | **Yes** | **No** | **Don't know** |
| Student discipline | 57.9 | 13.8 | 28.4 | 55.2 | 12.2 | 32.6 |
| | (57.2-58.6) | (13.8-14.2) | (27.7-29.1) | (54.7-55.6) | (11.9-12.6) | (32.2-33) |
| Use of physical or chemical restraints | 44.9 | 18.46 | 36.64 | 43.7 | 16.03 | 40.28 |
| | (44.2-45.6) | (18-18.9) | (35.9-37.4) | (43.3-44.1) | (15.6-16.4) | (39.8-40.8) |
| Use of firearms | 40 | 19.79 | 40.22 | 41 | 16.65 | 42.34 |
| | (39.3-40.7) | (19.4-20.2) | (39.5-40.9) | (40.6-41.4) | (16.3-17) | (41.9-42.8) |
| Making arrests on school grounds | 57.5 | 11.05 | 31.46 | 55.7 | 10.21 | 34.13 |
| | (56.8-58.2) | (10.7-11.4) | (30.7-32.2) | (55.2-56.1) | (9.9-10.5) | (33.6-34.6) |
| Reporting criminal offenses to authorities | 64.32 | 7.27 | 28.41 | 64.8 | 4.88 | 30.31 |
| | (63.7-64.9) | (7-7.5) | (27.7-29.1) | (64.4-65.2) | (3.8-6.2) | (29.9-30.7) |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: Numbers in parentheses provide 95 percent confidence intervals.

[59]With a 95 percent confidence interval, an estimated 32.59 percent of schools (32.07-33.12) had SROs with body cameras in school year 2017-18 and an estimated 16.33 percent of schools (15.94-16.72) had SROs with them in school year 2015-16.

AR_285090

# Recently, Education Resolved Complaints of Hostile Behaviors Faster, Due in Part to More Dismissals and Fewer Complaints Filed

## Since the 2016-17 School Year, the Length of Time to Resolve Complaints of Hostile Behaviors Declined

Since the 2016-17 school year, Education's OCR has resolved complaints of alleged civil rights violations in K-12 schools that involved hostile behaviors targeting people in protected classes faster than it did in each previous year.[60] For this set of complaints, our analysis showed that the average resolution time dropped and remained below the 180 day target for each protected class—race, color, or national origin; sex; or disability status since school year 2017-18 (see fig. 17). Such declines were the greatest for complaints of alleged violations on the basis of sex, with the average number of days to resolve these complaints peaking at 447 in school year 2015-16, and declining every year until reaching an average of 74 days in school year 2019-20.

---

[60]For this section of the report, hostile behaviors are limited to complaints categorized by OCR as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status at elementary or secondary schools. See appendix I for additional information about the complaints included in our analysis. According to OCR officials, they do not collect information about the alleged victim that would allow us to isolate incidents that affected students. Similarly, the alleged perpetrators can be students or staff and are not distinguishable in the data available in OCR's case management system.

AR_285091

**Figure 17: Average Resolution Time (days) of Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020**



Source: GAO analysis of Department of Education's Office for Civil Rights data.  |  GAO-22-104341

Notes: School years in figure begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

AR_285092

Figure 18 describes the different ways OCR resolves complaints. Of the ways to resolve complaints, dismissing them generally took the least amount of time over the 10 years included in our analysis, and closures with change took the most time (see table 4).

**Figure 18: Department of Education's Office for Civil Rights' (OCR) Complaint Processing Procedures and Resolution Types**



Source: GAO summary of OCR's case processing procedures.  |  GAO-22-104341

[a]This is coded as "no violation or insufficient evidence" in OCR's Case Management System.

[b]Prior to 2015, a facilitated resolution between the parties was called an early complaint resolution.

[c]Prior to 2018, OCR distinguished between dismissals and administrative closures based on when, during the investigation, the determination was made that the complaint met the criteria for dismissal.

AR_285093

**Table 4: Average Number of Days to Resolve Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights (OCR) by Resolution Type, School Years 2010-2011 to 2019-2020**

| | 2010-2020 10-year average | 2010-2011 | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dismissal | 100 | 69 | 63 | 77 | 70 | 161 | 201 | 166 | 82 | 59 | 60 |
| Facilitated resolution between the parties | 199 | 79 | 82 | 98 | 172 | 322 | 360 | 391 | 200 | 154 | 117 |
| No violation or insufficient evidence | 319 | 225 | 217 | 225 | 324 | 414 | 463 | 451 | 307 | 218 | 186 |
| Closure with change | 364 | 291 | 297 | 323 | 393 | 514 | 526 | 432 | 273 | 230 | 167 |

Source: GAO analysis of Department of Education's Office for Civil Rights data. | GAO-22-104341

Notes: Two complaints that resulted in enforcement action during the 10-year period are not depicted in the table because an average could not be calculated. School years in table begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

## Higher Dismissal Rates and, More Recently, Fewer Complaints Contributed to Shorter Resolution Times

Education's OCR uses timeliness metrics to evaluate its effectiveness in addressing complaints of alleged civil rights violations in schools, aiming to resolve at least 80 percent of all new complaints within 180 days.[61] Across all types of complaints received, OCR has reported meeting this metric every fiscal year between 2009 and 2020, with the exception of 2016. For the set of complaints of hostile behaviors we analyzed, an increase in the use of dismissals and a decrease in the number of complaints filed with OCR in recent years contributed to faster resolution times and also helped OCR address its case backlog.

---

[61]According to OCR officials, OCR also aims to have no more than 25 percent of all pending complaints older than 180 days. We focused on the timeliness of resolutions for our analysis. In addition, according to OCR officials, OCR uses two metrics associated with annual staff performance plans, both also centered on timeliness: (1) the staff reduces the number of pending complaints that are 730 days old and older by 20 percent compared to the number of such pending complaints on the first day of the fiscal year, and (2) the staff, on average, responds to appeals that are filed and for which a response is due within 90 days of receipts by the regional office. GAO did not analyze metrics related to individual OCR staff or regional offices.

AR_285094

| | |
|---|---|
| **Increased Dismissals** | Over the 10-year period, OCR increasingly resolved complaints of hostile behaviors by dismissing them. Dismissals accounted for 49 percent of resolutions in the 2010-11 school year, rising to 81 percent in the 2019-20 school year, as shown in figure 19. Complaints of alleged civil rights violations on the basis of sex were the most frequently dismissed complaint in the 2019-20 school year (88 percent), followed by those on the basis of race, class, or national origin (87 percent), and disability status (76 percent). |

Complaints can be dismissed for a variety of reasons. As shown in figure 20, OCR most frequently dismissed complaints in recent years because it did not receive consent to disclose the name of the complainant. Such dismissals accounted for 8 percent of resolutions at the beginning of the 10-year period, rising to 21 percent at the end of the 10-year period.[62]

When asked about the increase in dismissals in recent years, OCR officials only chose to comment on the increase in dismissals of complaints related to gender identity. OCR officials said that after Education rescinded its May 2016 Dear Colleague Letter on Transgender Students in February 2017, it subsequently dismissed the majority of these kinds of complaints.[63]

---

[62]OCR requires written consent from the complainant to disclose the complainant's identity to the recipient and witnesses when such disclosure is needed to resolve the complaint. When written consent is necessary, OCR informs the complainant that the complaint will be dismissed if it does not receive the written consent within 20 calendar days of the date that OCR requests consent from the complainant. This requirement was in place for the 10-year period we reviewed. According to OCR officials, prior to 2008 these dismissals were coded as "insufficient factual basis."

[63]In May 2016, Education and Justice issued a joint Dear Colleague Letter to affirm Title IX protections for transgender students. The guidance did not add requirements to applicable law, but instead clarified how Education and Justice evaluate a school's compliance with the law. For example, the guidance addressed issues such as treating students consistent with their gender identity in terms of their names and pronouns and their participation in single-sex activities and facilities. The letter was rescinded by both agencies on February 22, 2017.

In June 2021, Education issued a Notice of Interpretation clarifying that Education interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity. Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021). Justice issued a Memorandum to Federal Agency Civil Rights Directors in March 2021 concluding that Bostock's analysis applies to Title IX. Both of these changes were made subsequent to our analysis of complaints filed with OCR.

AR_285095

**Figure 19: Percentage of Resolved Complaints of Hostile Behaviors in K-12 Schools Filed with Education's Office for Civil Rights, by Resolution Type, School Years 2010-2011 to 2019-2020**



Source: GAO analysis of Department of Education's Office for Civil Rights data. | GAO-22-104341

Notes: Two complaints that resulted in enforcement action during the 10-year period are not depicted in the figure. School years in figure begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

AR_285096

**Figure 20: Five Most Common Reasons for Dismissals of Complaints of Hostile Behaviors in K-12 Schools by Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020**



Source: GAO analysis of Department of Education's Office for Civil Rights data.  |  GAO-22-104341

Notes: School years in figure begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

AR_285097

While OCR reported an overall substantial increase in the number of complaints resolved with change across all of its complaints for the 4-year period between fiscal years 2017 and 2020, we found that the number of complaints specifically related to hostile behaviors in K-12 schools that were resolved with change declined for the 4-school-year period 2016-17 through 2019-20. Resolutions with change, which include complaints closed with change and complaints resolved through facilitated resolutions between the parties according to OCR officials, require schools or districts to make substantive changes to protect students' civil rights, such as training teachers or revising school or district policies. OCR reported resolving 4,443 complaints with change over the 4-year period from fiscal year 2013 through 2016, and resolving 6,018 over the following 4-year period from fiscal 2017 through 2020. In contrast, since school year 2017-18, the number of complaints alleging civil rights violations in K-12 schools that involved hostile behaviors targeting people in protected classes that were resolved with change declined, falling from 1,300 from school years 2012-13 through 2015-16 to 1,078 from school years 2016-17 through 2019-20.

**Declining Number of Complaints**

The number of complaints of hostile behaviors filed with OCR declined in both the 2018-19 and 2019-20 school years following a general increase over the previous 8 years (see fig. 21). This decline in recent years contributed to faster resolutions in two ways: (1) with fewer complaints to address, OCR could tend to them more quickly and (2) OCR could address the complaint backlog that had grown in previous years.

AR_285098

**Figure 21: Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020**



Source: GAO analysis of Department of Education's Office for Civil Rights data.  |  GAO-22-104341

Notes: Sum of bars for each identity may exceed the total line in a year because complaints can contain alleged violations related to more than one group. School years in figure begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

AR_285099

OCR officials said that several factors could affect the number of complaints they receive each year, including new guidance or regulations, changes in the law, and administration specific projects or initiatives. A portion of the decline in complaints filed in the 2019-20 school year—for example those related to physical harassment/assault—is also likely attributable to schools' transition to distance learning in March 2020 due to the COVID-19 pandemic.

Several civil rights experts we spoke with said that in recent years, changes to OCR's guidance made them reluctant to file some types of complaints on behalf of students or to encourage students and their families to file some types of complaints with OCR. As OCR's priorities changed, some civil rights experts lost confidence in OCR's ability to address civil rights violations in schools, they noted. For example:

- Representatives from one legal organization focused on civil rights protections said that in recent years they have opted to file complaints related to racial harassment or discrimination in federal court instead of filing complaints with OCR. They said that OCR no longer following its 2014 Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline was a deterrent to filing racial harassment or discrimination complaints with OCR. That guidance, which had discussed disproportionate discipline of students of color and called for investigations to examine disproportionate impact in complaints related to discipline, was rescinded in December 2018.[64] Although the guidance specifically applied to school discipline, the legal organization perceived the rescission as a broader shift in Education's investigations of alleged racial harassment violations.

- Representatives of another civil rights organization said that in recent years they were hesitant to encourage students and families to file complaints with OCR, particularly in instances of alleged sex

[64]In January 2014, Education and Justice issued a Joint Dear Colleague Letter on Nondiscriminatory Administration of School Discipline on the basis of race, color, or national origin. According to the guidance, the administration of student discipline can result in unlawful discrimination based on race if a student is subjected to different treatment based on the student's race or if, even though a policy is neutral on its face and is administered in an evenhanded manner, the policy has an unlawful disparate impact, i.e., a disproportionate and unjustified effect on students of a particular race. The guidance acknowledges racial disparities in the frequency and severity of the administration of school discipline, particularly for Black students, and provides guidance for both agencies to assess for different treatment and disparate impact in the investigation of complaints. The guidance was rescinded by both agencies on December 21, 2018. As of July 30, 2021, subsequent to our analysis of complaints filed with OCR, the guidance and underlying issues are under review by Education and Justice.

AR_285100

discrimination against LGBTQI+ students. They said this was because of Education rescinding its Dear Colleague Letter affirming Title IX protections for transgender students. The representatives said rescinding this guidance in February 2017 also created concern that continued filing of such complaints might have prompted Education to create new policies that could further impact students.

- Representatives from a third organization said that in the last 5 years students and advocates have been reluctant to file complaints related to sexual harassment and violence. They said that under Education's 2011 guidance on standards of evidence for investigating alleged sexual assault and violence, students felt like they understood their rights. That guidance was withdrawn in September 2017 and the Title IX Final Rule went into effect in August 2020.[65] As a result, the organization said that there has been a mistrust of Education and lack of confidence in OCR.

Regarding the changes to guidance cited by civil rights experts above, Education has started to review or has reinterpreted each of them. The Joint Dear Colleague Letter on Nondiscriminatory Administration of School Discipline to assess for different treatment based on race that was rescinded in 2018 is under review by both Education and Justice as of July 2021. While the guidance affirming Title IX protections for transgender students was rescinded in 2017, Education issued a Notice of Interpretation in June 2021 clarifying that Education interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity.[66] Finally, regarding regulations related to investigating allegations of sexual misconduct in schools,

---

[65]On April 4, 2011, Education had issued a Dear Colleague Letter addressing sexual violence. Among other things, the Dear Colleague Letter stated that preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence in schools, as opposed to the clear and convincing standard. On September 22, 2017, Education issued a Dear Colleague Letter withdrawing the 2011 Dear Colleague Letter and additional guidance related to sexual harassment and violence. These 2017 guidance documents were rescinded in August 2020, when the Title IX Final Rule went into effect. The Title IX Final Rule defines sexual harassment, including sexual assault, as unlawful sex discrimination and established new processes for investigating allegations of sexual misconduct in schools.

In April 2021, subsequent to our analysis of complaints filed with OCR, Education announced that OCR would be launching a comprehensive review of Title IX regulations. During this review process, the existing Title IX regulations, as amended in 2020, remain in effect.

[66]Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021).

AR_285101

Education announced in April 2021 that OCR would be launching a comprehensive review of Title IX regulations, including the new Title IX Final Rule.

## Agency Comments

We provided a draft of this report to the Department of Education for review and comment. Education provided written technical comments, which we incorporated as appropriate.

At this time, we will send copies of this report to the appropriate congressional committees and the Secretary of Education. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (617) 788-0580 or nowickij@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix III.

Sincerely yours,

Jacqueline M. Nowicki, Director
Education, Workforce, and Income Security Issues

AR_285102

# Appendix I: Objective, Scope, and Methodology

---

**Overview**

This report examines: (1) the prevalence and nature of hostile behaviors in K-12 public schools; (2) the presence of K-12 school programs and practices to address hostile behaviors; and (3) how the Department of Education has addressed complaints related to these issues in school years 2010-11 through 2019-20.

To conduct this work, we analyzed the most recent years of data available that capture hostile behaviors exhibited in K-12 public schools, including bullying, hate speech and hate crimes, sexual assault and rape, and physical violence, from two nationally generalizable federal surveys. Specifically, we conducted descriptive and regression analyses on Education's School Crime Supplement (SCS) to the Department of Justice's National Crime Victimization Survey and the School Survey on Crime and Safety (SSOCS). See appendix II for information on our regression analysis. The SCS provides information from students' perspectives and the SSOCS provides information from schools' perspectives. We assessed the reliability of the data by reviewing existing documentation about the data and performing electronic testing on required data elements from both surveys and determined they were sufficiently reliable for the purposes of our analyses. We analyzed the SCS and SSOCS data using the analysis weights and sampling design information in order to account for the complex sample design. We express the precision of our particular sample's results with a 95 percent confidence interval, meaning we are 95 percent confident that the true values in the study population are within this range. All regressions use the 0.05 level of significant to determine statistically significant.

Additionally, we analyzed Education's Office for Civil Rights' (OCR) case management system database for school years 2010-11 through 2019-20, which captures the types and numbers of complaints it receives, resolutions, and processing times. We assessed the reliability of OCR's case management system data by checking for errors or inconsistencies in the data and interviewing OCR officials familiar with the system. We limited our analysis to data elements that were sufficiently reliable.

To inform all aspects of our work, we interviewed academic researchers, education policy organizations, civil rights experts, and federal agency officials from Education and Justice. We also selected examples of hostile behaviors by randomly selecting from a list of news articles from calendar years 2019 and 2020. Finally, we reviewed relevant federal agency documentation, regulations, and laws. The following sections contain detailed information about the scope and methodology for this report.

Appendix I: Objective, Scope, and Methodology

## Analysis of the School Crime Supplement to the National Crime Victimization Survey (student survey)

The School Crime Supplement (SCS)—referred to in the body of this report as the student survey—is a biennial survey that was created as a supplement to the National Crime and Victimization Survey.[1] The survey is co-designed by Education's National Center for Education Statistics and Justice's Bureau of Justice Statistics and is a nationally representative survey of approximately 9,500 students between the ages of 12 through 18 in grades 6 to 12, enrolled in U.S. public and private elementary, middle, and high schools.[2] Because our focus is on public schools, we excluded students that attended private schools for each survey year in our analysis.

Our analysis was conducted using the public-use data file of the SCS for the three most recent surveys (school years 2014-15, 2016-17, and 2018-19.) The SCS data are self-reported by students, and consequently, as is generally true with self-reported data, there is potential for misreporting of information. The SCS asks about school-related topics such as alcohol and drug availability; fighting, bullying, and hate-related behaviors; fear and avoidance behaviors; safety measures; gun and weapon carrying; and gangs at school.

We analyzed the 3 most recent school years of the SCS to learn about (1) the prevalence of hostile behaviors (e.g., bullying, harassment, and hate speech), (2) student perceptions of the school climate and fear and avoidance behaviors, and (3) characteristics of schools where such incidents happen more frequently.

In some instances, we consolidated responses to multiple related survey questions. For example, to estimate the percentage of all students nationwide that were bullied related to their identity, we consolidated all responses by students who were bullied related to their identity. In

---

[1]The National Crime Victimization Survey is administered by Justice's Bureau of Justice Statistics and collects data every year from a nationally representative sample of households. Persons are interviewed on the frequency, characteristics, and consequences of criminal victimization. In some years, the survey included the School Crime Supplement, which collects data about victimization at school. For more information, please see https://bjs.ojp.gov/data-collection/ncvs.

[2]With a 95 percent confidence interval, we estimated that there were approximately 22 million students ages 12-18 (20,986,567 to 23,972,017) in school year 2014-15; 22 million students ages 12-18 (21,218,217 to 23,327,983) in school year 2016-17; and 23 million students ages 12-18 (21,733,074 to 24,488,300) in school year 2018-19. In general, the number of students ages 12 to 18 attending K-12 public schools in the United States has remained similar for the time periods we analyzed.

AR_285104

Appendix I: Objective, Scope, and
Methodology

addition, we estimated percentages of students experiencing various types of hostile behavior by certain school characteristics—location, school size, grade level, percent who were minority, percent who were eligible for free or reduced priced lunch, and residential classification (urban, suburban, and rural).

## Analysis of the School Survey on Crime and Safety (school survey)

The School Survey on Crime and Safety (SSOCS)—referred to in the report as the school survey—is a nationally representative survey of principals in K-12 public schools conducted by the National Center for Education Statistics about every 2 years.[3] The survey collects data from schools to provide estimates of school crime, security mechanisms, programs and policies.[4] The survey samples approximately 4,800 U.S. public school principals or other administrators. Our analysis was conducted using the restricted-use data file of the SSOCS for school years 2015-16 and 2017-18, the most recent data available at the time of our analysis. The SSOCS data are self-reported by principals or other administrators, and consequently, as is generally true with self-reported data, there is potential for misreporting of information.

The survey covers school security practices, student training programs, parent and community involvement at school, numbers and duties of school security staff, school mental health services, staff training and practices, adverse incidents, disciplinary problems and disciplinary actions. The survey also includes information on hate crimes and other types of crime.

We conducted a descriptive analysis of the SSOCS using the 2 most recent years. For the SSOCS, there were two sets of variables we analyzed: (1) incidents of bullying, hate crimes, and victimization; and (2) programs to address behavior and create safe environments, such as training and programs for staff and students, mental health services, discipline and school security staff and programs.

To further understand the extent to which incidents such as bullying or hate crimes may vary by school characteristics, and the extent to which

---

[3]Respondents to the school survey are primarily principals and other knowledgeable school administrators. We estimated 83,591 schools (83,532 to 83,651) in school year 2015-16 and 82,288 schools (82,190 to 82,385) in school year 2017-18. In general, the number of public schools in the United States has remained similar for the time periods we analyzed.

[4]For the 2017-18 survey, 4,803 public schools were sampled, and a total of 2,762 submitted completed questionnaires for a weighted response rate of 61.7 percent.

AR_285105

Appendix I: Objective, Scope, and
Methodology

programs to address behavior and create safe environment may vary by
school characteristics, we also analyzed those data by characteristics
such as a schools' locale, size, level (e.g., elementary or high school),
percent of students who were minority, and percent of students who were
eligible for free or reduced lunch.

We conducted generalized linear regressions using the 2015-16 and
2017-18 SSOCS data to explore associations between selected school-
level characteristics and programs and frequencies of crime and violence,
in addition to occurrences of hate crimes, disciplinary problems, and
bullying, while controlling for other factors.[5] Such a model allowed us to
test the association between adverse school climate incidents, such as
bullying or incidents of crime and violence, and school characteristics,
programs and policies, while holding other school characteristics constant
(e.g. student demographics, school security measures, teacher training,
school type).

## Analysis of Education's Office for Civil Rights Case Management Data

To assess Education's response to complaints of hostile behaviors, we
analyzed data from OCR's case management system that met the
following criteria:

- institution type was elementary or secondary;

- case type was complaint;

- case opening date was between July 1, 2010 and June 30, 2020;

- specific basis was Title VI of the Civil Rights Act of 1964 (Title VI),
  Title IX of the Education Amendments of 1972 (Title IX), Title II of the
  Americans with Disabilities Act of 1990 (Title II), or Section 504 of the
  Rehabilitation Act of 1973 (Section 504), and the complaint filed
  involved one of the following:

  - Title VI: racial harassment (assault); racial harassment (insults,
    slurs, derogatory expressions); racial harassment (other);
    retaliation; national origin discrimination involving religion;

  - Title IX: sexual harassment (sexual violence); sexual harassment
    (physical harassment or intimidation); sexual harassment (insults,

---

[5]We used a Poisson generalized linear regression for this analysis because the data on
incidents of crime and violence represent counts and therefore are not appropriate for a
traditional normal linear model. In addition, we used a negative binomial regression
instead of a Poisson regression because negative binomial models are appropriate for
count analyses with observed over-dispersion (i.e., when the variance of the count
variable is much larger than the mean of that variable).

AR_285106

slurs, derogatory expressions); sexual harassment (gender stereotyping); sexual harassment (other); gender harassment (not of a sexual nature), retaliation; or

- Title II or Section 504: disability harassment (assault); disability harassment (insults, slurs, and derogatory expressions); disability harassment (other); and retaliation.

If the complaint data in the case management system did not include information in any of the fields related to the criteria mentioned above, we excluded the case from our analysis.

We performed descriptive analyses of the complaints that met the criteria to understand trends in the nature of complaints filed over the 10-year period, including the number of complaints filed and their specific bases (protected class); the manner of resolution; the most common reasons for dismissing complaints; and average resolution times and resolution types, compared to OCR's 180 day resolution target. Some complaints contained alleged violations related to more than one protected class or more than one type of hostile behavior. In these instances, we counted such complaints as one complaint, but counted each alleged violation named in a complaint separately in our analyses.

## Selecting Examples of Hostile Social Behaviors

### News Articles

Because the surveys we analyzed do not contain detailed, descriptive information about the hostile behaviors that occur in K-12 schools, we conducted a news media search and randomly selected examples from the results for inclusion in the report to provide illustrative examples of some of these types of incidents. To obtain recent results, we limited the search to articles published between January 2019 and September 2020. We searched databases using specific keywords to identify incidents where students were targeted related to their membership in certain identity groups: race, color, or national origin; religion; sex (including sexual orientation and gender identity); or disability status. Next, we sorted the results into lists by identity group (for example race or disability status) and type of incident (for example sexual harassment) and randomized the lists. In randomized order, we analyzed the incidents using sufficiency and relevancy criteria, including whether the article had information about the nature of the incident and where it occurred, and whether a student was the alleged target. We selected the first two examples from each list that met our criteria: one in which a student was the alleged perpetrator and one in which school staff was the alleged

**Appendix I: Objective, Scope, and Methodology**

perpetrator. The news articles provide illustrative descriptions of individual incidents and do not represent the experiences of all students and schools. We did not assess whether the incidents could potentially constitute unlawful discrimination or hate crimes under federal or state law.

## Interviews

In total, we interviewed representatives of 25 groups representing civil rights experts, education advocacy organizations, and academic researchers, among others. Our interviews gathered information on the prevalence of hostile behaviors in schools (e.g., bullying, harassment, hate, and victimization); practices and programs schools use to prevent and address these issues; and Education's role in responding to incidents involving discriminatory harassment, hate, and victimization.

We selected groups for interviews based on their knowledge of relevant information and their ability to describe school practices. Regarding civil rights experts, we interviewed leadership from several associations representing a range of identity groups including race and ethnicity; sex; sexual orientation and gender identity; and disabilities because students in those categories have experienced increased hostile behaviors. These groups accounted for the largest share of bullying, discriminatory harassment, hate speech and hate crimes, and victimization incidents in our data analysis. We also interviewed national groups representing a range of K-12 school officials, including teachers, principals, and school social workers.

We conducted this performance audit from May 2020 to November 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

AR_285108

# Appendix II: Regression Analysis

Overview

We conducted generalized linear regressions using the School Crime Supplement (SCS) to the National Crime Victimization Survey and the School Survey on Crime and Safety (SSOCS) survey data to explore associations between selected school-level characteristics and programs and outcomes of hostile behaviors such as bullying. Such a model allowed us to test the association between incidents of hostile behaviors, such as bullying, and school programs and policies, while holding other school characteristics constant (such as school demographics). We conducted a separate regression for each of the hostile behaviors relating to adverse climate incidents.

Typically, a generalized linear regression model is appropriate when the model assumption of normality is not appropriate, as is the case with a binary (yes/no) outcome for logistic regressions, or a count outcome for Poisson regressions. A logistic regression model provides an estimated odds ratio of an event occurring, such as whether a school characteristic is associated with higher or lower odds of bullying. A Poisson regression model provides an estimated incidence rate ratio of an event, such as whether a school policy or program is associated with higher rates of crime and violence. For both the estimated odds ratio and estimated incidence rate ratio, a value greater than one indicates a higher or positive association, and a value less than one indicates a lower or negative association. For example, an estimated odds ratio less than one indicates lower odds of being bullied when a factor is present. Additionally, one can quantify just how much more or less likely the incidence is, according to the estimated model coefficients. For example, an incidence rate ratio of 2.5 would indicate that a school having regular student disorder would be associated with 2.5 times higher incidence of bullying relative to schools never experiencing student disorder, holding all other variables in the model constant. Given limitations of our models, including that we must rely on observational data which did not come from an experimental design which would allow for causal inference, we present a general summary of associations by providing the direction, rather than an estimated rate (incidence) of hostile behaviors.

To obtain a better understanding of potential control variables and their association with outcomes, and to identify potential controls used by subject matter experts from studies using similar methodologies, a literature review was performed. In particular, regression studies, which were similar in scope to the engagement objectives, were reviewed and summarized. Data from these regression studies represent a range of school years from 2003 to 2015. This information was used to inform our final control variable selection.

AR_285109

Appendix II: Regression Analysis

## Regression Analysis of the School Crime Supplement to the National Crime Victimization Survey

Our regression model used the same universe of approximately 22 million students as our descriptive analysis of the SCS data for each of the three time periods surveyed. Since the regression models are based on observations across all independent variables, and some variables had a small number of missing data points, our final models had between 5,600 and 6,000 observations, depending on the outcome. For two survey years, 2014-15 and 2018-19, a split sample questionnaire was used for bullying-related items, where only a portion of the sample was relevant for items in our analysis. For each year, we used the SCS person weights (incoming and continuing) for our analyses. For the 2014-15 and 2018-19 SCS data, we only used respondents to version 1 of the respective questionnaires and adjusted those weights to account for this, following technical documentation. For 2014-15, we doubled the person weights. For 2018-19, we multiplied person weights by a factor of 100/60.

All regression models are subject to limitations and for this model, some known limitations include:

- Some variables that might be related to student or school characteristics were not available in the data. For example, in this context, it could be household income adjusted for family size or household type (single- versus multiple-headed households) that could be related to students' vulnerability or bully-related experiences. Additionally, these data are subject to both sampling and non-sampling error. While the analysis has accounted for sampling error, survey data are also affected by non-sampling error which could occur for many reasons, including a failure to sample a segment of the population, inability to obtain information for all respondents in the sample, inability or unwillingness of respondents to provide correct information, mistakes by respondents, and errors made in the collection or processing of data (such as imputation or data quality checks). A nonresponse bias analysis and nonresponse adjustments were carried out in order to address non-sampling error associated with nonresponse.

- Results of our analyses are associational and do not imply a causal relationship.

Table 5 lists the variables we included in our regression model. We conducted a separate regression for each of the hostile behaviors listed as an outcome variable.

AR_285110

**Appendix II: Regression Analysis**

**Table 5: Variables Included in GAO's Regression Model on the Department of Education's School Crime Supplement (SCS) to the Department of Justice's National Crime Victimization Survey, School Years 2014-2015, 2016-2017, and 2018-2019**

| Independent variables |
|---|
| **Percent of the student population racial/ethnic demographics:** percent of combined American Indian/Alaska Native, Asian, Black/African American, Hispanic/Latino, Native Hawaiian/Other Pacific Islander: 0 to less than 5 percent, 5 to less than 20 percent, 20 to less than 50 percent, 50 percent or more (SCS220) |
| **School level:** primary, middle, high (SCS217) |
| **Locale:** rural, suburban, town, city (SCS216) |
| **School size:** 1-299 students, 300-599 students, 600-999 students, 1,000-1,499 students, 1,500-1,999 student, 2,000 or more students (SCS218) |
| **School region:** Midwest, Northeast, South, West (SCS218) |
| **School security measures:** guards or assigned police officers (VS0036), adult hall supervisor (VS0036), metal detectors (VS0038), locked entrance/exit (VS0039), visitor sign in and badge (VS0040), locker checks (VS0041), students wear badge or picture ID (VS0042), security cameras (VS0043), code of conduct (VS0044), anonymous reporting of threats (VS0045) |
| **Student teacher ratio:** less than 13, 13-15, 16-19, 20 or more (SCS219) |
| **Alcohol and drug availability:** students under the influence of illegal drugs or alcohol at school (SCS210), access to illegal drugs or alcohol at school (VS0058, VS0059, VS0067, SCS209) |
| **Weapon carrying and availability:** brought gun, knife, or other weapons to school or know of/see others at school with a gun (VS0127, VS0128, VS0129, VS0130) |
| **Gang presence:** gangs at school (VS0133) |
| **Feelings about school:** agree that rules are fair and enforced, punishment is known and the same for all students, feel safe at school, crime in the neighborhood of the school (SCS189) |
| **Student demographics:** sex (V3018), white non-Hispanic (V3023A, V3024), household income (categories: $0-$24,999, $25,000-$49,999,$ 50,000-$74,999, $75,000 or more) (SCS214A) |
| **Extracurricular activities:** participated in any activity (VS0029, VS0030, VS0031, VS0032, VS0033, VS0034, VS0035) |
| **School year:** 2014-15, 2016-17, or 2018-19 |
| Outcome (or dependent) variables |
| • Any bullying  (VS0073,  VS0074,  VS0075,  VS0076,  VS0077,  VS0078,  VS0079) |
| • Physical bullying (VS0075,  VS0076,  VS0079) |
| • Emotional bullying (VS0073, VS0074, VS0077, VS0078) |
| • Hate words (VS0105) |
| • Physical fight (VS0071) |
| • Bullied related to students' identity/bullied for any other reason (SCS200, SCS201, SCS202, SCS203, SCS204, SCS205) |

Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey for school years 2014-15, 2016-17, and 2018-19. | GAO-22-104341

Given the limitations of our model as described above, we present the results of our regression model in table 6 by describing the direction of the associations, rather than the estimated odds of outcome variables. For categorical variables in these tables, we describe the comparison school characteristic in the column labeled "Effect: groups compared in Odds Ratio Estimate." For example, the results in these tables should be

AR_285111

**Appendix II: Regression Analysis**

interpreted as a student that reports feeling safe in school (yes) is less likely to report being bullied than a student that reports not feeling safe, because the association is negative.

AR_285112

Appendix II: Regression Analysis

**Table 6: Associations of Regression Model Variables with Bullying based on the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey, School Years 2014-2015, 2016-2017, and 2018-2019**

| Variable label | Effect: groups compared in odds ratio estimate | Logistic any bullying | Logistic physical bullying | Logistic emotional bullying | Logistic hate words | Logistic physical fight | Multinomial bullied identity vs. not bullied | Multinomial bullied not identity vs. not bullied |
|---|---|---|---|---|---|---|---|---|
| Security measure: guards or assigned police officers | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: hall supervisor | Yes vs. no | Negative | — | Negative | Negative | — | — | — |
| Security measure: metal detectors | Yes vs. no | Negative | — | Negative | Negative | — | — | — |
| Security measure: locked entrance/exit | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: visitor sign in or badge | Yes vs. no | Positive | — | Positive | Positive | — | Positive | Positive |
| Security measure: locker checks | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: student wear badge/picture ID | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: security cameras | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: code of conduct | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: anonymous reporting of threats | Yes vs. no | Negative | — | Negative | Negative | Negative | — | Negative |
| Observed students under influence of illegal drugs or alcohol at school | Yes vs. no | Positive | Positive | Positive | Positive | — | Positive | Positive |
| Access to illegal drugs or alcohol at school | Yes vs. no | Positive | Positive | Positive | Positive | — | Positive | Positive |

AR_285113

**Appendix II: Regression Analysis**

| Variable label | Effect: groups compared in odds ratio estimate | Logistic any bullying | Logistic physical bullying | Logistic emotional bullying | Logistic hate words | Logistic physical fight | Multinomial bullied identity vs. not bullied | Multinomial bullied not identity vs. not bullied |
|---|---|---|---|---|---|---|---|---|
| Brought gun, knife, or other weapons to school or know of/seen others at school with gun? | Yes vs. no | Positive | Positive | Positive | Positive | Positive | Positive | Positive |
| Gangs at your school? | Yes vs. no | Positive | Positive | Positive | Positive | Positive | Positive | Positive |
| Agree with any of the fairness questions, rules known and consequences are the same. | Yes vs. no | — | — | — | — | — | — | — |
| Feel safe at school | Yes vs. no | Negative | Negative | Negative | Negative | — | Negative | Negative |
| High school crime in school neighborhood | Yes vs. no | — | — | — | — | — | — | — |
| Sex | Female vs. male | Positive | Negative | Positive | — | Negative | Positive | Positive |
| White non-Hispanic | Yes vs. no | Positive | Positive | Positive | — | — | — | Positive |
| Household income | $25,000 to $49,999 vs. less than $25,000 | — | ---- | — | — | — | — | — |
| Household income | $50,000 to $74,999 vs. less than $25,000 | — | Negative | — | — | — | — | — |
| Household income | $75,000 and over vs. less than $25,000 | Negative | Negative | — | — | Negative | Negative | — |
| Participate in activity, sports, spirit, academic, student government | Yes vs. no | Positive | — | Positive | — | — | — | Positive |
| School locale | Suburb vs. city | — | — | — | — | — | — | — |
| School locale | Town vs. city | ---- | — | — | Negative | — | — | — |
| School locale | Rural vs. city | — | — | — | — | — | — | — |
| School level | Primary vs. middle | — | — | — | — | — | — | — |

GAO-22-104341  K-12 Education

AR_285114

**Appendix II: Regression Analysis**

| Variable label | Effect: groups compared in odds ratio estimate | Logistic any bullying | Logistic physical bullying | Logistic emotional bullying | Logistic hate words | Logistic physical fight | Multinomial bullied identity vs. not bullied | Multinomial bullied not identity vs. not bullied |
|---|---|---|---|---|---|---|---|---|
| School level | High vs. middle | Negative | Negative | Negative | Negative | Negative | Negative | Negative |
| School level | Other vs. middle | — | Negative | — | — | Negative | — | — |
| School enrollment size | 300-599 vs. less than 300 | — | — | — | — | — | — | — |
| School enrollment size | 600-999 vs. less than 300 | — | — | — | — | — | — | — |
| School enrollment size | 1,000-1,499 vs. less than 300 | Negative | — | Negative | — | — | — | Negative |
| School enrollment size | 1,500-1,999 vs. less than 300 | Negative | — | Negative | — | Negative | — | Negative |
| School enrollment size | 2,000 or more vs. less than 300 | Negative | — | Negative | — | — | — | Negative |
| Student to full-time-equivalent teacher ratio | 13 to less than 16 vs. less than 13 students | — | — | — | — | — | — | — |
| Student to full-time-equivalent teacher ratio | 16 to less than 20 vs. less than 13 students | — | — | — | — | — | — | — |
| Student to full-time-equivalent teacher ratio | 20 or more vs. less than 13 students | — | — | — | — | — | — | — |
| Percent of combined American Indian/Alaska Native, Asian, Black/African American, Hispanic/Latino, Native Hawaiian/Other Pacific Islander | 5 to less than 20 percent vs. less than 5 percent | — | — | — | Positive | Positive | — | — |

AR_285115

Appendix II: Regression Analysis

| Variable label | Effect: groups compared in odds ratio estimate | Logistic any bullying | Logistic physical bullying | Logistic emotional bullying | Logistic hate words | Logistic physical fight | Multinomial bullied identity vs. not bullied | Multinomial bullied not identity vs. not bullied |
|---|---|---|---|---|---|---|---|---|
| Percent of combined American Indian/Alaska Native, Asian, Black/African American, Hispanic/Latino, Native Hawaiian/Other Pacific Islander | 20 to less than 50 percent vs. less than 5 percent | — | — | Positive | — | — | Positive | — |
| Percent of combined American Indian/Alaska Native, Asian, Black/African American, Hispanic/Latino, Native Hawaiian/Other Pacific Islander | 50 percent or more vs. less than 5 percent | — | — | — | — | — | — | — |
| School region | Midwest vs. northeast | — | — | — | — | — | — | — |
| School region | South vs. northeast | — | — | — | — | — | — | — |
| School region | West vs. northeast | — | — | — | — | — | — | — |
| 2014-15 or 2016-17 | 2015 vs. 2017 | — | — | — | — | — | — | — |
| 2014-15 or 2018-19 | 2015 vs. 2019 | — | — | — | — | — | — | — |

Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey, school years 2014-15, 2016-17, and 2018-19. | GAO-22-104341

Note: Cells marked "Positive" indicate instances where we found school characteristics were associated with a significantly higher likelihood of experiencing the given hostile behavior. Cells marked "Negative" indicate a significantly lower likelihood of experiencing the given hostile behavior. Cells marked as "—" indicate no association between the given school characteristic and the likelihood of experiencing the given hostile behavior. Significance is indicated by a p value of less than 0.05.

AR_285116

## Regression Analysis of the School Survey on Crime and Safety

We conducted generalized linear regressions using the same universe of approximately 4,800 U.S. school principals and other administrators sampled from Education's School Survey on Crime and Safety (SSOCS) for school years 2015-16 and 2017-18 as our descriptive analysis of the SSOCS data.[1] Because one regression outcome could only be calculated using SSOCS 2017-18 data, that regression model was limited to the sample of approximately 2,700 schools from that year. Because the data come from a nationally representative survey, these data use sampling weights to allow for inferences to be made about the larger population of schools from which the sample units were drawn. For each year, SSOCS covers a population of over 84,000 schools. In addition to incorporating sample weights, the data contain replicate weights which were used in variance estimation to account for the sample design.

All regression models are subject to limitations and for this model, the limitations included:

- Data analyzed for these regression analyses were by school rather than by student. Consequently, they are not able to describe the association between our independent variables and a student's experience of incidents of hostile behaviors, such as bullying or crime and violence, while controlling for characteristics of an individual student such as gender, race or ethnicity, or grade level. Instead, the school-level nature of the SSOCS data limited this particular analysis of the associations between school characteristics and school practices and programs to whether there was an increase, decrease, or no effect on measure of hostile behaviors, such as bullying and incidents of crime and violence, controlling for other characteristics of the entire school's population, such as school type, or percent of students who are male.

- Some variables which may be related to school practices and hostile behaviors are not available in the data. For example, in this context, it could be a school's average student household income adjusted for family size that could be related to students' exposure to adverse incidents in schools, such as bullying.

- Results of our analyses are associational and do not imply a causal relationship because, for example, SSOCS data are observational in nature and were not gathered by a randomized controlled trial, where students would be randomized to attend schools with certain characteristics.

---

[1]We used a Poisson generalized linear regression since the data on incidents of crime and violence represent counts and therefore are not appropriate for a traditional normal linear model. In addition, we used a negative binomial regression instead of a Poisson regression because negative binomial models are appropriate for count analyses with observed over-dispersion (i.e. when the variance of the count variable is much larger than the mean of that variable).

AR_285117

- Additionally, SSOCS data are subject to both sampling and non-sampling error. While the analysis has accounted for sampling error, survey data are also affected by non-sampling error which could occur for many reasons, including a failure to sample a segment of the population, inability to obtain information for all respondents in the sample, inability or unwillingness of respondents to provide correct information, mistakes by respondents, and errors made in the collection or processing of data (such as imputation or data quality checks).

For the purposes of our analysis, we created some composite variables (see table 7). Table 8 lists the variables we included in our regression model. We conducted a separate regression for each of the hostile behaviors listed as an outcome variable.

AR_285118

**Appendix II: Regression Analysis**

**Table 7: Created Variables Used in the Regression Analysis of the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2015-2016 and 2017-2018**

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| School type | Type of school (C0564):<br>• Regular public school<br>• Charter school<br>• Has a magnet program for part of the school<br>• Exclusively a magnet school<br>• Other (specify) | Regular public school<br>Magnet school (exclusively or partially)<br>Charter or other school |
| Net transfers | • Transferred to (C0570)<br>• Transferred from (C0572) | Transferred to (minus) Transferred from (continuous) |
| Disorder | • Student racial ethnic tensions (C0374)<br>• Student verbal abuse of teachers (C0380)<br>• Widespread disorder in classrooms (C0382)<br>• Student acts of disrespect for teachers (C0384)<br>• Gang activities (C0386) | Regular (if at least one occurs daily or weekly)<br>Rare (if else at least one occurs monthly or occasionally)<br>Never (if all never occur) |

AR_285119

**Appendix II: Regression Analysis**

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Total security practices | • During the school year, was it a practice of your school to do the following?<br>  • Require visitors to sign or check in and wear badges (C0110)<br>  • Control access to school buildings during school hours (e.g., locked or monitored doors, loading docks) (C0112)<br>  • Control access to school grounds during school hours (e.g., locked or monitored gates) (C0114)<br>  • Require metal detector checks on students every day (C0116)<br>  • Perform one or more random metal detector checks on students (C0120)<br>  • Equip classrooms with locks so that doors can be locked from the inside (C0121)<br>  • Close the campus for most or all students during lunch (C0122)<br>  • Perform one or more random sweeps (e.g., locker checks, dog sniffs) for contraband (e.g., drugs or weapons) (C0125)<br>  • Require drug testing for students participating in athletics or other extracurricular activities (C0129)<br>  • Require students to wear uniforms (C0134)<br>  • Enforce a strict dress code (C0136)<br>  • Provide school lockers to students (C0138)<br>  • Require clear book bags or ban book bags on school grounds (C0140)<br>  • Have "panic button(s)" or silent alarm(s) that directly connect to law enforcement in the event of an incident (C0139)<br>  • Provide an electronic notification system that automatically notifies parents in case of a school-wide emergency (C0141)<br>  • Provide a structured anonymous threat reporting system (e.g., online submission, telephone hotline, or written submission via drop box) (C0143)<br>  • Require students to wear badges or picture IDs (C0142)<br>  • Require faculty and staff to wear badges or picture IDs (C0144)<br>  • Use one or more security cameras to monitor the school (C0146)<br>  • Provide two-way radios to any staff (C0150)<br>  • Prohibit non-academic use of cell phones or smartphones during school hours (C0153) | Count of number of security measures in place |

AR_285120

**Appendix II: Regression Analysis**

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Total school activities | • During the school year, did your school have any activities that included the following components for students?<br>  • Prevention curriculum, instruction, or training for students (e.g., conflict resolution, anti-bullying, dating violence prevention) (C0174)<br>  • Social emotional learning for students (e.g., social skills, anger management, mindfulness) (C0183)<br>  • Behavioral or behavior modification intervention for students (including the use of positive reinforcements) (C0176)<br>  • Individual mentoring/tutoring/coaching of students by adults (C0181)<br>  • Student involvement in peer mediation (C0175)<br>  • Student court to address student conduct problems or minor offenses (C0177)<br>  • Student involvement in restorative circles (e.g., "peace circles," "talking circles," "conflict circles") (C0179)<br>  • Programs to promote a sense of community/social integration among students (C0186) | Count of number of school activities in place |
| School prevention program | • During the school year, did your school have any activities that included the following components for students?<br>  • Prevention curriculum, instruction, or training for students (e.g., conflict resolution, anti-bullying, dating violence prevention) (C0174)<br>  • Social emotional learning (SEL) for students (e.g., social skills, anger management, mindfulness) (C0183)<br>  • Behavioral or behavior modification intervention for students (including the use of positive reinforcements) (C0176)<br>  • Individual mentoring/tutoring/coaching of students by adults (C0181)<br>  • Programs to promote a sense of community/social integration among students (C0186) | Yes (if at least one program is in place)<br><br>No (if no programs are in place) |
| Student involvement program | • During the school year, did your school have any activities that included the following components for students?<br>  • Student involvement in peer mediation (C0175)<br>  • Student court to address student conduct problems or minor offenses (C0177)<br>  • Student involvement in restorative circles (e.g., "peace circles," "talking circles," "conflict circles") (C0179) | Yes (if at least one program is in place)<br><br>No (if no programs are in place) |

GAO-22-104341  K-12 Education

AR_285121

**Appendix II: Regression Analysis**

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Inclusive student groups | • During the school year, did your school have any recognized student groups with the following purposes?<br>　• Acceptance of sexual orientation and gender identity of students (e.g., Gay-Straight Alliance) (C0604)<br>　• Acceptance of students with disabilities (e.g., Best Buddies) (C0606)<br>　• Acceptance of cultural diversity (e.g., Cultural Awareness Club) (C0608) | Yes (if at least one program is in place)<br>No (if no programs are in place) |
| Parental involvement | • Which of the following does your school do to involve or help parents?<br>　• Have a formal process to obtain parental input on policies related to school crime and discipline (C0190)<br>　• Provide training or technical assistance to parents in dealing with students' problem behavior (C0192) | Yes (if at least one occurs)<br>No (if none occur) |
| Total parent and community involvement activities | • During the school year, were any of the following community and outside groups involved in your school's efforts to promote safe, disciplined, and drug-free schools?<br>　• Parent groups (C0204)<br>　• Social service agencies (C0206)<br>　• Mental health agencies (C0212)<br>　• Civic organizations/service clubs (C0214)<br>　• Private corporations/businesses (C0216)<br>　• Religious organizations (C0218) | Count of number of community involvement activities in place |
| Justice involvement | • During the school year, were any of the following community and outside groups involved in your school's efforts to promote safe, disciplined, and drug-free schools?<br>　• Juvenile justice agencies (C0208)<br>　• Law enforcement agencies (C0210) | Yes (if at least one occurs)<br>No (if none occur) |
| Sworn Law Enforcement Office (SLEO) participation | • Did these SLEOs (including School Resource Officers) participate in the following activities at your school?<br>　• Security enforcement and patrol (C0630)<br>　• Maintaining student discipline (C0632)<br>　• Identifying problems in the school and proactively seeking solutions to those problems (C0636)<br>　• Recording or reporting discipline problems to school authorities (C0644) | Yes (if at least one occurs)<br>No (if none occur) |
| Additional security | • Aside from SLEOs (including School Resource Officers), how many additional security guards or security personnel were present at your school at least once a week? (C0232, C0234) | Yes (if reported a value greater than 0 for at least one)<br>No (if reported a value of 0 for both) |

AR_285122

**Appendix II: Regression Analysis**

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Mental health services (for SSOCS 2018 only) | • During the 2017–18 school year, did your school provide diagnostic mental health assessments (e.g., psychological/psychiatric diagnostics assessments) to evaluate students for mental health disorders? (C0663, for SSOCS 2017-18 only) <br><br> • During the 2017–18 school year, did your school provide treatment (e.g., psychotherapy, medication) to students for mental health disorders? (C0667, for SSOCS 2017-18 only) | Yes (if at least one occurs) <br> No (if none occur) |
| Mental health services (for SSOCS 2016 only) | • Diagnostic assessment at school by school-employed mental health professional (C0662, for SSOCS 2015-16 only) <br><br> • Diagnostic assessment at school by school-funded mental health professional (C0664, for SSOCS 2015-16 only) <br><br> • Diagnostic assessment outside of school by school-funded mental health professional (C0666, for SSOCS 2015-16 only) <br><br> • Treatment at school by school-employed mental health professional (C0668, for SSOCS 2015-16 only) <br><br> • Treatment at school by school-funded mental health professional (C0670, for SSOCS 2015-16 only) <br><br> • Treatment outside of school by school-funded mental health professional (C0672, for SSOCS 2015-16 only) | Yes (if at least one occurs) <br> No (if none occur) |

AR_285123

**Appendix II: Regression Analysis**

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Total staff training measures | • During the school year, did your school or school district provide any of the following for classroom teachers or aides? | Count of number of staff training measures in place |
| | • Training in classroom management for teachers (C0266) | |
| | • Training in school-wide discipline policies and practices related to violence (C0268) | |
| | • Training in school-wide discipline policies and practices related to cyberbullying (C0265) | |
| | • Training in school-wide discipline policies and practices related to bullying other than cyberbullying (C0267) | |
| | • Training in school-wide discipline policies and practices related to alcohol and/or drug use (C0269) | |
| | • Training in safety procedures (e.g., how to handle emergencies) (C0270) | |
| | • Training in recognizing early warning signs of students likely to exhibit violent behavior (C0272) | |
| | • Training in recognizing signs of self-harm or suicidal tendencies (C0278, for SSOCS 2017-18 only) | |
| | • Training in intervention and referral strategies for students displaying signs of mental health disorders (e.g., depression, mood disorders, ADHD) (C0271) | |
| | • Training in recognizing physical, social, and verbal bullying behaviors (C0273) | |
| | • Training in recognizing signs of students using/abusing alcohol and/or drugs (C0274) | |
| | • Training in positive behavioral intervention strategies (C0276) | |
| | • Training in crisis prevention and intervention (C0277) | |
| Total exclusionary disciplinary measures | • During the school year, did your school allow for the use of the following disciplinary actions? If "yes," were the actions used this school year? | Count of number of disciplinary measures in place |
| | • Removal with no continuing school services for at least the remainder of the school year (C0390) | |
| | • Removal with school-provided tutoring/home instruction for at least the remainder of the school year (C0394) | |
| | • Transfer to a specialized school for disciplinary reasons (C0398) | |
| | • Transfer to another regular school for disciplinary reasons (C0402) | |
| | • Out-of-school suspension or removal for less than the remainder of the school year (C0406,C0410) | |
| | • In-school suspension for less than the remainder of the school year (C0414,C0418) | |

GAO-22-104341  K-12 Education

AR_285124

**Appendix II: Regression Analysis**

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Total other disciplinary measures | • During the school year, did your school allow for the use of the following disciplinary actions? If "yes," were the actions used this school year?<br>   • Referral to a school counselor (C0422)<br>   • Assignment to a program (during school hours) designed to reduce disciplinary problems (C0426)<br>   • Assignment to a program (outside of school hours) designed to reduce disciplinary problems (C0430)<br>   • Loss of school bus privileges due to misbehavior (C0434)<br>   • Corporal punishment (C0438)<br>   • Placement on school probation with consequences if another incident occurs (C0442)<br>   • Detention and/or Saturday school (C0446)<br>   • Loss of student privileges (C0450)<br>   • Requirement of participation in community service (C0454) | Count of number of disciplinary measures in place |
| Total crime and violence incidents | • Rape or attempted rape (C0310)<br>• Sexual assault other than rape (C0314)<br>• Robbery, with and without weapon (C0318 + C0322)<br>• Physical attack or fight, with and without weapon (C0326 + C0330)<br>• Threats of physical attack, with and without weapon (C0334 + C0338)<br>• Theft/larceny (C0342)<br>• Hate crimes (C0690)<br>• Possession of weapons, firearms and knives (C0346 + C0350) | Count of number of incidents |
| Bullying, sexual harassment, and cyberbullying | • Student bullying (C0376)<br>• Student sexual harassment (C0378)<br>• Cyberbullying among students (C0389) | Regularly (if at least one occurs daily, at least once a week, or at least once a month)<br><br>Rarely (if else at least one occurs on occasion)<br><br>Never (if none occur) |
| Bullying based on identity (for SSOCS 2017-18 only) | • Student harassment based on sexual orientation (C0381)<br>• Student harassment based on gender identity (C0383)<br>• Student harassment based on religion (C0385)<br>• Student harassment based on disability (C0387) | Regularly (if at least one occurs daily, at least once a week, or at least once a month)<br><br>Rarely (if else at least one occurs on occasion)<br><br>Never (if none occur) |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety, school years 2015-16 and 2017-18. | GAO-22-104341

AR_285125

**Appendix II: Regression Analysis**

**Table 8: Variables Included in Our Regression Models Using the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2016-2017 and 2017-2018**

**Control/Independent variables**

**School characteristics (continuous):** total enrollment (C0522); percent eligible for free or reduced lunch (C0524); percent English language learner (C0526); percent special education students (C0528); percent male (C0530); percent below the 15th percentile on standardized tests (C0532); percent likely to go to college after high school (C0534); average daily attendance (C0568); net transfers; school year

**School characteristics (categorical):** Crime level in the area where your school is located (C0560: low, moderate, high; students come from areas with very different levels of crime); school type (public school, magnet (exclusively or partially), charter or other school); disorder (regularly, rarely, never)

**School security practices (continuous):** total security practices

School security practices (categorical, yes/no): require visitors to sign or check in and wear badges (C0110); Control access to school buildings during school hours (e.g., locked or monitored doors, loading docks) (C0112); Perform one or more random metal detector checks on students (C0120); Perform one or more random sweeps (e.g., locker checks, dog sniffs) for contraband (e.g., drugs or weapons) (C0125); Provide a structured anonymous threat reporting system (e.g., online submission, telephone hotline, or written submission via drop box) (C0143); Require students to wear badges or picture IDs (C0142); Prohibit non-academic use of cell phones or smartphones during school hours (C0153)

**School activities (continuous): total school activities**

**School activities (categorical, yes/no):** school prevention program; student involvement program; inclusive student groups

**Parent and community involvement (categorical, yes/no):** parental involvement; justice involvement; SLEO participation; additional security

**Parent and community involvement (continuous):** total parent and community involvement activities

**Parent and community involvement (continuous):** total parent and community involvement activities

**Staff training and practices (continuous):** total staff training measures

**Staff training and practices (categorical, yes/no):** mental health services

**Disciplinary actions (continuous):** total exclusionary disciplinary measures; total other disciplinary measures

| Outcome/Dependent variables | Model specification |
|---|---|
| Frequency of crime and violence (continuous, count) | Poisson regression |
| Bullying, sexual harassment, and cyberbullying (categorical)<br>Never occurring vs. rarely occurring vs. frequently occurring<br>• Frequently occurring bullying vs. infrequently (rarely or never) occurring bullying<br>• Frequently occurring bullying vs. infrequently (rarely or never) occurring bullying | Multinomial logistic regression<br>Logistic regression |
| Bullying based on identity (categorical) (*for SSOCS 2017-18 only*)<br>• Never occurring vs. rarely occurring vs. frequently occurring<br>• Any bullying occurring (frequent or rarely) vs. never or no bullying occurring | Multinomial logistic regression<br>Logistic regression |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety 2015-16 and 2017-18. | GAO-22-104341

AR_285126

**Appendix II: Regression Analysis**

Given the limitations of our model as described above, we present the results of our regression models in tables 9 and 10, by describing the direction of the associations. Positive means that a particular variable was significantly associated with an increase in the bullying, sexual harassment, or cyberbullying rate or odds at the 0.05 level and negative indicates a decrease in the rate or odds, while holding all other variables in the model constant. Insignificant indicates the variable is not significantly associated with the given bullying, sexual harassment, or cyberbullying action at the 0.05 level. For categorical variables in these tables, we provided the comparison school characteristic in brackets. For example, the results in these tables should be interpreted as a school that reports disorder occurring is more likely to report discipline problems occurring because the association is positive.

AR_285127

**Table 9: Associations of Multinomial Logistic Regression Model Variables based on the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2015-2016 and 2017-2018**

| | | Model type, outcome | | | |
|---|---|---|---|---|---|
| Variable | Effect of Variable | Frequency of bullying based on identity (rarely vs. never) | Frequency of bullying based on identity (regularly vs. never) | Frequency of bullying, sexual harassment, or cyberbullying (rarely vs. never) | Frequency of bullying, sexual harassment, or cyberbullying (regularly vs. never) |
| Additional security | Yes vs. no | — | — | Positive | Positive |
| Require visitors to sign or check in and wear badges | Yes vs. no | — | — | — | — |
| Control access to school buildings during school hours | Yes vs. no | — | — | — | — |
| Perform one or more random metal detector checks on students | Yes vs. no | — | — | — | — |
| Perform one or more random sweeps (e.g., locker checks, dog sniffs) for contraband | Yes vs. no | — | — | — | Positive |
| Require students to wear badges or picture IDs | Yes vs. no | — | — | — | — |
| Provide a structured anonymous threat reporting system | Yes vs. no | — | — | — | — |
| Prohibit non-academic use of cell phones or smartphones during school hours | Yes vs. no | — | — | — | — |
| Total student enrollment | For one unit increase | — | — | — | — |
| Percent eligible for free or reduced lunch | For one unit increase | — | — | — | — |
| Percent English language learner students | For one unit increase | — | — | — | — |

AR_285128

**Appendix II: Regression Analysis**

| | | Model type, outcome | | | |
|---|---|---|---|---|---|
| Variable | Effect of Variable | Frequency of bullying based on identity (rarely vs. never) | Frequency of bullying based on identity (rarely vs. never) | Frequency of bullying based on identity (rarely vs. never) | Frequency of bullying based on identity (rarely vs. never) |
| Percent 'Special education students' | For one unit increase | — | — | — | — |
| Percent male students | For one unit increase | — | — | — | — |
| Percent students below the 15th percentile on standardized tests | For one unit increase | — | — | — | — |
| Percent students likely to go to college after high school | For one unit increase | — | — | — | — |
| Crime level in the area where school is located | Low level of crime vs High level of crime | — | — | — | — |
| Crime level in the area where school is located | Moderate level of crime vs High level of crime | — | — | — | — |
| Crime level in the area where school is located | Students come from areas with very different levels of crime vs High level of crime | — | — | — | — |
| School average daily attendance | For one unit increase | — | — | — | — |
| Total parent and community involvement activities | For one unit increase | — | Positive | — | — |
| Disorder | Rarely vs. Never | Positive | — | Positive | Positive |
| Disorder | Regularly vs. Never | Positive | — | — | — |
| Total exclusionary disciplinary measures | For one unit increase | — | — | — | — |
| Inclusive student groups | Yes vs. no | — | — | — | — |
| Justice Involvement | Yes vs. no | — | — | — | — |

AR_285129

**Appendix II: Regression Analysis**

| | | Model type, outcome | | | |
|---|---|---|---|---|---|
| **Variable** | **Effect of Variable** | **Frequency of bullying based on identity (rarely vs. never)** | **Frequency of bullying based on identity (rarely vs. never)** | **Frequency of bullying based on identity (rarely vs. never)** | **Frequency of bullying based on identity (rarely vs. never)** |
| Mental health services | Yes vs. no | — | — | — | — |
| Net transfers | For one unit increase | — | — | — | — |
| Total other disciplinary measures | For one unit increase | Positive | Positive | — | — |
| Parental involvement | Yes vs. no | — | — | — | — |
| School prevention program | Yes vs. no | — | — | — | — |
| Total school activities | For one unit increase | — | — | — | — |
| School type | Magnet program (exclusive or partial) vs. Charter or Other school | — | — | — | — |
| School type | Regular Public school vs. Charter or Other school | — | — | — | — |
| Total security practices | For one unit increase | — | — | — | — |
| SLEO Participation | Yes vs. no | — | — | — | — |
| Total staff training measures | For one unit increase | — | — | — | — |
| Student involvement program | Yes vs. no | — | — | — | — |
| SSOCS School Year | 2017-2018 vs. 2015-2016 | — | — | — | — |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety, school years 2015-16 and 2017-18. | GAO-22-104341

Note: Cells marked "positive" indicate instances where we found school characteristics were associated with a significantly higher likelihood of experiencing the given hostile behavior. Cells marked "negative" indicate a significantly lower likelihood of experiencing the given hostile behavior. Cells marked as "—" indicate no association between the given school characteristic and the likelihood of experiencing the given hostile behavior. Significance is indicated by a p value of less than 0.05.

GAO-22-104341  K-12 Education

AR_285130

**Appendix II: Regression Analysis**

**Table 10: Associations of Poisson and Binary Logistic Regression Model Variables for the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2015-2016 and 2017-2018**

| Variable | Effect of Variable | Poisson regression: Count of incidents of crime and violence | Logistic regression: Bullying and cyberbullying at schools (Frequent vs. Infrequent Bullying) | Logistic regression: Bullying based on identity at schools (Any bullying vs. Never Bullying) SSOCS18 only |
|---|---|---|---|---|
| Additional security | Yes vs. no | — | — | — |
| Require visitors to sign or check in and wear badges | Yes vs. no | — | — | — |
| Control access to school buildings during school hours | Yes vs. no | — | — | — |
| Perform one or more random metal detector checks on students | Yes vs. no | — | Negative | — |
| Perform one or more random sweeps (e.g., locker checks, dog sniffs) for contraband | Yes vs. no | — | Positive | — |
| Require students to wear badges or picture IDs | Yes vs. no | — | — | — |
| Provide a structured anonymous threat reporting system | Yes vs. no | — | — | — |
| Prohibit non-academic use of cell phones or smartphones during school hours | Yes vs. no | — | — | — |
| Total student enrollment | For one unit increase | — | — | — |
| Percent eligible for free or reduced lunch | For one unit increase | — | — | — |
| Percent English language learner students | For one unit increase | — | — | — |
| Percent 'Special education students' | For one unit increase | — | — | — |
| Percent male students | For one unit increase | — | — | — |

GAO-22-104341  K-12 Education

AR_285131

Appendix II: Regression Analysis

| Variable | Effect of Variable | Model Type, Outcome | | |
|---|---|---|---|---|
| | | Poisson regression: Count of incidents of crime and violence | Poisson regression: Count of incidents of crime and violence | Poisson regression: Count of incidents of crime and violence |
| Percent students below the 15th percentile on standardized tests | For one unit increase | — | — | — |
| Percent students likely to go to college after high school | For one unit increase | — | — | — |
| Crime level in the area where school is located | Low level of crime vs. high level of crime | Negative | — | — |
| Crime level in the area where school is located | Moderate level of crime vs. high level of crime | — | — | — |
| Crime level in the area where school is located | Students come from areas with very different levels of crime vs. high level of crime | — | — | — |
| School average daily attendance | For one unit increase | — | — | — |
| Total parent and community involvement activities | For one unit increase | — | — | — |
| Disorder | Rarely vs. never | Positive | Positive | Positive |
| Disorder | Regularly vs. never | Positive | Positive | Positive |
| Total exclusionary disciplinary measures | For one unit increase | — | — | — |
| Inclusive student groups | Yes vs. no | — | — | — |
| Justice Involvement | Yes vs. no | — | — | — |
| Mental health services | Yes vs. no | Positive | — | — |
| Net transfers | For one unit increase | — | — | — |
| Total other disciplinary measures | For one unit increase | — | Positive | Positive |

GAO-22-104341  K-12 Education

AR_285132

Appendix II: Regression Analysis

| Variable | Effect of Variable | Model Type, Outcome | | |
| --- | --- | --- | --- | --- |
| | | Poisson regression: Count of incidents of crime and violence | Poisson regression: Count of incidents of crime and violence | Poisson regression: Count of incidents of crime and violence |
| Parental involvement | Yes vs. no | — | — | — |
| School prevention program | Yes vs. no | — | — | — |
| Total school activities | For one unit increase | — | — | — |
| School type | Magnet program (exclusive or partial) vs. Charter or Other school | — | — | — |
| School type | Public school vs. charter or other school | Positive | — | — |
| Total security practices | For one unit increase | — | — | — |
| SLEO Participation | Yes vs. no | Positive | — | — |
| Total staff training measures | For one unit increase | — | — | — |
| Student involvement program | Yes vs. no | — | — | — |
| SSOCS school year | 2017-18 vs. 2015-16 | — | — | — |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: Cells marked "positive" indicate instances where we found school characteristics were associated with a significantly higher likelihood of experiencing the given hostile behavior. Cells marked "negative" indicate a significantly lower likelihood of experiencing the given hostile behavior. Cells marked as "—" indicate no association between the given school characteristic and the likelihood of experiencing the given hostile behavior. Significance is indicated by a p value of less than 0.05.

AR_285133

# Appendix III: GAO Contact and Staff Acknowledgments

| GAO Contact | Jacqueline M. Nowicki, Director, (617) 788-0580 or nowickij@gao.gov |
| --- | --- |
| Staff Acknowledgments | In addition to the contact named above, Sherri Doughty (Assistant Director), Lara Laufer (Analyst in Charge), Manuel Valverde (Analyst in Charge), Christina Bixby, Elizabeth Calderon, Justin Dunleavy, Holly Dye, Sarah Gilliland, Jessica Mausner, Jean McSween, John Mingus, Mimi Nguyen, Almeta Spencer, Frances Tirado, Tania Uruchima, and Sonya Vartivarian made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: <br><br> Website: https://www.gao.gov/about/what-gao-does/fraudnet <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

# THEY, THEM, AND THEIRS

*Jessica A. Clarke*

## CONTENTS

INTRODUCTION ......................................................................................................896

I. NONBINARY GENDER ....................................................................................904

   A. *The Diversity of Nonbinary Gender Identities* ........................................905

   B. *Reasons for Bias Against Nonbinary People* ..........................................910

   C. *Convergences and Divergences with Other Rights Struggles* ...............914

      1. *Feminist Arguments* ........................................................................915

      2. *Transgender Rights* .........................................................................921

      3. *Sexual Orientation* ..........................................................................925

      4. *Intersex Variations* .........................................................................928

      5. *Antiracist and Postcolonial Struggles* ...........................................930

II. A CONTEXTUAL APPROACH TO NONBINARY GENDER RIGHTS ...............933

   A. *Against Universal Definitions of Sex and Gender* ................................933

   B. *Regulatory Models for Nonbinary Gender Rights* ................................936

      1. *Third-Gender Recognition* .............................................................937

      2. *Sex or Gender Neutrality* ...............................................................940

      3. *Integration into Binary Sex or Gender Regulation* .......................945

III. LEGAL INTERESTS IN BINARY SEX OR GENDER? ....................................945

   A. *Identification* ..........................................................................................947

   B. *Antidiscrimination Rules* .......................................................................951

      1. *Data Collection and Affirmative Action* .......................................952

      2. *Pregnancy Protections* ....................................................................954

      3. *Misgendering and Pronouns* ..........................................................957

   C. *Sex-Specific Roles and Programs* ..........................................................963

      1. *Education* .........................................................................................963

      2. *Athletics* ..........................................................................................966

      3. *Workplaces* ......................................................................................974

   D. *Sex-Segregated Spaces* ..........................................................................981

      1. *Restrooms and Changing Facilities* ...............................................981

      2. *Housing* ...........................................................................................983

   E. *Health Care* .............................................................................................986

CONCLUSION ......................................................................................................990

894

AR_292755

# THEY, THEM, AND THEIRS

## Jessica A. Clarke[*]

*Nonbinary gender identities have quickly gone from obscurity to prominence in American public life, with growing acceptance of gender-neutral pronouns, such as "they, them, and theirs," and recognition of a third-gender category by U.S. states including California, Colorado, Minnesota, New Jersey, Oregon, and Washington. People with nonbinary gender identities do not exclusively identify as men or women. Feminist legal reformers have long argued that discrimination on the basis of gender nonconformity — in other words, discrimination against men perceived as feminine or women perceived as masculine — is a harmful type of sex discrimination that the law should redress. But the idea of nonbinary gender as an identity itself appears only at the margins of U.S. legal scholarship. Many of the cases recognizing transgender rights involve plaintiffs who identify as men or women, rather than plaintiffs who seek to reject, permute, or transcend those categories. The increased visibility of a nonbinary minority creates challenges for other rights movements, while also opening new avenues for feminist and LGBT advocacy. This Article asks what the law would look like if it took nonbinary gender seriously. It assesses the legal interests in binary gender regulation in areas including law enforcement, employment, education, housing, and health care, and concludes these interests are not reasons to reject nonbinary gender rights. It argues that the law can recognize nonbinary gender identities, or eliminate unnecessary legal sex classifications, using familiar civil rights concepts.*

*What gender am I? I bet you thought either male or female before I even asked the question. And this assumption is called the gender binary.*

*I was born non-binary, meaning my body and mind don't fit into either gender. At the age of 2, I told my parents I wasn't a girl. At 12, I was the only person on my football team without a penis. And today at 36, I can wield a chainsaw 50 feet up a tree, and I'm also really a soft sensitive artist type.*

---

[*] Professor of Law, Vanderbilt University Law School. Thanks to Toby Adams, Bradley Areheart, Genny Beemyn, Stephanie Bornstein, Mary Bryson, Erin Buzuvis, Mary Anne Case, Paul Castillo, Arli Christian, David Cruz, Heath Fogg Davis, Robin Dembroff, Deborah Dinner, Elizabeth Emens, Katie Eyer, Joseph Fishkin, Andrea Freeman, Andrew Gilden, Michele Goodwin, Aimi Hamraie, Gautam Hans, Jill Hasday, Aziz Huq, Alex Iantaffi, Neha Jain, Dru Levasseur, Bill McGeveran, Shannon Minter, Amy Monahan, Rebecca Morrow, Douglas NeJaime, AJ Neuman Wipfler, Bethany Davis Noll, David Noll, Aaron Potenza, Jessica Roberts, Darren Rosenblum, Laura Rosenbury, Alan Rozenshtein, Naomi Schoenbaum, Jennifer Shinall, Russell Spiker, Maayan Sudai, Hudson Taylor, Ezra Young, the University of Minnesota Public Law Workshop, the Institute for Advanced Study at the University of Minnesota, the Vanderbilt LGBT Policy Lab, the University of Chicago Workshop on Regulation of Family, Sex, and Gender, and the law faculties at the University of Minnesota and the University of Florida for conversations and comments on this project. Thanks to Katie Hanschke of the Vanderbilt Law Library for tracking down sources. For research assistance and valuable substantive feedback, I am grateful to Maria Brekke, Emily Lamm, Sara Lewenstein, Jessica Sharpe, Derek Waller, Claire Williams, and the editors of the *Harvard Law Review*. All opinions expressed here are my own.

895

> *Our identities, who we know ourselves to be, is affected by our biology and the environment, nature and nurture. There are non-binary folks who are intersex, they have ambiguous genitalia, chromosomes that are not XX or XY. 1 in 100 people have bodies that differ from standard male or female.*
>
> *And there are non-binary folks who do have genitalia that is considered standard male or female, but our brains have always been transgender. And collectively, we are the solid evidence that there is, and always has been, a spectrum of gender variation in the human species.*
>
> — Carly Mitchell[1]

## INTRODUCTION

With stunning speed, nonbinary gender identities have gone from obscurity to prominence in American public life. The use of gender-neutral pronouns such as "they, them, and theirs" to describe an individual person is growing in acceptance.[2] "All gender" restrooms are appearing around the country.[3] And an increasing number of U.S. jurisdictions are recognizing a third-gender category. In June 2016, an Oregon court became the first U.S. court to officially recognize nonbinary gender identity.[4] In October 2017, California passed its Gender Recognition Act,[5] a law allowing any individual to change the sex

---

[1] *Gender Identity: Female, Male, or Nonbinary: Hearing on S.B. 179 Before the Assemb. Standing Comm. on Judiciary,* 2017–2018 Leg., Reg. Sess. (Cal. 2017) [hereinafter *Cal. Assemb. Judiciary Hearing*] (statement of Carly Mitchell), https://ca.digitaldemocracy.org/hearing/53965?startTime=705&vid=55910b927084f97bc382c39bf0ecade2 [https://perma.cc/H8T3-NJ6R].

[2] *See, e.g.,* THE ASSOCIATED PRESS STYLEBOOK 274 (Paula Froke et al. eds., 2017) (advising journalists in describing "people who identify as neither male nor female or ask not to be referred to as he/she/him/her" to "[u]se the person's name in place of a pronoun, or otherwise reword the sentence, whenever possible. If they/them/their use is essential, explain in the text that the person prefers a gender-neutral pronoun. Be sure that the phrasing does not imply more than one person" (emphasis omitted)); Lexy Perez, *Super Bowl: Coca-Cola Represents "Them" in Non-binary Ad,* HOLLYWOOD REP. (Feb. 5, 2018, 10:37 AM), https://www.hollywoodreporter.com/news/super-bowl-coca-cola-represents-binary-ad-1081767 [https://perma.cc/JJ3B-4ZWD] (discussing a Super Bowl advertisement featuring a person described as a "them" rather than a "him" or a "her").

Not all nonbinary people use "they, them, and theirs" but these seem to be the most commonly used gender-neutral pronouns. SANDY E. JAMES ET AL., THE REPORT OF THE 2015 U.S. TRANSGENDER SURVEY 18, 49 (2016), http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf [https://perma.cc/35MN-AVDX] (surveying 27,715 transgender people and reporting that 29% use "they/them," *id.* at 49). Some people who have male or female gender identities use "they, them, and theirs" as well.

[3] Aimee Lee Ball, *In All-Gender Restrooms, the Signs Reflect the Times,* N.Y. TIMES (Nov. 5, 2015), https://nyti.ms/1RxHpEM [https://perma.cc/789Q-N2TX].

[4] *In re* The Sex Change of Jamie Shupe, No. 16CV13991, slip op. at 1 (Cir. Ct. Or. Multnomah Cty. June 10, 2016).

[5] S.B. 179, 2017 Leg., Reg. Sess. (Cal. 2017) (enacted).

designation on their official documents to "nonbinary."[6]  At the time of
this writing, eight states, New York City, and Washington, D.C., have
all adopted rules to allow "non-binary" or "X" designations on certain
identification documents.[7]  These U.S. jurisdictions are catching up with
other countries, including Canada, Australia, India, and Germany.[8]

People with nonbinary gender identities do not exclusively identify
as men or women.[9]  The term "gender identity" generally refers to a
person's internal sense of whether they are a man or a woman[10] while
"sex" refers to "bodily characteristics" or the male or female designation
ascribed to an infant at birth.[11]  Nonbinary people are often said to fit

---

[6] *Id.* § 11 (allowing applicants to change the sex markers on their birth certificates and drivers' licenses to "nonbinary" upon attestation that the change "is to conform the person's legal gender to the person's gender identity and is not made for any fraudulent purpose").

[7] *Id.*; N.J. STAT. ANN. § 26:8-40.12 (West 2018) (allowing people to change their birth certificate gender markers to "undesignated/non-binary" effective February 2019); Nonbinary Identification Cards Amendment Act of 2018, D.C. Act 22-466, 65 D.C. Reg. 011402 (Oct. 9, 2018) (to be codified at D.C. CODE § 50-1401.01 after a 30-day period of congressional review) (allowing applicants for drivers' licenses to "designate their gender as nonbinary"); WASH. ADMIN. CODE § 246-490-075 (2018) (allowing people to identify as X rather than M or F on birth certificates); N.Y.C., N.Y., ADMIN. CODE § 17-167.1 (Oct. 9, 2018) (allowing an "x" designation on birth records to designate "a sex that is not exclusively male or female," *id.* § 17-167.1(a)); Press Release, Dep't of the Sec'y of State, State of Me., Maine BMV to Offer Non-binary Gender Designation on Driver's Licenses, ID Cards (June 11, 2018), https://www.maine.gov/sos/news/2018/genderdesignationdlid.html [https://perma.cc/T9XA-Y9XQ]; News Release, Or. Dep't of Transp., "Not Specified" Gender Choice Coming to Driver Licenses (June 15, 2017), https://content.govdelivery.com/accounts/ORDOT/bulletins/1a2bd9e [https://perma.cc/9JU4-86C4]; Associated Press, *Minnesota Licenses Can Now Designate Gender as "Nonbinary,"* STARTRIBUNE (Oct. 3, 2018, 1:00 PM), http://www.startribune.com/Minnesota-licenses-can-now-designate-gender-as-nonbinary/495046021/ [https://perma.cc/PJH5-5BDG]; Curtis M. Wong, *Arkansas Has Been Offering a Nonbinary Gender Option on State IDs for Years,* HUFFINGTON POST (Oct. 17, 2018, 6:50 PM), https://www.huffingtonpost.com/entry/Arkansas-gender-neutral-state-id-option_us_5bc79f75e4b0d38b5874a669 [https://perma.cc/GF2K-ZA3S]; *FAQ: Non-binary Sex Identifier on Driver Licenses and Identification Cards,* COLO. DEP'T OF REVENUE (Nov. 8, 2018), https://www.colorado.gov/pacific/sites/default/files/CO%20nonbinary%20sex%20identifier%20FAQ%2011.08.18.pdf [https://perma.cc/K6G6-M7L8].

[8] Canada began offering nonbinary designations on identity documents in August 2017, joining Australia, Bangladesh, Germany, India, Malta, Nepal, New Zealand, and Pakistan, which all offer some form of nonbinary recognition.  Niraj Chokshi, *Canada Introduces "X" as a Third Sex Category for Passport Holders,* N.Y. TIMES (Aug. 25, 2017), https://nyti.ms/2wvdnRf [https://perma.cc/JG9H-CKU7].

[9] GLAAD MEDIA REFERENCE GUIDE 11 (10th ed. 2016), http://www.glaad.org/sites/default/files/GLAAD-Media-Reference-Guide-Tenth-Edition.pdf [https://perma.cc/Z7PR-C8ZQ].  I offer the definitions in this paragraph in the interest of clarity.  I do not purport that these definitions are "correct" in any metaphysical or moral sense, nor do I argue the law should define these terms in any particular way in every context.  *See infra* section II.A, pp. 933–36 (arguing against any one definition).  I also note that terminology is in flux.  While these terms and definitions are standard at present, they may one day be supplanted by others as social movements refine the relevant terminology to reflect evolving understandings.

[10] GLAAD MEDIA REFERENCE GUIDE, *supra* note 9, at 10 (defining "gender identity" as "[a] person's internal, deeply held sense of their gender," most commonly whether they are "man or woman (or boy or girl)").

[11] *Id.* (explaining that "sex" means "a combination of bodily characteristics including: chromosomes, hormones, internal and external reproductive organs, and secondary sex characteristics").

under the heading "transgender": "An umbrella term for people whose gender identity and/or gender expression differs from what is typically associated with the sex they were assigned at birth."[12]  But not all non-binary people identify as transgender, and many transgender people identify as men or women.[13]  Nonbinary gender identity is not the same thing as intersex variation.  "'Intersex' refers to people who are born with any of a range of sex characteristics that may not fit a doctor's notions of binary 'male' or 'female' bodies."[14]  While some nonbinary people have intersex variations, not all do,[15] and many people with intersex variations have male or female gender identities.[16]

Nonbinary gender identities are not new,[17] but media attention to nonbinary people in the United States has increased significantly since 2015.[18]  Nonbinary characters are now portrayed on television as

---

[12] *Id.*  Gender expression means "[e]xternal manifestations of gender, expressed through a person's name, pronouns, clothing, haircut, behavior, voice, and/or body characteristics." *Id.*

[13] *See, e.g.,* Paisley Currah, *Gender Pluralisms Under the Transgender Umbrella, in* TRANSGENDER RIGHTS 3, 4–5 (Paisley Currah et al. eds., 2006).

[14] *Intersex Definitions*, INTERACT, https://interactadvocates.org/intersex-definitions/ [https://perma.cc/JA3P-JXA5] ("Variations may appear in a person's chromosomes, genitals, or internal organs like testes or ovaries.  Some intersex traits are identified at birth, while others may not be discovered until puberty or later in life.").  The percentage of the population with intersex traits is estimated at less than 2%.  Melanie Blackless et al., *How Sexually Dimorphic Are We? Review and Synthesis*, 12 AM. J. HUM. BIOLOGY 151, 161 (2000) (surveying medical literature since 1955 and concluding that deviation from medical ideals of dimorphism in chromosomes, gonads, and genitalia could be as frequent as 2% of live births, although a much smaller percentage of those infants would be recognized as intersex).  While this percentage may seem small, it is larger than the incidence of children born with Down syndrome.  Kristin Zeiler & Anette Wickström, *Why Do "We" Perform Surgery on Newborn Intersexed Children? The Phenomenology of the Parental Experience of Having a Child with Intersex Anatomies*, 10 FEMINIST THEORY 359, 359 (2009).

[15] *See supra* note 1 and accompanying text.

[16] *See, e.g.,* SHARON E. PREVES, INTERSEX AND IDENTITY: THE CONTESTED SELF 60–85 (2003) (interviewing people with intersex variations who struggle to be accepted as women or men).

[17] *See, e.g.,* Gilbert Herdt, *Preface, in* THIRD SEX, THIRD GENDER: BEYOND SEXUAL DIMORPHISM IN CULTURE AND HISTORY 11, 11 (Gilbert Herdt ed., 1996) ("For centuries the existence of people who did not fit the sex/gender categories male and female have been known but typically dismissed from reports of certain non-Western societies, while in the Western European tradition they have been marginalized, stigmatized and persecuted.").  While nonbinary gender identity has only recently become prominent in national media in the United States, people have been publicly identifying as nonbinary since at least the 1990s.  *See* KATE BORNSTEIN, GENDER OUTLAW: ON MEN, WOMEN AND THE REST OF US 51–69 (Vintage Books 1995) (1994); GENDERQUEER: VOICES FROM BEYOND THE SEXUAL BINARY (Joan Nestle et al. eds., 2002).

[18] *See, e.g., Gender: The Space Between* (CBS News television broadcast Mar. 27, 2017), https://www.cbsnews.com/video/gender-the-space-between/ [http://perma.cc/9THJ-KNZL]; Julie Scelfo, *A University Recognizes a Third Gender: Neutral*, N.Y. TIMES (Feb. 3, 2015), https://nyti.ms/16rpy0Y [https://perma.cc/B343-ABH4].  This group identifies by a variety of terms, including "genderqueer," "gender-nonconforming, bi-gender, non-binary, or just being fluid." Steven Petrow, *Don't Know What "Genderqueer" Is? Meet Someone Who Identifies that Way.*, WASH. POST (May 9, 2016), http://wapo.st/1OhnQ14 [https://perma.cc/7LSG-27HQ].

AR_292759

sympathetic rather than silly.[19]  In the largest survey of transgender people to date, 35% stated that they identify as nonbinary.[20]  If that survey is representative, there may be about half a million people who identify as nonbinary in the United States, a population the size of the city of Miami.[21]  These numbers are likely to increase as social acceptance of nonbinary gender identities grows.[22]  Yet nonbinary people still face discrimination.  Medical professionals are recognizing individuals with nonbinary identities as a population at risk of particular mental health problems due to stress stemming from marginalization and victimization.[23]  Survey responses about transgender people's experiences with

---

[19] *See, e.g.,* Scott Collins, *Asia Kate Dillon on "Billions," Acting and Non-binary Choices,* VARIETY (June 6, 2017, 11:30 AM), http://variety.com/2017/tv/awards/asia-kate-dillon-billions-acting-non-binary-choices-showtime-1202454977/ [https://perma.cc/DP8Z-4799] (discussing Asia Kate Dillon, who identifies as nonbinary and plays Taylor Mason, a nonbinary character on the cable-network show *Billions*); Danielle Corcione, *"Chilling Adventures of Sabrina" Star Lachlan Watson on Non-binary Identity and Telling a Bit of Their Own Story Through Susie Putnam,* TEEN VOGUE (Oct. 29, 2018, 2:54 PM), https://www.teenvogue.com/story/lachlan-watson-susie-putnam-chilling-adventures-of-sabrina [https://perma.cc/CXL4-TL25] (discussing a nonbinary actor who plays a character who "is exploring their gender" on a Netflix series); Jackie Strause, *Blowing Up the Binary: How "Transparent" Season 4 Is Personal for Jill Soloway,* HOLLYWOOD REP. (Sept. 25, 2017, 9:35 AM), https://www.hollywoodreporter.com/live-feed/transparent-season-4-jill-soloway-gender-binary-1042629 [https://perma.cc/PJZ9-CT3P] (discussing an Amazon series that "features one character's journey to identifying as gender non-binary").  In the 1990s, the Saturday Night Live sketch "It's Pat" featured a character whose indeterminate sex was played for laughs.  *See* MARJORIE GARBER, VICE VERSA: BISEXUALITY AND THE EROTICISM OF EVERYDAY LIFE 207, 230–31 (1995).

[20] JAMES ET AL., *supra* note 2, at 18, 45 (describing the results of the U.S. Transgender Survey (USTS) and concluding: "With non-binary people making up over one-third of the sample, the need for advocacy that is inclusive of all identities in the transgender community is clearer than ever," *id.* at 5).  The USTS defined its study population to include "individuals who identified as transgender, trans, genderqueer, non-binary, and other identities on the transgender identity spectrum . . . at any stage of their lives, journey, or transition." *Id.* at 23.

[21] This rough calculation assumes 35% of the 1.4 million transgender adults in the United States identify as nonbinary.  ANDREW R. FLORES ET AL., WILLIAMS INST., HOW MANY ADULTS IDENTIFY AS TRANSGENDER IN THE UNITED STATES? 2 (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf [https://perma.cc/M9LJ-3HHQ] (estimating that 1.4 million adults identify as transgender).  This figure may not reflect the growing number of people who do not identify exclusively as men or women.  In a 2017 survey of 31,217 college students, 1.5% reported that they describe their gender identity as something other than man, woman, trans man, or trans woman.  AM. COLL. HEALTH ASS'N, NATIONAL COLLEGE HEALTH ASSESSMENT, FALL 2017 REFERENCE GROUP DATA REPORT 55, https://www.acha.org/documents/ncha/NCHA-II_FALL_2017_REFERENCE_GROUP_DATA_REPORT.pdf [https://perma.cc/A9T9-NELK] (surveying students from fifty-two postsecondary institutions in the United States).

[22] One commonly reported experience is a "moment" when a nonbinary person first realized that a gender identity other than man or woman might be possible and "everything . . . fell into place and made sense."  *Gender: The Space Between, supra* note 18, at 11:36 (interview with Ela Hosp).  The Internet is facilitating this moment.  *See id.* at 21:00 (interview with Talia Bellia).

[23] *See, e.g.,* Hélène Frohard-Dourlent et al., *"I Would Have Preferred More Options": Accounting for Non-binary Youth in Health Research,* 24 NURSING INQUIRY, Jan. 2017, at 1, 4; Christina Richards et al., *Non-binary or Genderqueer Genders,* 28 INT'L REV. PSYCHIATRY 95, 97–98 (2016).

education, health care, employment, and policing suggest that those with nonbinary gender identities are "suffering significant impacts of anti-transgender bias and in some cases are at higher risk for discrimination and violence" than transgender men and women.[24]

Nonbinary gender identity is not a niche concern. To the contrary, the legal response to nonbinary gender has important implications for a variety of other identity-based legal movements. Feminist legal reformers have long argued that discrimination on the basis of gender nonconformity — in other words, against men perceived as feminine or women perceived as masculine — is a harmful type of sex discrimination that the law should redress.[25] And scholars advocating for transgender rights have debated the role of what we might today call nonbinary identities in transgender rights struggles.[26] But surprisingly, the idea of nonbinary gender as an identity itself has appeared only at the margins of legal scholarship, not as a central object of study.[27]

This Article asks what American law would look like if it took nonbinary gender seriously.[28] What would it mean for the law to ensure

---

[24] Jack Harrison et al., *A Gender Not Listed Here: Genderqueers, Gender Rebels, and OtherWise in the National Transgender Discrimination Survey*, 2 LGBTQ POL'Y J. HARV. KENNEDY SCH. 13, 13 (2011–2012) (describing results of the 2008 National Transgender Discrimination Survey (NTDS), which surveyed 6450 transgender and gender-nonconforming people).

[25] *See, e.g.*, Mary Anne C. Case, *Disaggregating Gender from Sex and Sexual Orientation: The Effeminate Man in the Law and Feminist Jurisprudence*, 105 YALE L.J. 1, 2–3 (1995); Katherine M. Franke, *The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex from Gender*, 144 U. PA. L. REV. 1, 3–5 (1995); Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 YALE L.J. 1683, 1774–88 (1998); Francisco Valdes, *Queers, Sissies, Dykes, and Tomboys: Deconstructing the Conflation of "Sex," "Gender," and "Sexual Orientation" in Euro-American Law and Society*, 83 CALIF. L. REV. 1, 9–10 (1995).

[26] *See, e.g.*, Currah, *supra* note 13, at 4–5. Legal scholars have argued about whether sex discrimination law would protect nonbinary genders. *Compare, e.g.*, David B. Cruz, *Acknowledging the Gender in Anti-transgender Discrimination*, 32 LAW & INEQ. 257, 258 (2014) (arguing that sex discrimination law forbids discrimination against "transgender people," including those with an "inner sense of themselves as female or male (or less often, as both or neither)"), *with* Stevie V. Tran & Elizabeth M. Glazer, *Transgenderless*, 35 HARV. J.L. & GENDER 399, 403 (2012) (arguing that "imperfect gender-nonconformists, whose gender identities are more difficult to understand from a binary perspective . . . would likely fall outside of the protection of federal civil rights law in its current formulation of gender non-conformity as sex discrimination"). The law review literature has advanced broad theories of gender deconstruction, including recent works such as Adam R. Chang & Stephanie M. Wildman, *Gender In/sight: Examining Culture and Constructions of Gender*, 18 GEO. J. GENDER & L. 43, 54–63, 67–68 (2017) (outlining concepts); and Melina Constantine Bell, *Gender Essentialism and American Law: Why and How to Sever the Connection*, 23 DUKE J. GENDER L. & POL'Y 163, 206–220 (2016) (advocating an approach to challenge sex classifications grounded in Canadian doctrine).

[27] Christina Richards et al., *Introduction, in* GENDERQUEER AND NON-BINARY GENDERS 2 (Christina Richards et al. eds., 2017) (discussing "the dearth of existing literature" on nonbinary gender from various academic perspectives, and offering a chapter on U.K. but not U.S. law).

[28] No prior work of legal scholarship has asked this question. A few articles have focused on identity documents. *See, e.g.*, Dean Spade, *Documenting Gender*, 59 HASTINGS L.J. 731, 732–38 (2008) (discussing gender reclassification doctrines for transgender people); Anna James (AJ) Neuman Wipfler, *Identity Crisis: The Limitations of Expanding Government Recognition of Gender*

nonbinary people's full participation in social, political, and economic life? This Article assesses the legal interests in maintaining systems that divide people into male and female categories in areas including law enforcement, employment, education, housing, and health care, and demonstrates that those interests are not reasons to reject the project of nonbinary inclusion. The law can recognize nonbinary gender using familiar civil rights tools and concepts. Nonbinary gender rights might take the form of recognition of a third-gender category, elimination of unnecessary legal sex classifications, or thoughtful integration of nonbinary people into rules or spaces that require binary categories. Many of the interventions suggested in this Article would require only modest extensions of existing law.

One contribution of this Article is to offer the legal literature a descriptive account of nonbinary gender. While nonbinary gender is not new, its legal possibilities are. Rights claims based on nonbinary gender require particular attention, because they are distinct from, if overlapping with, those focused on women or men who are gender-nonconforming, transgender, lesbian, gay, bisexual, or intersex. Nonbinary people pose a direct challenge to all modes of sex segregation, unlike transgender people seeking recognition as men or women.[29] Earlier iterations of feminist argument against binary gender took place within a cultural context in which alternatives to binary gender were scarcely imaginable. To many jurists and theorists, the concept of gender freedom seemed too "conceptually complex and practically costly" to implement.[30] Against this backdrop, challenges to binary gender appeared theoretical, utopian, and impossible, and therefore threatening to other feminist and LGBT projects. The increased visibility and advocacy of nonbinary people, as a minority, makes new legal arguments possible.[31] Yet nonbinary gender is, in many ways, a misfit for legal

---

*Identity and the Possibility of Genderless Identity Documents*, 39 HARV. J.L. & GENDER 491, 491 (2016) (advocating the eventual end of sex classification). My own work has explored binary sex classifications by analogy to the problem of *numerus clausus* in commercial law: When should there be a limited number of legal forms that the law recognizes, as in property, as opposed to a nearly infinite variety of agreements, as in contract? *See* Jessica A. Clarke, *Adverse Possession of Identity: Radical Theory, Conventional Practice*, 84 OR. L. REV. 563, 609 (2005); Jessica A. Clarke, *Identity and Form*, 103 CALIF. L. REV. 747, 768–69 (2015). For a different take on that analogy, see Sonia K. Katyal, *The Numerus Clausus of Sex*, 84 U. CHI. L. REV. 389, 398–400 (2017) (arguing that sex is better analogized to intellectual property than to real estate). This Article's ambition is different — it is to examine the very recent and dramatic advance in nonbinary visibility and to ask what the law would look like, as a practical matter, if it took nonbinary gender seriously.

[29] *Cf.* Whitaker *ex rel.* Whitaker v. Kenosha Unified Sch. Dist., 858 F.3d 1034, 1055 (7th Cir. 2017) (noting approvingly that "allowing transgender students to use [male or female] facilities that align with their gender identity has actually reinforced the concept of separate facilities for boys and girls").

[30] KIMBERLY A. YURACKO, GENDER NONCONFORMITY AND THE LAW 143–44 (2016).

[31] *Cf.* S. Bear Bergman & Meg-John Barker, *Non-binary Activism, in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 31, 33 (discussing how the "new social movement," as

---

categorization because nonbinary people defy categorization as a group. In resisting categorization, this minority casts new light on long-running debates over sex and gender regulation.

But this Article is not about theories of gender. Sex and gender regulation is an area of legal scholarship that might be described as *over*-theorized.[32] A second contribution of this Article is to suggest a contextual approach to debates over sex and gender regulation: analysis of the interests at stake in binary gender in each particular legal context. It examines recent legal, public, and legislative debates over nonbinary gender rights. These debates are often stymied by efforts to craft an all-purpose definition of sex or gender. They are hindered by simplistic assumptions about the shape that nonbinary gender rights must take. Opponents caricature the options as either creating a separate third-gender category that is afforded special legal treatment, or stripping law and society of all gender. For example, they ask, would nonbinary people require their own sports teams under Title IX?[33] Or would they demand the end of all women's sports under Title IX?[34]

This Article argues that U.S. civil rights law offers many options for addressing nonbinary gender rights. One strategy might be sex neutrality: eliminating the use of unnecessary sex classifications by government. This strategy would not attempt to abolish gender or mandate androgyny.[35] It would simply mean getting rid of rules that require people to choose the "male" or "female" category, when those rules do not serve important interests. For example, there is no good reason to designate

---

well as "the longer histories of non-binary gender experience which have often been erased," can "provide some sense of liveable non-binary lives").

[32] *See infra* section II.A, pp. 933–36 (discussing theoretical debates about the definitions of sex, gender, and gender identity).

[33] *See Gender Identity: Female, Male, or Nonbinary: Hearing on S.B. 179 Before the S. Standing Comm. on Judiciary*, 2017–2018 Leg., Reg. Sess. (Cal. 2017) (statement of Jonathan Keller, Chairman and CEO, California Family Council), https://ca.digitaldemocracy.org/hearing/52473?startTime=465&vid=64fe0449e847fdf5c9d8d349540eaa75 [https://perma.cc/8HEA-SVDH] ("The third gender would be subject to Title IX, which could mean that California's 150 public universities, and over 10,000 public schools serving K-12 students would be required under federal law to not only provide male and female athletic teams and facilities, but non-binary facilities and teams as well.").

[34] *See infra* section III.C.2, pp. 966–74.

[35] For example, it is telling that MTV's first gender-neutral acting award went to an actor portraying a Disney princess. Hilary Lewis, *MTV Movie & TV Awards: Asia Kate Dillon Presents Gender-Neutral Acting Award to Emma Watson*, HOLLYWOOD REP. (May 7, 2017, 5:31 PM), http://www.hollywoodreporter.com/news/mtv-movie-tv-awards-asia-kate-dillon-presents-gender-neutral-acting-award-emma-watson-1000935 [https://perma.cc/DQ68-M2YF] (discussing Emma Watson's award for her role as the bookish princess Belle in Disney's live-action *Beauty and the Beast*). This move toward gender neutrality is hardly the end of gender. Instead, it is a renegotiation of gender roles, which might be analyzed critically. *See, e.g.*, PEGGY ORENSTEIN, CINDERELLA ATE MY DAUGHTER: DISPATCHES FROM THE FRONT LINES OF THE NEW GIRLIE-GIRL CULTURE 14 (2011).

single-user restrooms as men's and women's.[36]  But sometimes, sex or gender classifications may serve useful functions.  For example, at present, having an identification document with a sex designation that matches one's self-reported gender identity may protect a person from harassment by government officials.[37]  In such cases, the appropriate strategy might be third-gender recognition: providing a third category to protect people with nonbinary gender identities and to express that they deserve the same respect as men and women.  In a limited number of cases, there may be significant impediments to both third-gender recognition and sex neutrality.  Sex-segregated prison housing might be an example.[38]  In such cases, thoughtful integration of nonbinary people into binary categories may be the best short-term approach.  This approach would redefine binary sex and gender categories to best fulfill the purposes of the regulation, while also respecting every person's gender identity, to the extent possible.  This Article argues that these approaches are not mutually exclusive and that no one approach is the best fit for every context.

Opponents of nonbinary gender recognition argue that their "objections go well beyond the ideological" and pertain to the government's "many legitimate interests" in maintaining a system of binary sex classification.[39]  They claim that the right to nonbinary gender identity will "open[] a Pandora's Box" of unforeseen evils.[40]  A final contribution of this Article is to demonstrate this is not the case.  Now that marriage law no longer needs to determine anyone's sex,[41] a diminishing number of legal arrangements rely on binary sex or gender classifications.  This Article assesses the remaining legal interests in dividing people into male and female categories, including: ensuring the accuracy of identification documents and data; facilitating law enforcement; administering pregnancy protections; allowing people to use gendered pronouns without fear of liability for harassment; maintaining single-sex restrooms, educational programs, sports, and housing facilities; hiring members of one sex for particular jobs; and avoiding health care costs.  It does not aim to rehash debates about transgender rights in general; it takes as a given

---

[36]  *See infra* section III.D.1, pp. 981–83.

[37]  *See infra* section III.A, pp. 947–51.

[38]  *See infra* section III.D.2, pp. 983–86.

[39]  *WoLF Members Pushing Back Against Local "Gender Identity" Legislation*, WOMEN'S LIBERATION FRONT (Aug. 21, 2017), http://womensliberationfront.org/wolf-members-pushing-back-against-local-gender-identity-legislation/ [https://perma.cc/JH7T-F46M].

[40]  Tammerlin Drummond, *Not Male or Female: Proposed Law Would Create Gender-Neutral Option on California IDs*, EAST BAY TIMES (Aug. 21, 2017, 9:37 AM), http://www.eastbaytimes.com/2017/08/20/not-male-or-female-proposed-law-would-create-third-gender-neutral-option-on-california-ids/ [https://perma.cc/RVR6-KETB] (quoting Jonathan Keller, CEO of the Family Research Council).

[41]  Obergefell v. Hodges, 135 S. Ct. 2584, 2604–05 (2015).

that the law should generally respect a transgender person's gender identity as a man or a woman.[42] This Article is interested in how non-binary gender changes the discussion in each particular context of binary gender regulation. Upon careful examination, it turns out that rather than opening Pandora's box, nonbinary gender rights may have unforeseen benefits.

This Article proceeds in three Parts. Part I describes nonbinary gender identity as a discrete phenomenon, advancing legal claims that both converge with and diverge from those of other civil rights movements. Part II argues for a contextual approach to nonbinary gender rights, demonstrating that civil rights law offers many possible legal models. Part III applies that contextual approach, cataloguing and assessing potential legal interests in keeping sex and gender binary, as opposed to the best legal alternatives in each context. It concludes the law does not require a universal definition of sex or gender that limits the options to two.

## I. NONBINARY GENDER

This Part describes nonbinary gender identities. It discusses the diversity of nonbinary genders and reasons for bias against nonbinary people. It then situates nonbinary gender with respect to movements around other identity issues, including feminist arguments for rights to gender nonconformity, the rights of transgender men and women, intersex advocacy, arguments for sexual-orientation nondiscrimination, and antiracist and postcolonial struggles. While there are overlaps between these rights claims, there are also areas of divergence.

This Part makes descriptive claims based on currently available data and information. These claims are provisional, by necessity, because nonbinary gender identities, terminology, and legal arguments are ever evolving. This Article does not presume to speak for any particular person or group. People with nonbinary gender identities and their advocates are developing a variety of arguments for inclusion, based on values such as liberty, equality, respect, privacy, and human flourishing. While I hope that some of these arguments may resonate with readers, this Article's goal is not to build the positive case for inclusion as an abstract matter.[43] I ask readers to assume that the law should treat

---

[42] This Article cannot and does not attempt to persuade any reader who does not share this premise or is unwilling to assume it for the sake of argument. For a human rights argument, see Holning Lau, *Gender Recognition as a Human Right*, *in* NEW HUMAN RIGHTS: RECOGNITION, NOVELTY, RHETORIC (Andreas von Arnauld et al. eds., forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3056110 [https://perma.cc/Q8WR-HBWB].

[43] One U.K. court made the positive case for nonbinary gender rights in terms of the rights to "private life" and "gender identification" protected by the European Convention on Human Rights.

nonbinary gender identities as having the same status as male and fe-
male ones.  My question is what legal results would follow.  This Arti-
cle's normative argument, advanced in Parts II and III, is that the law
has no abiding interest in maintaining a universal scheme of binary sex
or gender regulation that would exclude nonbinary people.

### A. The Diversity of Nonbinary Gender Identities

There is no single model or even archetype of nonbinary gender iden-
tity.  The following is a brief overview of the diversity of nonbinary
gender identities.  My purpose is not to offer anything approaching a
precise definition of nonbinary gender, nor is it to flatten the diversity
of nonbinary genders into a classificatory scheme.[44]  Social media site
Facebook offers its U.S. English–language users the option to describe
their own gender identities in "a free-form field."[45]  As one set of survey
researchers concluded, the wide array of gender identifiers listed by re-
spondents "speak[s] to the creative project of gender identity creation"
and "testifies to resilience, humor, and a spirit of resistance to gender
indoctrination and policing."[46]  Nonbinary people may have any number
of relationships to gender, including, to name a few, hybridity, rejection,
dynamism, insistence on a third option, subversion, or all of these.[47]

---

R (on the application of Elan-Cane) v. Sec'y of State for the Home Dep't [2018] EWHC (Admin)
1530 [107]–[08], 2018 WL 03093374.

   For thoughts on normative theories that might ground claims to nondiscrimination in the U.S.
context, see Jessica A. Clarke, *Against Immutability*, 125 YALE L.J. 2 (2015) (criticizing theories
based on immutability and advancing theories based on antisubordination); and Elizabeth F.
Emens, *Compulsory Sexuality*, 66 STAN. L. REV. 303, 377–78 (2014) (listing criteria that might
apply to traits covered by discrimination law).

[44]  I use the umbrella term nonbinary following the USTS, JAMES ET AL., *supra* note 2, at 4–5,
while recognizing there is controversy over the best umbrella term to describe those people who do
not exclusively identify as men or women, as well as controversy over whether an umbrella term is
appropriate at all.

   If anything, I aim to suggest a "nonce taxonomy" of individualized gender identities.  "Nonce"
means a term that can be used only once.  *Cf.* EVE KOSOFSKY SEDGWICK, EPISTEMOLOGY OF
THE CLOSET 23 (1990).  Sedgwick wrote of the diversity of desires — each one unique — but
"nonce taxonomy" is also an apt descriptor for a discussion of nonbinary gender identities.

[45]  Facebook Diversity, FACEBOOK (Feb. 26, 2015), https://www.facebook.com/facebookdiversity/
posts/774221582674346 [https://perma.cc/SWN9-NZKZ]; *see also* Dylan Vade, *Expanding Gender
and Expanding the Law: Toward a Social and Legal Conceptualization of Gender that Is More
Inclusive of Transgender People*, 11 MICH. J. GENDER & L. 253, 261 (2005) (rejecting the analogy
of gender to a "spectrum" and referring to it as a "galaxy").

[46]  Harrison et al., *supra* note 24, at 20.

[47]  *See, e.g., id.* ("There appears to be no tension for many [survey respondents who wrote in
their gender identities] between simultaneously identifying as fluidly gendered, multiply gendered,
performing gender, or having no gender."); Interview by Andrea Jenkins with Alex Iantaffi,
Transgender Oral History Project 3 (Oct. 6, 2015) [hereinafter Iantaffi Interview], https://umedia.
lib.umn.edu/sites/default/files/archive/60/application/pdf/1553623.pdf [https://perma.cc/HM52-4G2Z]
(describing their gender identity as "non-binary gender-queer trans masculine"); Interview by
Andrea Jenkins with Kate Bornstein, Transgender Oral History Project 3 (Aug. 20, 2015) [herein-
after Bornstein Interview], https://umedia.lib.umn.edu/sites/default/files/archive/60/application/

Examples of gender hybridity — combining gender roles into non-traditional configurations — might include bigender, pangender, and androgynous identities. For example, during an interview with the Transgender Oral History Project, therapist and scholar Alex Iantaffi described their identity as "mixed": "not fully masculine, not fully feminine."[48] They recall seeing the movie *Flashdance* when they were fourteen years old and identifying with the main character, named Alex, who "had sexual agency, she wears this tuxedo thing at one point, and she is a metal-welding dancer."[49] College student Quinn Cox explains: "My gender identity, or how I feel inside, is more masculine, but still not fully male. If being female was like vanilla ice cream and male was like chocolate, I would be chocolate with a tiny vanilla stripe."[50]

Examples of gender rejection — refusal to adopt traditional gender categories — might include agender, genderless, gender neutral, or unisex identities. For example, as one person explained: "I take agender a bit literally, in that my gender is more about the lack of it. Growing up, I never had that sense of being a guy, girl, or something else. My gender simply isn't there."[51] Gender rejection may also be about avoiding stereotyped expectations. Television producer and writer Jill Soloway observes that "when people see me as non-binary, I get treated more as a human being."[52] They explain: "I identify as trans, which means that I am not seeking to synthesise my appearance with the label assigned to me at birth and instead am opting to live in a space where a label other than male or female is used to define me."[53]

Examples of gender dynamism — gender identities that are not static over time — might include gender fluidity.[54] A gender fluid person

---

pdf/1337158.pdf [https://perma.cc/VZ6Z-Y5FH] ("[R]ight now I would call myself non-binary . . . femme-identified transsexual, or transgender . . . . [T]here's my sexual identity . . . I would call that diesel-femme. . . . Then there's the identity I live every day now and I would call that, 'little old lady.' Really.").

[48] Iantaffi Interview, *supra* note 47, at 16.

[49] *Id.*

[50] Quinn Cox, Opinion, *The Sex "X" Bill*, WESTERN HERALD (Nov. 9, 2017), http://www.westernherald.com/opinion/article_3267eb80-c564-11e7-8548-f77dde6f35e1.html [https://perma.cc/9HYZ-7DJX] (describing their identity as "landing on the genderqueer spectrum").

[51] Vera Papisova, *What It Means to Identify as Agender*, TEEN VOGUE (Jan. 20, 2016, 9:51 AM), https://www.teenvogue.com/story/what-is-agender [https://perma.cc/ACY6-YWSJ] (quoting an unidentified interviewee).

[52] Hadley Freeman, *Transparent's Jill Soloway: "The Words Male and Female Describe Who We Used to Be,"* THE GUARDIAN (May 21, 2017, 10:00 AM), https://www.theguardian.com/tv-and-radio/2017/may/21/transparents-jill-soloway-the-words-male-and-female-describe-who-we-used-to-be [https://perma.cc/AFM6-ZZTS]. At the same time, Soloway has stated that they are "happy to speak on behalf of women and on behalf of feminism." *Id.* They "agree that 'woman' shouldn't mean a particular thing." *Id.*

[53] *Id.*

[54] *See, e.g.*, Harrison et al., *supra* note 24, at 14 (reporting that 20% of 2008 NTDS respondents selected "part time as one gender, part time as another" for their primary gender identity today).

might experience their gender differently at different times.[55]    Actor Amandla Stenberg has said "I don't think of myself as statically a girl."[56] Gender fluid people may feel more male and use "he" pronouns on some occasions and feel more female and use "she" pronouns on others.[57]  Or a person might be working on discovery of their gender identity, conceptualizing it as a journey or process.  Professor Petra Doan's experience of gender fluidity has prompted her to ask "whether one can perform the same gender twice."[58]  Author, playwright, and scholar Kate Bornstein has described gender fluidity as "the ability to freely and knowingly become one or many of a limitless number of genders, for any length of time, at any rate of change."[59]

Examples of third genders — categories in addition to man and woman — might include "Two-Spirit (First-Nations)" or "Mahuwahine (Hawaiian)," or any number of other culturally recognized gender forms.[60]  They might include "creative and unique" genders, "such as twidget, birl, OtherWise, and transgenderist."[61]    For example, Jessi Brandon, another participant in the Transgender Oral History Project, identified themself as "non-binary, although [they] have had thoughts of maybe identifying . . . as a demiboy . . . where you feel partially like a boy but not really."[62]

[55]  Laura K. Case & Vilayanur S. Ramachandran, *Alternating Gender Incongruity: A New Neuropsychiatric Syndrome Providing Insight into the Dynamic Plasticity of Brain-Sex*, 78 MED. HYPOTHESES 626, 627 (2012) (studying the experiences of thirty-two bigender people who experience "involuntary" gender switches as frequently as "multiple times a day").

[56]  Abby Aguirre, *Amandla Stenberg Is a Voice for the Future*, VOGUE (Apr. 19, 2017, 9:01 AM), https://www.vogue.com/article/amandla-stenberg-interview-gender-feminism-black-culture [https://perma.cc/JSK2-7PA6].

[57]  Vivian Giang, *What It's Like to Be Young, Gender Neutral and in the Job Market*, FORTUNE (Oct. 20, 2015), http://fortune.com/2015/10/20/gender-neutral-fluid-job/ [https://perma.cc/EQU8-2ZY9]; *see also Gender: The Space Between*, *supra* note 18, at 27:45 (interviewing Brendan Jordan and his friends with Jordan explaining that he is not offended when his friends use both "he" and "she" to refer to him).

[58]  Petra L. Doan, *The Tyranny of Gendered Spaces — Reflections from Beyond the Gender Dichotomy*, 17 GENDER, PLACE & CULTURE 635, 639 (2010).

[59]  BORNSTEIN, *supra* note 17, at 52.

[60]  Harrison et al., *supra* note 24, at 14.  Some cultures have more than three genders.  *See, e.g.,* SHARYN GRAHAM DAVIES, GENDER DIVERSITY IN INDONESIA: SEXUALITY, ISLAM AND QUEER SELVES 2, 10–11 (2010) (discussing the Bugis, an ethnic group in South Sulawesi).

[61]  Harrison et al., *supra* note 24, at 14 (listing responses to the gender identity question on the 2008 NTDS); *id.* at 20 (describing other write-in genders including "Jest me, skaneelog, . . . gender-treyf, trannydyke genderqueer wombat fantastica, Best of Both, and gender blur").

[62]  Interview by Andrea Jenkins with Jessi Brandon, Transgender Oral History Project 6 (Nov. 27, 2016) [hereinafter Brandon Interview], https://umedia.lib.umn.edu/sites/default/files/archive/60/application/pdf/1553882.pdf [https://perma.cc/S77K-YGFQ].

Examples of subversive genders — gender identities that parody or deconstruct the gender binary — might include genderqueer.[63] For example, Bornstein describes their identity as a set of paradoxes, including "not man, not woman," "lovable freak," and "[s]mart blonde."[64] In response to the question, "What is your primary gender today?," some 2008 National Transgender Discrimination Survey Respondents wrote that "gender is a performance."[65]

People with nonbinary identities may view their gender identity, in terms of their inner sense of self, as separate from their gender expression, in terms of their outward appearance.[66] They may sometimes be perceived as men or women.[67] High school student Star Hagen-Esquerra, for example, "likes to wear lacy dresses, dramatic cat-eye makeup, and their hair styled in cascading curls. They like to date straight boys. This made coming out as nonbinary harder, more confusing."[68]

Like transgender men and women, nonbinary people may or may not seek or require medical treatment.[69] Some nonbinary people may not seek medical treatment because they do not wish to "pass" as men

---

[63] The term "genderqueer" derives from "queer theory," an academic theory that questions and critiques norms with respect to sex, gender, and sexuality. *See* Jen Jack Gieseking, *Queer Theory*, *in* 2 ENCYCLOPEDIA OF SOCIAL PROBLEMS 737 (Vincent N. Parrillo et al. eds., 2008) (describing queer theory); Riki Wilchins, *A Certain Kind of Freedom: Power and the Truth of Bodies — Four Essays on Gender*, *in* GENDERQUEER: VOICES FROM BEYOND THE SEXUAL BINARY, *supra* note 17, at 23, 27–29 (discussing the term "genderqueer").

[64] Bornstein Interview, *supra* note 47, at 6.

[65] Harrison et al., *supra* note 24, at 20. Other subversive gender identities included "genderfuck, rebel, or radical." *Id.* The statement "gender is a performance" may be a reference to ideas from queer theory. *See supra* note 63.

[66] See *supra* note 12 for a definition of "gender expression."

[67] JAMES ET AL., *supra* note 2, at 48 (asking nonbinary respondents to the 2015 USTS "what gender they were perceived to be by people who did not know they were non-binary," and reporting that 58% "assumed they were non-transgender women," 17% "assumed they were non-transgender men," and 19% "reported that assumptions about their gender varied"); *id.* at 50 (asking nonbinary respondents "[h]ow often people could tell they were transgender without being told," and reporting that 6% said "[a]lways or most of the time," 32% said "sometimes," and 62% said "[r]arely or never").

[68] Jessica Testa, *This 17-Year-Old Could Be the First Teenager to Put Nonbinary on Their Driver's License*, BUZZFEED NEWS (May 27, 2017, 10:04 AM), https://www.buzzfeed.com/jtes/california-non-binary-gender-identity-recognition [https://perma.cc/NU6R-5WMV].

[69] *See, e.g.*, James Bellringer, *Surgery for Bodies Commonly Gendered as Male*, *in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 247, 249–50, 261–62 (discussing possible surgical options for nonbinary people); David Ralph et al., *Genital Surgery for Bodies Commonly Gendered as Female*, *in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 265, 267, 280 (same); Andrew Yelland, *Chest Surgeries*, *in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 225, 225–26 (same).

or women.[70]  Others might seek medical treatment so as not to have physical features inconsistent with their gender identities.[71]

While nonbinary gender may be most prevalent among younger people, it is not limited to millennials.[72]  In the 2015 U.S. Transgender Survey (USTS), 80% of nonbinary respondents "had female on their original birth certificate, and 20% had male on their original birth certificate."[73]  Most nonbinary respondents who reported having transitioned stated that they began their transitions between the ages of eighteen and twenty-four.[74]  Nonbinary people do not share uniform views on political issues, not even those related to transgender rights.[75]  Some nonbinary people are religious.[76]  There is some evidence nonbinary people are less likely to be white and more likely to be multiracial than other transgender people.[77]  They have a variety of sexual orientations,

---

[70]  *See* Tim Murphy, *Non-binary Brown Alumni Discuss Life Beyond the Bounds of Gender*, NEWS FROM BROWN (Aug. 15, 2018), https://news.brown.edu/articles/2018/08/nonbinary [https://perma.cc/BT7U-36DK] (interviewing Dréya St. Clair) ("I actually had started meeting trans women of color not on campus but in the broader Providence community, in clubs, and some of them were pressuring me into taking hormones, telling me that I had soft features and that I could easily transition and pass on the streets.  But I didn't want that.  I was saying, 'I'm a boy who's feminine and dresses like a girl and there's nothing wrong with that.'  And I've stayed on that course ever since.").

[71]  Colby Sangree, *A Non-binary Perspective on Top Surgery*, HUFFINGTON POST (Mar. 23, 2017), https://www.huffingtonpost.com/entry/a-non-binary-perspective-on-top-surgery_us_58d27b27e4b062043ad4ae76 [https://perma.cc/K552-DBB5] (discussing reasons for seeking "top surgery": "Everyone in my life told me that growing breasts defined femininity.  No longer could I remain a tomboy — genderfluid, free to express myself — I was on my way to a forced womanhood").

[72]  JAMES ET AL., *supra* note 2, at 46 (reporting that 61% of nonbinary respondents to the 2015 USTS were aged eighteen to twenty-four, 35% were aged twenty-five to forty-four, and 5% were forty-five or older).

[73]  *Id.* at 45.

[74]  *See id.* at 48 (reporting that 24% of nonbinary respondents transitioned under the age of eighteen, 56% between the ages of eighteen and twenty-four, 16% between the ages of twenty-five and thirty-four, and 4% at the age of thirty-five or over).  The survey defined transitioning as "living full-time in a gender other than that on their original birth certificate." *Id.*

[75]  For example, Jamie Shupe, the first person to win a U.S. court order changing their sex designation to nonbinary, has argued there can be "problems with transgender military service." Jamie Shupe, *This Debate Is About Gender Dysphoria, Not Transgender Military Service*, MERCATORNET (Aug. 1, 2017), https://www.mercatornet.com/conjugality/view/this-debate-is-about-gender-dysphoria-not-transgender-military-service/20168 [https://perma.cc/WL8H-GJ6A] ("President Trump is seriously mistaken in putting a blanket ban on transgender military service because not every trans service member is impacted by gender dysphoria.  Neither does every trans person need to transition their sex.  But the President and those that share his views are not completely wrong.").

[76]  Wail Qasim, *Being a Black, British, Queer, Non-binary Muslim Isn't a Contradiction*, THE GUARDIAN (June 20, 2016, 4:00 AM), https://www.theguardian.com/commentisfree/2016/jun/20/black-british-queer-non-binary-muslim-isnt-contradiction [https://perma.cc/Z5VH-W8SL]; Brandon Interview, *supra* note 62, at 11 ("One of my main concerns was finding a place where I could be out as queer but I could also be a Christian and talk about how my queerness and my religion intersect . . . .").

[77]  Harrison et al., *supra* note 24, at 18–19 (reporting that those selecting "gender not listed here" on the 2008 NTDS were 70% white, compared with 77% of other respondents; 18% multiracial,

*HARVARD LAW REVIEW* [Vol. 132:894

although only 2% identify as "[s]traight or heterosexual."[78] Some survey evidence suggests that this population has a significantly higher level of educational attainment than average, but a lower household income.[79] They may be more likely to live on the coasts and in the Northeast than transgender men and women.[80]

### B. *Reasons for Bias Against Nonbinary People*

Nonbinary people report that they face harassment, violence, and discrimination, with adverse health consequences. Out of nonbinary respondents to the 2015 USTS, 39% had attempted suicide, compared with 4.6% of the general population.[81] This may relate to other findings of the survey — that nonbinary people experience high rates of discrimination, family rejection, harassment, and assault.[82] Nonbinary people may encounter mistreatment for a variety of reasons, including disbelief in nonbinary identity, erasure of nonbinary experiences, dehumanization of those who do not fit conventional gender categories, concern that nonbinary people will undermine traditional gender roles, and politicization of nonbinary identity in a time of increasing polarization.

Bias against nonbinary people often takes the form of disbelief, disregard, disrespect, and paternalism. Nonbinary people report that one of the most common reasons for bias against them is the belief that they are insincere and attention seeking,[83] or that nonbinary identity is a

---

compared with 11% of other respondents; 5% Black, compared with 4% of other respondents; 3% Asian, compared with 2% of other respondents, and 4% Latino/a, compared with 5% of other respondents).

[78] JAMES ET AL., *supra* note 2, at 59 (reporting that, among nonbinary respondents to the 2015 USTS, 34% identify as queer, 21% identify as pansexual, 17% identify as asexual, 10% identify as bisexual, 8% identify as gay, lesbian, or same-gender-loving, 2% as straight or heterosexual, and 8% as an orientation not listed).

[79] Harrison et al., *supra* note 24, at 19–20. The 2008 NTDS respondents in general had a higher level of educational attainment than the general population. *Id.* at 20.

[80] *Id.* at 19.

[81] JAMES ET AL., *supra* note 2, at 114; *see also id.* at 105 (49% of nonbinary people reported current, serious psychological distress).

[82] *Id.* at 76 (32% reported family rejection since transitioning); *id.* at 133–34 (16% reported being physically attacked and 10% reported being sexually assaulted in K-12 schools because of the perception that they were transgender); *id.* at 135 (15% left a K-12 school because of mistreatment); *id.* at 150 (7% lost a job because of their gender identity or expression); *id.* at 186 (71% reported that they were never or only sometimes treated with respect by law enforcement).

[83] Papisova, *supra* note 51 ("For Mya, the biggest misconception they face about their gender identity is 'definitely that it doesn't exist, or that I'm just trying to get attention.'"); Brandon Interview, *supra* note 62, at 12 (describing the response: "They're just being special snowflakes who want attention"). Psychologists regard it as unlikely that claiming a nonbinary gender is attention-seeking behavior. *See* STEPHANIE BRILL & LISA KENNEY, THE TRANSGENDER TEEN: A HANDBOOK FOR PARENTS AND PROFESSIONALS SUPPORTING TRANSGENDER AND NON-BINARY TEENS 14 (2016) ("Being . . . non-binary . . . is a difficult road to walk. . . . If your teen simply wanted to annoy you or try to get your undivided attention with their gender, they would likely do

trend or a political posture.[84]  Some opponents of nonbinary recognition argue that science and religion demonstrate that everyone is either a man or a woman, and the idea of a third gender is "ridiculous," "nonsense," "insane," "absurd," and the result of "brainwash[ing]."[85]  Another common reaction is that nonbinary identities should not be respected because those identities are a developmental phase, a result of confusion, or a form of experimentation.[86]  Relatedly, bias against nonbinary people is often rooted in paternalism: beliefs by medical professionals, family members, and educators that nonbinary people must be protected from themselves, lest they make choices they will come to regret, such as medical intervention, or that will expose them to tragic and irreversible social consequences.[87]

Yet another form of bias is erasure — a sense of "feeling like the debris that is falling through the cracks" of policies aimed at transgender inclusion.[88]  Some nonbinary people may be criticized for "not being trans enough" and left out of networks of support for transgender people.[89]  Mistreatment of nonbinary people may sometimes result from

what teens have done for generations and use gender expression to assert their individuality and independence (think hair, makeup, clothing styles).").

[84]  *See, e.g.*, Trav Mamone, *9 Things Not to Say to a Non-binary Person*, EVERYDAY FEMINISM (Feb. 15, 2017), https://everydayfeminism.com/2017/02/things-not-to-say-non-binary-ppl/ [https://perma.cc/SGL6-ZFNY] (discussing people "who want to write off anything that doesn't fit the binarist view of gender as 'made up'" and the false charge that the social media site Tumblr "invented" nonbinary gender).

[85]  Just Want Privacy, *Oppose 3rd Gender Option on WA Birth Certificates*, FACEBOOK (Dec. 5, 2017), https://www.facebook.com/events/967556456753263/ [https://perma.cc/2SMH-L3FX] (quotations from a public Facebook page collecting comments on Washington State's rule to allow a nonbinary designation on birth certificates).

[86]  At the hearing for recognition of Star Hagen-Esquerra's nonbinary gender identity, the judge asked them if they were making an impulsive decision. Hagen-Esquerra, an AP student, responded, "I've never made an impulsive decision in my entire life."  Testa, *supra* note 68; *see also Gender Identity: Female, Male, or Nonbinary: Hearing on S.B. 179 Before the Assemb. Standing Comm. on Transp.*, 2017–2018 Leg., Reg. Sess. (Cal. 2017) [hereinafter *Cal. Assemb. Transp. Hearing*] (statement of Jonathan Clay), https://ca.digitaldemocracy.org/hearing/54049?startTime=0&vid=a0f9eb2f37a98dafa47cac34d69378d8 [https://perma.cc/ZC5J-VRR7] ("We've been asked many times, is this a phase for our child?  And the answer's no.  I mean, since a very early age, it's now, looking back, been pretty apparent, that this was . . . the path our child is taking.").

[87]  Parents of transgender children commonly report concern that their children will never find romantic love, will be targeted for violence and discrimination, or will engage in self-harm.  BRILL & KENNEY, *supra* note 83, at 19–20.

[88]  Interview by Andrea Jenkins with Roze (R.B.) Brooks, Transgender Oral History Project 11 (Nov. 3, 2016) [hereinafter Brooks Interview], https://umedia.lib.umn.edu/sites/default/files/archive/60/application/pdf/1553885.pdf [https://perma.cc/K5YB-PZM9].

[89]  Genny Beemyn, *Get Over the Binary: The Experiences of Nonbinary Trans College Students*, *in* TRANS PEOPLE IN HIGHER EDUCATION (Genny Beemyn ed., forthcoming 2019) (manuscript at 251) (on file with the Harvard Law School Library) (discussing nonbinary interviewees who were assigned male at birth and were "frequently critiqued by both cis and other trans people on how well they 'do transgender'").

ignorance or misunderstanding.[90] Policymakers may sometimes refuse to entertain the claims of nonbinary people because they believe it is only "a very small number of people" that "consider themselves to be of neither gender."[91] A related form of discrimination is insistence that nonbinary people hide, "cover," or downplay their nonbinary identities so as not to disrupt their schools or workplaces.[92] Many nonbinary people report that they often let strangers assume they are men or women, rather than spend their time trying to explain nonbinary gender identities.[93] Nonbinary respondents to the 2015 USTS were almost twice as likely as other transgender respondents to avoid asking their employers to use their correct pronouns.[94]

Other reactions to nonbinary identities may be dehumanizing. The moment the sonogram technician proclaims "It's a girl!" or "It's a boy!" may be the moment someone is first recognized as human.[95] Some people regard as monstrous "that which eludes gender definition."[96] They may react with discomfort, disgust, or anger, feeling that a nonbinary person is trying to deceive them.[97] Nonbinary people may be targeted

---

[90] Misunderstandings abound; there is an entire genre of online news articles that lists them. *See, e.g.,* Suzannah Weiss, *9 Things People Get Wrong About Being Non-binary,* TEEN VOGUE (Feb. 15, 2018, 4:56 PM), https://www.teenvogue.com/story/9-things-people-get-wrong-about-being-non-binary [https://perma.cc/NDR5-3TSZ]; Meg Zulch, *7 Things Genderqueer People Want You to Know,* BUSTLE (Dec. 3, 2015), https://www.bustle.com/articles/124009-7-things-genderqueer-people-want-you-to-know [https://perma.cc/TA5M-YNZ9].

[91] Bergman & Barker, *supra* note 31, at 36 (quoting a U.K. Ministry of Justice statement that it is "not aware that that results in any specific detriment" to this group).

[92] JAMES ET AL., *supra* note 2, at 155 (reporting that 14% of nonbinary respondents to the USTS hid their "past transition to avoid discrimination in the past year"); Giang, *supra* note 57 (quoting one nonbinary job seeker: "I fear I and many other people may have to hide an essential part of who we are — our genders — in order to find jobs"). *See generally* KENJI YOSHINO, COVERING: THE HIDDEN ASSAULT ON OUR CIVIL RIGHTS ix (2006) ("To cover is to tone down a disfavored identity to fit into the mainstream.").

[93] JAMES ET AL., *supra* note 2, at 49 (finding that 44% of nonbinary respondents to the 2015 USTS "usually let others assume they were a man or woman, and 53% sometimes corrected others"). The most common reasons for not disclosing a nonbinary identity were: "[m]ost people do not understand so they do not try to explain it" (86%), "[i]t is easier not to say anything" (82%), "[m]ost people dismiss it as not being a real identity or a 'phase'" (63%), and "[t]hey might face violence" (43%). *Id.*

[94] *Id.* at 154.

[95] *See* JUDITH BUTLER, BODIES THAT MATTER 232 (1993).

[96] PETER BROOKS, *What is a Monster? (According to* Frankenstein*), in* BODY WORK 199, 219 (1993) ("Because a monster is that which calls into question all our cultural codes, including language itself, we can understand the persistent afterlife of Mary Shelley's creation, which shows us that, quite literally, once you have created a monster, whatever the ambiguities of the order of its existence, you can never get rid of it."); *cf.* Susan Stryker, *My Words to Victor Frankenstein Above the Village of Chamounix: Performing Transgender Rage,* 1 GLQ: J. LESBIAN & GAY STUD. 237, 250 (1994) ("Like [Mary Shelley's] creature, I assert my worth as a monster in spite of the conditions my monstrosity requires me to face, and redefine a life worth living.").

[97] Doan recalls an incident of street harassment in which a man confronted her with "smouldering anger" and "started yelling 'I know what you are! You can't fool me! You are disgusting!'" Doan, *supra* note 58, at 640.

for violence and assault because they are perceived as both socially vulnerable and without human feeling and dignity.[98]  Nonbinary gender identities may unleash moral panic because they call into question accepted social norms about gender identity.[99]  One agender person reports regularly being told to "throw myself on the tracks" when waiting for a subway train.[100]  People may fear that those who are willing to transgress social norms with respect to binary gender may also be willing to transgress other social boundaries, posing threats to safety.[101]  Or they may fear contagion.  One nonbinary trans man reports that his father kicked him out of the house for fear that he would influence his younger sister to "be gay or be trans."[102]

Investments in binary gender may also drive animus against nonbinary people.  Those who celebrate and cherish gender difference may fear that nonbinary identities will render their views politically incorrect or even legally impermissible.[103]  They may worry that binary gender will become a minority perspective that is no longer the default position respected by public discourse or institutions.  Additionally, those who are privileged because they fall on the masculine side of the gender binary may fear a loss of that privilege if gender were reconceived as a free-form range of possibilities.  Or, those whose feminine identities afford them particular forms of privilege — such as access to all-female social spaces or awards — may fear the intrusion of nonbinary people, the dilution of benefits as nonbinary people insist on spaces for themselves, or the dissolution of the very categories of women or femininity.[104]

---

[98]  Doan tells about an incident in which a drunken man in an elevator groped her breasts, expecting to find them false.  *Id.* at 641.  What was most hurtful about the assault was that the man had a female companion, which had "lulled" Doan "into feeling safe."  *Id.*  Doan writes, "I am fairly certain that if he had tried to fondle a female whose femininity was unimpeachable, his companion would probably have pulled him back in horror. . . . This incident simply drove home the point that people whose gender does not seem quite right are fair game for all manner of treatment."  *Id.*

[99]  *See* Tucker Carlson, *Are "Gender-Neutral" Babies the Future?*, FOX NEWS (July 17, 2017), http://video.foxnews.com/v/5510847908001/?#sp=show-clips [https://perma.cc/FU8K-YQGY] ("Well for all of our lives we've lived in a world of boys and girls but that is changing along with everything else in 2017. . . . Are we ready for a world here where baby boys and girls are replaced by baby somethings?").  For discussion of moral panics, see generally STANLEY COHEN, FOLK DEVILS AND MORAL PANICS: THE CREATION OF THE MODS AND ROCKERS (1972).

[100]  *Gender: The Space Between*, *supra* note 18, at 7:00 (interviewing Brin Solomon).

[101]  *Cf.* Kath Browne, *Genderism and the Bathroom Problem: (Re)materialising Sexed Sites, (Re)creating Sexed Bodies*, 11 GENDER, PLACE & CULTURE 331, 336–38 (2004) (discussing experiences of the "bathroom problem" "where individuals are challenged in toilet spaces and their gender questioned," *id.* at 336–37, and hypothesizing that "where bodies are revealed as unstable and porous, flowing between sexes may be more threatening," *id.* at 338).

[102]  *Gender: The Space Between*, *supra* note 18, at 2:34 (interviewing Brin Solomon).

[103]  *See Cal. Assemb. Transp. Hearing*, *supra* note 86 (statement of Michael McDermott) (opposing California's Gender Recognition Act because "the purpose of political correctness is neither to inform nor to educate, but rather to humiliate").

[104]  *See* Jessica Chasmar, *Girls Complain After "Non-binary" Boy* [sic] *Is Crowned Prom Queen in NYC*, WASH. TIMES (June 29, 2016), https://www.washingtontimes.com/news/2016/jun/29/high-

General trends of increasing political polarization may increase hostility toward nonbinary people, who may be figured as emblems of the left's position on gender roles. Opposition to nonbinary gender identity may result in intentional "misgendering": the refusal to refer to a person by the correct pronouns or other gender designations.[105] Nonbinary people may be stereotyped as "difficult."[106] Underlying this concern may be a fear of causing social offense by using the wrong terms.[107] Nonbinary people may be associated with controversial ideas in higher education, such as "trigger warnings" or "political correctness."[108]

### C. Convergences and Divergences with Other Rights Struggles

Advocates of nonbinary recognition have framed their case in terms of universal values such as self-determination, love, safety, privacy, human flourishing, inclusion, and respect.[109] This section begins to map out some of the connections between the movement for nonbinary gender rights and feminist, LGBT, intersex, antiracist, and postcolonial

---

school-girls-complain-after-non-binary-boy-is/ [https://perma.cc/WB6N-CY8J] (discussing negative reactions on social media). *But see* Zoe Sullivan, *Wisconsin High School to Unveil Gender-Neutral Homecoming Court*, THE GUARDIAN (Oct. 16, 2015, 7:00 AM), https://www.theguardian.com/us-news/2015/oct/16/wisconsin-high-school-to-unveil-gender-neutral-homecoming-court [https://perma.cc/SY3S-WGYL] ("A high school in Wisconsin is poised to unveil a gender-neutral homecoming court after nearly half the student body signed a petition calling for changes to the court's structure. . . . Instead of being crowned 'king' or 'queen', the top vote earners at Madison West will be able to choose their titles.").

[105] Misgendering may also be negligent or accidental. Nonbinary people sometimes report that a consequence of accidental misgendering is a demand that the nonbinary person forgive and console the person who made the mistake. *See, e.g.*, Mamone, *supra* note 84; Paulus van Horne, *Introducing Myself as "They/Them/Their" at My Workplace*, at 19:58, PUB. RADIO INT'L (Aug. 8, 2016, 11:00 AM), https://www.pri.org/stories/2016-08-08/so-what-are-your-pronouns [https://perma.cc/WQK6-GNFD] (interview with Jack Qu'emi) ("You don't need to make a big deal about it. . . . I had somebody misgender me and then cry in front of me about it. I was uncomfortable . . . .").

[106] Bergman & Barker, *supra* note 31, at 37.

[107] *See supra* note 105.

[108] Bergman & Barker, *supra* note 31, at 37.

[109] *See, e.g., Cal. Assemb. Judiciary Hearing*, *supra* note 1 (statement of Cristina Garcia, Member, Assemb. Standing Comm. on Judiciary) (responding to an opponent of the Gender Recognition Act: "I do hope that as we move forward, we come from a place of love, a place of understanding, and a place where we let individuals decide for themselves what they need"); *id.* (statement of Ash Kalra, Member, Assemb. Standing Comm. on Judiciary) (arguing in support of the Gender Recognition Act as a way to "stand on the side of ensuring that we create not just a safe community for all but one in which everyone can live their full potential and live their lives in a way that allows them to be loved and supported by their community"); Press Release, Exec. Office of the Mayor of D.C., Mayor Bowser Announces Addition of Gender Neutral Identifier to Drivers Licenses and Identification Cards (June 23, 2017), https://mayor.dc.gov/release/mayor-bowser-announces-addition-gender-neutral-identifier-drivers-licenses-and [https://perma.cc/V4VS-8AYT] (quoting a Washington, D.C., official: "The implementation of a gender neutral identifier is consistent with our DC values of inclusion and respect").

advocacy, with an emphasis on legal arguments.[110]  It is beyond the
scope of this Article to canvass these connections in any comprehensive
way.  This section intends to provide an overview of some potential
convergences and divergences among the legal interests of these identity
movements.  Its aim is to illustrate that nonbinary gender identity is
worthy of independent analysis and has broad implications.

*1. Feminist Arguments.* — Feminist theory of the late twentieth cen-
tury criticized binary concepts of gender, and those critiques found lim-
ited uptake in the law.  Nonbinary gender rights advocacy today both
draws on feminist arguments and diverges from them, opening new legal
possibilities.

Early feminist critiques of binary gender were built on a distinction
between sex as physical and gender as social.[111]  In 1975, cultural an-
thropologist Gayle Rubin criticized the "sex/gender system," which she
analogized to Marx's explanation of the relationship between race and
slavery.[112]  Rubin argued for critical analysis of the "social apparatus
which takes up females as raw materials and fashions domesticated
women as products."[113]  She described how kinship systems, resting on
"[c]ompulsory heterosexuality,"[114] organized social life and production
around marriage and "the sexual division of labor," making men domi-
nant breadwinners and women subordinate caretakers.[115]  This system
rests on "a taboo against the sameness of men and women, a taboo di-
viding the sexes into two mutually exclusive categories, a taboo which
exacerbates the biological differences between the sexes and thereby *cre-
ates* gender."[116]  Thus, Rubin made the case for freeing women from the
constraints of subordination.  But her theory was also about broader
gender freedom.  She concluded: "Ultimately, a thoroughgoing feminist
revolution would liberate more than women.  It would liberate forms of
sexual expression, and it would liberate human personality from the
straightjacket of gender."[117]

---

[110]  These topics were selected due to the extent of their overlap with nonbinary rights claims,
but that is not to deny that there may also be useful intersections to explore with respect to disability,
class, age, religion, and other identities.

[111]  *See, e.g.*, Donna J. Haraway, *"Gender" for a Marxist Dictionary: The Sexual Politics of a
Word, in* CULTURE, SOCIETY AND SEXUALITY: A READER 82, 86–89 (Richard Parker & Peter
Aggleton eds., Routledge 2d ed. 2007) (1999).

[112]  *See* Gayle Rubin, *The Traffic in Women: Notes on the "Political Economy" of Sex, in* TO-
WARD AN ANTHROPOLOGY OF WOMEN 157, 158–59 (Rayna R. Reiter ed., 1975).

[113]  *Id.* at 158.

[114]  *Id.* at 198.  This term was popularized in an essay by Adrienne Rich.  Adrienne Rich, *Com-
pulsory Heterosexuality and Lesbian Existence*, 5 SIGNS: J. WOMEN CULTURE & SOC'Y 631
(1980).

[115]  Rubin, *supra* note 112, at 178.

[116]  *Id.*

[117]  *Id.* at 200.

Twentieth-century feminists debated whether this liberation would result in a sort of idealized androgyny, where all individuals combine the best of both masculine and feminine traits,[118] or in an unbounded diversity of gender identities, with each person determining their own reconfigurations of masculinity and femininity, and other genders off the spectrum.[119] Fiction, like Ursula Le Guin's novel *The Left Hand of Darkness*, assisted in the project of imagining different configurations of gender.[120]

At the same time, feminist lawyers pursued legal strategies that attempted to chip away at legally enforced sex roles for men and women, stereotype-by-stereotype, rather than engaging in wholesale critique of binary gender.[121] In these cases, men challenged rules that assumed that only women would be caretakers,[122] and women challenged rules that assumed only men would be breadwinners.[123] Today, the U.S. Supreme Court is skeptical of laws that classify on the basis of sex, requiring that they be supported by an "exceedingly persuasive justification."[124] That justification must hold up by present-day standards.[125] The Supreme Court's sex-stereotyping jurisprudence protects gender nonconformists: for example, women who want to attend military academies and men

---

[118] *Compare* CAROLYN G. HEILBRUN, TOWARD A RECOGNITION OF ANDROGYNY, at ix–x (1973) ("[O]ur future salvation lies in a movement away from sexual polarization and the prison of gender toward a world in which individual roles and the modes of personal behavior can be freely chosen."), *with* Joan W. Scott, *Deconstructing Equality-Versus-Difference: Or, the Uses of Poststructuralist Theory for Feminism*, 14 FEMINIST STUD. 33, 45 (1988) (arguing that the problem with "subsuming women into a general 'human' identity" is that it brings us back "to the days when 'Man's' story was supposed to be everyone's story").

[119] *See, e.g.*, Frances E. Olsen, *The Family and the Market: A Study of Ideology and Legal Reform*, 96 HARV. L. REV. 1497, 1578 (1983) ("Rather than shades of grey as an alternative to all black and all white, I envision reds and greens and blues.").

[120] URSULA K. LE GUIN, THE LEFT HAND OF DARKNESS (1969) (depicting, in science fiction, an androgynous species in which individuals move back and forth between male and female reproductive roles). For a different fictional vision of androgyny, see MARGE PIERCY, WOMAN ON THE EDGE OF TIME (1976).

[121] *See, e.g.*, Cary Franklin, *The Anti-stereotyping Principle in Constitutional Sex Discrimination Law*, 85 N.Y.U. L. REV. 83, 120 (2010).

[122] *See, e.g.*, Weinberger v. Wiesenfeld, 420 U.S. 636, 648–53 (1975) (holding unconstitutional a Social Security rule that provided benefits to mothers but not fathers).

[123] *See, e.g.*, Frontiero v. Richardson, 411 U.S. 677, 688–91 (1973) (plurality opinion) (holding unconstitutional a statutory requirement that female officers, but not male officers, needed to prove the dependency of their spouse in order to receive benefits).

[124] Sessions v. Morales-Santana, 137 S. Ct. 1678, 1690 (2017) (quoting United States v. Virginia, 518 U.S. 515, 531 (1996)).

[125] *Id.* ("Moreover, the classification must substantially serve an important governmental interest *today*, for 'in interpreting the [e]qual [p]rotection [guarantee], [we have] recognized that new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged.'" (alterations and omission in original) (quoting Obergefell v. Hodges, 135 S. Ct. 2584, 2603 (2015))).

who want to attend nursing schools.[126]  Even without the Court's direction, the antistereotyping principle has succeeded in convincing legislatures to remove sex classifications from the statute books.[127]

But the force of the antistereotyping principle has been limited.  The Court has distinguished laws based on "overbroad generalizations about the different talents, capacities, or preferences of males and females" from those sex classifications based on the "enduring" nature of "[p]hysical differences between men and women."[128]  Thus, equal protection challenges against laws that forbid women, but not men, to bare their chests, have had mixed success.[129]  Courts have refused to upset sex-specific rules they regard as reflecting "comfortable gender conventions" and having a trivial impact on women, such as job requirements that women, but not men, wear makeup.[130]  And courts have upheld policies that consider sex for affirmative action purposes.[131]

In the twentieth century, the more radical feminist project of re-envisioning gender identity to include genders that are not male or female ran into opposition.  Conventional wisdom is that everywhere one looks, one sees human life sorted into male and female categories — with counterexamples written off as exceptions to the rule.[132]  The

---

[126] *Virginia*, 518 U.S. at 534 (holding that the exclusion of women from the Virginia Military Institute was unconstitutional); Miss. Univ. for Women v. Hogan, 458 U.S. 718, 729–31 (1982) (holding unconstitutional a policy of excluding men from a nursing school because it "tends to perpetuate the stereotyped view of nursing as an exclusively woman's job," *id.* at 729).

[127] For example, although the Supreme Court in 1981 upheld a state statute defining statutory rape as sexual intercourse by a male with a female, Michael M. v. Superior Court, 450 U.S. 464, 472–73 (1981), all U.S. states have since amended their laws to apply to anyone who has sex with a minor, Carolyn Cocca, *"16 Will Get You 20": Adolescent Sexuality and Statutory Rape Laws, in* ADOLESCENT SEXUALITY: A HISTORICAL HANDBOOK AND GUIDE 15, 21 (Carolyn Cocca ed., 2006).  Though the statutes may be gender neutral, it is important to note they are selectively enforced along gendered lines.  *See* Cynthia Godsoe, *Recasting Vagueness: The Case of Teen Sex Statutes*, 74 WASH. & LEE L. REV. 173, 204 (2017).

[128] *Virginia*, 518 U.S. at 533; *see also id.* at 550 n.19 (noting that physical differences between male and female cadets "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs").  In 2001, the Supreme Court upheld an immigration rule that "require[d] unwed U.S.-citizen fathers, but not mothers, to formally acknowledge parenthood of their foreign-born children in order to transmit their U.S. citizenship to those children." *Morales-Santana*, 137 S. Ct. at 1694 (discussing Nguyen v. INS, 533 U.S. 53, 62–63 (2001)).  The explanation: because of the physical nature of pregnancy, a woman's parental status is established when she gives birth, while an unwed father's connection to a child requires some additional evidence.  *Id.*

[129] *Compare* Free the Nipple v. City of Fort Collins, 216 F. Supp. 3d 1258, 1264–66 (D. Colo. 2016) (denying a motion to dismiss plaintiff's equal protection challenge), *with* Tagami v. City of Chicago, 875 F.3d 375, 380 (7th Cir. 2017) (upholding, in a divided decision, a law that allows men, but not women, to bare their breasts against equal protection challenge).

[130] YURACKO, *supra* note 30, at 45.

[131] *See, e.g.*, Johnson v. Transp. Agency, 480 U.S. 616, 619–20 (1987) (Title VII challenge); Schlesinger v. Ballard, 419 U.S. 498, 499–500, 510 (1975) (constitutional challenge).

[132] *See* Joan C. Williams, *Feminism and Post-Structuralism*, 88 MICH. L. REV. 1776, 1778 (1990) (reviewing ZILLAH R. EISENSTEIN, THE FEMALE BODY AND THE LAW (1988)) (arguing that

critique of binary gender is often reduced to straw figures easily dismissed. For example, critics charge that feminists deny biological facts about sexual dimorphism in the human species or deny biology altogether.[133] Critics assume the only alternative is an impossible form of gender blindness or a tyrannical form of gender abolition.[134]

Some advocates for nonbinary people today frame their arguments in terms that recall Rubin's idea of "liberat[ing] human personality from the straightjacket of gender."[135] These new arguments emphasize the liberty and autonomy of each individual with respect to gender, rather than the potential for subordination in dualisms like male/female.[136] They also emphasize authenticity.

Consider the case brought by Dana Zzyym challenging the State Department's policy of requiring an applicant to mark either M or F on a passport application.[137] Zzyym is intersex[138] and nonbinary[139] and uses they/them pronouns.[140] Zzyym requested a passport with an X as the sex designation, and the State Department denied that request.[141] The district court ruled for Zzyym, holding that the State Department's "gender policy is arbitrary and capricious and not the product of rational decision making."[142] While the court's decision did not discuss the

---

theory cannot dissuade people, rather, feminists need "detailed redescription" in the form of "psychological data that allows us to see how a continuum of behavior variation is so consistently interpreted as a male/female dichotomy" in order to "help[] people recognize the artificiality of the gender verities they 'see' at work around them").

[133] Many feminist arguments have been "interactionist": about the relationship between biology and culture, not a denial of biology. Haraway, *supra* note 111, at 87.

[134] Suzanne B. Goldberg, Essay, *Risky Arguments in Social-Justice Litigation: The Case of Sex-Discrimination and Marriage Equality*, 114 COLUM. L. REV. 2087, 2089, 2133 (2014) (arguing that judges may have "an internalized sense . . . that if sex-based rules were not tolerated on occasion, we would all wind up in unisex tunics, having lost our sexed and gendered bearings," *id.* at 2133); Joan Williams, *Implementing Antiessentialism: How Gender Wars Turn Into Race and Class Conflict*, 15 HARV. BLACKLETTER L.J. 41, 81 (1999) ("We live in a world where most people feel awkward if they don't know whether you are a 'he' or a 'she.' A world where gender was as unimportant as eye color, many people feel, would leave them literally speechless. (The alternative of inventing a new language, which holds considerable appeal for intellectuals, probably holds little appeal for most people.)").

[135] Rubin, *supra* note 112, at 200.

[136] *See, e.g., Cal. Assemb. Judiciary Hearing, supra* note 1 (statement of Carly Mitchell) ("We need autonomy over our own bodies and minds, which means we need doctors taken out of this process.").

[137] Zzyym v. Pompeo, No. 15-cv-02362, 2018 WL 4491434, at *1 (D. Colo. Sept. 19, 2018).

[138] *Id.*

[139] Reporter's Transcript Hearing on Pending Motions at 7, Zzyym v. Kerry, 220 F. Supp. 3d 1106 (D. Colo. 2016) (No. 15-cv-02362) [hereinafter Zzyym Transcript].

[140] *Id.*

[141] *Zzyym*, 2018 WL 4491434, at *1.

[142] *Id.* at *8. The court also held that the State Department had exceeded its statutory authority, because "[t]he authority to issue passports and prescribe rules for the issuance of passports under 22 U.S.C. § 211a does not include the authority to deny an applicant on grounds pertinent to basic identity, unrelated to any good cause as described in" Supreme Court precedents. *Id.* at *9.

nature of the harm to Zzyym, Zzyym's rights claims were plainly important. The government's lawyer accused Zzyym of "cause litigation," arguing they were "asking the Court to upset the traditional binary that pervades our society."[143] The accusation of "cause litigation" suggests that theoretical arguments against binary gender are not persuasive, perhaps because they are political rather than legal. The government further argued that the passport "is not a matter of self-expression," rather, it "is a government form."[144]

The judge, however, asked questions suggesting the issue was the right of nonbinary people to travel internationally, without having to misrepresent their identities by selecting inaccurate F or M designations.[145] This argument stakes a claim to a type of liberty, but not in the thin sense of freedom of choice. It asserts that nonbinary people should not be forced to adopt a binary sex category that is a lie. As California Senator Scott Wiener explained in support of the Gender Recognition Act: "[W]e want people to live their authentic lives as who they are, and this is simply removing a government barrier."[146] Senator Wiener connected the Gender Recognition Act to the feminist critique of binary gender:

> We have a history in this country and in this world of forcing people into gender roles. Whether it's forcing women to be a certain way in life or forcing young boys to be a certain way or forcing all manner of people to be who society says they are as opposed to who they actually are.[147]

While nonbinary gender rights claims may build on feminist arguments, it is important to note potential areas of divergence between feminist and nonbinary gender advocacy. Some feminists may be concerned that expanding the space outside binary gender will trade off with efforts to expand what it means to be a woman.[148] Others may believe sex discrimination law should challenge only the most egregious forms of subordination of women, rather than pursuing the libertarian project

---

143  Zzyym Transcript, *supra* note 139, at 45.

144  *Id.* at 52.

145  *See, e.g., id.* at 14 (question from Judge Jackson asking the lawyer for the government to respond to the concern that a "person with . . . ambiguous genitalia, who is neither male or female, can't leave the country because you have to have the passport to get out legally, can't leave the country unless they lie. And by lie, they check 'F' or they check 'M.'").

146  *Cal. Assemb. Judiciary Hearing, supra* note 1 (statement of Sen. Scott Wiener).

147  *Id.; see* Brandon Interview, *supra* note 62, at 13 ("[T]o me, really, identifying as non-binary is really a rather cool notion because you're basically looking at centuries worth of this enforced expectation of the gender you were assigned at birth and just saying, 'Screw that, that's not how I feel, this is how I feel and I want this to be respected.'").

148  *Cf.* Freeman, *supra* note 52 (discussing an interview with nonbinary writer and director Jill Soloway in which the interviewer voiced the concern "that the definition of a woman should be broader, as they have shown in their work. To retreat from being called a woman feels as if they are giving up the field").

of releasing all people from the straightjacket of gender.[149]  And others have criticized moves toward gender neutrality on the ground that, due to the unique forms of subordination experienced by people who were socialized as women, certain spaces or opportunities should be reserved for only those who were assigned female at birth.[150]  In debates over nonbinary gender rights, some radical feminists have expressed concerns about the "implications . . . for the safety, privacy, and bodily integrity of women and girls."[151]

Other feminists have drawn upon transgender experiences without concern about how feminist projects would affect transgender people.[152]  Feminists have been criticized for reducing transgender people to useful examples, rather than subjects in their own right.  In the 1990s, Riki Wilchins described the evolution of academic approaches to transgender people as one in which "psychiatrists" first cast them as "patients," and "[t]hen came the feminist theorists who — while erasing our own voices, and without soiling their pages with the messy complexities of our lived experience — appropriated us as illustrations for their latest telling theories or perceptive insights.  We had become examples."[153]  A feminist movement focused on expanding the social space for gender nonconforming women or men does not necessarily make space for those who cast off those labels altogether.

As nonbinary people become increasingly visible, their existence may work to undermine the conventional wisdom that gender identities are binary and that sex-specific rules are largely inoffensive.  The circulation of narratives about nonbinary people trying to navigate social and

---

[149] *See* YURACKO, *supra* note 30, at 23–24 (describing how this view influences legal doctrine in the context of "sex-based grooming codes").

[150] For an example of this genre of "radical feminist" writing, see Sheila Jeffreys, *The Politics of the Toilet: A Feminist Response to the Campaign to "Degender" a Women's Space*, 45 WOMEN'S STUD. INT'L F. 42, 42 (2014).  For background on arguments raised by radical feminists such as Jeffreys against transgender rights in general, see Michelle Goldberg, *What Is a Woman?: The Dispute Between Radical Feminism and Transgenderism*, NEW YORKER (Aug. 4, 2014), https://www.newyorker.com/magazine/2014/08/04/woman-2 [https://perma.cc/565N-5DBQ].  For a thoughtful response to the radical feminist argument, see generally Lori Watson, *The Woman Question*, 3 TRANSGENDER STUD. Q. 246 (2016).

[151] *WoLF Members Pushing Back Against Local "Gender Identity" Legislation*, *supra* note 39 ("Will any man, for any reason, be allowed to declare himself to be 'nonbinary gender' and gain access to women's spaces?  Will the District's special programs for women and girls become available to men who self-identify as 'non-binary'?").

[152] The same could be said of some feminist appropriations of postcolonial and antiracist struggles, without concern for how feminist projects might impact people of color.  *See infra* section I.C.5, pp. 930–33.

[153] RIKI ANNE WILCHINS, READ MY LIPS: SEXUAL SUBVERSION AND THE END OF GENDER 21 (1997).  This Article makes no effort to advance any particular gender theory.  It does not intend to use nonbinary people as "patients," "examples," or, as Wilchins charges anthropologists with doing, as "natives."  *Id.* at 22.  This Article attempts to ask what it would mean for U.S. law to take nonbinary people seriously as full and equal participants in social, economic, and political life.

legal institutions founded on binary sex classifications can compel empathy, understanding, and efforts at inclusion.[154]   As the diversity of nonbinary gender identities becomes more apparent, it may defang the arguments that inclusion requires enforced androgyny, the end of gender, or the abolition of programs that benefit women.

   *2.  Transgender Rights.* — Some nonbinary people identify as transgender, but others do not.[155]   Most transgender respondents to the 2015 USTS primarily identified as men or women.[156]   From its inception, the transgender rights movement has included voices arguing for what might now be called nonbinary inclusion.[157]   But the legal strategies of transgender men and women may sometimes diverge from those whose gender identities are nonbinary.

   Whatever their gender identities, transgender people may share interests in self-determination with respect to sex and gender.[158]   They may sometimes agree that the law should not classify people by sex or gender at all.[159]   Advocates for nonbinary rights also stake their claims in terms of the commonalities of discrimination, oppression, and violence visited upon nonbinary people and transgender men and women.[160]

---

[154] *Cf.* Edward Schiappa et al., *The Parasocial Contact Hypothesis*, 72 COMM. MONOGRAPHS 92, 94–97, 111 (2005) (discussing support for the "Contact Hypothesis": that interpersonal contact with members of minority groups reduces prejudice, especially with respect to gay men and lesbians, and conducting experiments providing some support for the "Parasocial Contact Hypothesis": that exposure to television and other mass media depictions of "gay men and male transvestites" also reduces prejudice, *id.* at 111); Martha Minow, *Rights of One's Own*, 98 HARV. L. REV. 1084, 1099 (1985) (reviewing ELISABETH GRIFFITH, IN HER OWN RIGHT: THE LIFE OF ELIZABETH CADY STANTON (1984)) (discussing the history of women's rights struggles, including "Lucy Stone's unprecedented decision to keep her own name after marriage," and reflecting that "[a]lthough one who takes extreme positions runs the risk of moving beyond the comprehension of people in the mainstream, being 'ultra' may also succeed in expanding the bounds of what is comprehensible").

[155] For a definition of "transgender," see *supra* text accompanying note 12.   Out of nonbinary respondents to the 2015 USTS, 82% reported they were "'very comfortable,' 'somewhat comfortable,' or 'neutral' . . . with the word 'transgender' being used to describe them."   JAMES ET AL., *supra* note 2, at 40.

[156] JAMES ET AL., *supra* note 2, at 45 (reporting that 29% of USTS survey respondents identified primarily as a "transgender man" or a "man" and 33% identified primarily as a "transgender woman" or a "woman").   *But see* Rob Clucas & Stephen Whittle, *Law, in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 73, 74 (arguing it is "short sighted" to view transgender men and women as binary, because they too undermine the naturalization of gender).

[157] *See, e.g.,* Bergman & Barker, *supra* note 31, at 32–33 (discussing work by Kate Bornstein and Stephen Whittle written in the 1990s).

[158] *See, e.g.,* Clarke, *Identity and Form, supra* note 28, at 763–64 (discussing "elective" concepts of sex and gender).

[159] *See, e.g.,* Olga Tomchin, Comment, *Bodies and Bureaucracy: Legal Sex Classification and Marriage-Based Immigration for Trans\* People*, 101 CALIF. L. REV. 813, 815 n.4, 818 (2013) (arguing that "only total elimination of 'sex' as a legal category will eliminate [the] harms" of rules such as those "governing marriage-based immigration for trans\* people," *id.* at 818).

[160] *See, e.g., Cal. Assemb. Judiciary Hearing, supra* note 1 (statement of Carly Mitchell) ("So, why do we need a non-binary identification?   This week alone, I was harassed multiple times, because

These claims sound in universal rights to human flourishing and respect, rather than liberty. They tap into arguments against group-based stigma, caste, and subordination.[161]

But "who decides your sex or gender?" is a different question than "how many options are there?" In law, arguments for transgender rights have sometimes been in tension with critiques of binary gender.[162] Some transgender people may want legal recognition of their male or female gender identities, rather than elimination of those categories.[163] On the flip side, scholars and activists who critique binary gender have long debated whether the inclusion of transgender people in the existing categories of "male" or "female" will make it more difficult to reimagine those categories.[164]

Pragmatic legal advocates may calculate that it is strategic to decouple arguments for recognition of a male or female gender identity from arguments for recognition of nonbinary identities. Nonbinary gender may sound less sympathetic, more disruptive, and too novel to judges and the public. There is a Kafkaesque "man trapped in a woman's body" narrative that is sometimes persuasive to non-transgender people, who can imagine what it would be like to wake up one day in the wrong body.[165] But nonbinary people may seem to disrupt this narrative. For example, Wilchins has said, "I've never been trapped in anyone else's body, and I hope you haven't either . . . . I admit I do still occasionally

---

I deviate from my assigned gender. We are assaulted, imprisoned, murdered, and this daily stress has caused 41% of us to attempt suicide, like I did."); *supra* p. 910.

[161] *See* Jessica A. Clarke, *Frontiers of Sex Discrimination Law*, 115 MICH. L. REV. 809, 833–37 (2017) (book review) (discussing antisubordination theories and their potential in transgender rights litigation).

[162] *See, e.g.*, JANET HALLEY, SPLIT DECISIONS: HOW AND WHY TO TAKE A BREAK FROM FEMINISM 262–63 (2006) (asking how "insistence on the fluidity of all the elements of gender and sexuality" would "cope with the strong desire of many transsexuals to embody one gender or the other, *really*, and to consolidate themselves and their lovers as m or f all the way down").

[163] *See, e.g.*, Talia Mae Bettcher, *Trapped in the Wrong Theory: Rethinking Trans Oppression and Resistance*, 39 SIGNS: J. WOMEN CULTURE & SOC'Y 383, 385 (2014) ("Many trans people see themselves as men and women. Taken to its most extreme, the beyond-the-binary model suggests these people are mistaken (i.e., it invalidates their self-identities).").

[164] *See, e.g.*, WILCHINS, *supra* note 153, at 67 (expressing the concern that a "transgender rights movement . . . unable to interrogate the fact of its own existence, will merely end up cementing the idea of a binary sex which I am presumed to somehow transgress or merely traverse"). For a recent debate about how this plays out in legal arguments, *compare* YURACKO, *supra* note 30, at 174 (arguing that "[v]ictory" for nonconformists who rely on arguments about the immutability of gender identity "may come at the expense of greater rigidity of gender roles and expectations for all workers"), *with* Paisley Currah, *Transgender Rights Without a Theory of Gender?*, 52 TULSA L. REV. 441, 446 (2017) (book review) (arguing that Yuracko has no evidence of a causal connection between the successes of transgender plaintiffs who argue gender identity is immutable and the losses of other gender-nonconforming plaintiffs), *and* Cruz, *supra* note 26, at 277 (arguing that those authors concerned about tradeoffs "overstate what a court must do to rule for a transgender plaintiff").

[165] Riki Wilchins, *Epilogue: Gender Rights Are Human Rights*, *in* GENDERQUEER: VOICES FROM BEYOND THE SEXUAL BINARY, *supra* note 17, at 289, 290.

AR_292783

awake quivering in the night with the conviction that I am trapped in the wrong culture."[166]

Additionally, nonbinary gender seems to require more extensive social change in disrupting sex-segregated spaces and binary gender norms. In a 2017 case in which a transgender boy won the right to use facilities consistent with his gender identity, the court noted approvingly that "allowing transgender students to use [male or female] facilities that align with their gender identity has actually reinforced the concept of separate facilities for boys and girls."[167] Courts may perceive requests for accommodation from nonbinary individuals as a much greater "ask" than requests to be integrated into male or female categories.

Opponents of the extension of discrimination law to cover gender identity may point to nonbinary people as demonstrating the purported absurdity of the project.[168] While these opponents may have been willing to agree that it is gender identity–based harassment for an employer to insist on referring to a transgender woman as "he" and "Mr.," they may not agree that employers should be required to use more unfamiliar pronouns, such as "ze and hir."[169] Issues related to pronouns are often distorted and politicized. After a guide on gender-neutral pronouns led to false reports that the University of Tennessee, Knoxville, had banned the use of "he" and "she," the Tennessee legislature voted to defund the University's Office for Diversity and Inclusion, and to forbid the University from using state funds "to promote the use of gender neutral pronouns."[170] But sometimes, nonbinary gender recognition may be uncontroversial. When New Jersey passed its Babs Siperstein Law[171] recognizing the right of transgender people to change the sex designations on their birth certificates without the need for any medical

---

166  *Id.* at 290–91.

167  Whitaker *ex rel.* Whitaker v. Kenosha Unified Sch. Dist., 858 F.3d 1034, 1055 (7th Cir. 2017).

168  *See supra* notes 85–86 and accompanying text (discussing unique reasons for opposition to nonbinary gender identities, including the idea that these identities are a trend or are absurd).

169  *Cf.* Eugene Volokh, Opinion, *You Can Be Fined for Not Calling People "Ze" or "Hir," If That's the Pronoun They Demand that You Use*, WASH. POST: VOLOKH CONSPIRACY (May 17, 2016), https://wapo.st/24Xqa6Y [https://perma.cc/3D4H-5B2E] [hereinafter Volokh, *You Can Be Fined*] ("Or what if some people insist that their title is 'Milord,' or 'Your Holiness'? They may look like non-gender-related titles, but who's to say?"). Professor Volokh himself, however, has a number of First Amendment objections to harassment doctrine in general, and might not even agree that it should be illegal harassment to insult a transgender woman by calling her "Mr." and "him." *See, e.g.*, Eugene Volokh, Comment, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. REV. 1791, 1819–43, 1846 (1992). For a discussion of harassment law, see *infra* section III.B.3, pp. 957–63.

170  TENN. CODE ANN. § 9-4-5119 (West 2018); *see also* Scott Jaschik, *Fear of New Pronouns*, INSIDE HIGHER ED (Sept. 8, 2015), https://www.insidehighered.com/news/2015/09/08/u-tennessee-withdraws-guide-pronouns-preferred-some-transgender-people [https://perma.cc/L7R3-X2QT].

171  N.J. STAT. ANN. § 26:8-40.12 (West 2018).

documentation, the fact that the law also included a new "undesignated/non-binary" option did not seem to attract any specific opposition.[172]

A related novelty concern may be that legal claims that sex discrimination law prohibits discrimination on the basis of transgender status will be weighed down by nonbinary gender, because nonbinary gender was not envisioned by the drafters of civil rights–era statutes in the 1960s and 1970s.[173] This controversy turns on what "sex" discrimination means.[174] Federal courts increasingly agree that discrimination against someone for being transgender is a form of sex discrimination because it rests on sex stereotypes.[175] The Obama Administration explicitly extended this logic to nonbinary gender identity, promulgating regulations that clarify that "[sex] stereotypes can include the expectation that individuals will consistently identify with only one gender."[176] This

---

[172] Or at least, none is apparent from the legislative history. *See Hearing on A. 1718 Before the Assemb. Human Servs. Comm.*, 218th Leg., 2018 Sess., at 1:07:08 (N.J. 2018) https://www.njleg.state.nj.us/media/mp.asp?M=A/2018/AHU/0312-0200PM-M0-1.M4A&S=2018 [https://perma.cc/X5MA-BES2].

[173] *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) (2012); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (2012). There is a good argument that the drafters' intentions should *not* govern this question. *See* Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79–80 (1998) (Scalia, J.) (holding that, with respect to the meaning of "sex" discrimination in Title VII, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed," *id.* at 79).

[174] *See* Clarke, *supra* note 161, at 824. Title VII and Title IX do not include "gender identity" as a prohibited ground for discrimination, although many state and local rules do. *See State Maps of Laws & Policies*, HUM. RTS. CAMPAIGN, https://www.hrc.org/state-maps [https://perma.cc/2DQ3-C2QZ] (cataloguing state laws that prohibit discrimination on the basis of gender identity in education, employment, identification documents, hate crimes, housing, public accommodations, and health care). *But cf.* Mary Anne Case, Essay, *Legal Protections for the "Personal Best" of Each Employee: Title VII's Prohibition on Sex Discrimination, the Legacy of* Price Waterhouse v. Hopkins, *and the Prospect of ENDA*, 66 STAN. L. REV. 1333, 1366–68 (2014) (discussing how "gender identity" provisions might be defined or interpreted so as to preclude coverage for nonbinary forms of gender identity and expression).

[175] Grimm v. Gloucester Cty. Sch. Bd., 302 F. Supp. 3d 730, 745–46 (E.D. Va. 2018) (discussing precedents from the First, Sixth, Ninth, and Eleventh Circuits). A recent Sixth Circuit opinion held that discrimination based on transgender status is sex discrimination because, among other reasons, it rests on sex stereotyping and might be analogized to discrimination based on religious conversion. EEOC v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560, 574–76 (6th Cir. 2018).

[176] 45 C.F.R. § 92.4 (2017) (defining sex stereotypes in Department of Health and Human Services (HHS) regulations interpreting the Affordable Care Act); Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,392 (May 18, 2016) (responding to the comment that there was no authority for the proposition that "non-binary genders" are "a protected class" by explaining that prohibited "[s]ex stereotypes can also include a belief that gender can only be binary and thus that individuals cannot have a gender identity other than male or female"). The Affordable Care Act borrows its definition of sex discrimination from Title IX. 42 U.S.C. § 18116(a) (2012). For discussion of litigation over this regulation, see *infra* section III.E, pp. 986–90.

The Sixth Circuit noted its approval of the Obama Administration's argument in a Title VII sex discrimination case, stating:

> [D]iscrimination because of a person's transgender, intersex, or sexually indeterminate status is no less actionable than discrimination because of a person's identification with two

interpretation may be exploited by opponents of transgender rights.[177] Their argument: Congress's references to "one sex" or "the other sex" in another provision of the statute demonstrate that Congress could not have intended to cover nonbinary genders.[178]  But no court has adopted this view.  If a court were to agree with this argument, it would justify voiding the regulation only as to nonbinary gender, not as to transgender men and women.

  *3.  Sexual Orientation.* — Gender identity is conceptually distinct from sexual orientation.[179]  Nonbinary people have a diverse array of sexual orientations.  In response to the 2015 U.S. Transgender Survey, 17% of nonbinary people reported being asexual,[180] 2% reported being straight or heterosexual, and the other 81% reported various orientations, such as queer, pansexual, bisexual, gay, or lesbian.[181]  In discussing why many nonbinary people prefer terms such as pansexual and queer, scholar Genny Beemyn explains: "They see *bisexual* as implying a binary, and they are attracted to individuals who are outside of a gender binary or identify outside of a gender binary themselves, or they consider bisexuals to be attracted to different aspects of gender in different people, whereas they are attracted to people regardless of gender."[182]

  There are many convergences between arguments for equality based on nonbinary gender identity and arguments for lesbian, gay, and bisexual equality.  Advocates for nonbinary recognition often phrase their claims in the same core values of the marriage equality movement, such as love and acceptance.[183]  Legal arguments for nonbinary gender

---

religions, an unorthodox religion, or no religion at all.  And 'religious identity' can be just as fluid, variable, and difficult to define as 'gender identity'; after all, both have 'a deeply personal[,] internal genesis that lacks a fixed external referent.'

  *R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d at 575 n.4 (quoting Sue Landsittel, Comment, *Strange Bedfellows? Sex, Religion, and Transgender Identity Under Title VII*, 104 NW. U. L. REV. 1147, 1172 (2010)).

  [177] *See* Plaintiffs' Brief in Support of Their Motion for Partial Summary Judgment or, in the Alternative, Preliminary Injunction at 13, Franciscan All., Inc. v. Burwell, 227 F. Supp. 3d 660 (N.D. Tex. 2016) (No. 16-cv-00108), 2016 WL 9049696.

  [178] *Id.* at 16 (quoting 20 U.S.C. § 1681(a)(2), (8)).  The relevant provisions of Title IX include an exception for "father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex," 20 U.S.C. § 1681(a)(8), as well as an exemption for certain institutions transitioning from single-sex to admitting "students of both sexes," *id.* § 1681(a)(2).

  [179] GLAAD MEDIA REFERENCE GUIDE, *supra* note 9, at 6 (defining sexual orientation as "an individual's enduring physical, romantic and/or emotional attraction to members of the same and/or opposite sex, including lesbian, gay, bisexual, and heterosexual (straight) orientations").

  [180] *See* Emens, *supra* note 43, at 307–29 (discussing asexuality as a sexual orientation).

  [181] *See supra* note 78 and accompanying text.

  [182] Genny Beemyn, *Coloring Outside the Lines of Gender and Sexuality: The Struggle of Nonbinary Students to Be Recognized*, 79 EDUC. F. 359, 360 (2015) (discussing interviews of college students).

  [183] *See* sources cited *supra* note 109.

inclusion in the United States are possible only against the backdrop of prior achievements in sexual orientation equality.[184]  Before *Obergefell v. Hodges*,[185] opponents of nonbinary gender rights had the easy argument that binary sex definitions were required to ensure marriage was only between a man and a woman.[186]  That argument is no longer in their quiver.

However, nonbinary people may end up with interests in conflict with some LGBT rights arguments, for reasons similar to the marginalization of bisexuality.[187]  As Professor Kenji Yoshino has explained, one reason bisexuality is often left out of discussions of LGBT rights is that it seems to detract from the argument that sexual orientation is immutable.[188]  "[I]mmutability offers absolution by implying a lack of choice."[189]  Yet bisexuals are perceived to have had the choice to engage in heterosexual relationships.[190]  On the one hand, nonbinary gender identity might be perceived as mutable, particularly by those who see it as a phase, a political statement, or a trend.[191]  On the other hand, nonbinary gender (like bisexuality) might be immutable in the sense of being an expression of one's authentic self and a fundamental feature of identity that no one should be asked to change.[192]  A second reason for bisexual erasure is that the LGBT community may perceive bisexuals as "flight risks — individuals who could at any time abandon the gay

---

[184]  *See* Obergefell v. Hodges, 135 S. Ct. 2584, 2607 (2015) (holding that same-sex couples may not be deprived of the right to marry); United States v. Windsor, 570 U.S. 744, 751 (2013) (striking down a federal law that excluded same-sex partners from the definition of "spouse"); Lawrence v. Texas, 539 U.S. 558, 578 (2003) (striking down a Texas statute criminalizing same-sex intimacy between consenting adults).

[185]  135 S. Ct. 2584.

[186]  *See, e.g.*, Mathew D. Staver, *Transsexualism and the Binary Divide: Determining Sex Using Objective Criteria*, 2 LIBERTY U. L. REV. 459, 473 (2008).

[187]  *See* Michael Boucai, *Sexual Liberty and Same-Sex Marriage: An Argument from Bisexuality*, 49 SAN DIEGO L. REV. 415, 452–53 (2012) (discussing how advocates in the marriage equality cases went to great lengths to ignore bisexuality and to characterize their clients as lesbian or gay); Ann E. Tweedy & Karen Yescavage, *Employment Discrimination Against Bisexuals: An Empirical Study*, 21 WM. & MARY J. WOMEN & L. 699, 699–700 (2015) (arguing that bisexuals "remain largely invisible in the case law and in the popular understanding of discrimination").

[188]  *See, e.g.*, Kenji Yoshino, *The Epistemic Contract of Bisexual Erasure*, 52 STAN. L. REV. 353, 405–07 (2000) (offering several explanations for the marginalization of bisexuals in lesbian and gay rights movements).

[189]  *Id.* at 406; *see also* Clarke, *supra* note 43, at 13–17 (discussing the "powerful intuitive appeal," *id.* at 17, of the concept that a person should not be penalized for "'accidents of birth' . . . because they bear no relationship to individual responsibility," *id.* at 16, and tracing this idea through equal protection law).

[190]  Yoshino, *supra* note 188, at 406.  This is despite the fact that some bisexuals report they could not live exclusively as heterosexuals or homosexuals.  *Id.* at 407 n.294.

[191]  *See supra* pp. 910–11; *cf.* Tran & Glazer, *supra* note 26, at 401–02 ("[W]hat troubles society most about transgender people is that they make choices about aspects of their gender that society believes are not their choices to make.").

[192]  *See* Clarke, *supra* note 43, at 23–28 (discussing this version of immutability).

community to lead straight lives."[193]   Similarly, one reason for bias
against nonbinary people is fear that their choices as to gender identity
will be reversed.[194]   A third reason for bisexual erasure is that, by as-
serting that sex might not be the primary factor in desire, bisexuality
threatens sex as a primary category of social organization.[195]   Many var-
iations on nonbinary gender identity do this explicitly rather than im-
plicitly.[196]   And finally, bisexual people make poor poster children due
to stereotypes that they are "promiscuous."[197]   Nonbinary people, many
of whom adopt sexual orientations other than straight, gay, or lesbian,
may trigger this prejudice as well.

   Yet there are also opportunities for convergence.  To the extent that
nonbinary legal advocacy challenges the need for legal sex classifica-
tions, it may assist legal arguments for nondiscrimination on the basis
of sexual orientation.  Federal antidiscrimination statutes, such as Title
VII of the Civil Rights Act of 1964[198] and Title IX of the Education
Amendments of 1972,[199] do not explicitly prohibit discrimination on the
basis of "sexual orientation."   One controversy in federal courts is
whether discrimination on the basis of sexual orientation is always a
type of sex discrimination prohibited by federal law.[200]   The Second
Circuit has accepted the argument that it is, because to discriminate on
the basis of sexual orientation, the discriminator must first classify peo-
ple based on sex — for example, the discriminator must identify a person
as a woman, and then disapprove of her sexual attraction for other
women.[201]   Opponents argue that this logic would void every sex classi-
fication by employers, disturbing, for example, sex-differentiated dress

---

[193] Yoshino, *supra* note 188, at 407.

[194] *See supra* notes 83–86 and accompanying text (discussing the fear of flight*iness* as a reason
for bias against nonbinary people).

[195] Yoshino, *supra* note 188, at 413 ("Without a clear and privileged distinction between 'man'
and 'woman,' there is no clear and privileged distinction between 'straight' and 'gay.'").

[196] *See supra* notes 95–98 and accompanying text.  Some forms of third-gender identity may serve
to underscore the importance of sex as a category of social organization.  *See infra* note 236 and
accompanying text.

[197] Yoshino, *supra* note 188, at 420.

[198] 42 U.S.C. § 2000e-2(a)(1) (2012).

[199] 20 U.S.C. § 1681(a) (2012).

[200] *Compare* Zarda v. Altitude Express, Inc., 883 F.3d 100, 108 (2d Cir. 2018) (en banc) (holding
it is), *and* Hively v. Ivy Tech Cmty. Coll., 853 F.3d 339, 341 (7th Cir. 2017) (en banc) (same), *with*
Evans v. Ga. Reg'l Hosp., 850 F.3d 1248, 1255 (11th Cir.) (holding it is not), *cert. denied*, 138 S. Ct.
557 (2017).

[201] *Zarda*, 883 F.3d at 113–14.  A similar argument is that discrimination against, for example, a
lesbian, is sex discrimination because if she were a man, her employer would not object to her sexual
attraction to women.  *Hively*, 853 F.3d at 345.  This argument is consistent with a concept of sexual
orientation that recognizes people outside of sex and gender binaries.  Robin A. Dembroff, *What Is
Sexual Orientation?*, 16 PHILOSOPHERS' IMPRINT, no. 3, Jan. 2016, at 1, 19–20.

*HARVARD LAW REVIEW*

codes for men and women.[202]  As nonbinary people challenge the need for sex-differentiated rules across a number of domains of social life, and as nonbinary gender identities gain greater acceptance, they may undermine the persuasive force behind this type of argument.

    *4. Intersex Variations.* — There are also obvious overlaps between intersex and nonbinary organizing.[203]  But the intersex movement is a distinct one, with its own particular relationships to other social justice movements.[204]  Many people with intersex variations have binary gender identities, but not all do.[205]  And many people with nonbinary gender identities do not have intersex variations.[206]  These groups may sometimes share legal interests, although their interests may sometimes diverge.

    Individuals who are both intersex and nonbinary may be at the forefront of advocacy efforts, for strategic and practical reasons.  Nonbinary people with intersex traits may seem more sympathetic to the public and judiciary, because intersex traits are regarded as somatic rather than psychological or elective.[207]  In American legal discourse, psychological conditions are often treated with skepticism.[208]  Nonbinary people like Dana Zzyym, whose claims appear to be grounded in their physical bodies, may have more legitimacy with a skeptical public and judiciary.[209]

---

[202] *See Zarda*, 883 F.3d at 150–51 (Lynch, J., dissenting); Brief for the United States as Amicus Curiae at 17, *Zarda*, 883 F.3d 100 (No. 15-3775), 2017 WL 3277292.  There are also doctrinal arguments against this position, for example, that courts can and do handle dress code controversies under a special doctrinal framework.

[203] One advocacy group marries these two concerns, calling itself the Intersex & Genderqueer Recognition Project.  INTERSEX & GENDERQUEER RECOGNITION PROJECT, http://www.intersexrecognition.org/ [https://perma.cc/L9NH-SWGS].

[204] *See, e.g.*, JULIE A. GREENBERG, INTERSEXUALITY AND THE LAW: WHY SEX MATTERS 97–105 (2012) (mapping out conflicts).  To say the movement is distinct is not to say that everyone agrees "intersex" is an identity.  *See* Ellen K. Feder & Katrina Karkazis, *What's in a Name?: The Controversy over "Disorders of Sex Development,"* 38 HASTINGS CTR. REP., no. 5, Sept.–Oct. 2008, at 33, 35 (discussing controversies over conceptualizing intersex as an identity versus a set of "clinically specific diagnoses" that are "widely disparate" in their features).

[205] *See, e.g.*, PREVES, *supra* note 16, at 60–85.

[206] *See, e.g.*, JAMES ET AL., *supra* note 2, at 44 (describing a USTS survey question asking participants to check all items that described their gender identities in which 31% of respondents selected "non-binary" but only 3% selected "intersex").

[207] *See* M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to Reflect Modern Medical Science Is Key to Transgender Rights*, 39 VT. L. REV. 943, 988 (2015) ("One of the barriers to recognition and respect that transgender people face in the courts and beyond is that 'brain sex' is not readily apparent, and transgender people must be believed about who they are." (footnote omitted)).

[208] *See, e.g.*, Dov Fox & Alex Stein, *Dualism and Doctrine*, 90 IND. L.J. 975, 977–80 (2015) (arguing that "much of our doctrine . . . treats mind and body as if they work and matter in critically different ways," often minimizing mental harm, *id.* at 979).  Judges may be wholly unsympathetic to what they perceive as choices with respect to identities.  *See* sources cited *supra* note 189 and accompanying text.

[209] *See supra* pp. 918–19.  In the *Zzyym* case, the government argued that it could not issue passports with gender options other than M or F because of "uncertainty about how it would evaluate persons 'transitioning' to a third sex."  Zzyym v. Pompeo, No. 15-cv-02362, 2018 WL 4491434,

They may be able to secure legal changes that redound to the benefit of all nonbinary people. Intersex people in general embody the argument that sex is not a coherent set of binary traits: that chromosomes, hormones, and phenotype do not always provide a consistent answer to the question of whether a person is male or female.[210]

There is a risk, though, that legal efforts on behalf of people with intersex variations may be limited to those deemed to possess an immutable or natural trait.[211] This might exclude altogether the claims of nonbinary people without intersex traits. Or it might support arguments for medical gatekeeping — requiring that nonbinary people secure a physician's opinion regarding their psychological gender as a prerequisite to legal protection.[212] Moreover, opponents of nonbinary recognition often point to the fact that a small percentage of the population is intersex as a reason the law should not protect nonbinary people at all.[213]

One area of potential convergence is with respect to ending the practice of unnecessary surgeries to "fix" intersex infants. The new visibility of nonbinary people may lend support to "[t]he primary goal of the intersex movement," which "is to eliminate or decrease the number of medically unnecessary cosmetic genital surgeries being performed on infants with an intersex condition."[214] A United Nations Special Rapporteur

---

at *7 (D. Colo. Sept. 19, 2018). The court held that this argument "misse[d] the ball" because "intersex people are born as they are." *Id.* This argument also misses the ball for people undergoing transitions to nonbinary gender identities. The State Department's rules for receiving a passport with a different gender marker simply require a letter from a doctor "stating the applicant has had appropriate clinical treatment for gender transition to the new gender of either male or female." U.S. DEP'T OF STATE, 8 FOREIGN AFFAIRS MANUAL 403.3-2(B)(d)(5) (2018), https://fam.state.gov/FAM/08FAM/08FAM040303.html [https://perma.cc/K7CD-2863]. Appropriate clinical treatment does not always entail surgery or hormone therapy. *See, e.g.*, WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, STANDARDS OF CARE FOR THE HEALTH OF TRANSSEXUAL, TRANSGENDER, AND GENDER NONCONFORMING PEOPLE 2, 8–9 (7th ed. 2011) [hereinafter WPATH STANDARDS]. If there is some reason a doctor's certification is required, people with nonbinary gender identities might also provide letters certifying that they have received appropriate clinical treatment for their gender transitions.

[210] *See* sources cited *supra* note 14 and accompanying text.

[211] *See* Clarke, *supra* note 43, at 32–52 (discussing ways courts have artificially curtailed the reach of discrimination law to exclude protection for traits deemed mutable).

[212] *Cf.* Dean Spade, *Resisting Medicine, Re/modeling Gender*, 18 BERKELEY WOMEN'S L.J. 15, 24 (2003) (critiquing requirements that trans people perform a certain narrative of binary gender identity to medical professionals before receiving legal protection).

[213] *See, e.g.*, Letter from Women's Liberation Front to John Wiesman, Sec'y, Wash. State Dep't of Health, Comments on Preproposal Statement of Inquiry to Amend Chapter 246-490 WAC, Vital Statistics (Aug. 22, 2017), at 2–3 (Sept. 28, 2017) [hereinafter WoLF Letter], http://womensliberationfront.org/wp-content/uploads/2017/09/Comment-on-wac-246-490-075-birth-certificates_final_9-28-17.pdf [https://perma.cc/C9UF-TKKC].

[214] GREENBERG, *supra* note 204, at 4. *See generally* GEORGIANN DAVIS, CONTESTING INTERSEX: THE DUBIOUS DIAGNOSIS (2015); ALICE DOMURAT DREGER, HERMAPHRODITES

has characterized "involuntary genital normalizing surgery" as a form of torture.[215]  An international coalition of medical authorities recommends delaying "unnecessary genital surgery to an age of patient informed consent."[216]  Surgeries on infants have been criticized for "caus[ing] more physical and psychological trauma than does growing up with atypical genitalia."[217]  One justification for these surgeries has been that binary sexual anatomy is crucial for parents to raise a child with a binary gender identity.[218]  Parents are sometimes advised to allow these surgeries to avoid stigmatization of their child, or to ensure their child appears "normal."[219]  But, as Professor Georgiann Davis writes: "Intersex is a problem because it disrupts the traditional gender order. If our behaviors weren't constrained by gender, if opportunities weren't filtered through gender, and if gender weren't tied to bodies and identities, it is doubtful that intersex would be as problematic throughout the world as it is today."[220]  As nonbinary lives become mainstream, parents and the medical profession may have less to fear for children with ambiguous genitalia or other sex characteristics, and these surgeries may decrease.[221]

   5. *Antiracist and Postcolonial Struggles.* — Struggles for nonbinary gender rights also have convergences with and divergences from antiracist and postcolonial arguments.

   Some nonbinary people point to intersections with antiracist struggles.  For example, Jessi Brandon reports that what resonated with them was the slogan "[r]espect my existence or expect my resistance," because

---

AND THE MEDICAL INVENTION OF SEX (1998); KATRINA KARKAZIS, FIXING SEX: INTERSEX, MEDICAL AUTHORITY, AND LIVED EXPERIENCE (2008); SUZANNE J. KESSLER, LESSONS FROM THE INTERSEXED (1998).

   [215] Juan E. Mendéz (Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment), *Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* ¶ 77, U.N. Doc. A/HRC/22/53 (Feb. 1, 2013), http://www.ohchr.org/Documents/HRBodies/HRCouncil/RegularSession22/A.HRC.22.53_English.pdf [https://perma.cc/K72Z-U8M6].

   [216] Christopher P. Houk et al., *Summary of Consensus Statement on Intersex Disorders and Their Management*, 118 PEDIATRICS 753, 755 (2006); *see also* INTERACT & LAMBDA LEGAL, PROVIDING ETHICAL AND COMPASSIONATE HEALTH CARE TO INTERSEX PATIENTS 2 (2018), https://www.lambdalegal.org/sites/default/files/publications/downloads/resource_20180731_hospital-policies-intersex.pdf [https://perma.cc/7X96-XMTC] ("Leading medical associations, recognizing that irreversible and deeply life-altering procedures can be safely delayed to both ensure best outcomes and avoid the potential ramifications of anesthesia on the developing brain, are developing policies informed by the patient community to delay harmful, medically unnecessary procedures.").

   [217] GREENBERG, *supra* note 204, at 18.

   [218] *See, e.g.*, Zeiler & Wickström, *supra* note 14, at 367.

   [219] *Id.* at 360; *see also id.* at 367.

   [220] DAVIS, *supra* note 214, at 7–8.

   [221] *But cf.* Maayan Sudai, *Revisiting the Limits of Professional Autonomy: The Intersex Rights Movement's Path to De-medicalization*, 41 HARV. J.L. & GENDER 1, 19–20 (2018) (discussing how some parents of intersex children may prefer medical understandings of intersex traits to avoid associating their children with the LGBT movement).

"all Black people want, what people of color want, all that queer people and non-binary people want is to be respected and treated as equals, as equals to someone who is cis gender or straight or white."[222] Others point to how the intersection of racial and gender stereotypes can complicate nonbinary identity. As writer Cicely-Belle Blain explains: "Society does not allow space for black folks to be alternative, to be nerdy, to be weird, to be queer, to be different from the narrow boxes created for us throughout history."[223]

Others argue by analogy. Lauren Lubin, a nonbinary athlete, criticizes application forms that force an applicant to select one of two categories for sex, asking: "Can you imagine if you did that with race?"[224] This argument invites a comparison to multiracial identities. In the race context, there is debate over whether racial fluidity makes it impossible to collect meaningful data about the persistence of racial disparities or to identify beneficiaries of affirmative action programs.[225] Those who "decline to state" their race on official forms may be making the political statement that they believe race should not be significant for purposes of diversity programs.[226] While it is unlikely that those nonbinary people who resist sex classifications are doing so because they oppose affirmative action, similar concerns might be raised about the impact of gender fluidity on data about sexism.[227] Moreover, there could be tensions between the goals of nonbinary rights movements and antiracist struggles. For example, advocates for nonbinary and other transgender

---

[222] Brandon Interview, *supra* note 62, at 14. "Cis" is a term meaning the opposite of trans — in other words, a person who identifies with the gender associated with the sex they were assigned at birth.

[223] Cicely-Belle Blain, Opinion, *The Political Rebellion of Being Black and Non-binary*, XTRA (June 9, 2017, 1:34 PM), https://www.dailyxtra.com/the-political-rebellion-of-being-black-and-non-binary-73646 [https://perma.cc/JW4S-X7RM]. Ashleigh Shackelford makes another intersectional argument: "As we see in the media and within our interpersonal spaces, femininity is significantly scripted through whiteness and thinness. I am none of those things." Ashleigh Shackelford, *Why I'm Non-binary but Don't Use "They/Them,"* HUFFINGTON POST (Feb. 21, 2017, 1:36 PM), https://www.huffingtonpost.com/entry/why-im-nonbinary-but-dont-use-they-them_us_58ac875ee4b05e6b9b192c07 [https://perma.cc/T6SH-QN6K] ("The way whiteness and white supremacist ideology is set up, we're not seen as feminine or woman or human. In many ways, the masculinizing of our bodies and performance has been the basis for our dehumanizing and denial of gender conformity.").

[224] Aimee Heckel, *Lauren Lubin, Former CU Athlete, Subject of Documentary*, DAILY CAMERA (Sept. 5, 2016, 9:25 PM), http://www.dailycamera.com/news/ci_30326197/lauren-lubin-former-cu-athlete-subject-documentary [https://perma.cc/66Y4-7FYH].

[225] *See* Lauren Sudeall Lucas, Essay, *Undoing Race? Reconciling Multiracial Identity with Equal Protection*, 102 CALIF. L. REV. 1243, 1245 (2014).

[226] Camille Gear Rich, *Decline to State: Diversity Talk and the American Law Student*, 18 S. CAL. REV. L. & SOC. JUST. 539, 549 (2009).

[227] *See, e.g.*, WoLF Letter, *supra* note 213, at 4 (speculating about the impact of nonbinary gender recognition on the collection of crime statistics based on sex).

people might seek better enforcement of hate crime statutes.[228]  But those laws operate within the context of a criminal justice system that disproportionately burdens racial minorities.[229]

Other advocates of nonbinary recognition may link their resistance with anticolonialism, pointing to the history of suppression of third genders in non-Western cultures.[230]  Researchers highlight that nonbinary genders have existed "across time and place" to challenge the view that humanity is naturally and inevitably divided into male and female categories.[231]  Historical and present-day examples include Indian Hijra, Thai Kathoey, Indonesian Waria, various Two-Spirit identities of First Nations tribes, and South American Machi identities, among others, each with a distinct meaning not reducible to man or woman.[232]  These examples may suggest it is possible "for alternate genders and sexual categories to emerge in certain times and places, transcending sexual dimorphism."[233]  But these examples have been overlooked due to "ethno-centric Western interpretations of gender" that "have dominated the natural and social sciences."[234]  For example, when the British came to rule India, they passed laws criminalizing Hijra practices and removing state protection.[235]  Cross-cultural and historical arguments may serve to denaturalize binary gender arrangements.  But they may not point the way toward gender liberation.  For example, in India, despite "the continued salience of the alternative gender role of the hijra," hijras

---

[228] However, it is important to note that transgender people, particularly those who are people of color, are often reluctant to seek assistance from law enforcement.  *See* JAMES ET AL., *supra* note 2, at 188 (reporting that 57% of transgender respondents to the 2015 USTS were "somewhat uncomfortable or very uncomfortable asking for help from the police"); *id.* at 189 fig. 14.9 (breaking down percentages by race and ethnicity).  Seventy-one percent of nonbinary respondents to the 2015 USTS reported they were "never or only sometimes . . . treated with respect" by law enforcement, compared with 55% of transgender men and women.  *Id.* at 186.

[229] *See generally* MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS (rev. ed. 2012).

[230] *See* Iantaffi Interview, *supra* note 47, at 18 ("[T]here are the bigger issues tha[n] the gender binary itself . . . it's part of this colonizing, Christianizing, white supremacist thing because the more we really look at evidence from anthropology, there have always been a variety of genders in lots of different cultures and places." (ellipsis in original)).

[231] Ben Vincent & Ana Manzano, *History and Cultural Diversity, in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 11, 11; *see also, e.g.*, Herdt, *supra* note 17; Vincent & Manzano, *supra*, at 18–25.  Vincent and Manzano also point out that European history includes examples of nonbinary understandings of gender, such as English mollies, Italian femminielli, and Albanian sworn virgins.  Vincent & Manzano, *supra*, at 13–17.

[232] *See* Vincent & Manzano, *supra* note 231, at 18–25.  I cannot do justice here to these identities, so I will not attempt to explain them.  I refer readers to the cited texts.

[233] Herdt, *supra* note 17, at 16 (posing this as a question).

[234] Vincent & Manzano, *supra* note 231, at 12.

[235] Serena Nanda, *Hijras: An Alternative Sex and Gender Role in India, in* THIRD SEX, THIRD GENDER: BEYOND SEXUAL DIMORPHISM IN CULTURE AND HISTORY, *supra* note 17, at 373, 414.  In 2014, India's Supreme Court recognized a third gender category entitled to equal rights under India's Constitution.  Nat'l Legal Servs. Auth. v. Union of India, (2014) 5 SCR 119, 142–44.

remain stigmatized, and the "role functions in a culture in which male and female sex and gender roles are viewed as essential, sharply differentiated and hierarchical."[236]

\* \* \*

Thus, nonbinary gender identities are diverse. Nonbinary people are targeted for discrimination due to animus, ignorance, disbelief, disregard, disrespect, and the threat they pose to traditional gender norms. The movement for nonbinary gender rights has complicated relationships with other identity-based legal arguments. It may sometimes be in tension with feminist, LGBT, intersex, and antiracist legal efforts, but it also offers these movements new opportunities and possibilities for convergence.

## II. A Contextual Approach to Nonbinary Gender Rights

This Part asks how the law might respond to rights claims by a diverse nonbinary minority.[237] Its purpose is not to prescribe any particular model for legal response. Rather, it is to argue that there are many ways the law might address nonbinary gender, and that efforts to find a one-size-fits-all theory stifle discussion. It argues instead for a contextual approach. It will begin by resisting the demand to define sex and gender with precision, arguing instead that these terms are and should be culturally contested, and must be defined with attention to each legal context. It will then discuss possible regulatory models, resisting the characterization of the issue as either third-gender recognition or gender abolition.

### A. Against Universal Definitions of Sex and Gender

Rather than attempting an all-purpose legal definition of sex or gender, this section argues that when a definition is required, it should be tailored to serve the interests at stake in regulation. Attempts to settle metaphysical debates about what sex and gender *are* distract from the question of how these concepts *should be* defined in particular legal contexts, if at all.

---

[236] Nanda, *supra* note 235, at 417. *But see* Andrew Gilden, *Toward a More Transformative Approach: The Limits of Transgender Formal Equality*, 23 BERKELEY J. GENDER L. & JUST. 83, 122 (2008) (discussing historical examples from Native American societies in which "[g]ender variance was fully incorporated into tribal life and was generally well-respected and valued within the community").

[237] I note where these various approaches are already supported by U.S. legal doctrine, but I leave for another day questions about whether courts, legislatures, or agencies, or federal, state, or local governments are best suited to implement legal change.

*HARVARD LAW REVIEW*    [Vol. 132:894]

Debates over procedural rules are instructive here.[238]  In these debates, scholars ask whether rules should be "transsubstantive," meaning the same in every substantive context.[239]  The benefits of uniform rules are simplicity and depoliticization.  Uniform rules are easier for courts, lawyers, and the public to learn.[240]  They are depoliticizing, because they avoid debates over which rules apply in which contexts — debates that will inevitably entail political judgments.[241]  The main disadvantage is that uniform rules may not serve the interests of particular substantive regulatory schemes.  Uniform definitions are inappropriate for terms like "employee," a concept that serves different purposes under the common law, the Fair Labor Standards Act, the Occupational Safety and Health Act, the Tax Code, and so forth.[242]

The "simplicity" advantage of universal rules does not have much force in the context of sex and gender.  Because there are relatively few contexts left in which the law requires an operative definition of sex or gender, devising contextual definitions is not an unwieldy legal project.[243]

The "depoliticization" argument works against universal definitions.  Because sex and gender identities are deeply controversial, personal, and important to many people, any attempt at universal definition will be met with immediate resistance.  Even the distinction between sex and gender, once the pivot point of feminist argument, is controversial.[244]  Some on the left would prefer to deconstruct the distinction — following the views of influential theorist Judith Butler.[245]  They argue that the hormonal, genetic, nervous, and morphological aspects of what we call sex are only about sex because we call them that.[246]  Some on the right

---

[238] I have previously analogized legal sex to the property law "metaphor of a bundle of sticks." Clarke, *Identity and Form, supra* note 28, at 829.  Rather than thinking of ownership as a right to a thing, this metaphor suggests it "is a bundle of rights, such as the right to exclude others from the property, . . . to sell the property, and so forth." *Id.*  We might similarly think of legal identities as bundles of rights that can be unbundled.  Sex might be unbundled into the right to use certain restrooms, to have particular occupations, to participate on certain sports teams, and so forth. *See id.* at 831–32; *see also infra* Part III, pp. 945–90.

[239] *See, e.g.*, Stephen N. Subrin, *The Limitations of Transsubstantive Procedure: An Essay on Adjusting the "One Size Fits All" Assumption*, 87 DENV. U. L. REV. 377, 378 (2010).

[240] *Id.* at 387.

[241] *See id.* at 387–88.

[242] *See, e.g.*, Kristin E. Hickman & Claire A. Hill, *Concepts, Categories, and Compliance in the Regulatory State*, 94 MINN. L. REV. 1151, 1179–81 (2010).

[243] *See infra* Part III, pp. 945–90 (listing possible contexts).

[244] *See supra* section I.C.1, pp. 915–21.

[245] *See* JUDITH BUTLER, GENDER TROUBLE: FEMINISM AND THE SUBVERSION OF IDENTITY 1–34 (1990).

[246] Please forgive me for this oversimplification for the sake of brevity.  *See, e.g.*, Judith Butler, *Performative Acts and Gender Constitution: An Essay in Phenomenology and Feminist Theory*, 40 THEATRE J. 519, 522 (1988) (arguing that although sex and gender purport to be natural, they are both constituted by "tacit collective agreement to perform, produce, and sustain discrete and polar genders").

would prefer to reconstruct an integrated understanding of sex and gender.[247]  For example, the Catholic Church views traditional roles for men and women as natural rather than socially constructed.[248]  The nuances of these debates may be altogether lost on the judiciary, which uses the word "gender" rather than "sex" because the term "sex" sounds salacious.[249]  Ultimately, neither the Catholic Church,[250] nor the American Psychological Association,[251] nor the state of North Carolina[252] can settle ideological controversies over sex and gender by defining terms.

Moreover, "there is no logically necessary connection between showing or proving that gender is contingent and achieving any particular substantive outcome or result."[253]  Some opponents of transgender rights base their arguments on the premise that there is a distinction between sex and gender identity.[254]  They argue sex should be primary.[255]  Which definition of sex or gender should matter is a moral or political question. It cannot be settled with factual arguments.[256]

---

[247]  Consider the views of the Vatican.  *See* Mary Anne Case, *After Gender the Destruction of Man? The Vatican's Nightmare Vision of the "Gender Agenda" for Law*, 31 PACE L. REV. 802, 803 (2011) ("For the last several decades, the English word 'gender' has been anathema to the Vatican and those seeking to influence secular law and policy throughout the world on its behalf.").

[248]  The Church's reasons include opposition to "ideologies which, for example, call into question the family, in its natural two-parent structure of mother and father, and make homosexuality and heterosexuality virtually equivalent, in a new model of polymorphous sexuality."  *Id.* at 806–07 (quoting Letter from Joseph Cardinal Ratzinger, Prefect, Congregation for the Doctrine of the Faith, to the Bishops of the Catholic Church on the Collaboration of Men and Women in the Church and in the World (May 31, 2004), http://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20040731_collaboration_en.html [https://perma.cc/7J5R-NNAX]).

[249]  In a now-famous story, then-lawyer Ruth Bader Ginsburg began using the term "gender" rather than "sex" in the 1970s, after her assistant pointed out that judges would be distracted by seeing the term "sex" in legal briefs.  For a colorful retelling, listen to *More Perfect: Sex Appeal*, WNYC STUDIOS (Nov. 23, 2017), https://www.wnycstudios.org/story/sex-appeal/ [https://perma.cc/946D-BR3J].

[250]  *See* Case, *supra* note 247, at 806–07.

[251]  *See* AM. PSYCHOLOGICAL ASS'N, DEFINITIONS RELATED TO SEXUAL ORIENTATION AND GENDER DIVERSITY IN APA DOCUMENTS (2015), https://www.apa.org/pi/lgbt/resources/sexuality-definitions.pdf [https://perma.cc/CEA8-CWHH] (adopting progressive definitions).

[252]  *See* Public Facilities Privacy & Security Act, 2016 N.C. Sess. Laws 3, § 1.3 (defining "biological sex" as "male" or "female"), *repealed by* 2017 N.C. Sess. Laws 4, § 1.

[253]  Shannon Minter, Why Gender Theory Should Not Determine Transgender Advocacy 13 (2010) (unpublished manuscript) (on file with the Harvard Law School Library).

[254]  *See, e.g.*, Boyden v. Conlin, No. 17-cv-264, 2018 WL 4473347, at *4 (W.D. Wis. Sept. 18, 2018) (discussing the argument of opponents of health insurance coverage for transition-related care that "sex is immutable, whereas gender identity is a developmental process"); WoLF Letter, *supra* note 213, at 2 (opposing nonbinary recognition on the ground that "[s]ex and 'gender' are distinct concepts" and arguing the law should only recognize sex).

[255]  WoLF Letter, *supra* note 213, at 2–4.

[256]  *See* David B. Cruz, Essay, *Getting Sex "Right": Heteronormativity and Biologism in Trans and Intersex Marriage Litigation and Scholarship*, 18 DUKE J. GENDER L. & POL'Y 203, 217 (2010) ("It misdirects our focus, to someone's political detriment, to appeal to the natural or to 'the facts' of sex (as proclaimed by medical practitioners) as the basis for what are really political judgments about what identities and relationships to recognize."); Robin Dembroff, Real Talk on the

Conversation might be facilitated by careful examination of the interests at stake in each potential area of sex or gender regulation.[257] Whether sex or gender should be defined based on genetics, hormones, morphology, physiology, psychology, elective choice, documentary evidence such as birth certificates, public perceptions, something else, or not at all — is a difficult question to answer in general.[258]  The answer may be different if the law's purpose is to forbid discrimination, express respect for a person's identity, ensure accurate medical records, create fair divisions in sporting events, provide affirmative action for people disadvantaged by male dominance, or some mix of these goals.  Meanings may change over time.  Rather than attempting to settle questions once and for all, contextualized definitions might create opportunities for various constituencies to argue about what is at stake in each context of sex or gender regulation.  To be sure, one danger of contextual analysis is that its results are contestable.  Decisionmakers may ultimately prioritize interests in different ways and arrive at different outcomes.[259]  But a particularized approach may create opportunities for discussion about nonbinary gender rights that are not foreclosed at the outset by ideological or theoretical disagreements about the meaning of sex or gender.[260]

## B. Regulatory Models for Nonbinary Gender Rights

Discussions of nonbinary gender rights are often stifled by the assumption that those rights must always take the form of gender neutrality or, alternatively, that the law must always recognize a third gender.

---

Metaphysics of Gender 1–2 (May 15, 2017) (unpublished manuscript) (on file with the Harvard Law School Library).

[257] *But see* Talia Mae Bettcher, *Trans Women and the Meaning of "Woman," in* THE PHILOSOPHY OF SEX: CONTEMPORARY READINGS 233, 243 (Nicholas Power et al. eds., 6th ed. 2013) (objecting to context-specific definitions of who is a woman because they mean that there could be contexts in which a trans woman's claims to being a woman might be false, while, on the author's alternative "multiple-meaning view, a trans woman can say that she is a woman in *all* legitimate contexts because those contexts in which she is not a woman occur in a dominant culture" with a view of gender that she rejects on philosophical grounds).  While this Article assumes that people's gender identities are what they say they are, it does not begin from the premise that there could never be a context in which the law might legitimately offer definitions based on something other than self-identification.  Instead, it examines each legal context.

[258] *See, e.g.*, Clarke, *Identity and Form*, *supra* note 28, at 760, 763–64, 792–99 (discussing alternative legal definitions of "sex").

[259] This objection is roughly analogous to a line of criticism of balancing tests in constitutional law.  *See, e.g.*, T. Alexander Aleinikoff, *Constitutional Law in the Age of Balancing*, 96 YALE L.J. 943, 982 (1987) (arguing that balancing approaches to constitutional law are problematic because, among other reasons, "[n]o system of identification, evaluation, and comparison of interests has been developed").

[260] Consider, for example, how some advocates of policies to address climate change have overcome polarization by framing discussions around individual legal or policy questions on a micro level.  Hari M. Osofsky & Jacqueline Peel, *Energy Partisanship*, 65 EMORY L.J. 695, 701–02 (2016) (discussing research from psychology that explains why political polarization makes solutions to climate change at the federal legislative level impossible and proposing that change proceed locally by building consensus on specific proposals).

*THEY, THEM, AND THEIRS*

Rather than advocating either of these options as the best fit for nonbinary gender rights, this section describes potential upsides and downsides of each model. It proposes that there are variations on these models, and combinations of the two approaches, that might best fit different circumstances. There is also a third option: integrating nonbinary people into binary sex or gender regulations, but tailoring the definition of "sex" or "gender" so as to best fulfill the purposes of the regulation, while respecting every person's gender identity to the extent possible.

*1. Third-Gender Recognition.* — A recognition model would provide a third option to better reflect the lived experiences of people who do not check the M or F boxes. This model has the potential upsides of conferring legal dignity and protection, as well as facilitating affirmative efforts at inclusion and accommodation. But recognition also has potential downsides: the forms of gender identity the law can recognize are limited. Additionally, a third legal option may generate backlash, reinforce stereotypes about the third category, and domesticate the radical potential of nonbinary gender.

A first potential benefit of third-gender recognition is in conferring legal status and protection. A recognition model responds to concerns about disbelief, disrespect, and disregard of nonbinary people. Recognition legitimates nonbinary identity as a "civil status"; in other words, it affirms the "position of a person within the legal system."[261] By giving legal imprimatur to nonbinary gender, on par with the gender identities of men and women, recognition expresses the civil equivalence of nonbinary identities. Legal recognition may serve as a shield, giving nonbinary people authority in their demands for fair treatment from public and private actors.

Another advantage of recognition is that it might facilitate projects that see nonbinary gender as an aspect of organizational diversity that should be sought after. Recognition can facilitate the collection of data and information on the nonbinary population to identify problems and challenges people with nonbinary gender identities commonly face, as with the U.S. Transgender Survey. It might entail a right to affirmative changes in policy to accommodate nonbinary gender identities. The concept of "reasonable accommodation" found in disability law is a type

---

[261] Press Release No. 95/2017, Bundesverfassungsgericht, Civil Status Law Must Allow a Third Gender Option (Nov. 8, 2017), https://www.bundesverfassungsgericht.de/SharedDocs/Pressemitteilungen/EN/2017/bvg17-095.html [https://perma.cc/F5HP-MP8G] (describing an order of the First Senate of the German Federal Constitutional Court recognizing the right to registration of a "diverse" gender other than male or female); Peter Dunne & Jule Mulder, Developments, *Beyond the Binary: Towards a Third Sex Category in Germany?*, 19 GERMAN L.J. 627, 636–37 (2018) (discussing how the German decision "expressly acknowledges and validates the legitimacy of non-male and non-female identities," *id.* at 637).

HARVARD LAW REVIEW [Vol. 132:894

of recognition.[262] On this theory, institutions must make reasonable adjustments to their policies and practices to accommodate people with disabilities.[263] When a person with a disability requests an accommodation, their employer must engage in an "interactive process" to come to a solution.[264]

Whether the Americans with Disabilities Act[265] (ADA) protects nonbinary gender, as a legal matter, is a complicated question. The ADA explicitly excludes "gender identity disorders not resulting from physical impairments."[266] But one court has construed this provision "narrowly to refer to simply the condition of identifying with a different gender, not to exclude from ADA coverage disabling conditions that persons who identify with a different gender may have — such as . . . gender dysphoria."[267] This reasoning could extend to those nonbinary people with gender dysphoria, but would not cover anyone unwilling or unable to assert they suffer from a "disabling condition."[268] Some, but not all, nonbinary people may have gender dysphoria.[269] At present, U.S. sex discrimination law does not include any right to reasonable

---

[262] See, e.g., 42 U.S.C. § 12112(b)(5)(A) (2012) (providing that prohibited discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless . . . the accommodation would impose an undue hardship on the operation of the business").

[263] Id.

[264] 29 C.F.R. § 1630.2(o)(3) (2018) ("To determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee].").

[265] 42 U.S.C. §§ 12101–12213.

[266] Id. § 12211(b)(1). For an argument that this exclusion is a violation of the Constitution's Equal Protection Clause, see Kevin M. Barry et al., A Bare Desire to Harm: Transgender People and the Equal Protection Clause, 57 B.C. L. REV. 507, 551, 557–58 (2016).

[267] Blatt v. Cabela's Retail, Inc., No. 14-cv-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017). Gender dysphoria is significant distress or impairment resulting from incongruence between one's gender identity and one's assigned sex. Id. at *2 & n.1. The Trump Administration agrees that the ADA covers gender dysphoria when it results from a "physical impairment." Statement of Interest of the United States of America at 3, Doe v. Arrisi, No. 16-cv-08640 (D.N.J. July 17, 2017).

[268] Blatt, 2017 WL 2178123, at *3–4 (concluding that the plaintiff's gender dysphoria was a disability because it "substantially limits her major life activities of interacting with others, reproducing, and social and occupational functioning," id. at *4). One concern may be that disability law pathologizes transgender identity. But see Kevin Barry & Jennifer Levi, Blatt v. Cabela's Retail, Inc. and a New Path for Transgender Rights, 127 YALE L.J.F. 373, 386 (2017) ("This concern ignores the distinction between transgender identity and gender dysphoria. Transgender identity is not a medical condition. Gender dysphoria, on the other hand, is a medical condition; it is real, serious, and physically incapacitating, and often can only be ameliorated by medical care." (footnote omitted)).

[269] In 2013, the American Psychiatric Association's Diagnostic Statistical Manual updated the definition of "[g]ender dysphoria," to "reflect[] a change in conceptualization of the disorder's defining features by emphasizing the phenomenon of 'gender incongruence' rather than cross-gender identification per se." AM. PSYCHIATRIC ASS'N, HIGHLIGHTS OF CHANGES FROM DSM-IV-TR TO DSM-5, at 14 (2013). It clarifies: "The experienced gender incongruence and resulting gender dysphoria may take many forms." Id.

accommodation.[270]  Whether or not the letter of the law applies, nonbi-
nary people might make arguments for institutional inclusion that sound
in the theory of reasonable accommodation: sometimes equality requires
affirmative changes in structures and rules.

However, the recognition model also has potential drawbacks.  One
is that recognition may be purely expressive, amounting to lip service to
nonbinary gender that does not disturb existing institutional arrangements
that work to the advantage of the binary majority.  Recognition does
not always entail accommodation.  For example, recognition could mean
that a university includes "nonbinary" as an optional sex designation in
its official records but does no work to educate staff or students about
nonbinary gender identities, fails to respond to complaints of harassment
from nonbinary students, and maintains only single-sex dormitories.

Additionally, precisely because it expresses the legitimacy of nonbi-
nary gender identities, recognition may incur political backlash from
those who are invested in maintaining binary gender.  As new identities
make claims for recognition, they are also met with resistance from those
fatigued by identity politics in general.[271]  To the extent that recognition
is perceived to entail costly accommodations, it may incur all the more
resistance.[272]

Moreover, adding an X option to M and F does not confer dignity
on every gender identity; it only expands the list of legal sex classifica-
tions to three.  The X designation may be a poor fit for those people
who regard their gender identities as hybrids of M and F, altogether
absent, or subversive.  Conceivably, sex designations could be a blank
form field, allowing people to choose whatever gender descriptor they
might prefer, as on social media websites.[273]  But in the law, infinite
variation can be a problem.  On the principle of *numerus clausus*, the
law sometimes limits the types of social forms that will be legally recog-
nized because third parties have an interest in understanding legal
claims.[274]  To the extent that there are third-party interests in under-
standing someone's sex or gender identity, it may be impossible to

---

[270]  This is relevant assuming that sex discrimination includes discrimination against someone for
having a nonbinary gender identity.  *See supra* p. 924.

[271]  *See, e.g.*, Kenji Yoshino, *The New Equal Protection*, 124 HARV. L. REV. 747, 794 (2011).

[272]  *See, e.g.*, Michelle A. Travis, *Lashing Back at the ADA Backlash: How the Americans with
Disabilities Act Benefits Americans Without Disabilities*, 76 TENN. L. REV. 311, 311–12 (2009)
(identifying a "socio-legal backlash," for which "[a] primary target . . . has been the ADA's accom-
modation mandate").

[273]  *See, e.g.*, Facebook Diversity, *supra* note 45.

[274]  *See* Thomas W. Merrill & Henry E. Smith, *Optimal Standardization in the Law of Property:
The* Numerus Clausus *Principle*, 110 YALE L.J. 1, 4 (2000).  This is the case in property law, where
a limited number of types of ownership are recognized.  *Id.*  In other instances, such as in contract
law, the law enforces a nearly unlimited variety of forms of private agreements.  *Id.* at 3.  For
applications of this theory to sex and gender, see Clarke, *Identity and Form*, *supra* note 28, at 769;
and Katyal, *supra* note 28.

recognize an unlimited variety of identities. Many fill-in-the-blank gender identities are unlikely to have widespread social understanding or may be misunderstood.

By identifying a third gender, the recognition model also runs the risk of reinforcing new stereotypes, exclusionary categories, and stigmatizing practices. The X category may come to stand for a new "package" of gender stereotypes, rather than opening space for a diversity of gender identities.[275] Authorities may end up policing who is and is not a legitimate member of the third category. The history of racial categorization demonstrates that the addition of new categories can be in the service of subordination rather than liberation.[276] Even if it is freely chosen, the X may come to mark stigma. In those cultures that recognize third genders, the third-gender category is usually subordinate.[277]

A recognition model also risks domesticating nonbinary identity, in the way that queer theorists expressed concern that marriage would domesticate LGB people, blunting the edge of radical critiques of normative sexualities.[278] Integration of nonbinary people into a third category may remove the pressure to eliminate the state's power to impose legal sex classifications.[279] But whether this is likely to be true in a given context is an empirical question. Social movements might pursue recognition as a stopgap strategy, while keeping more radical goals as long-term aspirations. Or they might pursue limited forms of recognition in some contexts and make more radical demands for sex or gender neutrality in others.

  2. *Sex or Gender Neutrality.* — An alternative legal strategy is sex or gender neutrality. The term "gender neutrality" has long generated confusion.[280] One question is what aspects of sex or gender the law should treat neutrally. Another question is how neutrality is to be achieved. Neutrality is unlikely to mean enforced androgyny. Rather, the law might insist on masking gendered characteristics in certain contexts, eliminating rules that classify by sex, or decoupling certain traits

---

[275] *See* Mary Anne Case, *Unpacking Package Deals: Separate Spheres Are Not the Answer*, 75 DENV. U. L. REV. 1305, 1306 (1998).

[276] Professor Mary Anne Case offers the example of "the ever finer slicing of racial classifications from Black and White to quadroon and octoroon in antebellum Louisiana, or the distinction between Black, White, and Colored in South African apartheid law." Case, *supra* note 25, at 15 n.35.

[277] *See, e.g.*, S.F. Ahmed et al., Review, *Intersex and Gender Assignment; The Third Way?*, 89 ARCHIVES OF DISEASE IN CHILDHOOD 847, 848 (2004). *But see* Gilden, *supra* note 236, at 122–23 (describing the "high status granted to gender variant individuals" in some Native American communities, *id.* at 123).

[278] *See, e.g.*, MICHAEL WARNER, THE TROUBLE WITH NORMAL: SEX, POLITICS, AND THE ETHICS OF QUEER LIFE 84–116 (1999); Katherine M. Franke, Commentary, *The Domesticated Liberty of* Lawrence v. Texas, 104 COLUM. L. REV. 1399, 1400–01 (2004).

[279] *Cf.* Currah, *supra* note 164, at 445–46 (discussing an analogous debate with respect to rights for transgender men and transgender women).

[280] *See, e.g.*, Joan C. Williams, *Deconstructing Gender*, 87 MICH. L. REV. 797, 837–38 (1989).

from sex classifications. Alternatively, it might follow the nonendorsement or pluralism strands of the law's treatment of religion.

One view is that the law should be neutral not only with respect to sex, in the physical sense of that term, but also with respect to gender, in the social sense of masculinity and femininity.[281] This would mean abolition of gender — the old radical feminist dream of an androgynous or unisex society.[282] But ending gender is a troublesome legal project, for theoretical and practical reasons.[283] As a matter of theory — what would it mean to end gender? Would it mean no one could wear frilly dresses or suits and ties?[284] Would it mean jobs like firefighting, which prize traditionally masculine traits, like risk-taking and physical strength, must be restructured to give equal weight to traditionally feminine traits, like caretaking and gentleness?[285] As a practical matter, this version of "gender neutrality" would be difficult to implement and likely to encounter political resistance. The idea that law could eradicate social practices like race or gender, even if it tried, is questionable.[286] Whatever the virtues of gender abolition might be, the idea is unlikely to catch on in a culture in which gender remains a source of meaning and identity for many people, including many transgender men, transgender women, and nonbinary people.

Alternatively, gender neutrality might attempt a project of lesser ambition. It might aim not to eradicate gender across the board, but to "mask" gendered social characteristics in certain contexts, as in the famous orchestra auditions study in which aspiring musicians played behind a curtain so that the judges could not guess their sexes or gender

---

[281] Psychologists have devised measures for determining what traits are gendered in this social sense, such as the Bem Sex Role Inventory, which report the results of surveys about whether particular traits, behaviors, or characteristics are desirable in men or women. *See, e.g.*, Andrew P. Smiler & Marina Epstein, *Measuring Gender: Options and Issues*, *in* 1 HANDBOOK OF GENDER RESEARCH IN PSYCHOLOGY 133, 134 (Joan C. Chrisler & Donald R. McCreary eds., 2010). Notably, these surveys allow masculinity and femininity to be assessed independently; individuals may be high in both male and female traits or low in both. *See id.*

[282] *See supra* p. 916.

[283] *See* YURACKO, *supra* note 30, at 144.

[284] *See* JULIA SERANO, EXCLUDED: MAKING FEMINIST AND QUEER MOVEMENTS MORE INCLUSIVE 128 (2013) ("What exactly is the 'end of gender'? What does it look like? Are there words to describe male and female bodies at the end of gender? Or do we purge all words that refer to male- or female-specific body parts and reproductive functions for fear that they will reinforce gender distinctions? Do we do away with activities such as sports, sewing, shaving, cooking, fixing cars, taking care of children, and of course, man-on-top-woman-on-bottom penetration sex, because these have been too closely associated with traditional masculine and feminine roles in the past? What clothes do we wear at the end of gender?").

[285] *See* YURACKO, *supra* note 30, at 146–48. Or would it mean somehow attempting to delink these stereotypical traits from gender?

[286] Antidiscrimination law has more moderate ambitions: to intervene in particular social practices that uphold racialized, gendered, or otherwise problematic hierarchies. *See, e.g.*, Robert Post, 1998–99 Brennan Center Symposium Lecture, *Prejudicial Appearances: The Logic of American Antidiscrimination Law*, 88 CALIF. L. REV. 1, 17 (2000).

identities, and as a result, more women ended up being selected.[287] This approach might aim to protect privacy in addition to ensuring equality.

Another limited form of neutrality is anticlassification. Rather than insisting that the law neuter society, this variation on neutrality would insist that legal rules stop classifying people based on sex.[288] Rather than adding a third-gender option to identity forms, this approach might mean eliminating the sex category altogether from official documents. It would mean treating sex more like race, which was once, but is no longer, a classification listed on the face of birth certificates[289] and a mode of segregating restrooms. Eliminating classifications makes it more difficult for governments and others "to locate and persecute members of stigmatized groups."[290]

Yet another approach is decoupling. Neutrality might mean decoupling traits or characteristics associated with men or women from sex. To give another musical example, an a cappella group might limit its members to those with tenor, baritone, or bass voices, rather than to men only.[291] Family law rules might define their beneficiaries in terms of the category of "primary caretakers," who could be mothers, fathers, or parents with nonbinary gender identities, rather than limiting their benefits to mothers.[292] Or a sports team might limit players to those with low levels of testosterone, rather than women per se.[293]

Thus, these limited forms of sex neutrality may reduce discrimination against nonbinary people. But sex neutrality may also have advantages for other transgender and gender-nonconforming people, and for society as a whole. One is that sex neutrality avoids the need for

---

[287] *See* Claudia Goldin & Cecilia Rouse, *Orchestrating Impartiality: The Impact of "Blind" Auditions on Female Musicians*, 90 AM. ECON. REV. 715, 715–16 (2000).

[288] *See* HEATH FOGG DAVIS, BEYOND TRANS: DOES GENDER MATTER? 10 (2017) (arguing that "[t]he administrative discretion to decide who is female and who is male is the essence" of a harmful type of sex discrimination that the author terms "sex identity discrimination"); Tomchin, *supra* note 159, at 861 (arguing that "legal sex classification . . . — which hurts so many — should be eliminated, much like the formerly ubiquitous system of legal racial classification," but not proposing "gender-blindness," which, "like race-blindness, would harm those who are most impacted by discrimination").

[289] Racial data are still collected. *See* Clarke, *Identity and Form*, *supra* note 28, at 800.

[290] Laurie Shrage, *Does the Government Need to Know Your Sex?*, 20 J. POL. PHIL. 225, 228 (2012).

[291] *See* Pat Eaton-Robb, *Poof! Ivy League Glee Club's Gender Restrictions Disappear*, ASSOCIATED PRESS (Feb. 11, 2018), https://www.apnews.com/76974daff4ade44ed81196f18f8437fca0 [https://perma.cc/7BBA-7MH8] ("The 14-member Whiffenpoofs, a group formed in 1909, will continue to comprise tenor, baritone and bass voices, and the Whims will continue to be for sopranos and altos.").

[292] *See, e.g.*, Williams, *supra* note 280, at 839–40 ("People disadvantaged by gender can be protected by properly naming the group: in this case, not mothers, but anyone who has eschewed ideal worker status to fulfill child-care responsibilities.").

[293] *See, e.g.*, Joanna Harper, *Athletic Gender*, 80 LAW & CONTEMP. PROBS. 139, 151–53 (2017) (proposing the concept of "athletic gender," which would be determined based on testosterone levels solely for purposes of sporting events and considered distinct from one's gender identity).

AR_292803

gender policing, which can be degrading and humiliating. Professor Heath Fogg Davis offers the example of the "male" and "female" stickers that the Southeastern Pennsylvania Transportation Authority insisted on affixing to bus passes up until 2013.[294] As a result of the stickers, many gender-nonconforming people were refused rides, harassed, humiliated, or had their passes confiscated.[295] This included both people who self-identified as LGBT and those who did not, such as younger and older people with more androgynous appearances.[296] Gender policing is often based on definitions of masculinity and femininity inflected with classism and racism.[297] A second set of advantages is expressive. Sex segregation may reflect archaic or confining stereotypes about men and women. Its unquestioned use sends the message that sex is a primary and important way of dividing people into groups.[298] It also suggests one's sex is, and should be, a public matter or one left to the government.[299] A third advantage is practical: as with the a cappella example, it is possible that the best baritone is not a man. Confining the group to men means that the group may not include the best voices.

But even limited forms of sex neutrality have drawbacks. The anticlassification strand in race discrimination law is often faulted for failing to redress covert or implicit biases, disparate impacts, and structural inequalities.[300] These same criticisms are leveled at contemporary sex discrimination doctrine. Neutrality may be in name only. Neutral rules may have the purpose or effect of classifying based on traditional notions of sex, for example, if testosterone testing is intended to (or widely believed to) preserve women's sports for "real women."[301] In practice,

---

[294] DAVIS, *supra* note 288, at 2. The purported purpose of these stickers was to stop husbands and wives from sharing monthly bus passes. *Id.* at 2–3.

[295] *Id.* at 3 (describing "the widespread harm done by the stickers" to "people who self-identified as transgender and those who did not, as well as . . . riders who self-identified as queer and those who did not").

[296] *Id.* at 5–6.

[297] *See, e.g., id.* at 30.

[298] *Cf. id.* at 14 ("We are asked to tick binary sex boxes on myriad bureaucratic forms ranging from school, job, mortgage, and apartment rental applications to government census forms, dental and medical intake questionnaires, online dating sites, social media and marketing surveys, and on and on.").

[299] *Cf.* Robin Dembroff, *The Nonbinary Gender Trap,* N.Y. REV. BOOKS (Jan. 30, 2018, 7:00 AM), http://www.nybooks.com/daily/2018/01/30/the-nonbinary-gender-trap/ [https://perma.cc/DRV6-GTJF] ("For me, adding 'nonbinary' to the list of legal gender options does not address the core problem: any legal system that requires a person to record their gender perpetuates government control over our bodies and identities.").

[300] *See, e.g.,* Neil Gotanda, *A Critique of "Our Constitution is Color-Blind,"* 44 STAN. L. REV. 1, 68 (1991); Reva B. Siegel, *Discrimination in the Eyes of the Law: How "Color Blindness" Discourse Disrupts and Rationalizes Social Stratification,* 88 CALIF. L. REV. 77, 84–107 (2000).

[301] *Cf.* Katrina Karkazis & Morgan Carpenter, *Impossible "Choices": The Inherent Harms of Regulating Women's Testosterone in Sport,* J. BIOETHICAL INQUIRY 3 (Aug. 16, 2018), https://

supposedly neutral baselines often favor those who adopt traditionally male life patterns. Feminists have long argued that in workplace and family law, the sex-blind approach can result in rules tailored for the "ideal worker" who needs no flexibility because he is supported at home by a caretaking partner.[302] While women could theoretically meet the "ideal worker" standard, they rarely do because of the prevalence of gender roles. Moreover, a rule against all sex classifications could sweep away not only those classifications that perpetuate subordination, but also those designed to remedy it.[303] For example, some legal rules might give women favorable treatment.[304] To impose "neutrality" might mean "leveling down" by holding women to the same inhumane standards as men, rather than "leveling up" to give men the same humane treatment as women.[305]

Another version of the neutrality model would draw on religious freedom for support, employing concepts such as nonendorsement and pluralism.[306] Such a model might protect a panoply of beliefs about gender identity, just as the First Amendment protects a wide array of religious beliefs without endorsing any particular set of beliefs. For purposes of this Article, I will refer to pluralism strategies as those in which a sex or gender neutral option is created alongside a sex or gender segregated one. In practice, however, the neutral category may end up indistinguishable from a third-gender one, incurring all the disadvantages of third-gender recognition, such as the possibility of stereotyping and stigmatization. Moreover, a pluralism model invites objections from those with religious commitments to traditional, binary

---

link.springer.com/article/10.1007/s11673-018-9876-3 [https://perma.cc/2ETP-QWPX] (arguing that even a testosterone rule that states that it does not intend to question a competitor's sex can "mete out both suspicion and judgment on the sex and gender identity of the athletes regulated").

[302] JOAN WILLIAMS, UNBENDING GENDER: WHY FAMILY AND WORK CONFLICT AND WHAT TO DO ABOUT IT 2 (2000); *see also, e.g., id.* at 1–3.

[303] *See, e.g.,* CATHARINE A. MACKINNON, SEXUAL HARASSMENT OF WORKING WOMEN 117 (1979) (proposing an alternative approach to sex classifications that would ask "whether the policy or practice in question integrally contributes to the maintenance of an underclass or a deprived position because of gender status").

[304] *See, e.g.,* Sessions v. Morales-Santana, 137 S. Ct. 1678, 1689–93 (2017) (scrutinizing an immigration rule that gave favorable treatment to the children of unmarried citizen mothers over those of unmarried citizen fathers).

[305] *See id.* at 1701 (selecting leveling down as a remedy to apply the same harsh standard whether the child's U.S. citizen parent was their mother or father).

[306] *See* David B. Cruz, *Disestablishing Sex and Gender,* 90 CALIF. L. REV. 997, 1005, 1040 (2002) (discussing the analogy to religious freedom and describing how U.S. law's neutrality, non-preferentialism, and nonendorsement approaches to religion could be translated to sex and gender); Katyal, *supra* note 28, at 477 (advocating "gender pluralism as a replacement for the binary system" that would "demonopolize the classificatory power of the state in determining sex or gender identity").

notions of sex, who will argue that their interests should win out over the interests of gender nonconformists when in competition.[307]

3. *Integration into Binary Sex or Gender Regulation.* — A final approach to nonbinary gender rights would be to integrate nonbinary people into binary sex or gender regulations, while tailoring the definition of "sex" or "gender" so as to best fulfill the purposes of each legal rule, and respecting every person's gender identity, to the extent possible.[308] This approach would ask what interests sex segregation serves, and whether the definition of sex or gender used is tailored to meet that interest.[309] For example, if a program sought to increase gender diversity in a traditional, male-dominated workplace, it might define its beneficiaries as not just "women," but also "people who do not identify exclusively as male and LGBT people."[310] The advantage of this approach is that it may be the least disruptive to binary structures that would require time and money to change, such as physical or digital architectures, and so it might serve as a stopgap or compromise solution as regulators consider recognition and neutrality approaches. But integration strategies have all the drawbacks of third-gender recognition. In addition, they are likely to shoehorn nonbinary people into misfit categories at the expense of gender self-determination.

* * *

Rather than being faced with a choice between third-gender recognition and gender neutrality, the law offers an array of options for the protection of nonbinary gender identities. Determining which legal model is optimal requires investigation of the interests at stake in binary sex or gender, and will therefore depend on context. Any definition of sex or gender should be tailored to serve the purposes of regulation.

## III. LEGAL INTERESTS IN BINARY SEX OR GENDER?

This Part responds to the claim that nonbinary gender rights would upset a host of legal interests that are ostensibly advanced by maintaining a single, uniform system of binary sex classification.[311] Nonbinary rights would have implications for the law with respect to identification documents, antidiscrimination, and sex-segregated physical spaces and

---

[307] For an example of these arguments in the sexual orientation context, see *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1724 (2018).

[308] This integration strategy differs from the decoupling strategy described above only in that there is no formal attempt at neutrality — it uses binary categories that are explicitly about sex or gender.

[309] *See supra* section II.A, pp. 933–36.

[310] *See infra* section III.B.1, pp. 952–54.

[311] *See supra* p. 903.

activities.[312]  These domains have also been sites of contestation for
transgender people seeking recognition as men and women.  It is often
assumed that nonbinary people only complicate and heighten these chal-
lenges.  But that assumption may be based on unquestioned premises
about the need for binary categories and simplistic ideas about the legal
options for advancing nonbinary gender rights.

This Part rebuts the argument that nonbinary gender rights would
upset some foundational premise of the legal order, with unforeseen
and catastrophic results.  Rather than being a universal ordering prin-
ciple, legal sex and gender classifications are diminishing and excep-
tional.  A careful look at the remaining contexts in which the law regu-
lates sex and gender reveals no abiding and universal interest in binary
classification.  Rather, it shows that the purported interests binary clas-
sifications serve are variable and context dependent.  These interests
might include protecting conventionally gendered ideas of privacy or
safety; facilitating easy identification; preserving free speech; providing
opportunities for women; collecting relevant data; creating educational,
athletic, or health care programs tailored toward the needs of specific
populations defined by sex or gender; or avoiding the costs of transition.
This Part argues that in most instances, these interests are weak or un-
substantiated, or they can be accommodated, if not better served, by one
of the regulatory approaches to nonbinary gender rights discussed in
Part II: neutrality, recognition, or integration.

This Part builds from the premise that in most every context of sex
or gender regulation, the law should recognize self-determination with
respect to someone's gender identity as a man or woman.[313]  It also takes
for granted that nonbinary genders deserve the same legal status as bi-
nary ones, rather than making that case on abstract grounds.[314]  It asks
how the assumption that nonbinary gender identities should be accorded
the same status as male and female gender identities would transform
legal debates.  It offers tentative conclusions on the best regulatory
model for nonbinary gender rights in each context, considering how non-
binary rights claims might converge and diverge with those of other
identity-based movements, including feminist and other LGBT inter-
ests.  These conclusions reflect political judgments about how to priori-
tize the various interests at stake in each context.  There is room for
reasonable disagreement with my particular conclusions as to the best
approach in each case.  But my overall argument does not depend on
the outcomes of these fine-grained legal debates. Rather, I aim to show
that legal regimes that rely on binary sex or gender classification are

---

[312] While my main focus is on legal rules, at points this discussion also considers how nongov-
ernmental institutions might revise their rules and procedures to take nonbinary gender identities
seriously.  For detailed advice on how to conduct a "gender audit" to "make [an] organization[] more
inclusive of people with diverse sex identities," see DAVIS, *supra* note 288, at 151.

[313] *See supra* note 42 and accompanying text.

[314] *See supra* note 43 and accompanying text.

AR_292807

exceptional, not inevitable, and not a reason to resist the larger project of nonbinary gender rights.

## A. Identification

One argument often raised against nonbinary inclusion is that it will render efforts at identification and surveillance by law enforcement more difficult. This argument has long been made with respect to *any* changes to official sex markers, even from M to F or F to M.[315] But the argument takes new forms with respect to nonbinary gender, which would also require the recognition of an X category or, alternatively, the elimination of any sex or gender markers altogether. The question is, does law enforcement need binary M and F sex markers to identify people, determine police or emergency response, or track crimes?[316] Third-gender recognition is the best option in this context, at least at present.

Those who assert the importance of binary gender markers for identification documents do not explain why law enforcement needs those markers in addition to photographs.[317] In *Zzyym v. Pompeo*,[318] the court concluded that the State Department's policy of requiring an applicant to mark either M or F on a passport application was arbitrary and capricious.[319] Not all law enforcement databases include sex or gender designations, and in the case of transgender individuals, the designations in various databases may already conflict.[320] The "identity fraud" argument — that criminals will change their gender markers so that their names do not come up in law enforcement databases — is not a unique problem with recognizing nonbinary gender; it is a problem with any system that allows corrections to gender markers. The State Department already allows sex marker corrections between M and F, without proof of surgery.[321] Moreover, fraud concerns are dubious considering the

---

[315] *See, e.g.*, Lisa A. Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 MICH. J. GENDER & L. 373, 413–15 (2013).

[316] *See* WoLF Letter, *supra* note 213, at 2 (arguing that the government has "legitimate interests in recording and maintaining accurate information about its residents' sex, for purposes of identification, tracking crimes, . . . and determining the appropriate emergency medical and police services").

[317] Even if photographs can be tampered with, those seeking to commit fraud can tamper with the gender marker as well, or can simply find false passports with M or F markers that match their own appearances. Facial recognition and other biometric forms of identification are better tailored to address fraud concerns.

[318] No. 15-cv-02362, 2018 WL 4491434 (D. Colo. Sept. 19, 2018).

[319] *Id.* at *1. Zzyym brought suit under the Administrative Procedure Act, which disallows agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012).

[320] *See Zzyym*, 2018 WL 4491434, at *6 (noting that a passport holder's identity could be verified without checking the gender designation because databases include "other fields" such as "social security number, date of birth, name, etc.").

[321] Mottet, *supra* note 315, at 415.

number of other countries, including Australia, New Zealand, and India, that have managed nonbinary markers without apparent incident.[322] The United States accepts passports from these countries with nonbinary gender markers.[323] The International Civil Aviation Organization, the UN agency that sets international standards for machine-readable passports, has long allowed "X" as a sex marker for "unspecified."[324] As Judge Jackson put it during a hearing in the *Zzyym* case, "I'll bet you that if the State Department rethought its policy and decided to accept the X designation, the sun would still come up tomorrow."[325]

Another version of this argument might be that law enforcement and emergency services routinely use binary gender identifiers to visually identify crime suspects and people in need of assistance.[326] But authorities may use any number of descriptors for these purposes, not just perceived sex or gender presentation, but also race, age, height, weight, and other identifying features. Under equal protection doctrine, this limited use of visually identifying features, even racial ones, is widely regarded as permissible.[327] It is therefore implausible that recognition of nonbinary gender rights would invalidate the use of perceived gendered characteristics for purposes of visual identifications. Nor should it.

Opponents of nonbinary gender recognition have also expressed the worry that it would skew crime statistics, obscuring the fact that men commit more violent crimes than women.[328] But considering the vast disparities in violent crime rates between men and women, the number of criminals likely to identify as nonbinary is too small to have this effect.[329]

---

[322] *See Zzyym* Transcript, *supra* note 139, at 37. The lawyer from the State Department in *Zzyym* was not aware of any evidence that jurisdictions that recognize an X designation had any law enforcement trouble. *Id.* at 46.

[323] *Id.* at 35–36 (discussing how the U.S. State Department will permit noncitizens from Australia to enter the United States with an X designation on their passports, but will not allow citizens of the United States to leave with an X designation).

[324] Int'l Civil Aviation Org. [ICAO], *Machine Readable Travel Documents*, at 14, ICAO Doc. 9303 (7th ed. 2015), https://www.icao.int/publications/Documents/9303_p4_cons_en.pdf [https://perma.cc/H6DH-LFN4] (allowing "F for female, M for male, or X for unspecified").

[325] Zzyym Transcript, *supra* note 139, at 52.

[326] Bela August Walker, Note, *The Color of Crime: The Case Against Race-Based Suspect Descriptions*, 103 COLUM. L. REV. 662, 671 (2003) ("The description of a criminal suspect, whether created by the victim, an eyewitness, or the police, always begins with race and gender.").

[327] R. Richard Banks, *Race-Based Suspect Selection and Colorblind Equal Protection Doctrine and Discourse*, 48 UCLA L. REV. 1075, 1090–95 (2001) (explaining that race-based suspect descriptions have not triggered equal protection scrutiny because "the prevailing approach [is to assume] that suspect description reliance should never be viewed as a racial classification"). Even if this were not the case, suspect descriptions might survive the test of strict scrutiny, as narrowly tailored to achieve a compelling state interest. *See id.* at 1119.

[328] *See* WoLF Letter, *supra* note 213, at 4.

[329] *See id.* (citing FBI statistics that men committed 88% of murders in 2015). The Williams Institute estimates that 0.58% of adults in the United States identify as transgender. FLORES ET AL., *supra* note 21, at 3.

Recognition of an X designation may have law enforcement *benefits*. Some nonbinary people do not consistently appear to others as men or women.[330] A third designation might better match how they are perceived. Providing an X designation might avoid friction from police, customs, or TSA officers who would otherwise question a person whose gender identity does not appear to match the designation on their documents.[331] This type of friction is administratively costly for law enforcement, leading to unnecessary delays and even wrongful arrests and detentions. More importantly, it harms nonbinary people and their families, who are forced to reargue their gender identities with officials on a regular basis.[332]

As many have argued, the fact that official documents include sex designations at all is offensive to the values of self-determination and privacy, and it reinforces state authority over sex and gender in a troubling way.[333] An X designation has the potential drawback of allowing those who would harm nonbinary people to identify targets for violence and abuse, although I am unaware of any examples in which identity documents have been used for this purpose.[334] At present, there are good reasons to prefer a recognition model to a neutrality one. Recognition is more politically palatable, it allows the limited collection of sex-differentiated statistics to continue, and identity documents that reflect a person's gender identity offer that person a measure of security and legitimacy. A partial solution is to make sex designators on identification documents optional, giving people the choice to leave them blank, as New York City does with its identification cards.[335]

---

[330] *See* JAMES ET AL., *supra* note 2, at 48; *supra* p. 908.

[331] *See* JAMES ET AL., *supra* note 2, at 89 (reporting that 10% of nonbinary respondents to the 2015 USTS had been denied services or benefits when the name or gender on their identification documents did not match their gender presentation).

[332] *Cal. Assemb. Transp. Hearing, supra* note 86 (statement of Jonathan Clay) (discussing how a nonbinary child's incorrect ID "always opens us up to all sorts of questions going through security and other places. . . . Which is very difficult for my wife and I, because it puts [us] in a role where we are now having conversations with people, whether it's security, doctors, other folks. Having this conversation in a venue that we don't control, and unfortunately, it typically happens in front of our child which is also very difficult. Because that identity is very important to them").

[333] *See, e.g.*, Spade, *supra* note 28, at 738 ("Why is gender identification taken for granted as a legitimate domain of governance?"); Wipfler, *supra* note 28, at 492 ("Ultimately, . . . so long as such documents include a sex designation field, new and seemingly progressive government policies of gender inclusivity harmfully reify sex classification.").

[334] This concern was initially raised in litigation over the X designation on U.K. passports, but dropped when evidence failed to substantiate it. R (on the application of Elan-Cane) v. Sec'y of State for the Home Dep't [2018] EWHC (Admin) 1530 [16], [82], 2018 WL 03093374. The U.K. court nonetheless refused to require an X designation on passports pending a "comprehensive review" of the implications of such a change by U.K. authorities. *Id.* at [124].

[335] Wipfler, *supra* note 28, at 526 (discussing this approach, which has been adopted by a number of municipalities, but arguing it "still runs the risk of outing those who choose not to include a sex designation as abnormal if the majority of bearers opt to display their gender"). Another idea would

One reason the drafters of California's Gender Recognition Act opted for the recognition model was because it had been used by the District of Columbia, Oregon, and countries outside of the United States without problems.[336]  Additionally, federal regulations implementing the REAL ID Act require "gender" designations on identity documents, giving states discretion to define that term.[337]

Moreover, the federal government uses birth certificate sex data, just as it uses data on race, for purposes of collecting public health statistics.[338]  Although this is an argument for continuing to collect the data, it does not suggest that the data must be displayed on the face of the certificate.[339]  Collection of information on intersex infants and nonbinary gender identities might improve this data by allowing researchers to study the health of these populations.[340]

Additionally, identity documents with gender designations can act as shields against discrimination and sources of validation for transgender people, whether those designations are M, F, or X.  Designations that better match a person's self-presentation may help avoid difficult and dangerous conflicts with law enforcement.[341]  Transgender men and

---

be to design application forms that leave the gender designation blank by default, requiring individuals who wish to have gender designations to affirmatively select them.

[336] *Cal. Assemb. Transp. Hearing*, *supra* note 86 (statement of Sen. Toni Atkins) (responding to the question, "why even have gender or sex on an ID card, or on a driver's license specifically" with the answer: "We could go the other route, but we really would then be further out of compliance with what other countries and states are doing").

[337] 6 C.F.R. § 37.17 (2018) ("To be accepted by a Federal agency for official purposes, REAL ID driver's licenses and identification cards must include on the front of the card (unless otherwise specified below) the following information: . . . (c) *Gender*, as determined by the State.").

[338] Wipfler, *supra* note 28, at 539.

[339] One scholar has proposed a partial neutrality approach: that the birth certificate provided to parents not include sex information on its face, but that data about the baby's phenotypical sex at birth be collected and sent to the National Center for Health Statistics, to be treated like data on race and kept confidential. *See* Elizabeth Reilly, *Radical Tweak — Relocating the Power to Assign Sex*, 12 CARDOZO J.L. & GENDER 297, 318 (2005) (proposing that the "sex" field on the birth certificate be moved from the section on identifying data to the one on "information for medical and health purposes only").

[340] How sex or gender should be defined depends on the aims of the research.  Canada offers one model.  *See, e.g.*, *Gender of Person*, STAT. CAN. (Jan. 25, 2018), http://www23.statcan.gc.ca/imdb/p3Var.pl?Function=DEC&Id=410445 [https://perma.cc/CR2J-XNDM] (urging that users of statistics exercise caution in comparing indicators for sex and gender, as "[s]ex and gender refer to two different concepts"); *Classification of Gender*, STAT. CAN. (Jan. 25, 2018), http://www23.statcan.gc.ca/imdb/p3VD.pl?Function=getVD&TVD=467245 [https://perma.cc/Q4SK-EMY8] (providing options for gender including "Male gender," "Female gender," and "Gender diverse").

[341] *See Cal. Assemb. Transp. Hearing*, *supra* note 86 (statement of Cecilia Aguiar-Curry, Member, Assemb. Standing Comm. on Transp.) ("In emergency services, and if someone were to come upon an automobile accident or something along that, be able to look at someone's identification and know that they're special and may need special handling, that would be really important to me as a family member.").  Documents alone cannot always overcome prejudice.  *See* DAVIS, *supra* note 288, at 55 (discussing an incident in which a bouncer harassed a transgender woman in the women's restroom, and when she showed him an ID demonstrating she was a woman, he said: "Your ID is

women may need readily available documentation to prove they are not trespassing in sex-segregated spaces like restrooms.[342]  This may be a particularly acute concern "[f]or low-income trans women of color," for whom an "'accurate' ID is essential to avoiding harassment or violence, being turned away for public assistance, or being placed in dangerous sex-segregated environments in detention facilities and/or homeless shelters."[343]

Identity documents such as passports, driver's licenses, and birth certificates can also play a meaningful role in a person's conception of self.[344]  The documentary formalities that recognize nonbinary gender can legitimate an individual's claim to that status.[345]  In recognizing nonbinary gender, state and local governments express its moral equivalence to male and female gender identities, which may undermine discrimination by delegitimizing arguments that nonbinary identity is not real or valid.

## B. *Antidiscrimination Rules*

Taking nonbinary gender seriously would entail protection from discrimination and harassment in housing, employment, education, public accommodations, and other domains.

As an initial matter, some might object that nonbinary identities are too diverse and amorphous to be included as a "protected class" for purposes of antidiscrimination law.  But antidiscrimination law can protect a diverse array of nonbinary gender identities, just as it protects people of every race and religion.[346]  Nondiscrimination rules do not generally define identity groups with precision; rather, they define prohibited grounds for discrimination (such as "sex" or "gender identity").[347]  The question in a sex discrimination case is not whether the plaintiff belonged to a particular class.[348]  It is whether the plaintiff was mistreated because of sex.  For example, it is sex discrimination for an employer to

---

neither here nor there"); Wipfler, *supra* note 28, at 539 (arguing that in the short term, transgender people need IDs reflecting their gender identities to avoid "gender-probing" and other administrative problems).

[342]  Wipfler, *supra* note 28, at 541.

[343]  *Id.* at 540 (footnote omitted).

[344]  *See* Clarke, *Identity and Form*, *supra* note 28, at 792.

[345]  *See, e.g.*, JAMES ET AL., *supra* note 2, at 85 (quoting one survey respondent: "As a non-binary person, not being able to change my gender on any of my identification documents is really disheartening, dysphoria inducing, and kind of dehumanizing.  I'm not allowed to be me").

[346]  Including atheists.  Nancy Leong, *Negative Identity*, 88 S. CAL. L. REV. 1357, 1402 (2015) (discussing antidiscrimination protection for atheists).

[347]  Jessica A. Clarke, *Protected Class Gatekeeping*, 92 N.Y.U. L. REV. 101, 110 (2017).

[348]  *See id.*; *see also* Cruz, *supra* note 26, at 278 ("Title VII sex discrimination doctrine . . . does not actually confine protection to a limited class of persons and so does *not* require courts to decide the sex/gender class to which a plaintiff belongs.").

insist that a worker conform to sex stereotypes.[349]  In the federal courts, there is an emerging consensus that discrimination on the ground of transgender status is a form of sex discrimination because it rests on sex stereotypes.[350]  This logic extends to discrimination against someone for not adhering to sex stereotypes that require binary gender identity.[351]  Those federal, state, and local rules that ban discrimination on the basis of "gender identity" should cover nonbinary gender identities as well.[352]

Most of the arguments against prohibiting discrimination against nonbinary gender identities are no different from the arguments against prohibiting discrimination against transgender identities in general.  But there are some questions uniquely applicable to extending protection to nonbinary gender identities, including (1) whether it would eliminate data collection necessary to identify patterns of sex discrimination, and relatedly, whether it would eliminate affirmative action for women, (2) whether it would preclude pregnancy protections, and (3) whether harassment law would require the use of unfamiliar pronouns.  This section will discuss these arguments, which apply to antidiscrimination doctrines generally.  Later sections will discuss arguments that apply specifically to the operation of antidiscrimination law in particular domains, such as educational programs, the workplace, housing, and health care.

*1. Data Collection and Affirmative Action.* — With respect to data and affirmative action, recognition approaches work best.[353]  Institutions collect information on racial identity, even though some people's identities are multiracial and others refuse to state any racial information.[354]  The existence of complicated racial identities does not preclude the enforcement of legal doctrines that depend on statistical underrepresentation of minority groups, despite the fact that a larger percentage of people identify as multiracial than transgender.[355]  Neither

---

[349] *See, e.g.*, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . .").

[350] *See supra* note 175.

[351] *See supra* note 176.

[352] *See supra* p. 924.

[353] For a discussion of theories of discrimination that rely on statistical patterns, such as "pattern or practice" and "disparate impact," and an argument that these theories can work without a concept of the "protected class," see Clarke, *supra* note 347, at 173–77.

[354] *See* Lucas, *supra* note 225, at 1249; Rich, *supra* note 226, at 549.

[355] *See* FLORES ET AL., *supra* note 21, at 3 (reporting that 0.58% of adults in the United States identify as transgender); NICHOLAS A. JONES & JUNGMIWHA BULLOCK, U.S. DEP'T OF COMMERCE, THE TWO OR MORE RACES POPULATION: 2010, at 4 tbl.1 (2012), https://www.census.gov/prod/cen2010/briefs/c2010br-13.pdf [https://perma.cc/7MNL-C2ZA] (reporting that 2.9% of the population identified as two or more races).

should the existence of complicated gender identities be a barrier to collection of information on sex or gender identity.[356]

As for affirmative action, the Supreme Court has held that Title VII allows employers to consider an applicant's sex as a factor pursuant to an affirmative action plan.[357] Nonbinary gender and other LGBT identities can be factors recognized for diversity or affirmative action programs as well.[358]

Nor does nonbinary gender throw a wrench into gender-based affirmative action programs with numerical requirements.[359] The recognition that some people's genders are not binary does not render unadministrable laws that would require, for example, that corporate boards include one or more self-identified women.[360] The Democratic National Committee charter states that all committees "shall be as equally divided as practicable between men and women (determined by gender self-identification) meaning that the variance between men and women in the group cannot exceed one," and that "gender non-binary delegates . . . shall not be counted as either a male or female, and the remainder of

---

[356] Equal Employment Opportunity Commission (EEOC) forms require data on race and sex to help the Agency identify discriminatory patterns and trends. Camille Gear Rich, *Elective Race: Recognizing Race Discrimination in the Era of Racial Self-Identification*, 102 GEO. L.J. 1501, 1520 (2014). At present, these forms include only two options for sex, but multiple options for "Race/Ethnicity" including "Two or more races." *See* Equal Emp't Opportunity Comm'n, Standard Form 100, EMPLOYER INFORMATION REPORT EEO-1 (2006) https://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2-2.pdf [https://perma.cc/9DXU-VPTU]. The rules for racial data collection prioritize self-determination and privacy. *See* Rich, *supra*, at 1520–27. Just as rulemakers give consideration to whether they are interested in data on race or ethnicity, they can give consideration to whether they are interested in data on sex, gender identity, or some other trait. *See supra* note 340 (discussing how Canada's national statistical agency takes this approach).

[357] Johnson v. Transp. Agency, 480 U.S. 616, 632 (1987) (allowing consideration of sex as a factor pursuant to an affirmative action plan designed to eliminate a "manifest imbalance" in a "traditionally segregated job category").

[358] *See, e.g.*, Exec. Order No. 11,246, 3 C.F.R. 339 (1964–1965), *amended by* Exec. Order No. 11,375, 32 Fed. Reg. 14,303 (Oct. 17, 1967), Exec. Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014), *reprinted as amended in* 42 U.S.C.A. § 2000e (West 2018) (providing that federal contractors "will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin"); CAL. PUB. RES. CODE § 25230(a)(4), (b)(1) (West 2018) (requiring that a state commission that administers grants and loans "implement an outreach program" to minority businesses, including "LGBT business enterprises" defined as those that are "at least 51 percent owned by a lesbian, gay, bisexual, or transgender person or persons").

[359] These rules may fall outside the ambit of Title VII because Title VII applies only to employment relationships. They are not subject to constitutional requirements unless they are tied to state action.

[360] *See* 2018 Cal. Legis. Serv. 954 (S.B. 826) (West) (to be codified at CAL. CORP. CODE §§ 301.3, 2115.5). The question whether any particular gender-based affirmative action policy by a government entity will survive constitutional scrutiny has never turned on whether gender is or is not binary. *Cf.* Ajmel Quereshi, *The Forgotten Remedy: A Legal and Theoretical Defense of Intermediate Scrutiny for Gender-Based Affirmative Action Programs*, 21 AM. U. J. GENDER SOC. POL'Y & L. 797, 813–17 (2013) (outlining the various legal tests courts have applied to gender-based affirmative action under the Constitution).

the delegation shall be equally divided."[361]  Such a rule does not create
incentives to exclude nonbinary people, but neither does it create any
incentives to include them.  Policymakers should go further to reconsider
the purposes of these programs and ask whether those purposes might
be better served by rules that aim to affirmatively encourage the inclu-
sion of nonbinary and other LGBT people.[362]

2. *Pregnancy Protections.* — Like transgender men who become
pregnant, nonbinary people may at first seem to pose a challenge to rules
that prohibit discrimination on the basis of pregnancy and related
conditions, or rules that afford accommodations for pregnancy[363] or spe-
cial treatment for biological mothers.[364]  In the pregnancy context, a
decoupling approach works.[365]  Pregnancy is distinct from gender iden-
tity.  People of all gender identities can be pregnant,[366] and pregnancy
protections can be neutral as to gender identity.  Sometimes such pro-
tection requires no stretch of the statutory language.  Title VII, for ex-
ample, prohibits pregnancy discrimination by defining discrimination

---

[361] DEMOCRATIC NAT'L COMM., THE CHARTER & THE BYLAWS OF THE DEMOCRATIC
PARTY OF THE UNITED STATES 8 (2018), https://democrats.org/wp-content/uploads/2018/10/
DNC-Charter-Bylaws-8.25.18-with-Amendments.pdf [https://perma.cc/HG2Y-2J45].

[362] The moral case may be stronger than the business one.  *See, e.g.*, Deborah L. Rhode &
Amanda K. Packel, *Diversity on Corporate Boards: How Much Difference Does Difference Make?*,
39 DEL. J. CORP. L. 377, 379 (2014) ("[T]he 'business case for diversity' is less compelling than other
reasons rooted in social justice, equal opportunity, and corporate reputation.").

[363] *See* NAT'L P'SHIP FOR WOMEN & FAMILIES, REASONABLE ACCOMMODATIONS FOR
PREGNANT WORKERS: STATE AND LOCAL LAWS (2018), http://www.nationalpartnership.org/
research-library/workplace-fairness/pregnancy-discrimination/reasonable-accommodations-for-
pregnant-workers-state-laws.pdf [https://perma.cc/45XZ-PWLS] (surveying state and local laws).

[364] *See, e.g.*, Douglas NeJaime, *The Nature of Parenthood*, 126 YALE L.J. 2260, 2314 (2017) (re-
viewing the law of parentage with respect to artificial reproductive technologies and concluding
that "even in an age of sex and sexual-orientation equality, courts and legislatures continue to treat
*biological mothers* as the parents from whom the *legal family* necessarily springs").

[365] I focus here on pregnancy rather than parenting in general, but with respect to parental leave,
consider that even a scholar arguing for "fatherhood bonuses" to encourage fathers to take parental
leave admits that these benefits should also be extended to "lesbian co-mothers" and even "single
parents" who would receive double the benefits.  Keith Cunningham-Parmeter, *(Un)Equal Protec-
tion: Why Gender Equality Depends on Discrimination*, 109 NW. U. L. REV. 1, 55 (2014).

[366] *See, e.g.*, Lara Karaian, *Pregnant Men: Repronormativity, Critical Trans Theory and the
Re(conceive)ing of Sex and Pregnancy in Law*, 22 SOC. & LEGAL STUD. 211, 212–13 (2013); Tori
Truscheit, *All the Things I Worry About as My Nonbinary Partner Prepares to Give Birth*, THE
CUT (Dec. 12, 2017), https://www.thecut.com/2017/12/giving-birth-outside-the-gender-binary.html
[https://perma.cc/7MVL-X2DA].  Nonbinary people may also menstruate, *see, e.g.*, James Michael
Nichols, *Powerful Photo Shows that Women Aren't the Only Ones Who Get Periods*, HUFFINGTON
POST (Dec. 22, 2017), https://www.huffingtonpost.com/entry/cass-clemmer-trans-periods_us_
5a97101bce4b0aa14ea78a251 [https://perma.cc/7XWB-DYS4] (discussing trans menstrual health ad-
vocate Cass Clemmer), and lactate, *see, e.g.*, Trevor MacDonald et al., *Transmasculine Individuals'
Experiences with Lactation, Chestfeeding, and Gender Identity: A Qualitiative Study*, 16 BMC
PREGNANCY & CHILDBIRTH, at 1, 2 (2016), https://bmcpregnancychildbirth.biomedcentral.com/
articles/10.1186/s12884-016-0907-y [https://perma.cc/6J8Y-3LEX].

based on "sex" to include discrimination based on pregnancy.[367] This provision is not limited to discrimination against women.[368] But sometimes statutory language refers to females or women. For example, Title VII also includes a provision that states: "women affected by pregnancy, childbirth, or related medical conditions" are to be treated the same as nonpregnant workers "similar in their ability or inability to work."[369] Rules such as this can be clarified to specify that they apply to all people who are pregnant.[370] In statutes governing family law as well, terms such as "gestational mother" might be replaced with "gestational parent."[371]

One feminist objection might be that this logic severs pregnancy from women's issues and indirectly hinders arguments for constitutional protection.[372] In 1974, the Supreme Court rejected an equal protection challenge to a state disability fund that excluded pregnancy coverage, reasoning that "[t]he program divides potential recipients into two groups — pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes."[373] One rebuttal to this formalistic argument is to insist, just as formalistically, on the equivalence of women and pregnancy, because only "biological women" get pregnant.[374] This rebuttal has had some

---

[367] 42 U.S.C. § 2000e(k) (2012) (defining discrimination "because of sex" to include discrimination "because of . . . pregnancy, childbirth, or related medical conditions").

[368] *See* Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 684–85 (1983) (allowing male employees to challenge employer benefits plans that covered female employees' pregnancies but not male employees' spouses' pregnancies).

[369] 42 U.S.C. § 2000e(k).

[370] For an example of one fix, see Cal. Fair Emp't & Housing Council, Amendments to the Fair Employment and Housing Act Regulations 25–26 (2015) (codified at CAL. CODE REGS. tit. 2, § 11035(f)–(g) (2018)) https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2017/06/FinalText.pdf [https://perma.cc/UPX7-TLUU] (clarifying that an "eligible female employee" for purposes of pregnancy accommodation includes "a transgender employee who is disabled by pregnancy").

[371] The 2017 Uniform Parentage Act's definitions of parents have moved in the direction of gender neutrality. *See, e.g.*, UNIF. PARENTAGE ACT § 107 (UNIF. LAW COMM'N 2017) ("To the extent practicable, a provision of this [act] applicable to a father-child relationship applies to a mother-child relationship and a provision of this [act] applicable to a mother-child relationship applies to a father-child relationship." (alterations in original)). However, the Act still uses gendered terms such as "woman who gave birth to a child." *E.g.*, *id.* § 301. This language could be changed to "person who gave birth to a child" or "gestational parent" to include nonbinary people and transgender men.

[372] *Cf.* Chase Strangio, *Can Reproductive Trans Bodies Exist?*, 19 CUNY L. REV. 223, 229–30 (2016) (offering examples of this genre of argument against transgender inclusion in reproductive rights discussions).

[373] Geduldig v. Aiello, 417 U.S. 484, 496 n.20 (1974).

[374] *See, e.g.*, Vivian M. Gutierrez & Berta E. Hernández-Truyol, *UnSexing Pregnancy?*, *in* Darren Rosenblum et al., *Pregnant Man?: A Conversation*, 22 YALE J.L. & FEMINISM 207, 233 (2010) ("A person/parent with a female reproductive system is pregnant, regardless of how that person presents socially or legally.").

*HARVARD LAW REVIEW* [Vol. 132:894

success in state courts interpreting their own constitutions to prohibit discrimination based on pregnancy.[375]

But the argument also has risks for feminists. If the law defines women as a class by their capacity to become pregnant, then this capacity appears to be a legitimate basis for discrimination against women.[376] In any event, there are any number of more substantive arguments linking pregnancy discrimination to sex: for example, that in practice, discrimination based on pregnancy drives women's inequality,[377] that it is based on the assumption that all workers meet a traditionally male norm,[378] or that it is a thinly veiled attempt to exclude women from the workplace.[379] The fact that nonbinary people, like transgender men, may also avail themselves of pregnancy protections in no way undermines these substantive arguments.

Likewise, in the family law domain, even scholars arguing for rules that would mostly benefit mothers are able to cast their prescriptive recommendations in sex-neutral terms.[380] Laws governing parents might go further in the direction of gender neutrality by recognizing more of the social as well as biological aspects of parenthood.[381] Nonbinary parents, like many other LGBT parents, may demonstrate the

---

[375] A Connecticut state court advanced this formalistic argument, among several others, in holding that the Connecticut Constitution's Equal Rights Amendment prohibited the state from refusing to fund medically necessary abortions. Doe v. Maher, 515 A.2d 134, 159–60 (Conn. Super. Ct. 1986) ("Since only women become pregnant, discrimination against pregnancy by not funding abortion when it is medically necessary and when all other medical expenses are paid by the state for both men and women is sex oriented discrimination." *Id.* at 159.).

[376] *See, e.g.*, Cary Franklin, *Biological Warfare: Constitutional Conflict over "Inherent Differences" Between the Sexes*, 2017 SUP. CT. REV. 169, 180 ("[P]regnancy is, in some instances, deemed to be a fundamental difference between the sexes that gives the state a legitimate reason to treat men and women differently.").

[377] This was the type of argument that the *Doe* court regarded as "most important." *Doe*, 515 A.2d at 159 ("Since time immemorial, women's biology and ability to bear children have been used as a basis for discrimination against them. . . . This discrimination has had a devastating effect upon women.").

[378] *Cf. id.* (holding that a benefits plan was discriminatory because "all the male's medical expenses associated with their reproductive health, for family planning and for conditions unique to his sex are paid and the same is provided for women *except* for the medically necessary abortion that does not endanger her life").

[379] *See* Geduldig v. Aiello, 417 U.S. 484, 496 n.20 (1974) (stating that "a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other" would be sufficient to constitute a violation of the Equal Protection Clause).

[380] *See, e.g.*, Jennifer S. Hendricks, *Fathers and Feminism: The Case Against Genetic Entitlement*, 91 TUL. L. REV. 473, 500 (2017) (arguing that genetics alone should not entitle a person to parental rights, but biology along with a relationship should).

[381] For an argument about how "[p]arentage law could move away from separate regulations of *maternity* and *paternity* and instead work toward general regulation of *parentage*" by considering social as well as biological connections, see NeJaime, *supra* note 364, at 2337–38. For an argument that the law should go even further to "unsex" pregnancy protections by encouraging nonpregnant partners to engage in more care work, such as setting up health care appointments, choosing a

importance of social bonds as well as biological relationships in family law, reproductive health care, and parenting.[382]

3. *Misgendering and Pronouns.* — Another concern is whether law will require the use of nonbinary pronouns and titles. Most transgender people, including many who identify as nonbinary, use gendered pronouns such as he and she.[383] However, 29% of transgender respondents to the USTS stated they use "they/them" pronouns.[384] Some transgender people may request even more unfamiliar pronouns, such as ze (pronounced "zee") and hir (pronounced "hear").[385] Rather than Ms., Mrs., or Mr., some may request the honorific prefix Mx. (most often pronounced "Mix").[386] When nonbinary people request unfamiliar pronouns, they may encounter discrimination and harassment.[387] The law should recognize nonbinary gender identities in this context, just as it requires equal respect for male and female gender identities. Whether harassment law applies will depend on the circumstances: harassment

---

pediatrician, purchasing a car seat, or taking a childcare class, see David Fontana & Naomi Schoenbaum, *The Sexed Pregnancy*, COLUM. L. REV. (forthcoming 2019) (manuscript at 16–20) (on file with the Harvard Law School Library).

[382] This Article does not develop these arguments, because they have been discussed in other work. *See e.g.*, Darren Rosenblum, *Epilogue and Response, in* Rosenblum et al., *supra* note 374, at 261, 269 ("Parenting should be unsexed to embrace both the fluidity of contemporary understandings of gender and the need for balancing roles within the family."); *supra* note 381.

[383] JAMES ET AL., *supra* note 2, at 49 (reporting that 37% of nonbinary respondents to the 2015 USTS use he/his pronouns, 37% use she/her, 29% use they/their, 20% do not ask for any particular pronouns, and 4% use other unique choices).

[384] *Id.*

[385] *See e.g., id.* at 49–50 (reporting that 2% use ze/hir); Beemyn, *supra* note 182, at 359. Beemyn explains that "students who want to be recognized as nonbinary have tended to gravitate toward 'they/them/their,' because it is language that others already have and its usage to describe one person is gaining support in the dominant society." Beemyn, *supra* note 89, at 251 (discussing the results of a survey of 111 nonbinary college students in 2014). "The handful of students I interviewed who had chosen other pronoun options, specifically 'ze/hir/hir,' 'ze/zim/zir,' or 'xe/xem/xir,' often had difficulty, or did not try, getting people beyond their close friends to refer to them with these pronouns." *Id.*

[386] Robin Henry, *Now Pick Mr, Mrs, Miss, Ms . . . or Mx for No Specific Gender*, THE TIMES (May 3, 2015, 1:01 AM), https://www.thetimes.co.uk/article/now-pick-mr-mrs-miss-ms-or-mx-for-no-specific-gender-t2rb5bh62rs [https://perma.cc/B489-J2Y4] (reporting that "[t]he first recorded use of Mx was in Single Parent, the American magazine, in 1977" and quoting an assistant editor of the Oxford English Dictionary as saying: "The early proponents of the term seem to have had gender politics as their central concern [and] saw the title as one which could sidestep the perceived sexism of the traditional 'Mr', 'Mrs' and 'Miss.'" (second alteration in original)); *On the Pronunciation of Mx*, GENDER CENSUS (Apr. 25, 2016, 12:40 PM), http://gendercensus.com/post/143382802540/on-the-pronunciation-of-mx [https://perma.cc/X83B-6BG6] (informal online poll on pronunciation).

[387] *See e.g.*, Casey Parks, *Gresham-Barlow School District Agrees to Pay Transgender Teacher, Add Gender-Neutral Bathrooms After Complaint*, OR. LIVE (May 20, 2016), http://www.oregonlive.com/education/index.ssf/2016/05/gresham_barlow_transgender_tea.html [https://perma.cc/Q8DW-JJAZ]; Lori Rozsa, *Transgender Teacher Removed from Classroom After Some Parents Object to Gender-Neutral Prefix "Mx."*, WASH. POST (Sept. 29, 2017), http://wapo.st/2xLEiYL [https://perma.cc/BRN4-SDK5].

law does not reach accidental or isolated remarks, nor does it generally require the use of any idiosyncratic pronouns a person might request.

Sincere questions about pronouns, as well as accidental or isolated misgendering, do not qualify as harassment. This is because the law generally requires that harassment be "severe or pervasive" to be actionable.[388] Even in the most protective of jurisdictions, harassment law does not reach "petty slights and trivial inconveniences."[389] For example, the New York City Commission on Human Rights has issued a guidance document stating that City rules require employers, landlords, and providers of public accommodations "to use an individual's preferred name, pronoun, and title (*e.g.*, Ms./Mrs.)."[390] It further provides that pronouns may include "they/them/theirs or ze/hir."[391] As an example of a violation of the law, the guidance gives: "[i]ntentional or repeated refusal" to use the correct terms "after [a person] has made clear which pronouns and title she uses."[392] Misgendering a nonbinary person could therefore be part of a pattern of prohibited gender-identity or sex-based harassment.[393]

Additionally, the law requires that harassment be objectively hostile, not just subjectively offensive.[394] Thus, the law must account for the social meaning of harassing language, not just the individual victim's

---

[388] Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

[389] Nelson v. HSBC Bank USA, 929 N.Y.S.2d 259, 264 (N.Y. App. Div. 2011). New York does not have a "severe or pervasive" requirement. *Id.* at 263.

[390] N.Y.C. COMM'N ON HUMAN RIGHTS, LEGAL ENFORCEMENT GUIDANCE ON DISCRIMINATION ON THE BASIS OF GENDER IDENTITY OR EXPRESSION: LOCAL LAW No. 3 (2002); N.Y.C. ADMIN. CODE § 8-102(23), at 4 (2016), https://www1.nyc.gov/assets/cchr/downloads/pdf/publications/GenderID_InterpretiveGuide_2015.pdf [https://perma.cc/C994-QAMV]. This Article generally avoids the term "preferred pronouns" because this phrasing suggests pronoun usage is a matter of mere preference rather than an issue of equal respect. It uses the term "correct pronouns" instead.

[391] *Id.*

[392] *Id.* at 5; *see also* D.C. MUN. REGS. tit. 4, § 808.2 (2017) (providing that "[d]eliberately misusing an individual's preferred name[,] form of address or gender-related pronoun" "may constitute evidence of unlawful harassment and hostile environment" considering "the nature, frequency, and severity of the behavior," among other factors).

[393] A court might require a plaintiff to demonstrate some form of mistreatment in addition to refusal to use gender-neutral pronouns. I have found no cases in which a nonbinary person has brought a claim alleging discrimination based solely on a refusal to use gender-neutral pronouns. In one Oregon case, a schoolteacher alleged that their employer forbade other employees from using the correct pronoun ("they"), and their coworkers called them "she," "lady," or "Miss," smeared Vaseline on their cabinets, yelled insults at them in the hallway, and conspired to prevent them from using the school's only gender-neutral restroom. Parks, *supra* note 387. The teacher won a settlement. *Id.*

[394] Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview.").

perspective.[395]  Harassment that expresses disrespect for a person's gender identity is objectively hostile, just like harassment that expresses disrespect for a person's racial or religious identity.  For example, imagine a scenario in which xenophobes harass a coworker they know to be from India by referring to him as an "Arab."[396]  This deliberate ascription of an incorrect identity is a form of racism — among other things, it expresses the idea that all people with brown skin are "Arab" and that Indian identity is unworthy of respect.[397]  Similarly, intentional misgendering expresses stereotypes about what real "men" and "women" are and informs its target that their own gender identity is unworthy of respect.  It is unreasonable to refuse to refer to a person by their first name, for example, calling a man "Jane" rather than "John," due to a disagreement about whether his male gender identity is valid.[398]  Likewise, it is unreasonable to insult him by referring to him as "she," as the Equal Employment Opportunity Commission has concluded.[399]  And if a person uses they/them pronouns, it is unreasonable to insist on referring to them as "he" or "she."[400]

But what if a person who goes by the name Jane-John insists on a new set of pronouns that no one else uses?[401]  At present, it does not seem unreasonable to deny this request, although it may be unkind.  The law does not protect a person's right to be identified in any manner they wish; it prohibits harassment based on sex.  Pronouns, unlike proper names, are "closed class words" that require particular "mental effort"

---

[395] Some courts may consider the inquiry to ask what a reasonable person would think, "from the victim's perspective," noting that men and women may view the same conduct differently.  *See, e.g.*, Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991).  But not even this standard is a subjective one; it asks what a reasonable person in the plaintiff's circumstances would perceive.

[396] *See, e.g.*, EEOC v. WC&M Enters. Inc., 496 F.3d 393, 401–02 (5th Cir. 2007) (reversing a district court's conclusion that an Indian plaintiff whose coworkers called him an "Arab" was unprotected by Title VII).

[397] *Cf.* Robin Dembroff & Daniel Wodak, *He/She/They/Ze*, 5 ERGO 371, 376 n.8 (2018).  It also denigrates Arab identity, but that is not the only reason it is wrong.

[398] This is true whether or not John is transgender.

[399] *See* Lusardi v. McHugh, EEOC Appeal No. 0120133395, 2015 WL 1607756, at *11 (Apr. 1, 2015) ("While inadvertent and isolated slips of the tongue likely would not constitute harassment, under the facts of this case, S3's actions and demeanor made clear that S3's use of a male name and male pronouns in referring to Complainant was not accidental, but instead was intended to humiliate and ridicule Complainant.  As such, S3's repeated and intentional conduct was offensive and demeaning to Complainant and would have been so to a reasonable person in Complainant's position.").

[400] *See* Dembroff & Wodak, *supra* note 397, at 372 ("[E]nough of the morally relevant facts that explain why it is wrong to misgender transgender women . . . are equally applicable to genderqueer individuals . . . .").

[401] *Cf.* Brenda Cossman, *Gender Identity, Gender Pronouns, and Freedom of Expression: Bill C-16 and the Traction of Specious Legal Claims*, 68 U. TORONTO L.J. 37, 51 (2018) (discussing the "unsettled" controversy over whether Ontario's human rights law grants the right to choose *which* gender neutral pronouns to use).

*HARVARD LAW REVIEW*                    [Vol. 132:894

to adopt.[402]  They create a sort of *numerus clausus* problem.[403]  What is objectively unreasonable is to misgender Jane-John as "he" or "she" when there are gender-neutral alternatives, like the singular "they" or "hir."  These options are not wholly idiosyncratic,[404] they are not novel,[405] and regulated entities in some places have been put on notice by administrative agencies that they might be required to use such terms.[406]  Readers may object that harassment law offers no bright-line rule as to what modes of address are required, but there is never any bright-line test of what constitutes sexual, racial, or religious harassment.[407]  The test cannot be pinned down with precision or frozen in time because it must depend on context and contemporary norms.[408]

There are special institutional contexts in which there might be particular reasons to compel recognition of any pronouns used by a person, including idiosyncratic ones.  A California law known as the LGBT Senior Bill of Rights, passed in October 2017, makes it unlawful for nursing home staff to "[w]illfully and repeatedly fail to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns," unless that requirement is "incompatible with any professionally reasonable clinical judgment."[409]  Such a rule is warranted in the context of the long-term care industry, which involves a

---

[402]  *See* John McWhorter, *Goodbye to "He" and "She" and Hello to "Ze"?*, CNN (Oct. 14, 2015, 8:31 AM), https://www.cnn.com/2015/10/14/opinions/mcwhorter-pronouns-gender-neutral/index.html [https://perma.cc/SU86-NJ55].

[403]  *See supra* p. 939.

[404]  *See supra* p. 957.

[405]  *See, e.g.,* LESLIE FEINBERG, TRANS LIBERATION: BEYOND PINK OR BLUE 71 (1998) (discussing the author's use of "hir" and "ze" in the 1990s).

[406]  *See supra* p. 958.

[407]  *See, e.g.,* Post, *supra* note 286, at 17 ("[A]ntidiscrimination law is itself a social practice, which regulates other social practices, because the latter have become for one reason or another controversial.  It is because the meaning of categories like race, gender, and beauty have become contested that we seek to use antidiscrimination law to reshape them in ways that reflect the purposes of the law.").

[408]  *Cf.* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (per curiam) (holding that a court of appeals had erred by concluding that the insult "boy," used to describe an adult African American man, was nondiscriminatory, and noting that whether a term is evidence of discrimination "depend[s] on various factors including context, inflection, tone of voice, local custom, and historical usage").

[409]  CAL. HEALTH & SAFETY CODE § 1439.51 (West 2018).  This is a criminal rather than a civil statute because, when the law was first proposed, the long-term care industry objected to any private right of action.  *See, e.g., Hearing on S.B. 219 Before the S. Standing Comm. on Judiciary,* 2017–2018 Leg., Reg. Sess. (Cal. 2017) [hereinafter *Cal. Hearing on S.B. 219*] (statement of Matthew Robinson, California Association of Health Facilities), https://ca.digitaldemocracy.org/hearing/52473?startTime=52&vid=6c776ddd1a23558229f9c6de97aadecc [https://perma.cc/ZDK7-DB4U]; *id.* (statement of Lori Ferguson, California Assisted Living Association).  Violations are misdemeanors, which could technically be penalized with fines of up to $2500, 180 days in county jail, or both, depending on factors including "[w]hether the violation exposed the patient to the risk of death or serious physical harm."  CAL. HEALTH & SAFETY CODE § 1290(c).  If the statute were ever enforced, it is likely that prosecutors would seek small fines.  Chris Nichols, *Claims Mislead About*

captive and vulnerable population of LGBT seniors.[410] Long-term care providers are charged with protecting the physical and mental health of this population and should not endanger the well-being of their charges by disrespecting their identities, however idiosyncratic.

A number of objections have been raised to the extension of harassment law to require recognition of nonbinary identity. Some object that by requiring pronouns other than "he" or "she," government is taking sides on the acceptability of nonbinary gender identities, an issue on which public opinion polls are divided.[411] But discrimination law always takes sides in social controversies,[412] and harassment law inevitably intervenes in the use of language. Changing modes of address often express changes in the social status of groups. During the civil rights era, the Supreme Court once intervened to require that an African American woman be addressed with the honorific "Miss," just like a white woman.[413] Formerly common modes of class-based address — such as "my lord" — have fallen out of favor.[414] Experience with "Ms." demonstrates that new forms of address are possible and can quickly become culturally legible.[415]

Other objections are particular to pronouns. Law professor Eugene Volokh has argued that "[c]ompelling people to change the way they use the ordinary, commonplace words of everyday speech — turning plurals into singulars (or vice versa) — is a serious imposition."[416] But why is

---

*California Forcing Jail Time for Using Wrong Transgender Pronoun*, POLITIFACT (Sept. 26, 2017, 5:13 PM), http://www.politifact.com/california/article/2017/sep/26/claims-mislead-about-california-bill-forcing-jail-/ [https://perma.cc/U22T-QF5U] (statement by the bill's sponsor, Senator Scott Wiener, that "no one is going to jail" for incorrect pronoun use, an infraction that he predicts will be treated akin to a violation of the ban on smoking).

[410] *See Cal. Hearing on S.B. 219, supra* note 409 (statement of Sen. Scott Wiener) ("[T]hese seniors, people who are in their 70s, 80s, 90s and above today, are the people who created the modern LGBT community. . . . These are heroes, and they deserve to age gracefully and with the dignity and respect that they have earned 100 times over.").

[411] *See* Josh Blackman, Opinion, *The Government Can't Make You Use "Zhir" or "Ze" in Place of "She" and "He*,*"* WASH. POST (June 16, 2016), https://wapo.st/1tt4rWZ [https://perma.cc/Q4MC-GTTW] (opposing antiharassment rules that would require gender-neutral pronouns on the ground that "while a non-binary view of gender may be orthodoxy in certain segments of society, a near-majority of Americans reject it as a fact of life").

[412] *See* Post, *supra* note 286, at 17.

[413] Bell v. Maryland, 378 U.S. 226, 248 n.4 (1964) (Douglas, J., concurring) (discussing Hamilton v. Alabama, 376 U.S. 650 (1964) (per curiam)).

[414] Titles of nobility never made it over to the United States. *See* U.S. CONST. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States . . . .").

[415] "Ms." has a long history, but quickly entered common usage in the 1970s due to feminist advocacy. *See, e.g.,* Ben Zimmer, *Ms.*, N.Y. TIMES MAG. (Oct. 23, 2009), https://nyti.ms/2k9ehvH [https://perma.cc/KQV6-CXDS].

[416] Eugene Volokh, Opinion, *Claims by Transgender Schoolteacher (Who Wants to Be Called "They") Yield $60,000 Settlement, Agreement to Create Disciplinary Rules Regulating "Pronoun Usage*,*"* WASH. POST: VOLOKH CONSPIRACY (May 25, 2016), https://wapo.st/1qJ29RU [https://perma.cc/X6NS-BMUX].

this a "serious" imposition?  The objection might be related to grammar, clarity, or compulsion.

Rules of grammar are often invoked to resist gender-neutral pronouns.[417]  The primary problem with this objection is that it elevates rules of grammar over considerations of how to treat one another equally.  But even on its own terms, the grammatical objection is dubious.  Language is ever evolving.  The American Dialect Society voted the singular "they" Word of the Year in 2015, noting that it was used by writers including Geoffrey Chaucer, William Shakespeare, and Jane Austen to refer to an unknown person.[418]  Usage of the singular "they" to describe an unknown person is still ubiquitous, despite the strivings of Victorian grammarians to replace it with a universal "he."[419]

A related objection may be the lack of clarity — is the referent of "they" a singular person or group?  But context is usually clarifying, as with "you," a pronoun that is both singular and plural.[420]  While English speakers once distinguished "thou" (singular) from "you" (plural), "thou" has disappeared.[421]  While new uses of language may at first cause friction, as new terms become more familiar, confusion abates.  The English language is plastic, and "change is normal, ongoing, and entertaining."[422]  In any event, as philosophers Robin Dembroff and Daniel Wodak have argued, "[e]ven if using *they* slightly complicates communication, it is preferable to further maligning minority gender groups."[423]

The objection may be about government compulsion of speech: mandating particular pronouns rather than forbidding misgendering.[424]  Yet

---

[417] Some ersatz grammarians are insincere.  Bergman & Barker, *supra* note 31, at 43 (pointing out that some people who oppose the singular "they" do not otherwise care about grammatical rules and hypothesizing that grammatical objections are easier to voice than the real sentiment: "I think your identity is invalid because it challenges my beliefs about the world").

[418] *2015 Word of the Year Is Singular "They,"* AM. DIALECT SOC'Y (Jan. 8, 2016), https://www.americandialect.org/2015-word-of-the-year-is-singular-they [https://perma.cc/F3MD-V296].

[419] Geoff Nunberg, *Everyone Uses Singular "They," Whether They Realize It or Not*, NPR (Jan. 13, 2016, 1:00 PM), https://www.npr.org/2016/01/13/462906419/everyone-uses-singular-they-whether-they-realize-it-or-not [https://perma.cc/9PDN-4LEP].

[420] *See* McWhorter, *supra* note 402.

[421] *See id.*

[422] AM. DIALECT SOC'Y, *supra* note 418.

[423] Robin Dembroff & Daniel Wodak, *The Problem with Pronouns*, PHILOSOPHER (June 23, 2017), https://politicalphilosopher.net/2017/06/23/featured-philosophers-robin-dembroff-daniel-wodak/ [https://perma.cc/LUR6-UG5D].

[424] *See* Cossman, *supra* note 401, at 42–45 (discussing the compelled speech objection to Canadian gender nondiscrimination law); Volokh, *You Can Be Fined*, *supra* note 169 ("New York is requiring people to actually say words that convey a message of approval of the view that gender is a matter of self-perception rather than anatomy, and that, as to 'ze,' were deliberately created to convey that . . . message.").

AR_292823

harassment law constantly compels speech by requiring people to inter-act on equal terms with others they believe are unequal.[425]  For example, a sexist police officer would be compelled to refer to a female colleague as "Officer," even if he believes women should not have that title because their role is in the home.  Alternatively, those who object to the gender-neutral honorific "Mx." have the option of avoiding gendered honorifics altogether, and not referring to any students or coworkers as "Mr." or "Ms."  An analogy to our instincts about harassment based on religion might be instructive.  Should it be considered harassment on the basis of religion to refuse to refer to a person by religious titles such as "Your Holiness," "Rabbi," or "Imam," when no one else in a school or work-place uses religious titles?  To compel participants in secular life to use religious honorifics seems incorrect.  Those who object to gender-neutral pronouns may use proper names to refer to everyone, as the district court ultimately did in one of its *Zzyym* opinions.[426]  In close quarters, where it is impossible to avoid the use of pronouns, equal treatment means giving "them" the same respect as "he" and "she."

### C.  Sex-Specific Roles and Programs

The law allows binary sex segregation in some educational programs, sporting events, and workplaces.  These limited contexts are not reasons to reject the project of nonbinary inclusion.

*1. Education.* — Many controversies over transgender students — such as whether schools should respect the gender identities of children over parental opposition — are not any different with respect to nonbi-nary gender, and so are beyond the scope of this Article.  But nonbinary students may pose special challenges for sex-segregated schools, class-rooms, and programs.  Various neutrality, recognition, and integration strategies may be ways forward in these contexts.

Many feminist scholars have advocated for an anticlassification ap-proach to education, based on research finding that single-sex programs have negligible educational benefits, they are costly, and they advance damaging gender stereotypes.[427]  The existence of nonbinary students,

---

[425]  In 2006, the Supreme Court rejected a compelled speech objection to a law that required law schools to treat military recruiters like other recruiters, even though it compelled law schools to speak by including military recruiters in their promotional materials.  Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 61–62 (2006).  The Court noted that the regulation of speech is always "incidental" to the enforcement of antidiscrimination laws: the fact that Title VII "will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct."  *Id.* at 62.

[426]  *See* Zzyym v. Kerry, 220 F. Supp. 3d 1106 *passim* (D. Colo. 2016) (referring to the plaintiff throughout as "Dana" without pronouns).

[427]  *See, e.g.*, Rebecca S. Bigler et al., *Analysis and Evaluation of the Rationales for Single-Sex Schooling, in* 47 ADVANCES IN CHILD DEVELOPMENT AND BEHAVIOR 225, 252–53 (Lynn S.

who do not fit the stereotypes behind single-sex education, provides an-
other argument against these programs. But those who disagree on the
policy arguments need not oppose inclusion of nonbinary people in gen-
eral, because the law requires pluralism. Department of Education reg-
ulations permit funding of single-sex schools and classes, so long as stu-
dent enrollment is "completely voluntary" and the school "provides to
all other students, including students of the excluded sex, a substantially
equal coeducational class or extracurricular activity in the same subject
or activity."[428] Thus, all students have the option of coeducational clas-
ses, while students who wish to claim binary gender identities can opt
into segregated classes.

Nonbinary gender also creates challenges for private women's col-
leges.[429] But these institutions have responded to these challenges with
integration strategies: asking what interests sex-segregation serves and
whether the definition of sex or gender used is tailored to meet those
interests.[430] Thus, many are moving toward admitting any students
who identify as transgender (men or women) or nonbinary.[431] The ar-
gument in favor of this move is that these institutions regard their mis-
sions as countering marginalization based on sex and gender identity.[432]
Professor Davis suggests that these colleges should go further to become

---

Liben & Rebecca S. Bigler eds., 2014) (arguing that empirical research does not support rationales
for single-sex education, and that studies that show benefits fail to control for selection effects);
Diane F. Halpern et al., *The Pseudoscience of Single-Sex Schooling*, 333 SCIENCE 1706, 1707 (2011)
(discussing evidence of the stereotyping argument); Erin Pahlke et al., *The Effects of Single-
Sex Compared with Coeducational Schooling on Students' Performance and Attitudes: A Meta-
Analysis*, 140 PSYCHOL. BULL. 1042, 1064–65 (2014) (meta-analysis of 184 studies of single-sex
education concluding that those that used the best research methods demonstrated only trivial ad-
vantages, and noting that poorly designed studies may be fueling advocacy for single-sex schooling).

[428] 34 C.F.R. § 106.34(b) (2018). For an argument that this regulation is unconstitutional, see
David S. Cohen & Nancy Levit, *Still Unconstitutional: Our Nation's Experiment with State-
Sponsored Sex Segregation in Education*, 44 SETON HALL L. REV. 339 (2014).

[429] Title IX includes an exemption for "any public institution of undergraduate higher education
which is an institution that traditionally and continually from its establishment has had a policy of
admitting only students of one sex." 20 U.S.C. § 1681(a)(5) (2012).

[430] *See* DAVIS, *supra* note 288, at 98–101.

[431] *See Admission of Transgender Students*, MOUNT HOLYOKE, https://www.mtholyoke.edu/
policies/admission-transgender-students [https://perma.cc/BLV2-HDLZ] (clarifying that it admits
anyone "who is female or identifies as a woman" in whole or in part); Anna North, *Can Transgender
Students Go to Women's Colleges? Across the Country, the Answer Is Evolving.*, VOX (Sept. 22,
2017, 11:17 AM), https://www.vox.com/identities/2017/9/21/16315072/spelman-college-transgender-
students-womens-colleges [https://perma.cc/CAB3-MEXC] (surveying women's colleges and
demonstrating the trend toward admitting all transgender students).

[432] Scott Jaschik, *Trans Applicants Welcome*, INSIDE HIGHER ED (Sept. 3, 2014), https://www.
insidehighered.com/news/2014/09/03/mount-holyoke-will-now-accept-applications-transgender-
women [https://perma.cc/5NVG-GCQ6].

"historically women's colleges," following the model of historically black institutions that now admit students of all races.[433]

Nonbinary students might also challenge school dress codes that prescribe different standards for boys and girls. This would be a good thing, because sex-differentiated dress codes perpetuate gender stereotypes that are harmful to all students, "communicat[ing] that girls' bodies are inherently sexual, provocative, [and] dangerous" and that boys will inevitably objectify and harass girls.[434] The best practice is sex neutrality: to prohibit certain forms of inappropriate apparel or "mandate[] which body parts must be covered," and to apply the rules uniformly.[435]

Another question is whether teachers should refer to students with gendered terms. A radical demand would be for gender-neutral early-childhood education, to allow young children to work out their own gender identities.[436] This would follow the model of some taxpayer-funded preschools in Stockholm, Sweden, where teachers assiduously avoid gendering their young charges, using the gender-neutral Swedish pronoun "hen," calling them "friends" rather than "boys and girls," and not treating them according to stereotypes.[437] In the United States, however, where publicly funded preschool is not even universally available, the goal of eliminating sex stereotyping in early childhood education

---

[433] DAVIS, *supra* note 288, at 87; *see id.* at 107 (arguing that single-sex admissions policies are not essential to the mission of women's colleges and suggesting instead that these colleges require essays that "ask prospective students to reflect upon how their own sex identities relate to the college's commitment to fighting institutional sexism").

[434] Meredith Johnson Harbach, *Sexualization, Sex Discrimination, and Public School Dress Codes*, 50 U. RICH. L. REV. 1039, 1044 (2016); *id.* at 1047 (discussing successful equal protection challenges to discriminatory school dress codes).

[435] Kimmie Fink, *The Importance of Inclusive School Dress Codes*, HUM. RTS. CAMPAIGN (Jan. 30, 2017), https://www.hrc.org/blog/the-importance-of-inclusive-school-dress-codes [https://perma.cc/J3NT-86HS] (advising schools to "[a]void gender-specific policies altogether and instead allow all students the same clothing choices regardless of gender").

[436] *See* Iantaffi Interview, *supra* note 47, at 18 ("I dream of a world where a child is born and, of course, we're not going to know their gender until they tell us. So we just use gender neutral pronouns and then when they're four or five, they'll tell us because that's when children tell you who they are.").

[437] John Tagliabue, *Swedish School's Big Lesson Begins with Dropping Personal Pronouns*, N.Y. TIMES (Nov. 13, 2012), https://nyti.ms/2uLI7sq [https://perma.cc/CJT7-9S4Y]. One study found that children at a gender-neutral preschool scored lower on a measure of gender stereotyping and were more willing to play with children of other genders. Kristin Shutts et al., *Early Preschool Environments and Gender: Effects of Gender Pedagogy in Sweden*, 162 J. EXPERIMENTAL CHILD PSYCHOL. 1, 12 (2017). Other Swedish psychologists are skeptical that the schools will have any long-term impacts on the children or society. Katy Scott, *These Schools Want to Wipe Away Gender Stereotypes from an Early Age*, CNN (Nov. 1, 2018, 8:39 AM), https://www.cnn.com/2017/09/28/health/sweden-gender-neutral-preschool/index.html [https://perma.cc/8NK8-WG9E].

seems a remote one.[438]  Nonetheless, teachers might work to avoid language that excludes nonbinary students, using terms like "students" rather than "ladies and gentlemen."[439]  Educational institutions should provide nonbinary students with processes that allow them to decide when to disclose their pronouns, without requiring that they confront teachers or putting them on the spot to announce their gender identities in front of other students.[440]

    2. *Athletics.* — Another domain in which nonbinary inclusion poses a challenge is sports.  In the longer term, nonbinary athletes may inspire society to think creatively about forms of sport in which many different types of bodies are competitive.  But in the shorter term, neutrality strategies may come at the cost of women's participation, and integration of nonbinary athletes into the men's or women's divisions may be preferable.  Whether neutrality or integration is the best solution will depend on the type of competition, the age of the competitors, and the reasons for sex-segregated events.[441]  In any event, the legal issues that nonbinary gender raises for sports are not reasons to reject nonbinary gender wholesale.

    Sex discrimination in athletics may run afoul of U.S. law, most notably Title IX, which forbids sex discrimination in sports programs at schools receiving federal funding.[442]  In 1975, Department of Education

---

[438] *See, e.g.*, U.S. DEP'T OF EDUC., A MATTER OF EQUITY: PRESCHOOL IN AMERICA (2015), https://www2.ed.gov/documents/early-learning/matter-equity-preschool-america.pdf [https://perma.cc/8ZX7-EXH3] (describing the lack of access to preschool for many American children).

[439] Meg-John Barker et al., *Non-binary Staff and Student Guidance for Higher Education Institutions*, REWRITING THE RULES 4, https://rewriting-the-rules.com/wp-content/uploads/2017/01/Non-BinaryGenderHigherEducationGuidance-1.pdf [https://perma.cc/UX7Y-GWS7].

[440] *Id.* at 3–4; Beemyn, *supra* note 182, at 361 (interviewing over 200 college students who identify outside of gender or sexual binaries and reporting "[t]he interviewees who approached faculty members about their pronouns stated that most were willing to use the requested pronouns, but many of the students did not feel comfortable going to their instructors, not knowing how they would react or not wanting to have such a conversation with a professor"); Dembroff & Wodak, *supra* note 423 ("Your student should get to choose whether and when they disclose their gender identity to others; you should not force them to disclose this information to strangers, partly out of respect for their autonomy, and partly to protect them from serious risks of stigmatization and discrimination.").

[441] *Cf.* DAVIS, *supra* note 288, at 113–14 (asking that, for each age and level of play, organizations reconsider the aims of sex segregation in athletics, which might be fostering equal opportunity, student athleticism, recreation, or elite competition, or catering to the desires of fans for gender specialization).

[442] 20 U.S.C. § 1681(a) (2012) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance [with certain specified exceptions].").  Additionally, the Fourteenth Amendment may forbid sex discrimination by sports leagues that qualify as "state actors."  *See* Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18 (1st Cir. 1999) (concluding that a "voluntary, nonprofit" basketball league, *id.* at 16, did not qualify as a "state actor").  Some state and local laws may forbid sex discrimination by sports leagues that qualify as public accommodations.  *See* Nat'l Org. for Women v. Little League Baseball, Inc., 318 A.2d

regulations carved out an exception to this rule, allowing sex-segregated teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[443]  If selection is based on competitive skill, members of the sex whose athletic opportunities were previously limited (generally women or girls) "must be allowed to try-out for the team offered unless the sport involved is a contact sport."[444]  The regulation requires that, on the whole, a school must "provide equal athletic opportunity for members of both sexes."[445]

Third-gender recognition is an unlikely approach to athletics.  Opponents of California's Gender Recognition Act argued that recognition of nonbinary gender would require that schools establish separate sports teams just for nonbinary students.[446]  Even assuming the regulation applies to nonbinary athletes despite its reference to "both sexes," separate teams would not "effectively accommodate" nonbinary athletes because they are too small in number at present.[447]  Moreover, without a critical mass of athletes, separate nonbinary divisions are likely to amount to stigmatization rather than inclusion.[448]

The best way to accommodate nonbinary athletes may be incremental moves toward eliminating sex classifications in sports.[449]  Growing recognition of gender fluidity renders the project of classification of athletes into the male and female divisions more difficult and suspect.[450]

---

33, 37–38 (N.J. Super. Ct. App. Div. 1974) (holding that a Little League was a place of public accommodation and therefore could not discriminate on the basis of sex under New Jersey antidiscrimination law).

[443] 34 C.F.R. § 106.41(b) (2018).  For legal discussion of the interaction between Title IX and equal protection standards, and an argument in favor of revision of the statute or Department of Education regulations, see Jamal Greene, *Hands Off Policy: Equal Protection and the Contact Sports Exemption of Title IX*, 11 MICH. J. GENDER & L. 133, 163–65 (2005).

[444] 34 C.F.R. § 106.41(b).

[445] *Id.* § 106.41(c).

[446] *See* sources cited *supra* note 33 and accompanying text.

[447] *See* 34 C.F.R. § 106.41(c) (discussing factors to consider in assessing "whether equal opportunities are available," including whether the allocation of teams "effectively accommodate[s] the interests and abilities of members of both sexes").

[448] A third category for intersex athletes is particularly troubling.  Karkazis & Carpenter, *supra* note 301, at 6–7 (opposing the creation of an intersex division in track and field on the grounds that it forces people into the "third sex as punishment" for refusing to submit to medical treatments that would lower their testosterone and requires an athlete to disclose her "intersex variation violating her privacy and calling her identity into question," *id.* at 7).

[449] Erin Buzuvis, *Hormone Check: Critique of Olympic Rules on Sex and Gender*, 31 WIS. J.L. GENDER & SOC'Y 29, 48 (2016) ("The approach of eliminating gender categories [in sporting events] would also be inclusive of those individuals whose gender-identities are non-binary or fluid."); Alex Channon et al., *Introduction: The Promises and Pitfalls of Sex Integration in Sport and Physical Culture*, *in* SEX INTEGRATION IN SPORT AND PHYSICAL CULTURE 1, 3 (Alex Channon et al. eds., 2017) (discussing, as a benefit of sex-integrated sports, "greater inclusivity of non-binary people").

[450] *See* Ronald S. Katz & Robert W. Luckinbill, *Changing Sex/Gender Roles and Sport*, 28 STAN. L. & POL'Y REV. 215, 241 (2017) ("[I]n a gender-fluid era, by what right does an organization or person dictate to another on the subject of that other's sex or gender?").

968                    *HARVARD LAW REVIEW*                    [Vol. 132:894

Nonbinary people's narratives of the cruelties and indignities of classi-
fication are also persuasive arguments for integrating sports.[451]  Nonbi-
nary athlete Lauren Lubin has said: "The first identity I ever formed, as
a young child, was 'I'm an athlete,' before even a gender."[452]  Lubin
played women's college basketball until the dissonance with their inter-
nal sense of nonbinary identity caused them to quit the team and lose
their scholarship.[453]

Reenvisioning sports without sex classifications aligns with the goals
of much feminist theory.  A large body of sociological research describes
how sports inculcate gender roles: producing, maintaining, and validat-
ing male privilege and virtue.[454]  While women's sports have given
women a chance to "challenge the notion that it is only men who can be
brave, competitive, and strong," the fact that sports remain sex segre-
gated sends the message that men will always have the edge with respect
to these characteristics.[455]

There are already many examples of integrated sports leagues for
children in grades K–12.[456]  Prior to puberty, children can play in the
same games, and arguments about safety and fairness find no basis in
statistical differences between boys' and girls' bodies.[457]  Some sociolog-
ical research supports the argument that at older ages, desegregated
events — such as equestrian competitions, cheerleading, karate, tennis,
korfball, quidditch, and floorball — can emphasize "collaboration and
teamwork" over "policing gender divisions and broadly help to establish

---

[451] Jon Shadel, *This Gender Neutral Athlete Wants to End Sex Segregation in Sports*, VICE (Nov. 10, 2016, 4:28 PM), https://www.vice.com/en_us/article/mvk33x/this-gender-neutral-athlete-wants-to-end-sex-segregation-in-sports [https://perma.cc/AKD9-53Y6] (observing that nonbinary "athletes face a dizzying, seemingly impossible choice: disregard their gender identity — arguably an un-healthy and wholly unacceptable option given the negative effects of remaining closeted — or sac-rifice their love of sports").

[452] NON-BINARY INCLUSION IN SPORTS (WNET New York Public Media 2015), https://tpt.pbslearningmedia.org/resource/fp17.lgbtq.werun.nonbinary/non-binary-inclusion-in-sports/ [https://perma.cc/K9Q2-LQVB].

[453] Kristin Russo, *An Athlete Makes the Case for Gender Not to Matter in Sports*, TIME (Oct. 7, 2015), http://time.com/4063096/how-important-is-gender/ [https://perma.cc/6Z92-5J97].

[454] Channon et al., *supra* note 449, at 1.

[455] *Id.* at 2; *see also* Nancy Leong, *Against Women's Sports*, 95 WASH. U. L. REV. 1249, 1275–78 (2018) (discussing how sex-segregated sports perpetuate gender stereotypes).

[456] Scott Skinner-Thompson & Ilona M. Turner, *Title IX's Protections for Transgender Student Athletes*, 28 WIS. J.L. GENDER & SOC'Y 271, 274–79 (2013).

[457] *See id.* at 287; *see also* Susanna Stenevi Lundgren et al., *Normative Data for Tests of Neuro-muscular Performance and DXA-Derived Lean Body Mass and Fat Mass in Pre-Pubertal Children*, 100 ACTA PÆDIATRICA 1359, 1361 (2011) (finding "no constant gender differences" in neuromus-cular performance such as balance and jumping in boys and girls under age twelve); Marnee J. McKay et al., *Reference Values for Developing Responsive Functional Outcome Measures Across the Lifespan*, 88 NEUROLOGY 1512, 1516 (2017) (comparing physical capabilities of children aged three to nine and finding no significant sex differences).

positive, supportive, mutually respectful relationships between men and women."[458]

Sports might be redesigned so as not to advantage male or female bodies.[459]  The Paralympic movement demonstrates how restructured games and the integration of technology can facilitate competition for athletes with different types of bodies.[460]  It also suggests ways athletes might be classified other than by sex, including by age, body mass, or performance level.[461]  Handicaps in golf and weight classes in wrestling are examples.[462]  At some point in the future, the advantages of male bodies might be leveled out by genetic enhancements or e-sports.[463]  When asked about how sports will change to include nonbinary people, Lubin said: "There's not a single answer.  I believe this is going to be the culmination of many different disciplines and institutions coming together to reorganize themselves."[464]

But in the short term, inclusion of nonbinary athletes may require integration into sporting events that are segregated by sex (or that, like

---

[458]  Channon et al., *supra* note 449, at 3; *see, e.g.*, Eric Anderson, *"I Used to Think Women Were Weak": Orthodox Masculinity, Gender Segregation, and Sport*, 23 SOC. F. 257, 258 (2008) (studying "heterosexual men who were first socialized into the masculinized sport of high school football but later joined the feminized sport of collegiate cheerleading" and finding that "[v]irtually all informants who had not previously respected women's athleticism reported changing their attitudes; and all informants said they had learned to better respect women's leadership abilities and to value their friendship"); Adam Cohen et al., *Investigating a Coed Sport's Ability to Encourage Inclusion and Equality*, 28 J. SPORT MGMT. 220, 226 (2014) (conducting qualitative analysis of the coed sport quidditch, including surveys and focus groups, and finding that "both females and males reported a stereotype reduction of the opposite gender occurring due to their participation in the sport"). This is not to say integrated sports are necessarily egalitarian; paternalistic sex stereotypes and male dominance may simply change form in integrated games. *See, e.g.*, Channon et al., *supra* note 449, at 4 (offering examples); Cohen et al., *supra*, at 230 (noting that among quidditch players, "some males held a degree of ambivalent sexism toward their female teammates . . . commend[ing] them for their efforts, but maintain[ing] the belief that they are sacrificing competitiveness for the sake of fairness or inclusivity").

[459]  *See* Leong, *supra* note 455, at 1286–87 (imagining a gymnastics competition combining men's and women's events, "floor, vault, beam, parallel bars, uneven parallel bars, high bar, pommel horse, and rings," in which the best all-around athlete would win).

[460]  For a critical take, see generally DAVID HOWE, THE CULTURAL POLITICS OF THE PARALYMPIC MOVEMENT 120–52 (2008).

[461]  *See, e.g.*, Sean M. Tweedy et al., *Paralympic Classification: Conceptual Basis, Current Methods, and Research Update*, 6 PM&R S11, S12 (2014); *see also* Leong, *supra* note 455, at 1284.

[462]  Another example is a recreational tennis league that divides athletes into A, B, C, and D skill levels, rather than by gender. *See* DAVIS, *supra* note 288, at 138.

[463]  *Cf.* THE FUTURE OF SPORTS 14–15, 30–33 (Josh McHugh et al. eds., 2015), https://www.gannett-cdn.com/usatoday/editorial/sports/The-Future-of-Sports-2015-Report.pdf [https://perma.cc/4DGP-98QN] (predicting that genetic enhancements for athletes will one day become commonplace and regulated and that e-sports will grow in popularity).  To say this might be possible as a technical matter is not to say it is likely that gaming culture will welcome non-male competitors. *Cf.* Giovanni Luca Ciampaglia, *Can Online Gaming Ditch Its Sexist Ways?*, THE CONVERSATION (Nov. 16, 2017, 7:59 PM), https://theconversation.com/can-online-gaming-ditch-its-sexist-ways-74493 [https://perma.cc/MB7X-2CPX].

[464]  Shadel, *supra* note 451.

mixed doubles tennis or pairs figure skating, require an athlete of each sex).[465]  Integration requires careful analysis of the purposes for limiting eligibility in each division, so that definitions of eligibility can be tailored to meet those purposes.[466]

The arguments in favor of excluding "non-males" (however defined) from any male sports are weak.  While some non-males may not have the ability to compete at high levels, that is not an argument for excluding those who do.[467]  The exception for contact sports in Title IX's implementing regulations is much criticized.[468]  Courts have rejected the argument that certain games are too dangerous for girls,[469] and the number of girls playing football is on the rise.[470]  To the extent that male games are too dangerous for women, girls, and nonbinary people, they are likely too dangerous for men and boys as well.[471]  Paternalistic arguments support banning these games, or changing the rules or equipment to make them safer for everyone, rather than excluding non-males. Arguments that nonbinary and female athletes degrade homosocial male sporting experiences deserve particular skepticism for how they might perpetuate toxic gender ideologies.[472]

---

[465] One alternative is a gender maximum rule.  Quidditch, a game with seven athletes per team, requires that teams may not have more than four or five players "who identify as the same gender in play" at various points during the game.  US QUIDDITCH RULEBOOK 10 (12th ed. 2018), https://www.usquidditch.org/files/USQ_Rulebook_12.pdf [https://perma.cc/86QB-T3JL].  This rule applies to "those who don't identify within the binary gender system" as well as those who do.  *Id.*

[466] For an argument that this analysis is required by the Constitution's Equal Protection Clause, see Leong, *supra* note 455, at 1283–84.

[467] *See, e.g.*, Greene, *supra* note 443, at 136 ("[T]he skills gap, long used to justify exclusion of females, is the best argument in favor of a reasonable one-way ratchet that allows women to participate in male-only sports without extending the same opportunity to males who wish to participate in female-only sports."); Katz & Luckinbill, *supra* note 450, at 226 ("[P]rohibiting females from trying out for contact sports — has been consistently found by the courts to be unconstitutional. . . . Why should the 180-pound woman be prevented from trying out for football when the 97-pound male may do so?"); Skinner-Thompson & Turner, *supra* note 456, at 276 ("Put simply, courts have often rejected essentialist arguments claiming that girls are physically incapable of participating in youth sports with boys.").

[468] *See, e.g.*, Greene, *supra* note 443, at 160–63 (arguing that "[t]he contact sports exemption, even if it directly affects only younger athletes, eventually affects the interest and abilities of older ones," *id.* at 160; that it limits the number of teams on which women can be involved and thereby excludes them from the educational, social, and health advantages of sports; and that it sends an expressive message enforcing gender stereotypes).

[469] Skinner-Thompson & Turner, *supra* note 456, at 275 (discussing cases rejecting arguments about "keeping girls safe").

[470] Cork Gaines, *The Number of Girls Playing High School Football Is on the Rise Even Though Overall Participation Is Down*, BUS. INSIDER (Oct. 3, 2016, 2:47 PM), https://www.businessinsider.com/more-girls-are-playing-high-school-football-2016-10 [https://perma.cc/PPT7-7DCA] (describing data from the National Federation of State High School Associations showing an increasing number of girls playing football).

[471] *See* Leong, *supra* note 455, at 1271–72.

[472] *See, e.g.*, Anderson, *supra* note 458, at 257 (discussing how "segregation of men into a homosocial environment limits their social contact with women and fosters an oppositional masculinity

AR_292831

As for women's sports, this is a context in which gender neutrality can have the disadvantage of precluding equal opportunity for women.[473]  Where the competitive stakes are low, as with most high school and amateur athletics, the best rule is one like California's or CrossFit's: deference to a person's choice to play in the women's division if it best matches their gender identity.[474]  Some nonbinary people may be willing to play on women's teams.[475]  A self-identification rule is best because "equal opportunity" in this context means giving everyone a chance to participate.  It does *not* mean fairness in the sense of leveling any natural advantage that was not the result of hard work and training.  Not just testosterone, but many traits give athletes advantages: height, body mass, better eyesight, larger hands, coordination, and lung

---

that influences the reproduction of orthodox views regarding women"); Deborah L. Brake, *Wrestling with Gender: Constructing Masculinity by Refusing to Wrestle Women*, 13 NEV. L.J. 486, 488 (2013) (arguing that when boys refuse to wrestle girls, "what is really at stake in the incident is the construction of masculinity, both the masculinity of the forfeiter and the masculinity of the sport of wrestling — a masculinity that is deeply threatened by mixed-sex wrestling competition"); Channon et al., *supra* note 449, at 1 ("[T]he exclusion of women from many high-profile sporting competitions throughout much of the twentieth century preserved much of the twentieth century preserved sport as a symbolic space for celebrating men's embodiment of . . . 'masculine' virtues, while the tendency to stigmatize and ridicule female athletes when they did enter the 'male' sporting arena helped prevent them from effectively challenging the legitimacy of men's symbolic ownership of sport and its requisite qualities.").

[473]  *See* Buzuvis, *supra* note 449, at 48–49.

[474]  *See, e.g.*, CAL. EDUC. CODE § 221.5(f) (West 2018) ("A pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on records."); Mary Emily O'Hara, *EXCLUSIVE: The CrossFit Games Will Now Allow Transgender Athletes to Compete*, THEM. (Aug. 4, 2018), https://www.them.us/story/crossfit-games-trans-policy [https://perma.cc/UEZ4-TSQM] (discussing the announcement by CrossFit's CEO that "[i]n the 2019 CrossFit competitive season, starting with the Open, transgender athletes are welcome to participate in the division with which they identify").

In 2016, the Obama Department of Education took the position that Title IX requires that schools defer to students' gender identities rather than the sex assigned at birth, but the Trump Administration rescinded that advice and is now reconsidering the issue.  Dear Colleague Letter from Sandra Battle, Acting Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. & T.E. Wheeler, II, Acting Assistant Attorney Gen. for Civil Rights, U.S. Dep't of Justice (Feb. 22, 2017), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.docx  [https://perma.cc/SZX3-4E82] (withdrawing the Obama Administration's May 13, 2016 letter "in order to further and more completely consider the legal issues involved").

[475]  *See, e.g.*, Kevin Majoros, *Breaking Barriers for Non-binary Athletes*, WASH. BLADE (Aug. 24, 2017, 3:51 PM), http://www.washingtonblade.com/2017/08/24/breaking-barriers-non-binary-athletes/ [https://perma.cc/X3JA-KPEG] (discussing competitive swimmer G Ryan who "identifies as non-binary or genderqueer and swims on the women's team at the University of Michigan"); NCAA OFFICE OF INCLUSION, NCAA INCLUSION OF TRANSGENDER STUDENT-ATHLETES 15 (2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf [https://perma.cc/UL7N-A2L7] (quoting Morgan Dickens, former Cornell basketball and rugby player, as saying: "There are differences between being male and female, but being gender fluid doesn't mean I reject these differences, it just means I'm rejecting the idea that I have to be defined one way or another").

capacity, among other accidents of birth.[476]  Some male athletes have atypically high testosterone levels, but no one suggests they be barred from competition.[477]  In any event, gains in "fairness" must be weighed against the costs of subjecting intersex and transgender athletes to cruel and demeaning sex-verification rules.

The specter of fraud haunts these discussions, but it is hard to find evidence of recent bad faith claims to gender identity in sports, however "bad faith" is defined.[478]  Due to continued stigma and bias against transgender people, it is unlikely that many people would be willing to claim a gender identity not their own in any public context.  A more likely "gender identity fraud" scenario is the man who chooses to identify as nonbinary in an effort to show how lax the self-determination standard is and thereby undermine the case for nonbinary rights.[479]  A rule against bad faith conduct would screen out these types of behavior.  The rule could forbid athletes from selecting nonbinary or female gender identities for the sole purpose of prevailing in or disrupting athletic competition.  Such rules would not be inadministrable.  The law of religious accommodation offers a model for how to ensure that claims to identity are not made insincerely.[480]

There may be different considerations in elite sports.  There is typically a ten to twelve percent performance difference between male and

---

[476] Buzuvis, *supra* note 449, at 43 (citing Chand v. Athletics Fed'n of India, CAS 2014/A/3759 ¶ 260 (CAS July 24, 2015)) (listing "increased hemoglobin levels caused by defective EPO receptors, tallness (in some sports), shortness (in others), low body mass index, unusually high lung capacity, mitochondrial conditions that increase aerobic capacity, acromegaly (i.e. large hands and feet), perfect vision, and unusually efficient systems for muscle growth and blood flow").

[477] *See id.*

[478] *See* Katz & Luckinbill, *supra* note 450, at 242.

[479] Similar protest strategies have been attempted in school restroom cases.  *See* Doe v. Reg'l Sch. Unit 26, 86 A.3d 600, 603 (Me. 2014) (discussing how a transgender girl's "use of the girls' bathroom went smoothly, with no complaints from other students' parents, until a male student followed her into the restroom on two separate occasions, claiming that he, too, was entitled to use the girls' bathroom.  The student was acting on instructions from his grandfather, who was his guardian and was strongly opposed to the school's decision to allow [the transgender girl] to use the girls' bathroom").

[480] Courts are generally reluctant to find religious beliefs to be insincere.  *See* Frederick Mark Gedicks, *"Substantial" Burdens: How Courts May (and Why They Must) Judge Burdens on Religion Under RFRA*, 85 GEO. WASH. L. REV. 94, 112 (2017) ("Even when religiously contradictory behavior is evident, the courts defer to the claimant's explanations.").  But they can tell when a claim to religious faith is no more than a sham to gain some particular benefit.  *See, e.g.*, Ideal Life Church of Lake Elmo v. County of Washington, 304 N.W.2d 308, 318 (Minn. 1981) (holding that an institution was not a "church" where "the primary, and perhaps the sole, purpose for incorporating . . . was to provide [taxpayers] the benefit of a tax-free home while maintaining the same use and control they had prior to incorporation"); *see also* Ben Adams & Cynthia Barmore, Essay, *Questioning Sincerity: The Role of the Courts After Hobby Lobby*, 67 STAN. L. REV. ONLINE 59, 59–60 (2014) ("There is a long tradition of courts competently scrutinizing asserted religious beliefs for sincerity without delving into their validity or verity.").

female competitors at elite levels.[481]   Testosterone may be the reason, although the evidence on this is, to say the least, complex.[482]   Professor Erin Buzuvis has argued: "If eliminating the binary in sport is a strategy for challenging gender stereotypes, it is one with great potential to back-fire."[483]   At elite levels, gender neutrality would reduce the number of women who qualify for national teams and win medals.[484]   If only a few women succeed, they will be written off as "outliers" and their small numbers will be used as evidence of women's natural athletic inferiority rather than "an indictment of society's suppression of female athleticism."[485]

This Article's task is to argue nonbinary gender inclusion is feasible; it cannot settle broader debates about intersex and transgender inclusion in elite women's sports.   But one principle to consider might be protecting the reliance interests of those people who have competed in women's sports all their lives.[486]   This principle avoids hormonal testing of athletes with intersex variations, which is widely regarded as a public referendum on a female athlete's gender identity.[487]   Athletes with intersex variations disqualified from women's sports have faced stigmatization and shunning, and as a result of one case, an athlete attempted suicide.[488]   On the ground, sex verification practices are suspiciously intertwined with racialized notions of femininity; it cannot be ignored that

---

[481]  *See, e.g.,* Robinson Meyer, *We Thought Female Athletes Were Catching Up to Men, but They're Not,* THE ATLANTIC (Aug. 9, 2012), https://www.theatlantic.com/technology/archive/2012/08/we-thought-female-athletes-were-catching-up-to-men-but-theyre-not/260927/ [https://perma.cc/B6Y5-98HD].

[482]  Buzuvis, *supra* note 449, at 40–42 (discussing evidence that there is no linear relationship between endogenous testosterone and performance, that elite male and female performance levels often overlap, that women whose bodies are insensitive to testosterone are overrepresented among female athletes, and that many male athletes have low testosterone levels).   *But see* Doriane Lambelet Coleman, *Sex in Sport,* 80 LAW & CONTEMP. PROBS. 63, 70–84 (2017) (arguing the ten to twelve percent performance gap is driven by differences in testosterone, even if there is no perfect mathematical correlation).

[483]  Buzuvis, *supra* note 449, at 48.

[484]  *Id.*

[485]  *Id.* at 49.

[486]  *Id.* at 54–55 ("Reliance is the legal principle that says in some circumstances, one's rights are determined by the fact that one has been exercising those rights for a long time on the reasonable assumption that those rights were secure." *Id.* at 54.); *see also* Katz & Luckinbill, *supra* note 450, at 241 ("[I]ndividuals should not have to go through invasive, humiliating and degrading procedures about one of the most personal subjects, one's sex or gender.").   Bioethicist Alice Dreger has long taken this position.   *See, e.g.,* Alice Dreger, *Intersex and Sports: Back to the Same Old Game,* HASTINGS CTR.: BIOETHICS F. (Jan. 22, 2010), https://www.thehastingscenter.org/intersex-and-sports-back-to-the-same-old-game/ [https://perma.cc/ELE4-637N].

[487]  *See* Buzuvis, *supra* note 449, at 47 ("[A]s long as the categories for participation are still called 'men's' and 'women's,' (rather than 'above' and 'below' 10 nmol/L) the hormone standard will likely be interpreted as a proxy for sex verification.").

[488]  *Id.* at 37.

*HARVARD LAW REVIEW*

women of color from the Global South are disproportionately (if not exclusively) scrutinized by sporting authorities.[489]

Some transgender men may also have reliance interests in playing women's sports, having been denied equal athletic opportunities for most of their lives.[490]  But there are concerns that, due to high levels of testosterone from hormone treatments, these athletes will dominate and crowd out opportunities for others.  Accordingly, the NCAA allows transgender men who are not taking testosterone to play women's sports.[491]  Transgender women, however, may not have had the same history of disadvantage.  Buzuvis therefore suggests a rule that "would exclude transgender women who have not undergone hormone treatment" from elite women's sports unless they "bring their testosterone level below the 'normal male range' cutoff of 10 nmol/L."[492]  This same rationale would support allowing elite nonbinary athletes who have long competed in women's sports to continue to do so, as long as they are not pursuing masculinizing hormonal therapy.[493]

While nonbinary athletes present a long-term challenge to sex-segregated sports, in the short term, they may prompt rethinking of the rules of eligibility for particular events, along with transgender and intersex athletes.

    *3. Workplaces.* — Another potential argument against nonbinary inclusion is that the labor market requires that men and women do different jobs.  Although the majority of job categories are filled primarily by women (like administrative assistant) or men (like truck driver), formal occupational sex segregation is rare.[494]  Title VII bars employer rules

---

[489] Katrina Karkazis & Rebecca M. Jordan-Young, *The Powers of Testosterone: Obscuring Race and Regional Bias in the Regulation of Women Athletes*, 30 FEMINIST FORMATIONS, 2018, at 1, 6 (discussing how "black and brown women from the Global South come to be the exclusive targets of the supposedly new, neutral, and scientific T regulation").

[490] Buzuvis, *supra* note 449, at 51–52 ("[A] transgender man may by virtue of his female body and birth assignment have been raised as female, a designation that influenced — and likely limited — his athletic opportunities." *Id.* at 52.).

[491] *Id.* at 52 (citing NCAA OFFICE OF INCLUSION, *supra* note 475, at 8).

[492] *Id.* at 53.  The International Association of Athletics Federations now recommends a threshold of 5 nmol/L for certain track and field events.  Press Release, Int'l Ass'n of Athletics Fed'ns, IAAF Introduces New Eligibility Regulations for Female Classification (Apr. 26, 2018), https://www.iaaf.org/news/press-release/eligibility-regulations-for-female-classifica [https://perma.cc/3LSA-GCE5].

[493] *See* Buzuvis, *supra* note 449, at 55.  For an argument that it is unwise and unfair to require any hormonal treatment as a condition of participation in collegiate sports, see Elliot S. Rozenberg, *The NCAA's Transgender Student-Athlete Policy: How Attempting to Be More Inclusive Has Led to Gender and Gender-Identity Discrimination*, 22 SPORTS LAW. J. 193, 207–08 (2015).

[494] *See, e.g.*, ARIANE HEGEWISCH ET AL., INST. FOR WOMEN'S POLICY RESEARCH, BRIEFING PAPER: SEPARATE AND NOT EQUAL? GENDER SEGREGATION IN THE LABOR MARKET AND THE GENDER WAGE GAP 13 (2010).

AR_292835

that classify by sex,[495] except where sex is a bona fide occupational qualification (BFOQ).[496] This defense is construed "narrowly,"[497] and applies to a diminishing number of jobs. The simple fact that customers might prefer men or women cannot support a BFOQ defense.[498] Nor can stereotypes about men or women.[499] Apart from the BFOQ defense, there are also judicially crafted exceptions to Title VII's ban on explicit sex-based classifications with respect to sex-differentiated dress codes and physical standards.[500] In light of the small number of remaining employment contexts in which binary sex segregation is permissible, the main challenge in integrating nonbinary people into employment markets is overcoming the biases against them. Nonetheless, nonbinary workers may prompt renewed scrutiny of the validity of BFOQ defenses, dress codes, and physical standards, requiring that employers and courts rethink whether sex classifications meet important interests or reaffirm stereotypes.

    *(a) The BFOQ Defense.* — The most commonly accepted sex-based BFOQ argument is that certain positions must be filled by men or women to protect the privacy interests of patients, customers, or inmates in being viewed or touched only by members of the same sex.[501] To the extent that nonbinary people throw a wrench in this doctrine, it is good riddance. The doctrine tends to disadvantage women in the labor market.[502] The cases are premised on a troubling assumption of universal

---

[495] *See, e.g.,* City of L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 709 (1978).

[496] 42 U.S.C. § 2000e-2(e) (2012) (allowing discrimination "on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise").

[497] Int'l Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 201 (1991).

[498] *See, e.g.,* Diaz v. Pan Am. World Airways, Inc., 442 F.2d 385, 389 (5th Cir. 1971) ("[I]t would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome."); 29 C.F.R. § 1604.2(a)(1) (2018).

[499] *See, e.g.,* Phillips v. Martin Marietta Corp., 400 U.S. 542, 545 (1971) (Marshall, J., concurring) ("By adding the prohibition against job discrimination based on sex to the 1964 Civil Rights Act Congress intended to prevent employers from refusing 'to hire an individual based on stereotyped characterizations of the sexes.' . . . The exception for a 'bona fide occupational qualification' was not intended to swallow the rule." (footnote omitted)).

[500] Theories of discrimination that rely on statistical showings and affirmative action are discussed *supra* pp. 952–54.

[501] Amy Kapczynski, Note, *Same-Sex Privacy and the Limits of Antidiscrimination Law,* 112 YALE L.J. 1257, 1259–60 (2003) (describing cases in which courts accepted this defense in "contexts including labor and delivery rooms, mental hospitals, youth centers, washrooms, and nursing homes" (footnotes omitted)).

[502] *Id.* at 1283 (describing how same-sex privacy BFOQs disadvantage women in labor markets because in the prison context, ninety-five percent of prisoners are men, and in the nursing context, they prevent men from filling jobs in lower-status care work); *see also* KATHARINE T. BARTLETT & DEBORAH L. RHODE, GENDER AND LAW: THEORY, DOCTRINE, COMMENTARY 116–17 (4th ed. 2006) (arguing that the BFOQ defense reinforces "age-old stereotypes that Title VII was meant

*HARVARD LAW REVIEW*        [Vol. 132:894]

heterosexuality — that there is no same-sex sexual desire.[503]  The cases
overvalue traditional notions of female modesty and discount threats to
men.[504]  They sanction stereotypes about the female gaze as nonthreat-
ening[505] and men as natural predators.[506]  They are "shot through with
discriminatory attitudes about class and possibly race."[507]  To give legal
sanction to these attitudes is troubling.

However, there may be instances in which the privacy BFOQ holds
up to scrutiny, involving physical touching or bodily exposure of vulner-
able populations.  Professor Amy Kapczynski has explained "the same-
sex privacy BFOQ" as "a concession to the way people experience cross-
sex bodily exposure as a threat or risk."[508]  She gives an example of a
woman in a prison who was forced to undergo a clothed body search by
a male correctional officer.  The woman "was so distressed that 'her
fingers had to be pried loose from the bars she had grabbed; she returned
to her cell-block, vomited, and broke down.'"[509]  Kapczynski reflects:

> We could insist, of course, that her reaction was a kind of false conscious-
> ness, that she was misidentifying all men as a threat, or at least misidenti-
> fying *this* man as a threat.  There is a way in which these things in fact
> might be true — but is *this* the place to make that point?  Would it be
> possible, in a context in which approximately eighty-five percent of women
> have been sexually or physically abused by men, to remake associations
> between gender and assault by ignoring them?[510]

---

to condemn — i.e., women's role washing and cleaning up after people, and men's role as the skilled
professional," *id.* at 117).

[503]  Kapczynski, *supra* note 501, at 1287.

[504]  *See id.* at 1291 (discussing how courts disregard the threat of same-sex assault against male
inmates).

[505]  *See* Kim Shayo Buchanan, *Engendering Rape*, 59 UCLA L. REV. 1630, 1638–39 (2012) ("[S]ur-
vey respondents consistently report much higher rates of sexual victimization by women staff than
by fellow inmates.").

[506]  *See, e.g.*, Ambat v. City and County of San Francisco, 757 F.3d 1017, 1028 (9th Cir. 2014)
(reversing grant of summary judgment on a prison employer's BFOQ defense because "the County
has not shown that the Sheriff had 'a substantial basis for believing that all or nearly all' male
deputies were likely to engage in sexual misconduct with female inmates, nor has it shown that 'it
is impossible or highly impractical . . . to insure by individual testing' that a male deputy does not
pose such a threat" (omission in original)); Breiner v. Nev. Dep't of Corr., 610 F.3d 1202, 1211 (9th
Cir. 2010) (rejecting a BFOQ defense based on arguments that male correctional officers presented
a risk of sexual misconduct in a women's prison as based on "unproven and invidious stereotype[s]");
Kapczynski, *supra* note 501, at 1281.

[507]  Kapczynski, *supra* note 501, at 1286 ("Courts have been more solicitous of the privacy inter-
ests of white collar men who fear that a cleaning woman might knock on their bathroom door than
of the privacy interests of women and men incarcerated in prisons that are often the site of severe
violations of physical and sexual integrity." (footnote omitted)).

[508]  *Id.* at 1274.

[509]  *Id.* at 1288 (quoting Jordan v. Gardner, 986 F.2d 1521, 1534 (9th Cir. 1993) (Reinhardt, J.,
concurring)).

[510]  *Id.* (footnote omitted).  Men are also victims of sexual assault, including by other men.
Bennett Capers, *Real Rape Too*, 99 CALIF. L. REV. 1259, 1266–71 (2011).  However, the law con-
cedes here to social norms that construct cross-gender exposure as uniquely threatening to one's

AR_292837

Kapczynski proposes that the costs of changing gender norms should not be imposed on particularly vulnerable persons, such as inmates and patients in residential care.[511]

The best approach to this problem is to ask: "Might there be technologies, if not today, then tomorrow, that can accomplish the state's interest in engaging in bodily searches to maintain safety without raising the troubling issue of gender?"[512]  In the interim, integration may be best.  Whether any particular nonbinary person might trigger fear of sexual assault in vulnerable populations is not a question that can be answered in general, due to the diversity of the nonbinary population. Fears of sexual assault from nonbinary people may stem from anti-transgender biases in general, that, like racism, the law cannot endorse.[513]  In the limited set of jobs involving bodily contact with vulnerable people, or exposure of naked bodies, a compromise would be to exclude those nonbinary people who will not identify as women (or men) for purposes of the job.

The BFOQ defense might also justify sex-specific casting calls in entertainment,[514] and sex-specific hiring for sex work, although there is little litigation on these questions.[515]  The idea of a sex BFOQ for acting and sex work that might exclude transgender people is a strange one, as transgender people have long been actors and sex workers.[516]  In the

---

dignity.  *See, e.g.*, Byrd v. Maricopa Cty. Sheriff's Dep't, 629 F.3d 1135, 1142 (9th Cir. 2011) (en banc) (holding that a strip search of a male inmate was unreasonable under the Fourth Amendment because it was conducted by a female officer in the absence of an emergency).

[511] Kapczynski, *supra* note 501, at 1291–92; *see also* Teamsters Local Union No. 117 v. Wash. Dep't of Corr., 789 F.3d 979, 990, 994 (9th Cir. 2015) (affirming summary judgment to a prison employer on its BFOQ defense for a narrow category of female-only job assignments to ensure inmate privacy, improve security by allowing more pat downs, and prevent sexual assaults); Jones v. Henryville Corr. Facility, 220 F. Supp. 3d 923, 929 (S.D. Ind. 2016) (granting summary judgment to an employer on its BFOQ defense where the prison preferred male employees for particular shifts in case a strip search of male inmates might be required).

[512] I. Bennett Capers, *Unsexing the Fourth Amendment*, 48 U.C. DAVIS L. REV. 855, 916 (2015) (footnotes omitted) (discussing advances in surveillance technologies).

[513] *Cf. TLDEF Helps Transgender Man Achieve Settlement in Discrimination Suit*, TRANSGENDER LEGAL DEF. & EDUC. FUND, http://www.transgenderlegal.org/headline_show.php?id=429 [https://perma.cc/2DRK-3NY9] (discussing a 2011 settlement in a discrimination case on behalf of a transgender man who was fired from a job "monitoring male outpatients as they provided urine samples for drug testing" after his employer learned he was transgender).

[514] *See* 29 C.F.R. § 1604.2(a)(2) (2018); Russell K. Robinson, *Casting and Caste-ing: Reconciling Artistic Freedom and Antidiscrimination Norms*, 95 CALIF. L. REV. 1, 3 (2007).

[515] Those cases discussed in Kimberly A. Yuracko, *Private Nurses and Playboy Bunnies: Explaining Permissible Sex Discrimination*, 92 CALIF. L. REV. 147, 157 & n.27 (2004), mostly involve dicta about the possibility of this defense.  For an argument that discriminatory preferences should be allowed in "proximate sex work that involves physical contact or face-to-face interactions" because of the implications for "decisional privacy," see Adrienne D. Davis, *Regulating Sex Work: Erotic Assimilationism, Erotic Exceptionalism, and the Challenge of Intimate Labor*, 103 CALIF. L. REV. 1195, 1269 (2015); and also *id.* at 1262–69.

[516] *Cf.* Case, *supra* note 25, at 12 n.23 ("I find it bizarre that sex is considered a BFOQ, in the interests of 'authenticity or genuineness,' for the job of actor or actress.  After all, the very essence

1950s and 1960s, "[t]ransitioning often led to sharp downward mobility, and for working class women especially, dancing and sex work were two of the most likely jobs after surgery."[517]  Nonbinary people might also play roles as men or women.  Nonbinary actor Asia Kate Dillon, for example, has played female characters[518] as well as a nonbinary character.[519]  Dillon has said they wished to play male characters as well.[520]

*(b) Dress Codes.* — Under a judicially crafted exception to Title VII, employers are permitted to prescribe sex-differentiated dress codes, so long as those dress codes do not impose "unequal burdens" on men and women.[521]  This separate-but-equal doctrine is explained by courts' desires to protect employer prerogatives and comfortable gendered social conventions, while avoiding subordination of women by ensuring women are not overly burdened.[522]  Sex-differentiated dress codes may not be problematic for transgender people, so long as they are permitted to choose the set of rules consistent with their gender identities.[523]  But they pose a challenge for those nonbinary people who do not feel comfortable complying with either set of rules.

While courts have not been persuaded by what they regard as freedom of expression arguments in favor of dress code noncompliance,[524] they are more likely to be persuaded by the claims of nonbinary people.  One reason is that many nonbinary people make arguments in the register of immutability: that they have a core, authentic, essential identity that they should not be forced to sacrifice to keep their jobs.[525]  A second reason is the increasing uptake of the argument that binary gender is

---

of this job is to pretend to be something one is not.  All that a producer should be allowed to require is that the pretense be convincing." (citation omitted)).

[517] *See* Margot Canaday, Pink Precariat: LGBT Workers in the Shadow of Civil Rights, 1945–2000 ch. 2, at 40 (Oct. 27, 2017) (unpublished manuscript) (on file with the Harvard Law School Library).  Professor Canaday discusses transgender soap opera star Aleshia Brevard, who had a successful career as an actress in the 1960s. *Id.* at 35–40.

[518] Julie Miller, *Meet the Actor Breaking Down Hollywood's Gender Barriers*, VANITY FAIR (May 5, 2017, 1:21 PM), https://www.vanityfair.com/hollywood/2017/05/asia-kate-dillon-mtv-awards [https://perma.cc/F9BU-4Z8S] (mentioning Asia Kate Dillon's role as a female character on the television show *Orange is the New Black*).

[519] *The Ellen DeGeneres Show* (CBS television broadcast Mar. 20, 2017), https://www.youtube.com/watch?v=f97aLkl_kWc [https://perma.cc/D3VC-FP9X] (discussing the character Taylor Mason on *Billions*).

[520] *Id.* (discussing their childhood desire to play the title role in *Oliver!*).

[521] *See, e.g.,* Jespersen v. Harrah's Operating Co., 444 F.3d 1104, 1108–11 (9th Cir. 2006) (en banc).

[522] *See* YURACKO, *supra* note 30, at 24.

[523] *See* EEOC v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560, 572–74 (6th Cir. 2018) (rejecting the argument that enforcement of a sex-specific dress code that required men to wear a pants-suit with a necktie and women to wear a skirt-suit would be a defense against a discrimination suit brought by a transgender woman).

[524] *See* YURACKO, *supra* note 30, at 137–46.

[525] *See* Clarke, *supra* note 43, at 23–27 (discussing the persuasiveness of the "new immutability," and the drawbacks of this argument).

AR_292839

itself a subordinating sex-stereotype that may not be enforced.[526] And a third reason is that, as nonbinary gender presentations become more mainstream, the implicit assumption that they are disruptive to employer prerogatives loses force.[527] This mainstreaming also makes it less likely that employers will respond to calls for neutrality by insisting that all workers dress in a blandly androgynous manner.[528]

*(c)  Physical Standards.* — As for differential physical standards,[529] many of the same arguments that apply to segregated sports apply in this context as well.[530]   But here, sex neutrality may be the best approach: leveling down to the minimum standard required to do the job. Courts have gone wrong by inventing legal rules that ask only whether different rules for men and women are "separate but equal," and giving no consideration to whether the standard has any relationship to the job.[531]   Disparate standards may perpetuate false stereotypes about women's inferiority for law enforcement and fire-fighting jobs.[532]   An inquiry into the business reasons for disparate standards is likely to reveal that the bar is set too high for men: if women can do the job by meeting a lower standard, then men can too.[533]

---

[526]  *See supra* note 176.

[527]  *Cf.* YURACKO, *supra* note 30, at 146.

[528]  *But see id.* at 52 ("The employer who does not want to employ men in bob haircuts will simply not make this an option under its dress code, even if it does not mind women wearing them.").

[529]  A 2003 study found that approximately twenty-seven percent of police departments surveyed that use physical fitness tests apply different cutoffs for men and women.  Kimberly A. Lonsway, *Tearing Down the Wall: Problems with Consistency, Validity, and Adverse Impact of Physical Agility Testing in Police Selection*, 6 POLICE Q. 237, 258 (2003).

[530]  *See supra* section III.C.2, pp. 966–74.

[531]  In one recent case, *Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016), the Fourth Circuit applied the judicially invented "equal burdens" analysis, *id.* at 349, which asks only if men and women are equally burdened by separate tests.  *Id.* at 349–51 (upholding a sex-differentiated standard for a push-up test against a challenge by a male applicant for a position as an FBI special agent).  But the Supreme Court has prescribed a different rule in an analogous situation involving race.  *See* Ricci v. DeStefano, 557 U.S. 557, 585 (2009).  Under *Ricci*, a higher standard for men would only be allowed if an employer had a strong basis in evidence for believing that applying the same standard would have a disparate impact on women and if applying the same standard would not serve a business necessity.  *See id.*  There is no basis in the text of Title VII for rejecting this rule in a sex discrimination case.  *See* Price Waterhouse v. Hopkins, 490 U.S. 228, 244 n.9 (1989) (plurality opinion) ("[T]he statute on its face treats each of the enumerated categories exactly the same.").  The only potential difference is the BFOQ defense, which applies to sex but not race.  Like the *Ricci* framework, the BFOQ defense would have required an examination of the business justifications for the disparate standard.  *See* Eve A. Levin, Note, *Gender-Normed Physical-Ability Tests Under Title VII*, 118 COLUM. L. REV. 567, 590 (2018) (arguing the BFOQ defense should have applied in *Bauer*).

[532]  *Cf.* Ruth Colker, *Rank-Order Physical Abilities Selection Devices for Traditionally Male Occupations as Gender-Based Employment Discrimination*, 19 U.C. DAVIS L. REV. 761, 796 (1986) ("The stereotype that 'more strength is better' has led employers to use physical performance tests on a rank-order basis and thereby exclude women from employment opportunities.").

[533]  *Id.; see also* Case, *supra* note 25, at 88–94.

A number of nonbinary people serve in the military.[534] Title VII does not apply to the U.S. military, but the military too is moving away from sex classifications, even with respect to physical fitness standards.[535] Although the Supreme Court upheld the male-only draft system in 1981,[536] as of 2012, all positions in the U.S. military are formally open to women.[537] Only the Marine Corps still segregates male and female troops for basic training.[538] It is true that the status of transgender servicemembers is now uncertain. But the Trump Administration's legal arguments in favor of exclusion of transgender service members are based in speculation about medical costs and do not differentiate between binary and nonbinary gender identities.[539]

---

[534] JAMES ET AL., *supra* note 2, at 168 (reporting that 22% of "non-binary people with male on their original birth certificate" and 2% of "non-binary people with female on their original birth certificate" were "[a]mong those with past or current military service").

[535] *See* Jeff Schogol, *The PFT and CFT Can Be Gender Neutral. Here's How.*, MARINE CORPS TIMES (July 10, 2017), https://www.marinecorpstimes.com/off-duty/military-fitness/2017/07/10/the-pft-and-cft-can-be-gender-neutral-here-s-how/ [https://perma.cc/YN94-BEXM] (quoting Lt. Col. Misty Posey, commander of the Marine Corps' only female recruit training battalion, as saying: "Whether intentional or not, the Marine Corps has been evolving toward a single fitness standard"). Air Force Major Mary Jennings Hegar argues, "I've seen firsthand that the warrior spirit is not directly proportional to how many pull-ups you can do. . . . In my opinion, you keep the standards very high and you maintain one standard. There shouldn't be two standards for women and men, there should be *a* standard for this job: To do this job, you should have to do these things. And those requirements should be job-specific and not arbitrarily high in order to specifically keep women out." *A Purple Heart Warrior Takes Aim at Military Inequality in "Shoot Like a Girl,"* NPR: FRESH AIR (Mar. 2, 2017, 2:56 PM) (alteration in original), https://www.npr.org/2017/03/02/517944956/a-purple-heart-warrior-takes-aim-at-military-inequality-in-shoot-like-a-girl [https://perma.cc/37NJ-FRAS].

[536] *See* Rostker v. Goldberg, 453 U.S. 57, 83 (1981). Should the draft return, it seems likely it would be gender neutral. *See* Jill Elaine Hasday, *Fighting Women: The Military, Sex, and Extra-judicial Constitutional Change*, 93 MINN. L. REV. 96, 134 (2008) ("[E]xtrajudicial changes since *Rostker* in women's military status may undermine *Rostker* and support a Court judgment striking down male-only registration, conscription eligibility, and combat positions."). In 2016, the Senate approved a bill that would extend the draft to women, although the effort ultimately failed. Jennifer Steinhauer, *Senate Votes to Require Women to Register for the Draft*, N.Y. TIMES (June 14, 2016), https://nyti.ms/1UtDflf [https://perma.cc/TRN3-7UGS].

[537] Memorandum from Martin E. Dempsey, Chairman of the Joint Chiefs of Staff & Leon Panetta, Sec'y of Def., to Sec'ys of the Military Dep'ts, Acting Under Sec'y of Def. for Pers. and Readiness & Chiefs of the Military Servs. (Jan. 24, 2013), https://dod.defense.gov/Portals/1/Documents/WISRJointMemo.pdf [https://perma.cc/C7AM-M9GD]. Women have even begun Navy SEAL training, although none have yet made it through. Nancy Coleman, *First Woman Enlists to Become a Navy SEAL*, CNN (July 22, 2017, 11:19 PM), http://www.cnn.com/2017/07/21/us/first-female-navy-candidates-seal-trnd/index.html [https://perma.cc/3YCQ-6MNC].

[538] Associated Press, *The Marine Corps Is the Only Military Boot Camp that Separates Sexes. That Could Soon Change in Southern California*, L.A. TIMES (Aug. 8, 2017, 8:25 AM), https://www.latimes.com/nation/nationnow/la-na-women-in-combat-training-20170808-story.html [https://perma.cc/8JTV-Q6TG].

[539] *See* Defendants' Motion to Dismiss and Opposition to Plaintiffs' Motion for a Preliminary Injunction at 33–34, Karnoski v. Trump, No. C17-1297 (W.D. Wash. Dec. 29, 2017), 2017 WL 7058272 (arguing that the exclusion "rests on the reasonable concern that at least some transgender

### D. Sex-Segregated Spaces

The law allows, and sometimes requires, sex segregation of public and private spaces, most notably restrooms, changing facilities, and dormitories. But these arrangements are exceptional, not inevitable, and not a reason to resist the larger project of nonbinary inclusion.

*1. Restrooms and Changing Facilities.* — The restroom debate has engendered political controversy over claims for recognition of the gender identities of transgender people who are asking only to use the male or female facilities.[540] This Article is interested in how people with nonbinary gender identities change that debate. People with nonbinary gender identities, like many transgender men and women, report avoiding public restrooms altogether, with adverse health consequences.[541] Because their gender presentations may not accord with norms, the presence of a nonbinary person in either the men's or women's restroom may result in harassment or even violence.[542] The best solution is neutrality: to phase out gendered restrooms in favor of spaces that provide safety and privacy for each individual. This approach would require legal, architectural, and social change — but that is not an argument for disregarding nonbinary gender altogether. Stopgap efforts include integration: allowing people to use whichever male or female facility they are most comfortable in, or recognition: creating third options such as "family" restrooms, in addition to "male" and "female" ones.

---

individuals suffer from medical conditions that could impede the performance of their duties," *id.* at 33).

[540] *See, e.g.*, G.G. *ex rel.* Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 714–15 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017) (mem.); Carcaño v. McCrory, 203 F. Supp. 3d 615, 621 (M.D.N.C. 2016).

[541] JAMES ET AL., *supra* note 2, at 228 (reporting that 53% of nonbinary respondents to the 2015 USTS stated they "[s]ometimes or always avoid[ed] bathrooms in the past year").

[542] *See, e.g.*, Hannah Boufford, *Transgender, Non-binary Students Discuss Bathroom Concerns*, IND. DAILY STUDENT (Feb. 19, 2017, 7:58 PM), http://www.idsnews.com/article/2017/02/transgender-non-binary-students-discuss-bathroom-concerns [https://perma.cc/NN2B-ZFGG] (quoting nonbinary student Spencer Biery: "They say you can use whichever [restroom] you're comfortable with . . . . And I'm not comfortable going into a restroom with a bunch of guys, but I also know that if I went into a female restroom — which I also don't really identify with — people would cause even more of a ruckus."); Ashe McGovern, Commentary, *Bathroom Bills, Selfies, and the Erasure of Nonbinary Trans People*, ADVOCATE (Apr. 1, 2016, 6:01 AM), https://www.advocate.com/commentary/2016/4/01/bathroom-bills-selfies-and-erasure-nonbinary-trans-people [https://perma.cc/NL5H-KYTV] ("Most days, entering a bathroom means experiencing discomfort because of disapproving, confused looks and comments. But it also brings up memories of when I've been physically threatened and attacked because someone believes I'm in the 'wrong bathroom.' . . . As a white, masculine-presenting person, I know experiences like mine, although far too common, are also far from the worst ones."); Jacob Tobia, *Why All Bathrooms Should Be Gender-Neutral*, TIME (Mar. 23, 2017), http://time.com/4702962/gender-neutral-bathrooms/ [https://perma.cc/CVK2-EQAJ] ("If I choose the women's restroom, I risk facing panicked women who take one look at my facial hair and assume that I'm a predator. If I choose the men's restroom, I risk facing transphobic men who, with one glance at my dangling earrings, begin hurling slurs or throwing punches.").

The ideal solution is neutrality: making all facilities "all gender," with larger, open, public spaces and fully enclosed private stalls that would better ensure safety, accommodate families, and operate fairly and efficiently.[543]  There are design ideas and architectural solutions that would enable "people [to] sort themselves out by the equipment they need rather than what they putatively *are*."[544]  As people gain experience using all-gender facilities, concerns about safety, cleanliness, and discomfort will deflate.[545]

One revelation of the locker room debate is that many students — whatever their gender identities — would prefer private spaces for undressing.[546]  As the awareness and acceptability of same-sex desire have increased, the assumption that same-sex spaces are "no sex" spaces has withered.[547]  And students may want privacy for reasons other than avoiding sexualization, such as maintaining autonomy over who can view (and possibly judge and shame them for) their naked bodies.[548]  In one case, an investigation revealed that girls in a girls' locker room had

---

[543] *See, e.g.*, Mary Anne Case, *Why Not Abolish Laws of Urinary Segregation?*, *in* TOILET: PUB-LIC RESTROOMS AND THE POLITICS OF SHARING 211, 220–25 (Harvey Molotch & Laura Norén eds., 2010) (debunking the various arguments in favor of "urinary segregation"); Ruth Colker, *Public Restrooms: Flipping the Default Rules*, 78 OHIO ST. L.J. 145, 152 (2017) ("We should transition towards making large, communal public restrooms available to 'all-comers,' with a variety of private toileting options, as well as have available a limited number of single-stall restrooms."); Terry S. Kogan, *Public Restrooms and the Distorting of Transgender Identity*, 95 N.C. L. REV. 1205, 1206, 1234–38 (2017) (discussing the sexist origins of separate men's and women's facilities, and arguing that "all gender, multi-user public restrooms," *id.* at 1238, would best protect everyone's privacy and safety); Joel Sanders & Susan Stryker, *Stalled: Gender-Neutral Public Bathrooms*, 115 S. AT-LANTIC Q. 779, 781–88 (2016) (similar).

[544] Harvey Molotch, *On Not Making History: What NYU Did with the Toilet and What It Means for the World*, *in* TOILET: PUBLIC RESTROOMS AND THE POLITICS OF SHARING, *supra* note 543, at 255, 265; *see also* Lisa Selin Davis, *The Simple Design Solutions that Can Make Bathrooms Better — For All Genders*, QUARTZ (Mar. 16, 2017), https://qz.com/933704/how-to-design-transgender-friendly-bathrooms-that-make-people-of-all-genders-feel-safe/ [https://perma.cc/LT82-N4FV].

[545] It is false that women's restrooms provide safe hiding places from violent men, as men can and do enter women's restrooms to commit violence. Case, *supra* note 543, at 220. And it is false that women's restrooms are cleaner than men's. *See, e.g.*, Mary Schmich, *Sharing Bathroom with Men Raises Question of Cleanliness*, CHI. TRIB. (Jan. 29, 2016, 5:02 AM), http://www.chicagotribune.com/news/columnists/schmich/ct-gender-neutral-bathroom-mary-schmich-0129-20160128-column.html [https://perma.cc/4JMV-SRTM] (reporting the comment of the owner of one commercial cleaning service that women's restrooms are dirtier "hands down").  In any event, it is unfair to subject men or women to dirtier spaces based on stereotypes.

[546] *See* Clarke, *supra* note 161, at 829.

[547] Naomi Schoenbaum, *Heteronormativity in Employment Discrimination Law*, 56 WASHBURN L.J. 245, 249 (2017) ("[O]ne of the reasons behind sex-segregated bathrooms is the heteronormative assumption that same-sex spaces will not entail sexuality or acts of sex.").

[548] Carcaño v. McCrory, 203 F. Supp. 3d 615, 624 (M.D.N.C. 2016) (discussing the testimony of a school diversity officer who was "confident that the privacy interests of transgender and non-transgender students alike could be accommodated through the same means used to accommodate any student with body image or shyness issues" in locker rooms).

devised a "buddy system" in which friends would hold up towels to protect one another's privacy while they changed into swimming attire.[549] The best solution might be to provide privacy curtains for all students who would prefer them.

But it is costly to upgrade old facilities. Moreover, some anachronistic building codes require separate spaces.[550] A pluralism approach is an interim solution: creating additional "all gender" or "family" spaces alongside the men's and women's ones.[551] This approach is not optimal, as it runs the risk of signaling that transgender people are different. Transgender people might end up being *required* to use inadequate or stigmatizing third facilities, when the male or female facilities would accord with their gender identities.[552] Another temporary solution is to permit nonbinary people to use whichever facility they feel the safest in, or which they believe best matches their sex or gender, just as transgender men and women should be able to.

*2. Housing.* — Nonbinary inclusion may also threaten interests in sex-segregated housing in unique institutional contexts such as incarceration, shelters, long-term care facilities, and education. Changing all spaces to neutral ones is worth consideration. Barring that, institutions can take an integration approach: determining the placement that will be the safest and most affirming.

Third-category recognition strategies have been tried in some contexts, but they have major drawbacks. In the prison context, one example is L.A. County's special facility for LGBT inmates.[553] This approach is problematic in many ways, including that prison officials rely on stereotypes to determine which prisoners are LGBT; that it, in effect, excludes bisexual people; that it constructs gay and transgender people as victims; and that it forces inmates to disclose their LGBT status in the violent context of incarceration.[554] Sometimes correctional facilities may have space to house nonbinary people in individual sleeping

---

[549] Letter from Adele Rapport, Reg'l Dir., U.S. Dep't of Educ., Office for Civil Rights, to Daniel E. Cates, Superintendent, Twp. High Sch. Dist. 211, at 6 (Nov. 2, 2015), https://www2.ed.gov/documents/press-releases/township-high-211-letter.pdf [https://perma.cc/A44V-GET9].

[550] Colker, *supra* note 543, at 161.

[551] *See, e.g.*, Keress Weidner, *I'm Non-binary, and "Trans-Accessible" Restrooms Should Include Me, Too*, GLSEN, https://www.glsen.org/blog/i%E2%80%99m-non-binary-and-%E2%80%9Ctrans-accessible%E2%80%9D-restrooms-should-include-me-too [https://perma.cc/V74X-D6EN].

[552] *See, e.g.*, G.G. *ex rel.* Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 716–17 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017) (mem.).

[553] Russell K. Robinson, *Masculinity as Prison: Sexual Identity, Race, and Incarceration*, 99 CALIF. L. REV. 1309, 1309 (2011) ("The Los Angeles County Men's Jail segregates gay and transgender inmates and says that it does so to protect them from sexual assault. But not all gay and transgender inmates qualify for admission to the K6G unit. Transgender inmates must appear transgender to staff that inspect them.").

[554] *Id.* (among other drawbacks).

*HARVARD LAW REVIEW* [Vol. 132:894

quarters, but there is a danger that they will end up isolated for too long, which can be psychologically damaging.[555]

As Professor Dean Spade has explained, gender-neutral prisons, or "co-corrections," are not unprecedented.[556] Beginning in the 1970s, a number of minimum security prisons housed men and women together, although men and women had separate living units.[557] Some survey research suggests these programs provided more safety and better training opportunities for women, although they came with the disadvantage of increased surveillance.[558] But "[i]n the eyes of conservative politicians," these "minimum-security facilities were . . . coed 'country clubs.'"[559] The co-correctional experiment was a casualty of the "tough-on-crime" policies of the 1990s, and by 1999 there were no co-correctional facilities left.[560] The experiment is worth trying again.

From 2012 to 2018, the federal approach to housing gender-nonconforming prisoners was integration: determining the best placement for gender-nonconforming prisoners on a case-by-case basis.[561] Facilities were required to screen all individuals for their risk of perpetrating or experiencing sexual abuse, and to use that information to determine housing.[562] Rather than presenting an insurmountable challenge to sex classification in prisons, nonbinary people were assimilated into it. This ought to have allayed any fears that nonbinary gender might open a Pandora's box of disruptive consequences for prison housing.[563] Yet the Trump Administration has revised the policy to give

---

[555] RHODES PERRY ET AL., N.Y.C. ADMIN. FOR CHILDREN'S SERVS., SAFE & RESPECTED: POLICY, BEST PRACTICES, & GUIDANCE FOR SERVING TRANSGENDER, GENDER EXPANSIVE, & NON-BINARY CHILDREN AND YOUTH INVOLVED IN THE CHILD WELFARE, DETENTION, AND JUVENILE JUSTICE SYSTEMS 26–27 (2017), https://www1.nyc.gov/assets/acs/pdf/lgbtq/SAFEAndRespectedUpdate061417.pdf [https://perma.cc/56F4-F48S].

[556] Spade, *supra* note 28, at 811.

[557] MICHAEL WELCH, CORRECTIONS: A CRITICAL APPROACH 195 (3d ed. 2011) (discussing a co-correctional facility, the Federal Correctional Institution in Fort Worth, Texas, which housed "low-risk and non-violent" inmates between 1971 and 1988).

[558] Sue Mahan et al., *Sexually Integrated Prisons: Advantages, Disadvantages and Some Recommendations*, 3 CRIM. JUST. POL'Y REV. 149, 149 (1989) ("Despite the shortcomings, staff and inmate responses were in general agreement with the statement: 'For the most part the co-corrections institution is an agreeable place.'"); *cf.* James R. Davis, *Co-Corrections in the U.S.: Housing Men and Women Together Has Advantages and Disadvantages*, 23 CORRECTIONS COMPENDIUM, Mar. 1998, at 1, 3 (discussing the need for longitudinal studies on co-correctional facilities).

[559] WELCH, *supra* note 557, at 195–96.

[560] *Id.* at 196 ("In view of the tough-on-crime campaigns and President George Bush's initiative to eliminate furlough and other unpopular policies, the U.S. Department of Justice worried that co-corrections did not uphold the 'tough' image of prison life that the White House had been fiercely promoting.").

[561] 28 C.F.R. § 115.42(a), (c) (2018).

[562] *Id.*

[563] It should be worrying, however, that anyone can be assimilated into the system of mass incarceration. *See generally* ALEXANDER, *supra* note 229.

AR_292845

primacy to "biological sex" for purposes of placement of transgender and intersex inmates.[564]

Economically marginalized transgender people encounter difficulties seeking social services and shelters due to sex segregation.[565] As a result of fear of violence and harassment, transgender and nonbinary people who need these services may not even approach them.[566] The Department of Housing and Urban Development's regulations require that single-sex emergency shelters and other services defer to a person's stated gender identity,[567] but this policy does not assist in cases in which a person's identity is nonbinary.[568] Gender-neutral social services may be the best option for survivors of gender-based violence.[569] Arguments related to women's safety are troubling in this context.[570] The assumptions of masculine predation and invulnerability that underlie these defenses of sex-segregated services are not supported and are harmful to men.[571] There is some anecdotal evidence that trainings and education may help to undermine these assumptions.[572] Providing all residents with doors that lock, panic buttons, and other measures may improve safety and ensure a sense of security.[573] Nonetheless, for temporary shelters, or those that cannot afford private rooms or apartments, there may be a good argument for continuing to sex-segregate shared bedrooms by gender identity[574] — based on the same considerations that might

---

[564] FED. BUREAU OF PRISONS, U.S. DEP'T OF JUSTICE, CHANGE NOTICE, TRANSGENDER OFFENDER MANUAL 6 (2018), https://www.bop.gov/policy/progstat/5200-04-cn-1.pdf [https://perma.cc/AAA2-V85R]. The policy allows assignment to facilities in accord with an inmate's gender identity in certain cases "where there has been significant progress towards transition as demonstrated by medical and mental health history." *Id.*

[565] Spade, *supra* note 28, at 752–53, 778–80.

[566] *See, e.g.*, MICHAEL MUNSON & LOREE COOK-DANIELS, FORGE, GENDER-INTEGRATED SHELTERS: EXPERIENCE AND ADVICE 7 (2016), http://forge-forward.org/wp-content/docs/gender-integrated-shelter-interivews-FINAL.pdf [https://perma.cc/9MWQ-G2ZG] (reporting on a survey of 1000 transgender and nonbinary individuals in 2011, in which nearly two-thirds stated they would not, or might not, access domestic violence or rape crisis centers).

[567] 24 C.F.R. § 5.106 (2018). The Violence Against Women Act (VAWA), which provides federal grants to programs like emergency shelters, prohibits discrimination on the basis of "gender identity" by grant recipients. 34 U.S.C.A. § 12291(b)(13)(A) (West 2018). It allows "sex-specific programming" that "is necessary to the essential operation of a program," so long as "comparable services" are provided to those who are excluded from those programs. *Id.* § 12291(b)(13)(B).

[568] MUNSON & COOK-DANIELS, *supra* note 566, at 8.

[569] *Id.* (arguing that integrated services are the most inclusive way to respond to VAWA's requirement of offering "comparable services" to all, and noting that alternatives, such as putting male survivors up in hotels, are not cost effective).

[570] *Id.* at 23–28 (listing objections to integration such as the concern that cisgender men would assault women and children in the shelter).

[571] *Cf. id.* at 12–17 (offering anecdotes from staff at integrated shelters about men, including men who are not LGBTQ, who are survivors of abuse).

[572] *Id.* at 31–33 (discussing experiences with training shelter staff).

[573] *Id.* at 45–46.

[574] *See* OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF JUSTICE, FREQUENTLY ASKED QUESTIONS: NONDISCRIMINATION GRANT CONDITION IN THE VIOLENCE AGAINST WOMEN

*HARVARD LAW REVIEW*                     [Vol. 132:894

support the privacy BFOQ.[575]  Nonbinary people might appropriately be placed where they are most safe and comfortable.[576]

As for housing on college campuses and in other educational and professional contexts, institutions are adopting a pluralism strategy. Campus housing is a problem for transgender students in general.[577] Many educational institutions are developing gender-inclusive housing policies.[578]  One school, for example, "allows students to live in a suite with others regardless of their sex or gender identity" if they "complete a gender inclusive housing contract confirming their agreement."[579] Some colleges designate certain residence halls or floors as gender neutral, or provide living space for students who identify as LGBTQ.[580] Others provide case-by-case accommodation.[581]

## E. *Health Care*

In the health care domain, the ideal approach would be an individualized sort of recognition: to tailor care to the particular needs of each

---

REAUTHORIZATION ACT OF 2013, at 6–7 (2014) (discussing situations in which sex-segregated housing may be appropriate, depending on the circumstances); MUNSON & COOK-DANIELS, *supra* note 566, at 39.

[575]  *See supra* p. 976.

[576]  *See* MUNSON & COOK-DANIELS, *supra* note 566, at 39–40.

[577]  JAIME M. GRANT ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 33 (2011), https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf [https://perma.cc/ZP9E-4JKE] (reporting that nearly one-fifth of respondents in higher education were denied appropriate campus housing, and five percent were denied housing altogether).

[578]  Joseph Erbentraut, *College Campuses Are More Trans-Inclusive than Ever, but Still Have a Long Way to Go*, HUFFINGTON POST (Dec. 6, 2017), http://www.huffingtonpost.com/2015/05/18/trans-friendly-colleges_n_7287702.html [https://perma.cc/46ZG-HX52].  For a list of the 267 colleges and universities with gender-inclusive housing, see *Colleges and Universities that Provide Gender-Inclusive Housing*, CAMPUS PRIDE, https://www.campuspride.org/tpc/gender-inclusive-housing/ [https://perma.cc/TFF5-P6QB].

[579]  *Harvard College Handbook for Students: Gender Inclusive Housing*, HARV. U., https://handbook.fas.harvard.edu/book/gender-neutral-housing [https://perma.cc/8345-NEFX].

[580]  *See, e.g., Gender Neutral Program*, DARTMOUTH GROUP DIRECTORY, http://dgd.dartmouth.edu/group/450 [https://perma.cc/RXV9-RBVS] ("Gender neutral housing allows for same-gender, opposite-gender or other-gender identities to live together regardless of biological sex. This program floor will provide a living/learning environment where residents can learn about and explore gender identity and expression in a supportive environment."); *Inclusive Housing*, U. NEB. OMAHA, https://www.unomaha.edu/student-life/housing-and-residential-life/prospective-students/inclusive-housing.php [https://perma.cc/22T8-ULSW] ("Any student who is lesbian, gay, bisexual, transgender, queer/questioning, intersex, asexual, not straight, gender nonconforming, (LGBTQIA+) and/or ally is eligible to live in University housing including in an apartment designated as Gender-Inclusive Housing.").

[581]  *See, e.g., Contract*, U. WIS.-MADISON, https://www.housing.wisc.edu/residence-halls/assignments/contract/ [https://perma.cc/8FPA-5W7E] ("University Housing acknowledges that not all students may identify as female or male, and we want to create a welcoming environment for you in the residence halls.  We would be happy to work with students who may identify as trans*gender, genderqueer, gender non-conforming, and/or non-binary regarding life in the halls.").

nonbinary person, with awareness of the unique forms of bias that non-binary people may face.[582]  Like other gender-nonconforming people, nonbinary people may ask that reproductive health care be offered in ways that do not assume gender roles or stereotypes.[583]  Nonbinary people, like transgender men and women, may require transition-related health care and be diagnosed with gender dysphoria.[584]  However, the law requires no more than neutrality with respect to any transgender patient.

Health care providers are beginning to recognize the unique needs of nonbinary patients, and finding ways to provide more supportive and affirming care.[585]  In addition to asking for a patient's "sex" assigned at birth, health care forms should also ask an open-ended question about "current gender identity."[586]  Patients must be assured that their responses to questions about sex and gender identity will be kept confidential, like other health care information.  One set of guidelines concludes, "all of the recommended practices could be easily implemented in any health care setting, without a need for large-scale structural change, or extensive knowledge on gender identity."[587]

Like transgender men and women, some nonbinary adults have sought or received access to transition-related health care services, such as hormone therapy, chest reduction or reconstruction, augmentation mammoplasty, phalloplasty, vaginoplasty, hair removal, and voice surgery, among other treatments.[588]  Nonbinary children, like other transgender children, may seek reversible puberty-blocking hormones and other treatments.[589]  Opponents liken such treatments to "elective

---

[582] *See* NAT'L LGBT HEALTH EDUC. CTR., PROVIDING AFFIRMATIVE CARE FOR PATIENTS WITH NON-BINARY GENDER IDENTITIES 8–9 (2017), https://www.lgbthealtheducation.org/wp-content/uploads/2017/02/Providing-Affirmative-Care-for-People-with-Non-Binary-Gender-Identities.pdf [https://perma.cc/DDS7-CJ5T].

[583] *See supra* note 366 and accompanying text.

[584] *See* Richards et al., *supra* note 27, at 3; *see also supra* note 269 and accompanying text.

[585] NAT'L LGBT HEALTH EDUC. CTR., *supra* note 582, at 3.

[586] *Id.* at 7.  One sample form offers the options "male," "female," and "choose not to disclose" for sex assigned at birth.  *Id.*

[587] *Id.* at 13.

[588] *See, e.g.*, JAMES ET AL., *supra* note 2, at 99, 101 fig.7.13, 103 fig.7.15.  In general, people who identify as nonbinary report less interest in these treatments than do transgender men and women.  *See, e.g.*, *id.* at 99 (reporting that 95% of transgender men and women have wanted hormone therapy, compared with 49% of nonbinary survey respondents).

[589] *See* Sara Solovitch, *When Kids Come in Saying They Are Transgender (or No Gender), These Doctors Try to Help*, WASH. POST (Jan. 21, 2018), http://wapo.st/2DrsBL4 [https://perma.cc/MG8N-645Z].

In the United States, parental consent is generally required for minors seeking medical treatments.  Anne C. Dailey & Laura A. Rosenbury, *The New Law of the Child*, 127 YALE L.J. 1448, 1534–35 (2018).  While there is research suggesting positive mental health outcomes from allowing transgender children to "socially transition" to their male or female gender identity, more research is required on nonbinary children.  Jack L. Turban, *Transgender Youth: The Building Evidence Base for Early Social Transition*, 56 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 101, 102

cosmetic surgery" that is not covered by insurance.[590]  But unlike elective cosmetic surgery, transition-related services are covered by health insurers as medically necessary to treat gender dysphoria.[591]  Patients should not be required to conform to binary concepts of gender to receive care.[592]  Under section 1557 of the Affordable Care Act[593] (ACA), any health program or activity that receives federal funds may not discriminate on the basis of sex.[594]  Federal courts have interpreted such language to preclude discrimination against someone due to transgender identity.[595]  A set of 2016 regulations interpreting the ACA clarified that providers could not discriminate based on "[s]ex stereotypes" including "the expectation that individuals will consistently identify with only one gender."[596]  Health plans may also be precluded from discriminating against transgender patients under Title VII, which bars sex discrimination in employment;[597] the Fourteenth Amendment, which bars sex discrimination by public entities;[598] and some state insurance laws, which bar discrimination based on gender identity.[599]

While health care providers should affirmatively accommodate nonbinary patients and insurers should cover medically necessary care, the law seems to require, at most, neutrality.  The 2016 ACA regulations provide that covered entities may not deny health care coverage "for specific health services related to gender transition if such denial . . .

---

(2017) ("Children have a range of identities along a spectrum that might not fall neatly into male or female categories.  More data are needed to better understand the benefits of social transition in these gender-non-binary children.").

[590] See, e.g., Activist Clinicians Tout "Cultural Humility" & Surgery-on-Demand for "Nonbinaries" & "Genderfluids," 4THWAVENOW (Dec. 27, 2015), https://4thwavenow.com/2015/12/27/activist-clinicians-tout-cultural-humility-surgery-on-demand-for-nonbinaries-genderfluids/ [https://perma.cc/EKF3-E2VC] (characterizing nonbinary people seeking transition-related services as motivated by "[c]omfort, exploration, wants" rather than medical necessity). 4thWaveNow is a website that describes itself as "[a] community of parents & others concerned about the medicalization of gender-atypical youth and rapid-onset gender dysphoria." Id.

[591] See AM. MED. ASS'N HOUSE OF DELEGATES, RESOLUTION: 122, SUBJECT: REMOVING FINANCIAL BARRIERS TO CARE FOR TRANSGENDER PATIENTS (2008) (recognizing "[a]n established body of medical research" that "demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and [gender-affirming] surgery as forms of therapeutic treatment for many people diagnosed with [gender dysphoria]"); WPATH STANDARDS, supra note 209, at 8; see also Boyden v. Conlin, No. 17-cv-264, 2018 WL 4473347, at *11–15 (W.D. Wis. Sept. 18, 2018) (rejecting an "unsupported analogy," id. at *12, between gender-conforming surgeries and uncovered cosmetic surgeries on the ground that it does not rest on judgments about what is appropriate treatment according to medical standards and research).

[592] See, e.g., Spade, supra note 212, at 19–23.

[593] Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of 26 and 42 U.S.C.).

[594] 42 U.S.C. § 18116 (2012).

[595] See, e.g., supra note 175.

[596] See supra note 176.

[597] Boyden v. Conlin, No. 17-cv-264, 2018 WL 4473347, at *11–15 (W.D. Wis. Sept. 18, 2018).

[598] Id. at *16–18.

[599] See, e.g., CAL. CODE REGS. tit. 10, § 2561.2(a)(4)(A) (2018).

results in discrimination against a transgender individual."[600]  Whether a denial constitutes "discrimination" is a difficult question.  It may be discrimination if a provider acknowledges it declined coverage because the services in question were transition related.[601]  Or it may be discrimination if similar services are covered for people who are not seeking transition-related care.[602]  This latter rule is unlikely to apply in a scenario in which "a medical procedure would be denied as cosmetic or medically unnecessary in all other cases, but is in fact medically necessary to treat gender dysphoria."[603]  Thus, if for example, a health plan never covered hair removal, it would not have to cover hair removal as treatment for gender dysphoria.  But in any event, the rules are likely to apply (or not), to transgender women, transgender men, and nonbinary people alike.

The 2016 regulation has been challenged in court and seems likely to be reversed by the Trump Administration.[604]  The questions in litigation are whether there must be religious exemptions to the regulations, and whether the definition of "sex" should include "gender identity" at all, or is limited "to the biological differences between males and

---

[600]  45 C.F.R. § 92.207(b)(5) (2017).

[601]  Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,433 (May 18, 2016) ("OCR will evaluate whether coverage for the same or a similar service or treatment is available to individuals outside of that protected class or those with different health conditions and will evaluate the reasons for any differences in coverage.  Covered entities will be expected to provide a neutral, nondiscriminatory reason for the denial or limitation that is not a pretext for discrimination.").  Sex stereotypes, such as the idea that transgender people should "maintain the physical characteristics of their natal sex," will not suffice.  *Boyden*, 2018 WL 4473347, at *12.

[602]  *Boyden*, 2018 WL 4473347, at *12 (concluding that a health insurance plan discriminated on the basis of "natal sex" by covering care like reconstructive breast surgery for women who were assigned the female sex at birth, but not chest surgery for transgender women who had been assigned the male sex at birth); Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. at 31,433.

[603]  Samuel Rosh, *Beyond Categorical Exclusions: Access to Transgender Healthcare in State Medicaid Programs*, 51 COLUM. J.L. & SOC. PROBS. 1, 20 (2017).

[604]  In 2016, a number of states and health care providers brought suit, arguing that the rule's provision with respect to "gender identity" violates the Administrative Procedure Act because it is incorrect as a matter of law, and that it violates the Religious Freedom Restoration Act because it fails to include religious exemptions.  Franciscan All., Inc. v. Price, No. 16-CV-00108, 2017 WL 3616652, at *1 (N.D. Tex. July 10, 2017).  A federal district court in Texas granted a preliminary injunction, preventing the HHS from enforcing the regulation.  *Id.* at *2.  The litigation is now stayed while the Trump Administration reassesses the regulation.  *Id.* at *5.  But the injunction purports to apply only to government actions to enforce the regulation, not private parties seeking to enforce the statute's nondiscrimination provisions.  *See, e.g.*, Prescott v. Rady Children's Hosp.-San Diego, 265 F. Supp. 3d 1090, 1105 (S.D. Cal. 2017) (holding that a private action alleging gender-identity discrimination under the ACA could proceed based on the language of the statute and did not need to rely on the 2016 HHS regulations).

females."[605]  The resolution of this dispute does not turn on whether nonbinary people are covered.[606]

$$* \quad * \quad *$$

This examination of the few remaining contexts of sex or gender regulation demonstrates that the law has no reason to require a universal definition of sex or gender that limits the options to two.  The purpose of this Part has not been to definitively settle particular legal debates, but rather, to argue that U.S. civil rights law offers various tools to resolve controversies over inclusion of nonbinary gender identities.  As U.S. states increasingly enact legislation to recognize nonbinary gender, researchers will have more opportunities to collect empirical evidence on the upsides and downsides of different interventions.[607]

## CONCLUSION

This Article has asked what it would mean for the law to take nonbinary gender seriously, in other words, to treat people with nonbinary gender identities as full participants in social, economic, and political life.  It has argued for a contextual approach to nonbinary gender rights, rather than insisting on uniform definitions or universal rules.  This approach would examine each context of sex or gender regulation, considering the relative merits of various strategies for achieving nonbinary gender rights, including third-gender recognition, the elimination of sex classifications, or integration into binary sex or gender categories.  While opponents have argued that nonbinary gender rights would have unforeseen and dangerous effects on a host of legal regimes, careful analysis reveals that there are few contexts left in which the law relies on binary sex classifications after *Obergefell*.  In those few remaining contexts of binary sex regulation, there are many possible paths forward for nonbinary gender rights.

Theoretical debates — such as how the law should define sex or gender as a general matter, or whether the optimal end state is third-gender recognition or gender neutrality — can make it appear as though there are irreconcilable conflicts among nonbinary gender rights claims and feminist and LGBT priorities, particularly those of transgender men and women.  But analysis of each legal context suggests fewer such conflicts in practice.  Existing sex discrimination law protects transgender men and women because bias against them is based on sex stereotypes, not

---

[605] Franciscan All., Inc. v. Burwell, 227 F. Supp. 3d 660, 688 (N.D. Tex. 2016).

[606] Opponents of the regulation pointed to the fact that it covered nonbinary gender identities in their legal briefs — as if that were a damaging fact for the government.  *See supra* notes 177–178 and accompanying text. But it did not seem to matter in terms of the legal argument, and the court made no mention of it.  *See Franciscan All., Inc.*, 227 F. Supp. 3d 660.

[607] International experience may also prove instructive.  *See supra* note 8.

because they are a protected class or because their identities are immutable in some way. The same anti-stereotyping argument precludes discrimination against people with nonbinary gender identities. Rather than requiring dramatic legal changes or novel theories, protection of nonbinary rights may only require moderate extensions of existing law and the application of familiar civil rights concepts from doctrine on sex, race, and religion.

Feminists have long argued for release from the straightjacket of gender, but never before have nonbinary gender identities seemed so likely to go mainstream. This movement may be challenged by entrenched attitudes about the naturalness of binary gender and the belief that the legal options are limited to unpalatable forms of gender recognition or absolute gender neutrality. But on a closer look, it is apparent that neither human lives nor legal options are binary. Indisputably, nonbinary gender poses challenges to legal interests, but these challenges are not insurmountable, and the possibility of inclusion, which not long ago seemed unimaginable, is now beginning to seem inevitable.



# Erasure and Resilience: The Experiences of LGBTQ Students of Color

## Asian American and Pacific Islander LGBTQ Youth in U.S. Schools



A Report from GLSEN and the National Queer Asian Pacific Islander Alliance

AR_292853

AR_292854



# Erasure and Resilience: The Experiences of LGBTQ Students of Color

**Asian American and Pacific Islander**

**LGBTQ Youth in U.S. Schools**

by Nhan L. Truong, Ph.D.
   Adrian D. Zongrone, M.P.H.
   Joseph G. Kosciw, Ph.D.

AR_292855

**National Headquarters**
110 William St., 30th Floor
New York, NY 10038
Ph: 212-727-0135 Fax: 212-727-0254

**DC Policy Office**
Make Office K Street
6th Floor, Attn: GLSEN
1015 15th Street, NW
Washington, DC, 20005
Ph: 202-347-7780 Fax: 202-347-7781

© 2020 GLSEN

ISBN 978-1-934092-30-9

glsen@glsen.org
www.glsen.org

When referencing this document, we recommend the following citation:
Truong, N. L., Zongrone, A. D., & Kosciw, J. G. (2020). *Erasure and resilience: The experiences of LGBTQ
students of color, Asian American and Pacific Islander LGBTQ youth in U.S. schools*. New York: GLSEN.

**GLSEN** is the leading national education organization focused on ensuring safe schools for all students.
Established in 1990, GLSEN envisions a world in which every child learns to respect and accept all
people, regardless of sexual orientation or gender identity/expression. GLSEN seeks to develop school
climates where difference is valued for the positive contribution it makes to creating a more vibrant and
diverse community. For more information on our educator resources, research, public policy agenda,
student leadership programs, or development initiatives, visit www.glsen.org.

Graphic design: Adam Fredericks

Cover illustration: Mohammed Fayaz

Electronic versions of this report and all other GLSEN research reports are available at
www.glsen.org/research.

## TABLE OF CONTENTS

PREFACE...................................................................................................................................vii

ACKNOWLEDGEMENTS.............................................................................................................xi

EXECUTIVE SUMMARY..............................................................................................................xiii

    English......................................................................................................................................xiii

    Chinese (Simplified)...............................................................................................................xxi

    Korean....................................................................................................................................xxix

    Vietnamese...........................................................................................................................xxxvii

    Hindi........................................................................................................................................xlv

INTRODUCTION............................................................................................................................1

METHODS AND SAMPLE DESCRIPTION ....................................................................................5

PART ONE: SAFETY AND EXPERIENCES WITH HARASSMENT AND ASSAULT AT SCHOOL..................11

    Safety......................................................................................................................................13

    Biased Remarks......................................................................................................................14

    Harassment and Assault .........................................................................................................14

    Reporting School-Based Harassment and Assault ..................................................................18

    Insight on Family Reporting and Intervention.........................................................................19

    Conclusions............................................................................................................................20

PART TWO: SCHOOL PRACTICES ...............................................................................................21

    Experiences with School Discipline.........................................................................................23

    School-Based Supports and Resources for AAPI LGBTQ Students..........................................25

    Insight on Club Participation and Leadership..........................................................................28

    Insight on Inclusive Curriculum..............................................................................................32

    Conclusions............................................................................................................................33

DISCUSSION ...............................................................................................................................35

    Limitations..............................................................................................................................37

    Conclusions............................................................................................................................37

    Recommendations ..................................................................................................................38

ENDNOTES..................................................................................................................................41

AR_292857

## LIST OF TABLES AND FIGURES

Table S.1     Demographic Characteristics of Survey Participants........................................................8

Table S.2     Characteristics of Survey Participants' Schools ...............................................................9

Figure 1.1    AAPI LGBTQ Students Who Felt Unsafe at School Because of Actual or
              Perceived Personal Characteristics.................................................................................13

Figure 1.2    Frequency of Hearing Anti-LGBTQ and Racist Remarks in School ...............................14

Figure 1.3    Percentage of AAPI LGBTQ Students Who Experienced Victimization
              Based on Personal Characteristics .................................................................................15

Figure 1.4    Victimization Based on Sexual Orientation and AAPI LGBTQ Student
              Well-Being and Academic Outcomes.............................................................................15

Figure 1.5    Victimization Based on Race/Ethnicity and AAPI LGBTQ Student Well-Being and
              Academic Outcomes.......................................................................................................16

Figure 1.6    Differences in Level of Victimization by Trans/GNC Status............................................16

Figure 1.7    Differences in Level of Victimization by Multiple Racial/Ethnic Identities.....................17

Figure 1.8    AAPI LGBTQ Student Well-Being and Multiple Forms of Victimization
              Based on Sexual Orientation and Race/Ethnicity .........................................................17

Figure 1.9    Frequency of AAPI LGBTQ Students Reporting Incidents of Harassment and
              Assault to School Staff ...................................................................................................18

Insight Figure:  Frequency of Intervention by AAPI LGBTQ Students' Family Members .......................19

Figure 2.1    Percentage of AAPI LGBTQ Students Who Experienced School Discipline....................23

Figure 2.2    Experiences of School Discipline by Missing School Because of Feeling Unsafe ...........24

Figure 2.3    Experiences of School Discipline by Anti-LGBTQ Discrimination ..................................25

Figure 2.4    Availability of GSAs and Ethnic/Cultural Clubs ............................................................26

Insight Figure:  Participation in GSAs and Ethnic/Cultural Clubs......................................................28

Figure 2.5    AAPI LGBTQ Students' Reports on the Number of Teachers and
              Other School Staff Who are Supportive of LGBTQ Students.........................................30

Figure 2.6    AAPI LGBTQ Students' Reports on How Supportive Their
              School Administration is of LGBTQ Students ................................................................30

Figure 2.7    Supportive School Staff and Well-Being and School Belonging .....................................31

Insight Figure:  Inclusive Curriculum and Feelings of Safety, Peer Acceptance,
              and School Belonging among AAPI LGBTQ Students ...................................................32

AR_292858

AR_292859

AR_292860

# Preface

AR_292862

Twenty years ago, GLSEN began investing in applied research capacity to build the evidence base for action on LGBTQ issues in K–12 schools, and to track the impact of efforts to improve the lives and life prospects of LGBTQ students. Now conducted under the banner of the GLSEN Research Institute, each new report in this body of work seeks to provide clarity, urgency, and renewed inspiration for the education leaders, advocates, and organizational partners dedicated to the work.

*Erasure and Resilience: The Experiences of LGBTQ Students of Color* is a series of four reports, each publication focusing on a different group of LGBTQ students, their lives at school, and the factors that make the biggest difference for them. The reports in this series examine the school experiences of Asian American and Pacific Islander (AAPI), Black, Latinx, and Native and Indigenous LGBTQ youth. Each report was conducted and is released in partnership with organizations specifically dedicated to work with the student population in question. We are so grateful for the partnership of the National Queer Asian Pacific Islander Alliance, the National Black Justice Coalition, UnidosUS and the Hispanic Federation, and the Center for Native American Youth.

These reports arrive as the United States wrestles with two fundamental challenges to our commitment to provide a K–12 education to every child — the depth of the systemic racism undermining true educational equity in our K–12 school systems; and the rising tide of racist, anti-LGBTQ, anti-immigrant, and White Christian nationalist sentiment being expressed in the mainstream of U.S. society. The students whose lives are illuminated in these reports bear the brunt of both of these challenges. Their resilience calls on each of us to join the fight.

Eliza Byard, Ph.D.
Executive Director
GLSEN

AR_292863

Dear Readers,

For almost 30 years, GLSEN has worked to defend the rights of LGBTQ youth. Despite growing awareness built by communities like GLSEN and NQAPIA, GLSEN's research shows that youth continue to face discrimination and marginalization. As the country grows to understand queer and gender expansive youth, we must remember to highlight the unique experiences Asian American and Pacific Islanders (AAPIs) face at the intersections of their identities. We must uplift the complex experiences of youth of color and recognize a need for a nuanced framework that enhances liberation of all.

NQAPIA feels deeply honored and proud to support GLSEN's *Erasure and Resilience: The Experiences of LGBTQ Students of Color, Asian American and Pacific Islander LGBTQ Youth in U.S. Schools* and their work in creating these nuanced frameworks. With research like this and resources like the, "10 Things To Know About LGBTQ AAPI Communities," created by GLSEN, NQAPIA & the NEA, we can begin to provide the life-saving and culturally relevant support for our youth that they need. This research will help us navigate how to best support our youth in their schools and communities as we continue to strive to build a world in which all AAPI LGBTQ individuals are fully accepted as they are.

We stand with GLSEN in the belief that school is and should be a safe space for all our youth. Unfortunately, racism toward youth of color and discrimination against LGBTQ youth are prevalent in secondary schools. While research has shown that AAPI students commonly experience racism in school, discussions around harassment toward AAPI youth in schools are often missing. As a result, there is a lack of visibility around these types of school experiences for AAPI students, and even more so for AAPI LGBTQ students.

This report examines the intersectional, educational experiences of AAPI LGBTQ secondary school students, and demonstrates that the majority of AAPI LGBTQ students experience safety concerns and harassment in school because of their sexual orientation, gender expression, and race/ethnicity. The report also shows that AAPI LGBTQ students who experience both homophobic and racist harassment in school have the poorest academic outcomes and psychological well-being. Further, AAPI LGBTQ students who experience harassment in school are also more likely to experience school discipline.

This report is a critical tool for educators, policymakers, safe school advocates and others who want to make schools a more inclusive space for marginalized groups of students to continue to work on making accessible specific resources that support AAPI LGBTQ students. NQAPIA is proud to work with GLSEN to present this important research and we stand alongside GLSEN to do our part in ensuring safe and supportive school environments for AAPI LGBTQ students in the U.S. NQAPIA strongly encourages you to not only read the report, but translate this information into knowledge and informed care. We hope this information will lead to deeper conversations and nuanced work to enhance the lives of AAPI LGBTQ students.

Sincerely,

Khudai Tanveer
Organizing Director
National Queer Asian Pacific Islander Alliance

## *Acknowledgements*

The authors first wish to thank the students who participated in our *2017 National School Climate Survey*, the data source for this report. We also wish to acknowledge the full LGBTQ Students of Color Committee for their invaluable feedback throughout the process of the report. We offer particular thanks to the members of the AAPI report subcommittee: Kevin Kumashiro, Kevin Nadal, Marcus Breed, Vinisha Rana, and Tamanna Sohal. We also thank our Research Assistant, Alicia Menard-Livingston for helping to write the Executive Summary and for proofreading the report. We are indebted to our former GLSEN Director of Research, Emily Greytak, for her guidance and support from the study's inception. Finally, much gratitude goes to Eliza Byard, GLSEN's Executive Director, for her comments and her deep commitment to GLSEN Research.

AR_292865

AR_292866

# Executive Summary

AR_292867

AR_292868

## Introduction

Existing research has illustrated that both Asian American and Pacific Islander (AAPI) as well as lesbian, gay, bisexual, transgender, and queer (LGBTQ) youth often face unique issues in school related to their marginalized identities. For instance, AAPI youth are also challenged with the model minority stereotype that all AAPI students are hardworking and excel academically, which can deny, downplay, or erase racism and discrimination that AAPI students experience. Yet prior studies have shown that the incidence of racism from peers against elementary and secondary AAPI students is common. This may, in part, be why AAPI youth are often missing from policy discussions on bullying in schools. With regard to LGBTQ youth, they often face unique challenges related to their sexual orientation, gender identity, and gender expression. LGBTQ youth often reported experiencing victimization and discrimination, resulting in poorer educational outcomes and decreased psychological well-being. Further, they have limited or no access to in-school resources that may improve school climate and students' experiences. Although there here has been a growing body of research on the experiences of AAPI youth and LGBTQ youth in schools, there has been little research examining the intersections of these identities – the experiences of AAPI LGBTQ students. Existing studies show that schools nationwide are hostile environments for LGBTQ youth of color, where they experience victimization and discrimination based on race, sexual orientation, gender identity, or all of these identities. This report is one of a series of reports that focus on LGBTQ students of different racial/ethnic identities, including Black, Latinx, and Native and Indigenous LGBTQ youth.

In this report, we examine the experiences of AAPI LGBTQ students with regard to indicators of negative school climate and their impact on academic achievement, educational aspirations, and psychological well-being:

- Feeling unsafe in school because of personal characteristics, such as sexual orientation, gender expression and race/ethnicity, and missing school because of safety reasons;

- Hearing biased remarks, including homophobic and racist remarks, in school;

- Experiencing victimization in school; and

- Experiencing school disciplinary practices.

In addition, we examine whether AAPI LGBTQ students report these experiences to school officials or their families, and how these adults address the problem.

We also examine the degree to which AAPI LGBTQ students have access to supportive resources in school, and explore the possible benefits of these resources:

- GSAs (Gay-Straight Alliances or Gender and Sexuality Alliances) or similar clubs;

- Ethnic/cultural clubs;

- Supportive school staff; and

- Curricular resources that are inclusive of LGBTQ-related topics.

## Methods

Data for this report came from GLSEN's *2017 National School Climate Survey* (*NSCS*). The full sample for the *2017 NSCS* was 23,001 LGBTQ middle and high school students between 13 and 21 years old. In the *NSCS*, when asked about their race and ethnicity, participants had the option to choose "Asian," and "Pacific Islander," among other racial/ethnic categories. The sample for this report consists of any

AR_292869

LGBTQ student in the national sample who identified as "Asian or South Asian" or "Native Hawaiian or Other Pacific Islander" (henceforth referred to as Asian American and Pacific Islander or AAPI), including those who only identified as AAPI, and those who identified as AAPI and one or more additional race/ethnic identities (multiracial AAPI). It is important to note that the sample size of Pacific Islander LGBTQ students was too small to examine their school experiences alone. Therefore, LGBTQ students who identified as Pacific Islander were combined with those who identified as Asian.

The final sample for this report was a total of 1,480 AAPI LGBTQ students. Students were from all states except for Wyoming, as well as District of Columbia, Puerto Rico, and the U.S. Virgin Islands. Two-fifths (40.0%) identified as gay or lesbian, over half (57.7%) were cisgender, and over half (56.0%) identified with one or more racial/ethnic identities in addition to AAPI. The majority of students were born in the U.S. and nearly all learned English as their first language, or as one of their first languages. The majority of students attended high school and public schools.

## Key Findings

### *Safety and Victimization at School*

**School Safety**

- Over half of AAPI LGBTQ students (51.8%) felt unsafe at school because of their sexual orientation, 41.1% because of their gender expression, and 26.4% because of their race or ethnicity.

- Over a quarter of AAPI LGBTQ students (27.6%) reported missing at least one day of school in the last month because they felt unsafe or uncomfortable, and nearly one-tenth (8.4%) missed four or more days in the past month.

**Biased Remarks at School**

- 97.8% of AAPI LGBTQ students heard "gay" used in a negative way; almost two-thirds (61%) heard this type of language often or frequently.

- 92.4% of AAPI LGBTQ students heard other homophobic remarks; over half (51.1%) heard this type of language often or frequently.

- 89.3% of AAPI LGBTQ students heard negative gender expression remarks about not acting "masculine" enough; half (50.2%) heard these remarks often or frequently.

- 81.4 % of AAPI LGBTQ students heard remarks about not acting "feminine" enough; a third (33.9%) heard these remarks often or frequently.

- 89.3% of AAPI LGBTQ students heard racist remarks; just over half (52.7%) heard these remarks often or frequently.

- 82.3% of AAPI LGBTQ students heard negative remarks about transgender people; over a third (35.5%) heard these remarks often or frequently.

**Harassment and Assault at School**

- Many students experienced harassment or assault at school based on personal characteristics, including sexual orientation (60.5%), gender expression (54.7%), and race/ethnicity (53.8%).

- AAPI LGBTQ students who experienced higher levels of victimization based on sexual orientation at school:

- were more than three times as likely to skip school because they felt unsafe (57.5% vs. 16.9%);

- were somewhat less likely to plan to graduate high school (96.1% vs. 99.3%); and

- experienced lower levels of school belonging (22% vs 60.9%) and greater levels of depression (73.2% vs. 41.2%).

- AAPI LGBTQ students who experienced higher levels of victimization based on race/ethnicity at school:

  - were almost twice as likely to skip school because they felt unsafe (35.5% vs. 18.4%); and

  - experienced lower levels of school belonging and greater levels of depression.

- Transgender and gender nonconforming (trans/GNC) AAPI students experienced greater levels of victimization based on sexual orientation and gender expression than LGBQ cisgender AAPI students.

- AAPI LGBTQ students who identified with multiple racial/ethnic identities experienced greater levels of victimization based on sexual orientation and gender expression than LGBTQ students who only identified as AAPI.

- Two-fifths of AAPI LGBTQ students (40.0%) experienced harassment or assault at school due to both their sexual orientation and their race/ethnicity. Compared to those who experienced one form of victimization or neither, AAPI LGBTQ students who experienced both forms of victimization:

  - experienced the lowest levels of school belonging;

  - had the greatest levels of depression; and

  - were the most likely to skip school because they felt unsafe.

**Reporting School-based Harassment and Assault, and Intervention**

A majority of AAPI LGBTQ students (56.5%) who experienced harassment or assault in the past year never reported victimization to staff, most commonly because they did not think that staff would do anything about it (67.4%).

- Less than half (42.3%) reported that staff responded effectively when students reported victimization.

- Less than half (43.5%) of AAPI LGBTQ students had told a family member about the victimization they faced at school.

- Among AAPI LGBTQ students who reported victimization experiences to a family member, half (50.5%) indicated that a family member talked to their teacher, principal or other school staff.

*School Practices*

**Experiences with School Discipline**

- Nearly a third of AAPI LGBTQ students (30.7%) experienced some form of school discipline, such as detention, out-of-school suspension, or expulsion.

- Multiracial AAPI LGBTQ students experienced greater levels discipline than those who identified only as AAPI.

**xvii**

- Negative school experiences were related to experiences of school discipline for AAPI LGBTQ students. Those who experienced school discipline:

  - experienced higher rates of victimization based on sexual orientation, gender expression, and race/ethnicity;

  - were more likely to skip school because they felt unsafe; and

  - were more likely to experience anti-LGBTQ discriminatory school policies or practices.

- Experiences with school discipline may also negatively impact educational outcomes for AAPI LGBTQ students. Those who experienced school discipline:

  - were less likely to plan on pursuing post-secondary education; and

  - had lower grade point averages (GPAs).

## *School-Based Supports and Resources for AAPI LGBTQ Students*

**GSAs**

### *Availability and Participation*

- Almost two-thirds of AAPI LGBTQ students (63.5%) reported having a GSA at their school.

- AAPI LGBTQ students who attended rural schools, schools in the South, and smaller schools, were less likely to have access to a GSA.

- The majority of AAPI LGBTQ students (57.7%) who had access to a GSA participated in the club, and 18.9% participated as an officer or a leader.

### *Utility*

- Compared to those without a GSA, AAPI LGBTQ students with a GSA:

  - were less likely to miss school due to safety concerns (22.4% vs. 36.9%);

  - were less likely to feel unsafe because of their sexual orientation (45.6% vs. 62.3%) and gender expression (38.6% vs. 45.4%); and

  - felt greater belonging to their school community.

- AAPI LGBTQ students who participated in their GSA felt more comfortable bringing up LGBTQ issues in class and were more likely to participate in a GLSEN Day of Action or in a political rally, protest, or demonstration.

**Ethnic/Cultural Clubs**

### *Availability and Participation*

- Three-quarters of AAPI LGBTQ students (74.6%) reported that their school had an ethnic or cultural club at their school.

- 12.2% of AAPI LGBTQ students with an ethnic/cultural club at school attended meetings, and 2.4% participated as an officer or leader.

**Utility**

- AAPI LGBTQ students who had an ethnic/cultural club at their school:

  - felt greater belonging to their school community; and

  - were less likely to feel unsafe due to their race/ethnicity.

- AAPI LGBTQ students who were born in another country were more likely to participate in ethnic/cultural clubs than those who were born in the U.S.

**Supportive School Personnel**

*Availability*

- The vast majority of AAPI LGBTQ students (97.2%) could identify at least one supportive staff member at school, but only about half (48.5%) could identify many supportive staff (11 or more).

- Only about half of AAPI LGBTQ students (49.2%) reported having somewhat or very supportive school administration.

- Multiracial AAPI LGBTQ students reported having fewer supportive staff and less supportive administrators than students who identified as AAPI only.

*Utility*

- AAPI LGBTQ students who had more staff who were supportive of LGBTQ students:

  - were less likely to miss school due to safety concerns;

  - were less likely to feel unsafe because of their sexual orientation, gender expression, and race/ethnicity;

  - had higher levels of self-esteem and lower levels of depression;

  - had greater feelings of connectedness to their school community;

  - had higher GPAs (3.5 vs. 3.2); and

  - were more likely to plan to pursue post-secondary education (97.6% vs. 93.8%).

**Inclusive Curriculum**

We also examined the inclusion of LGBTQ topics in school curriculum. We found that just over a quarter of AAPI LGBTQ students (27.4%) were taught positive representations of LGBTQ people, history, or events. Further, we found that AAPI LGBTQ students who had some positive LGBTQ inclusion in the curriculum at school were:

- less likely to feel unsafe because of their sexual orientation (16.8% vs. 30.2%) and gender expression (19.4% vs. 30.1%);

xix

AR_292873

- more likely to have peers be accepting of LGBTQ people at school (76.4% vs. 43.7%); and

- felt more connected to their school community.

We were unable to examine other important forms of curricular inclusion, such as positive representations of people of color and their histories and communities. Nevertheless, we did find that AAPI LGBTQ students with an LGBTQ-inclusive curriculum were less likely to feel unsafe at school because of their race or ethnicity (22.5% vs. 27.8%).

## Conclusions and Recommendations

AAPI LGBTQ students' have unique experiences with victimization, discriminatory school practices and access to supportive resources. Results from this report show that AAPI LGBTQ students experience institutional and interpersonal discrimination. The findings also demonstrate the ways that school supports and resources, such as GSAs and supportive school personnel can positively affect AAPI LGBTQ students' school experiences. Based on these findings, we recommend that school leaders, education policymakers, and other individuals who want to provide safe learning environments for AAPI LGBTQ students to:

- Support student clubs, such as GSAs and ethnic/cultural clubs. Organizations that work with GSAs and ethnic/cultural clubs should also come together to address AAPI LGBTQ students' needs related to their multiple marginalized identities, including sexual orientation, gender, and race/ethnicity.

- Provide professional development for school staff that addresses the intersections of identities and experiences of AAPI LGBTQ students.

- Increase student access to curricular resources that include diverse and positive representations of both AAPI and LGBTQ people, history, and events.

- Establish school policies and guidelines for staff in responding to anti-LGBTQ and racist behavior, and develop clear and confidential pathways for students to report victimization that they experience. Local, state, and federal education agencies should also hold schools accountable for establishing and implementing these practices and procedures.

- Work to address the inequities in funding at the local, state, and national level to increase access to institutional supports and education in general, and to provide more professional development for educators and school counselors.

Taken together, such measures can move us toward a future in which all students have the opportunity to learn and succeed in school, regardless of sexual orientation, gender identity, gender expression, race, or ethnicity.

AR_292874

# 执行摘要

AR_292875

AR_292876

## 引言

现有研究表明，亚裔美国人和太平洋岛民（AAPI）以及女同性恋、男同性恋、双性恋、跨性别者和酷儿

（LGBTQ）青少年在学校经常面临与其边缘化身份相关的独特问题。例如，AAPI 青少年还会面临模范少数族裔刻板印象带来的挑战，即所有 AAPI 学生都勤奋努力且成绩优异，这可以否决、淡化或消除 AAPI 学生经历的种族主义和歧视。然而，之前的研究表明，在小学和中学同龄人对 AAPI 学生的种族歧视是很常见的。这可能部分解释了为何在有关校园欺凌的政策讨论中经常缺少 AAPI 青少年。就 LGBTQ 青少年而言，他们往往在性倾向、性别认同和性别表达等方面面临特别的挑战。经常会有 LGBTQ 青少年遭受侵害和歧视的报道，导致教育成果较差以及心理健康状况下降。此外，他们只有很少或根本无法获得可以改善学校环境和 LGBTQ 学生体验的校内资源。虽然有越来越多针对 AAPI 青少年和 LGBTQ 青少年在学校经历的研究，但很少有研究审视这些身份的交叉性——即 AAPI LGBTQ 学生的经历。现有研究表明，全国范围内的校园环境对于有色人种 LGBTQ 青少年来说都充满恶意的，他们在那里经历着因种族、性倾向、性别身份或所有这些身份带来的侵害和歧视。本报告是一个系列报告之一，该系列报告关注不同种族/民族身份的 LGBTQ 学生，包括黑人、拉丁裔和美国原住民 LGBTQ 青少年。

在这份报告中，我们调查了 AAPI LGBTQ 学生群体关于负面校园氛围的经历，及其对于学业成绩、教育抱负和心理健康的影响：

- 因性倾向、性别表达和种族/民族等个人特征而在学校感到不安全，并因为安全原因而缺课；
- 在学校听到带有偏见的言论，包括恐同和种族主义言论；
- 在学校遭受侵害；以及
- 遭受学校的纪律处罚。

此外，我们亦调查了 AAPI LGBTQ 学生群体是否会向学校员工或其家人报告这些经历，以及这些成年人如何解决这些问题。

我们还研究了 AAPI LGBTQ 学生群体在学校能够获得支持资源的程度，并探讨了这些资源可能会带来的益处：

- GSA（同性恋-异性恋联盟或性倾向联盟）或类似团体；
- 民族/文化社团；
- 友好支持的学校教职员工；以及
- 包括 LGBTQ 相关主题的课程资源。

## 方法

本报告的数据来自 GLSEN 的《2017 年全国学校氛围调查》(NSCS)。2017 NSCS 的完整样本是 23,001 名年龄在 13 到 21 岁之间的 LGBTQ 初中和高中学生群体。在 NSCS 中，当被问及他们的种族和民族时，参与者可以选择"亚裔"和"太平洋岛民"，以及其他种族/民族类别。本报告的样本包括任何

自我认同为"亚裔或南亚裔"或是"夏威夷原住民或其他太平洋岛民"的全国样本中的 LGBTQ 学生群体（此后称为亚裔美国人和太平洋岛民或 AAPI），包括那些只认同为 AAPI，以及那些认同同时具备 AAPI 和一个或多个其他种族/民族身份之人（多种族 AAPI）。值得注意的是，太平洋岛民 LGBTQ 学生群体的样本数量太少，无法单独研究其学校经历。因此，太平洋岛民的 LGBTQ 学生与亚裔 LGBTQ 学生的数据结合在一起进行分析。

这份报告的最终样本是 1480 名 AAPI LGBTQ 学生。学生来自除怀俄明州、哥伦比亚特区、波多黎各和美属维尔京群岛以外的所有州府。五分之二（40.0%）确认为同性恋，超过一半

（57.7%）为顺性别者，超过一半（56.0%）确认具备 AAPI 以外的一个或多个种族/民族身份。绝大多数学生出生于美国，几乎所有人都将英语作为母语或母语之一。大多数学生都上高中和公立学校。

## 主要发现

### 在校安全与侵害

#### 学校安全

超过一半 AAPI LGBTQ 学生群体（51.8%）因其性倾向感到在学校不安全，还有 41.1% 因其性别表达以及 26.4% 因其种族或民族身份感到不安全。

超过四分之一的 AAPI LGBTQ 学生（27.6%）表示他们上个月因为感到不安全或不自在而至少缺课一天，近十分之一（8.4%）的学生在上个月缺课四天或以上。

#### 学校的偏见性言论

- 97.8% 的 AAPI LGBTQ 学生听到过"同性恋"被用作贬义词；近三分之二（61%）的学生经常或频繁听到此类语言。
- 92.4% 的 AAPI LGBTQ 学生听到过其他恐同言论；超过一半（51.1%）的学生经常或频繁听到此类语言。
- 89.3% 的 AAPI LGBTQ 学生听到过关于性别表达不够"男性化"的负面言论；一半（50.2%）学生经常或频繁听到此类言论。
- 81.4% 的 AAPI LGBTQ 学生听到过关于性别表达不够"女性化"的负面言论；三分之一（33.9%）的学生经常听到此类言论。
- 89.3% 的 AAPI LGBTQ 学生听到过种族主义言论；超过一半（52.7%）学生经常或频繁听到此类言论。
- 82.3% 的 AAPI LGBTQ 学生听到过关于跨性别的负面言论；超过三分之一（35.5%）的学生经常或频繁听到此类言论。

#### 在学校受到的侵害

- 许多学生因个人特征在学校经历过骚扰或攻击，包括性倾向（60.5%）、性别表达（54.7%）和种族/民族（53.8%）。
- 因性倾向而在学校遭受更高程度侵害的 AAPI LGBTQ 学生：
  - 因为感到不安全而逃学的可能性是其他人的三倍以上（57.5% 比 16.9%）；
  - 更低可能性计划高中毕业（96.1% 比 99.3%）；以及
  - 对学校的归属感较低（22% 比 60.9%），抑郁程度则更高（73.2% 比 41.2%）。
- 因种族/民族而在学校遭受更高程度侵害的 AAPI LGBTQ 学生：
  - 因为感到不安全而逃学的可能性是其他人的近两倍（35.5% 比 18.4%）；以及
  - 对学校的归属感较低，而抑郁程度则更高。
- 跨性别(Transgender)和非性别常规者（Gender non-confroming, GNC）AAPI 生会因性倾向和性别表达而比 LGBQ 顺性别 AAPI 学生遭受更大程度的侵害。

AR_292878

- 认同具备多种族/民族身份的 AAPI LGBTQ 学生会因性倾向和性别表达而比仅确认为 AAPI 的 LGBTQ 学生遭受更大程度的侵害。
- 五分之二的 AAPI LGBTQ 学生（40.0%）会同时因其性倾向和种族/民族这两种身份而受到骚扰或攻击。与那些只经历一种或并未经历侵害的学生相比，同时经历这两种侵害的 AAPI LGBTQ 学生：

  - 对于学校的归属感最低；

  - 抑郁程度最高；以及

  - 最有可能因为感到不安全而逃学。

### 报告在学校遭受的骚扰和攻击，以及干预

大多数过去一年遭受过骚扰或攻击的 AAPI LGBTQ 学生（56.5%）从未向教职员工报告过侵害事件，最常见的原因是他们认为教职员工不会采取任何行动（67.4%）。

- 不到一半（42.3%）的学生报告教职员工会在学生报告自己受到侵害时做出有效回应。
- 不到一半（43.5%）的 AAPI LGBTQ 学生告诉了家人他们在学校遭受的侵害。
- 在向家庭成员报告自己遭受侵害的 AAPI LGBTQ 学生当中，有一半（50.5%）表示家庭成员与老师、校长或其他学校教职员工进行了交谈。

## 学校措施

### 学校纪律惩罚经历

- 近三分之一的 AAPI LGBTQ 学生（30.7%）经历过某种形式的学校纪律惩罚，如留校、停课或开除。
- 多种族 AAPI LGBTQ 学生比那些仅具备 AAPI 身份的学生经历更高程度的惩罚。

美国学校中的亚裔美国人和太平洋岛民青少年 LGBTQ 群体

- AAPI LGBTQ 学生的负面学校经历与学校纪律惩罚经历有关。经历学校纪律惩罚的学生：

  - 曾因性倾向、性别表达和种族/民族而经历更高比例的侵害；

  - 更有可能因感到不安全而逃课；以及

  - 更有可能经历歧视 LGBTQ 学生的学校政策或措施。

- 学校惩罚经历还可能会对 AAPI LGBTQ 学生的教育结果产生负面影响。经历学校惩罚的学生：

  - 更低可能性继续接受中学后教育；以及

  - 平均绩点（GPA）更低。

## AAPI LGBTQ 学生在学校获得的支持与资源

### GSA

### 可及性与参与

- 近三分之二的 AAPI LGBTQ 学生（63.5%）自己学校有 GSA。
- 在乡村学校、南方学校和规模较小学校就读的 AAPI LGBTQ 学生能接触到 GSA 的可能性较小。

- 大多数能接触到 GSA 的 AAPI LGBTQ 学生（57.7%）参与到团体当中，其中有 18.9% 以干事或领导者身份参与其中。

*效用*

- 与无法接触到 GSA 的学生相比，能够接触到 GSA 的 AAPI LGBTQ 学生：

  - 因安全顾虑而缺课的可能性较低（22.4% 比 36.9%）；

  - 因性倾向（45.6% 比 62.3%）和性别表达（38.6% 比 45.4%）而感到不安全的可能性较低；以及

  - 对于学校社区的归属感更强。

- 参与 GSA 的 AAPI LGBTQ 学生更愿意在课堂上提出 LGBTQ 议题，也更愿意参加 GLSEN 行动日或政治集会、抗议或示威活动。

### 民族/文化社团

*可及性与参与*

- 四分之三的 AAPI LGBTQ 学生（74.6%）报告他们的学校设有民族或文化社团。
- 学校设有民族/文化社团的 AAPI LGBTQ 学生中有 12.2% 会参加会议，有 2.4% 会以干事或领导者身份参加。

*效用*

- 学校设有民族/文化社团的 AAPI LGBTQ 学生：

  - 对于学校社区的归属感更强；以及

  - 因种族/民族而感到不安全的可能性较低。

- 出生于其他国家的 AAPI LGBTQI 学生比出生于美国的学生参加民族/文化社团的可能性更高。

### 学校支持人员

*可及性*

- 绝大多数 AAPI LGBTQ 学生（97.2%）能确认学校有至少一名支持Ta们的教职员工，但只有大约一半（48.5%）能够确认众多支持性教职员工(11 名或以上)。
- 只有大约一半的 AAPI LGBTQ 学生（49.2%）表示学校管理能够提供一些或较多支持。
- 多种族 AAPI LGBTQ 学生表示与仅具备 AAPI 身份的学生相比，支持他们的教职员工和管理人员更少。

*效用*

- 拥有更多支持 LGBTQ 学生群体的教职员工的 AAPI LGBTQ 学生：

  - 因安全顾虑而缺课的可能性较低；

  - 因性倾向、性别表达和种族/民族而感到不安全的可能性较低；

  - 自尊心更强，抑郁程度更低；

  - 与其学校社区有更强的情感联结；

- 平均绩点（GPA）更高（3.5 比 3.2）；以及

- 计划继续接受中学后教育的可能性更高（97.6% 对 93.8%）。

**包容性课程**

我们还研究了学校课程对于 LGBTQ 话题的包容性。我们发现，仅有略超过四分之一的 AAPI LGBTQ 学生（27.4%）获得了关于 LGBTQ 人群、历史或事件的正面教育。此外，我们发现学校课程包含 LGBTQ 正面内容的 AAPI LGBTQ 学生：

• 因性倾向（16.8% 比 30.2%）和性别表达（19.4% 比 30.1%）而感到不安全的可能性较低；以及

• 在学校有同伴能够接受 LGBTQ 人群的可能性较高（76.4% 比 43.7%）；以及

• 感觉与学校社区的联系更加紧密。

我们无法研究其他重要的课程包容形式，比如对有色人种及其历史和群体的正面表述。虽然如此，我们确实发现有 LGBTQ 包容性课程的 AAPI LGBTQ 学生因其种族或民族而在学校感到不安全的可能性较低（22.5% 对 27.8%）。

## 结论与建议

AAPI LGBTQ 学生群体面临与受侵害、歧视性学校措施和获得支持性资源相关的独特经历。本报告的结果显示，AAPI LGBTQ 学生群体经历了制度上和人际上的歧视。研究结果也证明了如 GSA 和支持性学校人员等学校支持和资源，能够对 AAPI LGBTQ 学生的学校经历产生积极影响。基于这些结果，我们建议学校领导、教育决策者和其他想要为 AAPI LGBTQ 学生群体提供安全学习环境的个人：

• 支持如 GSA 和民族/文化社团等学生社团。与 GSA 和民族/文化社团合作的组织也应当一起来应对 AAPI LGBTQ 学生群体关于自身多重边缘化身份（包括性倾向、性别和种族/民族）的需求。

• 就 AAPI LGBTQ 学生问题为学校教职员工提供职业培训。

• 增加学生接触课程资源的机会，包括对于 AAPI 和 LGBTQ 人群、历史和事件的多样化与积极表述。

• 针对反 LGBTQ 和种族主义行为制定学校政策和指导方针，并为学生建立明确保密的渠道，方便他们报告自己所遭受的侵害。当地、州府和联邦教育机构也应当督促学校负责建立和实施这些措施。

• 努力解决当地、州府和国家层面资金不平等的问题，增加获得机构支持和教育的机会，为教育工作者和学校辅导员提供更多专业培训机会。

综合起来，这些措施可以推动我们走向更美好的未来，届时，所有学生，无论其性倾向、性别身份、性别表达、种族或民族为何，都将有机会在学校求学并取得成功。

**xxvii**

AR_292881

AR_292882

# 개요서

AR_292883

AR_292884

## 서론

기존의 연구에 따르면, 레즈비언, 게이, 양성, 성전환 및 퀴어 (LGBTQ, 성 소수자)뿐만 아니라, 아시아계 미국인과 태평양 섬 주민 (AAPI) 젊은이들은 학교에서 소외된 정체성에 관련된 독특한 문제를 종종 직면한다. 이를 테면, AAPI 젊은이들은 또한 열심히 공부하고 학교에서 성적이 좋다는 전형적인 소수 고정관념의 도전을 받는데, 이는 AAPI 학생들이 경험하는 인종 차별주의와 차별을 부정하고 과소 평가하거나 지워버릴 수가 있다. 하지만 이전의 연구에 따르면, 초등 및 중등 AAPI 학생들에 대한 또래들의 인종 차별 발생 건수는 흔하다고 한다. 부분적으로는 바로 그러한

이유 때문에 학교에서의 왕따에 대한 정책 토론에서 AAPI 젊은이들이 종종 보이지 않는다. LGBTQ 젊은이들에 관해서 말하자면, 그들은 자주 성적 성향, 성 정체성 및 성 표현에 관련된 독특한 도전에 직면한다. LGBTQ 젊은이들은 종종 피해자가 되고 차별을 경험하면서 초라한 교육적 결과를 낳고 심리적 행복이 줄어든다. 더구나, 그들은 학교 분위기나 학생들의 경험을 개선해줄지도 모르는 학교 내 자원에 대한 접근이 제한되거나 또는 전무하다. 학교 내 AAPI 젊은이와 LGBTQ 젊은이들의 경험에 대한 연구가 많이 진행되고 있지만, 이 두 정체성의 교차점, 즉 AAPI LGBTQ 학생들의 경험을 조사하는 연구는

거의 없었다. 기존의 연구에 따르면, 전국의 학교는 LGBTQ 유색 젊은이들에게 적대적인 환경이고, 그 환경에서 그들은 인종, 성적 성향, 성 정체성 혹은 그러한 모든 정체성에 근거하여 괴롭힘과 차별을 경험한다. 이 보고서는 흑인, 라틴계 및 아메리카 인디언 LGBTQ 젊은이들을 포함하여, 여러 인종/민족 정체성을 가진 LGBTQ 학생들에 집중하는 일련의 보고서 중의 하나이다.

이 보고서에서는 부정적인 학교 분위기 지표와 그 지표가 학교 성적, 교육 열망 및 심리적 복지에 미치는 영향에 관하여 AAPI LGBTQ 학생들의 경험을 조사한다:

- 개인적 특성, 이를테면 성적 성향, 성 표현 및 인종/민족 등 때문에 학교에서 불안을 느끼고, 안전 이유 때문에 학교를 빠짐;
- 학교에서 동성애를 혐오하고 인종차별주의적인 발언 등의 편향된 말을 들음;
- 학교에서 괴롭힘을 당하는 경험을 함; 그리고
- 학교 훈육 방법을 경험함.

게다가, AAPI LGBTQ 학생들이 자신의 경험을 학교 관리나 가족에게 보고하는지 그리고 어떻게 이런 어른들이 그 문제에 접근을 하는지 조사한다.

또한 AAPI LGBTQ 학생들이 학교에서 지원 자원에 대한 접근을 할 수 있는지 이런 자원의 가능한 혜택을 알아보는 정도를 조사할 것이다:

- GSA (동성애-일반 연합 혹은 성 및 성생활 연합) 혹은 비슷한 클럽;
- 민족/문화 클럽;
- 지원하는 학교 직원; 그리고
- LGBTQ 관련 토픽을 포함하는 교과과정 자원.

## 방법

이 보고서의 데이터는 GLSEN의 2017년 전국 학교 분위기 설문조사 (NSCS)에서 나왔다. 2017 NSCS의 전체 샘플은23,001명의13-21세 LGBTQ 중, 고등 학교 학생이다. NSCS에서 인종과 민족에 대한 질문을 받았을 때, 참가자들은 여러 인종/민족 범주 중에서 "아시아인" 과 "태평양 섬 주민"을 선택하는 옵션을 갖고 있었다. 이 보고서의 샘플에 속한 사람들은

전국 샘플 중에서 "아시아인 혹은 남 아시아인" 또는 "하와이 원주민 혹은 다른 태평양 섬 주민" (이하 아시아계 미국인 혹은 태평양 섬 주민, 즉 AAPI로 지칭함)으로 자신을 밝히는 LGBTQ 학생들인데, 여기에는 자신을 AAPI라고 밝힌 사람들, 자신을 AAPI라고 밝히고 하나 혹은 그 이상의 추가적인 인종/민족적 정체성 (다 인종 AAPI)을 밝힌 사람들이 포함된다. 태평양 섬 주민 LGBTQ 학생의 샘플 크기는 너무 적어서 학교 경험만을 조사할 수 없었음을 주목하는 것이 중요하다. 그러므로, 자신을 태평양 섬 주민이라고 밝힌 LGBTQ 학생들은 아시아인이라고 밝힌 학생들과 합쳐졌다.

이 보고서의 최종 샘플은 총 1,480명의 AAPI LGBTQ 학생들이었다. 학생들은 와이오밍, 콜롬비아 특별구, 푸에르토리코 및 미국 버진 아일랜드를 제외한 모든 주에서 온 학생들이다. 2/5 (40.0%)가 동성애자, 레즈비언이라고 밝혔고, 반 이상 (57.7%)이 시스젠더라고 밝혔고, 반 이상 (56.0%)이 AAPI 외에도 하나 혹은 그 이상의 인종/민족적 정체성이 있음을 밝혔다. 대부분의 학생은 고향은

미국이고, 거의 모두 영어가 모국어이거나 제1 언어 중의 하나였다. 대부분의 학생은 고등학교, 공립학교를 다녔다.

## 주요 결과

### 학교에서의 안전 및 괴롭힘

#### 학교안전
- 반 이상의 AAPI LGBTQ 학생이불안을 느낀 경우 중에서, 51.8%가 성적 성향 때문, 41.1%가 성 표현 그리고 26.4%이 인종 혹은 민족 때문이었다.
- 무려 ¼의 AAPI LGBTQ 학생 (27.6%)이 불안 혹은 불편하다고 느꼈기 때문에 지난 달 학교를 하루 안 나갔다고 보고했고, 거의 1/10 (8.4%)이 지난 달에 4일 이상을 빠졌다고 했다.

#### 학교에서의 편향된 발언
- 97.8%의 AAPI LGBTQ 학생이 "동성애자"라는 말이 부정적으로 사용되는 것을 들었고; 거의 2/3 (61%)가 종종 혹은 자주 이런 유형의 표현을 들었다.
- 92.4%의 AAPI LGBTQ 학생이 다른 동성애 혐오 발언을 들었고; 무려 반 (51.1%) 이상이 이런 유형의 표현을 종종 혹은 자주 들었다.
- 89.3%의 AAPI LGBTQ 학생이 "남자답게" 행동하지 못하는 것에 대하여 부정적인 성 표현 용어를 사용하였고; 반 (50.2%)이 그런 용어를 종종 혹은 자주 들었다.
- 81.4%의 AAPI LGBTQ 학생이 "여자답게" 행동하지못하는 것에 대한 표현을 들었고; 1/3 (33.9%)이 이런 표현을 종종 혹은 자주 들었다.
- 89.3%의AAPI LGBTQ 학생이 인종 차별 주의적인 표현을 들었고; 반 이상 (52.7%)이 그런 표현을 종종 혹은 자주 들었다.
- 82.3%의AAPI LGBTQ 학생이 성 전환한 사람들에 대한 부정적인 표현을 들었고; 무려 1/3 (35.5%)이 이런 표현을 종종 혹은 자주 들었다.

#### 학교에서의 괴롭힘
- 많은 학생이 개인적 특성에 근거한 괴롭힘 혹은 공격적인 행동을 학교에서 경험했는데, 개인적 특성에는 성적 성향 (60.5%), 성 표현 (54.7%) 및 인종/민족 (53.8%)이 포함된다.
- 학교에서 성적 성향에 근거한 높은 수준의 괴롭힘을 경험한AAPI LGBTQ 학생은,

- 불안하다고 느끼기 때문에 학교를 빠질 가능성이 3배 이상 높았고 (57.5% 대 16.9%),

- 고등학교를 졸업할 가능성이 다소 낮았고 (96.1% 대 99.3%), 그리고

- 학교 소속감이 더 낮은(22% 대 60.9%) 경험을 하고, 더 큰 수준의 우울증 (73.2% 대 41.2%)을 경험하였다.

• 인종/민족 때문에 학교에서 높은 수준의 괴롭힘을 경험한 AAPI LGBTQ 학생은

- 불안하다고 느끼기 때문에 학교를 빠질 가능성이 거의 두 배에 달했고 (35.5% 대 18.4%), 그리고

- 학교 소속감 수준이 더 낮고 우울증 수준이 더 높았다.

• 성 전환한 사람과 생물학적 성에 불응하는 (트랜스//GNC) AAPI 학생은 성적 성향과 성 표현에 근거하여 LGBTQ 시스젠더 AAPI 학생들보다 더 큰 수준의 괴롭힘을 경험하였다.

• 자신이 다 인종/민족 정체성을 갖고 있다고 밝힌 AAPI LGBTQ 학생은 성적 성향과 성 표현에 근거하여 AAPI라고만 밝힌 LGBTQ 학생보다 더 큰 수준의 괴롭힘을 경험하였다.

• 2/5의 AAPI LGBTQ 학생 (40.0%)이 성적 성향과 인종/민족 때문에 학교에서 괴롭힘이나 공격적인 행동을 경험하였다. 하나의 괴롭힘이나 괴롭힘을 경험하지 않은 학생과 비교했을 때, 두 가지의 괴롭힘을 모두 경험한 AAPI LGBTQ 학생은

- 가장 낮은 수준의 학교 소속감을 경험했고,

- 가장 높은 수준의 우울증을 가졌고,

- 불안하게 느껴서 학교를 빠질 가능성이 가장 높았다.

## 학교에서의 괴롭힘과 공격적인 행동의 보고 및 개입

괴롭힘이나 공격적인 행동을 경험한 과반수의 AAPI LGBTQ 학생 (56.5%)이 그 사실을 직원에게 알리지 않았는데, 대부분의 이유는 직원이 그것에 대하여 뭘 할 수 있다고 생각하지 않았기 때문이다.

• 반 이하 (42.3%)가 괴롭힘을 보고했을 때 직원이 효과적으로 대응했다고 보고했다.

• 반 이하 (43.5%)의 AAPI LGBTQ 학생이가 학교에서 직면한 괴롭힘에 대하여 가족 구성원에게 말했다.

• 가족에게 괴롭힘 경험을 보고한 AAPI LGBTQ 학생 중에서 반 (50.5%)이 가족 구성원이 교사, 교장 혹은 학교 직원에게 이야기했다고 말했다.

## 학교의 관행

### 학교 규율에 대한 경험

• AAPI LGBTQ 학생의 거의 1/3 (30.7%)이 어떤 형태의 학교 훈육, 이를테면, 방과 후 남기, 정학 혹은 추방을 경험하였다.

• 다인종 AAPI LGBTQ 학생은 AAPI라고만 밝힌 학생들보다 더 큰 훈육을 경험하였다.

• 부정적인 학교 경험은 AAPI LGBTQ 학생의 학교 훈육 경험과 관련이 있었다. 학교 훈육을 경험한 학생은

- 성적 성향, 성 표현 및 인종/민족에 근거한 괴롭힘을 경험한 비율이 더 높았고

- 안전하지 않다고 느껴서 학교를 빠질 가능성이 더 높았고

- LGBTQ에 반하는 차별적인 학교의 방침이나 관행을 경험할 가능성이 더 높았다.

xxxiii

- 학교 훈육 경험은 또한 AAPI LGBTQ 학생의 교육적 결과에 부정적으로 영향을 미칠 수가 있다 학교 훈육을 경험한 학생은

  - 고등학교 이후의 교육에 대한 계획을 세울 가능성이 덜하고

  - 평점 (GPA)도 낮았다.

---

## *AAPI LGBTQ 학생들을 위한 학교에 근거한 지원과 자원*

---

**GSA**

*가용성 및 참여*
- 거의 2/3의 AAPI LGBTQ 학생 (63.5%)이 학교에서 GSA가 있다고 보고했다.
- 지방 학교, 남부 학교, 더 작은 학교 등을 다녔던 AAPI LGBTQ 학생은 GSA를 접할 가능성이 더 적었다.
- GSA을 접할 수 있었던 대부분의 AAPI LGBTQ 학생 (57.7%)이 그 클럽에 참여하였고 18.9%가 간부 혹은 지도자로 참여하였다.

*유용성*
- GSA 가 없는 학생과 비교하여 GSA가 있는 AAPI LGBTQ 학생은

  - 안전 걱정 때문에 학교를 빠질 가능성이 더 적었고 (22.4% 대 36.9%),

  - 자신의 성적 성향 (45.6% 대 62.3%)과 성 표현 (38.6% 대 45.4%) 때문에 불안하다고 느낄 가능성이 더 적었고,

  - 학교 공동체에 대한 소속감이 더 크다고 느꼈다.
- GSA에 참여한 AAPI LGBTQ 학생은 수업시간에 LGBTQ 문제를 꺼내는데 더 편안함을 느꼈고 GLSEN 행동의 날, 정치 집회, 항의 혹은 시위에 참여할 가능성이 더 높았다.

**민족/문화 클럽**

*가용성 및 참여*
- ¾의 AAPI LGBTQ 학생 (74.6%)이 자신의 학교가 민족적 혹은 문화적 클럽을 갖고 있다고 보고했다.
- 학교에 민족/문화 클럽이 있는 AAPI LGBTQ 학생의 12.2%가 회의에 참석하고 2.4%가 간부 혹은 지도자로 참여했다.

*유용성*
- 학교에 민족/문화 클럽이 있는 AAPI LGBTQ 학생은

  - 학교 공동체에 대한 소속감이 더 크다고 느꼈고

  - 인종/민족 때문에 불안하다고 느낄 가능성이 덜 했다.
- 다른 나라에서 태어난 AAPI LGBTQ 학생은 미국에서 태어난 학생보다 민족/문화 클럽에 참여할 가능성이 더 컸다.

**지원하는 학교 직원**

*가용성*

- 압도적인 다수의 AAPI LGBTQ 학생 (97.2%)이 학교에서 적어도 하나 이상의 도움을 주는 직원을 알 수 있었지만, 약 반 (48.5%)만이 그런 직원을 많이 (11명 이상) 확인할 수 있었다.

- AAPI LGBTQ 학생의 약 반 (49.2%)만이 학교 행정이 다소 혹은 매우 도움을 준다고 보고했다.

- 다인종 AAPI LGBTQ 학생은 AAPI라고만 밝힌 학생보다 도움을 주는 직원 수가 적었고 학교 행정관이 도움을 덜 준다고 보고했다.

*유용성*

- LGBTQ 학생을 도와주는 더 많은 직원을 가진 AAPI LGBTQ 학생은

  - 안전 문제로 학교를 빠질 가능성이 적었고,

  - 성적 성향, 성 표현 및 인종/민족 때문에 불안하다고 느낄 가능성이 더 적었고,

  - 더 높은 수준의 자존감과 낮은 수준의 우울증을 가졌고,

  - 학교 공동체와의 연결 느낌이 더 컸고,

  - 평점도 높았고 (3.5 대 3.2),

  - 고등학교 이후의 교육을 계획할 가능성이 더 높았다 (97.6% 대 93.8%).

**포괄적인 교과과정**

우리는 또한 학교 교과과정에서 LGBTQ 토픽을 포함하는 지의 여부를 조사하였다. 무려 ¼의 AAPI LGBTQ 학생 (27.4%)이 LGBTQ, 역사 및 행사에 대한 긍정적인 표상을 배웠다는 것을 알았다. 게다가, 교과과정에서 LGBTQ를 긍정적으로 포괄하는 학교의 AAPI LGBTQ 학생은

- 성적 성향 때문에 (16.8% 대 30.2%) 그리고 성 표현 때문에(19.4% 대 30.1%) 불안을 느낄 가능성이 더 적었고,

- 학교에서 LGBTQ를 수용하는 또래를 가질 가능성이 더 컸고,

- 자신의 학교 공동체에 대한 소속감이 더 컸다.

다른 포괄적인 교과과정, 이를테면, 유색 인종과 역사 및 지역 공동체에 대한 긍정적인 표상 같은 다른 중요한 형태를 조사할 수 없었다. 그럼에도 불구하고, LGBTQ를 포괄하는 교과과정이 있는 학교의 AAPI LGBTQ 학생은 자신의 인종 및 민족 때문에 불안을 느낄 가능성이 덜 했다는 것을 발견했다 (22.5% 대 27.8%).

## 결론 및 권장 사항

AAPI LGBTQ 학생은 괴롭힘, 학교의 차별적인 관행 및 지원 자원에 대한 차별적인 접근 같은 독특한 경험을 갖고 있다. 이 보고서의 결과에 따르면, AAPI LGBTQ 학생은 제도적이고 대인관계적인 차별을 경험한다고 한다. 이 결과는 또한 학교 지원과 자원, 이를테면 GSA와 학교 지원 직원 등이 AAPI LGBTQ 학생의 학교 경험에 긍정적인 영향을 줄 수 있는 방법을 보여준다. 이런 결과에 근거하여, 우리는 학교 지도자, 교육 정책 입안자 및 AAPI LGBTQ 학생에 대한 안전한 학습 환경을 제공하고 싶어하는 다른 사람들이

- GSA와 민족/문화 클럽을 지원할 것을 권장한다. GSA와 민족/문화 클럽과 협력하는 조직은, 성적 성향, 성 및 인종/민족 등을 포함하여 다중의 소외된 정체성과 관련된 AAPI LGBTQ 학생의 요구사항을 함께 다루어야 한다.

- AAPI LGBTQ 학생의 문제에 대하여 학교 직원의 전문적 발달을 제공한다.

- AAPI LGBTQ, 역사 및 행사를 다양하고 긍정적으로 대표해주는 교과과정 자원에 대한 학생의 접근을 높인다.

- 반 LGBTQ 행동 및 인종 차별 행동에 대한 반응으로 직원에 대한 학교 방침과 가이드라인을 확립하고 학생들이 경험하는 괴롭힘을 보고할 수 있는 분명하고도 비밀을 보장하는 경로를 개발한다.

- 지역, 주 및 연방 교육 기관은 또한 학교가 이러한 관행과 절차를 확립하고 수행하도록 해야 한다.

- 지역, 주 및 연방 수준에서의 자금 지원 불평등 문제를 다루어서 기관의 지원 및 교육 일반에 대한 접근을 더 가능하게 하고, 교육자와 학교 상담사에게 더 많은 전문적인 개발을 제공하도록 힘쓴다.

종합하면, 그러한 조치는 성적 성향, 성 정체성, 성 표현, 인종 및 민족에 관계없이 모든 학생이 학교에서 배우고 성공할 기회를 갖는 그런 미래로 우리를 이끌어 줄 수 있다.

# Tóm tắt dự án

AR_292891

AR_292892

## Giới thiệu

Nghiên cứu hiện nay đã cho thấy rằng cả các bạn trẻ người Mỹ gốc Á và Quần đảo Thái Bình Dương (AAPI) cũng như các bạn trẻ đồng tính nữ, đồng tính nam, lưỡng tính, chuyển giới và lệch lạc giới tính (LGBTQ) thường phải đối mặt với các vấn đề của riêng mình tại trường liên quan đến các bản sắc bên lề của mình. Ví dụ, các bạn trẻ AAPI cũng bị thách thức với định kiến về nhóm thiểu số gương mẫu, bị cho rằng tất cả học sinh AAPI đều chăm chỉ và xuất sắc trong học tập, có thể từ chối, xem thường hoặc xóa bỏ hành vi phân biệt chủng tộc và phân biệt đối xử mà học sinh AAPI gặp phải. Tuy nhiên, các nghiên cứu trước đây đã cho thấy mức độ phổ biến của hành vi phân biệt chủng tộc từ các bạn học đối với các học sinh AAPI tiểu học và trung học. Điều này có thể là một phần lý do

vì sao các bạn trẻ AAPI thường không có mặt trong các buổi thảo luận về chính sách đối với nạn bắt nạt học đường. Về các bạn trẻ LGBTQ, các bạn thường phải đối mặt với những thách thức của riêng mình liên quan đến xu hướng tính dục, bản dạng giới tính và thể hiện giới. Các bạn trẻ LGBTQ hay báo việc mình bị ngược đãi và bị phân biệt đối xử, dẫn đến kết quả học tập kém hơn và sức khỏe tinh thần bị sa sút. Ngoài ra, các bạn cũng bị hạn chế hay không được tiếp cận các nguồn tài nguyên học tập tại trường để có thể cải thiện môi trường học đường và những trải nghiệm của học sinh. Mặc dù đã có một tổ chức đang phát triển nghiên cứu về các trải nghiệm của các bạn trẻ AAPI và các bạn trẻ LGBTQ tại các trường, nhưng vẫn có rất ít nghiên cứu xem xét sự giao thoa của những bản dạng này - những trải nghiệm của các bạn học sinh LGBTQ AAPI. Các nghiên cứu hiện nay cho thấy các trường học trên toàn quốc là môi trường không thân thiện đối với các bạn trẻ LGBTQ da màu, là nơi các bạn bị ngược đãi hay bị phân biệt đối xử về chủng tộc, xu hướng tính dục, bản dạng giới tính hoặc tất cả các bản sắc này. Báo cáo này là một trong chuỗi các báo cáo tập trung vào các học sinh LGBTQ thuộc chủng tộc/ dân tộc khác nhau, bao gồm các bạn trẻ LGBTQ da đen, Latinh và người Mỹ bản địa.

Trong báo cáo này, chúng tôi xem xét các trải nghiệm của các bạn học sinh LGBTQ AAPI khi xét về yếu tố về môi trường học đường tiêu cực và tác động của chúng đến thành tích học tập, nguyện vọng học tập và sức khỏe tâm lý:

- Cảm thấy không an toàn ở trường vì các đặc điểm cá nhân, ví dụ như xu hướng tính dục, thể hiện giới tính và chủng tộc/ dân tộc, và nghỉ học vì lý do an toàn;

- Nghe nhận xét thiên vị tại trường học, bao gồm nhận xét đồng tính và phân biệt chủng tộc;

- Bị ngược đãi tại trường; và

- Bị kỷ luật;

Ngoài ra, chúng tôi có xét đến việc các học sinh LGBTQ AAPI có báo cáo những trải nghiệm này cho các cán bộ nhà trường hoặc gia đình của mình hay không và cách thức những người trưởng thành này giải quyết vấn đề.

Chúng tôi cũng xét đến mức độ học sinh LGBTQ AAPI được truy cập vào các tài nguyên hỗ trợ học tập tại trường, và khám phá những lợi ích có thể có được từ các tài nguyên này:

- Các câu lạc bộ GSAs (Liên minh Người đồng tính nam – Người dị tính hay Liên minh Giới tính và Xu hướng tình dục) hay các câu lạc bộ tương tự;

- Các câu lạc bộ dân tộc / văn hóa;

- Nhân viên nhà trường hỗ trợ; và

- Nguồn tài nguyên học tập ngoại khóa bao gồm các chủ đề liên quan đến LGBTQ.

AR_292893

## Các phương pháp

Dữ liệu cho báo cáo này được lấy từ bài Khảo sát Môi trường Học đường Toàn quốc 2017 (NSCS) của GLSEN. Toàn bộ mẫu đối tượng khảo sát cho 2017 NSCS là 23.001 học sinh LGBTQ tại trường trung học cơ sở và trung học phổ thông từ 13 đến 21 tuổi. Trong NSCS, khi được hỏi về chủng tộc và dân tộc của mình, những người tham gia khảo sát có quyền tùy chọn "Người Châu Á", "Người Quần đảo Thái Bình Dương", trong số các chủng tộc và dân tộc khác Mẫu đối tượng khảo sát của báo cáo này bao gồm bất kỳ

học sinh LGBTQ trong mẫu đối tượng toàn quốc, những người đã xác định là "Người Châu Á hoặc Nam Á", hoặc "Người Hawaii bản xứ hay Người Quần đảo Thái Bình Dương khác" (nay gọi là Người Mỹ gốc Á và Quần đảo Thái Bình Dương hoặc AAPI), bao gồm cả những người chỉ xác định là người AAPI và những người xác định như người AAPI và một hoặc nhiều chủng tộc/ dân tộc khác (AAPI đa chủng tộc). Điều quan trọng cần lưu ý là kích thước mẫu đối tượng học sinh LGBTQ Quần đảo Thái Bình Dương quá nhỏ đến nỗi không thể xem xét riêng những trải nghiệm của các bạn tại trường. Do đó, các bạn học sinh LGBTQ, những người xác định là Người Quần đảo Thái Bình Dương đã được kết hợp với những người xác định là người châu Á.

Mẫu đối tượng cuối cùng của báo cáo này có tổng cộng 1.480 học sinh LGBTQ AAPI. Học sinh đến từ tất cả các tiểu bang, trừ bang Utah, cũng như Quận Columbia, Puerto Rico và Quần đảo Virgin thuộc Hoa Kỳ. Hai phần năm (40,0%) đã xác định là đồng tính nam hoặc đồng tính nữ, hơn một nửa (57,7%) là người có bản dạng giới tính đúng với giới tính sinh học và hơn một nửa (56,0%) đã xác định thuộc một hoặc nhiều chủng tộc/ dân tộc ngoài AAPI. Phần lớn các học sinh được sinh tại

Hoa Kỳ và hầu hết tất cả học sinh đều đã học tiếng Anh là ngôn ngữ đầu tiên của mình, hoặc là một trong những ngôn ngữ đầu tiên của mình. Phần lớn là các học sinh học trường trung học và công lập.

## Các nhận định chính

### *Sự an toàn và ngược đãi tại trường*

#### Sự an toàn tại trường

- Hơn một nửa số học sinh LGBTQ AAPI (51,8%) cảm thấy không an toàn ở trường vì xu hướng tính dục của mình, 41,1% vì thể hiện giới tính của mình và 26,4% vì chủng tộc hoặc dân tộc của mình.
- Hơn một phần tư học sinh LGBTQ AAPI (27,6%) đã được báo là nghỉ học ít nhất một ngày trong tháng trước vì cảm thấy không an toàn hoặc không thoải mái, và gần một phần mười (8,4%) nghỉ học từ bốn ngày trở lên trong tháng vừa qua.

#### Những nhận xét thiên vị ở trường

- 97,8% học sinh LGBTQ AAPI đã nghe nói từ "đồng tính nam" một cách tiêu cực; gần hai phần ba (61%) hay hoặc thường xuyên nghe loại ngôn từ này.
- 92,4% học sinh LGBTQ AAPI nghe những nhận xét đồng tính khác; hơn một nửa (51,1%) hay hoặc thường xuyên nghe loại ngôn từ này.
- 89,3% học sinh LGBTQ AAPI đã nghe nhận xét tiêu cực về thể hiện giới tính đối với việc chưa ứng xử đủ mức "nam tính"; một nửa (50,2%) hay hoặc thường xuyên nghe những nhận xét này.

- 81,4% học sinh LGBTQ AAPI đã nghe nhận xét tiêu cực đối với việc chưa ứng xử đủ mức "nữ tính"; một phần ba (33,9%) hay hoặc thường xuyên nghe những nhận xét này.

- 89,3% học sinh LGBTQ AAPI đã nghe những nhận xét phân biệt chủng tộc; chỉ hơn một nửa (52,7%) hay hoặc thường xuyên nghe những nhận xét này.

- 82,3% học sinh LGBTQ AAPI đã nghe những nhận xét tiêu cực về người chuyển giới; hơn một phần ba (35,5%) hay hoặc thường xuyên nghe những nhận xét này.

**Việc ngược đãi tại trường**

- Nhiều học sinh đã bị quấy rối hoặc bạo hành tại trường do các đặc điểm cá nhân, bao gồm xu hướng tính dục (60,5%), thể hiện giới tính (54,7%) và chủng tộc/ dân tộc (53,8%).

- Học sinh LGBTQ AAPI bị ngược đãi nhiều hơn tại trường do xu hướng tình dục:

  - có nhiều khả năng bỏ học gấp ba lần vì cảm thấy không an toàn (57,5% so với 16,9%);

  - ít có khả năng dự định tốt nghiệp trung học (96,1% so với 99,3%); và

  - cảm nhận là thành viên trường được tôn trọng ở mức độ thấp (22% so với 60,9%) và mức độ trầm cảm cao hơn (73,2% so với 41,2%).

- Học sinh LGBTQ AAPI bị ngược đãi nhiều hơn tại trường do chủng tộc/ dân tộc:

  - gần như có gấp đôi khả năng bỏ học vì cảm thấy không an toàn (35,5% so với 18,4%); và

  - cảm nhận là thành viên trường được tôn trọng ở mức độ thấp và mức độ trầm cảm cao hơn.

- So với các bạn học sinh AAPI có giới tính phù hợp với giới tính sinh học LGBQ, các bạn học sinh AAPI là người chuyển giới và người không theo chuẩn giới nào (trans / GNC) bị ngược đãi nhiều hơn tại trường do xu hướng tình dục và thể hiện giới tính.

- Các bạn học sinh LGBTQ AAPI , những người xác định thuộc nhiều chủng tộc/ dân tộc bị ngược đãi nhiều hơn do xu hướng tính dục và thể hiện giới tính so với các bạn học sinh LGBTQ chỉ xác định là AAPI.

- Hai phần năm học sinh LGBTQ AAPI (40,0%) bị quấy rối hoặc bạo hành ở trường do cả xu hướng tính dục và chủng tộc / dân tộc của mình. So với những bạn từng hay chưa từng bị ngược đãi, các bạn học sinh LGBTQ AAPI đã bị ngược đãi dưới hai hình thức sau:

  - cảm nhận là thành viên trường được tôn trọng ở mức độ thấp;

  - có mức độ trầm cảm nhiều hơn; và

  - gần như có gấp đôi khả năng bỏ học vì cảm thấy không an toàn;

**Báo cáo quấy rối và bạo hành ở trường, và Sự can thiệp**

Phần lớn các bạn học sinh LGBTQ AAPI (56,5%) từng bị quấy rối hoặc bạo hành trong năm qua chưa bao giờ báo cho cán bộ nhà trường việc mình bị ngược đãi, chủ yếu vì các bạn không cho rằng cán bộ nhà trường sẽ làm điều gì đó để giải quyết vấn đề (67,4%).

  - Chưa đến một nửa (42,3%) đã báo rằng cán bộ nhà trường đã giải quyết một cách hiệu quả khi các bạn học sinh báo việc ngược đãi.

  - Chưa đến một nửa (43,5%) số học sinh LGBTQ AAPI đã nói với thành viên gia đình về việc mình bị ngược đãi ở trường.

AR_292895

- Trong số các bạn học sinh LGBTQ AAPI đã báo cho thành viên gia đình việc mình bị ngược đãi, một nửa (50,5%) trong số các bạn đã xác nhận việc thành viên trong gia đình đã nói chuyện với giáo viên, hiệu trưởng hoặc cán bộ khác tại trường.

## Các quy định thực hành tại trường

### Bị kỷ luật tại trường

- Gần một phần ba các bạn học sinh LGBTQ AAPI (30,7%) đã bị phạt một số hình thức kỷ luật tại trường, như phạt ở lại, đình chỉ việc học, hoặc cho thôi học.

- Các bạn học sinh LGBTQ AAPI đa chủng tộc bị kỷ luật nặng hơn so với các bạn học sinh chỉ xác định là AAPI.

- Những trải nghiệm tiêu cực tại trường liên quan đến việc bị kỷ luật tại trường đối với các bạn học sinh LGBTQ AAPI Các bạn học sinh từng bị kỷ luật tại trường:

  - bị ngược đãi nhiều hơn do xu hướng tình dục, thể hiện giới tính, và chủng tộc/ dân tộc;

  - có nhiều khả năng bỏ học do cảm thấy không an toàn; và

  - có nhiều khả năng trải nghiệm các chính sách hoặc thực tiễn phân biệt đối xử chống lại cộng đồng LGBTQ.

  - Việc bị kỷ luật tại trường có thể ảnh hưởng tiêu cực đến kết quả học tập đối với các bạn học sinh LGBTQ AAPI . Các bạn học sinh từng bị kỷ luật tại trường:

- ít có khả năng lên kế hoạch theo học chương trình giáo dục sau trung học; và

- có điểm trung bình (ĐTB) thấp hơn (GPAs).

## Sự hỗ trợ và Các nguồn tài nguyên học tập tại trường dành cho các bạn học sinh LGBTQ AAPI

### GSAs (Các Câu lạc bộ Liên minh Người đồng tính nam – Người dị tính)

#### Tình trạng hoạt động và sự tham gia

- Gần hai phần ba các bạn học sinh LGBTQ AAPI (63,5%) đã báo cáo có GSA tại trường của mình.

- Các bạn học sinh LGBTQ AAPI học tại các trường ở nông thôn, các trường ở miền Nam và các trường nhỏ hơn, ít có khả năng tiếp cận với GSA

- Phần lớn các bạn học sinh LGBTQ AAPI (57,7%) có quyền tiếp cận GSA đã tham gia câu lạc bộ, và 18,9% đã tham gia giữ chức vụ hay làm người chỉ dẫn;

#### Lợi ích

- So vơi các bạn học sinh không có GSA, các bạn học sinh LGBTQ AAPI có GSA:

  - ít có khả năng nghỉ học do vấn đề an toàn (22,4% so với 36,9%);

  - ít có khả năng cảm thấy không an toàn vì xu hướng tình dục của mình (45,6% so với 62,3%) và thể hiện giới tính (38,6% so với 45,4%); và

  - cảm thấy là thành viên được tôn trọng hơn trong cộng đồng học đường.

- Các bạn học sinh LGBTQ AAPI tham gia GSA cảm thấy thoải mái hơn khi đưa ra các vấn đề về LGBTQ trong lớp và có nhiều khả năng tham gia Ngày hành động vì cộng đồng GLSEN hoặc biểu tình, bảo vệ, biểu dương chính trị.

**Các câu lạc bộ Văn hoá/ Dân tộc**

*Tình trạng hoạt động và sự tham gia*

- Ba phần tư học sinh LGBTQ AAPI (74,6%) báo cáo rằng trường của họ có một câu lạc bộ Văn hóa hoặc Dân tộc tại trường của mình.
- 12,2% các bạn học sinh LGBTQ AAPI với một câu lạc bộ văn hóa / dân tộc tại trường đã tham dự các cuộc họp và 2,4% các bạn học sinh này đã tham gia giữ chức vụ hay làm người chỉ dẫn;

*Lợi ích*

- Các bạn học sinh LGBTQ AAPI có câu lạc bộ văn hóa / dân tộc tại trường của mình:
- cảm thấy là thành viên được tôn trọng hơn trong cộng đồng học đường; và
- ít có khả năng cảm thấy không an toàn vì chủng tộc/ dân tộc
- Các bạn học sinh LGBTQ AAPI sinh ra tại một quốc gia khác có nhiều khả năng tham gia các câu lạc bộ văn hóa/ dân tộc hơn so với những bạn sinh ra ở Hoa Kỳ.

**Bộ phận Nhân sự Hỗ trợ của Nhà trường**

*Tình trạng hoạt động*

- Đại đa các bạn học sinh LGBTQ AAPI (97,2%) có thể xác định ít nhất một thành viên là cán bộ hỗ trợ tại trường, nhưng chỉ khoảng một nửa (48,5%) trong số các bạn có thể xác định nhiều cán bộ hỗ trợ (11 cán bộ hỗ trợ trở lên).
- Chỉ có khoảng một nửa trong số các bạn học sinh LGBTQ AAPI (49,2%) đã báo cáo có bộ phận hành chính nhà trường đã rất hỗ trợ hay giải quyết phần nào vấn đề.
- Các bạn học sinh LGBTQ AAPI thuộc đa chủng tộc đã báo cáo việc có ít cán bộ nhà trường hỗ trợ và ít cán bộ hành chính hỗ trợ hơn so với các bạn học sinh chỉ xác định là AAPI.

*Lợi ích*

- Các bạn học sinh LGBTQ AAPI có nhiều cán bộ hỗ trợ hơn cho các bạn học sinh LGBTQ:
  - ít có khả năng nghỉ học do vấn đề an toàn;
  - ít có khả năng cảm thấy không an toàn vì xu hướng tình dục, thể hiện giới tính, dân tộc và chủng tộc;
  - có mức độ tự trọng cao hơn và mức độ trầm cảm thấp hơn;
  - cảm thấy kết nối tốt hơn với cộng đồng học đường;
  - có ĐTB học tập cao hơn (3,5 so với 3,2); và
  - có nhiều khả năng lên kế hoạch theo học chương trình sau trung học hơn (97,6% so với 93,8%).

**Chương trình giảng dạy được lồng ghép**

Chúng tôi cũng đã xem xét việc lồng ghép các chủ đề LGBTQ vào chương trình giảng dạy tại

xliii

trường. Chúng tôi thấy rằng chỉ hơn một phần tư các bạn học sinh LGBTQ AAPI (27,4%) được giảng dạy với nội dung trình bày tích cực về con người, lịch sử, hay các sự kiện LGBTQ. Ngoài ra, chúng tôi cũng nhận thấy rằng các bạn học sinh LGBTQ AAPI tham dự chương trình giảng dạy có lồng ghép tích cực nội dung về LGBTQ:

- ít có khả năng cảm thấy không an toàn vì xu hướng tình dục của mình (16,8% so với 30,2%) và thể hiện giới tính (19,4% so với 30,1%);

- có nhiều khả năng được các ba5n học chấp nhận là người LGBTQ tại trường (76,4% so với 43,7%); và

- cảm thấy kết nối nhiều hơn với cộng đồng học đường;

Chúng tôi không thể xem xét các hình thức lồng ghép nội dung quan trọng khác trong chương trình giảng dạy, như trình bày nội dung tích cực về người da màu và lịch sử cũng như cộng đồng của họ. Tuy nhiên, chúng tôi đã nhận thấy rằng các bạn học sinh LGBTQ AAPI trong chương trình giảng dạy được lồng ghép chủ đề LGBTQ ít có khả năng thấy không an toàn ở trường vì chủng tộc hoặc dân tộc của mình (22,5% so với 27,8%).


## Kết luận và Kiến nghị

Các bạn học sinh LGBTQ AAPI có những trải nghiệm của riêng mình về các quy định thực hành tại trường đối với việc phân biệt đối xử, ngược đãi, và truy cập các nguồn hỗ trợ. Kết quả từ báo cáo này cho thấy các bạn học sinh LGBTQ AAPI đã trải nghiệm trường hợp phân biệt đối xử giữa các cá nhân và tổ chức. Các phát hiện cũng cho thấy cách thức nhà trường hỗ trợ và các nguồn hỗ trợ, như GSA và bộ phận nhân sự hỗ trợ của nhà trường, có thể ảnh hưởng tích cực đến trải nghiệm của các bạn học sinh LGBTQ AAPI tại trường. Dựa trên những phát hiện này, chúng tôi kiến nghị các nội dung sau đến ban giám hiệu nhà trường, các nhà hoạch định chính sách giáo dục và các cá nhân khác muốn cung cấp môi trường học tập an toàn cho các bạn học sinh LGBTQ AAPI :

- Các câu lạc bộ hỗ trợ học sinh, như GSA và các câu lạc bộ văn hoá/ dân tộc; Các tổ chức làm việc với GSA và các câu lạc bộ văn hóa / dân tộc cũng nên hợp tác để đáp ứng nhu cầu của các bạn học sinh LGBTQ AAPI , liên quan đến nhiều bản sắc bên lề, bao gồm các bản sắc xu hướng tính dục, giới tính và chủng tộc/ dân tộc.

- Mang đến sự phát triển chuyên môn cho các cán bộ nhà trường liên quan đến các vấn đề của học sinh LGBTQ AAPI.

- Tăng khả năng tiếp cận của học sinh đối với các nguồn tài nguyên học tập bao gồm các nội dung trình bày đa dạng và tích cực về con người, lịch sử và sự kiện AAPI và LGBTQ.

- Lập các nội dung chính sách và hướng dẫn của trường dành cho các cán bộ xử lý hành vi phân biệt chủng tộc và chống đối cộng đồng LGBTQ, đồng thời phát triển các quy trình bảo mật rõ ràng để học sinh báo vấn đề bị ngược đãi của mình.

- Các cơ quan quản lý giáo dục tại địa phương, tiểu bang và liên bang cũng nên yêu cầu nhà trường chịu trách nhiệm cho việc lập và thực hiện các quy định thực hành và thủ tục này.

- Làm việc để giải quyết sự bất bình đẳng trong hoạt động tài trợ ở cấp địa phương, tiểu bang và quốc gia để tăng khả năng tiếp cận các hoạt động giáo dục và hỗ trợ từ các tổ chức nói chung, và mang đến sự phát triển chuyên nghiệp hơn cho các nhà giáo dục và cán bộ tư vấn học đường.

Khi được kết hợp lại với nhau, các biện pháp này có thể đưa chúng ta đến một tương lai mà các bạn học sinh có cơ hội học tập và đạt kết quả tốt tại trường, bất kể mọi xu hướng tính dục, bản dạng giới tính, thể hiện giới tính, chủng tộc hay dân tộc.

# एक्ज़ीक्यूटिव सारांश

AR_292899

AR_292900

## परिचय

मौजूदा शोध में बताया गया है कि स्कूल में एशियाई अमेरिकी और प्रशांत द्वीप वासी (AAPI), दोनों के लेस्बियन, गे, बाईसेक्सुअल, ट्रांसजेंडर, और होमोसेक्सुअल (LGBTQ) युवा अक्सर अपनी अधिकारहीन पहचान से संबंधित खास समस्याओं का सामना करते हैं. उदाहरण के लिए, AAPI के युवाओं को मॉडल माइनॉरिटी स्टीरियोटाइप (आदर्श अल्पसंख्यक रूढ़िबद्ध धारणा) के साथ चुनौती भी दी जाती है कि AAPI के सभी विद्यार्थी शैक्षणिक रूप से मेहनती और विशिष्ट हैं, इससे उस जातिवाद और भेदभाव का खंडन किया जा सकता है, उसके महत्व को कम किया जा सकता है, या खत्म किया जा सकता है जिसे AAPI के विद्यार्थी अनुभव करते हैं. इससे पहले के अध्ययनों में देखा गया है कि AAPI के प्राथमिक और माध्यमिक विद्यार्थियों के विरुद्ध सहपाठियों द्वारा जातिवाद की घटना सामान्य है. ऐसा आंशिक रूप से इसलिए हो सकता है

क्योंकि AAPI के युवा अक्सर स्कूलों में धमकी पर होने वाली नीतिगत चर्चा में शामिल नहीं होते। LGBTQ युवा होने के कारण, वे अक्सर अपने लैंगिक-रुझान, लिंग पहचान और लिंग अभिव्यक्ति से संबंधित खास चुनौतियों का सामना करते हैं। LGBTQ युवाओं ने कई बार उत्पीड़न और भेदभाव की रिपोर्ट की है जिसके कारण शैक्षिक परिणाम अच्छे नहीं रहे और मनोवैज्ञानिक हानि में कमी आई। इसके अलावा, उनके पास स्कूल में मौजूद उन संसाधनों तक सीमित पहुंच है या कोई पहुंच नहीं है जिससे स्कूल के परिवेश और विद्यार्थियों के अनुभव को बेहतर बनाया जा सके। हालांकि, यहां स्कूलों में AAPI के युवाओं और LGBTQ युवाओं के अनुभवों पर काफ़ी शोध किया जा रहा है, इन पहचानों के प्रतिच्छेदन की जांच में बहुत कम शोध हुए हैं – AAPI LGBTQ

विद्यार्थियों के अनुभव. मौजूदा अध्ययनों से पता चलता है कि सार्वजनिक स्कूलों में LGBTQ युवाओं के रंग को लेकर द्वेषपूर्ण परिवेश है जहां वे जाति, लैंगिक-रुझान, लिंग पहचान, या इन सभी पहचानों के आधार पर उत्पीड़न और भेदभाव का अनुभव करते हैं. यह रिपोर्ट उन रिपोर्टों की एक श्रृंखला है जिसमें ब्लैक, लेटिनेक्स और मूल अमेरिकी LGBTQ युवाओं सहित अलग-अलग जातीय/संजातीय पहचान वाले LGBTQ विद्यार्थियों पर फ़ोकस किया गया है.

इस रिपोर्ट में, हम स्कूल में नकारात्मक परिवेश के संकेतकों, और शैक्षणिक उपलब्धि, शैक्षिक आकांक्षाओं, और मनोवैज्ञानिक हानि पर उनके प्रभाव के संबंध में AAPI LGBTQ विद्यार्थियों के अनुभव की जांच कर रहे हैं:

- व्यक्तिगत विशेषताओं, जैसे कि लैंगिक-रुझान, लिंग अभिव्यक्ति और जाति/संजातीयता, के कारण स्कूल में असुरक्षित महसूस करना, और सुरक्षा कारणों के कारण स्कूल न आना;
- स्कूल में पक्षपातपूर्ण टिप्पणियां सुनना जिसमें समलैंगिकता और जातीयता से संबंधित टिप्पणियां शामिल हैं;
- स्कूल में उत्पीड़न का अनुभव करना; और
- स्कूल की अनुशासनात्मक कार्यप्रणालियों का अनुभव करना।

इसके अलावा, हम इसकी जांच कर रहे हैं कि AAPI LGBTQ विद्यार्थी इन अनुभवों के बारे में स्कूल के अधिकारियों या अपने परिजनों को बताते हैं या नहीं, और ये लोग समस्या पर कैसे कार्य करते हैं।

हम उस स्थिति की भी जांच कर रहे हैं जिसके लिए AAPI LGBTQ विद्यार्थियों के पास स्कूल के सहायक संसाधनों तक पहुंच है, और इन संसाधनों के संभावित लाभों का पता लगाते हैं:

- GSA (गे-स्ट्रेट एलायंस या जेंडर ऐंड सेक्सुअलिटी एलायंस) या इससे मिलते-जुलते संघ;
- जातीय/सांस्कृतिक संघ;
- सहायक स्कूल कर्मचारी; और
- पाठ्यचर्या संबंधी संसाधन जिन्हें LGBTQ से संबंधित विषयों में शामिल किया जाता है।

## तरीके

इस रिपोर्ट का डेटा GLSEN के 2017 नेशनल स्कूल क्लाइमेट सर्वे (NSCS) से प्राप्त किया गया है। 2017 NSCS के पूरे सैंपल में 23,001 LGBTQ विद्यार्थियों को शामिल किया गया था जो मिडिल और हाई स्कूल के थे और उनकी आयु 13 से लेकर 21 वर्ष के बीच थी। NSCS में, जब उनसे उनकी जाति और संजातीयता के बारे में पूछा गया, तो प्रतिभागियों के पास अन्य जाति/संजातीयता श्रेणियों के बीच "एशियाई," और "प्रशांत द्वीप वासी" चुनने का विकल्प था। इस रिपोर्ट के सैंपल में नेशनल सैंपल के ऐसे

किसी भी LGBTQ विद्यार्थी को शामिल किया जाता है जो "एशियाई या दक्षिणी एशियाई" या "मूल हवाई या अन्य प्रशांत द्वीप वासी" (इसलिए, उन्हें एशियाई अमेरिकी और प्रशांत द्वीप वासी या AAPI के रूप में संदर्भित किया जाता है) के रूप में पहचाने जाते हैं, इनमें वे लोग भी शामिल हैं जो केवल AAPI के रूप में पहचाने जाते हैं, और जो AAPI और एक या एक से अधिक अतिरिक्त जातीय/संजातीय पहचानों (बहुजातीय AAPI) के रूप में पहचाने जाते हैं। यह ध्यान रखना ज़रूरी है कि प्रशांत द्वीप वासी LGBTQ विद्यार्थियों का सैंपल साइज़ स्कूल में केवल उनके अनुभवों की जांच करने के लिए बहुत कम था। इसलिए, प्रशांत द्वीप वासी के रूप में पहचाने गए LGBTQ विद्यार्थियों को उन विद्यार्थियों के साथ संयुक्त किया गया जिन्हें एशियाई के रूप में पहचाना गया।

इस रिपोर्ट के आखिरी सैंपल में कुल 1,480 AAPI LGBTQ विद्यार्थी थे। व्योमिंग, डिस्ट्रिक्ट ऑफ़ कोलंबिया, प्यूर्टो रिको और यूएस वर्जिन आइलैंड को छोड़कर सभी राज्यों के विद्यार्थी इसमें थे। दो बटा पांच (40.0%) को गे या लेस्बियन के रूप में पहचाना गया, आधे से अधिक (57.7%) सिसजेंडर थे, और AAPI के अलावा एक या एक से अधिक जातीय/संजातीय पहचान के साथ आधे से अधिक (56.0%) को पहचाना गया। अमेरिका में अधिकांश विद्यार्थियों के लिए

पाया गया कि लगभग सभी ने अपनी पहली भाषा के रूप में, या अपनी पहली भाषाओं में से एक के रूप में अंग्रेजी का अध्ययन किया। अधिकांश विद्यार्थी हाई स्कूल और पब्लिक स्कूलों में उपस्थिति हुए।

## मुख्य निष्कर्ष

### स्कूल में सुरक्षा और उत्पीड़न

#### स्कूल सुरक्षा

- आधे से अधिक AAPI LGBTQ विद्यार्थियों (51.8%) ने अपने लैंगिक-रुझान के कारण, 41.1% ने अपनी लिंग अभिव्यक्ति के कारण, और 26.4% ने अपनी जातीय या संजातीयता के कारण स्कूल में असुरक्षित महसूस किया।
- एक चौथाई से अधिक AAPI LGBTQ विद्यार्थियों (27.6%) को पिछले महीने स्कूल में कम से कम एक दिन अनुपस्थित इस कारण पाया गया क्योंकि उन्होंने असुरक्षित या असहज होने का अनुभव किया, और पिछले महीने में लगभग एक बटा दस (8.4%) विद्यार्थी चार या इससे अधिक दिन अनुपस्थित रहे।

### स्कूल में पक्षपातपूर्ण टिप्पणियां

- 97.8% AAPI LGBTQ विद्यार्थियों ने "गे" शब्द का उपयोग नकारात्मक तरीके से करते हुए सुना; लगभग दो-तिहाई विद्यार्थियों (61%) ने कई बार या बार-बार इस तरह के शब्दों को सुना।
- 92.4% AAPI LGBTQ विद्यार्थियों ने समलैंगिकता संबंधी अन्य टिप्पणियों को सुना; आधे से अधिक विद्यार्थियों (51.1%) ने कई बार या बार-बार इस तरह के शब्दों को सुना।
- 89.3% AAPI LGBTQ विद्यार्थियों ने अपर्याप्त "पुरुष" से संबंधित नकारात्मक लैंगिक अभिव्यक्ति की टिप्पणियां सुनी; आधे विद्यार्थियों (50.2%) ने इन टिप्पणियों को कई बार या बार-बार सुना।
- 81.4 % AAPI LGBTQ विद्यार्थियों ने अपर्याप्त "स्त्री" से संबंधित टिप्पणियां सुनी; एक तिहाई विद्यार्थियों (33.9%) ने इन टिप्पणियों को कई बार या बार-बार सुना।
- 89.3% AAPI LGBTQ विद्यार्थियों ने जातीय टिप्पणियां सुनी; आधे से अधिक विद्यार्थियों (52.7%) इन टिप्पणियों को कई बार या बार-बार सुना।
- 82.3% AAPI LGBTQ विद्यार्थियों ने ट्रांसजेंडर होने के संबंध में नकारात्मक टिप्पणियां सुनी; एक तिहाई से अधिक विद्यार्थियों (35.5%) इन टिप्पणियों को कई बार या बार-बार सुना।

### स्कूल में उत्पीड़न

- कई विद्यार्थियों ने स्कूल में निजी विशिष्टताओं पर आधारित उत्पीड़न या अवैध भाषा का अनुभव किया जिसमें लैंगिक-रुझान (60.5%), लिंग अभिव्यक्ति (54.7%), और जातीय/संजातीयता (53.8%) शामिल है।
- AAPI LGBTQ विद्यार्थी जिन्होंने स्कूल में लैंगिक-रुझान के आधार पर उच्च उत्पीड़न स्तर का अनुभव किया:

ASIAN AMERICAN AND PACIFIC ISLANDER LGBTQ YOUTH IN U.S. SCHOOLS

- – स्कूल छोड़ने की संभावना तीन गुना से अधिक इस कारण थी क्योंकि वे असुरक्षित महसूस करते थे (57.5% बनाम 16.9%);

- – हाईस्कूल पूरा करने की योजना संभावित रूप से काफ़ी हद तक कम थी (96.1% बनाम 99.3%); और

- – संबंधित स्कूल में निम्न स्तर (22% बनाम 60.9%), और डिप्रेशन के उच्च स्तर का अनुभव किया (73.2% बनाम 41.2%)।

- AAPI LGBTQ विद्यार्थी जिन्होंने स्कूल में जाति/संजातीयता के आधार पर उच्च उत्पीड़न स्तर का अनुभव किया:

- – स्कूल छोड़ने की संभावना लगभग दो गुना इस कारण थी क्योंकि वे असुरक्षित महसूस करते थे (35.5% बनाम 18.4%);

- – संबंधित स्कूल में निम्न स्तर और डिप्रेशन के उच्च स्तर का अनुभव किया।

- ट्रांसजेंडर और जेंडर नॉनकॉन्फ़र्मिंग (trans/GNC) AAPI विद्यार्थियों ने लैंगिक-रुझान और लिंग अभिव्यक्ति के आधार पर उच्च स्तर वाले उत्पीड़न का अनुभव LGBQ सिसजेंडर AAPI विद्यार्थियों से अधिक किया।

- एक से अधिक जाति/संजातीय पहचानों वाले AAPI LGBTQ विद्यार्थियों ने लैंगिक-रुझान और लिंग अभिव्यक्ति के आधार पर उच्च स्तर वाले उत्पीड़न का अनुभव उन LGBTQ विद्यार्थियों से अधिक किया जो केवल AAPI विद्यार्थी के रूप में पहचाने गए।

- दो बट्टा पांच AAPI LGBTQ विद्यार्थियों (40.0%) ने अपने लैंगिक-रुझान और अपनी जाति/संजातीयता, दोनों के कारण स्कूल में उत्पीड़न या अवैध भाषा का अनुभव किया। उत्पीड़न के एक रूप का अनुभव या उत्पीड़न का अनुभव नहीं करने वाले AAPI LGBTQ विद्यार्थियों की तुलना में, उत्पीड़न के दोनों रूपों का अनुभव करने वाले AAPI LGBTQ विद्यार्थियों ने:

- – संबंधित स्कूल में निम्न स्तरों का अनुभव किया;

- – डिप्रेशन के उच्चतर स्तरों का अनुभव किया; और

- – स्कूल छोड़ने की सबसे अधिक संभावना इसलिए जताई क्योंकि वे असुरक्षित महसूस करते थे।

### स्कूल आधारित उत्पीड़न और अवैध भाषा की रिपोर्टिंग, और बीच-बचाव

पिछले वर्ष उत्पीड़न या अवैध भाषा का अनुभव करने वाले अधिकांश AAPI LGBTQ विद्यार्थियों (56.5%) ने उत्पीड़न की रिपोर्ट कर्मचारियों को कभी नहीं की, सबसे आम कारण यह था कि उन्हें ऐसा नहीं लगा कि कर्मचारी इस संबंध में कुछ भी करेंगे (67.4%)।

- आधे से भी कम विद्यार्थियों (42.3%) ने बताया कि विद्यार्थियों द्वारा उत्पीड़न की रिपोर्ट किए जाने पर कर्मचारियों ने प्रभावी ढंग से कार्रवाई की।

- आधे से भी कम AAPI LGBTQ विद्यार्थियों (43.5%) ने स्कूल में उनके द्वारा सामना किए जा रहे उत्पीड़न के बारे में परिजनों को बताया।

- जिन AAPI LGBTQ विद्यार्थियों ने परिजनों को उत्पीड़न के अनुभव की सूचना दी, उनमें से आधे (50.5%) ने बताया कि परिजनों ने उनके शिक्षक, प्रिंसिपल या स्कूल के अन्य कर्मचारी से इस संबंध में बात की।

## स्कूल की कार्यप्रणाली

### स्कूल व्यवस्था के साथ अनुभव

- लगभग एक तिहाई AAPI LGBTQ विद्यार्थियों (30.7%) ने स्कूल व्यवस्था के कुछ कार्यों का अनुभव किया, जैसे कि अवरोधन, स्कूल से निलंबन, या निष्कासन।

- बहुजातीय AAPI LGBTQ विद्यार्थियों ने उन विद्यार्थियों की तुलना में उच्च स्तरीय व्यवस्था का अनुभव किया जिन्हें केवल AAPI के रूप में पहचाना गया।

- स्कूल के नकारात्मक अनुभव, AAPI LGBTQ विद्यार्थियों के लिए स्कूल व्यवस्था के अनुभवों से संबंधित थे। स्कूल व्यवस्था का अनुभव करने वाले विद्यार्थियों ने:

AR_292903

- लैंगिक-रुझान, लिंग अभिव्यक्ति, और जाति/संजातीयता के आधार पर उच्च उत्पीड़न दर का अनुभव किया;
- स्कूल छोड़ने की अधिक संभावना इसलिए जताई क्योंकि उन्होंने असुरक्षित महसूस किया; और
- स्कूल में LGBTQ पक्षपाती विरोधी नीतियों या कार्यप्रणालियों का अनुभव करने की अधिक संभावना जताई।
- स्कूल व्यवस्था वाले अनुभव भी AAPI LGBTQ विद्यार्थियों के शैक्षिक परिणामों पर नकारात्मक प्रभाव डाल सकते हैं। स्कूल व्यवस्था का अनुभव करने वाले विद्यार्थियों ने:
  - माध्यमिक शिक्षा के बाद आगे की शिक्षा के लिए योजना बनाने की कम संभावना जताई; और
  - निम्न ग्रेड पॉइंट एवरेज (GPA) का प्रदर्शन किया।

## *AAPI LGBTQ विद्यार्थियों के लिए स्कूल द्वारा दी जाने वाली सहायता और संसाधन*

### GSA

#### उपलब्धता और भागीदारी
- लगभग दो-तिहाई AAPI LGBTQ विद्यार्थियों (63.5%) ने अपने स्कूल में GSA होने की सूचना दी।
- ग्रामीण स्कूलों, दक्षिण के स्कूलों, और छोटे स्कूलों के AAPI LGBTQ विद्यार्थियों ने GSA तक पहुंच होने की कम संभावना जताई।
- GSA तक पहुंच वाले अधिकांश AAPI LGBTQ विद्यार्थियों (57.7%) ने संघ में भाग लिया, और 18.9% विद्यार्थियों ने अधिकारी या नेता के रूप में भाग लिया।

#### उपयोगिता
- बिना GSA वाले AAPI LGBTQ विद्यार्थियों की तुलना में GSA वाले AAPI LGBTQ विद्यार्थियों ने:
  - सुरक्षा चिंताओं के कारण स्कूल छोड़ने की कम संभावना जताई (22.4% बनाम 36.9%);
  - अपने लैंगिक-रुझान (45.6% बनाम 62.3%) और लिंग अभिव्यक्ति (38.6% बनाम 45.4%) के कारण असुरक्षित होने का अनुभव करने में कम संभावना जताई; और
  - अपने संबंधित स्कूल समुदाय में अधिक बेहतर होने का अनुभव किया।
- GSA में भाग लेने वाले AAPI LGBTQ विद्यार्थियों ने कक्षा में LGBTQ की समस्याओं को सामने लाने में अधिक सहज होने का अनुभव किया, और GLSEN डे ऑफ़ एक्शन में, या राजनीतिक रैली, विरोध प्रदर्शन या प्रदर्शन में भाग लेने की अधिक संभावना जताई।

### जातीय/सांस्कृतिक संघ;

#### उपलब्धता और भागीदारी
- तीन-चौथाई AAPI LGBTQ विद्यार्थियों (74.6%) ने बताया कि उनके स्कूल में एक जातीय या सांस्कृतिक संघ था।
- स्कूल के जातीय/सांस्कृतिक संघ वाले 12.2% AAPI LGBTQ विद्यार्थियों ने बैठकों में भाग लिया, और 2.4% विद्यार्थियों ने अधिकारी या नेता के रूप में भाग लिया।

#### उपयोगिता
- अपने स्कूल के जातीय/सांस्कृतिक संघ से जुड़े AAPI LGBTQ विद्यार्थियों ने:
  - अपने संबंधित स्कूल समुदाय में अधिक बेहतर होने का अनुभव किया; और
  - अपनी जाति/संजातीयता के कारण असुरक्षित होने की कम संभावना जताई।

- किसी अन्य देश के AAPI LGBTQ विद्यार्थियों ने अमेरिकी AAPI LGBTQ विद्यार्थियों की तुलना में जातीय/सांस्कृतिक संघों में भाग लेने की अधिक संभावना जताई।

## सहायक स्कूल कर्मचारी

### उपलब्धता

- अधिकांश AAPI LGBTQ विद्यार्थी (97.2%) स्कूल के कम से कम एक सहायक कर्मचारी की पहचान कर पा रहे थे, लेकिन केवल लगभग आधे विद्यार्थी (48.5%) ही कई सहायक कर्मचारियों (11 या इससे अधिक) की पहचान कर पा रहे थे।

- केवल लगभग आधे AAPI LGBTQ विद्यार्थियों (49.2%) ने कुछ हद तक या बहुत अधिक सहायक स्कूल प्रशासन होने की सूचना दी।

- बहुजातीय AAPI LGBTQ विद्यार्थियों ने, केवल AAPI के रूप में पहचाने गए विद्यार्थियों की तुलना में कम सहायक कर्मचारी और कम सहायक प्रशासन होने की सूचना दी।

### उपयोगिता

- वे AAPI LGBTQ विद्यार्थी जिन्होंने LGBTQ विद्यार्थियों की सहायता करने वाले अधिक कर्मचारियों की सूचना दी, उन्होंने:

  - सुरक्षा चिंताओं के कारण स्कूल छोड़ने की कम संभावना जताई;

  - अपने लैंगिक-रुझान, लिंग अभिव्यक्ति, और जाति/जातीयता के कारण असुरक्षित होने की कम संभावना जताई;

  - उच्च स्तरीय आत्म-सम्मान और निम्न स्तरीय डिप्रेशन का प्रदर्शन किया;

  - अपने स्कूल समुदाय से जुड़ाव की अधिक भावना का प्रदर्शन किया;

  - उच्च GPA (3.5 बनाम 3.2) का प्रदर्शन किया; और

  - माध्यमिक शिक्षा के बाद आगे की शिक्षा के लिए योजना बनाने की अधिक संभावना जताई (97.6% बनाम 93.8%)।

### समावेशी पाठ्यक्रम

हमने स्कूल के पाठ्यक्रम में LGBTQ विषयों को शामिल करने की भी जांच की। हमने पाया कि केवल एक चौथाई AAPI LGBTQ विद्यार्थियों (27.4%) को LGBTQ लोगों, इतिहास, या कार्यक्रमों के सकारात्मक प्रतिरूप के बारे में बताया गया था। इसके अलावा, हमने यह भी पाया कि जिन AAPI LGBTQ विद्यार्थियों को स्कूल के पाठ्यक्रम में LGBTQ समुदाय से जुड़े कुछ सकारात्मक पहलुओं को बताया गया था, उन्होंने:

- अपने लैंगिक-रुझान (16.8% बनाम 30.2%) और लिंग अभिव्यक्ति (19.4% बनाम 30.1%) के कारण असुरक्षित होने का अनुभव करने में कम संभावना जताई;

- स्कूल में सहपाठियों द्वारा LGBTQ लोगों को स्वीकार करने की अधिक संभावना जताई (76.4% बनाम 43.7%); और

- अपने स्कूल समुदाय में अधिक जुड़ाव का अनुभव किया।

हम पाठ्यक्रम समावेश के अन्य महत्वपूर्ण रूपों की जांच नहीं कर पाएं, जैसे कि अलग-अलग रंग वाले लोगों, और उनके इतिहास और समुदायों का सकारात्मक प्रतिरूप। इसके बावजूद, हमने पाया कि LGBTQ-समावेशी पाठ्यक्रम में शामिल वाले AAPI LGBTQ विद्यार्थियों में अपनी जाति या संजातीयता के कारण स्कूल में असुरक्षित होने का अनुभव करने की संभावना कम थी (22.5% बनाम 27.8%)।


## निष्कर्ष और सुझाव

AAPI LGBTQ विद्यार्थियों में उत्पीड़न, स्कूल की पक्षपाती कार्यप्रणालियों, और सहायक संसाधनों तक पहुंच से संबंधित अद्वितीय अनुभव है। इस रिपोर्ट के परिणाम बताते है कि AAPI LGBTQ विद्यार्थी संस्थागत और

AR_292905

पारस्परिक भेदभाव का अनुभव करते हैं। निष्कर्ष में स्कूल द्वारा दी जाने वाली सहायता और संसाधन जैसे तरीके भी सामने आए हैं, जैसे कि GSA और सहायक स्कूल कर्मचारी, AAPI LGBTQ विद्यार्थियों के स्कूल के अनुभवों पर सकारात्मक रूप से असर डाल सकते हैं। इन निष्कर्षों के आधार पर, हम सुझाव देते हैं कि स्कूल लीडर, शिक्षा नीति निर्माता, और AAPI LGBTQ विद्यार्थियों को सुरक्षित शिक्षण परिवेश देने की चाह रखने वाले अन्य व्यक्ति:

- GSA और जातीय/सांस्कृतिक संघ जैसे विद्यार्थी संघों का समर्थन करें। GSA और जातीय/सांस्कृतिक संघों के साथ कार्य करने वाले संगठन को AAPI LGBTQ विद्यार्थियों की उन आवश्यकताओं को पूरा करने के लिए काम करना चाहिए जो लैंगिक-रुझान, लिंग, और जाति/संजातीयता सहित उनकी कई अधिकारहीन पहचानों से संबंधित हैं।

- AAPI LGBTQ विद्यार्थी की समस्याओं के बारे में स्कूल के कर्मचारियों को पेशेवर सुधार की जानकारी दें।

- उन पाठ्यक्रम संसाधनों तक विद्यार्थी की पहुंच को बढ़ाएं जिनमें AAPI और LGBTQ, दोनों के लोगों, इतिहास और कार्यक्रमों के विविध और सकारात्मक प्रतिरूप शामिल हों।

- LGBTQ और जातीय विरोधी व्यवहार के संबंध में कर्मचारियों के लिए स्कूल नीतियों और दिशानिर्देशों को स्थापित करें, और विद्यार्थियों द्वारा उस उत्पीड़न की रिपोर्ट करने के लिए स्पष्ट और गोपनीय तरीके बनाएं जिनका वे अनुभव करते हैं।

- स्थानीय, राज्य और संघीय शिक्षा एजेंसियों द्वारा भी इन कार्यप्रणालियों और प्रक्रियाओं को स्थापित करने और लागू करने के लिए स्कूलों को जवाबदेह बनाया जाना चाहिए।

- सामान्य रूप से संस्थागत समर्थन और शिक्षा तक पहुंच बढ़ाने के लिए स्थानीय, राज्य और राष्ट्रीय स्तर पर वित्त पोषण में असमानताओं को संबोधित करने का कार्य करें, और शिक्षकों और स्कूल के परामर्शदाताओं के लिए अधिक पेशेवर विकास प्रदान करें।

ऐसे उपाय एक साथ मिलाकर करने से हम ऐसे भविष्य की ओर जा सकते हैं जिसमें लैंगिक-रुझान, लिंग पहचान, लिंग अभिव्यक्ति, जाति, या संजातीयता को नज़रअंदाज़ करते हुए सभी विद्यार्थियों को स्कूल में पढ़ने और सफल होने का अवसर मिलता है।

# Introduction

AR_292908

Asian American and Pacific Islander (AAPI)[1] elementary and secondary school students represent 5% of the U.S. population, yet they are often missing from policy discussions on bullying in schools.[2] In fact, national data on school victimization for AAPI are often missing or unavailable.[3] It may be that smaller racial/ethnic student populations, such as AAPI and Native American youth, are often overlooked because of population size. However, AAPI students may also be left out of school bullying conversations, in part, because of the model minority myth that AAPI students are innately intelligent and hardworking, and excel academically.[4] These stereotypes perpetuate fallacies, create social pressures for high achievement, and deny, downplay, or erase the racism and discrimination that AAPI students experience, and as a result, can be damaging to the student.[5] Prior studies, in fact, show that the incidence of racism from peers against AAPI elementary and secondary school students is common.[6] Another consequence of the model minority myth may be the false assumption that all AAPI youth are driven to excel academically and, thus, are somehow able to avoid experiences of bullying and harassment at school. This may lead educators and administrators to believe that, by focusing on their studies, AAPI youth are able to avoid situations that lead to bullying, and thus, they do not experience bullying in school.

Lesbian, gay, bisexual, transgender, and queer (LGBTQ) youth often face unique challenges related to their sexual orientation, gender identity, and gender expression, challenges which most of their non-LGBTQ peers do not face. GLSEN's *2017 National School Climate Survey* found that schools are often unsafe places for LGBTQ students.[7] LGBTQ youth often reported experiencing harassment, discrimination, and other troubling events in school, often specifically related to their sexual orientation, gender identity and/or how they express their gender,[8] including high levels of verbal and physical harassment and assault, sexual harassment, social exclusion and isolation, and other interpersonal problems with peers. In addition, many LGBTQ students did not have access to in-school resources that may improve school climate and students' experiences, such as Gender and Sexuality Alliances (GSAs), supportive educators, and supportive and inclusive school policies.

Although a growing body of research has focused on examining AAPI youth's school experiences

and LGBTQ youth's school experiences separately or uniquely, much less research has examined the school experiences of LGBTQ AAPI students. Research on LGBTQ youth of color in general has shown that schools nationwide are hostile environments for LGBTQ youth of color, where they experience victimization and discrimination based on race, sexual orientation, and gender identity, or all of the above simultaneously.[9] Because LGBTQ youth are not a monolithic population, some research has examined racial/ethnic group differences in school climate indicating that AAPI LGBTQ students tended to fare better than other groups, including lower levels anti-LGBTQ victimization, and school disciplinary action.[10] Nevertheless, it was still a common occurrence that AAPI LGBTQ students experience a hostile school climate. Therefore, it is important to highlight the experiences of AAPI LGBTQ students, and how school climate is related to their educational experiences and psychological well-being. In this report, we explore more deeply the school experiences of AAPI LGBTQ students.

Given that the majority of research on this population has examined AAPI youth and LGBTQ youth separately, we approach this report with an intersectional framework.[11] Where possible, we examine the school experiences of AAPI LGBTQ student's multiple intersecting marginalized identities (e.g., race, gender, sexual orientation) in relation to multiple interlocking systems of oppression (e.g., racism, transphobia, homophobia). For instance, the homophobic bias that an AAPI LGBTQ individual may experience is tied to their experiences of racism as an AAPI individual. Our focal point is on the school experiences of AAPI LGBTQ youth as a whole, with attention to also examining differences within AAPI LGBTQ youth. This report will not compare AAPI LGBTQ youth to other racial/ethnic LGBTQ groups.

This report is one of a series of reports on LGBTQ students of color, including Black, Latinx, and Native and Indigenous LGBTQ youth. In this report, we examine the experiences of AAPI LGBTQ students with regard to indicators of negative school climate, as well as supports and resources. In *Part One: Safety and Victimization at School*, we begin with examining AAPI LGBTQ students' feelings of safety at school due to their personal characteristics (race/ethnicity, sexual orientation, and gender identity/expression), experiences of racist and anti-LGBTQ victimization from

3

peers, as well as reporting racist and anti-LGBTQ victimization to school staff and staff responses to these reports, and family reporting and intervention as an additional form that impacts their school experiences. In *Part Two: School Practices*, we shift to AAPI LGBTQ students' experiences with school staff and practices, including experiences of school disciplinary action and its relation to anti-LGBTQ discriminatory school policies and practices, as well as school resources and supports for AAPI LGBTQ students, and club participation and leadership.

# Methods and Sample Description

AR_292911

AR_292912

## Methods

Data for this report came from GLSEN's *2017 National School Climate Survey (NSCS)*, a biennial survey of U.S. secondary school students who identify as LGBTQ. Participants completed an online survey about their experiences in school during the 2016-2017 school year, including hearing biased remarks, feelings of safety, experiencing harassment and assault, feeling comfortable at school, and experiencing anti-LGBTQ discriminatory school policies and practices. They were also asked about their academic achievement, attitudes about school, school involvement, and availability and impact of supportive school resources. Eligibility for participation in the survey included being at least 13 years of age, attending a K-12 school in the United States during the 2016-2017 school year, and identifying as lesbian, gay, bisexual, queer, or a sexual orientation other than heterosexual (e.g., pansexual, questioning) or being transgender or as having a gender identity that is not cisgender (e.g., genderqueer, nonbinary). For a full discussion of methods, refer to GLSEN's *2017 NSCS* report.[12]

The full sample for the *2017 NSCS* was 23,001 LGBTQ middle and high school students between 13 and 21 years old. In the survey, participants were asked how they identified their race/ethnicity, including "Asian or South Asian" and "Native Hawaiian or other Pacific Islander". Participants could check all that apply. The sample for this report consisted of any LGBTQ student in the national sample who identified as "Asian or South Asian" or "Native Hawaiian or other Pacific Islander" (henceforth referred to as Asian American and Pacific Islander), including those who only identified as AAPI, and those who identified as AAPI and one or more additional racial/ethnic identities (multiracial AAPI). It is important to note that the sample size of Pacific Islander LGBTQ

students was too small to examine their school experiences alone. Therefore, LGBTQ students who identified as Pacific Islander were combined with those who identified as Asian. The final sample for this report was a total of 1,480 AAPI LGBTQ students.

## Sample Description

As seen in Table S.1, two-fifths (40.0%) of AAPI LGBTQ students in the sample identified as gay or lesbian, with just over a quarter (28.9%) identifying as bisexual and nearly one-fifth (19.8%) identifying as pansexual. Just over half (57.7%) identified as cisgender, nearly a quarter (22.1%) identified as transgender, and the remainder identified with another gender identity or were unsure of their gender identity. Among students who only identified as only AAPI, 91.7% identified as Asian or South Asian, and 13.7% identified as Pacific Islander or Native Hawaiian (see Table S.1). Just over half of the AAPI LGBTQ students in this report (56.0%) identified with one or more racial/ethnic identities in addition to AAPI, as described in Table S.1. For example, nearly half of respondents (45.9%) also identified as White. The majority of respondents were born in the U.S. (86.9%) and nearly all learned English as their first language, or as one of their first languages (91.1%). Additionally, just over half (54.5%) identified with no religion.

Students attended schools in all 50 states, the District of Columbia, Puerto Rico, Guam, American Samoa, and the Northern Mariana Islands. As seen in Table S.2, the majority of students attended high school (67.0%), the vast majority attended public school (87.7%), and just over half attended majority-White schools (56.5%).

7

## Table S.1. Demographic Characteristics of Survey Participants

**Sexual Orientation**[13] (n = 1474)

| | |
|---|---|
| Gay or Lesbian | 40.0% |
| Bisexual | 28.9% |
| Pansexual[14] | 19.8% |
| Queer | 4.0% |
| Asexual[15] | 2.7% |
| Another Sexual Orientation (e.g., fluid, heterosexual) | 3.9% |
| Questioning or Unsure | 3.3% |

**Race and Ethnicity**[16] (n = 1480)

| | |
|---|---|
| Asian or Pacific Islander Only | 44.0% |
| *Asian or South Asian* | *91.7%* |
| *Pacific Islander or Native Hawaiian* | *13.7%* |
| Multiple Racial/Ethnic Identities[17] | 56.0% |
| *White* | *45.9%* |
| *Native American, American Indian, or Alaska Native* | *7.8%* |
| *Black or African American* | *8.4%* |
| *Hispanic or Latino/Latina/Latinx* | *12.8%* |
| *Middle Eastern or Arab American* | *2.9%* |

**Immigration Status** (n = 1478)

| | |
|---|---|
| U.S. Citizen | 96.8% |
| *Born in the U.S. or a U.S. territory* | *86.9%* |
| *Born in another country*[18] | *9.9%* |
| U.S. Non-citizen | 3.1% |
| *Documented* | *2.8%* |
| *Undocumented* | *0.3%* |

**English Learned as First Language** (n = 1462) — 91.1%

**Average Age** (n = 1480) = 15.5 years

**Grade in School** (n = 1449)

| | |
|---|---|
| 6th | 1.2% |
| 7th | 7.5% |
| 8th | 14.4% |
| 9th | 20.2% |
| 10th | 23.4% |
| 11th | 21.7% |
| 12th | 11.5% |

**Gender**[19] (n = 1425)

| | |
|---|---|
| Cisgender | 57.7% |
| *Female* | *37.3%* |
| *Male* | *17.3%* |
| *Unspecified* | *3.1%* |
| Transgender | 22.1% |
| *Female* | *1.8%* |
| *Male* | *13.9%* |
| *Nonbinary (i.e., not identifying as male or female, or identifying as both male and female)* | *5.1%* |
| *Unspecified* | *1.3%* |
| Genderqueer | 11.2% |
| Another Nonbinary Identity (e.g., agender, genderfluid) | 7.3% |
| Questioning or Unsure | 1.8% |

**Religious Affiliation** (n = 1475)

| | |
|---|---|
| Christian (non-denominational) | 13.5% |
| Catholic | 10.6% |
| Protestant | 1.4% |
| Jewish | 1.2% |
| Buddhist | 6.2% |
| Muslim | 1.3% |
| Another Religion (e.g., Unitarian Universalist, Wiccan) | 11.3% |
| No Religion, Atheist, or Agnostic (and not affiliated with a religion listed above) | 54.5% |

**Received Educational Accommodations**[20] (n = 1466) — 23.6%

AR_292914

## Table S.2. Characteristics of Survey Participants' Schools

| Grade Level (n = 1474) | | School Type (n = 1453) | |
|---|---|---|---|
| K through 12 School | 7.7% | Public School | 87.7% |
| Lower School (elementary and middle grades) | 1.8% | *Charter* | *5.3%* |
| | | *Magnet* | *11.2%* |
| Middle School | 15.3% | Religious-Affiliated School | 4.6% |
| Upper School (middle and high grades) | 8.2% | Other Independent or Private School | 7.7% |
| High School | 67.0% | | |
| | | **Single-Sex School** (n = 1474) | 1.9% |
| **Region**[21] (n = 1472) | | | |
| Northeast | 17.1% | **School Locale** (n = 1452) | |
| South | 24.2% | Urban | 27.7% |
| Midwest | 15.3% | Suburban | 54.2% |
| West | 41.2% | Rural or Small Town | 18.1% |
| U.S. Territories | 2.2% | | |
| **School Racial Composition** (n = 1316) | | | |
| Majority AAPI | 13.1% | | |
| Majority White | 56.5% | | |
| Majority Other Race | 18.6% | | |
| No Majority Race | 11.8% | | |

9

AR_292916

# Part One: Safety and Victimization at School

AR_292917

AR_292918

For AAPI LGBTQ youth, school can be an unsafe place. Our previous research indicates that the majority of LGBTQ students regularly hear biased language at school, and most experience some form of identity-based harassment or assault. These experiences may negatively impact students' academic outcomes, as well as their psychological well-being. Thus, we explored the reasons AAPI LGBTQ students feel unsafe at school, the types of biased language they hear, and both the extent and effects of in-school harassment and assault. Because school staff have a responsibility to intervene on such incidents of bias, we also examined AAPI LGBTQ students' rates of reporting their victimization to staff, and how school staff responded.

## Safety

We asked students if they ever felt unsafe at school due to any personal characteristics. As shown in Figure 1.1, the most common reason for AAPI LGBTQ students to feel unsafe was due to their actual or perceived sexual orientation (51.8%), followed by the way they express their gender, or how traditionally "masculine" or "feminine" they were in appearance or behavior (41.1%).[22] Additionally, just over a quarter of students (26.4%) felt unsafe due to their race or ethnicity. For some, feeling unsafe at school may even result in avoiding school altogether. When asked about absenteeism, over a quarter of AAPI LGBTQ students (27.6%) reported missing at least one day of school in the last month because they felt

**Figure 1.1 AAPI LGBTQ Students Who Felt Unsafe at School Because of Actual or Perceived Personal Characteristics**



AR_292919

unsafe or uncomfortable, and nearly one-tenth (8.4%) missed four or more days in the last month.

## Biased Remarks

AAPI LGBTQ students may feel unsafe at school, in part, because of homophobic, racist, or other types of biased language that they hear from their peers in classrooms or hallways. We asked students how often they heard anti-LGBTQ language from other students, including: the word "gay" being used in a negative way (such as "that's so gay" being used to call something "stupid" or "worthless"), other homophobic remarks (such as "faggot" and "dyke"), comments about students not acting "masculine" enough, comments about students not acting "feminine" enough, and negative remarks about transgender people (such as "tranny" or "he/she"). We also asked students how often they heard racist language from other students at school. As shown in Figure 1.2, the most common form of biased language was "gay" used in a negative way, followed by racist remarks. Nearly two-thirds of AAPI LGBTQ students heard "gay" used in a negative way often or frequently (61.9%), and just over half heard racist remarks often or frequently (52.7%). The next most common forms of biased remarks heard by AAPI LGBTQ students were other homophobic remarks and comments about not acting "masculine" enough (see also Figure 1.2).[23]

## Harassment and Assault

In addition to hearing biased language in hallways or classrooms, many students experience victimization at school, including verbal harassment (e.g., being called names or threatened), physical harassment (e.g., being shoved or pushed), and physical assault (e.g., being punched, kicked, or injured with a weapon). LGBTQ students who experience harassment or assault may feel excluded and disconnected from their school community, and may respond by avoiding school. This victimization may also have a negative impact on students' psychological well-being and academic success.[24] Therefore, we examined how often AAPI LGBTQ students experienced victimization in the past year based on their actual or perceived sexual orientation, the way they express their gender, and their actual or perceived race/ethnicity. We also examined whether victimization based on sexual orientation or based on race/ethnicity was associated with academic outcomes as well as key indicators of student well-being, including: educational aspirations, skipping school due to feeling unsafe, school belonging, and depression.

**Extent and effects of harassment and assault based on personal characteristics.** As shown in Figure 1.3, the majority of AAPI LGBTQ students experienced harassment and assault based on their race/ethnicity, sexual orientation and gender expression. Victimization based on their sexual orientation was most common, followed by victimization because of gender expression (see also Figure 1.3).[25]

We examined whether victimization at school due to sexual orientation and victimization due to race or ethnicity were associated with AAPI LGBTQ students' psychological well-being and

Figure 1.2 Frequency of Hearing Anti-LGBTQ and Racist Remarks in School



AR_292920

educational outcomes. We found that victimization based on sexual orientation was related to skipping school due to feeling unsafe, lower educational aspirations, lower levels of school belonging, and greater levels of depression.[26] For example, as seen in Figure 1.4, students were more than three times as likely to skip school because they felt unsafe if they experienced higher than average levels of victimization based on sexual orientation (57.5% vs. 16.9%). Similarly, we found that victimization based on race/ethnicity was related to skipping school due to feeling unsafe, lower levels of school belonging, and greater levels of depression (see Figure 1.5).[27] We did not, however, observe a relationship between victimization based on race/ethnicity and educational aspirations.

*Differences in victimization by transgender status.* Previous research, from GLSEN, as well as other scholars, has demonstrated that transgender and other gender nonconforming (trans/GNC) students experience greater levels of anti-LGBTQ victimization and harassment than cisgender LGBQ students.[28] We found this to be true for AAPI LGBTQ students as well. Specifically, we found that trans/GNC AAPI students experienced greater levels of victimization based on sexual orientation and gender expression than their cisgender LGBQ AAPI peers (see Figure 1.6), but they did not differ on victimization based on race/ethnicity (see also Figure 1.6).[29] Given that the general population tends to hold less favorable views of transgender people than of gay and lesbian people,[30] trans/GNC AAPI students may be greater targets for anti-LGBTQ victimization.

*Differences in victimization by multiple racial/ ethnic identities.* For multiracial students, their own racial/ethnic identification or how they are identified by their peers in terms of their race/ ethnicity may vary based on context.[31] Because they do not belong to any single racial/ethnic group, these students may face greater levels of social exclusion that may result in increased risks for peer victimization.[32] Thus, we examined whether AAPI LGBTQ students who endorsed multiple racial/ethnic identities differed from those who identified only as AAPI with regard to their experiences of victimization. We found that multiracial AAPI LGBTQ students experienced greater levels of victimization based on sexual

**Figure 1.3 Percentage of AAPI LGBTQ Students Who Experienced Victimization Based on Personal Characteristics**



**Figure 1.4 Victimization Based on Sexual Orientation and AAPI LGBTQ Student Well-Being and Academic Outcomes**



15

orientation and based on gender expression than LGBTQ students who identified only as AAPI (see Figure 1.7).[33]

We did not find that multiracial AAPI LGBTQ students, overall, experienced different levels of race-based harassment than those who only identified as AAPI. However, we did find differences when we considered the racial composition of the school. In majority AAPI schools, multiracial AAPI LGBTQ students experienced a higher severity of racist victimization than LGBTQ students who only identified as AAPI. However in all other school compositions — majority White, majority other non-White race, and no majority race schools — LGBTQ students who only identified as AAPI experienced higher

severity of racist victimization than multiracial AAPI students.[34] It is possible that multiracial AAPI students are more likely to be targeted for victimization in AAPI majority schools because of their other racial/ethnic identities, whereas students who only identify as AAPI may be more targeted for victimization in schools where they are not a racial majority. Further research is warranted to explore other possible connections between multiracial/multiethnic identity and different forms of victimization among students of color.

**Experiencing multiple forms of victimization.** Thus far in this section, we have discussed AAPI LGBTQ students' in-school experiences of victimization based on sexual orientation, on gender expression, and on race/ethnicity independently. However,

**Figure 1.5 Victimization Based on Race/Ethnicity and AAPI LGBTQ Student Well-Being and Academic Outcomes**



**Figure 1.6 Differences in Level of Victimization by Trans/GNC Status**
(Percentage of AAPI LGBTQ Students Experiencing Higher than Average Levels of Victimization)



AR_292922

many AAPI LGBTQ students experience victimization that targets both their LGBTQ and their racial/ethnic identities. In fact, two-fifths of AAPI LGBTQ students in our study (40.0%) experienced harassment or assault based on both their sexual orientation and their race/ethnicity.[35] Previously in this report, we reported that both types of victimization separately were related to skipping school due to feeling unsafe, lower school belonging, and greater levels of depression. However, it is important to understand how these outcomes are associated with experiencing multiple forms of harassment. Therefore, we examined the combined effects of race-based



**Figure 1.7 Differences in Level of Victimization by Multiple Racial/Ethnic Identities**
(Percentage of AAPI LGBTQ Students Experiencing Higher than Average Levels of Victimization)

Victimization Based on Sexual Orientation — Identify Only as AAPI: 20.8%; Identify as AAPI and One or More Other Racial/Ethnic Identities: 30.9%

Victimization Based on Gender Expression — Identify Only as AAPI: 23.8%; Identify as AAPI and One or More Other Racial/Ethnic Identities: 29.6%

Victimization Based on Race/Ethnicity — Identify Only as AAPI: 54.5%; Identify as AAPI and One or More Other Racial/Ethnic Identities: 53.3%

Legend: Identify Only as AAPI · Identify as AAPI and One or More Other Racial/Ethnic Identities



**Figure 1.8 AAPI LGBTQ Student Well-Being and Multiple Forms of Victimization Based on Sexual Orientation and Race/Ethnicity**

Missed School in the Past Month — Neither Form of Victimization: 9.7%; Victimization Based on Sexual Orientation Only: 17.2%; Victimization Based on Race/Ethnicity Only: 28.8%; Both Forms of Victimization: 42.3%

School Belonging (Above Average Levels) — Neither Form of Victimization: 75.5%; Victimization Based on Sexual Orientation Only: 55.0%; Victimization Based on Race/Ethnicity Only: 48.7%; Both Forms of Victimization: 34.1%

Depression (Above Average Levels) — Neither Form of Victimization: 27.9%; Victimization Based on Sexual Orientation Only: 45.3%; Victimization Based on Race/Ethnicity Only: 51.7%; Both Forms of Victimization: 64.3%

Legend: Neither Form of Victimization · Victimization Based on Sexual Orientation Only · Victimization Based on Race/Ethnicity Only · Both Forms of Victimization

17

and homophobic victimization on missing school, school belonging, and depression. We found that students who experienced both homophobic and racist victimization were the most likely to skip school due to feeling unsafe,[36] experienced the lowest levels of school belonging,[37] and experienced the highest levels of depression,[38] as compared to those who experienced only one form of victimization or neither (see Figure 1.8).

In that AAPI LGBTQ students likely have a longer history with experiencing victimization based on their race/ethnicity than their LGBTQ identity, it is possible that these experiences of race-based victimization may equip AAPI LGBTQ students with skills to navigate other types of victimization, such as anti-LGBTQ victimization, and provide a buffer against the psychological harms of these additional forms of victimization.[39] Thus, we also examined how the experience of racist victimization might alter the effect of homophobic victimization on school outcomes and well-being. We found that the effects of victimization on school belonging and depression were more pronounced if students only experienced one form of victimization.[40] For example, the negative effect of homophobic victimization on depression was strongest among AAPI LGBTQ students who experienced higher levels of homophobic victimization and lower levels of racist victimization. Thus, the findings suggest that an AAPI LGBTQ student who has early and possibly ongoing experiences of racist victimization may be better equipped to respond to subsequent victimization, including harassment based on their sexual orientation.[41] We did not find this same effect with regard to missing school, however. More investigation is warranted to further understand the impacts of multiple forms of victimization, although it remains clear that experiencing additional forms of victimization means experiencing additional harm, and AAPI LGBTQ students who experienced victimization targeting both their race/ethnicity and sexual orientation experienced the poorest outcomes.

## Reporting School-Based Harassment and Assault

GLSEN advocates for clear guidelines for school staff on anti-bullying and harassment incidents, and for staff to be trained in effectively responding to victimization incidents. We asked AAPI LGBTQ students who had experienced harassment or

assault in the past school year how often they had reported the incidents to school staff, and found that the majority of students (56.5%) never reported victimization to staff (see Figure 1.9). Less than 1 in 5 students (17.1%) reported victimization to staff "most of time" or "always."

AAPI LGBTQ students who indicated that they had not always told school personnel about their experiences with harassment or assault were asked why they did not always do so. The most common reason for not reporting victimization to staff was that they did not think that staff would do anything about it (67.4%).

We asked LGBTQ students who had reported incidents to school staff about the actions that staff had taken in response to the reported incident. The most common staff responses to students' reports of harassment and assault was talking to the perpetrator/telling the perpetrator to stop (42.3%), followed by telling the student to ignore it (40.8%), and doing nothing/taking no action (34.3%). Thus, AAPI LGBTQ students may be justified in thinking that staff may not address the victimization they experience. Furthermore, nearly half of students (44.9%) reported that staff responded ineffectively to their reports of victimization. We also found that the only common response that could be considered appropriate or effective was talking to the perpetrator/telling the perpetrator to stop.[42]



Figure 1.9 Frequency of AAPI LGBTQ Students Reporting Incidents of Harassment and Assault to School Staff (n=687)

Some of the Time 26.4%

Most of the Time 10.5%

Always 6.6%

Never 56.5%

AR_292924

# Insight on Family Reporting and Intervention

Family support has been shown to improve educational opportunities and academic success for marginalized groups, such as students with disabilities and students of color.[43] However, little is known about factors that contribute to family support, particularly for AAPI LGBTQ students. Prior studies have focused on AAPI parents' involvement in their children's academic achievement.[44] In part, this may be because education research regarding parental involvement in general, regardless of the students' race/ethnicity, has typically examined the relationship between parental involvement and academic achievement.[45] Therefore, relatively less attention has been paid to non-educational outcomes in the school lives of AAPI youth, including family support for AAPI students with regard to bullying. In this section, we examined family intervention in response to their child's victimization at school, and conditions that promote family intervention for AAPI LGBTQ students.

**Reporting Victimization to Family.** Given that family members may be able to intervene when incidents of victimization occur, we asked students in our survey if they reported harassment or assault to a family member. Less than half of AAPI LGBTQ students (43.5%) said that they had ever told a family member about the victimization they faced at school. When LGBTQ students experience victimization at school, they may be hesitant to tell family members if they are not out to them. We found that students who were out as LGBTQ to at least one family member were more likely to tell their families about the victimization they were experiencing at school, but it remained only slightly more than half (52.3% of those out to family vs. 32.0% of those not out).[46]

**Family Intervention.** Among AAPI LGBTQ students who reported victimization experiences to a family member, half (50.5%) reported that a family member talked to their teacher, principal or other school staff about the harassment or assault they experienced (see Figure).



Frequency of Intervention by AAPI LGBTQ Students' Family Members (n = 687)

Some of the Time 28.7%

Most of the Time 10.6%

Always 11.2%

Never 49.5%

Certain factors may increase the likelihood that family members intervene on behalf of the student with the school. Family members may be more likely to intervene when the student experiences a high severity of victimization. Further, family members of students with disabilities or educational accommodations may be more likely to be involved in the student's general school life and thus, more likely to intervene when that student is victimized in school. In fact, we found that family members of AAPI LGBTQ students were more likely to talk to staff about victimization when the student had experienced higher levels of victimization based on gender expression (54.5% vs. 45.2%).[47] However, victimization based on sexual orientation and victimization based on race/ethnicity were not related to family members talking to staff about victimization. We also found that AAPI LGBTQ students who had a disability were more likely to report that their family members talked to staff about their victimization, compared to AAPI LGBTQ students who did not have a disability (54.4% vs. 44.6%).[48] Receiving educational accommodation services was not related to family members talking to staff about victimization.

**Conclusions.** We found that many AAPI LGBTQ students who experienced victimization in school reported victimization to their family members and many family members talked to staff about victimization experiences. Certain conditions at school make it more likely for family members of AAPI LGBTQ students to intervene, such as when there is a more hostile school climate and when their child has a disability. It is interesting to note that family members of AAPI LGBTQ students were more likely to intervene when the student experienced higher levels of victimization based on gender expression, but this was not the case for victimization based on sexual orientation and victimization based on race/ethnicity. Further research is warranted to explore connections between different forms of victimization and family intervention among AAPI LGBTQ students. Finally, findings from our data show whether family members intervene, but not how effective their interventions are. Thus, it is critical for research to assess the effectiveness of family intervention efforts in improving school climate.

AR_292925

## Conclusions

The majority of AAPI LGBTQ students experienced anti-LGBTQ and racist victimization, and these forms of victimization may result in poorer academic outcomes and student well-being. In fact, those who experienced both of these forms of victimization had the most adverse outcomes with regard to skipping school due to feeling unsafe, school belonging, and depression. Thus, it is important that educators be particularly attentive to the needs of students who lie at the intersection of multiple forms of bias. Unfortunately, we also found that the majority of AAPI LGBTQ students who experienced victimization at school never reported these experiences to staff. Further, for those who did report their victimization to staff, the second most common staff response was telling the student to ignore the incident. Thus, it is critical that schools implement clear and confidential pathways for students to report incidents of bias that they experience, and that educators and other school staff receive training to understand how to intervene effectively on both anti-LGBTQ and racist victimization.

# Part Two: School Practices

AR_292927

AR_292928

Schools have a responsibility to promote positive learning for all students, including AAPI LGBTQ students. The availability of resources and supports in school for AAPI LGBTQ students is another important dimension of school climate. There are several key resources that may help to promote a safer climate and more positive school experiences for students: student clubs that address issues for LGBTQ students; school personnel who are supportive of LGBTQ students; and LGBTQ-inclusive curricular materials. However, our previous research has found that many LGBTQ students do not have such supports available in their schools.[49] In addition, schools also often have disciplinary practices that contribute to a hostile school climate. Thus, in this section, we examined school practices, and their impact on the educational outcomes and well-being of AAPI LGBTQ students. Specifically, we examined AAPI LGBTQ students' experiences of school disciplinary action, as well as the availability and utility of specific supports and resources that may uniquely impact AAPI LGBTQ students in ways that differ from the general LGBTQ student population, including student clubs that address LGBTQ and ethnic/cultural issues, school personnel, and LGBTQ-inclusive curriculum.

## Experiences with School Discipline

The use of harsh and exclusionary discipline, such as zero tolerance policies, has contributed to higher dropout rates as well as reliance on alternative educational settings, where educational supports and opportunities may be less available.[50] Prior research shows that school disciplinary policies and practices disproportionately targets LGBTQ students,[51] and may have serious academic consequences for these students. School discipline can also be directly connected to greater time out of school and even a greater likelihood in juvenile justice system involvement. We examined three categories of school disciplinary action: in-school discipline (including referral to the principal, detention, and in-school suspension), out-of-school discipline (including out-of-school suspension and expulsion), and having had contact with the criminal justice or juvenile justice system as a result of school discipline, such as being arrested and serving time in a detention facility. As shown in Figure 2.1, nearly a third of AAPI LGBTQ students (30.7%) reported having ever been disciplined at school. Students most commonly reported in-school discipline, and fewer students received out-of-school suspension and expulsion.



**Figure 2.1 Percentage of AAPI LGBTQ Students Who Experienced School Discipline**

AR_292929

A small percentage of students (1.4%) had had contact with the criminal justice or juvenile justice system.

**Impact of victimization and safety on school discipline.** Several factors may be associated with LGBTQ students' school disciplinary experiences, including those stemming from unsafe or discriminatory school environments. As we found in GLSEN's *2017 National School Climate Survey*, LGBTQ students are often disciplined when they are, in fact, the victim of harassment or assault. We found that AAPI LGBTQ students who experienced greater levels of victimization based on sexual orientation, gender expression, and race/ethnicity were more likely to experience all three forms of school discipline (in-school discipline, out-of-school discipline, and contact with law enforcement).[52]

LGBTQ students who are victimized at school may also miss school because they feel unsafe, and thus, face potential disciplinary consequences for truancy. We found that AAPI LGBTQ students who missed more days of school were more likely to experience all three forms of discipline (in-school, out-of-school, and contact with law enforcement).[53] For instance, as shown in Figure 2.2, just over two-fifths of AAPI LGBTQ students (42.8%) who missed school in the past month because they felt unsafe experienced some form of in-school discipline, compared to a quarter of students (24.5%) who did not miss school.

**Impact of discriminatory school policies and practices on school discipline.** Schools often employ anti-LGBTQ discriminatory practices, which may lead to more disciplinary action against LGBTQ students. In our survey, we asked LGBTQ students about a number of specific LGBTQ-related discriminatory school policies and practices at their school that they may have personally experienced, such as being disciplined for expressing public displays of affection, prevented from starting a GSA, and gender-related discrimination (e.g., prevented from using the bathroom or locker room that aligns with their gender, prevented from using their chosen name or pronouns). Half of AAPI LGBTQ students (50.0%) experienced discriminatory school policies and practices.

We examined how anti-LGBTQ discriminatory school policies and practices were associated with school disciplinary action. As illustrated in Figure 2.3, we found that AAPI LGBTQ students who experienced discrimination in school were more likely to experience both in-school and out-of-school-discipline than AAPI LGBTQ students who did not experience discrimination, but did not find any differences with regard to contact with law enforcement.[54]

**Differences in school discipline by transgender status.** Previous research from GLSEN has demonstrated that, in general, transgender and other gender nonconforming (trans/GNC) students experience higher rates of in-school discipline and



**Figure 2.2 Experiences of School Discipline by Missing School Because of Feeling Unsafe**
(Percentage of AAPI LGBTQ Students Who Experienced School Discipline)

AR_292930

out-of-school discipline, compared to cisgender LGBQ students.[55] We also found this to be true for AAPI LGBTQ students. Trans/GNC AAPI students were more likely to experience in-school discipline and out-of-school discipline than cisgender LGBQ AAPI students.[56] However, trans/GNC AAPI students did not differ with regard to contact with law enforcement.

Given our previous finding that trans/GNC AAPI students experienced greater levels of anti-LGBTQ victimization and that they are more likely to experience in-school and out-of-school discipline than cisgender LGBQ AAPI students, we examined whether anti-LGBTQ victimization played a role on the relationships between trans/GNC status and in-school and out-of-school discipline. We found that trans/GNC AAPI students experienced greater levels of anti-LGBTQ victimization than their cisgender LGBQ AAPI peers, and in turn, they were more likely to experience in-school and out-of-school discipline.[57]

**Differences in school discipline by multiple racial/ ethnic identities.** Prior research has found that among secondary school students, students who identify as two or more racial/ethnic identities are at greater risk for school disciplinary action than other racial/ethnic groups.[58] Thus, we examined whether AAPI LGBTQ students who endorsed multiple racial/ethnic identities differed from those who only identified as AAPI with regard to their experiences with school disciplinary action. We found that multiracial AAPI LGBTQ students were more likely to experience all three forms of school discipline, including in-school discipline (34.6% vs. 23.0%), out-of-school discipline (5.9% vs. 3.1%), and contact with law enforcement (2.2% vs. 0.3%), than AAPI LGBTQ students who identified only as AAPI.[59] Further research is warranted to explore the possible connections between multiracial/multiethnic identity and school discipline among students of color.

**Impact of school discipline on educational outcomes.** School disciplinary action may impinge on a student's educational success. Exclusionary school disciplinary practices, those that remove students from the classroom, may lead to poorer grades and a diminished desire to continue on with school. In fact, we found that AAPI LGBTQ students' experiences with in-school discipline, out-of-school discipline, and contact with law enforcement were related to lower likelihood to plan on pursuing post-secondary education,[60] and lower grade point average (GPA)[61] than those who did not experience in-school discipline, out-of-school discipline and contact with law enforcement.

## School-Based Supports and Resources for AAPI LGBTQ Students

In our *2017 National School Climate Survey* report, we demonstrated the positive impact of LGBTQ-related school resources and supports on educational outcomes and well-being for LGBTQ secondary school students in general. Unfortunately, we also found that many LGBTQ



**Figure 2.3 Experiences of School Discipline by Anti LGBTQ Discrimination**
(Percentage of AAPI LGBTQ Students Who Experienced School Discipline)

AR_292931

students did not have access to these types of resources in school. Thus, in this section, we examined the availability and utility of school supports, including LGBTQ-related school supports as well as student-led ethnic/cultural clubs, for AAPI LGBTQ students. It is important to note that for institutional supports, including the presence of GSAs and ethnic/cultural clubs, school characteristics may be related to their availability, such as region, locale, school racial composition, and school size. Other school supports, such as having educators and administrators who are supportive of LGBTQ students, may differ based on the identities of AAPI LGBTQ students. For example, a student's AAPI or LGBTQ identities may not be related to whether they have a GSA or an ethnic/cultural club, but they may be related to how supportive their teachers are. Yet, one's racial/ethnic identities may be related to the types of schools one attends or has access to (e.g., school racial composition, region, locale), and schools then vary in the availability of LGBTQ-related institutional supports (see GLSEN's *2017 National School Climate Survey* report for full discussion of school characteristics and the availability of supports). Therefore, we also examined how the availability of these supports may be related to various demographic and school characteristics, such as school location and student body racial composition.

**GSAs.** GSAs, often known as Gay-Straight Alliances or Gender and Sexuality Alliances, are student-led clubs that address LGBTQ student issues and can be supportive spaces for LGBTQ students.



**Figure 2.4 Availability of GSAs and Ethnic/Cultural Clubs**
(Percentage of AAPI LGBTQ Students Who Reported Having Club at Their School)

The presence of GSAs, regardless of participation in them, can provide LGBTQ students with a safe and affirming space within a school environment that may be hostile. Nearly two-thirds of AAPI LGBTQ students (63.5%) reported having a GSA at their school (see Figure 2.4). While our findings show that just over a third of AAPI LGBTQ students (36.5%) do not have access to a GSA, the percentage of AAPI LGBTQ students who have access to a GSA is still higher than the national percentage for LGBTQ students, based on the *2017 National School Climate Survey.*[62] Further research is warranted to explore possible school-level characteristics that may contribute to differences in access to GSAs for AAPI LGBTQ students, compared to LGBTQ students nationally.

We also examined whether school characteristics, including school racial composition, locale (urban, suburban, rural), region (Northwest, South, Midwest, West), and school size were related to the availability of GSAs. With regard to locale, AAPI LGBTQ students in suburban schools were most likely and rural schools were least likely to have a GSA at their school.[63] Regarding region, AAPI LGBTQ students who attended schools in the South were the least likely to have a GSA, and those attending schools in the West were more likely to have a GSA than those in the Midwest.[64] Finally, regarding size of the school population, AAPI LGBTQ students who attended larger schools were more likely to have a GSA at their school.[65] School racial composition was not related to GSA availability.[66]

GSAs and other similar student clubs can provide a safe and inclusive school environment for LGBTQ students and their allies to meet, socialize, and advocate for change in their school communities.[67] Thus, students who have a GSA may feel more connected to school and may be less likely to miss school because they have supportive groups for LGBTQ students. Also, in that GSAs can often effect change in schools for a safer environment for LGBTQ students, LGBTQ students with a GSA may be less likely to feel unsafe at school and feel a greater sense of belonging to the school community. AAPI LGBTQ students with a GSA at their school were less likely to miss school due to safety concerns (22.4% vs. 36.9%), and felt more connected to their school community than those who did not have a GSA.[68] AAPI LGBTQ students who had a GSA at their school were also less likely to feel unsafe because of their sexual orientation

(45.6% vs. 62.3%) and gender expression (38.6% vs. 45.4%).[69] There was, however, no relationship with feeling unsafe because of race/ethnicity.

**Ethnic/cultural clubs.** Ethnic/cultural clubs that bring together students of a particular racial, ethnic, and/or cultural background can offer a supportive space in school for those students. As such, the presence of these clubs, regardless of participation in them, may offer AAPI LGBTQ youth a network of peer support with other AAPI youth that may be more difficult to find in the general student population. Three-quarters of AAPI LGBTQ students (74.6%) reported that their school had an ethnic or cultural club at their school (see Figure 2.4). We also found that certain school characteristics were related to the availability of ethnic/cultural clubs.

Regarding school racial composition, the availability of ethnic/cultural clubs was greater in majority-AAPI schools than in majority-White schools.[70] Given that the AAPI population is ethnically and culturally diverse, AAPI LGBTQ students in majority-AAPI schools may be more likely to have ethnic/cultural clubs than AAPI LGBTQ students in majority-White schools because majority-AAPI schools have a larger pool of AAPI ethnic subgroups.

Regarding region, AAPI LGBTQ students who attended schools in the West were more likely to have an ethnic/cultural club than those who attended schools in the South and Northeast.[71] This may be, in part, because majority-AAPI schools were more likely to be in the West than in other regions.[72]

Regarding locale, AAPI LGBTQ students who attended rural schools were less likely to have an ethnic/cultural club than those who attended urban and suburban schools.[73] Regarding size of the school population, AAPI LGBTQ students who attended larger schools were more likely to have an ethnic/cultural club at their school.[74]

Schools with ethnic/cultural clubs may afford AAPI LGBTQ students the opportunity to network with other AAPI students. Further, similar to GSAs, regardless of participation, ethnic/cultural clubs may indicate to the LGBTQ AAPI student that the school is a welcoming and supportive place for them. We, in fact, found that AAPI LGBTQ students who had an ethnic/cultural club at their school felt safer due to their race/ethnicity, and had greater feelings of school belonging.[75]

27

# Insight on Club Participation and Leadership

As discussed in this report, having a GSA or ethnic/cultural club at school is associated with several benefits for AAPI LGBTQ students, regardless of whether one participates in these clubs. However, it is also important to examine participation in these types of clubs and the possible benefits of participating for AAPI LGBTQ students. Prior research has demonstrated that participation in GSAs may mitigate some of the harmful effects of anti-LGBTQ victimization.[76] However, some research on AAPI gay cis male youth indicates that these youth may have negative perceptions of GSA participation, including a fear of being targeted for discrimination.[77] There is also evidence that ethnic/cultural clubs may provide a means of cultural validation for students of color.[78] However, there has been little research on the benefits of participation in these clubs for LGBTQ students of color. Thus, we examined the effects of participation on student well-being. Also, given that GSAs and ethnic/cultural clubs may encourage students to work toward social and political change,[79] we examined the relationship between club participation and civic engagement.

**GSA Participation.** As previously noted, nearly two-thirds of AAPI LGBTQ students (63.5%) had a GSA or similar club at their school. As shown in the figure, the majority of AAPI LGBTQ students with a GSA participated in the club (57.7%). Given the prior research indicating that AAPI LGBTQ youth may be hesitant to participate in GSAs, it is possible that certain school characteristics may be related to their participation in GSAs, such as school racial composition. However, no differences in GSA participation were found by racial composition of the school that AAPI LGBTQ students attend.[80] Participation in GSAs may also differ by demographic characteristics of AAPI LGBTQ students, specifically race/ethnicity (multiracial vs. AAPI only) and immigration status, but we found no significant differences in this regard.[81]



Participation in GSAs and Ethnic/Cultural Clubs

Did Not Attend Meetings

Attended Meetings, Not as Leader

Attended Meetings as Leader

Given that GSAs may offer AAPI LGBTQ youth a network of support at school, we examined whether GSA members felt an increased sense of school belonging, but did not observe a significant relationship.[82] However, we did find that GSAs may offer students opportunities and build skills to work towards more LGBTQ-inclusive schools and communities. For example, we found that AAPI LGBTQ students who led their GSAs and other GSA members felt more comfortable bringing up LGBTQ issues in class than those who were not part of their GSA.[83] We also found that GSA members were more likely than those who did not attend meetings to participate in a GLSEN Day of Action (such as Day of Silence)[84] or in a rally, protest, or demonstration for a cause, with GSA leaders being most likely to take part in either of these activities.[85] Moreover, GSA leaders were also more likely than those not involved in their GSA, to participate in a boycott against a company, and contact politicians, governments, or authorities about issues that are important to them.[86] Finally, we found that GSA members were more likely than those who did not attend meetings to participate in an event where people express their political views (such as a poetry slam or youth forum), volunteer to campaign for a political cause or candidate, and express views about politics or social issues on social media, with no differences between leader and non-leader GSA members.[87]

AAPI LGBTQ students who participate in GSAs may also face challenges at school regarding their LGBTQ identity. We found that GSA leaders experienced greater levels of victimization due to sexual orientation and gender expression than GSA non-leaders and those not involved in their GSA.[88] However, there were no differences between GSA non-leader members and those not involved in their GSA. It could be that greater levels of anti-LGBTQ harassment compel AAPI LGBTQ students to lead their school's GSA and take action toward making school safer for themselves and for other LGBTQ students. It may also be that GSA leaders are more visible as LGBTQ and, thus, more likely to be targeted for anti-LGBTQ victimization than GSA non-leaders and those not involved in their GSA.

**Ethnic/Cultural Club Participation.** As previously noted, a majority of AAPI LGBTQ students (74.8%) had an ethnic/cultural club at their school; however, only 16.4% of those with such a club attended meetings, with 3.2% who participated as an officer or a leader (see Figure). Although the percentage of those

AR_292934

participating in these clubs may seem low, it is important to note that some may have an ethnic/cultural club at their school for an ethnic or cultural community with which they do not identify.

Given that we previously found that AAPI LGBTQ students had more access to ethnic/cultural clubs in majority AAPI schools than in majority White schools, the racial composition of the school that AAPI LGBTQ students attend may also play a role in their participation in these clubs. However, we did not find differences in ethnic/cultural club participation by school racial composition.[89]

We did find demographic differences in ethnic/cultural club attendance and leadership, specifically with immigration status. AAPI LGBTQ students who were born in another country were more likely to participate as leaders in ethnic/cultural clubs than those who were born in the US.[90] However, multiracial AAPI LGBTQ students and those who only identify as AAPI did not differ on ethnic/cultural club attendance and leadership.[91]

Ethnic/cultural clubs may create a space for students of a particular racial, ethnic, or cultural background to meet, offering a network of peer support with other AAPI LGBTQ youth at school. However, we found no differences in sense of school belonging between those who had and had not attended ethnic/cultural clubs.[92] One possible explanation is that participation in ethnic/cultural clubs may foster a greater sense of school belonging for AAPI LGBTQ students when they attend AAPI majority schools compared to non-AAPI majority schools. However, we did not find any differences in school belonging by ethnic club participation when we considered the racial composition of the school.[93]

We found that involvement in the school's ethnic/cultural club was related to engagement in the various forms of activism discussed above with regard to GSA involvement. AAPI LGBTQ students who attended meetings at their ethnic/cultural club were more likely to participate in all forms of activism than those who did not attend meetings, except for a GLSEN Day of Action.[94] However, ethnic/cultural club leaders did not differ from non-leaders in these activities. This suggest that ethnic/cultural club membership itself may be associated with greater civic engagement, regardless of the level of club participation.

It is possible that AAPI LGBTQ student are more likely to participate in an ethnic/cultural club when they experience more racial victimization at school and have a greater need for support. However, we found that AAPI LGBTQ students who attended an ethnic/cultural club did not differ from those who did not attend meetings on experiencing race-based victimization.[95]

**Conclusions**. GSA and ethnic/cultural club participation were both associated with positive outcomes for AAPI LGBTQ students. For instance, participation in GSAs and ethnic/cultural clubs were both associated with greater levels of civic engagement. Future research is warranted regarding GSA and ethnic/cultural club activities that may promote political action and advocacy efforts among club members.

Our findings also suggest that having an ethnic/cultural club may be especially important for AAPI LGBTQ students who were born in another country, given their higher rates of ethnic/cultural club participation. It may be that AAPI LGBTQ students who were born in another country are more interested in participating in ethnic/cultural clubs because these students may already feel more connected to their cultural heritage, and participating in these clubs may be a way for them to maintain these ties.

It is interesting to note that GSA and ethnic/cultural club participation were not related to feelings of school belonging, but having access to them were, as discussed elsewhere in this report. This suggests that for AAPI LGBTQ students in general, it may simply be the presence of a GSA and ethnic/cultural club at their school that signals to these students that their school is a supportive place for them.

Finally, we found that AAPI LGBTQ students who led their GSAs experienced greater levels of anti-LGBTQ victimization, although ethnic/cultural club participation was not related to racist victimization. It may be that attending a GSA brings visibility to one's actual or perceived LGBTQ status, whereas the same would not be true for attending an ethnic/cultural club. However, it is unclear whether heightened visibility among students who lead their GSA leads to greater levels of victimization, or whether greater levels of victimization lead students to lead their GSAs. Further research is needed to examine the nature of this relationship, the reasons that compel LGBTQ students to participate in GSAs, and the impact of GSA leadership.

AR_292935

**Supportive school personnel.** Previous research has established that for LGBTQ students in general, having supportive teachers, principals, and other school staff and administration has benefits for educational and psychological outcomes. However, educators who are supportive of LGBTQ students may vary in their ability to respond to the needs of youth of color.[96] For AAPI LGBTQ students, having such supports may be especially beneficial because they may experience victimization or discrimination that targets their multiple identities, and because they may receive less support in general because of both their race/ethnicity and LGBTQ identity. In our survey, we asked about how many school staff are supportive of LGBTQ students, and how supportive administrators are of LGBTQ students. Similar to our findings on LGBTQ students in general from the *2017 National School Climate Survey* report, the vast majority of AAPI LGBTQ students (97.2%) could identify at least one supportive staff member at school. However, only about half (48.5%) reported having 11 or more supportive staff (see Figure 2.5). Furthermore, only about half of AAPI LGBTQ students (49.2%) reported having somewhat or very supportive school administration (see Figure 2.6). It is possible that multiracial AAPI LGBTQ students may be treated differently by educators and administrators than those who only identify as AAPI. In fact, we found that multiracial AAPI LGBTQ students reported having fewer supportive staff and a lower level of support from administrators than students who identified only as AAPI.[97] This may be due to differences in educator and administrator attitudes toward various racial/ethnic groups.

Given that AAPI LGBTQ students often feel unsafe and unwelcome in school, as discussed earlier in this report, having access to supportive school personnel may be critical for creating better learning environments for AAPI LGBTQ students. Therefore, we examined the relationships between the presence of staff who are supportive of LGBTQ students and several indicators of school climate, including: absenteeism, feeling unsafe because of personal characteristics, psychological well-being, feelings of school belonging, academic achievement, and educational aspirations.

As illustrated in Figure 2.7, AAPI LGBTQ students who had more staff who were supportive of LGBTQ students:

- had increased feelings of connectedness to their school community;

- had higher levels of self-esteem; and

- had lower levels of depression.[98]

In addition, AAPI LGBTQ students who had more staff who were supportive of LGBTQ students:

- were less likely to miss school due to safety concerns (e.g., 15.3% with 11 or more supportive staff reported missing at least one day of school in the past month vs. 41.5% with no supportive staff);

- were less likely to feel unsafe because of their sexual orientation (e.g., 40.6% with 11 or more supportive staff reported feeling unsafe



**Figure 2.5 AAPI LGBTQ Students' Reports on the Number of Teachers and Other School Staff Who are Supportive of LGBTQ Students**

None 2.8%
One 4.3%
11 or More 48.5%
Between 2 and 5 25.4%
Between 6 and 10 19.0%



**Figure 2.6 AAPI LGBTQ Students' Reports on How Supportive Their School Administration is of LGBTQ Students**

Very Unsupportive 7.5%
Very Supportive 23.4%
Somewhat Unsupportive 12.9%
Somewhat Supportive 25.8%
Neutral 30.3%

AR_292936

because of their sexual orientation vs. 70.7% with no supportive staff);

• were less likely to feel unsafe because of their gender expression (e.g., 33.9% with 11 or more supportive staff reported feeling unsafe because of their gender expression vs. 43.9% with no supportive staff);

• were less likely to feel unsafe because of their race/ethnicity (e.g., 20.8% with 11 or more supportive staff reported feeling unsafe because of their race/ethnicity vs. 29.3% with no supportive staff);

• had higher GPAs (e.g., average GPA of 3.5 with 11 or more supportive staff vs. 3.2 with no supportive staff);[99] and

• had greater educational aspirations (e.g., 97.6% with 11 or more supportive staff planning to pursue post-secondary education vs. 93.8% with no supportive staff).[100]





Figure 2.7 Supportive School Staff and Well-Being and School Belonging

School Belonging (Above Average Levels)

Self-Esteem (Above Average Levels)

Depression (Above Average Levels)

# Insight on Inclusive Curriculum

Findings from GLSEN's *2017 National School Climate Survey* show that having an LGBTQ inclusive curriculum, such as learning about LGBTQ history and positive roles models, can positively shape the school experiences of LGBTQ students in general. With regard to LGBTQ curricular inclusion, we found that just over a quarter of AAPI LGBTQ students (27.4%) were taught positive representations of LGBTQ people, history, or events, which is similar to the percentage of the full sample of LGBTQ students.

Teaching students about LGBTQ people, history, and events in a positive manner may help AAPI LGBTQ students feel more valued at school, and it may also promote positive feelings toward LGBTQ students from peers. Thus, we examined the relationship between having an inclusive curriculum and feeling unsafe because of personal characteristics, peer acceptance of LGBTQ people, and school belonging. As shown in the figure, compared to AAPI LGBTQ students who did not have an inclusive curriculum at their school, those who had an inclusive curriculum:

- were less likely to feel unsafe because of their sexual orientation and gender expression;[101]
- were more likely to have peers at school be accepting of LGBTQ people;[102] and
- felt more connected to their school community.[103]

Interestingly, AAPI LGBTQ students who had an LGBTQ inclusive curriculum were also less likely to feel unsafe because of their race/ethnicity than those who did not have an LGBTQ inclusive curriculum (22.5% vs. 27.8%).[104] It may be that teaching students positive representations of LGBTQ people, history, and events not only makes peers more accepting of LGBTQ students, but perhaps also more accepting of diversity in general, including racial/ethnic diversity. It is also possible that schools or school districts that include positive representations of LGBTQ topics may also be more likely to have positive inclusion about race/ethnicity in their curriculum, policies and practices.



Inclusive Curriculum and Feelings of Safety, Peer Acceptance, and School Belonging among AAPI LGBTQ Students

It is important to note that we did not ask questions about other types of curricular inclusion, such as content about AAPI people, history or events. Previous research has shown that for students of color, positive representations of people of color, history and events can help to dissolve stereotypical mainstream representations.[105] This would also benefit the learning experience and well-being of AAPI LGBTQ youth, and could also work in concert with LGBTQ inclusion to greater benefit this population of students.

**Conclusions.** A school curriculum that is inclusive of diverse identities may help to instill beliefs in the intrinsic value of all individuals. We found that AAPI LGBTQ students who were taught positive representations about LGBTQ people, history, and events at school felt more connected to their school community and felt safer at school, not only with regard to their LGBTQ identity, but also with their racial/ethnic identity. Therefore, having an LGBTQ curriculum may mitigate anti-LGBTQ victimization, as well as racist victimization for AAPI LGBTQ students. However, such an inclusive curriculum was unavailable for the majority of AAPI LGBTQ youth. Thus, it is imperative that educators are provided with both training and resources to deliver school lessons and activities that reflect the diverse identities and communities present in their classrooms.

AR_292938

## Conclusions

In this section, we examined AAPI LGBTQ students' experiences with school practices, particularly school disciplinary action and school resources and supports. AAPI LGBTQ students experienced somewhat high rates of school discipline, with the most common form being in-school discipline. We also found that AAPI LGBTQ students who experienced institutional discrimination were more likely to experience both in-school and out-of-school discipline. Research and policy initiatives that attempt to address school disciplinary action and juvenile justice must be inclusive of, and respond to the experiences of AAPI LGBTQ youth. In order to ensure that schools are welcoming and affirming to all students, schools should eliminate policies and practices that discriminate against AAPI LGBTQ students. Moreover, administrators, policymakers, and teachers should advocate for disciplinary policies that are restorative instead of punitive.

Overall, having access to school supports and resources helped to improve the school safety and educational outcomes for AAPI LGBTQ students. We found that having more LGBTQ-supportive staff was associated with greater feelings of school belonging and school safety, greater educational outcomes, and improved psychological well-being. Similarly, having an LGBTQ-inclusive curriculum was related to greater feelings of school belonging and school safety. Further, not only are the availability of and participation in GSAs beneficial for AAPI LGBTQ students, but ethnic/cultural clubs are as well. However, as our findings indicate, many AAPI LGBTQ students do not have access to these supportive resources. It is important to note that we did not explore any other resources regarding race/ethnicity, and so we do not have information on racial/ethnic specific resources. For instance, we do not know whether AAPI LGBTQ students are exposed to positive representations of AAPI history, people, and events or how such representations may be beneficial for their educational experience. Further, we were able to examine the benefits of having school personnel who are supportive of LGBTQ students, but were not able to examine school personnel who are supportive of AAPI students in general. Given that the experiences of AAPI LGBTQ students lie at the intersection of multiple forms of bias, future research should examine resources that support and affirm these students' multiple marginalized identities.

33

AR_292940

# Discussion

AR_292942

## Limitations

The findings presented in this report provide new information and valuable insights on the school experiences of AAPI LGBTQ students. However, there are some limitations to our study. The participants in this study were only representative of those who self-identified as lesbian, gay, bisexual, transgender, or queer, and have some connection to the LGBTQ community either through local organizations or online, and LGBTQ youth who were not comfortable identifying their sexual orientation in this manner may not have learned about the survey. Therefore, AAPI LGBTQ youth who self-identified as LGBTQ but had no connection to the LGBTQ community may be underrepresented in this sample. The participants in this study also did not include students who have a sexual attraction to the same gender or multiple genders, but do not identify themselves as LGBQ.

In the survey, there were several instances where we asked about sexual orientation, gender identity, and gender expression as it pertained to the unique school experiences of LGBTQ youth of color, but we did not ask similar questions regarding race/ethnicity. For instance, we did not ask about peer or educator support related to race/ethnicity, which would have provided a more comprehensive understanding on the school experiences of AAPI LGBTQ students.

In the survey, we only included two ethnic categories for AAPI when we asked students about their race/ethnicity: "Asian or South Asian" (Asian) and "Native Hawaiian or Pacific Islander" (Pacific Islander). Therefore, we could not examine school experiences within and across Asian LGBTQ students (e.g., Southeast Asian, South Asian, East Asian). Also, as noted in the Methods section of this report, the sample size of Pacific Islander LGBTQ students was too small to examine their school experiences alone; therefore, students who identified as Pacific Islander were combined with those who identified as Asian. Examining feelings of safety, victimization experiences, school discipline, and supports and resources among Asian ethnic groups and among Pacific Islanders, as well as differences across these ethnic groups, could provide more insight into the unique school experiences of AAPI LGBTQ students.

It is also important to note that our survey only reflects the experiences of LGBTQ students who were in school during the 2016-2017 school year. Thus, findings from this survey may not necessarily reflect the experiences of AAPI LGBTQ students who had already dropped out of school, whose experiences may be different from students who remained in school.

## Conclusions

Findings presented in this report highlight the unique experiences of AAPI LGBTQ students at the intersection of their various identities, including race, gender, and sexual orientation. The majority of AAPI LGBTQ students experienced harassment in school in the past year because of their sexual orientation, gender expression, and race/ethnicity. Experiences of anti-LGBTQ victimization were particularly severe for both trans/GNC AAPI students as well as multiracial AAPI students, which may be related to greater levels of social exclusion faced by these groups at school. We also found that racist victimization was particularly severe for multiracial AAPI LGBTQ students who attended majority AAPI schools. It may be that AAPI LGBTQ students who attend majority AAPI schools experience greater levels of social exclusion based on their multiracial status. Further, we also found that AAPI LGBTQ students who experienced both homophobic and racist victimization experienced the poorest academic outcomes and psychological well-being. AAPI LGBTQ youth who experienced sexual orientation-based victimization, gender expression-based victimization, or race-based victimization were also more likely to experience exclusionary school discipline, such as detention, suspension, or expulsion. Such disciplinary actions may increase their likelihood of involvement with the criminal and juvenile justice system.

The findings in this report help to provide a deeper understanding of the experiences of AAPI students by examining the school-related experiences of AAPI LGBTQ students. Much of the general literature on AAPI students has focused on achievement, perhaps in order to challenge

AR_292943

the model minority myth that all AAPI youth are academically successful. The myth may also promote the notion that they avoid or are exempt from experiencing victimization at school. Further, it may also lead educators and administrators to believe that focusing on their studies prevents AAPI youth from being placed in situations that can lead to experiencing victimization. Yet our findings clearly demonstrate that many AAPI LGBTQ students experience challenges in school and need greater support. Trans/GNC and multiracial AAPI LGBTQ students may especially need support from school educators and administrators — not only do these students face greater victimization due to their trans/GNC and multiracial status, but they may also be overlooked due to their AAPI status.

We did identify critical resources that were beneficial for AAPI LGBTQ youth. For example, having an LGBTQ-inclusive curriculum and having LGBTQ-supportive educators at school were both associated with AAPI LGBTQ students feeling more connected to their school community and feeling less unsafe regarding their sexual orientation, gender expression, and even their race/ethnicity. Supportive student clubs such as GSAs and ethnic/cultural clubs were also associated with greater feelings of safety, and those who attended these clubs were more likely to engage in activism in their schools and communities. However, we found that many AAPI LGBTQ students did not have access to these supportive school resources. We also found that LGBTQ students who only identified as AAPI had more supportive school educators and higher level of support from administrators than multiracial AAPI LGBTQ students. This may be due to differences in attitudes toward various racial/ethnic groups. In this vein, staff and administrators may apply the model minority stereotype to students who only identify as AAPI, and less so to multiracial AAPI students, and therefore treat those who only identify as AAPI more favorably than multiracial AAPI LGBTQ students.

## Recommendations

As educators, advocates, and others concerned with issues of educational equity and access continue to address the myriad forms of oppression found in and out of school, such as racism, heterosexism, homophobia and transphobia, they must also account for the intersections of these forms of oppression. Therefore, addressing the concerns of AAPI LGBTQ students requires a nuanced approach to combating racism, homophobia, and transphobia. Further, it is important to have a greater understanding of the experiences, needs and concerns of AAPI LGBTQ students through specific and focused efforts.

Given the paucity of data on challenges faced by AAPI youth in school and on discussions that involve bullying in schools in this population, information that is critical in policymaking and advocacy for AAPI LGBTQ youth may not always be available. Education researchers must work to obtain diverse and robust samples so that they can explore smaller racial/ethnic populations such as AAPI. This report continues to fill this gap in knowledge, so that educators, policymakers, safe school advocates, and others working to make schools a more inclusive space can continue to seek to understand the multifaceted experiences of AAPI LGBTQ students, particularly with regard to how we can render accessible specific resources that support these students at school and in larger communities outside of school. This report demonstrates the ways in which the availability of supportive student clubs, supportive educators, and other school-based resources for AAPI LGBTQ students can positively affect their school experiences. We recommend school leaders, education policymakers, and other individuals who want to provide safe learning environments for AAPI LGBTQ students to:

- Support student clubs, such as GSAs and ethnic/cultural clubs. Organizations that work with GSAs and ethnic/cultural clubs should also come together to address AAPI LGBTQ students' needs related to their multiple marginalized identities, including sexual orientation, gender, and race/ethnicity.

- Provide professional development for school staff that addresses the intersections of identities and experiences of AAPI LGBTQ students.

- Increase student access to curricular resources that include diverse and positive representations of both AAPI and LGBTQ people, history, and events.

- Establish school policies and guidelines for staff in responding to anti-LGBTQ and racist

AR_292944

behavior, and develop clear and confidential pathways for students to report victimization that they experience. Local, state, and federal education agencies should also hold schools accountable for establishing and implementing these practices and procedures.

- Work to address the inequities in funding at the local, state, and national level to increase access to institutional supports and education

in general, and to provide more professional development for educators and school counselors.

Taken together, such measures can move us toward a future in which all students have the opportunity to learn and succeed in school, regardless of sexual orientation, gender identity, gender expression, race, or ethnicity.

AR_292945

AR_292946

# Endnotes

AR_292947

AR_292948

1    The term Asian American and Pacific Islander (AAPI) is the current term used within the AAPI communities to include persons having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent, as well as Native Hawaiian and other Pacific Islands people within and outside of the United States jurisdictions. Prior to this, Asian Pacific Americans (APA) was the term commonly used in the 1990s. For more about the use of "Asian American" and "AAPI," refer to:

Agbayani, A., & Ching, D. (2017). Scholarship, policy, and praxis recommendations for institutional change. In S. D. Museus, A. Agbayani, & D. M. Ching (Eds.), *Focusing on the underserved: Immigrant, refugee, and indigenous Asian American and Pacific Islanders in Higher Education* (pp. 241–253). Charlotte, North Carolina: Information Age Publishing.

Kandil, C. Y. (2018). After 50 years of 'Asian American,' advocates say the term is 'more essential than ever'. NBC News. https://www.nbcnews.com/news/asian-america/after-50-years-asian-american-advocates-say-term-more-essential-n875601

U.S. Census Bureau. Asian-American and Pacific Islander Heritage Month: May 2019. https://www.census.gov/newsroom/facts-for-features/2019/asian-american-pacific-islander.html

2    Ocampo, A. C., & Soodjinda, D. (2016). Invisible Asian Americans: the intersection of sexuality, race, and education among gay Asian Americans. *Race Ethnicity and Education, 19*(3), 480–499.

Only recently was there a report from the AAPI Bullying Prevention Task Force, specifically about bullying against AAPI students. See:

AAPI Task Force. (2016). AAPI Bullying Prevention Task Force Report, 2014–2016. https://sites.ed.gov/aapi/files/2015/02/AAPI-Bullying-Prevention-Task-Force-Report-2014-2016.pdf

3    Tran, N., & Okazaki, S. (2012). Bullying & victimization among Asian American students. Asian American Psychological Association. https://www.apa.org/pi/oema/resources/ethnicity-health/asian-american/bullying-and-victimization.pdf

4    Yi, V. & Museus, S. D. (2016). Model minority myth. *The Wiley Blackwell Encyclopedia of Race, Ethnicity, and Nationalism.* John Wiley & Sons.

5    Kian, L., Huynh, V. W., Cheah, C. S. L., Wang, Y, & Yoshikawa, H. (2017). Moving beyond the model minority. *Asian American Journal of Psychology, 8*(1), 1–6.

6    Rosenbloom, S. R. & Way, N. (2006). Experiences of discrimination among African American, Asian American, and Latino adolescents in an urban high school. *Youth and Society, 35*(4), 420–451.

Siu, S-F. (1996). Asian American students at risk: A literature review. *Center for Research on the Education of Students Placed at Risk (CESPAR).* pp. 1–90.

7    Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

8    Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

9    GSA Network. (2018). LGBTQ youth of color: Discipline disparities, school push-out, and the school-to-prison pipeline. https://gsanetwork.org/wp-content/uploads/2018/08/LGBTQ_brief_FINAL.pdf

Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

10   Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

11   Bowleg, L. (2012). The problem with the phrase women and minorities: Intersectionality—an important theoretical framework for public health. *American Journal of Public Health, 102*(7), 1267–1273.

Crenshaw, K. (1990). Mapping, the margins: Intersectionality, identity politics, and violence against women of color. *Stanford Law Review, 43*(6), 1241–1299.

12   For a full discussion of the Methods, refer to page 7 of GLSEN's *2017 National School Climate Survey* report.

13   Sexual orientation was assessed with a multi-check question item (i.e., gay, lesbian, straight/heterosexual, bisexual, pansexual, questioning, queer, and asexual) with an optional write-in item for sexual orientations not listed. Students in the categories Queer, Another Sexual Orientation, and Questioning/Unsure did also indicate that they were gay/lesbian, bisexual, or pansexual.

14   Pansexual identity is commonly defined as experiencing attraction to some people, regardless of their gender identity. This identity may be distinct from a Bisexual identity, which is commonly described as either experiencing attraction to some male-identified people and some female-identified people or as experiencing attraction to some people of the same gender and some people of different genders.

15   Students who indicated that they were asexual and another sexual orientation were categorized as another sexual orientation. Additionally, students who indicated that their only sexual orientation was asexual and also indicated that they were cisgender were not included in the final study sample. Therefore, all students included in the Asexual category also are not cisgender (i.e., are transgender, genderqueer, another nonbinary identity, or questioning their gender).

16   Race/ethnicity was assessed with a single multi-check question item (i.e., African American or Black; Asian or South Asian; Native Hawaiian or other Pacific Islander; Native American, American Indian, or Alaska Native; White or Caucasian; Hispanic or Latino/a; and Middle Eastern or Arab American) with an optional write-in item for race/ethnicities not listed. All participants included in this report identified as "Asian or South Asian" or "Native Hawaiian or Other Pacific Islander." Percentages are listed for students who selected other racial/ethnic identities in addition to "Asian or South Asian" or "Native Hawaiian or Pacific Islander."

17   The racial/ethnic groups reported here are not mutually exclusive categories. Students who identified with more than one racial/ethnic group in addition to identifying as "Asian or South Asian" or "Native Hawaiian or Other Pacific Islander" are counted in each of the relevant categories.

18   It is important to note that we do not know the immigration status of the parents/guardians of students in our survey. Therefore, it is possible that students in the survey who were born outside the U.S. and its territories have U.S. citizenship because one of their parents/guardians does, and would not technically be immigrants to the U.S. Therefore, U.S. citizens born outside the U.S. may include both immigrants and non-immigrants.

19   Gender was assessed via three items: an item assessing sex assigned at birth (i.e., male or female), an item assessing gender identity (i.e., male, female, nonbinary, and an additional write-in option), and a multiple response item assessing sex/gender status (i.e., cisgender, transgender, genderqueer, intersex, and an additional write-in option). Based on responses to these three items, students' gender was categorized as: Cisgender Male, Cisgender Female, Cisgender Unspecified (those who did not provide any assigned sex or gender identity information), Transgender Male, Transgender Female, Transgender Nonbinary, Transgender Unspecified (those who did not provide any gender identity information), Genderqueer, Another Nonbinary Identity (i.e., those who indicated a nonbinary identity but did not indicate that they were transgender or genderqueer, including those who wrote in identities such as "gender fluid" or "demi gender"), or Questioning/Unsure.

20   Receiving educational accommodations was assessed with a question that asked students if they received any educational support services at school, including special education classes, extra time on tests, resource classes, or other accommodations.

21   Students were placed into region based on which state the last school they attended was located in – Northeast: Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, Washington, DC; South: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia; Midwest: Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Wisconsin; West: Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, Wyoming; U.S.

43

Territories: American Samoa, Guam, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands.

22  Mean differences in reasons for feeling unsafe were examined using a repeated measures multivariate analysis of variance (MANOVA). The multivariate effect was significant: Pillai's trace = .57, $F$(10, 1470) = 190.87, $p$<.001. Pairwise comparisons were considered at $p$<.05. Significant differences were found between all reasons with the exception of: gender and body size/weight were not different from each other, and; actual or perceived disability and actual or perceived religion were not different from each other. Percentages are shown for illustrative purposes.

23  Mean differences in rates of hearing biased language were examined using a repeated measures multivariate analysis of variance (MANOVA). The multivariate effect was significant: Pillai's trace = .37, $F$(5, 1467) = 171.07, $p$<.001. Pairwise comparisons were considered at $p$<.05. Significant differences were found between all forms of biased language with the exception of: other homophobic remarks and not acting "masculine" enough were not different from each other, and; other homophobic remarks and racist remarks were not different from each other. Percentages are shown for illustrative purposes.

24  Gruber, J. E. & Fineran, S. (2008). Comparing the impact of bullying and sexual harassment victimization on the mental and physical health of adolescents. *Sex Roles, 59*(1–2), 1–13.

Hammig, B. & Jozkowski, K. (2013). Academic achievement, violent victimization, and bullying among U.S. high school students. *Journal of Interpersonal Violence, 28*(7), 1424–1436.

Hase, C. N., Goldberg, S. B., & Smith, D. (2015). Impacts of traditional bullying and cyberbullying on the mental health of middle school and high school students. *Psychology in Schools, 52*(6), 607–617.

Holt, M. K., Vivolo-Kantor, A. M., Polanin, J. R., Holland, K. M., DeGue, S., Matjasko, J. L., Wolfe, M., & Reid, G. (2015). Bullying and suicidal ideation and behaviors: A meta-analysis. *Pediatrics, 135*(2), 496–509.

Strom, I. F., Thoresen, S., Wentzel-Larsen, T., & Dyb, G. (2013). Violence, bullying and academic achievement: A study of 15-year-old adolescents and their school environment. *Child Abuse & Neglect, 37*(4), 243–251.

25  Mean differences in rates of experiencing different forms of victimization were examined using a repeated measures multivariate analysis of variance (MANOVA). The multivariate effect was significant: Pillai's trace = .06, $F$(2, 1436) = 41.42, $p$<.001. Pairwise comparisons were considered at $p$<.05. Significant differences were found between all forms of victimization with exception of victimization based on sexual orientation and victimization based on gender expression. Percentages are shown for illustrative purposes.

26  The relationships between missing school, school belonging, and depression and severity of victimization due to sexual orientation were examined through Pearson correlations. Missing school: $r$(1468) = .46, $p$<.001; school belonging: $r$(1465) = -.45, $p$<.001; depression: $r$(1446) = .38, $p$<.001.

The relationship between educational aspirations and severity of sexual orientation-based victimization was examined using an analysis of variance (ANOVA), with victimization based on sexual orientation as the dependent variable and educational aspirations as the independent variable. The effect was significant: $F$(5, 1448) = 6.21, $p$<.001, $\eta_p^2$ = .02. Post hoc comparisons were considered at $p$<.05. Those not planning to graduate high school or unsure of their high school graduation plans experienced greater levels of victimization than all others, except for vocational school. There were no other observable differences. Percentages are shown for illustrative purposes.

27  The relationship between missing school, school belonging, and depression and severity of victimization due to race/ethnicity was examined through Pearson correlations. Missing school: $r$(1473) = .27, $p$<.001; school belonging: $r$(1471) = -.32, $p$<.001; depression: $r$(1452) = .31, $p$<.001.

The relationship between educational aspirations and severity of race-based victimization was examined using an analysis of variance (ANOVA), with victimization based on race/ethnicity as the dependent variable and educational aspirations as the independent variable. The effect was not significant. There were no observable differences.

28  Toomey, R. B., Ryan, C., Diaz, R. M., Card, N. A., & Russell, S. T. (2013). Gender-nonconforming lesbian, gay, bisexual, and transgender youth: School victimization and young adult psychosocial adjustment. *Psychology of Sexual Orientation and Gender Diversity, 1*(S), 71–80.

29  To test differences in severity of victimization by trans/GNC identity, a series of t-tests were conducted, with trans/GNC identity as the independent variable, and severity of victimization as the dependent variable. The effect was significant for victimization based on sexual orientation and victimization based on gender expression. Victimization based on sexual orientation: $t$(984.48) = 6.13, $p$<.001; victimization based on gender expression: $t$(889.00) = 10.62, $p$<.001. Trans/GNC AAPI students and cisgender LGBQ AAPI students did not differ on victimization based on race/ethnicity. Percentages are shown for illustrative purposes.

30  Lewis, D. C., Flores, A. R., Haider-Markel, D. P., Miller, P. R., Tadlock, B. L., & Taylor, J. K. (2017). Degrees of acceptance: Variation in public attitudes toward segments of the LGBT community. *Political Research Quarterly, 70*(4), 861–875.

31  Herman, M. (2004). Forced to choose: Some determinants of racial identification in multiracial adolescents. *Society for Research in Child Development, 75*(3), 730–748.

32  Renn, K. A. (2000). Patterns of situational identity among biracial and multiracial college students. *The Review of Higher Education, 23*(4), 399–420.

33  To test differences in severity of victimization by multiracial/multiethnic status, a series of t-tests were conducted, with multiracial/multiethnic status as the independent variable, and severity of victimization as the dependent variable. The effect was significant for victimization based on sexual orientation and gender expression. Sexual orientation: $t$(1462.33) = -4.17, $p$<.001; gender expression: $t$(1368.63) = -2.32, $p$<.05. LGBTQ students who only identified as AAPI did not differ from multiracial AAPI LGBTQ students on experiences of victimization based on race/ethnicity. Percentages are shown for illustrative purposes.

34  To examine whether school racial composition moderated the relationship between multiracial/multiethnic status and race-based victimization, a two-way analysis of variance (ANOVA) was conducted, with multiracial/multiethnic status and school racial composition as the independent variables, multiracial/multiethnic status X school racial composition as the interaction term, and severity of race-based victimization as the dependent variable. The univariate effect was significant: $F$(7, 1302) = 5.14, $p$<.001. School racial composition was significantly associated with severity of race-based victimization: $F$(3, 1302) = 3.97, $p$<.01. Multiracial/multiethnic status X school racial composition interaction was significantly associated with severity of race-based victimization: $F$(3, 1302) = 4.68, $p$<.01. No differences were found between multiracial/multiethnic status and race-based victimization.

A similar analysis was conducted to examine whether school racial composition moderated the relationship between multiracial/multiethnic status and anti-LGBTQ victimization. A two-way multivariate analysis of variance (MANOVA) was conducted, with multiracial/multiethnic status and school racial composition as the independent variables, multiracial/multiethnic status X school racial composition as the interaction term, and severity of victimization based on sexual orientation and based on gender expression as the dependent variables. No interaction effects were found for both victimization based on sexual orientation and based on gender expression.

35  The full percentage breakdowns are as follows – did not experience victimization due to sexual orientation or race/ethnicity: 25.3%; experienced victimization due sexual orientation, but not race/ethnicity: 21.0%; experienced victimization due to race/ethnicity, but not sexual orientation: 14.2%; experienced victimization due to both sexual orientation and race/ethnicity: 39.5%.

36  To examine differences in number of school days missed, a one-way analysis of covariance (ANCOVA) was conducted, with experiences of sexual orientation-based victimization, race-based victimization, or both as the independent variable, and number of school days missed due to feeling unsafe as the dependent variable, while controlling for school racial composition and racial identification (only AAPI vs. multiracial AAPI). The main effect was significant: $F$(3, 1464) = 43.95, $p$<.001, $\eta_p^2$ = .08. Pairwise comparisons were considered at $p$<.05: students who experienced both forms of victimization missed more days than all others; students who

AR_292950

experienced neither form of victimization missed fewer days than those who only experienced victimization based on sexual orientation and both forms of victimization. All other comparisons were not significant. Percentages are shown for illustrative purposes.

37  To examine differences in levels of school belonging, a one-way analysis of covariance (ANCOVA) was conducted, with experiences of sexual orientation-based victimization, race-based victimization, or both as the independent variable, and school belonging as the dependent variable, while controlling for school racial composition and racial identification (only AAPI vs. multiracial AAPI). The main effect was significant: $F(3, 1462) = 70.93$, $p<.001$, $\eta_p^2 = .13$. Pairwise comparisons were considered at $p<.05$: students who experienced both forms of victimization had lower levels of belonging than all others; students who experienced neither form of victimization had the highest levels of belonging. All other comparisons were not significant. Percentages are shown for illustrative purposes.

38  To examine differences in levels of depression, a one-way analysis of covariance (ANCOVA) was conducted, with experiences of sexual orientation-based victimization, race-based victimization, or both as the independent variable, and depression as the dependent variable, while controlling for school racial composition and racial identification (only AAPI vs multiracial AAPI). The main effect was significant: $F(3, 1443) = 58.84$, $p<.001$, $\eta_p^2 = .11$. Pairwise comparisons were considered at $p<.05$: students who experienced both forms of victimization had higher levels of depression than all others; students who experienced neither form of victimization had the lowest levels of depression. All other comparisons were not significant. Percentages are shown for illustrative purposes.

39  Niwa, E. Y., Way, N., Qin, D. B., & Okazaki, S. (2011). Hostile hallways: Asian American adolescents' experiences of peer discrimination in school. In F. T. Leong, L. Juan, D. B. Qin, & H. E. Fitzgerald (Eds.), *Asian American and Pacific Islander Children and Mental Health* (pp. 193–217). Santa Barbara, CA: Praeger.

40  To examine the interaction between victimization based on sexual orientation and victimization based on race/ethnicity on level of school belonging, a three-step hierarchical regression model was conducted. In the first step, level of school belonging was regressed onto the independent variable, severity of victimization based on sexual orientation. The model accounted for a significant portion of the variance (19.8%) and the model was significant: $F(1, 1461) = 361.21$, Adj. $R^2 = .198$, $p<.001$. Victimization based on sexual orientation was a significant predictor: $\beta = -.07$, $p<.001$. For step two, the moderator, victimization based on race/ethnicity was added. Victimization based on race/ethnicity accounted for an additional 3.0% above and beyond the variance accounted from victimization based on sexual orientation, and the model was significant: $F(2, 1460) = 216.73$, Adj. $R^2 = .228$, $p<.001$. Victimization based on race/ethnicity was a significant predictor: $\beta = -.10$, $p<.001$. For step three, the interaction term between the independent and moderator variables was introduced. The interaction term accounted for an additional 0.5% above and beyond the variance accounted from the independent and moderator variables, and the model was significant: $F(3, 1459) = 149.25$, $p<.001$; Adj. $\Delta R^2 = .233$, $p<.001$. Both forms of victimization remained significant predictors. The interaction was also significant: $\beta = .01$, $p<.001$, indicating that the negative effect of homophobic victimization on school belonging was strongest among AAPI LGBTQ students who experienced higher levels of homophobic victimization and lower levels of racist victimization.

To examine the interaction between victimization based on sexual orientation and victimization based on race/ethnicity on level of depression, a three-step hierarchical regression model was conducted. In the first step, level of depression was regressed onto the independent variable, severity of victimization based on sexual orientation. The model accounted for a significant portion of the variance (14.3%) and the model was significant: $F(1, 1430) = 239.39$, Adj. $R^2 = .143$, $p<.001$. Victimization based on sexual orientation was a significant predictor: $\beta = .07$, $p<.001$. For step two, the moderator, victimization based on race/ethnicity was added. Victimization based on race/ethnicity accounted for an additional 3.2% above and beyond the variance accounted from victimization based on sexual orientation, and the model was significant: $F(2, 1429) = 152.58$, Adj. $R^2 = .175$, $p<.001$. Victimization based on race/ethnicity was a significant predictor: $\beta = .13$, $p<.001$. For step three, the interaction term

between the independent and moderator variables was introduced. The interaction term accounted for an additional 0.5% above and beyond the variance accounted from the independent and moderator variables, and the model was significant: $F(3, 1428) = 105.59$, $p<.001$; Adj. $\Delta R^2 = .180$, $p<.001$. Both forms of victimization remained significant predictors. The interaction was also significant: $\beta = -.01$, $p<.01$, indicating that the negative effect of homophobic victimization on depression was strongest among AAPI LGBTQ students who experienced higher levels of homophobic victimization and lower levels of racist victimization.

A similar three-step hierarchical regression model was conducted to examine the interaction between victimization based on sexual orientation and victimization based on race/ethnicity on missing school due to safety concerns. In the first step, missing school was regressed onto the independent variable, severity of victimization based on sexual orientation. For step two, the moderator, victimization based on race/ethnicity was added. For step three, the interaction between the independent and moderator variables was introduced. The sexual orientation-based victimization X race-based victimization interaction was not related to missing school.

41  It is also relevant to consider the racial socialization that AAPI LGBTQ students may receive from parents, guardians, and other family members in the form of explicit and/or implicit messages about how to operate as an AAPI individual in the U.S. These messages may prepare young people for experiences with racial injustice, and could also possibly be helpful in preparing youth for experiences with other forms of injustice, such as anti-LGBTQ victimization. Read more:

Neblett, E. W. J., White, R. L., Ford, K. R., Philip, C. L., Nguyên, H. X., & Sellers, R. M. (2008). Patterns of racial socialization and psychological adjustment: Can parental communications about race reduce the impact of racial discrimination? *Journal of Research on Adolescence, 18*(3), 477–515.

42  Chi-square tests were performed examining the common types of school staff response by whether it was perceived to be effective or ineffective (a dichotomous variable was created for effectiveness: effective = "very effective" or "somewhat effective"; ineffective = "not at all effective" or "somewhat ineffective"). The only common response perceived to be effective was talking to the perpetrator/ telling the perpetrator to stop: $\chi^2(1) = 38.21$, $p<.001$, $\phi = -.318$. The other two common responses were perceived to be ineffective: telling the student to ignore it: $\chi^2(1)=92.76$, $p<.001$, $\phi = -.495$; did nothing/did not take action: $\chi^2(1)=86.99$, $p<.001$, $\phi = -.480$.

43  Bacon, J. K. & Causton-Theoharis, J. (2012). 'It should be teamwork': A critical investigation of school practices and parent advocacy in special education. *International Journal of Inclusive Education, 17*(7), 682–699.

Behnke, A. O., & Kelly, C. (2011). Creating programs to help Latino youth thrive at school: The influence of Latino parent involvement programs. *Journal of Extension, 49*(1), 1–11.

Jeynes, W. H. (2005). The effects of parental involvement on the academic achievement of African American youth. *The Journal of Negro Education, 74*(3), 260–274.

Nguyen, J. T., You, S., & Ho, H. Z. (2009). The process of Asian American parental involvement and its relationship to students' academic achievement. In C. C. Park, R. Endo, & X. L. Rong (Eds.), *New Perspectives on Asian American Parents, Students, and Teacher Recruitment* (pp. 25–49). Charlotte, North Carolina: Information Age Publishing.

44  Fu, A. S. & Markus, H. R. (2014). My mother and me: Why tiger mothers motivate Asian Americans but not European Americans. *Personality and Social Psychology, 40*(6), 739–749.

Jaiswal, S. K. & Choudhuri, R. (2017). A review of the relationship between parental involvement and students' academic performance. *The International Journal of Indian Psychology, 4*(3), 110–123.

Okasaki, S. & Lim, N. E. (2011). Academic and educational achievement among Asian American children and youth. In F. T. L., Leon, L., Juang, D. B. Qin, & H. E. Fitzgerald (Eds), *Asian American and Pacific Islander children and mental health* (pp. 143–167). Santa Barbara, California: Praeger.

45  Hill, N. E. & Tyson, D. F. (2009). Parental involvement in middle school: A meta-analytic assessment of the strategies that promote achievement. *Developmental Psychology, 45*(3), 740–763.

45

Shute, V. J., Hansen, E. G., Underwood, J. S., & Razzouk. R., (2011). A review of the relationship between parental involvement and secondary school students' academic achievement. *Educational Research International*, 1–10.

Spera, C. (2005). A review of the relationship among parenting practices, parenting styles, and adolescent school achievement. *Educational Psychology Review, 17*, 125–146.

Wilder, S. (2014). Effects of parental involvement on academic achievement: A meta-synthesis. *Educational Review, 66*(3), 377–397.

Yan, W. & Lin, Q. (2005). Parent involvement and mathematics achievement: Contrast across racial and ethnic groups. *The Journal of Education Research, 99*(2), 116–127.

46  To test differences in frequency of reporting victimization to family members by outness to family members while controlling for respondent's age and gender (cisgender vs. trans/GNC), we conducted an analysis of covariance (ANCOVA), where reporting to family was the dependent variable, outness to family members was the independent variable, and age and gender were covariates. After controlling for age and gender, the main effect for outness to family was significant: $F(1, 809) = 29.82$, $p<.001$.

47  The relationship between family members talking to school staff about the AAPI LGBTQ student's experiences with victimization, and experiences of anti-LGBTQ victimization (victimization based on sexual orientation, victimization based on gender expression), and race-based victimization, while controlling for reporting victimization to family members, outness to parents, and age were examined through partial correlations. The following relationship was significant: gender expression-based victimization: $r(344) = .17$, $p<.01$. Experiences with sexual orientation-based victimization, and race-based victimization were not related to a family members talking to school staff.

48  The relationship between family members talking to school staff about their AAPI LGBTQ child's experiences with victimization, and disability status and educational accommodation services, while controlling for reporting victimization to family members, outness to parents, and age were examined through partial correlations. The following relationship was significant: Disability status: $r(344) = .12$, $p<.05$. Receiving education accommodation services was not related to a family members talking to school staff.

49  Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

50  Cholewa, B., Hull, M. F., Babcock, C. R., & Smith, A. D. (2018). Predictors and academic outcomes associated with in-school suspension. *School Psychology Quarterly, 33*(2), 191–199.

Johnson, M., & Naughton, J. (2019). Just another school?: The need to strengthen legal protections for students facing disciplinary transfers. *Notre Dame Journal of Law, Ethics and Public Policy, 33*(1), 1–40.

51  Greytak, E. A., Kosciw, J. G., Villenas, C., & Giga, N. M. (2016). *From Teasing to Torment: School Climate Revisited, A Survey of U.S. Secondary School Students and Teachers.* New York: GLSEN.

Poteat, V. P., Scheer, J. R., & Chong, E. S. K. (2015). Sexual orientation-based disparities in school and juvenile discipline: A multiple group comparison of contributing factors. *Journal of Educational Psychology, 108*(2).

Snapp, S., Hoenig, J., Fields, A., & Russell, S. T. (2015). Messy, butch, and queer: LGBTQ youth and the school-to-prison pipeline. *Journal of Adolescent Research, 30*, 57–82.

52  The relationship between experiences with victimization (based on sexual orientation, gender expression, and race/ethnicity) and school disciplinary action, while controlling for race/ethnicity (AAPI only vs. multiracial AAPI), outness to students, and outness to staff, were examined through partial correlations. For in-school discipline, all correlations were significant: Sexual orientation-based victimization: $r(1388) = .26$, $p<.001$; Gender expression-based victimization: $r(1388) = .23$, $p<.001$; Race-based victimization: $r(1388) = .15$, $p<.001$. All correlations were also significant for out-of-school victimization: Sexual orientation-based victimization: $r(1388) = .22$, $p<.001$; Gender expression-based victimization: $r(1388) = .18$, $p<.001$; Race-based victimization: $r(1388) = .10$, $p<.001$. All correlations were also significant

for contact with law enforcement: Sexual orientation-based victimization: $r(1388) = .10$, $p<.001$; Gender expression-based victimization: $r(1388) = .10$, $p<.001$; Race-based victimization: $r(1388) = .08$, $p<.01$.

53  The relationship between missing school and school discipline (in-school discipline, out-of-school discipline, contact with law enforcement), while controlling for race/ethnicity (AAPI only vs. multiracial AAPI) was examined through partial correlations – In-school discipline: $r(1456) = .19$, $p<.001$; out-of-school discipline: $r(1456) = .18$, $p<.001$; contact with law enforcement: $r(1456) = .07$, $p<.01$.

54  The relationship between experiencing any anti-LGBTQ discriminatory policies and practices, and school discipline (in-school discipline, out-of-school discipline, contact with law enforcement), while controlling for race/ethnicity (AAPI only vs. multiracial AAPI), was examined through partial correlations – In-school discipline: $r(1444) = .17$, $p<.001$; out-of-school discipline: $r(1444) = .12$, $p<.001$. Experiences with any anti-LGBTQ discrimination was not related to contact with law enforcement.

55  Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

56  Chi-square tests were performed looking at experiences with school discipline (in-school discipline, out-of-school discipline, and contact with law enforcement) by gender (trans/GNC vs. cisgender LGBQ). In-school discipline: $\chi^2(1) = 6.55$, $p<.05$, $\phi = -.07$; out-of-school discipline: $\chi^2(1) = 7.36$, $p<.01$, $\phi = -.07$. There were no differences in contact with law enforcement between trans/GNC and cisgender LGBQ AAPI students.

57  To test for whether anti-LGBTQ victimization mediated the relationship between trans/gnc status and in-school and out-of-school discipline, six separate regression analyses were conducted, three for in-school discipline and three for out-of-school discipline. All three sets regression analyses must be significant for mediation to occur for each type of school discipline. For both in-school and out-of-school discipline, sexual orientation and gender expression based victimization were significant mediators. Regression analyses between trans/gnc status and victimization: sexual orientation-based victimization: β = -1.38, $p<.001$; sexual orientation-based victimization: β = -2.47, $p<.001$. Logistic regression analyses between victimization and discipline: sexual orientation-based victimization and in-school discipline: odds ratio (OR) = 1.16, $p<.001$; gender expression-based victimization and in-school discipline: OR = 1.12, $p<.001$; sexual orientation-based victimization and out-of-school discipline: OR = 1.15, $p<.001$; gender expression-based victimization and out-of-school discipline: OR = 1.13, $p<.001$. Regression analyses between trans/gnc status and discipline: in-school discipline: β = 0.74, $p<.05$; out-of-school discipline: β = 0.50, $p<.01$. The Sobel test for mediation was significant for sexual orientation as mediator: in-school discipline: $z = -6.53$, $p<.001$; out-of-school discipline: $z = -4.79$, $p<.001$. The Sobel test for mediation was significant for gender expression-based victimization as mediator: in-school discipline: $z = -7.86$, $p<.001$; out-of-school discipline: $z = -5.29$, $p<.001$.

The Sobel test was calculated using the Sobel test online interactive calculation tool: http://quantpsy.org/sobel/sobel.htm

58  Ksinan, A. J., Vazsonyi, A. T., Jiskrova, G. K., & Peugh, J. L. (2019). National ethnic and racial disparities in disciplinary practices: A contextual analysis in American secondary schools. *Journal of School Psychology, 74*, 106–125.

Silverman, T. (2019). School discipline disparities: How we can do better. https://www.iyi.org/school-discipline-disparities-how-we-can-do-better/

59  Chi-square tests were performed looking at experiences with school discipline (in-school discipline, out-of-school discipline, and contact with law enforcement) by race/ethnicity (AAPI only vs. multiracial AAPI). Multiracial AAPI LGBTQ students were more likely to experience all three types of school discipline than those who only identified as AAPI: In-school discipline: $\chi^2(1) = 23.51$, $p<.001$, $\phi = .13$; Out-of-school discipline: $\chi^2(1) = 6.03$, $p<.05$, $\phi = .06$; Contact with law enforcement: $\chi^2(1) = 9.43$, $p<.01$, $\phi = .08$.

60  Chi-square tests were performed looking at educational aspirations in-school discipline, out-of-school discipline, and contact with law enforcement. Students were less likely to plan on pursuing post-secondary education when they experienced: In-school

discipline: $\chi^2(5) = 11.23$, $p<.05$, Cramer's V = .09; Out-of-school discipline: $\chi^2(5) = 14.43$, $p<.05$, Cramer's V = .10, and; Contact with law enforcement: $\chi^2(5) = 36.72$, $p<.001$, Cramer's V = .16.

61 To test differences in GPA by in-school discipline, out-of-school discipline, and contact with law enforcement, while controlling for race/ethnicity (AAPI only vs. multiracial AAPI), partial correlations were conducted. All three types of school discipline were related to lower GPA: In-school discipline: $r(1457)=-.16$, $p<.001$; Out-of-school discipline: $r(1457)=-.22$, $p<.001$; Contact with law enforcement: $r(1457)=-.16$, $p<.001$.

62 Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools*. New York: GLSEN.

63 A chi-square test was performed looking at locale on the availability of GSAs at school: $\chi^2(2) = 78.50$, $p<.001$, Cramer's V = .23. Pairwise comparisons were considered at $p<.05$. AAPI LGBTQ students in suburban schools were more likely to have a GSA than students in urban and rural schools. Students in urban schools were more likely to have a GSA than students in rural schools.

64 A chi-square test was performed looking at region on the availability of GSAs at school: $\chi^2(3) = 80.96$, $p<.001$, Cramer's V = .24. Pairwise comparisons were considered at $p<.05$. Students in the Northeast were more likely to have a GSA than students in the South to have a GSA. Students in the West were more likely to have a GSA than students in the Midwest and South. Students in the Midwest were more likely to have a GSA than students in the South. Students in the Northeast did not differ from students in the Midwest and West on having a GSA at their school.

65 The relationship between school size and the availability of a GSA was examined through a Pearson correlation: $r(1464) = .34$, $p<.001$. AAPI LGBTQ students who attended larger schools were more likely to have a GSA at their school.

66 A chi-square test was performed looking at school racial composition on the availability of a GSA at their school. No differences were found on the availability of a GSA by school racial composition.

67 Porta, C. M., Singer, E., Mehus, C. J., Gower, A. L., Saewyc, E., Fredkove, W., & Eisenberg, M. E. (2017). LGBTQ youth's views on gay-straight alliances: Building community, providing gateways, and representing safety and support. *Journal of School Health, 87*(7), 489–497.

Toomey, R. B. & Russell, S. T. (2013). Gay-straight alliances, social justice involvement, and school victimization of lesbian, gay, bisexual, and queer youth: Implications for school well-being and plans to vote. *Youth & Society, 45*(4), 500–522.

68 To test differences in missing school and feelings of school belonging by the availability of a GSA at their school, independent t-tests were conducted, with GSAs as the independent variable, and missing school and feelings of school belonging as the dependent variables. Students who had a GSA at their school were less likely to miss school in the past month: $t(952.66) = 5.30$, $p<.001$. Students who had a GSA at their school also felt a greater sense of connection to their school community: $t(1052.47) = -8.81$, $p<.001$.

69 Chi-square tests were performed looking at feelings of safety (due to their sexual orientation, gender expression and race/ethnicity) and the availability of a GSA at their school. Students who had a GSA at their school were: less likely to feel unsafe because of their sexual orientation: $\chi^2(1) = 38.17$, $p<.001$, $\phi = -.16$, and; less likely to feel unsafe because of their gender expression: $\chi^2(1) = 6.42$, $p=.01$, $\phi = -.07$. Having a GSA at their school did not affect feelings of safety due to their race/ethnicity.

70 A chi-square test was performed looking at school racial composition and the availability of an ethnic/cultural club at their school: $\chi^2(3) = 14.62$, $p<.01$, Cramer's V = .11. Pairwise comparisons were considered at $p<.05$. Students in majority-White schools were less likely to have an ethnic/cultural club than students in majority-AAPI schools. No other differences were observed.

71 A chi-square test was performed looking at region (Northeast, South, Midwest, West) and the availability of an ethnic/cultural club at their school: $\chi^2(3) = 15.94$, $p<.01$, Cramer's V = .11. Pairwise comparisons were considered at $p<.05$. Students who attended schools in the West were more likely to have an ethnic/

cultural club than students in the Northeast and South. Students in the Northeast, Midwest, and South did not differ from each other.

72 A chi-square test was performed looking at school racial composition (majority AAPI, majority White, majority other non-White race, no majority race) and region (Northeast, South, Midwest, and West): $\chi^2(9) = 152.85$, $p<.001$, Cramer's V = .20. Pairwise comparisons were considered at $p<.05$. Students who attended majority-AAPI schools were more likely to be in the West than students in the Northeast, South, and Midwest: Students who attended majority-White schools were: more likely to be in the Midwest than students in the West and South, more likely to be in the Northeast than in the West, and more likely to be in the South than in the West. Students who attended majority other non-White schools were more likely to be in the South than students in the Midwest. No other differences were found.

73 A chi-square test was performed looking at locale (urban, suburban, rural) and the availability of an ethnic/cultural club at their school: $\chi^2(2) = 48.71$, $p<.001$, Cramer's V = .18. Pairwise comparisons were considered at $p<.05$. Students who attended rural schools were less likely to have an ethnic/cultural club than students in urban and suburban schools. No other differences were found.

74 The relationship between school size and availability of an ethnic/ cultural club was examined through a Pearson correlation. AAPI LGBTQ students who attended larger schools were more likely to have an ethnic/cultural club: $r(1454) = .38$, $p<.001$.

75 A chi-square test was performed looking at feelings of safety due to race/ethnicity and the availability of an ethnic/cultural club at their school. Students who had an ethnic cultural club at their school felt safer due to their race/ethnicity: $\chi^2(1) = 11.87$, $p<.001$, $\phi = -.09$

To test differences in school belonging by presence of an ethnic/ cultural club, an independent t-test was conducted, with availability of an ethnic/cultural club as the independent variable, and feelings of school belonging as the dependent variable. Students who had an ethnic/cultural club at their school had greater feelings of school belonging: $t(1463) = -4.03$, $p<.001$.

76 Toomey, R. B., Ryan, C., Diaz, R. M., & Russell, S. T. (2011). High school Gay-Straight Alliances (GSAs) and young adult well-being: An examination of GSA presence, participation, and perceived effectiveness. *Applied Developmental Science, 15*(4), 175–185.

77 Ocampo, A. C. & Soodjinda, D. (2016). Invisible Asian Americans: the intersection of sexuality, race, and education among gay Asian Americans. *Race Ethnicity and Education, 19*(3), 480–499.

78 Museus, S. (2008). The role of ethnic student organizations in fostering African American and Asian American students' cultural adjustment and membership at predominantly White institutions. *Journal of College Student Development, 49*(6), 568–586.

79 Bowman, N. A., Park, J. J., & Denson, N. (2015). Student involvement in ethnic student organizations: Examining civic outcomes 6 years after graduation. *Research in Higher Education, 56*(2), 127–145.

Poteat, V. P., Calzo, J. P., & Yoshikawa, Y. (2018). Gay-straight alliance involvement and youths' participation in civic engagement, advocacy, and awareness-raising. *Journal of Applied Developmental Psychology, 56*, 13–20.

Toomey, R. B. & Russell, S. T. (2013). Gay-straight alliances, social justice involvement, and school victimization of lesbian, gay, bisexual, and queer youth: Implications for school well-being and plans to vote. *Youth & Society, 45*(4), 500–522.

80 A chi-square test was performed looking at school racial composition and GSA participation. GSA participation was not related to school racial composition.

81 Chi-square tests were performed looking at demographic characteristics (multiracial AAPI vs. AAPI only, and immigration status) and GSA participation. GSA participation was not related to multiracial status and immigration status.

82 To examine differences in school belonging by GSA participation, an analysis of variance (ANOVA) was conducted with level of GSA participation as the independent variable, and feelings of school belonging as the dependent variable. No significant differences were observed.

83 To examine differences in comfort bringing up LGBTQ issues in class by GSA participation, an analysis of variance (ANOVA) was

AR_292953

conducted with level of GSA participation as the independent variable, and comfort bringing up LGBTQ issues in class as the dependent variable. The univariate effect was significant: $F(2, 932) = 12.02$, $p<.001$, $\eta_p^2 = .03$. Pairwise comparisons were considered at $p<.05$. Students who did not attend GSA meetings were less likely to bring up LGBTQ issues in class than those who attended GSA meetings as non-leaders or as leaders. GSA leaders and non-leaders did not differ on comfort with bringing up LGBTQ issues in class.

84   GLSEN Days of Action (including Ally Week, No Name-Calling Week, and Day of Silence) are national student-led events of school-based LGBTQ advocacy, coordinated by GLSEN. The Day of Silence occurs each year in the spring, and is designed to draw attention to anti-LGBTQ name-calling, bullying, and harassment in schools. Visit www.dayofsilence.org for more information.

85   To examine differences in rates of participation by level of GSA participation, two chi-square tests were conducted: participating in GLSEN Day of Action, and participating in a rally, protest, or demonstration for a cause. The effects for both were significant. GLSEN Day of Action: $\chi^2(2) = 132.02$, $p<.001$, Cramer's V = .38; rally, protest, or demonstration: $\chi^2(2) = 30.43$, $p<.001$, Cramer's V = .18. Pairwise comparisons were considered at $p<.05$. For both activities, GSA members, both leaders and non-leaders, were more likely to participate than students who were not GSA members; and GSA leaders were more likely than GSA non-leaders to participate.

86   To examine differences in rates of participation by level of GSA participation, two chi-square tests were conducted: participating in a boycott against a company, and contacting politicians, governments, or authorities about issues that were important to them. The effects for both were significant. Participating in a boycott against a company: $\chi^2(2) = 132.02$, $p<.001$, Cramer's V = .38; contacting politicians, governments, or authorities: $\chi^2(2) = 132.02$, $p<.001$, Cramer's V = .38. Pairwise comparisons were considered at $p<.05$. For both activities, GSA leaders were more likely to participate than non-members. No differences were found between GSA leaders and GSA non-leaders, and no differences were found between GSA non-leaders and non-members.

87   To examine differences in rates of participation by level of GSA participation, three chi-square tests were conducted: participating in an event where people express their political views, volunteering to campaign for a political cause or candidate, and expressing political views about politics or social issues on social media. The effects for all three were significant. Events for expressing views: $\chi^2(2) = 49.83$, $p<.001$, Cramer's V = .23; volunteering to campaign: $\chi^2(2) = 20.32$, $p<.001$, Cramer's V = .15; expressing political views: $\chi^2(2) = 11.66$, $p<.001$, Cramer's V = .11. Pairwise comparisons were considered at $p<.05$. For all three activities, GSA members, both leaders and non-leaders, were more likely to participate than students who were not GSA members; and no differences were found between GSA non-leaders and leaders on participation.

88   To examine differences in anti-LGBTQ victimization by GSA participation, a multivariate analysis of variance (MANOVA) was conducted with level of GSA participation as the independent variable, and two dependent variables: severity of victimization due to sexual orientation, and severity of victimization due to gender expression. The multivariate effect was significant: Pillai's Trace = .03, $F(4, 1780) = 7.52$. The univariate effects for victimization due to sexual orientation and gender expression were both significant. Sexual orientation: $F(2, 890) = 13.67$, $p<.001$. Gender expression: $F(2, 890) = 12.07$, $p<.001$. Pairwise comparisons were considered at $p<.05$. Sexual orientation: students attending as a leader/officer experienced greater levels of victimization than those who did not attend and those attending as a non-leader; there was no difference between those not attending and those attending as a non-leader. Gender expression: students attending as a leader/officer experienced greater levels of victimization than those who not attending and those attending as a non-leader; there was no difference between those not attending and those attending as a non-leader.

89   A chi-square test was conducted looking at school racial composition and ethnic/cultural club participation. School racial composition was not related to ethnic/cultural club participation.

90   A chi-square test was conducted looking at immigrant status and ethnic/cultural club participation: $\chi^2(2) = 7.57$, $p<.05$, $\varphi = .08$. Comparisons showed the following significant differences at $p<.05$: U.S. born students were less likely to participate than those born

outside the U.S.; U.S. born students were less likely to participate as a leader. U.S. born students did not differ from those born outside the U.S. on participating as a non-leader.

91   A chi-square test was conducted looking at racial identification (multiracial AAPI vs. AAPI only) and ethnic/cultural club participation. Multiracial AAPI LGBTQ students did not differ from those who only identify as AAPI on ethnic/cultural club participation.

92   To examine differences in school belonging by ethnic/cultural club participation, an analysis of variance (ANOVA) was conducted with level of ethnic/cultural club participation as the independent variable, and feelings of school belonging as the dependent variable. No significant differences were observed.

93   To examine whether school belonging was related to ethnic/cultural club participation by school racial composition, a two-way analysis of variance (ANOVA) was conducted with ethnic/cultural club participation as the independent variable, ethnic/cultural club participation X school racial composition as the interaction term, and school belonging as the dependent variable. The univariate effect was not significant. No differences were found between participation in ethnic/cultural clubs and school belonging, and no differences were found between the participation in ethnic/cultural clubs X school racial composition interaction and school belonging.

94   We examined differences in rates of participation in the following activities: participating in an event where people express their political views (such as a poetry slam or youth forum); volunteering to campaign for a political cause or candidate; participating in a boycott against a company; expressing views about politics or social issues on social media; participating in a rally, protest, or demonstration for a cause; participating in a GLSEN Day of Action; and contacting politicians, governments, or authorities about issues that are important to the student.

To examine differences in rates of participation by level of ethnic/cultural club participation, a series of chi-square tests were conducted for each form of activism. The effect was significant for the following forms of activism: Event to express political views: $\chi^2(2) = 43.27$, $p<.001$, Cramer's V = .20; volunteering: $\chi^2(2) = 33.74$, $p<.001$, Cramer's V = .18; boycott: $\chi^2(2) = 19.35$, $p<.001$, Cramer's V = .13; social media: $\chi^2(2) = 18.47$, $p<.001$, Cramer's V = .13; rally: $\chi^2(2) = 24.39$, $p<.001$, Cramer's V = .15; contacting politicians: $\chi^2(2) = 32.77$, $p<.001$, Cramer's V = .17. No differences were found for participating in a GLSEN Day of Action. Pairwise comparisons were considered at $p<.05$. For participating in a boycott, non-leader club members were more likely to participate than students who did not attend club meetings; no differences were found between ethnic/cultural club leaders and non-leaders and those who did not attend meetings on participation in boycotts. For participating in an event to express political views, volunteering to campaign, expressing views on social media, participating in a rally, and contacting politicians, club leaders were more likely than those who did not attend meetings to: club leaders and non-leaders were more likely to participate in these activities than those who did not attend club meetings; no differences were found between club leaders and non-leaders on participating in these activities.

95   To examine differences in racist victimization by ethnic/cultural club participation, an analysis of variance (ANOVA) was conducted, with frequency of racist victimization as the dependent variable, and level of ethnic/cultural club participation as the independent variable. The effect was not significant. A similar analysis of covariance (ANCOVA) was conducted, controlling for school racial composition. The results did not change.

96   Shelton, S. A. & Barnes, M. E. (2016). "Racism just isn't an issue anymore": Preservice teachers' resistances to the intersections of sexuality and race. *Teaching and Teacher Education, 55*, 165–174.

97   To test differences in race/ethnicity and supportive school personnel, two separate independent t-tests were conducted, with race/ethnicity (AAPI only vs. multiracial AAPI) as the independent variable, and supportive staff and supportive administrators as the dependent variables. LGBTQ students who only identified as AAPI were more likely to have supportive staff and administrators than multiracial AAPI LGBTQ students: $t(1456) = 2.97$, $p<.01$; supportive administrators: $t(1459) = 2.49$, $p<.05$.

98   The relationship between number of supportive educators, and feelings of school belonging and psychological well-being (self-esteem, depression) were examined through Pearson correlations.

Students who have more supportive staff had greater levels of school belonging, higher levels of self-esteem, and lower levels of depression: Feelings of school belonging: $r(1456) = .49$, $p<.001$; Self-esteem: $r(1439) = .26$, $p<.001$; Depression: $r(1438) = -.28$, $p<.001$

99  The relationship between number of supportive educators and missing school, feeling unsafe (due to sexual orientation, gender expression, and race/ethnicity), and GPA were examined through Pearson correlations. Students who had more supportive staff: were less likely to miss school; were less likely to feel unsafe due to sexual orientation, gender expression, and race/ethnicity; and had higher GPAs. Missing school: $r(1457) = -.28$, $p<.001$; feeling unsafe due to sexual orientation: $r(1458) = -.25$, $p<.001$; feeling unsafe due to gender expression: $r(1458) = -.15$, $p<.001$; feeling unsafe due to race/ethnicity: $r(1458) = -.13$, $p<.001$; GPA: $r(1458) = .15$, $p<.001$.

100  To examine differences in educational aspirations by number of supportive educators, an analysis of variance (ANOVA) was conducted with educational aspirations as the independent variable, and number of supportive educators as the dependent variable. The effect was significant: $F(5, 1440) = 43.38$, $p<.001$, $\eta^2 = .03$. Post hoc comparisons were considered at $p<.05$. Students who have more supportive staff were more likely to plan to pursue post-secondary education.

101  Chi-square tests were performed looking at feelings of safety due to sexual orientation and gender expression and the availability of inclusive curriculum at their school. Students who had an inclusive curriculum at their school were less likely to feel unsafe due to their sexual orientation: $\chi^2(1) = 43.48$, $p<.001$, $\phi = -.17$, and; less likely to feel unsafe because of their gender expression: $\chi^2(1) = 17.84$, $p<.001$, $\phi = -.11$.

102  To test differences in peer acceptance and having an inclusive curriculum at school, an independent t-test was conducted, with inclusive curriculum as the independent variable, and peer acceptance as the dependent variable. Students who had an inclusive curriculum at their school had greater peer acceptance: $t(881.74) = -15.13$, $p<.001$.

103  To test differences in feelings of school belonging and having an inclusive curriculum at school, an independent t-test was conducted, with inclusive curriculum as the independent variable, and school belonging as the dependent variable. Students who had an inclusive curriculum at their school had greater feelings of school belonging: $t(790.61) = -13.84$, $p<.001$.

104  A chi-square test was performed looking at feelings of safety due race/ethnicity and the availability of inclusive curriculum at their school. Students who had an inclusive curriculum at their school were less likely to feel unsafe due to their race/ethnicity: $\chi^2(1) = 4.22$, $p<.05$, $\phi = -.05$.

105  Givens, J. R., Nasir, N., Ross, K, & McKinney de Royston, M. (2016). Modeling manhood: Reimagining Black male identities in school. *Anthropology and Education Quarterly, 47*(2). 167–185.

49

AR_292955



**GLSEN**
110 William Street, 30th Floor
New York, NY 10038
www.glsen.org

$15.00
ISBN 978-1-934092-30-9
51500>

AR_292956

**OFFICE OF**
# Elementary & Secondary Education

Search 🔍

## Safe & Supportive Schools



Office of Safe and Supportive Schools (OSSS) addresses;

- the health and well-being of students
- school safety, security, and emergency management and preparedness.

OSSS administers, coordinates, and recommends policy as well as administers grant programs and technical assistance centers addressing the overall safe and health school community.

Safe and supportive schools are critical to the well-being of the whole school community as well as the academic success of students. The Department of Education provides schools, school districts, and state education agencies with resources aimed at creating and nurturing positive school climates; preventing school violence; and protecting the whole school community through school safety, security, and emergency management and preparedness planning. The program offices, grant programs, and technical assistance centers all respond to the recommendations put forth by the Federal Commission on School Safety and serve practitioners as they work to continually protect their school community students, staff, and families.

- **Secretary's School Safety Grants Announcement** Currently, the Department is competing grant programs addressing violence prevention, school climate and mental health services.
- **OSSS Programs** (OSSS) is organized into two (2) groups: The *Safe and Supportive Schools Group* and the *Student Support and Academic Enrichment Group*. Together, the groups support grantees across the nation and administer numerous programs including the:
  - **Project Prevent Grant Program**, which enhances schools' and school districts' ability to identify, assess, and serve students exposed to pervasive violence;
  - **School Climate Transformation Grant Program**, which helps schools and school districts develop, enhance, or expand their systems of support related school climate programs; and

AR_292957

- **Student Support and Academic Enrichment Program** (Title IV, Part A), which addresses well-rounded educational opportunities in both the traditional, in-person setting and virtual setting alike, as well as safe and healthy student programming.

- **<u>Federal Partners in Student Health Resource Hub</u>,** The Student Health Resource hub serves as a portal where K-12 schools, school districts, SEAs, and other stakeholders can access high quality federal and federally supported information, resources, and research that support student health. The goal of this hub is to provide information that supports the physical and mental health of all students as well as healthy, physical school environments. Content for the site is comprised of resources by the Federal Partners in School Health (FPSH) working group, which is an alliance of federal agencies that support healthy school environments.

- **<u>Readiness and Emergency Management for Schools (REMS) Technical Assistance (TA) Center</u>,** The REMSTA Center is the nation's higher ed and K-12 school safety, security, and emergency management and preparedness hub for information and services (e.g., guidance, training, tools, resources). The REMS TA Center serves K-12 schools and institutions of higher education (IHEs), public and private, as well as their local, state, and Federal partners with shared school safety responsibilities. They develop and maintain comprehensive, all-hazard, and high-quality campus and school Emergency Operations Plans (EOPs).  These plans focus on continually protecting the whole school community before, during, and after possible emergencies. In addition to its free virtual trainings, the REMS TA Center offers numerous interactive tools such as its EOP Assist software, which helps generate customized plans and its SITE ASSESS app which facilitate the walk-through and safety inspection of campus and buildings.

- **<u>National Center on Safe and Supportive Learning Environments (NCSSLE)</u>,** provides training and technical assistance to schools, school districts, and educational agencies to support efforts aimed at creating and nurturing safe and supportive learning environments. The national center addresses a wide variety of topics that impact school climate, ranging from bullying and violence prevention to tools for measuring and identifying needs for school climate. For example, NCSSLE produced and disseminates ED's <u>School Climate Survey and the School Climate Improvement Resource Package</u>.

## Contact Information

Bryan Williams, Director
Safe & Supportive Schools
U.S. Department of Education, OESE
400 Maryland Ave., SW
Washington D.C. 20202

📞  202-453-6715

✉️  E-mail

## Resources

## Announcements

Safe Firearm Storage Template Letter

OSSS TA Center Collaborative Supportive Schools Fact Sheets

Guiding Principles and Best Practices in School Discipline to Support Students' Social, Emotional, Behavioral, and Academic Needs

## Guidance

Dear Colleague Letter: K-12-Resources-for-Afghan-Evacuees

## Reports

FY 2020 ED Performance Summary

FY 2019 ED Performance Summary

FY 2017 ED Performance Summary

**Publications**

Study of State Policies to Prohibit Aiding and Abetting Sexual Misconduct in Schools

Fact-Sheet-Study-of-State-Policies-to-Prohibit-Aiding-and-Abetting-Sexual-Misconduct-in-Schools

Growing Up Drug Free: A Parent's Guide to Substance Use Prevention

Crecer Libre de Drogas: Una Guía Parental para Prevenir el Uso de Estupefacientes

Center to Improve Social and Emotional Learning and School Safety

Grants to States for Emergency Management

Mental Health Service Professional Demonstration Grant Program

Project Prevent

School Climate Transformation LEA

School Climate Transformation SEA

School Emergency Response to Violence (Project SERV)

Student Support and Academic Enrichment / Title IVA

Trauma Recovery Demonstration Grant Program

Expanding Access to Well-Rounded Courses Demonstration Grants Program

School-Based Mental Health Services Grant Program

# Stronger Connections Technical Assistance and Capacity Building Grant Program

Last Modified: 07/12/2024

HOME

PROGRAMS

GRANTEES & APPLICANTS

FAMILIES

EDUCATORS

RESOURCES

CONTACT OESE

Privacy Policy    Topics A-Z    ED.gov



*the*
# Williams
## INSTITUTE

# The Business Impact of LGBT-Supportive Workplace Policies

M.V. Lee Badgett, Laura E. Durso, Angeliki Kastanis & Christy Mallory

May 2013

Made possible with grants from



AR_292981

# The Business Impact of LGBT-Supportive Sexual Orientation And Gender Identity Policies



M.V. Lee Badgett, Laura E. Durso, Angeliki Kastanis & Christy Mallory          May 2013

## EXECUTIVE SUMMARY

Today's workforce is increasingly diverse in terms of personal characteristics such as race, ethnicity, gender, national origin, religion, gender identity, and sexual orientation. The "business case for diversity" suggests that such diversity in the workplace will lead to lower costs and/or higher revenues, improving the bottom line. Not surprisingly, employers have considered the economic benefits of adding lesbian, gay, bisexual, and transgender (LGBT)-supportive policies, including sexual orientation and gender-identity nondiscrimination policies and domestic partner benefits policies.

The present review identifies and evaluates all published research evaluating the impact of LGBT-supportive employment policies and workplace climates on business outcomes in order to answer two primary questions: 1.) Does research show that LGBT-supportive policies bring about the specific benefits mentioned by private companies that enact them, or are they associated with other similar economic benefits that may have an impact on the bottom line?; 2.) If LGBT-supportive policies bring about certain benefits, does research show that these benefits actually have an impact on the bottom line, and if so, is it possible to estimate that effect in quantitative terms?

In total, this study reviews 36 research studies that include findings related to the impact of LGBT-supportive policies or workplace climates on business outcomes. We conclude that this body of research supports the existence of many positive links between LGBT-supportive policies or workplace climates and outcomes that will benefit employers. However, none of the studies provides direct quantitative estimates of the impact on the bottom line.

More specifically, the existing set of studies demonstrates that LGBT-supportive policies and workplace climates are linked to greater job commitment, improved workplace relationships, increased job satisfaction, and improved health outcomes among LGBT employees. Furthermore, LGBT-supportive policies and workplace climates are also linked to less discrimination against LGBT employees and more openness about being LGBT. Less discrimination and more openness, in turn, are also linked to greater job commitment, improved workplace relationships, increased job satisfaction, improved health outcomes, and increased productivity among LGBT employees.

Figure 1 presents the number of studies finding that employers' LGBT-supportive policies and workplace climates lead to positive business outcomes compared to the number of studies that find a negative relationship or no relationship to business outcomes. As shown in the figure,

1

most studies find a positive relationship between LGBT-supportive policies or workplace climates and business-related outcomes, while few or none find a negative or no relationship.



Figure 1: Number of studies showing relationship between LGBT-supportive policies or workplace climates and economic outcomes

We assess the strength of each of the proposed associations between LGBT-supportive policies or climate to workplace outcomes by taking into account the number of studies supporting a particular link, the quality of studies supporting the link, and number of studies that did not support the link. These findings are also summarized in Figure 2.

- *Strongest finding:* LGBT-supportive policies or workplace climates are most strongly linked to more openness about being LGBT.
- *Fairly strong findings:* We see fairly strong links between LGBT-supportive policies and workplace climates to less discrimination, improved health outcomes, increased job satisfaction, and greater job commitment.
- *Findings from a small number of studies:* Other possible links between LGBT-supportive policies or workplace climates and improved workplace relationships, health insurance costs, creativity, and stock prices are not yet strong due to the small number of studies that assess these relationships.
- *No studies:* We have found no studies assessing possible links between LGBT-supportive policies or workplace climates and falling litigation costs, increased public sector customers, more individual consumers, and improved recruitment and retention.
- *Connection to other research on business outcomes:* Other research finds that these business outcomes, which are influenced by LGBT-supportive policies or workplace

2

outcomes, lead to higher productivity and lower costs for employers, which in turn would enhance business profitability.

Figure 2:  Strength of relationships in the research

We make several recommendations about directions for future research:
- Recruit more racially and ethnically diverse samples of LGBT people.
- Recruit larger samples of bisexual men and women and transgender employees.
- Use more direct measures of business outcomes, such as productivity and profit measures.
- Employ a wider range of sampling methods and research designs.

Finally, researchers and business officials should collaborate to fully utilize data collected by employers and to make findings available to policymakers, the public, and other businesses.



Strong Associations with:
Greater Disclosure in the Workplace

Fairly Strong Associations with:
Less Discrimination at Work
Better Health
Higher Job Satisfaction
Higher Job Commitment

Possible Associations with:
Organizational Citizenship Behaviors
Improved Co-worker Relationships
Lower Insurance Costs
Increased Creativity & Innovation
Improved Stock Prices

Unknown Associations with:
Lower Litigation Costs
Increased Customer Base
Greater Recruitment

# Introduction

A well-motivated and productive set of employees is essential for business success.  Today, businesses' employees are increasingly diverse in terms of race, ethnicity, sex, national origin, religion, gender identity, and sexual orientation, among other characteristics.  The impact of that diversity is much discussed in the global economy, and the "business case for diversity" has become a modern business mantra.  In short, the business case posits that a diverse workforce (or in more nuanced versions, a *well-managed* diverse workforce) will lead to lower costs and/or higher revenues, improving the corporate bottom line.  If the business case is correct, then employers have economic incentives to take actions that will create and maintain a diverse workforce.  This briefing paper assesses the research-based evidence related to the business case for diversity related to sexual orientation, and to a lesser extent, gender identity.

The roots of the business case for diversity hypothesis can be found in policies in the United States that were designed to eliminate discrimination and, in effect, to diversify the race and gender composition of the corporate workforce. Kelly and Dobbin (1998) argue that diversity management rhetoric emerged as government pressure on companies to comply with nondiscrimination laws and affirmative action diminished in the 1980's.  During earlier enforcement periods, companies had hired human resources professionals who developed

3

AR_292984

managerial expertise in practices that would result in more diverse workforces. As enforcement pressure lessened, those managers then became champions of retaining practices and internal policies that promote racial, ethnic, and gender diversity, using the argument that those practices were essential to creating a diverse workforce that had become a competitive necessity.

More recently, pressure from LGBT employees and, in some cases, policymakers and unions has pushed employers to end discriminatory practices against LGBT workers (Badgett, 2001; Raeburn, 2004). Those stakeholders often apply the business case for diversity to this newer territory, although the focus is less on increasing representation of LGBT people and more on equal treatment of LGBT employees. Voluntarily enacted sexual orientation and gender identity nondiscrimination policies, domestic partner benefits, transition-related health care benefits, and other related policies are said to be sound business decisions, in addition to be the fair or right thing to do.

Those efforts have been successful, as we see by the rapid growth in the number of corporations adopting LGBT-supportive policies. In 1999, 72% of Fortune 500 companies included sexual orientation in their nondiscrimination policies, and only a handful included gender identity (Human Rights Campaign, 1999). By 2009, 87% of such companies included sexual orientation and 41% included gender identity in their nondiscrimination policies (Luther, 2009). Over the same time period, the percentage of Fortune 500 companies offering domestic partner benefits increased from 14% to 59% (Human Rights Campaign, 1999; Luther, 2009).

A 2011 Williams Institute study found evidence that the business case for diversity motivates employers to take those actions (Sears & Mallory, 2011). The study found that almost all of the top 50 Fortune 500 companies and the top 50 federal government contractors (92%) state that, in general, diversity policies and generous benefit packages are good for their business. In addition, the majority of those companies (53%) have specifically linked policies prohibiting sexual orientation and gender identity discrimination or a decision to extend domestic partner benefits to their employees to improving their bottom line.

The question remains about how well the reality matches the rhetoric. An enormous amount of research over the last few decades has assessed the validity of the business case for diversity related to race, sex, age, experience, and other dimensions of employment diversity. Reviews of those studies have found that support for the business case for diversity is not straightforward (Jackson et al., 2003). Some studies find positive effects of diversity on firms' outcomes, but others find no effect or even a negative impact of diversity on business-related outcomes. One set of influential and highly detailed studies of diversity within particular firms found little direct effect of diversity, positive or negative, on team processes or on team and individual performance measures (Kochan et al., 2003). The "business case" has, instead, increasingly focused on the management of diversity, with an emphasis on cultural competency, training in group process skills, and efforts toward full inclusion of employees from varying social groups as a way to create value from a diverse workforce.

The business case for diversity-respecting policies related to LGBT people has been somewhat different, with a focus on the impact of policies rather than on the sexual orientation and gender identity diversity of an employer's workforce per se. As we discuss in the next section, policies

4

that equalize compensation or improve the workplace climate might have a direct impact on LGBT employees.

As a framework for our review, the next section outlines processes occurring within and outside an organization that could generate positive changes in business outcomes. After that discussion, the bulk of the report addresses our primary questions: Does research show that LGBT-supportive policies bring about the specific benefits mentioned by private companies, or other similar economic benefits that may have an impact on the bottom line? If LGBT-supportive policies bring about certain benefits, does research show that these benefits actually have an impact on the bottom line, and if so, is it possible to estimate that effect in quantitative terms? Various stakeholders and employers have suggested that LGBT-supportive policies would bring about the following specific benefits that would have a positive impact on the corporate bottom line (Sears & Mallory, 2011):

- Improved recruitment and retention of talented employees
- New ideas and innovations generated by drawing on a workforce with a wide range of characteristics and experiences
- Attracting and better serving a diverse customer base
- Increasing employee productivity
- Securing business with public sector clients that require employment nondiscrimination or domestic partner benefits policies
- Boosting morale and employee relations by responding favorably to requests from employees or unions

To answer those questions, we summarize the findings of 36 research studies that assess links between diversity-respecting policies and outcomes. We find that existing research supports the existence of many of those links at a qualitative level. LGBT-supportive employment policies lead to outcomes that will benefit employers. However, some proposed linkages have not yet been the subject of research, and none of the studies provides appropriate and generalizable quantitative estimates of the impact. Also, most of the studies we found focus in particular on lesbian and gay employees, with less research conducted with samples of bisexual and transgender employees. Below, we first evaluate research conducted with LGBT people as a group, LGB people, or only with lesbian and gay employees. The next two sections focus on findings based only upon bisexual and transgender employees. Because most of the policies discussed could include protection for bisexual and transgender employees, we use "LGBT-supportive" to describe these policies throughout the report, but distinguish the research populations studied.

Finally, we discuss other limitations of the existing research and make some preliminary recommendations for productive directions for future research.

## POTENTIAL LINKS BETWEEN POLICIES AND BUSINESS OUTCOMES

The business case implies a causal relationship between diversity-respecting policies and employers' competitiveness in their product markets. To put it simply, for improved competitiveness and rising profits, either the costs of doing business fall or revenues rise. Unfortunately, no existing study uses any direct measures of costs or revenues as an outcome

AR_292986

measure. Therefore, we first look for links between workplace policies and individual LGBT worker outcomes and organizational outcomes. We identify two primary possible individual outcomes, and eleven other secondary possible individual and organizational outcomes that have been suggested in the academic literature and in corporate discussions. Below we identify those outcomes with a lower-case letter. Since those outcomes are not measured in dollar terms of costs and revenue, the basic determinants of profit, we next look for evidence that the outcomes would have implications for costs and revenue.

*Diversity-respecting policies:* Prior studies have evaluated different diversity policies, including LGBT-supportive policies, and measures of workplace climate. In this report, we focus on the effect of sexual orientation and gender identity nondiscrimination policies, domestic partner benefits, or some more general measure of the workplace climate for LGBT people.

*Individual outcomes:* LGBT-supportive policies and workplace climates might have several important effects on LGBT employees that will increase their productivity levels or retention rates (effects that would reduce employer costs and increase profits). At the most immediate level, these policies could result in (a) less discrimination and (b) increased openness (or less concealment) in the workplace about being LGBT. Concealment of sexual orientation is associated with increased psychological distress (Pachankis, 2007) and poor immune functioning (Cole, Kemeny, et al., 1996; Cole, Taylor, et al., 1996), suggesting its importance as an outcome variable of interest. Those immediate primary effects, in turn, could have secondary effects on workplace-related outcomes through:

c) Improved health outcomes
d) Increased job satisfaction
e) Improved relationships with co-workers and supervisors
f) Greater commitment and other positive workplace behaviors and attitudes

Those secondary effects are more closely related to potential reductions in employer costs. Job satisfaction, better health outcomes, and improved relationships could increase productivity. All four secondary effects could reduce turnover.

*Organizational outcomes:* Diversity-enhancing policies also have organizational effects that could improve profits, both through lower costs and higher revenue, including:

g) Lower health insurance costs (through c)
h) Lower legal costs from litigation related to discrimination (through a)
i) Greater access to new customers, such as public sector entities that require contractors to have nondiscrimination policies or domestic partner benefits
j) More business from individual consumers who want to do business with socially responsible companies
k) More effective recruiting of LGBT and non-LGBT employees who want to work for an employer that values diversity
l) Increased creativity among employees that could lead to better ideas and innovations
m) Greater demand for company stock because of expected benefits of diversity policies

*Confounding factors:* It is important to note that other aspects of an employer's environment might also influence how the policies result in changes in individual or organizational outcome measures. For example, firm size might matter, since larger firms might have more effective

6

human resource departments. Industry could matter, since if competitors also have LGBT-supportive policies, prospective employees might have other good options for employment, reducing the benefits of the diversity policies by lowering their value as a unique workplace incentive. There are many other potential factors, including the employer's location, the existence of state or local nondiscrimination laws, and employee awareness of policies, that should be taken into account in studies that ask whether policies lead to better business outcomes.

In the next two sections, we look for evidence of these 13 potential links between policies and business-related outcomes for individuals and organizations.

## IMMEDIATE EFFECTS ON EMPLOYEES

### (a) Less discrimination

Figure 3: Number of studies showing relationship between LGBT-supportive policies or workplace climates and discrimination



Policy/climate → less discrimination

|  1 | 1 | 3 |

■ Positive business relationship
■ No business relationship
■ Negative business relationship

*LGBT-supportive policies → Less discrimination*

Research suggests that LGBT employees experience less discrimination when their employer has a nondiscrimination policy that includes sexual orientation and gender identity. For example, a 2001 survey of gay men and lesbians from 31 states and the District of Columbia found that employees covered by a sexual orientation workplace nondiscrimination policy were significantly less likely to have experienced discrimination than those who were not covered by a policy (Button, 2001). Additionally, a national survey of LGB employees reported less workplace discrimination if their company had a nondiscrimination or domestic partnership benefits policy in place, or if they lived in a state with legislation prohibiting discrimination on the basis of sexual orientation (Ragins & Cornwell, 2001). Having these types of policies at the organizational level was more strongly related to perceived workplace discrimination than having state-level legislation. One survey, which asked about discriminatory workplace treatment more specifically, found that employees who were covered by a nondiscrimination policy were less likely to have experienced each type of discrimination asked about than those who were not covered (Human Rights Campaign, 2009).

However, at least two studies suggest that LGBT-supportive workplace policies do not make it any less likely that employees will experience discrimination. A 1999 survey of LGB employees found that LGBT-inclusive nondiscrimination policies were unrelated to experiences of discrimination in the workplace (Waldo, 1999). Additionally, a 2006 study of gay men found

AR_292988

that workers who were covered by a LGBT-inclusive nondiscrimination policy rated their employers as significantly more hostile than workers who were not covered by a policy (Tejeda, 2006). The latter study included a small number of respondents (65) and was not able to separate out the possibility that gay men covered by a LGBT-inclusive nondiscrimination policy may have been more likely to report workplace hostility, as they may have felt protected from retaliation in reporting inappropriate behavior. In addition, though not finding a direct link between the existence of LGBT-supportive policies and incidents of discrimination, Waldo (1999) did find that LGBT-supportive workplace climates were significantly related to lower heterosexism in the workplace. In his analysis, Waldo used a measure of workplace climate that asked participants to rate how their workplace would respond to complaints about anti-LGBT behavior, a potential proxy measure for workplace procedures to address discrimination under corporate policies. Given these points, we conclude that these studies do not outweigh the conclusion drawn from the previous paragraph that LGBT-supportive policies appear to reduce discrimination.

### (b) Increased openness (or less hiding) in the workplace about being LGBT

Figure 4: Number of studies showing relationship between LGBT-supportive policies or workplace climates and openness about being LGBT



*LGBT-supportive policies → Increased openness about being LGBT*

Research indicates that LGBT-supportive policies can create a workplace climate where employees feel comfortable enough to disclose their sexual orientation and gender identity. Four studies have found that LGB people are more likely to disclose their sexual orientation when their employer has an LGBT-inclusive nondiscrimination policy or a domestic partner benefits policy (Badgett, 2001; Rostosky & Riggle, 2002; Tejada, 2006; Ragins & Cornwell, 2007). One of these studies also found that having a partner who was covered by an LGBT nondiscrimination policy increased the likelihood of an employee himself or herself being out in the workplace (Rostosky & Riggle, 2002). In total, these studies surveyed over 800 gay men and lesbians and people in same-sex couples across the country.

However, at least one survey has found that the presence of LGBT-supportive policies does not make it more likely that LGBT employees are out at work. The Human Rights Campaign's (2009) nationally representative survey of LGBT employees found that employees who were not covered by an LGBT-inclusive nondiscrimination policy were about as likely to be out as those who were covered. Though diverging from the literature reviewed above, these findings do not suggest that LGBT employees are *less* likely to be out at work when LGBT-supportive policies

AR_292989

are in place. Thus at worst, these policies are not a deterrent to disclosure in the workplace and at best may support employees in coming out.

*LGBT-supportive workplace climate → Increased openness about being LGBT*

Research has also found that employees are more likely to be out if they perceive their workplace to be supportive of LGBT people. Workplace support is measured differently in these studies, but generally it is broader than whether the company has a nondiscrimination or domestic partner benefits policy. Three studies conducted in the last ten years that together surveyed almost 2,000 people showed that employees are more likely to be out if they perceive their workplaces to supportive of LGBT people (Griffith & Hebl, 2002; Human Rights Campaign, 2009; Ragins, Singh, & Cornwell, 2007). The most recent of these surveys, the Human Rights Campaign's 2009 survey, found that employees were more likely to be out to everyone at work when they perceived their workplace climate to be supportive of LGBT people (29% compared to 9%). A 1996 study of lesbian employees also found that supportive workplace climates are significantly related to an employee's openness about his or her sexual orientation at work (Driscoll, Kelley, & Fassinger, 1996).

## SECONDARY EFFECTS FOR INDIVIDUALS IN THE WORKPLACE

### (c) Improved health and well-being outcomes

Figure 5: Number of studies showing relationship between LGBT-supportive policies or workplace climates and health outcomes



*LGBT-supportive policies → Improved health and well-being outcomes*

Several studies have found that employees covered by LGBT-supportive policies are psychologically healthier than those who are not covered by these policies. Studies show that these policies can have broader effects on employees' well-being outside of the workplace, as well as work-specific effects. A 2009 survey of LGBT employees (Human Rights Campaign, 2009) found that those who were covered by a nondiscrimination policy were less likely to feel depressed than those who were not covered by such a policy (26% compared to 42%); were less

9

likely to feel distracted (24% compared to 31%); and less likely to feel exhausted (20% compared to 25%). Similar results were found when looking at the impact of domestic partner benefits policies. For example, a 2007 study based on a national survey of LGB employees found that those who were offered domestic partner benefits through their employer reported significantly more organization-based self-esteem (Ragins & Cornwell, 2007). A 2000 study of lesbians and gay men in the Midwest found lower rates of work-home conflict among lesbian and gay employees whose workplaces had nondiscrimination policies in place (Day & Schoenrade, 2000). The study also found less job stress among employees who were covered by a nondiscrimination policy than those who were not, however the difference was not statistically significant.

*LGBT-supportive workplace climate → Improved health and well-being outcomes*

Other studies have found that LGB people who perceive their workplaces to be generally supportive of LGBT people are psychologically healthier than employees who work in unsupportive workplace climates (Driscoll, Kelley, & Fassinger, 1996; Waldo, 1999). A 2005 study based on a survey of lesbians and gay men found that the supportiveness of LGBT people in workplace climates was significantly related to lower job stress, however, this relationship was eliminated when taking into account perceived discrimination (Munoz, 2005). Other results from this study indicated that LGBT-supportive workplace climates had significant and positive effects on job-related variables such as turnover intentions, which suggests an overall beneficial effect of LGBT-supportive workplace climates on the well-being of LGBT employees.

*Increased openness about being LGBT → Improved health and well-being outcomes*

Generally, research has shown that LGBT employees who are out at work also report being psychologically healthier than those who conceal their sexual orientation or gender identity. For example, the Human Rights Campaign (2009) survey found that employees who were out in the workplace were less likely to feel depressed than those who were not out (26% compared to 44%); less likely to feel distracted (25% compared to 31%); less likely to feel exhausted (12% compared to 30%); and less likely to avoid social events (18% compared to 29%). Other studies show similar differences between employees who are out at work and those who are not, including less anxiousness and higher self-esteem reported by those who are out (Griffith & Hebl, 2002; Jordan & Deluty, 1998; Smith & Ingram, 2004). A 2006 study of Dutch lesbians and gay men found similar results for gay men (Sandford, Bos, & Vet, 2006).

Qualitative studies also suggest that LGB employees who are out at work are psychologically healthier. For example, an analysis of responses to a 1995 survey of Harvard Business School alumni found that employees who were not out at work reported higher stress, more discomfort with socializing, and lower self-esteem (Friskopp & Silverstein, 1996). Similar experiences have been described in other qualitative studies (Boatwright, Gilbert, Forrest, & Ketzenberger, 1996).

Two national studies, Driscoll, Kelley, and Fassinger (1996) and Ragins, Singh, and Cornwell (2007), indicate that being out in the workplace is not directly related to psychological well-being. However, other findings from these studies support the theoretical relationship between disclosure and improved health and well-being. Ragins et al. (2007) show that concealment of sexual orientation was associated with greater psychological distress, indicating that the inability

10

to disclose one's sexual orientation in the workplace is associated with negative outcomes. This suggests that policies which support disclosure, thus reducing the need to conceal, may lower the risk of experiencing this distress. Driscoll and colleagues show a significant positive relationship between disclosure and lesbian employees' perceptions of a supportive work environment, suggesting that disclosure has an indirect and positive effect on stress levels through workplace climate. Thus overall, these studies suggest that supporting disclosure of sexual orientation in the workplace has the net effect of improving the health and well-being of LGBT employees.

*Less discrimination → Improved health and well-being outcomes*

Research also shows that experiencing discrimination can affect an individual's mental and physical health (Williams, 2003). Munoz (2005) found that greater perceived workplace discrimination was associated with higher job-related stress among gay men and lesbians, whereas LGBT-supportive workplace climates were linked to lower job-related stress. Similarly, Waldo (1999) found poorer health outcomes among employees who had experienced direct heterosexism.

Other research shows that employees need not have experienced discrimination to feel similar negative effects. Those who work in environments that cause them to fear discrimination also report negative health outcomes (Ragins, Singh, & Cornwell, 2007; Sandfort, Bos, & Vet, 2006; Smith & Ingram, 2004).

### (d) Increased job satisfaction

Figure 6: Number of studies showing relationship between LGBT-supportive policies or workplace climates and job satisfaction



*LGBT-supportive policies → Increased job satisfaction*

Studies have found that LGB employees who are covered by a nondiscrimination policy are more satisfied with their jobs than employees who are not covered by a policy. For example, Day and Schoenrade (2000) found that job satisfaction was significantly higher among employees working for organizations that had LGBT nondiscrimination policies in place.

11

Similarly, Tejeda (2006) found that employees who were covered by a nondiscrimination policy reported significantly higher levels of job satisfaction than those who were not covered.

### *LGBT-supportive workplace climate → Increased job satisfaction*

Research has also found that LGB people who perceive their workplace climates to be supportive of LGBT employees are more likely to have positive attitudes about their jobs than people who see their workplaces as unsupportive. For example, Munoz (2005) found that LGBT-supportive workplace climates were associated with higher levels of career satisfaction. Additionally, Waldo (1999) found that employees who perceived their work environment to be heterosexist were significantly less satisfied with their jobs.

Some studies have indicated that overall supportiveness of LGBT people in the workplace may be more relevant to job satisfaction than just the presence of an LGBT-supportive policy. For example, a 2008 study of LGB employees found that informal types of general support from supervisors and work colleagues (rather than organization-level support) predicted job satisfaction and life satisfaction (Huffman, Watrous-Rodriguez, & King, 2008). Similarly, Griffith and Hebl (2002) found that the presence of a written workplace nondiscrimination policy was unrelated to job satisfaction once the researchers accounted for LGBT social support within the organization.

### *Increased openness about being LGBT → Increased job satisfaction*

We were able to find only one study that showed that employees who are open about their sexual orientation are more satisfied with their jobs than employees who are not open. A nationally representative survey of heterosexual and LGBT white-collar employees found that out employees were 31% less likely to feel stalled in their careers and 25% more likely to be satisfied with their rate of advancement or promotion (64% compared to 48%; Hewlett & Sumberg, 2011). The study also found that senior management positions held by LGBT people were much more likely to be held by an out LGBT person (71% compared to 28%).

Conversely, at least three studies have found that disclosure of sexual orientation is not predictive of job satisfaction (Day & Schoenrade, 2000; Driscoll, Kelley, & Fassinger, 1996; Tejeda, 2006). It may be the case that LGBT employees do not evaluate their job satisfaction based on whether or not they have disclosed their sexual orientation. In the context of other findings that link LGBT-supportive policies and workplace climates to increased job satisfaction, it is likely that perceptions of the workplace climate are more significantly related to an LGBT employee's satisfaction on the job than to his or her personal decision to come out.

### *Less discrimination → Increased job satisfaction*

Research has found that LGB employees who have not experienced discrimination are more satisfied with their jobs. For example, Button (2001) found that employees who did not experience discriminatory treatment were significantly more satisfied with their jobs than those who had. Similarly, Munoz (2005) found that those respondents who perceived more workplace discrimination were significantly less satisfied with their jobs and careers. Ragins, Singh, and Cornwell (2007) also found less job satisfaction and less satisfaction with opportunities for

AR_292993

promotion among those employees who were not out and who feared discrimination. Research out of Australia and the Netherlands has reached similar conclusions (Sandford, Bos, & Vet, 2006; Trau & Härtel, 2007).

However, Tejeda (2006) found that workplace hostility was unrelated to satisfaction with work. This sample only included 65 gay men who on average reported few incidents of workplace hostility and thus analyses may not have been able to detect relationships among these variables.

### (e) Improved relationships with co-workers and supervisors

Figure 7: Number of studies showing relationship between LGBT-supportive policies or workplace climates and relationships with co-workers and supervisors



*LGBT-supportive policies → Improved relationships with co-workers and supervisors*

Research has shown that LGB employees who are covered by LGBT-supportive policies are more likely to be socially and altruistically engaged in the workplace. For example, studies show that gay and lesbian employees who are covered by nondiscrimination policies report higher levels of organizational citizenship behaviors (OCBs) than employees who are not covered (Brenner, Lyons, & Fassinger, 2010; Tejeda, 2006). These behaviors relate directly to relationships with coworkers and supervisors. OCBs are "Good Samaritan" behaviors that are not necessarily part of an employee's job duties, but nevertheless positively contribute to the workplace environment (Organ, Podsakoff, & MacKenzie, 2006). Researchers who study OCBs look at the extent to which employees exhibit behaviors that benefit other employees or the company, such as altruism, courtesy, conscientiousness, civic virtue, sportsmanship, peacekeeping, cheerleading, helping, and loyalty, among others (Podsakoff, Whiting, Podsakoff, & Blume, 2009).

*Increased openness about being LGBT → Improved relationships with co-workers and supervisors*

One additional factor that has been shown to be associated with improved interpersonal engagement in the workplace is disclosure of sexual orientation. Ragins, Singh, and Cornwell (2007) reported that greater disclosure was associated with greater participation with others in

13

the work environment.  To our knowledge, this is the only study linking disclosure to workplace engagement or improved interpersonal relationships, and thus additional research is necessary to test the validity of this finding.

*Improved relationships with co-workers and supervisors → Greater commitment and other positive behaviors and attitudes*

Research has also shown that higher levels of OCBs are related to lower degrees of turnover intentions and lower actual turnover rates.  Researchers have hypothesized that turnover is less likely in organizations where employees report high levels of OCBs because helping and supporting behaviors, measured by OCBs, are likely to boost the attractiveness of the job.  For example, a 2009 meta-analysis of 168 studies of employee OCBs, a majority of which asked about job withdrawal behaviors, found that employees who exhibited higher levels of OCBs were less likely to say they intended to leave their job, and were less likely to actually have left jobs (Podsakoff, Whiting, Podsakoff, & Blume, 2009).  This finding will require replication among a sample of LGBT employees to assess whether the relationship between these variables exists within this population.

*Improved relationships with co-workers and supervisors → Increased productivity*

Research has shown that employees who exhibit higher levels of OCBs are more productive in the workplace.  Podsakoff et al.'s (2009) meta-analysis included seven studies which specifically measured productivity and found that workplaces whose employees exhibited higher levels of OCBs were significantly more productive than workplaces characterized by lower levels of OCBs.  Higher organization-level OBCs were also significantly related to increased workplace efficiency and reduced costs.  In addition, individual level OBCs were positively related to managers' evaluations of their employees' job performance.  Using a sample of gay and lesbian employees, Brenner, Lyons, and Fassinger (2010) found that OCBs were reported to have a strong relationship with organizational performance, accounting for 18% to 38% of the variance in organizational performance.

Additionally, Podsakoff et al. (2009) looked at 199 studies that measured employee engagement using a different model than the OCB model, and those studies also found that employee engagement was related to business performance outcomes.  The study found small but significant correlations between levels of employee engagement and the main outcome variables – customer loyalty, profitability, productivity, turnover, safety incidents, absenteeism, lost merchandise, patient safety incidents, and product quality.  As is the case with the relationship between OCBs and turnover intentions, these studies will need to be replicated using additional samples of LGBT employees.

**(f) Greater commitment and other positive workplace behaviors and attitudes**

Figure 8: Number of studies showing relationship between LGBT-supportive policies or workplace climates and job commitment and other positive workplace behaviors and attitudes



*LGBT-supportive policies → Greater commitment and other positive workplace behaviors and attitudes*

Studies have found that LGBT employees are more loyal to employers that have LGBT-supportive policies. For example, Ragins and Cornwell (2001) found that gay and lesbian employees who were covered by LGBT-supportive policies were significantly more committed to their employers and their careers, and significantly less likely to report that they planned to leave their jobs, than those who were not covered by a policy. This pattern of relationships was found regardless of whether employees had disclosed their sexual orientation, indicating that these policies can have a positive impact on all gay and lesbian employees. Further, the relationship between organizational policies and an employee's organizational commitment and turnover intentions was shown to occur independently of perceived workplace discrimination, again suggesting that the positive impact of these policies extends to all gay and lesbian employees, not only individuals who might have used the policies.

Other surveys of LGBT employees have found that employees who were covered by LGBT-supportive policies report higher emotional commitment to their employers (Day & Schoenrade, 2000), less intent to leave their jobs (Ragins & Cornwell, 2007), and are less likely to have searched for a new job within the past year (Human Rights Campaign, 2009), than those employees who were not covered.

However, at least one study suggests that a nondiscrimination policy may not have an effect on retention of gay male employees. Tejeda (2006) found that employees who were covered by a nondiscrimination policy were as likely to report turnover intentions as those who were not covered by a nondiscrimination policy. Given the small sample size of this study, there is presently greater empirical support for the existence of a relationship between LGBT-supportive workplace policies and organizational commitment.

15

*LGBT-supportive workplace climate→ Greater commitment and other positive workplace behaviors and attitudes*

Research has also found that LGB people who perceive their workplace climates to be LGBT-supportive are more likely to have positive attitudes about their jobs than LGB people who see their workplaces as unsupportive.  For example, Munoz (2005) found that LGBT-supportive organizational climates were significantly related to higher organizational commitment and lower turnover intentions.  At least one other quantitative study (Driscoll, Kelley & Fassinger, 1996) has also found a positive relationship between LGBT-supportive climates and turnover intentions or job commitment.  Individual employee responses in a qualitative analysis from the U.K. indicated that the employees felt a sense of loyalty to their employers when they perceived their workplace climates to be LGBT-supportive (Guasp & Balfour, 2008).

*Increased openness about being LGBT→ Greater commitment and other positive workplace behaviors and attitudes*

Studies have also found that LGBT employees who are open about their sexual orientation in the workplace report fewer turnover intentions than those who are not open.  Hewlett and Sumburg (2011) found that out employees were more likely to be satisfied with their rate of advancement or promotion compared to employees who had not disclosed their sexual orientation (64% compared to 48%). Those who were unsatisfied were at least three times more likely to plan to leave their companies within the next year.  Similarly, Day and Schoenrade (2000) found that out employees reported more commitment to their employers.

Published qualitative evidence supports these statistics.  For example, a qualitative analysis of responses to a 1995 survey of Harvard Business School alumni found that employees who had not disclosed their sexual orientation at work reported reservations about their long-term prospects with the company and less loyalty than employees who had disclosed.  A few of the alumni reported that they had left a job, or were thinking about leaving a job, in order to work for a company where they felt comfortable being out (Friskopp & Silverstein, 1996).

Only one paper we identified presents data suggesting the opposite conclusion— that disclosure in the workplace is related to greater turnover.  In a sample of gay men, Tejeda (2006) found that employees who were open about their sexual orientation reported greater turnover intentions than employees who were not open.  It may be that disclosing one's sexual orientation or gender identity in the workplace increases the vulnerability of an LGBT employee to discrimination, and experiencing these acts may increase turnover intentions.  In this case, policies that lessen the occurrence of discrimination (as in Button, 2001; Human Rights Campaign, 2009), and provide employees with recourse in the event of discrimination, provide a remedy that may also reduce the desire to leave one's company.

16

*Less discrimination → Greater commitment and other positive workplace behaviors and
attitudes*

Additionally, research has shown that employees who do not fear discrimination or have not
experienced discrimination report fewer turnover intentions and higher levels of commitment to
their employers. For example, a 2007 nationally representative survey of people who had quit or
been laid off within the five years prior to the survey found that gay and lesbian employees said
they left a job only because of workplace unfairness almost twice as often as heterosexual
Caucasian men (5.6% compared to 3.0%; Level Playing Field Institute, 2007). Almost half of
those gay and lesbian employees said they would have stayed at their job had their employer
offered more or better benefits. Additionally, Munoz (2005) found that those respondents who
perceived more workplace discrimination reported significantly lower levels of job commitment
and significantly higher levels of turnover intentions. Button (2001), Ragins, Singh, and
Cornwell (2007), and Trau and Härtel (2007) found a similar relationship between discrimination
and job commitment or turnover intentions.

Similarly, a review of literature related to the vocational decision-making of lesbians, highlights
that the career decisions of lesbian women may be highly influenced by the perception of the
safety of a work environment. The belief that she may be more likely to face discrimination in a
certain occupation or be unsupported by the management of an individual company, may cause a
lesbian woman to choose alternate career paths or work less hard toward promotions or salary
increases in order to shield herself from negative repercussions of being out at work (Hook &
Bowman, 2008).

## INDIVIDUAL EFFECTS: TRANSGENDER RESPONDENTS

Only four of the 36 research studies discussed in this report included transgender people in their
study samples. Two of those studies, Hewlett and Sumburg (2011) and Harris
Interactive/Witeck-Combs Communication (2006), did not report the number of transgender
people included in their samples. Hewlett and Sumburg (2011) did note, however, that they
could not separately analyze the responses of transgender people because there were too few of
them. Two studies, Law et al. (2011) and Human Rights Campaign (2009), separately analyzed
responses of transgender employees. These studies suggest that LGBT-supportive policies and
workplace climates might have the same effects on transgender employees that they have on
LGB employees, which, in turn, have a positive impact on workplace-related outcomes.

*LGBT-supportive workplace climate → Increased job satisfaction; Greater commitment
& other positive behaviors & attitudes; Improved health and well-being
outcomes*

In a survey of 88 transgender employees, Law et al. (2011) found that transgender respondents
who reported more workplace support were more satisfied with their jobs, reported higher levels
of affective and normative commitment, and reported lower levels of job anxiety (although this
finding was not significant). Workplace support, however, was not related to turnover
intentions.

17

AR_292998

Affective commitment refers to an employee's desire to stay with an organization because he or she likes working there. Normative commitment refers to an employee's desire to stay at a job due to feelings of obligation to the organization.

Figure 9:  Number of studies focused on transgender employees showing relationship between LGBT-supportive policies or workplace climates and economic outcomes



*Increased openness about being LGBT→ Increased job satisfaction; Greater commitment & other positive behaviors & attitudes; Improved health and well-being outcomes*

Law et al. (2011) found that transgender respondents who had disclosed their transgender status at work were more satisfied with their jobs and reported higher levels of affective commitment than those who had not disclosed.  The study also found that transgender respondents who had disclosed their gender identity at work experienced less job anxiety.  Disclosure was not found to be related to normative commitment.

Figure 10:  Number of studies focused on transgender employees showing relationship between more openness about being transgender and economic outcomes



Additionally, in a survey of LGBT people that included 23 transgender employees, the Human Rights Campaign (2009) found that many transgender respondents concealed their transgender

18

status at work out of safety concerns or fear of being fired. Forty-percent of transgender respondents reported that fear was the reason they were not out at work, compared to 20% of gay men (the next more likely group to report fear as the reason they were not out at work). Transgender people were also more likely to fear that they would be fired if they were open about their LGBT-identity at work (42% of transgender people compared to 22% of gay men, the next most likely group to report this fear). As described above, fear of discrimination can have a negative impact on employees' health and well-being, job satisfaction, job commitment, and other workplace attitudes and behaviors.

## INDIVIDUAL EFFECTS: BISEXUAL RESPONDENTS

Research specifically about the workplace attitudes of bisexual people is also lacking. Only 11 of the 36 studies we reviewed included bisexual respondents, and only the Human Rights Campaign (2009) study provided any information about just bisexual respondents. The Human Rights Campaign study does not provide enough information about bisexual respondents to show a relationship between the impact of LGBT-supportive policies or workplace climates on bisexual employees, specifically, and workplace-related outcomes. However, the study indicates that bisexual employees might experience discrimination or fear discrimination at higher levels than gay and lesbian employees. As described above, experiences of discrimination and fear of discrimination can have a negative impact on employees' health and well-being, job satisfaction, job commitment, and other workplace attitudes and behaviors.

Specifically, the Human Rights Campaign (2009) study found that bisexual respondents were less likely than gay and lesbian respondents to have co-workers acknowledge their sexual orientation in a positive way (7% of bisexual respondents, compared to 27% of gay men and 31% of lesbians). Bisexual respondents were also less likely than gay and lesbian respondents to report that they would disclose their sexual orientation on an anonymous, confidential human resources survey (59% compared to 79% of gay men and 77% of lesbians). They were also less likely than gay and lesbian respondents to report that they would feel comfortable providing feedback about the LGBT workplace climate to human resources (59% of bisexuals compared to 83% of gay men and 80% of lesbians).

Among all of the 36 studies we reviewed for this report, the studies described above are the only ones that included bisexual and transgender people's responses. The lack of data on transgender and bisexual employees is a significant limitation of the current research on the impact of LGBT-supportive workplace policies.

## EFFECTS ON ORGANIZATIONAL OUTCOMES

In previous sections, we reviewed evidence that LGBT-supportive policies and workplace climates are associated with positive changes for LGBT employees, including increased job satisfaction, better psychological health, and greater engagement with coworkers. We next consider the impact of these policies on higher-level organizational change. It is important to note that little research exists directly relating LGBT-supportive policies to macro-level organizational change. However, in an effort to provide a more comprehensive review of the

19

potential costs and benefits of adopting such policies, we outline several proposed theoretical relationships.

**(g) Changes in health insurance costs (through (c) above, and direct changes)**

Extending benefits to the same-sex partners of LGBT employees, such as health insurance coverage, will likely result in higher health insurance costs for companies enacting these policies, but that effect is relatively small. Domestic partner benefits for same-sex partners would raise health care costs by well under 1% for the typical firm (Ash & Badgett, 2006). An estimate of the cost of extending healthcare coverage to same-sex spouses suggested that 96% of U.S. firms would see no additional costs, and that approximately 190,000 out of 5 million U.S. firms would have only one new spouse covered by its health benefit programs (Badgett & Gates, 2006).

Where realized, this increase in healthcare expenditures is likely to be at least partially offset by savings in overall healthcare costs and increased productivity resulting from the improved health of LGBT employees, as mentioned earlier. In the general population, lack of health insurance is associated with decreased utilization of preventative services and delays in care among those with chronic poor health, which can lead to an increased likelihood of premature death, poorer quality of life, and greater functional impairment, including reduced work productivity (Institute of Medicine, 2009). As increased coverage can yield improvements in the health of an LGBT employee or their same-sex partner, LGBT employees may show more engagement in the workplace and higher levels of productivity. These direct physical health benefits can be coupled with the psychological benefits of reducing discrimination in the workplace, reviewed earlier, including possible reduction of the use of sick days (Huebner & Davis, 2007).

As part of a set of policies to enhance and support a diverse workforce, employers may provide health benefits that cover transition-related care. Transition-related care includes medically necessary treatments or procedures for an individual to transition to a gender different from the one assigned to that individual at birth.[1] As the transgender population in the United States is quite small (Gates, 2011), the number of transgender employees seeking this type of coverage is also likely to be small. One known estimate comes from the City and County of San Francisco, which reported that over the course of five years (2001-2006), 37 employees filed claims for transition-related care, out of a total of 80,000 insurance plan members (Harmon, 2006). The total expenditures ($383,000) were significantly less than had been anticipated (Harmon, 2006). Emerging social science research suggests that transition-related care results in significant improvements in the mental health of transgender persons (e.g. Ainsworth & Spigel, 2010; Dhejne, Lichtenstein, Boman, et al., 2011; Monstrey et al., 2007; Murad, Elamin, Garcia, et al., 2010), which may reduce healthcare costs associated with *not* providing these types of benefits.

---

[1] Transition-related healthcare encompasses a number of procedures and interventions that are deemed medically necessary in order to treat gender dysphoria and help transgender and gender non-conforming people achieve "lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment" (Coleman et al., 2011, p. 166).

AR_293001

**(h) Lower legal costs from litigation related to discrimination (through (a), above)**

The implementation of LGBT-supportive policies may serve to bring a company in-line with existing federal or state regulations or local ordinances. In doing so, a company may shield itself from legal costs associated with compliance lawsuits, an issue of concern to many employers. However, estimating the costs of addressing compliance issues is challenging and we were unable to find data or studies related to sexual orientation and gender identity.

**(i) Greater access to new customers, such as public sector entities that require contractors to have nondiscrimination policies or domestic partner benefits**

A number of states and localities require employers to adopt LGBT-supportive policies in order to bid on government contracts. A 2011 study identified 68 local governments that have laws requiring their contractors to have LGBT-supportive nondiscrimination policies, affirmative action policies, or to offer equal benefits to employees' domestic partners (Mallory & Sears, 2011). Some states have adopted similar laws (e.g. Cal. Pub. Cont. Code § 10295.3(a)(1), (e)(1)). By adopting LGBT-supportive policies, employers can qualify for potentially lucrative government contracts with these public sector entities. However, no studies have looked directly at the extent to which having the policies increases the likelihood of securing government contracts.

**(j) More business from individual consumers who want to do business with socially responsible companies**

A possible outcome of adopting LGBT-supportive workplace policies is a change in the way a company is viewed by those external to the organization, most notably customers and potential new employees. To the extent that state and local governments require contractors to have LGBT-inclusive nondiscrimination polices or to offer domestic partnership benefits, enacting LGBT-supportive policies may provide a company with greater access to new customers. An organization's customer base may also expand due to consumer preferences for supporting companies that value diversity. For example, an experimental study by Tuten (2005) evaluated consumers' reactions to a company that was described as having "gay-friendly" policies, and to a company that was described as lacking "gay-friendly" policies. Both LGBT and heterosexual participants had significantly more positive reactions to the "gay-friendly" company than to the non-gay friendly company (Tuten, 2005). This finding is complicated, however, by the concurrent result that heterosexual participants reported significantly higher brand commitment to the non-"gay friendly" company than to the "gay-friendly" company. Taken together, these findings suggest that LGBT-supportive policies are only one of a number of factors contributing to customer assessments of existing brands, but also that LGBT-supportive companies are viewed positively by some potential customers.

In addition to directly changing the external perceptions of a given company, LGBT-supportive policies might also indirectly lead to improved customer satisfaction through increased employee engagement. For example, Walz and Niehoff (2000) found that restaurants where employees exhibited higher levels of OCBs (a form of employee engagement) were rated higher in customer satisfaction and received fewer customer complaints. Recent meta-analyses support this

AR_293002

contention, demonstrating a significant correlation between employee engagement and customer loyalty and satisfaction (Harter, Schmidt, Killham, & Agrawal, 2009; Podsakoff, Whiting, Podsakoff, & Blume, 2009).

**(k) More effective recruiting of LGBT and non-LGBT employees who want to work for an employer that values diversity**

*LGBT-supportive policies → More effective recruiting of LGBT and non-LGBT employees*

Survey data from opinion polls suggest the importance of LGBT-supportive policies to LGBT people when they are considering where to work. Results from a 2006 national poll conducted by Harris Interactive/Witeck-Combs Communication indicated that 89% of LGBT respondents said it was important that they work for a company that has a written nondiscrimination policy that includes race, ethnicity, sex, religion, age, sexual orientation and disability (Out & Equal, Harris Interactive, & Witeck Combs Communications, 2006). An even greater percentage of LGBT respondents (91%) said it was important that they work for a company that offers equal benefits. Research conducted among LGB employees in the United Kingdom reports similar findings, with respondents seeking out LGB-inclusive organizations for employment opportunities while steering away from companies they believed were not supportive of the LGB community (Guasp & Balfour, 2008). Company policies such as nondiscrimination protections and domestic partnership benefits were signals to LGB employees that they would be supported in the workplace.

Having LGBT-supportive policies may have a similarly positive impact on the recruitment of non-LGBT employees. In the 2006 Harris poll, 72% of non-LGBT respondents said that, when deciding where to work, it was important that an employer have an LGBT-inclusive nondiscrimination policy, and 79% said that it was important that an employer offer equal benefits (Out & Equal, Harris Interactive, & Witeck-Combs Communications, 2006).

*Less discrimination → More effective recruiting of LGBT employees*

Other research suggests another recruitment-related business concern arising from discrimination—that employers limit their available talent pool by discriminating against qualified applicants because of their sexual orientation. For example, a 2011 study that sent out "matched resumes" of two equally qualified job applicants to employers, with the only difference being that one applicant was identifiably gay, found that employers were 40% more likely to callback the heterosexual applicant. Though the difference in callback rates varied by geographic region, gay men were less likely than non-gay men to be called back in every state included in the study, but discrimination was less in cities and states with nondiscrimination laws (Tilcsik, 2011). If this finding extends to voluntarily adopted company-level nondiscrimination policies, then employers who have rejected highly qualified LGBT applicants in the past might reduce their rejection of qualified applicants.

22

**(l) Increased creativity among employees that could lead to better ideas and innovations**

Though conclusions about the impact of a diverse workforce on business outcomes are varied and the challenges of conducting research in this area complex, there is some evidence to suggest that diversity in the workplace is related to increased innovation (Kochan et al., 2003). We located one qualitative study of LGB employees from 21 public and private sector companies in the U.K. that addressed a related question (Guasp & Balfour, 2008). Employees indicated that having to conceal their sexual orientation at work reduced their levels of creativity and innovation, while being out at work increased their confidence in sharing new ideas (Guasp & Balfour, 2008).

**(m) Greater demand for company stock because of expected benefits of diversity policies**

Based on our review, two published studies have looked at whether implementing LGBT-supportive policies affects stock prices. A 2008 study examined stock prices of 203 companies before and after the release of the Human Rights Campaign's Corporate Equality Index (CEI) to determine if perceptions of LGBT-friendliness would boost companies' stock market performance. (The CEI rates companies on their LGBT-friendliness, including whether they have nondiscrimination and domestic partner benefits policies.) The study found an initial increase in firm value on the day the CEI was released but no net impact over the three-day analysis period (Johnson & Malina 2008). A later study found that the more robust a company's LGBT-friendly policies, the better its stock performed over the course of four years (2002-2006), compared to other companies in the same industry over the same period of time (Wang & Schwarz, 2010). The construction of the stock price variable in that study does not allow for assessing the amount of change in the actual stock price, however.

## EVALUATION OF EVIDENCE AND LIMITATIONS

In a previous review of literature related to the vocational behavior of gay men, lesbians, and bisexual men and women, Croteau (1996) outlined methodological limitations among empirical articles published on the topic between 1980 and 1995. He noted that across the nine studies, all used convenience samples of predominantly white, well-educated, self-identified sexual minorities recruited through connections with the LGBT community. These studies also used measurement tools that had not been previously validated and conducted largely descriptive analyses of the survey data. Though research published since then has improved in the use of validated instruments, such as the Lesbian, Gay, Bisexual, and Transgendered Climate Inventory (Liddle, Luzzo, Hauenstein, & Schuck, 2004), and the use of more complex statistical analyses, such as path analyses, the limitations related to study design, methodology, and sampling remain largely the same.

The majority of studies reviewed in this report are cross-sectional studies using convenience samples of gay men and lesbians, with a smaller number of studies that are inclusive of bisexual men and women and transgender men and women. No study identified in this review presented longitudinal data to assess whether adding supportive policies in one period is associated with

23

better outcomes in later periods, which would provide stronger evidence that there is a causal relationship between policies and outcomes. In addition, samples were predominantly white and well-educated, and had higher incomes than the general population, limiting the generalizability of reported findings.

Effect sizes found among the current set of studies were generally small and the presence of LGBT-supportive policies accounted for only a limited amount of the variance in outcome measures. This indicates that there are likely other factors impacting employee attitudes, employee behaviors, and a company's bottom line, and that LGBT-supportive policies such as nondiscrimination and benefits policies are only part of what influences the work experiences of LGBT employees.

The challenges of sampling LGBT populations have been reviewed elsewhere and as has been previously noted in the literature, the studies reviewed here used samples predominantly recruited from LGBT-related organizations, including member lists of LGBT rights organizations (e.g. Day & Schoerade, 2000) and LGBT affinity groups (e.g. Sandfort, Bos, & Vet, 2006). This sampling strategy has implications for the conclusions that can be drawn from existing studies, in that what is largely known about LGBT employees is a set of findings about a specific subsample of LGBT people— those who are connected to the LGBT community and willing to self-identify as such. One set of studies identified in this review used a stratified sampling technique to obtain equal numbers of men and women from the same geographic regions (Ragins & Cornwell, 2001; Ragins & Cornwell, 2007; Ragins, Singh, & Cornwell, 2007), however, these participants were recruited from the membership of national LGBT rights organizations. This again limits the findings to a description of LGBT people who may be more likely to have disclosed their sexual orientation at work, who may be more likely to seek out employers who provide domestic partnership benefits or offer protections from discrimination, or other characteristics of individuals who actively affiliate with LGBT political or advocacy organizations.

Another limitation among the studies reviewed for this report is the use of self-report questionnaires as the most frequently used method of assessment. While the use of self-report questionnaires is common to much of social science research and may adequately measure constructs such as work-related attitudes, research on LGBT-supportive workplace policies using this type of methodology relies on participants' accurate knowledge of the presence of these policies. Importantly, between 9.1% and 18% of participants in studies assessing the presence of nondiscrimination policies and/or domestic partnership benefits either did not know or were not sure of whether such policies existed at their organization, a finding which calls into question the reliability of some of the data collected. In addition, this result suggests that for some proportion of LGBT employees, there is no relationship between the presence of LGBT-supportive workplace policies and employee-level outcomes simply because these individuals are unaware that such policies even exist.

Finally, the studies outlined in this review measure a wide variety of constructs, which provides greater breadth than depth of the findings. Among the challenges faced by researchers exploring workplace outcomes is the selection not only of the variables of interest, but of variables which may confound results or better explain the relationships between LGBT-supportive policies,

24

employee attitudes and behaviors, and company productivity. For example, studies that assess the degree to which an organizational climate is supportive of LGBT individuals may also wish to include assessments of an organization's general support for diversity in order to understand the unique contribution of LGBT-affirmative company environments on LGBT workers. Similarly, a limitation of the published studies is that none have taken into account other types of diversity, such as age, race/ethnicity, or gender, when examining the relationship between workplace policies and outcomes. There may be meaningful differences among LGBT workers who face discrimination based on multiple factors; for example, among lesbian employees who already experience wage discrimination based on their gender. The interaction of different dimensions of diversity will be an important area for further research.

## RESEARCH RECOMMENDATIONS

Based on the present review, there are number of ways in which research on the effects of LGBT-supportive policies could be expanded and improved. As noted in the limitations section, future work in this area would benefit from recruiting more diverse samples of LGBT people. Literature published to-date represents a small subsample of this population and additional research is needed on LGBT people of different racial and ethnic backgrounds, educational attainment, and occupations. Studying the interaction of these different dimensions of diversity will be an important area for future research. Further, the existing literature base predominantly reports on the experiences and beliefs of lesbian and gay employees, and special attention should be paid to recruiting larger samples of bisexual men and women and transgender employees. Care should also be taken to consider the effects of workplace policies related to sexual orientation separate from policies related to gender identity or expression. This is particularly true since a greater number of U.S. states protect employees from discrimination based on sexual orientation than protect them from discrimination based on gender identity (National Gay and Lesbian Task Force, 2012).

In addition to diversifying the characteristics of study participants, future research should employ a greater number of sampling methods and research designs, particularly so that firmer conclusions can be drawn about the relationship between the presence of LGBT-supportive policies and business outcomes. The use of probability samples would allow for greater generalization of study findings, and using time-series, quasi-experimental, and experimental designs would allow researchers to test hypotheses about causal relationships among workplace policies, organizational climate, and outcomes of interest. For example, larger companies with businesses across multiple states provide an opportunity to conduct natural experiments that test the impact of local laws and social climates on LGBT employees, as well as more downstream targets like productivity, customer base, and profitability. It will also be important to include comparison and control groups to assess whether changes in diversity-respecting workplace practices differentially affect subsets of employees. Companies that have existing methods of collecting data on their employees and workplace outcomes, such job satisfaction and work-life balance, already have the infrastructure to support asking specific questions about diversity practices that are supportive of LGBT people. Doing so would allow for greater control of firm-level factors that might confound the results of these earlier studies, such as organization size, climate, and existing diversity practices. Researchers and company officials should collaborate to fully utilize such data and to make findings available to policymakers and the public.

AR_293006

Finally, future research should use additional and more direct measures of business outcomes, such as productivity and profit measures.  As shown in this report, a number of factors appear to mediate the relationship between the existence of LGBT-supportive policies and business outcomes, such as disclosure of sexual orientation in the workplace, office climate, and job satisfaction and engagement, and more work needs to be done to connect these mediating factors to organization-level costs and benefits.

## SUMMARY AND CONCLUSIONS

On a qualitative level, we find support in the social science research for links between LGBT-supportive policies and outcomes that will benefit employers.  Although the number of available studies was small, we are able to draw some tentative conclusions:

- Having LGBT-supportive policies in the workplace is associated with reduced incidence of discrimination, and less discrimination is associated with better psychological health and increased job satisfaction among LGBT employees.
- A supportive workplace climate – which includes both LGBT-supportive policies and more broad support from co-workers and supervisory staff – is associated with a greater likelihood that LGBT employees will feel comfortable disclosing their sexual orientation at work.  In turn, increased disclosure of sexual orientation is related to improved psychological health outcomes among LGBT employees.
- LGBT employees report more satisfaction with their jobs when covered by LGBT-supportive policies and working in positive climates.
- The presence of LGBT-supportive policies and workplace climates are associated with improved relationships among LGBT employees and their co-workers and supervisors. In addition, LGBT employees are more engaged in the workplace, are more likely to go above-and-beyond their job description to contribute to the work environment, and report greater commitment to their jobs.
- Although there may be initial costs to enacting LGBT-supportive policies, such as extending health benefits to same-sex partners of LGBT employees, we find that these costs are likely negligible and could be offset by cost savings in other areas.  Healthier, more committed LGBT employees are likely to make greater contributions to the workplace.
- Among consumers and job-seekers who value LGBT-inclusive diversity practices, businesses with LGBT-supportive policies may be seen as better companies from which to buy products or for whom to work, thereby increasing their customer base and pool of prospective employees.

Most research in this area supports the contention that in the workplace context, feeling comfortable disclosing one's sexual orientation or gender identity and being shielded from discrimination based on those characteristics are two mediating factors for the other relationships reported in the literature.  These may be important mechanisms to explain how LGBT-supportive policies result in better business outcomes.  Thus current research suggests that companies who wish to leverage their commitment to diversity to improve their bottom line ought to consider ways in which they can create and sustain LGBT-inclusive workplace climates and foster the safety and wellbeing of their LGBT employees.

26

# REFERENCES

Ainsworth, T.A., & Spigel, J.H. (2010). Quality of life of individuals with and without facial feminization surgery or gender reassignment surgery. *Quality of Life Research, 19,* 1019-1024

Ash, M. A. & Badgett, M. V. L. (2006). Separate and Unequal: The Effect of Unequal Access to Employment-Based Health Insurance on Same-sex and Unmarried Different-Sex Couples. *Contemporary Economic Policy, 24,* 582-599.

Badgett, M.V.L., & Gates, G.J. (2006). The effect of marriage equality and domestic partnership on business and the economy. Retrieved from The Williams Institute website: http://www.law.ucla.edu/williamsinstitute/publications/MarriageEqualityontheEconomy.pdf

Badgett, M. V. L. (2001). *Money, myths, and change: The economic lives of lesbians and gay men*. Chicago: University of Chicago Press.

Boatwright, K.J., Gilbert, M.S., Forrest, L., & Ketzenberger, K. (1996). Impact of identity development upon career trajectory: Listening to the voices of lesbian women. *Journal of Vocational Behavior, 48,* 210-228.

Bowling, N. A. (2007). Is the job satisfaction-job performance relationship spurious? A meta-analytic examination. *Journal of Vocational Behavior, 71,* 167–185.

Brenner, B.R., Lyons, H.Z., & Fassinger, R.E. (2010). Can heterosexism harm organizations? Predicting the perceived organizational citizenship behaviors of gay and lesbian employees. *The Career Development Quarterly, 58,* 321-335.

Button, S.B. (2001). Organizational efforts to affirm sexual diversity: A cross-level examination. *Journal of Applied Psychology, 86,* 17-28.

Cole, S. W., Kemeny, M. E., Taylor, S. E., & Visscher, B. R. (1996). Elevated physical health risk among gay men who conceal their homosexual identity. *Health Psychology, 15,* 243-251.

Cole, S. W., Kemeny, M. E., Taylor, S. E., Visscher, B. R., & Fahey, J. L. (1996). Accelerated course of human immunodeficiency virus infection in gay men who conceal their homosexual identity. *Psychosomatic Medicine, 58,* 219-231.

Coleman, E. Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., … Zucker, K (2011). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism, 13,* 165–232.

AR_293008

Croteau, J.M. (1996). Research on the work experiences of lesbian, gay, and bisexual people: An integrative review of methodology and findings. *Journal of Vocational Behavior, 48,* 195-209.

Crow, S.M., Fok, L.Y., & Hartman, S.J. (1988). Who is at greatest risk of work-related discrimination—women, blacks, or homosexuals? *Employee Responsibilities and Rights Journal, 11,* 15-26.

Currie, J., Madrian, B.C., (1999). Health, health insurance and the labor market. In: O. Ashenfelter, & D. Card (Eds.), *Handbook of a Labor Economics, Vol. 3* (pp. 3309-3407). Amsterdam: Elsevier.

Day, N.E. & Schoenrade, P. (2000). The relationship among reported disclosure of sexual orientation, anti-discrimination policies, top management support and work attitudes of gay and lesbian employees. *Personnel Review, 29,* 346-363.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A.L.V., Långström, N., et al., (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS ONE, 6,* e16885- e16885.

Driscoll, J.M., Kelley, F.A., & Fassinger, R.E. (1996). Lesbian identity and disclosure in the workplace: Relation to occupational stress and satisfaction. *Journal of Vocational Behavior, 48,* 229-242.

Friskopp, A., & Silverstein, S. (1996). *Straight jobs, gay lives: Gay and lesbian professionals, the Harvard Business School, and the American workplace.* New York: Touchstone.

Gates, G. J. (2011). How many people are lesbian, gay, bisexual, and transgender? Retrieved from The Williams Institute website: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Gates-How-Many-People-LGBT-Apr-2011.pdf.

Goldberg, Ramos, & Badgett, M.V.L. (2008). The fiscal impact of extending federal benefits to same-sex domestic partners. Retrieved from The Williams Institute website http://williamsinstitute.law.ucla.edu/wp-content/uploads/Badgett-Goldberg-Ramos-S2521FiscalAnalysis-Sept-2008.pdf

Griffith, K.H., & Hebl, M.R. (2002). The disclosure dilemma for gay men and lesbians: "Coming out" at work. *Journal of Applied Psychology, 87,* 1191-1199.

Guasp, A., & Balfour, J. (2008). Peak performance: Gay people and productivity. Retrieved from Stonewall website: http://www.stonewall.org.uk/documents/peak_performance.pdf.

Harmon, V. (2006). *San Francisco city and county transgender health benefits.* San Francisco: Human Rights Commission.

28

Harter, J.K, Schmidt, F.L., Asplund, J.W., Killham, E.A., Agrawal, S. (2010). Causal impact of employee work perceptions on the bottom line of organizations. *Perspectives on Psychological Science, 5,* 378-389.

Harter, J.K., Schmidt, F.L., Killham, E.A., & Agrawal, S. (2009). Q12 meta-analysis: The relationship between engagement at work and organizational outcomes (Technical paper). Omaha, NE: Gallup.

Hebl, M.R., Foster, J.B., Mannix, L.M., & Dovidio, J.F. (2002). Formal and interpersonal discrimination: A field study of bias toward homosexual applicants. *Personality and Social Psychology Bulletin, 28,* 815-825.

Hewlett, S.A., & Sumberg, K. (2011, June). *The power of out.* Center for Work-Life Policy.

Huebner, D.M., & Davis, M.C. (2007). Perceived antigay discrimination and physical health outcomes. *Health Psychology, 26,* 627-634.

Hook, M.K., & Bowman, S. (2008). Working for a living: The vocational decision making of lesbians. *Journal of Lesbian Studies, 12,* 85-95.

Horvath, M., & Ryan, A.M. (2003). Antecedents and potential moderators of the relationship between attitudes and hiring discrimination on the basis of sexual orientation. *Sex Roles, 48,* 115-130.

Huffman, A. H., Watrous-Rodriguez, K. M., & King, E. B. (2008). Supporting a diverse workforce: What type of support is most meaningful for lesbian and gay employees? *Human Resource Management, 47,* 237-253.

Human Rights Campaign (2009). *Degrees of equality: A national study examining workplace climate for LGBT employees.* Retrieved from Human Rights Campaign Web site: http://www.hrc.org/files/assets/resources/DegreesOfEquality_2009.pdf.

Human Rights Campaign (1999). *State of the Workplace for Lesbian, Gay, Bisexual and Transgendered Americans.* Retrieved from http://www.hrc.org/documents/sotw1999.pdf.

Iaffaldano, M.T., & Muchinsky, P.M. (1985). Job satisfaction and job performance: A meta-analysis. *Psychological Bulletin, 97,* 251-273.

IOM (Institute of Medicine). (2009). *America's Uninsured Crisis: Consequences for Health and Health Care.* Washington, DC: The National Academies Press.

Jackson, S.E., Joshi, A., & Erhardt, N.L. (2003). Recent research on team and organizational diversity: SWOT analysis and implications. *Journal of Management, 29,* 801-830.

Johnston, D., & Malina, M.A. (2008). Managing sexual orientation diversity: The impact on firm value. *Group and Organization Management, 33,* 602-625.

29

Jordan, K.M., & Deluty, R.H. (2008). Coming out for lesbian women. *Journal of Homosexuality, 35,* 41-63.

Kelly, E., & Dobbin, F. (1998). How affirmative action became diversity management: Employer response to antidiscrimination law, 1961 to 1996. *American Behavioral Scientist, 41,* 960-984.

Kochan, T., Bezrukova, K., Ely, R., Jackson, S., Joshi, A., Jehn, K., Leonard, J., Levine, D., & Thomas, D. (2003). The effects of diversity on business performance: Report of the Diversity Research Network. *Human Resource Management, 42,* 3-21.

Law, C.L., Martinez, L.R., Ruggs, E.N., Hebl, M.R., Akers, E. (2011). Trans-parency in the workplace: How the experiences of transsexual employees can be improved. *Journal of Vocational Behavior, 79,* 710-723.

Level Playing Field Institute (2007). *The cost of employee turnover due solely to unfairness in the workplace.* Retrieved from Level Playing Field Institute website: http://www.lpfi.org/sites/default/files/corporate-leavers-survey.pdf.

Liddle, B.J., Luzzo, D.A., Hauenstein, A.L., & Schuck, K. (2004). Construction and validation of the lesbian, gay, bisexual, and transgendered climate inventory. *Journal of Career Assessment, 12,* 33-50.

Mallory, C., & Sears, B. (2011). An evaluation of local laws requiring government contractors to adopt LGBT-related workplace policies. *Albany Government Law Review, 5,* 478-551.

Monstrey, S., De Cuypere, G., & Ettner, R. (2004). Surgery: General principles. *Principles of Transgender Medicine and Surgery* (pp. 89–104). The Haworth Press.

Munoz, C.S. (2005). A multi-level examination of career barriers for sexual minority employees. *Unpublished doctoral dissertation.*

Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J. and Montori, V. M. (2010). Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology, 72*, 214–231.

National Gay and Lesbian Task Force (2012, January). Nondiscrimination laws map. Retrieved from The National Gay and Lesbian Task Force website: http://www.thetaskforce.org/downloads/reports/issue_maps/non_discrimination_1_12_co lor.pdf.

Organ, D.W., Podsakoff, P.M., & MacKenzie, S.B. (2006). *Organizational citizenship behavior: Its nature, antecedents, and consequences.* Thousand Oaks, CA: Sage.

AR_293011

Out & Equal, Harris Interactive, & Witeck Combs Communications (2006). *Majority of
Americans: Companies not government should decide benefits offered to same-sex
employees* (Press release). Retrieved from Out & Equal website:
http://outandequal.org/documents/2006_Workplace_Survey052306.pdf

Pachankis, J. E. (2007). The psychological implications of concealing a stigma: A cognitive-
affective-behavioral model. *Psychological Bulletin, 133,* 328-345.

Podsakoff, N.P., Whiting, S.W., Podsakoff, P.M., & Blume, B.D. Individual- and organizational-
level consequences of organizational citizenship behaviors: A meta-analysis. *Journal of
Applied Psychology, 94,* 122-141.

Raeburn, N.C. (2004). *Changing corporate America from inside out: Lesbian and gay workplace
rights.* Minneapolis: University of Minnesota Press.

Ragins, B.R., & Cornwell, J.M. (2001). Pink triangles: Antecedents and consequences of
perceived workplace discrimination against gay and lesbian employees. *Journal of
Applied Psychology, 86,* 1244-1261.

Ragins, B.R., & Cornwell, J.M. (2007). We are family: The influence of gay family-friendly
policies on gay, lesbian, and bisexual employees. In M.V.L. Badgett & J. Frank (Eds.)
*Sexual Orientation Discrimination: An International Perspective* (pp. 105-117). New
York: Routledge.

Ragins, B.R, Singh, R., & Cornwell, J.M. (2007). Making the invisible visible: Fear and
disclosure of sexual orientation at work. *Journal of Applied Psychology, 92,* 1103-1118.

Rostosky, S.S., & Riggle, E.D.B. (2002). out at work: The relations of actor and partner
workplace policy and internalized homophobia to disclosure status. *Journal of
Counseling Psychology, 49,* 411-419.

Samir Luther. (Sept. 21, 2009). How Fortune-ranked companies stack up on LGBT workplace
policies [Web log post]. Retrieved from http://www.hrcbackstory.org/2009/09/how-
fortune-ranked-companies-stack-up-on-lgbt-workplace-policies/

Sandfort, T.G.M., Bos, H., & Vet, R. (2006). Lesbians and gay men at work: Consequences of
being out. In A.M. Omoto & H.S. Kurtzman (Eds.) *Sexual Orientation and Mental
Health: Examining Identity and Development in Lesbian, Gay, and Bisexual People* (pp.
225-244). Washington, D.C.: American Psychological Association.

Sears, B., & Mallory, C. (2011). Economic motives for adopting LGBT-related workplace
policies. Retrived from The Williams Institute website:
http://williamsinstitute.law.ucla.edu/wp-content/uploads/Mallory-Sears-Corp-Statements-
Oct2011.pdf.

AR_293012

Smith, N.G., & Ingram, K.M. (2004). Workplace heterosexism and adjustment among lesbian, gay, and bisexual individuals: The role of unsupportive social interactions. *Journal of Counseling Psychology, 51,* 57-67.

Tejeda, M.J. (2006). Nondiscrimination policies and sexual identity disclosure: Do they make a difference in employee outcomes? *Employee Responsibilities and Rights Journal, 18,* 45-59.

Tilscik, A. (2011). Pride and prejudice: Employment discrimination against openly gay men in the United States. *Journal of Sociology, 117,* 586-626.

Trau, R.N.C., & Härtel, C.E.J. (2007). Contextual factors affecting quality of work life and career attitudes of gay men. *Employee Responsibilities and Rights Journal, 19,* 207-219.

Tuten, T.L. (2005). The effect of gay-friendly and non-gay-friendly cues on brand attitudes: A comparison of heterosexual and gay/lesbian reactions. *Journal of Marketing Management, 21*, 441-461.

Walz, S.M., & Niehoff, B.P. (2000). Organizational citizenship behaviors: Their relationship to organizational effectiveness. *Journal of Hospitality and Tourism Research, 24,* 301-319.

Waldo, C.R. (1999). Working in a majority context: A structural model of heterosexism as minority stress in the workplace. *Journal of Counseling Psychology, 46,* 218-232.

Wang, P., & Schwarz, J.L. (2010). Stock price reactions to GLBT nondiscrimination policies. *Human Resource Management, 49*, 195– 216.

Williams, D.R., Neighbors, H.W., & Jackson, J.S. (2003). Racial/ethnic discrimination and health: Findings from community studies. *American Journal of Public Health, 93,* 200-2008.

AR_293013

## ABOUT THE AUTHORS

**M.V. Lee Badgett** is the Research Director at the Williams Institute, UCLA School of Law, and Director of the Center for Public Policy and Administration & Professor of Economics at the University of Massachusetts Amherst.

**Laura E. Durso** is a Public Policy Fellow at the Williams Institute, UCLA School of Law.

**Angeliki Kastanis** is a Public Policy Fellow at the Williams Institute, UCLA School of Law.

**Christy Mallory** is the Reid Rasmussen Fellow of Law & Policy at the Williams Institute, UCLA School of Law.

## ABOUT THE WILLIAMS INSTITUTE

The Williams Institute on Sexual Orientation and Gender Identity Law and Public Policy at UCLA School of Law advances law and public policy through rigorous, independent research and scholarship, and disseminates its work through a variety of education programs and media to judges, legislators, lawyers, other policymakers and the public. These studies can be accessed at the Williams Institute website.

## FOR MORE INFORMATION

The Williams Institute, UCLA School of Law
Box 951476
Los Angeles, CA 90095-1476
(310)267-4382
williamsinstitute@law.ucla.edu
www.law.ucla.edu/williamsinstitute

33

# APPENDIX A

## Methodology

Studies included in our analysis were identified using several methods. First, we collected relevant materials that were cited in previous Williams Institute reports on this topic, including *Documented Evidence of Employment Discrimination & Its Effects on LGBT People* (Sears & Mallory, 2011) and internal memos (on file with the author). Second, we gathered all of the scholarship cited in those materials. Third, we conducted computerized searches between January 16, 2012 and April l, 2013 using Google Scholar and the UCLA Library article search function which gathers relevant scholarship from several databases including EBSCOhost, JSTOR, and LexisNexis, among others. We searched these sources using systematic combinations of the following words:

*Sexual orientation, gender identity, LGBT, LGB, gay, lesbian, bisexual, transgender, transsexual, homosexual, domestic partner, same-sex partner, benefits, discrimination, discriminate, discriminated, employ, employee, employer, employed, employment, work, works, worked, workplace, worker, company, corporate, business, anti-discrimination, nondiscrimination, discrimination, policy, policies, environment, climate, out, outness, disclose, disclosure, OCBs, organizational citizenship behaviors, health, well-being, stress, meta-analysis, recruit, recruitment, retain, retains, retained, retention, quit, quitting, satisfied, satisfaction, creative, creativity, innovate, innovation, innovations, idea, ideas, customer, customers, customer service, customer satisfaction, productive, productivity, better, performance, contract, contractor, ordinance, morale, profit, profitability, bottom line, benefit, economic.*

Fourth, we gathered relevant scholarship cited in the materials identified in the database search. Finally, we used systematic combinations of the terms above to search the Internet (using the Google search engine) for relevant materials produced by research organizations and non-profits focused on LGBT issues or workplace issues. Our research method yielded 33 relevant published articles, books, book chapters, and other written materials produced by research and non-profit organizations that are included in this report.

In addition to compiling relevant written materials, we singled out a set of study characteristics that helped us determine the overall methodological strength of each paper included in this report. Although we did not use a formal rating system, the findings reported in this document were done so in a manner that considered overall study strength. The set of study characteristics included in our detailed review (Table 1) are as follows: 1) sample size 2) LGBT populations included 3) gender 4) race/ethnicity of participants 5) education level of participants 6) response rate 7) recruitment strategy 8) use of validated measures.

Table 1.    Study Characteristics for LGBT Employee Outcomes

| Author (Year) | Sample Size | LGBT | % Female | % White | % College Degree | Response Rate | Recruitment Strategy | Qualitative or Quantitative | Validated Outcome Measures | Sample Reliability Coefficients | Validated Disclosure Measure |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Boatwright et al. (1996) | 10 | L | 100% | 90% | 70% | 100% | Convenience Sample | Qualitative | + | + | + |
| Brenner, Lyons & Fassinger (2010) | 606 | L,G | 55% | 89% | 75% | - | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Button (2001) | 537 | L,G | 34% | 90% | - | 42% | Convenience Sample, Snowball Sampling | Quantitative | Yes | Yes | + |
| Day & Schoenrade (2000) | 744 | L,G | 35% | - | - | 29% | Convenience Sample | Quantitative | Yes | No | No |
| Driscoll, Kelley & Fassinger (1996) | 123 | L | 100% | 85% | - | 69% | Convenience Sample, Snowball Sampling | Quantitative | Yes | Yes | No |
| Griffith & Hebl (2002) | 379 | L,G | 42% | 82% | 69% | - | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Guasp & Balfour (2008) | 107 | L,G,B | - | - | - | - | - | Qualitative | + | + | + |
| Hewlett & Sumberg (2011) | 2,593 | L,G,B, T,H* | - | - | 100% | - | Random Sample | Quantitative, Qualitative | No | No | No |
| Horvath & Ryan (2003) | 236 | - | 77% | 85% | - | - | Convenience Sample | Quantitative | Yes | Yes | + |
| Huffman, Watrous-Rodriguez & King (2008) | 99 | L,G,B | 38% | 84% | 79% | 90% | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Human Rights Campaign (2009) | 831 | LGBT | 46% | 63% | 37% | - | Random Sample from Panel, Outreach Convenience Sample, Snowball Sampling | Qualitative, Quantitative | No | No | No |
| Jordan & Deluty (1998) | 499 | L | 100% | 83% | 95% | 33% | | Quantitative | Yes | No | Yes |

35

| Author (Year) | Sample Size | LGBT | % Female | % White | % College Degree | Response Rate | Recruitment Strategy | Qualitative or Quantitative | Validated Outcome Measures | Sample Reliability Coefficients | Validated Disclosure Measure |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Law, et. al. (2011) | 114 | T | 54%++ | 81% | - | - | Convenience Sample, Snowball Sampling | Quantitative | Yes | Yes | Yes |
| Level Playing Field Institute (2007) | 1780 (100 L,G) | L,G | - | - | - | 88% | Random Digit Dialing | Quantitative | No | No | No |
| Munoz (2005) | 346 | L,G,H | 34% | 89% | 90% | - | Convenience Sample, Snowball Sampling | Quantitative | Yes | Yes | No |
| Out & Equal (2006) | 2,501 (270 LGBT) | L,G,B, T, H | - | - | - | - | Convenience Sample | Quantitative | - | - | - |
| Ragins & Cornwell (2001) | 534 | L,G,B | 32% | 68% | 85% | 30% | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Ragins & Cornwell (2007) | * | * | * | * | *same* | *as* | *above* | * | * | * | * |
| Ragins, Singh & Cornwell (2007) | * | * | * | * | *same* | *as* | *above* | * | * | * | * |
| Rostosky & Riggle (2002) | 261 | - | 54% | 86% | 60% | 68% | Convenience Sample | Quantitative | Yes | Yes | No |
| Sandfort, Bos & Vet (2006) | 320 | L,G,B | 52% | - | 60% | 24% | Network, Random Sample from Panel | Quantitative | Yes | No | No |
| Smith & Ingram (2004) | 97 | L,G,B | 41% | 82% | 66% | - | Convenience Sample, Snowball Sampling | Quantitative | Yes | No | No |
| Tejeda (2006) | 65 | G | 0% | 100% | 81% | 36% | Convenience Sample | Quantitative | Yes | Yes | No |
| Trau & Härtel (2007) | 581 | G | 0% | - | 55% | - | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Waldo (1999) | 287 | L,G,B | 41% | 91% | More than half | 55% | Convenience Sample | Quantitative | Yes | Yes | Yes |

\* H: Heterosexual          + Not Applicable
- Information not provided          ++ 54% transwomen, 24% transmen, 22% did not identify a gender identity

36

AR_293017

## CHSAA Transgender Inclusion Bylaw & Policy

| Bylaw 300. | EQUITY CODE |
|---|---|

1. The Colorado High School Activities Association is committed to ensuring that all students have equal access and opportunities to participate in CHSAA sponsored activities and athletics.

2. Member schools shall ensure that all students have equal access and opportunities to participate in activities and athletics without unlawful discrimination based on disability, race, creed, color, gender, sexual orientation, religion, age, national origin, or ancestry.

3. The Colorado High School Activities Association recognizes the right of transgender student-athletes to participate in interscholastic activities free from unlawful discrimination based on sexual orientation. In order to insure appropriate gender assignment for purposes of athletic eligibility, a transgender student-athlete's home school will perform a confidential evaluation to determine the gender assignment for the prospective student-athlete. The CHSAA will review athletic eligibility decisions based on gender assignment of transgender student-athletes in accordance with its approved policies and appeals procedures.

### CHSAA INCLUSION POLICY & OCR DEAR COLLEAGUE LETTER ON TRANSGENDER STUDENTS

The Colorado High School Activities Association (CHSAA) Board of Directors approved this policy and process to address the eligibility of transgender/transitioned/student-participants in CHSAA sanctioned activities/athletics.

For the purposes of this policy, the following definitions will apply:

1. The term "sexual orientation" means a person's orientation toward heterosexuality, homosexuality, bisexuality, transgender status or another person's perception thereof.
2. The term "gender identity" means an individual's internal sense of gender.
3. The term "sex assigned at birth" refers to the sex designation recorded on an infant's birth certificate should such a record be provided at birth.
4. The term "transgender" describes those whose gender identity is different from the sex they were assigned at birth.
5. The term "gender expression" means external appearance, characteristics or behaviors typically associated with a specific gender.
6. The term "gender fluid" means denoting or relating to a person who does not identify themselves as having a fixed gender.
7. The term "detransition" means the cessation or reversal of a transgender identification or gender transition, whether by social, legal or medical means.
8. The term "covered entity" means any person, business, or institution required to comply with the antidiscrimination provisions of the law.

9. Unlawful harassment includes severe or pervasive conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of gender identity, gender expression, or sexual orientation.  Prohibited conduct includes, but is not limited to, the following:

   a. Asking unwelcome personal questions about an individual's gender identity;
   b. Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation or transgender status;
   c. Using offensive names or terminology regarding an individual's gender identity, gender expression, or sexual orientation; or
   d. Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun.

**Policy Privacy:**

All discussions and documentation in each level of the process either by a member school and/or CHSAA shall be kept confidential unless the student and family make a specific request.

**Procedures:**

The student's member school will be the first point of contact for determining the student's eligibility to participate in CHSAA sanctioned event(s).  The student and parent(s)/guardian must notify the school in writing that the student has a consistent gender identity different than the student's gender assigned at birth and list the sanctioned event(s) in which the student would like to participate.   The consistent gender identity as stated in the school letter will be the gender recognized for the entirety of the students participation in CHSAA athletics/activities.  (See Detransition Policy) A transgender student shall participate in accordance with their gender identity, and CHSAA Bylaw 2850.3 shall still apply.

The school *may* use the following criteria to determine participation:

- Current transcript and school registration information
- A written statement from the student affirming their gender identity.

The school may consider but *may not require* the following information, if it is voluntarily provided by the student or their parent/guardian:

- Documentation from individuals such as, but not limited to, parents, friends, and/or teacher, which affirm that the actions, attitudes, dress and manner demonstrate the student's gender identity.
- Written verification from an appropriate health-care professional (doctor, psychiatrist, psychologist) of the student's gender identity.
- Medical documentation (hormonal therapy, sexual re-assignment surgery, counseling, medical personnel, etc.)

**Gender Fluid:**

Students that want to participate in CHSAA athletics and activities, must select one gender to participate.   The process for gender identification and notification to the school is the same as stated above.  Any subsequent detransition by a gender fluid student must also follow the detransition policy as stated below.

**Detransition Policy:**

Students that detransition after competing in their consistent gender identity at the high school level, must notify the school in writing of their intent to detransition and apply via written request to the school for further eligibility.  The decision to approve the request will be made at the local level.

**Areas of Awareness for Schools:**

- Have a plan in place and be proactive.
- Use correct names/pronouns according to the student's self-identification, and permit the student to dress according to gender identity and or expression.
- Allow restroom and locker room access consistent to gender identity.
- Educate teachers, counselors, coaches, administrators, parents and students on transgender inclusion and awareness.

**Resources:**

- CHSAA Contact:
  Bethany Brookens, Assistant Commissioner
  14855 E. Second Avenue – Aurora, CO  80011
  Office Phone:  303-344-5050
  Office E-mail:  bbrookens@chsaa.org

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# 2022-2023 FRAMINGHAM HIGH SCHOOL

# ATHLETIC HANDBOOK

For Student-Athletes, Coaches, and Parents

**"Success is peace of mind which is a direct result of self-satisfaction in knowing you did your best to become the best you are capable of becoming."**
**---- John Wooden**

Paul Spear
Athletic Director
508-782-7650

Ashley Paulsen
Assistant Athletic Director
508-782-7510

AR_293021

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# TABLE OF CONTENTS

**Statement of Athletic Philosophy**…………………………Page 1

**Expectations for Student-Athletes**……………………....Page 2

**MIAA Bona Fide Team Rule**……………………………..Page 3

**Athletic and Co-Curricular Eligibility**…………………..Page 4

**Registration, Transportation, Varsity Letters**………….Page 5

**Expectations for Team Captains**…………………………Page 6

**Expectations for Parents/Spectators**……………………..Page 7

**Communication for Athletic Concerns**…………………..Page 8

**Expectations for Coaches**………………………………..Page 9

**Perspectives on College Scholarships**……………………Page 10

**Student-Athlete, Coach, Parent Contract**………………...Page 11

**MIAA Chemical Health Rule**…………………………….Appendix A
**State Law Regarding Hazing**…………………………….Appendix B
**Wellness Center Policies and Procedures**………………..Appendix C
**Expectations of Athletic Trainer**………………………..Appendix D

AR_293023

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

## STATEMENT OF ATHLETIC  PHILOSOPHY

Framingham High School Athletics mission is to support our students as they represent our city in interscholastic athletics.  It is our gopal to develop their skills and passion for athletics so they will have a lifelong love of sport.  Students will learn self-discipline and habits of mind that foster success in all areas of life.

Athletes will serve through community service, accept a role on a team, and serve a purpose larger than themselves.

Athletics teaches wellness. Athletes should learn good habits in the areas of nutrition and exercise. Likewise, athletes learn time management as well as how to balance competition and fatigue.

Athletics teaches the growth mindset. Athletes get better through focused, purposeful practice. Skills and development of a team will be fostered through time dedicated to practice.

Finally, athletics teaches fun. Every athlete should be playing because they love their sport. Every athletic event is an opportunity to create memories and lifelong friendships.

We will not be outcome driven in determining the success of our teams.  We will be driven by effort and it will be our effort, commitment to community service, wellness, and growth by which we judge ourselves.

1

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# EXPECTATIONS FOR STUDENT-ATHLETES

As members of their team, a student athlete serves as a role model. They are admired and respected by many, including younger athletes, and their behavior and actions often have a significant impact on others. The student athlete plays an essential role in the promotion of sportsmanship and they must accept the responsibility to always display high standards of sportsmanship.

1. Accept the responsibility and privilege that a student-athlete has in representing their school and community by learning and showing teamwork, sportsmanship, and discipline in all aspects of the game.

2. Demonstrate respect for self, coach, teammates, opponents, officials and spectators by exhibiting good character and conducting themselves as a positive role model.

3. Win and lose graciously.

4. Abide by all rules of the game as well as relevant school and MIAA policies.

5. Work for the good of the team at all times.

6. Cheer for your team, not against your opponent.

7. Congratulate opponents in a sincere manner following either victory or defeat.

8. Refrain from the use of illegal or unhealthy substances to gain an unfair

   advantage.

9. Leave locker rooms (home and away), buses, and playing facilities clean and in good repair.

2

## MIAA BONA FIDE TEAM MEMBER RULE

A bona fide member of the school team is a student who is consistently present for, and actively participates in, all high school team sessions (e.g. practices, tryouts, competitions). Bona fide members of a school team are precluded from missing a high school practice or competition in order to participate in a non-school athletic activity/event in any sport recognized by the MIAA. Students cannot be given special treatment (late arrival, early dismissal, etc.) for non-school athletic programs.

    **First Offense:** Student-athlete is suspended for 25% of season

    **Second Offense:** Suspension for an additional 25% of the season and
    Ineligible for tournament play immediately upon confirmation of violation

A student-athlete must be a team member for 50% of the regular season schedule for that sport to participate in any MIAA Tournament competition.

If ineligible, cannot be in uniform. Attendance at event to be determined by High School Principal.

A student-athlete shall participate in only one MIAA interscholastic sport in any defined MIAA sport season (Fall, Winter, or Spring), including tournaments or championships in that season. For the purposes of this rule only, a student-athlete officially becomes a member of his/her team for the sport season on the date of that school's first regular season contest in that sport.

    Exception: If a licensed physician recommends that an athlete terminate participation in a sport for medical reasons after the first contest, the athlete will be permitted to join another team if he/she receives the written approval of a licensed physician.

    Exception: A school may approve a varsity or sub-varsity request to join a second varsity or sub-varsity team after terminating his/her membership with the first varsity or sub-varsity team, providing written approval is received from the principal, athletic director, and both coaches involved with the change, and it happens within the first ½ of the season.

PENALTIES: If a student-athlete violates this rule, he/she will be ineligible
For that season, and all contests in which he/she participated in both sports must be forfeit.

3

# ● Framingham Inclusive Sports Participation Policy

Definitions of words used within this policy: The following definitions intend to create a common vocabulary, understanding that the administrators, school staff, volunteers, students and others who interact with students must be respectful of the ways in which individual people ask to be identified and in general employ the terms that students use to describe themselves. 1. Sexual orientation means a person's romantic or sexual attraction to people of the same sex, different sex or any sex. Transgender and gender expansive people may have any sexual orientation. 2. Gender identity is an individual's sincerely held core belief regarding their gender, whether that individual identifies as male, female, both, neither or in some other way (for example, students who identify in some other way such as nonbinary, queer, genderqueer or gender fluid). 3. Gender expression means an individual's external expression of their gender, through such means as clothing, hairstyling, accessories, voice, behavior and mannerisms. 4. Transgender is an umbrella term for people whose gender identity is different from that traditionally associated with their assigned sex at birth. 5. Gender expansive is an umbrella term used to describe people who expand notions of gender expression and identity beyond what is perceived as the expected gender norms for their society or context. Some gender-expansive people identify with being either male or female, some identify as neither, and others identify as a mix of both. Gender-expansive people include those with transgender and nonbinary identities as well as those whose gender in some way is seen to be stretching society's notions of gender. PHILOSOPHY OF GENDER IDENTITY PARTICIPATION Framingham Public Schools believes that interscholastic athletic and co-curricular participation are valuable to students' physical, intellectual, social, and/or character development and accordingly, we value inclusion. Guided by this value and in compliance with all applicable laws, our policy ensures that students can participate in athletics and co-curricular activities in a manner consistent with their gender identity. POLICY REGARDING GENDER IDENTITY-BASED PARTICIPATION All students shall have the opportunity to participate in Framingham Public Schools athletics and/or co-curricular activities in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's records and without prior medical or mental health care. Eligibility to participate. A student has the right to participate in athletics and co-curricular activities in a manner consistent with the gender listed on their school records. A student whose gender identity is different than the gender listed on the student's registration records shall have the right to participate in a manner consistent with their gender identity. For students whose school records indicate "non-binary" the student has the right to participate in sports team of either gender; however, pursuant to MIAA policy, students are not permitted to try out simultaneously for MIAA sports teams of both genders. ADDITIONAL POLICIES

FOR INCLUSION IN ATHLETICS The Framingham Public Schools endorse the following policies to ensure the full inclusion of students participating in Framingham Public Schools' athletics. 1. Changing Areas, Toilets, and Showers. Student-athletes shall be able to use the locker room, shower, and toilet facilities consistent with the student's gender identity. Every student-athlete has the right to access a private enclosed changing area, shower, and toilet. No student-athlete shall be required to use separate facilities. 2. Hotel Rooms. Student-athletes shall be assigned to share hotel rooms based on their gender identity, with a recognition that any student who needs extra privacy should be accommodated whenever possible. 3. Language: Affirmed Names and Pronouns. A student may have a name and pronouns that are different from what may be indicated by the student's school records. Coaches, administrators, and officials shall use the student's affirmed name and pronouns and shall ensure that the student's name and pronouns are respected by others including teammates, opponents, fans, volunteers, announcers, etc. 4. Dress codes and team uniforms. All team members shall have access to uniforms that are appropriate for their sport and that they feel comfortable wearing provided it maintains compliance with MIAA and National Federation sport specific uniform regulations. No student shall be required to wear a gendered uniform that conflicts with the student's gender identity. Dress codes for athletic teams when traveling or during a game day at school shall be gender-neutral. (Instead of requiring a girls' or women's team to wear dresses or skirts, for example, ask that team members wear dresses or slacks that are clean, neat, well cared for and appropriately "dressy" for representing their school and team.) 5. Competition at another School. When discussing competitions and student expectations, decisions shall be made in consultation with the student and without violating a student's confidentiality or privacy. If requested by the student, school leaders, athletic directors, and coaches should communicate with their counterparts at other schools prior to competitions in which a transgender or gender expansive athlete is participating about expectations for treatment of student-athletes on and off the field, including to ensure access to appropriate changing, showering, or bathroom facilities, and to request the use of affirmed names and pronouns by coaches, opponents, officials, announcers, fans, and media. 6. Training and Education: The District shall provide culturally-competent training regarding this policy to all staff, including but not limited to athletic department staff and coaches, and to all student-athletes, including captains, on an annual basis as well as at the start of each athletic season for the student-athletes.. This policy shall be distributed to all staff, students and parents and posted on the District's website. References: FPS Policy JBD - Gender Identity Support Policy MIAA policy 28.3 and policy clarification http://www.doe.mass.edu/ssce/GenderIdentity.pdf An Act Relative to Gender Identity (Chapter 199 of the Acts of 2011) MGL c.4

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

**ATHLETIC AND CO-CURRICULAR ELIGIBILITY Student Eligibility: Academic Requirements
58.1 A student must secure during the last marking period preceding the contest (e.g. second quarter
marks and not semester grades determine third quarter eligibility) a passing grade, and full credit, in
the equivalent of four traditional year-long major English courses. A transfer student may not gain
academic eligibility if student was not, or would not be, eligible at the sending school, unless transfer
was necessitated by a move of parents and then eligibility would be determined by receiving schools
eligibility standards (see Rule 57.7.1). 58.2 A student cannot at any time represent a school unless that
student is taking courses which would provide Carnegie Units equivalent to four traditional year-long
major English courses. 58.3 To be eligible for the fall marking period, students are required to have
passed and received full credits for the previous academic year the equivalent of four traditional
year-long major English courses. 58.4 Academic eligibility of all students shall be considered as official
and determined on the published date when the report cards for that ranking period are to be issued to
the parents of all students within a particular class. 58.4.1 Senior student-athlete academic eligibility
following the third-quarter report cards being issued, will carry through to the conclusion of the
spring sport season. Fourth quarter grades can't then render a senior academically eligible.**

**(**MIAA Chemical Health Policy (see Appendix A).

State Law on Hazing (see Appendix B)

Framingham Public Schools Anti-Bullying Information ( see FHS Student Handbook- page 28)

Use of Internet and Social Media: The Athletic Office encourages safe and responsible behavior with regard
to internet use and social media. We highly recommend our students avoid inappropriate use of public
websites such as Twitter, Instagram, Snap Chat, Facebook, etc. Any identifiable image, photo, video, or
posted on-line conversation which implicates a student-athlete in a violation of our Alcohol and Drug Policy
or our Core Values may be investigated by the administration.

4

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

**Registration for a sport:** All registrations are conducted on-line through flyerathletics.com. The process must be completed prior to the start of the season. In addition, proof of a physical must be submitted to the athletic office. Students are expected to adhere to the deadlines established. Failure to do so will result in the inability to try out for a sport. Registrations will not be allowed after cuts have been made during the initial week of practice.

**Transportation:** The athletic office works with the Transportation Department to arrange buses for away games and practices. Unfortunately, there have been occasions when events have been postponed due to the inability to find a bus or driver. Students are expected to be respectful of the wishes of the driver and leave the bus clean. We encourage teams to travel together. Parents who wish to transport their child home after an event must obtain prior approval from the coach and athletic director.

**Varsity Letter:** A varsity letter and pin are earned through satisfactory participation at the varsity level for the first time during a particular year. If an athlete letters in more than one sport per year, he/she will be awarded a pin to designate the sport, but not an additional letter. If an athlete letters in the same sport, he/she will receive an additional sport pin indicating years of service at the varsity level in that sport. Coaches will recommend the awarding of letters based on the following criteria:
A) attend practice and games on a consistent basis
B) display a cooperative spirit with the coach, teammates, and opponents
C) display respect for others on and off the playing surface
D) observe all rules and regulations as outlined in this handbook
E) be an actual participant in varsity contests.
F) End the season in good standing
The coach and athletic director will have the prerogative to award varsity status to a senior who has not met the seasonal requirements. A student manager who has successfully met all of his/her responsibilities may be awarded a letter at the discretion of the coach.

5

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

## EXPECTATIONS FOR TEAM CAPTAINS AT FRAMINGHAM HIGH SCHOOL

The role of team captain is one of honor and privilege, and brings with it a great deal of responsibility. The leadership necessary to be a successful team captain can be difficult and will be supported by the FHS Administration.

Team Captains will be expected to exhibit the following qualities:

- Honest, strong focus on academics, dedicated, leads by example
- Hard working, selfless, recognizes and values team needs over individual accomplishments
- Respectful, appropriate behavior and conduct in and out of school
- Enthusiastic, dependable, positive outlook

Team Captains will attend Leadership Academy at 6:55am each Thursday morning during their season.

Failure to meet the above leadership expectations may subject a student athlete to lose the privilege of being a "Captain".

The method by which captains are chosen shall be determined by each coach.

6

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

## EXPECTATIONS FOR PARENTS/SPECTATORS

As your child's first "coach" in life, we ask for your help in making our athletic program of the highest quality. High School athletics, when done the right way, is a thing of beauty. While winning will always be important as long as a scoreboard exists, we all know that there are more important and enduring lessons to be learned from participation in athletics. In the long run, your child's high school career will not be measured by wins and losses but by how they conduct themselves on the field, court, or track. Together, let us strive to model the virtues of honor, integrity, respect, and character. Specifically, I ask you to keep each sporting event or activity in perspective and pledge that you will:

- Use positive encouragement
- Be respectful of all players, coaches, game officials, and other spectators.
- Never target anyone for abuse- physical, verbal, or emotional.
- Refrain from taunting, harassment, obscene language, or other acts of disrespect.
- Recognize and show appreciation for sportsmanship and fair play by either team
- Respect the judgment of the coach and do not openly criticize players
- Trust that our coaches and administrators have the best interests of your child in mind

7

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# COMMUNICATION PLAN FOR ATHLETIC CONCERNS

Good communication is critical in athletics, on and off the field. A communication plan is in place to assist and to improve communication between parents, coaches and administrators, ultimately for the benefit of the student. Involvement in athletics and activities will allow the students to experience some of the most rewarding times of their lives. However, there will likely be times when things don't go their way or they disagree with a coach. It is important that students and parents realize these difficult situations are as much a part of the learning experience as are the good times. The coaches work hard to do the best they can for all of their athletes, and we ask the students and parents to respect the fact that their decisions are often extremely difficult, and are made based on factors of which students and parents may not be aware. **The student, not the parent, is strongly encouraged to talk to the coach about any issues or problems that arise during the season**. This is not only the most direct and productive means of communication, but also a valuable method of teaching responsibility.

The following protocol will be used for registering concerns:

1.  The student-athlete meets with the coach.
2.  The parent contacts the coach to set up a meeting with the student-athlete present.
3.  If the issue is not resolved, call and set up an appointment with the Athletic Director (508-782-7650).
4.  After this step, an additional meeting may be held with the parent, coach, athlete, and AD.

IMPORTANT: PLEASE DO NOT…

1.  Confront a coach before, during, or after a practice or contest. These can be emotional times for both parties. Meetings of this nature do not promote resolution.
2.  Discuss the following issues with coaches: playing time, play calling, team strategy, other team members. This will only undermine the coach's ability to help your child improve and to develop team harmony and constructive team play.

The intent of this communication plan is to help make the experience in the Framingham High School Athletic program more enjoyable and productive for all athletes, coaches, parents and fans.

8

AR_293033

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# EXPECTATIONS FOR COACHES

## THE IMPACT OF A COACH

I have come to a frightening conclusion.
I am the decisive element at the field, court, or track.
It is my personal approach that creates the climate.
It is my daily mood that makes the weather.
I possess tremendous power to make an athlete's life miserable or joyous.
I can be the tool of torture or an instrument of inspiration.
I can humiliate or humor, hurt or heal.
In all situations, it is my response that decides whether a crisis will be escalated or
De-escalated, and an athlete humanized or dehumanized.
(An Adaptation of Haim Ginott, published by the Washington State Coaches Assoc.)

## COACHING PHILOSOPHY

The profession of coaching is a profession of teaching. In addition to teaching the mental and

physical dimensions of their sport, coaches shall through words and example, strive to build the

character of their student athletes by teaching them to be trustworthy, respectful, responsible,

and fair. Success in the classroom is the first priority of any student-athlete. This message should

be consistently delivered to student-athletes and their parents throughout the season. Coaches must

model respectful behavior and demand that their athletes refrain from verbally abusing opponents

and officials, profane and belligerent trash-talking, and taunting or inappropriate celebrations.

9

**ADMINISTRATORS' GUIDE FOR INTERPRETING AND ENFORCING**

# MIAA HANDBOOK RULE #62

### *Student (and Coach) Eligibility: Chemical Health/Alcohol/Drugs/Tobacco*

This policy has been developed to assist school administrators in the implementation and administration of the MIAA Chemical Health Rule, (MIAA Handbook Part IV–Rules Affecting an Individual Student Athlete or Coach, Rule #62–Student

(and Coach) Eligibility: Chemical Health/Alcohol/Drugs/Tobacco. Hopefully, it will be of some help when you have to deal with the sometimes difficult task of determining whether or not a student is in violation of the Chemical Health Rule.

## PART I – CHEMICAL HEALTH RULE

## RULE 62: Student (and Coach) Eligibility: Chemical Health/Alcohol/Drugs/Tobacco

**62.1** From the earliest fall practice date, to the conclusion of the academic year or final athletic event (whichever is latest), a student shall not, regardless of the quantity, use, consume, possess, buy/sell, or give away any beverage containing alcohol; any tobacco product (including e-cigarettes); marijuana; steroids; or any controlled substance. This policy includes products such as "NA or near beer". It is not a violation for a student to be in possession of a defined drug specifically prescribed for the student's own use by his/her doctor.

This MIAA statewide minimum standard is not intended to render "guilt by association", e.g. many student athletes might be present at a party where only a few violate this standard. This rule represents only a minimum standard upon which schools may develop more stringent requirements.

If a student in violation of this rule is unable to participate in interscholastic sports due to injury or academics, the penalty will not take effect until that student is able to participate again.

## FIRST VIOLATION MINIMUM PENALTIES*:

*When the Principal confirms, following an opportunity for the student to be heard, that a violation occurred, the student shall lose eligibility for the next consecutive interscholastic contests totaling 25% of all interscholastic contests in that sport. For the student, penalties will be determined by the current or next season of participation. No exception is permitted for a student who becomes a participant in a treatment program. It is recommended that the student be allowed to remain at practice for the purpose of rehabilitation. Any fractional part of an event will be dropped when calculating the 25% of the season.*

**# of Events/Season # of Events/Penalty**
**1-7 1**
**8-11 2**
**12-15 3**
**16-19 4**
**20 or over 5**

*Also see rule 32.8 – Ineligible Students

**SECOND & SUBSEQUENT VIOLATIONS AND MINIMUM PENALTIES:**

*When the Principal confirms, following an opportunity for the student to be heard, that a violation occurred, the student shall lose eligibility for the next consecutive interscholastic contests totaling 60% of all interscholastic contests in that sport. For the student, penalties will be determined by the current or next season of participation. Any fractional part of an event will be dropped when calculating the 60% of the season.*

| # of Events/Season | # of Events/Penalty |
| --- | --- |
| 1-3 | 1 |
| 4 | 2 |
| 5-6 | 3 |
| 7-8 | 4 |
| 9 | 5 |
| 10-11 | 6 |
| 12-13 | 7 |
| 14 | 8 |
| 15-16 | 9 |
| 17-18 | 10 |
| 19 | 11 |
| 20 or over | 12 |

*If after the second or subsequent violations the student of his/her own volition becomes a participant in an approved chemical dependency program or treatment program, the student may be certified for reinstatement in MIAA activities after a minimum of 40% of events provided the student was fully engaged in the program throughout that penalty period. The high school principal in collaboration with a Chemical Dependency Program or Treatment Program must certify that student is attending or issue a certificate of completion. If student does not complete program, penalty reverts back to 60% of the season. All decimal part of an event will be truncated i.e. All fractional part of an event will be dropped when calculating the 40% of the season.*

| # of Events/Season | # of Events/Penalty |
| --- | --- |
| 1-4 | 1 |
| 5-7 | 2 |
| 8-9 | 3 |
| 10-12 | 4 |
| 13-14 | 5 |
| 15-17 | 6 |
| 18-19 | 7 |
| 20 or over | 8 |

*Penalties shall be cumulative each academic year, but serving the penalty could carry over for one year. Or, if the penalty period is not completed during the season of violation, the penalty shall carry over to the student's next season of actual participation, which may affect the eligibility status of the student during the next academic year. (e.g. A student plays only football: he violates the rule in winter and/or the spring of same academic year: he would serve the penalty(ies) during the fall season of the next academic year.)*

*Appendix A*

## *Hazing*

Section 17. Whoever is a principal organizer or participant in the crime of hazing, as defined herein, shall be punished by a fine of not more than three thousand dollars or by imprisonment in a house of correction for not more than one year, or both such fine and imprisonment.

The term "hazing" as used in this section and in sections eighteen and nineteen, shall mean any conduct or method of initiation into any student organization, whether on public or private property, which willfully or recklessly endangers the physical or mental health of any student or other person. Such conduct shall include whipping, beating, branding, forced calisthenics, exposure to the weather, forced consumption of any food, liquor, beverage, drug or other substance, or any other brutal treatment or forced physical activity which is likely to adversely affect the physical health or safety of any such student or other person, or which subjects such student or other person to extreme mental stress, including extended deprivation of sleep or rest or extended isolation.

Notwithstanding any other provisions of this section to the contrary, consent shall not be available as a defense to any prosecution under this action.

AR_293038

# UCLA
## Other Recent Work

**Title**

Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms

**Permalink**

https://escholarship.org/uc/item/4rs4n6h0

**Authors**

Hasenbush, Amira
Flores, Andrew R
Herman, Jody L

**Publication Date**

2018-07-23

**DOI**

10.1007/s13178-018-0335-z

**Data Availability**

The data associated with this publication are not available for this reason: Licensing Restrictions

Peer reviewed

eScholarship.org

Powered by the California Digital Library
University of California

AR_293039

# Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms

Amira Hasenbush[1] & Andrew R. Flores[1,2] & Jody L. Herman[1]

## Introduction

North Carolina's Public Facilities Privacy & Security Act, also known as H.B. 2, introduced much of the United States to a debate regarding the use of public restrooms that had previously largely gone unnoticed. In an emergency session, the North Carolina legislature passed H.B. 2 in one day, legally requiring sex-segregated restrooms and changing facilities to be limited to use based on the sex on a person's birth certificate (Philipps, 2016). While this law would have no legal impact on restroom use among cisgender (i.e., nontransgender) people, it meant that transgender people who had transitioned from their sex assigned at birth to a different gender would be required to use the restroom of their sex assigned at birth unless they had legally changed their birth certificate. The new law also opened up the possibility of increased harassment and policing, both social and actual, of gender nonconforming people in public restrooms, whether they were transgender or not. H.B. 2 was passed as a direct reaction to a local nondiscrimination ordinance that the City of Charlotte passed that included gender identity as one of the protected classifications in public accommodations, legally codifying the rights of individuals to use the public restroom that corresponded to their gender identity, even if that did not match their sex assigned at birth (Philipps, 2016). The primary argument levied against the passage of public accommodations nondiscrimination policies that protect trans- gender people is that the policy creates a loophole for sexual predators to access women's public restrooms and locker rooms, thus decreasing women's and girls' safety and privacy in such spaces. For example, at a floor hearing on H.B. 2, Senator E. S. "Buck" Newton stated:

> [T]he City Council of Charlotte lost their mind, and decided to embark upon a very radical course … of radical political correctness. And in so doing, created a real public safety risk … would allow men into the locker rooms and the bathrooms of females − of our daughters, of our wives … And that common sense tells us that men don't belong in the ladies' bathroom. It's a matter of public safety. Under this ordinance that they've put forward, anyone, quite frankly, with − with that intent, could use this Charlotte ordinance as an excuse to be somewhere that we all know they don't belong." (House Bill 2: Senate Floor Session, 2016).

On the other hand, there were those who argued that such nondiscrimination laws had already been enacted in localities across the United States with no noticeable change in criminal activity in public accommodations. For example, Representative Rodney Moore stated in the H.B. 2 House floor debate:

> [W]hat you have here is − you have fear-stoking. The LGB − I've done the research. This ordinance is in over 200 cities, as it was referenced before, and there has not, to my knowledge, been any catastrophic incident of as- saults, of rapes in these bathrooms or anything, and so the argument that this is such a grave challenge or a grave issue of public safety, just doesn't − just doesn't mesh; doesn't − doesn't pan out based upon the data." (House Bill 2: House Floor Debate, 2016).

While H.B. 2 was partially repealed in 2017, the debates, legislation, and litigation about restroom access and safety continue. For example, the Commonwealth of Massachusetts is now facing a ballot measure in the 2018 elections asking its citizens to decide whether to repeal a recently passed statewide public accommodations nondiscrimination law that is inclusive of gender identity. It is important to evaluate the empirical validity of the underlying claims to assess whether nondiscrimination laws are actually related to privacy and safety in restrooms, evidence of which has yet to be provided. We sought to empirically assess such claims through the analysis of police records of safety and privacy crimes in public restrooms, locker rooms, and changing rooms.

---

[1] UCLA School of Law, The Williams Institute, Box 951476, Los Angeles, CA 90095-1476, USA

[2] Department of Public Policy & Political Science, Mills College, Oakland, CA, USA

## Legal Background

State and local employment and public accommodations non- discrimination statutes and ordinances have included gender identity for over 20 years. In 1993, Minnesota passed the first statewide nondiscrimination law that included gender identity (Minn. Stat., 1993). Currently, 20 states and over 200 towns, cities, boroughs, and counties have nondiscrimination laws and ordinances that are inclusive of gender identity (Movement Advancement Project, 2017; Human Rights Campaign, 2016). In theory, employment nondiscrimination laws that include gen- der identity would apply to restroom use in the workplace, and public accommodations nondiscrimination laws that include gender identity would apply to public restrooms; however, the specific language, interpretation, and implementation of such laws and ordinances have varied throughout the country.

There is no federal law that prohibits discrimination in employment or public accommodations based on gender identity. However, some federal agencies and courts[3] have interpreted laws that prohibit discrimination based on sex to include gender identity. For example, the Equal Employment Opportunity Commission held that Title VII's prohibition on sex discrimination in employment also prohibits discrimination based on gender identity in employment, including by requiring that employers allow employees to use restrooms in the workplace that are consistent with their gender identity (Lusardi v. Dep't of the Army, 2015). The Department of Housing and Urban Development has issued regulations to ensure equal access to shelter housing and restrooms without discrimination based on gender identity (Department of Housing and Urban Development, 2016),[4] and the Occupational Safety and Health Administration has issued guidance instructing employers to allow employees to have access to restrooms based on their gender identity (Occupational Safety and Health Administration, 2015). In 2016, the Civil Rights Divisions of the Department of Education and the Department of Justice issued guidance that students should have access to restrooms that correspond to students' self-identified gender identity (U.S. Department of Justice & U.S. Department of Education, 2016). That guidance was repealed less than a year later (U.S. Department of Justice & U.S. Department of Education, 2017). In June of 2017, an instructional letter was sent to Department of Education Civil Rights Office regional directors stating that sex discrimination complaints from transgender stu- dents should be evaluated based on Title IX and its implementing regulations, as interpreted in decisions of federal courts and other Office for Civil Rights guidance documents, but specifically excluding the repealed guidance (Jackson, 2017). By February of 2018, a Department of Education spokesperson asserted that the department would no longer accept discrimination complaints from transgender students who are blocked access to restrooms in accordance with their gender identity (Holden, 2018).

The 2015–2016 state legislative sessions across the country saw increases in proposed legislation seeking to prohibit access to public restrooms based on gender identity (Kralik, 2017). Some of these policies sought to roll back protections granted by municipal governments (Fausset, 2017; Kralik, 2017). In addition, some localities such as Anchorage, Alaska and Houston, Texas sought repeal of protective policies through public ballot measures (Fernandez & Smith, 2015; Kelly, 2016). Additionally, some states that did not have any statewide laws related to public accommodations access, such as North Carolina, sought to pro- actively prohibit any future enactment of gender identity nondiscrimination laws at the state or local level that would allow transgender people to access restrooms that correspond with their gender identity (Kralik, 2017).

At the same time, litigation across the country has sought to determine the extent of state, local, and federal powers to either prohibit or mandate restroom access based on gender identity. For example, after the Departments of Education and Justice issued the initial federal school bathroom guidance in 2016, states and representatives from Texas and 12 other states filed a lawsuit against the federal government. The District Court granted a preliminary injunction against implementation of the guidance in 2016, and in 2017, the federal government withdrew its initial appeal (Texas v. U.S., 2016, 2017). At the same time, a transgender student has been engaged in litigation against his local school board for access to school restrooms in accordance with his gender identity. That case had been accepted to be heard by the Supreme Court but was remanded to the Fourth Circuit Court for reevaluation in response to the repeal of the federal school restroom guidance (G. G. v. Gloucester County School Board, 2017). After the student graduated from high school with- out having a final court decision, he amended his complaint to request a declaration that the school board violated his rights under Title IX and the Equal Protection Clause and to allow him to use male restrooms when he returned to school grounds for alumni activities (American Civil Liberties Union, 2017). Nebraska and nine other states filed a case similar to the Texas case that was stayed pending a ruling in the G.G. case and later was voluntarily dismissed by the plaintiffs without prejudice, in other words, with the right to reinstate the case later (Nebraska v. U.S., 2016, 2017). Several other lawsuits specific to transgender student restroom access are currently winding their way through state and federal courts. Concerns about restroom privacy and/or safety have been considered in all of these cases (G.G. v. Gloucester County School Board, 2015; Nebraska v. U.S. First Amended Complaint, 2016; Texas v. U.S., 2016).

---

[3] See, e.g., EEOC v. Harris Funeral Homes, 2018, which affirmed the Sixth Circuit's previous holdings that discrimination against a transgender individual is illegal sex discrimination under Title VII. In that case, a funeral home director was fired after she told her employer that she was transgender and planned to transition and begin wearing women's work clothing on the job. The court also stated that religious beliefs and the Religious Freedom Restoration Act do not overrule the nondiscrimination requirements of Title VII. The last paragraph in this section discusses court cases that directly address sex discrimination as it applies to transgender individuals in the context of restroom access.

[4] The Department of Housing and Urban Development has slowed support for this Equal Access Rule in the last year. Online training materials meant to support homeless shelters in the implementation of the rule were ordered removed from the department's website (MacGillis, 2017).

## Literature Review

Using new policy proposals continues to be a central strategy between the LGBT rights social movement and countermovement. Stone (2012) describes different forms of tactical innovation the Religious Right has taken on sexual orientation and gender identity public policy. These innovations vary in terms of venue (e.g., local, statewide, or national), strategy (e.g., legislative, direct initiative, or referendum), and issue (e.g., gay teachers, same-sex marriage, transgender inclusion in public accommodations). As such, the Religious Right has played a large role in controlling the issue agenda of the LGBT rights movement (Fetner, 2008). The present case of carving out gender identity protections in public accommodations policies may be seen as another form of tactical innovation. As is the case of other issues of LGBT rights, many times these policies are seen as seeking solutions to problems that may not really exist, which may be linked to social perceptions of sexual and gender minorities as deviants (Fejes, 2008). For example, Anita Bryant's campaign and the Briggs Initiative to prohibit gay and lesbian school teachers are key moments when public policy and the general public were targeted for policy advancement against the rights of LGBT people.

The movement counter to the advancement of LGBT rights has increased its focus on transgender people (Andersen, 2017). The discursive strategy on transgender rights remains similar to gay rights discourses with a focus on the harms gender identity inclusive policies pose primarily to children. A social constructionist framework of social policy (Shneider and Ingram, 1993) would consider both the political power and social favorability of transgender people in the consideration of the types of policies getting passed. As Westbrook and Schilt (2014) identify, issues involving sex- segregated spaces become overly focused on biologic sex and anatomy, which increases the "gender panic" people experience relating to transgender people. By focusing on public accommodations, the discourses focus on sex-segregated spaces in ways that exacerbate "gender panics" which would further lower the social valence of transgender people (see also Miller et al., 2017). Thus, arguments against the inclusion of gender identity protections in such sex-segregated spaces are likely motivated by such social constructions of a politically powerless and negative valence group.

Critiques of anti-LGBT policies are abounding. Fogg Davis (2017), for example, argues for the abolishment of using sex as a criterion for separating facilities. In other LGBT policy areas, scholars have marshaled evidence that the claims made by those advocating against LGBT rights are unfounded in the arenas of marriage and family (Herek, 1991, 2006) and in employment (Badgett, 2001; Herek, 1991). The arguments used to justify anti-LGBT policies tend to be emotionally stirring, though of- ten lack empirical validity.

Given the recently targeted focus on transgender rights, it is important to understand and evaluate both the motivations for policy, as well as its negative externalities. The asserted motivations for proscribing transgender inclusion in public ac- commodations are the perceived negative externalities of in- creased harassment and victimization in public spaces such as bathrooms and locker rooms. The current project examines the policy motivation portion. In essence, we ask: "Are inclusive transgender public accommodations laws associated with these negative externalities?" If not, then public policy may be seeking a policy solution to solve a problem that does not exist or that would exist even if policies changed.

Some research has suggested that states with more supportive gay rights policies overall correlate with lower sexual orientation hate crimes and discrimination (Levy & Levy, 2017; Hasenbush, Flores, Kastanis, Sears, & Gates, 2014). Local gender identity accommodation protections may be one of many indicators that may, counter to arguments against such laws, reduce victimization rates with respect to sexual and gender minorities, which could make a discernable reduction in overall victimization rates. Given this research we propose three hypotheses:

H0: The passage of gender identity accommodations policies will have no effect on victimization rates.
H1: The passage of gender identity accommodations policies will reduce victimization rates.
H2: The passage of gender identity accommodations policies will increase victimization rates.

H0 is motivated both by previous scholarship dispelling myths in other areas of LGBT rights as well as the insufficiency of single policies to lead to vast changes in victimization. H1 is motivated by Levy and Levy (2017) who note that inclusive policies in localities indicate supportive environments where victimizations are lower. H3 is motivated by the standard arguments made by opponents to gender identity inclusive nondiscrimination policies.

## Methods

We sought to empirically assess whether reports of safety or privacy violations in public restrooms, locker rooms, and dressing rooms change in frequency in localities that have gender identity inclusive public accommodations nondiscrimination ordinances (GIPANDOs) as compared to matched localities without GIPANDOs. Massachusetts was selected as a case study for this analysis, because, for a period of time, Massachusetts had a statewide nondiscrimination law that was inclusive of gender identity in employment and housing, but not public accommodations. Thus, these conditions created an optimal context in which to compare rates of public restroom privacy and safety incidents in localities that had passed local GIPANDOs with matched localities that had not. All data col- lection, analysis, and results are inclusive of criminal incidents in public restrooms,

public locker rooms, and public changing rooms. For simplicity's sake, authors may refer to only "restrooms" when describing the results of this study.

Victimization rates can fluctuate both over time and place. Using matched pairs and difference-in-differences analysis allows a comparison between different locations over time in order to determine whether any changes can be attributed to normal fluctuations over time or whether the changes can be attributed to some distinct difference in one location versus the other (see e.g., Dimick & Ryan, 2014; Raifman, Moscoe, Austin, & McConnell, 2017). A difference-in-difference analysis was used in this study to compare similarly-situated localities in MA to determine whether differences in restroom crime rates over time can be attributed to the introduction of a GIPANDO.

Unlike some trends over time, crime rates do not consistently increase or decrease. Small fluctuations in crime rates over time may be based on random variability and may not be attributable to any one specific policy change. Using a matched pairs analysis allows timewise comparisons across policy con- texts to seek out differences that appear to be due to more than just small random fluctuations. The matched pairs analysis ensures that the localities being compared to each other in the difference-in-difference analysis are similar enough to make appropriate comparisons. For example, Fig. 1 shows the violent crime rates across five New England states as documented by the U.S. Department of Justice. The matched pairs design of this study accounts for such temporal instability in crime rates by finding localities that have the most similar trends. In Fig. 1, it would be more appropriate to draw comparisons between Massachusetts and Connecticut because they follow a similar trend, and it would be inappropriate to compare Massachusetts to New Hampshire because they do not. Likewise, the selection of comparison localities was designed in a way to minimize differences to draw accurate comparisons.

**Selection of Localities** The Commonwealth of Massachusetts has had a broad nondiscrimination policy protecting against sexual orientation discrimination since 1989 (Mass. Gen. Laws, 1989). Massachusetts also passed a law in November 2011 extending nondiscrimination protections for transgender people in employment, housing, credit, and services (Gender Identity Act, 2011). However, that extension of the law did not contain any explicit protections for transgender people in public accommodations. Some individual localities within Massachusetts expanded upon state law by incorporating explicit gender identity protections in public accommodations laws, which includes protections in public restrooms, locker rooms, and changing rooms. This allowed for a between- localities study, comparing localities that passed GIPANDOs with matched localities within the state that did not have GIPANDOs, but otherwise had gender identity nondiscrimination protections in employment, housing, credit, and services.[5] The matched pairs strategy means that the distinguishing factor between these localities is the existence or absence of a public accommodations-specific nondiscrimination law that applied to gender identity.

---

[5] Boston and Cambridge both had a GIPANDO prior to the 2011 state law. Neither locality is included in this analysis.



Fig. 1 Violent crime rate across New England states, 2005 to 2014. Source: Uniform Crime Reporting Statistics, FBI, U.S. Department of Justice

Table 1 reports the localities within Massachusetts that have ordinances that contain language that includes gender identity protections and the date when those ordinances went into effect. There were seven localities that had identifiable nondiscrimination ordinances relating to gender identity protections in public accommodations. Two other localities in close geographic proximity to the GIPANDO localities were also identified as having some gender identity protections, though their coverage was not as extensive as the seven other localities. Cambridge includes gender identity protections in public accommodations except for restroom access, which is of primary concern to this study. Brookline law contains a gender identity resolution, but it is unclear the extent to which this resolution resulted in actionable changes or any enforcement mechanism within the locality.

In October 2016, a new Massachusetts state law went into effect to provide for protection against discrimination in public accommodations based on gender identity (Transgender Anti- Discrimination Act, 2016). However, results of the public re- cords requests in this study did not overlap with the time that Massachusetts had this statewide gender identity inclusive public accommodations nondiscrimination law in effect, and thus, enable this study to focus on the period when localities introduced GIPANDOs in the absence of statewide protections.

Notably, after the law went into effect, enough signatures were gathered to put a repeal measure on the 2018 ballot to allow Massachusetts residents to vote on whether to repeal the non- discrimination law (Young, 2016).

**Matched Pairs Design** After identifying the localities with GIPANDOs, we used quantitative models to identify localities within Massachusetts to match for comparison. Matched localities were in the same geographic regions of Massachusetts as the GIPANDO localities and were matched on demographic and other characteristics that may relate to the likelihood that locations would pass a GIPANDO as well as characteristics that may be predictive of criminal incidents (or a lack thereof) in public restrooms. We started the matched pair locality selection by identifying a full list of localities within Massachusetts that did not have GIPANDOs and that were in the same regions of Massachusetts as the localities with GIPANDOs.[6] We then collected pre- policy introduction information about both the GIPANDO localities and the candidate pool of potential matched localities. These covariates included: population size, the percent of the population over the age of 65, the percent of population that is non- Hispanic white, the percent of population earning more than $200,000, median income, the percent of the population living below the poverty line, the percent of the population that identifies as Born Again, percentage of the vote for Barak Obama in the 2012 presidential election, and a composite crime score based on numerous indices.[7] Since all of the metrics of crime were highly intercorrelated, a composite score was created based on a factor analysis. The researchers then used a covariate balancing approach to create a propensity score to identify the most fitting matched localities for each of the GIPANDO localities (Imai & Ratkovic, 2014). The fitted propensity score was extracted and used in addition to the covariates in a genetic matching procedure (Diamond & Sekhon, 2013; Sekhon, 2011). The genetic matching procedure identifies appropriate comparison localities by examining the full distribution of covariates, which may improve the matching procedure that other matching processes may worsen.

---

[6] The initial design also planned to identify contiguous localities, treating boundary lines as regression discontinuities (Keele & Titiunik, 2015). However, since the occurrence of the crimes sought was rare, there was insufficient analytical power to utilize geographic variation to the full extent possible. Instead, the researchers opted for simpler analytical methods relying on data preprocessing and case selection to reduce analytical assumptions. However, the matched localities were limited to localities that had a shared boundary with at least one of the GIPANDO localities.

[7] The indices were: the Neighborhood Scout Crime Index (retrieved from https://www.neighborhoodscout.com/ma/crime/), violent crimes per 1000 residents and property crimes per 1000 residents, the USA.com Crime Index (retrieved from http://www.usa.com/massachusetts-state-crime-and-crimerate.htm), and the City Data.com 2012 Index (retrieved from http://www.city-data.com/crime/crime-Massachusetts.html).

Table 1 Localities within MA that contain GIPANDOs

| Locality | GIPANDO | Date in effect | Statute |
|---|---|---|---|
| Boston | Yes | October 30, 2002 | Bos., Mass., Code § 12-9.7 (2002). |
| Medford | Yes | December 16, 2014 | Medford, Mass., Rev. Ordinances part 1, ch. 50, div. 2, § 50-61 (2014). |
| Melrose | Yes | December 17, 2014 | Melrose, Mass., Code ch. 15, art. X, § 15-50 (2014). |
| Newton | Yes | October 14, 2014 | Newton, Mass., Ordinances ch. 12, art. V, § 12-50 (2014). |
| Salem | Yes | February 27, 2014 | Salem, Mass., Code part III, ch. 2, art. XVI, §2-2056 (2014). |
| Somerville | Yes | May 29, 2014 | Somerville, Mass., Code ch. 2, art. V, div. 6, § 2-237 (2014). |
| Swampscott | Yes[a] | February, 18, 2015 | Swampscott, Mass. Nondiscrimination Policy (Feb. 18, 2015). |
| Cambridge | Yes, but contains a restroom exception | February 24, 1997 | Cambridge, Mass., Code tit. 2, ch. 2.76, §§ 2.76.030; 2.76.120 (1997). |
| Brookline | Unclear, a gender identity Bresolution^ exists | November 18, 2014 | Brookline, Mass. Code, part III, art. 3.9 § 3.9.2 (2014). |

Note:

[a] Swampscott was identified as a locality with a GIPANDO for these analyses. Record requests failed because the Swampscott Police Department records division lacked sufficient staff and capacity to perform the requested search. Therefore, public records requests were not sent to their matched localities (Marblehead and Milton)

While Cambridge and Brookline were categorized as limited GIPANDO localities and selected because of their geographic proximity to the clear GIPANDO localities, a few other localities in the state that were not in close geographic proximity to the clear GIPANDO localities also had gender identity ordinances that were unclear or limited as related to restroom access. These were: Northampton, Amherst, and Worcester, and they were not included in this analysis, since it was originally designed to include a boundary regression discontinuity that would have required localities to share physical borders. Northampton, Massachusetts has a Human Rights Commission with a voluntary advisory committee that does not have any investigative or enforcement authority. It is also unclear whether their Human Rights Commission prohibits discrimination based on gender identity (Simmons, 2015). Amherst, Massachusetts prohibits the denial of "any rights" based on gender identity (Human Rights Bylaw, 2009). However, the town's director of human resources and human rights, who investigates complaints of discrimination, was unable to confirm whether such rights included access to public accommodations and/or public restrooms (Radway, 2015). Worcester, Massachusetts has a local ordinance that states that its policy is "to assure that every individual shall have equal access to and benefit from all public services, accommodations and employment opportunities to protect every individual ..." and that, "behavior which denies equal treatment to any of our citizens as a result of their … gender identity …undermines civil order and deprives persons of the benefits of a free and open society." (Worcester, Mass., Rev. Ordinances §9(c), 2014). However, the local human rights commission only has explicit authority to investigate complaints of discrimination "based on race, color, religious creed, national origin, gender, age, ancestry, marital status, parental status, sexual orientation, disability or source of income." (Worcester, Mass., Rev. Ordinances §18(c)(1), 2014). Matched localities were selected for all of the localities with clear GIPANDOs that applied to public restrooms. The final GIPANDO localities and their matched localities for two different analyses are listed in Table 2.

## Data

Public Record Requests Through a thorough reading of municipal ordinances and consultation with local human rights commissions, town and city clerks, and attorneys, we ascertained an exhaustive list of all of the localities in Massachusetts with GIPANDOs. Localities with GIPANDOs and matched localities received two sets of public records requests from the investigators. In July 2015, a first set of requests under the Massachusetts Public Records Law (M.G.L.A. c. 66, §10, 2016) was sent to target localities. These letters requested, "All records documenting complaints made to [the local police] agency and records of crimes alleged or committed or incidents … that took place in a public bathroom, public restroom, public locker room, or public changing room."

Table 2 Localities with GIPANDOs and matched localities

| GIPANDO Locality | Matched locality (1) | Matched locality (2) |
|---|---|---|
| Boston | Cambridge[b] | Chelsea[c] |
| Medford | Beverly | Watertown |
| Melrose | Beverly | Beverly |
| Newton | Brookline | Arlington |
| Salem | Revere[b] | Waltham |
| Somerville | Cambridge[b] | Waltham |
| Swampscott[a] | Marblehead[a] | Milton[a] |
| Brookline (unclear enforceability) | | Arlington |
| Cambridge[b] (restroom exclusion) | | Everett |

Notes:

[a] Swampscott was identified as a locality with a GIPANDO for these analyses. Record requests failed because they lacked sufficient staff and capacity to perform the requested search. Therefore, public records requests were not sent to their matched localities

[b] Cambridge and Revere were unable to supply results of the public records requests after repeated attempts over the course of nine months. Therefore, data from their matched localities, Salem, Somerville, Boston, and Everett were excluded from analyses that required the missing data

[c] Chelsea's results were excluded due to an incomplete response to the request

The request covered a one- to two-year timespan before and after the gender identity inclusive public accommodations nondiscrimination law had gone into effect in the localities that had such an ordinance and the same time period for the localities that were matched localities. In some cases, the local ordinance had been passed less than one or two years prior to the public records request. In those instances, records were requested "through the present." If matched localities were matched to more than one GIPANDO locality, the matched locality records request would cover the matching timespan for both of the GIPANDO localities to which they were matched. The total timespan covered (either two or four years) was selected based on the size and crime rate of the locality; smaller localities or those likely to have fewer incidents were given longer timespans to search, and larger localities or those in which more incidents were likely to occur were given shorter timespans. The investigators requested information on the type of crime/incident alleged, the gender of the victim(s) and the perpetrator(s) (as applicable), the date of the incident, and the address of the public bathroom, restroom, locker room, or changing room in which the alleged incident took place.

After mailing public records requests, follow-up emails and phone calls were placed with all of the records custodians to facilitate the process of data collection. Some larger localities were able to comply with the requests relatively quickly and easily, while others did not have the tools necessary to perform a key word search that would make such a request possible or feasible. Several record clerks noted that the cost to pay for staff time to complete a search by hand would be prohibitively expensive. After assessing the initial completed responses, the investigators noted that the majority of incidents occurring in restrooms were not related to the types of crimes that are the subject of concern related to public accommodations nondiscrimination ordinances. In other words, the fears projected as potential problems related to such ordinances are related to violations of safety and privacy, but most incidents were related to vandalism and drug use in public restrooms and theft in locker rooms.

Given the mismatching scope between the search and the crimes of concern and the challenges for smaller localities to respond to the public records requests, the researchers completed a second round of public records requests with a narrower scope in February 2016. In the second round of requests, the investigators requested, "All records documenting complaints made to [the local police] agency and records of crimes alleged or committed or incidents … involving conduct that took place in a public bathroom, public restroom, public locker room, or public changing room" regarding criminal codes related to: murder, manslaughter and attempts; assault or assault and battery and attempts; theft involving assault or battery and kidnap- ping; rape, stalking, harassment, indecent exposure, public sex and voyeurism; and solicitation. The individual Massachusetts General Law sections were cited in the request. The full updated request was sent to all police departments that had not fully responded to the first round of public records requests. For those who had responded, but for whom the timespan was still continuing until "the present," a modified request was sent for any new records that may have arisen since the first round of requests.

Follow-up phone calls and emails were again used to assist in the facilitation of data collection until all of the localities had either responded with the results of their search or made it clear that they were unable to complete the search. By the end of the second round of data collection, two localities were unable to complete the search at all, and one locality provided an incomplete response. Records were then organized and reviewed to ensure only inclusion of incidents under the narrower scope related to assault, sexual assault, rape, voyeur- ism, public sex (including sex work), lewd behavior, and in- decent exposure.

As a result of the data collection, we received public re- cords of incidents occurring within our selected municipalities. The unit of analysis in this collection is an incident. Consistent with previous research, we transformed these incidents to average annual incident rates per 100,000 individuals. This normalizes our measure accounting for varying size of municipalities and time period.

## Analysis and Results

The first round of analysis was a simple comparison of the average annual number of incidents before and after the pas- sage of GIPANDOs in the localities with such nondiscrimination ordinances and their comparable matched localities. This comparison was made to determine whether the rate of reported incidents in public restrooms and locker rooms over the timespan in which the GIPANDOs were passed was different between the places with the ordinances and their matched localities. Since we use matched pairs for our analyses, we did not employ additional controls, and since time frames were equal between the GIPANDO localities and their matched localities, time is also controlled by design. The results are shown in Table 3. When a matched locality had missing results, the GIPANDO locality's results were excluded from the count.

Table 3 provides a contingency table showing the average number of incidents per year. There were fewer average annual incidents in the localities with clear GIPANDOs when compared to their matched localities. The differences in incident rates over time (comparing before and after GIPANDO passage) were not statistically significant in the GIPANDO localities or among the matched localities. Most importantly, a Fisher's exact test of the difference in crime rates between places with and without GIPANDOs before and after GIPANDOs were passed indicates no statistically significant relationship (at a one-sided alpha level of 0.10) between GIPANDO policy passage and victimization. A comparison of the change in the number of criminal incidents after passage of public accommodations protections between GIPANDO localities and their matched localities also showed no statistically significant difference. In these comparisons, there does not appear to be a relationship between passage of GIPANDOs and criminal incidents in restrooms between localities.

A finding of no difference between the GIPANDO localities and the matched localities may be driven by the small number of localities included in the analysis. However, we are able to assess whether our finding of no difference was a result of our small sample size. A power analysis shows that we would likely still find no statistically significant difference between the GIPANDO localities and matched localities even with a larger sample size. If there was a sample with 50 matched pairs with observed effect size at 90% power, then a one-tailed alpha would be 0.108, suggesting that there is no difference between the GIPANDO localities and the matched localities. By increasing the number of matched pairs, the inference with the observed effect size would increase the probability that GIPANDO localities have *lower* annual crime rates than their matched localities, though this inference would barely satisfy less stringent accounts of statistical significance. Beyond before-and-after differences, we can also assess trends in crime rates in public bathrooms between these localities. This way, it can be assessed whether trends in crime rates increase in GIPANDO localities compared to their matched localities. Figure 2 provides the timeframe from 24 months before to 24 months after the passage of the local GIPANDOs. A 24-month window was chosen because all localities in this analysis were asked to provide incidents within a four-year timeframe. Unlike a change in the annual incident rate before and after the introduction of GIPANDOs, this model com-pared the change in the average monthly incident rates in GIPANDO and matched localities. If the argument about GIPANDOs negatively impacting safety and privacy in restrooms is correct, then an increase in reported incidents among localities with GIPANDOs, above and beyond any increase in localities without GIPANDOs, would be expected after the introduction of such policies.

In Fig. 2, the model included the difference between localities with clear enforceable GIPANDOs that applied to restrooms and their matched localities. As can be seen in the graph, the rates over time showed no significant increases in victimization rates in GIPANDO localities compared to matched localities. To the contrary, localities introducing GIPANDOs had slightly, yet significantly, lower rates of criminal incidents than their matched localities at the time these ordinances were introduced. About 10 to 20 months after GIPANDO passage, the difference appeared to increase; during that time, the average monthly proportion of criminal incidents remained rather stable in GIPANDO localities but slightly increased among matched pairs. By 24 months after GIPANDO passage, rates between the two sets of localities appeared to have little difference.

Table 3   Average number of incidents per year documented by police departments by localities with clear GIPANDOS and matched pairs before and after policy passage

| | Localities with clear GIPANDOs | Matched localities without GIPANDOs | Difference per 100,000 (clear-matched) |
|---|---|---|---|
| Before passage | 0 (0 per 100,000) [0 per 100,000, 0 per 100,000] | 3.5 (2.54 per 100,000) [2.53 per 100,000, 2.55 per 100,000] | − 2.54 per 100,000 [− 2.55 per 100,000, − 2.53 per 100,000] |
| After passage | 0.5 (0.62 per 100,000) [− 0.49 per 100,000, 1.73 per 100,000] | 5.5 (4.50 per 100,000) [1.22 per 100,000, 7.78 per 100,00] | − 3.88 per 100,00 [− 7.34 per 100,000, − 0.42 per 100,000] |
| Change per 100,000 (After − before) | 0.62 per 100,000 [− 0.49 per 100,00, 1.73 per 100,000] | 1.96 per 100,000 [− 1.32 per 100,000, 5.24 per 100,000] | − 1.35 per 100,000 [− 4.30 per 100,00, 1.60 per 100,000] |
| Total annual average | 0.25 (0.31 per 100,000) [− 0.25 per 100,000, 0.86 per 100,000] | 4.5 (3.52 per 100,000) [1.86 per 100,000, 5.19 per 100,000] | |

Notes: Average annual crime rate in incidents per 100,000 people are in the parentheses; 90% confidence intervals are in the brackets; $\chi^2_1 = 0.62$; $p = 0.43$; Fisher's exact $= 1.00$; one-sided Fisher's exact $= 0.632.$; difference-in-difference $= − 1.35$ bootstrapped S.E. $= 1.80$, $p = 0.454$

# Discussion

Opponents of gender identity nondiscrimination laws and policies have cited fears of attacks and privacy violations against women and children in restrooms as one of their main reasons for resistance to them, while proponents have asserted that such laws are necessary to protect transgender people and cause no increase in these kinds of crimes. However, no study, to our knowledge, has examined crime report data to assess changes in rates of crime before and after the introduction of GIPANDOs. This is the first study to do so. While this analysis initially chose Massachusetts as a case study because of its unique legal paradigm, it has taken on more direct importance in that state, because over the course of the data collection and analysis, Massachusetts passed a statewide public accommodations law that includes gender identity and that law is now up for repeal on the November 2018 ballot. By using public records and statistical modeling, we found no evidence that privacy and safety in public restrooms change as a result of the passage of GIPANDOs.[8]

The inclusion of GIPANDOs may signal a more inclusive context and thus relate to lower victimization rates, which we propose in H1. Based on previous empirical work on dispel- ling the myths to oppose LGBT rights in marriage, family, and employment, we suspected in H0 that GIPANDOs would have no relationship with victimization rates. We find greater support for H0. The inclusion of GIPANDOs had little relationship with victimization rates. Complimentary to research on hate crimes policies, sometimes, policy-specific provisions have little relationship to victimization. The cumulative addition of legal inclusion of marginalized groups may, however, reduce victimization rates (Levy & Levy, 2017).

**Limitations** Limitations of this study include issues inherent with the data source. For example, the data used to represent safety and privacy violations in public restrooms were police records of criminal incidents. While these records should have a relatively high level of reliability in their objective accuracy in recording the existence of such incidents, they fail to include any incidents that were not reported to local law enforcement. For example, it is estimated that only 30 to 35% of rapes and sexual assaults are reported to the police (Truman & Langton, 2014). Nevertheless, by assessing trends over time and using a matched pairs analysis, the authors sought to control for any issues related to unreported incidents. There is no reason to assume that incidents are more or less likely to be reported in a locality with a GIPANDO than in a matched locality.

The crime reports also were not recorded in a way that allows a reviewer to distinguish between incidents involving cisgender people and transgender people. Police departments generally do not distinguish between sex assigned at birth and gender identity. Therefore, there is no way to identify if there were any incidents that involved transgender people being attacked in public restrooms because of their externally perceived gender. A 2008 survey of 93 transgender people in the Washington, DC metropolitan area found that 9% reported experiencing physical assault in a public restroom (Herman, 2013). There was also no way to identify if there were incidents of transgender people or people pretending to be transgender accessing restrooms with intent to harm others. Among the incidents that had notes attached providing more detail, there was no evidence of transgender people being either victims or perpetrators of crimes or of people pretending to be transgender in order to harm others in public restrooms.

---

[8] We conducted a second analysis using a matching procedure that included localities with clear GIPANDOs, localities with limited GIPANDOs, and matched localities that clearly did not have a GIPANDO. This second analysis found similar results to the analysis presented above. See Appendix for a description and results of this second analysis



Fig. 2 Difference in the average monthly rate of criminal incidents in public restrooms, locker rooms, and changing rooms between localities with clear GIPANDOs and matched localities. Note: Dashed lines represent 90% confidence intervals; negative values show lower rates of victimizations in GIPANDO localities compared to matched localities before, during, and after policy introduction

It is also important to note that violent and other privacy- related crimes in public restrooms, locker rooms, and changing rooms are exceedingly rare. As a point of comparison, our findings indicated that reports of privacy or safety violations in these public spaces occurred annually at most at a rate of 4.5 per 100,000 population in the jurisdictions we studied; in the Commonwealth of Massachusetts in 2015, violent crimes were reported at a rate of 390.1 per 100,000 population, and rapes were reported at a rate of 32.6 per 100,000 (Federal Bureau of Investigation, 2016). While this may be comforting to those who have safety and privacy related concerns about those spaces, the rarity of such incidents may act as a limitation to this analysis. Nevertheless, the matched pairs design was used intentionally to compensate for limited data. The data were requested from 15 different police departments of different sizes and geographies. Each had its own individual record keeping system, policy for responding to public records requests, and records clerks. Some departments responded by sending extra data and allowing the researchers to search through to find the relevant incidents, while others sent tables with dates and criminal codes. Some appeared to have the ability to search electronically while others had to search manually. Therefore, we are unable to determine whether every single search was equally thorough and turned up every single incident that matched the researchers' search criteria. For example, the locality that showed the highest limitation to this analysis. Nevertheless, the matched pairs design was used intentionally to compensate for limited data. The data were requested from 15 different police departments of different sizes and geographies. Each had its own individual record keeping system, policy for responding to public records requests, and records clerks. Some departments responded by sending extra data and allowing the researchers to search through to find the relevant incidents, while others sent tables with dates and criminal codes. Some appeared to have the ability to search electronically while others had to search manually. Therefore, we are unable to determine whether every single search was equally thorough and turned up every single incident that matched the researchers' search criteria. For example, the locality that showed the highest number of restroom incidents was the locality in which the police department sent their full criminal logs to the researchers and allowed the researchers to review the records to find incidents that met their search criteria. The higher number of incidents might be more likely to indicate that the researchers performed a more detailed and exhaustive search than the other searches performed within police departments, rather than that there were actually more incidents in that locality. That locality was a matched pair locality, so this may have contributed to the greater number of incidents reported in matched pair localities, as compared to GIPANDO localities. However, the difference-in-difference approach would account for any such bias because we do not rely on the numbers of individual incidents reported for the analyses, but instead rely on the differences within jurisdictions before and after passage of GIPANDOs. We can assume that data collection efforts were consistent within each jurisdiction, and therefore, our calculations produce differences that are comparable across jurisdictions.

Table 4   Average number of incidents per year as documented by police departments by localities with clear GIPANDOs, limited GIPANDOs and matched localities before-and-after policy passage

| | Localities with clear GIPANDOs | Localities with limited GIPANDOs | Matched localities without GIPANDOs | Difference per 100,000 (clear-matched) |
|---|---|---|---|---|
| Before passage | 1.0 (0.26 per 100,000) [− 0.91 per 100,000, 1.44 per 100,000] | 1.5 (2.55 per 100,000) [− 0.07 per 100,000, 5.18 per 100,000] | 2.5 (1.07 per 100,000) [− 0.00 per 100,000, 2.15 per 100,000] | − 0.81 per 100,000 [−2.40 per 100,000, 0.78 per 100,000] |
| After passage | 1.5 (0.63 per 100,000) [− 0.54 per 100,000, 1.81 per 100,000] | 0.5 (0.85 per 100,000) [− 1.78 per 100,000, 3.48 per 100,000] | 3 (1.32 per 100,000) [0.24 per 100,000, 2.39 per 100,000] | − 0.68 per 100,000 [−2.27 per 100,000, 0.91 per 100,000] |
| Change per 100,000 (after-before) | 0.37 per 100,000 [− 1.29 per 100,000, 2.03 per 100,000] | − 1.70 per 100,00 [− 5.42 per 100,000, 2.01 per 100,000] | 0.24 per 100,000 [− 1.27 per 100,000, 1.76 per 100,000] | 0.13 per 100,000 [−2.12 per 100,000, 2.38 per 100,000] |
| Total annual average | 1.25 (0.45 per 100,000) [0.05 per 100,000, 0.85 per 100,000] | 1.0 (1.70 per 100,000) [0.24 per 100,000, 3.16 per 100,000] | 2.75 (1.19 per 100,000) [0.29 per 100,000, 2.10 per 100,000] | |

Notes: Average annual crime rate in incidents per 100,000 people are in the parentheses; 90% confidence intervals are in the brackets; $\chi^2_2 = 1.42$; $p = 0.49$; Fisher's exact = 0.658. Difference-in-difference = 0.41, bootstrapped S.E. = 1.05, $p = 0.699$

Finally, though all of the requests were worded and followed up upon in the same manner, the depth of the results may have varied. Three localities were unable to provide complete incident data, which may decrease the internal validity of the current study. Cases where there was missing data from a matched locality led to the exclusion of the locality with a GIPANDO from the analysis because of the lack of comparable data, which may impact the external validity of the current study.

Despite these limitations, this study is able to empirically assess the relationship between nondiscrimination laws that are inclusive of gender identity in public accommodations and safety and privacy in public restrooms. While criminal incidents do, in fact, rarely occur in such spaces, these findings suggest that concerns over the safety in those spaces should be more generally related to community safety and policing, and not related to nondiscrimination laws.

Fig. 3 Differences in the average monthly rate of criminal incidents in public restrooms, locker rooms and changing rooms among localities with clear GIPANDOs and limited GIPANDOs compared to matched localities without GIPANDOs. Notes: 90% confidence intervals represented by dashed lines; negative values show lower rates of victimizations in GIPANDO localities compared to matched localities before, during, and after policy introduction.



## Conclusion

Opponents of gender identity nondiscrimination laws in public accommodations have largely cited fear of safety and privacy violations in public restrooms, locker rooms, and changing rooms if such laws are passed, while proponents have argued that the laws do not increase danger or harm in such spaces. To date, no evidence has been gathered to empirically test the hypothesized effect of these laws. This is the first study to collect public records and analytically compare the safety of public restrooms, locker rooms, and changing rooms in localities that have gender identity inclusive nondiscrimination laws that apply to public restrooms and matched localities that do not have such laws. The results show that the passage of such nondiscrimination laws is not related to the number or frequency of criminal incidents in such public spaces. Additionally, the results show that reports of privacy and safe- ty violations in public restrooms, locker rooms, and changing rooms were exceedingly rare and much lower than statewide rates of reporting violent crimes more generally. This study provides evidence that fears of increased safety and privacy violations as a result of nondiscrimination laws are not empirically grounded.

**Acknowledgements** The authors would like to thank Kerith Conron and Brad Sears for their extensive feedback on analytical approaches and presentation of findings. The authors would also like to thank the records keepers at the police departments throughout Massachusetts who assisted in responding to the public records requests that were a necessary part of the data collection for this project. The authors would also like to thank Chrissy Reinard and Joseph Rocha, who provided assistance in executing one round of public records requests. Thanks also go to Taylor Brown, who provided research assistance on crime rates throughout New England, and Fernanda Miramontes, who copy edited this paper. Finally, thank you to the editor and anonymous reviewers for their feed- back and publication assistance.

## Compliance with Ethical Standards

Ethical Approval This article does not contain any studies with human participants or animals performed by any of the authors. An IRB exemption was obtained by the authors for use of de-identified criminal record data (IRB#15-001060).

Conflict of Interest Amira Hasenbush declares that she has no conflict of interest. Andrew Flores declares that he has no conflict of interest. Jody Herman declares that she has no conflict of interest.

## Appendix: Placebo Matched Pairs Analysis

The analysis was re-conducted using a second matching procedure. Localities with clear GIPANDOs were matched to localities that clearly did not have a GIPANDO, and localities with limited GIPANDOs (i.e., Brookline and Cambridge) were also matched to localities that clearly did not have a GIPANDO (see Table 2). The limited GIPANDOs offer a type of placebo comparison, where a policy was introduced but not clearly inclusive of the protections that are afforded in localities with clear GIPANDOs.

Table 4 provides a contingency table showing the average annual number of incidents, similar to the analysis in the re- port. For this analysis, there were three levels of treatment: a group of localities with clear GIPANDOs, a limited GIPANDO group that introduced a gender identity policy, but made exceptions or lacked clarity on restrooms, and the matched localities group without GIPANDOs. There were fewer overall incidents in the group with clear GIPANDOs when compared to the matched localities, but there were no apparent patterns of an increase in victimization in the timeframe after passage. These differences were also not significantly different from one another. A Fisher's exact test indicated that there was no significant relationship between GIPANDOs and restroom crimes. An estimate of the before- and-after changes between the localities with clear GIPANDOs and their matched pairs of the average proportion of monthly incidents in locations also showed no statistically significant difference. There does not appear to be a relation- ship between policy introduction and restroom incidents. Again, here, even if there were many more localities, a statistical power analysis found that it is unlikely that there would be a statistically significant difference between GIPANDO localities and matched localities. If there was a sample with 50 matched pairs with observed effect size at 90% power, then a one-tailed alpha would be 0.85, suggesting that the null hypothesis of no difference would also fail to be rejected with a greater number of matched pairs.

Similar to before, we assessed trends in crime rates be- tween these localities. This way, it could be assessed whether trends in crime rates increased in clear GIPANDO localities and limited GIPANDO localities, as compared to their matched localities. The figure limits the timeframe to 12 months before and 12 months after the passage of the local GIPANDOs. A 12-month window was chosen because some localities in this analysis were asked to provide incidents with- in a two-year timeframe, so we restrict the plot to the timeframe common to all localities.

In Fig. 3, the model included differences between localities with clear enforceable GIPANDOs that applied to restrooms and their matched localities (black line), and differences be- tween the limited GIPANDOs with unclear enforceability or restroom exceptions and their matched localities (gray line). The local regressions showed a lot of overlap between and across these three groups. As opposed to the analysis in the body of the report, which showed slightly lower crime rates in the GIPANDO localities as compared to their matched pairs after policy introduction, there was no statistically significant difference in the average monthly proportion of criminal incidents in restrooms both over time and across contexts.

These results indicate that changes in the average rate of criminal incidents are not related to the passage of GIPANDOs. The limited GIPANDOs provide another source of comparison, and these additional comparisons indicate that clear GIPANDOs are not uniquely related to increases in aver- age rates of criminal incidents.

# References

American Civil Liberties Union. (2017). G.G. v. Gloucester County School Board. Retrieved March 16, 2018, from https://www.aclu. org/cases/gg-v-gloucester-county-school-board.

Andersen, E. A. (2017). Transformative events in the LGBTQ rights movement. *Indiana Journal of Law and Social Equality, 5*(2), 441–475.

Badgett, M. V. L. (2001). *Money, myths and change: Economic lives of lesbians and gay men*. Chicago: University of Chicago Press.

Department of Housing and Urban Development (2016, September 20). HUD issues final rule to ensure equal access to housing and services regardless of gender identity. Retrieved May 25, 2017, from https:// portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_ advisories/2016/HUDNo_16-137

Diamond, A., & Sekhon, J. S. (2013). Genetic matching for estimating causal effects: A general multivariate matching method for achiev- ing balance in observational studies. *The Review of Economics and Statistics, 95*(3), 932–945.

Dimick, J. B., & Ryan, A. M. (2014). Methods for evaluating changes in health care policy: The difference-in-differences approach. *Journal of the American Medical Association, 312*(22), 2401–2402.

Equal Employment Opportunity Commission v. Harris Funeral Homes, 884 F.3d 560 (6th Cir. 2018)

Fausset, R. (2017, March 29). Retrieved May 2, 2017, from https://www. nytimes.com/2017/03/29/us/north-carolina-lawmakers-reach-deal- to-repeal-so-called-bathroom-bill.html.

Federal Bureau of Investigation. (2016). Crime in the United States by region, geographic division, and state, 2014–201. Retrieved February 2, 2017, from https://ucr.fbi.gov/crime-in-the-u.s/2015/ crime-in-the-u.s.-2015/tables/table-4.

Fejes, F. (2008). *Gay rights and moral panic: The origins of America's debate on homosexuality*. New York: Palgrave Macmillan.

Fernandez, M., & Smith, M. (2015, November 3). Retrieved May 2, 2017, from http://www.nytimes.com/2015/11/04/us/houston- voters-repeal-anti-bias-measure.html?_r=0.

Fetner, T. (2008). *How the religious right shaped lesbian and gay activism*. Minneapolis: University of Minnesota Press.

Fogg Davis, H. (2017). Why the ʙtransgenderᐱ bathroom controversy should make us rethink sex-segregated public bathrooms. *Politics, Groups, and Identities*, 1–18. https://doi.org/10.1080/21565503. 2017.1338971.

G. G. v. Gloucester County School Board, 137 S. Ct. 1239 (2017).

G.G. v. Gloucester County School Board, 132 F. Supp. 3d 736, 750 (E.D. Va. 2015)

Gender Identity Act, H.B. 3810, 187th Gen. Court (Mass. 2011). Hasenbush, A., Flores, A. R., Kastanis, A., Sears, B., & Gates, G. J. (2014). The LGBT divide: A data portrait of LGBT people in the Midwestern, Mountain & Southern states. The Williams Institute. Available from https://williamsinstitute.law.ucla.edu/wp-content/ uploads/LGBT-divide-Dec-2014.pdf.

Herek, G. M. (1991). Myths about sexual orientation: A lawyer's guide to social science research. *Law & Sexuality, 1*(133), 133–172.

Herek, G. M. (2006). Legal recognition of same-sex relationships in the United States: A social science perspective. *American Psychologist, 61*(6), 607–621.

Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management and Social Policy*, 65–80.

Holden, D. (2018, February 12). Retrieved March 16, 2018, from https:// www.buzzfeed.com/dominicholden/edu-dept-trans-student- bathrooms?utm_term=.mvmwQx3mb#.bwlqp5QIV.

House Bill 2: House Floor Debate on H.B. 2, 2015–2016 Gen. Assemb., 2016 Extra Sess. 2 43 (2016) (testimony of Rodney W. Moore).

House Bill 2: Senate Floor Session on H.B. 2, 2015–2016 Gen. Assemb., 2016 Extra Sess. 2 14–16 (2016) (testimony of E. S. ʙBuckᐱ Newton).

Human Rights Bylaw, Amherst, Mass., Gen. Bylaws Art. 1 (2009).

Human Rights Campaign. (2016). Cities and counties with non- discrimination ordinances that include gender identity. Retrieved May 24, 2017, from http://www.hrc.org/resources/cities-and- counties-with-non-discrimination-ordinances-that-include-gender.

Imai, K., & Ratkovic, M. (2014). Covariate balancing propensity score. *Journal of the Royal Statistical Society, 76*(1), 243–263.

Jackson, C. (2017, June 6). *OCR instructions to the field re complaints involving transgender students [memorandum]*. Washington, DC: Office for Civil Rights, Department of Education Retrieved July 11, 2017, from https://assets.documentcloud.org/documents/ 3866816/OCR- Instructions-to-the-Field-Re-Transgender.pdf

Keele, L., & Titiunik, R. (2015). Geographic boundaries as regression discontinuities. *Political Analysis, 23*(1), 127–155.

Kelly, D. (2016, March 28). Anchorage LGBT rights law opponents seek amendments through initiative. Alaska Dispatch News. Retrieved May 2, 2017, from https://www.adn.com/alaska-news/article/ opponents-anchorage-equal-rights-law-seek-amendments/2016/03/29/.

Kralik, J. (2017, April 12). ʙBathroom billᐱ legislative tracking. Retrieved May 2, 2017, from http://www.ncsl.org/research/ education/- bathroom-bill-legislative-tracking635951130.aspx.

Levy, B. L., & Levy, D. L. (2017). When love meets hate: The relationship between state policies on gay and lesbian rights and hate crime incidence. *Social Science Research, 61*, 142–159.

Lusardi v. Dep't of the Army, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Mar. 27, 2015).

MacGillis, A. (2017, August 22). Is anybody home at HUD? New York Magazine. Available from http://nymag.com/daily/intelligencer/2017/08/ben-carson-hud-secretary.html.

Mass. Gen. Laws ch. 151B § 4 (1989). Mass. Gen. Laws. ch. 66, §10 (2016).

Miller, P. R., Flores, A. R., Haider-Markel, D. P., Lewis, D. C., Tadlock, B. L., & Taylor, J. K. (2017). Transgender politics as body politics: Effects of disgust sensitivity and authoritarianism on transgender rights attitudes. *Politics, Groups, and Identities, 5*(1),4–24.

Minn. Stat. § 363A.11 (1993).

Movement Advancement Project. (2017). Non-discrimination laws. Retrieved May 24, 2017, from http://www.lgbtmap.org/equality-maps/non_discrimination_laws.

Nebraska v. U.S., No. 4:16-CV-03117, first amended complaint for de- claratory and injunctive relief (U.S.D. Neb. Oct. 21, 2016).

Nebraska v. U.S., No. 4:16-cv-03117-JMG-CRZ (U.S.D. Neb. Mar. 16, 2017).

Nebraska v. U.S., No. 4:16CV3117 (U.S.D. Neb. Nov. 23, 2016).

Occupational Safety and Health Administration. (2015). Best practices: A guide to restroom access for transgender workers. Retrieved May 25, 2017, from https://www.osha.gov/Publications/ OSHA3795.pdf.

Philipps, D. (2016, March 23). Retrieved May 25, 2017, from https:// www.nytimes.com/2016/03/24/us/north-carolina-to-limit- bathroom-use-by-birth-gender.html.

Radway, D. B., Town of Amherst, Mass. Director of Human Resources & Human Rights. (2015 April 23). [E-mail correspondence]. On file with the author.

Raifman, J., Moscoe, E., Austin, S. B., & McConnell, M. (2017). Difference-in-differences analysis of the association between state same-sex marriage policies and adolescent suicide attempts. *Journal of the American Medical Association Pediatrics, 171*(4), 350–356.

Schneider, A., & Ingram, H. (1993). Social construction of target popu- lation: Implications for politics and policy. *American Political Science Review, 87*(2), 334–347.

Sekhon, J. S. (2011). Multivariate and propensity score matching soft- ware with automated balance optimization: The matching package for R. *Journal of Statistical Software, 42*(7), 1–52.

Simmons, L. N., Chief of Staff, City of Northampton, Mass. Office of the Mayor. (2015, April 23–May 12). [E-mail correspondence]. On file with the author.

Stone, A. L. (2012). *Gay rights at the ballot box*. Minneapolis: University of Minnesota Press.

Texas v. U.S., 201 F. Supp. 3d 810 (N.D. Tex. Aug. 21, 2016).

Texas v. U.S., No. 16-11534, defendants-aAppellants' nNotice of wWithdrawal of mMotion for pPartial sStay pPending aAppeal and jJoint mMotion to cCancel oOral aArgument (2017).

Transgender Anti-Discrimination Act, Mass. Gen. Laws ch. 272 §§ 92A, 98 (2016).

Truman, J. L., & Langton, L. (2014). Criminal victimization, 2013. Retrieved from Bureau of Justice Statistics website May 2, 2017, http://www.bjs.gov/content/pub/pdf/cv13.pdf.

U.S. Department of Justice & U.S. Department of Education. (2016). . Retrieved May 2, 2017, from http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

U.S. Department of Justice & U.S. Department of Education. (2017). . Retrieved May 2, 2017, from https://www.justice.gov/crt/page/file/942021/download.

Westbrook, L., & Schilt, K. (2014). Doing gender, determining gender: Transgender people, gender panics, and the maintenance of the sex/gender/sexualitysystem. *Gender and Society, 28*(1), 32–57.

Worcester, Mass., Rev. Ordinances part 2, art. 10 §18(c)(1) (2014). Worcester, Mass., Rev. Ordinances Part 2, art. 10 §9(c) (2014).

Young, C. A. (2016, October 11). Question to repeal transgender accom- modations law qualifies for 2018 ballot. Retrieved May 2, 2017, from http://www.wbur.org/news/2016/10/11/ballot-question- transgender-accommodations-law.



**HUMAN RIGHTS WATCH**

# SHUT OUT

Restrictions on Bathroom and Locker Room Access
for Transgender Youth in US Schools

AR_293056

AR_293057



# Shut Out

Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools

AR_293058

Copyright © 2016 Human Rights Watch

All rights reserved.

Printed in the United States of America

ISBN: 978-1-6231-34037

Cover design by Rafael Jimenez

Human Rights Watch defends the rights of people worldwide. We scrupulously investigate abuses, expose the facts widely, and pressure those with power to respect rights and secure justice. Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all.

Human Rights Watch is an international organization with staff in more than 40 countries, and offices in Amsterdam, Beirut, Berlin, Brussels, Chicago, Geneva, Goma, Johannesburg, London, Los Angeles, Moscow, Nairobi, New York, Paris, San Francisco, Sao Paulo, Sydney, Tokyo, Toronto, Tunis, Washington DC, and Zurich.

For more information, please visit our website:  http://www.hrw.org



SEPTEMBER 2016

ISBN: 978-1-6231-34037

# Shut Out

## Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools

**Glossary**..................................................................................................... I

**Summary** ................................................................................................... 1

**Recommendations**.................................................................................. 3

To the US Congress ............................................................................. 3

To State Legislatures .......................................................................... 3

To School Administrators ................................................................... 3

**Methodology**........................................................................................... 5

**Background**.............................................................................................. 6

**I. Students at Risk** ................................................................................... 9

Safety.................................................................................................... 9

Health ................................................................................................ 10

Privacy ............................................................................................... 12

Education .......................................................................................... 14

**II. Discipline** ............................................................................................17

**III. All-Gender Options** ........................................................................ 18

**IV. Human Rights Analysis**................................................................. 20

**Acknowledgments**................................................................................ 23

AR_293061

# Glossary

**Agender:** A descriptor used by people who do not identify with any gender.

**Cisgender:** The gender identity of people whose sex assigned at birth conforms to their identified or lived gender.

**Genderfluid:** A gender identity in which one's gender fluctuates and may differ over time.

**Gender Identity:** A person's internal, deeply felt sense of being female or male, neither, both, or something other than female and male. A person's gender identity does not necessarily correspond to their sex assigned at birth.

**Gender Non-Conforming:** A descriptor for people who do not conform to stereotypical appearances, behaviors, or traits associated with their sex assigned at birth.

**LGBT:** The umbrella term to describe those who are lesbian, gay, bisexual, or transgender.

**Non-Binary:** The gender identity of people who identify as neither male nor female.

**Sexual Orientation:** A person's sense of attraction to, or sexual desire for, individuals of the same sex, another sex, both, or neither.

**Transgender:** The gender identity of people whose sex assigned at birth does not conform to their identified or lived gender.

AR_293062

AR_293063

# Summary

Over the past year, transgender individuals' access to bathrooms, locker rooms, and other facilities has erupted as a divisive and sensationalized issue in political debates, statehouses, courts, and communities across the United States. Efforts to limit transgender people's access to facilities that correspond with their gender identity have had a particular focus on public schools and universities, typically under the guise of protecting children.

To date in 2016, at least 18 state legislatures considered bills that would have restricted transgender students' access to bathrooms, locker rooms, and other facilities not in accordance with their gender identity. When the state of North Carolina enacted a set of sweeping restrictions, the federal Department of Justice and Department of Education issued guidance clarifying that treating transgender students differently from other students constitutes sex discrimination under Title IX of the Education Amendments of 1972. A number of states and state officials subsequently sued to challenge the Departments' interpretation of Title IX, and state officials and school administrators in many places signaled they would not require schools to allow transgender students to access facilities in accordance with their gender identity. On August 21, 2016, a federal judge in Texas issued a preliminary injunction blocking the federal guidance from taking effect nationwide while the lawsuit proceeds.

As these battles play out, transgender youth are struggling to meet basic physical needs in their school environments. For these students, being barred from facilities is not an abstract legal question, but a daily source of frustration and isolation. In an interview with Human Rights Watch in Texas, Tanya H., the mother of a nine-year-old transgender boy named Elijah, recalled: "A year ago at this time, he was having a really hard time, and he'd go into the girl's bathroom and girls would yell, 'There's a boy in here!' and he couldn't go to the boys' bathroom, and so he stopped going to the bathroom. There were a lot of meltdowns." When Elijah mentioned suicide and was briefly hospitalized, his mother spoke to administrators to ensure that he would be treated as a boy when he started at a new school in the fall. Tanya recalled: "He was kind of worried about going to a new school, and he said, 'If I can go as a boy, okay.' He's just fallen into it, and he's so much happier.… He's making friends who know him as a boy." For Elijah and other transgender

AR_293064

youth, access to bathrooms and locker rooms is an urgent issue that affects their safety, health, privacy, and ability to learn.

This report documents how restrictions on access to shared facilities directly affect transgender youth. From November 2015 to May 2016, researchers interviewed 74 current or former transgender students in Alabama, Pennsylvania, South Dakota, Texas, and Utah as part of a larger project on LGBT issues in US schools. The five states examined have not enacted sweeping restrictions like those of North Carolina. Yet in the absence of clear and inclusive nondiscrimination laws, policies at the school and school district level, and training for teachers and administrators, transgender students face access issues in these states as well.

The results of this research illustrate why restricting transgender students' access to shared spaces is not only unnecessary, but discriminatory and dangerous. Barring transgender students from facilities that are safe, comfortable, and gender affirming is discriminatory, and that discrimination causes real harm. It places transgender students at heightened risk of harassment, assault, and bullying, impedes their ability to secure an education and participate fully in the life of their schools, and can cause damage to their physical and emotional health. Conversely, there is no evidence that allowing transgender students to choose bathroom or locker room facilities that correspond to their gender identity puts other students at risk. As the new school year begins, it is imperative that schools and school districts implement measures that advance the rights of all their students, regardless of their gender identity or expression.

AR_293065

# Recommendations

## To the US Congress

- Enact the Equality Act or similar legislation to prohibit discrimination on the basis of sexual orientation and gender identity in education, employment, and public accommodations;
- Enact the Student Non-Discrimination Act or similar legislation to prohibit discrimination on the basis of sexual orientation and gender identity in public schools.

## To State Legislatures

- Ensure that state nondiscrimination laws include explicit protections from discrimination on the basis of sexual orientation and gender identity, particularly in education, employment, and public accommodations;
- Require schools and school districts to allow transgender students to access bathrooms, locker rooms, and other gender-segregated facilities in accordance with their gender identity;
- Ease any building regulations that require particular numbers or percentages of gendered bathrooms in public or commercial buildings to permit the designation of all-gender bathrooms.

## To School Administrators

- Ensure that students are able to access bathrooms, locker rooms, and other gender-segregated facilities in accordance with their gender identity;
- Train staff on accessibility issues related to transgender students, emphasizing that staff should not question or discipline students who choose to use all-gender bathrooms or other facilities made available to them—for example, nurse or faculty bathrooms—and should recognize that such facilities may be distant from classrooms and require extra time;
- Consider erecting stalls, barriers, and privacy curtains to maximize student privacy in bathrooms, locker rooms, and shared facilities;

AR_293066

- Designate all-gender bathrooms in easily accessible locations throughout the school wherever feasible, particularly in instances where single-user bathrooms are currently gendered;
- Incorporate all-gender bathrooms and private changing and shower areas into planned renovations or any construction of new facilities.

AR_293067

# Methodology

Human Rights Watch conducted the research for this report between November 2015 and May 2016 in five US states: Alabama, Pennsylvania, South Dakota, Texas, and Utah. Human Rights Watch contacted potential interviewees through nongovernmental organizations, LGBT organizations in high schools and middle schools, and LGBT organizations in postsecondary institutions where recent graduates reflected on their high school experiences. Researchers spoke about accessibility issues in schools with 74 transgender students or recent graduates, as well as with more than 50 teachers, administrators, parents, service providers, and advocates for transgender youth.[1]

All interviews were conducted in English. No compensation was paid to interviewees. Whenever possible, interviews were conducted one-on-one in a private setting. Researchers also spoke with interviewees in pairs, trios, or small groups when students asked to meet together or when time and space constraints required meeting with members of student organizations simultaneously. Researchers obtained oral informed consent from interviewees, and notified interviewees why Human Rights Watch was conducting the research and how it would use their accounts, that they did not need to answer any questions they preferred not to answer, and that they could stop the interview at any time. When students were interviewed in groups, those who were present but did not actively participate and volunteer information were not recorded or counted in our final pool of interviewees.

In this report, pseudonyms are used for interviewees who are students, teachers, or administrators in schools. Pseudonyms are not used for individuals and organizations who work in a public capacity on the issues discussed in this report.

---

[1] Here, the umbrella term "transgender" is used to broadly encompass students who identify as transgender boys or transgender girls as well as those who identified as agender, genderfluid, non-binary, or other gender identities that differ from their sex assigned at birth.

AR_293068

# Background

In 2016, legislatures in at least 18 states considered bills that would have prohibited transgender students from accessing bathrooms and locker rooms consistent with their gender identity.[2] The majority of these bills were withdrawn, were defeated or stalled in committee, or otherwise failed to garner legislative approval, with the exceptions of bills in South Dakota and North Carolina. In South Dakota, legislators approved a bill restricting access for transgender youth in schools, but it was vetoed by Governor Dennis Daugaard and did not become law.[3] In North Carolina, legislators convened for a special, daylong session on March 23, 2016, where they introduced, debated, and passed a sweeping law restricting access to facilities and repealing local ordinances that prohibited discrimination on the basis of sexual orientation and gender identity. The same evening, Governor Pat McCrory signed the law, which took immediate effect.[4]

The passage of North Carolina's law put the state's regulation of shared facilities in conflict with the positions of the federal Department of Justice and Department of Education. In enforcement actions, both agencies had taken the position that Title IX of the Education Amendments of 1972, which prohibits sex discrimination in educational programs or activities that receive federal funding, encompasses discrimination on the basis of gender identity. On May 9, 2016, the Department of Justice sued North Carolina, arguing the state's law constituted discrimination on the basis of sex under Title IX, Title VII of the Civil Rights Act of 1964, and provisions of the Violence Against Women Reauthorization Act of 2013.[5] The same day, officials in North Carolina sued the Department of Justice in a federal

---

[2] Bills restricting access to shared facilities were introduced in Illinois, Indiana, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New York, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Virginia, Washington, and Wisconsin. See National Center for Transgender Equality, "Action Center," http://www.transequality.org/action-center (accessed August 22, 2016).

[3] Office of Gov. David Daugaard, "Gov. Daugaard Vetoes HB 1008," March 1, 2016, http://news.sd.gov/newsitem.aspx?id=19926 (accessed August 15, 2016).

[4] Michael Gordon, Mark S. Price, and Katie Peralta, "Understanding HB2: North Carolina's Law Solidifies State's Role in Defining Discrimination," *Charlotte Observer*, March 26, 2016, http://www.charlotteobserver.com/news/politics-government/article68401147.html (accessed August 27, 2016); General Assembly of North Carolina, "House Bill 2," http://ncleg.net/Sessions/2015E2/Bills/House/PDF/H2v4.pdf (accessed August 27, 2016).

[5] Complaint in *United States v. North Carolina*, https://www.justice.gov/opa/file/849946/download (accessed August 27, 2016).

AR_293069

court in North Carolina, challenging its interpretation of sex discrimination under the federal statutes.[6]

On May 13, 2016, the Department of Justice and Department of Education jointly issued guidance for all schools that receive federal assistance, affirming that:

> The Departments interpret Title IX to require that when a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, the school will begin treating the student consistent with the student's gender identity.[7]

The guidance addressed bathrooms and locker rooms, and specified that, "[w]hen a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity."[8]

In the days that followed, officials in at least six states instructed schools and school officials to disregard the federal guidance.[9] On May 25, 2016, a group composed of nine state governments and several other state and local authorities sued the US Department of Justice, Department of Education, Department of Labor, and Equal Employment Opportunity Commission in a federal court in Texas, challenging the agencies' interpretation of Title IX to

---

[6] Complaint in *McCrory v. United States*, http://www.newsobserver.com/news/politics-government/state-politics/article76561707.ece/BINARY/Complaint%20McCrory%20V%20USA (accessed August 27, 2016); Complaint in Berger v. United States, http://media2.newsobserver.com/content/media/2016/5/9/1=Complaint.pdf (accessed August 27, 2016).

[7] US Department of Justice & US Department of Education, "Dear Colleague Letter on Transgender Students," May 13, 2016, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf (accessed September 1, 2016).

[8] Ibid.

[9] Officials in North Carolina, Texas, Mississippi, Kentucky, Utah, and Arkansas all indicated that schools were not bound by or should reject the guidance shortly after it was issued. "States Push Back on Transgender Bathroom Use," CBS News, May 13, 2016, http://www.cbsnews.com/news/states-push-back-on-transgender-bathroom-use (accessed August 27, 2016); Daphne Chen, "Herbert Slams Obama 'Bathroom' Directive as Federal Overreach," *Deseret News*, May 13, 2016, http://www.deseretnews.com/article/865654260/Herbert-slams-Obama-bathroom-directive-as-federal-overreach.html?pg=all (accessed August 27, 2016); Emanuella Grinberg, "Feds Issue Guidance on Transgender Access to School Bathrooms," CNN, May 14, 2016, http://www.cnn.com/2016/05/12/politics/transgender-bathrooms-obama-administration (accessed August 27, 2016); "Bevin: Schools Should Disregard 'Unlawful' Transgender Bathroom Guidance from White House," *WDRB News*, May 31, 2016, http://www.wdrb.com/story/32105292/bevin-schools-should-disregard-unlawful-transgender-bathroom-guidance-from-white-house (accessed August 27, 2016); Greg Gordon and Colin Campbell, "McCrory Says Obama Policy Upends Bathroom Etiquette," McClatchy, May 13, 2016, http://www.mcclatchydc.com/news/politics-government/article77539102.html (accessed August 27, 2016).

AR_293070

prohibit discrimination on the basis of gender identity.[10] Days later, Kentucky and Mississippi joined the suit. On July 8, 2016, 10 additional states brought a similar suit regarding Title IX in a federal court in Nebraska.[11] On August 21, 2016, a federal judge issued a preliminary injunction blocking federal agencies from enforcing their interpretation of Title IX nationwide while the case is under consideration.[12] On August 26, 2016, another federal judge gave credence to the federal guidance, and issued a preliminary injunction blocking North Carolina's law from being applied to three transgender plaintiffs at the University of North Carolina.[13] As these cases about the scope of Title IX proceed through the judicial system, transgender students who need access to bathrooms, locker rooms, and other shared facilities are returning to school across the United States.

---

[10] The states are Alabama, Georgia, Louisiana, Oklahoma, Tennessee, Texas, Utah, West Virginia, and Wisconsin. Arizona's Department of Education, Governor Paul LePage of Maine, and school districts in Arizona and Texas were also plaintiffs in the suit.

[11] The states are Arkansas, Kansas, Michigan, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, and Wyoming.

[12] *Texas v. United States*, No. 7:16-cv-00054-O (N.D.Tex. Aug. 21, 2016).

[13] Mark Berman, "Federal Judge Says UNC Can't Enforce North Carolina's Transgender Bathroom Restrictions," *Washington Post*, August 26, 2016, https://www.washingtonpost.com/news/post-nation/wp/2016/08/26/federal-judge-says-unc-cant-enforce-restroom-restrictions-in-north-carolinas-bathroom-bill/?utm_term=.bb3b9ecebc03 (accessed September 1, 2016).

# I. Students at Risk

## Safety

One of the most pressing concerns for transgender students is safety in bathrooms and locker rooms. Although proponents of bathroom and locker room restrictions cite student safety as a reason to require students to use facilities according to their sex assigned at birth, the reality is that transgender individuals face high rates of verbal harassment and even physical assault in bathrooms.[14] Because bathrooms and locker rooms are not monitored by teachers, students are often at heightened risk for bullying and harassment in these spaces. When schools require transgender girls to use the men's room or force transgender boys to use the women's room, they put them at risk of physical, verbal, or sexual assault from other students or adults.

Transgender students interviewed by Human Rights Watch said that being made to use facilities that did not correspond to their gender identity made them feel unsafe at school or exposed them to verbal and physical assault. Willow K., a 14-year-old transgender girl in Texas, recalled of her required eighth grade gym class: "I had to strip down into my girly underwear in front of a bunch of guys who would call me these rude names, and I couldn't go to the bathroom [or girls' locker room] to change … and it made me so uncomfortable."[15] The previous year, Willow had been assaulted by a group of football players in the locker room, making the requirement that she use the male locker room particularly difficult. Alexis J., a self-described genderfluid 19-year-old in Texas, recalled a gym class where "I had to strip down to girly underwear in front of a bunch of dudes. And they're like, 'faggot.' And this was freshman year, so they're just vicious."[16]

Transgender students expressed particular concern about physical assault and harassment in boys' bathrooms and locker rooms, but described harassment in girls' bathrooms and locker rooms as well. Kevin I., a 17-year-old transgender boy in Utah, noted

---

[14] Jeff Brady, "When a Transgender Person Uses a Public Bathroom, Who is at Risk?" NPR Weekend Edition, May 15, 2016, http://www.npr.org/2016/05/15/477954537/when-a-transgender-person-uses-a-public-bathroom-who-is-at-risk (accessed August 27, 2016).

[15] Human Rights Watch interview with Willow K. (pseudonym), Texas, November 10, 2015.

[16] Human Rights Watch interview with Alexis J. (pseudonym), Texas, November 10, 2015.

AR_293072

"It was hard for me to be in a female locker room. People would ask if I was a lesbian, or was going to have sex with anyone in the locker room, and it was just very uncomfortable."[17] And while many of the transgender students we interviewed identified strongly as boys or girls and wanted to use the corresponding facilities, many others said they did not feel safe in either space and felt their only option was to forego bathrooms, gym classes, and gendered extracurricular activities with their peers altogether.

## Health

Bathrooms, locker rooms, and other shared facilities are necessary to perform bodily functions or maintain physical hygiene when students are confined to the school environment for significant portions of the day. Restricting access to these facilities negatively affects the physical and mental health of transgender youth.

As noted above, many transgender students told us that when they lacked a safe or accessible bathroom or locker room in school, their standard strategy was to avoid all school bathrooms and locker rooms. Sans N., a 15-year-old transgender boy in Utah, explained: "I just don't go to the bathroom at school. It's just so awkward. I just look at the signs and I'm like, I can't go in the ladies' because it makes it me uncomfortable, and I can't go in the boys' because I'm going to get yelled at."[18] Paisley E., a 15-year-old transgender boy in Texas, found that his school's limited all-gender options were often inaccessible or unavailable: "There's one gender neutral bathroom in the janitor's closet, and they finally put one in the nurse's office. And then there's one in the special needs classroom, and I didn't always feel comfortable walking in when they were doing the lessons. So for about one-and-a-half months I did not go to the bathroom at school."[19]

Avoiding the bathroom for the duration of the school day can have negative repercussions for students' physical and mental health. Research indicates that avoiding bathroom use for extended periods of time is linked to dehydration, urinary tract infections, and kidney problems.[20] Cassidy R., a self-described agender 18-year-old in Utah, recalled: "I know a

---

[17] Human Rights Watch telephone interview with Kevin I. (pseudonym), Utah, January 9, 2016.

[18] Human Rights Watch interview with Sans N. (pseudonym), Utah, December 7, 2015.

[19] Human Rights Watch interview with Paisley E. (pseudonym), Texas, November 15, 2015.

[20] Jody L. Herman, "Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender Peoples' Lives," *Journal of Public Management and Social Policy*, Vol. 19 (2013), p. 75-76.

AR_293073

lot of my friends just didn't go to the bathroom and suffered a lot of infections and health problems because of that."[21] Daniel N., a 17-year-old transgender boy in Texas, described the planning it required to take advantage of the sole all-gender bathroom in his school in the face of administrative indifference: "I talked to people at the school and they said I had to use the bathroom in the clinic. It's three minutes to walk to the bathroom, and then I have to pee, and then I have to go back. The teacher is like, where were you, and why were you in the clinic bathroom, and it's awkward. I don't pee during school, which is a very bad habit. Because I don't drink [water] at school, and I'm dehydrated."[22]

In addition to physical health issues, students underscored the mental health repercussions of being denied access to the spaces their peers used because they were transgender, including anxiety and feelings of gender dysphoria.[23] Acanthus R., a 17-year-old transgender student in Utah, pointed out: "If you're assigned female at birth now, you go to the women's room, and it's just a reminder about what you hate most about yourself. And if you go the men's bathroom, it's, 'Am I going to get jumped,' 'Am I going to get suspended,' 'Is someone going to call me a tranny?'"[24]

Parents of transgender youth observed the repercussions of that dilemma, particularly in elementary schoolers and middle schoolers. Tanya H. noted that Elijah, the transgender boy whose case is described in the summary of this report, vocalized thoughts of suicide when he was treated as a girl at his former school but was happier and healthier when recognized as a boy by teachers and peers at his new school. Ingrid A., the parent of a transgender girl in Pennsylvania, recalled a similar shift when her daughter transitioned at school: "She was a darker child, prior. When she would be angry, her tantrums would go to a dark place: 'I want to die,' 'God made a mistake,' 'I'm not supposed to be a boy.'... But that year of transition, she just became comfortable with herself and you just saw this kid blossom."[25]

---

[21] Human Rights Watch interview with Cassidy R. (pseudonym), Utah, December 2, 2015.

[22] Human Rights Watch interview with Daniel N. (pseudonym), Texas, November 10, 2015.

[23] The American Psychiatric Association has explained that gender dysphoria occurs when there is "a marked difference between the individual's expressed/experienced gender and the gender others would assign him or her," which "causes clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association, "Gender Dysphoria," 2013, http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf.

[24] Human Rights Watch interview with Acanthus R. (pseudonym), Utah, December 7, 2015.

[25] Human Rights Watch interview with Ingrid A. (pseudonym), Pennsylvania, May 5, 2016.

AR_293074

The health problems associated with restricting transgender students' bathroom use are not limited to high schoolers, and may occur before parents and teachers are aware that the student is questioning their gender or identifying as transgender and struggling to find safe and accessible options. Jillian Hill, the Director of Operations at the Inclusion Center for Community and Justice in Utah, recounted meeting an elementary school student who avoided the bathroom for the duration of the school day.[26] Susanna K., the mother of a transgender boy in Utah, recalled that when her son came out as transgender: "[H]e told us about junior high and not going to the bathroom all day. He was getting bladder infections and we didn't know why. [He] said if he went into the boys' bathroom, he would have gotten beaten up, and if he went into the girls' bathroom, he would have been teased, and maybe been beaten up."[27] Susanna's son eventually switched to a local charter school, where he was able to use bathrooms consistent with his gender identity. As she recalled, that decision "ended up being the best thing for him. He made a lot of friends and was able to be authentic there."[28]

## Privacy

Proponents of restrictions on bathroom and locker room access often cite privacy as a justification for excluding transgender youth. In this telling, the presence of transgender students in bathrooms that correspond to their gender identity compromises the privacy of cisgender students using the same facilities, and exposes them to feelings of discomfort or insecurity. However, as described above, these concerns are far outweighed by the harmful and potentially dangerous impact on transgender students of policies that deny them the use of facilities that correspond to their gender identity. Such discrimination can also undermine transgender students' right to privacy, by effectively outing them as transgender to peers and school staff.

Some schools have allowed transgender students to use alternative facilities, including faculty bathrooms normally off-limits to students, as an alternative to giving them free access to facilities that correspond with their gender identity. This is not an adequate compromise. Several transgender students told us that requesting or using gender neutral

---

[26] Human Rights Watch interview with Jillian Hill, Director of Operations at the Inclusion Center for Community and Justice, Salt Lake City, Utah, November 25, 2015.

[27] Human Rights Watch interview with Susanna K. (pseudonym), Utah, December 8, 2015.

[28] Human Rights Watch interview with Susanna K. (pseudonym), Utah, December 8, 2015.

options served to convey their transgender status to faculty, staff, and peers as well. Julian L., a 15-year-old transgender boy in South Dakota, noted: "I talked to my counselors and they told me to use the staff bathroom. I once saw three students there and they were like, 'Why are you here? You're a student,' and I told them and they understood. And it would be nice to not have to explain it to them."[29] Silas G., a 15-year-old transgender boy in South Dakota, had a similar experience: "My teacher would grill me, 'Why are you going to the nurse?' 'Why are you going to the nurse?' 'Why are you going to the nurse?' And I got yelled at for using the faculty bathroom."[30] Teagan W., a 16-year-old transgender boy in Texas, noted that, when using the faculty bathroom, "I get a lot of weird looks from teachers. I'll wait until teachers go in so they're not like, 'What are you doing?'"[31]

On the other hand, some transgender students prefer the use of all-gender facilities because they do not feel comfortable in bathrooms that correspond to either gender. In these situations, schools should take steps to minimize the degree of unwanted scrutiny this generates, including by instructing teachers to refrain from interrogating students' use of alternative facilities.

Many transgender students' fear of being "outed" extends beyond the school environment to their own families. Many students who are transgender or are exploring their gender identity are not out to their families, fearing hostility or negative repercussions at home. In some instances, students who have sought accommodations from their schools have been outed to family, classmates, and others without their consent. Henry C., a 16-year-old transgender boy in Pennsylvania, warned: "You can get a staff key for the faculty bathroom, but the last kid I know who asked to do that was outed to their parents by the office staff."[32] For students who feared strong disapprobation, violence, or being kicked out of their house if their transgender status was disclosed to their parents, the threat of disclosure can discourage them from talking with school officials about bathroom access, including discussions of all-gender alternatives.

Privacy is indeed lacking in many school bathroom and locker room facilities. Some schools have removed stall doors from bathrooms in an effort to deter drug use and other

---

[29] Human Rights Watch interview with Julian L. (pseudonym), South Dakota, February 14, 2016.

[30] Human Rights Watch interview with Silas G. (pseudonym), South Dakota, February 12, 2016.

[31] Human Rights Watch interview with Teagan W. (pseudonym), Texas, November 13, 2015.

[32] Human Rights Watch interview with Henry C. (pseudonym), Pennsylvania, April 15, 2016.

AR_293076

prohibited behavior. And many if not most school locker rooms require students to change clothes and/or shower in a shared, communal space without curtains or other barriers. Rather than bar transgender students from accessing bathrooms and locker rooms that correspond to their gender identities out of concern for student privacy, school administrators should consider steps to increase the level of privacy enjoyed by all students when using these facilities. Many transgender students told Human Rights Watch that they wished their schools would adopt such measures.

Some schools have successfully taken these steps. As Harley A., an administrator who has overseen the implementation of such a policy in Pennsylvania, noted: "One of the first things I did when I started this was to go to facilities and say, go around to every bathroom and locker room and make sure there are doors on the stalls."[33] With the inclusive policy in place, they added, "there's a couple kids changing for gym in the locker room of their gender identity, and that's worked fine."[34]

## Education

Restrictions on bathroom usage compromise transgender students' education and their ability to participate fully in the school community on an equal footing with others. Like all students, transgender and gender non-conforming students are in school to learn. When students are preoccupied with the unavailability of safe places to relieve themselves, forego participation in gym classes, or suffer other negative impacts resulting from discriminatory restrictions, they are less able to learn and participate fully in the school community.

Some students noted they had compromised their participation in gym to avoid having to change with their peers. Ursula P., a 16-year-old transgender girl in Alabama, recalled:

> They refused to put me in girls' PE last year, and I was scared to go in the locker room and [change clothes] and wouldn't participate, and so I failed. I requested to do girls' PE and it's been over a month; I don't think they're making the decision. And I need a whole year of PE to graduate. I'm worried about physical bullying and verbal bullying in the locker room, and

---

[33] Human Rights Watch interview with Harley A. (pseudonym), Pennsylvania, April 13, 2016.
[34] Ibid.

harassment; I've experienced harassment every time I went in there, and
finally I just couldn't do it anymore.[35]

Silas G., a 15-year-old transgender boy in South Dakota, described a similar problem:

> I have to use the female locker room or go in the health teacher's room,
> which is in the female locker room. When I had health, I was able to change
> in [the health teacher's] office, but it had a huge window so I'd have to
> change in the tiny bathroom or in an actual closet. I just stopped changing
> and I'd get points marked off.[36]

In some instances, students who had been offered the use of all-gender bathrooms noted
that these were inconveniently located. Because of the way that schools are designed, all-
gender options near the office, nurse, auditorium, or theater were often distant from the
classroom wing of the building, and far less prevalent than gendered options. Zack T., a
16-year-old transgender boy in Texas, noted: "I've been trying to get gender-neutral
bathrooms this year. I have a problem holding it or having to go to the counselor's
restroom or the office's bathroom. It takes probably three minutes to get there, three
minutes to use the restroom, three minutes to get back, like ten minutes. And that's out of
an hour of classroom time, and is cutting into my learning time. But the nearest guy's room
is just down the hallway."[37] Brook E., an 18-year-old agender student in Utah, recalled:
"[T]here are technically teacher bathrooms that are single stall and gender neutral, but
they're all locked. And I was like, can I just have a key for those bathrooms? And that didn't
work, they said no, just walk down to the nurse's office.… I just want to go to the bathroom,
not hike across the school."[38]

The unavailability of safe and accessible bathrooms and locker rooms also compromises
participation in the school community more generally. Lucas K., an 18-year-old transgender
boy in South Dakota, requested access to the single-stall staff bathroom as an all-gender
option at the school. When the principal refused the request, he devised an alternative to

---

[35] Human Rights Watch interview with Ursula P. (pseudonym), Alabama, January 28, 2016.

[36] Human Rights Watch interview with Silas G. (pseudonym), South Dakota, February 12, 2016.

[37] Human Rights Watch interview with Zack T. (pseudonym), Texas, November 8, 2015.

[38] Human Rights Watch interview with Brook E. (pseudonym), Utah, November 27, 2015.

AR_293078

avoid having to use the women's bathroom: "I go home for lunch and use the bathroom there. And I don't go for the rest of the day."[39] Other students described similar strategies of leaving the campus entirely to find a bathroom at a gas station, fast food restaurant, or other establishment that they could use safely and comfortably, and, as a result, missing out on opportunities to eat lunch or socialize with peers. Students also explained that they did not participate in extracurricular activities—primarily sports, but also activities like choir—because they expected they would have to participate as their sex assigned at birth in the activity and any associated use of locker rooms or bathrooms for out of town trips.

---

[39] Human Rights Watch interview with Lucas K. (pseudonym), South Dakota, February 13, 2016.

# II. Discipline

Strictly regulating transgender students' access to shared facilities also puts those students at risk of disciplinary action. When students feel there was no bathroom they could safely, privately, and conveniently use, they often break the rules. Willow K., a 14-year-old transgender girl in Texas, recalled: "I've tried going to the girl's bathroom; there's a girl who doesn't like me and she told one of the teachers and I got in trouble and got written up. I talked to the principal and said, 'Hey, I'm this way, and it makes me really uncomfortable,' and he said, 'No, you're a boy.'"[40]

A number of students shared stories of being reprimanded by teachers or administrators, despite the fact that no incidents occurred as a result of their use of the bathroom that matched their gender identity. In one incident, a student in Alabama was dragged from the bathroom by the school principal, and, in many others, students were told they had to stop using the bathroom immediately.[41]

---

[40] Human Rights Watch interview with Willow K. (pseudonym), Texas, November 10, 2015.

[41] Human Rights Watch interview with Lucia Hermo, Outreach Paralegal, ACLU of Alabama, Montgomery, Alabama, January 26, 2016; Human Rights Watch interview with Lacey Kennedy, Youth Advocacy Organizer at AIDS Alabama, Birmingham, Alabama, January 29, 2016.

AR_293080

# III. All-Gender Options

Some students told Human Rights Watch that all-gender facilities, introduced as an option available to all students, would be their preferred solution, and lessen the stress of gender policing by peers and teachers. Schools should consider doing so where possible.

Cassidy R., an 18-year-old agender student in Utah, recalled:

> I would just not go to the bathroom at school. It was just an overall sense of discomfort, and I personally just don't feel that using the women's or the men's bathroom is accurate for who I am, and don't feel comfortable using either. If you go to the men's bathroom, you risk being assaulted, and if you go to the women's bathroom, you get, 'Why are you here?'[42]

Logan J., an 18-year-old student in Utah, similarly noted: "I identify as non-binary and it's difficult to even use a restroom in public. I'm stuck here for eight hours and I don't feel comfortable going to the bathroom because I have to make a choice there, and I'm not comfortable in either and there's no gender neutral option."[43]

Cassidy's and Logan's dilemmas were not uncommon for students who were agender, genderfluid, or non-binary, and even some transgender boys and girls found gendered bathrooms intimidating. As Dominic J., a 13-year-old transgender boy in Pennsylvania, noted: "I've been yelled at in both the men's bathrooms and the women's bathrooms in my school."[44]

In interviews, students lauded a range of approaches that some schools have adopted to expand all-gender options. Some schools simply redesignated gendered, single-stall bathrooms as all-gender bathrooms, and opened them for use by anyone who needs them. As other schools were built or remodeled, they added more single-stall bathrooms, often in the form of family bathrooms or accessible bathrooms that serve the needs of families and

---

[42] Human Rights Watch interview with Cassidy R. (pseudonym), Utah, December 2, 2015.

[43] Human Rights Watch telephone interview with Logan J. (pseudonym), Utah, January 9, 2016.

[44] Human Rights Watch interview with Dominic J. (pseudonym), Pennsylvania, April 15, 2016.

AR_293081

people with disabilities as well as transgender individuals. A third option—increasingly common in colleges and in LGBT spaces—is to designate certain multi-stall bathrooms as all-gender, often by outfitting them to maximize privacy for all patrons with dividers or stalls. Although students should not be forced to use all-gender options and should be able to access facilities according to their gender identity, the provision of additional options provides an alternative to anyone who is uncomfortable in gendered facilities.

AR_293082

# IV. Human Rights Analysis

As the 2016/2017 school year begins, legal challenges to the federal guidance interpreting Title IX are still working their way through the courts, leaving the obligations of state governments and school districts under US federal law unsettled. However, the steps needed to protect and uphold the human rights obligations of transgender students are clear, regardless of the precise scope of federal regulatory power in this space.

State governments are obliged under international human rights law to refrain from discriminating against transgender students. North Carolina's law is an act of affirmative and deliberate discrimination that is in violation of international human rights law; other states should not emulate it. They should instead take steps to encourage school administrations to facilitate transgender students' access to facilities that correspond with their gender identities and, where appropriate, to all-gender facilities they can use safely and comfortably. Such steps are necessary to ensure transgender students' ability to access education on an equal footing with others in an environment that is safe and free of discrimination and fear, and also to protect their health. For its part, the US federal government should continue to take steps to both mandate and encourage state governments to undertake these actions, to the extent possible given the limits of federal legislative and regulatory authority.

The International Covenant on Civil and Political Rights (ICCPR), which the United States has ratified, obliges all levels of the US government[45] to respect and uphold the rights of transgender people to be free from discrimination, to recognition as a person before the law, and to privacy, as well as the right of children to special measures of protection.[46] The Human Rights Committee, the treaty body that monitors and provides guidance to

---

[45] The provisions of the ICCPR "extend to all parts of federal States without any limitations or exceptions." ICCPR, art. 50.

[46] ICCPR arts. 16, 17, 24, 26. The Human Rights Committee, the expert body that guides states in their implementation of the ICCPR, has affirmed that article 24 requires states to adopt "special measures to protect children." Human Rights Committee, "General Comment No. 17: Rights of the Child," April 7, 1989, http://www.refworld.org/docid/45139b464.html, para 1-2. The United States has also signed the Convention on the Rights of the Child (CRC). Although it has not ratified the treaty, as a signatory it is bound to avoid actions that contravene the purpose of the treaty. The Committee on the Rights of the Child, the UN treaty body that interprets and applies the Convention on the Rights of the Child, has concluded that the treaty's prohibited grounds for discrimination "also include sexual orientation, gender identity, and health status." Committee on the Rights of the Child, "General Comment No. 15 (2013) on the Right of the Child to the Enjoyment of the Highest Attainable Standard of Health (Art. 24)," U.N. Doc. CRC/C/GC/15, April 17, 2013, para. 8.

AR_293083

governments on implementation of the ICCPR, has expressed concern about discrimination on the basis of gender identity and lauded states that have taken steps to recognize the gender identity of transgender people.[47]

The right to education under international law is elaborated by the Universal Declaration on Human Rights, the Convention on the Rights of the Child (CRC), and the International Covenant on Economic, Social and Cultural Rights (ICESCR). The United States has signed, but not ratified, both the CRC and the ICESCR, meaning that it is not bound by either treaty but is obliged to act consistently with their object and purpose. The Committee on the Rights of the Child, which guides states in their implementation of the CRC and is an authoritative voice on the rights of children, has rightly explained that the process of fulfilling the right to education must take account of "the environment within which education takes place," and that governments should ensure schools are safe for all students.[48] As this report has explained, the failure of authorities at all levels to enact reasonable accommodations for transgender students creates an environment that negatively impacts their ability to participate fully in the experience of schooling and education, places their health at risk, and places them at heightened risk of violence, harassment, and bullying.

In districts across the US, many schools have recognized that they have or will have transgender students in their care, and have taken proactive steps to ensure their rights are respected.[49] At least eight of the schools or school districts visited by Human Rights Watch have developed policies and proposals to ensure that transgender students are able to access facilities according to their gender identity, and officials or parents of transgender youth told us that those policies have been implemented without incident.[50]

---

[47] See Concluding Observations of the Human Rights Committee on Ireland, U.N. Doc. CCPR/C/IRL/CO/3,July 30, 2008, para. 8; Concluding Observations of the Human Rights Committee on the United Kingdom of Great Britain and Northern Ireland, U.N. Doc. CCPR/C/GBR/CO/6, July 30, 2008, para. 5. The Committee has also indicated that transgender individuals who have undergone gender reassignment procedures have a right under the ICCPR to be issued identity documents that correspond with their gender identity. Concluding Observations on Ireland, para. 8.

[48] UN Committee on the Rights of the Child, "General Comment No. 1, The Aims of Education (Article 29)," U.N. Doc. CRC/GC/2001/1, April 17, 2001, para. 8. The United States has signed, but not ratified, the CRC.

[49] Nearly every school visited by Human Rights Watch had at least one student who identified as transgender, agender, genderfluid, or non-binary. Data on the number of transgender youth are scarce, but a number of teachers and administrators interviewed by Human Rights Watch suggested that policy concerns related to gender identity in schools are arising with greater frequency as awareness increases and merit proactive attention.

[50] Human Rights Watch interview with Tanya H. (pseudonym), Texas, November 14, 2015; Human Rights Watch interview with Susanna K. (pseudonym), Utah, December 8, 2015; Human Rights Watch interview with Pam A. and Chuck A. (pseudonyms), Alabama, January 21, 2016; Human Rights Watch interview with Kent D. (pseudonym), Alabama, January 22, 2016; Human

AR_293084

Schools around the United States should take similar steps to ensure that all students are able to use facilities without discrimination and are equally able to participate and learn.

---

Rights Watch interview with Harley A. (pseudonym), Pennsylvania, April 13, 2016; Human Rights Watch interview with Vanessa M. (pseudonym), Pennsylvania, May 3, 2016; Human Rights Watch interview with Ingrid A. (pseudonym), Pennsylvania, May 5, 2016; Human Rights Watch interview with Lillian D. (pseudonym), Pennsylvania, May 6, 2016.

AR_293085

# Acknowledgments

This report was written and primarily researched by Ryan Thoreson, the Yale Law School Robert L. Bernstein International Human Rights Fellow in the LGBT Rights Program at Human Rights Watch. Additional interviews were conducted by Michael Bochenek, senior counsel in the Children's Rights Division.

The report was reviewed by Boris Dittrich, advocacy director of the LGBT Rights Program; Michael Bochenek, senior counsel in the Children's Rights Division; Megan McLemore, senior researcher in the Health and Human Rights Division; Antonio Ginatta, US advocacy director; Chris Albin-Lackey, senior legal advisor; and Joseph Saunders, deputy program director.

Human Rights Watch would like to thank the experts and organizations that assisted us in reaching out to potential interviewees, especially Youth First in Dallas, TX; LGBTQ Saves in Fort Worth, TX; Hatch Youth in Houston, TX; Out Youth in Austin, TX; the Utah Pride Center in Salt Lake City, UT; Equality Utah in Salt Lake City, UT; the ACLU of South Dakota in Sioux Falls, SD; the Center for Equality in Sioux Falls, SD; the Black Hills Center for Equality in Rapid City, SD; the Magic City Acceptance Project in Birmingham, AL; the Alabama Alliance for Healthy Youth in Birmingham, AL; the Alabama Safe Schools Coalition in Birmingham, AL; Montgomery Pride United in Montgomery, AL; Free2Be in Huntsville, AL; the ACLU of Pennsylvania in Philadelphia, PA; the Mazzoni Center in Philadelphia, PA; the LGBT Center of Central Pennsylvania in Harrisburg, PA; the Bradbury-Sullivan LGBT Community Center in Allentown, PA; and the NEPA Rainbow Alliance in Pittston, PA.

AR_293086



# SHUT OUT

Restrictions on Bathroom and Locker Room Access
for Transgender Youth in US Schools

In 2016, lawmakers across the United States proposed bills to restrict transgender individuals' access to bathrooms and locker rooms consistent with their gender identity. Although only one of these bills became law—in North Carolina—transgender youth face analogous restrictions in schools and school districts across the country. This report, based on interviews with 74 transgender students and over 50 parents, educators, and administrators in Alabama, Pennsylvania, South Dakota, Texas, and Utah, documents how these restrictions expose transgender youth to bullying and harassment, mental and physical health problems, unwanted disclosure of their transgender status, and barriers to participation in the educational environment. It urges federal, state, and local officials to ensure that all students are able to access bathrooms and locker rooms consistent with their gender identity in the school environment.

*(above) Demonstrators protesting passage of legislation limiting bathroom access for transgender people stand in front of the Charlotte-Mecklenburg Government Center in Charlotte, NC on March 31, 2016.*
*© 2016 Skip Foreman/AP Photo*

*(front cover) Students hold stickers about to be placed on a new all-gender bathroom as members of the cheer squad applaud at Nathan Hale High School in Seattle, WA on May 17, 2016.*
*© 2016 Elaine Thompson/AP Photo*

hrw.org

# Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives

Jody L. Herman
*The Williams Institute*
*UCLA School of Law*

The designers of our built environment have created public facilities that are segregated by gender, such as public restrooms, locker rooms, jails, and shelters. Reliance upon gender segregation in our public spaces harms transgender and gender non-conforming people. This paper employs a minority stress framework to discuss findings from an original survey of transgender and gender non-conforming people in Washington, DC about their experiences in gendered public restrooms. Seventy percent of survey respondents reported being denied access, verbally harassed, or physically assaulted in public restrooms. These experiences impacted respondents' education, employment, health, and participation in public life. This paper concludes with a discussion of how public policy and public administration can begin to address these problems by pointing to innovative regulatory language and implementation efforts in Washington, DC and suggests other policies informed by the survey findings.

The concept of two separate and opposing genders – men and women – is entrenched in our society and reflected in our built environment. Public spaces throughout the United States are constructed with gender-segregated facilities, which serve to determine who is and is not allowed to use a particular space. Gender segregation is commonly found in public restrooms, locker rooms, dressing rooms, homeless shelters, jails, and prisons and is intended to provide safety, order, modesty, and security in these facilities. However, the concept of gender that underlies the design of these facilities ignores people who do not fit into a binary gender scheme, particularly transgender and gender non-conforming people. Traditional beliefs about gender are being challenged now more than ever and we must address the inadequacies of our built environment to meet the needs of all people regardless of gender.[1]

Restrooms in particular are an integral and necessary part of the built environment for our daily lives. All people share the real human need for safe restroom facilities when we go to work, go to school, and participate in public life. Since the need is universal, one

---

[1] For the purposes of this paper, "transgender" and "gender non-conforming" describe people whose gender identity or expression is different from those traditionally associated with their assigned sex at birth.

AR_293089

would think that it would be a priority of our society to make sure restrooms are safe and available for all people. Yet, the way gendered public restrooms are designed and constructed harms transgender and gender non-conforming people, some of whom may not conform to reified expectations of how men and women will look and act.

One way to conceptualize this harm is through a minority stress model. Minority stress develops by experiencing major stressors, such as when one is fired from a job, but can also develop through everyday experiences of disrespect and disparate treatment (Meyer 2003). Research on minority stress has found that it negatively impacts the mental health and social well-being of lesbian, gay, and bisexual people (Meyer 1995; Meyer 2003; Kertzner et al. 2009). Furthermore, lesbian, gay, and bisexual people may suffer minority stress as the result of prejudice and discrimination based on their gender non-conformity in addition to their sexual orientation (Gordon and Meyer 2007). Though these studies did not include transgender-identified participants, the findings on minority stress related to gender non-conformity suggest that minority stress models are appropriate to measure the impacts of prejudice and stigma experienced by transgender and gender non-conforming people.

This paper will utilize a minority stress framework to describe the experiences of transgender and gender non-conforming people when accessing and using gendered public restrooms. Data for this paper come from an original survey of transgender and gender non-conforming residents of Washington, DC, conducted in 2008 and follow-up interviews with selected survey participants. This survey collected data from 93 respondents on their experiences in gendered public restrooms in the DC metropolitan area, including experiences of denial of access, verbal harassment, and physical assault, and how those experiences impacted their education, employment, health, and participation in public life. Analysis of the survey data also will outline differences in these experiences based on race, income, and gender. Public restrooms fall under the purview of public policies that govern their design, construction, maintenance, and use. Public policy and public administration, therefore, can address problems that gender segregation creates. This paper will conclude by pointing to innovative public policy and public administration solutions that have created and implemented protections for transgender and gender non-conforming people and by taking a forward look at the role of gender segregation in urban planning and the built environment.

## Gender Segregation and Minority Stress

Ilan Meyer (2003) outlined processes of minority stress as they relate to lesbian, gay, and bisexual (LGB) people. Meyer (2003) locates minority stressors on a range from distal to proximal. Distal minority stressors are those that are based on events external to the individual and unrelated to the individual's self-perception or identity. These could be acute events, such as experiencing an incident of violence or job loss due to being perceived as LGB, or chronic events, such as homelessness due to family rejection. Proximal minority stressors are those that are based in an individual's self-perception and identity. Meyer explains, "Minority identity is linked to a variety of stress processes; some LGB people, for example, may be vigilant in interactions with others (expectations of rejection), hide their identity for fear of harm (concealment), or internalize stigma (internalized homophobia)" (2003, 676).

Meyer has modeled and tested the relationship between these processes of minority stress and mental health outcomes for gay and bisexual people, finding that minority stress is associated with negative outcomes in social well-being and mental health (Meyer 1995; Meyer 2003; Kertzner, Meyer, Frost, and Stirratt 2009). Though Gordon and Meyer (2007)

AR_293090

*Journal of Public Management & Social Policy*                                    *Spring 2013*

found that LGB people suffer from prejudice, discrimination, and violence due to gender non-conformity, very little research has applied minority stress models directly to the experiences and health outcomes of transgender individuals and none have focused on gender segregation as a cause of minority stress (see, for example, Effrig, Bieschke, and Locke 2011; Garofalo, Emerson, and Mustanski 2010; Vilain and Sanchez 2009; Kelleher 2009). Without question, transgender and gender non-conforming individuals experience violence, stigmatization, and discrimination (see, for example, Grant et al. 2011; Stotzer 2009, and Lombardi et al. 2001). In the largest survey of trans people to date, transgender and gender non-conforming people reported being fired due to anti-transgender bias (26%), being harassed (78%) and physically assaulted (35%) at school, suffering double the rate of unemployment, and attempting suicide at alarming rates (41%) (Grant et al. 2011). Transgender and gender non-conforming people across the United States certainly are suffering the negative impacts and consequences of distal and proximal minority stressors. Furthermore, as a matter of tradition and policy, we have built minority stressors for transgender and gender non-conforming people into our very environment due to our reliance on gender segregation in public facilities.

The impact of gender segregation in transgender and gender non-conforming people's lives has received little attention or study in scholarly research and, as of this writing, no studies have been published in the fields of Public Policy and Public Administration on this topic. However, research in Sociology and by transgender organizations has provided descriptions of the experiences of transgender and gender non-conforming people in public restrooms. In *Queering Bathrooms: Gender, Sexuality, and the Hygienic Imagination*, sociologist Sheila Cavanagh presents findings from 100 interviews with lesbian, gay, bisexual, transgender, and intersex (LGBTI) people on their thoughts and experiences regarding public restrooms (2010). While Cavanagh's study is mainly a theoretical mapping of how public restrooms reinforce gender and sexuality norms and why LGBTI people are harmed in these spaces, she relates narratives from interview participants that describe instances of harassment, humiliation, arrest, and physical violence in public restrooms.

Organizations that serve the trans community have also conducted research on transgender and gender non-conforming people's experiences in public restrooms. The Transgender Law Center (TLC), in cooperation with the National Center for Lesbian Rights (NCLR), found in a survey of transgender people in San Francisco that 63 percent of 75 respondents to questions regarding experiences in public accommodations experienced denial of access and/or harassment at least once while using public restrooms (Minter and Daley 2003). In a separate, more qualitative survey of transgender people in San Francisco, Dylan Vade found that "out of 116 responses from those who did not identify as male or female, 48 people took the time to write out specific bathroom experiences, all negative. These experiences ranged from harassment to violence to getting fired" (Vade 2002, 2). Respondents reported being physically abused, verbally harassed, fired, arrested, and made ill from avoiding restrooms altogether. A 2007 study in Virginia found that public restroom facilities served as a barrier to health care for some respondents (Xavier, Honnold, and Bradford 2007). Out of the sample of 350 Virginians self-identified as transgender, 37 respondents (11 percent) reported that a "lack of appropriate restroom facilities" had prevented them from seeing a doctor or getting health care (Xavier, Honnold, and Bradford 2007, 17).

AR_293091

*Herman*                                                               *Gendered Restrooms and Minority Stress*

Original analysis of the two data sets from the San Francisco surveys revealed that respondents experienced problems differently and at differing rates based on race and ethnicity, gender identity, and income. People of color reported problems using restrooms at a much higher rate than white respondents.[2] People who were transitioning from female-to-male reported problems at a much higher rate than people who were transitioning from male-to-female. Lower income groups reported more restroom problems than higher income groups, though this difference was not significant when tested. These differences suggest that discrimination based on race and ethnicity, class, and gender is intertwined with and may exacerbate experiences of prejudice in gender-segregated spaces. The survey conducted for this study improves on these prior surveys by focusing specifically on gendered restrooms, collecting more detailed quantitative data on a wider range of experiences, while also providing a more nuanced understanding of the impact of problems in gendered restrooms though qualitative data collection.

**Survey Method and Analysis**

Washington, DC served as the site for this survey, which was targeted to transgender and gender non-conforming people who work, live, and/or attend school in the District.[3] As a "hard-to-reach" population, usual sampling techniques for randomization, such as random-digit dialing, were not feasible for this survey. This survey utilized a convenience sampling method designed to reach as many members of the target community as possible. The survey was open for four months beginning November 2008 and advertised and/or distributed directly through seven community organizations, one online community, and two local listserves, all of which serve the LGBT community in Washington, DC. Advertisements for the survey encouraged respondents to forward news of the survey on to others they think are part of the target respondent group. The survey was offered online, in print, and via one-on-one interview in order to be as accessible as possible for people without internet access or low literacy. An incentive to participate was included in the form of a lottery for one of four $50 cash prizes. Follow-up interviews were conducted with six survey participants: two young transgender men, one young and two older transgender women, and one male crossdresser.

Analysis of the survey data was conducted using descriptive statistics, cross tabulations, and where appropriate, Pearson's chi-square and Fisher's exact tests.[4] As noted above, prior research suggests that transgender and gender non-conforming people experience problems at different rates based on race, income, and gender, so analyses of those differences are presented. The survey contained open-ended questions that generated qualitative data, which, along with follow-up interview data, was coded and analyzed. Follow-up interviews conducted for this study offer more detailed qualitative data that

---

[2] Original analysis was conducted by the author. Pearson's chi-square tests were conducted in this prior research. Unless otherwise noted, the findings reported here were found to be significant ($p < 0.05$).

[3] Data collection activities were originally conducted for the author's doctoral dissertation in cooperation with the DC Trans Coalition and received final approval from the George Washington University Institutional Review Board under IRB #080708, and all approval memos and approved documents are on file with the GWU IRB and the author.

[4] Pearson's chi-square tests and Fisher's exact tests are only generalizable with random samples. With a non-random sample, not only is the test not generalizable, but the test's ability to find statistical significance may be limited. Yet the test can be used to crudely measure a statistical relationship between two variables without the sample and provide hypotheses for future research. Chi-square tests of independence were performed when the expected value of each cell was 5 or higher. The Fisher's exact test, a test designed for use with thin cells, was used when any cell had an expected value of 4 or below. Test statistics and p-values are reported and will indicate which test was used.

AR_293092

*Journal of Public Management & Social Policy*                                    *Spring 2013*

allowed for better understanding of how people's experiences have impacted their lives by
tracing and linking specific events to any subsequent impacts.

**Survey Sample Demographics**

The target population for the survey was transgender and gender non-conforming
people who live, work, or have spent significant time in Washington, DC. Approximately 50
percent (n=47) of survey respondents lived in Washington, DC. DC-resident respondents
came from all four quadrants of the city, with the majority living in the northwest quadrant.
Only 3 of the 93 respondents lived in zip codes outside the Washington, DC metropolitan
area, which includes northern Virginia and the Maryland suburbs.

Table 1 shows the racial/ethnic and age composition of the full survey sample and
how it compares to the District of Columbia. Though nearly half of the survey respondents
reside outside of Washington, DC, in Virginia or Maryland, this comparison gives a rough
idea of how the survey sample differs from the general DC population.[5]  In the survey
sample, 67 percent of respondents identified as white only, 17 percent identified as Black or
African American only, and 12 percent reported two or more races. This sample appears
skewed in favor of white respondents. The survey sample is composed mainly of individuals
44 years old and younger. Compared to the DC population, the survey sample seems much
younger overall.

**Table 1. Race and Age of the Survey Sample and the District of Columbia**

| Demographic | Survey Sample | | DC |
|---|---|---|---|
| | Frequency | Percent of Sample | Percent of Population |
| Race/Ethnicity (n=93) | | | |
| Black/African-American alone | 16 | 17% | 54% |
| Hispanic/Latin@ alone[6] | 2 | 2% | 9% |
| Native American/American Indian alone | 0 | 0% | <1% |
| Asian/Pacific Islander alone | 2 | 2% | 2% |
| White/Caucasian alone | 62 | 67% | 34% |
| Two or more races | 11 | 12% | 1% |
| Age (n=93) | | | |
| 18-24 | 34 | 37% | 14% |
| 25-34 | 30 | 32% | 24% |
| 35-44 | 15 | 16% | 18% |
| 45-54 | 8 | 9% | 16% |
| 55-64 | 5 | 5% | 14% |
| 65 and older | 1 | 1% | 14% |

*Source for DC Data: U.S. Census Bureau, Current Population Survey, Annual Social and Economic
Supplement, 2008.*

---

[5] An analysis of just the DC-resident respondents did not show any impact on the trends observed in Table 1 except in the
case of race. DC residents in the sample seemed slightly less skewed from the DC population than the sample as a whole:
60 percent identified as white only, 29 percent identified as Black or African American only, and 13 percent reported two
or more races. Yet, regardless of the residency of the respondents, this sample appears skewed in favor of white
respondents.
[6] The use of "@" in the word "Latin@" is sometimes used in written Spanish to make the word gender-neutral in a concise
manner.

AR_293093

Table 2 presents the income and educational attainment of the survey sample and the District of Columbia. Nearly half of the survey sample and the population of the District of Columbia had annual individual incomes of $19,999 or less – 46 percent and 48 percent, respectively. While the third and fourth income quintiles seem slightly larger in the survey sample, DC appears to have a larger share in the highest income category, at 9 percent versus 5 percent in the survey sample. While there appears to not be a large difference in income, survey respondents in the survey sample report higher educational attainment than the DC population. The survey sample had fewer people in the three lowest categories of educational attainment, and markedly higher percentages for those who had some college (no degree) and those who completed a bachelor's degree.

**Table 2. Income and Educational Attainment of the Survey Sample and the District of Columbia**

| Demographic | Survey Sample | | DC |
| --- | --- | --- | --- |
| | Frequency | Percent of Sample | Percent of Population |
| Income (n=92) | | | |
| $0-$19,999 | 42 | 46% | 48% |
| $20,000-$39,999 | 17 | 18% | 20% |
| $40,000-$59,999 | 15 | 16% | 12% |
| $60,000-$99,999 | 13 | 14% | 11% |
| $100,000+ | 5 | 5% | 9% |
| Educational Attainment (n=93) | | | |
| 8th grade or less | 0 | 0% | 4% |
| Some high school (no diploma) | 6 | 6% | 9% |
| High school/GED | 9 | 10% | 18% |
| Some college (no degree) | 19 | 20% | 12% |
| Associate's degree | 4 | 4% | 3% |
| Bachelor's degree | 26 | 28% | 19% |
| Graduate/professional degree | 17 | 18% | 19% |

*Source for DC Data: U.S. Census Bureau, Current Population Survey, Annual Social and Economic Supplement, 2008. Percentages in each category may not add to 100% due to rounding.*

Table 3 describes the gender identity of the survey respondents in four categories, arranged by respondents' sex assigned at birth and gender identity today. Sixty respondents (65 percent) were assigned female at birth. Thirty-seven of those respondents identified as a man, transgender, transsexual, and/or female-to-male (FTM). Twenty-three respondents assigned female at birth did not identify as transgender in any way, but identified themselves as gender non-conforming and/or genderqueer. Thirty-three respondents (35 percent) were assigned male at birth. Twenty-nine of these respondents identified as a woman, transgender, transsexual, and/or male-to-female (MTF). Four respondents assigned male at birth did not identify as transgender in any way, but identified themselves as gender non-conforming and/or genderqueer.

AR_293094

*Journal of Public Management & Social Policy*                                                    *Spring 2013*

**Table 3. Self-Identified Gender and Transition Status of the Survey Sample**

| Gender Identity Today | Gender Identity (n=93) | | Has had any medical transition (n=49) | |
|---|---|---|---|---|
| | Frequency | % of Sample | Frequency | Row % |
| Assigned Female at Birth (n=60) | | | | |
| Man / Transgender / Transsexual / FTM | 37 | 40% | 24 | 65% |
| Gender Non-Conforming / Genderqueer (not trans identified) | 23 | 25% | 0 | 0% |
| Assigned Male at Birth (n=33) | | | | |
| Woman / Transgender / Transsexual / MTF | 29 | 31% | 24 | 83% |
| Gender Non-Conforming / Genderqueer (not trans identified) | 4 | 4% | 1 | 25% |

Table 3 above also shows medical transition status by each gender category. Overall, 49 respondents (53 percent) have had medical transition of some sort. Sixty-five percent of those transitioning from female-to-male (FTM) and 83 percent of those transitioning from male-to-female (MTF) have had some form of medical transition, which may include hormone treatment, surgery, and other medical treatments or procedures for purposes of gender transition. The most common medical treatment respondents reported was hormone treatment. Forty-five respondents reported having had hormone treatment; these 45 respondents comprise 48 percent of the sample and 92 percent of those who have had any medical transition.

**Survey Respondents' Experiences with Gendered Public Restrooms**

The survey assessed people's experiences accessing or using gender-segregated public restrooms by asking specifically about denial of access to facilities, verbal harassment, and physical assault. Overall, 65 respondents (70 percent) reported experiencing one or more of these problems. Eighteen percent of respondents have been denied access to a gender-segregated public restroom, while 68 percent have experienced some sort of verbal harassment and 9 percent have experienced some form of physical assault when accessing or using gender-segregated public restrooms. This section reviews the results of questions about denied access, verbal harassment, and physical assault provided through the survey and follow-up interviews and provides an analysis of each based on gender, race/ethnicity, and income.

*Denied Access*

Eighteen percent of respondents have been denied access to at least one gender-segregated public restroom in Washington, DC. Table 4 describes the income, race/ethnicity, and gender of those denied access to gender-segregated public bathrooms. Comparing the rates of those denied access in each of the lowest three income quintiles shows very little difference, at 21 percent, 24 percent, and 20 percent. Twenty-five percent of all Black or African American respondents were denied access to gendered public bathrooms, which is

AR_293095

slightly higher than the share of white respondents (18 percent) and respondents of two or more races (18 percent). Twenty-six percent of all female-to-genderqueer respondents were denied access, which is about 10 points higher than the other two gender categories reporting denied access. There appears to be no significant relationship between being denied access to public restrooms and income (*Fisher's exact* = 0.377), race/ethnicity ($\chi^2$ = 0.36, $p$ = 0.85), or gender ($\chi^2$ = 0.4073, $p$ = 0.816).

**Table 4. Denied Access to Gender-Segregated Public Restrooms by Income, Race/Ethnicity, and Gender**

| Demographic | Denied Access (n=17) | |
| --- | --- | --- |
| | Frequency | % of row category |
| Income (n=92) | | |
| $0-$19,999 (n=42) | 9 | 21% |
| $20,000-$39,999 (n=17) | 4 | 24% |
| $40,000-$59,999 (n=15) | 3 | 20% |
| $60,000-$99,999 (n=13) | 1 | 8% |
| $100,000+ (n=5) | 0 | 0% |
| Race/Ethnicity (n=93) | | |
| Black/African-American alone (n=16) | 4 | 25% |
| Hispanic/Latin@ alone (n=2) | 0 | 0% |
| Asian/Pacific Islander alone (n=2) | 0 | 0% |
| White/Caucasian alone (n=62) | 11 | 18% |
| Two or more races (n=11) | 2 | 18% |
| Gender (n=93) | | |
| Transgender Female-to-Male (n=37) | 6 | 16% |
| Transgender Male-to-Female (n=29) | 5 | 17% |
| Female-to-Genderqueer (n=23) | 6 | 26% |
| Male-to-Genderqueer (n=4) | 0 | 0% |

*Verbal Harassment*

Sixty-eight percent of respondents reported experiencing at least one instance of verbal harassment in gender-segregated public restrooms. For purposes of this survey, "verbal harassment" was defined very broadly. These experiences could include, but were not limited to, having been told they were in the wrong facility (n=39), told to leave the facility (n=12), questioned about their gender (n=34), ridiculed or made fun of (n=19), verbally threatened (n=8), and stared at or given strange looks (n=56). Respondents also reported in qualitative responses having had the police called, having been confronted while using urinals, and being followed after using a facility.

Table 5 describes respondents' verbal harassment experiences by income, race/ethnicity, and gender. Eighty-two percent of those in the second income quintile ($20,000-$39,000) have experienced verbal harassment, which is the highest rate by income category in this sample. Black or African-American respondents reported the second-highest rate of verbal harassment (87 percent) and 64 percent of those reporting two or more races experienced verbal harassment. The percent of those who identified as gender non-conforming or genderqueer who have experienced verbal harassment is 78 percent for those assigned female at birth and 75 percent for those assigned male at birth. The rate of verbal harassment is relatively lower for those who identify as transgender female-to-male (68 percent) or transgender male-to-female (59 percent).

AR_293096

**Table 5. Verbal Harassment in Gender-Segregated Public Restrooms by Income, Race, and Gender**

| Demographic | Verbal Harassment (n=63) | |
| --- | --- | --- |
| | Frequency | % of row category |
| Income (n=92) | | |
| $0-$19,999 (n=42) | 29 | 69% |
| $20,000-$39,999 (n=17) | 14 | 82% |
| $40,000-$59,999 (n=15) | 11 | 73% |
| $60,000-$99,999 (n=13) | 7 | 54% |
| $100,000+ (n=5) | 1 | 20% |
| Race/Ethnicity (n=93) | | |
| Black/African-American alone (n=16) | 14 | 87% |
| Hispanic/Latin@ alone (n=2) | 2 | 100% |
| Asian/Pacific Islander alone (n=2) | 1 | 50% |
| White/Caucasian alone (n=62) | 39 | 63% |
| Two or more races (n=11) | 7 | 64% |
| Gender (n=93) | | |
| Transgender Female-to-Male (n=37) | 25 | 68% |
| Transgender Male-to-Female (n=29) | 17 | 59% |
| Female-to-Genderqueer (n=23) | 18 | 78% |
| Male-to-Genderqueer (n=4) | 3 | 75% |

There seems to be no significant relationship between experiencing verbal harassment and one's race/ethnicity (*Fisher's exact* = 0.269) or gender (*Fisher's exact* = 0.517). However, experiencing verbal harassment is related to one's income ($\chi^2$ = 4.396, *p* = 0.036). Survey respondents who made $49,999 or less annually are more likely to experience verbal harassment than survey respondents who made $50,000 or more annually.

*Physical Assault*

Eight respondents (9 percent) reported experiencing at least one instance of physical assault in gender-segregated public restrooms. Like the term "verbal harassment" discussed above, "physical assault" was defined very broadly in this survey to capture a range of experiences respondents had where an altercation involving physical contact with others occurred. These experiences could include, but were not limited to, having been physically removed from the facility (n=4), hit or kicked (n=2), physically intimidated and/or cornered (n=6), and slapped (n=1). One transgender male-to-female respondent reported having been sexually assaulted while using the men's room.

Table 6 describes the distribution of experiences of physical assault by income, race/ethnicity, and gender. In this sample, there is a marginal relationship between race/ethnicity and experiences of physical assault (*Fisher's exact* = 0.078). This suggests that people of color in this sample were more likely than white respondents to experience physical assault. There is also a marginal relationship between income and physical assault in this sample (*Fisher's exact* = 0.056). Respondents making less than $50,000 annually in this sample were more likely to experience physical assault than respondents making $50,000 or above. There seems to be no relationship between gender and physical assault in this sample (*Fisher's exact* = 0.530).

AR_293097

**Table 6 Physical Assault in Gender-Segregated Public Restrooms by Income, Race, and Gender**

| Demographic | Physical Assault (n=8) | |
| --- | --- | --- |
| | Frequency | % of row category |
| Income (n=92) | | |
| 0 to $19,999 (n=42) | 5 | 12% |
| $20,000-$39,999 (n=17) | 2 | 12% |
| $40,000-$59,999 (n=15) | 1 | 7% |
| $60,000-$99,999 (n=13) | 0 | 0% |
| $100,000+ (n=5) | 0 | 0% |
| Race/Ethnicity (n=93) | | |
| Black/African-American alone (n=16) | 3 | 19% |
| Hispanic/Latin@ alone (n=2) | 0 | 0% |
| Asian/Pacific Islander alone (n=2) | 0 | 0% |
| White/Caucasian alone (n=62) | 3 | 5% |
| Two or more races (n=11) | 2 | 18% |
| Gender (n=93) | | |
| Female-to-Male (n=37) | 2 | 5% |
| Male-to-Female (n=29) | 4 | 14% |
| Female-to-Genderqueer (n=23) | 2 | 9% |
| Male-to-Genderqueer (n=4) | 0 | 0% |

**Impact of Gendered Restrooms in Education, Employment, Health and Public Life**

A single experience of denied access, verbal harassment, or physical assault is certainly a problem in its own right. These experiences, however, can have far-reaching effects that impact people's lives. Experiences of discrimination can impact people's lives in many ways, even leading to poverty or to negative health consequences (Grant et al. 2011). This survey sought to assess the impact on people's lives in four areas: education, employment, health, and participation in public life.

*Education*

Thirty-one respondents currently attend or have attended school in Washington, DC. Forty-two percent of these respondents reported being denied access to and/or verbally harassed in restrooms at their school in DC. Ten percent of the 31 respondents reported that incidents of denied access to and/or verbal harassment in restrooms negatively impacted their education in some way. One respondent had excessive absences due to problems with using restroom facilities. Another respondent reported that problems with restrooms caused poor performance as well as excessive absences. One former DC student reported that she had performed poorly in school and had to change schools; she finally dropped out of school due to problems with restrooms.

Although other respondents reported that problems using these facilities at school did not affect their education, some reported that accessing and using restrooms was disruptive to their daily life at school. For example, students reported avoiding going to the restroom at school when they needed to or having to find restrooms that had very little traffic. In a follow-up interview, a young transgender man described the situation at his school where school administration required him to use the restroom in the guidance office instead of the regular men's restrooms. He explains:

> The ones in the guidance office are supposed to be unisex, but they're still marked men/women, so I don't feel comfortable using the one

AR_293098

*Journal of Public Management & Social Policy*                                    *Spring 2013*

> marked women and then I have to wait an hour before I can try going there again. . . There's not always a line, but we only have ten minutes between classes, so if the bathroom is occupied, I don't have any time to wait. It's also not easy to leave during class, which means I would have to go back at the end of class.

This situation distracted him in class both because of his need to remain continent in the face of physical discomfort and his anxiety about finding an available restroom at the end of the class period.

*Employment*

Sixty survey respondents have worked in Washington, DC. Twenty-seven percent of these respondents reported being denied access and/or verbally harassed while using restrooms at their place of employment in DC. Thirteen percent reported that problems of denied access to and/or verbal harassment in restrooms at work affected their employment in some way. Four of these respondents changed jobs or quit their job. Four respondents reported that problems using these facilities contributed to poor job performance, excessive absences, and excessive tardiness.

Other respondents discussed how problems with gender-segregated restrooms at work caused them other kinds of complications. One respondent described having to deal with co-worker resentment, "When I transitioned at work, some of the other women complained behind my back because they didn't want me to use the women's room along with them, and at least one of them started going to the women's room on a different floor of the building just to shun me." Another respondent explained how he carefully planned for restroom use:

> I felt forced to make sure I used the bathroom before I left the house and did not use the public restroom unless I was 100% [sure] there was no one in there or [I would] go to a different floor that I didn't work on where I was less likely to encounter the same jerks, or I waited until I got home to use the bathroom [because] I usually didn't feel safe at all using the restrooms in public.

Another respondent reported that problems using the restroom caused him to plan out what time he would use the restroom so he could avoid confrontations.

*Health*

Fifty-four percent of respondents reported having some sort of physical problem from trying to avoid using public bathrooms, all of whom reported that they "held it" to avoid public restrooms. Health problems that respondents reported due to avoiding using public bathrooms include: dehydration (n=9), urinary tract infections (n=7), kidney infection (n=2), and other kidney-related problems (n=2). Six percent of respondents have seen a doctor for health problems caused by avoiding public restrooms.

Respondents described additional health problems due to avoiding public restrooms. One respondent explained, "I had avoided using public bathrooms for so many years and would hold it when I needed to go that now my bladder is weaker." Another respondent described how excessive continence might aggravate an existing medical condition: "I have kidney problems already. I know it's not good for me to hold it, but the alternative could be much worse."

AR_293099

In addition to the physical problems caused by avoiding public restrooms, some respondents have avoided getting health care when they needed it. Nine percent of respondents have avoided going to a hospital, healthcare facility, or doctor's office because those facilities have gender-segregated restrooms. One respondent avoided going to the doctor when he got a urinary tract infection. He explained: "I knew when I had contracted an infection from holding it daily and [I] drank a lot of prune juice and used a friend's left over prescription to get rid of it. I didn't want to hear the lecture from a medical professional." The lecture he did not want to hear was instruction from a doctor not to avoid using the restroom when he needed to go.

*Participation in Public Life*

Problems or expectation of problems with gender-segregated public facilities can impact a person's participation in public life, causing him or her to refrain from going to public places or attending public events. Fifty-eight percent of respondents reported that they have avoided going out in public due to a lack of safe restroom facilities. Thirty percent of respondents reported not attending a specific event for a variety of reasons related to public restrooms. The most common reasons for avoiding an event were that the length of the event was too long to avoid using the restroom (n=20) and a lack of familiarity with the venue where the event was being held (n=18). Respondents also reported avoiding events because the event was not important enough to risk problems with restrooms (n=17), restrooms at the event seemed unsafe (n=15), and there would be no friends or people the respondent knew at the event who could help navigate the restroom (n=14).

Thirty-eight percent of respondents reported avoiding particular public places because they only have gender-segregated facilities available. The places respondents most frequently avoided include shopping malls, retail stores, restaurants, gyms, and bars, including gay bars. Conversely, 49 percent reported that they will plan their route through certain areas of the city or will go to a specific place because they know there are safe restrooms there to use. One respondent described a similar strategy she used as follows:

> Given that the anti-androgen most MTF [transsexual] folks have to take, Spiro, causes frequent urination, I quickly learned where all the safe bathrooms were when having to go into Washington, DC. Once I found safe places, I plotted my travel routes to be near them, and I avoided going very much beyond those set routes.

Respondents offered other strategies they use to navigate gendered public restrooms. Common strategies involved finding gender-neutral restrooms, having a friend along for a trip to the restroom, using the restroom at home before going out in public, and if necessary, swinging by a nearby friend's house to use the restroom. Other suggestions respondents offered include using the restroom during "off peak" hours when traffic is low and avoiding places where one has previously had problems using the restroom. One respondent uses a strategy that combines several elements: "Stay out in DC for short periods of time. Scout bathroom options. If men's and women's entrances are very close and the bathrooms are not currently in use, I will use them. If there is a line to use the restrooms, I will not. Standing in line usually always results in verbal abuse or denial of access."

Respondents also noted that the ability to "pass" in restrooms is important in avoiding problems when using them. As one respondent put it, "There are tricks to passing in the bathroom. I have never been 'caught.'" One respondent, who self-identified as a butch lesbian, described a strategy that involves singing: "I sing and/or talk to people and feminize my walk every time I enter a public bathroom. I do this to help clue people in to

*Journal of Public Management & Social Policy*                    *Spring 2013*

the fact that I am a woman without announcing it. It works under 50% of the time. I am often still read as a man."

**Gender Segregation as a Cause of Minority Stress**

Minority stressors created by gender segregation range from the distal to the proximal. Seventy percent of survey respondents experienced denied access, verbal harassment, and/or physical assault when trying to access or while using gendered public restrooms. Respondents experienced these problems in public places, at work, and at school. These experiences of distal stressors created expectations of problems in these spaces, causing some to hide from public life. These more proximal stressors that survey participants reported included absences from work and school, poor performance at work or school, choosing to not participate in public life, avoiding particular places or events, and having to develop strategies to navigate gendered restrooms. While some specific negative impacts on physical health were discussed through the survey, such as bladder infections and distress, it is reasonable to assume there is an impact on the mental health of those who suffer this type of minority stress (see, for example, Lombardi and Bettcher 2005).

This survey was not designed to measure mental health outcomes based on the minority stress study participants experienced, but many offered narratives that describe possible impacts on mental health. Experiencing consistent problems in gender-segregated public restrooms can contribute to a sense of stigmatization and ubiquitous discrimination. In a follow-up interview, a participant discussed the dangers of constant harassment:

> There have been plenty of times where, for example, in the women's bathrooms when women say mean things about me to their friends but not to my face, that's really emotionally damaging, and that, to me, that's dangerous. . . . I mean, we are talking about someone's gender identity, which is something that is so fundamental to who people are. People questioning that, and having that questioned on a daily basis can and does lead to self-harm and even suicide and all sorts of things. Verbal harassment and even non-verbal harassment, people just staring at you, can be dangerous.

No survey respondents reported that problems navigating gendered public facilities directly contributed to any self-harm, but several respondents expressed dismay or sadness due to other people consistently challenging their gender identity. One respondent remarked, "It's depressing to have to often explain my gender identity when others don't have to." Another respondent explained, "I just hope I never have to experience these negative experiences, though it appears this it is all very possible based upon past happenings. I am sad, about all this stuff." One respondent predicted a future threshold where consistent glares would finally cause her to avoid using public restrooms altogether. She stated, "I do not really avoid any place because I am at the moment not at a limit with the uncomfortable stares and glares I get." One respondent offered an apt summary statement to the complexities of problems restrooms create when she stated, "Subtlety is the key to cruelty."

The survey findings presented above describe the minority stressors that result from our reliance on gender segregation in our built environment. Certainly individual actors who would deny access, harass, or physically assault anyone in public spaces are responsible for their actions in those instances, but gender segregation immediately creates a system of surveillance and policing of public spaces based on subjective assessments of a person's gender and gender expression (Cavanagh 2010). Transgender and gender non-conforming

AR_293101

people must navigate a public world organized around gender and be subject to this type of surveillance when using gendered spaces. Minority stress for these groups of people is literally built into our environment. Further research is needed to better understand the mental health impacts of gender segregation for transgender and gender non-conforming people.

**Limitations**

This study should be viewed as an exploratory study, which provides a definition of the problems that gender segregation creates for transgender and gender non-conforming people and seeks to establish this problem as one that public policy and public administration should address. Continued research on this subject is warranted, both to further establish an understanding of the problems related to minority stress for transgender and gender non-conforming people, particularly as it pertains to gender segregation, and the solutions that public policy and public administration can offer. Future research endeavors similar to this study would benefit from improved sampling methods that allow for greater generalizability, better representation of the demographics of the underlying population, and a more sophisticated accounting of gender transition. In over-representing white respondents, the results of this survey are likely biased toward finding fewer reported incidents in gender-segregated restrooms, particularly in the area of physical assault. Since this survey limited responses to experiences in Washington, DC, rather than over the lifetime of the respondents, results may be biased toward fewer reported incidents. Several survey respondents remarked that they had moved to Washington, DC after they transitioned gender and experienced much fewer problems after having transitioned. Researchers would improve upon this study by better accounting for the temporal nature of gender for study participants who have transitioned or will transition gender.

**Conclusion**

Transgender and gender non-conforming people can find themselves in danger in the gendered spaces in our built environment. Until public policy and public administration can meet the challenge to address this problem and rethink our reliance on gender segregation in our built environment, the onus will always be on the individual to try to navigate these spaces safely. In considering the role gender segregation plays in our environment, we should consider whether gender segregation is necessary to organize our public spaces. This is something that many legislators, public officials, and administrators are currently grappling with as transgender and gender non-conforming people have increased their visibility, formed political coalitions in the United States, and organized to make known the issues and problems they encounter in our society. While some jurisdictions have responded to the call to make changes to their policies and public spaces, many have not yet taken on this challenge but undoubtedly must face it in the future.

There are some models of public policy and public administration initiatives that have begun to address the problems gender segregation creates in public restrooms. For instance, statutory language that gives transgender and gender non-conforming people legal protections in restrooms have been adopted in the state of New Jersey, the cities of Oakland, Boston, Denver, and Boulder, and several jurisdictions within the state of Oregon. Enforcement regulations, which are drafted and implemented by government agencies, provide restroom protections in the cities of San Francisco, New York, and Washington, DC. Washington, DC's enforcement regulations contain the strongest language in the

AR_293102

*Journal of Public Management & Social Policy*                                                    *Spring 2013*

country in regard to gender-segregated public facilities and serve as a good model for creation of public policy and implementation to address this problem.

In 2005, the DC Human Rights Act was amended to include "gender identity or expression," and enforcement regulations for this amendment were adopted in 2006 that cover gender-segregated public facilities. These enforcement regulations for the DC Human Rights Act not only protect the rights of people to use the public facility consistent with their gender identity, but also mandate the creation of more gender-neutral restrooms in the District. Single-occupancy public restrooms in DC are now required to be gender-neutral. This requirement makes the enforcement regulations in DC the strongest in the country as of this writing. Implementation of the regulations is ongoing, with the DC Office of Human Rights working in conjunction with local advocacy groups, like the DC Trans Coalition and the DC Center, to identify and educate businesses that are out of compliance.

In addition to adopting legal protections for transgender and gender non-conforming people and creating more gender-neutral restrooms, transition-related health care coverage for transgender individuals must be considered as part of any public policy solution to the problems transgender people experience in gendered spaces. Participants in the survey for this paper suggested that medical gender transition decreases instances of denied access, harassment, and physical assault. Indeed in this sample, people who had any medical treatments or procedures to transition were less likely to experience harassment than those who had not transitioned ($\chi^2 = 5.0107$, $p = 0.025$). People assigned male at birth who had undergone electrolysis or laser hair removal for facial hair were less likely to experience verbal harassment than those assigned male at birth who had not ($\chi^2 = 11.2108$, $p = 0.001$). Significant barriers exist to getting medical transition treatments and procedures for those who need them. Fifty-two respondents said they wanted to have some (or more) transition-related medical treatments or procedures, but 63 percent said they cannot afford it. Eighty-five percent of these respondents said they would be more likely to get the medical treatments or procedures they want if they had insurance that covered them. Expanding access to transition-related health care for transgender people would be an important part any public policy initiative to address the problems created by gender segregation.

**Acknowledgements:** The author wishes to thank the DC Trans Coalition for their collaboration in the research for this paper. The author also wishes to thank Ilan Meyer and Brad Sears for their thoughtful reviews.

**Jody L. Herman** holds a Ph.D. in Public Policy and Public Administration from The George Washington University. She currently serves as the Peter J. Cooper Public Policy Fellow and Manager of Transgender Research at the Williams Institute, UCLA School of Law. Before joining the Williams Institute, she served as a co-author on the groundbreaking report *Injustice at Every Turn*, based on the National Transgender Discrimination Survey conducted by the National Gay and Lesbian Task Force and the National Center for Transgender Equality. Her main research interests are the impacts of gender identity-based discrimination and issues related to gender regulation in public space and the built environment. Email: hermanj@law.ucla.edu.

AR_293103

# References

Cavanagh, Sheila L. 2010. *Queering Bathrooms: Gender, Sexuality, and the Hygienic Imagination.* Toronto: University of Toronto Press.

Effrig, Jessica C., Kathleen J. Bieschke, and Benjamin D. Locke. 2011. Examining victimization and psychological distress in transgender college students. *Journal of College Counseling,* 14 (2): 143-157.

Gordon, Allegra R. and Ilan H. Meyer. 2007. Gender nonconformity as a target of prejudice, discrimination, and violence against LGB individuals. *Journal of LGBT Health Research, 3*(3): 55-71.

Grant, Jaime M., Lisa A. Mottet, Justin Tanis, Jack Harrison, Jody L. Herman, and Mara Keisling. 2011. *Injustice at Every Turn: A report of the National Transgender Discrimination Survey.* Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

Kelleher, Cathy. 2009. Minority stress and health: Implications for lesbian, gay, bisexual, transgender, and questioning (LGBTQ) young people. *Counselling Psychology Quarterly,* 22(4): 373-379.

Kertzner, Robert M., Ilan H. Meyer, David M. Frost, and Michael J. Stirratt. 2009. Social and psychological well-being in lesbians, gay men, and bisexuals: the effects of race, gender, age, and sexual identity. *The American Journal of Orthopsychiatry,* 79(4): 500-510.

Lombardi, Emilia and Talia Bettcher. 2005. Lesbian, Gay, Bisexual, and Transgender/Transsexual Individuals. In Barry S. Levy and Victor W. Sidel (Eds.), 130-144. *Social Injustice and Public Health*, New York: Oxford University Press.

Lombardi, Emilia L., Riki A. Wilchins, Dana Priesing, and Diana Malouf. 2001. Gender Violence: Transgender Experiences with Violence and Discrimination. *Journal of Homosexuality* 42(1):89-101.

Meyer, Ilan H. 1995. Minority stress and mental health in gay men. *Journal of Health and Social Behavior,* 36:38-56.

Meyer, Ilan H. 2003. Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: conceptual issues and research evidence. *Psychological Bulletin,* 129(5): 674-697.

Minter, S., & Daley, C. 2003. *Trans Realities: A Legal Needs Assessment of San Francisco's Transgender Communities.* San Francisco: National Center for Lesbian Rights and Transgender Law Center.

Mustanski, Brian S., Robert Garofalo, and Erin M. Emerson. 2010. Mental health disorders, psychological distress, and suicidality in a diverse sample of lesbian, gay, bisexual, and transgender youths. *American Journal of Public Health,* 100(12): 2426-2432.

Sánchez, Francisco J. and Eric Vilain. 2009. Collective self-esteem as a coping resource for male-to-female transsexuals. *Journal of Counseling Psychology* 56(1): 202-209

Stotzer, Rebecca L. 2009. Violence against transgender people: A review of United States data. *Aggression and Violent Behavior,* 14: 170–179.

Vade, Dylan. 2002. *Gender Neutral Bathroom Survey.* Unpublished report on file with author. Factsheet Accessed August 29, 2012 at http://archive.srlp.org/files/ documents/toolkit/gnb_survey.pdf

Xavier, Jessica, Julie A. Honnold, and Judith Bradford. 2007. *The Health, Health-related Needs, and Lifecourse Experiences of Transgender Virginians.* Virginia: Virginia HIV Community Planning Committee and Virginia Department of Health.

AR_293104

## Children's Legal Rights Journal

Volume 36 | Issue 2                                                                                   Article 9

2016

# Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity

Katherine Szczerbinski

Follow this and additional works at: https://lawecommons.luc.edu/clrj

 Part of the Family Law Commons, and the Juvenile Law Commons

**Recommended Citation**
Katherine Szczerbinski, *Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity*, 36 CHILD. LEGAL RTS. J. 153 (2020).
Available at: https://lawecommons.luc.edu/clrj/vol36/iss2/9

This Article is brought to you for free and open access by LAW eCommons. It has been accepted for inclusion in Children's Legal Rights Journal by an authorized editor of LAW eCommons. For more information, please contact law-library@luc.edu.

*Education Connection:*
## The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity
*By: Katherine Szczerbinski*

Transgender children have recently become more visible and outspoken, which has led to a general trend of support in the education system. Calling the child by their preferred name and letting them join the sports team of their identified gender have become more common practices. Unfortunately, there is still a major issue for schools that is the subject of great controversy: whether students should use the bathrooms and locker rooms reflecting their gender identity. The split in viewpoints presents a significant issue in schools and in the courts as equal protection and privacy concerns are considered. Restricting students from using the bathroom reflective of their gender identity can produce negative social consequences, and schools should adjust their policies to better serve their children.

Contemporary media readily discusses transgender issues, and most of this attention has been positive. Children can easily find transgender people, both young and old, on social media and in popular culture. The Internet is filled with "Tumblrs" and YouTube videos chronicling gender transitions, television programs such as "Glee" feature transgender youth, and books such as *Parrotfish* by Ellen Wittlinger are available. The heightened frequency of conversation about the transgender community has affected policies and guidelines, leading to a search for the best practices for interactions with transgender persons.

With the media spotlight on transgender issues, schools have been working to establish best practices for their transgender students. Some districts have aimed to support their transgender students, believing that restricting full access to the facilities of their choosing is denying these children fair and equal treatment. Further, studies have shown that without proper caregiving structures and support, transgender children have a clinically significant increased risk of anxiety, depression, suicidal ideations, and suicide. A school district that supports its transgender students not only attempts to give all students fair and equal treatment, but also supports the mental health of these students.

Some schools have attempted to achieve a solution by giving transgender students access to separate bathrooms or spaces for their private use. Although helpful to students who want such treatment, having separate facilities deprives and further stigmatizes students who want to be in the same facilities as their classmates, ultimately leading to their isolation from their peers.

In Illinois, Barrington Community Unit School District 220 has its officials working with transgender students and their families to ensure an inclusive environment for these students. For example, where a particular transgender middle school student

153

AR_293106

required use of the locker room, that student was given full access to the locker room requested, and further provided a student aide to accompany the student and observe in case issues or questions arise. Illinois' largest school district, Chicago Public Schools, has yet to adopt a comprehensive solution to this issue, instead adopting guidelines for a case-by-case determination of locker room and bathroom use. Neither Chicago nor Barrington has reported an issue.

Although Barrington and Chicago schools have found ways to accommodate transgender students, other school districts, including Township High School District 211 in Illinois ("District 211"), claim they cannot allow full access of facilities reflective of transgender students' gender identity due to privacy concerns. District 211's policy allows transgender students to play on sports teams of their gender and use the bathrooms of that gender, but remains firm that offering these students a private place to change is a proper accommodation. When schools have not been as accommodating, students have found ways to adapt. A student at Lake Forest High School, also in Illinois, was told to use faculty bathrooms that were out of the way, so she chose to use the girls' bathroom stalls to change for physical education.

A fear raised by those wanting students to use the facility of their gender at birth is that allowing students to decide based on their gender identity will lead to children pretending to be transgender to allow them unfettered access to the bathroom of their choosing. This access will result in the opportunity for those pretending to be transgender to commit nefarious acts and that sexual assaults in these places will increase. However, the actual numbers show that this fear is unfounded. As of publication of this article, there has been only one reported instance of a person abusing this access: this instance occurred in Canada, where an already storied sexual predator pretended to be a woman in order to have access to female-only spaces.

This unfounded concern hurts both transgender students and cisgender students (*i.e.*, students who identify with their biological sex). These arguments fail to rely on actual data, instead relying on unsubstantiated fears that portray transgender people as sexual predators and deviants. Gender-nonconforming students are at risk of being removed from bathrooms when their gender expression differs from societal standards. These consequences can weigh heavily on these students and not only isolate them from their peers, but also be harmful to their mental health.

Title IX and its application have a significant impact in regards to transgender students' use of bathrooms and locker rooms. The application of Title IX in cases such as *Grimm v. Gloucester County School Board* and *Johnston v. University of Pittsburgh* held that Title IX does not mandate public schools to allow access for transgender students to the bathroom or locker room of their preference. This interpretation still stands, shifting advocates' focus to determining what mechanisms can be utilized to provide transgender

AR_293107

Szczerbinski: Education Connection: The Importance of Allowing Students to Use

students access to bathrooms and locker rooms of their preference. One potential solution is to withhold federal funding until public schools comply with this emerging standard.

Schools need to make a shift towards better practices that give transgender students the same access as their peers to facilities. The social and mental negative consequences of restricting these students are too great to ignore and demand change. Being able to support transgender students can help break stigmas regarding the transgender community and empower children to better accept their peers.

**Sources**

Brynn Tannehill, *Debunking Bathroom Myths*, HUFF. POST (Nov. 28, 2015), http://www.huffingtonpost.com/brynn-tannehill/debunking-bathroom-myths_b_8670438.html.

Duaa Eldeib & Robert McCoppin, *Feds Reject School District's Plan for Transgender Student, Locker Room*, CHI. TRIBUNE (Oct. 13, 2015), http://www.chicagotribune.com/news/local/breaking/ct-transgender-student-locker-room-palatine-met-20151012-story.html.

Eliana T. Baer, *Navigating the Murky Waters of Best Interests with a Transgender Child*, NEW JERSEY L.J., (June 5, 2014), http://www.foxrothschild.com/publications/navigating-the-murky-waters-of-best-interests-with-a-transgender-child/.

Eric Peterson, *Law Professor: Title IX Not Relevant in Dist. 211 Transgender Case*, DAILY HERALD (Oct. 26, 2015), http://www.dailyherald.com/article/20151026/news/151029160/.

G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., No. 4:15CV54, 2015 WL 5560190 (E.D. Va. Sept. 17, 2015).

Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ., 97 F. Supp. 3d 657 (W.D. Pa. 2015).

Julie Bosman & Motoko Rich, *As Transgender Students Make Gains, Schools Hesitate at Bathrooms*, N.Y. TIMES (Nov. 3, 2015), http://www.nytimes.com/2015/11/04/us/as-transgender-students-make-gains-schools-hesitate-at-bathrooms.html?_r=0.

Margaret Talbot, *About a Boy: Transgender Surgery at Sixteen*, NEW YORKER (Mar. 18, 2013), http://www.newyorker.com/magazine/2013/03/18/about-a-boy-2.

AR_293108

# NJSIAA

# GUIDELINES,

# POLICIES AND

# PROCEDURES



## 2020 – 2021

AR_293140

# TABLE OF CONTENTS

Anonymous Contact Policy ............................................................................................. 1
Alcoholic Beverages/Illegal Substances ......................................................................... 1
Boy/Girl Competition ...................................................................................................... 2
Broadcasting Rights ......................................................................................................... 2
Chaperones-Team/Individual .......................................................................................... 2-3
Club Programs .................................................................................................................. 3-4
Coaches Certifications & Regulations ............................................................................. 4-5
Coaches Qualifications ..................................................................................................... 5
Commercial Endorsements ............................................................................................... 5-6
Concussion Policy ............................................................................................................ 6-7
Controversies and Disputes ............................................................................................. 7
Cooperative Sports Programs .......................................................................................... 7-10
Disqualification of Coaches/Players ............................................................................... 10-13
Drone Policy .................................................................................................................... 13
Emergency Medical Procedures ...................................................................................... 14-15
Football Open Recruiting Period Guidelines .................................................................. 15
Heat Acclimatization Requirements ................................................................................ 15-17
Heat Participation Policy/Cold Water Immersion Tub Policy ......................................... 17-21
Homeschool Guidelines ................................................................................................... 21-22
Infectious Disease Policy ................................................................................................ 22
Junior High Athletics (9th Grade) ................................................................................... 22-25
Labor Disputes ................................................................................................................. 25-26
League/Conference Position Statement ........................................................................... 26-28
Lightning Procedure ......................................................................................................... 28-30
Paraprofessional Aide Positions ...................................................................................... 30
Participation Limitations: School/Coach/Athlete ........................................................... 31
Participation Chart ........................................................................................................... 32
Protests and Forfeits ........................................................................................................ 33
Use of a Prosthesis .......................................................................................................... 34
Review of Officials Chapters ........................................................................................... 34-35
Registration of Officials .................................................................................................. 35-37
Officials Failure to Arrive/Continue ............................................................................... 37-38
Sales and Solicitations ..................................................................................................... 38
Steroid Testing Procedures .............................................................................................. 38-39
Student-Athlete Residency Affidavit ............................................................................... 40
Suspended Football Games .............................................................................................. 41
Terminated Game ............................................................................................................. 41-42
Transgender Policy ........................................................................................................... 42
Unified Sports® Guidelines ............................................................................................. 42-44
Uniforms – Religious Exemption .................................................................................... 45
Vapor/E-Cigarettes Policy (Interim) ............................................................................... 45

AR_293141

## ANONYMOUS CONTACT POLICY STATEMENT

The high school principal, athletic director and coaches are responsible for assuring conformity with NJSIAA eligibility and other regulations, as evidenced by the eligibility affidavits. The NJSIAA relies on its member schools to self-report any eligibility or other violations that they may encounter, to avoid penalties in addition to forfeitures set forth in Article X, Section 1 of the Bylaws. The NJSIAA discourages anonymous complaints against schools. If anonymous complaints are received, the NJSIAA will convey that complaint to the school in question to investigate. If the school determines that there is a violation, no penalties will be imposed other than forfeiture. However, if at a later time it is determined by the NJSIAA that there was a violation based on competent evidence, then more substantial penalties may be imposed on the school and/or responsible school athletic personnel.

## ALCOHOLIC BEVERAGES/ILLEGAL SUBSANCES AT INTERSCHOLASTIC EVENTS

Players and coaches involved with alcoholic beverages/illegal substances during or after the game at the game site or on school property, including chartered busses, **shall be suspended from NJSIAA tournament play for one year and be denied any championship rights.**

This action was taken in support of the fact that such actions concerning alcoholic beverages/illegal substances are in violation of N.J.S.A. 2C:33-15a, N.J.S.A. 2C:33-16, N.J.S.A. 2C:35-7 and N.J.S.A. 2C:35-10 as noted below.

*N.J.S.A. 2C:33-15a:*
Any person under the legal age to purchase alcoholic beverages who knowingly possesses without legal authority, or who knowingly consumes any alcoholic beverage in any school, public conveyance, public place, or place of public assembly, or motor vehicle, is guilty of a disorderly person's offense and shall be fined not less than $100.00.

*N.J.S.A. 2C:33-16:*
Any person of legal age to purchase alcoholic beverages, who knowingly and without the express written permission of the school board, its delegated authority, or any school Principal, brings or possesses any alcoholic beverages on any property used for school purposes which is owned by any school or school board, is guilty of a disorderly persons offense.

*N.J.S.A. 2C:35-7:*
Any person who violates subsection a. of N.J.S.A. 2C:35-5 by distributing, dispensing or possessing with intent to distribute a controlled dangerous or controlled substance analog while on any school property used for school purposes which is owned by any elementary or secondary school or school board, or within 1,000 feet of any school property or school bus, or while on any school bus, is guilty of a crime of the third degree and shall…

*N.J.S.A. 2C:35-10:*
It is unlawful for any person, knowingly or purposely to obtain, or to possess, actually or constructively, a controlled dangerous substance or controlled substance analog, unless the substance was obtained directly or pursuant to a valid prescription or order form from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized.

AR_293142

## BOY/GIRL COMPETITION

Although the implementation of Title 6 and the final decision on Boy/Girl participation in interscholastic athletics in New Jersey is the jurisdiction of the Office of Equal Educational Opportunity (OEEO), New Jersey Department of Education, the NJSIAA Executive Committee has approved the following guidelines for NJSIAA athletic programs:

1.  Males shall be excluded from female athletic teams although there are no teams for boys in the same sport.

2.  Based on the directives of the Commissioner of Education, girls shall be allowed to participate in any boys' sports teams, on an equal basis with boys, provided that the same sports team is not available to girls at that school.

3.  Female athletes are not entitled to participate on boys' teams where there are girls' teams in the same sport. However, if particular events are not provided to girls' teams in the same sport, then girls must be allowed to try out for those events not offered to the female team.

## BROADCASTING RIGHTS

The NJSIAA has granted the exclusive rights to create, distribute and license programming in connection with NJSIAA tournaments (and NJSIAA sporting events to the extent the NJSIAA controls or otherwise has authority to grant such rights with regard to NJSIAA sporting events) in all media currently existing or yet to be developed. This includes, without limitation, network and cable television broadcast, pay-per-view television, radio, webcasting, streaming, podcasting, distribution over wireless telephone networks, optical media including DVD, and print publications. The foregoing shall not be interpreted to restrict NJSIAA member schools from producing print publications (i.e. programs or similar) for distribution on school property during the regular season NJSIAA sports events, or to restrict the NJSIAA from producing print publications (i.e. programs or similar) for distribution during post-season NJSIAA tournaments.

Any third party seeking to create, distribute or otherwise exploit programming in connection with the NJSIAA sporting events in any media will be directed to the NJSIAA's designated broadcast partners, as applicable, by the NJSIAA or the applicable member school. The NJSIAA designated broadcast partners shall have the right to enter into license arrangements with such third parties.

The NJSIAA designated broadcast partners may create NJSIAA programming for distribution via any media distribution means owned or controlled by their parent organization.

Notwithstanding anything herein to the contrary, including but not limited to the information above, NJSIAA member schools may broadcast regular season (but not playoff, post-season tournament, or championship) athletic contests involving such schools' own teams or athletes, without charging any fee to any viewer or other third party, on such schools' own commercial-free television networks, their own commercial-free websites, or on commercial-free public access television channels (provided that any agreement between an NJSIAA member school and a commercial-free public access television channel does not permit sublicense or other use of the telecast).

## CHAPERONES

Chaperones are individuals appointed to accompany teams or individuals to NJSIAA Championships.

2

Member schools are reminded that a team or an individual is not permitted to compete in NJSIAA Championship events unless a properly appointed "coach" is present, and was present at six (6) practices prior to the event. When making these assignments, a public school must be aware of the provisions of the New Jersey Administrative Code, Section 6A:9-5.19, entitled "Athletics Personnel," which mandates the requirements which a board of education must follow when appointing individuals in a coaching capacity. The practice of having a parent, a private instructor, or other adults accompany a student-athlete as the coach is a violation of this provision. Your county superintendent will be able to confirm the certification or lack thereof of the individual you are assigning. A properly appointed coach will thereafter be subject to the Rules and Regulations, Section 11 Out-of-Season Practice.

Although non-public schools are not governed by the provisions of the Administrative Code, it is important that such assignments be made in the best interests of the student-athlete; when a parent, a private instructor, or other adults are appointed as coaches by the principal to accompany student-athletes, such coach will thereafter be subject to the Rules and Regulations, Section 11 Out-of-Season Practice.

Gymnastics "spotters" must be approved coaches within this regulation; therefore, tournament directors are instructed to disqualify any contestant who is accompanied by someone in a coaching/spotting capacity who is not properly certified by the board of education in public schools or appointed by the principal in non-public schools.

A principal's signature on the event entry form certifies that the coach/certified faculty member has been appointed by the board of education within the provisions of the Administrative Code or the rules of the private school.

**If a properly qualified and certified appointment cannot be made, the school should not enter the team or individual in an NJSIAA event.**

Such appointments must be approved by the Board of Education; neither the NJSIAA nor the meet director has the authority or the responsibility for enforcement of this statute, sole jurisdiction rests with the Department of Education, and, therefore, a Principal's signature on the entry form certifies that the coach/certified faculty member has been appointed by the Board of Education within the provisions of Title 6 Education.

## CLUB PROGRAMS

The NJSIAA recognizes twenty (20) separate and distinct sports for which the member schools have approved rules and regulations to govern interscholastic competition. These are listed under Contest Rules, Section 9, Rule 2, Rules and Regulations.

As a pilot program, many member schools have initiated bona fide club programs in a recognized sport to determine the interest and feasibility of seeking Board of Education approval to conduct the program on an interscholastic basis. Most often these programs function with limited financial support from the Board; the coach volunteers his/her services gratis; students, booster clubs, and sometimes the Board provide the equipment; facilities are made available for the program and before long, this club program matures into a skilled, competitive, stature seeking program.

In order to establish a firm credibility for the program, at this point the school agrees to schedule scrimmages or games with schools conducting similar club programs. The misconception is that such scrimmages or games may take place since the Board of Education condones it, even though they have not formally approved the program, without relinquishing the title of a club activity. The moment interschool scrimmages or games take place, the

program is no longer a club activity, and member schools must adhere to all NJSIAA rules and regulations governing the interscholastic program.

The interscholastic status then requires both schools to conduct their programs within the rules and regulations of the NJSIAA and the State Board of Education; i.e., eligibility forms must be on file, physical examinations are required, seasonal guidelines observed, course requirements must be met, and all other regulatory provisions satisfied.

**Question:**     When does a club program become an interscholastic sport?
**Answer:**       The day an interschool scrimmage or game takes place.

All member schools sponsoring programs under the "Club" label and competing in interschool scrimmages or games are reminded they are subject to Executive Committee action within the penalties outlined in the NJSIAA Bylaws, Article X, Section 1 through 3.

## NJSIAA COACHING CERTIFICATION AND REGULATIONS

A person shall be eligible to coach in any interscholastic contest, provided the person satisfies all of the conditions listed below (For the purposes of this section, "coach" shall mean all persons who coach an interscholastic high school athletic team in any way, whether for pay or as a volunteer at the varsity, junior varsity and/or freshman level – ninth grade through twelve grade).

In addition to State Department of Education Regulations, the following regulations must be adhered to:

1.  The person's appointment as coach must be approved by the local educational agency responsible for the member school at which the person coaches.

2.  All new coaches will have 120 days after being hired to register for the NFHS Fundamentals of Coaching (Blended Version) course. Upon completion of the classroom components, coaches will have s sixty (60) days to complete the remaining four (4) components. A certificate of course completion must be submitted to respective athletic supervisors by June 30th to be eligible to coach at an NJSIAA member school for the subsequent school year.

**Under no circumstances may a coach take the NFHS Fundamentals of Coaching Course completely on-line.**

3.  All coaches must hold a current certificate in CPR, AED and Basic First Aid. Online CPR/AED training courses do not satisfy this requirement.

4.  Beginning with the 2016-2017 school year all coaches must successfully complete a basic first aid course when renewing or completing CPR/AED certification.

5.  All coaches must obtain a "Concussion Awareness" certificate or its equivalent, renewed annually.

6.  All coaches must obtain a "Heat Acclimation Awareness and Wellness" certificate or its equivalent, renewed annually.

7.  Coaches currently in place, and/or who have experience coaching in an NJSIAA high school prior to the 2006-2007 school year, will be exempt from provision 2 above. (While experienced coaches will not be

4

required to adhere to provision 2 above, it is recommended that all coaches are encouraged to take the fundamentals of coaching period.)

Note: The above regulations do not apply to the coaches appointed by the school to accompany student athletes to individual events.

## STATE ADMINISTRATIVE CODE REQUIREMENTS FOR QUALIFICATION OF COACHES

The *New Jersey Administrative Code* sets forth qualifications for the coaching of public school pupils. These qualifications are found at ***N.J.A.C. 6A:9-5.16***, as follows:

***N.J.A.C 6A:9B-5.16*** *Athletics* Personnel

    a.  Any teaching staff member employed by a district board of education shall be permitted to organize students for purposes of coaching or for conducting games, events, or contests in physical education or athletics.

    b.  School districts may employ any holder of either a New Jersey teaching certificate or a substitute credential pursuant to     N.J.A.C. 6A:9B-7 to work in the interscholastic athletic program provided the position has been advertised. The 20-day limitation noted in N.J.A.C. 6A:9B-7.4(a) shall not apply to such coaching situations.

## COMMERCIAL ENDORSEMENTS

The following guidelines have been developed to insure that all commercial endorsements meet goals and objectives of the Association, and are undertaken for the benefit of the NJSIAA, its member schools, and their Student-Athletes.

1.   All commercial endorsements must have the approval of the Executive Committee on recommendation of the Finance Committee.

2.   No member of the Executive Committee (including the Finance Committee) or any member of the NJSIAA staff will participate or vote on approving any endorsement of a commercial sponsor if they have any direct ownership interest in such sponsor.

3.   In considering any commercial endorsement, the NJSIAA will apply the following criteria:
    a.  The relationship of the commercial sponsorship to the goals and objectives of the Association.
    b.  The benefits to be derived from the sponsorships or activities by the Association and its member schools.
    c.  The quality of the production or program with appropriate evaluation and references.
    d.  The time length and extent of commitment required by the activities.
    e.  The ultimate educational value of the activities or the beneficial educational effect of conducting the activities (e.g. the support of a particular educational program through sponsorships).
    f.  The possibility of creating a conflict of interest for the Association.
    g.  The clarity of purpose and activities of the program or service to be sponsored.
    h.  The positive nature of a sponsor's product or activity.
    i.  The effect of the financial activities on the maintenance and improvement of the positive image by the Association.
    j.  The willingness of a sponsor to enter into a save-harmless agreement with the Association.

5

k. The necessity of avoiding sponsorships or activities which are in any way connected to productions or services of questionable value to or, in fact, detrimental to students (e.g. alcohol and tobacco products, medicines, gambling, etc.).

l. The prohibition on advocating a religion or political party Termination, or temporary suspension, must always take place when an electrical storm is imminent. The decision to terminate or suspend a game/meet/event when an electrical storm is imminent may be made by either the host school or the official.

## CONCUSSION POLICY

The NJSIAA Concussion Policy mirrors the state law as it pertains to the development of interscholastic athletic head injury safety training program, required measures to protect student athletes with concussions, and the continuing education for athletic trainers.

A student who participates in an interscholastic sports program and who sustains or is suspected of having sustained a concussion or other head injury while engaged in a sports competition or practice shall be immediately removed from the sports competition or practice. A student-athlete who is removed from competition or practice shall not participate in further sports activity until he is evaluated by a physician or other healthcare provider trained in the evaluation and management of concussions, and receives written clearance from a physician trained in the evaluation and management of concussions to return to competition or practice.

Written clearance may take place at game site on game day, if so given by trained physician as stated above. Written release forms, must be present at all practices and competitions. However, once a student-athlete is removed from competition or a practice, only a physician trained in the evaluation and management of concussions can sign off on a written clearance that would allow a concussed or suspected concussed athlete to return. NJSIAA has created a standardized written, RTP, form that will be available on NJSIAA.ORG. When a student athlete is evaluated by a trained physician and is **not** cleared to return to play or practice that day/night, the school district's Return to Play guidelines shall be followed.

Game officials will follow the protocol previously established and disseminated on September 1, 2010, namely upon observing any signs, symptoms or behaviors that are consistent with a concussion, and the signs, symptoms or behaviors are a result of an impact or contact of the player with another person, an object or the ground, the student athlete is immediately removed from play and may not return to play without a written clearance from a physician trained in the evaluation and management of concussions. The mechanics to enforce the rule are as follows:

1. Using sound game management procedures and judgment, upon observing a player who exhibits the signs, symptoms or behaviors that are consistent with a concussion, the official shall follow the sport specific guidelines for handling an injured player.
2. When appropriate, call time out. If the player's safety is in jeopardy, call time out immediately.
3. Beckon the physician/ATC onto the playing surface.
4. Observe the injured player.
5. Other game officials keep players/others away from the injured player.
6. Apprise the physician/ATC of your observations as to the signs, symptoms, behaviors that are consistent with a concussion, including any conversation that you had with the injured player (any questions and answers that took place prior to the physician/ATC arriving).
7. Note the game time, score, period or half, player name/number, etc. when injury and removal took place (for those sports that officials do not normally keep a game card on their person, begin doing so).

6

8.  If the prescribed written clearance form is signed by a physician, and the player returns to play that day/night, the official in charge must obtain a copy of the signed written clearance form and subsequently submit it to the association's keeper of records.

Schools and officials are reminded that NJSIAA is a 100% state, meaning that we follow the playing rules established by the NFHS. Every NFHS sports rule book contains the following:

*"Any player who exhibits signs, symptoms or behaviors consistent with a concussion (such as loss of consciousness, headache, dizziness, confusion or balance problems) shall be immediately removed from the game and shall not return to play until cleared by an appropriate health-care professional."*

## CONTROVERSIES AND DISPUTES BETWEEN OFFICIALS, SCHOOLS AND LEAGUES/CONFERENCES

Prior, during, or after a New Jersey Interscholastic athletic event if an incident occurs between officials, players, spectators, and/or school personnel and the incident warrants investigation, the following procedures should be followed:

1.  Immediate attempt should be made to resolve the incident at the local administrative level with building Principals. A report with request for review should be forwarded to the school administration.

2.  If there is no successful resolution of the incident at this level, and the aggrieved party is an official, then all facts should be presented in written form to the president of the official's chapter who will forward a written hearing request to the appropriate league or conference.

3.  If the aggrieved party is a member school, then all facts shall be presented in a written form to the league or conference or official's chapter, as the case may be; with a request for a hearing.

4.  At this time, the Executive Director of the NJSIAA shall be notified in writing of the hearing request by the aggrieved party's chapter, league or conference.

5.  The NJSIAA will become directly involved in the incident; (1) If, after a hearing, the case is referred to the NJSIAA Controversies Committee or (2) If the aggrieved party believes the hearing action to be unsatisfactory and requests further review by the NJSIAA Controversies Committee.

6.  Whenever a coach removes a team from the field/court prior to the conclusion of the game, meet or event, an official must report this violation to the NJSIAA immediately; and all disqualifications within seven (7) days.

## GUIDELINES – COOPERATIVE SPORTS PROGRAMS

**Section 10**
**Cooperative Sports Programs**

A.  The Executive Committee shall approve all Cooperative Sports Programs (CSP) upon the recommendation of the Cooperative Sports Committee (CSC) or the Cooperative Sports Appeals Committee (CSAC). Such Cooperative Sports Programs will be based upon an agreement between the cooperating schools whereby one of the two schools shall have the complete responsibility as the Local Education Agency (LEA) for the conduct of the specific sport(s), which will be available to the students at both schools.

7

*CL 1: Cooperative Sports Program applications should be signed by an officer of the Participating League or Conference, and indicate whether the League or Conference endorses or not endorses the application. The Participating League or Conference is defined as the entity that schedules the regular season games for that particular sport.*

*CL 2: This section establishes a process by which Cooperative Sports Program applications are processed, reviewed, and appealed. A CSP is an exception to the general requirement that students play sports at the school at which they are enrolled. A CSP is not to be used to place students in another school's program simply because the student(s)' school does not offer the particular sport. Both schools must demonstrate a need for and commitment to the CSP.*

B.  The purpose of a Cooperative Sports Program is to provide opportunities for participation when none would otherwise exist, as for instance when a school lacks a particular program or when a school has declining enrollment in a particular program. Under no circumstances is a CSP to be used for purposes of creating a stronger or more competitive team, or as an excuse for eliminating an otherwise viable athletic program.

Cooperative Sports Programs should be comprised of schools from the same Participating League or Conference or General League or Conference. Crossover to other Leagues or Conferences is only permitted after efforts have been exhausted to partner with a school within the same League or Conference. If a CSP is comprised of schools from different Leagues and Conferences, then approval must be received from all Leagues and Conferences involved.

C.  Schools may enter into a Cooperative Sports Program for any sport and for any Group size. However, the following conditions must be met in order for a Cooperative Sports Program application to be considered by the CSC:

    1.  A public high school can only enter into Cooperative Sports Programs with another public high school while non-public high schools can only enter into such programs with another non-public high school.

    2.  A member school may enter into Cooperative Sports Programs with more than one other school for more than one sport; however, a member school may only enter into one Cooperative Sports Program for a particular sport.

    3.  In Cooperative Sports Programs involving ice hockey, three public schools or three non-public schools may combine to form a tri-school Cooperative Sports Program with a maximum thirty (30) student athlete roster, if their respective leagues approve. Public schools may not combine with non-public schools.

    4.  A Cooperative Sports Program is for a two year period with an automatic two year renewal. Written notification of automatic renewal must be submitted by the sports specific deadlines indicated below.

Completed applications and required written documentation must be submitted to the NJSIAA office by the following sports specific deadlines:

**Fall sports – January 15th; Winter sports – April 15th; Spring sports – September 15th**

D.  The total enrollment used for classification purposes of the Cooperative Sports Program will be determined based upon the most current year joint pupil enrollment of grades 9, 10, and 11. One hundred percent (100%) of the partner school's enrollment shall be added to the LEA's enrollment for the purpose of postseason playoff classification. In addition, the Cooperative Sports Committee may place a CSP in a more competitive classification if necessary for competitive balance. Such classification of the CSP will not affect either school's classification in any other sport.

8

E.  Cooperative Sports Committee (CSC):
The President of the Executive Committee shall nominate a Cooperative Sports Committee of no less than five members and a chairperson, none of whom shall be members of the NJSIAA Executive Committee. The CSC will approve or disapprove each Cooperative Sports Program application. Approved applications will be presented at the next Executive Committee for final approval.

The CSC will also make classification determinations at the time of approval of the Cooperative Sports Program. The CSC will take into consideration the combined enrollments as well as other factors determined by the Committee.

The LEA, Partner school or Participating League or Conference may appeal any such decision by the CSC. Such appeal will be heard by the Cooperative Sports Appeal Committee per Article III, Section 10.E.

*CL 2:  The CSC will meet three times per year and their decisions will be based on written documentation submitted to the committee. Such meetings will occur within 45 days after each deadline prescribed in Article III, Section 10.B. Decisions of the CSC will be communicated to the applying schools within 10 business days of the meeting date.*

*CL 3:  The CSC may change the classification determination previously made. Such change in classification will coincide with the automatic renewal period.*

F.  Cooperative Sports Appeals Committee (CSAC):
The President of the Executive Committee shall nominate a Cooperative Sports Appeals Committee of no less than five members and a chairperson, all of whom shall be members of the NJSIAA Executive Committee. All appeals from initial decisions of the CSC shall be determined by the Cooperative Sports Appeals Committee. The CSAC will not hear appeals of the classification determination made by the CSC.

The CSAC shall consider Cooperative Sports Program matters, in accordance with the following procedures:

    i.  The CSAC shall decide an appeal on either written submission or at a hearing.

    ii.  The CSAC shall meet to determine any pending appeals on days corresponding with the regularly scheduled meetings of the Executive Committee.

    iii.  Four members of the CSAC shall constitute a quorum. The Chairperson shall be a non-voting member of the Committee except where there is a tie to vote on any appeal. A member shall not vote on any appeal, the outcome of which would affect the schedule of that member's school.

If the CSAC approves a Cooperative Sports Program application, then they will make the classification determination at the time of approval. The CSAC will take into consideration the combined enrollments as well as other factors determined by the Committee.

G.  The LEA, Partner school or Participating League or Conference may appeal any such decision of the CSAC. Such appeal will be heard by the Executive Committee and such decision will be considered final.

H.  Cooperating schools may include all school names on their uniforms; however, the LEA name will be used by the NJSIAA for classifications and seeding brackets.

I.  Either the LEA or Partner school may exit a Cooperative Sports Program at any time during the time period covered by the approved application. Written notice must be submitted to the NJSIAA and the

9

other participating school(s). Upon early termination, the participating schools will be reclassified to their natural classification as a single school.

J.    A Cooperative Sports Program for a particular sport will cover all levels of competition (i.e. freshman, J.V. and varsity). However, either school may establish a stand-alone sub-varsity team while continuing in the cooperative program in that same sport.

K.    The Executive Committee shall be authorized to adopt appropriate guidelines, not inconsistent with the provisions of this Section, so as to implement the Cooperative Sports Programs.

L.    No Cooperative Sports Program shall be allowed unless approved by the Executive Committee after prior approval by the Boards of Education of the cooperating schools.

## DISQUALIFICATION OF COACHES/PLAYERS

The following guidelines will serve to implement, clarify and interpret the provisions of Note 4: Specific Sport Regulations.

The rules in many sports are now providing explicit instructions as to the removal of a coach/player from the game and the designated area to which they are assigned. **If there are any specific playing rules which require disqualification within a sport, the official must be cognizant of these rules as they apply to that specific sport.** These circumstances have necessitated establishing specific guidelines for officials to follow when a coach/player is disqualified.

Whenever it becomes necessary to disqualify a coach from the game, the official should ascertain the availability of another coach or qualified faculty member who can assume responsibility for the team, and then employ the following procedures:

1.    If the administrator or representative is able to designate such a person, the disqualified coach should be removed from the immediate area;

2.    If the administrator or representative is not able to make this designation, the disqualified coach should be assigned to an area where the coach can visually observe the game and be available to protect the safety and welfare of the team. If the disqualified coach uses this privilege to communicate with the team or is again guilty of an unsportsmanlike act, the game shall be terminated and the Central Office of the NJSIAA notified in writing.

3.    Any coach/player disqualified before, during or after an interscholastic event for unsportsmanlike flagrant verbal or physical misconduct will be disqualified from the next two (2) regularly scheduled games/meets, with the exception of football which will carry a one (1) game disqualification, at that level of competition and all other game(s) meet(s) in the interim at any level in addition to any other penalties which the NJSIAA or a league/conference may assess. Such disqualification prevents a coach/player from being present at the site.

*CL 1: Definition of not being present at the site means the disqualified player or coach is not to be present in the locker room, on the bus, on the sidelines, in the stands or site area before, during or after the game/meet.*

*Any player/coach in violation of this provision will be cause for forfeiture of those games during the period of disqualification.*

AR_293151

*CL 2: These NJSIAA procedures will supersede a playing rule which requires a coach or player to leave the premises upon disqualification; therefore, a player will be confined to the bench area to remain under the supervision of the coach. If said player continues to be disruptive or acts in an unsportsmanlike manner, the official may terminate the game/event.*

Officials must use discretion in exercising their prerogative as most often these situations call for a high degree of tact. The unruly coach should be dealt with in a stern but courteous manner the very first time actions prompt any cautioning by an official. This will usually forestall any punitive measures having to be taken at a later and more critical time of the game.

<u>Mechanics at Time of Disqualification</u>:

1.  Call time out – stop the action.

2.  Do not hurry – if player is disqualified, request player to accompany you to the coach – go directly to coach, if player hesitates – give a direct statement of explanation to the coach/player as to why "player" was disqualified – do not debate the issue – be professional, courteous and assertive. If coach is disqualified, same procedure applies.

3.  Go to opposing coach, and give exact same statement.

4.  Resume the game.

<u>Upon Conclusion of Game</u>:

1.  If conditions permit, include a brief explanation of reason for disqualification, name and/or number of coach/player and offending school in each team's scorebook before signing same, if signature is required.

2.  Any questions relative to period of disqualification should be referred to NJSIAA. The official is not an enforcer of the additional game(s) disqualification; however, if the official is aware of the presence of a coach/player at a game during the disqualification period, the offending individual should be reported to the NJSIAA by the official.

3.  The coach of the offending team (freshman, junior varsity, varsity has a dual responsibility with the official to report each disqualification to his/her Athletic Director in person or via phone by noon of the next day. Failure of a coach/official to follow the prescribed procedure in reporting the disqualification *does not* void the penalty and, if the official is at fault, it should be reported to the official's Chapter Secretary and the NJSIAA.

4.  A disqualification report must be completed online within 48 hours of the disqualification. No other reporting process will be accepted. The online form will be electronically sent to the offending school's principal, athletic director and the NJSIAA. The official should also notify their chapter of the disqualification. **Failure to file these reports will result in punitive action by the chapter and the NJSIAA.**

5.  Any disqualification resulting from harassing verbal or physical related to race, gender, ethnicity, disability, sexual orientation or religion at an interscholastic event must be noted on the Disqualification Form, with a description of the offending conduct provided.

11

6. Disqualifications for Federated/Non-Member Schools will not be reported to the NJSIAA. Officials will forward D.Q. forms to the Federated School Ex. Sec. for their records. Any disqualifications for member schools will continue to be reported to the NJSIAA regardless of the opponent's status.

Attention:

1. Once a coach/player has been disqualified, NO appeals will be honored from the player, coach, official or any other party. Disqualification is a judgement call and officials must be certain the act warrants disqualification. All complaints against an official must be directed to the official's Chapter Secretary and the NJSIAA.

2. Any coach who is disqualified a second time in single or multiple sports within a 365 day period will be required to appear before the Controversies Committee.

Clarifications – Disqualification Rule:

The Cardinal Rule is:
> Officials officiate the game.
> Coaches coach the game.
> Players play the game.
> Concentrate on your area of the game.

*CL 1: Officials are reminded that prudent judgement should be utilized prior to any disqualification. An official may not have a "change of mind" after the disqualification has been enforced; there is no such condition as "the act was not serious enough for the player/coach to be disqualified from additional game(s)." All disqualification for flagrant, unsportsmanlike conduct will always carry the additional game(s) penalty; flagrant, unsportsmanlike conduct is not a "playing rule" violation. The determination of disqualification must be made at the time of the violation.*

*CL 2: Flagrant is a glaring action by a player or coach which is excessive physical play or unacceptable conduct as adjudged by the game/meet official(s).*

*CL 3: Regular season, rescheduled or tournament games which are in place prior to the disqualification will be used to satisfy the penalty; any games arranged by the school after the disqualification to be played during the disqualification period will be added to the penalty. Scrimmages cannot be used to satisfy the disqualification rule. The competition must begin in order to fulfill the requirements of the disqualification rule.*

*CL 4: "Not being present at the site" means the disqualified player or coach is not to be present in the locker room, on the sidelines, in the stands or site area before, during or after the game/meet. Any player/coach in violation of this provision will be cause for forfeiture of those games during the period of disqualification.*

*CL 5: Ejection or removal of a player for a specific sport rule will carry the disqualification penalty only when it includes a flagrant unsportsmanlike act.*

*CL 6: Seniors who are disqualified from their last game will serve the penalty in a subsequent sports season. When seniors are disqualified from their last game of their high school careers, member schools are required to take proper administrative action to discipline the offending student.*

12

*CL 7: Seniors who quit a sport and have not fulfilled their penalty in that sport, must serve it in the new sport before beginning playing in the new sport.*

*CL 8: Any player/coach disqualified in single or multiple sports for a second time will have the penalty doubled (i.e., in football -disqualified for two (2) games; all other sports – four (4) games. Disqualifications will count for 365 days from the date of the first disqualification.*

*CL 9: Any player with two or more disqualifications in the current season, prior to the start of an NJSIAA tournament, will be ineligible to compete in said tournament. A second disqualification for an individual in any game/meet/match supersedes NFHS rules in this regard.*

*CL 10: Any varsity team accumulating three or more player or coach disqualifications for flagrant unsportsmanlike conduct prior to the start of a tournament will not be permitted to participate in same. Seeded teams will forfeit their right to compete if a disqualification limit is reached prior to the start of the tournament for the team.*

*CL 11: Single/multiple sports – on the third offense; players disqualified will be suspended indefinitely, and must apply, in writing, to the NJSIAA through the office of their Principal for reinstatement. Disqualifications will count for 365 days from the date of the first disqualification.*

*CL 12: Any coach disqualified a second time in single or multiple sports in a 365 day period from the date of the first disqualification will be required to appear before the Controversies Committee with the Principal and the Athletic Director.*

*CL 13: Any coach who is disqualified and/or has three or more players on a team disqualified during the course of the preceding school year must complete the NFHS Teaching and Modeling Behavior course. This course license must be obtained from the NJSIAA with the course completion certificate due to the NJSIAA within sixty (60) days of initial NJSIAA notification of the disqualification requirement. A disqualified coach must also complete the New Jersey component and submit the Course Completion Certificate to the NJSIAA within 60 days.*

NOTE: Any coach failing to fulfill his/her responsibility as it applies to CL13, would be suspended from coaching in any capacity at any NJSIAA member school until the successful completion of the NFHS Teaching and Modeling Behavior and the New Jersey stand-alone component (located on the NFHS Learn.com website).

## DRONE POLICY

1. Except as provided in paragraph 4 below, the use of unmanned aerial systems ("UAS"), commonly referred to as "drones", by any NJSIAA member school is permitted during practice and at home events in accordance with applicable local, State, and Federal laws and regulations.

2. Member schools are permitted to use UAS at away events with advance written permission of the host school, or, in the event there is no home school, the site manager.

3. If only one school operates a UAS at an event, the UAS video shall be provided to all other participating schools as soon as practicable after the conclusion of the event.

4. The use of UAS at an NJSIAA tournament event is prohibited.

AR_293154

## EMERGENCY MEDICAL PROCEDURES

The NJSIAA and the National Federation recommend that a physician be present at athletic contests and available (on call) during practice sessions. With many sports activities in progress at any one time, it is often impossible to have physicians present at all contests. In fact, some small communities in rural areas and inner-city schools may not have the services of a physician. This makes it mandatory for the school administrators and coaches to arrange a procedure to obtain medical care and treatment for emergencies to include athletic trainer where applicable.

Some sources of assistance that may be utilized when physicians are not available are certified athletic trainers, emergency medical technicians usually on emergency vehicles, ambulance vehicle with trained personnel, rescue vehicles with trained first-aid personnel and, in some areas, National Guard or Army Reserve medical personnel assigned to ambulance duty. Schools may also have other school personnel qualified in first-aid, who may be available for duty during activities

Recommended procedures that may be followed in successful emergency care are:

1. Immediate, on the spot first-aid by an individual with adequate training.

2. Communication System.  An available, non-pay telephone with an outside line to contact a physician or ambulance service.  Arrangements should be made in advance to insure availability.

3. Emergency care facility. Arrangements should be made, in advance, with staff personnel of local hospital or clinic to notify, in case of emergency, that emergency service is necessary.

4. Notification. The facility to which the injured player is being transported should be immediately informed of the injured player's status. Necessary personnel and equipment should be available at the facility or physicians, on call, could be notified of the emergency.

5. Transportation. Ambulance, emergency vehicle, first-aid vehicle or rescue vehicle, with appropriate equipment and personnel may be parked at the field or game site. If this procedure is not feasible, prior arrangements should be made to have equipment on call when an emergency develops. Again, an available, non-pay telephone with an outside line should be immediately available.

6. Communities without physicians, medical clinics or hospital service should complete arrangements with medical personnel and hospital facilities in the nearest community where such services are available.

The plan of action specified above should be carefully covered, in advance, with responsibilities of all concerned – trainer, coach, vehicle personnel, school administrators, local police, deputies, or constables – defined. When an emergency does occur, everyone involved can function as an informed, effective team.

Local plans of action to meet emergency situations will vary depending on availability of medical personnel and facilities, the location of the playing field or site and communications. In all cases, the emergency situation plan is best developed through cooperative action of local school personnel, participating professional medical staff and allied groups.

When there is a school physician or community health department providing school health services, the medical people involved should share in the planning. When no such service exists, the school administration should request medical assistance through the local medical professional groups, the county medical society, the community hospital staff or personal contact with a physician. Many doctors may be interested in assisting as

14

team physicians but school administrators should initiate the first contact. Ethics of the medical profession necessitates this procedure.

Understanding is the key to an effective emergency care plan. Everyone involved – school personnel, medical professionals, allied medical groups, transportation staff, and the like – must know exactly what is going to be done in an emergency and who will be responsible for carrying out the various tasks involved. When this procedure has been completed, the players, coaches, administrators, parents, and medical personnel will know that everything possible has been done to protect the health, safety and welfare of a player who may be injured.

## FOOTBALL OPEN RECRUITING PERIOD GUIDELINES

The following are guidelines for all member schools to adhere to during the NCAA Open Recruiting Period:

1.     When a college coach is onsite at a NJSIAA-member high school, the high school coach shall be permitted to administer a football specific evaluation session at the request of a college coach.

2.     High school coaches shall be permitted to attend and assist with any workout observed by the college coach.

3.     The workouts to be observed by a college coach may include:
   a.     Strength training
   b.     Agility, speed and endurance training
   c.     Position specific skills workouts (see details below)

4.     Position specific skills workouts include, but is not limited to, throwing, blocking, running routes, kicking/punting, or defensive positioning.

5.     The workouts SHALL NOT resemble any form of organized practice.  Therefore, no diagramed plays may be executed, no individual skills training may occur, and no scrimmaging of any kind regardless of the number of players participating in the workout.

6.     Each onsite visit/workout may not exceed one hour in length.

7.     No player protective gear may be used.  Protective gear includes, but is not limited to, helmets, shoulder pads, rib pads or thigh/knee pads.

8.     THUD or live contact with another student-athlete is not allowed at any time.  The only football-specific equipment that may be in use are blocking/tackling dummies, blocking/tackling sleds or hand-shields.

A high school coach that violates any part of these guidelines will receive an automatic two-game suspension, such suspension to be served during the first two regular season games during the immediate next season.

## NATIONAL ATHLETIC TRAINER'S ASSOCIATION PRE-SEASON HEAT ACCLIMATIZATION REQUIREMENTS FOR SECONDARY SCHOOL ATHLETICS

Before participating in the preseason practice period, all student-athletes should undergo a pre-participation medical examination administered by a physician (MD or DO) or as required/approved by state law. The examination can identify predisposing factors related to a number of safety concerns, including the identification of youths at particular risk for exertional heat illness.

15

The heat-acclimatization period is defined as the initial 14 consecutive days of preseason practice for all student-athletes. The goal of the acclimatization period is to enhance exercise heat tolerance and the ability to exercise safely and effectively in warm to hot conditions. This period should begin on the first day of practice or conditioning before the regular season. Any practices or conditioning conducted before this time should not be considered a part of the heat-acclimatization period. Regardless of the conditioning program and conditioning status leading up to the first formal practice, all student-athletes (including those who arrive at preseason practice after the first day of practice) should follow the 14-day heat-acclimatization plan. During the preseason heat acclimatization period, if practice occurs on 6 consecutive days, student-athletes should have 1 day of complete rest (no conditioning, walk-throughs, practices, etc.).

Days on which athletes do not practice due to a scheduled rest day, injury, or illness do not count toward the heat-acclimatization period. For example, an athlete who sits out the third and fourth days of practice during this time (eq, Wednesday and Thursday) will resume practice as if on day 3 of the heat-acclimatization period when returning to play on Friday.

A practice is defined as the period of time a participant engages in a coach-supervised, school-approved, sport- or conditioning-related physical activity. Each individual practice should last no more than 3 hours. Warm-up, stretching, and cool-down activities are included as part of the 3-hour practice time. Regardless of ambient temperature conditions, all conditioning and weight-room activities should be considered part of practice.

A walk-through is defined as a teaching opportunity with the athletes not wearing protective equipment (e.g., helmets, shoulder pads, catcher's gear, shin guards) or using other sport-related equipment (e.g., footballs, lacrosse sticks, blocking sleds, pitching machines, soccer balls, marker cones). The walk-through is not part of the 3-hour practice period, can last no more than 1 hour per day, and does not include conditioning or weight-room activities.

A recovery period is defined as the time between the end of 1 practice or walk-through and the beginning of the next practice or walk-through. During this time, athletes should rest in a cool environment, with no sport- or conditioning-related activity permitted (e.g., speed or agility drills, strength training, conditioning, or walk-through). Treatment with the athletic trainer is permissible.

The 14-Day Heat Acclimatization Period – Core Principles:

1. Days 1 through 5 of the heat-acclimatization period consist of the first 5 days of formal practice. During this time, athletes may not participate in more than 1 practice per day.

2. If a practice is interrupted by inclement weather or heat restrictions, the practice should recommence once conditions are deemed safe. Total practice time should not exceed 3 hours in any 1 day.

3. A 1-hour maximum walk-through is permitted during days 1–5 of the heat-acclimatization period. However, a 3-hour recovery period should be inserted between the practice and walk -through (or vice versa).

4. During days 1–2 of the heat-acclimatization period, in sports requiring helmets or shoulder pads, a helmet should be the only protective equipment permitted (goalies, as in the case of field hockey and related sports, should not wear full protective gear or perform activities that would require protective equipment). During days 3–5, only helmets and shoulder pads should be worn. Beginning on day 6, all protective equipment may be worn and full contact may begin.

    a. Football only: On days 3–5, contact with blocking sleds and tackling dummies may be initiated.
    b. Full-contact sports: 100% live contact drills should begin no earlier than day 6.

16

5. Beginning no earlier than day 6 and continuing through day 14, double-practice days must be followed by a single-practice day. On single-practice days, 1 walk-through is permitted, separated from the practice by at least 3 hours of continuous rest. When a double practice day is followed by a rest day, another double practice day is permitted after the rest day.

6. On a double-practice day neither practice should exceed 3 hours in duration, and student-athletes should not participate in more than 5 total hours of practice. Warm-up, stretching, cool-down, walk-through, conditioning, and weight-room activities are included as part of the practice time. The 2 practices should be separated by at least 3 continuous hours in a cool environment.

7. Because the risk of exertional heat illnesses during the preseason heat-acclimatization period is high, we strongly recommend that an athletic trainer be on site before, during, and after all practices.

## HEAT PARTICIPATION POLICY

Introduction:

History shows that most exertional heat stroke deaths occur during August; however, athletes will be at risk whenever in the presence of elevated ambient temperatures with high humidity. For many years, coaches have utilized the Heat Index to determine safe conditions for exercise in a hot environment. Evidence-based research, first initiated with the military, proves that Wet Bulb Globe Temperature (WBGT) should be the environmental monitoring measure during athletic participation in the heat.

The Heat Index was developed as a measurement of ambient temperatures and relative humidity while resting in the shade. It is intended to provide outdoor restrictions for the elderly and adolescents during times of elevated temperatures. It is not relevant to a athletic activity settings. However; the WBGT is a measurement of ambient temperature, relative humidity, radiant heat from the sun and wind speed. When outdoor activities are conducted in the direct sun, the WBGT is the most pertinent to use. Although read in degrees, the WBGT does not reflect degrees of air temperature. A WBGT reading of 92 F may equate to a Heat Index reading of 104-105 degrees F.

Method:

The *NJSIAA Heat Participation Policy* will be utilized in conjunction with the *NJSIAA Pre-Season Heat Acclimatization Policy.* Monitoring the environmental conditions through the WBGT and making the appropriate activity modifications is an effective preventative measure in reducing the risk of exertional heat stroke. The athletic trainer, certified designee or individual (e.g. coach) appointed by the athletic director must use a scientifically-reliable WBGT measuring device and take an on-site reading 30 minutes prior to activity and a minimum of every hour during activity. Readings must be recorded on the *NJSIAA Heat Participation Policy Record Chart.* All corresponding modifications must also be recorded on the chart.

References:

http://ksi.uconn.edu/prevention/wet-bulb-globe-temperature-monitoring/
http://ksi.uconn.edu/high-school-state-policies/wbgt-policies/
ttp://ksi.uconn.edu/prevention/heat-acclimatization/

Frequently Asked Questions:

Is the *NJSIAA Heat Participation Policy* just for football in the fall preseason?

The *NJSIAA Heat Participation Policy* must be followed by all sports and has no specific ending date. Athletic trainers and coaches must follow the policy anytime the Wet Bulb Globe Temperature (WBGT) readings are

17

at an elevated level. During this time, practices and games must be held in accordance with the *NJSIAA Heat Participation Activity Guidelines*.

<u>What does the Wet Bulb Globe Temperature (WBGT) mean and how is this different from the heat index?</u>

The Heat Index is a measurement of ambient temperatures and relative humidity while resting in the shade. It is intended to provide outdoor restrictions for the elderly and adolescents during times of elevated temperatures. It is not relevant to an athletic practice setting.
The Wet Bulb Globe Temperature (WBGT) is a measurement of ambient temperature, relative humidity, radiant heat from the sun and wind speed. When outdoor activities are conducted in the direct sun, the WBGT is the most pertinent to use. Although read in degrees, it does not reflect degrees of air temperature. A WBGT reading of 92 F may equate to a Heat Index reading of 104 – 105 degrees F.

<u>How frequently should WBGT readings be taken during practices and games?</u>

WBGT readings must be taken on the practice and game site a minimum of every hour, beginning 30 minutes before the beginning of the practices and games. All readings must be recorded on the *NJSIAA Heat Participation Policy Record Chart*.

<u>Does the *NJSIAA Heat Participation Policy* apply to both practices and games?</u>

The *NJSIAA Heat Participation Policy* applies to both practices and games. At least 30 minutes prior to the start of a game, the officials must be informed of the on-site WBGT reading and the recommended modifications if the WBGT reaches an Orange Flag or Red Flag (e.g. built-in water breaks). There have been very few documented catastrophic heat-related incidents during a game; likely due to the nature of games having built in rest breaks already (e.g. quarters and half-time). Therefore, modifications during games should include increased rest breaks, access to fluids, and cooling zones. Protective equipment must be worn during a game according to the rule book. However, for sports requiring protective equipment, the equipment must be removed and active cooling (e.g. cold towel rotation, misting fans) initiated during the built-in water breaks. Keep in mind that scrimmages take place during the preseason acclimatization period and are considered practices; therefore, must also follow the *Heat Participation Activity Guidelines*. If the WBGT reaches a Black Flag during the game, the game must be postponed for 30 minutes followed by another WBGT reading (similar to the lightning rule). The game must not resume until the WBGT falls below a Black Flag.

Heat Participation Policy Guidelines:

Schools must follow this best practice policy when conducting outdoor practices and games in all sports. The policy follows modified guidelines of the American College of Sports Medicine, and is specific to New Jersey, in regard to:

1. The scheduling of practices during times of various Wet Bulb Globe Temperature (WBGT) levels
2. The ratio of workout time to time allotted for rest and hydration during times of various WBGT levels
3. The WBGT levels which will result in practices and contests being modified or terminated.

An instrument scientifically approved to measure WBGT must be utilized at each practice and game. WBGT readings must be taken on the practice and game site a minimum of every hour, beginning 30 minutes before the beginning of practice and game. All readings must be recorded or data logged (e.g. written or electronic

AR_293159

form). In the event that a modification or cancellation was required, documentation using the WBGT *NJSIAA Heat Participation Policy Record Chart* must be completed.

| WBGT READ-ING | Flag | Risk for Heat Illness | ACTIVITY GUIDELINES AND REST BREAK GUIDELINES |
|---|---|---|---|
| Under 80.0°F | Green | Very Low | Normal activities – Provide at least three separate rest breaks each hour of minimum duration of 3 minutes each during workout. |
| 80.0° F – 85.0°F | Yellow | Low | Use discretion for intense or prolonged exercise; watch at-risk players carefully; Provide at least three separate rest breaks each hour with a minimum duration of 4 minutes each. |
| 85.1°F – 88.0°F | Orange | Moderate | Maximum practice time is 2 hours, <u>For Football, Lacrosse and Field Hockey</u>: All helmets and shoulder pads must be removed for practice and conditioning activities. If the WBGT rises to this level **during** practice, football players may continue to work out wearing football pants without changing into shorts. <u>For All Sports</u>: provide at least four separate rest breaks each hour with a minimum duration of 4 minutes each. |
| 88.1°F – 90°F | Red | High | Maximum length of practice is 1 hour. <u>For Football, Lacrosse and Field Hockey</u>: No protective equipment may be worn during practice and there must be no conditioning activities. <u>For All Sports</u>: there must be no conditioning and there must be 20 minutes of rest breaks distributed throughout the hour of practice. |
| Over 90°F | Black | Very High | **NO OUTDOOR WORKOUTS. Delay practice until a cooler WBGT level is reached.** |

Guidelines for hydration and rest breaks:

1. Rest time must involve unrestricted access to fluids (e.g. water or electrolyte beverages).
2. With sports requiring helmets (e.g. football, lacrosse, field hockey), the helmets must be removed during rest time.
3. The site of the rest time must be a in a shaded area.
4. When the WBGT reading is >85.0°F
   a. Ice towels, spray bottles filled with ice water or equivalent must be available to aid in the cooling process within the shaded area.

Definitions:

1. Game: any NJSIAA sanctioned event.
2. Practice: the period of time that a participant engages in coach-supervised, school-approved sport or conditioning-related activity. Practices are timed from the time the players report to the field until they leave.
3. Walk through: this period of time shall last no more than one hour and is not considered to be a part of the practice time regulation and may not involve conditioning or weight-room activities. Players may not wear protective equipment.

AR_293160

The aforementioned policy must be carried out by the athletic trainer, certified designee or individual as appointed by the athletic director which includes a coach or any individual responsible or sharing duties for making decisions concerning the implementation of modifications or cancellation of practices and games based on WBGT.

In accordance with the current school compliance checks, the compliance monitors checklist will include items specific to:

- Presence of a WBGT device
- Documentation of all practices and games requiring modification on the NJSIAA Heat Participation Policy Record Chart
- Proof of written and signed off Heat Participation Policy document

## COLD WATER IMMERSION TUB POLICY

All schools participating in interscholastic athletics must have a comprehensive, detailed Emergency Action Plan (EAP), including heat injury. When treating a potential Exertional Heat Stroke (EHS), schools must be properly *prepared and equipped* to initiate Cold Water Immersion (CWI) or other approved cooling technique. Cooling techniques must be implemented immediately, and concurrently EMS should be contacted. This must be followed during all summer conditioning, pre-season practices/contests on school grounds, or when a coach, paid or otherwise, is present. This includes the 1st 21 days of fall practice, and any day the temperature is greater than 80 F WBGT.

| WBGT READING | Flag | COLD WATER IMMERSION TUB GUIDELINES |
|---|---|---|
| Under 80.0°F | Green | Mandatory alternative cooling measures of a cooler with ice and towels or a tarp (taco/burrito method) must be available at the practice, game and event site. |
| 80.0°F – 85.0°F | Yellow | It is required a 150 gallon cold water immersion tub or a tarp (taco/burrito method) must be filled with water temperature of less than 60 F and accessible for cooling within 5-10 minutes of the practice/contest site. Remove external clothing/equipment prior to cooling or immediately after entering tub. Aggressively stir water during cooling process. |
| 85.1°F – 88.0°F | Orange | It is required a 150 gallon cold water immersion tub or a tarp (taco/burrito method) must be filled with water temperature of less than 60 F and accessible for cooling within 5-10 minutes of the practice/contest site. Remove external clothing/equipment prior to cooling or immediately after entering tub. Aggressively stir water during cooling process. |
| 88.1°F – 90°F | Red | It is required a 150 gallon cold water immersion tub or a tarp (taco/burrito method) must be filled with water temperature of less than 60 F and accessible for cooling within 5-10 minutes of the practice/contest site. Remove external clothing/equipment prior to cooling or immediately after entering tub. Aggressively stir water during cooling process. |

20

| Over 90°F | Black | **NO OUTDOOR WORKOUTS.** Delay practice until a cooler WBGT level is reached. If the WBGT rises to this level **during** practice, it is required a 150 gallon cold water immersion tub (or a tarp (taco/burrito method) must be filled with water temperature of less than 60 F and accessible for cooling within 5-10 minutes of the practice/contest site. Remove external clothing/equipment prior to cooling or immediately after entering tub. Aggressively stir water during cooling process. |

Treatment of Extertional Heat Stroke:

If the athletic trainer/medical staff is onsite, utilize the principle of *Cool First, Transport Second*. When cooling, use CWI or other approved cooling technique, until core temperature is at 103 F. If the athletic trainer/medical staff is not onsite, cool immediately until the athlete starts to shiver, or for a minimum of 20 minutes based upon the known cooling rate of 1 degree per 3 minutes. If athletic trainer/medical staff *is not* present, EMS assumes control of the EHS patient upon arrival and continues cooling for the minimum of 20 minutes or until rectal temperature is obtained.

## NEW JERSEY HOMESCHOOL GUIDELINES

A home schooled student is eligible to participate in interscholastic athletics if the following conditions are met:

1. Approval by the local Board of Education. Consistent with Department of Education guidelines a home schooled student may participate in interscholastic athletics if the local board of education, in its discretion, approves of the participation of home schooled students on the high school teams.

2. Residency. The home schooled student must reside in the school district that serves the high school and must meet the residency criteria pursuant to N.J.A.C. 6A:22 and provide proof of residence as required by the local school board. In school districts that serve more than more town a home schooled student must be assigned to the school of record in the same manner as other students.

3. Notice and request to Principal. The parents of the home schooled student must submit a written request to the principal of the member school to try out for an athletic team in interscholastic athletics.

4. Compliance with local requirements. The home schooled student must comply with the same physical examination, insurance, age, academic and other requirements for participation as required of all students at that high school. The home schooled student must adhere to the same standards of behavior, responsibilities and performance as other members of the team.

5. Compliance with local requirements. Home schooled students must meet all eligibility requirements established by the NJSIAA, including but not limited to rules relating to amateur status, age, recruitment, academic credits, semesters of eligibility and transfers. Home schooled students will be subject to all rulings and decisions of the NJSIAA, and may appeal any adverse decision to the Commissioner of Education under N.J.A.C. 6A:3-7.1 et seq.

6. Demonstration of equivalent education. The parents of the home schooled student must meet with local school officials to demonstrate that the student is receiving an academically equivalent education.

7. Certification of academic eligibility. The parents of the home schooled student must submit evidence satisfactory to the Principal that the home schooled student has met the requirements of the Academic Credit Rule and the requirements of the school's own academic policy.

21

8. <u>Transfer to a home school program.</u>  Any student who withdraws from a public school program to enroll in a home school program, and who is ineligible at the time of withdrawal from the public school program due to his/her failure to meet academic, behavioral or eligibility standards, shall be ineligible to compete in interscholastic athletic competition in the same manner as a student who has transferred from one school to another for athletic advantage.

9. The rights, privileges and responsibilities associated with all other student athletes attending NJSIAA member schools will apply to home schooled students who have satisfied the requirements above.

## INFECTIOUS DISEASE POLICY
*Presented by the NJSIAA Medical Advisory Committee*

Purpose:
The New Jersey State Interscholastic Athletic Association Executive Committee has adopted this policy in an effort to minimize the possibility of transmission of any infectious disease during a high school athletic practice or contest.

The policy primarily addresses blood borne pathogens such as Hepatitis B Virus (HBV), Hepatitis C Virus (HCV), and the Human Immunodeficiency Virus (HIV). However, it also discusses Methicillin Resistant Staphylococcus Aureus (MRSA) and common sense precautions against the spread of less serious infections such as influenza and the common cold.

Much of this policy has been written with contact sports such as football, wrestling, and basketball in mind. However, it is applicable for all sports.

The entire text of this policy is available upon request.

Guidelines for withdrawal of teams from competition upon diagnosis of infectious diseases:
School administrators should rely solely upon the advice of the school's medical inspector in determining the action to withdraw a team from competition when a member is diagnosed as having an infectious disease.

## JUNIOR HS (9th GRADE) ATHLETICS

**Foreword:**
The philosophy, objectives and regulations under which Junior High Schools (9th grade) may become members of the NJSIAA are not intended to influence expansion of existing athletic programs, nor to promote programs where none exist, nor to exert undue pressures for the establishment of interscholastic athletic programs in the Junior High Schools (9th grade) of the state.

The recommendations which are made are promulgated toward the establishment of policies and practices for athletic programs in Junior High Schools (9th grade) of New Jersey.

**Philosophy:**

22

AR_293163

If athletics are to serve educational ends, they must be wisely guided, developed, and administered as a vital and effective phase of the educational program. Each school district should develop a philosophy of desirable goals and values from which a sound athletic curriculum can be built.

Participation in sound athletic programs contributes to individual development, physical skill, health, strength, self-reliance, emotional maturity, social competencies, and good sportsmanship.

Junior High School (9th grade) athletics shall be an integral part of the Junior High School (9th grade) educational program and the Junior High School (9th grade) Principal shall be responsible for guiding the school athletic program in line with the accepted philosophy of the school. Every school should conduct as complete an athletic program as meets the needs of the Junior High School (9th grade) child. Participation and competition shall be kept at a "readiness level" with the age and physical development of the early adolescent ever in mind.

The intramural program shall be the foundation of the school athletic program providing opportunity for the total school population to meet its athletic needs and interests. The interschool athlete program grows out of and in no way handicaps the intramural program.

In fulfillment of this philosophy member Junior High Schools (9th grade) subscribe to the following:

1. The entire athletic program shall be determined and under the direction of the Principal and faculty of the school.
2. The athletic program shall in no way interfere with the academic program, but rather integrated with other activities essential to Junior High School (9th grade) youth.
3. Interschool athletic participation offers an opportunity for a select group with a special talent to perform.
4. The interschool athletic program through team competition provides children another opportunity to recognize their abilities and limitations.
5. The interschool athletic program provides early opportunities for children to develop and express leadership qualities.
6. The interschool athletic program shall not be a farm or feeder system for high school athletic teams. Improved articulation between Junior (9th grade) and Senior High Schools and community should always be sought.
7. The interschool athletic program should be financed by the local board of education.
8. The interschool athletic program should be administered through established standards and controls. These standards and controls should be established by the schools and administrators or through membership in an association composed of representing groups interested in good wholesome athletic programs for the children of New Jersey.

**Specific regulations to be considered:**
Unless otherwise specified in the paragraphs which here follow, the Rules and Regulations of the New Jersey State Interscholastic Athletic Association for Senior High Schools apply to Junior High School and 9th grade member schools of this Association.

A. Membership
   1. Membership in the Junior High School Division of the New Jersey State Interscholastic Athletic Association is a voluntary one.
   2. Any Junior High School approved by the New Jersey Department of Education as a secondary school shall be eligible to apply for membership.
   3. A school shall become a member of the Junior High School Division of NJSIAA when the membership request has been properly executed and it is officially accepted by action of the NJSIAA Executive Committee.

23

B. Grade Limitation

Students in 6th, 7th or 8th grades who will reach age nineteen (19) prior to September 1 of their senior year while properly enrolled in a member school may request a waiver of the Bylaws, Article V, Section 4.I, Pre-High School Student, to have an opportunity to participate in interscholastic athletics for four (4) years prior to becoming ineligible.

C. Interpretation

This is not meant to restrict grades 7 and 8 from participating with other schools in competition at their own level.

D. Supervision

All pupils on Junior High (9th grade) interscholastic teams must be enrolled in the same school and be under the supervision of the same administrative head.

E. Classification

There will be no classification of Junior High Schools on the basis of enrollment.

F. Eligibility

1. Academic Requirements – The same eligibility requirements for 9th grade pupils will be enforced as applies in the high schools.
2. Age Requirements – An athlete becomes ineligible for Junior High School or 9th grade athletics if he/she attains the age of sixteen prior to September 1. However, any athlete attaining age sixteen on or after September 1 shall be eligible for the ensuing school year.

G. Semester Attendance

A pupil becomes ineligible for Junior High School or 9th grade interscholastic athletic competition after he/she spends two (2) semesters in the 9th grade.

H. Transfers

Article V, Section 4.K of the Bylaws applies.

I. Dues

Each school shall be assessed an annual dues of $60.00 for membership in the Junior High School Division of NJSIAA.

J. Officials

It is urgently suggested that qualified and registered officials be used in all interscholastic games.

K. Safety Measures

In order to assure Junior High School (9th grade) contestant optimum protection against injury to their bodies and their health, the following minimum regulations shall be enforced:

1. Physical Examination – In each school year before a pupil participates in an organized practice session or game of the athletic program, he/she must have a physical examination and present the athletic Participation Form properly signed by himself and his parents (or guardian). This form shall be filed with the administrative head of the school.

2. Conditioning Period – To insure good physical condition of participants each athlete should be given sufficient days of practice and conditioning before engaging in any interscholastic contest.

24

3. Equipment – Proper equipment and safety precautions must be stressed, such as properly fitted and protective clothing, pads, shoes, helmets, etc.

4. Facilities – The physical facilities such as playing areas, locker and shower rooms, bleachers, transportation, etc., shall be designed and maintained to safeguard the health and safety of all participants and spectators.

L. Competition
1. It is recommended that schools compete with member schools only or with schools following similar regulations.
2. In contests between Junior and Senior High Schools on a 9th grade level, the Junior High School regulations will be mandatory.

3. Wrestling weight classes shall be the same as those provided for high schools in the National Federation Wrestling Rules with the following exception:
   a. Add a 90-lb. weight class (Wrestler must weigh at least 75 lbs. to compete at this weight class.)

M. Penalties
The penalty for violation of these Rules and Regulations may be suspension or expulsion.


## LABOR DISPUTES

It is the philosophy of the NJSIAA Executive Committee that interscholastic athletes should not be used as a pawn during professional negotiations between the Board of Education and the Educational Association. Although athletics is only a part of the total school program, it is obvious that the emotions of people are aroused when anything seems to disrupt the athletic program or deprive young people of an opportunity to participate.

Therefore, we recommend that boards of education, administrators, coaches, and professional organizations begin to plan now in advance of any crisis, i.e., withholding of services, work stoppage, so that rational decisions can be made before serious conflicts and problems develop. Students, advisors, parents, and coaches should know in advance whether co-curricular programs, including athletics, will continue to be postponed during a professional labor dispute. If no planning is done, it is likely that students will suffer most, even though they are the innocent bystanders in the negotiations process.

The NJSIAA Executive Committee has adopted the following guidelines for situations which may arise during a professional labor dispute:

1. The decision whether to continue the athletic program or not must be made at the local level, but the safety and well-being of the participants ought to be the primary factor in reaching that decision. If practices or contests are carried on, the local administration ought to be aware of the responsibility for continuous competent supervision and limitations on practices, scrimmages, etc.

2. When a contest must be postponed, it may, by mutual agreement between the contesting schools, be rescheduled. If a postponed game cannot be rescheduled before the end of the regular season, a forfeit shall be declared.

3. In any state tournament, the records of teams at the time of the cut-off date will determine the eligibility of a team to participate. Games not played up to the cut-off date for tournament qualification must be forfeited.

25

4.  If a school has already entered a state tournament and is unable to compete in any scheduled game, that game shall be declared a forfeit (subject to the procedures listed in 22. **Procedure for filing a protest or declaring a forfeit)** 34 and a win shall be credited to the offended school.

5.  Transfer students who are affected by a strike will count those days as if school was in session and games being played provided the regular game schedule has begun.

6.  We urge all school districts to plan ahead so that everyone is aware of these responsibilities in case of an emergency. The NJSIAA will continue to be available for advice and consultation whenever requested.

<div align="center">

**EXCERPTS FROM LEAGUE/CONFERENCE POSITION STATEMENT**
*Adopted by NJSIAA Executive Committee on April 11, 1983, Amended on June 6, 2002*

</div>

Guiding Principles:

The Association is charged with establishing *statewide standards* for the conduct of the interscholastic sports which cannot be left to local or regional discretion, including the establishment and enforcement of minimum standards of eligibility of Student-Athletes, as well as the rules and regulations for the various interscholastic sports, the maintenance of standards of sportsmanship; and the conduct of statewide championships in various sports. As such, the Association cannot delegate these vital responsibilities to any member school or group of such schools, whether they be formed as a conference or not. On the other hand, the Executive Committee recognizes that there must be greater home rule among our conferences so as to foster an improvement in both the quantity and quality of athletic programs; convenient and reasonable scheduling of sports activities; and the development of greater sportsmanship and competition. Toward that end, conferences will be given the greatest degree of self-governance, provided that there is not a violation of the Constitution and Bylaws of the Association, as well as the standardized rules and regulations for the conduct of interscholastic sports, and the mandate of the Commissioner of Education that all schools receive an opportunity to have a full schedule of interscholastic sports for their students. While the respective roles of the parent association and the member conferences is not easily discernible, the Executive Committee believes that it must set down certain guidelines, which will hereafter be observed by member schools. In doing so, the Committee wishes to make clear that this statement is intended to clarify the relationship between the State Association and local conferences. Accordingly, the Executive Committee reserves all of its rights under the Association's Constitution and Bylaws.

The Role of NJSIAA:

The role of NJSIAA, principally through its Executive Committee, will continue to exercise the following responsibilities *vis a vis* various conferences and leagues:

1.  The determination of eligibility for Student-Athletes.

2.  The maintenance of rules and regulations governing the conduct of various interscholastic sports, including contest rules, the calendar for the start of practice, and the start of, and conclusion of, regular seasons, and the minima and maxima of contests in any sport.

3.  The determination of state champions in the various sports.

4.  Assuring that all students enrolled in member schools, who would otherwise be eligible to participate in interscholastic sports, are not precluded from a full opportunity to do so, irrespective of their race, sex, religion, or the school that they are attending.

<div align="center">26</div>

5.  Review of all constitution conferences, pursuant to Article XII, Section 2 of the Association Bylaws, and the exercise of other authority granted to it under the Association Constitution and Bylaws.

The Role of Individual Leagues and Conferences:

The Executive Committee strongly believes that our conferences must be strengthened, rather than weakened, if they are to perform the very important tasks for which they were originally created. Therefore, conferences should have exclusive authority over certain functions, which will not be appealable to the Association; while at the same time assuming expanded authority for other responsibilities, with a very limited review by the Association.

1.  Exclusive Responsibilities:
    In addition to the traditional internal matters which have never been appealable to the Association, such as the election of officers and the conduct of meetings, conferences will have the exclusive authority over the following functions:
    a.  Any academic or recreational activity conducted by a conference outside of the interscholastic sports within the jurisdiction or the NJSIAA.
    b.  The determination of conference or league championships.
    c.  Internal finances and administration of league activities.

2.  Responsibilities of Leagues and Conferences Appealable to the NJSIAA:
    The following responsibilities will be vested in conferences, with a limited right to appeal by member schools who are challenging league or conference determinations.
    a.  The Association will continue to exercise its supervisory role to assure *membership* by applicant schools in appropriate conferences and leagues. However, unless it can be shown that there has been a violation of the order of the Commissioner of Education or at variance with the "Conference Criteria" established in May, 1981 by the Association, no appeal from such internal divisional alignments will be considered by the NJSIAA.* In that vein, the Executive Committee wants to strongly emphasize that a school should not have the right to appeal its placement in a division because the school believes that it should be given a "weaker" or "stronger" schedule. The ability of member schools to have a winning season, or to obtain state or national prominence in its particular sport, is simply not a concern of the Association.
    b.  Many of the larger conferences and leagues have segmented their membership into "divisions," usually on the basis of geography or size. Unless it can be shown that such divisional breakdowns are violation of the order of the Commissioner of Education or at variance with the "Conference Criteria" established in May, 1981 by the Association, no appeal from such internal divisional alignments will be considered by the NJSIAA.* In that vein, the Executive Committee wants to strongly emphasize that a school should not have the right to appeal its placement in a division because the school believes that it should be given a "weaker" or "stronger" schedule. The ability of member schools to have a winning season, or to obtain state or national prominence in its particular sport, is simply not a concern of the Association.
    c.  To assure full scheduling for all member schools, every member school should be allowed to enter a League or Conference appropriate to size and geography and other factors set forth in the "Conference Criteria," as approved by the Commissioner of Education.* Any school denied entrance into a League or Conference may appeal to the NJSIAA. When a school seeks to transfer membership from one conference to another, any appeal from denial by either Conference must be based on substantial reasons, recognizing the goal of assuring the stability of Conference structures.
    d.  The various conferences are strongly encouraged to adopt disciplinary procedures by which infractions of good sportsmanship can be penalized after there has been an observance of appropriate due process. Toward that end, all conferences which have not done so should set forth in their Constitution and/or Bylaws, specific violations and penalties which may be assessed for such violations, as well as a hearing procedure. Pursuant to Article XIII of the NJSIAA Bylaws, any school or school official or coach penalized by a conference may appeal to the Executive Committee. However, that Committee's role will be limited to determine whether the actions of the conferences were arbitrary or capricious or in violation of the NJSIAA Constitution and Bylaws. The NJSIAA and

27

its Executive Committee will not substitute its judgement concerning such issues for that of the conference.

e.  The conferences are strongly encouraged to maintain appropriate health and safety standards for athletic facilities among their member schools, provided that such standards are not being utilized to exclude schools, contrary to the order of the Commissioner of Education. Accordingly, the Executive Committee's role on appeal will be limited to determine whether the action of the conference is arbitrary and capricious or in violation of the order of the Commissioner of Education concerning the inclusion of minority and non-public schools. Neither the NJSIAA nor its Executive Committee will substitute its judgement on such questions of health and safety for that of the individual conferences.

f.  Article V of the NJSIAA Bylaws incorporates a comprehensive set of minimum eligibility standards for student athletes. While the NJSIAA will continue to exercise exclusive authority in determining the eligibility of students, member schools and conferences will continue to be the free to adopt *higher* eligibility standards. Neither the NJSIAA nor its Executive Committee will interfere in the adoption of such standards, or the enforcement of them by a conference, league or member schools, unless it can be shown these standards are arbitrary or capricious or in violation of the NJSIAA Constitution and Bylaws.

*The Commissioner of Education mandated that the NJSIAA provide an opportunity for public schools with high minority enrollment to join appropriate athletic conferences utilizing Conference Criteria such as enrollment, geography and the impact on the involved conference.*

## PROCEDURE IN THE EVENT OF LIGHTNING

Termination, or temporary suspension, must always take place when an electrical storm is imminent. The decision to terminate or suspend a game/meet/event when an electrical storm is imminent may be made by either the host school or the official.

As noted previously, a chain of command and designated decision-maker should be established for each organized practice and competition.

Recognition: Coaches, certified athletic trainers, athletes and administrators must be educated regarding the signs indicating thunderstorm development. Since the average distance between successive lightning flashes is approximately 2-3 miles, any time that lightning can be seen or thunder heard, the risk is already present. Weather can be monitored using the following methods:

1.  Monitor Weather Patterns - Be aware of potential thunderstorms by monitoring local weather forecasts the day before and morning of the practice or competition, and by scanning the sky for signs of potential thunderstorm activity.

2.  National Weather Service (NWS) - Weather can also be monitored using small, portable weather radios from the NWS. The NWS uses a system of severe storm watches and warnings. A watch indicates conditions are favorable for severe weather to develop in an area; a warning indicates severe weather has been reported in an area and for everyone to take proper precautions.

Management:

1.  Evacuation - If lightning is imminent or a thunderstorm is approaching, all personnel, athletes and spectators must evacuate to available safe structures or shelters. A list of the closest safe structures must be announced and displayed on placards at all athletic venues.

28

2.  Thirty-minute rule - Once lightning/thunder has been recognized, it is mandatory to wait at least 30 minutes after the last flash of lightning is witnessed or thunder is heard. Given the average rates of thunderstorm travel, the storm should move 10-12 miles away from the area. This significantly reduces the risk of local lightning flashes. Any subsequent lightning or thunder after the beginning of the 30-minute count must reset the clock and another count must begin.
3.  When one contest is suspended on a site due to thunder being heard and/or lightning being observed, all contests/activities on that site must be suspended.

Education on Lightning Danger:
Coaches, athletic trainers, officials, administrators, as well as athletes, must be educated regarding the signs indicating nearby thunderstorm development. Generally speaking, it is felt that anytime that lightning can be seen, or thunder heard, risk is already present.
Criteria for Suspension and Resumption of Activity

Once lightning has been recognized or thunder heard, by an official, a coach, the host site management personnel, or by a lightning detection system, the game must be suspended immediately with all players, coaches, spectators, and officials directed to appropriate shelters.

After the suspension, the plan should include strict, documented criteria for the resumption of activities. It is mandatory to wait at least 30 minutes after the last flash of lightning is witnessed or thunder is heard. Any subsequent lightning or thunder after the beginning of the 30-minute count must reset the clock and another count must begin.

Once the contest has been suspended, the 30-minute mandatory suspension in play is in effect. If the lightning detection system gives an "all clear signal" prior to the end of the 30-minute suspension time, the contest shall not be resumed until the 30-minute suspension time limit has elapsed, per the NJSIAA and NFHS policy.

However, if a member school has a Board policy that states no play/no activity may resume until the lightning detection system gives the "all clear signal" even though the 30-minute suspension time has elapsed per NJSIAA/NFHS rule, that Board policy shall supersede NJSIAA/NFHS policy.

Evacuation Plan:

All personnel, athletes and spectators must be clearly informed of available safe structures or shelters in the event a thunderstorm approaches. A list of the closest safe structures should be announced and displayed on placards at all athletic venues when applicable. The person in authority must be aware of the amount of time it takes to get to each structure and the number of persons each structure can safely hold. For large events, time needed for evacuation is increased and there must be a method (i.e., announcement over loud speaker) for communicating the need for evacuation and directing both athletes and spectators to the appropriate safe shelters.

Safe Structures: The most ideal structure is a fully enclosed, substantial building with plumbing, electrical wiring and telephone service, which aids in grounding the structure. A fully enclosed automobile with a hard metal roof and rolled up windows is also a reasonable choice. School buses are an excellent lightning shelter that can be utilized for large groups of people. However, it is important to avoid contact with any metal while inside the vehicle.

Avoid using shower facilities for safe shelter and do not use showers or plumbing facilities during a thunderstorm as the current from a local lightning strike can enter the building via the plumbing pipelines or electrical connections. It is also considered unsafe to stand near utilities, use corded telephones or headsets during a

29

thunderstorm, due to the danger of electrical current traveling through the telephone line. Cellular and cordless telephones are considered reasonably safe and can be used to summon help during a thunderstorm.

When caught in a thunderstorm without availability or time to reach safe structures, you can minimize the risk of lightning-related injury by following a few basic guidelines:

1.  Avoid being the highest object. Seek a thick grove of small trees or bushes surrounded by taller trees or a dry ditch.

2.  Avoid contact with anything that would be attractive to lightning. Stay away from freestanding trees, poles, antennas, towers, bleachers, and baseball dugouts, metal fences, standing pools of water and golf carts.

3.  Crouch down with legs together, the weight on the balls of the feet, arms wrapped around knees, and head down with ears covered.

## PARAPROFESSIONAL AIDE POSITIONS

Nothing in the rules governing coaching positions would preclude a board of education from creating, pursuant to N.J.A.C. 6A:32-4.7, paraprofessional aide positions to assist in the supervision of athletic activities under the direction of a certified coach. However, all such positions must be created and maintained in full compliance with the provisions of N.J.A.C. 6A:32-4.7, including requirements for written job descriptions and qualification standards, and approvals by, and annual reporting to, the county superintendent. As with classroom aides employed to assist certified teachers, athletic paraprofessionals may only function under the direct supervision of a certified coach, or if not assisting with coaching duties, under the direct supervision of designated certified staff; they may not independently undertake coaching duties or any other duties requiring educational certification. Additionally, all persons employed by a district in a paraprofessional capacity (i.e., not serving on a volunteer basis) are subject to the criminal history record check law.

If a board contemplates the use of an aide (paid or unpaid), the policies of the local board must be adopted and in place regarding this type of position, and the rules of the league or conference to which the district belongs must be followed.

Please contact your county superintendent of schools should you have any questions.

30

## NJSIAA INTERPRETIVE GUIDELINES CONCERNING SCHOOL/COACH/ATHLETE PARTICIPATION LIMITATIONS

The NJSIAA Constitution, Bylaws, Rules and Regulations has for all intent and purposes defined the twelve-month sequence of participation in the following manner:

(A) In-Season (B) Out-of-Season and (C) Summer Recess

A. In Season:

The Constitution clearly stipulates this time frame by our Rules and Regulations and causes few problems with the exception of early season practice and the length of the seasons. The participation limits and association with coaches is clearly established and needs no elaboration here. (Program Regulations, Section 5)

Athletes in some sections of the State play in <u>out-of-school</u> (non-school sponsored) competition which is not prohibited by our rules during the in-season period. This competition is not sponsored by the schools in any way and the NJSIAA does not sanction said participation which is a local option in that regard. (Student-Athlete Guidelines, Section 8)

B. Out-of-Season:

During this period athletes may not be involved in intramurals in which they have attained team status. Coaches may participate in these programs as long as their players are not involved. (Student-Athlete Guidelines, Section 2)

Open-gym and recreation participation are permitted for players as long as their coaches are not present. In the same vein, coaches may be involved but not with their athletes present. (Student-Athlete Guidelines, Section 4 and 5)

Camp/clinic participation is permitted for players provided their coaches are not involved. (Student- Athlete Guidelines, Section 6)

While the open-gym programs can be sponsored by the member schools, recreation and camp/clinic sponsorship is prohibited. (Student-Athlete Guidelines, Section 4 and 5)

A Student-Athlete may be involved with a non-school team with the approval of the school in accordance with our rule. (Student-Athlete Guidelines, Section 8)

Camp/clinic participation is permitted for players provided that their coaches are spectators only at such.

31

**Participation Chart (Out-of-Season)**

|  | Athletes | Coaches | School Sponsorship |
|---|---|---|---|
| Intramurals * | No | Yes (w/a) | Yes |
| Open-Gym | Yes (w/c) | Yes (w/a) | Yes |
| Camps | Yes (w/c) | Yes (w/a) | No |
| Clinics/Participatory** | Yes (w/c) | Yes | No |
| Clinics/Non-Participatory | Yes | Yes | Yes |
| Recreation Programs | Yes (w/c) | Yes (w/a) | No |
| Independent Play *** | Yes (w/c) | Yes (w/a) | No |
| (w/c) – without coach     (w/a) – without athletes | | | |

*If student has attained team status in the sport being offered.  All freshman are considered to have team status.

**Coaches may be spectators.  See Student-Athlete Guidelines, Section 6.

***An athlete may compete on a non-school team (independent) with approval of the school.  See Student-Athlete Guidelines, Section 8 for Limitations.

C.   Summer Recess:
Participation Limitations Summer Recess – Practice sessions during the summer period are the prerogative of the member school within existing regulations.

A coach/team or Student-Athlete may not be sponsored or supported by a school or school-related group (i.e. Booster Club) when team (interscholastic) or individual competition takes place as part of the activity in camps, clinics, recreation programs or independent play.

**Participation Chart (Summer Recess)**

|  | Athletes | Coaches | School Sponsorship |
|---|---|---|---|
| Camps: | | | |
| Team/Individual Interscholastic Competition | Yes* | Yes* | No |
| Clinics: | | | |
| Team/Individual Interscholastic Competition | Yes* | Yes* | No |
| School's Summer Camp(s): | | | |
| Practice only | Yes | Yes | Yes** |
| Recreation/Independent Programs: | | | |
| Team/Individual | Yes* | Yes* | No |
| Open-Gym Facility: | | | |
| Practice only | Yes | Yes | Yes** |

*Not representing their school.

**Only for that school's athletes/programs involving intra-squad practice.

**Please Note:** The NJSIAA does not regulate or sanction non-school activity and to that extent member schools, for their own protection, are encouraged to inform their coaches and athletes of their independent status when involved in said activities. Information supplied to coaches/athletes should include, but not be limited to, issues dealing with eligibility, injuries, insurance and potential litigation on the part of participants and use of the school name or nickname. In addition, coaches/players must be instructed **not** to use the school name or nickname in any non-school participation.

AR_293173

## FILING A PROTEST OR DECLARING A FORFEIT

<u>Protest</u> – The NJSIAA Bylaws, Article VII, Section 1 provides that:

Section 1:   Protests against alleged violations of contracts, violations of the accepted standards of good sportsmanship, or of the Constitution and Bylaws of this Association, must be reported in writing and posted by the Principals of the participating schools or the game officials to the Executive Committee, through the Executive Director, within one hundred twenty (120) hours of the time of such violation, with a copy to the alleged violator. Protests based upon an official's judgement or misinterpretation of the playing rules will not be honored.

The one hundred twenty (120) hour provision will be satisfied, if the school's Principal notifies the League or Conference President, in writing, prior to the expiration of this time period since disputes and controversies involving League or Conference members must be initially heard at that level.

Note:  See CL 1 – Article VII, Section 1.

"Protests based upon an official's judgement or misinterpretation (misapplication) of the playing rules will not be honored" does not preclude a League or Conference from addressing same; however, the NJSIAA will not honor such protests for non-conference games/meets, neither will the NJSIAA hear appeals to a League or Conference decision based upon an official's judgement or misinterpretation of the playing rule.

<u>Forfeit</u> – Schools may not mutually agree to a forfeit; only Leagues or Conferences or the NJSIAA may award forfeits.

When submitting records for tournament qualification, schools listing forfeit wins/losses must attach an explanation for same.
Coaches must be cautioned not to refuse to play or to complete a game/meet. Such decisions are within the jurisdiction of the game/meet officials once game/meet has started, or rest with home management and/or tournament director if the game/meet has not started.

<u>Forfeit</u> – League/Conference – Non-Conference

When a penalty involving a forfeit is assessed against a member school by a League or Conference it is mandatory that the conference/league Secretary submit, immediately in writing, the action taken, reason why, schools involved, ate and site of the game/meet/match to the Central Office. This applies to all sports.

If a member school in a non-conference game/meet/match feels a forfeit might be warranted, relevant information as stated above should be forwarded by the Principal, immediately in writing, to the Central Office for the Executive Director's decision.

*CL:  When forfeits are received, a member school may not compete on the "forfeit day" when such competition would put the school in conflict with the number of games permitted per day/week/season unless the forfeiture is expunged from the record by League or Conference action or by mutual agreement of the schools*

AR_293174

## USE OF A PROSTHESIS (ARTIFICIAL LIMB)

Federal legislation which prohibits discrimination on the basis of a physical handicap makes it difficult for state associations to defend the former blanket prohibition of the use of a prosthesis when challenged in the courts.

Many sports now have revised rules to provide "artificial limbs which, in the judgement of the rules administering officials, are no more dangerous to players than the corresponding human limb and do not place an opponent at a disadvantage may be permitted." The NJSIAA endorses this policy so long as it is not in conflict with the rules for a specific sport.

The NJSIAA procedure for approving the wearing of a prosthesis by a Student-Athlete will be as follows:

1. The member school must notify the NJSIAA and arrange for a meeting to determine the legality of the prosthesis; present at this meeting must be the school physician, Athletic Director, Principal, coach, a representative from NJSIAA, and the player who must be fully equipped as he/she will be when competing; an athletic trainer or other school representative may also be present.

2. The criteria recommended as a guideline to follow in determining the legality and suitability of wearing a prosthesis in a contact sport are:

   a. The prosthesis should be approved at any Juvenile Amputee Clinic listed in the National Directory. Kessler Institute for Rehabilitation, 1199 Pleasant Valley Way, West Orange, New Jersey 07052 is the only New Jersey clinic listed.
   b. Prosthesis should be properly padded.
   c. Signed approval by an orthopedic surgeon or physician associated with a juvenile amputee clinic and the school physician. Such approval must be represented to the officials before each game for the official's final inspection and approval of proper padding.

   *CL: A series of photos showing the unpadded, partially padded, and full padding of the approved prosthesis should be included.*

Note: Member schools are given this advance notice to allay the possibility of having a prosthesis declared illegal, thereby preventing the player from participating until approval is granted.

## NJSIAA MINIMUM REQUIREMENTS
## FOR REVIEW OF OFFICIALS CHAPTERS

Certification of an officials' chapter or association is at the discretion of the Executive Committee, which may consider, among other things, the need for a new chapter or association, the number of new officials in the membership of the new chapter or association, and whether the new chapter or association was created as a result of a conflict with an existing chapter or association. In addition, all officials' chapters or associations must meet the following minimum requirements to be eligible for consideration by the Executive Committee.

1. The chapter must provide evidence of officiating experience of its membership noting league, conference, or levels of competition and years of service.
2. The chapter must provide a list of its duly elected officers and membership.
3. The chapter must provide a copy of its Constitution and Bylaws for review by the NJSIAA.
4. The chapter must agree to grant the NJSIAA the final authority for testing, training, and evaluation

34

procedures adopted by the chapter.

5. The chapter must provide an outline of its testing, training, and evaluating procedures for certification of prospective and present members. ALL MEMBERS MUST PASS AN ANNUAL WRITTEN RULES EXAMINATION, AS APPROVED BY THE NJSIAA.

6. The chapter must agree to comply with all provisions of the Constitution, Bylaws, and Rules and Regulations of the NJSIAA; decisions of the Executive Committee of the NJSIAA; and the tenets of agreements effected by the Officials' Councils and the NJSIAA.

## NJSIAA MINIMUM REQUIREMENTS
## FOR REGISTRATION OF OFFICIALS

The Executive Committee, at its discretion, may approve the certification or registration of officials and/or official chapters in all sports, and may establish the minimum requirements for testing, training and evaluating of officials.

I. NJSIAA Registration

   a. All officials must be registered with the NJSIAA via the Arbiter to be eligible to officiate ANY level of high school contests the NJSIAA governs.

   b. All officials must register for each sport each year.

   c. All officials must have paid the appropriate registration fees based on their current level. All NJSIAA payments must be paid through the Arbiter, which includes both the registration and the background check fees.

   d. All officials must consent to a yearly background check and pay the background check fee. The background check is required once a year not per sport. Inactive officials are not required to have background checks.

   e. All background checks will expire in June on the day of the last NJSIAA event regardless of when your background check was submitted.

   f. All registered NJSIAA officials are considered independent contractors and not employees of the NJSIAA.

II. NJSIAA Officials Registration Levels:

   a. **Active** - An active official is defined as any official that is registered with the NJSIAA and affiliated with an NJSIAA approved officials chapter. The active official must have also successfully completed all necessary requirements of the chapter to which they are affiliated with. An active official is permitted to work all NJSIAA contests at any level. All registered "Active" officials are covered by the NFHS Liability Insurance.

   b. **Cadet** - A cadet is considered an "official in training" and must be registered with the NJSIAA and affiliated with an NJSIAA approved officials chapter. A cadet is not permitted to work any NJSIAA varsity contest but can work all levels under the varsity level. All NJSIAA approved chapters are required to have a cadet training program and will determine the advancement of their cadets within a set period of time. All cadet training must be completed within 3 years, meaning that upon registering in year 4, the official must be either "active" or "inactive". All registered "Cadets" are covered by the NFHS Liability Insurance.

   c. **Inactive** - An inactive official is defined as any official that is registered with the NJSIAA and may or may not be affiliated with an NJSIAA approved officials chapter. The inactive official is not permitted to work any NJSIAA contest at any level. An inactive official will continue to be covered under the NFHS General Liability and Accident Insurance if they choose to officiate any contest other than NJSIAA, Semi-Pro, and Professional levels. In order for an official to become active again, they must complete all requirements for an "active official".

III.   Testing
    a.  All candidates and members must pass a National Federation Rules Examination or other comprehensive exam approved by the NJSIAA.

IV.   Training
    a.  Candidates must align themselves with an approved chapter of officials within ninety (90) days of notification of successfully passing the approved exam.
    b.  Chapters must designate a rules interpreter who must attend the NJSIAA Rules Interpretation meeting and who must conduct a chapter rules interpretation meeting prior to the opening of the interscholastic sport season for that sport. Attendance at any NJSIAA Regional Rules meetings for those sports in which NJSIAA conducts such regional meetings shall be mandatory for all members. Chapters are encouraged to hold rules interpretation meetings throughout the respective sport season(s).
    c.  Chapters shall conduct meetings at which rules, mechanics, and NJSIAA modifications are reviewed for the in-service improvement of officiating.  A member shall be required to attend a combination of a NJSIAA meeting and two-chapter meetings, which totals three required meetings.
    d.  Cadet and in-service training programs must be established to insure a high caliber of officiating for the member schools. It is highly recommended that officials who are not of legal age (18), even though they may have obtained varsity game status, be assigned to games/matches/meets with mentor officials who are of legal age (18 or older. Officials who are under the age of 18 may not officiate his/her peer group/high school competitions in any sport.

V.   Evaluation and Certification
    a.  Chapters shall develop a means of evaluating their members for continuing their memberships in good standing
    b.  Chapter secretaries shall furnish the NJSIAA with a list of their members in good standing by the NJSIAA designated date.

VI.   Chapter Registration
    a.  Candidates must provide at least two references attesting to his/her character.
    b.  Registration by the chapter will not be issued or renewed for any adult (an adult is defined as any person 18 years of age or older):
        1.  Convicted, or adjudicated with a finding of fault, guilt or violation, in regard to an offense against a minor or any sexual offense unless/until such offense has been reversed by proper authority with jurisdiction over the matter; or,
        2.  Convicted, or adjudicated with a finding of fault, guilt or violation, in regard to an offense involving any illegal/illicit drug or controlled substance as prescribed by federal or state law or regulation, prior to five (5) years following the completion of any sentence, parole, or probation period imposed for the offense.
    c.  Currently Registered Officials
        1.  When a currently registered official is indicted or charged with any indictable criminal offense or charged with a violation of any statute pertaining to minors, drugs or a controlled substance, such license will automatically be suspended, pending resolution of the indictment or charge. Conviction or adjudication of fault, guilt or a violation under any such indictment or charge shall result in immediate and automatic forfeiture of the officiating license.
        2.  Currently registered officials must inform the local chapter of any such indictment or indictable criminal charge immediately upon receipt of or upon having knowledge of such indictment or charge. Failure to notify the chapter shall itself be a basis for immediate and automatic forfeiture of the officiating license.
    d.  Reinstatement/Reapplication for Registration. An official whose registration has been forfeited, suspended or revoked or an applicant who is denied registration, under the provisions of this policy,

36

may petition the chapter for reinstatement/reapplication based on the following:

1. If suspension, revocation or forfeiture of registration is based upon conviction, adjudication or finding of guilt as a result of an indictable offense: The official/applicant may petition the chapter for registration one (1) year after the completion of the parole/probation period; other than conviction of illegal/illicit drugs, controlled substance where a five (5) year probation period is used, or immediately upon dismissal or reversal of the charge or conviction (provided the offense was NOT involving a minor or a sexual offense.

2. If suspension, revocation, forfeiture or denial of registration is based upon any conviction, adjudication or finding of guilt involving a minor or sexual offense, reinstatement/reapplication will not be permitted, unless/until such offense has been reversed by proper authority having jurisdiction over the matter.

## PROCEDURE WHEN OFFICIALS FAIL TO ARRIVE
## OR ARE UNABLE TO CONTINUE

Member schools on a few occasions have been faced with the failure of officials to arrive for a scheduled event. The NJSIAA would like to reemphasize the absolute necessity for having properly executed contracts, in writing, with either the individual official or the chapter assignor. The officials have been repeatedly advised to report to the game site well in advance of the starting time for a pregame meeting and to permit ample time for their pregame duties relative to facility inspection, equipment approval and instructions to game-related aides. Upon arrival at an event, an official should immediately report to the athletic director or site director.

Hopeful, that schools will never have the experience of having teams poised for action, with thousands of spectators awaiting the start of the contest only to discover late arriving or totally absent officials, the following recommendations are provided as a procedural plan in the event officials fail to arrive for the game.

To reassure yourself, a reminder should be forwarded to officials one week prior to the game. Schools must not permit contracted officials to assign substitute officials without the approval of the school.

If the officials have failed to arrive within one-half hour of game time, an attempt should be made to contact the officials or their assignor.

When it becomes apparent that the expected officials will not be present for the game, the following procedure is recommended:

Contact chapter assignor, chapter secretary or local NJSIAA officials for last minute replacements;

If this fails:
Request via the P.A. system that NJSIAA officials (of the sport in question) report to a central location. Assignment to be the responsibility of the home athletic director.

Every attempt should be made to play the game, unless it can be clearly established that to do so would not be in the best interest of the participating schools.

The responsibility for assigning officials and for determining the playing or postponing of a game under these circumstances rests with the Principal and the Athletic Director of the host school-this is not a coaching staff decision. When only one (1) official arrives for game to which two (2) officials-umpires are usually assigned, the game must be played. Same applies when an official is unable to complete the assignment.

AR_293178

Schools withholding their teams from competition under these conditions will be subject to severe punitive action under Article X of the Bylaws and officials are required to report the violation to the NJSIAA within seven (7) days.

## SALES AND SOLICITATIONS

Only NJSIAA promotional items will be sold at NJSIAA tournaments. No solicitations, sale of publications or products, or similar activities are permitted without prior authorization from NJSIAA.

The New Jersey State Interscholastic Athletic Association is the sponsoring association for all levels of State Tournaments/Championships. The NJSIAA reserves all rights in regard to the management of these Tournaments/Championships and the sale or distribution of clothing, souvenirs or any other items is strictly prohibited without permission of the NJSIAA.

## STEROID TESTING PROCEDURES

In accordance with Executive Order 72, issued by the Governor of the State of New Jersey, Richard J. Codey, on December 20, 2005, the NJSIAA will test a random selection of student athletes, who have qualified, as individuals or as members of a team, for state championship competition.

1. List of banned substances – A list of banned substances shall be prepared annually by the Medical Advisory Committee, and approved by the Executive Committee.

2. Consent form – Before participating in interscholastic sports, the student-athlete and the student-athlete's parent or guardian shall consent, in writing, to random testing in accordance with this policy. Failure to sign the consent form renders the student-athlete ineligible.

3. Selection of athletes to be tested – Tested athletes will be selected randomly from all of those athletes participating in championship competition. Testing may occur at any state championship site or at the school whose athletes have qualified for championship competition

4. Administration of tests – Tests shall be administered by a certified laboratory, selected by the Executive Director and approved by the Executive Committee.

5. Testing methodology – The methodology for taking and handling samples shall be in accordance with current legal standards.

6. Sufficiency of results – No test shall be considered a positive result unless the approved laboratory reports a positive result, and the NJSIAA's medical review officer confirms that there was no medical reason for the positive result. A "B" sample shall be available in the event of an appeal.

7. Appeal process – If the certified laboratory reports that a student-athlete's sample has tested positive, and the medical review officer confirms that there is no medical reason for a positive result, a penalty shall be imposed unless the student-athlete proves, by a preponderance of the evidence, that he or she bears no fault or negligence for the violation. Appeals shall be heard by a NJSIAA committee consisting of two members of the Executive Committee, the Executive Director/designee, a trainer and a physician. Appeal of a decision of the Committee shall be to the Commissioner of Education, for public school athletes, and to the superior court, for non-public athletes. Hearings shall be held in accordance with NJSIAA By-Laws, Article XIII, and "Hearing Procedure."

38

8. Penalties – Any person who tests positively in an NJSIAA administered test, or any person who refuses to provide a testing sample, or any person who reports his or her own violation, shall immediately forfeit his or her eligibility to participate in NJSIAA competition for a period of one year from the date of the test. Any such person shall also forfeit any individual honor earned while in violation. No person who tests positive, refuses to provide a test sample, or who reports his or her own violation shall resume eligibility until he or she has undergone counseling and produced a negative test result.

9. Confidentiality – Results of all tests shall be considered confidential and shall only be disclosed to the individual, his or her parents and his or her school.

10. Compilation of results – The Executive Committee shall annually compile and report the results of the testing program.

11. Yearly renewal of the steroid policy – The Executive Committee shall annually determine whether this policy shall be renewed or discontinued.

39

# NEW JERSEY STATE INTERSCHOLASTIC ATHLETIC ASSOCIATION
## STUDENT-ATHLETE RESIDENCY AFFIDAVIT

| | | |
|---|---|---|
| Print Student's Full Name | School | Date |

I,_____, of full age, being duly sworn to law, upon my oath depose and say:

1. I am the parent/legal guardian of the above listed student. (circle)
2. I currently reside at: _____

   I have resided at the above address since: _____

3. The above-named student moved with me at my new address on: _____

4. Prior to moving to the new residence address listed above, I resided at the following address:

   _____

5. Prior to moving to the new address listed in #2 above, the student resided at the following address:

   _____

   with named parent/legal guardian _____
6. I hereby authorize the New Jersey State Interscholastic Athletic Association ("NJSIAA") to investigate and confirm any and all Statements made by me in this affidavit. I agree to provide any additional information that may be requested by the NJSIAA.
7. I will notify the present school immediately, in writing, if any of the conditions recited herein are changed.
8. This residence may not be associated with, leased, or provided by anyone associated with the school or acting at the direction of the school, including but not limited to administration, staff, coaches, students, parents, booster clubs, or any organization having a connection with the school.

I hereby certify that the forgoing statements are true, and I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

| | |
|---|---|
| Parent/Guardian Signature | Print Parent/Guardian Full Name |

STATE OF NEW JERSEY, COUNTY OF_____. The above-named affiant appeared before me, a notary public of the State of New Jersey, on the___day of_____, 20___ and I made known to him/her the contents of the above affidavit which was then sworn and subscribed to by said affiant before me on this date.

Notary Public: ___

***Copies of this Affidavit must be sent to the New Jersey State Interscholastic Athletic Association upon request***

EC Approved 4/1/20

40

## SUSPENDED FOOTBALL GAMES

Games interrupted/suspended due to reasons beyond anyone's control, e.g., electrical storms, torrential rains and the like. All games to be continued will be at the site of the interrupted game unless otherwise agreed upon by competing schools.

1. If both schools agree, the game will be a completed game or the game will be continued from the point of interruption but no later than Tuesday of the following week.

2. If both schools belong to the same Conference (divisional or inter-divisional game), the Conference must have adopted guidelines in the event the schools do not agree to resolve the issue by mutual agreement; however, if the game is to be continued from the point of interruption, it must be played no later than Tuesday of the following week.

3. If the game is a non-conference game, and the schools do not agree to resolve the issue, the NJSIAA will resolve the issue as follows:

   a. If the point difference is twenty-two (22) points or more, the game shall be a completed game regardless of the point of interruption.
   b. If the interrupted game has completed three (3) quarters, the game will be a completed game.
   c. If the game is interrupted after the completion of the first half and the point difference is fifteen (15) or more points, the game shall be a completed game.
   d. All other games, except as provided in #5, will be continued from the point of interruption no later than Tuesday of the following week. If the schools cannot agree on the date, the game will be continued on the Monday following the game at 3:00 p.m.
   e. Whenever it is not considered prudent to complete an interrupted game, the Executive Director will have the authority to rule on the status of the game.

## BEFORE A GAME IS TERMINATED

The host school management has full responsibility for determining whether or not conditions are such as to postpone or start a game/meet. Schools must know that once a game/meet/event has started, the official(s) have jurisdiction for terminating same prematurely.

Termination, once the game has started, is not the prerogative of a coach or school management, and the action of removing a team from the event prior to the conclusion of the game/meet/event, regardless of the circumstances, will result in severe punitive actions by the NJSIAA controversies or executive committee.

The following procedure should be implemented before termination of the event by the official(s):

1. Coaches and/or players should be penalized for misconduct as provided for in the playing rules;

2. Continued misconduct should result in the coach(es) of the teams being advised to correct the situation or be faced with possible termination of the game;

3. Officials should confer and, if they consider the circumstances warrant, teams should be directed to their respective bench areas while the coaches, Athletic Directors, and administrators of the schools discuss, in the center of the field or in a private area, an attempt to restore control of their teams and/or spectators;

41

4. When it is apparent to the <u>game official(s) and the host school administration</u> that to continue the event would present a clear and present danger to the safety and welfare of any party, the game should be terminated and the schools' head coaches advised accordingly. This should not be a unilateral decision; however, if the responsible parties are unable or unwilling to control their teams and/or spectators, the official(s) must inform the head coach (es) of the teams that the game is terminated;

5. Officials must not rule on forfeiture of any prematurely terminated events; only conferences and/or the NJSIAA have the jurisdiction to determine forfeits. All games terminated due to control problems, will require a comprehensive report to the NJSIAA Central Office and the Chapter Secretaries by the officials and the Principals of the involved schools. Said report from the officials should be forwarded immediately to the NJSIAA with a copy to the principals of the involved schools. The report(s) will be forwarded to the League/Conference for a hearing by them prior to any action by the NJSIAA.

## TRANSGENDER POLICY

1. A transgender student, defined as a student whose gender identity differs from the student's sex assigned at birth, shall be eligible to participate in accordance with either their birth sex or in accordance with their gender identity, but not both. Exceptions to this policy shall be subject to appeal to the Eligibility Appeals Committee.

2. In the event of a positive test result under the NJSIAA's "General Prohibition Against Performance Enhancing Drugs", a transgender student's use of a banned substance for the purposes of hormone therapy may be considered by the NJSIAA medical review officer as a medical reason for the positive result.

3. Any member school may appeal the eligibility of a transgender student on the grounds that the student's participation in interscholastic athletics would adversely affect competition or safety. Any appeal under this paragraph will be heard by the Eligibility Appeals Committee and shall be confidential. The Eligibility Appeals Committee will not consider whether the school has properly determined the student's sex-assignment.

4. If a transgender student has not yet declared their transgender status, this policy shall not apply. If a transgender student, at some point during their high school career, no longer identifies as a transgender student, this policy shall not apply.

## UNIFIED SPORTS®

Unified Sports® is a joint effort between the NJSIAA and Special Olympics New Jersey (SONJ) to incorporate Unified Sports® programs in NJSIAA member schools recognizing and offering opportunities for students with and without disabilities to compete in NJSIAA sanctioned activity. On June 19, 2014, Governor Christie signed legislation regarding the inclusion of students with disabilities in athletic activities. This law requires school districts ensure students with disabilities have equal access and opportunities to participate in athletics.

Unified Sports® was created by Special Olympics International to give individuals with intellectual disabilities the opportunity to train and compete in sports activities alongside their peers. The vision of the joint NJSIAA/SONJ effort is to allow high school students with and without intellectual disabilities the opportunity to represent their high school by participating on Unified Sports® teams, providing the students with a quality experience of sports training and competition. No person shall, on the basis of gender, race, religion, color or national origin, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity of Special Olympics.

42

Section 1. ATHLETE ELIGIBILITY FOR UNIFIED SPORTS®

1. General Statement – A person with an intellectual (ID) or closely related developmental (DD) disability that has satisfied one of the following requirements:
   a. An appropriate agency or professional has identified him/her as having an intellectual disability, with functional limitations in both general learning and adaptive skills;
   b. (S)he is identified as having a cognitive delay after completing an acceptable standardized test or other instrument generally accepted within the professional community as providing a reliable measurement. ie, IQ test.
   c. An appropriate agency or professional has identified him/her as having a closely related developmental disability (DD), which means having functional limitations in both general learning and in adaptive skills (such as recreational, work, independent living, self-direction, or self-care). This includes students on the Autism Spectrum.
   d. Individuals whose functional limitations are based solely on a physical, behavioral, or emotional disability, or a specific learning or sensory disability, are not eligible to participate as Special Olympic athletes, but may be eligible to participate as a Unified partner, coach, manager or volunteer.

Section 2. UNIFIED PARTNER ELIGIBILITY

1. Definition - Unified Sports® is a program that combines approximately equal numbers of Special Olympics athletes and athletes without ID (Unified partners) on sports teams for training and competition.
2. Any student participating in a sport at the **varsity level** at any time during the season is NOT eligible to compete as a Unified partner in the **same sport**. Appropriate participation for such a student-athlete may take place as a manager.
3. Refer to NJSIAA By-Law Article V, Section 1.

Section 3. AGE

1. Unified Student Athlete – A student with ID may participate in Unified Sports® as long as he or she is enrolled in the school.
2. Unified Partner - Refer to NJSIAA By-Law Article V, Section 4, C (Age)

Section 4. CREDITS

1. Unified Student Athlete - Refer to NJSIAA By-Law Article V, Section 4, F (Handicapped/Classified Students)
2. Unified Partner - Refer to NJSIAA By-Law Article V, Section 4, E (Credits)

43

Section 5. SEMESTERS

1. Unified Student Athlete – Students defined by the NJ DOE under IDEA shall be permitted to participate as long as they are properly enrolled in school and maintain other eligibility requirements as per his/her IEP.
2. Unified Partner - Refer to NJSIAA By-Law Article V, Section 4, E, J

Section 6. MEDICAL PHYSICAL REQUIREMENTS

1. Refer to N.J.A.C 6A:16-2.2 – All participants will follow the State administrative code for required health services as well as other school requirements for athletic participation.

Section 7. ALIGNMENT OF SPORTS

1. Unified Sports® shall be aligned in its own division.
2. Unified Sports® shall be contested as co-ed in both team and individual sports.

Section 8. COOPERATIVE SPORTS PROGRAMS

1. Refer to NJSIAA By-Laws Article III, Section 10

Section 9. SPORTS SEASON

1. Refer to NJSIAA Rules and Regulations Section 5 – 8
2. Practices prior to competition – Although highly recommended, the 6 practice and one day of rest rule is waived for Unified Sports.

Section 10. OUT-OF-SEASON GUIDELINES

1. During the out-of-season period (refer to NJSIAA Rules and Regulations Section 2), coaches ARE permitted to work with Unified athletes and Unified partners ONLY when it is being run as a Unified Sports® event and/or a SONJ event.

Section 11. CONTEST RULES

1. Contests played between member schools will be played according to the rules of the NFHS or National Governing Body of that sport. Rules and regulations for Unified Sports® will be jointly published by NJSIAA and SONJ prior to each season, as approved by the NJSIAA Executive Board.

Section 12. COACH REQUIREMENTS

1. Unified Sports® coaches are required to meet all NJSIAA coaching certifications and regulations as outlined in the NJSIAA Guidelines, Policies and Procedures. Additionally, Unified Sports coaches must obtain a Unified Sports coaching certification by completing the online NFHS Coaching Unified Sports course.

AR_293185

## UNIFORMS – RELIGIOUS EXEMPTION

<u>Participant Uniforms</u>:  Schools may modify uniforms for their athletes for religious reasons. The religious group must file a letter with the school. A copy of the letter must accompany the participant at each event to be available for the official to review and approve.

### INTERIM VAPOR/E-CIGARETTES POLICY (under review)

It has come to the attention of NJSIAA that vapor/e-cigarettes maybe/are being used by student athletes and/or coaches prior to, during, or after interscholastic events. The NFHS rule book(s) state "the use of tobacco products" results in a flagrant disqualification, but there is no mention of vapor/e-cigarettes. When contacted, the NFHS replied that vapor/e-cigarettes are to be treated as a traditional cigarette, which is identified as a tobacco/and or nicotine product, and therefore means any use of the vapor/e-cigarettes shall be enforced as a flagrant disqualification. The NJSIAA position on this matter is that we will adhere to the ruling stated above. We will refer this matter to the NJSIAA Medical Advisory Committee for further study and after receiving the Medical Advisory Committees' recommendation(s), we will develop a permanent policy and will distribute such to the member schools of NJSIAA.

AR_293186

# Examples of Policies and Emerging Practices for Supporting Transgender Students



U.S. Department of Education

Office of Elementary and Secondary Education

Office of Safe and Healthy Students

May 2016

U.S. Department of Education
Office of Elementary and Secondary Education
Office of Safe and Healthy Students

Ann Whalen
*Senior Advisor to the Secretary, Delegated the Duties of the Assistant Secretary, Office of Elementary and Secondary Education*

David Esquith
*Director, Office of Safe and Healthy Students*

May 2016
This resource is in the public domain. Authorization to reproduce it in whole or in part is granted. The guide's citation should be:
U.S. Department of Education, Office of Elementary and Secondary Education, Office of Safe and Healthy Students, *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 2016).

This guide is also available on the Office of Safe and Healthy Students website at www.ed.gov/oese/oshs/emergingpractices.pdf. Any updates to this guide will be available at this website.

If you need technical assistance, please contact the Office of Safe and Healthy Students at:
OESE.Info.SupportingTransgenderStudents@ed.gov

**Availability of Alternate Formats**
Requests for documents in alternate formats such as Braille or large print should be submitted to the Alternate Format Center by calling 202-260-0852 or by contacting the 504 coordinator via e-mail at om_eeos@ed.gov.

**Notice to Limited English Proficient Persons**
If you have difficulty understanding English you may request language assistance services for Department information that is available to the public. These language assistance services are available free of charge. If you need more information about interpretation or translation services, please call 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-437-0833), or e-mail us at ED.Language.Assistance@ed.gov. Or write to U.S. Department of Education, Information Resource Center, LBJ Education Building, 400 Maryland Ave. SW, Washington, DC 20202.

## Examples of Policies and Emerging Practices for Supporting Transgender Students

The U.S. Department of Education ("ED") is committed to providing schools with the information they need to provide a safe, supportive, and nondiscriminatory learning environment for all students.  It has come to ED's attention that many transgender students (*i.e.*, students whose gender identity is different from the sex they were assigned at birth) report feeling unsafe and experiencing verbal and physical harassment or assault in school, and that these students may perform worse academically when they are harassed.  School administrators, educators, students, and parents are asking questions about how to support transgender students and have requested clarity from ED.  In response, ED developed two documents:

- ED's Office for Civil Rights and the U.S. Department of Justice's Civil Rights Division jointly issued a Dear Colleague Letter ("DCL") about transgender students' rights and schools' legal obligations under Title IX of the Education Amendments of 1972.[1]  Any school that has questions related to transgender students or wants to be prepared to address such issues if they arise should review the DCL.

- ED's Office of Elementary and Secondary Education compiled the attached examples of policies[2] and emerging practices[3] that some schools are already using to support transgender students.  We share some common questions on topics such as school records, privacy, and terminology, and then explain how some state and school district policies have answered these questions.  We present this information to illustrate how states and school districts are supporting transgender students.  We also provide information about and links to those policies at the end of the document, along with other resources that may be helpful as educators develop policies and practices for their own schools.

---

[1] 20 U.S.C. §§ 1681-1688; Dear Colleague Letter: Transgender Students (May 13, 2016), www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[2] In this document, the term *policy* or *policies* refers generally to policies, guidance, guidelines, procedures, regulations, and resource guides issued by schools, school districts, and state educational agencies.

[3] ED considers *emerging practices* to be operational activities or initiatives that contribute to successful outcomes or enhance agency performance capabilities.  Emerging practices are those that have been successfully implemented and demonstrate the potential for replication by other agencies.  Emerging practices typically have not been rigorously evaluated, but still offer ideas that work in specific situations.

i

Each person is unique, so the needs of individual transgender students vary. But a school policy setting forth general principles for supporting transgender students can help set clear expectations for students and staff and avoid unnecessary confusion, invasions of privacy, and other harms. The education community continues to develop and revise policies and practices to address the rights of transgender students and reflect our evolving understanding and the individualized nature of transgender students' needs.

This document contains information from some schools, school districts, and state and federal agencies. Inclusion of this information does not constitute an endorsement by ED of any policy or practice, educational product, service, curriculum or pedagogy. In addition, this document references websites that provide information created and maintained by other entities. These references are for the reader's convenience. ED does not control or guarantee the accuracy, relevance, timeliness, or completeness of this outside information. This document does not constitute legal advice, create legal obligations, or impose new requirements.

AR_293263

## Table of Contents

Student Transitions ........................................................................................................... 1

   1.   How do schools find out that a student will transition? ................................................. 1

   2.   How do schools confirm a student's gender identity? ..................................................... 1

   3.   How do schools communicate with the parents of younger students compared to older transgender students? ........................................................................................ 2

Privacy, Confidentiality, and Student Records ................................................................. 4

   4.   How do schools protect a transgender student's privacy regarding the student's transgender status? .................................................................................................... 4

   5.   How do schools ensure that a transgender student is called by the appropriate name and pronouns? ............................................................................................................ 5

   6.   How do schools handle requests to change the name or sex designation on a student's records? ..................................................................................................................... 6

Sex-Segregated Activities and Facilities .......................................................................... 7

   7.   How do schools ensure transgender students have access to facilities consistent with their gender identity? ................................................................................................. 7

   8.   How do schools protect the privacy rights of all students in restrooms or locker rooms? ..................................................................................................................... 7

   9.   How do schools ensure transgender students have the opportunity to participate in physical education and athletics consistent with their gender identity? ...................... 8

   10.  How do schools treat transgender students when they participate in field trips and athletic trips that require overnight accommodations? ................................................. 9

Additional Practices to Support Transgender Students ...................................................... 10

   11.  What can schools do to make transgender students comfortable in the classroom?.. 10

   12.  How do school dress codes apply to transgender students? ....................................... 10

   13.  How do schools address bullying and harassment of transgender students? ............. 11

   14.  How do school psychologists, school counselors, school nurses, and school social workers support transgender students? ....................................................................... 11

   15.  How do schools foster respect for transgender students among members of the broader school community? ........................................................................................ 12

   16.  What topics do schools address when training staff on issues related to transgender students? .................................................................................................................... 12

   17.  How do schools respond to complaints about the way transgender students are treated? .................................................................................................................... 13

AR_293264

**Terminology** ................................................................................................ **14**

   18.   What terms are defined in current school policies on transgender students?............. 14

   19.   How do schools account for individual preferences and the diverse ways that students describe and express their gender?.............................................................. 15

**Cited Policies on Transgender Students**.............................................................. **16**

**Select Federal Resources on Transgender Students** ............................................ **18**

iv

<u>**Student Transitions**</u>

1. **How do schools find out that a student will transition?**

Typically, the student or the student's parent or guardian will tell the school and ask that the school start treating the student in a manner consistent with the student's gender identity. Some students transition over a school break, such as summer break.  Other students may undergo a gender transition during the school year, and may ask (or their parents may ask on their behalf) teachers and other school employees to respect their identity as they begin expressing their gender identity, which may include changes to their dress and appearance. Some school district or state policies address how a student or parent might provide the relevant notice to the school.

- Alaska's Matanuska-Susitna Borough School District issued guidelines ("Mat-Su Borough Guidelines") advising  that transgender students or their parents or guardians should contact the building administrator or the student's guidance counselor to schedule a meeting to develop a plan to address the student's particular circumstances and needs.

- The guidelines issued by Washington's Superintendent of Public Instruction ("Washington State Guidelines") offer an example of a student who first attended school as a boy and, about midway through a school year, she and her family decided that she would transition and begin presenting as a girl.  She prefers to dress in stereotypically feminine attire such as dresses and skirts.  Although she is growing her hair out and consistently presents as female at school, her hair is still in a rather short, typically boyish haircut.  The student, her parents, and school administrators asked her friends and teachers to use female pronouns to address her.

2. **How do schools confirm a student's gender identity?**

Schools generally rely on students' (or in the case of younger students, their parents' or guardians') expression of their gender identity.  Although schools sometimes request some form of confirmation, they generally accept the student's asserted gender identity.  Some schools offer additional guidance on this issue.

- Los Angeles Unified School District issued a policy ("LAUSD Policy") noting that "[t]here is no medical or mental health diagnosis or treatment threshold that

1

AR_293266

students must meet in order to have their gender identity recognized and respected" and that evidence may include an expressed desire to be consistently recognized by their gender identity.

- The New York State Education Department issued guidance ("NYSED Guidance") recommending that "schools accept a student's assertion of his/her/their own gender identity" and provides examples of ways to confirm the assertion, such as a statement from the student or a letter from an adult familiar with the student's situation.  The same guidance also offers the following example:  "In one middle school, a student explained to her guidance counselor that she was a transgender girl who had heretofore only been able to express her female gender identity while at home.  The stress associated with having to hide her female gender identity by presenting as male at school was having a negative impact on her mental health, as well as on her academic performance.  The student and her parents asked if it would be okay if she expressed her female gender identity at school.  The guidance counselor responded favorably to the request.  The fact that the student presented no documentation to support her gender identity was not a concern since the school had no reason to believe the request was based on anything other than a sincerely held belief that she had a female gender identity."

- Alaska's Anchorage School District developed administrative guidelines ("Anchorage Administrative Guidelines") noting that being transgender "involves more than a casual declaration of gender identity or expression but does not require proof of a formal evaluation and diagnosis.  Since individual circumstances, needs, programs, facilities and resources may differ; administrators and school staff are expected to consider the needs of the individual on a case-by-case basis."

### 3.  How do schools communicate with the parents of younger students compared to older transgender students?

Parents are often the first to initiate a conversation with the school when their child is transgender, particularly when younger children are involved.  Parents may play less of a role in an older student's transition.  Some school policies recommend, with regard to an older student, that school staff consult with the student before reaching out to the student's parents.

- The District of Columbia Public Schools issued guidance ("DCPS Guidance") noting that "students may choose to have their parents participate in the transition process, but parental participation is not required."  The guidance further

2

recommends different developmentally appropriate protocols depending on grade level.  The DCPS Guidance suggests that the school work with a young student's family to identify appropriate steps to support the student, but recommends working closely with older students prior to notification of family.  The guidance also provides a model planning document with key issues to discuss with the student or the student's family.

- Similarly, the Massachusetts Department of Elementary and Secondary Education issued guidance ("Massachusetts Guidance") that notes:  "Some transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance.  School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian.  For the same reasons, school personnel should discuss with the student how the school should refer to the student, *e.g.,* appropriate pronoun use, in written communication to the student's parent or guardian."

- Chicago Public Schools' guidelines ("Chicago Guidelines") provide:  "When speaking with other staff members, parents, guardians, or third parties, school staff should not disclose a student's preferred name, pronoun, or other confidential information pertaining to the student's transgender or gender nonconforming status without the student's permission, unless authorized to do so by the Law Department."

- Oregon's Department of Education issued guidance stating, "In a case where a student is not yet able to self-advocate, the request to respect and affirm a student's identity will likely come from the student's parent. However, in other cases, transgender students may not want their parents to know about their transgender identity. These situations should be addressed on a case-by-case basis and school districts should balance the goal of supporting the student with the requirement that parents be kept informed about their children. The paramount consideration in such situations should be the health and safety of the student, while also making sure that the student's gender identity is affirmed in a manner that maintains privacy and confidentiality."

AR_293268

**Privacy, Confidentiality, and Student Records**

4. **How do schools protect a transgender student's privacy regarding the student's transgender status?**

There are a number of ways schools protect transgender students' interests in keeping their transgender status private, including taking steps to prepare staff to consistently use the appropriate name and pronouns. Using transgender students' birth names or pronouns that do not match their gender identity risks disclosing a student's transgender status. Some state and school district policies also address how federal and state privacy laws apply to transgender students and how to keep information about a student's transgender status confidential.

- California's El Rancho Unified School District issued a regulation ("El Rancho Regulation") that provides that students have the right to openly discuss and express their gender identity, but also reminds school personnel to be "mindful of the confidentiality and privacy rights of [transgender] students when contacting parents/legal guardians so as not to reveal, imply, or refer to a student's actual or perceived sexual orientation, gender identity, or gender expression."

- The Chicago Guidelines provide that the school should convene an administrative support team to work with transgender students and/or their parents or guardians to address each student's individual needs and supports. To protect the student's privacy, this team is limited to "the school principal, the student, individuals the student identifies as trusted adults, and individuals the principal determines may have a legitimate interest in the safety and healthy development of the student."

- The Mat-Su Borough Guidelines state: "In some cases, a student may want school staff and students to know, and in other cases the student may not want this information to be widely known. School staff should take care to follow the student's plan and not to inadvertently disclose information that is intended to be kept private or that is protected from disclosure (such as confidential medical information)."

- The Massachusetts Guidance advises schools "to collect or maintain information about students' gender only when necessary" and offers an example: "One school reviewed the documentation requests it sent out to families and noticed that field trip permission forms included a line to fill in indicating the student's gender. Upon consideration, the school determined that the requested information was irrelevant to the field trip activities and deleted the line with the gender marker request."

4

**5. How do schools ensure that a transgender student is called by the appropriate name and pronouns?**

One of the first issues that school officials may address when a student notifies them of a gender transition is determining which name and pronouns the student prefers. Some schools have adopted policies to prepare all school staff and students to use a student's newly adopted name, if any, and pronouns that are consistent with a student's gender identity.

- A regulation issued by Nevada's Washoe County School District ("Washoe County Regulation") provides that: "Students have the right to be addressed by the names and pronouns that correspond to their gender identity. Using the student's preferred name and pronoun promotes the safety and wellbeing of the student. When possible, the requested name shall be included in the District's electronic database in addition to the student's legal name, in order to inform faculty and staff of the name and pronoun to use when addressing the student."

- A procedure issued by Kansas City Public Schools in Missouri ("Kansas City Procedure") notes that: "The intentional or persistent refusal to respect the gender identity of an employee or student after notification of the preferred pronoun/name used by the employee or student is a violation of this procedure."

- The NYSED Guidance provides: "As with most other issues involved with creating a safe and supportive environment for transgender students, the best course is to engage the student, and possibly the parent, with respect to name and pronoun use, and agree on a plan to reflect the individual needs of each student to initiate that name and pronoun use within the school. The plan also could include when and how this is communicated to students and their parents."

- The DCPS Guidance includes a school planning guide for principals to review with transgender students as they plan how to ensure the school environment is safe and supportive. The school planning guide allows the student to identify the student's gender identity and preferred name, key contacts at home and at school, as well as develop plans for access to restrooms, locker rooms, and other school activities.

AR_293270

**6. How do schools handle requests to change the name or sex designation on a student's records?**

Some transgender students may legally change their names. However, transgender students often are unable to obtain identification documents that reflect their gender identity (*e.g.*, due to financial limitations or legal restrictions imposed by state or local law). Some school district policies specify that they will use the name a student identifies as consistent with the student's gender identity regardless of whether the student has completed a legal name change.

- The NYSED Guidance provides that school records, including attendance records, transcripts, and Individualized Education Programs, be updated with the student's chosen name and offers an example: "One school administrator dealt with information in the student's file by starting a new file with the student's chosen name, entered previous academic records under the student's chosen name, and created a separate, confidential folder that contained the student's past information and birth name."

- The DCPS Guidance notes: "A court-ordered name or gender change is not required, and the student does not need to change their official records. If a student wishes to go by another name, the school's registrar can enter that name into the 'Preferred First' name field of [the school's] database."

- The Kansas City Procedure recognizes that there are certain situations where school staff or administrators may need to report a transgender student's legal name or gender. The procedure notes that in these situations, "school staff and administrators shall adopt practices to avoid the inadvertent disclosure of such confidential information."

- The Chicago Guidelines state: "Students are not required to obtain a court order and/or gender change or to change their official records as a prerequisite to being addressed by the name and pronoun that corresponds to their gender identity."

- The Massachusetts Guidance also addresses requests to amend records after graduation: "Transgender students who transition after having completed high school may ask their previous schools to amend school records or a diploma or transcript that include the student's birth name and gender. When requested, and when satisfied with the gender identity information provided, schools should amend the student's record."

6

**Sex-Segregated Activities and Facilities**

7. **How do schools ensure transgender students have access to facilities consistent with their gender identity?**

Schools often segregate restrooms and locker rooms by sex, but some schools have policies that students must be permitted to access facilities consistent with their gender identity and not be required to use facilities inconsistent with their gender identity or alternative facilities.

- The Washington State Guidelines provide:  "School districts should allow students to use the restroom that is consistent with their gender identity consistently asserted at school."  In addition, no student "should be required to use an alternative restroom because they are transgender or gender nonconforming."

- The Washoe County Regulation provides:  "Students shall have access to use facilities that correspond to their gender identity as expressed by the student and asserted at school, irrespective of the gender listed on the student's records, including but not limited to locker rooms."

- The Anchorage Administrative Guidelines emphasize the following provision: "However, staff should not require a transgender or gender nonconforming student/employee to use a separate, nonintegrated space unless requested by the individual student/employee."

8. **How do schools protect the privacy rights of all students in restrooms or locker rooms?**

Many students seek additional privacy in school restrooms and locker rooms.  Some schools have provided students increased privacy by making adjustments to sex-segregated facilities or providing all students with access to alternative facilities.

- The Washington State Guidelines provide that any student who wants increased privacy should be provided access to an alternative restroom or changing area.  The guidelines explain:  "This allows students who may feel uncomfortable sharing the facility with the transgender student(s) the option to make use of a separate restroom and have their concerns addressed without stigmatizing any individual student."

7

- The NYSED Guidance gives an example of accommodating all students' interest in privacy: "In one high school, a transgender female student was given access to the female changing facility, but the student was uncomfortable using the female changing facility with other female students because there were no private changing areas within the facility. The principal examined the changing facility and determined that curtains could easily be put up along one side of a row of benches near the group lockers, providing private changing areas for any students who wished to use them. After the school put up the curtains, the student was comfortable using the changing facility."

- Atherton High School, in Jefferson County, Kentucky, issued a policy that offers examples of accommodations to address any student's request for increased privacy: "use of a private area within the public area of the locker room facility (e.g. nearby restroom stall with a door or an area separated by a curtain); use of a nearby private area (e.g. nearby restroom); or a separate changing schedule."

- The DCPS Guidance recommends talking to students to come up with an acceptable solution: "Ultimately, if a student expresses discomfort to any member of the school staff, that staff member should review these options with the student and ask the student permission to engage the school LGBTQ liaison or another designated ally in the building."

9. **How do schools ensure transgender students have the opportunity to participate in physical education and athletics consistent with their gender identity?**

Some school policies explain the procedures for establishing transgender students' eligibility to participate in athletics consistent with their gender identity. Many of those policies refer to procedures established by state athletics leagues or associations.

- The NYSED Guidance explains that "physical education is a required part of the curriculum and an important part of many students' lives. Most physical education classes in New York's schools are coed, so the gender identity of students should not be an issue with respect to these classes. Where there are sex-segregated classes, students should be allowed to participate in a manner consistent with their gender identity."

- The LAUSD Policy provides that "participation in competitive athletics, intramural sports, athletic teams, competitions, and contact sports shall be facilitated in a

8

manner consistent with the student's gender identity asserted at school and in
accordance with the California Interscholastic Federation bylaws."  The California
Interscholastic Federation establishes a panel of professionals, including at least one
person with training or expertise in gender identity health care or advocacy, to make
eligibility decisions.

- The Rhode Island Interscholastic League's policy states that all students should have
  the opportunity to participate in athletics consistent with their gender identity,
  regardless of the gender listed on school records.  The policy provides that the
  league will base its eligibility determination on the student's current transcript and
  school registration information, documentation of the student's consistent gender
  identification (*e.g.*, affirmed written statements from student, parent/guardian, or
  health care provider), and any other pertinent information.

## 10. How do schools treat transgender students when they participate in field trips and athletic trips that require overnight accommodations?

Schools often separate students by sex when providing overnight accommodations.  Some
school policies provide that students must be treated consistent with their gender identity in
making such assignments.

- Colorado's Boulder Valley School District issued guidelines ("Boulder Valley
  Guidelines") providing that when a school plans overnight accommodations for a
  transgender student, it should consider "the goals of maximizing the student's
  social integration and equal opportunity to participate in overnight activity and
  athletic trips, ensuring the [transgender] student's safety and comfort, and
  minimizing stigmatization of the student."

- The Chicago Guidelines remind school staff:  "In no case should a transgender
  student be denied the right to participate in an overnight field trip because of
  the student's transgender status."

9

<u>**Additional Practices to Support Transgender Students**</u>

**11. What can schools do to make transgender students comfortable in the classroom?**

Classroom practices that do not distinguish or differentiate students based on their gender are the most inclusive for all students, including transgender students.

- The DCPS Guidance suggests that "[w]herever arbitrary gender dividers can be avoided, they should be eliminated."

- The Massachusetts Guidance states that "[a]s a general matter, schools should evaluate all gender-based policies, rules, and practices and maintain only those that have a clear and sound pedagogical purpose."

- Minneapolis Public Schools issued a policy providing that students generally should not be grouped on the basis of sex for the purpose of instruction or study, but rather on bases such as student proficiency in the area of study, student interests, or educational needs for acceleration or enrichment.

- The Maryland State Department of Education issued guidelines that include an example of eliminating gender-based sorting of students: "Old Practice: boys line up over here." New Practice: birthdays between January and June; everybody who is wearing something green, etc."

**12. How do school dress codes apply to transgender students?**

Dress codes that apply the same requirements regardless of gender are the most inclusive for all students and avoid unnecessarily reinforcing sex stereotypes. To the extent a school has a dress code that applies different standards to male and female students, some schools have policies that allow transgender students to dress consistent with their gender identity.

- Wisconsin's Shorewood School District issued guidelines ("Shorewood Guidelines") that allow students to dress in accordance with their gender identity and remind school personnel that they must not enforce a dress code more strictly against transgender and gender nonconforming students than other students.

- The Washington State Guidelines encourage school districts to adopt gender-neutral dress codes that do not restrict a student's clothing choices on the basis of gender: "Dress codes should be based on educationally relevant considerations, apply

10

consistently to all students, include consistent discipline for violations, and make reasonable accommodations when the situation requires an exception."

**13. How do schools address bullying and harassment of transgender students?**

Unfortunately, bullying and harassment continue to be a problem facing many students, and transgender students are no exception.  Some schools make clear in their nondiscrimination statements that prohibited sex discrimination includes discrimination based on gender identity and expression.  Their policies also address this issue.

- The NYSED Guidance stresses the importance of protecting students from bullying and harassment because "[the] high rates experienced by transgender students correspond to adverse health and educational consequences," including higher rates of absenteeism, lower academic achievement, and stunted educational aspirations.

- The Shorewood Guidelines specify that harassment based on a student's actual or perceived transgender status or gender nonconformity is prohibited and notes that these complaints are to be handled in the same manner as other discrimination, harassment, and bullying complaints.

- The DCPS Guidance provides examples of prohibited harassment that transgender students sometimes experience, including misusing an individual's preferred name or pronouns on purpose, asking personal questions about a person's body or gender transition, and disclosing private information.

**14. How do school psychologists, school counselors, school nurses, and school social workers support transgender students?**

School counselors can help transgender students who may experience mental health disorders such as depression, anxiety, and posttraumatic stress.  Mental health staff may also consult with school administrators to create inclusive policies, programs, and practices that prevent bullying and harassment and ensure classrooms and schools are safe, healthy, and supportive places where all students, including transgender students, are respected and can express themselves. Schools will be in a better position to support transgender students if they communicate to all students that resources are available, and that they are competent to provide support and services to any student who has questions related to gender identity.

11

- The NYSED Guidance suggests that counselors can serve as a point of contact for transgender students who seek to take initial steps to assert their gender identity in school.

- The Chicago Guidelines convene a student administrative support team to determine the appropriate supports for transgender students. The team consists of the school principal, the student, adults that the student trusts, and individuals the principal determines may have a legitimate interest in the safety and healthy development of the student.

### 15. How do schools foster respect for transgender students among members of the broader school community?

Developing a clear policy explaining how to support transgender students can help communicate the importance the school places on creating a safe, healthy, and nondiscriminatory school climate for all students. Schools can do this by providing educational programs aimed at staff, students, families, and other community members.

- The Massachusetts Guidance informs superintendents and principals that they "need to review existing policies, handbooks, and other written materials to ensure they are updated to reflect the inclusion of gender identity in the student antidiscrimination law, and may wish to inform all members of the school community, including school personnel, students, and families of the recent change to state law and its implications for school policy and practice. This could take the form of a letter that states the school's commitment to being a supportive, inclusive environment for all students."

- The NYSED Guidance states that "school districts are encouraged to provide this guidance document and other resources, such as trainings and information sessions, to the school community including, but not limited to, parents, students, staff and residents."

### 16. What topics do schools address when training staff on issues related to transgender students?

Schools can reinforce commitments to providing safe, healthy, and nondiscriminatory school climates by training all school personnel about appropriate and respectful treatment of all students, including transgender students.

12

- The Massachusetts Guidance suggests including the following topics in faculty and staff training "key terms related to gender identity and expression; the development of gender identity; the experiences of transgender and other gender nonconforming students; risks and resilience data regarding transgender and gender nonconforming students; ways to support transgender students and to improve school climate for gender nonconforming students; [and] gender-neutral language and practices."

- The El Rancho Regulation states that the superintendent or designee "shall provide to employees, volunteers, and parents/guardians training and information regarding the district's nondiscrimination policy; what constitutes prohibited discrimination, harassment, intimidation, or bullying; how and to whom a report of an incident should be made; and how to guard against segregating or stereotyping students when providing instruction, guidance, supervision, or other services to them. Such training and information shall include guidelines for addressing issues related to transgender and gender-nonconforming students."

## 17. How do schools respond to complaints about the way transgender students are treated?

School policies often provide that complaints from transgender students be handled under the same policy used to resolve other complaints of discrimination or harassment.

- The Boulder Valley Guidelines provide that "complaints alleging discrimination or harassment based on a person's actual or perceived transgender status or gender nonconformity are to be handled in the same manner as other discrimination or harassment complaints."

- The Anchorage Administrative Guidelines provide that "students may also use the Student Grievance Process to address any civil rights issue, including transgender issues at school."

13

**Terminology**

**18. What terms are defined in current school policies on transgender students?**

Understanding the needs of transgender students includes understanding relevant terminology. Most school policies define commonly used terms to assist schools in understanding key concepts relevant to transgender students.  The list below is not exhaustive, and only includes examples of some of the most common terms that school policies define.

- *Gender identity* refers to a person's deeply felt internal sense of being male or female, regardless of their sex assigned at birth.  (Washington State Guidelines)

- *Sex assigned at birth* refers to the sex designation, usually "male" or "female," assigned to a person when they are born.  (NYSED Guidance)

- *Gender expression* refers to the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice or mannerisms.  (Washoe County Regulation)

- *Transgender* or *trans* describes a person whose gender identity does not correspond to their assigned sex at birth.  (Massachusetts Guidance)

- *Gender transition* refers to the process in which a person goes from living and identifying as one gender to living and identifying as another.  (Washoe County Regulation)

- *Cisgender* describes a person whose gender identity corresponds to their assigned sex at birth.  (NYSED Guidance)

- *Gender nonconforming* describes people whose gender expression differs from stereotypic expectations.  The terms *gender variant* or *gender atypical* are also used. Gender nonconforming individuals may identify as male, female, some combination of both, or neither.  (NYSED Guidance)

- *Intersex* describes individuals born with chromosomes, hormones, genitalia and/or other sex characteristics that are not exclusively male or female as defined by the medical establishment in our society.  (DCPS Guidance)

- *LGBTQ* is an acronym that stands for "lesbian, gay, bisexual, transgender, and queer/questioning."  (LAUSD Policy)

14

- *Sexual orientation* refers to a person's emotional and sexual attraction to another person based on the gender of the other person.  Common terms used to describe sexual orientation include, but are not limited to, heterosexual, lesbian, gay, and bisexual.  Sexual orientation and gender identity are different.  (LAUSD Policy)

### 19. How do schools account for individual preferences and the diverse ways that students describe and express their gender?

Some students may use different terms to identify themselves or describe their situations.  For example, a transgender male student may identify simply as male, consistent with his gender identity.  The same principles apply even if students use different terms.  Some school policies directly address this question and provide additional guidance.

- The Washington State Guidelines recognize how "terminology can differ based on religion, language, race, ethnicity, age, culture and many other factors."

- Washington's Federal Way School District issued a resource guide that states:  "Keep in mind that the meaning of gender conformity can vary from culture to culture, so these may not translate exactly to Western ideas of what it means to be transgender. Some of these identities include Hijra (South Asia), Fa'afafine (Samoa), Kathoey (Thailand), Travesti (South America), and Two-Spirit (Native American/First Nations)."

- The Washoe County Regulation, responding to cultural diversity within the state, offers examples of "ways in which transgender and gender nonconforming youth describe their lives and gendered experiences:  trans, transsexual, transgender, male-to-female (MTF), female-to-male (FTM), bi-gender, two-spirit, trans man, and trans woman."

- The DCPS Guidance provides this advice to staff:  "If you are unsure about a student's preferred name or pronouns, it is appropriate to privately and tactfully ask the student what they prefer to be called.  Additionally, when speaking about a student it is rarely necessary to label them as being transgender, as they should be treated the same as the rest of their peers."

15

**Cited Policies on Transgender Students**

- Anchorage School District (AK): *Administrative Guidelines: Working with Transgender and Gender Nonconforming Students and Employees* (2015) (on file with ED)

- Atherton High School, Jefferson County School District (KY), *Policy on School Space* (2014), www.jefferson.k12.ky.us/schools/high/atherton/SBDMDocuments/Policy%20500%20Draft-%20Los%20Angeles%20Unified%20School%20District%20Revised%20Model.pdf

- Boulder Valley School District (CO), Guidelines Regarding the Support of Students and Staff Who Are Transgender and/or Gender Nonconforming (2016), http://www.bvsd.org/policies/Policies/AC-E3.pdf

- California Interscholastic Federation, *Guidelines for Gender Identity Participation* (2015), http://static.psbin.com/m/5/0ndq7wwfgh2em9/Guidelines_for_Gender_Identity_Participation.pdf

- Chicago Public Schools (IL), *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students* (2016), cps.edu/SiteCollectionDocuments/TL_TransGenderNonconformingStudents_Guidelines.pdf

- District of Columbia Public Schools, *Transgender and Gender-Nonconforming Policy Guidance* (2015), dcps.dc.gov/publication/dcps-transgender-and-gender-non-conforming-policy-guidance

- El Rancho Unified School District, *Transgender and Gender-Nonconforming Students* (AR 5145.3) (2014), www.erusd.org/pdf/board_policies/5145_3.pdf

- Federal Way Public Schools (WA), *Working with Transgender and Gender-Nonconforming Students and Staff* (2014-2015), www.fwps.net/districtresources/wp-content/uploads/sites/32/2013/12/FWPS_Transgender3.pdf?7a385a

- Kansas City 33 School District (MO), *Prohibition Against Discrimination, Harassment and Retaliation (Transgender and Gender Nonconforming Employee and Students*) (2013), eboard.eboardsolutions.com/ePolicy/policy.aspx?PC=AC-AP(1)&Sch=228&S=228&RevNo=1.01&C=A&Z=R

- Los Angeles Unified School District (CA), *Transgender Students – Ensuring Equity and Nondiscrimination* (2014), notebook.lausd.net/pls/ptl/docs/PAGE/CA_LAUSD/FLDR_ORGANIZATIONS/FLDR_GENERAL_COUNSEL/BUL-6224.1%20TRANSGENDER%20POLICY,%2008-15-14%20-%20ADDED%20ED%20CODE%20221%205.PDF

16

- Maryland State Department of Education, *Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* (2015), marylandpublicschools.org/MSDE/divisions/studentschoolsvcs/student_services_alt/docs/ProvidingSafeSpacesTransgendergenderNonConformingYouth012016.pdf

- Massachusetts Department of Elementary and Secondary Education, *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment Nondiscrimination on the Basis of Gender Identity* (2014), www.doe.mass.edu/ssce/GenderIdentity.pdf

- Matanuska-Susitna Borough School District (AK), *Transgender Student Guidelines* (2015), www.matsuk12.us/site/handlers/filedownload.ashx?moduleinstanceid=10846&dataid=41646&FileName=Title IX--Transgender Students Guidelines.pdf

- Minneapolis Public Schools (MN), *Permissible Grouping Principles* (2014), policy.mpls.k12.mn.us/uploads/regulation_6135_a.pdf

- New York State Education Department, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* (2015), www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf

- Oregon Department of Education, *Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students* (2016), www.ode.state.or.us/groups/supportstaff/hklb/schoolnurses/transgenderstudentguidance.pdf.

- Rhode Island Interscholastic League, *Rules & Regulations* (Article I, Section 22 – Gender Identity), www.riil.org/files/8214/3861/6354/ARTICLE_1_ORGANIZATION_2015.pdf

- Shorewood School District (WI), *Nondiscrimination Guidelines Related to Students Who Are Transgender and Students Nonconforming to Gender Role Stereotypes* (2014), www.shorewood.k12.wi.us/uploaded/Board_Documents/Policies/411_Guidelines_and_Exhibit.pdf?1393865642372

- Washington Office of State Superintendent of Public Instruction, *Prohibiting Discrimination in Washington Public Schools* (2012), www.k12.wa.us/Equity/pubdocs/ProhibitingDiscriminationInPublicSchools.pdf

- Washoe County School District (NV), *Gender Identity and Gender Non-Conformity – Students* (2015), washoecountyschools.net/csi/pdf_files/5161%20Reg%20-%20Gender%20Identity%20v1.pdf

17

**Select Federal Resources on Transgender Students**

- U.S. Department of Education

  - Office for Civil Rights and U.S. Department of Justice's Civil Rights Division, *Dear Colleague Letter: Transgender Students* (May 13, 2016), www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf

  - Office for Civil Rights, *Resources for Transgender and Gender-Nonconforming Students*, www.ed.gov/ocr/lgbt.html

  - Office for Civil Rights, *Publications on Title IX*, www.ed.gov/about/offices/list/ocr/publications.html#TitleIX

  - Office for Civil Rights, *How to File a Discrimination Complaint*, www.ed.gov/about/offices/list/ocr/docs/howto.html

  - National Center on Safe Supportive Learning Environments, safesupportivelearning.ed.gov

- U.S. Department of Health and Human Services

  - Administration for Children and Families, *Resources for Serving Lesbian, Gay, Bisexual and Transgender Youth*, http://ncfy.acf.hhs.gov/features/serving-lesbian-gay-bisexual-transgender-and-questioning-youth-open-arms/resources-serving

  - Centers for Disease Control and Prevention, *LGBT Youth Resources*, www.cdc.gov/lgbthealth/youth-resources.htm

  - Homelessness Resource Center, *Homeless Populations: LGBTQI2-S Youth*, http://homeless.samhsa.gov/Channel/LGBTQ-153.aspx

  - Stopbullying.gov, *Bullying and LGBT Youth*, http://www.stopbullying.gov/at-risk/groups/lgbt

- U.S. Department of Housing and Urban Development

  - *Community-Wide Prevention of LGBTQ Youth Homelessness* (June 2015), https://www.hudexchange.info/resources/documents/LGBTQ-Youth-Homelessness-Prevention-Initiative-Overview.pdf

18

AR_293283

- U.S. Department of Labor

  - Office of Job Corps, *Directive: Job Corps Program Instruction Notice No. 14-31* (May 1, 2015), https://supportservices.jobcorps.gov/Program Instruction Notices/pi_14_31.pdf

**2022**

# U.S. TRANS SURVEY

## EARLY INSIGHTS

AR_293285

# Early Insights:
# A Report of the 2022
# U.S. Transgender Survey

by:

Sandy E. James, Jody L. Herman, Laura E. Durso,
and Rodrigo Heng-Lehtinen

February 2024









AR_293286

# ACKNOWLEDGEMENTS

**T**HE 2022 U.S. Transgender Survey (USTS) team extends our gratitude to all the members of the transgender community who participated in the 2022 USTS and the hundreds of individuals and organizations who assisted with recruitment. We thank the Black Trans Advocacy Coalition, National Queer Asian Pacific Islander Alliance, and TransLatin@ Coalition for partnering with the National Center for Transgender Equality (NCTE) to present the survey. We thank the members of the 2022 USTS Scientific Advisory Council and Outreach Council for their substantial guidance and contributions and without whom the survey would not have been successful. We thank the many experts who assisted with questionnaire development and countless other USTS volunteers who made contributions at every stage of the project. We also thank Chivita Espacial and Aldo Resendiz for providing translations, and we thank Burness, Pickaxe, Qualtrics, Teal Media, and the Williams Institute for their contributions to the project.

Special thanks to Josie Caballero, Alex del Rosario, Sybastian Smith, Leroy Thomas, Tekla Taylor, Illyana Bocanegra and the following NCTE staff and contractors for their significant contributions to the project (in alphabetical order): Will Cole, Andrew Flores, Brendon Holloway, Olivia Hunt, Leesh Menard, Nikki Mia, Lisa Mottet, Devon Ojeda, Kathryn O'Neill, Dakota Strode, Luke Wegener, and Jami Westerhold.

This project would not have been possible without the generous support of the Robert Wood Johnson Foundation and the TAWANI Foundation.

## Recommended Citation

James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). *Early Insights: A Report of the 2022 U.S. Transgender Survey*. National Center for Transgender Equality, Washington, DC.

© 2024 The National Center for Transgender Equality. We grant permission for the reproduction and distribution of this publication in whole or in part, provided that it is done with attribution to the authors and the National Center for Transgender Equality. Further written permission is not required.

AR_293287

# INTRODUCTION

**T**HIS report provides a first look at the results of the 2022 U.S. Transgender Survey (USTS), a study conducted by the National Center for Transgender Equality (NCTE) in partnership with the Black Trans Advocacy Coalition, National Queer Asian Pacific Islander Alliance, and TransLatin@ Coalition. The 2022 USTS is the follow up to the 2015 USTS, which has been an essential source of data on the experiences of transgender people for advocates, educators, researchers, policymakers, and the general public since the publication of its report in 2016.[1] Building upon the success of the prior study, the 2022 USTS is now the largest survey ever conducted to examine the experiences of binary and nonbinary transgender people in the United States, with an unprecedented 92,329 respondents. The 2022 USTS provides updated information to help the public better understand the lives and experiences of transgender people in the United States and the challenges that many transgender people face. As such, it is an invaluable resource for identifying and addressing issues that are of vital importance to binary and nonbinary transgender people in the United States.

In the years since the 2015 USTS was conducted, the United States has experienced substantial social, political, legal, and other changes that have impacted the lives of binary and nonbinary transgender people. The 2022 USTS was designed to offer updated and expanded perspectives on the experiences of transgender people, including in the areas of education, employment, family life, health care, housing, life satisfaction, and public accommodations. By expanding the scope of the survey and filling the significant gaps in understanding about the lives and challenges faced by transgender people, the USTS will continue to serve as a crucial tool for research, education, advocacy, and policymaking.

This report presents preliminary findings that provide an overview of the experiences of binary and nonbinary transgender people. The findings and information presented are high-level statistics and should be interpreted and contextualized accordingly. For example, although the survey was open to transgender people aged 16 and older, findings in this report are limited to respondents aged 18 and over unless otherwise noted. This report presents select findings from a range of survey topics, but it does not include findings from every issue area covered in the survey. This report also does not present differences in outcomes based on demographic and other characteristics or provide comparisons to the U.S. general population or the 2015 USTS. This report does, however, provide important information and updated perspectives

---

[1] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey.* Washington, DC: National Center for Transgender Equality.

AR_293288

on some of the most substantial issues and experiences impacting transgender people in the United States. With these early insights from the 2022 USTS, readers can better understand some of the challenges that binary and nonbinary transgender adults face in the United States. The forthcoming full report of the 2022 U.S. Transgender Survey will present comprehensive findings of the survey and paint a more complete picture of the diversity, resilience, and strength of the transgender community.

AR_293289

# METHODOLOGY

## Overview

The U.S. Transgender Survey (USTS) was administered online in English and Spanish and open to binary and nonbinary transgender people aged 16 and older residing in the United States, a U.S. territory, or on a U.S. military base overseas. The survey instrument included questions covering a wide range of experiences and issues, such as those related to health care, employment, education, housing, and public accommodations. The survey was hosted by Qualtrics and could be accessed exclusively through the USTS website (USTransSurvey.org). Data were collected over a 48-day period, from October 19 through December 5, 2022. The sample included 92,329 respondents, including 84,170 adults (18 and older), from all fifty states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the U.S. Virgin Islands, and U.S. military bases overseas. The following sections provide an overview of the survey methodology. While these sections provide general information about the USTS's methodology, they do not include a detailed discussion of all aspects of the methodology. A detailed description of the methodology will be included in the full report of the 2022 U.S. Transgender Survey.

## History of the U.S. Transgender Survey

The 2022 USTS is the successor to the 2015 USTS, which was conducted by the National Center for Transgender Equality (NCTE) and was previously the largest and most comprehensive survey about the experiences of transgender people in the United States, with 27,715 respondents. The 2015 USTS was developed as the follow-up to the National Transgender Discrimination Survey (NTDS), which was conducted by NCTE and the National LGBTQ Task Force from late 2008 to early 2009. The NTDS was conducted to address the significant lack of data about transgender people in the United States, particularly from federal surveys. The NTDS became the first large, national survey to broadly examine the experiences of transgender people in the United States and the NTDS report, published in 2011, provided groundbreaking findings.[2]

Throughout the long history of developing, conducting, and reporting on the largest, most comprehensive surveys about the experiences and life outcomes of transgender people in the U.S., USTS and NTDS researchers and authors acknowledged the need to evolve and collect data to identify and address both current and emerging needs of transgender people. This included improving upon on survey question design and expanding substantive content to fill remaining knowledge gaps, examine new and underexplored issues, investigate potential changes in experiences and outcomes over time, and improve comparisons between the experiences of transgender people and the U.S. general population. The 2022 USTS was developed with those considerations, and feedback received from researchers, practitioners, and advocates was continuously assessed while constructing and finalizing the questionnaire.

[2] Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

AR_293290

# USTS Respondents

The USTS documents the experiences of transgender people, which the project defines as anyone who identifies with a different gender than they were assigned at birth. As such, the study was inclusive of those with binary and nonbinary transgender identities and other identities on the transgender identity spectrum, regardless of the terminology used by the respondent. The term "transgender" or "trans" was defined broadly for the purposes of this study to include a wide range of identities, but some individuals for whom the study was intended may have assumed that the term did not include them. Accordingly, promotional materials worked to affirm that the survey was inclusive of a range of gender-expansive identities and was open to transgender people at any stage of their lives, journey, or transition.

The study included individuals aged 16 and older at the time of survey completion. This differed from the 2015 USTS sample, which was limited to respondents 18 and older. As with all survey research, it is important to consider the context in which the study is being conducted, and the research team evaluated the context of being transgender in the U.S. at the time of the study when deciding to expand the sample to 16- and 17-year-olds. Since the USTS was last conducted, there have been numerous social, political, and legal developments that impact the experiences of transgender people of all ages in the United States, including those that have had a profound impact on transgender youth. There have also been advancements in research that have improved our understanding of the experiences of transgender youth. These cultural and research-related changes underscored the importance of collecting data about the experiences of transgender youth. Therefore, in consultation with the USTS Scientific Advisory Committee, the research team determined that it was appropriate to include 16- and 17-year-olds in the USTS sample and developed the survey instrument accordingly. As previously noted, however, findings presented in this preliminary report only include respondents aged 18 and over unless otherwise noted.

The study population was limited to individuals currently residing in a U.S. state or territory, or on a U.S. military base overseas, to capture the experiences of transgender people who were subject to laws, policies, and social and cultural environments in the U.S. at the time they completed the survey.

# Developing the Survey Instrument

The 2022 USTS research team worked for more than a year to develop the survey instrument under the advisement of a Scientific Advisory Committee and in collaboration with dozens of individuals with lived experience, advocacy and research experience, and subject matter expertise. Using the 2015 USTS survey instrument as the foundation, it was important to focus on the general goals of collecting updated data on a wide range of topics and to address data collection gaps. It was also critical to develop a survey instrument that expanded the range of topics presented, responded to changing social, environmental, and political landscapes, and responded to feedback about the 2015 iteration. For example, given the unparalleled impact of the COVID-19 pandemic, the research team had to consider how the pandemic might affect respondents'

AR_293291

experiences with respect to USTS-specific measures. Accordingly, the research focused on collecting data that would be comparable to the 2015 USTS while expanding or adding topics and questions for context (e.g., COVID-19), to respond to issues in law and policy (e.g., health care, sports), and to yield new or improved information (e.g., physical health, transition-related health care, education, life satisfaction).

To further refine the survey, nearly 100 people participated in a pilot study to evaluate the questionnaire and were offered a $25 gift card for their participation. Pilot study participants included individuals who were eligible for the survey and who represented a wide range of characteristics and experiences that reflected the diversity of the intended study sample. The pilot study was administered through an online test site using the same platform and format in which the final survey later appeared, and its purpose was to evaluate the substantive content and technical aspects of the survey. Pilot study participants were asked to provide general feedback on individual questions and the entire questionnaire and to address specific questions from the research team as part of their evaluation. Pilot study feedback was compiled, discussed, and used to inform final revisions to the survey instrument.

The final survey questionnaire contained a total of 605 possible questions presented in thirty-eight sections addressing topics across a range of life experiences. This was a significant expansion over the 324 possible questions in the 2015 USTS and reflects efforts to substantially increase knowledge in many issue areas. The additional questions often sought a more nuanced understanding of an issue that only affected some respondents rather than resulting in more questions for all respondents. No respondent received all possible questions, and the online survey platform allowed respondents to move efficiently through the questionnaire using skip logic to ensure that respondents only received questions that were appropriate based on their previous answers. As a result, despite having nearly twice the number of possible questions as in the 2015 USTS, the 2022 USTS maintained an average completion time of 60 minutes, as verified by the pilot study. As with both the 2015 USTS and the NTDS, evaluations of the USTS questionnaire confirmed that the length was appropriate for such a comprehensive survey, and the need for data about the experiences of transgender people outweighed concerns about the survey length.

# Outreach

The primary outreach objective was to raise awareness of the survey and provide opportunities to complete the survey for as many transgender people as possible across the U.S. and its territories. Outreach efforts also focused on connecting with people who are often underrepresented in survey research and those with limited access and opportunity to complete an online survey. This included, but was not limited to, people of color, seniors, people residing in rural areas, and low-income individuals.

The outreach team substantially improved on the 2015 USTS outreach model by expanding efforts on multiple fronts and applying lessons learned, such as the benefits of a longer outreach period and diverse approaches to community engagement. The outreach period began approximately one year before the survey launch, and the outreach team used various strategies to connect with transgender people through multiple

AR_293292

points of access, such as through transgender- or LGBTQ-specific organizations, support groups, health centers, and online communities. The outreach team expanded on the eleven-person 2015 USTS Advisory Committee to assemble a USTS Outreach Council comprised of twenty-two organizations and individuals who advised on and participated in outreach to transgender people in communities across the U.S. and in U.S. territories throughout the outreach period. Working with the Outreach Council significantly increased outreach engagement and served as the bedrock for outreach efforts. The outreach team also contacted nearly 1,900 organizations and individuals to request their support by sharing information about the survey with their members and contacts. The team directly corresponded with more than 250 organizations during the outreach period and while the survey was in the field, and countless other organizations promoted the survey to their communities. The team worked to connect with potential respondents through a variety of methods, including making thousands of phone calls and sending tens of thousands of text messages.

Throughout the outreach period, the team conducted a survey pledge campaign, which was among the most important methods for engaging and communicating with potential respondents. The campaign invited potential participants and allies to pledge to take the survey and/or spread the word about the survey. The survey pledge was designed to raise awareness about the survey and engage potential respondents for a sustained period leading up to the survey launch. Individuals who completed pledge information received email and text communications throughout the outreach period. The pledge was an important component of the outreach and communications strategy in the 2015 USTS, and the large number of pledgers in 2015 (~14,000) was thought to correspond to the eventual large number of respondents (27,715). The 2022 USTS outreach team improved upon the survey pledge campaign to substantially increase connections and engagement, resulting in 34,576 people who pledged to take the survey before it launched, 12,015 of whom also pledged to share the survey with other transgender people in their life.

As an incentive to complete the survey, participants were offered the opportunity to enter into a random drawing for one of three cash prizes upon completion of the survey, including one $500 cash prize and two $250 cash prizes. After completing and submitting their anonymous survey responses, USTS respondents were re-directed away from the survey hosting site to a web page on the NCTE-hosted USTS website to sign up for the random drawing.

The outreach team worked with organizations to reduce barriers to accessing the survey and increase opportunities to take the survey for people who may otherwise not have had access. One such method was by working with organizations to organize "survey-taking events." These were events during which organizations provided a location and resources for attendees to take the survey, such as computers or tablets. These events were intended to provide access to individuals with limited or no computer or internet access, those who may have needed assistance when completing the survey, or those who needed a safe place to take the survey. The team also ran a tablet-loan program to provide another avenue through which organizations could offer survey access.

# Communications

The communications strategy was implemented in coordination with outreach efforts with a goal of reaching a wide range of transgender people, including those in populations that are traditionally underrepresented in surveys. The communications team employed a range of methods to share information about the survey, including email, social media, and print media, and created engaging materials to spread the word about the survey. The USTS website was redesigned to improve functionality and better share information with potential respondents and organizations and individuals interested in promoting the survey. The website included a description of the survey, information about the team working on the survey, frequently asked questions, and an interactive map with information about organizations that supported the survey.

The communications team created promotional materials and messaging to share through email, social media, and other methods. They maintained communication with thousands of individuals and organizations, including people who pledged to take or spread the word about the survey, organizations that committed to support the survey through outreach efforts, and people who had signed up to be in communication with NCTE about the organization's work and projects more generally. They also developed a "partner toolkit" with materials for organizations to download and use, including key messaging, promotional graphics, video scripts, social media posts, event materials, and language for emails. The team provided information through many channels, resulting in the survey being promoted by influencers, organizations, and content creators through social media platforms, such as Instagram, Twitter, Facebook, TikTok, and Tumblr. The team also commissioned videos from key influencers to promote the survey prior to the survey launch and during the data-collection period, including "progress videos" that were embedded in the survey to thank respondents and encourage them to continue completing the survey. In addition to providing materials about the survey, the USTS team held dozens of events to raise awareness about the survey, such as Instagram and Facebook Live events to discuss the survey with influencers and organizations.

# Institutional Review Board and Confidentiality

The USTS was approved by an Institutional Review Board (IRB), which is an entity intended to protect the rights and welfare and ensure confidentiality of individuals participating in a research study. The study underwent an extensive full-board review by the University of California, Los Angeles, North General IRB, which included review and approval of the study design, questionnaire, and all recruitment materials leading up to the launch of the survey and throughout the fielding period in English and Spanish. As required by the IRB, the survey began with a study information sheet describing aspects of the study and participants' rights in the study. Participants were required to consent to taking the survey at the end of the information sheet and before beginning the questionnaire.

The survey was anonymous, and maintaining privacy and confidentiality in the collection and maintenance of survey data was an important component of preserving participants' anonymity. The IRB required the research team

AR_293294

to ensure that confidentiality protections were in place for the study and demonstrate sufficiency of data security protocols. The research team also obtained a Certificate of Confidentiality from the National Institutes of Health, which could be used to legally refuse to disclose information that may identify respondents in any federal, state, or local civil, criminal, administrative, legislative, or other proceedings, such as if there is a court subpoena.

## Survey Hosting, Data Collection, and Cleaning

The survey was programmed and hosted by Qualtrics, and data collection was managed by Qualtrics throughout the 48-day fielding period. Following the end of the survey data-collection period, the database was securely transferred to the USTS research team for cleaning and analysis. The data then underwent cleaning using standard practices and additional cleaning for eligibility to remove responses that did not belong in the sample (e.g., duplicate responses, incomplete responses, illogical responses) and improve the quality of the final sample. The data were then recoded as needed, including recoding of write-in responses for questions with a "not listed above" answer choice. Write-in responses were recoded into existing answer choices when possible, and in some cases, new answer categories were created for frequently repeated write-in responses.

Several survey weights were developed for use in our analyses to reduce sampling biases and be more representative of the U.S. transgender population with regard to age, race/ethnicity, education, and geographical region. Findings in this report for these demographic characteristics reflect the weighted percentages. Separate weights were developed for the full sample (ages 16+) and for the adult sample (ages 18+). The weights were based on the Centers for Disease Control and Prevention's Behavioral Risk Factor Surveillance System (BRFSS), which is one of the few sources of representative data for the U.S. trans population.

As previously noted, the forthcoming full report of the 2022 U.S. Transgender Survey will contain a detailed description of survey methodology, including more information about the cleaning and weighting processes.

## Presentation of Findings

Findings in this early insights report of the 2022 USTS represent the overall findings for each topic examined, presented as weighted percentages of the entire adult sample or of specified subgroups. Results are only reported for respondents aged 18 and older, except as noted for findings that also include 16- and 17-year-olds. This report does not include additional analyses to examine differences in outcomes based on demographic and other characteristics. Comprehensive results, including those for 16- and 17-year-olds and broken down by a variety of characteristics, will be reported in the full report of the 2022 U.S. Transgender Survey.

Percentages are rounded to whole numbers, and results were rounded according to the following convention: findings with 0.50 and above were rounded up, and findings with 0.49 and below were rounded down (e.g., 1.50% rounded to 2% and 1.49% rounded to 1%). Findings of 0.49% or less were labeled "less than 1%" or "<1%." Findings presented in figures and tables may not always add up to 100% due to rounding.

AR_293295

Throughout the survey, respondents answered questions about experiences that occurred within a certain time period prior taking the survey, such as "in the last 12 months" or "in the last 30 days." When time periods are noted in this report, they relate to when the respondent took the survey. For example, "in the last 12 months" in this report means that the respondent had the experience in the 12 months prior to taking the survey.

When interpreting the preliminary findings presented in this report, it is important to note that although the team sought to recruit a sample that was as representative as possible of transgender people in the U.S. and analytic weights reduce sample biases, study respondents were not drawn from a random sample. Therefore, while this sample is a large one, the findings may not be representative of all transgender people.

AR_293296

# RESULTS

## Characteristics of USTS Respondents

- **Gender:** Thirty-eight percent (38%) of respondents identified as nonbinary, 35% identified as a transgender woman, 25% identified as a transgender man, and 2% identified as a crossdresser.

- When considering sex assigned at birth, 35% of respondents identified as a transgender woman, 30% identified as nonbinary (assigned female at birth), 25% identified as a transgender man, 8% identified as nonbinary (assigned male at birth), and 2% identified as a crossdresser.



Gender Identity





Gender identity (By Sex Assigned At Birth)



- **Intersex Status.** Five percent (5%) of respondents reported they were born with a variation in physical sex characteristics or had an intersex variation or Difference of Sex Development, 72% reported they were not, and 23% reported that they did not know.

AR_293297



**Race/Ethnicity**

- **Race:** One percent (1%) of respondents identified as American Indian or Alaska Native ("AIAN"), 7% identified as Asian/Asian American or Native Hawaiian/Pacific Islander ("Asian/NHPI"), 8% identified as Black/African American ("Black"), 14% identified as Latino(a)(x)(e)/Hispanic ("Latino(a)(x)(e)"), less than 1% identified as Middle Eastern/North African ("MENA"), 56% identified as White/European American ("White"), and 13% identified as two or more races ("Biracial/Multiracial"). Additionally, less than 1% identified as "a racial or ethnic identity not listed above."



**Age**

- **Age:** Forty-three percent (43%) of respondents were age 18 to 24, 36% were age 25 to 44, 9% were age 45 to 54, 6% were age 55 to 64, and 7% were over the age of 65.

- **Parental Status:** Seventeen percent (17%) of respondents reported that they were parents and 3% were parents of a transgender or nonbinary child (including adult children).

AR_293298

- **Geographic location:** USTS respondents were living in all fifty states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the U.S. Virgin Islands, and U.S. military bases overseas. Based on Census regions, 41% were living in the South, 23% lived in the West, 19% lived in the Northeast, and 17% lived in the Midwest. Census regional categories do not include U.S. territories or U.S. military bases overseas.



**Location by Region**

**South:** AL, AR, DE, DC, FL, GA, KY, LA, MD, MS, NC, OK, SC, TN, TX, VA, WV
**West:** AK, AZ, CA, CO, HI, ID, MT, NM, NV, OR, UT, WA, WY
**Northeast:** CT, ME, MA, NH, NJ, NY, PA, RI, VT
**Midwest:** IA, IN, IL, KS, MI, MN, MO, NE, ND, OH, SD, WI

- **Citizenship Status:** Nearly all respondents were U.S. citizens either by birth (95%) or through naturalization (3%), and 1% were Permanent Residents. One percent (1%) of respondents held another immigration status, such as visa holder (including T, U, HB-1, or other visa), undocumented, Deferred Action for Childhood Arrivals (DACA) recipient, refugee, or asylee.

- **Educational Attainment:** Thirty-five (35%) percent of respondents had completed high school or obtained a GED, 26% had completed some college, 13% had not completed high school, 11% had a bachelor's degree, 7% had an associate's degree, and 7% had a master's degree or higher.



**Educational Attainment**

| Have Not Completed High School | High School Diploma Or GED | Some College (No Degree) | Associate's Degree | Bachelor's Degree | Graduate Or Professional Degree |
|---|---|---|---|---|---|
| 13% | 35% | 26% | 7% | 11% | 7% |

# HEALTH AND HEALTH CARE

## Impact of the COVID-19 Pandemic

Respondents were asked questions about their experiences with the COVID-19 pandemic to determine how it impacted the ways in which they move through the world and interact with others.

- Most respondents reported that, in the last 12 months, they went out in public places (such as a grocery store, restaurant, or shopping mall) less than they did before the COVID-19 pandemic, including 27% who went out "somewhat less" than before, 33% who went out "a lot less" than before, and 1% that did not go out at all. Twenty-seven percent (27%) of respondents went out "about the same amount" as before the pandemic, 7% went out "somewhat more" than before, and 5% went out "a lot more" than before.

- Most respondents wore a mask at least some of the time when out in public in the last 12 months, including 28% who wore a mask "all of the time," 33% who wore one "most of the time," and 24% who wore one "some of the time." Twelve percent (12%) wore a mask "a little of the time," and 4% wore a mask "none of the time."

## General Health and Experiences with Health Care Providers

- Approximately two-thirds of respondents reported that their health status was "good" (36%), "very good" (24%), or "excellent" (6%). One-quarter (25%) rated their health status as "fair," and 9% said it was "poor."

- More than one-quarter of respondents (28%) did not see a doctor when they needed to in the last 12 months due to cost.

- Nearly one-quarter of respondents (24%) did not see a doctor when they needed to in the last 12 months due to fear of mistreatment.

- Forty-four percent (44%) of respondents experienced serious psychological distress in the last 30 days (based on the Kessler 6 Psychological Distress Scale).

- Seventy-nine percent (79%) of respondents saw a doctor or health care provider within the last 12 months, and 9% saw a provider between 1 and 2 years ago.

- Of those who saw a health care provider within the last 12 months, nearly one-half (48%) reported having at least one negative experience because they were transgender, such as being refused health care, being misgendered, having a provider use harsh or abusive language when treating them, or having a provider be physically rough or abusive when treating them.

AR_293300

## Health Insurance

- Eighty-seven (87%) percent of respondents had health insurance coverage.

- Approximately 1 in 4 respondents (26%) had at least one issue with their insurance company in the last 12 months, such as being denied coverage for hormone therapy, surgery, or another type of health care related to their gender identity/transition; gender-specific health care because they were transgender; or routine health care because they were transgender.

## Gender Identity and Transition

- Nearly all respondents (94%) who lived at least some of the time in a different gender than the one they were assigned at birth ("gender transition") reported that they were either "a lot more satisfied" (79%) or "a little more satisfied" (15%) with their life. Three percent (3%) reported that transitioning gender made them "neither more nor less satisfied" with their life, 1% were "a little less satisfied," and 2% were "a lot less satisfied" with their life.

### Life Satisfaction Since Transitioning Gender

| | |
|---|---|
| A Lot More Satisfied | 79% |
| A Little More Satisfied | 15% |
| Neither More Nor Less Satisfied | 3% |
| A Little Less Satisfied | 1% |
| A Lot Less Satisfied | 2% |

AR_293301

■ Nearly all respondents (98%) who were currently receiving hormone treatment reported that receiving hormones for their gender identity/transition made them either "a lot more satisfied" (84%) or "a little more satisfied" (14%) with their life. One percent (1%) reported that hormones made them "neither more nor less satisfied" with their life, and less than 1% said that they were "a little less satisfied" or "a lot less satisfied" with their lives after receiving hormones.

### Life Satisfaction With Receiving Hormone Treatment

| | |
|---|---|
| A Lot More Satisfied | 84% |
| A Little More Satisfied | 14% |
| Neither More Nor Less Satisfied | 1% |
| A Little Or A Lot Less Satisfied | <1% |

■ Nearly all respondents (97%) who had at least one form of surgery for their gender identity/ transition reported that they were either "a lot more satisfied" (88%) or "a little more satisfied" (9%) with their life. One percent (1%) reported that surgery made them "neither more nor less satisfied" with their life, less than 1% were "a little less satisfied," and 1% were "a lot less satisfied" with their life.

### Life Satisfaction After Gender-Affirming Surgery

| | |
|---|---|
| A Lot More Satisfied | 88% |
| A Little More Satisfied | 9% |
| Neither More Nor Less Satisfied | 1% |
| A Little Less Satisfied | <1% |
| A Lot Less Satisfied | 1% |

AR_293302

# FAMILY LIFE

*This section includes some data for 16- and 17-year-old respondents.*

- Thirty-six percent (36%) of adult respondents who said that some or all of their immediate family knew that they were transgender said their family members were "supportive" of them being transgender, and 31% said they were "very supportive." Eight percent (8%) said their immediate family was "unsupportive" of them being transgender, 4% had "very unsupportive" immediate families, and 22% reported that they were "neither supportive nor unsupportive."

- Among 16- and 17-year-old respondents who said that some or all of their immediate family knew that they were transgender, 27% said their family members were "supportive" of them being transgender, and 17% said they were "very supportive." Fifteen percent (15%) said their immediate family was "unsupportive" of them being transgender, 14% had "very unsupportive" immediate families, and 28% reported that they were "neither supportive nor unsupportive."

 **Immediate Family Support by Age**



Legend: Very Supportive | Supportive | Neither Supportive Nor Unsupportive | Unsupportive | Very Unsupportive

| Age | Very Supportive | Supportive | Neither Supportive Nor Unsupportive | Unsupportive | Very Unsupportive |
|---|---|---|---|---|---|
| 16 - 17 | 17% | 27% | 28% | 15% | 14% |
| 18 - 24 | 24% | 42% | 20% | 9% | 4% |
| 25 - 44 | 31% | 37% | 22% | 7% | 3% |
| 45 - 64 | 39% | 26% | 24% | 7% | 3% |
| 65+ | 39% | 24% | 29% | 4% | 4% |
| Adults (18+) | 31% | 36% | 22% | 8% | 4% |

- Thirty-five percent (35%) of adult respondents who said that some or all of their extended family members (such as grandparents, aunts, uncles, and cousins) knew that they were transgender said their family members were "supportive" of them being transgender, and 23% said they were "very supportive." Seven percent (7%) said their extended family was "unsupportive" of them being transgender, 3% had "very unsupportive" extended families, and 32% reported that they were "neither supportive nor unsupportive."

- Among 16- and 17-year-old respondents who said that some or all of their extended family members (such as grandparents, aunts, uncles, and cousins) knew that they were transgender, 35% said their family members were "supportive" of them being transgender, and 13% said they were "very supportive." Seventeen percent (17%) said their extended family was "unsupportive" of them being transgender, 6% had "very unsupportive" extended families, and 29% reported that they were "neither supportive nor unsupportive."



**Extended Family Support by Age**

Very Supportive | Supportive | Neither Supportive Nor Unsupportive | Unsupportive | Very Unsupportive

| Age | Very Supportive | Supportive | Neither Supportive Nor Unsupportive | Unsupportive | Very Unsupportive |
|---|---|---|---|---|---|
| 16 - 17 | 13% | 35% | 29% | 17% | 6% |
| 18 - 24 | 13% | 36% | 39% | 9% | 3% |
| 25 - 44 | 21% | 38% | 32% | 7% | 2% |
| 45 - 64 | 47% | 31% | 16% | 4% | 3% |
| 65+ | 25% | 28% | 43% | 4% | 1% |
| Adults (18+) | 23% | 35% | 32% | 7% | 3% |

- More than one in ten (11%) adult respondents who grew up in the same household with family, guardians, or foster parents said that a family member was violent towards them because they were transgender, and 8% were kicked out of the house because they were transgender.

- Five percent (5%) of 16- and 17-year-old respondents who grew up in the same household with family, guardians, or foster parents said that a family member was violent towards them because they were transgender, and 1% were kicked out of the house because they were transgender.

AR_293304

# Income, Employment, Workplace Experiences, and Housing Stability

- More than one-third (34%) of respondents were experiencing poverty.

- The unemployment rate among USTS respondents was 18%.

- More than one in ten (11%) respondents who had ever held a job said they had been fired, forced to resign, lost the job, or been laid off because of their gender identity or expression.

- Nearly one-third (30%) of respondents had experienced homelessness in their lifetime.

# Experiences In Restrooms

- Four percent (4%) of respondents were denied access to a restroom in a public place, at work, or at school in the last 12 months.

- In the last 12 months, 6% of respondents had been verbally harassed, physically attacked, or experienced unwanted sexual contact when accessing or using a restroom.

# Harassment and Violence

- Nearly one in ten (9%) respondents reported that they were denied equal treatment or service in the last 12 months because of their gender identity or expression.

- Nearly one-third (30%) of respondents reported that they were verbally harassed in the last 12 months because of their gender identity or expression.

- More than one-third (39%) of respondents reported that they were harassed online in the last 12 months because of their gender identity or expression.

- Three percent (3%) of respondents reported that they were physically attacked in the last 12 months because of their gender identity or expression.

AR_293305

## Comfort with Law Enforcement

- Nearly half (47%) of respondents reported that they would feel "very uncomfortable" asking the police for help if they needed it, and 26% reported feeling "somewhat uncomfortable." Ten percent (10%) of respondents reported feeling "somewhat comfortable," 8% felt "very comfortable," and 10% felt "neutral" about asking the police for help when they needed it.

- Sixty-two percent (62%) of respondents reported that they were "very uncomfortable" or "somewhat uncomfortable" asking for help from the police when needed because of their gender identity or expression.

## Identity Documents

- Nearly half (48%) of respondents who had at least one form of identity document (such a birth certificate, passport, or driver's license) said that none of their IDs listed the name they wanted. Twenty percent (20%) had the name they wanted on some of their IDs, and 33% had the name they wanted on all their IDs.

- Fifty-nine percent (59%) of respondents who had at least one ID said that none of their IDs listed the gender they wanted, 23% said some of their IDs listed the gender they wanted, and 19% said that all their IDs listed the gender they wanted.

- Twenty-two percent (22%) of all respondents reported being verbally harassed, assaulted, asked to leave a location, or denied services when they have shown someone an ID with a name or gender that did not match their presentation.

## Experiences at School

*This section includes some data for 16- and 17-year-old respondents.*

- More than three-quarters of adult respondents (80%) and nearly two-thirds of 16- and 17-year-old respondents (60%) who were out or perceived as transgender in K-12 experienced one or more form of mistreatment or negative experience, including verbal harassment, physical attacks, online bullying, being denied the ability to dress according to their gender identity/expression, teachers or staff refusing to use chosen name or pronouns, or being denied the use of restrooms or locker rooms matching their gender identity.

AR_293306

## Impact of Unequal Treatment

- Forty percent (40%) of respondents had thought about moving to another area because they experienced discrimination or unequal treatment where they were living, and 10% of respondents had actually moved to another area because of discrimination.

- Nearly half (47%) of respondents had thought about moving to another state because their state government considered or passed laws that target transgender people for unequal treatment (such as banning access to bathrooms, health care, or sports), and 5% of respondents had actually moved out of state because of such state action.

- The top 10 states from which respondents moved because of state laws targeting transgender people for unequal treatment were (in alphabetical order): Alabama, Arizona, Florida, Georgia, Missouri, North Carolina, Ohio, Tennessee, Texas, and Virginia.



**Top 10 States USTS Respondents Reported Leaving**

*(Presented in alphabetical order)*

| |
|---|
| Alabama |
| Arizona |
| Florida |
| Georgia |
| Missouri |
| North Carolina |
| Ohio |
| Tennessee |
| Texas |
| Virginia |

AR_293307

Superintendent Procedure 3210SP.C
# Nondiscrimination and Affirmative Action: Transgender and Gender-Expansive Student Rights and Supports

Approved by:_____*s/Denise Juneau*_____ Date:___3/5/2020___
### Denise Juneau, Superintendent

This procedure is to advise District staff regarding the rights and supports Seattle Public Schools provides transgender and gender X, gender-expansive, students. Its purpose is to create a safe, welcoming, and inclusive learning environment for all students, and to ensure that every student has equal access to all components of their educational program.

This procedure does not anticipate every situation that might occur. Rather, it offers suggested approaches to specific instances when there may be implications regarding the protection or the safety of transgender and gender X, gender-expansive, students.

## PRIMARY CONTACT

The Manager of Health Education is designated as the District's primary contact regarding this procedure and its associated policy in relation to transgender and gender X students. The primary contact will receive copies of all informal and formal complaints regarding transgender students. As primary contact, the Manager of Health Education will receive training required by RCW 28A.642.080. All questions regarding the application of this procedure should be directed to the Manager of Health Education.

## DEFINITIONS

Note: The following definitions provided are not meant to label students, but instead are intended as functional descriptors.

**"Assigned sex at birth"** refers to the sex a person was given at birth, usually based on anatomy or chromosomes (e.g. male, female, intersex, or X).
**"Cisgender"** is a term used to describe people whose assigned sex at birth matches their gender identity and/or gender expression (e.g., a person who was assigned female at birth and whose gender identity and/or gender expression is also female.
**"Gender identity"** refers to a person's internal and deeply felt sense of being female, male, both, or neither. Persons may identify as nonbinary, gender-expansive, or other -- regardless of their assigned sex at birth. The District records the gender identity of students one of three ways: male, female, or X.
**"Gender-Expansive"** refers to a wider, more flexible range of gender identities than those typically associated with the binary (male or female) gender system. People who are gender-expansive may use a variety of terms including nonbinary or others to describe their gender identity. For the District, the gender X designation is inclusive of all identities associated with a gender-expansive identity.

AR_293376

**"Gender expression"** refers to the way a person expresses their gender, often through behavior, gestures, emotional expression, movement, dress and grooming.

**"Transgender"** is a general term used to describe a person whose gender identity or expression is different from that traditionally associated with the person's assigned sex at birth.

**"Transitioning"** is the process in which a person goes from living and identifying as one gender to living and identifying as another.

## SUMMARY

Washington State law and District policy require that all programs, activities, and employment practices be conducted without discrimination based on sex, sexual orientation, gender expression, or gender identity. Furthermore, and as a general rule, decisions regarding assignment, participation, and use in Seattle Public Schools are determined pursuant to a student's gender identity and not their assigned sex at birth.

Our schools are expected to implement Washington State law and District policy in the following ways:

- <u>Names/Pronouns:</u>  Students have the right to be addressed by the name and pronoun that corresponds to their gender identity consistently asserted at school.
- <u>Name on Educational Records:</u> A parent/guardian or eligible student (18 years of age or older) may request to have the legal name changed on their educational record at Enrollment Services located at John Stanford Center for Educational Excellence (JSCEE).
- <u>Gender on Educational Records:</u> A student or their parent/guardian may request to have the gender changed on their educational record at Enrollment Services located at JSCEE.
- <u>Restroom Accessibility:</u> Students have the right to use the restroom that corresponds to the gender identity they consistently assert at school. Students who identify as gender X have the right to use the restroom the student determines to best align with their gender identity.
- <u>Locker Rooms:</u>  Students have the right to use the locker room that corresponds to the gender identity they consistently assert at school. Students who identify as gender X have the right to use the locker room the student determines to best align with their gender identity.
- <u>Physical Education Courses and Club Sports:</u>  Students have the right to participate in physical education courses and club sports in a manner consistent with the gender identity they consistently assert at school.
- <u>Interscholastic Athletic Teams:</u> Transgender students have the right to participate on the interscholastic athletic team consistent with the gender identity they consistently assert at school.
- <u>Student Dress:</u>  Students will not be contacted or disciplined for wearing clothing perceived to be not consistent with their gender identity. All student attire, and the enforcement of student attire is determined by Board Policy No. 3224 and its associated Superintendent Procedure.
- <u>Overnight Field Trips:</u> Students have the right to be assigned to overnight accommodations in accordance with the gender identity they consistently assert at school. Staff will never assign students to shared sleeping accommodations

AR_293377

when they are aware of a romantic interest or relationship between the students assigned.

- Gender Segregation in Other Areas: As a general rule, schools should consider options to avoid separating students by gender unless necessary. In circumstances where students are separated by gender in school activities, students have the right to participate in accordance with the gender identity they consistently assert at school.

## GUIDELINES

### Issues of Privacy:

All persons have a right to privacy; this includes keeping a student's transgender or gender X status private. Information about a student's gender identity, legal name, or assigned sex at birth may constitute confidential medical or educational information. Disclosing this information to others may violate privacy laws, including the federal Family Education Rights and Privacy Act (FERPA) (20 U.S.C. s 1232g; 34 C.F.R. Part 99). Therefore, to ensure student safety and well-being, and to provide identity-safe schools for all, staff should not disclose a student's transgender or gender X status to others unless (1) legally required to do so or (2) the student has authorized disclosure.

Whenever speaking with a transgender or gender X student about a particular issue such as conduct, discipline, grades, attendance, or health, focus on the conduct or particular issue and avoid making assumptions regarding the student's actual or perceived gender identity. Further, when contacting the parents/guardians of a transgender or gender X student and it is unclear whether the student asserts the same gender identity at home, it is best practice to avoid using gender pronouns. For example, one could say, "I am concerned about P.J.'s attendance," rather than, "I am concerned about his attendance."

### Official Records:

The District is required to maintain a permanent student education record which includes the legal name of the student and the student's gender. A parent/guardian (or eligible student over 18 years old) may request a change to a student's recorded legal name. A student or their parent/guardian may request a change to their recorded gender. Requests for name and gender changes are accepted and processed at JSCEE Enrollment Services.

- Legal Name: The District will change a student's legal name on their education record when a parent/guardian or eligible student (over age 18) provides documentation of a legal name change, such as documentation of a court-ordered name change or an affidavit of name change made pursuant to common law. Affidavit of name change templates are available from JSCEE Enrollment Services.
- Gender: A Seattle Public Schools student has the right to have the gender on their educational record reflect their gender identity consistently asserted at school. For educational purposes, there are no legal requirements surrounding gender. The District will change a student's gender on their education record upon request from the student or their parent/guardian upon completion of an enrollment form at JSCEE Enrollment Services.

AR_293378

Upon the receipt of all required documentation, the Admissions Center will ensure that all student systems are updated to reflect changes in name and/or gender, e.g. PowerSchool and The Source.

To the extent that the District is not legally required to use a student's legal name on school records or documents, the District will use the name by which the student identifies. In situations where school staff or administrators are required by law to use or report a student's legal name, such as for standardized testing, school staff should adopt practices to avoid the inadvertent disclosure of such confidential information.

### Names/Pronouns:
Students have the right to be addressed by a name and pronoun corresponding to the gender identity they consistently assert at school. The District uses the term "preferred name" to reference names corresponding to gender identity that are different from a student's legal name on their educational record. A Student or their parent/guardian are not required to change their gender, and a parent/guardian is not required to legally change their student's name, as a prerequisite for the student to be addressed by the name and pronoun that corresponds to their gender identity.

The District acknowledges that initially, inadvertent slips or honest mistakes in the use of the preferred names or pronouns might occur but will not condone an intentional and persistent refusal to respect a student's gender identity. The student's preferred name will be included in the electronic student record system along with the student's legal name to inform teachers of the name and pronoun to use when addressing the student.

### Restroom Accessibility:
Students have the right to use the restroom that is consistent with the gender identity they consistently assert at school. Students who identify as X, gender-expansive, will be provided access to the restroom that the student determines to best align with their gender identity. Further, all students regardless of the underlying reason who have a need or desire for increased privacy should be provided access to an alternative restroom (e.g., staff restroom or health office restroom). This allows students who may feel uncomfortable sharing the facility with transgender or gender X student(s) the option to make use of a separate restroom and have their concerns addressed without stigmatizing any individual student. No student, however, should be required to use an alternative restroom because they are transgender or gender X.

If school administrators have legitimate concerns about the safety or privacy of students, as related to a transgender or gender X (gender-expansive) student's use of the restroom or locker room, school building administrators should bring these concerns to the Manager of Health Education. Such privacy or safety issues should be immediate and reasonably foreseeable, not speculative. School building administrators and/or the Manager of Health Education should meet with the student and/or parents/guardians to determine if there is a need for an alternative facility. The decision to provide an alternative facility for any student will be determined on a case-by-case basis.

### Locker Room Accessibility:
All students have the right to use the locker room that corresponds with the gender identity they consistently assert at school. Students who identify as X (gender-expansive) will be provided access to the locker room that the student determines to

AR_293379

best align with their gender identity. However, if there is a reason or desire for increased privacy and safety, regardless of the underlying reason, any student should be provided access to a reasonable alternative locker room. Reasonable alternative locker rooms include, but are not limited to:

- Use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, an office in the locker room, or a nearby health office restroom).
- A separate changing schedule (either utilizing the locker room before or after the other students).

For transgender and gender X students, any alternative arrangement should be provided in a way that protects the student's ability to keep his or her transgender or gender X status private. However, no student should be required to use a locker room that conflicts with his or her gender identity.

## Physical Education, Club Sports, and Interscholastic Athletics:
Students have the right to participate in physical education courses and club sports consistent with the gender identity they consistently assert at school. Further, subject to the participation polices of the Washington Interscholastic Activities Association (WIAA) for high school interscholastic athletics, transgender students have the right to participate on the interscholastic athletic team consistent with the gender identity they consistently assert at school.

In circumstances where physical education courses and club sports are gender specific and there is not a gender X option, students who identify as gender X have the right to participate in the course and/or on the club sport team that the gender X student determines best aligns with their gender identity.

## Student Dress:
Providing students an environment where they can express their identity through their attire is a value of the District and an important element in providing identity-safe spaces for students. Board Policy No. 3224, Student Dress, provides that all Seattle Public Schools' students have the right to be treated equitably and dress code enforcement will not be more strictly enforced against students because of their gender identity, gender expression, or gender nonconformity.

## Overnight Field Trips:
In situations where students are separated by gender for overnight accommodations, all students will be assigned to accommodations in accordance with the gender identity they consistently assert at school (M, F, or X). In situations where there are not overnight accommodations identified for gender X students, the student will determine the gendered overnight accommodations that best align with their gender identity. A school will not require transgender or gender X students to stay in single-occupancy accommodations or disclose personal information when not required of other students. However, this does not prevent a school from honoring any student's voluntary request for single-occupancy accommodations if they so choose.

Note: A staff member will never assign students to shared sleeping accommodations when they are aware of a romantic interest or relationship between the students assigned.

AR_293380

## Gender Segregation in Other Areas:

Teachers/school employees should make every effort to separate students based on factors other than gender when possible. Listed below are examples of common situations where students are separated by gender where there are other reasonable alternatives:

- Class Discussions: Students can be divided by birth month or birth order instead of gender.
- Graduations: Students should be divided their color preference instead of assigned a graduation gown color based on their gender.
- Calling for Students' Attention: Instead of using gendered phrases to get students' attention such as "girls and boys," "you guys," and "ladies and gentlemen," it is recommended to use phrases such as "calling all readers," "could all the athletes/scholars/learners come here."

Activities that may involve the need for accommodations to address student privacy concerns should be addressed on a case-by-case basis. In such circumstances, staff shall make reasonable efforts to provide an accommodation that addresses any such concerns.

## Variations:

Recognizing that this procedure's goal is to provide for the safety and protection of transgender and gender X students, the rules provided may not always be appropriate to apply in every situation. Therefore, for any given situation, the parent/guardian of a transgender or gender X student, a transgender or gender X student, and/or school principal may request a procedure variation from the Manager of Health Education. Upon request for a procedure variation, the Manager of Health Education will consult with District legal counsel and determine whether to grant the variation. A decision to deny a procedure variation may be appealed to the Superintendent. The decision of the Superintendent is final.

Approved: December 2012
Revised: February 2015; August 2016; December 2016; June 2017; March 2020 (typo corrected April 14, 2020)
Cross Reference: Policy Nos. 2145; 3207; 3210; 3224; Supt Proc. 3210SP.A; Supt. Proc. 3210SP.B; Supt. Proc. 3224SP
RCW 28A.642, Discrimination prohibition; WAC 392-190 WAC; RCW 49.60 RCW, Washington Law Against Discrimination; Prohibiting Discrimination in Washington Public Schools - OSPI Guidelines for school districts to implement Chapters 28A.640 and RCW 28A.642 and WAC 392-190 (February 2012); 20 U.S.C. 1232g, Family Education Rights and Privacy Act; 34 C.F.R. Part 99; U.S. Department of Education Office for Civil Rights, Dear Colleague Letter: Transgender Students (May 2016).

AR_293381

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-4    Filed: 08/16/24    Page: 617 of 690 -
Page ID#: 4975
*Sex-segregated Bathrooms and Suicidal Ideation in Transgender Youth*

# Sex-segregated Bathrooms and Suicidal Ideation in Transgender Youth

Thea A. Schlieben

Numerous studies (Craig & Pepler, 2003; Goldblum, Testa, Pflum, Hendricks, Bradford & Bongar, 2012; Mustanski & Liu, 2013) have found that lesbian, gay, bisexual, and transgender youth are at high risk for depression, anxiety, suicidal ideation, and suicide attempts. It is the view of the current author and others  (McCarthy, 2003) that sexual and gender minority students, lesbian, gay, bisexual, and transgender persons (LGBTQ) are too often considered as a single group or entity. As a result, when addressing discrimination and the community needs for LGBTQ persons, the differences between sexual orientation and transgender issues may be ignored. By not having specific discussions about transgender issues, it may be assumed that transgender students have the same needs as lesbian, gay, and bisexual students (McCarthy, 2003). Even when teachers and researchers recognize inequality in sexual orientation, gender variance is an often-overlooked form of diversity (McCarthy, 2003).

Transgender students are those whose gender expression does not conform to societal expectations and/or whose gender identity does not align entirely with the sex they were assigned at birth. In this context, transgender is used as an umbrella term that may include those who identify as transgender, gender non-conforming, genderqueer, agender, non-binary, queer, and any other non-cisgender individual. Cisgender refers to people whose gender identity aligns with the sex they were assigned at birth.

Almost forty-five percent of transgender or gender non-conforming students report victimization in their schools from peers and teachers, versus 19.9 percent of the general population of students (Goldblum, et al., 2012). Gender minorities are even more likely to experience victimization

27

*Journal of Advanced Generalist Social Work Practice*

in schools than cisgender (non-transgender) sexual minorities. Seventy-six percent of transgender students reported feeling unsafe in their schools because of their sexual or gender orientation as compared to the 52.9 percent of lesbian, gay, and bisexual students who reported the same feeling (Goldblum, et. al. 2012). If classrooms are going to be fully inclusive, they must allow for a range of gender identities and expressions.

In February 2016, the South Dakota Senate passed a measure that would force schools to make students use bathrooms and locker rooms according to their chromosomes and anatomy (Steinmetz, 2016). The supporters of sex-segregated bathroom bills argue if people are allowed to use a bathroom according to their gender identity, instead of the sex they were assigned at birth, it will increase sexual harassment and voyeurism, especially in women's bathrooms. There is no evidence to support this claim. Those in opposition to this legislation do so with the concern that such laws will encourage further hostility, abuse, and aggression toward transgender people. This form of discrimination has been shown to negatively affect mental health (Wang, Solomaon, Durso, McBride & Cahill, 2016). In fact, it is this adverse impact on the mental health of young persons that makes sex-segregated bathrooms an important social work issue. Protecting and serving vulnerable populations, such as transgender and gender variant youth, are central to the core values and ethics of social work.

**REVIEW OF LITERATURE**

The freedom to access public bathrooms is a basic necessity for all people, and mandatory for equal access to education and employment (Wang, Solomon, Durso, McBride, & Cahill, 2016). When faced with consistent problems using gender segregated bathrooms, transgender people may experience a greater sense of stigmatization and discrimination (Herman, 2013). The federal Occupational Safety and Health Administration (2015) released guidelines identifying the risk of marginalization that can occur if transgender employees are forced to use separate bathroom facilities, or facilities inconsistent with their gender identity. Forcing people to use bathrooms inconsistent with their gender identity or separate from their peer group creates a negative environment, whether in the workplace or an educational setting.

**Unequal access.** Anti-transgender bathroom bills, or laws that force people to use public bathrooms according to the gender they were assigned at birth, are written with the intention of increasing public safety.

AR_293383

*Sex-segregated Bathrooms and Suicidal Ideation in Transgender Youth*

Wang, et al. (2016) claim that rather than increasing public safety, these laws increase the risk of harassment and hostility toward transgender people. In 2015, Texas, Kentucky, Florida, Minnesota, and Missouri were considering bills that would regulate transgender and gender non-conforming people's access to public bathrooms and locker rooms. The laws proposed in Minnesota and Kentucky were a reaction to schools in those states that had created transgender inclusive bathroom policies. Even though the bills in those two states were defeated, other states have similar legislation moving through their governing bodies (Wang, et.al, 2016). The legislation passed by South Dakota, similar to the bills in Minnesota and Kentucky, include an exception for gender non-conforming students. It states that if a student cannot use the facilities aligning with the sex they were assigned at birth, and they obtain parental consent, "reasonable accommodations" will be made. Those accommodations are restricted to single occupancy, unisex facilities, or faculty bathrooms (Wang, et al., 2016). Wang, et al. (2016) argue that rather than being an acceptable compromise, this rule requires the student to disclose their transgender status to people who may not be supportive of their gender identity. Furthermore, if the child had begun transitioning before they enrolled in school, they also would be forced to reveal their assigned sex to the school community. This type of forced disclosure leaves gender non-conforming and transgender students vulnerable to bullying and victimization by peers and faculty.

**Negative school environment, bullying and victimization.** Studies have shown that improving the culture in schools around accepting and supporting LGBTQ students reduces both victimization and suicide attempts (DeCamp & Bakken, 2016). In turn, this finding suggests that a school environment that is not supportive of sexual and gender minority students increases the likelihood of victimization and suicidal behavior.

Educational systems in this country have not made significant progress in exploring and meeting the needs of their LGBTQ students (Little, 2001). Data presented by Riley, Sitharthan, Clemson, and Diamond (2013) suggests that even when children try to adhere to stereotyped gender roles, they are often targeted as "the other" by those seeking to marginalize and victimize them. The surveyed parents of LGBTQ children spoke of having to watch their children struggle socially. One-third of parents reported that their children were sad, depressed,

AR_293384

*Journal of Advanced Generalist Social Work Practice*

or suicidal (Riley, Sitharthan, Clemson, & Diamond, 2013).

Victimization of LGBTQ students is widespread and comes from both peers and teachers (Russell, Ryan, Toomey, & Sanchez, 2011). As noted above (Goldblum et.al), nearly 49 percent of transgender students participating in a 2012 study reported having been subject to hostility or insensitivity due to their gender expression. Russell, et al. (2011) showed that even small successes in reducing LGBTQ victimization in middle and high school could significantly improve the long-term health of students. It is thought that the mental health consequences of bullying increase when the victimization is based on these factors (Russell, Ryan, Toomey, & Sanchez, 2011). Participants who reported victimization based on gender were four times as likely to have attempted suicide as those who did not, and 28.5 percent of all respondents reported past suicide attempts (Goldblum, et al., 2012). The findings of this study reinforce the need to promote safer school environments for transgender and gender non-conforming students.

Craig and Pepler (2003) found children were most likely to be bullied at school, especially in areas that are not well supervised, such as school buses, playgrounds, hallways, bathrooms, and locker rooms. In recent years, the problem of school bullying appears to have intensified in severity and prevalence, and behaviors of students towards their peers have become more vicious. On a more hopeful note, more attention is being paid to the bullying of LGBTQ young people who are at a high risk of suicide (Russell, Ryan, Toomey, & Sanchez, 2011).

**Depression, anxiety, isolation, and hopelessness.** There is recognition in the literature that pressuring children to conform to gender roles and stereotypes creates damage and suffering that persists through adolescence and adulthood (Riley, Sitharthan, Clemson, & Diamond, 2013).

When young people are victimized, they report increased levels of anxiety and somatization, as well as problems with forming and maintaining good relationships (Craig & Pepler, 2003). Isolation for LGBTQ youth can be fatal. When isolated, LGBTQ young people are less likely to seek support for fear of rejection (Little, 2001).

Children suffering from depression and anxiety are at increased risk of being victimized (Craig & Pepler, 2003). Forty-one percent of the respondents in the National Transgender Discrimination Survey reported having attempted suicide, compared to 4.6 percent of the general population and 10.2 percent of lesbian, gay, and bisexual identified people. Among the group

*30*

*Sex-segregated Bathrooms and Suicidal Ideation in Transgender Youth*

of transgender respondents with histories of suicide attempts, several factors contributed to higher suicide rates: a previous attempted suicide, lower levels of education, and having experienced harassment or bullying at school.

Mustanski and Liu (2013) found that hopelessness and depression are determinants of suicidal behavior. LGBTQ youth are not only more likely to attempt suicide, they also are more likely to succeed in their attempts (Little, 2001). Increased rates of depression, sadness, and hopelessness have a significant effect on self-injury and suicidal ideation in all young people, regardless of gender identity or sexual orientation (DeCamp & Bakken, 2016). However, there also are factors specific to LGBTQ youth that may account for higher rates of suicidal behavior in this population (Mustanski & Liu, 2013).

In a longitudinal study examining the predictors of suicide attempts in LGBTQ youth, Mustanski and Liu (2013) found that when they examined suicide attempts by gender, transgender youth had the highest reported rates of hopelessness, victimization, and childhood gender non-conformity. These three elements represent significant risk factors for suicidality. Transgender youth also had the highest rate of suicide attempts (Mustanski & Liu, 2013). The findings of this study also support the belief that thwarted belongingness and isolation are risk factors for suicidality.

While some studies have found that concealing one's sexual orientation is detrimental to mental health for lesbian, gay, and bisexual people, the findings of the National Transgender Discrimination Survey, as reported by Haas, Rogers and Herman (2014), suggest that disclosing gender identity does not have the same effect for transgender people. The findings suggest that it serves as a protective factor and it is safer to be recognized as gender conforming. One-half of the respondents with a history of suicide attempts had previously disclosed their gender identity (Haas, Rodgers, & Herman, 2014).

**CONCLUSION**

Sex-segregated school bathroom laws impact transgender students and the entire school community negatively. The literature, reviewed in this paper, shows that sex-segregated bathrooms increase the likelihood of transgender students becoming depressed, anxious, isolated, and hopeless. They also establish a school environment that stigmatizes transgender students as "different" and "unusual," ultimately leading to social dynamics of being shamed and bullied. As the above literature demonstrates,

AR_293386

*Journal of Advanced Generalist Social Work Practice*

elevated levels of depression and hopelessness may lead to suicidal ideation and attempts.

Laws that require public schools to institute rules that all students must use the bathroom, shower, and locker room in accordance with their biological sex as determined at birth are unjust and discriminatory. Instead of focusing on sex-segregated bathrooms, students, parents, teachers, school administrators, and the entire school community are best served by tolerance and acceptance. Educators and mental health professionals must begin to teach about and fight against gender oppression in the same way they confront racial discrimination and have begun to normalize the conversation around homophobia (McCarthy, 2003).

# References

Craig, W. M., & Pepler, D. J. (2003). Identifying and targeting risk for involvement in bullying and victimization. *Canadian Journal of Psychiatry, 48*(9), 577-582.

DeCamp, W., & Bakken, N. W. (2016). Self-injury, suicide ideation, and sexual orientation: differences in causes and correlates among high school students. *Journal of Injury & Violence Research, 8*(1), 15-24.

Goldblum, P., Testa, R. J., Pflum, S., Hendricks, M. L., Bradford, J., & Bongar, B. (2012). The relationship between gender-based victimization and suicide attempts in transgender people. *Professional Psychology: Research and Practice, 43*, 468-475.

Haas, A., Rodgers, P., & Herman, J. (2014). Suicide attempts among transgender and gender non-conforming adults: Findings of the national transgender discrimination survey. American Foundation for Suicide Prevention and The Williams Institute, UCLA School of Law. Retrieved from http://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf

AR_293387

*Sex-segregated Bathrooms and Suicidal Ideation in Transgender Youth*

Herman, J. L. (2013). Gendered restrooms and minority stress: The public
regulation of gender and its impact on transgender people's lives.
*Journal of Public Management & Social Policy*, 65-80.

Little, J. N. (2001). Embracing gay, lesbian, bisexual and transgendered
youth in school-based settings. *Child & Youth Care Forum, 30*(2),
99-110.

Mustanski, B., & Liu, R. T. (2013). A longitudinal study of predictors of
suicide attempts among lesbian, gay, bisexual and transgender youth.
*Archives of Sexual Behavior, 42*, 437-448.

Occupational Safety and Health Administration (2015).
OSHA Trade Release. Retrieved from https://www.osha.gov/news/
newsreleases/trade/06012015

Riley, E. A., Sitharthan, G., Clemson, L., & Diamond, M. (2013).
Recognising the needs of gender-varient children and their parents.
*Sex Education, 13*(6), 644-659.

Rogers, A., Rebbe, R., Gardella, C., Worlein, M., & Chamberlin, M.
(2013, August). Older LGBT Adult Training Panels: An Opportunity
to Educate About Issues Faced by the Older LGBT Community.
*Journal of Gerontological Social Work*, 580-595.

Russell, S. T., Ryan, C., Toomey, R. B., & Sanchez, J. (2011, May).
Lesbian, gay, bisexual, and transgender adolescent school
victimization: Implications for young adult health and adjustment.
*Journal of School Health, 81*(5), 223-230.

Wang, T., Solomon, D., Durso, L. E., McBride, S., & Cahill, S. (2016).
State anti-transgender bathroom bills threaten transgender people's
health and participation in public life [PDF file]. Policy Brief,
Fenway Institute and Center for American Progress. Retrieved from
http://fenwayhealth.org/wp-content/uploads/2015/12/COM-2485-
Transgender-Bathroom-Bill-Brief_v8-pages.pdf

AR_293388

LGBT Health
Volume 6, Number 1, 2019
© Mary Ann Liebert, Inc.
DOI: 10.1089/lgbt.2018.0194

Downloaded from 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

# Sexual Orientation Enumeration in State Antibullying Statutes in the United States: Associations with Bullying, Suicidal Ideation, and Suicide Attempts Among Youth

Ilan H. Meyer, PhD,[1] Feijun Luo, PhD,[2] Bianca D.M. Wilson, PhD,[1] and Deborah M. Stone, ScD, MSW, MPH[3]

## Abstract

*Purpose:* The aim was to assess the associations of antibullying U.S. state statutes that enumerate sexual orientation with exposure to bullying and other stressors and with suicidal ideation and suicide attempts in sexual minority and non sexual minority youth.
*Methods:* We analyzed data from the 2015 national school-based Youth Risk Behavior Survey, representative of 9th through 12th grade students attending public and private schools in the United States. We reviewed each state's antibullying statutes and classified them on enumeration.
*Results:* Antibullying state laws that enumerate sexual orientation were associated with lower risk for suicide attempts and serious attempts requiring medical attention and lower risk for forced sexual intercourse. They were also associated with feeling safe at school or on the way to or from school. Results did not differ by sexual orientation.
*Conclusions:* Enumeration of sexual orientation was associated with reduced stressors and suicide attempts, but it is insufficient to remove significant disparities based on sexual orientation. Additional policies and practices are required to address persistent sexual orientation disparities in exposure to bullying and suicidal behavior.

Keywords: bullying, law and policy, schools, sexual minority youth, suicide attempts

## Introduction

HOMOPHOBIC AND TRANSPHOBIC VIOLENCE, including bullying, is a challenge for educators and policy makers internationally as shown by data from Africa, Asia, Europe, Latin America and the Caribbean, North America, and the Pacific.[1] The United States has some of the highest rates of homophobic and transphobic violence.[1] Bullying has been identified as a particular challenge in U.S. schools and is associated with suicide risk factors, including physical and sexual violence, feeling unsafe, depression, thoughts of suicide, and suicidal behavior.[2–4] A comprehensive report by the United Nations Educational, Scientific and Cultural Organization recommended a variety of policy approaches to address homophobic and transphobic violence.[1] For example, a study in Australia has shown that sexual and gender minority students' perceptions of policies that protect them were associated with increased sense of safety and reduced likeli-

hood of thinking about self-harm, actual self-harm, suicidal ideation, and attempted suicide.[5]

In the United States, by 2015, all 50 states and the District of Columbia enacted laws aimed at reducing bullying.[6] However, little research has tested the effectiveness of state antibullying policies in reducing bullying and its ill effects; the research that is available has shown mixed results. One study found lower odds of reported bullying behavior in states that were compliant with U.S. Department of Education guidelines, such as having a clearly defined scope of the law and stated requirements for districts to implement local policies.[7] However, in another study of bullying prevalence in Iowa, researchers found no reduction from before to 3 years after the enactment of the antibullying law.[8]

Sexual and gender minorities are particularly targeted for bullying and suffer its negative effects, including increased risk for suicidal ideation and behavior.[9–11] In 2015, 34% of lesbian, gay, and bisexual (LGB) students had been bullied

[1]The Williams Institute, School of Law, University of California Los Angeles, Los Angeles, California.
Divisions of [2]Analysis, Research, and Practice Integration, [3]Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia.

AR_293389

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

at school over a year, compared with 19% of heterosexual students. During this same time frame, 28% of LGB students reported online bullying, compared with 14% of heterosexual students; 43% had seriously considered attempting suicide, and 29% had attempted suicide, compared with 15% and 6%, respectively, of heterosexual students.[9]

Advocates recommend that laws specifically enumerate sexual orientation and gender identity—that is, specifically list these categories in the statute. The argument is that enumeration would impel school personnel to address these specific forms of bullying, which can be otherwise ignored even in the presence of a general anti-bullying law.[12–15] In one study, researchers assessed the role of sexual orientation enumeration in Oregon school districts and found that counties with more school districts that enumerated sexual orientation in their antibullying policies had the lowest rates of suicide attempts among lesbian and gay (but not bisexual) youth.[16]

To fill the gap in understanding the effectiveness of enumerated antibullying laws, we assess whether youth in states that have such enumerated sexual orientation antibullying statutes are exposed to fewer experiences of bullying and other stressors at school and have less suicidal ideation and fewer suicide attempts compared with youth in states whose antibullying statutes do *not* enumerate sexual orientation.[17] We further assess whether such an association, if it exists, is specific to sexual minority youth or whether it is generalized across all students, regardless of sexual orientation.

## Methods

### Sample

The national Youth Risk Behavior Survey (YRBS) is a school-based survey conducted by the Centers for Disease Control and Prevention biannually.[18] Survey responses are representative of 9th through 12th grade students attending public and private schools in the United States. Although schools in all 50 states and the District of Columbia are included in the sampling frame, because the survey uses a three-stage cluster sample design, not all states have schools drawn into the sample.[9] The 2015 national YRBS sample included 15,624 respondents from 27 states. More detailed information about YRBS sampling and weighting is available elsewhere.[9] The study was exempt from institutional review board review as the analyses involved a deidentified data set that is available publicly.

### Measures

Sexual minority status. We defined sexual minority youth based on responses to two items: sexual identity and sexual contact. Youth who endorsed being "gay or lesbian," "bisexual," or "not sure" or who reported that they had any same-sex sexual contact during their lifetime were classified as *sexual minority* youth. Youth not classified as sexual minority were classified as *non sexual minority* youth. Sexual minority status was missing if sexual identity was missing and sexual contact was missing or none ($N=882$).

Enumerated antibullying law. States were coded as to whether by 2015 they did or did not have an antibullying statute that enumerated sexual orientation. A statute was considered to enumerate sexual orientation if the statute listed

sexual orientation specifically as a focus of the law (Supplementary Table S1; Supplementary Data are available online at www.liebertpub.com/lgbt).

Experienced bullying and related stressors. Two items assessed bullying, asking whether respondents were "bullied" on school property and "electronically bullied." We also assessed five stressful experiences and indicators of victimization: felt unsafe at school or on their way to or from school in the past 30 days; threatened or injured with a weapon such as a gun, knife, or club on school property; in a physical fight; injured and had to be treated by a doctor or nurse after being in a physical fight; and ever physically forced to have sexual intercourse. All responses were dichotomized as "yes," if the outcome occurred, or "no," if the outcome never occurred.

Suicidal ideation and suicide attempts. Respondents answered the following four items related to the year before the interview: seriously considered attempting suicide; made a plan for attempting suicide; actually attempted suicide; and made an attempt that resulted in an injury, poisoning, or overdose that had to be treated by a doctor or nurse. Responses were dichotomized as "yes," if this occurred, or "no," if it never occurred.

Demographic characteristics. Sex (male or female), grade in school (9, 10, 11, or 12), and race/ethnicity (categorized as non-Hispanic American Indian/Alaska Native, Asian, Black or African American, Native Hawaiian/other Pacific Islander, or White; or Hispanic/Latino or non-Hispanic multiple races or Hispanic multiple races) were self-reported by respondents.

### Data analysis

We calculated frequencies to describe the sample and conducted logistic regression to test whether antibullying laws that enumerated sexual orientation were associated with reduced bullying, related stressors, and suicidal ideation and suicide attempts, controlling for demographic characteristics. We calculated odds ratios and 95% confidence intervals for youth attending schools in a state with enumerated antibullying statutes compared with youth attending schools in states that do not have such enumeration, across all respondents, as well as among sexual minority youth compared with non sexual minority youth, across all states. We also tested interactions to assess whether the associations between enumerated antibullying state laws and bullying and other stressors and suicidal ideation and suicide attempts differed based on sexual minority status.

We used SAS software version 9.3 (SAS Institute Inc., Cary, NC) with survey procedures in all statistical analyses to account for the complex sampling design of the YRBS.[19] Missing data were handled using the SAS survey procedure option NOMCAR (not missing completely at random).[20] A weight based on student sex, race/ethnicity, and grade was applied to each record to adjust for school and student nonresponse and oversampling of Black and Hispanic students. The overall weights were scaled so that the weighted count of students equals the total sample size, and the weighted proportions of students in each grade match the national population proportions. Therefore, weighted estimates are

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

representative of all students in grades 9–12 attending public and private schools in the United States.[9]

## Results

The 2015 national YRBS sample included 15,624 respondents from 27 states, in which 12 states had an antibullying statue that enumerated sexual orientation and 15 states did not (Supplementary Table S1). The weighted percentages of male and female students were 51.3% and 48.7%, respectively, and percentages of 9th, 10th, 11th, and 12th grade students were 27.2%, 25.7%, 23.9%, and 23.1%, respectively. White, Black/African American, multiple-Hispanic, and Hispanic/Latino were the leading four race/ethnicity categories, with weighted percentages of 54.5%, 13.6%, 12.3%, and 9.9%, respectively.

Nationwide, 12.8% (standard error [SE] = 0.8%) of students met this study's definition of sexual minority youth. Sexual minority youth were more likely than non sexual minority youth to be female (68.8% vs. 45.7%, Rao–Scott chi square $[Q_{RS}] = 74.6$ [1], $p < 0.001$), and were more likely to be Black/African American (16.9% vs. 13.1%, $Q_{RS} = 5.7$ [1] $p = 0.017$). Sexual minority youth were less likely than non sexual minority youth to be White (48.0% vs. 55.5%, $Q_{RS} = 6.5$ [1] $p = 0.011$) and more likely to have multiple race/ethnicities (both Hispanic and non-Hispanic, 14.7% vs. 12.1%, $Q_{RS} = 5.8$ [1] $p = 0.015$ and 6.8% vs. 4.2%, $Q_{RS} = 16.7$ [1] $p < 0.001$, respectively). Sexual minority and non sexual minority youth did not differ in the grade they attended in school.

Table 1 shows bullying and other stressors and suicidal ideation and suicide attempts among youth by antibullying law (sexual orientation enumerated vs. not enumerated) and youth sexual orientation (sexual minority vs. non sexual minority). First, across all respondents, regardless of sexual orientation, and controlling for sex, grade, and race/ethnicity, having an antibullying state law that enumerates sexual orientation was associated with reduced odds of bullying, stressors, and suicidal ideation and suicide attempts (Table 1, Column C). Related to stressors, the relationship was significant for feeling unsafe at school or on the way to or from school and ever having been physically forced to have sexual intercourse. Related to suicidal ideation and suicide attempts outcomes, the association was significant for attempting suicide and making a suicide attempt that required being treated by a doctor or nurse.

Second, across all states, compared with non sexual minority youth, more sexual minority youth experienced each of the bullying and other stressors we examined and they were more likely than non sexual minority youth to have suicidal ideation and suicide attempts (Table 1, Column D).

A test of the interaction between sexual minority status and the presence of an enumerated antibullying state law was not significant for any of the outcomes we examined, suggesting that the effect of enumerated state laws on bullying, stressors, and suicide was similar for sexual minority and non sexual minority youth (not shown).

## Discussion

Our results show that enumeration of sexual orientation in antibullying laws at the state level was associated with fewer suicide attempts, including serious attempts requiring medical attention, compared with state statutes that do not enumerate sexual orientation. Youth in states with enumerated statues also reported feeling safer at school or on the way to or from school, and were less likely to have been physically forced to have sexual intercourse. In considering the significant effects we found, it is important to recall that all states have antibullying laws, which provide some baseline protection. It is, thus, all the more noteworthy that even with the general antibullying laws, evidence shows an impact that is specific for enumerated statutes.

Interestingly, our results show that the effects of having sexual orientation enumeration were the same for sexual minority and non sexual minority youth. An explanation may be that actions taken along with enumeration, such as enactment of specific policies and model programs, have an impact that does not distinguish sexual minority and non sexual minority youth. Because we were limited in testing mechanisms of the associations we detected, this could not be assessed.

Thus, our findings show that while enumeration is effective in reducing suicide attempts and other stressors, it is insufficient at reducing *disparities* between sexual minority and non sexual minority youth in bullying, related stressors, and suicide attempts. That is, while fewer youth attempted suicide in states with enumerated statutes compared with states that do not have enumerated statutes, sexual minority youth have higher prevalence of suicide attempts than non-sexual minority youth both in states with and without enumerated statutes.

Our results are consistent with advocates' and other researchers' assertions that sexual orientation enumeration is merely a first step in addressing bullying and its ill effects. For example, Russell et al. suggested that enumeration is "a foundation on which other lesbian, gay, bisexual, transgender, and questioning (LGBTQ) safe school policies and practices can be based."[12] In addition to enumeration, the authors recommended training of teachers on effective intervention strategies, school-based support groups (e.g., Gay–Straight Alliances), inclusion of LGBTQ people or issues in school curricula, and improved access to information and resources. Other strategies and approaches to prevent risk of youth suicide include promoting social connectedness among youth and schools, parents/caregivers, and communities; promoting protective school environments to improve prosocial behaviors and help-seeking behavior; and teaching coping and problem-solving skills to reduce bullying, violence, and suicide risk.[21–23]

### Study limitations

Among our study limitations are that the cross-sectional data do not allow us to test whether state enumeration of sexual orientation was the cause of the observed differences or whether other correlated state-level factors were at work. For example, states that included enumeration by sexual orientation in their laws may also have made other efforts to address bullying and to improve the social environment. Also, we cannot state that sexual orientation enumeration *per se* explains the results as all states that enumerate sexual orientation also enumerate other characteristics, such as race or religion.

In addition, 27 states were randomly included in the YRBS national sample; we do not know if results would have differed had other states been included. We used a

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

TABLE 1. BULLYING, OTHER STRESSORS, AND SUICIDAL IDEATION AND SUICIDE ATTEMPTS AMONG YOUTH FROM THE YOUTH RISK BEHAVIOR SURVEY 2015 (N = 15,624): UNWEIGHTED NUMBERS AND WEIGHTED PROPORTIONS, BY ENUMERATED ANTIBULLYING STATE LAW AND SEXUAL ORIENTATION

| | A—Nonenumerated[a] state statute | | | | B—Enumerated[a] state statute | | | | C—Difference between states with and without enumerated antibullying statute (across all respondents) | D—Difference between sexual minority and non sexual minority youth (across all states) |
| | Non sexual minority youth | | Sexual minority youth | | Non sexual minority youth | | Sexual minority youth | | | |
| | N | % (SE) | N | % (SE) | N | % (SE) | N | % (SE) | OR (95% CI) | OR (95% CI) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bullying and other stressors** | | | | | | | | | | |
| Felt unsafe at school or on their way to or from school | 276 | 5.4 (0.7) | 99 | 14.1 (1.5) | 385 | 4.1 (0.4) | 149 | 9.8 (1.3) | 0.7 (0.5–0.9) | 2.5 (2.0–3.1) |
| Threatened or injured with a weapon on school property | 284 | 6.2 (0.5) | 79 | 10.5 (1.6) | 386 | 4.3 (0.4) | 126 | 11.3 (1.2) | 0.8 (0.7–1.0) | 2.2 (1.8–2.7) |
| Were in a physical fight | 1024 | 24.8 (1.4) | 225 | 33.2 (2.3) | 1219 | 19.6 (0.8) | 257 | 28.8 (2.7) | 0.8 (0.7–1.0) | 1.8 (1.5–2.2) |
| Were injured in a physical fight | 125 | 2.5 (0.4) | 50 | 7.4 (1.4) | 132 | 2.2 (0.2) | 52 | 5.4 (0.9) | 1.0 (0.7–1.4) | 3.2 (2.4–4.4) |
| Were ever physically forced to have sexual intercourse | 292 | 6.4 (0.7) | 143 | 19.1 (2.1) | 424 | 4.4 (0.5) | 224 | 16.1 (2.3) | 0.7 (0.5–0.9) | 2.8 (2.1–3.7) |
| Were bullied on school property | 788 | 18.5 (1.2) | 239 | 31.4 (3.6) | 1382 | 18.7 (1.1) | 378 | 31.0 (2.0) | 0.9 (0.8–1.1) | 1.8 (1.5–2.2) |
| Were electronically bullied | 546 | 13.0 (0.7) | 194 | 27.4 (2.9) | 1062 | 14.5 (0.9) | 335 | 26.8 (2.2) | 1.0 (0.8–1.2) | 2.0 (1.6–2.4) |
| **Suicidal ideation and suicide attempts** | | | | | | | | | | |
| Seriously considered attempting suicide | 672 | 14.7 (0.6) | 311 | 41.3 (2.8) | 1177 | 14.3 (0.8) | 483 | 37.5 (2.2) | 0.9 (0.7–1.0) | 3.3 (2.8–3.8) |
| Made a plan about how they would attempt suicide | 563 | 12.0 (0.6) | 269 | 35.7 (2.5) | 934 | 11.2 (0.9) | 440 | 34.5 (2.4) | 0.9 (0.7–1.1) | 3.5 (3.0–4.2) |
| Attempted suicide | 298 | 7.2 (0.6) | 174 | 28.2 (2.2) | 417 | 5.5 (0.6) | 233 | 21.7 (1.8) | 0.7 (0.5–0.9) | 4.1 (3.4–5.0) |
| Attempted suicide resulted… treated by a doctor or nurse | 102 | 2.5 (0.5) | 68 | 10.8 (1.2) | 127 | 1.5 (0.3) | 72 | 7.0 (1.1) | 0.6 (0.4–0.9) | 4.1 (3.0–5.5) |

[a]"Enumerated" refers to state statutes that specifically identify sexual orientation as a characteristic that is protected by the law in addition to other characteristics such as gender, race, and religion (see states' categorization in Supplementary Table S1).

SE, standard error; OR, odds ratio.

12

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

broad definition of sexual minority status but do not know if results would vary by other definitions of sexual orientation or separately for sexual minority groups (e.g., bisexual individuals). Another limitation of the study is the potential increase in error introduced by including private school student participants of the YRBS in the study. Not all states with antibullying laws require private schools to adhere to them; although some private schools adopt such state laws voluntarily, it is unclear how the voluntary adoption of regulations among private schools differs between states with and without enumerated antibullying laws. As such, the inclusion of private school participants' data likely adds misclassification error, potentially attenuating true differences between states with and without enumerated laws.

We were also limited to explore sexual orientation but not gender identity and level of conformity to conventional gender roles because, to date, YRBS has no data relevant to transgender and gender nonbinary youth. Other research has shown that gender nonconformity is strongly associated with exposure to victimization among both sexual and gender minority youth.[15]

## Conclusions

Despite improvement in the social environment for sexual minority individuals in the United States, sexual orientation and gender identity disparities in exposure to bullying and its ill effects persist.[23] The results of this analysis show that enumeration of antibullying laws by sexual orientation is associated with significant reduction in exposure to some stressful experiences and suicide attempts among all students. However, enumeration alone has not been sufficient to remove disparities based on sexual orientation in experiences of bullying and suicide attempts. Additional policies and practices to address persistent sexual orientation and gender identity disparities in exposure to bullying and suicidal behavior are promising.[14,21]

## Acknowledgments

The authors thank Christy Mallory, JD, Maxwell Patton, and Akiesha Anderson, JD, for producing Supplementary Table S1, classifying state antibullying statutes. The authors thank Christy Mallory, JD, for her comments on an earlier version of this article.

## Disclaimer

The findings and conclusions in this report are those of the authors and do not necessarily represent the official position of the Centers for Disease Control and Prevention.

## Author Disclosure Statement

No competing financial interests exist.

## References

1. UNESCO: *Out in the Open: Education Sector Responses to Violence Based on Sexual Orientation and Gender Identity/Expression.* Paris, France: United Nations Educational, Scientific and Cultural Organization, 2016.

2. Arseneault L, Bowes L, Shakoor S: Bullying victimization in youths and mental health problems: ''much ado about nothing''? Psychol Med 2010;40:717–729.

3. Espelage DL, Basile KC, Hamburger ME: Bullying perpetration and subsequent sexual violence perpetration among middle school students. J Adolesc Health 2012; 50:60–65.

4. Volk A, Craig W, Boyce W, King M: Adolescent risk correlates of bullying and different types of victimization. Int J Adolesc Med Health 2006;18:575–586.

5. Jones TM, Hillier L: Sexuality education school policy for Australian GLBTIQ students. Sex Educ 2012;12:437–454.

6. Stopbullying.gov: Laws & Policies. U.S. Department of Health and Human Services. n.d. Available at https://www.stopbullying.gov/laws/index.html, Accessed December 22, 2017.

7. Hatzenbuehler ML, Schwab-Reese L, Ranapurwala SI, et al.: Associations between antibullying policies and bullying in 25 states. JAMA Pediatr 2015;169:e152411.

8. Ramirez M, Ten Eyck P, Peek-Asa C, et al.: Evaluation of Iowa's anti-bullying law. Injury Epidemiol 2016;3:15.

9. Kann L, Olsen EO, McManus T, et al.: Sexual identity, sex of sexual contacts, and health-related behaviors among students in grades 9–12 - United States and selected sites, 2015. MMWR Surveill Summ 2016;65:1–202.

10. Eisenberg ME, Gower AL, McMorris BJ, et al.: Risk and protective factors in the lives of transgender/gender nonconforming adolescents. J Adolesc Health 2017;61:521–526.

11. Stone DM, Luo F, Ouyang L, et al.: Sexual orientation and suicide ideation, plans, attempts, and medically serious attempts: Evidence from local Youth Risk Behavior Surveys, 2001–2009. Am J Public Health 2014;104:262–271.

12. Russell ST, Kosciw JG, Horn S, Saewyc E: Safe schools policy for LGBTQ students. Soc Policy Rep 2010;24:1–25.

13. GLSEN: Enumeration. GLSEN. n.d. Available at https://www.glsen.org/sites/default/files/Enumeration_0.pdf, Accessed December 9, 2018.

14. Thoreson R: ''Like Walking Through a Hailstorm'' Discrimination Against LGBT Youth in US Schools. Human Rights Watch. 2016. Available at https://www.hrw.org/report/2016/12/07/walking-through-hailstorm/discrimination-against-lgbt-youth-us-schools#, Accessed December 9, 2018.

15. Toomey RB, Ryan C, Diaz RM, et al.: Gender-nonconforming lesbian, gay, bisexual, and transgender youth: School victimization and young adult psychosocial adjustment. Dev Psychol 2010;46:1580–1589.

16. Hatzenbuehler ML, Keyes KM: Inclusive anti-bullying policies and reduced risk of suicide attempts in lesbian and gay youth. J Adolesc Health 2013;53(1 Suppl):S21–S26.

17. Meyer IH: Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. Psychol Bull 2003;129:674–697.

18. Centers for Disease Control and Prevention: Youth Risk Behavior Surveillance System (YRBSS) Overview. 2017. Available at https://www.cdc.gov/healthyyouth/data/yrbs/overview.htm, Accessed March 21, 2018.

19. Centers for Disease Control and Prevention: Software for Analysis of YRBS Data. Available at https://www.cdc.gov/healthyyouth/data/yrbs/pdf/2015/2015_YRBS_analysis_software.pdf, Accessed February 7, 2017.

20. Gorrell P: Survey Analysis: Options for Missing Data. IMPAQ International, LLC. 2010. Available at https://www.lexjansen.com/nesug/nesug10/sa/sa13.pdf, Accessed December 21, 2017.

21. Stone DM, Holland KM, Bartholow B, et al.: *Preventing Suicide: A Technical Package of Policies, Programs, and Practices.* Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, 2017.

22. Burton CL, Bonanno GA, Hatzenbuehler ML: Familial social support predicts a reduced cortisol response to stress in sexual minority young adults. Psychoneuroendocrinology 2014;47:241–245.

23. Stone DM, Luo F, Lippy C, McIntosh WL: The role of social connectedness and sexual orientation in the prevention of youth suicide ideation and attempts among sexually active adolescents. Suicide Life Threat Behav 2015;45:415–430.

24. Meyer IH: The elusive promise of LGBT Equality. Am J Public Health 2016;106:1356–1358.

Address correspondence to:
*Ilan H. Meyer, PhD*
*The Williams Institute*
*School of Law*
*University of California Los Angeles*
*Box 951476*
*Los Angeles, CA 90095-1476*

*E-mail:* meyer@law.ucla.edu

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63 , No 10 - Get Access

Case: 2:24-cv-00072-DCR-CJS     Doc #: 132-4     Filed: 08/16/24     Page: 630 of 690 -

Home ▶ All Journals ▶ Journal of Homosexu... ▶ List of Issues ▶ Volume 63, Issue 10 ▶ Transgender Adults' ...

**Journal of Homosexuality** ▯
Volume 63, 2016 - Issue 10

18,530 | 111 | 402
Views | CrossRef citations to date | Altmetric

Articles

# Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality

Kristie L. Seelman ▯ , PhD, MSW

Pages 1378-1399 | Published online: 12 Apr 2016

▯ Cite this article    ▯ https://doi.org/10.1080/00918369.2016.1157998

▯ Full Article    ▯ Figures & data    ▯ References    ▯ Citations    ▯ Metrics    ▯ Reprints & Permissions    Read this article

## ABSTRACT

Transgender and gender non-conforming people frequently experience discrimination, harassment, and marginalization across college and university campuses (Bilodeau, 2007; Finger, 2010; Rankin et al., 2010; Seelman et al., 2012). The minority stress model (Meyer, 2007) posits that experiences of discrimination often negatively impact the psychological wellbeing of minority groups. However, few scholars have examined whether college institutional climate factors—such as being denied access to bathrooms or gender-appropriate campus housing—are significantly associated with detrimental psychological outcomes for transgender people. Using the National Transgender Discrimination Survey, this study analyzes whether being denied access to these spaces is associated with lifetime suicide attempts, after controlling for interpersonal victimization by students or teachers. Findings from

AR_293395

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63 , No 10 - Get Access

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-4    Filed: 08/16/24    Page: 631 of 690 -
Page ID#: 4989

sequential logistic regression ($N$ = 2,316) indicate that denial of access had a significant relationship to suicidality, even after controlling for interpersonal victimization. This article discusses implications for higher education professionals and researchers.

☐ KEYWORDS: Bathrooms | campus housing | harassment | higher education | minority stress model | suicidality | transgender

## Acknowledgments

Thanks to Dr. K. Jurée Capers for reviewing a draft of this article and offering constructive feedback.

The author acknowledges the National LGBTQ Task Force and the National Center for Transgender Equality conducted the National Transgender Discrimination Survey, which generated the data analyzed within this study. Their report on the survey data is available at http://www.thetaskforce.org.

## Notes

[1.] Within the present study, *transgender* encompasses those whose gender identity differs from predominant cultural expectations for their sex assigned at birth. This includes people who undergo medical treatment to transition from one gender to another, as well as those who have not or will not undergo such treatment, and is meant to match the definition used by the organizations that conducted the National Transgender Discrimination Survey (Grant et al., 2011). I will often use the term *trans\** to denote inclusion of a broader range of gender non-conforming identities, including those who may not use the term *transgender* for themselves.

[2.] This statistic was calculated using the inverse odds ratio: 1 / 0.69 = 1.45.

---

☐ **Previous** article       **View** issue table of contents       **Next** article ☐

### Log in via your institution

☐  Access through your institution

### Log in to Taylor & Francis Online

☐  Log in

### Restore content access

☐  Restore content access for purchases made as guest

## Purchase options * Save for later

**PDF download + Online access**
- 48 hours access to article PDF & online version
- Article PDF can be downloaded
- Article PDF can be printed

**USD 53.00**                                    ☐ Add to cart

**Issue Purchase**

- 30 days online access to complete issue
- Article PDFs can be downloaded
- Article PDFs can be printed

**USD 412.00**

Add to cart

* Local tax will be added as applicable

Related Research

People also read | Recommended articles | Cited by 111

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63 , No 10 - Get Access

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-4    Filed: 08/16/24    Page: 633 of 690 -
Page ID#: 4991

| Information for | Open access |
| --- | --- |
| Authors | Overview |
| R&D professionals | Open journals |

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63 , No 10 - Get Access

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-4    Filed: 08/16/24    Page: 634 of 690 - Page ID#: 4992

Editors

Librarians

Societies

Opportunities

Reprints and e-prints

Advertising solutions

Accelerated publication

Corporate access solutions

Open Access

Dove Medical Press

F1000Research

Help and information

Help and contact

Newsroom

All journals

Books

Keep up to date

Register to receive personalised research and resources by email

☐ Sign me up

☐ ☐ ☐

☐ ☐

Copyright © 2024  Informa UK Limited    Privacy policy    Cookies    Terms & conditions    Accessibility

Taylor & Francis Group
an informa business

Registered in England & Wales No. 3099067
5 Howick Place | London | SW1P 1WG

# Endocrine Treatment of Gender-Dysphoric/ Gender-Incongruent Persons: An Endocrine Society* Clinical Practice Guideline

Wylie C. Hembree,[1] Peggy T. Cohen-Kettenis,[2] Louis Gooren,[3] Sabine E. Hannema,[4] Walter J. Meyer,[5] M. Hassan Murad,[6] Stephen M. Rosenthal,[7] Joshua D. Safer,[8] Vin Tangpricha,[9] and Guy G. T'Sjoen[10]

[1]New York Presbyterian Hospital, Columbia University Medical Center, New York, New York 10032 (Retired); [2]VU University Medical Center, 1007 MB Amsterdam, Netherlands (Retired); [3]VU University Medical Center, 1007 MB Amsterdam, Netherlands (Retired); [4]Leiden University Medical Center, 2300 RC Leiden, Netherlands; [5]University of Texas Medical Branch, Galveston, Texas 77555; [6]Mayo Clinic Evidence-Based Practice Center, Rochester, Minnesota 55905; [7]University of California San Francisco, Benioff Children's Hospital, San Francisco, California 94143; [8]Boston University School of Medicine, Boston, Massachusetts 02118; [9]Emory University School of Medicine and the Atlanta VA Medical Center, Atlanta, Georgia 30322; and [10]Ghent University Hospital, 9000 Ghent, Belgium

> ***Cosponsoring Associations:** American Association of Clinical Endocrinologists, American Society of Andrology, European Society for Pediatric Endocrinology, European Society of Endocrinology, Pediatric Endocrine Society, and World Professional Association for Transgender Health.

**Objective:** To update the "Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline," published by the Endocrine Society in 2009.

**Participants:** The participants include an Endocrine Society–appointed task force of nine experts, a methodologist, and a medical writer.

**Evidence:** This evidence-based guideline was developed using the Grading of Recommendations, Assessment, Development, and Evaluation approach to describe the strength of recommendations and the quality of evidence. The task force commissioned two systematic reviews and used the best available evidence from other published systematic reviews and individual studies.

**Consensus Process:** Group meetings, conference calls, and e-mail communications enabled consensus. Endocrine Society committees, members and cosponsoring organizations reviewed and commented on preliminary drafts of the guidelines.

**Conclusion:** Gender affirmation is multidisciplinary treatment in which endocrinologists play an important role. Gender-dysphoric/gender-incongruent persons seek and/or are referred to endocrinologists to develop the physical characteristics of the affirmed gender. They require a safe and effective hormone regimen that will (1) suppress endogenous sex hormone secretion determined by the person's genetic/gonadal sex and (2) maintain sex hormone levels within the normal range for the person's affirmed gender. Hormone treatment is not recommended for prepubertal gender-dysphoric/gender-incongruent persons. Those clinicians who recommend gender-affirming endocrine treatments—appropriately trained diagnosing clinicians (required), a mental health provider for adolescents (required) and mental health

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

ISSN Print 0021-972X  ISSN Online 1945-7197
Printed in USA
Copyright © 2017 Endocrine Society
Received 24 July 2017. Accepted 24 August 2017.
First Published Online 13 September 2017

Abbreviations: BMD, bone mineral density; DSD, disorder/difference of sex development; DSM, Diagnostic and Statistical Manual of Mental Disorders; GD, gender dysphoria; GnRH, gonadotropin-releasing hormone; ICD, International Statistical Classification of Diseases and Related Health Problems; MHP, mental health professional; VTE, venous thromboembolism.

doi: 10.1210/jc.2017-01658    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903    https://academic.oup.com/jcem    **3869**

professional for adults (recommended)—should be knowledgeable about the diagnostic criteria and criteria for gender-affirming treatment, have sufficient training and experience in assessing psychopathology, and be willing to participate in the ongoing care throughout the endocrine transition. We recommend treating gender-dysphoric/gender-incongruent adolescents who have entered puberty at Tanner Stage G2/B2 by suppression with gonadotropin-releasing hormone agonists. Clinicians may add gender-affirming hormones after a multidisciplinary team has confirmed the persistence of gender dysphoria/gender incongruence and sufficient mental capacity to give informed consent to this partially irreversible treatment. Most adolescents have this capacity by age 16 years old. We recognize that there may be compelling reasons to initiate sex hormone treatment prior to age 16 years, although there is minimal published experience treating prior to 13.5 to 14 years of age. For the care of peripubertal youths and older adolescents, we recommend that an expert multidisciplinary team comprised of medical professionals and mental health professionals manage this treatment. The treating physician must confirm the criteria for treatment used by the referring mental health practitioner and collaborate with them in decisions about gender-affirming surgery in older adolescents. For adult gender-dysphoric/gender-incongruent persons, the treating clinicians (collectively) should have expertise in transgender-specific diagnostic criteria, mental health, primary care, hormone treatment, and surgery, as needed by the patient. We suggest maintaining physiologic levels of gender-appropriate hormones and monitoring for known risks and complications. When high doses of sex steroids are required to suppress endogenous sex steroids and/or in advanced age, clinicians may consider surgically removing natal gonads along with reducing sex steroid treatment. Clinicians should monitor both transgender males (female to male) and transgender females (male to female) for reproductive organ cancer risk when surgical removal is incomplete. Additionally, clinicians should persistently monitor adverse effects of sex steroids. For gender-affirming surgeries in adults, the treating physician must collaborate with and confirm the criteria for treatment used by the referring physician. Clinicians should avoid harming individuals (via hormone treatment) who have conditions other than gender dysphoria/gender incongruence and who may not benefit from the physical changes associated with this treatment. (*J Clin Endocrinol Metab* 102: 3869–3903, 2017)

## Summary of Recommendations

### 1.0 Evaluation of youth and adults

1.1. We advise that only trained mental health professionals (MHPs) who meet the following criteria should diagnose gender dysphoria (GD)/gender incongruence in adults: (1) competence in using the Diagnostic and Statistical Manual of Mental Disorders (DSM) and/or the International Statistical Classification of Diseases and Related Health Problems (ICD) for diagnostic purposes, (2) the ability to diagnose GD/gender incongruence and make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (3) training in diagnosing psychiatric conditions, (4) the ability to undertake or refer for appropriate treatment, (5) the ability to psychosocially assess the person's understanding, mental health, and social conditions that can impact gender-affirming hormone therapy, and (6) a practice of regularly attending relevant professional meetings. (Ungraded Good Practice Statement)

1.2. We advise that only MHPs who meet the following criteria should diagnose GD/gender incongruence in children and adolescents: (1) training in child and adolescent developmental psychology and psychopathology, (2) competence in using the DSM and/or the ICD for diagnostic purposes, (3) the ability to make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (4) training in diagnosing psychiatric conditions, (5) the ability to undertake or refer for appropriate treatment, (6) the ability to psychosocially assess the person's understanding and social conditions that can impact gender-affirming hormone therapy, (7) a practice of regularly attending relevant professional meetings, and (8) knowledge of the criteria for puberty blocking and gender-affirming hormone treatment in adolescents. (Ungraded Good Practice Statement)

1.3. We advise that decisions regarding the social transition of prepubertal youths with GD/gender incongruence are made with the assistance of an MHP or another experienced professional. (Ungraded Good Practice Statement).

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

1.4. We recommend against puberty blocking and gender-affirming hormone treatment in pre-pubertal children with GD/gender incongruence. (1 |⊕◯◯◯)

1.5. We recommend that clinicians inform and counsel all individuals seeking gender-affirming medical treatment regarding options for fertility preservation prior to initiating puberty suppression in adolescents and prior to treating with hormonal therapy of the affirmed gender in both adolescents and adults. (1 |⊕⊕⊕◯)

## 2.0 Treatment of adolescents

2.1. We suggest that adolescents who meet diagnostic criteria for GD/gender incongruence, fulfill criteria for treatment, and are requesting treatment should initially undergo treatment to suppress pubertal development. (2 |⊕⊕◯◯)

2.2. We suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty. (2 |⊕⊕◯◯)

2.3. We recommend that, where indicated, GnRH analogues are used to suppress pubertal hormones. (1 |⊕⊕⊕◯)

2.4. In adolescents who request sex hormone treatment (given this is a partly irreversible treatment), we recommend initiating treatment using a gradually increasing dose schedule after a multidisciplinary team of medical and MHPs has confirmed the persistence of GD/gender incongruence and sufficient mental capacity to give informed consent, which most adolescents have by age 16 years. (1 |⊕⊕◯◯).

2.5. We recognize that there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years in some adolescents with GD/gender incongruence, even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years. As with the care of adolescents ≥16 years of age, we recommend that an expert multidisciplinary team of medical and MHPs manage this treatment. (1 |⊕◯◯◯)

2.6. We suggest monitoring clinical pubertal development every 3 to 6 months and laboratory parameters every 6 to 12 months during sex hormone treatment. (2 |⊕⊕◯◯)

## 3.0 Hormonal therapy for transgender adults

3.1. We recommend that clinicians confirm the diagnostic criteria of GD/gender incongruence and the criteria for the endocrine phase of gender transition before beginning treatment. (1 |⊕⊕⊕◯)

3.2. We recommend that clinicians evaluate and address medical conditions that can be exacerbated by hormone depletion and treatment with sex hormones of the affirmed gender before beginning treatment. (1 |⊕⊕⊕◯)

3.3. We suggest that clinicians measure hormone levels during treatment to ensure that endogenous sex steroids are suppressed and administered sex steroids are maintained in the normal physiologic range for the affirmed gender. (2 |⊕⊕◯◯)

3.4. We suggest that endocrinologists provide education to transgender individuals undergoing treatment about the onset and time course of physical changes induced by sex hormone treatment. (2 |⊕◯◯◯)

## 4.0 Adverse outcome prevention and long-term care

4.1. We suggest regular clinical evaluation for physical changes and potential adverse changes in response to sex steroid hormones and laboratory monitoring of sex steroid hormone levels every 3 months during the first year of hormone therapy for transgender males and females and then once or twice yearly. (2 |⊕⊕◯◯)

4.2. We suggest periodically monitoring prolactin levels in transgender females treated with estrogens. (2 |⊕⊕◯◯)

4.3. We suggest that clinicians evaluate transgender persons treated with hormones for cardiovascular risk factors using fasting lipid profiles, diabetes screening, and/or other diagnostic tools. (2 |⊕⊕◯◯)

4.4. We recommend that clinicians obtain bone mineral density (BMD) measurements when risk factors for osteoporosis exist, specifically in those who stop sex hormone therapy after gonadectomy. (1 |⊕⊕◯◯)

4.5. We suggest that transgender females with no known increased risk of breast cancer follow breast-screening guidelines recommended for non-transgender females. (2 |⊕⊕◯◯)

4.6. We suggest that transgender females treated with estrogens follow individualized screening according to personal risk for prostatic disease and prostate cancer. (2 |⊕◯◯◯)

4.7. We advise that clinicians determine the medical necessity of including a total hysterectomy and oophorectomy as part of gender-affirming surgery. (Ungraded Good Practice Statement)

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

**3872**    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

## 5.0 Surgery for sex reassignment and gender confirmation

5.1. We recommend that a patient pursue genital gender-affirming surgery only after the MHP and the clinician responsible for endocrine transition therapy both agree that surgery is medically necessary and would benefit the patient's overall health and/or well-being. (1 |⊕⊕○○)

5.2. We advise that clinicians approve genital gender-affirming surgery only after completion of at least 1 year of consistent and compliant hormone treatment, unless hormone therapy is not desired or medically contraindicated. (Ungraded Good Practice Statement)

5.3. We advise that the clinician responsible for endocrine treatment and the primary care provider ensure appropriate medical clearance of transgender individuals for genital gender-affirming surgery and collaborate with the surgeon regarding hormone use during and after surgery. (Ungraded Good Practice Statement)

5.4. We recommend that clinicians refer hormone-treated transgender individuals for genital surgery when: (1) the individual has had a satisfactory social role change, (2) the individual is satisfied about the hormonal effects, and (3) the individual desires definitive surgical changes. (1 |⊕○○○)

5.5. We suggest that clinicians delay gender-affirming genital surgery involving gonadectomy and/or hysterectomy until the patient is at least 18 years old or legal age of majority in his or her country. (2 |⊕⊕○○).

5.6. We suggest that clinicians determine the timing of breast surgery for transgender males based upon the physical and mental health status of the individual. There is insufficient evidence to recommend a specific age requirement. (2 |⊕○○○)

## Changes Since the Previous Guideline

Both the current guideline and the one published in 2009 contain similar sections. Listed here are the sections contained in the current guideline and the corresponding number of recommendations: Introduction, Evaluation of Youth and Adults (5), Treatment of Adolescents (6), Hormonal Therapy for Transgender Adults (4), Adverse Outcomes Prevention and Long-term Care (7), and Surgery for Sex Reassignment and Gender Confirmation (6). The current introduction updates the diagnostic classification of "gender dysphoria/gender incongruence." It also reviews the development of "gender identity" and summarizes its natural development. The section on

clinical evaluation of both youth and adults, defines in detail the professional qualifications required of those who diagnose and treat both adolescents and adults. We advise that decisions regarding the social transition of prepubertal youth are made with the assistance of a mental health professional or similarly experienced professional. We recommend against puberty blocking followed by gender-affirming hormone treatment of prepubertal children. Clinicians should inform pubertal children, adolescents, and adults seeking gender-confirming treatment of their options for fertility preservation. Prior to treatment, clinicians should evaluate the presence of medical conditions that may be worsened by hormone depletion and/or treatment. A multidisciplinary team, preferably composed of medical and mental health professionals, should monitor treatments. Clinicians evaluating transgender adults for endocrine treatment should confirm the diagnosis of persistent gender dysphoria/gender incongruence. Physicians should educate transgender persons regarding the time course of steroid-induced physical changes. Treatment should include periodic monitoring of hormone levels and metabolic parameters, as well as assessments of bone density and the impact upon prostate, gonads, and uterus. We also make recommendations for transgender persons who plan genital gender-affirming surgery.

## Method of Development of Evidence-Based Clinical Practice Guidelines

The Clinical Guidelines Subcommittee (CGS) of the Endocrine Society deemed the diagnosis and treatment of individuals with GD/gender incongruence a priority area for revision and appointed a task force to formulate evidence-based recommendations. The task force followed the approach recommended by the Grading of Recommendations, Assessment, Development, and Evaluation group, an international group with expertise in the development and implementation of evidence-based guidelines (1). A detailed description of the grading scheme has been published elsewhere (2). The task force used the best available research evidence to develop the recommendations. The task force also used consistent language and graphical descriptions of both the strength of a recommendation and the quality of evidence. In terms of the strength of the recommendation, strong recommendations use the phrase "we recommend" and the number 1, and weak recommendations use the phrase "we suggest" and the number 2. Cross-filled circles indicate the quality of the evidence, such that ⊕○○○ denotes very low–quality evidence; ⊕⊕○○, low quality; ⊕⊕⊕○, moderate quality; and ⊕⊕⊕⊕, high quality. The task force has confidence that persons who receive care according to the strong recommendations will derive, on average, more benefit than harm. Weak recommendations require more careful consideration of the person's circumstances, values, and preferences to determine the best course of action. Linked to each recommendation is a description of the evidence and the

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

values that the task force considered in making the recommendation. In some instances, there are remarks in which the task force offers technical suggestions for testing conditions, dosing, and monitoring. These technical comments reflect the best available evidence applied to a typical person being treated. Often this evidence comes from the unsystematic observations of the task force and their preferences; therefore, one should consider these remarks as suggestions.

In this guideline, the task force made several statements to emphasize the importance of shared decision-making, general preventive care measures, and basic principles of the treatment of transgender persons. They labeled these "Ungraded Good Practice Statement." Direct evidence for these statements was either unavailable or not systematically appraised and considered out of the scope of this guideline. The intention of these statements is to draw attention to these principles.

The Endocrine Society maintains a rigorous conflict-of-interest review process for developing clinical practice guidelines. All task force members must declare any potential conflicts of interest by completing a conflict-of-interest form. The CGS reviews all conflicts of interest before the Society's Council approves the members to participate on the task force and periodically during the development of the guideline. All others participating in the guideline's development must also disclose any conflicts of interest in the matter under study, and most of these participants must be without any conflicts of interest. The CGS and the task force have reviewed all disclosures for this guideline and resolved or managed all identified conflicts of interest.

Conflicts of interest are defined as remuneration in any amount from commercial interests; grants; research support; consulting fees; salary; ownership interests [*e.g.*, stocks and stock options (excluding diversified mutual funds)]; honoraria and other payments for participation in speakers' bureaus, advisory boards, or boards of directors; and all other financial benefits. Completed forms are available through the Endocrine Society office.

The Endocrine Society provided the funding for this guideline; the task force received no funding or remuneration from commercial or other entities.

## Commissioned Systematic Review

The task force commissioned two systematic reviews to support this guideline. The first one aimed to summarize the available evidence on the effect of sex steroid use in transgender individuals on lipids and cardiovascular outcomes. The review identified 29 eligible studies at moderate risk of bias. In transgender males (female to male), sex steroid therapy was associated with a statistically significant increase in serum triglycerides and low-density lipoprotein cholesterol levels. High-density lipoprotein cholesterol levels decreased significantly across all follow-up time periods. In transgender females (male to female), serum triglycerides were significantly higher without any changes in other parameters. Few myocardial infarction, stroke, venous thromboembolism (VTE), and death events were reported. These events were more frequent in transgender females. However, the quality of the evidence was low. The second review summarized the available evidence regarding the effect of sex steroids on bone health in transgender individuals and identified 13 studies. In transgender males, there was no statistically significant difference in the lumbar spine, femoral neck, or total hip BMD at 12 and 24 months compared with baseline values before initiating masculinizing hormone therapy. In transgender females, there was a statistically significant increase in lumbar spine BMD at 12 months and 24 months compared with baseline values before initiation of feminizing hormone therapy. There was minimal information on fracture rates. The quality of evidence was also low.

## Introduction

Throughout recorded history (in the absence of an endocrine disorder) some men and women have experienced confusion and anguish resulting from rigid, forced conformity to sexual dimorphism. In modern history, there have been numerous ongoing biological, psychological, cultural, political, and sociological debates over various aspects of gender variance. The 20th century marked the emergence of a social awakening for men and women with the belief that they are "trapped" in the wrong body (3). Magnus Hirschfeld and Harry Benjamin, among others, pioneered the medical responses to those who sought relief from and a resolution to their profound discomfort. Although the term transsexual became widely known after Benjamin wrote "The Transsexual Phenomenon" (4), it was Hirschfeld who coined the term "transsexual" in 1923 to describe people who want to live a life that corresponds with their experienced gender vs their designated gender (5). Magnus Hirschfeld (6) and others (4, 7) have described other types of trans phenomena besides transsexualism. These early researchers proposed that the gender identity of these people was located somewhere along a unidimensional continuum. This continuum ranged from all male through "something in between" to all female. Yet such a classification does not take into account that people may have gender identities outside this continuum. For instance, some experience themselves as having both a male and female gender identity, whereas others completely renounce any gender classification (8, 9). There are also reports of individuals experiencing a continuous and rapid involuntary alternation between a male and female identity (10) or men who do not experience themselves as men but do not want to live as women (11, 12). In some countries, (*e.g.*, Nepal, Bangladesh, and Australia), these nonmale or nonfemale genders are officially recognized (13). Specific treatment protocols, however, have not yet been developed for these groups.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

Instead of the term transsexualism, the current classification system of the American Psychiatric Association uses the term gender dysphoria in its diagnosis of persons who are not satisfied with their designated gender (14). The current version of the World Health Organization's ICD-10 still uses the term transsexualism when diagnosing adolescents and adults. However, for the ICD-11, the World Health Organization has proposed using the term "gender incongruence" (15).

Treating persons with GD/gender incongruence (15) was previously limited to relatively ineffective elixirs or creams. However, more effective endocrinology-based treatments became possible with the availability of testosterone in 1935 and diethylstilbestrol in 1938. Reports of individuals with GD/gender incongruence who were treated with hormones and gender-affirming surgery appeared in the press during the second half of the 20th century. The Harry Benjamin International Gender Dysphoria Association was founded in September 1979 and is now called the World Professional Association for Transgender Health (WPATH). WPATH published its first Standards of Care in 1979. These standards have since been regularly updated, providing guidance for treating persons with GD/gender incongruence (16).

Prior to 1975, few peer-reviewed articles were published concerning endocrine treatment of transgender persons. Since then, more than two thousand articles about various aspects of transgender care have appeared.

It is the purpose of this guideline to make detailed recommendations and suggestions, based on existing medical literature and clinical experience, that will enable treating physicians to maximize benefit and minimize risk when caring for individuals diagnosed with GD/gender incongruence.

In the future, we need more rigorous evaluations of the effectiveness and safety of endocrine and surgical protocols. Specifically, endocrine treatment protocols for GD/gender incongruence should include the careful assessment of the following: (1) the effects of prolonged delay of puberty in adolescents on bone health, gonadal function, and the brain (including effects on cognitive, emotional, social, and sexual development); (2) the effects of treatment in adults on sex hormone levels; (3) the requirement for and the effects of progestins and other agents used to suppress endogenous sex steroids during treatment; and (4) the risks and benefits of gender-affirming hormone treatment in older transgender people.

To successfully establish and enact these protocols, a commitment of mental health and endocrine investigators is required to collaborate in long-term, large-scale studies across countries that use the same diagnostic and inclusion criteria, medications, assay methods, and response assessment tools (e.g., the European Network for the Investigation of Gender Incongruence) (17, 18).

Terminology and its use vary and continue to evolve. Table 1 contains the definitions of terms as they are used throughout this guideline.

## Biological Determinants of Gender Identity Development

One's self-awareness as male or female changes gradually during infant life and childhood. This process of cognitive and affective learning evolves with interactions with parents, peers, and environment. A fairly accurate timetable exists outlining the steps in this process (19). Normative psychological literature, however, does not address if and when gender identity becomes crystallized and what factors contribute to the development of a gender identity that is not congruent with the gender of rearing. Results of studies from a variety of biomedical disciplines—genetic, endocrine, and neuroanatomic—support the concept that gender identity and/or gender expression (20) likely reflect a complex interplay of biological, environmental, and cultural factors (21, 22).

With respect to endocrine considerations, studies have failed to find differences in circulating levels of sex steroids between transgender and nontransgender individuals (23). However, studies in individuals with a disorder/difference of sex development (DSD) have informed our understanding of the role that hormones may play in gender identity outcome, even though most persons with GD/gender incongruence do not have a DSD. For example, although most 46,XX adult individuals with virilizing congenital adrenal hyperplasia caused by mutations in *CYP21A2* reported a female gender identity, the prevalence of GD/gender incongruence was much greater in this group than in the general population without a DSD. This supports the concept that there is a role for prenatal/postnatal androgens in gender development (24–26), although some studies indicate that prenatal androgens are more likely to affect gender behavior and sexual orientation rather than gender identity *per se* (27, 28).

Researchers have made similar observations regarding the potential role of androgens in the development of gender identity in other individuals with DSD. For example, a review of two groups of 46,XY persons, each with androgen synthesis deficiencies and female raised, reported transgender male (female-to-male) gender role changes in 56% to 63% and 39% to 64% of patients, respectively (29). Also, in 46,XY female-raised individuals with cloacal

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

## Table 1.   Definitions of Terms Used in This Guideline

*Biological sex, biological male or female:* These terms refer to physical aspects of maleness and femaleness. As these may not be in line with each other (*e.g.*, a person with XY chromosomes may have female-appearing genitalia), the terms biological sex and biological male or female are imprecise and should be avoided.

*Cisgender:* This means not transgender. An alternative way to describe individuals who are not transgender is "non-transgender people."

*Gender-affirming (hormone) treatment:* See "gender reassignment"

*Gender dysphoria:* This is the distress and unease experienced if gender identity and designated gender are not completely congruent (see Table 2). In 2013, the American Psychiatric Association released the fifth edition of the DSM-5, which replaced "gender identity disorder" with "gender dysphoria" and changed the criteria for diagnosis.

*Gender expression:* This refers to external manifestations of gender, expressed through one's name, pronouns, clothing, haircut, behavior, voice, or body characteristics. Typically, transgender people seek to make their gender expression align with their gender identity, rather than their designated gender.

*Gender identity/experienced gender:* This refers to one's internal, deeply held sense of gender. For transgender people, their gender identity does not match their sex designated at birth. Most people have a gender identity of man or woman (or boy or girl). For some people, their gender identity does not fit neatly into one of those two choices. Unlike gender expression (see below), gender identity is not visible to others.

*Gender identity disorder:* This is the term used for GD/gender incongruence in previous versions of DSM (see "gender dysphoria"). The ICD-10 still uses the term for diagnosing child diagnoses, but the upcoming ICD-11 has proposed using "gender incongruence of childhood."

*Gender incongruence:* This is an umbrella term used when the gender identity and/or gender expression differs from what is typically associated with the designated gender. Gender incongruence is also the proposed name of the gender identity–related diagnoses in ICD-11. Not all individuals with gender incongruence have gender dysphoria or seek treatment.

*Gender variance:* See "gender incongruence"

*Gender reassignment:* This refers to the treatment procedure for those who want to adapt their bodies to the experienced gender by means of hormones and/or surgery. This is also called gender-confirming or gender-affirming treatment.

*Gender-reassignment surgery (gender-confirming/gender-affirming surgery):* These terms refer only to the surgical part of gender-confirming/gender-affirming treatment.

*Gender role:* This refers to behaviors, attitudes, and personality traits that a society (in a given culture and historical period) designates as masculine or feminine and/or that society associates with or considers typical of the social role of men or women.

*Sex designated at birth:* This refers to sex assigned at birth, usually based on genital anatomy.

*Sex:* This refers to attributes that characterize biological maleness or femaleness. The best known attributes include the sex-determining genes, the sex chromosomes, the H-Y antigen, the gonads, sex hormones, internal and external genitalia, and secondary sex characteristics.

*Sexual orientation:* This term describes an individual's enduring physical and emotional attraction to another person. Gender identity and sexual orientation are not the same. Irrespective of their gender identity, transgender people may be attracted to women (gynephilic), attracted to men (androphilic), bisexual, asexual, or queer.

*Transgender:* This is an umbrella term for people whose gender identity and/or gender expression differs from what is typically associated with their sex designated at birth. Not all transgender individuals seek treatment.

*Transgender male (also: trans man, female-to-male, transgender male):* This refers to individuals assigned female at birth but who identify and live as men.

*Transgender woman (also: trans woman, male-to female, transgender female):* This refers to individuals assigned male at birth but who identify and live as women.

*Transition:* This refers to the process during which transgender persons change their physical, social, and/or legal characteristics consistent with the affirmed gender identity. Prepubertal children may choose to transition socially.

*Transsexual:* This is an older term that originated in the medical and psychological communities to refer to individuals who have permanently transitioned through medical interventions or desired to do so.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

exstrophy and penile agenesis, the occurrence of transgender male changes was significantly more prevalent than in the general population (30, 31). However, the fact that a high percentage of individuals with the same conditions did not change gender suggests that cultural factors may play a role as well.

With respect to genetics and gender identity, several studies have suggested heritability of GD/gender incongruence (32, 33). In particular, a study by Heylens *et al.* (33) demonstrated a 39.1% concordance rate for gender identity disorder (based on the DSM-IV criteria) in 23 monozygotic twin pairs but no concordance in 21 same-sex dizygotic or seven opposite-sex twin pairs. Although numerous investigators have sought to identify

specific genes associated with GD/gender incongruence, such studies have been inconsistent and without strong statistical significance (34–38).

Studies focusing on brain structure suggest that the brain phenotypes of people with GD/gender incongruence differ in various ways from control males and females, but that there is not a complete sex reversal in brain structures (39).

In summary, although there is much that is still unknown with respect to gender identity and its expression, compelling studies support the concept that biologic factors, in addition to environmental factors, contribute to this fundamental aspect of human development.

**3876**    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

## Natural History of Children With GD/Gender Incongruence

With current knowledge, we cannot predict the psychosexual outcome for any specific child. Prospective follow-up studies show that childhood GD/gender incongruence does not invariably persist into adolescence and adulthood (so-called "desisters"). Combining all outcome studies to date, the GD/gender incongruence of a minority of prepubertal children appears to persist in adolescence (20, 40). In adolescence, a significant number of these desisters identify as homosexual or bisexual. It may be that children who only showed some gender nonconforming characteristics have been included in the follow-up studies, because the DSM-IV text revision criteria for a diagnosis were rather broad. However, the persistence of GD/gender incongruence into adolescence is more likely if it had been extreme in childhood (41, 42). With the newer, stricter criteria of the DSM-5 (Table 2), persistence rates may well be different in future studies.

## 1.0 Evaluation of Youth and Adults

Gender-affirming treatment is a multidisciplinary effort. After evaluation, education, and diagnosis, treatment may include mental health care, hormone therapy, and/or surgical therapy. Together with an MHP, hormone-prescribing clinicians should examine the psychosocial impact of the potential changes on people's lives, including mental health, friends, family, jobs, and their role in society. Transgender individuals should be encouraged to experience living in the new gender role and assess whether this improves their quality of life. Although the focus of this guideline is gender-affirming hormone therapy, collaboration with appropriate professionals responsible for each aspect of treatment maximizes a successful outcome.

### Diagnostic assessment and mental health care

GD/gender incongruence may be accompanied with psychological or psychiatric problems (43–51). It is therefore necessary that clinicians who prescribe hormones and are involved in diagnosis and psychosocial assessment meet the following criteria: (1) are competent in using the DSM and/or the ICD for diagnostic purposes, (2) are able to diagnose GD/gender incongruence and make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (3) are trained in diagnosing psychiatric conditions, (4) undertake or refer for appropriate treatment, (5) are able to do a psychosocial assessment of the patient's understanding, mental health, and social conditions that can impact gender-affirming hormone therapy, and (6) regularly attend relevant professional meetings.

Because of the psychological vulnerability of many individuals with GD/gender incongruence, it is important that mental health care is available before, during, and sometimes also after transitioning. For children and adolescents, an MHP who has training/experience in child and adolescent gender development (as well as child and adolescent psychopathology) should make the diagnosis, because assessing GD/gender incongruence in children and adolescents is often extremely complex.

During assessment, the clinician obtains information from the individual seeking gender-affirming treatment. In the case

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

---

**Table 2.    DSM-5 Criteria for Gender Dysphoria in Adolescents and Adults**

A. A marked incongruence between one's experienced/expressed gender and natal gender of at least 6 mo in duration, as manifested by at least two of the following:
  1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)
  2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)
  3. A strong desire for the primary and/or secondary sex characteristics of the other gender
  4. A strong desire to be of the other gender (or some alternative gender different from one's designated gender)
  5. A strong desire to be treated as the other gender (or some alternative gender different from one's designated gender)
  6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's designated gender)

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.
Specify if:
  1. The condition exists with a disorder of sex development.
  2. The condition is posttransitional, in that the individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one sex-related medical procedure or treatment regimen—namely, regular sex hormone treatment or gender reassignment surgery confirming the desired gender (*e.g.*, penectomy, vaginoplasty in natal males; mastectomy or phalloplasty in natal females).

Reference: American Psychiatric Association (14).

doi: 10.1210/jc.2017-01658

of adolescents, the clinician also obtains information from the parents or guardians regarding various aspects of the child's general and psychosexual development and current functioning. On the basis of this information, the clinician:

- decides whether the individual fulfills criteria for treatment (see Tables 2 and 3) for GD/gender incongruence (DSM-5) or transsexualism (DSM-5 and/or ICD-10);
- informs the individual about the possibilities and limitations of various kinds of treatment (hormonal/surgical and nonhormonal), and if medical treatment is desired, provides correct information to prevent unrealistically high expectations;
- assesses whether medical interventions may result in unfavorable psychological and social outcomes.

In cases in which severe psychopathology, circumstances, or both seriously interfere with the diagnostic work or make satisfactory treatment unlikely, clinicians should assist the adolescent in managing these other issues. Literature on postoperative regret suggests that besides poor quality of surgery, severe psychiatric comorbidity and lack of support may interfere with positive outcomes (52–56).

For adolescents, the diagnostic procedure usually includes a complete psychodiagnostic assessment (57) and an assessment of the decision-making capability of the youth. An evaluation to assess the family's ability to endure stress, give support, and deal with the complexities of the adolescent's situation should be part of the diagnostic phase (58).

### Social transitioning

A change in gender expression and role (which may involve living part time or full time in another gender role that is consistent with one's gender identity) may test the person's resolve, the capacity to function in the affirmed gender, and the adequacy of social, economic, and psychological supports. It assists both the individual and the clinician in their judgments about how to proceed (16). During social transitioning, the person's feelings about the social transformation (including coping with the responses of others) is a major focus of the counseling. The optimal timing for social transitioning may differ between individuals. Sometimes people wait until they start gender-affirming hormone treatment to make social transitioning easier, but individuals increasingly start social transitioning long before they receive medically supervised, gender-affirming hormone treatment.

### Criteria

Adolescents and adults seeking gender-affirming hormone treatment and surgery should satisfy certain criteria before proceeding (16). Criteria for gender-affirming hormone therapy for adults are in Table 4, and criteria for gender-affirming hormone therapy for adolescents are in Table 5. Follow-up studies in adults meeting these criteria indicate a high satisfaction rate with treatment (59). However, the quality of evidence is usually low. A few follow-up studies on adolescents who fulfilled these criteria also indicated good treatment results (60–63).

## Recommendations for Those Involved in the Gender-Affirming Hormone Treatment of Individuals With GD/Gender Incongruence

1.1. We advise that only trained MHPs who meet the following criteria should diagnose GD/gender incongruence in adults: (1) competence in using the DSM and/or the ICD for diagnostic purposes, (2) the ability to diagnose GD/gender incongruence and make a distinction between GD/gender incongruence and conditions that have similar features (e.g., body dysmorphic disorder), (3) training in diagnosing psychiatric conditions, (4) the ability to undertake or refer for appropriate treatment, (5) the ability to psychosocially assess the person's understanding, mental health, and social conditions that can impact gender-affirming hormone therapy, and (6) a practice of regularly attending relevant professional meetings. (Ungraded Good Practice Statement)

1.2. We advise that only MHPs who meet the following criteria should diagnose GD/gender incongruence in children and adolescents: (1) training in child and adolescent developmental psychology and psychopathology, (2) competence in using the DSM and/or ICD for diagnostic

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

---

**Table 3.    ICD-10 Criteria for Transsexualism**

**Transsexualism (F64.0) has three criteria:**

1. The desire to live and be accepted as a member of the opposite sex, usually accompanied by the wish to make his or her body as congruent as possible with the preferred sex through surgery and hormone treatments.
2. The transsexual identity has been present persistently for at least 2 y.
3. The disorder is not a symptom of another mental disorder or a genetic, DSD, or chromosomal abnormality.

3878    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

---

**Table 4.    Criteria for Gender-Affirming Hormone Therapy for Adults**

1. Persistent, well-documented gender dysphoria/gender incongruence
2. The capacity to make a fully informed decision and to consent for treatment
3. The age of majority in a given country (if younger, follow the criteria for adolescents)
4. Mental health concerns, if present, must be reasonably well controlled

Reproduced from World Professional Association for Transgender Health (16).

---

purposes, (3) the ability to make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (4) training in diagnosing psychiatric conditions, (5) the ability to undertake or refer for appropriate treatment, (6) the ability to psychosocially assess the person's understanding and social conditions that can impact gender-affirming hormone therapy, (7) a practice of regularly attending relevant professional meetings, and (8) knowledge of the criteria for puberty blocking and gender-affirming hormone treatment in adolescents. (Ungraded Good Practice Statement)

**Evidence**

Individuals with gender identity issues may have psychological or psychiatric problems (43–48, 50, 51, 64, 65). It is therefore necessary that clinicians making the diagnosis are able to make a distinction between GD/gender incongruence and conditions that have similar features. Examples of conditions with similar features are body dysmorphic disorder, body identity integrity disorder (a condition in which individuals have a sense that their anatomical configuration as an able-bodied person is somehow wrong or inappropriate) (66), or certain forms of eunuchism (in which a person is preoccupied with or engages in castration and/or penectomy for

---

**Table 5.    Criteria for Gender-Affirming Hormone Therapy for Adolescents**

**Adolescents are eligible for GnRH agonist treatment if:**
1. A qualified MHP has confirmed that:
- the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed),
- gender dysphoria worsened with the onset of puberty,
- any coexisting psychological, medical, or social problems that could interfere with treatment (*e.g.*, that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment,
- the adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment,
2. And the adolescent:
- has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility,
- has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,
3. And a pediatric endocrinologist or other clinician experienced in pubertal assessment
- agrees with the indication for GnRH agonist treatment,
- has confirmed that puberty has started in the adolescent (Tanner stage ≥G2/B2),
- has confirmed that there are no medical contraindications to GnRH agonist treatment.

---

**Adolescents are eligible for subsequent sex hormone treatment if:**
1. A qualified MHP has confirmed:
- the persistence of gender dysphoria,
- any coexisting psychological, medical, or social problems that could interfere with treatment (*e.g.*, that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start sex hormone treatment,
- the adolescent has sufficient mental capacity (which most adolescents have by age 16 years) to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment,
2. And the adolescent:
- has been informed of the (irreversible) effects and side effects of treatment (including potential loss of fertility and options to preserve fertility),
- has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,
3. And a pediatric endocrinologist or other clinician experienced in pubertal induction:
- agrees with the indication for sex hormone treatment,
- has confirmed that there are no medical contraindications to sex hormone treatment.

Reproduced from World Professional Association for Transgender Health (16).

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

reasons that are not gender identity related) (11). Clinicians should also be able to diagnose psychiatric conditions accurately and ensure that these conditions are treated appropriately, particularly when the conditions may complicate treatment, affect the outcome of gender-affirming treatment, or be affected by hormone use.

### Values and preferences

The task force placed a very high value on avoiding harm from hormone treatment in individuals who have conditions other than GD/gender incongruence and who may not benefit from the physical changes associated with this treatment and placed a low value on any potential benefit these persons believe they may derive from hormone treatment. This justifies the good practice statement.

1.3. We advise that decisions of the social transition of prepubertal youths with GD/gender incongruence are made with the assistance of an MHP or another experienced professional. (Ungraded Good Practice Statement).

1.4. We recommend against puberty blocking and gender-affirming hormone treatment in prepubertal children with GD/gender incongruence. (1 l⊕⊕○○)

### Evidence

In most children diagnosed with GD/gender incongruence, it did not persist into adolescence. The percentages differed among studies, probably dependent on which version of the DSM clinicians used, the patient's age, the recruitment criteria, and perhaps cultural factors. However, the large majority (about 85%) of prepubertal children with a childhood diagnosis did not remain GD/gender incongruent in adolescence (20). If children have completely socially transitioned, they may have great difficulty in returning to the original gender role upon entering puberty (40). Social transition is associated with the persistence of GD/gender incongruence as a child progresses into adolescence. It may be that the presence of GD/gender incongruence in prepubertal children is the earliest sign that a child is destined to be transgender as an adolescent/adult (20). However, social transition (in addition to GD/gender incongruence) has been found to contribute to the likelihood of persistence.

This recommendation, however, does not imply that children should be discouraged from showing gender-variant behaviors or should be punished for exhibiting such behaviors. In individual cases, an early complete social transition may result in a more favorable outcome, but there are currently no criteria to identify the

GD/gender-incongruent children to whom this applies. At the present time, clinical experience suggests that persistence of GD/gender incongruence can only be reliably assessed after the first signs of puberty.

### Values and preferences

The task force placed a high value on avoiding harm with gender-affirming hormone therapy in prepubertal children with GD/gender incongruence. This justifies the strong recommendation in the face of low-quality evidence.

1.5. We recommend that clinicians inform and counsel all individuals seeking gender-affirming medical treatment regarding options for fertility preservation prior to initiating puberty suppression in adolescents and prior to treating with hormonal therapy of the affirmed gender in both adolescents and adults. (1 l⊕⊕⊕○)

### Remarks

Persons considering hormone use for gender affirmation need adequate information about this treatment in general and about fertility effects of hormone treatment in particular to make an informed and balanced decision (67, 68). Because young adolescents may not feel qualified to make decisions about fertility and may not fully understand the potential effects of hormonal interventions, consent and protocol education should include parents, the referring MHP(s), and other members of the adolescent's support group. To our knowledge, there are no formally evaluated decision aids available to assist in the discussion and decision regarding the future fertility of adolescents or adults beginning gender-affirming treatment.

Treating early pubertal youth with GnRH analogs will temporarily impair spermatogenesis and oocyte maturation. Given that an increasing number of transgender youth want to preserve fertility potential, delaying or temporarily discontinuing GnRH analogs to promote gamete maturation is an option. This option is often not preferred, because mature sperm production is associated with later stages of puberty and with the significant development of secondary sex characteristics.

For those designated male at birth with GD/gender incongruence and who are in early puberty, sperm production and the development of the reproductive tract are insufficient for the cryopreservation of sperm. However, prolonged pubertal suppression using GnRH analogs is reversible and clinicians should inform these individuals that sperm production can be initiated following prolonged gonadotropin suppression. This can be accomplished by spontaneous gonadotropin recovery after

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

**3880**  Hembree et al  Guidelines on Gender-Dysphoric/Gender-Incongruent Persons  J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

cessation of GnRH analogs or by gonadotropin treatment and will probably be associated with physical manifestations of testosterone production, as stated above. Note that there are no data in this population concerning the time required for sufficient spermatogenesis to collect enough sperm for later fertility. In males treated for precocious puberty, spermarche was reported 0.7 to 3 years after cessation of GnRH analogs (69). In adult men with gonadotropin deficiency, sperm are noted in seminal fluid by 6 to 12 months of gonadotropin treatment. However, sperm numbers when partners of these patients conceive are far below the "normal range" (70, 71).

In girls, no studies have reported long-term, adverse effects of pubertal suppression on ovarian function after treatment cessation (72, 73). Clinicians should inform adolescents that no data are available regarding either time to spontaneous ovulation after cessation of GnRH analogs or the response to ovulation induction following prolonged gonadotropin suppression.

In males with GD/gender incongruence, when medical treatment is started in a later phase of puberty or in adulthood, spermatogenesis is sufficient for cryopreservation and storage of sperm. *In vitro* spermatogenesis is currently under investigation. Restoration of spermatogenesis after prolonged estrogen treatment has not been studied.

In females with GD/gender incongruence, the effect of prolonged treatment with exogenous testosterone on ovarian function is uncertain. There have been reports of an increased incidence of polycystic ovaries in transgender males, both prior to and as a result of androgen treatment (74–77), although these reports were not confirmed by others (78). Pregnancy has been reported in transgender males who have had prolonged androgen treatment and have discontinued testosterone but have not had genital surgery (79, 80). A reproductive endocrine gynecologist can counsel patients before gender-affirming hormone treatment or surgery regarding potential fertility options (81). Techniques for cryopreservation of oocytes, embryos, and ovarian tissue continue to improve, and oocyte maturation of immature tissue is being studied (82).

## 2.0 Treatment of Adolescents

During the past decade, clinicians have progressively acknowledged the suffering of young adolescents with GD/gender incongruence. In some forms of GD/gender incongruence, psychological interventions may be useful and sufficient. However, for many adolescents with GD/gender incongruence, the pubertal physical changes are unbearable. As early medical intervention may prevent

psychological harm, various clinics have decided to start treating young adolescents with GD/gender incongruence with puberty-suppressing medication (a GnRH analog). As compared with starting gender-affirming treatment long after the first phases of puberty, a benefit of pubertal suppression at early puberty may be a better psychological and physical outcome.

In girls, the first physical sign of puberty is the budding of the breasts followed by an increase in breast and fat tissue. Breast development is also associated with the pubertal growth spurt, and menarche occurs ~2 years later. In boys, the first physical change is testicular growth. A testicular volume ≥4 mL is seen as consistent with the initiation of physical puberty. At the beginning of puberty, estradiol and testosterone levels are still low and are best measured in the early morning with an ultrasensitive assay. From a testicular volume of 10 mL, daytime testosterone levels increase, leading to virilization (83). Note that pubic hair and/or axillary hair/odor may not reflect the onset of gonadarche; instead, it may reflect adrenarche alone.

2.1. We suggest that adolescents who meet diagnostic criteria for GD/gender incongruence, fulfill criteria for treatment (Table 5), and are requesting treatment should initially undergo treatment to suppress pubertal development. (2 |⊕⊕○○)

2.2. We suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty (Tanner stages G2/B2). (2 |⊕⊕○○)

### Evidence

Pubertal suppression can expand the diagnostic phase by a long period, giving the subject more time to explore options and to live in the experienced gender before making a decision to proceed with gender-affirming sex hormone treatments and/or surgery, some of which is irreversible (84, 85). Pubertal suppression is fully reversible, enabling full pubertal development in the natal gender, after cessation of treatment, if appropriate. The experience of full endogenous puberty is an undesirable condition for the GD/gender-incongruent individual and may seriously interfere with healthy psychological functioning and well-being. Treating GD/gender-incongruent adolescents entering puberty with GnRH analogs has been shown to improve psychological functioning in several domains (86).

Another reason to start blocking pubertal hormones early in puberty is that the physical outcome is improved compared with initiating physical transition after puberty has been completed (60, 62). Looking like a man or woman when living as the opposite sex creates difficult

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

barriers with enormous life-long disadvantages. We therefore advise starting suppression in early puberty to prevent the irreversible development of undesirable secondary sex characteristics. However, adolescents with GD/gender incongruence should experience the first changes of their endogenous spontaneous puberty, because their emotional reaction to these first physical changes has diagnostic value in establishing the persistence of GD/gender incongruence (85). Thus, Tanner stage 2 is the optimal time to start pubertal suppression. However, pubertal suppression treatment in early puberty will limit the growth of the penis and scrotum, which will have a potential effect on future surgical treatments (87).

Clinicians can also use pubertal suppression in adolescents in later pubertal stages to stop menses in transgender males and prevent facial hair growth in transgender females. However, in contrast to the effects in early pubertal adolescents, physical sex characteristics (such as more advanced breast development in transgender boys and lowering of the voice and outgrowth of the jaw and brow in transgender girls) are not reversible.

### Values and preferences

These recommendations place a high value on avoiding an unsatisfactory physical outcome when secondary sex characteristics have become manifest and irreversible, a higher value on psychological well-being, and a lower value on avoiding potential harm from early pubertal suppression.

### Remarks

Table 6 lists the Tanner stages of breast and male genital development. Careful documentation of hallmarks of pubertal development will ensure precise timing when initiating pubertal suppression once puberty has started. Clinicians can use pubertal LH and sex steroid levels to confirm that puberty has progressed sufficiently before starting pubertal suppression (88). Reference ranges for sex steroids by Tanner stage may vary depending on the assay used. Ultrasensitive sex steroid and gonadotropin assays will help clinicians document early pubertal changes.

Irreversible and, for GD/gender-incongruent adolescents, undesirable sex characteristics in female puberty are breasts, female body habitus, and, in some cases, relative short stature. In male puberty, they are a prominent Adam's apple; low voice; male bone configuration, such as a large jaw, big feet and hands, and tall stature; and male hair pattern on the face and extremities.

> 2.3. We recommend that, where indicated, GnRH analogues are used to suppress pubertal hormones. (1 |⊕⊕◯◯)

### Evidence

Clinicians can suppress pubertal development and gonadal function most effectively via gonadotropin suppression using GnRH analogs. GnRH analogs are long-acting agonists that suppress gonadotropins by GnRH receptor desensitization after an initial increase of gonadotropins during ~10 days after the first and (to a lesser degree) the second injection (89). Antagonists immediately suppress pituitary gonadotropin secretion (90, 91). Long-acting GnRH analogs are the currently preferred treatment option. Clinicians may consider long-acting GnRH antagonists when evidence on their safety and efficacy in adolescents becomes available.

During GnRH analog treatment, slight development of secondary sex characteristics may regress, and in a later phase of pubertal development, it will stop. In girls, breast tissue will become atrophic, and menses will stop. In boys, virilization will stop, and testicular volume may decrease (92).

An advantage of using GnRH analogs is the reversibility of the intervention. If, after extensive exploration of his/her transition wish, the individual no longer desires transition, they can discontinue pubertal suppression. In subjects with

---

**Table 6.    Tanner Stages of Breast Development and Male External Genitalia**

The description of Tanner stages for breast development:
  1. Prepubertal
  2. Breast and papilla elevated as small mound; areolar diameter increased
  3. Breast and areola enlarged, no contour separation
  4. Areola and papilla form secondary mound
  5. Mature; nipple projects, areola part of general breast contour
For penis and testes:
  1. Prepubertal, testicular volume <4 mL
  2. Slight enlargement of penis; enlarged scrotum, pink, texture altered, testes 4–6 mL
  3. Penis longer, testes larger (8–12 mL)
  4. Penis and glans larger, including increase in breadth; testes larger (12–15 mL), scrotum dark
  5. Penis adult size; testicular volume > 15 ml

Adapted from Lawrence (56).

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

precocious puberty, spontaneous pubertal development has been shown to resume after patients discontinue taking GnRH analogs (93).

Recommendations 2.1 to 2.3 are supported by a prospective follow-up study from The Netherlands. This report assessed mental health outcomes in 55 transgender adolescents/young adults (22 transgender females and 33 transgender males) at three time points: (1) before the start of GnRH agonist (average age of 14.8 years at start of treatment), (2) at initiation of gender-affirming hormones (average age of 16.7 years at start of treatment), and (3) 1 year after "gender-reassignment surgery" (average age of 20.7 years) (63). Despite a decrease in depression and an improvement in general mental health functioning, GD/gender incongruence persisted through pubertal suppression, as previously reported (86). However, following sex hormone treatment and gender-reassignment surgery, GD/gender incongruence was resolved and psychological functioning steadily improved (63). Furthermore, well-being was similar to or better than that reported by age-matched young adults from the general population, and none of the study participants regretted treatment. This study represents the first long-term follow-up of individuals managed according to currently existing clinical practice guidelines for transgender youth, and it underscores the benefit of the multidisciplinary approach pioneered in The Netherlands; however, further studies are needed.

### Side effects

The primary risks of pubertal suppression in GD/gender-incongruent adolescents may include adverse effects on bone mineralization (which can theoretically be reversed with sex hormone treatment), compromised fertility if the person subsequently is treated with sex hormones, and unknown effects on brain development. Few data are available on the effect of GnRH analogs on BMD in adolescents with GD/gender incongruence. Initial data in GD/gender-incongruent subjects demonstrated no change of absolute areal BMD during 2 years of GnRH analog therapy but a decrease in BMD $z$ scores (85). A recent study also suggested suboptimal bone mineral accrual during GnRH analog treatment. The study reported a decrease in areal BMD $z$ scores and of bone mineral apparent density $z$ scores (which takes the size of the bone into account) in 19 transgender males treated with GnRH analogs from a mean age of 15.0 years (standard deviation = 2.0 years) for a median duration of 1.5 years (0.3 to 5.2 years) and in 15 transgender females treated from 14.9 ($\pm$1.9) years for 1.3 years (0.5 to 3.8 years), although not all changes were statistically significant (94). There was incomplete catch-up at age 22 years after sex hormone treatment from age 16.6 ($\pm$1.4)

years for a median duration of 5.8 years (3.0 to 8.0 years) in transgender females and from age 16.4 ($\pm$2.3) years for 5.4 years (2.8 to 7.8 years) in transgender males. Little is known about more prolonged use of GnRH analogs. Researchers reported normal BMD $z$ scores at age 35 years in one individual who used GnRH analogs from age 13.7 years until age 18.6 years before initiating sex hormone treatment (65).

Additional data are available from individuals with late puberty or GnRH analog treatment of other indications. Some studies reported that men with constitutionally delayed puberty have decreased BMD in adulthood (95). However, other studies reported that these men have normal BMD (96, 97). Treating adults with GnRH analogs results in a decrease of BMD (98). In children with central precocious puberty, treatment with GnRH analogs has been found to result in a decrease of BMD during treatment by some (99) but not others (100). Studies have reported normal BMD after discontinuing therapy (69, 72, 73, 101, 102). In adolescents treated with growth hormone who are small for gestational age and have normal pubertal timing, 2-year GnRH analog treatments did not adversely affect BMD (103). Calcium supplementation may be beneficial in optimizing bone health in GnRH analog–treated individuals (104). There are no studies of vitamin D supplementation in this context, but clinicians should offer supplements to vitamin D–deficient adolescents. Physical activity, especially during growth, is important for bone mass in healthy individuals (103) and is therefore likely to be beneficial for bone health in GnRH analog–treated subjects.

GnRH analogs did not induce a change in body mass index standard deviation score in GD/gender-incongruent adolescents (94) but caused an increase in fat mass and decrease in lean body mass percentage (92). Studies in girls treated for precocious puberty also reported a stable body mass index standard deviation score during treatment (72) and body mass index and body composition comparable to controls after treatment (73).

Arterial hypertension has been reported as an adverse effect in a few girls treated with GnRH analogs for precocious/early puberty (105, 106). Blood pressure monitoring before and during treatment is recommended.

Individuals may also experience hot flashes, fatigue, and mood alterations as a consequence of pubertal suppression. There is no consensus on treatment of these side effects in this context.

It is recommended that any use of pubertal blockers (and subsequent use of sex hormones, as detailed below) include a discussion about implications for fertility (see recommendation 1.3). Transgender adolescents may

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

want to preserve fertility, which may be otherwise compromised if puberty is suppressed at an early stage and the individual completes phenotypic transition with the use of sex hormones.

Limited data are available regarding the effects of GnRH analogs on brain development. A single cross-sectional study demonstrated no compromise of executive function (107), but animal data suggest there may be an effect of GnRH analogs on cognitive function (108).

### Values and preferences

Our recommendation of GnRH analogs places a higher value on the superior efficacy, safety, and reversibility of the pubertal hormone suppression achieved (as compared with the alternatives) and a relatively lower value on limiting the cost of therapy. Of the available alternatives, depot and oral progestin preparations are effective. Experience with this treatment dates back prior to the emergence of GnRH analogs for treating precocious puberty in papers from the 1960s and early 1970s (109–112). These compounds are usually safe, but some side effects have been reported (113–115). Only two recent studies involved transgender youth (116, 117). One of these studies described the use of oral lynestrenol monotherapy followed by the addition of testosterone treatment in transgender boys who were at Tanner stage B4 or further at the start of treatment (117). They found lynestrenol safe, but gonadotropins were not fully suppressed. The study reported metrorrhagia in approximately half of the individuals, mainly in the first 6 months. Acne, headache, hot flashes, and fatigue were other frequent side effects. Another progestin that has been studied in the United States is medroxyprogesterone. This agent is not as effective as GnRH analogs in lowering endogenous sex hormones either and may be associated with other side effects (116). Progestin preparations may be an acceptable treatment for persons without access to GnRH analogs or with a needle phobia. If GnRH analog treatment is not available (insurance denial, prohibitive cost, or other reasons), postpubertal, transgender female adolescents may be treated with an antiandrogen that directly suppresses androgen synthesis or action (see adult section).

### Remarks

Measurements of gonadotropin and sex steroid levels give precise information about gonadal axis suppression, although there is insufficient evidence for any specific short-term monitoring scheme in children treated with GnRH analogs (88). If the gonadal axis is not completely suppressed—as evidenced by (for example) menses, erections, or progressive hair growth—the interval of GnRH analog treatment can be shortened or the dose increased. During treatment, adolescents should be monitored for negative effects of delaying puberty, including a halted growth spurt and impaired bone mineral accretion. Table 7 illustrates a suggested clinical protocol.

Anthropometric measurements and X-rays of the left hand to monitor bone age are informative for evaluating growth. To assess BMD, clinicians can perform dual-energy X-ray absorptiometry scans.

2.4. In adolescents who request sex hormone treatment (given this is a partly irreversible treatment), we recommend initiating treatment using a gradually increasing dose schedule (see Table 8) after a multidisciplinary team of medical and MHPs has confirmed the persistence of GD/gender incongruence and sufficient mental capacity to give informed consent, which most adolescents have by age 16 years (Table 5). (1 |⊕⊕○○)

2.5. We recognize that there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years in some adolescents with GD/gender incongruence, even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years. As with the care of adolescents ≥16 years of age, we recommend that an expert multidisciplinary team of medical and MHPs manage this treatment. (1 |⊕○○○)

2.6. We suggest monitoring clinical pubertal development every 3 to 6 months and laboratory parameters every 6 to 12 months during sex hormone treatment (Table 9). (2 |⊕⊕○○)

---

### Table 7.    Baseline and Follow-Up Protocol During Suppression of Puberty

Every 3–6 mo
    Anthropometry: height, weight, sitting height, blood pressure, Tanner stages
Every 6–12 mo
    Laboratory: LH, FSH, E2/T, 25OH vitamin D
Every 1–2 y
    Bone density using DXA
    Bone age on X-ray of the left hand (if clinically indicated)

Adapted from Hembree *et al.* (118).

Abbreviations: DXA, dual-energy X-ray absorptiometry; E2, estradiol; FSH, follicle stimulating hormone; LH, luteinizing hormone; T, testosterone;

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

---

**Table 8.    Protocol Induction of Puberty**

Induction of female puberty with oral 17$\beta$-estradiol, increasing the dose every 6 mo:
    5 $\mu$g/kg/d
    10 $\mu$g/kg/d
    15 $\mu$g/kg/d
    20 $\mu$g/kg/d
    Adult dose = 2–6 mg/d
    *In postpubertal transgender female adolescents, the dose of 17$\beta$-estradiol can be increased more rapidly:*
        1 mg/d for 6 mo
        2 mg/d
Induction of female puberty with transdermal 17$\beta$-estradiol, increasing the dose every 6 mo (new patch is placed every 3.5 d):
    6.25–12.5 $\mu$g/24 h (cut 25-$\mu$g patch into quarters, then halves)
    25 $\mu$g/24 h
    37.5 $\mu$g/24 h
    Adult dose = 50–200 $\mu$g/24 h
    *For alternatives once at adult dose, see Table 11.*
    *Adjust maintenance dose to mimic physiological estradiol levels (see Table 15).*

Induction of male puberty with testosterone esters increasing the dose every 6 mo (IM or SC):
    25 mg/m$^2$/2 wk (or alternatively, half this dose weekly, or double the dose every 4 wk)
    50 mg/m$^2$/2 wk
    75 mg/m$^2$/2 wk
    100 mg/m$^2$/2 wk
    Adult dose = 100–200 mg every 2 wk
    *In postpubertal transgender male adolescents the dose of testosterone esters can be increased more rapidly:*
        75 mg/2 wk for 6 mo
        125 mg/2 wk
    *For alternatives once at adult dose, see Table 11.*
    *Adjust maintenance dose to mimic physiological testosterone levels (see Table 14).*

Adapted from Hembree *et al.* (118).

Abbreviations: IM, intramuscularly; SC, subcutaneously.

## Evidence

Adolescents develop competence in decision making at their own pace. Ideally, the supervising medical professionals should individually assess this competence, although no objective tools to make such an assessment are currently available.

Many adolescents have achieved a reasonable level of competence by age 15 to 16 years (119), and in many countries 16-year-olds are legally competent with regard to medical decision making (120). However, others believe that although some capacities are generally achieved before age 16 years, other abilities (such as good risk assessment) do not develop until well after 18 years (121). They suggest that health care procedures should be divided along a matrix of relative risk, so that younger adolescents can be allowed to decide about low-risk procedures, such as most diagnostic tests and common therapies, but not about high-risk procedures, such as most surgical procedures (121).

Currently available data from transgender adolescents support treatment with sex hormones starting at age 16 years (63, 122). However, some patients may incur potential risks by waiting until age 16 years. These include the potential risk to bone health if puberty is suppressed

---

**Table 9.    Baseline and Follow-up Protocol During Induction of Puberty**

Every 3–6 mo
  •Anthropometry: height, weight, sitting height, blood pressure, Tanner stages
Every 6–12 mo
  •In transgender males: hemoglobin/hematocrit, lipids, testosterone, 25OH vitamin D
  •In transgender females: prolactin, estradiol, 25OH vitamin D
Every 1–2 y
  •BMD using DXA
  •Bone age on X-ray of the left hand (if clinically indicated)
*BMD should be monitored into adulthood (until the age of 25–30 y or until peak bone mass has been reached).*
*For recommendations on monitoring once pubertal induction has been completed, see Tables 14 and 15.*

Adapted from Hembree *et al.* (118).

Abbreviation: DXA, dual-energy X-ray absorptiometry.

doi: 10.1210/jc.2017-01658    https://academic.oup.com/jcem    **3885**

for 6 to 7 years before initiating sex hormones (*e.g.*, if someone reached Tanner stage 2 at age 9-10 years old). Additionally, there may be concerns about inappropriate height and potential harm to mental health (emotional and social isolation) if initiation of secondary sex characteristics must wait until the person has reached 16 years of age. However, only minimal data supporting earlier use of gender-affirming hormones in transgender adolescents currently exist (63). Clearly, long-term studies are needed to determine the optimal age of sex hormone treatment in GD/gender-incongruent adolescents.

The MHP who has followed the adolescent during GnRH analog treatment plays an essential role in assessing whether the adolescent is eligible to start sex hormone therapy and capable of consenting to this treatment (Table 5). Support of the family/environment is essential. Prior to the start of sex hormones, clinicians should discuss the implications for fertility (see recommendation 1.5). Throughout pubertal induction, an MHP and a pediatric endocrinologist (or other clinician competent in the evaluation and induction of pubertal development) should monitor the adolescent. In addition to monitoring therapy, it is also important to pay attention to general adolescent health issues, including healthy life style choices, such as not smoking, contraception, and appropriate vaccinations (*e.g.*, human papillomavirus).

For the induction of puberty, clinicians can use a similar dose scheme for hypogonadal adolescents with GD/gender incongruence as they use in other individuals with hypogonadism, carefully monitoring for desired and undesired effects (Table 8). In transgender female adolescents, transdermal 17β-estradiol may be an alternative for oral 17β-estradiol. It is increasingly used for pubertal induction in hypogonadal females. However, the absence of low-dose estrogen patches may be a problem. As a result, individuals may need to cut patches to size themselves to achieve appropriate dosing (123). In transgender male adolescents, clinicians can give testosterone injections intramuscularly or subcutaneously (124, 125).

When puberty is initiated with a gradually increasing schedule of sex steroid doses, the initial levels will not be high enough to suppress endogenous sex steroid secretion. Gonadotropin secretion and endogenous production of testosterone may resume and interfere with the effectiveness of estrogen treatment, in transgender female adolescents (126, 127). Therefore, continuation of GnRH analog treatment is advised until gonadectomy. Given that GD/gender-incongruent adolescents may opt not to have gonadectomy, long-term studies are necessary to examine the potential risks of prolonged GnRH analog treatment. Alternatively, in transgender male adolescents, GnRH analog treatment can be discontinued once an

adult dose of testosterone has been reached and the individual is well virilized. If uterine bleeding occurs, a progestin can be added. However, the combined use of a GnRH analog (for ovarian suppression) and testosterone may enable phenotypic transition with a lower dose of testosterone in comparison with testosterone alone. If there is a wish or need to discontinue GnRH analog treatment in transgender female adolescents, they may be treated with an antiandrogen that directly suppresses androgen synthesis or action (see section 3.0 "Hormonal Therapy for Transgender Adults").

### Values and preferences

The recommendation to initiate pubertal induction only when the individual has sufficient mental capacity (roughly age 16 years) to give informed consent for this partly irreversible treatment places a higher value on the ability of the adolescent to fully understand and oversee the partially irreversible consequences of sex hormone treatment and to give informed consent. It places a lower value on the possible negative effects of delayed puberty. We may not currently have the means to weigh adequately the potential benefits of waiting until around age 16 years to initiate sex hormones vs the potential risks/harm to BMD and the sense of social isolation from having the timing of puberty be so out of sync with peers (128).

### Remarks

Before starting sex hormone treatment, effects on fertility and options for fertility preservation should be discussed. Adult height may be a concern in transgender adolescents. In a transgender female adolescent, clinicians may consider higher doses of estrogen or a more rapid tempo of dose escalation during pubertal induction. There are no established treatments yet to augment adult height in a transgender male adolescent with open epiphyses during pubertal induction. It is not uncommon for transgender adolescents to present for clinical services after having completed or nearly completed puberty. In such cases, induction of puberty with sex hormones can be done more rapidly (see Table 8). Additionally, an adult dose of testosterone in transgender male adolescents may suffice to suppress the gonadal axis without the need to use a separate agent. At the appropriate time, the multidisciplinary team should adequately prepare the adolescent for transition to adult care.

## 3.0 Hormonal Therapy for Transgender Adults

The two major goals of hormonal therapy are (1) to reduce endogenous sex hormone levels, and thus reduce

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

**3886**  Hembree et al   Guidelines on Gender-Dysphoric/Gender-Incongruent Persons   J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

the secondary sex characteristics of the individual's designated gender, and (2) to replace endogenous sex hormone levels consistent with the individual's gender identity by using the principles of hormone replacement treatment of hypogonadal patients. The timing of these two goals and the age at which to begin treatment with the sex hormones of the chosen gender is codetermined in collaboration with both the person pursuing transition and the health care providers. The treatment team should include a medical provider knowledgeable in transgender hormone therapy, an MHP knowledgeable in GD/gender incongruence and the mental health concerns of transition, and a primary care provider able to provide care appropriate for transgender individuals. The physical changes induced by this sex hormone transition are usually accompanied by an improvement in mental well-being (129, 130).

3.1. We recommend that clinicians confirm the diagnostic criteria of GD/gender incongruence and the criteria for the endocrine phase of gender transition before beginning treatment. (1 |⊕⊕⊕○)

3.2. We recommend that clinicians evaluate and address medical conditions that can be exacerbated by hormone depletion and treatment with sex hormones of the affirmed gender before beginning treatment (Table 10). (1 |⊕⊕⊕○)

3.3. We suggest that clinicians measure hormone levels during treatment to ensure that endogenous sex steroids are suppressed and administered sex steroids are maintained in the normal physiologic range for the affirmed gender. (2 |⊕⊕○○)

## Evidence

It is the responsibility of the treating clinician to confirm that the person fulfills criteria for treatment. The treating clinician should become familiar with the terms and criteria presented in Tables 1–5 and take a thorough history from the patient in collaboration with the other members of the treatment team. The treating clinician must ensure that the desire for transition is appropriate; the consequences, risks, and benefits of treatment are well understood; and the desire for transition persists. They also need to discuss fertility preservation options (see recommendation 1.3) (67, 68).

### Transgender males

Clinical studies have demonstrated the efficacy of several different androgen preparations to induce masculinization in transgender males (Appendix A) (113, 114, 131–134). Regimens to change secondary sex characteristics follow the general principle of hormone replacement treatment of male hypogonadism (135). Clinicians can use either parenteral or transdermal preparations to achieve testosterone values in the normal male range (this is dependent on the specific assay, but is typically 320 to 1000 ng/dL) (Table 11) (136). Sustained supraphysiologic levels of testosterone increase the risk of adverse reactions (see section 4.0 "Adverse Outcome Prevention and Long-Term Care") and should be avoided.

Similar to androgen therapy in hypogonadal men, testosterone treatment in transgender males results in increased muscle mass and decreased fat mass, increased facial hair and acne, male pattern baldness in those genetically predisposed, and increased sexual desire (137).

## Table 10.  Medical Risks Associated With Sex Hormone Therapy

Transgender female: estrogen
  Very high risk of adverse outcomes:
    •Thromboembolic disease
  Moderate risk of adverse outcomes:
    •Macroprolactinoma
    •Breast cancer
    •Coronary artery disease
    •Cerebrovascular disease
    •Cholelithiasis
    •Hypertriglyceridemia

Transgender male: testosterone
  Very high risk of adverse outcomes:
    •Erythrocytosis (hematocrit > 50%)
  Moderate risk of adverse outcomes:
    •Severe liver dysfunction (transaminases > threefold upper limit of normal)
    •Coronary artery disease
    •Cerebrovascular disease
    •Hypertension
    •Breast or uterine cancer

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

## Table 11.    Hormone Regimens in Transgender Persons

| | |
|---|---|
| **Transgender females**[a] | |
|   Estrogen | |
|     Oral | |
|       Estradiol | 2.0–6.0 mg/d |
|     Transdermal | |
|       Estradiol transdermal patch | 0.025–0.2 mg/d |
|       (New patch placed every 3–5 d) | |
|     Parenteral | |
|       Estradiol valerate or cypionate | 5–30 mg IM every 2 wk |
| | 2–10 mg IM every week |
|   Anti-androgens | |
|     Spironolactone | 100–300 mg/d |
|     Cyproterone acetate[b] | 25–50 mg/d |
|   GnRH agonist | 3.75 mg SQ (SC) monthly |
| | 11.25 mg SQ (SC) 3-monthly |
| **Transgender males** | |
|   Testosterone | |
|     Parenteral testosterone | |
|       Testosterone enanthate or cypionate | 100–200 mg SQ (IM) every 2 wk or SQ (SC) 50% per week |
|       Testosterone undecanoate[c] | 1000 mg every 12 wk |
|     Transdermal testosterone | |
|       Testosterone gel 1.6%[d] | 50–100 mg/d |
|       Testosterone transdermal patch | 2.5–7.5 mg/d |

Abbreviations: IM, intramuscularly; SQ, sequentially; SC, subcutaneously.

[a]Estrogens used with or without antiandrogens or GnRH agonist.

[b]Not available in the United States.

[c]One thousand milligrams initially followed by an injection at 6 wk then at 12-wk intervals.

[d]Avoid cutaneous transfer to other individuals.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

In transgender males, testosterone will result in clitoromegaly, temporary or permanent decreased fertility, deepening of the voice, cessation of menses (usually), and a significant increase in body hair, particularly on the face, chest, and abdomen. Cessation of menses may occur within a few months with testosterone treatment alone, although high doses of testosterone may be required. If uterine bleeding continues, clinicians may consider the addition of a progestational agent or endometrial ablation (138). Clinicians may also administer GnRH analogs or depot medroxyprogesterone to stop menses prior to testosterone treatment.

### Transgender females

The hormone regimen for transgender females is more complex than the transgender male regimen (Appendix B). Treatment with physiologic doses of estrogen alone is insufficient to suppress testosterone levels into the normal range for females (139). Most published clinical studies report the need for adjunctive therapy to achieve testosterone levels in the female range (21, 113, 114, 132–134, 139, 140).

Multiple adjunctive medications are available, such as progestins with antiandrogen activity and GnRH agonists (141). Spironolactone works by directly blocking androgens during their interaction with the androgen receptor (114, 133, 142). It may also have estrogenic activity (143). Cyproterone acetate, a progestational compound with antiandrogenic properties (113, 132, 144), is widely used in Europe. 5α-Reductase inhibitors do not reduce testosterone levels and have adverse effects (145).

Dittrich et al. (141) reported that monthly doses of the GnRH agonist goserelin acetate in combination with estrogen were effective in reducing testosterone levels with a low incidence of adverse reactions in 60 transgender females. Leuprolide and transdermal estrogen were as effective as cyproterone and transdermal estrogen in a comparative retrospective study (146).

Patients can take estrogen as oral conjugated estrogens, oral 17β-estradiol, or transdermal 17β-estradiol. Among estrogen options, the increased risk of thromboembolic events associated with estrogens in general seems most concerning with ethinyl estradiol specifically (134, 140, 141), which is why we specifically suggest that it not be used in any transgender treatment plan. Data distinguishing among other estrogen options are less well established although there is some thought that oral routes of administration are more thrombogenic due to the "first pass effect" than are transdermal and parenteral routes, and that the risk of thromboembolic events is dose-dependent. Injectable estrogen and sublingual

3888    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

estrogen may benefit from avoiding the first pass effect, but they can result in more rapid peaks with greater overall periodicity and thus are more difficult to monitor (147, 148). However, there are no data demonstrating that increased periodicity is harmful otherwise.

Clinicians can use serum estradiol levels to monitor oral, transdermal, and intramuscular estradiol. Blood tests cannot monitor conjugated estrogens or synthetic estrogen use. Clinicians should measure serum estradiol and serum testosterone and maintain them at the level for premenopausal females (100 to 200 pg/mL and <50 ng/dL, respectively). The transdermal preparations and injectable estradiol cypionate or valerate preparations may confer an advantage in older transgender females who may be at higher risk for thromboembolic disease (149).

### Values

Our recommendation to maintain levels of gender-affirming hormones in the normal adult range places a high value on the avoidance of the long-term complications of pharmacologic doses. Those patients receiving endocrine treatment who have relative contraindications to hormones should have an in-depth discussion with their physician to balance the risks and benefits of therapy.

### Remarks

Clinicians should inform all endocrine-treated individuals of all risks and benefits of gender-affirming hormones prior to initiating therapy. Clinicians should strongly encourage tobacco use cessation in transgender females to avoid increased risk of VTE and cardiovascular complications. We strongly discourage the unsupervised use of hormone therapy (150).

Not all individuals with GD/gender incongruence seek treatment as described (*e.g.*, male-to-eunuchs and individuals seeking partial transition). Tailoring current protocols to the individual may be done within the context of accepted safety guidelines using a multidisciplinary approach including mental health. No evidence-based protocols are available for these groups (151). We need prospective studies to better understand treatment options for these persons.

3.4.  We suggest that endocrinologists provide education to transgender individuals undergoing treatment about the onset and time course of physical changes induced by sex hormone treatment. (2 |⊕○○○)

### Evidence

#### Transgender males

Physical changes that are expected to occur during the first 1 to 6 months of testosterone therapy include cessation of menses, increased sexual desire, increased facial and body hair, increased oiliness of skin, increased muscle, and redistribution of fat mass. Changes that occur within the first year of testosterone therapy include deepening of the voice (152, 153), clitoromegaly, and male pattern hair loss (in some cases) (114, 144, 154, 155) (Table 12).

#### Transgender females

Physical changes that may occur in transgender females in the first 3 to 12 months of estrogen and anti-androgen therapy include decreased sexual desire, decreased spontaneous erections, decreased facial and body hair (usually mild), decreased oiliness of skin, increased breast tissue growth, and redistribution of fat mass (114, 139, 149, 154, 155, 161) (Table 13). Breast development is generally maximal at 2 years after initiating hormones (114, 139, 149, 155). Over a long period of time, the prostate gland and testicles will undergo atrophy.

Although the time course of breast development in transgender females has been studied (150), precise information about other changes induced by sex hormones is lacking (141). There is a great deal of variability among individuals, as evidenced during pubertal development. We all know that a major concern for transgender females is breast development. If we work with estrogens, the result will be often not what the transgender female expects.

Alternatively, there are transgender females who report an anecdotal improved breast development, mood, or sexual desire with the use of progestogens. However, there have been no well-designed studies of the role of progestogens in feminizing hormone regimens, so the question is still open.

Our knowledge concerning the natural history and effects of different cross-sex hormone therapies on breast

### Table 12.    Masculinizing Effects in Transgender Males

| Effect | Onset | Maximum |
|---|---|---|
| Skin oiliness/acne | 1–6 mo | 1–2 y |
| Facial/body hair growth | 6–12 mo | 4–5 y |
| Scalp hair loss | 6–12 mo | —[a] |
| Increased muscle mass/strength | 6–12 mo | 2–5 y |
| Fat redistribution | 1–6 mo | 2–5 y |
| Cessation of menses | 1–6 mo | —[b] |
| Clitoral enlargement | 1–6 mo | 1–2 y |
| Vaginal atrophy | 1–6 mo | 1–2 y |
| Deepening of voice | 6–12 mo | 1–2 y |

Estimates represent clinical observations: Toorians *et al.* (149), Asscheman *et al.* (156), Gooren *et al.* (157), Wierckx *et al.* (158).

[a]Prevention and treatment as recommended for biological men.

[b]Menorrhagia requires diagnosis and treatment by a gynecologist.

doi: 10.1210/jc.2017-01658

**Table 13.    Feminizing Effects in Transgender Females**

| Effect | Onset | Maximum |
|---|---|---|
| Redistribution of body fat | 3–6 mo | 2–3 y |
| Decrease in muscle mass and strength | 3–6 mo | 1–2 y |
| Softening of skin/decreased oiliness | 3–6 mo | Unknown |
| Decreased sexual desire | 1–3 mo | 3–6 mo |
| Decreased spontaneous erections | 1–3 mo | 3–6 mo |
| Male sexual dysfunction | Variable | Variable |
| Breast growth | 3–6 mo | 2–3 y |
| Decreased testicular volume | 3–6 mo | 2–3 y |
| Decreased sperm production | Unknown | >3 y |
| Decreased terminal hair growth | 6–12 mo | >3 y[a] |
| Scalp hair | Variable | —[b] |
| Voice changes | None | —[c] |

Estimates represent clinical observations: Toorians *et al.* (149), Asscheman *et al.* (156), Gooren *et al.* (157).

[a]Complete removal of male sexual hair requires electrolysis or laser treatment or both.

[b]Familial scalp hair loss may occur if estrogens are stopped.

[c]Treatment by speech pathologists for voice training is most effective.

development in transgender females is extremely sparse and based on the low quality of evidence. Current evidence does not indicate that progestogens enhance breast development in transgender females, nor does evidence prove the absence of such an effect. This prevents us from drawing any firm conclusion at this moment and demonstrates the need for further research to clarify these important clinical questions (162).

**Values and preferences**

Transgender persons have very high expectations regarding the physical changes of hormone treatment and are aware that body changes can be enhanced by surgical procedures (*e.g.*, breast, face, and body habitus). Clear expectations for the extent and timing of sex hormone–induced changes may prevent the potential harm and expense of unnecessary procedures.

## 4.0 Adverse Outcome Prevention and Long-Term Care

Hormone therapy for transgender males and females confers many of the same risks associated with sex hormone replacement therapy in nontransgender persons. The risks arise from and are worsened by inadvertent or intentional use of supraphysiologic doses of sex hormones, as well as use of inadequate doses of sex hormones to maintain normal physiology (131, 139).

4.1. We suggest regular clinical evaluation for physical changes and potential adverse changes in response to sex steroid hormones and laboratory monitoring of sex steroid hormone levels every

3 months during the first year of hormone therapy for transgender males and females and then once or twice yearly. (2 |⊕⊕◯◯)

**Evidence**

Pretreatment screening and appropriate regular medical monitoring are recommended for both transgender males and females during the endocrine transition and periodically thereafter (26, 155). Clinicians should monitor weight and blood pressure, conduct physical exams, and assess routine health questions, such as tobacco use, symptoms of depression, and risk of adverse events such as deep vein thrombosis/pulmonary embolism and other adverse effects of sex steroids.

*Transgender males*

Table 14 contains a standard monitoring plan for transgender males on testosterone therapy (154, 159). Key issues include maintaining testosterone levels in the physiologic normal male range and avoiding adverse events resulting from excess testosterone therapy, particularly erythrocytosis, sleep apnea, hypertension, excessive weight gain, salt retention, lipid changes, and excessive or cystic acne (135).

Because oral 17-alkylated testosterone is not recommended, serious hepatic toxicity is not anticipated with parenteral or transdermal testosterone use (163, 164). Past concerns regarding liver toxicity with testosterone have been alleviated with subsequent reports that indicate the risk of serious liver disease is minimal (144, 165, 166).

*Transgender females*

Table 15 contains a standard monitoring plan for transgender females on estrogens, gonadotropin suppression, or antiandrogens (160). Key issues include avoiding supraphysiologic doses or blood levels of estrogen that may lead to increased risk for thromboembolic disease, liver dysfunction, and hypertension. Clinicians should monitor serum estradiol levels using laboratories participating in external quality control, as measurements of estradiol in blood can be very challenging (167).

VTE may be a serious complication. A study reported a 20-fold increase in venous thromboembolic disease in a large cohort of Dutch transgender subjects (161). This increase may have been associated with the use of the synthetic estrogen, ethinyl estradiol (149). The incidence decreased when clinicians stopped administering ethinyl estradiol (161). Thus, the use of synthetic estrogens and conjugated estrogens is undesirable because of the inability to regulate doses by measuring serum levels and the risk of thromboembolic disease. In a German gender clinic, deep vein thrombosis occurred in 1 of 60 of transgender females treated with a GnRH analog and oral

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157553 by National Library of Education user on 15 August 2024

**3890**    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

---

**Table 14.    Monitoring of Transgender Persons on Gender-Affirming Hormone Therapy: Transgender Male**

---

1. Evaluate patient every 3 mo in the first year and then one to two times per year to monitor for appropriate signs of virilization and for development of adverse reactions.
2. Measure serum testosterone every 3 mo until levels are in the normal physiologic male range:[a]
    a. For testosterone enanthate/cypionate injections, the testosterone level should be measured midway between injections. The target level is 400–700 ng/dL to 400 ng/dL. Alternatively, measure peak and trough levels to ensure levels remain in the normal male range.
    b. For parenteral testosterone undecanoate, testosterone should be measured just before the following injection. If the level is <400 ng/dL, adjust dosing interval.
    c. For transdermal testosterone, the testosterone level can be measured no sooner than after 1 wk of daily application (at least 2 h after application).
3. Measure hematocrit or hemoglobin at baseline and every 3 mo for the first year and then one to two times a year. Monitor weight, blood pressure, and lipids at regular intervals.
4. Screening for osteoporosis should be conducted in those who stop testosterone treatment, are not compliant with hormone therapy, or who develop risks for bone loss.
5. If cervical tissue is present, monitoring as recommended by the American College of Obstetricians and Gynecologists.
6. Ovariectomy can be considered after completion of hormone transition.
7. Conduct sub- and periareolar annual breast examinations if mastectomy performed. If mastectomy is not performed, then consider mammograms as recommended by the American Cancer Society.

---

[a]Adapted from Lapauw et al. (154) and Ott et al. (159).

estradiol (141). The patient who developed a deep vein thrombosis was found to have a homozygous C677 T mutation in the methylenetetrahydrofolate reductase gene. In an Austrian gender clinic, administering gender-affirming hormones to 162 transgender females and 89 transgender males was not associated with VTE, despite an 8.0% and 5.6% incidence of thrombophilia (159). A more recent multinational study reported only 10 cases of VTE from a cohort of 1073 subjects (168). Thrombophilia screening of transgender persons initiating hormone treatment should be restricted to those with a personal or family history of VTE (159). Monitoring D-dimer levels during treatment is not recommended (169).

> 4.2. We suggest periodically monitoring prolactin levels in transgender females treated with estrogens. (2 |⊕⊕○○)

**Evidence**

Estrogen therapy can increase the growth of pituitary lactrotroph cells. There have been several reports of prolactinomas occurring after long-term, high-dose estrogen therapy (170–173). Up to 20% of transgender females treated with estrogens may have elevations in prolactin levels associated with enlargement of the pituitary gland (156). In most cases, the serum prolactin levels will return to the normal range with a reduction or discontinuation of the estrogen therapy or discontinuation of cyproterone acetate (157, 174, 175).

The onset and time course of hyperprolactinemia during estrogen treatment are not known. Clinicians should measure prolactin levels at baseline and then at least annually during the transition period and every 2 years thereafter. Given that only a few case studies reported prolactinomas, and prolactinomas were not reported in large cohorts of estrogen-treated persons, the risk is likely to be very low. Because the major presenting findings of microprolactinomas (hypogonadism and sometimes gynecomastia) are not apparent in transgender females, clinicians may perform radiologic examinations of the pituitary in those patients whose prolactin levels persistently increase despite stable or reduced estrogen levels. Some transgender individuals receive psychotropic medications that can increase prolactin levels (174).

---

**Table 15.    Monitoring of Transgender Persons on Gender-Affirming Hormone Therapy: Transgender Female**

---

1. Evaluate patient every 3 mo in the first year and then one to two times per year to monitor for appropriate signs of feminization and for development of adverse reactions.
2. Measure serum testosterone and estradiol every 3 mo.
    a. Serum testosterone levels should be <50 ng/dL.
    b. Serum estradiol should not exceed the peak physiologic range: 100–200 pg/mL.
3. For individuals on spironolactone, serum electrolytes, particularly potassium, should be monitored every 3 mo in the first year and annually thereafter.
4. Routine cancer screening is recommended, as in nontransgender individuals (all tissues present).
5. Consider BMD testing at baseline (160). In individuals at low risk, screening for osteoporosis should be conducted at age 60 years or in those who are not compliant with hormone therapy.

---

This table presents strong recommendations and does not include lower level recommendations.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

4.3. We suggest that clinicians evaluate transgender persons treated with hormones for cardiovascular risk factors using fasting lipid profiles, diabetes screening, and/or other diagnostic tools. (2 |⊕⊕○○)

## Evidence

### Transgender males

Administering testosterone to transgender males results in a more atherogenic lipid profile with lowered high-density lipoprotein cholesterol and higher triglyceride and low-density lipoprotein cholesterol values (176–179). Studies of the effect of testosterone on insulin sensitivity have mixed results (178, 180). A randomized, open-label uncontrolled safety study of transgender males treated with testosterone undecanoate demonstrated no insulin resistance after 1 year (181, 182). Numerous studies have demonstrated the effects of sex hormone treatment on the cardiovascular system (160, 179, 183, 184). Long-term studies from The Netherlands found no increased risk for cardiovascular mortality (161). Likewise, a meta-analysis of 19 randomized trials in nontransgender males on testosterone replacement showed no increased incidence of cardiovascular events (185). A systematic review of the literature found that data were insufficient (due to very low–quality evidence) to allow a meaningful assessment of patient-important outcomes, such as death, stroke, myocardial infarction, or VTE in transgender males (176). Future research is needed to ascertain the potential harm of hormonal therapies (176). Clinicians should manage cardiovascular risk factors as they emerge according to established guidelines (186).

### Transgender females

A prospective study of transgender females found favorable changes in lipid parameters with increased high-density lipoprotein and decreased low-density lipoprotein concentrations (178). However, increased weight, blood pressure, and markers of insulin resistance attenuated these favorable lipid changes. In a meta-analysis, only serum triglycerides were higher at ≥24 months without changes in other parameters (187). The largest cohort of transgender females (mean age 41 years, followed for a mean of 10 years) showed no increase in cardiovascular mortality despite a 32% rate of tobacco use (161).

Thus, there is limited evidence to determine whether estrogen is protective or detrimental on lipid and glucose metabolism in transgender females (176). With aging, there is usually an increase of body weight. Therefore, as with nontransgender individuals, clinicians should monitor and manage glucose and lipid metabolism and blood pressure regularly according to established guidelines (186).

4.4. We recommend that clinicians obtain BMD measurements when risk factors for osteoporosis exist, specifically in those who stop sex hormone therapy after gonadectomy. (1 |⊕⊕○○)

## Evidence

### Transgender males

Baseline bone mineral measurements in transgender males are generally in the expected range for their pre-treatment gender (188). However, adequate dosing of testosterone is important to maintain bone mass in transgender males (189, 190). In one study (190), serum LH levels were inversely related to BMD, suggesting that low levels of sex hormones were associated with bone loss. Thus, LH levels in the normal range may serve as an indicator of the adequacy of sex steroid administration to preserve bone mass. The protective effect of testosterone may be mediated by peripheral conversion to estradiol, both systemically and locally in the bone.

### Transgender females

A baseline study of BMD reported T scores less than −2.5 in 16% of transgender females (191). In aging males, studies suggest that serum estradiol more positively correlates with BMD than does testosterone (192, 193) and is more important for peak bone mass (194). Estrogen preserves BMD in transgender females who continue on estrogen and antiandrogen therapies (188, 190, 191, 195, 196).

Fracture data in transgender males and females are not available. Transgender persons who have undergone gonadectomy may choose not to continue consistent sex steroid treatment after hormonal and surgical sex reassignment, thereby becoming at risk for bone loss. There have been no studies to determine whether clinicians should use the sex assigned at birth or affirmed gender for assessing osteoporosis (e.g., when using the FRAX tool). Although some researchers use the sex assigned at birth (with the assumption that bone mass has usually peaked for transgender people who initiate hormones in early adulthood), this should be assessed on a case-by-case basis until there are more data available. This assumption will be further complicated by the increasing prevalence of transgender people who undergo hormonal transition at a pubertal age or soon after puberty. Sex for comparison within risk assessment tools may be based on the age at which hormones were initiated and the length of exposure to hormones. In some cases, it may be

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

**3892**    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

reasonable to assess risk using both the male and female calculators and using an intermediate value. Because all subjects underwent normal pubertal development, with known effects on bone size, reference values for birth sex were used for all participants (154).

> 4.5. We suggest that transgender females with no known increased risk of breast cancer follow breast-screening guidelines recommended for those designated female at birth. (2 |⊕⊕○○)
>
> 4.6. We suggest that transgender females treated with estrogens follow individualized screening according to personal risk for prostatic disease and prostate cancer. (2 |⊕○○○)

### Evidence

Studies have reported a few cases of breast cancer in transgender females (197–200). A Dutch study of 1800 transgender females followed for a mean of 15 years (range of 1 30 years) found one case of breast cancer. The Women's Health Initiative study reported that females taking conjugated equine estrogen without progesterone for 7 years did not have an increased risk of breast cancer as compared with females taking placebo (137).

In transgender males, a large retrospective study conducted at the U.S. Veterans Affairs medical health system identified seven breast cancers (194). The authors reported that this was not above the expected rate of breast cancers in cisgender females in this cohort. Furthermore, they did report one breast cancer that developed in a transgender male patient after mastectomy, supporting the fact that breast cancer can occur even after mastectomy. Indeed, there have been case reports of breast cancer developing in subareolar tissue in transgender males, which occurred after mastectomy (201, 202).

Women with primary hypogonadism (Turner syndrome) treated with estrogen replacement exhibited a significantly decreased incidence of breast cancer as compared with national standardized incidence ratios (203, 204). These studies suggest that estrogen therapy does not increase the risk of breast cancer in the short term (<20 to 30 years). We need long-term studies to determine the actual risk, as well as the role of screening mammograms. Regular examinations and gynecologic advice should determine monitoring for breast cancer.

Prostate cancer is very rare before the age of 40, especially with androgen deprivation therapy (205). Childhood or pubertal castration results in regression of the prostate and adult castration reverses benign prostate hypertrophy (206). Although van Kesteren *et al.* (207) reported that estrogen therapy does not induce hypertrophy or premalignant changes in the prostates of transgender females, studies have reported cases of benign prostatic hyperplasia in transgender females treated with estrogens for 20 to 25 years (208, 209). Studies have also reported a few cases of prostate carcinoma in transgender females (210–214).

Transgender females may feel uncomfortable scheduling regular prostate examinations. Gynecologists are not trained to screen for prostate cancer or to monitor prostate growth. Thus, it may be reasonable for transgender females who transitioned after age 20 years to have annual screening digital rectal examinations after age 50 years and prostate-specific antigen tests consistent with U.S. Preventive Services Task Force Guidelines (215).

> 4.7. We advise that clinicians determine the medical necessity of including a total hysterectomy and oophorectomy as part of gender-affirming surgery. (Ungraded Good Practice Statement)

### Evidence

Although aromatization of testosterone to estradiol in transgender males has been suggested as a risk factor for endometrial cancer (216), no cases have been reported. When transgender males undergo hysterectomy, the uterus is small and there is endometrial atrophy (217, 218). Studies have reported cases of ovarian cancer (219, 220). Although there is limited evidence for increased risk of reproductive tract cancers in transgender males, health care providers should determine the medical necessity of a laparoscopic total hysterectomy as part of a gender-affirming surgery to prevent reproductive tract cancer (221).

### Values

Given the discomfort that transgender males experience accessing gynecologic care, our recommendation for the medical necessity of total hysterectomy and oophorectomy places a high value on eliminating the risks of female reproductive tract disease and cancer and a lower value on avoiding the risks of these surgical procedures (related to the surgery and to the potential undesirable health consequences of oophorectomy) and their associated costs.

### Remarks

The sexual orientation and type of sexual practices will determine the need and types of gynecologic care required following transition. Additionally, in certain countries, the approval required to change the sex in a birth certificate for transgender males may be dependent on having a complete hysterectomy. Clinicians should help patients research nonmedical administrative criteria and

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

provide counseling. If individuals decide not to undergo hysterectomy, screening for cervical cancer is the same as all other females.

## 5.0 Surgery for Sex Reassignment and Gender Confirmation

For many transgender adults, genital gender-affirming surgery may be the necessary step toward achieving their ultimate goal of living successfully in their desired gender role. The type of surgery falls into two main categories: (1) those that directly affect fertility and (2) those that do not. Those that change fertility (previously called sex reassignment surgery) include genital surgery to remove the penis and gonads in the male and removal of the uterus and gonads in the female. The surgeries that effect fertility are often governed by the legal system of the state or country in which they are performed. Other gender-conforming surgeries that do not directly affect fertility are not so tightly governed.

Gender-affirming surgical techniques have improved markedly during the past 10 years. Reconstructive genital surgery that preserves neurologic sensation is now the standard. The satisfaction rate with surgical reassignment of sex is now very high (187). Additionally, the mental health of the individual seems to be improved by participating in a treatment program that defines a pathway of gender-affirming treatment that includes hormones and surgery (130, 144) (Table 16).

Surgery that affects fertility is irreversible. The World Professional Association for Transgender Health Standards of Care (222) emphasizes that the "threshold of 18 should not be seen as an indication in itself for active intervention." If the social transition has not been satisfactory, if the person is not satisfied with or is ambivalent about the effects of sex hormone treatment, or if the person is ambivalent about surgery then the individual should not be referred for surgery (223, 224).

Gender-affirming genital surgeries for transgender females that affect fertility include gonadectomy, penectomy, and creation of a neovagina (225, 226). Surgeons often invert the skin of the penis to form the wall of the vagina, and several literatures reviews have reported on outcomes (227). Sometimes there is inadequate tissue to form a full neovagina, so clinicians have revisited using intestine and found it to be successful (87, 228, 229). Some newer vaginoplasty techniques may involve autologous oral epithelial cells (230, 231).

The scrotum becomes the labia majora. Surgeons use reconstructive surgery to fashion the clitoris and its hood, preserving the neurovascular bundle at the tip of the penis as the neurosensory supply to the clitoris. Some surgeons are also creating a sensate pedicled-spot adding a G spot to the neovagina to increase sensation (232). Most recently, plastic surgeons have developed techniques to fashion labia minora. To further complete the feminization, uterine transplants have been proposed and even attempted (233).

Neovaginal prolapse, rectovaginal fistula, delayed healing, vaginal stenosis, and other complications do sometimes occur (234, 235). Clinicians should strongly remind the transgender person to use their dilators to maintain the depth and width of the vagina throughout the postoperative period. Genital sexual responsivity and other aspects of sexual function are usually preserved following genital gender-affirming surgery (236, 237).

Ancillary surgeries for more feminine or masculine appearance are not within the scope of this guideline. Voice therapy by a speech language pathologist is available to transform speech patterns to the affirmed gender (148). Spontaneous voice deepening occurs during testosterone treatment of transgender males (152, 238). No studies have compared the effectiveness of speech therapy, laryngeal surgery, or combined treatment.

Breast surgery is a good example of gender-confirming surgery that does not affect fertility. In all females, breast size exhibits a very broad spectrum. For transgender females to make the best informed decision, clinicians should delay breast augmentation surgery until the patient has completed at least 2 years of estrogen therapy, because the breasts continue to grow during that time (141, 155).

Another major procedure is the removal of facial and masculine-appearing body hair using either electrolysis or

---

**Table 16.    Criteria for Gender-Affirming Surgery, Which Affects Fertility**

1. Persistent, well-documented gender dysphoria
2. Legal age of majority in the given country
3. Having continuously and responsibly used gender-affirming hormones for 12 mo (if there is no medical contraindication to receiving such therapy)
4. Successful continuous full-time living in the new gender role for 12 mo
5. If significant medical or mental health concerns are present, they must be well controlled
6. Demonstrable knowledge of all practical aspects of surgery (*e.g.*, cost, required lengths of hospitalizations, likely complications, postsurgical rehabilitation)

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157553 by National Library of Education user on 15 August 2024

**3894**   Hembree et al   Guidelines on Gender-Dysphoric/Gender-Incongruent Persons   J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

laser treatments. Other feminizing surgeries, such as that to feminize the face, are now becoming more popular (239–241).

In transgender males, clinicians usually delay gender-affirming genital surgeries until after a few years of androgen therapy. Those surgeries that affect fertility in this group include oophorectomy, vaginectomy, and complete hysterectomy. Surgeons can safely perform them vaginally with laparoscopy. These are sometimes done in conjunction with the creation of a neopenis. The cosmetic appearance of a neopenis is now very good, but the surgery is multistage and very expensive (242, 243). Radial forearm flap seems to be the most satisfactory procedure (228, 244). Other flaps also exist (245). Surgeons can make neopenile erections possible by reinervation of the flap and subsequent contraction of the muscle, leading to stiffening of the neopenis (246, 247), but results are inconsistent (248). Surgeons can also stiffen the penis by imbedding some mechanical device (*e.g.*, a rod or some inflatable apparatus) (249, 250). Because of these limitations, the creation of a neopenis has often been less than satisfactory. Recently, penis transplants are being proposed (233).

In fact, most transgender males do not have any external genital surgery because of the lack of access, high cost, and significant potential complications. Some choose a metaoidioplasty that brings forward the clitoris, thereby allowing them to void in a standing position without wetting themselves (251, 252). Surgeons can create the scrotum from the labia majora with good cosmetic effect and can implant testicular prostheses (253).

The most important masculinizing surgery for the transgender male is mastectomy, and it does not affect fertility. Breast size only partially regresses with androgen therapy (155). In adults, discussions about mastectomy usually take place after androgen therapy has started. Because some transgender male adolescents present after significant breast development has occurred, they may also consider mastectomy 2 years after they begin androgen therapy and before age 18 years. Clinicians should individualize treatment based on the physical and mental health status of the individual. There are now newer approaches to mastectomy with better outcomes (254, 255). These often involve chest contouring (256). Mastectomy is often necessary for living comfortably in the new gender (256).

5.1. We recommend that a patient pursue genital gender-affirming surgery only after the MHP and the clinician responsible for endocrine transition therapy both agree that surgery is medically necessary and would benefit the patient's overall health and/or well-being. (1 |⊕⊕○○)

5.2. We advise that clinicians approve genital gender-affirming surgery only after completion of at least 1 year of consistent and compliant hormone treatment, unless hormone therapy is not desired or medically contraindicated. (Ungraded Good Practice Statement)

5.3. We advise that the clinician responsible for endocrine treatment and the primary care provider ensure appropriate medical clearance of transgender individuals for genital gender-affirming surgery and collaborate with the surgeon regarding hormone use during and after surgery. (Ungraded Good Practice Statement)

5.4. We recommend that clinicians refer hormone-treated transgender individuals for genital surgery when: (1) the individual has had a satisfactory social role change, (2) the individual is satisfied about the hormonal effects, and (3) the individual desires definitive surgical changes. (1 |⊕○○○)

5.5. We suggest that clinicians delay gender-affirming genital surgery involving gonadectomy and/or hysterectomy until the patient is at least 18 years old or legal age of majority in his or her country. (2 |⊕⊕○○).

5.6. We suggest that clinicians determine the timing of breast surgery for transgender males based upon the physical and mental health status of the individual. There is insufficient evidence to recommend a specific age requirement. (2 |⊕○○○)

### Evidence

Owing to the lack of controlled studies, incomplete follow-up, and lack of valid assessment measures, evaluating various surgical approaches and techniques is difficult. However, one systematic review including a large numbers of studies reported satisfactory cosmetic and functional results for vaginoplasty/neovagina construction (257). For transgender males, the outcomes are less certain. However, the problems are now better understood (258). Several postoperative studies report significant long-term psychological and psychiatric pathology (259–261). One study showed satisfaction with breasts, genitals, and femininity increased significantly and showed the importance of surgical treatment as a key therapeutic option for transgender females (262). Another analysis demonstrated that, despite the young average age at death following surgery and the relatively larger number of individuals with somatic morbidity, the study does not allow for determination of

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

causal relationships between, for example, specific types of hormonal or surgical treatment received and somatic morbidity and mortality (263). Reversal surgery in regretful male-to-female transsexuals after sexual reassignment surgery represents a complex, multistage procedure with satisfactory outcomes. Further insight into the characteristics of persons who regret their decision postoperatively would facilitate better future selection of applicants eligible for sexual reassignment surgery. We need more studies with appropriate controls that examine long-term quality of life, psychosocial outcomes, and psychiatric outcomes to determine the long-term benefits of surgical treatment.

When a transgender individual decides to have gender-affirming surgery, both the hormone prescribing clinician and the MHP must certify that the patient satisfies criteria for gender-affirming surgery (Table 16).

There is some concern that estrogen therapy may cause an increased risk for venous thrombosis during or following surgery (176). For this reason, the surgeon and the hormone-prescribing clinician should collaborate in making a decision about the use of hormones before and following surgery. One study suggests that preoperative factors (such as compliance) are less important for patient satisfaction than are the physical postoperative results (56). However, other studies and clinical experience dictate that individuals who do not follow medical instructions and do not work with their physicians toward a common goal do not achieve treatment goals (264) and experience higher rates of postoperative infections and other complications (265, 266). It is also important that the person requesting surgery feels comfortable with the anatomical changes that have occurred during hormone therapy. Dissatisfaction with social and physical outcomes during the hormone transition may be a contraindication to surgery (223).

An endocrinologist or experienced medical provider should monitor transgender individuals after surgery. Those who undergo gonadectomy will require hormone replacement therapy, surveillance, or both to prevent adverse effects of chronic hormone deficiency.

## Financial Disclosures of the Task Force*

**Wylie C. Hembree (chair)**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **Peggy T. Cohen-Kettenis**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **Louis Gooren**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **Sabine E. Hannema**—financial or business/organizational interests: none declared, significant financial interest or leadership position: Ferring Pharmaceuticals Inc. (lecture/conference), Pfizer (lecture). **Walter J. Meyer**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **M. Hassan Murad****—financial or business/organizational interests: Mayo Clinic, Evidence-based Practice Center, significant financial interest or leadership position: none declared. **Stephen M. Rosenthal**—financial or business/organizational interests: AbbVie (consultant), National Institutes of Health (grantee), significant financial interest or leadership position: Pediatric Endocrine Society (immediate past president). **Joshua D. Safer, FACP**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **Vin Tangpricha**—financial or business/organizational interests: Cystic Fibrosis Foundation (grantee), National Institutes of Health (grantee), significant financial interest or leadership position, Elsevier *Journal of Clinical and Translational Endocrinology* (editor). **Guy G. T'Sjoen**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared.* Financial, business, and organizational disclosures of the task force cover the year prior to publication. Disclosures prior to this time period are archived.**Evidence-based reviews for this guideline were prepared under contract with the Endocrine Society.

## Acknowledgments

*Correspondence and Reprint Requests:*    The Endocrine Society, 2055 L Street NW, Suite 600, Washington, DC 20036. E-mail: publications@endocrine.org; Phone: 202971-3636.
    *Disclosure Summary:*    See Financial Disclosures.

    *Disclaimer:* The Endocrine Society's clinical practice guidelines are developed to be of assistance to endocrinologists by providing guidance and recommendations for particular areas of practice. The guidelines should not be considered inclusive of all proper approaches or methods, or exclusive of others. The guidelines cannot guarantee any specific outcome, nor do they establish a standard of care. The guidelines are not intended to dictate the treatment of a particular patient. Treatment decisions must be made based on the independent judgement of healthcare providers and each patient's individual circumstances.

    The Endocrine Society makes no warranty, express or implied, regarding the guidelines and specifically excludes any warranties of merchantability and fitness for a particular use or purpose. The Society shall not be liable for direct, indirect,

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157553 by National Library of Education user on 15 August 2024

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

special, incidental, or consequential damages related to the use of the information contained herein.

# References

1. Atkins D, Best D, Briss PA, Eccles M, Falck-Ytter Y, Flottorp S, Guyatt GH, Harbour RT, Haugh MC, Henry D, Hill S, Jaeschke R, Leng G, Liberati A, Magrini N, Mason J, Middleton P, Mrukowicz J, O'Connell D, Oxman AD, Phillips B, Schünemann HJ, Edejer T, Varonen H, Vist GE, Williams JW, Jr, Zaza S; GRADE Working Group. Grading quality of evidence and strength of recommendations. *BMJ.* 2004;**328**(7454):1490.

2. Swiglo BA, Murad MH, Schünemann HJ, Kunz R, Vigersky RA, Guyatt GH, Montori VM. A case for clarity, consistency, and helpfulness: state-of-the-art clinical practice guidelines in endocrinology using the grading of recommendations, assessment, development, and evaluation system. *J Clin Endocrinol Metab.* 2008;**93**(3):666–673.

3. Bullough VL. Transsexualism in history. *Arch Sex Behav.* 1975;**4**(5):561–571.

4. Benjamin H. The transsexual phenomenon. *Trans N Y Acad Sci.* 1967;**29**(4):428–430.

5. Meyerowitz J. *How Sex Changed: A History of Transsexuality in the United States.* Cambridge, MA: Harvard University Press; 2002.

6. Hirschfeld M. *Was muss das Volk vom Dritten Geschlecht wissen.* Verlag Max Spohr, Leipzig; 1901.

7. Fisk NM. Editorial: Gender dysphoria syndrome—the conceptualization that liberalizes indications for total gender reorientation and implies a broadly based multi-dimensional rehabilitative regimen. *West J Med.* 1974;**120**(5):386–391.

8. Diamond L. Transgender experience and identity. In: Schwartz SJ, Luyckx K, Vignoles VL, eds. *Handbook of Identity Theory and Research.* New York, NY: Springer; 2011:629–647.

9. Queen C, Schimel L, eds. *PoMoSexuals: Challenging Assumptions About Gender and Sexuality.* San Francisco, CA: Cleis Press; 1997.

10. Case LK, Ramachandran VS. Alternating gender incongruity: a new neuropsychiatric syndrome providing insight into the dynamic plasticity of brain-sex. *Med Hypotheses.* 2012;**78**(5):626–631.

11. Johnson TW, Wassersug RJ. Gender identity disorder outside the binary: when gender identity disorder-not otherwise specified is not good enough. *Arch Sex Behav.* 2010;**39**(3):597–598.

12. Wibowo E, Wassersug R, Warkentin K, Walker L, Robinson J, Brotto L, Johnson T. Impact of androgen deprivation therapy on sexual function: a response. *Asian J Androl.* 2012;**14**(5):793–794.

13. Pasquesoone V. 7 countries giving transgender people fundamental rights the U.S. still won't. 2014. Available at: https://mic.com/articles/87149/7-countries-giving-transgender-people-fundamental-rights-the-u-s-still-won-t. Accessed 26 August 2016.

14. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders.* 5th ed. Arlington, VA: American Psychiatric Association Publishing.

15. Drescher J, Cohen-Kettenis P, Winter S. Minding the body: situating gender identity diagnoses in the ICD-11. *Int Rev Psychiatry.* 2012;**24**(6):568–577.

16. World Professional Association for Transgender Health. Standards of care for the health of transsexual, transgender, and gender nonconforming people. Available at: http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=3926. Accessed 1 September 2017.

17. Kreukels BP, Haraldsen IR, De Cuypere G, Richter-Appelt H, Gijs L, Cohen-Kettenis P. A European network for the investigation of gender incongruence: the ENIGI initiative. *Eur Psychiatry.* 2012;**27**(6):445–450.

18. Dekker MJ, Wierckx K, Van Caenegem E, Klaver M, Kreukels BP, Elaut E, Fisher AD, van Trotsenburg MA, Schreiner T, den Heijer M, T'Sjoen G. A European network for the investigation of gender incongruence: endocrine part. *J Sex Med.* 2016;**13**(6):994–999.

19. Ruble DN, Martin CL, Berenbaum SA. Gender development. In: Damon WL, Lerner RM, Eisenberg N, eds. *Handbook of Child Psychology: Social, Emotional, and Personality Development.* **Vol. 3.** 6th ed. New York, NY: Wiley; 2006;858–931.

20. Steensma TD, Kreukels BP, de Vries AL, Cohen-Kettenis PT. Gender identity development in adolescence. *Horm Behav.* 2013;**64**(2):288–297.

21. Rosenthal SM. Approach to the patient: transgender youth: endocrine considerations. *J Clin Endocrinol Metab.* 2014;**99**(12):4379–4389.

22. Saraswat A, Weinand JD, Safer JD. Evidence supporting the biologic nature of gender identity. *Endocr Pract.* 2015;**21**(2):199–204.

23. Gooren L. The biology of human psychosexual differentiation. *Horm Behav.* 2006;**50**(4):589–601.

24. Berenbaum SA, Meyer-Bahlburg HF. Gender development and sexuality in disorders of sex development. *Horm Metab Res.* 2015;**47**(5):361–366.

25. Dessens AB, Slijper FME, Drop SLS. Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. *Arch Sex Behav.* 2005;**34**(4):389–397.

26. Meyer-Bahlburg HFL, Dolezal C, Baker SW, Ehrhardt AA, New MI. Gender development in women with congenital adrenal hyperplasia as a function of disorder severity. *Arch Sex Behav.* 2006;**35**(6):667–684.

27. Frisén L, Nordenström A, Falhammar H, Filipsson H, Holmdahl G, Janson PO, Thorén M, Hagenfeldt K, Möller A, Nordenskjöld A. Gender role behavior, sexuality, and psychosocial adaptation in women with congenital adrenal hyperplasia due to CYP21A2 deficiency. *J Clin Endocrinol Metab.* 2009;**94**(9):3432–3439.

28. Meyer-Bahlburg HFL, Dolezal C, Baker SW, Carlson AD, Obeid JS, New MI. Prenatal androgenization affects gender-related behavior but not gender identity in 5–12-year-old girls with congenital adrenal hyperplasia. *Arch Sex Behav.* 2004;**33**(2):97–104.

29. Cohen-Kettenis PT. Gender change in 46,XY persons with 5α-reductase-2 deficiency and 17β-hydroxysteroid dehydrogenase-3 deficiency. *Arch Sex Behav.* 2005;**34**(4):399–410.

30. Reiner WG, Gearhart JP. Discordant sexual identity in some genetic males with cloacal exstrophy assigned to female sex at birth. *N Engl J Med.* 2004;**350**(4):333–341.

31. Meyer-Bahlburg HFL. Gender identity outcome in female-raised 46,XY persons with penile agenesis, cloacal exstrophy of the bladder, or penile ablation. *Arch Sex Behav.* 2005;**34**(4):423–438.

32. Coolidge FL, Thede LL, Young SE. The heritability of gender identity disorder in a child and adolescent twin sample. *Behav Genet.* 2002;**32**(4):251–257.

33. Heylens G, De Cuypere G, Zucker KJ, Schelfaut C, Elaut E, Vanden Bossche H, De Baere E, T'Sjoen G. Gender identity disorder in twins: a review of the case report literature. *J Sex Med.* 2012;**9**(3):751–757.

34. Fernández R, Esteva I, Gómez-Gil E, Rumbo T, Almaraz MC, Roda E, Haro-Mora J-J, Guillamón A, Pásaro E. Association study of ERβ, AR, and CYP19A1 genes and MtF transsexualism. *J Sex Med.* 2014;**11**(12):2986–2994.

35. Henningsson S, Westberg L, Nilsson S, Lundström B, Ekselius L, Bodlund O, Lindström E, Hellstrand M, Rosmond R, Eriksson E, Landén M. Sex steroid-related genes and male-to-female transsexualism. *Psychoneuroendocrinology.* 2005;**30**(7):657–664.

36. Hare L, Bernard P, Sánchez FJ, Baird PN, Vilain E, Kennedy T, Harley VR. Androgen receptor repeat length polymorphism associated with male-to-female transsexualism. *Biol Psychiatry.* 2009;**65**(1):93–96.

37. Lombardo F, Toselli L, Grassetti D, Paoli D, Masciandaro P, Valentini F, Lenzi A, Gandini L. Hormone and genetic study in

doi: 10.1210/jc.2017-01658

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

male to female transsexual patients. *J Endocrinol Invest.* 2013; 36(8):550–557.

38. Ujike H, Otani K, Nakatsuka M, Ishii K, Sasaki A, Oishi T, Sato T, Okahisa Y, Matsumoto Y, Namba Y, Kimata Y, Kuroda S. Association study of gender identity disorder and sex hormone-related genes. *Prog Neuropsychopharmacol Biol Psychiatry.* 2009;33(7):1241–1244.

39. Kreukels BP, Guillamon A. Neuroimaging studies in people with gender incongruence. *Int Rev Psychiatry.* 2016;28(1): 120–128.

40. Steensma TD, Biemond R, de Boer F, Cohen-Kettenis PT. Desisting and persisting gender dysphoria after childhood: a qualitative follow-up study. *Clin Child Psychol Psychiatry.* 2011;16(4):499–516.

41. Wallien MSC, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. *J Am Acad Child Adolesc Psychiatry.* 2008;47(12):1413–1423.

42. Steensma TD, McGuire JK, Kreukels BPC, Beekman AJ, Cohen-Kettenis PT. Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study. *J Am Acad Child Adolesc Psychiatry.* 2013;52(6):582–590.

43. Cohen-Kettenis PT, Owen A, Kaijser VG, Bradley SJ, Zucker KJ. Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: a cross-national, cross-clinic comparative analysis. *J Abnorm Child Psychol.* 2003;31(1):41–53.

44. Dhejne C, Van Vlerken R, Heylens G, Arcelus J. Mental health and gender dysphoria: a review of the literature. *Int Rev Psychiatry.* 2016;28(1):44–57.

45. Pasterski V, Gilligan L, Curtis R. Traits of autism spectrum disorders in adults with gender dysphoria. *Arch Sex Behav.* 2014; 43(2):387–393.

46. Spack NP, Edwards-Leeper L, Feldman HA, Leibowitz S, Mandel F, Diamond DA, Vance SR. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics.* 2012;129(3):418–425.

47. Terada S, Matsumoto Y, Sato T, Okabe N, Kishimoto Y, Uchitomi Y. Factors predicting psychiatric co-morbidity in gender-dysphoric adults. *Psychiatry Res.* 2012;200(2-3):469–474.

48. VanderLaan DP, Leef JH, Wood H, Hughes SK, Zucker KJ. Autism spectrum disorder risk factors and autistic traits in gender dysphoric children. *J Autism Dev Disord.* 2015;45(6):1742–1750.

49. de Vries ALC, Doreleijers TAH, Steensma TD, Cohen-Kettenis PT. Psychiatric comorbidity in gender dysphoric adolescents. *J Child Psychol Psychiatry.* 2011;52(11):1195–1202.

50. de Vries ALC, Noens ILJ, Cohen-Kettenis PT, van Berckelaer-Onnes IA, Doreleijers TA. Autism spectrum disorders in gender dysphoric children and adolescents. *J Autism Dev Disord.* 2010; 40(8):930–936.

51. Wallien MSC, Swaab H, Cohen-Kettenis PT. Psychiatric comorbidity among children with gender identity disorder. *J Am Acad Child Adolesc Psychiatry.* 2007;46(10):1307–1314.

52. Kuiper AJ, Cohen-Kettenis PT. Gender role reversal among postoperative transsexuals. Available at: https://www.atria.nl/ezines/web/IJT/97-03/numbers/symposion/ijtc0502.htm. Accessed 26 August 2016.

53. Landén M, Wålinder J, Hambert G, Lundström B. Factors predictive of regret in sex reassignment. *Acta Psychiatr Scand.* 1998; 97(4):284–289.

54. Olsson S-E, Möller A. Regret after sex reassignment surgery in a male-to-female transsexual: a long-term follow-up. *Arch Sex Behav.* 2006;35(4):501–506.

55. Pfäfflin F, Junge A, eds. *Geschlechtsumwandlung: Abhandlungen zur Transsexualität.* Stuttgart, Germany: Schattauer; 1992.

56. Lawrence AA. Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Arch Sex Behav.* 2003;32(4):299–315.

57. Cohen-Kettenis PT, Pfäfflin F. *Transgenderism and Intersexuality in Childhood and Adolescence: Making Choices.* Thousand Oaks, CA: SAGE Publications; 2003.

58. Di Ceglie D, Freedman D, McPherson S, Richardson P. Children and adolescents referred to a specialist gender identity development service: clinical features and demographic characteristics. Available at: https://www.researchgate.net/publication/276061306_Children_and_Adolescents_Referred_to_a_Specialist_Gender_Identity_Development_Service_Clinical_Features_and_Demographic_Characteristics. Accessed 20 July 2017.

59. Gijs L, Brewaeys A. Surgical treatment of gender dysphoria in adults and adolescents: recent developments, effectiveness, and challenges. *Annu Rev Sex Res.* 2007;18:178–224.

60. Cohen-Kettenis PT, van Goozen SHM. Sex reassignment of adolescent transsexuals: a follow-up study. *J Am Acad Child Adolesc Psychiatry.* 1997;36(2):263–271.

61. Smith YLS, van Goozen SHM, Cohen-Kettenis PT. Adolescents with gender identity disorder who were accepted or rejected for sex reassignment surgery: a prospective follow-up study. *J Am Acad Child Adolesc Psychiatry.* 2001;40(4):472–481.

62. Smith YLS, Van Goozen SHM, Kuiper AJ, Cohen-Kettenis PT. Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychol Med.* 2005;35(1):89–99.

63. de Vries ALC, McGuire JK, Steensma TD, Wagenaar ECF, Doreleijers TAH, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics.* 2014;134(4):696–704.

64. Cole CM, O'Boyle M, Emory LE, Meyer WJ III. Comorbidity of gender dysphoria and other major psychiatric diagnoses. *Arch Sex Behav.* 1997;26(1):13–26.

65. Cohen-Kettenis PT, Schagen SEE, Steensma TD, de Vries ALC, Delemarre-van de Waal HA. Puberty suppression in a gender-dysphoric adolescent: a 22-year follow-up. *Arch Sex Behav.* 2011; 40(4):843–847.

66. First MB. Desire for amputation of a limb: paraphilia, psychosis, or a new type of identity disorder. *Psychol Med.* 2005;35(6): 919–928.

67. Wierckx K, Van Caenegem E, Pennings G, Elaut E, Dedecker D, Van de Peer F, Weyers S, De Sutter P, T'Sjoen G. Reproductive wish in transsexual men. *Hum Reprod.* 2012;27(2):483–487.

68. Wierckx K, Stuyver I, Weyers S, Hamada A, Agarwal A, De Sutter P, T'Sjoen G. Sperm freezing in transsexual women. *Arch Sex Behav.* 2012;41(5):1069–1071.

69. Bertelloni S, Baroncelli GI, Ferdeghini M, Menchini-Fabris F, Saggese G. Final height, gonadal function and bone mineral density of adolescent males with central precocious puberty after therapy with gonadotropin-releasing hormone analogues. *Eur J Pediatr.* 2000;159(5):369–374.

70. Büchter D, Behre HM, Kliesch S, Nieschlag E. Pulsatile GnRH or human chorionic gonadotropin/human menopausal gonadotropin as effective treatment for men with hypogonadotropic hypogonadism: a review of 42 cases. *Eur J Endocrinol.* 1998; 139(3):298–303.

71. Liu PY, Turner L, Rushford D, McDonald J, Baker HW, Conway AJ, Handelsman DJ. Efficacy and safety of recombinant human follicle stimulating hormone (Gonal-F) with urinary human chorionic gonadotrophin for induction of spermatogenesis and fertility in gonadotrophin-deficient men. *Hum Reprod.* 1999; 14(6):1540–1545.

72. Pasquino AM, Pucarelli I, Accardo F, Demiraj V, Segni M, Di Nardo R. Long-term observation of 87 girls with idiopathic central precocious puberty treated with gonadotropin-releasing hormone analogs: impact on adult height, body mass index, bone mineral content, and reproductive function. *J Clin Endocrinol Metab.* 2008;93(1):190–195.

73. Magiakou MA, Manousaki D, Papadaki M, Hadjidakis D, Levidou G, Vakaki M, Papaefstathiou A, Lalioti N, Kanaka-Gantenbein C, Piaditis G, Chrousos GP, Dacou-Voutetakis C. The

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-4    Filed: 08/16/24    Page: 664 of 690 - Page ID#: 5022

3898    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157553 by National Library of Education user on 15 August 2024

efficacy and safety of gonadotropin-releasing hormone analog treatment in childhood and adolescence: a single center, long-term follow-up study. *J Clin Endocrinol Metab.* 2010;95(1):109–117.

74. Baba T, Endo T, Honnma H, Kitajima Y, Hayashi T, Ikeda H, Masumori N, Kamiya H, Moriwaka O, Saito T. Association between polycystic ovary syndrome and female-to-male transsexuality. *Hum Reprod.* 2007;22(4):1011–1016.

75. Spinder T, Spijkstra JJ, van den Tweel JG, Burger CW, van Kessel H, Hompes PGA, Gooren LJG. The effects of long term testosterone administration on pulsatile luteinizing hormone secretion and on ovarian histology in eugonadal female to male transsexual subjects. *J Clin Endocrinol Metab.* 1989;69(1):151–157.

76. Baba T, Endo T, Ikeda K, Shimizu A, Honnma H, Ikeda H, Masumori N, Ohmura T, Kiya T, Fujimoto T, Koizumi M, Saito T. Distinctive features of female-to-male transsexualism and prevalence of gender identity disorder in Japan. *J Sex Med.* 2011; 8(6):1686–1693.

77. Vujovic S, Popovic S, Sbutega-Milosevic G, Djordjevic M, Gooren L. Transsexualism in Serbia: a twenty-year follow-up study. *J Sex Med.* 2009;6(4):1018–1023.

78. Ikeda K, Baba T, Noguchi H, Nagasawa K, Endo T, Kiya T, Saito T. Excessive androgen exposure in female-to-male transsexual persons of reproductive age induces hyperplasia of the ovarian cortex and stroma but not polycystic ovary morphology. *Hum Reprod.* 2013;28(2):453–461.

79. Trebay G. He's pregnant. You're speechles. New York Times. 22 June 2008.

80. Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. *Obstet Gynecol.* 2014;124(6):1120–1127.

81. De Sutter P. Donor inseminations in partners of female-to-male transsexuals: should the question be asked? *Reprod Biomed Online.* 2003;6(3):382, author reply 282–283.

82. De Roo C, Tilleman K, T'Sjoen G, De Sutter P. Fertility options in transgender people. *Int Rev Psychiatry.* 2016;28(1):112–119.

83. Wennink JMB, Delemarre-van de Waal HA, Schoemaker R, Schoemaker H, Schoemaker J. Luteinizing hormone and follicle stimulating hormone secretion patterns in boys throughout puberty measured using highly sensitive immunoradiometric assays. *Clin Endocrinol (Oxf).* 1989;31(5):551–564.

84. Cohen-Kettenis PT, Delemarre-van de Waal HA, Gooren LJG. The treatment of adolescent transsexuals: changing insights. *J Sex Med.* 2008;5(8):1892–1897.

85. Delemarre-van de Waal HA, Cohen-Kettenis PT. Clinical management of gender identity disorder in adolescents: a protocol on psychological and paediatric endocrinology aspects. *Eur J Endocrinol.* 2006;155:S131–S137.

86. de Vries ALC, Steensma TD, Doreleijers TAH, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med.* 2011;8(8):2276–2283.

87. Bouman MB, van Zeijl MCT, Buncamper ME, Meijerink WJHJ, van Bodegraven AA, Mullender MG. Intestinal vaginoplasty revisited: a review of surgical techniques, complications, and sexual function. *J Sex Med.* 2014;11(7):1835–1847.

88. Carel JC, Eugster EA, Rogol A, Ghizzoni L, Palmert MR, Antoniazzi F, Berenbaum S, Bourguignon JP, Chrousos GP, Coste J, Deal S, de Vries L, Foster C, Heger S, Holland J, Jahnukainen K, Juul A, Kaplowitz P, Lahlou N, Lee MM, Lee P, Merke DP, Neely EK, Oostdijk W, Phillip M, Rosenfield RL, Shulman D, Styne D, Tauber M, Wit JM; ESPE-LWPES GnRH Analogs Consensus Conference Group. Consensus statement on the use of gonadotropin-releasing hormone analogs in children. *Pediatrics.* 2009;123(4):e752–e762.

89. Roth CL, Brendel L, Rückert C, Hartmann K. Antagonistic and agonistic GnRH analogue treatment of precocious puberty: tracking gonadotropin concentrations in urine. *Horm Res.* 2005; 63(5):257–262.

90. Roth C. Therapeutic potential of GnRH antagonists in the treatment of precocious puberty. *Expert Opin Investig Drugs.* 2002;11(9):1253–1259.

91. Tuvemo T. Treatment of central precocious puberty. *Expert Opin Investig Drugs.* 2006;15(5):495–505.

92. Schagen SE, Cohen-Kettenis PT, Delemarre-van de Waal HA, Hannema SE. Efficacy and safety of gonadotropin-releasing hormone agonist treatment to suppress puberty in gender dysphoric adolescents. *J Sex Med.* 2016;13(7):1125–1132.

93. Manasco PK, Pescovitz OH, Feuillan PP, Hench KD, Barnes KM, Jones J, Hill SC, Loriaux DL, Cutler GB, Jr. Resumption of puberty after long term luteinizing hormone-releasing hormone agonist treatment of central precocious puberty. *J Clin Endocrinol Metab.* 1988;67(2):368–372.

94. Klink D, Caris M, Heijboer A, van Trotsenburg M, Rotteveel J. Bone mass in young adulthood following gonadotropin-releasing hormone analog treatment and cross-sex hormone treatment in adolescents with gender dysphoria. *J Clin Endocrinol Metab.* 2015;100(2):E270–E275.

95. Finkelstein JS, Klibanski A, Neer RM. A longitudinal evaluation of bone mineral density in adult men with histories of delayed puberty. *J Clin Endocrinol Metab.* 1996;81(3):1152–1155.

96. Bertelloni S, Baroncelli GI, Ferdeghini M, Perri G, Saggese G. Normal volumetric bone mineral density and bone turnover in young men with histories of constitutional delay of puberty. *J Clin Endocrinol Metab.* 1998;83(12):4280–4283.

97. Darelid A, Ohlsson C, Nilsson M, Kindblom JM, Mellström D, Lorentzon M. Catch up in bone acquisition in young adult men with late normal puberty. *J Bone Miner Res.* 2012;27(10):2198–2207.

98. Mittan D, Lee S, Miller E, Perez RC, Basler JW, Bruder JM. Bone loss following hypogonadism in men with prostate cancer treated with GnRH analogs. *J Clin Endocrinol Metab.* 2002;87(8):3656–3661.

99. Saggese G, Bertelloni S, Baroncelli GI, Battini R, Franchi G. Reduction of bone density: an effect of gonadotropin releasing hormone analogue treatment in central precocious puberty. *Eur J Pediatr.* 1993;152(9):717–720.

100. Neely EK, Bachrach LK, Hintz RL, Habiby RL, Slemenda CW, Feezle L, Pescovitz OH. Bone mineral density during treatment of central precocious puberty. *J Pediatr.* 1995;127(5):819–822.

101. Bertelloni S, Baroncelli GI, Sorrentino MC, Perri G, Saggese G. Effect of central precocious puberty and gonadotropin-releasing hormone analogue treatment on peak bone mass and final height in females. *Eur J Pediatr.* 1998;157(5):363–367.

102. Thornton P, Silverman LA, Geffner ME, Neely EK, Gould E, Danoff TM. Review of outcomes after cessation of gonadotropin-releasing hormone agonist treatment of girls with precocious puberty. *Pediatr Endocrinol Rev.* 2014;11(3):306–317.

103. Lem AJ, van der Kaay DC, Hokken-Koelega AC. Bone mineral density and body composition in short children born SGA during growth hormone and gonadotropin-releasing hormone analog treatment. *J Clin Endocrinol Metab.* 2013;98(1):77–86.

104. Antoniazzi F, Zamboni G, Bertoldo F, Lauriola S, Mengarda F, Pietrobelli A, Tatò L. Bone mass at final height in precocious puberty after gonadotropin-releasing hormone agonist with and without calcium supplementation. *J Clin Endocrinol Metab.* 2003;88(3):1096–1101.

105. Calcaterra V, Mannarino S, Corana G, Codazzi AC, Mazzola A, Brambilla P, Larizza D. Hypertension during therapy with triptorelin in a girl with precocious puberty. *Indian J Pediatr.* 2013; 80(10):884–885.

106. Siomou E, Kosmeri C, Pavlou M, Vlahos AP, Argyropoulou MI, Siamopoulou A. Arterial hypertension during treatment with triptorelin in a child with Williams-Beuren syndrome. *Pediatr Nephrol.* 2014;29(9):1633–1636.

107. Staphorsius AS, Kreukels BPC, Cohen-Kettenis PT, Veltman DJ, Burke SM, Schagen SEE, Wouters FM, Delemarre-van de Waal

doi: 10.1210/jc.2017-01658

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

HA, Bakker J. Puberty suppression and executive functioning: an fMRI-study in adolescents with gender dysphoria. *Psychoneuro-endocrinology*. 2015;**56**:190–199.

108. Hough D, Bellingham M, Haraldsen IR, McLaughlin M, Rennie M, Robinson JE, Solbakk AK, Evans NP. Spatial memory is impaired by peripubertal GnRH agonist treatment and testosterone replacement in sheep. *Psychoneuroendocrinology*. 2017; **75**:173–182.

109. Collipp PJ, Kaplan SA, Boyle DC, Plachte F, Kogut MD. Constitutional Isosexual Precocious Puberty. *Am J Dis Child*. 1964; **108**:399–405.

110. Hahn HB, Jr, Hayles AB, Albert A. Medroxyprogesterone and constitutional precocious puberty. *Mayo Clin Proc*. 1964;**39**: 182–190.

111. Kaplan SA, Ling SM, Irani NG. Idiopathic isosexual precocity. *Am J Dis Child*. 1968;**116**(6):591–598.

112. Schoen EJ. Treatment of idiopathic precocious puberty in boys. *J Clin Endocrinol Metab*. 1966;**26**(4):363–370.

113. Gooren L. Hormone treatment of the adult transsexual patient. *Horm Res*. 2005;**64**(Suppl 2):31–36.

114. Moore E, Wisniewski A, Dobs A. Endocrine treatment of transsexual people: a review of treatment regimens, outcomes, and adverse effects. *J Clin Endocrinol Metab*. 2003;**88**(8):3467–3473.

115. Krueger RB, Hembree W, Hill M. Prescription of medroxyprogesterone acetate to a patient with pedophilia, resulting in Cushing's syndrome and adrenal insufficiency. *Sex Abuse*. 2006; **18**(2):227–228.

116. Lynch MM, Khandheria MM, Meyer WJ. Retrospective study of the management of childhood and adolescent gender identity disorder using medroxyprogesterone acetate. *Int J Transgenderism*. 2015;**16**:201–208.

117. Tack LJW, Craen M, Dhondt K, Vanden Bossche H, Laridaen J, Cools M. Consecutive lynestrenol and cross-sex hormone treatment in biological female adolescents with gender dysphoria: a retrospective analysis. *Biol Sex Differ*. 2016;**7**:14.

118. Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ 3rd, Spack NP, Tangpricha V, Montori VM; Endocrine Society. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2009;**94**(9):3132–3154.

119. Mann L, Harmoni R, Power C. Adolescent decision-making: the development of competence. *J Adolesc*. 1989;**12**(3):265–278.

120. Stultiëns L, Goffin T, Borry P, Dierickx K, Nys H. Minors and informed consent: a comparative approach. *Eur J Health Law*. 2007;**14**(1):21–46.

121. Arshagouni P. "But I'm an adult now ... sort of". Adolescent consent in health care decision-making and the adolescent brain. Available at: http://digitalcommons.law.umaryland.edu/cgi/viewcontent.cgi?article=1124&context=jhclp. Accessed 25 June 2017.

122. NHS. Prescribing of cross-sex hormones as part of the gender identity development service for children and adolescents. Available at: https://www.england.nhs.uk/commissioning/wp-content/uploads/sites/12/2016/08/clinical-com-pol-16046p.pdf. Accessed 14 June 2017.

123. Ankarberg-Lindgren C, Kriström B, Norjavaara E. Physiological estrogen replacement therapy for puberty induction in girls: a clinical observational study. *Horm Res Paediatr*. 2014;**81**(4): 239–244.

124. Olson J, Schrager SM, Clark LF, Dunlap SL, Belzer M. Subcutaneous testosterone: an effective delivery mechanism for masculinizing young transgender men. *LGBT Health*. 2014;**1**(3): 165–167.

125. Spratt DI, Stewart I, Savage C, Craig W, Spack NP, Chandler DW, Spratt LV, Eimicke T, Olshan JS. Subcutaneous injection of testosterone is an effective and preferred alternative to intramuscular injection: demonstration in female-to-male transgender patients. *J Clin Endocrinol Metab*. 2017. doi:10.1210/jc.2017-00359

126. Eisenegger C, von Eckardstein A, Fehr E, von Eckardstein S. Pharmacokinetics of testosterone and estradiol gel preparations in healthy young men. *Psychoneuroendocrinology*. 2013;**38**(2): 171–178.

127. de Ronde W, ten Kulve J, Woerdeman J, Kaufman J-M, de Jong FH. Effects of oestradiol on gonadotrophin levels in normal and castrated men. *Clin Endocrinol (Oxf)*. 2009;**71**(6):874–879.

128. Money J, Ehrhardt A. Man & woman, boy & girl: differentiation and dimorphism of gender identity from conception to maturity. Baltimore, MD: Johns Hopkins University Press; 1972:202–206.

129. Heylens G, Verroken C, De Cock S, T'Sjoen G, De Cuypere G. Effects of different steps in gender reassignment therapy on psychopathology: a prospective study of persons with a gender identity disorder. *J Sex Med*. 2014;**11**(1):119–126.

130. Costa R, Colizzi M. The effect of cross-sex hormonal treatment on gender dysphoria individuals' mental health: a systematic review. *Neuropsychiatr Dis Treat*. 2016;**12**:1953–1966.

131. Gooren LJG, Giltay EJ. Review of studies of androgen treatment of female-to-male transsexuals: effects and risks of administration of androgens to females. *J Sex Med*. 2008;**5**(4):765–776.

132. Levy A, Crown A, Reid R. Endocrine intervention for transsexuals. *Clin Endocrinol (Oxf)*. 2003;**59**(4):409–418.

133. Tangpricha V, Ducharme SH, Barber TW, Chipkin SR. Endocrinologic treatment of gender identity disorders. *Endocr Pract*. 2003;**9**(1):12–21.

134. Meriggiola MC, Gava G. Endocrine care of transpeople part I. A review of cross-sex hormonal treatments, outcomes and adverse effects in transmen. *Clin Endocrinol (Oxf)*. 2015;**83**(5):597–606.

135. Bhasin S, Cunningham GR, Hayes FJ, Matsumoto AM, Snyder PJ, Swerdloff RS, Montori VM. Testosterone therapy in adult men with androgen deficiency syndromes: an endocrine society clinical practice guideline. *J Clin Endocrinol Metab*. 2006;**91**(6): 1995–2010.

136. Pelusi C, Costantino A, Martelli V, Lambertini M, Bazzocchi A, Ponti F, Battista G, Venturoli S, Meriggiola MC. Effects of three different testosterone formulations in female-to-male transsexual persons. *J Sex Med*. 2014;**11**(12):3002–3011.

137. Anderson GL, Limacher M, Assaf AR, Bassford T, Beresford SA, Black H, Bonds D, Brunner R, Brzyski R, Caan B, Chlebowski R, Curb D, Gass M, Hays J, Heiss G, Hendrix S, Howard BV, Hsia J, Hubbell A, Jackson R, Johnson KC, Judd H, Kotchen JM, Kuller L, LaCroix AZ, Lane D, Langer RD, Lasser N, Lewis CE, Manson J, Margolis K, Ockene J, O'Sullivan MJ, Phillips L, Prentice RL, Ritenbaugh C, Robbins J, Rossouw JE, Sarto G, Stefanick ML, Van Horn L, Wactawski-Wende J, Wallace R, Wassertheil-Smoller S; Women's Health Initiative Steering Committee. Effects of conjugated equine estrogen in postmenopausal women with hysterectomy: the Women's Health Initiative randomized controlled trial. *JAMA*. 2004;**291**(14):1701–1712.

138. Dickersin K, Munro MG, Clark M, Langenberg P, Scherer R, Frick K, Zhu Q, Hallock L, Nichols J, Yalcinkaya TM; Surgical Treatments Outcomes Project for Dysfunctional Uterine Bleeding (STOP-DUB) Research Group. Hysterectomy compared with endometrial ablation for dysfunctional uterine bleeding: a randomized controlled trial. *Obstet Gynecol*. 2007;**110**(6): 1279–1289.

139. Gooren LJ, Giltay EJ, Bunck MC. Long-term treatment of transsexuals with cross-sex hormones: extensive personal experience. *J Clin Endocrinol Metab*. 2008;**93**(1):19–25.

140. Prior JC, Vigna YM, Watson D. Spironolactone with physiological female steroids for presurgical therapy of male-to-female transsexualism. *Arch Sex Behav*. 1989;**18**(1):49–57.

141. Dittrich R, Binder H, Cupisti S, Hoffmann I, Beckmann MW, Mueller A. Endocrine treatment of male-to-female transsexuals using gonadotropin-releasing hormone agonist. *Exp Clin Endocrinol Diabetes*. 2005;**113**(10):586–592.

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-4    Filed: 08/16/24    Page: 666 of 690 - Page ID#: 5024

**3900**   Hembree et al   Guidelines on Gender-Dysphoric/Gender-Incongruent Persons   J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157563 by National Library of Education user on 15 August 2024

142. Stripp B, Taylor AA, Bartter FC, Gillette JR, Loriaux DL, Easley R, Menard RH. Effect of spironolactone on sex hormones in man. *J Clin Endocrinol Metab.* 1975;**41**(4):777–781.

143. Levy J, Burshell A, Marbach M, Afflalo L, Glick SM. Interaction of spironolactone with oestradiol receptors in cytosol. *J Endocrinol.* 1980;**84**(3):371–379.

144. Wierckx K, Elaut E, Van Hoorde B, Heylens G, De Cuypere G, Monstrey S, Weyers S, Hoebeke P, T'Sjoen G. Sexual desire in trans persons: associations with sex reassignment treatment. *J Sex Med.* 2014;**11**(1):107–118.

145. Chiriacò G, Cauci S, Mazzon G, Trombetta C. An observational retrospective evaluation of 79 young men with long-term adverse effects after use of finasteride against androgenetic alopecia. *Andrology.* 2016;**4**(2):245–250.

146. Gava G, Cerpolini S, Martelli V, Battista G, Seracchioli R, Meriggiola MC. Cyproterone acetate vs leuprolide acetate in combination with transdermal oestradiol in transwomen: a comparison of safety and effectiveness. *Clin Endocrinol (Oxf).* 2016;**85**(2):239–246.

147. Casper RF, Yen SS. Rapid absorption of micronized estradiol-17 beta following sublingual administration. *Obstet Gynecol.* 1981;**57**(1):62–64.

148. Price TM, Blauer KL, Hansen M, Stanczyk F, Lobo R, Bates GW. Single-dose pharmacokinetics of sublingual versus oral administration of micronized 17β-estradiol. *Obstet Gynecol.* 1997;**89**(3):340–345.

149. Toorians AWFT, Thomassen MCLGD, Zweegman S, Magdeleyns EJP, Tans G, Gooren LJG, Rosing J. Venous thrombosis and changes of hemostatic variables during cross-sex hormone treatment in transsexual people. *J Clin Endocrinol Metab.* 2003;**88**(12):5723–5729.

150. Mepham N, Bouman WP, Arcelus J, Hayter M, Wylie KR. People with gender dysphoria who self-prescribe cross-sex hormones: prevalence, sources, and side effects knowledge. *J Sex Med.* 2014;**11**(12):2995–3001.

151. Richards C, Bouman WP, Seal L, Barker MJ, Nieder TO, T'Sjoen G. Non-binary or genderqueer genders. *Int Rev Psychiatry.* 2016;**28**(1):95–102.

152. Cosyns M, Van Borsel J, Wierckx K, Dedecker D, Van de Peer F, Daelman T, Laenen S, T'Sjoen G. Voice in female-to-male transsexual persons after long-term androgen therapy. *Laryngoscope.* 2014;**124**(6):1409–1414.

153. Deuster D, Matulat P, Knief A, Zitzmann M, Rosslau K, Szukaj M, am Zehnhoff-Dinnesen A, Schmidt CM. Voice deepening under testosterone treatment in female-to-male gender dysphoric individuals. *Eur Arch Otorhinolaryngol.* 2016;**273**(4):959–965.

154. Lapauw B, Taes Y, Simoens S, Van Caenegem E, Weyers S, Goemaere S, Toye K, Kaufman J-M, T'Sjoen GG. Body composition, volumetric and areal bone parameters in male-to-female transsexual persons. *Bone.* 2008;**43**(6):1016–1021.

155. Meyer III WJ, Webb A, Stuart CA, Finkelstein JW, Lawrence B, Walker PA. Physical and hormonal evaluation of transsexual patients: a longitudinal study. *Arch Sex Behav.* 1986;**15**(2):121–138.

156. Asscheman H, Gooren LJ, Assies J, Smits JP, de Slegte R. Prolactin levels and pituitary enlargement in hormone-treated male-to-female transsexuals. *Clin Endocrinol (Oxf).* 1988;**28**(6):583–588.

157. Gooren LJ, Harmsen-Louman W, van Kessel H. Follow-up of prolactin levels in long-term oestrogen-treated male-to-female transsexuals with regard to prolactinoma induction. *Clin Endocrinol (Oxf).* 1985;**22**(2):201–207.

158. Wierckx K, Van Caenegem E, Schreiner T, Haraldsen I, Fisher AD, Toye K, Kaufman JM, T'Sjoen G. Cross-sex hormone therapy in trans persons is safe and effective at short-time follow-up: results from the European network for the investigation of gender incongruence. *J Sex Med.* 2014;**11**(8):1999–2011.

159. Ott J, Kaufmann U, Bentz EK, Huber JC, Tempfer CB. Incidence of thrombophilia and venous thrombosis in transsexuals under cross-sex hormone therapy. *Fertil Steril.* 2010;**93**(4):1267–1272.

160. Giltay EJ, Hoogeveen EK, Elbers JMH, Gooren LJG, Asscheman H, Stehouwer CDA. Effects of sex steroids on plasma total homocysteine levels: a study in transsexual males and females. *J Clin Endocrinol Metab.* 1998;**83**(2):550–553.

161. van Kesteren PJM, Asscheman H, Megens JAJ, Gooren LJG. Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clin Endocrinol (Oxf).* 1997;**47**(3):337–343.

162. Wierckx K, Gooren L, T'Sjoen G. Clinical review: breast development in trans women receiving cross-sex hormones. *J Sex Med.* 2014;**11**(5):1240–1247.

163. Bird D, Vowles K, Anthony PP. Spontaneous rupture of a liver cell adenoma after long term methyltestosterone: report of a case successfully treated by emergency right hepatic lobectomy. *Br J Surg.* 1979;**66**(3):212–213.

164. Westaby D, Ogle SJ, Paradinas FJ, Randell JB, Murray-Lyon IM. Liver damage from long-term methyltestosterone. *Lancet.* 1977;**2**(8032):262–263.

165. Weinand JD, Safer JD. Hormone therapy in transgender adults is safe with provider supervision; a review of hormone therapy sequelae for transgender individuals. *J Clin Transl Endocrinol.* 2015;**2**(2):55–60.

166. Roberts TK, Kraft CS, French D, Ji W, Wu AH, Tangpricha V, Fantz CR. Interpreting laboratory results in transgender patients on hormone therapy. *Am J Med.* 2014;**127**(2):159–162.

167. Vesper HW, Botelho JC, Wang Y. Challenges and improvements in testosterone and estradiol testing. *Asian J Androl.* 2014;**16**(2):178–184.

168. Asscheman H, T'Sjoen G, Lemaire A, Mas M, Meriggiola MC, Mueller A, Kuhn A, Dhejne C, Morel-Journel N, Gooren LJ. Venous thrombo-embolism as a complication of cross-sex hormone treatment of male-to-female transsexual subjects: a review. *Andrologia.* 2014;**46**(7):791–795.

169. Righini M, Perrier A, De Moerloose P, Bounameaux H. D-dimer for venous thromboembolism diagnosis: 20 years later. *J Thromb Haemost.* 2008;**6**(7):1059–1071.

170. Gooren LJ, Assies J, Asscheman H, de Slegte R, van Kessel H. Estrogen-induced prolactinoma in a man. *J Clin Endocrinol Metab.* 1988;**66**(2):444–446.

171. Kovacs K, Stefaneanu L, Ezzat S, Smyth HS. Prolactin-producing pituitary adenoma in a male-to-female transsexual patient with protracted estrogen administration. A morphologic study. *Arch Pathol Lab Med.* 1994;**118**(5):562–565.

172. Serri O, Noiseux D, Robert F, Hardy J. Lactotroph hyperplasia in an estrogen treated male-to-female transsexual patient. *J Clin Endocrinol Metab.* 1996;**81**(9):3177–3179.

173. Cunha FS, Domenice S, Câmara VL, Sircili MH, Gooren LJ, Mendonça BB, Costa EM. Diagnosis of prolactinoma in two male-to-female transsexual subjects following high-dose cross-sex hormone therapy. *Andrologia.* 2015;**47**(6):680–684.

174. Nota NM, Dekker MJHJ, Klaver M, Wiepjes CM, van Trotsenburg MA, Heijboer AC, den Heijer M. Prolactin levels during short- and long-term cross-sex hormone treatment: an observational study in transgender persons. *Andrologia.* 2017;**49**(6).

175. Bunck MC, Debono M, Giltay EJ, Verheijen AT, Diamant M, Gooren LJ. Autonomous prolactin secretion in two male-to-female transgender patients using conventional oestrogen dosages. *BMJ Case Rep.* 2009;**2009**:bcr0220091589.

176. Elamin MB, Garcia MZ, Murad MH, Erwin PJ, Montori VM. Effect of sex steroid use on cardiovascular risk in transsexual individuals: a systematic review and meta-analyses. *Clin Endocrinol (Oxf).* 2010;**72**(1):1–10.

177. Berra M, Armillotta F, D'Emidio L, Costantino A, Martorana G, Pelusi G, Meriggiola MC. Testosterone decreases adiponectin

doi: 10.1210/jc.2017-01658

levels in female to male transsexuals. *Asian J Androl*. 2006;8(6): 725–729.

178. Elbers JMH, Giltay EJ, Teerlink T, Scheffer PG, Asscheman H, Seidell JC, Gooren LJG. Effects of sex steroids on components of the insulin resistance syndrome in transsexual subjects. *Clin Endocrinol (Oxf)*. 2003;58(5):562–571.

179. Giltay EJ, Lambert J, Gooren LJG, Elbers JMH, Steyn M, Stehouwer CDA. Sex steroids, insulin, and arterial stiffness in women and men. *Hypertension*. 1999;34(4 Pt 1):590–597.

180. Polderman KH, Gooren LJ, Asscheman H, Bakker A, Heine RJ. Induction of insulin resistance by androgens and estrogens. *J Clin Endocrinol Metab*. 1994;79(1):265–271.

181. Maraka S. Effect of sex steroids on lipids, venous thromboembolism, cardiovascular disease and mortality in transgender individuals: a systematic review and meta-analysis. Available at: http://press.endocrine.org/doi/abs/10.1210/endo-meetings.2016.RE.15.FRI-136. Accessed 3 July 2017.

182. Meriggiola MC, Armillotta F, Costantino A, Altieri P, Saad F, Kalhorn T, Perrone AM, Ghi T, Pelusi C, Pelusi G. Effects of testosterone undecanoate administered alone or in combination with letrozole or dutasteride in female to male transsexuals. *J Sex Med*. 2008;5(10):2442–2453.

183. Giltay EJ, Toorians AW, Sarabdjitsingh AR, de Vries NA, Gooren LJ. Established risk factors for coronary heart disease are unrelated to androgen-induced baldness in female-to-male transsexuals. *J Endocrinol*. 2004;180(1):107–112.

184. Giltay EJ, Verhoef P, Gooren LJG, Geleijnse JM, Schouten EG, Stehouwer CDA. Oral and transdermal estrogens both lower plasma total homocysteine in male-to-female transsexuals. *Atherosclerosis*. 2003;168(1):139–146.

185. Calof OM, Singh AB, Lee ML, Kenny AM, Urban RJ, Tenover JL, Bhasin S. Adverse events associated with testosterone replacement in middle-aged and older men: a meta-analysis of randomized, placebo-controlled trials. *J Gerontol A Biol Sci Med Sci*. 2005; 60(11):1451–1457.

186. Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults. Executive summary of the Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). *JAMA*. 2001;285(19):2486–2497.

187. Murad MH, Elamin MB, Garcia MZ, Mullan RJ, Murad A, Erwin PJ, Montori VM. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clin Endocrinol (Oxf)*. 2010;72(2): 214–231.

188. Van Caenegem E, Wierckx K, Taes Y, Schreiner T, Vandewalle S, Toye K, Lapauw B, Kaufman JM, T'Sjoen G. Body composition, bone turnover, and bone mass in trans men during testosterone treatment: 1-year follow-up data from a prospective case-controlled study (ENIGI). *Eur J Endocrinol*. 2015;172(2): 163–171.

189. Turner A, Chen TC, Barber TW, Malabanan AO, Holick MF, Tangpricha V. Testosterone increases bone mineral density in female-to-male transsexuals: a case series of 15 subjects. *Clin Endocrinol (Oxf)*. 2004;61(5):560–566.

190. van Kesteren P, Lips P, Gooren LJG, Asscheman H, Megens J. Long-term follow-up of bone mineral density and bone metabolism in transsexuals treated with cross-sex hormones. *Clin Endocrinol (Oxf)*. 1998;48(3):347–354.

191. Van Caenegem E, Taes Y, Wierckx K, Vandewalle S, Toye K, Kaufman JM, Schreiner T, Haraldsen I, T'Sjoen G. Low bone mass is prevalent in male-to-female transsexual persons before the start of cross-sex hormonal therapy and gonadectomy. *Bone*. 2013;54(1):92–97.

192. Amin S, Zhang Y, Sawin CT, Evans SR, Hannan MT, Kiel DP, Wilson PW, Felson DT. Association of hypogonadism and

estradiol levels with bone mineral density in elderly men from the Framingham study. *Ann Intern Med*. 2000;133(12):951–963.

193. Gennari L, Khosla S, Bilezikian JP. Estrogen and fracture risk in men. *J Bone Miner Res*. 2008;23(10):1548–1551.

194. Khosla S, Melton LJ III, Atkinson EJ, O'Fallon WM, Klee GG, Riggs BL. Relationship of serum sex steroid levels and bone turnover markers with bone mineral density in men and women: a key role for bioavailable estrogen. *J Clin Endocrinol Metab*. 1998;83(7):2266–2274.

195. Mueller A, Dittrich R, Binder H, Kuehnel W, Maltaris T, Hoffmann I, Beckmann MW. High dose estrogen treatment increases bone mineral density in male-to-female transsexuals receiving gonadotropin-releasing hormone agonist in the absence of testosterone. *Eur J Endocrinol*. 2005;153(1):107–113.

196. Ruetsche AG, Kneubuehl R, Birkhaeuser MH, Lippuner K. Cortical and trabecular bone mineral density in transsexuals after long-term cross-sex hormonal treatment: a cross-sectional study. *Osteoporos Int*. 2005;16(7):791–798.

197. Ganly I, Taylor EW. Breast cancer in a trans-sexual man receiving hormone replacement therapy. *Br J Surg*. 1995;82(3):341.

198. Pritchard TJ, Pankowsky DA, Crowe JP, Abdul-Karim FW. Breast cancer in a male-to-female transsexual. A case report. *JAMA*. 1988;259(15):2278–2280.

199. Symmers WS. Carcinoma of breast in trans-sexual individuals after surgical and hormonal interference with the primary and secondary sex characteristics. *BMJ*. 1968;2(5597):83–85.

200. Brown GR. Breast cancer in transgender veterans: a ten-case series. *LGBT Health*. 2015;2(1):77–80.

201. Shao T, Grossbard ML, Klein P. Breast cancer in female-to-male transsexuals: two cases with a review of physiology and management. *Clin Breast Cancer*. 2011;11(6):417–419.

202. Nikolic DV, Djordjevic ML, Granic M, Nikolic AT, Stanimirovic VV, Zdravkovic D, Jelic S. Importance of revealing a rare case of breast cancer in a female to male transsexual after bilateral mastectomy. *World J Surg Oncol*. 2012;10:280.

203. Bösze P, Tóth A, Török M. Hormone replacement and the risk of breast cancer in Turner's syndrome. *N Engl J Med*. 2006;355(24): 2599–2600.

204. Schoemaker MJ, Swerdlow AJ, Higgins CD, Wright AF, Jacobs PA; UK Clinical Cytogenetics Group. Cancer incidence in women with Turner syndrome in Great Britain: a national cohort study. *Lancet Oncol*. 2008;9(3):239–246.

205. Smith RA, Cokkinides V, Eyre HJ. American Cancer Society guidelines for the early detection of cancer, 2006. *CA Cancer J Clin*. 2006;56(1):11–25, quiz 49–50.

206. Wilson JD, Roehrborn C. Long-term consequences of castration in men: lessons from the Skoptzy and the eunuchs of the Chinese and Ottoman courts. *J Clin Endocrinol Metab*. 1999;84(12): 4324–4331.

207. van Kesteren P, Meinhardt W, van der Valk P, Geldof A, Megens J, Gooren L. Effects of estrogens only on the prostates of aging men. *J Urol*. 1996;156(4):1349–1353.

208. Brown JA, Wilson TM. Benign prostatic hyperplasia requiring transurethral resection of the prostate in a 60-year-old male-to-female transsexual. *Br J Urol*. 1997;80(6):956–957.

209. Casella R, Bubendorf L, Schaefer DJ, Bachmann A, Gasser TC, Sulser T. Does the prostate really need androgens to grow? Transurethral resection of the prostate in a male-to-female transsexual 25 years after sex-changing operation. *Urol Int*. 2005;75(3):288–290.

210. Dorff TB, Shazer RL, Nepomuceno EM, Tucker SJ. Successful treatment of metastatic androgen-independent prostate carcinoma in a transsexual patient. *Clin Genitourin Cancer*. 2007;5(5): 344–346.

211. Thurston AV. Carcinoma of the prostate in a transsexual. *Br J Urol*. 1994;73(2):217.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

AR_293432

Case: 2:24-cv-00072-DCR-CJS    Doc #: 132-4    Filed: 08/16/24    Page: 668 of 690 - Page ID#: 5026

**3902**  Hembree et al  Guidelines on Gender-Dysphoric/Gender-Incongruent Persons  J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

212. van Harst EP, Newling DW, Gooren LJ, Asscheman H, Prenger DM. Metastatic prostatic carcinoma in a male-to-female transsexual. *BJU Int.* 1998;**81**:776.

213. Turo R, Jallad S, Prescott S, Cross WR. Metastatic prostate cancer in transsexual diagnosed after three decades of estrogen therapy. *Can Urol Assoc J.* 2013;**7**(7–8):E544–E546.

214. Miksad RA, Bubley G, Church P, Sanda M, Rofsky N, Kaplan I, Cooper A. Prostate cancer in a transgender woman 41 years after initiation of feminization. *JAMA.* 2006;**296**(19):2316–2317.

215. Moyer VA; U.S. Preventive Services Task Force. Screening for prostate cancer: U.S. Preventive Services Task Force recommendation statement. *Ann Intern Med.* 2012;**157**(2):120–134.

216. Futterweit W. Endocrine therapy of transsexualism and potential complications of long-term treatment. *Arch Sex Behav.* 1998;**27**(2):209–226.

217. Miller N, Bédard YC, Cooter NB, Shaul DL. Histological changes in the genital tract in transsexual women following androgen therapy. *Histopathology.* 1986;**10**(7):661–669.

218. O'Hanlan KA, Dibble SL, Young-Spint M. Total laparoscopic hysterectomy for female-to-male transsexuals. *Obstet Gynecol.* 2007;**110**(5):1096–1101.

219. Dizon DS, Tejada-Berges T, Koelliker S, Steinhoff M, Granai CO. Ovarian cancer associated with testosterone supplementation in a female-to-male transsexual patient. *Gynecol Obstet Invest.* 2006;**62**(4):226–228.

220. Hage JJ, Dekker JJML, Karim RB, Verheijen RHM, Bloemena E. Ovarian cancer in female-to-male transsexuals: report of two cases. *Gynecol Oncol.* 2000;**76**(3):413–415.

221. Mueller A, Gooren L. Hormone-related tumors in transsexuals receiving treatment with cross-sex hormones. *Eur J Endocrinol.* 2008;**159**(3):197–202.

222. Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Feldman J, Fraser L, Green J, Knudson G, Meyer WJ, Monstrey S, Adler RK, Brown GR, Devor AH, Ehrbar R, Ettner R, Eyler E, Garofalo R, Karasic DH, Lev AI, Mayer G, Meyer-Bahlburg H, Hall BP, Pfaefflin F, Rachlin K, Robinson B, Schechter LS, Tangpricha V, van Trotsenburg M, Vitale A, Winter S, Whittle S, Wylie KR, Zucker K. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgenderism.* 2012;**13**:165–232.

223. Colebunders B, D'Arpa S, Weijers S, Lumen N, Hoebeke P, Monstrey S. Female-to-male gender reassignment surgery. In: Ettner R, Monstrey S, Coleman E, eds. *Principles of Transgender Medicine and Surgery.* 2nd ed. New York, NY: Routledge Taylor & Francis Group; 2016:279–317.

224. Monstrey S, Hoebeke P, Dhont M, De Cuypere G, Rubens R, Moerman M, Hamdi M, Van Landuyt K, Blondeel P. Surgical therapy in transsexual patients: a multi-disciplinary approach. *Acta Chir Belg.* 2001;**101**(5):200–209.

225. Selvaggi G, Ceulemans P, De Cuypere G, VanLanduyt K, Blondeel P, Hamdi M, Bowman C, Monstrey S. Gender identity disorder: general overview and surgical treatment for vaginoplasty in male-to-female transsexuals. *Plast Reconstr Surg.* 2005;**116**(6):135e–145e.

226. Tugnet N, Goddard JC, Vickery RM, Khoosal D, Terry TR. Current management of male-to-female gender identity disorder in the UK. *Postgrad Med J.* 2007;**83**(984):638–642.

227. Horbach SER, Bouman M-B, Smit JM, Özer M, Buncamper ME, Mullender MG. Outcome of vaginoplasty in male-to-female transgenders: a systematic review of surgical techniques. *J Sex Med.* 2015;**12**(6):1499–1512.

228. Wroblewski P, Gustafsson J, Selvaggi G. Sex reassignment surgery for transsexuals. *Curr Opin Endocrinol Diabetes Obes.* 2013;**20**(6):570–574.

229. Morrison SD, Satterwhite T, Grant DW, Kirby J, Laub DR, Sr, VanMaasdam J. Long-term outcomes of rectosigmoid neocolporrhaphy in male-to-female gender reassignment surgery. *Plast Reconstr Surg.* 2015;**136**(2):386–394.

230. Dessy LA, Mazzocchi M, Corrias F, Ceccarelli S, Marchese C, Scuderi N. The use of cultured autologous oral epithelial cells for vaginoplasty in male-to-female transsexuals: a feasibility, safety, and advantageousness clinical pilot study. *Plast Reconstr Surg.* 2014;**133**(1):158–161.

231. Li FY, Xu YS, Zhou CD, Zhou Y, Li SK, Li Q. Long-term outcomes of vaginoplasty with autologous buccal micromucosa. *Obstet Gynecol.* 2014;**123**(5):951–956.

232. Kanhai RC. Sensate vagina pedicled-spot for male-to-female transsexuals: the experience in the first 50 patients. *Aesthetic Plast Surg.* 2016;**40**(2):284–287.

233. Straayer C. Transplants for transsexuals? Ambitions, concerns, ideology. Paper presented at: Trans*Studies: An International Transdisciplinary Conference on Gender, Embodiment, and Sexuality; 7–10 September 2016; University of Arizona, Tucson, AZ.

234. Bucci S, Mazzon G, Liguori G, Napoli R, Pavan N, Bormioli S, Ollandini G, De Concilio B, Trombetta C. Neovaginal prolapse in male-to-female transsexuals: an 18-year-long experience. *Biomed Res Int.* 2014;**2014**:240761.

235. Raigosa M, Avvedimento S, Yoon TS, Cruz-Gimeno J, Rodriguez G, Fontdevila J. Male-to-female genital reassignment surgery: a retrospective review of surgical technique and complications in 60 patients. *J Sex Med.* 2015;**12**(8):1837–1845.

236. Green R. Sexual functioning in post-operative transsexuals: male-to-female and female-to-male. *Int J Impot Res.* 1998;**10**(Suppl 1):S22–S24.

237. Hess J, Rossi Neto R, Panic L, Rübben H, Senf W. Satisfaction with male-to-female gender reassignment surgery. *Dtsch Arztebl Int.* 2014;**111**(47):795–801.

238. Nygren U, Nordenskjold A, Arver S, Sodersten M. Effects on voice fundamental frequency and satisfaction with voice in trans men during testosterone treatment—a longitudinal study. *J Voice.* 2016;**30**(6):766.e23-766.e34.

239. Becking AG, Tuinzing DB, Hage JJ, Gooren LJG. Transgender feminization of the facial skeleton. *Clin Plast Surg.* 2007;**34**(3):557–564.

240. Giraldo F, Esteva I, Bergero T, Cano G, González C, Salinas P, Rivada E, Lara JS, Soriguer F; Andalusia Gender Team. Corona glans clitoroplasty and urethropreputial vestibuloplasty in male-to-female transsexuals: the vulval aesthetic refinement by the Andalusia Gender Team. *Plast Reconstr Surg.* 2004;**114**(6):1543–1550.

241. Goddard JC, Vickery RM, Terry TR. Development of feminizing genitoplasty for gender dysphoria. *J Sex Med.* 2007;**4**(4 Pt 1):981–989.

242. Hage JJ, de Graaf FH, Bouman FG, Bloem JJAM. Sculpturing the glans in phalloplasty. *Plast Reconstr Surg.* 1993;**92**(1):157–161, discussion 162.

243. Thiagaraj D, Gunasegaram R, Loganath A, Peh KL, Kottegoda SR, Ratnam SS. Histopathology of the testes from male transsexuals on oestrogen therapy. *Ann Acad Med Singapore.* 1987;**16**(2):347–348.

244. Monstrey SJ, Ceulemans P, Hoebeke P. Sex reassignment surgery in the female-to-male transsexual. *Semin Plast Surg.* 2011;**25**(3):229–244.

245. Perovic SV, Djinovic R, Bumbasirevic M, Djordjevic M, Vukovic P. Total phalloplasty using a musculocutaneous latissimus dorsi flap. *BJU Int.* 2007;**100**(4):899–905, discussion 905.

246. Vesely J, Hyza P, Ranno R, Cigna E, Monni N, Stupka I, Justan I, Dvorak Z, Novak P, Ranno S. New technique of total phalloplasty with reinnervated latissimus dorsi myocutaneous free flap in female-to-male transsexuals. *Ann Plast Surg.* 2007;**58**(5):544–550.

247. Ranno R, Veselý J, Hýza P, Stupka I, Justan I, Dvorák Z, Monni N, Novák P, Ranno S. Neo-phalloplasty with re-innervated latissimus dorsi free flap: a functional study of a novel technique. *Acta Chir Plast.* 2007;**49**(1):3–7.

doi: 10.1210/jc.2017-01658

248. Garcia MM, Christopher NA, De Luca F, Spilotros M, Ralph DJ. Overall satisfaction, sexual function, and the durability of neo-phallus dimensions following staged female to male genital gender confirming surgery: the Institute of Urology, London U.K. experience. *Transl Androl Urol.* 2014;3(2):156–162.

249. Chen H-C, Gedebou TM, Yazar S, Tang Y-B. Prefabrication of the free fibula osteocutaneous flap to create a functional human penis using a controlled fistula method. *J Reconstr Microsurg.* 2007;23(3):151–154.

250. Hoebeke PB, Decaestecker K, Beysens M, Opdenakker Y, Lumen N, Monstrey SM. Erectile implants in female-to-male trans-sexuals: our experience in 129 patients. *Eur Urol.* 2010;57(2):334–341.

251. Hage JJ. Metaidoioplasty: an alternative phalloplasty technique in transsexuals. *Plast Reconstr Surg.* 1996;97(1):161–167.

252. Cohanzad S. Extensive metoidioplasty as a technique capable of creating a compatible analogue to a natural penis in female transsexuals. *Aesthetic Plast Surg.* 2016;40(1):130–138.

253. Selvaggi G, Hoebeke P, Ceulemans P, Hamdi M, Van Landuyt K, Blondeel P, De Cuypere G, Monstrey S. Scrotal reconstruction in female-to-male transsexuals: a novel scrotoplasty. *Plast Reconstr Surg.* 2009;123(6):1710–1718.

254. Bjerrome Ahlin H, Kölby L, Elander A, Selvaggi G. Improved results after implementation of the Ghent algorithm for sub-cutaneous mastectomy in female-to-male transsexuals. *J Plast Surg Hand Surg.* 2014;48(6):362–367.

255. Wolter A, Diedrichson J, Scholz T, Arens-Landwehr A, Liebau J. Sexual reassignment surgery in female-to-male transsexuals: an algorithm for subcutaneous mastectomy. *J Plast Reconstr Aesthet Surg.* 2015;68(2):184–191.

256. Richards C, Barrett J. The case for bilateral mastectomy and male chest contouring for the female-to-male transsexual. *Ann R Coll Surg Engl.* 2013;95(2):93–95.

257. Sutcliffe PA, Dixon S, Akehurst RL, Wilkinson A, Shippam A, White S, Richards R, Caddy CM. Evaluation of surgical procedures for sex reassignment: a systematic review. *J Plast Reconstr Aesthet Surg.* 2009;62(3):294–306, discussion 306–308.

258. Selvaggi G, Elander A. Penile reconstruction/formation. *Curr Opin Urol.* 2008;18(6):589–597.

259. Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, Landén M. Long-term follow-up of transsexual persons un-dergoing sex reassignment surgery: cohort study in Sweden. *PLoS One.* 2011;6(2):e16885.

260. Kuhn A, Bodmer C, Stadlmayr W, Kuhn P, Mueller MD, Birkhäuser M. Quality of life 15 years after sex reassignment surgery for transsexualism. *Fertil Steril.* 2009;92(5):1685–1689.e3.

261. Papadopulos NA, Lellé JD, Zavlin D, Herschbach P, Henrich G, Kovacs L, Ehrenberger B, Kluger AK, Machens HG, Schaff J. Quality of life and patient satisfaction following male-to-female sex reassignment surgery. *J Sex Med.* 2017;14(5):721–730.

262. Simonsen RK, Hald GM, Kristensen E, Giraldi A. Long-term follow-up of individuals undergoing sex-reassignment surgery: somatic morbidity and cause of death. *Sex Med.* 2016;4(1):e60–e68.

263. Djordjevic ML, Bizic MR, Duisin D, Bouman MB, Buncamper M. Reversal Surgery in regretful male-to-female transsexuals after sex reassignment surgery. *J Sex Med.* 2016;13(6):1000–1007.

264. Liberopoulos EN, Florentin M, Mikhailidis DP, Elisaf MS. Compliance with lipid-lowering therapy and its impact on car-diovascular morbidity and mortality. *Expert Opin Drug Saf.* 2008;7(6):717–725.

265. Forbes SS, Stephen WJ, Harper WL, Loeb M, Smith R, Chris-toffersen EP, McLean RF. Implementation of evidence-based practices for surgical site infection prophylaxis: results of a pre- and postintervention study. *J Am Coll Surg.* 2008;207(3):336–341.

266. Davis PJ, Spady D, de Gara C, Forgie SE. Practices and attitudes of surgeons toward the prevention of surgical site infections: a pro-vincial survey in Alberta, Canada. *Infect Control Hosp Epidemiol.* 2008;29(12):1164–1166.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

# THE TREVOR PROJECT

# NATIONAL SURVEY ON LGBTQ YOUTH MENTAL HEALTH 2021

AR_300195

# TABLE OF CONTENTS

| | |
|---|---|
| Introduction | 2 |
| Suicide & Mental Health | 3 |
| Finding Support: Mental Healthcare | 5 |
| Finding Support: Crisis Services | 6 |
| COVID-19 | 7 |
| Supporting Transgender & Nonbinary Youth | 10 |
| Food Insecurity | 11 |
| Conversion Therapy | 12 |
| Discrimination | 13 |
| Affirming Spaces | 14 |
| Finding Joy | 15 |
| Research | 16 |
| Methodology | 17 |

AR_300196

# INTRODUCTION

The past year has been incredibly difficult for so many, but we also know that lesbian, gay, bisexual, transgender, queer and questioning (LGBTQ) youth have faced unique challenges. The Trevor Project's 2021 National Survey on LGBTQ Youth Mental Health sheds light on many of these challenges by capturing the experiences of nearly 35,000 LGBTQ youth ages 13-24 across the United States.

Our third annual survey provides brand new data on the impacts of the COVID-19 pandemic, mental health care disparities, discrimination, food insecurity, conversion therapy, and suicide — in addition to the benefits of LGBTQ-affirming spaces and respecting the pronouns of transgender and nonbinary youth.

**We are also proud that this sample is our most diverse yet, with 45% being LGBTQ youth of color and 38% being transgender or nonbinary.**

Among some of the key findings of the survey:

- **42% of LGBTQ youth** seriously considered attempting suicide in the past year, including **more than half of transgender and nonbinary youth.**

- **12% of white youth** attempted suicide compared to **31% of Native/Indigenous youth, 21% of Black youth, 21% of multiracial youth, 18% of Latinx youth,** and 12% of Asian/Pacific Islander youth.

- **94% of LGBTQ youth** reported that recent politics negatively impacted their mental health.

- **More than 80% of LGBTQ youth** stated that COVID-19 made their living situation more stressful — and **only 1 in 3 LGBTQ youth** found their home to be LGBTQ-affirming.

- **70% of LGBTQ youth** stated that their mental health was "poor" most of the time or always during COVID-19.

- **48% of LGBTQ youth** reported they wanted counseling from a mental health professional but were unable to receive it in the past year.

- **30% of LGBTQ youth** experienced food insecurity in the past month, including half of all Native/Indigenous LGBTQ youth.

- **75% of LGBTQ youth** reported that they had experienced discrimination based on their sexual orientation or gender identity at least once in their lifetime.

- **Half of all LGBTQ youth of color** reported discrimination based on their race/ethnicity in the past year, including **67% of Black LGBTQ youth and 60% of Asian/Pacific Islander LGBTQ youth.**

- **13% of LGBTQ youth** reported being subjected to conversion therapy, with **83% reporting** it occurred when they were under age 18.

- **Transgender and nonbinary youth** who reported having **pronouns respected** by all of the people they lived with attempted suicide at half the rate of those who did not have their pronouns respected by anyone with whom they lived.

- **Transgender and nonbinary youth** who were able to change their name and/or gender marker on **legal documents,** such as driver's licenses and birth certificates, reported **lower rates** of attempting suicide.

- **LGBTQ youth who had access to spaces** that affirmed their sexual orientation and gender identity reported **lower rates** of attempting suicide.

- **An overwhelming majority of LGBTQ youth** said that social media has both positive **(96%)** and negative **(88%)** impacts on their mental health and well-being.

This data underscores many of the serious challenges experienced by LGBTQ youth over the last year and should serve as an urgent call to action. But it also speaks to the diversity and resiliency of LGBTQ youth and provides valuable insights into their everyday sources of strength and positivity.

We hope these findings will be used by fellow researchers, policymakers, and other youth-serving organizations to better support LGBTQ youth across the country and around the globe.

Over the next year, The Trevor Project will release new data from this national survey sample in the form of monthly research briefs and quarterly reports related to LGBTQ youth mental health and suicide prevention. Through our research, education, advocacy, and direct services, we strive to amplify the experiences of LGBTQ youth and to facilitate the implementation of comprehensive, intersectional policy solutions.

And as always, we will continue to do all we can to remind LGBTQ youth that they deserve love and support and the ability to live their lives without fear, discrimination, and violence. If you are an LGBTQ young person, please know that you are never alone and The Trevor Project is here to support you 24/7.



**Amit Paley**
CEO & Executive Director
The Trevor Project

AR_300197

## SUICIDE & MENTAL HEALTH

**42% of LGBTQ youth** seriously considered attempting suicide in the past year, including **more than half of transgender and nonbinary youth**.

**12% of white youth** attempted suicide compared to **31% of Native/Indigenous youth, 21% of Black youth, 21% of multiracial youth, 18% of Latinx youth,** and **12% of Asian/Pacific Islander youth**.

LGBTQ youth who:
● Considered suicide  ○ Attempted suicide

By gender identity

Cisgender
32%
10%

Transgender & nonbinary
52%
20%

By age

13–17
48%
20%

18–24
34%
9%

By race/ethnicity

Asian/Pacific Islander
38%
12%

Black
47%
21%

Latinx
43%
18%

Native/Indigenous
52%
31%

White
39%
12%

More than one race/ethnicity
48%
21%

p.3

AR_300198

## SUICIDE & MENTAL HEALTH

**72% of LGBTQ youth** reported symptoms of generalized anxiety disorder in the past two weeks, including **more than 3 in 4 transgender and nonbinary youth.**

**62% of LGBTQ youth** reported symptoms of major depressive disorder in the past two weeks, including **more than 2 in 3 of transgender and nonbinary youth.**



LGBTQ youth who experienced symptoms of:
Generalized anxiety disorder   Major depressive disorder

**By gender identity**

Cisgender
65%
53%

Transgender & nonbinary
77%
70%

**By age**

13–17
73%
67%

18–24
69%
40%

**By race/ethnicity**

Asian/Pacific Islander
65%
60%

Black
65%
65%

Latinx
70%
64%

Native/Indigenous
76%
71%

White
72%
60%

More than one race/ethnicity
75%
68%

AR_300199

FINDING SUPPORT: MENTAL HEALTHCARE

# In the past year, **nearly half of LGBTQ youth** have wanted counseling from a mental health professional, but did not receive it.



Received mental health care
36%

Wanted mental health care, but didn't get it
48%

Did not want mental health care
16%

LGBTQ youth who wanted counseling from a mental health professional in the past year:
● Wanted mental health care, but didn't get it
● Received mental health care



By race/ethnicity

Asian/Pacific Islander
51%
28%

Black
53%
27%

Latinx
54%
29%

Native/Indigenous
49%
31%

White
45%
41%

More than one race/ethnicity
51%
35%

AR_300200

FINDING SUPPORT: CRISIS SERVICES

# More than 80% of LGBTQ youth of all races/ethnicities said it was important that a crisis line include a focus on LGBTQ youth, should they need it.

LGBTQ youth who say a focus on LGBTQ youth would be important if they needed to use a crisis line:



By gender identity



By age

By race/ethnicity

| | |
|---|---|
| Asian/Pacific Islander | 82% |
| Black | 86% |
| Latinx | 85% |
| Native/Indigenous | 84% |
| White | 81% |
| More than one race/ethnicity | 82% |

Features LGBTQ youth said would be important if they needed to contact a crisis line:



| | |
|---|---|
| Available 24/7 | 94% |
| Available by text | 94% |
| Focuses on LGBTQ youth | 82% |
| Available using web-chat | 78% |
| Available by phone | 77% |
| Available by messaging system | 61% |

(e.g. WhatsApp or Facebook Messenger)

p.6

AR_300201

## COVID-19

# 70% of LGBTQ youth stated that their mental health was "poor" most of the time or always during COVID-19.

LGBTQ youth who said:
- COVID-19 negatively impacted their mental health
- Their mental health was "poor" most of the time or always during COVID-19



By gender identity                                        Cisgender
75%
61%

Transgender & nonbinary
85%
78%

By age                                                    13–17
80%
72%

18–24
81%
67%

By race/ethnicity                                Asian/Pacific Islander
76%
63%

Black
77%
68%

Latinx
80%
70%

Native/Indigenous
80%
77%

White
80%
69%

More than one race/ethnicity
82%
75%

AR_300202

COVID-19

# Nearly half of LGBTQ youth said that COVID-19 impacted their ability to express their sexual orientation.

# Nearly 60% of transgender and nonbinary youth said that COVID-19 impacted their ability to express their gender identity.

LGBTQ youth who said COVID-19 impacted their ability to express their:
● Sexual orientation  ● Gender identity



By age

13–17
50%
65%

18–24
44%
52%

By race/ethnicity

Asian/Pacific Islander
51%
63%

Black
53%
64%

Latinx
51%
64%

Native/Indigenous
46%
55%

White
44%
57%

More than one race/ethnicity
47%
61%

p.8

## COVID-19

# Nearly 40% of LGBTQ youth who had a job reported that they lost it during COVID-19.

# More than 80% of LGBTQ youth stated that COVID-19 made their living situation more stressful.

LGBTQ youth who, due to COVID-19:
● Lost a job (if they had one)  ● Experienced a more stressful living situation



AR_300204

## SUPPORTING TRANSGENDER & NONBINARY YOUTH

# Affirming **transgender and nonbinary youth** by respecting their **pronouns** and allowing them to change **legal documents** is associated with lower rates of attempting suicide.

Transgender & nonbinary youth who wanted to change their legal documents, such as driver's licenses and birth certificates:



Changed legal documents 7%
Not legally able to change legal documents 57%
Planning to change legal documents 36%

Transgender & nonbinary youth who attempted suicide in the past year, comparison across ability to change legal documents:



Not legally able 25%
Planning 19%
Changed 11%

If you live with other people, how many of them respect your pronouns?



All of the people 29%
None of the people 49%
Some of the people 22%

Transgender & nonbinary youth who attempted suicide in the past year, comparison across the number of people they live with who respected their pronouns:



None 24%
Some 19%
All 13%

p.10

AR_300205

## FOOD INSECURITY

**30% of LGBTQ youth** experienced food insecurity in the past month, including **half of all Native/Indigenous LGBTQ youth.**

**27% of LGBTQ youth** said they worried that food at home would run out in the last month before they or their family had money to buy more.

LGBTQ youth who had trouble affording enough food in the past month:



Cisgender 24%
Transgender & nonbinary 38%
By gender identity

13–17 31%    30% 18–24
By age

By race/ethnicity

Asian/Pacific Islander 18%
Black 35%
Latinx 36%
Native/Indigenous 50%
White 27%
More than one race/ethnicity 36%

LGBTQ youth who attempted suicide in the past year, comparison across experiences of food insecurity:



Had trouble 25%
Didn't have trouble 11%
Affording enough food in the past month

**19% of LGBTQ youth** said that in the last month, they were hungry but didn't eat because they or their family didn't have enough food.

AR_300206

## CONVERSION THERAPY

# LGBTQ youth who were subjected to conversion therapy reported more than twice the rate of attempting suicide in the past year compared to those who were not.

LGBTQ youth who reported being subjected to conversion therapy:







LGBTQ youth who attempted suicide in the past year, comparison across those subjected to conversion therapy:

**Transgender and nonbinary youth** reported being subjected to conversion therapy at **twice the rate** of cisgender LGBQ youth.

**LGBTQ youth who reported being subjected to conversion therapy** were an average of 15 years old at the time, with **83% of LGBTQ youth** reporting that it occurred when they were younger than 18.

p.12

AR_300207

## DISCRIMINATION

**75% of LGBTQ youth** reported that they had experienced discrimination based on their sexual orientation or gender identity at least once in their lifetime.

**More than half of LGBTQ youth** reporting that they had experienced discrimination based on their sexual orientation or gender identity in the past year.

LGBTQ youth who attempted suicide, comparison across those who have been discriminated against in the past year:



Discriminated against **21%** / Not been discriminated against **9%**
On the basis of sexual orientation

Discriminated against **24%** / Not been discriminated against **12%**
On the basis of gender identity among transgender & nonbinary youth

Discriminated against **23%** / Not been discriminated against **14%**
On the basis of race, ethnicity, or nationality among LGBTQ youth of color

LGBTQ youth who attempted suicide in the past year, comparison across the number of types of discrimination experienced:

By number of types



**36%** 3 types of discrimination
**24%** 2 types of discrimination
**13%** 1 type of discrimination
**7%** 0 types of discrimination

**Half of LGBTQ youth of color** reported discrimination based on their race/ethnicity in the past year, including **67% of Black LGBTQ youth** and **60% of Asian/ Pacific Islander LGBTQ youth.**

p.13

## AFFIRMING SPACES

# Only **1 in 3 LGBTQ youth** found their home to be LGBTQ-affirming.

Where LGBTQ youth access LGBTQ-affirming spaces:



**LGBTQ youth who had access to spaces that affirmed their sexual orientation and gender identity** reported **lower rates** of attempting suicide than those who did not.

Where transgender and nonbinary youth access gender-affirming spaces:



**Most LGBTQ youth** had access to online spaces that affirmed their sexual orientation and gender identity.

LGBTQ youth who attempted suicide in the past year, comparison across access to LGBTQ-affirming spaces:



Social media has both positive and negative impacts on LGBTQ youth. **96% of LGBTQ youth** said social media positively impacted their well-being, and **88% of LGBTQ youth** said it negatively impacted their well-being.

Transgender & nonbinary youth who attempted suicide in the past year, comparison across access to gender-affirming spaces:



● Affirming
● Not affirming

p.14

AR_300209

**FINDING JOY**

# Although LGBTQ youth described a number of challenges in their lives, they also listed hundreds of ways they find joy and strength, including:

Affirming parents • Anime • Chosen family

Educational opportunities • Faith & spirituality

Feeling seen • Finding community online

Having a pet • Having a supportive partner

Learning more about LGBTQ history

LGBTQ support at school • Moving away • Music

Others who identify in similar ways

Reading & writing • Representation in media

Seeing others take pride in being LGBTQ

Seeing rainbow flags & stickers in public

Supportive friends • Theater • Therapy

Unapologetic embracing of self • Video games

Watching LGBTQ people on TikTok & YouTube

Working out

p.15

## RESEARCH

The mission of The Trevor Project's Research Department is to **produce and use innovative research** that brings new knowledge and clinical implications to the field of suicidology and LGBTQ youth mental health.

## To address this mission we:

### Advance Scientific Inquiry

Providing empirical data to better understand the lives of LGBTQ youth and suicidality including risk factors, protective factors, and outcomes.

- The Trevor Project will be a leading source of scientific information on the needs and strengths of LGBTQ youth
- The Trevor Project will collaborate with key national and international research teams and agencies to improve the lives of LGBTQ youth

### Support The Trevor Project's Life-Saving Work

Using internal and external data and research findings to advance The Trevor Project's crisis services and peer support programs as well as advocacy and education initiatives.

- The Trevor Project's advocacy and training activities will be supported by data collected directly by The Trevor Project as well as evidence gathered from the broader research literature
- The Trevor Project will embody an evidence-informed culture in which all staff are supported and recognized in the use of research evidence

### Inform Public Knowledge

Ensuring our research and evaluation findings are applicable and widely communicated to the broader public including LGBTQ youth-serving agencies and mental health organizations.

- The Trevor Project will serve as a national model on how to integrate the best research evidence into its practices, programs, and policies
- The Trevor Project will be a leading resource on terminology related to LGBTQ youth

**Recommended Citation**
The Trevor Project. (2021).
2021 National Survey on LGBTQ Youth Mental Health.
West Hollywood, California: The Trevor Project.

For additional information please contact:
Research@TheTrevorProject.org

AR_300211

# METHODOLOGY

## The content and methodology for **The Trevor Project's 2021 National Survey on LGBTQ Youth Mental Health** were approved by an independent Institutional Review Board.

A quantitative cross-sectional design was used to collect data through an online survey platform between October 12, 2020 and December 31, 2020. A sample of individuals ages 13–24 who resided in the United States was recruited via targeted ads on social media. No recruitment was conducted via The Trevor Project website or any of The Trevor Project's social media sites. Respondents were defined as being LGBTQ if they identified with a sexual orientation other than straight/heterosexual, a gender identity other than cisgender, or both. In order to ensure representativeness of the sample, targeted recruitment was conducted to ensure adequate sample sizes with respect to geography, gender identity, and race/ethnicity. Qualified respondents completed a secure online questionnaire that included a maximum of 142 questions. Questions on considering and attempting suicide in the past 12 months were taken from the Centers for Disease Control and Prevention's Youth Risk Behavior Survey to allow for comparisons to their nationally representative sample. Each question related to mental health and suicide was preceded by a message stating.

"If at any time you need to talk to someone about your mental health or thoughts of suicide, please call The Trevor Project at 1-866-488-7386."

Participation was voluntary and informed consent was obtained. No names or personal details were included to ensure anonymity. A total of 82,147 youth from unique IP addresses consented to complete the survey. Eligible youth included those between the ages of 13–24 who identified as LGBTQ and resided in the U.S.

Additionally, in order to develop a sample that more closely approximated the race and ethnicity composition of the United States, quota limits were set for race/ethnicity categories. After providing demographic information — including their age, state, sex assigned at birth, gender identity, sexual orientation, and race/ethnicity — 2,158 youth were screened out based on ages outside of the sample range and residency outside of the United States. Additionally, 27,588 youth were screened out of the survey due to quotas for race/ethnicity already being met, resulting in an eligible sample of 54,559 respondents. A validity check was placed midway through the survey which asked participants to select "agree" from a five-point statement with answers ranging from "strongly disagree" to "strongly agree." Youth who did not select "agree" (n=804) or who did not reach the validity question in the mid-point of the survey (18,365) were removed from the analytic sample. More detailed screening of response consistency and quality resulted in the removal of an additional 631 respondents.

The final analytic sample consisted of 34,759 LGBTQ youth between the ages of 13–24 residing in the United States who provided valid and reliable responses to survey questions.

This report uses "transgender and nonbinary" as an umbrella term to encompass non-cisgender youth, which includes young people who identify as transgender and nonbinary as well as other labels outside of the cisgender binary, including genderqueer, agender, genderfluid, gender neutral, bigender, androgynous, and gender non-conforming, among others.

AR_300212

# METHODOLOGY

## Comparability to 2019 Youth Risk Behavior Survey by the Centers for Disease Control and Prevention (CDC):

In order to better understand how our sample compares to a national probabilistic sample, we included questions regarding considering and attempting suicide that were identical to those used by the Centers for Disease Control and Prevention (CDC) in their Youth Risk Behavior Surveillance System (YRBS).

Analyses were conducted to compare rates of seriously considering suicide and attempting suicide in the past 12 months among youth ages 13–18 in our sample to the 2019 YRBS sample of lesbian, gay, and bisexual (LGB) high school students.

YRBS prevalence rates among LGB youth for seriously considering suicide (47%) were comparable to rates among the same age range in our sample (47%).

Additionally, 23% of LGB youth in the 2019 YRBS reported a suicide attempt in the past 12 months compared to 19% in our sample of youth ages 13–18.

Our analytical sample has representation from over 7,500 Latinx LGBTQ youth, over 3,700 Asian/Pacific Islander LGBTQ youth, over 3,400 Black LGBTQ youth, and over 1,700 Native/Indigenous LGBTQ youth who reported their race/ethnicity either exclusively or as part of a multiracial identity.



2021 Trevor Project Survey (13–18)  47%      47%  Most recent CDC YRBS Survey

Considering suicide



2021 Trevor Project Survey (13–18)  19%      23%  Most recent CDC YRBS Survey

Attempting suicide



**Sexual Orientation**

- Bisexual — 37%
- Gay or lesbian — 28%
- Pansexual — 19%
- Queer — 12%
- I am not sure — 4%
- Straight or heterosexual — 1%



**Region**

- South — 35%
- West — 26%
- Midwest — 23%
- Northeast — 16%



**Asexual/Ace Spectrum**

- Not asexual/ace spectrum — 86%
- Asexual/ace spectrum — 14%



**Race/Ethnicity**

- White — 55%
- More than one identity — 18%
- Latinx — 15%
- Asian/Pacific Islander — 6%
- Black — 5%
- Native/Indigenous — 2%



**Gender Identity**

- Girl or woman — 41%
- Nonbinary, gender fluid, or gender non-conforming — 26%
- Boy or man — 23%
- Not sure or questioning — 9%



**Age**

- 13–17 — 57%
- 18–24 — 43%



**Transgender & Nonbinary Identity**

- Cisgender — 44%
- Questioning if transgender or nonbinary — 18%
- Transgender or nonbinary — 38%



**Socioeconomic Status**

- Has more than enough to meet basic needs — 77%
- Has just enough or less than enough to meet basic needs — 23%

AR_300213



**The Trevor Project** is the world's largest suicide prevention and crisis intervention organization for lesbian, gay, bisexual, transgender, queer & questioning young people.

### Need Help?
### We are here for you 24/7

For over 20 years, we have worked to save young lives by providing support through our free and confidential crisis services programs, including TrevorLifeline, TrevorChat, and TrevorText. We also run TrevorSpace, the world's largest safe space social networking site for LGBTQ youth, and operate innovative advocacy, research, and education programs across the country.

### TheTrevorProject.org

@TrevorProject
@TheTrevorProject
@TrevorProject



**Crisis services.**

Direct suicide prevention and crisis intervention services to support LGBTQ youth 24/7 via phone, text, and chat



**Peer support.**

The world's largest safe space social networking community for LGBTQ youth



**Research.**

Evaluations and external research that support The Trevor Project in significantly improving its services while maintaining preeminence in scientific inquiry



**Advocacy.**

Advocacy at the federal, state, and local levels to fight for policies and laws that protect LGBTQ youth



**Education and public awareness.**

Programs, trainings, and content promoting awareness around issues and policies relevant to LGBTQ youth and the adults who support them

AR_300214

Message

**Sent**:        6/23/2021 3:44:30 PM
**Subject**:    Title IX Anniversary - Dear Educator Letter and Fact Sheet on Anti-LGBTQI+ Harassment in Schools

Dear Colleagues:

It is a pleasure to mark today's 49th anniversary of Title IX with a <u>Dear Educator Letter</u> focused on Title IX and, in conjunction with the U.S. Department of Justice's Civil Rights Division, a new resource for students and families on *<u>Confronting Anti-LGBTQI+ Harassment in Schools</u>*.  The Secretary has also <u>issued a statement</u> recognizing the power of Title IX in supporting equal opportunity for students.

The letter highlights the importance and broad scope of Title IX, with resources available to help ensure schools are free from sex discrimination, including last week's notice related to *Bostock* and Title IX. The fact sheet includes examples of harassment and discrimination against LGBTQI+ students and information about steps students and families can take if they believe that students have been treated unfairly because of their sexual orientation or gender identity.

As we celebrate Title IX's anniversary and Pride Month, today's letter and fact sheet continue OCR's efforts to provide supportive resources and accessible information to promote safe and inclusive schools for LGBTQI+ students, as underscored by President Biden's Executive Orders on *<u>Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity</u>* and *<u>Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation</u>*.

I would appreciate your sharing the <u>letter</u> and <u>fact sheet</u> with your networks and thank you, again, for the work you do every day to ensure that all students are taught in safe, supportive, and welcoming school environments.

Sincerely,

Suzanne

Suzanne B. Goldberg
Acting Assistant Secretary for Civil Rights
Deputy Assistant Secretary for Strategic Operations and Outreach
U.S. Department of Education