**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

STATE OF TENNESSEE et al.,

     *Plaintiffs*,

v.

MIGUEL CARDONA, in his official capacity
as Secretary of Education, et al.,

     *Defendants*.

Case No. 2:24-cv-00072-DCR-CJS

Chief District Judge Danny C. Reeves
Magistrate Judge Candace J. Smith

**DEFENDANTS' CONSOLIDATED OPPOSITION TO
PLAINTIFFS' AND INTERVENOR-PLAINTIFFS' MOTIONS FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT AND
SUPPORTING MEMORANDUM**

# TABLE OF CONTENTS

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 3

I.     Title IX and Its Implementing Regulations ................................................................. 3

II.    The Department's 2024 Rule ....................................................................................... 4

III.   Procedural History ....................................................................................................... 7

Legal Standard ................................................................................................................. 8

Argument .......................................................................................................................... 8

I.     The Court should grant summary judgment to the Department. ................................. 8

      A.    Plaintiffs have not shown that the challenged provisions of the Rule are contrary to Title IX or arbitrary and capricious. .............................................................. 9

            1.    Section 106.10 correctly sets forth the scope of Title IX's prohibition on sex-based discrimination. ................................................................................... 9

            2.    Section 106.31(a)(2) is consistent with the text and structure of Title IX. 15

            3.    The Department lawfully exercised its authority in promulgating Section 106.2's definition of hostile environment harassment. ............................... 20

            4.    None of the challenged provisions violate the major questions doctrine. 21

      B.    Plaintiffs have not shown that the challenged provisions of the Rule are unconstitutional. ............................................................................................... 22

            1.    The challenged provisions do not violate the Spending Clause or principles of federalism. ............................................................................... 22

            2.    Section 106.31(a)(2) does not violate any right to safety or privacy. ........ 24

            3.    Section 106.31(a)(2) does not violate parental rights. ............................... 27

            4.    Section 106.10 and Section 106.2's hostile environment harassment definition do not violate the First Amendment. ....................................... 28

II.    To the extent Plaintiffs are entitled to any relief, that relief should be limited to the parties and to the provisions of the Rule that the Court concludes are unlawful. ........................ 35

      A.    Any relief should be limited to the parties. ........................................................... 36

      B.    Any relief should be limited to provisions of the Rule that the Court finds unlawful and that cause harm to the parties. ......................................................... 39

            1.    Any injunctive relief should be appropriately tailored. ............................. 39

            2.    The Rule is severable. ................................................................................. 45

      C.    The Court should not grant all of Plaintiffs' requested remedies. ........................ 50

Conclusion ...................................................................................................................... 50

# TABLE OF AUTHORITIES

### Cases

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ...................................................................... 11, 16

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) .................................................................... 8

*Am. Fuel & Petrochemical Mfrs. v. EPA,*
  3 F.4th 373 (D.C. Cir. 2021) ........................................................................ 47

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) ...................................................................................... 32

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.,*
  64 F.4th 1354 (D.C. Cir. 2023) .................................................................... 38

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ........................................................................ 38, 39

*Arnold, Constable & Co. v. United States,*
  147 U.S. 494 (1893) ...................................................................................... 13

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................... 21

*Ayotte v. Planned Parenthood of N. New Eng.,*
  546 U.S. 320 (2006) ...................................................................................... 49

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
  591 U.S. 610 (2020) .............................................................................. 36, 45, 46

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) .................................................................... 23

*Bostock v. Clayton Cnty.,*
  590 U.S. 644 (2020) .............................................................................. *passim*

*Brannum v. Overton Cnty. Sch. Bd.,*
  516 F.3d 489 (6th Cir. 2008) ........................................................................ 24

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ...................................................................................... 35

*California v. Texas,*
  593 U.S. 659 (2021) ...................................................................................... 40

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979) .................................................................................. 45

*Chisholm v. St. Marys City Sch. Dist.*,
    947 F.3d 342 (6th Cir. 2020) ................................................................... 12

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .................................................................................. 43

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    589 U.S. 327 (2020) .................................................................................. 10

*Cumberland Med. Ctr. v. Sec'y of Health & Hum. Servs.*,
    781 F.2d 536 (6th Cir. 1986) ................................................................... 48

*D.T. v. Sumner Cty. Sch.*,
    942 F.3d 324 (6th Cir. 2019) ................................................................... 43

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) .................................................................................. 40

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
    526 U.S. 629 (1999) ................................................................. 20, 21, 28, 33

*Dep't of Educ. v. Louisiana*,
    --- S. Ct. --- , 2024 WL 3841071 (U.S. Aug. 16, 2024) ........................... 7, 8, 10, 46

*Dep't of State v. Munoz*,
    144 S. Ct. 1812 (2024) ............................................................................. 24

*Direct Mktg. Ass'n v. Brohl*,
    575 U.S. 1 (2015) ..................................................................................... 38

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v.*
    *Raimondo*, 18 F.4th 38 (1st Cir. 2021) ................................................... 44

*Dodds v. U.S. Dep't of Educ.*,
    845 F.3d 217 (6th Cir. 2016) ................................................................... 17

*Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518 (3d Cir. 2018) ............................................................... 24, 25

*Doe v. Miami Univ.*,
    882 F.3d 579 (6th Cir. 2018) ......................................................... 20, 28, 31, 33

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) .................................................................................. 39

*Ent. Prods., Inc. v. Shelby Cnty.*,
  588 F.3d 372 (6th Cir. 2009) ............................................................. 32

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................................................ 9

*Fischer v. Thomas*,
  78 F.4th 864 (6th Cir. 2023) ............................................................. 44

*Garland v. Aleman Gonzalez*,
  142 S. Ct. 2057 (2022) ....................................................................... 38

*Gebser v. Lago Vista ISD*,
  524 U.S. 274 (1998) ........................................................................... 21

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................. 35, 42, 50

*Grabowski v. Ariz. Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023) ........................................................... 11

*Grayned v. Rockford*,
  408 U.S. 104 (1972) ........................................................................... 35

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ............. 11, 16

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ........................................................................... 10

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ..................................................................... 27, 44

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ...................................................................... *passim*

*Heartland Reg'l Med. Ctr. v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009) .......................................................... 37

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ........................................................................... 37

*Herrell v. Benson*,
  261 F. Supp. 3d 772 (E.D. Ky. 2017) ................................................ 39

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ................................................................... 1, 3, 23

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018) .................................................................................. 12

*Kansas v. U.S. Dep't of Educ.,*
   No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) ......................... 38, 39

*Kent v. Johnson,*
   821 F.2d 1220 (6th Cir. 1987) ...................................................................... 24

*Kentucky v. Biden,*
   23 F.4th 585 (6th Cir. 2022) ........................................................................ 44

*Kentucky v. Biden,*
   57 F.4th 545 (6th Cir. 2023) ........................................................................ 42

*Kentucky v. Fed. Highway Admin.,*
   2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) .................................................... 38

*Kollaritsch v. Mich. St. Univ.,*
   944 F.3d 613 (6th Cir. 2019) .................................................................. 10, 12

*Kutchinski v. Freeland Cmty. Sch. Dist.,*
   69 F.4th 350 (6th Cir. 2023) ........................................................................ 33

*Labrador v. Poe,*
   144 S. Ct. 921 (2024) .................................................................................. 38

*Maben v. Thelen,*
   887 F.3d 252 (6th Cir. 2018) ........................................................................ 18

*Maryland v. King,*
   567 U.S. 1301 (2012) .................................................................................. 44

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923) ............................................................................... 23, 24

*MD/DC/DE Broadcasters Ass'n v. FCC,*
   236 F.3d 13 (D.C. Cir. 2001) ........................................................................ 45

*Memphis A. Philip Randolph Inst. v. Hargett,*
   978 F.3d 378 (6th Cir. 2020) ........................................................................ 41

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021) .................................................................. 31, 33

*Mich. Coal. of Radioactive Material Users v. Griepentrog,*
   945 F.2d 150 (6th Cir. 1991) ........................................................................ 44

*Muldrow v. St. Louis*,
    144 S. Ct. 967 (2024) ................................................................. 15, 18

*New York v. U.S. Dep't of Educ.*,
    477 F. Supp. 3d 279 (S.D.N.Y. 2020) ........................................ 42, 43

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ................................................................... 22, 23

*North Carolina v. Covington*,
    585 U.S. 969 (2018) .......................................................................... 40

*Oceana, Inc. v. Evans*,
    389 F. Supp. 2d 4 ............................................................................. 48

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) ..................................................................... 49

*Parents Def. Educ. v. Olentangy Loc. Sch. Dist.*,
    109 F.4th 453 (6th Cir. July 29, 2024) ....................................... 30, 32

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) .......................................................... 24

*Peltier v. Charter Day School, Inc.*,
    37 F.4th 104 (4th Cir. 2023) ............................................................ 17

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ............................................................ 23, 24, 27, 43

*Pennsylvania v. DeVos*,
    480 F. Supp. 3d 47 (D.D.C. 2020) .................................................... 42

*Protect Our Aquifer v. Tenn. Valley Auth.*,
    654 F. Supp. 3d 654 (W.D. Tenn. 2023) ............................................. 8

*Roark v. S. Iron R-1 Sch. Dist.*,
    573 F.3d 556 (8th Cir. 2009) ............................................................ 50

*Rowles v. Univ. of Mo.*,
    983 F.3d 345 (8th Cir. 2020) ...................................................... 33, 34

*Rumsfeld v. FAIR, Inc.*,
    547 U.S. 47 (2006) ........................................................................... 30

*Sierra Club v. U.S. Env't Prot. Agency*,
    60 F.4th 1008 (6th Cir. 2023) ..................................................... 37, 42

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ........................................................................... 34

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019) ............................................................................... 45

*Taylor-Travis v. Jackson St. Univ.,*
    984 F.3d 1107 (5th Cir. 2021) ............................................................................. 12

*Tennessee v. Cardona,*
    No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024).......................... 7, 8, 46

*Tennessee v. Department of Education,*
    104 F.4th 577 (6th. Cir. 2024) ............................................................................. 43

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ............................................................................... 50

*United States v. Texas,*
    599 U.S. 670 (2023) ....................................................................................... 37, 39

*United Steel v. Pension Ben. Guar. Corp.,*
    707 F.3d 319 (D.C. Cir. 2013) ............................................................................ 27

*Univ. of Texas v. Camenisch,*
    451 U.S. 390 (1981) .............................................................................................. 1

*Waldo v. Consumers Energy Co.,*
    726 F.3d 802 (6th Cir. 2013) ............................................................................... 33

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................................................. 24

*West Virginia v. EPA,*
    597 U.S. 697 (2022)....................................................................................... 21, 22

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008).................................................................................................. 45

## Statutes

5 U.S.C.
    § 702................................................................................................................. 37
    § 703................................................................................................................. 36
    § 706(2)............................................................................................................ 36

20 U.S.C. § 1681 ............................................................................................ 9, 10, 18
   § 1681(a) ................................................................................................... 3, 15, 48
   § 1681(a)(6) ....................................................................................................... 5
   § 1681(a)(6)(A) ................................................................................................ 15
   § 1682............................................................................................................ 3, 21, 43
   § 1686 .............................................................................................................. 18

42 U.S.C.
   § 2000e-2(a)(1) ................................................................................................. 4
   § 2000e-2(e) .................................................................................................... 13

## Regulations

34 C.F.R.
   § 100.7(a) .......................................................................................................... 3
   § 106.2 ...................................................................................................... *passim*
   § 106.6(d) ........................................................................................................ 29
   § 106.6(d)(1) ..................................................................................................... 6
   § 106.6(g) ........................................................................................................ 27
   § 106.8(a) ..................................................................................................... 4, 48
   § 106.9 .......................................................................................................... 7, 46
   § 106.10 ........................................................................................................ 5, 9
   § 106.30 ........................................................................................................... 34
   § 106.31(a)(2) ................................................................................................... 5
   § 106.33 ........................................................................................................... 16
   § 106.40(b) ...................................................................................................... 40
   § 106.41(a) ................................................................................................. 14, 19
   § 106.41(b) ...................................................................................................... 18
   § 106.45 ........................................................................................................... 40
   § 106.71 ........................................................................................................... 40

45 C.F.R. § 86.1 ................................................................................................... 48

62 Fed. Reg. 12,034 (Mar. 13, 1997)................................................................... 21

66 Fed. Reg. 5,512 (Jan. 19, 2001) ..................................................................... 20

85 Fed. Reg. 30,026 (May 19, 2020) ..................................................................... 4

Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021)............................... 4

87 Fed. Reg. 41,390 (July 12, 2022)...................................................................... 4

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving*
   *Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ............... *passim*

## INTRODUCTION

Title IX prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave the statute a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Congress also authorized the Department of Education to issue rules to effectuate the statute's sweeping prohibition on sex discrimination. In April 2024, the Department exercised that authority by issuing an omnibus rule that makes amendments to its Title IX regulations. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Rule"). The Plaintiff States and Intervenors (collectively, "Plaintiffs") now seek to vacate the entire Rule based on statutory and constitutional challenges to three of the Rule's many provisions. *See* States' Consol. MSJ & Supp. Mem., ECF No. 126 ("PMSJ"); Intervenor-Pls.' Mem. in Supp. of MSJ, ECF No. 127-1 ("IMSJ"). Because these challenges are baseless, the Court should instead grant judgment to the Department.

