## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

STATE OF TENNESSEE,
COMMONWEALTH OF KENTUCKY,
STATE OF OHIO, STATE OF INDIANA,
COMMONWEALTH OF VIRGINIA, and
STATE OF WEST VIRGINIA,

     *Plaintiffs,*

and

CHRISTIAN EDUCATORS ASSOCIA-
TION INTERNATIONAL, and A.C., by
her next friend and mother, Abigail Cross,

     *Intervenor-Plaintiffs,*


v.

MIGUEL CARDONA, in his official capac-
ity as Secretary of Education, and UNITED
STATES DEPARTMENT OF EDUCA-
TION,

     *Defendants.*

Case No. 2:24-cv-00072-DCR-CJS
District Judge Danny C. Reeves
Magistrate Judge Candace J. Smith

---

**THE STATES' CONSOLIDATED REPLY SUPPORTING THEIR SUMMARY JUDGMENT
MOTION AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND SUPPORTING MEMORANDUM**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 1

I.      The Supreme Court's stay analysis supports granting summary judgment ................................. to the States. ........................................................................................................ 1

II.     The States, not the Department, are entitled to judgment because the Rule is unlawful. ......... 2

     A.      Sections 106.10 and 106.31(a)(2) exceed the Department's Title IX authority ..................... 2

     B.      Section 106.2's definition of harassment exceeds the Department's Title IX authority. ................................................................................................................ 14

     C.      The Rule violates the Constitution. ....................................................................... 14

     D.      The Rule is arbitrary and capricious. .................................................................... 18

III.    The States are entitled to vacatur, a permanent injunction, and declaratory relief. ................ 21

     A.      Vacatur is appropriate under the APA and governing precedents ..................................... 21

     B.      Entry of relief against the entire Rule is warranted. ............................................... 22

     C.      This Court should enter additional injunctive and declaratory relief ................................ 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. v. Metro. Sch. Dist. of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ................................................................................5

*Adams v. Sch. Bd. of St. Johns Cnty.,*
  57 F.4th 791 (11th Cir. 2022) ..........................................................................*passim*

*Alabama v. Cardona,*
  2024 WL 3981994 (11th Cir. Aug. 22, 2024) ...........................................14, 15, 16

*B.P.J. ex rel. Jackson v. W.V. State Bd. of Educ.,*
  98 F.4th 542 (4th Cir. 2024) ...........................................................................5, 9

*Banner Health v. Price,*
  867 F.3d 1323 (D.C. Cir. 2017) ........................................................................19

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ................................................................................10, 11

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ..................................................................................*passim*

*Briscoe v. Health Care Serv. Corp.,*
  281 F. Supp. 3d 725 (N.D. Ill. 2017) ..................................................................12

*Cape v. TSSAA,*
  563 F.2d 793 (6th Cir. 1977) ..........................................................................4, 9

*Childers v. Casey Cnty. Sch. Dist. Bd. of Educ.,*
  2024 WL 3623527 (6th Cir. Aug. 1, 2024) ..........................................................5

*Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.,*
  947 F.3d 342 (6th Cir. 2020) ............................................................................5

*Corner Post, Inc. v. Bd. of Gov'rs of Fed. Rsrv. Sys.,*
  144 S. Ct. 2440 (2024) .............................................................................3, 21, 22

*CSX Transp., Inc. v. Ala. Dep't of Revenue,*
  562 U.S. 277 (2011) ........................................................................................2

*Dambrot v. Centr. Mich. Univ.,*
  55 F.3d 1177 (6th Cir. 1995) ..........................................................................16

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ................................................................................................. 14, 18

*Delek US Holdings, Inc. v. United States*,
32 F.4th 495 (6th Cir. 2022) ..................................................................................... 4

*Dep't of Educ. v. Louisiana*,
2024 WL 3841071 (U.S. Aug. 16, 2024) ........................................................ 1, 2, 25

*Dodds v. U.S. Dep't of Educ.*,
845 F.3d 217 (6th Cir. 2016) ..................................................................................... 12

*Doe v. BlueCross BlueShield of Tenn., Inc.*,
926 F.3d 235 (6th Cir. 2019) ..................................................................................... 12

*Gazeli v. Session*,
856 F.3d 1101 (6th Cir. 2017) ................................................................................... 3

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ............................................................................... 5, 20

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ...................................................................................................... 18

*Hawkins v. Anheuser-Busch, Inc.*,
517 F.3d 321 (6th Cir. 2008) ..................................................................................... 18

*Hazen Paper Co. v. Biggins*,
507 U.S. 604 (1993) .................................................................................................... 7

*In re Juntoff*,
76 F.4th 480 (6th Cir. 2023) ..................................................................................... 14

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) .................................................................................................... 10

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) .................................................................................................... 16

*Kent v. Johnson*,
821 F.2d 1220 (6th Cir. 1987) ................................................................................... 20

*Kentucky v. Fed. Highway Admin.*,
2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) ............................................................ 22

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ............................................................................... 10, 15

*Kiakombua v. Wolf,*
    498 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................................21

*Kollaritsch v. Mich. State Univ. Bd. of Trs.,*
    944 F.3d 613 (6th Cir. 2019) ...........................................................................................5

*L.W. v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023) ...................................................................................4, 9, 12

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007) ......................................................................................................23

*Long Island Power Auth. v. FERC,*
    27 F.4th 705 (D.C. Cir. 2022) ......................................................................................22

*Loper Bright Enter. v. Raimondo,*
    144 S. Ct. 2244 (2024) .................................................................................................14

*Mayor of Baltimore v. Azar,*
    973 F.3d 258 (4th Cir. 2020) ........................................................................................23

*Meister v. U.S. Dep't of Agric.,*
    623 F.3d 363 (6th Cir. 2020) ........................................................................................13

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ...........................................................................6, 16, 17

*Million v. Warren County,*
    856 F. App'x 1 (6th Cir. 2021) ..................................................................................8, 10

*Ohio v. EPA,*
    144 S. Ct. 2040 (2024) .................................................................................................23

*Parents Defending Educ. v. Oletangy Loc. Sch. Dist. Bd. of Educ.,*
    109 F.4th 453 (6th Cir. 2024) ......................................................................................16

*Paul v. Whitley Cnty. Detention Ctr.,*
    2024 WL 188368 (E.D. Ky. 2024) ...............................................................................19

*Pelcha v. MW Bancorp, Inc.,*
    988 F.3d 318 (6th Cir. 2021) ..........................................................................................7

*Peltier v. Charter Day Sch., Inc.,*
    37 F.4th 104, 156-57 (4th Cir. 2022) ......................................................................10, 14

*Roark v. S. Iron R-1 Sch. Dist.,*
    573 F.3d 556 (8th Cir. 2009) ........................................................................................25

iv

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) ..................................................................................................18

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ...................................................................................................... 12, 20

*Sierra Club v. EPA*,
   60 F.4th 1008 (6th Cir. 2023) ...............................................................................................22

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) .................................................................................................................6

*South Dakota v. Dole*,
   483 U.S 203 (1987) ................................................................................................................17

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) .............................................................................................18

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ................................................................................................18

*Taylor-Travis v. Jackson State Univ.*,
   984 F.3d 1107 (5th Cir. 2021) ................................................................................................6

*Tennessee v. Cardona*,
   2024 WL 3453880 (6th Cir. 2024) ................................................................................*passim*

*Tennessee v. Dep't of Educ.*,
   104 F.4th 577 (6th Cir. 2024) .......................................................................................*passim*

*Tennessee v. U.S. Dep't of Educ.*,
   615 F. Supp. 3d 807 (E.D. Tenn. 2022) ..............................................................................25

*Texas v. Cardona*,
   2024 WL 2947022 (N.D. Tex. June 11, 2024) ......................................................................3

*Texas v. Cardona*,
   2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) ........................................................................2

*Texas v. Yellen*,
   105 F.4th 755 (5th Cir. 2024) ...............................................................................................15

*United States v. Virginia*,
   518 U.S. 515 (1996) .................................................................................................................9

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ........................................................................................................3, 7, 8

v

*Van Buren v. United States,*
    593 U.S. 374 (2021) ............................................................................. 8, 9

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995) .................................................................................. 9

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury,*
    59 F.4th 1124 (11th Cir. 2023) ............................................................... 15

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ........................................................................... 10, 11

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989) ................................................................................. 11

