# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### COVINGTON DIVISION

| | |
|---|---|
| **State of Tennessee**; **Commonwealth of Kentucky**; **State of Ohio**; **State of Indiana**; **Commonwealth of Virginia**; and **State of West Virginia**, | |
| *Plaintiffs,* | |
| *and* | |
| **Christian Educators Association International**; **A.C.**, by her next friend and mother, Abigail Cross, | **Case No. 2:24-cv-00072-DCR-CJS** |
| *Intervenor-Plaintiffs,* | District Judge Danny C. Reeves |
| v. | Magistrate Judge Candace J. Smith |
| **Miguel Cardona**, in his official capacity as Secretary of Education; and **United States Department of Education**, | |
| *Defendants.* | |

## INTERVENOR-PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# CONTENTS

Table of Authorities .................................................................................................. ii

Introduction ............................................................................................................. 1

Argument .................................................................................................................. 1

I.  The Rule goes against Title IX's text, context, and history ............................ 1

    A.  The new definition of sex discrimination both inflates and destroys Title IX. ........................................................................................................ 2

    B.  The "de minimis harm" provision—and its new form of discrimination based on gender identity—distorts Title IX. ............................................. 6

    C.  Constitutional canons of construction prohibit the Rule's gender-identity mandate. ...................................................................................... 9

II.  The Rule's standard for sex-based "hostile environment harassment" is contrary to law. ............................................................................................. 10

    A.  Precedent disallows the harassment standard. ................................... 10

    B.  The Rule infringes on First Amendment rights. ................................ 12

III.  The Rule is arbitrary and capricious. ........................................................... 16

IV.  The Rule should be vacated, and the Department enjoined. ......................... 19

    A.  The Court should vacate the Rule. ..................................................... 20

    B.  The Court should issue equitable relief foreclosing future action on the same basis. ................................................................................. 24

Conclusion .............................................................................................................. 25

Certificate of Service ............................................................................................. 27

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ...................................................................................... 12

*Adams ex rel. Kasper School Board of St. John's County,*
   57 F.4th 791 (11th Cir. 2022) ..................................................................... 18

*Alabama v. U.S. Secretary of Education,*
   No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) ...................... 1, 23

*Alaska Airlines, Inc. v. Brock,*
   480 U.S. 678 (1987) ...................................................................................... 23

*Alliance for Hippocratic Medicine v. U.S. Food & Drug Administration,*
   78 F.4th 210 (5th Cir. 2023) ....................................................................... 20

*Americans for Beneficiary Choice v. U.S. Department of Health & Human
Services,*
   No. 4:24-cv-00439-O, 2024 WL 3297527 (N.D. Tex. July 3, 2024) ............... 22

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................................... 11

*Bostock v. Clayton County,"*
   590 U.S. 644 ............................................................................................. 1, 3

*Braidwood Management, Inc. v. Becerra,*
   104 F.4th 930 (5th Cir. 2024) ..................................................................... 22

*Career Colleges and Schools of Texas v. U.S. Department of Education,*
   98 F.4th 220 (5th Cir. 2024) .................................................................... 21, 22

*Cooper Industries, Inc. v. Aviall Services, Inc.,*
   543 U.S. 157 (2004) ........................................................................... 11, 12, 16

*Corner Post, Inc. v. Board of Governors of Federal Reserve System,*
   144 S. Ct. 2440 (2024) .................................................................................. 20

*Dambrot v. Central Michigan University,*
   55 F.3d 1177 (6th Cir. 1995) ........................................................................ 12

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
   526 U.S. 629 (1999) ......................................................................... 10, 11, 16

*Davis v. Michigan Department of Treasury,*
    489 U.S. 803 (1989) ............................................................................ 2

*Department of Education v. Louisiana,*
    603 U.S. __, 2024 WL 3841071 (2024)............................................ 1, 24

*Department of Homeland Security v. Regents of the University of California,*
    140 S. Ct. 1891 (2020) ...................................................................... 20

*Doe v. Miami University,*
    882 F.3d 579 (6th Cir. 2018) ............................................................ 16

*Dubin v. United States,*
    599 U.S. 1101 (2023) ......................................................................... 2

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ..................................................................... 24, 25

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) .......................................................................... 16

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..................................................................... 16, 17

*F.E.C. v. Cruz,*
    596 U.S. 289 (2022) .......................................................................... 22

*Franciscan Alliance, Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) ................................................... 21, 24, 25

*Gebser v. Lago Vista Independent School District.*
    524 U.S. 274 (1998) ............................................................................ 6

*Griffin v. HM Fla.-ORL, LLC,*
    144 S. Ct. 1 (2023) .................................................................. 20, 22, 23

*Harris v. Forklift Systems, Inc.,*
    510 U.S. 17 (1993) ............................................................................ 16

*Horner v. Kentucky High School Athletic Association,*
    206 F.3d 685 (6th Cir. 2000) .............................................................. 6

*Kansas v. Department of Education,*
    No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) ........................ 23

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) .............................................................. 10

iii

*Meriwether v. Hartop,*
     992 F.3d 492 (6th Cir. 2021) ...................................................................... 12, 13

*Sierra Club v. U.S. Environmental Protection Agency,*
     60 F.4th 1008 (6th Cir. 2023) .......................................................................... 20

*Tennessee v. Cardona,*
     No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024)...................... 1, 15, 23

*Texas v. Becerra,*
     No. 6:24-cv-00211 (N.D. Tex. Aug. 30, 2024) ................................................. 22

*Texas v. Cardona,*
     __ F. Supp. 3d __, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024)............... 12, 24

*Texas v. United States,*
     201 F. Supp. 3d 810 (N.D. Tex. 2016)............................................................. 24

*United Savings Association of Texas v. Timbers of Inwood Forest Associates.*
     *Limited,*
     484 U.S. 365 (1988) ........................................................................................... 2

*United States v. Fitzgerald,*
     906 F.3d 437 (6th Cir. 2018) .............................................................................. 7

*United States v. Jackson,*
     390 U.S. 570 (1968) .......................................................................................... 23

*West Virginia v. EPA,*
     597 U.S. 697 (2022) .......................................................................................... 10

## Statutes and Regulations

5 U.S.C. § 706.......................................................................................................... 20

