# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### COVINGTON DIVISION

|  |  |
|---|---|
| STATE OF TENNESSEE et al., | |
| *Plaintiffs*, | Case No. 2:24-cv-00072-DCR-CJS |
| v. | Chief District Judge Danny C. Reeves |
| MIGUEL CARDONA, in his official capacity as Secretary of Education, et al., | Magistrate Judge Candace J. Smith |
| *Defendants*. | |

## <u>DEFENDANTS' REPLY IN SUPPORT OF<br>CROSS-MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Argument .............................................................................................................................. 2

I.       The Court should grant summary judgment to the Department. ........................................ 2

         A.       The Supreme Court's order denying an emergency stay does not mandate
                  judgment for Plaintiffs. ....................................................................................... 2

         B.       Section 106.10 correctly sets forth the scope of Title IX's prohibition on sex-
                  based discrimination. .......................................................................................... 3

         C.       Section 106.31(a)(2) is consistent with the text and structure of Title IX. ............. 8

         D.       Section 106.2 does not conflict with *Davis* or violate the First Amendment. ...... 13

II.      To the extent Plaintiffs are entitled to any relief, that relief should be limited to the parties
         and to the provisions of the Rule that the Court concludes are unlawful. ........................ 18

         A.       Any relief should be limited to the parties. ........................................................... 18

         B.       Any relief should be limited to provisions of the Rule that the Court finds
                  unlawful and that cause harm to the parties. ......................................................... 20

         C.       Plaintiffs' new request for relief extending beyond the Rule is meritless. ........... 22

Conclusion .......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Am. Stewards of Liberty v. Dep't of Interior*,
  960 F.3d 223 (5th Cir. 2020) ................................................................. 25

*Ammex, Inc. v. Cox*,
  351 F.3d 697 (6th Cir. 2003) ................................................................. 24

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ............................................................................. 17

*Audi AG v. D'Amato*,
  469 F.3d 534 (6th Cir. 2006) ................................................................. 22

*Bangura v. Hansen*,
  434 F.3d 487 (6th Cir. 2006) ................................................................. 23

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020) ............................................................................. 22

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................. 23

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ..................................................................... *passim*

*CBA Pharma, Inc. v. Perry*,
  2023 WL 129240 (6th Cir. Jan. 9, 2023) ............................................... 24

*Chisholm v. St. Marys City Sch. Dist.*,
  947 F.3d 342 (6th Cir. 2020) ................................................................... 7

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................. 24

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
  589 U.S. 327 (2020) ............................................................................... 4

*D.T. v. Sumner Cnty. Schs.*,
  942 F.3d 324 (6th Cir. 2019) ................................................................. 25

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ......................................................................... 13, 14

*Dep't of Educ. v. Louisiana*,
  144 S. Ct. 2507 (2024) ....................................................................... 2, 3

*Doe v. Bos. Coll.*,
   892 F.3d 67 (1st Cir. 2018) ......................................................................... 4

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016) .......................................................................... 4

*Doe v. Princeton Univ.*,
   30 F.4th 335 (3d Cir. 2022) ....................................................................... 4

*Doe v. Purdue Univ.*,
   928 F.3d 652 (7th Cir. 2019) ...................................................................... 4

*Doe v. Samford Univ.*,
   29 F.4th 675 (11th Cir. 2022) .................................................................... 4

*Doe v. Univ. of Denver*,
   1 F.4th 822 (10th Cir. 2021) ...................................................................... 4

*Ent. Prods., Inc. v. Shelby Cnty.*,
   588 F.3d 372 (6th Cir. 2009) .................................................................... 17

*GBX Assocs., LLC v. United States*,
   2022 WL 16923886 (N.D. Ohio Nov. 14, 2022) ...................................... 19

*Gebser v. Lago Vista ISD*,
   524 U.S. 274 (1998) ............................................................................. 5, 14

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009) .................................................................................... 4

*Franciscan All., Inc. v. Becerra*,
   47 F.4th 368 (5th Cir. 2022) ............................................................... 23, 24

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) .......................................................................... 8, 9, 10

*Jama v. Dep't of Homeland Sec.*,
   760 F.3d 490 (6th Cir. 2014) .................................................................... 23

*Kentucky v. Fed. Highway Admin.*,
   --- F. Supp. 3d ---, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024),
   *appeal filed*, No. 24-5532 (6th Cir. June 3, 2024) ................................... 19

*Laird v. Tatum*,
   408 U.S. 1 (1972) ..................................................................................... 18

*Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*,
   883 F.3d 644 (6th Cir. 2018) .................................................................... 11

*Muldrow v. St. Louis*,
    601 U.S. 346 (2024) ......................................................................................... 9, 17

*Nat'l Mining Ass'n v. U.S. Dep't of Interior*,
    251 F.3d 1007 (D.C. Cir. 2001) ......................................................................... 23

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist.*,
    109 F.4th 453 (6th Cir. 2024) ....................................................................... 15, 17

*Rowles v. Univ. of Mo.*,
    983 F.3d 345 (8th Cir. 2020) ........................................................................... 4, 17

*Schwake v. Ariz. Bd. of Regents*,
    967 F.3d 940 (9th Cir. 2020) ............................................................................... 4

*Sierra Club v. EPA*,
    60 F.4th 1008 (6th Cir. 2023) ............................................................................ 19

*Taylor-Travis v. Jackson St. Univ.*,
    984 F.3d 1107 (5th Cir. 2021) ............................................................................. 4

*Tennessee v. Cardona*,
    2024 WL 3453880 (6th Cir. July 17, 2024) ...................................................... 20

*Texas v. United States*,
    523 U.S. 296 (1998) .......................................................................................... 24

*Tingley-Kelley v. Univ. of Pa.*,
    677 F. Supp. 2d 764 (E.D. Pa. 2010) ................................................................ 5

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017) .......................................................................................... 24

*United States v. Texas*,
    599 U.S. 670 (2023) .......................................................................................... 20

*Waldo v. Consumers Energy Co.*,
    726 F.3d 802 (6th Cir. 2013) ............................................................................ 17

*Williams v. Lew*,
    819 F.3d 466 (D.C. Cir. 2016) .......................................................................... 24

*Wyoming v. U.S. Dep't of Interior*,
    587 F.3d 1245 (10th Cir. 2009) ........................................................................ 23

**Statutes, Regulations, and Rules**

5 U.S.C. § 704 ........................................................................................................ 23

20 U.S.C.
  § 1681 ........................................................................................................... 3, 5
  § 1686 .............................................................................................................. 6
  § 1689 .............................................................................................................. 6

42 U.S.C. § 2000e-2 ............................................................................................... 5

34 C.F.R.
  § 106.2 ........................................................................................................... 15
  § 106.6 ...................................................................................................... 12, 15
  § 106.30 .......................................................................................................... 14
  § 106.31 ............................................................................................................ 9
  § 106.33 .......................................................................................................... 10
  § 106.45 ...................................................................................................... 16, 22

