## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

STATE OF TENNESSEE,
COMMONWEALTH OF KENTUCKY,
STATE OF OHIO, STATE OF INDIANA,
COMMONWEALTH OF VIRGINIA, and
STATE OF WEST VIRGINIA,

    *Plaintiffs,*

and

CHRISTIAN EDUCATORS ASSOCIA-
TION INTERNATIONAL, and A.C., by
her next friend and mother, Abigail Cross,

    *Intervenor-Plaintiffs,*

v.

LINDA McMAHON, in her official capacity
as Secretary of Education, and UNITED
STATES DEPARTMENT OF EDUCA-
TION,

    *Defendants,*

and

A BETTER BALANCE,

    *Proposed Intervenor-Defendant,*

and

VICTIM RIGHTS LAW CENTER and
JANE DOE,

    *Proposed Intervenor Defendants.*

Case No. 2:24-cv-00072-SCM-CJS
District Judge S. Chad Meredith
Magistrate Judge Candace J. Smith

---

## THE STATES' AMENDED CONSOLIDATED OPPOSITION TO PROPOSED INTERVENOR-DEFENDANTS' MOTIONS TO INTERVENE

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................. 4

I.      Proposed-intervenors lack Article III standing, so they cannot intervene to appeal. ............... 4

      A.      Post-judgment intervenors must establish Article III standing to appeal. ................... 4

      B.      ABB and the Center do not establish an injury-in-fact. ................................................ 6

            1.      The diversion-of-resources allegations do not support standing. .................... 6

            2.      *Havens Realty Corp. v. Coleman* does not support standing. ......................... 8

      C.      Regardless, independent factors foreclose traceability and redressability. ................. 13

            1.      Other decisions vacating and enjoining the 2024 Rule. ................................ 13

            2.      The Department's enforcement discretion. ..................................................... 15

            3.      Schools' independent choice to offer certain hearing procedures. ................. 16

II.     Separately, the intervention factors warrant denying proposed-intervenors' motions. ........... 16

CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama v. U.S. Sec'y of Educ.*,
  No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) ..............................................14

*Ariz. All. for Retired Ams. v. Mayes*,
  117 F.4th 1165 (9th Cir. 2024) ...................................................................................... 8, 9, 10

*Arkansas v. U.S. Dep't of Educ.*,
  742 F. Supp. 3d 919 (E.D. Mo. 2024) ..............................................................................14

*Assoc. Builders & Contractors v. Perry*,
  16 F.3d 688 (6th Cir. 1994) ...................................................................................................5

*Blount-Hill v. Zelman*,
  636 F.3d 278 (6th Cir. 2011) ...............................................................................................19

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
  595 U.S. 267 (2022) .............................................................................................................19

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*,
  No. 4:24-cv-00461-O, 2025 WL 1782571 (N.D. Tex. May 15, 2025) ........................... 11, 12, 13, 14

*Chapman v. Tristar Prods., Inc.*,
  940 F.3d 299 (6th Cir. 2019) .......................................................................................5, 6, 10

*Cherry Hill Vineyards LLC v. Lilly*,
  553 F.3d 423 (6th Cir. 2008) .................................................................................................5

*Clapper v. Amnesty Int'l*,
  568 U.S. 398 (2013) ...................................................................................................8, 14, 16

*Ctr. for Powell Crossing LLC v. Ebersole*,
  696 F. App'x 702 (6th Cir. 2017) ..........................................................................................5

*Ctr. for Powell Crossing, LLC v. City of Powell*,
  No. 1:14-cv-2207, 2016 WL 3384298 (S.D. Ohio June 20, 2016) ....................................16

*Cuyahoga Valley Ry. Co. v. Tracy*,
  6 F.3d 389 (6th Cir. 1993) ...................................................................................................19

*Diamond v. Charles*,
  476 U.S. 54 (1986) .............................................................................................................5, 6

iii

*Doe v. Baum,*
    903 F.3d 575 (6th Cir. 2018) ................................................................................16

*Doe v. DeWine,*
    910 F.3d 842 (6th Cir. 2018) ................................................................................13

*Doe v. Univ. of Scis.,*
    961 F.3d 203 (3d Cir. 2020) .................................................................................16

*Fair Elections Ohio v. Husted,*
    770 F.3d 456 (6th Cir. 2014) ............................................................................7, 8, 9

*Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC,*
    124 F.4th 990 (6th Cir. 2025) ...........................................................................7, 9

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) .......................................................................................*passim*

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998) ..............................................................................................10

*Grae v. Corr. Corp. of Am.,*
    57 F.4th 567 (6th Cir. 2023) ............................................................................5, 18

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.,*
    816 F.3d 1241 (9th Cir. 2016) .............................................................................11

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ......................................................................................8, 9, 12

*In re Auto. Parts Antitrust Litig,*
    33 F.4th 894 (6th Cir. 2022) ................................................................................18

*Jansen v. City of Cincinnati,*
    904 F.2d 336 (6th Cir. 1990) ...............................................................................17

*Kansas v. U.S. Dep't of Educ.,*
    739 F. Supp. 3d 902 (D. Kan. 2024) ....................................................................14

*Kansas v. U.S. Dep't of Educ.,*
    No. 24-3097, 2024 WL 4024782 (10th Cir. Aug. 26, 2024) ................................14

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.,*
    82 F.4th 345 (5th Cir. 2023) ...........................................................................12, 13

*Louisiana v. U.S. Dep't of Educ.,*
    737 F. Supp. 3d 377 (W.D. La. 2024) ..................................................................14

iv

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................. 5, 6, 16

*McKay v. Federspiel,*
    823 F.3d 862 (6th Cir. 2016) ................................................................................ 5

*NAACP v. New York,*
    413 U.S. 345 (1973) .................................................................................... 17, 19

*Ohio v. EPA,*
    603 U.S. 279 (2024) .......................................................................................... 21

*Oklahoma v. Cardona,*
    743 F. Supp. 3d 1314 (W.D. Okla. 2024) ......................................................... 14

*Salem Pointe Cap., LLC v. BEP Rarity Bay, LLC,*
    854 F. App'x 688 (6th Cir. 2021) ..................................................................... 17

*Somberg v. McDonald,*
    117 F.4th 375 (6th Cir. 2024) ........................................................................... 13

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................ 6

*SurvJustice Inc. v. DeVos,*
    No. 18-cv-00535-JSC, 2018 WL 4770741 (N.D. Cal. Oct. 1, 2018) ................. 11

*Tenn. Conf. of the NAACP v. Lee,*
    105 F.4th 888 (6th Cir. 2024) .................................................................... *passim*

