1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at COVINGTON
- - -

STATE OF TENNESSEE, et al.,      : Docket No. 2:24-cv-72
                                 :
                      Plaintiffs, : Covington, Kentucky
                                 : Wednesday, January 21, 2026
                                 : 1:00 p.m.
versus                           :
                                 :      **Via Electronic Recording**
LINDA McMAHON, in her Official :
Capacity as Secretary of         :
Education, et al.,               :
                                 :
                   Defendants.   :

- - -
TRANSCRIPT OF MOTION HEARING
BEFORE S. CHAD MEREDITH
UNITED STATES DISTRICT COURT JUDGE
- - -

APPEARANCES:

For the Plaintiff,        VIRGINIA N. ADAMSON, ESQ.
State of Tennessee:       Office of Attorney General - TN
                          P.O. Box 20207
                          Nashville, TN 37202

                          STEVEN J. GRIFFIN, ESQ.
                          Tennessee Attorney General &
                          Reporter
                          P.O. Box 20207
                          Nashville, TN 37202


For the Plaintiff,        VICTOR B. MADDOX, ESQ.
Commonwealth of Kentucky: Office of Attorney General - KY
                          1024 Capital Center Drive
                          Suite 200
                          Frankfort, KY 40601


For the Defendants, Linda PARDIS GHEIBI, ESQ.
McMahon, United States    DOJ - Civil Federal Programs Branch
Department of Education:   1100 L Street NW
                          Room 11526
                          Washington, DC 20005

2

For Intervenor Defendant,    HADLEY ROOD, ESQ.
A Better Balance:            Braun Hagey & Borden LLP
                             747 Front Street
                             4th Floor
                             San Francisco, CA 94111

                             NED PILLERSDORF, ESQ.
                             Pillersdorf Law Offices
                             124 W. Court Street
                             Prestonsburg, KY 41653


For Intervenor Defendant,    ELLEN EARDLEY, ESQ.
Victim Rights Law Center:    Mehri & Skalet PLLC
                             2000 K Street NW
                             Suite 325
                             Washington, DC 20006

                             OLIVER P. WILHITE, ESQ.
                             Gatlin Voelker, PLLC
                             50 E. Rivercenter Boulevard
                             Suite 1275
                             Covington, KY 41011


For Intervenor Plaintiff:    BRITTANY B. BURNHAM, ESQ.
                             Alliance Defending Freedom - VA
                             44180 Riverside Parkway
                             Lansdowne, VA 20176

                             NATALIE D. THOMPSON, ESQ.
                             Alliance Defending Freedom - DC
                             440 First Street NW
                             Suite 600
                             Washington, DC 20001


Transcriber:                 LISA REED WIESMAN, RDR-CRR
                             Official Court Reporter
                             35 W. Fifth Street
                             Covington, KY 41011
                             (513) 266-6271



      Proceedings recorded digitally, transcript produced by computer.

3

(Proceedings commenced at 1:00 p.m.)

THE COURT:  Madam Clerk, please call the case.

COURTROOM DEPUTY:  State of Tennessee, et al., versus McMahon, et al.

THE COURT:  Thank you.  Let's have counsel enter their appearances for the record, starting with counsel for the plaintiffs.

MS. ADAMSON:  Your Honor, Virginia Adamson on behalf of the State of Tennessee.  I'm accompanied by my co-counsel, Steven Griffin from the State of Tennessee and Victor Maddox from the State of Kentucky.

THE COURT:  Thank you all.  Welcome.

Counsel for the defendants.

MS. GHEIBI:  Good afternoon, Your Honor.  Pardis Gheibi representing the United States this afternoon.

THE COURT:  Thank you.  And counsel for the proposed intervenors.

MS. ROOD:  Good afternoon, Your Honor.  Hadley Rood with the firm Braun, Hagey & Borden for the proposed intervenors, A Better Balance.  I'm here with my co-counsel, Ned Pillersdorf, as well.

THE COURT:  Thank you.

MS. EARDLEY:  Your Honor, Ellen Eardley with the firm Mehri & Skalet.  I represent the Victims Rights Law Center. With me today is Oliver Wilhite from Gatlin Volker as well.

4

MS. THOMPSON:  Thank you, Your Honor.  Natalie Thompson from Alliance Defending Freedom, representing the intervenor plaintiffs.  This is my colleague, Brittany Burnham.

THE COURT:  Thank you both.

Okay.  We're here today to take up the pending motions to intervene from A Better Balance and the Victim Rights Law Center.  I like to do these hearings maybe a little differently than what you all are used to.  Instead of having lawyers come to the lectern and give an argument like you might give in an appellate court or just kind of speaking, I'm going to invite you to the lectern, but I'm going to begin with a series of questions that I have.

And then once we kind of exhaust my questions, you're welcome to put whatever else on the record that you'd like. You can make whatever argument at that point.

I find if we don't do it that way, people tend to just kind of regurgitate their briefs, and that's not especially helpful.  So let's avoid doing that, if we can.

I thought we would begin today with my questions for the proposed intervenors.  And since there are two of you, you can just stand at counsel table and answer because it will be a little awkward for both of you to use the lectern at the same time.  I'll kind of alternate my questions, if that works.

So let's begin with the proposed intervenors.  The first

5

question I have regards Article III standing for both of you. What precisely is the Article III injury that both of your organizations claim to be suffering?

MS. ROOD:  I can go first, Your Honor, on behalf of A Better Balance.  A Better Balance runs a helpline that pregnant and postpartum students and workers can call for counseling.  This is a core part of their business activities, and it is these services that are being perceptibly impaired by the vacatur.