Of course, the Department acknowledges that the Court has already held that Plaintiffs are likely to prevail on some of their challenges. *See* Mem. Op. & Order, ECF No. 100 ("PI Op."); Mem. Op. & Order, ECF No. 117 ("Stay Op."). But given that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties" until the Court can render a final disposition, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" on summary judgment. *Id.*

In particular, three aspects of this case warrant another look. The first is the structure of the Rule itself, which consists of numerous severable provisions, including many that Plaintiffs do not

even challenge—ranging from revising recordkeeping requirements to guaranteeing access to lactation spaces for breastfeeding students. Because plaintiffs challenge only three discrete provisions (the "challenged provisions"), the remaining provisions of the Rule should be permitted to go into effect. But the challenged provisions should also be permitted to take effect because they are consistent with—or even compelled by—the text and structure of Title IX. To wit, § 106.10 recognizes, consistent with the Supreme Court's interpretation of Title VII's materially indistinguishable text, that Title IX's prohibition on sex discrimination encompasses discrimination based on gender identity. Section 106.31(a)(2) reflects Title IX's statutory design by providing that a school violates Title IX when it differentiates on the basis of sex in a way that causes more than de minimis harm, unless Congress has authorized such differentiation. And § 106.2 includes a definition of "hostile environment harassment" that the Department designed to effectuate Title IX's broad reach, consistent with the definitions used in other civil-rights statutes. Each of these provisions can operate separately and must be examined individually.

The second is that the Department now has the opportunity to provide a more fulsome explication of the reasoning underlying the challenged provisions of the Rule—one that draws upon the extensive administrative record. That record furnishes ample support for propositions that the Court found lacking, like evidence of the serious physical and emotional harms that can be caused by excluding transgender students from facilities that correspond to their gender identity, and evidence that allowing transgender students to use such facilities does not interfere with other students' interests in safety and privacy. The Department's fact-based conclusions about the need for the challenged provisions, backed as they are by the Department's enforcement experience, relevant case law, empirical evidence, and stakeholder comments, should not lightly be cast aside.

The third is the importance of tailored relief. Plaintiffs seek an expansive remedy: not only

vacatur but injunctive and declaratory relief as well. Plaintiffs seek to bind non-parties and vacate or enjoin provisions of the Rule that they do not even challenge. Vacatur is not an available remedy under the APA, and if it were, it would not be appropriate here. Moreover, the description of sex discrimination in § 106.10 is not necessary to the functioning of the remainder of the Rule, given that Title IX's implementing regulations have operated without a regulatory definition of sex discrimination for decades. Without that piece of the argument, the presumption of severability and the balance of equities clearly counsel in favor of limited relief. Such an approach would also align with the Department's unequivocally stated intention for severability in the Rule.

For the foregoing reasons, the Court should enter judgment for Defendants. In the alternative, any relief should be limited to the parties and to the provisions of the Rule that the Court concludes are unlawful.

## BACKGROUND

### I.      Title IX and Its Implementing Regulations

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Congress gave the statute['s]" prohibition on sex discrimination "a broad reach" subject only to a "list of narrow" statutory exceptions and exclusions. *Jackson*, 544 U.S. at 173, 175; *see* 20 U.S.C. §§ 1681(a), 1686. Congress also authorized the Department to "issu[e] rules … consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682. And Congress established a detailed administrative scheme requiring the Department to first attempt to secure compliance through voluntary means before the Department may suspend or terminate federal financial assistance. *See id.* §§ 1234g(a), 1682–1683; *see also* 34 C.F.R. §§ 100.7(a)–(d), 100.8(a).

Since Title IX's enactment, the Department has promulgated regulations implementing the

3

statute's prohibition on sex discrimination, including in 2020. *See* 85 Fed. Reg. 30,026 (May 19, 2020). One month after publication of the 2020 rule, the Supreme Court held that the prohibition on discrimination "because of … sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). Following *Bostock*, the President directed the Department to review the 2020 rule "for consistency with governing law." Exec. Order No. 14,021, § 2(a), 86 Fed. Reg. 13,803 (Mar. 8, 2021).

## II.    The Department's 2024 Rule

Following an extensive public engagement process, the Department issued the Rule. In June 2021, the Department's Office for Civil Rights held a nationwide virtual public hearing on Title IX. 89 Fed. Reg. at 33,480. OCR received more than 30,000 written comments in connection with the hearing as well as over 280 live comments. *Id.* at 33,835, 33,860. OCR also held listening sessions with a wide variety of stakeholders. *Id.* at 33,480. In July 2022, the Department issued a Notice of Proposed Rulemaking ("NPRM"). *See* 87 Fed. Reg. 41,390 (July 12, 2022). Following extensive review of the over 240,000 comments submitted in response to the NPRM, the Department published the Rule, which went into effect as to states and schools not encompassed within a preliminary injunction on August 1, 2024. *See* 89 Fed. Reg. at 33,476.

The omnibus Rule contains a multitude of provisions intended to "fully effectuate Title IX's sex discrimination prohibition." *Id.* Among other things, the Rule contains provisions that streamline requirements related to Title IX Coordinators, 34 C.F.R. § 106.8(a); revise recipients' notice of nondiscrimination and record-keeping requirements, *id.* § 106.8(c), (f); ensure access to lactation spaces for breastfeeding students and employees, *id.* §§ 106.40(b)(3)(v), 106.57(e)(2); address a recipient's response to sex discrimination, *id.* § 106.44; and provide recipients additional flexibility regarding procedures to respond to claims of sex discrimination, including sex-based

harassment, *id.* §§ 106.45-106.46. Many could have been entirely separate rulemakings.

Plaintiffs' challenges focus only on three other provisions, and particularly those provisions' application to gender-identity discrimination. *See* PMSJ 4; IMSJ 3–4.

**Section 106.10** recognizes that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 34 C.F.R. § 106.10. Consistent with the Supreme Court's reasoning in *Bostock*, the Rule explains that "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

**Section 106.31(a)(2)** sets out the general principle that Title IX permits "different treatment or separation on the basis of sex" only to the extent that such differential treatment or separation does not "discriminate[] … by subjecting a person to more than de minimis harm." 34 C.F.R. § 106.31(a)(2). The Department derived the de minimis harm standard from the "well-established" understanding "that the concept of discrimination includes an element of injury or harm." 89 Fed. Reg. at 33,815. This provision also recognizes, however, that Congress carved out certain contexts in which a school may permissibly differentiate on the basis of sex even though greater than de minimis harm may result. *See, e.g.*, 20 U.S.C. § 1681(a)(6) (membership in fraternities or sororities); *id.* § 1686 (maintenance of sex-separate living facilities). The Rule also makes explicit that it does not amend § 106.41(b), which concerns sex separation in athletic teams and is the subject of a separate rulemaking, and that § 106.31(a)(2) does not apply in that context. *See* 89 Fed. Reg. at 33,817; PI Op. 78–79.

Applying this framework, the final sentence of § 106.31(a)(2) provides that a policy or

practice that "prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,887. That provision reflects the Department's evidence-backed conclusion that "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity," including "physical, emotional, and dignitary harms." *Id.* at 33,818.

**Section 106.2** is a glossary of terms used in the Department's Title IX regulations, and the amendments to § 106.2 address over a dozen terms, including "sex-based harassment." One form of sex-based harassment is "[h]ostile environment harassment," defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment)." 34 C.F.R. § 106.2. The Department drew the definition of hostile environment harassment from "Title IX's broad language," further concluding that the definition "will better align with the definitions of harassment in other civil rights laws[] and will reduce confusion." 89 Fed. Reg. at 33,497. As with other civil rights statutes, § 106.2 explains that "[w]hether a hostile environment has been created is a fact specific inquiry that includes consideration" of several enumerated factors.

In promulgating § 106.2's "hostile environment harassment" definition, the Department took multiple steps to protect First Amendment rights. The Department preserved language from the 2020 amendments stating that nothing in the Department's Title IX regulations "requires a recipient to … [r]estrict any rights" protected "by the First Amendment of the U.S. Constitution," 34 C.F.R. § 106.6(d)(1); reiterated that "a recipient must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees"; and acknowledged that "the

6

First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503.

**Severability.** Although the Department "believes that every provision of the final regulations is legally supportable," it reiterated that the severability clauses in its existing regulations "continue[d] to be applicable." *Id.* at 33,848; *see, e.g.*, 34 C.F.R. §§ 106.9, 106.18, 106.24, 106.46, 106.62, 106.72, 106.82. The Department "confirm[ed] that each of the provisions in the final regulations is intended to operate independently of each other," and described how different provisions—including §§ 106.2, 106.10, and 106.31(a)(2)—operated independently from one another and from the remainder of the Rule. 89 Fed. Reg. at 33,848.

## III.    Procedural History

The Court entered a preliminary injunction on June 17, ECF No. 100, which Defendants appealed, ECF No. 103. On appeal, the Defendants filed an emergency motion seeking to partially stay the injunction, which a divided motions panel of the Sixth Circuit denied, reasoning that *Bostock* did not automatically apply to Title IX and that the Department had failed to show that the challenged provisions could be severed from the rest of the Rule "in the context of this emergency stay motion." *Tennessee v. Cardona*, 2024 WL 3453880, at *4 (6th Cir. July 17, 2024).

The Solicitor General filed an application asking the Supreme Court to partially stay the injunction pending appeal. The Court denied the applications. *Dep't of Educ. v. Louisiana*, --- S. Ct. ----, 2024 WL 3841071 (U.S. Aug. 16, 2024). The Court stated that it "today accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to" the challenged provisions, noting that the dispute before the Court concerned whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals." *Id.* at *1. As to that issue, the Court reasoned that, "[i]n this emergency posture in this Court, the burden is on the Government as applicant" to

show entitlement to relief and that, "[o]n this limited record and in its emergency applications, the Government has not provided this Court a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule." *Id.* Justice Sotomayor—joined by Justices Kagan, Gorsuch, and Jackson—dissented in part, explaining that the "injunctions are overbroad" because they "bar the Government enforcing the entire rule—including provisions that bear no apparent relationship to [the plaintiffs'] alleged injuries." *Id.* at *2.

Plaintiffs and Intervenors have also filed summary judgment motions. ECF Nos. 126, 127. The Department opposes those motions and cross-moves. Pursuant to the Court's July 19 Order, ECF No. 125, Defendants have consolidated their responsive pleading with this motion, as it explains why Plaintiffs fail to state a claim under Rule 12(b)(6).

## LEGAL STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Summary judgment is "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Protect Our Aquifer v. Tenn. Valley Auth.*, 654 F. Supp. 3d 654, 666 (W.D. Tenn. 2023) (cleaned up).

## ARGUMENT

### I.   The Court should grant summary judgment to the Department.

The challenged provisions of the Rule—(i) the description of the scope of prohibited sex discrimination in § 106.10, (ii) the specification of how Title IX's prohibition on sex

discrimination applies to separation or differentiation based on sex in § 106.31(a)(2), and (iii) the definition of hostile environment harassment in § 106.2—are lawful in their application to gender-identity discrimination and otherwise. The Department is therefore entitled to judgment.