*Williams v. Sch. Dist. of Bethlehem,*
    998 F.2d 168 (3d Cir. 1993) ..................................................................... 4

*Ziyadat v. Diamondrock Hosp. Co.,*
    3 F.4th 1291 (11th Cir. 2021) ................................................................... 7

## Constitution & Statutes

U.S. Const. art. I, § 8, cl. 1 ....................................................... 9, 10, 14, 15

U.S. Const. amend. I ..................................................................... *passim*

5 U.S.C. § 703 ................................................................................... 25

Title IX of the Educational Amendments Act of 1972,
    20 U.S.C. § 1681 *et seq.* ........................................................... *passim*

    20 U.S.C. § 1681(a) ................................................................... *passim*

    20 U.S.C. § 1681(a)(5) ..................................................................... 4

    20 U.S.C. § 1681(a)(6) ..................................................................... 4

    20 U.S.C. § 1681(a)(7) ................................................................ 4, 13

    20 U.S.C. § 1681(a)(8) ............................................................ 4, 7, 13

    20 U.S.C. § 1686(a)(9) ..................................................................... 4

    20 U.S.C. § 1686 ................................................................... 3, 8, 19

    20 U.S.C. § 1689(a)(6) ..................................................................... 4

Title VII of the Civil Rights Act of 1964,
　42 U.S.C. § 2000e *et seq.*...................................................................................*passim*

　　42 U.S.C. § 2000e-2(a)(1) ...............................................................................6

　　42 U.S.C. § 2000e-2(e).....................................................................................7

　　42 U.S.C. § 2000e-2(m)....................................................................................7

　　42 U.S.C. § 2000e-5(g)(2).................................................................................7

28 U.S.C. § 2201......................................................................................................25

Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*...........................7

Javits Amendment, 88 Stat. 484 (1974) ...................................................................19

**Rules**

Fed. R. Civ. P. 57 ....................................................................................................25

**Regulations and Administrative Materials**

34 C.F.R. § 106.2 (proposed 2024)..................................................................*passim*

34 C.F.R. § 106.10 (proposed 2024)................................................................*passim*

34 C.F.R. § 106.31(a)(2) (proposed 2024) .......................................................*passim*

34 C.F.R. part 106 (2023)

　§ 106.33 .............................................................................................................13

　§ 106.34 ......................................................................................................4, 7, 13

　§ 106.41......................................................................................................4, 7, 13

Dep't of Health, Educ., & Welfare, Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance: Nondiscrimination on the Basis of Sex,
　39 Fed. Reg. 25,667 (June 20, 1974)...........................................................................4

U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,
　85 Fed. Reg. 30,026 (May 19, 2020)................................................................... 15, 17

U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance,
    87 Fed. Reg. 41,390 (July 12, 2022) ..........................................................................................10

U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance,
    89 Fed. Reg. 33,474 (Apr. 29, 2024) ...................................................................*passim*

**Other Authorities**

117 Cong. Rec. 30,407 (1971) ......................................................................................................3, 4

118 Cong. Rec. 5,807 (1972) ...........................................................................................................9

*The Random House College Dictionary* (rev. ed. 1975) .....................................................................2

## INTRODUCTION

The Department's briefing confirms the correctness of this Court's prior analysis. *Bostock* remains the Department's one note, even though the Sixth Circuit and the Supreme Court have rejected the same old song. And the Department's attempt to defend the indefensible collapses in on itself. The Department insists that the Rule's sex-discrimination definition unambiguously flows from Title IX's text; but it says enjoining the Rule and leaving only the text would maintain the status quo. *Compare* Dep't Br. 22, *with id.* at 48. The Department points to *Bostock* as clearly dictating the Rule's redefinitions; but it denies that the de minimis provision stems from *Bostock*. *Compare* Dep't Br. 23, *with id.* at 14. The Department claims the de minimis provision might extend beyond gender-identity harms; but it rejects that students' aversion to using sex-comingled facilities could ever trigger the provision's protection. *Compare* Dep't Br. 17-18, *with id.* at 25. Rather than try to square these and the Department's many other self-contradictions, this Court need only reiterate its prior conclusion that Title IX does not mean what the Department claims. The States are entitled to judgment.

## ARGUMENT

## I.   The Supreme Court's stay analysis supports granting summary judgment to the States.

The Supreme Court's stay decision confirms this Court's initial conclusions, strongly signaling the propriety of granting permanent relief. All nine Justices approved the entry of preliminary relief:

> Importantly, all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity.

*Louisiana v. Dep't of Educ.*, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024) (per curiam); *accord id.* at *2 (Sotomayor, J., dissenting) (citing §§ 106.10, 106.31(a)(2), and 106.2's challenged "harassment" definition). This initial finding mirrors that of the Sixth Circuit panel. *See Tennessee v. Cardona*, 2024 WL 3453880, at *3 (6th Cir. 2024). And contra the Department's no-merits claim (at 10 n.1), the Court's

1

"interim relief" discussion means it "had to have found" that the States "met" "all" the preliminary injunction requirements. *Alabama v. Cardona*, 2024 WL 3981994, at *1 n.1 (11th Cir. Aug. 22, 2024).

The Supreme Court's reasoning about severability also supports the States' requested remedy—entire vacatur. Although the Court disagreed on the injunction's proper scope, the majority approved enjoining the whole Rule. The Department, the majority wrote, failed to rebut this Court and the Sixth Circuit panel's conclusion that "the new definition of sex discrimination is intertwined with and affects many other provisions of the new rule" and that schools would face "difficulty" partially implementing the Rule. *Louisiana*, 2024 WL 3841071, at *1. The Department's similarly unpersuasive attempt to defeat final relief, in whole or in part, should fare no better. *See infra* Part III.

## II.    The States, not the Department, are entitled to judgment because the Rule is unlawful.

### A.  Sections 106.10 and 106.31(a)(2) exceed the Department's Title IX authority.

#### 1.    Title IX exclusively bars male-female discrimination.

This Court correctly held that Title IX bars discrimination between similarly situated males and females, not just any differential treatment that arguably involves sex. PI Op. 17-28; MSJ 7-10.

*Text.* Title IX's reference to "discrimination" most naturally refers to "treatment or distinction not based on individual merit in favor of or against a person[ or] group." *The Random House College Dictionary* 379 (rev. ed. 1975); *see also* PI Op. 18-19. The term's usage with "subjected to," especially in association with two similar phrases—"excluded from participation in" and "denied the benefits of"— confirms this meaning. *See Texas v. Cardona*, 2024 WL 3658767, at *32 (N.D. Tex. Aug. 5, 2024) (citing associated-words canon). So does the Supreme Court's reading of a contemporary discrimination statute to bar unequal treatment of "similarly situated" individuals or groups without "justification." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 280, 286-87 (2011).

The Department now accepts (at 9, 11) that "sex" refers to "biological sex, i.e., discrimination between males and females." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815 (11th Cir. 2022).

2

That leaves "on the basis of." The "root word 'basis'" means "'foundation' or 'support.'" *See* Stay Op. 6-7. Together with the definite article "*the*," this language shows that Title IX's "text focuses on a specific" basis for unlawful discrimination—"sex." *See Corner Post, Inc. v. Bd. of Gov'rs of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2455 (2024); *see also Gazeli v. Session*, 856 F.3d 1101, 1107 (6th Cir. 2017) (similar).

In sum: This Court was right to begin with—Title IX prohibits "treating an individual *worse* than others who are similarly situated" "'based on biological sex.'" PI Op. 18-19 (quoting *Texas v. Cardona*, 2024 WL 2947022, at *32 (N.D. Tex. June 11, 2024)). The Department has no first-principles rebuttal. Indeed, it implicitly concedes that § 106.10 diverges from this ordinary-meaning reading, arguing (at 48) that "if § 106.10 remained enjoined, regulated entities would simply apply" the remaining regulations "in accordance with *the text* of Title IX … just as they have for nearly 50 years."

_Statutory and regulatory structure._ Congress's "structural choices" confirm Title IX's scope. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). *First*, Title IX and the 1975 regulations rest on the binary meaning of "sex." *See* MSJ 2-3 (collecting examples).