20 U.S.C. § 1232(c).................................................................................................. 21

20 U.S.C. § 1681(a) .................................................................................. 2, 9, 23, 24

20 U.S.C. § 1686...................................................................................................... 2

34 C.F.R. § 106.41(a)–(b) ......................................................................................... 5

34 C.F.R. § 106.10 ........................................................................... 4, 5, 10, 16, 17

34 C.F.R. § 106.31(a)(2) .................................................................................. 10, 18

34 C.F.R. § 106.33 ......................................................................................... 5

34 C.F.R. § 106.34 ......................................................................................... 5

42 U.S.C. § 2000e-2(e) .................................................................................. 5

40 Fed. Reg. 24,128 (June 4, 1975) ......................................................... 2, 3

85 Fed. Reg. 30,026 (May 19, 2020) ..................................................... 11, 15

89 Fed. Reg. 33,474 (April 29, 2024) ................................................*passim*

Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235............................ 3

## Other Authorities

ADF Comment re: Athletics, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Docket ID ED-2021-OCR-0166-200280 ........................................................................ 19

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ......................................................................................... 2, 13

EPPC Scholars Comment Opposing "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," RIN 1870-AA16, Docket ID ED-2021-OCR-0166 ......................................... 8

Excerpt of Transcript from *Carroll Independent School District v. United States Department of Education* .................................................. 6

John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2003) ............... 7

Hilary Cass, *The Cass Review: Independent Review of Gender Identity Services for Children and Young People: Final Report* (April 2024) ........................ 8

Ruth Hall, et al., *Impact of social transition in relation to gender for children and adolescents: a systematic review*, 109 Archive Disease Childhood (April 9, 2024), https://bit.ly/4dM2LyM ....................................................................... 8

Morandini, et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Archive Sexual Behavior (April 4, 2023) ...................................................................... 8

Expert Report of Stephen B. Levine, M.D., *Darren Patterson Christian Academy v. Lisa Roy, et al.*, Case No. 1:23-cv-1557-DDD-STV, Dist. Ct. of Colorado ........................................................................................................ 8

Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 N.D. L. Rev. 1997 (2023) ................................................................... 20, 22

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020) ........ 23

Tennessee Attorney General, et al. Comment, AR259365-79 ....................................... 8

## INTRODUCTION

As this Court and many others have already concluded, the Department's Rule unlawfully transforms Title IX from a statute ensuring equal educational opportunities for women and men to a statute mandating preferences for gender ideology. But Title IX's ban on sex discrimination has not changed since 1972. Nor has Title IX's text suddenly become a speech code mandating gender ideology and requiring students and teachers to affirm that boys can be girls and vice versa. The Rule's Title IX interpretation is unlawful. This Court should grant Plaintiffs' and Intervenors' summary-judgment motions, ECF 126, 127, deny the Department's cross-motion, Dept. Br., 134, and vacate the Rule.[1]

## ARGUMENT

### I. The Rule goes against Title IX's text, context, and history.

The Department says its new definition of "sex-based" discrimination is a "straightforward application" of *Bostock* to Title IX. Dept. Br. [Cross-MSJ/Resp.] at 10 (citing *Bostock v. Clayton Cnty.*, (2020)). This Court, the Sixth Circuit, and the Supreme Court have all rejected that justification. *See Dep't of Educ. v. Louisiana*, 603 U.S. __, 2024 WL 3841071, *1 (2024) (per curiam); *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2–3 (6th Cir. July 17, 2024); Op., ECF 100. So have many others. *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, *4–5, (11th Cir. Aug. 22, 2024) (per curiam); *id.* at *1 n.2 (collecting cases).[2]

---

[1]    The Department filed two identical documents, each entitled Defendants' Consolidated Opposition to Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment and Cross-Motion for Summary Judgment and Supporting Memorandum. ECF 133, 134. This brief refers to both as "Dept. Br."

[2]    The Supreme Court agreed the challengers will likely show that § 106.10 is contrary to law—otherwise, they would not be entitled to preliminary relief. *See id.* at *1 n.1; *contra* Dept. Br. at 10 n.1.

## A.    The new definition of sex discrimination distorts Title IX.

**1.**    As the Department recognizes (at 11), this case is about "what sex-based conduct Title IX prohibits." Title IX forbids treating one sex worse than the other. Int. Mem. at 6–9. Section 1681(a) "must be read in … context" and construed to fit "the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 371 (1988) (courts must accept an interpretation that is "compatible with the rest of the law"). Here, a nearby provision states: "[N]othing [in Title IX] shall be construed to prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This rule of construction shows that § 1681(a) *itself* allows sex distinctions.

The Department treats § 1686's rule of construction as just another exception to § 1681(a). *E.g.,* Dept. Br. at 15; 89 Fed. Reg. at 33,818. But § 1686 specifies that Title IX cannot "be construed" to prohibit "separate living facilities for the different sexes." And Congress titled § 1686 an "[i]nterpretation" principle. *Id.* That "reinforces what the text's nouns and verbs independently suggest," *Dubin v. United States*, 599 U.S. 110, 121 (2023)—that § 1681(a) allows some sex distinctions, including to preserve sex-specific spaces. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 221–24 (2012) (explaining title-and-headings canon). Section 1686 is not an exception, but an interpretive command.

The Department concedes as much later, saying § 1681(a) allows the regulations to provide for sex-specific "toilet, locker room, and shower facilities." Dept. Br. at 18. If § 1686 were an exception from § 1681(a)'s non-discrimination rule, then the 1975 regulations could not have provided for sex-specific "toilet, locker room, and shower facilities" unless these private facilities count as "living facilities." *See* Nondiscrimination on the Basis of Sex in Education Programs and

2

Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24,128, 24,139–43 (June 4, 1975) ("1975 rulemaking"). To specify one exception is to exclude others. Scalia & Garner, *supra*, at 107–11. But the Department says these do not count as living facilities subject to § 1686. *E.g.*, 89 Fed. Reg. at 33,816, 33,821. The Department cannot have it both ways. To read § 1686 as the interpretive rule it is, one must read Title IX to allow some biological distinctions between males and females, as the regulations have done since 1975. The better reading is that locker rooms, restrooms, and showers are within § 1686.

    **2.**    The Department insists (at 9–11) "sex-based discrimination" occurs any time schools consider sex, so "gender-identity discrimination is sex discrimination even under" the ordinary "binary understanding of sex." 89 Fed. Reg. at 33,802. That cannot be. While § 106.10's definition hinges on assuming any distinction that notices sex is consequently sex-based discrimination, § 1686, the rest of the statutory context, and longstanding regulations foreclose that assumption. The Department's reading cannot account for distinctions long-accepted under Title IX—from dormitories and showers to sports and P.E. classes.

    As *Bostock* observed, "sex discrimination" implies "a focus on differential treatment between the two sexes as groups." 590 U.S. at 659. "Sex Discrimination Prohibited" was the original heading for the provision codified at § 1681(a), and Title IX was entitled "Prohibition of Sex Discrimination." Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 373. A group-based understanding explains the many provisions providing for comparable treatment of men and women "as groups." *See* Ints.' Mem. re: MSJ, ECF 127-1, at 10–11. It's telling that the Department never addresses this significant difference between the two statutes. It offers no response because it has no justification.