62 Fed. Reg. 12,034 (Mar. 13, 1997) ................................................................... 13

## INTRODUCTION

This case is about three distinct provisions of an omnibus rule—a rule which addresses subjects as varied as recordkeeping requirements and access to lactation spaces for breastfeeding students—issued by the Department of Education pursuant to its authority to effectuate Title IX's broad prohibition on sex discrimination. Those provisions are lawful. *See* Defs.' Consol. Opp., ECF No. 133 ("DMSJ"). Section 106.10 applies the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020), which dealt with Title VII, to Title IX's materially indistinguishable text. Section 106.31(a)(2) reflects Title IX's text and structure by interpreting Title IX to proscribe sex-based separation or differentiation that causes harm, unless Congress has permitted it. And § 106.2 includes a definition of "hostile environment harassment" designed to effectuate Title IX's broad reach, consistent with the standards applied under other civil-rights statutes. The States' and Intervenors' ("Plaintiffs") replies provide no basis to invalidate those provisions. *See* States' Reply, ECF No. 135 ("P. Reply"); Intervenor-Pls.' Reply, ECF No. 136 ("I. Reply").

But even if the Court were to disagree, the Court should limit any relief to the parties in this litigation and to the specific provisions of the Rule that the Court finds unlawful and harmful. On this more complete record, it is clear that the Rule is severable, and Plaintiffs fail to demonstrate that broader relief is necessary to address their claimed irreparable harm. Equitable principles thus counsel in favor of limited relief. The Court certainly should not countenance Plaintiffs' new request for relief that sweeps even beyond the Rule to future hypothetical actions by the Department—which is neither authorized nor warranted in this case.

For the foregoing reasons, the Court should enter judgment for Defendants. In the alternative, any relief should be limited to the parties and to the provisions of the Rule that the Court concludes are unlawful and harmful to Plaintiffs.

## ARGUMENT

**I.     The Court should grant summary judgment to the Department.**

**A.     The Supreme Court's order denying an emergency stay does not mandate judgment for Plaintiffs.**

Plaintiffs begin by asserting that the Supreme Court's denial of the Department's stay request warrants judgment in their favor. *See* P. Reply 1–2; I. Reply 1 n.2. That is incorrect. *See* DMSJ 7–8, 10 n.1, 46 n.14. In denying that request, the Court reasoned that, "[i]n this emergency posture in this Court, the burden is on the Government as applicant," and that, "[o]n this limited record and in its emergency applications, the Government has not provided this Court a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule." *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2510 (2024) (per curiam). The Court noted that the dispute before it concerned only "the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals." *Id.* at 2509–10.

Moreover, the Supreme Court's order does not even mention *Bostock* or the text of Title IX, belying the States' claim that the Court "signal[ed] the propriety of granting permanent relief." P. Reply 1. Nor did the Court address any other merits issue. The Court's order merely noted that "all Members of the Court *today* accept[ed]" that Plaintiffs were entitled to preliminary relief, a statement describing only a stay-stage determination regarding the preliminary injunctions, as the dissent made clear. *Louisiana*, 144 S. Ct. at 2509–10 (emphasis added); *see id.* at 2510–11 (Sotomayor, J., dissenting in part) ("For now, on the briefing and record currently before us, I would stay the preliminary injunctions except as to the three [challenged] provisions … .").

The Supreme Court also noted that the Sixth Circuit had "already expedited its consideration of the case" and emphasized that it "expect[ed] that the Courts of Appeals will render

their decisions with appropriate dispatch." *Id.* at 2510 (per curiam). That observation would make little sense if the Supreme Court already dictated, in a brief per curiam order without any meaningful discussion, victory for the Plaintiffs. In addition, given that the Supreme Court specifically identified the pending appeal in this case and the Sixth Circuit's expedited treatment of it as one of the circumstances the Court considered in denying the government's stay motion, the most appropriate course is to defer a decision on summary judgment until the Sixth Circuit, and potentially the Supreme Court, has had a chance to act without the delay that issuing a final judgment could introduce. Particularly given that the Sixth Circuit has now scheduled argument for October 30, this Court may wish to await further guidance before resolving these motions.

### B. Section 106.10 correctly sets forth the scope of Title IX's prohibition on sex-based discrimination.

In its opening brief, the Department showed that § 106.10 relies on a simple application of *Bostock*'s two-step reasoning to Title IX's statutory text, which is materially indistinguishable from the parallel text of Title VII. DMSJ 9–14. First, by prohibiting discrimination "on the basis of" sex, 20 U.S.C. § 1681, Title IX "incorporates" a causation standard no more stringent than "the 'simple' and 'traditional' standard of but-for causation." *Bostock*, 590 U.S. at 656. Second, whether in the workplace or in a school, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity. *Id*. at 660–61 (emphasis omitted). Those two propositions should dispose of Plaintiffs' challenge to § 106.10.

1.    Plaintiffs' reply briefs advance an alternative reading of Title IX's causation standard. They argue that Title IX's prohibition of discrimination "on the basis of" sex must carry a "distinct" meaning from Title VII's prohibition of discrimination "because of" sex, and thus that sex cannot simply be "one but-for cause," as in Title VII, but rather must be the *sole or primary* cause of a challenged action. P. Reply 3, 6; I. Reply 4. That is wrong for three reasons. First,

*Bostock* used the phrases "because of" and "on the basis of" interchangeably, and in *contrast* to language like "*primarily* because of," which indicates a heightened standard. 590 U.S. at 656–57 (emphasis added). *Contra* P. Reply 6. Second, the Supreme Court has construed the phrase "on the basis of" to impose a causation standard no higher than the traditional but-for standard. *See, e.g.*, *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335 (2020); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). And third, a heightened standard would greatly limit the force of Title IX as to all bases of sex discrimination by precluding discrimination claims where "other factors may contribute to the decision." *Bostock*, 590 U.S. at 661.

That is why the courts of appeals have uniformly concluded that discrimination is actionable under Title IX even when sex is only one but-for cause. *See Doe v. Bos. Coll.*, 892 F.3d 67, 90 (1st Cir. 2018); *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016); *Doe v. Princeton Univ.*, 30 F.4th 335, 343 (3d Cir. 2022); *Taylor-Travis v. Jackson St. Univ.*, 984 F.3d 1107, 1119–20 (5th Cir. 2021); *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019); *Rowles v. Univ. of Mo.*, 983 F.3d 345, 359 (8th Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020); *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021); *Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022). Plaintiffs cite no case interpreting Title IX to impose a higher standard, relying instead on cases addressing the word "the" in vastly different contexts. *See* P. Reply 3. Section 106.10 therefore faithfully elucidates the "ordinary meaning" of Title IX. *Id.*

2.      Plaintiffs' other arguments about the meaning of Title IX likewise fail to overcome the fundamental textual similarity between Title VII and Title IX. *See* P. Reply 2–9; I. Reply 1–5.