*Texas v. United States,*
    740 F. Supp. 3d 537 (N.D. Tex. 2024) ............................................................. 14

*United States v. Michigan,*
    68 F.4th 1021 (6th Cir. 2023) ..................................................................... 17, 18

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) .......................................................................................... 18

*United States v. Tennessee,*
    260 F.3d 587 (6th Cir. 2001) ...................................................................... 17, 18

*United States v. Texas,*
    599 U.S. 670 (2023) .......................................................................................... 15

*Victim Rts. L. Ctr. v. Cardona,*
    552 F. Supp. 3d 104 (D. Mass. 2021) ............................................................... 11

v

*Vinson v. Washington Gas Light Co.*,
   321 U.S. 489 (1944) .................................................................................................17

*Va. House of Delegates v. Bethune-Hill*,
   587 U.S. 658 (2019) ...................................................................................................6

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................................13

*Wittman v. Personhuballah*,
   578 U.S. 539 (2016) ...................................................................................................6

**Rules**

Fed. R. Civ. P. 24(a) ...................................................................................................17

Fed. R. Civ. P. 24(a)(2) ........................................................................................ 19, 20

Fed. R. Civ. P. 24(b)(1) ...............................................................................................17

**Regulations**

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Funding Assistance*,
   85 Fed. Reg. 30,026 (May 19, 2020) ..........................................................................3

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1916 (3d ed.) ........................17

## INTRODUCTION

The final judgment entered in this case was years in the making. To secure it, the States submitted comments during the Department of Education's rulemaking, brought suit, filed an injunction motion filled with reams of evidence on an emergency timeline, presented in-person testimony at a motions hearing, defended this Court's preliminary injunction in emergency appellate proceedings, and briefed cross-motions for summary judgment. On January 9, 2025, this Court entered a final judgment vacating the 2024 Title IX Rule as unlawful.

Then, two nonprofit groups and a college-age student sought eleventh-hour entry into the case to take an appeal. Although the nonprofit groups concede that the student's claims have been mooted, the groups persist in seeking to reinstate certain portions of the 2024 Rule relating to pregnancy, sexual harassment, and various procedural requirements governing hearings and complaints. Such an appellate win, they posit, will spring parts of the 2024 Rule back to life in schools, thus replacing other aspects of the now-operative 2020 Rule they oppose and redressing their cited injuries.

This Court should deny the motions both for lack of Article III standing and on the merits.

At the outset, Sixth Circuit precedent stresses that a party seeking to intervene to take its own appeal must have independent Article III standing. No proposed-intervenor clears that bar. A Better Balance ("ABB") and the Victim Rights Law Center lack organizational standing because their diversion-of-resources and mission-harm theories of injury are now foreclosed. Nor would either group's alleged injuries be redressed by a favorable ruling on appeal in all events, given the interplay between other Title IX rulings and the Department's and schools' independent enforcement and implementation decisions. Proposed-intervenors' Article III failings are a dispositive basis to deny intervention.

The proffered intervention case also fails on its own terms. No form of intervention is proper given the prejudice that would flow from the parties' post-judgment entry and their distinct focus on

1

severability. Each proposed intervenor had many months to try to inject, defend, and brief their preferred severability route while the summary-judgment stage was still live. Allowing appeals with proposed-intervenors' shifted focus would sandbag the States with new arguments to rebut for the first time on appeal without the benefit of record development. The Center, moreover, has an existing challenge to the 2020 Rule it now opposes still pending in a different court. That (unacknowledged) pending case provides the Center an adequate means other than intervention to protect its interests. Complications arising from the many alternative Title IX vacatur and injunction rulings, and proposed-intervenors' spliced severability positions, further cut against intervention.

In short, there is no basis for allowing ABB or the Center to intervene as parties to appeal.

## BACKGROUND

The States recite only that background relevant to the pending motions. After obtaining and successfully defending their preliminary injunction, the States continued to seek summary judgment and vacatur of the 2024 Rule. The parties' cross-motions mainly focused on whether the *Bostock*, sexual-harassment, and de minimis harm provisions violated Title IX, the U.S. Constitution, or the bar on arbitrary and capricious agency action. *See* Docs. # 126-27, 133-34. As to remedy, the parties also disputed whether those three provisions were severable from the 2024 Rule's remainder. *Id.*

Meanwhile, as the parties' cross-summary-judgment motions were pending, and after oral argument in the Sixth Circuit on the Department's preliminary injunction appeal, President Trump won election on November 5, 2024. His plans for the 2024 Rule on assuming office were no secret: "We're gonna end it on Day 1"; "[i]t'll be terminated." *The Uncertainty Ahead for Title IX and Transgender Students in Trump's New Term*, Ed Week, (Nov. 21, 2024), https://perma.cc/4P9G-6PYV; *see id.* (quoting counsel for the Center). Many weeks went by, yet no intervention request came.

2

Then, on January 9, 2025, this Court issued an opinion and judgment vacating the 2024 Rule in its entirety. Docs. # 143, 144. Under the applicable 60-day deadline, the appeal window would close March 10, 2025. Still more weeks passed. Later, on January 31, 2025, the Department of Education issued a "Dear Colleague Letter" explaining that it would begin enforcing the 2020 Rule across-the-board. Off. for Civ. Rts., U.S. Dep't of Educ., *Dear Colleague Letter on Title IX Enforcement* 1 (as amended Feb. 4, 2025), https://perma.cc/2E6D-LH4K; *see Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Funding Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ("2020 Rule"). Subsequently, the U.S. District Court for the Northern District of Texas separately vacated the 2024 Rule nationwide. *See Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-cv-00461-O, Doc. # 86, at 8 (N.D. Tex. Feb. 19, 2025).

Finally, on February 26, 2025, ABB filed (i) a motion to intervene and (ii) a motion to extend the appeal deadline. Docs. # 152-53. Two days later, on February 28, 2025, the Victim Rights Law Center and an anonymous university student did the same; they also sought highly expedited resolution of their motions, citing their self-created time crunch. Docs. # 164-65. The student's proposed claims are now moot and "she will not be participating further," Doc. # 196, at 2 n.1, but ABB and the Center still seek to intervene for purposes of appealing this Court's vacatur of the 2024 Rule. Their theory is that, should they prevail on appeal, schools might in turn apply provisions of the 2024 Rule they favor—covering pregnancy, sexual harassment, and hearings—rather than the 2020 Rule.