Without the clear guidelines that the 2024 rule would impose, A Better Balance has to scramble to do intensive research and follow-up that makes calls take longer and makes them able to serve fewer callers and to serve those callers less effectively.

THE COURT:  So how is that an injury?  That's what your organization does anyway, right?  You advise individuals on their rights, correct?

MS. ROOD:  That's correct.  However, as Sixth Circuit precedent has recognized, the fact that more resources are being spent on a core business activity can still constitute an injury because it makes those activities more difficult to carry out.

So, again, here A Better Balance is caught, effectively, between a rock and a hard place.  They would either need to take longer with each caller in order to provide this

6

individualized and highly specialized research, which would mean they wouldn't be able to serve as many callers, or they would need to fundamentally change the nature of their helpline, which, again, is one of the core activities that they offer as an organization.  It's part of their mission.

THE COURT:  But it sounds to me like you're saying that it's just going to -- they're just going to have to do a little more work.  They have to do more advising.  They have to do a little more research and a little more legwork and then provide a little more advice to people.

Is that what you're saying?

MS. ROOD:  That is correct, Your Honor.  And they have a limited amount of resources, as does any nonprofit organization.  And if they were able to more quickly and effectively and efficiently counsel these callers, they would, again, be able to advise and counsel more of the people who call their helpline, and they would also be able to do things like offer more full-scope direct representation, which is another service that they offer but aren't able to do as much of if more of their resources are dedicated to the helpline.

I would also add that without the 2024 regulation, the outcomes for callers, again, take longer and are less effective.

As A Better Balance's legal director's declaration pointed out, there are cases where, you know, A Better Balance

7

is having to engage in extensive back and forth with schools. For instance, one school saying that it did not believe that, under the old Title IX rules, postpartum students would have a right to a private lactation space.  This, for example, is something that in the 2024 rules is laid out clearly.

So had A Better Balance been armed with the, again, clear and concise rules within the 2024 regulations, they would have been able to sort of provide that to the student and their school in order to better advocate for that student.

THE COURT:  Do you have a legally protected interest in having a more efficient way of delivering your services?

MS. ROOD:  I don't believe it's a legally protected interest for efficiency.  Again, this goes to A Better Balance's core mission.  It cannot effect- -- it is hampered in its ability to carry out its services, and this is an injury that is quite like the organizational plaintiff in *Havens*, where the Supreme Court found that because a home could not as effectively provide counseling to the low and moderate income callers who called their housing counseling helpline, it had been injured by *Havens*' actions.

THE COURT:  You're still doing the thing that you want to do, right?  And you're arguably doing more of it, right, because you're having to give extra advice to people.  So how is doing the thing that you exist to do an injury?

MS. ROOD:  As the Sixth Circuit found in the case

8

*Online Merchants Guild*, which was abrogated on other grounds, but in that case, the fact that an organization had to, again, perform -- extend more resources to do its core mission activities, the fact that those activities became more laborious was enough to establish injury.

This isn't a case where A Better Balance's activities stay completely the same with the vacatur. This is quite the opposite. Again, A Better Balance is not able to serve as many callers. Its helpline serves all comers, and so it's unlike a situation where, perhaps, a law firm could decide what cases to take. This is a situation where any caller who calls the helpline is entitled to services and counseling from A Better Balance.

And A Better Balance is not able to help all of the callers who call in either at all or to the extent that they would like to because their resources are being diverted into this specific jurisdiction-by-jurisdiction, state-by-state research that would be made significantly easier with the clear guidelines protecting pregnant students in the 2024 rules.

THE COURT: Haven't the Supreme Court and the Sixth Circuit both held in the last couple years that diversion of resources is not itself a sufficient basis for Article III standing?

MS. ROOD: No, Your Honor. The diversion of

9

resources basis survives *Alliance* so long as, as the Sixth Circuit has noted in cases like *Lee* and also *Fair Housing*, where it's not a voluntary expenditure of resources in order to oppose a governmental action.

That would be the situation where a diversion of resources to, say, do campaigns that directly oppose a government action that were completely voluntary, that would not be enough to establish standing.

As the Supreme Court said in *Alliance*, a plaintiff cannot spend its way into standing.  Here that's not what A Better Balance is doing.  Again, they cannot escape the impediment to their services.  Their mission is to serve these callers, and whoever calls has a right to be served by them.

THE COURT:  Well, if your clients aren't able to get services, it seems to me like that's an injury to them, not an injury to you that you're alleging.  Are you seeking third-party standing, or are you seeking first-party organizational standing?

MS. ROOD:  Here A Better Balance is seeking first-party organizational standing, again because of the perceptible impairment to its own core business activities.

The *Fair Housing* case actually recognized that with *Alliance* in mind, an injury where an organization was not able to as effectively counsel callers who called a counseling line, as was the issue in *Havens*, that could be enough to

10

establish standing.  And that is exactly what's occurring here for A Better Balance.

THE COURT:  So you're referring to the *Fair Housing* case from the Sixth Circuit?  Is that what you're referring to?

MS. ROOD:  Yes, Your Honor.  *The Fair Housing Center of Detroit v. Singh Senior Living Center*.

THE COURT:  But that decision didn't actually decide standing, did it?  Didn't they just remand for a decision in the first instance from the district court?

MS. ROOD:  That's correct.  They did sort of explicitly recognize *Alliance* and sort of what *Alliance* did to *Havens*-type standing and, again, as part of that recognized that a *Havens*-type injury, which again mirrors A Better Balance's injury here, could be enough for standing.

THE COURT:  Okay.  So what I'm hearing is that your injury is that you're diverting resources and, therefore, cannot serve as many clients.

Are there any other injuries that you're alleging?