*First*, Plaintiffs' APA challenges fail because the challenged provisions of the Rule are consistent with—indeed, in substantial measure, compelled by—the text of Title IX, its statutory design, and pertinent Supreme Court decisions, including *Bostock*. To the extent the Rule reflects interstitial policy decisions by the Department, the Department acted well within the "zone of reasonableness" in making them. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

*Second*, the challenged provisions of the Rule are constitutional, whether Plaintiffs' constitutional concerns are framed in terms of constitutional violations, canons of statutory interpretation and avoidance doctrines, or factors the Department was obliged to consider in exercising its policy discretion. The challenged provisions of the Rule should therefore be upheld.

## A. Plaintiffs have not shown that the challenged provisions of the Rule are contrary to Title IX or arbitrary and capricious.

### 1. Section 106.10 correctly sets forth the scope of Title IX's prohibition on sex-based discrimination.

Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681. Section 106.10 accurately describes the scope of that prohibition: "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10, "because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655). Section 106.10 thus makes clear that prohibited sex discrimination includes actions like excluding a student from homecoming for being pregnant, giving a student detention for being gay, or barring a student from band for being transgender. That interpretation is lawful.

**a.**      Section 106.10 reflects a straightforward application of *Bostock*'s two-step reasoning to the materially indistinguishable language of Title IX's prohibition on sex discrimination. *Contra* PMSJ 7–10, 13–17; IMSJ 6–10; PI Op. 16–28; Stay Op. 5–8.[1]

*First,* by prohibiting discrimination "on the basis of" sex, 20 U.S.C. § 1681, Title IX "incorporates" a causation standard no more stringent than "the 'simple' and 'traditional' standard of but-for causation." *Bostock*, 590 U.S. at 656 (quotation omitted); *see Kollaritsch v. Mich. St. Univ.*, 944 F.3d 613, 622 (6th Cir. 2019) (applying "but for" causation to Title IX harassment claim). In other contexts, the Supreme Court has explained that "the phrase 'based on' indicates a but-for causal relationship" and that the phrase has "the same meaning as the phrase, 'because of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quotation omitted). The same is true of the phrase "on the basis of," which is "strongly suggestive of a but-for causation standard." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335 (2020).

*Second*, whether in the workplace or in a school, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660–61 (emphasis omitted). That is why various courts have concluded that in light of *Bostock*, discrimination on the basis of sexual orientation

---

[1]    In denying the Department's stay applications, the Supreme Court did not address—or even mention—the applicability of *Bostock* to Title IX's text. Nor did it otherwise resolve the merits of the Department's appeals from the preliminary injunction. As explained above, the brief per curiam order merely noted that "all Members of the Court today accept[ed]" that the plaintiffs were entitled to preliminary relief as to the challenged provisions, a statement describing only a stay-stage determination regarding the preliminary injunctions, as the dissent made clear. *Louisiana*, 2024 WL 3841071, at *1; *see id.* at *2 (Sotomayor, J., dissenting in part). The unpublished decision of the Sixth Circuit motions panel denying a stay of the preliminary injunction is similarly not controlling given that, as an interlocutory appeal from the entry of a preliminary injunction, it did not render a final determination on the merits.

and gender identity are necessarily forms of prohibited sex discrimination under Title IX. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).

**b.**    Plaintiffs' responses are unavailing. Like the Court in *Bostock*, the Department did not "redefine" the term sex, nor construe the term "sex" in Title IX to mean anything other than "physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655). *Contra* PMSJ 8–9; IMSJ 8; PI Op. 1, 18–20. Section 106.10, like *Bostock*, recognizes that gender-identity discrimination is sex discrimination even under that binary understanding of sex. 89 Fed. Reg. at 33,802. Indeed, Intervenors concede that the Rule "assumes that 'sex' means biological differences," but fault the Department for declining to define the term. IMSJ 6. The Department rightly concluded, however, that defining the term was unnecessary, 89 Fed. Reg. at 33,802, given that the Department's regulations have long referred to "discrimination on the basis of sex" without defining those terms. *See infra* pages 47–48.

As in *Bostock*, "[t]he question isn't just what 'sex' mean[s], but what [Title IX] says about it," 590 U.S. at 656—i.e., what sex-based conduct Title IX prohibits. It prohibits discrimination "on the basis of" sex, language that imposes a causation standard no more stringent than but-for causation under Title VII. *Id.* This Court previously indicated that, "[r]ather than indicating cause-and-effect, 'on the basis of' is a preposition that indicates a foundational criterion upon which distinctions are made," namely, "sex—male or female." Stay Op. 6–7. But that way of framing the question does not meaningfully change the answer. The question remains what relationship that criterion must have to a discriminatory act, and *Bostock* still supplies the answer: as with Title VII, it must be a but-for cause. To the extent that the Court suggested sex must be the only cause, or

read the statute's use of the term "*the* basis" in that way, that reading would impose a conception of sole or primary causation that courts have rejected and would greatly restrict the force and effect of Title IX. *See, e.g.*, *Taylor-Travis v. Jackson St. Univ.*, 984 F.3d 1107, 1119 (5th Cir. 2021). Indeed, as the Supreme Court explained in *Bostock*, when Congress intends to impose those causal standards, it typically uses language like "solely" or "primarily." 590 U.S. at 656–57.

It makes no difference that Title IX and Title VII use slightly different formulations for their parallel prohibitions on sex discrimination. *Contra* PMSJ 13–14; IMSJ 7; Stay Op. 7–8. "[T]here is no canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing," much less words used in *different* statutes. *Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018) (quotation omitted). Indeed, the Sixth Circuit has "looked to the Title VII landscape for guidance" when interpreting Title IX precisely because "both statutes prohibit discrimination on the basis of sex." *Chisholm v. St. Marys City Sch. Dist.*, 947 F.3d 342, 350 (6th Cir. 2020); *see Kollaritsch*, 944 F.3d at 622 (same). In *Bostock* itself, the Supreme Court substituted the phrase "on the basis of" for Title VII's "because of" formulation at least eight times. *See, e.g.*, 590 U.S. at 649 (noting that "in Title VII, Congress outlawed discrimination in the workplace on the basis of race, color, religion, sex, or national origin"). Other differences between Title IX and Title VII are similarly immaterial: both speak in equally broad terms, and prohibit discrimination—understood in either context as acts that cause cognizable harm—against individuals where sex plays an impermissible role. *Contra* IMSJ 7–9. And the fact that Title VII also prohibits discrimination on bases like race does not affect the requisite causal relationship between the discriminatory act and the prohibited basis, whatever it may be.

As for the fact that Title IX and its original implementing regulations contain provisions allowing sex separation in some contexts, *contra* PMSJ 9–10, 14–15; IMSJ 7–9; Stay Op. 8, those

provisions do not compel a different understanding of what constitutes sex discrimination. Title VII, too, contains statutory exceptions, *see* 42 U.S.C. § 2000e-2(e) (bona fide qualifications), and has long been understood to allow certain forms of sex separation, like "sex-segregated bathrooms, locker rooms, and dress codes," and yet the Supreme Court still held that gender-identity discrimination is necessarily a form of sex discrimination. *Bostock*, 590 U.S. at 681. In any event, the presence of statutory provisions that allow for sex separation in certain contexts demonstrates that Congress understood Title IX's general prohibition against sex discrimination otherwise could have been interpreted to preclude such separation or differentiation. *See Arnold, Constable & Co. v. United States*, 147 U.S. 494, 499 (1893) ("[T]he exception of a particular thing from general words proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made.") (quotation omitted).

Extratextual considerations, like the purpose and history of Title IX, do not undermine the straightforward textual analysis set out above, nor could they. *Contra* PMSJ 15–17; PI Op. 27–28. "[I]t is ultimately the provisions of [a statute] rather than the principal concerns of our legislators by which we are governed." *Bostock*, 590 U.S. at 674 (quotation omitted). In any event, the relevant purpose of both statutes is the same: to root out sex discrimination—for *all* individuals, not just women and girls—albeit in different settings. Nor does unfounded speculation about how § 106.10 might hypothetically apply to discrete factual contexts, including preferred names, choir roles, or lactation accommodations, warrant failing to give Title IX's text its plain meaning. *See* PMSJ 15–16; IMSJ 19–20; PI Op. 27; Stay Op. 11–12.[2] The Rule does not resolve those questions,

---

[2]   Intervenors also suggest that a series of court cases and filings that predate the Rule are indicative of § 106.10's implications, *see* IMSJ 19–20, but it is § 106.10 that appears in the Code of Federal Regulations, not these other documents. Similarly, Intervenors invoke concerns about how § 106.10 might hypothetically apply to the general prohibition on sex discrimination in

and much the same could have been speculated about how the Court's ruling in *Bostock* might have affected the name an employer must use for an employee at work, job assignments, or other accommodations. However, the Court rejected similarly "naked policy appeals" in favor of applying the statute's plain language. 590 U.S. at 681–82. This Court should do the same here.

    **c.**    Plaintiffs' arbitrary-and-capricious arguments largely reprise their statutory arguments or rest on misunderstandings of what § 106.10 does. To start, it was not arbitrary and capricious for the Department to rely on *Bostock*; its reasoning applies to Title IX's materially indistinguishable language for the reasons provided above. *Contra* PMSJ 20, IMSJ 12; PI Op. 67–69. Nor does § 106.10 improperly redefine sex discrimination, elevate new protected classes, or encompass characteristics that have nothing to do with sex. *Contra* IMSJ 8, 10; Stay Op. 8, 10–12. To discriminate on any of the bases listed in § 106.10, including on the basis of sex stereotypes, *contra* IMSJ 13, is simply to make impermissible sex-based distinctions. For example, permitting only male students to enroll in advanced math classes because men are supposedly more gifted at math would constitute discrimination on the basis of sex stereotypes, and thereby discrimination on the basis of sex. Finally, it was not unreasonable for the Department to follow *Bostock*'s lead in declining to address how a general prohibition on gender identity discrimination could bear on contexts involving sex separation. *See* 89 Fed. Reg. at 33,809; *Bostock*, 590 U.S. at 681 (declining "to address bathrooms, locker rooms, or anything else of the kind"). *Contra* IMSJ 12–13, 19–20. Those questions are addressed by § 106.31(a)(2) or by separate rulemaking, as this Court has recognized in the context of sex-separate athletic teams. PI Op. 78–79 ("Until the Proposed Athletics Rule is finalized and issued, the current regulations on athletics continue to apply.").

---

athletics, *see* 34 C.F.R. § 106.41(a), but § 106.10 does not expressly address that subject, and Intervenors' claimed harms all relate to sex separation in competitive or contact athletics, *see* IMSJ 4–5, which the Rule does not address at all.

### 2.      Section 106.31(a)(2) is consistent with the text and structure of Title IX.

It is § 106.31(a)(2), not § 106.10, that addresses how Title IX's prohibition on sex discrimination applies to sex separation or differentiation. It does so in three steps:

*First*, § 106.31(a)(2) effectuates Title IX's plain text, which prohibits "discrimination" on the basis of sex, 20 U.S.C. § 1681(a), by providing that Title IX generally permits "different treatment or separation on the basis of sex" only to the extent that such differential treatment or separation does not "discriminate[] … by subjecting a person to more than de minimis harm." 89 Fed. Reg. at 33,887. As the Supreme Court has explained, "the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals." *Bostock*, 590 U.S. at 681 (quotation marks omitted); *see Muldrow v. St. Louis*, 144 S. Ct. 967, 974 (2024) (same). Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at 33,815, the Department "does not interpret Title IX to prohibit all sex-based distinctions or separation," including where such distinctions cause no harm, *id.* at 33,814.