*Second*, Title IX specifies that not all sex separation is discrimination; policies based on fundamental physiological differences do not discriminate. *See* PI Op. 19-20, 25. The Department doesn't address 20 U.S.C. § 1686's allowance for sex-separated living facilities, other than obliquely arguing (at 13) that such provisions show sex-separation would otherwise be "discrimination." But the opposite is true—§ 1686 expressly instructs that "nothing" in Title IX "shall be construed to prohibit" sex-separated living facilities—full stop. Since their inception, Title IX's regulations have likewise interpreted § 1681(a) to allow sex separation rooted in sex differences. *See* MSJ 3; PI Op. 19-20, 25.

These statutory and regulatory provisions track broader discrimination principles. Physiological differences mean males and females are not "similarly situated" when it comes to such contexts as "living facilities" and sexual-education courses—both implicate students' "personal privacy." 117

3

Cong. Rec. 30,407 (1971) (Sen. Bayh); *accord* 39 Fed. Reg. 25,667 (1974).  The same goes for sports, where physiological differences create distinct fairness and safety issues.  *Cape v. TSSAA*, 563 F.2d 793, 795 (6th Cir. 1977); *Adams*, 57 F.4th at 818-21 (Lagoa, J., concurring).  And the same is true for choirs, where the sexes have differing "vocal range[s]."  34 C.F.R. § 106.34(a)(4).  As these provisions illustrate, it is simply not discrimination to regulate in light of the sexes' "'enduring' differences."  *L.W. v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (citation omitted), *cert. granted*, 2024 WL 3089532 (2024).

*Third*, Title IX preserves sex separation in certain traditional contexts to ensure students retain access to valuable educational opportunities.  Title IX directs that schools may operate or host programs traditionally open to one sex only, like historically single-sex public colleges (§ 1681(a)(5)), social fraternities and sororities (§ 1681(a)(6)), and Boys and Girls State (§ 1681(a)(7)).  These provisions safeguard programs that cultivate social bonds among young men or women and promote personal development.  Another provision permits "'beauty' pageants" open to "one sex only," thus protecting a historical "scholarship" source for women in line with Title IX's aim.  *See id.* § 1681(a)(9).

*Fourth*, Title IX allows certain sex-specific programs, so long as males and females receive generally equal treatment on a group level.  *See, e.g.*, *id.* § 1681(a)(8); 34 C.F.R. § 106.34(b).  The athletics regulation allows sex-separate teams but requires schools to provide "equal athletic opportunity" for "both sexes," as measured by group-level considerations like "[p]ublicity."  34 C.F.R. § 106.41(b)-(c).

*Fifth*, Congress's express choice to reference "consideration of" "LGBT" status in 20 U.S.C. § 1689(a)(6) "cautions against inferring" coverage of the same traits in distinct Title IX provisions. *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 501 (6th Cir. 2022) (citation omitted).

*History.*  Title IX's history belies that it addresses sexual orientation or gender-identity discrimination—let alone to women's detriment.  *See Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175-76 (3d Cir. 1993).  In fact, Congress has declined to extend Title IX to these bases.  PI Op. 29-30.

4

**2.  *Bostock* does not apply to Title IX's distinct education context.**

The Department hinges everything on *Bostock* and cramming its "two-step reasoning" (Dep't Br. 10) into Title IX's complex and distinct text and structure.  That dooms the Rule.

**a.  Sixth Circuit decisions preclude applying *Bostock*.**

To begin, the Sixth Circuit has already rejected the Department's apply-*Bostock* formula.  *See* MSJ 13-15; PI Op. 23-24.  The Eleventh Circuit recently agreed.  *Alabama*, 2024 WL 3981994, at *5.

The Department (at 10-14 & n.1) doesn't even try to distinguish these cases, other than noting that the panel order is non-binding—disregarding the binding reasoning of *Meriwether*, *Pelcha*, and *L.W.*  Instead, it relies on inapposite in-Circuit cases and unpersuasive out-of-circuit ones.  *Kollaritsch v. Michigan State University Board of Trustees* (cited at 10, 12) addressed how the *Davis* standard applies to particular patterns of harassment—not the meaning of Title IX more generally.  944 F.3d 613, 622-24 (6th Cir. 2019).  And *Chisholm v. St. Mary's City School District Board of Education* (cited at 12) notes that the "Title VII landscape" may sometimes provide "guidance" when interpreting Title IX.  947 F.3d 342, 350 (6th Cir. 2020).  But that follows if importing Title VII principles is "appropriate," *Childers v. Casey Cnty. Sch. Dist. Bd. of Educ.*, 2024 WL 3623527, at *2 (6th Cir. Aug. 1, 2024)—unlike here.

Nor should this Court follow the Department's favored out-of-circuit cases (cited at 11).  All apply *Bostock* to Title IX as uncritically as the Rule.  *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020).  One relies on the flawed sex-means-gender-identity reasoning the Department now disavows.  *See A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769-70 (7th Cir. 2023).  Dissents and other separate writings have highlighted these shortcomings.[1]

---

[1] *See, e.g.*, *B.P.J. ex rel. Jackson v. W.V. State Bd. of Educ.*, 98 F.4th 542, 565-580 (4th Cir. 2024) (Agee, J., concurring in part and dissenting in part); *Grimm*, 972 F.3d at 627-35 (Niemeyer, J., dissenting); *A.C.*, 75 F.4th at 775 (7th Cir. 2023) (Easterbrook, J., concurring in the judgment only).

### b. Statutory differences foreclose applying *Bostock*.

"Title VII differs from Title IX in important respects." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021); *see also* MSJ 13-17. Comparing the two regimes confirms that *Bostock* is an ill fit for Title IX.

*Text.* The statutes employ "materially different language: discrimination 'because of' sex in Title VII and discrimination 'on the basis of' sex in Title IX." *Tennessee v. Cardona*, 2024 WL 3453880, at *3 (citing 42 U.S.C. § 2000e-2(a)(1); 20 U.S.C. § 1681(a)). *Bostock* read "because of" in Title VII to require that sex merely be "one but-for cause." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). But the ordinary meaning of Title IX's phrase "on the basis of" indicates that sex must be more than "one" cause, *id.*; it must be *the* cause. *Supra* p. 3.

The Department's reading (at 9-12) improperly fails to give distinct language "different meanings." *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (citation omitted). Other cases' use of "on the basis of" or similar phrases and "because of" interchangeably in casual dicta or other contexts does not show otherwise (*cf.* Dep't Br. 10, 12). Indeed, contra the Department (at 11-12), the differences between "because of" and "on the basis of" resemble those *Bostock* accepted might "indicate that the prohibited factor had to be the main cause" of the challenged action. 590 U.S. at 656-57 ("primarily because of"). The Department's counter-authority (at 12) held that Fifth Circuit precedent did not require showing protected activity was the "sole" cause to prove Title IX retaliation; it did not analyze Title IX's "on the basis of" language or address the causal standard for a substantive Title IX claim. *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1119-20 (5th Cir. 2021). This Court correctly prioritized Title IX's best meaning, not *Bostock*'s discussion of distinct language. PI Op. 17-19, 24-28.

And even if but-for causation applies, it doesn't produce the Department's preferred outcome (at 10-11). To paraphrase the Department, the "question isn't just what" on the basis of "'sex' mean[s],

6

but what [Title IX] says about it." Dep't Br. 11 (quoting *Bostock*, 590 U.S. at 656). And Title IX makes clear both what it prohibits and what it doesn't. It does bar "exclud[ing]," "den[ying] … benefits" to, or "subject[ing] to discrimination" males or females vis-à-vis similarly situated members of the opposite sex. 20 U.S.C. § 1681(a). It doesn't prohibit separating males or females when they aren't similarly situated. Nor does it prohibit treating opposite-sex groups differently in certain contexts when "reasonably comparable opportunities" are provided for "the other sex," even if individual students suffer some manner of harm as a result. *Id.* § 1681(a)(8); *see also* 34 C.F.R. §§ 106.34(b), 106.41(b)-(c). Nor does it prohibit differential treatment of males vis-à-vis other males or females vis-à-vis other females.

*Bostock* itself acknowledges that alternative statutory schemes might counsel a different "approach." 590 U.S. at 656; *accord Nassar*, 570 U.S. at 353. Thus, in *Pelcha v. MW Bancorp, Inc.*, the Sixth Circuit rejected applying *Bostock* to the ADEA given that statute's distinct history and structure, which requires a plaintiff to show age was "*the* determinative reason" for a decision. 988 F.3d 318, 323-24 (6th Cir. 2021). *Cf.* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B). That was so even though Title VII and the ADEA use identical "because of" language. *Pelcha*, 988 F.3d at 323-24; *cf. Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993) (no ADEA violation to consider length of service even when "correlated" with age). Other courts have extended this "determinative influence" test to other "but-for causation statutes." *See, e.g., Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1297-98 (11th Cir. 2021).