    Section 106.10 is unlawful even assuming but-for causation. Context forecloses applying *Bostock*'s any-consideration-of-sex formula. After all, if every

consideration of sex were sex-based discrimination (as *Bostock* says of Title VII), Title IX would *have to* prohibit sex-specific "living facilities," sports, and restrooms. But that's not viable. The Department accepts that Title IX permits separate sports teams, so it must also permit separate locker rooms. *See, e.g.,* 89 Fed. Reg. at 33,817; Dept. Br. at 18–19. To be sure, the Department says it takes the word "sex" to mean biological sex. 89 Fed. Reg. at 33,802. But that still does not justify transplanting *Bostock*'s sex-blind logic from Title VII to Title IX. Nor does it mean § 106.10 "is not the cause of Plaintiffs' claimed harms." Dept. Stay Mot., ECF 104, at 5. Section 106.10 defines "sex-based *discrimination*." It cannot avoid saying what discrimination means. And what it says deviates from the statute.

Specifically, § 106.10 elevates gender identity, sex stereotypes, and other characteristics to the same level as sex—the one classification covered by Title IX. As Intervenors have explained (at 9–10), not even *Bostock* justifies that. *Bostock* did not give gender identity equal billing with sex or create new protected classes. The Rule does, and that makes it impossible for schools to implement the statute, at least as it has always been understood. If gender identity and sex must receive the same treatment, as § 106.10 requires, schools cannot separate locker rooms or P.E. classes based on gender identity *or* based on sex. Either way, there would be discrimination. Title IX does not extend to distinctions based on gender identity, "sex stereotypes," or the like. And that makes sense, or else teachers would be in danger of "sex stereotyping" anytime they discuss the differences between men and women. Decl. of Winkler, ECF 127-12, ¶¶ 37–38; Suppl. Decl. of McKay, ECF 127-17, ¶¶ 6–14; Suppl. Decl. of Taylor, ECF 127-16, ¶¶ 5–15.

To support transplanting *Bostock* onto Title IX, the Department says (at 12–13) that "Title VII, too, contains statutory exceptions" and can protect privacy. But Title IX's provisions are more than "exceptions" to the nondiscrimination rule; they govern its interpretation (§ 1686) and reflect the shared understanding (including

in 1972) that recognizing sex differences for privacy and sports is not discrimination (*e.g.*, 34 C.F.R. §§ 106.33, 106.34, 106.41(a)–(b)). Moreover, the only Title VII provision the Department cites (at 13)—Title VII's "bona fide occupational qualification" provision—is unlike Title IX's § 1686. The BFOQ provision says certain distinctions "shall not be an unlawful employment practice." 42 U.S.C. § 2000e-2(e). Unlike § 1686, that is an exception to the general rule.

The Department also argues (at 13) that because Title IX and its regulations include provisions allowing sex-specific programs and facilities, "Congress understood Title IX's general prohibition against sex discrimination otherwise could have been interpreted to preclude such separation or differentiation." That supports Intervenors, not the Department. Again, § 1686 is an interpretive rule, not an exception. *Supra* at 2. And longstanding regulations reflect what Congress (and the public) have long understood—biological sex is relevant in education, and schools do not act unlawfully every time they distinguish based on sex.

Finally, to minimize the Rule's effect, the Department dismisses (at 13–14) the States' and Intervenors' structural arguments as "unfounded speculation about how § 106.10 might hypothetically apply to discrete factual contexts," such as "preferred names" or athletics. But pre-enforcement APA review exists to foreclose unlawful future applications, and the Department does not challenge the propriety of judicial review here. In any event, such contexts illustrate that the Rule's new definition contradicts the statutory structure. After all, the Rule cites cases that applied the same logic to require gender identity to supersede sex when it comes to restrooms, locker rooms, athletics, and pronouns under Title IX. *See* Int. Mem. at 19–20. The Department cannot cite these cases to support the Rule's logic but pretend the same cases and its Rule do not affect particular applications.

## B.    The "de minimis harm" provision—and its new form of discrimination based on gender identity—distorts Title IX.

The Rule's new form of sex discrimination is unsupported by the statute and would violate constitutional requirements.

*First*, the new provision turns Title IX into a disparate-impact statute—but only for gender identity. Title IX requires "intentional discrimination," not disparate impact. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 692 (6th Cir. 2000). The "de minimis harm" provision recognizes that long-recognized distinctions, like restrooms and showers, are generally permissible. But as applied to someone who is transgender, these same distinctions turn out to be unlawful discrimination. The Department lacks authority to expand Title IX liability to cover disparate impact. And even if it did, the agency has never admitted the change—that, too, is arbitrary and capricious.

The Department defends its new provision as "effectuat[ing] Title IX's plain text." Dept. Br. at 15. It doesn't. Section 106.31(a)(2)'s final sentence reveals what is really at stake: the only sex distinctions that cause cognizable harm are those that "prevent[] a person from participating … consistent with the person's gender identity." *Id.* The Department says (at 15) this is just "an example in which separation or differential treatment on the basis of sex causes more than de minimis harm." But in a related case, the Department said § 106.31(a)(2) does not "kick in" unless the alleged harm is "based on gender identity." Ex. 6, Tr. at 89:21–24. When the agency's own counsel cannot agree on what the provision means, it is arbitrary and capricious for lack of reasoned explanation. As another example, the Department says (at 17-18) a sex-specific dress code could fit the new form of discrimination "if girls are harmed." (cleaned up). But even if dress codes are also amenable to as-applied "more than de minimis harm" claims, only gender identity

gets guaranteed access to the new form of discrimination. And the Department cannot justify treating dress codes differently from restrooms.

*Second*, the Department's interpretation fails to harmonize the statutory scheme. *See* Scalia & Garner, *supra*, at 180. Section 106.31(a)(2) illogically carves out exceptions where (according to the Department), sex-based harm is *allowed*. It is unreasonable to conclude that Congress meant to subject students to legally cognizable injury in dorms across the nation, while mandating that girls share locker rooms with boys and wrestle against them in P.E. class. The Department still has no explanation for § 106.31(a)(2)'s bizarre patchwork, opting instead to blame Congress (at 17). But that just shows the Department's interpretation is wrong, not that Congress enacted incoherent text. *See* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2458–59 (2003); *e.g.*, *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018). For five decades Title IX has recognized sex-specific spaces, but in the Department's view, these have been discrimination waiting to happen all along.