***Section 106.10 is consistent with interpreting Title IX to refer to "biological sex."*** *Contra* P. Reply 2–3. The Department has repeatedly explained that, as in *Bostock*, discrimination "on the basis of" sex encompasses gender-identity discrimination "even if [sex] is understood to mean

4

only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. 33,474, 33,802 (Apr. 29, 2024) (quoting *Bostock*, 590 U.S. at 655). Plaintiffs insist that Title IX only bars discrimination "vis-à-vis similarly situated members of the opposite sex," P. Reply 7, but Title IX's nondiscrimination mandate is not limited to circumstances where an individual can identify a similarly situated comparator. *See Tingley-Kelley v. Univ. of Pa.*, 677 F. Supp. 2d 764, 777 (E.D. Pa. 2010) (collecting cases). Even if Title IX were limited in that way, its prohibition on sex discrimination would still encompass discrimination based on gender identity: a school that punishes a transgender girl for being transgender has engaged in discrimination "on the basis of sex," 20 U.S.C. § 1681(a), because it has penalized her for traits it would have tolerated in an otherwise identical student identified as female at birth.

**Title IX is not a "group-based" statute.** *Contra* P. Reply 8; I. Reply 3. Both Title IX and Title VII "prohibit discrimination … against individuals where sex plays an impermissible role," DMSJ 12, and do not simply mandate comparable conditions at the group level. *See Gebser v. Lago Vista ISD*, 524 U.S. 274, 287 (1998) ("Title IX focuses … on 'protecting' individuals from discriminatory practices."); *compare* 20 U.S.C. § 1681(a) (prohibiting discrimination against any "person"), *with* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination against "any individual"). If Congress had intended to establish only a group comparability mandate, it could have said so. *See Bostock*, 590 U.S. at 658–59.

**Section 106.10 is consistent with Title IX's statutory exemptions and implementing regulations.** *Contra* P. Reply 3–4, 7–9; I. Reply 2–4. Title IX's allowance for sex differentiation in specific contexts does not undermine the core insight that discrimination for being transgender is sex discrimination and thus barred in any context where Title IX's nondiscrimination mandate applies. Indeed, Congress's determination as to the need for statutory carve-outs only underscores

the scope of Title IX's core mandate. DMSJ 12–13. And it is § 106.31(a)(2) that addresses how Title IX applies in contexts in which the statute or regulations permit sex-based differentiation or separation. It makes no difference that 20 U.S.C. § 1686 frames its carveout as an "interpretation with respect to living facilities," *contra* I. Reply 2–4; the upshot is that Title IX does not prohibit "separate living facilities for the different sexes," as § 106.31(a)(2) acknowledges. *See* 89 Fed. Reg. at 33,820–21. Reading § 1686 to allow harmful differentiation or segregation outside the living-facilities context, I. Reply 3; *see* P. Reply 3, would cause the exception to swallow the rule.

 ***References to LGBT status in other statutes are irrelevant.*** *Contra* P. Reply 4. The States note that Congress referenced LGBT status in 20 U.S.C. § 1689, but that provision is entirely separate from Title IX's prohibition on sex discrimination, and was crafted to serve an entirely different purpose—the creation of a task force. *Bostock* also rejected identical arguments, pointing to the absence of "authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't amend this one." 590 U.S. at 670; *see also* DMSJ 22 n.4.

 ***The Sixth Circuit has not foreclosed the application of* Bostock *to Title IX.*** *Contra* P. Reply 5, 7. As this Court acknowledged, "no Sixth Circuit case following *Bostock* confronts the precise issues at hand." PI Op. 23. And the States' assertion that importing Title VII principles is inappropriate because Title IX is different simply begs the question. Because the statutes are similar in the manner critical to *Bostock*—i.e., their texts impose analogous causation standards— this case is closer to *Kollaritsch*, *Chisholm*, and *Childers* than to *Meriwether*, *Pelcha*, and *L.W.*

 ***Interpreting Title IX to encompass gender-identity discrimination would not lead to Plaintiffs' parade of horribles.*** *Contra* P. Reply 8–9; I. Reply 4–5, 19. Plaintiffs shy away from their atextual reliance on Title IX's purported purpose, and for good reason; as *Bostock* reiterated, "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard

its plain terms based on some extratextual consideration," 590 U.S. at 674. But Plaintiffs maintain that speculation about potential applications of § 106.10 somehow "illustrate[s]" that § 106.10 "contradicts the statutory structure." I. Reply 5; *see* P. Reply 9. Not so. Section 106.10 does not "address separation of students based on sex." 89 Fed. Reg. at 33,809. It is § 106.31(a)(2) that does that, based on an interpretation of the term "discrimination" and Title IX's structure. Plaintiffs' arguments about hypothetical implications of § 106.10 ultimately abandon "any pretense of statutory interpretation" and invite the Court to let speculation about results drive its analysis of Title IX's text—"an invitation no court should ever take up." *Bostock*, 590 U.S. at 680-81.

**3.**     That leaves Plaintiffs' assertions that, even if Title IX imposes the traditional but-for causation standard, it still does not encompass gender-identity discrimination or the other bases listed in § 106.10. P. Reply 6–7; I. Reply 3-4. But Plaintiffs have no response to *Bostock*'s recognition that "sex is *necessarily* a but-for cause" of discrimination on the basis of sexual orientation or gender identity "because it is *impossible* to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. at 660 (emphasis added). The same is true of the other bases listed in § 106.10, which similarly require consideration of sex. *Contra* P. Reply 11–12. That recognition does not create new "protected classes." I. Reply at 4. Section 106.10 simply recognizes that giving a student detention for being gay, kicking a student out of the band for being transgender, or barring men from home economics classes based on stereotypes about women as homemakers all constitute sex discrimination. *See also Chisholm v. St. Marys City Sch. Dist.*, 947 F.3d 342, 351 (6th Cir. 2020) (recognizing that Title IX prohibits "sex stereotyping … as a form of sex discrimination").

**4.**     Because it faithfully reflects Title IX's broad and unambiguous prohibition on sex discrimination, § 106.10 does not run afoul of the Spending Clause, the major-questions doctrine,

or federalism principles. *Contra* P. Reply 10–11, 14–15; I. Reply 10–11. Like the provision in *Bostock*, Title IX is "written in starkly broad terms," and gives clear notice that it prohibits sex discrimination in all its forms. 590 U.S. at 680; *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Any "elephant," then, "has never hidden in a mousehole; it has been standing before us all along." *Bostock*, 590 U.S. at 680. Simply recognizing that fact does not give Title IX's text a new meaning or impose an "extra-statutory funding condition[]." P. Reply 10, 14–15.