The States, Intervenor-Plaintiffs, and Defendants all opposed ABB's and the Center's proposed interventions and their motions to extend the appeal deadline. Docs. # 175, 176, 177, 180.

On March 10, 2025, ABB and the Center filed protective notices of appeal. Docs. # 181, 182. The Court held that the notices of appeal divested it of jurisdiction over the pending motions and denied all of them as moot. Doc. # 186.

In October, the U.S. Court of Appeals for the Sixth Circuit granted ABB's and the Center's motions in that court to remand their pending appeals "for the limited purpose of permitting the district court to adjudicate the parties' motion to intervene."  Doc. # 195, at 3.

At proposed-intervenors' motion, this Court then partially vacated its order denying the then-pending motions as moot, reinstated ABB's and the Center's motions to intervene (Docs. # 152 and 164), and set response and reply deadlines.  Docs. # 196, 199; *see also* Doc. # 207 (clarifying which parties could respond).

## ARGUMENT

Post-judgment intervention is improper for threshold reasons and on the merits.  Intervenors must establish their own Article III standing to prosecute an appeal, but these proposed-intervenors lack standing for several independent reasons.  Nor, separately, is late entry appropriate under the legal and equitable factors governing as-of-right and permissive intervention.

## I.    Proposed-intervenors lack Article III standing, so they cannot intervene to appeal.

The proposed-intervenors seek intervention purely to take an appeal from an already-entered final judgment.  *See* ABB Br. 1; Center Br. 3.  In this scenario, would-be intervenors must establish standing.  But these proposed-intervenors have not.  Intervention is thus improper.

### A.    Post-judgment intervenors must establish Article III standing to appeal.

"A party may not invoke the federal judiciary's coercive powers against an adversary unless their dispute has taken the shape of the 'Cases' or 'Controversies' that fall within Article III's text." *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 901 (6th Cir. 2024).  And that bedrock requirement is not satisfied "unless the plaintiff has standing to sue."  *Id.* at 902.  To establish standing, proposed-intervenors need to prove three elements as a matter of law—that they have "suffered (or will suffer) a 'concrete and particularized' injury; that a 'causal connection' exists between the injury" and the

challenged conduct; and that "the requested remedy will redress the injury." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016).

In active district-court litigation between parties, intervenors may sometimes enter a case without showing their own standing. By contrast, "intervenors must establish Article III standing if they wish to *appeal* the outcome of a lawsuit" independent of the original parties. *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 304 (6th Cir. 2019). Supreme Court and this Circuit's caselaw spells out that obligation,[1] which can alone support denying intervention, *see, e.g.*, *Chapman*, 940 F.3d at 302-03; *Ctr. for Powell Crossing LLC v. Ebersole*, 696 F. App'x 702, 704 (6th Cir. 2017). ABB thus errs when it claims (at 16) that "[a]t this juncture, it does not need Article III standing."

The Center at least acknowledges (at 6) that "Article III standing" is "necessary to appeal where no original party is doing so." But it then insists (at 4 n.3) that it need only satisfy the "motion to dismiss" plausibility standard, citing a lone district court decision that's decades old. That position conflicts with the textbook standing rule that "each element" of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Here, the Center seeks to intervene following entry of judgment. In intervention-for-appeal cases similarly postured, the Supreme Court and Sixth Circuit have required would-be intervenors to "bear the burden of *establishing*" their standing using "record evidence" or other factual support.

---

[1] *See id.*; *see also Diamond v. Charles*, 476 U.S. 54, 56, 62 (1986) ("The standing Article III requires must be met by persons seeking appellate review," so "[a]n intervenor cannot step into the shoes of the original party unless the intervenor independently fulfills the requirements of Article III"); *Grae v. Corr. Corp. of Am.*, 57 F.4th 567, 569 (6th Cir. 2023) ("If the original parties to a case don't appeal the district court's decision," intervenors "must have standing" to "step into the shoes of the original parties." (cleaned up)); *Cherry Hill Vineyards LLC v. Lilly*, 553 F.3d 423, 428 (6th Cir. 2008) ("[A]n intervenor seeking to appeal, like any other party, must fulfill the requirements of Article III of the Constitution before it can continue to pursue an action in the absence of the party on whose side intervention was permitted."); *Assoc. Builders & Contractors v. Perry*, 16 F.3d 688, 690 (6th Cir. 1994) ("[A]n intervenor seeking to appeal must have standing under Article III of the Constitution entitling it to have the court decide the merits of the dispute.").

*Wittman v. Personhuballah*, 578 U.S. 539, 545 (2016) (emphasis added); *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 670 (2019); *accord Diamond*, 476 U.S. at 67.

In short, ABB incorrectly dismisses any standing showing as unnecessary while the Center misreports what its standing burden requires.  Though these legal errors infect both groups' intervention cases, their standing arguments would fail under any arguable burden.

**B.    ABB and the Center do not establish an injury-in-fact.**

ABB and the Center are private nonprofit organizations who provide advocacy and legal services.  *See* Doc. # 162-2 ("ABB Decl.") ¶¶ 2-5; Doc. # 164-2 ("Center Decl.") ¶¶ 6-8.  The groups are not regulated by Title IX directly; the implementing regulations "neither require nor forbid any action on [their] part."  *NAACP*, 105 F.4th at 902 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  They instead challenge how the Department is regulating "someone else," making their standing burden "substantially more difficult" to carry.  *Id.* (quoting *Lujan*, 504 U.S. at 562).

Because "Article III requires more than a desire to vindicate value interests," ABB and the Center must demonstrate that they have a "concrete injury" stemming from this Court's vacatur decision.  *Diamond*, 476 U.S. at 66 (citation omitted).  "[P]olicy views" favoring the 2024 Rule over the 2020 Rule do not confer standing.  *Chapman*, 940 F.3d at 307; *cf.* ABB Br. 5-7; Center Br. 2-3.  And their remaining asserted injuries fail on law and fact alike.

**1.    The diversion-of-resources allegations do not support standing.**

ABB (exclusively) and the Center (largely) hinge their organizations' standing on a diversion-of-resources theory.  Each group claims that this Court's final judgment, by vacating the 2024 Rule, has in turn prompted the Department to return to enforcing the 2020 Rule; the groups say that dynamic will require them to "expend" "more time" and "more resources" providing advocacy and advice about the requirements of Title IX.  *See* ABB Br. 17 (quoting ABB Decl. ¶¶ 25, 30); Center Br.

6

10-11 (citing Center Decl. ¶¶ 13, 27). They say that this drain on resources will "reduce" their ability to operate "other programs" and pursue "other ends." ABB Br. 17; Center Br. 11.