MS. ROOD:  The other injury that A Better Balance is alleging is a procedural one.  Because defendants have effectively abandoned their defense of the litigation and are not only declining to appeal but are actively opposing other parties intervening in that appeal, they're doing what Justice Roberts and three other Supreme Court justices

11

criticized the Biden administration of doing in their concurrence in the *Arizona v. San Francisco* decision.

This is rule-making by collective acquiescence, where the federal government seeks to repeal a rule that was passed through notice and comment but without going through notice and comment for procedure.

THE COURT:  Did the Supreme Court say that you can't do that, or did a separate opinion just criticize that practice?

MS. ROOD:  The Supreme Court has not addressed this issue, to my knowledge.  Procedural injuries are well-recognized in cases like *Lujan* and *Massachusetts v. EPA*. It's only recently that the federal government has begun sort of taking this tactic of seeking to repeal rules without going through proper notice and comment.

So it would be sort of -- four Supreme Court justices have criticized and effectively condemned the practice, and it would now be up to the federal courts to decide how to deal with that.

THE COURT:  Well, this is a little different, isn't it?  I mean, you're not alleging that this is some kind of a collusive lawsuit where the plaintiffs and the defendant got together and decided they would come up with this lawsuit and get an injunction and, therefore, change the regulation without going through notice and comment, are you?

12

MS. ROOD:  Not quite, Your Honor, although it at this point does appear similar to the hypothetical you just described.

THE COURT:  Well, there was a different administration in charge when the lawsuit was filed, right?

MS. ROOD:  That's correct.  When the administration changed and when it became clear that the administration was not going to appeal this lawsuit and when the administration began actively opposing other intervenors from stepping into their shoes, these actions, combined with statements by the administration saying that they agree with the Court's decision and would seek to enforce the old versions of the rule, all of this taken together is what sort of signifies that they've, again, abandoned their defense of the lawsuit and are seeking to, as I believe Justice Roberts noted as well, kind of seize on to these adverse opinions in order to get around notice and comment.

THE COURT:  But isn't this the government's prerogative under Article II?  Doesn't the United States get to decide for itself what it's going to appeal and what it's not going to appeal and whether its regulations are going to be defended or not?

MS. ROOD:  That's correct, Your Honor.  And, again, here it is -- the federal government is going beyond just declining to appeal.  That would be sort of within its

13

prerogative, as you say.  But the combination of abandoning the appeal while still seeking to stop anyone else from defending the regulations is what signifies that it's attempting to kind of do this end run around notice and comment.

THE COURT:  But does Article II present kind of a bar to you?  I mean, if this is the government's prerogative to decide whether to appeal or not, how does a private party get to second guess the exercise of that prerogative?

MS. ROOD:  I think, Your Honor, if it was just a question of whether the federal government was going to appeal or not, it would be their prerogative.  Again, here they're taking actions that sort of go beyond just passively deciding not to appeal.

THE COURT:  But you just want to appeal, though, right?  You basically want to step into the government's shoes and appeal the case, right?

MS. ROOD:  That's correct, Your Honor.

THE COURT:  So why doesn't Article II prohibit that?

MS. ROOD:  Here, private parties are able to sort of step into the government's shoes.  Again, I think the issue here is that the government is actively opposing that opportunity to do so.

THE COURT:  Well, because they've got to protect their prerogatives, I guess, right?  I mean, I don't want to

14

put words in their mouth, but I would assume that each branch of government wants to protect its prerogatives.

How does Article II allow a private party to exercise discretion that would otherwise belong to the executive branch of government?

MS. ROOD:  I think that it likely does not.  But, again, here I would just say that there are -- A Better Balance is, you know, seeking to appeal in order to reverse the vacatur.  And it is true that in the Supreme Court case *Perez*, it does state that rules that are passed through notice and comment need to be repealed or changed through notice and comment as well.

So, in effect, that is what the appeal brought by A Better Balance would seek to do would be to sort of revert things back to as if the 2024 provisions were in place, and then the government could choose whether or not to go through the proper procedures to repeal or change the rule if it chose to.

THE COURT:  Okay.  Thank you.  Let's hear from Victim Rights Law Center for a second.  Thank you for indulging all my questions there.  I kept you on your feet for a long time.

What, precisely, are the injuries that the Victim Rights Law Center is alleging here?

MS. EARDLEY:  Sure.  There are several injuries for the Victims [*sic*] Rights Law Center, Your Honor.  First, the

15

Victims Rights Law Center's core business activities are being perceptibly impaired, and that's in two main ways.

The Victims Rights Law Center provides direct legal services to victims of sexual harassment and violence and is experiencing a reduction in requests for service, a reduction in clients as a result of the vacatur.

And then, second, the Victims Rights Law Center must spend additional time and resources -- essentially, costs -- representing the clients that it does have now that the 2020 rule is back in place.

Hearings with cross-examination, which are required by the 2020 rule, can take five to ten hours.  We understand that even one client of the Victims Rights Law Center was on cross for over eight hours, and preparing for such hearings takes considerable time and resources from the Victims Rights Law Center.

THE COURT:  That's what you do anyway, right?  I mean, that's what your organization exists to do, right?

MS. EARDLEY:  So, Your Honor, the organization has two core missions.  One is to provide legal services to -- direct legal services to victims of sexual harassment and sexual violence in school and also to promote a national movement committed to seeking justice for every victim of sexual harassment.  So there are two parts of the core mission that are being frustrated, and they are no longer able to

16

continue to do that in the way that they were doing before the vacatur.

THE COURT: Okay. Are there any other injuries that you're alleging?

MS. EARDLEY: No, Your Honor.

THE COURT: Okay. What do you have to say about that Article II issue that I raised with your counterpart?