*Second*, § 106.31(a)(2) follows Congress's direction by excepting certain contexts in which Congress permitted recipients to separate or distinguish on the basis of sex, even if doing so causes cognizable harm. *See id.* at 33,886. Those limited contexts include sex-separate fraternities and sororities, 20 U.S.C. § 1681(a)(6)(A); certain youth service organizations*, id.* § 1681(a)(6)(B); and "living facilities," *id.* § 1686. The Rule effectuates Congress's decision to treat certain contexts differently by providing that § 106.31(a)(2)'s de minimis harm standard does not apply to the statutory carve outs and their implementing regulations. 89 Fed. Reg. at 33,816.

*Third*, § 106.31(a)(2) includes an example in which separation or differential treatment on the basis of sex causes more than de minimis harm: preventing someone from participating in an education program or activity consistent with the person's gender identity. Therefore, except as covered by a congressionally specified exception, recipients must permit individuals to access sex-

15

separate facilities and activities consistent with their gender identity. In particular, the Department has long recognized that sex separation "in the context of bathrooms or locker rooms[] is not presumptively unlawful sex discrimination" because, for example, a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom. 89 Fed. Reg. at 33,818; *see* 34 C.F.R. § 106.33. But it violates Title IX to bar transgender students from accessing restrooms that align with their gender identity because restrooms are not exempted from the statute's general nondiscrimination mandate and barring such students *does* cause them cognizable sex-based harm. 89 Fed. Reg. at 33,818. Consistent with that conclusion, various courts have held that policies that prevent students from accessing the restrooms that correspond to their gender identity violate Title IX. *See, e.g.*, *A.C*, 75 F.4th at 769; *Grimm*, 972 F.3d at 616.

Plaintiffs do not challenge the Department's conclusion—supported by ample case law, research, testimony and comments from stakeholders, and evidence from schools' many years of practical experience, *see* 89 Fed. Reg. at 33,818–19—that preventing a person from participating in a program or accessing a sex-separate facility consistent with their gender identity subjects them to harm. Nor could they. As the American Medical Association and thirteen other medical associations have explained, substantial evidence[3] demonstrates that excluding students from facilities that correspond to their gender identity "endangers their health, safety and well-being,

_____

[3]     *See, e.g.*, Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. of Pub. Mgmt. & Soc. Pol'y 65 (2013), AR_293089–104; Jason Rafferty et al., Am. Acad. of Pediatrics, *Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents*, 142 Pediatrics 1 (2018), AR_281253–66; Thea A. Schlieben, *Sex-Segregated Bathrooms and Suicidal Ideation in Transgender Youth*, 15 J. Adv. Gen. Soc. Work Prac. 1 (2020), AR_293382–88; Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378 (2015), AR_293395, https://perma.cc/W6UL-NKSW; Katherine Szczerbinski, *Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity*, 36 Child. Legal Rts. J. 153, 153 (2016), AR_293105–08.

leads to negative health outcomes and heightens stigma and discrimination." Tanya Albert Henry, *Exclusionary Bathroom Policies Harm Transgender Students*, Am. Med. Ass'n (Apr. 17, 2019), AR_275350–52; *see also Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) ("[E]xclusion of [transgender girl] from the girls' restrooms has already had substantial and immediate adverse effects on the daily life and well-being of an eleven-year-old child").

Instead of contesting that evidence-based conclusion, Plaintiffs contend that § 106.31(a)(2) produces inconsistencies that Congress could not have intended because it treats Title IX's statutory exceptions "as cases where Congress expressly *allowed discrimination* against students whose sex and gender identity differ." PMSJ 14; *see also* IMSJ 14–15; PI Op. 25–26. But § 106.31(a)(2) reflects the distinctions that Congress drew in enacting Title IX. For example, *Congress* (not the Department) expressly excepted fraternities' membership practices from Title IX's general nondiscrimination mandate. *See* 89 Fed. Reg. at 33,816. *Congress* included no such exception for restrooms and locker rooms. *Id.* at 33,819. The Rule's careful adherence to statutory text and structure is entirely appropriate, given that neither courts nor agencies may "disregard [a statute's] plain terms based on some extratextual consideration," *Bostock*, 590 U.S. at 674–75.

Nor does § 106.31(a)(2) grant some sort of preferential treatment to transgender students. *Contra* PMSJ 16–17; IMSJ 13–14. Section 106.31(a)(2)'s protections are not limited to transgender students, but apply "with equal force to all students." 89 Fed. Reg. at 33,818; *see also id* at 33,820 (explaining that § 106.31(a)(2) "protects all students from harm"). The Rule protects all students from harmful sex-based distinctions not recognized as permissible by Congress, such as discriminatory dress and appearance codes. *See, e.g., Peltier v. Charter Day School, Inc.*, 37 F.4th 104, 130 (4th Cir. 2023) (en banc) (holding that a school dress code "requirement that only girls must wear skirts, when boys may wear shorts or pants" discriminates in violation of Title IX

17

if girls "are harmed by the requirement"). The Rule simply recognizes, as many courts have, that "prevent[ing] a person from participating in an education program or activity consistent with the person's gender identity" is one example of separation or differentiation that "subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,818. Plaintiffs offer no reason to doubt that well-reasoned conclusion.

Intervenors assert that Title IX's text does not support a de minimis harm standard at all, but their criticisms are off-base. *Contra* IMSJ 13–14. "[I]t is well-established that the concept of discrimination includes an element of injury or harm." 89 Fed. Reg. at 33,815 (collecting cases); *see also Muldrow*, 144 S. Ct. at 974 ("The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees.") (quoting *Bostock*, 590 U.S. at 681). And courts, including the Sixth Circuit, have conceived of de minimis harm as harm that "do[es] not rise to the level of a constitutionally cognizable injury." *Maben v. Thelen*, 887 F.3d 252, 266 (6th Cir. 2018). Thus, the de minimis harm standard is well-grounded in the statute's text.

Plaintiffs' arbitrary-and-capricious arguments about § 106.31(a)(2) reprise their statutory arguments and similarly fail. The Department hardly acted arbitrarily in recognizing distinctions drawn by Congress—such as for "separate living facilities for the different sexes," 20 U.S.C. § 1686—and effectuating Title IX's nondiscrimination mandate accordingly. *Contra* PMSJ 20–22; PI Op. 69–72. Plaintiffs assert that restrooms can constitute living facilities, but those contexts have always been treated differently; when the Department promulgated its regulations regarding "toilet, locker room, and shower facilities," it relied on the statute's general nondiscrimination prohibition, 20 U.S.C. § 1681, not the living-facilities provision. 89 Fed. Reg. at 33,821.

The Department likewise explained why the regulation concerning sex-separate athletic teams, 34 C.F.R. § 106.41(b), is one of the exceptions in § 106.31(a)(2), and why it chose to

address the issue of sex-separate athletic teams by separate rulemaking. *Contra* PMSJ 21; PI Op. 71. Congress recognized by statute that athletics is a special context, 89 Fed. Reg. at 33,816; *see* Education Amendments of 1974, section 844, and the Department's regulations have similarly recognized that athletics merit a different approach, "governed by an overarching nondiscrimination mandate and obligation to provide equal athletic opportunities for students regardless of sex." 89 Fed. Reg. at 33,816 (citing 34 C.F.R. § 106.41(a), (c)). This approach allows that students may be excluded from a particular team based on their sex, even when doing so may impose harm. *Id.* at 33,817. The Department also explained that "[c]lasses … focus on learning skills and competencies and do not raise the unique issues that are present in sex-separate interscholastic or intercollegiate athletic competition." *Id.* at 33,819. *Contra* PMSJ 21.

Finally, the Department addressed concerns about recipients' reliance interests and potential costs. *Contra* PMSJ 22; IMSJ 18; PI Op. 76. The Department explained that recipients may, but are not required to, provide "single-occupancy facilities" both "because such facilities are not the only way a recipient could provide nondiscriminatory access" and because it "would likely carry significant cost implications." 89 Fed. Reg. at 33,820. Similarly, the Department addressed scenarios concerning the application of § 106.31(a)(2). *Contra* IMSJ 18. As to how § 106.31(a)(2) applies to individuals whose gender identity is nonbinary, the Department explained that "a recipient may, for example, coordinate with the student, and the student's parent or guardian as appropriate, to determine how to best provide the student with safe and nondiscriminatory access to facilities." 89 Fed. Reg. at 33,818. The Department also made clear that where a parent and a child disagree about how the child should be treated, the parent's views should prevail. *See infra* Section I.B.3. In sum, § 106.31(a)(2) is lawful.

3.      **The Department lawfully exercised its authority in promulgating Section 106.2's definition of hostile environment harassment.**

Plaintiffs also provide no reason to invalidate § 106.2's definition of hostile environment harassment, much less why any flaws in that one definition, as applied to gender-identity discrimination, would taint all other applications of that definition, all of § 106.2, or the remainder of the Rule. *Contra* PMSJ 17–21; IMSJ 21–24. Section 106.2 defines hostile environment harassment to mean "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 34 C.F.R. § 106.2. This definition closely tracks the "Department's longstanding interpretation of Title IX" and accompanying "enforcement practice" prior to the 2020 amendments. 89 Fed. Reg. at 33,508; *see* 66 Fed. Reg. 5,512 (Jan. 19, 2001). It also mirrors the standards applied in "numerous civil rights laws, including Title VII." 89 Fed. Reg at 33,508; *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (applying a "severe or pervasive" standard to conduct that "alter[ed] the conditions" of employment) (quotation omitted); *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (explaining that "[a] Title IX hostile-environment claim is analogous to a Title VII hostile-environment claim").

Plaintiffs incorrectly assert that § 106.2's definition is unlawful simply because it adopts a different standard for assessing hostile environment harassment in the context of administrative enforcement than the Supreme Court articulated for private actions for damages in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). *Contra* PMSJ 17–18. Not so. As the Court made clear in *Davis*, it was "asked to do more than define the scope of the behavior that Title IX proscribes"; it had to "determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." 526

U.S. at 639. The Court thus framed its inquiry as "the proper definition of 'discrimination' *in the context of a private damages action.*" *Id.* at 649 (emphasis added). Because such a suit rests on a "disfavored" implied cause of action, *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009), rather than one expressly created by Congress, it involves questions of fair notice not present in administrative enforcement. *See Davis*, 526 U.S. at 642–43; *Gebser v. Lago Vista ISD*, 524 U.S. 274, 290–91 (1998) (noting that funding can only be terminated administratively after "notice and unsuccessful efforts to obtain compliance"). Thus, *Davis* did not purport to describe the harassment standard that may apply in administrative enforcement proceedings.

Moreover, *Davis* expressly acknowledged that "[f]ederal departments … with the authority to provide financial assistance are entrusted to promulgate rules" to enforce Title IX, including in administrative proceedings. 526 U.S. at 638–89 (citing 20 U.S.C. § 1682). In doing so, the Court repeatedly and approvingly cited the Department's then-recently published guidance regarding sexual harassment, *see id.* at 647–48, 651 (citing 62 Fed. Reg. 12,034 (Mar. 13, 1997))—guidance that specifically stated that schools could be found to violate Title IX if the relevant harassment "was sufficiently severe, persistent, *or* pervasive to create a hostile environment." 62 Fed. Reg. at 12,040 (emphasis added). It would have been passing strange for the Court to approve of standards that it did not believe the Department could lawfully promulgate.

### 4. None of the challenged provisions violate the major questions doctrine.

None of the challenged provisions run afoul of the major questions doctrine because they find adequate support in Title IX's text and structure, and so reflect "policy decisions" made by "Congress … itself." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted). *Contra* PMSJ 11–12; IMSJ 10–12; PI Op. 28–30. Specifically, § 106.10 rests on an interpretation of Title IX's unambiguous text; § 106.31(a)(2) reflects the meaning of "discrimination" and Congress's decision to exempt certain contexts from Title IX's overarching prohibition; and § 106.2's

definition of hostile environment harassment implements the statute's broad reach in a manner consistent with the definitions of harassment used in other civil-rights contexts.