<u>Structure.</u> Reading *Bostock* into Title IX's discrimination prohibition makes a hash of Title IX's broader regime. *Bostock*'s premise is that sex, "homosexuality, or transgender status *is not relevant*"— in whole or "in part"—for hiring and firing (outside the rare contexts where employers can satisfy the affirmative bona-fide-occupational-qualification defense, *see* 42 U.S.C. § 2000e-2(e)). 590 U.S. at 660 (emphasis added). In contrast, "Title IX, unlike Title VII, includes express statutory and regulatory

carve-outs for differentiating between the sexes." *Adams*, 57 F.4th at 811.  Those carve-outs confirm that it is often *not* discrimination for schools to consider sex.  *See* MSJ 9-10, 14-15.

Title IX's structure also bucks Title VII's focus on individual treatment.  *Bostock* doesn't work for statutes that "require [courts] to consider … how a policy affects one sex as a whole versus the other as a whole."  590 U.S. at 658.  There, it *is* a "defense" to an individual claim to show that the sexes are treated equally "as groups."  *Id.* at 659.  So treating someone "worse in part because of her sex" does not resolve the liability question.  *Id.*  But Title IX brims with provisions focused on "treatment of groups," rather than individual harm.  *See supra* p. 4 (collecting provisions).  The Rule's interpretation thus conflicts unlawfully with Title IX's "design and structure."  *Nassar*, 570 U.S. at 353.

The Department tries and fails (at 12-14) to explain these differences.  It notes (at 13) that Title VII also has "statutory exceptions."  But unlike in Title IX, Title VII's sex-based exception is an "affirmative defense" that presumes taking sex into account is *always* "overt discrimination."  *Million v. Warren County*, 856 F. App'x 1, 11 (6th Cir. 2021) (citation omitted).  Then, the Department claims (at 13) that Title VII allows "sex-segregated bathrooms, locker rooms, and dress codes.'"  But EEOC guidance the Rule cites (and the Department of Justice is defending) reads *Bostock* to dictate the opposite.  *See generally* Compl., *Tennessee v. EEOC*, No. 3:24-cv-224-CEA (E.D. Tenn. May 13, 2024).

Nor can the Department square (at 13) *Bostock*'s switch-the-sex logic with Title IX's structure.  To accommodate *Bostock*, the Department treats § 1681(a)'s exceptions and § 1686 as cases where Congress implausibly *authorized sex discrimination* against students whose sex and gender identities differ.  *See* 89 Fed. Reg. at 33,814-21; *see also* MSJ 14-15.  This Court has already properly debunked that theory and recognized instead that Title IX excludes gender-identity discrimination, period.  PI Op. 24-28.

Relatedly, the Court properly considered § 106.10's "fallout."  *Van Buren v. United States*, 593 U.S. 374, 394 (2021); *see also* MSJ 15-16 (citing PI Op. 27; Stay Op. 10).  *Cf.* Dep't Br. 13-14.  Section

8

106.10's applications are not "naked policy appeals," predicting consequences for "other federal or state [discrimination] laws," *Bostock*, 590 U.S. at 680-81 (cited at 14); instead, they "underscore[] the implausibility of the [Department's] interpretation" of Title IX, *Van Buren*, 593 U.S. at 394.

*Statutory context.* The Department's assertion (at 12) that Title IX and Title VII's differences are "immaterial" ignores the stay panel's point about the statutes' "different goals." *Tennessee v. Cardona*, 2024 WL 3453880, at *3. Protecting minors' "safety and health" implicates issues that Title VII's "adult-centered employment" focus does not. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995); *L.W.*, 83 F.4th at 485. Title IX also embodies Congress's recognition that differentiation by sex is sometimes "necessary to the success" of a school's "program." 118 Cong. Rec. 5,807 (1972) (Sen. Bayh); *cf. United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (acknowledging such necessity in "living arrangements" and "physical training"). Absent sex separation in sports, for example, most "females would quickly be eliminated from participation." *Cape*, 563 F.2d at 795; *see also Adams*, 57 F.4th at 821 (Lagoa, J., concurring). A holding that *Bostock* governs Title IX would explode this balance across the board and beyond the Rule. So shows the Department's insistence elsewhere that *Bostock*'s reasoning bars *any* allowance for sex differentiation as a statutory matter—in housing, showers, sports, and otherwise. *See* U.S. Br. at 24-27, *B.P.J.*, 98 F.4th 542; Doc. 132-2, AR_279308-09.

### c. Interpretive canons foreclose applying *Bostock* to Title IX.

*Spending Clause.* The fact that Title IX is a Spending Clause statute, unlike Title VII, is "[n]o less important[]" than the statutes' other distinctions. *Tennessee v. Cardona*, 2024 WL 3453880, at *3.

The Department does not dispute (at 22-23) that the Spending Clause clear-statement rule applies. *See* MSJ 10-11. But it says notice is clear because the Rule implements Title IX's "unambiguous" bar on gender-identity discrimination per *Bostock*. But *Bostock* does not redefine Title IX "sex" discrimination, let alone clearly. And even if that argument could save § 106.10, it can't salvage

§ 106.31(a)(2) given the Department's claim elsewhere that it is "simply wrong" that § 106.31(a)(2) flows from § 106.10 and *Bostock*. U.S. App. for Partial Stay at 31, No. 24A79 (U.S. July 22, 2024).

The Department emphasizes Title IX's "breadth" (at 23) and says the Rule's recognition of new "*bases* of discrimination" is no different than cases recognizing new "*forms* of sex discrimination." *Cf. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) (cited at 23). But "breadth" is not "the same as clarity, which is at issue" here. *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 157 (4th Cir. 2022) (Wilkinson, J., dissenting). And Title IX does not clearly extend beyond "sex." 89 Fed. Reg. at 33,807.

Indeed, the Department's decades-long practice shows the Rule's position is a "new" one. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 600 (6th Cir. 2024). Since 1974, the Department and its predecessor have advised schools that Title IX allows certain sex separation. *See* 87 Fed. Reg. 41,390, 41,394 (2022) (admitting as much). Put simply, "[i]t can't be that sexual orientation and gender identity have always been protected given the clear evidence of prior contrary agency positions." *Tennessee*, 104 F.4th at 612. That the Rule "encroach[es] upon a traditional state power," *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022) (citation omitted), is further reason it fails Spending Clause scrutiny, MSJ 10. The Rule's other Spending Clause problems add fuel to the fire. *Id.* at 11.

*Major Questions.* The Department disclaims a major-questions violation (at 21) by asserting that §§ 106.10 and 106.31(a)(2) rest on Title IX's "unambiguous" text and "the meaning of 'discrimination.'" That response is no more persuasive here than in the Spending Clause context.

The Department contends (at 22) that this is not the "extraordinary" case where the doctrine applies because it won't involve the requisite "costs and restructuring." One, the doctrine applies not just in "extraordinary" circumstances but also to "transformative expansion[s]" of an agency's claimed "regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 721, 724 (2022) (citation omitted); *see also, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2372-73 (2023). As demonstrated by courts' nearly unified initial

rejection of the agency's Title IX reading, the Rule squarely presents the kind of "fundamental revision of the statute" that triggers the doctrine. *See Biden*, 143 S. Ct. at 2373 (quoting *West Virginia*, 597 U.S. at 728). In any case, requiring intimate exposure to members of the opposite sex in every federally funded American school pre-K on up is "major" in any sense, as hundreds of thousands of opposing comments confirm. Compl. ¶ 117. Section 106.31(a)(2)'s impacts also include "restructuring" facilities to protect "privacy" and associated "significant cost[s]." 89 Fed. Reg. at 33,815, 33,820; *e.g.*, Docs. 92-1, 92-2. And beyond infrastructure, the Rule comprehensively reorders school life—requiring schools to rewrite policies affecting bathrooms, locker rooms, shower facilities, and any other single-sex program not covered by an express statutory exception. These changes affect millions of students in the States alone, Doc. 19-3 ¶ 3; Doc. 19-11 ¶ 3, and billions in critical federal funding, *see, e.g.*, Doc. 19-2 ¶ 3. *Bostock* does not solve the Department's major-questions problem, *cf.* Dep't Br. 22, having *disclaimed* any application to "bathrooms, locker rooms, or anything else of the kind," 590 U.S. at 681.