To justify the many other provisions allowing sex-specific facilities and programs, the Department gives an example, stating women's restrooms are discriminatory when applied to males who identify as female but not males who identify as males because "a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom." Dept. Br. at 16 (citing 89 Fed. Reg. at 33,818). But that disparate-impact logic is impossible to square with the Department's *Bostock* theory that *any* sex distinction causes harm. *Supra* Part I.A. And this conclusion is also completely unproven. While the Rule cites medical groups as justification, *e.g.*, 89 Fed. Reg. at 33,819, these groups did not hold these novel views about gender in 1972. Their recent policy views cannot change the public understanding of sex discrimination in Title IX's text in 1972. Indeed, these groups can and often do change their minds. Under the Department's logic, Title

IX's meaning would change too. But Title IX's text did not peg Title IX's protections in 1972 to the evolving views of medical advocacy organizations in 2024.[3]

Even more fundamentally, the Department's logic ignores the key injury here: students—particularly girls and women—losing access to *their own* sex-designated spaces. After all, a middle school girl does not care whether the male who enters her shower has an "internal sense" that he is a boy, girl, or something else. That female middle schooler suffers the same privacy loss either way; she loses the same educational benefit (safe access to sex-specific spaces) either way. There is simply no textual basis in Title IX to make the harm women suffer when losing their privacy turn on how *someone else* identifies.[4]

---

[3]    A growing body of evidence contradicts the Department's claimed "substantial evidence." ECF 133 at 16 & n.3. The Cass Report publicized that there is *no reliable evidence* that "social transition," such as using pronouns, restrooms, or dressing as the opposite sex, improves mental health for children. Worse still, evidence suggests social transition *harms* children by increasing the odds of persisting in a transgender identity, taking hormones to interfere with normal development, and even surgery. Ex. 9, Hilary Cass, *The Cass Review: Independent Review of Gender Identity Services for Children and Young People: Final Report* (April 2024); Ex. 8, Ruth Hall, et al., *Impact of social transition in relation to gender for children and adolescents: a systematic review*, 109 Archive Disease Childhood (April 9, 2024), https://bit.ly/4dM2LyM; *see also* Ex. 7, Morandini, et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Archive Sexual Behavior 1045 (April 4, 2023); Ex. 5, Expert Report of Stephen B. Levine, M.D., *Darren Patterson Christian Academy v. Lisa Roy, et al.*, Case No. 1:23-cv-1557-DDD-STV, Dist. Ct. of Colorado, ¶¶ 178–181. Although the Cass Report and associated systematic reviews were published after the comment period closed, the Department cannot claim to have been ignorant of these highly publicized developments.

[4]    Decl. of A.C., ECF 21-5, ¶¶ 42–50; Suppl. Decl. of A.C. ECF 127-15, ¶¶ 4–22; EPPC Scholars Comment Opposing "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," RIN 1870-AA16, Docket ID ED-2021-OCR-0166-228237, 13 ("[Title IX's sex based distinctions] recognize that women's safety is often threatened by the intrusion of males into private spaces where women are sexually vulnerable."); Tenn. Att'y Gen. et al. Comment, AR259365-79 (the Department has not adequately accounted for the risks these new regs could pose to student and faculty safety).

At most, the Department justifies its more-than-de-minimis-harm gloss based on the concept that the word "discrimination" carries an element of harm. Dept. Br. at 18. But § 1681(a) also bans *exclusions* and *denials of benefit*s based on sex, not just sex discrimination. The Department never even tries to explain why or how that language in § 1681(a) incorporates notions of harm tied to someone's gender identity. Nor can it. A woman who cannot access a women's only restroom or locker room is effectively "excluded" from an educational program "on the basis of sex" and is "denied the benefits of" that program. That exclusion and loss do not change depending on the gender identity of males accessing these private spaces.

The Department's reading also fails to justify sex-specific sports teams. As even the Rule recognizes, there is no statutory "exception" for athletics. While the Javits Amendment instructed the agency to promulgate regulations on "intercollegiate athletics," it did not amend the operative statutory text. So even under the Department's justification, only intercollegiate athletics have been exempted from its *de minimis* harm rule. But that cannot justify the 1975 regulations, which apply to elementary and secondary school sports too. In other words, the reasoning behind the de-minimis-harm rule would at minimum and on its own terms make sex-designated sports illegal in K-12 schools. That is reason enough to reject the agency's theory in favor of Intervenors' better reading: the Javits Amendment is evidence of the contemporaneous understanding that Title IX allows—even requires—sex-specific designations that protect student privacy and women's athletic opportunities.

## C.    Constitutional canons of construction prohibit the Rule's gender-identity mandate.

Neither provision of the Rule's gender-identity mandate is a permissible reading of Title IX's plain text. On top of that, the new conditions do not satisfy constitutional requirements. The Department contends (at 22) that the major-

questions doctrine cannot apply because §§ 106.10 and 106.31(a)(2) are just plain-text applications of the statute. As Intervenors have explained, that is wrong. Int. Mem. at 7–12. Requiring schools to assign locker rooms, P.E. classes, and sex-ed instruction based on gender identity instead of sex is a "highly consequential" and "transformative" change. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). Congress itself must make such major policy determinations.

Acknowledging that Title IX is Spending Clause legislation subject to a strong clear statement rule, the Department insists (at 22–23) that §§ 106.10 and 106.31(a)(2) "merely apply Title IX's unambiguous prohibition on sex discrimination." But the clear-statement rule requires contemporaneous notice to recipients of what action is required or proscribed; it is not enough to give notice that some condition exists. Int. Mem. at 15–16. And because in 1972 "on the basis of sex" did not mean "on the basis of gender identity," "sex characteristics," or the like, Congress gave no clear notice that these other characteristics were impermissible bases for distinguishing between individuals. And an agency cannot add conditions or provide the necessary notice—it has to come from Congress. *See Kentucky v. Yellen*, 54 F.4th 325, 352 (6th Cir. 2022). The Rule's failure here is all the clearer because of Title IX's rule of construction allowing respect for sex-specific privacy and the contemporaneous regulations recognizing sex-based distinctions in programs like athletics, classes, locker rooms, and the like. *See supra* at 2–3.

## II.    The Rule's standard for sex-based "hostile environment harassment" is contrary to law.

The Rule's broadened standard for hostile environment harassment is also unlawful, both alone and along with the gender-identity mandate.

### A.    Precedent disallows the harassment standard.

The Rule's new definition of hostile environment harassment broadens the interpretation set out by the Supreme Court in *Davis ex rel. LaShonda D. v.*

*Monroe County Board of Education*, 526 U.S. 629 (1999). The Supreme Court held that hostile environment harassment could be proscribed when "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities… [and] only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633. As Intervenors have explained (at 21–22), the Rule's new harassment standard departs from *Davis*.