5.      Because Title IX's prohibition on sex discrimination unambiguously encompasses discrimination on the bases listed in § 106.10, Plaintiffs are wrong that § 106.10, which simply states that straightforward textual conclusion, is arbitrary and capricious. *Contra* P. Reply 18; I. Reply 16–19. The Department was not required to—and could not—hypothesize about how Title IX's prohibition on sex discrimination might apply to every conceivable context or circumstance. *Cf. Bostock*, 590 U.S. at 681 (declining to "prejudge any such question[s]"). The States also wrongly rely on a truncated quotation to suggest that, despite the Rule's express statement to the contrary, § 106.10 addresses sex separation. P. Reply 18. But the quoted language merely explains that § 106.10's reference to sexual orientation, for example, does not mean that the Department's regulations permitting "sex" separation thereby permit separation based on "sexual orientation." 89 Fed. Reg. at 33,810. And Intervenors say that the Department was required to explain why it was deviating from what Intervenors characterize as its previous view that "required gender identity to supersede sex anywhere sex-based differentiation is lawful," I. Reply 16, but that has never been the Department's view, and in any event, it is § 106.31(a)(2) and other regulatory provisions, not § 106.10, that address questions of sex separation and differentiation.

**C.      Section 106.31(a)(2) is consistent with the text and structure of Title IX.**

Section 106.31(a)(2) effectuates the text and structure of Title IX, which contains "a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to

that broad prohibition." *Jackson*, 544 U.S. at 175; DMSJ 15–19. Section 106.31(a)(2) does so in three steps. First, § 106.31(a)(2) recognizes that Title IX's prohibition on "discrimination" means that sex-based differentiation or separation is impermissible if it "subject[s] a person to more than de minimis harm." Second, § 106.31(a)(2) recognizes that the de minimis harm standard does not apply where Congress has indicated that such differentiation or separation is not prohibited. Third, § 106.31(a)(2) identifies one example, based on substantial record evidence, where such differentiation or separation causes harm: "prevent[ing] a person from participating in an education program or activity consistent with the person's gender identity." Because each of these steps is consistent with Title IX's text and structure, § 106.31(a)(2) is neither arbitrary nor in conflict with the Spending Clause or the major questions doctrine. *Contra* P. Reply 9–10.

1.      Plaintiffs apparently recognize that the de minimis harm standard does no more than reflect the common understanding of discrimination: "distinctions or differences in treatment that injure protected individuals." *Bostock*, 590 U.S. at 681; *see Muldrow v. St. Louis*, 601 U.S. 346, 354–55 (2024) (same); P. Reply 12–13. The States assert that Title IX does not bar "*any* 'harm' to *any* person based on *any* quality however tangentially related to sex," P. Reply 13, but that is not what the de minimis harm standard prohibits. Rather, § 106.31(a)(2) interprets Title IX's prohibition of "discrimination" on the basis of sex to specify that "different treatment or separation on the basis of sex" is prohibited discrimination if it subjects a person to legally cognizable—i.e., "more than de minimis"—harm. Intervenors focus on § 1681's prohibitions on any person being "excluded from" or "denied the benefits of" programs, I. Reply 9, but that language reinforces the common understanding of "discrimination" reflected in § 106.31(a)(2).

2.      Nor do Plaintiffs lodge any cogent objection to how § 106.31(a)(2) tracks Congress's "specific" and "narrow exceptions" and exclusions from Title IX's nondiscrimination

mandate. *Jackson*, 544 U.S. at 175. *Contra* P. Reply 8, 13; I. Reply 7, 18. What Plaintiffs criticize as "selective textualism," P. Reply 13, and "blam[ing] Congress," I. Reply 7, reflects a careful adherence to the very distinctions that Congress itself drew. Congress "could have, but did not," exempt other sex-separate education programs and activities, including school facilities like restrooms, from the general nondiscrimination mandate. 89 Fed. Reg. at 33,821. Plaintiffs' atextual speculation about Congress's supposed intent cannot overcome the "words on the page" actually "adopted by Congress and approved by the President." *Bostock*, 590 U.S. at 654.

Section 106.31(a)(2) adheres to Congress's judgments. The States object that "Congress blessed … sex-separated places and programs" by acquiescing in the Department's 1975 regulations, which included the precursor to 34 C.F.R. § 106.33's provision allowing comparable sex-separate restrooms. P. Reply 19. But § 106.31(a)(2) does not contradict those regulations; instead, it addresses circumstances in which otherwise permissible sex separation under those provisions causes harm. Similarly, § 106.31(a)(2) excepts sex-separate athletic teams from the de minimis harm standard because Congress "made clear"—including by passing the Javits Amendment—"that the Title IX regulations should reflect the fact that athletic competition raises unique considerations." 89 Fed. Reg. at 33,819. *Contra* P. Reply 19; I. Reply 9.

**3.** Plaintiffs principally focus on the final sentence of § 106.31(a)(2), which expresses the Department's evidence-based conclusion that excluding persons from facilities that correspond to their gender identity causes a wide variety of physical, emotional, and dignitary harms. 89 Fed. Reg. at 33,818–19; DMSJ 16–17 & n.3. Yet the States have nothing to say about the evidence, *see* P. Reply 13, and Intervenors simply assert that the evidence has no bearing on "the public understanding of sex discrimination in Title IX's text in 1972." I. Reply 7. But "discrimination" has always meant differentiation or separation that causes harm; the evidence simply demonstrates

10

that, as a *factual* matter, excluding persons from facilities that correspond to their gender identity causes harm. Intervenors cite extra-record studies about the purported harms of "social transition," *see id.* at 8 n.3, ignoring the rule that "[t]he focal point for judicial review should be the administrative record already in existence." *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*, 883 F.3d 644, 657 (6th Cir. 2018) (quotation omitted). But even if these studies were reliable and properly before the court, the Department reasonably explained that "individuals (and their parents, as appropriate) are better positioned to weigh any harms and benefits for themselves than is an educational institution." 89 Fed. Reg. at 33,819–20.

As to safety and privacy, Plaintiffs seem to concede that the Constitution does not support the sweeping rights they claim, *see* DMSJ 24, and instead pivot to an equally unavailing arbitrary-and-capricious argument. *See* P. Reply 20. Plaintiffs still give short shrift to the record evidence indicating that allowing individuals to access facilities consistent with their gender identity does not diminish safety, privacy, or access to educational opportunities for other students. *See* DMSJ 25–27; 89 Fed. Reg. at 33,820. *Contra* P. Reply 20–21; I. Reply 8 & n.4, 18. To the extent Plaintiffs assert that allowing access poses concrete safety risks, the record evidence and the experience of recipients with such policies are unequivocal: it does not. *See* DMSJ 26 n.5 (citing the only study, Hasenbush et al., to compare jurisdictions with different policies). To the extent Plaintiffs assert that allowing access stokes generalized privacy concerns, the record similarly indicates that recipients have methods of protecting all students' privacy, including by providing "gender-neutral or single-occupancy facilities," or by "taking nondiscriminatory steps … consistent with their general codes of conduct." 89 Fed. Reg. at 33,820; *see* DMSJ 25–26 & n.5.