Though perhaps sufficient in the past, such allegations do not survive the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). There, various medical associations challenged FDA regulations that made it easier for pregnant women to obtain an abortion pill called mifepristone. *Id.* at 372-74, 394. The groups claimed they had organizational standing because the challenged "FDA regulations" were "forcing them to devote extra time and expense to informing the public about the risks of the abortion drug" and made public education "more difficult." *NAACP*, 105 F.4th at 905 (citation omitted); *All. for Hippocratic Med.*, 602 U.S. at 367. But the Supreme Court disagreed, instead directing that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394.

The Sixth Circuit has since been clear about the import of the Supreme Court's standing holding: It is no longer "enough to broadly gesture toward a 'drain on an organization's resources' and call it a day, as some of our pre-*Alliance* cases have done." *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 993 (6th Cir. 2025). That is, an organization cannot merely rest on "indirect 'pocketbook' harm"—*i.e.*, the claim that a law makes an organization's "efforts *more costly* by requiring it to spend 'extra time and money' on those efforts." *NAACP*, 105 F.4th at 905.

Like the medical associations in *Alliance for Hippocratic Medicine*, ABB and the Center lack standing because they suffer no concrete injury from reversion back to the 2020 Rule. At most, their resource-diversion theory shows that they will voluntarily expend resources assisting and "advis[ing] others how to comport with" Title IX regulations. *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014). But groups cannot "manufacture [their] own standing" in that manner by voluntarily

7

spending resources to counteract or address regulations that do not concretely harm the organizations themselves. *All. for Hippocratic Med.*, 602 U.S. at 394; *accord Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1175 (9th Cir. 2024) (noting that *Hippocratic Medicine* forecloses theory that "an organization suffers cognizable harm because it voluntarily spends money to further its goals").

Indeed, accepting the proffered diversion-of-resources theory here would create the free-for-all the Supreme Court warned against in *Hippocratic Medicine*: That "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." 602 U.S. at 395. Any organization can generate arguments about how new legal rules (or their absence) would "make it more difficult" to inform stakeholders about the law or advocate on behalf of particular clients. ABB Br. 17. Accepting that "expansive theory of standing" would defy the limited role of federal courts, *All. for Hippocratic Med.*, 602 U.S. at 395, and "separation-of-powers principles," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013).

### 2.   *Havens Realty Corp. v. Coleman* does not support standing.

Citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), ABB (at 17) and the Center (at 6) say they have standing because vacatur of the 2024 Rule impairs their "missions." Not so.

**a.** To begin, *Havens* was an "unusual case" that the Supreme Court "has been careful not to extend." *All. for Hippocratic Med.*, 602 U.S. at 396. The organizational plaintiff there ("HOME") "operated a housing counseling service" that existed alongside the organization's issue-advocacy efforts. *Id.* Under federal law, and unlike here, HOME *itself* enjoyed a "broad legal right" to "truthful information concerning the availability of housing"—"a right that cu[t] to the core" of its counseling-and-referral services. *Fair Elections*, 770 F.3d at 460 n.1 (citation omitted). So when the defendant directly gave false information to HOME, that "perceptibly impaired HOME's ability to provide [its] counseling and referral services." *Havens*, 455 U.S. at 379. A similar "informational injury," the Sixth

Circuit noted, might apply to similar groups in receipt of "false information" that harms their ability to provide services. *Fair Hous. Ctr. of Metro. Detroit*, 124 F.4th at 993 (cited at ABB Br. 17; Center Br. 6). But in all events, under *Havens*, "a defendant's actions must have directly affected and interfered with" a group's "core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395.

*Havens* thus rests on two premises—(1) HOME operated its own business separate from its advocacy efforts, and (2) the challenged conduct directly interfered with that business's legal right to truthful information under federal law. 455 U.S. at 378-79. Here, each proposed-intervenor falls outside *Havens'* "narrow domain." *NAACP*, 105 F.4th at 903.

A Better Balance. ABB operates no business akin to HOME's counseling agency. The Court in *Havens* found it "critica[l]" that HOME's "housing counseling service" suffered a "direc[t] injury to its own statutorily protected "legal right."" *All. for Hippocratic Med.*, 602 U.S. at 395; *Fair Elections*, 770 F.3d at 460 n.1. ABB by contrast describes itself a "legal advocacy organization." ABB Decl. ¶ 2. It does not run a business whose legal rights the 2020 Rule impairs; unlike the challenged action in *Havens*, the rule change affects ABB only indirectly.

Moreover, ABB's cited "mission" harm is that it now must "expend 'more time and other resources to counsel student callers'" that it "could otherwise devote to other ends." ABB Br. 17. But that merely repackages the organization's failed diversion-of-resources theory. Nothing about a change from the 2024 Rule to the 2020 Rule frustrates the substance of ABB's advocacy and counseling work—to the contrary, the group can "still" advise interested parties about what relevant laws require, "[w]ith or without" the 2024 Rule in effect. *Ariz. All.*, 117 F.4th at 1178. Nor does ABB possess an independent "legal right" to obtain particular Title IX information. *Fair Elections*, 770 F.3d at 460 n.1. ABB's argument is thus unlike the "narrow" theory in *Havens*, where the false provision of

9

information *directly* harmed HOME's ability to operate its counseling-services business and HOME thereafter sought damages. *See NAACP*, 105 F.4th at 902-05.

The Center. For similar reasons, *Havens* does not license the Center's "mission" harm theory either. Center Br. 8-9. The Center invokes its interest in receiving certain Title IX-related information. *See* Center Decl. ¶¶ 10, 20-22. But as with ABB, the Center does not allege its own statutory entitlement to accurate Title IX information. There is thus no cognizable "informational injury." *All. for Hippocratic Med.*, 602 U.S. at 395-96 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998)).

Otherwise, the Center's "frustration of purpose" argument (at 7) posits that stricter Title IX rules will make student victims more hesitant to file and prosecute complaints, which in turn will lead to a reduction in "requests for [the Center's] services," which ultimately will harm the Center's mission to provide legal assistance to "student survivors." The Center then gives (at 9-10) several reasons why it favors the 2024 Rule as a policy matter over the 2020 Rule, which it alleges has led to "decreased deterrence of sex-based harassment." And it proffers statistics that it says show a decline in Title IX complaints following the 2020 Rule and this Court's vacatur order. *See* Center Decl. ¶ 11.