MS. EARDLEY: Your Honor, we did not brief and are not making a procedural argument. What I would say, though, is that both A Better Balance and Victims Rights Law Center are suffering the same article -- same injury, procedural injury.

I would say that Article II and Article III are both at play here. Article III allows courts to hear cases and controversies, and the Federal Rules of Civil Procedure allow parties to intervene. In fact, there's mandatory intervention. I think the parties, the Victims Rights Law Center and A Better Balance, meet all the prongs here because they have satisfied the tests for mandatory intervention.

THE COURT: Okay. I want to explore the consequences of your arguments should they be adopted.

On the diversion of resources, anytime a new law is passed, a new regulation is adopted, law firms all across the country start doing work, start doing research to get up to speed on it. Does that mean that any law firm has standing to

17

challenge any new law just because it's diverting its resources to have to get up to speed on that new law?

MS. EARDLEY:  I don't believe so, Your Honor.  I think that standing is a fact-intensive inquiry, first of all. So I think it would depend on the organization as well as the challenge it was bringing.

But what we know from *Alliance* and its reading of *Havens* is that an organization that has its core business activities perceptibly impaired can still have standing, like the parties in *Havens*, even though the party cannot be the architect of its own harm.  So simply doing research about a new law doesn't prohibit a law firm from carrying out its core business activities.  It still has customers and clients.  And here, Victims Rights Law Center has fewer customers or clients.

THE COURT:  Well, I understood you to be saying two things.  One, diversion of resources.  Two, your inability to serve your clients.  But it sounds like you can serve your clients.  You're just maybe not doing it as efficiently as you would like.  Is that accurate or not?

MS. EARDLEY:  Well, we can't serve -- Victims Rights Law Center can't serve the clients in the same way.  There are fewer clients, and the clients that are being served are receiving poorer outcomes under the 2020 rule in its schools, and it's requiring additional time and cost to do that.  It's

18

also taking resources away from the education and advocacy part of the Victims Rights Law Center's mission.

THE COURT:  How do we trace the outcomes to the 2020 versus 2024 rule?  I mean, that seems very speculative to me because all of those cases would be very fact-intensive, right?  So how do we know that the outcomes are worse because of the vacatur of this rule?

MS. EARDLEY:  Your Honor, I would point you to the *Malone* declaration that we submitted with our motion to intervene, which the executive director of the Victims Rights Law Center describes the organization's experience providing direct services to victims of sexual harassment under the 2020 rule in the past.

And I would say that at that time, when the schools implement -- it was reasonable that the schools would implement the 2020 rule, and then it was reasonable that the outcomes are predictable, that the outcomes would be that it would be more difficult to represent those individuals.

And the 2020 rule, in fact, engineered this result.  In the rule itself, it talks about reducing the number of sexual harassment investigations.  And so because of the Victims Rights Law Center experience under the 2020 rule in the past, its reduction in clients as well as its additional time that it had to spend to represent individuals in these Title IX hearings in school, we can trace the 2020 rule's

19

reimplementation to the harms that the Victims Rights Law Center is facing.

THE COURT:  Okay.  Can you speak a little more directly to my hypothetical about law firms, though?  Like let's say that a federal agency promulgates a new regulation and a law firm does some work to get up to speed on it and sends out a pro bono client bulletin.  That has arguably diverted the law firm's resources.  Would you agree?

MS. EARDLEY:  I don't know that, Your Honor.  I think law firms are in the business of attracting clients, and the law is regularly changing.

THE COURT:  Well, how is that different from your situation?  Aren't you -- I mean, I understand you're a nonprofit, right?

MS. EARDLEY:  Yes, the Victims Rights Law Center is a nonprofit.  It has limited resources.

THE COURT:  So you're not in the business of attracting clients for profit motive, but you are in the business of serving clients, correct?

MS. EARDLEY:  Correct.  And I think that's really perhaps the difference between a for-profit organization and a nonprofit organization.  In your hypothetical, the very mission of the organization is more important than the profit motive.  The organization exists to provide these legal services and to change the landscape with regard to sexual

20

harassment throughout the country.

THE COURT:  I mean, there are a lot of for-profit law firms that take the position that their mission is to change the world.  How is it different for them?  I mean, it seems to me that if a law firm spends time getting up to speed on a new regulation so that it can counsel its clients and then spends a lot of time and energy learning that regulation, that doesn't seem to me to be altogether different from the diversion of resources that you're talking about here.

MS. EARDLEY:  I would argue that the law firm is getting paid for those services.

THE COURT:  Let's say they do it pro bono.

MS. EARDLEY:  They did it pro bono.  It's also still not the mission of the organization.  The mission of the organization isn't being frustrated by spending this time doing this work.

THE COURT:  Okay.  Before we move on to another party, is there anything that either one of you would like to say further?

MS. ROOD:  I'm happy to go first, Your Honor.  First, just briefly, on the law firm hypothetical, just to kind of clarify, the injury here for A Better Balance is that -- not that the law has become more complex but that in the absence of those kind of clear regulations laying out the specific protections for pregnant and postpartum students, A Better

21

Balance is forced to do more outside research into state law, schools' regulations, and things like that.

So it's a slightly different type of impact than, say, a law firm that is kind of being faced with a new regulation. In this case, it's kind of the lack of clarity from the new regulation that's leading to the injury.

I'd add, just to briefly address the opposing parties' arguments around timeliness, just that A Better Balance's intervention is timely. There is finding, Supreme Court and Sixth Circuit precedent, saying that when a party seeks to intervene for purposes of an appeal, as A Better Balance does here, the motion is timely if it is filed before the appeal deadline runs. And that was the relevant factor here, and A Better Balance appealed within that timeline.