Regardless, that doctrine is reserved for "extraordinary" cases: cases that involve "unprecedented" agency action relying on "ancillary" statutory provisions to regulate issues of great "economic and political significance." *West Virginia*, 597 U.S. at 721–24 (quotation omitted). In contrast, the challenged provisions of the Rule exercise the Department's longstanding authority to implement Title IX, including its core prohibition on sex discrimination. Plaintiffs also have not shown that any of the challenged provisions will "require the kind of costs or restructuring that might implicate the major questions doctrine," a prediction the Department rejected. 89 Fed. Reg. at 33,815. Accordingly, just as the Supreme Court did not invoke the doctrine when it endorsed an interpretation of Title VII previously adopted by the EEOC in *Bostock*, there is no basis for invoking it here. *See Bostock*, 590 U.S. at 680.[4]

### B. Plaintiffs have not shown that the challenged provisions of the Rule are unconstitutional.

#### 1. The challenged provisions do not violate the Spending Clause or principles of federalism.

The challenged provisions of the Rule do not pose any issues under the Spending Clause because they merely apply Title IX's unambiguous prohibition on sex discrimination. *See* 89 Fed. Reg. at 33,802. *Contra* PMSJ 10–11, IMSJ 10–12; PI Op. 30–32. "Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds," *NFIB v. Sebelius*, 567 U.S. 519, 579 (2012), so long as it does so

---

[4]   The Court also held that Title VII encompassed discrimination on the basis of sexual orientation even though prior legislation to prohibit such discrimination had failed in Congress, reasoning that "speculation about why a later Congress declined to adopt new legislation offers a particularly dangerous basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock*, 590 U.S. at 670 (quotation omitted). *Contra* PI Op. 29–30.

"unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). That requirement obligates Congress to "make the existence of the condition itself" "explicitly obvious," not to list all of the ways in which a recipient could fail to comply. *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (citation omitted). In particular, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Id.* at 1306.

Moreover, § 106.10 simply reflects the scope of Title IX's unambiguous prohibition on sex discrimination in light of *Bostock*. "[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up). Title IX places recipients clearly on notice that they must comply with the statute's prohibition on sex discrimination. The Rule's recognition in § 106.10 that Title IX's prohibition encompasses various *bases* of discrimination that involve consideration of sex no more implicates the Spending Clause than the recognition that this prohibition encompasses various *forms* of sex discrimination, like retaliation or harassment. *Cf. Jackson*, 544 U.S. at 174–75 (2005). *Contra* PI Op. 31.

To the extent Plaintiffs intend to raise a standalone Spending Clause challenge to § 106.10 (or any of the Rule's other provisions), that claim is underdeveloped and meritless. *Contra* PMSJ 11. No court has ever held Title IX to be coercive or to otherwise violate the Spending Clause, and Plaintiffs certainly have not met the high bar to show that the Rule's implementation of Title IX is coercive; "in the typical case we look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments." *NFIB*, 567 U.S. at 579 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). Nor do the other factors support Plaintiffs: the Rule advances Title IX's legitimate purpose of protecting all individuals from sex

discrimination, while respecting First Amendment rights. *See* 89 Fed. Reg. at 33,516, 33,810.

Finally, Plaintiffs' federalism arguments are duplicative of their Spending Clause arguments. The Rule does not "displace States' traditional spheres of authority," PMSJ 12; *see* IMSJ 10–12, PI Op. 56–63, because States remain free to reject funding under Title IX. *See Mellon*, 262 U.S. at 482. Even if the Rule could conceivably be viewed that way, Title IX has never been held to infringe on states' rights, and the Rule finds ample support in Title IX's text and structure.

### 2.     Section 106.31(a)(2) does not violate any right to safety or privacy.

Plaintiffs also incorrectly assert that § 106.31(a)(2), in particular, violates rights to bodily safety and privacy, which they variously frame in terms of statutory construction, *see* IMSJ 14–15, constitutional rights, *see id.* at 16–17, or the APA's arbitrary-and-capricious standard, *see id.* at 17–18; PMSJ 21–22; PI Op. 72–75. However, each of these arguments falters in light of the record before the Department, which decisively rebuts those concerns.

As an initial matter, Plaintiffs fail to identify any case that has recognized a right to privacy along the lines they suggest. Substantive due process analysis "start[s] with a 'careful description of the asserted fundamental liberty interest.'" *Dep't of State v. Munoz*, 144 S. Ct. 1812, 1822 (2024) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). But references to cases involving asserted Fourth Amendment rights to be free from invasive searches or surveillance by government actors, *see Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987), do not support the vastly different right that Plaintiffs claim: a right to prevent individuals from using facilities consistent with their gender identity when there are nondiscriminatory methods available to protect privacy and safety. Indeed, more than one court has rejected the assertion that there exists a "right to privacy that protects against any risk of bodily exposure to a transgender student in school facilities." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1225 (9th Cir. 2020); *see Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018).

Regardless, § 106.31(a) does not violate any constitutional right to privacy or safety, and the Department thoroughly addressed all concerns to the contrary. The Department "agree[d] that recipients have a legitimate interest in protecting all students' safety and privacy," and concluded that such goals are not "inconsistent with § 106.31(a)(2)." 89 Fed. Reg. at 33,820. Specifically, the Department emphasized that nothing prevents recipients from taking steps "to ensure privacy and safety for all students in a recipient's sex-separate facilities—steps that many recipients already take consistent with their general codes of conduct, including rules prohibiting harassment, assault, and other forms of misconduct." *Id.* The Rule further explained that recipients may, but would not be required to, "offer[] single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason." *Id.*

The Department's conclusion that § 106.31(a)(2) would not infringe upon safety and privacy was amply backed by the record before the agency. The Department explained that based on its "enforcement experience, listening sessions with stakeholders, and its review of Federal case law," it disagreed that "transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interests." 89 Fed. Reg. at 33,820. The Department further pointed to the experience of schools across the country which attested that, when required to "integrate transgender students into gender-specific facilities," "hypothetical fears and concerns" regarding safety and privacy have been "wholly unfounded in practice." Amici Br. of School Administrators *18–19, *Grimm v. Gloucester Cnty. Sch. Bd.*, No. 19-1952, 2019 WL 6341095 (4th Cir. Nov. 25, 2019) (cited at 89 Fed. Reg. at 33,820; AR_280882). And it noted court decisions that have rejected "unsubstantiated" and "generalized" claims that "transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." 89 Fed. Reg. at 33,820. Again, empirical

evidence confirms the Department's conclusions.[5]

To the extent commenters expressed concerns that non-transgender individuals might attempt to exploit § 106.31(a)(2) to gain access to sex-separate spaces, the Department addressed ways that recipients can verify an individual's gender identity for purposes of allowing them to access the appropriate facility. *Contra* PMSJ 22; PI Op. 70, 76. The Department acknowledged that "many recipients rely on a student's *consistent* assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher." 89 Fed. Reg. at 33,819 (emphasis added). Recipients may also request documentation except to the extent requesting such documentation would be invasive or burdensome, or where "access to such documentation is prohibited by law." *Id.* That hardly amounts to a requirement of allowing unverified access, as demonstrated by the practices of the many recipients who permit students to access facilities based on their gender identity.

No more was required to justify the conclusion that a "recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." 89 Fed. Reg. at 33,821. The Department did not "ignore" contrary evidence, as Plaintiffs suggest; it simply concluded that the evidence summarized above outweighed the evidence Plaintiffs presented in their comment letter, which consisted of a list of anecdotes largely involving crimes committed by

---

[5]   *See, e.g.*, Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70 (2019), AR_293039–53 (reviewing public records to compare the safety of public restrooms, locker rooms, and changing rooms in localities that permit access based on gender identity with localities that do not and concluding that those laws are not related to the frequency of criminal incidents); Office of Safe & Healthy Students, U.S. Dep't of Educ., *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 2016), AR_293260–84 (providing examples of how schools have provided access without resulting in safety and privacy concerns).

cisgender men in non-school contexts. *See* PMSJ 22 (citing Compl. ¶¶ 168–70, 257); Comment #218129 (Tenn. Att'y Gen. et al.), AR259365–79. The Department's reasonable assessment of the facts is entitled to deference, and should be upheld. *See United Steel v. Pension Ben. Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013) ("[W]eighing the evidence is not the court's function.").

### 3.     Section 106.31(a)(2) does not violate parental rights.

Nor does § 106.31(a)(2) violate parental rights. As an initial matter, Intervenors do not invoke parental rights at all, and Plaintiffs only do so as an argument for constitutional avoidance, asserting that § 106.31(a)(2) may require schools "to accommodate a student's stated gender identity, regardless of parental opposition." *See* PMSJ 12 (citing 89 Fed. Reg. at 33,821–22). Plaintiffs presumably do not assert a standalone parental-rights claim because states "do[] not have standing as parens patriae to bring an action against the Federal Government," *Haaland v. Brackeen*, 599 U.S. 255, 294–95 (2023) (quotation omitted), particularly where they do not identify any parent whose rights would be threatened by the Rule in any way.

Regardless, "nothing in the final regulations disturbs parental rights." 89 Fed. Reg. at 33,821. As the Department made clear, "[w]hen a parent and minor student disagree about how to address sex discrimination against that student, deference to the judgment of a parent, guardian, or other authorized legal representative with a legal right to act on behalf of that student is appropriate." *Id.* at 33,822. The Department's regulations themselves specify that they may not "be read in derogation of any legal right of a parent to act on behalf" of a minor child, 34 C.F.R. § 106.6(g), including any rights parents have "to guide their own children on matters of identity," PI Op. 64. Moreover, if a recipient wants to notify parents in such circumstances, it may do so— nothing in the Rule "prohibits a recipient from notifying a parent, guardian, or authorized legal representative of a minor student's complaint alleging sex discrimination so they can exercise their rights to act on behalf of the minor student." 89 Fed. Reg. at 33,540.

### 4.   Section 106.10 and Section 106.2's hostile environment harassment definition do not violate the First Amendment.

Finally, neither § 106.10 nor the hostile environment harassment definition in § 106.2 infringes on protected speech. As to § 106.10, Plaintiffs do not explain how interpreting Title IX's prohibition on sex discrimination to encompass gender-identity discrimination has First Amendment implications at all. Whether or not the term "gender identity" is vague, for example, *see* IMSJ 21, it is § 106.2, not § 106.10, that addresses how recipients must respond to hostile environments involving gender-identity harassment. *Cf. Bostock*, 590 U.S. at 682 (deciding that sex discrimination includes gender identity discrimination while indicating that "[h]ow these doctrines protecting religious liberty interact with Title VII are questions for future cases.").

In any event, Plaintiffs are wrong to contend that either provision, as applied to harassment implicating gender identity, violates the First Amendment, *contra* PMSJ 18–20; IMSJ 21–24, or that the Department failed to adequately consider First Amendment concerns, *contra* PMSJ 21; IMSJ 24. As to § 106.2, Plaintiffs' argument boils down to the unfounded assertion that recipients will inevitably adopt policies to comply with § 106.2 that run afoul of the First Amendment. But § 106.2's definition mirrors the standards long applied in the Title VII and Title IX contexts—standards which, prior to this litigation, no court had held contravened the First Amendment. To the contrary, the Supreme Court upheld "similar proscriptions on hostile environment harassment" in both contexts "without raising any First Amendment concerns." 89 Fed. Reg. at 33,506 (citing *Davis*, 526 U.S. 629; *Harris*, 510 U.S. at 23).

That makes sense: A recipient can safeguard the expression of "politically charged and contentious ideas," PI Op. 35, while still protecting students from an "educational experience … 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's educational environment." *Doe*, 882 F.3d

at 590 (quoting *Harris*, 510 U.S. at 21). Indeed, the Department structured the definition of hostile environment harassment to redress any First Amendment concerns by "cover[ing] only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits" a person's ability to participate in the recipient's education program or activity. 89 Fed. Reg. at 33,503. The Department even "revised the definition to retain the 2020 amendments' reference to offensiveness," *id.*, and made plain that the definition "only prohibit[s] conduct that meets all the elements" set forth, *id.* at 33,506. The Department also clarified that "a stray remark, such as a misuse of language, would not constitute harassment." *Id.* at 33,516.