<u>*Federalism*</u>. Congress must "make its intention" to displace States' authority "unmistakably clear." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (cleaned up); *see also* MSJ 12. The Sixth Circuit has rejected the rebuttal (at 24) that the Rule does not displace the States' authority. *See Tennessee*, 104 F.4th at 593-94. Nor can the fact that Title IX has "never been held to infringe" States' rights defeat this canon, *cf.* Dep't. Br. 24, given the Rule's shift from Title IX's settled interpretation.

### 3. Even if *Bostock* applies, §§ 106.10 and 106.31(a)(2) are unlawful.

<u>*Sex-discrimination definition (§ 106.10)*</u>. *Bostock* does not support § 106.10's scope. MSJ 16. *Bostock*'s reasoning rested on a link to "sex." 590 U.S. at 662. But the Rule is "capable of regulating conduct that neither implicates the male/female dichotomy nor relates to sex at all." Stay Op. 10; *see also* MSJ 15-16; PI Op. 27. That reflects the Rule's defining gender identity to include any subjective "sense" of gender, including some identifies like nonbinary that are divorced from sex entirely. *See*

11

89 Fed. Reg. at 33,809; WPATH Guidelines, SOC 8, at S80, S88 (cited at 89 Fed. Reg. 33,819 n.90).

*De minimis provision (§ 106.31(a)(2).* Section § 106.31(a)(2) inverts *Bostock* by positing that dif-ferentiation between opposite sex persons who are *not* "similarly situated" always entails discrimination "on the basis of sex"—when it causes "more than de minimis harm." 89 Fed. Reg. at 33,887 (quoting § 106.31(a)(2)); *cf. Bostock*, 590 U.S. at 657-58. And the Department argues that the harm § 106.31(a)(2) restricts does *not* implicate so-called "cisgender students." *Id.* at 33,887, 33,818, 33,820; Dep't Br. 16. So § 106.31(a)(2) isn't protecting *males* or *females* vis-à-vis the opposite sex. Instead, § 106.31(a)(2) prohibits sex differentiation that might disparately impact some other group. But Title IX tracks Title VI, which does not permit disparate-impact claims. *Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 738–39 (N.D. Ill. 2017) (collecting cases); *cf. Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 240 (6th Cir. 2019). And the Department certainly cannot defend § 106.31(a)(2) on disparate-impact grounds now, having never done so before. *Cf. SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943).

Section 106.31(a)(2) goes further, moreover, by mandating that schools provide accommoda-tions for students whose "gender identity" and sex do not align. 89 Fed. Reg. at 33,887; *see also id.* at 33,516, 33,821. But Title IX does not mandate gender-identity-based *accommodations*; it bars discrimi-natory differentiation between similarly situated males and females. *See* Stay Op. 8.[2]

The Department's defenses thus portray § 106.31(a)(2)'s mandate as something it is not.

*First*, the Department argues (at 15) that § 106.31(a)(2) simply "effectuates [the] plain text" of § 1681(a)'s prohibition of sex "discrimination." But the question is not whether discrimination in the abstract "includes an element of injury or harm," Dep't Br. 15 (quoting 89 Fed. Reg. at 33,815), but

---

[2] Nor do policies recognizing "inherent differences between" the sexes discriminate based on sex stereotypes. *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring); *see Tennessee*, 104 F.4th at 614 (discussing *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016)). *L.W.* instructed that the Sixth Circuit's sex-stereotyping analysis is limited to "dress [and] appearance" and does not "create a new rule for transgender discrimination." 83 F.4th at 486.

12

what constitutes discrimination under Title IX, *cf. id.* at 11.  And Title IX makes clear that it does not bar just *any* "harm" to *any* person based on *any* quality however tangentially related to sex.  *See* 89 Fed. Reg. at 33,887.  It bars only discrimination between males and females and, even then, it allows certain differentiation that results in substantially equal treatment on a group level.  *See, e.g.,* 20 U.S.C. § 1681(a)(8); 34 C.F.R. §§ 106.34(b), 106.41(b)-(c).  Section 106.31(a)(2) impermissibly rewrites Title IX to gut long-accepted sex-separation policies that have never violated Title IX.

*Second*, the Department (at 15) suggests that, because § 106.31(a)(2) preserves Title IX's statutory exceptions, the Rule simply "effectuates" congressional intent.  That selective textualism can't explain the implausible contradictions § 106.31(a)(2) creates—like allowing males into girls' showers (34 C.F.R. § 106.33) but not Girls State (20 U.S.C. § 1681(a)(7)).  *See* MSJ 14; PI Op. 25-26.  And the Department ignores that rules cannot contradict in-force regulations.  *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2020).  Yet the Rule's interpretations do.  *See Tennessee*, 104 F.4th at 610-11.

*Third*, the Department tries (at 15-17) to justify this contradictory approach by pointing to examples and evidence of gender-identity-based harms the Department designed § 106.31(a)(2) to prevent.  But the Department's primary example—exclusion of a person from "bathrooms or locker rooms[]," Dep't Br. 16 (quoting 89 Fed. Reg. at 33,818)—highlights § 106.31(a)(2)'s inconsistency with Title IX.  The Department's gerrymandered conception of harm requires schools to allow only males identifying as females to use female facilities while excluding males identifying as males *based on those students' gender identity*.  This necessarily *prefers* transgender over non-transgender students.  MSJ 17; PI Op. 27-28; Stay Op. 8-9.  In short, the Department's own understanding of § 106.31(a)(2) shows that the de minimis provision enshrines the very gender-identity discrimination it purports to prohibit.

The Department has no response (at 17-18), except to assert that the de minimis provision "protects all students."  But it doesn't protect students, like A.C., who suffer dignitary harms from

using sex-separate facilities with biological males.  89 Fed. Reg. at 33,820.  And the Department's example of how § 106.31(a)(2) might apply beyond gender identity—barring "discriminatory dress and appearance codes"—ignores that § 106.31(a)(2) applies only to "different treatment or separation" that Title IX or its regulations "permit[]."  89 Fed. Reg. at 33,887 (quoting § 106.31(a)(2)).  Yet, the Rule itself argues there is no statutory exception for dress codes, *see* 89 Fed. Reg. at 33,824, if Title IX covers dress codes at all, *see Peltier*, 37 F.4th at 156-57 (Wilkinson, J., dissenting).  So dress codes can't disguise § 106.31(a)(2)'s contrived nature.

**B.      Section 106.2's definition of harassment exceeds the Department's Title IX authority.**

The Department concedes (at 20), as it must, that the Final Rule's harassment definition is "different" than the Supreme Court's in *Davis*.  *See Alabama*, 2024 WL 3981994, at *5.  But the Department had no authority to swap the Supreme Court's definition of "harassment" in Title IX for its own.  MSJ 17-18.  It is no excuse, *contra* Dep't Br. 20-21, that *Davis* dealt with a private damages claim, since "the Supreme Court was … interpreting the same word in the same statute to address the same legal question."  *Alabama*, 2024 WL 3981994, at *5; *see also In re Juntoff*, 76 F.4th 480, 485 (6th Cir. 2023); *Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).  Nor did *Davis* "approve" alternative harassment standards in "then-recently published guidance regarding sexual harassment," *contra* Dep't Br. 21, since the validity of those rules was not at issue, *see Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 647 (1999).  The Court simply decided the statutory definition of harassment, *id.* at 652, including the "very real limitations" that the Final Rule jettisons, *see Alabama*, 2024 WL 3981994, at *5-6.

**C.      The Rule violates the Constitution.**

The Final Rule also fails constitutional review.  *See* PI Op. 32-56; MSJ 18-20.