The Department argues (at 20–21) that *Davis* is relevant only for private lawsuits. That is wrong. As the Department recognized in 2020, "Nothing in … *Davis* purports to restrict [its] framework only to private lawsuits for money damages." 85 Fed. Reg. at 30,033. And although implied causes of action may be "disfavored" today, Dept. Br. at 21 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), *Davis* remains good law. Whatever the source of the cause of action, Title IX has only one substantive non-discrimination provision: § 1681(a). The same text cannot have a different meaning in administrative enforcement than in private lawsuits. Notice matters for both administrative enforcement and private rights of action, and the Rule fails to give sufficient notice. Clear standards like those in *Davis*'s definition succeed at this in a way the Rule's redefinition fails.

Nor can the Rule reconcile with *Davis*. *Davis* repeatedly discusses the "severe and pervasive" requirement and takes seriously First Amendment concerns. While the Department points to *Davis*'s references to then-recent agency guidance on sexual harassment, which used the language "severe or pervasive," the *Davis* Court's citations did not involve that standard. The references affirm that Title IX covers "student-on-student" harassment and that the age of the harasser and victims and the number of individuals involved are relevant in Title IX claims. *See Davis*, 526 U.S. at 647–48, 652. Whether "severe *or* pervasive" would fit with the statute (or First Amendment) was, at most, a question that "merely lurk[ed] in

the record, neither brought to the attention of the court nor ruled upon." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). And in any event, when the Court defined the standard, it required conduct to be "severe *and* pervasive."

### B.    The Rule infringes on First Amendment rights.

Even if permitted under Title IX, the new harassment standard violates the First Amendment. *See* Int. Mem. at 21–24. The Department assures the Court (at 30) that the Rule does not require schools to "violate anyone's First Amendment rights." That disclaimer is meaningless. *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995). The Department never intimates how to toe that line, because it can't. Because of the radical expansion of what counts as sex discrimination on top of its reinvention of hostile-environment harassment, the Rule cannot comply with the First Amendment. Not only that, but the Rule's vagueness will chill far more speech than intended by the Department. To comply with the Rule's redefinition, schools must create policies that compel, restrict, and chill speech. Its standards are vague and overbroad.

1.    The Rule compels and restrains speech based on viewpoint. The Rule all but acknowledges that it requires students and employees to use requested pronouns and to affirm a non-binary and non-biological understanding of gender. 89 Fed. Reg. 33,504, 33,516. This tracks the Department's prior position. *See Texas v. Cardona*, __ F. Supp. 3d __, 2024 WL 3658767, at *4–5 (N.D. Tex. Aug. 5, 2024) (discussing agency guidance documents). The Rule admits that "misgendering" could violate the Rule if it is "persistent" and "limits another student's … performance," 89 Fed. Reg. at 33,508–09, but dismisses First Amendment concerns because (the Department says) violators could be punished in a way that complies with the First Amendment. This overlooks the near per se bar against compelled speech. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *Meriwether v. Hartop*,

992 F.3d 492, 503 (6th Cir. 2021) ("Start with the basics. ... the government may not compel affirmance of a belief with which the speaker disagrees.") (cleaned up).

The Rule also will require schools to implement viewpoint-based speech restrictions, which violates the free-speech rights of students and teachers. The Rule lowers the standard to any time an experience "limits" an individual's participation or benefit from an educational program. The Rule also inquires into subjective feelings of offense that can be based on § 106.10's undefined litany of new characteristics. And the Department makes clear that for gender identity, it is only concerned with offense to people who espouse the Department's views. But it celebrates and even requires silencing those who disagree, such as anyone who wants to state that "there are only two genders." *See* Int. Mem. at 22. This viewpoint-based restriction is unconstitutional and incompatible with equal educational opportunity.

The Rule also restricts speech during Title IX proceedings through § 106.45(b)(5), which could bar parties from consulting anyone other than "their family members, confidential resources, or advisors." 89 Fed. Reg. at 33,674. The Defendant waived any defense of this gag-order requirement by addressing it only in a footnote. *See* Dept. Br. at 29 n.6. And this prior restraint will leave complainants and respondents alike isolated and silenced.

**2.**    The Rule also chills speech. Ambiguity about the Rule's requirements will significantly chill protected expression. Teachers will thus cease private conversations with other teachers and students for fear of being reported and punished. Decl. of Campbell, ECF 21-8, ¶¶ 35–36; 42–43; Decl. of Keaton, ECF 21-9, ¶¶ 33–36; Decl. of McKay, ECF 21-10, ¶¶ 33–39, 49–53; Decl. of Moore, ECF 21-11, ¶¶ 18–23; Decl. of Taylor, ECF 21-12, ¶¶ 23–24, 48–50; Decl. of Winkler, ECF 127-12, ¶¶ 40–41, 46; Decl. of Parker, ECF 127-13, ¶¶ 36–37; Decl. of Field, ECF 127-14, ¶¶ 23–24, 45–47. And they will be punished for this speech even though it

causes no disruption at school. Ex. 3, Suppl. Decl. of Winkler ¶¶ 9–10; Ex. 4, Second Supp. Decl. of Taylor ¶¶ 5–6. Causing self-censorship of protected expression means the Rule violates the First Amendment, and it is counterproductive to the purpose of education—teaching students to think for and express themselves respectfully, engage with contrary views, and interact productively. The Rule conveys that those who agree with the Department have free rein to speak—and to complain about their friends and teachers—but those who do not agree must get in line.

3.    The Rule is also vague and overbroad. Its expansive harassment definition threatens the First Amendment rights of teachers and students by prompting schools to overregulate for fear of liability. Though the Department seems to deny that the redefinition of sex to include sex stereotyping could implicate the First Amendment, the impact is substantial. *See* Decl. of Winkler ¶¶ 37–38; Suppl. Decl. of McKay, ECF 127-17, ¶¶ 6–14; Suppl. Decl. of Taylor, ECF 127-16, ¶¶ 5–15. The Rule disfavors some perspectives and treats them as harassment, incentivizing recipients to censor based on viewpoint. The lack of goalposts sets administrators, teachers, staff, and students alike up for failure.