Plaintiffs' remaining arguments are either conclusory or inapposite.

***The Department reasonably addressed concerns about verification.*** *Contra* P. Reply 21.

As the Department's opening brief explained, recipients may, and frequently do, verify gender identity by relying on a student's consistent assertion of their gender identity, written confirmation from a reliable source like a parent or counselor, or reasonable documentation requests. DMSJ 26. The States suggest that these methods are insufficient, but they never say why, nor explain why additional or different measures would be needed to provide appropriate access to school visitors.

**The Department reasonably addressed parental rights.** *Contra* P. Reply 21. The States fail to address the Department's showing that "[w]hen a parent and minor student disagree about how to address sex discrimination against that student, deference to the judgment of a parent … is appropriate." 89 Fed. Reg. at 33,822; *see id.* ("[N]othing in the final regulations restricts any right of a parent to act on behalf of a minor child or requires withholding of information about a minor child from their parents."); 34 C.F.R. § 106.6(g) (providing that the Rule is not to "be read in derogation of any legal right of a parent … to act on behalf" of a minor child).

**The Department reasonably addressed the appropriate treatment of nonbinary students**. *Contra* I. Reply 18. Intervenors assert (at 18) that the Rule leads to "logical failure" when applied to nonbinary students, but do not explain how the Rule's approach—coordination with the student and their parents about appropriate treatment—is inadequate. 89 Fed. Reg. at 33,818.

**Section 106.31(a)(2) does not treat Title IX as a disparate-impact statute.** *Contra* P. Reply 12; I. Reply 6-7. Section 106.31(a)(2) reflects that Title IX prohibits different *treatment* or *separation* on the basis of sex that causes more than de minimis harm and has not been carved out by Congress; § 106.31(a)(2) does not prohibit acts that merely have a disparate impact.

**Section 106.31(a)(2) protects all students.** *Contra* P. Reply 12; I. Reply 6-7. Plaintiffs' insinuations that § 106.31(a)(2) protects only transgender students are self-evidently false: by its terms, § 106.31(a)(2) applies "with equal force to all students," 89 Fed. Reg. at 33,818, and thereby

"protects all students from harm," *id.* at 33,820. The Department simply found no evidence that the typical cisgender student suffers any sex-based harm from being treated consistent with their gender identity—and nothing akin to the wide variety of serious, concrete harms that transgender students face from being treated inconsistent with their gender identity, *see id.* at 33,818–19. The States also misunderstand how § 106.31(a)(2) interacts with discriminatory dress codes, P. Reply 13–14; because Congress did not exempt dress codes from Title IX's nondiscrimination mandate, sex-based dress codes may constitute unlawful discrimination if they result in harm. And Intervenors provide no reason why it was unreasonable for the Department to identify one example of serious, proven harm, while not foreclosing other possible harms. I. Reply 6–7.

### D. Section 106.2 does not conflict with *Davis* or violate the First Amendment.

Finally, the Department's opening brief explained that § 106.2's definition of hostile environment harassment neither conflicts with *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), nor infringes on protected speech. *See* DMSJ 20–21, 28–35. By defining hostile environment harassment to mean "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity," § 106.2 adopts a standard for administrative enforcement of Title IX that mirrors those applied in "numerous civil rights laws, including Title VII." 89 Fed. Reg at 33,508.

1. This Court did not enjoin § 106.2's definition of hostile environment harassment for departing from *Davis*, and rightly so: *Davis* addressed the "scope of liability in private damages actions" under Title IX's judicially implied right of action, 526 U.S. at 641, not the scope of administrative enforcement. If the Supreme Court had intended to disturb the Department's then-applicable hostile-environment standard, which—similar to the Rule—defined harassment to include "severe, persistent, or pervasive" conduct, 62 Fed. Reg. 12,034, 12,034 (Mar. 13, 1997),

it could have said so, rather than repeatedly citing it, *see Davis*, 526 U.S. at 647–48, 651.

Plaintiffs' principal response is that the term "discrimination" must carry the same meaning in both contexts, *see* P. Reply 14; I. Reply 11, but that misreads *Davis*. The Court in *Davis* made clear that it was "asked to do *more* than define the scope of the behavior that Title IX proscribes," and that it instead had to determine when a recipient's inaction "can support a private suit for money damages." 526 U.S. at 639 (emphasis added). In structuring that implied cause of action, the Court noted that "liability in private damages actions under Title IX is circumscribed" by the requirement "that funding recipients have notice of their potential liability," *id.* at 641, unlike in administrative enforcement proceedings, which may only impose sanctions after "notice and unsuccessful efforts to obtain compliance," *see Gebser*, 524 U.S. at 290. That notice requirement "also bears on the proper definition of 'discrimination' *in the context of a private damages action*." *Davis*, 526 U.S. at 649 (emphasis added). In that specific "context," *id.*, the Court concluded that schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment" that is sufficiently "severe" and "pervasive," *id.* at 650. In other words, *Davis* did not purport to establish a generally applicable definition of prohibited sex discrimination.

**2.**     As to all of Plaintiffs' First Amendment theories, several overarching points demonstrate that § 106.2's definition of hostile environment harassment does not infringe on protected speech, as applied to gender-identity discrimination or otherwise. That definition, which "only prohibit[s] conduct that meets *all* the elements," 89 Fed. Reg. at 33,506 (emphasis added), more closely resembles the standards applied in *Harris* and *Miami University* than the sweeping restrictions on speech invalidated in Plaintiffs' cases. DMSJ 28–29. *Contra* P. Reply 18; I. Reply 16. Indeed, the only way in which § 106.2's definition is actually broader than the 2020 Rule's standard, *see* 34 C.F.R. § 106.30—which Plaintiffs did not challenge—is that it encompasses

14

severe *or* pervasive conduct, and Plaintiffs never explain how that alone creates First Amendment implications. (Section 106.2's use of the term "limits" is the same as the 2020 Rule's standard, *see infra* page 16.) And to the extent the Rule could be construed to affect speech, the Rule instructs recipients to err in favor of complying with the First Amendment. *See* 89 Fed. Reg. at 33,516; 34 C.F.R. § 106.6(d). Regardless, Plaintiffs' claims fail on their own terms.