Even accepting all that, nothing about the reversion to the 2020 Rule precludes the Center from engaging in the legal work it typically performs. It can "still" advise on sexual harassment issues "[w]ith or without" the 2024 Rule in effect, meaning its mission stands. *Ariz. All.*, 117 F.4th at 1178. And it can still represent victims who choose to carry forward their complaints. To be sure, the 2020 Rule imposes different requirements the Center must account for when assisting alleged victims of Title IX misconduct. *See* Center Decl. ¶¶ 17, 19, 21-22. But those requirements do not impede the Center's work, and the Center "cannot establish its standing merely through its 'legal, moral, ideological, or policy' disagreement" with the 2020 Rule's different approach. *NAACP*, 105 F.4th at 902 (quoting *All. for Hippocratic Med.*, 602 U.S. at 381); *cf. Chapman*, 940 F.3d at 307.

10

The Center's contrary reliance (at 7) on district court decisions in Massachusetts and California is not persuasive. (Citing *Victim Rts. L. Ctr. v. Cardona*, 552 F. Supp. 3d 104, 126 (D. Mass. 2021); *SurvJustice Inc. v. DeVos*, No. 18-cv-00535-JSC, 2018 WL 4770741, at *6 (N.D. Cal. Oct. 1, 2018), *order amended*, 2019 WL 1434144, *appeal dismissed*, 2023 WL 9847714). The former cites the latter in holding that *Havens*-qualifying harm triggers whenever an "organization focused on assisting" clients experiences "a reduction in requests for its services." *Victim Rts. L. Ctr.*, 552 F. Supp. 3d at 126 (citing *SurvJustice Inc.*, 2018 WL 4770741, at *6-7). And the latter points to no authority for the proposition that the Center has its own, cognizable interest in keeping reporting of Title IX harassment high.

Such reasoning flouts *Hippocratic Medicine*. It would license organizational standing whenever regulatory changes lead to increased (in *Hippocratic Medicine*) or decreased (allegedly here) service requests to an organization. But on that view, any organization—from legal-aid groups, to immigrant-rights organizations, to unions, to pro- and anti-abortion centers, and more—could challenge any alteration of a substantive legal standard that affects third-party demand for their services. *Cf. Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.*, 816 F.3d 1241, 1250 (9th Cir. 2016) (rejecting standing theory that would "permit attorneys to challenge any governmental action or regulation when doing so would make the scope of their clients' rights clearer and their strategies to vindicate those rights more easily selected"). That "approach to standing" is "flatly inconsistent with Article III." *All. for Hippocratic Med.*, 602 U.S. at 392.

**b.** Even assuming *Havens* applied as broadly as ABB and the Center contend, their standing argument would fail on its own terms. Neither group has shown that any diversion of resources related to the 2024 Rule's vacatur has caused a "'perceptible impair[ment]' to [the] organization's ability to carry out its mission"—as even ABB and the Center acknowledge their standing theory requires. *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-cv-00461-O, 2025 WL 1782571, at *3 (N.D. Tex.

11

May 15, 2025) (indirectly quoting *Havens*, 455 U.S. at 379); ABB Br. 17; Center Br. 6-7. One district court has already agreed in rejecting ABB's and the Center's attempts to intervene on identical grounds to appeal a separate vacatur of the 2024 Rule. *Id.* That court's reasoning applies directly here.

As to ABB, the court held that "[n]one of ABB's alleged injuries ha[d] perceptibly impaired its ability to carry out its mission." *Id.* at *4. The reason? "[T]he efforts ABB has taken to counteract the effects of the Court's vacatur of the Final Rule 'would appear to advance, rather than impair, [ABB's] mission of' providing legal services and assisting workers and students through its helpline." *Id.* (quoting *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 354 (5th Cir. 2023)). The claim that ABB must spend "'more time and other resources to counsel student-callers,'" for example, "squarely comport[s] with [that] mission." *Id.* (quoting ABB Br.); *see also* ABB Decl. ¶¶ 14-15, 18, 24-29 (presenting similar claims). Similarly, any "'diver[sion of] resources from one core mission activity to another'" does not demonstrate a perceptible mission impairment since the "diversion is [still] furthering one of [ABB's] 'core mission activit[ies].'" *Id.* (internal quotations omitted) (quoting *La. Fair Hous. Action Ctr.*, 82 F.4th at 354); *see also* ABB Decl. ¶ 30 (arguing diverted resources could be spent on other activities). Thus, ABB cannot show that its mission is "'perceptibly impaired'" by the Rule's vacatur as needed to show an "injury-in-fact" under Plaintiffs' reading of *Havens*. *Carroll*, 2025 WL 1782571, at *4 (quoting *La. Fair Hous. Action Ctr.*, 82 F.4th at 352-53).

The court applied similar reasoning to the Center. First, it rejected the Center's claim that the vacatur injured it by "interfer[ing] with its core organizational activity, that is '[the Center's] ability to provide legal assistance to student survivors.'" *Id.* (quoting Center Br.); *see* Center Decl. ¶ 10 (same). As the court explained, the Center "does not contend that the Court's vacatur of the Final Rule has perceptibly impaired its ability to provide *legal representation* to victims of sex-based harassment" but that "its *clients*" have suffered negative effects. *Carroll*, 2025 WL 1782571, at *5. The same is true

here. *See generally* Center Decl. But those client challenges just mean that the Center "must now navigate new and complicated legal issues"—"which comports with its stated mission and purpose." *Carroll*, 2025 WL 1782571, at *5. And even if navigating those issues requires the Center's attorneys to expend more time and resources counseling and representing clients, *see, e.g.*, Center Decl. ¶¶ 19, 24, any diversion-of-resources argument "fail[s] because" those activities "squarely comport with [the Center's] routine activities," *Carroll*, 2025 WL 1782571, at *5. Thus, the Center also cannot establish "a concrete and demonstrate injury" "based on any alleged perceptible impairment of its mission." *Id.*

### C.    Regardless, independent factors foreclose traceability and redressability.

To satisfy Article III, any demonstrated injury also must be fairly traceable to the complained-of action and redressable by a ruling against it. Causation and redressability are "flip sides of the same coin," *Somberg v. McDonald*, 117 F.4th 375, 378 (6th Cir. 2024) (citation omitted), and are not shown unless "a judicial decree can provide 'prospective relief' that will 'remove the harm,'" *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).

All of the proposed-intervenors' asserted injuries flow from the renewed effect of the 2020 Rule. To demonstrate traceability and redressability, they therefore must show (i) that this Court's vacatur of the 2024 Rule is indeed the cause of the 2020 Rule's taking effect and (ii) that reversing this Court's vacatur decision would render the 2024 Rule operative again in schools. Three independent factors foreclose what proposed-intervenors' standing theory requires.