And just to also briefly address any prejudice due to timeliness that the opposing parties raise, the issue of severability, which is what A Better Balance would advance on appeal, has been briefed in this case previously. It's been mentioned in approximately 14 filings in the proceedings so far and was explicitly reached in the district court's vacatur order when it pointed out the unchallenged pregnancy provisions as ones that were not necessarily at issue in the lawsuit, but it still declined to sort of separate those out from the rest of the rule.

So any arguments as to prejudice are unavailing because

22

the issue of severability has been preserved, and defendants could have filed an identical appeal if they had chosen to.

That's all, Your Honor.

THE COURT:  Thank you.

MS. EARDLEY:  Your Honor, I would join my friend's remarks with regard to timeliness and intervention.  There is one additional thing on standing that I wanted to point out, Your Honor, and I'm having trouble finding the citation.

I just wanted to call the Court's attention to a new Supreme Court decision that came down last week, and it's *Bost v. Illinois State Board of Elections*.  If you give me a minute, maybe on rebuttal I can give you the Westlaw citation.

In that case, a representative from the State of Illinois sued the Illinois State Board of Elections for counting ballots that came in that were absentee up to two weeks after election day.  And the Supreme Court, in deciding the issue of standing, took a look at whether or not there was an economic injury to the representative.

And I think what the decision really drives home that's similar to our case is that there can be an economic injury to protect noneconomic interests.  In this case, it was the interest of fairness in elections and representing the constituents.

And I think for the Victims Rights Law Center it would be similar, that they are expending resources.  There's an

23

economic injury to protect the noneconomic interests of being able to continue providing the direct legal services.

THE COURT:  Thank you.  Next I'd like to hear from the United States.  The first thing I'll ask you is do you have anything to say directly in rebuttal to what you just heard from the proposed intervenors?

MS. GHEIBI:  Not in direct rebuttal, but I'm sure my answers to your questions will touch on some of the similar topics.

THE COURT:  Sure.  The first and primary question I have for you is, is this an Article II problem?

MS. GHEIBI:  So we have not asserted Article II as an independent barrier for them to intervene.  We believe Article III is a sort of threshold question.  If plaintiffs did have Article III standing, then there would be serious questions about whether or not there's a structural constitutional problem with private litigants interjecting themselves and asking the Article III Court to essentially overrule a strategic litigation decision by the executive branch.

Again, we have not asserted it.  If the Court is interested, we're happy to provide supplemental briefing, although we think it's an unnecessary constitutional question for the Court to reach due to the threshold Article III problem.

24

So under the canon of constitutional avoidance, we think if the Court agrees with us that they don't have Article III standing, there's no need to reach the structural constitutional question.

THE COURT:  What's the answer if we get past standing?  Is it an Article II problem?

MS. GHEIBI:  I don't have an answer for the Court at this moment.  But, again, I'm happy to take that back if the Court would like a position from the government on that issue.

THE COURT:  I'll think about that.  I think that was the main question I had for the government right now.

Is there anything else that you would like to put on the record?

MS. GHEIBI:  Yes.  I'll just add to the law firm hypothetical.  The consequences of plaintiffs' theory would be quite grave for Article III standing because there are plenty of organizations, including many law firms and nonprofit organizations, whose core activities include advising the public on rules and regulations by the government.

The government makes rules and regulations all the time, it rescinds rules and regulations, and those will necessarily impact the way those entities do business.

Under plaintiffs' theory, for instance, if the government were to rescind some tax regulation that happened to be the bread and butter of some tax lawyers, under their theory,

25

there's nothing stopping them from suing us, saying, well, we have less business now because you have now rescinded this rule.

There is no daylight between that particular hypothetical and what plaintiffs are asserting here. So on that ground alone, we think that's exactly the type of thing the Supreme Court was trying to avoid in *Alliance*.

By making clear that this sort of diversion of resources theory is not, in and of itself, sufficient, we think the Sixth Circuit has recognized that both in the *Singh Senior Living* case, in which it remanded the case on the informational injury question, implicitly recognizing that at this point, that is the scope of *Havens*. To the extent *Havens* can come to the rescue of parties, it's in that context.

And also in the *Tennessee Conference of the NAACP*, where the Court recognized that there may be sort of tough questions on the economic downstream issue but that, you know, reading it as any sort of economic harm to third parties would be sufficient for Article III standing would -- I believe the Court used the language saying it would essentially turn *Alliance* into a mere game of semantics.

And we think that's what plaintiffs are asserting here. They're essentially repackaging their diversion of resources theory.

THE COURT: Well, they make a somewhat distinctive

26

claim, perhaps.  Maybe not, but somewhat distinguishable about the economic downstream injury that you mentioned about losing clients.

MS. GHEIBI:  Yes.

THE COURT:  I understand them to be making that argument.  Can you tell me where the line is drawn on economic downstream standing?

MS. GHEIBI:  Right.  So I think that that's the question that the Sixth Circuit struggled with in the *Tennessee Conference of the NAACP*, recognizing that economic downstream, there are some instances in which it could possibly establish standing, and there will be hard questions.

We think there's no need for the Court to say where the line is because we think it clearly can't encompass plaintiffs for all the reasons we discussed about the law firms and entities.

It can't be a situation in which entities such as plaintiffs, whose job it is, whose core business activities it is to advise on government rules and regulations so long as they can assert, well, the way in which we go about our job has now changed because the substance of the rule has changed.  That theory of standing, that theory of downstream economic impact is so expansive that it would essentially swallow the rule.  Everybody and anybody could essentially assert standing.

27

So we acknowledge that there may be tough questions, but we think this is not one of them.

THE COURT:   What would we have to have to have a valid claim of standing to assert an economic downstream injury?