If any doubt remained, the Rule also makes clear that "nothing in the regulations"— including any definition in § 106.2—"requires or authorizes a recipient to violate anyone's First Amendment rights." *Id.*; *see also* 34 C.F.R. § 106.6(d). Thus, while recipients must address hostile environments, the "First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503. To the extent recipients adopt policies that raise First Amendment concerns, those policies are neither required nor authorized by the definition in § 106.2.[6]

Plaintiffs' First Amendment theories fare no better when assessed individually.

a.     As to compelled speech and viewpoint discrimination, Plaintiffs assert that recipients will adopt policies to comply with § 106.2's definition of hostile environment harassment that "mandate[]" the use of preferred pronouns and compel or prohibit certain

---

[6]     Intervenors also make the conclusory assertion that § 106.45(b)(5), which "require[s] the recipient to take reasonable steps to protect the privacy of the parties and witnesses during" the pendency of grievance procedures, requires recipients to impose unconstitutional "gag orders." IMSJ 23. However, in addition to the Rule's carveouts for First Amendment rights, § 106.45(b)(5) prohibits recipients from "restrict[ing] the parties' ability to obtain evidence, consult with certain individuals, or prepare for or participate in the grievance procedures." 89 Fed. Reg. at 33,674.

viewpoints on subjects of sex and gender. *See* PMSJ 18–20; IMSJ 21–22; PI Op. 47–48. But the definition neither compels any particular speech by students or staff, nor requires anyone to affirm "any particular view on any issue." 89 Fed. Reg. at 33,505. It merely requires that recipients address sex-based harassment that is "subjectively and objectively offensive" and so "severe or pervasive" as to limit or deny a person's ability to access their programs. 34 C.F.R. § 106.2.

Requiring schools to address sex-based harassment—even where it involves speech—is different in kind from "telling" students and staff "what they must say." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 61 (2006). The government can ensure that the classroom, no less than the workplace, is free from sex-based "intimidation, ridicule, and insult" without governing every "utterance." *Harris*, 510 U.S. at 21 (quotation omitted). Indeed, the Rule requires recipients to "formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment." 89 Fed. Reg. at 33,503. That is true in every context, including with respect to gender identity.

Even if there were circumstances in which the repeated or acute refusal to use pronouns consistent with a student's gender identity contributed to a hostile environment, nothing in the Rule would "require[] or authorize[]" the recipient to take remedial measures that would "violate anyone's First Amendment rights," 89 Fed. Reg. at 33,516. Nor would anything in the Rule require or authorize the recipient to "compel[] silence of opposing viewpoints." *Id*. As the Sixth Circuit recently reiterated, schools have been able to implement policies that avoid the creation of a hostile environment while respecting "deeply held beliefs concerning gender identity." *Parents Def. Educ. v. Olentangy Loc. Sch. Dist.*, 109 F.4th 453, 467 (6th Cir. 2024). While the Department cannot "prejudge or comment on whether specific cases or factual scenarios comply with Title IX prior to conducting an investigation and evaluating the relevant facts and circumstances," 89 Fed. Reg.

at 33,507, these policies indicate that recipients are capable of balancing these concerns.

Nor does the definition conflict with *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). There, the Court reversed the dismissal of a college professor's First Amendment claim based on allegations that he suffered disciplinary action for failing to comply with a policy that required faculty to "refer to students by their 'preferred pronoun[s]'" and that applied despite the professor's "religious objections." *Id*. at 498 (quotation omitted). The Court nowhere suggested that a narrowly tailored harassment standard—like the one set out in § 106.2—conflicts with the First Amendment. To the contrary, the Court recognized that Title IX prohibits hostile environment harassment, including "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter the conditions of the victim's educational environment," *id*. at 511 (quoting *Doe*, 882 F.3d at 590)—a standard materially indistinguishable from the one in § 106.2. The Court simply concluded that Title IX was "not implicated" because there was no indication "at this stage of the litigation" that the professor's failure to comply with the policy "inhibited" any student's "education or ability to succeed in the classroom." *Id*.

Plaintiffs also distort the government's position in other submissions. *See* PMSJ 19; IMSJ 22–23. In *Kluge*, for example, the only claim at issue was grounded in Title VII, and concerned whether a school permissibly declined to retain a particular accommodation for a teacher's religious objection to using preferred names and pronouns where the accommodation "harmed students" and created Title IX-related litigation risk for the school. *See* Amicus Br. of the U.S. 2–3, 29–30, *Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 21-2475, 2021 WL 5405970 (7th Cir. Nov. 8, 2021). Nothing in the filing addressed the standard for hostile environment harassment, much less undermines the Department's commitment that "nothing in the [Rule] requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516.

31

**b.**      Even if the definition of hostile environment harassment were susceptible to unconstitutional applications by recipients in certain contexts, that still would not warrant invalidating the definition (much less the rest of § 106.2 or other provisions of the Rule). *Contra* PI Op. 49–56. "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quotation omitted). As the Sixth Circuit has "repeatedly" warned, however, "[f]acial invalidation" of an overbroad regulatory scheme is "strong medicine" that should be "deployed sparingly and only as a last resort." *Ent. Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 379 (6th Cir. 2009) (cleaned up). Such extraordinary relief is not "unambiguously warranted" here. *Id.*

Section 106.2's definition of hostile-environment harassment poses no overbreadth problems. It "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate." 89 Fed. Reg. at 33,503. The Rule "only prohibit[s] conduct that meets all the[se] elements" and requires an evaluation based on the "totality of the circumstances" to ensure that no "required element[] … is ignored." *Id.* at 33,506. Even if the prohibition occasionally "sweeps in speech," *id.* at 33,494, there is no indication that the standard prohibits a substantial amount of protected speech "in an absolute sense" or relative to the Rule's "plainly legitimate sweep." *Ent. Prods.*, 588 F.3d at 379 (quotation omitted); *see Parents Def. Educ.*, 109 F.4th at 471 (rejecting overbreadth challenge to anti-harassment policy). Indeed, Plaintiffs do not dispute that the definition has many legitimate applications, including to sex-based harassment that has nothing to do with gender identity, or to allegations of gender-identity harassment that have nothing to do with pronoun usage or political and religious views about sex.

Courts and agencies have long applied similar standards under Title VII and Title IX. *See Harris*, 510 U.S. at 23; *Rowles v. Univ. of Mo.*, 983 F.3d 345, 352, 355 (8th Cir. 2020) (rejecting overbreadth challenge to standard nearly identical to § 106.2). That includes the Sixth Circuit, which has utilized similar standards in cases arising under both statutes. *See Meriwether*, 992 F.3d at 511; *Doe*, 882 F.3d at 590; *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) (concluding that being "repeatedly … called derogatory and demeaning names" was "severe or pervasive harassment" under Title VII). *Davis* is not to the contrary. *Contra* IMSJ 23. *Davis* did not adopt the standard for sex-based harassment to avoid constitutional concerns, but rather to limit damages to circumstances where schools are "indifferent[] to known peer sexual harassment," as Congress intended, *Davis*, 526 U.S. at 653. The *Davis* majority only discussed the First Amendment to correct a misunderstanding by the dissent. *Id.* at 652.

Nor does § 106.2 sweep in protected speech simply because it may apply to speech located outside of the physical classroom. *Contra* PMSJ 19; IMSJ 22–23. As the Department explained, a recipient is obligated to address a hostile environment occurring "under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside" the program or activity. 89 Fed. Reg. at 33,530. That is consistent with the Sixth Circuit's precedent, which recognizes that schools may regulate "off-campus speech that materially disrupts classwork or involves substantial disorder or invasions of the rights of others." *Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 357-58 (6th Cir. 2023) (cleaned up). Section 106.2 also bears no resemblance to the policy in *Speech First, Inc. v. Cartwright*, which prohibited "a wide range of 'verbal, physical, electronic, and other' expression concerning any of (depending on how you count) some 25 or so characteristics," and "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's

33

speech." 32 F.4th 1110, 1125 (11th Cir. 2022).

     **c.**     Section 106.2's definition of hostile environment harassment also is not vague. *Contra* PMSJ 21; IMSJ 21–22; PI Op. 49–56. It offers "specific and required elements," 89 Fed. Reg. at 33,506, "using language with common usage and understanding" in the antidiscrimination context, *Rowles*, 983 F.3d at 358. And it enumerates relevant considerations based on factors that "courts and agencies have used in evaluating a hostile environment" in both the Title VII and Title IX contexts. *Id.* at 33,512. Indeed, the Department discussed at length questions regarding the "objectively offensive," "severe or pervasive" and "limits or denies" elements. *See id.* at 33,508–11. The hostile environment standard's specificity and long lineage more than suffices to put the public on constitutionally adequate notice of its contours and demonstrates that it is neither unworkable nor prone to arbitrary enforcement.

     In fact, § 106.2's definition of hostile environment harassment utilizes many of the same terms as the standard adopted by the 2020 rule (which Plaintiffs did not challenge and have not challenged here), including "unwelcome," "severe," "pervasive," and "objectively offensive." 34 C.F.R. § 106.30 (2020). Section 106.2 adds the term "limits," but the Department explained that the term is consistent with how the Department previously construed the term "denies" and "more accurately captures the full scope of Title IX's nondiscrimination mandate." 89 Fed. Reg. at 33,511. It simply requires a complainant to "demonstrate some impact on their ability to participate or benefit from the education program or activity," but "does not specify any particular limits or denials." *Id.* Likewise, the standard is not vague merely because it applies to discrimination based on "gender identity," a term the Department did not define because it "is now well understood" and "used widely in laws and policies." 89 Fed. Reg. at 33,809. Even so, the Rule did offer guidance, explaining that gender identity "describe[s] an individual's sense of their gender." *Id.*

To be sure, the hostile environment standard is fact-dependent; it is "not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. The Department permissibly declined to answer "all the potential questions it raises," and to reiterate that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* at 23. "It will always be true that the fertile legal imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question," but that does not render § 106.2 unconstitutionally vague. *Grayned v. Rockford*, 408 U.S. 104, 110 n.15 (1972) (cleaned up).[7]

## II. To the extent Plaintiffs are entitled to any relief, that relief should be limited to the parties and to the provisions of the Rule that the Court concludes are unlawful.

The Department is confident that the Rule is lawful in its entirety, and summary judgment in favor of Defendants is therefore appropriate on all claims. But to the extent the Court disagrees, Plaintiffs' requested relief is overbroad—most of the Rule has not been challenged and thus should not be held unlawful. In crafting a remedy, then, the Court should adhere to a twin set of well-established, intertwined principles.

*First*, because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" on their valid claims. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). *Second*, the Supreme Court has "developed a strong presumption of severability," reflecting a court's

---

[7] For similar reasons, the Department adequately addressed First Amendment concerns. *See*, *e.g.*, 89 Fed. Reg. at 33,492–97, 33,500–11, 33,514–16, 33,542, 33,559, 33,570–71, 33,616, 33,810, 33,828, 33,838. *Contra* PMSJ 21; IMSJ 24. The Department also explained why it gave examples but would not prejudge specific cases raised by commenters: "because a fuller, fact-specific analysis is required," based on the "totality of the circumstances." *Id.* at 33,512–13.

obligation to "salvage rather than destroy" an otherwise lawful statute or regulation. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625 (2020) (plurality).[8]

Because the Rule clearly evinces the Department's determination that the Rule's component parts can function sensibly independently and that the Department would have promulgated them even in isolation, the Court should opt for nothing more than a party-specific injunction targeted against only those provisions that Plaintiffs have shown to be unlawful and that cause them injury.

### A.    Any relief should be limited to the parties.

Plaintiffs first urge the Court to vacate the Rule in its entirety, "treating it as void as to all regulated parties." PMSJ 23. But the APA does not provide for universal vacatur as a remedy, and in any case, neither vacatur nor a nationwide injunction is appropriate here.

As an initial matter, the APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs seek. As a matter of first principles, the "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703 of the APA. Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Because Plaintiffs do not purport to identify any applicable "special statutory review proceeding," § 703 affords them only traditional equitable remedies like injunctions. In contrast, § 706(2) does not address remedies at all. Rather, § 706(2) is properly understood as a rule of

---

[8]    Six Justices agreed as to the severability portion of the Court's opinion. *Barr*, 591 U.S. at 625 (Kavanaugh, Roberts & Alito, JJ.); *id.* at 648 (Breyer, Ginsburg & Kagan, JJ.).

decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it, consistent with basic principles of judicial review. Universal vacatur is therefore not an available remedy under the APA. *See United States v. Texas*, 599 U.S. 670, 693–99 (2023) (Gorsuch, J., concurring in the judgment).