1.      The Department's counter to the States' Spending Clause argument—that "[n]o court has ever held Title IX" to violate the Spending Clause—fails given that no previous regulation has

interpreted Title IX to cover "concept[s]" "distinct" from "sex." 89 Fed. Reg. at 33,807, 33,810. Four decades of contrary interpretation and enforcement across the federal government demonstrate that the States could not have "voluntarily and knowingly" consented to such a prohibition. *Yellen*, 54 F.4th at 348 (citation omitted); *see Tennessee*, 104 F.4th at 611-12. To the contrary, the Rule's interpretations of Title IX represent a "new" understanding that would "'substantially change[] the experience" of the States. *Tennessee*, 104 F.4th at 600, 612-13. The Spending Clause clear-statement rule forbids agencies from imposing extra-statutory funding conditions through after-the-fact rulemaking. *Yellen*, 54 F.4th at 348; *accord West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1140 (11th Cir. 2023); *Texas v. Yellen*, 105 F.4th 755, 769-70 (5th Cir. 2024).

2.      The Department rejects (at 28-35) any First Amendment problem with the Final Rule. But warping "sex" to include terms like "gender identity"—which has no fixed meaning and morphs to every individual's subjective "sense"—renders the Final Rule impossibly vague. *See* PI Op. 50; MSJ 18-19. And shoehorning (*see* Dep't Br. 28) that amorphous term into the Final Rule's expanded definition of harassment compounds § 106.2's speech-chilling impact. PI Op. 49-56; MSJ 18-19. For individuals who are not chilled entirely, their only hope for avoiding liability is to abide by the Department's viewpoint and use preferred pronouns. PI Op. 41-48; MSJ 18-19.

While § 106.2 "retain[s] the 2020 amendments' reference to offensiveness," Dep't Br. 29 (citation omitted), the Department ignored its own warning that importing an otherwise more lenient harassment definition might "cause recipients to chill [their speech] and infringe upon the First Amendment freedoms of students, teachers, and faculty by broadening the scope of prohibited speech and expression," 85 Fed. Reg. 30,026 30,037 (2020); *see also id.* at 30,033, 30,151-52, 30,162-65 & nn.738-39. *Davis*'s warning "against courts 'impos[ing] *more sweeping liability than we read Title IX to require*'" also went unheeded. *Alabama*, 2024 WL 3981994, at *6 (citation omitted). The fallout: a bevy

15

of First Amendment problems, *see* PI Op. 41-56; *accord Alabama*, 2024 WL 3981994, at \*6, including the Final Rule's compelling students and teachers to use "preferred," not accurate, pronouns, 89 Fed. Reg. at 33,887 (§ 106.31(a)(2)); *see also id.* at 33,516 (suggesting harassment includes "misgendering").

Indeed, because pronouns "communicate a message," they implicate "speech subject to the First Amendment's protections." *Parents Defending Educ. v. Oletangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 466 (6th Cir. 2024). So whatever *Parents Defending Education* (cited at 30) says about the particular K-12 policy it reviewed in a preliminary posture, *see* Dep't Br. 30-31, the Rule's broader policies fail at the university level, *see Meriwether*, 992 F.3d at 507, 510-11; PI Op. 40-41. Contra the Department (at 31), *Meriwether*'s conclusion that "harassment" had not occurred did not bless a harassment standard "like the one set out in § 106.2" given the court's core holding that punishing a professor for using accurate pronouns conflicts with the First Amendment. 992 F.3d at 511-12.

The Department also cannot escape the pronoun issue with after-the-fact evasions. The Department's retcon of *Kluge v. Brownsburg Community School Corp.*, No. 21-2475 (7th Cir.) (discussed at Dep't Br. 31) as dealing only with Title VII does not square with its repeated attempts to link Title VII and Title IX, *see, e.g.*, Dep't Br. 33. In any event, the United States' amicus brief in *Kluge*, was just one piece of the broader pattern and practice on pronouns. A raft of other guidance and enforcement confirms the Department's current view that Title IX requires use of gender-identity-based pronouns. *See, e.g.*, Doc. 1 at 31-32, 54 (collecting guidance examples); Doc. 92-3. So does the Final Rule itself. *E.g.*, 89 Fed. Reg. at 33,516 (relying on EEOC Title VII guidance so stating to define hostile environment). And the Final Rule's boilerplate First Amendment disclaimer (cited at 29, 31) cannot negate this constitutional conflict. *Cf. Dambrot v. Centr. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995). Particularly so since the government bears a "heav[ier] burden" to justify a regulation that compels speech. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 907 (2018) (citation omitted).

16

Nor can the Department shift blame for compelling speech. *See* Dep't Br. 30. The Department claims (at 30) that its harassment provisions in no way tell individual students and staff what they must say. But the Rule collapses that distinction by informing schools that addressing harassment requires adhering to students' preferred pronouns. Just ask Professor Meriwether, *Meriwether*, 992 F.3d at 498-502 (detailing protracted Title IX "harassment" investigation,), or ask school employees, who under the Final Rule must receive training on and report all conduct that "may constitute sex discrimination"—including students' and colleagues' speech. 89 Fed. Reg. at 33,885-86, 33,888. It makes no difference that the States and their school systems generally are the ones that enforce harassment schemes, not the Department, because federal funds may not be used to "induce the States to engage in activities that would themselves be unconstitutional." *South Dakota v. Dole*, 483 U.S. 203, 210 (1987).

The Rule's many "vague" expansions of the definition of harassment combine to chill protected speech on a range of topics. PI Op. 59-56. Lowering the liability bar to anything that "limits" a student's education provides little more than a heckler's veto for "offensive" speech on subjective concepts like "gender identity" and "sex stereotypes." 89 Fed. Reg. at 33,492; *see id.* at 33,505, 33,516, 33,493 (conceding definition reaches "verbal" acts and "speech"). Female students who once question a man's presence in their bathroom may face Title IX sanctions, since the "harassment" need not be pervasive, severity is subjective, and offensiveness is measured from the complainant's view. 89 Fed. Reg. at 33,498. Other controversial speech will likewise find itself verboten. *See id.* at 33,504 (approving a school's decision to punish a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS"). The Department cannot credibly discount (at 32-33) the amount of protected speech § 106.2 affects after the 2020 rule acknowledged parallel concerns. *See, e.g.,* 85 Fed. Reg. at 30,151-52.

And § 106.2's combination of factors differentiates it from other proscriptions on hostile environment harassment—like Title VII's—that courts have upheld. Dep't Br. 28, 33. Also, alleged

Title VII harassment is actionable only if it "alter[s] the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted); *accord Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). Under the Rule, however, harassment can be anything that "limits" students' benefits from a program—requiring only "some impact on their ability to participate." 89 Fed. Reg. at 33,511, 33,884. And even if Title VII permits more stringent speech regulation, *Davis* presumes that schools warrant additional free-expression leeway because they "are unlike the adult workplace." 526 U.S. at 651. Thus, it is unsurprising that multiple courts have held that policies like § 106.2 are unconstitutionally chilling. *See, e.g., Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114-15, 1120 (11th Cir. 2022); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215-17 (3d Cir. 2001) (Alito, J.); *cf. Speech First, Inc. v. Fenves*, 979 F.3d 319, 323, 334, 336-37 & n.16 (5th Cir. 2020).

### D. The Rule is arbitrary and capricious.

The Rule's profoundly arbitrary reasoning independently sinks it. MSJ 20-22; PI Op. 66-77.

*First*, the Department's blinkered focus on *Bostock* was "arbitrary." PI Op. 67-69; *see also* MSJ 20. The Department's primary response (at 14)—that it reasonably "follow[ed] *Bostock*'s lead" in "declining to address" § 106.10's application to sex separation—ignores the differing roles of a court resolving the "case or controversy" before it and an agency engaging in notice and comment. *Cf. Bostock*, 590 U.S. at 681 (emphasizing "sex-segregated bathrooms," etc., weren't "before" the Court).

The Department's claim (at 14) that § 106.31(a)(2) and the athletics rule, not § 106.10, address sex separation simply misreports the Rule, which states that "106.10 does not permit a recipient to separate students on the basis of sexual orientation or other bases in § 106.10, such as pregnancy or sex stereotypes." 89 Fed. Reg. at 33,810. That view accords with the Department's recent history of relying on the statute itself to require gender-identity accommodation in sex-separated spaces. *See supra* p. 9. The Department can't insulate § 106.10 from the Rule's arbitrariness.