The Department claims it provides sufficient clarity because the new standard lists "specific and required elements." 89 Fed. Reg. at 33,506. But as discussed above, what the elements condone and restrict is unclear. For example, it is cold comfort that the Rule "simply requires a complainant to 'demonstrate *some impact* on their ability to participate or benefit from the education program or activity[.]'" Dept. Br. at 34 (emphasis added) (quoting 89 Fed. Reg. at 33,511). "Some impact" has no limiting principle. Schools will have to investigate complaints for minor incidents or comments that would be best handled within the classroom. Equally disconcerting, the Rule fails to limit its reach to on-campus or closely tied activities. The harassment standard can sweep in online activities and

14

even conduct occurring outside the country. *See* 89 Fed. Reg. 33,532. This gives students and employees no reprieve from censorship. *See* Decl. of Parker ¶¶ 32–33.

The Department brushes off the Rule's failure to clarify what it means by undefined concepts, claiming "gender identity" needs no definition because it "is now well understood." Dept. Br. at 34 (quoting 89 Fed. Reg. at 33,809). But as this Court recognized, that "offers no guidance whatsoever. Arguably worse, it suggests that this term of vital importance can be subjectively defined by each and every individual…." *Tennessee*, 2024 WL 3019146, at *24.

This ambiguity creates First Amendment pitfalls. Teachers and students are left uncertain if they can share views about whether students should be allowed to use the restroom or compete on sports teams of the opposite sex. *See* Decl. of Keaton ¶ 33; Decl. of McKay ¶¶ 33–38. Teachers will be unsure what they can say about males and females in the context of genetics, statistics, or anatomy without being accused of sex stereotyping or advocating for a binary gender conception. Decl. of Winkler ¶¶ 37–38; Suppl. Decl. of McKay, ECF 127-17, ¶¶ 6–14; Suppl. Decl. of Taylor, ECF 127-16, ¶¶ 5–15; Decl. of Field ¶¶ 29–31. And students will find themselves self-censoring interactions with friends and teammates, unwilling to share their views for fear of being reported for "harassment."

To justify its new standard, the Department points (at 20) to the definition of hostile environment harassment found in non-binding guidance documents from the 1990s. *See* 85 Fed. Reg. at 30,035. This comparison does not save the Rule's broad standard. For starters, the harassment definition promulgated in 2020 was spurred in part because the prior standard failed to adequately protect First Amendment rights. 85 Fed. Reg. at 30,036, n.88 (the guidance "led to infringement of rights of free speech and academic freedom of students and faculty"). First Amendment issues are much worse here, where a broader standard combines with the Rule's radical new interpretation of "sex discrimination" in § 106.10.

15

The Department next suggests similar definitions of hostile environment harassment have been "upheld" in the Title VII context. Dept. Br. at 20, 28–29 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993); *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018)). Neither case "upheld" anything against a First Amendment challenge—neither *Harris* nor *Miami University* involved a First Amendment claim, so these cases are not precedent on that issue. *See Cooper Indus.*, 543 U.S. at 170. In any event, even the Title VII standard addressed in *Harris* required a much greater showing than is required under the Rule. Combined with the Rule's redefinition of sex-based discrimination and refusal to define key terms, that standard would also infringe on First Amendment freedoms. Moreover, Title VII's standards reflect the reality that "schools are unlike the adult workplace and…children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651–52.

## III.    The Rule is arbitrary and capricious.

It is unlawful for an agency to "depart from a prior policy *sub silentio*." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Department's prior interpretation of *Bostock* required gender identity to supersede sex anywhere sex-based differentiation is lawful. *See* Int. Mem. at 19–20. It does not matter whether this prior position ever "appear[ed] in the Code of Federal Regulations," as the Department suggests (at 13 n.2). An agency must acknowledge a position change even if the original policy appeared outside the regulations. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 215, 222 (2016) (regulation failed to provide reasoned explanation for departing from position set out by the agency in an interpretive rule); *Fox Television*, 556 U.S. at 515 (change from agency practice not formally published or codified anywhere). Here, if the Department has

backed off from applying *Bostock* to sports teams, restrooms, and showers, it fails to "display awareness that it is changing position." *Fox Television*, 556 U.S. at 517.

Intervenors have identified many other problems too. *See* Int. Mem. at 17–18. The Department's responses (at 14–15) are unavailing. *First*, *Bostock* cannot apply to Title IX, so it was arbitrary and capricious for the Rule to enact a new definition of "sex-based discrimination" on that basis. *See supra* at 3–5. Intervenors also discussed Title IX's many provisions providing for comparable treatment of men and women "as groups"—one of the characteristics the *Bostock* Court said was absent from Title VII. *See* Int. Mem. at 10–11. The Department does not even acknowledge this significant difference between the two statutes.

*Second*, the Department insists—without analysis—that the Rule does not "redefine sex discrimination, elevate new protected classes, or encompass characteristics that have nothing to do with sex." The first claim is puzzling—providing a new definition of "sex-based discrimination" is exactly what § 106.10 does. And this Court has recognized that § 106.10's definition puts "gender identity" and other attributes at the same level as "sex." *See* Op., ECF 117, at 9–12. That improperly provides additional levels of coverage, or, put another way, creates new protected classes.

*Third*, the Department argues it was "not unreasonable" to "declin[e] to address how a general prohibition on gender identity discrimination could bear on contexts involving sex separation." As Intervenors have explained (at 19–20), the new definition cannot help but put males in girls' sex-specific spaces and programs. The two provisions are intertwined. More than that, the Rule left in place longstanding provisions allowing sex-based distinctions. It cannot legitimately ignore how § 106.10 would impact those regulations. That is particularly important because the Department insists that § 106.10 is severable from § 106.31(a)(2), and thus might go into effect on its own. If every provision is severable from every

other, then the agency must consider and explain how every provision interacts with every other provision, with and without others.

In defense of the bizarre exemptions from § 106.31(a)(2)'s new form of discrimination, the Department repeats (at 18) the Rule's theory that "toilet, locker room, and shower facilities" are not "living facilities." Even if that is so, there's no reasoned justification for respecting privacy in dormitory showers but not the showers in the girls' gym. And if these private facilities are not "living facilities," then the Department has no explanation for allowing these sex-based distinctions in the first place. *See supra* at 2–3.

*Fourth*, the Department ignores the problem in claiming (at 18) that the Rule adequately considered privacy and reliance interests. Rather than account for the traditional and constitutionally protected privacy interests the Rule threatens, the Rule says these are *not legitimate*, and thus ignores them. 89 Fed. Reg. at 33,820. From there, it assumes schools, too, will ignore the supposedly illegitimate privacy concerns of parents and young girls, and thus will not have to convert to single-user facilities to protect privacy for all. With those moves, the Department avoids the "significant cost implications," *id.*, of complying with the Rule while still protecting privacy. All of that is arbitrary and capricious, as is the Rule's refusal to acknowledge the logical failure of its interpretation as applied to anyone who identifies as "nonbinary"—that, too, would require significant change. For all its insistence that schools are free to "coordinate with" students and parents, 89 Fed. Reg. at 33,818, the Department has already said it thinks requiring a student to use a single-user facility or one aligned with the student's sex, but not gender identity, is discriminatory. *See Adams ex rel. Kasper Sch. Bd. of St. John's Cnty.*, 57 F.4th 791, 811–17 (11th Cir. 2022) (en banc) (rejecting the Government's argument about school bathrooms).