>        ***The definition does not compel speech or discriminate on the basis of viewpoint.***
Plaintiffs' assertions that the Rule requires policies that compel the use of preferred pronouns or particular views about gender rest on distortions of § 106.2's definition of hostile environment harassment. To reiterate, the definition does neither. 89 Fed. Reg. at 33,505. It merely requires that recipients address harassment that is "subjectively and objectively offensive" and so "severe or pervasive" that it limits or denies access to their programs. 34 C.F.R. § 106.2.

Plaintiffs try to spin general statements about § 106.2's terms as specific requirements for recipients to address "misgendering." *See* P. Reply 16–17; I. Reply 12–13. What the Rule *actually* said in response to comments about misgendering, however, is that "whether verbal conduct constitutes sex-based harassment is necessarily fact-specific," and "a stray remark, such as a misuse of language, would *not* constitute harassment under this standard." 89 Fed. Reg. at 33,516 (emphasis added). Moreover, nothing in the Rule allows recipients to take remedial measures that would "violate anyone's First Amendment rights," *id.*, let alone "punish[]" someone in an effort to "compel[] speech," I. Reply 12. Further, the Sixth Circuit itself recently recognized that a policy using the "severe or pervasive" standard could bar harassment—including the "intentional use of non-preferred pronouns"—without "unconstitutionally compel[ling] speech." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist.*, 109 F.4th 453, 468 (6th Cir. 2024).

Finding no support in § 106.2's actual terms, Plaintiffs again try to manufacture a "pronoun

issue" by cobbling together unrelated court filings and agency actions. P. Reply 16. Plaintiffs distort those documents just as they do the Rule: to the extent it addressed Title IX, the amicus brief in *Kluge* merely argued that the school's reasonable concerns about an increased risk of liability under Title IX offered additional evidence confirming the district court's finding of undue hardship under Title VII, *see* DMSJ 31; the Department's prior guidance in no way established requirements concerning pronouns; and the Department's citations to guidance issued by other agencies do not incorporate by reference every idea contained therein. *Contra* P. Reply 16; I. Reply 12–13. But the more fundamental problem with Plaintiffs' arguments is that *none of these documents are the Rule*, the provisions of which speak for themselves.

Intervenors make several other misguided assertions in their effort to show that the Rule imposes speech restrictions. I. Reply 13. To wit, § 106.2 does not "lower[] the standard" by prohibiting conduct that "limits" access to a program, *id.*, because the Department has always construed the term "denies" that way. *See* DMSJ 34 (citing 89 Fed. Reg. at 33,511). And the "subjectively … offensive" element *narrows* § 106.2's scope because it adds to the preexisting "objectively offensive" requirement. Intervenors insist that the Department is "only concerned with offense to people who espouse the Department's views," but that is untrue, and Intervenors cite nothing to support it. *See* I. Reply 13. Finally, Intervenors claim that the Department "waived" any defense of § 106.45(b)(5), *id.*, but that is grasping at straws. The Department pointed out how Intervenors' arguments were (and still are) conclusory, including because § 106.45(b)(5), in addition to the Rule's other First Amendment disclaimers, prohibits recipients from "restrict[ing] the parties' ability to obtain evidence, consult with certain individuals, or prepare for or participate in the grievance procedures." 89 Fed. Reg. at 33,674; *see* DMSJ 29 & n.6.

**The definition is not overboard.** Plaintiffs essentially abandon overbreadth, and for good

reason. They do not, and cannot, dispute that "[f]acial invalidation" is "strong medicine" that should be "deployed sparingly and only as a last resort," *Ent. Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 379 (6th Cir. 2009) (cleaned up); that invalidation is only warranted "if a substantial number of [§ 106.2's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quotation omitted); or that § 106.2's definition of hostile environment harassment has many plainly legitimate applications. *See* DMSJ 32. Intervenors simply assert that the definition is "overbroad" and "expansive," I. Reply 14, but those conclusory averments fail to meet their burden to show that facial invalidation is "unambiguously warranted." *Ent. Prods., Inc.*, 588 F.3d at 380; *see also Olentangy*, 109 F.4th at 471 (rejecting overbreadth challenge). Thus, even if Plaintiffs were to demonstrate that the hostile-environment standard could be invalid as applied to some conduct, the proper remedy would be to enjoin only those potential applications.

**The definition is not vague.** Once again, Plaintiffs fail to explain why § 106.2's definition is any less clear than the standard adopted by the 2020 rule. They criticize the term "limits," P. Reply 17; I. Reply 14, but, as explained above, the 2020 rule already interpreted "denies" to include "limits." 89 Fed. Reg. at 33,511. The term "limits" simply requires a showing of harm to one's ability to access an educational program—a common inquiry in the nondiscrimination context. *Cf. Bostock*, 590 U.S. at 681; *Muldrow*, 601 U.S. at 354–55. The only difference that Plaintiffs actually identify is the "severe *or* pervasive" requirement, but that standard uses the same terms as a "severe *and* pervasive" standard, and is commonly applied by courts—including the Sixth Circuit— without any suggestion that it is impermissibly vague. *See, e.g.*, *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) (using "severe or pervasive" in Title VII context). Thus, § 106.2 uses "language with common usage and understanding." *Rowles*, 983 F.3d at 358.

Plaintiffs' other vagueness objections are similarly unavailing. The term "gender identity" is "well understood" and "used widely in laws and policies." 89 Fed. Reg. at 33,809. *Contra* P. Reply 15; I. Reply 15. Although gender identity may differ by person, like many other qualities, that fact does not render the term itself ambiguous. Intervenors assert that "the Rule fails to limit its reach to on-campus or closely tied activities," I. Reply 14, but as the Department explained, *see* DMSJ 33, the Rule, consistent with Sixth Circuit precedent, requires a recipient to address a hostile environment occurring "under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside" the program or activity. 89 Fed. Reg. at 33,530. Finally, Intervenors rely on declarations concerning the purported chilling effect of the Rule, *see* I. Reply 13–14, but without some demonstration that the Rule is actually vague or overbroad, those averments do not establish a First Amendment violation. *Cf. Laird v. Tatum*, 408 U.S. 1, 13 (1972) (explaining that "[a]llegations of a subjective 'chill'" are insufficient).

**The definition is not arbitrary.** It does not help Plaintiffs to recast their First Amendment theories as arbitrary-and-capricious arguments. *See* P. Reply 19. Far from conceding the issue, the Department identified the many places in the Rule where it addressed First Amendment concerns. *See* DMSJ 35 n.7. What the States deride as "punting" was the Department responsibly deciding not to prejudge specific factual scenarios before engaging in the ordinary work of the administrative process—conducting an investigation, gathering facts, and then determining whether those facts amount to a legal violation.

## II.      To the extent Plaintiffs are entitled to any relief, that relief should be limited to the parties and to the provisions of the Rule that the Court concludes are unlawful.