### 1.    Other decisions vacating and enjoining the 2024 Rule.

Other judicial decisions account for the 2020 Rule's effect—not just this Court's order. "So even if" proposed-intervenors prevailed on their appellate arguments, "nothing about that" appellate decision "would stop" their complained-of harms. *Somberg*, 117 F.4th at 379. Redressability fails.

13

To begin, the entire 2024 Rule has been vacated nationwide by at least one other court. *See Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-cv-00461-O, Doc. # 86, at 8 (N.D. Tex. Feb. 19, 2025). Proposed-intervenors point this Court to a status report from that case, ABB Br. 5, 16; Center Br. 17. Yet they fail to mention the subsequent vacatur, which provides an independent basis for their claimed harms outside the scope of any appeal here. To demonstrate redressability and thus standing, then, proposed-intervenors would have to successfully intervene and prevail on appeal in Texas—and any other subsequent case vacating the 2024 Rule. *See, e.g., Kansas v. U.S. Dep't of Educ.*, No. 5:24-cv-04041, Doc. # 111, at 3 (June 25, 2025) (status report arguing the court retains jurisdiction "to issue a final ruling regarding … the validity of the Final Rule"). Yet, as discussed, the district court in *Carroll* denied ABB's and the Center's motions to intervene in that case. 2025 WL 1782571, at *1. And although both groups appealed, *see Carroll ISD v. Educ.*, No. 25-10651 (5th Cir. 2025), it is simply "too speculative" that proposed-intervenors could string together an unbroken streak of multi-court victories to reverse vacatur of the Rule nationwide, *Clapper*, 568 U.S. at 401.

The 2024 Rule moreover remains subject to an independent series of geographic and school-specific preliminary injunctions. Those injunction decisions together mean that over half of the States,[2] and "thousands of individual schools across the country" from K-12 through college, Appellant Br. of Dep't, *Kansas v. U.S. Dep't of Educ.*, No. 24-3097, 2024 WL 4024782, at *3 (10th Cir. Aug. 26, 2024), would continue to operate under the 2020 Rule until some unforeseen point. Again, any

---

[2] *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *9 (11th Cir. Aug. 22, 2024) (Alabama, Florida, Georgia, and South Carolina) ; *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 410 (W.D. La. 2024) (Louisiana, Mississippi, Montana, and Idaho), *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 936-37 (D. Kan. 2024) ("Kansas, Alaska, Utah, Wyoming, [Plaintiff's] school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as the schools attended by the children of the members of Moms for Liberty"); *Texas v. United States*, 740 F. Supp. 3d 537, 559 (N.D. Tex. 2024) (Texas); *Arkansas v. U.S. Dep't of Educ.*, 742 F. Supp. 3d 919, 951 (E.D. Mo. 2024) (Arkansas, Missouri, Iowa, Nebraska, North Dakota, and South Dakota); *Oklahoma v. Cardona*, 743 F. Supp. 3d 1314, 1333 (W.D. Okla. 2024) (Oklahoma).

appeal from this Court's judgment would not affect those independent injunctions.  But neither ABB nor the Center addresses—let alone adduces sufficient facts to demonstrate—how their harms are redressable when a patchwork of preliminary injunctions would continue to maintain the 2020 Rule throughout the country's schools.

The upshot:  Even if proposed-intervenors managed to prevail on the merits of an appeal, the 2024 Rule would remain vacated and enjoined by multiple, overlapping decisions from other courts that are not subject to appellate challenge.  That dynamic defeats traceability and redressability.

### 2. The Department's enforcement discretion.

Proposed-intervenors' reliance (at ABB Br. 4, Center Br. 2, 17, 21) on the Department's *Dear Colleague Letter* further undercuts their redressability showing.  That letter clarifies that, as it stands, the Department "will enforce Title IX under the provisions of the 2020 Title IX Rule, rather than the 2024 Title IX Rule."  *Dear Colleague Letter*, *supra*, at 1.  The Department explains that its enforcement stance reflects not only this Court's vacatur of the 2024 Rule, but also the Department's need to align Title IX enforcement with a January 20, 2025 Executive Order.  *Id.* at 1-2.

There is no indication in the *Dear Colleague Letter* that the Department will take a different enforcement position should this Court's vacatur decision be reversed.  To the contrary, its reasoning would apply equally to the Texas vacatur ruling already discussed.  *See supra* p. 14.  And the need to align Title IX enforcement with President Trump's Executive Orders is an enforcement justification independent from any vacatur decision.  Yet this case involves only the issue of the 2024 Rule's validity, not any distinct exercise of the Department's "enforcement choices" through separate agency actions not presently subject to challenge.  *United States v. Texas*, 599 U.S. 670, 679-80 (2023).

### 3. Schools' independent choice to offer certain hearing procedures.

Proposed-intervenors also cannot establish causation and redressability because applicability of the 2020 Rule, rather than the 2024 Rule, reflects the "result [of] the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is "substantially more difficult" to establish on such theories, and this case is no exception. *Id.* at 562.

The Department has by now provided its independent view that the 2020 Rule is better reflective of what Title IX and due process require. And many schools have already chosen or are required to implement cross-examination procedures absent the Rule. *See, e.g., Doe v. Univ. of Scis.*, 961 F.3d 203, 214-15 (3d Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018). So to prevail, proposed-intervenors must establish that school administrators would buck the Department's direction, risk liability from respondents, and continue to apply the 2024 Rule despite contrary enforcement warnings. They have not provided sufficient factual support for any of those propositions, leaving this Court to guess at the import of any appellate decision. Such "speculation about the decisions of independent actors" fails to show causation and redressability as a matter of law. *Clapper*, 568 U.S. at 414. Yet proposed-intervenors have not provided sufficient support for the proposition that schools would indeed continue to enforce the 2024 Rule even were this Court's decision vacated.

## II. Separately, the intervention factors warrant denying proposed-intervenors' motions.

Lack of standing itself warrants rejecting proposed-intervenors' participation for appeal. *Supra* Part I. But to address all dispositive issues, this Court can and should alternatively hold that the Rule 24 factors likewise foreclose intervention as a matter of law and under "inherently discretionary considerations of equity and judicial economy." *See, e.g., Ctr. for Powell Crossing, LLC v. City of Powell*, No. 1:14-cv-2207, 2016 WL 3384298, at *3-4 (S.D. Ohio June 20, 2016) (alternative standing and Rule 24 holdings), *aff'd*, 696 F. App'x 702 (6th Cir. 2017); 6 Moore's Fed. Prac. Civil § 24.10.