MS. GHEIBI:   We think the hypothetical about the manufacturer being sold a defective good the Court sort of acknowledged.   And in that instance, we think that there could be standing.   That's a sort of downstream economic impact that could give injury.   That's distinct from the informational injury in *Havens* because, again, in *Havens*, the informational injury came from the fact that they had a legal right to accurate information.

So the manufacturer hypothetical would be an example.

THE COURT:   What about *Diamond Alternative Energy* from last year?   The Supreme Court said that fuel producers had standing to challenge an EPA action because it was going to reduce purchases of gasoline.

Is that akin to what the Victim Rights Law Center is alleging here because they're alleging they're going to not have some clients come to them?

MS. GHEIBI:   No, we don't think that that reasoning can be applicable.   We think that reasoning should be really read narrowly as a sort of sale of goods, as opposed to sale of services.   We think the problem with the sort of proffering

28

services is that it could be too expansive. Again, anybody could say I lost clients because of you. It's difficult to trace the causation to that.

So we think that those cases, to the extent they exist, they can't encompass the sort of loss of client for services that plaintiffs assert here.

THE COURT: Okay. Anything else from the United States at this point?

MS. GHEIBI: Nothing else. Thank you, Your Honor.

THE COURT: Thank you. Who is going to argue for the states?

MS. ADAMSON: I am, Your Honor.

THE COURT: Excellent. Let's follow up on that question. What makes this case different from *Diamond Alternative Energy*?

MS. ADAMSON: Your Honor, so I think one of the things that the Sixth Circuit struggled with was whether *FDA* rejected the injury there based on injury or causation.

I think it's proper to look at those two inquiries really closely when you're talking about this sort of imminent injury. I think the *Diamond Alternative Energy* case shows that although the Court ultimately decided the grounds based on finding that the causal chain made sense, it did say that the argument that the gasoline producers in that case were arguably being directly regulated was a pretty strong

29

argument.

And I think that just shows that we're talking about how attenuated the chain is between the rule or the law that you're challenging and the injury. And in that case, the injury was a lot closer to the regulation because there was actually an argument there that the regulation was targeting gasoline manufacturers, even though it was doing it by regulating cars themselves.

THE COURT: Okay. The proposed intervenors put a lot of emphasis on *Havens*, and you say that *Havens* doesn't apply here. What would be necessary for this case to look like *Havens*, in your view?

MS. ADAMSON: Well, I think *Havens* can be limited to -- well, so I think that the Fifth Circuit opinion in *South Deep* [*sic*] *Center* helpfully explained that the best way to interpret *FDA* is requiring either a prevention of the core activities or to require the party to do something.

And in *Havens*, what we see -- and that's what *FDA* says -- is the organization was actually prevented from accomplishing one of its core activities, which was providing accurate information. And it was prevented by defendant providing it inaccurate information.

So my colleague from DOJ is correct that differentiating *Havens* based on the informational injury is correct. It's also significant that the injury was providing incorrect

30

information so then the organization couldn't provide correct information.  So it was directly prevented from accomplishing one of its core missions.

THE COURT:  Okay.  Do you have any response to the intervenors' reference to the *Illinois State Board of Elections* case?

MS. ADAMSON:  So, Your Honor, I haven't reviewed that closely, but my recollection is that standing in that case was based on the idea that a candidate is directly impacted by rules governing that candidate's election.

So, again, we're not talking about the attenuated causation situation we have here where both parties are arguing that they are indirectly impacted by the regulation of schools, which then impacts students, and then students might make some decision which might then impact these organizations.

So there's a much more attenuated causal chain than in that case.

THE COURT:  Okay.  Is there anything else you would like to say at this time for the record?

MS. ADAMSON:  Just a few short points, Your Honor.

One, in response to the notion that *Online Merchants Guild* preserves the diversion of resources theory, that case preceded *FDA*.  And in the *NAACP* case, the Sixth Circuit said *FDA*, quote, disavowed our diversion of resources theory.  So

31

that theory does not survive.

I do think that it's helpful to distinguish between ABB's theory here and the Center's. ABB's theory is quite clearly solely diversion of resources so I think that kicks that out. The Center has this more nuanced theory about a decline in clients due to a decline in complaints.

On the law firm hypothetical, in *FDA* -- so *FDA* discussed *Havens*. It also has a section where it rejects doctor standing. And it talks about the sort of attenuated causal theory, and it says if we adopted the doctor's theory here, we would essentially be adopting doctor standing anytime the government adopts a regulation that somehow impacts health and safety.

I think it's very hard to distinguish between that theory and the theory that the organizations have raised here.

THE COURT: Okay. I've got, actually, a couple more questions for you.

MS. ADAMSON: Sure.

THE COURT: Number one, and I know this isn't really your purview, but I'm curious if you have any views on it. That's the Article II issue that we've discussed. Do you have any view on whether that's a bar to the intervention here?

MS. ADAMSON: So, Your Honor, I would answer the same way my colleague from DOJ did. We haven't briefed that issue. We would be happy to brief it. We don't think that these

32

organizations have a right to notice and comment before a Court vacates the rule, and that's essentially the procedural injury that they're asserting here.

THE COURT: Okay. Last question I have for you is I believe I read in your brief, maybe it was another one of the opposing parties' briefs, but I think it was in your brief, you said that one or both of the proposed intervenors have a live case challenging the 2020 rule that was from Massachusetts, I believe.

Is the standing analysis the same in that case, and do you concede that they have standing to challenge the 2020 rule?

MS. ADAMSON: Your Honor, the issues at stake in that case are not before us so we have not taken a position on whether they have standing in that case. We do think it's relevant to whether redressability in this case is likely, as opposed to speculative.

It also assists us in the causal analysis because the fact that they have this open challenge to the 2020 rule just illustrates that that's the more proximate cause of the injury they assert here, rather than the 2024 rule.