The Department recognizes that the Sixth Circuit recently held that "[r]eviewing courts certainly have the power to vacate an agency action they find unlawful." *Sierra Club v. U.S. Env't Prot. Agency*, 60 F.4th 1008, 1021 (6th Cir. 2023). Even still, vacatur is not required: *Sierra Club* itself declined to vacate the challenged regulation, instead remanding to the agency without vacatur "[g]iven the overall equities of the situation." *Id.* at 1023; *see also Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009).

Assuming it is available as a remedy, whether "vacatur is appropriate depends 'on the seriousness of the agency error and the disruptive consequences of vacatur.'" *Sierra Club*, 60 F.4th at 1022 (quotation omitted). But neither of these factors "is dispositive; rather, 'resolution of the question turns on the [c]ourt's assessment of the overall equities and practicality of the alternatives.'" *Id.* (cleaned up). That comports with longstanding Supreme Court precedent that a statute authorizing remedies, especially equitable remedies, should be interpreted consistent with "the traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Indeed, the APA explicitly states that its authorization of judicial review does not affect "the power or duty of the court to … deny relief on any … equitable ground." 5 U.S.C. § 702.

Vacatur would be inappropriate under these standards. Here, as described above, the Department's position is not wrong on the merits.[9] *See supra* Section I. Conversely, vacatur of the

---

[9]   The "seriousness of the error" factor also considers whether the agency's error can be corrected on remand. *Sierra Club*, 60 F.4th at 1022. To the extent the Court were to find that the Department

rule would be deeply disruptive in the many states where it has not been enjoined. *See infra* Section II.B.1.c. Most important, though, is that the Court has powerful, equitable alternatives available. Declaratory relief could adequately define the legal rights of the parties and establish any unlawfulness of the Rule, preventing any alleged harm. *See Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1366–67 (D.C. Cir. 2023). If the Court chooses to implement an injunction, it could do so in a way that would also fully resolve any harm to Plaintiffs. The injunction "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), and it requires federal officials to "refrain from taking actions to enforce, implement, or otherwise carry out" agency action that contravenes the injunction. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Declaratory relief or an injunction could therefore provide sufficient relief to Plaintiffs.

The critical difference between vacatur and declaratory or injunctive relief is that the latter two remedies could be tailored to the parties.[10] The problems caused by overbroad universal remedies are well catalogued and apply whether such a remedy takes the form of a nationwide injunction or universal vacatur. *See, e.g., Labrador v. Poe*, 144 S. Ct. 921, 921–28 (2024) (2024) (Gorsuch, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring). Indeed, as Judge Beaton of the Western District noted earlier this year, "vacatur suffers from the same problems" as nationwide injunctions. *Kentucky v. Fed. Highway Admin.*, 2024 WL 1402443, at *19 (W.D. Ky. Apr. 1, 2024). Vacating the rule in that case, he wrote, would

---

failed to adequately explain its interpretation of the statute, or that the Department's determinations were arbitrary and capricious, those errors could potentially be rectified on remand.

[10]   Intervenors claim that nationwide relief is the only way to grant them complete relief. *See* IMSJ 24. But as they acknowledge, *id.* at 25, the District of Kansas recently entered a tailored injunction that covered each school attended by an organization's members. *Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *21 (D. Kan. July 2, 2024).

"transgress the 'bedrock practice' of courts to issue only 'case-by-case judgments with respect to the parties' before them, and 'sweep up nonparties who may not wish to receive the benefit of the court's decision.'" *Id.* at *18 (quoting *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring); *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring)). In contrast, "[a] party-specific injunction seems tailor-made to fit relief—and the judicial role—to their proper size." *Id.* at *16. So too here.

**B.** **Any relief should be limited to provisions of the Rule that the Court finds unlawful and that cause harm to the parties.**

**1.** **Any injunctive relief should be appropriately tailored.**

To obtain a permanent injunction, a plaintiff must demonstrate irreparable injury, that remedies at law are unavailable, and that the balance of equities and the public interest warrant a permanent injunction. *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, 391 (2006). Unlike a preliminary injunction, a permanent injunction also requires a plaintiff to "demonstrate actual success on the merits rather than likelihood of success." *Herrell v. Benson*, 261 F. Supp. 3d 772, 776 (E.D. Ky. 2017).

No injunction is warranted here because Plaintiffs have not demonstrated success on the merits or irreparable harm. And it is also clear that Plaintiffs have not satisfied the permanent injunction factors as to the unchallenged provisions of the Rule. The Court observed in its initial stay opinion that "[t]he Department's suggested remedy would require the Court to scour the Final Rule's more than four-hundred pages of text and make sweeping cuts," resulting in a departure "from the Court's judicial function and wade into the realm of executive rulemaking." Stay Op. 15. Not so. If more than the challenged regulations needed to be enjoined, it was Plaintiffs' job to support such sweeping relief. *See eBay Inc.*, 547 U.S. at 391. They failed to do so.

### a. Plaintiffs have not attempted to establish that most of the Rule is unlawful.

Portions of the Rule that were not challenged by Plaintiffs should not be enjoined.[11] The legal violations asserted by Plaintiffs—if any—relate exclusively to §§ 106.10, 106.31(a)(2), and 106.2. Any relief should go no further.

Broad swaths of the Rule are, as the Court put it, "innocuous." Stay Op. 2. Plaintiffs have not alleged legal defects in these provisions, nor did the Court find legal defects at the preliminary stage. Many of them have nothing to do with gender identity. To identify a few specific examples:

- The Rule requires schools to provide pregnant and post-partum students with reasonable modifications and to notify pregnant students of their rights. 34 C.F.R. § 106.40(b).

- The Rule alters the definition of "complainant" to permit complaints by former students and employees who suffered discrimination while participating or attempting to participate in a covered program. 34 C.F.R. § 106.2; *see* 89 Fed. Reg. at 33,481-33,884.

- The Rule clarifies that funding recipients must prohibit retaliation, including peer retaliation, and take appropriate action in response to information about conduct that reasonably may constitute retaliation. 34 C.F.R. § 106.71.

- The Rule provides schools with more flexibility regarding the timing and structure of their grievance procedures. 34 C.F.R. §§ 106.45-106.46.

None of those amendments depends in any way on the challenged provisions addressing gender-identity discrimination and harassment. All of them would remain fully operative if the challenged provisions were enjoined in whole or in part, and each of them could easily have been issued as separate rules. Without holding that these provisions conflict with Title IX, the Constitution, or any other federal law, the Court should not enjoin them. *See, e.g.*, *North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (per curiam) (a court's "remedial authority" is "limited"

---

[11]   Plaintiffs also lack standing to seek relief as to portions of the Rule that they do not challenge. *California v. Texas*, 593 U.S. 659, 680 (2021) (holding that injury must be fairly traceable to "the defendants' conduct in enforcing the specific statutory provision they attack as unconstitutional"); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

to curing the violation established by the plaintiffs).

Moreover, although Plaintiffs purport to challenge §106.10, Plaintiffs do not identify any harm they would suffer as a result of § 106.10's inclusion of gender identity discrimination within the scope of Title IX's prohibition on sex discrimination. They have never suggested that they wish to punish transgender students "simply for being … transgender," *Bostock*, 590 U.S. at 651, by, for example, barring them from participating in the science fair or the marching band. And § 106.10 addresses much more than gender-identity discrimination, including "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886. Plaintiffs have not sought to allow discrimination against students for being pregnant, gay, or failing to conform to sex stereotypes. There is thus no reason to enjoin § 106.10, and certainly not the portions unrelated to gender identity.

Section 106.2 also contains numerous definitions that respondents have not contested and that have nothing to do with gender identity. As discussed above, amended § 106.2 serves as a glossary, defining terms used throughout the Title IX regulations that range from "administrative law judge" to "complaint" and "complainant" to "remedies." 34 C.F.R. § 106.2. Plaintiffs challenge the definition of only one term, "hostile-environment harassment." And they focus their challenge on alleged harms to their First Amendment rights from the application of that definition to certain scenarios involving gender-identity discrimination. *See, e.g.*, PMSJ 18–20; IMSJ 21–24. There is thus no basis for enjoining other definitions in § 106.2 or other applications of § 106.2's definition of hostile-environment harassment.

### b. Plaintiffs have not demonstrated irreparable harm, and certainly have not for unchallenged portions of the Rule.

To constitute irreparable harm, the asserted injury "must be both certain and immediate, not speculative or theoretical." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391

(6th Cir. 2020) (quotation marks omitted). Plaintiffs have not demonstrated irreparable harm.[12] To the degree the Court believes their alleged harms could be sufficient, those harms still do not justify relief as to the entire Rule. Irreparable harm must be tied to *wrongful* conduct, but Plaintiffs fail to make that connection, and do not even try to do so as to unchallenged portions of the Rule.

Plaintiffs' request for an injunction rests entirely on the Court's earlier determinations of irreparable harm at the preliminary injunction stage, PMSJ 25, which are each addressed in turn. First, the Court determined that the costs of complying with the Rule amounted to irreparable harm. PI Op. 79. Because compliance costs "commonly result from new government regulation," this Court looks to the "peculiarity and size" of those costs in evaluating whether they suffice. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Plaintiffs, however, made no effort to quantify their costs or to tie those costs to the provisions they challenged. Absent such a showing, courts routinely reject claims of irreparable harm. *See Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 68 (D.D.C. 2020) (rejecting claims of irreparable harm premised on undifferentiated costs in challenge to 2020 Title IX Rule); *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 304 (S.D.N.Y. 2020) (same). Moreover, the overwhelming majority of the costs relate to unchallenged provisions of the Rule. *See, e.g.*, PI Op. 79 (pointing to costs associated with Rule's training requirements). Those costs represent the sort of garden-variety expenses that districts incur every year—and are not tied to any allegedly wrongful conduct. *See* Tr. 28:8–14, ECF No. 109 (testimony that it is part of a "school's general routine practice" to provide Title IX training).

The Court next considered potential loss of federal funding. PI Op. 82. Although the Court noted that the mere prospect of losing federal funding could make "budget planning" difficult, *id.*

---

[12]   Without a showing of irreparable harm, the most appropriate remedy would be remand-without-vacatur. *See Sierra Club*, 60 F.4th at 1021.

at 86, the Court stopped short of finding that any recipient faced an imminent loss of funding. *See D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (requiring that injury be both "imminent and irreparable"). Nor have Plaintiffs attempted to support such a finding at this stage. That makes sense, given that "Title IX clearly provides that an agency may not take administrative action to revoke a recipient's funding until notice and opportunity to cure has been provided." *New York*, 477 F. Supp. 3d at 304 n.12. Funding cannot be terminated until the completion of an administrative process. *See* 20 U.S.C. § 1682. Any such loss of federal funds, at this point, is thus speculative, particularly given that Plaintiffs have not evinced any desire not to comply with unchallenged provisions of the Rule. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 316 (2013).

The Court next addressed alleged interference with the Plaintiffs' sovereign interests. First, Plaintiffs have not attempted to show that the unchallenged portions of the Rule conflict with any state's duly enacted laws, or even that they infringe on "public policies that have traditionally been left to state determination." *See* PI Op. 87. Harm to sovereign interest therefore cannot sustain a permanent injunction as to the Rule as a whole. And even as to the portions of the Rule that Plaintiffs allege do conflict with state law, the Rule does not actually prevent the states from enforcing their laws; in implementing Spending Clause legislation, it operates "in the nature of a contract: in return for federal funds, the States *agree* to comply with federally imposed conditions," *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17 (emphasis added).[13]

Finally, the Court considered "citizen harms." PI Op. at 87. Again, Plaintiffs have not demonstrated how the broadly "innocuous" provisions of the Rule would impact anyone's rights or interests. Additionally, precedent makes clear that a "State does not have standing as *parens*

---

[13]   To the extent that *Tennessee v. Department of Education*, 104 F.4th 577, 613 (6th. Cir. 2024), suggests states suffer irreparable harm whenever they are dissatisfied with conditions on federal funding, we respectfully preserve our disagreement.