18

*Second*, the Rule arbitrarily treats "like cases differently" and advances "internally inconsistent" logic. *Banner Health v. Price*, 867 F.3d 1323, 1349 (D.C. Cir. 2017) (citations omitted); *see also* PI Op. 72; MSJ 20-21.  The Department's responses (at 18-19) fail.  As for the illogical statutory-regulatory distinctions § 106.31(a)(2) introduces, the Department's claim that Congress intended them doesn't fly.  Congress blessed the sex-separated places and programs in the Department's original regulations, which were consistent with long-accepted justifications for statutory provisions like § 1686.  And the Department's attempt to distinguish the housing and bathroom regulations indicts the agency's reasoning since its predecessor, HEW, also cited § 1681(a) in adopting the athletics regulation, which the Department says legitimately allows sex separation.  HEW's promulgation of the bathroom regulation under § 1681(a) (*cf.* Dep't Br. 18) shows HEW thought such separation did not violate Title IX.

As to athletics, the Department explains only that they're "special," but it doesn't say why. Dep't Br. 19 (quoting 89 Fed. Reg. at 33,819).  That would require acknowledging that sex separation based on physiological differences is not discrimination, which the Department won't do.  Nor can the Department justify the Rule's abandonment of its own statute-versus-regulation reasoning in classifying after-school sports on the "statutory" side of the line—even though a regulation, not Title IX or the Javits Amendment, addresses sex separation in that context.  As this Court correctly found, the Rule does not acknowledge, much less explain, this "contradictory" approach.  PI Op. 70-71.

*Third*, the Department (at 28-35) provides no explanation for shrugging off commenters' First Amendment concerns.  MSJ 21.  That's enough to concede the issue.  *See Paul v. Whitley Cnty. Detention Ctr.*, 2024 WL 188368, at *7 (E.D. Ky. 2024).  Even if the Department believes (at 28-29, 35) that the Final Rule is First Amendment compliant, it needed to explain its thinking to commenters, *see* MSJ 21; it could not (*contra* 35 & n.7) punt resolving citizens' here-and-now concerns by claiming a need for more "specific" facts later, 89 Fed. Reg. at 33,512.  Especially so given the Department's intentional

19

decision "*to leave … vague terms undefined*," PI Op. 54, and its openness to engaging with specific "examples" elsewhere, *e.g.*, 89 Fed. Reg. at 33,803, 33,813.

*Fourth*, the Department's failure to consider "important aspect[s] of the problem" or address unfavorable evidence betrays "the political preferences of an outcome-oriented rule." PI Op. 67, 72-75, 77 (citation omitted); *see also* MSJ 22. The Department's response (at 24-27) continues to strawman the States' arguments. First, it characterizes (at 24) the States' privacy and safety objection as a claim that the Fourteenth Amendment protects students from the presence of the opposite sex in intimate facilities. That dodge can't refute the mountain of authority recognizing that exposure to "the other sex may be especially demeaning and humiliating," regardless of whether the Fourteenth Amendment forbids it. *E.g.*, *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987) (citation omitted); PI Op. 73-75 (collecting cases). Nor does schools' purported ability (at 25) to offer "single-occupancy facilities" mitigate the Rule's fallout. The Rule agrees that step would carry "significant cost implications," yet declined to account for them. 89 Fed. Reg. at 33,820. So that is no solution. PI Op. 76.

The Department also tries to sidestep its failure to consider commenters' evidence of the Rule's dangers for safety and privacy by pointing to evidence that it did consider (at 25-26). Notably, the Rule did not cite some of the evidence the Department now highlights (at 26 n.5). *See generally* 89 Fed. Reg. at 33,820-21. *Cf. Chenery*, 318 U.S. at 94-95. And the evidence cited by the Rule likewise dismissed or failed to address the "legitimate privacy interest" protected by same-sex facilities. 89 Fed. Reg. at 33,820; *see also* Amici Br. of School Administrators *18–19, *Grimm v. Gloucester Cnty. Sch. Bd.*, 2019 WL 6341095 (4th Cir. Nov. 25, 2019) (cited at 25).

The Department's dismissal of commenters' evidence (at 26-27) as a "list of anecdotes" condemns the Department's own evidence. *See, e.g.*, Amici Br. of School Administrators, *supra*, at *19–25 (citing individual school administrators' anecdotal experiences with gender-affirming policies) (cited

20

at 25).  Regardless, the Department's assertion (at 26-27) that the Department "[]weighed" all the evidence, requiring deference to its conclusion, doesn't survive a cursory review.  The Rule did *not* address commenters' evidence of attacks on women in intimate facilities, PI Op. 72-73 (discussing Tenn. Comment, Doc. 1-3 at 9-11)—the Department's brief identifies no such passage.  Instead, the Rule "disagree[d]" § 106.31(a)(2) heightens such harms without explaining *why*.  89 Fed. Reg. at 33,820. That some commenters favor promoting gender ideology over securing women's success does not itself reasonably explain why the agency rejected well-founded objections to so upending Title IX.

Nor can the Department complete its Hail Mary on verification.  The Department's claim (at 26) that schools can seek "documentation" contradicts the Rule's statement that "burdensome documentation requirements" "impose[] more than de minimis harm."  89 Fed. Reg. at 33,819.  That some schools have been provided "written confirmation" of gender identity does not authorize schools to seek such information.  Dep't Br. 32; 89 Fed. Reg. at 33,819.  Nor does it clarify how—or whether— schools can verify sex to enforce the statutory exceptions.  *See* PI Op. 70; 89 Fed. Reg. at 33,819.  And there's no way for schools to assess internal gender identity for visitors who seek on-the-spot access.

*Fifth*, the Rule would drive schools to accommodate gender-identity preferences even over parental opposition, lest liability arise.  *See* PI Op. 64-66.  The Rule's failure to grapple with these constitutional and implementation issues creates an additional arbitrary-and-capricious defect.

## III.   The States are entitled to vacatur, a permanent injunction, and declaratory relief.

### A.   Vacatur is appropriate under the APA and governing precedents.

Contra the Department (at 36-39), vacatur is the "ordinary result" in APA cases like this one and aligns with "countless" Supreme Court decisions that have "vacated … agency rules."  *Corner Post, Inc.*, 144 S. Ct. at 2462-64, 2467-70 (Kavanaugh, J., concurring) (collecting authorities); *accord Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 50-52 (D.D.C. 2020) (Jackson, J.).  Justice Kavanaugh's *Corner Post*

21

concurrence rejected the Department's claim (at 36) that § 703, not § 706(2), "authoriz[es]" remedies because, among other reasons, "no court" has ever read § 703 that way.  144 S. Ct. at 2467-68 (citation omitted).  As the Department concedes (at 37), this argument is academic here because the Sixth Circuit agrees that courts "have the power to vacate" unlawful agency action.  *Sierra Club v. EPA*, 60 F.4th 1008, 1021 (6th Cir. 2023).

Vacatur of the Rule is proper under *Sierra Club*.  The Rule's flaws go to the Rule's heart and could not be rectified on remand because they involve misinterpretations of Title IX's "unambiguous" text (*cf.* Dep't Br. 37).  *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) (cited by *Sierra Club*).  Nor is vacatur inappropriate because injunctive relief is available.  *Cf.* Dep't Br. 38.  The Department's authorities (at 38) discussing the propriety of injunctive relief in different contexts and the dangers of overbroad injunctive relief don't show otherwise.  *Cf. Kentucky v. Fed. Highway Admin.*, 2024 WL 1402443, at *19 (W.D. Ky. Apr. 1, 2024) (entering declaratory relief in light of another court's previous order vacating the challenged rule), *appeal filed* No. 24-5532 (6th Cir. June 3, 2024).

### B.   Entry of relief against the entire Rule is warranted.

#### 1.   The Court should vacate the Rule in its entirety.

Alternatively, the Department argues (at 45-50) the Court should vacate just part of the Rule.  But as this Court has explained in affirmed reasoning, the Department's lack of statutory authority to adopt the Rule, as well as its arbitrary reasoning, invalidates the entire Rule.  *See* Stay Op. 5; PI Op. 90.

Nor can the Rule's "severability provision" solve the agency's problem (*cf.* Dep't Br. 46-47).  The Department's proposals for severing the Rule fail the first step of the severability analysis— "whether the [regulation] will function in a *manner* consistent with the intent of [the agency]."  Stay Op. 20 (citation omitted).  The three challenged provisions and "embedded interpretive guidance" are "so integral" to the Final Rule that severing them would "leave an incoherent regulatory framework."