*Fifth*, Intervenors have explained (at 20–21) why the Rule will impact interscholastic and intercollegiate athletics. The Department offers no rejoinder to Intervenors' textual analysis. It may have saved § 106.41(b)'s revision for a separate rulemaking, but it cannot deny that its new definition changes § 106.41(a)'s meaning and applies throughout the regulations. It is arbitrary and capricious to refuse to acknowledge this problem or address its implications.

*Finally*, the Department still fails to acknowledge how its new form of discrimination impacts P.E. classes, sex-ed lessons, and other sex-specific classes that have long been consistent with Title IX. *See* Int. Mem. at 8–9. Girls required to compete against males in P.E. class face greater risks of injury.[5] Worse still, a girl seldom has a choice about whether to participate in P.E.—at least not if she wants to pass the class. Similarly, the Department failed to acknowledge the pedagogical impact of mandating that schools use gender identity when assigning students to sex-specific classes, like sex-ed lessons. It does not so much as acknowledge the absurdity of sending a boy to the sex-ed lesson about female puberty, much less consider the distress this will cause adolescent girls and the teachers instructing them on sensitive topics.

## IV.    The Rule should be vacated, and the Department enjoined.

The Rule is unlawful—it misinterprets the statutory text, exceeds constitutional requirements, and it is arbitrary and capricious. The Court should vacate it for all these reasons. And because the core unlawful provisions are inextricable from the rest of the Rule, this Court should vacate the entire Rule. Intervenors also need injunctive and declaratory relief preventing the Department from trying to implement its unlawful interpretations through new agency action.

---

[5]    *See, e.g.*, ADF Comment, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Docket ID ED-2021-OCR-0166-200280, 9–10, 17–21, and cited evidence.

### A.    The Court should vacate the Rule.

**1.**    Agency action found contrary to law is to be "h[e]ld unlawful and set aside," or vacated. 5 U.S.C. § 706. That means "the federal court vacates th[e agency's] order—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2462 (2024) (Kavanaugh, J., concurring). Once vacated, it's "treated as though it had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., statement respecting denial of application).

To avoid that fate here, the Department first contends (at 36–37) that "the APA does not provide for universal vacatur as a remedy." That contradicts binding precedent, *Sierra Club v. U.S. Env't Prot. Agency*, 60 F.4th 1008, 1021 (6th Cir. 2023), and persuasive authority, *e.g.*, *Corner Post*, 144 S. Ct. at 2462 (Kavanaugh, J., concurring), so it can easily be dismissed. *E.g., Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020) (holding that the unlawful agency action must "be vacated"). The federal government's novel reading ignores decades of practice and Congress's understanding of administrative review. *See* Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 N.D. L. Rev. 1997, 2016–17 (2023). As long understood, the APA "empower[s] the judiciary to act directly against the challenged agency action." *Griffin*, 144 S. Ct. at 2 n.1 (Kavanaugh, J.) (cleaned up). That means vacating agency action found contrary to law. *See Corner Post*, 144 S. Ct. at 2462 (Kavanaugh, J., concurring).

Next, the Department urges the Court (at 42) to "remand without vacatur." That alternative depends on "the seriousness of the agency error," including whether it could be corrected on remand, "and the disruptive consequences of vacatur." *Sierra Club*, 60 F.4th at 1022. But it is "inappropriate for situations in which the court has found a defect that cannot possibly be repaired, such as a flat legal prohibition on the agency's chosen policy." Levin, *supra*, at 2022. Here,

further explanation will not stretch "discrimination … on the basis of sex" to include gender identity, "sex characteristics," or "preventing a person from participating consistent with their [sic] gender identity." The text does not mean that, and (unless Congress amends Title IX), it never will, whatever an agency might say. Nor has the Department shown it could remedy the Rule's procedural defects and still reach the Rule's conclusions.

As to disruption, the Department points (at 38) to "states where [the Rule] has not been enjoined." Vacating the Rule would not prevent schools in those states from maintaining existing policies and practices so long as they comply with Title IX and its existing regulations. If the Rule has engendered policies that do *not* comply, "disruption" is required. Such schools must change their policies, not keep violating Title IX under cover of a Rule already found contrary to law. Remand without vacatur would be improper.

The Department next asks (at 39) that the Court issue only *in personam* remedies because these can "provide sufficient relief to Plaintiffs" and be "tailored." To start, Intervenors agree with the Department's implicit concession that under governing precedent vacatur is "not party-restricted." *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). But that is no reason to eschew vacatur.

*First*, vacatur is "the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022). It is "the default rule," *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 255 (5th Cir.), *rev'd for lack of jurisdiction*, 602 U.S. 367 (2024), and this case is not exceptional. The Department's regulations must be "uniformly applied and enforced throughout the 50 States," 20 U.S.C. § 1232(c), and it would be absurd to enforce a patchwork of different regulations in schools across the county. Title IX is a circumstance where regulations must be uniform, or

administration will be incoherent. *Cf.* Levin, *supra*, at 2005–06. An award to only one teacher or student—or only one school—would create chaos. *Id.* at 2005.

*Second*, agencies cannot legitimately act unlawfully as to anyone. *See* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1131 (2020); *e.g. Texas v. Becerra*, No. 6:24-cv-00211-JDK, ECF 41 (N.D. Tex. Aug. 30, 2024). "An agency, after all, literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *F.E.C. v. Cruz*, 596 U.S. 289, 301 (2022). Unlike an action *in personam*, judicial review of rules under the APA is not aimed at setting the relationship between parties, but at ending unlawful agency action. *Cf.* Levin, *supra*, at 2004. That explains why plaintiffs don't have to show irreparable harm or the balance of interests to obtain vacatur of an unlawful rule. *See Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951 (5th Cir. 2024). The Rule is unlawful here, so it is unlawful everywhere.

*Third*, when an agency uses universal regulations, rather than individualized adjudications, it should not be surprising that equitable relief has a universal effect. *See Career Colls.*, 98 F.4th at 255 (agency's objections "are incoherent in light of its use of the Rule to prescribe uniform federal standards"); *accord Ams. for Beneficiary Choice v. U.S. Dep't of Health & Hum. Servs.*, No. 4:24-cv-00439-O, 2024 WL 3297527, at *7 (N.D. Tex. July 3, 2024).