### A.      Any relief should be limited to the parties.

If the Court finds that Plaintiffs have succeeded on the merits, rather than vacate the challenged provisions of the Rule as to every school in the country, the Court should only enjoin

the Department from enforcing the provisions as applied to the parties. Even assuming *arguendo* that vacatur is authorized by the APA, *contra* DMSJ 36-37, it certainly is not required. Plaintiffs rely on nonbinding authorities to claim that vacatur is the only remedy in APA cases. *See* P. Reply 21; I. Reply 21–22. However, their argument runs headlong into the Sixth Circuit's decision in *Sierra Club v. EPA*, which held that whether vacatur is appropriate depends on the circumstances of the case. 60 F.4th 1008, 1022 (6th Cir. 2023); *see GBX Assocs., LLC v. United States*, 2022 WL 16923886, at *15 n.11 (N.D. Ohio Nov. 14, 2022) (noting before *Sierra Club* that, while other appellate courts "have found that universal vacatur is the 'ordinary remedy,' the Sixth Circuit has (without expressly analyzing the issue) ordered relief in cases challenging unlawful agency action as to the plaintiffs only, as opposed to extending that relief to non-parties").

Vacatur or a universal injunction would be inappropriate here because party-specific injunctive relief would redress any injuries Plaintiffs claim to have suffered. The States' assertion that vacatur is warranted even if injunctive relief would be sufficient, P. Reply 22, again ignores *Sierra Club*'s holding that vacatur "turns on the court's assessment of the overall equities and *practicality of the alternatives*." 60 F.4th at 1022 (cleaned up and emphasis added).[1] Intervenors, meanwhile, argue again that this Court's ruling should be extended to "broad swaths of the country" not before the Court. I. Reply 22. Intervenors nowhere demonstrate why they need this broad relief, rather than a remedy that is tailored to their alleged injuries. And, in any event, such

---

[1]    Plaintiffs also misstate the holding of *Kentucky v. Fed. Highway Admin.*, --- F. Supp. 3d ---, 2024 WL 1402443, at *19 (W.D. Ky. Apr. 1, 2024), *appeal filed*, No. 24-5532 (6th Cir. June 3, 2024), by claiming that court opted for declaratory judgment "in light of another court's previous order vacating the challenged rule." P. Reply 22. Judge Beaton in fact chose not to vacate the rule because it "would exceed the parties' requested relief, transgress the 'bedrock practice' of courts to issue only 'case-by-case judgments with respect to the parties' before them, and 'sweep up nonparties who may not wish to receive the benefit of the court's decision.'" 2024 WL 1402443, at *18. He then noted that "for these reasons (and others) some judges and scholars have begun to question whether vacatur is in fact authorized under the APA." *Id.* at *18 n.19.

broad relief would sweep in the many "nonparties who may not wish to receive the benefit of the court's decision." *United States v. Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring). Indeed, twenty states and the District of Columbia filed an amicus brief with the Sixth Circuit explicitly disagreeing with the Court's preliminary ruling. *See* Br. Amici Curiae California et al., *Tennessee v. Cardona*, No. 24-5588 (6th Cir. Aug. 13, 2024), ECF No. 60; *cf. Texas*, 599 U.S. at 703 ("Dozens of States, counties, and cities tell us they did not seek and do not want the 'benefit' of the district court's vacatur order in this case."). These disagreements can be addressed more equitably by an injunction targeted at Intervenors' membership.

**B.     Any relief should be limited to provisions of the Rule that the Court finds unlawful and that cause harm to the parties.**

Plaintiffs' arguments for relief against the entire Rule are largely a rehash of the arguments advanced in their opening briefs. Particularly notable is their failure to reckon with Defendants' irreparable harm arguments. *See* DMSJ 41–44. Defendants thus stand mostly on their own opening brief, but address three discrete points here.

*First*, Plaintiffs insist that the challenged provisions of the Rule are its "core" or "backbone." *See* P. Reply 23–24; I. Reply 23–24. But they provide little support for this assertion. The Sixth Circuit motions panel's nonbinding stay-stage determination did not provide any factual support for its assumption that these three provisions were "core" to the Rule. *See Tennessee v. Cardona*, 2024 WL 3453880, at *4. The States point to the Rule's explanation of the "[n]eed for [r]egulatory [a]ction," claiming that the Rule characterized its purpose as "eliminating gender-identity discrimination." P. Reply 23. But the Rule in fact explains that its primary purpose is "ensur[ing] that all aspects of its regulatory framework under Title IX are well suited to implementing Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance." 89 Fed. Reg. at 33,860. Indeed, the first substantive revision

discussed is related to grievance procedures, and the Rule recognized that benefits would flow from "[r]equiring recipients to adopt grievance procedures that provide for the prompt and equitable resolution of complaints of sex discrimination." *Id.* Similarly, before any mention of the de minimis harm standard, the Rule noted the importance of "[c]larifying a recipient's obligations to students and employees who are pregnant or experiencing pregnancy-related conditions." *Id.*

Relying on this fallacy that they challenged the "core" of the Rule, Plaintiffs claim that the Department could not have imagined severing *all three* of the provisions they challenge. But that is belied by the language of the severability provisions, which specifically reference §§ 106.10, 106.2, and 106.31(a). 89 Fed. Reg. at 33,848. And the Rule clarifies that "[e]ach provision provides a distinct value … separate from, and in addition to, the value provided by the other provisions." *Id.* There is no indication that the agency would have foregone revisions to grievance procedures, pregnancy protections, or other provisions without the three challenged provisions.

*Second*, Plaintiffs seem to suggest at various points in their briefs that without the Rule, "sex discrimination" would have no meaning. The States quote the Sixth Circuit's observation that the meaning of sex discrimination is "the subject of separate litigation." P. Reply 23–24. But that fact, on its own, is unremarkable: litigation about the meaning of sex discrimination is possible whenever the Department enforces Title IX or engages in final agency action. "Sex discrimination" retains meaning during the pendency of those lawsuits. And, oddly, the States seem to fault the Department for arguing that provisions of the Rule "unambiguously flow from Title IX's text." *See id.* at 1. But the Department's belief in the lawfulness of the Rule does not change the text of the statute, which retains meaning even without a regulatory gloss. As Defendants explained, the Department's regulations have long operated without a regulatory explanation of "sex discrimination." *See* DMSJ 47–48.