16

*Prejudicial delay*.  Because intervention requests must be "timely," Fed. R. Civ. P. 24(a), (b)(1), undue delay provides sufficient reason to deny both mandatory and permissive intervention, *see United States v. Michigan*, 68 F.4th 1021, 1024 (6th Cir. 2023) (quotation omitted).  While filing within the appeal window can be one factor favoring timeliness, *see* ABB Br. 8; Center Br. 14, it is not controlling.  Instead, "[t]he most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for intervention will prejudice the existing parties to the case."  7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1916 (3d ed.).  Other relevant "circumstances" to assess include "(1) the stage of the proceedings; (2) the purpose for the intervention; [and] (3) the length of time that the movant knew or should've known of its interest in the case."  *Michigan*, 68 F.4th at 1024-25.[3]  "Timeliness is to be determined from all the circumstances" by the court "in the exercise of its sound discretion."  *NAACP v. New York*, 413 U.S. 345, 366 (1973).

Start with the prejudice to the States.  Prejudice occurs when a movant's entry "would add a complicated issue to the litigation" that goes "beyond the scope of the suit's initial focus."  *United States v. Tennessee*, 260 F.3d 587, 594 (6th Cir. 2001); *see Salem Pointe Cap., LLC v. BEP Rarity Bay, LLC*, 854 F. App'x 688, 699 (6th Cir. 2021).  That limit reflects the "usual procedural rule[]" that an "intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding."  *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944).  The Center agrees (at 16) that whether an intervenor "seek[s] to expand the scope of issues before the court" is an important consideration.

---

[3] Need for a situation-specific approach to intervention belies proposed-intervenors' attempt (at ABB Br. 11, Center Br. 5) to compare their eleventh-hour, post-judgment ask to Intervenor-Plaintiffs' intervention motion, Doc. # 21; *cf.* 6 Moore's Fed. Prac. Civil § 24.21 (noting that post-judgment intervention is "generally disfavored").  That motion occurred at the outset of the case, came only days after the Final Rule was promulgated, and did not inflict the prejudice now present.  Inapt too are other cited cases, like *Jansen v. City of Cincinnati*, 904 F.2d 336, 341 (6th Cir. 1990) (cited at Center Br. 14), that permitted intervention at earlier stages in district-court proceedings.

17

Here, though, proposed-intervenors seek to fundamentally shift the focus of this appeal from one about the merits of the 2024 Rule's central gender-identity and harassment provisions to the continued operability of certain other provisions the Department never meaningfully addressed. As far as the States can tell, any appeal would center on advancing different severability arguments over provisions scattered throughout the lengthy Final Rule. But to this point, severability has been a second-order remedial issue flowing from this Court's principal assessment of the 2024 Rule's *Bostock*, sexual-harassment, and de minimis harm provisions. The Department, and thus the States, "frame[d] the issues" as such. *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). The proposed-intervenors thus can only "step into the shoes" of the Department, not advance new appellate theories. *Grae v. Corrs. Corp. of Am.*, 57 F.4th 567, 569 (6th Cir. 2023). If proposed-intervenors had sought to advance their distinct severability arguments earlier, the States would have had the ability to provide responsive legal briefing and additional severability evidence. Yet the requested late-in-the-day intervention strips the States of that opportunity. That is textbook prejudice, which is fatal to the intervention motion. *Tennessee*, 260 F.3d at 594; *see Michigan*, 68 F.4th at 1028.

Closely related to prejudice is the stage-of-the-proceedings factor. "This factor weighs against intervention when movants request party status during the final stages of litigation." *Michigan*, 68 F.4th at 1025. The Sixth Circuit has held that "[l]itigation is in its final stages when the district court has already ruled on dispositive motions," and "closed discovery." *In re Auto. Parts Antitrust Litig*, 33 F.4th 894, 901 (6th Cir. 2022) (internal citations omitted). Of course, "those benchmarks ha[ve] long passed in this case." *Id.* The proceedings in this Court are not just at their final stages; they are over.

Finally, proposed-intervenors should have long known of their interest in intervening. "An entity that is aware that its interests may be impaired by the outcome of the litigation is obligated to seek intervention as soon as it is reasonably apparent that it is entitled to intervene." *Tennessee*, 260

18

F.3d at 594 (citing *NAACP v. New York*, 413 U.S. at 367); *see Blount-Hill v. Zelman*, 636 F.3d 278, 285-86 (6th Cir. 2011); *Cuyahoga Valley Ry. Co. v. Tracy*, 6 F.3d 389, 396 (6th Cir. 1993). As discussed, all would-be intervenors should have been on notice of a likely Department position change starting in early November 2024 with President Trump's election. *See supra* p. 2-3. Yet "[i]nstead of seeking to intervene promptly after" that point, proposed-intervenors "did not act, but instead waited" for well over three months and until after entry of final judgment. *Blount-Hill*, 636 F.3d at 285-86. That delay further cuts against timeliness. It also distinguishes this case from others in which post-judgment intervenors sought entry "as soon as it became clear that [their] interests would no longer be protected by the parties." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279-80 (2022) (citation omitted) (quoted at Center Br. 16).

*Alternative avenues to protect interests*. To intervene as of right, proposed-intervenors must demonstrate that denying intervention would "impair or impede" their ability "to protect [their] interest." Fed. R. Civ. P. 24(a)(2). But the Center claims "the vacatur of the 2024 Rule *and resultant reinstatement of the 2020 Rule are injuring VRLC.*" Doc. # 164-2 at 20 (emphasis added). And the Center has a clear alternative avenue for protecting against the 2020 Rule: the Center's still-live case directly challenging the 2020 Rule's harassment provisions and procedures. *See Victim Rts. L. Ctr. v. Carter*, 1st Cir. No. 21-1782. After the Massachusetts district court entered a decision upholding in part and vacating in part the 2020 Rule, the Center appealed in order to argue against largely the same provisions of the 2020 Rule it now targets in its intervention motion. Though that appeal was later placed into abeyance, it was never dismissed. *See* Defendants-Appellees' Status Report, *id.* (Nov. 24, 2025) (noting appeal continues to "remain in abeyance"). By prevailing there, the Center will achieve directly what an appellate decision here could not—vacating the provisions of the 2020 Rule the Center disfavors. It is difficult to see a cleaner way for the Center to "protect its interest" in challenging the 2020 Rule's

19

sexual-harassment provisions than prosecuting its still-pending challenge to the 2020 Rule's sexual-harassment provisions. Fed. R. Civ. P. 24(a)(2).