So, yes, that's how I would answer that.

THE COURT: Okay. Thank you very much. I don't, at this time, have any questions for the intervening plaintiffs. Is there anything that the intervening plaintiffs would like

33

to put on the record?

MS. THOMPSON:  Just a couple of quick points.  Since we've been talking about VRLC's injury about lost clients, VRLC doesn't have a pocketbook injury from a decrease in clients because they don't charge their clients any money.

So even -- you know, I would part ways with DOJ on the idea that a loss of providing direct services, that could be a downstream economic injury if the evidentiary showing were made.  But they haven't made the evidentiary showing, and it doesn't seem like they can because they don't charge any money.  So, again, the pocketbook injury just should come right off the table there.

Also, on the injuries that each of the organizations is asserting, a lot of the things that have been mentioned today fall into the category of abstract social interests.  VRLC says their mission is to change the legal landscape, promote a national movement.  Those are abstract social interests, not cognizable Article III injuries.

And then as one of the premises of Your Honor's question earlier to ABB asked, if students are achieving worse outcomes, that very well could be an injury to a student, but it's not an injury to lawyers representing the student, and they're not asserting third-party standing, as we heard today.

So even if they had made an evidentiary showing of particular students who they intend to help in the future who

34

will receive worse outcomes, which they haven't made, that wouldn't suffice either because it would be a harm to the student, not to the organization.

Thank you.

THE COURT: Thank you. Let's hear again from proposed intervenors. First, is there anything you would like to say in response to anything you've heard from the other parties?

MS. ROOD: Thank you, Your Honor. Just a couple of quick points in rebuttal. First, kind of to the opposing parties' arguments that the proposed intervenors' theory of standing would, in effect, open the floodgates or just allow a lot of organizations to have standing, anyone who would seek to challenge a new rule would need to have, as a plaintiff, a cause of action. It would need to fall within sort of the zone of interests of any proposed regulation.

So places like law firms or potentially, you know, other nonprofit legal firms wouldn't have -- likely wouldn't have a cognizable claim.

THE COURT: Why not? It seems like they would.

MS. ROOD: It would be -- for instance, in this case, the proposed intervenor, A Better Balance, has concrete interests in serving the people who call its helpline. Compared to a private law firm, which can often, you know, choose cases or doesn't have to accept all clients, A Better

35

Balance serves anyone who calls its helpline and serves those callers specifically by providing counseling regarding the rules that were covered in the 2024 Title IX regulation.

THE COURT:  I'm aware of law firms, for-profit law firms that have pro bono helplines.  So, I mean, why couldn't any law firm just open up a helpline for free and give itself standing?

MS. ROOD:  Again, I think that would likely go to the sort of voluntariness that was criticized by *Alliance*.  A law firm couldn't, you know, change its activities in order to oppose a regulation to give itself standing, as opposed to A Better Balance, which here has the core mission of providing those resources to callers already.

And, also, on the point of whether *Alliance* limits *Havens* to an informational injury, the injury in *Havens* was that it was not, again, able to effectively counsel its callers.  So the fact that false information was given to testers was just sort of how *Havens* -- or how HOME proved that injury.

As the Supreme Court noted in *Havens*, HOME had to divert resources and expend more resources to identify and counteract the false -- the racial steering practices of *Havens*.  So it was not solely the informational injury on which *Havens* relied.

And since *Alliance*, persuasive out-of-circuit cases, including the Fourth Circuit's *Republican National Committee*

36

case and the Fifth Circuit's *Nairne v. Landry* case, have both held similar injuries to what A Better Balance is asserting here can constitute standing.

And I can say more about those cases or answer any additional questions you have.

THE COURT:  Sure.  I've got a couple of questions for both of you about redressability.

Even if you were to intervene here and even if you were to get the Sixth Circuit to reverse the judgment here, there will still remain the injunction from the Texas court, right?

MS. ROOD:  That's correct, and we are seeking to intervene in that case as well.

THE COURT:  That was denied, right?

MS. ROOD:  That's correct.  It's on appeal right now, Your Honor.

THE COURT:  But there's no guarantee that anything that happens here will give you any kind of outcome that will redress the injuries you're alleging, right?

MS. ROOD:  It is true that a successful outcome for A Better Balance in this case would not immediately put the pregnancy-related provisions back into effect.  However, that's not necessary to establish redressability for standing.

As the Supreme Court in *Parsons* held, even partial redress is enough to establish standing.  And, here, successful outcome for A Better Balance on appeal would take

37

away one roadblock in the kind of path to having these provisions reinstated in at least large portions of the country.

THE COURT:  What do you have to say to the point that the intervening plaintiff makes about the fact that neither your client nor Victims Rights Law Center has a pocketbook injury here because you don't charge clients anyway?  Is that significant?

MS. ROOD:  I don't think so here, Your Honor, because, again, the injury that A Better Balance and I believe we're both addressing is an injury to the core services, to the mission of A Better Balance, which, again, is a well-recognized way to establish organizational standing, which has, again, been sort of cited to and affirmed even post-*Alliance*.

THE COURT:  Okay.  Thank you.  Anything else from your perspective before we move on to your counterpart?

MS. ROOD:  No, Your Honor.  Thank you.

THE COURT:  Anything from Victim Rights Law Center that you'd like to say in response to what you heard from the other parties?

MS. EARDLEY:  Sure, Your Honor.  I wanted to address the pending case that Victims Rights Law Center has regarding the 2020 rule in Massachusetts.

We think that we would continue to have standing there as

well, and a decision in that case doesn't do what a decision in this case would provide the Victims Rights Law Center because it won't revive the 2024 rule, which is essentially what the Victims Rights Law Center is doing here, seeking to appeal and advance the severability argument so that the other portions of the 2024 rule could stand.