*patriae* to bring an action against the Federal Government." *Haaland*, 599 U.S. at 295 (quotation omitted). Even if the court were correct that states may assert "quasi-sovereign interests" against the federal government, *see* PI Op. 87, Plaintiffs' claims are more fairly characterized as standing in for individuals' harms. Moreover, unlike the plaintiffs in *Kentucky v. Biden*, 23 F.4th 585, 597 (6th Cir. 2022), Plaintiffs' complaint does not actually claim "quasi-sovereign" harm. *See* Compl.

As for Intervenors, they have not established irreparable harm either. None of the declarations submitted by Intervenors refer to the unchallenged portions of the Rule. And even as to the challenged provisions, the declarations simply speculate that the Rule will lead their schools to impose policies that prevent them from discussing their views. *See, e.g.*, Campbell Decl. ¶ 39, ECF No. 127-2; Keaton Decl. ¶ 31, ECF No. 127-2; Taylor Decl. ¶ 48, ECF No. 127-2. Such "speculative [and] theoretical" allegations of harm do not suffice. *Mich. Coal. of Radioactive Material Users v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991); *see also, e.g.*, *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023). As to A.C.'s supplemental declaration describing her discomfort using sex-separate facilities under her school's apparently preexisting policy, ECF No. 127-2 at 91, her alleged harms are not redressable by relief against the Rule. No action by the Court would require A.C.'s school to ban transgender women from using women's facilities.

### c. The balance of the equities and public interest counsels against enjoining the entire Rule.

The equities and public interest tilt decisively towards the Department and against an overbroad injunction. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). That is all the more true for the federal government, which is responsible for implementing Acts of Congress that serve and protect the people of all States. *See Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc.*

*Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (extending *Maryland v. King* to federal agencies). Enjoining the Rule—particularly the portions of the Rule with which the Court has no disagreement—prevents the Department from exercising the authority given to it by Congress under Title IX and therefore causes it irreparable harm.

The harm is particularly pronounced here because the Rule effectuates the compelling public interest of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Plaintiffs' harms, even if the Court finds them cognizable, are dramatically outweighed by the government's interest in stamping out sex discrimination and ensuring all students' access to federally funded educational opportunities. *Cf. Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008) (public interest in naval training "outweighed" irreparable injury to wildlife). And Plaintiffs' interests are further reduced by granting a limited injunction going only to any provisions of the Rule that are found to be unlawful.

### 2. The Rule is severable.

Whatever form of relief the Court elects to enter, the "strong presumption of severability," *Barr*, 591 U.S. at 625, coupled with the severability provisions in the Department's Title IX regulations, 89 Fed. Reg. at 33,848, confirm that any such relief should be limited to the provisions that the Court has concluded are unlawful. "Whether the offending portion of a regulation is severable depends upon [1] the intent of the agency and [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (emphasis omitted); *accord Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only "the portions of the final rule" that the court decided were unlawful). In determining intent, "courts hew closely to the text of severability

45

or nonseverability clauses." *Barr*, 591 U.S. at 624. Here, each prong favors severability.[14]

### a. The Rule's severance clauses establish that the agency intended for the Rule to be broadly severable.

The agency "intent" prong of the severability analysis is clear—the Department expressly determined and provided in the Rule itself that the Rule's various provisions are severable. The Department explained that each provision serves "an important, related, but distinct purpose," and that "[e]ach provision provides a distinct value" that is "separate from, and in addition to, the value provided by the other provisions." 89 Fed. Reg. at 33,848. The Department thus "confirm[ed]" that "each of the provisions" is "intended to operate independently" and that "the potential invalidity of one provision should not affect the other provisions." *Id.* The Department also invoked the severability provisions in its existing regulations, which provide as to each relevant subpart that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected." *Id.* (citing 34 C.F.R. §§ 106.9, 106.18 (redesignated in the Rule as § 106.16), 106.24, 106.46 (redesignated in the Rule as § 106.48), 106.62, 106.72, and 106.82). The Department unambiguously confirmed that those severability instructions apply to the provisions added or amended by the Rule. *Id.*

These severability determinations remove any doubt that the Department would have adopted the Rule's unchallenged provisions addressing grievance procedures, lactation

---

[14] The Sixth Circuit motions panel's brief discussion of severability "emphasiz[ed] how the Department framed its arguments below" and noted that it was considering the question "in the context of this emergency stay motion." *Tennessee*, 2024 WL 3453880, at *4. The Supreme Court similarly emphasized that the stay application was evaluated in an "emergency posture" and on a "limited record" where "the burden is on the Government as applicant to show" entitlement to emergency relief. *Louisiana*, 2024 WL 3841071, at *1. Again, neither the panel's nor the Supreme Court's preliminary determination is binding upon this Court. *See supra* pages 7–8, 10 n.1.

accommodations, and other issues not related to gender identity on their own. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021) (explaining that severability of regulations "depends on the issuing agency's intent," and whether the "agency would have adopted the severed portion on its own" to "operate[] independently") (citations omitted).

> **b.      The Rule can function without the challenged provisions.**

The Department made its determination that each provision of the Rule was severable with good reason. As to § 106.10, although the terms "sex discrimination" and "discrimination on the basis of sex" appear throughout the Department's Title IX regulations, *see* Stay Op. 16, decades of regulatory history confirm that the Department's Title IX regulations can function without a regulatory definition of sex discrimination. Enjoining § 106.10 would not leave recipients without an understanding of sex discrimination, and the remaining regulations would remain operable.[15] *See supra* Section II.B.1.a (providing examples of provisions that can operate independently).

*First*, any relief should be limited to the portion of § 106.10 recognizing that sex discrimination includes gender-identity discrimination—the only part challenged as unlawful. With such an injunction in place, the Department would be required to treat § 106.10 as if it provided: "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, [and] sexual orientation." Such an injunction would not render the unchallenged remainder incoherent or unworkable.

*Second*, even if § 106.10 were enjoined or vacated in its entirety, the remainder of the Rule could remain in place using the pre-Rule understanding of sex discrimination. The Department's pre-existing regulations (amended in 2020 by then-Secretary DeVos) repeatedly reference "sex

---

[15]   Neither Plaintiffs nor Intervenors spend time challenging the idea that §§ 106.31(a)(2) and 106.2 can be easily severed. These provisions address plainly discrete topics, and Plaintiffs have offered no reason to ignore the severability clauses as to these two sections.

discrimination" without defining that term. *See, e.g.*, 34 C.F.R. § 106.8(a) (Title IX coordinators), (c) (grievance procedures), (d) (extraterritoriality), and 106.71(a) (retaliation) (2020). Earlier regulations, too, referred to "discrimination on the basis of sex" and "discrimination based on sex" without defining those terms. *See, e.g.*, 45 C.F.R. §§ 86.1, 86.3(a)-(b), 86.4, 86.6(a), 86.9(a) and (c), 86.36(a)-(c), 86.37(a)(2) and (b), 86.38(a), 86.39, 86.51(a)(4), 86.53, 86.56(b), 86.59 (1975). In short, the term "sex discrimination" or its variants has been ubiquitous in the Department's Title IX regulations for decades, and both the Department and regulated entities have understood that term to simply incorporate Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. 1681(a), without a further regulatory gloss.

Section 106.10 refines that approach by expressly specifying that the Department understands Title IX's prohibition against discrimination on the basis of sex to "include[]" discrimination based on gender identity and certain other grounds. 89 Fed. Reg. at 33,886. But if § 106.10 remained enjoined, regulated entities would simply apply the rest of the updated Title IX regulations in the Final Rule in accordance with the text of Title IX, relevant precedent, and valid and unenjoined regulations and agency guidance, just as they have for nearly 50 years. *See Cumberland Med. Ctr. v. Sec'y of Health & Hum. Servs.*, 781 F.2d 536, 538 (6th Cir. 1986) (holding that invalidating new regulation reinstates previous regulation); *see also Oceana, Inc. v. Evans*, 389 F. Supp. 2d 4, 7 n. 2 (D.D.C. 2005) (collecting cases from other circuits).

*Third*, even if the Court finds that the issues with the Rule's clarification of the scope of "discrimination on the basis of sex" go beyond § 106.10, to include any incorporation of *Bostock*'s reasoning, *see* Stay Op. 10, that too can be accommodated by a tailored injunction. Equitable relief is not limited to excision of specific text—it can instead be used to prohibit "only the unconstitutional applications of a [regulation] while leaving other applications in force, or to sever

48

its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) (citations omitted). The Court may simply enjoin the Department to follow an understanding of sex discrimination that did not include gender identity discrimination in applying the relevant provisions of the Rule to Plaintiffs.

Finally, altering or excising § 106.10 would not be inconsistent with the Department's cost-benefit analysis. *See* PMSJ 24. As a general matter, it cannot be that an agency must separately justify every permutation for how a rule may someday be severed—an impossible task.[16] Regardless, Plaintiffs' argument mischaracterizes the careful balancing that the Department undertook. Although the total benefit of the Rule is "difficult to quantify," it is still significant: "reduc[ing] the occurrence of sex discrimination in a recipient's education program or activity and facilitat[ing] a prompt and equitable resolution when sex discrimination occurs, thereby supporting a recipient's efforts to provide an educational environment free from sex discrimination." 89 Fed. Reg. at 33,861. Although it would be unfortunate for an injunction to strip this benefit from transgender individuals, the remainder of the Rule continues to carry these significant benefits forward, as described in the Rule. The grievance procedures, for example, "provide for fair, prompt, and equitable resolution of complaints of sex discrimination and take other necessary steps to provide an educational environment free from sex discrimination." *Id.* at 33,860–61. As for costs, the Department took reasonable steps to keep them as low as possible, *see* 89 Fed. Reg. at 33,851, and those costs are unlikely to increase based on the precise contours of § 106.10.

---

[16]   The Supreme Court's decision in *Ohio v. EPA*, 144 S. Ct. 2040 (2024), is not to the contrary. There, the Court stayed the application of a rule because it concluded that the agency had not adequately responded to comments objecting that the agency's justification for the rule would no longer be valid if the rule applied in fewer States than originally contemplated. *Id.* at 2054–55. Plaintiffs do not suggest that they or anyone else raised any similar objection to severability during the rulemaking process here. To the contrary, the Rule's preamble notes that there were no comments on severability. 89 Fed. Reg. 33,848.

\* \* \*

For these reasons, if the Court determines that an injunction or partial vacatur is necessary, it should restrict only the application of the challenged provisions to Plaintiffs in ways the Court has concluded would be unlawful. Specifically, it should enjoin or vacate only the application of § 106.31(a)(2) and the application of the term "hostile environment harassment" in § 106.2. If the Court finds it necessary to address § 106.10, it should enjoin or vacate only the application of the term "gender identity." No more is required to "redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73. Plaintiffs have not done the work to warrant slashing the remainder of the Rule, which furthers the Department's important mission of combatting discrimination.

### C.     The Court should not grant all of Plaintiffs' requested remedies.

Plaintiffs would have the Court expend every resource at its disposal to remedy their alleged harm: vacatur, an injunction, and declaratory relief. *See* PMSJ 24. But such a course would be an unusual departure from the law. *See, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 451 (5th Cir. 2019) ("Ample precedent establishes that we should not exercise our discretion to extend declaratory relief when a challenged law or policy no longer affects the plaintiff."); *Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556, 562 (8th Cir. 2009) (vacating "superfluous" declaratory relief as abuse of discretion). The Court should limit Plaintiffs' remedy, if necessary, to one form.

### CONCLUSION

For the foregoing reasons, the Court should enter judgment for Defendants. In the alternative, any relief should be limited to the parties and to the provisions of the Rule that the Court concludes are unlawful.

Dated: August 23, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

*/s/ John T. Lewis*

ELIZABETH TULIS
REBECCA KOPPLIN
BENJAMIN TAKEMOTO
HANNAH SOLOMON-STRAUSS
PARDIS GHEIBI
CLAYTON BAILEY
JOHN T. LEWIS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: 202-353-0533
Fax: (202) 616-8460
E-mail: john.t.lewis.iii@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 23, 2024, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ John T. Lewis*

John T. Lewis