*Id.*  Indeed, the Rule substantially justifies its significant costs by referencing the benefits flowing from the provisions it now says can be severed.  *See* 89 Fed. Reg. at 33,859-63.  But the Rule does not meaningfully "address[]" how it could satisfy that cost-benefit calculus without those provisions.  *Ohio v. EPA*, 144 S. Ct. 2040, 2055 (2024).  The lack of comments specifically addressing severability does not compensate for that failure.  *Cf.* Dep't Br. 49 n.16.  After all, the Department can finalize only those requirements that reflect a logical outgrowth of its proposed rule.  *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).  Its severability argument would eviscerate this procedural check by leaving parties with an impossible guess at which among the exponentially large combinations of a rule's provisions might take ultimate effect.

Given the Rule's focus on implementing the Administration's view of what *Bostock* requires, moreover, *see* PI Op. 9; 89 Fed. Reg. at 33,859-60, there is "substantial doubt" the Department would have adopted the Rule "without the prohibition[]" on gender-identity discrimination—defeating severability at the second step of the analysis.  *Mayor of Baltimore v. Azar*, 973 F.3d 258, 292-93 (4th Cir. 2020) (citation omitted); *see also* Stay Op. 20.  The Rule itself links its "purpose" to the three challenged provisions and traces the "[n]eed for [r]egulatory [a]ction" to eliminating gender-identity discrimination.  89 Fed. Reg. at 33,476, 33,859-60.  The Department does not address these facts.

Even if vacatur of the entire Rule were not appropriate, the Department's severance proposals (at 47-50) ignore the States' arguments and this Court's findings.  *First*, contra the Department (at 47), the States have consistently argued § 106.10's entire definition is unlawful.  *See* Stay Op. 12.  The States have also challenged § 106.31(a)(2) and § 106.2's harassment definition independently and as related to § 106.10, *see* MSJ 7-8—arguing those provisions are not severable either.  *Contra* Dep't Br. 47 n.15.

*Second*, despite the Department's claims otherwise (at 47-48), vacating or enjoining § 106.10 alone would affect the Rule's remainder.  For one, subbing in the "pre-Rule understanding of sex

23

discrimination" (at 47) wouldn't work because "even that definition is 'the subject of separate litiga-tion.'" *Tennessee v. Cardona*, 2024 WL 3453880, at *4 (6th Cir. July 17, 2024).  For another, the chal-lenged "provisions, particularly [§ 106.10's] new definition of sex discrimination, appear to touch every substantive provision of the Rule." *Id.* at *3 (collecting provisions); Stay Op. 20-21.  The States showed how on appeal with an exhaustive provision-by-provision exercise the Department has never attempted, much less in this Court.  *See Tennessee v. Cardona*, 2024 WL 3453880, at *5-9.  The Depart-ment cannot avoid vacatur by pretending that § 106.10 is not intertwined with the Rule's remaining provisions or ignoring the cross-cutting flaws in the Rule's reasoning.  Stay Op. 16-21.

Nor would vacating or enjoining § 106.10 alone resolve the mismatch between the Rule's cost-benefit analysis and a partially vacated Rule.  *Cf.* Dep't Br. 49.  As the stay panel reasoned, there is no evidence the Department "contemplated … allowing these provisions to go into effect with a *different* definition of sex discrimination." *Tennessee v. Cardona*, 2024 WL 3453880, at *4.  And assuming § 106.10 isn't separable from the other challenged provisions—it isn't—the Department "has not identified any evidence that it contemplated, during the rulemaking process, how the remainder of the Rule would apply without *any* of its core provisions," not just § 106.10.  *Id.* (emphasis added).

## 2.    Alternatively, the Court should enjoin the entire Rule.

If the Court proceeds by injunction, the same severability analysis would pertain.  The Court's preliminary findings that partial relief would cause widespread confusion and wasted costs likewise apply here.  Stay Op. 2, 24; *see also Tennessee v. Cardona*, 2024 WL 3453880, at *4.  Instead of hurling schools into a compliance conundrum, the Court should vacate the Rule, not rewrite it.  These equities also support an alternative finding that the States are entitled to permanent injunctive relief as to the whole Rule.  At a minimum, the Court should enjoin the Rule's three central provisions.

24

### C.      This Court should enter additional injunctive and declaratory relief.

The Department seeks (at 50) to limit the States to "one form" of relief.  But the States have not sought the kind of "superfluous" relief that might make multiple forms of relief improper.  *Cf. Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556, 562 (8th Cir. 2009) (cited at 50).  Vacatur won't suffice to protect the States given prior Department practice and its arguments in this Court about what Title IX's text requires.  *Tennessee v. U.S. Department of Education* exemplifies the problem.  There, the court enjoined the Department from implementing gender-identity guidance.  615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022).  But the Department has continued to open investigations consistent with those interpretations.  *See* Doc. 92-3.  Additional relief here would help head-off such action.

Permanent injunctive relief is warranted for the same reasons that this Court held that the States were entitled to preliminary relief.  MSJ 25.  The Department's responses only seek to relitigate issues it lost in this Court, *see* PI Op. 79-88, in the stay-phase proceedings, *see Tennessee v. Cardona*, 2024 WL 3453880, at *4; *Louisiana*, 2024 WL 3841071, at *1, and in the Title IX guidance case, *see Tennessee v. Department of Education*, 104 F.4th at 589-90, 613.  Its arguments fare no better now.

This Court should likewise enter declaratory relief.  *See* 28 U.S.C. § 2201(a); 5 U.S.C. § 703.  Contra the Department (at 50), "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  Fed. R. Civ. P. 57.  As discussed in their opening brief, the States are entitled to declaratory relief proclaiming the Final Rule and its interpretations unlawful and declaring the States, their political subdivisions, and their recipient schools entitled to funding irrespective of compliance with the Rule.  *See* MSJ 24-25.  Such relief is necessary to ensure the Department cannot enforce its unlawful interpretations against the States by other means.

### CONCLUSION

This Court should grant Plaintiff States' motion for summary judgment and requested relief.

Dated: September 4, 2024

Respectfully Submitted,

**RUSSELL COLEMAN**
  Attorney General

*/s/ Justin D. Clark*
JUSTIN D. CLARK
  Civil Chief
VICTOR B. MADDOX
  Counsel for Special Litigation
LINDSEY R. KEISER
  Assistant Attorney General
**Kentucky Office of the Attorney General**
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
victor.maddox@ky.gov
justind.clark@ky.gov
lindsey.keiser@ky.gov

*Counsel for the Commonwealth of Kentucky*

**JONATHAN SKRMETTI**
  Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE*
  Solicitor General
WHITNEY D. HERMANDORFER*
  Director of Strategic Litigation
STEVEN J. GRIFFIN*
  Senior Counsel for Strategic Litigation &
  Assistant Solicitor General
VIRGINIA N. ADAMSON*
  Counsel for Strategic Litigation &
  Assistant Solicitor General
BRIAN DANIEL MOUNCE*
  Counsel for Strategic Litigation &
  Assistant Solicitor General
**Office of the Tennessee Attorney General**
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3491
matt.rice@ag.tn.gov
whitney.hermandorfer@ag.tn.gov
steven.griffin@ag.tn.gov
jenna.adamson@ag.tn.gov
brian.mounce@ag.tn.gov

*Counsel for the State of Tennessee*

**THEODORE E. ROKITA**
  Attorney General

*/s/ James A. Barta*
JAMES A. BARTA*
  Solicitor General
CORRINE L. YOUNGS*
  Policy Director and Legislative Counsel
JOSHUA DAVID*
  Deputy Attorney General - Policy
**Indiana Attorney General's Office**
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709

**DAVE YOST**
  Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
  Solicitor General
MATHURA SRIDHARAN*
  Deputy Solicitor General
**Office of the Ohio Attorney General**
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

26

james.barta@atg.in.gov
corrine.youngs@atg.in.gov
joshua.david@atg.in.gov

*Counsel for the State of Indiana*

**JASON S. MIYARES**
  Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER*
  Principal Deputy Solicitor General
BRENDAN T. CHESTNUT*
  Deputy Solicitor General
**Virginia Attorney General's Office**
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

*\*Admitted pro hac vice*

**PATRICK MORRISEY**
  Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS*
  Solicitor General
**Office of the West Virginia Attorney General**
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September 2024 a true and correct copy of the foregoing document was served on all counsel of record via the Court's electronic filing system, which provided copies of the foregoing to all counsel of record.

/s/ Whitney D. Hermandorfer
WHITNEY D. HERMANDORFER

28