The Department's "tailored" relief option would leave an unlawful Rule in place in broad swaths of the country, including states where Christian Educators members live and work. Ex. 2, Second Suppl. Decl. of David Schmus ¶¶ 4–55 (Christian Educators has members who teach in public schools in all fifty states). That is not an option. Whatever the "catalogued" challenges with "nationwide injunctions," Dept. Br. at 38, in the APA context, *Congress* "empower[ed] the judiciary to act directly against the challenged agency action." *Griffin*, 144 S. Ct. at

2 n.1 (Kavanaugh, J.) (cleaned up). Contrary to the Department's accusation (at 39), carrying out Congress's directive is no enlargement of "the judicial role."

Finally, any relief limited to members' workplaces or A.C.'s school still leaves Intervenors exposed to the unlawful Rule when they visit other campuses for school activities. *See* Suppl. Decl. of A.C. ¶¶ 10–11, 13–14; Ex. 2, Second Suppl. Decl. of David Schmus ¶¶ 4–55. Such partial protection helps temporarily, as the *Kansas* district court concluded, *see Kansas v. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024), but it is not a permanent solution.

**2.**     Severability asks whether a rule can function as intended without the challenged portions. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Sections 106.2, 106.10, and 106.31(a)(2) are central to the Rule's functioning, and the Department cannot show that a severed Rule would be workable.

To be sure, the Rule includes severability clauses, but the severability clauses do not meaningfully establish that the Rule can function without the challenged provisions. *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968). As the Sixth Circuit noted, the Department "did not contemplate enforcement of the Rule without *any* of the core provisions." *Tennessee*, 2024 WL 3453880, at *4. And there is no "suggestion that the cost-benefit analyses underlying the Rule contemplated the idea of allowing these provisions to go into effect with a different definition of sex discrimination." *Id.*; *accord Alabama*, 2024 WL 3981994, at *8. The Department's efforts to contest this conclusion by pointing, for example, to some modifications to the grievance process fall short. Dept. Br. at 49. That's for the same reason the Rule is non-severable—the challenged provisions are the backbone of the Rule, which operates as a unit. Given this, educators should not have to implement even conceivably beneficial subsections in piecemeal fashion.

The Department incorrectly asserts that only § 106.10's inclusion of gender identity is being challenged. But § 1681(a) does not encompass "sex characteristics"

or "sex stereotypes" any more than gender identity—each of the listed characteristics is a distinct thing from "sex." Intervenors have provided examples of how including sex stereotyping, sex characteristics, and sexual orientation also threaten their First Amendment rights. *See* Supp. Decl. of Taylor ¶¶ 5–12; Supp. Decl. of McKay ¶¶ 6–14.

Finally, the Department argues that the Rule's *Bostock* logic can be severed. But the extension of *Bostock* to Title IX is the backbone of the Rule. And the Department fails to "adequately identif[y] which particular provisions, if any, are sufficiently independent of the enjoined definitional provision and thus might be able to remain in effect." *Louisiana*, 2024 WL 3841071, at *1. That is because the Rule operates as a unified whole.

### B. The Court should issue equitable relief foreclosing future action on the same basis.

Along with vacating the Rule, the Court should issue declaratory relief and an injunction prohibiting the Department from imposing its erroneous reading of Title IX through future agency action. *See, e.g.*, *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 378–79 (5th Cir. 2022) (upholding permanent injunction on top of vacatur of unlawful rule); *Texas*, 2024 WL 3658767, at *48 (vacating agency action and granting declaratory and injunctive relief because "the Department has enacted similar guidance in the past and may attempt to do so again"). This is not the Department's first attempt to impose a gender-identity mandate on Title IX; it is likely to try again. *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 585–87 (6th Cir. 2024) (discussing history of the Department's actions on gender identity and Title IX); *Texas v. United State*s, 201 F. Supp. 3d 810, 816–17 (N.D. Tex. 2016) (finding unlawful the Department 2016 "Dear Colleague" letter on gender identity).

A permanent injunction is proper when the plaintiff prevails on the merits, has no adequate legal remedy for its injury, the balance of harms is in its favor,

and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Intervenors satisfy these requirements, as this Court recognized when granting preliminary relief. Op., ECF 100, at 87–88. (If they did not, vacatur would be all the more necessary—the Department cannot both oppose injunctive relief and object to vacatur because it cannot be tailored in the way an injunction could.)

The Department again claims (at 41, 44) that § 106.10 does not cause Intervenors' injuries. The Court has already rejected that contention. Op., ECF 117, at 16. And without permanent relief, A.C. would once again be forced to choose between her educational opportunity and her privacy and safety from sexual harassment. *See* Decl. of A.C., ECF 21-5, ¶¶ 51–58, 63–68. Christian Educators members would have to sacrifice their First Amendment freedoms and lose their own privacy protections. *See* Op., ECF 100, at 41–56. Such harms are irreparable. *See Franciscan All.*, 47 F.4th at 380. The problem is not a mere possibility that schools will adopt policies that violate First Amendment rights—it is the reality that the Rule mandates such policies. *See supra* Part II.B.1.

There is no reason to favor enforcing the Department's (unlawful) gender-identity mandate over Intervenors' and the public's interest. Schools will still apply Title IX to prevent *sex* discrimination, as they have since 1972. *See* Op., ECF 117, at 23–24. Barring the Department from yet again imposing gender ideology on the nation's schools is necessary to *prevent* the sex-based discrimination—and attendant harms—that Title IX was enacted to address.

## CONCLUSION

Plaintiffs-Intervenors respectfully request that the Court grant their motion for summary judgment, vacate the Rule, 5 U.S.C. § 706, issue declaratory and injunctive relief, and enter judgment as a matter of law in their favor.

Respectfully submitted this 4th day of September, 2024.

*/s/ Natalie D. Thompson*

<div style="display:flex">
<div>

Edward L. Metzger III
Kentucky Bar No. 94138
OMEGA LAW PLLC
P.O. Box 559
Union, KY 41091
(859) 898-2140
Lee@nkylaw.net

</div>
<div>

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Natalie D. Thompson**
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

</div>
</div>

*Counsel for Intervenor-Plaintiffs*

*\*Admitted pro hac vice*

*\*\*Admitted pro hac vice; practice supervised by one or more D.C. Bar members while D.C. Bar application is pending.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4th, 2024, a copy of this document was filed with the Clerk of Court using the CM/ECF system. I further certify that this document was served using the CM/ECF system on all counsel of record.

*/s/ Natalie D. Thompson*
Natalie D. Thompson
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org