*Third*, contrary to Plaintiffs' suggestion, Defendants *have* identified specific provisions that can operate independently of the challenged provisions. *See id.* at 40 (identifying specific unchallenged provisions). Nor do the challenged provisions permeate these other portions of the Rule. To illustrate, consider 34 C.F.R. § 106.45(e), which provides that "[a] recipient may consolidate complaints of sex discrimination … when the allegations of sex discrimination arise out of the same facts or circumstances." The Department found that offering recipients the discretion to consolidate cases "enables a recipient to coordinate cases involving multiple parties and minimize unnecessary burdens that could interfere with a party's ability to access their education." 89 Fed. Reg. at 33,690. But because § 106.45(e) includes the term "sex discrimination," Plaintiffs claim that the provision would become confusing and unworkable if § 106.10 is enjoined. Not so. This provision on consolidation simply means that for whatever set of cases recipients investigate as "sex discrimination," they can consolidate them if they wish. This fundamental error infects the bulk of Plaintiffs' severability analysis. Moreover, it is *Plaintiffs* that bear the burden of justifying the scope of their injunction. *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006). And there is a "strong presumption of severability," particularly when there is a severability clause. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 624–25 (2020) (plurality). The burden applied by the Supreme Court in this case related to the government's emergency stay motion, not severability generally. *See supra* Section I.A.

### C.   Plaintiffs' new request for relief extending beyond the Rule is meritless.

For the first time in their reply papers, Plaintiffs request broad injunctive and declaratory relief that extends beyond the Rule to other hypothetical future actions by the Department. *See* P. Reply 25; I. Reply 24. The Court should reject this request for three reasons.

*First*, relief extending beyond the challenged Rule is not authorized by the APA because future agency actions are not final agency actions. All of Plaintiffs' substantive claims were

brought pursuant to the APA. *See* Compl. ¶¶ 221, 233, 246, 259, ECF No. 1; Intervenor-Pls.'

Compl. ¶¶ 293, 325, 343, ECF No. 21-3. And as this Court has recognized, PI Op. 78–79, judicial

review under the APA is limited to "[a]gency action made reviewable by statute and final agency

action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also Bangura*

*v. Hansen*, 434 F.3d 487, 500 (6th Cir. 2006). "An agency action is not final if it does not of itself

adversely affect complainant but only affects his rights adversely on the contingency of future

administrative action." *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 496 (6th Cir. 2014)

(quotation omitted). Plaintiffs clearly cannot demonstrate that any future agency actions related to

gender identity, if any come to be, currently constitute final agency action. There has been no

"consummation" of agency decision-making nor has there been any action from which legal

consequences can flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). This principle—that

courts hearing cases under the APA may grant relief only as to the final agency action before

them—is why APA cases are regularly mooted when a challenged rule is rescinded, because no

further relief is available to courts. *See, e.g.*, *Wyoming v. U.S. Dep't of Interior*, 587 F.3d 1245,

1253 (10th Cir. 2009) (Gorsuch, J.) (Because the "new Park Service rule also supersedes its 2007

rule, it is now beyond cavil … that the petitioners' underlying challenge to that rule is also moot.");

*Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (similar).

Neither the States nor Intervenors adequately grapple with this problem. Intervenors cite

to *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 378–79 (5th Cir. 2022), in support of their

argument that courts may grant a permanent injunction "on top of vacatur." I. Reply 24. But for

APA cases, *Franciscan Alliance* held the exact opposite. The Fifth Circuit held that "[f]or

Franciscan Alliance's APA claim . . . the court is unable to provide relief beyond what the 2020

Rule already gave," namely "vacatur of the 2016 Rule's prohibition of discrimination on the basis

of 'termination of pregnancy' and 'gender identity.'" 47 F.4th at 374–75. It was only under Franciscan Alliance's Religious Freedom Restoration Act claims—claims not brought by Plaintiffs here—that the court granted further injunctive relief. *Id.* at 377–78.

*Second*, Plaintiffs lack standing as to speculative future agency actions, and any dispute is not yet ripe for adjudication. It is well established that Plaintiffs must establish standing "for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Past injuries alone are not enough; Plaintiffs must "establish an ongoing or future injury that is certainly impending." *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (cleaned up). But Plaintiffs have made no showing that they face "actual or imminent" injury from some unspecified future agency action reliant on the interpretation of Title IX reflected in the Rule. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Similarly, the ripeness doctrine seeks to prevent the adjudication of claims relating to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted). The Sixth Circuit has noted that the "ripeness inquiry arises most clearly when litigants seek to enjoin the enforcement of statutes, regulations, or policies that have not yet been enforced against them." *Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003). In making a ripeness determination, courts "consider whether the issues are fit for judicial review and if the parties will suffer hardship if we withhold adjudication." *CBA Pharma, Inc. v. Perry*, 2023 WL 129240, at *3 (6th Cir. Jan. 9, 2023). These factors weigh against entering relief regarding future, uncertain agency actions. In the event a future dispute does arise, future courts would benefit from a "concrete factual context," *Ammex*, 351 F.3d at 706, and from full proceedings and briefing on the issue that do not begin with responsive papers on summary judgment. And as discussed below, neither Plaintiffs nor Intervenors have demonstrated

24

any continuing hardship between now and some hypothetical future agency action.

Adherence to these principles ensures that federal courts remain within their assigned role in our system of separated powers. A plaintiff cannot sue to obtain "advisory opinions," including anticipatory injunctions based on its speculative predictions about what policies an agency may adopt in the future. *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 228 (5th Cir. 2020). Article III courts are limited to real disputes requiring immediate resolution. Thus, to the extent Plaintiffs are entitled to relief at all, the Court should do nothing more than resolve the current controversy, and enter injunctive relief limited to the Rule's offending provisions and the parties.

*Third*, contrary to Plaintiffs' assertion, injunctive or declaratory relief that extends to future agency actions would be superfluous to relief targeting the Rule, whether in the form of vacatur, injunction, or declaratory judgment. *See* P. Reply 25 (conceding that seeking "superfluous" relief "might make multiple forms of relief improper"). Plaintiffs have consistently argued that their claimed irreparable harms were caused by the Rule. *See, e.g.*, States' Mot. for § 705 Stay & Prelim. Inj. 3, ECF No. 19 ("allowing the Final Rule to take effect … would inflict multiple irreparable harms on the States"). But Plaintiffs have never explained which of their claimed irreparable harms cannot be redressed by vacating or enjoining the Rule, or whether those harms would remain "imminent" absent the Rule. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). Without demonstrating that their claimed harms would remain unaddressed by relief targeting the Rule, additional relief would be superfluous and should not be granted. *See* DMSJ 50.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment for Defendants. In the alternative, any relief should be limited to the parties and to the provisions of the Rule that the Court concludes are unlawful and harmful to Plaintiffs.

Dated: September 13, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

*/s/ John T. Lewis*
ELIZABETH TULIS
REBECCA KOPPLIN
BENJAMIN TAKEMOTO
HANNAH SOLOMON-STRAUSS
PARDIS GHEIBI
CLAYTON BAILEY
JOHN T. LEWIS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: 202-353-0533
Fax: (202) 616-8460
E-mail: john.t.lewis.iii@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 13, 2024, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ John T. Lewis*
John T. Lewis