_Complicating effect of other Title IX cases_. The Center claims that, even if prejudice results from their intervention, it is outweighed by the interests in "avoiding multiplicity of litigation" about the 2024 Rule. Center Br. 23. But as set out earlier, this Court's decision does not resolve the 2024 Rule's legality given the existence of alternative vacatur and injunction orders. _See supra_ p. 13-15 & n.2. Contrary to proposed-intervenors' contentions, their case for intervention works _only if_ they are able to intervene and successfully prevail in "numerous similar lawsuits." Center Br. 23-24. So this is not a case in which intervention would permit resolution of competing legal positions from across cases in a single lawsuit. To the contrary, given the overlapping vacatur orders and injunctions, intervention in this case would not resolve even these proposed-intervenors' legal rights vis-à-vis the 2024 and 2020 Rules. On proposed-intervenors' own terms, the complicating effect of other Title IX cases on their rights cuts against permitting post-judgment intervention.

_Other discretionary factors_. In its discretion, this Court also can consider whether proposed-intervenors would be well positioned to advance the arguments they seek and could obtain relief.

On both fronts, neither proposed-intervenor has explained whether and how it intends to address the pervasive flaws with the 2024 Rule's core _Bostock_, sexual-harassment, and de minimis harm provisions. Neither ABB nor the Center claim an intent to challenge this Court's central merits reasoning; indeed, the Center disclaims (at Br. 4 n.2) that it has standing to challenge the _Bostock_ or de minimis harm provisions. But the Court's merits reasoning is linked with the scope of relief, since this Court correctly ruled that the entire 2024 Rule is "arbitrary and capricious" because the Department's unlawful focus on the _Bostock_, sexual-harassment, and de minimis harm provisions overrides any of the rule's other justifications and benefits. Doc. # 143, at 1. So the proposed-intervenors'

20

filings at best leave questions about whether their arguments will tee up severability in a way that would inhibit full judicial assessment. *Cf. Ohio v. EPA*, 603 U.S. 279, 295 (2024) (agency's arbitrary-and-capricious approach foreclosed severability). At worst, they demonstrate that proposed-intervenors could not obtain full relief. Neither helps proposed-intervenors' cause.

## CONCLUSION

For the reasons given above, this Court should deny ABB's and the Center's motions to intervene for several independent reasons:

*First*, the proposed-intervenors each lack Article III standing, as needed to intervene for purposes of pressing an independent appeal. *Supra* Part I. ABB and the Center lack organizational standing because their asserted diversion-of-resources and mission-frustration harms do not constitute a cognizable injury-in-fact, particularly after the Supreme Court's *Hippocratic Medicine* decision. *Supra* Part I.B. And ABB's and the Center's alleged harms also are not fairly traceable to this Court's vacatur order or redressable by a favorable appellate decision. *Supra* Part I.C. That is because (i) other court orders independently vacate and enjoin the 2024 Rule across the nation, (ii) the 2020 Rule's status stems from the independent enforcement decisions of the Department, and (iii) whether the 2020 Rule is applied reflects the decisions of third-party schools based on factors not before this Court. *Id.*

*Second*, the proposed-intervenors' case for intervening after final judgment fails on its own terms. *Supra* Part II. Intervening now, post-judgment, inflicts undue prejudice in light of the arguments the parties previously pressed, the stage of the proceedings, and the months of notice proposed-intervenors had of any need to protect their interests. The Center also has adequate legal means to protect its interests against the 2020 Rule—namely, the Center's still-live challenge to the 2020 Rule pending in the U.S. Court of Appeals for the First Circuit. And the multiple, overlapping Title IX vacatur and injunction orders means intervention here will not resolve proposed-intervenors' rights

21

vis-à-vis the 2024 Rule, let alone streamline proceedings about the 2024 Rule's legality. The artificial posture of proposed-intervenors' severability arguments likewise undermines their ability to fully address the relevant legal arguments or obtain meaningful relief.

The Court should deny intervention.

Dated: December 2, 2025                                    Respectfully Submitted,

**RUSSELL COLEMAN**                                        **JONATHAN SKRMETTI**
  Attorney General                                          Attorney General and Reporter

*/s/ Justin D. Clark*                                      */s/ Virginia N. Adamson*
JUSTIN D. CLARK                                            J. MATTHEW RICE*
  Civil Chief                                                Solicitor General
VICTOR B. MADDOX                                           STEVEN J. GRIFFIN*
  Counsel for Special Litigation                             Deputy Attorney General
LINDSEY R. KEISER                                         VIRGINIA N. ADAMSON*
  Assistant Attorney General                                 Assistant Solicitor General
**Kentucky Office of the Attorney General**               **Office of the Tennessee Attorney General**
700 Capital Avenue, Suite 118                             P.O. Box 20207
Frankfort, Kentucky 40601                                 Nashville, Tennessee 37202
(502) 696-5300                                            (615) 741-3491
victor.maddox@ky.gov                                      matt.rice@ag.tn.gov
justind.clark@ky.gov                                      steven.griffin@ag.tn.gov
lindsey.keiser@ky.gov                                     jenna.adamson@ag.tn.gov

*Counsel for the Commonwealth of Kentucky*                *Counsel for the State of Tennessee*


**THEODORE E. ROKITA**                                    **DAVE YOST**
  Attorney General                                          Attorney General

*/s/ James A. Barta*                                      */s/ Mathura Sridharan*
JAMES A. BARTA*                                            MATHURA SRIDHARAN*
  Solicitor General                                          Solicitor General
**Indiana Attorney General's Office**                     **Office of the Ohio Attorney General**
IGCS – 5th Floor                                          30 East Broad Street, 17th Floor
302 W. Washington St.                                     Columbus, Ohio 43215
Indianapolis, IN 46204                                   (614) 466-8980
(317) 232-0709                                            mathura.sridharan@ohioago.gov
james.barta@atg.in.gov
                                                         *Counsel for the State of Ohio*
*Counsel for the State of Indiana*

22

**JASON S. MIYARES**
  Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER*
  Solicitor General
**Virginia Attorney General's Office**
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of Virginia*


**JOHN B. McCUSKEY**
  Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS*
  Solicitor General
**Office of the West Virginia Attorney General**
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*


*\*Admitted pro hac vice*

23

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 2nd day of December 2025, a true and correct copy of the foregoing document was served on all counsel of record via the Court's electronic filing system, which provided copies of the foregoing to all counsel of record.

*/s/ Virginia N. Adamson*
VIRGINIA N. ADAMSON

24