THE COURT:  Do you have a legally protected interest in having the rule that you prefer?

MS. EARDLEY:  No, Your Honor.  We're being harmed by the reversion to the 2020 rule, which we are challenging.

THE COURT:  But you're challenging the 2020 rule, right?

MS. EARDLEY:  That's correct, Your Honor.

THE COURT:  So your alleged injuries can be redressed through that lawsuit, right?

MS. EARDLEY:  The 2020 rule would no longer be in effect.  The 2024 rule, which was implemented to address the harms and some of the confusion that the schools were experiencing in response to the 2020 rule, would not be alleviated if the 2024 rule provisions, which were intended to provide more information, it's my understanding, and clarity to the schools would not be in effect anymore.

THE COURT:  So are you saying you're harmed both by the 2020 rule and by the nonexistence of the 2024 rule?

MS. EARDLEY:  Not in this case, Your Honor.

39

THE COURT:  Okay.  In this case, what is it?

MS. EARDLEY:  We are seeking to appeal the entire vacatur of the 2024 rule.

THE COURT:  What do you have to say about the lack of a pocketbook injury?  Doesn't that make this a little bit different from the *Diamond Alternative Energy* case?

MS. EARDLEY:  I don't think so, Your Honor.  The Supreme Court in *Alliance* and in the *Diamond* case that followed were talking about downstream harms and specifically recognized that downstream harms that have economic injury could suffice for standing, and that's really what is happening here.

The same way that the gasoline producers are losing clients or customers, so is the Victims Rights Law Center. Even though it isn't getting paid for those services, it's expending resources and costs.  So I don't see why they should be prohibited as a nonprofit from seeking redress for their economic injuries.

THE COURT:  Okay.  That's all I have today, but I want to make sure that everybody has had an opportunity to say everything that they came here to say today.

So is there anybody who feels like they haven't had the chance to say something that they really wanted to say?

MS. EARDLEY:  Your Honor, I would just add the citation to the *Bost* case, if you'd like it for the record.

40

THE COURT:  Sure.

MS. EARDLEY:  It's number 24568, and the Westlaw citation is 2026 Westlaw 96707.

Thank you, Your Honor.

THE COURT:  Yes?

MS. ADAMSON:  Your Honor, I just had a quick point on redressability since we didn't really get to respond to that in a brief.

THE COURT:  Sure.

MS. ADAMSON:  The *Haaland v. Brackeen* case from the Supreme Court recently made it clear that in order for an injury to be redressable, the Court must have power to grant relief.  But here, this Court lacks that power because another Court has vacated the rule nationwide.

And there are a couple of district courts that have similarly held that an injury from the repeal of a rule is not redressable if another Court has vacated the same rule.  Those are *Whitman-Walker Clinic v. HHS*, 485 F.Supp.3d 1, page 26. That's a District of D.C. case from 2020.  And *Walker v. Azar*, 480 F.Supp.3d 417, 427, and that's from the Eastern District of New York, 2020.  And that's all I have.

THE COURT:  Thank you.  Anyone else?

Okay.  Well, thank you all for being here.  Yes?

MS. THOMPSON:  Your Honor, just briefly, could I --
just a quick point on the *Bost* case, since we came back to

41

that.  The majority in *Bost* said that economic costs to the candidate don't matter.  So that's a case about a noneconomic concrete interest in the procedure of the elections.

And then just one other point on ABB's procedural injury point.  This case is unlike the *San Francisco County* case, where not only did the government decide not to appeal, something which the concurring opinion that my friend's cite recognized is the government's prerogative, but then the agency issued a new rule repealing the old rule without notice and comment.

So there's another layer of agency action that was being challenged there, where we do think that an organization that has a concrete interest in the regulation could have established standing to challenge that agency action under the APA, that vacatur, without a notice and comment.

Now, we agree that there can be a procedural injury from a failure to conduct notice and comment.  But, of course, as has already been mentioned, there is no right to notice and comment when a Court vacates a rule.  That's exactly what the APA instructs the Courts to do.

Finally, just a quick sort of preliminary thought on the Article II idea.  I have not looked into this exhaustively either, but I don't think that Article II is independently a barrier here.  The APA instructs courts to conduct judicial review of agency action, and so that means that APA cases have

42

to fit within the confines of Article III.

So as long as the APA standards are met for cause of action and the rules of procedure are met for intervention and, if standing is necessary, standing is established, all other jurisdictional barriers are there, then we do think that it would be -- that it's appropriate for a Court to let another intervenor in to appeal a decision that the government is no longer appealing.

That showing hasn't been made here both because of the untimeliness of the intervention and, more importantly, because neither of the proposed intervenors has established Article III standing.

THE COURT: Okay. Thank you. That's all I had today. We're going to take this under advisement. We're actively working on it. We will get an opinion out as expeditiously as possible. I can't guarantee you when that will be. We've got a lot going on. I've got a pretty busy trial schedule over the next four weeks. So all I can tell you is we'll be working on it and we're not going to let this sit. We'll get an opinion out sooner rather than later but I don't know when exactly that is.

Thank you all again very much for being here. We'll be in recess.

(Proceedings concluded at 1:56 p.m.)

- - -

43

C E R T I F I C A T E

        I, LISA REED WIESMAN, RDR-CRR, certify that the foregoing is a correct transcript from the electronic recording proceedings in the above-entitled matter, transcribed to the best of my ability to hear and understand said recording.


_\s\ Lisa Reed Wiesman_                    February 20, 2026
LISA REED WIESMAN, RDR-CRR                Date of Certification
Official Court Reporter